IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff/Respondent, | ) |
| v. | )   Criminal No. 2:04-cr-55 |
| | ) |
| | ) |
| | ) |
| ALFONSO RODRIGUEZ, JR., | ) |
| | ) |
| Defendant/Petitioner. | ) |

---

MOTION FOR COLLATERAL RELIEF,
TO VACATE, SET ASIDE, OR CORRECT SENTENCE,
AND FOR A NEW TRIAL

---

**Table of Contents**

Statement of Form

I.    Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Mr. Rodriguez Was Denied Effective Assistance of Counsel at the Pretrial
       and Guilt/Innocence Phases of Trial, In Violation of 18 U.S.C. §§ 3005 &
       3006A and the Fifth, Sixth and Eighth Amendments to the United States
       Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       A.    Trial Counsel Failed to Properly Challenge the Government's Purported
             Evidence of Sexual Assault.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             1.    Background

             2.    Dr. McGee's Testimony About the Acid Phosphatase Test Was
                   Materially False and Inaccurate.

                   a.    Lab Protocols

                   b.    The Beckman Dri-STAT Reagent

             3.    Trial Counsel Failed To Properly Challenge the Materially False and
                   Inaccurate Acid Phosphatase Evidence.

                   a.    The *Daubert* Hearing

                   b.    Trial Counsel's Failures Constituted Deficient
                         Performance.

                   c.    Trial Counsel's Deficient Performance Prejudiced Mr.
                         Rodriguez.

       B.    Trial Counsel Failed to Properly Challenge the Government's Purported
             Evidence that the Victim's Neck Had Been Slashed.. . . . . . . . . . . . . . . . 39

             1.    Dr. McGee's Testimony About the "Knife Wounds"

             2.    Dr. McGee's Testimony About the "Knife Wounds" Was

Materially False and Inaccurate.

a.     There Were No Wounds Caused by a Knife or Other Sharp
       Object.

b.     Even If the Wounds Were Caused by a Knife, It is Impossible
       to Connect the Wounds to a Particular Object.

c.     Trial Counsel Failed To Properly Challenge the Materially
       False and Inaccurate "Knife" Evidence.

       i.      Trial Counsel's Failures Constituted Deficient
               Performance.

       ii.     Trial Counsel's Deficient Performance Prejudiced Mr.
               Rodriguez.

C. Redacted


D.     Trial Counsel Were Ineffective at the Culpability Phase:
       They Presented What Should Have Been Left Out, and Left Out What
       Should Have Been Presented.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

       1.     Trial Counsel Presented a Legally and Factually Incoherent Defense.

       2.     Trial Counsel Failed to Present the One Defense That Was Viable
              and Readily Available:  That Mr. Rodriguez Was Not Guilty by
              Reason of Insanity.

E.     Trial Counsel Failed to Mount a Proper Challenge to the Government's
        Reliance on Rule 413.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

       1.     The Rule 413 Evidence At Trial

       2.     Trial Counsel Was Ineffective in Their Opposition to Rule 413
              Evidence.

       3.     Mr. Rodriguez Was Prejudiced By Counsel's Ineffective Handling of
              the Rule 413 Evidence.

F.     Trial Counsel Improperly Allowed Dr. McGee To Testify Regarding Laboratory Testing Performed By Others... . . . . . . . . . . . . . . . . . . . . . . 101

III.   Trial Counsel Provided Ineffective Assistance at the Eligibility Phase in Violation of 18 U.S.C. §§ 3005 & 3006A and the Fifth, Sixth and Eighth Amendments to the United States Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

A.     Trial Counsel Failed to Move for a Mistrial When The Jury Deliberated For 10 Hours Deciding Whether Mr. Rodriguez Was Eligible For the Ultimate Punishment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

B.     Trial Counsel Failed to Contest An Invalid Statutory Aggravating Factor.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

IV.    Trial Counsel Were Ineffective For Failing to Uncover and Present the Readily Available Mitigating Evidence, in Violation of 18 U.S.C. §§ 3005 & 3006A and the Fifth, Sixth and Eighth Amendments to the United States Constitution.. . . . 105

A.     Had Counsel Presented the Readily Available Life History, No Reasonable Juror Would Have Voted to End Alfonso Rodriguez's Life.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

B.     Counsel's Failure to Conduct and Present an Adequate Social and Mental Health History Was Objectively Unreasonable.. . . . . . . . . . . . . . 197

C.     But for Counsel's Deficient Performance, There is a Reasonable Probability that at Least One Juror Would Have Struck a Different Balance Between the Aggravating and Mitigating Evidence, and Mr. Rodriguez Would Not Be on Death Row.. . . . . . . . . . . . . . . . . . . . . . 206

V.     Because Mr. Rodriguez is Mentally Retarded Now, Was Mentally Retarded at the Time of the Crime, and Was Mentally Retarded Prior to the Age of 18, His Execution Would Violate the Eighth Amendment.. . . . . . . . . . . . . . . . . . . . . . 208

VI.    Trial Counsel Rendered Ineffective Assistance of Counsel Regarding Penalty Phase Jury Instructions in Violation of  18 U.S.C. §§ 3005 & 3006A and the Fifth, Sixth and Eighth Amendments to the United States Constitution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210

A.     Trial Counsel Failed to Argue the Accident of Geography As a Mitigating

Factor.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

B.      Trial Counsel Failed to Seek a Corrective Instruction When the Government
        Raised an Improper "Nexus" Requirement for Mitigating Evidence.... 214

        1.      A Plainly Improper Argument

        2.      Mr. Rodriguez Was Prejudiced By Counsel's
                Failure.

C.      Trial Counsel Failed to Properly Challenge the "Three-Step Process"
        During the Selection Phase and on the Special Verdict Form, Which
        Unlawfully Required the Jury to Make a Finding of Law Regarding the
        Proffered Mitigating Factors.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

        1.      Counsel's Failure to Properly Challenge the "Three Step Process"
                Was Objectively Unreasonable and Constituted Deficient
                Performance.

        2.      Counsel's Deficient Performance Resulted in Prejudice.

D.      Trial Counsel Failed to Argue that Application of the Death Penalty to
        Alfonso Rodriguez Violates the Tenth Amendment.. . . . . . . . . . . . . . . 235

E.      Trial Counsel Failed to Effectively Address the Issue of Burden of Proof at
        The Penalty Phase.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

VII.    *Redacted*

VIII.   The Cumulative Prejudicial Effect of Trial Counsel's Deficient Performance
        Deprived Mr. Rodriguez of His Right to Effective Assistance of Counsel, as
        Guaranteed by the Fifth, Sixth and Eighth Amendments.. . . . . . . . . . . . . . . . . 239

IX.     Mr. Rodriguez's Conviction and Sentence Are Illegal and Must Be Set Aside
        Because the Government Knowingly Presented False and Misleading Testimony,
        in Violation of the Fifth and Eighth Amendments.. . . . . . . . . . . . . . . . . . . . . . 240

        A.      False Testimony About the Crime.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

                1.      The Government Knowingly Presented False Testimony that Mr.

Rodriguez Raped the Decedent.

a.    The Government Knew, or Should Have Known, that Dr. McGee's Testimony About the AP Test Was Materially False, Inaccurate and Substantially Misleading.

b.    Dr. McGee's Testimony About Acid Phosphatase Was Material and Prejudicial.

2.    False Testimony About the "Knife Wounds"

a.    The Government Knew, or Should Have Known, That Dr. McGee's Testimony About the Knife Was Materially False, Inaccurate and Substantially Misleading.

b.    Dr. McGee's Testimony about the Knife Was Material and Prejudicial.

3.    Dr. McGee Has Often Given False Testimony

a.    Michael Ray Hansen

b.    Evan Zimmerman

c.    Thomas Rhodes

B.    The Government Knowingly Presented False Testimony About the Minnesota Department of Corrections... . . . . . . . . . . . . . . .  258

X.    The Government Failed to Disclose Material Exculpatory Evidence in Violation of the Fifth and Eighth Amendments and *Brady v. Maryland* and its Progeny.. . .  260

A.    Due Process and *Brady v. Maryland*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

B.    Exculpatory Evidence Regarding the Failures of the Minnesota DOC. . . 262

XI.    The Jury that Sentenced Mr. Rodriguez to Death Improperly Relied on Materially False and Inaccurate Information During the Capital Sentencing Hearing.. . . . . 264

XII.  *Redacted*

XIII.  Petitioner's Sentence Violates the Tenth Amendment Because Congress Lacks the
Power to Make Death an Available Sentence in the Particular Circumstances
Presented in this Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 287

    A.      This Court Must Weigh the Federal Government's Interest in
Punishing Mr. Rodriguez Against North Dakota and
Minnesota's Interests in Applying Their Penal Policies.. . . . . . . . . . . . . 289

        1.      To Punish Kidnapping, Congress Must Rely on its Power
Under the Necessary and Proper Clause.

        2.      Courts Must Now Evaluate Congress's Necessary and Proper
Authority Under *Comstock*, Which Requires Weighing State and
Federal Interests.

    B.      North Dakota and Minnesota Have a Strong and Legitimate Interest in
Enforcing Their Penal Policies in This Case.. . . . . . . . . . . . . . . . . . . . . . 293

        1.      The Legislatures of North Dakota and Minnesota Have Repeatedly
Expressed Their View that the Death Penalty Does Not Fit With the
Traditions and Needs of Those States.

        2.      State Policy is Particularly Important in the
Case of Capital Punishment.

    C.      The Federal Government Has No Legitimate Interest at Stake
in this Case: the Bare Desire to Secure a Death Sentence
Unavailable Under State Law is Not Cognizable.. . . . . . . . . . . . . . . . . . . 297

        1.      Congress Enacted the Federal Kidnapping Statute So That the
Federal Government Could Assist States in Pursuing Kidnappers,
Not to Permit the Federal Government to Override State Penal
Policy.

        2.      The Federal Government Has No Legitimate Interest in Using
the Kidnapping Act to Override the Results of State
Democratic Processes.

D.      On Balance, the States' Interests Strongly Outweigh Any Federal
        Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

E.      As Applied to Mr. Rodriguez, the Federal Death Penalty is
        Unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 303

XIV.    Mr. Rodriguez Was Denied Due Process of Law, Equal Protection of Law, and the
        Right to Be Free of Cruel and Unusual Punishment Because the Federal Death
        Penalty Is Disproportionately and Unconstitutionally Applied According to the
        Race and Gender of the Victim, and the Race of the Perpetrator. . . . . . . . . . . . 304

XV.     The Trial Court's Instructions to the Jury Violated Mr. Rodriguez's Rights Under
        the Fifth, Sixth, and Eighth Amendments Because the Jury was Not Required to
        Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt. . 315

XVI.    Petitioner's Conviction and Sentence Are Illegal and Must Be Set Aside Because
        The Trial Court Violated the Confrontation Clause of the Sixth Amendment as
        Well as the Requirements of the Eighth Amendment When it Allowed Dr. McGee
        to Testify About Testing Performed by Others. . . . . . . . . . . . . . . . . . . . . . . . 319

XVII.   Mr. Rodriguez's Sentence is Illegal and, Absent Reweighing By the Fact-finder,
        Must Be Set Aside Because the Jury Considered and Relied Upon an Invalid
        Aggravating Factor, in Violation of the Eighth Amendment. . . . . . . . . . . . . . . 321

XVIII.  Alfonso Rodriguez's Rights Under the Fifth, Sixth and Eighth
        Amendments Were Violated Because the Jury Was Improperly Asked to
        Determine Whether Certain Mitigating Evidence Put Forth by the Defense Was in
        Fact Mitigating Before Giving it Consideration. . . . . . . . . . . . . . . . . . . . . . . . 322

IX.     Trial Counsel Failed to Secure Transcription of Critical Portions of the
        Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 323

XX.     The Failure of Counsel to Raise or Effectively Argue on Appeal Claims Which
        Are of Record Violated Mr. Rodriguez's Due Process Rights to Effective
        Assistance of Appellate Counsel, and the Sixth and Eighth Amendments. . . . . . 325

A.      Violation of the Confrontation Clause. . . . . . . . . . . . . . . . . . . . . . . . . . 326

B.      Rule 413 Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 327

C.    Reasonable Doubt Standard in Penalty Phase. . . . . . . . . . . . . . . . . . . . . 328

D.    Appellate Counsel Was Ineffective in Failing to Challenge the Court's Three Step Process During the Selection Phase and the Instructions in the Special Verdict Form, Which Impermissibly Required the Jurors to Make Findings of Law With Respect to the Mitigating Factors. . . . . . . . . . . . . 329

E.    Cumulative Errors Not Raised. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 330

XXI.  Mr. Rodriguez's Conviction and Sentence Must be Vacated as a Result of the Cumulative Prejudicial Effect of the Many Errors in This Case. . . . . . . . . . . . . 331

PRAYER FOR RELIEF

**Statement Regarding Form**

Citation forms used in this petition are generally in conformity with traditional legal citations and the *Blue Book*.  However, throughout the Petition, the following abbreviations and citation conventions are employed:

Citations to all three phases of the trial transcript are formatted Tr. 8766

Citations to pleadings filed with the Court are referenced by a shortened pleading title, followed by the docket number.  They are not attached as exhibits to this Petition.

Citations to pretrial proceedings and hearings are referenced by the name of the hearing, the date and the page number: Pretrial Hearing, April 4, 2006, p. 42.

Citations to exhibits filed with this Petition include a description of the exhibit and exhibit number:  Declaration of *redacted*, Exhibit *redacted*.

*Redacted*

x

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION


UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff/Respondent,     )
     v.                             )     Criminal No. 2:04-cr-55
                                    )
ALFONSO RODRIGUEZ, JR.,             )
                                    )
          Defendant/Petitioner.     )

---

MOTION FOR COLLATERAL RELIEF,
TO VACATE, SET ASIDE, OR CORRECT SENTENCE,
AND FOR A NEW TRIAL

---

COMES NOW defendant/petitioner, Alfonso Rodriguez, Jr., by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, Rule 2 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court grant him a new trial, vacate the judgment entered against him, and/or vacate, set aside or correct the sentence.  Through counsel, Mr. Rodriguez states the following grounds for granting this Petition[1]:

I.     **Introduction**

Some trials uncover the truth.  Some conceal it.

In September 2006, a jury convicted Alfonso Rodriguez, Jr., and sentenced him to

---

[1]This document, and every claim herein, incorporates all the attached declarations and exhibits by reference.

1

die.  According to the prosecution, Mr. Rodriguez abducted Dru Sjodin, raped her, drove her to a remote field in Crookston, Minnesota, slashed her throat, and left her to bleed to death on the frozen ground.  For his part, Mr. Rodriguez was depicted as little better than an animal, uncaring and unworthy.  We now know this carefully scripted tale conceals much and reveals little.  Little about the government's case, and even less about Alfonso Rodriguez, was true.  In the pages that follow, we describe in meticulous detail the difference between what was and what could have been.

Indeed, it is the difference between what was and what *should* have been, had the government not presented what it knew or should have known to be false; had defense counsel heeded the many red flags that fluttered around them; had they discovered and presented the mountains of mitigating evidence that lay just outside their field of vision; ***Redacted***    In a word, it is the difference between what was and what should have been, had Mr. Rodriguez received the trial envisioned by the Constitution.

In large part, this is a case about junk science and false forensics.  The centerpiece of the government's case was the horrific testimony of Michael McGee, the Ramsey County Medical Examiner.  Dr. McGee testified in the clinical and seemingly detached language of an impartial scientist.  Ms. Sjodin, he said, had been raped in the 24 to 36 hours before her death.  She died from two slash wounds to her neck, bleeding to death where she was found nearly five months later, her body badly decomposed.  He divined the first opinion from elevated acid phosphatase levels found on swabs taken from her body, and the second from his autopsy examination.  He was the only witness to support

these two critical contentions.

Unfortunately, both conclusions are incorrect.  To put it bluntly, the suggestion that acid phosphatase in a decomposed body can, without more, be attributed to semen is simply false.  Contrary to Dr. McGee's confident assertion at trial that forensic pathologists testify like this all the time, so far as we can tell, *no crime lab in the country would have endorsed Dr. McGee's testimony*.  The pages that follow explore some of the many prominent labs that specifically *forbid* testimony of the sort offered by Dr. McGee.

Because acid phosphatase has so many origins, the next step, universally demanded by forensic pathologists, is to conduct one or more of three confirmatory tests before opining whether sperm is present.  The first two confirmatory tests were conducted in this case, and their results were negative.  Dr. McGee did not bother to conduct the third test.

In a word, Dr. McGee's insistence that science "proves" Dru Sjodin had been raped is a lie.  So too is his testimony that her throat had been slashed.  By the time investigators found Ms. Sjodin's body, it was badly decomposed.  Dr. McGee thought he could nonetheless discern not one but two slash wounds on her neck.  In fact, he claimed to have seen "scalloping," which indicated to him that the blade had been re-positioned, plunged deeper into her neck. But four independent pathologists have now examined the evidence in this case.  All of them agree that Dr. McGee is wrong.  There were no knife wounds on this body.  The marks he attributed to a knife were the result of animal activity and decomposition, and were created after Ms. Sjodin died.  The dramatic and

3

inflammatory testimony offered by Dr. McGee, including when he stepped down off the stand to indicate for the jury precisely where the knife was plunged deeper into her neck, was all untrue.

Yet this leaves open the question of how Ms. Sjodin died.  If the trial concealed much of what we now know to be true about the crime, it obscured even more about Mr. Rodriguez and his behavior that fateful night.  We now know that Mr. Rodriguez was not simply "slow."  He was not simply "cognitively impaired."  He was not just the child who everyone picked on because he couldn't keep up.  Not just the little boy with the big head who failed the first grade twice; who failed so many grades that he was 18 years old in the ninth grade; who boasts that he has read hundreds of books — the pitiful boast of a simple man with a child's brain, who dons a "cloak of competence" to convince everyone that he is smart like them.  Alfonso Rodriguez is mentally retarded.  Only with considerable difficulty, and with limited success, is he able to "understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others."  *Atkins v. Virginia*, 536 U.S. 304, 318 (2002).

In the pages that follow, we discuss in great detail the evidence demonstrating Mr. Rodriguez's mental retardation, evidence that could have been uncovered by the trial team, and would have been, but for their ineffectiveness.  And were there no more to learn about Mr. Rodriguez than the fact that he is retarded, that would be enough.  Because the law accepts what no civilized society should question:  we do not kill the

4

mentally retarded.

The same vulnerable little boy who fell gradually farther and farther behind his mates is also the one who was preyed upon. Among his peers, he was the one who was taunted. He was the one who was violated. He was the one who was sexually abused. Because he is retarded, he was a target. And because he is retarded, he cannot understand the deep shame and intense humiliation he feels. He does not understand the symptoms that a trained expert recognizes for what they are. He does not know what it means to have a severe case of post-traumatic stress disorder. He only knows that sometimes, when he sees a person who triggers a memory of shame and rekindles the sense of humiliation, he can be thrown against his will into another time and place. A time and place of terrible, unspeakable things. He becomes overwhelmed, and fear gives way to panic. This panic-stricken and retarded man is the one who encountered Dru Sjodin in November, 2003. What followed was an unspeakable tragedy, but not a capital crime.

Naturally, there is more to Alfonso Rodriguez than is recounted in this brief introduction, just as there is more to the government's misconduct. Much more of the difference between what was and what should have been is presented in great detail in the pages that follow. *Redacted*.

*Redacted*

All of the information recounted in the pages that follow and included in the many exhibits could have, and should have, been part of the trial. All of Dr. McGee's falsehoods, for instance, were either known or should have been known to the

prosecution.  Everything we relate about Mr. Rodriguez could and should have been uncovered and utilized by the defense. *Redacted*.  And had this information been part of what took place before, none of us would be engaged in the present effort, for Alfonso Rodriguez would not be on death row.  But some trials uncover the truth and some conceal it.  And sometimes the truth waits for a later stage in the proceeding.  That time is now.

### Claims for Relief

**II.    Mr. Rodriguez Was Denied Effective Assistance of Counsel at the Pretrial and Guilt/Innocence Phases of Trial, In Violation of 18 U.S.C. §§ 3005 & 3006A and the Fifth, Sixth and Eighth Amendments to the United States Constitution.**

In any criminal case, the accused is entitled to competent counsel.  That much is axiomatic.  *See, e.g.*, *Strickland v. Washington,* 466 U.S. 668, 686 (1984).  But because death is indisputably different from all other sentences—because the stakes are higher, and the jurisprudence immeasurably more complex—more is demanded of counsel in a capital case.  That too is abundantly well-settled.  *See, e.g.*, *Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010)*; Porter v. McCollum,* 130 S. Ct. 447, 449 (2009)*; Rompilla v. Beard*, 545 U.S. 374, 378 (2005); *Wiggins v. Smith*, 539 U.S. 510, 515-16 (2003)*; Williams v. Taylor*, 529 U.S. 362, 398 (2000).  In this case, in a variety of ways, counsel failed to provide Mr. Rodriguez with the representation demanded by 18 U.S.C. §§ 3005 & 3006A and the Fifth, Sixth and Eighth Amendments to the United States Constitution.

But for these errors — whether their effect is examined in isolation or assessed cumulatively — there is well beyond a reasonable probability that the outcome of the trial

would have been different and Mr. Rodriguez would not be on death row. *Strickland, 466 U.S. at 694*. In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court noted that in a death penalty scheme where a non-unanimous jury spares the defendant's life, such as the federal system, confidence in the outcome is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." *Id*. at 536. The Supreme Court has stressed that "the adjective ["reasonable"] is important" and has equated it with "a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). As explained in *Strickland* itself: "reasonable probability of a different result" is *less than a preponderance of the evidence*. It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693.

In this section, we describe the errors at the pretrial and guilt/innocence phases of Mr. Rodriguez's prosecution. In subsequent sections, we describe the errors at the eligibility phase and the sentencing phase.

A.    **Trial Counsel Failed to Properly Challenge the Government's Purported Evidence of Sexual Assault**.

More than anything else, the government's case for death depended on the inflammatory testimony of Dr. Michael McGee, the Ramsey County Medical Examiner.[2]

---

[2] Dr. McGee has an exceptionally close relationship with law enforcement. He is a lecturer for the Law Enforcement Training Program with the Minnesota Bureau of Criminal Apprehension (BCA) and Course Director of the BCA's Forensic Police Training Program. For at least the past fifteen years, the overwhelming majority of his professional presentations have been to law enforcement, particularly in Minnesota. *See* Curriculum Vitae of Dr. Michael McGee, Ex. F-04.

In support of the government's case, Dr. McGee added two critical props:  first, that Mr. Rodriguez raped the victim within 24-36 hours of her death; and second, that he slashed her neck and stabbed her in the flank.  He said the wounds to her neck caused her death. Aside from the illegitimate fact of race, the significance of which is discussed in section XIV below, it was Dr. McGee who transformed a homicide into a capital case.

Yet Dr. McGee's testimony was mistaken in both respects.  Indeed, it was more than mistaken:  it was false.  This subsection demonstrates that counsel was ineffective when they failed to mount a proper challenge to Dr. McGee's testimony about the supposed sexual assault.  The following subsection demonstrates that counsel was likewise ineffective when they failed to mount a proper challenge to the knife wounds that never were.  And in subsequent claims, the petition shows how an overlapping set of facts regarding Dr. McGee establishes that the government engaged in deliberate misconduct, in violation of the Fifth and Eighth Amendments.

### 1.    Background

Although never formally alleged as an aggravating factor, the government repeatedly argued to the jury that Mr. Rodriguez deserved to die because the murder was committed in order to fulfill a "rape fantasy."  Indeed, the government used the highly inflammatory language of "rape fantasy" or "fantasizing about rape" no fewer than ten times in its closing argument,[3] and it focused on the sexual nature of the crime and Mr.

---

[3] Tr. 8662, ln 7-8; 8663, ln 5-6; 8663 ln 13; 8688, ln 22;  8689, ln 1-2l; 8689, ln 13-14; 8690, ln 2-3; 8690, ln 19-20; 8694, ln 19; 8707, ln 17

Rodriguez's alleged violent sexual impulses no fewer than twenty times in that same argument to convince the jury that a death sentence was justified.[4]

In this venture, the government relied heavily on Dr. McGee, who testified he conducted "sexual assault exam testing."[5]  In response to the government's question whether there is any forensic test to "determine whether there's been a semen deposit of some kind," Dr. McGee testified "[y]ou test for the enzyme prostatic acid phosphatase."[6] Acid phosphatase ("AP") is an enzyme that is produced by the male prostate, so its presence may suggest semen.  Acid phosphatase, however, is not an enzyme that is unique to the prostate; it is also produced by other organs in the body, including the vagina.[7] Thus, the mere presence of AP is not confirmatory evidence of a semen deposit, much less of a sexual assault, because any AP that is detected by the test is not necessarily prostatic in origin.

Dr. McGee, however, testified to the jury that prostatic AP can be isolated from non-prostatic AP, and that if the detected amount of prostatic AP exceeds a particular "cutoff" score – in this case, 25 units per liter – AP testing can conclusively indicate the presence of semen.  Here, Dr. McGee testified that the swabs taken from the vaginal and

---

[4] Tr. 8661-62, ln 24-8; 8663, ln 2-6; 8663, ln 11-13; 8665, ln 10-16; 8665, ln 18-22; 8667, ln 21-25; 8673, ln 9; 8668, ln 19-22; 8689, ln 1-4; 8689, ln 5-14; 8690, ln 1-7; 8690, ln 15-21; 8690-91, ln 24-6; 8693, ln 16-23;  8693-94, ln 24-3;  8694, ln 15-21; 8695, ln 19-20;  8698, ln 14-15;  8706, ln 5-7; 8707, ln 15-17

[5] Tr. 6717

[6] Tr. 6721

[7] Tr. 6530

cervical areas of Ms. Sjodin yielded respective prostatic AP values of 47.4 and 130.7 units per liter, and that such scores are "considered positive for seminal [deposition]."[8] Moreover, Dr. McGee testified that based on those "elevated levels," the seminal deposit had to have occurred "24 to 36 hours prior to the subject's death."[9]  Since other testimony excluded Ms. Sjodin's boyfriend as the possible source of any semen, the jury was told that there was reliable and compelling forensic evidence proving that Mr. Rodriguez had raped Ms. Sjodin.

The evidence presented to the jury, however, was false.  Dr. McGee's testimony that a "positive" AP test can provide support for his testimony confirming the presence of semen is simply not true.  Contrary to Dr. McGee's confident testimony to this Court during the *Daubert* hearing on this matter, his use of a "cutoff" score to positively determine the presence of semen is not the practice of the forensic pathology community at large.  Indeed, as explained below, not only do most forensic laboratory protocols refuse to recognize such a practice, almost all labs *forbid* their employees from testifying to the presence of semen when the only evidence for such a claim is a positive AP test.

Moreover, the AP test upon which Dr. McGee relied, the Beckman Dri-STAT was never approved by the manufacturer or the federal Food and Drug Administration ("FDA") for the detection of prostatic AP in the manner in which it was used in this case. The Beckman Dri-STAT reagent—that is, the substance that is used to create a chemical

---

[8] Tr. 6722-23

[9] Tr. 6723

10

reaction with the sample being tested—was only designed and validated for use with detection of prostatic AP in *serum,* i.e., blood.  Here, however, the Beckman Dri-STAT reagent was applied to *dry stains* that were swabbed from the body.  As is explained in more detail below, the use of the Beckman Dri-STAT reagent has never been validated for use with dry stains.  There is no evidence that the Beckman Dri-STAT reagent can accurately and reliably detect the presence or amount of prostatic AP in a dry stain.  Neither the manufacturer of the reagent, nor the FDA, nor any other forensic laboratory recognizes the use of the Beckman Dri-STAT reagent on a dry stain to detect or quantify the presence of prostatic AP.

Dr. McGee never should have been allowed to testify to the jury that the AP test upon which he relied constituted positive evidence of the presence of semen. However, because of the ineffectiveness of trial counsel combined with the misconduct of the government, this Court was never provided with the readily available information necessary to evaluate and properly exclude Dr. McGee's testimony in this regard.[10]  Thus,

---

[10]Although counsel challenged the admission of the AP evidence on direct appeal, the issue presented in this § 2255 motion is significantly different than the argument raised to the Eighth Circuit.  Indeed, as the court noted in its opinion, the appellate claim was limited to the following issues:  (1) Dr. McGee's AP testimony was based on his own experience, rather than peer-reviewed research; (2) the time-frame testimony was unreliable; and (3) Dr. McGee's opinion was not supported by scientific literature.  *United States v. Rodriguez*, 581 F.3d 775, 794-95 (8th Cir. 2009).  In other words, the Eighth Circuit did not have the opportunity to consider the claims that Dr. McGee's opinion was contrary to the practices and protocols of his own forensic pathology community, or that the use of the Beckman Dri-STAT reagent was unreliable on dry stain samples.

Additionally, the Eighth Circuit's resolution of the admissibility of Dr. McGee's testimony rested on two premises:  (1) acid-phosphatase testing is valid because it is based on established, peer-reviewed scientific methods and data, *id.* at 794; and (2) even the defense expert "acknowledged

the jury that sentenced Mr. Rodriguez to die did so on the basis of materially false and inaccurate forensic evidence. Had Dr. McGee's false testimony about the AP test been excluded, the government's evidence that a sexual assault took place would have been severely undermined. But for that false evidence, there is a reasonable probability that at least one juror would have struck a different balance in the penalty phase proceedings and the outcome of the case would have been different.

### 2. Dr. McGee's Testimony About the Acid Phosphatase Test Was Materially False and Inaccurate.

#### a. Lab Protocols

At the time of Mr. Rodriguez's trial, crime laboratory protocols considered acid phosphatase testing merely a presumptive test for the presence of semen. A presumptive positive result mandated further confirmatory testing. And confirmatory tests were indeed conducted in this case. Microscopic examination revealed no spermatazoa, and DNA testing uncovered no male DNA. Dr. McGee did not conduct the remaining confirmatory test: he did not test for p30, a male-specific antigen. As much to the point, the accepted standard of practice in 2006 forbade a forensic practitioner from reporting a

---

widespread support among American scientists for [Dr. McGee's] approach. *Id.* at 795. The record before the court on direct appeal, however, omitted the critical evidence raised in this § 2255 motion. Had that evidence been part of the record, the Eighth Circuit would have been apprised of the fact: (1) although acid-phosphatase testing has been validated *in general*, the result of an AP test will be unreliable if the reagent used to perform the test is misused, as was the case here; and (2) the defense expert's acknowledgment of "widespread support among American scientists" for Dr. McGee's approach was not only incorrect, but was expressly contradicted by readily available evidence that the community of forensic pathologists rejected his approach to AP testing. In sum, both this Court and the Eighth Circuit were deprived of the necessary record and arguments to property conclude that Dr. McGee's testimony concerning the AP testing was unreliable and inadmissible.

conclusive finding of semen based solely on a presumptive positive AP test.  The

well-known (and readily available) treatise *Forensic Sciences*, for example, concluded its

section on semen identification:

> To summarize, the AP test is still used for screening and locating stains.  It is not a specific test for semen, *and semen should not be identified solely on the basis of a positive AP test.*[11]

Even in March 2000, the American Society of Crime Lab Directors, the oldest and

most well-known crime lab accrediting body, instructed that "[w]hen the procedures used

in examination are presumptive tests, the conclusions reported must be consistent with

those examinations and include appropriate qualifiers of limitations of the scope of the

examination."[12]  Thus, a positive AP finding, standing alone, would only allow a forensic

examiner to state that the presence of semen was indicated but not confirmed.

This requirement is reflected in standards that were well accepted at the time of

Mr. Rodriguez's trial and should have been readily known to Dr. McGee, the government,

and trial counsel.  The FBI protocols in 2002, for example, noted that a positive AP result

"provides a presumptive indication that semen may be present on an item but it *does not

constitute an identification of semen.*  A confirmatory testing procedure is required to

---

[11] R.E. Gaensslen, *Forensic Analysis of Biological Evidence,* in 1 Forensic Sciences § 29.06[a][1][iii] (29th ed. 2000)(emphasis added), Ex. A-01.  The non-confirmatory status of AP testing is so well accepted that the whole discussion of acid phosphatase in the treatise is contained in a section entitled "Presumptive tests and searching aids."  A subsequent chapter entitled "Confirmatory methods" discusses sperm detection and p30 testing.  *Id.* at § 29.06 [a] [1] and [a] [2].

[12] American Society of Crime Lab Directors/Laboratory Accredidation Board (ASCLD/LAB), ASCLD/LAB'S position on reporting of blood screening tests in the 1980's and 1990's (Feb. 2011), Ex. A-02.

13

identify the presence of semen in a questioned stain."[13]  The 2006 FBI reporting

requirements reflected the accepted standard of practice nationwide at the time of trial.

> Because AP activity is present in body fluids other than semen (e.g., vaginal fluid, etc.), a confirmatory test for the presence of semen is necessary to conclusively identify semen on an item of evidence.  If a confirmatory test for semen is not/cannot be conducted [i.e., a stain(s) is of limited size, etc.], the following general statement should be included in the report when only a positive BCIP result is obtained for an item:
>
> *"The result of the serological examination performed on specimen Q1 for the possible presence of semen does not satisfy the nuclear DNA Unit reporting criteria; therefore no conclusion can be offered."*[14]

The fact is that, as Dr. McGee knew or should have known, forensic crime labs

have uniformly prohibited precisely the sort of testimony he offered and have been

prohibited since long before 2004.  In fact, so far as Mr. Rodriguez can ascertain, no

forensic crime lab in the country would have allowed one of their examiners to testify as

Dr. McGee did.  Forensic crime labs at the city, county, and state level, like the FBI,

provide explicit protocols for serological testing and reporting requirements, and

uniformly refer to the use of acid phosphatase as a preliminary, presumptive indicator of

the presence of semen.  All lab protocols obtained require further confirmatory testing in

the form of microscopic identification of semen or p30 testing before a lab analyst may

testify as Dr. McGee did in this case.

Of particular note are the standards employed by the Minnesota Bureau of

---

[13] FBI Serology Manual, § 10.1, Ex. A-06.

[14] *Id.* at § 7.5.2.1(emphasis in original).

14

Criminal Apprehension, where Dr. McGee is the Director of the Forensic Police Training Program.[15]  The government relied upon the BCA lab for the bulk of the forensic examination in Mr. Rodriguez's case.  Since as early as 1995, Minnesota's BCA Forensic Laboratory has used AP testing as a presumptive indicator of semen, but has required confirmatory tests in the form of microscopic identification of sperm or p30 testing.[16] BCA Protocol MBI-1020-C directs lab analysts to state that no semen is found in the event of positive acid phosphatase testing and both negative p30 and negative microscopic identification.[17]  At the very least, under the BCA's own protocols, Dr. McGee  would have had to conduct p30 testing before making any conclusion as to the presence of semen.  Significantly, the protocols direct lab analysts to conduct confirmatory testing in the event of either positive or negative acid phosphatase test results, indicative of the unreliable nature of the testing.

Also of particular note are the standards employed by North Dakota's Office of the Attorney General, Crime Laboratory Division.  The protocols for the Forensic Section/DNA Unit for the AP Spot Test state that the test "is a screening test used to determine which items should be further tested for the presence of semen."[18]

Other crime labs are in agreement:

---

[15] *See* Curriculum Vitae, Dr. Michael McGee, Ex. F-04.

[16] *Preparation and Use of the Acid Phosphatase Test*, BI-110, Ex. A-05.

[17] *Examination of Sexual Assault Evidence*, MBI-102-C, Ex. A-05.

[18] North Dakota Office of the Attorney General, Crime Laboratory Division, Forensic Section/DNA Unit, *AP Spot Test Background Information,* Ex. A-07.

15

▸ **Texas Department of Public Safety**

The Texas DPS explicitly forbids a lab analyst from asserting the presence of semen based solely on a positive AP test, and requires confirmation through the identification of spermatozoa.[19] The strongest conclusion allowable under these guidelines when an AP test is positive but no spermatozoa are found is that semen is indicated on an item but not confirmed.[20] Lab analysts may also state in this scenario that no sperm was found. Texas DPS operating procedures are also significant in that they mandate the identification of spermatozoa before semen may be confirmed.

▸ **The California Department of Justice**

California DOJ does not allow analysts to claim that semen has been confirmed through acid phosphatase testing alone. The department's manual contains a chart for lab analysts, giving them directions for what they may report based on the results of acid phosphatase testing.[21] Significantly, the chart states that if positive AP testing occurs, but no other confirmatory tests are conducted, the analyst should report that seminal fluid was not confirmed. The procedures warn that AP is present in other bodily fluids including vaginal secretions, saliva, milk, and feces, indicating the department cannot distinguish between prostatic and non-prostatic acid phosphatase.

---

[19] Texas Department of Public Safety, *Standard Operating Procedures: DNA-08-03, Report Writing Guidelines* 2.3, Ex. A-08.

[20] *Id.*

[21] California Department of Justice, Bureau of Forensic Services, *Biology Technical Procedures* Section 4, Ex. A-09.

▶ **Connecticut Department of Public Safety**

The Connecticut DPS does not use acid phosphatase to confirm the presence of semen in sexual assault cases. Their protocols state that AP testing is presumptive, and requires further analysis to confirm the presence of semen.[22] Again, the Department regards microscopic identification of spermatozoa or p30 as confirmatory testing.

▶ **Pennsylvania State Police**

The Pennsylvania State Police use AP testing as an initial indicator of semen that requires confirmatory testing. The protocols state that lab analysts should test for acid phosphatase in order to determine whether to move forward with confirmatory testing.[23]

▶ **Missouri State Highway Patrol**

The Missouri State Highway Patrol's crime laboratory manual states, "Acid Phosphatase (AP) is used as an indicator of the possible presence of semen in a stain."[24] The manual provides for the initial testing for AP, followed by p30 and microscopic identification tests.

▶ **Oklahoma Bureau of Investigation**

Oklahoma's State Bureau of Investigation treats acid phosphatase as a presumptive

---

[22] Connecticut Department of Public Safety, Forensic Science Laboratory, *Forensic Biology,* Ex. A-10.

[23] Pennsylvania State Police Laboratory System, *Serology Procedures Manual,5.2,* Ex. A-11.

[24] Missouri State Highway Patrol, Crime Laboratory Division, *Detection of Biological Fluids Procedure Manual Section II. Presumptive Tests, C. Presumptive Tests for Semen*, Ex. A-12.

test for the identification of semen.  If a sample tests positive for acid phosphatase, but other confirmatory tests are not conducted or are negative, reporting requirements allow the lab analysts to say that acid phosphatase activity was detected—and nothing else.[25]

▸    **Alaska Department of Public Safety**

Alaska's DPS does not use acid phosphatase to confirm the presence of semen. According to their Forensic Biology Standard Operating Procedures, AP testing may only be used as a presumptive test, and lab analysts must microscopically identify spertmatozoa before concluding semen is present.[26]  The standard operating procedures also warn against the possibility of false positives, given that AP is present in other bodily fluids.

▸    **San Francisco Police Department**

The San Francisco Police Department Analytical Protocols for Serology Testing direct lab analysts to conduct an AP spot test on all suspected semen stains:  "Samples giving positive preliminary ACP qualitative tests (spot tests) will require further examination to confirm the presence of semen."[27]  The protocols require confirmation of semen through additional testing:  an analyst cannot report the positive identification of semen without microscopic identification of sperm and/or detection of p30.

---

[25] Oklahoma State Bureau of Investigation Criminalistic Services Division, *Forensic Biology Protocol Manual*, B23, Rev. 6, Ex. A-13.

[26] Alaska Department of Public Safety Scientific Crime Detection Laboratory *Forensic Biology Standard Operating Procedures,* Ex. A-14.

[27] San Francisco Police Department Criminalists Laboratory, *Serology and DNA Analysis Manual Analytical Protocols*, Sections I, III (Effective date April, 1998), Ex. A-15.

▸        **Houston Police Department**

The Houston Police Department crime laboratory does not allow for the confirmation of semen through the use of acid phosphatase.  The laboratory manual states that a positive finding for AP provides reason to suspect the presence of semen.[28]   The manual warns that AP testing is only a presumptive test for the identification of semen because it is found in other bodily fluids.  Again, the department does not differentiate between prostatic and non-prostatic AP and requires further testing to confirm the presence of semen.

▸        **Fort Worth Police Department**

Fort Worth likewise does not allow for the confirmation of semen through the use of AP testing alone.  Confirmation is required through the use of p30 testing or the microscopic observation of three intact sperm.  Furthermore, even if a lab analyst sees spermatozoa, if he identifies three or less, confirmation from a second lab analyst is required.  The department allows for the positive confirmation of semen even in cases where AP is negative but p30 or microscopic spermatozoa are positive, indicating that the department regards AP as a potentially un-reliable test.[29]

▸        **The Phoenix Police Department**

The Phoenix Police Department does not use acid phosphatase to confirm the

---

[28] Houston Police Department Crime Laboratory, *Standard Operating Procedures: Serology/DNA, Section 7.4,* Ex. A-16.

[29] Ft. Worth Police Department, *STR DNA SOP Manual, Section 1.13*, Ex. A-17 .

19

presence of semen.  The department's laboratory services division uses AP testing only as a presumptive test because other substances can produce a false positive reaction.  Again, there is no reference to prostatic or non-prostatic acid phosphatase, but rather a warning that other substances can yield a false positive result.[30]

> **Columbus Police Department**

The Columbus, Ohio, Police Crime Laboratory explicitly warns analysts in their Standard Operating Procedures that AP testing is not a confirmatory test for the presence of semen.  The Procedures describe semen identification as a two-step process involving presumptive tests followed by confirmatory tests.[31]

> **Pinellas County, Florida, Forensic Laboratory**

Pinellas County Forensic Laboratory does not allow for the confirmation of semen evidence based solely on the presence of acid phosphatase.  The lab manual requires confirmation testing with microscopic analysis.  The manual also includes reporting guidelines for lab analysts, and states that if a sample tests positive for AP only, the analyst may report that acid phosphatase, was indicated.  Lab analysts may not report the presence of semen based solely on a positive AP finding.[32]

> **San Diego County Sheriff**

San Diego County Sheriff's Forensic Biology procedures only use acid

---

[30] Phoenix Police Department Laboratory Services Division, *Forensic Biology*, Ex. A-18.

[31] Columbus Police Crime Laboratory, *SOP Manual ACID PHOSPHATASE FOR SEMEN*, Ex. A-19.

[32] Pinellas County Forensic Laboratory, *Quality Manual POLICY 2020P*, Ex. A-20.

20

phosphatase as a presumptive test for semen: microscopic spermatozoa identification and p30 testing are required in the case of an AP positive test.[33]

► **Broward County Sheriff**

The Broward County, Florida, Crime Laboratory, like the others, requires confirmatory testing for all AP swabs, regardless of result.[34]

\* \* \* \*

In sum, a presumptive positive AP test combined with other negative findings, such as no observation of sperm, requires a forensic examiner to report that although a presumptive test for semen was positive, further testing suggests that semen was not detected on the item. Dr. McGee's testimony that the positive AP test alone meant that semen was present, despite DNA testing that excluded a male donor, the absence of p30 testing, and despite the failure to observe spermatozoa microscopically,[35] is so far outside the norm that it is not even contemplated by lab protocols. Most protocols, such as those used by the Minnesota BCA (where Dr. McGee is the Director of Forensic Training) require DNA testing only after a positive AP *and* at least one confirmatory test (p30 or discovery of sperm). Based on these findings, any report indicating a positive finding of semen (or suggesting when that supposed semen was deposited) is contrary to the

---

[33] San Diego County Regional Sheriff's Department Regional Crime Laboratory, *Forensic Biology Technical Procedures Manual*, Section 4, Ex. A-21.

[34] Broward County Sheriff's Office Crime Laboratory, *Analytical Methods Manual,* Section 8*,* Ex. A-22.

[35] Tr. 6721, 6753, 6754

21

standard of practice for forensic practitioners at present and in 2006.  Dr. McGee knew or

should have known that his testimony was not simply contrary to the uniformly accepted

science, but a deliberate falsehood.

### b.    The Beckman Dri-STAT Reagent

Dr. McGee's testimony regarding the acid phosphatase levels relied solely on the

testing conducted by Regions Hospital in St. Paul, Minnesota.[36]  Trial counsel raised

several challenges to the validity of this testing based on the length of time between the

victim's death and the testing, as well as the science underlying Dr. McGee's assertion

that the test could definitively distinguish prostatic from non-prostatic AP.  This Court

was never informed, however, that the Regions testing itself—apart from its application

in this case—was fundamentally flawed.

First, although quantitative AP testing is used in laboratory studies, it is not

generally accepted in forensic practice and is not currently used in accredited crime labs.

The fundamental problem is that quantitative AP testing is meant to determine the

quantity of an enzyme in a liquid specimen and thus the results are reported by volume

(*e.g.*, units per liter).  When testing air-dried swabs, however, as criminal forensic labs

mostly do, it is impossible to know the volume of semen (if any) in a particular stain.  As

a result, it is not possible to relate a quantity of AP found in some part of a semen stain

back to the liquid specimen data in order to interpret the results of the test.

---

[36] Mr. Rodriguez alleges, in separate sections of his Motion, that this testimony violated *Crawford v. Washington*, 541 U.S. 36 (2004), and should have been objected to by trial counsel and excluded by this Court. *See* sections II, F and XVI, *infra*.

Chapter 29 of the leading treatise for attorneys and forensic practitioners, *Forensic Sciences*, states this without equivocation:

> There are various ways of performing an AP test, but they generally fall into two categories—qualitative and quantitative. A qualitative test is generally set up to produce a characteristic color in the presence of AP. Qualitative tests, by definition, are not designed to determine the actual quantity of AP in a specimen, but like any test, they have a lower limit of detection. Quantitative AP tests are generally spectrophotometric and are designed to measure the quantity of enzyme in the sample of specimen tested. *The problem with quantitative tests in dried stains is that there is no way to know what volume of semen makes up the stain. All of the data available on AP quantity in semen is from liquid specimens, which is the only way to collect this data that makes sense. As a result, it is not possible to relate a quantity of AP found in some part of a semen stain back to the liquid specimen data in order to interpret the results of the stain test.*[37]

Thus, use of a quantitative AP test in this case was not appropriate, did not conform to accepted practice in crime laboratories examining sexual assault evidence, and should not have been allowed in evidence.

Second, the actual testing reagent used in this case, the Beckman Dri-STAT, was designed solely as a diagnostic test for prostate cancer and was not intended for use on anything except blood serum. This reagent is now obsolete but it was developed solely for diagnostic purposes in clinics and hospitals to determine AP levels during prostate exams and other related evaluations. It is neither an appropriate nor valid reagent to use in a forensic crime lab. The package insert for the reagent, obtainable from the

---

[37] R.E. Gaensslen, *Forensic Analysis of Biological Evidence*, 1 Forensic Sciences §29.06[a][1][iii] (emphasis added). Ex. A-01. This treatise is updated yearly but the information quoted above was readily available prior to Mr. Rodriguez's trial.

manufacturer, clearly states "Dri-STAT ACP Reagent is intended for use in *in vitro* diagnostic determinations of acid phosphatase in serum." [38]  The manufacturer validated this reagent solely for serum testing and neither the manufacturer nor any other published studies have considered or validated its use testing dry stains for forensic purposes. Regions Hospital's use of this reagent for forensic purposes was, at the time of Mr. Rodriguez's trial, contrary to both the intended use of the manufacturer and the established practice of forensic laboratories.

Furthermore, Regions Hospital imposes additional restrictions on its testing that were not followed in this case.  For instance, as Dr. McGee well knew, under the Regions protocol governing acid phosphatase, no sample is even collected if more than 48 hours have elapsed since the alleged sexual assault.  In relevant part, Regions protocol 07.59.01 provides as follows:

> Acid Phosphatase is found in very high concentrations in semen and this fact is utilized in Sexual Assault cases.  However, 30 to 36 hours following sexual assaults the possibility of recovering significant acid phosphatase activity decreases dramatically.  After 48 hours, no acid phosphatase samples will even be collected.[39]

On direct examination, Dr. McGee testified that AP degrades in the human body over time, dead or alive, and that this process happens over the course of hours or days.[40]  Dr. McGee justified his conclusion that the AP tests showed the presence of semen nearly

---

[38] Beckman Dri-STAT Package Insert,  Ex. A-23.

[39]  Regions Hospital Protocol 07.59.01, Ex. A-04.

[40] Tr. 6544

24

five months after death by pointing to the weather, specifically a claim that Ms. Sjodin died and was deposited in the extreme cold, and that her body remained in that state until "almost up to the time she was discovered."[41]

The problem with this premise is that it is not true.  Between the day of Ms. Sjodin's disappearance and the day her body was found, the high was above freezing on 50 days, including seventeen of the previous eighteen days.[42]  It was a warm spring.  In fact, the high was above 50 degrees for eleven of the preceding seventeen days, including the day the body was found and the three days before.  Ten days earlier, the highs were above 60 degrees for two consecutive days.

3.   **Trial Counsel Failed To Properly Challenge the Materially False and Inaccurate Acid Phosphatase Evidence**.

a.   **The *Daubert* Hearing**

As early as the filing of the Indictment, trial counsel were on notice that the government would seek to introduce evidence that the kidnapping in this case was sexually-motivated.  Indeed, during the course of pre-trial discovery, counsel learned that the government would rely on forensic evidence and expert testimony to prove that Ms. Sjodin had been sexually assaulted.  In particular, Dr. McGee would testify that, in his expert opinion, Ms. Sjodin was sexually assaulted, and that he reached this conclusion using the numerical values derived from an acid phosphatase test conducted at Regions

---

[41] Tr. 6557

[42]  Weather Data, *National Climate Data Center,* NOAA, November 2003 - April 2004, Ex. F-02.

Hospital. According to Dr. McGee, the results of the AP test on the vaginal and cervical swabs allowed him to conclude that there was positive evidence of seminal deposit within 24 to 36 hours of Ms. Sjodin's death.

As part of its pre-trial litigation, trial counsel filed a motion to exclude Dr. McGee's anticipated expert opinion under *Daubert*.[43]  The defense's *Daubert* challenge, however, was narrowly confined to two issues:  (1) that the acid phosphatase testing conducted by Regions Hospital was not specific for male prostate-specific acid phosphatase, and (2) that no conclusions about the presence of male prostate-specific acid phosphatase could be drawn based simply on the acid phosphatase levels that were reported.[44]

In a pre-trial hearing conducted on July 5, 2006, the Court discussed the relevant standard that would need to be met for Dr. McGee's testimony to satisfy the legal test of *Daubert*.  Specifically, the Court emphasized the need to determine whether Dr. McGee's opinions regarding the results of the AP test were in line with the practices and protocols of the relevant community of experts in the field of forensic pathology:

> The problem could be is if you are so far afield from the standard that is ordinarily applied within the community of experts, and I can't answer that question.  And I've read those briefs carefully, and that's really the question.  The question is they've got a numerical number of X and you've got a statement by Dr. McGee that in their lab they always treat that—numerical number Y as the cutoff point, this is above that cutoff point.  And then when he's asked what do

---

[43] Motion for *Daubert* Hearing, dckt. # 393.

[44] Tr. 6514

other labs do?  He says, well, it's a flexible standard.  I don't know what other labs do.

And the question that really becomes is, is what this lab is doing within sort of a bell curve, you know.  Because I mean if it's whacked out on either end on that bell curve—well, if their standard is strange on the high end, it doesn't matter because they're over whatever standard they set.  But if they've set the standard way low compared to what ordinarily folks would do who are in this business, and if there's no literature out there that supports setting it there, then that might be a cause for concern under *Daubert*.[45]

Indeed, at several points during that pre-trial conference, the Court made it clear to trial counsel that a critical question to be answered at the *Daubert* hearing was whether Dr. McGee's testimony about the AP test conformed to the practices of the community of forensic pathologists.  "If you're the only guy in the world saying X is true because we saw Y, you're going to have a hard time getting that to satisfy *Daubert*  . . ."[46]  The Court continued:

And the question then becomes, well, do other folks do it?  What's his training show? … You know, what—how do other people treat that evidence? . . . I mean, I'm not—I'm not saying I've made up my mind on anything.  I'm just saying that that's the discussion that we really need to have in *Daubert*, and it probably – under *Daubert* and that that's where – that's what – I guess I've now told you exactly where my questions were and why I think I want a hearing.[47]

At the ensuing *Daubert* hearing, the government made sure to elicit the testimony from Dr. McGee that purported to address the Court's concerns:

---

[45] Pretrial Conference, July 5, 2006, pp. 64-65

[46] *Id.* at 60

[47] *Id.* at 62-63

Q:      Over all these years and all of this experience that you've talked about, has anything come to your attention that seriously calls into question the Ramsey County Medical Center AP cutoff of 25?

A:      No.

Q:      Are you aware of other labs and other forensic pathologists who have the same practice of arriving at and then offering opinions on AP cutoffs as indicative when it's above of seminal deposit and not indicative when it's below that cutoff of seminal deposit?

A:      Sure.[48]

Under cross-examination, Dr. McGee conceded that the AP "cutoff score" of 25, which he used as confirmatory evidence of a semen deposit, was not based on any national standard or published study of any kind.[49]  Rather, as Dr. McGee explained to the Court, the use of such a cut-off score was the product of his experience as a forensic pathologist and was consistent with the practices of the forensic pathology community at large.[50]  At no time did defense counsel challenge this testimony by proffering lab protocols adopted by, or testimony from, other forensic pathologists that demonstrated that Dr. McGee's use of an AP cutoff score in such a manner was not in keeping with the relevant community of experts.

Instead, trial counsel presented the testimony of Dr. George F. Sensabaugh, Jr., an academic professor of forensic science.  Although Dr. Sensabaugh was knowledgeable about the underlying science involved in AP testing, he was not a forensic pathologist,

---

[48] Tr. 6560

[49] Tr. 6575

[50] Tr. 6595-99

nor did he have experience working with that community of experts.[51]  Under

cross-examination by the government, Dr. Sensabaugh also testified that he had no

experience using the Beckman Dri-STAT test, nor did he have any knowledge of how

broadly the test is used by crime laboratories in the analysis of sexual assault evidence.[52]

Indeed, a substantial line of the government's cross-examination of Dr. Sensabaugh was

directed at establishing that his expertise regarding acid phosphatase testing is from an

academic perspective, and that he had neither the experiential nor practical knowledge of

such testing that forensic pathologists develop from working in the field on actual cases.[53]

At the conclusion of the *Daubert* hearing, the Court was thus faced with the

testimony of one expert who putatively could speak authoritatively to the standards and

practices of the forensic pathology community, and one who could not.  In the absence of

the available evidence that would have informed the Court of the true state of affairs, the

Court credited Dr. McGee's testimony that his practices were consistent with the

protocols used by the forensic pathology community and found that this testimony was

dispositive of the *Daubert* issue before it:

> I found particularly interesting the experience and the background of Dr.
> McGee and the basis for which he offered his opinion.  I found particularly
> interesting his observations that really relied on the laboratory scientists to
> explain to him the nature of the testing and the he reasonably relied on that.
> I found interesting that he reasonably relied upon his training and
> experience, that he's had discussions with other forensic pathologists, that

---

[51] Tr. 6643-45

[52] Tr. 6651-52; 6553-54

[53] Tr. 6661-63

during the course of these discussions there's been a recognition that different labs do different testing but that generally speaking there's sort of a range of expectation and that he believes that the testimony that he is about to offer falls within that expected range and that it's accepted generally in the school of forensic pathology.

I found interesting Dr. Sensabaugh's description that says, look, within the criminal scientist community, the forensic criminology kind of—or criminalist experience that he would view this testing as not definitive and that it did not exhaust the testing that might be available. I thought particularly interesting that he noted that he suspected that Dr. McGee would not be alone among forensic pathologists in offering the opinion that he's offering but that within his community; that is, the research community and the forensic criminal science community, that the testing that's been offered really doesn't quite get there; that it falls short because there are too many areas that are left open.

And so what I see here is really pretty fascinating. It's kind of almost textbook law school kind of *Daubert* stuff. What you have are two experts that are testifying from very interrelated fields but are scientifically different communities and that there are different opinions held between those two communities. And so that there's a question that arises as to which school of thought—because this is really a school of thought question at this point. It becomes which school of thought is more probable, more probative, more reasonable, more reliable.

And so you have a school of thought that is experiential and that would be—the forensic pathologists seem to be basing their opinions based on their observations of what they find in conjunction with the testing and what it all means. And then you have the more scientific—rigorously scientific community which is much more interested in what does the data tell us? And it was interesting that as you looked at it the forensic pathologist kept coming back: We view totality of the circumstances. We look at this as a piece of the puzzle. It's indicative. And on the other side you have somebody saying: Now really you look at the scientific data. And the data doesn't lie and you've got to be very careful that you're not misled.

Ultimately this is precisely the kind of question that we have juries for. The juries make a determination as to which explanation seems plausible assuming that both are scientifically valid and reliable. And it strikes me that this is—that we don't see here sort of the classic junk science on either

30

side. What we see are two distinct schools of scientific thought and that as such it's a question for the jury. The questions really that are raised are weight and credibility determinations. Admissibility seems not to be, to the court anyhow, the primary issue here. It seems that to me the primary issue is in fact which opinion has the greatest weight and which opinion does the jury tend to believe.

And ultimately I believe that that's an appropriate analysis based on all the evidence that's been presented.[54]

Shortly thereafter, Dr. McGee was allowed to testify to the jury that, in his expert opinion, forensic testing using the AP test established that Ms. Sjodin had been raped.

### b.    Trial Counsel's Failures Constituted Deficient Performance.

Under the prevailing norms of capital defense practice, competent trial counsel "must independently investigate the circumstances of the crime and all evidence—whether testimonial, forensic, or otherwise—purporting to inculpate the client" and must "subject[] all forensic evidence to rigorous independent scrutiny." Commentary to Guideline 1.1 of the *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* ("*ABA Guidelines*"), 31 Hofstra Law Rev. 913, 926 (2003). Moreover, qualified capital counsel are obligated to "aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence." Commentary to *ABA Guideline* 10.7, 31 Hofstra Law Rev. at 1020; *see also, e.g.*, *ABA Guideline* 5.1.B.2.e (capital counsel expected to demonstrate "skill in the use of expert witnesses

---

[54] Tr. 6667-70

and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence."); Commentary to *ABA Guideline* 8.1, 31 Hofstra Law Rev. at 980 (capital counsel are expected to keep "abreast of the field" and "must not only have mastery of current developments in law, forensics, and related areas, but also be able to anticipate future ones.").

As the discussion above demonstrates, the basis for challenging Dr. McGee's testimony was much broader and much stronger than the grounds that trial counsel pursued in this case.  First, there was readily available evidence demonstrating that Dr. McGee's testimony had no support in the established practices and protocols of the forensic crime laboratories.  Counsel's failure to investigate and present such information was particularly deficient considering that the Court put trial counsel on notice that the dispositive issue to be decided at the *Daubert* hearing was whether Dr. McGee's use of the AP test was consistent with the relevant community of experts.  Competent counsel should have investigated the practices of the forensic pathology community to learn what conclusions can properly be drawn from an AP test.  Had trial counsel done so, they would have been able to present compelling evidence to the Court that the experts' differing testimony about the proper conclusions to be drawn from the AP test was not simply a "textbook case" of "different opinions" held by "differing scientific communities."  Rather, Dr. McGee's use of the AP test did not even satisfy the relevant standards adopted and employed by his own community of forensic pathologists and was contrary to established practice in virtually every crime laboratory in the country,

32

including the very lab at which he is the current director of training.

Second, trial counsel unreasonably failed to challenge the use of the Beckman Dri-STAT test given that the reagent was only validated for the detection of prostatic acid phosphatase in serums, not dry stains.  This information was publicly available from the manufacturer.  There could be no tactical or strategic reason why counsel failed to present this evidence in their challenge to the AP testing.  Indeed, trial counsel had already decided to challenge the test on the ground that it had not been validated for use on post-mortem samples.  An additional challenge based on the fact that the reagent was misused because it was tested on a type of substance for which it was not designed and validated would have been consistent with counsel's other *Daubert* arguments.  This would have only strengthened counsel's argument for exclusion of Dr. McGee's testimony, as it established that Dr. McGee's use of the reagent was not recognized as appropriate by the reagent's own developer and manufacturer, much less the community of forensic pathologists.

Simply put, trial counsel's performance was deficient.  Counsel unreasonably failed to marshal readily available evidence that Dr. McGee's testimony concerning the AP test failed the *Daubert* standard, and was therefore inadmissible at trial.  Had trial counsel presented the available evidence to the Court, there is beyond a reasonable probability that Dr. McGee's testimony—that he confirmed that semen was deposited on the body within 24 to 36 hours of the subject's death—would have been excluded.

      **c.**    **Trial Counsel's Deficient Performance Prejudiced Mr.**

**Rodriguez.**

Trial counsel's failure to properly challenge Dr. McGee's testimony undoubtedly prejudiced Mr. Rodriguez. As noted above, had trial counsel presented the Court with the evidence demonstrating the unreliability of Dr. McGee's testimony, there is a reasonable probability that he would have been precluded from testifying that Ms. Sjodin had been sexually assaulted.[55] Consequently, this would have significantly altered the weight of the evidence as to whether, in fact, a rape had occurred.[56] In light of the central importance the government placed on the alleged sexual nature of the crime in urging the jury to sentence Mr. Rodriguez to death, there is a reasonable probability that at least one juror would have struck a different balance and the outcome of the proceedings would have

---

[55] Moreover, even in the unlikely event that trial counsel would not have prevailed on the *Daubert* challenge based on this evidence, trial counsel would still have been in a position to cross-examine Dr. McGee with this evidence and provide the jury with a compelling basis on which to reject Dr. McGee's testimony about the presence of semen. There is quite plainly no objectively reasonable reason why competent counsel would have failed to avail themselves of such evidence, be it at the pre-trial or trial stages of the case. Indeed, even if Dr. McGee's testimony had been deemed admissible, prevailing professional norms would still require that counsel pursue a vigorous cross-examination based on a thorough investigation of any available challenges to the forensic evidence about which he was expected to testify. *See* Commentary to *ABA Guideline* 1.1, 31 Hofstra L. Rev. at 924 ("Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination.").

[56] Absent Dr. McGee's authoritative testimony that semen was deposited in the body within 24 to 36 hours of Ms. Sjodin's death, the government's basis for claiming that a sexual assault had occurred would have been substantially undermined. Indeed, the only other evidence suggesting that there was a sexual assault was purely circumstantial–i.e., that the decedent's body was found partially disrobed. While this condition in which the body was found could be consistent with a sexual assault, that is a far cry from what the jury heard in this case–*viz.*, that a forensic test confirmed the presence of semen in the body. Absent such testimony, the jury would have been faced with a much weaker basis for concluding that the decedent was sexually assaulted.

been different had Dr. McGee's testimony been excluded from evidence.

Indeed, the government's closing argument in the sentencing phase was almost singularly organized around the theme of Mr. Rodriguez's alleged sexual sadism. This argument was not subtly made. Through the brute force of repetition, the government again and again made the point that the murder was tied to Mr. Rodriguez's alleged pathological need to "brutalize" women and live out his alleged "rape fantasies." During the course of its initial summation to the jury, the government referred to such "rape fantasies" no fewer than ten times.[57] Moreover, the government referenced sexual assault and/or Mr. Rodriguez's alleged violent sexual impulses no fewer than twenty times [58] in its initial summation to the jury:

- "You must determine what is the appropriate punishment for such intentional acts, such intentional acts by a defendant with a proven record of repeatedly picking out women to victimize for his own sexual gratification. Brutalizing them in the process, threatening, choking, stabbing, damaging them for life, and he was just getting warmed up. All that before he chose to ready his knife, locate some cord, drive his car to Grand Forks in search of someone to drag kicking and screaming into his sordid rape fantasies."[59]

- "He cares for those that he chooses to care about. And he ravages, rapes, sodomizes and terrorizes those who he decides don't matter much to him, those who become the target of obscene phone calls, stalking, his rape

---

[57]Tr. 2576; 2577; 2579; 2580; 2583; 2587; 2588; 2589; 2590; 2591; 259; 2593; 2594; 2596; 2598; 2626; 2627; 2629; 2641; 2642; 2644; 2645; 2647; 2648

[58]Tr. 8661-62, ln 24-8; 8663, ln 2-6; 8663, ln 11-13; 8665, ln 10-16; 8665, ln 18-22; 8667, ln 21-25; 8673, ln 9; 8688, ln 19-22; 8689, ln 1-4; 8689, ln 5-14; 8690, ln 1-7; 8690, ln 15-21; 8690-91, ln 24-6; 8693, ln 16-23; 8693-94, ln 24-3; 8694, ln 15-21; 8695, ln 19-20; 8698, ln 14-15; 8706, ln 5-7; 87-07, ln15-17

[59] Tr. 8661-62

fantasies, and then a string of rape attacks."[60]

• "Terror and acute mental anguish. The raw fear of what would be her fate as the defendant drove her into the night, stopped to strip off her clothes, battled her in the back seat of his car where the blood is found, sexually assaulted her, and drove her to a ravine and directed her to the ground on which her body would lie."[61]

• "Remember what this defendant chose to do to Dru and what her final hours and minutes were like. Not just the result of them, but how did we get there. Keep in mind the defendant's other aggravating factors, including his vicious attacks on Shirley, Elizabeth and Ardyce."[62]

• "… this serial kidnapper and rapist and now murderer…"[63]

• "[The experts] agree that the defendant has rape fantasies. We all know he is a multiple rape defendant and now an intentional killer, and nobody can much claim that the defendant does not act on his own volition."[64]

• "The defendant views women who are not important to him . . . as prey to be followed and intimidated and raped at his choosing. Women are subjected to obscene calls and harassment so the defendant can slip into his idea of pleasurable imaginings. Then as he has looked many times in the faces of those rape victims, ladies and gentlemen, and witness their terror, their terror and their pain, the defendant continues to fantasize about further rape, more victims. Continues to fantasize."[65]

• "He controlled his impulses around female prison workers. Never once chose to act on his rape fantasies or so much as utter an obscene word

---

[60] Tr. 8663

[61] Tr. 8665

[62] Tr. 8667

[63] Tr. 8673

[64] Tr. 8689

[65] Tr. 8689

to a female corrections officer or a caseworker.  That's 23 ½ years of biding his time, controlling his impulses day in and day out, and waiting for the chance to rape again when he could avoid the consequences."[66]

•    "[The defense is arguing] send the defendant back to prison. We say send the defendant back to his room where he can take a good long look at himself, think long and hard about what it is that he's done.  But that's the problem . . . because you know exactly which part of that November night in 2003 that he's going to be thinking back on."[67]

•    "He went to prison.  He attended sex offender treatment, and then he returned to Crookston upon release and he chose to target another victim, Ardyce Whalen.  A vicious knife attack followed Ardyce Whalen's refusal to become his latest sexual assault victim."[68]

•    "Then he refused treatment altogether before walking off all of his time, fighting civil commitments, strolling out the door back out of prison, never looking back, never looking for help.  He chose not to care, and he chose to live out his rape fantasy on Dru Sjodin.  She suffered for his pleasure.  She died for his convenience."[69]

•    "He chose to kidnap, bind, strip, rape and cut the throat of Dru [Sjodin]."[70]

•    "She walked with her hands bound behind her back, naked from the waist down.  She had already been sexually assaulted, physically assaulted."[71]

•    "And so the defendant secured her somehow and he prepared to do what he had to do to ensure that he would not be caught after living out his

---

[66] Tr. 8690

[67] Tr. 8690-91

[68] Tr. 8693-93

[69] Tr. 8694

[70] Tr. 8695

[71] Tr. 8706

rape fantasies."[72]

As the record makes clear, the argument the government made again and again in its closing remarks to persuade the jury to reject a life sentence was that Alfonso Rodriguez was a dangerous sexual sadist who killed Ms. Sjodin as part of an escalating "rape fantasy."  The most critical piece of evidence in support of this argument was Dr. McGee's testimony, as it was the only evidence that "positively" established that semen was deposited in the body prior to the murder.  Absent this evidence, the government's case would have been significantly weaker—and sufficiently weak that there is a reasonable probability that at least one juror would have struck a different balance and the outcome of the sentencing proceeding would have been different.

**B.      Trial Counsel Failed to Properly Challenge the Government's Purported Evidence that the Victim's Neck Had Been Slashed**

**1.      Dr. McGee's Testimony About the "Knife Wounds"**

Dr. McGee's testimony about semen is of a piece with his testimony about the knife wounds to the victim's body:  both were extraordinarily inflammatory; both were given special prominence by the government as the reason Mr. Rodriguez should be sentenced to die; and both were false.

Dr. McGee testified with clinical precision and the patina of scientific accuracy that the victim had "a large gaping wound to her neck area caused by a sharp-edged instrument that extends across her entire anterior neck region measuring 13.5 centimeters

---

[72] Tr. 8707

in length."[73]  He also described "[a] second possible incision wound" on the left neck region measuring eight centimeters.[74]  While Dr. McGee drew these two wounds on a diagram with a pen, he described their characteristics to the jury.[75]  He characterized the larger, 13.5-centimeter neck wound as "sharp-force injury" that has a "sharp well-formed edge that is notched and has a scalloping to it."[76]  When asked to explain the terms "notched" and "scalloping," the following exchange took place:

> McGee:    If you look at the edge of the wound, it will—instead of going across the subject's neck in a uniform straight pattern, it will go and then stop and slightly scallop and then begin again and then slightly scallop and again begin again.  So it almost looks like gentle waves on the edge of the wound.
>
> Q: In your experience what does that signify?
>
> A: The weapon that was causing the slash of the neck was being plunged into her neck.
>
> Q: Describe that process for us that would create marks like that.
>
> A: I believe the waves or the notching, whatever term you wish to use, is consistent with repositioning the knife so as the knife is plunged inside the neck it's going to cut to that depth and being drawn across it will cause one in which as it's repositioned and you're moving across the neck it will get that notched or that hesitation-like mark instead of making a uniform draw all the way across a body.[77]

--------

[73] Tr. 6688-89

[74] Tr. 6689

[75] Tr. 6693

[76] Tr. 6694

[77] Tr. 6694-95

39

Dr. McGee continued that these marks were probably caused by the knife striking internal neck organs, coming to rest, being withdrawn, and then plunged in again.[78]  He said there was "notching" on the smaller, 8 cm. wound as well, and that it too was a "sharp-force" injury.[79]  Indeed,  Dr. McGee did not content himself with the opinion that the victim's throat had been slashed.  He also claimed the wound was "consistent with" having been caused by the knife given to him by the police and represented to him as identical to the knife obtained from Mr. Rodriguez.[80]  Finally, after discussing the wounds and speculating about their provenance, Dr. McGee testified that, in his opinion, Ms. Sjodin died as a result of these slash wounds and that they had been inflicted at the site where her body was recovered.[81]  Though he acknowledged other possible causes of death, including asphyxiation and strangulation, he discounted them and opined for the jury that the neck wounds were the most likely cause of death.[82]

Throughout the proceeding, the government made special use of Dr. McGee's horrific testimony as proof that the crime was particularly heinous.  And at the punishment phase, the government returned to this evidence and stressed that the jury

---

[78] Tr. 6695

[79] Tr. 6696

[80] Tr. 6733-35

[81] Tr. 6728

[82] Tr. 6727-28.  With regard to the flank wound, Dr. McGee said it was caused by a knife as well.  Tr. 6706.  He stated that although there were no defects in the clothing that indicated a stab wound, the appearance of the wound was oval-shaped and therefore consistent with a knife wound.  *Id.*

could rely on all it had heard before.  Social science has long shown that capital jurors

tend to make up their minds about the defendant's moral culpability well before the

punishment phase, notwithstanding instructions to the contrary.  *See, e.g.*,  William J.

Bowers, Benjamin D. Fleury-Steiner & Michael E. Antonio, *The Capital Sentencing*

*Decision: Guided Discretion, Reasoned Moral Judgment, or Legal Fiction, in America's*

*Experiment with Capital Punishment* 427 (James R. Acker, Robert M. Bohm & Charles

S. Lanier eds., 2003); William J. Bowers, *The Capital Jury Project: Rationale, Design,*

*and Preview of Early Findings*, 70 Ind. L. J. 1043, 1089-90 & tbl.6 (1995); William J.

Bowers, Marla Sandys & Benjamin D. Steiner, *Foreclosed Impartiality in Capital*

*Sentencing: Jurors' Predispositions, Guilt-Trial Experience, and Premature Decision*

*Making*, 83 Cornell L. Rev. 1476, 1488 & tbl.1 (1998); Craig Haney, *Violence and the*

*Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to*

*Death*, 49 Stan. L. Rev. 1447, 1457 (1997).

>Thus, at the guilt phase, the government argued:

>Dru's throat had been slashed at least two times, with one of the cuts extending 13 and a half centimeters across from one side of her throat to the other, and the other cut running parallel to the first cut extending eight centimeters in length.  Dr. McGee described in detail the notching on the margins of those cuts.  That notching was caused by uneven pulling across Dru's throat.  The tissue resisted, Dr. McGee told you, the advance of the sharp edge.  … Death still took long minutes, he said, from an injury like that.[83]

>At the eligibility phase, the government returned to the theme.  "The defendant

---

[83] Tr. 6875

41

stabbed Dru in the side, but not through her clothing," the prosecutor argued.[84]  "That was

a coercive wound.  A control wound.  Make no mistake, though, it was torturous and it

was serious."[85]

> But it was the neck wounds where the defendant made his intentions most
> clear.  There would be no witness this time.  He would face no witness. …
>
> A 13½ centimeter cut, ear to ear, notched from the knife, positioning and
> repositioning.  An 8 centimeter cut for good measure and more notching.
> Certainly certainty (sic) his murderous intent was successful.  Dru Sjodin
> would not breathe a word of this to anyone.  Not one single breath.  That
> was his intent.[86]

Again at the punishment phase closing argument, though the prosecutor repeatedly

adverted to Mr. Rodriguez's "rape fantasies," the final image he would create for the jury

was of the knife wounds.  "That's how Dru Sjodin died," he said:

> The grave ear-to-ear knife wounds.  Dr. McGee described them for you. …
> You need, when you're weighing, to think about that act.  A hand had to
> draw that knife across her throat.  The defendant's. …  And so the
> defendant secured her somehow and he prepared to do what he had to do to
> ensure that he would not be caught after living out his rape fantasies.
> Somehow he held her and he plunged the knife into her neck and he drew it
> across her neck, and it got stopped, as Dr. McGee said, by tissue and had to
> be repositioned again and again and again.  Ear to ear.[87]

### 2.    Dr. McGee's Testimony About the "Knife Wounds" Was Materially False and Inaccurate.

Dr. McGee's gruesome testimony about the supposed knife wounds was

---

[84] Tr. 7259

[85] *Id.*

[86] Tr. 7259

[87] Tr. 7259

completely false.  The relevant evidence in this case has now been examined afresh by three forensic pathologists.  Each conducted his review and prepared his declaration independently, unaware of the opinions or conclusions of any other expert.  And each has concluded that Dr. McGee's testimony is simply untrue.[88]

Dr. Mark Flomenbaum, for instance, is an M.D., Ph.D., who received his advanced degrees from the Albert Einstein College of Medicine of the Yeshiva University.  He is an associate professor of pathology and laboratory medicine at the Boston University School of Medicine.  He served as a medical examiner for sixteen years, including five years as the First Deputy Chief of the New York City Office and two years as the Chief Medical Examiner of Massachusetts.[89]

Dr. Jonathan L. Arden, M.D., is the President of Arden Forensics.  He received his M.D. from the University of Michigan and received training from the New York University Medical Center and the Office of the Chief Medical Examiner for the State of Maryland.  He was certified in anatomic and forensic pathology by the American Board of Pathology and served for nine years in the Office of the Chief Medical Examiner for New York City, rising to the level of First Deputy Chief Medical Examiner.  He spent a further five years as the Chief Medical Examiner of Washington D.C.[90]

Dr. Michael J. Ferenc, M.D., J.D., received his M.D. from the University of Texas

---

[88] Declaration of Dr. Mark Flomenbaum, Ex. B-03; Declaration of Dr. Jonathan Arden, Ex. B-02; Declaration of Dr. Michael Ferenc, Ex. B-04.

[89] Declaration of  Dr. Flomenbaum, Ex. B-03.

[90] Declaration of Dr. Arden, Ex. B-02.

Southwestern Medical Center and his J.D. from the University of San Francisco School of Law. He is certified in forensic and anatomic pathology by the American Board of Pathology and is a Deputy Chief Medical Examiner for the State of Maine. Previously, he served as the Chief Forensic Pathologist for the Alameda County Sheriff's Office in Oakland, California. He has held teaching positions at Cornell University, the University of California at San Francisco, and other institutions.[91]

In addition to these three experts, the evidence has been examined by a fourth forensic pathologist—Dr. Garry Peterson—the same pathologist with whom the defense consulted prior to trial. Dr. Peterson, now retired, is the former Chief Medical Examiner for Hennepin County, Minnesota. He too has concluded that Dr. McGee's testimony is false.[92] Indeed, he would have offered this testimony at trial, had counsel provided him with the proper material.[93] Four separate experts, in other words, now confirm that the most inflammatory evidence in the case—the evidence that purported to describe how the victim died—is entirely untrue. All could have testified at trial. Had they done so, Alfonso Rodriguez would not have been sentenced to die.

---

[91] Declaration of Dr. Ferenc, Ex. B-04.

[92] Declaration of Dr. Garry Peterson, Ex. B-01.

[93] The defense met with Dr. Garry Peterson in 2005. But as new information became available about Dr. McGee's autopsy and findings, they inexplicably failed to provide it to Dr. Peterson. Rather than provide him with the necessary material upon which to base his professional opinion, counsel abandoned the inquiry. It was not until post-conviction proceedings that new counsel provided Dr. Peterson with the material withheld by trial counsel. Based on the entire corpus of evidence, including evidence Dr. Peterson could have but did not previously review, Dr. Peterson has reached the same conclusion as Drs. Flomenbaum, Arden, and Ferenc: there is simply no evidence of a knife. Declaration of Dr. Peterson, Ex. B-01.

### a.  There Were No Wounds Caused by a Knife or Other Sharp Object

These four experts analyzed autopsy and crime scene photographs, reviewed Dr. McGee's autopsy reports and the laboratory results Dr. McGee relied upon, read trial and deposition transcripts of Dr. McGee's testimony, and went over materials the government presented as evidence or disclosed during discovery.[94]  All four experts agreed Ms. Sjodin died of strangulation or asphyxiation.

McGee's first mistake, they noted, was his failure to measure the circumference of the ligature around the victim's neck. Dr. Flomenbaum considered the ligature "the most significant finding at autopsy," yet "the circumference of the ligature was never measured."  These experts did what Dr. McGee did not, and found that the ligature was approximately 9-1/2"–11-3/4".  Dr. Arden noted that the diameter is "clearly smaller than the circumference of an adult neck."[95]  This is a startling oversight: "A ligature of this size . . . could easily cause fatal strangulation."[96]  Dr. Ferenc "would have certified the cause of death as follows: homicidal violence consistent with complications of asphyxia. The plastic bag over the head and neck, the tight cinched ligature around the neck, or both would be the source of asphyxia."[97]  Dr. Flomenbaum agrees: "The cause of death was

---

[94] Declaration of Dr. Arden, Ex. B-02, 1; Ferenc Dec., Ex. B-04 ,1; Flomenbaum Dec., Ex. B-03, 1.

[95]  Declaration of Dr. Arden, Ex. B-02, 3.

[96] *Id.*

[97] Declaration of Dr. Ferenc, Ex. B-04, 4.

'ligature strangulation.'"[98]

Dr. McGee ignored evidence that confirms the ligature was extremely tight: Ms. Sjodin's neck has an obvious ligature skin furrow, a feature commonly found in cases of ligature strangulation.[99] It is "a deep furrow of dry stiff skin under the ligature" caused when a ligature is so tight that it "squeezes blood out of the vessels as it compresses the tissue . . . ."[100] In the autopsy photos taken before the ligature was removed, no skin is visible within the boundaries of the large neck defect.[101] But photos taken once the ligature was removed show a narrow band of skin in exactly the same location—the ligature had concealed it.[102] That band of skin is the ligature furrow, and Dr. McGee missed it.

Furthermore, the professional opinions of Dr. Arden, Flomenbaum, Ferenc, and Peterson – all of which were available at the time of trial – fit hand in glove with the account provided by Drs. Silva and Stewart, who describe Mr. Rodriguez's mental state at the time of the crime. We discuss the mental health evidence in great detail in the following claim, and incorporate that discussion here by specific reference. At this point, it is enough to note that Mr. Rodriguez was "in a full-blown dissociative state" at the

---

[98] Declaration of Dr. Flomenbaum, Ex. B-03, 3.

[99] *Id.* at 3.

[100] *Id.*

[101] *Id.* at 8.

[102] *Id.*

time of the offense, passing in and out of reality and hysterical with fear.[103]  In a brief,

panic-stricken moment, he cinched the cord around the neck of the person he thought was

his abuser.  "He was angry at his abuser, not at Dru Sjodin."[104]  Inadvertently, the cord

was too tight, with tragic, unintended results.

In addition, and as importantly, the experts unanimously and independently

concluded that Sjodin's supposed "pre-mortem wounds" were actually the result of

post-mortem animal depredation and of decomposition.  Quite simply, no evidence

supports Dr. McGee's theory that the defects on Ms. Sjodin's body were caused by a

knife.  Dr. Arden, for instance, found that "[t]he purported 'remnants of slash wound' on

the front of the neck actually was the result of decomposition and animal depredation of

the tissues."[105]  Animal activity was "particularly evident by the near absence of all soft

tissues on the left side of the face where they were obviously eaten away . . . ."[106]

Likewise, Dr. Ferenc noted "predator-type teeth scalloping" at the margins of the neck

defect.[107]  The remnants of the plastic bag beneath the ligature show similar signs of

gnawing.[108]  This gnawing explains the "notching" that Dr. McGee attributed to a knife

---

[103]  *See*, *e.g.*, Declaration of Pablo Stewart, Ex. D-17, ¶ 156.

[104]  *Id.* at ¶ 157.

[105]  Declaration of Jonathan Arden., Ex. B-02, 2.

[106]  *Id.*

[107]  Declaration of Dr. Ferenc, Ex. B-04, 2

[108]  *Id.* at 3; Declaration of Mark Flomenbaum, Ex. B-03, 6, 9.

being repositioned as it was drawn across the neck.[109]  Indeed, the so-called neck

"'wound' looks no different from the other obviously postmortem changes seen in the

autopsy photographs."[110]  Yet without offering any reason for distinguishing among the

defects, Dr. McGee decided that one was caused by a knife and the others were not.[111]

Dr. McGee's scant attention to the ligature was a momentous and inexcusable

error.  As already discussed, it led him to eliminate the true cause of death.  But it also led

him to see evidence of a phantom knife everywhere he looked, including in the piece of

evidence that most strongly supports ligature strangulation.  For example, the most

striking feature of the neck defect is not its straight edges, which Dr. McGee believed

indicate a knife wound, but instead a "long strip of intact skin [that] paradoxically appears

to span the center of the large skin defect while there is widespread anthropophagous[112]

exenteration[113] of the anterior neck structures."[114]  This was the ligature neck furrow

discussed above.  "[T]he sharp edges of the ligature skin furrow . . . were protected from

animal activity (and therefore spared consumption despite being located in the center of

_____

[109] Tr. 6695

[110] Declaration of Dr. Arden, Ex. B-02, 3.

[111] As shown below, this is a leitmotif that recurs throughout Dr. McGee's autopsy protocol:  he explains similar defects differently.

[112]"Anthropophagy" means "animal feeding." Declaration of Dr. Flomenbaum, Ex. B-03, 2.

[113]Although it usually refers to a surgical procedure, "exenteration" is "commonly used to indicate radical excision of the contents of a body cavity ...." Dorland's Medical Dictionary 474 (26th ed. 1981).

[114] Declaration of Dr. Flomenbaum, Ex. B-03, 9.

48

an area of extensive feeding)." So Dr. McGee relied on the clearest evidence of strangulation as though it were evidence of his hypothesized knife. Of course, he had nothing to say about why an intact strip of skin would be hovering in the middle of a slash wound when so much of the area around it had been subject to animal feeding.

Furthermore, if the neck defect had been from a slash wound, Ms. Sjodin's clothes would likely have been soaked in blood. But "there is not the typical spatter or soaking of her upper garments consistent with such a neck wound."[115] Even a victim pressed to the ground with clothing pulled to the side would likely have a stained upper garment due to "the sheer volume of blood."[116]

Similar errors taint Dr. McGee's reasoning about the defect on Ms. Sjodin's flank. Dr. Arden, for instance, noted that "the irregular margins on the flank defect are much more consistent with animal activity than with a knife wound."[117] According to Dr. Ferenc, "Postmortem animal/insect depredation of a decomposing body is consistent with the autopsy findings."[118] The so-called wounds are "are not sharp force injuries and are primarily postmortem artifact [sic] related to decomposition and postmortem animal/insect depredation."[119] And Dr. Flomenbaum concluded that "[n]one of the areas

---

[115] Declaration of Dr. Ferenc, Ex. B-04, 4.

[116] *Id.*

[117] Declaration of Dr. Arden, Ex. B-02, 3.

[118] Declaration of Dr. Ferenc, Ex. B-04, 3.

[119] *Id.* at 1.

of skin defects on the body represent pre-mortem injury"; they were "mis-interpretations of post-mortem artifacts."[120]

Once again, when it comes to the flank "wound," Dr. McGee explains similar defects dissimilarly. Several defects on Ms. Sjodin's body were similar to the defect on her flank but clearly occurred after her death. For example, a wound on Ms. Sjodin's knee was "indistinguishable from" the wound to her flank, yet Dr. McGee calls the former post-mortem and the latter pre-mortem.[121] And although Dr. McGee thought the flank defect was so deep that a sharp instrument must have caused it, he did not assert that Ms. Sjodin's left lung was excised by a knife at the time of her death.[122] Yet the cause of the missing lung—a "postmortem depredation-related cul-de-sac"—explains both defects.[123]

Additionally, all of the defects on Ms. Sjodin's body follow natural cleavage lines in the skin called "Lines of Langer,"[124] with a level of fidelity that belies mere coincidence. Decomposition processes can cause portions of the skin on a body to split open. "The directions taken by these skin splits will almost always be in the paths of least

---

[120] Declaration of Dr. Flomenbaum, Ex. B-03, 9.

[121] Declaration of Dr. Arden, Ex. B-02, 3.

[122] Declaration of Dr. Ferenc, Ex. B-04, 3.

[123] *Id.*

[124] *See generally* Declaration of Dr. Flomenbaum, Ex. B-03, 4–5.

resistance and will split parallel to the Lines of Langer."[125]   These lines curve and run in

different directions on different parts of the body.  For this reason, the skin defects are

markedly more consistent with artifacts of natural decomposition, unless the

knife-wielding perpetrator was a skilled surgeon and learned anatomist who could

reorient the weapon multiple times and each time strike perfectly in line with the very

specific anatomic skin creases (Langer's lines) that are barely known or even appreciated

outside of a few very specialized areas of medical practice.

As with the neck defect, the state of Ms. Sjodin's clothing was inconsistent with a

knife wound to her flank.  There were no fabric defects, and although the clothing was

found in contact with the flank defect, "there is no description and no evidence in the

pictures of focal blood staining . . . ."[126]

> **b.      Even If the Wounds Were Caused By a Knife, It is Impossible to Connect the Wounds to a Particular Object**

Dr. McGee's testimony that purported to link the wounds to Mr. Rodriguez's knife

was wholly misleading, and stands as a singular testimonial to the extent of his

overreaching.  Thus, Dr. Arden found no evidence of pre-mortem injuries, but wrote that

"[e]ven if this were a knife wound, its features have been so altered by postmortem

changes as to render it uninterpretable."[127]  This is because, "given the extensive

postmortem changes . . ., no comparisons of consistency with any blade are valid in this

---

[125] *Id.* at 6.

[126] Declaration of Dr. Ferenc, Ex. B-04, 3.

[127] Declaration of Dr. Arden, Ex. B-02, 3.

51

case regarding stab wounds."[128]  For example, "nearly all of the tissues that would be relevant for assessment of a stabbing or cutting wound to the neck were absent at the time of autopsy."[129]  The same was true of the features of the flank defect, which "were so distorted by postmortem changes that any such comparison would also be invalid."[130]

Moreover, because cutting wounds are "largely unrelated to the physical characteristics of the blade, most sharp edges will be consistent with causing almost any cutting wound.  Therefore, any opinion relating the consistency of a given knife to an individual cutting wound would be generically accurate but usually so non-specific as to be of no value."[131]  As a result, Dr. McGee's testimony about the Menard's knife is "irrelevant and in a practical sense, meaningless."[132]

Dr. Ferenc echoed both these conclusions.  "The remote possibility that sharp force injuries indeed did occur in these regions cannot be excluded with absolute certainty.  Of course, neither can the possibility of firearm injuries, crossbow darts, chainsaws, meat cleavers, or scissors . . . ."[133]  Dr. Flomenbaum used a similar *reductio ad absurdum* in his independently prepared declaration:

---

[128] *Id.*

[129] *Id*. at 2–3

[130] *Id.* at 3

[131] *Id.* at 3

[132] *Id.*

[133] Declaration of Dr. Ferenc, Ex. B-04, 4.

Every sharp object is equally as consistent as every other one. A carpet knife, surgical scalpel, machete, or pizza wheel would be as equally consistent with having caused Dr. McGee's hypothesized slash injury as whatever weapon was shown to him could.[134]

### c.      Trial Counsel Failed To Properly Challenge the Materially False and Inaccurate "Knife" Evidence.

### i.      Trial Counsel's Failures Constituted Deficient Performance.

Naturally, the same norms and standards that illuminate counsel's failures with respect to the acid phosphatase apply with equal force to the supposed "knife wounds." They are noted here for the sake of completeness.  As pointed out before, competent counsel "must independently investigate the circumstances of the crime and all evidence—whether testimonial, forensic, or otherwise purporting to inculpate the client" and must "subject[] all forensic evidence to rigorous independent scrutiny."[135]  This, of course, is part of counsel's duty to "aggressively re-examine all of the Government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence."[136]  As the discussion above makes plain, counsel understood full well that Dr.

---

[134] Declaration of Dr. Flomenbaum, Ex. B-03, 9.

[135] *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* ("*ABA Guidelines*"), Commentary to Guideline 1.1, 31 Hofstra Law Rev. 913, 926 (2003).

[136] Commentary to *ABA Guideline* 10.7, 31 Hofstra Law Rev. at 1020; *see also*, e.g., *ABA Guideline* 5.1.B.2.e (capital counsel expected to demonstrate "skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence"); Commentary to *ABA Guideline* 8.1, 31 Hofstra Law Rev. at 979-80 (capital counsel are expected to keep "abreast of the field" and "must not only have mastery of current developments in law, forensics, and related areas, but also be able to anticipate future one").

McGee's testimony would be central to the government's case for death.  Indeed, it was apparent to all that the supposed knife wounds, and particularly the slash wound to the neck, represented the centerpiece of the government's argument that the crime was especially aggravated and therefore different from the run of the mill homicide.  Yet the evidence uncovered in post-conviction proceedings makes equally clear that—as with the false acid phosphatase evidence—there was readily available evidence that would have revealed Dr. McGee's testimony as false.  Indeed, the evidence now reveals that counsel could have presented multiple experts to debunk Dr. McGee's pseudo-science, including the expert with whom the defense initially consulted.

Unfortunately for Mr. Rodriguez, counsel's failure in this regard was not confined to a failure to present readily available evidence that would have demonstrated the core of the government's case to be false.  Believing mistakenly that Dr. McGee's testimony about these matters was unassailable, trial counsel affirmatively stipulated that the defense would not contest the nature and causation of the neck wounds and flank wound.[137]  Additionally, counsel promised not to contest Dr. McGee's opinion that the wounds had been initially created by a sharp instrument.[138]  As a result, counsel could do little more than sit mute as Dr. McGee testified falsely to the jury, eliciting only that Dr. McGee could not exclude the possibility, however remote, that the knife wounds were in fact only skin deep.  At closing, the prosecutor made short work of this suggestion.  "We

---

[137] Stipulation Letter, dckt. # 448.

[138] *Id.*

know exactly what the defendant did with that knife."[139]

In a word, therefore, counsel's performance was deficient within the meaning of *Strickland* and its progeny. Their failure properly to investigate and present readily available evidence on this score fell below the standard required of reasonably competent capital counsel. Moreover, this failure cannot be discounted as a strategic judgment. On the contrary, the record leaves no doubt but that counsel's strategy was to mount precisely the challenge we have presented in this pleading. Counsel simply failed to do what they understood full well needed to be done. Once they had failed, counsel made an equally fatal stipulation that forced them to sit mute as the government larded the case with its most sensationalistic, but false, allegations.

### ii.   Trial Counsel's Deficient Performance Prejudiced Mr. Rodriguez.

Trial counsel's failure to mount a proper challenge to Dr. McGee's testimony about the "knife wounds" undoubtedly prejudiced Mr. Rodriguez. Contrary to the slow, sadistic death falsely imagined by Dr. McGee and endlessly repeated by the government, we now know the victim died during a brief struggle in the back seat of Mr. Rodriguez's car, while Mr. Rodriguez was panic-stricken, overcome by memories of his abuser, and "in a full-blown dissociative state."

The prosecution repeatedly described what it falsely cast as the horror of "Dru's last hours and her last minutes," directing the jury to understand "the terror and acute

---

[139] Tr. 6865

mental anguish" that she must have felt "as the defendant drove her into the night …

drove her to a ravine and directed her to the ground on which her body would lie."[140]

Dru Sjodin, they said, "walked with her hands bound behind her back, naked from the

waist down."[141]

> Dru Sjodin was marched.  She was shivering, she was cold, she was scared,
> and everything else that goes along with the torture that you found.  She
> was marched down that embankment into the night, into the freezing night
> and over to the point where her death occurred.[142]

But the horrific scene described at length by the prosecution bears no relation to the truth.

Nothing of the sort took place.  Had the jury heard the readily available truth, there is at

least a reasonable probability that at a minimum one juror would have struck a different

balance in the weighing of aggravating and mitigating evidence, and would have reached

a different result.  *Strickland, supra*.

    **C.**    *Redacted*

    **D.**    **Trial Counsel Were Ineffective at the Culpability Phase:  They Presented What Should Have Been Left Out, Left Out What Should Have Been Presented, and Failed to Develop a Coherent Theory of the Case That Would Span the Guilt and Punishment Phases.**

At the culpability phase, Mr. Rodriguez's lawyers presented a legally and factually

unsustainable defense that accomplished nothing except to inflame the jury against their

client.  At the same time, they failed to present the readily available defense that a

---

[140] Tr. 8665

[141] Tr. 8706

[142] Tr. 8706

reasonable juror could have relied upon to spare Mr. Rodriguez's life by finding him ineligible for the death penalty. Counsel also failed to present a coherent theory that would unify the phases and support an outcome of life.

### 1.    Trial Counsel Presented a Legally and Factually Incoherent Defense.

At the culpability phase, Mr. Rodriguez was defended principally by Robert Hoy.[143]  In his opening statement, Mr. Hoy showed his hand:

> I suggest to you at the outset that this case represents the wrong charge in the wrong court. . . . I expect no prosecution witness will be able to tell you when Dru Sjodin died, nor will anyone tell you where she was when she died, nor will they tell you the precise cause of her death.[144]

Mr. Hoy went on to state:

> The importance of this evidence, of course, is that it will show that it is entirely possible Dru Sjodin died almost immediately from suffocation while still in the Columbia Mall parking lot. Under those circumstances, we submit there would have been no federal kidnapping which occurred.[145]

The defense, in other words, was that Mr. Rodriguez killed Dru Sjodin the instant he confronted her, which meant there had been no kidnapping. The defense asked the jury to acquit Mr. Rodriguez because no federal crime had been committed. "You could very well find," he said, "that Alfonso Rodriguez is responsible for the death of Dru Sjodin,

---

[143] The defense team divided the case as follows:  Mr. Hoy took responsibility for the culpability phase, and Mr. Ney was responsible for the eligibility and punishment phases, as well as jury selection.  Mr. Ney took little part in the culpability phase, and Mr. Hoy had few responsibilities in the punishment phase.

[144] Tr. 5509

[145] Tr. 5511

and the transportation of her body from Grand Forks to Crookston, just as the prosecution

alleges, and at the same time find him not guilty of this federal kidnapping charge

because the prosecution has failed in their strict proof of each element as instructed by the

court."[146]

This defense, however, suffered from two deficiencies:  it was contrary to settled

law and contradicted by undisputed facts.  The federal kidnapping statute itself broadcasts

the impossibility of trial counsel's approach, requiring not that a victim be alive when

state lines are crossed, but only that he or she be alive when "transportation" began.  18

U.S.C. § 1201(a).  The judge interpreted the statute's plain meaning for the jury:

> The victim is willfully transported in interstate commerce, regardless of
> whether the victim was alive when transported across a State boundary, if
> the victim was alive at the moment transportation began.  The transportation
> of the victim began when the defendant was moved any distance
> whatsoever from the precise point or place of her abduction, so long as that
> movement was not merely incidental to an offense other than the
> kidnapping charged in the Indictment.[147]

The Court explained to counsel during discussion about jury instructions that the

suggestion that any movement of the victim was sufficient was based upon the plain

language of the statute, the dictionary definitions of the terms involved, jury instructions

from other jurisdictions, and the directly-on-point decision from *United States v. Horton*,

321 F.3d 476, 481 (4th Cir. 2003).[148]

---

[146] Tr. 5510-11; 5513

[147] Final Instructions to the Jury, dckt. # 554.

[148] Tr. 6838.  The Court even added "so long as that movement was not merely incidental
to another offense," to avoid the suggestion that *de minimis* movement, like that of bank tellers

More importantly, Mr. Hoy's defense was factually absurd.  On the night she was abducted, Ms. Sjodin left her job at Victoria's Secret at the Grand Forks mall at roughly 5:00 p.m. and placed a call to her boyfriend, Chris Lang.[149]  The call ended abruptly a few minutes later when Ms. Sjodin said something like, "Okay, Okay."[150]  The police later found her car parked in an unusual location, considerably removed from where she ordinarily parked.[151]  Near the car, the police found the sheath for a knife.[152]  Traces of Ms. Sjodin's blood were found in Mr. Rodriguez's car.[153]  On questioning, Mr. Rodriguez provided the police with an alibi that proved untrue.[154]  Nearly five months later, her body was discovered miles away, in Crookston, Minnesota.[155]  Fibers found on her body and clothes were consistent with fibers found in Mr. Rodriguez's car;[156] other fibers found on her body were consistent with a blanket seized from his home.[157]  A hair found on

---

into a vault during a robbery, was sufficient.

[149] Tr. 5620.  This recitation of facts comes from the trial testimony and is, in general, not in dispute.  Nor were these facts disputed at trial.

[150] Tr. 5621

[151] Tr. 5642-44

[152] Tr. 5648

[153] Tr. 6437-44

[154] Tr. 5826-29, 5854-55

[155] Tr. 6715-16

[156] Tr. 6396-97, 6405, 6408

[157] Tr. 6392-95, 6400-02

Sjodin's body was a mitochondrial DNA match with Alfonso Rodriguez.[158]  Perhaps most significantly, Mr. Hoy stipulated (wrongly, it would turn out)[159] that Ms. Sjodin's neck had been slashed by a knife.

The defense, therefore, called upon the jury to believe Ms. Sjodin decided for no particular reason to leave her car in an unusual part of the mall parking lot.  At the end of her work day, she was somehow confronted by Mr. Rodriguez, who somehow forced her into his car without kidnapping her, and killed her more or less on the spot by slashing her throat without leaving more than traces of her blood in his car; he then drove her dead body to Minnesota.

Not only was the guilt phase defense unsustainable in light of both the facts and the governing law, but during trial the defense tactics in furtherance of this defense made little sense.  Trial counsel used cross-examination to highlight meaningless facts and minor collateral inconsistencies in the government's evidence. For instance, counsel cross-examined Ms. Sjodin's manager at Victoria's Secret to point out that some prosecution witnesses had been confused about whether Ms. Sjodin was originally scheduled to finish her shift at 4:00 pm on the day she disappeared.[160]  He also cross-examined UND Police Officer Daniel Lund about whether law enforcement had exercised proper care when searching Mr. Rodriguez's car, though the evidence found

---

[158] Tr. 6484-87

[159] *See* section II B, *supra*, and IX A, *infra*.

[160] Tr. 5595

there was essentially unchallenged.[161]  He questioned the manager at Menards about when they first sold the knife in question.[162]  None of this bore any relevance to the defense theory that Ms. Sjodin had been killed at the moment of first contact with Mr. Rodriguez. Nor did these odd lines of questioning bring out mitigating facts.  Yet they nonetheless proved irresistible to the defense.

In guilt phase closing argument, the two sides continued along the paths they had followed during the trial.  The government made the most of Dr. McGee's testimony in painting a horrific picture of cruelty and rape, while the defense stuck to their incoherent theory.  At the outset of its closing, the government dismissed as factually untenable and legally unsupportable the defense theory that Ms. Sjodin had died immediately in the parking lot.  At length, the prosecution emphasized that the defense was incredible, even impossible:  Mr. Rodriguez would have had to kill Ms. Sjodin exactly where she stood in the parking lot when he first encountered her, and therefore that tying her hands behind her back and placing the bag around her head were all done after death, or precisely where she stood.[163]  The narrow ledge on which the defense was trying to balance was dismissed as "a lawyerly verbal cartoon."  *Id.*  A "journey begins with a single step," the prosecution said, just like a federal kidnapping.[164]

---

[161] Tr. 5667

[162] Tr. 5923

[163] Tr. 6882

[164] Tr. 6882

While the government made short shrift of the "perhaps he killed her before he moved her" defense in its closing, it took full advantage of the opportunity to emphasize the most gruesome aspects of McGee's testimony, undoubtedly looking beyond a guilty verdict to the next phases of the trial.

> Dru's throat had been slashed at least two times, with one of the cuts extending thirteen and a half centimeters across from one side of her throat to the other, and the other cut running parallel to the first cut, extending eight centimeters in length....[The] notching was caused by uneven pulling across Dru's throat.  The tissue resisted...the advance of the sharp edge...but the edge must have been pulled across forcefully creating the nothing or the scales.  Death still took long minutes...and it most likely occurred out in that ditch.[165]

Again, "she's laying face down in the ditch with her throat sliced open...."[166]  "We know exactly what the defendant did with that knife."[167]  "[T]he neck wounds and certain death were inflicted at the death scene where Dru's body was found."[168]

In contrast, the defense continued to grasp at a story that found support in neither law nor facts.

> But where their proof is lacking is on the issue that we pointed out at the very beginning of this case, and that is that they cannot prove that Dru Sjodin was alive at the time her transportation began.  And without their ability to prove that, they cannot prove that she was transported interstate commerce as the court has instructed you, and therefore their proof fails.[169]

---

[165] Tr. 6875

[166] Tr. 6867

[167] Tr. 6866

[168] Tr. 6877

[169] Tr. 6892

Trial counsel also highlighted some of the irrelevant points of dispute that had been brought out on cross, collateral details that did nothing to support the tenuous defense or even to undermine the Government's burden of proof.  For instance, counsel noted that one of the samples taken from the back of Mr. Rodriguez's car contained a mixture of Ms. Sjodin's blood and someone else's;[170] that some of the fibers connecting Ms. Sjodin and Mr. Rodriguez had an unknown source;[171] that a hair fragment was found on the knife sheath taken from the parking lot that matched neither Mr. Rodriguez nor Ms. Sjodin.[172] None of these observations did anything to support the defense theory that Ms. Sjodin was not transported until after death, nor did they undermine the evidence connecting Mr. Rodriguez to Ms. Sjodin's disappearance.

### 2. Trial Counsel Failed to Present the One Defense That Was Viable and Readily Available:  That Mr. Rodriguez Was Not Guilty by Reason of Insanity.

The pursuit and presentation of an incoherent defense fell below the standard required of reasonably competent capital counsel and prejudiced Mr. Rodriguez, within the meaning of the Fifth, Sixth and Eighth Amendments and *Strickland v. Washington,* 466 U.S. 668 (1984).  But the prejudice that Mr. Rodriguez suffered was made still greater when counsel compounded their error by failing to present the one defense that was both viable and readily available.  Had counsel conducted an appropriate

---

[170] Tr. 6896

[171] Tr. 6897

[172] Tr. 6898

investigation, a culturally competent, thorough investigation, with appropriate mental health experts properly deployed, they would have learned that Alfonso Rodriguez was insane at the time of the offense.

In the following section, we discuss at great length trial counsel's failures to uncover and present the readily available mitigating evidence surrounding Mr. Rodriguez's mental health and retardation; we incorporate that discussion here by specific reference. At this point, it is sufficient to note that Dr. Pablo Stewart has concluded that at the time of the offense, Mr. Rodriguez "was unable to appreciate the wrongfulness of his actions."[173] The evidence is simply overwhelming that Mr. Rodriguez suffers from an exceptionally severe case of post-traumatic stress disorder which can sometimes trigger "full-blown dissociative states."[174] Dr. Stewart recounts in considerable detail the rich cache of readily available evidence supporting his diagnosis and conclusion, but his account of the offense bears quoting at length:

> During my clinical interview, Alfonso described his encounter with Dru Sjodin. . . . . He reported that he could not stop staring at her and immediately experienced a flood of emotions and physiological reactions. He described feeling fear followed by anger, and then panic. He began to dissociate, re-experiencing the abuse of his childhood. He described confused and chaotic thinking. At one level, he realized that the woman who abused him would have to be much older than the young woman he saw at the mall. But, he could not convince himself and could not act on that reality. He felt compelled to follow the woman. He described struggling with himself as he followed her. When she got to her car, she sat in the driver's seat talking on her phone with her head turned. As Alfonso

---

[173] Declaration of Dr. Pablo Stewart, Ex. D-17, ¶ 180.

[174] *Id.* at ¶ 156.

approached, she looked up at him and, although he had been telling himself that it couldn't be his abuser, he described feeling shock and a physical reaction of surprise when he realized that she was not the same woman who abused him. He was, by this point, in a full-blown dissasociative state.

Seeing a woman that resembled his abuser was a cue that triggered Alfonso's PTSD symptoms so that he began to experience a dissociative state. He described going in and out of a dissociative state over the course of the crime.... He had very powerful feelings that this actually was the woman who had abused him and he re-experienced the fear and anger and confusion and anxiety of that original trauma. And, there were moments, when she looked at him directly in the face, when he realized that she was not his abuser and he came back to reality. But, he could not control that process and could not stay with the reality that he was a grown man in 2003 and not a little boy in 1959. He was angry at his abuser, not at Dru Sjodin.

Alfonso's cognitive impairments are mainly manifested through impulse control and hyperarousal. Alfonso was operating with severe cognitive impairments as a result of his PTSD, and these impairments were profoundly damaging to his executive functioning capabilities. Once he had begun to dissociate and experience the symptoms of hyperarousal, including psychological distress, reactivity and reliving the original trauma, he could not stop himself....[175]

Unable to "stay with the reality," Mr. Rodriguez was overwhelmed with panic.

According to Dr. Stewart, he passed "in and out of a dissociative state," unsure whether

he was with the woman who assaulted him or an innovent stranger; he "never decided to

take her life".

At one point, when he was driving around town with her in the car, she began to struggle and bang on the windows. He tried to subdue her, struggled with her and eventually hit her, knocking her out and drawing blood. Once she was bleeding from the face and unconscious, he put a plastic bag over her head to contain the blood and he tied it with a string. His memories of this time are very fragmented, consistent with a dissociative episode. And, his description of his thinking at the time is

---

[175] *Id*. at ¶ 156-57

65

chaotic and illogical.  He does not remember exactly when he realized she was dead, but he knows that he then panicked and drove around looking for a place to put her body.[176]

As Dr. Stewart notes, the federal insanity statute, 18 U.S.C. § 17, makes it an affirmative defense to any federal statute that, "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect," could not "appreciate the nature and quality or the wrongfulness of his acts."  In Dr. Stewart's professional opinion, "Mr. Rodriguez meets this standard because at the time of the offense he was unable to appreciate the wrongfulness of his actions because he was suffering from a severe and chronic case of PTSD (post-traumatic stress disorder)."[177]

Dr. Stewart's "overwhelming sense" about Mr. Rodriguez's prior sex offenses "is that they were characterized by a chaotic disorganization and a complete failure of executive functioning."[178]  As he explains, "executive functioning regulates the process of taking in new experiences and stimuli and incorporating them with past life experiences in a way that results in behavior that is in that individual's best interests.  This executive functioning is typically disrupted in individuals with PTSD."[179]

---

[176] *Id.* at ¶ 159

[177] *Id*. at ¶ 180.  This is not just Dr. Stewart's opinion.  It would have been the opinion of Dr. Marilyn Hutchinson, the defense expert, had she not been precluded by the defense from discussing the crime with Mr. Rodriguez.  See Declaration of Marilyn Hutchinson, Ex. D-24. The implications of the defense's failures in this regard are discussed below.

[178] *Id.* at ¶ 183.

[179] *Id.*

In Mr. Rodriguez's case, however, the "disruption in executive functioning was unusually severe."[180]  In part, this is because of the prior sexual abuse that led to his PTSD.  But it is compounded by his "significant problems with frontal lobe functioning," as identified by Dr. Froming, and which "is directly related to executive functioning."[181]

In addition, Mr. Rodriguez labors under the burden of "severe cognitive impairments."  Indeed, his impairments are so severe that he is now mentally retarded, and was mentally retarded at the time of the crime.  The net effect of these compounding forces, PTSD, frontal lobe damage, and mental retardation, "clearly made him unable to appreciate the wrongful nature of his conduct."

> Throughout the course of the crime he was  re-experiencing his own sexual abuse through dissacotiative flashbacks.  While he knew in the abstract that his actions were illegal, Mr. Rodriguez had no sense of their moral wrongfulness due to his severe impairment in cognitive ability and executive functioning.  It is my professional opinion, which I hold to reasonable degree of professional certainty that at the time of the crimes in question Mr. Rodriguez was unable to appreciate the wrongfulness of his conduct because of these PTSD-induced impairments.[182]

Had trial counsel presented this evidence, no reasonable jury would have concluded that Mr. Rodriguez had been of sound mind at the time of the offense.  There is at least a reasonable probability, therefore, that the outcome of the proceeding would have been different and that Mr. Rodriguez would presently be in a secure federal hospital rather than on death row.

---

[180] *Id.* at ¶ 184.

[181] *Id.*

[182] *Id*. at ¶ 186.

Indeed, even if the jury did not find Mr. Rodriguez to be legally insane, it is undeniable that this evidence reveals a substantially less culpable actor than was depicted at trial by counsel's incoherent defense. As demonstrated below, the jury could have given effect to this reduced culpability both at the eligibility and punishment phases. For instance, the jury would have likely reached a different conclusion regarding Alfonso Rodriguez's state of mind at the time of the crime.[183] Here, it is enough to say what can hardly be denied: had trial counsel presented the viable defense that was available, instead of the impossible defense that was not, Mr. Rodriguez, though in custody, would not be on death row. *See Strickland, supra*.

E.     **Trial Counsel Failed to Mount a Proper Challenge to the Government's Reliance on Rule 413.**

At trial the government, relying on Federal Rule of Evidence 413, introduced testimony from two victims of Alfonso Rodriguez's prior convictions for aggravated sexual assault and attempted aggravated sexual assault. While the defense opposed the government's motion, it failed to mount the correct challenge. Specifically, the defense provided ineffective assistance of counsel in three respects: when counsel failed to argue that the Rule did not apply because the charges against Mr. Rodriguez did not have as an element anything related to a sexual assault; when counsel failed to argue that there was insufficient evidence of sexual assault in the current case to support application of the Rule; and when counsel failed to renew the motion to exclude and seek corrective action

---

[183] *See* Eligibility Phase Special Verdict Form, dckt. # 585.

or a mistrial in light of the government's guilt phase closing argument.  Had counsel acted competently in these matters, there is a reasonable probability that the outcome of Mr. Rodriguez's trial would have been different.

### 1.    The Rule 413 Evidence At Trial

On May 17, 2006, the prosecution moved to introduce, in its case in chief, evidence of Mr. Rodriguez's two 1975 convictions for Attempted Aggravated Sexual Assault and Aggravated Sexual Assault, using Federal Rule of Evidence 413 as the vehicle for admission.[184]  The defense resisted those efforts in writing on June 12, 2006, and submitted a legal memorandum in support of exclusion of the proffered priors.[185]  The defense effort was unsuccessful, and on June 26, 2006, the Court ruled that the two 1975 convictions could be introduced in the guilt phase of the trial.[186]

Both Shirley Seddon Iverson and Elizabeth Knudson testified during the first phase of the trial about their experience as victims.[187]  The government made aggressive use of this testimony in its first and third closing arguments.  First, the government painted a picture in the guilt phase closing argument of a repeat offender.[188]  After

---

[184] Dckt.# 346, May 17, 2006; the government also moved unsuccessfully to introduce evidence of a rape charge for which Mr. Rodriguez was acquitted and a 1980 Attempted Kidnapping and Assault conviction.

[185] Dckt. # 395.

[186] Order, June 26, 2006, dckt. # 424.

[187] Tr. 6186; 6205

[188] Tr. 6868

reliving the victims' experiences in detail to the jury, the government continued:

> The law allows us to present that evidence of this defendant's propensity for crimes of sexual assault. . . . [The evidence] informs your judgment about what the defendant did in this case to Dru Sjodin on November 22nd, 2003. Everyone thinks – everyone thinks that they would know what to do if they were in Shirley's or Elizabeth's or Dru's situation. . . . But Alfonso Rodriguez is very methodical.  And he managed to make fear so overmastering that these women complied so that they might survive and two of them did.[189]

Second, over repeated objections sustained by the Court, the prosecution argued that the defense theory (that Ms. Sjodin had perhaps been killed in the parking lot of the Mall) should be rejected in part because Mr. Rodriguez's past offenses evidenced a pattern of taking women to a remote area to sexually assault them.[190]

> Now there's another way you know that he's not going to do it that way, and that's from the way that he's done it before.  In Shirley Seddon's case he took Shirley Seddon to an abandoned house and Shirley Seddon said that they drove around to the back. . . . [191]

Following a sustained objection, the government again argued: "You heard Elizabeth Knudson testify that in that case she was taken to a remote area."[192]

The government knew from the earliest days of the case that Mr. Rodriguez's prior convictions would strongly motivate the jury to convict him of a capital offense in the guilt phase.  Yet the government made even more effective and damaging use of this

---

[189] Tr. 6870

[190] Tr. 6921

[191] Tr. 6921

[192] Tr. 6921

evidence at the penalty phase closing arguments.[193]  As explored in great detail above, *see* section II A *supra*, one of the prosecutor's primary themes for death relied upon Mr. Rodriguez's assaults against Ms. Seddon and Ms. Knudson.  Over and over again, he referenced Mr. Rodriguez's "rape fantasies," and "repeat rape crimes," telling a story of escalating sexual violence to argue for death.  According to the government, the sexual nature of the kidnapping of Ms. Sjodin was proven in part by the propensity evidence introduced under Rule 413, and the sexual nature of the crime was absolutely central to the government's case for death.

### 2. Trial Counsel Was Ineffective in Their Opposition to Rule 413 Evidence.

Federal Rule of Evidence 413 provides in relevant part:

> In a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing on any matter to which it is relevant.

FRE 413(a).  The Rule was designed to create an exception to the general prohibition against introducing evidence of prior "bad acts" in order to prove the defendant's propensity to commit crimes or engage in certain behaviors.  However, in part because of the power of the highly inflammatory evidence that the Rule admits, there are clear limits

---

[193] Certainly, evidence of the same two convictions was presented to the jury at the eligibility phase of Mr. Rodriguez's trial.  However, the sole issue for which the prior convictions were introduced there, and the issue about which the victims testified, was whether the two convictions resulted in serious bodily injury, a statutory aggravating factor which helped make Mr. Rodriguez eligible for the death penalty.  The purpose for which the evidence was introduced at this stage was far more narrow than the virtually limitless use to which the government put the evidence once it was admitted under FRE 413.

built into the Rule itself.  As an initial matter, the defendant must be "accused of an offense of sexual assault," which the Rule defines:

> For purposes of this rule and Rule 415, "offense of sexual assault" means *a crime* under Federal law or the law of a State (as defined in section 513 of title 18, United States Code) that involved –
>
> (1) any conduct proscribed by chapter 109A of title 18, United States Code;
>
> (2) contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person;
>
> (3) contact, without consent, between any part of the defendant's body or anus of the defendant and any part of another person's body;
>
> (4) deriving sexual pleasure or gratification from the infliction of death, bodily injury, pr physical pain on another person; or
>
> (5) an attempt or conspiracy to engage in conduct described in paragraph (1)-(4).

Federal Rule of Evidence 413(d)(emphasis added).

Alfonso Rodriguez was not "accused of" an offense of sexual assault, or even an offense that involved conduct proscribed by 18 U.S.C. § 109A or the other listed offenses.  Instead he was accused of Kidnapping Resulting in Death in violation of 18 U.S.C. § 1201.  The Court set forth the elements of § 1201 in its instructions to the jury at the close of the guilt phase of Mr. Rodriguez's trial:

> The offense of kidnapping resulting in death as charged in the Indictment has four essential elements, which are:
>
> One: Alfonso Rodriguez, Jr., knowingly acting contrary to law, kidnapped, seized, confined, inveigled, decoyed, abducted or otherwise carried away Dru Katrina Sjodin;

Two: Alfonso Rodriguez, Jr., held Dru Katrina Sjodin for some purpose or benefit;

Three: Alfonso Rodriguez, Jr., willfully, knowingly and unlawfully, transported Dru Katrina Sjodin in interstate commerce while she was so kidnapped, seized, confined, inveigled, decoyed, abducted or otherwise carried away; and

Four: the death of Dru Katrina Sjodin resulted from the conduct.[194]

In short, the elements did not require that the prosecution prove the current crime was an "offense of sexual assault," or even that it had any sexual element whatsoever. Indeed, the Court never mentioned sexual assault in its final instructions to the jury. Instead, the Court instructed the jury that it did not have to agree on why Mr. Rodriguez kidnapped Ms. Sjodin, but merely that he "had some purpose or derived some benefit" from doing so.[195]

After using Rule 413 to gain admission of some of the most prejudicial evidence in the case, the prosecution quickly retreated from the pretense that the crime was necessarily a sexual offense as contemplated by the Rule, and disavowed any obligation to prove a sexual component to the crime. In its guilt phase closing argument, the prosecution argued in reliance on the Court's instructions that it need not prove that a sexual assault had occurred or that it had been the purpose of the kidnapping:

Similarly, for element No. 2, you may each find that the defendant's purpose was something different and that's perfectly permissible as well. The law allows you to have those differences of opinions, ladies and

---

[194] Final Instructions to the Jury, dckt. # 554, # 4.

[195] *Id.*

73

> gentlemen. . . . The law simply requires that you agree that there was some purpose, whether it was sexual assault or otherwise.  If you agree that he had a purpose, this element is proven.  You need not agree on what the purpose was.[196]

The government continued to distance itself from any obligation to prove sexual assault in its rebuttal argument:

> But again keep in mind that we don't need to prove any of that.  The kidnapping can be for any purpose.  The judge has already told you that.  It doesn't have to be for sexual assault. . . . I know Mr. Hoy was up here talking earlier about what the acid phosphatase actually shows.  Who cares what it shows? It doesn't make that big a difference.  He may not have sexually assaulted her at all.  He still kidnapped her for some purpose or some reason of his own. . . .[197]

Trial counsel provided ineffective assistance of counsel on this issue in three ways.[198]  First, the defense failed to resist the characterization by the United States, ultimately adopted by the Court, that Alfonso Rodriguez was "accused of an offense of sexual assault," despite the total absence of a sexual crime or intent as an element of the kidnapping charge.[199]  In relying on Rule 413,  the government claimed that "involved," as used in the Rule's definition, was broad enough to include the charge against Mr.

---

[196] Tr. 6854

[197] Tr. 6919

[198] In addition, appellate counsel was ineffective for failing to raise the proper challenge to Rule 413 evidence on appeal, relying instead on a challenge to the constitutionality of the rule, an argument that had already been rejected.  *See* section XX, B, *infra.*

[199] Instead, trial counsel essentially argued that the current offense was not a "sexual offense" because the government alleged that Mr. Rodriguez's took Ms. Sjodin for several possible purposes, only one of which was sexual.  No analysis was made of the elements of the kidnapping offense or the burden of proof on the government.  Dckt. # 654, pp. 9-10.

Rodriguez, and further relied on the Eighth Circuit's decision from *United States v. Blazek*, 431 F.3d 1104 (8th Cir. 2005).  Ultimately, based upon the government's reasoning, the Court admitted not just the fact of the prior convictions but live testimony from both victims, and cited *Blazek* as authority to do so.[200]  The Court adopted the government's incorrect reasoning, and the defense team was ineffective because they did not frame the issue properly.

Textual interpretation begins with the language itself.  A plain reading of Rule 413 is that it is only triggered when the sexual aspect of the offense is an *element* or *required proof* for the instant charge.  The Rule itself requires that the defendant currently be "accused" of an offense of sexual assault.  Rule 413(d) is very specific that "an offense of sexual assault" means "a crime that involves" the listed sexual conduct or attempts to commit such conduct.  The offense of which Mr. Rodriguez stood *accused* was simply not a crime involving sexual assault in any way.  As the government itself made clear in its closing argument at the guilt phase, it had no duty to prove anything related to a sexual offense.

Nor does the inclusion of surplusage about a sexual offense in the Indictment convert a non-sexual offense into an offense which permits application of Rule 413.  Even the *Blazek* case, on which the government and the Court relied, does not support the application of Rule 413 in this case.  *Blazek* held that the charged offense, 18 U.S.C. § 2423(b), involved "traveling in interstate commerce for the purpose of 'knowingly

---

[200] Dckt. # 424, p. 2.

engaging in a sexual act with a person who has attained the age of 12 years, but has not attained the age of 16 years.'" *United States v. Blazek,* 431 at 1108. An explicit element of that offense is that the defendant intended to commit a sexual act that would certainly qualify as a triggering offense for Rule 413. *Id.* at 1109 ("[T]he charged travel offense required the government to prove that Blazek traveled for the purpose of engaging in a sexual act with a minor. . . .") *Id.* At 1109

Neither the government nor the Court pointed to a single case in which Rule 413 evidence was admitted but the defendant was not accused of an offense that had as an element a sexual assault. Indeed, two Eighth Circuit cases decided in 2006 that affirmed the admissibility of evidence admitted pursuant to Rule 413, *United States v. Medicine Horn*, 447 F.3d 620 (8th Cir. 2006), and *United States v. Benais*, 460 F.3d 1059 (8th Cir. 2006), both involved current charges of "sexual abuse of a minor," a crime that is expressly covered by the Rule and has sexual abuse as a required element of proof.

A recent decision from the Seventh Circuit confirms that Rule 413 was both misapplied and misargued in a case, such as this one, involving a charge of kidnapping resulting in death. In *United States v. Courtright*, 632 F.3d 363, 368 (7th Cir. 2011), the court noted that under Rule 413, the defendant must be currently "accused of an offense of sexual assault," and found that "accused" is used in the technical sense to describe someone charged with a crime. *Id*. at 368. Relying on longstanding legal definitions of the term "accused," the court in *Courtwright* determined that the current charged offense has to be a sexual offense. *Id.* at 368-69 (citing Black's Law Dictionary). "There is

76

nothing in the text or committee notes of Rule 413 to indicate that the word 'accused' was used in a broader fashion." *Id*.  In failing to focus the Court's attention on the requirement that the defendant be accused of an offense that requires proof of a sexual element, trial counsel failed to provide constitutionally required effective assistance to Mr. Rodriguez.

Second, the defense failed to argue that the current offense does not trigger Rule 413 because there was insufficient evidence of sexual assault.  Although the defense was preparing to challenge the government's central evidence of sexual assault, i.e., the acid phosphatase testimony, no mention was made in its Rule 413 opposition that the evidence of sexual assault was inadequate.[201]  While the defense argued that the government was improperly attempting to bolster its evidence that the current offense is a triggering offense for Rule 413 by asserting that the prior offenses were sex offenses, the defense never resisted the government's contention that the circumstances of the current offense demonstrated that the purpose of Ms. Sjodin's abduction was a sexual assault.  This failing is more glaring in light of counsel's ineffective handling of the acid phosphatase evidence, as explored above.  Indeed, by the time the weaknesses inherent in the forensic evidence of sexual assault were explored at the *Daubert* hearing, the Rule 413 evidence had already come in and the damage was done.

Finally, the defense failed to renew its argument related to Rule 413 following the government's closing argument, when it became clear that the government had conceded that proof of the sexual assault claim was in fact completely unnecessary.  Effective

---

[201] Dckt. # 365

77

representation in a capital case required revisiting the Court's ruling regarding the Rule 413 evidence when it became clear that the basis for admissibility, namely the fact that the current offense was a sexual one, was plainly not true.  Unlike a post-closing objection in a non-capital case, it was not too late at that point in Mr. Rodriguez's trial for such an objection to be meaningful and to assist the defense.[202]  As explored above, the damaging propensity evidence was put to much more persuasive use in the penalty phase during closing argument than in the guilt phase.  Had trial counsel sought a ruling that, in light of the government's concession, the evidence had been admitted in error, the government would have been unable to rely on the propensity evidence in seeking a sentence of death weeks later.

Effective assistance of counsel, as required by the Constitution, includes a clear requirement to properly litigate pretrial motions.  "In *Strickland* we explained that 'access to counsel's skill and knowledge' is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986)(finding trial counsel ineffective for failing to correctly understand the law and litigate pretrial motions); *see also* Commentary to *ABA Guideline* 10.8, 31 Hofstra Rev. 913, 1032 (2003) ("Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case.")  Trial

---

[202] *See* Commentary to *ABA Guidelines* 10.8, 31 Hofstra L. Rev. 913, 1032, fn 233 (noting that counsel should re-open issues already ruled on where new facts support doing so).

counsel fell far short of the standards for competent capital representation in handling the Rule 413 issue.

### 3.   Mr. Rodriguez Was Prejudiced By Counsel's Ineffective Handling of the Rule 413 Evidence

As described above, the harm from counsel's failure and the resulting admission of the Rule 413 evidence was great, and infected both the guilt and the penalty phases of Mr. Rodriguez's trial.  Had the damaging propensity evidence been excluded, there is a reasonable probability that the outcome of Mr. Rodriguez's trial would have been different.  Indeed, the final stage closing argument of the government would have lost much of its power had the prosecution been unable to paint a picture of Mr. Rodriguez as a repeat rapist whose behavior escalated over decades.  It is likely that at least one juror would have voted for life had Rule 413 been properly applied.  *See Strickland, supra*.

### F.   Trial Counsel Improperly Allowed Dr. McGee To Testify Regarding Laboratory Testing Performed By Others.

A glaring violation of the Confrontation Clause to the United States Constitution occurred at Alfonso Rodriguez's trial.  As explored in detail above, Dr. Michael McGee testified about results of acid phosphatase testing conducted by a lab at Regions Hospital in St. Paul.  Dr. McGee, however, neither performed the test nor witnessed it.  At trial the defense failed to object that Dr. McGee's testimony was a violation of the Confrontation Clause of the Sixth Amendment to the Constitution.  *See Crawford v. Washington*, 541 U.S. 36 (2004).

This issue is explored in greater detail in section XVI, *infra*., a section which is

79

incorporated by reference here but not fully restated.  As that section demonstrates, the Confrontation Clause was violated by Dr. McGee's testimony regarding tests performed by and processes used by the Regions Lab.

Despite the settled authority regarding the Confrontation Clause and its clear application to the out-of-court statements of the Regions Lab technician, no objection was raised at trial to the impermissible testimony.  This failure fell below prevailing professional norms of capital defense practice.  *See Strickland v. Washington*, 466 U.S. 668 (1984); *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986).

Not only was the failure to raise the Confrontation Clause unreasonable, it was prejudicial and it adversely affected the outcome of Alfonso Rodriguez's trial.[203]  There is more than a reasonable probability that, but for this critical error, the outcome of the trial would have been different.  As explained above, the acid phosphatase evidence offered by the government was both unreliable as scientific evidence and powerfully deployed by the government in the guilt and penalty phases of the trial.  Had counsel raised an objection based on the Confrontation Clause, either Dr. McGee would have been precluded entirely from testifying about the acid phosphatase results, or the government would have been forced to call the lab technician to the stand, leading to the exposure of the myriad flaws in the evidence.  As explored above, testimony from a Regions Hospital lab employee would have established that Dr. McGee's conclusions about the significance of the acid

---

[203] In addition, appellate counsel was ineffective for failing to raise the Confrontation Clause violation.  *See* section XX, A *infra.*

80

phosphatase violated the lab's own protocols for use of the test[204] and that the test itself was only validated for use in human serum testing, not for testing dry stains in a forensic context.[205]   Both facts would have given rise to powerful indictment of the government's claim of sexual assault.  Therefore, there is a reasonable probability that, but for counsel's error, the outcome of the trial would have been different.

**III.    Trial Counsel Provided Ineffective Assistance at the Eligibility Phase, In Violation of 18 U.S.C. §§ 3005 & 3006A and the Fifth, Sixth and Eighth Amendments to the United States Constitution.**

**A.    Trial Counsel Failed to Move for a Mistrial When The Jury Deliberated For 10 Hours Deciding Whether Mr. Rodriguez was Eligible For the Ultimate Punishment.**

Court records reflect that the eligibility phase proceedings consisted of brief testimony on September 5, arguments on September 6, and deliberations that stretched from September 6 to September 7, 2006.  The clerk's minutes suggest that the testimony lasted for less than one hour and 40 minutes.  The prosecution recalled two victims from Mr. Rodriguez's prior convictions.  They also recalled Dr. McGee, who again testified concerning his conclusions about Ms. Sjodin's injuries.[206]  The defense asked no questions of Dr. McGee in this phase, and offered no witnesses of its own.  In stark contrast, the deliberations at the eligibility phase stretched over two days.  Merely to determine what the possible range of punishment of Mr. Rodriguez would include and

---

[204] *See* section II A, *supra*; Regions Hospital Protocol, Ex. A-04.

[205] *See* section __, *supra*; Beckman Dri-STAT Package Insert, Exhibit A-23, pp. 3-10..

[206]  Tr. 7170-89

81

whether the case would proceed to a punishment phase, the jury deliberated for nearly ten hours, almost six times as long as it took for the entirety of the evidence.[207]

In deciding whether to grant a mistrial, courts consider the proportion of time spent in deliberations to the time it took to present the evidence upon which the deliberations focus.[208]  As the ratio of evidence to deliberations becomes imbalanced, mistrial becomes an indicated response.  As the ratio increases, the propriety of a mistrial and the appropriateness of a motion for a mistrial likewise increases.

Here, the ratio of evidence to deliberations was imbalanced in the extreme.  The deliberations lasted nearly six times as long as the evidence.  These circumstances unambiguously called for a mistrial.  Trial defense counsel neither heard, nor responded to, the call.  Counsel's failure to recognize or respond to the jury's inability to reach a verdict within a reasonable time was unreasonable, deficient performance.  Their failure to respond to the lengthening deliberations with a motion for a mistrial violated the standards set in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny.  Mr. Rodriguez was prejudiced when the jury was permitted to continue deliberations that lead to a sentence of death.

**B.      Trial Counsel Failed to Contest an Invalid Statutory Aggravating Factor.**

---

[207] *Compare* Tr. 7204-7360, Minutes Sept. 6 & 7, 2006.

[208] *See., e.g., United States v. Velarde-Gomez, 269 F.3d 1023, 1036 (court considered long deliberations in reversing conviction); United States v. Caruto*, 532 F.3d 822 (9th Cir. 2008)("lengthy deliberations suggest a difficult case"); *Walker v. Martel*, __F. Supp. 2d __, 2011 WL 1226093 (N.D. Cal., March 31, 2011).

As already shown,[209] counsel's ineffectiveness in handling Dr. McGee's false and unreliable testimony about the supposed rape and knife wounds had consequences that rippled throughout the case.  Had counsel effectively contested Dr. McGee's inflammatory testimony as explored above, *see* section II A, *supra*, there would have been no legitimate basis for the jury to find a critical statutory aggravating factor at the eligibility phase, namely that "Alfonso Rodriguez, Jr., killed Dru Sjodin in an especially heinous, cruel or depraved manner," in that it "involved the torture of Dru Sjodin."[210]

Without repeating the litany of facts explored above, which are instead incorporated by reference here, it is apparent that the death of Ms. Sjodin was neither "especially heinous, cruel or depraved," nor did it involve "torture."  Counsel was ineffective in failing to develop and offer the necessary facts that would have undermined this aggravating factor.  The failure to do so certainly prejudiced Mr. Rodriguez.  In addition, counsel failed to adequately re-investigate Mr. Rodriguez's prior offenses, which were likewise used to suggest this crime was particularly aggravated.  Had the jury not had the mistaken evidence of the heinous and tortuous nature of the crime to weigh against the mitigating evidence, it is beyond reasonably probable that at least one juror would have reached a different balance and agreed that a sentence of death was not appropriate.  *See, Strickland v. Washington, supra.*

---

[209] *See* section II, A, *supra*.

[210] Eligibility Phase, Special Verdict Form (Phase II), dckt. # 585.

**IV.    Trial Counsel Were Ineffective For Failing to Uncover and Present the Readily Available Mitigating Evidence, in Violation of 18 U.S.C. §§ 3005 & 3006A and the Fifth, Sixth and Eighth Amendments to the United States Constitution.**

Despite counsel's performance at the guilt/innocence phase of the trial, a life sentence for Mr. Rodriguez remained within their grasp. But the deficient performance that dogged the defense at earlier stages of the trial continued at punishment, and as a result, the chance to avoid a sentence of death was lost. Because trial counsel missed the obvious red flags—because they did not uncover and present the readily available mitigating evidence; because they did not investigate and present his social and mental health history in its richness and detail; because they did not properly challenge the government's mental health evidence; because they failed to communicate Mr. Rodriguez's fundamental humanity, they failed to give the jury a reason to spare his life.

The centerpiece of the defense case in mitigation was the testimony of three experts. A toxicologist testified about exposure to toxins in pesticides.[211] A neuropsychologist opined about the results of several psychological tests she had administered to Mr. Rodriguez.[212] And a psychologist diagnosed Mr. Rodriguez as suffering from *inter alia*, "low grade long-term depression" and post-traumatic stress disorder, among other things.[213] Each, however, was hobbled by trial counsel's deficient performance.

---

[211] Tr. 7700

[212] Tr. 7792

[213] Tr. 8029

The toxicologist, Dr. Donald Echobichon, never examined Mr. Rodriguez.[214] He testified generally about the effect of exposure to pesticides,[215] but readily acknowledged that he had no idea whether Mr. Rodriguez had been so exposed.[216] At the same time, he acknowledged that, because North Dakota is an agricultural area, it was quite probable that "tens of thousands of people" in the region have ben exposed to the same pesticides.[217] Dr. Echobichon also had nothing to say about any possible connection between exposure to these pesticides and "someone's propensity for violent crime."[218] Finally, because he reviewed no records associated with Mr. Rodriguez, reviewed none of the work undertaken by others on the defense team, and conducted no investigation of his own, he could not say whether anything in Mr. Rodriguez's physical, medical, or psychological profile had the remotest connection to any possible exposure to pesticides.[219]

In closing arguments, the government made short work of Dr. Echobichon's testimony, pointing out that he had no idea whether Mr. Rodriguez had in fact been exposed to toxins or in what dosage, and no idea what effect this exposure may have had

---

[214] Tr. 7774

[215] *See, e.g.*, Tr. 7736-39, 7749-51

[216] Tr. 7774

[217] Tr. 7773-75

[218] Tr. 7781

[219] Tr. 7773-74

on Mr. Rodriguez's behavior.[220]  Not surprisingly, on the verdict form, no jurors found

that Mr. Rodriguez "suffers from the effects of his exposure to toxins."[221]

The neuropsychologist and psychologist, Drs. Karen Froming and Marilyn

Hutchinson, were even more severely handicapped by counsel's ineffectiveness.  The

defense team explicitly instructed their mental health experts not to speak with Mr.

Rodriguez about the crime,[222] thereby sending the unmistakable signal to the jury that Mr.

Rodriguez could not be trusted, even by his own team.  As much to the point, the defense

deliberately made it impossible for their experts to offer a mitigating account of the crime,

and to do so in light of Mr. Rodriguez's true history.[223]

Counsel's limiting instruction to their experts all but guaranteed that whatever

good may have come from Drs. Froming and Hutchinson would be modest at best.  In

fact, however, because the defense did not adequately prepare Dr. Froming and Dr.

Hutchinson, their testimony was far more damaging than it was helpful.  Dr. Froming, for

instance, miscalculated and substantially overstated Mr. Rodriguez's IQ.[224]  In addition,

she seemed unaware of his pervasive adaptive deficits.  She said that his mental

functioning was on a par with a high school graduate, and even asserted — mistakenly —

---

[220] Tr. 8675-76

[221] Special Findings Form, dckt. # 626, p. 2.

[222] Tr. 8041

[223] *See generally* Declaration of Marilyn Hutchinson, Ex. D-24, and Declaration of Karen Froming, Ex. D-23.

[224] Tr. 7793-94

that Mr. Rodriguez had graduated from high school.[225]  Yet she seemed oddly untroubled by the fact that Mr. Rodriguez could not read the tests she administered, and that she had to read them to him so he "wouldn't be confused or misread any of the choices."[226] Significantly, Dr. Froming now agrees her IQ testing was flawed.[227]

For her part, Dr. Hutchinson said her task was "to get to know Alfonso in all kinds of ways."[228]  Yet Dr. Hutchinson labored under the same injunction as Dr. Froming and "didn't talk about the crime at all."[229]  In fact, apart from her cabined interactions with Mr. Rodriguez, she spoke with no one other than Mr. Rodriguez's mother and sisters.[230]  She did not interview other family members, neighbors, childhood friends and acquaintances, or fellow inmates.  Not surprisingly, therefore, she acquired a singularly distorted view of Mr. Rodriguez's family.  "I think it was a family life that had a lot of love in it," she speculated.[231]  Beatings with a belt she dismissed as not atypical for a Latino home.[232]

As we describe in detail below, if the defense had deployed Drs. Froming and

---

[225] Tr. 7793

[226] Tr. 7817

[227] *See* Declaration of Karen Froming, Ex. D-23, ¶¶ 13-14.  Dr. Froming now believes that his full-scale IQ is 81.  *Id.*  In his attached declaration, Dr. Greenspan closely explores the errors in Dr. Froming's work and the correct methodology for testing for mental retardation.  Ex. D-19.

[228] Tr. 7950

[229] Tr. 7954

[230] Tr. 7949

[231] Tr. 7956

[232] Tr. 7956

Hutchinson competently, their testimony would have been entirely different.  If Dr. Hutchinson had known then what she knows now, if she had been allowed to speak with Mr. Rodriguez about the crime, she would have come to the same conclusion as Dr. Stewart – namely, that Mr. Rodriguez was "in a full-blown dissociative state" during the offense and "unable to appreciate the nature and quality of the wrongfulness of his acts."[233]  *Redacted*

In short, if the goal of the defense case in mitigation was to make the case for life, it fell woefully short.  The great tragedy of this shortcoming is the difference between what was and what could have been, had counsel been competent.

**A.      Had Counsel Presented the Readily Available Life History, No Reasonable Juror Would Have Voted to End Alfonso Rodriguez's Life.**

**A Day in the Life[234]**

On a late spring day in 1971, eighteen year old Alfonso (Tito) Rodriguez, Jr.  woke up early to go to Central High School in Crookston, Minnesota, as he did every weekday, to attend the ninth grade for the second time.  Because he was 18, he didn't have to go.  Because it was May and he had been failing all semester, there was little hope the academic year could be salvaged.  But he went anyway.

---

[233] Declaration of Marilyn Hutchinson, Ex. D-24.

[234] This section, the beginning of a detailed life history of Alfonso Rodriguez, begins with the story of a day in his life in 1971.  While few citations to the record are provided in this section, it is fully substantiated in the sections that follow.

He wasn't looking forward to the school day.  Alfonso was very small, only 5'4" and 135 pounds, and particularly dark-skinned even among the handful of other Latino kids in the small, nearly all-white town where he had never learned to be comfortable.  Because one leg was shorter than the other, and because he suffered from tremors in both hands, Alfonso shook as he limped down the street.  That his head was disproportionately large for his body further attracted the attention of school bullies.  In fourth grade, there had been a particularly humiliating experience when he was standing at the sink in art class, washing his paintbrushes, and a boy named Jeff came up behind him and pulled down his pants.  When he turned around, yanking up his pants to cover himself, all the children in line behind him were laughing.  And, for him, the laughing never stopped.  He would always believe that every kid in the school knew of his depanting.  For years, when he saw fellow students laughing, especially the white girls, he knew they were retelling the story of that day.

In trying to negotiate this new place where they were one of only three or four Mexican families, Alfonso and his siblings had studied the white townfolks, trying to figure out how to tell which might be friendly and which harbored prejudices that would inevitably surface.  On the day his pants were pulled down, Alfonso was surprised to see how wrong his judgments had been.  Kids he thought were friendly now seemed cruel.  Over decades of mandatory mental health exams, he would recount the shame and humiliation of that time of public nakedness – the vulnerability, the fear, the alienation, the sense of betrayal – and examine the feelings of anger and bitterness that never left

89

him.

This reality was made so much worse by the fact that Alfonso was mentally retarded.  Over and over he was called in for special testing – an IQ test that the normal kids rarely had to take, but that was administered to him and other impaired children every other year.  Each time he scored well below the cut-off for mental retardation, which was 85 at the time.  Other than further marking him for the school bullies, the testing accomplished little.  He received no lifeskills training or vocational training, no access to social services, no opportunity to attend an appropriate school.  For one period each day, he would be pulled into a special class with kids who had speech impediments and other impairments;  in the late 1960s and early 1970s in rural Minnesota grade schools, the special education that his nieces and nephews would later receive wasn't yet available.

There was little help at home.  His parents, both from the dying mining town of Dolores, Texas, for which his mother was named, met as teenagers in Laredo, where the mining families had been relocated.  They were uneducated and ill-equipped to navigate the world of parent-teacher conferences and social services.  Alfonso's father was a migrant farmworker who had brought the family back and forth from their home in Laredo to pick sugar beets and potatoes in Minnesota and North Dakota before he broke his back and settled down as a handyman in Crookston.  He was illiterate, and spoke no English.  Alfonso's mother, who had once also worked in the fields but learned English and took a job as a cook to support the family, had a fourth grade education.  She could

90

write and she could read her Bible, but she couldn't help her five kids with their school work.  That fell to her oldest child, Sylvia, who did her best to help mother Alfonso, Paco, Rosa and Ileanna.  Sylvia especially became Alfonso's caretaker and guide at home, at school, and around town.

Alfonso and his family told themselves and others that his repeated failures in school were due to the language barrier.  This "cloak of competence" worked as a catch-all explanation to those who weren't looking very closely.  But it wasn't true.  Though the teachers and students at his school back in Texas spoke Spanish as their first language, the books and the tests and the classes were in English.  And, there, among his Tejano peers who had grown up in the same neighborhood, speaking Spanish at home, at church and on the playground and learning English for the first time in grade school, Alfonso had failed first grade twice.  Some would later attribute Alfonso's early failures to the family's migratory pattern, but many of the children at Leyendecker Elementary School in Laredo switched schools every April as they migrated with their parents to the fields up north; Alfonso failed to  keep up even among this community of kids like him.  Alfonso had even failed the 1959-1960 school year, although his mother did not go into the fields that spring and kept the children in Laredo all year, with their cousins and life-long friends.

Folks back in Laredo knew Alfonso was "slow" – in any language.  Among his childhood playmates had been a boy with polio who couldn't walk or talk and another boy with epilepsy and mental retardation.  That was the group in which the people of Laredo's

91

"La Ladrillera" neighborhood, the people who had known Alfonso all his life, understood that he belonged.  But in Crookston, Alfonso's impairments had been lost in the racism of lowered expectations, masked by his quietness and flat affect, drowned out by his more exuberant and mischievous brother, and overlooked due to his obedience, good behavior, politeness and lack of complaints.

By now, Sylvia had moved out of the house.  Paco, though two years younger, had passed him by into the tenth grade and become a handsome, athletic boy who was popular with the girls and embarrassed to be seen hanging out with Alfonso at school.  Rosa was being raised by family in Laredo.  Ileanna, just eleven years old, went to a different school.  The Mexican-American boys Alfonso had befriended in earlier grades had by now all graduated or dropped out.  His closest white friend, Bill Mauer, was in jail for burglary.  And Morris Nelson had joined the Air Force.  So, he didn't have many friends at Central.

But, Alfonso was sure everyone there knew who he was.  There had been an incident when he was thirteen and in the sixth grade.  He'd made lewd phone calls to women in town and been caught by the police.  The calls themselves were humiliating enough, as the women hadn't taken him very seriously, had laughed at him and called him "a little boy."  Things became even worse when the police traced the number to his house.  Everyone assumed it was Paco, since he was the outgoing, funny one and young enough that this sort of thing might be expected.  But, Alfonso had eventually confessed.

Alfonso couldn't explain why he did it.  He'd always been socially inept and

awkward, due to what would later be identified as neurological deficits. So, he didn't know how to talk to girls and was frequently confused about what they expected of him. As he'd reached puberty, he thought a lot about sex, as did all the boys his age. Alfonso had also begun to have nightmares and terrifying memories of being sexually abused as a small child when he was staying away from home at a church camp for migrant kids. He'd always remembered being molested by a teenage boy back in Laredo when he was seven. That was confusing enough. But now memories of the female college student who molested him in his camp bunk at night when he was homesick and scared had come to him unbidden, surprising and confusing. These thoughts invaded him, distracted him, scared him and made him anxious and unable to sleep. But, mostly he was filled with shame and fear when he remembered.

Alfonso didn't want to remember. And, he'd discovered that whiskey would help. So, he drank a lot of it. Sometimes he would be invited to parties or, more often, tag along behind Paco. But, mostly he drank alone and with a purpose. By now, he had quietly developed a serious dependence on alcohol. Because he was quiet and well-behaved, because Sylvia was gone and Paco was in his own world, because his mother was busy working and his father a distant, severe and inattentive man preoccupied with his own problems, no one really noticed.

Despite it all, Alfonso wanted very badly to be liked by his classmates. He had developed the habit of bragging. He told kids his parents were from Europe and that his family owned lots of land. He would later tell doctors that he could "decapitate" a man

93

six inches taller than himself with a karate chop, that he had once shot a 10 point buck, that he read 900 books and that he'd slept with 30 women.  None of that was true of Alfonso, of course, but the stories were true of his father or his sister or his brother and they seemed to be the sorts of things one said when one wanted to make friends.

Because he'd been going there for years and because he had no other plan and because no one ever thought to suggest that he do anything different, Alfonso trudged off to Central High School hoping, perhaps, that today would be the day things changed.

* * *

Alfonso Rodriguez, Jr., was born February 18, 1953 in Laredo, Texas.  He was born into a family steeped in generations of poverty and physical and mental illness; a family plagued by substance abuse, that struggled to survive each day.  Alfonso's paternal grandfather, Antonio Rodriguez, was an immigrant to the United States from Mexico, and found the only unskilled  work he could in migrant farming.[235]  His wife Maria was a lay midwife, a trade that was passed on from her mother.  Between them they struggled to raise their eight children, two of whom died as babies.  The youngest was Alfonso Sr. (Alfonso's father ), who was born in 1929.  Although the family already had eight mouths to feed, they added a ninth, Belia Flores.  Belia was adopted by Antonio and Maria and raised as one of their own when her own family no longer wanted her.[236]

Alfonso Jr.'s maternal grandfather, Genaro Rodriguez, began as a coal miner in the

---

[235] Declaration of Belia Flores, Ex. D-1, ¶¶ 5-9.

[236] Declaration of Belia Flores, Ex. D-1, ¶ 2; Declaration of Rosa Rodriguez, Ex. D-14, ¶ 9.

small town of Dolores, Texas.  The mine closed due to hazardous conditions in 1938 and

Genaro and his wife, Lorenza, were forced to settle in Laredo to seek work and support

their nine children, one of whom was Dolores, Alfonso Jr.'s mother.  Once in Laredo they

became migrant farmers.

By this time Lorenza was a mean woman, a bitter and resentful person.  Like many in her

family Lorenza suffered with diabetes, but she never had check-ups and went blind in her

twenties.[237]  After she went blind Lorenza had a nervous breakdown. She became suicidal

and mentally ill.  During this time, when Genaro went to work each day he would tie

Lorenza up so that she couldn't hurt herself and to contain her raving while he was

gone.[238]  Lorenza would make her children sit close enough to her so that she could beat

them with a belt.[239]

By this time Lorenza already had five children; Dolores was six years old.

Dolores' younger siblings were three years and eight months old and she was left to take

care of them because of her mother's disabilities.[240]  Lorenza was an unaffectionate

mother who never kissed or hugged her children or told them she loved them.[241]  She

would later say hurtful things about Alfonso Sr., her son-in-law, because his mother was

---

[237] Declaration of Belia Flores, Ex. D-1, ¶ 16.

[238] Declaration of Rosa Rodriguez, Ex. D-14, ¶ 13.

[239] Declaration of Rosa Rodriguez, Ex. D-13.

[240] Dolores Rodriguez, Tr. 7622

[241] Declaration of Rosa Rodriguez, Ex. D-14, ¶¶ 12, 15.

popular within the community.[242]  Lorenza struck fear into people, so much so that she was able to force a man into marrying her daughter, Maria Luisa, though he didn't want to.  People did what Lorenza said.[243]

Dolores and Alfonso Sr. met as teenagers in 1948 at a dance.  Dolores was fifteen and Alfonso Sr. was seventeen.  They married soon after and by the time she was eighteen, she was pregnant with their first of five children, Sylvia.[244]  Dolores and Alfonso Sr.  went on to have four more children, Alfonso Jr. in 1953, Francisco in 1955, Rosa in 1958 and Ileanna in 1960.

### Multi-Generational Illness

Both Dolores and Alfonso Sr's families were riddled with severe intellectual impairment, debilitating mental and physical illness, and substance abuse.  Alfonso's paternal family have suffered at least three generations of Alzheimer's disease:  his paternal grandfather Antonio, two of his paternal aunts, and his father were all afflicted.[245]  Alfonso himself has started to show signs of developing Alzheimer's - often repeating words over and over.  Depression runs in the family as well.  Dolores, Sylvia, Rosa, Ileanna and even Ileanna's daughter have all struggled with depression throughout

---

[242] Declaration of Belia Flores, Ex. D-01, ¶ 16; Declaration of Rosa Rodriguez, Ex. D-14, ¶ 12.

[243] Declaration of Rosa Rodriguez, Ex. D-14, ¶ 14.

[244] Declaration of Dolores Rodriguez, Ex. D-11, ¶¶ 2, 4.

[245] Declaration of Belia Flores, Ex. D-01, ¶ 43.

their lives.[246]

Diabetes is also prevalent and severe on both sides of Alfonso's family.  His maternal grandmother went blind from it, and his mother, Dolores, suffers from the illness.[247]  Dolores' sister has it, and her brothers were both alcoholics who died from complications with the illness.  Among Alfonso's paternal relatives, many are diabetic.  One of Alfonso's cousins succumbed to the disease.[248]  Alfonso himself received a diagnosis of diabetes at USP Terre Haute in 2009.[249]

Other serious ailments plague the Rodriguez family.  Dolores developed uterine cancer, for which she underwent surgery in 1989 and 1993.[250]  Alfonso's father died of a cancer that eventually ravaged his brain and pancreas.[251]  Alfonso lost several other relatives to cancer, including a cousin who died of leukemia at 11 years-old.[252]

Neurological impairments, such as hand tremors, are also common.  Alfonso himself has severe hand tremors, like his father Alfonso Sr.[253]  Sylvia, Alfonso's sister, has a similar tremor and also suffers from numerous other neurological and motor

---

[246] Declaration of Ileanna Noyes, Ex. D-09, ¶ 43.

[247] Dolores Rodriguez, Medical Records, Ex. D-35, D-36, D-37, D-39.

[248] Declaration of Rosa Rodriguez, Ex. D-14, ¶ 7.

[249] Alfonso Rodriguez, Jr., BOP Terre Haute medical records, (2007 to 2011), Ex. D-127.

[250] Dolores Rodriguez, Medical Records, Ex. D-35, D-36, D-37, D-39.

[251] Declaration of Rosa Rodriguez, Ex. D-14, ¶ 6.

[252] Declaration of Rosa Rodriguez, Ex. D-14, ¶ 5.

[253] Declaration of Rosa Rodriguez, Ex. D-14, ¶ 27.

malfunctions.  Sometimes she loses feelings on the right side of her body and her tongue rolls over to the side, causing spittle to run down her face.

Learning disabilities further compound the problems suffered by the Rodriguez family.[254]  Alfonso Sr., was cognitively impaired, as are his two oldest children, Sylvia and Alfonso, Jr.  Sylvia struggled through school, and to this day cannot easily read an article in a magazine or newspaper.  She cannot read or write well, and she cannot perform simple arithmetic.[255]

In conjunction with the family's severe history of mental and physical health issues, there is, perhaps unsurprisingly, an abundance of substance abuse.  Many of Alfonso's relatives have either died due to alcoholism or are severely ill as a result.[256]  All of his maternal uncles are alcoholics except one, and all of his maternal cousins are alcoholics.  At least three of Alfonso's cousins have died from alcohol related problems, as have at least three uncles.[257]

**A Migrant Life**

Dolores and Alfonso Sr. followed in the footsteps of their families and became migrant farmers.  From before his birth, through the first six years of Alfonso Jr.'s life (until 1959), the Rodriguez family traveled between Texas and Minnesota, forcing the

---

[254] School records for Alfonso's siblings are included as exhibits to this petition and incorporated by reference herein.  *See* Ex. D-27 through D-32.  Alfonso's own school performance is explored in detail below.

[255] Declaration of Sylvia D'Angelo, Ex. D-125.

[256] Declaration of Rosa Rodriguez, Ex. D-14, ¶¶ 5, 7.

[257] *Id.*

children to change schools over and over again.  Twice each year the families had to make the long journey north.[258]  The trip took three days and they drove straight through. Antonio Rodriguez  and Alfonso Sr. would drive everyone in a truck with a tarp over the truck bed, and no windows.[259]  The whole family crammed into the back of that truck, at times as many as fifteen people.[260]

> The journey itself was traumatic for Alfonso Jr. and his siblings. On the way up north I remember being hungry, getting sick, sleeping a lot, and vomiting a lot.  We would stop places on the way to eat and people would tell us that we weren't allowed in the stores because we were Mexican, they would say 'Mexicans aren't allowed'.  We weren't allowed to use the bathrooms either.  Some places would allow us, but we would have to use the back door.  Tito and I both got motion sickness on the journey to and from Texas.  There was a bucket we had in the back of the truck to vomit in.  The same bucket was used if we had to pee or pooh.  We didn't use to make a lot of stops.  I remember those horrible fumes in the back of the truck.[261]

Despite the fact that Dolores and Alfonso Sr. worked long and strenuous hours, the family remained destitute.  When they traveled to Crookston, Minnesota each year to work the potato fields, they stayed at a house in the fields.  It was furnished with only beds, a table and chairs, and a stove.  It was an old house with no water, gas or electricity. The family used a well outside the house for drinking, washing clothes, cooking, and

---

[258] Belia Flores, Tr. 8121

[259] Declaration of Belia Flores, Ex. D-01, ¶ 19.

[260] Declaration of Sylvia D'Angelo, Ex. D-125, ¶¶ 6.

[261] Declaration of Sylvia D'Angelo, Ex. D-125, ¶¶ 4-5.

bathing.

The workers and children alike were exposed to pesticides while working the fields as the planes flew overhead.[262]  The wind also blew the chemicals over the house when they were spraying.[263]  Their well was polluted with the pesticides.  When the spraying was done, there was a bad smell, and afterwards the clothes that had been drying on the line were sticky.

The children remember this time as hard and lonely.  They were often hungry," and remember "being scared, being alone"[264] because their parents were at work.   The Rodriguez family shared the farmhouse with three other families.  One of the few joys in the childrens' lives was being taken to the city dump to find toys, and sometimes, if they were lucky, candy bars.[265]

**Difficult First Steps**

Alfonso Jr. was born into this struggle and deprivation.  For the first five months of Dolores' pregnancy with Alfonso, she worked as a beet puller at a farm in Minnesota.  Pesticides were sprayed on the fields while she worked.[266]  During this time Dolores was very depressed because the family didn't have enough food or money and it was hard

---

[262] Declaration of Belia Flores, Ex. D-01, ¶ 22.

[263] Declaration of Belia Flores, Ex. D-01, ¶ 22.

[264] Sylvia Rodriguez, Tr. 7910

[265] Declaration of Sylvia D'Angelo, Ex. D-125, ¶ 15; Dolores Rodriguez, Tr. 7628-29

[266] *Id.*; Declaration of Belia Flores, Ex. D-01, ¶ 22.

working out in the cold and rain while pregnant.[267]

Alfonso's start in life was just as bleak as his existence inutero:

> [A]s an infant, Alfonso had diarrhea and was very fussy. [My] breast milk didn't agree with him. [I] tried breast feeding for one month.  He was not able to suckle well.  He was crying continually.  He was irritable.  He wouldn't sleep.  All of this started within a day or two of birth.   Then, he developed diarrhea at two weeks of age.  They put him on half water and half Carnation milk for two months.  But, he was still irritable, couldn't sleep, and kept losing weight.  He was getting thinner, but his belly was enlarged with gas.  Around the third month or so, a doctor told [me] to boil rice and use that water to feed him.  He stayed on that for six weeks and nothing changed.  He would cry throughout the day and night. [I] took him to a curandero [folk healer] in those first few months of life for empacho [obstructed bowels].  They would rub oils and things on his belly and massage him.  They had a ceremony.  His grandmother was a midwife and healer and she tried to help.  Doctors eventually told [me] that he was starving on the rice water.  He was crying because he was hungry. [She] was told [we] should make every effort to put him on regular food.  [We] started giving him oats.[268]

The effects of this early deprivation were clear.  From birth Alfonso has had an usually large head, so big that others called him "tack head."[269]  As a toddler Alfonso was slow to achieve developmental milestones.  "Everything came slower with him," describes his mother.[270]  He didn't start walking until he was about two years old and he

---

[267] Declaration of Dolores Rodriguez, Ex. D-11, ¶ 4.

[268] Declaration of Dolores Rodriguez, Ex. D-11, ¶¶ 6-8.

[269] Declaration of Dolores Rodriguez, Ex. D-11, ¶ 5; Declaration of Maria Del Refugio Ruiz, Ex. D-07, ¶ 23; Declaration of Rosa Rodriguez, Ex. D-14, ¶ 36; Declaration of Ileanna Noyes, Ex. D-09, ¶ 3; Declaration of Sylvia D'Angelo, Ex. D-125, ¶ 8.

[270] Declaration of Dolores Rodriguez, Ex. D-11, ¶ 10

didn't start talking until he was two and a half.  He wet the bed until he was nine to thirteen years old.[271]

When Alfonso Jr. was four years old his grandmother passed away and the responsibility of taking care of the younger children while Dolores was in the fields fell on six year old Sylvia.[272]  Sylvia's role as de facto mother for young Alfonso continued for many years.  Even as the family stopped migrating and settled down in Crookston for good, Dolores and Alfonso Sr. were, for stretches,  rarely home at the same time as the children.  When Dolores worked in the evenings, she would leave food prepared but ultimately it fell to Sylvia to take charge.  Despite her young age, Sylvia felt the other children were her responsibility.[273]

Dolores and Alfonso Sr. themselves struggled, trying and failing to make end meet, and unable to really help their children.  Likely due to the neglect she received from own mother, Dolores was emotionally unavailable to her family.[274]  Dolores doesn't like people close to her, leaving her unable to show any intimacy towards her young children.  She even pushed her husband away when he attempted to hug her.  Her own daughter describes her a "cold fish."

---

[271] *Id.*; Declaration of Rosa Rodriguez, Ex. D-14, ¶ 37; Records for Alfonso Rodriguez, Jr., MSH Records, Ex. D-66, (Medical and Social History Questionnaire).

[272] Declaration of Sylvia D'Angelo, Ex. D-125, ¶ 2; Declaration of Ileanna Noyes, Ex. D-09, ¶ 4.

[273] Declaration of Sylvia D'Angelo, Ex. D-125, ¶ 2.

[274] Declaration of Ileanna Noyes, Ex. D-09, ¶¶ 41-42; Declaration of Rosa Rodriguez, Ex. D-14, ¶ 10

Dolores also worked long hours, first in the fields and later in a Crookston restaurant after her husband had an accident and broke his back. The job was hard and left her tired, with little energy for the children.

Alfonso Sr. was illiterate his whole life and he was embarrassed and ashamed of this fact.[275] He avoided situations where his learning disability would be highlighted. He never attended teacher parent conferences because they would give him things to read.[276] He patronized the same businesses all the time so he could order "the usual" and avoid trying to read a menu.[277] Alfonso Sr. also relied on his more capable children to help him write checks. He had a check printing machine, but he needed Rosa to read the bills and underline the name for him to put on the check. Even then, Alfonso Sr. would make mistakes and mix up the letters. On the advice of Rosa, he practiced his signature over and over.

Alfonso Sr.'s children did what they could to help him mask his problems. They gave driving directions when he was going somewhere new, and someone would sit up front with him to read the road signs. Alfonso Sr.'s sisters also helped by reminding the children where they were going before their father took them anywhere, so they could help him not get lost. Alfonso Sr. described letters as just not looking right to him.[278]

---

[275] Declaration of Ileana Noyes, Ex. D-09, ¶ 8

[276] Declaration of Rosa Rodriguez, Ex. D-14, ¶ 48

[277] *Id. at* ¶¶ 42-43

[278] Declaration of Rosa Rodriguez, Ex. D-14.

103

Eventually, his inability to read and write led him to close the small radiator repair shop he ran after his accident.[279]

Sadly, the family suffered at the hands of Alfonso, Sr.  Whether because of his frustration with his own limitations or for some other reason, Alfonso Sr. had a short and angry temper.  When his anger became physical, he would beat the children repeatedly with a belt, especially the boys.[280]  Alfonso Sr. hurled insults at his children.  He called Alfonso Jr. stupid and mocked him, even calling him "cabezón" which means bighead.[281]  These comments hurt Alfonso Jr. deeply and in response he simply walked away.  Alfonso Jr. had always been very sensitive to yelling and tried to stay away from home as much as he could.[282]

### "He Was Always Slow": Developmental and Cognitive Impairments

While the Rodriguez children all struggled in this difficult life, Alfonso struggled the most in many ways.  It was apparent from a very early age that Alfonso had serious cognitive difficulties.  As Dr. Stephen Greenspan reports with studied understatement, the available evidence "provides a clear picture of a boy who was struggling academically."[283]  As a child he was incapable of playing the simplest of games, choosing instead to sit by and watch the other children.  Alfonso "was a slow learner," his mother

---

[279] *Id.* at ¶ 45

[280] Declaration of Ileanna Noyes, Ex. D-09, ¶ 38

[281] Declaration of Sylvia D'Angelo, Ex. D-125

[282] Declaration of Sylvia D'Angelo, Ex. D-125; Declaration of Ileanna Noyes, Ex. D-09.

[283] Declaration of Dr. Stephen Greenspan, Ex. D-19, ¶ 48.

104

recalls.

> He was slower than my other children.  He did poorly in
> school, and he especially had a lot of trouble with reading,
> writing, and spelling.  His attendance at school was good, but
> he didn't do particularly well in any subject.  He had a lot of
> problems with his reading and he didn't want to go to school.
> My daughter Sylvia tried to help him with his reading, but he
> just couldn't get it.[284]

But it was not simply that Alfonso was "slow."  He was quiet.  Withdrawn.  Sad.

He seemed out of step with the other children.  "Tito tended to just sit down and be quiet.

His head was always up in the clouds somewhere, like he wasn't all there. I don't

remember seeing Tito smiling, he didn't express his emotions much.  I never saw Tito

read or write."[285]  "Tito was sad most of the time.  It was rare to see him smile or laugh.

Tito was also slower than other kids.  Most of the time he was very quiet."[286]

> As a neighbor described:
>
> Tito was different. He was very quiet, quieter than his brother
> and sisters. Mostly Tito would just sit and be quiet. Our house
> was the first house in the neighborhood with a television and
> lots of kids from the neighborhood would come over and
> watch with us. When we watched television, the other kids
> would talk and laugh about what was on, but Tito wouldn't.
> He didn't react to things. He just sat there quietly.[287]

Alfonso had difficulty with the simplest games.  "I used to play a game called

---

[284] Declaration of Dolores Rodriguez, Ex. D-11, ¶ 19.

[285] Declaration of Maria Del Refugio Ruiz, Ex. D-07, ¶ 7.

[286] Declaration of Hector Gallegos, Ex. D-05, ¶ 3.

[287] Declaration of Gloria Gonzalez, Ex. D-04, ¶ 7.

jacks," his cousin recalled.  "Tito never played it though, he would just watch me.  I tried to show him how to play, but he didn't learn.  He would only watch me."[288]  His isolation and limitations were apparent to other children.  "Tito didn't play with us as much as the other kids in the neighborhood did.  When he was outside with us, he would usually sit quietly by himself and watch us play."[289]  "Some kids played jacks or hopscotch. Tito didn't play jacks or hopscotch. He just watched."[290]

In the same way, Alfonso had trouble understanding the most basic concepts.

> Tito sometimes struggled to understand things as a child. He would get stuck on just one idea of something and couldn't understand anything different. Like, when he saw a picture of a traditional Thanksgiving turkey, he thought that's the only way a turkey could look. When Isabel and Santos made a turkey in a Mexican "mole' sauce, Tito didn't believe it was turkey because it didn't look like the picture.[291]

Alfonso's lack of comprehension was remarkable even then.

> In Texas, we call people 'Spanish' if they are Spanish-speaking Hispanics. That does not mean they come from Spain. Usually, they come from Mexico or Honduras or El Salvador. Tito could never understand that and he thinks his grandfather came from Spain. Everybody else that grows up in Texas understands the expression.[292]

And as his older sister recalls, "I never saw Tito read or write. I never even saw

---

[288] Declaration of Belia Flores, Ex. D-01, ¶ 29.

[289] Declaration of Gloria Gonzalez, Ex. D-04, ¶9.

[290] Declaration of Sylvia Garcia, Ex. D-08, ¶ 16.

[291] Declaration of Belia Florez, Ex. D-01, ¶ 27.

[292] *Id.* at ¶ 7

Tito with a book.  We both had problems reading, and I still do to this day. I send him books now, but we never discuss them. We both have trouble concentrating."[293]

And these limitations made it nearly impossible for Alfonso to help with adult tasks.  He just couldn't figure them out.  While Alfonso's parents would sometimes take the other children to work with them to help out, they never took Alfonso.[294] His brother reports, "I worked with my dad sometimes in the radiator shop, and I worked in the restaurant with my mom. Tito wasn't really good at anything and they didn't take him to work with them."[295]

Alfonso was not just slow, but compulsively tidy, especially for a child, and trying to impose order in the world that overwhelmed him.  As his sister recalls, he washed his hands a lot.

> [He] has always been picky about his possessions.  He kept all of his things organized and neatly in order.  As a kid, Alfonso would clean his possessions over and over again.  If he had finished playing with a toy, he would clean it and put it back in its place.  He had a little case that had a cleaning solution and a cleaning cloth inside of it.  That's what he used to clean his things, especially his shoes.  When he finished cleaning one of his possessions, he would fold up the little cloth and put it neatly back in its case.  Alfonso would clean his shoes every day when he came home from school, as he was taking them off.[296]

---

[293] Declaration of Sylvia D'Angelo, Ex. D-125, ¶ 11.

[294] Declaration of Francisco Rodriguez, Ex. D-0, ¶ 15.

[295] *Id.*

[296] Declaration of Sylvia D'Angelo, Ex. D-125, ¶ 14.

Though he could not keep up with his friends or his family, he struggled to keep his own small world under control where he could.

### Teasing and Bullying: An Easy Target

Because he was slow, because he was different, because he could not keep up, Alfonso was picked on mercilessly. Some of the teasing was directed at his entire family, one of the few Mexican families in Crookston. The majority of the people in Crookston, and therefore within the Crookston school system, were white.[297] The Rodriguez children had insults hurled at them such as "dirty Mexican," "greasers," and "spicks," and were told they smelled.[298] They were made fun of for not having nice clothes, which their parents could not afford. The bullying didn't end with the verbal assaults: sometimes the Rodriguez children were kicked and spat on.[299] The bullying also didn't come simply from other children. Even teachers and other parents treated them differently. They were made to sit at the back of the classroom. Dolores Rodriguez was told by her neighbor that their children were not allowed to play together.[300]

In this torment, Alfonso bore the brunt. He was darker than his siblings and much quieter, making him an easier target.[301] He was often tormented by the other

---

[297] Sylvia Rodriguez, Tr. 7932

[298] Declaration Sylvia D'Angelo, Ex. D-125, ¶ 7; Declaration of Ileanna Noyes, Ex. D-09, ¶ 2.

[299] Declaration of Ileanna Noyes, Ex. D-09, ¶ 2.

[300] Marilyn Hutchinson, Tr. 7979; Declaration of Ileanna Noyes, Ex. D-09, ¶ 12.

[301] Declaration of Sylvia D'Angelo, Ex. D-125 ¶ 8.

children.  They would kick him.  They would push him off his seat.  One of the kids on the bus used to threaten to paint him white.  Alfonso was just too easy to bully.  In addition to being darker than everyone else, he had a big, oblong head, he was short and had a limp, his hands shook and he was in special classes.[302]  Even his own brother, younger and popular, made fun of him.[303]

It was during this time that a group of children pulled his pants down in front of the entire class.  Even a few children he thought were his friends laughed at him.  The humiliation and shame of this incident has stayed with him his whole life.  But he was the perennial target.  "Alfonso was teased for his big head, and because his eyes bulged."[304] He got teased for his accent.  He got teased for being short.  He got teased for not doing well in school.  Alfonso got teased in school because he had one leg that was shorter than the other so he ran funny.  "He got teased about so many things."[305]

Sometime, to hide his pain, Alfonso would pretend that he was stronger, faster, more successful than he was. His sister remembers that he "would come home and say that he had won a race with his friends that day," though neither the race nor the friends were true.[306]

Alfonso quickly developed a powerful sense of rejection.   As records from the

---

[302] Declaration of Francisco Rodriguez, Ex. D-03, ¶ 6.

[303] *Id.*

[304] Declaration of Ileanna Noyes, Ex. D-09, ¶ 3.

[305] *Id.*

[306] Declaration of Sylvia D'Angelo, Ex. D-125, ¶ 9.

1970s describe, "[i]t appears that Mr. Rodriguez often felt rejected and defensiveness regarding his language difficulties in school, his Hispanic background, and his small stature."[307]  And because Alfonso was an outcast, to the extent he had friends, he was drawn to other outcasts.  His friend Juan Ruiz had polio when he was little and was unable to walk until he was six.  Juan didn't talk until he was seven and was in special classes.[308]  Another friend of Alfonso Jr.'s was Johnny Rocha, who has been hearing impaired since the age of nine and is also from a migrant worker family.  ***Redacted*** Sadly, the fiction that Alfonso later told about having had many and close friends was just that. As Ray Espinosa, a classmate, later said, the notion that Alfonso was popular "is just not true and was not true at the time."[309]

**Repeated Sexual Abuse**

As Alfonso grew, his limitations and isolation, and the poverty that kept his parents working long hours, left him vulnerable to sexual abuse and exploitation, abuse that began when he was very young and recurred for many years.

During the summers of 1957, 1958 and 1959,  Alfonso and his siblings were sent to a migrant camp in Crookston during the week while their mother and father worked in the fields.[310]  The migrant school was a strict environment run by nuns and priests of the

---

[307] Records for Alfonso Rodriguez, Jr., Minnesota Security Hospital, Ex. D-66.

[308] Declaration of Juan Ruiz, Ex. D-06, ¶ 3.

[309] Declaration of Ray Espinosa, Ex. D-02, ¶¶ 6-7.

[310] Declaration of Dolores Rodriguez, Ex. D-11, ¶ 33.

110

Cathedral of Immaculate Conception in Crookston. The bus would pick them up on Sunday afternoon and drop them home on Friday afternoon.

It was at the migrant camp that he was sexually abused for the first time. At night Sylvia was separated from her younger brothers but Alfonso and Francisco would still sneak over to her cot to be with the person who has become their de facto mother. One summer evening, Alfonso was pulled from Sylvia's bed by a female hand.[311] Sylvia could see what was happening by the light coming in from the street. The woman performed oral sex on Alfonso, who "cried and cried and cried."[312] Alfonso was four or five-years-old at the time. The woman then returned Alfonso to the bed and Sylvia cleaned him up. To this day Sylvia still suffers nightmares about this memory, and can recall the smell of incense and the light shining in from outside .[313]

When Alfonso wet the bed at the migrant camp, instead of considering why a child might still be wetting the bed, the nuns punished him by pulling down his pants and spanking him, then made him clean up the mess. Alfonso didn't stop wetting the bed until he was thirteen years old.[314]

---

[311] Sylvia Rodriguez, Tr. 7920-22; Dr. Marilyn Hutchinson, Tr. 7959-60 and 8046-47; Declaration of mitigation by Marilyn Hutchinson, Ex. D-90; Declaration of Sylvia D'Angelo, Ex. D-125; ¶¶ 36, 42; Declaration of Dr. Pablo Stewart, Ex. D-17, ¶¶ 19, 21.

[312] *Id.*

[313] Declaration of Sylvia D'Angelo, Ex. D-125, ¶ 42.

[314] Records for Alfonso Rodriguez, Jr., Minnesota Security Hospital, Ex. D-66, (Medical and Social History Questionnaire).

111

Tragically, the abuse wasn't limited to this camp or to this woman.  Later, but when he was still four or five, he and his family harvested potatoes near Grafton, North Dakota.  It was during this time that a heavyset man began taking Alfonso Jr. and his sister Sylvia into an outhouse.  The man made them fondle and touch him and would dip his penis in a jar of pickle juice and make them suck it.[315]  At times, when the man was coercing Sylvia into doing it, Alfonso Jr. would step forward and volunteer to protect the sister that he loved so much.[316]

When Alfonso was six years old he was abused again by a young female college student.  This time, he and his sister Sylvia stayed at a church camp for about a month, to prepare for their first communion.  Alfonso remembers being lonely. One night, when he was lying in his cot, crying, a young woman he thought was a college student and worked at the camp came into his room, ostensibly to comfort him.

> And it just started her petting, that's all.  But it.. .and
> progressed through the time.  For me having. . . she put my
> hand on her. . . on her vagina and on her breasts, and she
> kissed me — not kiss like you would kiss a little kid.  She
> tried to kiss me like I'm adult.  And, uh, she tried, uhm, uhm,
> oral sex one time, like I was . . . I was six years old, you
> know.[317]

The abuse was repeated several times during Alfonso's month-long stay.  The nuns

---

[315] Sylvia Rodriguez, Tr. 7903, 7922, 7927-28; Dr. Marilyn Hutchinson, Tr. 7965; Report of mitigation by Dr. Marilyn Hutchinson, Ex. D-90; Declaration of Dr. Pablo Stewart, Ex. D-17, ¶ 20.

[316] *Id.*; *see also* Declaration of Sylvia D-Angelo, Ex. D-125, ¶ 31.

[317] Transcript of clinical interview with Drs. Martell and Pitt, Ex. D-83.

who supervised the camp never noticed.

When Alfonso was about seven-years-old, he was sexually assaulted by a teenager from his neighborhood,G.M.[318]  There were two occurrences, approximately a week apart. The first incident involved the older boy masturbating and ejaculating, while he also touched Alfonso.  The second time G.M. attempted to penetrate Alfonso, but was not able to, and Alfonso managed to get away.[319]  Alfonso remembers that G.M. offered him fruit and boxes of candy as a kind of bribe to get the abuse to continue.  Alfonso always remembered these events, unlike some of the earlier abuse, because "it wasn't really as traumatic as the first one, with the girl."[320]  However, he never told anybody about these incidents: "I don't know why.  . . .I never talked about it, you know, stuff like that."[321] His brother Francisco ("Paco") suspected that his older brother had been abused, and described G.M. "creepy" and "known to be odd."[322]  Frank suggested that Alfonso was

---

[318] Transcript of clinical interview with Drs. Martell and Pitt, Ex. D-83; Declaration of Francisco Rodriguez, Ex. D-03, ¶ 11; Declaration of Dr. Pablo Stewart, Ex. D-17, ¶ 23; Report on mitigation by Marilyn Hutchinson, Ex. D-90.

[319] Transcript of clinical interview with Drs. Martell and Pitt, Ex. D-83; Declaration of Francisco Rodriguez, Ex. D-03, ¶ 11; Report on mitigation by Marilyn Hutchinson, Ex. D-90; Declaration of Dr. Pablo Stewart, Ex. D-17, ¶ 23; Declaration of Melanie Carr, Ex. D-21, ¶¶ 70, 72.

[320] Transcript of clinical interview with Drs. Martell and Pitt, Ex. D-83; Report of mitigation by Dr. Marilyn Hutchinson, Ex. D-90.

[321] *Id.*

[322] Declaration of Francisco Rodriguez, Ex. D-03, ¶ 11.

not the only neighborhood child abused by G.M.[323]

The abuse continued even after the family stopped migrating and settled down in Crookston. In 1963, the Rodriguez family was renting the top part of a house, owned by an alcoholic man who lived downstairs. Dolores was working very long hours in the restaurant, and Alfonso Sr. was also often away from the house, so the children were again left alone. There was no partition between the upper and lower stories, so the landlord was free to come up to the family's rooms whenever he wanted. The visits would start out with the man taking his false teeth out, making funny faces and trying to make the children laugh or be scared, but then he would try to touch and abuse Sylvia, who was twelve years old. Alfonso, who was nine or ten, would try to protect Sylvia, telling the landlord she was not home. She would get in the closet and Alfonso would cover her with the clothes to hide her.[324]

Alfonso did not remember some of these instances of sexual abuse until approximately 1966, when he was thirteen. Before that time he had registered a certain unease whenever he went into the Catholic Church, which he attributes in retrospect to the smell of Lemon Pledge, which was also used at the camp where the abuse took place. "Every time I smell like what would be Lemon Pledge, I always would get this weird

---

[323] *Id.*

[324] Sylvia Rodriguez, Tr. 7929-30. This man likely also molested Alfonso; Alfonso has a vague memory of a man in long johns who used to abuse him during his childhood. As Dr. Stewart relates, repressed memories are typical for Alfonso, and diagnostic of his post-traumatic stress disorder. *See* Declaration of Dr. Pablo Stewart, Ex. D-17.

feeling, you know.  And then finally it just started coming back."[325]  He had not been able to admit to himself why he no longer wanted to go to church, but from the age of seven he only wanted to go to services at the Salvation Army, in order to avoid going to the Catholic Church at all.

As well as the smell, Alfonso's abiding memory of the abuse was the sight of the nineteen year old girl in her college jersey.  In fact, it was this vivid mental image which caused him to realize the abuser was not a nun, as he had once thought.  "And I remember the jersey.  That's the first thing that popped into my. . .my psychic [sic] I guess was a jersey.  I'm not sure how it affected me."[326]

**School Records: A Sad Tale in Black and White**

What family and friends recall–a lonely, slow and abused boy–Alfonso's school records confirm.[327]  On November 10, 1959, six-year-old Alfonso Rodriguez Jr. was enrolled at Leyendecker Elementary School in Laredo, Texas and placed in the first grade.  Despite staying in Texas that year, he failed and was placed in the first grade again.  When school began again in the fall of 1960, he repeated the first grade and in the summer of 1961 was promoted to the second grade by the Laredo school.

---

[325] Declaration of Dr. Pablo Stewart, Ex. D-17, ¶ 94; Report of mitigation by Marilyn Hutchinson, Ex. D-90; Transcript of clinical interview of Drs. Martell and Pitt, Ex. D-83.

[326] Transcript of clinical interview of Drs. Martell and Pitt, Ex. D-83.

[327] This recitation of Alfonso's academic history, such as it was, are document in two sets of school records.  The records from the Laredo Independent School District are found at D-33, and those from the Crookston School District are found at D-34.  In addition, the school records of Mr. Rodriguez's siblings are attached for review as well: *see* Ex. D-27 through D-32.

In the fall of 1961, Alfonso and his siblings were enrolled in the Crookston Public School District in rural Minnesota. Alfonso's IQ was tested on September 19, 1961. He scored a 77 on the Kuhlmann-Anderson IQ Test and was placed back in the first grade.[328] In November, Alfonso's family went back to Texas. Alfonso was put into the second grade at Leyendecker, and his six year old brother Frank enrolled in the first grade at the same school. On April 17, 1962, Alfonso's family once again returned to Minnesota.

In May of 1962, upon arrival in Crookston, Minnesota, Alfonso took the Metropolitan Achievement Test and his grade equivalent was 1.7. He was again placed back in the first grade until the school year ended that summer. By this age, Alfonso should have been in at least third grade instead of first.

In the fall of 1962, Alfonso started the second grade in Crookston, while his younger brother Frank started the first grade. That winter, the family migrated back to Texas and Alfonso entered the second grade for the second time at Leyendecker Elementary. After being in Texas for a few months, Alfonso's family decided to move to Minnesota permanently. On January 30, 1963, Alfonso was withdrawn from Leyendecker Elementary.

In February 1963, just before he turned ten, Alfonso arrived in Minnesota with his family. He was placed in the second grade at Eugene Field Elementary. That spring his IQ was tested for a second time and he scored an 80 on the Kuhlmann-Anderson. He also

---

[328] As Dr. Stephen Greenspan notes, this score was substantially below the cut-off for mental retardation in use at the time. Declaration of Dr. Stephen Greenspan, Ex. D-19.

took the Metropolitan Achievement Test in April and, although he was as old as most fifth graders, his grade equivalent was 2.1. About a month later when the school year ended, Alfonso was promoted to the third grade only "because of age" at Eugene Field Elementary in Minnesota.

In the fall of 1963, Alfonso started the third grade and was given the Kuhlmann-Anderson IQ test for the third time. He now scored a 79. Alfonso also took the Iowa Basic Skills Test in the fall. His grade equivalent was 2.3, and he was in the eighth percentile. His younger brother Frank, who was only eight, also took the Iowa Basic Skills test this fall and his grade equivalent was 2.6, and his percentile rank was 23. Alfonso was passed from third grade this year.

The next year, Alfonso started the fourth grade and this time the Iowa Basic Skills Test showed his grade equivalent to be 3.3. At the age of twelve, Alfonso passed the fourth grade with C's, D's, and a B in Physical Education. Frank was placed in the fourth grade, and Sylvia in the seventh grade. The next year, Alfonso started the fifth grade and his IQ was tested for the fourth time. He now scored a 74 on the IQ test. Alfonso passed the fifth grade with mostly D's, an F in arithmetic, and a B in Physical Education.

When Alfonso was thirteen years old, he began sixth grade and soon took the Iowa Basic Skills Test again: this time his grade equivalent was 4.8, and the percentile rank was 19 among other sixth graders. That summer, fourteen year old Alfonso "passed" the

117

sixth grade with C's, D's, an F, and a B in Physical Education.[329]

By this time, young Alfonso had taken four IQ tests over a handful of years, and every score qualified him for a classification of mental retardation.[330]

In 1968, Alfonso was a fifteen year old eighth grader. He passed the eighth grade with mostly D's and F's, despite attending 165 of 175 days of school. The next year, however, he failed ninth grade at age sixteen. Alfonso tried again the next year, beginning ninth grade for the second time in 1970. When the school year ended, Alfonso was eighteen years old and had nearly perfect attendance.[331] Alfonso dropped out at age eighteen, and went to work as a janitor at the very same school.[332]

**Struggling to Become A Man**

By the time he was thirteen, Alfonso had begun to cope with the bullying, the sexual abuse and the strange memories that were haunting him daily by turning to drugs and alcohol. He started with beer and cigarettes and moved to marijuana in later years.[333] By his early teenage years, Alfonso was heavily abusing both alcohol and narcotics.[334]

---

[329] *Id.*

[330] Declaration of Dr. Stephen Greenspan, Ex. D-19 at ¶ 48.

[331] *Id.* at ¶ 49.

[332] Alfonso Rodriguez, Jr., Employment Records, Crookston Independent School District, Ex. D-57.

[333] FBI Interview with Gayle Tate, August 12, 2006, Ex. D-112.; FBI Interview with Dorothy Knutson, August 2006, Ex. D-111.

[334] MSH Records, Ex. D-66 (Drug History, March 26, 1980)

Alfonso's drinking was not limited to social occasions.  He would often drink alone, even before going to school.  When he was in the ninth grade, Alfonso took eight seconals (downers) with his friend, Billy Mauer, and passed out in school.[335]

Around this time he started to avoid physical contact. "As a teenager, if someone went to hug Tito, he would tighten up, curl up, and get stiff. He did that when almost anyone hugged him, except for me. He didn't like to be hugged, he stiffened up in an uncomfortable way."[336]  Frank, Alfonso's younger brother, also remembered that his brother did not like to be touched or even to spend time with the family, always slipping away from the dinner table to eat alone.

In the same way Alfonso had trouble fitting in at school, he had trouble navigating the sexual feelings of adolescence.  During 1966 and 1967, Alfonso started making obscene telephone calls to several women.  At first, he would call and hang up.  But on further calls, he gathered his confidence.  He started to put on  a deeper voice to make himself seem more grown-up.  The response Alfonso received was perhaps not what he would have hoped.  Linda Daniels, for instance, refused to take him seriously after he spoke obscenely to her:  "Are you old enough to know what that means? Are you sure you aren't just a little boy playing games?"[337]  Alfonso tried to persuade her that he was over

---

[335]Marilyn Hutchinson, Tr. 7988

[336]Declaration of Sylvia D'Angelo, Ex. D-125, ¶ 26; *see also* Declaration of Thea Posel, Ex. D-15.

[337]Statement of Linda Daniels, April,1967,  Ex. D-148.

eighteen but failed. Instead, she demanded to know where he went to school and then admonished him for "smart[ing] off."[338]

After the police became involved, they traced the number back to the Rodriguez household,[339] Alfonso admitted making the calls and his mother was shocked.[340] The women decided not to press charges, but Alfonso was sent for some mental health care.[341] Although he was never charged or convicted, Alfonso was deeply ashamed.[342] As his sister later recalled, "He was taken to jail by himself. I remember his eyes looking back as they drove him away in the police car. His eyes looked so scared and so sad, like a lost little boy."[343]

Alfonso's family continued to watch him struggle and decline. In 1969, Dolores Rodriguez, out of concern for her son, went to the Crookston Police Department to ask them what she should do about Alfonso. She told the police he "has been acting kind of strange at home for the last year or so. He does not do real good in school." She said she had found a notebook in which he had written "Someone is going to kill me" or "I'm going to kill someone." She reported that he experienced headaches so severe "that he

---

[338] *Id.*

[339] Statement Report by Gail Regan, April 19, 1967, Ex. D-150.

[340] Declaration of Dolores Rodriguez, Ex. D-11, ¶ 27.

[341] Statement Report by Gail Regan, dated April 19, 1967, Ex. 150.

[342] Declaration of Dolores Rodriguez, Ex. D-11, ¶ 27.

[343] Declaration of Sylvia D'Angelo, Ex. D-125, ¶ 37.

just trembles . . . and he goes and puts his head in deep freeze." Dolores said she had taken Alfonso to three clinics, and gotten "pills" from two, with no success. Alfonso had "swelling in back of head at times. She thinks the boy could have a tumor."

Dolores went on to tell the police about other strange behavior Alfonso had been exhibiting. She found panties under his pillow and in his room. Dolores asked the police to put Alfonso "into hospital to see if he has head injuries inside or a tumor." The police left it that Dolores would call them the next Thursday to see if they could get Alfonso into a hospital or clinic.[344] His father continued to deny he had a problem.[345]

Alfonso fared no better in the work world than he had in school. As an adult, the only employment Alfonso has been able to hold down has been menial work, work which requires little thought and can be explained through basic instructions. When Alfonso got a job in the local sugar plant, he was given the worst job they had, on the pellatizer, a job that is described as "smelly and the job they give to the dummies."[346] For a time he even returned to working the fields. "When Tito was about 20, he was working at the alfalfa plant in Crookston. My mother would make lunch for him every day and my father would give him a ride to work. Instead of picking up his lunch, Tito would sometimes accidentally pick up a bag of stale bread or some caramel rolls. Then he'd get to work, realize he picked up the wrong bag, and call the house and ask dad to bring his lunch to

---

[344] Notes of interview with Dolores Rodriguez made by Bernard LaChance, Ex. D-149.

[345] *Id.*

[346] Declaration of Francisco Rodriguez, Ex. D-03.

him."[347]

Alfonso never learned to write well and he would ask his much younger sister Rosa to help him complete forms.[348]  He could not sit still even to watch television and his attention wandered.[349]  Even in his twenties he needed help reading his own medical records.[350]  When sending him books in jail in recent years, his family soon realized that he could not read adult material, not even *Harry Potter*.[351]  Even a greeting card sent to his family never said more than "Love, Tito."[352]

As a teen, the social isolation and outcast life that had begun in grade school became even more severe.  On one occasion, while hanging out with his friends at Sekula's restaurant, Alfonso experienced a particularly traumatic, violent encounter with the father of his girlfriend, Dotsie Dahl.  The man, apparently angry that Alfonso was dating Dotsie, barged into the restaurant brandishing a butcher's knife at Alfonso and threatening him.  No one did anything.  No one called the police.[353]  Once again the people that he thought were his friends had abandoned him.

---

[347]Declaration of Rosa Rodriguez, Ex. D-14.

[348] Declaration of Rosa Rodriguez, Ex. D-14, ¶ 26

[349] Declaration of Ileanna Noyes, Ex. D-09, ¶ 17

[350] Minnesota State Hospital Records, Ex. D-66.

[351] Declaration of Rosa Rodriguez, Ex. D-14, ¶ 29.

[352] *Id.*

[353] FBI Interview with Dorothy Dahl, August 13, 2006, Ex. D-111.

*Redacted*

**Pretending to Be Just Like Us**

Alfonso was mortified by his own cognitive and developmental limitations and went to great lengths to conceal them. Routinely, he exaggerated his abilities or achievements, making every effort to appear as smart––or even smarter—than those around him. "Tito tries to make you think he is smart," his sister Rosa recalled. "He has a hard time admitting that he has challenges and that he has trouble learning and that he struggles with reading and writing."[354]

To compensate, he would boast of mythical achievements. Thus, Drs. Pitt and Martell, the government mental health experts, asked Alfonso to estimate the number of books he had read just in the past two years. "I've got a list," Alfonso said. "About 900."[355]  When Drs. Pitt and Martell asked him to estimate the number of sexual partners he had had, Alfonso paused as if to recall and said, "Phew... Counting one night stands? ... About thirty." He told them he knew martial arts and could "decapitate" someone. "I can knock people out no matter how big," he said. "I can knock them down." He claimed he was a hunter and that he had shot a ten point deer.[356]

He boasted about his wealth, telling an employee at the Minnesota Department of Corrections he had "a large sum of money which he earned through a farm that his

---

[354] Declaration of Rosa Rodriguez, Ex. D-14.

[355] Clinical Interview by Drs. Pitt and Martell, August 4, 2006, Ex. D-83.

[356]*Id.*

grandmother left for him as an inheritance."[357]  He also bragged about "the amount of interest he was earning through unknown investments."  He boasted about his masculinity and virility.  When he was with friends at Sekula's Restaurant, he "would often stand on a brick ledge outside ... in order to look taller."[358]  And in prison, he used to say "he preferred using the lower urinal in order to avoid his penis being submerged in the water."  He "always talked 'tough' among the inmate population, but never showed his aggression physically."[359]

But none of this was true.  There was no inheritance from a wealthy grandmother in Texas and no hidden investments; Alfonso's family has always been poor, sometimes desperately so.  There was no ten point deer; when Alfonso went hunting with his brother and father, "he would just watch them, he would never shoot."[360]  There were no races with friends; "Tito couldn't run" and walked with a pronounced limp.[361]  Alfonso certainly has never read 900 books in his life, let alone in two years at the jail.  In fact, while he was at the jail awaiting trial, his sister took to sending him "puzzles like word searches" because he couldn't understand the "pre-teen books" she used to send him.[362]

---

[357] FBI Interview with Gordon Stoltz, July 14, 2006, Ex. D-110.

[358] FBI Interview with Dorothy Knutson (nee Dahl), p. 7, Ex. D-111.

[359] FBI Interview with Gordon Stoltz, July 14, 2006, Ex. D-110.

[360] Declaration of Francisco Rodriguez, Ex. D-03.

[361] Declaration of Sylvia D'Angelo, Ex. D-111; FBI Interview with Dorothy Knutson (nee Dahl), Ex. D-11.

[362] Declaration of Rosa Rodriguez, Ex. D-14.

*Redacted*

### Falling Apart

In October 1973, Alfonso visited the Northwestern Mental Health Center complaining of anxiety. At that time, Alfonso wanted desperately to understand his increasingly odd behavior and to control his increasingly distressing thoughts and memories. Robert Whalen, the Mental Health Consultant, reported that in November 1974, Alfonso came to see him again requesting help in understanding and discontinuing his behavior. He appeared to feel "lonely, useless, unsuccessful, and lacking in impulse control."[363] Robert Whalen later had three separate interviews with Alfonso when he was in jail at the request of Alfonso's attorney. Alfonso described "feeling down" in jail, having "too much time to think."[364]

On October 18, 1974, not long after midnight, Shirley Seddon was leaving the Viking Bar in Crookston, when Alfonso asked her for a ride home. During the ride, they engaged in small talk, but "Alfonso made no advances towards her, was not flirting with her, and was just talking about various things, although there were some periods of silence."[365] Alfonso knew Shirley from grade school. He remembered her as one of the kids who laughed at him when the fourth grade bully pulled down his pants in front of the

---

[363] MSH Records, Ex. D-66 ( Letter from Northwestern Mental Health Center to Minnesota Security Hospital, January, 1975).

[364] *Id.*

[365] Police statement of Shirley Seddon, October 19, 1974, Ex. D-61.

art class, and he knew she was friends with his brother, Paco.

Shirley told the police that Alfonso directed her to the driveway of a house and when she pulled up by the garage, he "reached over and turned off the ignition" and told her to turn the lights off. Alfonso then grabbed her by the neck and unsnapped her pants, but when she went limp he let go. She started to get out of the car when he pulled her back, saying "let me make it with you." She refused his request for sex, saying she had a disease and she had her period.[366] At that point, Alfonso insisted Ms. Seddon perform oral sex on him, pulling her head into his lap, and "promised that was all that he would do."[367] Alfonso's attitude shifted back and forth from demanding and aggressive to concerned and remorseful. At times he seemed to have no control of himself: he agreed not to touch Ms. Seddon, then placed his hand under her sweater, but stopped when she "screamed at him not to touch her."[368] "He absolutely went from yelling that he was going to kill me to saying he was sorry when it [was over]." In his memory of the event, Alfonso said "she just kept objecting and got me back to my senses."[369] "He seemed to be very sorry for what he had been doing. He told her 'don't be scared.'"[370] During the

---

[366] Shirley Seddon Tr. 6192; Police statement of Shirley Seddon, October 19, 1974, Ex. D-61; Alfonso Rodriguez Police Interview, October 19, 1974, Ex. D-62.

[367] Shirley Seddon, August 21, 2006, Tr. 6192.

[368] Police statement of Shirley Seddon, October 19,1974.

[369] Police Statement of Alfonso Rodriguez, October 21, 1974, Ex. D-62.

[370] Police statement of Shirley Seddon, October 19, 1974, Ex. D-61.

126

incident, Alfonso did not reach a climax.[371]

On the drive back to his house, Alfonso told Ms. Seddon "he had problems and he needed help." When they reached Alfonso's house, Ms. Seddon told him she was going to report the incident and Alfonso "told me he was sorry and he didn't know what was wrong with him, and asked me to help him."[372] Shirley and her parents reported the attack to the police the following afternoon, and Alfonso was arrested. He reiterated this remorse and desire for help when interviewed by the police. "I told her that I needed help," to which the officer replied, "[w]hy did you tell her you needed help?", and Mr. Rodriguez replied "I don't know, but I do need help."

Alfonso repeatedly told the police he did not remember most of the incident with Ms. Seddon, and appeared to remember little of it even immediately afterwards.[373] When she heard about his arrest, Alfonso's sister Sylvia told their mother that Alfonso may have been "acting out" because both Sylvia and Alfonso had been sexually abused at the Catholic migrant school as young children. Dolores and Ileanna went to the jail to confront Alfonso with this information and he told his mother about it for the first time.[374] After Alfonso was released from jail, he returned home and his parents found him quieter

---

[371] Police Statement of Shirley Seddon, October 19, 1974, Ex. D-61

[372] Shirley Seddon, Tr. 6198.

[373] Police Statement of Alfonso Rodriguez, October 19, 1974, Ex. D-62.

[374] Declaration of Dolores Rodriguez, Ex. D-11, ¶ 32; Declaration of Sylvia D'Angelo, Ex. D-125, ¶ 36.

and more withdrawn than usual, unwilling even to sit at the dinner table with them,

preferring to eat his meals elsewhere in the house.[375]

After about a week, perhaps because he was ashamed, he moved out of his parents'

house. "We thought, although he never told us, that he was ashamed of what he had

done. So after about a week he found an apartment and moved out."[376] Alfonso moved in

with Dotsie Dahl. Although he was living with his girlfriend, his father still came to pick

up his laundry for him, and his mother still washed his clothes.

Unable to control or comprehend what was happening, Alfonso continued his

downward spiral. On November 19, 1974, he brandished a knife at Elizabeth Knudson as

she was getting into her father's pick up truck outside a movie theater and forced her to

drive to a secluded area.[377] He then told her to undress, at which point ". . . he touch[ed]

me. And asked me if I was a virgin? And I said that's none of your business. And then

he said are you a virgin? And I said that's none of your business, and he asked me again.

And then I said no I am not. And he said good. And then he said lay down. And I layed

down and he got on top of me. And went through it."[378] Afterwards, Elizabeth said, "I

don't want you to hurt me and I don't want to be killed. But get rid of that knife," and

---

[375] MSH Records, Ex. D-66 (Medical and Social History Questionnaire, February 1975)

[376] *Id.*

[377] Police interview with Elizabeth Knudson, November 20,1974, Ex. D-60; Elizabeth Knudson, Tr. 6206-09.

[378]Police interview with Elizabeth Knudson, November 20, 1974, Ex. D-60.

Alfonso threw the knife out of the window.[379] Ms. Knudson then drove him back into town. During the ride, Alfonso told Ms. Knudson "he felt ridiculous after what he had just done. Ms. Knudson then drove home and reported the incident to the police.

After pleading guilty in December 1974, to the attempted rape of Shirley Seddon and the aggravated rape, aggravated assault and kidnapping of Elizabeth Knudson, Alfonso was admitted to the Minnesota Security Hospital ("MSH") in January 1975. He was admitted for purposes of a 65 day, pre-sentence social, physical, and mental examination, pursuant to Minnesota Statute 246.43.[380] Between the examination, his sentence, and the treatment he received, he was there for over five years.

Alfonso Rodriguez's life did not end when he went to prison. At his capital trial, the defense focused on his compliance, his complete absence of disciplinary infractions, his adaptability to prison. All of this is certainly true. But the signs and symptoms that mark Alfonso as mentally ill – that identify him as cognitively and developmentally impaired, as traumatized, as a man who has been horribly abused – were also present in prison. They are an integral part of his life and cannot be ignored.

### Minnesota State Hospital[381]

---

[379] *Id.*

[380] MSH Records, Ex. D-66 (Physician's Order Sheet, January 2, 1975).

[381] Mr. Rodriguez's time in the Minnesota State Hospital and programs related to it, from 1975 until 1980, is summarized in a narrative that is attached to this petition as Ex. D-147. The records themselves appear at Ex. D-66. The narrative and exhibits are incorporated here by reference.

While at the Minnesota State Hospital ("MSH"), Alfonso Rodriguez's developmental and mental health difficulties continued to manifest, as is abundantly reflected in the records of his time there. Mr. Rodriguez was diagnosed upon entering MSH, and repeated findings highlighting anxiety and depression were made throughout his stay. His history of alcohol abuse also figured prominently. It was decided that he could derive benefit from programs on his alcohol use, counseling and sex offender treatment.[382] As such, it was recommended to the Commissioner of Public Welfare that Alfonso should be committed "for care and treatment as a convicted sex offender."[383]

In May 1975, Alfonso began the Chemical Dependency Program.[384] In June 1975, he entered the Intensive Treatment Program for Sexual Aggressives (I.T.P.S.A.),[385] and was transferred to the Sex Offender Treatment Unit.[386] To move through the latter phases

---

[382] MSH Records, Ex. D-66 (Letter to Minnesota Department of Public Welfare, February 14, 1975).

[383] MSH Records, Ex. D-66 (Letter to Commissioner of Public Welfare, February 14, 1975).

[384] MSH Records, Ex. D-66 (Progress Notes, May 6, 1975).

[385] MSH Records, Ex. D-66 (Psychological Report, November 28, 1978).

[386] MSH Records, Ex. D-66 (Psychological Report, December 1, 1976). The I.T.P.S.A. is broken down into 15 Steps of Progress which are split into different phases: Phase 1 is the in-patient treatment and includes ten steps, each one lasting a minimum of 30 days, except for stage 10, which lasts a minimum of 4 months. Phase 2 consists of Step 11, which lasts a minimum of 4 months. Phase 3 includes Step 12, which lasts a minimum of 3 months. Phase 4 consists of Step 13, which lasts a minimum of 3 months. For a person to move on, the staff must be comfortable with the resident's "ability, honesty, and effort in his day-to-day functioning." Phase 4 also consists of Step 14, which lasts a minimum of 3 months. Phase 6 consists of Step 15 which lasts a minimum of 12 months.

of the program, staff must be satisfied with the resident's "ability, honesty, and effort in his day-to-day functioning." In the final stages, all reports must be favorable and the resident's support system must be firmly established.[387]

The medical director of MSH, C.G. Sheppard, and psychologist Gerald Ziesemer assessed Alfonso in January 1975.[388] Psychological testing suggested:

> [A] person who is quite depressed with considerable anxiety and undue sensitiveness. He appears to have a tendency to drink excessively and an effort to relax and escape from feelings of inadequacy, sexual conflict, and chronic tension. He may appear overly sensitive to the responses and intentions of people around him and chronically misinterpret the words and actions of other people which then results in difficulties in his interpersonal relationships. He may lack insight and have difficulty empathizing with other people and understanding other people's reactions to him. He may appear to be resentful, constricted and an apprehensive person who feels delusional and embittered. A distrustful, suspicious, and querulous life style may alienate people and impair his social interactions. Such a pattern of response usually occurs in psychiatric patients who require in-patient care because of a major emotional disorder.[389]

Upon Mr. Rodriguez's admission at MSH, psychological testing indicated depression and anxiety.[390] He was diagnosed and treated for depressive symptoms, and

---

[387] MSH Records, Ex. D-66 (I.T.P.S.A. Steps of Progress).

[388] MSH Records, Ex. D-66 (Psychological Report, January 29, 1975).

[389] MSH Records, Ex. D-66 (Psychological Report, January 29, 1975).

[390] Declaration of Dr. Pablo Stewart, Ex. D-17, MSH Records, Ex. D-66 (MSH Psychological Report, Jan. 29, 1975).

received anti-depressants in 1976.[391]  Staff noted that test results "indicate that he is a depressed individual who often experiences feelings of inadequacy, sexual conflict and rigidity which are accompanied by a loss of efficiency, initiative and self-confidence."[392]

In addition to the difficulties he experienced in functioning, discussed below, Mr. Rodriguez was diagnosed with anxiety, depression, and alcohol dependence, throughout his time at MSH.[393]  In that same time frame, he was treated for symptoms of nervous tension, impulsivity, sleep disturbances, social anxiety and depression.[394]  He experienced blackouts, serious enough that they once forced the cancellation of a visit from his parents.[395]

A March 1978 review highlighted Alfonso's chemical dependency as one "very significant problem" area remaining to be addressed.[396]  Although he varied on this point, Alfonso showed self-awareness about his chemical dependency in August 1978, and had visited the Horizon House, a chemical dependency halfway house in Mankato.  "He believes there is a personal need to continue working on his chemical dependency problems.  He reports a history of drug and alcohol dependency, explaining how his use

---

[391]  Declaration of Dr. Pablo Stewart, Ex. D-17, p. 15,  MSH Records, Ex. D-66.

[392]  Declaration of Dr. Pablo Stewart, Ex. D-17, MSH Records, Ex. D-66.

[393]  Declaration of Dr. Pablo Stewart, Ex. D-17, at p. 9.

[394]  *Id*.

[395]  MSH Records, Ex. D-66 (Progress Notes, September 20, 1976).

[396]  MSH Records, Ex. D-66 (Psychological Report, March 17, 1978).

of drugs was first an escape and eventually a crutch to him.  Mr. Rodriguez believes

drinking enabled him to lower his self-esteem and getting down on himself.  He states,

'I've got to stay on top of it.'"[397] Alfonso was looking for a chemical dependency support

group and help as early as October 1978 when considering a move to Mankato.[398]  In

November 1978, Alfonso "cited a recent example of telling a friend that he is chemically

dependent.  He seemed to be tremendously pleased about his own openness in telling the

friend as well as the friend's respect of his position."[399]

A Drug History review in March 1980 showed Mr. Rodriguez to be chemically

dependent.  "The Mac Andrews outcome scale raw score is 32, indicative of an alcohol

problem.  Mr. Rodriguez is aware of his chemical dependency, but seems to minimize its

magnitude of possible future consequences.  He has been involved in AA in Mankato and

Crookston and plans to attend.  He is "OK" with AA philosophy but has difficulty with

AA meetings being supportive rather than confrontive; self helping rather than

therapeutic."[400]  It is noted that alcohol or drug use could "undo the positive changes he

has made."[401]  In April 1980, Alfonso attended a Transition Group meeting and was

---

[397]  MSH Records, Ex. D-66 (Mini Team Meeting, August 30, 1978).

[398]  MSH Records, Ex. D-66 (Psychiatric Consultation, October 12, 1978).

[399]  MSH Records, Ex. D-66 (Psychological Report, November 28, 1978).

[400]  MSH Records, Ex. D-66 (Drug History, March 26, 1980).

[401]  MSH Records, Ex. D-66 (Drug History, March 26, 1980).

"somewhat negative about his past experience with Alcoholics Anonymous."[402]  In May 1980, Alfonso attended a CD group and "participated in the discussions."[403]

A diagnosis of depression, supported by observations of specific symptoms, persisted during Mr. Rodriguez's time at MSH.  In February 1976, Alfonso recorded feeling quite depressed:  "For the past weeks I have felt depressed because there is a lot of thing going on that I don't know where to begin…I feel like quitting the whole thing."[404]  In March 1976, his psychologists observed that, "[d]uring the last two weeks Mr. Rodriguez seems to be experiencing some severe problems with depressions and anxiety."[405]

Alfonso's depression continued as his anxieties grew, especially around the idea of him being released.  "But there's something wrong with me.  I don't want to get out because I am a little scared it feels like I'd be here so long I don't know what it would be like out there."[406]  His awareness of his feelings seemed to frighten him further.  "For the past week I have felt real funny inside…But I don't know what is going on.  I have never felt this way before."[407]

---

[402]  MSH Records, Ex. D-66 (Progress Notes, April 2, 1980).

[403]  MSH Progress Notes, May 8, 1980.

[404]  MSH Records, Ex. D-66 (Progress Notes, February 27, 1976.)

[405]  MSH Records, Ex. D-66 (Psychological Report, March 22, 1976).

[406]  MSH Records, Ex. D-66 (Medical Progress Notes, March 15, 1976).

[407]  MSH Records, Ex. D-66 (Progress Notes, March 20, 1976).

As was the case for depression, MSH records include repeated observations, diagnoses, and treatment of anxiety.[408]  In April 1976, Alfonso discussed his childhood sexual abuse with a staff member.[409]  In May 1976, Alfonso dreamt about the girl he had raped and said that, "at time there feeling get so drown that I feel like cry.  Past six weeks I have being dreaming about the girl I'd raped maybe it's guilt but it's getting to me at time I can't even go to sleep.  But I am working on all the feeling and it will work out."[410] In another dream in May 1976, Alfonso felt that "some guy was going to shot me and at the time that he fired the N.G. were out in front of the hospital for Memorial Day."[411]

Alfonso's symptoms of anxiety increased in the time leading up to his release, when he began to panic.[412]  His anxiety around his fear of leaving one phase of the treatment program became severe enough that he was placed on medication.[413]  His fear of departure increased.  His family observed the same thing.  Writing about the end of his time at MSH, his mother says "I remember that he would be very anxious when he came back to Crookston.  He started to panic sometimes and wanted to go back to the

---

[408]  Declaration of Dr. Pablo Stewart, Ex. D-17; MSH Records, Exhibit 66 (Progress Notes, Active Treatment Plan, Psychological Report, Jan. 29, 1975-April 2, 1980).

[409]  Tr. 8018

[410]  MSH Records, Ex. D-66 (Progress Notes, May 2, 1976).

[411]  MSH Records, Ex. D-66 (Progress Notes, May, 31,1976).

[412]  Declaration of Dr. Pablo Stewart, Ex. D-17;  MSH Records, Ex. D-66.

[413]  Declaration of Dr. Pablo Stewart, Ex. D-17, MSH Records, Ex. D-66 (MSH Monthly Summary Notes, April 11, 1976).

135

hospital."[414]

He frequently displayed symptoms of hyperarousal, including being particularly sensitive to derogatory remarks about his race, going so far as to request a special group session to discuss it and confront other group members about it.[415] He exhibited problems falling asleep because of persistent thoughts of his problems, considered to be a classic symptom of PTSD, and was eventually provided medication for insomnia.[416]

Many of Mr. Rodriguez's functional limitations were noted by MSH staff. Unfortunately, the observations were not followed through to conclusion. Among these, staff observed Mr. Rodriguez's difficulties in reading. They realized that he had "limitations in reading as indicated in his Peabody Individual Achievement Tests scores and it is possible that some of the apparent confusion and disorganization may have been the result of his inability to understand the items."[417] Progress notes reflect that Mr. Rodriguez had difficulty reading his medical records, in sharp contrast to his exaggerated claims about the number of books he had read. He needed and asked for the assistance of staff in order to make his way through them.[418] He also had difficulty writing. Written

---

[414] Declaration of Dolores Rodriguez, Ex. D-11, p. 6.

[415] Declaration of Dr. Pablo Stewart, Ex. D-17, MSH Records, Ex. D-66.

[416] Declaration of Dr. Pablo Stewart, Ex. D-17, MSH Records, Ex. D-66.

[417] MSH Records, Ex. D-66 (Psychological Report, January 29, 1975).

[418] Declaration of Stephen Greenspan, Ex. D-19, p. 21;  MSH Records, Exhibit D-66.

assignments were described as brief and sketchy in content.[419]

Mr. Rodriguez's limitations are reflected in his employment before, during and after his time at MSH.  Mr. Rodriguez had demonstrated difficulty in holding a job for long.  Just as before his arrival and after his departure, his job skills and his ability to function in an employment setting remained low.[420]  While at MSH, Mr. Rodriguez worked as a janitor on campus for four hours a day.

Mr. Rodriguez's limitations were also reflected in his ability to form and maintain relationships while in prison.  Although there were times when notes reflect him interacting with others more effectively, MSH records show that "his social life does not appear to involve much relationship building of a significant degree."[421]

Alfonso struggled with social interactions, even within his own ward at the hospital.  He was observed "hiding in his room quite a bit."[422]  One writer observed that "Al needs to deal with the fact that he can still be swayed easily and this continually confuses him as to where he's at in the program and how he views the program itself."[423]  Staff noted an ongoing failure to stick up for himself.  He was not was always able to

---

[419]  MSH Records, Ex. D-66 (Psychological Report, December 1, 1976).

[420]  Declaration of Stephen Greenspan, Ex. D-19, p. 21; MSH Records, Ex. D-66 (MSH Progress Notes, October 4, 1978).

[421]  Declaration of Stephen Greenspan, Ex. D-19, p. 21;  MSH Records, Ex. D-66 (MSH Progress Notes, Feb. 13, 1979).

[422]  MSH Records, Ex. D-66 (Progress Notes, January 9, 1976).

[423]  MSH Records, Ex. D-66 (Progress Notes, January 9, 1976).

share his opinions because he wanted to retain friends. "AR says he is afraid to speak out against the bad attitudes on the ward because he's afraid of losing all his friends."[424] Mr. Rodriguez's preferred solution was to leave the situation. He wanted to escape the problem by going to "the Hill."[425] Observers felt that he was holding many things inside which were affecting him.[426]

In April 1976, the results of a psychiatric consultation discussed Alfonso's alcohol abuse and the fact that "a suppression of feelings helped precipitate the rapes." While at this time, Alfonso felt that he was ready to leave MSH and go to a half-way house in the Mankato area, this opinion was "apparently not shared by members of the staff who feel that he should come closer to completing the two year program." The consultant questioned the accuracy of Alfonso's declarations. "I had some feeling that I was being conned and that Mr. Rodriguez was conning himself - that is to say that he is not as ready for the outside as he believes."[427] The conclusion of the psychiatric and psychological re-evaluation of Alfonso was that he continued "to remain free of psychosis."[428] In a 1976 Letter to the Commissioner in April 1976, it was recommended that Alfonso continue at

---

[424] MSH Records, Ex. D-66 (Progress Notes, 1976).

[425] MSH Records, Ex. D-66 (Progress Notes, 1976).

[426] MSH Records, Ex. D-66 (Progress Notes, January 27, 1976).

[427] MSH Records, Ex. D-66 (Psychiatric Consultation, April 1, 1976).

[428] MSH Records, Ex. D-66 (Letter to Commissioner Vera J. Likins, April 5,1976).

least another year of treatment.[429]

Mr. Rodriguez also showed difficulty functioning and living independently at the time of his arrival at MSH.  MSH medical and social history records reflect that he had not lived in the community as an adult for any significant time, and even on the brief occasions when he was not living at home he remained functionally tethered there.[430]

In an interview in November 1978, Alfonso still felt "'out of place' both with white people and with Spanish people."[431]  He expressed a desire to move to Texas to "gain a stronger sense of his racial identity."[432]  Psychologists observed that there was a period of time in which "he became more accessible to a broader group of people" but he still had a tendency to follow others' opinions too.  In the months of 1978, it was noted that "Mr. Rodriguez has attained a level of independency within the small therapy group while maintaining adequate openness with most group members in the therapy sessions and on the living unit as well."[433]

Although he at times was able to function independently, on furloughs and in community placement, the difficulty Alfonso experienced with adapting to the challenges of independent functioning when he arrived at MSH toward the end of his stay at MSH

---

[429]  MSH Records, Ex. D-66 (Letter to Commissioner Vera J. Likins, April 5, 1976).

[430]Declaration of Stephen Greenspan, Ex. D-19, p. 22;  MSH Records, Ex. D-66.

[431]  MSH Records, Ex. D-66 (Psychological Report, November 28, 1978).

[432]  MSH Records, Ex. D-66 (Psychological Report, November 28, 1978).

[433]  MSH Records, Ex. D-66 (Psychological Report, November 28, 1978).

mirrored those that the demonstrated toward the end of his stay, five years later.  Later in his stay, while he was in the process of transitioning into community-based placement, staff noted his difficulties in making arrangements to set up work placement, saying "he appears to be awaiting movement."[434]

In August 1979, Alfonso was on furlough in Mankato when a woman there was sexually assaulted.  Alfonso was accused of the crime and held in Blue Earth County Jail on charges of for kidnapping, aggravated rape, criminal sexual assault first and second degree, and second degree assault.[435]

Alfonso returned voluntarily to the I.T.P.S.A. Unit until the trial and after his eventual aquittal.[436]  He was "co-operative and helpful on the unit at that time"[437]

---

[434]  Declaration of Stephen Greenspan, Ex. D-19, p. 21; MSH Records, Ex. D-66 (MSH Progress Notes, Nov. 13, 1978).

[435]  MSH General Team Meeting, March 20, 1980.

[436]  MSH Records, Ex. D-66 General Team Meeting, March 19, 1980.

[437]  MSH Records, Ex. D-66 Progress Notes, November 14, 1979.

**Minnesota Department of Corrections**

On May 9, 1980, Alfonso Rodriguez Jr. was arrested by the Polk County Sheriff while at Minnesota Security Hospital (MSH).  He was charged with three counts of assault, one count of false imprisonment and one count of kidnapping in the case of Ardyce Whalen and placed in the Polk County Jail.[438]  On June 11, 1980, he was found guilty of first degree assault and the attempted kidnapping of Ardyce Whalen and sentenced to 0-20 years in prison, to run consecutively with the remainder of his 0-15 year sentence from his 1974 conviction:  on July 9, he was transferred to The Minnesota Correctional Facility in Stillwater.[439]

In his admission interview on July 15, the interviewer noted that Mr. Rodriguez "tries to present himself as extremely masculine and adventurous."  In his first classification summary at Stillwater, on September 8, 1980, Alfonso was described as having "below average" intelligence with an achievement level on the WRAT test of Reading: 6.7 and Math: 4.3.  Mr. Rodriguez quickly obtained employment in the "B shop" of the prison industries as an assemblyman, and was described as a capable worker.[440]

As he would continue to do throughout his incarceration, Mr. Rodriguez

---

[438] DOC Records, Ex. D-66 (MSH Psychological Report, July 15, 1981).

[439] DOC Records, Ex. D-67 (MN DOC Uniform Case Report, June 17, 1980; MCF Stillwater Classification Summary, September 8, 1980).

[440] DOC Records, Ex. D-67 (MCF Stillwater Classification Summary, September 9, 1980).

proclaimed his innocence of the Ardyce Whalen attack, and made clear his sense of injustice.[441]

During his first year at Stillwater, Mr. Rodriguez participated in the ATZLAN Mexican Cultural Support Group, which organized a Spanish mass, meals, donations of food and consumer goods, and involved prisoners going out into the community under supervision. He declined chemical dependency treatment, stating that he did not have a chemical dependency problem.[442]

On September 16, 1980, Mr. Rodriguez appeared before the Classification Team, who again encouraged him to participate in the sex offender treatment program. However, the bureaucratic hurdles were already apparent. The Lino Lakes Sex Offender Program would not take Mr. Rodriguez because of his lengthy involvement in the St. Peter Sex Offender Program. Mr. Rodriguez was informed that if he did not receive treatment it was a very good likelihood that the Minnesota Corrections Board (MCB) would require him to serve his full sentence, and he stated that he was willing to participate in the treatment at some point in the future, but as he was appealing his case, he wanted to await the final disposition of his appeal before making any commitment toward a treatment program.[443]

---

[441] DOC Records, Ex. D-67 (MCF Stillwater Classification Summary, December 7,1980).

[442] DOC Records, Ex. D-67 (MCF Stillwater Classification Summary, September 8, 1980).

[443] DOC Records, Ex. D-67 (Classification Committee Recommendation, September 16, 1980).

In October, 1980, a memo from the Transitional Sex Offender Program (TSOP) Staff indicated that Alfonso "appears to be an appropriate candidate for treatment; discuss our program with him."[444]  On November 25, 1980, Alfonso's case was evaluated by the full five-member MCB.  The Board decided Alfonso could not be released until he was certified as no longer dangerous.[445]  In December the parole board came to the same conclusion.[446]

Alfonso was visited at Stillwater by an MSH psychiatrist on July 3, 1981, pursuant to his previous commitment to the Commissioner of Public Welfare under Statute 246.43. Dr Beltt of the MSH sought the cooperation of Stillwater authorities to assess Alfonso's mental health issues, to discover whether he should be re-institutionalized at St Peter.[447] Alfonso reiterated his innocence claim, and his sense of betrayal.  He was upset none of the MSH staff supported him by attending his trial, and said he would never return to the program because of his feelings of abandonment by the staff.

Dr. Beltt decided that there was nothing in Mr. Rodriguez's assessment which would warrant placing him in a psychiatric hospital.[448]  Consequently, on July 20, Dr. C.

---

[444] DOC Records, Ex. D-67, Office Memo, October 1, 1980.

[445] DOC Records, Ex. D-67, Corrections Board Action Report, November 25, 1980.

[446] MSH Records, Psychological Report, July 15, 1981.

[447] MSH Records, Progress Notes, July 15, 1981.

[448] MSH Records, Psychological Report, 7/15/81; MSH Psychological Report, Bruce M. Beltt, July 15, 1981.

G. Sheppard wrote to Commissioner Arthur Noot to tell him he felt Alfonso was "not a suitable candidate for rehabilitative efforts in the mental health system," and that he should stay at Stillwater.[449] On January 18, 1982, Commissioner Arthur Noot notified the court that the Department of Public Welfare would not be attempting to maintain any legal jurisdiction over Mr. Rodriguez beyond April 3, 1982.[450]

A sentencing guideline change, in August 1981, had the effect of setting a projected release date for Alfonso of 12/08/2002, later than he had anticipated, and was a cause of further resentment on Alfonso's part.[451]

On December 14, 1982 Alfonso's annual evaluation noted that Alfonso was employed in the print shop.[452] On February 3, Alfonso received a transfer authorization from Stillwater to Oak Park Heights.[453] The general feeling by the prison authorities was that Alfonso's time at Stillwater had been positive. He was frequently recalled as a quiet, tidy, inmate who stayed out of trouble. Paul Stack stated that Alfonso was a quiet inmate, almost unknown outside of his own culture group and had no discipline reports.[454]

---

[449] MSH Records, D-66, Letter from C.G. Sheppard to Commissioner Arthur Noot, July 20, 1981.

[450] MSH Records, D-66, Letter from Commissioner Noot to Judge Peterson, January 18, 1982.

[451] DOC Records, D-67, Classification Summary, December 07,1981.

[452] DOC Records, D-67, Annual Review, December 14, 1982.

[453] Transfer Authorization, February 3, 1983.

[454] Classification Notes, February 22, 1983.

Alfonso moved to Oak Park Heights on May 10, 1983.  At his new facility, Alfonso was quickly employed in the bookbinding area, and as a canteen clerk.[455]

On December 29, 1983, Alfonso had his annual review at Oak Park Heights, which included another WRAT exam.  The review noted that his reading grade was 6.7 and his math grade was 4.3.  The report further noted that his overall adjustment was excellent, that he maintained a continuous above-average work history and a report-free discipline history.[456]  On March 8, 1984, Alfonso learned that his petition for post-conviction relief in the Ardyce Whalen case, based upon objections to the use of hypnotism, had been denied.[457]  In December, 1984 Alfonso met with the Annual Review Committee, who noted that he "remains report-free to date and maintains a positive continuous work history."[458]

Also this year, Alfonso was struck by an attack of Bell's Palsy, severe enough to warrant a trip to the Ramsey Hospital's Ear, Nose and Throat Clinic.  Alfonso first complained of pain in his left ear on October 4, and by October 16, he was taken to the hospital for care.[459]  In 1985, Alfonso began working in the service unit as a "swamper,"

---

[455] Classification Notes for Transfer Request, August 11, 1983.

[456] Annual Review, December 29, 1983.

[457] Ms. Frederick Letter to Alfonso, March 8, 1984.

[458] Annual Progress Review, December 28, 1984.

[459] DOC Medical Records, October16, 1984; Outside Trip Request October 12, 1984.

in the laundry at Oak Park Heights.[460]  By this year, he was also residing in the Honor

Unit, and received above average performance evaluations and no disciplinary reviews.[461]

On August 19, Alfonso complained that his heart was pounding and he exhibited

hand, arm, and mouth tremors, a shaky voice, and "looked extremely anxious…heart

pounding and cannot catch his breath…admits to being very nervous lately."  As well as

treating the physical symptoms, the doctor decided to refer Alfonso to a psychiatrist.[462]

On December 27, 1985 Alfonso's annual review at Oak Park Heights was

conducted.  A WRAT was administered.  His reading grade level was 6.7 and math level

was 4.3.  On January 1, 1986, a continuation of Alfonso's annual review noted Alfonso

lived in the Service/Honor Unit, was effectively employed in the unit Laundry, received

above average performance evaluations, and received no disciplinary reports.[463]  In his

December, 1986 annual review, Alfonso continued to put off the question of undertaking

sex offender treatment programming.[464]  By 1987, Alfonso was working in the office

machine repair program,[465] and earned $980 in total through his work at Oak Park

---

[460] Mark E. Brooks, Tr. 8162-63.

[461] Annual Review, December 27, 1985.

[462] DOC Clinical Record, August 1985.

[463] Continuation of Annual Review, January 2, 1986.

[464] Oak Park Heights Annual Review, December 4, 1986.

[465] Jill Rhoda Tigner, Tr. 8151.

Heights.[466] Alfonso had asked to transfer back to Stillwater and on April 23, the request was approved. The transfer request comments noted that "he has received above average performance evaluations" in his work department and "since becoming incarcerated on 7/9/1980, Mr. Rodriguez has remained free of all major and minor disciplinary infractions."[467] On April 29, 1987, Alfonso's records were transferred to Stillwater from Oak Park Heights.[468]

In December 1987, Alfonso's first annual review after his return to Stillwater noted that he had been employed as a press worker in the print shop and that his positive adjustment in the institution had continued. The recommendation was that Alfonso's file go back before the Program Review Team to discuss the issue of mandated residential placement.[469] On May 29, the WRAT was administered to Alfonso. He scored: Level 11; Reading 6E; Mathematics 6E.[470]

Alfonso's annual review in 1988 noted that he was continuing to do well in the institution and had no disciplinary activity, but that he had failed to take sex offender treatment. Alfonso again expressed a willingness to participate in the future, but again no

---

[466] Social Security Earnings Information, September 13, 2005.

[467] Transfer Request, April 23, 1987.

[468] Receipt of Inmate and/or Records, April 29, 1987.

[469] Annual Review, December 11, 1987.

[470] Initial Education Summary, May 12, 1987.

action was taken.[471]  On December 12, 1989, Alfonso had his 1989 annual review, which

stated:

> To date, Mr. Rodriguez continues to work in [the print shop].
> His supervisor indicates an excellent job performance.  Mr.
> Rodriguez was reviewed at his Annual Review. Team notes
> that he does meet the residential mandate. Currently he is
> employed in MOR and has a good work record.  The subject
> has had no disciplinary reports in the last year.  Mr. Rodriguez
> should be commended on his institutional behavior.[472]

On December 3, 1991, Alfonso's annual review was prepared by Jose Lopez, who

states: "Subject's adjustment is excellent, remaining discipline free, and continuing to

work for Office Machinery Repair."  His supervisor stated that his work is excellent and

his institutional adjustment very satisfactory.  Alfonso had become eligible for medium

security placement, but at first the team members elected to take no action on this,

because of the substantial confinement time remaining.[473]  The next year, Alfonso was

given permission to transfer to a medium security facility, given that "subject's

adjustment in this institution has been excellent, remaining discipline free.[474]

During his time in Stillwater, Alfonso was known as a quiet inmate, and, according

to his case manager, did not talk to anyone more than he had to.  His days began with

work in the print shop, then he usually spent the rest of the day watching television or

---

[471] Annual Review, December 15, 1988.

[472] Annual Progress Review, December 12, 1989.

[473] Annual Progress Review, December 3, 1991.

[474] Annual Progress Review, November 23, 1992.

reading.  Particularly after giving up drinking and drugs, Alfonso became even more of a loner.[475]

On October 1, 1993, Alfonso's father, Alfonso Rodriguez Sr. died of cancer.[476] Alfonso was given special permission to attend the wake.  Alfonso was escorted by just one guard, Mr. Lopez.  When the other guard who had also been assigned to the visit did not show up, Mr. Lopez decided to take Alfonso himself because he knew Alfonso to be such a trouble-free inmate.  On the eight hour drive, Mr. Lopez and Alfonso did not speak about anything personal.  Mr. Lopez recalled that Alfonso wept and seemed very upset at the funeral.  In Mr. Lopez's view, Alfonso's behavior on the visit indicated to him, Mr. Lopez, that Alfonso was "ready to go out."  Mr..Lopez took Alfonso's shackles off part way through the visit, leaving the handcuffs on.[477]

On December 3, 1993, Alfonso's annual review was prepared by Mr. Lopez, the team chair.  The review states:

> His supervisor work evaluations are good to excellent.
> Subject has remained discipline free through all this year of
> incarceration.  It is this writer's belief that Mr. Rodriguez
> deserves to be transferred to a medium facility.  Subject is in
> good heath and he stated that he does not have any
> compatibility problems here or at any other institution.  Mr.
> Rodriguez expresses a willingness to participate in sex

---

[475] Ex. D-146 (FBI Interview of Jose Lopez).

[476] Dolores Rodriguez, Tr.7672. Tr. 7475; Social Security – Alfonso Rodriguez Sr.

[477] DOC Records, Ex. D-67, Outside Trip Request, October 1, 1993, (Classification Committee Recommendation, September 16, 1980).

offender programming at a medium facility.[478]

In addition, the team "records a unanimous vote in favor of transfer to either MCF/LL Work Program/Sex Offender Program or MCF/ML Work Program/Sex Offender Program. Team rationale is that when the total length of sentence is taken into consideration Mr. Rodriguez has done more than 50% of his time and done so in an exemplary manner. Additionally, he is willing to participate in sex offender treatment programming at either medium facility."[479]

On February 23, 1994 Alfonso was transferred to Moose Lake Correctional Facility, a medium security institution.[480] The first recorded interruption of Alfonso's perfect institutional disciplinary record came this year. Alfonso received a notice of violation for tampering with a security device—he threw rocks at a perimeter patrol vehicle. The rocks did not hit the vehicle. Alfonso pled guilty to the violation and was given 10 days of segregation for the incident.[481] On July 1, the Due Process Office at MCF-St. Cloud sent Alfonso a memo regarding Good Time/Discipline Confinement Time Added Adjustment. They informed him that he has lost two days of good time for the rock-throwing incident.[482]

---

[478] Annual Progress Review, December 3, 1993.

[479] Authorization for Institution Transfer, December 14, 1993.

[480] Authorization for Transfer, February 23, 1994; Steven J. Ergen, Tr. 8205-6.

[481] Waiver of Hearing and Plea of Guilty, June 9, 1994.

[482] Good Time/Discipline Confinement Time Added Adjustment Memo, July 1, 1994.

Back problems also began to plague Alfonso from 1994 onwards. Several times in March he reported back pain and was prescribed pain killers, and in October he painfully twisted his lower back and was prescribed Robaxin.[483]

Despite the single disciplinary infraction, by 1996, Alfonso was on unit ten in Moose Lake Correctional Facility, known as the Honor Unit. To be on this unit, an inmate needed to have a clear disciplinary record for a certain period of time, and to have good work reports.[484] For the next several years, Alfonso's annual reviews followed the same pattern. His good work reports and discipline-free confinement were duly noted, alongside the need for sex offender treatment. Prison officials claim Alfonso annually declined to participate in this treatment, but no such refusal is noted in his prison records until December 2001.[485]

As Alfonso's release date approached, his sister Ileanna became concerned about how he would cope. She contacted Keith Mills, Alfonso's Probation Officer, to see about support groups or reintegration programs. She was disappointed to learn there was nothing available. Mills told her Alfonso would have no supervision at all. Ileanna noted that Mills was shocked at discovering the decision to release Alfonso without supervision. Sylvia and Ileanna also called Ruth Johnson at the Minneapolis office of Amicus in an attempt to find a halfway house for Alfonso. Again, they were told there was no funding

---

[483] Clinical Record, March-October 1994; DOC Dental Records, March10, 1994.

[484] Steven J. Ergen, Tr. 8195.

[485] Ted Mickelson, Tr. 8257.

151

available.  Even when Sylvia volunteered to pay privately, nothing was offered.[486]

Ileanna also called the Polk County Attorney's office, and Tim Motherway, the Crookston

Police Chief in 2003, to find out more about the Civil Commitment and Community

Notification processes.[487]

In December 2002, Ted Mickelson made Alfonso's end of confinement review

packet.[488]  On December 17, Barbara Overland wrote to notify the Crookston Police

Department of Alfonso's upcoming End of Confinement Review and informed the Chief

that the department had the right to provide relevant information, particularly for the

Community Notification decision.[489]  In late 2002, when she heard that Alfonso may be

released without any supervision, Ileanna called Ted Mickelson to express her concern

that Alfonso may struggle without a structured environment, and to ask if there was

anything that could be done.[490]

The End of Confinement Review took place January 21, 2003.  Alfonso was

assigned a risk level of 3.  The next day, Alfonso sent a kite request which read, "I need

to talk to someone about a mental health problem."  The prison responded by saying he

---

[486]Sylvia D'Angelo, Tr. 7937.

[487]Ileanna Noyes, Tr. 8429-8435.

[488]End of Confinement Review Packet, Dec., 2002.

[489]Letter from Barbara Overland to Crookston PD, December,17, 2002

[490]Ileanna Noyes, Tr. 8432

had been put on the list and Dr. Rita St. George would contact him when possible.[491]  The

following day, on January 23, Alfonso met with Dr. St. George for about an hour.[492]  In

her write-up, she remarked that Alfonso was demonstrating "marked distress above what

would normally be expected."  She noted that Alfonso "commented that he wished there

was someplace that he go [sic] where he was still locked up, but not locked up."  She did

not make a referral to psychiatry, but told Alfonso to send another kite, should his

symptoms worsen.[493]  On March 28, Alfonso registered as a sex offender in Minnesota.

On April 28, he reported that his new address would be his mother's home in Crookston.

### 2003

Finally, on May 1, 2003 Alfonso was released from prison after serving 23 years.

He was greeted by his mother and Ileanna, ready for the journey home and the rest of his

life.  Alfonso took his paycheck that he received while in prison, cashed it and drove to a

small town nearby to have breakfast with his loved ones.  He ordered eggs, bacon,

potatoes, juice and toast.  Next stop was to visit his other sister, Rosa, who lives in the

Twin Cities.  They took him shopping to get him some new clothes, and gave him some

spending money to help him get on his feet.

After the long journey across Minnesota, Alfonso returned to his home in

Crookston.  The last time he was in Crookston was in 1993, when his father had passed

---

[491] Offender Kite Form, January 22, 2003.

[492] DOC Record of Mental Health Contacts, January 23, 2003.

[493] MCF-Willow River/Moose Lake Diagnostic Assessment, January 23, 2003.

away.  He had high hopes for what was to come, but the community gave him little chance.  He was told upon his return that the town had called a meeting to notify the citizenry of his arrival as a Level 3 Sex Offender.

Alfonso wanted to find a job and place to call home.  He did not realize how tough that would be.  He applied to work at a bus factory and after he spent time filling out the application could only watch as the clerk tossed it in the garbage without a glance.[494]  That was just one of many places he tried to find work, but no one would give him a shot.  He began to feel embarrassed and hopeless.

Alfonso was hurt and upset that he could not find a job, but struggled to remain positive.  He decided to spend his time with his family and helping Dolores.  Clifford Hegg, a neighbor from across the street watched Alfonso care for his mother. "When Alfonso got out of prison he took care of Dolores.  He would take her to her appointments and anywhere she needed to go.  He took over the household chores caring for his mother."[495]  Dolores had been on her own for ten years after the passing of Alfonso's father, so she welcomed the help.  "I'd been living by myself since my husband died in 1993. I was happy to have someone else living there with me.  I was happy because I had someone to help me with my chores around the house and I was glad that he was out with me."[496]

---

[494]  Dolores Rodriguez, Tr. 7676

[495]  Clifford Hegg, Tr. 8289

[496]  Dolores Rodriguez, Tr. 7674

Alfonso spent many hours caring for the garden and doing other yard work for his mother's house.[497]  He spent a lot of time out in the yard and, trying to fit in, had a chance to talk with her neighbors.  Velma Axtel, a friend and neighbor of Dolores, had many interactions with him while he was out in the yard.  "Working in the garden, tending to the flowers, played with our dog, came over to visit.  He baked.  Just a nice neighbor."[498]

But old habits die hard.  Alfonso's obsessive compulsive behavior, for instance, continued after he got out of prison.  "He was obsessed with the laundry.  He would also wash his shoes once a week.  He would do the laundry every night after he took a shower."  The chaos of an uncontrolled environment made Alfonso increasingly uncomfortable.  His younger sister, Ileanna, describes a time that she leant him her van and asked him to watch her property and care for her animals while she was away.  Alfonso, "on taking the van, he goes, Okay.  First thing we have to do is get all your junk out of here."  And so that's—and he—he did my carpets for me, and just everything."[499]  As Alfonso describes, "[e]verything has to be in their place, like I can't have ... I don't like change that much."

Though he was uneasy with other adults—who had always been quicker than he was, and now were quick to judge—Alfonso loved spending time with his niece and nephews.  Alfonso took his niece, Alina, to see "Finding Nemo" at the movie theaters and

---

[497]  Transcript of Clinical Interview by Drs. Pitt and Martell, August 4, 2006, Ex. 83

[498]  Velma Axtel, Tr. 5815

[499]  Sylvia Rodriguez, Grand Jury Tr. 22

bought her a bag of Skittles.  He played catch with her in the yard that he had worked so hard to maintain.  One of Alina's favorite things to do was to play four square, and her Uncle Alfonso played with her even though he was not very good.  One day when it was raining Alina was begging someone to go outside with her to use her brand new umbrella, and Alfonso volunteered to take her.  The two of them went outside under her new umbrella smiling, walking and talking.[500]

Alfonso also played football with his nephew Steven in the back yard.  He gave him rides to school, to the grocery store, to a friend's house, and to the movies.  Alfonso went as far as to pick things up from the store for him.  It was not only Steven he did this for.  He also spent time with Josh, his other nephew.  He would drive him around taking him out to lunch and telling him old stories.  They would wash the cars together and play catch in the yard.[501]

When Alfonso was not spending time with his family, he kept to himself.

*Redacted*

Eventually, after months of searching, he found what he had been looking for:  a job.  Ileanna got Alfonso a construction job with her friend, Jose DeLeon.  He would be hanging drywall at construction sites.  Finally Alfonso would have a chance to make his own money.  Alfonso got up early every morning to arrive at the work site at 8:00 a.m.

---

[500]  Ileanna Noyes, Tr. 8440

[501]  Joshua Noyes, Tr. 8418

He sometimes received a ride from his boss, but he eventually was able to drive himself. Alfonso worked for 8 to 10 hours each day, doing manual labor. When Alfonso's boss arrived each day, Alfonso was already there, and at the end of the day they would leave at the same time.[502]

Alfonso was a hard worker, and willing to do any job, but was restricted by the tremor in his hands, which made it very difficult to hang the heavy drywall. He struggled to lift the drywall and hold it in place while others fastened it in. This caused the other workers to poke fun at the fact that he was incapable of lifting the dry wall. They called him a "mucha puenta," which mocked him for his weakness and inability to do the work. As a grown man Alfonso still faced the rejection he felt as a young boy. Alfonso worked for close to two months when he received the news that the work would be ending before Thanksgiving. Alfonso felt ashamed and did not tell his family. He tried to find work elsewhere.

On October 24, 2003 Alfonso and his family made their way to Laredo, Texas, for his Uncle Luis' funeral and service. The plan was to stay at his Aunt Belia's house for two weeks for the funeral and return to Crookston on the first of November. It had been quite some time since Alfonso had been to his hometown. Naturally, he was excited to return to see family, but he was also excited by the idea that he may find work and could stay. But Laredo was not the same as Alfonso had remembered it. It had changed, which

---

[502] FBI interview with Jose De Leon Hernandez, December 1, 2003, Ex. D-131.

left him morose and depressed. "That trip to Laredo after Al got out in 2003 was really sad. So much had changed. What he remembered was years ago. He wanted to see certain places that were gone. He was always bringing up the past because his life was in prison."[503] Alfonso became more depressed and isolated.

On the trip down to Laredo they had stopped in Perry, Oklahoma. They stayed in a motel and Alfonso started to behave oddly. "There were two beds. Mom and Lina shared one. Al was in the other one. I was on a sleeping bag on the floor in between. In the middle of the night, I heard Al tossing and turning and then he got up and I asked what he was doing. He said he was claustrophobic and he wanted to sleep in the van."[504] Alfonso started to feel anxious and depressed before he got to Laredo. "I noticed that something was wrong. In the hotel, he didn't talk." He became more isolated and depressed. "He was so anxious, he couldn't stay in the room."[505]

While staying at his Aunt Belia's house, he was able to visit with his old friends from childhood. Alfonso and his mother decided to say hello to the family that lived across the street, the Ruiz family. They were thrilled to see Alfonso, but they noticed a change in him. He was reserved and edgy. "My sister Lolita went to Tito to give him a hug, and he jumped back like he didn't want to be touched. Something must have happened to Tito after he left Laredo. Somebody must have done something to him. He

---

[503]  Declaration of Ileanna Noyes, Ex. D-09.

[504]  *Id.*

[505]  Declaration of Dolores Rodriguez, Ex. D-11

wasn't the same Tito we knew before."[506]  Alfonso was not the same.  Something was wrong, and everyone could tell.

Along with being reserved, Alfonso was acting very strangely during his trip in Texas.  "He was very quiet. He slept outside in the car. He didn't want to sleep in the house."[507]  Alfonso increasingly kept to himself and made no effort to rekindle lost friendships.  When he went with his mother to visit other families he sat in the car, and could not muster the effort to socialize.  Alfonso did not enjoy his time in Laredo.  Things had changed, which caused him to spiral into a deep depression.

Alfonso returned to Crookston after a long depressing trip to his home town.  He was unsure about his job, and had to start looking for another one secretly; he was too ashamed to tell his family that his job would be ending.  Luckily the job did not end right away, and he continued working up to Thanksgiving.  In November, Alfonso went to work every weekday, except for the 13th because he was sick.  On the weekends, when he was not working, Alfonso went to Grand Forks with his family, but he would also go by himself.[508]

Toward the end of November Alfonso was finishing up his construction job and running errands for his family.  On November 22, 2003, Alfonso woke up early, as he did

---

[506]  Declaration of Sylvia Garcia, Ex. D-08

[507]  Declaration of Francisco Rodriguez, Ex. D-03

[508]  Supplementary Investigation Report on Dolores Rodriguez and Ileanna Noyes, December 2, 2003, Ex. D-114

every morning.  It was the weekend so he was preparing to relax at home with his family

and take care of some chores.  When lunch time rolled around Alfonso set out to Hardee's

restaurant to get his mother a chicken burger and a hamburger for himself.  He brought

the food home for his mother and ate his lunch.  Shortly after that he left for Grand Forks

to do some shopping for the house and his mother.

Alfonso set out for the stores.  There were many people at the mall that day, but

one stuck out.

> Seeing a woman that resembled his abuser was a cue that
> triggered Alfonso's PTSD symptoms so that he began to
> experience a dissociative state.  He described going in and out
> of a dissociative state over the course of the crime.  There
> were moments in which he saw the victim from a particular
> perspective and she looked so much like his abuser that he
> lost touch with reality.  He had very powerful feelings that
> this actually was the woman who had abused him and he re-
> experienced the fear and anger and confusion and anxiety of
> that original trauma.  And, there were moments, when she
> looked at him directly in the face, when he realized that she
> was not his abuser and he came back to reality.  But, he could
> not control that process and could not stay with the reality that
> he was a grown man in 2003 and not a little boy in 1959.  He
> was angry at his abuser, not at Dru Sjodin.[509]

Alfonso followed Ms. Sjodin outside and forced himself into her car.  They drove

a short distance until they switched into his car and drove off.  Like his previous offenses,

it was done on impulse, in a state of panic.  Alfonso found a side road and pulled off.  He

had no plans to take her life, and repeatedly told her he would let her go.  He tied her

---

[509] Declaration of Dr. Pablo Stewart, Ex. D-17

hands together with a piece of cord he had to help him tend to his mother's yardwork:

> At one point, when he was driving around town with her in the car, she began to struggle and bang on the windows. He tried to subdue her, struggled with her and eventually hit her, knocking her out and drawing blood. Once she was bleeding from the face and unconscious, he put a plastic bag over her head to contain the blood and he wrapped it with a piece of cord. His memories of this time are very fragmented, consistent with a dissociative episode. And, his description of his thinking at the time is chaotic and illogical. He does not remember exactly when he realized she was dead, but he knows that he then panicked and drove around looking for a place to put her body.[510]

When Alfonso returned to his present reality, he had no sense for what he had done and re-entered the uneventful life he had been living before. He arrived home that evening at 8:30 p.m. with the things he bought in hand. He had lotion and socks for himself that he took downstairs to his room. His mother offered to make him dinner but he decided to go to McDonald's to get a hamburger. He returned home, took a shower, and went to bed.

Alfonso was arrested December 1, 2003, and has been in custody ever since. On May 12, 2004, he was transferred from the Grand Forks County Correctional Facility to the Cass County Jail.[511]

---

[510] *Id.*

[511] Cass County jail records, Ex. D-71, (May 14, 2004). During his time at Cass County, Alfonso was visited by his defense attorney approximately once a month. Mary Geller, a Classification Officer at the Cass County Jail met with Alfonso once a week to check that all was well. No disciplinary issues were reported related to Alfonso during this entire period. Mary Geller Testimony, Tr. 8383.

* * *

The life history recounted in the prior pages should have alerted any reasonably competent capital counsel to explore a number of matters in greater detail, and to have retained the proper experts to assist them. First, and perhaps most prominently, there is the matter of Mr. Rodriguez's severe cognitive and developmental limitations. Post-conviction counsel did what trial counsel did not, but should have — seek the professional judgment of an authority on mental retardation.

Dr. Stephen Greenspan, Ph.D., is a Clinical Professor of Psychiatry at the University of Colorado Health Sciences Center and Emeritus Professor of Educational Psychology at the University of Connecticut.[512] He received his Ph.D. in Developmental Psychology at the University of Rochester, and was a Postdoctoral Fellow in Mental Retardation and Developmental Disabilities at the University of California at Los Angeles' Neuropsychiatric Institute. He has been elected a "Fellow" by the MR/ID division of the American Psychological Association and by the American Association on Intellectual and Developmental Disabilities ("AAIDD"). He was also elected to a term as President of the Academy on Mental Retardation (the most prestigious research organization in the field) and is licensed to practice psychology. Dr. Greenspan has published extensively on mental retardation, with a particular emphasis on adaptive

---

[512] Declaration of Dr. Stephen Greenspan, Ex. D-19.

162

behavior. His complete qualifications are described in his attached Declaration.[513]

Dr. Greenspan was asked to review the available material in this case and determine whether Mr. Rodriguez was mentally retarded. Mental retardation, as Dr. Greenspan explains, has been defined by AAIDD as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior, which covers many everyday social and practical skills. This disability originates before the age of 18."[514] An alternative definition, contained in the most recent DSM4-TR manual, provides:

> Mental retardation (MR) is a developmental disability that first appears in children under the age of 18. It is defined as a level of intellectual functioning (as measured by standard intelligence tests) that is well below average and results in significant limitations in the person's daily living skills (adaptive functioning).[515]

The diagnosis, in other words, depends on three criteria: well below average intellectual functioning; significant adaptive deficits; and onset before the age of 18.

Applying these definitions and criteria, Dr. Greenspan readily concludes, "to a reasonable degree of scientific certainty, that the evidence available at the time of his arrest indicates that Alfonso Rodriguez, Jr., was a person with mental retardation."[516]

---

[513]*Id*. pp. 1-2.

[514]*Id*. pp. 4-5.

[515]*Id.*

[516] *Id.* at p. 11.

With respect to intellectual functioning, the available evidence "provides a clear picture of a boy who was struggling academically."[517] Dr. Greenspan examines that evidence in great detail, easily concluding that Mr. Rodriguez's IQ scores "could have qualified him for a MR classification and placement." (It is important to recall that during Mr. Rodriguez's childhood, "the IQ criterion in place in the clinical definition of MR . . . was 85.")[518] More important than mere IQ scores, Dr. Greenspan reviews the school records, discussed above, in great detail, and opines that they lend further corroboration to the obvious conclusion: Mr. Rodriguez's intellectual limitations are serious, profound, and long-standing.

It is the evidence of adaptive deficits that is the most poignant (and that would have been the most powerful at trial). There is, as Dr. Greenspan notes, "considerable information obtained from declarations provided by percipient witnesses that suggest that Mr. Rodriguez had significant adaptive deficits during the pre-18 period." Dr. Greenspan organizes these deficits into three categories: conceptual, practical and social. In each area, Mr. Rodriguez is profoundly impaired.

With respect to conceptual adaptive deficits in the pre-18 period, the evidence is abundant and obvious. Among many other items, Dr. Greenspan notes that Alfonso needed help filling out forms, that he had difficulty admitting when he needed help but

---

[517]*Id.*

[518]*Id.*

also struggled with reading and writing, and that he was always a slow learner.[519]  Dr. Greenspan also finds it significant that Alfonso was "sad," "different," withdrawn, and very quiet.  Dr. Greenspan also observed that Alfonso was confounded by simple, concrete ideas.[520]  He notes with interest the observation of family members:  "Tito sometimes struggled  to understand things as a child.  He would get stuck on just one idea of something and couldn't understand anything different."[521]  Dr. Greenspan also noted that Alfonso didn't seem to fit in:

> Tito tended to just sit down and be quiet.  His head was always up in the clouds somewhere, like he wasn't all there.  I don't remember seeing Tito smiling, he didn't express his emotions much. I never say Tito read or write.[522]

In short, the many memories and observations of people who knew Alfonso—recounted in detail in both the life history above and Dr. Greenspan's detailed declaration—signal to a trained professional the conceptual deficits that beset the young Alfonso Rodriguez.

Dr. Greenspan also found that Alfonso struggled with practical adaptive deficits in the critical pre-18 time frame.  For instance, Alfonso had difficulty learning to play even simple games, and instead of playing with the other children in his neighborhood, he

---

[519] Declaration of Dr. Greenspan, Ex. D-19, pp. 14-15.

[520] *Id.*

[521] *Id.* at p. 15 (quoting Declaration of Belia Flores, Ex. D-01).

[522] *Id.* at p. 15 (citing Declaration of Maria Del Refugio Ruiz, Ex. D-07).

often just sat quietly and watched.[523]   "I tried to show him how to play [jacks] but he didn't learn. He would only watch me."[524]  Likewise, Alfonso wet the bed until he was thirteen and was hard to toilet train as a young child. Dr. Greenspan also notes that, unlike his brother and sisters, his parents never had him help them at work because he wasn't "really good at anything."[525]

Evidence of the third category—social adaptation—is similarly replete in the available record, as Dr. Greenspan concludes.  He notes, for instance, that Alfonso never fit in.  He was taunted and mocked by other children.  "Although two years older than other children because of retention, he was picked on a lot."[526]  Dr. Greenspan examined reports about the time when, in fourth grade, Alfonso had his pants pulled down in front of the class, a class full of children who were two years younger because he had been held back.  "The fact that he would be targeted for such victimization, and lacked the skills to know how to protect himself from it, is a strong indication that he had the social skills of a much younger child."[527]

> Tito used to get picked on.  The other kids would beat up on
> him.  They would push him or throw rocks at him. He was

---

[523] *Id.* at p. 16 (citing Declaration of Belia Flores, Ex. D-01, and Declaration of Gloria Gonzalez, Ex. D-04).

[524] *Id.* at p. 16 (citing Declaration of Belia Flores, Ex. D-01)

[525] *Id.* at p.16 (citing Declaration of Francisco Rodriguez, Ex. D-03).

[526] *Id.* at p. 16.

[527] *Id*. at p. 16.

very short, dark skinned and had a big head.[528]

Dr. Greenspan also observes  that Alfonso was repeatedly sexually abused by adults and teens.  He specifically discussed the times he was molested at church camp and the abuse he experienced when molested by an older boy (the additional significance of which is recounted below, in the discussion of the declaration of Dr. Pablo Stewart).

In addition, Dr. Greenspan took particular note of Alfonso's childhood friends. "[O]ne clue to MR in children," he writes, "has to do with the kids they hang out with or are accepted by; as a rule kids with MR do not have many normally developing friends." Dr. Greenspan observes that Alfonso's friends were also cognitively limited:

> Tito's friends in Laredo were the slower kids.  He was friends with the Gallegos children, who were all a little odd.  One of them was in special education classes, he was a very innocent boy who was easily amazed at things.  Another one of the Gallegos children that Tito was close with had epilepsy.[529]

Dr. Greenspan notes that Alfonso's brother, even then, saw the pattern. "Tito hung out with the misfits, like Beto and Pache Gallegos and Johnny Ruiz in Laredo.  And, in Crookston, he also hung out with people who had problems or were behind."[530]  Even the way Alfonso responded to the teasing was indicative of his social deficits.  As his sister Sylvia described, "Tito, when he was teased, would go into his shell."[531]  He didn't "get

---

[528] *Id.* at p. 17 (quoting Declaration of Sylvia Garcia, Ex. D-08).

[529] *Id.* at p. 17 (quoting Declaration of Rosa Rodriguez, Ex. D-14).

[530] *Id.* at p. 17 (Quoting declaration of Francisco Rodriguez, Ex. D-03).

[531] *Id.* at p. 18 (quoting Declaration of Sylvia D'Angelo, Ex. D-125).

mad or upset when people called him this or picked on him, and he didn't fight back."[532]

He similarly avoided conflict within his own family, leaving the dinner table when

arguing began.[533]

In sum, Dr. Greenspan concludes that all three categories of adaptive deficits were

present in Alfonso's life before he was eighteen.  He suffered from well-documented

adaptive deficits in the conceptual, practical and social arenas.  He notes:

> The evidence available at the time of his arrest indicated that
> Alfonso Rodriguez, Jr. was a person with mental retardation.
> He had significant deficits in intellectual functioning, as
> reflected in intelligence scores and a pattern of academic
> failure, that were in the MR range as definited in clinical
> manuals during that time period.  He had many deficits in
> adaptive functioning, in conceptual, practical and social areas.
> Clearly, these deficits became evident at a very early
> period.[534]

His conclusions are clear.[535]

A second area that trial counsel should have explored relates to the mental health

consequences of Mr. Rodriguez's long and tragic history of sexual abuse, and called upon

counsel to consider whether and to what extent that history contributed to the kidnapping

---

[532] *Id.* at p. 18 (quoting Declaration of Sylvia Garcia, Ex. D-08).

[533] *Id.* at p. 18

[534] *Id.* at p. 19.

[535] Dr. Greenspan also addressed whether a single IQ score of 81 precludes mental retardation.  The answer, he said, is "an unequivocal no."  *Id*. pp. 19-25.  "In fact," he says, "I believe that Mr. Rodriguez continues to have a neuro-developmental disorder ..., that he continues to have significant adaptive deficits, and that there are many indices of cognitive impairment," in spite of the single IQ score of 81.

and murder of Ms. Sjodin.  Trial counsel failed to undertake this inquiry; post-conviction counsel has done so.  Dr. Pablo Stewart was retained to examine the case and Mr. Rodriguez.  Dr. Stewart is a leading authority on post-traumatic stress disorder.  His qualifications are described in detail in his accompanying Declaration.[536]  He examined Mr. Rodriguez at length and reviewed thousands of pages of relevant records.

As Dr. Stewart explains, PTSD is a chronic condition that is characterized by trauma-induced changes to a person's stress response systems.  Put simply, in individuals with PTSD, "the hormones and other chemicals involved in our natural 'fight or flight' response become engaged on a much more routine, day-to-day manner, and in much more dysfunctional manifestations, resulting in a variety of symptoms including severe cognitive impairments."  And as Dr. Stewart concludes, based on his "personal interviews with Alfonso as well as the accounts of his relatives and of numerous other treating clinicians, it is clear that Alfonso has long exhibited the full range of symptoms of PTSD as a result of early childhood sexual abuse."[537]

Indeed, Dr. Stewart concludes that "since childhood," Mr. Rodriguez has "suffered from a severe and chronic case of [PTSD], which resulted in profoundly impaired impulse control and a chronic state of hyperarousal.  It is also [Dr. Stewart's] opinion that he has suffered from the co-morbid diagnosis of substance abuse secondary to the trauma."[538]

---

[536] Declaration of Dr. Pablo Stewart, Ex. D-17.

[537] *Id.* at ¶ 16.

[538] *Id.* at ¶ 12.

Finally, as explored above, Dr. Stewart also concludes, in his perhaps most

significant finding:

> [PTSD] played a significant role in the crime for which
> Alfonso has been convicted and sentenced to die.  I further
> conclude that this mental disorder along with his other mental
> health conditions rendered him "unable to appreciate the
> nature and quality or the wrongfulness of his actions," at the
> time of the offense in question, and that as a result he meets
> the federal standard for not guilty by reason of insanity. . . .
> Specifically, although Alfonso was able to appreciate the
> nature and quality of his actions, he was unable to appreciate
> the wrongfulness of his actions because of cognitive
> impairments associated with his PTSD and the resulting
> impaired executive functioning.[539]

The basis for Dr. Stewart's various opinions are presented in great detail in his

accompanying declaration, the entire content of which is incorporated by reference. To

put it plainly, Mr. Rodriguez amply satisfies the diagnostic criteria for PTSD.[540]  Dr.

Stewart's conclusions merit quoting at length:

> It is my considered professional opinion, which I hold to a
> reasonable degree of medical and psychiatric certainty, that
> Mr. Rodriguez meets this standard because at the time of the
> offense he was unable to appreciate the wrongfulness of his
> actions because he was suffering from a severe and chronic
> case of PTSD.
>
> Mr. Rodriguez's chronic and severe Posttraumatic Stress
> Disorder arose from several incidents of sexual abuse in early
> childhood. . . . It is evident from many different records and

---

[539] *Id.* at ¶ 12.

[540]*Id.* at ¶¶ 87-155.  Based on his review, Dr. Stewart concludes that Mr. Rodriguez "overwhelmingly meets the criteria for PTSD." *Id.* at ¶ 155.

170

reports that Mr. Rodriguez has long exhibited severe symptoms of PTSD, including but not limited to re-experiencing, avoidance, increased arousal, cognitive impairment and self-medication.  Of particular relevance here are the indicators of increased arousal typically associated with severe cases of PTSD that are clearly present in Mr. Rodriguez's case: hyper-vigilance, exaggerated startle response and impulsivity.  Unfortunately, when he sought treatment for these conditions, Mr. Rodriguez was not provided with the types of intensive, ongoing therapy and support required to address his PTSD related symptoms and pathologies.

As noted above, I have spoken with Mr. Rodriguez at length about the sex offenses, and my overwhelming sense about them is that they were characterized by a chaotic disorganization and a complete failure of executive functioning.[541]

Dr. Stewart notes that, for Mr. Rodriguez, the disruption in executive functioning is unusually severe.  Not only did Dr. Stewart observe such disruption in his interviews, but he notes that the observation is supported by neuropsychological testing done by Dr. Karen Froming.  "Mr. Rodriguez suffers from significant problems with frontal lobe functioning," which is "directly related to executive functioning"[542]  Dr. Stewart describes the impact of Mr. Rodriguez's cognitive impairments and impairments in executive functioning:

His PTSD rendered his mental functioning severely disorganized.  That is, he has

---

[541] *Id.* at ¶ 183.  Dr. Stewart explains that executive functioning is the process of incorporating new experiences and stimuli with past life experiences in a way that results in behaviors that are in that person's best interest.  This essential ability is disrupted in people with PTSD, but particularly so with Mr. Rodriguez.

[542] *Id.* at ¶ 184.

significantly impaired executive functioning coupled with impulse control problems and his being in a state of hyperarousal.

> Throughout the course of the crime he was re-experiencing his own sexual abuse through dissociative flashbacks. While he knew in the abstract that his actions were illegal, Mr. Rodriguez had no sense of their moral wrongfulness due to his severe impairment in cognitive ability and executive functioning.[543]

Dr. Stewart concludes: "It is my professional opinion, which I hold to a reasonable degree of professional certainty, that at the time of the crimes in question Mr. Rodriguez was unable to appreciate the wrongfulness of his conduct because of these PTSD-induced impairments."[544]

* * *

Assembling a life history like this does not simply happen. It is the result of a conscious effort to gather and present all available mitigating evidence and present it in the most compelling fashion, and in that way satisfy the obligations imposed on competent capital counsel. It is what should have been presented at trial. The many points where defense counsel failed to meet these obligations provide a roadmap to their ineffectiveness.

### B. Counsel's Failure to Conduct and Present an Adequate Social and Mental Health History Was Objectively Unreasonable.

---

[543] *Id.* at ¶ 185.

[544] *Id.* at ¶ 186. Dr. Stewart's declaration is sufficiently detailed and persuasive that, had the defense authorized Dr. Marilyn Hutchinson to discuss the crime with Mr. Rodriguez, she has concluded she would have come to the same conclusion as Dr. Stewart. *See* Declaration of Marilyn Hutchinson, Ex. D-24.

The duty to investigate the client's social and mental health history has been well-settled for many years.  *See*, *e.g.*, *Rompilla v. Beard*, 545 U.S. 374 (2005);  *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 466 U.S. 668 (1984); *ABA Guidelines,* Guideline 10.7 & Commentary (rev. ed. 2003), in 31 Hofstra L. Rev. 913, 1015-27 (2003); *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases* (2008), in 36 Hofstra L. Rev. 677 (2008).  *Guideline* 5.1(E) at 683, *Guideline* 10.11 (D) at 689.

A competent investigation in the trial for life takes a very particular form.  Counsel must search for and uncover the many sources and countless records–the telling, contemporaneous details from unbiased witnesses–that can transform a black box into a human being.  These records and sources, as the Supreme Court has had occasion to stress, will contain the "red flags" about ongoing psychological, psychiatric, or physical problems that in turn will alert competent counsel to other lines of investigation. *Rompilla*, 545 U.S. at 382-93 (2005).  The investigation must be multi-generational, beginning long before the client's birth.  It must be comprehensive, stretching far beyond the immediate family.  And above all, it must be exhaustive, since nothing else will be sufficient to recreate the client's life and reveal his humanity.  The *Supplementary ABA Guidelines* provides a recent iteration of this long-standing obligation:

> The defense team must conduct an ongoing, exhaustive and
> independent investigation of every aspect of the client's
> character, history, record and any circumstances of the
> offense, or other factors, which may provide a basis for a

173

sentence less than death. The investigation into a client's life history must survey a broad set of sources and includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances *in utero* and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.

*Supplementary ABA Guidelines* 10.11.B, 36 Hofstra L. Rev. at 689.

Toward this end, the defense must, *inter alia*, assemble the appropriate team. Among other things, the team must be equipped to conduct a culturally competent investigation.  *See generally*, Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation*, 36 Hofstra L. Rev. 883 (2008).  This obligation is not discharged simply by concluding the client may speak English; culture is obviously not the same as the ability to speak.  *Id.*  In any event, as we demonstrate above, though Mr. Rodriguez speaks English, much of his extended family does not.  The Commentary to the *Supplementary ABA Guidelines* speaks to this matter directly:

The defense team should strive to have at least one member who fluently speaks the primary language or dialect of the client, the client's family, and community.[545]

Yet the Rodriguez defense team included neither Spanish-speaking mitigation

---

[545]  Scharlette Holdman and Christopher Seeds, *Cultural Competency in Capital Mitigation*, in Hofstra L. Rev. 677 (2008), at 919.

specialists nor Latinos.  Simply by limiting the team, therefore, the defense precluded itself from contacting these sources.  The defense could not and did not travel to Texas or Colorado, and could not and did not conduct life history investigations in Spanish, all to their considerable disadvantage.[546]  Indeed, the defense team did not even venture to Mr. Rodriguez's home town of Laredo.

Even had the defense assembled the right mitigation team, mitigation specialists must employ the right methods.  They must not conduct interviews by phone, for instance, as they did in this case.  They must not rely on family members to identify the universe of relevant mitigation witnesses, as they did in this case.  They must recognize adaptive deficits and the "cloak of competence" for what they are, rather than what they seem to be.[547]  In short, they must establish a relationship of trust with the client, built on a foundation of handling the investigation properly, which the Rodriguez team—because of the way it was staffed and the way the case was investigated—could not and did not do. *See*, *e.g.*, *ABA Guideline* 10.5 ("counsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client...").

In addition, the defense must conduct a sufficiently robust investigation to allow counsel to make intelligent use of experts.  *See, e.g.*, *Supplementary ABA Guidelines*

---

[546] The life history described above corrects these omissions and relies on information gathered from all corners of Mr. Rodriguez's life, including Texas and Colorado.

[547] *See generally* Declaration of Melanie Carr, Ex. D-21; *Supplementary ABA Guidelines*, 36 Hofstra L. Rev. 677.

4.1.B; 5.1, 36 Hofstra L. Rev at 680-83.  Among other things, this means that counsel must identify and retain the appropriate experts.  In this case, for instance, when presented with the many "red flags" of mental retardation, the evidence of exceedingly poor academic performance; of repeated IQ scores in the 70s; of great difficulty reading; of pervasive adaptive deficits; of the "cloak of competence" so often associated with retardation, counsel nonetheless failed to retain the experts who could investigate his true condition and see the boasts and bravado for what they were—namely, mental retardation. Post-conviction counsel has addressed this defect, as the exceptionally detailed declaration from Dr. Greenspan attests.[548]

Even if it were determined that Mr. Rodriguez's profound cognitive and developmental impairments do not rise to the level of retardation, counsel was nonetheless ineffective for failing to develop and present the evidence of these impairments in all its richness and detail, despite the obvious "red flags."  *See*, *e.g.*, *Tennard v. Dretke*, 542 U.S. 274, 287 (2004) ("impaired intellectual functioning is inherently mitigating"); *id*. at 288 ("Evidence of significantly impaired intellectual functioning is obviously evidence that might serve as a basis for a sentence less than death") (internal quotation marks and citation omitted).

Likewise, when presented with almost countless "red flags" from  multiple, overlapping and confirmed reports of early childhood sexual abuse, trial counsel failed to

---

[548] *See* Declaration of Stephen Greenspan, Ex. D-19.

176

retain experts in the areas of post-traumatic stress disorder, trauma spectrum disorders, or any field relevant to the diagnosis and presentation of Mr. Rodriguez's debilitating traumatization. They failed to deploy an expert who could recognize the pattern of dissociative states experienced by Mr. Rodriguez, and who could explain how, in the throes of these dissociative episodes, Mr. Rodriguez could engage in what appeared to be goal-directed behavior that was nonetheless beyond his capacity to control, and therefore exquisitely mitigating. Post-conviction counsel has resolved these many defects, as the equally detailed declaration from Dr. Pablo Stewart, M.D., makes plain.[549]

In the same way, when faced with multiple reports by Mr. Rodriguez that he experienced traumatic responses to women who appeared a certain way, that he suffers from deep shame and humiliation regarding issues of sexuality, and that he is anxious and nervous about discussing his history, they inexcusably failed to hire mitigators and experts appropriate to overcoming these barriers and who could put Mr. Rodriguez at ease and elicit shameful information from him. Instead, they sent white female experts who intensified Mr. Rodriguez's sense of anxiety and shame, which in turn was used by the prosecution experts (all male) to discredit the defense case for life.

At the same time, the defense failed to hire a medical doctor to conduct a thorough

---

[549]As we discuss above, defense counsel made the same mistake in the challenge to the acid phosphatase evidence offered by Dr. McGee. The defense retained Dr. George Sensabaugh, even though comments from the Court made it plain that the critical question was whether Dr. McGee's methodology and results were accepted by the community of forensic pathologists. In point of fact, they are not, but because the defense did not present the right experts, they were not able to establish this. *See supra*, Claim II, A.

177

physical examination of Mr. Rodriguez,[550] even though their own expert on toxins, Dr. Donald Ecobichon, recommended that the trial team retain a physician. He predicted that the government would have at least one physician, and he warned that their testimony would outweigh that of his and Dr. Karen Froming, the neuropsychologist for the defense.[551] In 2005, it was recommended to the trial team by Dr. Vincent Garry to have Mr. Rodriguez screened for genetic conditions, but that too never happened.[552]

Counsel also has a duty to prepare their experts in an appropriate fashion. It is not enough merely to hire an expert. Counsel must deploy them properly. This requires, among other things, providing them with the material they will need to perform their duties competently, to permit them to testify as well and as forcefully as their expertise will allow, and to defend them from hostile cross-examination by the government. It requires that they provide the expert with a focused and appropriate referral question, so the expert answers the right questions. It requires that counsel protect the client from harmful and irrelevant testing that might be conducted by the government's experts. And it requires a careful evaluation of whether instructing defense experts not to inquire about the crime will adversely affect the validity of any testing instruments that were used. In this case, counsel failed in each of these respects.

---

[550] Again, post-conviction counsel has corrected this omission, and learned much more about Alfonso Rodriguez than the snapshot shown at trial. *See* Declaration of Dr. Stewart, Ex. D-17, and Dr. Arturo Silva, Ex. D-20.

[551] Letter from Dr. Ecobichon to Richard Ney, January 3, 2006, Ex. D-74.

[552] Memo from A. Daniel to Rodriguez team re: Dr. V. Garry, Ex. D-75.

In addition, counsel failed to properly prepare the experts for both their direct and cross-examinations.  This led the experts' testimony to seem weak and unsupported, as though they were grasping at straws.  One illustration in this regard is the testimony of Dr. Hutchinson, who opined that an over-large head (like Mr. Rodriguez's) can be evidence of mental retardation.[553]  On cross-examination, however, she quickly disavowed even the suggestion that Mr. Rodriguez was retarded, repeating once again the flawed IQ tests of Dr. Froming and the remarkable number of books Mr. Rodriguez has supposedly read.[554]  At closing, the prosecution denigrated her testimony as "just another cloud to blast up into the air."[555]  More than anything else, this exchange revealed a failure by the defense to alert Dr. Hutchinson to the mounds of records and sources supporting the fact that Mr. Rodriguez is indeed mentally retarded, as Dr. Greenspan describes and as the defense would have known if they had heeded the "red flags" in their own case.

***Redacted***

Still another example is the failure to allow Dr. Hutchinson to interview Mr. Rodriguez about the crime.  Were it not for this prohibition, Dr. Hutchinson would have concluded—as Dr. Stewart has—that Mr. Rodriguez suffers from such a severe case of post-traumatic stress disorder that he was in a dissociative state at the time of the crime and not legally responsible for his actions.

---

[553] Tr. 7964

[554] Tr. 7982

[555] Tr. 8684

179

At the same time, counsel has a duty to make proper use of the mitigating evidence they uncover. They must present it, in other words, in a competent fashion. Here, however, counsel failed to present the evidence they had assembled. As Dr. Greenspan describes, the records are filled with indications of retardation.[556] Yet counsel ignored them and failed entirely to explore whether Mr. Rodriguez was retarded. Likewise, as Dr. Pablo Stewart makes plain, the records are replete with evidence of long-standing and severe post-traumatic stress disorder.[557] Yet counsel inexplicably and inexcusably failed properly to marshal and present this evidence, leaving the jury with the mistaken impression (and the government with the erroneous argument) that the diagnosis made by Dr. Hutchinson was spurious.

In short, counsel's mitigation presentation was fundamentally flawed in myriad ways and constitutionally deficient.

**C.    But for Counsel's Deficient Performance, There is a Reasonable Probability That at Least One Juror Would Have Struck a Different Balance Between the Aggravating and Mitigating Evidence, and Mr. Rodriguez Would Not Be on Death Row.**

No reasonable jury could have heard the evidence collected by post-conviction counsel and be unmoved. Mr. Rodriguez's life has been one of unremitting tragedy, a well-chronicled record of trauma, suffering, and abuse. We now know (and trial counsel should have known) that Mr. Rodriguez was not simply "slow," not simply "cognitively

---

[556] Declaration of Dr. Greenspan Dec., Ex. D-19.

[557] Declaration of Pablo Stewart, Ex. D-17.

impaired," not simply a child who failed the first grade twice, or an eighteen year old freshman.  He was mentally retarded before the age of eighteen, mentally retarded at the time of the crime and is mentally retarded today.  He is in that small subset of the population that is so markedly impaired that we reserve for them a separate label, a special badge of functional and intellectual inadequacy.  We now know (and trial counsel should have known) that Mr. Rodriguez's boasts that he had read hundreds of books – today 500, tomorrow 300, the next day 900 – are simply the "cloak of competence," the sad and pitiful attempts that a mentally retarded person makes so that he may appear every bit the equal of a world that seems forever beyond their grasp.[558]

And it was this vulnerable, mentally retarded child who was sexually assaulted. The government understands perfectly well how being the victim of a sexual assault can change a person's life forever,  such evidence featured prominently in their case.[559] With Mr. Rodriguez, this abuse accelerated the decline that would lead from poverty, racism, and organic brain damage to an exceptionally severe case of post-traumatic stress disorder.

But it is not simply PTSD.  With Mr. Rodriguez, we now know (and trial counsel should have known) the disorder is so severe that it can lead, as Dr. Stewart has documented and Dr. Hutchinson now agrees, to "full-blown dissociative states."  During

---

[558] Declaration of Dr. Greenspan, Ex. D-19.

[559] Tr. 7117, 7148

181

these episodes, Mr. Rodriguez cannot maintain contact with his present reality. He becomes overwhelmed, confused, disoriented. Because he is mentally retarded, his intellectual defenses and cognitive resources are already substantially diminished. And because he is brain damaged, his capacity to deliberate is still further compromised.

Perhaps most importantly, we now know that almost nothing the defense said in its attempt to persuade the jury that Mr. Rodriguez should live was complete, and little the government said in its attempt to convince the jury that Mr. Rodriguez should die was correct. Mr. Rodriguez is no predator with a "rape fantasy." He is a mentally retarded man with the brain of a child who suffers from a disorder so severe that he can be tossed unbidden into an earlier reality, re-experiencing the abuse of his childhood. He cannot shake the powerful conviction that he is elsewhere. He begins to panic, and fear takes the place of reason. He passes in and out of two different worlds: the present world, where the people around him bear him no ill, and a past world, where the people around him betray and violate him in truly horrible ways. During these episodes, he cannot appreciate the wrongfulness of his actions because he cannot maintain contact with the present. He experienced such a break on the evening of November 22, 2003. He became confused. Fear was followed by anger, which quickly gave way to panic. He struggled against the panic, but became overwhelmed.

As the Court well knows, the essence of the prosecution's attack on the defense case for life was that the mitigation did nothing to explain or excuse the crime. Clearly

182

this argument was legally improper. But had the defense done its job, such an argument would have been impossible. Indeed, it would have been unthinkable. And Mr. Rodriguez would not be on death row. But for counsel's deficient performance, there is a reasonable probability the result would have been different. *See Wiggins v. Smith*, 539 U.S. 523 (2002), *supra*; *Rompilla v. Beard*, 545 U.S. 374 (2005) *supra*.

**V.      Because Mr. Rodriguez is Mentally Retarded Now, Was Mentally Retarded at the Time of the Crime, and Was Mentally Retarded Prior to the Age of Eighteen, His Execution Would Violate the Eighth Amendment.**

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court recognized the constitutional significance of the firmly established "national consensus" against the execution of the mentally retarded. "Because of their disabilities in areas of reasoning, judgment, and control of their impulses," the Court observed, people who are mentally retarded "do not act with the level of moral culpability that characterizes the most serious adult criminal conduct. Moreover, their impairments can jeopardize the reliability and fairness of capital proceedings against mentally retarded defendants." *Atkins*, 536 U.S. at 306-07. For that reason, the "evolving standards of decency" captured by the Eighth Amendment prohibit the federal government from taking the life of one who committed the crime while laboring under such an impairment. *Id*. at 311-12. And because Mr. Rodriguez is indeed such a person–because he satisfies any definition of mental retardation–his execution is barred by the Eighth Amendment.

In the pages above, we have described in great detail the expert and lay evidence

183

documenting Mr. Rodriguez's mental retardation.  We do not unnecessarily lengthen this document by repeating it here.  Instead, we incorporate it by specific reference.  It is apparent from this discussion, however, that Mr. Rodriguez is retarded within the meaning of *Atkins*, and indeed, within the meaning of any test.  He suffers from "not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18."  *Id.* at 318.  Consistent with this standard, Mr. Rodriguez may "know the difference between right and wrong," but because of his impairment he suffers from "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others."[560]  *Id.*

Furthermore, in this case, Mr. Rodriguez's mental retardation had a particularly adverse effect on the trial process.  Because of his retardation, and in particular because his "cloak of competence" was mistakenly perceived as genuine, Mr. Rodriguez was substantially "less able to give meaningful assistance to [his] counsel."  *Id.* at 320-21.  Because his lawyers negligently failed to uncover and develop the available evidence in support of his mental retardation, they never came to understand their own client, and

---

[560]As we note elsewhere, Mr. Rodriguez is not merely mentally retarded.  He also suffers from such a severe case of post-traumatic stress disorder that he can lapse into "full-blown dissociative states" when his memories of childhood sexual abuse are triggered.  On the evening of the crime, he was in the throes of such an episode and, as Dr. Stewart chronicles, "unable to appreciate the wrongfulness of his actions."  Declaration of Dr. Pablo Stewart, ¶ 180, Ex. D-17.

mistook him for someone substantially more capable than he is.  This left them

unequipped to represent him effectively, and to counter the government expert's woefully

mistaken argument that Mr. Rodriguez was calculating and unremorseful.  As the Court

in *Atkins* makes plain, the demeanor of a mentally retarded defendant may often "create

an unwarranted impression of lack of remorse for their crimes."  *Id.* at 321

In sum, Mr. Rodriguez is mentally retarded, just as he was at the time of the crime,

and just as he was prior to age eighteen.  His execution would therefore violate the Eighth

Amendment.

**VI.    Trial Counsel Rendered Ineffective Assistance of Counsel With Respect to the Penalty Phase Jury Instructions, in Violation of 18 U.S.C. §§ 3005 & 3006A and the Fifth, Sixth, and Eighth Amendments to the Constitution.**

**A.    Trial Counsel Failed to Argue the Accident of Geography As A Mitigating Factor.**

Federal jurisdiction for the capital prosecution of Alfonso Rodriguez was based on

an accident of geography, and a slight one at that.  Because Ms. Sjodin's body was found

roughly 20 miles into Minnesota (following her abduction not even two miles into North

Dakota), the case became eligible not only for prosecution in federal courts, but for the

death penalty.  Neither North Dakota nor Minnesota has a death penalty statute.[561]  Had

Mr. Rodriguez's prosecution continued in North Dakota's courts, or been relocated to

---

[561] In a separate claim, we demonstrate that, in the unique circumstances presented by this case, Congress exceeded its power under the Necessary and Proper Clause when it made death a possible penalty for kidnapping resulting in death.  *See infra* claim XIII.

185

Minnesota, there would have been no capital prosecution.

Despite the fundamental unfairness of a federal capital prosecution under these circumstances, trial counsel neither argued the lack of a death penalty in the state courts as mitigation in the penalty phase of the trial, nor sought to include it in the list of mitigating factors for the jury's specific consideration.[562]  This fell below objectively reasonable standards of performance for capital counsel.[563]  Moreover, there is a reasonable probability that, had the jury been advised of the mitigating nature of the lack of a death penalty in either involved state, the outcome at sentencing would have been different and Mr. Rodriguez would not presently be on death row.

As early as 2002, competent counsel in federal capital cases recognized as mitigating the fact that the state within which the crime occurred had no death penalty, and a factor as random as the geography of the crime should not support a capital prosecution.  In *United States v. Gabrion*, the federal capital prosecution of a defendant was similarly based upon nothing more than the location of the body and presumably the location of the murder at issue.  In that case, the victim of the crime was found 227 feet within the border of a National Forest, giving rise to a capital prosecution despite the fact that the state in which the park fell, Michigan, had abolished the death penalty in 1864.

---

[562] Defendant's Proposed List of Mitigating Factors, dckt. # 608.

[563] As the Commentary to the *ABA Guidelines* makes clear, "areas of mitigation are extremely broad and encompass any evidence that tends to lessen the defendant's moral culpability for the offense or otherwise supports a sentence less than death."  Commentary to *ABA Guideline* 10.11, 31 Hofstra L. Rev. 913, 1060 (2003).

*See United States v. Gabrion*, 648 F.3d 307, 321 (6th Cir. 2011).  The district court

erroneously precluded the defense from arguing to the jury that the barely-federal location

of the crime was an insufficient reason to seek the death penalty in a state with a

long-standing policy against capital punishment.  *Gabrion*, 648 F.3d at 323-24.  As the

*Gabrion* appellate court explained, "[t]hese arguments are all 'mitigating' because they

could conceivably make a juror question 'the appropriateness in the case of imposing a

sentence of death.'" *Id*. at 323 (quoting the Federal Death Penalty Act, 18 U.S.C.

3593(c)).  The *Gabrion* court went on to conclude that the district court's error in

precluding such possibly compelling mitigation could not be dismissed as harmless:

> We have no way of knowing beyond a reasonable doubt what one or  more
> jurors would have done after listening to a lawyer arguing for life by
> effectively using Michigan's longstanding policy to buttress the argument,
> even with respect to a murderer as vile as Gabrion.

*Id*. at 324.  The Court of Appeals reversed and remanded for a new penalty phase.

Not only was the mitigating nature of the lack of a state court death penalty an

issue in the Gabrion trial in 2002, but a very similar mitigating factor was also raised in

*United States v. Mohamed*, No. 98-CR-1023 (S.D.N.Y.  2001), a case in which a sentence

of life in prison was imposed instead of death.  In the *Mohamed* case, the court instructed

the jury that, as a matter of law, the fact that Mr. Mohamed was extradited from a country

(South Africa) which had no death penalty and should not have sent him to a country that

187

did was a mitigating factor.[564]  The jury was instructed to weigh that fact in reaching its decision regarding the sentence.  Ultimately, the jury in that case rejected death.

In the instant case, the geographic accident that gave rise to both the federal prosecution and the death penalty was no less compelling a mitigating circumstance than in *Gabrion*.  Ms. Sjodin's body was found roughly 20 miles inside Minnesota, from her abduction just over the border.  Had she been killed in precisely the same manner, but driven two miles to the west instead of the east, no federal death penalty would have been available.  Given this obvious and compelling fact, which underscored the randomness of the death penalty, trial counsel were ineffective and their performance fell below objective standards of performance for capital counsel when they neither submitted the absence of state death penalty as a mitigating fact nor argued it in mitigation to the jury.  *See ABA Guideline* 10.11(K), 31 Hofstra Law. Rev 913, 1058 (2003) ("Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions.")  Moreover, as with the *Gabrion* case, had this important mitigation been raised, it is reasonably probable that at least one juror would have reached a different conclusion.  *See, e.g., Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2002).

---

[564] *United States v. Mohamed*, 98-CR-1023 (S.D.N.Y.), verdict form (July 10, 2001); Ex. F-03, p. 13.

**B.    Trial Counsel Failed to Seek A Corrective Instruction When the Government Raised an Improper "Nexus" Requirement for Mitigating Evidence**

### 1.    A Plainly Improper Argument

At trial, the government radically misstated the proper standard for the jury to use in considering the defense's proffered evidence in mitigation, suggesting that in order for the evidence to be mitigating it had to lessen what Mr. Rodriguez did to Ms. Sjodin, to directly reduce his responsibility.

> With regard to the test for what is and is not a mitigating factor, it is on the second determination, *the matter of does it mitigate in this case*, that the defendant's mitigating factors fail most obviously right down the line. The decision on what is mitigation in this case is up to you, ladies and gentlemen. And while the court will not tell you how to determine what is or is not mitigating in this case, *the United States further submits that this can and should be one of your tests for what is mitigating. Does the factor explain what the defendant did to Dru Sjodin or reduce the defendant's responsibility?*[565]

Defense counsel objected to this characterization of the law surrounding mitigation.[566]

The Court issued a non-specific instruction:

> Once again, I will remind the jury that I have instructed you on the law that applies to this case. If there is any statement made by any party that is inconsistent with the statements that I have given, you should disregard them and apply the law as I have given it to you.[567]

At sidebar, defense counsel registered dissatisfaction that the Court had not also

---

[565] Tr. 8677

[566] Tr. 8677

[567] *Id.*

189

sustained the objection itself: "The Court has to do more, frankly, than just saying, frankly, you've heard what I said, that isn't correct, and that objection should have been sustained. I'm sorry. You can't argue things that are not the law."[568]

The Court initially overruled defense counsel's objection.[569] However, the defense clarified the basis of its objection regarding misstatements about the law by the government and voiced its concern that the jury would be unable to discern the legal distinction between the government's test and the court's instructions.[570] The Court eventually agreed that the government was improperly trying to suggest a legal test that was not appropriate. The Court sustained the objection at sidebar but said that it believed it had sufficiently corrected the problem with its earlier general instruction.[571] The defense neither sought nor suggested an actual curative instruction, and none was given.

The government, undeterred, repeated its impermissible nexus requirement at least three more times during closing argument. The prosecution went so far as to characterize all of the defense's mitigating factors as flawed and non-mitigating because they did not influence Mr. Rodriguez's ability to choose and, therefore, they could not have factored into how he could have chosen to act differently in

[568] Tr. 8679

[569] Tr. 8680

[570] Tr. 8681

[571] Tr. 8682

this case.[572] Despite the government's flagrant and repeated misstatements on this critical point during closing arguments, counsel neither sought a specific curative instruction nor renewed the objection when the error continued. This constituted ineffective assistance of counsel and fell below widely accepted standards for performance of capital counsel. *See Strickland, supra.*

### 2. Mr. Rodriguez Was Prejudiced By Counsel's Failure

The government's misstatement of the law was neither inadvertent nor isolated, but flagrant and purposeful; this is particularly revealed by the government's return to its improper nexus requirement in closing even after the sustained objection. The flawed argument was a central part of the government's systematic denigration of the value and persuasiveness of the mitigation offered by the defense, a denigration facilitated by counsel's failure to timely object and request curative instructions. This misstatement and counsel's failure to correct it, deprived Mr. Rodriguez of the right to a fair trial in a capital case. Had counsel properly objected to the erroneous nexus argument, there is a reasonable probability that at least one juror would have reached a different conclusion regarding penalty. *See Strickland, supra.*

### C. Trial Counsel Failed to Properly Challenge the "Three-Step Process" During the Selection Phase and on the Special Verdict Form, Which Unlawfully Required the Jury to Make a Finding

---

[572] Tr. 8687, Tr. 8690, and Tr. 8748

191

**of Law Regarding the Proffered Mitigating Factors.**

On September 18, 2006, just prior to the closing arguments in the selection phase, trial counsel filed a motion in limine requesting, *inter alia*, that the government be precluded from arguing that the jury may not consider or give effect to mitigating evidence put forth by the defense.[573]  The motion was taken up by the Court the following day as part of the charge conference concerning the selection phase instructions.[574]  As the Court noted at the time, counsel's motion in limine necessarily implicated the instructions that the jury would receive concerning the finding and weighing of mitigation, which the Court believed to be an accurate statement of the law regarding the jury's role:

> The Court:   All right. Let's talk about the argument that the – that the jury should assign no weight to a mitigating circumstance.  I think that my jury instructions actually address it.  It says plainly that when you look at the mitigating circumstances and you look at the language of the paragraph right before, it talks about that they must be proved by the greater weight of the evidence to mitigate against a sentence of death, which does mean that they've got to be things – proving the mere existence of the fact would be insufficient to, quote, prove the mitigator.  You have to prove that it actually mitigates, that it is evidence that would mitigate a sentence of death.  And so I think that any argument that you would give it no weight at all, if you found that, would be legally incorrect.  But to argue that a fact does not mitigate, I don't see where that would run afoul of the law.

---

[573] Motion in Limine, dckt. # 603.

[574] Tr. 8589-31

192

And do you have a different position on that Mr. Ney?

Mr. Ney:    I believe I understand what the court is saying the difference, and I don't believe we have a different position.[575]

During the same colloquy, the Court made clear that it believed the jury's deliberation with respect to the finding and consideration of mitigating evidence had to follow a three-step process:  first, determining whether the proffered evidence is proven by a preponderance of the evidence; second, determining whether that proven evidence is actually mitigating in nature; and finally, determining what weight to assign that mitigating evidence.[576]  As the Court explained:

> I don't know how much more plainly I can state what my view is, and my view is that really there are three distinct questions on every aggravator and every mitigator. One is, has the fact been proven? Two, does it in fact aggravate or mitigate? Three, what weight's it worth? All right? And I think that if you kind of keep every one of those little boxes in the right order that the jury will follow you and we'll not have a problem.[577]

Most significantly, the Court repeatedly stated that the jury was required to determine whether a proffered factor constituted mitigating evidence.[578]  Indeed,

---

[575] Tr. 8590

[576] Tr. 8597-98 ("One says let's take the fact and say, is it true or not true? First question. Second question, does it mitigate or doesn't it? Third question, how does it weigh?")

[577] Tr. 8598

[578] Tr. 8591 ("They have to consider the mitigator that's advanced, and they have to consider whether or not the mitigator advanced actually mitigates."); Tr. 8596-97 ("And I think that, as long as we lay out the appropriate context, as long as the jury knows that what we're

193

the Court made clear that it would be appropriate for the government to argue that,
under the second step, proffered mitigating evidence could be rejected on the basis
that it was not actually mitigating:

> The Court:    Now, you get to decide whether or not it mitigates, and if you
> find that it mitigates, and we submit to you it doesn't, but if
> you do, we think it has very little weight. All right? That kind
> of argument I think is appropriate.[579]

As the Court further noted, the second step of the three-step process was
incorporated into the special verdict form in an instruction preceding the list of
proffered mitigating factors.[580]  The instruction appeared on the verdict form as
follows:  "For each of the following mitigating factors indicate, in the space
provided, the number of jurors who have found that factor to be proved by the
greater weight of the evidence *to mitigate against a sentence of death.*"[581]  As the
Court made clear during the charge conference, that particular written command
was intended to convey to the jury that for each factor, it was required to make the
"second step" finding regarding whether that the factor was actually mitigating.[582]

---

really talking about here is like, look, you're going to decide whether or not these facts took
place, you're going to decide whether or not they mitigate, and then if you find they mitigate,
then you're going to decide what weight you assign to them.")

[579] Tr. 8597

[580] Tr. 8631

[581] Special Findings Form, dckt. # 626.

[582] Tr. 8631 ("The Court: In both of them – in both the verdict – in the special findings
from here and in the verdict form before what I always did was I said – added the language to

Despite being invited by the Court to do so, trial counsel failed to properly object to the Court's "three-step process" with respect to mitigation. Specifically, counsel should have objected to the second step of the process – i.e., requiring the jury to decide if the proffered evidence was actually mitigating. Such a requirement was improper because the issue of whether proffered evidence constitutes relevant mitigation is a question of law, not a question of fact. *United States v. Sampson*, 335 F. Supp. 2d 166, 228-32 (D. Mass. 2004). This has particular constitutional significance in the context of capital sentencing because capital defendants are constitutionally required to be sentenced by jurors who are not "mitigation-impaired" – that is, jurors who do not recognize certain evidence as mitigating. *See Morgan v. Illinois*, 504 U.S. 719, 739 (1992); *United States v. Fell*, 372 F. Supp. 2d 766, 771 (D. Vt. 2005) ("Other jurors may have biases regarding particular forms of mitigating evidence. For example, some jurors may be unable to fairly consider any mitigating evidence relating to the defendant's background or upbringing. Such jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing. *See Lockett v. Ohio*, 438

---

mitigate or to aggravate, not to the specifics, but in the kind of lead-in paragraph. If you look at it here, it talks about – at least I think I added it in both, it says, "proof to the greater weight of the evidence to mitigate against a sentence of death." So it's actually in there. It's just in the instructions rather than point by point. I'll take a look at it again, but I think that I'm comfortable with the verdict form as it exists.")

195

U.S. 586, 604-05 (1978).")  In other words, the second step of the three-step process impermissibly allowed juror nullification with respect to mitigation – that is, rejecting a proffered mitigating factor established by the preponderance of the evidence *solely* because the juror disagreed that the particular category of evidence constituted legally-cognizable mitigation.

Counsel's failure to properly object to the three-step process was objectively unreasonable.  Indeed, in light of counsel's motion in limine, there was no strategic or tactical reason for counsel to refrain from raising the aforementioned challenge, as the objection was entirely consistent with counsel's stated aim of precluding the government from arguing that the jury was free to disregard mitigating evidence put forth by the defense.  Counsel's deficient performance in this regard resulted in prejudice to Mr. Rodriguez.  Specifically, there is a reasonable probability that the  adoption of the three-step process, as reflected in the instructions in the special verdict form, as well as the government's closing argument, resulted in one or more jurors engaging in nullification and impermissibly refusing to consider constitutionally relevant mitigating evidence. But for counsel's error, there is a reasonable probability that the outcome of the selection phase proceeding would have been different.

1.    **Counsel's Failure to Properly Challenge the "Three Step Process" was Objectively Unreasonable and Constituted Deficient Performance.**

196

Trial counsel has a duty to ensure that a capital sentencing jury is instructed correctly concerning its deliberations in the penalty phase proceedings, especially with respect to its consideration of the proffered mitigating factors. This duty necessarily includes properly objecting to any aspects of the jury instructions or the verdict form that are inaccurate, confusing or legally incorrect. *See ABA Guideline* 10.11(K), 31 Hofstra Law. Rev 913, 1058 (2003) ("Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate, or confusing and should offer alternative instructions.")[583] Here, the second step of the Court's three-step process was an incorrect and constitutionally flawed statement of the law. Specifically, the second step impermissibly required the jury to make a finding of law – namely, whether a proffered factor actually constituted relevant mitigating evidence. What constitutes "relevant" mitigation is clearly a legal question, and one which is vested with the Court.

Indeed, as the record demonstrates, the Court and the parties themselves

---

[583] *See also* Commentary to *ABA Guideline* 10.11(K), 31 Hofstra Law Rev. at 1068-69 ("It is *essential* that counsel object to evidentiary rulings, instructions, or verdict forms that improperly circumscribe the scope of the mitigating evidence that can be presented or the ability of the jury to consider and give effect to such evidence. ... [C]ounsel should request instructions that will ensure that the jury understands, considers, and gives effect to all relevant mitigating evidence. ... If the jury instructions are insufficient to achieve the purposes described [above] or are otherwise confusing or misleading, counsel must object, even if the instructions are the standard ones given in the jurisdiction.")(emphasis added).

recognized that the inquiry posed by the second step was fundamentally legal in nature and that any disputes about whether a proffered factor was mitigating could only properly be resolved by the Court.  During the selection phase charge conference, the Court explicitly took up the question of whether the government objected to any of the mitigating factors proffered by the defense on the special verdict form.  The government, in fact, raised objections to two of the factors: (1) that if not put to death, Mr. Rodriguez would spend the rest of his life incarcerated in federal prison;[584] and (2) that Mr. Rodriguez's family would suffer emotional pain if he were to be executed.[585]  In making these objections, the government argued that the first factor "is not an appropriate matter to be listed as mitigation," and the second factor "is not appropriate mitigation" and "the law does not recognize that as a mitigating factor."[586]  In other words, the government argued the second step of the three-step process – i.e., that the proffered factors were not actually mitigating.  As the government's argument made clear, resolution of the government's objections required the Court to make a legal finding: whether, as a matter of law, the proffered factors were mitigating.  Notably, the Court overruled the government's objections and permitted these factors to be included on the

---

[584] Tr. 8609

[585] Tr. 8611

[586] Tr. 8609, 8611

198

defense list of mitigating factors.[587]

Having given the government an opportunity to object to any of the proffered factors on the ground that the factors in question were not actually mitigating, and having ruled on those objections, the Court itself properly conducted the second step of the "three-step process" with respect to the defense-proffered factors.  In other words, the list of proffered mitigating factors was properly vetted to ensure that only factors that were actually mitigating would be included on the special verdict form.[588]  In light of this fact, counsel should have objected to any argument or instructions that permitted the jury to veto the Court's legal determination.  Counsel, however, unreasonably failed to do so.

Counsel had numerous opportunities during the charge conference to object that the second step impermissibly required the jury to make a finding of law.  Just after the Court articulated its rationale for adopting this process, the Court specifically inquired of counsel:  "[D]o you have a different position on that, Mr Ney?" – to which counsel replied:  "I believe I understand what the court is saying the difference, *and I don't believe we have a different position*."[589]  Moreover, when the Court later noted that the special verdict form would include an

[587] Tr. 8610, 8612

[588] It should be noted that the government did not object to any of the other proffered mitigating factors. Thus, the government implicitly conceded that the remaining proffered factors were actually mitigating as a matter of law.

[589] Tr. 8590

199

instruction adopting the three-step process with respect to mitigation, counsel

again made no objection.[590]  The next day, when the parties were presented with

the final version of the instructions and verdict form, trial counsel failed to raise

this objection, despite the Court again stating: "It has to be found to mitigate. And,

like I said, I think the analysis is divisible into three: has the fact been proven?

Does the fact mitigate?  And then what weight is it assigned? It's that same three-

part analysis that I think applies to every factor both in aggravation and

mitigation."[591]

There is no tactical or strategic rationale that can excuse counsel's deficient

performance.  Quite the contrary.  As is demonstrated by counsel's motion *in

limine*, it was part of trial counsel's strategy to seek to preclude the government

from arguing that the jury may not consider or give effect to mitigating evidence

put forth by the defense.  Indeed, during voir dire, trial counsel made a similar

argument regarding the jury's proper consideration of mitigation factors.[592]  On

this record, it was objectively unreasonable for counsel to waive any prior

objections it raised on this matter, or to otherwise fail to make an objection that

was entirely consistent with the aim of insuring that its mitigating factors would be

given due consideration by the jury.  Trial counsel's failure to challenge the second

---

[590] Tr. 8631

[591] Tr. 8649-50

[592] Memorandum Re:  Jury's Consideration of Mitigating Factors, dckt. # 515.

step of the three-step process was objectively unreasonable.

Moreover, at the time of Mr. Rodriguez's trial, there was readily available caselaw that established the basis of the objection that counsel should have made. First, although the Supreme Court has stated that trivial or unimportant evidence should be excluded as irrelevant to the issue of mitigation, *Tennard v. Dretke*, 542 U.S. 274, 286-87 (2004), the Court has long held the view that the standard for relevance with respect to mitigation is broad: "[T]he question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death." *Id*. at 287 (internal quotation marks and citation omitted). Moreover, although the range of potential mitigators that a capital defendant can proffer is broad, there are certain categories of evidence that the Court has recognized *always* constitute relevant mitigating evidence as a matter of law – namely, information about a defendant's background and upbringing. As the Supreme Court has noted, evidence "about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989).

Consequently, the Supreme Court has held that jurors who cannot fairly consider such mitigation evidence because they deem such evidence "irrelevant"

201

are excusable for cause. *Morgan v. Illinois*, 504 U.S. at 739 (1992). Such jurors "not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id.* at 736. As the Court recognized, a juror cannot properly refuse to consider a mitigating factor on the grounds that it is "irrelevant" because whether evidence constitutes relevant mitigation is a matter of law, and in order to serve on a trial, a juror must swear to impartially follow the law as set out by the court's instructions. *Id.* at 738-9.

Indeed, in several federal death penalty prosecutions that were tried prior to Mr. Rodriguez's case, a number of district courts relied on *Morgan* and *Penry*, as well as other relevant Supreme Court precedent, to find that jurors who evinced a bias against certain categories of mitigation were excusable for cause under *Morgan*, because such jurors had plainly demonstrated that they could not impartially consider the evidence in the case in reaching a sentencing decision. *See United States v. Fell*, 372 F. Supp. 2d 766, 771 (D. Vt. 2005); *United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005). *See also United States v. Sampson*, 335 F. Supp. 2d 166, 228-32 (D. Mass. 2004) (whether a factor is actually mitigating is a question of law, not a fact for the jury to decide).

Trial counsel failed to marshal this extant caselaw to object to the three-step process adopted by the Court. Not only is it axiomatic that a jury may not decide

questions of law, but here there was relevant capital jurisprudence that addressed the question of what constituted relevant mitigating evidence and the proper role of a juror in assessing mitigation for its relevance. In light of this, counsel's failure to rely on favorable law to adequately challenge the second step of the three-step process was objectively unreasonable. This was especially so considering that the result of this failure was that the jury was instructed, by way of the special verdict form, to engage in a deliberative process that was constitutionally unlawful.

### 2.    Counsel's Deficient Performance Resulted in Prejudice.

There is a reasonable probability that, but for counsel's deficient performance, one or more jurors would have struck a different balance during the selection phase and that the outcome of the proceeding would have been different. Counsel's failure to properly object to the three-step process had two distinct consequences which likely affected the jury's deliberations with respect to the mitigating factors. First, counsel's failure allowed the government to repeatedly argue to the jury that it could simply disregard any proffered factor that it deemed to be irrelevant for purposes of mitigation. Second, it resulted in an instruction on the special verdict form that validated the government's incorrect statement of the law and effectively encouraged jury nullification with respect to the proffered list of mitigating factors. As is explained in more detail below, the findings on the verdict form reflect that some

203

jurors likely failed to consider relevant mitigation that was proven by a preponderance of the evidence solely because of their answer to the second step of the three-step process.

With respect to the government's closing, the record demonstrates the government's heavy reliance on the three-step process as a tactic to encourage the jurors to simply disregard the proffered mitigating factors, even if the defense had met its burden and established a given factor by a preponderance of the evidence. Indeed, the government repeatedly emphasized that it was the jury's prerogative, under the Court's instructions, to use the second step of the three step process to disregard the defense evidence on the ground that it did not constitute relevant mitigation:

- Also, the information has to be shown that the information mitigates in this case. Whether proven or not, does it mitigate, tend to lessen the severity in this case? A defense proposal for mitigation or mitigation that you find is only qualified to go on the decision scale if you answer yes for both of those mitigation questions, and then there's a third issue, what weight do you want to give it?  If either of those first two is not proven, either factually or that it mitigates, then you don't have to give further consideration to that proposed factor.[593]

- With regard to the test for what is and is not a mitigating factor, it is on this second determination, the matter of does it mitigate in this case, that the defendant's mitigating factors fall most obviously right down the line. The decision on what is mitigation in this case is up to you, ladies and gentlemen. And while the court will not tell you how to determine what is or is not mitigating in this case, the United States further submits that this can and should be one of your tests for what is

---

[593] Tr. 8674-75

mitigating. Does the factor explain what the defendant did to Dru Sjodin or reduce the defendant's responsibility?[594]

- Remember that you assess the aggravating factors independently, ladies and gentlemen, in reaching your conclusions so now you should do the same with the proposed mitigation. Assess it. And for each one of their proposals you can ask yourselves: Does it meet the test the judge gave us? Does it meet it? Is it proven. Does it mitigate? And even if it does, what weight does it have?[595]

- If you decide that some of the proposed factors are proven factually, they do not mitigate we argue to you in this case because they do not influence the defendant's ability to choose and, therefore, choose differently. You get to choose if they mitigate.[596]

- I know I said this during my closing, but Mr. Ney talked about the mitigating factors and I want to be clear, we want you to read them. We hope you'll go through all of them right away and look at every single one that's been proposed and consider them fully, and that's why we pointed out the two-part test that the judge talks about, that it is one thing for it to be shown, it's another to say that it mitigates.[597]

Indeed, in the most striking and effective deployment of this argument, the government guided the jury on how to use the second step to do precisely what the law forbids – that is, deem evidence about the defendant's background and upbringing "irrelevant" to the question of whether to impose a sentence of death:

> We heard that the defendant was a colicky baby, he was one of the poor kinds in school, some kids teased him, and he is said to have encountered racism and sexual abuse, as did his sisters.

---

[594] Tr. 8677

[595] Tr. 8682

[596] Tr. 8690

[597] Tr. 8745

Very serious matters. He inherited a benign hand tremor from his father, and he would rather have lived in Texas than in Minnesota. Perhaps these factors would mitigate the defendant getting into a fistfight with one of the people who wronged him long ago, but what could it have to do with a 22-year old girl the defendant spotted in a mall, lusted after, kidnapped, assaulted and raped, and finally killed on November 22nd, 2003?

No matter what the defendant thinks he would change about his life, everyone agrees he is capable of choosing for himself. There's nothing in the law that allows him to choose to do what he did to Dru Sjodin and his other victims, and there is nothing that says you are required to agree to it by way of his mitigation claims.[598]

There is no question that such argument, combined with the instruction that the jury received on the special verdict form itself, affected the outcome of the jury's deliberations regarding the mitigating factors. Indeed, the fact that the instruction on the special verdict form codified the government's position provided the government's closing arguments with the imprimatur of the law. And here, the government's argument could not be any clearer – that is, under the law as it was given to them, the jury could disregard every piece of evidence it heard about Mr. Rodriguez's background and upbringing as simply irrelevant to whether it mitigated the capital crime of which he had been found guilty. Had any juror voiced such an opinion in voir dire – i.e., that he or she could not fairly consider evidence of Mr. Rodriguez's background and upbringing as relevant mitigation of the crime of which he was accused – there is no question that this juror would have been validly struck

---

[598] Tr. 8687

206

for cause.  Such a juror would have been "mitigation-impaired" under *Morgan*, and therefore excludable for being unable to impartially consider relevant mitigation evidence.  *Morgan*, 504 U.S. at 739.

The prejudice is demonstrable.  For example, as explained below, with respect to mitigator number 2 ("Alfonso Rodriguez was sexually abused as a child"), five jurors rejected – and, therefore, failed to consider – this factor in determining whether Mr. Rodriguez should be sentenced to death.[599]  The fact of Mr. Rodriguez's childhood sexual abuse, however, was essentially conceded by the government at trial.  As the record demonstrates, the government declined to cross-examine the family members and lay witnesses about Mr. Rodriguez's childhood rape, so the fact of Mr. Rodriguez's childhood sexual abuse was uncontested.[600]  Given the trial record, it is extremely unlikely that the five jurors who failed to find this mitigator did so on the basis of the first step of the three step process, i.e., that the fact was not proven by a preponderance of the evidence.  Rather, the only explanation for why these five jurors rejected what was essentially uncontested evidence of Mr. Rodriguez's childhood sexual abuse was that these jurors thought the factor failed the second step – they simply agreed with the government's argument that the evidence of Mr. Rodriguez's childhood sexual abuse was not relevant mitigation given the

---

[599] Special Verdict Form, dckt. # 626

[600] *See generally*, Tr. 7902-44 (Sylvia Rodriguez); Tr. 7944-8097 (Dr. Hutchinson).

207

crime of which he had been convicted.  Such a determination – that childhood sexual abuse does not constitute relevant mitigation – clearly runs afoul of the law.  *See United States v. Fell*, 372 F. Supp. 2d 786, 790 (D. Vt. 2005) (striking juror for cause because juror stated that "he could not consider evidence relating to the defendant's upbringing or childhood sexual abuse as mitigating evidence").

Similarly, three jurors failed to find another mitigator that was also effectively conceded:  "Alfonso Rodriguez had learning problems in school because he was developmentally delayed as a child."  These findings lend credence to the fact that many of the jurors simply refused to consider relevant mitigation evidence about Mr. Rodriguez's background and upbringing for an impermissible reason – i.e., they decided that, as a matter of law, such evidence was irrelevant to their sentencing deliberation.  The implication of this pattern on the special verdict form is that even for factors which were contested by the government (e.g., "Alfonso Rodriguez suffers from brain damage," factor, which was found by only three jurors),[601] it is quite likely that the jurors who rejected these factors did so not because the defense failed to establish the fact by a preponderance of the evidence, but rather, because the jurors simply deemed the fact to be irrelevant for purposed of mitigation.

In *Wiggins v. Smith*, the Supreme Court noted that in a death penalty scheme where a non-unanimous jury spares the defendant's life, such as the federal system,

---

[601] Special Verdict Form, dckt. # 626

confidence in the outcome is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins,* 539 U.S. 510, 537 (2003). The Supreme Court has stressed that "the adjective ["reasonable"] is important" and has equated it with "a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). As explained in *Strickland* itself: "reasonable probability of a different result" is *less than a preponderance of the evidence. Strickland v. Washington*, 466 U.S. 668, 694 (1984). It is present when an evaluation of all of the evidence that should have been before the jury is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693. Here, the jury's sentencing verdict is not worthy of confidence. The verdict form reflects that uncontested evidence regarding Mr. Rodriguez's background and upbringing – that is, the kind of evidence that has been legally recognized to constitute valid, relevant mitigation which a jury is required to consider in its sentencing deliberations – was rejected. Moreover, those jurors likely rejected this relevant mitigation on the basis of incorrect constitutionally flawed arguments and instructions that they received. There is a reasonable probability that at least one juror would have struck a different balance if the impermissible three-step process had not been injected into the jury's consideration of the mitigating factors. Therefore, Mr. Rodriguez's death sentence should be vacated.

> **D.    Trial Counsel Failed to Argue that Application of the Federal  Death Penalty to Alfonso Rodriguez Violates The**

**Tenth Amendment.**

As explored in detail in section XIII, infra., the application of the federal death penalty under the unique circumstances of this case violates the Tenth Amendment to the United States Constitution.[602]  However, trial counsel failed to challenge the capital prosecution of Alfonso Rodriguez on this basis or even to explore application of the Tenth Amendment at all.  Counsel's failure fell below widely accepted standards of competence for capital counsel.  If a court concludes the argument has been defaulted, then counsel was ineffective for failing to have raised it.  Had the argument been properly raised, given its strength and merit, the Court would likely have concluded that a death sentence was unavailable in this prosecution.

E.    **Trial Counsel Failed to Effectively Address the Issue of Burden of Proof At The Penalty Phase.**

As explored in detail in section XV, *infra*, Alfonso Rodriguez's constitutional rights were violated because the jury was not instructed that the reasonable doubt standard governed the ultimate penalty determination in this case.[603]  The Court's instructions on this point infringed on essential rights protected by the Due Process Clause, the Sixth Amendment and the Eighth Amendment.  *See Ring v. Arizona,* 536 U.S. 584, 600 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

While trial counsel requested an instruction including the reasonable doubt

---

[602] The entire argument set forth in that section is incorporated and reasserted herein.

[603] That entire claim is incorporated by reference herein.

210

standard for the ultimate determination of penalty,[604] counsel did not raise the issue as

a constitutional requirement, and cited neither *Apprendi* nor *Ring* in seeking the

instruction.  The Court, therefore rejected the instruction without addressing the

constitutional error as explored herein.  In this way, counsel rendered constitutionally

ineffective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686

(1984). Counsel's performance fell far below the standards expected of competent

counsel in capital cases.  Moreover, had counsel effectively requested an appropriate

instruction on this issue, there is a substantial probability that Mr. Rodriguez would

not have been sentenced to death.[605]

## VII.    *Redacted*

## VIII.  The Cumulative Prejudicial Effect of Trial Counsel's Deficient Performance Deprived Mr. Rodriguez of His Right to Effective Assistance of Counsel, as Guaranteed by the Fifth, Sixth, and Eighth Amendments.

In the prior sections we have broken counsel's failings into discrete claims

simply to facilitate the presentation.[606]  Each of these claims, standing alone, justifies

relief under the standard established in *Strickland v. Washington*, 466 U.S. 668

---

[604] Defendant's Proposed Sentencing Instructions, dckt. # 536, page 32.

[605] In addition, appellate counsel for Mr. Rodriguez was ineffective for failing to raise any formulation of this critical issue for review by the Eighth Circuit, as explored in section XX, *infra*.

[606] The previous sections alleging ineffective assistance are all incorporated by reference herein.

(1984).  But in no sense should the Court suppose that the effect of these many errors should be assessed independent of each other.  It is when all of counsel's failings are evaluated cumulatively–from the pre-trial failures to mount an effective challenge to the government's false forensics, to the failure to discover and present the mountains of readily available mitigating evidence, to the failure to recognize and develop the fact of Mr. Rodriguez's mental retardation, to the presentation of an incoherent defense–that the full impact of counsel's failings becomes clear.  And from that vantage, it is particularly evident that counsel's performance was objectively unreasonable, and that were it not for counsel's failings, there is at the very least a reasonable probability that Mr. Rodriguez would not be on death row.  *Strickland*, *supra*.

**IX.    Mr. Rodriguez's Conviction and Sentence Are Illegal and Must Be Set Aside Because the Government Knowingly Presented False and Misleading Testimony  in Violation of the Fifth and Eighth Amendments.**

The trial of Alfonso Rodriguez rested heavily on false, misleading, and prejudicial testimony presented and argued by the United States.  This testimony falls into two categories:  Dr. McGee testified falsely about the crime, and witnesses from the Minnesota Department of Corrections testified falsely about Mr. Rodriguez.  Whether evaluated independently or cumulatively, the false testimony in this case was material and entitles Mr. Rodriguez to a new trial.

Prosecutors violate due process by presenting material testimony that is false,

by presenting material testimony that creates a false impression, or allowing false or misleading testimony to stand uncorrected. *See, e.g., Mooney v. Holohan*, 294 U.S. 103 (1935) (presenting knowingly false testimony violates due process); *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is likewise offended by direct statements which are untrue and by testimony which, "taken as a whole," gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957). This is true even where the particular prosecutor does not know the testimony is false or misleading. *See, e.g., Giglio*, 405 U.S. at 154. Indeed, the truthfulness of the process is of the utmost importance even when a specific prosecutor acts in good faith. *Id.* at 153. As the Supreme Court stated in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."[607]

### A.    The Government Knowingly Presented False Testimony About the Crime.

---

[607] In this claim, we describe the violation caused by the government's knowing presentation of false evidence. But the government's failure to *disclose* their knowledge that Dr. McGee's testimony was false also violates their obligation to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). In the next claim, we specifically incorporate all the facts and exhibits supporting the false evidence claim and re-urge them as a violation of *Brady* as well.

### 1.  False Testimony That Mr. Rodriguez Raped the Decedent

As recounted above, one of the most critical aspects of the government's case was the apparent forensic evidence that Dru Sjodin had been sexually assaulted before her death.  The government repeatedly used this "fact" to argue that Mr. Rodriguez deserved to die because he committed the murder as part of a sadistic "rape fantasy."  Dr. McGee's testimony about acid phosphatase was the centerpiece of this argument.  But this testimony, as we have shown, was materially false, inaccurate and substantially misleading, as the government knew or should have known.

### a.    The Government Knew, or Should Have Known, That Dr. McGee's Testimony About the AP Test Was Materially False, Inaccurate and Substantially Misleading.

In *United States v. Agurs*, 427 U.S. 97, 103 (1976), the Supreme Court held that in cases where the government "knew or should have known" of false testimony, a conviction obtained with such testimony is "fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *Id*. at 103 (footnotes omitted); *see also United States v. Kaufmann*, 803 F.2d 289, 291 (7th Cir. 1986) (adopting "knew or should have known" standard).  That standard is met here.

The existing FBI protocols at the time of Mr. Rodriguez's trial unequivocally stated that a positive AP result is insufficient evidence to support an identification of

semen.  Section 10.1 of the FBI Serology Manual, for example, noted that a positive AP result "provides a presumptive indication that semen may be present on an item but it does not constitute an identification of semen.  A confirmatory testing procedure is required to identify the presence of semen in a questioned stain."[608]   No FBI analyst would have been allowed to take the stand in Mr. Rodriguez's case and inform the jury that semen was discovered in the victim (let alone provide a window of time in which the semen was deposited).  The prosecutors in this case were employees of the Department of Justice, and they are imputed with knowledge in the possession of other employees of that same agency.  *See United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) ("The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right hand is doing."); *United States v. Barkett*, 530 F.2d 189 (8th Cir. 1976) ("[O]ne office within a single federal agency must know what another office of the same agency is doing. … This is no more than to hold the Government to the same standard of conduct as governs private individuals in transmitting notice from agent to principal.").  Thus, the government knew, or should have known, that Dr. McGee's testimony that a positive AP test was confirmatory of the presence of semen was materially false, inaccurate and substantially misleading.

Moreover, any knowledge which Dr. McGee possessed should be imputed to

---

[608] Procedure for the Presumptive Testing of Semen, FBI Serology Manual, 102.2 §10.1, Ex. A-06.

215

the prosecution. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the Government's behalf in the case."). Indeed, it is a well-settled principle of law that the government is responsible for the knowledge of a government agent who actually testifies as a witness. *See, e.g., Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977); *Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir. 1982); *United States v. Rosner*, 516 F.2d 269 (2d Cir. 1975); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973); *Curran v. State of Delaware*, 259 F.2d 707, 712-13 (3d Cir. 1958); *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995); *United States ex rel. Kowal v. Attorney General of Illinois*, 550 F. Supp. 447, 451 (N.D. Ill. 1982); *United States v. Andrews*, 824 F. Supp. 1273, 1289 (N.D. Ill. 1993). *See also United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("If disclosure were excused in instances where the prosecution has not sought out information readily available to it, we would be inviting and placing a premium on conduct unworthy of representatives of the United States Government. This we decline to do."). Dr. McGee was a forensic pathologist with a medical degree; clearly, he knew the difference between a serum and a dry stain, and it is highly improbable that he did not know that a chemical reagent that was only approved and validated for use on a serum could not be properly used on a dry stain. Similarly, as a member of the forensic pathology community, Dr. McGee must have known that an AP test cannot properly be regarded as anything other than a

216

presumptive test for the presence of semen.  Such knowledge can and must be imputed to the government.

Finally, under the law, Mr. Rodriguez need not demonstrate that the prosecutors who tried his case were personally aware of the falsity of Dr. McGee's testimony.  The Supreme Court has held that the presentation of false evidence against a defendant violates due process even if the falsity was unknown to the prosecutor.  *See, e.g., Giglio v. United States*, 405 U.S. 150, 154 (1972).  This is because the underlying purpose of *Napue* and *Giglio* is not to punish the prosecutor for the misdeeds of a witness, but rather to ensure that jury is not misled by any falsehoods.  *See, e.g., United States v. Meinster*, 619 F.2d 1041, 1044 (4th Cir. 1980). Nevertheless, in light of the fact that the basis for determining the falsity of Dr. McGee's testimony was within the institutional knowledge of the FBI and the Department of Justice, the government knew or should have known that Dr. McGee's testimony was substantially misleading and created a false impression for the jury.

### b. Dr. McGee's Testimony About Acid Phosphatase was Material and Prejudicial.

Under *Napue*, a violation is material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103, (1976) (emphasis supplied).  That standard is easily met here.

One of the main arguments upon which the government relied in arguing to

the jury that it should sentence Mr. Rodriguez to die was that he was a psycho-sexual killer who committed the murder in order to satisfy his pervasive "rape fantasies."[609] As noted above, this was central to the government's closing argument to the jury before it retired to deliberate over Mr. Rodriguez's punishment.  In order to "link" the prior sexual assaults in Mr. Rodriguez's criminal history to the instant case, and therefore make a persuasive case that the decedent's murder was the result of Mr. Rodriguez's alleged escalating "rape fantasy" and deep-seated violent sexual impulses, the government had to establish that the kidnapping was sexually motivated.  The most critical piece of evidence that the jury heard corroborating the government's claim in this regard was Dr. McGee's testimony that Dru Sjodin was sexually assaulted 24 to 36 hours prior to the murder. Moreover, this testimony came stamped with the credibility and imprimatur of forensic science.  Thus, the likelihood that Dr. McGee's testimony "could have affected the judgment of the jury," *Augurs*, 427 U.S. at 103, is substantial because it was the singular piece of evidence that "confirmed" the underlying crime was sexual in nature.

> **2.     False Testimony That Mr. Rodriguez Slashed the Decedent's Neck and Stabbed Her in the Side.**

The second critical aspect of the government's case was the apparent forensic evidence that the decedent's neck had been slashed and her side had been stabbed. The government repeatedly returned to this gruesome "evidence" to substantiate its

---

[609] Tr. 8663

argument that the victim's death was a long, torturous ordeal for which Mr. Rodriguez should pay with his life. But this testimony—just like the testimony about the acid phosphatase—was materially false, inaccurate and substantially misleading, as the government knew or should have known.

### a.    The Government Knew, or Should Have Known, That Dr. Mcgee's Testimony about the Knife Was Materially False, Inaccurate and Substantially Misleading.

Naturally, the government knew the decedent had been found with a cord around her neck. The government knew or should have known the circumference of this cord was substantially less than the diameter of an adult female's neck. Naturally also, the government knew or should have known that a ligature furrow was present immediately under the ligature, indicating substantial compression of the neck tissue that would cause strangulation. The government also knew, obviously, that this furrow was untouched even though it was in precisely the area that had otherwise been subjected to extensive animal activity. And the government knew that this furrow created a straight edge. And the government knew or should have known that Dr. McGee failed to measure the circumference of the ligature. Finally, the government knew or should have known that when Dr. McGee interpreted the straight edge of the furrow as one side of a knife wound, he had deliberately ignored the evidence of the furrow's provenance—that is, from the ligature. Manifestly, therefore, the government knew or should have known that Dr. McGee had lent the

219

imprimatur of scientific infallibility to testimony that was false, inaccurate, and substantially misleading.[610]  Of course, it is no answer that the prosecutors may not have made the effort to learn of Dr. McGee's falsehoods; that knowledge plays no part in the constitutional analysis, as we have shown above.  Dr. McGee was a vital part of the prosecution team nearly from the moment the victim's body was discovered, long before it reached federal court, and the prosecution is responsible for that which is known by its government agents.

### b.    Dr. McGee's Testimony About the Knife Was Material and Prejudicial.

As noted, the materiality question turns simply on whether "there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, (1976) (emphasis supplied).  The answer here is easily yes.  It was the false testimony about the "knife wounds" that allowed the government to paint a picture of a slow, sadistic death, rather than a quick, panic-stricken struggle.  The government used Dr. McGee's false testimony to paint a picture of "Dru's last hours and her last minutes," and "the terror and acute mental anguish" she felt as Mr. Rodriguez drove her from North Dakota to Minnesota.[611]  But the powerful scene created by the prosecution of a "shivering,"

---

[610] We recount this evidence above, section II B, and incorporate it herein by specific reference.

[611] Tr. 8665

"scared" victim who was "marched down that embankment into the night" was nothing but an artifact of Dr. McGee's false testimony.[612]  It is preposterous to suggest that without this testimony the result would have been the same.  At the very least, Dr. McGee's testimony "could have affected the judgment of the jury," *Aguurs*, 427 U.S. at 103, and Mr. Rodriguez is therefore entitled to relief.

### 3.    Dr. McGee Has Often Given False Testimony

It should come as no surprise that Dr. McGee testified falsely in this case.  He has often performed shoddy work and drawn questionable conclusions for the benefit of the prosecution.  His reputation is well known and richly deserved, having been earned in cases like the following.

### Michael Ray Hansen

In the late morning hours of May 2, 2004 in Alexandria, Minnesota, Michael Ray Hansen awoke to find his three-month-old daughter Avryonna unresponsive and not breathing.  Paramedics worked to revive Avryonna without success; she was pronounced dead and taken to the county hospital for autopsy.[613]  During the postmortem investigation, the pathologist involved took note of a complex fracture in the left side of Avryonna Hansen's skull.  Once alerted, law enforcement pursued a second autopsy.[614]  The forensic pathologist whom they called upon to perform it was

---

[612] Tr. 8706

[613] *Id.* at ¶ 1, 2

[614] *Id.* at ¶ 2

Michael McGee.[615]

While Dr. McGee was conducting his investigation, law enforcement consulted with him at length about the facts surrounding Avryonna Hansen's death and the days preceding it. Law enforcement had also gathered evidence that alerted Dr. McGee to the following: Avryonna was sleeping face-down; the futon's mattress was softer than a traditional bed; and that Avryonna shared the mattress with both her three year-old sister and her father, who had gone to bed under the influence of alcohol.[616]

All of these facts were brought directly to Dr. McGee's attention. Medical experts count every one of these conditions as hallmark risk factors for accidental positional asphyxiation among children under one year old. [617] Despite being apprised of these risk factors, Dr. McGee reached a more sinister conclusion. He focused on the child's skull to the exclusion of all the other evidence and, once he found the fracture on its left side, he stopped looking for a cause of death.[618] He recorded the manner as homicide all the same.[619] Dr. McGee, however, had already been told by Douglas County law enforcement that Avryonna Hansen had sustained a

---

[615] *Id.* at ¶ 3

[616] Post-Conviction Hearing, Findings of Fact, ¶ 18. Ex. C-01

[617] *Id.* at ¶ 17

[618] *Id.* at ¶ 20

[619] Trial Testimony of McGee, 3:1-14, Ex. C-03.

violent fall in her car seat six days before her death, an accident that could account for the child's skull fracture.[620]

In the wake of Dr. McGee's homicide determination, Michael Ray Hansen was charged with second-degree murder.  A jury convicted him in February 2006, having heard not one word about accidental positional asphyxiation from Dr. McGee.

Hansen served five years in prison before Douglas County district court Judge Peter Irvine granted him a post-conviction hearing.  The testimony that was heard at this proceeding — both from Dr. McGee and from six independent experts who controverted his conclusions — establishes that Dr. McGee was dead wrong multiple respects.  On the basis of these fundamental failings, Judge Irvine granted Michael Ray Hansen a new trial, concluding that "Dr. McGee's testimony regarding the symptoms and clinical course of a child with a skull fracture like Avryonna's and Avryonna's shopping cart fall was false or incorrect."[621]  Judge Irvine's conclusions triggered a review of McGee's work by Ramsey County officials and a flood of media scrutiny into his previous investigations.[622]

Dr. McGee's work on the Hansen case has been criticized by nearly a dozen

---

[620] Post-Conviction Hearing, Findings of Fact, ¶ 4, Ex. C-01.

[621] Post-Conviction Hearing, Conclusions of Law, ¶ 2,  Ex. C-01.

[622] *See, e.g.*, *Review: Ramsey Coroner Complied with State Laws*, Fargo Forum, Sept. 7, 2011.  Ex. C-05.

physicians and experts on child death investigations.[623]  Each of these experts directly disputed Dr. McGee's determinations.

Dr. McGee had undertaken no investigation of the child's accident with which he could counter the testimony at the post-conviction hearing.  When asked why he discounted the parking lot fall as the source of Avryonna's fracture, Dr. McGee replied with an impossibly unsatisfactory two-word answer: "Common sense."[624]  Judge Irvine, in his findings, slammed McGee for his inexperience, his incuriosity and his clipped, meager answers: "These grounds are insufficient and his conclusion on this point is not credible."[625]

Before Judge Irvine granted him a new trial, Michael Ray Hansen served five years in prison for a murder that did not happen.  His now overturned conviction came by way of a jury that was, as Irvine noted, tainted by testimony from Michael McGee.  This testimony revealed unprofessional, slapdash conclusions and investigatory methods that were incomplete.  Like others before him and others since, Hansen paid a dear price for McGee's incompetence.

On September 16, 2011, the Douglas County Attorney dismissed all charges. In his motion to dismiss, the prosecutor explained that "such alternate explanations of the cause of Avry's death within the context of a very circumstantial and forensically

---

[623] Post-Conviction Hearing, Findings of Fact, ¶ 7,  Ex. C-01.

[624] Post-Conviction Testimony of McGee, 8, Ex. C-04.

[625] Post-Conviction Hearing, Findings of Fact, ¶ 42, Ex. C-01.

224

compromised case deprives the State of the ability to prove the Defendant's guilt beyond a reasonable doubt."[626]

### Evan Zimmerman

Evan Zimmerman was convicted of the February, 2000, murder of his former girlfriend Kathleen Thompson in Eau Claire, Wisconsin.  He was sentenced to life in prison, with eligibility for extended supervision after 20 years.[627]

During Mr. Zimmerman's four-day trial, the prosecution called Michael McGee to discuss the autopsy he had conducted of Ms. Thompson at law enforcement's request.  Ms. Thompson's body was found on the curb of an Eau Claire street in the early morning; an eyewitness had told police he thought he saw Mr. Zimmerman driving Ms. Thompson in his van to the spot where her body was discovered.[628]   Dr. McGee provided testimony that largely corroborated the eyewitness.  He testified that Ms. Thompson could have been strangled with a telephone cord that was found in Mr. Zimmerman's van, and that the murderer could have done so while he drove and Ms. Thompson sat in the passenger seat.[629]  Dr. McGee added that the pattern of nasal secretions on the body suggested she might have been upright during the ordeal and that the body showed no signs of sexual

---

[626] State's Motion for Dismissal of Indictment, 2–3, Ex. C-07.

[627] Zimmerman Appellate Brief, 10, Ex. C-08.

[628] *Id.* at 16

[629] *Id.*

assault.[630]   Mr. Zimmerman's trial attorney challenged none of Dr. McGee's findings and presented no defense expert.

Later, new attorneys brought a post-conviction appeal on his behalf.  At the hearing that resulted, Dr. Jeffrey Jentzen, a forensic pathologist and the Chief Medical Examiner for Milwaukee County,[631] specifically disputed virtually all of Dr. McGee's central findings.

The judges at Mr. Zimmerman's hearing were persuaded by Dr. Jentzen, whom their opinion described as challenging "much of McGee's testimony."[632] Twice the judges labeled Dr. McGee's statements as "inconclusive," and questioned their reliability in the face of Dr. Jentzen's findings.[633]  On the basis of Dr. Jentzen's testimony, which challenged Dr. McGee's prejudicial conclusions in a way that nobody had at trial, the Wisconsin Third District Court of Appeals reversed Mr. Zimmerman's conviction and remanded for a new trial.[634]

At the 2005 retrial in Eau Claire, the cross-examination of Dr. McGee fully

---

[630]  *State v. Zimmerman*, 2003 Wis. App. 196 ¶ 19, Ex. C-09.

[631] Zimmerman Appellate Brief, 24, Exhibit C-08.

[632] *State v. Zimmerman*, 2003 Wis. App. 196 ¶ 41, Ex. C-09.

[633] Id. at ¶ 42.

[634] *Id.* at ¶  51, 53.

and finally exposed the extent of his unreliable investigation.[635]   Dr. McGee admitted

that he had not reviewed critical information: "I haven't read the lab reports and I

haven't been informed of [the fibers]…"[636]   In an exchange that removed any of his

remaining credibility, the district attorney asked if the information provided by the

defense changed any of the opinions Dr. McGee had already rendered.  To this the

pathologist responded simply:  "No."[637]

Tellingly, the district attorney dropped all charges before Mr. Zimmerman

could even begin his case in chief, saying that in light of such compromised evidence,

his office lacked the ability to prove guilt beyond a reasonable doubt.[638]   Mr.

Zimmerman-an innocent man-walked free a full five years after prosecutors had

relied on McGee's false testimony to put him away.

**Thomas Rhodes**

---

[635] Mr. Zimmerman's attorney, Keith Belzer, confronted Dr. McGee about his belief that the killer had used a telephone cord to strangle Kathy Thompson and forced Dr. McGee to admit he had missed one of the investigation's most crucial pieces of evidence.  In fact during the initial examination of Thompson's body that Dr. McGee had overseen in 2000, tape lifts around the victim's neck had revealed a number of blue cotton fibers of the precise kind that were also found under her fingernails. Trial Testimony, Ex. C-10, C-11.  These fibers-which the investigation lab reports documented in detail-forcefully suggested that the murder weapon was a piece of clothing (such as a scarf) or other cloth, not a plastic cord. Trial Testimony, Ex. C-10, C-11.  On cross-examination at the retrial, Belzer confronted Dr. McGee about the cotton fibers on Thompson's neck.  Dr. McGee testified that he had seen none during his own inspection of the tape lifts. Trial Testimony, 6, Ex. C-10.

[636] *Id.* at 58:22-23.  Ex. C-10.

[637] *Id.* at 11:21-92:2.

[638] *See* Dee J. Hall, *Man Freed; Murder Charge Is Dropped*, Wisc. State Journal, April 30, 2005.  Ex. C-12.

On December 10, 1997, Thomas Rhodes was indicted for the murder of his wife, Jane Rhodes.[639] After a twelve-day trial in July 1998, Mr. Rhodes was convicted of first- and second-degree murder and received a mandatory sentence of life imprisonment.[640] Mr. Rhodes's indictment was filed more than a year after his wife's body was found in Green Lake near Spicer, Minnesota. The Rhodes family, including their two sons, had traveled there for vacation, and Mr. and Mrs. Rhodes had taken a nighttime ride in the family boat.[641] Mr. Rhodes told authorities that while he was driving the boat, he looked back and saw his wife go over the edge of the boat.[642] He turned the boat around and went back to where he thought she had gone overboard, but could not find her. At one point, he dove off the boat into the water to look for her, but found nothing. He continued looking for some time, but not finding anything or hearing any response to his calls, he returned to shore and headed to his hotel to find help. A local fisherman found Mrs. Rhodes's body the next afternoon.[643]

During trial the state called Dr. McGee, who had performed the autopsy, to

---

[639] *State v. Rhodes,* Indictment, 1997 WL 34726957, *1 (Dec. 10, 1997).

[640] *Rhodes v. Fabian*, 2005 WL 2704896, *1 (Sept. 12, 2005).

[641] *State v. Rhodes*, 627 N.W.2d 74, 77–78 (Minn. 2001) ("*Rhodes I*").

[642] *Id.* at 78

[643] *Id.* at 79

provide the "most critical evidence supporting the state's theory."[644]  Dr. McGee

testified that the facial injuries he observed must have occurred while Mrs. Rhodes

was alive, and that the injuries to her forearms were defensive wounds.  Dr. McGee

testified that other minor injuries, like the laceration on the side of her mouth,

occurred before her death.  Although other witnesses testified, Dr. McGee's

testimony provided the hard evidence to support the state's allegation that Mrs.

Rhodes's death was not accidental.  He was the lynchpin of Mr. Rhodes's conviction;

no other direct evidence implicated Mr. Rhodes.[645]

Following his conviction, Mr. Rhodes retained new counsel who brought a

petition for post-conviction relief.[646]  An evidentiary hearing regarding Mr. Rhodes's

claim was eventually held on September 10-11, 2001.  At the hearing Mr. Rhodes

brought three separate medical experts, Dr. John Plunkett, Dr. Lindsey Thomas, and

Dr. Ronald Wright.  All of them testified that Dr. McGee's conclusions and testimony

were dubious at best.[647]  At the time of his testimony, Dr. Wright had performed

roughly 16,000 autopsies, including 1,200–1,500 in drowning cases.[648]  After

---

[644] *Id.*

[645] *See generally* Appellant's Post-conviction Appeal Brief, *State v. Rhodes*, 657 N.W.2d 823 (Minn. 2003) (dckt. # C3-98-1839), 1998 WL 34303126.

[646] *State v. Rhodes*, 657 N.W.2d 823, 832–33 (Minn. 2003) ("*Rhodes II*").

[647] *Id.* at 835.

[648] Appellant's Post-conviction Appellant Brief, at *16.

reviewing the relevant evidence, Dr. Wright testified that he found "no scientific evidence that was inconsistent with an accidental drowning."[649]  Media reports indicate that, after his testimony, Dr. Wright apologized to Mr. Rhode's parents, shaking their hands and saying "I need to apologize for the mistakes of my colleague."[650]

The trial court ultimately dismissed Mr. Rhodes's ineffective assistance of counsel claim, finding counsel's actions strategic in nature, and concluding that the outcome of the trial did not depend upon his failure.[651]  Yet the government should take no comfort in the fact that Mr. Rhodes remains in custody.  The three qualified experts in Mr. Rhodes's case all testified that Dr. McGee's testimony was entirely unsupported by the evidence.  The fact that counsel made unfortunate strategic decisions in Mr. Rhodes's case does not detract from the complete agreement by the experts at his postconviction hearing that Dr. McGee's conclusions were speculative at best and blatantly false at worst.         Dr. McGee's tenure as Ramsey County Chief Medical Examiner has been marred by altogether too much falsehood.   Mr. Rodriguez's case is but one of an unfortunate string of cases where McGee testified falsely based on questionable science.

### B.    The Government Knowingly Presented False Testimony

[649] *Id.* at *20.

[650] *Dead Wrong*?, Fox News broadcast, Nov. 22, 2010.

[651] *State v. Rhodes*, 657 N.W.2d 823, 838–39 (Minn. 2003) ("*Rhodes II*").

**About the Minnesota Department of Corrections.**

At trial, Dr. Rita St. George testified she met with Mr. Rodriguez on January 23, 2003, because he had sent a "kite form" to psychiatric services the day before to seek help for anxiety and serious mental health concerns related his impending release.[652]  Dr. St. George was a clinical psychologist at Moose Lake Correctional Facility, in Moose Lake, Minnesota, when Mr. Rodriguez was incarcerated there.[653] At this meeting, Mr. Rodriguez told Dr. St. George he was "very frightened" about being released into the community and was experiencing a high level of anxiety, manifesting in physiological disruptions to his daily life and well-being, including difficulty breathing, interrupted sleep patterns, and erratic appetite.[654]  Dr. St. George also testified that she believed Mr. Rodriguez wasn't merely experiencing a little bit of anxiety but was someone who was "frightened of himself."[655]

She hypothesized that the anxiety could have manifested from an underlying, more serious condition, such as depression/anxiety, psychoses, and even from "having lots and lots of fantasies about raping someone," combined with the knowledge and reality of release in a few months.[656]  Finally, Dr. St. George also

---

[652] Sentencing Hearing at 8322 – 23.

[653] *Id*. at pp. 8320 – 21.

[654] *Id*. at pp. 8326 – 27.

[655] *Id*. at pp. 8343 – 44.

[656] *Id.* at pp. 8346 – 47.

231

testified that Mr. Rodriguez questioned her about other alternatives to being released without supervision.  He expressed a desire to be placed  where he could be "locked up but not locked up" after his scheduled release date.[657]  This meeting and conversation with Mr. Rodriguez gave rise to sufficient  concerns.  Dr. St. George called her supervisor the very next day to inform him of the meeting.  She was told, however, that Mr. Rodriguez would be released and "there was nothing they could do for him."[658]

In fact, however, the statement that there was nothing the Minnesota Department of Corrections (DOC) could do for Mr. Rodriguez is blatantly false. According to a letter from the Minnesota Attorney General's Office, dated December 17, 2003, the Minnesota Department of Corrections not only could have pursued other alternatives under Minnesota law, it should have done so.[659]  Specifically, Mr. Rodriguez could have and should have been referred for civil commitment, where he would have received the help he needed.[660]  Dr. St. George's testimony to the contrary was simply false, as the government knew or should have known. In addition, Dr. St. George's testimony was both material and prejudicial.  The

---

[657] *Id*. at 8327.

[658] *Id*. at pp. 8344 – 45.

[659] MN Attorney General's Letter, dated Dec. 17, 2003, at 1, 4-5, Ex F-01.  As we discuss below, this letter was not disclosed to the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.

[660] *Id.*

defense raised Mr. Rodriguez's expressed concern about his release and the state's mishandling of that concern as mitigating factors and as important themes at sentencing.  Had Dr. St. George not testified falsely regarding the state's failings, this important mitigation would have been greatly strengthened.  Instead it was undermined by falsehood.  But for this falsehood, there is a reasonable likelihood that the false testimony could have affected the judgment of the jury.  Mr. Rodriguez's sentence therefore violates the Fifth and Eighth Amendments.

**X.      The Government Failed to Disclose Material Exculpatory Evidence in Violation of the Fifth Amendment and *Brady v. Maryland* and its Progeny.**

**A.      Due Process and *Brady v. Maryland***

The government's obligations pursuant to *Brady v. Maryland*,  373 U.S. 83 (1963), are well- settled.  The government had an affirmative duty to learn about evidence favorable to the defense, whether as to liability or punishment, including, of course, impeachment material, in the possession of law enforcement agencies, and to disclose that evidence to Mr. Rodriguez's counsel.  *Banks v. Dretke*, 540 U.S. 668, 696 (2004); *Strickler v. Green*, 527 U.S. 263 (1999); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *Giglio v. United States*, 405 U.S. 150, 154 (1972);  *United States v. Barraza Cazares*, 465 F.3d 327, 333 (8th Cir. 2006).  This duty extends beyond the point in time when any individual witness testified, and continues to the present day. *See  Banks*, 540 U.S. at 696; *Giglio*, 405 U.S. at 155; *Steidl v. Fermon*, 494 F.3d 623, 630 (7th Cir. 2007); *High v. Head*, 209 F.3d 1257, 1264 n.8 (11th Cir. 2000); *Thomas*

233

*v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992) (prosecution has an obligation to turn over exculpatory evidence relevant to habeas proceedings, even if it was not discovered prior to the close of trial).

To establish a *Brady* violation, Mr. Rodriguez must show that material favorable to the defense was not disclosed. *United States v. Barraza Cazares*, 465 F.3d at 333 (8th Cir. 2006) (citing *United States v. Thomas*, 940 F.2d 391, 392 (8th cir. 1991). The good faith of the prosecution is irrelevant. "Evidence is material 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 334, quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985). The question is whether, considering the cumulative effect of the suppressed evidence, *Kyles*, 514 U.S. at 436, "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable. *Id.* at 441.[661]

###### B.    Exculpatory Evidence Regarding the Failures of the Minnesota DOC

As discussed above, the government knew or should have known that Dr. St. George's testimony that "there was nothing" that could be done to address Mr.

---

[661] In addition to the *Brady* claims asserted in Claim X, above, counsel specifically incorporates all the facts, arguments, and exhibits supporting Claim IX and realleges them as *Brady* violations. That is, the government's failure to disclose their knowledge that Dr. McGee's testimony was false violates not only the prohibition against the use of false evidence, but also the obligation to disclose exculpatory evidence.

234

Rodriguez's concerns about his impending release was simply untrue.  But in addition to the knowing presentation of false evidence, the government also failed to disclose the letter from the Minnesota Department of Corrections, the letter which demonstrated Dr. St. George's falsehood.  This was a separate violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

It is no answer that the prosecutor may not have been in physical possession of this document.  The prosecutor is responsible for *Brady* materials, even if they are not in his or her actual possession.  *Strickler v.Green*, 527 U.S. 263 (1999)(finding that only the prosecutor can judge the likely effects of evidence favorable to the defendant, so she has the sole responsibility for disclosing that information—even if it is not in her actual possession.)  Constructive knowledge or possession of *Brady* materials is imputed to a federal prosecutor when, as in this case, the agency in actual possession played a substantial role in the federal investigation.  *See, e.g., Risha v. United States*, 445 F.3d 298 (3ʳᵈ Cir. 2006); *Avetone v. United States*, 603 F.2d 566 (5ᵗʰ Cir. 1979); *Carriger v. Stewart*, 132 F.3d 463, 480 (9ᵗʰ Cir. 1997(finding prosecutorial duty to obtain and disclose information found in the corrections file of the governments key witness); *Smith v. Sec. of N. Mex dept. Of Corrections*, 50 F.3d 801, 824 (10ᵗʰ Cir. 1995)(imputing to prosecutor evidence held by other arms of the state for *Brady* purposes).

Indeed, the Court has interpreted the scope of a prosecutor's constructive

knowledge of exculpatory and impeachment evidence broadly to not only include law enforcement agencies but also state and federal agencies. *See, e.g., Kyles, 514 U.S. at 437* (finding the prosecutor had the duty to learn of evidence held by government actors "including the police" and interpreted "including" as non-exhaustive of ); *Pennsylvania v. Richie*, 480 U.S. 39, 57-58 (1987)(affirming the expansion of *Brady* obligations to government actors outside  traditional law enforcement agencies to include state agencies); *see also Lavellee v. Coplan*, 239 F.Supp.2d 140, 144-45 (D.N.H., 2003)(finding no distinction in the respective disclosure requirements of the prosecution and a state protective agency); *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997)(making prosecutors responsible for information contained in corrections file held by another agency); *Wood v. United States*, 57 F,3d 733, 737 (9th Cir. 1995)(considering the FDA part of the prosecution team, thus imputing to the prosecutor any exculpatory or impeachment material possessed by that federal agency).

Accordingly, the government is charged with the constructive possession of *Brady* material.  The letter from the Minnesota Attorney General demonstrates conclusively that the Department of Corrections could and should have "done something" to prevent Mr. Rodriguez's release and thereby protect him from himself. This evidence obviously contradicts Dr. St. George, and is therefore relevant and material impeachment which should have been disclosed.  As much to the point, this

is material evidence, the delayed disclosure of which undermines confidence in the verdict. There is a reasonable likelihood that, had the evidence been disclosed, the jury would have reached a different conclusion in its penalty phase deliberations. Given proper disclosure of DOC's negligence, the defense's mitigation case would have been situated in a different position. The government's failure to disclose *Brady* material was therefore a failure to fulfill its obligations under *Brady* and the Fifth and Eighth Amendments. Accordingly, Mr. Rodriguez' sentence should be reversed.

**XI.    The Jury That Sentenced Mr. Rodriguez to Death Improperly Relied on Materially False and Inaccurate Information During the Capital Sentencing Hearing.**

As the Supreme Court has long recognized, the "fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). That heightened need for reliability in capital sentencing proceedings is necessarily violated if a sentencing jury "is allowed to consider evidence that has been revealed to be materially inaccurate." *Johnson*, 486 U.S. at 590.

There is very little doubt that Dr. McGee's testimony regarding "positive" forensic evidence of the presence of semen, that Dru Sjodin was sexually assaulted within 24 to 36 hours of her death, and that her neck had been "slashed," was false.

237

We have recounted this evidence at length and do not report it here; it incorporated

by specific reference.  Consequently, the heightened need for reliability at Mr.

Rodriguez's capital sentencing hearing was violated because the jury that sentenced

Mr. Rodriguez to die was allowed to consider evidence that "has been revealed to be

materially inaccurate."  Indeed, just as in Johnson, the violation is demonstrable

because "the prosecutor repeatedly urged the jury to give [the inaccurate information]

weight in connection with its assigned task of balancing aggravating and mitigating

circumstances against one another."  *Johnson*, 486 U.S. at 586 (internal quotation

marks omitted).  For this reason as well, Mr. Rodriguez's death sentence runs afoul of

the Eighth Amendment and should be reversed.

**XII.**  ***Redacted***

**XIII.  Petitioner's Sentence Violates the Tenth Amendment Because Congress Lacks the Power to Make Death an Available Sentence in the Particular Circumstances Presented in this Case.**

Immediately after Ms. Sjodin disappeared, North Dakota, Minnesota, and the

federal government cooperated closely to investigate.  By December 2003, North

Dakota was moving ahead with Mr. Rodriguez's prosecution. Then, although the

state prosecution was under way, the United States Attorney filed charges against Mr.

Rodriguez and sought the death penalty.  Mr. Rodriguez was not targeted for federal

prosecution because his alleged acts threatened federal interests or confounded

interstate cooperation.  Nor was Mr. Rodriguez's case some part of a coherent or

238

systematic course of federal prosecutions. The only plausible explanation for the prosecution is that the federal government wanted Mr. Rodriguez to be executed but knew that the legislatures of North Dakota and Minnesota had rejected the death penalty a century or more earlier.

The federal government can no longer override state penal policy simply because an Attorney General disagrees with the results of state democratic processes. *United States v. Comstock*, 130 S. Ct. 1949 (2010), set out a new framework for analyzing legislation Congress enacted under the Necessary and Proper Clause: Courts must now balance state and federal interests. Mr. Rodriguez's sentence cannot stand up to this scrutiny. U.S. Const. art. I, § 8, cl. 18.  The imposition of death for the crime of federal kidnapping, as applied to Mr. Rodriguez, is unconstitutional because it relies upon the Necessary and Proper Clause but does not satisfy Comstock's balancing requirement.

On one side of the balance, North Dakota and Minnesota have powerful interests at stake in this case.  Each state has a longstanding policy against capital punishment.  And, as discussed below, the death penalty is an area in which state policy is unusually important: the Supreme Court's death penalty jurisprudence has stressed the significance of local conditions.

On the other side of the balance, the federal government has no legitimate interest at stake here.  Many federal criminal laws protect uniquely federal interests

— laws that criminalize counterfeiting or murder committed on federal land, for example.[662]  In contrast, the Federal Kidnapping Act, codified at 18 U.S.C. § 1201, simply empowers federal authorities to help the states when state authorities run into obstacles in enforcing their own laws.[663]  While the federal government may be justified in seeking death when a defendant would be eligible for that penalty in state court, the federal government cannot assist North Dakota or Minnesota by imposing a penalty both states have banned.

When Congress passed the Act in 1932, states had difficulty pursuing, apprehending, and prosecuting kidnappers who fled across state lines.[664]  The Act enabled federal authorities to cut through the red tape: it put the federal government in a role like that of a trustee, empowered to exercise the kind of police power usually reserved to the states.  But like a trustee, the federal government must use its authority in a manner that truly assists the states.

For this reason, the federal government's desire to seek capital punishment against Mr. Rodriguez is illegitimate: it is not the kind of true "federal interest" that *Comstock* weighs against state interests.  And even if it were, the policy preferences

---

[662] *See* M. Todd Scott, *Kidnapping Federalism: United States v. Wills and the Constitutionality of Extending Federal Criminal Law into the States*, 93 J. Crim. L. & Criminology 753, 762 (*citing* U.S. Const. Art. I, § 8, cl. 3).

[663] *See Id.* at 764 (*citing* Thomas J. Maroney, Fifty Years of Federalization of Criminal Law: Sounding the Alarm or "Crying Wolf?," 50 Syracuse L. Rev. 1317, 1341 (2000)).

[664] *Id.* at 772

of a handful of Justice Department officials cannot outweigh the fact that the residents at both states had rejected the death penalty time and again over the course of a century.

### A. This Court Must Weigh the Federal Government's Interest in Punishing Mr. Rodriguez Against North Dakota and Minnesota's Interests in Applying Their Penal Policies.

#### 1. To Punish Kidnapping, Congress Must Rely on its Power Under the Necessary and Proper Clause

Congress's power to criminalize interstate kidnapping flows from its power to "regulate Commerce . . . among the several States . . . ." U.S. Const. art. I, § 8, cl. 3. But the Commerce Clause does not specifically empower Congress to criminalize any conduct; this is a power necessary and proper to regulating commerce. Punishing these crimes, then, is two levels removed from the commerce power, and so it clearly relies upon the Necessary and Proper Clause.

Chief Justice Marshall recognized that Congress's power to punish — with the exception of the specific punishment clauses in Article I and III — derives from the Necessary and Proper Clause. *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 416-18 (1819); s*ee also Comstock*, 130 S. Ct. at 1957. Those punishment provisions demonstrate that the framers knew how to empower Congress to punish specific crimes; all other punishments must rely on the Necessary and Proper Clause.

#### 2. Courts Must Now Evaluate Congress's Necessary and Proper Authority Under *Comstock*, Which Requires Weighing State and

241

**Federal Interests.**

In *Comstock*, the Supreme Court upheld a federal civil commitment statute that permitted the federal government to continue holding sexually dangerous former prisoners after their sentences ended.  Under the statute, the federal government first had to look for a state to take the former federal prisoner into custody.  The Court held that, taken together, five considerations combined to make that statute a constitutional exercise of Congress's necessary-and-proper power:

1.   "the breadth of the Necessary and Proper Clause";

2.   "the long history of federal involvement in this arena";

3.   "the sound reasons for the statute's enactment in light of the Government's custodial interest in safeguarding the public from dangers posed by those in federal custody";

4.   "the statute's accommodation of state interests"; and

5.   "the statute's narrow scope."

*Comstock*, 130 S. Ct. at 1965.

What emerges from these five factors and from the separate opinions (discussed below) is that the scope of Congress's Necessary and Proper authority is broader when federal interests are most acute and less broad when state interests predominate.

Each factor in Justice Breyer's list relates to the balance between state and federal power.  The first factor, although apparently static, recognizes that the federal

government must have flexibility to see through the important federal interests the Constitution enumerates. The second factor uses a statute's long history as a proxy for "the reasonableness of the relation between the new statute and pre-existing federal interests." *Comstock*, 130 S. Ct. at 1958. The third factor explicitly considers federal interests. The fourth factor explicitly considers state interests. And the fifth factor considers whether the "links between [the statute] and an enumerated Article I power are not too attenuated," thus situating Comstock among other recent federalism cases. *Id.* at 1963; s*ee, e.g., Gonzales v. Raich,* 545 U.S. 1, 38 (2005)(explaining that *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), "affirm that Congress may not regulate certain 'purely local' activity within the States based solely on the attenuated effect that such activity may have in the interstate market" under the Commerce Clause).

In *Comstock,* four Justices wrote separately to underscore the importance of state interests. Justice Kennedy concurred to "caution that the Constitution does require the invalidation of congressional attempts to extend federal powers in some instances" and argued that the level of scrutiny under the Necessary and Proper Clause should be increased. *Comstock*, 130 S. Ct. at 1966 (Kennedy, J., concurring). Justice Alito also concurred, pointing out the narrowness of the civil commitment statute at issue and the need under the Necessary and Proper Clause that the link between legislation and an enumerated power be strong. *Comstock*, 130 S. Ct. at

243

1968-70 (Alito, J., concurring).  Justice Thomas dissented, joined in part by Justice Scalia, to argue that the civil commitment statute exceeded Congress's power, violating the Tenth Amendment.  *Comstock*, 130 S. Ct. at 1970-83 (Thomas, J., dissenting).  Thus, although the *Comstock* factors may be awkward to apply element-by-element, the thrust of the case is clear: Congress may not use its necessary-and-proper authority to intrude into areas in which state interests are powerful and federal interests are attenuated.

### B.   North Dakota and Minnesota Have a Strong and Legitimate Interest  in Enforcing Their Penal Policies in This Case.

#### 1.    The Legislatures of North Dakota and Minnesota Have Repeatedly Expressed Their View that the Death Penalty Does Not Fit With the Traditions and Needs of Those States.

North Dakota and Minnesota have a strong interest in empowering the democratic choices of their citizens by applying their longstanding policy against the death penalty.  North Dakota last executed a prisoner in 1905,[665] Minnesota in 1906.[666]  And despite the publicity Mr. Rodriguez's case generated, neither state came close to readopting the death penalty afterwards.

North Dakota began narrowing the scope of its death penalty in 1885 when it separated murder into degrees and made the death penalty the prerogative of juries

---

[665] *The Death Penalty: N.D. v. U.S.,* North Dakota Supreme Court News, *available at* http://www.ndcourts.gov/court/news/deathpenalty.htm (last visited Sept. 19, 2011).

[666] Brian Leehan, *Botched Hanging Led State to Halt Executions,* Star Trib. (Minneapolis), Feb. 11, 2008, at 2B.

only.[667]  Juries rarely exercised this authority.[668]  With a narrow exception—first

degree murder by a prisoner sentenced to life for an earlier first degree

murder—North Dakota banned capital punishment in 1915.[669] A bill made that ban

absolute in 1975.[670] Attempts to reinstate the death penalty failed in the

nineteen-twenties,[671] '30s,[672] '70s,[673] and '90s.[674]

In 1868, Minnesota limited its death penalty to circumstances in which the jury

recommended it.[675] The legislature reversed course in 1883, imposing death in cases

of first-degree murder unless the jury recommended against it.[676] Then, in 1906, the

---

[667] Frank Vyzralek, *Capital Crimes and Criminals Executed in Northern Dakota territory and North Dakota, 1885-1905,* North Dakota Supreme Court News (2000), *available at* http://www.court.state.nd.us/court/news/ExecuteND.htm.

[668] John F. Galliher et al., *America Without the Death Penalty* 100 (2002).

[669] *Id.* at 555-56; *The Death Penalty: N.D. v. U.S., supra* note 35.

[670] Eileen M. Connor, *The Undermining Influence of the Federal Death Penalty on Capital Policymaking and Criminal Justice Administration in the States,* 100 J. Crim. L. & Criminology 149, 200 (2010).

[671] John F. Galliher, Gregory Ray & Brent Cook, *Abolition and Reinstatement of Capital Punishment During the Progressive Era and Early 20ᵗʰ Century,* 83 J. Crim. & Crimonology 538, 549 (1992).

[672] Mike Hagburg, *North Dakota's Last Lynching*, N.D. Supreme Court news, *available at* http://www.ndcourts.gov/court/news/bannon/bannon.htm.

[673] Galliher, *supra* note 38, at 109-10.

[674] Janell Cole, *Senate Rejects Death Penalty*, Bismarck Trib., Jan. 31, 1995, at 1A.

[675] John D. Bessler, *The "Midnight Assassination Law" and Minnesota's Anti-Death Penalty Movement, 1849-1911,* 22 Wm. Mitchell L. Rev. 577, 603-05 (1996).

[676] *Id.* at 613.

grisly details of a botched execution began to turn the tide in the state — it would be the state's last execution.[677]  When the newly elected governor and the warden of Stillwater prison came out against the death penalty, the state legislature banned capital punishment in Minnesota in 1915.[678]  Efforts to reinstate the death penalty in the nineteen-teens[679] and '20s[680] failed, as did modern efforts through the '80s[681] and '90s.[682]

Ms. Sjodin's disappearance and murder again stirred efforts to reinstate the death penalty in both states.[683]  But a 2004 bill in Minnesota died in committee,[684] and nothing emerged from the North Dakota legislature.  With the single exception of this federal case, no one convicted of committing a crime in either state has been sentenced to death in a century.

---

[677] Leehan, *supra* note 36.

[678] John D. Bessler, Death in the Dark: Midnight Executions in America 125 (1997).

[679] Galliher, *supra* note 38, at 83-84.

[680] *Id*. at 84.

[681] E.g., Donna Halversen, *Despite Public Backing, Death Penalty Appears Doomed in Legislature,* Star Trib. (Minneapolis), Feb. 4, 1992, at A1.

[682] Galliher, *supra* note 38, at 99.

[683] *See, e.g.,* Dave Kolpack, *Rodriguez Case may Revive North Dakota Death Penalty Debate,* Bismarck, Trib., Sept. 22, 2006, *available at* http://www.bismarcktribune.com/news/local/article_5419ed4c-0-efl-5827-963f-34ba892c3521.html; conrad deFiebre, *Death Penalty Bill Is Voted Down,* Star Trib. (Minneapolis), Mar. 25, 2004, at B1.

[684] DeFiebre, *supra* note 53.

**2.   State Policy is Particularly Important in the Case of Capital Punishment.**

The Supreme Court recognizes the critical importance, in the context of capital punishment, of "[t]he ability of the people to express their preference through the normal democratic processes . . .." *Gregg v. Georgia*, 428 U.S. 153, 175 (1976). This is so, in part, because "[t]he value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions." *Id.* at 186 (emphasis added).

Local decision making has long been a crucial value in our federal system, and the key value the Tenth Amendment protects. As Justice Brandeis wrote:

> Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.

*New State Ice Co. V. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). This concern remains relevant even though Mr. Rodriguez's jury was composed of North Dakota citizens. While a jury can help to "maintain a link between contemporary community values and the penal system," simply seating a jury made up of state residents is insufficient to guard state interests. *Id.* at 190 (quoting *Witherspoon v. Illinois,* 391 U.S. 510, 519 n.15 (1968)).   Federal jury pools are different than state jury pools.  More importantly, the Supreme Court envisions the

247

jury's role as setting a limit on the severity of punishment, not as a means of elevating it. *Cf. Gregg*, 428 U.S. at 173 ("[P]ublic perceptions of standards of decency with respect to criminal sanction are not conclusive.  A penalty must also accord with the dignity of man, which is the basic concept of underlying the Eighth Amendment." Finally, *Lockhart v. McCree*, 476 U.S. 162 (1986),  and related cases assured that only pro-death-penalty state citizens could be empaneled in Mr. Rodriguez's trial.

While each state could still have prosecuted independently under the separate-sovereigns doctrine, the states cannot, as a practical matter, protect their interests by carrying on a symbolic trial rendered moot by capital charges pending in federal court.

**C.   The Federal Government Has No Legitimate Interest at Stake in this Case: the Bare Desire to Secure a Death Sentence Unavailable Under State Law is Not Cognizable.**

**1.   Congress Enacted the Federal Kidnapping Statute So That the Federal Government Could Assist States in Pursuing Kidnappers, Not to Permit the Federal Government to Override State Penal Policy.**

Congress drafted the federal kidnapping law to provide federal authorities with a tool to deal with the "snatch racket" of the early 1930s.[685]  Gangs of organized kidnappers-for-ransom used "[t]he fast automobile and the great network of fine

---

[685] Hugh A. Fisher & Matthew F. McGuire, *Kidnapping and the So-Called Lindbergh Law,* 12 N.Y.U. L.Q. Rev. 646, 652-53 (1934).

248

roads . . . the radio, speedboat, and aeroplane."[686] Once across state lines, the kidnappers found themselves in "friendly territory,"[687] where they could act with impunity, untroubled by the authorities from the second state. This was especially problematic in areas like St. Louis and East St. Louis, a single metropolitan area cut by a state border.[688] The bill languished for a time, but passed quickly after the high-profile 1932 kidnapping and murder of 18-month-old Charles A. Lindbergh, Jr.[689]

Some House members argued that the federal statute should carry the death penalty even if the victim didn't die because "some States do not have capital punishment,"[690] so the law was "the only way you can reach [kidnappers] and punish them properly."[691] But the debates and committee reports show widespread concern about this kind of expansion of federal power.[692] The pro-death side lost the argument: recognizing that interest in the bill might fade without swift action, the House voted for the Senate version of the bill, which had never included the death

---

[686] *Id.* at 653.

[687] *See, e.g.,* 75 Cong. Rec. 13,289 (1932) (statement of Rep. Laguardia).

[688] *Id.* at 13283.

[689] Federal Kidnapping Act, Pub. L. No. 72-189, 47 Stat. 326 (1932).

[690] 75 Cong. Rec. 13,284 (1932) (statement of Rep. Rankin).

[691] 75 Cong. Rec. 13,284 91932) (statement of Rep. Cochran).

[692] *See generally* 75 Cong. Rec. 13,282-304 (1932); H. Rep. No. 72-1493 (1932).

penalty.[693] And while the law was amended in 1934 to provide for the death penalty[694]

(a provision struck down in 1968,[695]) nothing in the Congressional record suggests

that Congress acceded to the view that federal authorities should be able to inflict

their policy views on the states.[696]

The House Report that accompanied the 1932 House Bill echoes this

interpretation:

> It is declared to be the public policy that the enactment of this bill shall not shift from the States to the Federal Government any share of the original responsibility of the States, increase the official personnel of the Federal Government, or result in an increase of public expenditure except such as shall be necessary for the trial in the Federal courts of those charged with the violation of the provisions of this act.[697]

### 2. The Federal Government Has No Legitimate "Interest" in Using the Kidnapping Act to Override the Results of State Democratic Processes.

The Kidnapping Act empowers the federal government to chase and

apprehend kidnappers if the states cannot, to prosecute them if the states cannot, and

to punish them if the states cannot.  In a sense, the statute makes the United States

---

[693] 75 Cong. Rec. 13,282-304 (1932).

[694] Act Amending the Federal Kidnapping Act, 48 Stat. 781, Pub. L. No. 73-232 (1934).

[695] *United States v. Jackson*, 390 U.S. 570 (1968).

[696] *See, e.g.,* H. Conf. Rep. No. 1595 (1934).

[697] H. Rep. No. 72-1493 (1932).  The House Bill originally contained a provision designed temporarily to clothe state actors with federal power and thereby to avoid expanding federal authority.  Although ths provision did not become part of the statute, the Report of the House Judiciary Committee accurately reflects federalism concerns at large in both chambers during the debates.

Attorney a trustee for the states, empowering him to do what the states would if they could.  Just as a trustee cannot assert a legitimate "interest" in misappropriating client funds, the federal government cannot assert a legitimate "interest" in overriding local policy under the rubric of assisting the states.  And that is the only motive that suggests itself in this case.

> The United States Attorney's Manual sets the following policy:

> When concurrent jurisdiction exists with a State or local Government, a Federal indictment for an offense subject to the death penalty generally should be obtained only when the Federal interest in the prosecution is more substantial than the interests of the State or local authorities.[698]

One of the factors that the manual directs the United States Attorney to weigh is "[t]he relative ability and willingness of the State to prosecute effectively and obtain an appropriate punishment upon conviction."[699] Other factors include the relative weights of state and federal interests, and the interstate scope of the crime.[700]

Here, the decisive factor cannot have been an overpowering federal interest, as it might be for a crime on federal property or involving counterfeiting of United States currency.  The interstate scope of the crime was modest, both in terms of geography and impact: the Columbia Mall is within walking distance of the Minnesota line and the two states cooperated superbly. While the states cooperated

---

[698] United States Dep't of Justice, *United States Attorney's Manual* § 9-10.090, *available at* http://www.justice.gov/usao/eousa/foia_reading_room/usam/ (last visited Sept. 19, 2011).

[699] *Id.* § 9-10.090(C).

[700] *Id.* § 9-10.090(A), (B).

with the FBI during the investigation, they did not thereby waive any future interest in the case. Investigating and punishing crimes are distinct questions.

Until 2001, the United States Attorney's Manual said, "In states where the imposition of the death penalty is not authorized by law, the fact that the maximum Federal penalty is death is insufficient, standing alone, to show a more substantial interest in Federal prosecution."[701] The deletion is telling, suggesting "an intention to impose the death penalty in states that don't have it."[702]

The only plausible motive for the federal Government having prosecuted Mr. Rodriguez was to see Mr. Rodriguez executed, a penalty both states' legislatures have long rejected. This is not a legitimate federal interest.

### D.    On Balance, the States' Interests Strongly Outweigh Any Federal Interest.

The states' interest in applying their penal policy strongly outweighs the federal Government's desire to execute Mr. Rodriguez. Under *Comstock*, at least the last three factors cut against applying the federal death penalty to Mr. Rodriguez: the federal interest in this case is nonexistent; the statute does not accommodate state interests; and the statute, as the government interprets it, is quite broad.

Even if the federal government's bare desire to execute Mr. Rodriguez were

---

[701] Sean M. Morton, *Death Isn't Welcome Here*, 64 Alb. L. Rev. 1435, 1442 n.49 (2001) (quoting the 2000 version of the U.S. Attorney's Manual); Raymond Bonner, *U.S. Executes a Second Killer in a Week*, N.Y. Times, June 20, 2001, at A12 (noting the recent policy change).

[702] Bonner, N.Y. Times, at A 12 (internal quotation marks omitted).

cognizable as a legitimate federal interest, it is weak in comparison to the states'
interest in vindicating state penal policy.  Overexuberant federal involvement in
criminal enforcement is sometimes called "federalization," and academic and
industry commentators have pointed out how it harms state interests.[703]

First, it derogates state authority in several ways.  The Attorney General makes
the final decision whether to seek death from Washington, yet he and the United
States Attorney are only accountable, indirectly, to national constituencies.  So
although both the Attorney General and United States Attorney exercise local
authority, they lack local political accountability.[704]  Federalization also harms the
reputation of states and their courts,[705] shifts policymaking power to federal
prosecutors and detracts from the authority of state prosecutors,[706] and both confuses
local citizens and diminishes their political power.[707]

Federalization also damages the rule of law by facilitating selective

---

[703] Am. Bar Ass'n, Task force on Federalization of Criminal law, *The Federalization of Criminal Law* 42-43 (1998) *available at* http://www.americanbar.org/content/dam/aba/publishing/criminal_justice_section_newsletter/crimjust_pubs_catalog_fedcrimlaw2.authcheckman.pdf.

[704] Am. Bar Ass'n, Task force on Federalization of Criminal law, *The Federalization of Criminal Law* 42-43 (1998)

[705] *Id.* at 26.

[706] *Id.* at 32.

[707] *Id.* at 43-43.

prosecution, treating like cases in an unlike manner.[708] This creates the danger, one realized in this case, that a defendant can be singled out for different treatment from his neighbors for reasons that don't relate to any coherent policy.

Finally, when it comes to the death penalty, federalization is especially harmful. As shown above, death penalty policy is of particular interest to state governments because local conditions are so important in death penalty policymaking. Put simply, the political views of a few members of the Justice Department are not as important in this case as the outcomes of a century of two states' democracies.

### E. As Applied to Mr. Rodriguez, the Federal Death Penalty is Unconstitutional.

Mr. Rodriguez was not charged with trying to assassinate the President, storm a military base, or sell state secrets. If he were, it would be necessary and proper for the federal government to make use of the range of punishments that Congress has authorized. Instead, Mr. Rodriguez was charged with having abducted Ms. Sjodin from a shopping mall near his house and having killed her nearby. Although a state line separates the site of Ms. Sjodin's disappearance and the place where her body was found, that geographic accident was of no practical import. The states cooperated remarkably well, identifying Mr. Rodriguez as a suspect within four days.

While kidnapping and murder are serious charges, they are nearly always the

---

[708] *See id.* at 28-33.

province of the states.  The Kidnapping Act creates a narrow exception to allow the

federal government to help out when the interstate nature of a crime frustrates state

efforts to investigate and prosecute.  It is not an invitation to Justice Department

officials to set aside state policies in favor of their own preferences.

*Comstock* makes clear that legislation enacted under the Necessary and Proper

Clause must take both federal and state interests into account.  *Comstock*, 1230 S. Ct.

at 1953.  The federal government may have had an interest in helping North Dakota

and Minnesota investigate Ms. Sjodin's disappearance and murder.  But punishing

crime is a different question:  Mr. Rodriguez's death sentence must stand on its own

bottom.  It cannot satisfy *Comstock's* balancing requirement and so it is

unconstitutional because it violates the Tenth Amendment.

**XIV.  Mr. Rodriguez Was Denied Due Process of Law, Equal Protection of Law, and the Right to Be Free of Cruel and Unusual Punishment Because the Federal Death Penalty Is Disproportionately and Unconstitutionally Applied According to the Race and Gender of the Victim, and the Race of the Perpetrator.**

Mr. Rodriguez's case involves a white, female victim.  Mr. Rodriguez is a

Hispanic male.  Numerous studies, both at the federal and state level, have

documented the disparity between the treatment of defendants like Mr. Rodriguez,

whose cases involve white female victims, and the treatment of defendants whose

victims are from any other gender-racial group.  Because of this wide disparity in

treatment both in the charging and sentencing decisions, Mr. Rodriguez's death

255

sentence is unconstitutional under the Fifth and Eighth Amendments to the United States Constitution.

A victim's race and gender influence the Department of Justice's (DOJ's) process for authorizing capital prosecutions and affect subsequent government decisions about whether to accept guilty pleas in exchange for seeking sentences less than death, according to statistics maintained by the Federal Death Penalty Resource Counsel. This is a violation of the concept of equal protection embodied in the Due Process Clause of the Fourteenth Amendment[709] and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

The DOJ seeks death in a significantly higher percentage of cases involving white victims than cases involving non-white victims. As Professor David Baldus reported in 2001 to Sen. Russell D. Feingold of the Senate Judiciary Committee, "Between January 27, 1995, and July 20, 2000, Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases—a 16 percentage point difference that is statistically significant at the .001 level."[710]  During the administration of Attorney General

---

[709] The Due Process Clause of the Fifth Amendment holds the federal government to the same equal-protection standards as the Fourteenth Amendment applies to the states. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) ("This Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."); *Bolling v. Sharpe*, 347 U.S. 497, 499-500 (1954).

[710] Kevin McNally, *Race and the Federal Death Penalty:  A Nonexistent Problem Gets Worse,* 53 DePaul L. Rev. 1615, 1623-24, (2004).  Ex. E-01.

Ashcroft, 32% of cases involving white victims that were presented for authorization were authorized for death, while only 19% of cases involving non-white victims were so authorized. During the administration of Attorney General Gonzales, the difference was even more striking: 41% of cases involving white victims were authorized, while only 16% of cases involving non-white victims were authorized.[711]

Moreover, when those cases involving white victims go to trial, there is a much greater likelihood of a death sentence. According to Professor Baldus's 2001 review of DOJ figures, "The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases. Nationwide, the rates were .05 (10/198) for the white victims cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim case—a nine percentage-point difference."[712]

According to statistics maintained by Kevin McNally, Director of the Federal Death Penalty Resource Counsel Project, 70% of the last 33 federal death sentences (as of September 18, 2008) involved situations in which the victim was white.[713] Additionally, Mr. McNally noted that 62% of the 61 federal defendants currently

[711] Overall authorization rates were roughly equal: 22% for Attorney General Ashcroft and 20% for Attorney General Gonzales.

[712] McNally, *Race and the Federal Death Penalty,* at 1624. Ex. E-01.

[713] Declaration of Kevin McNally, Regarding Alleged Witness Killings and Race and the Federal Death Penalty, ¶ 8, Ex. E-02.

sentenced to death were convicted in connection with the murder of a white person.[714]

In contrast, of the 127 defendants serving life sentences for federal crimes, only 33% were convicted in cases that involved a white murder victim.[715]

This disparity is even more striking when the gender of the victim is taken into account. The Federal Death Penalty Act (FDPA) operates with a demonstrable and dramatic "white-female-victim effect": a defendant's chances of being authorized for a capital prosecution and then sentenced to death increase dramatically where the victim is a white female.

Throughout the death penalty's history, there are signs of a protective, even paternalistic attitude that many prosecutors and juries exhibited toward white females, considering them to be more important, worthy, or valuable than other victims. In his dissent in *Furman v. Georgia*, 408 U.S. 238, 310 (1972), Chief Justice Burger "acknowledged that statistics 'suggest, at least as a historical matter, that Negroes have been sentenced to death with greater frequency than whites . . . particularly for the crime of interracial rape.'" *McCleskey v. Kemp*, 481 U.S. 279, 331 (1987). Interracial rape, of course, refers to assaults against white women. *See generally, Maxwell v. Bishop*, 398 F.3d 138 (8th Cir. 1968) (death penalty constitutional although imposed almost exclusively for the rape of white women). In

---

[714] *Id.* at p. 4, ¶ 12. Ex. E-2

[715] *Id.* Ex. E-02

*McCleskey v. Kemp,*[716] 481 U.S. at 331–32, the dissent discusses this history of greater penalties for crimes against white victims, particularly white women.  The *McCleskey* dissenters also suggested that the decision in *Coker v. Georgia*, 433 U.S. 584 (1977) (finding death penalty unconstitutional for the rape of an adult women), was motivated in part by the Court's unspoken concern that protecting white women was the real motive behind the Georgia statute.

More than 15 years ago, when glaring racial disparities began to show up in the "early days" of the post-*Furman* federal death penalty cases, the House Subcommittee on Civil and Constitutional Rights investigated and concluded as follows: "Race continues to plague the application of the death penalty in the United States.  On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims."  "Racial Disparities in Federal Death Penalty Prosecutions 1988–1994," Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103rd Congress, 2nd Session, March 1994.  A Government Accounting Office study from 1990 provides even

---

[716] In *McCleskey v. Kemp,* the Court in a 5-4 decision turned back a challenge to the constitutionality of Georgia's capital-punishment scheme based on a statistical study suggesting that the killers of whites were 11 times more likely to face a sentence of death than the killers of non-whites.  These statistics encompassed charging decisions as well as jury verdicts.

It is time that this issue is revisited in the federal arena.  In *United States v. Sampson II*, 275 F. Supp.2d 49, 89-94 (D. Mass. 2003) and *United States v. Sampson VIII*, 332 F. Supp.2d 325, 335-40 (D. Mass. 2004), the court rejected a related complaint, based on much less data and without analysis of the gender of the victim, but also noted that "a rigorous, honest study of the federal system illuminating this issue would be valuable."  *Id.* at 339.

earlier evidence of the race effect of the death penalty.  At the time Congress enacted

the FDPA, the GAO was directed to study the potential influence of race on the death

penalty.  21 U.S.C. § 848(o)(2) (repealed March 9, 2006).  The GAO study concluded

as follows:

> Our synthesis of the 28 studies shows a pattern of evidence indicating
> racial disparities in the charging, sentencing and imposition of the death
> penalty after the Furman decision.
>
> In 82 percent of the studies, race of victim was found to influence the
> likelihood of being charged with capital murder or receiving the death
> penalty, i.e., those who murdered whites were found to be more likely
> to be sentenced to death than those who murdered blacks.  This finding
> was remarkably consistent across data sets, states, data collection
> methods and analytic techniques.  The finding held for high medium
> and low quality studies.[717]

In his 1999 law review article, Professor Rory Little, who served on Attorney

General Reno's Capital Case Review Committee, noted that serious questions about

racial disparities have not been ameliorated by the administrative process within the

Justice Department.  Rory K. Little, *The Federal Death Penalty: History and Some

Thoughts About the Department of Justice's Role*, 26 Fordham Urban L.J. 347,

450–90 (1999).

The problems that Professor Little observed have only been exacerbated by the

actions of the Attorney General in choosing when to seek death.  The DOJ still values

white female victims more highly than male victims or women of color.  Recently,

---

[717] "Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities"
(GAO/GGD-90-57, Feb. 1990), p. 5.  Ex. E-03.

Lauren Cohen Bell, Ph.D., conducted a comprehensive statistical analysis of the relationship between victim's race and gender and the sentencing outcomes in federal capital cases. Dr. Bell based this study on data maintained by the Federal Death Penalty Resource Counsel Project regarding the 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008.[718] Dr. Bell excluded from her analysis only the one non-homicide case and the five mass victim (terrorist attack) cases among the 403.[719] Dr. Bell concluded that the race and gender of the victim is "highly statistically significant"[720] and that the likelihood that the discrepancy occurs by chance is "essentially zero."[721]

This gender and racial bias can be seen even before the trial begins. The Attorney General authorizes and in some cases requires[722] a federal capital

---

[718] *Id.*

[719] Declaration of Lauren Cohen Bell, Ph.D., Regarding Sentencing Dynamics in Federal Death Penalty Cases, p. 2, ¶ 6. Ex. E-04

[720] *Id.* at p. 3, ¶ 8.

[721] *Id. at* p. 3, ¶ 8, p. 5, ¶ 12.

[722] Attorneys General Ashcroft and Gonzales have overruled decisions by local United States Attorneys not to seek the death penalty in several cases involving homicides of white women and required pursuit of the death penalty: *United States v. Marvin Gabrion* (W.D. Mich. CR No. 1:99-CR-76) (death sentence by all-white jury); *United States v. Donald Fell* (D. Vt. 00-M-66-ALL) (same); *United States v. Bryant Lakeith Wilson* (W.D. Tenn. CR No. 01-20041 DV); *United States v. Cornell McClure and Rufus Millegan* (D. Md. CR No. 01-CR-367-ALL); *United States v. Meier Jason Brown* (S.D. Ga. CR No. CR 403-1) (death sentence); *United States v. Israel Ward and Thomas Smith* (W.D. Mo. CR No. 3:02 Cr 05025-All); *United States v. Jose Rios-Rico* (D. Ariz. No. CR 05-0272-PHX-JAT). Since such decisions are often not made public, there are likely many other cases.

prosecution disproportionately in cases involving white female victims.  For example, in *United States v. Fell*, (D. Vt. 00-M-66-ALL), Attorney General Ashcroft required the United States Attorney to seek the death penalty and rejected a signed plea agreement.  Two of the three homicide victims were white women.  Mr. Fell was sentenced to death by an all-white jury.

In *United States v. Meier Jason Brown*, (S.D. Ga. No. 02-M-53), Attorney General Gonzales rejected an offer to plead guilty in a case where Mr. Brown killed a white female victim.  Mr. Brown was sentenced to death.  *See generally United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006).

In contrast, Attorneys General Ashcroft and Gonzales declined to seek death in a large number of potential capital prosecutions where the victims were not white females, including cases where the federal interest was much stronger than present in Mr. Rodriguez's case.  For example, there have been a number of cases involving federal witness elimination or intimidation — a case in which the federal interest is much stronger — where the witness was a member of a minority group and death was not sought.[723]

The *Rios-Rico* case from New Mexico led to the firing of the United States Attorney, Paul Charlton.  Goldstein, "Fire Prosecutor Says Gonzales Pushed Death Penalty," *Wash. Post*, A07 (June 28, 2007).  "Charlton . . . asked to speak directly with Gonzales and was denied."  *Id.*

[723] *United States v. Lash* (E.D. La. No. 03-Cr-135); *United States v. Mejia and Zuniga* (E.D.N.Y. No. S2:03 CR 00851-LDW); *United States v. Yellowman, et al.* (D. Ariz. No. 03-CR-764); *United States v. Roosevelt Walker* (S.D. Miss. 03-CR-30); *United States v. Sylvester* (D. La. No. 04-CR 094); *United States v. Kenneth Walker* (N.D. Miss. 2:06-CR-00103-MPM-EMB); *United States v. Collins* (S.D. Miss. No.

State prosecutions are no different. The white-victim effect plays an influential role in determining whether a state capital defendant is ultimately condemned.[724]  The studies cited in the notes document that "[d]eath row's racial disparity . . . is not the result of race-neutral application of the death penalty or a perverse form of affirmative action to favor black defendants.  Rather, a racial hierarchy clearly exists among cases based upon who the victim is."  *See* John Blume, Theodore Eisenberg & Martin T. Wells, *Explaining Death Row's Population and Racial Composition*, 1 J. of Empirical Legal Stud. 1, 167 (2004).[725]

A substantial body of social science research has examined the role of victim's race (alone, not combined with gender) as a distinct predictor of  sentencing outcomes in state capital cases.  This literature has repeatedly demonstrated that criminal defendants are substantially more likely to be sentenced to death in cases involving white victims than non-white victims.  In addition, research commissioned

3:06-CR-00024-HTW-JCS); *United States v. Prilliman* (D. Md. No. RDB-06-0297).

[724] *See* Raymond Paternoster, Glen Pierce & Michael Radelet, *Race and Death Sentencing in Georgia, 1989–1998*, *in* American Bar Association, Evaluating Fairness and Accuracy in State Death Penalty Systems: The Georgia Death Penalty Assessment Report app., at S-T (2006), *available at* http://www.abanet.org/moratorium/assessmentproject/Georgia/finalreport.doc ("The data show that among all homicides [in Georgia] with known suspects, those suspected of killing whites are 4.56 times as likely to be sentenced to death as those who are suspected of killing blacks."); Andrew Welsh-Huggins, *Death Penalty Unequal – Study: Race, Geography Can Make a Difference*, The Cincinnati Enquirer (May 7, 2005) ("Offenders facing a death penalty charge [in Ohio] for killing a white person were twice as likely to go to death row [compared to those charged with having] killed a black victim.").0

[725] *See also* McNally, *Race and the Federal Death Penalty* (documenting the white-victim effect—but not the effect of gender—through analysis of federal capital prosecutions under Attorneys General Reno and Ashcroft through January 26, 2004).  Ex. E-1

by state governments in, for example, California, Maryland, Nebraska, and Illinois has found that defendants convicted of killing white victims are more frequently sentenced to death than defendants convicted of killing non-white victims. *See, e.g.,* Paternoster *et al., An Empirical Analysis of Maryland's Death Sentencing System with Respect to the Influence of Race and Legal Jurisdiction,* available at http://www.newsdesk.umd.edu/pdf/finalrep.pdf.

Recently, three state studies examined the joint effects of victim race and gender in capital prosecutions. The Colorado, Georgia, and Ohio studies each found that defendants were treated most harshly when their victim was a white female. A Colorado study examined prosecutors' decisions to seek the death penalty after conviction, while the Georgia and Ohio studies looked at capital sentencing outcomes.

In a 2006 study of Colorado death penalty cases from 1980 to 1999, researchers found that prosecutors were more likely to seek the death penalty in cases involving white female victims than they were in cases involving victims of any other race/gender combination. *See* Hindson, Potter & Radelet, *Race, Gender, Region, and Death Sentencing in Colorado*, 1980–1999, 77 Colo. L. Rev. 549 (2006). The authors concluded:

> [T]he death penalty is sought for defendants who kill white females at a rate much higher than it is sought for any other victims. White females, who account for only 17.9 percent of all homicide victims, make up 34.5 percent of victims in death penalty cases. Thus, death sentences

are pursued against those who kill white women at almost twice the rate
as their rate of homicide victimization.

*Id.* at 577.

A November 2007 study analyzed state court data from Georgia cases in the

1970s and similarly concluded:

Defendants who murder females are more likely to receive a death
sentence than defendants who murder males.  Furthermore, we show
that large differences exist in the likelihood of receiving a death
sentence when the variables "victim race" and "victim gender" are
considered jointly.  Cases that involve white female victims are treated
the most harshly . . . ."

Williams, DeMuth & Holcomb, *Understanding the Influence of Victim Gender in*

*Death Penalty Cases: The Importance of Victim Race, Sex-Related Victimization and*

*Jury Decision Making*, 45 Crim. 4, 885 (2007).

In a 2004 Ohio study, the same research group found that death sentences were

a product of a strong association between one victim race-gender group—white

female victims—and the imposition of a death sentence.  Holcomb, Williams &

DeMuth, *White Female Victims and Death Penalty Research*, 21 Justice Quarterly

877–902 (2004).  These  recent research findings underscore the issue of unfairness

and discrimination raised by the analysis presented in Dr. Bell's declaration.

In sum, these statistics and analyses demonstrate that the federal death penalty

is sought, obtained and applied in a manner that is severely racially discriminatory.

This is particularly true in cases like the present:  a defendant of color and a white

265

female victim.  Therefore, the death sentence for Alfonso Rodriguez violates the Due

Process and Equal Protection Clauses as well as the Eighth Amendment to the

Constitution.

**XV.  The Trial Court's Instructions to the Jury Violated Mr. Rodriguez's Rights Under the Fifth, Sixth, and Eighth Amendments Because the Jury was Not Required to Find that Death was an Appropriate Punishment Beyond a Reasonable Doubt.**

Alfonso Rodriguez's death sentence is unlawful and was obtained in violation

of his rights under the Fifth, Sixth and Eighth Amendments because the jury was not

instructed that the reasonable doubt standard governed the ultimate penalty

determination in this case.  *See Ring v. Arizona*, 536 U.S. 584, 600 (2002); *Apprendi*

*v. New Jersey*, 530 U.S. 466 (2000).

Trial counsel sought instructions which contained the proper burden of proof,

requiring the jurors to conclude "beyond a reasonable doubt that the aggravating

factors proved so outweigh any mitigating factors that justice cannot be served absent

a sentence of death."[726]  The defense also sought an umbrella instruction mandating

that the burden of proof beyond a reasonable doubt rested with the government as to

all considerations for sentencing.[727]  The defense renewed its request for these

instructions during the discussion of the jury instructions prior to closing arguments

---

[726] Dckt. # 536, Defendant's Proposed Sentencing Instructions, p. 32

[727] Dckt. # 536, Defendant's Proposed Sentencing Instructions, p. 20

in the penalty phase.[728]  The Court declined to instruct the jury that it had to decide beyond a reasonable doubt that the aggravators outweighed the mitigators, or that death was ultimately the appropriate decision, instead concluding that they must simply determine that the aggravating circumstances sufficiently outweigh mitigating ones.[729]  This instruction mirrors the federal death penalty statute, which provides only that no death penalty can be imposed unless the jury first finds that the aggravating factors "sufficiently outweigh" any mitigating factors.  *See* 18 U.S.C. § 3593(e).  However, although the Court instructed the jury that it must determine whether the government had proven the existence of the specific aggravating factors beyond a reasonable doubt, the court declined to instruct the jury that this reasonable doubt obligation applied as well to the ultimate weighing of aggravating versus mitigating factors and the decision of whether to sentence Mr. Rodriguez to die.

This instruction, however, fails to meet the requirements of the Constitution, which mandate that jurors be instructed that they may only impose a sentence of death if they are unanimously persuaded beyond a reasonable doubt that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that they substantially outweigh them.  The *Apprendi* principle applies to fact-finding necessary to put a capital defendant to death.  *Ring*, 536 U.S. at 609.

---

[728] Tr. 8581-84

[729] Tr. 8580; Final Selection Phase Instruction, dckt. # 616.

A sentence greater than that authorized by a jury's simple verdict of guilt cannot be imposed unless the facts supporting an increased sentence are also submitted to the jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 478 (2000).

Under federal statutes, neither a judge nor a jury may sentence a defendant to death based solely on the jury's findings at the guilt phase. *See* 18 U.S.C. § 3593 (b)(c). In order to impose the increased punishment of death, the jury must make additional factual findings at the penalty phase, including the ultimate finding that the aggravating factors substantially outweigh any mitigating factors. *See* 18 U.S.C. § 3593(c)(e). Under *Apprendi*, because these findings are necessary before the increased punishment of death can be imposed, they are sentencing factors that must be proven beyond a reasonable doubt. *See* 18 U.S.C. § 3593(c). The "fact" that aggravating factors outweigh the evidence in mitigation is the essential one that "increases the penalty for a crime beyond the prescribed statutory maximum." *See Apprendi*, 530 U.S. at 490. In other words, while the finding of one or more statutory aggravating factors is a necessary step toward imposition of the death penalty, that finding is not sufficient under the FDPA. See 18 U.S.C. § 3593(e). Instead, under the statute, before a death sentence can be returned, the jury must find that the aggravating circumstances outweigh the mitigating ones. *Id.* Therefore the Court should have instructed the jury during Mr. Rodriguez's penalty phase that it had to find that the aggravating factors outweighed the mitigating ones beyond a

268

reasonable doubt.

This obvious application of *Apprendi* and *Ring* and the Constitutional provisions they interpret are supported by two Circuit level decisions.  In *Rojem v. Gibson*, 245 F.3d 1130, 1135-38 (10th Cir. 2001), the Tenth Circuit vacated a sentence of death because the trial court had failed to give the jury a weighing instruction altogether.  If the weighing process was not fact-finding, that is essential to the imposition of the sentence, then the absence of a weighing instruction would not have mattered.  More recently, in *United States v. Gabrion*, the Sixth Circuit ruled that failure to instruct the jury in a capital case that the ultimate decision had to be based upon proof beyond a reasonable doubt was reversible error and required a new sentencing hearing.  *Gabrion*, 648 F.3d 307, 325 (6th Cir. 2011):

> We, therefore, hold that a jury's finding that the aggravating factors outweigh the mitigating factors is an element of the death penalty and must be found beyond a reasonable doubt, the same standard constitutionally required for all other findings of fact and mixed questions of law and fact.

*Id.* at 325-29.  At great length, the *Gabrion* Court explored the Constitution as interpreted in *In Re Winship*, 397 U.S. 358 (1970), through *Apprendi* and *Ring*, and concluded that the Constitution required that the ultimate weighing of aggravating and mitigating factors be proven beyond a reasonable doubt.  Because the jury was not so instructed in his case, the Court reversed.  "Accordingly," the court held, "our determination that Gabrion was entitled to a reasonable doubt instruction as to the

269

weighing of aggravating and mitigating factors *requires the reversal of his death sentence*." *Id.* at 329. (emphasis added)

This Court's identical failure to appropriately instruct the jury on this point likewise requires reversal; indeed it is a structural error "without which [the penalty trial] cannot serve its function." *See Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). It is therefore reversible error, per se. *Id*. at 281-82.

These constitutional errors warrant the Court granting Mr. Rodriguez's Petition without any determination of whether these violations substantially affected or influenced the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 538 n. 9. Furthermore, these errors so infected the integrity of these proceedings that the error cannot be deemed harmless. These violations of Mr. Rodriguez's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair and resulting in a miscarriage of justice.

**XVI. Petitioner's Conviction and Sentence Are Illegal and Must Be Set Aside Because The Trial Court Violated the Confrontation Clause of the Sixth Amendment as Well as the Requirements of the Eighth Amendment When it Allowed Dr. McGee to Testify About Testing Performed by Others.**

A glaring violation of the Sixth Amendment's Confrontation Clause occurred at Alfonso Rodriguez's trial. As explored in detail above, Dr. Michael McGee testified about results of acid phosphatase testing conducted by a lab at Regions Hospital in St. Paul. McGee, however, neither performed the test nor witnessed it.

270

At trial the defense failed to object that Dr. McGee's testimony constituted a violation of the Confrontation Clause of the Sixth Amendment to the Constitution. *See Crawford v. Washington*, 541 U.S. 36 (2004).[730]

A full two years before the trial in this case, the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), reminded us about the meaning of the Confrontation Clause found in the Sixth Amendment. "Where testimonial statements are at issue, the only indicum of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: Confrontation." *Crawford*, 541 U.S. at 70. *Davis v. Washington*, 547 U.S. 813 (2006) further explored the definition of testimonial statements, making it clear that the test reports upon which Dr. McGee relied were testimonial in nature and subject to confrontation. Statements are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822. The *Davis* court noted that, although it was using the term "interrogations" in its holding, they were not suggesting that non-interrogated statements were somehow exempt. *Id.* at 822, fn.1.

In light of this settled case law, Mr. Rodriguez's Sixth Amendment

---

[730] If the Court determines that this claim has been defaulted, then counsel's failure to raise this Confrontation Clause objection constituted ineffective assistance of counsel, *see Strickland v. Washington*, 466 U.S. 668 (1984), as explored in section II F, *infra*.

Confrontation rights were violated at trial.  The error was neither minor nor harmless.

Had the Confrontation Clause been properly applied, either Dr. McGee would have

been precluded entirely from testifying about the acid phosphatase results, or the

government would have been required to call the lab technician to the stand, leading

to the exposure of the myriad flaws in the evidence.  As explored above, testimony

from a Regions Hospital lab employee would have established that Dr. McGee's

conclusions about the significance of the acid phosphatase violated the Lab's own

protocols for use of the test[731] and that the test itself was only validated for use in

human serum testing, not for testing dry stains in a forensic context.[732]   Both facts

would have given rise to powerful indictment of the government's claim of sexual

assault, and there is a strong probability that the outcome of the trial would have been

different.

**XVII. Petitioner's Sentence Is Illegal and, Absent Reweighing by the Fact-finder, Must Be Set Aside Because the Jury Considered and Relied Upon an Invalid Aggravating Factor, in Violation of the Eighth Amendment.**

Dr. McGee's false and unreliable testimony about the supposed rape and knife

wounds had consequences that rippled throughout the case.  For one thing, as we

discuss above, had the falsity of the testimony been known, it would have resulted in

the exclusion of the prosecutions's Rule 413 evidence, which in turn would have

---

[731] *See* section II A, *supra*; Regions Hospital Protocol, Ex.A-04.

[732] *See* section II A, *supra*; Beckman Dri-STAT Package Insert, Ex. A-23, pp. 3-10.

precluded the government from arguing that Mr. Rodriguez had a "propensity" for this sort of behavior.[733]  In addition, however, without  Dr. McGee's false testimony, there would have been no legitimate basis for the prosecution to offer the statutory aggravating factor that the crime was "especially heinous, cruel, or depraved," or whether it involved "the torture of Dru Sjodin." [734]  We do not belabor the facts recited at length above in Claims I, II, and III, and incorporate them here by reference, but it is apparent that this case was never "especially heinous, cruel, or depraved," and simply did not involve "torture," however these terms are defined.  As a consequence of Dr. McGee's falsehoods, the jury relied on an invalid aggravating factor.  Absent reweighing by the fact-finder, Mr. Rodriguez's sentence must be set aside because it was secured in violation of the Eighth Amendment.  *See, e.g., Maynard v. Cartwright,* 486 U.S. 356 (1988)*; Clemons v. Mississippi,* 494 U.S. 738 (1990).

**XVIII. Alfonso Rodriguez's Rights Under the Fifth, Sixth and Eighth Amendments Were Violated Because the Jury Was Improperly Asked to Determine Whether Certain Mitigating Evidence Put Forth by the Defense Was in Fact Mitigating Before Giving it Consideration.**

As explored in section VI C, *supra*, Alfonso Rodriguez's jury was instructed that it had to both find a mitigating factor to be true *and* find it to be mitigating before

---

[733] That entire claim is incorporated by reference here.  *See* II E, *supra*.

[734] Jury Verdict Phase II (Eligibility Phase), Dckt. # 585.  The jury also considered whether the offense involved "serious physical abuse" and concluded it did not.

it could be given any weight in considering the propriety of a death sentence.[735]  This

instruction, made manifest on the verdict form, improperly invited the jury to reject

and ignore facts which the Court had determined to be mitigating as a matter of law.

The Court's error violated Mr. Rodriguez's rights under the Fifth, Sixth and Eighth

Amendments to the Constitution.  Counsel's ineffective handling of this critical error

is addressed above, and the entire content is so fundamental that, even aside from the

counsel's ineffectiveness, it requires a new sentencing hearing for Mr. Rodriguez

with proper jury instructions.

## XIX.  Trial Counsel Failed to Secure Transcription of Critical Portions of the Proceedings.

The Supreme Court has long noted the importance of insuring that review of

capital sentences is based on a complete record.  *See Dobbs v. Zant*, 506 U.S. 357,

358-359 (1993); *Gardner v. Florida,* 430 U.S. 349, 361 (1977) (plurality opinion).

Cf. *Gregg v. Georgia,* 428 U.S. 153, 167 (1976) (joint opinion of Stewart, Powell,

and STEVENS, JJ.) (Georgia capital sentencing provision requiring transmittal on

appeal of complete transcript and record is important "safeguard against arbitrariness

and caprice" ).  Because a complete record is crucial for full and fair review in a

capital case, trial counsel has a duty to ensure that all proceedings are transcribed in a

---

[735] That entire section is incorporated by reference herein.

complete and accurate manner.[736]

In this case, trial counsel failed to ensure that all aspects of Mr. Rodriguez's trial were transcribed, including, but not limited to, conferences regarding the jury questionnaire, voir dire, jury selection, and mental health firewall proceedings, as well as the Court's initial instructions to the jury panel before they completed their questionnaires.[737]  As a result, appellate and habeas counsel are unable to properly raise all issues concerning jury selection, the ineffectiveness of trial counsel during jury selection and in dealing with the mental health evidence, any claims regarding the government's misconduct surrounding the Rule 12.2 firewall team, and the apparent inconsistencies in the Court's pre-questionnaire instruction of potential jurors and trial counsel's failure to respond to these instructions.  Had counsel ensured full transcription, Mr. Rodriguez would have been able to fully present his

---

[736] *See Commentary to ABA Guideline* 10.8, 31 Hofstra Law. Rev 913, 1033 (2003) ("[C]ounsel at every stage must ensure that there is a complete record respecting all claims that are made, including objections, motions, statements of grounds, questioning of witnesses or venire members, oral and written arguments of both sides, discussions among counsel and the court, evidence proffered and received, rulings of the court, reasons given by the court for its rulings, and any agreements reached between the parties... Further, as reflected in Guideline 10.7(B)(2), counsel at all stages of the case must determine independently whether the existing official record may incompletely reflect the proceedings, e.g., because the court reporter took notes but did not transcribe them or an interpreter's translation was inaccurate, or because the court clerk did not include legal memoranda in the record transmitted to subsequent courts, or there was official negligence or misconduct.")

[737] Although the nature of missing transcriptions creates inherent difficulties for § 2255 counsel to definitively determine when unrecorded  discussions occurred, counsel have identified missing transcripts, including but not limited to, the following dates: April 20, 2005, December 12, 2005, March 3, April 20, April 21, June 5, June 6, June 7 and June 8, 2006.

claims on appeal and the courts would have had a complete record to review.

There was no "strategic effort" on trial counsel's part not to have a complete transcript. The un-transcribed events appear to relate to jury selection and other claims presented here. Had trial counsel's performance in this regard not been sub-standard, it is reasonably probable that the outcome of Mr. Rodriguez's case would have been different. *See*, *e.g. Simmons v. Beyer*, 44 F.3d 1160, 1170 (3d Cir.1995) (granting writ of habeas corpus since defendant was prejudiced by inadequate transcripts that made his claim unreviewable); *United States v. Wilson*, 16 F.3d 1027, 1031 (9th Cir.1994) (on direct appeal remanding for a new trial because inadequate transcripts precluded review of merits)[738]

Mr. Rodriguez urges that counsel's ineffectiveness on this both merits relief and serves to excuse and justify the later amendment of this Petition.

**XX.** **The Failure of Counsel to Raise or Effectively Argue on Appeal Claims Which Are of Record Violated Mr. Rodriguez's Due Process Rights to Effective Assistance of Appellate Counsel, And the Sixth And Eighth Amendments.**

---

[738] *See also Ben-Yisrayl v. Davis*, 277 F. Supp. 2d 898, 906 (N.D. IN 2003) ("The goal of a verbatim transcript is to get down on paper every word spoken during trial as accurately as possible. Often there are keen verbalizations that are important in form and content. Important verbal nuances are often present. Such is clearly evident from the recent Supreme Court opinion in Wiggins…this transcript contains too many errors and uncertainties for this court to use it as a basis for the life and death decision presented in this case and this court will not countenance the execution of the petitioner based on this record...[d]espite the dedicated efforts of other court reporters to reconstruct this record, this court does not have confidence that their skills, no matter how great, could compensate for inaccurate, inadequate, or absent notes. The more complicated and nuanced the proceeding is, the more important the need for good notes. Death penalty cases are an invariably complicated and nuanced.").

The Due Process Clause of the Fifth Amendment guarantees to a defendant in a criminal case the effective assistance of counsel on appeal. *Evitts v. Lucey* 469 U.S. 387, 396 (1985); *Steele v. United States*, 518 F.3d 986, 988 (8th Cir. 2008). Where a petitioner challenges the outcome of his appeal, the question whether the result should be upheld is resolved based upon the familiar standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *Roe v. Flores-Ortega*, 528 U.S. 470 (2000). The performance of Alfonso Rodriguez's counsel fell below prevailing professional norms in that counsel failed to recognize and raise meritorious issues. As a result, the outcome of Mr. Rodriguez's direct appeal to the Eighth Circuit Court of Appeals and the United States Supreme Court is unreliable; the issues appellate counsel could have raised, either individually or cumulatively, create a reasonable probability that the judgment or sentence would not have been affirmed.

Imposition of a death sentence without meaningful appellate review violates the Eighth Amendment. *Parker v. Dugger*, 498 U.S. 308, 321 (1991). The record of this case presented numerous grounds for reversal, and for distinguishing this case from others in which a death sentence was imposed, and likening this case to cases in which a sentence less than death was imposed. Appellate counsel was ineffective for failing to raise those arguments.

### A.    Violation of the Confrontation Clause

Appellate counsel was ineffective for failing to raise on direct appeal that Mr.

Rodriguez's rights protected by the Confrontation Clause were violated when Dr. Michael McGee testified regarding laboratory testing performed by Regions Hospital Lab, as explored in detail at II F and XVI, *supra*. Although no objection was made at trial, this issue could have been raised on direct appeal under a plain error standard of review. *See*, *e.g. United States v. Johnson*, 520 U.S. 461, 467 (1997); *United States v. Olano*, 507 U.S. 725, 732 (1993).

Because the Confrontation Clause issue was meritorious even based on the record created in the trial court, no reasonable strategic basis existed for excluding it from the appeal. The failure to raise the issue was therefore professionally unreasonable. Had the issue been raise, a reasonable probability exists that the outcome of the appeal would have been different.

### B.    Rule 413 Error

Appellate counsel was ineffective for failing to raise on direct appeal that the district court misapplied Federal Rule of Evidence 413, as explored in detail at II E, *supra*.[739] The Court's misapplication of the Rule permitted highly prejudicial evidence to be introduced at guilt phase and to be used unfairly in penalty phase closing arguments.

Appellate counsel was professionally unreasonable in failing to properly raise the Rule 413 error on direct appeal. Admittedly, appellate counsel raised a

---

[739] Mr. Rodriguez incorporates that section by reference here.

278

constitutional challenge to Rule 413, a challenge which had already been rejected by the Eighth Circuit in *United States v. Mound*, 149 F.3d 799, 801 (8th Cir. 1998).[740] However, counsel failed to argue that the kidnapping offense of which Mr. Rodriguez was "accused" did not trigger application of Rule 413's propensity evidence because it lacked an element of sexual assault, an argument with strong support in the statute's language and the case law. *See* section II E, *supra*. Not only could the argument have been raised effectively on direct appeal, but had it been raised, there if a reasonable probability that the outcome of the appeal would have been different. *Evitts v. Lucey*, 469 U. S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).

### C.      Reasonable Doubt Standard in Penalty Phase

As explored at XV, *supra*, the Court failed to properly instruct the jury that it had to find beyond a reasonable doubt that aggravating factors outweighed mitigating factors such that a death sentence should be imposed. This erroneous instruction violated Mr. Rodriguez's rights under the Fifth, Sixth and Eighth Amendments to the Constitution. In addition, to the extent that the claim could have been raised on for plain error review despite the failure of trial counsel to properly frame the issue, appellate counsel was ineffective for failing to do so. Had the issue been raised, there is a reasonable probability that the outcome of the appeal would have been different.

---

[740] *See* Appellant's Opening Brief, *United States v. Alfonso Rodriguez, Jr.*, Eighth Circuit No. 07-1316, filed April 18, 2008, p. 150.

The likelihood of appellate relief on this issue is made even greater by the reality, explored above, that such an error is not amenable to harmless error review, but is structural error requiring reversal and a new sentencing phase.  *See Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993); *United States v. Gabrion*, 648 F.3d 307, 329 (6th Cir. 2011).

> **D.    Appellate Counsel Was Ineffective in Failing to Challenge the Court's Three Step Process During the Selection Phase and the Instructions in the Special Verdict Form, Which Impermissibly Required the Jurors to Make Findings of Law with Respect to the Mitigating Factors.**

Mr. Rodriguez hereby re-alleges and incorporates by reference the facts and arguments alleged in  section VI C, *supra*.  Specifically, the three-step process that the Court adopted for purposes of structuring the jury's selection phase deliberations was legally incorrect and constitutionally flawed because it erroneously required the jurors to make a finding of law with respect to the proffered mitigating factors. As a result, the government was impermissibly allowed to argue, and the jury was wrongly instructed by the Court and by the special verdict form, that the jurors should disregard indisputably relevant mitigation evidence, even if it was proven by a preponderance of the evidence, solely because the jurors disagreed that the factors constituted legally relevant mitigation.  Consequently, one or more jurors impermissibly failed to consider relevant mitigation evidence regarding Mr. Rodriguez's background and upbringing that, by law, they were obligated to consider,

as part of their capital sentencing deliberations.

To the extent that appellate counsel could have raised claims on direct appeal challenging the Court's adoption of the three-step process and the instructions on the special verdict form based on the extant record, appellate counsel was ineffective for failing to raise these claims. Had counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the appellate proceeding would have been different because the record and the extant authority established the merit of these claims on direct review, as articulated above. *See also Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *Smith v. Robbins*, 528 U.S. 259 (2000).

### E.   Cumulative Errors Not Raised

On direct appeal, a court can vacate a sentence or conviction or otherwise grant relief on the basis of cumulative error, even in a case in which the court is persuaded that any individual error is not by itself enough to merit reversal. *See United States v. Riddle*, 193 F.3d 995, 998 (8th Cir. 1999) ("We may reverse where the case as a whole presents an image of unfairness that has resulted in the deprivation of a defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal."); *see, e.g.*, *United States v. Walrath*, 324 F.3d 966, 971 (8th Cir. 2003). Appellate counsel for Mr. Rodriguez raised twenty separate claims for relief, many of which focused on errors in the penalty phase that

justified a new sentencing.[741]  However, counsel failed to argue that the reviewing

court should give weight to the cumulative effect of the many errors, and different

types of errors, in assessing whether relief is required.  This fell below reasonable

performance of appellate counsel.  Had the argument been raised, there is a

reasonable probability that the outcome of the trial would have been different.

**XXI.  Mr. Rodriguez's Conviction and Sentence Must be Vacated as a
Result of the Cumulative Prejudicial Effect of the Many Errors in
this Case.**

Mr. Rodriguez's conviction and sentence were unconstitutionally imposed, in

violation of the Fifth, Sixth, and Eighth Amendments, because the cumulative effect

of the errors at all stages of his trial and appeal violated his rights to a fair trial,

***redacted***, to due process, to effective assistance of counsel, to equal protection, to a

reliable determination of guilt and punishment, and to fundamental fairness.  *See,*

*e.g.*, *Taylor v. Kentucky*, 436 U.S. 478, 487, n. 15 (1978).  As a consequence of these

many errors, "the case as a whole presents an image of unfairness," and if the claims,

when considered cumulatively, warrant relief, relief is compelled.  *United States v.*

*Riddle*, 193 F. 3d 995, 998 (8th Cir. 1995); *see also*, *e.g.*, *United States v. Walrath*,

324 F. 3d 966, 971 (8th Cir. 2003).

In making this argument, Mr. Rodriguez incorporates by specific reference all

facts, allegations, and arguments made elsewhere in this pleading and the exhibits

---

[741] *Id.*

attached.  In addition, he re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, incorporating those claims, allegations, and objections as well.

In addition, the cumulative error justifies relief without determination of whether the violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  The many constitutional violations in this case so infected the integrity of the proceedings that the errors cannot be harmless.  But even if harmless error analysis were appropriate, the errors had a substantial and injurious effect or influence on the proceeding, rendering it fundamentally unfair.

**Prayer For Relief**

WHEREFORE, Movant Alfonso Rodriguez Jr., asks that this Court provide him the following relief:

1. That the Court conduct a status conference and set a schedule for further proceedings related to this Petition, including submission of the government's Answer pursuant to Rule 5 of the Rules Governing 28 U.S.C. § 2255 Cases (§ 2255 Rules) and Petitioner's Amended Petition, to be submitted in accordance with Rule 15(a) of the Federal Rules of Civil Procedure.

2. That Mr. Rodriguez be permitted to file a traverse to Respondent's Answer, responding to any affirmative defenses raised by Respondent.

3. That the Court permit Mr. Rodriguez to utilize the processes of discovery as contemplated by Rule 6 of the § 2255 Rules.

4. That Mr. Rodriguez be permitted to file a Memorandum of Law in Support of this Petition in accordance with a schedule established by the Court.

5. That the Court permit Mr. Rodriguez to amend this Petition to include any

283

additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this Petition, and to allow the amendment to relate back to the date of the filing of this Petition.

6. That the Court conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Petition, or by Mr. Rodriguez's Response to any Affirmative Defenses raised by the Respondent.

7. That the Court permit oral argument.

8. That the Court Vacate Petitioner's conviction and sentence and Order that appropriate retrial and/or resentencing hearings be conducted.

9. That the Court grant such further and additional relief as may be just.

284

Dated:  October 16, 2011

Respectfully submitted,
*s/ Joseph Margulies*

_____

JOSEPH MARGULIES
Roderick MacArthur Justice Center
Northwestern University Law School
750 North Lake Shore Drive
Chicago, IL  60611

Attorney for the Petitioner


Respectfully submitted,
*s/ Katherine M. Menendez*

_____

KATHERINE M. MENENDEZ
Assistant Federal Defender
District of Minnesota

U.S. Courthouse, Suite 107
300 South Fourth Street
Minneapolis, MN  55415
612-664-5858

Attorney for the Petitioner


Respectfully submitted,
*s/ Andrew H. Mohring*

_____

ANDREW H. MOHRING
First Assistant Federal Defender
District of Minnesota

U.S. Courthouse, Suite 107
300 South Fourth Street
Minneapolis, MN  55415
612-664-5858

Attorney for the Petitioner

285

## VERIFICATION UNDER PENALTY OF PERJURY

My name is Joseph Margulies. I am an attorney licensed to practice in the State of Illinois, and am admitted in this case *pro hac vice*.  In 2010, I was appointed to represent Mr. Alfonso Rodriguez, Jr., in post-conviction proceedings.

Mr. Rodriguez has authorized me to file the foregoing pleading–a motion to vacate, set aside, or correct the sentence, and for a new trial pursuant to 28 U.S.C. Sec. 2255 and Rule 33 of the Federal Rules of Criminal Procedure.  I am filing this pleading on his behalf.  Mr. Rodriguez is confined at the federal penitentiary in Terre Haute, Indiana.

I declare that the content of the foregoing pleading is true and correct except for those matters based upon information and belief, and I believe the latter matters to be true.  The sources of my information include, but are not limited to, official court records, documents obtained or prepared druing investigation of this pleading, and items in possession of other lawyers, investigators, or other experts connected with the preparation of this pleading.  I make this verification pursuant to Rule 2(b)(5) of the Rules Governing Sec. 2255 Proceedings because these matters are more within my knowledge than Mr. Rodriguez's.

I declare, under penalty of perjury, that the foregoing verification is true and correct.

Executed by me this 16 day of October, 2011, in Hennepin County, Minneapolis, MN

*s/ Joseph Margulies*

Joseph Margulies

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff/Respondent, | ) | Case No.: 2:04-cr-55 |
| | ) | |
| v. | ) | |
| | ) | |
| ALFONSO RODRIGUEZ, JR., | ) | |
| | ) | |
| Defendant/Petitioner. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2011, the following documents:

Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255

were filed electronically with the Clerk of Court through ECF.

I hereby certify that on October 17, 2011, the same document will be mailed by first class mail, postage paid, to the following non-ECF participants:

Alfonso Rodriguez, Jr.
Reg. No. 08720-059
USP Terre Haute
P.O. Box 33
Terre Haute, IN  47808

Dated: October 16, 2011

Electronic Signature

*s/ Wendi Tilden*

Rev. 7/2011