FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.1    ABBREVIATIONS

Positive results are noted with a "+" sign.
Negative results are noted with a "=" sign.

The following abbreviations may be used on the evidence list to indicate routine events or items:

| | |
|---|---|
| B | BAG/BAGGIE |
| BX | BOX |
| C/ | CONTAINING |
| IN# | INVOICE NUMBER |
| PE | PAPER ENVELOPE |
| PK | PACKAGE |
| PL | PLASTIC |
| PR | PAPER/CARDBOARD |
| RCL | RECEIVED IN CRIME LAB |
| RPR | RECEIVED IN PROPERTY ROOM |
| S | STAPLED |
| SB | SUBMITTED BY |
| SSAK | SEALED SEXUAL ASSAULT KIT |
| T | TAPED |
| TS | TAPE SEALED |
| W | WRAP |

Other common abbreviations include:

| | |
|---|---|
| AP | Acid Phosphatase |
| B/C | Because |
| C | Control (ABA Card) |
| c | With |
| CACU | Crimes Against Children Unit |
| CID | Criminal Investigation Division |
| CODIS | Combined DNA Index System (National DNA database) |
| C/W | Consistent With |
| Δ | Change |
| DNA | Deoxyribonucleic Acid |
| DUID | Driving Under the Influence of Drugs |
| DWI | Driving While Intoxicated |
| ER | Evidence Room |
| ET | Evidence Transmittal |
| FSL | Forensic Science Laboratory |
| FWPDFSL | Fort Worth Police Department Forensic Science Laboratory |
| HT | HemaTrace |
| INC | Inconclusive results |
| JPS | John Peter Smith Hospital |
| JPSEB | John Peter Smith Hospital Evidence Box |

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.1    ABBREVIATIONS Continued

| | |
|---|---|
| N/A | Not Applicable |
| NOVN | Nothing of value noted |
| NR | No results |
| NT | No testing |
| p | After |
| PCU | Property Control Unit |
| PT | Phenolphthalein |
| SA | Sexual Assault |
| SAK | Sexual Assault Kit |
| SOP | Standard Operating Procedure |
| STR | Short Tandem Repeat |
| T | Test (ABA Card) |
| TAK | Takayama |
| TCME | Tarrant County Medical Examiner |
| TCDA | Tarrant County District Attorney |
| W/ | With |
| W/O | Without |

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.2    EVIDENCE TRANSMITTALS (ET)

The evidence transmittals need to be filled out as completely as possible with the information requested.  The following should be documented in the appropriate place on the ET's when evidence is signed out of or signed back into the Property Control Unit (PCU).

1.    Signature of person receiving the evidence

2.    Signature of person releasing the evidence

3.    Time and date of transaction

4.    Number of packages and/or boxes

5.    Item numbers actually received.  If the analyst is not receiving all of the items listed on the ET, the specific item number must be documented.  Likewise, if the analyst is not submitting to the PCU all the items he/she originally signed out, these specific items must be documented.  Item numbers do not need to be documented if there is only one item or all of the items are being received/ released.

**Biological Evidence Stamp**

It is now necessary to indicate on the evidence transmittal if biological samples have been retained. The method of documentation will be with a stamp or stamps as follows:

1.  If probative biological evidence has been detected and retained, identify the specific items on the stamp (add date):

    **"SAMPLES RETAINED IN CRIME LAB FOR POSSIBLE DNA TESTING BY _____ "**

2.  If an item was examined but no probative biological evidence was detected, identify the specific items on the stamp:

    **"NO BIOLOGICAL DNA EVIDENCE WAS DETECTED ON ITEMS_____ BY_____ "**

3.  If an item was not examined for the possible presence of biological fluids, identify the specific items on the stamp:

    **"ITEMS _____WERE NOT EXAMINED FOR BIOLOGICAL EVIDENCE   BY/DATE_____ "**

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.3    EVIDENCE LIST

It is necessary to inventory all evidence pertaining to a case that may be submitted on multiple Evidence Transmittals (ET).  Evidence is retrieved from the PCU, submitted directly to the FSL, or obtained from JPS or TCME. The evidence list must reflect all chain of custody information, a brief description of the evidence and corresponding item numbers. Reference Sexual Assault Evidence and Evidence Received from TCME

The following are guidelines for information that needs to be listed on the Evidence List:

1.    Case number, offense number and analyst's initials on each page

2.    ALL chain of custody information.  Person receiving / person submitting / date and time of submission / placed received.

3.    The Property Control Unit (PCU) invoice number and name of individual who originally submitted the evidence to the PCU.  This is usually a detective or crime scene officer.

4.    A detailed description of the packaging:
   - "sealed" means the package is both taped and initialed
   - "taped" means the package is ONLY taped
   - "stapled" means the package is ONLY stapled shut
   - "gum-sealed" means the package or envelope has been sealed with moisture
   - Any package that is NOT sealed in any manner must be documented as such

5.    The following abbreviations may be used on the evidence list to indicate routine events or items:

| | |
|---|---|
| **B** | **BAG/BAGGIE** |
| **BX** | **BOX** |
| **C/** | **CONTAINING** |
| **IN#** | **INVOICE NUMBER** |
| **PE** | **PAPER ENVELOPE** |
| **PK** | **PACKAGE** |
| **PL** | **PLASTIC** |
| **PR** | **PAPER/CARDBOARD** |
| **RCL** | **RECEIVED IN CRIME LAB** |
| **RPR** | **RECEIVED IN PROPERTY ROOM** |
| **S** | **STAPLED** |
| **SB** | **SUBMITTED BY** |
| **SSAK** | **SEALED SEXUAL ASSAULT KIT** |
| **T** | **TAPED** |
| **TS** | **TAPE SEALED** |
| **W** | **WRAP** |

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.3    EVIDENCE LIST  Continued

6.    Number all items successively.  Do not give the package a number.  Whenever possible use integer numbers (i.e. 1,2,3,4,).  If the case has previously been worked, be sure to begin with the next sequential number.

7.    Briefly describe each item (use the description given by the crime scene officer when possible). The crime scene officer's number for an item may be included in parenthesis for clarity.

8.    Items of the same kind should be described more specifically so as to be able to distinguish between them.  For example, if there are two pairs of panties:
   1.    Pink panties
   2.    White panties with flowers
      **OR**
   1.    Panties (CSSU number 3)
   2.    Panties (CSSU number 4)

9.    If an item on the ET is stated as being collected from a particular place or person, the notation 'reportedly' can be used on the Evidence List in the description.

10.    If the items listed on the ET agree with the items actually packaged but not all items are opened or examined, these items can be documented on the analyst's notes with no item number assigned.  If the item is given a number, the Evidence list should state, "reported to contain X but item not opened or examined".

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.4    ANALYST'S NOTES (GREEN SHEETS)

Green sheets are used to describe the evidence examined and items collected.

1.    The green sheets should be filled out with the following minimal information:
   - Analyst's initials on all sheets
   - Date started/worked on all sheets
   - Date completed—at least on the last page
   - Page numbers—the page numbers should be noted as "1 of X, 2 of X" and so on.
   - Laboratory number
   - Analyst initials on every sheet
   - Number and types of packages (i.e.- boxes, envelopes or paper sacks)

2.    Descriptions and examinations of evidence are to be clearly documented on the green sheets.  Reference Examination of Evidence.

3.    The results of presumptive tests, confirmation tests and the controls will be included on the green sheets with the date tested.

4.    Additional items included on the Evidence Transmittal (ET) that are not received in the package should be noted on the green sheets. Any discrepancies between the ET and what is actually received should be noted on the green sheets.

5.    If the items listed on the ET agree with the items actually packaged but not all items are opened or examined, these items can be documented on the green sheets with no item number assigned.  If the item is given a number, the green sheets should state, "Reported to contain X but item not opened or examined".

6.    Packaging of the evidence may be included on the green sheets but must be documented on the Evidence List.

7.    Pictures/photographs of evidence should be labeled with the lab number, item number and analyst's initials.  These can be either taped onto the green sheets or placed inside a separate envelope. Label with the lab number, item number and analyst's initials and retain with the case folder.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.5      EXAMINATION OF EVIDENCE

1.    Documentation of evidence is done on the Analyst's Notes (green sheets). Packaging of the evidence may be included on the green sheets but must be documented on the Evidence List.

2.    Primary (1°) packaging should be labeled with the following minimal information: analyst's initials, date of examination, lab number and item number, time and date when received from the Property Control Unit (PCU) for chain of custody information.  Primary packaging is considered to be the outer most packaging of the evidence.

3.    Secondary (2°) and subsequent packaging should be labeled with the following minimal information: analyst's initials, date of examination, lab number and item number. Secondary packaging is considered to be inside the primary package.

4.    Whenever possible do not break any pre-existing seals.

5.    When examination is completed, re-seal all primary packages with red evidence tape, initial and date the seal.

6.    Scissors, forceps, scalpels and/or any other utensils used must be cleaned with 70% EtOH or 10% bleach between every sample collection.  Gloves should be changed as needed or cleaned with 70% EtOH to minimize contamination.

7.    Initials:  The analyst must initial each item examined.  The initials used must be unique to each individual.  If two analysts have the same initials one will have to consistently use a different form of their name.  It is strongly recommended that a permanent ink marker, like a Sharpie be used to initial evidence seals as well as evidence.  Initial in an easy to locate place for court identification (i.e. on/near the product labels).  DO NOT write over any stains or other initials.  When needed, process items for fingerprints before initialing to avoid accidental destruction of latent prints.

8.    Item descriptions: A detailed description of the item should be given including the size, manufacturer, color, pattern, type of material, measurements (knives, scissors or other weapons), serial numbers of firearms, description of hairs or any other pertinent notation.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.5    EXAMINATION OF EVIDENCE Continued

9.    Visual examination: A visual inspection of the item should be done before any sample collection.  Note any defects and document. When screening evidence, many different samples are considered probative evidence.  Primarily, the examiner will be looking for biological stains; however, there will be occasions that trace evidence is important and should be collected first.  The analyst should test any stain that appears biological with the appropriate presumptive test, i.e. Phenolphthalein (PT) for blood and Acid Phosphatase (AP) reagent for semen.  To locate possible semen stains the item of evidence may be examined under a 'blue light'.  Any area of fluorescence should be marked clearly with a marker being careful not to disrupt the stain.  These areas should then be tested with the AP reagent and confirmed if necessary.

10.    Sample Collection: The presumptive positive stains are to be collected at the discretion of the analyst. The method of collection will depend on the state of the sample.  Most stains will be cut out.  Other samples can be swabbed with sterile swabs or a clean cloth dampened with saline or $DH_2O$.  If scraping the sample is necessary, use a clean scalpel and scrape onto weigh paper to reduce static.  Trace evidence can be collected by shaking or scraping the entire item over paper, or by using forceps to transfer the trace material to glassine paper. Tape lifts may also be utilized to collect trace evidence. Do not discard any residual trace evidence.  Retain residual trace evidence in an appropriate container.  These items should be packaged in separate envelopes or bindles. (A bindle is a small piece of paper that is folded to contain a small item.)

The location and number of stains should be clearly documented.  For semen stains the notation "1S" is to be used for the first stain collected and "2S" etc. for subsequent stains collected.  For bloodstains use "1B" and so on. The numbering starts over for each individual item of evidence.  The results of the presumptive tests can be marked on the item (e.g. AP = or PT +).

Most samples will be collected in coin envelopes.  Label the envelope with the lab number, item number, stain notation, date collected and analyst's initials.  Seal the envelope with red evidence tape and initial and date when sealed.  If multiple bindles are to be stored in one envelope, label each individual bindle with the stain notation and analyst initials.

11.    Document any alteration that is made to any item during examination

Temporarily store all cuttings and samples associated with a case in the serology freezer #5.  Indicate the date the cuttings have been transferred to the long-term storage freezer on a sample retention document. Reference Stain/Sample Storage.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.6    SEXUAL ASSAULT EVIDENCE

The purpose of collecting evidence from a sexual assault victim is to attempt to detect trace, semen or other biological fluids that may have been left by the suspect. Any body orifice that was possibly assaulted is swabbed and tested for possible semen. Additionally, the victim's body is examined for possible trace evidence, semen or saliva deposits. The pubic hair is combed to find any hairs left by the suspect. If the victim reports loss of consciousness, a urine sample may be taken to test for GHB, Rohypnol or other drugs. Buccal (cheek) swabs and pubic hair cuttings are taken from the victim to serve as known standards should further testing be necessary. (An EDTA blood sample may be collected as a known standard from victims of oral sexual assault.)

### Contents of a Sexual Assault Kit (SAK)

1. Tarrant County Physical & Sexual Abuse Medical Protocol
2. Swabs (10)
3. Comb
4. Slide holder with microscope slide (Vaginal smear)
5. Envelopes labeled
   - Wood's Lamp specimen
   - Vaginal swabs
   - Pubic Hair combings
   - Pubic Hair cuttings
   - Buccal swab

   Note: Items 2-5 are contained in a 9 x 12 envelope labeled "Sexual Assault Kit". This envelope and the protocol are contained in an unmarked 11 x 14 envelope.

### Contents of an Oral Assault Kit

1. Swabs (4)
2. Slide holder with microscope slide (Oral smear)
3. Envelope labeled "Oral swabs"
4. EDTA blood vial

   Note:  Items 1-3 are contained in a 6 x 9 envelope labeled "Oral Assault Kit".

### Contents of an Anal Assault Kit

1. Swabs (6)
2. Slide holder with microscope slide (Anal smear)
3. Envelope labeled "Anal swabs"

   Note:  Items 1-3 are contained in a 6 x 9 envelope labeled "Anal Assault Kit".

Case 2:04-cr-00055-RRE    Document 753-22    Filed 10/17/11    Page 10 of 74

STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.6      SEXUAL ASSAULT EVIDENCE Continued

**Receipt of Sexual Assault Evidence**

There are three ways to receive evidence in a sexual assault case.

1.      The Emergency Department of John Peter Smith Hospital (JPS) maintains a special room to examine sexual assault victims (Signal 5 room) that contains a locked evidence box in a refrigerator. The only key to this box is kept in the Serology Unit along with a key to the room.  The charge nurse has an additional key to the room.  A staff member with the Fort Worth Police Department Forensic Science Laboratory (FSL) will pick up all Sexual Assault Kits (SAK) and any possibly submitted clothing from the locked box at least every two weeks.  The used kits will be replaced with new kits as needed.

