San Diego County Sheriff's Department                           Forensic Biology
Regional Crime Laboratory                          FB Technical Procedures Manual

## Table of Contents

**1    INTRODUCTION**

**2    EVIDENCE PROCEDURES**

**3    REAGENTS AND SUPPLIES**
- **3.1**    Reagents – Policies, Procedures, Protocols
  - 3.1.1    General Policies
  - 3.1.2    Procedure for Preparing Reagents
  - 3.1.3    DNA Critical Reagents
- **3.2**    Reagent Information Sheets
  - 3.2.1    Screening Reagents
    - 3.2.1.1    ABAcard p30
    - 3.2.1.2    α-Amylase Standard
    - 3.2.1.3    Anti-Serum or Serum for Species Testing
    - 3.2.1.4    AP Spot Test Reagent
    - 3.2.1.5    Christmas Tree Stain
    - 3.2.1.6    Coomassie Blue Stain and Destain
    - 3.2.1.7    DMAC
    - 3.2.1.8    Hemastix
    - 3.2.1.9    Hematrace
    - 3.2.1.10    3% Hydrogen Peroxide
    - 3.2.1.11    Iodine
    - 3.2.1.12    Kastle-Meyer Reagent
    - 3.2.1.13    Mercuric Chloride Reagent
    - 3.2.1.14    10% NaOH
    - 3.2.1.15    Phosphate Buffer
    - 3.2.1.16    Picric Acid
    - 3.2.1.17    RSID Saliva Kit
    - 3.2.1.18    0.85% Saline
    - 3.2.1.19    Zinc Chloride
  - 3.2.2    DNA Reagents
    - 3.2.2.1    Bovine Serum Albumin
    - 3.2.2.2    Deionized Formamide
    - 3.2.2.3    Digest Buffer
    - 3.2.2.4    DTT
    - 3.2.2.5    EDTA
    - 3.2.2.6    EZ1 DNA Investigator Kit
    - 3.2.2.7    GeneScan – 500 LIZ Internal Size Standard
    - 3.2.2.8    10X Genetic Analyzer Buffer with EDTA
    - 3.2.2.9    Glycogen Stock
    - 3.2.2.10    Identifiler Amplification Kit
    - 3.2.2.11    MTL Buffer
    - 3.2.2.12    5 M NaCl

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

3.2.2.13    Performance Optimized Polymer 4 (POP-4)
3.2.2.14    Phosphate Buffered Saline
3.2.2.15    Phenol:Chloroform:Isoamyl Alcohol
3.2.2.16    Proteinase K
3.2.2.17    20 % SDS
3.2.2.18    Spectral Calibration Standard DS-33
3.2.2.19    1 M Sodium Acetate
3.2.2.20    $TE^{-4}$
3.2.2.21    $TE^{-4}$/glycogen buffer
3.2.2.22    Tris-HCl, pH 7.5
3.2.2.23    Tris-HCl, pH 8.0
3.2.2.24    Quantifiler Human
3.2.2.25    Quantifiler Duo

4    METHODS
    4.1    Screening and Body Fluid Identification
        4.1.1    Introduction
        4.1.2    Hemastix
        4.1.3    Kastle-Meyer
        4.1.4    ABAcard HemaTrace
        4.1.5    Ouchterlony Double Diffusion
        4.1.6    Acid Phosphatase
        4.1.7    Sexual Assault Stain Sample Extraction
        4.1.8    Microscopic Sperm Identification – Stained
        4.1.9    P30 Detection by ABAcard P30 Test
        4.1.10   RSID (Rapid Stain ID) Saliva Test
        4.1.11   Detection of Amylase by Diffusion
        4.1.12   Detection of Urine
        4.1.13   Detection of Feces
    4.2    DNA Extraction and Purification
        4.2.1    DNA Sample Preparation
        4.2.2    DNA Extraction from Non-Sperm Containing Biological Samples
        4.2.3    DNA Extraction from Sperm Containing Biological Samples
        4.2.4    Purification of DNA by Organic Extraction and Ultrafiltration
        4.2.5    Purification of DNA Using EZ1 DNA Investigator Kit
        4.2.6    DNA concentration using Microcon 100
    4.3    DNA Quantitation
        4.3.1    Quantifiler Human Quantitation
        4.3.2    Quantifiler Duo Quantitation
    4.4    STR Analysis Procedures
        4.4.1    Introduction
        4.4.2    STR Amplification - Identifiler
        4.4.3    3130 Sample Preparation
        4.4.4    3130 Instrument Setup Processes

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

4.4.5    Performing a Spectral Calibration for the ABI 3130 Genetic Analyzer

4.4.6    3130 Capillary Electrophoresis

4.4.7    GeneMapper ID

**4.5    STR Interpretation Guidelines**

4.5.1    Introduction

4.5.2    Preliminary Evaluation of STR Data

4.5.3    Interpretation of STR Data

4.5.4    Conclusions

4.5.5    Statistical Calculations

**4.6    CODIS Procedures**

4.6.1    CODIS Overview

4.6.2    CODIS Security

4.6.3    CODIS Profile Development

4.6.4    CODIS Profile Entry

4.6.5    Additional CODIS Functions

4.6.6    CODIS Case Review


**5    INSTRUMENTS**


**6    CASE NOTES**


**7    REPORTS**

**7.1    Report Format**

**7.2    CODIS Profile Reporting**

**7.3    Review Process**


**8    QUALITY ASSURANCE**

**8.1    Quality Control (QC) of Critical Reagents**

8.1.1    QC of purchased and lab-prepared reagents

8.1.2    QC of AmpF/STR kits

8.1.3    QC of Quantifiler Human kits

8.1.4    QC of Quantifiler Duo kits

**8.2    Calibration and Maintenance of Equipment**

8.2.1    General Principles and Scheduling

8.2.2    Calibration of Single-Dose Pipettes

8.2.3    Temperature-Controlled Equipment Monitoring

8.2.4    Performance Verification of ABI Model 9700 Thermal Cycler

8.2.5    Scheduled Maintenance and Performance Verification of the ABI 7500 Sequence Detection System

8.2.6    Scheduled Maintenance of the Qiagen BioRobot EZ1 and EZ1 Advanced XL

8.2.7    Performance Verification of ABI 3130 Genetic Analyzer

**8.3    Routine Laboratory Maintenance and Cleaning**

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

8.3.1   Maintenance and Cleaning Schedules
8.3.2   Reusable Labware Washing Procedure
8.3.3   Centrifuge Cleaning Procedure
**8.4**   **Audit Process**
**8.5**   **Good Laboratory Practice**
**8.6**   **Proficiency Testing**
**8.7**   **Continuing Education**
**8.8**   **Testimony Monitoring**
**8.9**   **Incident Log of Potential Quality Issues**
**8.10**  **Verification of Compliance of Subcontracting DNA Analysis Labs**
**8.11**  **Corrective Action**
**8.12**  **Quality System Review**

**9**     **REFERENCES**

**10**    **APPENDIX**
**10.1**  **Appendix 1: Case Note Abbreviations**
**10.2**  **Appendix 2: Alternate Light Source**
**10.3**  **Appendix 3: Basic Microscope Setup**
**10.4**  **Appendix 4: Suggested Report Wording**
**10.5**  **Appendix 5: Summary of Instrument Maintenance**

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 1    INTRODUCTION:  OVERVIEW, SCOPE AND PURPOSE

The Forensic Biology section is responsible for analysis of evidence from crimes against persons and property, with the purpose of identifying and individualizing biological materials which may be part of that evidence.  Analysts assigned to the section conduct physical and chemical analysis; provide scientific support to law enforcement personnel regarding physical evidence, its collection, preservation and forensic value; and provide expert testimony in court.

The Crime Laboratory Quality Manual serves as the Forensic Biology section's quality manual as defined in the "Quality Assurance Standards for Forensic DNA Testing Laboratories" issued by the FBI director.  The quality manual elements listed in standard 3.1.1 of this document are discussed in the following sections of the Crime Laboratory Manual.

| Standard 3.1.1 subhead | Quality Manual /General Lab information | Section-specific information |
|---|---|---|
| (1)  goals and objectives | Section 1 | Section 1 |
| (2)  organization and management | Section 2 | N/A |
| (3)  personnel | Section 2* and Appendix B | Section 8.15 and Training Manual |
| (4)  facilities | Section 3 | N/A |
| (5)  evidence control | Section 5 | Section 2 |
| (6)  validation | Section 9 | N/A |
| (7)  analytical procedures | N/A | Section 4 |
| (8)  equipment calibration and maintenance | Section 9 | Sections 8 |
| (9)  reports | Section 6 | Section 7 |
| (10)  review | Section 6 | Section 7.3 |
| (11)  proficiency testing | Section 9 | Section 8.14 |
| (12)  corrective action | Section 9 | Section 8.19 |
| (13)  audits | Section 9 | Section 8.12 |
| (14)  safety | Section 10 | N/A |
| (15) outsourcing | N/A | Section 8.18 |

* job descriptions for all lab personnel, including minimum qualifications for each position, and resumes for each employee, are available from the Quality Assurance Manager

This manual documents the procedures used by the Forensic Biology section.  It is intended as a reference to the Standard Operating Procedures (SOP) in the section to allow analysts to select appropriate techniques for forensic analysis of biological

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

samples. Specifically required elements of a procedure include the words "shall", "must", or "will". Recommended elements include the words "should", "can", or "may".

Since not all forensic situations may be foreseen, changes may occasionally be made to these methods to accommodate a particular sample, subject to documentation of the change, and its rationale. Prior approval from the DNA Technical Manager is required and must be documented; if the DNA Technical Manager is unavailable their designee may provide approval.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 2    EVIDENCE PROCEDURES

Forensic Biology section staff will transfer, handle, store, and examine evidence, as well as document these procedures in accordance with the Crime Lab Manual (section 5) and Property and Evidence manual.  Practices specific to the section are described below.

Material generated as a function of analysis (such as sample cuttings, microscope slides, DNA extracts, and amplified DNA) is considered work product and not evidence.  Unless otherwise designated, storage and retention of work product is at the discretion of the analyst.

**Marking and packaging evidence:**

a)    All items or their proximal containers shall be marked with the examiner's initials, case number, item number, and date, when practical.  Outer packaging will always be marked with the same information.  When examination is complete, the item should be placed back into the original container, whenever possible, and sealed.  The examiner shall initial and date across the seal.

b)    Should items need to be repackaged, keep the original packaging with the item, and note that the item was repackaged.  The original bar-code tags shall be placed on the outside of the new packaging.

c)    In general, items of evidence produced by the Forensic Biology section will be marked and packaged according to the provisions of the Property and Evidence section's Evidence Manual.  Analysts producing new evidence items must complete property/evidence forms for the items, which shall be submitted to Property along with the items.  A copy of the form(s) shall be included in the case packet.

d)    Items of evidence produced by the Forensic Biology section can be bar-coded separately or included with other evidence from the same case.  The entire envelope can then be bar-coded as a DNA evidence pack.

e)    Any evidence produced by the Forensic Biology Section that is separately barcoded will be given an item number.

f)    Each separately barcoded derivative item shall be numbered in two-digit format; 1.01, 1.02, etc.

g)    Evidence items that are received together under a single item number, such as the contents of sexual assault exam kits, may be assigned

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

individual letter designations if they are not barcoded as derivative items; eg.1A, 1B, etc.

h)    Documentation of chain of custody for items inside a DNA evidence pack will be the responsibility of its creator.  Analyst's notes and reports shall include chain-of-custody information for all items inside DNA evidence packs.

i)    Containers used for processing evidence samples during analysis (centrifuge tubes, etc.) will be marked with identifying information consisting of, at a minimum, the sample's item number and the last four digits of the SDSO case number for the item. Containers used to store extracted and amplified DNA after analysis will be marked with a unique identifier with sufficient information to distinguish between all samples derived from the original evidence item (generally case number, item number, date, and initials).

**Preservation of evidence integrity in the laboratory**

Evidence checked out to section members shall be stored and examined only within the Forensic Biology section lab area or other secure areas in the Crime Lab facility. Evidence will not be stored or examined in offices or other generally accessible areas.

Only one evidence item shall be examined at a time.

All attempts shall be made to maintain the integrity of the evidence while in analysts' possession.  Analysts are responsible for selecting and maintaining appropriate storage conditions for evidence in their custody.

Evidence should be repackaged and resealed as soon as possible after examination. Unsealed evidence shall not be left unattended for extended periods of time.  Evidence that is left unsealed between shifts or for extended periods of time during shifts must be stored under individual control.  "Individual control" is established by storing evidence in a locked container or other enclosure, where access to the enclosure is limited solely to the person with custody of the evidence.  Facilities for individual control are available to all section members.

Extracted DNA from evidence samples shall be stored at 2°C to 8°C for short-term storage and at ~ -20°C for long-term storage. DNA extracts will be maintained in the forensic biology laboratory indefinitely.

Evidence from different locations or persons (i.e. suspect and victim, scene and suspect, evidence and reference, etc.) shall be examined at separate places and/or times.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Evidence examination and DNA extraction will be performed only in designated areas within the lab.  In cases where areas are used for both purposes, such as individual work stations, the processes shall be performed at different times, not simultaneously.

PCR setup will be performed only in the designated PCR setup areas.

Amplified DNA will be stored only in the designated amplification area.  Amplified DNA should be stored at 2°C to 8°C for short-term storage and at ~ -20°C for long-term storage.  Amplified DNA will be retained in long-term storage for up to three years, as space allows.  After this time it may be discarded as biohazardous material.  In certain cases, where only amplified DNA remains from the analysis of an item, the amplified DNA may be retained indefinitely.  It is the responsibility of the person placing the amplified DNA in long-term storage to indicate which samples require indefinite storage by marking the samples' containers accordingly.  These containers will be marked with a red or orange label with the word "Hold" written on it.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 3      REAGENTS AND SUPPLIES

### 3.1      Reagents – Policies, Procedures, Protocols

### 3.1.1  General Policies

#### Inventory

Reasonable quantities of chemicals and reagents will be maintained within the biology section.  These chemicals and reagents will be stored accordingly to safety guidelines found either on the chemical containers or in the lab's chemical hygiene plan (see Quality manual section 10).  Extra stock may be located in the chemical supply rooms.

#### Purchasing

A designated member of the section staff, usually the section lab assistant, will be responsible for purchasing chemicals and reagents.  Requests for chemical orders will be sent to the designated person, who will conduct purchases in accordance with lab chemical ordering procedures (see Quality manual section 4). On receipt, all chemicals and reagents will be labeled with the date of receipt, initials of the person receiving, and expiration date.  Purchased reagents that do not have a manufacturer expiration date will be labeled with an expiration date of five years after the reagent was received.  When opened, chemicals and reagents will be labeled with the date and initials of the person opening.  A commercial reagent log book will be maintained to keep track of lot numbers, dates received, dates opened, dates disposed or similar information.  Commercial reagents not used for casework are not required to be in this log book.  Any staff member who receives a commercial reagent for use in casework is responsible for making an entry in the log book documenting the receipt.

#### Disposal

Specific recommendations for chemical disposal are included in each reagent's information sheet.  Chemicals and reagents will be disposed of according to laboratory safety policy.

### 3.1.2  Procedure for preparing reagents

All regents shall be prepared as indicated on the reagent information sheet for that reagent.

Unless otherwise indicated, reagents shall be prepared from molecular biology grade or similar quality stock chemicals.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

The person preparing each reagent will make an entry on the reagent log sheet for that reagent.  The log sheet entry will include: the preparation date, the initials of the preparer, the amount prepared, any quality control documentation as specified in the reagent information sheet, and source information about each component of the reagent.  For purchased components, record the amount used, the manufacturer, and lot number.  For components which are themselves lab-prepared reagents, record the amount used and date of preparation.

The person preparing each reagent will be responsible for ensuring that the reagent is tested using any necessary quality control procedures, and for documenting those procedures accordingly, as described on the reagent information sheet or in FB manual section 8.1.

The person preparing each reagent will label it with the identity of the reagent, the dates of preparation and expiration, and the initials of the person preparing the reagent.  Unless otherwise specified, lab-prepared reagents will have an expiration date of one year from the date prepared or the earliest expiration date of individual reagent components, if less than one year.

Exceptions to the above policy are as follows:

- Secondary containers of water and alcohols do not have to be labeled with an expiration date, and do not need to be recorded on reagent log sheets.

- Batches of single-use reagents (spot tests, etc.) and single-use aliquots of previously prepared reagents may be labeled only with the identity of the reagent, and do not need to be recorded on reagent log sheets.

- Dates and preparer's initials are not necessary on any container of water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.1.3 DNA Critical Reagents

The performance of critical reagents used in DNA analysis will be tested and verified using known samples before they are used in casework, as described in FB manual section 8.1.  The following are considered critical reagents:

| | |
|---|---|
| Digest buffer | Proteinase K |
| DTT | Phenol/chloroform/isoamyl alcohol |
| TE$^{-4}$ Buffer | EZ1 DNA Investigator Kit |
| Buffer MTL | Quantifiler Human DNA Quantitation Kit |
| Identifiler PCR Kit | Quantifiler Duo DNA Quantification Kit |
| AmpliTaq Gold DNA Polymerase | Bovine Serum Albumin (BSA) |
| GeneScan-500 [LIZ] size standard | Deionized formamide |

Except during use, critical DNA reagents will be stored as specified in their reagent information sheets.  Brief departures from specified storage temperature ranges, as for freezer defrost cycles, are acceptable.

The lot numbers of the critical DNA reagents used in each case will be recorded in case notes.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2    Forensic Biology Section Reagent Information Sheet

### 3.2.1  Reagent Information Sheet for Screening Reagents

### 3.2.1.1        "OneStep" ABAcard® p30 Test Kit (Abacus Diagnostics #308322)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Perform quality control process on each lot of new kits before using in casework (see procedure in "Reliability Test" below).

**Use:**

Detection method for seminal protein p30.

**Reliability Test:**

1.      Using a reconstituted human semen standard (SERI item no. R563), prepare the following three dilutions as follows:
1:10,000 – 4ul stock + 796ul water,
1:100,000 – 50ul 1:10,000 + 450ul water,
1:1,000,000 – 50ul 1:100,000 + 450ul water.

2.      Test all three dilutions and a negative control sample (sterile DI water) using the ABAcard device. Wait the full 10 minutes. A positive reaction at the 1:1,000,000 dilution is dependent upon the p30 concentration of the known semen sample, as this dilution is at the lower range of detectability. Bands should be visible with the 1: 10,000 and 1: 100,000 dilution in both the test and control regions. If no test band is seen at 1:1,000,000, prepare a 1:500,000 and 1: 200,000 dilution as follows:
1:200,000 – 100ul 1:100,000 + 100ul water,
1:500,000 – 50ul 1:100,000 + 200ul water.
Test accordingly. No test band should be seen at the "T" location with the negative control (water). The control band should be visible for all samples tested.

3.      Prepare an entry in the ABAcard QC log.  Kit lots meeting the criteria above may then be considered suitable for use in forensic casework.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

**Storage and Stability:**

Store at room temperature.  Do not use in casework after manufacturer's expiration date.

**Disposal:**

Used test devices should be disposed as biohazard materials.  Unused devices can be treated as regular trash.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.2        α-Amylase Standard

**Safety Information:**

Use chemical hygiene and biohazard precautions when handling.

**Reagent Preparation:**

Reconstitute lyophilized human α-amylase standard (Sigma #A-0521, ~100 units, or equivalent) with distilled water according to manufacturer's instructions. Prepare 30 µL aliquots in microcentrifuge tubes.

**Use:**

As a standard for detection of amylase by diffusion (Section 4.1.11).

**Reliability Test:**

Prepare 1:10, 1:100, 1:200, and 1:400 dilutions of the initial reconstituted stock. Test the initial stock and each dilution for the presence of amylase with the diffusion method described in Section 4.1.11. All dilutions should produce visible clearing on the gel.  The 1:100 dilution will typically give a clearing diameter of 13-16 mm.

**Storage and Stability:**

Store dry stock and aliquots at ~ -20 degrees C.  Discard the unused portion of each aliquot after use. Do not use in casework analysis more than five years after reagent receipt date.  Reconstituted standard should not be used more than one year after preparation date.

**Disposal:**

Dispose of as biohazardous waste.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.3      Species Anti-Serum or Serum

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Reconstitute the serum or antiserum with sterile deionized water as per the manufacturer's instructions (Cappel products use 2 mL and SERI products use 1 mL).  Prepare 20 µL aliquots of antiserum, or 150 µL aliquots of serum, in sterile microcentrifuge tubes.

**Use:**

Detection method for animal proteins.

**Reliability Test:**

1.      For antisera, prepare 1:10, 1:50, and 1:100 dilutions of the serum that corresponds to the antiserum being tested.  Use Ouchterlony Double Diffusion method to determine the dilution that produces the sharpest precipitin band.

2.      Using the Ouchterlony method, test each new lot of serum or antiserum for reactivity to available species antisera/sera, including, bovine, cat, chicken, dog, human, and swine.  For new antisera, also include the host species serum.  If all the antisera/sera listed above are not available for QC testing, test all available sera against the new standards.

Cross-reactions should be noted on the quality control worksheet.  No cross-reactions, other than those specified by the manufacturer, are acceptable for antisera used in casework.

3.      Prepare a species serum or antiserum quality control form to document the results of these tests, and attach the appropriate Ouchterlony results. Lots of serum and antiserum meeting the criteria above may then be considered suitable for use in forensic casework.

**Storage and Stability:**

Store freeze-dried stocks and prepared aliquots at -15° to -25°C.  Thawed aliquots may be kept at 2° to 8°C for up to two weeks.  Do not thaw and refreeze aliquots. Do not use in casework analysis more than five years after reagent

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

receipt date.  For reconstituted serum, do not use for casework more than one year after preparation date.

**Disposal:**

These reagents may be flushed down the sink.



*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.4      AP Spot Test Reagent

**Safety Information:**

This reagent is composed of the following chemicals:
1) Dibasic Sodium Phosphate
2) Maleic Acid
3) Alpha Naphthyl Acid Phosphate
4) O-dianisidine, Tetrazotized

This reagent is hazardous.  Should be treated as having the following hazards:

1)  Carcinogen
2)  Irritant (eyes and skin)
3)  Corrosive

In powder form this reagent should be handled with the following:

1)  Gloves (nitrile gloves recommended)
2)  Mask
3)  Safety goggles
4)  Fume hood

First Aid Procedures:  If there is skin or eye contact, then rinse with copious amounts of water.  Do not inhale!  If inhaled then move to fresh air.

Spill Clean Up:  Wear safety equipment and carefully sweep up the powder avoiding raising dust particles.  Place the powder in a proper container for Hazardous Waste Disposal.  Liquid spill can be cleaned with water.

**Use:**

To test for the presence of semen

**Reagent Preparation:**

Dissolve 0.26 grams of AP Spot Test Reagent (SERI #R558) in 10 mL DI water.

**Reliability Test:**

The reagent shall be tested using known positive and negative controls on each day of use.  Run a positive control (known semen sample dried on cloth) and a negative control (unused swab or cloth) simultaneously.  Apply reagent.  A strong positive result is the appearance of a purplish color within 30 seconds.  A

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

negative result is no color development.  If a strong reaction is not obtained (3+ to 4+) within 30 seconds, make fresh reagent.  Or, if that does not work, obtain a fresh positive control sample.

## Procedure for Use:

For swab specimens:
1.    Moisten filter paper with DI water and squeeze around the swab.
2.    Add a few drops of test reagent to the filter paper.

For stains:
1.    Moisten a clean swab or filter paper.
2.    Apply to stained area, and add a few drops of test reagent to the swab or filter paper.

## Interpretation:

A strong positive result is the appearance of a purplish color within 30 seconds. A negative result is no color development. The highest concentration of acid phosphatase is found in seminal fluid, however other body fluids contain lower levels of this enzyme.

## Storage and Stability:

Store freeze-dried stocks at -15° to -25°C. Do not use in casework analysis after the manufacture's expiration date. Prepared reagent is subject to reuse (depending on the quantity made) and shall be tested daily.

## Disposal:

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.5    Christmas Tree Stain

**Safety Information:**

The Nuclear Fast Red solution is non-hazardous.  The Picroindigocarmine stain is a hazardous chemical.  Avoid inhaling the dust from all chemicals while preparing

**Use:**

To differentially visualize different cell types, including sperm cells and non-sperm cells.

**Reagent Preparation:**

Nuclear Fast Red (NFR) Stain
5.0 grams    Aluminum sulfate
100 mL       Hot sterile DI water
0.1 gram     Nuclear Fast Red
Dissolve the aluminum sulfate in the water and add the Nuclear Fast Red.  Stir and allow to cool, then filter through a cone of Whatman #4 paper.

Picroindigocarmine (PIC) Stain
4 grams      Picric acid
300 mL       Sterile DI water
1 gram       Indigo carmine
Add the picric acid to the water, cover, and allow to stand, giving a saturated solution.  Stir, and add the Indigo carmine.  Filter through a cone of Whatman #4 paper.

Note: Stains can also be purchased pre-prepared (SERI# R540)

**Storage and Stability:**

The stock can be stored refrigerated.  Working stains can be kept at room temperature or stored in the refrigerator. Do not use in casework analysis more than one year after preparation date.

Purchased stains will be stored per manufactures recommendations. Do not use in casework analysis more than five years after reagent receipt date or after the manufacturer's expiration date.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

**Disposal:**

Large unused quantities of PIC should be disposed of as hazardous waste. NFR can be flushed down the sink with water. NFR and PIC used in staining slides followed by washing steps can be flushed down the sink with water.



*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                          Forensic Biology
Regional Crime Laboratory                           FB Technical Procedures Manual

### 3.2.1.6      Coomassie Blue Stain and Destain

**Safety Information:**

Use hand and eye protection when using.  Large quantities should be handled in a fume hood.

**Use:**

To visualize proteins in precipitin tests.

**Reagent Preparation:**

Staining solution
0.2 g   Coomasie Blue
50 mL methanol
50 mL sterile DI water
10 mL acetic acid
Dissolve the Coomassie blue in methanol, then add remaining ingredients.

Destaining solution
50 mL methanol
50 mL sterile DI water
10 mL acetic acid
Combine together.

**Reliability Test:**

The standards on the gel plate should appear as blue lines on the species ID tests.

**Storage and Stability:**

Store at 2° – 8° C. Do not use prepared solution in casework analysis more than one year after preparation date.

**Disposal:**

These solutions are disposed of as hazardous waste.

Issued By: DNA Technical Manager                                    Revision 1
Issue Date: 5/12/2011                                           Page 22 of 272

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.7        DMAC Reagent (p-dimethylaminocinnamaldehyde)

**Safety Information:**

Wear gloves, glasses, and appropriate lab attire.  Use in a fume hood.  This chemical is an irritant.  Skin should be flushed with copious amounts of water if contact occurs.

**Reagent Preparation:**

Immediately prior to use, combine:
0.1 g DMAC
9 mL absolute ethanol
1 mL HCl

**Use:**

As a reagent in the detection of urine.

**Reliability Test:**

Known urine samples should produce positive results when tested for urea with this reagent.  Negative controls should produce negative results.  Known urine samples and negative controls are included in each urea test procedure.

**Storage and Stability:**

Prepare reagent fresh immediately before use.  Store stock DMAC at room temperature.  Do not use stock for casework analysis after manufacturer's suggested expiration date.

**Disposal:**

Dispose of as hazardous waste.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.8      Hemastix® reagent strips (Bayer #2190)

**Safety Information:**

Non-hazardous under OSHA guidelines.

**Reagent Preparation:**

None (prepared test strip).

**Use:**

As a presumptive test for blood.

**Reliability Test:**

Known blood samples should produce positive results when tested with Hemastix strips.  Negative controls should produce negative results.  Known blood samples and negative controls are tested before each use of Hemastix in casework analysis.

**Storage and Stability:**

Store at room temperature and out of direct sunlight.  Do not use in casework analysis after the manufacturer's suggested expiration date.

**Disposal:**

Dispose of as biohazard after use.  Unused strips can be discarded in regular trash.

Uncontrolled Document

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.9    OneStep ABAcard® HemaTrace® For the Forensic Identification of Human Blood (Abacus Diagnostics #708424)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Perform quality control process on each lot of new kits before using in casework (see procedure in "Reliability Test" below).

**Use:**

Detection method for human hemoglobin (hHb).

**Reliability Test:**

1.  Using a portion of the DNA Positive Extraction Control (PEC) prepare the following dilutions:
    stock – extract ~1/2cm2 cutting from the PEC in 400µl HemaTrace® buffer
    1:100 – 4µ stock + 396 µl HemaTrace buffer
    1:10,000 – 4µ 1:100 + 396 µl HemaTrace buffer
    1:100,000 – 50µ 1:10,000 + 450 µl HemaTrace buffer
    1:1,000,000 – 50µ 1:100,000 + 450 µl HemaTrace buffer

2.  Test the 1:10,000, 1:100,000, and 1:1,000,000 dilutions and a negative control sample (HemaTrace buffer) using the ABAcard HemaTrace device. Wait the full 10 minutes. A positive reaction at the 1:1,000,000 dilution is dependent upon the hHb concentration of the known blood sample, as this dilution is at the lower range of detectability. Bands should be visible with the 1:10,000 and 1:100,000 dilution in both the test and control regions. If no test band is seen at 1:1,000,000, prepare a 1:500,000 and 1:200,000 dilution as follows:
    1:200,000 – 100µl 1:100,000 + 100µl HemaTrace buffer
    1:500,000 – 50µl 1:100,000 + 200µl HemaTrace buffer
    Test accordingly. No test band should be seen at the "T" location with the negative control (HemaTrace buffer).  The control band should be visible for all samples tested.

3.  Prepare an entry in the ABAcard HemaTrace QC log.  Kit lots meeting the criteria above may then be considered suitable for use in forensic casework.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

**Storage and Stability:**

> Store at room temperature.  Do not use in casework after manufacturer's expiration date.

**Disposal:**

> Used test devices should be disposed as biohazard materials.  Unused devices can be treated as regular trash.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.10      3% Hydrogen Peroxide

**Safety Information:**

Hydrogen peroxide is an oxidizer, a corrosive, and may cause burns.  Use with appropriate skin and eye protection.

**Reagent Preparation:**

Aliquot if necessary.

**Use:**

As a part of the Kastle-Meyer test for blood.

**Reliability Test:**

The reagent shall be tested on each day of use.  A known blood sample can be used as a positive control.  A negative control will be run simultaneously.

**Storage and Stability:**

Store at 2° to 8°C.  Do not use in casework analysis after manufacturer's suggested expiration date.

**Disposal:**

Dilute with water and flush down the sink.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.11      Iodine Solution

**Safety Information:**

Wear gloves, glasses and suitable lab attire.  This chemical is highly toxic.

**Reagent Preparation:**

Dilute stock iodine solution (SERI #R512 or equivalent) 1:100 with distilled water.

**Use:**

As a starch stain to determine the presence of amylase activity.

**Reliability Test:**

Known saliva samples and α-amylase standards should produce positive results for amylase when development of amylase diffusion assays is conducted with this reagent.  Negative controls should produce negative results.  Amylase standards and negative controls are included in each amylase diffusion assay.

**Storage and Stability:**

Prepare dilution immediately before use.  Store stock solution at 4°C.  This chemical is light sensitive and should be stored in an amber or opaque container. Do not use in casework analysis more than five years after reagent receipt date.

**Disposal:**

Dispose of unused stock as hazardous waste.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.12    Kastle-Meyer Reagent

**Safety Information:**

The chemical phenolphthalein in powder form is a carcinogen.  Handle with gloves, safety glasses and in a fume hood.

This colorless solution should be stored under refrigeration over fresh granular zinc to keep it in reduced form.  In contact with atmospheric oxygen and limited amounts of water, zinc dust will generate heat, and may spontaneously combust if allowed to dry.  When the reduced Kastle Meyer stock is depleted, cover the zinc in the bottom of the bottle completely with a solution of potassium hydroxide in distilled water (25 g KOH/100 ml $dH_2O$) and dispose of properly in hazardous waste.  If the Kastle Meyer stock is expired then properly dispose in hazardous waste.  Store the metal dry, and keep residues thoroughly wet until disposal.

**Use:**

As a presumptive test for blood.

**Reagent Preparation:**

Stock Solution
  2 g     phenolpthalein
 20 g     potassium hydroxide
100 mLsterile DI water
 20 g     powdered zinc
Boil gently (reflux) until colorless (2-3) hours.
Refluxing apparatus:
Kimax condenser
1 L single-neck round-bottom flask
Heating mantle with power controller
Ring stand
Tubing for condenser inlet and outlet

Working dilution (1:5 dilution of the stock)
2 mL   stock solution
8 mL   ethanol

Keep working dilutions in amber bottles in the refrigerator when not in use. Do not use in casework analysis more than one year after preparation date.

**Reliability Test:**

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

The reagent shall be tested on each day of use.  A known blood sample can be used as a positive control.  A negative control will be run simultaneously.  A positive test is the appearance of a bright pink color.  A clean swab or piece of filter paper can be used as a negative control.  A negative test is the lack of a bright pink color.

**Storage and Stability:**

Store refrigerated in an amber bottle over excess zinc to keep the phenolpthalein in the reduced state. Do not use in casework analysis more than one year after preparation date.

**Disposal**

Due to the presence of a metal, this solution must be disposed of as hazardous waste.

Uncontrolled Document

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

### 3.2.1.13    Mercuric Chloride Reagent

**Safety Information:**

POISON! DANGER!  Mercuric Chloride is toxic by contact, ingestion, or inhalation.  Prepare and use reagent in a fume hood.  Use eye, skin, and respiratory protection.

**Reagent Preparation:**

Prepare saturated solution in reagent ethanol (~10% mercuric chloride is a saturated solution).

**Use:**

As a color test reagent for feces identification.

**Reliability Test:**

Tested as part of urobilinogen method reliability test.

**Storage and Stability:**

Prepare fresh before each use. Do not use stock in casework analysis more than five years after reagent receipt date.

**Disposal:**

Dispose of as hazardous waste.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.14    10% NaOH (aqueous solution)

**Safety Information:**

Use gloves, safety glasses and wear appropriate lab attire.  NaOH can cause severe burns and is harmful if swallowed.

**Reagent Preparation:**

None (prepared stock solution).

**Use:**

As a reagent in the detection of urine.

**Reliability Test:**

Known urine samples should produce positive results when tested for creatinine using this reagent in conjunction with picric acid.  Negative controls should produce negative results.  Known urine samples and negative controls are included in each creatinine test procedure.

**Storage and Stability:**

Store at room temperature. Do not use in casework analysis more than one year after preparation date.

**Disposal:**

Neutralize to pH 6-9 and flush down the drain with copious amounts of water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.15    Phosphate Buffer (.1M, pH 6.9)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Reconstitute powdered buffer mix (SERI #B116 or equivalent) with distilled water according to manufacturer's instructions.

**Use:**

As a gel buffer for amylase diffusion gels.

**Reliability Test:**

Known saliva samples should produce positive results for amylase on gels prepared with this reagent.  Negative controls should produce negative results.  Known saliva samples and negative controls are included with each amylase diffusion test.

**Storage and Stability:**

Store powdered mix at room temperature.  Store reconstituted buffer at 2 to 8°C.  Do not use in casework analysis more than one year after preparation date.

**Disposal:**

Reconstituted buffer may be flushed down the drain with copious amounts of water.  Any solids should be disposed of as hazardous waste.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                                    Forensic Biology
Regional Crime Laboratory                                    FB Technical Procedures Manual

### 3.2.1.16    Picric Acid, saturated aqueous solution

**Safety Information:**

Use gloves, safety glasses and wear appropriate lab attire when using this product.  Normal room ventilation is adequate.  This chemical may cause an allergic skin rash if contact occurs.

**Reagent Preparation:**

No preparation is necessary.

**Use:**

To test for the presence of creatinine.

**Reliability Test:**

Concentrated known urine should produce a positive result when tested for creatinine using this reagent.  Negative controls should produce negative results. Known urine samples and negative controls are tested concurrently with each evidentiary test for creatinine.

**Storage and Stability:**

Store at room temperature. Do not use in casework analysis more than five years after reagent receipt date or after the manufacturer's expiration date.

**Disposal:**

Dispose of as hazardous chemical waste.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.17    **RSID Saliva test kit** (Independent Forensics)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Perform quality control process on each lot of new kits before using in casework (see procedure in "Reliability Test" below).

**Use:**

Detection method for human salivary α-amylase (saliva).

**Reliability Test:**

1.    Prepare a sterile cotton swab with fresh human saliva.  Prepare a second swab with distilled water.  Allow both swabs to dry for ~ 1 hour at room temperature.

2.    Perform a RSID test on both the swabs according to the protocol in section 4.1.10.  Dilute the extract of the human saliva 1:5, 1:25, 1:125. The saliva swab should give a positive result within 10 minutes.  Record the highest dilution that obtained a positive result.  The dilution of 1:25 is the minimal passing dilution required to pass QC.  The water swab should give a valid negative result (control band visible).

Prepare an entry in the RSID Saliva kit QC log.  Kit lots meeting the criteria above may then be considered suitable for use in forensic casework.

RSID extraction buffer can also be incorporated into the DNA QC process.

**Storage and Stability:**

Store the RSID-Saliva cassettes at room temperature.  Store RSID-Saliva Extraction and Running Buffers at ~4° C.  Do not use in casework after manufacturer's expiration date.

**Disposal:**

Used test devices should be disposed as biohazard materials.  Unused devices can be treated as regular trash.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.18     0.85% Saline (Fisher #23-312-651 or equivalent)

**Safety Information:**

May cause eye irritation.  Use standard chemical hygiene procedures.

**Reagent Preparation:**

None (prepared stock solution).

**Use:**

Gel buffer for the Ouchterlony diffusion procedure (Section 4.1.5).

**Reliability Test:**

Known species sera and their corresponding antisera should produce precipitin bands in gels prepared with this reagent.  Negative controls should produce negative results.  Appropriate species standards and negative controls are included with each Ouchterlony test.

**Storage and Stability:**

Store in a dry environment at room temperature.  Do not use for casework analysis after manufacturer's suggested expiration date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.1.19    Zinc Chloride Reagent

**Safety Information:**

DANGER!  Causes burns.  Prepare and use reagent in a fume hood.  Use eye, skin, and respiratory protection.

**Reagent Preparation:**

Prepare saturated solution in reagent ethanol.

**Use:**

As a color test reagent for feces identification.

**Reliability Test:**

Tested as part of urobilinogen method reliability test.

**Storage and Stability:**

Prepare fresh before each use. Do not use in casework analysis more than five years after reagent receipt date.

**Disposal:**

Dispose of as hazardous waste.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2  Reagent Information Sheets for DNA Reagents

### 3.2.2.1       **Bovine Serum Albumin** – 3.2 mg/mL (5 mL)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Dissolve powdered BSA in appropriate amount of sterile distilled water (ultra pure) to make a 3.2 mg/ml concentration.

Dispense 50 µL aliquots into sterile 0.5 mL tubes.

**Use:**

Chemical used in STR amplification of inhibited or difficult samples.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store stock BSA powder at ~2-8 °C.  Liquid aliquots should be stored at ~ -20°C. Do not use in casework analysis after the manufacturer's expiration date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.2    Deionized Formamide

**Safety Information:**

WARNING!  CHEMICAL HAZARD!  Formamide is an irritant and a teratogen.  Avoid skin contact and inhalation.  Use in a well-ventilated area.  Wear lab coat, gloves and protective eyewear when handling.

**Reagent Preparation:**

Prepare 0.5 mL aliquots in 1.5 mL microcentrifuge tubes.  Do not prepare aliquots except from freshly opened bottles.

**Use:**

As a component of the sample loading mixture used in capillary electrophoresis analysis of amplified DNA.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store unopened bottles and aliquots at -15° to -25° C. in the amplified DNA area.  Do not use in casework analysis more than five years after reagent receipt date.

**Disposal:**

Dispose of as hazardous waste.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.3    **Digest Buffer** – 10mM Tris-HCL pH 7.5, 10 mM EDTA, 50 mM NaCl, 2% SDS (1L)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Combine:
| | |
|---|---|
| 10 mL | 1M Tris-HCl, pH 7.5 |
| 20 mL | 0.5M EDTA |
| 10 mL | 5M NaCl |
| 100 mL | 20% SDS (w/v) |
| 860 mL | Sterile DI water (Ultra Pure) |

Either:
1. Sterilize by autoclaving.  In this case, the SDS must be added as a sterile solution after autoclaving.
Or
2. Use previously autoclaved solutions, sterile DI water (Ultra pure), and aliquot into sterile bottles (150 ml volume).

**Use:**

Cell lysis buffer in DNA extraction procedures.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at room temperature. Dispose if solution becomes cloudy, or if precipitate is noted. Do not use in casework analysis more than one year after preparation date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.4      DTT – 1 M Dithiothreitol, 10mM Sodium Acetate, pH 5.2 (5 ml)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Dissolve:
0.77 g dithiothreitol (Gibco #15508-013 or equivalent) in 5 mL sterile DI water (ultra pure).
Add:
50 $\mu$L 1 M sterile sodium acetate pH 5.2
Dispense100 $\mu$L aliquots into sterile 0.5 mL PP tubes.

**Use:**

Used in the cell lysis buffer for hair and the sperm component of DNA differential extraction. DTT reduces disulfide bonds. This action is critical to dissolve the cell wall of sperm cells and may assist in the lysis of other difficult samples.

**Reliability test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at –20° C. Do not use in casework analysis more than one year after preparation date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.5     0.5 M EDTA, pH 8.0 (1 L)
(purchased stock solution - BRL  #15575-020)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Purchased stock solution
Aliquot into sterile bottles if necessary.

To prepare stock solution:
Slowly add:
186.1 g disodium ethylenediamine tetraacetate·2H2O
800 mL DI water.
Stir vigorously on a magnetic stirrer.
Adjust to pH 8.0 by adding NaOH pellets (approximately 20 g).
Adjust final volume to 1 liter with sterile DI water.
NOTE: EDTA will not go into solution without pH adjustment.
Aliquot and sterilize by autoclaving, or aliquot into sterile bottles.

**Use:**

Stock solution for preparation of DNA reagents.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC
procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at room temperature. Discard if solution becomes cloudy or precipitate is
noted. Do not use in casework analysis more than one year after preparation
date.  If stock is purchased, do not use for casework after manufacturer's
expiration date or five years from the date it was received.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.7        **EZ1 DNA Investigator Kit** (48) (QIAGEN #952034 or equivalent)

**Safety Information:**

Buffers in the reagent cartridges contain guanidine hydrochloride/guanidine thiocyanate, which can form highly reactive compounds when combined with bleach.  DO NOT add bleach or acids directly to sample-preparation waste.  DO NOT clean up spilled buffers with bleach.  If buffers combined with biohazardous material is spilled, clean first with laboratory detergent solution, then bleach.

**Reagent Preparation:**

None

**Use:**

For purification of DNA from digested samples.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FM manual section 8.1).

**Storage and Stability:**

Store kit at room temperature.  Do not use in casework analysis after the manufacturers expiration date.

**Disposal:**

Dispose of unused reagent cartridges in biohazardous waste.  Unused tips and other kit components can be disposed of in regular trash.

Uncontrolled Document

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.7    GeneScan®-500 [LIZ] Internal Lane Size Standard Kit (Applied Biosystems #4322682)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Kit contains:
GeneScan®-500 internal lane size standard (2 X 200 μL)

On receipt, store as indicated below.

**Use:**

As an internal lane size standard for capillary electrophoresis analysis of DNA amplified with "Identifiler" reagents.

**Reliability Test:**

The quality of these reagents will be verified by including them in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at 2° to 8°C in the amplified DNA area. Do not use in casework analysis more than five years after reagent receipt date.

**Disposal:**

Discard in regular trash.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.8      10X Genetic Analyzer Buffer with EDTA (Applied Biosystems #402824)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Stock solution: none.  For working solution, prepare 1X dilution as described in Section 4.3.4.

**Use:**

As an electrophoresis buffer for capillary electrophoresis analysis of amplified DNA.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at 2° to 8°C in the amplified DNA area. Do not use in casework analysis more than five years after reagent receipt date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.9 **Glycogen stock**–20 mg/mL glycogen in double distilled sterile water (Purchased stock solution – Roche Diagnostics #901-393 or equivalent)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Purchased stock solution.

**Use:**

Stock solution for preparation of DNA reagents.  Thaw prior to use.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store frozen at -20°C.  Do not use in casework analysis after manufacturer's expiration date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                          Forensic Biology
Regional Crime Laboratory                          FB Technical Procedures Manual

### 3.2.2.10    AmpFlSTR® Identifiler™ PCR Amplification Kit
(Applied Biosystems #432288)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

The kit contains the following components:
AmpFlSTR® PCR Reaction Mix (2 X 1.1 mL)
AmpFlSTR® Identifiler™ Primer Set (1.1 mL)
AmpliTaq Gold® DNA Polymerase (2 X 50 µL)
AmpFlSTR® Control DNA 9947A (0.3 mL)
AmpFlSTR® Identifiler™ Allelic Ladder (50 µL)
Upon receiving a kit, open it and store the components as described below.

**Use:**

To amplify DNA at the fifteen "Identifiler" STR loci and the amelogenin locus.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC
procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store all kit components EXCEPT AmpliTaq Gold DNA Polymerase and allelic
ladder at 2° to 8°C.  Store AmpliTaq Gold DNA Polymerase at -15° to -25° C.
Store allelic ladder in the amplified DNA area, and other components in the main
lab area.  Do not use kit components for casework after manufacturer's
expiration dates.

Store allelic ladder at -15° to -25° C until opened, and at 2° to 8°C thereafter.
Allelic ladder should not be used more than six months after it is opened.  If a
bottle of allelic ladder is opened more than six months before the manufacturer's
expiration date, change the expiration date on the bottle to six months after the
open date.

**Disposal:**

Kit components can be discarded in regular trash.

---

Issued By: DNA Technical Manager                          Revision 1
Issue Date: 5/12/2011                          Page 47 of 272

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

### 3.2.2.11    MTL Buffer
(QIAGEN #1023430 or equivalent)

**Safety Information:**

Contains guanidine thiocyanate, which can form highly reactive compounds when combined with bleach.  DO NOT add bleach or acids directly to sample-preparation waste.  DO NOT clean up spilled buffer with bleach.  If buffer combined with biohazardous material is spilled, clean first with laboratory detergent solution, then bleach.

**Reagent Preparation:**

None

**Use:**

For use in conjunction with the EZ1 DNA Investigator Kit for purification of DNA from digested samples (FB manual section 4.2.5).  Do not aliquot reagent directly from stock bottles.  Carefully pour the necessary amount into a sterile disposable tube, then pipette aliquots from the tube.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at room temperature.  Do not use in casework analysis more than five years after receipt date.

**Disposal:**

Dispose of unused buffer as hazardous waste.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                          Forensic Biology
Regional Crime Laboratory                          FB Technical Procedures Manual

### 3.2.2.12      5 M NaCl (1 L)
(purchased stock solution – Sigma #S-5150 or equivalent)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Purchased stock solution
Aliquot into sterile bottles if necessary.

To prepare stock solution:
Dissolve:
292.2 g NaCl
800 mL DI water
Adjust final volume to 1 liter.
Aliquot and sterilize by autoclaving.

**Use:**

Stock solution.

**Reliability Test:**

The quality of this reagent will not be verified by itself.  However, it will be
verified as a component in other solutions which will be included in the QC
procedure (see FB manual section 8.1).

**Storage and Stability:**

Store at room temperature. Discard if solution becomes cloudy or if precipitate is
noted. Do not use in casework analysis more than one year after preparation
date.  Purchased stock solution should not be used in casework after the
manufacturer's expiration date.

**Disposal:**

This reagent can be poured down the sink.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.13    3130 Performance Optimized Polymer 4 (POP-4) (Applied Biosystems #4352755)

**Safety Information:**

This reagent contains organic acid and alicyclic amine components and is listed as an irritant.  Use skin and eye protection when handling.  Avoid prolonged exposure to vapor.

**Reagent Preparation:**

None.

**Use:**

As an electrophoresis medium for capillary electrophoresis analysis of amplified DNA.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at 2° to 8°C in the amplified DNA area.  Do not use for casework after manufacturer's expiration date.

**Disposal:**

Dried polymer may be disposed of in regular trash.  Dispose of liquid polymer as hazardous waste.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.14    Phosphate Buffered Saline (PBS), pH 7.4

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Dissolve 1 tablet of PBS concentrate (SERI #B117) in 200 mL of sterile DI water in a sterile bottle.

Alternatively, PBS solution can be purchased.

**Use:**

Buffer or wash solution for cells during a differential lysis procedure.

**Reliability test:**

A known semen sample prepared with this reagent should give predicted typing results.  A reagent blank prepared with this reagent should give no typing results.

**Storage and Stability:**

Store the solution in a stoppered bottle in the refrigerator.  If solution is purchased, store as manufacture recommends. Do not use in casework analysis more than one year after preparation date.  Purchased reagent should not be used after the manufacturer's expiration date.

**Disposal:**

This solution can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.15    Phenol:Chloroform:Isoamyl alcohol 25:24:1, saturated with pH 8.0 buffer (Fisher #BP17521 or equivalent)

**Safety Information:**

Phenol, chloroform, and isoamyl alcohol are organic solvents and toxic by contact or inhalation.  Use only in a fume hood.  Wear eye protection, and use appropriate personal protection equipment.

**Reagent Preparation:**

If the reagent comes with saturating buffer supplied separately, add the buffer to the reagent bottle and swirl to mix.  Verify pH for each new lot of reagent as follows:
Pour approximately 1 mL reagent into a 10X75 or larger test tube.
Add an approximately equal volume of sterile DI water and vortex briefly.
Test the pH of the upper aqueous phase using a pH indicator strip (EM Science #9590 or similar).  The pH should be 8±1.  Lots of reagent with pH outside this range shall not be used in casework.  Record the pH on the reagent preparation worksheet.

**Use:**

To purify DNA from other cellular components in organic DNA extraction procedures.

**Reliability test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at 2 – 8 °C.  Do not use in casework after manufacturer's expiration date, or more than one year after receipt if no manufacturer's date is provided.  Do not use if solution becomes discolored. This may indicate a pH shift.

**Disposal:**

Phenol:chloroform:isoamyl alcohol must be disposed of as hazardous waste.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.16    Proteinase K – 10 mg/mL, (10 mL)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Dissolve 100 mg Proteinase K (Gibco #25530-015 or equivalent) in 10 mL sterile DI water (ultra pure).  If preparing more than 10 mL of solution as a single lot, add the appropriate amount of water to each bottle of the proteinase K, and then combined before aliquoting out.
Dispense 200 µL aliquots into sterile 0.5 mL PP tubes.

**Use:**

Used in cell lysis buffer for DNA extraction procedures.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at –20°C. Do not use in casework analysis more than one year after preparation date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.17    20% (w/v) SDS – Sodium Dodecyl Sulfate
(purchased stock solution – Amresco #0837 or equivalent)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Purchased stock solution:
Warm to resolubilize if necessary. Aliquot into sterile bottles if necessary.

**Use:**

Stock solution in preparation of DNA reagents.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at room temperature. If SDS precipitates out of solution due to cool ambient temperature, the solution can be gently reheated to resolublize. Do not use in casework analysis more than five year after the date received or after the manufacturers expiration date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.18      Spectral Calibration Standard Set DS-33
(Applied Biosystems #4345833)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

None.

**Use:**

As standards in the preparation of spectral files for use with the ABI 3130 genetic analyzer, for the five-dye (DS-33) analysis (see FB manual section 4.3.5).

**Reliability Test:**

In the procedure for preparing a spectral calibration (see FB manual section 4.3.5), standard  should show a pattern of peaks, one peak for each color.

**Storage and Stability:**

Store at 2° to 8°C in the amplified DNA area. Do not use in casework analysis more than five years after reagent receipt date.

**Disposal:**

Set components can be discarded in regular trash.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.19    **1 M Sodium Acetate**, pH 5.2 (1 L)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Dissolve:
136 g $CH_3COONa \cdot 3H_2O$
800 mL sterile DI water
Adjust to pH 5.2 by adding glacial acetic acid (approximately 20 mL).
Adjust the final volume to 1000 mL with sterile DI water.
Aliquot and sterilize by autoclaving.

Alternatively, this reagent can be purchased.

**Use:**

Stock solution for preparation of DNA reagents. Used in preparation of DTT reagent.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents as a component of DTT (see FB manual section 8.1).

**Storage and Stability:**

Store at room temperature. Discard if solution becomes cloudy of if precipitate is noted. Do not use in casework analysis more than one year after preparation date.  For purchased solution, do not use in casework analysis more than five years after received date or the manufacturers expiration date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.20    TE$^{-4}$ – 10 mM Tris-HCl, 0.1 mM EDTA (1 L)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Add:
10 mL of 1 M Tris-HCl, pH 8.0
200 µL 0.5 M EDTA
990 mL sterile DI water (ultra pure).

Aliquot and sterilize by autoclaving.

**Use:**

Buffer for DNA extraction, dilution, and storage.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at room temperature. Discard if solution becomes cloudy or if precipitate is noted. Do not use in casework analysis more than one year after preparation date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

**3.2.2.21      TE$^{-4}$/glycogen buffer**– 10 mM Tris-HCl, 0.1 mM EDTA (1 L), 20 µg/mL glycogen

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Combine 9,990 µL TE$^{-4}$ buffer and 10 µL 20 µg/mL glycogen reagent.

**Use:**

Buffer for qPCR human DNA quantitation standard storage.

**Reliability Test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at room temperature. Do not use in casework analysis more than one year after preparation date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department  
Regional Crime Laboratory

Forensic Biology  
FB Technical Procedures Manual

### 3.2.2.22    Tris-HCl – 1 M, pH 7.5 (1 L)
(purchased stock solution – BRL #15567-027 or equivalent)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

For purchased solution:  
Aliquot into sterile bottles if necessary.

To prepare:  
Dissolve:  
121.1 g Tris base  
800 mL sterile DI water  
Adjust to pH 7.5 by adding concentrated HCl (approximately 65 mL).  
Adjust final volume to 1 L with sterile DI water.  
Aliquot and sterilize by autoclaving.

**Use:**

Stock solution for DNA reagent preparation.

**Reliability Test:**

The quality of this reagent (as a component of a DNA reagent) will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at room temperature. Do not use in casework analysis more than one year after preparation date.  For purchased solution, do not use in casework analysis more than five years after received date or the manufacturers expiration date.

**Disposal:**

This reagent can be flushed down the sink with water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

### 3.2.2.23   Tris-HCl – 1 M, pH 8.0 (1 L)
(purchased stock solution – BRL #15568-025 or equivalent)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

For purchased solution:
Aliquot into sterile bottles if necessary.

To prepare:
Dissolve:
121.1 g Tris base
800 mL sterile DI water
Adjust to pH 8.0 by adding concentrated HCl (approximately 45 mL).
Adjust final volume to 1 L with sterile DI water.
Aliquot and sterilize by autoclaving.

**Use:**

Stock solution for DNA reagent preparation.

**Reliability Test:**

The quality of this reagent (as a component in another DNA reagent) will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store at room temperature. Do not use in casework analysis more than one year after preparation date.  For purchased solution, do not use in casework analysis more than five years after received date or the manufacturers expiration date.

**Disposal:**

This reagent can be flushed down the sink with water.

Issued By: DNA Technical Manager
Issue Date: 5/12/2011

Revision 1

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.24    Quantifiler® Human DNA Quantitation Kit
(AB #4343895)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Applied Biosystems Quantifiler kit (catalog #4343895) contains:
A human DNA standard (prepare as described in Quantifiler DNA quantitation procedure)
Quantifiler PCR reaction mix
Quantifiler Human primer mix

**Use:**

Quantifiler DNA quantitation procedure.

**Reliability test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store the PCR reaction mix refrigerated at 2-8°C.
Store the Human Primer mix and Human DNA standard frozen at -20°C.
Do not use kit components in casework analysis after the manufacturer's expiration date.

**Disposal:**

Dispose of kit components as regular trash.

Uncontrolled Document

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 3.2.2.25      Quantifiler® Duo DNA Quantification Kit
(AB #4387746)

**Safety Information:**

Use normal chemical hygiene precautions.

**Reagent Preparation:**

Applied Biosystems Quantifiler Duo kit (catalog #4387746) contains:
Quantifiler Duo DNA standard (prepare as described in Quantifiler Duo DNA quantitation procedure)
Quantifiler Duo PCR Reaction Mix
Quantifiler Duo Primer Mix
Quantifiler Duo DNA Standard Dilution Buffer

**Use:**

Quantifiler Duo DNA quantitation procedure.

**Reliability test:**

The quality of this reagent will be verified by including it in the batch QC procedure for each lot of new reagents (see FB manual section 8.1).

**Storage and Stability:**

Store all components at -15°C to -25°C upon receipt and store refrigerated at 2-8°C after first use.

Do not use kit components in casework analysis after the manufacturer's expiration date.

**Disposal:**

Dispose of kit components as regular trash.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 4.    METHODS

### 4.1    Screening and Body Fluid Identification

### 4.1.1  Introduction to Screening and Body Fluid Identification

Evidentiary examinations are generally performed in order to determine if an individual or individuals are associated with a crime.

Evidence should be examined in the order of the best associative evidence first. Once an association is established, no further exams are required, unless circumstances dictate otherwise, i.e. multiple suspects, case history etc.

General guidelines for screening evidence:

- Determine the examinations that will be required based on the request and the alleged incident (i.e. sexual assaults-potential semen).
- Remove any debris (trace evidence) which could be lost in the analysis method, package as appropriate.
- Look for stains with the naked eye or utilize alternate light sources (i.e. omnichrome, oblique light, high intensity lights, flashlight, etc.) and/or a stereo microscope.
- Test stains with the appropriate presumptive tests.  Record results in the case notes and, where possible, on the item (KM+, AP-).  A stain which gives a positive presumptive test may be assigned a sub-number.

Detection of Blood

To indicate the presence of blood on an evidence item, a detection method that is quick and easy is necessary to ascertain what stains may or may not be suitable for further analysis.
   a.  Hemastix (FB manual section 4.1.2)
   b.  Kastle-Meyer (FB manual section 4.1.3)
   c.  Hematrace (FB manual section 4.1.4)

Detection of Semen

Typically the analysis of Sexual Assault evidence includes semen detection and, at times, other bodily fluids dependent on the case scenario.
   a.  Presumptive Test for Acid Phosphatase (FB manual section 4.1.6)
   b.  Slide Staining/Spermatozoa Search (FB manual section 4.1.7/4.1.8)
   c.  One Step ABAcard p30 (FB manual section 4.1.9)

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Detection of Saliva

Amylase is an enzyme present in high concentrations in saliva. Other body fluids such as semen, tears, urine, sweat, vaginal fluids, and blood serum have varying, lower amounts of amylase activity.  Human salivary α-amylase is an antigen found in human saliva.  Amylase testing may be done on samples from cases where there is possible licking or biting involved.  Screening tests for saliva may be done at analyst discretion on swabs that are suspected to contain saliva and are being taken forward to DNA analysis.
   a.  RSID (Rapid Stain ID) Saliva Test Kit (FB manual section 4.1.10)
   b.  Amylase Diffusion  (FB manual section 4.1.11)

Uncontrolled Document

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                                    Forensic Biology
Regional Crime Laboratory                                    FB Technical Procedures Manual

### 4.1.2      "Hemastix" Presumptive Test for Blood

**Materials and Supplies:**

"Hemastix" is a product of Ames Division, Miles Laboratories.  Each plastic reagent strip contains a reagent pad for each test.  The active ingredients for blood are 3,3',5,5'-tetramethylbenzidine (TMB) and diisopropylbenzene dihydroperoxide.

**Controls:**

Positive and negative controls shall be tested prior to testing evidence in order to verify the reliability and purity of the reagents.

         Positive     Known blood on moistened swab touched to reagent pad

         Negative    DI water added to reagent pad

**Procedure:**

Touch the un-moistened pad to the stain, then add a drop of DI water.
Add a small aliquot of stain extract directly to the pad.
OR
Gently rub a swab, which has been slightly moistened with DI water, to the area to be tested then touch the swab to the reagent pad.

**Interpretation:**

The appearance of a greenish color or green spots on the reagent pad within 60 seconds indicates the presence of heme, a component of blood.

Catalytic blood tests are very sensitive, but not specific.  The positive color test alone should not be interpreted as a positive proof of the presence of blood.

Potential sources of false positives are chemical oxidants and vegetable peroxidases.  If a chemical oxidant is suspected, retest the sample with Phenolphthalein.

**References:**

Technical notes for Hemastix Reagent Strips for Urinalysis.  Ames Division, Miles Laboratory, 1992, rev. 4/94.

Burdett, P.E., Presumptive Tests for Blood - A Comparative Survey, CRE Report No. 201, October 1976.

Issued By: DNA Technical Manager                                    Revision 1
Issue Date: 5/12/2011                                    Page 65 of 272

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Sheehan, F.X. and Koblinsky, L., Human Blood Identification:  A Forensic Science Approach, Journal of Chemical Education, Vol. 61, No. 6, 1984, pp 542-546.

Barner, D.D., Cano, K.M., Peimer, R.S., and Yeshion, T.E., An Evaluation of Tetramethylbenzidine as a Presumptive Test for Blood, Journal of Forensic Science, Vol. 21, No. 4, 1976, pp. 816-821.

Uncontrolled Document

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                    Forensic Biology
Regional Crime Laboratory                         FB Technical Procedures Manual

### 4.1.3    Kastle-Meyer method for presumptive identification of blood

**Materials and Supplies:**

Kastle-Meyer reagent working solution (1:5 dilution of stock)
    2 ml   Kastle-Meyer reagent stock solution (2% phenolphthalein / 20% KOH / 2% zinc)
    8 ml   reagent ethanol
3% hydrogen peroxide
Clean cotton swabs or Whatman filter paper

**Controls:**

Positive and negative controls shall be tested prior to testing evidence in order to verify the reactivity of the solution.

| | |
|---|---|
| Positive | Known blood on a moistened swab or filter paper |
| Negative | DI water added to a swab or filer paper |

**Procedures:**

1.  Rub a small portion of the suspected bloodstain with a moistened clean cotton swab or clean piece of filter paper.  Alternatively, a small portion of the stain may be cut out and tested directly.

2.  Add one drop of the Kastle-Meyer working solution to the swab, filter paper, or cutting.

3.  After a few seconds, add one drop of 3% hydrogen peroxide.

**Interpretation:**

The rapid appearance of a bright pink color after the addition of 3% hydrogen peroxide indicates the presence of heme, a component of blood.  A negative result can be interpreted as the absence of detectable amounts of heme, a component of blood.

Catalytic blood tests are very sensitive, but not specific.  The positive color test alone should not be interpreted as proof positive of the presence of blood.

Potential sources of false positive reactions are chemical oxidants and vegetable peroxidases.  These, however, are usually visibly distinguished from blood.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Color development which occurs before the addition of the 3% hydrogen peroxide may be due to the presence of a chemical oxidant. This should not be considered a positive result.

**References:**

Burdett, P.E., Presumptive Test for Blood - A Comparative Survey, CRE Report No. 201, October 1976.

Sheehan, F.X., and Koblinsky, L., Human Blood Identification:  A Forensic Science Approach, Journal of Chemical Education, Vol. 61, No. 6, 1984, pp 542-546.

Cox, M., A Study of the Sensitivity and Specificity of Four Presumptive Tests for Blood, Journal of Forensic Sciences, Vol. 36, No. 5, Sept. 1991, pp. 1503-1511.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.1.4          Human Blood Detection by ABAcard® HemaTrace®

**Materials and Supplies:**

ABAcard® HemaTrace® test device
HemaTrace® buffer
Sterile DI water
Sterile microcentrifuge tubes or Spin-Ease tubes and baskets

**Controls:**

A negative control shall be run with each batch of samples run on the Hematrace cards.  The negative control should be prepared in a similar manner to the evidence sample using the same reagents.  The lot number of the HemaTrace card shall be recorded in notes in order to trace the QC of the kits.

**Procedure:**

1.  Extract sample (typically, 1/2 swab or 0.5 sq. cm fabric) in a minimal amount of sterile DI water or 5% ammonia for 30-60 minutes at room temperature in a sterile Spin-Ease or microcentrifuge tube. Mechanically agitate the sample during extraction.  Prepare a reagent blank similarly.

    Note: do not freeze sample extracts prior to conducting the remaining steps of the test procedure.

2.  Remove the liquid extract from the substrate.

3.  Prepare a dilution (ranging from 1:100-1:1000, depending on perceived concentration of the stain) of the extract in HemaTrace buffer (a total volume of at least 150 µL is required).

4.  Add 150 µL of the dilution to the sample well "S" of the test device.

5.  Allow to develop for 10 minutes at room temperature.  Positive results may be visible as early as 30 seconds.

6.  If test results from a questioned sample are negative, and a high concentration of human hemoglobin is suspected, prepare a 1:1000 or greater dilution of the extract with HemaTrace buffer and proceed from step 4 above.

**Interpretation:**

Test results are interpreted as follows:

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

POSITIVE – If there are two pink bands on the card, one each in the test area "T" and the control area "C", within ten minutes of adding the sample to the card, the test result is positive and indicates that human hemoglobin is present in concentrations at or above 0.05 µg/mL.  Results shall not be interpreted after more than ten minutes.

NEGATIVE – If there is only one pink line in the control area "C", the test result is negative. This may indicate that either no human hemoglobin is present at or above 0.05ug/ml or the presence of "High Dose Hook Effect". This refers to a false negative due to extremely high concentrations of human hemoglobin, such as in concentrated human blood. If a false negative is suspected, proceed with step 6 described above.

INVALID – If there is no pink line in the control area "C", the test is inconclusive. Repeat if possible.

Human hemoglobin may be detected in other human body fluids in dilutions more concentrated than 1:100, and hemoglobin from non-primate species has been reported to give positive results. A positive HemaTrace result obtained from a sample diluted to at least 1:100 indicates, but does not positively confirm, the presence of human (or other primate) blood.

**References:**

ABAcard® HemaTrace® Technical Information Sheet

San Diego County Sheriff's ABAcard® HemaTrace® internal validation study

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.1.5    Ouchterlony Double Diffusion Method for Determination of Species Origin

**Materials and Supplies:**

1% Agar in small petri dishes
Dissolve 1.0 gm of purified agar (SERI #R517 or equivalent) in 100 mL of 0.85% saline.  Heat to dissolve.  Pour 3 mL aliquots into small petri dishes.  Store upside down, refrigerated.
Anti-species-specific serum

**Controls:**

Positive and negative controls shall be tested concurrently with evidence samples in order to verify the process and chemicals are working properly.

Positive control - Known species-specific blood standard dried on cloth (or diluted species-specific serum)
Negative control - Saline or sterile DI water

**Procedure:**

1. Fill out FB Ouchterlony Diffusion worksheet.

2. Prepare agar gel.

3. Form a circular pattern by punching a series of 6 wells spaced evenly around a center well.  Use the template on the Ouchterlony worksheet to space the wells.

4. Prepare samples by extracting in saline or sterile DI water.  Degraded or older stains may need to be extracted in 5% NH4OH solution.  A 5% NH4OH blank extract solution should be run in these instances.  Alternatively, apply samples directly into sample wells.

5. Apply about 2 to 10 µL of anti-species-specific serum to the center well, and approximately the same volume of control and unknown sample extractions in the outer wells.  Alternate controls and unknown samples in the outer wells.  Every questioned stain must be flanked by at least one known positive control.  Add about 2 to 10 µL of saline or DI water to un-extracted samples added directly to the gel.  Apply about 2 to 10 µL of the solvent used to dilute the samples to one outer well as a negative control.

6. The labeled gel plates can be placed into a 37° C incubator or allowed to incubate at room temperature until sufficient precipitin line formation occurs to

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

allow for interpretation.  This is usually 2 to 3 hours at 37° C, or from four hours to overnight at room temperature.  Alternatively, the gel plates can be placed in a refrigerator for longer development.

7. If needed, plates may be stained to aid in visualizing precipitin bands, as follows: Moisten a small filter paper with DI water and lay it on top of the gel, making sure all the areas of interest are covered.  Put additional dry filter paper over the gel and use a weight to press the gel for approximately 10-15 minutes.

8. Remove all the filter paper and place gel in oven until it is dry (approximately 15 minutes).

9. Stain the dry gel with a small amount of 0.2% Coomassie blue solution.  Stain until the bands are visible.

10. De-stain the gel with de-stain solution.

**Interpretation of Results:**

Examine the areas between the central well with the antiserum and the outer wells for the presence of precipitin bands.  The presence of a point of identity formed between a questioned sample and an adjacent positive control confirms the presence of species-specific proteins.
A positive result is depicted in the diagram below:



Two possible negative results are depicted below:
Partial identity (spurring)                                          Nonidentity




The absence of a point of identity is indicative of a negative result, even in the presence of a precipitin band.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

**Protocol Notes:**

While antigen and antibody concentrations do not have to be precisely the same, it is important to attempt to have the concentrations as close as possible.  Excess of one reactant over the other can result in the diffusion pattern being off center (i.e. closer to the center well than the outer well, or vice versa) or may prevent the formation of any visible precipitate.

A spurring pattern is indicative of a partial identity.  This does not indicate an identical species of origin, but may indicate a related species.

A record of the test results shall be maintained with the case notes in the form of a photograph or diagram.

A positive Ouchterlony result, in combination with a positive catalytic test for blood, indicates the presence of species-specific blood.

**References:**

Lee, H.C., Identification and Grouping of Bloodstains, in Forensic Science Handbook, (ed. Saferstein, R.), Prentice-Hall, Englewood Cliff, New Jersey, pp. 283-297, 1982.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.1.6       Acid Phosphatase Presumptive Test for Semen

**Materials and Supplies:**

Acid Phosphatase Spot Test Reagent (SERI #R558):
Dissolve 0.26 grams of dry reagent in 10 ml sterile DI water.
Whatman filter paper circles or clean cotton swabs

**Controls:**

Positive and negative controls shall be tested prior to testing evidence in order to verify the reactivity of the solution.

| | |
|---|---|
| Positive | known semen sample |
| Negative | DI water |

**Procedure:**

1.  Prepare AP test reagent.

2.  Sample testing:

    a.  For swab specimens, moisten filter paper with DI water and squeeze around swab.  Add a few drops of test reagent to the filter paper.

    b.  For stains, moisten a clean swab or filter paper.  Apply to stained area, and add a few drops of test reagent to the filter paper or swab.

    c.  For cuttings, add a few drops of test reagent directly to the cutting (in a test tube or on filter paper).

3.  Mapping technique:

    a.  Dampen a suitable sized piece of filter paper with DI water.

    b.  Place the dampened paper over the area to be tested, marking both the paper and the area tested, and apply pressure.

    c.  Remove the paper and apply the AP reagent to the area which had contact with the sample.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

d. A purple color appearing on the paper indicates the possible presence of seminal fluid, as well as the size, shape, and location of the stain.

**Interpretation:**

After the addition of test reagent, look for the development of a purplish color. This is a positive reaction and indicates the presence of acid phosphatase, found in large quantities in seminal fluid. The lack of a purple color indicates a failure to detect seminal fluid. Acid phosphatase is also found in lesser amounts in other body fluids, including vaginal fluid, saliva, and perspiration.

The reaction will be graded as follows:

| Color | Development time | Grading |
|---|---|---|
| Strong, dark purple | Fast | 4+ |
| Strong, dark purple | Less than 30 seconds | 3+ |
| Medium purple | Less than 30 seconds | 2+ |
| Light purple | Less than 60 seconds | 1+ |
| Some color | Less than 2 minutes | weak |
| No color | Greater than 2 minutes | negative |

Note: P30 testing shall only be performed on samples with a 2+ or higher AP result.

**References:**

SERI        AP Spot Test Reagent product literature

Sensabaugh, G.F., The Acid Phosphatase Test, Proceedings of a Forensic Science Symposium on the Analysis of Sexual Assault Evidence, FBI Academy, Quantico, Virginia pp 65-81, July 1983

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.1.7         Sexual Assault Stain Sample Extraction

**Materials and Supplies:**

> Microcentrifuge tubes
> Sterile PBS or sterile DI water

**Procedure:**

1. Add 200 µL sterile PBS or sterile DI water to the sample (approximately 1/2 swab head or 0.5 sq cm of stained material) in a sterile Spin-Ease or 1.5 mL microcentrifuge tube (sample should not be frozen while extracting). If a different sample size is used, adjust volume accordingly.  Samples may be extracted in a larger volume (500 µL) in accordance with the DNA sperm extraction protocol; however, if p30 analysis is done using the supernatant, adjust the dilution accordingly.

2. Incubate for approximately 1 hour.  Mechanically agitate the sample during this incubation to increase sperm yield.  Alternatively, sonicate the sample for approximately 30 minutes.

3. Using spin baskets, put the material in the top of the basket, cap the tube, and centrifuge for 5 minutes at ~14,000X g to pellet the debris.

**4.** Transfer all but 50 µL of the supernatant to a clean microcentrifuge tube.  **The supernatant can be used for fluid ID tests.**

5. The pellet can be used for microscopic examination and DNA typing.

6. With some samples, a proteinase K digest may improve recovery of spermatozoa and improve the ability to see spermatozoa when excess epithelial cells are present.  If a digest is necessary, add the substrate back to the cell pellet and proceed as per steps 2 through 8 of FB manual section 4.2.3 (DNA extraction from sperm-containing biological samples).  At the conclusion of this process, part or the entire cell pellet can be used for microscopic examination.

   Note:      Store extracts in freezer or refrigerator.  Re-spin before spotting on a microscope slide.

**References:**

Blake, E., Sensabaugh, G., and Bashinski, J., Genetic Markers in Human Semen: Application to Analysis of Semen Evidence in Sexual Assault Case Materials,

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

(unpublished) United States Department of Justice LEAA Grant 79-NI-AX00043. 1979-1986

Hueske, E., E., 'Techniques for Extraction of Spermatozoa from Stained Clothing: A Critical Review, Journal of Forensic Sciences, Vol. 22, No. 3, July 1977, pp. 596-598.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.1.8    Microscopic Identification of Spermatozoa and Non-sperm Cells Using Christmas Tree Stain

**Materials and Supplies:**

Microscope slides and coverslips
Mounting medium (Cytoseal or equivalent)
Nuclear Fast Red stain (as per reagent information sheet, or purchased from SERI)
Picroindigocarmine stain (as per reagent information sheet, or purchased from SERI)

**Procedure:**

1. Either extract the suspected stain as per section 4.1.7 for stain extraction, and spot 3 μL of the re-suspended cell pellet using a sterile disposable pipette tip and spot on a glass microscope slide OR rub a swab or cutting over a slide containing a few drops of sterile DI water. Do not put more than one sample extract on a slide (pre and post digest extracts may be placed on a single slide).

2. Fix cells to the microscope slide (i.e. place slide in oven or heat block until liquid has completely evaporated).

3. Cover the sample area with Nuclear Fast Red stain for 10 - 20 minutes.

4. Wash the slide gently with DI water until the Nuclear Fast Red stain washes off.

5. Cover the sample area with picroindigocarmine stain for about 15 seconds.

6. Wash the slide gently with DI or tap water and/or reagent alcohol. The slide can be air dried or dried in an oven.

7. The slide can be treated with Cytoseal® or xylene and covered with a cover slip to aid in the identification of spermatozoa and epithelial cells.

8. Examine the slide for sperm cells. The slide shall be visualized at 400X magnification. Lower magnification can be used for an initial screening examination. Phase Contrast or Bright Field can be used to visualize the slide. -- See Appendix 3 for microscope setup.

9. Any slide that contains spermatozoa shall be placed in a slide mailer, labeled, and returned with the evidence or as a separate evidence item/package.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Note:  An analyst may choose to use a wet mount technique (in which the sample is not heat fixed to the slide or stained).  If this is done, it must be noted in the case notes.

**Interpretation:**

Look for ovoid structures with or without tails.

Nuclear material is stained red by the nuclear fast red stain.  Sperm heads are usually well differentiated with the acrosome staining significantly less densely than the distal region of the head.  With bright field microscopy, the nuclear material in the head appears red and the acrosome appears almost colorless.  With phase contrast, the acrosome appears darker.  The cytoplasm of epithelial cells are appear green from the PIC stain.  Nuclei inside epithelial cells appear red.

Yeast cells also stain red.  However, the stain is uniform throughout the cell and extends into polyp-like structures which are occasionally observed with yeast cells.  If the presence of debris or other cellular material (i.e. white blood cells, epithelial cells) precludes the identification of spermatozoa, the differential DNA extraction procedure (section 4.2.3) may be employed to clean up the sample and re-examine.

Record results as the average number of sperm and epithelial cells detected per field.  If there is a limited number of sperm, it may also be recorded as the number of sperm per slide.

Note:  A single spermatozoon on a slide shall be confirmed by a second qualified analyst.  The case notes shall include the date and initials of the second analyst.

**References:**

Gaensslen, R., Sourcebook in Forensic Serology, Immunology, and Biochemistry.  U.S. Government Printing Office, 1983.

Gaensslen, R., Mertens J., Lee, H., Stolorow, M., Staining and Extraction Techniques, Proceeding of a Forensic Science Symposium on the Analysis of Sexual Assault Evidence.  FBI Academy, 1983.

Package Insert, SERI, 3053 Research Drive, Richmond, Ca. 94806.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.1.9        P30 Detection by ABAcard® p30 Test

**Materials and Supplies:**

ABAcard® p30 test device
Sterile DI water
Spin-Ease tubes and baskets

**Controls:**

A negative control shall be run with each batch of samples run on the p30 cards. The negative control should be prepared in a similar manner to the evidence sample using the same reagents.

**Procedure:**

**Note: Testing shall only be performed on swabs/stains which yield a 2+ or higher AP result.**

1. Extract samples as per sexual assault stain extraction procedure (see FB manual section 4.1.7)

2. Transfer 50µL of supernatant to a fresh tube and add 150µL of sterile DI water (1:4 dilution). If the stain was extracted in a larger initial volume, adjust dilution accordingly.

3. Add all 200µl of the dilution to the sample well "S" of the test device.

4. Allow to develop 10 minutes at room temperature.  Positive results may be visible as early as 30 seconds.

5. If test results are negative, and a high concentration of p30 is suspected as indicated by AP results, prepare a 1:50 dilution of the supernatant and proceed from step 3 above.

**Interpretation:**

Test results are interpreted as follows:

POSITIVE – If there are two pink bands, one each in the test area "T" and in the control area "C", the test result is positive and indicates that p30 is present in concentrations at or above 4ng/ml.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

NEGATIVE – If there is only one pink line in the control area "C", the test result is negative. This may indicate that either no p30 is present at or above 4ng/ml or the presence of "High Dose Hook Effect". This refers to a false negative due to extremely high concentrations of p30, such as in undiluted seminal fluid. If a false negative is suspected, repeat the test using the 1:50 dilution of the supernatant.

INVALID – If there is no pink line in the control area "C", the test is inconclusive. Repeat if possible.

P30 activity has been detected from non-prostatic sources, such as breast milk and amniotic fluid (Yu, H. and Diamandis, E.P.). However, these sources are rarely encountered in casework and would not yield a positive AP result.

**References:**

ABAcard® p30 Test Technical Information Sheet

Yu, H. and Diamandis, E.P., Prostate-specific Antigen in Milk of Lactating Women Clinical Chemistry, 41(1): 54-58, 1995

Yu, H. and Diamandis, E.P., Prostate-specific Antigen Immunoreactivity in Amniotic Fluid Clinical Chemistry, 41(2): 204-210, 1995

Sensabaugh, G.F., Isolation and Characterization of a Semen-Specific Protein for Human Seminal Plasma: A Potential New Marker for Semen Identification Journal of Forensic Science, 23(1): 106-115, 1978

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.1.10    Detection of human α-amylase by RSID©-Saliva Kit

**Materials and Supplies:**

RSID Saliva test kit (Independent Forensics), containing:
Saliva test device (25 per kit)
Extraction buffer
Running buffer
Sterile microcentrifuge tubes
Sterile spin baskets

**Controls:**

A negative control shall be run with each batch of samples run on the RSID cards. The negative control should be prepared in a similar manner to the evidence sample using the same reagents.  The lot number of the kit and associated buffers should be recorded in case notes so it can be associated with the QC.

**Procedure:**

1. Extract sample (1 swab or 1 cm$^2$ of fabric) in 100-200 µl RSID extraction buffer for 1-2 hours at room temperature.  Prepare negative control similarly.  Reduce the extraction volume accordingly if using a smaller sample.

2. Using spin baskets, put the material in the top of the basket, cap the tube, and centrifuge for 5 minutes at 14,000 rpm to pellet the debris.  Save substrate for further analysis as appropriate.

3. Remove all but 50 µl of the liquid extract and place in separate tube (this is the portion of the extract used for testing).  The cell pellet can be further processed for DNA analysis if appropriate.

4. Add 80 µl RSID running buffer to a clean microcentrifuge tube, and then add 20µl extract and mix.

5. Add combined extract and buffer to the sample well on a test device.

6. Allow to develop for 10 minutes at room temperate.  Record results at 10 minutes.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

**Interpretation:**

POSITIVE- If there are two pink bands on the card, one in the test area "T" and one in the control area "C", at 10 minutes after adding the sample to the card, the test result is positive and indicates the presence of human salivary α-amylase, which is found in human saliva.  Results shall not be interpreted after more than ten minutes.

Note: Human breast milk contains low levels of human salivary α-amylase.  False positives may occur in samples with large quantities of breast milk present.  Human fecal material also has been reported as a false positive for this test.

NEGATIVE- If there is only one pink band in the control area "C", the test result is negative.

INCONCLUSIVE- If "C" band does not fully develop, test is inconclusive and steps 3-5 should be repeated using a new card.

**References:**

Independent Forensics, Rapid Stain Identification of Human Saliva technical information sheet, rev. B (2006)

Old, J. et al, Developmental Validation of RSID- Saliva: A Lateral Flow Immunochromatographic Strip Test of the Forensic Detection of Saliva, Journal of Forensic Sciences, July 2009, Vol. 54 (2)

SDSO internal validation study

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                                      Forensic Biology
Regional Crime Laboratory                                        FB Technical Procedures Manual

### 4.1.11        Detection of Amylase by Diffusion

**Materials and Supplies:**

Phosphate buffer 0.1 M, pH 6.9  (SERI #B116)
Agarose: Sigma type V (Sigma A-3768) or equivalent, OR Seri EA (SERI #R524)
Soluble starch
Iodine solution (SERI #R512)
Prepare 1:100 dilution of stock iodine solution (SERI #R512) as needed.
α-Amylase standard or known saliva sample

**Controls:**

Positive and negative controls shall be tested concurrently with evidence samples in order to verify the process and chemicals are working properly. The positive controls also serves as a way to interoperate the amount of amylase in a evidence sample.
> Positive control - α-Amylase standard or known saliva sample
>> Remove an aliquot of the standard from frozen storage and allow to come to room temperature.  Prepare 1:100 and 1:400 dilutions with DI water.  The 1:100 dilution serves as the working standard solution.  Alternately a known saliva sample can be utilized instead of the amylase standard.
> Negative control - sterile DI water

**Procedure:**

1. Fill out the FB Amylase Diffusion worksheet.

2. Prepare gel by adding 0.1 gm agarose to 10 mL phosphate buffer.  If not using Seri EA, also add 0.01 gm soluble starch.  Heat until agarose dissolves.  Pour into one 9.5 cm square plastic Petri dish and allow to solidify.  The gel should be ~2 mm thick.

3. Extract stains in a minimum volume of sterile DI water.  Extracts of known body fluids or stains may also be employed as interpretation aids or additional controls, when appropriate.  Prepare extracts of known stains similarly to unknowns.  Prepare a negative control, consisting only of sterile DI water, in a similar fashion.

4. Punch ~1 mm diameter wells into the gel at least 1.5 cm apart using the Amylase Diffusion worksheet as a guide.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

5. Fill wells with samples and controls.  Each gel should include, at a minimum, one well prepared with the 1:100 α-amylase standard(or known saliva sample), one prepared with the 1:400 standard, and one prepared with negative control.

6. Cover petri dish, invert, and place in a 37°C incubator overnight.

7. Stain gel with diluted iodine solution.  Clear circles around the wells indicate amylase activity.

8. Measure the diameter (in mm) of the clear circles for each sample and control. Record the measurements on the FB Amylase Diffusion worksheet.

**Interpretation:**

Amylase hydrolyses starch, first to oligosaccharides, then to maltose and glucose. As the samples diffuse into the gel around each well, starch is hydrolyzed in an area proportional to the concentration of amylase present in the sample.  Iodine reacts with starch to produce a deep blue color.  Clear circles around sample wells indicate areas where amylase has hydrolyzed the starch.  The 1:100 α-amylase standard will typically produce a clear circle 13-16 mm in diameter.

1:400 α-amylase standard wells should produce clearing in the gel with diameters smaller than the 1:100 standard.  A negative control well should produce little or no clearing.

Amylase is present in saliva at high concentrations, hence the use of amylase as a presumptive test. However, amylase is present in most body fluids and tissues including semen, vaginal fluid, and blood, though generally at much lower levels than found in saliva. Perspiration, breast milk, and urine may have high levels of amylase. Therefore, the presence of amylase cannot be considered a conclusive indication of the presence of saliva.

An elevated level of amylase may be reported if a sample's clearing circle diameter is equal to or greater than the 1:100 α-amylase standard. However, since the amylase test is not conclusive for saliva, an appropriate caveat should be included in the report, such as:

"An elevated level of amylase was detected on [Item A]. Elevated levels of amylase are present in saliva, however, amylase is also present, generally at lower levels, in other body fluids."

**References:**

Metropolitan Police Forensic Science Laboratory, Biology Methods Manual, 1978.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Gaensslen, R., Sourcebook in Forensic Serology, Immunology, and Biochemistry US Government Printing Office, 1983.

Wraxall, B., Sexual Assault Analysis Manual, Serological Research Institute, 1990.



*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.1.12      Detection of Urine

**Materials and Supplies:**

DI water
Spot plates
Disposable pipettes
Picric acid test for creatinine:
    Saturated picric acid solution
    10% sodium hydroxide
DMAC test for urea:
    DMAC working solution (prepare fresh at time of test)
    0.1 gm DMAC (p-dimethylaminocinnamaldehyde)
    9.0 mL ethyl alcohol, absolute
    1.0 mL concentrated HCl

**Controls:**

Positive and negative controls shall be tested prior to testing evidence in order to verify the reactivity of the solution.

| | |
|---|---|
| Positive | Known urine stain, concentrated to yield a positive reaction when extracted in same manner as unknown stains |
| Negative | DI water |
| Substrate | (recommended if possible) A portion of the substrate adjacent to a stain but seemingly unstained.  Extracted in the same manner as unknown stains |

**Procedures and Interpretation:**

Physical Characteristics:

Fluorescence
Urine stains on fabric are usually colorless or very pale yellow in visible light owing to the presence of urinary pigments, particularly urochrome (a compound of urobilin or urobilinogen and a peptide). When viewed by UV light or viewed with the ALS (alternate light source), they may fluoresce.

Smell
The characteristic smell of urine, due partly to the presence of ammonia formed from the bacterial breakdown of urea, can be more easily discerned if the stain extract is concentrated over a water bath.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                          Forensic Biology
Regional Crime Laboratory                          FB Technical Procedures Manual

### Chemical Tests:

1. Extract a cutting of known urine stain (approximately 0.5 X 0.5 cm section) in a minimal volume (50 $\mu$L) of sterile DI water for 30 minutes at room temperature.

2. Transfer the cutting to a Spin-Ease basket and centrifuge to recover extract. Approximately 2 drops should remain.  Volume of extract may be adjusted for larger sample sizes.  DO NOT ADD MORE LIQUID THAN ABSOLUTELY NECESSARY.

3. Extract the questioned area(s) and negative control area in the same manner.

DMAC (p-dimethylaminocinnamaldehyde) procedure for urea detection

1. On a spot plate, place the following samples in as follows:
   a.   First well      =      DI water (negative control)
   b.   Second well  =      known urine
   c.   Third well      =      unknown sample

2. Add four drops of DMAC reagent to each well. DMAC forms a Schiff's base with any amine or amide (e.g. urea) present.

DMAC (p-dimethylaminocinnamaldehyde) test interpretation

A positive reaction (indicating urine) turns rose to magenta-colored, usually within 15 seconds, and always under one minute.

The substrate control should remain colorless. Since it is not always possible to ascertain a non-stained area for a substrate control, if a positive reaction is observed, a new substrate control should be taken from the evidence item and tested.

Water will remain colorless.

Picric acid procedure for creatinine detection

C. Place samples in spot-plate wells as described for DMAC test above.

D. Add one drop of saturated picric acid/water solution followed by one drop of 10% sodium hydroxide to each well.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Picric acid test interpretation

The picric acid solution is bright yellow. Addition of the 10% sodium hydroxide immediately turns the mixture a bright orange (creatinine picrate) if it is urine.

Water will remain yellow colored.

Stains with the physical characteristics of urine which give positive results to both the DMAC and picric acid tests should be reported as consistent with the presence of urine. However, the sensitivity of the chemical tests is limited. Therefore, negative findings on either or both tests do not necessarily indicate the absence of urine.

**References:**

Biology Methods Manual, Metropolitan Police Forensic Science Laboratory, Chapter 4, 1978

Gaensslen, R.E. Sourcebook in Forensic Serology, Immunology, and Biochemistry. Section 12, US Government Printing Office, 1983

Texas Department of Public Safety. Serology Guidelines and Procedures.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.1.13    Detection of Feces

**Materials and Supplies:**

DI water
Glass test tubes (NOT flint glass)
Microscope slides and coverslips
Mercuric Chloride (saturated solution in ethanol, about a 10% solution)
Zinc Chloride (saturated solution in ethanol, about a 10% solution)

**Procedure:**

A.  MACROSCOPIC FEATURES

Color
Fecal material is usually brown in color due chiefly to urobilinogen formed from bilirubin by reduction processes in the intestine.  In infants it is yellow, due partly to the presence of unchanged bilirubin and partly to the milk diet.  Fecal material may be green, black, or red depending on diet, drugs and pathological conditions.  (Newborn infants produce meconium for the first few days after birth.  This appears dark green/brown to black and sticky.  It consists of cells, fatty material, hairs, blood, protein, and biliverdin.  Meconium is also said to contain concentrations of blood group substances).

Odor
There is a distinctive odor associated with feces owing to the decomposition products, indole and skatole.  The strength of the odor depends on the amount of meat in the diet and on the activity of the putrefactive bacterial in the intestine. As with color, the odor will vary with diet and pathological conditions.  Other material occasionally passed includes concretions (gall stones), animal parasites, and mucus.

B. UROBILINOGEN TEST

1.  Prepare an aqueous extract of the stain or material in a small test tube.

2.  Put an equal amount of water into a second tube as a control.

3.  Add three drops of mercuric chloride solution.

4.  Add an equal volume of zinc chloride solution and shake.

5.  Observe the liquid under long wave UV light.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                          Forensic Biology
Regional Crime Laboratory                          FB Technical Procedures Manual

Note:  Urobilinogen may be absent in stools from infants under 6 months.

**Interpretation:**

The macroscopic examination can help aid in determining whether the properties are consistent with human feces.

The Urobilinogen test produces a stable apple green fluorescence occurs if urobilinogen is present.

**References:**

Biology Methods Manual, Metropolitan Police Forensic Science Laboratory, 1978

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 4.2    DNA Extraction and Purification

### 4.2.1  DNA sample preparation

**DNA sample preparation**

Refer to the Quality Manual (section 5, Evidence Handling in the Laboratory) for the laboratory policy on consuming samples.  When possible, a portion of each evidence sample or extract should be retained for possible reanalysis. However, if sample is limited, priority should be given to optimizing the chances for obtaining a useful result. In such cases, it may be permissible to consume the sample.

Questioned and known samples shall always be extracted separately with separate extraction controls.  Similarly, questioned samples originating from the victim shall be extracted separately from questioned samples originating from the suspect.

Samples that are going through a process of differential extraction (see FB manual section 4.2.3) shall have separate extraction controls from samples being processed with a regular non-sperm extraction (see FB manual section 4.2.2).

**Controls:**

**Positive Extraction Controls**

A positive extraction control (PEC) shall be included in each extraction set.  The PEC is used to ensure that the extraction process is working properly and the expected results are obtained.  The positive extraction controls are prepared from a known blood sample in batches designated by the date of preparation. Each batch of PEC samples shall be tested against a NIST standard reference material to make it a NIST traceable standard.

**Reagent Blank**

The Reagent Blank (RB) serves as a negative control for an extraction procedure and is processed in parallel with evidence samples.  The RB shall be processed at the same time, with the same procedures, and using the same lot of reagents as the evidence samples.  The extraction reagent volumes used for the RB will be approximately equal to or greater than the volumes used in the DNA extraction procedure for the corresponding samples.  Therefore, if samples may be combined and concentrated after extraction, the same number of reagent blank samples (total reagent volume) must also be combined as well. The final extraction volume of the reagent blank shall be approximately equal to or less than all the samples associated with that control.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Two or more reagent blanks should be used for a batch of questioned samples to ensure there is enough reagent blank for future testing.  If two or more reagent blanks are processed for one batch, each reagent blank will go through the quantitation process.

If all reagent blanks were processed identically (the same extract reagent volume used and has approximately the same final extract volume), the reagent blank with the highest quantitation value shall be used for the amplification process and the other reagent blank(s) will be kept for possible future analysis.  For these reagent blanks, if all reagent blanks are "undetermined" at the quantitation step, one reagent blank will be amplified and the others will be kept for possible future analysis.

If the reagent blanks for a batch were not processed identically (i.e. one reagent blank was concentrated and another one was not, two reagent blanks were combined and a third reagent blank was not, or after the initial extraction one reagent blank was later concentrated), the analyst shall consider what is the most appropriate sample to amplify.  If all reagent blanks are "undetermined" in the quantitation step, the most concentrated reagent blank shall be amplified.  If the least concentrated sample has the highest quantitation value, the analyst shall amplify this reagent blank as well as the most concentrated reagent blank in order for the blanks to represent all the samples in the batch.   If samples are concentrated after an initial quantitation step, the associated reagent blank must go through all of the same steps as the samples in further processing (quantification and the initial amplification).

Only one reagent blank is needed for extractions of known samples.

### Naming Extraction Controls and Evidence Samples

Control samples (positive and negative extraction controls) shall have a unique identifier to allow controls to be traced back to extraction batches.   Generally, the designation will include the type of control, affiliation to questioned or known samples, date initiated (extracted), and analyst initials (i.e.PECQ.082100.xxx). If multiple reagent blanks are used, there must be a unique label on all reagent blanks.  The analyst's initials are only required when a different analyst is performing a portion of the DNA analysis; generally the analyst's initials can be inferred by who is performing the analysis.

Each extracted sample shall have a unique name with sufficient information to distinguish between all samples derived from the original evidence item (generally case number and item number).  If a sample/stain is extracted more than once, the different extracts shall be named in order to distinguish between

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

the extracts and that name shall be carried through all associated paperwork as appropriate.

## Liquid blood

1. Sample 10 to 50 μL of whole blood or 2 to 10 μL buffy coat (approximately 105 white blood cells).

2. Place each sample in a microcentrifuge tube.

3. Proceed to DNA extraction procedure (FB manual section 4.2.2).

## Body fluid stains (not suspected of containing sperm)

1. For reference blood stains, approximately 0.5 sq. cm. may be extracted   For reference buccal swabs, half of a swab may be extracted.  The amount of sample taken from a body fluid stain should be based on the perceived concentration and quality of a sample.

2. Place each sample in a microcentrifuge tube.

3. Proceed to DNA extraction procedure (FB manual section 4.2.2).

## Body fluid stains potentially containing sperm (sexual assault evidence)

All samples that have a potential to contain sperm based on sample type (vaginal swabs, external genital swabs, penile swabs, scrotal swabs, and similar) or history shall be analyzed to determine if sperm are present prior to or as a part of DNA extraction.

The amount of sample removed for DNA should be based on the apparent concentration of semen or other cells which may be estimated based on presumptive test results.

To determine if sperm are present, see manual sections FB manual sections 4.1.7 and 4.1.8.  Be sure to save the substrate for further DNA analysis.

If a sample containing sperm is extracted for DNA analysis, the analyst shall use the differential extraction process (see FB manual section 4.2.3).  If a sample that has a potential to contain sperm but no sperm were identified in the initial microscopic

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

examination, the analyst has the option to proceed to a differential extraction or a straight extraction (see FB manual section 4.2.2).

**Cellular material from heat fixed and mounted slides/smears**

Note:  If the slide/smear has not been heat fixed and permounted, skip to step 5

1.  Place the slide into a clean Petri dish with a cover.

2.  Pour a sufficient volume of xylene over the slide until completely submerged.

3.  Incubate the slide overnight at room temperature.  If the coverslip does not float off easily, continue to soak the slide in xylene until the coverslip can be removed easily.  NOTE:  slides that have been mounted with an excess amount of mounting media may need to be incubated in the xylene solution as much as 5 days.

4.  Once the coverslip floats off, remove the slide from the Petri dish and air dry for a minimum of 5 minutes.  Do not discard the coverslip.

5.  Scrape the cellular material off the slide with a clean, unused scalpel or razor blade and place it into a labeled microcentrifuge tube.  Alternatively (or additionally), use a moistened swab to remove the material from the slide and place the swab into a labeled microcentrifuge tube.

6.  Retain the slide along with the coverslip until it is certain that DNA has been successfully been obtained.  Cells can stick to both the slide and the coverslip.

7.  Proceed with DNA extraction.

**Contact DNA**

There is a lot of variability in contact samples depending on the item or swab.  The analyst shall use their experience to determine an appropriate sample size and/or collection method.

Whole item:

1.  Determine the most appropriate areas to collect potential contact DNA.  If the item is a piece of clothing, the analyst may choose to sample areas

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

that would rub on a person's skin or use the alternate light source to determine where possible biological material may be.

2. Use an individually packaged sterile swab moistened with DI water to remove possible biological material from the item.  The moistened swab should be rubbed firmly on the item.  More than one swab may be used if a large area is being sampled.  Alternatively, cuttings from appropriate areas may be taken for DNA analysis.

3. Generally, the entire sample should be placed in one or more microcentrifuge tubes.  It is not recommended that more than one swab be extracted in one microcentrifuge tube.  These swabs can be combined later on in the DNA extraction (generally at the microcon concentration step).

Previously collected swab(s):

Generally, the entire sample should be placed in one or more microcentrifuge tubes.  It is not recommended that more than one swab be extracted in one microcentrifuge tube.

**Hair roots**

Wash the hair to reduce surface dirt and potential contaminants as follows:

For unmounted hairs:

1. Examine the hair under the microscope for the presence of a root and sheath material.
   Note the possible presence of body fluids on evidentiary hairs.

2. Wash as follows:
   a. 100% Ethanol wash
   b. Terg-A-Zyme detergent wash
   c. Rinse with sterile DI water

*[Note: If examination reveals the presence of body fluids on evidentiary hairs, the hairs can be pre-rinsed in digest buffer before washing.  In this case, save the digest buffer since it may have probative value. The buffer can be extracted to isolate the DNA content of the body fluids.  After washing, the hairs can be re-examined to determine how successful the washing process was at removing the body fluids.]*

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

3.  Use a clean scalpel to cut ~1 cm from the root end of the hair and place into microcentrifuge tube.  At the analyst's discretion, a shaft control may be analyzed by cutting ~ 1cm of the shaft adjacent to the cut root end and placing it into a microcentrifuge tube.  Using a shaft control is recommended when the hair is known or suspected of having another body fluid present on the hair (i.e. if the hair was recovered from a vaginal cavity, is covered in blood, or similar). Retain the remaining untested portion of the hair.

For slide mounted hairs:

1.  Microscopically locate the root end of the hair.

2.  Using a diamond tip scribe, cut or break the cover slip directly over the root.

3.  Remove the glass fragments exposing the mounting media.

4.  Allow the slide to soak in either xylene or toluene to dissolve the mounting media.

5.  Remove the coverslip and proceed with step 2 for unmounted hairs.

## Tissue

Tissues should be stored frozen until used.

1.  Place the tissue on a clean surface.

2.  Using a pair of sterile scissors or a new sterile scalpel blade cut a piece of tissue approximately 3 mm$^2$.  If sample is fetal tissue, rinse the piece of tissue with DI water or digest buffer prior to extraction or mincing.

3.  With the scissors or scalpel blade, mince the tissue into small pieces.

4.  Carefully place the pieces in a microcentrifuge tube using a sterile toothpick or a clean scalpel blade.

## Teeth

Note:  Follow the Aerosol Transmissible Disease Exposure Control Plan when sampling/grinding teeth.  Tooth sampling should be performed in a fume hood and

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

analysts should wear appropriate personal protective equipment. Respirators with a disposable filtering facepiece (at least as effective as an N95) will be worn during the grinding processes.

Pulp from teeth should be scraped out, or if necessary, the tooth may be crushed and placed directly into a microcentrifuge tube. Insoluble material should be spun out after DNA digestion.

**Bone**

Note:  Follow the Aerosol Transmissible Disease Exposure Control Plan when sampling/grinding bone.  Bone sampling should be performed in a fume hood and analysts should wear appropriate personal protective equipment.  Respirators with a disposable filtering facepiece (at least as effective as an N95) will be worn during the grinding processes.

There is a lot of variability in bone samples depending on bone type, size, and condition.  The analyst shall use their experience to determine an appropriate sample size and preparation.

1. Using a new or autoclaved hacksaw blade, cut the bone specimen to a size of approximately 2 cm x 5 cm. Sawing of bone should be performed in a vented hood. The resulting bone dust should be captured as it frequently makes excellent starting material for extraction.

2. Use a metal file or scalpel to scrape out any marrow that might be present in the bone and clean the outer surface of the bone of any tissue. Freeze any marrow or tissue recovered for possible later use.

3. Using a hammer, or other mechanism, break the bone into small pieces.

4. Using a clean scalpel blade, cut the crushed bone into small pieces.  If necessary, the piece can be frozen in liquid nitrogen and mechanically crushed.

5. Place approximately 0.02 - 0.05 g of bone chips, shavings, or dust into a microcentrifuge tube. Insoluble material should be spun out after DNA digestion.

Samples not described here should be treated as deemed appropriate by the experience of the analyst.

Proceed to one of the methods for DNA extraction.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.2.2  DNA extraction from non-sperm-containing biological samples

**Materials and Equipment:**

10 mg/mL Proteinase K
DTT (1M)
Digest buffer
1.5 mL sterile microcentrifuge tubes
Aerosol resistant sterile pipette tips

**Procedures:**

There may be cases in which these volumes might be altered proportionately to accommodate the size of the sample.  However, if the samples will be processed with EZ1 DNA Investigator kit, a larger volume will have to be divided into no more than ~500 µl of extract for purification.  Alternatively, a sample may be split into more than one tube for DNA extraction and combined later during microcon concentration.

1. Fill out and use the FB Non-sperm DNA Extraction worksheet.

2. Prepare the samples appropriately as described in FB manual section 4.2.1. Make sure to include a positive extraction control (PEC) and one or more reagent blanks.  Generally, at least two reagent blanks will be used for questioned samples and one reagent blank for known samples.  The PEC and the reagent blanks should be placed, respectively, in the second to last and last positions in the extraction line to monitor for contamination.  The PEC and reagent blanks should be labeled with a unique identifier to ensure that those controls are associated with a particular batch.  Suggested naming of controls should contain the date of extraction, affiliation with questioned or known samples, and initials of analyst (i.e.  PECQ 060709 SG).

3. Pipet 0.5 mL of digest buffer into each tube containing the prepared biological sample or control.

4. Add 15 µL of 10 mg/mL Proteinase K solution (to a final concentration of 0.3 mg/mL) to the tube and mix gently.

   For hairs add 3 mg fresh DTT or 20 µL of 1M DTT.  DTT also should be added to finger or toe nails for purposes of digesting the entire nail as a reference sample.

5. Incubate at 56°C for at least two hours for evidence samples and at least 30 minutes for reference (known) samples.  This incubation can be lengthened if necessary for difficult samples (such as bone, teeth, nails, or hair).  Spin briefly before opening.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

6. Additional Pro K and DTT may be added to samples if necessary.

   *Note: Alternately, perform the first digestion overnight, followed by addition of more Pro K and a short incubation the following day.  For hairs, also add additional DTT as in step 3 above.*

7. Agitate any substrate with a fresh sterile toothpick or a sterile, disposable pipet tip and remove, squeezing out as much liquid as possible. Generally, the substrate is discarded but it may be saved at analyst discretion.

8. If "piggybacking" is desired: Place the substrate in a spin basket, cap and spin 5 minutes in centrifuge. Remove the substrate and basket and recap tube.

Proceed to: Purification of DNA by organic extraction and ultrafiltration or Purification of DNA Using the EZ-1 DNA Investigator Kit

**References:**

FBI PCR Protocols 1994

Perkin Elmer AmpliType® User Guide 1990 Version 2

Texas Department of Public Safety DNA SOP

California Department of Justice DNA Protocols

Qiagen Inc.  Biorobot EZ-1 User Manual January 2003. Qiagen, Inc. 2004

Qiagen Inc.  EZ1 DNA Investigator Handbook 1/2006. Qiagen, Inc. 2005

Qiagen Inc. EZ1 Advanced XL User Manual 5/2009. Qiagen, Inc. 2009

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                                    Forensic Biology
Regional Crime Laboratory                                    FB Technical Procedures Manual

### 4.2.3  DNA extraction from sperm-containing biological samples

**Materials and Equipment:**

> 10 mg/ml Proteinase K
> 1M DTT
> Digest buffer
> 1.5 mL sterile microcentrifuge tubes
> Aerosol resistant sterile pipette tips
> Toothpicks

**Procedures:**

There may be cases in which the volumes of digest buffer, Proteinase K, and DTT might be altered to accommodate the size of the sample.

1. Fill out and use the FB Differential DNA Extraction worksheet.

2. Prepare the samples appropriately as described in section 4.1.7 Body fluid stains potentially containing sperm (sexual assault evidence). A predigest microscope slide shall be made prior to starting the differential extraction process.  Make sure to include a positive extraction control (PEC) and one or more reagent blanks prior to step 2.  The PEC and the reagent blanks should be placed, respectively, in the second to last and last positions in the extraction line to monitor for contamination.

*To lyse the non-sperm cells:*

3. Add 0.5 mL digest buffer and 15 $\mu$L of 10 mg/mL Proteinase K solution to the previously resuspended cell debris and vortex briefly.

4. Add the original substrate back to the tube. This will increase the DNA yield from the sample.

5. Incubate at 56°C for at least 1 hour to lyse epithelial cells, but for no more than 2 hours to reduce lysis of sperm.   Incubation for less than one hour is permissible under certain situations.

6. Vortex 15-30 seconds in order to loosen sperm cells. With a fresh sterile toothpick or a sterile implement agitate substrate and remove, squeezing out as much liquid as possible. Retain the substrate in a separate tube.

   Generally the substrate should be piggybacked to remove as much of the biological material from the substrate as possible.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

   a) Place the substrate in a spin basket, cap and spin ~5 minutes in microcentrifuge.
   b) Remove the substrate and the basket.
   c) Carefully remove all except ~50 µL of the supernatant.

7.  Spin the sample in a microcentrifuge for 5 minutes at 14,000 rpm at room temperature.

8.  Using a sterile 1 mL pipette tip, remove the supernatant to a fresh labeled microcentrifuge tube. This non-sperm fraction may be returned to 56°C incubation or refrigerated while the sperm are washed.  The analysis of the sperm fraction of the PEC may be discontinued at this point.

*To wash the sperm cells:*

9.  Resuspend the pellet in 0.5 -1 mL of digest buffer and vortex briefly.

    [The volume of digest buffer can be increased if the condition of the sample warrants, for instance if the ratio of non-sperm to sperm cells is large]

10. Spin the sample in a microcentrifuge for 5 minutes at 14,000 rpm.

11. Remove all but 50 µL of supernatant and discard.

12. Repeat wash steps 8-10 an additional 2 or 3 times, leaving 50 µL of the supernatant each time.

*[Note: Additional washes can be performed when the number of sperm cells is low and number of nonsperm cells is high.]*

13. Resuspend the pellet in 0.5 – 1 mL DI water or PBS and vortex briefly.  Spin the samples in a microcentrifuge for 5 minutes at 14,000 rpm.  Remove and discard all but 50 µL of the supernatant.  Resuspend the pellet in the remaining 50 µL.

14. Remove 3 µL of the resuspended sample with a sterile disposable pipette tip. Use Christmas Tree Stain for microscopic verification of digestion of the epithelial cells and recovery of the sperm (see FB manual section 4.1.8 step 2).

    The samples should be re-digested as needed if microscopy shows the presence of excessive undigested epithelial cells.  Proceed from Step 2 or Step 8 as appropriate.

   To lyse the sperm cells:

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

15. Add the following reagents to each sperm pellet tube:
    500 µL digest buffer.
    15 µL 10 mg/ml Proteinase K
    20 µL 1M DTT

16. Incubate at 56° C for at least 1 hour to overnight. For evidentiary material, it is recommended that digestion continue for a minimum of 2 hours or overnight. Alternatively, add another 15 µL Proteinase K solution to each sperm fraction tube and continue incubating at 56°C another 4 to 16 hours.

17. Proceed to Purification of DNA by organic extraction and ultrafiltration or Purification of DNA Using the EZ-1 DNA Investigator Kit

**References:**

FBI PCR Protocols 1994

Perkin Elmer AmpliType® User Guide 1990 Version 2

Texas Department of Public Safety DNA SOP

California Department of Justice DNA Protocols

Qiagen Inc.  Biorobot EZ-1 User Manual January 2003. Qiagen, Inc. 2004

Qiagen Inc.  EZ1 DNA Investigator Handbook 1/2006. Qiagen, Inc. 2005

Qiagen Inc. EZ1 Advanced XL User Manual 5/2009. Qiagen, Inc. 2009

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

### 4.2.4  Purification of DNA by organic extraction and ultrafiltration

**Materials and Equipment:**

Microcon 100 or Centricon 100 concentrators
Phenol:Chloroform:Isoamyl alcohol 25:24:1
TE-4 Buffer
1.5 mL sterile microcentrifuge tubes
Aerosol Barrier tips

**Procedure:**

**Organic extraction:**

**SAFETY:  Phenol is a caustic substance!! Wear gloves and eye protection. All portions of this procedure involving phenol/chloroform transfer will be performed in a fume hood.**

1. Fill out and use the FB Organic DNA Extraction with Microcon 100 worksheet or FB Organic DNA Extraction with Centricon 100 worksheet.

2. To the lysed and digested cells, add an equal volume, typically 0.5 mL, of buffered phenol-chloroform solution.  Cap the tube and vortex for 15 seconds or gently invert until emulsion forms.  Record the expiration date of the phenol-chloroform on the purification worksheet.

3. Spin in a microcentrifuge for 5 minutes at 14,000 rpm at room temperature to separate the two phases.

4. Use a sterile aerosol resistant pipette tip or sterile transfer pipette to transfer the upper aqueous phase to a fresh sterile 1.5 mL microcentrifuge tube. Discard the tube containing the lower organic phase.

5. If necessary, repeat Steps 1 to 3 an additional 1 to 3 times, until the interface is clean and the aqueous phase is clear.

6. Following the last solvent addition, spin in a microcentrifuge for 5 minutes at 14,000 rpm.

Ultrafiltration:  Wash and concentrate the DNA solution by one of the following methods:

**<u>Microcon 100 procedure:</u>**

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

1. Place filtration unit (sample reservoir) into the filtrate cup.

2. Add 25 – 50 µL of sterile DI water to the membrane to moisten the filter.

3. Add up to 500 µL of sample to the sample reservoir.  Do not touch the filtration membrane with the pipette tip or any other object.  Avoid pipetting organic solvent from the tube into the concentrator.

4. Centrifuge for at least 10 - 15 minutes at 500 x g (approximately 2300 rpm). Continue to centrifuge if an insufficient amount of filtrate has been passed through the membrane. The DNA sample will remain concentrated in the bottom of the sample reservoir.

5. Add an additional 150 $\mu$L TE$^{-4}$ buffer to sample reservoir to wash DNA and centrifuge for 5 minutes at 500 x g (2300 rpm). Additional washes may assist in additional purification.

6. If a significant amount of liquid is still noticeable on the membrane, centrifuge several minutes longer at 2300 rpm to allow most of the liquid to pass through the membrane. This minimizes the amount of impurities in the final DNA eluate. The membrane should be damp but have no fluid above it.

7. Invert the sample reservoir into a new properly labeled centrifuge tube. Note: Do not discard effluent until sample quantification is completed in order to ensure that the membrane on the Microcon 100 has not been damaged and the DNA sample has been sufficiently recovered and concentrated.

8. Centrifuge inverted unit for 2-3 minutes at 500 x g (2300 rpm) to recover DNA sample.

9. If the recovered sample volume is insufficient, up to 45 $\mu$L of TE$^{-4}$ buffer may be added to the back-side of the membrane.  After the addition, centrifuge for 3 minutes at 700 x g (approximately 2700 rpm).

10. Using a pipette tip, transfer retentate into a standard microcentrifuge tube for storage. Record the approximate volume of the sample as it is transferred.

**<u>Centricon 100 procedure</u>:**

1. Attach a lower (effluent) reservoir to the filter end of a Centricon 100 column. Attach a cap tube to the upper end of the column.   Label the column with appropriate identification information.

2. Add 2 ml sterile deionized water to sample reservoir.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

3. Centrifuge 2000 x g (approx. 4300 rpm) in a fixed-angle rotor for 5 minutes.

4. Add 500 -1000 µL TE$^{-4}$ to the upper (sample) reservoir of the column.

5. Without disturbing the interface, transfer the aqueous phase of the sample to the sample reservoir.

6. Centrifuge at 1000xg (approx. 2700 rpm) for ~15 minutes.

7. Add 500-1000 µL TE$^{-4}$ and spin at 1000xg (approx. 2700 rpm) for 15 minutes.

8. Empty the lower (effluent) reservoir.  Add an additional 500-1000 µL of TE$^{-4}$ and spin at 1000xg (approx. 2700 rpm) for 20 minutes. If a significant amount of liquid is still noticeable on the membrane centrifuge for an additional 2-10 minutes at 1000xg to allow most of the liquid to pass through the membrane.

9. Invert the column and spin at 1000xg (approx. 2700 rpm) for 5 minutes.

10. Record the approximate volume of the recovered sample.

Store DNA extract at 4°C for short-term storage or –20°C for long-term storage. Proceed to DNA quantitation.

**References:**

Microcon® User Guide, 1998

RCMP Biology Section Methods Guide

Texas Department of Public Safety DNA SOP

Centricon® User Guide, 2004

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.2.5  Purification of DNA from forensic samples using the EZ1 DNA Investigator Kit

**Materials and Equipment:**
EZ1 DNA Investigator Kit (48), including:
    Tissue Reagent Cartridges
    Disposable Tip Holders
    Disposable Filter Tips
    Sample Tubes (2 mL)
    Elution Tubes (1.5 mL)
Buffer MTL (Qiagen)

**Procedure:**

Note: this procedure is intended for purification of samples prepared for the EZ1.  It may also be used to re-purify samples originally prepared by organic extraction.  Up to ~500 µL of sample (one standard digested sample volume) may be purified in each EZ1 sample path; sample volumes less than 500 µL should be adjusted to 500 µL before the process by adding digest buffer.  Samples larger than ~500 µL may be split into more than one sample path, if needed.

1. Fill out and use the FB EZ1 DNA Purification worksheet or FB EZ1 Advanced XL DNA Purification worksheet.

2. If the EZ1 DNA Investigator Card / EZ1 Advanced XL Card is not already loaded, insert the card completely into the EZ1 Card slot of the BioRobot EZ1 or EZ1 Advanced XL.

3. Switch on the instrument.

4. Set up the protocol:
   a. For the EZ1:  Press "START" to display the "Protocols" menu.
   b. For the EZ1 Advanced XL: Press "START" to begin the purification protocol.  After pressing "START" you will be asked to create a report file.  Press "ESC" to decline.

5. Select the large-volume protocol:
   a. For the EZ1:  Press "4"
   b. For the EZ1 Advanced XL: Press "3"

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

6.  Choose the elution buffer and volume:
    a.  For the EZ1: press "2" to elute in TE, then press "1" to elute in 50 µL.
    b.  For the EZ1 Advanced XL: Press "2" to elute in TE, and then press "2" to elute in 50 µL.

7.  Press any key (except "ESC") to proceed through the text displayed in the LCD and start worktable setup.  The text summarizes the following steps which describe loading of the worktable.

8.  Open the workstation door.

9.  Invert the reagent cartridges gently to mix the magnetic particles. Then tap the cartridges to deposit the reagents at the bottom of their wells.

    *Note: Before loading cartridges, inspect well 1 (the well closest to the front of the instrument when the cartridge is installed) for precipitate.  If precipitate is noted, gently invert the cartridge at room temperature until the precipitate dissolves.*

10. Load the reagent cartridges into the cartridge rack.

    *Note: After sliding a reagent cartridge into the cartridge rack, ensure that you press down on the cartridge until it clicks into place.*

11. Load opened labeled elution tubes into the first row of the tip rack.

12. Load tip holders containing filter-tips into the second row of the tip rack.

    *Note: DO NOT aliquot Buffer MTL directly from stock bottles!  Carefully POUR the necessary amount (approximately 2.5 mL for a set of six samples) into a sterile disposable tube, then pipette aliquots from the tube.*

13. Add 400 µL Buffer MTL into labeled sample tubes, and transfer digested samples into the tubes.  Load the opened sample tubes containing digested samples into the back row of the tip rack.

14. Close the workstation door.

15. Press "START" to start the purification procedure.  The automated purification procedure takes 15–20 minutes.

16. When the protocol ends, the LCD displays "Protocol finished". Open the workstation door.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department

Regional Crime Laboratory

Forensic Biology

FB Technical Procedures Manual

17. Retrieve the elution tubes containing the purified DNA.  Each elution tube should be capped with a new cap. The DNA is ready to use, or can be stored at 2–8°C during analysis or at –20°C for longer periods.

18. Dispose of consumables in appropriate waste receptacles.  Cap all sample tubes prior to disposal.

19. End the protocol:
    a.    For the EZ1: Press "STOP" twice to return to the main menu.
    b.    For the EZ1 Advanced XL: Press "ENT" to continue with the UV purification run (this run is optional) or press "ESC" twice to return to the main menu.

    If running the UV protocol, use keys 0-9 to set the duration of the UV decontamination run (20-60 minutes). Press "ENT" and then "START" to switch on the lamp. At the end of the run the lamp cools for 3 minutes.  The XL door cannot be opened until after the cooling time has elapsed. After cooling, the main menu will appear.

20. Retrieve the elution tubes containing the purified DNA. The DNA is ready to use, or can be stored at 2–8°C during analysis or at –20°C for longer periods.

21. Dispose of consumables in appropriate waste receptacles.  Cap all sample tubes prior to disposal.

22. Clean the instrument following the procedure described in section 8.9 of the FB Manual.  If this is your last use of the instrument for the day, also perform the daily maintenance procedure described in section 8.9 of the manual.  At the conclusion of these procedures, close the workstation door and switch the instrument off.

23. Proceed to DNA quantitation.

**References:**

Qiagen Inc.  Biorobot EZ-1 User Manual January 2003. Qiagen, Inc. 2004

Qiagen Inc.  EZ1 DNA Investigator Handbook 1/2006. Qiagen, Inc. 2005

Qiagen Inc. EZ1 Advanced XL User Manual 5/2009. Qiagen, Inc. 2009

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                                         Forensic Biology
Regional Crime Laboratory                                        FB Technical Procedures Manual

### 4.2.6 DNA Concentration using Microcon 100

1. Fill out and use the FB Re-Microcon worksheet (if a sample is concentrated after quantitation and will not be quantitated after concentration) or FB Microcon Concentration worksheet.

2. Place filtration unit (sample reservoir) into the filtrate cup.

3. Add up to 500 µL of sample to the sample reservoir.  Do not touch the filtration membrane with the pipette tip or any other object.

4. Centrifuge for at least 20 minutes at 500 x g (approximately 2300 rpm). Continue to centrifuge if an insufficient amount of filtrate has been passed through the membrane (note on worksheet if it was necessary to spin for a longer period of time). The DNA sample will remain concentrated in the bottom of the sample reservoir.

5. Add 15 µL of TE$^{-4}$ to the membrane.  If a different amount of TE$^{-4}$ is added, note that on the worksheet.

6. Invert the sample reservoir into a new properly labeled centrifuge tube.

7. Centrifuge inverted unit for 3 minutes at 700 x g (2700 rpm) to recover DNA sample.

8. Using a pipette tip, transfer retentate into a standard microcentrifuge tube for storage. Record the approximate volume of the sample as it is transferred.

Issued By: DNA Technical Manager                                         Revision 1
Issue Date: 5/12/2011                                                  Page 110 of 272

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 4.3    DNA Quantitation

### 4.3.1    DNA Quantitation by Quantifiler™ Human

**Materials and Equipment:**

Applied Biosystems Quantifiler™ Human DNA Quantification Kit, including:
   Quantifiler Human Primer Mix
   Quantifiler Human DNA Standard (200 ng/µL stock solution)
   Quantifiler PCR Reaction Mix
TE$^{-4}$ buffer with glycogen (10 mM Tris-HCl pH 8, 0.1 mM EDTA, 20 ug/mL glycogen)
0.5 and 1.5 mL microcentrifuge tubes or 15 mL conical vials
Aerosol-resistant pipette tips
96-well optical reaction plates (Applied Biosystems part #4306737 or equivalent)
MicroAmp splash free support base (Applied Biosystems part #4312063 or equivalent)
Optical adhesive covers (Applied Biosystems part #4311971 or equivalent)
7500 SDS with software version 1.2.3

**Plate Set-up Worksheet:**

1.  Prepare a Quantifiler plate set-up worksheet using the Excel Quantifiler template (located on the LIMS Server in the SDS set-up folder which is in the 7500 folder) in order to document the positions of samples on the reaction plate, run details, and the case information.

2.  Calculate the total number of Quantifiler reactions to be prepared on the Quantifiler plate set-up worksheet, including standards, unknowns, and extraction controls.  Include enough reactions to run a reaction blank and duplicates of each standard. Add eight to sixteen additional ghost reactions per 96-well plate when calculating the reagent volumes.  The volume of each reagent is calculated as follows:

    Primer mix – 10.5 µL X (total number of reactions)
    Reaction mix – 12.5 µL X (total number of reactions)

3.  Print a copy of the plate set-up worksheet to use as a guide while setting up the reaction plate.

4.  Save a copy of the plate set-up worksheet on the LIMS server in the SDS set-up folder.  This will serve as documentation for each case analyst.  The saved

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

worksheet, and all subsequent saved documents, should be named with a six-digit date (mmddyy), followed by the analyst's initials.

5. Save the document in the following manner in order to import the set-up into the 7500 SDS instrument:

    Select the **plate document** tab, but do not make any changes.

    Go to **File > Save As**

    Open the SDS **import worksheet folder** on the LIMS server, enter a file name, and save as a **.txt** file type (text file)

    A warning window will appear; click **OK**. An information window will appear; click **Yes**.

    Close application. When prompted to save changes, select **No**.

*Sample/plate set-up steps are performed in a PCR Workstation mini-hood using dedicated pipettes*

**Preparation of Standards:**

1. Remove a tube of Quantifiler Human DNA Standard (50ng/µl) from frozen storage and thaw. Vortex 3-5 seconds and centrifuge briefly to remove condensation from vial lid.

2. Label a series of eight 0.5 mL microcentrifuge tubes with numbers 1 though 8.

3. Pipette 30 µL TE$^{-4}$/glycogen buffer into tube 1. Pipette 20 µL TE$^{-4}$/glycogen buffer into tubes 2 through 8.

4. Pipette 10 µL human DNA standard into tube 1, and mix thoroughly.

5. Using a new tip, pipette 10 µL of the contents of tube 1 into tube 2, and mix thoroughly. Repeat the serial dilution for tubes 3 through 8. Standards prepared in this fashion can be stored up to two weeks at 2-8 degrees C, and may be used for Quantifiler procedures for that length of time.

    NOTE: For increased volumes of standards, refer to the Quantifiler User Guide (page 3-3). Standard dilutions shall be as follows: 50ng/µl, 16.7ng/µl, 5.56ng/µl, 1.85ng/µl, .620ng/µl, .210ng/µl, .068ng/µl, and .023ng/µl.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                                          Forensic Biology
Regional Crime Laboratory                                          FB Technical Procedures Manual

### Analysis:

1.  Remove a tube of Quantifiler human primer mix from frozen storage and thaw.  Vortex 3-5 seconds to mix, then centrifuge briefly.

2.  Remove a bottle of Quantifiler PCR reaction mix from refrigerated storage and swirl gently to mix.  Do **not** vortex.

3.  Add the appropriate amount of PCR reaction mix and Quantifiler human primer mix reagents to a 1.5 mL microcentrifuge tube or 15 mL conical vial.  Vortex 3-5 seconds to mix, then centrifuge briefly.

4.  Place a 96-well optical reaction plate in a support base.  Add 23 μL of the master mix to each well to be used for a reaction.

    Important: Handle optical reaction plates with powder-free gloves only.  **Be sure to keep the 96-well reaction plate in its base (do not place it on the counter).  Dust and other debris from the counter top may interfere with the accuracy of the Quantifiler reading.**

5.  Using a high-precision pipette, pipette 2 μL of each standard, unknown, and control into the appropriate well on the reaction plate.  Pipette 2 μL of TE$^{-4}$/glycogen buffer into a well to serve as a negative control.

6.  Seal the plate with an optical adhesive cover and spin briefly to remove bubbles.

7.  Remove the plate from the support base and load it into the 7500 instrument.  Well A1 should be positioned in the upper left corner of the heat block and the notch on the plate at the upper right corner.  Close the instrument door.

Note: when closing the 7500 instrument tray, apply pressure to the right side of the tray and at an angle with direction towards the right.

8.  Power on the computer then the SDS instrument.  See page 21 of the 7500 Installation and Maintenance Guide for assistance in powering on the instrument.  Launch the AB 7500 system software from the desktop icon.

9.  Select **File>New**.

10. Make sure that the following settings are selected:

    Assay: Absolute Quantitation

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Container: 96-well clear

Template: HUMAN.sdt (for vertical quantitation standard loading)
                    OR
            HUMAN-B.sdt (for horizontal quantitation standard loading)

Select **Finish** if using the 7500.

11. Go to **File > Import Sample Set-Up**

12. Locate the appropriate .txt file in the LIMS server SDS import worksheet folder.  Double click on the file or highlight and select **Open**.

13. For wells with no sample, highlight the corresponding sample space on the plate setup and select **View>Well Inspector**.  Deselect both Human and IPC detectors.  Close the well inspector window.

14. Go to **File>Save** and save the document as a **.sds** file in the SDS files folder on the LIMS server.  Click on the **Instrument** tab on the worksheet.

    NOTE:  The Thermal Profile will need to be altered if the HUMAN or HUMAN-B template is not selected when setting up the file.

15. Select Start and verify the Estimated Time Remaining is displayed.

16. After the run is complete, document as appropriate in the instrument use and maintenance log.

**Data Analysis and Interpretation:**

1. After the run is complete, verify the analysis settings.  Select **Analysis>Analysis Settings**:
       7500 Analysis Settings:
            Detector: All
            Manual Ct
            Threshold: 0.200000
            Manual Baseline start (cycle): 3
            Manual Baseline end (cycle): 15
       Click **OK**.

2. Select **Analysis>Analyze**.  Select the **Results** tab to view the analyzed data.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

3.  View the standard curve by selecting the **standard curve** tab.  Verify that the $R^2$ value is at least 0.98 and the slope is between -2.9 and -3.5. The Y-intercept value should be approximately 28-29. Consult the Quantifiler Kit user's manual (page 5-6) if the $R^2$ value or the slope differs significantly from these specifications.  Some standards may be omitted in the standard curve calculation as long as there is at least one data point for each standard.

4.  View the amplification plot in the results tab by selecting the **Amplification Plot** tab.  Highlight the appropriate samples in the 96-well plate set-up or the sample table below the amplification plot.   The red bar representing the Ct on the amplification plot will be green once analysis is complete.  If the analysis settings are altered following the initial analysis, the bar will be red indicating that re-analysis is necessary.

5.  If the standard and amplification data meet the criteria listed above, the sample run can be accepted as valid.  If the data does not meet the listed criteria, the run cannot be accepted, and must be repeated.

6.  Go to **File** and select **Export>Results**.  Select the SDS **Results** folder on the LIMS server and save the file.  The contents of the results table can be edited by selecting **Tools>Report Settings**.  At a minimum, the results table should include the following:
    *   Well number
    *   Sample Name
    *   Task
    *   Ct
    *   Quantity

7.  Power down the instrument.

*Note: the remaining steps of the process can be conducted from the copy of the results document on the server.*

8.  Open the appropriate results file from the LIMS server and print the resulting .csv document.  Results greater than 50ng/ µl will not be used to estimate concentration for purposes of STR amplification.  Samples with quantities greater than 50ng/µl should be diluted and reanalyzed.  Samples with a quantity listed as "undetermined" can be reported as no human DNA detected.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

9. Assess the IPC (internal positive control) values of each sample for inhibition. The IPC Ct value should be approximately 27+/-1 for an uninhibited sample. The following table should be used to assist in interpretation.

| Sample Quantitation | IPC | Interpretation |
| --- | --- | --- |
| Negative | Positive | Negative |
| Negative | Negative | Invalid result |
| Low Ct, High delta Rn | Negative | Disregard IPC |
| High Ct, Low delta Rn | Negative | Partial inhibition |

10. The results table and a copy of the Quantifiler plate set-up worksheet will serve as documentation of the analysis. Print out the Standard Curve and include with the case notes.

11. In order to report out that no human DNA was detected all the following criteria shall be met:  the sample has a total volume of 20 µl or less with a quantitation value of "Undetermined", the appropriate standard curve values (slope, $R^2$, and y-intercept) are met, and the sample IPC does not indicate inhibition.  When the quantitation value is less than 0.01 ng/µl the limitations of the detection system do not allow us to distinguish between human DNA and background fluorescence. Negative control values of less than 0.01 ng/µl are not in themselves reason to believe the control is contaminated.

12. When Quantifiler detects human DNA less than 0.025ng/µl and meets the criteria above, there may not be enough DNA for further analysis.  These situations will be reported as "An insufficient amount of human DNA was detected from item X; therefore, no further analysis will be performed on this item." when no further analysis will be conducted.  This wording does not confirm the presence of human DNA, but it indicates that the analyst does not think it would be an appropriate sample for Identifiler STR typing.

**References:**

Applied Biosystems. ABI PRISM® 7000 Sequence Detection System User Guide. Applied Biosystems (2001)

Applied Biosystems. Quantifiler™ Human DNA Quantification Kit and Quantifiler™ Y Human Male DNA Quantification Kit User's Manual.  Applied Biosystems (2003)

Green, R., et al.  Developmental Validation of the Quantifiler Real-Time PCR Kits for the Quantification of Human Nuclear DNA Samples.   JFS (2005) 50(4):809-825.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                                    Forensic Biology
Regional Crime Laboratory                                        FB Technical Procedures Manual

### 4.3.2  DNA Quantitation by Quantifiler Duo™ Quantitation Kit

**Materials and Equipment:**

Applied Biosystems Quantifiler™ Duo DNA Quantification Kit, including:
    Quantifiler Duo Primer Mix
    Quantifiler Duo PCR Reaction Mix
    Quantifiler Duo DNA Dilution Buffer
    Quantifiler Duo DNA Standard (200 ng/µL stock solution)
0.5 and 1.5 mL microcentrifuge tubes or 15 mL conical vials
Aerosol-resistant pipette tips
96-well optical reaction plates (Applied Biosystems part #4306737 or equivalent)
MicroAmp splash free support base (Applied Biosystems part #4312063 or equivalent)
Optical adhesive covers (Applied Biosystems part #4311971 or equivalent)
7500 SDS with software version 1.2.3

**Plate set-up worksheet:**

1. Prepare a Quantifiler Duo plate set-up worksheet using the Excel Quantifiler Duo template (located on the LIMS Server in the SDS **set-up** folder which is in the 7500 folder) in order to document the positions of samples on the reaction plate, run details, and the case information.

2. Calculate the total number of Quantifiler Duo reactions to be prepared on the Quantifiler Duo plate set-up worksheet, including standards, unknowns, and extraction controls.  Include enough reactions to run a reaction blank and duplicates of each standard. Add eight to sixteen additional ghost reactions per 96-well plate when calculating the reagent volumes.  The volume of each reagent is calculated as follows:

    Primer mix – 10.5 µL X (total number of reactions)
    Reaction mix – 12.5 µL X (total number of reactions)

3. Print a copy of the plate set-up worksheet to use as a guide while setting up the reaction plate.

4. Save a copy of the plate set-up worksheet on the LIMS server in the SDS **set-up** folder.  This will serve as documentation for each case analyst.  The saved worksheet, and all subsequent saved documents, should be named with a six-digit date (mmddyy), followed by the analyst's initials.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

5. Save the document in the following manner in order to import the set-up into the 7500 SDS instrument:

   Select the **plate document** tab, but do not make any changes.
   Go to **File > Save As**
   Open the SDS **import worksheet folder** on the LIMS server, enter a file name, and save as a **.txt** file type (text file)
   A warning window will appear; click **OK**. An information window will appear; click **Yes**.
   Close application. When prompted to save changes, select **No**.

*Sample/plate set-up steps are performed in a PCR Workstation mini-hood using dedicated pipettes.*

**Preparation of standards:**

1. Remove a tube of Quantifiler Duo DNA Standard (200ng/ µl) from frozen storage and thaw. If the DNA standard has been previously opened, remove tube from refrigerator. Vortex 3-5 seconds and centrifuge briefly to remove condensation from vial lid.

2. Label a series of eight 0.5 mL microcentrifuge tubes with numbers 1 though 8.

3. Pipette 30 µL of the DNA dilution buffer into tube 1. Pipette 20 µL of the DNA dilution buffer into tubes 2 through 8.

4. Pipette 10 uL human DNA standard into tube 1, and mix thoroughly.

5. Using a new tip, pipette 10 µL of the contents of tube 1 into tube 2, and mix thoroughly. Repeat the serial dilution for tubes 3 through 8. Standards prepared in this fashion can be stored up to two weeks at 2-8 degrees C and may be used for Quantifiler Duo procedures for that length of time.

   NOTE: For increased volumes of standards, refer to the Quantifiler Duo User Guide (page 3-3). Standard dilutions shall be as follows: 50ng/ µl, 16.7ng/ µl, 5.56ng/ µl, 1.85ng/ µl, .620ng/ µl, .210ng/ µl, .068ng/ µl, and .023ng/ µl.

**Analysis:**

1. All Quantifiler Duo kit components are stored frozen until first use. Once completely thawed and opened, all components should be refrigerated.

2. Remove a tube of Quantifiler Duo primer mix. Vortex 3-5 seconds to mix, then centrifuge briefly.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

3. Remove a bottle of Quantifiler Duo PCR reaction mix and swirl gently to mix.  Do not vortex.

4. Add the appropriate amount of Quantifiler Duo PCR reaction mix and Quantifiler Duo primer mix reagents to a 1.5 mL microcentrifuge tube or 15 mL conical vial. Vortex 3-5 seconds to mix, then centrifuge briefly.

5. Place a 96-well optical reaction plate in a support base.  Add 23 µL of the master mix to each well to be used for a reaction.

   Important: Handle optical reaction plates with powder-free gloves only.  **Be sure to keep the 96-well reaction plate in its base (do not place it on the counter).  Dust and other debris from the counter top may interfere with the accuracy of the Quantifiler Duo reading.**

6. Using a high-precision pipette, pipette 2 µL of each standard, unknown, and control into the appropriate well on the reaction plate.  Pipette 2 µL of the DNA dilution buffer into a well to serve as a negative control.

7. Seal the plate with an optical adhesive cover and spin briefly to remove bubbles.

8. Remove the plate from the support base and load it into the 7500 instrument. Well A1 should be positioned in the upper left corner of the heat block and the notch on the plate at the upper right corner.  Close the instrument door.

   *Note: when closing the 7500 instrument tray, apply pressure to the right side of the tray and at an angle with direction towards the right.*

9. Power on the computer then the SDS instrument. See page 21 of the 7500 Installation and Maintenance Guide for assistance in powering on the instrument. Launch the ABI Prism 7500 System software from the desktop icon.

10. Select **File>New**.

11. Make sure that the following settings are selected:
    Assay: Absolute Quantitation
    Container: 96-well clear
    Template: DUOvertical.sdt (for vertical quantitation standard loading)
         OR
         DUOhorizontal.sdt (for horizontal quantitation standard loading)
    Select **Finish**.

12. Go to **File > Import Sample Set-Up**

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

13. Locate the appropriate .txt file in the LIMS server **SDS import worksheet** folder. Double click on the file or highlight and select **Open**.

14. Optional: for wells with no sample, highlight the corresponding sample space on the plate setup and select **View>Well Inspector**.  Deselect the human, male, and IPC detectors.  Close the well inspector window.

15. Go to **File>Save** and save the document as an **.sds** file in the **SDS files** folder on the LIMS server.  Click on the **Instrument** tab on the worksheet.

    NOTE:  The Thermal Profile may need to be altered if the DUOvertical or DUOhorizontal template is not selected when setting up the file.

16. Select **Start** and verify the Estimated Time Remaining is displayed.

17. After the run is complete, document as appropriate in the instrument use and maintenance log.

**Data analysis and interpretation:**

1. After the run is complete, verify the analysis settings.  Select **Analysis>Analysis Settings**:
   7500 Analysis Settings:
        Detector: All
        Manual Ct
        Threshold: 0.200000
        Manual Baseline start (cycle): 3
        Manual Baseline end (cycle): 15
   Click **OK**.

2. Select Analysis>Analyze.  Select the Results tab to view the analyzed data.

3. View the standard curves by selecting the standard curve tab.  Verify that the $R^2$ value is at least 0.98 and the slopes are between -3.0 and -3.6 for both the human and male assays. The Y-intercept value should be approximately 27-31. Consult the Quantifiler Duo Kit user's manual (page 5-3) if the $R^2$ value or the slope differs significantly from these specifications.  Some standards may be omitted in the standard curve calculation as long as there is at least one data point for each standard.

4. View the amplification plot in the results tab by selecting the **Amplification Plot** tab.  Highlight the appropriate samples in the 96-well plate set-up or the sample

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

table below the amplification plot.   The red bar representing the Ct on the amplification plot will be green once analysis is complete.  If the analysis settings are altered following the initial analysis, the bar will be red indicating that re-analysis is necessary.

5. If the standard and amplification data meet the criteria listed above, the sample run can be accepted as valid.  If the data **does not** meet the listed criteria, the run cannot be accepted, and must be repeated.

6. Go to **File** and select **Export>Results**.  Select the SDS **Results** folder on the LIMS server and save the file.  The contents of the results table can be edited by selecting **Tools>Report Settings**.  At a minimum, the results table should include the following:
    Well number
    Sample Name
    Task
    Ct
    Quantity

7. Power down the instrument.

8. Open the appropriate results file from the LIMS server and print the resulting .csv document.  Results greater than 50 ng/μl will not be used to estimate concentration for purposes of STR amplification. Samples with quantities greater than 50 ng/μl can be diluted and reanalyzed.  Therefore, for purposed of determining the male: female ratio and in instances where only the male DNA will be amplified (e.g. using Yfiler), the amount of female DNA may be greater than 50 ng/ μl as long as the amount of male DNA is less than 50 ng/ μl.

9. Assess the IPC (internal PCR control) values of each sample for inhibition.  The IPC Ct value should be approximately 28-31 for an uninhibited sample.  The following table should be used to assist in interpretation.

| Sample Quantitation | IPC | Interpretation |
|---|---|---|
| Negative | Positive | Negative |
| Negative | Negative | Invalid result |
| Low Ct, High delta Rn | Negative or Ct higher than 31 | Inconclusive IPC |
| High Ct, Low delta Rn | Negative or Ct higher than 31 | PCR inhibition |

10. The results table and a copy of the Quantifiler Duo plate set-up worksheet will serve as documentation of the analysis. Print out the standard curves for both the human and the male assays and include with the case notes.   This can be

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

accomplished by changing the selection in the **Detector:** drop-down menu to the right of the standard curve.

11. In order to report out that no human or no male DNA was detected all the following criteria shall be met:  the sample has a total volume of 20 µl or less with and "undetermined" quantitation value, the appropriate standard curve values (slope, $R^2$, and y-intercept) are met, and the sample IPC does not indicate inhibition.    When reporting no human DNA, both the human and male DNA must be "undertermined".

12. When Quantifiler Duo detects human (or male) DNA less than 0.025ng/µl and meets the criteria above, there may not be enough DNA for further analysis. These situations will be reported as "An insufficient amount of human DNA was detected from item X; therefore, no further analysis will be performed on this item" when no further analysis will be conducted.  This wording does not confirm the presence of human DNA, but it indicates that the analyst does not think it would be an appropriate sample for Identifiler STR typing.

13. From the Human and Male quantities provided by the Quantifiler Duo Kit, the ratio of male and female DNA can be calculated.  The ratio determines the extent of the mixture and is useful in determining how to proceed with analysis. The following equation can be used:

   Male DNA : Female DNA ratio =
   Male DNA/Male DNA : (Human DNA-Male DNA) /Male DNA

**References:**

Quantifiler™ Duo DNA Quantification Kit User's Manual, Applied Biosystems (2008)
Barbisin, M., et al.  Developmental Validation of the Quantifiler Duo DNA.

Quantification Kit for Simultaneous Quantification of Total Human and Human Male DNA and Detection of PCR Inhibitors in Biological Samples.   JFS (2009) 54(2):305-319.

AmpFlSTR® YfilerTM PCR Amplification Kit User's Manual, Applied Biosystems (2006).

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 4.4    STR Analysis Procedures

### 4.4.1    Introduction

The Polymerase Chain Reaction (PCR) is utilized for Short Tandem Repeat (STR) typing.  This analysis is performed using the AmpFlSTR Amplification Kits manufactured by Applied Biosystems.  Each kit provides sufficient reagents for 200 amplifications.  Each kit includes AmpFlSTR PCR reaction mix, primer set, Control DNA 9947A, AmpliTaq Gold DNA polymerase, and allelic ladder.  Upon receipt of kit, the AmpliTaq Gold DNA polymerase is removed from the kit and stored in a non-frost-free freezer (or in a Stratacooler in a frost-free freezer), and the allelic ladder is stored in a PCR room freezer until opened. The remainder of the kit is stored in a refrigerator (NOT in the PCR room).

**Controls for Amplification:**

A variety of controls are required to assess the quantity and quality of the extracted DNA as well as the effectiveness, accuracy, and precision of the analytical procedures.  Evaluation of the controls is essential to the proper interpretation of the test results.

- **Positive Extraction Control (PEC)**

    The positive extraction control (PEC) consists of whole blood from a known donor spotted on an appropriate medium, such as sterile cloth or filter paper. The primary purpose of the control is to ensure that the extraction process worked properly.  This control can also serve as a positive control for the amplification process in most cases, and also provides an additional control to detect adventitious laboratory contamination.

- **Positive Amplification Control (PAC - Control DNA 9947A)**

    The positive amplification control (PAC) is included in the AmpFlSTR typing kits. It is an analytical control sample used to determine if the PCR performed properly.  The PAC should generally serve as a primary positive control for the amplification process. The correct genotypes for the PAC are outlined in section 4.4.3. The positive amplification control shall be amplified concurrently with the samples at all loci and with the same primers as the forensic samples.  All samples typed shall also have the corresponding amplification controls typed.

    The PAC should be labeled with a unique identifier which generally includes amplification date, affiliation with known or questioned samples, and initials of analyst (i.e. PACQ 060709 SG).

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

- **Reagent Blank (RB)**

  The reagent blank is a tube containing all the reagents used for extraction, amplification, and typing, but lacking any DNA sample. The purpose of this sample is to detect contamination that might occur from the reagents, the environment, or between the samples being processed. A separate reagent blank is required for extraction sets of known (K) and questioned (Q) samples. A separate reagent blank is also required for the sperm and non-sperm fractions of a differential extraction. A reagent blank associated with a particular extraction sample/set must be carried through the extraction (including concentration if applicable), quantitation, amplification, and typing process.  If the samples associated with the reagent blank are stopped after the quantitation step, the reagent blank(s) may be stopped as well.

  Reagent blanks shall be extracted concurrently with their associated extraction set.  They shall be amplified using the same primers, instrument model, and concentration conditions as the sample containing the least amount of DNA in the extraction set. They shall be typed using the same instrument model, the most sensitive injection conditions, and most sensitive volume conditions of the extraction set.

- **Negative Amplification Control (NAC)**

  The negative amplification control contains only the reagents used to prepare the PCR amplification mixture for each batch of samples, including sample buffer (TE$^{-4}$).  The purpose of this sample is to detect contamination that might occur from the PCR reagents, the PCR set-up environment or between the PCR reactions being prepared. A negative amplification control will be included with each set of amplified samples. The negative amplification control (NAC) shall be amplified concurrently with the samples at all loci and with the same primers as the forensic samples.  All samples typed shall also have the corresponding amplification controls typed.  The NAC shall be typed using the same instrument model, the most sensitive injection conditions, and most sensitive volume conditions of the amplification set.

  The NAC should be labeled with a unique identifier which generally includes amplification date, affiliation with known or questioned samples, and initials of analyst (i.e. NACQ 060709 SG).

- **Substrate Sample**

  Under some circumstances, it is useful to sample and analyze an unstained portion of the substrate adjacent to the questioned stain. The results from

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

such a sample may aid in the interpretation of complex mixtures of DNA. This is subject to analyst discretion on a case-by-case basis.



*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.4.2  STR Amplification – Identifiler

**Materials and Equipment:**

AmpFlSTR Identifiler Amplification Kit, containing:
    Identifiler PCR Reaction Mix
    Identifiler Primer Set
    Identifiler Control DNA 9947A
    AmpliTaq Gold DNA Polymerase
    Identifiler Allelic Ladder
Sterile 0.2-mL reaction tubes
TE$^{-4}$ buffer
Bovine Serum Albumin (optional)
Aerosol resistant tips

**Procedure:**

1. Fill out and use FB Amplification worksheet or FB Amplification (SuperJuice) worksheet.

2. Turn on the thermal cycler (9700).

3. Press Run (F1 key) and select the Identifiler method.
    Thermal cycling parameters are as follows:
    Initial incubation:    95°C, 11 minutes
    Amplification: 28 cycles--
    94°C, 1 minute
    59°C, 1 minute
    72°C, 1 minute
    Final extension:    60°C, 60 minutes
    Hold:  25°C, indefinite
    **NOTE:**  *The amplified products can be removed from the thermal cycler at any time after reaching 25°C.*

4. Determine the number of samples to be amplified including control samples. Place the required number of 0.2-mL reaction tubes into a rack and label them. Sets of questioned and known samples shall be prepared independently from each other, with separate amplification controls.

5. Fill out an Amplification Set-Up Sheet with the pertinent information.  Be sure to record the amplification kit lot number, AmplTaq Gold lot number, box number, and expiration date of kit on the worksheet.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

*NOTE: Steps 6-10 are performed in a PCR Workstation mini-hood using dedicated pipettes.*

6.  Prepare a master mix by adding the following volumes of reagents to a 1.5 mL microcentrifuge tube:

    | # samples | X | 10.5 μL | PCR Reaction Mix |
    |---|---|---|---|
    | # samples | X | 5.5 μL | AmpFlSTR Primer Set |
    | # samples | X | 0.5 μL | AmpliTaq Gold DNA Polymerase |

    *NOTE: The formulation above provides a slight excess. A 1.5 mL microcentrifuge tube provides enough volume for a maximum of 84 samples (110 samples with a 2.0 mL tube). The PCR Reaction Mix and the Primer Set must be vortexed and spun down prior to preparing the master mix.*

7.  Mix the master mix thoroughly using a vortex mixer and spin the tube briefly in a microcentrifuge to remove any liquid from the cap.

8.  Dispense 15 μL of the master mix into each 0.2 mL tube.

9.  For each sample, set up in the following order:

    Questioned or known samples, Positive Extraction control (PEC), Reagent Blank (RB), Positive Amplification Control (PAC), and Negative Amplification Control (NAC):

    *   Quantity of TE-[4] needed for a total volume of 10 μL
        (The same pipette tip may be used for the addition of TE[-4] to all tubes if care is taken to avoid touching the tubes with the tip)

    *   Extracted DNA: typically 0.75 to 2.5 ng (depending on the sample). For difficult samples (mixtures or degraded DNA), it may be necessary to amplify more than 2.5 ng of DNA. Amplification of less than 250 pg total DNA should only be attempted with extreme caution at analyst discretion. For negative extraction controls, add a volume of extract equal to or greater than the largest volume added from any sample in the extraction batch.

    *   Negative Amplification Control: 10 μL of TE[-4] buffer. This sample shall be setup after all other samples in an amplification batch
    .
    (A fresh pipette tip will be used for the addition of each DNA sample)

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

*NOTE: For samples that may have some inhibition or are challenged, the analyst has the option to add "superjuice" [1.4 $\mu$L of Bovine Serum Albumin (3.2 mg/mL) and 1.1 $\mu$L of AmpliTaq Gold DNA Polymerase (5U/$\mu$L)] per sample. If the 2.5 $\mu$L of superjuice is added to a sample for amplification, only 7.5 $\mu$L of total DNA extract or TE may be added to that sample. Superjuice shall be added to all negative controls (reagent blank and negative amplification control) associated with the sample in that amplification. Generally, there should be two negative amplifications controls prepared if using superjuice (one with superjuice and one without). There may be a need to prepare more than one reagent blank if more than 7.5 $\mu$L of any samples extract is used in the amplification batch.*

10. Add the prepared sample (10 $\mu$L) or the appropriate amount of sample and TE[-4] (equal to 10 $\mu$L) to each reaction tube. Mix the sample by stirring with the pipette tip. Do not vortex. After the addition of sample, cap each tube before proceeding to the next sample. The final reaction volume in each tube is 25 $\mu$L.

11. **Make sure a 96-well sample tray (ABI part #N801-0541) is in place over the instrument's heat block before placing tubes in the block**. Place the tubes into the thermal cycler heat block and close the lid. Start the thermal cycler program. When prompted, select the appropriate reaction volume (25 $\mu$L). Make sure the Ramp speed is set to 9600.

12. After the amplification is complete, remove the tubes from the instrument block and store the amplified products protected from light. The amplified products can be stored in a refrigerator for short periods of time. For longer periods, the products should be frozen at ~ –20°C.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.4.3  Sample Preparation

Electrophoresis is performed only in the PCR room.  Use only pipettes dedicated to the PCR room for sample set-up.  The allelic ladders from the AmpFISTR kits (removed at the time the kit was opened and stored in the PCR room) will be used for "Genotyping".

**Materials and Equipment:**

Analytical Standards for Electrophoresis:

- GeneScan – 500 Internal Lane Size Standard (GS-500)
  This standard contains well-characterized fragments of dye-labeled plasmid DNA that are co-injected with the sample to estimate the sizes of STR alleles by interpolation.  Use GS-500 LIZ standard for Identifiler samples.

- AmpFISTR Identifiler Allelic Ladder
  The allelic ladders provided in the kits are used to determine the genotypes of samples.  While the ladders include the common alleles, additional alleles exist and may be detected.  The alleles included in the ladders and the size ranges they span on the Genetic Analyzers are listed below:

| STR Locus (dye color) | Ladder Alleles | PAC |
|---|---|---|
| D8S1179 (blue) | 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 | 13 |
| D21S11 (blue) | 24, 24.2, 25, 26, 27, 28, 28.2, 29, 29.2, 30, 30.2, 31, 31.2, 32, 32.2, 33, 33.2, 34, 34.2, 35, 35.2, 36, 37, 38 | 30 |
| D7S820 (blue) | 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 | 10,11 |
| CSF1PO (blue) | 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 | 10,12 |
| D3S1358 (green) | 12, 13, 14, 15, 16, 17, 18, 19 | 14,15 |
| THO1 (green) | 4, 5, 6, 7, 8, 9, 9.3, 10, 11, 13.3 | 8, 9.3 |
| D13S317 (green) | 8, 9, 10, 11, 12, 13, 14, 15 | 11 |
| D16S539 (green) | 5, 8, 9, 10, 11, 12, 13, 14, 15 | 11,12 |
| D2S1338 (green) | 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28 | 19,23 |
| D19S433 (yellow) | 9, 10, 11, 12, 12.2, 13, 13.2, 14, 14.2, 15, 15.2, 16, 16.2, 17, 17.2 | 14,15 |
| vWA (yellow) | 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 | 17,18 |
| TPOX (yellow) | 6, 7, 8, 9, 10, 11, 12, 13 | 8 |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

| D18S51 (yellow) | 7, 9, 10, 10.2, 11, 12, 13, 13.2, 14, 14.2, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27 | 15,19 |
|---|---|---|
| Amelogenin (red) | X, Y | X |
| D5S818 (red) | 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 | 11 |
| FGA (red) | 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 26.2, 27, 28, 29, 30, 30.2, 31.2, 32.2, 33.2, 42.2, 43.2, 44.2, 45.2, 46.2, 47.2, 48.2, 50.2, 51.2 | 23,24 |

The specific size assigned to each ladder allele may vary between instruments and between runs on one instrument. The GeneMapperID software determines sample genotypes by comparison to an allelic ladder injected in the same run.

Deionized formamide
ABI 3130 96-well plate
ABI 3130 96-well Septa

**WARNING! CHEMICAL HAZARD! Formamide is an irritant and a teratogen. Avoid skin contact and inhalation. Use in a well-ventilated area. Wear lab coat, gloves and protective eyewear when handling.**

**Procedure:**

1. Remove deionized formamide from the freezer to thaw. Remove the GS-500 LIZ in-lane size standard and allelic ladder from the refrigerator. Minimize exposure to light.

*NOTE: The formamide/GS-500 master mix should be made and aliquoted in a fume hood.*

2. Combine the necessary amount of formamide and GS-500 LIZ size standard in a single microcentrifuge tube as shown:

   (Number of samples + 2) x 8.8 μL formamide
   (Number of samples + 2) x 0.2 μL GS-500 LIZ size standard
   This mixture of formamide and GS-500 will be referred to as the master mix.

*NOTE: It is recommended that enough volume for at least an additional 2 samples be included in the calculation to account for volume lost in pipetting. Remember to include at least one ladder for every 16 samples/controls and blanks when determining how much master mix will be needed.*

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

3. Mix the tube briefly and ensure that all liquid is in the bottom of the tube. If the master mix is prepared in a trough for use with the multichannel pipette, ensure the liquid is properly mixed.

4. Aliquot 9.0 μL of the formamide/GS-500 master mix into each sample well. For each injection "run", you must have samples or blanks in the run (no empty wells where there will be an injection).

5. Add 1.0 μL of PCR product or allelic ladder to appropriate wells of the plate. Unknown samples and known samples from the same case shall not be set up directly adjacent to each other in the 3130 plates. Other samples from different cases, controls, or blank wells should be separating associated unknown and known samples. An allelic ladder shall be placed in the plate, at a minimum, every 16 samples in the plate. It is recommended to have one ladder in the first and last injection.

6. After all samples or sets of samples have been added (including the allelic ladders) place the plate septa on top of the plate. When not setting up an entire plate, the septa may be cut to cover the appropriate rows prior to placing it on the plate. Ensure the plate is properly sealed.



*NOTE: Do not attempt to remove the septa for any reason. If the septa are removed, re-prepare the entire plate and discard the original plate. Do not vortex the plate.*

7. Spin plate down in the plate centrifuge to remove any bubbles and ensure all liquid is in the bottom of the wells.

8. Heat the samples for three minutes at 95°C to denature.

9. Chill immediately for a minimum of three minutes in a bench top cooler.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

10. Remove plate from cooler and place in Plate base (6a).  Snap the plate retainer onto the plate and plate base (6b).



*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.4.4  3130 Instrument Setup Processes

The AB 3130 Genetic Analyzer must be prepared before each day of use by restarting the computer, starting the data collection software, and replenishing the buffer and water reservoirs, as described below.  Other setup processes should be performed either as needed, or on the schedule described in the following procedures. More detailed information about these procedures is located in the instrument Getting Started Guide and Maintenance, Troubleshooting and Reference Guide.  Performance of setup processes should be documented with appropriate notation in the instrument maintenance and use log.

**Materials and Supplies:**

Performance Optimized Polymer 4 (POP-4) for 3130
10X Genetic Analyzer Buffer with EDTA
Ultra pure deionized water (UUP water)
MicroAmp 96-well reaction plates
96-Well Plate Septa
3130/3100-Avant System 36 cm Capillary Array Genetic Analyzer Capillary, 47 cm

**Procedures:**

**Restarting the computer:**

1.  If the computer is on, close all programs and restart the computer.

2.  Press Ctrl + Alt + Delete to enter the user name and password.  The current username and password for the system can be obtained from the Technical Manager.

3.  Enter username and password then click OK.

**Starting the data collection software:**

1.  Ensure the AB 3130 Genetic Analyzer is powered on and that the green status light is on continuously (not flashing).  If the instrument is not powered on, perform the 'Starting the 3130 system' procedure before continuing.

2.  Launch the ABI Prism® 3130 Collection Software v3.0 by double-clicking the desktop icon .  The Service Console window will open.  Messaging Service, Data service, instrument service and viewer are all displayed in the

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

window.  All must sequentially cycle from red circle, yellow triangle to a green square.  If they do not all turn green, you may have to click the Restart All in order to get all status windows to turn green.



Do **NOT** close the service console when all displays are green.

3.  Once the service console lights are green, the Foundation Data Collection window will open.  Click all +'s to expand subfolders in the left hand navigation pane to visualize all application folders and subfolders

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual



**Refilling the buffer and water reservoirs:**

*NOTE: Important!  Failing to replace buffer may lead to loss of resolution, precision, and data quality.*

1.  Prepare fresh 1X Genetic Analyzer Buffer with EDTA.  In a 50 mL conical tube, combine 5 mL 10X Genetic Analyzer Buffer with EDTA and 45 mL UUP water. Mix well.

2.  Close the instrument doors.  Press the Tray button on the outside of the instrument to bring the autosampler to the forward position.

3.  Wait until the autosampler has stopped moving, then open the instrument doors and remove the cathode buffer reservoir and water reservoirs from the instrument.

4.  Rinse the reservoirs with UUP water.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

5. Rinse the cathode reservoir with 1X Genetic Analyzer Buffer with EDTA, and fill to the line with 1X Genetic Analyzer Buffer with EDTA (about 16 mLs). Dry the outside with a kimwipe. Make sure no drops of liquid are above the black line on the inside of the reservoir. Place the reservoir in the autosampler position 1. (See picture below.)

6. Rinse the water reservoirs with UUP water, and fill to the line with UUP water (about 16 mLs). Dry the outside with a kimwipe. Place the reservoirs in the autosampler positions 2 and 4. (See picture below.)



7. Replace the septa strip on each reservoir. Make sure that the septa strip is completely dry. Place a new septa strip on each reservoir approximately once a week.

**NOTE: Important** *Be sure that the septa fit snugly and flush on the tops of the reservoirs in order to prevent damaging the capillary array tips. (See picture below.)*



8. Remove the anode buffer reservoir by firmly pulling down and twisting slowly.

9. Rinse the reservoir with UUP water then with 1X Genetic Analyzer Buffer with EDTA.

10. Fill the anode buffer reservoir to the line with 1X Genetic Analyzer Buffer with EDTA (about 17 mLs).

11. Put the anode buffer reservoir on the lower polymer block.

**NOTE: Important** *The anode buffer reservoir could fill during bubble clearing. If the reservoir fills with fluid, repeat this procedure to discard and replace the 1X Genetic Analyzer Buffer with EDTA.*

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

**Running the Water Wash Wizard**

The Water Wash Wizard cleans the polymer delivery pump and lower block.  This process should be performed weekly.

1. Click on ▲GA instrument > ◼ ga 3130 > ▢ 3130 in the left hand navigation pane.   This displays "Wizards" in the toolbar between View and Help.



2. Select Water Wash Wizard.  8 mL of UUP water will be necessary.

3. Follow all instructions and prompts.

**Flushing the water trap**

The water trap should be flushed weekly.

1. Fill the supplied 20mL, Luer lock syringe with UUP water.  Expel any bubbles in the syringe.

Issued By: DNA Technical Manager
Issue Date: 5/12/2011

Revision 1

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

2. Attach the syringe to the forward facing Luer fitting (#1 in figure).   Hold the fitting in one hand while threading the syringe with the other hand.

3. Open the Luer fitting by grasping the body of the fitting and turning it and the attached syringe one-half turn counterclockwise.

4. Open the exit fitting a the top left side of the pump block (#2 in figure) by turning it approximately one-half turn counterclockwise.

5. Hold an empty tube or beaker under the exit fitting to receive approximately 5 mL of waste.  Flush the trap by pushing steadily on the syringe plunger.

6. Close the Luer fitting, then the exit fitting.



**Cleaning the instrument surfaces**

The instrument surfaces should be cleaned weekly or as needed.

1. Ensure the oven and instrument doors are closed.

2. Press the Tray button on the front of the instrument.

3. Wipe off any liquid on or around the autosampler using a lint-free tissue.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

4. Clean off any polymer build-up (crystals) on the instrument including the capillary tips and the stripper plate with UUP water and lint-free tissue.

5. Clean off any polymer build-up on the array port knob, plug, or opening threads of these parts with moistened lab wipes.

6. Clean out the drip trays with UUP water and lint-free tissue.

**Replenishing the polymer**

Replenishing the polymer should be performed weekly, or when the polymer on the instrument is consumed.  Weekly polymer replenishment will occur at the end of the Water Wash Wizard as prompted.

1. Remove a bottle of 3130 POP-4 polymer from the refrigerator.  Loosen the lid slightly and allow to equilibrate to room temperature.  Do not place POP-4 on the instrument if very small bubbles populate the container.

2. Click on GA instrument > ga 3130 > 3130 in the left hand navigation pane.   This displays "Wizards" in the toolbar between View and Help.

3. Select the Replenish Polymer Wizard.

4. Follow all instructions and prompts.

**NOTES:**

- The Change Polymer Type Wizard should not be used for HID applications at this time.

- Check the lot number of the polymer bottle on the instrument when discarding it, and replace it with a new bottle of the same lot number whenever possible.  If a different lot of polymer will be used to replace a bottle consumed between weekly cleaning processes, run a Water Wash Wizard before replenishing the polymer.

- Opened polymer on the instrument, at room temperature, expires after one week.

- Polymer older than 1 week may cause a transient increase in current (spikes) during electrophoresis due to urea decomposition/crystallization.

- Autosampler Calibration should only be performed by a service engineer.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

| Wizard | Use to... |
|---|---|
| Install Array | • Install a capillary array:<br>  – On a new instrument<br>  – To reactivate an instrument that has been shut down<br>• Replace an installed capillary array with another capillary array |
| Change Polymer Type | • Change to a different polymer type than the one presently being used |
| Replenish Polymer | • Replenish the polymer supply<br>• Replace the polymer in the PDP with polymer of the same or different lot<br>• Enter polymer information when Data Collection software is installed or upgraded |
| Bubble Remove | Remove bubbles in the PDP chamber, channels, and tubing |
| Water Wash | • Wash the PDP chamber, lower polymer block[a], channels, and tubing with water:<br>  – As part of a monthly maintenance protocol<br>  – To remove any suspected contaminants in the PDP<br>  – To remove persistent bubbles (followed by the Bubble Remove Wizard, if needed)<br>  – To replace old polymer in the PDP |
| Instrument Shutdown | Prepare the instrument for a period of disuse of greater than one week |
| Autosampler Calibration | Calibrate the autosampler positions |
| Update Cap Array Info | • Update the capillary array information and the serial number<br>• Correct an entry mistake after using a wizard |

a  The lower polymer block is cleaned on the instrument using this wizard and should not be removed.

**Defragmenting the computer hard drive**

The computer hard drive should be defragmented monthly. The user must have administrative privileges to perform this task.  See the Maintenance, Troubleshooting, and Reference Guide, page 33.

**Changing the capillary array**

Use a capillary array for approximately 200 runs or until instrument performance indicates the need for a change.  The following problems may indicate that a new capillary array is required:
• Poor sizing precision or allele calling.
• Poor resolution and/or decreased signal intensity.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

The installation procedure may be used to install either a new array or a previously used one.  Additional steps must be performed before installing a previously used array.

1. Close the oven and instrument doors, and then press the Tray button on the front of the 3130.

2. Click on ▲ GA instrument > 🖼 ga 3130 > 💾 3130 in the left hand navigation pane.    This displays "Wizards" in the toolbar between View and Help.

3. Select the Update Cap Array Info wizard.  Follow all instructions and prompts.

4. Select the Install Array Wizard.  Follow all instructions and prompts.

5. Record the array serial number, date on/off, and other pertinent information in the comments section of the 3130 Maintenance Log.

Additional steps before installing a previously used capillary array:

- Check that the cathode bar is dry, especially in the center, because a wet bar could lead to arcing.  See picture below:



3130 capillary array

- Clean the front of the detection cell if needed.  Put one drop of methanol on the front surface of the detection cell.  (The front surface of the detection cell faces the instrument.)  Blow dry the cell using clean pressurized air.



Front surface of detection cell

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

**Performing a Spatial Calibration**

A spatial calibration provides information about the position of the fluorescence from each capillary on the CCD camera.  It does not provide information about the performance of the capillaries.  POP-4 polymer has fluorescent properties.  This fluorescence is detected during the calibration.  A spatial calibration must be performed each time one of the following is done:

- Install or replace a capillary array.
- Move the capillary array from the detection block.
- Move the instrument

1. In the left hand navigation pane open ▲ GA instrument > 🔲 ga 3130 > 🔲 3130 > 🔳 Spatial Run Scheduler.

2. In the Spatial protocols window drop down menu select 3130 Spatial Fill_1 or 3130 Spatial No Fill_1.  Select the 3130 Spatial Fill_1 if the capillaries have no polymer or polymer in the capillaries has been used in a run.

*NOTE:   The capillaries do not need to be filled each time a spatial calibration is performed.*

3. Click Start.  The calibration takes approximately 2 minutes without filling the capillaries and 6 minutes with filling the capillaries.

4. View results and save the data:

- Evaluate the spatial calibration profile.  Use the following criteria to evaluate the data:

| Peak Attribute | Criteria |
|---|---|
| Height | Similar heights for all peaks. |
| Red Crosses | One orange cross marking the top of every peak (4 total). No misplaced crosses. |
| Shape | • Single sharp peak for each capillary<br>• Small shoulders are acceptable. |
| Spacing | Position values are 13-16 higher than the previous one for every capillary.  (Theoretical spacing between capillaries is 15.) |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                                    Forensic Biology
Regional Crime Laboratory                                    FB Technical Procedures Manual



- If the spatial calibration profile is…
  - a. Satisfactory.  Click Accept.
  - b. Unsatisfactory.  Click Reject and then click Start to repeat the calibration.  If satisfactory results can not be obtained, place the instrument out of service and contact the Technical Manager.

**Removing Bubbles**

Check the instrument prior to **each** run to determine if there are any bubbles present in the polymer filled tubes and block.  If bubbles are present, perform bubble removal.

1. Click on ▲GA instrument > ▓ ga 3130 > ▭ 3130 in the left hand navigation pane.    This displays "Wizards" in the toolbar between View and Help.

2. Select the Bubble Remove Wizard.  Follow all instructions and prompts.

**Performing a short-term shutdown**

Perform a short-term shutdown if the instrument will be unattended for no more than 1 week with a full buffer reservoir.

1. Launch the ABI Prism® 3130 Collection Software by double-clicking the desktop icon (if not already done).

2. In the left hand navigation pane open ▲GA instrument > ▓ ga 3130 > ▭ 3130 > ⊕ Manual Control.

3. Use the Send Defined Command For drop down menu to choose Capillary.  For Category Name use the drop down menu to choose Fill.  Then click Send Command.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

4. When the capillary fill is complete, push the Tray button on the front of the 3130 to move the autosampler forward. Wait for the autosampler to stop moving before opening the instrument doors.

5. Fill the buffer reservoir with 1X Genetic Analyzer Buffer with EDTA to the black line of the reservoir.

6. Fill the other reservoirs with fresh UUP water.

7. Secure septa onto each reservoir and place on the autosampler.

8. Close the instrument doors. The autosampler will move to Position 1, leaving the capillary array tips in the buffer reservoir.

9. Select *Stop All* in the Service Console window. Wait for messaging service, data service, instrument service and viewer to sequentially cycle from green square, yellow triangle to red circle.

10. Shut down the instrument followed by the computer.

**Performing a long-term shutdown**

A long-term shutdown may be done if the instrument will be unattended for more than 1 week. This procedure can also be done to clean the instrument for troubleshooting purposes.

1. Remove from the autosampler:
   - Plate assemblies
   - Reservoirs

2. Wipe the autosampler and drip trays with dampened kimwipes.

3. Close the instrument doors.

4. Click on GA instrument > ga 3130 > 3130 in the left hand navigation pane. This displays "Wizards" in the toolbar between *View* and *Help*.

5. Select Instrument Shutdown Wizard. Follow all instructions. Six water washes will be performed which are four minutes each.

6. Select *Stop All* in the Service Console window. Wait for messaging service, data service, instrument service and viewer to sequentially cycle from green square, yellow triangle to red circle.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

7.  Shut down the instrument followed by the computer.

8.  Record the date of cleaning and initials of the analyst in maintenance log.

**Storing a capillary array off the instrument**

Store the capillary array off of the instrument when the capillary array will be unused for longer than 1 month.

1.  Close the oven and instrument doors, and then press the Tray button on the front of the 3130.

2.  Click on ▲GA instrument > 📷 ga 3130 > 📁 3130 in the left hand navigation pane.   This displays "Wizards" in the toolbar between *View* and *Help*.

3.  Select *Install Array Wizard* and bullet - Store the Array.

4.  Follow the directions given in the wizard to remove the array for storage.

5.  Replace the cover over the detection cell.

6.  Fill a buffer reservoir with fresh 1X Genetic Analyzer Buffer with EDTA and cover with a septa strip.  Then insert the capillary tips into the buffer.

7.  Fill a storage cap from a new array with fresh 1X Genetic Analyzer Buffer with EDTA.  Then insert the rod end of the capillary array into the cap.

8.  Wrap the tube with Parafilm to prevent evaporation.

9.  Store the capillary upright.  Damage to the array can occur if stored lying down due to water soluble adhesives in the array.

10. Check the 1X Genetic Analyzer Buffer with EDTA level in the reservoir and tube weekly.

*NOTE:   A capillary array may be stored on the instrument if it will be unused for less than a month.  To store an array on the instrument, follow the short-term shutdown procedure.*

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

**Starting the 3130 System**

The 3130 system must be started following any instrument shutdown.  Also see the Maintenance, Troubleshooting and Reference Guide, page 7.

*It is imperative that the system is turned on in the appropriate order.  Powering down is done in the opposite order.*

- Start the computer

    1. Turn on the monitor then power on the computer.

    2. Press Ctrl + Alt + Delete to enter the user name and password.  The current username and password for the system can be obtained from the Technical Manager.

    3. Enter username and password then click OK.

- Start the instrument

    1. Ensure that the oven door is closed and locked and that the instrument doors are closed.

    2. Ensure that the computer is powered on.

    3. Turn on the instrument by pressing the on/off button on the front of the instrument.

    4. Ensure the green status light is on and constant before proceeding.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.4.5  Performing a Spectral Calibration for the ABI 3130 Genetic Analyzer

A spectral calibration is performed to create a matrix to correct for the overlapping of fluorescence emission spectra of the dyes. Application of this matrix to the raw data is called multicomponenting. The multicomponenting occurs as the data is collected. Therefore it is important to make good quality matrices for each capillary and ensure each is unique. A spectral calibration must be run after the laser or CCD camera has been realigned by a service engineer, when a new dye set is used on the instrument, and when a decrease in spectral separation is observed (pull-up and/or pull-down).

**Pre-Heat the Oven**

Pre-heat the 3130 oven for approximately 45 minutes prior to a run.

1.  GA instrument > ga 3130 > 3130 > Manual Control.

2.  From the Send Defined Command For drop down list select *Oven*.

3.  In the Command Name select *On*.

4.  Press the *Send* command to initiate the oven pre-heat action.

5.  In the Command Name list select *Set Temperature* and in the Value list select 60.

6.  Press the *Send* command to initiate the oven pre-heat action.


**Prepare the Spectral Standard Samples**

1.  Vortex the appropriate spectral standard set and spin down briefly in a microcentrifuge.

2.  For an Identifiler spectral, combine 5µl of the Spectral Standard Set DS-33 and 195µl of Hi-Di formamide in a 1.5 mL microcentrifuge tube.  The amount of Spectral Standard may be increased or decreased if the resulting peak heights are too low or too high for the spectral to pass.

3.  Vortex and briefly spin down in a microcentrifuge to remove any bubbles.

4.  Dispense 10µl of spectral/formamide mix into A1-D1 (4 wells) of a 96 well reaction plate and cover the plate with plate septa.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*



5.  Spin the reaction plate in the plate centrifuge.  Make sure all bubbles are removed after the spin.

6.  Remove the plate and set in the heat block set at 95ºC for 5 minutes.

7.  Quick chill the tray in the metal ice block for at least 3 minutes.

8.  Place the 96 well reaction plate into the plate base and cover with the plate retainer. Make sure the plate retainer holes are aligned with the holes in the septa strip and that it is securely attached.

9.  Load sample tray onto the instrument by pushing the tray button. Wait for the auto sampler to move to the front position and come to a stop. Open the doors and place the plate into position on the auto sampler. (The notched opening is toward the back of the instrument.)

**Create a Plate Record**

1.  Click ▲ GA instrument > 🖼 ga 3130 > 📒 3130 > 🟩 Plate Manager

2.  Click *New* to open the new plate dialog box

3.  Complete the new plate dialog box:
    *   Name the plate
    *   Optional – enter a description
    *   In the application drop down menu select Spectral Calibration
    *   In the plate type drop down menu select 96 well
    *   Enter an owner and operator name (mandatory)
    *   Click OK

4.  Complete the Spectral Calibration Plate Editor spreadsheet
    *   Type a name for the spectral samples
    *   Comment is optional
    *   Priority is left at 100.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

- Instrument Protocol 1 – Select DS-33 for Identifiler (or equivalent, the protocol injection time may be adjusted as necessary to obtain a passing spectral)
- Click OK

This creates a plate record for the calibration run in the database.

### Link the Plate

1. Click ▲ GA instrument > 🖼 ga 3130 > 🗔 3130 > 🟩 Run Scheduler

2. Select Find All to populate the Run Scheduler with all plate names.

3. Highlight the appropriate plate record then click the B: plate position indicator.

*Note: Once the plate has been linked, the plate position indicator changes from yellow to green, the plate record moves from the Pending Plate Records table to the Linked Plate Records table and the Run Instrument button on the toolbar is enabled, meaning that the instrument is ready to run.*



### Start the Run

1. To review the run schedule before beginning the run, click the *Run View* tab.

2. Click the *Run Instrument* (green triangle) button on the toolbar to begin the scheduled runs.

3. Click ▲ GA instrument > 🖼 ga 3130 > 🗔 3130 > 🟥 Instrument Status to monitor the status of the instrument during the run such as temperature (60°C), electrophoresis voltage (14.9kV), current (7-9uA), and laser power (~10mW).

4. During the run, you can view the data using the Array View and the Capillary View pages.  It is important to always exit from the Array View and Capillary View windows. Do not leave these windows open for extended periods during a run.

### Review the Spectral Data

**Important**: Review and evaluate the spectral calibration profile for each capillary.

1. Click ▲ GA instrument > 🖼 ga 3130 > 🗔 3130 > 🟥 Spectral Viewer.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

2. The spectral profile, raw data profile, and capillary data is displayed by clicking the appropriate well in the sample tray pictured.

3. Verify the order of the peaks in the spectral profile are 5-dye – Blue, Green, Yellow, Red, Orange



Example of a 5-dye spectral calibration profile

4. Verify the order of the peaks in the raw data profile are:

5-dye – Orange, Red, Yellow, Green, Blue



Example of a 5-dye fragment analysis raw data profile

***Note:*** *For a good-quality calibration, each capillary should have a Q value above 0.95.*

The condition number will depend on the dye set.  The software automatically compares the condition number generated during the calibration with the bounds set in the software.  If the condition number does not fall within the bounds set in the software, the spectral calibration will fail.

All capillaries must pass spectral calibration.

Issued By: DNA Technical Manager
Issue Date: 5/12/2011

Revision 1

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.4.6  3130 Capillary Electrophoresis

**Pre-heat Oven**

1. In the left hand navigation pane open ▲ GA instrument > 🖼 ga 3130 > 🗄 3130 > 🖐 Manual Control.

2. Use the *Send Defined Command For* drop down menu to choose *Oven*. For *Command Name* use the drop down menu to choose *Turn On/Off Oven*.   In the Value drop down menu select *On*. Then click *Send Command*.

3. Use the Send *Defined Command For* drop down menu to choose *Oven*. For *Command Name* use the drop down menu to choose *Set Temperature*.   In the Value menu type. Then click *Send Command*.

The oven should pre-heat to 60°C for approximately 45 minutes.

**Create a Plate Record**

1. In the left hand navigation pane open ▲ GA instrument > 🖼 ga 3130 > 🔲 Plate Manager.

2. A plate record can either be created directly on the instrument or imported from a text file.

   • To import, select *Import*, locate the appropriate file, and open it.  If needed, select *Edit* to change the plate record and save changes.  Then, proceed to loading the sample tray on the instrument.

   • To create a plate record directly, select *New* in the lower left-hand corner. This will open the New Plate Dialog window.

3. In the New Plate Dialog window:

   • Name the plate with the date and initals (062008.myh). Do not use spaces or disallowed characters \ / : * " < > | ? '

   • Enter a description in the description field (optional)

   • Under Application choice, select GeneMapper – 3130A,  3130B, or 3130C

   • Under Plate type, select 96-well

   • Populate the owner and operator name fields

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

- Select OK

4. In the GeneMapper Plate Editor window:

   - Type a name for each of the samples.  Do not use spaces or disallowed characters \ / : * " < > | ? '

   - Any additional comments may be entered in the *Comment* column.

   - Select a *sample type* from the drop down menu.

   - Select a *size standard* from the drop down menu (5Dye.GS500).

   - Select a *panel* from the drop down menu.  Open the AmpFlSTR_panels and select the appropriate panel (Identifiler_CODIS_v1.1) by double clicking.

   - Select the *ID_Casework(100RFU)*  or *ID_Casework(50RFU)*  analysis method from the drop down menu.

   - In the *SNP set* drop down menu select none or leave blank.

   - In the *User Defined 1* column type leave blank.

   - In the *Results Group* drop down menu select the desired Results group (i.e. - Results_Group_SDSO).

   - In the *Instrument Protocol 1* group drop down menu select SDSO_protocol. Note: if a run (injection) should be done at 3 seconds or 10 seconds, use the appropriate protocol setting (SDSO_protocol_3sec or SDSO_protocol_10sec).  If samples are run with a 10 second injection, associated negative controls must also be injected at 10 seconds.

   - **Note**: If you want to run (inject) a sample more than once, select Edit > Add sample run from the tool bar.  In the Results Group 2 drop down menu select Results_Group_SDSO and choose SDSO_protocol (or appropriate protocol) in the accompanying Instrument Protocol 2 group.

5. Once the plate record has been completed, go to the Plate Manager view and highlight the appropriate plate record.  Click on "Export" and export it into the appropriate folder on the LIMS server.  Print out a copy of the plate record ("injection list") for the case file.  The analyst may choose to delete the non-relevant columns (Comment, Priority, Sample types, Snp Set, Analysis Method,

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                    Forensic Biology
Regional Crime Laboratory                      FB Technical Procedures Manual

Panel, User-Defined 3, Size Standard, User-Defined 2, User-Defined 1) before printing it out.

**Load the tray onto the instrument**

1. Press the Tray button on the front of the 3130, wait for the autosampler to finish moving to the front location, then open the instrument doors.

2. Place the plate assembly on the autosampler. The notched area on the base will be toward the back of the instrument.



3130 genetic analyzer

3. Check that the tray is flat and properly placed on the autosampler. Check that the reservoir septa are firmly seated.  Close the doors. The autosampler will automatically move back into home position.

**Link the plate**

1. Select ▲GA instrument > ▣ ga 3130 > ▣ 3130  > ▦ Run Scheduler in the left-hand navigation pane.

2. Select *Find All* to populate the window with all plate records or type the plate name and select *Search*.

3. Once the plate record has been located click to highlight blue.  Then click in the yellow area of the 3130 autosampler position B: to link the plate record to the plate on the instrument.   The plate map will turn to green.  A "B:" will also be displayed next to the plate document in the run scheduler window indicating the link.

**Start the run**

1. To review the run schedule before beginning the run, click the *Run View* tab.

Issued By: DNA Technical Manager                         Revision 1
Issue Date: 5/12/2011                                 Page 153 of 272

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

2. After the plate is linked the green RUN arrow is enabled in the upper left hand corner.  Click the arrow to begin the run.  The Processing Plates dialog box will open, click *OK*.

3. Click ▲GA instrument > 🔺 ga 3130 > 🗂 3130 > 🔳 Instrument Status to monitor the status of the instrument during the run such as temperature (60°C), electrophoresis voltage (14.9kV), current (7-9uA), and laser power (~10mW).

4. During the run, you can view the data using the Capillaries Viewer and the Cap/Array Viewer pages.  It is important to always exit from these viewer windows. <mark>Do not leave these windows open for extended periods during a run</mark>.

**When the run is completed**

1. If any injection changes were made during the run, re-export the plate from the plate manager to the appropriate place on the LIMS server.  Print out a copy of the plate record ("injection list") for the case file.  The analyst may choose to delete the non-relevant columns (Comment, Priority, Sample types, Snp Set, Analysis Method, Panel, User-Defined 3, Size Standard, User-Defined 2, User-Defined 1).

2. Close the Collection software by closing the main window and then click *Stop All* on the *Service Console* window.  When the green symbols all change to red, close the service console window.

**Check hard disk and database space (optional)**

Before a run or batch of runs, the Data Collection software automatically checks the space on drives C, D, E and F to ensure that there is enough sufficient space to store the newly created database and sample file data.  If sufficient space is not available, the software can send the following message(s):

- Remove data – the drive is getting full
- Clean up the database

View the Errors pane's Instrument status window for generated errors and in the Event Log window for information in the error messages window.  Also, check the status light in the bottom left-hand corner of the data collection window to see if it flashes red.  If the Disk drive full error message is present, the run will not start until data is removed from the drive and/or database is cleaned.  The drives should be cleaned by archiving data, deleting unneeded files, and emptying the trash.  See the Maintenance, Troubleshooting, and Reference Guide, page 29-32.

To manually check available disk space:

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                    Forensic Biology
Regional Crime Laboratory                          FB Technical Procedures Manual

1.  In the left hand navigation pane, open ▲GA Instruments > ▄ Database Manager

2.  Check the free disk space of the E: drive.  This drive is where run data is stored.



Issued By: DNA Technical Manager                              Revision 1
Issue Date: 5/12/2011                                   Page 155 of 272

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.4.7   GeneMapper ID

GeneMapper analysis software is used to analyze the raw data collected by the 3130 Genetic Analyzer, determine base pair sizes for alleles, assign labels to alleles, and assign quality values to genotypes. The spectral calibration is applied to 3130 raw data at the time of collection.  Additional information gathered includes peak height, peak area, data point and minutes from injection to detection.  GeneMapper ID determines base pair size by comparing alleles to an internal size standard. A size curve is created using co-injected dye-labeled DNA fragments of known size. The unknown peaks are assigned a size by interpolation.  Genotypes are assigned by comparing the averaged sizes obtained for the alleles in the allelic ladders with the sizes obtained for the unknown sample alleles.  Genotype determinations and quality are facilitated by analysis settings and preset Process Quality Value (PQV) flags.

The procedures described in this section will provide the analyst with information needed to appropriately interpret AmpF/STR analytical data, and will produce sufficient documentation to record the interpretation process.  They are intended to serve as guidelines; the exact process used will vary from case to case.

**GeneMapper ID Analysis:**

1.  Open GeneMapper and login to the software, User Name (gmid) and Password. If GeneMapper has not been previously established, please see the GMID validation for complete instructions.

2.  Create a new project by selecting *Add Samples* to Project under the *File* menu or

    

    click on the following icon:       .  Locate the correct sample files and click on *Add to List*. The run folder(s) should appear in the column on the right under *Samples to Add*, when done adding samples, click the *Add* button, located on the bottom right hand side of this window.  Generally, all ladders flanking the samples in a case should be used for the GMID project.

3.  Prior to the analysis of samples for a specific case, a project needs to be made with all samples from the 3130 plate.  Once the samples have been added to the project, review all raw data from every sample.  This can be accomplished by highlighting the project name in the left panel.  Then click on the samples' names that appear below the project folder.
    Ensure that all wells that contained an amplified sample contain a primer peak (including negative extraction and amplification blanks) and that wells that were the formamide blanks do not contain primer peaks.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*



If the appropriate samples all contained primer peaks, note on the 3130 setup sheet that plate setup was ok.  If there are any samples that do not contain a primer peak that should (or a sample that has a primer peak but should not), print out relevant raw data for the DNA technical manager (or designee).  Try to determine where the problem occurred.  Document the problem on the 3130 sample setup sheet.  Show appropriate documentation to the DNA technical manager (or designee).  This occurrence shall be logged in the Incident Log (see FB manual section 8.9).  No printouts are required in the individual case files of any data from the run, however, data should be saved for possible discovery.  The entire plate will be re-prepared and run on the 3130.  No data from the problem run will be interpreted.

This procedure may be completed by the analyst who set up the run or each individual analyst who had samples in the run.  If there was a problem with the setup, only the individual responsible for the 3130 setup will fill out the incident log review form.

4. Begin the analysis in the main window under the *Samples* tab of GeneMapper. Make sure that all "Sample Types" are set correctly.  *Allelic ladders* should be set to Allelic Ladder.   The positive amplification control (PAC) can be set to Positive Control and negative controls (formamide blanks, reagent blanks, and negative amplification controls) can be set to Negative Control.  All others should be set to Sample.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

5.  Under Panel**, Identifiler_CODIS_v1.1** should be selected.

6.  Under Analysis Method, **ID_Casework(50RFU)** should be selected. Open the analysis method and check to be sure that the default settings match those shown in this figure:



The Analysis Partial Range may be changed based on a particular run or sample.

- Check **Peak Detection Algorithm**:

This setting shall be set to **Advanced**.  DO NOT CHANGE THIS SETTING.

- Check **Sizing Range**:

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

**Start Size** shall be set to 74, and **Stop Size** shall be set to 452.  The **Global Southern Method** uses all size standard peaks for analysis.  DO NOT CHANGE THIS SETTING.

- Check **Smoothing and Baselining**:

Smoothing shall be set to Light.  Baseline Window shall be set to 35.  Baseline Window controls how much area around a data point is used to draw the baseline.  A baseline point is determined for every data point within the analysis range.

- Check **Size Calling Method**:

Size Calling Method shall be set to Global Southern Method. DO NOT CHANGE THIS SETTING.

- Check **Peak Detection** parameters:

**Peak Amplitude Thresholds** shall be set to 50 RFU for blue, green, yellow and red channels.  The peak amplitude threshold for the orange channel generally is 100 or 150 RFUs.  This indicates the cut-off value above which GeneMapper ID will analyze.  Below the entered value, the peaks will not be detected.

**Min. Peak Half Width** shall be set to 2.  The Peak Half Width helps filter out spikes by measuring the width of the peak at half of its height.

**Polynomial Degree** shall be set to 5. The polynomial degree has to do with peak detection sensitivity.  The higher the polynomial degree creates more turning points in a curve.  More turning points allow the peak detection to identify more of the peak structure in the electropherogram.

**Peak Window Size** shall be set to 13.  This setting determines the window in data points that the polynomial curve will be stretched across.  Higher peak window size stretches the curve more, causing the less ability to identify the peak structure.  Lower peak window sizes do not stretch the curve as much allowing it to better identify peaks.

**Peak Start** and **Peak End** shall be set to 0.0.

DO NOT CHANGE THESE SETTINGS.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

7. Under Size Standard, **5Dye.GS500(-250,-340)** shall be selected for samples run with Identifiler.  Open the size standard and check to see that the default settings match those shown in this figure:



8. The matrix column should be left blank if data is from the 3130.

9. Confirm that the *Table Setting* at the top of the screen has **Casework.SDSO** selected from the pull down menu.  Once all the default settings have been confirmed, analyze the samples by clicking on the green arrow.  When prompted, enter the project name.

   GeneMapperID projects will be named with case number, analyst's initials, and date (i.e. **010001234. 082100.XXX**).  For GeneMapperID projects that contain more than one run, the analyst can name the project without the date of each 3130 run (i.e.  01000123.XXX).  A separate project shall be created for each case within a run. A separate project may be created for the control samples to avoid redundancy (the run should be named with the date of the run and the initials of the analyst i.e. 042811.XXX).  If multiple submissions of a case are processed for DNA typing, the submissions will be differentiated by the date created. Note:  the program does not recognize spaces, dashes, or slashes (underscore or periods can be used to create a space).

10. Examine the Size Quality (SQ) of each sample by looking at the flags on the right side of the table.  If a green flag is present, the size quality passed.  If there is a red or yellow flag, these samples should be further examined.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Open the *Size Match Editor* by clicking on the analysis tab or on the icon  to determine if size standard peaks were sized correctly.  If they were assigned correctly, click on the size quality override tab.  It may be necessary to view the raw data for that sample.  View raw data by highlighting the sample and selecting *Raw Data* under the *View* menu.  If the sizing peaks were labeled incorrectly due to an electrophoresis artifact or if the analysis range was incorrect, the sizing peaks can be edited.

To change the analysis range, open up GeneMapper Manager and click on the *Analysis Method* tab.  Open the *Peak Detector* tab and adjust range parameters. To edit the sizing peaks, open the *Size Match Editor* click on the *Edit* tab and select *Delete All Size Labels*.  Then click on *Add Size Label* under the *Edit* tab, and add the appropriate label to each size standard peak.  If only a few peaks were mislabeled, then right click on the peak and select *Delete*, right click again to select *Add*, and choose the appropriate size label, click *Apply* and click *OK*. Re-analyze the sample files edited.

11. To print out the size standards, highlight all samples by going to the *Edit* tab and click on *Select All* or click on the top of the *Sample File* column.  Go to the plot display by clicking on the *Analysis* tab and click on the *Display Plots* or click on

the icon.  *|Ctrl + L|*   Set the plot settings to **Check GS500 Liz** and zoom in to show the size range of 75 to 450 base pairs.  Zoom in on the Y-axis as much as necessary to show the peak shapes of all size standard peaks.  Print out this plot.



*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

12. Check all the allelic ladders by highlighting all ladders in the project by clicking on the sample file column (use the Ctrl to highlight more than one ladder). Go to the plot display and change the plot setting to **LadderPrintOut**. Zoom in the x and y axis as appropriate and check each ladder to determine if it is appropriate to use. Ladder allele peak heights should generally be >150 RFU and a peak should be present for each ladder allele. Make sure there are no OL alleles.

If one ladder is bad (peak heights are too low, bad injection, etc.), the analyst shall change the sample designation from Allelic Ladder to Sample and then reanalyze the project. Any allelic ladders in the project that are not used for analysis should be noted on the Liz printouts along with an explanation.

Multiple ladders within a run folder will be averaged together to calculate allelic bin offsets. Therefore, print out at least one representative ladder for the case file for each project. If multiple runs are within one project, at least one ladder must be printed for each separate run.



*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

13. (optional) Change to the *Genotypes* view by clicking on the tab above the sample files.  To view flagged loci, click on the *Analysis* tab and select *Low quality to Top*.  This will bring the samples with low quality PQV flags to the top.

   Check that all the controls (PAC and negative controls) have a green flag under the Control Concordance (CC) column.  Analysts are not required to use the PQVs to asses the concordance of the controls.

   (Mandatory) The analyst shall manually check all positive controls and note that they have been checked on the associated electropherograms.

14. Return to the *Sample* tab to view and evaluate the flagged samples first.  Select the injections from the sample(s) by highlighting on the number in left margin.  Click on the plots icon to view the plots.

15. Print out the negative samples and blanks by highlighting those samples and going to the Display Plot.  Change the plot setting to **CaseworkID.sdso**.  Zoom in to the y-axis 100 RFU.  To change the y-axis on all plots, right click one of the y-axis, click on *Zoom in*, change the Zoom to number to 100 and click on *Apply to all electropherograms*.

   Examine each sample and make sure there are no allele calls in the blanks.  No interpretable peaks (greater than 50 RFU) should be present between 75 bp and 450 bp.  If peaks are noted refer to Interpretation Guidelines.  Reproducible artifacts between 75 bp to over 100 bp are observed in the Identifiler system.  Most of these artifacts are outside of the range of all loci and do not type.  However, there is an artifact seen at the D3S1358 locus that is in the typable range and generally is between 115 bp and 125 bp.  This artifact in the Identifiler system is generally below 50 RFU.

   To edit a peak, follow the directions below:

   - Right click on labeled peak you want to edit.  Select *Delete Allele*, then it will prompt you to enter a comment.  Enter a two or three letter code for what the peak is (see Appendix 1 for abbreviations).

   - If an allele is inadvertently deleted, right click on the peak, select *Rename Allele* and click *OK*.  The correct label will be shown.  Or you can go to the edit menu and click on the undo tab if you just deleted that peak.

16. Each sample must be examined and printed out separately.  Highlight one sample and go to the Display Plot.  Zoom in as appropriate to clearly view peaks.  Evaluate the following parameters:

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

- Peak shape and height – Optimal values generally fall between 100-5000 RFU, although acceptable and typable signals may occur outside this range.

- Spectral quality – Baselines should be relatively flat and there should not be a pattern of pronounced peaks or dips below true DNA peaks in the other colors.  If baselines are not flat and dips are noted below true DNA peaks a new spectral will need to be made for the 3130 and the samples re-run.  The size standard peaks may create pull-up in blank samples.

- Peak profile – Examine for artifactual peaks.

Examine all peaks to make sure they are true alleles and not artifacts.  Delete all allele calls that are not true alleles and enter a reason when prompted.  To further examine the sample, view the raw data by pressing Ctrl F2 or clicking on the *View* tab and then on *Raw Data*.  Print out the final plot for each sample.  The labels in the plot shall contain allele designations, basepair size, peak height, and any edit comments.  The print outs should contain both the plots and the table.  If printing out a second plot to show a close up of alleles, you do not need to include the table in the second print out.

If there are too many labels due to a large mixture or high baseline, it may be necessary to change how the sample is printed in order to easily view the sample plot.  The sample can be printed in the landscape format.  To change to landscape, go to the *File* tab, click on page set up, and finally click on landscape.  If the sample is still difficult to read (generally having excess artifacts or noise), click off the show edits icon 🔲 to remove deleted allele labels.  The reasons for each deleted allele must be written in manually in the table portion of the plot if the edits are not shown in the plot.

If there are low level peaks (less than 200 RFU), the analyst shall print out the plot in the regular view and zoomed in to at least 200 RFU.  It may be necessary to zoom in to a particular peak to demonstrate whether or not it is a true allele or artifact.

If there are multiple injections of an evidence sample when only one injection is needed for analysis, the extra injections must be printed out as well.  The extra injections may be printed in the regular format or only the plots may be printed with the Y-axis zoomed in to 200 RFU.  This will allow the reviewer to ensure there are no significant differences between the sample being reported and the additional injections.  If a sample is saturated/overblown, has a bad injection, or the data cannot be used due to other technical issues, it is not necessary to

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

provide a close up view of the plot.  The analyst shall indicate on the printout that no analysis will be performed and state a reason.

If an off-ladder allele is determined to be a true allele, print out a plot display of one allelic ladder and the sample (zoomed in to the locus in question).  The plot should display the base pair size of the allelic ladder and the off-ladder allele.  Because a double injection is required, both injections should be printed out in this manner.

17. When the analysis of the GeneMapper ID project is completed (or after the review process is completed), the project file should be exported to the appropriate folder on the LIMS server.  To export the project: highlight the project in the *Projects* tab in GeneMapper Manager and click the *export* button.  Browse for the appropriate folder on the network and save the exported project using the project name.

18. The original project should be deleted from the GeneMapper ID database once the project is exported.  To delete the original project:  highlight the project in the *Projects* tab in GeneMapper Manager and click the *Delete* button.  Prior to deleting the project, it is recommended to check that the file was exported to the appropriate folder.

19. To view exported GeneMapper ID projects:  Open GeneMapper Manager and from the *Projects* tab click *Import*.  Browse the server and select the desired project. Click *OK*.  The project will have been imported to the GeneMapper ID database and can be opened as usual.  When the imported project is no longer needed it should be deleted from the database (see step17.).

**References:**

GeneMapper™ ID Software version 3.1 User Manual.

GeneMapper™ ID Software Tutorial

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 4.5    STR Interpretation Guidelines

### 4.5.1  Introduction

The interpretation of results in casework is a matter of professional judgment and expertise.  Not every situation can or should be covered by a preset rule; nor is it expected that competent analysts will always be in full agreement in a particular case.   Interpretation guidelines are based on validation studies, literature references, and casework experience.  The purpose of these guidelines is to establish a general framework and to outline minimum standards to ensure that:

> -Conclusions in casework reports are scientifically supported by the analytical data, including those obtained from appropriate standards and controls.

> -Interpretations are made as objectively as possible, and consistently from analyst to analyst. As such, in keeping with the objective nature of the analysis, suspect and/or victim centric statements in a conclusion should only be offered when using a likelihood ratio approach.

> -Statistical calculations convey the probative value of the evidence.

It is expected that these interpretation guidelines will continue to evolve as the collective experience of the laboratory and the profession grows.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.5.2      Preliminary evaluation of STR data

**Evaluation of Data – Injections and Controls**

1.  Examine the internal size standard (GS500 LIZ) to determine if each sample is appropriate for analysis.
    - All the size standard peaks (75-450 bp) need to be present.
    - The size standard peaks should be approximately equal in height and width within a sample.  If there is a dip in peak heights in the middle of the run, the analyst should consider if that sample is appropriate to analyze or if it should be reinjected.   A dip in the peak heights of the size standard may indicate lower peak heights at a few or all loci.
    - If the size standard contains additional peaks, the analyst should determine if those additional peaks affect the size quality or typing of that sample.  Analysts will note if the additional peaks do not affect the typing results and what the peaks represent (spikes, pull-up, etc.) if possible.
    - If a sample or control is not being analyzed due to a bad size standard, the analyst will print out a copy of the raw data to document the problem with the size standard.

2.  Examine ALL allelic ladders used for data analysis within a GMID project.
    - Generally, all the peak heights of the alleles in the allelic ladder should be >150 RFU.  Lower peak heights do not necessarily preclude the use of the allelic ladder if no other allelic ladder is available for analysis. However, in general if other allelic ladders are available, change the designation of the low peak height ladder in GeneMapper ID to "sample" and reanalyze the run.
    - Determine if any artifacts (i.e. spikes) could be negatively affecting the ladder calls.  If an artifact is affecting the ladder calls, change the designation of the affected ladder in GeneMapper ID to "sample" and reanalyze the run.
    - Evaluate each ladder to ensure that all allele calls are made and the alleles are not typing off-ladder.  If the ladder is not typing properly, it may be necessary to split up the GMID project, using some ladders for a portion of the samples and other ladders for other samples in the in the project.
    - If any ladders are changed to "sample", it must be indicated in the size standard print outs if a ladder was not used for typing and the reason. If the reason the ladder cannot be used is not clear in the size standard printout, an additional print out (raw or analyzed data) shall be printed out to illustrate the problem with the ladder.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

3.  Evaluate all control samples within a GMID project.  Controls are used to assess the effectiveness, accuracy, and precision of the analytical procedure. Generally, the following conditions should be met prior to reporting results in casework:

    - The formamide blank, reagent blank, and negative amplification control should exhibit no interpretable peaks (see assignment of alleles) in the 75-450 bp region.  The negative controls must be run on the same instrument and under the most sensitive conditions (injection time) that the associated samples are run.   If the formamide blank is a bad injection, the other negative controls may be used to show no contamination in the master mix of the formamide and size standard. This will be documented.
    - The positive extraction and positive amplification controls should exhibit interpretable peaks at each amplified locus.  These peaks should correspond to the alleles in the known profiles of each sample. No other interpretable peaks should be present.  Peaks that are interpreted as artifacts (elevated stutter, pull-up, etc) are not considered interpretable peaks.  Analyst shall make a note on all positive control electropherograms that the typing results were ok.
    - Results from samples associated with positive and negative controls for which these criteria are met may be interpreted.

Results from samples associated with positive and negative controls for which these criteria are NOT met must be jointly evaluated by the DNA analyst and the DNA technical manager (or his/her designee).  On a case-by-case basis, the DNA technical manager will evaluate the results obtained and determine the appropriate interpretation, taking the observed control results into account.  If the observed control results bring the reliability of a sample result into question (as determined by the DNA technical manager), the sample result will not be interpreted or reported.  The evaluation of the control results and the technical manager's approval (or his/her designee's) of the process must be documented in the analyst's case notes and, where appropriate, in an Incident Review Form (see FB manual section 8.9).

**Evaluation of Data – Assignment of Alleles**

1.  Determine if each peak should be interpreted as an allele by evaluating  if each allele meets the following criteria:

    - It has the correct peak morphology (triangular-shaped).
    - It is approximately within the known size range, to be assigned as an allele of a given locus.

2.  The analytical threshold is 50 RFU.  Peaks 50 RFU or larger shall be interpreted. No peak below 50 RFU shall be analyzed or reported.   If a peak looks like it

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

could be an artifact above 50 RFU, the analyst may re-inject or re-amplify the sample to determine if the peak represents a true allele.

3. Peaks meeting the criteria for assignment as an allele that fall within +/- 0.5 bases of the position of a known ladder allele shall be reported with that allele's numerical designation.  Peaks meeting the criteria which fall "off-ladder" (OL) must be reproduced in a second injection or second amplification of the sample to ensure that the "off-ladder" peak truly falls outside or between the ladder alleles.  The reproducible "off-ladder" alleles should be reported with the appropriate designation.

   Peaks falling between two ladder alleles should be reported as "A.x", where 'A' is the designation of the smaller of the two ladder alleles and 'x' is the apparent distance, in bases, between that allele and the off-ladder peak; i.e. A.1, A.2, A.3.

   Peaks falling outside the range of ladder alleles for a locus should be reported as either "<S" or ">L", where 'S' and 'L' are the smallest and largest ladder alleles, respectively, for the locus.  In addition, the analyst must indicate in the notes how many base pairs the "<S" or "<L" allele is above or below the closest ladder allele.  This is accomplished by subtracting the base pair size of the off-ladder peak from the base pair size of the closest allele in the allelic ladder.  When using these alleles for comparison, the size difference between the evidence and reference peaks should be within +/- 0.5 bases of each other in order for a match to be declared.

   Note:  For locus FGA, alleles that fall between 33.2 and 42.2 ladder alleles will be reported as >33.2.

4. Within-locus peak height ratios should be considered in assigning alleles at loci with two or more peaks.
   - Homozygote allele peak heights are approximately twice that of heterozygote peaks in the same general size range within a profile (taking into account factors such as allele length and degradation).
   - At a locus exhibiting two peaks, where the ratio of the peak heights is less than expected for alleles at heterozygous loci, the peaks may represent contributions from more than one person.  In single-source samples, the smaller peak at a heterozygous locus is expected to be at least 50% of the height of the larger peak in Identifiler products (when the peak height of the larger peak is above 500 RFU).

5. The analytical threshold is based on signal-to-noise considerations and may not filter out all artifacts that result from PCR products, instrument limitations, or are inherent to the DNA procedure.  An artifact is defined as a peak in a sample electropherogram that does not represent an authentic allele and may originate

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

from a source other than DNA.  Due to excessive noise or other factors, if an analyst is unsure if a peak is a true allele or artifact, it may be necessary to re-inject or reamplify a sample to make that determination. The following potential artifacts should be considered before assigning allele designations to peaks:

a) **Stutter (n-4)**

    i)    At any locus, a minor peak one repeat unit shorter than a designated primary allele peak will be considered stutter if its peak height is equal to or less than the predicted maximum stutter peak height determined for that locus by the SDSO Laboratory internal validation studies (average stutter plus 3 standard deviations).  A peak in a stutter position that is equal to or less than the predicted maximum stutter will not be designated as an allele.

Identifiler

| Locus | D8S1179 | D21S11 | D7S820 | CSF1PO | D3S1358 | THO1 | D13S317 |
|---|---|---|---|---|---|---|---|
| Statistical max | 8.0% | 9.0% | 8.0% | 8.0% | 10.0% | 5.0% | 9.0% |

| Locus | D16S539 | D2S1338 | D19S433 | vWA | TPOX | D18S51 | D5S818 | FGA |
|---|---|---|---|---|---|---|---|---|
| Statistical max | 9.0% | 11.0% | 12.0% | 12.0% | 6.0% | 15.0% | 8.0% | 12.0% |

    ii)    At any locus, a minor peak one repeat unit shorter than an allele peak may be interpreted as an allele peak if its peak height is greater than the predicted maximum stutter peak height determined for that locus by the SDSO Laboratory internal validation studies.

    iii)    Stutter peaks that exceed the maximum predicted value may be present for several reasons including some of the following conditions:

- In samples with minimal DNA template, stochastic effects can cause the stutter peak to be higher than expected.
- When a stutter peak is less than 100 RFU, the stutter peak's height can be disproportionately elevated by baseline noise compared to the true allele.
- Stutter peaks may also be elevated when in-between two alleles that are 8 bp apart.
- Stutter is from a true allele that is one of the largest alleles in the locus.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                                     Forensic Biology
Regional Crime Laboratory                                        FB Technical Procedures Manual

- Stutter from an off-scale peak (where the camera is saturated and noted by a pink line in the data) may be elevated.

An analyst may take these and other situations into account in order to determine if the peak in stutter position is a true allele or elevated stutter.  If an analyst determines a peak to be elevated stutter, the analyst must note reasons for this decision and the stutter percentage on the electropherogram.  If the reason is that there is no other sign of a mixture, a close up of the entire profile (y-axis zoomed into at least 200 RFU) shall be printed in order for the reviewer to check that there is no other sign of a mixture in the electropherogram.

In rare instances, stutter occurs four base pairs larger than the true allele (n+4).  There are no defined n+4 cutoffs for interpretation.  N+4 is generally only seen with high input of template DNA or if a stutter peak is in-between two true alleles.  Data believed to exhibit n+4 may be identified at the discretion of the analyst.

b) **Spikes (SPK)**

Spikes are typically narrow, non-reproducible peaks present in one or more colors. Spikes that appear in more than one color typically exhibit the same data point and/or base pair size at each peak.  They can result from electrophoresis inconsistencies.  If a spike is only callable in one color, the analyst must document the spike by printing out the raw data.

If a spike types on ladder, it may interfere with the true alleles in a given sample; therefore, the sample may need to be re-injected to ensure there are no true alleles being masked by the spike. True alleles are more prone to be masked by multicolor spikes with a large peak height. A peak that is not replicated in duplicate injections may be assumed to be a spike or other artifact.

c) **Pull-up (PU + color B, G, Y, R, or O)**

Pull-up is a result of spectral overlap between the dyes, which is normally corrected by the spectral calibration.  Pull-up typically appears as a peak at a similar data point and/or base pair size as a much larger allele peak in a different color. This may be caused by injecting excess amplified product or by use of an inadequate spectral calibration.

Depending on the cause of the problem, samples that exhibit excessive pull-up

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

can be diluted and re-injected, re-injected for less time (5 or 3 seconds), re-amplified with less target DNA, or re-injected after a new spectral is run. However, the analyst has discretion to determine if a sample containing pull-up is interpretable.

d) **Off-scale data**

Peaks that exceed the dynamic range of the instrument (when the camera is saturated on the 3130) may exhibit attenuation and improper sizing. The computer software will designate the off-scale peak with a pink line that appears in all colors of the sample plot. Off-scale peaks may result in artificial elevation of associated stutter peaks and excess pull-up. Following peak detection, off-scale peaks in the analyzed data are assigned an artifactual height value which is not representative of the true amplitude. As a result, peak height values for off-scale peaks should not be used in qualitative aspects of interpretation (e.g. stutter and peak height ratio assessments).

In most cases, samples should be diluted and re-injected, or re-injected using a shorter injection time (down to 5 or 3 seconds), before they are interpreted. Sometimes it is necessary to re-amplify a sample with less DNA. If the sample in question is a single source sample with only a few off-scale alleles, the sample may be interpreted at the discretion of the analyst. Mixed DNA samples cannot routinely be interpreted if saturation exists because stutter and balance issues cannot be appropriately addressed. In order to accurately interpret mixed samples, the data at a given <u>locus</u> must be brought into the dynamic range of the instrument either by lowering injection time or by selecting a smaller target amount of DNA for amplification.

In some situations it may be necessary to use multiple injections and amplifications to obtain appropriate data at all loci in a sample containing a mixture of DNA. The analyst may report a composite profile from multiple amplifications and/or injections of a single sample (the sample must have been amplified with the same sample extract). Therefore, some data reported may come from a sample containing some overblown data; however, all reported data for any given locus must be on scale.

If off-scale data will not be used for analysis, no close up (200 RFU zoom) is needed.

e) **Non-template dependent nucleotide addition (-A)**

Failure to attain complete terminal nucleotide addition can result in "band-splitting", which is exhibited as two peaks, one base pair apart. Typically the incomplete product appears as a smaller shoulder to the left of the allele peak,

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

and the dip between the peaks does not approach the baseline.  –A artifacts are usually caused by too much input DNA.  Samples in which this phenomenon is observed may be re-amplified to aid in interpretation.  However, at analyst discretion, the data may be interpreted and the artifacts designated as –A. Caution should be used when interpreting any –A peaks that are not off-ladder. The entire profile should be evaluated to determine the likelihood that the peaks are truly –A.  It may be necessary to provide close-up views of the data for review.

f) **Shoulder peaks (SHD)**

Shoulder peaks are peaks that fall within one or two base pairs (larger or smaller) of the true allele.  Care must be taken to determine if a shoulder peak is a true allele or artifact. The entire profile should be evaluated to determine the likelihood that the peaks are artifacts and not true alleles.  It may be necessary to provide close-up views of the data for review.

g) **General Artifacts (ART)**

Artifacts may be from electrophoresis or amplification.  One common general artifact is caused by dye components (disassociated primer dye artifacts) in the AmpFlSTR Identifiler kit. The shape of these artifacts is not consistent with the shape of true alleles.  These artifacts may or may not be reproducible.  A close up view of these artifacts and an explanation must be placed in the case notes.

h) **High baseline (HBL)**

Occasionally, the baseline will increase briefly and then go back down.  A baseline may be considered high if it is higher than is typically observed (typical baseline is less than ~15 RFU).  High baseline is the result of capillary issues and usually does not result in peaks with the correct peak morphology.  If the baseline is raised above the analytical threshold, however, the GeneMapperID software may label part or the entire high baseline as an allele(s). A close up view of the elevated baseline must be placed in the case notes.  The analyst may also choose to rerun the sample in an attempt to get a cleaner baseline.

i) **Noise (NOS)**

The noise level differs from sample to sample as well as within a sample for a variety of reasons. If a sample is excessively noisy, care should be taken to

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

distinguish true alleles from peaks that may be noise.  In general, noise peaks are not reproducible if they are from an electrophoresis issue.  If a noise peak is in the analysis range, the analyst must document it by printing a close-up view of the noise peak.

j) **Out of Range (OOR)**

If a peak is not within the size range of any locus, it may be designated as out of range.

Care should be used in order to ensure the out of range peak is not a true allele.  A peak may be a true allele if it fulfills at least one of the following criteria:
- Has a significant peak height (greater than 200 RFU).
- A stutter peak is associated with the out of range peak.
- Evaluate the entire profile, including the peak heights and number of peaks at the surrounding loci.  If the OOR peak is a true allele, it would be more constant with the profile (e.g. In a single source profile, the OOR peak is between one locus with two alleles and one locus that has a single allele more consistent with the peak height of a heterozygote than a homozygote).
- The peak is not in an area known to have common OL artifacts.
- If there is a second injection or second amplification, the peak is reproduced.

If the peak appears to not be a true allele after taking these things into consideration, the peak may be labeled as out of range.

If the out of range peak appears to be a true allele, follow the naming criteria for off-ladder alleles.  If the analyst cannot determine which of the closest loci the allele should be reported under, consult with the DNA Technical Manager to determine how to report it.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.5.3      Interpretation of STR data

1. The interpretation of STR data from evidence samples shall be done before the reference known samples when possible.

2. Determine the number of contributors.

   - A **single-source** sample is typically indicated by the presence of no more than two alleles at each locus and appropriate intra-locus peak height ratios. Single-source peak height ratios may be less balanced when low level results are obtained.

   - A **mixture** may be indicated by:

     Three or more alleles detected at one or more loci.  However, in some instances a single individual may exhibit more than two alleles at a locus due to genetic anomalies.  Tri-allelic patterns have been observed in single source samples and there is a known phenomenon where different tissues from the same individual may or may not exhibit the tri-allelic pattern.

     or

     At one or more heterozygous loci, an allele peak height ratio smaller than the minimum expected for single-source samples.  Degraded samples or those with a minimum amount of input DNA that yield peak heights less that 500 RFU may show peak height ratios that are lower than expected as compared to samples whose peak heights are in the 500 RFU to 8000 RFU range. Decisions about mixed samples whose peak heights average less than 500 RFU should be made with caution.

   If the sample is determined to be a mixture, the analyst shall include the number of possible contributors in their interpretation notes (either made on the electropherogram or additional note pages).  The minimum number of contributors to a mixture may be determined by the formula n/2, rounded up to the nearest whole number, where n = the total number of allele peaks at the locus with the largest number of allele peaks.  However, the peak height ratios or the presence of a major contributor may also be considered when determining the minimum number of contributors.

3. Determine if the profile is a partial profile
   - Partial profiles are profiles that have no allele designations at one or more loci.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

- Partial profiles may be obtained when the DNA template is degraded, in low quantity, or when PCR inhibitors are present.  A negative or inconclusive result at some loci may not impact allele designations at the remaining loci.

4. For Mixtures - Determine Major and Minor Contributors:

- It may be possible to identify major and minor contributors of a mixture.  Major and minor contributors need only be determined if their identification will aid in the mixture interpretation.

- When designating major and minor contributors, the major contributor will be attributed to a single individual contributing the majority of DNA to a sample with the exception of a dual major.

- A dual major is a major DNA profile that represents two contributors.  Some circumstances exist in which a minor component can be determined to represent the third or fourth contributor in a three or four person mixture.  A dual major will generally be called when there are apparently two strong contributors and a third or fourth contributor whose types may not be present at all loci.  Careful consideration of the profile must be done because of the greater complexity due to allele stacking.

- An allele at a locus can be defined as a minor component if the ratio of its peak height to the height of the smallest major peak at the locus is less than expected for single-source samples (<50%).   It may NOT be possible to identify major and minor contributors of a mixture if the peak heights in the profile are similar.

- It may not be possible to identify major and minor contributors of a mixture if there are a large number of contributors (three or more) or if possible allele sharing causes ambiguity as to which alleles could be from the major contributor(s).

- Larger-than-expected differences between the heights of heterozygote peaks are more common in samples with lower overall peak heights.  No designation of minor components will be performed in situations where the largest peak at a locus is less than 500 RFU.

Designation of major or minor DNA types shall be made on the electropherograms. If no minor call is made at a particular locus, note if the locus's alleles are part of the major profile (minimally needs to be noted if only one or two alleles are present at a particular locus).  The major DNA profile shall be denoted in the report by using bold font.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

5.  Examine all loci to determine what loci may be used for statistical purposes.

Single Source Profiles – individual loci:

- Any locus containing only one allele must be evaluated to determine if the one allele represents a true homozygote.
- At low levels of DNA template, stochastic effects (i.e. unequal signal from alleles in a heterozygote due to chance sampling and/or preferential amplification) may cause loss of an allele or a substantial imbalance of alleles at a locus.
- A locus with a single allele peak shall only be used for statistics if the peak height is greater than the stochastic threshold.  The stochastic threshold is the peak height above which it is reasonable to assume that allelic dropout of a sister allele of a heterozygote has not occurred at a given locus.  Therefore, if a single allele is above the stochastic threshold, it is reasonable to assume the single allele is a true homozygote.  The stochastic threshold is 175 RFU for 5 second injections and 200 RFU for 10 second injections.
- If a single allele's peak height is less than the stochastic threshold, the locus will be considered inconclusive (INC).  The analyst shall note this designation on the electropherogram and the table of results in the lab service report. A DNA profile with an INC locus is considered a partial profile.
- Loci with single allele peaks below the stochastic threshold should still be taken into consideration for reporting inclusions and exclusions.  In these situations, the absence of a peak in the evidence sample relative to the reference sample is insufficient grounds to warrant exclusion.

Mixtures of DNA – individual loci:

- An analyst should evaluate every locus and the entire profile to determine suitability for comparison and statistical analysis.
- In situations where minimal DNA (low template of the whole sample or a part of the sample) is amplified or the sample is degraded, stochastic effects may be present or drop out of alleles may occur.
- An analyst may take several factors into account to determine the suitability of a locus for statistics.
  - -Peak heights of alleles (with and without the additive effect of stutter or other artifacts)
  - -Peaks just below threshold (but distinctly above noise and not attributable to particular artifacts like stutter or pull-up)
  - -Number of contributors compared to number of alleles
  - -Size of the locus (more dropout may be present at larger loci)
  - -Degradation or inhibition

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

> -If appropriate assumptions can be made (i.e. number of contributors) and if using those assumptions allows the analyst to determine if all alleles are present at a specific locus
> -If major/minors can be called

- There may need to be a distinction between what loci can be used for statistics for the major contributor(s) and which loci can be used for statistics including the entire profile as a whole.
- Notes regarding which loci can be used for statistics should be clearly stated on the electropherogram or case notes.

Whole DNA profile suitability:

Some DNA profiles may not be amenable to interpretation or may not provide sufficient information to conclusively include or exclude specific potential contributors.  In some cases, the evidence of inclusion or exclusion may be insufficient to warrant statistical illustration; if no appropriate calculation of a probative inclusion can be made, no inclusion shall be reported for that sample.  Generally, no inclusions will be offered on DNA profiles of four or more contributors unless an unambiguous major or dual major DNA profile can be determined.  The interpretation notes on the electropherogram should reflect the reason that that profile is not suitable for comparison and/or inclusion.

6.  Determine if a composite profile should be used.

A composite profile is a DNA profile generated by combining typing results from multiple injections of the same amplified product and/or multiple amplifications of the same DNA extract.

If multiple injections derived from the same sample extract produce different results (generally a few additional alleles in each of the different injections), the analyst can determine if it is appropriate to make a composite profile.

In some situations, generally when DNA is degraded, it may be necessary to use data from injections with off-scale data at loci with smaller amplicon sizes in order to get information at the loci with larger amplicon sizes.  This data can be combined with data from other injections to get a full profile.   When making a composite profile involving data from an injection that contains off scale data, care should be taken to determine if the off scale data is producing artifacts that make the profile not interpretable.

When there are allele peaks with heights between the detection and stochastic thresholds, it would not be uncommon for a few alleles to amplify or be detected in one amplified product or injection and a few additional or different alleles to be detectable in another amplified product or injection.  The analyst can combine all

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

the interpretable alleles from all injections derived from a single DNA extract and report them in one profile. The analyst should indicate that they are doing this in their interpretation notes.

If two different amplified products or injections from the same extracted sample are significantly different, and the difference is not explainable based on the input DNA, injection time, stochastic range, or similar concerns, the profiles may not be suitable to make one composite profile.

7. Determine if a foreign profile can be pulled out of the DNA profile.
   (A foreign profile will only be deduced in a two person mixture with an expected contribution from one individual and no evidence of dropout/stochastic effects at the loci used).

   For intimate samples (body swabs, clothing, or similar) or evidence where a certain individual can be assumed to be a contributor, and the data is consistent with a two-person mixture, a "foreign profile" may be pulled out of the overall profile. The analyst shall use the reference sample from the assumed contributor in comparison to the data from the evidence sample to deduce the foreign profile. The peak heights of all alleles at a locus and the alleles that are inconsistent with the known contributor can be used to determine the foreign profile.

   Caution must be used when determining a foreign profile. The expected percentage of contribution of the known contributor and the foreign contributor to the sample may vary from locus to locus. At loci where the percentage of contribution does not fall close to the expected range seen throughout the profile or where ambiguity exists, the analyst may call the foreign profile inconclusive. These loci should be marked as such in the allele table under the "deduced foreign profile" row.

   Four allele loci:
   These loci can be used to determine the known contributor's percentage of contribution to the mixture. To determine this divide the sum of the peak heights of the two alleles that are assumed to be contributed by the known contributor by the total sum of the peak heights of the four alleles present at the locus. This should be done at each locus with four alleles to determine the range of the known contributor's percentage of contribution across the profile. The two alleles foreign to the known contributor can be pulled out as the foreign DNA types for that locus. The two alleles attributed to the known contributor and the two alleles attributed to the foreign profile should exhibit peak height balance of 50% or greater.

   Example:

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

| Allele | Peak height (RFU) |
|---|---|
| A | 303 |
| B | 344 |
| C | 777 |
| D | 832 |
| Total peak height at locus | 2256 |

If the known contributor has alleles C and D then his/her total RFU contribution to the mixture at this locus is 1609 RFU.  The known contributor percentage of contribution is 1609/2256 = 71%.  Alleles A and B can then be attributed to the foreign contributor and the percentage of contribution of the foreign contributor is 100-71=29%.  Alleles A and B have 88% peak height balance (303/344) and alleles C and D have 93% peak height balance (777/832).

Three allele loci:

If the known contributor is a homozygote at that locus, subtract out the known allele and the two remaining alleles can be pulled out as the foreign DNA type for that locus.   This situation can also be used to determine the known contributor's percentage of contribution to the mixture.

If the known contributor is a heterozygote, the analyst may or may not be able to pull out the foreign DNA profile.  The analyst must take the peak heights into account when determining if the foreign contributor is a homozygote (the one allele that does not match the known contributor) or if the foreign contributor is a heterozygote (one allele foreign to the known contributor and one allele that is shared by the known contributor).  Sum the total of the three alleles present and determine the known contributor's RFU contribution by using the previously calculated percentage of contribution.  This information can then be used to help determine if the foreign profile is homozygous or heterozygous at the locus.

Example: (known contributor heterozygous/foreign contributor homozygous)

| Allele | Peak height (RFU) |
|---|---|
| A | 660 |
| B | 573 |
| C | 744 |
| Total peak height at locus | 1977 |

The known contributor RFU contribution is predicted to be 1403 RFU (71% of total RFU).  If the known contributor has alleles A and C, his/her total RFU contribution would be 1404 which is consistent with the predicted value.  The remaining B allele could then be attributed to the foreign contributor (573 RFU is consistent with the 29% expected contribution of the foreign profile).

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Example: (known contributor heterozygous/foreign contributor heterozygous)

| Allele | Peak height (RFU) |
|---|---|
| A | 1003 |
| B | 250 |
| C | 823 |
| Total peak height at locus | 2076 |

The known contributor RFU contribution is predicted to be 1473 (71% of total RFU). If the known contributor has alleles A and C and he/she is assumed to account for the 823 RFU of the C allele, the remainder of the predicted known RFU contribution (1473-823=650 RFU) would be accounted for by the A allele. The known contributors alleles are balanced (650/823=78%). The remainder of the A allele RFU (353) and the B allele can then be attributed to the foreign contributor. The RFU values of these alleles are also balanced (250/353=70%) and consistent with the expected percentage of contribution of the foreign contributor (603/2076=29%)

Example: (known contributor homozygous/foreign contributor heterozygous)

| Allele | Peak height (RFU) |
|---|---|
| A | 1231 |
| B | 200 |
| C | 303 |
| Total peak height at locus | 1734 |

If the known contributor has an A allele at this locus, the foreign contributor is then assumed to have contributed the remaining B and C alleles. The foreign contributor's alleles are balanced (200/303=66%) and are consistent with the expected percentage of contribution of the foreign profile (503/1734=29%).

Two allele loci:

If the known contributor is a homozygote at that locus, subtract out the known allele and the remaining allele can be pulled out as the foreign DNA type for that locus. If the known contributor is a heterozygote, the analyst may or may not be able to pull out the foreign DNA profile. The analyst must take the peak heights into account when determining if the foreign contributor is a homozygote (sharing one allele with the known contributor) or if the foreign contributor is a heterozygote (sharing both alleles with the known contributor). Sum the total of the two alleles present and determine the known contributor's RFU contribution by using the previously calculated percentage of contribution. This information

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

can then be used to help determine if the foreign profile is homozygous or heterozygous at the locus.

Example: (known contributor heterozygous/foreign contributor homozygous)

| Allele | Peak height (RFU) |
|---|---|
| A | 1035 |
| B | 465 |
| Total peak height at locus | 1500 |

The known contributor RFU contribution is predicted to be 1065 (71% of total RFU). If the known contributor has alleles A and B and he/she is assumed to account for the 465RFU of the B allele, the remainder of the predicted known RFU contribution (1065-465=600 RFU) would be accounted for by the A allele. The known contributor's alleles are balanced (465/600=77%). The remainder of the A allele RFU (435) can then be attributed to the foreign contributor. This is consistent with the expected percentage of contribution of the foreign contributor (435/1500=29%).

Example: (known contributor heterozygous/foreign contributor heterozygous)

| Allele | Peak height (RFU) |
|---|---|
| A | 633 |
| B | 654 |
| Total peak height at locus | 1287 |

The known contributor RFU contribution is predicted to be 913 (71% of total RFU). If the known contributor has alleles A and B then he/she could be accounting for 456RFU of each allele (assuming he/she is contributing to each allele equally). The remainder of the A allele RFU (177) and the B allele RFU (198) can then be attributed to the foreign contributor. This is consistent with the expected percentage of contribution of the foreign contributor (375/1287=29%) and these allele RFUs are balanced (177/198=89%).

Example: (known contributor homozygous/foreign contributor homozygous)

| Allele | Peak height (RFU) |
|---|---|
| A | 670 |
| B | 329 |
| Total peak height at locus | 999 |

If the known contributor has an A allele at this locus then the foreign contributor is assumed to have contributed the B allele. These designations are consistent

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

with the predicted percentage of contributions (670/999=67% contribution from the known contributor and 329/999=32% contribution of the foreign contributor).

<u>One allele loci</u>:

If there is no reason to believe that the foreign contributor is dropping out at that locus, the known contributor and foreign contributor share that one allele.  The one allele may be reported out as part of the deduced foreign profile.

8. Interpretation notes shall be made for all interpreted DNA profiles in which a mixture is indicated.  If multiple injections exist for one sample, the notes may be written for only one injection if appropriate.  These notes shall be made on the electropherogram or on additional note pages and include the following:
    -the minimum number of possible contributors
    -If major/minor can be determined
    -If there is dropout suspected at certain loci or across the entire profile.
    -If any locus or the entire profile cannot be used for statistical analysis.

9. For profiles suitable for comparison, the evidence profiles should be compared to all known reference profiles in the case.  Determine if each reference donor can be included or excluded as a potential contributor.

A particular person may or may not be included as a possible contributor to an evidence profile exhibiting some, but not all, of the alleles in the putative donor's reference profile.  The following considerations should be taken into account to determine if a particular person is included as a possible contributor to a sample.

- Based on the quality and quantity of observed peaks in the unknown profile, the possible contributor's DNA might or might not be expected to produce interpretable peaks at all loci
- The data may or may not be sufficient to support an interpretation of either inclusion or exclusion

If the data does not specifically support either an inclusion or exclusion, this should be explicated and the profile reported as "inconclusive" as to the inclusion or exclusion of a particular individual or all individuals.  If no appropriate statistical calculation can be performed on a probative inclusion, the sample should also be reported as "inconclusive" as to the inclusion or exclusion of a particular individual or all individuals.   If there is not enough information in the profile or minor profile to make any comparison, this should be noted.

A particular person can be excluded as a possible contributor to a single-source partial DNA profile, if the sample profile contains alleles foreign to that individual.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

If an exclusion based on a partial profile is reported, the assumption that the evidence sample is from a single source should be stated.

Imbalanced amplification of heterozygous allele pairs at low template DNA levels is not necessarily an indication of a mixture, and the absence of an allele may not be a valid basis to exclude a potential contributor.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.5.4  Conclusions

**Definitions of conclusions as to a profile's source**

- *No Result*

  No interpretable results were obtained from any locus.

- *Exclusion*

  If alleles from the reference sample are not found in the profile of the evidence sample and their absence cannot be attributed to insufficient template, degradation, inhibition, masking at a stutter position, or a genetic anomaly, then the individual is excluded as a possible source of the biological material present in a sample.

- *Inconclusive*

  An inconclusive profile is one in which none of the loci are suitable for inclusionary/statistical purposes or if insufficient data exists to form a conclusion regarding the source of the sample.  Loci or profiles that have been interpreted as inconclusive may still be used to exclude an individual if alleles present in their reference profile are not detected in the mixture.  However, due to the possibility of allele dropout in such mixtures, even if alleles in the reference sample are not present in the mixture, an exclusion may not be possible or may only be possible if the analysts assume a certain number of contributors.  Due to the low-level results obtained from inconclusive mixtures, it may be that a particular individual can neither be included nor excluded.

- *Match*

  For single-source genetic profiles, the STR profile from the evidence sample exactly matches that of the reference sample.  A reference sample may also match a partial DNA profile where all the loci containing results (with the exception of inconclusive loci) match the reference sample.  Similarly, a major DNA profile can be considered a match to a reference sample if the loci where a major DNA contributor can be distinguished exactly matches a reference sample.

- *Inclusion (cannot exclude)*

  For single-source genetic profiles, the STR profile from the evidence sample matches that of the reference sample.  An individual may also be included when a partial profile is observed in an evidence sample if the evidence alleles

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

detected are the same as those at the corresponding loci in the reference sample.

Generally, if an individual's alleles are present or can be accounted for in a mixture, the individual may be included (or cannot be excluded) as a possible contributor to the sample.  Therefore, if there are no unexplainable differences (insufficient template, degradation, inhibition, and masking at a stutter position) between the evidence and reference samples, they may originate from a common source.

The inclusion of a reference sample as a potential contributor to a mixture where all of the reference sample's alleles are not represented may be appropriate after taking the following things into consideration:

> The absence of the reference sample's alleles in the mixture can be reasonably explained (dropout, stochastic effect, stutter positions)

> The reference sample's alleles are present in the mixture at the larger loci, and therefore should be present in the smaller loci.  Therefore, if they are absent in the smaller loci, this may not support an inclusion.

> The reference sample's alleles are represented at a majority of the loci from which interpretable results were obtained.

**Definitions of conclusions for parentage analysis**

- *Inclusion*

  A biological parent/child relationship can be evaluated by comparing the alleles present in both the possible parents' and child's DNA profiles.  In general, at least one allele between a biological parent and child will be the same at all loci.

- *Exclusion*

  Assuming full DNA profiles were obtained, if there are three or more loci where an individual does not share at least one allele with the possible biological child/parent, that person is excluded as a possible biological parent/child of that individual.

**Wording of Conclusions**

For recommended report wording of DNA conclusions, refer to Appendix 4.  Because each case is different, the wording of the conclusion for samples where a

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                          Forensic Biology
Regional Crime Laboratory                           FB Technical Procedures Manual

mixture is present must be customized to fit the specific circumstances of the case. Factors to be considered include:

a)  The number of possible contributors (this should be explained)
b)  Contributors that may be assumed in the sample  (for instance, in some cases, the victim of a sexual assault or the habitual wearer of an item of clothing may be assumed to be a contributor)
c)  Assumptions that a certain number of contributors must be present to make a specific conclusion
d)  A major contributor can be distinguished at some or all loci
e)  Alleles present in the reference profile that are absent in the evidence profile
f)  Alleles present in the evidence profile that are absent in the reference donor's profile
g)  If all the alleles present in the evidence are present in a combination of two putative donors AND if no alleles are present in the evidence that are foreign to a combination of the donor profiles
h)  Expectations regarding the detection of alleles of a minor donor at all loci

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.5.5  Statistical Calculations

Several legitimate methods exist to assess the strength of DNA evidence. The approach taken in any particular case will be determined by a combination of: the question that needs to be answered, the available data, any requisite assumptions, and the practicality of the approach. The strength of the relationship between any two samples may be expressed using various statistical tools including: a random match probability/frequency of occurrence, a probability of inclusion, or a likelihood ratio.  These three calculations assume that the randomly selected individual from the population is not closely related to the included individual (for example, the statistic given for an evidence sample in which a  suspect is included as a possible contributor does not represent the probability of the suspect's sibling also being included in that sample).  The Popstats statistical program should be used for these calculations.

All statistical calculations will be performed using the following population databases:

-Budowle, B. et al. Population data on the thirteen CODIS core short tandem repeat loci in African Americans, U.S. Caucasians, Hispanics, Bahamanians, Jamaicans, and Trinidadians. *JFS* (1999) (for CODIS core loci)

-Budowle, B. et al. Population Data on the STR Loci D2S1338 and D19S433. *Forensic Science Communications*, July 2001 vol 3 (3).

Statistical analysis of an evidence DNA profile (or a portion of the evidence DNA profile) will be provided when a probative inclusion is reported.  An inclusion of an individual who is assumed to be in a sample (victim in her own intimate sample, elimination reference in a sample, etc) does not require a statistic.  If the probative value of a sample is unclear, generally the analyst should report a statistic on the evidence.  In situations where there are several samplings of one item, it is at the analyst's discretion to report the statistic on the most complete or probative sample; the analyst may report statistics on all the associated samples.  Similarly, if a probative inclusion of the same individual is made in a sperm and non-sperm fraction of a single sample, the analyst will generally only need to report a statistic for the most probative fraction.

In some situations, when the presence of one of the contributors (e.g., the victim) can be assumed based on the nature of the sample, the information contained in the profile from the known source can be used to assist in mixture deconvolution and subsequent statistical analysis.  Depending on the profiles in the specific instance, this can be accomplished by subtracting the contribution of the known donor from the mixed profile.  It may be possible to infer the foreign profile by examining peak height ratios (see FB manual section 4.5.3).  A deduced foreign profile may be treated as a single source sample for statistical analysis.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### Single-source samples

- For single-source samples, frequency of occurrence can be calculated using recommendation 4.1 from the National Research Council report "The Evaluation of Forensic DNA Evidence" (1996), using a $\theta$ value of 0.01 and a minimum allele count of 5. Loci from apparent single source samples exhibiting three alleles at a single locus will not be used for this calculation.

### Partial profiles

- Single source –

  If a particular donor can be included as a possible source of an apparent single source sample for which only a partial profile has been obtained, the statistical calculation shall only include the alleles detected in the evidence sample.

  In instances where a single allele is present below the stochastic threshold, there is a possibility that there is dropout of the second allele of a heterozygote. Therefore, the locus shall be dropped for statistical analysis.

- Mixture –

  If a particular donor can be included as one of two or more possible sources of a sample for which only a partial profile has apparently been obtained, the statistical calculation shall include only the alleles detected in the evidence sample.

### Mixtures

- For mixtures in which a major profile can be distinguished and is attributed to a single source, the frequency of occurrence of the major profile can be calculated using the same formulae as for single-source samples using those loci at which the major profile is distinguishable.

- For mixtures in which a major contributor cannot be distinguished or in mixtures of DNA from three or more individuals, the combined probability of inclusion (CPI) may be used. If a dual major is distinguished in a mixture of three or more individuals, the restricted CPI may be used on the dual major. The homozygote correction factor of θ will not be used for the CPI calculations. The CPI calculation estimates the frequency that a randomly selected person of a given population would be included as a possible contributor to an observed mixture.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

For calculation purposes it may be inappropriate to use those loci which do not show evidence of a mixture in a sample which is clearly a mixture or where it is reasonable to assume the presence of dropout.

In mixed samples where the average peak height is 200 RFU or less, the inclusion and exclusion of a contributor should be made with caution as expected genetic information may be absent in the sample. In such instances, a determination of no conclusion may be justified.

- Generally, if a mixture of DNA can be assumed to be from only two contributors, it may be appropriate to employ a likelihood ratio. Likelihood ratios may be used in particular with mixtures where competing hypotheses regarding the origin of the evidence must be weighed. The homozygote correction factor of θ will not be used for the likelihood ratio calculations.

**Parentage**

The laboratory performs parentage analysis in certain situations. These may include identification of remains, cases where an evidentiary sample is compared to relatives of a victim for whom no reference sample is available, and criminal paternity cases. In these instances, the analyst should use the likelihood ratio approach and calculate a parentage (or paternity/maternity) index. For example, in a paternity case, this is the ratio comparing the probability that the tested man passed the obligatory paternal alleles to the probability that a random man passed the obligatory alleles.

A Reverse Parentage Index will used in cases where a man and woman are thought to be the biological parents of the donor of an evidence sample. This likelihood ratio compares the probability that the tested couple produced a child with the observed profile to the probability that a random couple produced a child with this profile.

The Popstats statistical program shall be used for these calculations (Parentage Trio calculation or the Reverse Parentage calculation). If an exclusion is noted at a given locus, the average mutation rate for that locus should be used based on the following formula:

$$LR = P(E|H_1)/P(E|H_2)$$

$$= \mathcal{U} \text{ (mutation rate for locus)/ (average exclusion probability for locus)}$$

This term must be calculated by hand using the published mutation rate for the given locus from the STRBase website. This calculation assumes that the allele has mutated to either one repeat larger or smaller than the putative parental allele. In the event that the putative parental has mutated 2 repeats larger or smaller then use $\mathcal{U}^2$.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

The incorporation of the mutation rate in the calculation will serve to lower that likelihood ratio.

**Relatives**

- If possible contributors of the evidence sample include relatives of the suspect, DNA profiles of those relatives should be obtained. If these profiles cannot be obtained, the likelihood of finding the evidence profile in those relatives can be calculated with formulae 4.8a, 4.8b, 4.9a or 4.9b from the National Research Council report "The Evaluation of Forensic DNA Evidence" (1996).  Popstats kinship program can be used for this calculation.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 4.6    CODIS procedures

## 4.6.1    CODIS Overview

Each individual DNA analyst is responsible for evaluating their casework profiles and determining eligibility and suitability for CODIS entry based upon in-house CODIS training, information contained in this section, periodic refresher training, "Annual Review of Casework Acceptance at NDIS" training, and advice from the CODIS Manager or their designee.

When an evidence DNA profile from a putative perpetrator is developed that is eligible for entry into CODIS, the analyst will fill in the profile on the "CODIS Sample Information Worksheet" or "CODIS Sample Mixture Information Worksheet".  After technical review, the analyst will enter the profile into the CODIS database.  The "CODIS Sample Information Worksheet" will be forwarded to the CODIS Administrator for entry into the CODIS –Caselog database for tracking purposes.

Upon receipt of a "Match Detail Report" from the local, state or national level, the CODIS Administrator may forward the match to the original analyst for additional evaluation. Based in part on the evaluation of the match by the original analyst, the CODIS Administrator will set the match disposition accordingly.

On receipt of the offender's identifying information from the state or national level, the CODIS Administrator will enter the offender's information in the CODIS-Caselog database. The CODIS-Caselog database will be used to generate a form letter that is forwarded by email to the submitting agency. Electronic copies of the notification letter are saved as a link to the original case information in the CODIS-Caselog database. Copies of the notification are also sent electronically to the casework analyst as well as the administration staff for inclusion in the case file.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.6.2  CODIS Data Security

The lab's CODIS network is generally administered by a member of the section staff designated by the laboratory manager.  The CODIS Manager is responsible for the integrity and security of data entered into CODIS by the lab.

DNA typing information and other associated data entered into CODIS or corresponding local databases by laboratory staff is considered confidential.  Access to, or disclosure of databased information will be permitted only in accordance with the operational procedures established by the FBI laboratory for those purposes. Administrator level access to the CODIS network is limited to the CODIS Manager and his/her designees.  Analyst level access is granted to all CODIS eligible casework qualified analysts. The CODIS Manager is responsible for controlling access to the network through physical and/or electronic means.

Quality control of CODIS data is generally established by technical review of CODIS report forms, and is overseen by the CODIS Manager.  The CODIS Manager may take other measures, as necessary, to ensure the quality of CODIS data, including termination of the lab's participation in CODIS.

Uncontrolled Document

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.6.3  CODIS profile development

The following are intended as general guidelines for the process of generating CODIS profiles. The eligibility of a profile for entry into CODIS will in part depend on its potential source (putative perpetrator), which is best evaluated based on casework circumstances.  The nature of the DNA profile will also affect a profile's eligibility. In particular, mixed or partial profiles, results from degraded, inhibited, or limited samples may not be eligible for entry.

*Criteria for Forensic, Unknown and Forensic, Mixture profiles*

To be entered in CODIS as a Forensic, Unknown or Forensic, Mixture, a profile must be derived from a questioned (unknown) sample, not from a reference, and must logically appear to result from the presence of a perpetrator's DNA.  The profile must also meet the following State and NDIS standards for upload:

- Must include alleles for at least 7 loci for search at the state level, or at least 10 loci for search at the national level

- Must contain no more than 4 alleles per locus

- Must contain no more than 4 alleles at a maximum of 4 core loci, and any of the remaining 9 core loci shall have no more than 2 alleles at each locus

- Samples that are from an apparent single source shall be entered under Forensic, Unknown. Samples that are a mixture of DNA shall be entered under Forensic, Mixture.

*Determining alleles to be reported*

- For apparent single-source profiles, report each allele detected.

- Mixed profiles require careful examination to determine if any part of the profile may be masked by stutter or absent due to allele dropout. For mixed-source profiles, where part of the profile at a locus logically appears to result from the presence of an offender's DNA, the profile may be reported as follows:

   a) Report all alleles at the locus
   b) Report all alleles at the locus and indicate the obligate allele (1 per locus allowed). Obligate alleles are indicated with a "+" following the allele entry.
   c) Report only the allele(s) that must have originated from the perpetrator
   d) Do not report any information at the locus

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

These options must be considered carefully as an incorrect assumption may cause a non-match to occur.

### *Unidentified Human Remains, Missing Persons profiles*

DNA profiles from unidentified humans remains and missing persons may be entered into CODIS. The appropriate category is based on the source from which the DNA sample was obtained. Samples in these categories require an associated mitochondrial DNA profile to be searched to their fullest extent in CODIS. As such, it is recommended that samples in either of these categories be forwarded to the California Department of Justice's Missing Persons program for both STR and mitochondrial DNA typing, and subsequent entry into CODIS.

### *Local Suspect and Homicide Victim profiles*

DNA profiles obtained from "suspects" may be entered into the "Suspect, local" index in CODIS. These profiles are not marked for upload to state, and as such remain and are searched at the local level only.  Although it is not absolutely necessary to enter a profile from a suspect if an evidence profile that already matches the suspect has been entered into CODIS, analysts are encouraged to enter ALL suspect profiles into the local database in order to track the presence of Suspect profiles in the lab.

DNA profiles obtained from homicide victims may be entered into the "Homicide Victim" index in CODIS. These profiles are not marked for upload to state, and as such remain and are searched at the local level only.

### *Suspect, Known profiles*

In select circumstances, DNA profiles from suspects are eligible for upload to the state's "Suspect, Known" category. In order for a profile to be eligible for upload in this category, the case investigator must fill out a form attesting that the profile was legally obtained from a legitimate suspect in an active and ongoing criminal investigation. This form must be returned to the casework analyst and attached to the "CODIS Suspect Known" worksheet. Samples uploaded in this category will remain at the state level for 2 years at which point in time they will be removed from the database, unless the lab is notified that the individual is still a suspect in an active and ongoing criminal investigation. It is the responsibility of the CODIS Manager or their designee to monitor the profiles in this category to ensure they are removed from CODIS at the conclusion of the 2 year period.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                              Forensic Biology
Regional Crime Laboratory                              FB Technical Procedures Manual

### *Local Forensic Unknown*

This category is for casework samples that are ineligible for upload to SDIS and NDIS due to limited sample information (insufficient number of loci for upload), inadequate documentation as to sample source, questionable circumstances regarding sample source, and poor sample discrimination based on statistical evaluation of the profile. Samples in this category will only be searched at a local level and are never uploaded to SDIS or NDIS.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                        Forensic Biology
Regional Crime Laboratory                          FB Technical Procedures Manual

### 4.6.4  CODIS profile entry

CODIS profiles shall be reported to the CODIS manager using the procedure outlined in manual section 7.2.  DNA analysts who are listed as CODIS users are also responsible for entering their own profiles into the CODIS database, as follows.

1.  Logon to a CODIS workstation.

2.  Select STR Data Entry, which is located on the Program menu under CODIS Programs.

3.  Enter the **Specimen ID** which consists of a combination of the case number and the item designation. For solved cases, precede the case number with the letter Z. This indicates to the DOJ lab that your case is already solved. For suspect and homicide victim samples, the item designation should be followed by a space and the initials of the suspect or homicide victim from whom the sample was taken.

4.  Under Specimen Category select the appropriate category under which to enter the profile. **Forensic, Unknown** will be the default index for data entry which is selected under **Specimen Category**. **Forensic, Unknown** shall only be used for single source samples or apparent single source major profiles. **Forensic, Mixture** shall be used for all profiles with more than two alleles at any locus. Forensic samples that are not suitable for upload are entered into the **Local Forensic Unk**. Suspect samples that are eligible for upload to State (accompanied by necessary documentation) are entered under the **Suspect, Known** index.  All other suspect samples are entered under **Suspect Local** and homicide victim samples are entered under the **Homicide Victim** index. (Ensure that you have the proper index selected for your samples as the Suspect Local and Homicide Victim indices are **not** uploaded). CODIS entry forms are available for all of the aforementioned sample types.

5.  In the **Assigned To** field your name will automatically be entered and cannot be changed.

6.  Enter the case number in the **Case ID** field.

7.  Under **Source Identified** select Yes if your sample has an identified source, select No if unidentified. Under **Partial Profile** select Yes if your sample is a partial profile, No if it is a complete profile.

8.  The **Sample Comments** field can be used to enter any pertinent information about your sample, such as the justification for entry into CODIS. If entering a suspect or victim sample, DO NOT enter the name of the individual in this field.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

9.  Starting with the column labeled **Reading #1**, enter your DNA profile. The allele designations must be separated by a comma. (When you are in data entry mode the - in the upper right corner of the number pad is a comma). When you have finished entering the data in the **Reading #1** column, repeat the same in the **Reading #2** column. (Placing the cursor over any locus listed in the Locus column, will bring up a list of all possible alleles for that locus). This duplication step helps to ensure that the correct DNA types are uploaded. Once you have completed entering all values in both columns, the **Final Results** column will show your final DNA profile.

10. Ensure that your profile is entered correctly. Click on the **SAVE** button at the bottom of the active window.

11. Click the "Print" button. This will bring up a window titled "LDIS Specimen Detail Report". Print this page and place it in the case file as an administrative document to maintain a record of submission of the profile to CODIS.

12. Fill in the CODIS Entry Date on the bottom left of the CODIS form. Include the form in the case file as an administrative document attached to the LDIS Specimen Detail Report.

13. Search the entered profile as per FB manual section 4.6.5.

14. To enter another profile, click the **CLEAR** button at the upper right of the active window. The first click will clear all of the values except the Specimen ID. A subsequent click will clear the Specimen ID field as well.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.6.5  Additional CODIS functions

**Specimen Query**

You can query any samples in the CODIS database that have been entered under your name. This step is performed from the STR Data Entry screen.

1.  Open STR Data Entry

2.  Type in the first few digits of the case number you are interested in. Click the **Query** button. Any sample that matches the digits you entered will come up in a new window. Select the sample of interest by clicking on it, which will bring up the sample in STR Data Entry.

3.  Alternatively, enter the entire Specimen ID of the sample and click on **Query**. This will select only the sample that is an exact match to your query.

**Popstats**

Popstats can be accessed from the STR Data Entry screen. After you have entered and saved your profile, click on the **Popstats** button on the bottom of the active window. This will launch Popstats which will open with your current profile already entered in Popstats. Clicking on the Calculate button will perform the required calculations.

**Searcher**

Using Searcher is a mandatory step for all samples entered into CODIS to check for contamination. Therefore, all profiles suitable and eligible for entry into CODIS should be searched against all profiles stored locally to;

- Check for case to case matches
- Check for case to local suspect matches
- Check for case to homicide victim matches
- Check for case to employee matches (indicative of contamination)

The Searcher program can also be accessed from the STR Data Entry screen. Searcher allows you to search a target profile against all locally entered profiles. After you have entered your profile, click on the **Search** button located at the bottom of the active window. This will launch Searcher, which will open with your current profile already entered in the Target Profile window.

1.  Click on the **Searcher Configuration** button, which is located immediately to the left of the yellow question mark on the toolbar.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

2. Set the "Minimum Number of Loci Required to Report a Match" to at least 6. Set "Include Candidate Specimens that Match on all but __ Loci" to 0 or 1. Leave "Maximum Number of Candidates to Return" set to 0.

3. Select the loci to be searched by clicking the box labeled **AutoSelect** adjacent to the appropriate locus. To change the display order of the loci, drag and drop the loci into their new positions on the list. Stringency is set to "Moderate" by default. DO NOT CHANGE THIS SETTING.

4. Select any combination of the **Forensic, Forensic Mixture, Employees, Suspect**, and **Homicide Victim** indices to be searched. To select multiple indices, hold down the CTRL key while making your selections. Searching against the Employee index is required. Click **OK**.

5. Click the **Search** button, which is the flashlight icon on the toolbar immediately to the right of the open door icon.

6. If the sample matches to an employee sample, print the match and forward a copy to the CODIS Manager and the DNA Technical Manager. Delete the sample profile from CODIS.

7. If the match is a legitimate match, save the match to Match Manager. To do so, click on the second icon from the left on the toolbar. (If you have already saved your profile in STR Data Entry, and if you select the same index to be searched in which your sample was already saved, then your search will result in at least one match as the sample listed in Target Profile is being searched against everything currently entered in the indices you selected). If the match returned is a match of the target profile against itself, do not save the match.

8. If you have a legitimate match and have saved the match to Match Manager, the additional match where the target sample matches itself will also be saved to Match Manager. To delete the match of the target sample to itself, you need to use the Match Manager program.

9. Select the Match Manager program, which is located on the Program menu under CODIS Programs.

10. Locate the match of the target sample to itself. From the Edit menu, select Delete. Ensure that you are only deleting the match of the target sample to itself.

11. Close Match Manager.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

12. If the match is a legitimate match, print a copy and also provide a copy for the CODIS administrator. Consult with the CODIS administrator to correctly disposition the match.

13. Close the program to exit. You will be prompted to save your match to Match Manager if you have not done so. If the match is not a legitimate match, click OK to continue without saving. If you changed any options under Searcher Configuration, you will be asked if you want to save the changes. If you select Yes, the next time you use Searcher your current settings will come up as the default settings.

**<u>Searcher – Local Keyboard Search</u>**

If you are not entering a sample into CODIS, you may use the Searcher to search a sample locally (you may set up the searcher configuration as described previously).

1. Open Searcher

2. Enter appropriate DNA types in the Target Profile window

3. Click the Search button, which is the flashlight icon on the toolbar immediately to the right of the open door icon.

4. You may print out matches as appropriate.  However, do not save matches.

5. Close LDIS Searcher.

When all work has been completed, close all programs and logoff the workstation.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 4.6.6  CODIS Case Review

Following technical review, all cases that yielded a DNA profile suitable for entry into CODIS will be submitted to the CODIS Manager or designee for review. The case packet will be reviewed to ensure that:

- the DNA profile is suitable for entry into CODIS

- the profile entered is the same profile reflected on the "CODIS Sample Information" worksheet

- the profile is entered in the appropriate category

- the justification for entry is suitably documented and in accordance with accepted guidelines.

In the event that the above criteria are not met, the case packet will be returned to the analyst for either proper documentation or removal of the profile from CODIS.

If all of the above criteria are met, the CODIS Manager or designee will initial the "LDIS Specimen Detail Report" present in the case file and will indicate on the "Case Packet Review Checklist" that the CODIS review has been completed. Upon completion of the review, the profile will be marked for upload to SDIS and/or NDIS by the CODIS Manager or designee.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 5      INSTRUMENTS

The instruments listed below are considered critical equipment for DNA analysis:

Single-dose and multichannel pipettors (various models)

Qiagen Biorobot EZ1and EZ1 Advanced XL robotic DNA extractors

Applied Biosystems 7500 sequence detection systems

Applied Biosystems 9700 thermal cyclers

Applied Biosystems 3130 genetic analyzers

Calibration and maintenance programs for these instruments are documented in FB manual section 8.2.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 6    CASE NOTES

1.  Case notes shall document the evaluation and physical analysis of items of evidence.  Notes shall allow a reader to determine what was done, how it was done, and how results were obtained.  Case notes shall be made contemporaneously with the analysis they describe.  At a minimum, the notes for examination of a piece of evidence shall include:

    a) Chain of custody information: item number or SDSO barcode, date of receipt and where received from, date of release and where released to

    b) Physical description and/or depiction of the item, including locations of any stains tested or other significant findings (locations of the stains that tested negatively for a serology tests may be described at the analyst's discretion)

    c) Documentation of the locations of samples collected from the item, as applicable

    d) Examinations performed and results

    e) The results of quality control tests and samples, including catalytic test reagents for body fluid identification, serological standards and controls, and DNA standards and controls.

    This information can be recorded in narrative form; by sketch, photograph, or diagram; in charts or tables, or in combinations of any of the above.  Generally, for items such as clothing, bedding, and weapons in which a biological stain is detected and sampled for DNA analysis, the item should be sketched and/or photographed to give a visual depiction of the stain location on an item of evidence.  Other pertinent information, such as communications with investigators or attorneys, may also be recorded in case notes.  In general, notes should document only information obtained directly by the analyst through observation and testing.  The source of any other information appearing in case notes should be documented.

    The analyst should document salient points leading to the decision-making process throughout the case. The analyst should also document the interpretation of data leading to a conclusion. This should include explicating any assumptions necessary to support the conclusion.

2.  Narrative notes shall be written in permanent ink.  Pencil may be used only in drawings and illustrations.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

3. Corrections will be made by marking through the word(s) or figure(s) to be changed with a single line. The correction will be marked with the analyst's initials. No corrections shall be made by obliteration or with correction fluid.

4. Each page of notes will be marked with the case number, the analyst's initials, and page number. Notes shall include dates sufficient to document when each analytical procedure was performed. The page number on the first page of notes shall be designated "Page 1 of (total) pages". Cases involving multiple types of documentation (i.e. screening notes, DNA extraction worksheets, DNA data analysis documentation, etc.) may be broken into numbered sections and assigned page numbers accordingly. Pages numbered by section should use a numbering format including both the section number and page number. In these cases, the first page of each section should include the total number of pages in the section; the first page of section 8 can be designated "Page 8-1 of (section total) pages." If desired, the total number of pages in each section may be recorded on a separate table of contents instead.

5. Narrative notes will be made on 8½" by 11" paper with the standard Forensic Biology section header. Loose items, such as evidence photographs, shall be attached to standard 8½" by 11" sheets, and labeled with the analyst's initials, date, and case number.

6. If abbreviations and symbols are not commonly used notations or otherwise obvious from the context, then the meaning shall be clearly defined by the laboratory (See Appendix 1). Definitions of abbreviations used other than as listed in the appendix should be given in notes.

7. All notes, data, photos, worksheets, population frequency printouts, etc. will be filed with the original report in the Laboratory office.

8. Administrative documents included in a case packet do not have to be page-numbered, and require only the Sheriff's case number as identifying information. All numbered pages in a case packet must conform to the format requirements described above for case notes and in Quality manual section 6.7, unless specifically designated as administrative documents.

This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.

## 7    REPORTS

### 7.1    Report Format

The laboratory shall have and follow written procedures for taking and maintaining casework notes to support the conclusions drawn in laboratory reports.  The laboratory shall maintain all analytical documentation generated by analysts related to case analyses.  The laboratory shall retain, in hard or electronic format, sufficient documentation for each technical analysis to support the report conclusions such that another qualified individual could evaluate and interpret the data.

Analysts shall prepare case reports for each case when their analysis of the evidence is finished.  Laboratory reports will be prepared as directed in the SDSO Laboratory Quality manual.

The function of the laboratory report is to communicate to the reader both the analytical results and the conclusions of the analyst, conveying the essence of what he/she would say if asked for his/her opinion in court.  The report is a vehicle through which the analyst states what the evidence means and what it does not mean.  The report should convey the full import of the analyst's conclusions because it may, at times, be the sole basis for decisions made by police officers, attorneys, and the courts.  Reports shall contain:

Case Identifier
> At a minimum, the SDSO case number

Analysis requested
> The analyst's interpretation of the analysis request should be clearly stated.

Evidence items
> All items examined shall be listed.  Items received by the analyst but not examined may also be listed, at the analyst's discretion.

Results
> The findings or results of all examinations conducted will be stated clearly and concisely.  For DNA analysis reports, a brief description of the technology employed (STR) and the loci analyzed or amplification system used shall be included.  DNA typing results will normally be presented in chart format.  The chart should represent allele, rather than genotype, designations.

Conclusions
> Any relevant logical inferences drawn from the results of examinations of

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

the evidence should be stated. All stated conclusions shall be based on the results of tests conducted by the analyst, and any assumptions made in reaching the conclusions should be explicated. Population statistics for genetic profiles shall be included, if applicable. See FB manual section 4.5.5 to determine when a statistic should be included. Population statistics presented in reports should be truncated to two significant figures. For conclusions which include likelihood ratios, the strength of the inference represented by the ratio may be expressed using the wordings recommended in Evett et al, "The impact of the principles of evidence interpretation on the structure and content of statements", Science and Justice 40:4 (2000) pp. 233-239. See Appendix 4 for suggested wording. For inconclusive results, a statement as to why no conclusions can be drawn will be made.

Disposition of evidence
This should include what happened to the evidence after the examination and where it is stored.

Signature and date
The analyst's signature block should include name and title, and the date the report was completed.

Administrative and technical review
The last page of the report shall include signature blocks for the administrative and technical reviewers. The signature blocks for the administrative and technical reviewer will include the signature of the reviewer and date reviewed.

A discussion or notes section may be added to the report if there is information that will be reported but does not qualify as results or conclusions.

After review, the final report, together with all notes and supporting documents, will be taken to the laboratory administration office for distribution.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 7.2    CODIS Profile Reporting

CODIS profiles shall be reported to the CODIS Manager using the approved forms. Completed forms relevant to a given case shall be included as part of the case packet submitted for review (see below), and will be submitted for entry into CODIS after the technical review is complete.  DNA analysts who are listed as CODIS users are responsible for entering their DNA profiles generated from casework into the CODIS database.  If the analyst is not a CODIS user, the casework DNA profiles will be entered by the CODIS Manager or designee (see FB manual section 4.6.4).

Match reports and other external documents related to CODIS hits shall be stored in the appropriate case file.  Before documents are placed in the case file, they must be marked as described in the Quality manual section 6.15 (External Reports and Documents).

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 7.3    Review Process

Technical review is an evaluation of reports, notes, data, and other documents to ensure there is an appropriate and sufficient basis for the scientific conclusions. Administrative review is an evaluation of the report and supporting documentation for consistency with laboratory policies and for editorial correctness.  Technical and administrative review processes are defined by and limited to the elements described below. Neither the technical nor administrative review process should be construed as shifting responsibility for the content of the case packet from the author to the reviewer.

All case reports will undergo a technical and an administrative review before they are released from the laboratory.  Analytical results will be considered preliminary, and should not be distributed in written form before a report documenting those results has successfully passed through both levels of review.

All case reports that include documentation of a CODIS entry in the 'Forensic, Unknown', 'Forensic, Mixture', 'Suspect, Known', or 'Local Forensic Unk' categories will be reviewed by the CODIS manager or their designee (see FB manual section 4.6.6 for review procedure). Eligible profiles will not be marked for upload to SDIS until the review is completed.

Technical reviews on cases involving screening can be performed by Criminalists assigned to the Forensic Biology section who have casework experience performing all the analytical techniques used in each case they are asked to review, or by a section supervisor or the technical manager.  The qualification of a Criminalist to perform technical reviews, and for which analytical techniques, shall be determined by the section supervisors in conjunction with the technical manager.  Technical reviews on cases involving DNA analysis can be performed by Criminalists qualified to perform DNA casework in the relevant analytical systems.  If a previously qualified analyst is no longer performing casework, the analyst must maintain their technical review proficiency by performing a technical review of proficiency tests for other analysts.  Administrative reviews can be performed by the section supervisors, technical manager, or their designees.

Normally, technical review will be performed before administrative review.  In some cases, the administrative reviewer may perform both reviews together. CODIS review will be performed after technical review, and may be performed either before or after administrative review.

The technical reviewer shall verify that:

1. The samples and any derivatives have been appropriately described and evaluated

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

2.  Case notes and test result documentation are complete and legible

3.  All worksheets, check sheets and other forms are completely and correctly filled out

4.  Appropriate standards and controls were run and their results are acceptable

5.  All results, observations, descriptions, etc. in the report are supported by documentation in the case note packet

6.  For cases involving STR DNA typing:

    •   All reported results are in agreement with and sufficiently documented by GeneMapperID data, as described in FB manual section 4.4

    •   All controls, internal lane standards, and representative allelic ladder(s) gave the expected results

    •   All CODIS profiles reported are supported and justified by analysis data, correctly entered on CODIS worksheets, eligible for CODIS entry, and entered into appropriate specimen category

7.  Conclusions stated in the report are justified by the reported results, reasonable, and within the constraints of scientific knowledge.  For cases involving DNA analysis, the stated inclusions, exclusions, or any inconclusive results are in accordance with lab guidelines

8.  All items tested or their probative fractions have been addressed in the conclusions/results of the report

9.  Population frequency statistics are included as appropriate and are correctly calculated

Technical reviewers shall document the completion of a review by initialing and dating the first page of the note packet and signing the provided line on the last page of the report.  The technical reviewer must also fill out the appropriate portion of the review checklist.  In cases where CODIS profiles are reported, the technical reviewer must also initial and date the provided spaces on the CODIS report form.

The administrative reviewer shall verify that:

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

1. Each page of the notes and the report is labeled with correct identifying information

2. The case notes and report have been technically reviewed by a qualified reviewer

3. The report is written in the correct format as specified by the SDSO Laboratory Policy and Procedures Manual

4. The report is legible, grammatically correct, and clearly conveys the analyst's conclusions

5. Chain of custody and disposition of evidence information is complete

Administrative reviewers shall document the completion of a review by signing the provided line on the last page of the report as well as filling out the appropriate portion of the review checklist.

Differences of opinion regarding matters other than CODIS suitability or eligibility between analysts and technical reviewers should be resolved by discussion if possible.  If an analyst and a reviewer cannot reach a common opinion on a given issue, they may attempt to resolve the issue by seeking information from other qualified analysts (inside or outside the laboratory), consulting literature sources, or discussion with a section supervisor and/or technical manager.  Differences of opinion that cannot be resolved by these means will be decided by the DNA technical manager. If, after reasonable attempts, the analysts and technical manager cannot come to a mutual agreement regarding the results or their interpretation, the results will be reported at the technical manager's discretion.

Differences of opinion regarding matters of CODIS suitability or eligibility that cannot be resolved by these means will be decided by the CODIS Manager. If, after reasonable attempts, the analysts and CODIS Manager cannot come to a mutual agreement regarding these issues, the CODIS Manager will determine the appropriate course of action.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 8      QUALITY ASSURANCE

### 8.1     Quality Control (QC) of Critical Reagents

The performance of all critical reagents used in DNA extraction, quantitation, and typing will be tested and verified using known samples before distributing them for general use.  Generally, the quality control procedure will be run on all purchased or lab-prepared reagents in a single batch.  If it becomes necessary to perform QC on single reagents, or small groups of reagents, the procedures listed below can be modified to test only the performance of the pertinent reagents.  The performance of each new lot of kits for DNA quantitation or typing will be verified using known samples before it is used in the analysis of casework samples.  Analysts who have completed training in DNA extraction, quantitation, and a DNA typing method, or employees who have successfully completed the applicable portions of laboratory support operations training, will be considered competent to perform quality control of critical reagents (see Forensic Biology Training Manual).

Reagents that meet the criteria for acceptance described in the procedures below can be used for casework analysis after completion of the appropriate quality control procedure.  Reagents that do not meet the criteria will <u>not</u> be used for casework analysis. The person conducting the quality control procedure on reagents not meeting acceptance criteria is responsible for reporting this failure to their supervisor or the DNA Technical Manager.  The Technical Manager (or designee) is responsible for taking any necessary remediative steps. These may include repeating the quality control procedure, discarding the reagent, or having it replaced by the manufacturer.

Lab-prepared reagents which ultimately do not meet the acceptance criteria will be discarded. Purchased reagents which ultimately do not meet the criteria will not be used in casework, and will either be returned to the manufacturer for replacement or discarded as appropriate. In either case, the DNA Technical Manager will prepare a memorandum detailing the remediation process, including the identity and lot number(s) of the reagent(s), the steps followed, and the ultimate disposition of the reagent(s). This memorandum will be saved in the QC logbook in the laboratory.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.1.1  Procedure for QC of purchased and lab-prepared reagents:

1. Prepare all reagents that will be included in the QC batch procedure (see reagent information sheets, FB manual section 3.2).

2. Perform extraction on a known bloodstain using standard extraction protocols. If 1M DTT is included in the batch, also perform extraction on a known semen stain. If reagents for both organic and EZ1 purification procedures are being tested, perform a purification by both methods on each sample. Although no results, per se, are obtained using these procedures, the QC technician should be alert for anything out of the ordinary, such as unexpected colors or odors.

3. Perform quantitation on the samples. If reagents for the Quantifiler Human procedure have been prepared, perform this procedure. If QC samples, standards, and blanks give the expected results for these procedures, and no unexpected results are obtained, the reagents used can be considered acceptable for casework.

4. Amplify and type the samples with Identifiler, using the standard methods described in the protocol (see FB manual section 4.4). Compare the results to known types. If the types match, and no contamination or other unexpected results are noted, the extraction and typing reagents may be considered acceptable for use in casework.

5. Prepare a quality control worksheet documenting the process. Save the worksheet in the QC logbook in the laboratory.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.1.2  Procedure for QC of AmpFISTR kits:

1.  The QC sample for the AmpFISTR kits will consist of a mixture of two known blood samples that together contain a wide range of alleles.  Amplify extracted DNA from a QC sample with the kit to be QCed using the standard method (see FB manual section 4.4).

2.  Analyze and type the QC sample. The QC sample should exhibit interpretable peaks at each amplified locus.  These peaks should correspond to the alleles in the known profile of the sample.  No other interpretable peaks should be present. If these criteria are met, all kits with the same lot numbers as those tested may be used for casework.

3.  Prepare an AmpFISTR kit quality control worksheet documenting the process. Save the worksheet in the QC logbook in the lab.

This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.

### 8.1.3  Procedure for QC of Quantifiler Human kits:

1. Conduct a qPCR run on the ABI 7500 SDS using the new Quantifiler Human kit. Include at least two reactions of the prepared DNA quantitation QC sample (Purchased NIST SRM 2372 DNA quantitation standard component B with a nominal DNA concentration of 53.6 ng/µL) in a dilution of 1:5 and 1:25 (dilution prepared with TE/Glycogen buffer). Sample vials shall be stored at 2º to 8ºC. Each vial should be vortexed and briefly spun down before use.  The prepared dilutions should be discarded after use.

2. Evaluate the analysis results. All kits with the same lot number can be considered acceptable for use in casework if:
   a) no reagent blank and no location lacking a sample show significant quantitation results (>/=.023ng/ul).
   b) the results from the QC samples run are 15 ng/µl +/- 13 ng/µl for the 1:5 dilution of Standard B and 3 ng/µl +/- 2.4 ng/µl for the 1:25 dilution of standard B. At least two interpretable results should be available.

3. Prepare a Quantifiler Human kit lot quality control worksheet documenting the process.  Save the worksheet in the QC logbook in the lab.

Uncontrolled Document

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.1.4  Procedure for QC of Quantifiler Duo kits:

1. Conduct a qPCR run on the ABI 7500 SDS using the new Quantifiler Duo kit. Include at least two reactions of the prepared DNA quantitation QC sample (Purchased NIST SRM 2372 DNA quantitation standard component A with a nominal DNA concentration of 52.4 ng/µL human male DNA) in a dilution of 1:5 and 1:25 (dilution prepared with Quantifiler Duo dilution buffer). Sample vials shall be stored at 2º to 8ºC.  Each vial should be vortexed and briefly spun down before use.  The prepared dilutions should be discarded after use.

2. Evaluate the analysis results. All kits with the same lot number can be considered acceptable for use in casework if:
   a) no reagent blank and no location lacking a sample show significant quantitation results (>/=.023ng/ul).
   b) the results from the QC samples run are 20 ng/µl +/- 10 ng/µl of human DNA for the 1:5 dilution of Standard A and 4 ng/µl +/- 3.2 ng/µl of human DNA for the 1:25 dilution of standard A.  The calculated Male:Female ratio must be 1: <0.3. At least two interpretable results should be available.

3. Prepare a Quantifiler Duo kit lot quality control worksheet documenting the process.  Save the worksheet in the QC logbook in the lab.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 8.2    Calibration and Maintenance of Equipment

### 8.2.1    General principles and scheduling

Calibration and maintenance of equipment will be performed on schedules specified in the procedures for each instrument.  Generally, procedures are performed on a weekly, monthly, semiannual, or annual basis.  For purposes of scheduling procedures, the following definitions apply:

- **Weekly** means approximately once per calendar week.

- **Monthly** means approximately once per calendar month, at intervals of approximately thirty days.

- **Semiannually** means approximately twice per calendar year, at intervals of approximately six months.

- **Annually** means approximately once per calendar year, at intervals of approximately twelve months.

See appendix 10.5 for a summary of scheduled maintenance and performance checks.

A performance check will also be conducted on each piece of equipment before its first use in casework analysis, and after any non-routine maintenance or repair (not including procedures described in this section, or operating procedures described in FB manual section 4).  Unless otherwise specified, the performance check for a piece of equipment will consist of the procedure described in this section.  A performance check may also consist of a partial or modified procedure, as described below.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.2.2  Calibration of Single-Dose Pipettes

To check the calibration of a given pipette, the accuracy of volume delivered can therefore be assessed by weighing the amount of water dispensed by the pipette at a specific volume setting.  Single-dose pipettes will have their calibration checked by performing this type of test at settings as close as possible to 25% and 75% of their maximum dispensing volume.  For specific maximum volumes, the values to be used in calibration checks are:

| Maximum volume (μL) | Low-end volume (μL) | High-end volume (μL) |
|---|---|---|
| 1000 | 250 | 750 |
| 200 | 50 | 150 |
| 20 | 5 | 15 |
| 10 | 2 | 7 |

A tolerance limit of +/- 5% of nominal volume has been established as the acceptable accuracy range for pipettes. Pipettes that fall outside of the 5% limit on either of the check volumes will be returned to the manufacturer for recalibration. A calibration check will be performed on all single-dose pipettes used in evidence screening, DNA extraction, DNA quantitation, and DNA amplification semiannually. (Note: multichannel pipettes used for these purposes, and single-dose pipettes with maximum delivery volumes below 10 μL, will be checked on the same schedule; these processes are performed by appropriate outside vendors.)  The manufacturer provides a certificate of calibration after all non-routine maintenance and repair; therefore, an in-house performance check is not required.

*Procedure:*

1. Place a piece of weigh paper on the analytical balance, close the balance windows, and zero the balance.

2. Set the pipette to the low-end volume (e.g. 250 μL for the R1000) and aspirate this volume of water. Open the balance windows and carefully pipette the water onto the   weigh paper. Record the weight in the calibration log.

3. Dispose of the weigh paper that is currently on the analytical balance and re-zero the balance with a new piece of weigh paper.

4. Set the pipette for the high-end volume (e.g. 750 μL for the R1000) and draw this volume of water. Open the balance windows and carefully pipette the water onto the weighing paper and record the weight in the pipette calibration log.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department                                    Forensic Biology
Regional Crime Laboratory                              FB Technical Procedures Manual

The acceptable 5% ranges for various pipettes are listed below:

| Maximum volume ($\mu$L) | Low-end volume ($\mu$L) | Acceptable range (mg) | High-end volume ($\mu$L) | Acceptable range (mg) |
|---|---|---|---|---|
| 1000 | 250 | 237.5 to 262.5 | 750 | 712.5 to 787.5 |
| 200 | 50 | 47.5 to 52.5 | 150 | 142.5 to 157.5 |
| 20 | 5 | 4.75 to 5.25 | 15 | 14.25 to 15.75 |
| 10 | 2 | 1.9 to 2.1 | 7 | 6.65 to 7.35 |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.2.3  Temperature-Controlled Equipment Monitoring

All temperature-controlled equipment used to store evidence or critical DNA reagents (refrigerators and freezers), and heat blocks used for digestion procedures, shall be monitored weekly.  The automated system uses NIST certified probes to monitor temperature in the heat blocks and other equipment.  The probes used to monitor critical equipment are replaced annually with NIST certified probes.  Monitoring will be performed either by automatic system or manually, as described below.

*Procedure for automatic monitoring:*

1. Log in to Tempsys CheckPoint software (see Tempsys User Manual).  The 'All Equipment Status' window will open.

2. Examine the entry for each monitored piece of equipment.  Verify that the temperature is within the acceptable range.

3. If the average temperature recorded for a monitored piece of equipment falls outside the acceptable range, take appropriate action to correct it, such as adjusting thermostatic controls.  Note any corrective action in the CheckPoint software (see Tempsys User Manual).

*Procedure for manual monitoring:*

1. Read the temperature on the thermometer mounted on the equipment, and record it on the temperature monitoring log for the equipment.

2. If the temperature recorded falls outside the acceptable range noted on the temperature monitoring log, take appropriate action to correct it, such as adjusting thermostatic controls.  Note any actions of this type on the temperature monitoring log.

After completing monitoring procedures for each monitored piece of equipment, initial the appropriate box on the weekly cleaning and maintenance log.  This serves as documentation that each monitored piece of equipment has been checked.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.2.4  Performance Verification of ABI Model 9700 Thermal Cyclers

Performance verification procedures shall be performed on each model 9700 thermal cycler semiannually.  The temperature verification system used to conduct the temperature measurements for this procedure shall be calibrated annually by an appropriate vendor, using NIST-traceable standards.  The performance verification will consist of performing the calibration verification, temperature non-uniformity, cool and heat rate, and cycle tests as described in the manual for the 96-well sample block module.  Results from these tests shall be documented on a thermal cycler performance verification worksheet.

The performance verification will also be performed after any repair is done on the thermal cycler.

Uncontrolled Document

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.2.5  Scheduled maintenance and performance verification of the ABI 7500 Sequence Detection System

Maintenance and performance verification processes shall be conducted on each instrument as per the schedules specified below.  Documentation of these processes will be kept in the instrument logs maintained for each instrument.

**Weekly maintenance schedule:**

Thermal Cycler Well Contamination Test-This procedure should be performed on a weekly basis to assess the presence of thermal cycler well contamination. Use with the following protocol when performing this assessment for the ABI 7500 SDS.

1. Select Instrument on the toolbar in the 7500 SDS software

2. Select Calibrate from the drop-down menu. The ROI inspector window will initiate.

3. Set the exposure time to 2048 ms in the "CCD Control/Settings" box.

4. Select Filter A in the "Capture Image From" box.

5. Select Snapshot. An image of the thermal cycler block will be generated. All wells that exhibit increased fluorescence (appear brighter than other wells) should be cleaned according to the procedure as described on page 112 of the 7300/7500/7500 Fast Installation and Maintenance Guide

The absence of contamination in all sample wells will qualify as the successful completion of this test. If contamination is detected in any well, the thermal cycler wells should be cleaned as described on page 112 of the 7300/7500/7500 Fast Installation and Maintenance Guide. The Thermal Cycler Well Contamination Test should be re-run following well cleaning.

Cleaning: Wipe instrument surfaces with a lint-free cloth or lab tissue. Do not use organic solvents to clean the instrument.

**Monthly maintenance schedule**:

Background Calibration Assay-The ABI Prism 7500 SDS software compensates for background fluorescence during each run. This assay shall be performed on a monthly basis to ensure accurate run results. The protocol can be found on page 51 of the 7300/7500/7500 Fast Installation and Maintenance Guide. If contamination is detected in any well, the thermal cycler wells should be cleaned as described on page 112 of the 7300/7500/7500 Fast Installation and Maintenance Guide prior to

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

extracting the background. Data must conform to the protocol specifications listed in the 7300/7500/7500 Fast Installation and Maintenance Guide. If this calibration is following the semi-annual ROI calibration, proceed to the optical calibration. (This procedure requires a run time of approximately 10 minutes).

System Hardware Verification Test-The System Hardware Verification Test is performed to ensure the components of the ABI 7500 SDS are functioning correctly. The protocol for performing this procedure can be found on page 30 of the ABI 7300/7500/7500 Fast Installation and Maintenance Guide. All tested components must pass to qualify as a successful test. In the event of a component failure, consult the troubleshooting guide on page 33 of the ABI 7300/7500/7500 Fast Installation and Maintenance Guide or contact the service representative. The successful completion of this test will also serve as the instrument performance check following any service or maintenance procedures performed beyond routine maintenance.

Defragment the Hard Drive-The computer's hard drive should be defragmented once a month. This can be accomplished by completing the following functions:
-Start Menu
    -Programs
    -Accessories
        -System Tools
            -Disk Defragmenter

   Note:  Computer administrator privileges are required to perform this function.

**Semi-annual maintenance schedule**:

Semi-annual maintenance procedures are normally performed by manufacturer's representatives as part of annual preventative maintenance, or by laboratory personnel using the procedures described below.

Regions of Interest-The Regions of Interest are the group of pixels on the CCD camera that correspond with each well of a reaction plate. This calibration shall be performed on a semi-annual basis. A Thermal Cycler Well Contamination Test should be performed prior to running the ROI calibration. All wells exhibiting possible contamination should be cleaned appropriately (please see Weekly Maintenance: Thermal Cycler Well Contamination Test as described above).  The protocol can be found on page 35 of the 7300/7500/7500 Fast Installation and Maintenance Guide. Refer to the 7300/7500/7500 Fast Installation and Maintenance Guide for acceptable run guidelines and troubleshooting points. After performing the ROI calibration, the background calibration assay shall be performed.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

ABI 7500 SDS Optical Calibration- The Optical Calibration compensates for the physical effects of the additional filter in the ABI 7500 SDS. The protocol can be found on page 62 of the 7300/7500/7500 Fast Installation and Maintenance Guide. Refer to the 7300/7500/7500 Fast Installation and Maintenance Guide for acceptable run guidelines and troubleshooting points. After completing the optical calibration, the pure dye spectra calibration must be performed. (This procedure requires a run time of approximately 10 minutes).

Pure Dye Spectra Calibration-The contribution of each fluorescent dye to the raw spectra is determined from the pure spectra component and the background component. Therefore it is necessary to generate a background plate document before performing the Pure Dye Spectra Calibration. Only the FAM, VIC, ROX, and TAMRA plates need to be run. The protocol for performing the Pure Due Spectra Calibration can be found on page 71 of the 7300/7500/7500 Fast Installation and Maintenance Guide. Refer to the 7300/7500/7500 Fast Installation and Maintenance Guide for acceptable run guidelines and troubleshooting points. After completing the Pure Dye Spectra Calibration, the System Hardware Verification shall be performed. (This procedure requires a run time of approximately 5 minutes per plate).

RNase P Verification Plate-The RNase P verification plate verifies that the instrument meets performance specifications. The procedure should be conducted on a semi-annual basis and as a performance check after non-routine maintenance. The protocol can be found on page 92 of the ABI 7300/7500/7500 Fast Installation and Maintenance Guide. Refer to the ABI Prism 7000 SDS user guide or the 7300/7500/7500 Fast Installation and Maintenance Guide for acceptable run guidelines and troubleshooting points. The RNase P Verification Plate can be used as an instrument performance verification tool as well as a diagnostic tool for troubleshooting purposes. (This procedure requires a run time of approximately 2 hours).

**Additional Maintenance**:

Replacing the Bulb- The ABI 7500 SDS lamp should be replaced after approximately 2000 hours of use. The status of the 7500 lamp can be assessed by selecting Instrument then Lamp Status/Replacement. The procedure for replacing the 7500 bulb can be found on page 122 of the 7300/7500/7500Fast Installation and Maintenance Guide. Indications for bulb replacement include jagged or fluctuating amplification plots, a decrease in ROX dye signal in the component view, low quantitation values with known high concentrations, inconsistent standard curve failures, no detected raw fluorescence. If the bulb is replaced, the following calibrations must be completed in order: ROI calibration, Background Calibration Assay, Optical Calibration, Pure Dye Spectra Calibration, and System Hardware Verification Test.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

<u>Replacing the Fuses</u>-The instrument's fuses may require replacement if the bulb has been replaced and the instrument does not function. The fuse specifications and the procedure for replacement can be found on page 126 of the 7300/7500/7500 Fast Installation and Maintenance Guide.



*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.2.6  Scheduled maintenance of the Qiagen BioRobot EZ1 and EZ1 Advanced XL

After each use, clean the piercing unit as follows:

1. <u>For the EZ1</u>: From the main menu, press "START" to display "PROTOCOLS". Select "1" for "TOOLS". Press "3" to select "Cleaning piercing unit". Wait for the piercing unit to move forward and downward. Wipe the piercing unit first using tissue moistened with ethanol, then using tissue moistened with water. Press "ESC" to return the piercing unit to its original position.

   <u>For the EZ1 Advanced XL</u>: Press "2" in the main menu for "Man" or manual function. Press "3" for "Clean." Press "START." Wait for the piercing unit to move forward and downward. Wipe the piercing unit first using tissue moistened with ethanol, then using tissue moistened with water. Press "ENT" to return the piercing unit to its original position, then press "ESC" to return to the main menu.

2. <u>For the EZ1 Advanced XL</u>: Before or after a run, an optional UV protocol may be performed. From the main menu, press "1" to run the UV protocol. Set the time for the UV run (between 20 and 60 minutes) and press "ENT." Press "START" to begin. After the UV protocol finishes, press "ESC" to return to the main menu. To run the UV protocol after a purification run, press "ENT" when the display reads "PROTOCOL FINISHED." You will be prompted to "PERFORM UV RUN," press "ENT." After removing everything from the instrument, press "ENT" again, set the time, and press "ENT" to start the run. After the UV protocol finishes, press "ESC" to return to the main menu.

A new protocol may be run or the machine may be turned off.

Daily preventative maintenance will be performed by the operator at the end of each day a particular EZ1 or EZ1 Advanced XL is used, as follows:

1. To clean the piercing unit, refer to the regular preventative maintenance.

2. Check that the tray is clean. If necessary, clean it with 70% ethanol followed by distilled water.

3. Clean the worktable and its racks by wiping it down with 70% ethanol followed by distilled water.

4. Wipe the other surfaces of the worktable with diluted neutral soap solution followed by distilled water.

5. Wipe the surface of the instrument and the door with 70% ethanol.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

6.  Wipe the O-rings of the tip adapters, if dirty, with tissue.

Periodically, the O-rings will need to be greased.  This is performed as a weekly preventative maintenance on the EZ1 Advanced XL and as a monthly preventative maintenance on the EZ1.

1.  Apply a small amount of silicon grease to your fingers.

2.  Apply the silicon grease to the surface of the O-rings.

3.  Use tissue to wipe off any excess grease on the O-rings and tip adapters.  NOTE:  Excess grease can affect the performance of the EZ1 and EZ1 Advanced XL.

In addition to cleaning the O-rings, the EZ1 Advanced XL weekly preventative maintenance also includes running the UV protocol for 20 minutes.  Please refer to the instructions above for how to run this protocol.

Annual preventative maintenance is typically performed by manufacturer's representatives. A performance check will be done after the annual maintenance or after non-routine repair or service.  The performance check will generally be a water run preformed by the manufacturer's representative or by lab personnel.  A manufacturer's completed field service report also serves as documentation of a performance check after non-routine maintenance or repair.   Documentation of these processes is maintained in each instrument's maintenance and use log.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.2.7  Performance Verification of ABI 3130 Genetic Analyzer

The 3130 Genetic Analyzer performance will be verified yearly and after non-routine maintenance.  The performance will be verified by running a set of QC samples. Each time these samples are run as part of the QC of a critical reagent on the 3130, a notation will be made in the log book.  Documentation of the results will be maintained in the QC log book under the reagent tested.  If no reagent was being tested, the performance verification documentation will be maintained in the Performance Check binder.

If the appropriate results are not obtained using these samples, additional testing will be done to determine if the problem is instrument or reagent specific.

**Daily use and weekly scheduled maintenance**:

See FB manual section 4.4.4 for daily use and weekly scheduled maintenance.

**Monthly scheduled maintenance**:

Defragment the Hard Drive-The computer's hard drive (drive E) should be defragmented once a month. The user log-in must be done by an administrator. Refer to user guide (3130 Maintenance, Troubleshooting, and Reference Guide-page 33) for complete instructions.

**Annually scheduled maintenance**:

Preventative maintenance should be performed by the manufacturer's service representative.  Performance verification will be done following this service.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 8.3    Routine Laboratory Maintenance and Cleaning

### 8.3.1  Maintenance and Cleaning Schedules

Analysts are responsible for maintaining their individual work areas, and any joint work areas they use (fume hoods, exam tables, etc.) in a clean and orderly condition.  Work surfaces in these areas shall be wiped down with 10% bleach after each use.

Section employees designated by the section supervisors will be responsible for the performance of cleaning and maintenance procedures on joint work areas and equipment.  These procedures should be performed weekly on all areas and equipment in use.  The procedures will include:

1.  All joint-use work surfaces outside the amplified DNA area (countertops, exam tables, fume hoods, etc.) will be wiped down with 10% bleach.

2.  All work surfaces in the amplified DNA area will be wiped down with 20% bleach.

3.  All reusable labware will be washed (see FB manual section 8.3.2).

4.  All joint-use centrifuges will be cleaned (see FB manual section 8.3.3).

5.  Small equipment, reagents, etc. on countertops should be put away.

The performance of weekly cleaning and maintenance procedures will be recorded in the weekly cleaning and maintenance procedures log by the designated employee(s).

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.3.2  Reusable Labware Washing Procedure

1.  Inspect all labware to be washed for stains, cracks, chips, or other damage. Discard damaged labware and arrange for its replacement.

2.  Wash labware with laboratory detergent solution.  Rinse several times in warm tap water.

3.  Rinse several times with distilled water.  Rack or invert on a clean surface, and allow to air dry.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.3.3  Centrifuge Cleaning Procedure

On a weekly basis, the rotors and interiors of each centrifuge in use should be wiped over with a disposable towel dampened with distilled water.  Centrifuges should be fully disassembled and cleaned in the following manner once a month or when a possible contamination event occurs (i.e. tube leakage):

1.  Turn off the power supply to the centrifuge.

2.  Remove the rotor (if removable).  Wipe the underside of the centrifuge cover, the inside of the chamber, and the outer surface (if needed) with a solution of water and laboratory detergent on a paper towel.  Do not use bleach or solvents.  Do not immerse the centrifuge or pour liquid directly into the chamber.  Rinse by wiping with tap or distilled water, and wipe dry.

3.  Rotors can be cleaned as in step 2.  Clean the rotor's tube cavities with a test-tube brush.  Removable tube holders can be cleaned as reusable labware.  Do not submerge metal rotor bodies or lids.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 8.4    Audit Process

The technical manager will be responsible for coordinating an annual audit of the Forensic Biology section.  This audit will be conducted according to Standard 15 of the "Quality Assurance Standards for Forensic DNA Testing Laboratories" issued by the FBI.  At least once every two years, a second agency will participate in the audit. The auditor(s) will generate a report, which will be submitted to the Quality Assurance Manager.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 8.5    Good Laboratory Practice

1. Substrate samples may be collected whenever practical and appropriate. Substrate samples may be analyzed when the results may assist in interpreting the data.

2. When a group of samples is being handled, only one sample container (i.e. extraction tube, amplification tube, etc.) shall be opened at a time.  When processing samples using the EZ1 or EZ1 Advanced XL biorobots, more than one tube will be opened at a time.

3. DNA extraction of evidence and reference samples from the same case shall be performed at different times.

4. Extracted DNA samples shall be frozen for long-term storage.  Samples may be stored refrigerated during the analysis process, but should be stored frozen afterward.

5. PCR setup shall be performed only in the designated setup area.

6. Amplified DNA will be generated, processed, and maintained only within the designated amplification area.  Paperwork, analytical supplies, and other equipment will not be moved from the amplification area to any other lab area.  If it is necessary to remove objects from the amplification area, they may not be brought into any other lab area until they are decontaminated by washing thoroughly in 20% bleach solution or autoclaving.  Lab coats used in the amplification area will not be brought into other lab areas until after being laundered.  Paper and other, similar absorbent materials will not be moved from the amplification area to any other lab area under any circumstances.

7. Whenever possible, retain a portion of each evidence sample or extracted DNA for possible reanalysis.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 8.6    Proficiency Testing

1. The section supervisors are responsible for assigning proficiency tests to section employees as required, and for providing documentation of test results to the quality assurance manager.  Proficiency testing is generally administered and records of testing are maintained by the quality assurance manager.  The quality assurance manager is responsible for communicating the results of proficiency tests to the supervisor and DNA technical manager.  The technical manager is responsible for evaluating the results and communicating those results to individual analysts.  If the technical manager takes a proficiency test or is unavailable to evaluate the results, a designated section supervisor or DNA technical manager's designee will be responsible for evaluating and communicating the results.  The technical manager and section supervisors are jointly responsible for taking any action indicated (see Quality manual section 9).  The review of results will be conducted according to the provisions of standard 13.1.7 of the "Quality Assurance Standards for Forensic DNA Testing Laboratories" issued by the FBI.  The evaluation will include the following: determining if all inclusions are correct, determining if all exclusions are correct, and determining if all the reported genotypes are correct or are reported within our laboratory's interpretation guidelines.

2. Analysis of proficiency tests shall be conducted in a manner as similar to casework analysis as possible.  Documentation of analysis shall be prepared as described for casework in Quality manual section 9.

3. All analysts performing evidence screening in casework will be required to complete at least one open proficiency test in this discipline per calendar year.

4. All analysts performing DNA analysis in casework will be required to complete external, open proficiency tests supplied by approved test providers (see Quality manual section 9) twice per calendar year in this discipline, at intervals of not less than four months and not exceeding eight months.  The interval between tests will be measured from the provider's due date for each test.

5. All non-casework-qualified section members performing technical review of casework involving STR DNA analysis will be required to complete a technical review of an external, open proficiency test supplied by an approved test provider (see Quality manual section  9) in this discipline at intervals as described above for DNA casework proficiency tests.

6. The quality assurance manager will maintain a file for each completed proficiency test.  This file will contain all analytical data (notes, photos, run sheets, etc.) generated in the analysis and a summary statement of results and conclusions.  For external tests, it will also contain the summary report of the test provider

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

regarding that particular test. In any situation where the results of the test are not satisfactory, the file will also include documentation of any corrective action taken.

7. The technical manager shall review any inconclusive results for compliance with laboratory guidelines.

8. The technical manager shall be informed of the results of all participants and this notification shall be documented.  The technical manager shall inform the casework CODIS Manager of all non-administrative discrepancies that affect the typing results and/or conclusions at the time of discovery.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 8.7    Continuing Education

In order to comply with standard 5.1.3 of the "Quality Assurance Standards for Forensic DNA Testing Laboratories" issued by the FBI, the section's technical manager and each section member who performs DNA analysis in casework must read current scientific literature.  In order to meet this requirement, the section supervisors or technical manager will put together a list of literature articles, and will require each analyst and the technical manager to read the assigned articles.  Documentation of this literature review will be recorded and maintained by the section supervisors.

In order to comply with Standard 5.1.3 of the "Quality Assurance Standards for Forensic DNA Testing Laboratories" issued by the FBI, the section's technical manager and each section member who performs DNA analysis in casework must attend at least eight hours of relevant continuing education per calendar year.  Each section member is responsible for arranging to attend continuing education events as required.  Each section member is responsible for providing documentation of attendance to the laboratory training coordinator or Quality Assurance Manager.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 8.8    Testimony Monitoring

All section analysts who testify as expert witnesses in any calendar year must have their testimony monitored at least once during that year.  The lab court monitoring officer is responsible for administering the monitoring process, keeping records of the process, and communicating the results to the appropriate supervisor.  The supervisor is responsible for evaluating the results, communicating them to section analysts, and for taking any necessary action resulting from the evaluation (see Quality Manual section 9).  The supervisor is also responsible for notifying the technical manager and consulting with the manager on necessary action.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 8.9    Incident Log of Potential Quality Issues

The Incident Log shall be used to track and document a variety of potential quality issues and incidents.  The incident or quality issue may be related to a specific method, analyst, or instrument.  All quality issues may not be anticipated so an incident not specifically defined will be logged at the discretion of the DNA technical manager if it is brought to their attention by analysts.  If the DNA technical manager is not available when an incident occurs or is reported, their designee will perform all the appropriate functions.

Potential Quality Issues / Incidents fall into two categories (I and II) based on the severity of the incident and its effect on casework.

A Type I Incident may affect the quality of the work, but is generally not persistent or serious enough to cause immediate concern for the overall quality of the laboratory's or analyst's work product. The issue must be case-specific or affect only a small number of cases. These types of incidents require actions that necessitate some documentation.  Examples of what would be a Type I Incident are as follows:

1. Interpretable alleles that appear in any negative control (reagent blank, negative amplification control, or formamide blank).  If the problem occurred in the 3130 sample setup in which a sample was inadvertently put in the same well as a blank and it was detected by analyzing the raw data in the plate, it would constitute a Type II incident.

2. Interpretable alleles in any positive extraction or amplification control that do not represent the known types for that control.

3. Sample to sample DNA transfer where there is clear evidence that one sample contaminated another sample during the screening or DNA analysis process.  If a mixture is detected in a sample expected to be from only one person (reference samples or similar), and a sample in the same batch is included as a possible contributor to that mixture, there may be evidence of a sample to sample transfer.  In some cases where this is suspected, evidence of sample to sample transfer may only be determined if samples are reanalyzed (re-extracted, re-amplified, and/or rerun on a Genetic Analyzer).

4. Interpretable alleles clearly attributable to an analyst in the Forensic Biology laboratory present in a casework DNA profile.  This would be determined to have occurred if an analyst obtains a DNA profile matching themselves or someone else in the Forensic Biology section, if the analyst is included as a possible contributor to a mixture (especially where a mixture is not expected), if the analyst's alleles are present in a control, or similar situation.  There should be clear evidence of a Forensic Biology analyst's DNA types in an

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

evidence sample.  If there are a large number of DNA contributors or only a few alleles are detected, there may be no clear evidence that it is attributable to an analyst.  This type of incident does not include possible contamination from an external source that may have occurred outside the Forensic Biology laboratory.

5.  Two or more samples have been switched at some point in the DNA analysis process.  If two sample results have the opposite gender than expected (for instance a male reference sample only contains an X allele at amelogenin where a female reference sample contains an XY in the same batch) a sample switch should be suspected.  Reanalysis of one or both samples may be necessary to confirm a sample switch has occurred.  If samples are re-analyzed for any reason and the results obtained from one sample do not match (if the same results are reasonable to expect) the previous results, but do match another sample run in the original extraction batch, this may also be evidence of a sample switch.  Under most circumstances, in addition to being included in the incident log, this type of incident will be elevated to a quality concern or corrective action.

A Type II incident has minimal effect on the overall quality of casework.  These appear to be isolated to one occurrence on an instrument or by an analyst and do not significantly affect the fundamental reliability of the laboratory's work.  These types of incidents are less severe in nature than Type I incidents.  Examples of what would be a Type II Incident are as follows:

1.  Sporadic instrument problems that cannot be easily addressed by the analyst and do not require immediate service.  These incidents are solely to track instrument issues to determine if a true problem is present.  These will be reported at analyst discretion.

2.  Mispipetting into a plate during the 3130 setup.  This can be determined to have occurred when no primer peak is present in the raw data of a sample in which amplified produce should have been added or if a primer peak is present in a sample that should have no primer peak (formamide blank).

3.  Mispipetting into a plate during the 7500 setup.  This can be determined to have occurred when a high amount of DNA is detected in a reagent or other blank and no DNA was obtained from a sample expected to have a high amount of DNA (positive extraction control, reference samples, or similar).  The samples may have to be re-quantified to confirm the pipetting error.

4.  No or partial results from a positive amplification control or a complete DNA profile could not be obtained from a positive extraction control.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

An analyst who encounters a potential quality issue/incident will take the following steps:

1.  Inform the DNA technical manager and appropriate DNA Supervisor of the situation before conducting any further analytical procedures.

2.  In conjunction with DNA technical manager, decide on and execute a course of action to address the situation if appropriate.  This course may, if necessary, take the form of a corrective action as described in Quality manual section 9, but need not do so if it is determined the situation can be addressed at the section level.  If the analyst has had 3 or more similar incidents attributed to them within one year, a corrective action will be initiated at the discretion of the DNA technical manager.  If the Forensic Biology section has had 5 or more similar incidents within 6 months, the DNA technical manager will examine the incidents to determine the need for some type of action (quality concern, corrective action, or instrument related maintenance).

3.  Fill out Incident Review form and gather all the relevant documentation.

4.  Turn in the Incident Review form and documentation to the appropriate supervisor and the DNA technical manager.  The DNA technical manager will review all the documentation and determine what type of incident it is and note that on the form.  Both the DNA technical manager and supervisor will sign the form once they are satisfied with the documentation and actions.  If additional follow-up is needed, the DNA technical manager will indicate that on the form.  If the incident type is determined to be Type I, a copy of the signed Incident Review form will be given to the analyst to include in any affected case files.

5.  The original Incident Review form and associated documentation will be maintained by a section supervisor.

The DNA technical manager will be responsible for reviewing similar incidents each time a new incident form is filed.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 8.10    Verification of Compliance of Subcontracting DNA Analysis Labs

In order to comply with standard 17 of the "Quality Assurance Standards for Forensic DNA Testing Laboratories" issued by the FBI, the laboratory shall request and maintain records of the accreditation status of each subcontracting laboratory to which DNA samples are sent for analysis.  This documentation shall consist of the initial ASCLD/LAB or equivalent accreditation certificate and the most recent annual audit report for each subcontracting lab.  Copies of these records shall suffice.  The laboratory shall conduct an initial on-site visit of the subcontracting laboratory prior to any casework analysis.  The documentation will be kept on file by a designated section supervisor.

Before DNA profiles generated by subcontracting labs are entered into CODIS, the analyst responsible for submitting the case to the subcontractor must perform a review of the subcontractor's data to confirm that the data support the conclusions, or must see that a review is conducted by a qualified person.  This review will be conducted in the manner of an independent review rather than an in-house technical or administrative review.  It will not substitute for the in-house technical review required of the subcontracting laboratory.  Any Criminalist qualified in the DNA technology used by the subcontractor or the DNA technical manager may conduct a review of subcontractor's data.  The review will be conducted as follows:

1.  The reviewer will obtain from the subcontractor copies of the analysis report, notes, and other relevant documentation associated with the analysis.

2.  The reviewer will examine the documentation, and determine if:
    a)      the reported results are supported by the analytical data,
    b)      the analysis was conducted using appropriate standards and controls, and that these gave the expected results.

3.  If both the above conditions are met, the analyst will complete a check list on the form approved by the CODIS Manager indicating that the analytical data support the reported conclusions and may be entered into CODIS.  The analyst will attach a copy of this memo to the documentation received from the subcontractor, and file the packet in the case file in the clerical section.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 8.11   Corrective Action

Corrective actions conducted by the Forensic Biology Section will generally result from the causes, and follow the procedures, described in the quality manual section 9.  The DNA Technical Manager must approve any corrective actions taken in response to technical problems related to DNA analysis before the corrective action is implemented. The DNA technical manager will ordinarily be a member of any review panel associated with corrective actions involving the section.  In addition to the remedies suggested in the quality manual section 9, revised or supplemental reports may be issued.

The DNA CODIS Manager has the responsibility and authority to terminate either an individual's or the Crime Laboratory's participation in CODIS in the event that the reliability or security of uploaded data cannot be assured. The CODIS Manager will use the Corrective Action policy, as outlined in the laboratory Quality Manual, to accomplish this should it become necessary

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

### 8.12   Quality System Review

Quality system reviews may identify areas in need of attention and provide the basis for changes to the quality system.  Such changes may include new or improved quality-control activities for monitoring the quality of the laboratory work product.

An annual review of the forensic biology quality system shall be performed under the direction and documented approval of the DNA technical manager.  This review will include the review of the quality manual, FB training manual, and this manual.

The laboratory as a whole will perform a quality system review which will review the laboratory's quality assurance system.  The DNA technical manager will review and approve the report generated as a product of this review (see quality manual section 9).

The laboratory's quality manual serves as the forensic biology section quality manual.  This manual is reviewed annually.  The person conducting this review will inform the DNA technical manager when this review is completed, and of any changes resulting from this review (see quality manual section 9).

The DNA technical manager will be responsible for addressing any deficiencies noted as a result of the review of the lab's manual, technical procedures, and training programs.  The DNA technical manager will review and approve any responses to relevant findings from the laboratory's quality system review. Once these processes are complete, the DNA technical manager will document the performance of the quality system review in a memo addressed to the laboratory's quality assurance manager.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 9    REFERENCES

Specific source references are provided for several methods in FB manual section 4. The most frequently cited sources include:

*Journals*

*Journal of Forensic Sciences*
6700 Woodlands Parkway, The Woodlands, TX 77381

*Science and Justice* (formerly *Journal of the Forensic Science Society*)
Forensic Science Society
18A Mount Parade, Harrogate, North Yorkshire, U.K. HG1 1BX

*Home Office Central Research Establishment Reports*
Home Office Central Research Establishment
Aldermaston, Reading, Berkshire, U.K. RG7 4PN

*Publications*

*A Forensic Science Symposium on the Analysis of Sexual Assault Evidence*
FBI Laboratory Division
U.S. Department of Justice, Washington, DC (1983)

Gaensslen, R.E. *Sourcebook in Forensic Serology, Immunology and Biochemistry*
U.S. Government Printing Office, Washington, DC (1983)

*Metropolitan Police Forensic Science Laboratory Biology Methods Manual*
Metropolitan Police Forensic Science Laboratory
109 Lambeth Road, London, SE1 7LP, England (1978)

*Perkin-Elmer AmpliType™ User's Guide, version 2*
Perkin-Elmer Corporation (1993)

*Unpublished Sources*

Texas Department of Public Safety Serology Guidelines and Procedures

Texas Department of Public Safety Forensic DNA Analysis Laboratory PCR Typing Protocols

Federal Bureau of Investigation PCR protocols

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

California Department of Justice DNA analysis protocols

Published sources for developmental validation information on the DNA extraction and quantitation methods include:

**Extraction of DNA for Forensic Analysis:**

Montpetit, S. Fitch, I. O'Donnell, P. A simple automated instrument for DNA extraction in forensic casework.  *JFS* (2005) 50(3):555-563.

Qiagen Inc.  EZ1 DNA Investigator Handbook 1/2006. Qiagen, Inc. 2005

Qiagen Inc. EZ1 Advanced XL User Manual 5/2009. Qiagen, Inc. 2009

**Human Quantitation of DNA for Forensic Analysis:**

Applied Biosystems. *Quantifiler™ Human DNA Quantification Kit and Quantifiler™ Y Human Male DNA Quantification Kit User's Manual*.  Applied Biosystems (2003)

Green, R., et al.  Developmental Validation of the Quantifiler Real-Time PCR Kits for the Quantification of Human Nuclear DNA Samples.  *JFS* (2005) 50(4):809-825.

Applied Biosystems. *ABI PRISM® 7000 Sequence Detection System User Guide*.  Applied Biosystems (2001)

Applied Biosystems *ABI PRISM® 7500 Installation and Maintenance Guide*. Applied Biosystems (2006)

Applied Biosystems *Quantifiler™ Duo DNA Quantification Kit User's Manual*, Applied Biosystems (2008)

Barbisin, M., et al.  Developmental Validation of the Quantifiler Duo DNA Quantification Kit for Simultaneous Quantification of Total Human and Human Male DNA and Detection of PCR Inhibitors in Biological Samples.   *JFS* (2009) 54(2):305-319.

Published sources for developmental validation information STR typing methods including Identifiler typing methods include:

**Molecular biology of STRs:**

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

Anker, R., Steinbrueck, T., and Donis-Keller, H. Tetranucleotide repeat polymorphism at the human thyroid peroxidase (hTPO) locus. *Human Molecular Genetics* 1: 137, 1992.

Armour, J., Neumann, R, Gobert, S., and Jeffreys, A.J. Isolation of human simple repeat loci by hybridization selection. *Human Molecular Genetics*. 3(4): 599-605, 1994.

Caskey, C.T. and Edwards, A. DNA typing with short tandem repeat polymorphisms and identification of polymorphic short tandem repeats. U.S. Patent 5,364,759, 1994.

Edwards, A., Civitello, A., Hammond, H. Caskey, T. DNA typing and genetic mapping with trimeric and tetrameric tandem repeats. *Am. J. Hum. Genet*. 49: 746-756, 1991.

Edwards, A. Hammond, H.A., Lin, J. Caskey, C.T. and Chakraborty, R. Genetic variation at five trimeric and tetrameric tandem repeat loci in four human population groups. *Genomics* 12: 241-253, 1994.

Hammond, H., Jin, L., Zhong, Y., Caskey, T., and Chakraborty, R. Evaluation of 13 Short Tandem Repeat Loci for Use in Personal Identification Applications. *Am. J. Hum. Genet*. 55: 175-189, 1994.

Junge, A. and Madea, B. Validation studies and characterization of variant alleles at the short tandem repeat locus D12S391. *Int. J. Legal Med*. 112(1): 67-69, 1998.

Li, H., Schmidt, L., Wei, M-H., Hustad, T., Lerman, M.I., Zbar, B. and Tory, K. Three tetranucleotide polymorphisms for loci: D3S1352; D3S1358; D3S1359. *Human Molecular Genetics* 2: 1327, 1993.

Murray, J., Sheffield, V. Weber, J.L., Duyk, G. and Butelow, K.H. Cooperative Human Linkage Center, GenBank accession number G07925. Unpublished, 1995.

Murray, J., Sheffield, V. Weber, J.L., Duyk, G. and Butelow, K.H. Cooperative Human Linkage Center, GenBank accession number G08616. Unpublished, 1995.

Weber, J. and May, P. Abundant Class of Human DNA Polymorphisms which can be typed using the polymerase chain reaction. *Am. J. Hum. Genet*. 44: 388-396, 1989.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

**Non-template Addition of Nucleotides:**

Clark, J.M.Novel Non-templated Nucleotide Addition Reactions Catalyzed by Prokaryotic and Eucaryotic DNA Polymorphism. *Nucleic Acids Res.* 16 (20): 9677-9686, 1988.

Oldroyd, N.J., Urquhart, A.J., Kimpton, C.P., Millican, E.S., Watson, S.K., Downes, T. and Gill, P.D. A highly discriminating octoplex short tandem repeat polymerase chain reaction system suitable for human individual identification. *Electrophoresis* 16: 334-337, 1995.

**System development of STRs:**

Applied Biosystems. *AmpFlSTR Profiler Plus User's Manual.* Perkin-Elmer Corporation (1998).

Applied Biosystems. *AmpFlSTR Identifiler User's Manual.* Applied Biosystems (2001)

GeneMapper™ ID Software version 3.1 User Manual.

Fregeau, C.J., and Fourney, R.M. DNA typing with fluorescently tagged short tandem repeats: a sensitive and accurate approach to human identification. *BioTechniques* 15(1): 100-119, 1993.

Puers, C., Hammond, H., Caskey, T., Lins, A, Sprecher, C., Brinkmann, B., Schumm, J. Allelic ladder characterization of the short tandem repeat polymorphism located in the 5' flanking region to the human coagulation factor XIII A subunit gene. *Genomics.* 23: 260-264, 1994.

Puers, C., Hammond, H., Jin, L., Caskey, T., Schumm, J. Identification of repeat sequence heterogeneity at the polymorphic short tandem repeat locus HUMTHOI[AATG]n and reassignment of alleles in population analysis by using a locus-specific allelic ladder. *Am. J. Hum. Genet.* 53: 953-958, 1993.

Smith, R.N. Accurate size comparison of short tandem repeat alleles amplified by PCR. *BioTechniques* 18(1): 122-128, 1995.

Sprecher, C., Puers, C., Lins, A., Schumm, J. General approach to analysis of polymorphic short tandem repeat loci. *BioTechniques.* 20(2): 266-276, 1996.

**Capillary Electrophoresis of STRs**

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Lazaruk, K., Walsh, P.S., Oaks, F., Gilbert D., Rosenblum, B.B., Menchen, S., Scheibler, D., Wenz, H.M., Holt, C. and Wallin, J. Genotyping of forensic short tandem repeat (STR) systems based on sizing precision in a capillary electrophoresis instrument. *Electrophoresis* 19: 86-93, 1998.

Applied Biosystems *3130/3130xl Genetic Analyzer Maintenance, Troubleshooting, and Reference Guide*. Applied Biosystems (2007)

Applied Biosystems *3130/3130xl Genetic Analyzer Getting Started Guide*. Applied Biosystems (2007)

**Contamination**

Gill, P. The utility of 'substrate controls' in relation to 'contamination'. *Forensic Sci. Int.* 85: 105-111, 1997.

**Mixtures**

Clayton, T.M., Whitaker, J.P., Sparkes, R., Gill, P. Analysis and interpretation of mixed forensic stains using DNA STR profiling. *Forensic. Sci. Int.* 91: 55-70, 1998.

Gill, P., Sparkes, R., Kimpton, C. Development of guidelines to designate alleles using an STR multiplex system. *Forensic. Sci. Int*. 89: 185-197, 1997.

Gill, P., Sparkes, R., Pinchin, R., Clayton, T. Whitiker, J, Buckleton, J. Interpreting simple STR mixtures using allele peak areas. *Forensic. Sci. Int*. 91: 41-53, 1998.

**Null Alleles**

Kline, M.C., and Jenkins B., Non-Amplification of a vWA Allele, *JFS* 43(1): 250, 1998.

Gusmao, L., Amorim, A., Prata, M.J., Pereira, L., Lareu, M.V. and Carracedo, A. Failed PCR amplifications of MBP-STR alleles due to polymorphism in the primer annealing region. *Int. J. Legal Med*. 108: 313-315, 1996.

Walsh, S. Commentary on Kline M.C., Jenkins B, Rogers S., Non-Amplification of a vWA Allele, *JFS* 43(5): 1103, 1998.

**Species Specificity**

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Crouse, C. and Schumm, J.W. Investigation of species specificity using nine PCR-based human STR systems. *JFS* 40: 952-956, 1995.

Fernandez-Rodriguez, A., Alonso, A., Albarran, C., Martin, P., Iturralde, M.J., Montesino, M. and Sancho, M. Microbial DNA challenge studies of PCR-based systems used in forensic genetics. *Advances in Forensic Haemogenetics*. 6: 177-179, 1996.

**Stutter**

Hauge, X.Y. and Litt, M. A study of the origin of 'shadow bands' seen when typing dinucleotide repeat polymorphisms by the PCR. *Hum. Mol. Genet*. 2: 411-415, 1993.

Levinson, G. and Gutman, G.A. Slipped-strand mispairing: A major mechanism for DNA sequence evolution. *Mol. Biol. Evol*. 43(3), 203-221, 1987.

Litt, M., Hauge, X., Sharma, V. Shadow bands seen when typing polymorphic dinucleotide repeats: some causes and cures. *BioTechniques*. 15(2): 280-284. 1993.

Schlotterer, C., and Tautz, D. Slippage synthesis of simple sequence DNA. *Nucleic Acids Research* 20(2): 211-215, 1992.

Walsh, P.S., Fildes, N.J., and Reynolds, R. Sequence analysis and characterization of stutter products at the teteranucleotide repeat locus vWA. *Nucleic Acids Research* 24: 2807-2812, 1996.

**Forensic validation**

Applied Biosystems. *AmpFISTR Identifiler User's Manual*.  Applied Biosystems (2001)

*AmpFISTR Profiler Plus™ PCR Amplification Kit User's Manual*, The Perkin-Elmer Corporation, 1997.

Andersen, J.F. and Bramble, S. The effects of fingermark enhancement light sources on subsequent PCR-STR DNA analysis of fresh bloodstains. *JFS* 42: 303-306, 1997.

Andersen, J.F., Greenhalgh, M.J., Butler, H.R., Kilpatrick, S.R., Piercy, R.C., Way, K.A., Myhill, H.S., Wright, J.C., Hallett, R. and Parkin, B.H. Further validation of a multiplex STR system for use in routine forensic identity testing. *Forensic Sci. Int*. 78: 47-64, 1996.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Andersen, J.F., Martin, P., Carracedo, A., Dobosz, M., Eriksen, B., Johnsson, V., Kimpton, C.P., Kloosterman, A.D., Konialis, C., Kratzer, A., Phillips, P., Mevag, B., Pfitzinger, H., Rand, S., Rosen, B., Schmitter, H., Schneider, P.M. and Vide, M.C. Report on the third EDNAP collaborative STR exercise. *Forensic Sci. Int*. 78: 83-93, 1996.

Budowle B., Sprecher C.J., Concordance study on population database samples using the PowerPlex™ 16 kit and AmpFLSTR® Profiler Plus™ kit and AmpFLSTR® COfiler™ kit, *JFS* 46(3): 637-641, 2001.

Budowle, B., Moretti, T.R., Keys, K.M., Koons, B.W., and Smerick, J.B. Validation studies of the CTT STR multiplex system. *JFS* 42(4): 701-707, 1997.

Clayton, T.M., Whitaker, J.P., Fisher, D.L., Lee, D.A., Holland, M.M., Weedn, V.W., Maguire, C.N., DiZinno, J.A., Kimpton, C.P. and Gill, P. Further validation of a quadruplex STR DNA typing system: a collaborative effort to identify victims of a mass disaster. *Forensic Sci. Int*. 76: 17-25, 1995.

Collins, P, et al, Developmental Validation of a Single-Tube Amplification of the 13 CODIS STR Loci, D2S1338, D19S433, and Amelogenin:  The AmpFlSTR Identifiler PCR Amplification Kit, *JFS* (2004) 49(6):1265-1277.

Frank W.E., Llewellyn B.E., Fish P.A., Riech A.K., Marcacci T.L., Gandor D.W., Parker D., Carter R.R., Thibault S.M., Validation of the AmpFLSTR™ Profiler Plus PCR Amplification Kit for Use in Forensic Casework, *JFS* 46(3): 642-646, 2001.

Frazier, R.R.E., Millican, E.S., Watson, S.K., Oldroyd, N.J., Sparkes, R.L., Taylor, K.M., Panchal, S., Bark, L., Kimpton, C.P. and Gill, P.D. Validation of the Applied Biosystems Prism™ 377 automated sequencer for forensic short tandem repeat analysis. *Electrophoresis* 17: 1550-1552, 1996.

Gill, P., Kimpton, C.P., d'Aloja, E., Andersen, J.F., Bar, W., Brinkmann, B., Holgersson, S., Johnsson, V., Kloosterman, A.D., Lareu, M.V., Nellemann, L., Pfitzinger, H., Phillips, C.P., Schmitter, H., Schneider, P.M. and Stenersen, M. Report of the European DNA profiling group (EDNAP)–towards standardisation of short tandem repeat (STR) loci. *Forensic Sci. Int*. 65: 51-59, 1994.

Gill, P., Kimpton, C.P., Urquhart, A., Oldroyd, N.J., Millican, E.S., Watson, S.K. and Downes, T.J. Automated short tandem repeat (STR) analysis in forensic casework–a strategy for the future. *Electrophoresis* 16: 1543-1552, 1995.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

Kimpton, C.P., Fisher, D., Watson, S., Adams, M., Urquhart, A., Lygo, J. and Gill, P. Evaluation of an automated DNA profiling system employing multiplex amplification of four tetrameric STR loci. *Int. J. Leg. Med*. 106: 302-311, 1994.

Kimpton, C.P., Gill, P., d'Aloja, E., Andersen, J.F., Bar, W., Holgersson, S., Jacobsen, S., Johnsson, V., Kloosterman, A.D., Lareu, M.V., Nellemann, L., Pfitzinger, H., Phillips, C.P., Rand, S., Schmitter, H., Schneider, P.M., Sternersen, M. and Vide, M.C. Report on the second EDNAP collaborative STR exercise. *Forensic Sci. Int*. 71: 137-152, 1995.

Kimpton, C.P., Oldroyd, N.J., Watson, S.K., Frazier, R.R.E., Johnson, P.E., Millican, E.S., Urquhart, A., Sparkes, B.L. and Gill, P. Validation of highly discriminating multiplex short tandem repeat amplification systems for individual identification. *Electrophoresis* 17: 1283-1293, 1996.

Lygo, J.E., Johnson, P.E., Holdaway, D.J., Woodroffe, S., Whitaker, J.P., Clayton, T.M., Kimpton, C.P. and Gill, P. The validation of short tandem repeat (STR) loci for use in forensic casework. *Int. J. Leg. Med*. 107: 77-89, 1994.

Micka, K.A., Sprecher, C.J., Lins, A.M., Comey, C.T., Koons, B.W., Crouse, C., Endean, D., Pirelli, K., Lee, S.B., Duda, N., Ma, M. and Schumm, J.W. Validation of multiplex polymorphic STR amplification sets developed for personal identification applications. *JFS* 41: 582-590, 1996.

Moretti T.R., Baumstark A.L., Defenbaugh D.A., Keys K.M., Brown A.L., Budowle B. Validation of STR typing by capillary electrophoresis, *JFS* 46(3): 661-676, 2001.

Moretti T.R., Baumstark A.L., Defenbaugh D.A., Keys K.M., Smerick J.B., Budowle B., Validation of short tandem repeats (STRs) for forensic usage: performance testing of fluorescent multiplex STR systems and analysis of authentic and simulated forensic samples, *JFS* 46(3): 647-660, 2001.

Oldroyd, N.J., Urquhart, A.J., Kimpton, C.P., Millican, E.S., Watson, S.K., Downes, T. and Gill, P.D. A highly discriminating octoplex short tandem repeat polymerase chain reaction system suitable for human individual identification. *Electrophoresis* 16: 334-337, 1995.

Sparkes, R., Kimpton, C.P., Watson, S., Oldroyd, N.J., Clayton, T.M., Barnett, L., Arnold, J., Thompson, C., Hale, R., Chapman, J., Urquhart, A. and Gill, P. The validation of a 7-locus multiplex STR test for use in forensic casework: (I) Mixtures, ageing, degradation and species studies. *Int. J. Legal Med*. 109: 186-194, 1996.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

van Oorschot, R.A.H., Gutowski, S.J., Robinson, S.L., Hedley, J.A. and Andrew, I.R. HUMTH01 validation studies: Effect of substrate, environment, and mixtures. *JFS* 41: 142-145, 1996.

Wallin, J.M., Buoncristiani, M.R., Lazaruk, K., Fildes, N., Holt, C., and Walsh, P.S. TWGDAM validation of the AmpFLSTR™ Blue PCR Amplification Kit for forensic casework analysis. *JFS* 43(4): 854-870, 1998.

## Parentage Analysis

Cifuentes, L.O., Martinez, E. H, Acuna, M.P., Jonquera, H.G.  Probability of Exclusion in Paternity Testing: Time to Reassess.  JFS 51(2): 349-350, 2006. Gunn, P. Trueman, K. Stapleton, P. Klarkowski, D. DNA analysis in disputed parentage:  The occurrence of two apparently false exclusions of paternity, both at short tandem repeat (STR) loci, in the one child.  *Electrophoresis* (1997) 18:1650-1652.

## Gender identification

LaFountain, M.J., Schwartz, M., Cormier, J., and Buel, E. Validation of capillary electrophoresis for analysis of the X-Y homologous amelogenin gene. *JFS* 43(6):1188-1194, 1998.

Mannucci, A., Sullivan, K.M., Ivanov, P.L. and Gill, P. Forensic application of a rapid and quantitative DNA sex test by amplification of the X-Y homologous gene amelogenin. *Int. J. Leg. Med*. 106: 190-193, 1994.

## Statistics

Budowle, B. et al. Population data on the thirteen CODIS core short tandem repeat loci in African Americans, U.S. Caucasians, Hispanics, Bahamanians, Jamaicans, and Trinidadians. *JFS* (1999) 44(6):1277-1286.

Budowle, B et al. Population Data on the STR Loci D2S1338 and D19S433. Forensic Science Communications, July 2001 vol 3 (3).

Budowle, B. et. al. Estimating minimum allele frequencies for DNA profile frequency estimates for PCR-based loci*.  Int. J. Leg*. Med. (1996) 108:173-176.

Budowle, B. Giusti, A. Waye, J. Baechtel, F. Fourney, R. Adams, D. Presley, L. Deadman, H. Monson, K. Fixed-bin analysis for statistical evaluation of continuous distributions of allelic data from VNTR loci, for use in forensic comparisons.  *Am. J. Hum. Genet.* (1991) 48(5):841-55.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

National Research Council. *The Evaluation of Forensic DNA Evidence* (1996) Washington, D.C., National Academy Press.

Budowle, B et al. Source Attribution of a Forensic DNA Profile. Forensic Science Communications, July 2000 vol 2 (3).



*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 10    APPENDIX

### 10.1    Appendix 1: Case Notes Abbreviations

| Abbreviation | Definition |
| --- | --- |
| + | positive results |
| ⊕ | positive results |
| Ø | negative results |
| = | equal |
| ≠ | not equal |
| ~ | approximately |
| < | less than |
| ≤ | less than or equal to |
| > | greater than |
| ≥ | greater than or equal to |
| -A | lack of non-template nucleotide addition |
| # | number |
| & | and |
| @ | at |
| @RT | at room temperature |
| λ | microliter |
| µL | microliter |
| µg | microgram |
| λ-serum | antiserum |
| Δ | heat |
| Δ-sld | heat sealed |
| 3s | 3 seconds |
| 5s | 5 seconds |
| 10s | 10 seconds |
| ALS | alternate light source |
| amp | amplification |
| AP | acid phosphatase test |
| approx. | approximately |
| b/c | because |
| BC | Bar code |
| BFS | body fluid stain |
| blk | black |
| Blnk | blank |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

| BPB | brown paper bag |
|-----|-----------------|
| brn | brown |
| b/w or b/t | between |
| $\overline{c}$ | containing |
| C/ | containing |
| C/O/F | cut out/frozen |
| CAL | calibrator |
| CET | clear evidence tape |
| CID or C/I/D | Case number, initials and date |
| CIDI | case #, initials, date, item# |
| cm | centimeter |
| $cm^2$ | square centimeter |
| Conc | concentrate |
| cont | continue |
| ctrl | control |
| Det. | Detective |
| DH2O | distilled water |
| DICE | date, initials, case #, exhibit # |
| diff | differential |
| diH20 | distilled water |
| dil | dilution |
| DMAC | dimethylaminocinnamaldehyde |
| DTT | dithiothreitol |
| e.cells or ec | epithelial cells |
| ea | each |
| env | envelope |
| Epi | epithelial cells |
| ext | extraction |
| ext'd | extracted |
| F√ | item was frozen |
| FB | Forensic Biology |
| f.o.v. | field of view |
| FZ | freeze |
| grn | green |
| H | sperm head |
| H/F | heads per field |
| Hetero | heterozygote |
| Homo | homozygote |

Issued By: DNA Technical Manager
Issue Date: 5/12/2011

Revision 1

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

| $H_20$ | water |
|---|---|
| HPF | high power field |
| Hx | Hemastix® |
| Inc | Inconclusive |
| info | information |
| init | initialed |
| ints | Initials/ initialed |
| inj | injection |
| IT | item |
| K | known sample |
| KM | Kastle-Meyer test |
| Ⓛ | left |
| L or Lg | large |
| LPD | Latent print development |
| LTS | long-term storage |
| M or Med | medium |
| Man | manilla |
| mic. | microscope examination |
| mL | milliliter |
| mm | millimeter |
| mm2 | square millimeter |
| N/A | not applicable |
| N/S or NS or NSF | non-sperm fraction |
| n-4 | stutter |
| NAC | negative amplification control |
| NBO | no blood observed |
| ND | Not Done |
| neg | negative |
| NFR/PIC | Nuclear fast red/Picroindigocarmine stains |
| NFE | No Further Exams |
| NFT | No Further Testing |
| ng | nanogram |
| NR | no result |
| O.O.R. | out of range |
| O/N | overnight |
| obs | observed |
| ODD | Ouchterlony double diffusion |
| ON | overnight |

Issued By: DNA Technical Manager
Issue Date: 5/12/2011

Revision 1
Page 256 of 272

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

| | |
|---|---|
| ouch | Ouchterlony |
| P&E or P/E | Property and Evidence |
| p. | page |
| PAC | positive amplification control |
| PAF | per a field |
| PEC | positive extraction control |
| pg. | page |
| pk | pack |
| pkg | package |
| pks | peaks |
| pos | positive |
| Poss | possible |
| pr | pair |
| prep'd | prepared |
| Pro K | proteinase K |
| Q | questioned sample |
| Q/C | quality control |
| QC | quality control |
| QNS | quantity not sufficient |
| quant | quantitation |
| ® | right |
| RA | Re-amplification |
| RB | reagent blank |
| r/b | Red/brown |
| rec. or rec'd | received |
| ref | reference |
| re-inj'd | re-injected |
| re-mic'd | re-Microconed |
| ret'd | returned |
| Rgt | reagent |
| RFU | relative fluorescence units |
| RT | room temperature |
| rx | reaction |
| rxn | reaction |
| S | sperm |
| Sp or SF | sperm fraction |
| (S) | suspect |
| s̄ | without |

Issued By: DNA Technical Manager
Issue Date: 5/12/2011

Revision 1
Page 257 of 272

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

| sec | seconds |
|---|---|
| Sm | small |
| S/I/D | sealed, initialed, and dated |
| S/T & I | sealed with tape and initialed |
| SART | Sexual Assault Response Team |
| SBPB | sealed brown paper bag |
| SDS | sodium dodecyl sulfate |
| SDSO | San Diego Sheriff's Office |
| SDS P&E | San Diego Sheriff Property and Evidence |
| SER | serology |
| sH$_2$0 | sterile water |
| sld | sealed |
| SME | sealed manila envelope |
| ST | standard |
| STD | standard |
| sus | suspect |
| susp | suspect |
| TE | TE-4 Buffer (Tris with EDTA) |
| TE/Gly | TE-4 Buffer with glycogen |
| temp | temperature |
| TS | tape sealed |
| UUP water | Ultra ultra pure water |
| (V) | victim |
| vic | victim |
| w/ | with |
| w/o | without |
| WBC's | white blood cells |
| wht | white |
| WKST | worksheet |
| x | time(s) |

GeneMapperID Abbreviations:

| Abbreviation | Issue |
|---|---|
| SPK | Spike |
| OOR | Out of Range |
| PU-(color B, G, Y, R, or O) | Pull up |
| OL | Off Ladder |
| ART | Artifact (general) |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

| NOS | Noise |
|-----|-------|
| HBL | High baseline |
| n-4 | Stutter – four base pairs smaller than the true allele |
| n+4 | Stutter – four base pairs larger than the true allele |
| -A | Incomplete nucleotide addition |
| SHD | Shoulder |
| NR | No Result |
| NRP | Not Reproduced |
| Inc | Inconclusive locus |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

## 10.2   Appendix 2: Alternate Light Source

The alternate light source is utilized to locate stains that may contain blood, semen or saliva.  Forensic analysis is performed at 450nm with yellow goggles to locate stains on evidentiary items unless otherwise noted.

Omnichrome Directions

Start up
1.  Turn "Optical Power Adjust" control fully clockwise (when present)
2.  "Power" switch to "On"
Fans start
3.  "Lamp" switch to "On"
Lamp flashes on
4.  Allow lamp to operate for 5 minutes to reach full output intensity
5.  Lamp output can then be adjusted if output is too intense

Shutdown
1.  "Lamp" switch to "off"
2.  Leave "Power" switch "On" allowing fans to cool unit for 5 minutes
3.  "Power" switch to "Off"

Positive and negative controls may be tested to verify that the Omnichrome is working correctly.

Uncontrolled Document

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

## 10.3    Appendix 3: Basic Microscope Setup

A.  Binocular Adjustment

1.  Turn on the light
2.  Adjust the light intensity, to half power or less.
3.  Make sure the eyepiece with the micrometer (if you have one) is in the right eyepiece tube.  Align the positioning pin on the eyepiece with the slot in the tube and insert the eyepiece.
4.  Focus on your specimen.
5.  Adjust the inter-pupillary distance for your best vision.
6.  Focus the right eyepiece to bring the eyepiece micrometer into focus by adjusting the knurled ring on the eyepiece.
7.  Look into the left eyepiece, and with the left eye only, adjust the diopter adjustment ring on the left eye piece to bring the specimen into the sharpest focus.

B.  Stage Centering Procedure

1.  Place a specimen on the stage and focus on it with the 40X objective.  Be sure the 40X is in a non-centerable position.
2.  Select a point on the specimen and locate it under the cross hair.  Note this point as point A.
3.  Rotate the specimen 180 degrees and this will be point C.
4.  The center position is halfway between point A and point C.  Use the centering wrench in the stage to move point C halfway to the cross hairs.
5.  Repeat steps 2-4 until the stage is centered as much as possible.

Halfway point



nt A

C.  Objective Centering

1.  Place a specimen on the stage and focus on it with the 10X objective.
2.  Select a point on the specimen and locate it under the cross hair.  Call this point A.
3.  Rotate the specimen 180 degrees and this is point C.

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

4. The center position is halfway between point A and point C in the above figure. Use the centering wrench in the stage to move point C halfway to the cross hairs.
5. Repeat the steps 2-4 until each of the objectives are centered as much as possible.

D.  Koehler illumination

1. Check the focus of a specimen with the 10X objective.
2. Open the aperature diaphragm on the condenser lens wide open.
3. Make sure the top condenser lens is in position.
4. Close down the aperature lens of the field diaphragm.
5. Adjust the condenser height until the image of the field diaphragm (edges of the diaphragm) is in sharp focus.  Reduce color fringes to a minimum.
6. Center the image of the field diaphragm by using the centering screws on the condenser.
7. Gradually widen the field diaphragm ensuring that it remains centered.  Open it to just outside the field of view.
8. Remove the right eyepiece.
9. Adjust the diaphragm until it leaves about 65-80% of the field of view through the right eyepiece tube.

*Microscopic examination:*

A.  Phase Contrast

1. Examine the slide with compound microscopy.
2. Move the substage filter ring to match the objective being used.
3. Examine the slide for the presence of spermatozoa (intact or heads).

B.  Bright Field

1. Examine the slide with compound microscopy.
2. Examine the slide for the presence of spermatozoa (heads, intact)

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

## 10.4   Appendix 4: Recommended Report Wording

Testing for Blood

| KM | HemaTrace | Ouchterlony | Possible Results Wording |
|---|---|---|---|
| ND | ND | ND | No blood observed on …<br>OR<br>No apparent bloodstains were observed on… |
| Neg | ND | ND | No blood was detected on… |
| Pos | ND | ND | The presence of blood was indicated on…<br>OR<br>A presumptive test indicated the presence of blood on… |
| Pos | Neg | ND | The presence of blood was indicated on….However, human origin could not be confirmed. |
| Pos | Pos | ND | Tests indicated the presence of human blood on…<br>OR<br>The presence of human blood was indicated on… |
| Pos | ND | Pos (Species) | The presence of (species) blood was indicated on… |
| Pos | ND | Neg (Species) | The presence of blood was indicated on….However, the (species) origin could not be confirmed. |

Testing for Semen

| AP | Sperm | P30 | Possible Results Wording |
|---|---|---|---|
| ND | ND | ND | (If ALS negative)  No apparent semen stains were observed on item… |
| Neg | ND | ND | No Semen was detected on item…<br>OR<br>No semen was detected with a presumptive test on item…<br>OR<br>A presumptive test did not indicate the presence of semen on item… |
| Neg | Neg | ND | No semen was detected on item… |
| Neg | Pos | ND | Spermatozoa were identified on item…,(confirming the presence of semen),<br>OR<br>Semen was detected on item…<br>OR |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department

Regional Crime Laboratory

Forensic Biology

FB Technical Procedures Manual

| | | | |
|---|---|---|---|
| | | | (if only one sperm was observed) A spermatozoon was identified on item… |
| ≥2+ | Neg | Neg | No semen was detected on item… |
| ≥2+ | Neg | Pos | Semen, with no spermatozoa, was detected on item… |
| ≤1+ | Neg | ND | No semen was detected on item… |
| Pos | Pos | ND | Semen was detected on item… OR Semen, containing spermatozoa, was detected on item… |

Testing for Saliva - Amylase Diffusion

| Amylase | Possible Results Wording |
|---|---|
| >1:100 Standard | A high level of amylase was detected on item...  Amylase, found in high concentrations in saliva, is also present in other body fluids at lower concentrations. |
| <1:100 Standard | A low level of amylase was detected on item...  Amylase, found in high concentrations in saliva, is also present in other body fluids at lower concentrations. |
| Negative | No amylase was detected on item… |

Testing for Saliva – RSID Saliva

| RSID | Possible Results Wording |
|---|---|
| Positive | The presence of human saliva was indicated on item… |
| Negative | No human saliva was detected on item… |

Extraction and Amplification

| Sample | Possible Results Wording |
|---|---|
| Extracted for DNA | A portion of item…. was extracted for DNA analysis. Item …. was extracted for DNA analysis. (indicate if all or a portion of the sample was extracted) |
| Differential Extraction | A differential extraction was performed on item…..  This procedure attempts to separate the non-sperm cells(NS) and the sperm cells (Sp).  (*if separation is not clean add the following sentence*) Complete separation of non-sperm cells and sperm cells is not always achieved, leading to a mixture of sperm DNA in the non-sperm fraction or non-sperm DNA in the sperm fraction. |
| Amplification | The extracted human DNA from -- was amplified using the AmpFlSTR Identifiler™ PCR amplification kit and analyzed on an Applied Biosystems Genetic Analyzer.  The results are listed on the |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

| | following page. |
|---|---|

Quantifiler Human Results

| Sample | Possible Results Wording |
|---|---|
| Total volume of 20µL or less with concentration of "undetermined" | No human DNA was detected. |
| Total volume of 20uL or less with concentration of less than 0.025 ng/µL if no further analysis will be conducted | An insufficient amount of human DNA was detected from item X; therefore, no further analysis will be performed on this item |

Quantifiler Duo Results

| Sample | Possible Results Wording |
|---|---|
| Total volume of 20µL or less with concentration of "undetermined" for Human DNA **and** "undetermined" for male DNA | No human DNA was detected. |
| Total volume of 20µL or less with concentration of "undetermined" for Male DNA | No human male DNA was detected. |
| Total volume of 20uL or less with concentration of less than 0.025 ng/µL if no further analysis will be conducted | An insufficient amount of human DNA was detected from item X; therefore, no further analysis will be performed on this item. |
| Total volume of 20uL or less with concentration of less than 0.025 ng/µL of MALE DNA-  if no further analysis will be conducted | An insufficient amount of human male DNA was detected from item X; therefore, no further analysis will be performed on this item. |
| The male:female ratio greater than cutoff | Due to the amount of male DNA in relation to the amount of female DNA, no further analysis will be conducted at this time. (Optional note:  The amout of male DNA detected may be suitable for Y-STR analysis.  If suspect references become available and further analysis is needed, please submit a new request.) |

Issued By: DNA Technical Manager
Issue Date: 5/12/2011

Revision 1

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

DNA Conclusions

| Results | Possible Results Wording |
|---|---|
| No Results – No true allele was detected above threshold | No results were obtained from item…. |
| No Results – alleles above threshold were detected but reported as inconclusive in the table | No interpretable results were obtained from item … |
| Partial DNA profile | A partial DNA profile was obtained from item…. |
| Single Source DNA profile, no reference to compare sample to | A male/female DNA profile was obtained from item…. or The DNA profile obtained from item … is from an unknown male/female  (if not sure if sample is single source or mixture because it is low level :  … is from at least one unknown male/female) |
| Single source match/ inclusion | The DNA profile obtained from item… matches the DNA profile obtained from (Reference Y). |
| Single source exclusion | (Reference X) can be excluded as a possible contributor to the DNA obtained from Item…. |
| Mixed DNA profile | A mixture of DNA from at least Y individuals was obtained from item …. Or The DNA profile obtained from item… (may) indicate a mixture of DNA from at least Y individuals. |
| Major DNA profile match/ inclusion | The major DNA profile obtained from item… matches the DNA profile obtained from (Reference Y). |
| Major DNA profile match/ inclusion (cannot call major at all loci) | The major DNA profile, where distinguishable, obtained from item… matches the DNA profile obtained from (Reference Y). |
| Mixture – Inclusion where all alleles of an individual are represented | (Reference X) can be included as a possible contributor of the DNA obtained from Item…. |
| Mixture – Inclusion where NOT all | (Reference X) cannot be excluded as a possible contributor to the DNA obtained from item…. |

Issued By: DNA Technical Manager
Issue Date: 5/12/2011

Revision 1

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

| | |
|---|---|
| alleles of an individual are represented | |
| Mixture –Exclusion | (Reference X) can be excluded as a possible contributor to the mixture of DNA from Item…. |
| Inconclusive due to number of contributors | Due to the number of contributors, Reference Y cannot be excluded or included as a possible contributor to this mixture. |
| Inconclusive due to the minimal information | Due to the limited amount of information obtained from item X, no conclusions can be drawn from item…. |
| Inconclusive due to low level types | Due to the low level results in the DNA profile, Reference Y cannot be excluded or included as a possible contributor to this mixture. |
| Inconclusive because no appropriate statistic can be calculated | Because no appropriate statistical analysis can be performed, Reference Y cannot be excluded or included as a possible contributor to this mixture. |
| If assumptions are made in the conclusion | Clearly state all assumptions |

Statistics

| Type of Statistic | Possible Results Wording/ Necessary Components |
|---|---|
| Frequency of Occurrence (Random Match Probability) | The estimated frequency of occurrence* of the DNA profile obtained from (item X) approximately 1 in N.<br>Caucasian:            1 in n<br>African American:    1 in n<br>Hispanic:             1 in n<br>(N is the smallest number of the three population groups calculated.  All frequencies for the three major population groups - Caucasian, African-American, and Southwest Hispanic - should be provided) |
| Combined Probability of Inclusion | Based solely on the DNA types observed [at # genetic locations/loci – **do not use amelogenin**], approximately 1 in N individuals* is included as a possible contributor to the mixture of DNA from (item X).<br>Caucasian:            1 in n<br>African American:    1 in n<br>Hispanic:             1 in n |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

| | |
|---|---|
| | (N is the smallest number of the three population groups calculated.  All frequencies for the three major population groups - Caucasian, African-American, and Southwest Hispanic - should be provided) |
| Likelihood Ratio | Given the DNA profile observed in this item and assuming only two contributors, you may consider the following two possibilities:<br> The DNA profile observed in (item X) is a mixture of DNA from A and B.<br>The DNA profile observed in (item X) is a mixture of DNA from A and an unknown individual.<br>Finding the DNA profile observed in (item X) is at least N* times more likely if the DNA on the item is from A and B, than if the DNA on the item is from A and an unknown individual.<br>　　　Caucasian:　　　　n times more likely<br>　　　African American:　　n times more likely<br>　　　Hispanic:　　　　　n times more likely<br>This is (qualitative statement++) evidence in favor of the first possibility.<br>[++Qualitative statement based on the strength of the likelihood ratio as follows:>1 to 10 Limited evidence<br>　　　　10 to 100　　　　　Moderate evidence<br>　　　　100 to 1000　　　　Moderately strong evidence<br>　　　　1,000 to 10,000　　Strong evidence<br>　　　　>10,000　　　　　　Very strong evidence<br>　　　　>1,000,000　　　　Extremely strong evidence<br>These qualitative statements are based on Evett, et al., "The impact of the principles of evidence interpretation of the structure and content of statements" Science & Justice 2000; 40:233-239.]<br>(N is the smallest number of the three population groups calculated.  All frequencies for the three major population groups - Caucasian, African-American, and Southwest Hispanic - should be provided) |
| Paternity – suggested wording | The (alleged DAD) is included as possible biological father of (Child/fetus).<br>Given the DNA profile obtained from (Child/fetus), you may consider the following two possibilities:<br>The DNA profile obtained from (Child/fetus) is the biological child of the (Alleged Father).<br>The DNA profile obtained from (Child/fetus) is the biological child of a randomly chosen individual.<br>(Alternate wording for A and B:  A- The Alleged Father is the biological father of the child/fetus.  B- The Alleged Father is |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

| | |
|---|---|
| | not the biological father of the child/fetus)<br>It is X times more likely that the DNA evidence (Child/fetus) would be observed if the (Alleged Father) was the biological father of the (Child/fetus) than an randomly chosen individual from the US population.<br>This is (qualitative statement++) evidence in favor of the first possibility. |
| Reverse Parentage – suggested wording | The donor of the DNA profile obtained from (CHILD) is included as a potential biological offspring of (DAD) and (MOM).<br>Given the DNA profile obtained from (CHILD), you may consider the following two possibilities:<br>The DNA profile obtained from (CHILD) originated from the biological offspring of (DAD) and (MOM).<br>The DNA profile obtained from (CHILD) originated from the biological offspring of 2 randomly chosen individuals.<br>It is at least X times more likely to obtain the DNA profile from (CHILD) if (DAD) and (MOM) are the biological parents of (CHILD) as compared to 2 randomly chosen individuals from the US population being the biological parents of (CHILD).<br>This is (qualitative statement++) evidence in favor of the first possibility. |
| If not all loci were used for the statistical calculations | List which loci were used (or which were not used). |
| Include on all Statistics | * All calculations are based on three major U. S. population groups. |

CODIS (for conclusion or notes section of the report)

If a sample has no known source and the purpose of the analysis is to enter something into CODIS, you should make some indication regarding if the sample will be entered or not.

| Sample | Possible Results Wording |
|---|---|
| Sample will be entered into CODIS (the exact profile) | The (major) DNA profile obtained from item … is suitable for entry into CODIS.<br>OR<br>The (major) DNA profile obtained from item… will be entered into CODIS in an attempt to develop an investigative lead. |
| Sample will be | A DNA profile from item …will be entered into CODIS. |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

| | |
|---|---|
| entered into CODIS (a portion of the profile) | OR<br>A portion of the DNA profile from item …will be entered into CODIS |
| Sample cannot be entered into CODIS | The DNA profile obtained from item…. is not suitable for entry into CODIS<br>(generally add a reason if possible: due to the number of contributors, the amount of information obtained, the low level results, no statistical analysis can be performed) |
| Sample is being entered into CODIS with no elimination sample from prior consensual partner or victim | In the "Notes" section of the report:<br>After unsuccessfully trying to obtain an elimination sample from the consensual partner, sample X will be entered into CODIS.  However, if the reference sample from the consensual partner becomes available please submit a new analysis request for DNA.  If the DNA profile from the consensual partner matches the profile entered into CODIS, that DNA profile will be removed.<br>OR<br>If a (victim, consensual partner, etc) reference sample is submitted, any DNA profiles obtained from item X that can be attributed to the (victim, etc) will be removed from CODIS. |

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department
Regional Crime Laboratory

Forensic Biology
FB Technical Procedures Manual

### 10.5   Appendix 5:  Summary of Lab Maintenance Schedule

**If an instrument is not currently being used for casework, the scheduled maintenance is not required to be performed.

| Instrument/ Equipment | Daily or per use | Weekly | Monthly | Semi-Annually | Annually | Performance Check after repair |
|---|---|---|---|---|---|---|
| Balance | | | | | Vendor performs calibration | |
| Microscope | | | | | Vendor performs calibration | |
| Pipettes | | | | Calibration (most in-house, p2 and multichannel get sent out) | | None – manufacturer does calibration after repair |
| Thermometers | | | | | Critical temperature probes get replaced | |
| EZ1 Biorobots | -Clean piercing unit -Daily Maintenance | | Grease O-rings | | Preventative maintenance by Qiagen | Water run |
| EZ1 Advanced XL | -Clean piercing unit -Daily Maintenance | Grease O-rings Run UV Protocol | | | Preventative maintenance by Qiagen | Water run |
| 7500 | Restart computer | -Well contamination test -Cleaning | -Background calibration -System hardware verification -Defragment hard drive | -Region of Interest -Optical Calibration -Pure Dye Spectra -RNase P plate | Preventative maintenance by AB (includes semi-annual maintenance) | RNase P plate |

Issued By: DNA Technical Manager
Issue Date:

Revision 1

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*

San Diego County Sheriff's Department  
Regional Crime Laboratory

Forensic Biology  
FB Technical Procedures Manual

| | | | | | | |
|---|---|---|---|---|---|---|
| 9700 | | | | Temperature verification tests | Temperature verification system set out for calibration | Temperature verification tests |
| 3130 | -Restart computer<br>-Replace water and buffer | -Water flush<br>-Water wash<br>-Replace polymer, buffer, water, and reservoir septa<br>-Clean surfaces | Defragment hard drive | | Preventative maintenance by AB | Set of QC samples |

Issued By: DNA Technical Manager  
Issue Date:

Revision 1  

*This is an uncontrolled copy of a San Diego Sheriff's Department document. It expires at midnight on 8/30/11.*