# ARdEN FORENSICS

Arden Forensics, PC

McLean, VA 22101

Jonathan L. Arden, MD
President

### *Declaration of Jonathan L. Arden, MD*
### *Re: USA v. Alfonso Rodriguez (Post-conviction Proceedings)*

## Introduction

I have been asked me to review materials and to provide consultation in the field of forensic pathology, which I have practiced for more than twenty five years. After receiving my MD degree from the University of Michigan in 1980, I completed training in anatomic pathology at the New York University Medical Center (1980-1983) and in forensic pathology at the Office of the Chief Medical Examiner for the State of Maryland (1983-1984); I was certified in both anatomic and forensic pathology by the American Board of Pathology in 1985. I am currently licensed to practice medicine in five states. I spent most of my career as a government-employed medical examiner, including nine years with the Office of Chief Medical Examiner for the City of New York where I finished as First Deputy Chief Medical Examiner, and more than five years as the Chief Medical Examiner of Washington, DC. I am currently president of Arden Forensics, PC, a consulting practice in forensic pathology and medicine, and I hold a part-time appointment as a Forensic Pathologist in the Office of the Chief Medical Examiner for the State of West Virginia. My full curriculum vitae is attached and is incorporated by reference.

I have testified as an expert witness in various state and federal courts, as well as in grand juries and depositions, a total of more than 500 times. My fees are not contingent upon the outcome of any case in which I consult.

## Materials Reviewed

I have reviewed the following materials regarding the above-captioned case:

- Provisional and Final Autopsy Reports for Dru Kathrina Sjodin from the Ramsey County, MN Office of the Medical Examiner, under Case No. ME 2004-0542;
- Autopsy photographs of Dru Sjodin;
- Crime scene photographs of the recovery of the body of Dru Sjodin;
- Discovery documents related to the crime scene;
- US Government filing (deposition exhibit 5), with summary of opinions from Dr. Michael McGee;
- Transcript of deposition testimony of Dr. Michael McGee;
- Transcript of trial testimony of Dr. Michael McGee, both culpability and punishment phases;
- Regions Hospital documents regarding cytopathology and acid phosphatase testing; and
- Transcript of trial testimony of Dr. George F. Sensabaugh.

I have also relied upon my education, training and experience as a physician, forensic pathologist and a medical examiner.

## Brief Factual Synopsis and Issues to be Addressed

Dru Sjodin was a 22 year old woman who disappeared in November, 2003. Her body was found in a ditch between farm fields in Polk Co., MN on 4/17/2004, partially covered with vegetation. She was nude from the waist down (except for a stocking partially on the left foot), had her wrists bound behind her, and had a ligature around her neck with remnants of plastic bag trapped in the neck ligature. She was in a state of severe decomposition.

USA v. Alfonso Rodriguez, Post-conviction Proceedings, Declaration of Dr. Arden, 9/15/2011

An autopsy was performed by Dr. Michael McGee of the Ramsey County (MN) Office of the Medical Examiner on 4/18/2004. The autopsy demonstrated that Ms. Sjodin had extensive decompositional tissue loss (including postmortem animal depredation) especially over her left face and head, and particularly involving the anterior (front) of the neck; various other soft-tissue defects were also present elsewhere on the body. The report described that the body had fixed livor on the ventral/anterior (i.e., front) aspects of the face and body. The autopsy report also characterized various findings as "Recent Injuries." These included the "[r]emnants of an elongated slash-type wound" on the front of the neck that had notching of its lower margin (but absence of the tissues that would have included the upper margin), and a defect in the right flank with irregular margins. "Possible" bruising was noted beneath the right orbit (eye socket). Microscopic examination was reported as showing "postmortem autolysis" or "postmortem decomposition." Swabs and smears were taken of vagina, cervix and anus which on cytological examination at Regions Hospital were negative for spermatozoa and on chemical analysis had "prostatic" acid phosphatase of 47.4 U/L, 130.7 U/L and 7.5 U/L, respectively; no male DNA was recovered from the swabs.

Dr. McGee concluded that the cause of death for Ms. Sjodin was "homicidal violence" and the manner of death was "homicide." Under the diagnosis of "Homicidal Violence" (in both the Provisional and Final Autopsy Reports) he listed factors that included "Remnants of slash wound - neck region" and "Defect to right flank region." He also rendered a diagnosis of postmortem decomposition with postmortem anthropophagy.

