State of Minnesota
Douglas County

District Court
Seventh Judicial District

Court File Number: **21-KX-04-001222**

Case Type:    Serious Felony

## Notice of Filing of Order

BRIDGET KEARNS SABO
INNOCENCE PROJECT OF MINNESOTA
1536 HEWITT AVENUE
ST PAUL MN  55104-1237

---

**The State of Minnesota vs. MICHAEL RAY HANSEN**

You are notified that an order was filed on this date.

Dated: July 13, 2011

Court Administrator
Douglas County District Court
305 8th Avenue W
Alexandria MN  56308
320-762-3033

cc:  Douglas County Dept - Corrections

Minnesota Attorney General
CHAD MICHAEL LARSON

STATE OF MINNESOTA                                IN DISTRICT COURT

COUNTY OF DOUGLAS                                 SEVENTH JUDICIAL DISTRICT

---

Michael Ray Hansen,                    District Court File No. 23-KX-04-1222

                    Petitioner,

vs.                                    **FILED**
                                       DISTRICT COURT

State of Minnesota,                    **JUL 13 2011**

                    Respondent.        DOUGLAS COUNTY
                                       COURT ADMINISTRATOR

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

---

Petitioner Michael Ray Hansen filed a post-conviction petition in Douglas County District Court on September 16, 2010. The state filed a response on October 1, 2010. On November 16, 2010, this Court granted Mr. Hansen a post-conviction hearing. This hearing was held on April 8 and 11 and May 16, 2011. Based upon testimony and evidence received at the post-conviction hearing, arguments presented by counsel and the entire record in this case, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### Background:

1. On May 2, 2004, Petitioner Michael Ray Hansen discovered his three and a half month-old daughter Avryonna Hansen, unresponsive. Hansen had been sleeping with Avryonna and his other three-year-old daughter on a futon mattress. Paramedics quickly responded to the home where Hansen was staying, but efforts to resuscitate Avryonna were unsuccessful.

2. Because Avryonna's death was unexpected, she was transferred to the Douglas County Coroner's Office where Dr. Michael Spannbauer began an autopsy. During the course of Dr. Spannbauer's autopsy, he discovered that Avryonna had a complex skull fracture in the left side of her skull. He contacted law enforcement to report the fracture and law enforcement determined that a forensic pathologist should also examine Avryonna's body.

1

3. Dr. Michael McGee conducted a second autopsy of Avryonna. In the course of his autopsy, Dr. McGee examined Avryonna's skull and brain. Neither Dr. McGee nor Dr. Spannbauer found any intracranial bleeding or injury to the surface of Avryonna's brain. Dr. McGee classified Avryonna's cause of death as blunt force trauma and her manner of death as a homicide.

4. Six days prior to her death, Avryonna fell from a WalMart shopping cart. She was strapped into her infant car seat, which her mother had balanced on the top front of the store's shopping cart. The cart hit an unexpected bump and Avryonna's car seat flipped off the shopping cart and landed upside down on the pavement.

5. Hansen was indicted by a grand jury of multiple counts of second-degree murder. He consistently maintained his innocence, but following a jury trial, Hansen was convicted of second-degree murder and sentenced to the presumptive term of 174 months in prison. Hansen's appeal to Minnesota Court of Appeals was denied.

6. On September 16, 2010 the Innocence Project of Minnesota filed a petition for post-conviction relief on Hansen's behalf and requested a hearing. This Court granted his request and a post-conviction hearing was held on April 8, 11 and May 16, 2011.

## Post-Conviction Hearing Witnesses:

7. At the post-conviction hearing, Hansen presented the testimony of the following witnesses:
   a. Robert Rothfeder, M.D. Dr. Rothfeder is a physician specializing in emergency medicine. He practiced hospital-based emergency medicine for approximately thirty years, twenty of which was spent as the Director of the Emergency Department. He has seen in excess of 100,000 patients, approximately half of whom were children.
   b. Lindsey Thomas, M.D. Dr. Thomas has been a board-certified physician specializing in forensic pathology for twenty-three years. She is a medical examiner for eight Minnesota counties. She performs approximately 100-150 autopsies a year and has conducted between 100-200 infant autopsies over the course of her career.
   c. Susan Roe, M.D. Dr. Roe is a board-certified physician specializing in forensic pathology. Dr. Roe has performed approximately 5,000 autopsies over the course of her career. She estimated that approximately 20% of those autopsies were conducted on children.

