STATE OF WISCONSIN
C O U R T  O F  A P P E A L S
DISTRICT III
Case No. 02-3097-CR

---

STATE OF WISCONSIN,

               Plaintiff-Respondent,

    v.

EVAN ZIMMERMAN,

               Defendant-Appellant.

---

ON APPEAL FROM A JUDGMENT OF CONVICTION
AND AN ORDER DENYING POSTCONVICTION RELIEF
ENTERED IN THE CIRCUIT COURT FOR EAU CLAIRE
COUNTY, THE HON. ERIC J. WAHL, PRESIDING

---

BRIEF AND APPENDIX OF DEFENDANT-APPELLANT

---

KEITH A. FINDLEY
Bar No. 1012149

NEIL F. BYL
MARY DELANEY
MEGAN MORRISEY
SHEILA SULLIVAN
Law Students

Wisconsin Innocence Project
Frank J. Remington Center
University of Wisconsin Law School
975 Bascom Mall
Madison, WI  53706
(608) 262-4763

Attorney for Defendant-Appellant

## TABLE OF CONTENTS

ISSUES PRESENTED .................................................................1

STATEMENT ON ORAL ARGUMENT  AND
PUBLICATION ........................................................................3

STATEMENT OF THE CASE ..................................................3

STATEMENT OF FACTS ..........................................................3

    The Murder ..........................................................................3

    The Evidence: ......................................................................5

        Obsession .....................................................................5

        "Guilty Knowledge" ...................................................6

        "Alibi" Statement(s) ..................................................10

        "Admissions" ..............................................................12

        Physical Evidence ......................................................13

        The "Eyewitness" .......................................................14

        Medical Testimony ....................................................16

    Other Postconviction Claims ............................................18

    Trial Court Decision ..........................................................18

ARGUMENT .............................................................................18

  I.    THE EVIDENCE WAS INSUFFICIENT. ................18

  II.   THE COURT PERMITTED THE STATE TO
       RELY ON SPECULATION TO CONNECT
       ZIMMERMAN WITH THOMPSON ON THE
       NIGHT OF THE MURDER......................................25

III. THE STATE KNOWINGLY PRESENTED FALSE EVIDENCE.................................................27

IV. DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE WHEN HE FAILED TO USE AVAILABLE EXCULPATORY EVIDENCE AND FAILED TO OBJECT TO IMPERMISSIBLE EVIDENCE AND ARGUMENT.................................................29

    A. Counsel failed to expose the state's false claim of "guilty knowledge." .............................30

    B. Counsel failed to present DNA test results excluding Zimmerman.........................................32

    C. Counsel failed to obtain and present alternative medical examiner testimony..............33

    D. Counsel failed to challenge adequately the hypnotically refreshed testimony.........................36

    E. Counsel failed to object to inadmissible hearsay and opinion testimony. ...........................41

        1. Police opinion testimony. .............................41

        2. Hearsay.......................................................45

    F. Counsel failed to object to improper closing arguments. ......................................................... 47

V. NEWLY DISCOVERED EVIDENCE WARRANTS A NEW TRIAL.................................49

    A. New evidence has been presented of an alternative suspect. .............................................49

    B. New evidence of another very similar homicide suggests a common perpetrator, and

excludes Zimmerman. ........................................51

VI. CUMULATIVELY,    THESE    ERRORS
REQUIRE A NEW TRIAL IN THE INTERST
OF JUSTICE. ...........................................55

CONCLUSION ................................................56

APPENDIX ....................................................100

## AUTHORITIES CITED

### Cases

*Bituminous Casualty Corp. v. United Military Supply, Inc.*,
69 Wis.2d 426, 230 N.W.2d 764 (1975) ...........................22

*Bose Corp. v. Consumers Union*,
466 U.S. 485 (1984) ........................................21

*Commonwealth v. Kitchen*,
730 A.2d 513 (Pa.Super.1999) ..........................44

*Hunter v. State*,
815 A.2d 730 (Del. 2002)..................................48

*Jackson v. Virginia*,
443 U.S. 307 (1979) ........................................19

*Jentges v. Milwaukee County Circuit Court*,
733 F.2d 1238 (7th Cir. 1984) ..........................21

*Miller v. Anderson*,
255 F.3d 455 (7th Cir. 2001) ............................36

*Neil v Biggers*,
409 U.S. 198 (1972) ........................................39

*Nix v. Whiteside*,
475 U.S. 157 (1986) ........................................21

*Peters v. State*,
70 Wis.2d 22, 233 N.W.2d 420 (1975) ............................21

*Piaskowski v. Bett*,
256 F.3d 687 (7th Cir. 2001) .............................................25

*Rogers v. Israel,*
746 F.2d 1288 (7th Cir. 1984) ...........................................36

*Runge v. State*,
160 Wis.2d 8, 150 N.W.2d 977 (1915) ............................46

*Soliz v. State*,
961 S.W.2d.545 (Tex.App. 1997) .....................................38

*State v. Armstrong*,
110 Wis.2d. 555, 329 N.W.2d 386 (1983) ......37, 38, 39, 40

*State v. Bembenek*,
140 Wis.2d 248, 409 N.W.2d 432 (Ct. App. 1987)...........49

*State v. Dean*,
67 Wis.2d 513, 227 N.W.2d 712 (1975) ..........................46

*State v. Denny*,
120 Wis.2d 614, 357 N.W.2d 12 (Ct. App. 1984).......50, 51

*State v. Harp*,
161 Wis.2d 773, 469 N.W.2d 210 (Ct. App. 1991)...........55

*State v. Haseltine*,
120 Wis.2d 92, 352 N.W.2d 673 (Ct. App. 1984).............42

*State v. Hicks*,
202 Wis.2d 150, 549 N.W.2d 435 (1996) .........................55

*State v. Kuehl*,
199 Wis.2d 143, 545 N.W.2d 840 (Ct. App. 1995)...........44

*State v. Multaler*,
2002 WI 35, 252 Wis.2d 54, 643 N.W.2d 437 ..................54

*State v. Neuser*,
191 Wis.2d 131, 528 N.W.2d 49 (1995) ...........................48

*State v. O'Brien*,
223 Wis.2d 303, 588 N.W.2d 8 (1999) .............................55

*State v. Poellinger*,
153 Wis.2d 493, 451 N.W.2d 752 (1990) .........................19

*State v. Romero*,
147 Wis.2d 264, 432 N.W.2d 899 (1988) ........................42

*State v. Scheidell*,
227 Wis.2d 285, 595 N.W.2d 661 (1999) ........................53

*State v. Smith*,
170 Wis.2d 701, 490 N.W.2d 40 (Ct. App. 1992), *cert.*
*denied*, 507 U.S. 1035 (1993)...........................................44

*State v. Stevens*,
171 Wis.2d 106, 490 N.W.2d 753 (Ct. App. 1992)...........46

*State v. Sullivan*,
216 Wis.2d 768, 576 N.W.2d 30 (1998) ..........................53

*State v. Tutlewski*,
231 Wis.2d 379, 605 N.W.2d 561 (Ct. App. 1999)...........48

*State v. Williams*,
518 A.2d 234 (NJ 1986) ...................................................53

*Stewart v. State*,
83 Wis.2d 185, 265 N.W.2d 489 (1978) ..........................21

*Strickland v. Washington*,
466 U.S. 668 (1984) ........................................................30

*Tim Torres Enterprises, Inc. v. Linscott*,
142 Wis.2d 56, 416 N.W.2d 670 (Ct. App. 1987).......45, 46

*United States v. Agurs,*
    427 U.S. 97 (1976) ...........................................................27

*United States v. Harber,*
    53 F.3d 236 (9th Cir. 1995) ...............................................44

*United States v. Young,*
    470 U.S. 1 (1985) .............................................................47

*Wester v. Bruggink,*
    190 Wis.2d 308, 527 N.W.2d 373 (Ct.App. 1994)............26

## Wisconsin Statutes

752.35 ................................................................................55
904.01 ................................................................................53
904.03 ................................................................................43
904.04(2) ...........................................................................53
907.01 ..........................................................................26, 42
908.045(2) ....................................................................45, 46

## Other Authorities

Ressler, et al., SEXUAL HOMICIDE PATTERNS AND MOTIVES
    (1988) ...........................................................................52

STATE OF WISCONSIN
C O U R T   O F   A P P E A L S
DISTRICT III

Case No. 02-3097-CR

---

STATE OF WISCONSIN,

Plaintiff-Respondent,

v.

EVAN ZIMMERMAN,

Defendant-Appellant.

---

ON APPEAL FROM A JUDGMENT OF CONVICTION
AND AN ORDER DENYING POSTCONVICTION RELIEF
ENTERED IN THE CIRCUIT COURT FOR EAU CLAIRE
COUNTY, THE HON. ERIC J. WAHL, PRESIDING

---

BRIEF AND APPENDIX OF DEFENDANT-APPELLANT

---

### ISSUES PRESENTED

1.      Was the evidence sufficient to support Evan Zimmerman's conviction for first-degree intentional homicide?

The circuit court answered: Yes.

2.      Did the trial court erroneously permit witnesses

to speculate that the victim likely would have wanted to visit Zimmerman within the hours before her death?

The trial court admitted the evidence as lay opinion testimony.

3.     Did the state violate Zimmerman's due process rights by knowingly presenting false testimony at trial, including evidence that Zimmerman had "guilty knowledge" about the murder, when in fact police and the prosecutor knew that Zimmerman's knowledge was about information that had been made public?

The circuit court held that the state did not knowingly present false testimony.

4.     Was Zimmerman's right to effective assistance of counsel violated because counsel failed to develop and use available exculpatory evidence and failed to object to impermissible evidence and argument?

The trial court held that counsel was not ineffective.

5.     Does newly discovered evidence—evidence of an alternative suspect and of a similar second homicide that Zimmerman could not have committed—warrant a new trial?

The trial court denied the request for a new trial.

6.     Is a new trial warranted in the interest of justice in light of the cumulative effect of these multiple errors?

The circuit court denied the request for a new trial.

## STATEMENT ON ORAL ARGUMENT AND PUBLICATION

The defendant-appellant requests oral argument. This case has an unusually complex series of interrelated facts and numerous complex issues, which cannot all be addressed adequately in the briefs.

The defendant-appellant also believes that publication of the court's opinion will be warranted because of the breadth and significance of the issues presented.

## STATEMENT OF THE CASE

Evan Zimmerman was convicted of first-degree intentional homicide after a four-day trial. He was sentenced to life in prison, with eligibility for extended supervision after 20 years (21). The circuit court subsequently denied both a motion for postconviction discovery and a motion for relief from the judgment (41).

