STATE OF WISCONSIN        CIRCUIT COURT        EAU CLAIRE COUNTY

-----------------------------------------------------------------------

STATE OF WISCONSIN,                              Case No. 01 CF 63

          Plaintiff,

vs.                                          JURY TRIAL PROCEEDINGS

EVAN M. ZIMMERMAN,                          (Day 3, Wednesday, 4/27/05)

          Defendant.

-----------------------------------------------------------------------

HONORABLE BENJAMIN D. PROCTOR

CIRCUIT COURT JUDGE, BR. 4, PRESIDING

Wednesday, April 27, 2005

Dodge County Courthouse, Juneau, Wisconsin

-----------------------------------------------------------------------

A P P E A R A N C E S

G. RICHARD WHITE, District Attorney, Eau Claire County Courthouse, 721 Oxford Avenue, Eau Claire, Wisconsin 54703, appearing for the Plaintiff;

KEITH BELZER, Attorney at Law, Devanie & Belzer, S.C., 300 North 2nd Street, Suite 310, LaCrosse, Wisconsin 54601-2001, appearing for the Defendant;

KEITH A. FINDLEY, Attorney at Law, Wisconsin Innocence Project, Remington Center, University of Wisconsin Law School, 975 Bascom Mall, Madison, WI 53706, appearing for the Defendant.

1

I N D E X

Caption of Case and Appearances -------------------------   1

MICHAEL B. MC GEE

    Direct Examination by Mr. White ---------------------   4

    Cross-Examination by Mr. Belzer ---------------------  39

    Redirect Examination by Mr. White ------------------  91

    Recross-Examination by Mr. Belzer ------------------  93

KAREN DOERFER DAILY

    Direct Examination by Mr. White --------------------  95

    Cross-Examination by Mr. Findley ------------------- 113

    Redirect Examination by Mr. White ------------------ 185

JOY HALVERSON

    Direct Examination by Mr. White -------------------- 190

    Cross-Examination by Mr. Findley ------------------- 220

    Redirect Examination by Mr. White ------------------ 293

    Recross-Examination by Mr. Findley ----------------- 295

Proceedings Adjourned ------------------------------- 307

Certificate of Reporter ----------------------------- 308

* * *

(Proceedings commencing at 8:30 a.m.)

\* \* \*

THE COURT:  Are we all ready to go?

MR. WHITE:  Before we bring the jury in, we just have two quick things.  Dr. McGee is going to be my first witness.  If we could take a break after Dr. McGee, I suspect it will be an hour or longer for him, but one of my witnesses from Washington, his son broke his arm so his flight was delayed.  So I have other witnesses coming, but I'm going to need to meet with them for ten or 15 minutes.  So if we could take a break after Dr. McGee, I can --

THE COURT:  That's fine.  When you say an hour, are you talking total or your direct or what?

MR. WHITE:  It's hard for me to say entirely, but I suspect total may be longer than that.  The direct may be a half hour, 45 minutes, so I suspect the whole thing may be an hour and a half but --

THE COURT:  Okay, fine.

MR. WHITE:  And then the other thing is the telephone cord that was used as Exhibit 78 in the first trial, Mr. Findley and Belzer and I have agreed, if you have no objection, Your Honor, that we could just cover the Exhibit 78 sticker from the first trial, replace it with the sticker for today's trial so that there's no confusion with the jury and we've got --

THE COURT:  Let's do that now.  What number will that be?

MR. WHITE:  I believe we could do 125.

THE COURT:  Yep.  All right, bring the jury in, please.

* * *

(Jury panel returns to the courtroom.)

* * *

THE COURT:  Please be seated everyone.  Good morning, Jurors.  It's always a good day when everybody shows up.  About 80 percent of living is just showing up.

Mr. White, are you ready to go?

MR. WHITE:  I am, Your Honor.

THE COURT:  All right, you may call your first witness.

MR. WHITE:  Thank you.  Dr. McGee.

