C

DePaul Law Review
Summer 2004

Symposium: Race to Execution

Articles

# *1615 RACE AND THE FEDERAL DEATH PENALTY: A NONEXISTENT PROBLEM GETS WORSE

Kevin McNally [FNa1]

Copyright (c) 2004 DePaul University; Kevin McNally

## Introduction: The Federal Death Penalty Before Furman [FN1]

Historically, the federal death penalty resulted in executions in roughly the same percentage as racial groups in the population. [FN2] Between August 17, 1927 and March 15, 1963, there were thirty-four executions. Of those thirty-four, twenty-eight of the condemned were ***1616** white, two were Native American, three were black, and the race or ethnic background of one individual is unknown. No more than six, or 18%, were non-white. (See Graph 1.) [FN3]

Graph 1 Race of Federal Defendants Executed Between August 17, 1927 and March 15, 1963

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The racial landscape of the modern federal death penalty, the product of post-Furman "reform" legislation, is quite different. "The persistent presence of statistical disparity" not only continues, it is getting worse. [FN4]

## II. The Modern Federal Death Penalty

As of January 26, 2004, the federal government had taken to trial a total of ninety-one federal death penalty cases involving 138 defendants in 104 trials in the post-Furman era. [FN5] These 138 defendants were culled from a larger pool of 312 against whom the Attorney General has authorized the Government to seek the death penalty. Under the previous administration, many capital defendants avoided trial by negotiated plea, or because the government either dropped its request for the death penalty, or dismissed charges entirely. Nine were found not guilty of the capital charge. Two were found to be innocent, and ***1617** murder charges were dismissed. One was granted clemency. There have been three executions. Juries or judges have rejected the death penalty sixty-four times and juries have voted for the death penalty thirty-six times. The dispositions of these cases are summarized in Table 1.

Table 1

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Of a total of 312 defendants against whom the Attorney General has authorized the Government to request the death penalty, 78 have been white, 54 Hispanic, 14 Asian/Indian/Pacific Islander/Native American, 3 Arab, and 163 African American. Two hundred and thirty-three of the 312 (75%) defendants approved for a capital prosecution by three Attorneys General to date are members of minority groups. Nineteen of the twenty-six defendants (73%) of those on federal death row under active death sentences, are non-white. Eighteen (69%) of the twenty-six federal death row inmates are black. (See Graph 2). Twenty-one (62%) of those sentenced to death have been black. Thirteen (50%) of federal death row inmates, as of January 26, 2004, had killed a white person. Seventeen (50%) of those sentenced to death had murdered a white person. [FN6]

***1618** Graph 2

Race of Defendants on Federal Death Row

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

III. The Protocols: The "Race Blind" Department of Justice Capital Case Review Process

Prior to 1995, if a United States Attorney was inclined to seek the death penalty, he or she would consult with the Attorney General. Permission was granted to seek the death penalty forty-seven of fifty-two times. [FN7] If the line prosecutor was not inclined to seek the death penalty and the United States Attorney agreed, that was the end of the matter. On January 27, 1995, shortly after passage of the 1994 Federal Death Penalty Act (FDPA), Attorney General Janet Reno established protocols for selecting which federal defendants would face the death penalty. [FN8] The so-called replacement "blue sheet" for the United States Attorney's Manual, Section 9-10.000 (Capital Crimes) ***1619** created a three-step bureaucratic process involving: (1) the local decision (sometimes made by a United States Attorney upon the recommendation of a local death penalty review committee); (2) review by the Attorney General's Capital Case Review Committee; and, finally, (3) the decision by the Attorney General. This process has been described in some detail elsewhere by a former member of the committee, Professor Rory Little. [FN9]

For current purposes, the most significant aspect of the Department of Justice (DOJ) capital case review process is the claim that the "review process is carried out in a 'race blind' manner." [FN10] "The United States Attorney's [O]ffice does not provide information about the race or ethnicity of the defendant to review committee members, to attorneys from the criminal division's Capital Case Unit to assist the review committee, or to the Attorney General." [FN11]

While the death penalty submission form does not require information regarding the race or ethnic background of the defendant (nor, presumably, the victim), this information is sometimes provided by defense counsel arguing against a death penalty prosecution and is presumably sometimes evident from the paperwork normally provided by the United States Attorney's Office as attachments to submission. It is not hard to guess the racial or ethnic background of the defendants whose indictments charge members of the "Bloods" gang, the "Cosa Nostra," or the "Latin Kings." [FN12] As such, the DOJ's insistence that the process, or the Attorney General's decision, is "race blind" seems perhaps more political cover than practical reality. Be that as it may, the decision making is not "race blind" at the most important stage, which is the initial selection of defendants by federal law enforcement and local prosecutors.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

IV. The Ashcroft Death Penalty Review Pool By Race and Ethnicity

Attorney General John Ashcroft reviewed 381 potential federal capital defendants by January 26, 2004: 72 whites, 182 blacks, 105 Hispanics,***1620** 12 Asians, 9 Native Americans, and 1 Pacific Islander. This pool is 19% white, 48% black, and 28% Hispanic. (See Graph 3.) The victims of these defendants are 30% (112 of 379) white and 70% (267 of 379) nonwhite. [FN13] (See Graph 4.)

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

V. Race and Ethnic Background of Federal Capital Defendants

A. Attorney General Ashcroft

As of January 26, 2004, Attorney General Ashcroft had approved a capital prosecution for 103 defendants: 26 whites, 56 blacks, 18 Hispanics, 2 Asians, and 1 Native American. This group is 25% white, 54% black, and 17% Hispanic. A higher percentage of black defendants than in the overall "Ashcroft pool" [FN14] have been selected by Attorney General Ashcroft for a federal capital trial. (See Graphs 5 and 6.) Attorney General Ashcroft orders a capital prosecution for non-Hispanic white defendants and black defendants at a higher rate than that in the overall federal death penalty pool. Attorney General Ashcroft approves Hispanic defendants at a much lower rate. Attorney General Ashcroft has initially ordered a death penalty trial for fifty-six of 182 eligible black defendants (31%), and twenty-six of seventy-two eligible white defendants (36%). On the other hand, Attorney ***1621** General Ashcroft has selected only eighteen Hispanics to face the federal death penalty of the 105 Hispanic defendants reviewed, representing only 17% of eligible Hispanic defendants. (See Graph 7.) [FN15]

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Attorney General Ashcroft did not approve capital prosecutions for 278 other defendants: 46 whites, 126 blacks, 87 Hispanics, 10 Asians, 8 Native Americans, and 1 Pacific Islander. This pool is 17% white, 45% black, and 31% Hispanic.

B. Attorney General Reno

The percentage of white defendants in the overall pool of 682 defendants was 13% between 1988 and 1994 and 20% between 1995 and 2000. [FN16] Attorney General Reno authorized 159 defendants, of whom 28% were white. [FN17] The 2001 Supplementary Survey examined an additional 231 defendants who were not submitted for review, or who were not charged with a capital offense but could have been, and another sixty defendants reviewed between July 2000 and June 2001, for ***1622** a total of 973 defendants. [FN18] Of this broader pool, only 166, or 17%, were white. [FN19]

"Attorney General Reno ultimately decided to seek the death penalty for 27% of the white defendants (44 out of 166), 17% of the black defendants (71 out of 408), and 9% of the Hispanic defendants (32 out of 350)." [FN20] Of the total pool of 973, four hundred eight (42%) were black. (See Graph 8.) [FN21]

***1623** Graph 8 Distribution Rates by Race and Ethnicity of Capital Defendants Selected by Attorney General Reno

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

A higher percentage of black defendants who had committed an interracial homicide (30 of 87, or 34%) were subjected to the death penalty than were black defendants who killed black victims (41 of 200, or 21%). (See Graph 9.) Conversely, a higher percentage of white defendants who killed white victims were subjected to the death penalty (37 of 90, or 41%), than were white defendants who had committed an interracial homicide (7 of 20, or 35%). [FN22]

Graph 9 Comparison of Selection Rates of Black Defendants Under Attorney General Reno for Inter- and Intra-Racial Murder

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Between January 27, 1995 and July 20, 2000, "Attorney General Reno's approval rate for capital prosecutions was .37 (61/167) in white-victim cases and .21 (81/383) in minority-victim cases--a 16 percentage***1624** point difference that is statistically significant at the .001 level." [FN23] The research of David C. Baldus, Professor of Law at the University of Iowa, revealed:

The death sentencing rate from 1995 to 2000 was twice as high in white victim cases as it was in minority victim cases. Nationwide, the rates were .05 (10/198) for the white victim cases versus .02 (10/446) for the minority victim cases. In the eleven states in which death sentences were actually imposed, the rate in the white victim cases was .17 (10/59) versus .08 (10/119) in the minority victim cases--a nine percentage-point difference. [FN24]

C. A Comparison of the Reno/Ashcroft Approval Rate for African American Defendants

Of those she reviewed, Attorney General Reno selected less than one in four (71 of 324 or 22%) of African-American potential capital defendants for a capital prosecution. If all potential capital defendants were included, whether reviewed by Attorney General Reno or not, 18% of the black defendants (71 of 387) were selected during the 1995 through 2001 time period. [FN25] Having personally reviewed all, or nearly all, of the African-American defendants in the 2000 through 2003 selection pool, Attorney General Ashcroft has selected 31% (56 of 180) of potential African-American defendants to face the federal death penalty, a greater percentage than his predecessor. (See Graph 10.)

