

# STATE OF MINNESOTA

### OFFICE OF THE ATTORNEY GENERAL

**MIKE HATCH**
**ATTORNEY GENERAL**

December 17, 2003

102 STATE CAPITOL
ST. PAUL, MN 55155-1002
TELEPHONE: (651) 296-6196

The Honorable Amy Klobuchar
Hennepin County Attorney
C2000 Government Center
300 South Sixth Street
Minneapolis, MN 55487

The Honorable Susan Gaertner
Ramsey County Attorney
Suite 315
50 West Kellogg Boulevard
St. Paul, MN 55102

Dear Mses. Klobuchar and Gaertner:

Thank you for meeting with Attorney General Hatch and me yesterday.

We have been receiving many telephone calls from county attorneys about the new Department of Corrections (DOC) policy to refer all Level III offenders to county attorneys for civil commitment. A number of issues have been raised in these conversations, several of which were also discussed at our meeting. The following attempts to summarize these issues.

## Should Mr. Rodriguez Have Been Referred For Civil Commitment

The DOC's new policy was instituted after the arrest of Alfonso Rodriguez, a Risk Level III sex offender who had not been referred to the local county attorney for commitment proceedings. (Exhibit 1.) At the time DOC's new policy was announced, the Governor and the Corrections Commissioner stated that Mr. Rodriguez did not meet the criteria for a civil commitment. (Exhibit 2.) They stated that the civil commitment evaluation was made in February of 2001 and that the statutes prohibit a review when there is less than one year remaining before the inmate's release. (Exhibit 3.)

On Friday, December 12, 2003, the search warrant for Mr. Rodriguez was unsealed. Attached to the search warrant was a Community Notification Risk Assessment of Mr. Rodriguez which is dated January 10, 2003, and was prepared by Dwight Close, a DOC psychologist. (Exhibit 4.) Mr. Close's report states that Mr. Rodriguez engaged in a violent sexual assault on October 18, 1974 and a violent sexual assault on November 19, 1974. It states he was a suspect in making obscene telephone calls. It also notes that he had a lengthy history of chemical abuse. It further notes that in 1974 Mr. Rodriguez acknowledged that he had sought

Facsimile: (651) 297-4193 • TTY: (651) 297-7206 • Toll Free Lines: (800) 657-3787 (Voice), (800) 366-4812 (TTY) • www.ag.state.mn.us

An Equal Opportunity Employer Who Values Diversity          Printed on 50% recycled paper (15% post consumer content)

The Honorable Amy Klobuchar
The Honorable Susan Gaertner
December 17, 2003
Page 2

help since the age of 18 and that he knew it was only a matter of time before he got into serious difficulties. Mr. Rodriguez was then committed to the St. Peter Hospital for sex offender treatment.

Mr. Close's report notes that, in 1979, Mr. Rodriguez was placed in independent living in Mankato as part of his treatment. In June he requested readmission to the security hospital because that there had been a number of recent rapes in Mankato in which he may be implicated. Mr. Rodriguez was charged with one of the rapes, but after a hung jury, he won an acquittal. The report notes that in 1980 Mr. Rodriguez was provisionally discharged from St. Peter to Crookston, and within four months, he was charged with attempting to abduct a young woman, stabbing her with a knife, and trying to rape her. She escaped, however, and he was convicted of attempted kidnapping and given a 20 year sentence.

The report notes that, while in prison, Mr. Rodriguez refused to continue participation in chemical dependency programs or in sex offender programs. The report states that Mr. Rodriguez refuses to acknowledge that he has a problem with either of these issues.

The report concludes that Mr. Rodriguez, who had been unable to reside in the community for more than 12 consecutive months without committing a sexual assault, was being released into an unsupervised environment even though he was known to be an untreated chemical abuser and an untreated sex offender. Mr. Close's evaluation also noted that Mr. Rodriguez "has demonstrated a willingness to use substantial force, including the use of a weapon. ... Mr. Rodriguez's use of force may be escalating in severity ..." (Exhibit 4.)

The earlier civil commitment report on Mr. Rodriguez, attached as Exhibit 5, does not recommend him for civil commitment. It is noteworthy, however, that this report was also prepared by Mr. Close, the same individual who prepared the community notification assessment evaluation. Both of these evaluations contain different facts which, cumulatively taken, indicate that Mr. Rodriguez should have been referred for civil commitment. For instance, in addition to the facts recited in the Community Notification Risk Assessment above, the civil commitment report notes that Mr. Rodriguez acknowledged the obscene phone calls, acknowledged a history of domestic violence, acknowledged that he had problems with anger, acknowledged that he had problems with alcohol, and acknowledged that he refused to participate in treatment.

