UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

-------------------------------------------------

United States of America,

Plaintiff,     Case No: 2:04-cr-55

vs.

Alfonso Rodriguez, Jr.,

Defendant.

-------------------------------------------------

\* \* \*

DEPOSITION OF

MICHAEL B. MCGEE, M.D.

\* \* \*

Taken before LISA M. THORSGAARD, on the 31st day of
May 2006, at St. Paul, Minnesota, commencing at
approximately 1:00 p.m.

(651) 681-8550 phone     1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-001

APPEARANCES

MR. DREW H. WRIGLEY, MR. NORMAN ANDERSON and MR. KEITH REISENAUER, Assistant U.S. Attorney, Suite 250, First Avenue North, Fargo, North Dakota 58102-4932, appeared on behalf of Plaintiff.

MR. ROBERT G. HOY, Attorney at Law, P.O. Box 458, Alerus Financial Building, 901 13th Avenue East, West Fargo, ND 58078-0458, appeared on behalf of Defendant.

US EXHIBIT-1-002

* * *

INDEX

EXAMINATION

Page

By Mr. Hoy.................................. 5

By Mr. Wrigley............................... 173

* * *

INSTRUCTIONS NOT TO ANSWER

Page

By Mr. Wrigley............................... 155

* * *

REQUEST FOR PRODUCTION OF DOCUMENTS/INFORMATION

Page

By Mr. Hoy.................................. 41, 46

* * *

REFERENCE INDEX

(ATTACHED TO BACK OF TRANSCRIPT)

(651) 681-8550 phone        1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-003

\* \* \*

I N D E X

DEPOSITION EXHIBITS

Exhibit                              Page

No. 1 ........................................ 5

No. 2 ........................................ 5

No. 3 ........................................ 5

No. 4 ........................................ 5

No. 5 ........................................ 5

No. 6 (Retained by witness) ................... 67

(651) 681-8550 phone       1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-004

PROCEEDINGS


(Deposition Exhibit No. 1 through 5 were

marked for identification)


MICHAEL B. MCGEE, M.D.


A witness in the above-entitled action,

after having been first duly sworn,

testifies and says as follows:


EXAMINATION


BY MR. HOY:

Q   Good afternoon, sir.  Would you please state

your full name for the record?

A   Michael B. McGee, M-C-G-E-E.

Q   Dr. McGee, have you given testimony previously

in depositions?

A   Yes.

Q   How many times?

A   A number of times.  I don't have an exact

number.

Q   Ballpark?

A   Well, I'm deposed on the average of anywhere

US EXHIBIT-1-005

from two to five times a year and I've been doing this work for the last 25 years.

Q   Have you given testimony in a courtroom before?

A   Yes.

Q   How many times?

A   Same answer.  I don't have an exact number, but I normally testify anywhere from 12 to 20 times a year and I've been doing this since 1980 when I came to St. Paul.

Q   You're familiar with the process, questions and answers and that sort of thing, then?

A   Yes.

Q   We're going to go through a variety of things here this afternoon.  And I would just like to remind you, although you've certainly done it a number of times, this lady is trying to take down a record.  She needs a yes or no answer if you've got it.  And if I ask you a question that you don't understand, please stop me, tell me you don't understand, and I'll rephrase it.  And if you go ahead and answer the question, I'm going to assume that you understood the question and answered it appropriately.

Is that fair?

A   Yes.

US EXHIBIT-1-006

Q Can you give me an understanding of your educational background briefly.

A Following graduation from Concordia College, Moorhead, Minnesota in 1970, I attended the University of Minnesota School of Medicine, Minneapolis, graduating with an M.D. degree in 1975.

I worked as an emergency room physician in the metro area for approximately one and a half years before beginning a residency in pathology, Hennepin County Medical Center, downtown Minneapolis. Served that time as well as a deputy medical examiner to the Hennepin County Medical Examiner's Office. Held that position until approximately 1979 when I came to St. Paul. Was named a staff pathologist, St. Paul-Ramsey Medical Center at that time and the assistant medical examiner to the medical examiner's office. Held that position until 1980 when I was named the chief. That's my job today.

Q Let me show you what we've had marked here as Deposition Exhibit No. 2. That's been provided to me as a curriculum vitae for yourself. You had a chance to look at it earlier. Satisfy

US EXHIBIT-1-007

yourself again, if you would, that that's current and accurate.

A   This is current and accurate.

Q   Are you presently licensed to practice medicine in any state?

A   Yes.

Q   Where?

A   Minnesota and Wisconsin.

Q   Have those licenses ever been suspended or have you ever been disciplined by any of those boards?

A   No.

Q   Are you Board certified in any specialties?

A   Yes.

Q   Which?

A   Anatomic and forensic pathology.

Q   What is anatomic forensic pathology?

A   Anatomic pathology is described as that field of pathology that deals with the examination of deceased or living individuals or specimens taken from them for the purpose of diagnosis.

Q   And what is the definition of forensic pathology?

A   Forensic pathology deals with basically a court of law, and it entails the examination of

(651) 681-8550 phone      1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-008

deceased individuals who die suddenly, unexpectedly and sometimes violently for purposes of determining cause and manner of death and providing that information to the police and the courts if so required.

Q   Are there any other fields of pathology besides anatomic and forensic?

A   Yes.

Q   What would they be?

A   The two general areas of pathology are clinical pathology and anatomic pathology. Within those two areas there are a number of areas of subspecialty training. Forensic pathology is one of those subspecialty trainings. There are basically -- I think there's either 11 or 12 subspecialty areas. For example, blood banking, chemistry, hematology. A pathologist that finishes his basic training can elect to subspecialize in one of those areas if he or she so chooses.

Q   Forensic pathology is a subspecialty of anatomic?

A   It is a subspecialty of pathology in itself. It's just considered -- it's not correct to consider it just a subspecialty of anatomic.

(651) 681-8550 phone        1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-009

It's a subspecialty in pathology.

Q   The others that you referred to, are they independent specialties or are they subspecialties of clinical pathology?

A   That's a good question. They're considered subspecialties but some of them deal more anatomically. Some of them deal with more clinical. For example, the chemistry subspecialty would deal almost specifically with the laboratory so it would be a clinical field, but they are, for purposes of classification, they call them subspecialties of pathology in general.

Q   You're Board certified then in anatomic and forensic pathology, not in clinical pathology or any of the others that you've talked about?

A   True.

Q   Do you have any professional training in serology?

A   No. Other than the training I've received in the office through working in the office, any specific courses, no.

Q   Any special training in immunology?

A   No.

Q   No certifications, then, in either of those

US EXHIBIT-1-010

specialties?

A   No.

Q   What is serology?

A   Serology is the science of examination of antibodies and the determination of typing of fluids and specimens taken from individuals. And it can deal with a whole range of starting as secreter and going all the way up to DNA, mitochondrial DNA and so forth. Most serologists are employed by commercial or hospital laboratories to work in a blood bank setting or a serology setting. That's in a hospital setting.

Q   What about immunology?

A   Immunology, again, immunology is primarily a hospital based laboratory where you are dealing with the identification of various types of antibodies and the diseases related to those and the response of subjects or individuals who have been immunized or have contracted a disease. Most immunologists are trying to identify disease patterns based on someone's immunologic response.

Q   Your current position, as I understand it, is Chief Medical Examiner here in Ramsey County,

US EXHIBIT-1-011

Minnesota?

A  Yes.

Q  And my understanding is that you also probably have contracts or Ramsey County has contracts with other counties around the state where you do their forensic pathology work as well?

A  Right.

Q  Is that fair to say that that's how you ended up with this case, that Ramsey County has a contract with Polk County, Minnesota?

A  It is at this time right now, but in all fairness, at the time this case was done, I was not the contract medical examiner.  I was the pathologist working for them as their existing medical examiner or coroner requested.  We do that a lot for existing counties in the state of Minnesota or Wisconsin.  There is a seated coroner or medical examiner and he or she determines what cases should be examined and then they will call our office and ask for the examination for them.  That was the circumstance in this case.

Q  So you did not have a contract with Polk County. You did the work on an on-call basis, then?

A  That's right.

US EXHIBIT-1-012

Q  Do you know who the medical examiner -- who probably the coroner was in Polk County, Minnesota that got you involved?

A  If memory serves me, I think it was Dr. Hanson at the time.

Q  And he's a medical doctor, then?

A  He is.

Q  Does he have pathology training of any kind or not?

A  Near as memory serves me, I think he's a general practitioner.

Q  In looking at your vitae, Exhibit No. 2, it seems to me that you have been involved in teaching a variety of courses primarily for law enforcement people in the forensic pathology area.

Is that a true statement?

A  True.

Q  You also apparently received a Distinguished Service Award from the Minnesota Bureau of Criminal Apprehension in 2005.

Can you tell me why you received that?

A  We have a training program -- well, for one reason because we worked with the BCA in our office for about the past 20 years.  And

US EXHIBIT-1-013

approximately 15 years ago we started a training program for death investigation. This is just for agents that do homicide investigation. And they have worked with our office closely. As a result, a number of the cases that occur in rural Minnesota that the BCA is asked to investigate end up being sent to our office. So we have worked with them and the agents on and off again for the past 20 years and not all but most of the agents we've trained at least the ones that are doing active death investigation.

