appearance that suggest possible postmortem anthropophagy and that's about as much as I can say. As far as to why the tissue is absent, it may be due to animal activity but I cannot exclude other possibilities.

Q   Can I ask you to go through the photographs again, and I'm looking for two things. Can you tell me the photographs that show the flank wound that you're talking about either externally or internally. And if you come across it, I'm looking for the photographs that show the ventral abdominal wall defect as well.

A   Sure. The flank wound is shown on P0872. The injuries to the lower abdominal wall are shown on P0873, 874, 875 of the photographs.

Q   Thank you. Turning to page 7 of Exhibit 4, top of the page, the category is external genitalia. You talk about "An enlarged defect can be observed centered over the midline of the subject's body in the region of the mons pubis."

Is this a continuation of what we just talked about before, the ventral -- the lower ventral abdominal wall defect?

A   This is a larger wound located just beneath the one previously described.

(651) 681-8550 phone        1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-094

Q   And this also would have been on an area that would have been toward the ground or on the ground where she's laying face down?

A   That's right.

Q   "Defect exhibits an inverted triangular configuration that extends laterally to the inguinal regions and distally into the superior aspect of the external genitalia."

Can you tell us in layman's terms the location of that, then?

A   The wound is located at the approximate midline of the lower front of the abdomen below the umbilicus extending distally or downward into the upper part of the external genitalia and presenting as an upside down triangle.

Q   The inguinal regions would be where?

A   The inguinal regions refer to the areas on the side of the subject's body where your leg and your torso join.  They are the creases that can be seen on either side that have a downward slant pointing toward the external genitalia.

Q   Would those be the outer portions of this downward pointing triangle that you've described?

A   Yes.

US EXHIBIT-1-095

Q   Margins of this defect also are distinct and irregular as we talked about before?

A   Yes.

Q   And why is that significant?

A   Same answer as before.  Because it may indicate postmortem anthropophagy changes at least to the margin of the wound.

Q   And again, same situation.  We're not able to determine the cause of the defect itself because of the loss of tissue through decomposition?

A   Exactly right.

Q   In the next paragraph you talk about the lower extremities.  "An elongated defect can be observed on the superior aspect of the right thigh beginning in the inguinal region and extending distally onto the superior and medial surface of the thigh. Then you give the dimensions.

A   Yes.

Q   "Margins of this defect are distinct and irregular in appearance."

A   Yes.

Q   What can you tell us about that?

A   Same answer as before.  The margins of the wound represent or have changes that could be

US EXHIBIT-1-096

identified as postmortem anthropophagy or tissue loss at least to the margins of the wound.

Q And again, we don't know because of loss of tissue through decomposition the exact cause of the defect whether it was wholly postmortem or not?

A Correct.

Q The next paragraph you talk about an oval shaped defect on the lower -- excuse me. On the lateral aspect of the left knee?

A Yes.

Q What is that?

A Outside of the left knee.

Q And do we know what caused that?

A Same answer as before.

Q We don't know, in other words?

A Correct.

Q No --

A At least we don't know what caused the tissue loss. We know that the margins exhibit what I think are postmortem anthropophagy. Whether that is responsible wholly for the tissue loss I cannot say.

Q So we don't know with any degree of medical certainty what the cause of the defect

US EXHIBIT-1-097

originally was?

A  Yes.

Q  Yes, we do not?

A  Yes, we do not.

Q  And then the third paragraph there you talk about "A defect can be observed on the medial aspect of the right ankle exhibiting an oval configuration." Then you give the dimension?

A  Yes.

Q  Again you talk about the margins are distinct and irregular.

Are we in the same situation there?

A  Yes.

Q  Medial aspect would be the inside of the right ankle?

A  Correct.

Q  And we don't know what caused the defect in the first place?

A  True.

Q  The margins show evidence of postmortem anthropophagy being --

A  Yes.

Q  -- distinct and irregular?

A  That's right.

Q  Can you go through the deck of photos while I

US EXHIBIT-1-098

think of it and can you tell me which

photographs depict the external genitalia

defects that you're talking about at the top of

page 7?

A  P0873 through 875 of the photographs.

Q  While you've got those, can you find the ones

that refer to the defects on her lower

extremities, please.  You talk about one on the

superior aspect of the right thigh, the lateral

aspect of the left knee, and the medial aspect

of the right ankle?

A  For the superior right thigh, P0873 through

P0875.  For the lateral left knee, P0880.  And I

don't know if I have a good photograph of the

one of the left ankle.

Q  Would be the right ankle, medial aspect of the

right ankle.

A  I have -- the best one I have is P0880.

Q  While I've got you going through those, the next

thing we're going to talk about is a contusion

observed on the dorsum of the right forearm 12

centimeters distal to the right elbow region.

Is there a photograph that depicts that?

A  The best photographs depicting the contusion to

the forearm are P0869 and 870.

(651) 681-8550 phone       1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-099

Q  And can you tell me, the dorsum of the right forearm, can you describe that for me?

A  The dorsum of the forearm refers to the back surface of the subject's forearm that is in continuation with the back of the hand.

Q  And can you tell me what that contusion was that you observed?

A  Discoloration of the soft tissue consistent with hemorrhage into the soft tissues normally observed at a postmortem examination.

Q  Can we tell anything about when that contusion occurred other than it was before death?

A  No.  The contusion was received before death. Other than that, I cannot say.

Q  The next paragraph talks about the dorsal torso.

A  Yes.

Q  A triangular shaped defect observed in the right buttock region?

A  Yes.

Q  Margins are irregular.  What can you tell me about that?

A  Same answer as before.  The tissue is absent, the margins are irregular, and I think exhibit evidence of a postmortem anthropophagy and decomposition and may be responsible for the

(651) 681-8550 phone        1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-100

loss of the tissue. But I cannot say to a medical certainty that it's -- that that's the only cause.

Q You can't say to a medical certainty what the cause is, then, either, can you?

A No. I can only say that there is absence of tissue with irregular margins and I cannot say that the tissue is completely due to postmortem change.

Q Say that again, please.

A There are loss of tissue present in the area with the irregular margins, and while it may be due -- and I cannot rule out the possibility that the tissue loss is due completely to postmortem anthropophagy.

Q Starting on page 7 and continuing through page 11.

A Yes.

Q You talk about the autopsy itself of the internal organs?

A Yes.

Q Rather than go through each of them individually, can you tell me if you found anything abnormal or unusual with regard to the thorax?

(651) 681-8550 phone    1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-101

A  No. I'm sorry, no.

Q  What about with regard to the heart?

A  No. The heart is consistent with the subject's age. Of course, the weight may be somewhat down given the decomposition but the heart otherwise appeared normal.

Q  And the great vessels of the heart?

A  Same answer.

Q  Normal for age, in other words?

A  That's right.

Q  What about the lungs?

A  Lungs. The right lung is normal for age and size. Left lung is diminished in size with portions of the upper lobe unavailable for examination. That was noted at the time of the examination.

Q  And what does that mean?

A  The absence of a portion of the upper -- a portion of the upper left lung is absent and may reflect decomposition or possible postmortem anthropophagy changes.

Q  Any other abnormalities regarding the lungs?

A  No.

Q  Same question regarding the skull and brain that you examined, any abnormal conditions or

US EXHIBIT-1-102

findings?

A   No.

Q   Regarding the abdomen, anything unusual or abnormal in your examination of that?

A   Other than the wound tract previously described regarding the flank wound on the right side, no.

Q   And that's on page 10 that we were talking about?

A   That's right.

Q   Did you come to any conclusions as to the causation of that kind of a wound?

A   I cannot rule out the possibility that it may represent a stab wound.

Q   Is there any other possibility?

A   I don't think -- the presentation of the wound tract I don't think is due solely to decomposition and postmortem anthropophagy and I am concerned that it may represent a preexisting stab wound.  At least that was my opinion at the time of the examination.

Q   When you say a preexisting stab wound, do you mean preexisting the postmortem anthropophagy activity?

A   That's right.

Q   And you said that was your opinion at the time

US EXHIBIT-1-103

of doing the autopsy or preparing this report?

A  Yes.

Q  Has your opinion changed in any way since then?

A  No.

Q  What is the dimensions of the wound that we're talking about that may have been a stab wound?

A  Go back.  1.5 by 5.0 centimeters.

