X-HAWKINSON-00014

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

-----------------------------------------------------------------

United State of America,

                    Plaintiff,

                                        Case No.  2:04-cr-55
vs.

Alfonso Rodriguez, Jr.,

                    Defendant.

-----------------------------------------------------------------


DEPOSITION OF

**BRUCE HAWKINSON**


Taken May 18, 2006
commencing at approximately 1:10 p.m.
at the Nicollet County Courthouse
St. Peter, Minnesota


Reported by

Denise A. Drill
Registered Professional Reporter
PO Box 1922  Mankato  MN  56002-1922
Phone: 507/387-3846
or toll-free at 888/890-3846
FAX:  612/605-5706
email: ddrill@rocketmail.com

US EXHIBIT-4-01

X-HAWKINSON-00015

2

(The deposition of Bruce Hawkinson was taken, pursuant to Notice to Take Oral Deposition, at the Nicollet County Courthouse, 501 South Minnesota Avenue, St. Peter, Minnesota, on the 18thday of May, 2006, commencing at approximately 1:10 p.m., before Denise A. Drill, a Registered Professional Reporter and Notary Public in the County of Nicollet, State of Minnesota.)

## A P P E A R A N C E S

for the Defendant:

    Robert S. Hoy, Attorney at Law, of the firm of
      Ohnstad Twichell, P.C., 901 13th Avenue East,
      PO Box 458, West Fargo, North Dakota
      58078-0458.

for the Deponent:

    Barbara Berg Windels, Assistant Attorney General,
      Bremer Tower, Suite 900, 445 Minnesota Street,
      Saint Paul, Minnesota 55101-2127.

## I N D E X

Examination                                              Page:

By Mr. Hoy..............................................3

## E X H I B I T S

| No. | Description | Page: |
|-----|-------------|-------|
| 1 | ITPSA team meeting notes, 6/28/79. | 3 |
| 2 | ITPSA team meeting notes, 2/12/80. | 3 |
| 3 | Annual psychological report prepared by Bruce Hawkinson, 3/19/80. | 3 |
| 4 | ITPSA team meeting notes, 3/20/80. | 3 |

US EXHIBIT-4-02

X-HAWKINSON-00016

3

(Hawkinson Deposition Exhibit Nos. 1-4 were marked for identification.)


BRUCE JOHN HAWKINSON

was called as a witness and, having been first duly sworn to tell the truth, was examined and testified as follows:

EXAMINATION

BY MR. HOY:

Q.    Good afternoon, sir.  Would you please state your name.

A.    My name is Bruce Hawkinson.

Q.    And Mr. Hawkinson, what do you do for a living?

A.    I'm employed at the State Operated Forensic Services in St. Peter, and I work there as a medical department manager.

Q.    Okay.  Can you give me an outline of your educational background?

A.    Yes.  I'm -- I have a bachelor's degree in psychology and a master's degree in counseling psychology.

Q.    Where did you get those and when?

A.    I got both of those degrees at Mankato State University, my BA degree in '74 and my master's

US EXHIBIT-4-03

X-HAWKINSON-00017

4

degree in 1977.

Q.   Okay.   And where have you been employed since '77?

A.   My primary employment has been with the -- the treatment center, if you will, in St. Peter here since that time.   I've also -- I also was -- I had a private practice that I was involved with for six years as well, but I'm no longer with that organization.

Q.   What time period was that?

A.   That was roughly 1980 to 1987.

Q.   Was that exclusive of working at the state facility?

A.   It was.

Q.   Oh, it was.

A.   It was.

Q.   So you worked for the state facility and then you went into private practice for a while?

A.   Yes.

Q.   And then back at the state facility?

A.   Yes.   It was very part-time, one evening or so a week.

Q.   Okay.

A.   So I was working at both facilities at the same time.

US EXHIBIT-4-04

X-HAWKINSON-00018

Q.    Okay.

A.    So it was a -- an evening job, if you will.

Q.    All right.  That's -- I wasn't sure if you ever left employment of the state hospital, and apparently you did not?

A.    I have not left employment of the state hospital.

Q.    Okay.  What is the proper name of the facility here in St. Peter, so I don't butcher it or call it something wrong?

A.    Right.  Well, right now, I -- it's -- the part that I work for out there is called the State Operated Forensic Services at the St. Peter site. State Operated Forensic Services is a large program that covers programming throughout the state of Minnesota, so I think for our purposes here, if we call it the treatment center, it would be probably the easiest way to refer to it.