   NOTE:   FWPDFSL no longer works cases from outside agencies.  The Tarrant County Medical Examiner's Office (TCME) performs testing on several outside agencies including, but not limited to, the Tarrant County Sheriff's Office, Parker County, Azle, Arlington, Bedford, Everman, Grand Prairie, Grapevine, Haltom City, Southlake, Federal Corrections Agency.  Sexual Assault Kits from these agencies obtained from the FSL JPS locked box will be immediately transferred to the TCME locked box in the JPS Signal 5 room.

2.      Sexual assault kits collected at Cook Children's Hospital will be picked up by a Crime Scene Officer and brought directly to the FSL.

   NOTE: If a SAK is received in the Forensic Science Laboratory from an agency listed in number 1 above, it is logged into the Crime Lab Log Book, given a unique lab number. A folder is made and the kit is then forwarded to the appropriate investigative agency. Reference Processing Sexual Assault Kits.

3.      An officer, detective or Crime Scene personnel submits any clothing or other items collected in relation to the case directly to the Property Control Unit (PCU). The crime laboratory analyst may then request the items from the PCU for evaluation.

**Processing Sexual Assault Kits**

Once the Sexual Assault Kit is received in the Forensic Science Laboratory it is processed according to the following guidelines:

1.      The SAK paperwork is removed from the outer envelope and contains the original service number for that case.  Write the service number and (if applicable) outside agency on the interior envelope (marked Sexual Assault Kit) and stamp with the chain of custody stamp. Complete all chain of custody information.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.6    SEXUAL ASSAULT EVIDENCE Continued

2.    Create an Evidence Transmittal (ET) that includes (if known) the type of offense, date of offense, victim's name, race, sex, age or date of birth, suspect's name, chain of custody information, service number, lab number (if already assigned), and outside agency.

3.    If a lab number has not been previously assigned, the service number is used to assign a unique Forensic Laboratory number into the Crime Laboratory Log Book. Enter the data concerning the victim's name, suspect's name, date and location of the assault. Write the lab number on the SAK, ET and each page of the hospital report. To prevent errors, only assign lab numbers at the computers in the front office.

4.    A Sexual Assault List is filled out with the service number, victim's name, and lab number. Additional information includes if a kit or evidence was received, if there was an unknown suspect, if the case was founded or unfounded and the detective. When this information is complete, add each case to the Serology Log.

5.    To identify the detective associated with the case, log onto the city mainframe. Use "p198 service number d" to display the original narrative report and any supplemental reports. The detective assigned may be identified by his badge number. Press the "pause/break" key to clear the screen for the next inquiry.

6.    A folder with a label is then made for the case and all paperwork is placed in the folder.  This includes all Evidence Transmittals, correspondence and the hospital report. An example of a label :

| Lab number | SA | Offense Date |
| --- | --- | --- |
| Victim's Name | | |
| Service Number | Outside Agency (if applicable) | |

Odd lab numbers are on left tab folders, even lab numbers are on right tab folders. Red tape should be placed on the tab for sexual assaults.

7.    If the kit is not worked immediately, remove the blood and/or urine, label with the lab number, date and initials and store them in the serology refrigerator #5. Note the items removed on the outside of the SAK envelope.

8.    Store the SAK in the Evidence Room or PCU.

9.    Contact the assigned detective to determine if the case is founded or unfounded. If it is unfounded, fill out an "Unfounded Form" and place it in the case folder. The analyst does not need to perform any examinations on the kit. Log it as completed in the crime lab log book and the serology logbook and file.  No report will be generated on this type of case.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.6      SEXUAL ASSAULT EVIDENCE Continued

10.    A detective may request that the SAK be screened but to 'hold on evidence' until further investigation.  This is NOT the same as an unfounded case.  The SAK is to be completed and a report generated with the results.  The request of the detective should be noted on a "Hold Evidence" form and put with the case folder.

**Screening Sexual Assault Kits**

All testing results should be recorded on the Sexual Assault Analysis Worksheet along with controls.

1.    Open and examine only one kit at a time.

2.    Inventory the contents and assign item numbers.

3.    If not already completed, remove blood and/or urine samples to be retained in the refrigerator.

4.    When assigning item numbers, the SAK will receive one number, all normal contents contained within the kit will receive a successive letter (i.e.- a, b, c and etc.):  vaginal swabs and smear, public hair combing and cuttings, EDTA blood sample and/or buccal swabs, oral swabs and smear and anal swabs and smear.  If an oral or anal kit is received within a SAK, each will receive a successive number and its' contents a successive letter.

5.    Any other items, such as urine, panties, saliva swabs, foreign material, trace material or tampons should be each assigned the next successive number.

6.    Clean utensils with 70% EtOH or 10% Bleach between each sample.

7.    Label all individual envelopes within the SAK with the unique lab number, item number, date and initials.

8.    Test swabs for Acid Phosphatase (a presumptive indication of semen). Retain if positive. Reference Acid Phosphatase Test in Serology protocols.

9.    Stain and review slides for the presence of sperm (a confirmation of semen). This may be done in lieu of the presumptive test and estimates quantity for possible DNA testing. Results include:
None seen – no sperm were seen on the slide
Rare sperm – 1-2 sperm were seen on the slide
Few sperm – 3-5 sperm were seen on the slide
Moderate – 5-11 sperm were seen on the slide
Many - >11 sperm were seen on the slide
Reference "Christmas Tree" Stain in Serology protocols.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.6    SEXUAL ASSAULT EVIDENCE Continued

10.    An alternative method of confirming semen is to test for the prostatic antigen, P30, with the ABA P30 kit. Reference ABA P30 Kit in Serology protocols.

11.    Examine the pubic hair combings and note the general appearance (macroscopic). Separately open the pubic hair cuttings to compare the appearance.  Note and retain any possible foreign hairs.

12.    Retain any swabs taken of potential saliva (i.e. a bite mark, hickey, etc.).

13.    If a urine specimen was submitted, contact the detective to determine if it should be sent for drug testing. Reference Submission of Samples to Other Laboratories.

14.    Buccal swabs from the victim are the preferred source of reference DNA. Alternatively, if a blood sample was submitted, make a dried blood stain when semen is confirmed. Once the stain is made, the victim's known sample may be discarded in appropriate biohazard container. Reference Dried Bloodstain Preparation.

    NOTE: Confirmation of semen should be conducted on at least one sample pertaining to the case. The presence of semen is confirmed with a positive P30 test or the visualization of a minimum of three sperm (intact or heads). Fewer than three sperm or rare sperm heads require confirmation by a second analyst.

15.    Seal all items with evidence tape if they are to be retained for further testing.

**Post-testing Processing**

1.    If the SAK is positive for semen, it is not necessary to examine additional items of evidence related to the offense. The decision to examine the evidence will be left to the analyst after review of all the details of the case (i.e. multiple suspects, stranger assault) and/or consultation with the detectives. In the case of negative SAKs, the detective must be consulted regarding the examination of any additional evidence.

2.    Store any positive swabs/stains in the serology freezer #5 with all other samples pertaining to the case. Transfer to long-term storage as necessary. Document on a sample retention document. Reference Stain/Sample Storage.

3.    Once all analysis is complete, the SAK and evidence should be sealed with red evidence tape and submitted to the Property Control Unit with the appropriate dated and signed evidence transmittal.  To maintain proper chain of custody, the property control specialist will note the time and date received and their initials on the evidence transmittal.  The original Evidence Transmittal is to remain with the case folder. Reference Evidence Transmittals.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.6    SEXUAL ASSAULT EVIDENCE Continued

4.    The case should then be noted as completed in the Crime Lab logbook and the Serology logbook.  In addition, the number of tests, examinations and findings should all be recorded in the serology logbook. Reference Statistics.

5.    The analyst will then compose a written report of the evidence examined and the results of the examinations for the detective.  **ALL** routine case reports are to be peer reviewed and reviewed by an administrator prior to release. Emergency case reports may be released after peer review with any administrative corrections subsequently reported on an "Amended Report". The original and amended reports remain in the case folder. Reference Reports.

6.    The case folder may then be filed or retained for DNA testing as indicated.

7.    All retained biological samples will be noted on the ET using a designated stamp. Also indicate on the ET the items that had no probative biological evidence and/or the items that were not examined for biological evidence. Reference Evidence Transmittals.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.7  SAMPLES RECEIVED FROM THE MEDICAL EXAMINER

Samples obtained from the Medical Examiner's Office are important evidentiary items. These guidelines have been established to ensure specimen integrity.

1. Arrange the transfer of items with the Medical Examiner's evidence technician.  Prior to acceptance, open and inventory the items documenting each item listed on the TCME Evidence Transmittal as received.

2. Generate a Fort Worth Evidence Transmittal using either a blank or template Medical Examiners Evidence Transmittal form (FW/ME-ET).

3. Identify or assign the case a unique Forensic Science Laboratory number. Record this information along with the number of packages received on the TCME transmittal and initial.  Fill out all information requested on the FW/ME-ET.  Prepare a case folder if not already done.

4. Label all primary packages with: analyst's initials, date of examination, lab number and item number, time and date when received from the Medical Examiner's Office for chain of custody information.

5. Open packages containing biological material and remove blood.  An EDTA whole bloodstain of the deceased individual should be made on ALL cases received from the Medical Examiners office. Reference Dried Blood Stain Preparation.

6. All blood tubes are to be labeled with the date, laboratory number and initials then heat sealed in a plastic sleeve and stored in the serology refrigerator #5. The outside of the clear packaging should also contain the victim's name and lab number.  The blood tubes are to be stored in refrigerator #5 for one year or as space permits then transferred to boxes in the crime lab Evidence Room. Reference Stain/Sample Storage and Disposal of Evidence.

7. Identify what evidence has been removed (i.e. blood vials or hairs) on the package and on the ET, include date, time and initials.

8. Reseal the package with red evidence tape and submit to the Property Control Unit.  Make certain to specify on the ET what specific evidence is being submitted and what evidence has been removed and retained in the serology or DNA section.

9. If any firearms evidence is received it should be separated out and repackaged. It can then be directly transferred to the Firearms Unit with an Inter-Office Evidence Transfer form OR repackaged in a PCU evidence envelope and submitted to the Property Control Unit. Document on the ET.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.8  BULLETS OBTAINED FROM JOHN PETER SMITH HOSPITAL

Occasionally there will be sealed bullets or fragments in the locked box at JPS.  These are usually recovered by the Emergency Room or Surgery staff.  These items should be handled as follows:

1. Make an evidence transmittal with all the information given.  Do not open the package unless it is necessary to obtain the associated paperwork.

2. Using the information provided by the hospital paperwork, search the mainframe and/or crime lab logbook for the service number and determine if the case has been assigned a unique laboratory number.  If there is a service number but no lab number, enter the information into the crime lab logbook and assign a lab number.

3. Label the outer package with the lab number, service number, date, initials and chain of custody information.

4. Submit the evidence either directly to the Firearms Unit through an inter-office evidence form or in a PCU envelope to the Property Control Unit.

5. If no service number can be found the package should be stored in the Crime Lab Evidence Room as the PCU will not accept evidence without associated service numbers.

6. Record the receipt of and location of the bullet in the BULLET LOGBOOK.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.9    COLLECTION OF REFERENCE BIOLOGICAL SAMPLES

The collection of biological evidence usually comes from the victim, the suspect, any consensual partners and/or samples necessary for elimination purposes.

**Suspect Samples:**

1.    Secure a copy of the search warrant and collect ONLY those samples specified by the warrant.  If the suspect is consenting to the sample collection, the detective will have the suspect sign the consent form. A Spanish version is available if necessary. Record the date, time, lab number, service number, and analyst's initials. Indicate which samples were collected.  This copy is to remain in the case folder. Document persons present, location and any unusual events.

2.    Take a digital or Polaroid photograph of the suspect. The analyst labels the photograph with the date, lab number and their initials. Put a copy of the Polaroid or digital photo print out in the case folder.

3.    Buccal swabs are the preferred method to obtain a known DNA specimen from an individual. Collect the sample by swabbing the inside cheeks of the person and allowing the swabs to dry. Place the swabs in a coin envelope. Label the envelope with the individuals name, date, time, analysts' initials and the laboratory number. Reference Buccal Swab Collection.

4.    Occasionally, a blood sample is needed from a suspect (or individual). Using proper collection procedures, collect the suspect's blood sample into a purple top (EDTA) tube.  Label the tube of blood with the suspect's name, date, time, analyst's initials and the laboratory number. If a vial of blood cannot be drawn, a fingerstick may be collected on a clean, white cloth.  The stain will need to be at least the size of a quarter. Reference Blood Collection.

5.    Using tweezers cleaned with 70% EtOH, collect approximately 20 hairs from various areas of the suspects head. Place them in a paper towel or piece of glassine paper.  Attempt to collect the hair root with the samples.  Place the sample inside an envelope, label with head hair, suspect name, date, lab number, and analysts' initials.

6.    Have the suspect, in the presence of an officer, repeat step 5 to collect pubic hairs.

7.    Record all case information in the Blood Draw Logbook.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.9    COLLECTION OF REFERENCE BIOLOGICAL SAMPLES Continued

8.    Prepare a bloodstain of the EDTA sample. Reference Dried Blood Stain Preparation.

9.    Record the bloodstain in the Blood Stain Logbook.

10.   Heat-seal the blood in a plastic sleeve and label the sleeve with the suspect's name and lab number. The blood tubes are to be stored in refrigerator #5 for one year or as space permits then transferred to boxes in the crime lab Evidence Room. Reference Stain/Sample Storage.

11.   Retain and separately store all items collected from the suspect(s) with any other evidence associated with the case.

12.   Record the collection in the serology logbook for statistical purposes.

If blood and/or other biological samples are to be collected by an individual other than crime laboratory personnel, supply the detective with a pre-made Suspect Kit or Buccal Swab Kit.  The Suspect Kit should contain:
- EDTA vial (purple top)
- Envelope labeled "head hair"
- Envelope labeled "pubic hair"
- Two pieces of paper for the hair samples
- Instruction form
- Consent form

The Buccal Swab Kit should contain:
- Two (2) sterile swabs
- Instruction form
- Consent form
- Labeled Coin Envelope "Buccal Swabs"

The detective may submit the evidence directly to the Forensic Science Laboratory. Generate an Evidence Transmittal and place in the case folder.  The Suspect Kit and/or Buccal Swab Kit will be given its own item number and its' contents given a letter.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.9    COLLECTION OF REFERENCE BIOLOGICAL SAMPLES Continued

### VICTIM SAMPLES

1. Biological evidence collection of the victims does not usually require warrants, therefore when collecting biological samples use the "Victim/Consensual Collection Form". A Spanish version is available if necessary. This consent form must be completely filled out with all case information and signed by the victim or legal guardian.  The original is to be placed in the case folder with a copy sent to the detective.