Dr. McGee testified that the defect to the front of the neck was a slash wound caused by a sharp-edged instrument. He described the lower margin as being notched or wavy, indicating in his opinion that the knife used to inflict this wound was repositioned as it was plunged into the neck (at pages 6694-6695). He also testified (at page 6706) that he was concerned that the right flank defect was a knife wound, although he noted that there was no corresponding clothing defect. Dr. McGee opined that these wounds were consistent with a knife found in the defendant's car, although he testified (at deposition) that he examined a knife that was a "duplicate" of the knife in question. He invoked several potential injuries and mechanisms that may have caused her death, including the slash wound, the rope around her neck and the plastic bag presumed to have been over her head (at page 6725), then settled on the slash wound to neck as the likely cause, with asphyxia and exposure as possible causes (at page 6728). (He addressed other issues, including that the livor matched her position at the scene [at page 6707] and that he made the cervical swabs after *en bloc* removal of the internal genitalia.)

Dr. McGee testified extensively regarding the utility of "prostatic" acid phosphatase testing in the postmortem assessment of sexual activity or assault. He maintained that values greater than 25 U/L in the swabs were indicative of recent sexual activity of the decedent, based on the unpublished experience of the hospital laboratory that performed the testing for him.

I shall discuss the autopsy examination, particularly addressing the diagnoses of antemortem injuries, postmortem decomposition and artifacts, the comparison of a knife to the purported wounds of the body, and the reliability of rendering postmortem conclusions on antemortem sexual activity based on "prostatic" acid phosphatase in the absence of corroborative or definitive supporting evidence.

**Analysis and Opinions**

The purported "remnants of slash wound" on the front of the neck actually was the result of decomposition and animal depredation of the tissues. The depredation is particularly evident by the near absence of all soft tissues on the left side of the face where they were obviously eaten away, often with finely scalloped and fairly sharply demarcated margins. The configurations of the margins of the absent tissues, ranging from smooth to scalloped, are in my experience commonly seen as a result of postmortem processes. The tissue loss extended along the underside of the mandible, thus incorporating the entire area that would have been the upper margin of the supposed wound. In addition, virtually all of the internal throat and neck soft-tissue structures were absent due to postmortem processes, precluding any assessment of potential injuries beneath the skin. In other words, nearly all of the tissues that would

2

USA v. Alfonso Rodriguez, Post-conviction Proceedings, Declaration of Dr. Arden, 9/15/2011

be relevant for assessment of a stabbing or cutting wound to the neck were absent at the time of autopsy. Furthermore, the appearances of the remaining tissue margins are all consistent with decomposition and/or depredation; no features are described in the autopsy report or depicted in the photographs that are indicative of or even suggestive of a knife wound, especially when viewed in the context of the obvious postmortem changes in the body (especially that portion of the body). There was no evidence (either gross or microscopic) of hemorrhage in the tissues related to this "wound" which would be indicative of an injury sustained during life (although the state of decomposition would render such an observation suspect anyway). In fact, this "wound" looks no different from the other obviously postmortem changes seen in the autopsy photographs. The other supposed antemortem injury in the right flank is indistinguishable from the areas described as postmortem artifacts in the autopsy report, for example the defect on the knee; the irregular margins on the flank defect are much more consistent with animal activity than with a knife wound. (Even if this were a knife wound, its features have been so altered by postmortem changes as to render it uninterpretable.) In summary, the available evidence does not permit one to diagnose slash or stab wounds of the neck in this severely decomposed body. Any such diagnoses are not supported by the evidence, and are at best highly speculative. In my opinion, the observed features of the neck were all the result of postmortem processes.

(Similarly, the discoloration beneath the right orbit cannot be diagnosed as an antemortem contusion given the state of decomposition in this body. To label this as a "possible" contusion is also speculative, at best. Also, Dr. McGee described livor mortis on the anterior/ventral body surfaces. Livor mortis is not discernable after severe decomposition, although this may have been postmortem staining of the tissues.)

It is rarely even possible to make a true match between a given knife and an individual stab or cutting wound, although a forensic pathologist can opine more generally on the consistency between a blade and a wound. To make a valid comparison for a stab wound, the features of the wound must be evident, such as its size on the skin surface, its configuration (presence of blunt or sharp corners) and its depth of penetration. None of these features was determinable in the neck of Dru Sjodin, given the extensive postmortem changes discussed above, so no comparisons of consistency with any blade are valid in this case regarding stab wounds. Similarly, the features of the purported stab wound in the right flank were so distorted by postmortem changes that any such comparison would also be invalid. Cutting wounds involve drawing the sharp edge of a blade along the skin surface and into the underlying tissues; as such, since the wound is largely unrelated to the physical characteristics of the blade, most sharp edges will be consistent with causing almost any cutting wound. Therefore, any opinion relating the consistency of a given knife to an individual cutting wound would be generically accurate but usually so non-specific as to be of no value. Thus, Dr. McGee's opinion that the "duplicate" of the knife recovered from the defendant's car was consistent with causing the purported slash wound of the neck is both irrelevant and in a practical sense, meaningless.