d. <u>Carolyn Levitt, M.D.</u> Dr. Levitt is a board-certified physician specializing in pediatrics and child abuse. In 1986 she founded the Midwest Children's Resource Center, a department of St. Paul Children's Hospital devoted to evaluating suspected cases of child abuse. Dr. Levitt is also a full professor at the University of Minnesota Medical School's Pediatric Department and was the lead author of a textbook chapter on abusive head trauma in infants.

e. <u>John Plunkett, M.D.</u> Dr. Plunkett is a board-certified physician specializing in forensic pathology. He retired from his hospital practice in 2004. Prior to retirement, he was the appointed medical examiner for seven Minnesota counties as well as the Medical Education Director for Regina Hospital in Hastings, MN. He has published original manuscripts in peer reviewed literature related to evaluation of infant head injury.

f. <u>Chris Van Ee</u> Mr. Van Ee is a biomechanical engineer specializing in orthopedic and impact biomechanics. He has worked extensively with the automotive industry and has studied car seat use and design. He has also conducted independent research on infant skull fractures.

g. <u>Andrew Pearson</u> Mr. Pearson was Mr. Hansen's lead attorney during the 2006 trial that resulted in Mr. Hansen's conviction of second-degree murder.

8. The state presented the testimony of Dr. McGee at the post-conviction hearing. Dr. McGee specializes in forensic pathology and is the Ramsey County medical examiner.

## New Evidence Regarding Positional Asphyxia:

9. Drs. Thomas and Roe are both experienced forensic pathologists who are knowledgeable about the proper investigation and classification of infant deaths. Historically, unexplained infant deaths were almost always labeled Sudden Infant Death Syndrome or SIDS. SIDS has generally been defined as a situation in which no anatomical explanation can be found for an infant's death.

10. Within the past five to seven years, however, there has been a growing understanding among medical examiners that the cause of many unexpected infant deaths is accidental asphyxiation due to unsafe sleep conditions.

11. In November 2005, the American Academy of Pediatrics issued a policy statement entitled "The Changing Concept of Sudden Infant Death Syndrome: Diagnostic Coding Shifts, Controversies Regarding the Sleeping Environment, and New Variables to Consider in Reducing Risk." This statement was issued nearly a year and half after Avryonna's death and autopsy.

3

12. The findings in the AAP policy statement as well as closer evaluation of recorded infant deaths in Minnesota eventually prompted the Minnesota Medical Examiners' and Coroners' Association to write a letter to primary health care providers. This letter, sent in July 2007, noted an "emerging trend…related to unsafe infant sleep practices" and found that in 2006 fifteen infants died from asphyxia. This letter was sent more than three years after Avryonna's death and autopsy and more than a year after Hansen's trial.

13. In 2008 Dr. Thomas presented information regarding the importance of thoroughly investigating and accurately classifying infant deaths to her peers at the Minnesota Medical Examiners' and Coroners' Association. One of the reasons Dr. Thomas made this presentation was because many Minnesota counties were still using the term "SIDS" and not necessarily completing an adequate scene investigation when an infant died unexpectedly.

14. Dr. McGee attends meetings of the Minnesota Medical Examiners' and Coroners' Association only sporadically and has not made any presentations to his peers in the last ten years. He has published only two articles, unrelated to any issue in Hansen's case, in the past twenty years.

15. There is no test for positional asphyxia. Even in infant deaths caused by positional asphyxia, medical examiners rarely see any physical evidence of asphyxia in the autopsies.

16. In the last five years, the forensic pathology community has learned that a thorough death scene investigation is vital whenever an infant dies unexpectedly. This investigation should include a discussion with the caregiver who discovered the infant about the infant's position, and a recreation of that position with a doll. It should involve careful documentation of the scene, and record risk factors for accidental suffocation that may not be immediately apparent. Often medical examiners will go to the death scene themselves.

17. It is now understood in the medical community that the following conditions increase the risk that an infant may die of accidental asphyxiation:
    a. Sleeping in a prone position
    b. Sleeping near pillows, loose blankets or plush toys
    c. Sleeping on a soft mattress
    d. Sleeping with other young children
    e. Sleeping with an adult who is exhausted or under the influence of alcohol, drugs or other medication
    f. Sleeping in a warm room
    g. Sleeping near cigarette smoke
    h. The child is less than one year old

18. Evidence gathered from the scene established the following:
    a. Avryonna had been sleeping face-down
    b. Avryonna was sleeping on a futon mattress, which is softer than a traditional bed mattress
    c. Avryonna was sleeping near three adult sized bed pillows
    d. Avryonna was sleeping near two small blankets and one large comforter
    e. Avryonna was sleeping on the same futon mattress as her three year old sister
    f. Avryonna was sleeping next to her father, who went to bed exhausted between 2:00 and 4:00 a.m. and had consumed some alcohol
    g. Avryonna was three and a half months old

19. Despite Dr. McGee's claim of familiarity with positional asphyxia, he identified only two risk factors for it in his hearing testimony.