## STATEMENT OF FACTS

### The Murder

Kathy Thompson's body was discovered about 5:45 a.m. on Saturday, February 26, 2000, on Laurel Avenue in Eau Claire (52:164). Her head lay on the curb of the quiet residential street, with her body extended into the street (52:169; 66:Exh.1)). Her sports bra had been pulled up, exposing both breasts. Her sweater lay a few feet from her head (65:Exh.1). The cause of death was asphyxia due to ligature strangulation (54:30). No one witnessed the murder.

Kathy Thompson was murdered on her wedding night. On Friday, February 25, 2000, Thompson had married Robert

-3-

Miles, a man whom she had been dating for several weeks (53:42). During the reception at a local tavern, Thompson and her new husband got into an argument (53:15, 52). Miles left the reception alone, and went home to bed (53:52). Thompson later went home and assaulted Miles, bloodying his head (53:60-61). Police were called at 1:52 a.m. to calm the domestic dispute (53:60-61). Thompson, who was intoxicated and upset but uninjured, was arrested, and Miles was picked up on a probation hold (53:61-62). Both were taken to jail.

Thompson was last seen alive around 3:00 a.m. when police released her from custody (53:64). Miles remained in jail until after the murder (53:45). Upon Thompson's release, an officer offered her a ride, but she said she wanted to walk home (53:66-7). She was last seen walking towards her home (53:65-6).

Kathy Thompson was 6'1" and 184 pounds (54:66). She had a history of volatile relationships with men (53:20). Shortly before her death she had been corresponding with several inmates, including several with whom she had had personal relationships (55:17-18; 66:Exh.P). Thompson had also recently broken off with another lover, Tim Maurice (53:21, 129).

Police, however, quickly focused the investigation on another former boyfriend. Evan Zimmerman had dated Thompson until she ended the relationship in May 1999, nine months prior to her murder (55:78). Police questioned Zimmerman within hours of finding the body and, with his consent, searched his apartment and confiscated his van (52:229; 54:132). During the next year, police repeatedly questioned Zimmerman, but failed to induce a confession

(*e.g.*, 54:172; 55:69).

Ultimately, the state charged Zimmerman with Thompson's homicide.   The state theorized that when Thompson was released from jail she met up with Zimmerman, he vented his anguish over the demise of their relationship by strangling her, and he then transported her, upright in the passenger seat of his van, to Laurel Avenue where he dumped her body (55:193-97).[1]

### The Evidence:

### *Obsession*

At trial, the state presented evidence that Zimmerman, an emotional man with an alcohol problem, had been obsessed with Thompson and devastated by their breakup some nine months before (52:181-87, 196-97, 220; 53:89, 101).  The state also presented evidence that after the breakup Zimmerman occasionally showed up at taverns where Thompson was drinking, or at her home, when she didn't want to see him (52:201; 53:28-29).  One witness testified that Thompson told her that Zimmerman had said that if he couldn't have her, nobody would (53:121).

Several of these witnesses admitted that nothing they observed led them to believe that he would harm Thompson (52:191, 209; 53:99, 123, 148).   They also testified that Thompson depended on Zimmerman after the breakup for help and money (52:198, 203).  Several witnesses noted that

---

[1] The state's theory of the case, and the evidence the state relied upon to support it, is graphically represented in an exhibit the state prepared for trial, which is reproduced in the Appendix (65:Exh.58; App. 115).

Thompson regularly borrowed his van, sometimes without his knowledge (52:226, 232; 53:22, 102, 160; 54:159; 55:81-83).

To suggest obsession, the state also introduced Zimmerman's computer diary, notes and emails, all relating to his relationship with Thompson (52:229-40). The diaries showed that he was having trouble getting over the relationship, but the entries ended nearly five months before Thompson's death (52:230). Email communication between the two continued through the end of December 1999 (52:239).

Other evidence showed that in the months prior to Thompson's death Zimmerman had expressed acceptance of her relationships with other men. Tim Maurice, who began dating Thompson in December 1999, explained that Zimmerman was not angry when he learned about the relationship, but rather told Maurice to treat Thompson well (53:134). Witnesses also reported that when Zimmerman learned that Thompson was planning to marry, Zimmerman said that it was okay with him and that he wished her luck and happiness (52:214-15; 65:Exh.187; 55:84). Another witness, Ronald Gibson, testified that Zimmerman dismissed "razzing" about Thompson's marriage with, "fuck that bitch," while drinking at the VFW (53:91-2).

### *"Guilty Knowledge"*

A significant part of the state's case rested on Zimmerman's own statements, collected by police during their year-long investigation.

The state contended that Zimmerman had knowledge of the offense on the day the body was discovered that was not yet public, and that only the murderer could have known.

In his opening statement, the prosecutor told the jury that on the afternoon Thompson's body was found police talked to Zimmerman at the VFW at 1:30 p.m.   According to the prosecutor:

> All the police told him and all the bartender told him was that Ms. Thompson had been killed not where she was located, not how she was killed.…
>
>     Mr. Gibson will tell you that [Zimmerman] told him that the body of Ms. Thompson had been located on Margaret Street.…   He knew where the body was located.  No one gave him that information.

(52:130.)

Ron Gibson then testified that Zimmerman told him on the afternoon the body was found that "Kathy was murdered. They found her up on Margaret Street gutted like a fish" (53:95).  Another acquaintance, Maureen Horne, testified that she spoke to Zimmerman mid-afternoon that day, and that Zimmerman said Thompson "had been murdered and that she had been disemboweled and strangled," and that her body had been found on Margaret Street (53:164).  Other witnesses also said Zimmerman told them that Thompson had been gutted (53:97).

Zimmerman's statements about the location and condition of the body were incorrect.  The body was actually found on Laurel Avenue, about a half-block from Margaret Street, and Thompson had not been disemboweled, but strangled (54:30; 52:169).[2]

---

[2] Months later, Zimmerman still had the facts of the murder wrong.  On May 3, 2000, he told police he believed Thompson had been strangled manually (54:11).  In fact, she was strangled with a ligature.

Nonetheless, the state portrayed this as guilty knowledge. Police testified that their first contact with Zimmerman was at about 1:45 p.m. the day the body was found (53:195). They said they told Zimmerman that Thompson had died, but told him nothing about the cause of death or where the body was found (53:196-97). Lieutenant Larsen then asserted that police "had received information about statements [Zimmerman] had made with regard to where the body was found and so on that we could find no way he would have known that" (55:16-17). In closing argument the prosecutor emphasized this point: "Mr. Zimmerman demonstrated piece after piece of guilty knowledge and made guilty statements" (55:197). He contended that Zimmerman knew too soon where the body had been found and that Thompson had been strangled (*id*.).

Zimmerman countered that he learned the (mis)information about the location and nature of the murder when he heard others discussing the murder at an Amoco station the morning the body was found (55:96-97). The state dismissed that claim as an excuse (55:197)("Mr. Zimmerman thought up an answer to that. I'll tell them that I went to the Amoco Station and I heard that it was on Margaret Street.").

In postconviction proceedings, Zimmerman claimed that the state knowingly presented false evidence when it contended that he had confidential information about the crime, and that defense counsel was ineffective for failing to expose that false testimony (59:83; 28:3-7). He presented evidence that the police had made all that information public long before he made his statements. One police press release, issued at 8:12 a.m.—hours before Zimmerman made any comments about the murder—stated that a woman had been found "unconscious on the side of the street at 1500 Laurel

-8-

Ave.  Responding officers found a woman, a 38 year old Eau Claire resident, to be deceased…. It is being investigated as a homicide" (66:Exh.A).

Another police report, dated February 26 at 7:49 a.m., indicated that an individual told police that "he had heard on the radio what had happened on Laurel … [and] that it was a 38 year-old younger woman that had been found this morning" (66:Exhibit B).

At the postconviction hearing Lieutenant Larsen admitted to having been aware of these reports at trial. He said he knew that both the location of the body and the fact that this was a homicide of a 38-year-old woman had been made public (59:61).  He admitted that his testimony claiming police could find no way Zimmerman would have known about the location and other facts was "incomplete," but asserted nonetheless that it was "accurate" (*id*.).

Zimmerman also claimed that defense counsel was ineffective in failing to respond to Maureen Horne's testimony that he knew that Thompson had been strangled before that fact became public (28:6-7).  He claimed that counsel could have impeached Horne with four separate statements, taken within days of the murder, in which she stated that Zimmerman told her (incorrectly) only that Thompson had been gutted (66:Exh.C-1, C-2, C-3, C-4).  Not until four months later, long after the fact of the strangulation had become public information, did Horne revise her account. She then, for the first time, told police that Zimmerman also had said that Thompson had been strangled (66:Exh.C-5). Even then, she said it was possible that Zimmerman made this remark at some later time (*id*.).  Police also noted that she "seemed to become more certain about that claim after we

talked some more" (*id*.). Defense counsel did not impeach Horne with any of this information.

### *"Alibi" Statement(s)*

The state also contended that Zimmerman made contradictory statements about what he had done the night Thompson died that constituted inconsistent alibis (52:131). Police admitted that, when they took some of these statements, Zimmerman appeared intoxicated (54:174).

First, Detective Adams testified that, on the evening the body was found, he spoke to Zimmerman in his apartment (54:132). Adams said Zimmerman explained some beer cans in his apartment, stating "that he had partied with Lowell [Brown], the next door neighbor" the night before (54:134-35). Zimmerman, however, testified that he had only told Adams that he sometimes partied with Brown; he did not claim to have partied with him the night of the murder (55:93).

Indeed, the next day when Zimmerman spoke with a work acquaintance, Shane Eckwright, he told him that he had been "with Dan Cox and Ron Gibson" the night of the murder, and that he had been questioned by police (53:152). Zimmerman also told Eckwright that he didn't think he needed an attorney "because he had nothing to hide" (53:155). At trial, Gibson and Cox, both state's witnesses, confirmed that they had indeed been with Zimmerman at the VFW bar from approximately 12:45 a.m. until just before 2:30 a.m. on the night of the murder (53:91, 100-01).

Next, police claimed that Lowell Brown reported that Zimmerman told him two days after the murder that he had spent the night of the murder with a friend, Diane Steinke

-10-

(54:147).  At trial, however, Brown denied recalling that conversation, but conceded that, if it was in a police report, he probably said it (53:170).  Steinke also denied telling police that Zimmerman stayed at her house the night of the murder (53:183).

Two months later, on May 3, 2000, police asked Zimmerman to explain all he had done that evening. Zimmerman explained that at bar time, after he left VFW, he went by Diane Steinke's home and knocked on her door, but did not get a response (54:6; 55:91-92).[3]  Steinke testified that she was home at the time, but has a hearing problem caused by a head injury and did not hear the door (53:189).