* * *

(Witness sworn in by the clerk.)

* * *

MICHAEL B. MC GEE,

being duly sworn upon his oath, testified, as follows:

DIRECT EXAMINATION,

BY MR. WHITE:

Q    Can you state your name and spell your last name for the record, please.

4

A    It's requiring you to use something that you don't readily have in your hand, if that's the case, yes.

Q    Unless it was something you planned out ahead of time?

A    True.

Q    Right?

A    Right.

Q    For instance, somebody who was along the street looking for a victim?

A    That is possible.

Q    The phone cord, we talked about the phone cord as being possible. You did, I forget, I'm sorry, I forget what they're called, the tape, you take tape things off the neck. What is it called?

A    Right.

Q    What's that called?

A    You mean when we process the body?

Q    Yeah.

A    We attempted to lift -- lift specimens. As part of processing, you're trying to lift any hair, fibers, any material that's present that the lab may be able to use to identify an object. That was done, right.

Q    You did that around her neck, right?

A    Right.

Q    To see if there was fibers there?

A    That's right.

Q    And there were, weren't there?

A    I didn't identify any, but we sent that to the lab, so the lab is the people you have to talk to.  But if the lab said there were fibers, then there were fibers.

Q    You didn't see anything on the tape?

A    I didn't see anything, but once again, same answer as before, some of these fibers are so small you can't see them, they need to be examined by the lab.  So just because I don't see them with the naked eye doesn't mean they're not there.

Q    But you did do the tape lift to see if there's anything on the neck?

A    Sure.

Q    And that's important because if there were fibers on that wound, very possible that that was the ligature device?

A    Right.

Q    I mean, that was the ligature, right?

A    Right.

Q    And nobody has ever told you that they found fibers there?

A    I haven't read the lab reports and I haven't been informed of that, no.

Q    You just came in and testified that this phone was -- may have been used, right?

A   Right.

Q   When you give that opinion, wouldn't you like to know
    that there were fibers found?

A   No.

Q   That's not of interest to you?

A   It's of interest to me, but I can't sit here and tell
    you that we have all of the lab results provided to us
    before all of our homicide testimony.  That would be
    untrue.

Q   Fair enough.  I'm not asking about lab results.  But you
    met with Mr. White, right?

A   Yes.

Q   In fact, you just met with him this morning?

A   Right.

Q   In his hotel room?

A   Correct.

Q   Happened to be right next door to my hotel room, that's
    how I knew that.

A   That was my understanding.

Q   Now, I didn't hear what you were saying, but I did hear
    you come in, heard you introduced in the hall.

A   I'll take your word for it.

Q   Okay.  He never told you there were fibers in there?

A   All I was told is there was mixed results present from
    the DNA that was not conclusive from the cord.  As far

as the material from the surface of the skin, no.

Q   The fact that there were fibers in that ligature mark --

A   Right.

Q   -- I mean, that's important?

A   Depending on the type of fiber, yes.

Q   It's not the sort of place you would usually find fibers unless they were from her sweater?

A   That's the answer, is it fibers that are from the clothing that she's wearing.  So, I mean, finding fibers on someone's neck, could it be from the ligature mark?  Oh, yes.  But it could be from the clothing, too.  Did the lab tell me where they came from?  Well, actually, I didn't get that, no.

Q   But you'd want to know, wouldn't you?

A   If you were trying to identify the ligature mark, yes, and it wasn't from fiber from her clothing, yes.

Q   Let's just hypothetically say if the fibers that were taken from her ligature mark matched a belt or something like that in Evan Zimmerman's van, that would be pretty bad for him, wouldn't it?

A   That would be important.

Q   But you never heard about those fibers, did you?

A   No.

Q   It takes some strength to strangle somebody, doesn't it?

A   It does.

Q    No socks?

A    No stockings.

Q    You mean the same thing by that, right?

A    What did you ask me?

Q    I said socks.