***1625** Graph 10 Percentage of African-American Defendants Reviewed and Selected by Attorney General Reno and Attorney General Ashcroft to Face the Federal Death Penalty

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

D. Death Row

African Americans constitute approximately 13% of the population of the United States. [FN26] As stated, 69% of federal death row is currently black. [FN27] This compares to 48% in the overall Ashcroft selection pool and 48% (324 of 682) in the Reno selection pool. Attorney General Reno's pool of authorized defendants was 45% (71 of 159) black. Attorney General Ashcroft's pool of authorized cases is 55% African American (56 of 103). [FN28] Black defendants actually constituted only 42% in the overall 1995 through 2001 pool, which presumably included all defendants--even those not reviewed by the Department of Justice. African-American defendants constitute 52% of all defendants who were approved for a capital trial by any Attorney General. (See

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Graph 11.) Seven of the thirty-five (20%) men sentenced to death are African Americans convicted of the murder of a white person.

Graph 11 African-Americans as a Percentage of the Population, in the Reno and Ashcroft Review and Selection Pools in Trial and on Federal Death Row

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

## VI. Race of Victims

### A. Attorney General Ashcroft

As to the 103 defendants Attorney General Ashcroft has approved for a federal capital prosecution, the breakdown of their victims by ***1626** race and ethnicity is as follows: 36 whites, [FN29] 38 blacks, 18 Hispanics, 4 black/Hispanic, 2 Asians, 2 white/mixture, 1 Native American, and 1 other. [FN30] So, thirty-six of 103 defendants, or 35%, are accused of killing a white person. Of the total of 381 defendants reviewed by Attorney General Ashcroft, 112, or 29%, are accused of killing a white victim. (See Graph 12.) Under Attorney General Ashcroft, the probability of being targeted for a capital prosecution are: 34% (38 of 112) if the defendant is accused of killing a white victim (See Graph 12) but only 24% (64 of 267) if the defendant is charged with killing a nonwhite victim. (See Graph 13.) Therefore, a higher percentage of white victim cases are selected by Attorney General Ashcroft for a federal capital trial than are represented in the pool that he reviews.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Under Attorney General Ashcroft, the probability of being targeted for a federal capital prosecution is: 40% (16 of 40) if you are a black defendant who kills a white victim, 28% (40 of 142) if you are a black defendant who kills a non-white victim, 31% (56 of 182) if you are a black defendant who kills anyone, 36% (26 of 72) if you are a white defendant who kills anyone, 17% (18 of 105) if you are an Hispanic defendant who kills anyone, and 27% (103 of 381) if you are any federal defendant who kills any victim. (See Graph 14.)

Graph 14 Probability of Facing the Death Penalty by Race of Defendant and Victim Combinations, Attorney General Ashcroft

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Of the 278 defendants for which Attorney General Ashcroft did not approve a capital prosecution, the victims were as follows: 70 white ***1627** (25%), 91 Hispanic, 74 black, 19 black/Hispanic, 12 Asian, 7 Native American, 2 White/Mixture, 1 White/Hispanic, and 1 other. [FN31]

The current administration has ignored or blurred the race-of-victim issue. In his testimony at the June 2001 Senate Hearing on the Federal Death Penalty, Deputy Attorney General Larry Thompson said this, and little more, about the race and ethnic background of victims in murder cases selected for the federal death penalty:

> It is a fact that minorities are more likely to be victims of violent crime today than the majority. My predecessor, former Deputy Attorney General Eric Holder, observed at a September press conference, that African-Americans constitute about fifty percent of the ***1628** nation's homicide victims. I find that a horrific statistic. In fact, Senator Feingold, sixty-three percent of the victims murdered by those individuals

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

sitting on death row in the Federal system are African-American. [FN32]

This blurs the issue by first counting each victim in multivictim cases and distorting the percentages, and consciously ignores the fact that one-half of federal death row is there for the murder of a Caucasian--well in excess of the white-victim cases in the initial selection pool. The commentary to the revised protocols likewise ignores the race-of-victim effect. Indeed, the 2001 Supplementary Survey presents no information regarding race of victims. This omission can only be deliberate.

B. Attorney General Reno

In contrast, the 2000 DOJ Survey does contain race-of-victim data. [FN33] The Survey reports that of 833 total victims, 30% were white. [FN34] Of authorized defendants, there were 578 victims, 33% of whom were white. Attorney General Reno also decided to seek the death penalty in disproportionate numbers in interracial murders--in 25% of intraracial homicides and 32% of interracial homicides. [FN35]

C. Black Men Who Kill Whites

Eleven percent (41 of 381) of the Ashcroft pool consists of black defendants who have killed or allegedly murdered a white person. Sixteen percent (16 of 103) of the defendants approved by Attorney General Ashcroft have involved cross-racial murders by black men. Eighteen percent (6 of 34) of those sentenced to death in federal court were likewise involved in cross-racial murders. (See Graph 15.)

***1629** Graph 15 Percentage of Black Defendant/White Victim Cases in the Attorney General Ashcroft Selection Pool, the Attorney General Ashcroft Authorization Pool and on Death Row

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

VII. The Supplementary Survey and Revised Protocols

Approximately four months after taking office, five days before the first federal execution in the modern era, [FN36] Attorney General Ashcroft issued revised death penalty protocols with commentary, the 2001 Supplementary DOJ Survey, which presented a different spin on the racial landscape of the federal death penalty. Deputy Attorney General Thompson explained the new administration's changes to the federal death penalty protocol at the Senate hearing on June 13, 2001, claiming that there was no evidence of disparate treatment based on the race of the defendant: [FN37]

> First, the Department released a report containing additional statistical data on potential capital cases prosecuted by the Department since 1995. The report also included an analysis of the Department's enforcement practices during the same period of time. Secondly, the Department announced that the protocols for reviewing death-eligible charges have been slightly revised to increase uniformity in the system and ensure greater scrutiny of cases in which a U.S. Attorney is recommending capital punishment. Third, the Attorney General announced that he is directing the National Institute of Justice to conduct a study of how capital cases are brought into the Federal system. . . . Attorney General Reno directed the Department to collect additional data on cases that had not been submitted***1630** for review over the same period of time. The cases in this category were not submitted because, for example, U.S. Attorneys entered into plea agreements with defendants before indictment on a capital offense charge. She took this

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

action to ensure that this additional information did not undermine the findings reached on the basis of the original data. The new data consists of nearly 300 cases. It is similar to the original data of the Reno report in that it provides no evidence of favoritism toward white defendants in comparison with minority defendants . . . [o]ur reports confirm that African-American and Hispanic defendants were less likely at each stage of the Department's review process to be subjected to the death penalty than white defendants . . . . Our study found abundant evidence that the statistical disparities observed in Federal capital cases resulted from non-invidious factors rather than from racial or ethnic bias. [FN38]

The Deputy Attorney General did not make clear to which “statistical disparities” he was referring. Nor did he comment on the reality that the review process is not “race blind” at the most important local level. Indeed, it is very interesting to examine which defendants were not submitted for a Main Justice death penalty review between 1995 and June 2001. [FN39]

VIII. The Frequency of Seeking the Federal Death Penalty

Attorney General Ashcroft has approved 103 out of 381 defendants that we know of, or 27%. “From 1995 to 2000, the Attorney General [Reno] decided to seek the death penalty for 159 defendants, out of a total of 588 or 27%.” [FN40] But Attorney General Ashcroft has actually approved or authorized capital prosecutions with greater frequency ***1631** than Attorney General Reno. Under Attorney General Reno, United States Attorneys were free to resolve cases through plea or cooperation agreements, thus removing defendants from the pool reviewed by the Attorney General. Including these cases, Attorney General Reno approved seeking the death penalty for 159 of 651 defendants, or 24.4%.

The June 2001 Supplementary Report by the DOJ identified a total of 973 potential defendants. [FN41] Attorney General Reno authorized a death penalty prosecution against a total of 162 defendants. So, Attorney General Reno actually approved death penalty prosecution for only approximately 18%, to perhaps 20%, of possible defendants in the available pool of federal capital defendants. [FN42]

A second aspect of the increasing use of the federal death penalty is actually more important: that is, how many times did the Attorney General actually require a death penalty trial? As of January 26, 2004, there are seventy defendants awaiting, or in, a federal capital trial. This is a significant increase. Additionally, Attorney General Ashcroft's repeated rejection of plea agreements suggests that most of these cases will be tried. So, in this sense, it is clear that Attorney General Ashcroft will, in the end, actually be asking for the death penalty at trial in greater numbers than did Attorney General Reno.