**Application of Existing Statutory Scheme to Mr. Rodriguez**

The civil commitment statutes are a means to treat in a secure setting an individual who is found to be a "sexual psychopathic personality" [SPP] or a "sexually dangerous person" [SDP].

> "Sexual psychopathic personality" means the existence in any person of *such* conditions of *emotional instability*, or *impulsiveness of behavior*, or lack of customary standards of good judgment, or failure to appreciate the consequences

The Honorable Amy Klobuchar
The Honorable Susan Gaertner
December 17, 2003
Page 3

of personal acts, or a combination of any of these conditions, *which render the person irresponsible for personal conduct with respect to sexual matters*, if *the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons.*

A "sexually dangerous person" means a person who:

(1) has engaged in a course of harmful sexual conduct as defined in subdivision 7a;

(2) has manifested a sexual, personality, or other mental disorder or dysfunction; and

(3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 7a.

For purposes of this provision, it is not necessary to prove that the person has an inability to control the person's sexual impulses.

Minn. Stat. § 253B.02, subds. 18b, 18c. The SDP definition has been judicially construed to require proof that the individual is *"highly likely" to reoffend* and that the person's mental disorder *"does not allow (him) to adequately control [his] sexual impulses." See In re Linehan (Linehan III)*, 557 N.W.2d 171, 180, *vacated and remanded*, 522 U.S. 1011 (1997), *aff'd as modified*, 594 N.W.2d 867 (Minn. 1999); *In re Linehan (Linehan IV)*, 594 N.W.2d 867, 876 (Minn. 1999).

By statute, the preliminary determination whether a convicted sex offender fits within one or both of these definitions is the responsibility of the Commissioner of Corrections:

*Before* the commissioner releases from prison any inmate convicted under sections 609.342 to 609.345 or sentenced as a patterned offender under section 609.108, and determined by the commissioner to be in a high risk category, *the commissioner shall make* a preliminary determination whether, in the commissioner's opinion, a petition under section 253B.185 may be appropriate.

Minn. Stat. § 244.05, subd. 7(a) (emphasis added).

The Commissioner's statutory determination traditionally has been based on the opinions of trained professionals in DOC who determine whether a high-risk offender meets the exacting standards established by the SPP and SDP statutes. County attorneys have relied on this preliminary determination by DOC staff as an expert opinion in pursuing civil commitments.

The Honorable Amy Klobuchar
The Honorable Susan Gaertner
December 17, 2003
Page 4

Mr. Rodriguez was not recommended by DOC for civil commitment. He was, however, determined to be a Risk Level III offender for purposes of the Community Notification Act. A Risk Level III offender is defined by statute as "an offender whose risk assessment score indicates a high risk of reoffense." *Id.*, subd. 3(e).

We are not aware of any defect in the current Minnesota statutory scheme that would have prevented DOC from referring Mr. Rodriguez for commitment or, had such a referral been made, a court petition having been filed to have Mr. Rodriguez committed. To the contrary, Mr. Rodriguez could have been referred by DOC to a county attorney for referral as late as his release from prison in May, 2003. Furthermore, Mr. Rodriguez appears to be precisely the type of sex offender who should be committed. Indeed, Commissioner Fabian now acknowledges that a referral for civil commitment should have been made. (Exhibit 6.) While DOC has offered a variety of explanations concerning its failure to make a civil commitment referral, these explanations appear to be flawed.

First, the Commissioner indicated that referrals must be made one year before release, and since the January, 2003 evaluation was less than five months before release, DOC could not then refer Mr. Rodriguez. (Exhibit 3.) The statutes, however, do not prevent DOC from making a late referral. Attached as Exhibit 7 is a list of several offenders who were referred by DOC to a county attorney less than one year from the offender's release date. Indeed, in 1998, Christopher Ivey was recommended for civil commitment by DOC. Prior to his release, however, he was extradited to Germany to serve a prison term. On November 19, 2003, the Carlton County Attorney was advised that Mr. Ivey was being released by the German authorities and was planning to return to Carlton County. On November 20, 2003--four days before his release-- DOC referred Mr. Ivey to the Carlton County Attorney for civil commitment. (Exhibit 8.)

DOC is well aware that there is no statutory impediment to its referral of sex offenders for commitment within one year of their release from prison. Four years ago, the Minnesota Court of Appeals specifically ruled that DOC's failure to refer a case at least 12 months before an inmate's release does not mean the inmate could not be referred upon less than 12 months' notice. *In re Schulz*, 1999 WL 1100941 (Minn. Ct. App. 1999). To the contrary, the one year notice provision is designed simply to give the county attorney sufficient time to complete the civil commitment proceeding before the offender's release date. A county attorney who receives a late referral cannot get the civil commitment completed before the offender's release from prison. In these cases, the county must "hold" the offender, which is expensive.