Q  And so the Distinguished Service Award, what, recognized your sponsoring or putting on that conference every year?

A  To be really honest with you, I'm not sure why I got that. When they told me, they said it's the only time -- it's the second one given in the history of the state. And much past that I really don't know. They never really got around. They just said here's the award, smile for the picture.

Q  In Exhibit 2 I also see that you have, like other physicians, published in different journals.

Can you tell me why you've published?

US EXHIBIT-1-014

A    The reason I publish is because I enjoy writing. And I thought the cases were interesting when they came through and that's the reason.

Q    What type of publications are those that you're writing for? I don't recognize them as standard coffee table fare. They seem to be professional journals of one sort or another.

A    Yes. These are professional journals. Primarily they're the journal for forensic sciences. That would be the Journal of the American Academy of Forensic Sciences. And then the other one would be the American Journal of Forensic Medicine. That's the journal for the National Association of Medical Examiners.

So by and large we publish in those two because that's where most forensic pathologist trained or inclined professionals will read the material. There are other journals you can go to like the Journal of Trauma and so forth but we try to publish in journals that people will read the report that have a similar interest in.

Q    Your peers, in essence?

A    True.

Q    So is it fair to say that the purpose of writing those is to help educate, if you will, or at

US EXHIBIT-1-015

least explain to your peers in the profession particular cases or particular things that you may have learned or done or found in the course of your work?

A   I think that's true.

Q   Is that similarly, then, for others that write in those journals, they're doing the same thing, would also be your peers or other scientists with similar interests?

A   I think that's true.

Q   Are there other reputable professional journals in the area of forensic pathology?

A   I know there are other journals. I'm not sure how reputable they are. There seems to be in the past few years a large number of publications, but to be honest with you, I don't read those. The reason I read these is because -- I'm not saying those journals aren't good but these are peer reviewed. So an article, in order for an article to appear in the journals that we publish, it must be peer reviewed by someone of similar training. And so the articles that appear, whether you agree with them or not, have passed some degree of scrutiny rather than just appearing at the author's

US EXHIBIT-1-016

request.  So that's why I've stayed with those.

And the other ones, unless there's a specific

article in those, we have a tendency not to

review them.  But that does not mean that

they're not good but that's the reason.

Q   What about textbooks, are there standardized

textbooks that relate to the area of forensic

pathology that you use or rely on in the course

of your work?

A   There are textbooks that -- there are textbooks

that we have our students read that I don't know

if we agree completely with every statement

that's made in them, but they generally

encompass accepted thought and theory regarding

forensic pathology.

Q   Are those textbooks that you rely on and use

yourself, then?

A   Occasionally I will rely on them depending on

the specific case.  I don't think there's any

case, any textbook that we go to on a daily

basis to refer to material.  We just don't do

that.  We use them primarily for teaching.  I

don't know if there is a single textbook that I

use as a reference that I refer to all the time.

Q   Give me three, if you can, that you refer to as

US EXHIBIT-1-017

necessary?

A  Probably the best one for students is Medical-legal Investigation of Death by Warner Spitz and Russel Fisher. That's probably the easiest to understand, most broadly written and well-illustrated text. A second book that would probably --

Q  Is that a text that you would make reference to yourself if you had a question?

A  Probably not. I would use that text primarily for teaching. A second text that you can refer to and, you know, I have referred to on occasion is DiMaio's Forensic Pathology. I think it's edition No. 2. That would be a second text. Third text I've used or refer to deals about pathology and it's Forensic Toxicology. And the name escapes me right now, the author. I'm sorry. I'll have to find that for you. That's a third text that we use regarding tox results. I'm sorry, it's Randal Basselt, B-A-S-S-E-L-T. I think that's the author's name.

Q  Are there any other texts that you may go to for reference if you had a particularly difficult or questionable case and wanted to see what your peers had written about the area?

(651) 681-8550 phone        1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-018

A   Really not.

Q   Are there any other places that you go for background assistance in the facility in the area, then, or is it simply journals and the text that you've told us about?

A   It's primarily journals.  One of the ways you can access some of the journals now a little easier than doing the manual searches you can go online and you can try to get the name, library, national association library.  We have most of those journals in my office so you can use that as a searching mechanism.  But primarily it's through the journals and the books named.

Q   Can you tell me what your first involvement in this particular case was?

A   The first involvement in the case where I became actually involved is when they called and notified me that Ms. Sjodin's body had been discovered outside of Crookston.

Q   Do you know who called you?

A   I confess I don't.  Just a moment.  Yes.  Our office was contacted by Stan Leech.  That's an investigator for the BCA who at that time was stationed in Thief River Falls.  He called the office and informed us that her body had been

US EXHIBIT-1-019

discovered.

Q   Dr. McGee, you just referred to your notes and materials here.

Do you have a file on this case?

A   Yes.

Q   Could I take a look at what you've brought with you?  Some of this I may or may not have seen.

Dr. McGee, I'll give those back to you. There's a considerable amount of lab work and other materials regarding this file --

A   Yes.

Q   -- contained in your notes that I have never seen.

A   Yes.

Q   I'd like to get copies of that before I leave here today, and I'd like to talk with you about it a little bit before we do that.  So maybe at a break or something we can impose on somebody to make some copies for us, if that's all right.

MR. WRIGLEY:  Mr. Hoy, might I interject that my only concern would be we don't have a copy of that either.

MR. HOY:  We'll make two.

MR. WRIGLEY:  I just want to make sure we have a way to structurally ensure

US EXHIBIT-1-020

that it's part of our formal discovery provision to you. So let's make sure we do that. We'll get one the same day.

MR. HOY: Let's go off the record a second.

(A discussion was had off the record)

BY MR. HOY:

Q   What information and materials were you provided by anybody concerning this case before you were asked to do the autopsy or before you did the autopsy?

A   I was initially contacted by the BCA, one of the BCA field agents regarding deposit material in the automobile that they had recovered, and they asked me questions regarding my interpretation of deposit material that they found.

Q   What kind of deposited material?

A   Fine spray of blood-like material on windows in the back seat.

Q   So you were contacted about that before the body was found, then?

A   Yes. After the body was discovered, the body was brought down with a large number of police

US EXHIBIT-1-021

officers. And if memory serves me correctly, I think it was the FBI agent gave me a summary of when she had been abducted, where her body was found, where evidence was located between the abduction site and her body was discovered, the general scene of where she was found, location, body positioning of the body, all the information you'd expect from a death scene investigator representing the office. And if memory serves me correctly, I believe the FBI agent was the primary person doing that.

Now, there were people there from the sheriff's office so I cannot sit here and tell you that they didn't add something. But that's how the information was supplied to me as her body was presented for the autopsy.

Q  Let's back up and talk about the first contact you had from somebody in law enforcement that talked to you about blood or something found in a vehicle.

Were you told whose vehicle? Were you told how much blood? Why did they get a hold of you?

A  The reason they got a hold of me is because he was a BCA field agent that we had trained. And

US EXHIBIT-1-022

generally they will contact us for reference regarding information they're finding at the scene. That's why he contacted me. And at the time was trying to determine is there any way to determine if an assault may have taken place inside the vehicle based on the amount of blood that they found. That's what the sum and substance of the conversation was about.

Q Do you remember what your advice to him was or your opinions?

A My advice to him was that the deposited material there most probably could have been as a result of an assault, but given large deposits of blood in the interior of the vehicle, you know, I told him, if memory serves me correctly, I didn't think any major altercation took there in regard to blood deposits.

Q Did you have any other contact with anybody in law enforcement from the time of that phone call until the body was presented to you?

A To the best of my recollection, no.

Q And I assume that the autopsy was done here at the Ramsey County Medical Center, your offices?

A Yes.

Q Were you provided any additional information at

US EXHIBIT-1-023

the time of the autopsy other than the general

description by the officers that you've just

described?

A  The only thing I cannot answer to a certainty is

if I was shown photographs of the death scene at

the time of the autopsy, and I cannot remember

the sequence or not.  I know that a diagram was

prepared for me by the agent trying to show

location and the verbal description.  I do not

believe photographs were available but I could

be wrong about that too.  If photographs were

shown, we didn't retain them.  They took them

with them.  So they may have been digital.

That's it.

Q  You've apparently seen photographs of the scene.

You don't know whether they were at the time of

the autopsy or sometime after?

A  Exactly right.

Q  What type of information have you been furnished

after you performed the autopsy?

A  Since the autopsy?

Q  Yes.

A  A review of the BCA's examination of specimens

collected and recovered at the scene of death

and at the scene of the possible abduction site

US EXHIBIT-1-024

as well as the vehicle interior and their impressions at the death scene investigation.

Q   Impressions meaning their personal thoughts about it from being there?

A   Right.  They have a narrative report that the lab -- the crime scene response team will, when they go to the lab, they'll give a -- it's a typed report that will show -- they'll describe the position of the body, their observations, what they're seeing and so forth.  I reviewed that.

Q   Did they give you a copy of that document?

A   No.

Q   But you've seen it, read it?

A   Yes.

Q   Do you know when you got that in relation to the autopsy?

A   That was provided after the autopsy.

Q   Do you know how long after?  The next day?