Q  Let me just stop you for a second.  You're on page 6?

A  Yes.

Q  Under the paragraph that talks about flank?

A  Yes.

Q  The 1.5 by 5.0 centimeters?

A  Yes.

Q  Is the dimensions that are contained there?

A  Yes.

Q  And what exactly were you measuring to come up with those dimensions?

A  Margins of the wound.

Q  What do you mean by margins of the wound?

A  The dimensions of the wound as it presents on the outer surface of the body.

Q  And that would be the margins that are irregular in nature?

A  Yes.

US EXHIBIT-1-104

Q   So that wound be the full extent of the wound after postmortem anthropophilic activity?

A   That's right.

Q   Did you take any measurements of the wound itself that extended into the body cavity?

A   Yes.

Q   And can you tell me what the dimensions of that were?

A   Eight centimeters in depth.

Q   That would be from the outside of the skin into the body cavity?

A   To the depth of the wound tract, yes.

Q   Did you take any measurements of the height and width of the object that would have been used to make that type of a wound?

A   I don't understand the question.

Q   As I understand it, and correct me if I'm wrong, on page 6 under the paragraph flank, you measured the outside dimensions of the defect on the outside of the skin?

A   Right.

Q   And that would have been after the postmortem anthropophilic activity by animals on the body?

A   Yes.  That may have enlarged the wound, yes.

Q   And on page 10 you talk about that wound

US EXHIBIT-1-105

extending 8 centimeters into the body cavity?

A   Yes.

Q   Did the wound into the body cavity measure a full 1.5 by 5 centimeters in height and width all the way in 8 centimeters into the body cavity?

A   Yes.  It was the same approximate dimensions all the way in.  It was measured and it was the same as the surface of the skin.

Q   So would you agree that there was postmortem anthropophilic activity inside of that wound?

A   I cannot rule that possibility out, no.

Q   In other words, that is possible?

A   Yes.

Q   In fact, the irregular margins on the outside of the wound that you observed would indicate that type of activity postmortem?

A   Yes.

Q   Under those circumstances, are you able to offer an opinion to any degree of certainty at all as to the size of the weapon that would have been used to cause that wound?

A   You can give an estimation to the police based on the size of the wound tract and the surface wound.  You can give an approximation of what

US EXHIBIT-1-106

the minimum of the blade may have been. Or I'm sorry, the maximum the blade may have been. Conceivable a smaller weapon may have caused it and there could have been the enlargement from the decomposition change.

Q   What I think you just said, and correct me if I'm wrong, was that the dimensions that you've provided would obviously provide the maximum dimensions of the weapon that could have been used, but due to the postmortem animal activity, the weapon could have been smaller than the dimensions that you measured on the outside of the body?

A   If that's not what I said, that's what I meant to say, yes.

Q   So whether this was done by an ice pick or a knife or some other type of sharp instrument, we don't know.

Is that true?

A   I cannot tell the police -- I could not tell the police the exact instrument used. I think it's larger than an ice pick given the size and dimensions. But as for the exact identification of a knife, I can give the approximate dimensions of the blade but I cannot give the

US EXHIBIT-1-107

108

exact dimensions, no.

Q  How were you able to give even approximate

dimensions?

A  The depth of the wound and the dimensions of the

surface of the skin at least give you an idea of

what the knife may have looked like, the blade

may have looked like for configuration.

Q  That's if we make the assumption that the

postmortem anthropophilic activity is uniform

around the entrance wound?

A  That's right.

Q  So if that activity is uniform, then you assume

that the entering object looked somewhat like

the outside wound?

A  Correct.

Q  But it's also just as likely that the postmortem

anthropophilic activity is not uniform.  That

is, there's more damage done to one side or one

edge of the wound than any of the others?

A  That's true, but given its location and given

its appearance and given the other changes to

the body that were the result of the

decomposition and the anthropophagy, this is the

only area of the body that exhibited this and

makes me concerned that this may represent more

US EXHIBIT-1-108

than just a purely postmortem anthropophagy but it may be an enlargement of a previous wound.

Q   And back to my question, then, was we don't know and there's no way of knowing whether the postmortem anthropophilic activity was uniform around the original wound that you believe was there?

A   True.

Q   And unless we know that, we really have no legitimate means of trying to estimate the size or dimensions of any instrument that may have been used to cause the original wound?

A   I think about all you can do is give an estimate.  I don't think you can identify any specific weapon, no.

Q   Aside from this wound that we've been talking about, did you observe any other unusual or abnormal changes to the abdomen?

A   No.

Q   On page 10 of your report, anything unusual or abnormal about your examination of the spleen?

A   No.

Q   Anything unusual or abnormal about your examination of the liver?

A   No.

US EXHIBIT-1-109

Q   How about the GI tract?

A   No.

Q   Anything unusual or abnormal about the pancreas?

A   No.

Q   The adrenal glands?

A   No.

Q   The genitourinary system?

A   No.

Q   The neck structures, anything unusual or abnormal there?

A   Loss of soft tissue associated with postmortem anthropophagy as described.

Q   That would be in what area?

A   That would be the floor of the -- that would be the floor of the mouth, the tongue, underneath the chin extending into the neck region.

Q   Were any of those structures present at autopsy?

A   No.

Q   And that's entirely related to postmortem anthropophagy?

A   I believe so.

Q   Anything else unusual about or abnormal about the neck structures besides what we've just talked about?

A   No.

US EXHIBIT-1-110

Q   Vertebral column, anything unusual or abnormal there?

A   No.

Q   And what the body cavities themselves?

A   No.

Q   On page 12 of your report you talk about specimens that you obtained?

A   Yes.

Q   Again, I think we've already talked about those a little bit. I was going to ask you about one thing. It may be in the documents. I don't find it right now. But regarding the pieces of plastic that were found.

A   Yes.

Q   And they're mentioned both as specimens on page 12 and also on page 1.

A   Yes.

Q   I think I saw that referred to somewhere to the fact that they were attached to the body?

A   Yes.

Q   Am I correct in that?

A   Yes.

Q   Can you tell me what you mean by that?

A   The brown and red material that was observed was in two areas. There were pieces lying attached

US EXHIBIT-1-111

to the outer surface of the subject's facial

region, if memory serves me correctly, as well

as on the outer surface of the subject's neck

beneath the ligature wrapped about her neck

region.

Q  And when you say attached to her, is it adhered?

A  Yes.

Q  Sticking to her, in other words?

A  Yes.

Q  Where on her face, then?

A  If I remember correctly, in the eye region.

Q  Left, right?

A  I believe right.

Q  And when you say it was also on her neck under

the ligature, where on the neck?

A  Well, not completely encircling but covering the

front and going off into the sides of either

side.

Q  Was that significant to you in any way?

A  Yes.

Q  How?

A  I think it represented remnants of a material

that may have been over the subject's head at

the time of her death or following her death.

Q  And that would sound like a plastic bag is what

US EXHIBIT-1-112

113

you're talking about?

A  Yes.

Q  And was there enough of the plastic bag remaining that you were able to examine it to determine, number one, its source?

A  If memory serves me correctly, the piece underneath the ligature about the neck region was large enough that you could observe printing.  I believe that was present but I'm afraid I can't remember what it said.

Q  And it actually had words that you could read or was it just color?

A  If memory serves me correctly, the color and its appearance and its printing it looked like a bag to me but to the police officers that were there it meant something to them and they were from the area.

Q  And so what happened to that?  Did you give the plastic to the police officers, then?

A  Yes.  I can look at the release.  Yes, the plastic from the subject's buttock -- I'm sorry, there's a piece on the buttock and from the orbit or about the right eye, that was released to the BCA, Stan Leech, on 4/18/04 at 1405 hours.

US EXHIBIT-1-113

Q   Under specimens on page 12, I also note that fingernail clippings are collected from each of the fingers on both hands were available?

A   Yes.

Q   And do you do that as part of the autopsy, then?

A   That's part of the protocol that's done on all homicide cases.

Q   Why is that done?

A   Attempting to identify extraneous material that may have been collected during the subject's assault.

Q   In other words, see if she had scratched her attacker?

A   That is one possibility, yes.

Q   What are the other possibilities?

A   You can look for blood deposit. You can look for skin deposit. You can look for anything that may allow you to have a DNA match.

Q   We talked about it before but I'm going to ask you again. Do you have an opinion on the medical cause of her death?