Q.    Okay.  There's apparently more than one area or part of the facility at St. Peter; is that true?

A.    Yes, that's true.

Q.    Can you tell me what kind of different portions of that facility there were back in like '79 or '80?

US EXHIBIT-4-05

X-HAWKINSON-00019

6

A.    Okay.   Yeah.   At that time, the treatment center consisted of the Minnesota Security Hospital and the -- the -- the open hospital, traditionally referred to as the state hospital, as well as a chemical dependency program as well.   So there were primarily three -- three large programs on the campus.

Q.    Okay.   The -- now, the chemical dependency unit, I think, is self-explanatory.

A.    Uh-huh.

Q.    Can you tell me the difference between the security hospital portion and what you refer to as the open ward?

A.    Uh-huh.   At that time, there were state hospitals -- open hospitals, as they were sometimes referred to -- throughout the state of Minnesota that accepted patients on a voluntary basis or under a committed basis from the various regions throughout the state.   And --

Q.    For mental-health-type things?

A.    For patients primarily with mental -- major mental illness.

Q.    Okay.

A.    Patients at the Minnesota Security Hospital, the difference there is that that was a

Superior Reporting Service
Denise A. Drill, RPR
(507) 387-3846 or (888) 890-3846

US EXHIBIT-4-06

X-HAWKINSON-00020

7

statewide facility, accepting admissions from throughout the state, including transfers from the state hospitals, for patients that were too aggressive to be handled adequately at the state facility, or for forensic evaluations and -- and for -- for other patients that couldn't be adequately handled at a state hospital.

Q.    Okay.  During 1979 or 1980, did either of those facilities have a sex offender treatment program?

A.    Yes, they did.

Q.    Which one of them?

A.    That was the Minnesota Security Hospital.

Q.    Okay.  And what -- can you tell me what that program was about?

A.    Yes.  That was a sex offender program at that time called the Intensive Treatment Program for Sexual Aggressives.  And it was a 48-bed inpatient program, and it also had a transition phase in it as well, to follow patients when they were out in the community.

Q.    So in other words, after someone had been through the inpatient process --

A.    Uh-huh.

Q.    -- then this transitional phase would

Superior Reporting Service
Denise A. Drill, RPR
(507) 387-3846 or (888) 890-3846

US EXHIBIT-4-07

X-HAWKINSON-00021

8

follow them into the community?

A.    That's correct.

Q.    Okay.

A.    Uh-huh.

Q.    And was that all, was the outpatient portion of that all at St. Peter or were there halfway houses or things elsewhere?

A.    That -- that was all at St. Peter.  And then St. Peter, as part of their transition services, utilized halfway houses that were in the community, depending on where the patient was going to reside.

Q.    Okay.  Can you describe for me what this Intensive Treatment Program for Sexual Aggressives -- I've often seen to it referred to as ITPSA as well?

A.    Yeah, the acronym is ITPSA, I guess.

Q.    Okay.  Can you tell me what that -- how that was structured and how it was intended to operate?

A.    Well, briefly, it was a fairly intensive inpatient program.  It was predicated on a 15-step program, 12 of those steps were on an inpatient basis and three were on the outpatient basis or the transitional phase of the project.  It generally took a patient two to three years to get through their program.  Of course, it was highly variable,

US EXHIBIT-4-08

X-HAWKINSON-00022

9

depending on the degree of motivation of the patient going through the program.

Superimposed upon that were individual treatment plans for the patients: There were daily group therapy sessions, evaluation groups, psychoeducational kinds of programming that went on.

The patients were also involved in work and recreational activities that were -- that were structured. And this was all within the context of a -- of a therapeutic milieu, where the patients were expected to do homework assignments and conduct themselves in a manner commensurate with the kinds of things that they were learning in treatment.

Q.    Okay. So for each of the people that was in that program, did they have a case worker or someone like that that was assigned to them, or were they responsible generally to a team of other people?

A.    To both, actually. They were responsible to both a team and to group therapy facilitators, would have been their primary case workers. And then the -- for ongoing assessment, they were also assigned a social worker, a psychologist, and then a consulting psychiatrist also did periodic reviews of the patients as well.

Q.    Okay.

Superior Reporting Service
Denise A. Drill, RPR
(507) 387-3846 or (888) 890-3846

US EXHIBIT-4-09

X-HAWKINSON-00023

10

A.    The primary case workers, as you seem -- you are using the term there, would have been whoever his group facilitators were at the present time, all those -- yeah . . .

Q.    Okay.  You were with the hospital, I think you told us, at least during '79 and '80, when Mr. Rodriguez was there.  What were your functions or role at the hospital and with regard to this program at that time?

A.    Okay.  I was a psychologist there, and my role was basically two-pronged:  One was to provide the therapy of the patients going through the program there, and also to provide evaluation for -- on an annual basis and as needed, and also providing evaluations for patients referred there for consideration for treatment.