2. Take a digital or Polaroid photograph of the victim. The analyst labels the photograph with the date, lab number and their initials. Put a copy of the Polaroid or digital photo print out in the case folder.

3. Buccal swabs are the preferred method to obtain a known DNA specimen from a person. Collect the sample by swabbing the inside cheeks of the person and allowing the swabs to dry. Place the swabs in a coin envelope. Label the envelope with the victim's name, date time, analyst's initials and the laboratory number. Reference Buccal Swab Collection.

4. Occasionally, a blood sample is needed from a victim. Using proper collection procedures, collect the victim's blood sample into a purple top (EDTA) tube.  Label the tube of blood with the victim's name, date time, analyst's initials and the laboratory number. If a vial of blood cannot be drawn, a fingerstick may be collected on a clean, white cloth.  The stain will need to be at least the size of a quarter. Reference Blood Collection.

5. If it is necessary, collect approximately 20 hairs from various areas of the head, place them on a paper towel or glassine paper and put into an envelope.  Label appropriately with the victim's name, lab number, date and analyst's initials.

6. Record all case information in the Blood Draw/Buccal Swab Logbook.

7. Prepare a bloodstain of the EDTA sample Reference Dried Blood Stain Preparation.

8. Record the bloodstain in the BLOODSTAIN LOG.

9. The victim's blood sample may then be discarded in an appropriate biohazard container.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.9    COLLECTION OF REFERENCE BIOLOGICAL SAMPLES Continued

**CONSENSUAL PARTNERS SAMPLES**

1. Blood collection of the consensual partner does not usually require warrants, therefore when collecting biological samples use the "Victim / Consensual Collection Form". A Spanish version is available if necessary. This consent form must be completely filled out with all case information and signed by the consensual partner. The original is to be place in the case folder with a copy sent to the detective.

2. Take a digital or Polaroid photograph of the individual. The analyst labels the photograph with the date, lab number and their initials. Put a copy of the Polaroid or digital photo print out in the case folder.

3. Buccal swabs are the preferred method to obtain a known DNA specimen from a person. Collect the sample by swabbing the inside cheeks of the person and allowing the swabs to dry. Place the swabs in a coin envelope. Label the envelope with the consensual partner's name, date time, analyst's initials and the laboratory number. Reference Buccal Swab Collection.

4. Occasionally, a blood sample is needed from a consensual partner. Using proper collection procedures, collect the person's blood sample into a purple top (EDTA) tube. Label the tube of blood with the person's name, date time, analyst's initials and the laboratory number. If a vial of blood cannot be drawn, a fingerstick may be collected on a clean, white cloth. The stain will need to be at least the size of a quarter. Reference Blood Collection.

5. If it is necessary, collect approximately 20 hairs from various areas of the head, place them on a paper towel or glassine paper and put into an envelope. Label appropriately with the person's name, lab number, date and analyst's initials.

6. Record all case information in the BLOOD DRAW/BUCCAL SWAB LOGBOOK

7. Prepare a bloodstain of the EDTA sample. Reference Dried Blood Stain Preparation.

8. Record the bloodstain in the BLOODSTAIN LOG

9. The blood sample may then be discarded in an appropriate biohazard container.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.10    PENILE SWAB COLLECTION

In many sexual assault cases, ejaculation of the male does not occur.  To demonstrate that penetration took place, a penile swab is collected in an attempt to detect female cells.  These samples should be collected as soon as possible and **DO NOT** require consent or a court order.  The maximum time between the assault and sample collection is 3-4 hours.

**CAUTION SHOULD BE USED TO KEEP THE VICTIM AND SUSPECT SEPARATE.**

The penile swab kit contains:
- Comb
- One (1) piece of paper for the pubic hair combings
- Two (2) sterile swabs
- Envelope labeled "Penile Swab"
- Instruction form

NOTE: These items are contained in a 6 x 9 envelope stamped with "Penile Swab Kit".

**Penile Swab Collection**

1.      Comb the pubic hair onto a paper.  Fold the paper, enclosing the hair and comb, and place in the appropriate envelope. Label the envelope with the suspect's name.

2.      Dampen two sterile swabs with either saline or deionized water.

3.      Swab the length of the penis with the swabs, paying close attention to the area around the head and the base of the penis.  Swab outside the penis only.

4.      Air dry the swabs for 1 hour then package in a small envelope and label with all case information, suspect name, victim name, service number, date, time, and name of individual collecting the sample.

5.      Place all collected items into larger envelope and seal with date, time and initials.  Label the envelope with the suspect's name, victim's name, date, time, service number and name of individual collecting the sample.

**Known Sample Collection**

Buccal swabs, blood samples and pulled hair samples **DO** require consent or a court order prior to collection.

1.      Make CERTAIN the suspect has SIGNED the consent form or a SEARCH WARRANT has been obtained. Once this is done, the process may proceed.

2.      Using forceps, pull 15-20 pubic hair samples and place in a paper towel.  Fold and place in the envelope labeled with the same information as above.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.10    PENILE SWAB COLLECTION Continued

3.      Buccal swabs are the preferred method to obtain a known DNA specimen from a person. Collect the sample by swabbing the inside cheeks of the person and allowing the swabs to dry. Place the swabs in a coin envelope. Label the envelope blood with the person's name, date time, initials and the service number. Reference Buccal Swab Collection.

4.      Occasionally, if the suspect will not cooperate with the buccal swab collection, a blood sample is needed from the suspect. Using proper collection procedures, collect the person's blood sample into a purple top (EDTA) tube.  Label the tube of blood with the person's name, date time, initials and the service number. If a vial of blood cannot be drawn, a fingerstick may be collected on a clean, white cloth.  The stain will need to be at least the size of a quarter. Reference Blood Collection.

5.      Place all items in the primary envelope and fill out all information. Label the envelope with the assigned lab number.

6.      Each item in the kit should be given an individual item number and must be logged into the Evidence List.

7.      Retain the samples with any other samples from the case in the appropriate freezer for possible STR DNA testing.

8.      Remove the Penile Swab Collection form and file in the case folder for appropriate chain of custody.

9.      The empty envelope should be sealed with red evidence tape and submitted to the Property Control Unit.

10.     If an officer, detective or hospital personnel collected the samples the kit may be submitted directly to the Forensic Science Laboratory. An Evidence Transmittal form must be completed and placed in the case folder.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

# SECTION 1.11    BUCCAL SWAB COLLECTION

In the event that known biological samples must be collected from an arrested person, the following protocol must be used.

1.  Secure a copy of the search warrant to be placed in the collection envelope and verify the items to be collected.  Only collect those items specified by the warrant.

2.  If the person is consenting to the collection, fill out the enclosed consent form and have them sign it.

3.  Take one sterile swab and scrape the inside of the cheek 10-15 times with an up and down motion.

4.  Repeat with a second swab on the other cheek.

5.  Air-dry the swabs.

6.  Package both swabs in one envelope.

7.  Label with the person's name, date and time collected, and the initials of the person collecting the sample.

8.  If requested, collect approximately 20 head hairs from various areas of the head by pulling with tweezers and place them on a paper towel.  Fold the hairs in the towel and put the towel into the appropriate envelope.  Label as above.

9.  If requested, collect approximately 20 pubic hairs by pulling (the person can do this themselves).  Place in a paper towel and label as above.

10. Place all items in the outer envelope along with the warrant or consent form, label the outside with the person's name, service number, date and time collected, and who collected the samples.

11. NOTE:  These samples may be introduced into court. Please be accurate and make as many notes as you need to recognize them during trial.

12. The envelope may then be submitted to the locked box at JPS, to the PCU or directly to the FSL.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.12    DRIED BLOODSTAIN PREPARATION

Guidelines for making dried bloodstains:

NOTE: Bloodborne pathogens may be transmitted by contact with mucus membranes or compromised skin. Always wear lab coats, gloves and a face shield while preparing bloodstains.

1.     Cut a piece of parafilm large enough to accommodate the cloth. Label with the lab number and/or person's name. Use clean scissors.

2.     Cut a piece of washed white cotton cloth with clean scissors and place it on the parafilm.

3.     Using a disposable pipette, place a sufficient amount of blood on the cloth to saturate (at least the size of a quarter).

4.     Let air-dry. Package the stain in an envelope labeled with the lab number, person's name, date, initials and type of sample (i.e. EDTA).

5.     If necessary, place the vial of blood in a plastic sleeve labeled with the person's name and lab number. Otherwise discard in a biohazard waste.

6.     One dried bloodstain per day per analyst is preferable.

7.     More than one bloodstain may be made per day if they are made in separate areas and/or separate times.

   • Stains of the suspect and victim of the same case should not be made on the same day.

   • Stains of consensual partners should be made separately from that of the suspect by either another analyst or separated by time and/or space.

   • Stains of multiple victims may be made on the same day.

8.     When the stain is completely dry, package inside an envelope labeled with the lab number, individuals name, date stain was made, type of sample, and the analyst's initials.

9.     Seal the envelope with red evidence tape and store with the other samples from the same case.

10.    Log the stain preparation in the DRIED BLOODSTAIN LOG.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.13   INTERPRETATIONS

**Confirmation of Semen**

1.     The Acid Phosphatase (AP) presumptive test is only an indication of semen. It is reported as "presumptive test for semen was positive/negative".

2.     The Acid Phosphatase presumptive test for semen is positive when a color change to purple is observed.  This reaction should take place within 10 seconds.

3.     The Acid Phosphatase presumptive test for semen is negative when no color change is observed.

4.     The presence of semen is confirmed with a positive ABA P30 test or the visualization of a minimum of three intact sperm (head and tail). Fewer than three sperm or rare sperm heads require confirmation by a second analyst.

5.     If the presumptive test is negative but one of the confirmation tests is positive, semen can be confirmed.

6.     A 'Suspect Note' will be included on the report for confirmed positive results (if a suspect sample has not previously been submitted). This may also pertain to hairs with roots or any other evidentiary items.  The 'Suspect Note' is included to inform the detectives and the district attorney that there is biological evidence that can be typed but known samples need to be submitted for the analysis.  If there is a report of consensual sex in the previous 7 days, for sexual assault cases, a buccal swab or blood sample from the consensual partner will also be requested.

7.     The text for the 'Suspect Note' is: "**\* Request for suspect's known sample -** If a suspect(s) is developed in this case, please furnish a buccal swab or blood sample and/or hair sample from the suspect(s).  These samples are required before further testing can be completed."

8.     For cases where negative results were obtained or semen could not be confirmed, a 'Suspect Note' may not be included.

9.     The positive and negative controls should be run prior to testing. If the controls do not work as expected, fresh reagents should be made and the controls re-tested. If the controls are run simultaneously with the samples (e.g. Ouchterlony) and do not work as expected, the test results must be considered invalid and reported as inconclusive.  Sample quantity permitting, the test will be re-run to obtain conclusive results.

10.    Evidence that is blue light negative will be reported as 'nothing of value noted'.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.13   INTERPRETATIONS Continued

**Confirmation of Blood**

1.      The presumptive Phenolphthalein test alone is only an indicator of blood. It is reported as "presumptive test for blood was positive/negative".

2.      The Phenolphthalein presumptive test for blood is positive when a color change to bright pink is observed.  This reaction should occur within 2-5 seconds.

3.      The Phenolphthalein presumptive test for blood is negative when no color change is observed within 5 seconds.

4.      The ABA® HemaTrace® kit is a confirmation of human hemoglobin and is reported as "human blood was detected".

5.      The Takayama test in an alternative confirmation test for blood.

6.      The Takayama confirmation test for blood is positive when hemochromagen crystals appear on the slide and is reported as "blood was detected".

7.      The Takayama confirmation test for blood is negative when no crystals appear on the slide.

8.      The Ouchterlony test is an alternative confirmation test for human protein. Confirmation of human blood can be reported with a positive Takayama and a positive Ouchterlony result.

9.      The Ouchterlony confirmation test for human proteins is positive when a white precipitin line forms between the sample well and the antiserum well and is reported as "human protein was detected".

10.     The Ouchterlony confirmation test for human proteins is negative when no precipitin line forms between the sample well and the antiserum well.

11.     If the Takayama test is negative but the Ouchterlony is positive only the presence of human proteins can be reported.

12.     If the Takayama test is positive but the Ouchterlony is negative, blood can be reported but human blood cannot be confirmed.

13.     Any ambiguous results will be reported as inconclusive and repeated if possible.

14.     For positive confirmation tests, a 'Suspect Note' will be included in the report. For negative, inconclusive or not confirmed results, a 'Suspect Note' is not routinely included in the report but the decision is left to the discretion of the analyst.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.13    INTERPRETATIONS Continued

15.    If the controls do not work as expected, the test must be considered invalid and reported as inconclusive.  Sample quantity permitting, the test will be repeated to obtain conclusive results.

16.    The Luminol presumptive test for blood is positive when chemiluminescence is seen.

17.    The Luminol presumptive test for blood is negative when no chemiluminescence is seen.

18.    The confirmation test for semen and blood using the ABA® P30 or HemaTrace® test, respectively, is positive if a line appears at both the T (test) and C (control) regions.

19.    The confirmation test for semen and blood using the ABA® P30 or HemaTrace® test, respectively, is negative if a line appears at the C (control) region but no line develops at the T (test) region.

20.    The confirmation test for semen and blood using the ABA® P30 or HemaTrace® test, respectively, is inconclusive if a line does not appear in the C (control) region.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.14   CONCLUSIONS

Each case will be different; however, standard phrases may be used.  All results and conclusions should accurately reflect the results of the testing performed.  Therefore, some variations of these statements are acceptable.