In my opinion, Dr. McGee has not given adequate consideration to the ligature around the neck. Based on the included ruler scales in the photographs of the ligature after removal, I measured its circumference to be approximately 9-10 inches, which is clearly smaller than the circumference of an adult neck. A ligature of this size about the neck would cause significant compression, which could easily cause fatal strangulation. Not only would this provide a reasonable explanation for the cause of death, but it also raises the possibility that the ligature caused damage to the neck surface. Damaged, exposed tissue and/or blood will preferentially attract insects and other animals, leading to accelerated tissue damage by depredation. This would explain the more severe postmortem damage observed in the neck and throat region of Ms. Sjodin.

Dr. McGee relied entirely on the results of the acid phosphatase analysis of the vaginal and cervical swabs to support his opinions that there had been seminal deposition in these locations. Acid phosphatase, although present in high concentrations in the prostate gland and its products, is not specific for the prostate gland nor is it a uniquely male product; it is also found in females. Even the tartrate-resistant acid phosphatase that is supposedly of prostatic origin is not chemically specific to the prostate gland. (Dr. Sensabaugh elaborated on the limitations of use of acid phosphatase for sexual assault/activity testing, with particular emphasis on additional potential confounding factors in postmortem

USA v. Alfonso Rodriguez, Post-conviction Proceedings, Declaration of Dr. Arden, 9/15/2011

applications.)  It is not well established that acid phosphatase analysis is reliable in decomposed body, or if it would chemically "survive" a prolonged postmortem interval.  Furthermore, Dr. McGee performed the cervical swab after removal of the internal genital organs at autopsy.  Thus, the integrity of any trace evidence on or in the cervix was compromised by the dissection process; it may have been contaminated, which is why those swabs are properly performed before the anatomy is disturbed.  (The "globule" that he testified finding and swabbing was also not described in the autopsy report, which is a critical omission.)  Most importantly from the perspective of the practice of forensic pathology, although a positive acid phosphatase test is reasonable to use as a screening test for the presence of semen, it cannot independently establish or verify the presence of seminal fluid.  To compound this issue, the criterion used by Dr. McGee for a "positive" acid phosphatase test (greater than 25 U/L) is not accepted in the medical community.  (He repeatedly referred to "the literature," but could only support this cut-off value by his unique experience and the unpublished results from that one laboratory, which have not been subjected to peer review or even public comment within the discipline.)  An article in the peer-reviewed forensic medical literature from 1994 does address this question (see Chiasson, DA *et al.* "Interpretation of Postmortem Vaginal Acid Phosphatase Determinations." Am J For Med Pathol, 1994; 15:242-246.)  In this study, the authors concluded that even in the absence of spermatozoa detected on smears, an acid phosphatase of greater than 400 U/L is strongly suggestive of the presence of semen with reduced or absent spermatozoa.  In other words, if one were to accept using acid phosphatase as the sole determinant to establish the presence of semen (which they were not recommending), the cut-off should be 400 U/L, not the 25 cited by Dr. McGee.  In practice, confirmatory evidence is necessary to conclude that semen is present after getting a "positive" acid phosphatase result.  Definitive laboratory evidence to establish the presence of seminal fluid includes spermatozoa or prostate specific antigen (PSA, also known as p30).  Spermatozoa constitute the defining component of semen, although some men are aspermic (e.g., from vasectomy or disease).  PSA is accepted as a specific prostatic product which does not have any female sources of origin, and there are readily available test systems that can be applied to testing of autopsy swabs for sexual activity/assault.  (Even the 1994 article discusses using p30 testing to confirm the presence of semen if the acid phosphatase value is in the 100-400 U/L range, or greater than 400 U/L in the absence of detected spermatozoa.)  Testing for male DNA is also useful and more specific than acid phosphatase.  If male DNA is detected in this context, it either indicates the presence of semen, or that male cells were deposited in the vagina (which may be skin cells shed during penetration).  In the case of Ms. Sjodin, the one screening test (acid phosphatase) was supposedly positive by use of an unestablished criterion, but the two definitive tests (spermatozoa and male DNA) performed were negative and one other definitive test (p30) was not done.  Based on that limited evidence, one cannot conclude with reasonable medical certainty that semen was present.  This analysis of the testing and evidence pertained in 2004, 2006 and still pertains today.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on 9/15/2011.