20. After finding Avryonna's fracture, Dr. McGee stopped looking for a cause of death, even though he could identify no anatomical injury sufficient to explain her death.

21. Had Drs. Thomas and Roe classified Avryonna's manner of death in 2004 or 2006, they would have called it undetermined. If they classified her manner of death today, however, they would call it an accident or probable accident due to positional asphyxia.

22. Dr. McGee did not personally visit the scene of Avryonna's death nor did he try to recreate the circumstances in which she was found. Law enforcement officers investigated the area where Avryonna had been sleeping for evidence of a crime. Dr. McGee did not conduct the sort of death scene investigation now recommended in unexpected infant deaths and he took no note of Avryonna's sleep conditions.

23. In the estimation of Mr. Pearson, Hansen's trial attorney, the greatest weakness in Hansen's case was the lack of a credible alternative cause of Avryonna's death. Mr. Pearson testified credibly that he "had never heard of positional asphyxia" and was not aware of risk factors for positional asphyxia. He also testified that neither of the doctors with whom he consulted or Dr. McGee ever mentioned positional asphyxia prior to trial.

24. The jury did not hear or see any information about positional asphyxia, accidental suffocation or overlay during Hansen's trial.

25. The five doctors who independently reviewed Avryonna's autopsy findings believe that positional asphyxia was the likely cause of her death.

## New Evidence Regarding the Clinical Presentation of Children With Skull Fractures:

26. None of the five doctors who independently reviewed the autopsy findings in Hansen's case believe that Avryonna's skull fracture caused her death.

27. Dr. Rothfeder and Dr. Levitt have each been engaged in clinical practice for more than thirty years and have diagnosed and treated a substantial number of children with skull fractures. Dr. Rothfeder has seen "hundreds" of skull fractures over the course of his career. Skull fractures are one of the most common injuries Dr. Levitt sees in her practice.

28. Dr. McGee is not now and has never been a clinician who treats live children. He has never been in a position to examine children who sustain skull fractures and live. His knowledge and understanding of skull fractures has been gained through examining people who have died.

29. Skull fractures, even large ones, are broken bones and not inherently dangerous. The danger associated with skull fractures is the underlying brain injury that sometimes results. The negative outcomes that Drs. Rothfeder and Levitt have seen in children with skull fractures have been directly connected to intracranial injury, bleeding or swelling.

30. It is well-settled that Avryonna did not have intracranial injury, bleeding or significant swelling in her brain tissue.

31. Drs. Thomas, Roe and Plunkett did not see any evidence of microscopic brain injury when they reviewed the microscopic tissue samples Dr. McGee obtained at autopsy.

32. Dr. McGee could not identify any injury in Avryonna's brain that directly caused her death. Although Dr. McGee testified that he saw areas of microscopic hemorrhage in Avryonna's brain, he consistently conceded that those injuries were not responsible for her death.

33. Dr. Rothfeder has neither seen in his own clinical practice nor read about in medical literature any mechanism by which a child could die so quickly from a

6

skull fracture that no evidence of significant trauma would be found in her brain.

34. In the clinical experience of Drs. Rothfeder and Levitt, children with skull fractures are often neurologically normal and do not display noticeable symptoms. Dr. Levitt explained that children with skull fractures "usually are not symptomatic at all."

35. In the experience of Drs. Rothfeder and Levitt, a skull fracture would rarely be apparent to a caregiver or even to a physician.

36. Given the lack of trauma to Avryonna's brain, both Drs. Rothfeder and Levitt would have expected her to appear normal to her caregivers after she sustained the fracture.

## New Evidence Regarding the Shopping Cart Fall and Avryonna's Skull Fracture:

37. Dr. Levitt testified credibly that Avryonna's fall from a shopping cart six days before her death could "very definitely" have caused the fracture discovered at autopsy. Dr. Rothfeder also believed that the shopping cart fall could have caused Avryonna's fracture.

38. The American Academy of Pediatrics specifically advises against placing an infant car seat on top of a shopping cart because of the risk that the child will fall and sustain a significant head injury.

39. Chris Van Ee, a biomechanical engineer with extensive experience in the area of car seat use and design, examined the car seat in which Avryonna was sitting when she fell. Using a similarly sized crash test dummy, Van Ee determined that it would be possible for Avryonna's head to impact the ground if she was strapped into the seat appropriately. The likelihood of impact would increase depending on how loosely or tightly Avryonna was restrained in the seat.