Zimmerman also told police on May 3 that after he left Steinke's home he went by the home of his neighbor, Lowell Brown, and hollered up to him to get up and have a beer with him (54:6).  He got no response, so he went home, let out his dog, and went to bed (54:7).  The state presented Brown's testimony confirming both that he heard Zimmerman holler at him and that he didn't answer (53:69).

Finally, three-and-a-half months later, on August 23, 2000, when police again pressed Zimmerman to account for all he had done the evening of the murder, he explained that he left the VFW, went by the home of another friend, Jim Stefanic, but saw no car, proceeded to Diane Steinke's home but could not get an answer, went home, hollered up to Lowell Brown, walked the dog, and then went to bed (54:171).  In his trial testimony, Zimmerman confirmed this

---

[3] Zimmerman had similarly told police, on March 1, 2000, that he had stopped by Steinke's house.  According to police, at that time, he said he did not do anything else after knocking on Steinke's door except go home to bed (54:142-43).

-11-

sequence of events (55:91-94).

No witnesses testified that any part of this sequence was untrue.  Instead, the state contended that Zimmerman was lying because he "told the police … five to six different stories about what had happened" (52:131).

### *"Admissions"*

The state also contended that, although Zimmerman steadfastly maintained his innocence, several of his responses to police questioning were incriminating.

Police testified that, while questioning Zimmerman, they told him they had an eyewitness who saw him with Thompson the night of the murder.  Chief Deputy Foster testified that Zimmerman responded, "they couldn't have seen—I want to get this right.…  Nobody saw us I think it was the way it was" (54:166).  Another officer testified that Zimmerman responded, "Who saw me?" (55:70).  On cross-examination, Foster admitted that Zimmerman actually said, "Nobody saw us because we weren't together" (54:172).  Foster claimed there was a "pause" between the two parts of that statement (54:173).

Foster also testified that "Lieutenant Larsen asked Evan that, in the event he was responsible for this situation if he went to his daughter, Jamie, and asked for forgiveness would she forgive him and he replied yes" (54:167).

Another officer testified that when Zimmerman expressed difficulty remembering all that had happened, police asked if he had experienced blackouts (55:69).  According to the officer, "Ev stated that he hadn't had any blackouts for years" (55:69).  The officer then asked if it was

-12-

possible he "could have done this thing while having a blackout and not know it" (*id*.). Zimmerman responded: "It would be, it's a possibility that that could have happened" (*id*.). At trial, Zimmerman explained that the blackout discussion was hypothetical, and that all he meant was that it was theoretically possible something like this could happen during a blackout (55:112-13, 145).

The state argued to the jury that these various responses constituted "admissions" (55:199).

### *Physical Evidence*

The state's theory was that Zimmerman met Thompson, murdered her, and then transported her in his van to Laurel Avenue where he dumped her body (55:193-97). But no physical evidence linked Zimmerman to that site, or linked Thompson to Zimmerman or his house or van that evening.

Zimmerman had a white and rust beagle-springer (55:94) and the interior of his van was covered with dog hair (55:33, 94). Thompson had a cat. Investigators found numerous cat hairs on Thompson's black sweater and black jeans, but not a single dog hair (55:34-35). Nor did investigators find any cat hairs inside Zimmerman's van (55:35). No traces of Thompson's DNA were found anywhere in the van (55:36), except on hairs in a hairbrush in the van, a brush that Zimmerman explained Thompson had used on the many occasions she had borrowed his van (55:80-81). No fingerprints linked Zimmerman to the crime scene, or Thompson to the van (55:7-9). Fibers found wedged in Thompson's shoe did not match Zimmerman's van or home (55:38-40).

Physical evidence collected at the area where Thompson was found included cigarette butts, hairs found on her body, and scrapings from her fingernails (59:71-73). DNA testing was conducted on that evidence. At trial, the prosecutor asked Lieutenant Larsen: "Was any identification made through that testing or any evidence generated that would provide any insight into the crime here?" Larsen answered: "No" (55:5).

In his postconviction motion Zimmerman claimed that defense counsel erred because he failed to reveal that DNA testing did produce probative results, and those results were exculpatory (28:8-9). In fact DNA testing on the cigarette butts, hairs, and fingernail scrapings conclusively *excluded* Zimmerman, and even produced a profile of an unknown male (59:71, 72, 73). Additionally, DNA testing on beer cans found in Zimmerman's van revealed only Zimmerman's DNA, which he claimed should have been presented as evidence that Thompson did not drink beer with him in his van before she was killed (59:74; 40:4). Defense counsel admitted that his failure to introduce the DNA results was a mistake (59:141-44).

### The "Eyewitness"

On April 15, 2000, a Saturday morning nearly two months after the murder, police conducted a traffic survey near the crime scene, stopping drivers to ask if they had been in the area on the morning of the murder (54:80). Police asked four questions, including whether the citizen had seen a white van on that morning. Police showed those they stopped three pictures of Zimmerman's van (54:81). A man named Brice Rene told police he had seen a white van with a female passenger in it, either passed out or asleep, that morning

-14-

(54:82).  Rene said he believed the van he saw was the one in the pictures, but was not sure (54:84).  He believed he saw the van at 5:30 a.m. (54:84).  Rene said he never saw the driver of the van, and did not identify or describe the woman he saw (54:87-88).

Police questioned Rene on several occasions, and eventually had him hypnotized by Dr. Roger McKinley (65:Exh.77).  At trial, Rene testified about his observations, and the jury then viewed a lengthy videotape of Rene being questioned under hypnosis (54:112, 122; 65:Exh.77).  By the time of trial, Rene had changed his original statement to indicate that the van might have turned in front of him instead of behind him (thereby offering him a better view of the passenger), that the woman in the passenger seat was in her mid-thirties and had shoulder-length brunette hair (matching Thompson), and that he saw the van at 5:20 a.m. (54:116), rather than between 5:30 and 6:00 a.m., as he originally told police (the body was found at around 5:45 a.m.).  At various times, Rene also described the van as possibly having a blue stripe (Zimmerman's van had woodgrain paneling, not a blue stripe), and as possibly being a Ford (Zimmerman's was a Dodge Caravan)(65:Exh.77).

In his postconviction motion, Zimmerman claimed that counsel was ineffective because he failed to challenge the admission of the hypnotically refreshed testimony and purported identification; failed to impeach the hypnotically refreshed testimony with expert testimony; and failed to cross-examine Rene adequately to reveal inconsistencies in his various statements (cross-examination consisted of only two questions (54:127))(28:12-24).  At the postconviction hearing Professor Alan Scheflin, an expert on hypnotically refreshed testimony, testified that the hypnosis session in this case was

-15-

impermissibly suggestive and violated standards established by the Wisconsin Supreme Court, and that the violations rendered the testimony unreliable (60:4-46).

### *Medical Testimony*

The state also produced medical examiner testimony that it claimed corroborated the inference that Rene observed Zimmerman driving Thompson to the Laurel Avenue site. The medical examiner, Dr. Michael McGee, testified that Thompson might have been strangled in Zimmerman's van by someone sitting on the driver's side of the van while she sat in the passenger seat (54:67). He also testified that a telephone cord found in Zimmerman's van might have been the instrument used to strangle Thompson (54:48). He also testified that nasal secretions occurred while her head was in an upright position—not while she was lying on the curb where her body was found—suggesting she might have been unconscious or dead while sitting upright in the passenger seat of the van (consistent with what Brice Rene claimed to have seen)(54:52-54). Dr. McGee also said that, while he could not rule out sexual assault, he did not believe that this was a sex crime (54:58, 70).

Defense counsel argued that there was no evidence linking the murder to Zimmerman's van, and that the kinks in the phone cord were inconsistent with the ligature mark on Thompson's neck (55:208). But the prosecutor argued in closing that, although the location of the murder could not be identified with certainty, "Dr. McGee's autopsy and findings support what Mr. Rene tells you…. Her physical condition when he examined her body, his observation of the van, … Dr. McGee told you was consistent with her being strangled in that van" (55:196).

-16-

In the postconviction proceedings Zimmerman presented expert medical examiner testimony that refuted Dr. McGee's conclusions, and he claimed that his attorney was ineffective in failing to consult an alternate medical examiner (28:9-12). Dr. Jeffrey Jentzen, forensic pathologist and Milwaukee County Chief Medical Examiner, disagreed with Dr. McGee's conclusion that the telephone cord could have been the murder weapon (59:89, 91).[4] He also testified that it was unlikely that Thompson was strangled by someone sitting in the driver's seat of a van (59:92). Dr. Jentzen also disagreed with Dr. McGee's conclusion that the nasal secretion on Thompson's face occurred while she was sitting upright; Dr. Jentzen concluded that the secretion pattern was consistent with being formed post-mortem, while the body lay as it was found (59:101).

Dr. Jentzen also disagreed with Dr. McGee's opinion that this was not a sexually motivated crime (59:102). Dr. Jentzen testified that several factors suggested a sexual assault by a stranger, including the placement and position of the body, the partial undressing, the bruise to Thompson's breast, strangulation, the fact that the body was left in an open area in full view, and the absence of facial injuries (59:103, 105-6).

Trial counsel testified that he did not consider obtaining an expert to determine whether Dr. McGee's conclusions could have been challenged (59:146). After hearing Dr. Jentzen's conclusions, however, he conceded that such testimony would have been helpful (59:146).

---

[4] Dr. Jentzen also consulted with colleagues, Dr. John Teggatz and Dr. Alan Stormo, who concurred in each of his opinions (59:85).

### Other Postconviction Claims

Zimmerman's postconviction motion raised a number of additional claims of ineffective assistance of counsel. The motion also alleged newly discovered evidence, including evidence that another man, who had more recently dated Thompson and was behaving suspiciously towards her on her wedding day, more likely committed this crime (28:41-45). He also offered evidence of a link between this homicide and another, similar strangulation murder, which Zimmerman could not have committed. Because the facts supporting these claims are complex and are intertwined with the legal arguments, they are set forth in the argument section of this brief.

### Trial Court Decision

The trial judge dismissed most of the postconviction claims as largely irrelevant because the evidence Zimmerman sought to undermine was not important (41:3). Without explanation, the court also asserted that Zimmerman's erroneous statement that the body had had been found on Margaret Street "was more accurate" than the police reports confirming that the body was actually found on Laurel Avenue (*id*.). The court concluded that "Zimmerman was primarily convicted on the basis of his own multiple statements to investigators assigned to the case" (41:3, 8-9).