A    No.  Right.

Q    Nothing on her feet other than shoes.  She was wearing jeans?

A    Right.

Q    Sweater?  Well, she wasn't wearing a sweater, a sweater was brought in.

A    Right.

Q    And a bra?

A    Correct.

Q    Bra pulled up over her breasts?

A    Right.

Q    The pants had no scrape marks or anything like that on them, correct?

A    I did not see any, no, on the front of them.  On the back, there may have been some deposited material on the back, the road surface material.  But did I see any scrapes on the front, if that's your question, no.

Q    There was no indication on the pants that her body had been dragged at all, was there?

A    On the front or any part?

Q   On any part.

A   Well, I thought I saw gravel on the back that I thought was probably from being dragged and deposited. But did I actually see defects in the fabric, I can't remember. If I had, I probably would have described it. Since it's not there, probably wasn't there.

Q   Right. Now the bra, other than being pulled up over her breasts, was unremarkable?

A   I thought it was.

Q   Wasn't stretched out?

A   Didn't appear to be.

Q   Pulled apart in any fashion?

A   I didn't see anything pulled apart, no.

Q   She was a 180-pound lady, right?

A   Right.

Q   If somebody had pulled her by that bra, pulled 180 pounds with that bra --

A   Right.

Q   -- we would expect that that bra would be stretched out, wouldn't we?

A   It would have some stretch, yes.

Q   In fact, it would be pretty near impossible to pull somebody with that bra without stretching it?

A   That's probably true.

Q   But there were no stretch marks on there, was there?

here right now giving you an answer, I can't do that.

Q    Do you agree with me it would be pretty high?

A    Depends on the type of alcohol they're drinking, the amount of alcohol in the content they're drinking.

Q    I just said 14 beers.

A    What kind of beer would it be?  What's your alcohol content?

Q    Bud Light, I think.

A    I think Bud Light would have less alcohol than other types.  I'd have to have those things that would have to be factored in.  But would you be drunk?  Yes, you'd be under the influence of alcohol, yes.

* * *

(Off-the-record discussion held between court and counsel.)

* * *

THE COURT:  Mr. White.

MR. WHITE:  Thank you.

* * *

REDIRECT EXAMINATION,

BY MR. WHITE:

Q    Trust me, Doctor, I don't want to go through every single point here, so let me just ask you a general question and then I'll ask you a few specifics.  The general question is, anything that Mr. Belzer said to you, does any of that change any of the opinions you've

91

already rendered?

A   No.

Q   Now, you measured the ligature wound yourself?

A   Right.

Q   You didn't look at a picture and try to figure it out based on pictures, you actually were there with the body?

A   Measurements were made right off the skin, right.

Q   Based on your autopsy, would a time of death of anywhere from, say, 4 a.m. to 5:45 be consistent with what you found?

A   Yes.

Q   Assuming the person that strangled Ms. Thompson was a 140-pound adult male out of shape with a bad back and intoxicated, does that change your opinion here to any extent?

A   No.

Q   The whole discussion about the movement of the bra, the placement of the body, the sweater, the scrape marks, anything about all of that, does that lead you to conclude that Ms. Thompson could not have been removed from a van and placed at the scene where her body was found and find exactly what you found here?

A   No.

Q   Do you think there are more transients, drug dealers and

## CERTIFICATE OF REPORTER

STATE OF WISCONSIN   )
                     )ss.
COUNTY OF EAU CLAIRE)

I, Gary E. Oas, Circuit Court Reporter in and for the State of Wisconsin, do hereby certify that I reported the foregoing matter and that the foregoing transcript has been carefully compared by me with my stenographic notes as taken down by me in machine shorthand, and by me have caused the same to be transcribed into typewriting, and that it is a full, true, and correct transcript of the proceedings had in said matter to the best of my knowledge.

Dated this 5th day of December , 2005.

_____
GARY E. OAS
Circuit Court Reporter

308