IX. Deference to the United States Attorney

Another difference between Attorney General Ashcroft and Attorney General Reno lies in the area of deference to local prosecutors. Of the 103 defendants Attorney General Ashcroft has approved for a federal capital prosecution, as best we can tell, forty-one (or 40% of the total) have been situations in which the Attorney General has required a federal capital prosecution without a request for permission from the United States Attorney. Thirty-six of the forty-one belong to minority groups. All forty-one cases involve either non-white defendants or white victims. In comparison, Attorney General Reno required capital prosecutions against twenty-six defendants over five years. She approved 161 other defendants for a capital prosecution. So, Attorney General Reno required a capital trial without a request by the local prosecution for 14% of the defendants she targeted for a capital prosecution. (See Graph 16.) [FN43]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***1632** Graph 16 Percentage of Reno and Ashcroft Capital Prosecutions Required Without a Request for Permission by the United States Attorney

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

As stated, African Americans make up 55% of those defendants against whom the death penalty is sought but only 48% of all defendants reviewed (See Graph 6.) So, the current Attorney General's allegedly “race blind” decision making exacerbates the racial disparity problem as to African American defendants. Of the forty-one defendants selected without a request for permission to seek the death penalty, twenty-four (59%) are African American. This means that Attorney General Ashcroft's decisions have resulted in a greater frequency of African Americans facing a federal death penalty trial compared to the percentage of black defendants in the overall pool reviewed and in the pool of those defendants for whom local prosecutors seek permission to ask for the death penalty. (See Graph 17.)

Graph 17 Percentages of African-American Defendants in Each Pool Reviewed, Authorized and Authorized Without A Request To Seek the Death Penalty Under Attorney General Ashcroft

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

In his testimony in June 2001, Deputy Attorney General Thompson stated: “One of the changes we have made in the protocol procedures ***1633** is that--at every step of this protocol review process, our statistical analysis indicated that blacks were treated slightly more favorably than whites, in fact.” [FN44] While this was technically true, under Attorney General Reno, the statement (1) ignores the all important race-of-victim issue; [FN45] and (2) no longer appears to be the case, certainly as to the cases in which Attorney General Ashcroft overrules the United States Attorney.

To the extent that the Main Justice selection process is, in fact, “race blind,” it is also powerless to correct the lopsided selection of African-American defendants and white victim cases. In fact, the so-called “race blind,” top-heavy process is exacerbating inequality. As such, it is difficult to see how such a system is a virtue, particularly when it is certainly not “race blind” at the most important selection stage--the local law enforcement and prosecutorial stage. [FN46]

The DOJ has defended these decisions as attempts to enhance consistency and uniformity nationwide. [FN47] But scrutiny of these decisions ***1634** suggests otherwise. Attorney General Ashcroft ordered that a capital trial be held for three African-American defendants who killed a rival drug dealer in Binghamton, New York. [FN48] No other homicides were alleged. Nothing appeared to distinguish the case from dozens of other single-victim drug gang homicides that fell (or could have fallen) under federal jurisdiction. Attorney General Ashcroft was informed that an expert retained by one defendant was of the opinion that one of the defendants was retarded. [FN49] One month after the United States Supreme Court held that it was unconstitutional to execute the retarded, the Attorney General ordered the local prosecutors to seek the death penalty. [FN50] A federal judge and others have criticized these decisions for reasons not involving racial disparity. [FN51]

Examining these forty-one decisions another way, of the 316 defendants against whom United States Attorneys were not inclined to seek the death penalty, Attorney General Ashcroft has required a capital prosecution forty-one times, a disagreement rate of 13%. In comparison, between 1995 and 2000, Attorney General Reno agreed 94% of the time, a disagreement rate of 6%, with a United States Attorney who was not inclined to seek the death penalty. [FN52]

***1635** The commentary to the 2001 amendments to the DOJ death penalty protocol includes this statement:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

"The Attorney General will, of course, retain legal authority as head of the Justice Department to determine in an exceptional case that the death penalty is an appropriate punishment, notwithstanding the United States Attorney's view that it should not be pursued." [FN53]

It is not readily apparent that all forty-one of these cases, involving mostly minority defendants, disproportionately black, are 'exceptional.' However, the effect of the Attorney General's decisions on the number of black men to face execution is readily apparent.

X. Capital Prosecutions Rejected by the Attorney General

Attorney General Ashcroft has, to our knowledge, refused permission to seek the death penalty against seven defendants in four cases from Alabama, Hawaii, Missouri, and Texas. One case involved two female African-American defendants and another case involved three Hispanic defendants, when the request for permission was made the week before the start of trial. So, Attorney General Ashcroft has approved sixty-three of seventy requests to seek the death penalty (90%). Attorney General Reno's Arate of agreement" for decisions to seek the death penalty was 83%, or 133 of 160 defendants for whom the United States Attorney recommended seeking the death penalty. [FN54]

XI. Public Disclosure

Attorney General Ashcroft's 2001 Supplementary Report stated that there was a need for the disclosure of public information about the use of the federal death penalty on a regular basis: "U.S. Attorneys will be required to submit information, including racial and ethnic data, about potential capital cases, as well as those in which a capital offense is actually being charged." [FN55] The DOJ, under Attorney General Ashcroft, has stated that "more complete racial and ethnic data" should be made "available for both actual and potential federal capital cases on a continuing basis." [FN56] This has not been done. [FN57]

***1636** XII. Plea Agreements

In his testimony at the June 2001 Senate Hearing, Deputy Attorney General Thompson said:

> [W]e did note some statistical disparity in the treatment of plea agreements following a decision by the Attorney General to seek the death penalty. This is the one component of the process that is not subject to subsequent review under the current protocols. In order to have greater consistency in all aspects of the application of the federal death penalty, we are changing the protocol to require prior approval by the Attorney General before a death penalty prosecution may be dropped in the context of a plea agreement.

One step in which whites did have a better treatment from the statistical analysis was whether or not after the death penalty had been warranted a plea was subsequently negotiated, and there was a little bit more favorable statistical analysis on that part. [FN58]

In fact, there was more than a "little bit." Whites were allowed to negotiate away death with considerably more frequency. [FN59] (See Graph 18.)

Graph 18 Distribution by Race and Ethnic Background of Federal Capital Defendants Who Pled Guilty - 1995 to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2000--By Race

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Once a case is authorized, Attorney General Ashcroft has only approved, to our knowledge, ten plea agreements (four defendants originally authorized by Attorney General Reno, and six authorized by Attorney General Ashcroft) [FN60] that have been accepted by a judge. [FN61] ***1637** Attorney General Ashcroft has withdrawn two notices of intent to seek the death penalty. [FN62] He has rejected ten plea agreements that we know of. [FN63] In contrast, under Attorney General Reno, there were seventy-nine plea agreements and requests for the death penalty were withdrawn twenty-two times due to new developments.

## XIII. White Mobsters

With the single exception of Thomas Pitera, who was spared by a Brooklyn, New York jury, [FN64] no members or associates of white organized crime gangs-- generally known as the Mafia--have faced the federal death penalty, although some eighty-one members of the mob were involved in many murders and most of these surely could have been faced with the death penalty. [FN65] At a June 2001 Senate hearing, referring to that day's newspaper exposé [FN66] comparing federal drug gang capital prosecutions to noncapital, but death eligible, mob prosecutions, Senator Russell Feingold noted that Newsday “compares Federal prosecution of street gangs to Federal prosecution of the Mafia. [The author, Tom Brune] found that the Federal Government is more likely to seek the death penalty against members of street drug gangs ***1638** than members of the Mafia.” In fact, Senator Feingold was being generous. The federal government almost never seeks the death penalty against the mob. [FN67] Senator Jeff Sessions correctly stated: “[T]he Mafia question is a good one.” [FN68]

## XIV. Race and Federal Capital Trials

The third federal execution in modern times involved the archetypical scenario: a black man who abducts, rapes, and murders a white woman. Although there was no explicit appeal to racial prejudice, one could argue, and the defendant Louis Jones did, that code words were used. [FN69] In Jones, the “petitioner argue[ed] that the term ‘personal characteristics' was so vague that the jury may have thought it could ***1639** consider the victim's race and the petitioner's race under factor 3(C).” [FN70] The Court held:

> [I]n light of the remainder of the factor and the Government's argument with respect to the factor, we fail to see that possibility. In any event, in accordance with the Death Penalty Act's explicit command in § 3593(f), the District Court instructed the jury not to consider race at all in reaching its decision. [FN71]

In Jones, the United States Court of Appeals for the Fifth Circuit was of the opinion that ‘[t]he use of the terms ‘background,’ ‘personal characteristics,’ and ‘unfamiliarity’ without further definition or instruction left the jury with . . . open-ended discretion.‘ [FN72] However, a plurality [FN73] of the Supreme Court disagreed. Five members of the Court found any error harmless, stating: “[A]ssuming that use of these loosely drafted factors was indeed error, we conclude that the error was harmless.” [FN74]

***1640** Eighty-four federal death penalty trials have been completed, involving 112 defendants; 67 black defendants, or 60% of the total defendants tried (67 of 112), faced the death penalty at a federal trial. Twenty-eight defendants were white (25%), and ten defendants were Hispanic (9%). Additionally, there have been two Asians, two Arabs, one Native American, and one Indian defendant placed on trial for their lives. One defendant was accused of espionage and not murder. Fourteen of the black defendants, or 13% of all defendants tried (14

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of 112), involved prosecutions against black defendants who killed white victims.