Second, the Commissioner claims that DOC staff was discouraged from referring offenders for civil commitment because county attorneys have declined to follow up on a petition in over half the cases. (Exhibit 5.) This does not appear to be a valid justification. It is believed that approximately 40 percent of DOC's referrals are made to rural county attorneys who are assisted by this Office in civil commitment proceedings. All DOC referrals over the past four years to the counties to which this Office provided assistance resulted in a civil commitment

The Honorable Amy Klobuchar
The Honorable Susan Gaertner
December 17, 2003
Page 5

petition being filed. Had a referral been made in Mr. Rodriguez's case, he would have been referred to the Polk County Attorney. Because Polk is a rural county which is assisted by this Office, a commitment proceeding would certainly have been initiated.

Third, DOC has offered the explanation that Mr. Rodriguez was less likely to reoffend because "he was 50, and the data show that recidivism is less likely the older an offender gets." (Exhibit 2.) Yet, many of the offenders that have been referred for civil commitment are more than 50-years-old. (Exhibit 9.)

Thus, Mr. Rodriguez could have, and indeed should have, been referred for commitment under existing Minnesota law. The issue, therefore, is not what is wrong with Minnesota law; rather, the issue is how existing law is being implemented by DOC.

### The Effect Of New DOC Policy On The Constitutionality Of The Sex Offender Program.

Several issues have been raised concerning the new DOC policy on civil commitments. As noted above, in the wake of questions surrounding DOC's decision not to refer Mr. Rodriguez for commitment, DOC announced that it would refer all Level III sex offenders to county attorneys for commitment. The new policy deviates from the statutory process established by the legislature, which was affirmed by the Minnesota Supreme Court as satisfying the due process clause of the Fourteenth Amendment of the Constitution.

Level III sex offenders pose a serious public safety risk for Minnesota communities. The courts have upheld Minnesota's sex offender commitment statutes, but, in doing so, have delicately balanced the public's right to safety with the offender's constitutional rights. Minnesota's civil commitment framework has withstood constitutional challenges precisely because it is narrowly tailored, with limited discretion and multiple layers of review. *See e.g. In re Linehan (Linehan III)*, 557 N.W.2d 171, 181, *vacated and remanded* 522 U.S. 1011 (1997), *affirmed as modified*, 594 N.W.2d 867 (Minn. 1999) (Exhibits 10 and 11).

As noted above, Minnesota law requires the Commissioner of Corrections to conduct the initial review for civil commitment of an inmate. Minn. Stat. § 244.05, subd. 7(a) ("Before the commissioner releases from prison [any patterned sex offender], the commissioner shall make a preliminary determination whether, in the commissioner's opinion, a petition under section 253B.185 [for civil commitment] may be appropriate.") The referral of a case to a county attorney connotes a decision by the Commissioner that a civil commitment petition may be appropriate. *See* Minn. Stat. § 244.05, subd. 7(c).

By delegating the responsibility to DOC to make the initial assessment for commitment and by appropriating funds to DOC to retain psychologists and psychiatrists to help fulfill these duties, the legislature has assured the courts that experts experienced in treating sex offenders would determine who should be referred for civil commitment. By consolidating the resources

The Honorable Amy Klobuchar
The Honorable Susan Gaertner
December 17, 2003
Page 6

into a state agency such as DOC, the courts are further assured that this expertise will be consistency applied. Under the new directive, the effective civil commitment determination will be made by 87 different county attorneys, each of whom has different budgets, different dispositions, and different psychiatrists and psychologists. Also, because a commitment proceeding is typically referred to the county where the inmate's last crime was committed, the decision to pursue commitment by a county attorney with limited funds and limited resources might be influenced by whether the offender intends to return to that county. The DOC's new policy may thus have a negative impact on the statewide concern for public safety.

Furthermore, as a pragmatic matter, DOC is in a better position than county attorneys to build a record necessary to sustain a commitment petition. DOC, not county attorneys, employ psychologists with specific expertise in assessing whether an offender meets the statutory criteria. DOC, not county attorneys, has the offender in custody and can readily interview him. DOC, not county attorneys, has access to the offender's criminal history records and prison disciplinary records, which should have been compiled while the inmate was in prison. Without DOC's involvement in the assessment process, it will be difficult for a county attorney to gather and evaluate the information required to successfully commit dangerous offenders.