A   No.  It was not the next day, no.  It would have been -- the reports -- I'm not sure when the reports were prepared.  The most recent review of the copies were provided by the U.S. Attorney's Office for purposes of reviewing this.  The first time I reviewed those, the same

US EXHIBIT-1-025

answer, I cannot say that I did not see those reports before and I probably did but they were shown to me, I read them, and then they were returned to the people that had them. So I didn't have an actual hard copy in my file, at least one that I could not find.

Q   What contacts have had you with the U.S. Attorney's Office in connection with this case?

A   Really contacts with the U.S. Attorney's Office have been within the past, I would say, six months, something like that, or year as we have prepared, got closer to trial date, reviewing the autopsy findings, and making some discussions regarding the findings over the phone.

Q   And how many times have you had a chance to talk about your findings or opinions with them?

A   In person, other than today, only once before. On the phone a number of times with the phone conversations being from just a few minutes. I think the longest one was like half an hour.

Q   Have you -- let me start over. I just had a chance to review the file materials that you brought with you and that's in front of you.

Do you have any other materials regarding

(651) 681-8550 phone        1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-026

this case in your personal file or in the Ramsey County Medical Examiner's file?

A No.

Q And did you generate any correspondence or e-mails or anything like that during your correspondence or contacts with law enforcement?

A No.

Q Same question about correspondence or e-mails regarding this case in your contacts with the U.S. Attorney's Office?

A I may have sent e-mail to the U.S. Attorney's Office regarding scheduling of this depo or something like that, but I think that's the only contact I had for e-mail. Most of it's been done by phone.

Q The documents, until today, the documents I've seen regarding your work on the case are contained in Exhibit 3 which is your provisional report.

A Yes.

Q And Exhibit No. 4, your final autopsy report.

A Yes.

Q And I've seen the series of photographs that we've looked at before we got started which are all paginated P0785 numerically right on through

US EXHIBIT-1-027

P0888.

A  Yes.

Q  First of all, have you generated any other reports or photographs regarding this case other than what we've just talked about, those three documents?

A  No.

Q  If you look at the first page of Depo Exhibit No. 4, which I believe to be your final autopsy protocol.

A  Yes.

Q  On the very first page, Roman numeral 3 says laboratory results?

A  Yes.

Q  Subpart A is toxicology.

A  Yes.

Q  Subpart 1 is liver screen.

A  Uh-huh.

Q  Can you tell me how that is done?

A  Sure.  Specimens of liver are collected and sent to a referenced toxicology laboratory that we normally use for purposes of screening for the drugs listed on the protocol.

Q  When you say a specimen of the liver, you actually take a sample of the liver itself,

US EXHIBIT-1-028

then?

A   Yes, that's right.

Q   Approximately how large of a sample?

A   If memory serves me, we normally collect at least 50 grams of liver.  The amount that's actually required by the lab is probably less than that, but for purposes of your answer, I'll say 50 grams.

Q   And that's harvested by you at the time of the autopsy?

A   That's right.

Q   And how is that conveyed to the lab?

A   After the specimen is recovered or after the specimen is collected at the autopsy, it is sealed, labeled, refrigerated, and then technicians will drive it personally to the laboratory where chain of custody is executed and the specimen is dropped off.

Q   And which lab did the tox screen on this liver sample?

A   That would be Hennepin County Medical Center, HCMC, Minneapolis.

Q   And do they then report their results back to you?

A   They do.

(651) 681-8550 phone      1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-029

Q   And how do they do that?

A   They will report back by a faxed report followed by hard copy mail.

Q   How do they know what you want them to do?

A   We will ask them to do that in the request form that accompanies the submitted specimen.

Q   Do you know how they do their work?

A   You mean what testing methodology do they use?

Q   Yes.

A   I'm assuming that for liver they'll do an extraction and do GCMS.  That would probably be a question better asked of the laboratory.  I don't want to speak for them.

Q   Do you know who does the work for them over there?

A   The laboratory is run by a Ph.D.  There are approximately -- there are a large number of technician.  So if you're asking for the specific technician that did the exam, I can't provide that for you at this time.

Q   That's fair.  That is the sum and substance, then, of the liver screen that you've noted in your final autopsy protocol, then?

A   Yes.

Q   Subpart IIIB talks about a sexual assault

US EXHIBIT-1-030

examination?

A    Yes.

Q    No. 1, vaginal; sperm negative, acid phosphatase is 47.4 U/L.

Can you tell me what that means?

A    In our office, based on our past experience with the laboratory, that would be a positive result. It would be above what we consider a cutoff level.

Q    Can you tell me what 47.4 U/L means?

A    The number refers to the numeric value of the level of the enzyme prostatic acid phosphatase at the site sample.

Q    And then 2 talks about the same thing regarding a rectal sample I assume with a different level 7.5 U/L?

A    Yes.

Q    Subparagraph 3 talks about a cervical at 130.7 U/L.

Is that correct?

A    Yes.

Q    Can you tell me how -- first of all, can you tell me which lab does that testing?

A    Testing for sexual assault examination is done by the laboratory at St. Paul-Ramsey Medical

US EXHIBIT-1-031

Center now called Regions Hospital.

Q   And how do they get material to test to come up with these results?

A   Material is collected in a standard protocol that's followed on all homicide cases used by the office for collection and submission of specimens.

Q   And how is that done? Is this a standard rape kit? Is that what we're talking about?

A   No. We don't use a standard rape kit because the laboratory is right next door since we have -- so we have devised our own mechanism of collecting material but it's much like a standard rape kit.

Q   Can you tell me what you do?

A   Sure. When the body is processed for purposes of a sexual assault examination, swabs are used to collect specimens from the site being sampled. All sites sampled are sampled with enough swabs that the swabs are arbitrarily divided into two separate groups. One are retained for police, the other are submitted for testing.

The specimens that are collected are used and then to prepare slides which are then sent

US EXHIBIT-1-032

to cytology for the examination visually of

sperm.  The same specimens are then sent to a

laboratory for determination of the presence of

the enzyme prostatic acid phosphatase, and if

present, to give a numerical value to it.

These specimens are collected during the

postmortem examination and are generally done

during the processing phase when the body is

initially being examined.

Specimens are labeled, sealed, and

transmitted immediately to the laboratory where

the chain of custody that is signed for before

the tests are performed.

Q  Let me go back and break that apart a little

bit.  If I understood it correctly, you said

that you sample each area.  And the areas here

I'm assuming are vaginal, rectal, and cervical?

A  Right.

Q  You sample each of those with more than one

swab?

A  Yes.

Q  And come up with how many at each site, then?

How many swabs?

A  Normally we -- once sampling is done and used

anywhere -- anywhere from four to six swabs are

US EXHIBIT-1-033

used for the sampling.

Q   Of each location?

A   Yes.  And this is all done at the same time to make sure you have a uniform collection of material.  Once the material is collected on the swabs, the swabs are arbitrarily divided.  Half will go for our testing, half will be retained for the police in the event that they should wish to do further examination at a later date.

Q   So you do four to six swabs of each site?

A   That's right.

Q   Divide those in half so two or three swabs go to Regions Hospital for their testing?

A   Correct.

Q   And that resulted in the results that you show on this report?

A   That's right.

Q   And where are the other two or three swabs, then, from each site?

A   They are containerized or packaged, properly labeled and frozen in an ultra cold freezer and held until the BCA or the examining laboratory calls and asks for them to be examined.  Then they're released to that agency and they test them.

(651) 681-8550 phone      1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-034

Q   Those second set of swabs in this case, are they still in your freezer or has BCA called for them?

A   BCA has called for them.

Q   So the second set of swabs have all gone back to Minnesota Bureau of Criminal Apprehension?

A   Yes.

Q   Do your records reflect who got those or when they got them?

A   Can I look?

Q   Certainly.

A   The sexual assault examination that was released to the BCA was released to John Fossum, F-O-S-S-U-M, at the BCA on April 20, 2004.

Q   Do you know Mr. Fossum?

A   Sure.

Q   Where is he headquartered at?

A   He was in the St. Paul office and at their main office in St. Paul.

Q   And give me the date that he picked those up again, please.

A   April 20, 2004.

Q   So shortly after the autopsy, then?

A   Yes.

Q   Within a couple days?

US EXHIBIT-1-035

A  Yes.

Q  Have you had anything to do with that extra set of swabs since that time?

A  No.  Once they're released to the laboratory, the laboratory conducts its own examination independent of our office.

Q  Now, let's go back, if we could, to the swabs that were sent to the Regions Medical Center.  You talked about cytology and their purpose was to, I think you said, check slides for the presence of sperm.

Is that correct?

A  Right.

Q  And do you know how they do that?

A  Yes.  What they do is they stain the slide.  The slide is received from our office unstained, dried and fixed.  The laboratory then stains the slide.

Q  Let me stop you for a second.  Do you send them the swab or do you send them a mounted slide?

A  For cytology you only send them the slide not mounted.

Q  Fixed anyway?

A  Fixed.

Q  And what happens to the swab, then?

(651) 681-8550 phone        1-877-681-8550 toll free
         www.johnsonreporting.com

US EXHIBIT-1-036

A   The swab goes to another section of the laboratory, the chemistry section if memory serves me correctly, where the enzyme analysis is performed.