A   The best opinion I can give you is homicidal violence as listed on the face sheet.

Q   We'll talk about that in more detail. And I asked you before whether you were able to date

US EXHIBIT-1-114

the death. That is, what day she died on.

A  I cannot tell you the day that she died.

Q  Have you made any effort to approximate the time of death beyond what you told me before which was the date her body was found?

A  All I can tell you is based -- I think that she died in -- it was my impression she died in fairly close approximation to the time that she was reported missing given the livor that could be observed and its location on the body and given the clothing, but I cannot give you an exact time and date.

Q  I think you just said that you approximated the time of death at close to the time of her disappearance.

Is that what you said?

A  Right.

Q  Tell me again why you hold that opinion?

A  Because there is livor present. Describes it in the autopsy protocol. Livor is present over the front of the subject's body that coincides with the placement of her clothing and the position of the subject's body and indicates that at least she was placed in this position and remained in this position after death and livor

US EXHIBIT-1-115

formed in that location.

So I can speak to the issue that I think she was in that position at the time of her death but giving an actual date of death, I cannot do that.

Q   What you just said was that you could -- from the livor you can tell that she was in that position at the time of her death?

A   Or at least she was put in that position immediately after death, yes.

Q   That's what I thought you meant to say.

A   Right.

Q   So livor mortis is the natural settling of the blood in the body after the heart stops beating?

A   Right.

Q   How long does it take for livor mortis to set in?

A   To a practiced hand you can begin to see livor at about 2 to 4 hours, more appreciable at 6 to 8, usually maxes out at about 12 hours.  From 12 hours it will stay and be present in the body, will fix, and the only thing that will obscure it is the onset of postmortem decomposition.

Q   And this body exhibited livor mortis basically on the anterior or front part of the body which

US EXHIBIT-1-116

is consistent with her body having been found face down?

A   Yes.

Q   And is there anything about the livor mortis, then, that allows you to date or tell us the time of death?

A   No.  All you can do is make the estimation or make the observation of the relationship of the livor of the position as found.  As far as the actual timing of when the death occurred, can't do it.

Q   If you said something different just a few moments ago, that would have been a misstatement, then?

A   If I said something different before, that would be a misstatement.

Q   Do you have an opinion as to the place of her death?

A   I do not know where her death occurred.

Q   Just so we're not quibbling, do you have an opinion on that to any degree of medical certainty as to where the death occurred?

A   I cannot assure you if she died at the location where her body was found or if she was transported to that site already expired.

(651) 681-8550 phone      1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-117

118

Q   We've talked about this to some degree before, but are you able to give us any kind of a day to a reasonable degree of medical certainty on any of the traumatic injuries that she suffered?

A   No. Other than the contusions that have been described as occurring before her death.

Q   Correct.

A   No.

Q   Is there any way to determine which of the injuries that you've observed may have occurred postmortem?

A   I think some of the injuries described to the lower abdomen, thigh region may represent, in part, postmortem changes as described previously.

Q   Is there any way of dating any of the other defects except for the contusions which we've talked about and agreed that that would have been obviously predeath would have caused that?

A   What do you mean by dating, sir?

Q   Can you tell me when they happened?

A   As opposed to before death or after death?

Q   Let's start there.

A   No, I can't.

Q   And as we've gone through this, it seems as

US EXHIBIT-1-118

though, and correct me if I'm wrong, that your ability to make some of these determinations has been hampered simply by the length of time that resulted in the natural decomposition of the body and the loss of a lot of the tissues through postmortem anthropophagy?

A   I think that's a true statement.

Q   Are you able to or do you have any opinions on whether or not this young lady suffered any sort of torture or physical abuse prior to her death?

A   Not able to tell you.

Q   Can you tell us from your examination of the body whether this young lady suffered a loss of consciousness at any time prior to her death?

A   That is always a possibility but there's nothing at the autopsy that would suggest that, no.

Q   Nothing that would suggest it.  Is there anything that would suggest that it did not happen?

A   No.

Q   So the results of the autopsy are ambiguous about that, but you're not able to tell us with a reasonable degree of medical certainty whether she did or did not lose consciousness at any time prior to her death?

US EXHIBIT-1-119

A   True.

Q   I'm assuming that you have no opinion on whether or not any psychological abuse occurred prior to her death?

A   I have no opinion regarding that.

Q   Show you what we've had marked here as Deposition Exhibit No. 5.  It's a pleading entitled United States Supplement in Compliance to the Court's May 12, 2006 Order.  It contains seven pages.  Not all of them pertain to you, Dr. McGee.  You're referenced at the bottom of page 1 and continue on through page 3 onto the very top of page 4.

A   Okay.

Q   I think I showed you this document just before we got started, and I think you told me at that time that this is the first time that you had ever seen this document?

A   This is the first time I've seen this document, yes.

Q   Let me describe it for you this way.  This is a document that was put together by the United States Attorney's Office in connection with this pending case?

A   Okay.

US EXHIBIT-1-120

Q   And they've numbered paragraphs 1 through 7 contained on pages 2, 3, and 4 in which they have listed for me the opinions that they believe you have and will express at trial concerning this case. Okay?

A   Yes.

Q   I'd like to talk about those with you.

A   Okay.

Q   Let's start on paragraph No. 1 on the bottom of page 2. Would you just read that out loud I guess would be a good way to do it.

A   No. 1?

Q   Yes, please.

A   "Dru Sjodin's neck was cut at least twice with a sharp-edged instrument resulting in elongated slash-type injuries. These are substantially severe injuries, visually inconsistent with having been caused by natural decomposition and/or animal insect activity. Edges are predominantly clean-cut, straight, and lacking in indicia of animal or insect activity. These cuts were likely inflicted at the scene where the victim's body was later located. Blood patterns and quantities on the victim's clothing and in the defendant's car are inconsistent with

US EXHIBIT-1-121

these injuries having been inflicted prior to

transport from another location."

Q  My first question is, are those your words or

someone in the U.S. Attorney's Office?

A  Someone in the U.S. Attorney's Office.

Q  And you and I have already talked about

substantially all of these issues here today.

And my question is does the information

contained in paragraph 1 accurately reflect your

actual opinions about these issues or have we

already talked about your actual opinions?

A  We've already talked about the actual opinions.

This represents, I think it fairly represents

what I will testify to in this case.

Q  Would you agree with me that what's written here

in paragraph No. 1 that you've just read is

inconsistent with what you've already told me

today?

A  If it is, then point that out to me.

Q  I don't remember in sentence No. 1 you and I

talking about the two -- I forget what you

called them.  I don't recall you calling them

slash-type injuries to her neck.

A  Right.  I described one as being across the top

of the neck.  I think I described it as 13.5.

US EXHIBIT-1-122

And then there's a second one right beneath it on the left lateral aspect of the neck region.

Q   Right. Are you describing that as a slash-type injury?

A   I think the larger one is and the one on the left lateral aspect could also represent one, yes.

Q   Could or does?

A   Could.

Q   Meaning you're not sure if it does or does not?

A   I cannot say to the degree of certainty that I can with the larger one going across the front of the neck.

Q   Here, reference is made that the edges are predominantly clean-cut, straight, lacking any indicia of animal, insect activity.

My recollection of your testimony here previously today was that the superior aspect of at least one of these was completely missing due to animal activity?

A   That's true. I took this to mean that they were describing the inferior margin that was available for examination. That's what I took it to mean.

Q   Well, here it says edges. I'm assuming that's

US EXHIBIT-1-123

124

both edges of each wound?

A   No.  Well, if you take edges as meaning both sides of the wound, then it would be wrong.

Q   And I don't recall you offering any opinion as to where the cuts were inflicted at.  That is, where she was at when the cuts were inflicted.

Have you offered any opinion like that?

A   You mean the location of where the incision was -- say that again.

Q   The location of Ms. Sjodin at the time that the cuts were made.  I don't recall you offering any opinion on that here today.

A   What I was trying to refer to was when we talked to the police initially and they described the deposits of blood present in the back of the car as being fine spray or small droplets, and I indicated that while I thought -- I told the police I thought an assault may have taken place in that location.  It probably was not a more major assault where there have been -- because there was not more major blood deposits present.  That's what I was trying to explain.

Q   I think you and I talked about that earlier.

A   That's right.