Q.    As a psychologist, then, you were separate from these group leaders?  They were other people, the group leaders?

A.    Generally speaking, as a psychologist, I was -- I was evaluating patients not in my therapy caseload; although that wasn't always the case, we generally tried to do that.  So I -- I wore two hats: I was a group facilitator, as well as -- as well as a psychologist providing -- providing assessments.

US EXHIBIT-4-10

X-HAWKINSON-00024

11

Q.    Okay.  And then generally you tried not to do the psychological work on the people that you were a group leader for?

A.    That's correct.

Q.    So I assume someone else was doing your caseload then?

A.    Yeah.

Q.    Okay.  Okay.  How was -- how was it determined within the program whether someone would move from Step 1 to Step 2 or any of the other steps as they went through the program?

A.    Generally speaking, the process was for the patient to bring the recommendation to their therapy group, then their therapy group facilitators would consider their request and look at their progress, and if they agreed with that request, they would bring that to the team meeting, that -- that was put forward and then that was approved at a team level there.

Q.    Okay.  Let's talk about the team just for a moment.

A.    Okay.

Q.    Obviously, you've got all of the patients.

A.    Uh-huh.

Q.    Obviously, 42 beds?

US EXHIBIT-4-11

X-HAWKINSON-00025

12

A.    Forty-eight beds.

Q.    Forty-eight beds?

A.    In that group, yes.

Q.    My mistake.

A.    Uh-huh.

Q.    And those are broken down, then, and each of them is given a -- a group leader, so each --

A.    Two group leaders, actually.

Q.    So each would have half, then?  Each would have 21, then, in their group?

Let me ask the question better. Approximately how many people would each group leader have?

A.    The program was actually divided into four different therapy groups around that time when there would have been 48 patients, so -- and then roughly 12 patients per group.

Q.    Okay.  And then the team you're talking about, who's a member of this team?

A.    Well, basically all of the staff were considered to be members of that team, and there was one general team that dealt with more major issues, program step increases and other significant issues that might arise.  And then in addition to that, we called what we had at the time a miniteam, and there

US EXHIBIT-4-12

X-HAWKINSON-00026

13

were two or three or perhaps more of those that dealt with more day-to-day sorts of issues with the patients, some steps -- changes, for example -- could come there.  Certain key step changes were brought to the larger team.

Q.    What, for instance, would be considered a larger step change?

A.    Sort of taxing my memory there since this was over 20 years ago, but I -- so I don't want to give you a specific step, but there were some steps that we had decided that, you know, were getting to be crucial jumps into the next stages of treatment. Certainly anybody leaving the program to go to the transition phase would have gone through the -- the main treatment team meeting.

Q.    Somebody through Step 12 --

A.    Uh-huh.

Q.    -- inpatient, looking to go Step 13 --

A.    Sure.

Q.    -- which I understand would be out?

A.    That's correct.

Q.    Transitional?

A.    Right.

Q.    Out in the community --

A.    Yeah.

Superior Reporting Service
Denise A. Drill, RPR
(507) 387-3846 or (888) 890-3846

US EXHIBIT-4-13

X-HAWKINSON-00027

14

Q.   -- would be one of those major changes?

A.   Right.

Q.   How were those team meetings put together or staffed?  What kind of paperwork accompanied them?

A.   Well, the hospital chart was available to us and so we utilized that.  The general -- the main team meeting consisted of all of the professionals that worked on the program at the time.

Q.   Okay.  You talk about the chart, and I want to just make a distinction.  The -- the Minnesota Security Hospital at St. Peter at that time, and still today, my understanding, operates under the Department of Human Services.

A.   That's correct.

Q.   Okay.  And so it's not a part of the Department of Corrections?

A.   That's correct.

Q.   Okay.  And so when you talk about your records, your records or that hospital's records would be maintained either at the facility or are any of them maintained in a central office somewhere in the state?

A.   No, they would have -- they would have all been at our facility down there --

Q.   Okay.

Superior Reporting Service
Denise A. Drill, RPR
(507) 387-3846 or (888) 890-3846



US EXHIBIT-4-14

X-HAWKINSON-00028

15

A.    -- for a treat -- for a patient involved in active treatment down there.

Q.    Okay.  And when a patient is -- is gone and has left and is no longer at your facility, does St. Peter maintain those records permanently or are those centrally filed somewhere?

A.    There is a place on the campus for storing records for a designated period of time.  And at some point, they may be shifted to another location; I can't speak to that exactly --

Q.    Okay.

A.    -- the process there.

Q.    Okay.  You mentioned earlier that there was a -- part of this was a psychological evaluation.  There was, I think you said occasionally or something, a psychiatric report done as well.  Do you know who the psychiatrist was that did the reports?