The serology results should reflect all testing performed on each item and all sample collection.  The Interpretations document provides a detailed description of how to determine what the final results and conclusions will be.  Below are examples of standard sentences that may be used:

- Semen (blood) was detected on the item.
- Semen (blood) was not detected on the item.
- The presumptive test for semen (blood) was positive (negative) on the item.
- Presumptive testing for semen (blood) was positive on the item.  However, the presence of semen (blood) cannot be confirmed.
- Blood was detected on the item.  However, the presence of human blood could not be confirmed.
- The presumptive test for blood was positive on the item.  Human proteins were detected.
- A possible foreign hair was noted in the pubic hair combings.
- Hair (trace evidence) was collected from item and retained as evidence
- Cuttings (samples) have been frozen and retained should further testing (analysis) be necessary.
- Due to the limited quantity, no further testing was performed.
- Due to the limited quantity, STR DNA testing is recommended.
- The urine sample was sent for drug analysis (screening).
- The testing for XXXX was inconclusive
- Nothing of value was noted.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.15   REPORTS

1.      A final report will be generated on all FWPDFSL cases.

2.      Reports will be typed on Forensic Science Laboratory (FSL) letterhead with the City of Fort Worth logo.

3.      Include title of report on all pages—Serology, STR DNA, Addendum, Amended or Supplemental.  "Supplemental" refers to additional testing performed after the initial report has been signed.  If evidence is received and retained in the laboratory after the initial report was signed and sent but no additional testing was performed, a supplemental report does not need to be generated. "Amended" refers to changes (i.e.- additions or deletions) made to the signed and dated initial report.

4.      Document the lab number, service number, suspect(s) name, if available, victim name, type of case, and the date.  The lab and offense numbers are to appear on all pages of the report.  In the case of sexual assaults or activity involving a child use only the individuals' initials not name.  Label pages '1 of X, 2 of X'.

5.      Address the report to the appropriate division:  Criminal Investigation Division (CID) or Crimes Against Children's Unit (CACU).  Include the Detective's name on all reports if known. If the case is from an outside agency, use their name, division and detective, if known.

6.      The chain of custody information, the Property Control Unit (PCU) invoice number, and the name of the person who submitted the evidence should appear on the report.

7.      List the items with their number as described on the Evidence List.  If this is a DNA report there may not be any evidence to list as it already appeared on the serology report.  In this case the final report from DNA will state "No additional Evidence".

8.      The analyst will state their results and conclusions. Multiple items with the same results may be combined. Refer to Results and Conclusions section for typical sentence examples.

9.      The analyst must sign the report prior to release.  If the report contains multiple pages the analyst's signature and name will appear on the last page.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.16   RETENTION of BIOLOGICAL EVIDENCE

Recent legislation now requires that all evidence containing probative biological fluids be retained until the sentence is complete. In order to comply with this directive, stamps will be utilized to indicate the status of the biological evidence. This information will be recorded on each evidence transmittal (both FSL and PCU copies). PCU will use this information when researching destruction orders.

1. If probative biological evidence has been detected and retained, identify the specific items on the stamp (add date):

   **"SAMPLES RETAINED IN CRIME LAB FOR POSSIBLE DNA TESTING BY_____"**

2. If an item was examined but no probative biological evidence was detected, identify the specific items on the stamp:

   **"NO BIOLOGICAL (DNA) EVIDENCE DETECTED ON: ITEMS_____    BY/DATE_____"**

3. If an item was not examined for the possible presence of biological fluids, identify the specific items on the stamp:

   **"ITEMS_____ WERE NOT EXAMINED FOR BIOLOGICAL EVIDENCE    BY/DATE_____"**

Cuttings from items of evidence that contain biological material will be maintained at -20°C for a minimum of 10 years. The samples may then be stored at room temperature until the sentence has been completed. After the sentence has been completed, the samples may be destroyed by court order.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.17    STATISTICS

It is important for the laboratory to keep track of the number of examinations performed to ensure proper staffing and workload. The analyst should keep track of each test completed along with the controls. The parameters captured for evidence screening include:

AP
SLIDES
P30
BLUE LIGHT
PT
TAKAYAMA
HEMATRACE
LUMINOL
HAIR
TAPELIFTS
# OF ITEMS
# OF CUTTINGS
BLOOD/BUCCAL COLLECTION
BLOOD SWATCH MADE
FINGERPRINTING
OTHER
TOTAL

The number of tests plus controls should be entered into the Serology logbook after peer review.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.18    STAIN / SAMPLE STORAGE

**Sexual Assault Evidence**

1.      Cuttings taken from sexual assault cases should be temporarily stored in the serology freezer #5.  No biological specimens or evidentiary samples are to be stored in the serology refrigerator/freezer #8.  This is for reagents and solutions ONLY.

2.      Samples storage is to be documented on a sample retention form and transferred to the appropriate –20°C freezer #2 or #3 with #2 containing the oldest cases. Storage of evidence in the freezer is necessary to minimize degradation of biological samples and should therefore be stored as long as possible before being transferred to the evidence room.

3.      When these freezers are to capacity, several boxes can be transferred to the crime lab evidence room.  Start with the oldest cases, placing them into a large storage box.  Label the outside of the box as 'sexual assault evidence' with the lab numbers contained within the box, the date the transfer took place and the analysts' initials.

4.      Victim's blood vials are temporarily stored in the serology refrigerator #5 until a bloodstain is made. All bloodstains are made upon their receipt.  If the case is positive for biological evidence, a bloodstain is retained. If the case is negative, the bloodstain is discarded. After the preparation of a bloodstain, the vial is discarded in an appropriate biohazard container. Reference Dried Bloodstain Preparation.

**Homicide/Blood Cases**

1.  Bloodstains made from deceased individuals can be temporarily stored in the serology freezer #5 in the box labeled Homicides. Reference Dried Bloodstain Preparation.

2.  When this box is to capacity, transfer the stains to the homicide freezer #7 located in the Chemistry section. Samples should be documented in the FREEZER INVENTORY LOG.  Bloodstains of victims should be stored by lab number and retained with all other evidentiary samples associated with that case.

3.  When these freezers are to capacity, several boxes can be transferred to the crime lab evidence room.  Start with the oldest cases, placing them into a large storage box. Label the outside of the box as 'homicide evidence' with the lab numbers contained within the box, the date the transfer took place and the analysts' initials. Storage of evidence in the freezer is necessary to minimize degradation of biological samples and should therefore be stored as long as possible before being transferred to the evidence room.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

# SECTION 1.18    STAIN / SAMPLE STORAGE Continued

4.  The vials of blood from deceased individuals are kept and stored indefinitely.  These can be temporarily stored in the serology refrigerator #5 and then transferred to boxes labeled with lab numbers included in the storage box, date of transfer and analyst initials and then placed into the crime lab evidence room.

**Suspect Blood Vials**

1.  Suspect blood vials are stored indefinitely.  These can be temporarily stored in the serology refrigerator #5 in a 'suspect blood sample' box.

2.  When this refrigerator box is to capacity, transfer to the crime lab evidence room. Organize by lab number in file folder boxes (or other small boxes) and place them into a large storage box.  Label the outside of the box as 'suspect samples' with the lab numbers contained in the box, the date the transfer took place and the analyst's initials.

3.  Store the suspect's bloodstain separate but with all other evidentiary samples associated with the case.

4.  If there is no additional evidence collected, the suspect's bloodstain and other samples should be stored.

**Unfounded Cases**

If a particular case is 'unfounded', any samples or cuttings taken can be either stored in the freezer #2 or #3 or replaced in the sexual assault kit and returned to the Property Control Unit. Any liquid biological samples (i.e. blood or urine) are discarded in a Biohazard container.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.19    SUBMISSION OF SAMPLES TO OTHER LABORATORIES

Occasionally there will be testing requested that cannot be performed by the Fort Worth Police Department Forensic Science Laboratory due to, for example, technology or backlog constraints.   In the event this occurs, the evidence will be sent out to another laboratory that is capable of performing such examinations.  Orchid Cellmark (Dallas and Nashville) is the DNA contract lab for the FWPDFSL.  All DNA cases are to be processed by these laboratories, unless otherwise indicated.   It is the responsibility of the agency, if not FWPD, requesting the examination to pay for any charges incurred as a result of the testing.  If it is a Fort Worth case, the laboratory manager must approve the outsourcing prior to it being sent.  In this case the Forensic Science Lab is responsible for appropriate payment.

**Whenever possible a portion of the sample will be retained in the custody of the Forensic Science Laboratory.**


**Submission to TCME**

1.      Re-seal evidence with red evidence tape or repackage a portion of the sample into a separate envelope and seal.  Label the envelope with all the appropriate case information including, lab number, name, date item, item number and analyst's initials.  TCME requests all samples be submitted individually and not in one large envelope.

2.      Complete a Crime Lab Evidence Transmittal AND the Medical Examiners Evidence Transmittal.  Document samples in the appropriate logbook on the server.

3.      Transport to the Medical Examiners Office.  The original Forensic Science Lab transmittal should be signed and dated by both parties and kept with the original case folder.  Both parties will then sign and date the Medical Examiners transmittal.  A copy of this transmittal is to be made and placed in the Fort Worth Crime Lab's case folder.  The Medical Examiner's office will retain the original.

4.      Sexual Assault Kits, from any outside agency, are not worked by the FWPDFSL. These cases may be submitted to the TCME office. The original ET is to be placed in the case folder after both parties have signed and dated the transfer. Agencies that are routinely worked by TCME are Tarrant County Sheriff's Office, Parker County, Azle, Arlington, Bedford, Everman, Grand Prairie, Grapevine, Haltom City, Southlake, and Federal Corrections Agency.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.19    SUBMISSION OF SAMPLES TO OTHER LABORATORIES Continued

**Submission to Orchid Cellmark**

1.      Re-seal evidence with red evidence tape or repackage a portion of the sample into a separate envelope and seal.  Label the envelope with all the appropriate case information including, lab number, name, date item, item number and analyst's initials.

2.      When possible, include any pertinent and/or probative documentation (e.g.- lab reports, evidence transmittals or brief case synopsis) along with the samples. Also, specifically indicate the type of testing that should be performed and which pieces of evidence should be examined.

3.      Indicate in writing, if known in advance, if samples can be consumed during testing.  If not known, include a note requesting that the FSL be notified prior to consumption.  Document samples in the appropriate logbook on the server.

**Submission to Other Laboratories**
If the receiving laboratory is out of town or the state, the evidence will be mailed.  UPS is the usual method of choice as it has a tracking system and receipt signature.

1.      Transfer a portion of the sample to a new envelope, seal with red evidence tape and label with lab number, item number, contents, date and analyst's initials. Place all small envelopes into a larger envelope, seal and label.

2.      Complete a yellow Evidence Receipt form and any paperwork that may be required for the receiving laboratory. A letter may be written to detail the testing requested. Enclose paperwork in an envelope to maintain confidentiality.  The original Evidence Receipt and the copy of the letter will remain in the case folder.

3.      Place all items inside a UPS Biological Sample Pak and complete the label.

4.      Contact UPS to schedule and confirm a pickup number and time. (1-800-PICK-UPS)

5.      When UPS picks up the package, record the date and time of pickup on the UPS receipt, have the courier sign and retain in the case folder(s), if possible.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.20    FINISHED CASE CHECKLIST

1.    All pages in the folder will have page numbers, analyst initials and lab number.

2.    Evidence list with packaging information.

3.    Semen worksheet if a sexual assault kit is examined. Include all test and control results.

4.    Green sheet if evidence other than sexual assault kit is examined.   Complete all information requested on the top of the green sheet.  Reference Analyst's Notes.

5.    Lot number and Control sheet.

6.    Evidence Transmittals with completed chain of custody information and disposition of biological evidence stamp.

7.    Return all evidence to the Property Control Unit.  If no service number can be found store evidence in the Laboratory Evidence Room.

8.    Retain and file all cuttings in the appropriate freezer and document in the logbook

9.    Peer review/administrative review form.

10.   Signed report, original to case folder and copies to the detective.

11.   Sign out the case in the computer under "Serology Logbook" and "Crime Lab Logbook". Be certain to complete all requested information, including statistics.

12.   Sample retention document, if necessary.

13.   Sign out in Personal Logbook, if one is kept.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

# STR DNA SOP SECTION

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.21 - GOAL/OBJECTIVE/PURPOSE

The DNA Standard Operating Procedure manual (SOP) specifies procedures for routine examinations and analyses of biological evidence for human identification.  This manual is intended to ensure effective and efficient use of DNA laboratory equipment and facilities for the benefit of the forensic DNA scientist.  Additionally, it incorporates the quality assurance and quality control elements necessary to ensure the reliability and uniformity of analyses and reported conclusions.  Each case is unique and heterogeneous and should be treated as such.  **Therefore, this manual is intended to be a guide**. It is imperative that the forensic DNA scientist use a combination of experience and common sense when processing evidence and interpreting results.

As new and improved STR DNA procedures are adopted, procedures will be changed or dropped to ensure that the most current, accepted and technologically advanced testing is performed.

A Forensic DNA Scientist is one who examines physical evidence for the presence of biological fluids and who characterizes them in ways useful to the criminal justice system.  It is to this goal that this manual is primarily directed.

A Forensic DNA Scientist's position in the total analysis of a case may influence the effectiveness of other Crime Lab units in their analysis of a case.  Another objective of this manual is to provide a guide for the Forensic DNA Scientist to examine evidence in a way that will assist rather than impede the work of other forensic disciplines.

Several considerations are vital to an efficient and successful development of evidence in a case.  These are:
- Evaluation of the evidence
- Preservation of the evidence
- Documentation
- Communication with the detectives, other analysts and the District Attorney's office and
- Analysis of the data generated from the evidence

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.22 – DNA CASE PARAMETERS

### 1.22.1  DNA CASE ACCEPTANCE CRITERIA

Cases will be accepted for STR DNA testing under the following criteria:

- Blood, semen or other biological material of potential probative value has been detected.
- Known samples from all involved parties have been submitted, unless other arrangements have been made.
- Cases with unknown suspects.

Violent crimes such as homicides, attempted murder, sexual / aggravated sexual assaults will be given higher priority than non-violent crimes, such as burglaries.  The forensic DNA analyst, detective, DA's office and/or any associated entity will make a collaborative effort to effectively and efficiently prioritize cases.  Priorities will be assigned as follows:

- Cases going to court
- High profile cases at the Detective's request
- Potential serial sexual assault cases
- Routine cases with known suspect samples
- Old cases with known suspect samples
- Unknown suspect cases

Submission of a known suspect sample is an automatic indication that STR DNA testing is requested. Those case folders will be distributed to a qualified analyst and started as soon as possible, if an analyst has not been previously assigned.  If an analyst has been previously assigned, additional testing will be conducted by that analyst, unless otherwise decided.