_____
Signature of Jonathan L. Arden, MD

4

# Arden Forensics

Jonathan L. Arden, MD
President

Arden Forensics, PC

*Curriculum vitae* of Jonathan L. Arden, MD

## Employment

| | |
|---|---|
| 5/08–Present | **Forensic Pathologist (Part-time)**<br>**Office of the Chief Medical Examiner**<br>**State of West Virginia** |
| 1/06-Present | **President, Arden Forensics, PC** |
| 3/04-Present | **Consultant in Forensic Pathology and Medicine** |
| 12/03- 7/05 | **Medical Examiner, Northern Virginia Region (Part-time)** |
| 4/98-10/03 | **Chief Medical Examiner**<br>**Office of the Chief Medical Examiner**<br>**Washington, DC** |
| 3/89-4/98 | **Office of Chief Medical Examiner, City of New York**<br>**New York, NY** |

| | |
|---|---|
| 7/96-4/98: | First Deputy Chief Medical Examiner |
| 7/91-7/96: | Acting First Deputy Chief Medical Examiner |
| 8/89-6/91: | Deputy Chief Medical Examiner |
| 3/89-7/89: | Deputy Medical Examiner |

| | |
|---|---|
| 2/86-2/89 | **Assistant Medical Examiner**<br>**Office of the Chief Medical Examiner, State of Delaware** |
| 7/84-2/86 | **Deputy Medical Examiner-Pathologist**<br>**Office of the Medical Examiner**<br>**Suffolk County, New York** |

## Graduate Medical Training

| | |
|---|---|
| 7/83-6/84: | Resident in Forensic Pathology<br>Office of the Chief Medical Examiner, State of Maryland |
| 7/80-6/83: | Resident in Anatomic Pathology<br>New York University Medical Center |

## Education

University of Michigan Medical School: **MD**, 1980
University of Michigan: **BS** with High Distinction, 1976
The Johns Hopkins University, 1972-1974

Curriculum vitae of Jonathan L. Arden, MD

## Medical Licensure

| | |
|---|---|
| West Virginia | 2008 |
| Maryland | 2005 |
| Virginia | 2003 |
| District of Columbia | 1998-2006 |
| Delaware | 1986-2001; reinstatement 2005 (lapsed by non-renewal) |
| New York | 1982 |

## Board Certification

1985    Diplomate, American Board of Pathology, Anatomic and Forensic Pathology

## Professional Memberships

National Association of Medical Examiners
        (Board of Directors, 2002-2008; Executive Committee, 2006-2008)
Medical Society of Virginia
Medical Society of the District of Columbia, 1998-2003

## Academic Appointments

Clinical Assistant Professor of Pathology, George Washington University School of Medicine, 1998-2003
Clinical Assistant Professor of Pathology, State University of New York Health Sciences Center at
        Brooklyn, 1989-1998
Clinical Assistant Professor of Forensic Medicine, New York University School of Medicine, 1989-1998

## Selected Professional Activities

Subject matter expert (representing National Association of Medical Examiners and working with RTI
        International) to develop web-based training program in forensic science, 2010-2011
Identification of the Missing focus group of the National Center for Forensic Science, National Institute of
        Justice (representing National Association of Medical Examiners), 2006-2007
Chair, Uniform Definitions and Standards Work Group, Center for Substance Abuse and Treatment's
        Project on Co-Occurring Disorders and Other Emerging Issues in Opioid Treatment, Substance
        Abuse and Mental Health Services Administration, US DHHS (representing National Association
        of Medical Examiners), 2004-2005
Environmental Clearance Committee for the Curseen-Morris Postal Facility (co-sponsored by US
        Environmental Protection Agency and DC Department of Health), 2003
Government of the District of Columbia:
        Child Fatality Review Committee, 1998-2003
        Mental Retardation and Developmental Disabilities Administration
            Fatality Review Committee, Chair, 2000-2003
        Emergency Preparedness Task Force and Emergency Preparedness Committee, 2001-2003
        Mayor's Health Policy Council, 1998-2003
Metropolitan Washington Council of Governments, Bio-terrorism Task Force, 2001-2003
Medical Society of the District of Columbia, Family Violence Task Force, 2000-2003
National Association of Medical Examiners, Interim Meeting, Program Chair, February 1997
New York State Commission on Domestic Violence Fatalities, 1996-1997
American Board of Pathology, Forensic Pathology Test Committee, 1992-1997
City of New York, Administration for Children's Services/Human Resources Administration, Child Fatality
        Review Panel, 1989-1998
City of New York, Criminal Justice Child Abuse Task Force, 1996-1998
New York City Multidisciplinary Child Fatality Review Team, Project Director, 1995-1998
Physician Assistant Program, The Brooklyn Hospital-Long Island University, Pathology Course Director,
        1991-1997