40. Mr. Van Ee also placed the crash test dummy in a similar, though not identical, car seat and proceeded to drop it from the established height of the WalMart shopping cart. In these tests, the dummy's head contacted the ground and approximately 500 pounds of force were exerted on the head.

41. It is well-documented that skull fractures very frequently result when a child falls from a height greater than 32 inches onto a hard surface. Avryonna fell from a height between 46 and 49 inches.

7

42. Dr. McGee is not a biomechanical engineer and has no specialized knowledge of car seat use and design. He has not attempted to study the gravitational forces at work in falls. His assertion that Avryonna's fall from the shopping cart could not have caused her fracture is based on "common sense" and "eye-balling" the car seat. These grounds are insufficient and his conclusion on this point is not credible.

## Evidence Regarding Ineffective Assistance of Counsel:

43. Hansen alleges that Mr. Pearson, as trial counsel, failed to adequately represent him. Hansen further alleges that this failure amounts to ineffective assistance of counsel.

44. In particular Hansen states that Mr. Pearson contacted only two potential expert witnesses. Both were forensic pathologists. He made no effort to contact any doctor engaged in diagnosing and treating live patients. Hansen further points out that Mr. Pearson did not contact additional experts because Hansen did not have the funds to pay what Mr. Pearson assumed they would charge.

45. Hansen argues that although Mr. Pearson and his firm were retained privately, Hansen was financially eligible for the services of a public defender. However, Mr. Pearson made no request to the court to pay for an expert witness. By not doing so, Hansen asserts that Mr. Pearson committed ineffective assistance of counsel in his representation.

46. The Court finds that such action or inaction on the part of Mr. Pearson was not objectively unreasonable, did not substantially prejudice Hansen's case, and simply does not rise to the level of ineffective representation of counsel. Such conduct on the part of Mr. Pearson would not, in and of itself, support an award of a new trial.

## Evidence Regarding the Age of the Fracture:

47. Every medical examiner who reviewed Avryonna's full autopsy reports and accompanying microscopic slides concluded that the tissue surrounding the fracture site showed evidence of healing.

48. Specifically, both Drs. Thomas and Plunkett noted that the presence of hemosiderin and macrophages in the tissue surrounding the fracture demonstrated that the injury was more than a few days, but less than three weeks old.

8

49. Dr. McGee reviewed his case file prior to the hearing and did not discover any new evidence about the case. He believed himself to be "forensically disadvantaged" because he did not perform the initial autopsy on Avryonna.

50. At the hearing, Dr. McGee acknowledged for the first time that the iron stains he made of the tissue surrounding the fracture showed evidence of healing. According to Dr. McGee, these stains indicate a prior injury that was healing at the time Avryonna sustained the fracture.

51. Dr. McGee's final autopsy report and prior testimony to the grand jury and at trial make no reference to these iron stains or to his belief that Avryonna sustained any previous injury. Although Dr. McGee claimed at the hearing to have discussed the iron stains in his autopsy report, the report itself does not bear this out.

52. Each medical examiner who testified on Hansen's behalf said that the standard and best practice is to take at least one and preferably more samples of the bone at the fracture site to date the injury most accurately.

53. Dr. McGee did not take any samples from the skull bone itself, even though he knew that the timing of Avryonna's injury would be a key issue.

## CONCLUSIONS OF LAW

1. Evidence regarding positional asphyxia is newly discovered and Hansen has met each of the four prongs set forth in *Rainer v. State,* 566 N.W.2d 692, 695 (Minn. 1997). This evidence was not known to Hansen or his attorneys at the time of trial; it was not available through due diligence at the time of Hansen's trial; it is not cumulative, impeaching or doubtful and it would probably result in a more favorable outcome at trial.

2. Mr. Hansen has met the compulsory prongs of the *Larrison* test for newly discovered evidence of false testimony. *Larrison v. United States,* 24 F.2d 82, 87 (7th Cir. 1928); *Ferguson v. State,* 645 N.W.2d 437, 442-43 (Minn. 2002). Dr. McGee's testimony regarding the symptoms and clinical course of a child with a skull fracture like Avryonna's and Avryonna's shopping cart fall was false or incorrect. *State v. Caldwell,* 322 N.W.2d 574, 585-86 (Minn. 1982). The jury might have reached a different conclusion in Mr. Hansen's case without this testimony.

3. The decision of Hansen's trial attorney to contact only two potential expert witnesses, both of whom were forensic pathologists, was not objectively unreasonable.

IT IS HEREBY ORDERED THAT:

Mr. Hansen's motion for a new trial is GRANTED.

Date:  7-12-11

The Honorable Peter M. Irvine
Judge of District Court

10