### ARGUMENT

### I.    THE EVIDENCE WAS INSUFFICIENT.

The trial court was probably right. Evan Zimmerman "was primarily convicted on the basis of his own multiple statements to investigators…" (41:8-9). In response to

-18-

Zimmerman's challenges in the postconviction proceedings, both the state and the court repeatedly dismissed the significance of most of the evidence on the basis that it wasn't very important (34:6-7, 10, 12, 23; 41:3-5, 9). That left little beyond Zimmerman's own statements. The problem with the trial court's conclusion, however, was that Zimmerman's statements were insufficient—either alone or in combination with any other evidence the state mustered—to support a finding of guilt beyond a reasonable doubt.

Sufficiency of the evidence is reviewed under the same standard whether the evidence presented at trial was direct or circumstantial. ***State v. Poellinger***, 153 Wis.2d 493, 503, 451 N.W.2d 752 (1990). Under that standard, "an appellate court may not substitute its judgment for that of the trier of fact unless the evidence, viewed most favorably to the state and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." *Id*. at 507. That is not to say, however, that *any* relevant evidence will suffice. In ***Jackson v. Virginia***, 443 U.S. 307 (1979), the Supreme Court held that a "no evidence" standard does not meet due process demands:

> [A] mere modicum of evidence may satisfy a "no evidence" standard …. Any evidence that is relevant—that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence … could be deemed a "mere modicum." But it could not seriously be argued that such a "modicum" of evidence could by itself rationally support a conviction beyond a reasonable doubt.

*Id*. at 320.

While there certainly was *some* evidence in

Zimmerman's case, none of it was sufficient to convince any juror acting reasonably of guilt *beyond a reasonable doubt*. The court relied primarily on three types of statements— allegedly false alibis, alleged admissions, and statements of alleged guilty knowledge—but none proved guilt.

That the state *claimed* Zimmerman's various statements about his activities on the night of the murder were false alibis did not make them so. The evidence merely showed that, over many months of repeated questioning, often conducted while Zimmerman was intoxicated and referring to events that occurred when he was drunk, Zimmerman recalled different details at different times. Ultimately, Zimmerman pieced it all together and said he had in fact done each of the things he told police about—he first spent time with Cox and Gibson at the VFW, then drove by Jim Stefanic's home but saw no one home, then went by Diane Steinke's home but could get no response at her door, then hollered at his neighbor, Lowell Brown, to have a drink with him, but got no response from Brown, and then walked his dog and went to bed.

The state did not dispute much of this. The state presented Cox and Gibson's testimony showing they were with Zimmerman at the VFW until almost 2:30 a.m. The state presented Brown's testimony confirming that he heard Zimmerman holler to him.

Police officers did testify that Steinke and Brown told them that Zimmerman had claimed he spent the night with Steinke, although Steinke denied telling police that, and Brown denied recalling it (53:169-70). Police never claimed Zimmerman made that claim to them. Finally, although police contended Zimmerman initially told them he had

partied with Lowell Brown the night of the murder, Zimmerman testified he was talking about other evenings.

Even considering the evidence in the light most favorable to the state and thus assuming that the jury accepted the police versions, these were at most minor inconsistencies about what Zimmerman did that night. Such inconsistencies are not proof of much. As Justice Stevens has observed, even "the most honest witness may recall (or sincerely believe he recalls) details that he previously overlooked." *Nix v. Whiteside*, 475 U.S. 157, 190-91 (1986)(Stevens, J., concurring).

Even if Zimmerman had wholly fabricated an alibi (which the evidence does not support), that would not be sufficient to prove guilt beyond a reasonable doubt. In *Stewart v. State*, 83 Wis.2d 185, 265 N.W.2d 489 (1978), the Wisconsin Supreme Court found the evidence insufficient to support a burglary conviction even though the defendant admitted he fabricated a story to support his claim of innocence. The court held that "a negative inference drawn from the witnesses' testimony is, standing alone, insufficient to support a conviction and that there must be independent support in the evidence for what is inferred." *Id*. at 193.

Similarly, in *Peters v. State*, 70 Wis.2d 22, 30-31, 233 N.W.2d 420 (1975), the court held that evidence of a fabricated alibi, while admissible, had only "slight" probative value: "It must be emphasized … that fabrication of alibi cannot be relied upon by the state as affirmative proof of elements as to which it has the burden of proof. The state must prove beyond a reasonable doubt all elements of the crime … by evidence independent and separate from the evidence relating to the fabrication of alibi." *See also Jentges*

***v. Milwaukee County Circuit Court***, 733 F.2d 1238, 1241 (7ᵗʰ Cir. 1984)("a conviction based solely upon the disbelief of [a] defendant's statements cannot stand"); ***Bose Corp. v. Consumers Union***, 466 U.S. 485, 512 (1984)("Normally … discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."); ***Bituminous Casualty Corp. v. United Military Supply, Inc.***, 69 Wis.2d 426, 434-35, 230 N.W.2d 764 (1975)(a party does not satisfy the burden to prove a fact "solely on the rejection of contrary testimony").

The state also claimed that Zimmerman made "admissions"—that he questioned who could have seen him with Kathy Thompson the night of the murder because he was not with her that night; that he said his family would forgive him if he had done something like this; and that he agreed it was possible such a crime could have been committed during a blackout. These innocuous responses could not lead any rational juror to conclude beyond a reasonable doubt that Zimmerman had committed murder.

For months police engaged in standard interrogation tactics: They tried to make Zimmerman believe his defense was hopeless because they had sufficient evidence—including an eyewitness—to convict him; they suggested it would be better for his family if he confessed; they posed a hypothetical about a blackout that would minimize his culpability. But the interrogation techniques utterly failed to induce the hoped-for confession. This was evidence of innocence, not evidence of guilt. Even viewed in the light most favorable to the state it amounts to virtually nothing.

Finally, the "guilty knowledge" statements cannot support the guilty verdict. As it turns out, that evidence was inaccurate and the state's contentions to the contrary were

false and misleading, as explained below. But even accepting the state's erroneous contentions at face value, Zimmerman's statements added little to establishing proof beyond a reasonable doubt. Showing that he was close but wrong on the location of the body,[5] and way off on the cause of death, doesn't prove anything. One witness added, after police interviewed her repeatedly, that Zimmerman might have also said that Thompson was not just gutted, but also strangled. But that was still wrong, as there were no knife wounds. The state used this evidence in a highly prejudicial manner by repeatedly contending that Zimmerman had guilty knowledge, but the evidence showed that in fact he had no such knowledge. This was not proof of murder. As the trial court asserted, "[i]n the big scheme of things, this testimony was not very important" (41:3).

The remainder of the evidence did not make up for these deficiencies. In postconviction proceedings the state listed nine pieces of evidence that it believed to be most compelling (34:26). Three of those consisted of Zimmerman's statements, discussed above. The other six included evidence that:

1.    Zimmerman was obsessed with Thompson.

2.    The obsession continued into the winter of 2000.

---

[5] Indeed, Zimmerman's mistake about Margaret Street was much more consistent with learning innocently of the location of the body than guilty knowledge, since police said the entire block of Laurel Avenue was blocked off at both ends after the body was found (55:4), meaning bystanders would have seen the blockade on Margaret Street. Talk in the community thus understandably might have referred to Margaret Street, but the real killer would not have made that mistake.

3.    Zimmerman was emotionally unstable during the winter of 2000.

4.    After her wedding, and before she was arrested, Thompson asked a friend to take her by Zimmerman's home (the friend declined).

5.    Thompson's hair was found in a hairbrush in Zimmerman's van.

6.    Brice Rene saw a white van with a woman who appeared to be passed out or sleeping in the front passenger seat in the vicinity where the body was found.

None of this evidence proved Zimmerman a murderer. Brice Rene expressly stated that he did not know if the van he saw was Zimmerman's, or if the woman in the passenger seat was Thompson, and he never even saw the driver. His description of the van also did not fit, as he thought it might have had a blue stripe (Zimmerman's had wood paneling) and that it might have been a Ford (Zimmerman's was a Dodge). As the trial judge put it, "Mr. Rene saw a white van containing a sleeping female. Mr. Rene's identification was inconclusive as to every other aspect of the case" (41:5).

Nor does it prove much that Thompson asked a friend to go with her to see Zimmerman before she was arrested that night. There is no evidence she wanted to see him after she was released from jail hours later. Indeed, she told police she just wanted to walk home at that time (53:66-7). Her hair in the hairbrush in the van meant little, as it was undisputed she had used Zimmerman's van on numerous prior occasions. The state claimed the brush proved Thompson had been in the van that night because Diane Steinke didn't see the brush in

-24-

the van three weeks earlier (53:180-81), but Steinke also didn't notice other things in the van, including a brightly colored plastic baseball bat (53:189; 55:45).

The rest of the physical evidence powerfully showed that Thompson had not been in Zimmerman's van that night. No DNA or other physical evidence linked the two (aside from the hairbrush). Particularly, Thompson, who wore black jeans and a black sweater, had no dog hair on her. Anyone who has been around a dog knows it is impossible to ride in a car covered with dog hair without picking up hairs. Nor did Thompson, who had cat hairs on her, leave any cat hairs in the van. Thompson simply was not in Zimmerman's van that night. And if she wasn't in the van, the state had no explanation whatsoever of how Zimmerman killed her and managed to get her to the location where her body was found.

Accepting the state's evidence and the reasonable inferences from it, Zimmerman may have been infatuated with Thompson. But that hardly proves he killed her. All the state can do is speculate about what happened that night. Speculation cannot meet the due process requirement of proof beyond a reasonable doubt. *See Piaskowski v. Bett*, 256 F.3d 687,693 (7th Cir. 2001)("each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation"; conviction reversed because based upon "conjecture camouflaged as evidence").

## II. THE COURT PERMITTED THE STATE TO RELY ON SPECULATION TO CONNECT ZIMMERMAN WITH THOMPSON ON THE NIGHT OF THE MURDER.

The state needed a way to link Zimmerman and

Thompson on the night of the murder. Without an identified murder scene, and no explanation for how Zimmerman could have known of Thompson's release from jail at 3:00 a.m., the state resorted to asking witnesses to speculate about what Thompson might have done. The prosecutor asked Loretta Harris and Sonja Knudtson whom they believed Thompson "may have gone to" or "would have sought out" upon her release from jail (52:204, 223-24). Defense counsel objected that the question called for "rank speculation" (52:204, 224). The court permitted the testimony as lay opinion under §907.01 (52:206, 224). Both witnesses testified that, in their opinions, Thompson would have gone to see Zimmerman (52:208, 224).

Under Wis. Stat. §907.01, opinion testimony offered by a lay witness is admissible if it is "limited to those opinions or inferences which are rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." In this case, the state invited, and the court admitted, speculation that violated this rule.