There have been repeated allegations, all rejected, of racial discrimination in federal capital trial jury selection. [FN75] Race has arisen in ***1641** other contexts in federal capital trials. [FN76] A number of federal death row residents had all-white juries. [FN77]

In the last three years, there have been eight new death sentences (plus one resentencing resulting in a death verdict) in trials involving thirty-three federal defendants. [FN78] Seven of nine (78%) of these trials resulting in a death sentence involved white murder victims. White victim cases make up only 29% of the total federal pool of cases. Seven of nine have involved female victims. [FN79]

The United States Supreme Court has acknowledged that conscious or unconscious racism affects capital selection and sentencing decisions and has shown a particular sensitivity to cross-racial capital murder: [FN80]

> Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected. . . . [A] juror who believes that blacks are violence prone or morally inferior might well be influenced. . . . [S]uch a juror might also be less favorably inclined toward[ ] petitioner's evidence of mental disturbance as a ***1642** mitigating circumstance. More subtle, less consciously held racial attitudes could also influence a juror's decision. . . . [FN81]

Justice Lewis F. Powell's dissent bitterly complained about the Court's “unjustified presumption that capital jurors harbor latent racial bias.” [FN82] But they do.

As stated, 30% of the Reno selection pool involved defendants who killed white victims. Similarly, the Ashcroft death selection pool involves 381 defendants, 30% of whom have killed a white victim. In contrast, federal capital trials have involved forty-three defendants who murdered a white person, 39% (43 of 110) of cases that were tried. As stated, 50% of those currently on death row, and 50% of those ever sentenced to death in federal court, murdered a white person. (See Graph 19.)

Graph 19 A Comparison of the Percentage of Defendants Who Allegedly Killed White Victims in the Reno-Ashcroft Selection Pools, in Trial and on Death Row

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

XV. Litigation Regarding Discovery of DOJ Charging Practices

Thus far, the efforts of federal capital defendants to obtain discovery or to support a claim of selective prosecution have been largely rejected. In United States v. Bass, [FN83] a unanimous Court reversed a Sixth Circuit order affirming the district court's grant of a motion for discovery of DOJ charging practices in a case involving a black defendant and multiple African-American victims. [FN84] The Court summarily reversed, finding that Bass had failed to present “relevant evidence ***1643** that similarly situated persons were treated differently . . . .” [FN85] Therefore, Bass was “not entitled to discovery.” [FN86] A divided panel of the Sixth Circuit had concluded that the DOJ Survey showed that the Government charged “blacks with a death-eligible offense more than twice as often as it charges whites” and that “the United States enters into plea bargains more frequently with whites than it does with blacks.” [FN87] The Court assumed for the moment that United States v. Armstrong [FN88] could be satisfied “by a nationwide showing . . .” but found that Bass's “raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants.” [FN89] The Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

also found that Bass' plea bargaining complaint was even "less relevant, since [Bass] was offered a plea bargain but declined it." [FN90] Similar efforts in the lower courts have generally failed for the same reason. [FN91] However, this is not to say that some courts have not noted ***1644** the problem. The DOJ Survey and admissions by national leaders, including the former Attorney General, "raises a further question: are minorities being charged by United States Attorneys with capital-eligible offenses at greater rates than whites who commit similarly culpable conduct? The DOJ Survey does not address this issue." [FN92] Three judges have ordered limited discovery. [FN93]

***1645** XVI. Conclusion

We decline to accept that racial disparity and the reality of racism, unconscious or not, in federal capital sentencing is a problem without a solution. We could start with a federal death penalty moratorium or, if that is too bitter a pill to swallow, [FN94] we could start where we should have--with a Racial Justice Act. [FN95] We could start by convincing Attorney General Ashcroft to heed the advice of his own prosecutors more often. We could start by opening the DOJ's death penalty selection books. We could start by limiting the removal of non-white citizens from jury pools. We could start by allowing evidence of the statistical disparities before capital juries. [FN96] We could start somewhere.

[FNa1]. Kevin McNally, of 513 Capitol Avenue, Frankfort, Kentucky, 40601, kmcnally@dcr.net, currently serves, along with David Bruck of South Carolina, and Richard Burr of Houston, Texas, for the Federal Death Penalty Resource Counsel Project (the Project). The Project has assisted court-appointed and defense attorneys charged with the defense of capital cases in the federal courts since January of 1992. Responsibilities of the Project include the monitoring of federal capital prosecutions throughout the United States, in order to ensure the delivery of cost-effective and adequate defense services to indigent federal capital defendants.

This effort includes the collection of data on the application of the federal death penalty, both as to prosecutions under the 1988 so-called "Drug Kingpin" death penalty statute, 21 U.S.C. § 848(e) (2000), and prosecutions pursuant to the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. § 3591 (2000). Among the aspects of each federal death penalty prosecution about which the Project collects information is the race of the defendant and the race of the victim, the government's allegations, and the position of the United States Attorney and the Attorney General regarding the death penalty.

Resource Counsel maintain a comprehensive list of federal death penalty prosecutions and information regarding each defendant. This information is regularly updated, and is checked for accuracy whenever possible against any available United States government information regarding federal capital prosecutions, with counsel appointed under the Criminal Justice Act, or retained by the defendant, or all three. The Project's information regarding practices in federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center, and by various federal district courts.

The work of the Federal Death Penalty Resource Counsel Project is described in Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation 28-30 (1998), available at http://www.uscourts.gov/dpenalty/1COVER.htm (last visited Jan. 28, 2004). The Subcommittee report urges the judiciary and counsel to "maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." Id. at 50.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Project is indebted to Mr. McNally's irreplaceable assistant, Rachelle Chattin, without whom tracking these life and death decisions would be impossible.

[FN1]. Furman v. Georgia, 408 U.S. 238 (1972) (per curiam).

[FN2]. For a thorough history of the federal death penalty, see Rory K. Little, The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role, 26 Fordham Urb. L.J. 347 (1999).

[FN3]. See Death Penalty Info. Ctr., Executions of Federal Prisoners 1927-2003 (2003), available at http://www.deathpenaltyinfo.org/ article.php? scid=29&did=149 (last visited Jan. 28, 2004); Rory K. Little, What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt and the Spectre of Timothy J. McVeigh, 53 Depaul L. Rev. 1591.

[FN4]. See Little, supra note 2, at 476. Professor Little, a former federal prosecutor and member of the Attorney General's Capital Case Review Committee, attributes this to "[u]nconscious racial identification with white defendants or victims or both by white prosecutors, judges and jurors ...." Id. at 485. See also S. Sundby, The Capital Jury and Empathy: The Problem of Worthy and Unworthy Victims, 88 Cornell L. Rev. 343 (2003).

[FN5]. All figures in this Article are as of January 26, 2004. All of the information in this Article, except as otherwise noted, regarding federal death penalty prosecutions and trials, is based on data collected by the Project, and is on file with the author.

[FN6]. In a Senate hearing on the federal death penalty on June 13, 2001, Senator Jeff Sessions from Alabama attempted to argue that the execution of whites in numbers reflective of their proportion in the population in the first half of the twentieth century was evidence that the post-Furman federal death penalty was operating in an acceptable manner. Senator Russell Feingold from Wisconsin saw things differently:

Senator Sessions: Mr. Chairman, I would just note, as we talk about the statistical numbers being small, I have a report here that 29 out of 35 Federal executions since 1927 have been white. I think you are correct to look at the numbers we are looking at today, but in the long run those numbers are somewhat comforting, I think, in terms of racial bias.

Senator Feingold: I take no comfort from the statistics you gave, they appall me because what they are ... based on is the Federal death penalty that stopped basically in 1963. The modern death penalty, a statistic that you call not significant, involves, out of 19 people, 17 minorities; 14 are black. That is the face of the modern death penalty at the Federal level, something that I believe never was true in American history. So I would take a different read, rather than comfort, on those numbers.

Senator Sessions: Maybe it is just a short-term statistical anomaly.

Senator Feingold: Let us hope.

Senator Sessions: Let us hope.

Racial and Geographic Disparities in the Federal Death Penalty System: Hearing Before the Subcommittee on the Constitution, Federalism, and Property Rights, 107th Cong. 107-396 (2001), available at http:// frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=107_senate_ hearings&docid=f:78760.wais (last visited Apr. 13, 2004).

[FN7]. U.S. Dep't of Justice, The Federal Death Penalty System: A Survey (1988-2000) (2000), available at http://www.usdoj.gov/dag/pubdoc/p_survey_ final.pdf (last visited Apr. 13, 2004) [hereinafter Survey 1].