The integrity of the commitment statutes is endangered by any manipulation of the system that is arbitrary and capricious. By not applying the civil commitment standards approved in *Linehan* and instead applying a community notification standard, the entire sex offender program could be subject to challenge. The bottom line is that, under its new policy, DOC shirks its statutory responsibilities. By not carrying out its statutory duties under the sex offender program, DOC opens the program to new constitutional challenges that could impede, rather than enhance, the ability to commit sex offenders. Rather than changing the standard, the DOC should enforce the law and refer inmates like Rodriguez for civil commitment.

**Budget Constraints and Problems in the Sex Offender Program.**

The sex offender program is expensive, costing approximately $100,000 per offender per year. There are about 200 offenders in the program, and the two security hospitals that treat the patients are full. Only one patient has been discharged from the program. Indeed, the vast majority are men who prey on children and vulnerable adults, for whom treatment is not very successful. Many of the offenders are young, and the State has been adding approximately 20 new offenders per year. The mortality rate is very low. The Minnesota Department of Human Services reported the cost of the program to be $20 million in 2002. *DHS Bulletin #02-77-01 (June 24, 2002)*. DOC further estimated that the cost of the program could grow to $76 million by 2010. *DOC, Civil Commitment Study Group, Report to Legislature 23 (1998)*.

A number of incidents in recent months have raised the question of whether budget concerns have resulted in changes to Minnesota's sex offender programs.

The Honorable Amy Klobuchar
The Honorable Susan Gaertner
December 17, 2003
Page 7

First, on June 7, 2003, the *Star Tribune* reported that the Department of Human Services was attempting to place six offenders into halfway houses. An issue was raised as to whether this initiative was proposed as a means to reduce the costs of this expensive program. After denying that there was a proposal to place patients in a halfway house, the Governor issued an Executive Order stating that no patient would be released from commitment during his administration. (Exhibit 12.) Since that time the DHS Commissioner acknowledged that the halfway house strategy had in fact been proposed. (Exhibit 13.) Anita Schlank, the executive director of the DHS sex offender program, has since acknowledged that she resigned her position because, due to budget constraints, she was directed to place 40 offenders in halfway houses. (Exhibit 14) Indeed, a law review article published by William Mitchell College of Law notes that, "the DOC continued, in 2003, to recommend increases in "the number and capacity of halfway houses" for sex offenders." (Exhibit 15.)

Second, attached as Exhibit 16 is a graph depicting the number of civil commitment referrals made by DOC to rural county attorneys and Hennepin County since 1997. The graph indicates a steady downward pattern of referrals. Attached as Exhibit 17 is a graph depicting the number of offenders placed in a risk Level III category for purposes of the Community Notification statute. This graph indicates that the number of risk Level III offenders has been relatively steady, following a "catch up" period immediately after the statute's enactment. A comparison of Exhibits 16 and 17 shows that, although Level III sex offenders have been released from prison at a steady rate, the number of civil commitment referrals has significantly dropped.

Third, and perhaps most troubling, were the cuts to DOC's 2004-05 budget. Attached as Exhibit 18 are budget documents in which the Administration recommends cuts of approximately $37 million to DOC. The Administration specifically recommended that all sex offender assessment reimbursements be eliminated; that services including the supervision of offenders released from prison be cut; and that 48 DOC positions responsible for sex offender evaluation, sex offender notification and other community services be eliminated. It was acknowledged that these cuts would have consequences. As stated in the DOC's budget proposal:

> The elimination or reduction of grants and pass-through funding for supervision and programming of offenders in the community could negatively impact recidivism rates.

In other words, the cuts were acknowledged to threaten public safety. Yet, the cuts were pursued.

Based upon the above statements of Dr. Schlank, the decline in civil commitment referrals from DOC, the budget cuts in the sex offender program, and the discussions at DHS and DOC about the future cost of the program, budget constraints may have been the source of some of the difficulties in the sex offender program.

The Honorable Amy Klobuchar
The Honorable Susan Gaertner
December 17, 2003
Page 8

This Office represents DOC when an inmate challenges his placement in a Risk Level III category under the community notification statute. Attached as Exhibit 19 are reports on a number of Level III sex offenders who have contested their designation. These are not believed to be the most dangerous Risk Level III offenders. We believe that the most dangerous Risk Level III offenders do not appeal their designation and, accordingly, we would not have been provided a copy of their evaluation. Nonetheless, a review of the attached evaluations raises substantial question as to whether some of these individuals should have, as in the case of Mr. Rodriguez, been referred for civil commitment by DOC.

### Requests for Assistance.

In response to calls from county attorneys, we are preparing a packet of materials to assist them in addressing the issues raised by the new policy. If you have any questions or would like to discuss this matter further, please call me.

Very truly yours,

Kristine L. Eiden
Chief Deputy Attorney General

AG: #961785-v1