Q   So cytology, then they take the slide that's fixed and do what with it?  You said they stain it and then look for what?

A   Stain it and then they will cover slip it and then they will physically examine it with a microscope looking for the presence of sperm.

Q   So the presence of sperm or the absence of sperm is determined by a microscopic examination?

A   That's right.

Q   And the report, Deposition Exhibit No. 4, under sexual assault examination, vaginal shows sperm negative, rectal shows sperm negative, cervical shows sperm negative.

Am I correct in assuming that that means that the cytology lab at Regions found no sperm on any of the slides from any of those three locations?

A   Yes.

Q   The swabs you said go to the chemistry department.  Do you know where that is or who's in charge of that lab?

US EXHIBIT-1-037

A   I don't know who's in charge of the lab anymore.

The physical location is in the laboratory

complex at Regions Hospital in the same location

it's always been.

Q   What do they do with the swabs, then?

A   The swabs will be tested using an enzymatic

method to determine the presence of the enzyme

prostatic acid phosphatase.

Q   What is prostatic acid phosphatase?

A   Prostatic acid phosphatase is an enzyme that is

found primarily in the male prostate that is

secreted at the time of ejaculation.

Q   Is there a difference between prostatic acid

phosphatase and just plain acid phosphatase?

A   Yes.

Q   What's the difference?

A   Prostatic acid phosphatase comes primarily from

the prostate.  Acid phosphatase at lower levels

can be found at body sites, yes.

Q   At body sites, what do you mean by that?

A   Sites where you sample.

Q   Like the skin?

A   Oral, anal, vaginal.

Q   From some source other than the male prostate?

A   Yes.

US EXHIBIT-1-038

Q   That's a fairly common thing?

A   Yes.

Q   Recognized by scientists to exist?

A   Yes.

Q   Are there other sources of acid phosphatase in the world beyond the male prostate?

A   I believe so, yes.

Q   Can you tell me what some of those might be?

A   No.

Q   Do you know whether or not it commonly exists in the female vagina?

A   It does.  You mean non -- yes.  You can have acid phosphatase in the female vagina that need not be from a male prostate, yes.

Q   Do you know why that would be?

A   I can only make the assumption.

Q   What is your assumption?

A   It is produced by the vagina in and of itself.

Q   Do you know whether acid phosphatase appears in other things in the world besides the male prostate and the female vagina?

A   No.

Q   Do you know whether some plants have acid phosphatase?

A   I'm sure they must.

(651) 681-8550 phone      1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-039

Q  Do you know whether it can be caused by bacterial action?

A  I do not know that.

Q  Do you know whether it's a product of decomposition of human bodies?

A  It may be but not to my knowledge.

Q  The results that you report on page 1 of Deposition Exhibit No. 4 reports an acid phosphatase level.  This does not say, and correct me if I'm wrong, the prostatic acid phosphatase level.

Am I correct in that?

A  Yes.

Q  Do you know what testing the Regions lab does to determine the acid phosphatase level that they report to you?

A  The actual chemical test, no.  And the numbers that are reflected on the autopsy protocol are the prostatic acid phosphatase level.  They do not include the nonprostatic acid phosphatase levels obtained at the time of the exam.

Q  And that is shown on the lab reports that you got back from Regions?

A  Yes.

Q  We talked about that briefly earlier.  I would

US EXHIBIT-1-040

like copies of all that material so I can review it again at my leisure and we'll talk about it again here in a little bit.

A   Sure.

Q   What happens to the swabs that you sent to Regions for the sexual assault examination?

A   It's my understanding they're destroyed after the examination is performed.

Q   Do you know whether or not they've been destroyed in this case?

A   Yes, they've been destroyed.

Q   Do you know what happens to the slides that are sent to the cytology department at Regions?

A   They are retained by the office.

Q   Their office or yours?

A   Mine.

Q   So you have those?

A   Yes.

Q   I'd like to talk just briefly about these photographs. And again, I'm not going to mark them separately for purposes of the deposition because each of them is already marked with a Bates number provided by the U.S. Attorney's Office. And I believe they start going in order from P0785 right on through P0888. It would be

US EXHIBIT-1-041

103 photographs if my math is correct.

You had a chance to look at these just before and you believe these are all of the photographs taken by the Ramsey County Medical Examiner's Office in connection with this autopsy.

Is that true?

A  Yes.

Q  Who actually is the photographer that took these?

A  Me.

Q  So you took all of them yourself?

A  Yes.

Q  Digital or film?

A  Digital.

Q  Let's talk about the autopsy itself for a moment. Can you tell me how the body was received by you?

A  The body was received in a body bag. We asked them in this case, as in other cases, to please move the body as minimally as possible so that it will be received into the office in the same position, the same condition as it was at the death scene. They did this with the body inside of a white transport pouch when it was delivered

(651) 681-8550 phone      1-877-681-8550 toll free
        www.johnsonreporting.com

US EXHIBIT-1-042

to the office.

Q   At some point there needs to be an identification made as to who this particular person is.

How was that identification made on this case?

A   On a case like this, given the sequence that is normally followed, identification is usually performed last so as not to interfere with the specimen collection.  In this case it was done by comparison of antemortem and postmortem dental x-rays.

Q   Do you still have those x-rays?

A   Yes.  We should have the x-rays filed in the office, yes.

Q   And I noted on some of the billings in your notes that you brought with you to the deposition today that there was a charge for like three x-rays.

Would those be dental x-rays?

A   The x-rays that were probably noted there would be full body x-rays.  And the dental x-rays, if they were not -- those would be full body x-rays of the head and other portions of the body.  The dental x-rays, if we retained them in the case,

US EXHIBIT-1-043

should be in the same file unless the dentist has asked them specifically to have them returned. I would have to check and see.

Q   What's the purpose of full body x-rays at autopsy?

A   Decomposed bodies are always x-rayed, sir, as a part of the standard protocol.

Q   Why do you do that?

A   Looking for any evidence of foreign objects, masses, and help in determining the cause and manner of death.

Q   Did you find any foreign bodies, bullets, anything like that in this body?

A   No.

Q   Any other foreign bodies at all show up on x-ray?

A   No. Other than the debris associated with decomposition, if memory serves me, no.

Q   Any broken bones?

A   If memory serves me --

Q   Take your time and look at your notes if you wish.

A   No. If there would have been a broken bone, that would have been noted in the report.

Q   At the time of this autopsy can you tell me who

US EXHIBIT-1-044

was present?

A   I'm not sure that I can. I can tell you what agencies were represented, but the actual names of the people I'd have to go back to the police reports and see who they noted. I know the FBI was there.

Q   Do you know who that was?

A   I'm sorry, I don't. It was the Polk County Sheriff's Office. I believe they had an investigator there. The Polk County Attorney's Office had one of their attorneys there.

Q   Do you know who that was?

A   I'm sorry, I'd have to go back and look at them. I'm sorry, I don't remember the names. I believe there were investigators from the Grand Forks -- the Grand Forks Police Department and possibly from Grand Forks County Sheriff's Office, if memory serves me correctly. And then the BCA, the BCA was there taking a set of autopsy photos at least for a portion of the examination. And I think -- and there was also a BCA agent, I believe Stan Leech, BCA, Thief River Falls was there. The names I'll have to go back and go through the records to get the exact names.

US EXHIBIT-1-045

Q   So you got two guys from BCA?

A   Right.

Q   You got an FBI agent?

A   Right.

Q   More than one?

A   I think it was just one.

Q   You've got a Polk County Sheriff's representative?

A   Right.

Q   Polk County Attorney's Office?

A   Right.

Q   Grand Forks Police Department?

A   I believe so.

Q   And perhaps a Grand Forks Sheriff's Office?

A   If memory serves me, yep.

Q   Anybody assisting you from your office?

A   Yes.  There was one tech assisting me.

Q   Who was that?

A   I'll have to go and look.  We don't keep track of the techs that assist.  I can find that out, but at this time I can't remember who the tech was that was helping me.  We have more than one.

Q   Can you make that determination and get that information to Mr. Wrigley.  I'd like to note that.

US EXHIBIT-1-046

A   Sure.

MR. ANDERSON:  What was it?

MR. HOY:  The name of the tech from his office that assisted him at the autopsy.

BY MR. HOY:

Q   That strikes me as a pretty full house for an autopsy.

Is that typical?

A   On some of the cases that we do, given their nature, yes.

Q   And somebody from BCA I think you said was taking their own photographs?

A   Yes.

Q   And that would be photographs other than the photographs that we've got here, P785 through P888?

A   Yes.

Q   These photographs were taken by you through your office and BCA's were separate?

A   Yes.

Q   Different set of photos.  Were you controlling or recommending what photographs they might take or were they just free to shoot when they wanted to?

US EXHIBIT-1-047

A    No. The way we run an autopsy in our office is we take the information that we need, the photographs we need. If police wish to photograph, they're more than happy to do so. They take pictures of whatever they want to take pictures of. They control the photographs. They have them. That's the way it operates on all autopsies.

Q    Can you tell me the process of creating the provisional autopsy report, Exhibit No. 3, and also the final autopsy protocol, Exhibit No. 4?

A    Physically how they're produced is during the examination, the observations are recorded into a voice digital dictation system that's set up in the office. That goes into creating --

Q    Is that done live at the time that you're actually doing the autopsy?