Q   Do you hold the opinion that these cuts were

US EXHIBIT-1-124

125

likely inflicted at the scene where the victim's body was later located?

A  I think that is a possibility, yes.

Q  It's also a possibility that they weren't, then.

Is that right?

A  Yes.

Q  And so we don't know with any degree of medical certainty where her body was at when the cuts were inflicted?

A  That is true.

Q  "The blood patterns and quantities on the victim's clothing and in the defendant's car are inconsistent with these injuries having been inflicted prior to transport from another location."

Is that your opinion or is that someone else's?

A  I think that is an opinion that was provided but then based on discussions of the findings at the autopsy and what I thought was going on based on the lab's evaluation of the car by the BCA.

Q  What part of your autopsy lead you to this conclusion?

A  There's no part of the autopsy.  It's from the evaluation that the lab performed on the car and

US EXHIBIT-1-125

from the scene investigation conducted by the

police at the death scene.

Q   Have you seen the car yourself?

A   I have not seen the car physically, no.  Only
photos and I believe diagrams from the lab.

Q   And my understanding is you were not at the
scene where the body was found?

A   At the time the body was discovered I was not at
the scene.

Q   Have you ever been there?

A   Yes.

Q   You've been there afterwards, then?

A   Yes.

Q   When was that?

A   It was at a time after the autopsy was completed
but I don't have the exact date.  I can provide
that but I can't remember.

Q   So what the U.S. Attorney's Office is saying
your opinion is, then, is based on the blood
patterns and quantities on the victim's clothes
and in the defendant's car are inconsistent with
the injuries having been inflicted prior to
transport from another location?

A   That's what I told the police with regard -- if
my memory serves me, I believe that's what I

US EXHIBIT-1-126

told the police regarding where the injuries may have been inflicted to her neck with a sharp force instrument.

Q   That's what I'm trying to get at. The opinion that's attributed to you here and which you may hold is based on what you've been told by the Minnesota BCA lab as to what they found in the car?

A   Right.

Q   And what they found at the scene?

A   Right.

Q   And not having anything at all to do with your professional work as a medical examiner doing this autopsy?

A   With the autopsy in and of itself, no.

Q   What car was the body dropped off from?

A   I don't know.

Q   Let's go to page 3, paragraph No. 2. Here they're talking about notching. Why don't you just read this into the record, if you would, please, so we know what we're talking about.

A   "The slash-type cuts to the neck include notching consistent in type, size, and appearance with causation by a sharp-edged instrument such as knife found in defendant

US EXHIBIT-1-127

128

Rodriguez's car. (See knife at Bates No. 17489 through 17491 of discovery material; BCA item No. 2). Notching resulted from the instrument being used with a saw-like motion cutting across the victim's neck."

Q   Does that accurately reflect the opinions that you hold?

A   I believe so, yes.

Q   What is at Bates No. 17489 through 17491?

A   I have no idea.

Q   And I thought we talked earlier about whether or not you'd ever seen a knife that was seized from Mr. Rodriguez, and I think you told me you had never seen that?

A   No.

Q   Had you also told me you never seen photographs of that?

A   Also true.

Q   But you're willing to testify apparently that whatever they say knife it is, that's the one it was.

Is that what you're telling me?

A   At the time of the examination, a duplicate knife was provided by the police department that was supposed to be the same size and dimensions

US EXHIBIT-1-128

as the one recovered. That is what the police informed me of.

Q  So that was provided to you when?

A  At the time of the autopsy.

Q  And so you have seen what was represented to you to be a duplicate knife?

A  That's what they said, yes.

Q  And explain to me the attributed opinion here about the notching resulted from the instrument being used with a saw-like motion cutting across the victim's neck.

What do you mean by that?

A  As the knife is going across, it's going across and making those dips or elevations that we saw previously in the photographs as the knife that's cutting through the tissue.

Q  When I think of a saw-like motion, I think of it being back and forth like a saw. You push it and you pull it, you push it and you pull it.

A  There may be some component of that going on. There may be some component of that going on when these wounds were inflicted and that's what I think you're seeing with the notching.

Q  Do you have the opinion that this knife that you're referring to, the duplicate, was used in

US EXHIBIT-1-129

a saw-like motion? That is, it was pushed and it was pulled and that resulted in the notching that you've described for me in the photographs?

A   Yes. I don't know if I would use the term saw-like action, but I would use a knife, a knife was drawn across the subject's neck in a fashion to cause notching and a smooth edge as described in the autopsy. That's what I would use. I don't know if I'd use the term saw-like motion. It's not a termination I would use but it's not incorrect. It indicates the hand moving.

Q   Well, if you're drawing it across, you're pulling it one direction?

A   That's right.

Q   Saw-like refers to it moving both directions?

A   That's true. But on the same hand, when the wound shows, instead of a smooth, clean margin that's uniform, it shows individual dips, so it indicates that the knife at least was repositioned or was moving across causing an irregularity of the margin on the skin as it came across.

Q   So that could have been caused by hesitation, regripping, changing the direction of the knife

(651) 681-8550 phone      1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-130

is what you're telling me?

A   That is possible.

Q   And that would have caused the notching that you showed me earlier today of the photographs?

A   I believe that is a possibility, yes.

Q   I think the photographs you showed me were P0858 through 863.

A   All right.

Q   Page 3, paragraph 3 of Exhibit 5.  I think we've already talked about this.

This is the right flank defect?

A   Correct.

Q   And could you just read that into the record, please?

A   "The right flank defect referred to in Dr. McGee's report is inconsistent with natural decomposition and/or animal insect activity alone due to location, depth, and directional tunneling characteristics and was initialized by a sharp-object trauma.  Presence of postmortem animal insect activity is apparent from the boundaries of the defect and the introduction of foreign material such as soil into the defect."

Q   I think we've talked about all of that previously about that right flank defect and

US EXHIBIT-1-131

your observation of it.

Is that true?

A Yes.

Q And I think I asked you before whether this apparent stab wound into her body touched any of the vital organs, touched anything at all?

A Did not.

Q So clearly that wound, whatever it was caused by, was not a fatal wound?

A True.

Q Paragraph No. 4 says, "Bruising to Dru Sjodin's right forearm is characteristic of a defensive injury sustained prior to death."

The right forearm injury I think you and I talked about earlier was on the back of her forearm. I think you said it was like an extension of the back of her hand, that surface?

A Right.

Q And I don't recall you calling that a defensive injury.

What does that mean?

A Defensive injury is an injury that can be sustained or can be seen on an assault victim when they're attempting to ward off blows during an assault.

US EXHIBIT-1-132

Q   And do you have that opinion?  Do you think this was some sort of a defensive injury?

A   I think it may represent a defensive injury given its location and the circumstances of her death, yes.

Q   What circumstances of her death leads you to that opinion?

A   Given the fact that she was taken from the parking lot in the manner described to me and that she was bound, I cannot rule out the possibility during that she may have struggled.

Q   I will assume that you would also concede that you don't know whether she did struggle or not?

A   True.

Q   And you don't know whether this bruise that you're talking about was sustained on that day, whereas we talked about before you don't know what day it might have been?

A   Also true.

Q   She may have had that bruise when she went to work that day, correct?

A   Also true.

Q   And there's nothing about your observations or the work you were able to do that would know whether that was true or not?

US EXHIBIT-1-133

134

A   Also true.

Q   Paragraph No. 5 on page 3. I'll let you read that into the record as well.

A   "Acid phosphatase levels in the vaginal and cervical tests are elevated beyond the normal range expected under the circumstances of decomposition. The lab results indicate the likelihood of seminal deposit at the time of death or within the preceding 24 hours because of absorption for deposits more than 24 hours prior to death."

Q   First of all, I'm going to ask you does that accurately reflect opinions that you hold about this case?

A   It does. I'm not sure I understand the last part of the line "The lab results indicate likelihood of seminal deposit at the time of death or within the preceding 24 hours." I think that's true. Because of the absorption for deposits more than 24 hours death, I don't think I understand what they're trying to describe in the wording there. So up to that point, yes.

Q   Let me go at it this way. This is a legal document that the U.S. Attorney's Office has

US EXHIBIT-1-134

provided to me. I'm trying to figure out what your professional opinions are.

A  Right.

Q  And whether they do or do not agree with what this says doesn't really matter for today's purposes. Okay? So I'm trying to find out what your opinions are.