A.    Yes.  William Erickson.

Q.    Okay.  And is he still there today?

A.    No, he is deceased.

Q.    Okay.  When -- what was -- was he a staff member or --

A.    He was -- he was a consulting psychiatrist, I believe, at that time.

Q.    Which means he had a private practice and

US EXHIBIT-4-15

X-HAWKINSON-00029

16

was paid on a contract or something to do it?  Or was he an employee?

A.   He -- my memory is that he was a consulting psychologist -- psychiatrist at that time, so he was not a state salaried employee.

Q.   Okay.  Do you know whether he was practicing in St. Peter or somewhere else at that time?

A.   I believe at that time he was working for the University of Minnesota and was the medical director for the adolescent unit at the University of Minnesota.

Q.   Okay.  So his primary practice was in the Minneapolis area, then?

A.   That's correct.

Q.   And he'd come down to St. Peter to do these?

A.   That's correct.

Q.   Okay.  Do you know when Mr. Erickson passed away?

A.   Dr. Erickson passed away approximately five years ago.

Q.   When he did a psychiatric evaluation, did that -- did his report -- well, first of all, did he do a report, a written report?

US EXHIBIT-4-16

X-HAWKINSON-00030

17

A.    Yes, he did.

Q.    And did that make its way to the records of the St. Peter facility?

A.    Yes, it did.

Q.    Okay.  I'm going to show you what we've had marked here as Exhibit 1.  Did you have a chance to look at all four of these exhibits before we got started?

A.    I did, all except the team meeting, the general team note.

Q.    Oh.  Exhibit 4, you haven't had chance to read through that?

A.    I haven't had a chance to read through that.

Q.    Okay.  We'll give you a chance to do that.

A.    Okay.

Q.    Exhibit No. 1, can you just tell me what this appears to be, what type of a --

A.    The typed part, it looks like a general team meeting to consider his request to move into independent living, and various professionals from the treatment team were present to consider that. And it was signed by the -- the ITPSA unit director, Richard Sealy (sp).

Q.    Okay.  This regards Alfonso Rodriguez,

US EXHIBIT-4-17

X-HAWKINSON-00031

18

whose name is shown on the top?

A.    Uh-huh.

COURT REPORTER:  Is your answer "yes"?

THE WITNESS:  Yes.

MR. HOY:  She has to have a "yes" or "no." If we say "uh-huh" or "uh-uh," it sounds the same to her, so . . .

THE WITNESS:  Thank you.

BY MR. HOY:

Q.    Just looking at Exhibit 1 and Exhibit 2 --

A.    Uh-huh.

Q.    -- these look to me to be sort of sheets that you'd have in a regular file where people note whatever significant event may take place by whomever they're being taken by.  And this looks like it's maybe been punched at the top and put into a file.

Is that kind of how these are maintained on each patient?

A.    Yeah.  This is part of the medical progress notes, and when a treatment general team meeting occurs or another type of team meeting, they're typed up and then pasted into the medical progress notes so that they are reasonably sequential.

Q.    Okay.  Let's just talk about Exhibit 1 again.

US EXHIBIT-4-18

X-HAWKINSON-00032

19

A.    Okay.

Q.    The top, general team review that you were talking about, looks like that would have taken place on June 28th of 1979.

A.    Yes.

Q.    And can you just summarize this for me or -- for the record so we can know what we're talking about?

A.    Uh-huh.  In general, the -- looks like the team was looking over his performance in the program and looking to, at his request, for moving into an independent living situation.

Q.    So that would be Mr. Rodriguez had asked to be considered to move out of the inpatient facility and into the transitional community program?

A.    Correct.

Q.    Okay.  So that would be, if I understand it, suggesting that he had completed inpatient Step 12 and was looking to move to Step 13 of the program?

A.    That's correct.

Q.    Sound right?

A.    Uh-huh.

Q.    Okay.  What type of considerations does the team take into account when it makes a decision on that issue?

Superior Reporting Service
Denise A. Drill, RPR
(507) 387-3846 or (888) 890-3846

US EXHIBIT-4-19

X-HAWKINSON-00033

20

A.    Well, it's in general looking at the reports from his group facilitators, any -- any recent assessments that have been done on them, plus any of the input any of the team members might have during the discussion of the patient.

Q.    The team members I think are listed at the top, at least those that were present are listed.

A.    That's correct.

Q.    Including yourself, I believe?

A.    Yes.

Q.    Okay.  Do you know whether you were there as the psychologist or whether you were Mr. Rodriguez's group leader?

A.    I believe I was there as a psychologist.

Q.    Okay.  So he was in someone else's group?

A.    Uh-huh.

Q.    Do you happen to know whose group that would have been?

A.    I don't have a recollection of whose group he was in.

Q.    That's fine.

It looks to me like, reading that entry on Exhibit 1, that after considering everything, the team supported his request and was going to approve his participation in the outpatient portion of the

US EXHIBIT-4-20

X-HAWKINSON-00034

21

program.  Is that true?