Cases with unknown suspects (e.g. serial sexual assaults) will be tested and entered into CODIS upon completion of the case. Communication with the detective is imperative to assign a priority.

The target turn-around time is 15 working days from the initiation of STR DNA testing. It is understood that problems with samples, instruments or projects will influence the actual turn-around time.

Retain a portion of the sample for any re-testing requested per court order.  However, the analyst should use enough sample to ensure that results can be obtained.  If the entire sample must be consumed, the detective and/or district attorney must be notified prior to testing. The analyst will retain all extracts, PCR products and/or extracted substrates from consumed samples.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

If applicable, cases will be rejected if the suspect has been excluded based on serological results or trace analysis.

Criminal paternity cases will be referred to the University of North Texas Health Science Center of Fort Worth.

**The ultimate decision whether or not a case will be accepted will be left to the discretion of the Technical Leader after consultation with the Laboratory Supervisor and/or the detective and/or the DNA analyst and/or the District Attorney's Office.**

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.22 – DNA CASE PARAMETERS Continued

### 1.22.2    SUBMISSION OF DNA EVIDENCE

The case analyst will perform the initial conventional serology examinations, if appropriate, and evaluate the evidence and circumstances for possible DNA analysis.

For any case involving potential DNA analysis the analyst will:

- As sample permits, identify the questioned samples as containing seminal material, blood, or other relevant evidentiary material. Samples that can be accepted for STR DNA testing, without the identification of biological fluid, include, but are not limited to, semen from vasectomized males (note: sperm cells may be absent but P-30 should still be present), stamps, cigarette butts, hairs with roots, penile swabs and stains containing possible sweat (i.e. headbands, hat bands).

- Determine what the most appropriate method of analysis to be performed based on the type of sample, quantity and quality of sample, and the information required.  The analyst may want to confer with the investigating agency.

- Submit samples for STR DNA analysis after all conventional testing has been performed.

- Request that all known samples from persons associated with the crime be submitted to the laboratory prior to initiation of testing unless other arrangements have been made.

- Retain a portion of the sample for any re-testing requested per court order. However, the analyst should use enough sample to ensure that results can be obtained.  If the entire sample must be consumed, the detective and/or district attorney must be notified prior to testing. The analyst will retain all extracts, PCR products and/or extracted substrates from consumed samples.

- Reports issued where biological evidence has been detected will include a statement indicating that a known sample from the suspect(s) must be provided before further testing can be conducted.  In addition, if the victim of a sexual assault reports that consensual intercourse has occurred within 72 hours of the assault, a known sample from that or those partners should also be provided prior to DNA testing.  It is ideal that all known samples be submitted before DNA analysis begins.  This will be communicated to the Investigative Agency/District Attorney's Office.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.22 – DNA CASE PARAMETERS Continued

### 1.22.3    DNA ANALYSIS TIME CONSIDERATIONS

The time required to complete DNA analysis will be communicated to the Investigating Agency and/or the District Attorney's Office.  STR DNA analytical procedures take approximately 3 weeks.  This time frame may vary depending on various aspects including, but not limited to, the DNA caseload, instrument problems, staffing and priority.

Requests for DNA analysis by the District Attorney's Office on cases which are set for trial within a short period of time will be considered on a case by case basis. Completion of DNA on these and other 'rush' cases cannot be guaranteed.  Attempts will be made to comply with the request but are dependent on caseload, other obligations, and overall priority.  The ultimate decision to accept a 'rush' case will be left to the discretion of the Technical Leader after discussion with the case analyst.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.23 – QUALITY CONTROL MEASURES

### 1.23.1  GENERAL QUALITY CONTROL MEASURES

- A reagent blank should be processed with each set of extractions.  This blank will consist of all reagents used in the extraction process, minus any sample, and is processed through the entire extraction, amplification, and capillary electrophoresis procedure alongside the evidence samples.  If more than one type of extraction procedure is used, with different extraction reagents, then a reagent blank should be set up for each extraction type used.  The appropriate amount of reagent blank should be amplified, which is generally 10 μl.

- An amplification blank containing all the amplification reagents plus 10 μl of sterile deionized water, in place of template DNA, should progress through the amplification procedure and the capillary electrophoresis procedure.

- The addition of reagents to the amplification tubes must be conducted in the Clean Spot hood with dedicated pipettes to minimize contamination. Template DNA must be added to the amplification tubes OUTSIDE the Clean Spot hood with dedicated pipettes. The amplification blank tube should be capped last. This provides a check for contamination during PCR setup.

- The positive control is a sample of known COfiler and Profiler Plus genotypes provided by the manufacturer.  It will be processed through the amplification and capillary electrophoresis procedures.

- Work surfaces should be decontaminated before and after use with 20% bleach solution followed by 70% ethanol solution.  Disposable, absorbent pads should cover the work surface during tasks and be disposed of in biohazard receptacles after completion.  Ultraviolet germicidal lamps located in the extraction area should be used for a period of one hour daily.  Timers have been installed to start the lamps at 0200 and end at 0300 daily. The ultraviolet germicidal lamp in the Clean Spot hood should be turned on after use and decontamination for approximately 20-30 minutes.  UV protective glasses must be worn when working with UV lamps.

- Dedicated lab coats should be worn in the evidence screening, DNA extraction and the PCR amplification areas.  Do not wear cloth lab coats into the PCR amplification room. Do not wear cloth lab coats outside the laboratory. Launder lab coats frequently with hot water and bleach in the laboratory washer and dryer.

- Gloves should be changed frequently.  However, gloves may be rinsed in ethanol or cleaned with a 10% bleach solution.

- Sharps should be cleaned between each sample with 70% ethanol or with a 10% bleach solution followed by a nanopure water rinse.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

- If results are not obtained due to limited quantity, degradation of sample or instrument problems, the following options are available:

  - Re-extract with greater amount of evidence sample
  - Concentrate the extract (up to 80 μL)
  - Re-amplify
  - Re-inject
  - Re-denature with greater amount of amplified sample (up to 5 μL)
  - Increase injection time (up to 10 sec)
  - Increase amplification cycles (up to 30 cycles)

  These options may be repeated as necessary until the analyst is satisfied with the results. **Re-analysis should be documented.**

- The robotic nature of the ABI 310 Genetic Analyzer enables the analyst to "batch" cases. Generally, the analyst should not examine more cases than can be comfortably completed in the target 15 working day turn around time.

- Extracted samples will be maintained in labeled tubes in the Sexual Assault freezer #1 for a minimum period of three months after completion of the case. Amplified samples can be discarded after the case is peer reviewed.

  Note: Samples consumed in testing will be maintained indefinitely (both extracts and amplified portions).  Store in containers designated as "Retained Samples".

- Runs will be stored as a default date/time, but may be personalized as desired.

- Runs will be stored on ZIP disks and/or CD-ROM. (SEE THE PROTOCOL MANUAL)

- If off-scale results are obtained, the following options are available:
  - Re-extract with smaller amount of evidence sample
  - Re-amplify with smaller amount of extract
  - Re-inject with decreased volume of amplified DNA (down to 0.5 μL)
  - Decrease injection time (down to 2 sec)
  - Dilute extract and re-quantify

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.23 – QUALITY CONTROL MEASURES Continued

### 1.23.2  CRITICAL REAGENTS & SUPPLIES QUALITY CONTROL

Certain reagents and supplies should be checked against known materials prior to being used for casework.  The reagents and supplies that should be tested and the testing parameters are listed below.

- **AmpF/STR® PROFILER PLUS AMPLIFICATION KIT**
  Each new lot of AmpF/STR® Profiler Plus Amplification Kit should be tested with the following samples: positive DNA control supplied with the kit and an amplification blank.

### PROFILER PLUS POSITIVE CONTROL RESULTS

| LOCUS | D3S1358 | vWA | FGA | AMELO | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|-------|---------|------|--------|-------|---------|--------|--------|--------|---------|--------|
| TYPE | 14, 15 | 17, 18 | 23, 24 | X, X | 13, 13 | 30, 30 | 15, 19 | 11, 11 | 11, 11 | 10, 11 |

- **AmpF/STR® COFILER AMPLIFICATION KIT**
  Each new lot of AmpF/STR® COfiler Amplification Kit should be tested with the following samples: positive DNA control supplied with the kit and amplification blank.

### COfiler POSITIVE CONTROL RESULTS

| LOCUS | D3S1358 | D16S539 | AMELO | TH01 | TPOX | CSF1PO | D7S820 |
|-------|---------|---------|-------|------|------|--------|--------|
| TYPE | 14, 15 | 11, 12 | X, X | 8, 9.3 | 8, 8 | 10, 12 | 10, 11 |

- **DITHIOTHREITOL (DTT) AND PROTEINASE K**
  Differential lysis of mixed body fluid and spermatozoa must be performed. Spermatozoa heads must be lysed by the Proteinase K/DTT mixture.  Perform PCR analysis on a known sample in order to demonstrate that the new lot of DTT does not interfere with the PCR or capillary electrophoresis procedure.

- **HYBOND N and BIODYNE B MEMBRANE**
  Each new lot of membrane is tested through slot blot analysis and compared with the results of the previous lot.

- **QUANTIBLOT KIT**
  Standards must be comparable to previous lot numbers.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.23 – QUALITY CONTROL MEASURES Continued

## 1.23.3        EQUIPMENT QUALITY CONTROL

- **GENEAMP SYSTEM 2400**
  Consult either the operator's or maintenance manual for detailed operating and maintenance instructions.  A temperature calibration and verification test is performed quarterly as per the operator's manual.  The sample block, heater cover, and exterior surfaces are cleaned as needed.

- **GENEAMP SYSTEM 2400/9700 TEMPERATURE VERIFICATION SYSTEM**
  Refer to the operator's manual for detailed operating instructions.  The digital thermometer and platinum probe is calibrated annually by sending the unit to Perkin Elmer.

- **GENEAMP SYSTEM 9700**
  Consult either the operator's or maintenance manual for detailed operating and maintenance instructions.  A temperature calibration and verification test is performed quarterly as per the operator's manual.  The sample block, heater cover, and exterior surfaces are cleaned as needed.

- **HOT SHAKER / WATERBATH**
  Water level and temperature are monitored prior to use.  Temperature is monitored with a NIST-traceable thermometer.  Water is replaced monthly using deionized water.  Exterior surfaces are cleaned as needed.  The hot shaker temperature must be maintained at $50°C \pm 1°C$.

- **REFRIGERATOR / FREEZER**
  Temperatures are monitored in the refrigerator and freezer compartments on a daily basis.  Freezer temperature is maintained at $-20°C \pm 5°C$.  Refrigerator temperature is maintained at $4°C \pm 5°C$.  Refer to QC manual for additional semi-annual and annual maintenance instructions.

- **ABI PRISIM™ 310 GENETIC ANALYZER**
  Refer to the operator's manual for detailed maintenance and operating instructions and refer to the maintenance log for additional semi-annual and annual maintenance instructions. General room conditions: Ensure the ambient temperature is between 24°C and 30°C whenever the instrument is in operation. Other components are as follows: the cathode, syringe and pump block are to be cleaned weekly.  The capillary should be replaced between 300 and 400 electrophoretic separations.  The buffer and water are to be replaced every three days.  The autosampler and exterior of the instrument should be wiped with a water-dampened lab wipe once a week. Wastewater is changed with each use.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

- **PIPETTE**
  Pipettes should be checked for accuracy quarterly and calibrated by an outside source annually.

- **MICROCENTRIFUGE**
  The bowl should be decontaminated with 20% bleach on a monthly basis.

- **HEAT BLOCK**
  Calibrate the thermometer annually with a NIST thermometer.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.24 – STR DNA INTERPRETATION AND GUIDELINES

The following general guidelines apply to the interpretation of STR data generated on the ABI 310 Genetic Analyzer using the Profiler Plus, Identifiler and COfiler kits:

### 1.24.1  STR DNA GENERAL GUIDELINES

The target analysis parameters are as follows:
- Input DNA: 0.5 – 1.0ng
- Five (5) second injection
- Amplification using 28 cycles
- 310 Genetic Analyzer: 1.5 µl amplified DNA

If there is < 0.125ng / 10 µl, then you may increase the cycles up to 30 or concentrate the sample prior to amplification.  **NOTE**: Preferential amplification may be observed at < 28 cycles.

Analyze with Gene Scan software at 75 Relative Fluorescent Units (RFU) for blue, green and yellow and 150 RFU for red.

Alleles $\geq$ 120 RFU may be used for all purposes.

Alleles between 75 and 120 RFU are to be interpreted with caution.

Data that falls between 75 and 120 RFU may be enhanced under the following options:

- Re-extract with greater amount of evidence sample
- Concentrate the extract
- Re-amplify
- Re-inject
- Re-denature with greater amount of amplified sample (up to 5 µl)
- Increase injection time (up to 10 seconds)
- Increase amplification cycles (up to 30 cycles)

The original analyst will analyze the data through Genotyper and/or GeneScan and create a table of the allele calls.

The peer reviewer will analyze the data, GeneScan and/or Genotyper allele calls, comparing the allele calls and reviewing the original analyst's conclusion for accuracy.

The case folder will contain the extraction, quantitation and amplification data.

Copies of the Gene Scan electropherograms and/or Genotyper analysis with allele calls and peak heights will be printed and placed in the case folder.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

All raw data, GeneScan and Genotyper data will be permanently stored on Compact Discs and/or Zip Discs

17. If off-scale results are obtained, the following options are available:

- Re-extract with smaller amount of evidence sample
- Re-amplify with smaller amount of extract
- Re-inject with decreased volume of input DNA
- Decrease injection time
- Dilute extract and re-quantify

18. Any variations/deviations from these general parameters must be documented. Additionally, any variations/deviations must be in compliance with FWPDFSL internal and/or developmental validation studies.