2

Curriculum vitae of Jonathan L. Arden, MD

## Selected Continuing Medical Education

43rd Annual Forensic Dental Identification and Emerging Technologies Course of the Armed Forces
Institute of Pathology, March 12-16, 2007

22nd Annual Washington Neuroradiology Course of the Armed Forces Institute of Pathology, February 17-
18, 2007

15th Annual Anatomic Pathology Review Course of the Armed Forces Institute of Pathology, April 17-23,
2005

## Selected Lectures and Presentations

"Postmortem Changes and Time of Death," "Sudden Natural Deaths," presented at the West Virginia
Office of the Chief Medical Examiner 2010 Forensic Death Investigation Training Course, Sutton,
WV, October 25, 2010

"Postmortem Changes and Time of Death," "Sudden Natural Deaths," and "Investigation of Early
Childhood Deaths," presented at the West Virginia Office of the Chief Medical Examiner 2009
Forensic Death Investigation Training Course, Sutton, WV, October 5-6, 2009

"Death Investigation," presented at the South Carolina Coroner's Association 2009 Training Conference,
Litchfield Beach, SC, June 10, 2009

"Forensic Pathology," presented at the Fifth National Seminar on Forensic Evidence and the Criminal
Law, Philadelphia, PA, January 9, 2009

"The Role of the Forensic Pathologist in Homicide and Capital Defense," lecture given at the Yale Law
School Capital Punishment Clinic, New Haven, CT, December 9, 2008

"Fatal Dissection and Rupture of a Coronary Artery Bypass Vein-Graft:  Implications for ME Jurisdiction
and Practice," presented at the National Association of Medical Examiners Annual Meeting,
October 2008

"Recognition and Interpretation of Child Abuse Injuries," Annual Meeting, Virginia Association of
Orthopaedic Technologists, McLean, VA, March 31, 2007

"Pitfalls in the Practice of Forensic Pathology," Forensic Grand Rounds, Commonwealth of
Massachusetts Office of the Chief Medical Examiner and Boston University School of Medicine,
November 1, 2006

"The Role of the Forensic Pathologist in Homicide Defense," Seminar, Office of the Georgia Capital
Defender, July 6, 2006

"Be Careful What You Wish For..." presented at the National Association of Medical Examiners Annual
Meeting, October 2005

"Sudden Natural Deaths," presented at the Armed Forces Institute of Pathology Basic Forensic Pathology
Course, December 2, 1999

"Subtle Child Abuse Fatalities" presented at the National Association of Medical Examiners Interim
Meeting, February 1997

3

Curriculum vitae of Jonathan L. Arden, MD

Teaching and lecturing for various audiences, including: physicians, graduate medical trainees and medical students, nurses and physician assistants, law enforcement, prosecutors and defense attorneys, and interdisciplinary government panels, 1986 - Present.  Topics include:
- pediatric forensic pathology (child abuse and neglect, sudden infant death syndrome)
- death investigation and certification
- deaths in custody
- sudden natural deaths
- mistakes in homicide investigations
- courtroom testimony and procedures

## Publications

Shuangshoti S, Hjardemaal GM, Ahmad Y, Arden JL and Herman MM. Concurrence of multiple sclerosis and glioblastoma multiforme. Clin. Neuropath. 22:304-8, 2003.

Borio L, Frank D, Mani V, Chiriboga C, Pollanen M, Ripple M, Ali S, DiAngelo C, Lee J, Arden J, Titus J, Fowler D, O'Toole T, Masur H, Bartlett J, Inglesby T. Death due to bioterrorism-related inhalational anthrax: report of 2 patients. JAMA. 2001 Nov 28; 286(20):2554-9.

Flomenbaum MA, Arden JL. Final Considerations: Interacting with the Medical Examiner, Chapter 24 in *Emergency Diagnostic Testing, 2nd Ed,* Flomenbaum NE, Goldfrank L and Jacobson S, eds. Mosby-Yearbook, Philadelphia, PA 1995

Fried KS, Arden JL, Gouge TH, Balthazar EJ. Multifocal granular cell tumors of the gastrointestinal tract. Am J Gastroenterology 79(10):751-755, 1984

Smialek JE, Arden JL, Monforte JR. Changes observed in blood carbon monoxide levels due to decomposition. Abstract #c10, presented at National Association of Medical Examiners meeting, Miami, FL, 1981

Han SS, Holmstedt J, Geha-Mitzel M, Pirbazari M, Arden JL. *Biology of Aging.* Published by Program in Biology of Aging, University of Michigan Institute of Gerontology, Ann Arbor, MI, 1979