Admission of evidence is reviewed for an erroneous exercise of discretion. *Wester v. Bruggink*, 190 Wis.2d 308, 317, 527 N.W.2d 373 (Ct.App. 1994). A trial court errs under §907.01 if it admits lay opinion that is "not based on perception." *Id*. at 318. The opinions offered by Harris and Knudtson were not based upon any perceptions of what Thompson was doing when she left the police station; neither of them was with her at the time. The two merely *speculated* about what she might do under such extraordinary circumstances. The court permitted trial by speculation.

The state cannot meet its burden of proving the error

harmless beyond a reasonable doubt. The importance of this evidence to the state's case can be understood from the prosecutor's closing argument:

> Thompson went to Zimmerman's during the early morning hours of February 26th. What evidence tells us that? You heard both Loretta Harris and Sonja Knudtson say she's out of jail, she's embarrassed she's just been arrested. She would have went [sic] to Evan Zimmerman no doubt.

(55:194.) Admission of this speculation as lay opinion testimony was critical to the very tenuous case the state patched together.

## III. THE STATE KNOWINGLY PRESENTED FALSE EVIDENCE.

A new trial is also warranted because the state knowingly used false testimony. A conviction obtained through the knowing use of false evidence violates due process. *United States v. Agurs*, 427 U.S. 97, 103 (1976). A new trial is required if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id*.

The state presented false testimony on two points. First, Lieutenant Larsen testified that several potential alternative suspects—men with whom Kathy Thompson had been corresponding while they were in prison—were incarcerated at the time of the murder (55:17-18). Larsen's testimony was false, and records in the prosecutor's file confirmed this. At the postconviction hearing Larsen admitted that he knew that one of these inmates, Brian Bennett, had been paroled weeks before the murder and was living in an unlocked halfway house, six blocks from

Thompson's home (66:Exh.N & O).  Larsen also admitted that he knew Bennett was trying to reach Thompson just days before her death (59:53-56).

Larsen said that he nonetheless testified that all of the inmates were incarcerated because he considered Bennett's parole to be incarceration (59:48).  This testimony was obviously meant to deceive.  The point of asking Larsen if all of the prison pen pals had been incarcerated was to show that it would have been impossible for any of them to have committed the crime, and the state clearly knew that wasn't true.  Zimmerman does not claim that Bennett is now a viable suspect, and thus on its own this deceit might not warrant a new trial.  But the fact remains that the state misled the jury on this point.  And this inaccurate testimony does not stand alone.

The state also knowingly presented false testimony when it claimed that Zimmerman had "guilty knowledge" about the location and nature of the crime.  Although the evidence really proved little—since it mainly showed only that Zimmerman had *incorrect* information about the crime— the state *used* this information in a way that made it extremely prejudicial.   The state repeatedly told the jury that Zimmerman had knowledge about the crime and that police could find no way he would have had that information unless he was the murderer.  Yet the state knew full well that the claim was untrue.

At the postconviction hearing Larsen admitted that he knew that the information about the location and nature of the crime had been made public before Zimmerman said anything about the murder (59:60).  He claimed that, "[h]ad the questioning gone further," he would have explained that he

thought it was significant that Zimmerman said Margaret Street, which was about 50 feet from the actual site on Laurel Avenue (59:58), and that police "couldn't establish why he would say the body was on Margaret Street which is a street that is commonly known" (59:60). He admitted, however, that that was not what he said in his testimony, and that his testimony was "incomplete" (59:60-61).

When the trial court ruled on Zimmerman's false testimony claim the court focused solely on the testimony about Brian Bennett. The court simply ignored the second perjury claim, although it was the more important misrepresentation, for it was one of the few pieces of evidence that the state could claim linked Zimmerman to the crime. And the jury obviously was troubled by this evidence; during deliberations the jury sent the judge a specific question asking, "when did it become public through radio, newspaper, TV, et cetera, that she had been strangled?" (55:235). The state's knowing use of false and misleading testimony and argument violated Zimmerman's right to due process.

## IV. DEFENSE COUNSEL PROVIDED INEFFECTIVE ASSISTANCE WHEN HE FAILED TO USE AVAILABLE EXCULPATORY EVIDENCE AND FAILED TO OBJECT TO IMPERMISSIBLE EVIDENCE AND ARGUMENT.

The state had no eyewitness, no physical evidence, and no confession. Because of the insufficiency of its evidence, the state sought to construct a case out of multiple intersecting inferences drawn from essentially insignificant facts, stretching the bounds of reason and the rules of evidence and due process along the way. Counsel repeatedly failed to respond to the state's incremental overreaching. These errors

permitted the jury to convict on the basis of highly prejudicial evidence that lacked real probative value.

Claims of ineffective assistance of counsel are reviewed under the two-prong standard established in **Strickland v. Washington**, 466 U.S. 668, 687 (1984). The defendant must prove both deficient performance and prejudice.

### A. Counsel failed to expose the state's false claim of "guilty knowledge."

While the state presented false testimony when it claimed that Zimmerman had guilty knowledge, defense counsel also erred by failing to respond to that claim. The records proving that the information had been made public were in discovery documents provided to defense counsel (66:Exh.A). Counsel failed to use that evidence to demonstrate that Zimmerman had no "guilty knowledge."

Counsel didn't know about those police reports and press releases because he never read them. Counsel admitted that he did not read all of the 4,000 pages of discovery, relying instead on his investigator to read them (59:124). He also admitted that it was critical to the defense that he demonstrate that Zimmerman had an innocent source for his information (59:131). He believed incorrectly that police officers had testified that they told Zimmerman about the location of the body (59:131). Counsel admitted that if he had known about the police reports he would have wanted to use them, and that failing to do so was error. He testified: "Should have been put in, you bet" (59:132), and "I should have done that" (59:133).

Defense counsel also erred by failing to utilize police

-30-

reports to impeach Maureen Horne's claim that Zimmerman told her on the day of the crime that Thompson had been "disemboweled and strangled" (53:164). Counsel should have known from the police reports that Horne made four statements between February 26th and 28th in which she consistently told police that Zimmerman said only that Thompson had been found on Margaret Street "gutted like a fish" (66:Exh.C-1, C-2, C-3, C-4). It was not until almost four months after the murder, long after the cause of death was widely known, that Horne first claimed that Zimmerman told her that Thompson was also strangled (66:Exh.C-5). Even then, Horne was not sure whether Zimmerman had discussed strangulation on the 26th or on some later date (66:Exh.C-5). And police bolstered her confidence in the revised statement; Detective Adams said she became more certain about her claim after "we talked some more" (66:Exh.C-5).

Counsel admitted that it would have been important to use these prior statements and conceded he erred; he said he did not recall the relevant police reports and had no strategic reason for not using them (59:133-36). Given the significance of the matter to resolving whether Zimmerman had any true "guilty knowledge," the error was prejudicial.[6]

---

[6] Counsel also failed to impeach other witnesses with prior inconsistent statements. For example, the, state elicited inflammatory testimony through Jay Schaaf that Zimmerman had made hostile and sexually vulgar comments about Thompson, although Schaaf asserted the comments were insignificant bar talk among men that he never took seriously (53:147). Counsel attempted to minimize the impact of the statements, but failed to cross-examine Schaaf with evidence (from police reports and counsel's investigator) that Schaaf had said it was possible that he, not Zimmerman, made the comment (59:39-40).

### B. Counsel failed to present DNA test results excluding Zimmerman.

At trial Lieutenant Larsen testified that no physical evidence found at the crime scene "provided any insight into the crime" (55:5). That testimony suggested that DNA results were inconclusive. But the DNA test results were not inconclusive. At the postconviction hearing, Larsen acknowledged that DNA profiles had been developed from a cigarette butt, hairs found on Kathy Thompson's clothing, and Thompson's fingernail scrapings (59:71-73). The profiles *excluded* Zimmerman and included at least one unknown male (59:71-73).

Additionally, beer cans gathered from Zimmerman's van contained only Zimmerman's DNA profile (59:74). Trial evidence showed that Zimmerman purchased beer as he left the VFW on the night of the murder, and that he drank it on the way home (53:109, 55:91-93). Lieutenant Larsen acknowledged that Thompson had attempted to find beer prior to her arrest and that after her death police found no beer in her home (53:30; 66:Exh.I). The absence of Thompson's DNA on the beer cans therefore suggests that, wherever Thompson found something to drink (stomach contents indicated she consumed fluids after 1:00 a.m. (66:Exh.H)), it was not with Zimmerman in his van.

Thus, DNA evidence was available that excluded Zimmerman and included some other unknown man. This was important evidence of innocence. But counsel failed to inform the jury of it. Counsel admitted that it was a mistake to fail to offer evidence about the DNA test results (59:142).

---

Counsel had no strategic reason for failing to impeach Schaaf with his prior statements (59:139).

The trial court dismissed this claim, as it did most of Zimmerman's claims, by contending that the DNA test results on the cigarette butt were not important (41:3-4). But the court wholly ignored the DNA results from the hairs, the fingernail scrapings, and the beer cans. Plainly each of these items was important—that's why the state tested them—and the fact that Zimmerman was actually excluded was a critical piece of information the jury should have heard. Counsel's non-strategic failure to present this evidence violated Zimmerman's right to effective assistance of counsel.

### C. Counsel failed to obtain and present alternative medical examiner testimony.

Counsel also erred by failing to consider challenging the state's medical testimony with his own medical expert. That failure had grave consequences, as demonstrated by the testimony presented at the postconviction hearing by Milwaukee County Medical Examiner Dr. Jeffrey Jentzen. Dr. Jentzen rebutted most of the medical evidence the state had used at trial to support its murder-in-the-van scenario.

The trial court rejected this claim of ineffective assistance because it concluded that the medical evidence, like so much else at trial, was insignificant (41:4). Medical evidence, however, was important not only to the state's claim that the murder of Thompson was an intimate, personal crime, but also to its theory that Brice Rene witnessed the crime.

The only direct evidence linking Zimmerman and Thompson on the morning of the murder was Rene's testimony about a white van with a woman passed out or sleeping upright in the passenger seat. The state used the testimony of Medical Examiner Michael McGee to argue that

Rene saw Zimmerman transporting Thompson in his van (52:125-26). The state relied on Dr. McGee's opinions that the nasal secretions indicated Thompson had been seated upright after death. Consistent with that theory, Dr. McGee also testified that the telephone cord found in the van could have been the murder weapon, and that blunt trauma wounds to Thompson's head could have been caused by contact with the van's walls or door (54:126).

Zimmerman's defense depended upon establishing that he and Thompson had no contact that night. But counsel could not effectively counter the state's medical testimony without his own expert.

Counsel offered no strategic reason for deciding not to pursue an alternate medical expert. He said he simply never thought of it, or didn't think he needed it. He also testified that, having seen Dr. Jentzen's report after trial, he recognized that it would have been helpful (59:146).