[FN8]. See U.S. Dep't of Justice, the Department of Justice Manual § 9-10.000 (1995) (Federal Prosecutions in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Which the Death Penalty May Be Sought), available at http://www.capdefnet.org/fdprc/contents/shared_files/docs/01a_doj_ manual.htm (last visited Apr. 13, 2004).

[FN9]. See Little, supra note 2. See also Little, The Future of the Federal Death Penalty, 26 Ohio N.U. L. Rev. 529, 533 (2000).

[FN10]. U.S. Dep't Of Justice, The Federal Death Penalty System: Supplementary Data, Analysis, and Revised Protocol for Capital Case Review (2001), available at http://www.doj.gov/dag/pubdoc/deathpenaltystudy.htm (last visited Apr. 13, 2004) [hereinafter Survey 2].

[FN11]. Id.

[FN12]. Professor Little has written that support staff excise race identifying information in the materials the Review Committee and the Attorney General review. See Little, supra note 2, at 411-12. The extent of the redaction is unclear.

[FN13]. Two defendants were spies who did not cause a death.

[FN14]. Attorney General Ashcroft's pool includes all cases submitted per the 2001 changes in the protocols. It does not include one defendant who died before review, a few who were not indicted but could have been, and some government cooperating witnesses who were not charged with a capital offense or whose agreements were apparently not reviewed by the Attorney General. It includes twenty African American noncapital codefendants in a huge District of Columbia prosecution where the Attorney General authorized pursuit of the death penalty against two other defendants. United States v. Gray, No. 1:00CR00157 (D.D.C.).

[FN15]. The Constitution of the territory of Puerto Rico prohibits the death penalty, possibly suppressing somewhat the selection of Hispanic defendants from Puerto Rico. See United States v. Acosta-Martinez, 252 F.3d 13 (1st Cir. 2001). Additionally, alien-smuggling cases usually involve people of Latino descent. While technically death eligible, no such case has ever been selected for a death penalty trial, presumably because the necessary “intent to kill” factor is normally not present or provable. See 18 U.S.C. § 3591(a) (2000).

[FN16]. See Survey 1, supra note 7, at 29 (examining a pool of 682 defendants). According to the Bureau of Justice Statistics, whites committed 46.4% of all homicides between 1976 and 2000. See http://www.ojp.usdoj.gov/bjs/homicide/race.htm (last visited Apr. 13, 2004). Attorney General Janet Reno stated that she was “sorely troubled” by the report and added: “The survey today finds that minorities are overrepresented in the federal death-penalty system, as both victims and defendants, relative to the general population.” Tom Brune, Death Penalty Disparities; Federal Study Finds Minorities Over-Represented on Death Row,Newsday, Sept. 13, 2000, at A5, available at 2000 WL 10033428. Deputy Attorney General Eric Holder, who oversaw the creation of the report, stated that he was “personally and professionally disturbed by the racial disparity.” Robert L. Jackson,Study Finds Racial Gap on Death Row: More Black Convicts Face Capital Punishment Than Whites. Activists Call for a Federal Moratorium on Executions, L.A. Times, Sept. 13, 2000, at A5, available at 2000 WL 2589108. Deputy Attorney General Holder added, “I knew there would be a disparity, but I did not expect [one] that large.” Id.; see also Katherine Johnson, Big Disparities in the Federal Death Penalty,USA Today, Sept. 13, 2000, at A4, available at 2000 WL 5789416. In a press conference that took place on June 28, 2000, President Clinton mentioned the federal death penalty: “The issues at the federal level relate more to the disturbing racial composition of those who have been convicted ....” Tom Brune, Execution To Be Stayed; President Waiting for New Clemency Guidelines, Newsday, July 8, 2000, at A07, available at 2000 WL 10023270. My Resource

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Counsel colleague, David Bruck, put it this way: "No state in America, not Mississippi, not Texas, not South Carolina, has produced such a racially lopsided death sentencing record as has the federal government." Marc Lacey & Raymond Bonner, Reno Troubled by Death Penalty Statistics, N.Y. Times, Sept. 13, 2000, at A17, available at 2000 WL 26777906.

[FN17]. See Survey 1, supra note 7, at 27.

[FN18]. See Survey 2, supra note 10, at 21-22.

[FN19]. Id.

[FN20]. Id. at 10.

[FN21]. Id.

[FN22]. See Survey 1, supra note 7, at 29.

[FN23]. Letter from David C. Baldus, Professor of Law, University of Iowa, to Senator Russell D. Feingold (June 11, 2001), available at http:// www.deathpenaltyinfo.org/article.php?scid=18&did=252 (last visited Apr. 13, 2004).

[FN24]. Professor Baldus wrote:

The race-of-victim disparity nationwide is significant at the .06 level, while the disparity in the states in which death sentences have been imposed is significant at the .09 level. The states in which death sentences were imposed between 1995 and 2000 are Arkansas, Georgia, Illinois, Kansas, Louisiana, Missouri, North Carolina, Oklahoma, Pennsylvania, Texas, and Virginia. Of particular relevance are the race-of-victim disparities involving black defendants. Nationwide, in black defendant/white victim cases, the death sentencing rate was .11 (6/55) while in the black defendant/minority victim cases, the rate was .03 (7/253), an 8 percentage point difference, significant at the .01 level. In the eleven death-sentencing states, the death-sentencing rate in the black defendant/white victim cases was .24 (6/25), while in the black defendant/minority victim cases, the rate was .07 (7/95), a 17 percentage point difference, significant at the .02 level."

Id.

[FN25]. See Survey 2, supra note 10, at 10; Survey 1, supra note 7, at 11.

[FN26]. Jesse McKinnon, The Black Population in the United States, Current Population Reps., Mar. 2002, available at http:// www.census.gov/prod/2003pubs/p20-54.pdf (last visited Apr. 13, 2004).

[FN27]. This total includes two inmates, Sinisterra and Ortiz, who are very dark-skinned men from Columbia, listed by the Bureau of Prisons as black.

[FN28]. See Survey 1, supra note 7, at 9.

[FN29]. Multi-victim cases, if they involve the murder of any white victim, are counted as a white victim case.

[FN30]. One defendant had no victims.

[FN31]. One defendant had no victims.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN32]. Racial and Geographic Disparities in the Federal Death Penalty System: Hearing Before the Subcomm. on the Constitution, Federalism, and Property Rights of the Senate Comm. on the Judiciary, 107th Cong. 10 (2001) (statement of Larry Thompson, Deputy Attorney General, Department of Justice), available at http://frwebgate.access.gbo.gov/cgi-bin/getdoc.cgi? dbname=107_senate_hearings&docid=f:78760.wais (last visited Apr. 13, 2004) [hereinafter Racial and Geographic Disparities].

[FN33]. U.S. Dep't of Justice, Bureau of Justice Statistics, Homicide Trends in the U.S. (2002), available at http:// www.ojp.usdoj.gov/bjs/homicide/race.htm (last visited Apr. 13, 2004).

[FN34]. Id. The Bureau of Justice Statistics reports that whites constituted 51.1% of homicide victims between 1976 and 2000.

[FN35]. Id.

[FN36]. Timothy McVeigh was executed on June 11, 2001. Lynda Gorov, As Bombing Memories Churn, a Curtain Falls Silent, McVeigh Executed While Survivors Watch, Boston Globe, June 12, 2001, at A1, available at 2001 WL 3937685. Juan Garza was executed eight days later. Richard A. Surano, Texas Murderer Becomes 2nd To Be Executed by U.S. in Eight Days, L.A. Times, June 20, 2001, at A11, available at 2001 WL 2496973. The 2001 Protocols were amended and the Supplementary Survey was released on June 6, 2001. Survey 2, supra note 10.

[FN37]. See Racial and Geographic Disparities, supra note 32.

[FN38]. See id. (emphasis added). During his confirmation hearing, Attorney General Ashcroft promised to continue and not terminate the National Institute of Justice study. 147 Cong. Rec. S5954-02 (2001), available at 2001 WL 630346. “Democratic senators extracted commitments from Ashcroft to continue ... studies begun by Attorney General Janet Reno of the racial and geographic disparities in the federal death penalty.” Craig Gordon & Tom Brune, Day 2 in Hot Seat; Ashcroft Hit by Barrage of Questions on His Beliefs, Newsday, Jan. 18, 2001, at A5.

After some delay, and some concern that the effort would be abandoned, two studies have been commissioned and are underway. Deputy Attorney General Thompson testified: “[T]he Attorney General has directed the National Institute of Justice to go forward with a study of the relationship between the state and federal criminal justice systems and the policies and practices that result in a capital case being prosecuted by the Federal Government.” See Racial and Geographic Disparities, supra note 32.

[FN39]. “There are 66% more Black defendants than Hispanic defendants in the September 12 report data (defendants submitted for review), while there are 85% more Hispanic defendants than Black defendants in the June 6 report (defendants not submitted for review).” David Algranati: Exploring Racial and Geographical Effects in the Decision to Seek the Federal Death Penalty 1995-2000 (2002) (unpublished manuscript, on file with author).