A    Yes.

Q    So if we watched Quincy or CSI, the microphone hanging over the autopsy table is fairly accurate?

A    Yes. If you wish to use that. We use headsets but it's the same principle, yes. And those are the observations that are contained within the final autopsy protocol. When the autopsy is

US EXHIBIT-1-048

completed, a separate document is dictated and is prepared--that's the provisional report--and basically summarize some of the important findings for police to be used in their investigation and possible charging.

The final autopsy protocol then follows a provisional weeks later at the conclusion of the testing and the laboratory as well as the microscopy.

Q   What's the purpose of the final autopsy protocol, Exhibit No. 4?

A   To summarize the autopsy observations at the time of the postmortem examination gross to summarize the results of the microscopic examination and combine that with the laboratory results to give the police the best picture of the information available from the postmortem examination.

Q   Does the final autopsy protocol, Exhibit No. 4, contain a medical cause of death?

A   Sometimes the medical cause of death and the case title are the same, but generally it need not -- generally we try to use the case -- we try to have the cause of death be the case title on most of our cases that come through the

US EXHIBIT-1-049

office.

Q   Does this Exhibit No. 4 in this case contain a medical cause of death?

A   Yes.

Q   And where is that found?

A   Under case title.

Q   Can you help me where that's on -- I find the case title on the top of page 1, Deposition Exhibit No. 4.

A   Right.  My cause of death was homicidal violence.

Q   Isn't that a legal cause of death?

A   I'm not sure if that is legal or not.  That's the term we use in our office for cases of this nature.  Whether it's legal or not, I'm sorry, I'm not an attorney.

Q   I always thought there was a difference between a legal cause of death and the medical cause of death?

A   There is.

Q   If someone died in a hospital, they would be -- usually they say it's a heart attack or something like that.

A   Right.

Q   I'm just curious if homicidal violence is as

US EXHIBIT-1-050

close as you've gotten in Deposition Exhibit No. 4 to providing a medical cause of death?

A   It is.

Q   From dictating what you're doing or your thoughts or your notes or however you're doing when you're dictating with the headsets during the course of the autopsy, does that go through an editing process of any kind before it ends up as a provisional report or a final autopsy protocol?

A   Yes.  After the observations are prepared, they're sent to the pathologist that was responsible for the dictation and you do your own editing.

Q   And what happens to the initial drafts?

A   Well, the initial drafts are changed when you do the editing.  It's all done online or with a computer.  The initial dictate -- is that what your asking?

Q   Yes.  The original reports, the original notes, original drafts don't exist anymore and that's what you're saying.  They get changed?

A   Yeah.  The original drafts become the final one after they're edited.  Right.

Q   Did you obtain any other specimens in this case

US EXHIBIT-1-051

other than the liver sample and then the multiple swabs that you talked about in connection with the sexual assault examinations?

A  Yes. Yes.

Q  What type of samples or specimens did you take?

A  They're enumerated underneath Roman numeral No. 7 on page 12 of the autopsy report.

Q  The first nine of those, under Roman numeral 7 on page 12, seem to be items that accompanied the body; ligature, cord, debris, plastic, transport pouch, jewelry, that sort of thing?

A  Yes.

Q  My question was whether you obtained any samples or specimens from the body itself and that's what I was getting at.  And I see at No. 10 it looks like you collected hair from the body?

A  Right.

Q  Do you know what you did with that?

A  That would have been -- it would have been properly stored, labeled.  In this case I believe it was released from the office to the laboratory for testing.  I'd have to check and see.

Q  Which lab?  You mean either Hennepin County or Regions or sent to the --

US EXHIBIT-1-052

A   No.

Q   -- law enforcement lab?

A   No.  I'm sorry.  The specimens we're talking about, hair, fingernail clippings, that sort of thing, you'd want to send that to a criminalistics laboratory or forensic laboratory, so that would go to the BCA.

Q   Below that, then, it talks about a sexual assault examination is performed with samples collected from the anal and vaginal and cervix regions.

    Is that the swabs that we've already talked about for the sexual assault exam?

A   Right.

Q   Specimens for toxicology are collected and include specimens of liver tissue?

A   Right.

Q   We've already talked about the liver sample.

A   Right.

Q   What other specimens for toxicology would have been collected in this case?

A   There were no other specimens.

Q   Talk about -- the next line talk about specimens of lymph node are collected and retained for possible DNA analysis.

US EXHIBIT-1-053

Is that retained by your lab?

A  Yes.

Q  And do you still have that?

A  I'll have to check the notes and see.  If our lab has it, it's retained in the ultra cold freezer as protocol.  If it has been released, then it's obviously not in our office.

Q  If I understand correctly, you don't know whether you've got it or not?

A  Give me a second.

Q  That's fine.  And if you don't have it, my question is who's got it.

A  Lymph node was released from our office to the BCA, Stan Leech, on April 18, 2004 at 1405 hours.

Q  And April 18 was the day of the autopsy, was it not?

A  Yes.

Q  So he took it when he left after the autopsy?

A  Some police agencies exercise that option, yes.

Q  So your lab would not have a lymph node in the freezer, then?

A  No.

Q  And a complete set of finger and palm prints are collected by BCA personnel at the conclusion of

US EXHIBIT-1-054

the postmortem exam.

They did the fingerprinting for their own purposes, then?

A   Yes.  On these cases we like to have them do that, given the condition of the body.

Q   While we're on page 12, let's jump down to paragraph numbered Roman numeral 9, microscopics.  You talk about the heart, postmortem autolysis can be observed.

First of all, who does this sort of microscopic exam?

A   I do.

Q   You do?  Not your lab tech or anybody else but you personally?

A   Yes.

Q   And is this simply -- well, I'll ask you.  Can you tell me what the process is in doing that?

A   Sure.  At the time of the autopsy representative samples are collected in each of the major organs and they're fixed in 10 percent buffered formalin and retained for a period of time until properly fixed.

Specimens are then sectioned and submitted to the laboratory for the preparation of microscopic slides.  When the microscopic

US EXHIBIT-1-055

slides have been prepared, they're returned to our office and examined by light microscopy by the pathologist responsible for doing the autopsy.

Q   Can you tell me what postmortem autolysis is?

A   Destruction of tissue following the subject's death.

Q   Decomposition?

A   Yes.

Q   Coronary vessels within normal limits.  What do you mean by within normal limits?

A   Normally accepted findings for a person of this age and sex.

Q   I assume that's what you mean as well on page 13 at the top talking about the aorta?

A   True.

Q   And then the lungs, spleen, liver, pancreas, all the other organs and tissues there, postmortem decomposition can be observed?

A   Correct.

Q   Or postmortem autolysis it looks like you used on most of them.  Is that interchangeable, autolysis and decomposition?

A   Yeah.  For purposes of understanding what autolysis means, yes, that's correct.

US EXHIBIT-1-056

Q   If you'll look at page 1 of Exhibit 4, the final
autopsy protocol, under your diagnosis, Roman
numeral No. 2 talks about postmortem
decomposition?

A   Yes.

Q   What do you mean by that?

A   The decomposition or breakdown of the body
following death.

Q   And is that affected by time?

A   Yes.

Q   Is it affected by the condition where the body
is at during that time?

A   Yes.

Q   Is it affected by what has access to the body
during the time?

A   Yes.

Q   Anything else?  Temperature perhaps?

A   Temperature.

Q   Direct sun?

A   The conditions that the body is exposed to at
the scene, wherever the body is at, will
directly affect it.  Sunlight, heat, extremes in
temperature, access to the elements, so forth.

Q   And subpart A under paragraph Roman numeral 2
says postmortem anthropophagy.

US EXHIBIT-1-057

Can you tell me what postmortem anthropophagy is?

A   Yes.  Destruction of tissue by animals following death.

Q   Is it always just animals or does that include insects and other things as well?

A   You can use insects in there if you wish, and that probably is correct to do that.  Animals generally will cause more of a tissue destruction but same applies for insects.

Q   And can you tell me what type of postmortem anthropophagy you found in this case?

A   Areas of tissue loss on various parts of the subject's body that I think are due, at least in part, to postmortem anthropophagy including the neck, ventral abdomen, exposed genitalia, and lower extremities.

Q   Is that visible to you when you do the autopsy?

A   Yes.

Q   Did you take photographs of those areas?

A   Yes.

Q   I'm going to show you the photographs here.  Can you just go through them at your own speed and I'd like you to just identify those photographs that reflect the effects of postmortem

US EXHIBIT-1-058

anthropophagy on the body.  And if you'll just identify each by the number as you go by it, that would be great.

A   Do you want me to respond?

Q   Yes, please.

A   Photos P0865 and 866 show evidence of postmortem anthropophagy to the subject's facial region and portions of the neck.  Photograph P0873 of the lower abdomen, external genitalia, and inner right thigh.  P0874 same.  P0875, at least in part, the same.  I believe that's it.

Q   I'm going to have you do that one more time.  This time I'd like you to point out those photographs that show evidence of postmortem decomposition on the body.

A   Photographs P0850 through 853 show decomposition change to the dorsum or back of the subject's body.  Photographs P0855 through P0875 all show some degree of decomposition of the subject's body in the photographs cited.  Photographs P0880 through P0888, same answer.  Decomposition changes can be observed on various parts of the body on the photographs numbered.