A  Okay.

Q  So if I understand what you've said, you think that this accurately reflects your opinions about this issue with the exception of the last clause which says because of absorption for deposits more than 24 hours prior to death?

A  That's right.

Q  And the rest of that accurately reflects the opinions that you hold about this?

A  Yes.

Q  Can you tell me what the normal range expected under the circumstances of decomposition are?

A  In our office for seminal fluid is anything below 25 is considered background scatter.

Q  You said that was in your lab?

A  The lab that performed the analysis in this case.

Q  And that was which lab?

US EXHIBIT-1-135

A   Regions Hospital.

Q   And is that a standard that they have or a standard that you have?

A   That was a standard that they have that they set up on the sexual assaults were examined -- when the sexual assault examinations were performed there.

Q   And so the standard means what?  If they have more than --

A   Well, the laboratory performs the analysis and generates the number.  The interpretation is in the purview of the pathologist reading the results.  In this case it would be me for our office.  For the hospital it would be whoever reads the sexual assaults there.  I was trained that levels below 25 -- 25 or below should be considered negative or background scatter.  Therefore, you don't consider anything being positive until it's at least above that number.

Q   That's 25 what?

A   Units per liter.

Q   Which is the measurement that you've got contained in your autopsy report, Exhibit 4?

A   Right.

Q   Now, what is the basis for 25 as being the

US EXHIBIT-1-136

standard, then?

A   It's my understanding the reason that was used as a cutoff number is because you can see levels up to that height in normal females and males when samples are routinely collected on nonassault victims.  And we have confirmed that in our office by doing those tests.

Q   And are you -- is this -- is this the levels that Regions Hospital routinely uses for sexual assault kits?

A   I don't know the answer to that.

Q   So if I understand it correctly, your professional opinion here is that if an acid phosphatase test comes back at more than 25 units per liter, that is a high range or above normal?

A   Right.  It's above normal.  And you have to consider, depending on what the number is, you have to start to consider if that may represent deposited material and has to be taken in context of the autopsy findings, the scene of death, and the circumstances of the subject's death.

Q   Well, now you've got me wondering if 25 is the cutoff or not.  Is 25 units per liter

US EXHIBIT-1-137

significant to you or not?

A   Twenty-five or below, no.  I think it's background scatter.  That's the way I was trained.

Q   And that was by whom?

A   We went through my forensic training when I was at Hennepin County Medical Center with John Koe.

Q   And so more than 25 is significant because it's more than just background scatter?

A   That's what I was trained, yes.

Q   Does that mean that that's an elevated level?

A   Above 25 it's an elevated level, but you have to take it in context with the levels you see on sexual assault victims that are examined in the hospital and compared with their results.

Q   And how do those results compare with this kind of a level?

A   They're in the hundreds to thousands on cases where there's an actual sexual assault and deposited material.

Q   So those sexual assault victims would show hundreds or thousands of units per liter of acid phosphatase?

A   They can, yes.

Q   Now, the levels that you report in your report,

US EXHIBIT-1-138

Exhibit 4, the vaginal acid phosphatase level you show at 47.4 units per liter?

A   Yes.

Q   The rectal is 7.5 units per liter?

A   Yes.

Q   And the cervical is 130.7 units per liter?

A   Yes.

Q   Are there any type of national standards utilized to determine what a high or low acid phosphatase level represents?

A   Every laboratory is going to have their cutoffs, what they consider positive and negative.  They may use the same testing and different units. That I'm not aware of.

Q   You're not aware of any national standard, then?

A   No.  I'm not aware of what other laboratories may use.  As far as an accepted national standard where you're asked to comply, no. About the only thing you can do is compare your results from your laboratory with the laboratory you're using with other reports that are in the literature giving an idea if that constitutes an elevated level in that laboratory's experience.

Q   Is there any difference in the levels reported in living victims of sexual assault and

US EXHIBIT-1-139

postmortem examinations?

A   There can be.  In living individuals if they have more of a deposition, more deposited material, it can be higher, yes.

Q   Is that as a result of living and death or is that just as a result of circumstance?

A   Both.  I think as the acid phosphatase is normally broken down in a living vagina over a period of hours, that process continues.  Literature has reported that process continuing in a deceased individual but at a slower rate.

Q   What literature are you referring to?

A   Again, the articles described or the journals described when referred to before.  I have no specific articles.  Just reading over a period of time.

Q   Can you walk me through, then, your process of professional analysis going from the absolute numbers that are contained as acid phosphatase levels in your final autopsy protocol until you get to the conclusions that are expressed in paragraph 5 of Exhibit 5 that says those -- those are elevated because the normal range expected under the circumstances of decomposition.  The lab results indicate the

US EXHIBIT-1-140

likelihood of seminal deposit at the time of death or within the preceding 24 hours.

Can you tell me how you get from those numbers to those opinions?

A  If you look at the sexual assault examination results in the bottom of page 4, 1 through 3, the rectal at 7.5 we would consider background scatter based on our experience with this lab doing the same type of testing. The vaginal at 47.4 is elevated above the 25 level, and given the circumstances of the subject's death, was felt to be important.

The third examination from the cervical area from viewed material deposited there was the highest at 130.7. It's been our experience in using this laboratory that the levels present, the 47.4 possibly and the 130.7 for sure, have not been seen from decomposition alone. That's the experience that we've had in our office with decomposed bodies and sexual assaults on nondecomposed cases and lead me to believe that the elevated levels of 47 and for sure 130.7 are the result of deposition of seminal fluid. Hence, the opinion the lab result indicated likelihood of seminal deposit

US EXHIBIT-1-141

at the time of death or within the preceding 24 hours.

The literature holds that when seminal fluid is deposited into the vaginal cavity, it will start to be decomposed or break down inside the vaginal cavity. The greatest breakdown occurs within the first 12 hours. And this process will continue generally for 24 hours after deposit, 24 to 26 hours. Although, there are outliers and some authors do report that the enzyme level can take more than 26 hours, can go out to possibly three days extending out.

So this is not a number that allows you to say with specificity when the deposition occurred for exact timing except to say, based on our experience in the 24-hour, 26-hour level given, it suggests that seminal fluid was deposited within the 24 hours prior to the subject's death.

Do you understand what I'm saying?

Q  I hear what you're saying. I still don't understand how you are able to date it to 24 hours -- to within 24 hours of the time of her death.

A  It's an estimation that you're getting. I'm not

US EXHIBIT-1-142

trying to date it, give you an exact time. I'm trying to give an estimation. That's what's provided to the police.

Based on the experience in our office and the reports from the literature, seminal fluid, the enzyme prostatic acid phosphatase is generally broken down within the first 24 hours after deposition. It can go slightly longer and there are some reports it can go out.

Therefore, the information provided to the police, we believe the deposited material represents seminal fluid and based on our experience, indicates that it was deposited generally within 24 hours prior to her death. That's what we informed the police in this case and have in other cases.

Q  And do you feel that you can offer that opinion in a courtroom to a reasonable degree of medical certainty?

A  Yes.

Q  What type of records has your office maintained that describes this history of determining acid phosphatase levels in decomposed bodies?

A  We have no study. It's only personal recollection when we've done sexual assault

(651) 681-8550 phone    1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-143

144

examinations on decomposed bodies over the years. We have no study that we performed with results tabulated. I don't have that.

Q  Can you point me at any textbook that would support that theory?

A  At this point right now but I can look in my literature and see what I've got.

Q  At this point now you can't, cannot point me to a textbook?

A  Not at this time, no. I'd have to go back and review the textbooks that I've got.

Q  Can you point me to any journal or other article that supports that theory?

A  Same answer. I can try to find it but can I sit here and give you a citation right now, I can't.

Q  Are you aware of any other study by anybody else that supports that theory?

A  No. That doesn't mean it doesn't exist. I'm just not aware of it.

Q  What happens to the acid phosphatase that's deposited in the vagina? You talk about it doing something in the live vagina. What happens?

A  It is broken down. It's broken down in the vagina until it gets below what is considered a

US EXHIBIT-1-144

positive or baseline level, and it goes back to baseline and cannot be differentiated from normal scatter.

Q   Meaning it gets down below 25 units per liter?

A   That's right.

Q   And then you ignore it because that's been your policy?

A   That's right.

Q   What happens to it physically?