A.    That's true.

Q.    Okay.  What would take place procedurally after that approval, then?

A.    Well, preparations would be made for him to move to an appropriate placement.  He would work with the -- his social worker to set up the appropriate arrangements in the community, and his probation officer as well.

Q.    And my understanding of this was that the community location he was headed for would have been a halfway house in Mankato, if I read that right, Horizon House?

A.    That's correct, uh-huh.

Q.    Okay.  Were you familiar with Horizon House at that time?

A.    I was familiar with Horizon House at that time, yes.

Q.    Can you just tell us what that was about?

A.    After -- the Horizon House, my recollection, was a halfway house for patients coming from a variety of different facilities, including our state hospital, our open hospital, as well as patients from the Minnesota Security Hospital.  It was considered a step down from institutional

US EXHIBIT-4-21

X-HAWKINSON-00035

22

long-term residential settings, to get -- get back into the community.

Q.    By moving, or authorizing Mr. Rodriguez's movement from the inpatient facility at St. Peter into the community in transition, the committee then is essentially confirming that he has then completed or received the benefit of the inpatient program that was offered or available to him at St. Peter?

A.    That's correct.

Q.    Okay.  And then apparently he goes to the Horizon House.  And I'm going to show you what we've had marked here as Exhibit 2, then.  This looks like also another ITPSA general team meeting.

A.    Uh-huh.

Q.    I think this is the following year, February of 1980.

A.    Uh-huh.

Q.    Actually, it's about -- looks like about six, seven months later.

Does that ring a bell?

A.    Um . . . .

Q.    Or at least am I reading that right?

A.    Yes, that's correct.  It looks like the team meeting occurred on February 12th, 1980.

Q.    And you were, again, in attendance?

Superior Reporting Service
Denise A. Drill, RPR
(507) 387-3846 or (888) 890-3846

US EXHIBIT-4-22

X-HAWKINSON-00036

23

A.     I was.

Q.     And can you tell us what the purpose of that team meeting was?

A.     The purpose of that team meeting was to discuss and approve a two-week pass to the Crookston area to visit his family, and the team then approved his pass from -- as a result of that.

Q.     Okay.  Can you -- can you explain for me the purpose or intended purpose of these passes?

A.     Uh-huh.  Well, it's all part of the eventual moving out in the community.  It's part of the transition process of gradually getting ready to move out there, to become accustomed to the area you're going to, and to make appropriate plans for work and -- and living arrangements and those sorts of things.

Q.     Okay.  Sort of back home on a trial basis?

A.     Uh-huh.

Q.     Make some contacts and then they can come back to the facility and continue?

A.     That's correct.

Q.     Okay.  Just going to show you the bottom of Exhibit 2, and I don't believe you made any of these entries.

A.     Uh-huh.

US EXHIBIT-4-23

X-HAWKINSON-00037

24

Q.    Just verify, if you would.

A.    I have not.

Q.    But I was curious, are you familiar with what they're talking about here?  Looks like the student social worker or student worker charted something about attendance.

Are you familiar with what that is?

A.    Uh-huh.

(Reviews document.)

Yeah, it appears the student was entering the participation scales for the -- for the group therapy sessions.

Q.    And what does that mean?  Looks like he's making a distinction between attendance and -- what's this, times focused?  Times on focus?

A.    Okay.  I'm not -- I'm just now reading the top part of the progress note there, too.  I see, yeah, he's -- he's recording the number of times that he was in the group for October, November, December and January, and then the number of times that he was on focus:  Looks like one time in October, one time in December.  That's where he would have had time in the group where he was discussing his treatment issues and -- so the focus then, if you will, would have been on that particular -- on -- on the patient.

Superior Reporting Service
Denise A. Drill, RPR
(507) 387-3846 or (888) 890-3846

US EXHIBIT-4-24

X-HAWKINSON-00038

25

Q.    Okay.

A.    And then there's also a group involvement scale rating that has to do with how much the participation was.  I don't remember all of the ingredients that went into that, but it was a collection of how much you spoke up and how attentive you were.

Q.    And --

A.    Uh-huh.

Q.    -- so the attendance reflected in this note talks about how many times he attended that group --

A.    That's correct.

Q.    -- session in each of those months?

A.    Uh-huh.

Q.    And then the "on focus" would have been the times during those group meetings where the focus was on him --

A.    That's right.

Q.    -- while he was attending those meetings?
      And then the -- there's recorded another scale or a calculated number here?