19. All data associated with a case will be retained in the case folder.  Documentation of re-injected samples will be kept in the case folder.  All original worksheets (extraction, quantitation, amplification and etc.) will be retained in the case folder, including all repeated tests/samples.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.24 – STR DNA INTERPRETATION AND GUIDELINES
## Continued

### 1.24.2     PRELIMINARY EVALUATON OF DATA

Allelic designations are computer assisted. To ensure accuracy of genotyping, the following criteria must be met:

1.    The internal lane marker (GS500) must have correct sizes assigned to the peaks used for sizing. It is noted that the 250 base pair (bp) peak is not assigned. However, it must be within 1-bp in all samples.  The 75 and 350-bp peaks must be captured for all samples.  The 400-bp peak must be captured for the D18S51 26 allele, or other alleles greater than 340-bp in size.

2.    All ladder alleles must be correctly called in Genotyper.

3.    All labeled peaks of 75 RFU and greater will be interpreted. However, peaks must be 120 RFU or greater to be considered conclusive for match purposes. Peaks falling below 120 RFU that offer exculpatory information or indicate the presence of a mixture, then this information will be reported. All peaks <120 RFUs will be interpreted with caution.

4.    Spikes are potential artifacts of the capillary electrophoresis process.  Generally, spikes are thin peaks with large peak heights, present in two or more colors and have the same scan number. If a sample has a spike at 75 bp, between 100 and 350 bp, or at 400 bp, the sample may be re-injected.

5.    Pull-up Peaks. Excess input DNA may cause the appearance of "pull-up" peaks, a matrix affect, because the fluorescent intensity exceeds the linear dynamic range of the instrument. The data may be "off-scale" and may result in raised baselines or "pull-up" of one or more colors under the off scale peaks. Samples exhibiting pull-up may be re-injected with less DNA. Injection time may also be varied and the matrix checked.

6.    Bleed-through. Crosstalk between data in adjacent channels (i.e., green and blue) may result in bleed-through. These peaks are similar to pull-up, however, all data is "on-scale". Samples exhibiting bleed-through may be re-injected. Check matrix, also.

7.    Dye artifacts. Reproducible peaks in one color in multiple samples that are a result of incomplete removal of excess dyes during the manufacturing process.

8.    Minus A (-A). Incomplete addition of a non-template adenine by Taq polymerase that results in a minor peak or shoulder one base shorter that the major peak. This is possibly due to shortened extension time.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

9.   Shoulder. Shoulders may appear on the trailing or cathodic side of an allele.  A broadening of the base of the peak may exceed 50 RFU thus triggering an allele designation.

10.   Stutter. A minor PCR product peak four bases shorter (n-4) than the corresponding main allele peak.  The stutter product is missing a single tetranucleotide core repeat unit relative to the main allele.

11.   Stochastic effect. of a stutter band as compared to a true allele must be considered when evaluating profiles from DNA of minimal quantity and/or poor quality because under these circumstances, the height of a stutter peak may be greater than the expected 15%.

12.   Samples with off scale data (8192 RFU seen in raw data) may be diluted and re-injected. *Reference General Parameters Off Scale Results for other options.*

13.   Samples with data between 75 and 120 RFU may be re-injected with a longer injection time. *Reference General Parameters for other options*.

14.   Within a single source sample, genotypes generated for Amelogenin, D3S1358 and D7S820 in the Profiler Plus and COfiler amplification and typing systems must be concordant for interpretable data.

14.   Reproducible off-ladder alleles that fall between alleles within the ladder will be designated in accordance with guidelines of the International Society for Forensic Haemogenetics. Off ladder (OL) calls are first converted to size in base pairs (bp), then compared to the size of the appropriate ladder alleles and the allelic designation determined. If the OL is not a "perfect" repeat, but rather varies by 1, 2 or 3-bp from a ladder allele, then it will be designated as an integer of that variation. For example, if a green OL peak size is 238.39-bp, and the 36 allele of D21S11 ladder is 236.32-bp, then the peak will be designated a D21S11 36.2. If an allele falls above the largest or below the smallest peak of the sizing ladder, the allele will be designated as either greater than (>) or less than (<) the respective ladder allele.

15.   The original analyst will determine all possible allele calls and a peer reviewer will verify all allele calls. Every effort will be made to come to a consensus should there be a disagreement between the analysts. "Inconclusive" is a valid designation for questionable loci.  The Technical Leader will make the final decision in cases where no consensus can be arrived.

16.    A homozygous profile appears as a single peak at a locus.  The peak must be of a sufficient size relative to the other amplification products in the sample to exclude the possibility of stochastic loss of a second allele.  A heterozygous profile appears as two peaks at a locus.  With a few exceptions, the peak heights should exhibit at least 60-75% peak height concordance.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

# SECTION 1.24 – STR DNA INTERPRETATION AND GUIDELINES Continued

## 1.24.3    INTERPRETATION OF CONTROL SAMPLES

### 1.24.3.1    Reagent Blank

A reagent blank tests for the possible presence of contamination of the extraction reagents and/or supplies by an adventitious source of DNA. The adventitious DNA can be non-amplified DNA or PCR product. If, at 75 bp, between 100 and 350-bp, or at 400-bp, a reagent blank exhibits any peaks (>75 RFU) not attributable to an artifact, the DNA specimens extracted or amplified with the reagents contained in the reagent blank will be considered inconclusive for match purposes. These samples can be used for purposes of exclusion. Reagent blanks containing artifacts at 75-bp, between 100 and 350-bp, or at 400-bp, may be re-injected. Artifacts that fall outside these areas are not significant.

### 1.24.3.2    Amplification Blank

An amplification blank is a test for the possible presence of contamination occurring during amplification set-up. If a negative control exhibits peaks >75 RFU, that are not attributable to a spike or other artifact at 75-bp, between 100 and 350-bp, or at 400-bp, the DNA specimens amplified at the same time as the negative control will be considered inconclusive for match purposes, but can be used for purposes of exclusion. Negative controls containing artifacts at 75-bp, between 100 and 350-bp, or at 400-bp may be re-injected. Artifacts that fall outside these areas are not significant.

### 1.24.3.3    Positive Control

The AmpF*l*STR® Control DNA 9947A is used for both the Profiler Plus and COfiler tests. The designated types are:

### PROFILER PLUS

| D3S1358 | vWA | FGA | Amelogenin | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---------|-----|-----|------------|---------|--------|--------|--------|---------|--------|
| 14, 15 | 17, 18 | 23, 24 | XX | 13, 13 | 30, 30 | 15, 19 | 11, 11 | 11, 11 | 10, 11 |

### COFILER

| D3S1358 | D16S539 | Amelogenin | THO1 | TPOX | CSF1PO | D7S820 |
|---------|---------|------------|------|------|--------|--------|
| 14, 15 | 11, 12 | XX | 8, 9.3 | 8,8 | 10, 12 | 10, 11 |

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## IDENTIFILER

| D8S1179 | D21S11 | D7S820 | CSF1PO | D3S1358 | THO1 | D13S317 |
|---------|--------|--------|--------|---------|------|---------|
| 13, 13 | 30, 30 | 10,11 | 10, 12 | 14,15 | 8, 9.3 | 11, 11 |

| D16S539 | D2S1338 | D19S433 | vWA | TPOX | D18S51 |
|---------|---------|---------|-----|------|--------|
| 11, 12 | 19,23 | 14,15 | 17,18 | 8,8 | 15, 19 |

| AMELOGENIN | D5S818 | FGA |
|------------|--------|-----|
| X,X | 11, 11 | 23,24 |

If the positive control does not exhibit the STR DNA typing results listed above, the following steps must be taken.

1.  If there appears to be an injection or electrophoresis problem, re-inject the control with a ladder.

2.  If re-injection of the positive control does not resolve the problem and it appears to be due to amplification issues, all samples set-up and amplified with this control will be considered inconclusive. If sufficient DNA remains of the samples co-amplified with a failed control, then it is appropriate to re-amplify them. If the positive control yields accurate typing results when re-amplified, then the samples amplified with this control will be considered conclusive for matching purposes.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.24 – STR DNA INTERPRETATION AND GUIDELINES
## Continued

### 1.24.4    DESIGNATION OF PROFILER PLUS, COFILER AND IDENTIFILER ALLELES

Peak heights $\geq$ 75 RFU on an electropherogram are analyzed and categorized as:

Allele peaks with an assigned allele designation and possibly their accompanying stutter peaks.

 Artifact peaks
- pull-up peaks
- spikes
- elevated baseline and its' associated peaks
- bleed through peaks
- insignificant fluorescence
- dye artifacts
- minus A

Unequal allele peak height ratios can be less than the locus specific percentage
- At peak heights between 75 and 120 RFU where heterozygous loci may appear homozygous (stochastic effects). **Interpret with caution.** Reference Peak Height Ratio values in section 4.8
- Because of stochastic effects at greater than 120 RFU
- At loci having mutations  (e.g. primer site) or rare variants

Amelogenin typing
- Is performed by comparing fragments to the ladder
- The X allele is at approximately 103 bp and the Y allele at approximately 108 bp

An allele peak is designated as belonging to a locus
- If it falls within the bounds of a locus as defined by a respective allelic ladder
- It is the correct dye color as the locus
- It is reproducible
- If it falls outside the bounds of a locus' allelic ladder, the peak is designated as belonging to the locus closest in size in the correct color
- If it is at least 75 RFU

Alleles will be designated according to (**CO**mbined **D**NA **I**ndex **S**ystem) CODIS recommendations. There must be an attempt to analyze the 13 core loci to enter the data into CODIS.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

An allele is designated by the number of repeat units and by comparison to an allelic ladder. Each allele in the ladder defines a size range (bin) in base pairs. The sample allele must fall within the bin and have the correct dye color in order to be designated that allele number.

- If the number of repeats is a simple multiple of the 4 base pair repeat, the allele is designated by the number of the basic repeat sequence (e.g. FGA 24)
- If the allele is a variant that contains a partial repeat (1,2, or 3 base pairs) its designation is the number of bases in the incomplete repeat (e.g. FGA 26.2)
- If an allele falls above the largest or below the smallest of the allelic ladder, the allele should be designated as either greater than ($>$) or less than ($<$) the respective ladder allele.
- Reproducible off-ladder alleles that fall between alleles within the ladder will be designated in accordance with guidelines of the International Society for Forensic Haemogenetics. Off ladder (OL) calls are first converted to size in base pairs (bp), then compared to the size of the appropriate ladder alleles and the allelic designation determined. If the OL is not a "perfect" repeat, but rather varies by 1, 2 or 3-bp from a ladder allele, then it will be designated as an integer of that variation. For example, if a green OL peak size is 238.39-bp, and the 36 allele of D21S11 ladder is 236.32-bp, then the peak will be designated a D21S11 36.2. If an allele falls above the largest or below the smallest peak of the sizing ladder, the allele will be designated as either greater than ($>$) or less than ($<$) the respective ladder allele.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.24 – STR DNA INTERPRETATION AND GUIDELINES Continued

**1.24.5    INTERPRETATION OF RESULTS FOR SINGLE SOURCE SAMPLES**

### 1.24.5.1  A SAMPLE PROFILE WILL BE CONSIDERED CONSISTENT WITH A SINGLE CONTRIBUTOR BY LOOKING AT ALL LOCI IF:

- The loci for the most part have either one allele or two alleles.
- The peak heights are > 120 RFU.
- Heterozygous loci must have alleles with peak height ratios within acceptable parameters. Reference Section 4.8. The occurrence of a variant mutation may result in peaks outside this range.
- One locus in a profile has three alleles and all other loci have either one allele or two alleles in which peak height ratios were within the expected values (determined for each loci) or greater. Three allelic patterns have been observed in single source samples.

### 1.24.5.2  INTERPRETATION OF DATA

- A locus has two alleles between 75 and 120 RFU that may be unequal in peak heights, then the typing for that locus can be used for exclusionary or inclusionary purposes. If inclusionary, a genotype frequency may be determined.
- A locus has a single allele between 75 and 120 RFU, the typing for that locus is inconclusive due to the possibility of a heterozygous allele below the 75 RFU threshold. The observed single allele can be used for exclusionary purposes.
- Interpret with caution any heterozygote locus that has one allele above 120 RFU and the other allele between 75 and 120 RFU.

### 1.24.5.3  CONCLUSIONS FOR SINGLE SOURCE SAMPLES

**Exclusion-** If the STR DNA profile generated from a questioned sample is different than the DNA profile generated from a known sample, then the contributor of the known sample is excluded as a possible source of the questioned sample.

**Inclusion –** If the STR DNA profile generated from a questioned sample is the same as the DNA profile generated from a known sample, then the contributor of the known sample is included as a possible source of the questioned sample.

- If a questioned sample has the same STR DNA profile as a known sample STR DNA profile, except for a single locus (i.e. a three band pattern in one

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

and a two banded pattern in the other sample), then the contributor of the known sample is a possible source of the questioned sample.

- If a sample is typed using redundant loci or is re-analyzed (i.e. additional typing following testing in which a partial profile was obtained) then the most complete concordant profile obtained from the sample will be used for interpretation and comparison.

**No Results**- If a questioned sample or a known sample produces no results (i.e. due to the sample quantity or quality), then no conclusion can be offered.

**Match** – Two or more profiles are declared a match when no significant differences can be discerned between the profiles.

**Inconclusive** – Inconclusive data may be defined in terms of the ability or inability to exclude, even though a genotype cannot be assigned. Possible examples of inconclusive data include:

- Quantity below the stochastic limit
- Data below 75 RFU
- Data between 75 RFU and 120 RFU
- Possible allelic dropout
- Results not meeting the minimum criteria

**Record results at each locus as follows:**
- Homozygotes – 16, 16
- Heterozygotes, record in order of increasing allelic size – 15, 16
- A single peak at a locus when there is a possibility that the other allele is not present – (16)
- A locus where no results are obtained – NR
- A locus where results are uninterruptible or questionable - INC

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.24 – STR DNA INTERPRETATION AND GUIDELINES Continued

### 1.24.6    INTERPRETATION OF RESULTS FOR MIXED SAMPLES

#### 1.24.6.1    Mixed Specimens

A sample profile consistent with DNA from more than one contributor is considered

1. If three or more alleles are observed at two or more loci in the profile.
2. If peak height ratios for heterozygotes fall outside the expected peak height ratios values (determined for each loci) when all loci are considered. Reference Section 4.8.
3. Because of additional contributors percent stutter may be greater than expected:
   10% - CSF1PO
   12% - D8S1179, D5S818, D13S317, D7S820, TPOX
   15% - D3S1358, vWA, FGA, D21S11, D16S539, THO1
   18% - D18S51
4. Non-template nucleotide addition
   - Can be incomplete and produce two peaks differing by 1-bp (N and N-1).
   - Loci most likely to show  N-1 peaks: vWA, D3S1358, THO1
   - For mixture interpretation determine:
     1)    if all alleles are accounted for
     2)    at which loci are N-1 peaks detected
     3)    are there common alleles at the locus in the N-1 position
5. Alleles between 75 and 120 RFU will be interpreted with caution.