Dr. Jentzen's testimony would have presented a very different picture than the one heard by the jury. Dr. Jentzen contradicted Dr. McGee's testimony on most of the critical issues, as demonstrated by the following chart.

| Dr. McGee | Dr. Jentzen |
|---|---|
| Telephone cord found in Zimmerman's van could have been the murder weapon (54:48). | Telephone cord could not have been the murder weapon, as the ligature left a wide, webbed, fabric-like pattern and buckle-mark (59:89, 91). |

| | |
|---|---|
| Nasal secretion pattern indicates formation while body was seated upright, as if in a van (54:53-54). | Nasal secretion pattern consistent with being formed post-mortem, while the body was lying down (59:100-1). |
| Wounds on body could have been caused by contact with the van's walls or door (54:51). | Wounds on body inconsistent with being inflicted in a vehicle and would have left behind biological material (none was found)(59:94-6, 98, 113). |
| Thompson might have been strangled while she sat in the passenger seat and her attacker sat in the driver's seat of a vehicle (54:51). | Thompson was strangled from the left posterior, a position "inconsistent with [being strangled by] someone sitting in the driver's seat" (59:92). |
| Not a sex-related crime (54:58). | Breast bruising, ligature, partial undressing, lack of facial injuries, and body left in plain view suggest a sex-related crime by a stranger (59:103, 106). |

Although the state did not claim to know each particular of the van-as-crime-scene scenario, the state's case depended upon the jury accepting that scenario in its basic outlines. If the jury had been offered evidence that exposed the fundamental flaws in that scenario there is more than a reasonable probability that the result of the proceeding would have been different.

A final point is also significant.  According to Dr. Jentzen, the autopsy indicates Thompson died with the equivalent of an 8 to 10 oz. drink in her system, and that fluid was likely consumed after 1:00 a.m. (59:107-8).  Because Thompson was unsuccessful in her efforts to find something to drink at her home before she was arrested and there is no evidence she drank at the jail, it is probable that she found something to drink after she was released.  Because DNA testing confirmed that only Zimmerman drank from the beer cans found in his van, it is unlikely she drank with Zimmerman in his van.  Without the expert assistance, counsel had no way of understanding that the autopsy reports provided this additional evidence refuting the contention that Thompson and Zimmerman were together that night.

Where expert testimony is key to linking the defendant to the crime scene, and the defense depends on establishing "that there was no objective evidence placing him at the scene," it is "irresponsible of the lawyer not to consult experts."  ***Miller v. Anderson***, 255 F.3d 455, 459 (7th Cir. 2001).  In ***Rogers v. Israel***, 746 F.2d 1288 (7th Cir. 1984), the court found ineffective assistance under similar circumstances.  Because the defendant showed that medical evidence could have been produced to counter key parts of the state's case, the failure to consult with a pathologist was "unreasonable and could not have been based on sound trial strategy."  *Id*. at 1295.  Likewise, in this case, counsel's failure to obtain an alternative medical opinion constituted ineffective assistance.

### D. Counsel failed to challenge adequately the hypnotically refreshed testimony.

Counsel was also ineffective in failing to challenge

Brice Rene's testimony directly.  Counsel should have moved to suppress Rene's testimony because the attempts to refresh his memory hypnotically violated the safeguards established in *State v. Armstrong*, 110 Wis.2d. 555, 329 N.W.2d 386 (1983), and rendered the testimony unreliable.  Counsel also failed to offer expert testimony on hypnotically refreshed testimony.  Counsel did nothing but cross-examine, and his cross-examination consisted of only two questions (54:127).

Counsel testified that he didn't move to suppress under *Armstrong* because he wanted the jury to see the videotape of the hypnotism session, showing that Rene had made inconsistent statements (59:148).  But, plainly, counsel would have preferred to suppress the testimony altogether, as he moved to suppress Rene's testimony in limine on relevancy grounds (69:14-17).  There could have been no strategic reason for failing to move to suppress under the stronger basis afforded by *Armstrong*.

In *Armstrong*, the court recognized the dangers of hypnotically refreshed testimony:  the extreme suggestibility of hypnotized subjects, the possibility of memory alteration, and the difficulty jurors might have in understanding how hypnosis can affect individual memories.  110 Wis.2d at 569. *Armstrong* established a two-prong test for admissibility:  a court must assess, first, whether the hypnosis session was impermissibly suggestive, and second, whether under the totality of circumstances the testimony was nonetheless reliable.  *Id*. at 574.  Admissibility should be determined at a pre-trial hearing at which the proponent of the testimony must demonstrate admissibility by clear and convincing evidence. *Id*. at 570-71.

At the postconviction hearing Professor Alan Scheflin,

an expert on hypnotically refreshed testimony, testified that, under the first prong of *Armstrong*, Rene's hypnotism was impermissibly suggestive (60:12). In his opinion the session violated between three and six of the nine guidelines recommended in *Armstrong* (60:13).

According to Professor Scheflin, multiple violations of guideline four—which requires videotaping the entire session—rendered the videotaping useless as a safeguard (60:14). According to Professor Scheflin, the hypnotist and others were off camera, and therefore there was no way to catch suggestive cuing (60:14). Other jurisdictions have held that such violations require suppression because they make it impossible to assess suggestiveness. *Soliz v. State*, 961 S.W.2d.545, 548 (Tex.App. 1997).

In double violation of guideline two, the police briefed Dr. McKinley (the hypnotist) orally (rather than in writing) and with more information than necessary prior to the session (18-19). Professor Scheflin testified that Dr. McKinley was told virtually everything the police knew about Rene, and was told that "Mr. Rene was the crucial witness, the key witness, the only eyewitness" (60:19). The result was a session "conducted along the lines to make a case for police" (60:19).

The third violation—of guideline eight, requiring the hypnotist to avoid adding content or structure to the subject's memories—was especially critical (60:24). Professor Scheflin identified myriad ways in which Dr. McKinley attempted to shape Rene's memory by reinforcing details police were interested in, such as the color of the van, and the assertion that it turned in front of Rene rather than behind him (60:25-26, 28, 30, 32, 38-42).

-38-

Professor Scheflin testified that the entire session was so contaminated that, in his opinion, Rene no longer knew what he remembered (60:33, 42). The contamination was significant even though Rene's pre and post-hypnotic statements did not differ entirely. Once the subject's memory is contaminated, he cannot rethink his own memories or independently assess the source of or confidence in his memories. As *Armstrong* recognized, cross-examination alone is insufficient to protect against such dangers. *Armstrong* at 570.

Under the second *Armstrong* prong, Rene's testimony was inadmissible because "under the totality of the circumstances" the post-hypnotic identification was not reliable. *Id*. at 574. The elements to be considered are the witness's opportunity to view the event; the accuracy of the witness's prior description; the witness's level of certainty; and the length of time between crime and identification. *Id*. at 578 (citing *Neil v Biggers*, 409 U.S. 198, 199-200 (1972)).

First, Rene had a poor opportunity to observe. He testified that he saw the van only for a second (54:127). It was dark, both vehicles had their headlights on, and he originally said the van turned behind him (52:164; 54:128; 66:Exh.M).

Second, Rene's description was not accurate but vague and incorrect; he initially said only that he saw a white van and a lady in it "passed out or asleep" (66:Exh.L). He later added and subtracted details from this description—the van had a blue stripe and may have been a Ford or a Chevrolet, the woman was of medium height, had shoulder length brunette hair, was in her late thirties (in the videotape Rene admits he got some of these details from the newspaper), and

-39-

the van may have turned in front of him (65:Exh.77). Some of these details were accurate, others were not, but that inconsistency only underlines the vagueness of the identification.

Third, Rene was never certain of anything he "identified." And fourth, the two-month lapse between the crime and Rene's initial statement only makes the "identification" more unreliable. Under the totality of the circumstances, Rene's hypnotically refreshed testimony lacks any substantial indicia of reliability and is therefore inadmissible.

Counsel thus provided constitutionally ineffective assistance when failed to move to suppress Rene's statements under *Armstrong*. His failure was prejudicial because it resulted in the admission of evidence critical to the state's murder-in-the-van scenario.

Having failed to challenge the admissibility of Rene's testimony, counsel compounded his error by failing to offer expert testimony on hypnotically refreshed testimony. Under *Armstrong*, Zimmerman had the right to call an expert. *Id*. at 569-70. Indeed, the court suggested that the primary purpose of the confrontation right, "to ensure that the trier of fact has a satisfactory basis for evaluating the truthfulness of evidence admitted in a criminal case," cannot be met without such testimony. *Id*. at 570 ("We hold this purpose is satisfied if the defendant has the opportunity to cross-examine the witness and is permitted to introduce testimony on the witness' pre-hypnosis recollection and the effect hypnosis can have on memory.").

Counsel's failure to employ a witness such as

-40-

Professor Scheflin meant the jury saw the hypnosis tape and heard Rene's testimony without the framework necessary to assess either. That failure was prejudicial, especially in the case of a witness whom the state described as "incapable of telling a lie" (55:195).

Finally, counsel failed to cross-examine Rene effectively. At the postconviction hearing, counsel suggested that he wanted the jury to see the tape because it showed inconsistencies (59:149-50). But he asked Rene only two questions on cross-examination, neither of which related to those inconsistencies (54:127). Even in light of counsel's asserted strategy, this cross-examination makes no sense. The jury heard Rene testify, in person or on tape, for two hours (65:77). But counsel used nothing in the tape to impeach Rene's credibility. He also failed to introduce any of Rene's prior inconsistent statements about the van or its passenger.

Counsel's failures were prejudicial. But for a virtually non-existent cross-examination, jurors would have heard evidence from which they could have inferred that Rene's memory was unreliable and his account unbelievable. Without Rene's testimony, the state's medical evidence made no sense, and without that evidence nothing linked Zimmerman and Thompson on the night of the murder.

### E. Counsel failed to object to inadmissible hearsay and opinion testimony.

#### 1. Police opinion testimony.

Counsel also erred by failing to object to extensive opinion testimony offered by several police officers about Zimmerman's veracity and guilt. It is improper for witnesses to testify that they believe the evidence proves guilt or

comment on the credibility of another witness. *See, e.g.*, Wis. Stat. §907.01; ***State v. Haseltine***, 120 Wis.2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984); ***State v. Romero***, 147 Wis.2d 264, 278, 432 N.W.2d 899 (1988).

Repeatedly and at length police testified that they told Mr. Zimmerman that they believed, from their investigation, that he had murdered Thompson, that they had an eyewitness who saw him with Thompson that night, that his "alibis" had been proven false, and that they found it hard "to believe anything that he said" (54:159-60, 165-66, 174-75; 55:27-30, 32, 66, 68, 70). The testimony on these points is extensive, and therefore is reproduced in full in the Appendix at 116-38.