[FN40]. See Survey 1, supra note 7, at 27.

[FN41]. See Survey 2, supra note 10.

[FN42]. Some of these 973 defendants were reviewed in the first few months of the tenure of Attorney General Ashcroft; it is unclear how many.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN43]. Of the forty-one defendants targeted by Attorney General Ashcroft, without a request by the United States Attorney for permission, two have been tried and sentenced to death; four were tried and received life sentences; three cases have resulted in guilty pleas; in two cases, the authorization was withdrawn; in one case the notice of intent to seek the death penalty was dismissed by the judge. Twenty-nine such defendants are pending trial. Thirty-six of the forty-one (88%) defendants belong to minority groups. However, non-whites only make up 74% of the overall Ashcroft pool of those defendants facing the death penalty. (Non-whites make up 81% of all defendants that Attorney General Ashcroft has reviewed.)

Of the twenty-six defendants in the pool for which Reno "required a capital trial," eight (31%) were white and eleven (42%) killed a white person. Again, it could be argued that the Attorney General's (whoever that might be) failure to listen to advice skews the racial makeup of the federal death penalty. On the other hand, Attorney General Reno refused to permit federal prosecutors to seek the death penalty twenty-eight times. Fifteen of these defendants (54%) killed a Caucasian person. Fifteen of these defendants (54%) were African American. Seven (25%) were black men who committed interracial murder. Therefore, Attorney General Reno's actions in blocking death penalty trials reduced the statistical racial disparity in the federal death penalty. Attorney General Ashcroft has not taken similar ameliorative action in rejecting requests to seek the death penalty.

[FN44]. See Racial and Geographic Disparities, supra note 32.

[FN45]. A vast majority of the white victim cases involve white defendants.

[FN46]. Professor Little writes that "the line prosecutor and lead investigator often have a large, if not primary, influence on the charging and sentencing contours of potential federal death penalty cases." See Little, supra note 4, at 476. Because the United States Attorney's position, even under the current regime, is generally accepted, particularly if it is "pro death," the local decision is critical.

[FN47]. See Rory K. Little, Good Enough for Government Work? The Tension Between Uniformity and Differing Regional Values in Administering the Federal Death Penalty, 14 Fed. Sentencing Rep. 7 (2001).

[FN48]. Carol DeMore, Law Beat, Ashcroft Taking a Hard Line in Death Penalty Decisions, Albany Times Union, Nov. 14, 2002, at B10.

[FN49]. Dan Barry, A Capital Case, and a Defendant Who May Be Retarded, N.Y. Times, Mar. 18, 2003, at B1, available at 2003 WL 17089979.

[FN50]. See Atkins v. Virginia, 536 U.S. 304 (2002). After a prosecution expert confirmed this diagnosis, the request for the death penalty was withdrawn. See Dan Barry, Ashcroft Retreats in Capital Case, Int'l Herald Trib., Mar. 21, 2003, at A1, available at 2003 WL 4536050. The jury sentenced the other two defendants to life in prison. Nancy Dooling, Lavin Matthews and Tebiah Tucker Were Spared a Death Sentence, Binghampton Press & Sun-Bull., June 14, 2003.

[FN51]. See John Gleeson, Supervising Federal Capital Punishment: Why the Attorney General Should Defer When U.S. Attorneys Recommend Against the Death Penalty, 89 Va. L. Rev. 1697, 1699-1700 (2003). However, Judge Gleeson noted the question of race:

This topic has many dimensions, most of which I will not address here. For example, there is the question of racial disparity among those who face the death penalty. Attorney General Reno found it troubling that only twenty percent of the defendants who face capital charges are white. Attorney General Ashcroft has dismissed that concern, contending that the disproportionate numbers of black and Hispanic defendants who face

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

capital charges are due not to bias, but rather to the overrepresentation of those groups in the pool of federal defendants who are accused of death-eligible crimes.

Id. at 1699-1700. Rather, Judge Gleeson questioned the need for so-called national uniformity and pointed out the negative law enforcement consequences of this policy. Former United States Attorney Mary Jo White and others have as well: ‘It's very, very dangerous on its face, and it's troubling, because it doesn't make sense from a law enforcement perspective.‘ Adam Liptak, The Death Penalty: A Witness for the Prosecution, N.Y. Times, Feb. 15, 2003, at B9. Capital defense attorney David Ruhnke has questioned why the new, supposedly uniform, national standard must be that of a “Texas District Attorney running for reelection.” Benjamin Weiser & William Glaberson, Ashcroft Pushes Executions in More Cases in New York, N.Y. Times, Feb. 6, 2003, at A1.

[FN52]. See Survey 2, supra note 10, at 20.

[FN53]. Id.

[FN54]. See Survey 2, supra note 10, at 43.

[FN55]. Id. at 4.

[FN56]. Id.

[FN57]. See U.S. Dep't of Justice, The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review (2001), available at http://www.usdoj.gov/dag/pubdoc/deathpenaltystudy.htm (last visited Apr. 13, 2004).

[FN58]. See supra note 6.

[FN59]. See Survey 2, supra note 10, at 40, tbls. 3A, 3B.

[FN60]. The defendants, all minorities, authorized by Attorney General Reno were defendants in United States v. Llera-Plaza, 181 F. Supp. 2d 414 (2002) (Latino defendants/victims) and United States v. Satcher, No. AW00 0105 (W.D. Md.) (black defendant/victim). The defendants authorized by Attorney General Ashcroft are United States v. Lallamand, No. 00 CR 143 (N.D. Ill.) (black defendant/victim); United States v. Wilson, No. 01 20041 DV (W.D. Tenn.) (black defendants/white victim); United States v. Millegan, No. 01 CR 367 ALL (D. Md.) (black defendant/white victim); United States v. Pham, No. 00 CR 411 ALL (E.D. Cal.) (Asian defendant/victim); and United States v. Maxwell, No. 01 CR 20247 ALL (W.D. Tenn.) (black defendant/victim).

[FN61]. Attorney General Ashcroft also approved three other plea agreements subsequently repudiated by the defendants: United States v. Minerd, No. 99 215 (W.D. Pa.) (white defendant/victim); and United States v. Castillo, No. 99 83 (A) DT (C.D. Cal.) (Hispanic defendants/victims).

[FN62]. See United States v. Best, No. 2:00CR171RL (N.D. Ind.) (black defendant/victim); and United States v. McMillian, No. 3:00 CR 269 ALL (N.D.N.Y.) (retarded black defendant/black victim).

[FN63]. Nine of the ten defendants are non-white. Two of the ten cases involved black<<backslash>>white cross racial murder. Two of the ten have been sentenced to death. United States v. Fell, No. 00 M 66 ALL (D. Vt.) (white defendant/victim); United States v. Ferebee, No. 96 96 2273 (D. Md.) (black defendant/victim); United States v. Anonymous (black defendant/victim) (cooperation agreement); United States v. Quinones, No.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

00 CR 761 (S.D.N.Y.) (Hispanic defendants/victim); United States v. Robinson, No. 00 CR 260 ALL (N.D. Tex.) (black defendant/Hispanic victims) (death sentence); United States v. Zapata, No. 01 516 (E.D.N.Y.) (Hispanic defendants/victims) (cooperation agreement); United States v. Nelson, No. 02 CR 304 ALL (E.D. La.) (black defendant/white victim); United States v. Brown, No. CR 403 1 (S.D. Ga.) (black defendant/white victim) (death sentence); and United States v. Gomez-Olmeda, No. 03 CR 73 ALL (D. P.R.) (Hispanic defendant/victim).

[FN64]. See United States v. Pitera, 5 F.3d 624 (2d Cir. 1993).

[FN65]. A declaration containing identifying information regarding these cases is on file with the author.

[FN66]. Tom Brune, The Two Faces of Death Penalty: Minority Gangs Face It, White Mobsters Do Not, Newsday, June 13, 2001, at A06, available at 2001 WL 9236329.

[FN67]. For a few examples, see United States v. Hernandez, No. 00 CR 6273 4 (S.D. Fla.), which involved Gambino crime family members who killed a Pembroke Pines exotic dancer who threatened their widespread racketeering, loan sharking, and bank fraud businesses. Massaro, of Sunny Isle Beach and Hollywood, ordered the March 1999 murder of Jeannette Anne Smith, 22, who worked at The Dollhouse in Sunny Isles. See Larry Lebowitz, Feds Drop Death Penalty in '99 Slaying: Accused Mobsters Face Racketeering Charges, Miami Herald, May 17, 2001, at A1; Erika Boland, 3 Mobsters Convicted in Death of Dancer: Gambino Guys Believed Pines Stripper Was Snitch, Miami Herald, Dec. 15, 2001, at A1. Her body was found stuffed in a cardboard box. Id. The woman was ordered killed by the Gambino crime family in the mistaken belief she was an FBI informant. Id. Massaro solicited two other crew members to kill Hernandez when the body was discovered. Id. Hernandez, of Miami, carried out the crime. Id. The United States did not seek the death penalty. Id. The defendants were convicted and sentenced to life in prison. Lebowitz, supra.