Q   Can you tell me what areas of the body generally were most affected by postmortem decomposition?

US EXHIBIT-1-059

A   Decomposition changes could be observed virtually on all surfaces of the subject's body. The areas exposed to the elements, that would be her dorsal torso, showed more severe change with regard to tissue changing in that process.

Q   And what type of tissue change in general are you referring to?

A   Discoloration, desiccation of the soft tissues.

Q   Drying out?

A   Yes.  Those two things.

Q   And generally speaking, which portions of the body were most affected by postmortem anthropophagy?

A   As before, areas in the neck, ventral abdomen, external genitalia, and inner aspect of the subject's right thigh.  There were other areas that showed smaller similar changes but not as pronounced.

Q   I noted, for instance, that in your report and in some of the photographs the soft tissues of the nose, soft tissues of the cheeks and side of the face are not prominent or are missing.

Is that attributable to either of those causes, either anthropophagy or decomposition?

A   Yes.

US EXHIBIT-1-060

Q   Can you tell me which?

A   Probably a combination of both.  It is possible that the tissue in those areas could be gone just from the decomposition process alone.  That is possible given its location.  I cannot rule out the possibility anthropophagy may have occurred in those sites.

Q   Given its location, you mean talking about the body being found on the ground?

A   That's right.

Q   My understanding was that the body was found substantially face down and that perhaps the areas where the exposed skin was in contact with the ground were some of those areas that was most decomposed or more subject to anthropophagy activity?

A   I think that's -- yes, that's true.  She was found in a face down position.  That's my understanding.  And it is true the areas that were in contact with the ground experienced the most postmortem anthropophagy or at least tissue loss was at least, in part, due to postmortem anthropophagy.  In those regards that is true.

         As far as the decomposition of the tissues, it really involved all tissues.  It

(651) 681-8550 phone        1-877-681-8550 toll free
         www.johnsonreporting.com

US EXHIBIT-1-061

depends on which areas were exposed to the air and which areas were down. That would determine how the tissue was decomposed in those sites.

Q   Do you know or were you ever told whether there were any animals in or on her body at the time it was discovered?

A   I was not informed of that, no.

Q   Did you find any?

A   No.

Q   I'm assuming you found evidence of animal activity?

A   I believe there is, yeah. I believe some of the sites on her body may indicate animal activity, yes.

Q   Do you know whether there were insects in or on her body at the time it was discovered?

A   There were dead insects on her body, yes.

Q   Do you know what type of insects?

A   Maggots.

Q   Do you know why they were dead?

A   I would assume it was because of the weather conditions and their normal cycle.

Q   Did you find dead maggots on the body at autopsy, then?

A   Yes. When we were in the process of processing,

US EXHIBIT-1-062

we found maggots and I think some maggot casings or shells present, yes.

Q  And do you know what parts of the body these were found on?

A  If memory serves me, I believe in her hair and on the area surrounding the body that would have been in contact with the ground.

Q  Was any effort made to date the life cycle of the maggots?

A  If memory serves me correctly, I don't believe samples were collected for that.

Q  How would that be possible to date the life cycle of the maggots if you had saved the samples?

A  If samples had been saved, it would allow a forensic entomologist to be able to go back and time the cycle of the organisms or the insects there and thereby possibly offer information regarding the time of the subject's death or when the body had been deposited there.

Q  I'm assuming that you have no training or experience as a forensic entomologist?

A  No.

Q  Do you have one on staff?

A  No.

(651) 681-8550 phone    1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-063

Q   Is there any in the Hennepin County, Ramsey County area that you could have called upon for assistance?

A   Yes.

Q   Have you done that in the past?

A   On some cases, yes.

Q   Who is that?

A   I believe the one we've used in the past has been Val Cervenka.

Q   Can you spell that name for the reporter, please?

A   C-E-R-V-E-N-K-A, I think.

Q   Do you know the first name?

A   Valerie.  Currently we don't use her.  We now use, I believe his name is Roger Moon, M-O-O-N, at University of Minnesota.

Q   And where was Valerie at?

A   Where was she?  She's located in the metro area.

Q   Was she associated with University of Minnesota?

A   She used to be.  She no longer works there.  I'm afraid I don't know who she's associated with.  Since we don't use her anymore, I'm afraid I don't know that.

Q   Was there a reason why a forensic entomologist wasn't called in to assist or offer additional

US EXHIBIT-1-064

expertise on this autopsy?

A   Yes because of the subject that it was believed to be, based on identification of the clothing and the time of her abduction, it was felt that it was -- it wasn't going to offer much in the way of information that you would normally expect on an unidentified body in the same circumstance.

Q   I think you earlier told me that a forensic entomologist could have studied the maggots and the casings and determine stage of life which would have helped estimate the actual time of death, correct?

A   It would give you an approximate time, yes.

Q   And do you have a time of death on this case?

A   All I can give you is the time found.  The time found is the time that we estimated.  If memory serves me, I told the police, I gave them an estimation when I thought she may have died.

Q   You're talking about time found.  That would have been the body would have been found on April 17, 2004 would have been the day before the autopsy?

A   Right.

Q   And my question is do you have a time of death?

(651) 681-8550 phone       1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-065

Do you know what date she died?

A   No.

Q   Have you made any effort to determine that?

A   No.

Q   Why not?

A   Because I can only give you, on a case like this, I can only make an effort -- I can only give you the time found.  I cannot get any closer to that.

Q   Well, the officer that found her could tell us when she was found, correct?

A   Right.

Q   And that's, in fact, what you're relying on?

A   That's right.

Q   So you're not providing any additional expert knowledge to assist in determining the actual time of death in this case, then?

A   Correct.

Q   Were there any other insects or insect activity on the -- strike that.

Were there any other insects alive or dead that you found on the body at autopsy?

A   No.

Q   I'd like to run through your final autopsy protocol, if I could.  And this will -- why

US EXHIBIT-1-066

don't we take about a ten-minute break.

(A break was had in the proceedings from 2:34 p.m. to 2:47 p.m.)

(Deposition Exhibit No. 6 was marked for identification)

BY MR. HOY:

Q  Dr. McGee, we're going to be back on the record here. I'm showing you what we've had marked as Deposition Exhibit No. 6. The secretary here apparently made a photocopy of your file materials. I want you to take a look at that and assure yourself that that's a full and complete copy of your file on this case.

A  It does look that, yes.

Q  And your office, as I understand it, has no other documents regarding this case besides what's there?

A  Yes. That's right.

Q  Thank you. I'd like you to take a look at Exhibit No. 4, your final autopsy protocol, if you would. And I'd like to go to page 3, paragraph number Roman numeral 4, initial

US EXHIBIT-1-067

inspection.

A   Yes.

Q   Can you tell me what you mean when you say body is cool to the touch with rigor having passed off in the muscles of mastication as well as the muscles of the upper and lower extremities?

A   Yes. It's an examination that is done during the initial inspection trying to determine the time of death. One of the signs of death that you look for is the presence of rigor mortis.

Q   What is rigor mortis?

A   Stiffening of muscles after death.

Q   And this talks about that having passed off, so it's no longer stiff?

A   That is correct.

Q   What is the time frame that is required for a body to pass from death to the passing off of the rigor condition?

A   Rigor normally begins at death, usually maxes at about anywhere at 10 to 12 hours. And depending upon the conditions that the body is kept in, would generally pass off after approximately 24 hours after death, rigor will be passed off and gone assuming it is a nonfreezing environment.

Q   How does a freezing environment affect that?

US EXHIBIT-1-068

A  Rigor is a chemical process and as all chemical processes, they are sped up by heat and slowed down by cold.

Q  So if a body were frozen, it would have what effect on the rigor mortis process?

A  It would stop it.

Q  Stop it from becoming stiff or stop it from passing off or both?

A  Stop it at its stage it is currently at defending on what phase of rigor it's at.

Q  Stop it at that stage at the time that it froze, in other words?

A  Right.

Q  And then when the body resumed a nonfreezing temperature, does rigor continue it's normal course or does the freezing alter that in some way?

A  I think it probably alters it.  It does continue.  Some authorities think it happens more -- the rigor develops more rapidly after the body is thawed.  But to answer the question, rigor will continue after the body has gone through -- it has been thawed.

Q  It may be a faster process --

A  Right.

US EXHIBIT-1-069

Q  -- than without the freezing?

A  That's right.

Q  The next sentence talks about livor can be observed. I'm assuming you're talking about livor mortis?

A  Correct.

Q  You say that livor is a dark red color and is fixed and will not blanch with finger pressure.

Can you just tell me what you mean by that?

A  That means the livor has gone -- has developed in the soft issues of the gravity dependent portions of the body and has gone to the -- has been there long enough that it will no more blanch with finger pressure. I'm sorry, it will no -- I'm sorry, it will not disappear with finger pressure applied.

Q  On the next page, at the top of page 4, you talk about the subject has entered the late postmortem interval and exhibits multiple changes consistent with advanced postmortem decomposition including, and then you go on to list a bunch.

Can you tell me, first of all, what you mean by the late postmortem interval?

US EXHIBIT-1-070

A   The late postmortem interval is defined by the interval of the -- the postmortem interval is divided into two phases, and the late postmortem interval is heralded by the onset of decomposition change.