A   Physically?

Q   Or chemically what happens to it?

A   Chemically the enzyme is broken down by the hostile environment inside the vagina.

Q   Did it cause you concern at all in offering an opinion like that that there was no sperm found in any of the tests?

A   Yes, that is a concern.  But given the amount of time that the subject's body was outside, I think you can explain it from that reason.

Q   What's that got to do with it?

A   I think the changes in temperature and the condition of the subject's body, and I don't know if you can account for -- I think that may account why there's no sperm present.  The second reason is may be incomplete collection.

US EXHIBIT-1-145

Q   Explain incomplete collection to me.

A   Well, when we sample these sites, we try to sample them as thoroughly as we can.  As described before, we try to do it as carefully as we can, but I cannot sit here and tell you that we collect every bit of a specimen that's present.  Hence, can I sit here and tell you that absolutely positively we collected every bit of material that was in her vaginal canal and therefore I can say there were no sperm present, I cannot say that.  We try to.  But I cannot sit here and tell you just because that's the way sampling is done.  We try to be careful but I can't sit here and say that I did.

Q   Wouldn't the acid phosphatase be subjected to the same temperature changes that the sperm would?

A   I think so, yes.

Q   And you think that can have an affect on sperm but not on acid phosphatase?

A   I think it can have an affect on acid phosphatase and may lower it, yes.

Q   Your opinion, then, I assume would allow for the possibility of consensual sexual intercourse within 24 hours before her death?

US EXHIBIT-1-146

A    Yes.

Q    And is there any testing that you've done or can be done to show whether that did or did not happen?

A    All I can tell you on this case, as testified to before or as we talked about before, those samples are sent to the serology laboratory.  We don't do that testing.

Q    I think I asked you before about how the acid phosphatase testing was done at the Regions Medical Center, and I think you told me that you didn't know.

Is that fair?

A    Right.  I don't think I can comment on how it was done and how -- I don't think I can comment accurately on how it was done in 2004, no.

Q    Would you agree with me that acid phosphatase is present in the world in places other than the male prostate?

A    Yes.

Q    And so it can certainly be found in other things besides male seminal fluid?

A    Yes.

Q    In fact, it's found in the female vagina?

A    Yes.

US EXHIBIT-1-147

Q   It's found in other things in the world?

A   Yes.

Q   Can be a product of natural decomposition of the body?

A   Yes. It may be, yes.

Q   It can be bacterial in origin?

A   It may be, yes.

Q   Are you aware of any test that is more specific than simply an acid phosphatase test to determine whether or not in any particular sample or specimen came from the male prostate and not some other place?

A   Other than the testing done, no.

Q   What about DNA testing?

A   For identification of sperm, yes.

Q   And so if this had been DNA tested, then, for the presence of male sperm, would you agree that that would be more specific than the testing that was done here just for acid phosphatase?

A   Yes. I think the finding of a positive DNA -- the presence of DNA would give you more information than just the acid phosphatase by itself, yes.

Q   Well, take the other side of it too. If DNA testing finds that there is no male DNA present,

US EXHIBIT-1-148

that would also be more specific, more

sophisticated than the simple acid phosphatase

test, correct?

A  Say that again.

Q  Assuming we had DNA tested these swabs and the

DNA testing came back that there was no male DNA

present --

A  Yes.

Q  -- that would be a more specific test than the

acid phosphatase test that was run at Regions

Hospital, correct?

A  It would be more specific with regard to the

sperm, but I don't know if it would discount the

importance of the acid phosphatase itself.  As

far as identification, obviously the DNA is more

important than the acid phosphatase.  But in

your question it doesn't diminish the importance

of the acid phosphatase but it would probably

offer more information to the police and the

investigators, yes.

Q  I'm not sure we're communicating.

A  I'm not either.

Q  Obviously, if the swabs were DNA tested and the

DNA testing results were that they found DNA, it

was male DNA, and these were what the alleles

US EXHIBIT-1-149

were --

A   Right.

Q   -- would be far more sophisticated, far more accurate, far more specific than the acid phosphatase testing that was done here, correct?

A   I think that's true, yeah.

Q   Same swabs, same testing for DNA purposes, and after they run it through the DNA lab, the DNA lab says we don't find any DNA from a male here at all.

A   Right.

Q   Isn't that just as sophisticated, just as specific to show that there is no male source, no male prostate source of the acid phosphatase?

A   I don't know if I can say that or not because, one, I'm not sure we had complete sampling. So there might have been male material there we just simply did not collect. I cannot say that.

Q   I'm not asking you to speculate about whether you did a good job or not. You sampled and took four to six swabs, as I understand it, of each of these areas and we've already talked about that.

A   Right.

Q   What I'm talking about where all we've got is

(651) 681-8550 phone      1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-150

the tests on the swabs that you had, right?

A   Right.

Q   That's what I'm talking about.

A   Well, then the absence of the DNA doesn't diminish the importance of the acid phosphatase because I've never seen a level this high just from decomposition alone.

Q   In other words, if you were confronted with DNA testing that showed no male DNA --

A   Right.

Q   -- that's not going to alter your opinion a bit?

A   No.

Q   Do you recognize the limitations of an acid phosphatase test?

A   I think I do, yes.

Q   Do you recognize and agree that it's simply a presumptive test.  It is not male prostate specific?

A   When the lab said it's male prostate enzyme, that component of it that's present, I take that to mean that's what they're talking about.

Q   And that's the assumption that you've made from their reports?

A   That's right.

Q   And you don't know how they did it or what they

US EXHIBIT-1-151

did?

A    Right.

Q    Do you agree or not that a simple acid phosphatase test is simply presumptive only. It is not specific to the male prostate?

A    Yes. It's presumptive only but I hate to quibble. It's presumptive only that there's deposited material. But I don't want to just say and end it at that because in the lab reports we get back it specifically says male -- it differentiates prostatic acid phosphatase and male prostatic acid phosphatase. So I just don't want to say it's just simply presumptive when the specificity of the test may specifically be tested for male prostatic acid phosphatase.

Do you understand what I'm saying?

Q    I understand what you're saying. And if I've got it straight, you're simply relying on the report you got from Regions Hospital?

A    That's right.

Q    You don't know what test they did or whether it was specific or not?

A    In 2004, no.

Q    Have you ever heard of the P30 antigen?

US EXHIBIT-1-152

A  Yes.

Q  What is it?

A  If I remember correctly, P30 antigen is also observed in seminal fluid and can be tested for the presence or to confirm the presence of deposited material, deposited seminal material.

Q  It's specific to the male prostate?

A  That's my understanding.

Q  After we get 50, we all get these PSA tests. That's what they're talking about, protein specific antigen, P30, correct?

A  Correct.

Q  And that is specific to acid phosphatase in the male prostate?

A  That's my understanding.

Q  Was that test done on this acid phosphatase?

A  No.

Q  Why not?

A  I'm not aware if that testing is available in the laboratory we use.

Q  Let me ask you this.  As a professional expected to be asked to go into a courtroom and give testimony on a case like this and offer an opinion about whether or not this young woman was or was not sexually assaulted prior to her

US EXHIBIT-1-153

death, wouldn't you like to know that?

A   You would if the lab would offer it.

Q   Is there any lab in the state of Minnesota that does that testing?

A   I don't know.

Q   Have you tried to find out?

A   No.

Q   Why not?

A   Because I think a level of 130 is enough to indicate that.

Q   Can you refer me to any learned text that supports the opinions that you're offering here about the acid phosphatase levels being elevated or being able to date the time of sexual --

MR. WRIGLEY:  Bob, I'm going to object.  You've asked that same question repeatedly.  I think it's astray of what the deposition was set for but I didn't object to it.  But it being asked over and over I'll object to.

THE WITNESS:  Do you want an answer?

MR. HOY:  Please.

THE WITNESS:  Same answer as before.  I can't give you a citation right now.

US EXHIBIT-1-154

I can go back and look in the journals and the texts that I have. That's as much as I can tell you.

BY MR. HOY:

Q  Have you ever given testimony in a deposition or a courtroom where you have attempted to date the time of sexual contact or seminal deposit, let's put it that way -- let me start over.

Have you ever testified in a deposition or a trial setting where you have tried to estimate the time of the seminal deposit on a deceased victim?

A  I imagine I have, yes.