A.    Uh-huh.

Q.    Do you know what that number is or why it's significant?

A.    Yeah.  That's the group involvement scale

US EXHIBIT-4-25

X-HAWKINSON-00039

26

rating, and it's a measure of how much they're participating in tending to the process going on.

Q. And I assume that runs from zero at the bottom to -- what's the top of the scale?

A. I don't recollect -- don't recall what the full range of that scale was.

Q. Okay. Do you know whether this is average? bad? good?

A. I don't from looking at it right now.

Q. Okay. Let me show you what we've had marked as Exhibit 3. Can you identify that document for me?

A. Yes. It's a psychological report that I dictated on March 19th, 1980.

Q. And this is regarding Alfonso Rodriguez?

A. That's correct.

Q. Okay. Do you happen to know the occasion or the reason or purpose for that report?

A. In reviewing the report, it looks like I was doing this report for his annual review.

Q. And how --

A. And --

Q. -- is that done? What do you do to put together such a report?

A. When I'm doing an annual report, I am

US EXHIBIT-4-26

X-HAWKINSON-00040

27

looking at his medical record over the past year, any significant events in there, which includes entries from his group therapy and any other professional staff offering medical progress notes, any assessments that would have been done by any of the other professionals, psychiatrists, social worker and what have you.

Q.    And that's all charted in --

A.    And that's --

Q.    -- the medical progress notes like Exhibits 1 and 2 that we've already talked about?

A.    That's -- that would be charted in the medical progress notes or there would be a separate assessment done in another section of the chart.

Q.    Like your report here?

A.    Such as my report.

Q.    Exhibit 3?

A.    Uh-huh.

Q.    Okay.  Okay.

A.    And in addition to that, I would have psychological testing that I would also review as well.

Q.    Did you administer the psychological testing?

A.    The psychological testing would have been

US EXHIBIT-4-27

X-HAWKINSON-00041

28

administered by a psychometrist, a person that was experienced in giving testing to the patients but doesn't interpret the testing.

Q.    Some other staff person --

A.    Some other staff person.

Q.    -- that administered it but did not interpret it?  Okay.

A.    Correct.

Q.    Okay.  And then the score sheets would go to you for interpretation --

A.    That's correct.

Q.    -- and use?

Did -- was there any element in your having a personal meeting with the individual prior to the report?

A.    I'm sorry, can you ask the question again?

Q.    Was there -- was any element of this you having a personal meeting with the person or were you making the report based just on the paperwork?

A.    In -- as part of the review then, too, ultimately, after reviewing the hospital record, I would have the patient in for -- for an interview, uh-huh.

Q.    Okay.  So you talked with them, questioned them?

US EXHIBIT-4-28

X-HAWKINSON-00042

29

A.    That's correct.

Q.    Okay.  Okay.

When you talked about an annual review, am I correct in assuming that each patient would have had a review of their case or their situation approximately annually?

A.    Approximately, uh-huh.

Q.    Okay.  Can you give me a summary of your psychological report here?

A.    Yes.

I -- as I indicated, I saw him for a psychological review as part of his annual psychological updating, and I reviewed his experience out in the community over the past year and his subsequent return to the treatment program.  He -- during the past year, he had been out in the community.  He had been placed out in the community in a -- in the Horizon Halfway House.  We talked about his experiences out there and his adjustment in the halfway house, which my assessment of that, from his reports and from other reports that I reviewed, was reasonably satisfactory.  And because he did well in the halfway house setting, he was ultimately then approved to go into an independent living situation.

And then sometime around August of 1979,

US EXHIBIT-4-29

X-HAWKINSON-00043

30

the part of the year that I would have been reviewing, he was charged with an offense and -- and then subsequently brought back into the program. So at the time that I saw him, he was actually back on an inpatient basis.

Q. When you say --

A. As part of that review, I noted that he was found not guilty, I believe, of those -- of those charges. And so as a result of that, he continued on in our program and continued to be an active participant and was doing well and meeting the expectations of the program, meeting goals and objectives in his treatment plan, and following the general guidelines of our treatment program.

Q. And that was his status then in March of 1980?

A. That's correct.

Q. And the program is still the ITPSA program you're talking about?

A. Actually, the -- the ITPSA program that we're talking about shifted to become the Minnesota Sex Offender Program approximately in the early 1990s, but the -- the -- so there continued to be a sex offender program, but the type of program began -- what it was called changed to the Minnesota

US EXHIBIT-4-30

X-HAWKINSON-00044

31

Sex Offender Program.

Q.    That happened sometime in the early 1990s?

A.    That happened sometime in the early 1990s.

Q.    Okay.  But as of March of 1980, then, we're still under I-T-P-S-A?

A.    That's correct.

Q.    ITPSA?

A.    Yes, yes.

Q.    And the -- the Exhibit 3, your report, would have accurately reflected your findings and opinions at that time regarding this particular patient?