#### 1.24.6.2    Major/Minor Contributors
**A major contributor is present when:**

1. There is a distinct contrast in the peak height and/or RFU values between alleles considering all loci.
2. The largest allele's peak heights satisfy conditions of a single source sample considering all loci.
3. Not all loci may be resolvable into a major and minor component, however a partial profile of the major component at those loci that are resolvable can be interpreted and compared.
4. Once the major contributor alleles are accounted for the minor component alleles may be determined if peaks meet expected peak heights and peak height ratios. Reference Section 4.8.
5. A known individual may be limited to inclusion or exclusion as a possible contributor of the major component or the minor component of the mixture at the same loci.

A genotype frequency can be reported for the major and minor contributors provided these conditions exist, however, it may be limited by the number of alleles, the peak height of the alleles detected, and the complexity of the mixture.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

**1.24.6.3    Indistinguishable Mixtures**
**A mixture is indistinguishable when:**
1.  The presence of similar peak heights and/or overlapping alleles that cannot be assigned occur.
2.  Low quantities of DNA from either component may demonstrate stochastic effects.
3.  A known individual may be included or excluded as a possible contributor to the mixture.
4.  If one or more of the contributors to a mixture is known (e.g. victim and/or consensual), then the profile of the unknown contributor may be inferred by subtracting the contribution of the known contributor from the mixture profile.

Statistics on indistinguishable mixtures may be calculated using the power of exclusion.

**NOTE:** Likelihood ratios can be used in the event that the number of potential contributors is known

**1.24.6.4    Mixture Conclusions**

Major/minor mixtures may be reported using statements such as:
- "The mixed profile from Q1 is consistent with originating from K1 and K2." Or
- "K1 is included as a possible contributor of the major component of the mixed profile from Q1. K2 cannot be excluded as a contributor of the minor component of Q1."

Additional conclusion statements for sample mixtures include:
- "K1 cannot be excluded as a contributor of the DNA on Q1" or "K1 is included as a as a possible contributor of the DNA on Q1" or
- "The results for the minor contributor are inconclusive." Indicate minor alleles with () on the allele table.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.24 – STR DNA INTERPRETATION AND GUIDELINES Continued

### 1.24.7    STUTTER

Stutter is predominately a minor product peak four bp (N-4) shorter than the corresponding "true" allele peak (N). The following table values should be used as guidelines for expected (or highest expected) levels of stutter (measured as percent of N):

**PROFILER PLUS % STUTTER**

| D3S1358 | vWA | FGA | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---------|-----|-----|---------|--------|--------|--------|---------|--------|
| 11 | 12 | 12 | 13 | 11 | 14 | 10 | 11 | 13 |

**COFILER % STUTTER**

| D3S1358 | D16S539 | THO1 | TPOX | CSF1PO | D7S820 |
|---------|---------|------|------|--------|--------|
| 11 | 10 | 16 | 13 | 8 | 9 |

**IDENTIFILER % STUTTER**

| D3S1358 | vWA | FGA | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|---------|-----|-----|---------|--------|--------|--------|---------|--------|
| 10.7 | 12.6 | 14.7 | 8.2 | 9.4 | 17.0 | 6.8 | 8.0 | 8.2 |

| D2S1338 | D16S539 | THO1 | TPOX | CSF1PO | D19S433 |
|---------|---------|------|------|--------|---------|
| 11.1 | 10.4 | 5.1 | 4.8 | 9.2 | 13.3 |

For purposes of mixture interpretation, peaks in the N-4 position that exceed the expected percent stutter at a particular locus may be designated as a true allele.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.24 – STR DNA INTERPRETATION AND GUIDELINES Continued

### 1.24.8    HETEROZYGOTE PEAK HEIGHT RATIOS

For alleles from a heterozygote individual at a particular locus, heterozygote peak height ratios are determined by dividing the peak height of the allele with the lowest RFU value by the peak height of the allele with the largest RFU value and multiplying this value by 100 to obtain a percentage. Alleles with peak heights between 75 and 120 RFU should be interpreted with caution. The following table should be used as a guideline for these ratios:

Minimum Expected Heterozygote Peak Height Ratios for PROFILER PLUS

|                | D3S1358 | vWA | FGA | D8S1179 | D21S11 | D18S51 | D5S818 | D13S317 | D7S820 |
|----------------|---------|-----|-----|---------|--------|--------|--------|---------|--------|
| 120-300 RFU    | 60      | 60  | 55  | 60      | 60     | 55     | 60     | 60      | 60     |
| 300-1000 RFU   | 65      | 65  | 65  | 65      | 60     | 60     | 65     | 65      | 65     |
| Above 1000 RFU | 70      | 65  | 65  | 70      | 65     | 65     | 70     | 70      | 70     |

Minimum Expected Heterozygote Peak Height Ratios for COfiler

|                 | D3S1358 | D16S539 | THO1 | TPOX | CSF1PO | D7S820 |
|-----------------|---------|---------|------|------|--------|--------|
| 120-300 RFU     | 60      | 60      | 60   | 60   | 60     | 60     |
| 300-1000 RFU    | 65      | 65      | 65   | 60   | 60     | 65     |
| Above 1000 RFU  | 70      | 75      | 75   | 75   | 75     | 70     |

These guidelines can be used for allele assignment in mixture analysis. In general, the ratios presented in these tables are minimum expected peak height ratios. Peak height ratios between 75 and 120 RFU are anticipated to be lower.

Mean Expected Heterozygote Peak Height Ratios for IDENTIFILER

|          | D3S1358 | vWA  | FGA  | D8S1179 | D21S11  | D18S51  | D5S818  | D13S317 |
|----------|---------|------|------|---------|---------|---------|---------|---------|
| >200 RFU | 88      | 86   | 85   | 90      | 88      | 82      | 89      | 87      |
|          | D16S539 | THO1 | TPOX | CSF1PO  | D2S1338 | D7S820  | D19S433 |         |
| >200 RFU | 88      | 86   | 87   | 86      | 84      | 89      | 88      |         |

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.24 – STR DNA INTERPRETATION AND GUIDELINES
## Continued

### 1.24.9  DATA ANALYSIS GUIDELINES

The original analyst will interpret all peaks from the GeneScan data and classify them as:

- Allele peak (between 75 and 120 RFU interpreted with caution)
- Major peak (peaks with greater RFU in a mixed sample)
- Minor peak (peaks with lesser RFU in a mixed sample
- Stutter peak (N-4 peak within specified % of major peak)
- Pull-up peak (insufficient color subtraction seen when excess DNA present)
- Spike (electronic spike usually in multiple colors)
- Dye Blob (same size, one color, multiple samples)
- Non-specific spike (possible bubble or polymer crystal in one or multiple colors)
- Other (Artifacts)

All data may be transferred to an allele chart and the allele numbers assigned. The allele designations can also be checked against the Genotyper data. A chart of the allele calls may be made and placed in the folder.

Only a qualified DNA analyst, in accordance with the FWPDFSL DNA SOP, will conduct peer reviews.

The peer reviewer will check the items on the Peer Review form including:

- Chain of Custody documentation
- Lab numbers and item numbers documented
- Samples stored and logged
- Evidence descriptions
- Appropriate testing documented
- Lot numbers recorded
- Retention of cuttings documented on transmittal
- Controls documented
- Appropriate conclusions included
- DNA worksheets present
- Raw data, Genotyper and/or Gene Scan (allele designations, RFU, peak heights)
- Report
- Statistics

**NOTE:**  Neither written nor verbal results will be released prior to the peer review process.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.24 – STR DNA INTERPRETATION AND GUIDELINES Continued

### 1.24.10        OFF-SCALE DATA

If too much sample (input) DNA is added to the PCR reaction mixture, the fluorescence intensity from the PCR products may exceed the linear dynamic range for detection by the ABI Prism® 310 Genetic Analyzer.  This is referred to as "off-scale data".  Multicomponent analysis cannot be performed accurately on data that is 'off-scale'.   Off-scale data usually exhibit raised baselines and/or excessive "pull-up" of one or more colors under the off-scale peaks.  At 8,192 RFU, all pixels in the Spectrograph of the ABI Prism® 310 Genetic Analyzer CCD camera are excited

Off-scale data should not be used for quantitative/qualitative comparisons.

If off-scale results are obtained, the following options are available:

- Re-extract with smaller amount of evidence sample
- Re-amplify with smaller amount of extract
- Re-inject with decreased volume of input DNA
- Decrease injection time
- Dilute extract and re-quantify
- Dilute amplified product

It is acceptable to interpret the data if only the Amelogenin locus is off scale, as pull-up and stutter generally do not interfere with the interpretation of this locus.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

# SECTION 1.25    APPLICATION OF POPULATION FREQUENCY DATA

1. Population frequency calculations are performed using POPSTATS version 5.2. which utilizes a database generated by the FBI.

2. A random match probability (RMP) (or the probability of selecting a random individual from the population possessing a specified DNA profile) will be calculated for all single source profiles obtained from questioned evidence items for complete or partial profiles. For partial profiles, loci in which the typing is inconclusive are not included in the frequency calculation.  In the event of an exclusion, RMP does not have to be calculated.

3. The genotype frequencies calculated at each locus are multiplied together following the product rule.  The reciprocal of this number is reported as a RMP.

4. For single source samples or mixture samples with a known contributor (major/minor contributors), the Popstats Forensic Single Sample Case type is used.

- The locus frequency (*f*) and the STR multi-locus profile frequency (F) are calculated for each of the three major groups (Caucasians, African Americans, and Southwestern Hispanics) using methods recommended by the National Research Council Report (1996).

- For each homozygous locus:

  o $f = p^2 + p(1-p)\theta$

- where  p = allele frequency, $\theta = 0.01$

- $\theta$ is a correction factor applied to homozygotes which describes the degree of relationship of alleles within the subpopulation relative to the total population; also a substructure parameter for adjustment of allelic dependence.

- For each heterozygous locus:

  o $f = 2pq(1-\theta)$

  o where p and q are the frequencies of the observed allele.

- The STR multilocus profile frequency is calculated using the product rule:

  o $F = \Pi f$

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

o  where $f$ is the locus frequency and $\Pi$ indicates a product

5.   The minimum allele frequency for each population group is calculated as recommended by the National Research Council Report (1996), as 5/2N, Where N = the number of individuals in the database.

5.   For samples containing more than one questioned DNA source:

- If the mixture contains a definitive major and minor component, then the frequency of those loci may be calculated as from a single source.

- For indistinguishable mixtures, individuals may or may not be included or excluded and a combined genotype frequency may be determined using the mixture calculation in POPSTATS:

  - The allele frequency (P) for each allele in the mixed DNA profile for an individual locus is determined.
  - The individual allele frequencies are summed, then the value is squared:

  $$(P_1 + P_2 + \ldots\ldots\ P_N)^2 = P_{locus}^{\ 1}$$

  Where N = the number of alleles present, and $P_{locus}$ is the probability of an unrelated individual being a contributor to that mixture at that locus.

  - The value of $P_{locus}$ for each locus will be multiplied together to generate the probability of an unrelated individual in the population being a contributor to that mixture for all loci examined.

  $$P_{locus\ 1} \times P_{locus\ 2} \times \ldots P_{locus(n)} = P_{mixture}$$
  Where n = the number of loci analyzed and present in the mixture.

  - The percent of the population that can be excluded as a possible donor to the mixture of DNA in the sample is calculated as follows:

  $$100 \times (1 - P_{mixture})$$

6.  A source attribution statement based on an evidentiary profile's random match probability may be used based on the STR DNA profile data obtained and the circumstances of the case.  Under given circumstances, if the random match probability of an observed DNA profile is greater or equal to 1 in 300 billion, then one is 99.9% certain of not seeing this profile in a sample of 30 million unrelated people.   Example statement:

"In the absence of identical twins or close relatives, it can be concluded based on these probabilities and within reasonable scientific certainty, that Jane/John Doe is the source of the DNA on the evidence (Q1)"

*NOTE:  This statement can only be used if a probability of at least 1 in 300 billion is observed in all racial/ethnic categories.*

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

7.  Statistical information is not utilized regarding frequencies for fragments detected at the Amelogenin locus.

8.  For parentage cases, the Parentage (Paternity) Index (PI), the Probability of Exclusion (PE), and the Probability of Parentage (W) are calculated with the POPSTATS Parentage case type.  Although criminal paternity cases are generally not worked by the FWPDFSL, the statistical calculations can be utilized in missing people's cases.

9.  Based on the year 2000 Census Data (demographic distribution), the following represents the population distribution in the world, United States and Texas:

| Locations: | Population (number of people) |
|---|---|
| 1. World | 6,000,000,000 (approximate) |
| 2. United States | 281,429,906 |
| 3. Texas | 20,851,820 |
| 4. Tarrant County | 1,446,219 |
| 5. Fort Worth | 534,694 |

10. **Likelihood Ratio:**  It compares the probabilities of a given observation under two mutually exclusive hypotheses.  It is described by the following equation:

$$L = \frac{P(H \mid Cx)}{P(H \mid Cy)} \quad \text{or} \quad \frac{P(H \mid Cp)}{P(H \mid Cd)}$$

Where:

Cx is the first explanation (the alleles of the mixed DNA profile attributed to unknown contributors under explanation Cx or Cp), where  x/p = prosecution proposition or the number of unknown contributors under explanation Cx/Cp

Cy is the second explanation (the alleles of the mixed DNA profile attributed to unknown contributors under explanation Cy or Cd), where y/d = defense proposition or the number of unknown contributors under explanation Cy/Cd

$P(H \mid Cx)$ is the probability of the DNA profile (H) using explanation Cx/Cp

$P(H \mid Cy)$ is the probability of the DNA profile (H) using explanation Cy/Cd

**NOTE:**  Two major assumptions in likelihood computations are (1) The different hypotheses of the origin of the mixture assume a prescribed number of contributors in the mixture and (2) All individuals contributing alleles in the mixture are assumed to

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

be of the same population-origin, so that the same allele frequencies remain applicable to all computations.