All of this testimony would have been grossly improper if police had been asked their opinions about these matters. As used in this case, its effect was equally improper. Although ostensibly offered as context for the interrogations, no instructions limited use of this testimony to that purpose. The testimony effectively communicated to the jury that Zimmerman's guilt was a foregone conclusion based upon an air-tight police investigation, that Zimmerman had, as an established fact, lied, and that the police investigation had established that Brice Rene had in fact seen Zimmerman and Thompson together. The testimony thereby both usurped the role of the jury and suggested to the jury that the police investigation had produced evidence of guilt and fabrication beyond the evidence presented at trial. Counsel's failure to object to this extensive and highly damaging testimony was deficient and prejudicial.

Even if the state legitimately needed to present some context for Zimmerman's statements, it could have done so without introducing all of this inadmissible testimony. For

example, the state argued that police confronted Zimmerman with evidence that he had provided several alibis, each of which had "proven to be inaccurate," and that Zimmerman responded that he was "sticking with the story that 'he had gone home and went to bed'" (34:13). But to introduce Zimmerman's statement there was no need to tell the jury, incorrectly and misleadingly, that police had "proven" his alibis to be false. The state could have simply presented testimony that Zimmerman made this comment when asked how he could reconcile his various prior statements. Each of Zimmerman's statements could have been presented in a similar fashion.

Moreover, even if the police opinion testimony had some probative value as "context," it nonetheless should have been excluded under Wis. Stat. §904.03, because its minimal probative value was substantially outweighed by the risk of unfair prejudice. Police subjected Zimmerman to months of questioning designed to elicit a confession. These efforts failed; Zimmerman remained steadfast in his assertions of innocence. The statements the police did get—that he nodded his head as he followed along while police told him they believed the evidence pointed to him; that he said his family loved him and would forgive him no matter what; that he agreed hypothetically that the crime could have been committed during a blackout; and that when he was told of an eyewitness he responded, "who saw me," and then said no one could have seen him because they weren't together that night (54:172)—were ambiguous at worst. Indeed, they were entirely consistent with the responses of an innocent person. If they had any probative value, it was significantly outweighed by the prejudice of allowing repeated police opinion testimony about guilt and veracity.

-43-

Other courts have recognized that it is improper to present police assessments of the defendant's guilt or veracity. *See* **Commonwealth v. Kitchen**, 730 A.2d 513, 521 (Pa.Super.1999)(portions of a defendant's interrogation, in which officers asserted, "You're lying," or "We know that you're lying," were inadmissible opinion testimony); *see also* **United States v. Harber**, 53 F.3d 236, 238 (9th Cir. 1995)(investigating officer's opinion as to defendant's guilt "was inherently or presumptively prejudicial").

This case is not like **State v. Smith**, 170 Wis.2d 701, 490 N.W.2d 40 (Ct. App. 1992), *cert. denied*, 507 U.S. 1035 (1993). In **Smith**, the court held that it was not error for a police officer to testify that an accomplice initially denied involvement in the crime, but later changed his story to reflect what the officer perceived to be the truth. *Id.* at 706. As this court later explained, this testimony was admissible because it "was not designed to attest to the accomplice's truthfulness," but to explain to the jury the circumstances under which the "accomplice changed his story." **State v. Kuehl**, 199 Wis.2d 143, 150, 545 N.W.2d 840 (Ct. App. 1995). Zimmerman, of course, never changed his story to admit any of the police accusations.

Here, the extensive police testimony went well beyond merely providing needed and harmless context. It repeatedly informed the jury that police believed Zimmerman was guilty, that Rene was an eyewitness, and that they had proven Zimmerman's "alibis" false. Counsel erred by failing to object to or at least request a limiting instruction about this testimony. Given that each of these points was critical and disputed at trial, permitting impermissible police opinion was also prejudicial.

## 2.  Hearsay.

Counsel also failed to object to extensive inadmissible hearsay.  For example, Loretta Harris, who had been a friend of Kathy Thompson, testified that Thompson told her in 1999 that "[w]henever she'd go somewhere she said—I mean she wouldn't tell everybody which bar she would go to or what she'd do but [Zimmerman] was there every time she turned around.  No matter where she went he was always right there a couple minutes after she got there, couple seconds.  She said she doesn't know how he knew" (52:201).  Similarly, Tim Maurice testified that, while he was dating Thompson, Thompson "had mentioned that someone, and I assumed it was an old boyfriend, had kept coming around her house and calling her and she wanted it to stop but it didn't" (53:129-30).

Because these statements purported to be statements that Thompson made to witnesses, their recounting of the statements was hearsay.  And the statements were not admissible under any exception to the hearsay rule.  The closest exception might be under Wis. Stat. §908.045(2), statement of recent perception.  But that exception is limited to a statement that "narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which he was interested, and while his recollection was clear.…"  *Id*.  It does not apply to statements, such as these, about a declarant's concerns or doubts about events, or about general circumstances not tied to specifically identifiable recent events.  *See Tim Torres Enterprises, Inc. v. Linscott*, 142 Wis.2d 56, 77-78, 416 N.W.2d 670 (Ct. App. 1987)(statements inadmissible where they related to a person's state of mind, and where there was no showing that

-45-

the statements related to a *recently* perceived event); *cf*., ***State v. Dean***, 67 Wis.2d 513, 531, 227 N.W.2d 712 (1975)(statements were inadmissible where homicide victim told a witness about problems she had had with the defendant); ***Runge v. State***, 160 Wis.2d 8, 13, 150 N.W.2d 977 (1915)(reversible error to admit testimony from various witness's to effect that the deceased had told them that she and her husband, the defendant, were always quarreling and she feared him).

These statements were also particularly damaging because the state had to demonstrate how Zimmerman could have known that Thompson was walking home from jail in the middle of the night on February 26, 2000.  This hearsay suggested that Zimmerman was stalking Thompson—a highly prejudicial suggestion itself—and might have been used by the jury to explain how Zimmerman could have found Thompson to kill her.

Another witness, Pam Thornwall, testified that Thompson told her "that she had seen Zimmerman, I don't know when, before, and he had made a comment to her that if nobody could have her—if he couldn't have her, nobody else would," and that Thompson seemed upset by that (54:121).

This testimony too was hearsay, but again counsel failed to object.  The statement was not admissible under any exception, including as a statement of recent perception under §908.045(2).  There is no indication that the statement was made recently, as required by this exception.  *See **Linscott***, 142 Wis.2d at 77-78.  More significantly, "this exception does not apply to the aural perception of an oral statement privately told to a person." ***State v. Stevens***, 171 Wis.2d 106, 119, 490 N.W.2d 753 (Ct. App. 1992).

This statement too was prejudicial. Indeed, counsel objected to that -statement, although he did not clearly articulate hearsay as a basis for the objection (53:1138). The court admitted the statement on the basis that the defense had opened the door to this testimony by presenting testimony that Zimmerman never made any threats. The court concluded that the evidence had "some probative value" (54:119).

Even if the prior testimony about the absence of threats gave this testimony some probative value, it was still hearsay, and still inadmissible. The court apparently understood defense counsel's objection only as a claim of unfair prejudice. If counsel's objection was inadequate to raise a hearsay issue, then counsel was ineffective.

In the postconviction proceedings the court rejected the claim that counsel erred by failing to raise hearsay objections. In a single sentence, without explanation, the court ruled that none of this evidence was inadmissible hearsay (41:5). The court was wrong. It was indeed inadmissible hearsay, and counsel was ineffective for failing to object on hearsay grounds.

## F. Counsel failed to object to improper closing arguments.

In his closing argument, the prosecutor impermissibly vouched for the truthfulness of Brice Rene's testimony. The prosecutor told the jury: "Brice Rene was honest, sincere and I submit to you absolutely incapable of telling a lie" (55:195). He also argued that Rene "told you what he saw and he was not lying" (55:196). Vouching for the credibility of a witness is impermissible and violated Zimmerman's due process rights. *See United States v. Young*, 470 U.S. 1, 18 (1985); *cf.,*

-47-

*State v. Tutlewski*, 231 Wis.2d 379, 381, 386-87, 605 N.W.2d 561 (Ct. App. 1999)(error for witness to testify that other witnesses were "incapable of lying").

The prosecutor also argued improperly when he told the jury:

> if you go in there, consider every piece of evidence and make that hard decision that she is on that street that morning lifeless and he didn't do it, I can accept that. I cannot accept [defense counsel] suggests [sic] that somehow you should measure this case any less seriously than that.

(55:230.) This argument informed the jurors that they could only acquit Zimmerman if they affirmatively found that he "didn't do it." But of course the jurors need not have found affirmatively that Zimmerman didn't do it in order to acquit. Indeed, they were *required to acquit* if they found far less than that—if they found just a reasonable doubt as to whether he did it. The jury's choice was not between "he did it" and "he didn't do it," but between "we are convinced he did it" and "we are not convinced." The prosecutor misstated the law, and wrongly placed a burden of proof on the defense to convince the jury of innocence.

Counsel failed to object to these improper arguments. He thought the statement about Rene was unimportant, and he had no reason for failing to object to the burden-shifting argument (59:159-60)

Improper arguments of this type can be, standing alone, sufficient to require a new trial. *E.g.*, *State v. Neuser*, 191 Wis.2d 131, 528 N.W.2d 49 (1995)(misstating the law and the import of court's ruling required new trial); *Hunter v. State*, 815 A.2d 730, 736-37 (Del. 2002)(reversible error for

-48-

prosecutor to undermine reasonable doubt standard, argue jurors would have to believe police were lying in order to acquit, and vouch for witnesses).  Given the closeness of the evidence in this case, and the combination of errors that accompany the failure to object to improper closing arguments, the errors here were prejudicial and violated Zimmerman's right to effective assistance of counsel.

## V.  NEWLY DISCOVERED EVIDENCE WARRANTS A NEW TRIAL.

Zimmerman moved for a new trial based on newly discovered evidence of an alternate suspect, and also of another, similar homicide that Zimmerman could not have committed (28:41-45).  The new evidence in this case meets the requirements for a new trial based upon newly discovered evidence:  1) the evidence was discovered after trial; 2) Zimmerman was not negligent in seeking to discover the evidence; 3) the evidence is material and 4) not merely cumulative; and 5) it is reasonably probable that a different result would be reached at a retrial.  *See State v. Bembenek*, 140 Wis.2d 248, 252, 409 N.W.2d 432 (Ct. App. 1987).