United States v. Robert Bloome, No. 98-841 (E.D.N.Y.) involved a 1990 racketeering murder of a possible witness in the course of drug trafficking (21 U.S.C. § 848 (2000)) by four white defendants and a second murder in 1994 by three others, all members of a Staten Island organized crime group, the ‘Port Richmond crew‘ of the Luchese Family. Id. All defendants were white. Id. They did not face the death penalty. Id.

United States v. Joseph Merlino, No. 99-363 (E.D. Pa.) involved multiple killings. Four top ranking members, including organized crime mob boss Joseph ‘Skinny Joe‘ Merlino, underboss Steve Mazzone, consigliore George Borgesi, and soldier John Ciancaglini, were charged with two gangland slayings. Id. In 1998, rival drug associate Anthony Turra, who made disparaging remarks about Merlino and his future wife, was killed leaving his South Philadelphia home for court to await a verdict in a drug case. Id. In 1995, William ‘Billy‘ Vessey was fatally shot the morning his brother John, a government witness and ex-mobster, was about to testify. Id. Merlino and Borgesi were charged in the murders of Turra and Vessey. Id. Mazzone was charged in Turra's killing, and Cincagilini is accused in Vessey's death. Id. The ‘godfather‘ was Ralph Natale, who admitted involvement in up to twenty-four murders. Id. He was a cooperating witness. Bias Cited in Case of Alleged Gangster: Lawyers for 3 Latino Defendants Say Race Is the Reason Prosecutors Are Seeking the Death Penalty, Phila. Inquirer, Aug. 26, 2001, at B1, available at 2001 WL 27023441.

United States v. Mauriello, No. S-97-0082-PMP (RLH) (D. Nev.) involved the murder of Las Vegas mobster Herbie Blitztein during a burglary. The death penalty was not sought. See United States v. Panaro, 266 F.3d 939 (9th Cir. 2001).

[FN68]. See supra note 6.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN69]. Jones v. United States, 527 U.S. 373 (1999).

[FN70]. Id. at 401 n.14.

[FN71]. Id. at 400-01 n.14. The Court noted that 18 USC § 3593(f) (2000) requires the trial court to

instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant or of any victim may be.

18 U.S.C. § 3593(f) (2000). This instruction was the "poor man's" replacement for the "Racial Justice Act." Id.

The Racial Justice Act was a part of the House Judiciary Committee bill in 1994. H.R. 4017, 103d Cong. (1994). See H.R. Rep. No. 103-458 (1994). "That Act, which ultimately was not enacted, would have permitted statistics to make out a prima facie case of race discrimination, thereby requiring prosecutors to demonstrate a non race-related basis for seeking a death sentence." Erwin Chemerinsky, Eliminating Discrimination in Administering the Death Penalty: The Need for the Racial Justice Act, 35 Santa Clara L. Rev. 519, 520 (1995)." See also Little, supra note 2, at 386 n.218.

As of December 5, 2003, there have been ninety-eight juries--1,176 jurors-- who have assured us that they were not conscious of any role that race played in their life and death decisions. This is difficult to believe. One critic of § 3593(f) approach calls it "almost laughable." Stephen B. Bright, Discrimination, Death and Denial: The Tolerance of Racial Discrimination in Infliction of the Death Penalty, 35 Santa Clara L. Rev. 433, 464 (1995). At any rate, assuming the accuracy and truthfulness of these promises, they do nothing to assure that "unconscious racism" did not play a role in the selection of a disproportionate number of black defendant or white victim cases for the federal death penalty.

[FN72]. United States v. Jones, 132 F.3d 232, 251 (5th Cir. 1998).

[FN73]. Justice Antonin Scalia declined to join this portion of Justice Clarence Thomas's opinion, which was joined by Justices Sandra Day O'Connor, Anthony Kennedy, and William Rehnquist. Justice Steven Breyer declined to join the dissenting opinion of Justice Ruth Bader Ginsburg, joined by Justices John Paul Stevens and David Souter, on this point. Jones, 527 U.S. at 373, 396-402, 405, 420-21.

[FN74]. Id. at 403. This is, of course, the first, and only, modern federal death sentence the Supreme Court has reviewed. How embarrassing is it to confront the specter of racism on the Court's first opportunity to examine the "new and improved" federal death penalty? "This case is pathmarking, for it is the first application of the FDPA." Id. at 406 (Ginsburg, J., dissenting).

[FN75]. At least eight federal death row inmates have filed such complaints. For more on jury selection in federal capital trials, see United States v. Webster, 162 F.3d 308, 348 (5th Cir. 1998) (eliminating all five blacks and the one Asian on the list of sixty); United States v. Ortiz, 315 F.3d 873, 896 (8th Cir. 2002) (removing four black jurors); United States v. Causey, 185 F.3d 407, 412 (5th Cir. 1999) (striking nine black females and two black males, leaving one black female on the jury); United States v. Barnette, 211 F.3d 803, 812 (4th Cir. 2000) (striking one black female); United States v. Chandler, 996 F.2d 1073, 1102 (11th Cir. 1993) (striking against ten African-American jurors); and United States v. Brown, 217 F.3d 841, 2000 WL 930786, at *4-5 (4th Cir. 2000) (upholding rationales such as the "venireperson's quiet and softspoken demeanor" and "spouse" is a pris-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

on guard, although two justifications were said to be "marginal" by the trial judge). In Brown, sixteen of sixty-six panel members were black, ten of the government's twenty-two strikes were employed against blacks. Id.

Other death penalty defendants who were not sentenced to death have complained as well. See United States v. Cooper, 19 F.3d 1154, 1158 (7th Cir. 1994) (striking four black jurors); United States v. Moore, 149 F.3d 773, 779 (8th Cir. 1998) (striking five out of seven potential black jurors); United States v. Gooding, 67 F.3d 297 (4th Cir. 1995) (striking four black jurors); United States v. Williams, 2001 WL 1089525 (4th Cir. 2001) (using eight of the Government's twelve peremptory challenges to strike black female venire members); United States v. Mathis, 96 F.3d 1577, 1582 (11th Cir. 1996) (striking one black and one Hispanic venire member).

In a potential capital case in which the death penalty was not sought at trial, relief is still possible. United States v. Thomas, 303 F.3d 138 (2d Cir. 2002), after remand, 320 F.3d 315 (2d Cir. 2003) (remanding for credibility determination). See also United States v. Murillo, 288 F.3d 1126 (9th Cir. 2002) (removing an Hispanic venire member). United States v. Diaz, 176 F.3d 52, 76 (2d Cir. 1999) (striking three blacks).

In other trials, the Government used peremptory challenges to remove minority venire members without objection or, if there was objection, without the issue being raised on appeal. See United States v. Hall, No 4:94-CR-121-Y (N.D. Tex.), where a co-defendant of Mr. Webster was prosecuted by the same Assistant United States Attorney; United States v. Roane, No. 3-92-CR-68 (E.D. Va.); United States v. Tipton, 90 F.3d 861, 882 (4th Cir. 1996), where a challenge was raised to remove a potential woman juror); United States v. Mitchell, No. 01-CR-1062-ALL (D. Ariz.) (appeal pending).

[FN76]. In United States v. Claiborne, Judge Williams was concerned about the "racial implications" of the Government's decision to waive the Petite policy and retry the defendant after a state court acquittal

by a predominantly African-American state jury.... The Court was permitted to review the AUSA's Petite policy correspondence with the Assistant Attorney General in camera.... [But] nowhere in the correspondence does either the AUSA or the Assistant Attorney General address the racial composition of the Richmond jury as compared to the statistically probable federal jury, the racial implications this may have because the defendant is African-American, or the disparate impact that may result. [T]he decision to continue the investigation after the Richmond jury's acquittal and the decision by the AUSA to ask for the Petite policy waiver was not a color-blind decision. The statistics on City of Richmond and the Richmond Division of the United States District Court for the Eastern District of Virginia jury pools are well-known to prosecutors. Despite these statistics, in this case absolutely no discriminatory purpose has been shown to be attributable to the AUSA in his decision to prosecute ... Claiborne.

92 F. Supp. 2d 503, 511-13 (E.D. Va. 2000). See also United States v. Barnette, 211 F. 3d 803, 815, 823-24 (4th Cir. 2000). "Barnette argues that the Psychopathy Checklist Revised is unreliable because it has not been standardized with respect to black inmates, and Dr. Duncan improperly used race, wealth, age, and sex to support his opinion that Barnette was a psychopath." Id. at 823.

[FN77]. Orlando Hall, David Hammer, Timothy McVeigh, Norris Holder, Billie Allen, Marvin Gabrion, and perhaps others, faced all white federal death penalty juries.

[FN78]. In the modern era in federal court, there have been thirty-five death sentences after trials of 109 defendants. Only four of the last twenty-seven federal defendants to stand trial were sentenced to death.

[FN79]. Those condemned are Jackson, Nelson, Robinson, Gabrion, Barnette, Mitchell, Sampson, Brown, and Purkey.