Q   And generally postmortem interval is the time between death and the time that you're examining the body?

A   The body is discovered or the body is examined, that's right.

Q   And so the late postmortem -- I'm having trouble understanding what you mean by late postmortem interval.

A   The postmortem interval there's an early and there's a late phase and there is no specific time that demarcates the two.  Therefore, the late postmortem interval usually is indicated by the onset of decomposition.  It can be short in some cases, long in others depending upon the condition that the body is kept in with reference to the onset of decomposition.

Q   So once decomposition begins, that heralds the onset of the late postmortem interval?

A   That's right.

Q   We've talked about soft tissue discoloration.

US EXHIBIT-1-071

We've talked about desiccation changes, isolated maggot infestation.

Tell me what you mean by focal areas of tissue loss consistent with postmortem anthropophagy?

A   Tissue absence present on the subject's body that may be due in part or completely to animal activity following the subject's death.

Q   Also on page 4, paragraph numbered Roman numeral 5, external examination, correct me if I'm wrong but the first paragraph basically indicates that there's a soft tissue loss on her head due to decomposition exposure?

A   Yes.

Q   It looks to me in the first two paragraphs that the decomposition and soft tissue loss is such that you've noted that exposed skeletal structures can be observed in these regions.

I'm assuming you're talking about the skull bone and other bones of the face?

A   Yes.

Q   In the fourth paragraph there on page 4 it talks about the left eye being unavailable for examination.

A   Yes.

US EXHIBIT-1-072

Q  Is that due to the decomposition and anthropophagy that's occurred to the body?

A  Yes.

Q  You don't believe that that was the result of trauma?

A  I cannot rule out the presence of trauma may be present.  I simply cannot say because it's not available for exam.

Q  The last sentence of that paragraph talks about no petechiae can be observed within the right periorbital region.

A  Yes.

Q  Can you tell me what petechiae is?

A  Small pinpoint hemorrhages that can be observed on the surface of the skin.

Q  Why is that important?

A  It's a common examination made to see if it may indicate a possible cause of death.

Q  And what type of cause of death would be indicated if petechiae were present?

A  In a female in this type of circumstance, generally asphyxial type deaths, at least asphyxial as it relates to compression of the neck area.

Q  Strangulation?

(651) 681-8550 phone    1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-073

A  Yes.

Q  And my reading of that, correct me if I'm wrong,
is you found no petechiae observed on the
palpebral or bulbar conjunctivae.

What is that?

A  The white areas inside your eye, inside the
eyelid, and on the outer surface of your
eyeball.

Q  And nor was it found in the right periorbital
region?

A  Correct.

Q  That would be the area around the eye?

A  Correct.

Q  Is that where you'd expect to find it if there
had been strangulation?

A  You can see it there, you can, yes.

Q  Toward the bottom of page 4 you talk about the
nasal region, almost complete loss of soft
tissue.  No traumatic injuries can be observed
to the exposed structures.

What we consider the nose, the soft
tissues of the nose were missing here?

A  Yes.

Q  Again, is that the result of the natural
decomposition and the postmortem anthropophagy

US EXHIBIT-1-074

activity?

A  I believe so.

Q  Exam of the oral cavity, bottom of page 4, top of page 5.  Again, decomposition changes to the soft tissues.  No traumatic injuries to any of the existing skeletal structures?

A  Yes.

Q  Second full paragraph on page 5, "Inspection of the external genitalia reveals soft tissue loss that is an extension the tissue loss noted to the lower ventral abdominal wall region."

Where is the lower ventral abdominal wall region?

A  Lower anterior abdomen or lower front of your abdomen.

Q  Below your belt buckle?

A  Yes.

Q  "This area of tissue loss includes the mons pubis region as well as superior aspect of the labium major and minor."

A  Yes.

Q  That would be from below the lower ventral abdominal wall region into the genitalia?

A  Yes.

Q  Was that loss of soft tissue as a result of the

US EXHIBIT-1-075

postmortem decomposition and postmortem anthropophagy activity?

A   I believe it is due to postmortem anthropophagy in part or possibly completely.

Q   And I assume that you don't know for certain so you don't have an opinion with any degree of certainty one way or the other, then?

A   I have an opinion that there's tissue loss there. The exact causation of it I cannot give that to a medical certainty.

Q   Same paragraph, "Inspection of the remaining external genitalia reveals a vaginal orifice that is erythematous in appearance."

What does that mean?

A   Erythematous. It means it's red appearing.

Q   Is that significant in any way?

A   Given the subject's positioning on there, it may reflect the presence of livor in that portion of the subject's body.

Q   Meaning she was face down which means her pubic region would be face down as well and the blood may have gathered there as a result of livor mortis?

A   I think that is a possibility, yes.

Q   Same paragraph. "No traumatic injuries can be

(651) 681-8550 phone      1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-076

appreciated to the perineal or perianal soft

tissues."

A   Right.

Q   And where are those areas?

A   perineum is the area surrounding the inner --

the external genitalia on the lower pelvic area

extending to the area around the anus and the

adjacent region.

Q   The paragraph right below that on page 5 talks

about a tattoo on the dorsal aspect of the left

foot in the configuration of an elongated blue

colored design.

Did you ever figure out what that was?

A   I'm sorry, no.

Q   Was that consistent with tattooing that you were

told Dru Sjodin had?

A   Yes.

Q   In that same paragraph you talk about defects

can be observed to the lateral aspect of the

left lower extremities as well as within the

popliteal region to be described in the

following dictation?

A   Correct.

Q   What time of defects are we talking about?

A   Loss of skin and underlying soft tissue similar

US EXHIBIT-1-077

to that described or observed in the lower ventral abdominal wall region.

Q   Again, are we talking about postmortem decomposition or postmortem anthropophagy?

A   That may be due to it in part or whole, yes.

Q   And apparently she was decomposed to the point where you can't say one way or the other with any degree of medical certainty.

Is that true?

A   True.

Q   The next paragraph, the second to the last paragraph on page 5, last sentence, "Traumatic injuries can be observed to the right upper extremity to be described in the following dictation."

The right upper extremity I'm assuming you're talking about her right arm?

A   Yes.

Q   And what type of traumatic injuries did you observe?

A   I believe it was a contusion.

Q   And a contusion is a bruise?

A   Yes.

Q   And how could you tell that it was a contusion?

A   By its appearance at the time of the external

US EXHIBIT-1-078

examination.

Q  And can you just tell me how it appeared or how that was significant to you?

A  How it appeared was a bluish discoloration of the soft tissue exhibiting the same appearance as a contusion that's normally during the external examination. It's important all injuries on a case of this nature are important.

Q  And a contusion and a bruise with discoloration would be something that would have had to have happened prior to the time of death?

A  Yes. Right.

Q  At this point in time is there any way of dating that injury?

A  No.

Q  So all we know is that it was sometime prior to death but we don't know when?

A  Right.

Q  The last paragraph on page 5, again another tattoo in the configuration of an elephant observed on the superior aspect of the right buttock region.

That would be above the right buttock, then?

A  Yes.

US EXHIBIT-1-079

Q   And again, was that a tattoo that was consistent with the tattoos you were told Dru Sjodin had on her body?

A   Yes.

Q   The second to the last sentence in that paragraph on the bottom of page 5 says, "Comparative sparing of the soft tissues can be observed to the lower dorsal torso and buttock regions consistent with placement of the clothing at the time of discovery."

Can you tell me what you mean by that?

A   The clothing was spared.  Some of the decomposition changes noted in other areas of the body not covered by clothing.

Q   It wasn't the clothing that was spared but the clothing on the body spared the part of her body that the clothing was covering?

A   That is what I mean to say.

Q   That's what I thought you meant.  Thank you.

You talk about a defect can be observed in the right buttock region to be described in the following dictation.

What type of a defect to the right buttock?  That was the last sentence, last paragraph on page 5.

US EXHIBIT-1-080

A   If memory serves me, I believe the same type of defect described in other areas of the body where there's tissue loss.

Q   Again, likely the result of postmortem decomposition or postmortem anthropophagy?

A   I cannot rule that out, no.

Q   When you say you can't rule it out, is that another way of saying we don't know with any degree of medical certainty what the cause was?

A   Yes.

Q   Turning to page 6 of Exhibit 4, Roman numeral 6, recent injuries, internal. The first part of that is facies, F-A-C-I-E-S. You talk about possible contused tissue.

Contused would be contusion, bruise again?

A   Yes.

Q   "Can be observed in the right infraorbital region." And then you describe the exact location.

Infraorbital, is that the area around the eye?

A   That's beneath the eye.

Q   Beneath the eye. Beneath her right eye, then?

A   That's right.

(651) 681-8550 phone      1-877-681-8550 toll free
        www.johnsonreporting.com

US EXHIBIT-1-081

Q   And then you say, "A similar area of
discoloration can be observed to the lower right
cheek region."

A   Correct.

Q   Can you tell me what the significance of that
is?

A   Same answer as before.  I believe it's a
contusion or bruise that was present on the
subject's body at the time of the examination.

Q   And like the other bruise that we talked about,
is there any way of dating that bruise, that is,
to know when it would have been caused?