Q  Can you tell me when that was?

A  No, I can't sitting here. I can't.

Q  Do you have that recorded anywhere?

A  No.

Q  Any way of finding out at all?

MR. WRIGLEY:  I'm going to object, Bob. Don't answer the question. Bob, that has nothing to do with the deposition. Mr. Hoy I should say. It has nothing to do with the deposition. It has nothing to do with his opinion. Has nothing to do with the basis for it or the reason for it.

US EXHIBIT-1-155

MR. HOY: We'll go off the record just a moment.

(A discussion was had off the record)

(A break was had in the proceedings from 4:38 p.m. to 4:45 p.m.)

BY MR. HOY:

Q Dr. McGee, we just had a nice little break again this afternoon. When we broke, I had asked you a question about your testimony, whether you'd ever given testimony in a deposition or courtroom about acid phosphatase levels in deceased victims.

A Right.

Q Mr. Wrigley interposed an objection and at some point he may have told you not to answer the question. I'll just ask it again and Mr. Wrigley can make his record as to he wants to do here.

My question to you is this. Have you ever given testimony in a deposition or trial before where you've been asked to try and estimate the date of a seminal deposit in a

US EXHIBIT-1-156

deceased victim strictly from acid phosphatase levels?

MR. WRIGLEY: I'm going to put on record here our objection before is based on the fact that these questions, and there have been many of them, are well outside the bounds of inquiry we believe under the judge's order which I've just reviewed again which pertained only to Rule 16 expert opinions, the bases for those opinions, and the reasons behind them.

When we were off the record, I repeatedly said to Mr. Hoy that perhaps we should get the judge on the line and perhaps we should go over with the judge and see how he feels about this line of questioning and some others which we had no objections all afternoon. Mr. Hoy then repeatedly said, when we were off the record, that it wasn't necessary. He wasn't going to call with the judge. He wanted to continue with this deposition. So he declined to take that opportunity.

It's not a question of this particular matter, Mr. Hoy, and for the record should be clear. Go ahead and ask the question. I haven't instructed the doctor. Answer this one.

(651) 681-8550 phone     1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-157

But I'll say this. We're objecting to any further questions that go beyond what we believe to be the scope of a Rule 16 inquiry which is clearly the context within which this was litigated and if there are any other questions beyond that and you want to ask them, then I would say again now on the record that we should just contact the judge and clarify it. Otherwise, I think that -- like I say, we're going to object to any of those questions and ask the doctor not to answer anything beyond that Rule 16 inquiry. That's all I have. As to this matter, withdraw the objection. Go ahead and answer it.

MR. HOY: Just so we're clear, if I ask a question that you want to instruct him not to answer, you need to make it at that time.

MR. WRIGLEY: Yeah. I'll object to it. I would ask that just as if we were in a courtroom, that the doctor, when an objection is lodged, until we get some clarification from a judge, I'd just ask him not to answer any of those things. And again, I'll only be objecting to questions that go beyond the scope of what I

US EXHIBIT-1-158

think is an appropriate Rule 16 inquiry which is what the context was of all this and which is the context of the judge's order which I again just reviewed.

BY MR. HOY:

Q   Dr. McGee, after all that, do you remember my question, sir?

A   I believe so.

Q   Could you give us an answer, please?

A   I imagine I have testified regarding that matter but can I give you specific case citations, no, I can't.

Q   Do you have any way of identifying when or where that might have been?

A   No.  I don't keep track of the cases I've testified in.

Q   Let's look, if we could, at paragraph No. 6 of Deposition Exhibit No. 5.

Does that fairly encompass your opinions on those issues or not?

A   Can I read it?

Q   Sure.  Please.

A   I think that it is correct.  It's not the --
obviously it's not the language that I would use but it's not my language.  But to answer the

US EXHIBIT-1-159

160

question, does it accurately summarize what I'm going to try to testify to, yes.

Q   And you and I have already talked about virtually all of that here today, correct?

A   Yes.

Q   And most of these were the defects that we talked about where there was postmortem anthropophagy and were really not able to tell what the cause of the original defect was?

A   Right.

Q   So although you may hold this opinion, you're not able to express it to a reasonable degree of medical certainty, correct?

A   That's right.

Q   Paragraph No. 7, page 3 of Deposition Exhibit No. 5, we talk again about cause of death.

Would you read that out loud, please?

A   "Cause of death is homicidal violence. Victim died as a result of slash-type wounds inflicted to her throat, suffocation, or exposure in combination with the injuries and conditions inflicted on her by her killer. Each homicidal factor here is self-sufficient, though a combination of any or all factors cannot be ruled out."

US EXHIBIT-1-160

Q  First of all, do you hold those opinions?

A  Once again, it's not -- these are not the words
I would use but I think it accurately summarizes
or tries to summarize what I think happened,
yes.

Q  Why don't you tell me what your opinions are
regarding those issues, then?

A  I think No. 7 describes the most probable causes
of death in the subject either through an
asphyxia, asphyxial type death, sharp force
injuries to the subject's neck region, and I
cannot rule out the possibility that possibly
even exposure may be related to the subject's
death since I cannot fix the exact time of the
subject's death.

Q  So as I understand it, she suffered obviously
wounds to her neck?

A  Yes.

Q  That were serious?

A  Yes.

Q  She suffered a -- you believe you found a
plastic bag or remnants of a plastic bag that
may have been over her head?

A  Yes.

Q  Would that be the cause of the asphyxiation that

US EXHIBIT-1-161

they're talking about?

A   It could be, yeah.  I didn't mean for the plastic bag to be the sole cause of asphyxia but it could be a component of it, yes.

Q   What other suffocation or asphyxia would you be referring to?

A   Pressure to the subject's neck region as in a strangulation.

Q   And I think we talked about that earlier and I don't think you found any evidence of that?

A   That's right.

Q   So let me ask it this way, then.  Is asphyxia or suffocation a possible cause of death here?

A   Yes.

Q   Why?

A   Because it's a cause of death that could result from the plastic bag or her being asphyxiated, suffocated during the sexual assault and you see no evidence of observable findings on the subject's body as noted at the time of the examination.

Q   So the suffocation you're talking about would have been in conjunction with a sexual assault?

A   Yes.

Q   And if there was no sexual assault, then there

US EXHIBIT-1-162

would have been no suffocation?

A  That's true.

Q  So are you able to tell us with any degree of certainty what the cause of death was, then?

A  All I can say is homicidal violence and the most likely cause and specific causes -- all I can say is the most general cause of death is homicidal violence and those -- within that area, the areas that I think are the most -- the mechanism that are most likely to cause the death are the sharp force injuries to her neck, the possible suffocation, or the exposure.

Q  Exposure means what?

A  Left outside to the elements.

Q  Now, the wounds inflicted to the neck, did those sever any major arteries or vessels?

A  No major vessels are available for examination. I cannot answer that.

Q  And again, that's because of postmortem decomposition and anthropophagy?

A  That's right.

Q  So you don't know whether the wounds to her neck were deep enough to have cut any major arteries or not?

A  Right.

US EXHIBIT-1-163

164

Q  Are there major arteries in that area or blood
vessels that are subject to being cut?

A  Yes.

Q  Which ones would they be?

A  The vessels within the vascular bundles on both
sides.  Internal jugulars, common corotids would
be the most likely vessels that would be cut if
you examine the location of the slash wound.

Q  That was my next question.  The location of
these wounds that you saw were in the area of
those type of vessels?

A  Yes.

Q  Assuming one or more of these vessels would have
been cut, how long would it take for death to
ensue?

A  Probably only a matter of minutes.

Q  And if those did not cause death, the wounds to
the neck that you observed were perhaps only
skin deep?

A  Right.

Q  What other wounds or injuries would have caused
the death here?

A  Either the suffocation.  She could have been
dead from suffocation prior to the wounds being
inflicted to the neck, or not given that, I

US EXHIBIT-1-164

cannot rule out the possibility exposure may have contributed to her death.

Q  And how would the asphyxia have been caused, then?  Are you talking about like a possible plastic bag over the neck?

A  Right.

Q  or head?

A  Right.

Q  And assuming that that would have happened, if someone had put a plastic bag over her head and tied it on.

A  Right.

Q  How long would someone be expected to live under those circumstances?

A  Again, experience from suicide cases in our office, it probably would not take very long.  Only a matter of minutes.