A.    Yes.

Q.    And this document, Exhibit 3, or your psychological report, gets used how in the system?  I mean, who does it go to and for what purpose?

A.    Well, it primarily goes to the hospital record, and from within the hospital record then, it's accessed by all other professionals when they are reviewing the patient's progress and when they're making their own assessments.  So that's primarily where that report goes.

And then in addition to that, there is a report -- because the patient was under a -- I believe it was a 2/4/6 commitment at that time, there

US EXHIBIT-4-31

X-HAWKINSON-00045

32

were required reports to the commissioner of the Department of Public -- Human Services, and this report as well as other assessments were used to compile the report.

Q.    Looking at the fourth page of Exhibit 3 --

A.    Uh-huh.

Q.    -- your signature appears there; correct?

A.    Correct.

Q.    And then there's two other signatures?

A.    Yes.

Q.    Can you tell me how it is that those other two individuals -- one look looks like the chief psychologist and the other is the medical director of the facility -- how they are involved or why they would be involved in reviewing this?

A.    Certainly. At the time that I saw -- that I saw the patient, I wasn't a licensed psychologist, I was working towards licensing, and the procedure at the facility at that time was to have the chief psychologist review all reports until the psychologist became licensed.

Q.    Okay.

A.    So that's why he would have reviewed my report.

The medical director at that time, the

US EXHIBIT-4-32

X-HAWKINSON-00046

33

third signature on the page, Dr. Shepherd, his preference was to also review all reports, and so he therefore signed them as well.  It wasn't a requirement.

Q.    Okay.  Have you since become licensed?

A.    Yes, I have.

Q.    Okay.  And when did that take place?

A.    That took place in December of 1980.

Q.    Okay.  This report, then, would have gone into his -- the patient's main file at the facility, relied upon, I assume, and available to -- like people do in team meetings?

A.    That's correct, uh-huh.

Q.    And for any other purpose that the staff needed, then?

A.    That's correct.

Q.    Okay.  And I assume this would have been available when the psychiatrist needed to do his work as well?

A.    Yes.

Q.    I'm going to show you what we've had marked as Deposition Exhibit No. 4.  I'm just going to give you a chance to read that.  That's the one I think you said you hadn't had a chance to look at yet.

A.    Thank you.

US EXHIBIT-4-33

X-HAWKINSON-00047

34

Okay.

Q.    Going to talk about Exhibit 4, now that you've had a chance read it.

Can you tell me what this document is, please?

A.    Yeah, it's a general team meeting to review Mr. Rodriguez's progress in treatment for the -- again, for the purpose of his annual review.

Q.    Okay.    And this is dated March 20th of 1980?

A.    That's correct.

Q.    Okay.    And were you present as a team member?

A.    Yes, I was.

Q.    Okay.    And the question I had was in the -- well, the first main paragraph here, last sentence says, "On January 9 of '79, Mr. Rodriguez was granted a parole by order of the Minnesota Commissioner of Public Welfare."

Did I read that correctly, and if I did, can you tell me what that means?

A.    I'm afraid I'm -- I can't explain that particular statement.

Q.    Okay.    Do you know the significance of it? I mean, did it have any effect on his involvement or

US EXHIBIT-4-34

X-HAWKINSON-00048

35

role or position or status in your program?

A.    I just don't recollect, I'm sorry.

Q.    Okay.  Can you summarize for the record here the nature of this report or what it's-- what it says?

A.    Yes.  It's reviewing his treatment and his behavior over the past year as part of his annual review, looking at his transition out into the community to the Horizon House, his subsequent move to independent living, and then his return to the unit as a result of charges that he encountered in August of 1979.  There's a report from social services which indicated that he had been doing well in his work setting out there, had been attending Alcoholics Anonymous, and maintaining a family contact -- contact; an overview by myself, from a psychological perspective, appearing to be functioning reasonably well both out in the community and -- and within the program; the psychiatric consultation wasn't available at the time; and the review of his therapy in the group -- his -- his behavior in group therapy, as well as his behavior on the unit and progress in the program.

          The general consensus appeared to be that he was working well within the program and was

US EXHIBIT-4-35

X-HAWKINSON-00049

36

showing progress.

Q.    No -- no disciplinary problems on the unit?

A.    No disciplinary problems on the unit.

Q.    Continuing employment?

A.    His employment was -- I -- I believe his employment was terminated after he was returned to the program, so I -- I can't tell generally from the record at the time that we were doing the team meeting if he was employed at that time.