## 11. **Combined Probability of Exclusion (CPE):**

$PE$ = 1 - $(P_1 + P_2 + \ldots P_N)^2$ , where N is the number of alleles present

In the presence of departure from Hardy Weinberg Equilibrium (HWE) $PE_N$ can be computed as:
$PE_N = 1 - [(P^2 + \theta P(1 - P)]$, where $P = P_1 + P_2 + \ldots P_N$ and $\theta = 0.01$

When multiple loci are typed, the Combined Probability of Exclusion can be computed as:

**CPE** $= 1 - (1 - PE_1) \times (1 - PE_2) \times \ldots \times (1 - PE_N)$

*Weir, Bruce. 1996. Genetic Data Analysis: Methods for Discrete Population Genetic Data. Massachusetts: Sinauer Associates, Inc. Publishers.*

*Evett, Ian W. and Bruce S Weir, 1998. Interpreting DNA Evidence: Statistical Genetics for Forensic Scientists. Massachusetts: Sinauer Associates, Inc. Publishers..*

*Centre of Forensic Sciences and the Northern Regional Laboratory: STR Multiplex Protocol, Section 8, Interpretation Guidelines*

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.26– REPORT WRITING

### 1.26.1  INFORMATION REFERENCED IN ALL STR DNA REPORTS:

- Date issued
- Laboratory case number
- Offense Number
- Offense
- Victim/Suspect (if known)
- Name of submitting agency
- Description of evidence received

**Note: Only document evidence not previously on the Serology report**

- Summary of testing results and conclusions
- Statistics, if applicable
- Signature and title of responsible analyst
- Description of DNA methodology
- Loci analyzed
- Disposition of evidence

### 1.26.2  GENERAL CATEGORIES OF TESTING CONCLUSIONS FOR SAMPLES UNDER COMPARISON

(1) Exclusion    The genetic information detected for the samples under comparison is different and could not have originated from a common source.

(2) Inclusion    The genetic information detected for the samples under comparison is consistent and the possibility of originating from a common source cannot be excluded.

(3) Inconclusive    Due to the amount of information present, an inclusion statement can not be issued regarding the comparison; however, in some instances, the results may be defined in terms of the ability or inability to exclude.

(4) Match    The genetic information detected for the samples under comparison is identical (at the loci tested and yielding results) and could have originated from a common source.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

# SECTION 1.26– REPORT WRITING Continued

### 1.26.3  DATA INCLUDED IN FOLDER

The following data will be included in the case folder:

- Extraction form
- Quantitation form
- Amplification form
- Gene Scan and/or Genotyper data for each sample
- Allele Table (optional)
- Allele Chart
- Report (See Sub-section 1.26.1: Information referenced in STR DNA Reports)

The original analyst will determine all possible allele calls and a peer reviewer will verify the allele calls.  Every effort will be made to come to a consensus should there be a disagreement between the analysts.   "Inconclusive" is a valid designation for questionable loci.  The Technical Leader will make the final decision in cases where no consensus can be arrived.

### 1.26.4  LABORATORY STATISTICS

Laboratory statistics are calculated in order to document the amount of cases received and completed.  Also, to document the types of testing which are performed on casework.  The parameters for STR DNA statistics are as follows:

- Extractions, Differential Extractions and Re-extractions – number of samples + controls
- Quantitation, Amplification and Re-amplifications – number of samples + controls
- 310 Runs, Re-injections, Re-denature – total number of injections
- Gene Scan – number of samples + controls
- Allelic Table/Chart – number of samples + controls
- Genotyper – number of samples + controls
- Analysis of Data – number of samples + controls
- Report – one per case + any supplemental report(s)
- Peer Review – one per case
- Other
- Total

**NOTE: Statistics should be entered into the Serology Logbook after peer review.**

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.26– REPORT WRITING Continued

### 1.26.5  STR DNA CONCLUSIONS
Although each case is unique, the following represents some examples of conclusions, which will generally be used in STR DNA reports:

- The following items (samples) were submitted for STR DNA analysis.
- K1  Known blood, buccal or hair from XXXX (item #)
- Q1  Sample XXXX (item #)
- Deoxyribonucleic Acid (DNA) was isolated and quantified from the above samples (items) and was amplified by Polymerase Chain Reaction (PCR).
- The samples were tested for the XXXX loci as indicated in the table (chart).
- XX = Female   • XY = Male
- INC = Inconclusive
- () = Faint or Minor Alleles
- NR = No Results
- NT = No Testing
- For STR DNA testing, samples with the same typings as the knowns can be stated as "consistent with" or "cannot be excluded" and/or "match".
- The victim (suspect) can be included as a potential contributor (donor) of the stain or DNA profile from the item.
- The victim (suspect) can be excluded as a potential contributor (donor) of the stain or DNA profile from the item.
- The victim (suspect) cannot be included as a potential contributor (donor) of the stain or DNA profile from the item.
- The victim (suspect) can be included as a potential contributor (donor) of the stain from the item but cannot be the sole contributor (donor)
- No conclusions can be made as to possible contributors.
- Due to the exclusion of John Doe (K2) as a potential contributor of the DNA sample, statistics were not calculated.
- The genetic profile generated from Q1 is consistent with a mixture from (at least) two/three/four individuals.  Neither Jane Doe (K1) nor John Doe (K2) can be excluded as potential contributors of this sample.
- The genetic profile generated from Q1 matched the profile of Jane/John Doe (K1).
- With reasonable scientific certainty, based on these probabilities, John Doe (K2), is the source of the DNA on item (Q1).
- A partial profile was generated from item Q1 and is consistent with the genetic profile generated from John Doe (K2).
- STR DNA profile(s) for item (Q1) have been entered into the Combined DNA Index System (CODIS).  The entered DNA profile(s) will be periodically searched for matches against the state and national DNA profiles of the convicted offender index and the casework index (for questioned or evidentiary samples).
- The observed mixture profile is 10-times more likely to occur under the scenario that it is a mixture of DNA from the victim and suspect as opposed to the scenario that it originated from a mixture of DNA of the victim and an unrelated unknown person.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.26– REPORT WRITING Continued

### 1.26.6  FINAL REPORTS

10.  Final reports will be typed on Forensic Science Laboratory letterhead with the City of Fort Worth logo.

11.  Include title of report on all pages—STR DNA, Addendum, or Supplemental. *Supplemental* refers to additional testing performed after the initial report has been signed.  If evidence is received and retained in the laboratory after the initial report was signed and sent but no additional testing was preformed, a supplemental report does not need to be generated.  However, the analyst will inform the detective or any other relevant party that this evidence is available for further testing.  All correspondence will be recorded on a pink sheet and retained with the case folder.  If a discrepancy is noted in a report, after its' issuance, an *Amended* report may be issued.

12.  Document the lab number, service number, suspect(s) name (if available) victim name, type of case, and the date.  The lab number is to appear on all pages of the report.  In the case of sexual assaults or activity involving a child use only the individual's initials not name.  Label pages '1 of X, 2 of X'.

13.  Address the report to the Criminal Investigation Division (i.e.-Crimes Against Children's Unit (CACU) or Homicide) if a Fort Worth case.  In the event of an outside agency use their name and division if known.  Include the Detective's name if possible on all reports.

14.  The chain of custody information, the Property Control Unit (PCU) invoice number, and the name of the person who submitted the evidence needs to appear on the final report and on the evidence inventory sheet.

15.  List the items with their number as described on the Evidence List.  If this is a STR DNA report there may not be any evidence to list as it already appeared on the serology report.  In this case the final report from DNA will state "No additional evidence".

16.  The analyst will state their results and conclusions. Multiple items with the same results may be combined.

17.  The analyst must sign the final report prior to release.  If the report contains multiple pages the analyst's signature and name will appear on the last page.

18.  For samples entered into CODIS, the following statement will be used: "The DNA profile generated from sample X (Q2) has been submitted to the **CO**mbined **D**NA **I**ndex **S**ystem (CODIS).  The submitted DNA profile will be periodically searched for matches against the state DNA profiles of the convicted offender index and the forensic index. Modifications to this statement can be made on a case-by-case basis.

*NOTE:  Neither written nor verbal results will be released prior to the peer review process.*

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.27 – LABORATORY WORK AREAS

### 1.27.1  DNA EXTRACTION AREA

This area is located in the main DNA laboratory and is physically separated from the PCR amplification room. Extraction and slot blot analysis of known and questioned samples will be performed in this area.

Dedicated equipment and supplies are present in the DNA extraction area AND MUST NOT LEAVE THIS AREA.

The extraction of known samples should be performed at a separate time and/or space from the extraction of evidentiary samples in order to minimize the potential for sample to sample contamination.

### 1.27.2  PCR SET-UP AREA

This area is in the DNA extraction lab. The Clean Spot is located here and is the site for the addition of reaction mix, primers and Taq (Master Mix) to amplification tubes. DNA will also be added to the tubes in the area, just to the side of the Clean Spot. The UV light should be turned on for 20 to 30 minutes after each use.

Dedicated equipment and supplies that are present in the PCR set-up area MUST NOT LEAVE THIS AREA.

### 1.27.3  DNA AMPLIFICATION AND TESTING AREA

The DNA amplification room is adjacent to the DNA extraction room. PCR amplification, analysis and storage of amplified DNA samples will be located in this area.  The analysis area has been designated by orange tape.  This area is considered a 'dirty area'.  PCR products are restricted to this area.

Dedicated equipment and supplies that are present in the DNA amplification area MUST NOT LEAVE THIS AREA. Waste disposal must leave this area in sealed containers to prevent the contamination of the DNA extraction area.

### 1.27.4  ANALYSIS AREA

The analysis of generated DNA data can be performed in two rooms: the amplification room or the computer room, which is located between the extraction and evidence examination areas. The analysis area has been designated by green tape. This area is considered a 'clean area' **NOTE:** No PCR product is allowed in this area (excluding amplified samples loaded onto the ABI Prism® 310 Genetic Analyzer)

**NOTE:** To avoid contamination, paperwork should be minimally transported between extraction and analysis areas.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

## SECTION 1.28 – CODIS (COMBINED DNA INDEX SYSTEM)

The 1994 DNA Identification Act established the FBI's Combined DNA Index System (CODIS), a national DNA database program.  The set of core STR loci required for participation in the National DNA Index System (NDIS) is as follows: D3S1358, vWA, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820, D16S539, THO1, TPOX and CSF1PO.  STR typing with a combination of the AmpF*l*STR Profiler Plus and COfiler PCR Amplification kits will satisfy this core loci requirement for CODIS entry.

Initially, the collection of DNA samples was primarily directed towards convicted sex offenders.  In 1999, the Texas 76th Legislature passed House Bill 1188 which expanded the collection of blood or other biological samples to include persons convicted of murder, aggravated assault, burglary of a habitation, or an offense or conviction of which registration as a sex offender is required.  In 2001-2002, this bill was expanded to include all felonies.

The purpose of the system is to create a national information repository where law enforcement professionals can share DNA information.  Law enforcement professionals can cross-reference their DNA information with that of other agencies around the country.  This 'cross-referencing' has the potential of producing DNA matches among previously unrelated cases.  Currently CODIS includes three levels:

1.  **N**ational **D**NA **I**ndex **S**ystem (NDIS): All 13 loci attempted and will accept specimen with data for 10 loci (not including Amelogenin) for searching.

2.  **S**tate **D**NA **I**ndex **S**ystem (SDIS):  Requires a minimum of 6 loci (not including Amelogenin) for searching.

3.  **L**ocal **D**NA **I**ndex **S**ystem (LDIS): Does not require a minimum number of loci for searching.

NDIS is maintained by the FBI.  Each state has one designated SDIS location.  Each law enforcement agency participating in the CODIS program maintains an LDIS database.  Local laboratories can create and maintain a database of their own DNA profiles.  This database is a storage area that contains specimen numbers, sizings and readings.  This part of CODIS, called LDAS, accepts RFLP and PCR data.  In 2003, CODIS will no longer accept RFLP data.  After entering data in LDAS, some of this data can then be transferred to LDIS.  Data is moved into LDIS so that it can be searched and eventually uploaded to SDIS.  Data is then moved into NDIS, assuming match and stringency criteria are met, by the state CODIS Administrator at the Texas Department of Public Safety in Austin, Texas (Dennis Loockerman).

Amelogenin is accepted at NDIS although not searched.  Texas does not upload Amelogenin to NDIS.

FWPD Forensic Science Laboratory
STR DNA SOP Manual
Effective Date: Dec 1, 2002 Version (02)

There is not a national or statewide requirement for standardization of naming specimens between labs as long as each lab can identify their own samples. However, the following abbreviations are recommended for use on all forensic profiles entered into the forensic database of CODIS:

- Single source forensic samples will begin with "FOR".

- Suspect samples will begin with "SUS".

- Mixed forensic samples will begin with "MFOR".

- The lab number and then the item number follow these abbreviations, i.e.- FOR0000444Q1, SUS0000444K1 OR MFOR0000444Q2.

- Outsourced cases: The previously mentioned nomenclature is to be used, however an "OS" will precede all abbreviations, i.e.- OSFOR0000444Q1, OSSUS0000444K1 OR OSMFOR0000444Q2

**The abbreviations are followed by the unique lab number and then the item number.**

It is a requirement to follow NDIS guidelines in order to obtain Federal financial support for the CODIS system.  All cases containing biological evidence should be evaluated for possible entry into CODIS.  All evidence should be fully characterized (or attempted) using COfiler and Profiler Plus for inclusion into CODIS.

The following rules should be applied to determine mixture suitability:

- A minimum requirement of 10 CODIS core STR loci with data will be applied to mixture profiles.

- A mixture profile from three or more contributors shall not be uploaded to LDIS OR SDIS. However, it may be added to LDAS.

Input to LDAS shall be performed immediately upon completion of a case. Uploads to SDIS shall be performed each Friday unless no new data has been entered or otherwise noted.  Uploads to NDIS are performed weekly by the State CODIS Administrator at the Texas DPS in Austin, TX.

DNA profiles will not be deleted from the LDIS index.  However, in certain instances (i.e. – expunctions) it is imperative that certain DNA profiles be removed from the uploading process.  In these cases, the DNA profile will simply be "unmarked" prior to uploading to the State Index.  This action will prevent the profile from being uploaded to the National Index.

**Under no circumstances are samples derived from victims (known or questioned) allowed into LDAS, LDIS, SDIS or NDIS.**