### A. New evidence has been presented of an alternative suspect.

Post-trial, Zimmerman presented evidence against an alternate suspect, Dan Turner.  Evidence was offered that both Thompson and Turner frequented the Elbow Room Bar in the months before her death (59:19).  Robert Miles testified that in the weeks prior to the murder Turner seemed to be watching the couple; he said that Turner routinely hung out in the parking lot as Miles and Thompson were leaving the bar (59:9-10).  On the wedding day, Turner eavesdropped on their

discussions about their wedding and made eye contact with them with an insulting smirk (59:8-10, 15). Turner's behavior was odd enough that Miles asked Thompson who he was. She said she had dated him briefly, and had slept with him (59:11, 13).

The bar manager also said that Turner had a pattern of upsetting women by aggressively trying to pick them up, until management would ask him to leave (59:20). Once, Turner turned violent after being asked to leave and stood in the parking lot screaming that he had a knife (59:21). Turner also had a history of violence against women, including strangling a woman to unconsciousness when she refused to sleep with him (60:48). Turner did not have an alibi for the morning of Thompson's death (59:22). Turner lived about seven blocks from where Thompson's body was found (59:68).

When police interviewed Turner before the postconviction hearing, he denied that he knew Thompson (59:63). He told police that all he knew about the case was that a girl was found on Galloway Street (59:63). In fact, Thompson was found on Laurel Avenue, but lived on Galloway (59:63). Despite claiming that he did not know Thompson, Turner somehow connected her street with the crime (59:63).

Police also reported that Thompson had been stalked by a man weeks before her murder, who had brought flowers to her home (59:13). Police found a floral delivery card at Thompson's home signed "Dan" (59:66).

This evidence would be admissible at trial. Under *State v. Denny*, 120 Wis.2d 614, 623, 357 N.W.2d 12 (Ct. App. 1984), third-party perpetrator evidence is admissible if

there is a "legitimate tendency" that the third person could have committed the crime. *Id*. at 623. A legitimate tendency requires showing "motive and opportunity" and "some evidence to directly connect a third person to the crime charged which is not remote in time, place or circumstances…." *Id*.

As discussed above, Turner had motive, opportunity, and a direct connection to Thompson just hours before her death. The Turner evidence was also material and not cumulative, and the defense knew nothing about it at trial (59:129)—the 4,000 pages of discovery in this case contained only one innocuous reference to Turner (59:129; 66:Exh.S). Finally, if jurors had heard about Turner, it is reasonably probable they would have had a reasonable doubt as to Zimmerman's culpability.

### B. New evidence of another very similar homicide suggests a common perpetrator, and excludes Zimmerman.

Zimmerman also presented new evidence of a second similar homicide, of a woman named Angelina Wall. The striking similarities between the two offenses can be seen by the following comparison:[7]

| Thompson Homicide | Wall Homicide |
| --- | --- |
| Last seen 2:30-3:00 a.m. on Saturday morning, February | Last seen 2:30-3:00 a.m. on Saturday morning, January 6, |

---

[7] The facts in this chart are from R:61. This chart only represents some of the similarities between the crimes. To avoid compromising an ongoing police investigation, Zimmerman has filed those additional facts about the Wall homicide under seal at R:61.

| 26, 2000. | 2001. |
|---|---|
| Last seen walking home alone. | Last seen walking home alone. |
| Lived in north-central Eau Claire (within a few blocks of Wall's home).[8] | Lived in north-central Eau Claire (within a few blocks of Thompson's home). |
| Strangled. | Strangled. |
| Body discovered dumped along city street in plain view, miles from her home.[9] | Body discovered dumped along rural road in plain view, miles from her home. |
| Body discovered about 5:45 a.m., meaning perpetrator had at most three hours to commit crime.[10] | Body discovered about 5:45 a.m., meaning perpetrator had at most three hours to commit crime. |
| Body partially undressed. | Body partially undressed. |
| A few personal items, but not all valuables, were missing. | A few personal items, but not all valuables, were missing. |

The similarities were so striking that, on the day of Wall's murder, detectives traveled to Luck, Wisconsin (94

---

[8] Sexually motivated killers often find victims within a circumscribed area and time of day. Ressler, et al., SEXUAL HOMICIDE PATTERNS AND MOTIVES 130, 142 (1988).

[9] That these victims were left in plain view is significant; visibility of the body is important to sexual killers. *Id*. at 59.

[10] The fact that the perpetrators spent similar amounts of time with each victim is another identifier of a sexually motivated murderer. *Id*. at 142.

-52-

miles one way), to question Zimmerman (32:9). Police ruled out Zimmerman, however, because he had been in northern Wisconsin at the time of the Wall murder (32:4).

This evidence meets the test for newly discovered evidence. First, Zimmerman's counsel learned of the evidence after trial, and he was not negligent in failing to pursue it sooner. Counsel had no access to investigative information about this unsolved homicide (59:130). Obviously, this evidence is also not cumulative; no related testimony was presented at trial.

Finally, the evidence is material and probably would produce a different result. The Wall evidence would be admissible. *State v. Scheidell*, 227 Wis.2d 285, 595 N.W.2d 661 (1999), holds that *State v. Sullivan*, 216 Wis.2d 768, 576 N.W.2d 30 (1998), "provides the proper framework when a defendant seeks to introduce other acts evidence that was perpetrated by an unknown third party." *Scheidell* at 287-88. Under *Sullivan*, other acts evidence is admissible if: 1) the evidence is offered for an acceptable purpose under Wis. Stat. §904.04(2); 2) the evidence is relevant under §904.01; and 3) the probative value of the evidence is not substantially outweighed by unfair prejudice. *Id*. at 772.

Evidence of Wall's murder is related to identity, a permissible purpose under §904.04(2). "[T]he threshold measure for similarity in the admission of other acts evidence with regard to identity is nearness in time, place and circumstance of other acts to the crime alleged." *Scheidell* at 305. Here, the similarities are conspicuous—more significant than in other cases in which the evidence has been admitted. *See, e.g.*, *State v. Williams*, 518 A.2d 234, 239 (NJ 1986)(evidence of two rapes, one of which involved stabbing,

were admissible at defendant's trial for stabbing his ex-girlfriend at same location and time of day).

*State v. Multaler*, 2002 WI 35, 252 Wis.2d 54, 643 N.W.2d 437, demonstrates the significance of these similarities. In *Multaler*, the court upheld probable cause for a search based on similarities analogous to those in the Wall and Thompson murders. The *Multaler* murders were linked by time; race and age of victims; common county of residence; indications the bodies were transported; signs of sexual motivation, including partial disrobing and strangulation; and the victims were missing small personal items. *Id*. at 64.

The evidence in this case meets the requirements both for admissibility and a new trial. Similarities suggest a third-party perpetrator was responsible for both murders. Because Zimmerman could not have committed the second murder, the evidence is exculpatory.

### C. At the least, Zimmerman should be entitled to postconviction discovery on his newly discovered evidence claim.

Zimmerman moved for postconviction discovery of records from the Wall homicide, including the autopsy report and results of any DNA testing, to determine if there are even more similarities to the Thompson murder. The state opposed the motion because it did not want to compromise the integrity of the ongoing investigation (61). Defense counsel therefore suggested an in camera review of the requested materials. The trial court denied the postconviction discovery motion without an in camera review (32:1-10; 33:1-4).

Criminal defendants have a right to postconviction

-54-

discovery "when the sought-after evidence is relevant to an issue of consequence." **State v. O'Brien**, 223 Wis.2d 303, 321, 588 N.W.2d 8 (1999). Evidence is consequential if there is a reasonable probability that, had the evidence reached the jury, it would have changed the outcome of the trial. *Id*.

Evidence showing similarities between the Wall and Thompson homicides is material to fairly determining Zimmerman's guilt or innocence. Indeed, DNA evidence showing a common third-party perpetrator could be dispositive. And the trial court's concerns about "chain of custody" or "contamination of evidence" (33:4) provide no reason to deny in camera review of an autopsy report and DNA test results. The court has not explained how such review might affect chain of evidence or contaminate the records. At a minimum, Zimmerman is entitled to an in camera review.

## VI.  CUMULATIVELY, THESE ERRORS REQUIRE A NEW TRIAL IN THE INTERST OF JUSTICE.

Wisconsin appellate courts have independent statutory authority to grant new trials in the interest of justice. Wis. Stat. §752.35; **State v. Hicks**, 202 Wis.2d 150, 159, 549 N.W.2d 435 (1996). This court may grant a new trial in the interest of justice whenever: 1) the real controversy was not fully tried; or 2) it is probable that justice has for any reason miscarried. *Id*. at 160. When the real controversy has not been fully tried, the court need not decide that the outcome would probably be different on retrial before granting a new trial. *See* **State v. Harp**, 161 Wis.2d 773, 775, 469 N.W.2d 210 (Ct. App. 1991).

In this case, the cumulative errors involve some of the

most critical pieces of evidence considered—or not considered—by the jury. The real case for innocence was never fully tried. In the interest of justice, Zimmerman's conviction must be vacated.

## CONCLUSION

Zimmerman asks that this court vacate his conviction and direct entry of a judgment of acquittal. In the alternative, he asks that the court vacate the conviction and the order denying postconviction discovery and remand for a new trial.

Dated this 27th day of March, 2003.

Respectfully submitted,

_____

KEITH A. FINDLEY
Bar No. 1012149

NEIL F. BYL
MARY DELANEY
MEGAN MORRISEY
SHEILA SULLIVAN
Law Students

Wisconsin Innocence Project
Frank J. Remington Center
University of Wisconsin Law School
975 Bascom Mall
Madison, WI  53706
(608) 262-4763

Attorney for Defendant-Appellant

-56-

I hereby certify that this brief conforms to the rules contained in s. 809.19(8)(b) and (c) for a brief and appendix produced with a proportional serif font. The length of the brief is 13,793 words.

_____

Keith A. Findley

## APPENDIX

## INDEX TO APPENDIX

Amended Judgment of Conviction, 7/16/01 ........................ 101

Decision and Order Denying Postconviction Discovery ..... 102

Decision and Order Denying Postconviction Motion .......... 106

Diagram of State's Theory of the Case (Exhibit 58) ........... 115

Excerpt of Testimony of Deputy Chief Foster
(54:159-62) ........................................................................ 116

Excerpt of Testimony of Lieutenant Larsen (54:165-67) .... 120

Excerpt of Testimony of Deputy Chief Foster
(54:172-73) ........................................................................ 123

Excerpt of Testimony of Lieutenant Larsen (55:26-32) ...... 127

Excerpt of Testimony of Officer Sturgal (55:66-70) ........... 134

http://www.courts.state.wi.us/ca/opinions/02/pdf/02-3097.pdf .