[FN80]. See Turner v. Murray, 476 U.S. 28 (1986) (holding that a defendant accused of interracial capital crime

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

is entitled to have the prospective jurors informed of the victim's race and questioned on the issue of racial bias).

[FN81]. Id. at 35. (emphasis added).

[FN82]. Id. at 50.

[FN83]. 536 U.S. 862 (2002).

[FN84]. See United States v. Bass, 266 F.3d 532 (6th Cir. 2001).

[FN85]. Bass, 536 U.S. at 863.

[FN86]. Id.

[FN87]. Id.

[FN88]. 517 U.S. 456 (1996) (holding that a defendant must show evidence of discriminatory effect and intent when seeking discovery on a claim of selective prosecution).

[FN89]. Bass, 536 U.S. at 863-64.

[FN90]. Id. at 864. All emphasis was supplied by the Court.

[FN91]. See, e.g., United States v. Jones, 287 F.3d 325, 333-34 (5th Cir. 2002) (rejecting claim of selective prosecution by a now-executed black defendant who murdered a white female absent proof that 'Jones was singled out for prosecution under the FDPA but that others similarly situated were not' and emphasizing that 'mere statistical evidence of racial disparity is usually per se insufficient to support an inference of any 'unacceptable risk of racial discrimination in the administration of capital punishment' since 'criminal defendants are closely and individually scrutinized on a variety of bases'"). See also United States v. Roman, 931 F. Supp. 960, 968 (D.R.I. 1996) (Roman "chose not ... to present any information reflecting the potential federal death penalty cases, wherein the government elected not to seek the death penalty.... Roman's proffer has also failed to identify other non-Hispanic defendants whose offense subjected them to the imposition of the death penalty, but they were not so prosecuted."); United States v. Sepulveda, 952 F. Supp. 94, 97 (D.R.I. 1997) (noting that defendants were not similarly situated to female members of organization who were forbidden from holding decision-making positions); United States v. Holloway, 29 F. Supp. 2d 435 (M.D. Tenn. 1998) (White defendant presented three allegedly comparable cases, but the Court found them distinguishable.); United States v. Cuff, 38 F. Supp. 2d 282, 287 (S.D.N.Y. 1999) (stating that Cuff "would have to show that others who have committed numerous drug related murders have not been targets of the death penalty ..."); United States v. Gilbert, 75 F. Supp. 12, 15 (D. Mass. 1999). "Defendant has not shown, let alone attempted to show, that the Attorney General has failed to authorize the death penalty for similarly situated non-white defendants ... she herself has not proffered an example of a case which even approaches the allegations present here." See also United States v. Bin Laden, 126 F. Supp. 2d 256, 261, 263 (S.D.N.Y. 2000) (holding that the only other "mass terrorist bombing" involved white defendants who were targeted for the death penalty--McVeigh and Nichols); United States v. Shakir, 113 F. Supp. 2d 1182, 1191 (M.D. Tenn. 2000) (apparently no showing at all by defendant Young); United States v. Edelin, 134 F. Supp. 2d 59, 86 (D.D.C. 2001) ("The Court will not ignore the Supreme Court's decision in McCleskey v. Kemp and find that the statistics included in the DOJ Study are sufficient evidence to support the defendant's claim of racial discrimination in the government's capital charging practices."); United States v. Minerd, 182 F. Supp. 2d 459, 463-67 (W.D. Pa. 2002) (refusing discovery because white defendant who killed his white girl-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

friend has "failed to produce 'some evidence' that the decision to seek the death penalty ... was made with discriminatory purpose or that it had a discriminatory effect'); United States v. Sampson, 275 F. Supp. 2d 49, 88-94 (D. Mass. 2003) (in which the white defendant who murdered three white men fails to make a "comparable showing" under Bass).

Other cases are: United States v. Williams, 181 F. Supp. 2d 267 (S.D.N.Y. 2001) (black defendants/victims); United States v. Cooper, 91 F. Supp. 2d 90, 114-16 (D.D.C. 2000) (black defendant/white victims); United States v. Gilbert, 75 F. Supp. 2d 12, 13-16 (D. Mass. 1999) (white female defendant/white male victims); United States v. Cuff, 38 F. Supp. 2d 282, 286-87 (S.D.N.Y. 1999) (black defendant/victims); United States v. Holloway, 29 F. Supp. 2d 435, 438-42 (M.D. Tenn. 1998) (white defendant/victim); United States v. Nguyen, 928 F. Supp. 1525, 1544-45 (D. Kan. 1996) (Asian defendant/victim); United States v. DesAnges, 921 F. Supp. 349, 357-58 (W.D. Va. 1996) (black defendant/victim); United States v. Feliciano, 998 F. Supp. 166 (D. Conn. 1996) (Latino defendant/victim); United States v. Walker, 910 F. Supp. 837, 858-60 (N.D.N.Y. 1995) (black defendant/white victim).

[FN92]. United States v. Bin Laden, 126 F. Supp. 2d 256, 259 n.5 (S.D.N.Y. 2000).

[FN93]. See United States v. Glover, 43 F. Supp. 2d 1217, 1233 (D. Kan. 1999). In Glover, the defendant was found to have "met the threshold showing under United States v. Armstrong . ..." Glover, an African American, charged with a Hobbs Act robbery, relied upon two comparable state prosecutions involving white defendants. Id. He also relied upon statistical evidence. Id. The Glover district court ordered the Government, within two weeks, "to comply with the discovery requests set forth in Mr. Glover's motion...." Id. See also United States v. Bradley, 888 F. Supp. 271, 280-81 (M.D. Pa. 1994) (holding that defendant's statistical evidence was not enough and that defendant failed to make "a threshold showing that others--for example white defendants ... have not faced capital prosecution"). But, because the information sought may have been "within the sole possession of the government, the Court ordered "the discovery that the Defendant sought." Id. See also United States v. Llera-Plaza, 181 F. Supp. 2d 414, 417-20 (E.D. Pa. 2002). "This court granted defendants' discovery request with respect to information pertaining to the decisions of the United States Attorney for the Eastern District of Pennsylvania to seek or not to seek the death penalty in death-eligible cases because there appeared to be a degree of parallelism between Merlino and the case at bar..." Id. Some discovery was provided and the Court reviewed the "death penalty prosecution memorandum" in camera for the case at bar and one comparison case. Id. Other efforts to open the DOJ's death selection books--seeking disclosure of the death penalty submission of United States Attorneys--have failed. Id. See United States v. Fernandez, 231 F.3d 1240 (9th Cir. 2000). See also United States v. Nguyen, 928 F. Supp. 1525, 1552 (D. Kan. 1996); United States v. Frank, 8 F. Supp. 2d 253, 284 (S.D.N.Y. 1998). 'Discovery of the deliberative materials would have a chilling effect on the thorough evaluation of these issues and hinder the just, frank, and fair review of the decision for every individual defendant who faces the prospect of receiving a Notice of Intent to Seek the Death Penalty.' See also United States v. Furrow, 100 F. Supp. 2d 1170 (C. D. Cal. 2000); United States v. Shakir, 113 F. Supp. 2d 1182, 1186 (M.D. Tenn. 2000); United States v. Edelin, 128 F. Supp. 2d 23, 39-41 (D.D.C. 2001); United States v. Perez, 222 F. Supp. 2d 164 (D. Conn. 2002); United States v. Haynes, 242 F. Supp. 2d 540 (W.D. Tenn. 2003). But see United States v. Kee, No. S1 98 CR 778 (S.D.N.Y. 2000), available at 2000 WL 863119 (in camera review ordered to determine if the submissions to the Attorney General included evidence that Kee did not personally commit the murder for which the Government seeks the death penalty and an explanation of a DOJ chart showing a decision not to seek the death penalty against Kee); Walker v. Reno, 925 F. Supp. 124, 129, 132-33 (N.D.N.Y. 1995). ("Plaintiff has not alleged, for instance ... that plaintiffs' counsel were denied a reasonable opportunity to present matters in opposition to capital punishment to the United States Attorney and DOJ, id. § 9- 10,000(B), (D)....

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[S]uch allegations might well provide a basis for this Court to set aside defendant Reno's determination ...”).

[FN94]. See Rory K. Little, Why Federal Death Penalty Moratorium?, 33 Conn. L. Rev. 791 (2001).

[FN95]. Kentucky passed just such a law in 1998 without a negative effect on law enforcement or criminal justice. Ky. Rev. Stat. Ann. § 532.300 (Michie 2003).

[FN96]. 18 U.S.C. § 3593(f) (2000) and 21 U.S.C. § 848(o)(1) (2000) could be a statutory basis for such evidence. See generally United States v. Cuff, 38 F. Supp. 2d 282, 287 (S.D.N.Y. 1999) (Evidence of African American defendant's race is admissible to show “effect on Cuff's behavior, if any, of such attribute.”); United States v. Davis, 904 F. Supp. 554 (E.D. La. 1995) (Evidence of African American defendant's race admissible if it demonstrates “culturally difficult or deprived background.”).
53 DePaul L. Rev. 1615

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.