A   Other than at the time of her -- other than
while she was still alive, no.

Q   Are there any photographs in the deck of photos
that we've had here, P785 through P888, that
would show the bruising that you're referring to
below her right eye?

A   Do you want me to look?

Q   Please.

A   To answer, the best photographs that show the
injuries described are P0855 and P0864.  It's
the same photograph.  The camera is simply moved
in closer with a different scale.

Q   Thank you, by the way.  The beginning of that

US EXHIBIT-1-082

sentence on page 6 under facies says "Possible contused tissue can be observed."

What did you mean by possible?

A   That it is a possibility that it's a contusion on the subject's body.

Q   It must also then be possible that it's not a contusion?

A   That is true.  The degree of specificity is inhibited by the degree of decomposition that's present on the subject's body, yet the marks that are present I think are more than just decomposition alone.  Hence, the term possible contusion being used.

Q   Again, enough question that we're not able to say with any degree of medical certainty whether there was a contusion or was not a contusion, then?  It's simply a possible contusion?

A   Right.

Q   I'd like to talk about your description of the neck on page 6 of your report, Exhibit 4.  This is quite long and I'm not going to read it into the record in its entirety, but can you tell me in your own words what you found?

A   I believe there are remnants of a slash wound to the anterior surface of the subject's neck

US EXHIBIT-1-083

84

region where the inferior margin of the slash wound is available for examination.

Q  Let me just stop you.  Anterior surface of the neck.  You're talking about the front?

A  Yes.

Q  And the inferior margin would be which one?

A  The lower margin.

Q  Toward her belt?

A  Toward her belt, yes.  Is available for examination while the superior margin, the one towards her head, is unavailable for examination due to the decomposition that is present.  Possible -- a possible second slash wound can be seen on the left lateral aspect of the subject's neck region in a somewhat parallel location.

Q  Let me stop you just a second.  Left lateral is where?

A  Side of the subject's neck, left.

Q  Her left side?

A  Her left side.

Q  That would be a second wound that you've described?

A  That is correct.

Q  You talk in the middle of that paragraph, after describing its location and length, it says it

US EXHIBIT-1-084

has a distinct margin.

What do you mean by margin or distinct margin?

A   What I mean to say is the edge of the wound itself.

Q   That exhibits notching and ends on an elongated and separated portion of tissue, et cetera, et cetera.

What do you mean by exhibits notching?

A   Notching can be seen on some sharp force injuries when the knife cuts through tissue and leaves it's mark present on the tissue in a somewhat elongated, somewhat scalloped or marked region.

Q   Is there any of the photographs that we've got here with us today that demonstrate or show what you referred to in that paragraph, both the wounds themselves and the notching?

A   Do you want me to look?

Q   Yes, please.

A   Photographs P0858 through 863.

Q   And particularly, can you show me or tell me which of those photographs display the notching that you're referring to?

A   All due to some degree or less, more or less.

US EXHIBIT-1-085

Q   Can you just show me where you're referring to on the photographs?

A   Do you want me to point it out to you?

Q   Yes, please.

A   Smooth line here, small notch indentation there. There again.

Q   Just for the record, you're just showing me on P0858 and now you've laid down 859.

A   Smooth, then a dip.  Smooth and another dip. Then another dip there.  Then a continuation on. And imagine it's going to be continue on. Smooth, even margins with small notches present.

Q   You just showed me 860?

A   These are all the same photographs.  These are all the same subject matter taken at different magnifications or at least in different positions with the lighting trying to show the irregularity seen in some areas that I believe represents notching on this wound.

Q   Just correct me if I'm wrong, but the locations on these three photographs that you've been pointing out where you describe what you believe to be evidence of notching, I took the notching to be a lower level than the surrounding clean cut area but here it's, the ones you point out

(651) 681-8550 phone        1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-086

seem to be higher than the surrounding area.

Am I fair on that?

A   Yes.

Q   And that's what you're referring to as notching?

A   Yes.

Q   Is notching a medical term or is that reference to the type of weapon that may have been used?

A   I don't think it's a medical term.  It's a term that -- it's referring, I think, primarily to the weapon that may have been used.

Q   There was a knife that was seized from Mr. Rodriguez's car.  He's the defendant in this action.

A   Yes.

Q   Have you had occasion to view that knife personally?

A   No.

Q   Have you seen photographs of it?

A   To the best of my knowledge, I don't think I've seen photos or the knife itself, no.

Q   Is it possible that the inconsistency in the margin of the wound that you just showed me in those three photographs could have been caused by animal or insect activity?

A   I don't believe so.

US EXHIBIT-1-087

Q You don't think it's possible at all?

A I don't think so, no.

Q Why was the superior margin of the first wound that you described unavailable for examination?

A Postmortem anthropophagy and decomposition.

Q So part of the wound was missing or unavailable because of insect or animal activity or decomposition?

A I believe so, yes.

Q But you don't think either one of those affected the other margin of the wound?

A I don't believe so.

Q Looking toward the bottom of page 6 where you talk about flank.

A Yes.

Q And this is, again, in your report, your final autopsy protocol, Exhibit 4. "A defect can be observed to the right lateral flank region," and then you locate where it is. "This defect exhibits an elliptical appearance and measures," certain size. "Wound margins are irregular in nature."

First of all, can you tell us in layman's terms where this is located?

A On the right side of the subject's body. The

(651) 681-8550 phone    1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-088

flank area is the side of the abdomen, for want of a better description.

Q   Somewhere between the ribs and the pelvis?

A   Yes.

Q   And how big of a defect is this?

A   It measures 1.5 by 5.0 centimeters.

Q   And that would be the height and width, if you will, from the outside?

A   That's right.

Q   Were you able to determine the depth of the wound?

A   Yes. The depth of the wound is -- just give me a second. Eight centimeters.

Q   Eight centimeters in depth?

A   Yes.

Q   And where were you looking to come up with that figure?

A   Page 10, first paragraph, line 4. Actually, start at line 2 and go to line 4.

Q   If I look at page 10, the top, it says -- I think this is where you were reading. It says, "A tract of tissue destruction can be observed to the right pelvic region associated with the previously described defect to the right flank region. This tract extends in a distal and

(651) 681-8550 phone        1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-089

midline direction for 8 centimeters."

Are we talking about the same location?

A Yes.

Q Same defect?

A Yes.

Q How were those two related, then?

A The wound present on the surface of the skin continues into the subject's abdominal cavity region as this wound tract described at the top of page 10.

Q And it continues in there for a distance of 8 centimeters?

A That's right.

Q Did that -- well, obviously 8 centimeters, it appears to the outer skin, then?

A Yes.

Q Did it touch any organs on the inside of the body?

A No.

Q Missed everything?

A Yes.

Q Continuing on page 10, the second sentence says, "Disruption of soft tissues in this region can be observed with debris observed."

What does that mean?

(651) 681-8550 phone        1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-090

A   The debris was from the decomposition process as well as the outside of the body.

Q   I don't know what you mean when you say the debris was from the outside of the body.

A   The same kind of debris that we saw on the outside of the body when the body was initially received and processed.

Q   Grass, weeds, that kind of stuff?

A   I don't know if it was grass or weeds but it was some type of material. It was not a clean wound by that is what I'm trying to say. And it was the same kind of dirt and debris, yeah, like that. It wasn't actual weeds or grass but there was dirt and decomposition material in the tract.

Q   Let's go back to page 6, if we can, then. The last sentence of the paragraph that talks about the flank says, "Wound margins are irregular in nature."

What do you mean by that?

A   That means the wounds have an irregular nature. The margins have an irregular appearance and are not sharp and well-formed as noted in the wound to the neck.

Q   And from what you've told me before, I assume

US EXHIBIT-1-091

that that's indicative of either postmortem decomposition or postmortem anthropophagy action?

A   Right.

Q   Bottom of page 6 you talk about the ventral abdominal wall. "A defect can be observed to the lower ventral abdominal wall."

Again, this is where? Below the belt?

A   Yes.

Q   That area?

A   Yes.

Q   And can you describe for me what you found there?

A   The defect to the lower abdominal wall lies at a point approximately 5 inches below the level of the umbilicus--belly button. Measurements are provided. And basically you have loss of skin and underlying subcutaneous tissue for a depth of 1.5 centimeters with exposed underlying soft tissue observed.

Q   This would be an area that would have been down toward the ground as she was laying face down?

A   True.

Q   Is that correct?

A   Yes.

(651) 681-8550 phone       1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-092

Q   You say the margins of this defect are well
formed and irregular?

A   Yes.

Q   Again, are we talking postmortem anthropophagy
action again?

A   Yes.  I think the margins on this wound may
represent postmortem anthropophagy given their
appearance.

Q   Is that -- you talk about the -- is that what
caused this wound, then, that we're talking
about?

A   That's what caused the margins to have that
appearance.  Whether that is wholly responsible
for the wound being present on the abdomen, I
cannot say.

Q   How come?

A   Because the tissue was absent and not available
for exam.

Q   So is it fair to say that we don't know with any
degree of medical certainty what did cause this
defect that you found at autopsy?

A   Yeah.  I think all you can say is there's a
defect present to her ventral abdominal wall
where there's an appreciable area of tissue
loss.  At least the margins have an irregular

US EXHIBIT-1-093