Q  Are you able to tell anything from the blood that you found on the clothing that she was wearing at autopsy about whether or not the vessels in the neck were cut?

A  No.  There is blood on the clothing but being able to differentiate the blood on the clothing from the wounds to the neck versus the decomposition process, I'm not able to say.

(651) 681-8550 phone        1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-165

166

Q   So as a result of the postmortem activity, both
anthropophagy and natural decomposition, the
structures of the body, especially the neck,
that you'd really like to examine aren't there?

A   Right.

Q   And so you really can't tell us what the medical
cause of death was?

A   In the neck area, no.

Q   Or any other area actually?

A   True.

Q   Do you hold any other professional opinions
about this case that we haven't already talked
about here today?

A   I don't believe so.

Q   Is there anybody else on your staff that plays a
role in formulating the cause of death injuries
that are seen?

A   In this case?

Q   Yes.

A   No.

Q   What is the function of the helper person?  I
forget the terminology you used.  Intern or a --

A   Tech.

Q   Tech --

A   The purpose of the tech --

(651) 681-8550 phone        1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-166

Q  -- that assisted you?

A  I'm sorry. The purpose of the tech is to help empty the body of organs and collect specimens, properly number them, package them, and so forth.

Q  And so would that person have been the person that took the sample of the liver?

A  No. That would be me would collect the sample of the liver. The tech would be the person that would package it and submit it to the lab.

Q  So you took both the liver sample and the sexual assault swabs?

A  No. The sexual assault swabs are normally done by the tech during the processing process.

Q  So in this case the tech in your office is the person that actually took the sexual assault swabs?

A  Right.

Q  Dr. McGee, I'm just going to show you what we've had marked here as Exhibit 6. This was the copies of your records that you brought with you?

A  Yes.

Q  Just opening up here to, it looks like it's page 8 or the eighth page down from the top.

US EXHIBIT-1-167

A  Yes.

Q  Can you tell me what this page and perhaps more are intended to be?

A  Those are investigative reports prepared by the office when a body is sent to our office or we assume jurisdiction of a case.  It's a hard copy from a computerized program that allows the investigator to basically provide the important information that's available at the time of the autopsy, or at least some of it, to give us an idea.

The first page is basically filling in spaces, age, so forth.  And then the second page that you've opened to is a narrative that allows them to provide as much information as they have at the time the body is received or is going to be sent.

Q  This page that we're referring to which you believe looks like it's the second page of the report.

A  That's right.

Q  I didn't realize they were connected.  It talks about note by Paulson.  Who is Paulson?

A  An investigator who works in the office.  He was --

US EXHIBIT-1-168

Q   In your office?

A   Yes. He's an investigator in the medical examiner's office who was on duty at the time her body -- the call came in that her body had been discovered and was being sent. So as a result, he prepared the report and information the BCA provided.

Q   What do you mean when you say they're an investigator?

A   The office employs nine investigators. They're civilians. Cover the office 24 hours a day, 7 days a week to investigate deaths for the county within our jurisdictions.

Q   They're not sworn law enforcement officers?

A   No.

Q   They're civilians operating under the Ramsey County Medical Examiner's Office?

A   That's right.

Q   On the third page of this report which is page 9 there's also reference to McArthur?

A   Yes.

Q   Who is that?

A   Same type of investigator, different person.

Q   Does this help refresh your memory at all as to who the tech was who was helping you with this

US EXHIBIT-1-169

autopsy?

A  I can look and see but usually techs aren't indicated.  Techs don't usually indicate themselves on the investigative report.  Give me a second here, though.

No.  That doesn't help.  I'll have to go back and see if I can find out in the office who was on.  Techs are not normally recorded who is assisting in the case.

Q  Further down in the documents that you brought with you, Exhibit 6, I think there's three pages that look like this.  It looks like they're probably from Regions Hospital.

A  Yes.

Q  And I think it says cytopathology at the top?

A  Yes.

Q  Would these be the results or maybe it's the request for their microscopic examination for sperm?

A  Yes, they are.

Q  Is that the request or the results?

A  Both.  It's the request and the results are written in the right-hand margin.  That's how they do it.

Q  Over here?

US EXHIBIT-1-170

A   That's right.

Q   And then below those is a Ramsey County Medical Examiner toxicology report?

A   Yes.

Q   And is this generated as a result of testing that you or your lab does or as a result of the testing that was done at Hennepin County Medical Center and Regions?

A   The latter part.  This is a summary form and it basically summarizes all the lab tests done by all the different labs and the results so that it saves the attorneys having to go through each individual form.  It summarizes all the results.  It's the same results that are on the autopsy protocol.

Q   Curiosity.  Why doesn't this accompany the autopsy protocol?

A   The results are already on the autopsy protocol.

Q   Show you another page of Exhibit 6.

A   Yes.

Q   It looks like it may say path office at the top?

A   That's right.

Q   Regions Hospital at St. Paul?

A   Yes.

Q   Can you tell me what this page is?

US EXHIBIT-1-171

A   This is a hard copy result from the laboratory
at Regions Hospital giving the results in this
case of the results of the prostatic acid
phosphatase determination from the rectal source
listing the numbers present, the date it appears
the examination was performed.

Q   And is this the report from Regions, then, that
you relied on to transfer this data to your
final autopsy protocol?

A   Yes.

Q   The next page looks like a similar document only
it looks like we probably are looking at
vaginal --

A   Yes.

Q   -- swabs.  And again, this is what you relied on
to include these numbers in your final autopsy
report?

A   Yes.

Q   And the next page, then, again looks like a
similar -- this appears to be the cervical swab?

A   Yes.

Q   And again, this is the information that's
included in your lab report?

A   Yes.

Q   Not your lab report but your final autopsy

US EXHIBIT-1-172

protocol?

A   Yes.

Q   Did Regions Hospital provide you anything else regarding this other than what we just talked about?

A   No.

Q   Dr. McGee, I don't have any further questions for you today.  Thank you.

MR. WRIGLEY:  I did have one follow-up question, if I might, about the asphyxiated issue.  Maybe I missed it.

EXAMINATION

BY MR. WRIGLEY:

Q   Just a clarification.  You said about the amount of time it would take for asphyxia to take place with a bag over one's head, and I think you gave that time as one minute to several minutes or something along those lines?

A   Right.

Q   Would that be dependent at all upon, you know, what was the tightness of the ligature that was securing at the bottom of the neck?  Would there be subjective factors or would it always be that

US EXHIBIT-1-173

time frame? Could it have been longer?

A  It could have been longer. It depends.

Obviously the pressure on the neck from the cord or anything else is going to influence the amount of time it's going to take, yes.

MR. WRIGLEY: That's all I have.

(A discussion was had off the record)

MR. HOY: Dr. McGee, would you like to read and sign your deposition when it's done?

THE WITNESS: Please.

\* \* \* 5:15 p.m. \* \* \*

US EXHIBIT-1-174

STATE OF MINNESOTA )
                   ) ss.
COUNTY OF WASHINGTON)

BE IT KNOWN, that I took the deposition at the time and place set forth herein;

That I was then and there a Notary Public in and for the County of Washington, State of Minnesota, and by virtue thereof I was duly authorized to Administer an oath;

That the witness before testifying was by me first duly sworn to testify to the whole truth relative to said cause;

That the testimony of said witness was recorded in shorthand and transcribed into typewriting, that the deposition is a true record of the testimony given by the witness, to the best of my ability;

That I am not related to any of the parties hereto nor interested in the outcome of the action;

That the reading and signing of the deposition by the witness and the Notice of Filing were waived;

That the original transcript was charged and delivered to the attorney conducting the deposition for filing, that copies were charged at the same rate to respective counsel;

IN EVIDENCE HEREOF, WITNESS MY HAND AND SEAL.

_____
Lisa M. Thorsgaard

(651) 681-8550 phone     1-877-681-8550 toll free
www.johnsonreporting.com

US EXHIBIT-1-175

READING & SIGNING CERTIFICATE

BE IT KNOWN, that I, the undersigned deponent, have on this date, _____, read the transcript of my deposition testimony, noting the following changes (if any):

                    _____
                    WITNESS

Page & Line No.    Correction        Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

(651) 681-8550 phone     1-877-681-8550 toll free
       www.johnsonreporting.com

US EXHIBIT-1-176