Q.    You're right.  I think I was thinking of Exhibit 3, where he was still in the halfway house --

A.    Uh-huh.

Q.    -- or independent living in Mankato.

A.    Uh-huh.

Q.    And he was employed at an engineering firm of some kind there?

A.    Yes, Kato Engineering, I believe.

Q.    Do you know what kind of work he did there?

A.    I don't recall.

Q.    What was the -- what was the result?  After the team meeting in March of 1980, what was the team's position on Mr. Rodriguez?

A.    Well, they -- very specific recommendation of that annual review was that he would be -- that we would continue his commitment pursuant to the

US EXHIBIT-4-36

X-HAWKINSON-00050

37

commitment that he was under, Minnesota Statute 246.43, which in effect said that we felt that he -- that his behavior and participation was such that he should continue -- continue his involvement in our program.

Q.    Okay.  And that was the ITPSA program?

A.    That's correct.

Q.    And how was that going to be continued? Does the team decide that?

A.    The team is, in general, saying that he is going to continue his involvement with the -- the ITPSA program, which includes his inpatient work with the therapy group and the other programming that's offered there, and work towards transition, his retransition back out into the community again.

Q.    Do you have any recollection of meeting Mr. Rodriguez in any of these interviews or team meetings or anything like that?

A.    I -- my recollection really doesn't go beyond my review of the written reports that you've supplied me.

Q.    Okay.  I'm sure you've seen --

A.    Uh-huh.

Q.    -- lots of people.  I'm just curious --

A.    Right.

US EXHIBIT-4-37

X-HAWKINSON-00051

38

Q.    -- if you had any specific recollection of Mr. Rodriguez or not.

A.    At the time that I would have seen him here, that would have been over 25 years ago, so I -- I do recollect seeing him on the program and in different -- different venues, but I can't honestly say that I remember him in any specific team meeting.

Q.    Okay.  So at least as of March of 1980, which was the -- this team meeting, Exhibit No. 4 --

A.    Uh-huh.

Q.    -- the team's proposal or plan for Mr. Rodriguez was to continue in the ITPSA program and work toward transitioning again back into the community?

A.    That's correct.

Q.    Okay.

MR. HOY:  Mr. Hawkinson, I don't have any further questions for you.

THE WITNESS:  Okay.

MR. HOY:  We'll go off the record for just a minute.

(Off-the-record discussion.)

MR. HOY:  Mr. Hawkinson, you and I have just discussed your right to read and sign your deposition or to waive that right, and you've elected

US EXHIBIT-4-38

X-HAWKINSON-00052

39

to read and sign, as I understand.  Is that correct?

THE WITNESS:  That's correct.

MR. HOY:  Okay.  That's fine.  Thank you.
I will keep the exhibits.


(The deposition was concluded, and the
witness excused, at approximately 1:55 p.m.)

Superior Reporting Service
Denise A. Drill, RPR
(507) 387-3846 or (888) 890-3846

US EXHIBIT-4-39

X-HAWKINSON-00053

40.

## CERTIFICATE OF COURT REPORTER

I hereby certify that I reported the deposition of Bruce John Hawkinson, on the 18th day of May, 2006, at Nicollet County Courthouse, St. Peter, Minnesota, and that the witness was by me first duly sworn to tell the truth.

The testimony was transcribed under my direction and is a true record of the testimony of the witness.

The cost of the original has been charged to the party who noticed the deposition, or by other arrangements made by and between counsel of record, and that all parties who ordered copies have been charged at the same rate for such copies.

I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel. I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects, or has a substantial tendency to affect, my impartiality.

The right to read and sign the deposition was reserved.

WITNESS MY HAND AND SEAL this 25th day of May, 2006.

(NOTE:  Reporter's signature
valid on original transcript
when appearing in blue ink.)

_____
Denise A. Drill
Registered Professional Reporter
and Notary Public

US EXHIBIT-4-40

X-HAWKINSON-00054

Re:    USA v. Alfonso Rodriguez, Jr.
Due:    Monday, June 26, 2006

41

### SIGNATURE PAGE

I, Bruce John Hawkinson, do hereby certify that I have read the transcript of my deposition, the foregoing pages 1 - 39, inclusive, and that, with the corrections noted below, if any, it is a true and accurate transcription.

*(Attach extra pages as necessary.)*

Page/Line    Correction                          Reason

_____

_____

_____

_____

_____

_____

_____            _____
(Date)                      (Signature)

Please deliver this completed signature page to:

        Robert G. Hoy
        Attorney at Law
        PO Box 458
        West Fargo ND  58078-0458

**DISTRIBUTION:**
Original - Robert G. Hoy
1 copy   - Barbara Berg Windels

Superior Reporting Service
Denise A. Drill, RPR
(507) 387-3846 or (888) 890-3846

US EXHIBIT-4-41