IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | |
|---|---|
| ALFONSO RODRIGUEZ, JR., | Case No. 2:04-cr-55 |
| Petitioner, | |
| | Answer Under 28 U.S.C. §  2255 |
| v. | Criminal Case No. 2:04-cr-00055-RRE |
| | Civil Case No. 2:11-cv-00088-RRE |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## UNITED STATES' ANSWER IN OPPOSITION TO MOTION UNDER 28 U.S.C. § 2255 FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW TRIAL

**Table of Contents**

Statement Regarding Form …………………………………………………………… ii

Index to United States Exhibits ……………………………………………………. iii

   I.    Introduction …………………………………………………………….    1

        A. Procedural History …………………………………………………..    2

        B. Statement of Facts …………………………………………………...    5

            1. Merits Phase Evidence …………………………………………...    6

                a. Disappearance of Dru Sjodin ……………………………… 6

                b. Investigation of Alfonso Rodriguez, Jr. ………………….…  8

                c. Recovering the Body of Dru Sjodin ……………………….. 11

                d. Evidence Testing ……………………………………………. 12

            2. Eligibility Phase Evidence ……………………………………… 15

            3. Selection Phase Evidence ………………………………………... 17

        C. Federal Collateral Review of Presumptively Final Criminal Judgments . 18

            1. Claims Not Based on Jurisdictional or Constitutional Error ………. 20

            2. Claims Previously Adjudicated on direct Appeal …………………... 21

            3. Procedurally Defaulted Claims ………………………………….... 21

            4. New Rule of Criminal Procedure …………………………………… 24

            5. Error that does not have a Substantial and Injurious Effect

                  Or Influence …………………………………………………… 25

            6. Time Barred Claims …………………………………………………… 26

        D. Standard for Reviewing Claims of Ineffective Assistance of Counsel …. 26

            1. Ineffective Assistance Standard …………………………………. 26

   II.    ………………………………………………………… 31

        A. Trial Counsel Properly Challenged the Acid Phosphatase Testing ……. 31

            1. Rodriguez Cannot Relitigate on Collateral Review his Objection to
the Admission of Acid Phosphatase Testing.

            2. Trial Counsel Properly Challenged the Acid Phosphatase Testing
at the <u>Daubert</u> Hearing, the Trial and Appeal.

            3. Rodriguez is Not Prejudiced.

        B. Rodriguez's Trial Counsel were not Ineffective with Respect to
Addressing the Neck Wounds ………………………………………….. 63

            1. Rodriguez's Trial Counsel Effectively Challenged Dr. McGee's
Opinion Regarding the Neck Wounds.

2. Dr. McGee did not Provide materially false or inaccurate Testimony Regarding the Knife Wounds.

3. Rodriguez's Trial Counsel did not Render Ineffective Assistance of Counsel by not Introducing Evidence that No Knife Wound Occurred.

C. Trial Counsel Provided Effective Assistance During Jury Selection ...... 84

    1. Counsel Conducted Constitutionally Adequate Voir Dire.

        a. Counsel Properly determined if Jurors Would Automatically Vote for the Death Penalty.

        b. Counsel Properly Determined if Jurors Would Consider or Give Effect to Mitigation Evidence.

        c. Counsel Properly Declined to Object to Court Comments During Jury Selection.

            1. The Court's Comments during Voir Dire did Not Constitute Improper Instructions.

            2. The Jury was Properly Questioned and Instructed About Mitigation.

        d. The Prosecution did not ask "Stakeout" Questions, and Defense Counsel did not act Ineffectively in omitting such Improper Voir Dire.

        e. Trial Counsel had No Obligation to Object to Permissible Voir Dire.

        f. Trial Counsel had No Obligation to Seek an Erroneous Instruction.

        g. Trial Counsel had No Basis for Making Blanket Motions to Excuse Members of the Venire.

        h. Trial Counsel Effectively Represented Rodriguez.

D. Trial Counsel was Effective at the Culpability Phase: They Presented Effective Assistance Through Tactical and Strategic Decisions Which Were Reasonably Calculated to Assist in Rodriguez's Defense …………………………………………………. 111

    1. Standard for Reviewing A Claim of Ineffective Assistance of Counsel.

    2. Trial Counsel are not held to a Standard of Perfection.

    3. Trial Counsel was not Ineffective at the Culpability Phase:

Defense Counsel Presented Relevant Evidence and Developed a Coherent Theory of the Rodriguez's Case.

4. Trial Counsel did not Fail to Present the One Defense that was Viable and Readily Available:  That Mr. Rodriguez was Not Guilty by Reason of Insanity.

5. Trial Counsel Conducted an Adequate Mental Health Investigation which Conformed to existing Standards of Professional Conduct.

E. Counsel mad Appropriate Arguments in Resisting the Admissibility of Rodriguez's Prior Sexually Assaultive Conduct under Federal Rule of Evidence 413 ……………………………………………… 133

1. Rodriguez's Counsel Raised, and This Court Rejected as without Merit, the Arguments Relating to Rule 413 that Rodriguez now Offers again and Claims His Counsel did not Raise.

2. There was no Ineffectiveness of Counsel Relating to Rule 413 in the Pretrial Litigation.

3. There was No Ineffectiveness of Counsel Relating to Rule 413 following the Government's Closing.

4. There was Not Ineffectiveness of Counsel Relating to Rule 413 in the Penalty Phase.

5. There was No Ineffectiveness of Counsel Relating to Rule 413 in the Appeal.

6. Rodriguez is Not Entitled to Relief Because it is Not Reasonably Probable that any Alleged Deficiency in Counsel's Performance Relating to Rule 413 Affected the Verdict or Sentence.

F. Counsel Appropriately Omitted an Objection to the Medical Examiner's Reliance on Lab Results Generated by Others ………………………………………….…………………..……....... 157

III. Counsel Effectively Represented Rodriguez During the Eligibility Portion of the Penalty Phase Trial …………………………………….. 164

A. Counsel Appropriately Omitted Any Request for a Mistrial Premised on the Length of Deliberations.

B. Counsel Properly Responded to the Government's Aggravating Factor Allegations.

IV. Trial Counsel Effectively Presented Mitigating Evidence …………………. 168

A.    Standard of Review  ……………………………………………… 170

B.    Trial Counsel Were Highly Experienced Criminal Defense Lawyers…. 172

C.    Counsel Conducted A Proper Mitigation Investigation and Presented an Adequate Mitigation Case at Trial  …………………………………….. 172

    1.  The Mitigation Investigation.

    2.  The Mitigation Case at Trial.

        a.  The Evidence.

            1.  Dolores Rodriguez.

            2.  Rodriguez's Sisters.

            3.  Other Family and Friends.

            4.  Expert Testimony.

            5.  Minnesota Correctional Officials.

        b.  Mitigating Factors.

        c.  Rodriguez's Claims are Cumulative.

        d.  Rodriguez's Insanity Claims are Not Meritorious.

        e.  Trial Counsel Properly Retained Drs. Hutchinson and Froming.

D.  Rodriguez has failed to Establish Prejudice  ………………….. ..  212

V.  Rodriguez Was Not and Is Not Mentally Retarded  ……………………….  216

A.  Legal Standard for Atkins Claims  …………………………………  216

B.  Definitions of "Mentally Retarded"  …………………………………  218

C.  Rodriguez is Not Mentally Retarded  …………………………………  223

    1.  Rodriguez is Not Mentally Retarded Under the AAMR/AAIDD's

Intellectual Functioning Analysis or Under the APA's

Criteria A Analysis.

    a.  Intellectual Functioning and Criteria A.

2.  Rodriguez's Intellectual Functioning Establishes that

He is Not Mentally Retarded.

    a.  The Experts.

    b.  Drs. Froming and Seward Both Concluded that

    Rodriguez's Intellectual Functioning is in the Low Average –

    Not Mentally Retarded Range.

    c.  Dr. Welner and Dr. Seward Concluded that

    Rodriguez's Poor Academic Performance was not

    Caused by Mental Retardation.

3.  Rodriguez is Not Mentally Retarded Under the

AAMR/AAIDD's Adaptive Functioning analysis or

Under the APA's Criteria B Analysis.

    a.  Rodriguez's Adaptive Functioning Shows that

    He is Not Mentally Retarded.

4.  Rodriguez Fails the Criterion C Benchmark:

He did not Show Onset of Mental Retardation Before Age 18.

VI.  Counsel Effectively Represented Rodriguez During the

    Penalty Phase Trial ..............……………………………………..… 310

  A.  Counsel Properly Omitted a Request to Permit a Mitigation

    Theory Based on Geography ………………………………….... 311

B.  Trial Counsel Did Not Fail to Seek Corrective Instructions

During Mitigation Phase …………………………………….. 318

  1.  The Claim is Barred by the Relitigation Doctrine.

  2.  Counsel Acted Reasonably and Did Not Prejudice Rodriguez.

C.  Trial Counsel Acted Effectively With Respect to the

"Three Step" Process During The Selection Phase and on the

Special Verdict Form ………………………………………… 327

  1.  The Eighth Circuit Analysis of the Selection Phase Instructions.

  2.  The "Three Step Process" was Objective and Reasonable.

  3.  Counsel's Performance did not Result in Prejudice.

D.  Counsel Properly Omitted to Seek the Jury's Determination

of the Kidnapping Act's Constitutionality ……………………… . 351

E.  Counsel Properly Omitted to Cite Ring and Apprendi in

Support of the Request for a Reasonable Doubt Instruction

Applicable to the Weighing of Penalty Phase Factors ……………. 352

VII.  Trial Counsel Did Not Render Ineffective Assistance of Counsel

by Failing to Secure a Settlement When It was Available …………. 354

VIII.  There are No Errors to Accumulate.  Rodriguez's Claim of

Cumulative Error has No Merit …………………………………... 361

IX.  The United States Did Not Knowingly Present False

and Misleading Testimony ………………………………………… 361

A.  There was No False Testimony about the Rape of

Dru Sjodin or the Knife Wounds ……………………………….. 362

B.  The Government Did Not Present False Testimony About the

Minnesota Department of Corrections  ……………………….    364

    1.  Procedurally Defaulted Claims.

    2.  The Additional Information Proffered by Rodriguez

       Post-Conviction is Cumulative, Is Not Material and

       Rodriguez Suffered No Prejudice.

X.    The Prosecution Honored Its Obligations to Disclose

Exculpatory Material to the Defense and to Afford Rodriguez

a Fair Trial  …………………………………………………    377

XI.   The Jury Did Not Rely on Materially False and Inaccurate

 Information During the Penalty Phase  ……………………………    382

XII.  Petitioner's Claim of Juror Misconduct Should Be Stricken.

The Jury Deliberations Were Not Tainted with Unlawful or
Unconstitutional Extraneous Information  …………………………    383

A.  Applicable Law  …………………………………………..    384

B.  The History and Purpose of Rule 606(b)  ………………………    386

C.  Applicability of Rule 606(b) to the Jurors Testimony or

Declarations in this Case  …………………………………    390

    1.  Jurors Answers to Jury Questionnaire and Voir Dire

       Did Not Deprive Rodriguez of a Fair Trial.

       a.  Alleged Incorrect Answers to Questions Posed

          During Voir Dire.

    2.  There is No Valid Basis For a Challenge for Cause.

3. Juror Declarations Do Not Fall Within One of the Enumerated Exceptions to 606(b).  Statements Made During Jury Deliberations Are Not "Extraneous Prejudicial Information" Improperly Brought to the Jury's Attention or an "Outside Influence" was Improperly Brought to Bear on Any Juror.

XIII.  Congress Properly Exercised Its Legislative Authority in Enacting the Death Penalty Provisions of Interstate Kidnapping Act .. 428

A.  Procedural Default ……………………………………………. 429

B.  The Death Penalty Provisions of the Kidnapping Act Comport with the Constitution …………………………………….. 431

XIV.  The Federal Death Penalty is Not Sought on a Racially Discriminatory Basis …………………………………………….. 436

XV.  Rodriguez Cannot Litigate His Argument that the Constitution Requires Capital Juries to Apply a Reasonable Doubt Burden of Proof to the Penalty Phase Weighing Process …… 439

A.  Procedural Default …………………………………………… 439

B.  The Jury Charge Properly Permitted the Weighing of Factors in the Absence of the Reasonable Doubt Standard …….. 440

XVI.  Rodriguez Failed to Raise His Confrontation Clause Claim on Direct Appeal and Has Therefore Procedurally Defaulted. Even So, It Fails on Its Merits …………………………………… 446

XVII. The Jury Did Not Consider and Rely Upon an Invalid

Aggravating Factor in Violation of the Eighth Amendment ……….. 449

XVIII. Rodriguez's Rights Under the Fifth, Sixth, and Eighth

Amendments were Not Violated because the Jury was

Improperly asked to Determine Whether Certain Mitigating

Evidence Put Forth by the Defense was in Fact mitigating

Before Giving it Consideration ……………………………………. 453

XIX.    Trial Counsel DID Not Fail to Secure Transcription of

Critical Portions of the Proceedings ………………………………. 463

XX.    Rodriguez Received the Assistance of Constitutionally

Adequate Appellate Counsel ………………………………………… 469

XXI.    The Cumulative Error Doctrine is Inapplicable …………………... 474

Conclusion ……………………………………………………………………… 475

## STATEMENT REGARDING FORM

Citation forms used in this Answer are generally in conformity with traditional

Legal citations and the *Blue Book*.  However, throughout the Answer the following

Abbreviations and citation conventions are employed:

Citations to Rodriguez's Motion for Collateral Relief, To Vacate, Set Aside, or Correct Sentence and for a New Trial will be referenced by a shortened pleading reference:  e.g., Mot. at 21.

Citations to all three phases of the trial transcript are formatted "Tr.".

Citations to Trial Exhibits are referenced as they were at the appellate level: e.g., Gov't. Ex. 22-2.

Citations to pleadings filed with the Court are referenced by a shortened pleading title followed by the docket number: e.g., DKT 34.  They are not attached as exhibits to this Answer except in specific instances where they are included as specific United States Exhibits and marked as such.

Citations to pretrial proceedings and hearings are referenced by the name of the hearing, the date and the page number: e.g., Pretrial Hearing, April 4, 2006, p. 42

Citations to exhibits filed with this Answer include a description of the exhibit and exhibit number: e.g., Report of Dr. Welner, U.S. Exhibit 34.

Citations to exhibits filed with the Motion filed by the Petitioner include a description of the exhibit and exhibit number:  Declaration of David Wymore, Exhibit S-31.  These exhibits will be referred to in this Answer as: Exhibit S-31.

Citations to Jury Questionnaires will be referenced by Individual Questionnaire, question number and page: e.g., Rebecca Jensen Questionnaire, Question 54, p. 11.

Attached as part of this Answer is a list of the United States' Exhibits.

## INDEX TO UNITED STATES EXHIBITS

**United States Exhibit 1**       Deposition of Dr. Michael McGee

**United States Exhibit 2**       Sensabaugh, G.F., "The Quantitative Acid Phosphatase Test: A Statistical Analysis of Endogenous and Postcoital AP Levels of the Vagina."  J. For. Sci., Vol. 24, No. 2, p. 346 (1979)

**United States Exhibit 3**       Cass County Jail Contact Records

**United States Exhibit 4**       Deposition of Bruce Hawkinson

**United States Exhibit 5**       Report of Dr. Michael Welner

**United States Exhibit 6**       Report of Dr. James Seward

**United States Exhibit 7**       Report of Dr. Susan Koslow

**United States Exhibit 8**       Video and audio of interview with Dr. Seward (filed conventionally)

**United States Exhibit 9**       Video and audio of interview with Dr. Welner (filed conventionally)

**United States Exhibit 10**      Transcript of video and audio of interview with Dr. Welner

**United States Exhibit 11**      Transcript of video and audio of interview with Dr. Seward

**United States Exhibit 12**      Statement of Connie Bush

**United States Exhibit 13**      Statement of Steve Ergen

**United States Exhibit 14**      Statement of Christopher Esty

**United States Exhibit 15**      Statement of Yvonne Kosloski

**United States Exhibit 16**      Statement of David Hall

**United States Exhibit 17**      Curriculum Vitae of Dr. James Seward

xi

| | |
|---|---|
| **United States Exhibit 18** | Curriculum vitae of Dr. Michael Welner |
| **United States Exhibit 19** | Cass County Jail Telephone Calls |
| **United States Exhibit 20** | Fragile X Report |
| **United States Exhibit 21** | Ardyce Whalen Statement |
| **United States Exhibit 22** | Rodriguez Interview with Macki and Senechal on 12/3/2003 at 12:00 p.m. |
| **United States Exhibit 23** | Report of Investigation of Rodriguez Interview with Macki and Senechal on 12/3/2003 at 12:00 p.m. |
| **United States Exhibit 24** | Supplemental Investigative Report by Agent Senechal regarding Ileanna Noyes and Rodriguez conversation |
| **United States Exhibit 25** | Grand Jury Testimony of Ileanna Noyes |
| **United States Exhibit 26** | Photos of Rodriguez home |
| **United States Exhibit 27** | Motion to Withdraw – Robert G. Hoy |
| **United States Exhibit 28** | Order allowing withdrawal of Robert Hoy as counsel |
| **United States Exhibit 29** | Rodriguez Interview on 12/3/2003 at 9:26 a.m. |
| **United States Exhibit 30** | Rodriguez Interview on 12/3/2003 at 11:13 a.m. |
| **United States Exhibit 31** | Findings of Fact, Conclusions of Law and Order for Judgment – American State Bank & Trust of Williston v. Mark M. Owan, et. al. |
| **United States Exhibit 32** | Affidavit of Charmayne Owan |
| **United States Exhibit 33** | Report of Dr. Ljubisa Dragovic |
| **United States Exhibit 34** | Curriculum Vitae of Dr. Ljubisa Dragovic |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff/Respondent,<br><br>v.<br><br>ALPHONSO RODRIGUEZ, JR.,<br><br>Defendant/Petitioner. | Case No. 2:04-cr-55<br><br>**UNITED STATES' ANSWER IN OPPOSITION TO MOTION UNDER 28 U.S.C. § 2255 FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR NEW TRIAL** |

The United States of America, by and through Lynn C. Jordheim, Attorney for the

United States Acting Under Authority Conferred by 28 U.S.C. § 515, for the District of

North Dakota, and Keith W. Reisenauer, Assistant United States Attorney, hereby files its

Answer in Opposition to Petitioner's Motion under Title 28 U.S.C. § 2255 for Collateral

Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial.

## I.    INTRODUCTION

### A.    Procedural History

On May 11, 2004, a federal grand jury for the District of North Dakota returned a

one-count Indictment that charged Alfonso Rodriguez, Jr. (hereinafter "Rodriguez") with

kidnapping Dru Sjodin and transporting her from North Dakota to Minnesota for the

purpose of sexual assault, and otherwise, resulting in the death of Dru Sjodin in violation

of 18 U.S.C. § 1201(a) (1).  DKT 1.  As required by the Federal Death Penalty Act, 18

U.S.C. §§ 3591–98 ("FDPA"), to justify a death sentence, the Indictment alleged that

Rodriguez was eighteen years of age or older at the time of the offense, had acted with the mental states described in 18 U.S.C. § 3591(a) (2), and that four statutory aggravators applied:  Rodriguez caused Sjodin's death during the commission of another crime, namely, a kidnapping (18 U.S.C. § 3592(c) (1)); Rodriguez had previously been convicted of two or more violent felonies (18 U.S.C. § 3592(c) (4)); Rodriguez killed Dru Sjodin in an especially heinous, cruel, and depraved manner (18 U.S.C. § 3592(c) (6)); and Rodriguez killed Dru Sjodin after substantial planning and premeditation (18 U.S.C. § 3592(c) (9)).  DKT 1.  On October 28, 2004, the United States filed a Notice of Intent to Seek a Sentence of Death, re-alleging the grand jury's FDPA findings and adding non-statutory aggravators, including victim impact.  DKT 34.

Jury selection began on July 7, 2006, and a panel was sworn on August 14, 2006. On August 30, 2006, the jury found Rodriguez guilty as charged in the Indictment.  On September 7, 2006, the jury found Rodriguez "eligible" for consideration of the death penalty and found true all but one FDPA allegations, rejecting only the assertion that Rodriguez substantially planned and premeditated the murder.  DKT 585.  On September 22, 2006, the jury returned special findings, including a unanimous determination finding Rodriguez liable for the non-statutory victim impact aggravator.  DKT 626. Additionally, the jury, or individual jurors, found twenty-five alleged mitigators true; the jury unanimously rejected five other mitigators.  Id.  The jury unanimously found that the aggravators sufficiently outweighed the mitigators to justify the imposition of a death sentence.  Id.  On February 8, 2007, following the denial of Rodriguez's motion for a new

2

trial, <u>United States v. Rodriguez</u>, 2007 WL 466752 (D.N.D. Feb, 12, 2007), the district

court formally sentenced Rodriguez to death.  DKT 652.

Rodriguez appealed the judgment to the Eighth Circuit Court of Appeals for the,

raising twenty claims of error:

1.  The trial court erroneously denied Rodriguez's motion for change of venue.

2.  The trial court erroneously denied funding for a venue study of Rodriguez's preferred venue, Minnesota.

3.  The trial court's jury selection plan did not ensure a venire that fairly represented a cross-section of the community.

4.  The trial court erroneously overruled Rodriguez's <u>Batson</u> challenge.

5.  Rodriguez's sentence resulted from a racially-biased process.

6.  The trial court erroneously struck jurors as <u>Witt</u> excludables.

7.  The trial court allowed the trial prosecutor to present improper arguments regarding a nexus between Rodriguez's proposed mitigation and the capital offense.

8.  The trial prosecutor committed misconduct during the penalty phase argument.

9.  The grand jury received insufficient evidence to find probable cause that Rodriguez's prior convictions involved the infliction of or attempted infliction of serious bodily injury.

10.  The trial court improperly refused to strike the prior violent felonies aggravator after analyzing the totality of the record, rather than the elements of the past offenses.

11.  Insufficient evidence supported the jury finding that Rodriguez's prior victims suffered serious bodily injury due to protracted loss or impairment of mental faculties.

12.  The trial court improperly denied Rodriguez's request to collaterally strike a prior conviction alleged in support of a statutory aggravator.

13.  The trial court erroneously instructed the jury about mitigation.

14.  The trial court improperly barred Rodriguez from arguing that a death verdict is never required.

15.  The trial court improperly precluded Rodriguez from relying on a claim of residual doubt.

16.  The trial court improperly admitted expert opinions from the pathologist.

17.  The trial court improperly admitted, under Federal Rule of Evidence 413, two previous crimes in which Rodriguez abducted and sexually assaulted women.

18.  The trial court improperly admitted victim impact evidence.

19.  The FDPA is unconstitutional because it does not preclude a grand jury presentment of special findings.

20.  The trial court improperly refused to strike the non-statutory aggravating factors for failure to include them in the Indictment.

The Eighth Circuit affirmed the conviction and sentence.  United States v. Rodriguez, 581 F.3d 775 (8th Cir. 2009), *reh'g and reh'g en banc denied* (Feb 11, 2010). The Supreme Court denied Rodriguez's petition for a writ of certiorari.  Rodriguez v. United States, 131 S. Ct. 413 (2010).

On October 17, 2011, Rodriguez filed a 334-page Motion for Collateral Relief, accompanied by thousands of pages of exhibits, asserting 20 enumerated claims of error. DKT 752.  Rodriguez claims that his conviction and death sentence violated his rights under the Fifth, Sixth and Eighth, Tenth and Fourteenth Amendments to the United States Constitution.  The vast majority of Rodriguez's claims rely on an allegation of ineffective assistance of counsel to justify his failure to raise these claims before the trial court and avoid procedural default.  Petitioner does not claim actual innocence.  The United States now files this Answer.

4

B.      **Statement of Facts**[1]

Dru Sjodin left a mall in Grand Forks, North Dakota, on the afternoon of November 22, 2003. After she missed work that evening, a friend reported her absence to the police, who discovered her car in the mall's parking lot with a knife sheath beside it. Sjodin's phone-service provider, when contacted, told police her phone was "bouncing" off a cell tower near Crookston, Minnesota. Three days later, investigators found one of Sjodin's shoes under a bypass near Crookston.

Investigators interviewed persons in the surrounding area with convictions for kidnapping or sex offenses. Alfonso Rodriguez, Jr.—a Crookston resident and a Level III sex offender released from prison six months earlier—told police he traveled to Grand Forks on November 22 to visit the mall and see a movie. Police examined his car, which had small blood splatters in the back seat and a knife in the trunk matching the sheath found near Sjodin's car. The movie Rodriguez claimed to have watched on November 22 was not playing at the mall's movie theater that day.

Sjodin's body was found on April 17, 2004, in a ravine outside of Crookston; her phone was nearby. Her body was naked below the waist, hands tied behind her back. Rope and remnants of a plastic bag encircled her neck. Her upper-body garments were pulled down off her shoulders. Police recovered hair and fiber samples from the body, which matched Rodriguez and his possessions. According to the autopsy, the most likely

---

[1] The Statement of Facts is drawn from the Eighth Circuit's opinion in this case. Rodriguez, 581 F.3d at 783-84 and the facts presented at trial. Throughout its Answer, the United States refers to the transcripts in Case No. 2:04-cr-00055-RRE by page number and prefaces the citations with "Tr."

cause of death was asphyxiation or suffocation, a slash wound to the neck, or exposure to the elements.

On May 11, 2004, a federal grand jury for the District of North Dakota returned a one-count Indictment that charged Alfonso Rodriguez, Jr. (hereinafter "Rodriguez") with kidnapping Dru Sjodin and transporting her from North Dakota to Minnesota for the purpose of sexual assault, and otherwise, resulting in the death of Dru Sjodin (18 U.S.C. § 1201(a) (1)).  Rodriguez pled not guilty.  Jury selection began on July 7, 2006.  On September 22, 2006, the jury determined Rodriguez should be sentenced to death.

## TRIAL PROCEDURE

The court "trifurcated" the trial proceedings in this case, granting Rodriguez's request.  The court viewed the trial as a three-phase procedure: "a 'merits' (guilt) phase, 'eligibility' phase, and 'selection' phase.  See, e.g., United States v. Johnson, 362 F. Supp. 2d 1043, 1111 (N.D. Iowa 2005); United States v. Jordan, 357 F. Supp. 2d 889, 903-04 (E.D. Va. 2005); United States v. Davis, 912 F. Supp. 938, 949 (E.D. La. 1996)." DKT 200.

### 1. Merits Phase Evidence.
### a. Disappearance of Dru Sjodin.

On November 22, 2003, Dru Sjodin was a 22-year-old college student at the University of North Dakota.  She also worked at Victoria's Secret in the Columbia Mall, Grand Forks, North Dakota. Tr. 5589-5594.

That day Ms. Sjodin worked at Victoria's Secret from approximately noon to 4:00 p.m. (Tr. 5591-94) then shopped in the Columbia Mall.  Ms. Sjodin was at Marshall Fields' in the mall, at approximately 5:00 p.m., where she bought a purse. Tr. 5606.

As she was leaving Marshall Fields', Ms. Sjodin called her boyfriend, Chris Lang (Tr. 5615), on her cell phone. Tr. 5619.  The conversation between Ms. Sjodin and Mr. Lang lasted about four minutes, at which time Mr. Lang heard Ms. Sjodin say "Okay, okay." Tr. 5621.  The call ended abruptly at approximately 5:04 p.m.  Tr. 5621-22, 5758-59.

Mr. Lang tried to call Ms. Sjodin several times within the two to three hours after their call was interrupted.  Tr. 5622-23.  She never answered. Id.

At 7:42 p.m., Mr. Lang's cell phone rang.  Tr. 5623.  He heard no voices, nobody spoke.  Tr. 5623.  This call came from Ms. Sjodin's cell phone, number (218) 330-4000. Sprint later informed law enforcement that Ms. Sjodin's cell was "bouncing" off a cell tower near Crookston, Minnesota.  Tr. 5635-37, 5746-54.

At approximately 11:00 p.m., Ms. Sjodin's car was found at the Columbia Mall parking lot.  Tr. 5642-44, 5653.  A search of her car revealed a Marshall Fields' bag containing the purse she had purchased.  Tr. 5644-45.  A knife sheath, bearing the logo "Tool Shop," was found next to her car.  Tr. 5646.  Ms. Sjodin was nowhere to be found.

On November 25, 2003, one of Ms. Sjodin's shoes was found underneath the bridge on Highway 75, near Crookston, Minnesota.  Tr. 5712-17, 5794-95.  Ms. Sjodin was still not found.

### b. Investigation of Alfonso Rodriguez, Jr.

Law enforcement began conducting the investigation into Ms. Sjodin's disappearance. Tr. 5822-26. Rodriguez among others became a person of interest because he was a Level III sex offender who had been released from prison in May 2003. Tr. 5823-24. Rodriguez was living in Crookston, Minnesota, at the time of Ms. Sjodin's disappearance. Tr. 5822.

On November 26, 2003, Minnesota Bureau of Criminal Apprehension Special Agent Dan Ahlquist went to a job site where Rodriguez was employed by Jose Hernandez as a sheetrock worker. Tr. 5824-25, 6175-78. Rodriguez told Ahlquist that on November 22, 2003, he had gone to Grand Forks, North Dakota, from his Crookston, Minnesota, home. Tr. 5825-27. Rodriguez reported going to a number of stores in Grand Forks, including Sam's Club, Wal-Mart, Target, the Columbia Mall, and then to a movie. Id. Rodriguez claimed that after the movie he went to the McDonald's restaurant in East Grand Forks, Minnesota. Tr. 5828-29. Rodriguez said he went to J.C. Penney's, Sears, and Marshall Fields' while at the Columbia Mall. Rodriguez said he did not buy anything at the mall. He said he was wearing blue jeans, a black shirt, a baseball-style cap, and a black leather jacket. Gov't. Ex. 21, 21-1 at 11,191-95.

Rodriguez recalled the name of the movie was "Once Upon A Time in Mexico," starring Antonio Banderas, a movie he said was about shooting and drugs. He could not elaborate about the details of the movie. Tr. 5827. Rodriguez reported he left the movie

and went to McDonald's at approximately 8:00 p.m., and then drove straight home to Crookston.  Tr. 5828-29.

Rodriguez consented to a search of his car.  Tr. 5829-30.  In the trunk of Rodriguez's car, Ahlquist observed a knife, in a small pan lying in a liquid solution. Tr. 5830-31.  Ahlquist did not take the knife at that time.  Tr. 5831.  Rodriguez told his employer, Mr. Hernandez, that law enforcement were searching for drugs in his car.  Tr. 6178-79.

Ahlquist learned the Tool Shop knife sheath, recovered from the Columbia Mall parking lot near Ms. Sjodin's car, was sold with a knife matching the knife observed in the trunk of Rodriguez's car.  Tr. 5855-56.

The movie, "Once Upon A Time In Mexico,"  was not showing at any theater in Grand Forks on November 22, 2003. Tr. 5854-55.  But, Alfonso Rodriguez, Jr., was in Grand Forks, North Dakota on November 22, 2003. Tr. 5826; Gov't. Ex. 21-1 at 11, 187. He was observed at the Target store near the Columbia Mall at approximately 4:00 p.m. that afternoon.  Tr. 5798-5804. The video tape from the McDonald's restaurant did not show Rodriguez at the establishment on the evening of November 22, 2003. Tr. 5853-54, 5883-86.

Ahlquist asked Rodriguez to come to the Crookston Police Department to straighten out the discrepancies.  Tr. 5856-58.  Rodriguez went to the Police Department and provided additional claims about his trip to the Columbia Mall on November 22, 2003.  Tr. 5857-58.

Previously, Rodriguez had emphatically told law enforcement that he had parked near the Marshall Fields' area of the Columbia Mall parking lot on November 22, 2003. Now Rodriguez said he parked near the Royal Fork Restaurant which was located on the opposite side of the mall from Marshall Field's.  Gov't. Ex. 22-2, 22-3 at 11,213-14. Rodriguez said he walked through the Marshall Field's store mistakenly, as he thought he parked on that side of the mall.  Gov't. Ex. 22-2, 22-3 at 11,219, 11,234-36.  Rodriguez said he wasn't sure what time he entered the Columbia Mall, but he did say that he was at the mall for approximately one hour.  Tr. 5838; Gov't Ex. 22-2, 22-3 at 11,221.

When Rodriguez was questioned about the knife in his car, he said he had bought it approximately four months earlier.  Gov't. Ex. 22-2, 22-3 at 11,258.  Rodriguez told Ahlquist that he had thrown the knife's sheath away.  Tr. 11,251, 11,258.  Rodriguez also stated that this particular knife was used for work.  Id.

Mr. Hernandez, Rodriguez's employer, later told law enforcement that Rodriguez did not have a knife or use a knife when he worked for Mr. Hernandez.  Hernandez stated that Rodriguez was not a sheetrock cutter.  Tr. 6182.  In fact, if Rodriguez had used a knife at work, it wouldn't be the type of knife which was seized from Rodriguez's car. He explained that a "sheetrock" knife would be needed to do the type of cutting involved in sheetrock work.  The knife seized from Rodriguez's trunk was not a sheetrock knife. Id.

Ahlquist obtained a search warrant to search and seize Rodriguez's vehicle.  Tr. 5866.  Ahlquist seized the knife in the trunk.  Tr. 5861.  BCA located small spots of

blood on the interior of the rear window, the back-rear seat cushion, sections of seat belts removed from the back seat, rear passenger-side window and adjacent door area, and the seat frame of the passenger seat. Tr. 6088-90, 6099-6109; 6126-46.

Another search warrant was obtained for Rodriguez's house. Tr. 5866. Items were seized from his residence, including boots, gloves, and a blanket. Id.

Mr. Hernandez also explained that prior to November 22, 2003, he picked up Rodriguez on his way to the job site each day. Tr. 6181. The Monday after November 22, 2003, Rodriguez told Mr. Hernandez that he would drive himself and did so for the next three days. Id.

### c. Recovering the body of Dru Sjodin.

Law enforcement, friends and family, and hundreds of people from the surrounding communities participated in the search for Ms. Sjodin. They went the winter without finding her. Their efforts were futile until April 17, 2004.

After four-and-one-half months of searching, Dru Sjodin's body was found by a ravine on the north side of Polk County No. 61 just northwest of Crookston, Minnesota. Tr. 6221-41.

Ms. Sjodin's body lay face down (Tr. 6233) with her hands and wrists bound behind her back with white woven cord. Tr. 6326. She was partially covered with grass that had been pulled and placed over her. Tr. 6237-6238. Ms. Sjodin was naked from the waist down but for one sock on her left foot, and a ligature of cord or rope tied around her neck with what appeared to be some plastic remnants underneath the rope. Tr. 6236. She

11

was wearing a dark coat, a pink blouse or sweater, pink tank top, and pink bra. The coat and blouse were pulled down off of her shoulders with her arms still in them. The blouse was ripped.  Tr. 6236, 6686, 6691.

Ms. Sjodin's body was found approximately 30 miles from the Columbia Mall, where she had last been seen. Tr. 6263-64. Her body was approximately two miles from the cell tower that her phone had "bounced" off.  Her body was approximately 2.1 miles from where her shoe had been found underneath the Highway 75 Bridge, only 4.2 miles from Rodriguez's house.  Tr. 6260-62.  Ms. Sjodin's cell phone was found a few feet away from her body.  Her second shoe was also found nearby. Tr. 6326-34.

Ms. Sjodin's pants were found approximately two weeks later just south of Crookston, approximately two miles south of Rodriguez's residence and approximately six miles from where her body was found. Tr. 6275-79; 6283-89.

### d.  Evidence Testing.

Testing of samples seized in the investigation was done by the Minnesota BCA, North Dakota BCI, and FBI Laboratories.  The blood observed in Rodriguez's car on the back window, back seat, and back seat belt was Dru Sjodin's. Tr. 6146-51, 6442-45.

A hair found on Ms. Sjodin's coat, which she still had on when her body was found, was tested by the FBI Laboratory.  Tr. 6341-43.  It was compared to the saliva sample obtained from Rodriguez.  Tr. 6441, 6453.  The mitochondrial DNA profile obtained from this particular hair matched Rodriguez's mitochondrial DNA profile obtained from his saliva sample.  Tr. 6452-53.

Minnesota BCA analyzed the numerous fibers obtained from several items during the investigation.  Tr. 6374-6415. The pink cotton blouse which Ms. Sjodin had been wearing the day she disappeared contained cotton fibers matching fibers found in Rodriguez's vehicle, on Rodriguez's boots, and on a pair of his gloves seized from his residence.  Tr. 6405.

Ms. Sjodin's black-and-blue pea coat contained certain wool fibers that were matching in type and color to fibers found in Rodriguez's vehicle. Tr. 6408-10.

A blanket seized from Rodriguez's bed in his residence was the source of red and fuchsia acrylic fibers.  Tr. 6371-72.  Matching red acrylic fibers were found on the knife sheath located outside of Ms. Sjodin's vehicle, and were also found inside Rodriguez's vehicle, on Rodriguez's boots, on Ms. Sjodin's coat, on Rodriguez's gloves, as well as on Ms. Sjodin's black pants.  Tr. 6253-55, 6390-99.

Ms. Sjodin's body was transported for an autopsy (Tr. 6253-55), which was performed by Dr. Michael McGee, M.D., the day after Ms. Sjodin's body was found. Tr. 6683-85.

The autopsy revealed that Ms. Sjodin's hands were bound behind her back, as noted above. Tr. 6686.  Ms. Sjodin was nude from the waist down, and a ligature was observed around her neck with remnants of a K-Mart plastic bag. Tr. 6686, 6701; Gov't Ex. 78-11, 78-39.

Dr. McGee observed that Ms. Sjodin had a bruise or contusion to her upper right arm. Tr. 6689.  She had a bruise or contusion on the back of her right forearm. Tr. 6689.

13

Ms. Sjodin also had a bruise or contusion beneath her right eye, and a bruise or contusion to her lower right cheek.  Tr. 6688.

A large gaping and notched slash wound was observed to the front of Ms. Sjodin's neck.  There were actually two slash wounds to the front of her neck that were caused by a knife drawn across the neck through the tissue in a fashion to cause notching. Tr. 6688-89, 6694-95.  Dr. McGee also determined that there was a "defect" to Ms. Sjodin's right side, between her ribs and pelvis, approximately eight centimeters deep, which may represent a stab wound.  Tr. 6689, 6692, 6706.

A sexual assault examination and laboratory testing revealed an elevated level of prostatic acid phosphatase, an enzyme, in the vaginal and cervical areas.  This enzyme is produced in high levels in the male prostate.  The elevated levels were considered a presumptive positive for seminal deposit. Tr. 6716-23.

Dr. McGee concluded that Ms. Sjodin died due to homicidal violence (Tr. 6726, 6728); that the probable cause of Ms. Sjodin's death was asphyxiation or suffocation (Tr. 6727, 6728), death from the slash wound injury to the front of her neck (Tr. 6728), or possible death from exposure to the elements, having been left in the bitter cold of a November day in the manner she was found, bound and half-naked. Id. It was his opinion that the slash wounds to Ms. Sjodin's neck took place where her body was found. Tr. 6729-33.

At the conclusion of the evidence the jury delivered a guilty verdict on August 30, 2006, on the sole count of the Indictment, kidnapping resulting in death.  Tr. 6946.

14

### 2.  Eligibility Phase Evidence.

In the "eligibility" phase the jury determined whether the defendant was 18 years of age or older when the offense occurred, whether he committed any intentional act listed in 18 U.S.C. § 3591(a) (2), and whether an aggravating factor under 18 U.S.C. § 3592(c) exists. 18 U.S.C. § 3593(e) (2).  DKT 585; Appendix 276.

The United States called three witnesses during the eligibility phase.  Tr. 7117-94. Elizabeth Knudson-Volker and Shirley Seddon Iverson each testified regarding prior attacks by Rodriguez upon them.  Rodriguez had been convicted of aggravated rape of Elizabeth Knudson in Polk County, Minnesota. Tr. 6209-10, 6217.  Elizabeth Knudson-Volker testified the rape attack caused her to suffer serious bodily injury.  After the rape she felt there was no meaning to her life.  She stopped eating, and thought about killing herself.  She continued to suffer with depression, insomnia, eating problems, and issues of self-worth.  Tr. 7147-70.

Rodriguez was also convicted of the attempted aggravated rape of Shirley Seddon, in Polk County, Minnesota.  Tr. 6199.  Shirley Seddon Iverson testified the rape attack caused her to suffer serious bodily injury.  She testified that she re-experiences the rape through bad dreams or nightmares of the assault; suffers reoccurring flashbacks of the rape; and experiences physical sensations during these flashbacks.  She continues to experience medical and emotional problems.  Tr. 7117-43.  Ms. Seddon Iverson and Ms. Knudson-Volker sought, and continue to seek counseling, treatment or other assistance

15

for the psychological trauma they still experience as a result of the attacks by Rodriguez.

Id.

The United States and Rodriguez entered into a stipulation regarding a third prior conviction that read:

> On June 24, 1980, the defendant, Alfonso Rodriguez, Jr, was convicted of the offense of Attempted Kidnapping and Assault in the 1st Degree in violation of Sections 609.25 and 609.17 and 609.221 of the Minnesota Statutes in a case entitled State of Minnesota v. Alfonso Rodriguez, Jr. in the 9th Judicial District Court, Polk County, Minnesota, case number 6192. During this incident, the victim was confronted by the defendant and directed into his car, an altercation ensued during which the victim was stabbed once in the left elbow and once in the abdominal area on her right side. These injuries required medical attention including stitches to close the wounds.

Tr. 7194-95.

Dr. McGee testified as to his findings on the injuries suffered by Dru Sjodin during the attack by Rodriguez.  Tr. 7170-93.

The jury determined the United States proved beyond a reasonable doubt each of the four threshold eligibility factors of mental state alleged in the Notice of Special Findings, specifically, that Rodriguez intentionally killed or committed acts resulting in the death of Dru Sjodin. DKT 585.  The jury further determined that the United States proved beyond a reasonable doubt three statutory aggravating factors:  (1) Rodriguez caused the death of Dru Sjodin during the commission of a violation of 18 U.S.C. § 1201 (kidnapping) (18 U.S.C. § 3592(c) (1)); (2) Rodriguez has previously been convicted of two or more federal or state offenses punishable by a term of imprisonment of more than

16

one year, committed on different occasions, involving the infliction of, and attempted infliction of, serious bodily injury or death upon another person (18 U.S.C. § 3592(c) (4)); (3) Rodriguez killed Dru Sjodin in an especially heinous, cruel, and depraved manner, in that it involved torture to Dru Sjodin (18 U.S.C. § 3592(c) (6)); however, the jury determined that the United States did not prove beyond a reasonable doubt that Rodriguez killed Dru Sjodin after substantial planning and premeditation to cause the death of Dru Sjodin.  18 U.S.C. § 3592(c) (9); DKT 585.

### 3. Selection Phase Evidence.

The United States called six victim impact witnesses:  Dru Sjodin's father, mother, stepfather, college roommate, one of her college sorority sisters, and Dru's boyfriend to explain what the loss of Dru and how it impacted the family.  Tr. 7484-7588.  Rodriguez called a total of 24 mitigation witnesses, including testimony from his mother, two sisters, an aunt, a niece, a nephew, and two family friends regarding his love and kindness towards them and the emotional pain they would suffer if he were executed. Rodriguez called numerous witnesses employed by the Minnesota Department of Corrections regarding his conduct during his previous imprisonment.  He called four expert witnesses, doctors, who testified concerning his alleged exposure to toxins as a child, his addiction to drugs and alcohol as a child, his alleged mental disorders, and his concerns about being released from prison.  Tr. 7621-8454.  In rebuttal, the United States called one expert witness, Dr. Steven Pitt, a Forensic Psychiatrist, to rebut Rodriguez's claims of diminished mental capacity and brain damage.  Tr. 8472-8564.  Dr. Pitt testified

that he diagnosed Rodriguez to have personality disorder with anti-social features, anxiety disorder and paraphilia nos, a sexual disorder. Tr. 8488-89, 8521-25. He testified that he had not seen any evidence of post-traumatic stress disorder as a result of child sexual abuse. Tr. 8512. He testified that Rodriguez suffered from no mental disease or defect, as he had shown the capacity to make choices, to engage in behaviors both lawful and unlawful, and he suffered from nothing that would impact his ability to understand the nature of his acts. Tr. 8516, 8525.

The United States submitted one non-statutory aggravating factor, that Rodriguez had caused loss, injury, and harm to Dru Sjodin and her family. Rodriguez requested, and the court submitted, 30 mitigating factors for consideration by the jury during its deliberations. The jury unanimously found that the United States had proved beyond a reasonable doubt that Rodriguez had caused loss, injury, and harm to Dru Sjodin and her family. Various jurors found that 25 of the 30 mitigating factors submitted had been proved by the greater weight of the evidence. Of those, the jury was unanimous on 19 of the mitigating factors. By unanimous vote, the jury determined that a sentence of death should be imposed. DKT 626; Appendix 310; Tr. 8770-78.

## C.    Federal Collateral Review of Presumptively Final Criminal Judgments.

[I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception. When the process of direct review–which, if a federal question is involved, includes the right to petition [the Supreme] Court for a writ of certiorari– comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while

18

important in assuring that constitutional rights are observed, is secondary and limited.

Barefoot v. Estelle, 463 U.S. 880, 887 (1983).

Section 2255 of Title 28 of the United States Code permits a prisoner in custody serving a federal sentence to ask the sentencing court to vacate, set aside, or correct his sentence. Collateral relief under 28 U.S.C. § 2255 is strictly circumscribed. Section 2255 states in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a); see Hill v. United States, 368 U.S. 424, 427 n.3 (1962) (citing 28 U.S.C. § 2255).

Section 2255 does not provide a remedy for "all claimed errors in conviction and sentencing." United States v. Addonizio, 442 U.S. 178, 185 (1979). Rather, it provides an avenue of redress for only "fundamental defect[s] which inherently [result] in a complete miscarriage of justice" and "omission[s] inconsistent with the rudimentary demands of fair procedure." Hill, 368 U.S. at 428; see United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996) ("Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised

19

for the first time on direct appeal and, if uncorrected, would result in a complete miscarriage of justice.").

As such, the grounds for relief under § 2255 are narrower than those for relief on direct appeal.  With limited exceptions, Section 2255 relief may not be based on (1) an error that is not of jurisdictional or constitutional dimension, (2) a claim previously raised and rejected on direct appeal, (3) a procedurally defaulted claim, (4) a "new rule" as defined by Teague v. Lane, 489 U.S. 288 (1989), or (5) an error that did not have a substantial and injurious effect or influence in determining the jury's verdict.  These unavailable avenues for relief are discussed in detail below.

### 1.  Claims Not Based on Jurisdictional or Constitutional Error.

Section 2255 "was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus."  Davis v. United States, 417 U.S. 333, 343 (1974); Sun Bear v. United States, 644 F.3d 700, 704 (8th Cir. 2011).  Like habeas, Section 2255 "does not encompass all claimed errors."  United States v. Addonizio, 442 U.S. 178, 185 (1979). Rather, the statute provides a remedy for jurisdictional and constitutional errors—"an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  Sun Bear, 644 F.3d at 704 (quoting Addonizio, 442 U.S. at 185).

20

### 2. Claims Previously Adjudicated on Direct Appeal.

In a Section 2255 proceeding, federal prisoners cannot relitigate claims that have been previously decided on direct appeal.  Sun Bear, 644 F.3d at 702 (noting that with "rare exceptions, § 2255 may not be used to relitigate matters decided on direct appeal"); Thompson v. United States, 7 F.3d 1377, 1378–79 (8th Cir. 1993) (*per curiam*); Dall v. United States, 957 F.2d 571, 572 (8th Cir. 1992) (citing United States v. Shabazz, 657 F.2d 189, 190 (8th Cir. 1981)).  This rule is an extension of the law-of-the-case doctrine to the federal-prisoner habeas context, and may be overridden only where exceptional circumstances exist.  Federal prisoners rarely succeed in persuading the court that extraordinary circumstances justify relitigation of an issue.  See, e.g., United States v. McGee, 201 F.3d 1022, 1023 (8th Cir. 2000) (*per curiam*).  Indeed, the only notable and recurring extraordinary circumstance is an intervening change in the law, which usually results from a judicial decision that narrowly construes the statute of conviction.  See Davis v. United States, 417 U.S. 333 (1974).  Relitigation of an appellate issue during Section 2255 proceedings "may [therefore] be proper when there has been an intervening change in the law of a circuit."  Baranski v. United States, 515 F.3d 857, 861 (8th Cir. 2008).  In the overwhelming majority of cases, however, a claim raised and rejected on direct appeal will preclude a merits review of the same claim under Section 2255.

### 3. Procedurally Defaulted Claims.

Similarly, a defendant who fails to raise a claim on direct review has procedurally defaulted on that claim, and it is barred.  The procedural default doctrine reflects the

21

general rule that "claims not raised on direct appeal may not be raised on collateral review." Massaro v. United States, 538 U.S. 500, 504 (2003); see United States v. Frady, 456 U.S. 152, 165 (1982); Dejan v. United States, 208 F.3d 682, 685 (8th Cir. 2000) (citing Bousley v. United States, 523 U.S. 614, 622 (1998)). The doctrine applies to all claims that are not raised and preserved during direct appeal, whether or not the failure was intentional or inadvertent. United States v. Olano, 507 U.S. 725, 733 (1993). In practice, the requirement to preserve a claim means that the defendant must raise it at trial and on direct appeal. See Murray v. Carrier, 477 U.S. 478, 490–92 (1986); see also Bousley v. United States, 523 U.S. 614, 621 (1998) (same). The doctrine of procedural default applies in death penalty cases. Nave v. Delo, 62 F.3d 1024, 1033 (8th Cir. 1995).

Courts may consider otherwise procedurally defaulted claims in only two instances: if the defendant shows "cause and actual prejudice, or that he is actually innocent." Johnson v. United States, 278 F.3d 839, 844 (8th Cir. 2002) (quoting Bousley v. United States, 523 U.S. 614, 622 (1998)). Courts have construed these two exceptions narrowly. Cause exists only if a factor external to the defense prevented counsel from raising the defaulted claim at an appropriate juncture. Murray v. Carrier, 477 U.S. 478, 488 (1986). To establish actual prejudice, a defendant must show not only that the claimed errors amount to more than the mere possibility of prejudice, but also that they "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." Frady, 456 U.S. at 170. A defendant who files a Section 2255

22

motion thus bears a greater burden than he would under the plain error standard applicable to forfeited claims on direct review.  See Frady, 456 U.S. at 166.

Second, a claim of "actual innocence" is not procedurally defaulted.  Johnson v. United States, 278 F.3d 839, 844 (8th Cir. 2002) (quoting Bousley v. United States, 523 U.S. 614, 622 (1998)).  Actual innocence can operate either as a freestanding claim, see Herrera v. Collins, 506 U.S. 390 (1993), or as a procedural "gateway" through which the defendant must pass in order to have the merits of the defaulted claim heard.  See Whitfield v. Bowersox, 324 F.3d 1009, 1019–20 (8th Cir.) (differentiating between freestanding and gateway claims of actual innocence), *vacated in part on other grounds on denial of reh'g en banc*, 343 F.3d 950 (8th Cir. 2003).  Newly discovered evidence purporting to demonstrate a defendant's innocence, such as DNA evidence, commonly forms the basis for an actual innocence claim.  See Calderon v. Thompson, 523 U.S. 538, 559 (1998).

Finally, claims of ineffective assistance of counsel are not subject to the procedural default doctrine.  See Massaro v. United States, 538 U.S. at 500; United States v. Cain, 134 F.3d 1345, 1352 (8th Cir. 1998); United States v. Martin, 59 F.3d 767, 771 (8th Cir. 1995).  The Supreme Court in Massaro concluded that criminal defendants may raise ineffective assistance claims for the first time during a Section 2255 petition. Defendants frequently raise claims that would not ordinarily be cognizable on collateral review by masking them as ineffective assistance of counsel claims.

23

### 4. New Rule of Criminal Procedure.

Collateral relief is further limited to claims based on established law. Teague v. Lane, 489 U.S. at 310; see also United States v. Ryan, 227 F.3d 1058, 1062 (8th Cir. 2000). When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances." Schriro v. Summerlin, 542 U.S. 348, 351 (2004) (citation omitted). Generally, new procedural rules do not apply retroactively, while new substantive doctrines—those that alter the range of punishable conduct or the class of punishable people—do. Id. at 351–52. A court employs a three-step analysis to ascertain whether a rule of criminal procedure applies retroactively. Beard v. Banks, 542 U.S. 406, 411 (2004). First, it determines when the judgment became final. Id. Second, it decides whether the pertinent rule of law was "new" at the time of finality by deciding whether a "court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution." O'Dell v. Netherland, 521 U.S. 151, 156 (1997) (internal quotations omitted); see also United States v. Moss, 252 F.3d 993, 997–98 (8th Cir. 2001). Finally, the court must ascertain whether the rule "is a watershed rule of criminal procedure, defined as a rule which implicates both the accuracy and fundamental fairness of criminal proceedings." Moss, 252 F.3d at 998 (citing Teague, 489 U.S. at 312). Only if a new rule of law meets each of these three criteria does it apply retroactively to cases on collateral review.

24

**5.  Error That Does Not Have a Substantial and Injurious Effect or Influence.**

Even where a defendant demonstrates an error, the error is harmless absent a showing of prejudice.  See United States v. Barnhart, 979 F.2d 647, 652 (8th Cir.1992). The harmless error standard applies differently depending on whether the error touched on a constitutional right.  See United States v. Drummond, 903 F.2d 1171, 1174 (8th Cir.1990).  If a constitutional error was of a fundamental or structural dimension, reversal is automatic.  See id.  In most cases where a constitutional error is non-structural or non-fundamental, courts apply the rule established in Chapman v. California, 386 U.S. 18, 22 (1967). Under Chapman, non-structural constitutional errors are deemed harmless if it is clear beyond a reasonable doubt that the outcome would have been the same absent the error.  See Barnhart, 979 F.2d at 652–53 (citing Chapman, 386 U.S. at 24).  Moreover, if a non-structural constitutional error has been addressed in a prior forum, courts apply the more deferential Brecht harmless error standard and uphold the conviction unless the error had a substantial or injurious effect on the verdict.  See Barrett v. Acevedo, 169 F.3d 1155, 1164 (8th Cir.1999) (citing Brecht v. Abrahamson, 507 U.S. 619, 629–31 (1993)).  Errors that are non-jurisdictional or are of less than constitutional proportion are harmless unless they "had a 'substantial influence' on the outcome" or cause "'grave doubt' as to whether [they] had such an effect."  See Drummond, 903 F.2d at 1174 (quoting Kotteakos v. United States, 328 U.S. 750 (1946)).

### 6. Time Barred Claims.

In 1996, Congress imposed a one-year statute of limitations in which federal prisoners may seek relief under Section 2255.  28 U.S.C. § 2255(f); see Paige v. United States, 171 F.3d 559, 560 (8th Cir. 1999).  The limitation period begins upon completion of direct review—for instance, when the Supreme Court denies a petition for a writ of certiorari.  United States v. McIntosh, 332 F.3d 550, 550 (8th Cir. 2003).  A defendant may file amendments to his initial Section 2255 motion that relate back to the original filing, but he may only add new claims within the one-year period.  See United States v. Hernandez, 436 F.3d 851, 858 (8th Cir. 2006).  A defendant who can demonstrate diligence in pursuing a Section 2255 motion may, however, justify an untimely pleading by showing "extraordinary circumstances" beyond his control that prevented timely filing.  See, e.g., United States v. Martin, 408 F.3d 1089, 1093 (8th Cir. 2005) (equitably tolling the one-year statute of limitations for an inmate whose counsel repeatedly lied to him about filing deadlines).

### D.      Standard for Reviewing Claims of Ineffective Assistance of Counsel.

#### 1.      Ineffective Assistance Standard.

The Sixth Amendment to the United States Constitution provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his [or her] defen[s]e."  U.S. Const., amend. VI.  The Supreme Court "has recognized that 'the right to counsel is the right to effective assistance of counsel.'"  Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v.

26

Richardson, 397 U.S. 759, 771 n.14 (1970)).  The defendant "faces a heavy burden" to establish ineffective assistance of counsel under 28 U.S.C. § 2255.  DeRoo v. United States, 223 F.3d 919, 925 (8th Cir. 2000).  A defendant must meet the two-part test established in Strickland to substantiate a claim of ineffective assistance of counsel.  The "[f]ailure to establish either prong is fatal to a claim of ineffective assistance."  Morelos v. United States, 709 F.3d 1246, 1250 (8th Cir. 2013).

First, a defendant must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." Strickland, 466 U.S. at 687.  To make this "deficient performance" showing, the defendant must establish that counsel's performance "fell below an objective standard of reasonableness."  Wiggins v. Smith, 539 U.S. 510, 521 (2003).  When evaluating attorney performance, "[c]ourts should avoid 'the distorting effects of hindsight' and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time."  United States v. Staples, 410 F.3d 484, 488 (8th Cir. 2005) (quoting United States v. Sera, 267 F.3d 872, 874 (8th Cir. 2001), in turn quoting Strickland, 466 U.S. at 689).

The benchmark for judging whether an attorney's conduct "fell below an objective standard of reasonableness" is whether the conduct so undermined the proper functioning of the process that it "cannot be relied upon as having produced a just result."  Strickland, 466 U.S. at 686.  In other words, Rodriguez must show that "counsel's errors were so

serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

Strickland, 466 U.S. at 687.

> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Strickland, 466 U.S. at 690.

In scrutinizing counsel's performance, a court is to be highly deferential. Strickland, 466 U.S. at 689. The Court should exercise a strong presumption that the representation was within a wide range of reasonable assistance. See, e.g., Strickland, 466 U.S. at 687; Johnson v. United States, 278 F.3d 839, 842 (8th Cir. 2002); Collins v. Dormire, 240 F.3d 724, 727 (8th Cir. 2001). "Strategic choices made after thorough investigation of law and facts relevant to the plausible options are virtually unchallengeable." Knowles v. Mirzayance, 556 U.S. 111, 124 (2009) (internal quotation omitted); United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006) (same). A defendant bears a heavy burden in overcoming the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at

28

689; Lawrence v. Lockhart, 767 F.2d 449, 450 (8th Cir. 1985). The presumption exists to "eliminate the distorting effects of hindsight" and recognizes that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689.

The Sixth Amendment right to counsel does not guarantee criminal defendants perfect or errorless representation. See Brunson v. Higgins, 708 F.2d 1353, 1356 (8th Cir. 1983) ("Counsel need not perform perfectly, and will not be held ineffective for failure to raise every tangential issue which might have a bearing on his client's case."). "Lawyers, like other people, are not perfect, and the ingenuity that diligent [habeas] counsel bring to a case long after the fact cannot be the only measure of what a lawyer should have done under the pressure of trial." Williams v. Nix, 751 F.2d 956, 962 (8th Cir. 1985). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688.

Second, a defendant must also show that he suffered prejudice by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see, e.g., United States v. Ledezma-Rodriguez, 423 F.3d 830, 836 (8th Cir. 2005) (holding that a defendant cannot establish ineffective assistance of counsel unless defendant shows that his counsel's deficient performance prejudiced his defense). Actual prejudice is not present where a defendant shows, at most, the mere possibility of prejudice. See Wainwright v. Torna, 455 U.S. 586, 587–88 (1982). Further, not every error undermines

29

the reliability of a conviction; it is not sufficient to show that an error had only a "conceivable effect" on the result of the proceeding. See Morales v. Ault, 476 F.3d 545 (8th Cir. 2007) (citing Odem v. Hopkins, 382 F.3d 846, 851 (8th Cir. 2004)); see also Pfau v. Ault, 409 F.3d 933, 939 (8th Cir. 2005) (internal quotation and citation omitted). Rather, a defendant must establish "'a probability sufficient to undermine confidence in the outcome.'" United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006) (quoting Strickland, 466 U.S. at 694). In a case, such as this, where a conviction has been the result of a trial, the defendant must demonstrate that but for counsel's errors, there is a reasonable probability that he would not have been convicted. See United States v. Orr, 636 F.3d 944, 950 (8th Cir. 2011). And when the allegation of ineffective assistance of counsel pertains to conduct of counsel in the penalty phase of a capital trial, a defendant must demonstrate that, absent counsel's deficient performance, at least one juror would have voted for life. Wiggins, 539 U.S. at 536.

The court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the Petitioner as a result of the alleged deficiency. Strickland, 466 U.S. at 697. A defendant must show not only that counsel's conduct fell below an objective standard of reasonableness, but also show that:

> [T]here is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, 466 U.S. at 694.  The same deferential review applies to the "prejudice" portion of the test.  Sanders v. Trickey, 875 F.2d 205, 210 (8th Cir. 1989).  The failure to establish "prejudice" is dispositive of the case without consideration of the Strickland "performance" factor.  Sanders, 875 F.2d at 211 n.8.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, the Court should do so.  Strickland, 466 U.S. at 697.

## II.

### A.  Trial Counsel Properly Challenged the Acid Phosphatase Testing.

### 1.Rodriguez Cannot Relitigate on Collateral Review His Objection to the Admission of Acid Phosphatase Testing.

Section 2255 does not require a federal court to second-guess itself.  When a federal prisoner raises a claim that has been previously decided on direct review, he ordinarily cannot later attempt to relitigate that claim in a Section 2255 proceeding. Thompson v. United States, 7 F.3d 1377, 1378–79 (8th Cir. 1993) (*per curiam*); see Sun Bear, 644 F.3d at 702 (noting that with "rare exceptions, § 2255 may not be used to relitigate matters decided on direct appeal"); Dall v. United States, 957 F.2d 571, 572 (8th Cir. 1992) (citing United States v. Shabazz, 657 F.2d 189, 190 (8th Cir. 1981)) (finding that a claim raised and decided on direct appeal may not be relitigated in a Section 2255 proceeding).  This approach to federal prisoner collateral litigation is an extension of the law-of-the-case doctrine to the federal-prisoner habeas context.

The only notable and recurring exception to this rule is when there has been an intervening change in the law, usually a new judicial decision narrowly construing the

statute of conviction.  See Davis v. United States, 417 U.S. 333 (1974).  Relitigation of an appellate issue during Section 2255 proceedings may be proper when there has been an intervening change in the law of a circuit.  Baranski v. United States, 515 F.3d 857, 861 (8th Cir. 2008).  In the overwhelming majority of cases, however, a direct-appeal decision rejecting a claim will preclude the defendant from obtaining a merits review of the same claim under Section 2255.

On direct appeal, Rodriguez challenged the admission of the acid phosphatase testing.  The Eighth Circuit found the testimony and evidence of the acid phosphatase results admissible.  There has been no intervening change in the law as it relates to the admission of the testimony regarding the acid phosphatase testing in this case.  Rodriguez thus cannot now attempt to relitigate this challenge in this Section 2255 proceeding.  Rodriguez attempts to do what many defendants often try— to raise claims that would not ordinarily be cognizable on collateral review by couching them as ineffective assistance claims.

Before trial, Rodriguez filed a motion seeking a Daubert hearing in an attempt to bar Dr. McGee, the medical examiner in this matter, from testifying as to—among other things—his opinion that elevated acid phosphatase levels in Dru Sjodin's cervix and vagina indicated a semen deposit within the 24 to 36 hours preceding her death.  DKT 393.  Under the Federal Rules of Evidence, the trial judge has the task of ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 580 (1993).

32

The district court held the <u>Daubert</u> hearing on August 28, 2006.  Tr. 6516–6670. The United States called Dr. Michael McGee as its only witness.  He was examined and cross-examined extensively, including by the district court. Tr. 6516–6601.  The defense called Dr. George Sensabaugh, a distinguished college professor at the University of California Berkeley.  Dr. Sensabaugh received his doctorate in criminology and is a professor of forensic science and biomedical sciences, and also head of the Division of Infectious Diseases, at the School of Public Health, at the University of California Berkeley.  The central focus of his research from the time he joined the faculty at Berkeley until 1985 related to extending the scope of analysis and interpretation of sexual assault evidence.  This included research on acid phosphatase data.  Dr. Sensabaugh conducted quantitative analysis of acid phosphatase levels found in vaginal samples, scientific research concerning the comparison of acid phosphatase from seminal fluids and endogenous acid phosphatase found in vaginal fluids as well as with acid phosphatases in other tissues.  He was also examined and cross-examined thoroughly. Tr. 6604–63.

Following the <u>Daubert</u> hearing, the district court ruled that Dr. McGee would be allowed to testify as to his opinion regarding the acid phosphatase levels.  Tr. 6664–70. The district court later issued a written opinion memorializing its decision.[2]  On direct appeal, the Eighth Circuit agreed with the district court's decision finding that "the

---

[2] Memorandum Opinion and Order Denying Motion to Exclude Testimony of Dr. Michael McGee, September 14, 2006, DKT 596.

district court did not abuse its discretion by admitting the acid-phosphatase test results." Rodriguez, 581 F.3d at 794. Further, Rodriguez's challenge to the conclusion that the acid phosphatase test showed semen deposits were made within 24 to 36 hours of Dru Sjodin's death was also denied by the district court and Eighth Circuit. The Circuit stated "Rodriguez's challenge – developed with thorough cross-examination – goes to credibility, not admissibility. The court did not abuse its discretion by allowing the testimony." Id. at 794–95.

Rodriguez now claims there was available evidence demonstrating that Dr. McGee's testimony had no support in the established practices and protocols of forensic crime laboratories. He claims that his trial counsel's failure to investigate and present such information was deficient considering that the dispositive issue to be decided at the Daubert hearing was whether use of the acid phosphatase test was consistent with the relevant community of experts. Rodriguez claims counsel should have investigated the practices of the forensic pathology community to learn what conclusions can properly be drawn from an acid phosphatase test. Rodriguez argues had trial counsel done so, they would have been able to present evidence to the Court that the experts' differing testimony about the proper conclusions to be drawn from the AP test were not simply a "textbook case" of "different opinions" held by "differing scientific communities." He also argues that trial counsel failed to challenge the use of the Beckman Dri-stat acid phosphatase test itself as it was designed to be used with serums and not dry stains. This claim also fails.

34

This issue was raised competently by trial counsel, and was ruled upon by the district court and by the Eighth Circuit. The direct-appeal decision rejecting the claim precludes the defendant from obtaining a merits review of the same claim under Section 2255 in this petition. There has been no intervening change in the law as it relates to Rodriguez's challenge to the admission of the testimony regarding the acid phosphatase testing in this case. His claim raised and decided on direct appeal may not be relitigated in this proceeding. Even if the court decides to review this claim, it fails for the same reasons the court originally found.

### 2. Trial Counsel Properly Challenged the Acid Phosphatase Testing at the Daubert Hearing, the Trial and Appeal.

At the time of the Daubert hearing, Dr. McGee had served as the Ramsey County Medical Examiner for over 20 years. Tr. 6517. He had also served as the Assistant Medical Examiner there for five years, as well as staff pathologist at the St. Paul-Ramsey Medical Center. Id. He is board certified as an anatomic and forensic pathologist. Tr. 6518. By the time of the hearing, he estimated he had conducted between 4,000 and 4,500 autopsies. Tr. 6520. He also spent approximately ten years studying living victims while working at Regions Hospital, for the purpose of interpreting "laboratory results on sexual assault victims coming from the ER." Tr. 6521.

The acid phosphatase test (hereinafter also referred as "AP test"), as it is usually called, is one of the best known and most widely employed techniques for semen identification, apart from sperm cell identification itself. It is based, in its many

35

variations, on the presence in human semen of high levels of a non-specific phosphohydrolase with acid pH optimum. This acid phosphatase is of prostatic origin. Dr. McGee testified that the presence or absence of semen deposits is just one factor that he considers helpful when determining whether there was sexual assault in a given case. Tr. 6522. The Regions Medical Center lab in this case used the Beckman Dri-STAT test to measure the acid phosphatase levels in swabbed samples, per the lab protocol[3]; the samples were collected from Dru Sjodin's vagina and cervix during autopsy. Tr. 6530–31, 6545–52. The vaginal swab result was 47.4 units per liter ("U/L") of acid phosphatase. Tr. 6546–47. The cervical swab result was 130.7 U/L. Tr. 6551–52. A positive reading means that the measured U/L exceeds an established baseline level of U/L that would be expected in bodily sites such as the vagina, the rectum, or the mouth. Tr. 6535. If the U/L measurement exceeds the baseline, that is deemed a presumptive positive for semen deposit. Id., Tr. 6597[4]. A historical internal study performed by the Regions Medical Center hospital, where the swabs in this case were tested, had a vaginal baseline acid phosphatase cutoff of 10 U/L Tr. 6535, and an oral and anal baseline of less than 10 U/L. Tr. 6536. (The hospital actually employed a 15 U/L cutoff just to maximize confidence in the analysis.)

---

[3] Regions Hospital, Acid Phosphatase lab protocol. Exhibit A-04. See also, Daubert Hearing, Defendant's Exhibit 3.

[4] Rodriguez spends pages making the point that this could only be deemed a presumptive test. This was recognized clearly by the court and Dr. McGee.

Dr. McGee testified at the <u>Daubert</u> hearing that he and the other doctors at the Ramsey County Medical Center had established a more conservative baseline cutoff for presumptive positive tests for all cases at 25 U/L. Tr. 6536–37. The 25 U/L cutoff is based on the analysis of the hospital study that involved approximately 1,200 known sexual assault victims. Tr. 6541. Forensic labs across the nation typically rely on a baseline cutoff of between 25 U/L and 50 U/L, beyond which they would deem the sample presumptively positive for semen. Tr. 6595–97. Thus, the acid phosphatase levels in this case were elevated compared to the baseline average noted above. It was Dr. McGee's opinion, therefore, that there had been a semen deposit in Dru Sjodin's body during the 24 to 36 hours preceding her death. Tr. 6554.

Dr. McGee had testified to this type of analysis and rendered derivative opinions "between 12 and 20 times a year" since approximately 1980. Tr. 6553. No courts have ever disallowed Dr. McGee's opinion testimony on this subject. Id. Dr. McGee testified that he had taken continuing education courses touching on the subject matter relevant to his assessment and baseline cutoff opinion for the isolation of the acid phosphatase enzyme and his interpretation of the results along those lines, discussed this topic with colleagues at national meetings, attended seminars, and read medical literature on the subject, and that nothing had come to his attention that seriously calls into question the Ramsey County Medical Center acid phosphatase cutoff of 25 U/L. Tr. 6558–60.

On cross examination, defense counsel raised numerous questions and concerns regarding the acid phosphatase testing. They elicited from Dr. McGee the fact that

37

decomposing bodies may produce acid phosphatase; that no sperm was found to be present at any of the swabbed sites; that duplicate swabs were also negative for the presence of male DNA; and that the acid phosphatase testing was not followed up by a p30 test for the antigen produced by the male prostate found in seminal fluid.  Tr. 6563, 6566, 6632, 6570.

The district court made several inquiries of Dr. McGee, noting that the test results were presumptive.  The court's inquiry went as follows:

Q.  But if you look at just acid phosphatase generally that's divided into nonprostatic and prostatic using the system that's been described herein, basically that's a presumptive test, right?

A.  Yes.

Q.  And ordinarily to get a confirmatory test you'd look for the presence of sperm?

A.  Yes.

Q.  And if you don't have the presence of sperm then you could look at the levels.

A.  Yes.

Q.  And I think that one of the articles that was produced says that levels 50 and below –

A.  Yes.

Q.  -- are inconclusive?

A.  Right.

Q.  Levels of 100 to 400 are likely indicators of sexual intercourse?

38

A. Right.

Q. And levels at 400 and above are not to be found in the absence of intercourse under any circumstance. That's how I read the literature as a layperson. Does that sound like what you saw as well?

A. Yes.

Q. All right. And we have a test here that's at 134?

A. Right.

Q. Which puts you kind of in that -- appears to be evidence of but not dispositive of the question.

A. True.

Q. In the absence of something anomalous happening as the result of decomposition.

A. Correct.

Q. Is that what your understanding is?

A. Using the article you're referring to? Yes, sir.

Q. And does that seem consistent with what forensic pathologists that you deal with, that they use?

A. Yes.

Tr. 6597–98.

The defense called Dr. George Sensabaugh as its expert during the Daubert hearing.[5] Dr. Sensabaugh and defense counsel were very familiar with the Beckman Dri-STAT test and clearly brought out the problems counsel now implore the court to

---

[5] Dr. Sensabaugh also testified at trial.

39

reevaluate. Tr. 6612–14. He acknowledged the accuracy of the Beckman Dri-STAT test

for measuring the acid phosphatase levels when applied to blood serum commonly used

with male cancer patients (Tr. 6612–14), and noted that "this is a fairly standard acid

phosphatase protocol used in clinical laboratories." Tr. 6613. He testified that "[t]he

Beckman Dri-Stat test is one of several very routine assays for prostatic acid phosphatase

that is used by clinical laboratories." Tr. 6652 And that "[t]he test is also used for--in the

analysis of sexual assault evidence." Tr. 6614.[6] He claimed, however, that the test

measures tartrate-inhibited acid phosphatase, and he questioned the test's ability to

isolate prostatic acid phosphatase. Tr. 6614. Dr. Sensabaugh testified that the test done

on the swabs in this case could have included vaginally endogenous acid phosphatase

and/or lysosomal acid phosphatase. And it was therefore impossible to distinguish

between them with the Beckman Dri-STAT test. Tr. 6626. Dr. Sensabaugh testified that

the acid phosphatase test is a presumptive test for semen, but in this case the arguably

positive test results should result in further testing for the male specific p30 antigen or Y-

chromosomal DNA. Tr. 6629–32.

Dr. Sensabaugh admitted, however, that the measure of endogenous acid

phosphatase could be eliminated as a concern simply by establishing a "normal

background level" of acid phosphatase "in the interpretation of any acid phosphatase test

done on test material." Tr. 6617. While Dr. McGee testified to such an assessment

---

[6] The Protocol from the Regions Hospital regarding the acid phosphatase test clearly indicates that the test is used for the investigation of sexual assaults. Counsel for defendant offered the protocol as Defendant's Exhibit 3 at the Daubert hearing. Tr. 6613.

40

having been affixed at 10 U/L Tr. 6535, Dr. Sensabaugh could not suggest a U/L level of what he would expect to see endogenously in a woman's vagina. Tr. 6617–29. He even agreed that "once one determines the distribution of acid phosphatase activity present in vaginal fluids in females that have not had sexual contact or have not been--have not engaged in sexual activity, then one can use statistics to define a threshold above which the detection of acid phosphatase is indicative of the presence of semen". Tr. 6621–22.

Dr. Sensabaugh could not testify to a level of lysosomal acid phosphatase that he would expect in a corpse, and he was aware of no studies on the subject. Tr. 6624. Additionally, he knew of no study that had ever assessed the rate of increase in U/L measurement in a decomposing body. Tr. 6621–23. Further, he acknowledged that he had no information regarding the conditions encountered by Dru Sjodin's body during the time period between November 22, 2003, and the date it was discovered, April 17, 2004. Tr. 6647. He recognized this information "would have considerable impact upon rates of . . . tissue breakdown" leading to the release of acid phosphatase and the degradation of acid phosphatase, and that he would have no way to predict the rate of lysosomal acid phosphatase creation due to decomposition, in any event. Tr. 6650-51. At one point, he even admitted he had no way of knowing whether the acid phosphatase levels in this case represented *any* measure of lysosomal acid phosphatase at all. Tr. 6654. He did acknowledge that acid phosphatase is present in high levels in the male prostate, so a high level of that enzyme in a woman's body under the circumstances present in this case

41

would be—in his words—"interesting" but not "definitive," and that high levels of acid phosphatase provide "circumstantial evidence of a seminal deposit." Tr. 6655, 6658–61.

Dr. Sensabaugh's testimony proved to be precisely the type that would be offered with the proponent's hope of challenging the weight of the opposing expert—Dr. McGee's—testimony. See, e.g., Tr. 6625–29, esp. 6629, lines 4-12.

The district court concluded in its written opinion regarding the acid phosphatase measurements in this case:

> The only dispute between these two experts is whether an acid phosphatase level that exceeds 25 U/L is sufficient evidence to prove the presence of semen. In Dr. McGee's scientific community, a level of approximately 25 U/L or slightly higher is sufficient to support this conclusion. These levels have been reached through these pathologists' years of experience in the field, and it has been generally accepted. Dr. Sensabaugh's scientific community, which is more data-driven, would require more proof than an elevated acid phosphatase test result to reach the conclusion that semen was present. This dispute does not go to the reliability of Dr. McGee's opinion; instead it goes to the weight of his opinion.

DKT 596, p.4.

The district court added, while refusing to grant Rodriguez a new trial, "[t]he jury was free to accept or reject the testimony of Dr. McGee, and, if accepted, the testimony could assist the trier of fact. The court did not commit error in admitting the testimony of Dr. McGee." DKT 656, p. 65.

Rodriguez directly appealed the district court's decision. Rodriguez argued the acid-phosphate testimony was based on Dr. McGee's own experience, rather than peer-reviewed research. He argued that the Daubert hearing demonstrated that the theory,

42

whether the levels of acid phosphatase was reliably reported, was invalid so as not to allow an opinion that there was a sexual assault.  The Eighth Circuit stated "Rodriguez's challenge – developed with thorough cross-examination – goes to credibility, not admissibility.  The court did not abuse its discretion by allowing the testimony."  Id. at 794–95.

First, Dr. McGee relied on his extensive career as a forensic pathologist which is, in and of itself, sufficient to form a reliable basis for this opinion.  See United States v. Jordan, 236 F.3d 953, 955 (8th Cir. 2001).  Second, Dr. McGee testified that he relied on authoritative texts for his opinions including the *Journal of the American Academy of Forensic Sciences* and the *American Journal of Forensic Medicine* published by the National Association of Medical Examiners.  See Deposition of Dr. McGee, pp. 15–16.[7] Dr. McGee also testified that he also referenced *Dimaio's Forensic Pathology and Forensic Toxicology* authored by Randal Basselt and considered it an authoritative publication in his field.  Id. at 19.

Dr. McGee's testimony regarding his reliance on such tests was properly admitted because the acid phosphatase test was routinely used in rape cases and the methodology employed in performing these tests was considered reliable.  The acid phosphate test is a regularly accepted procedure for determining whether sexual activity has occurred.  It has been routinely used in rape cases for years.  See Bradley v. Dretke, 2005 WL 955909 (N.D. Tex. Apr. 25, 2005) (positive test for acid phosphatase suggests the existence of

---

[7] Deposition of Dr. McGee, U.S. Exhibit 7.

semen); <u>Ross v. Vaughn</u>, 2001 WL 818359 (E.D. Pa. July 16, 2001) (high acid phosphatase levels were consistent with intercourse occurring 2-4 hours prior); <u>Reeves v. Hopkins</u>, 871 F. Supp. 1182 (D. Neb. 1994) (victim's vaginal acid phosphatase consistent with having intercourse); <u>United States v. Aburahmah</u>, 827 F. Supp. 612, 613 (D. Ariz. 1993) (acid phosphatase was present in her vaginal vault, indicative of recent sexual intercourse); <u>State v. Lord</u>, 822 P.2d 177, 190 (Wash. 1991) (the expert witness from the crime lab testified extensively about her testing methods and their general acceptability in the scientific community); <u>Crout v. Kelly</u>, 1989 WL 117103 (W.D.N.Y. Oct. 2, 1989) (positive for prostatic acid phosphatase indicating the presence of seminal fluid);  <u>Evans v. State</u>, 547 So.2d 38, 39 (Miss.1989) (acid phosphate test part of rape evidence kit collected by examining physician); <u>State v. Neal</u>, 535 So.2d 757, 760 (La.Ct.App.1988) (testimony of criminalist); <u>Commonwealth v. Willie</u>, 400 Mass. 427, 430, 510 N.E.2d 258 (1987) (testimony of serologist); <u>Andrade v. State</u>, 700 S.W.2d 585, 586 (Tex.Crim.App.1985) (testimony of county medical examiner), <u>cert. denied</u>, 475 U.S. 1112, 106 S. Ct. 1524, 89 L.Ed.2d 921 (1986); <u>Baden v. Koch</u>, 1984 WL 664, (S.D.N.Y., July 25, 1984) (presence of acid phosphatase was some evidence that a rape had been committed); <u>State v. Singleton</u>, 102 N.M. 66, 68, 691 P.2d 67 (Ct. App.1984) (testimony of forensic serologist); <u>State v. Harper</u>, 637 S.W.2d 170, 171, 173 (Mo. Ct. App.1982) (court ordered defendant to submit to acid phosphate test and a police serologist testified as to the results); <u>State v. Perry</u>, 169 S.E.2d 839 (N.C. 1969) (test showed the presence of acid phosphatase in large quantity, indicating sexual intercourse).

In this proceeding, Rodriguez advances arguments that both the district court and the Eighth Circuit have already rejected.

First, Rodriguez now argues there was readily available evidence demonstrating that Dr. McGee's testimony had no support in the established practices and protocols of the forensic crime laboratories.  He argues that trial counsel's failure to investigate and present such information was deficient considering that the court put trial counsel on notice that the dispositive issue to be decided at the Daubert hearing was whether Dr. McGee's use of the acid phosphatase test was consistent with the relevant community of experts.  As the above cases show, that is not correct.  Acid phosphatase testing has been approved and presented as testimony for years.  Further, counsel did properly investigate the issue and presented testimony from the leading expert in quantification of acid phosphatase.  Trial counsel presented compelling evidence to the court with regard to the science.  The experts' differing testimony about the proper conclusions to be drawn from the acid phosphatase test was, in fact, a "textbook case" of "different opinions" held by "differing scientific communities."

The United States argued Rodriguez's Rule 702 objection must be overruled because the application and interpretation of reliable test methodology goes to the weight of this evidence, not the admissibility.  See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc., 125 F.3d 1176, 1183 (8th Cir. 1997); Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995) (same); United States v. Gipson, 383 F.3d 689, 696 (8th Cir. 2004).  Dr. McGee's testimony was therefore properly admitted.

With regard to the threshold at which the level of acid phosphatase is significant enough to reach a conclusion with regard to seminal deposits, Dr. McGee testified that there was no national standard that applied and that each laboratory was compelled to consider the results it reached in the context of the experience of its scientists, the literature available, and the individual case at issue. Tr. 6535, 6575. See Deposition of Dr. McGee, p. 140. Consequently, interpretation of the acid phosphatase level is the very type of medical issue requiring the analysis by one who possesses forensic pathology field experience. Id. at 140. Dr. McGee's extensive experience in performing forensic pathology examinations on victims of alleged sexual assault provided the foundation necessary to meet Rule 702's reliability standards. See Arkwright Mut. Ins. Co., 125 F.3d at 1183 (8th Cir. 1997) ("'Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.'" (citation omitted)). The United States argued that the fact there are other forensic pathologists who might employ other threshold standards (most of them substantially lower), was a credibility issue going to the weight of Dr. McGee's opinions, not to admissibility.

The Eighth Circuit agreed with the district court in admitting the expert testimony:

> The district court conducted a Daubert hearing on acid-phosphate testing. Permitting the pathologist's testimony, the court noted that Rodriguez's own expert acknowledged that the government pathologist's test properly detects the presence of acid phosphate; that forensic labs across the country use acid-phosphate levels to indicate semen, and use the same cut-off levels as the government pathologist; and that while there is uncertainty about what acid-phosphate levels would be normal for a corpse, many

46

pathologists share the government pathologist's view of the reliability of the test, and any doubts go to the weight, not reliability, of the opinion.

United States v. Rodriguez, 581 F.3d 775, 794 (8th Cir. 2009).

The Court of Appeals found:

Daubert emphasizes that while peer-reviewed publication is a factor, "in some instances well-grounded but innovative theories will not have been published." Id. at 593, 113 S. Ct. 2786. The government's expert, a licensed medical doctor with three decades' experience, became the chief examiner of the Hennepin County Medical Examiner's office in 1985. He regularly participates in criminal investigations, including sex crimes, and testifies at trials. The pathologist did not invent acid-phosphate testing; he testified to attending national medical conferences and reviewing scientific literature on the topic. The test results are based on scientific methods and data, and assist the jury in its fact-finding. The district court did not abuse its discretion by admitting the acid-phosphate test results.

Id. at 794–95.

Because this issue was litigated at both the trial stage and on direct appeal, and because no exception exists that would support relitigated it in these proceedings, Rodriguez's argument here must fail.

Second, Rodriguez also challenges Dr. McGee's conclusion that seminal fluid was deposited within 24 to 36 hours of Dru Sjodin's death. Specifically, Rodriguez contends that Dr. McGee provided no authority for this proposition.

Regarding his opinion that seminal fluid was deposited within 24 to 36 hours of Dru Sjodin's death, Dr. McGee testified that "[b]ased on the experience in our office and the reports from the literature, seminal fluid, the enzyme prostatic acid phosphatase is generally broken down within the first 24 hours after decomposition." See Deposition of

47

Dr. McGee, p. 140, 141, 144.  He also testified that "from the time seminal fluid is deposited in the vagina it generally breaks down within 24 hours.  Sometimes people will extend it off to 36 [hours].  Some people will say 48 hours.  It depends on who you read."  Tr. 6543.  See also 6554, 6555, 6561, 6577, 6578, 6723, 6736, 6755, 6756.

The defense expert, Dr. George Sensabaugh, who is one of the leading researchers in this area, agreed.  Tr. 6816–17.  There has long been an interest in the medicolegal community in establishing the time of persistence of acid phosphatase activity in the vagina following sexual intercourse, and relating the residual activity to elapsed time if possible.  Research on the quantification of acid phosphatase in the vagina and the time of sexual intercourse has been done for decades.[8]  The time of deposition of the ejaculate in the vagina is based not only upon sperm motility and their morphologic survival but also on quantitative levels of acid phosphatase.  In fact, Dr. Sensabaugh wrote one of the leading papers on this subject in 1979.[9]  Sensabaugh found that

> Statistical analysis of the data shows that both endogenous and postcoital levels of ACP (acid phosphatase) in the vagina follow predictable distributions.  Moreover, it appears that there are in fact regularities in the decline of postcoital levels of ACP activity that allow, within limits,

[8] Findley, T.P., "Quantification of Vaginal Acid Phosphatase and Its Relationship to Time of Coitus", Amer. J. Clin. Pathology, Vol. 68, p. 238 (1977); McCloskey, K.L., et. al., "Prostatic Acid Phosphatase Activity in the Postcoital Vagina", J. For Sci., Vol. 20, p. 630 (1975); Gomez, R.R., et. al., "Determination of Acid Phosphatase Activity in Vaginal Washings", Amer. J. Clin. Pathology, Vol. 64, p. 423 (1975); Davies, A. And Wilson, E., "The Persistence of Seminal Constituents in the Human Vagina", Forensic Science, Vol. 3 p. 45 (1974)

[9] Sensabaugh, G.F., "The Quantitative Acid Phosphatase Test: A Statistical Analysis of Endogenous and Postcoital AP Levels of the Vagina."  J. For. Sci., Vol. 24, No. 2, p. 346 (1979), U.S. Exhibit 2.

estimates of postcoital intervals. These results thus provide some
guidelines for the interpretation of the quantitative ACP test.

Sensabaugh, G.F., "The Quantitative Acid Phosphatase Test: A Statistical Analysis of Endogenous and Postcoital AP Levels of the Vagina." J. For. Sci., Vol. 24, No. 2, p. 346, 347 (1979). See also, e.g., Hartman v. Bagley, 333 F. Supp. 2d 632 (N.D. Ohio 2004) (coroner testimony that the penetration of the victim based upon elevated levels of acid phosphatase in the vagina and anal cavity were consistent with the time of the victim's death).

Dr. McGee was questioned on direct and cross examination with regard to how a cold environment, like Dru Sjodin was in from her death in late November until she was found, would affect the dissipation of acid phosphatase. Dr. McGee testified:

It's a chemical process and all chemical processes in the body are speeded up by heat and they're slowed down by cold. So if you're a cold environment you have to take into effect that that may be slowing it down. The colder the environment the more slow that you have to consider may affect the degradation of the enzyme.

Tr. 6544.

When asked how there could still be acid phosphatase left in the body so many months after death, Dr. McGee explained,

And how do I account for it in this case? The day this lady was abducted and is -- the average temperature is 20 degrees for the first month that she is missing. It does not get above freeze on the average. An average day temperature doesn't get above freezing. I would submit that this lady died and was deposited in an extremely cold environment and was kept in that state basically until almost up to the time she was discovered. Some days prior to her discovery it starts to warm up. But for the first days she's literally, if I understand what the police are telling me, she's covered with

49

snow and she's in an extremely cold environment.  And I think that may explain why the enzyme is still able to be tested.

Tr. 6557.  See also Tr. 6736–37, 6754.

Counsel's cross-examination of Dr. McGee evidenced sufficient understanding of the acid phosphatase evidence against Rodriguez and its potential weaknesses.  In fact, defense counsel elicited testimony from Dr. McGee that the body of Dru Sjodin had been exposed to temperatures and conditions that would result in the decomposition of a human body.  Tr. 6564–65.  Something Rodriguez now claims should have been done. Defense counsel also elicited from Dr. McGee that it was possible the acid phosphatase may have originated as a result of decomposition and may not reflect only prostatic acid phosphatase.

The Eighth Circuit also upheld the district court's denial of the challenge to the admissibility of this testimony:

> [T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Questions of an expert's credibility and the weight accorded to his testimony are ultimately for the trier of fact to determine. Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded . . . Rodriguez's challenge—developed with thorough cross-examination—goes to credibility, not admissibility. The court did not abuse its discretion by allowing the testimony.

Rodriguez, 581 F.3d at 795.

Claims that Dr. McGee did not follow the Regions Hospital protocol because he submitted the fluid for testing after 48 hours after it was deposited do not give cause to

50

exclude the scientific evidence because he deviated from the test protocol under these circumstances. It was, after all, a kidnaping resulting in murder. What would counsel argue if the testing had not been done? This argument, again, simply goes to the weight of the evidence, not the admissibility.

Finally, Rodriguez also argues that trial counsel failed to challenge the use of the Beckman Dri-stat acid phosphatase test itself because it was designed to be used with serums and not dry stains. This argument is ill-conceived and inapplicable to this case. The test in this case was not done on dry stains. The test was done on serous fluid specimen collected from the vaginal, rectal and cervical areas conducted pursuant to the protocol at Regions Hospital.[10]

The district court did not commit error when it allowed Dr. McGee to testify to the matters Rodriguez now objects to again. The Eighth Circuit found the testimony and evidence of the acid phosphatase results admissible. There has been no intervening change in the law as it relates to Rodriguez's challenge to the admission of the testimony regarding the acid phosphatase testing in this case.

Regardless, his challenges now do not rise to the level of ineffective assistance of counsel. As previously noted, the defendant bears a heavy burden in overcoming the "strong presumption that counsel's conduct falls within the wide range of reasonable

---

[10] Regions Hospital, Acid Phosphatase lab protocol. Exhibit A-04. See also, Daubert Hearing, Defendant's Exhibit 3. "During Sexual Assault examination a specimen is collected for acid phosphatase determinations from each site examined (vaginal, oral, anal or miscellaneous).

51

professional assistance." Strickland, 466 U.S. at 689; Lawrence v. Lockhart, 767 F.2d 449, 450 (8th Cir. 1985). Petitioner has failed to demonstrate ineffective assistance of trial counsel. Counsel's conduct falls within the wide range of reasonable professional assistance. The same deferential review applies to the "prejudice" portion of the Strickland test. Sanders v. Trickey, 875 F.2d 205, 210 (8th Cir. 1989). The failure to establish "prejudice" is dispositive of the case without consideration of the Strickland "performance" factor. Sanders, 875 F.2d at 211 n.8.

Additionally, the claimed prejudice, that admitting these expert opinions allowed the United States to argue there was a scientific basis to believe Ms. Sjodin had been raped, was—if error at all—harmless because the other evidence of sexual assault and/or rape in this case was overwhelming.

### 3. Rodriguez is Not Prejudiced.

Rodriguez claims ineffectiveness of counsel based on an alleged failure to challenge adequately Doctor McGee's "acid phosphatase" testimony, and resulting prejudice in relation to his sentence in light of the United States references in its penalty phase argument to Rodriguez' sexually violent proclivities and the sexually assaultive nature of his crime against Dru Sjodin. He further claims that the United States knew or should have known that the acid phosphatase testimony was materially false, and that it was prejudicial in relation to his sentence for the same reason. Mot. at 8-39, 241, 245-46.

Rodriguez alleges that the United States relied primarily on the testimony of Ramsey County Medical Examiner, Dr. Michael McGee ("Dr. McGee") in arguing for the

52

death penalty.  Mot. at 8-9.  Specifically, Rodriguez asserts that the United States' case for the death penalty rested on establishing Rodriguez's "sexual sadism."  Id. at 9, 35-36. "The most critical piece of evidence in support of this argument was Dr. McGee's testimony regarding the results of the acid-phosphatase tests, as it was the only evidence that 'positively' established that semen was deposited in the body prior to the murder." Id. at 39.  Rodriguez provides fourteen separate quotes from the sentencing phase of the trial which allegedly "prove" this reliance.  Id. at 36-38.

Rodriguez's claims regarding the heavy, if not exclusive, reliance on this testimony by the United States, and presumably the jury, are not reasonable, nor accurate. Indeed, there is substantial evidence that neither the United States nor the jury relied on the acid phosphatase test result testimony in arguing or deciding the case.  Most importantly, any reliance was superfluous since determining the victim was sexually assaulted was unnecessary to convict or sentence Rodriguez.  As such, even if Dr. McGee's acid phosphatase testimony was excluded as Rodriguez suggests, there is no basis to believe it would change the jury's verdict or sentence.

These claims of prejudice are groundless -- whether assessed under the prejudice standard for  ineffectiveness-of-counsel claims, Strickland v. Washington, 466 U.S. 668, 694-96 (1984), or the prejudice standard for knowing-use-of-perjury claims, United States v. Boyce, 564 F.3d 911, 918 (8th Cir. 2009) -- regardless of whether the acid phosphatase testimony was properly admitted.  Independent of that testimony, the United States' argument concerning Rodriguez' sexually violent tendencies and sexual assault on

53

Dru Sjodin was abundantly supported by other evidence in the record.  The relevant evidence included his history of similar, sexually violent crimes against other women. See United States v. Rodriguez, 581 F.3d at 795-96 (Rodriguez' prior convictions "involved conduct similar to the charged offense"); id. at 804 ("Rodriguez objects to references in the government's closing argument to his criminal history . . . .  [T]he government was permitted to argue that the evidence here shows Rodriguez raped Sjodin before killing her."); id. at 807-10 (facts of earlier offenses).  The relevant evidence also included the waist-down nudity of the victim's body and the testimony presented regarding Rodriguez' sexually violent thoughts and feelings.  The record in this case includes evidence of this nature at all stages of the proceedings -- in the guilt phase, the eligibility phase, and the selection phase.

In the guilt phase, the United States, at the outset, explained the grounds for concluding that Rodriguez kidnapped Dru Sjodin in order to sexually assault her were, based on information independent of the acid phosphatase testimony, including his history of committing similar sexual assaults and the condition of the victim's body. Brief in Support of United States' First Motion in Limine at 9-10, 14-17, DKT 346. Evidence received at the guilt phase established the relevant facts.  See Tr. 6187-94 (testimony of victim of Rodriguez' first sexual assault), Tr. 6205-10 (testimony of victim of Rodriguez' second sexual assault), Tr. 6324-26, 6685-87, 6701-06 (evidence regarding condition of victim's body including ligatures binding her hands behind her back and ligatures around her neck, partial stripping of upper body, ripped clothing and nudity

54

from the waist down), Tr. 6867-70 (related argument).

At the eligibility phase, the victims of Rodriguez' prior sexual assaults again testified, in support of the statutory aggravating factor under 18 U.S.C. § 3592(c) (4), which is satisfied if the defendant has two or more felony convictions for offenses "involving the affliction of, or attempted infliction of, serious bodily injury or death upon another person." Tr. 7117, *et seq.*, 7148, *et seq.* Rodriguez's conviction for stabbing and attempting to kidnap a third woman was also disclosed in support of this factor. Tr. 7194-95.

At the selection phase, additional evidence was presented establishing the matters referenced in the United States argument -- including Rodriguez's history of sexually assaulting women, his sexually violent fantasies and proclivities, his obscene phone calls, and his stalking of women -- which Rodriguez now attempts to portray as somehow dependent on the acid phosphatase testimony.

The relevant information included testimony from his own expert, Dr. Marilyn Hutchinson:

> He began making obscene phone calls . . . to . . . young women adults that he knew . . . . [H]e was arrested for attempted rape of Shirley Seddon with whom he got a ride home from a bar . . . . He said that he got really angry . . . and forced her to perform oral sex . . . . [H]e followed Miss Knudson from where he first saw her to a parking lot, confronted her with a knife and then raped her . . . . Mr. Rodriguez reported a . . . long-standing habit of sexual fantasy regarding women that he would see in public . . . . He indicated that he had these persistent sexual thoughts beginning as a teenager and they would be triggered whenever he was angry . . . . [H]e had a history of making obscene phone calls . . . [a]nd . . . of stalking women on the street . . . . [H]e has had and still does have forbidden or

55

perverse sexual thoughts, images or impulses . . . [a]nd . . . [t]houghts about sexual behavior towards others and being aggressive . . . .  The respondent acknowledges fantasizing about the following sexually deviant behaviors: . . . controlling a female . . . .

Tr. 7989, 8054-57, 8078-83.

And Dr. Stephen Pitt testified:

He told me about Ms. Seddon . . . that this was retribution for pulling his pants down when he was in grade school . . . .  He told me that the reason he perpetrated against Ms. Knudson was because he and his girlfriend . . . had gotten into a fight, and as a result of that fight he was upset and he went out and perpetrated . . . .  We have a history of obscene telephone calls being made . . . .  Mr. Rodriguez talked about rape fantasies.  You have the offenses themselves, the serial nature of the offenses for which he's been found guilty . . . and you also have stalking behavior . . . .

Tr. 8503-04, 8522.

Rodriguez's assertions about the reliance of the United States and or the jury on the acid phosphatase testimony are unsupported by the record.  Even his own "proof" as to this reliance falls short.  In not one of the proffered quotes from the trial transcript does the United States directly reference Dr. McGee's testimony when arguing that Dru Sjodin was sexually assaulted.  See Motion at 36-38. In fact, these excerpts strongly suggest the United States did not rely in any significant way on Dr. McGee's testimony when making its case that the victim was sexually assaulted.  Although the acid phosphatase test results are never mentioned, many other evidentiary factors suggesting the sexual assault of the victim and Rodriguez's violent sexual behavior are highlighted.  See Tr. 8661-62, 8663, 8667, 8689, 8693 (referencing Rodriguez's previous convictions), Tr. 8694 (describing

56

Rodriguez's refusal to seek treatment and fighting civil commitment), Tr. 8706 (describing Dru Sjodin being bound and naked from the waist down), Tr. 8707 (describing how Dru Sjodin was bound). If the acid phosphatase was as crucial as Rodriguez claims, it makes little sense that it was not specifically referenced. Rather, this lack of reference supports a conclusion that the United States' case and the jury's decision relied on other factors.

The sheer amount of evidence suggesting Rodriguez sexually assaulted the victim was overwhelming. As set out above, it included: his previous convictions for sex offenses (rape and attempted rape) with fact patterns similar to the instant case, that Dru Sjodin was found naked from the waist down and her remaining clothing ripped or partially removed in ways which suggested sexual assault, that she was beaten prior to death, and the fact her hands were bound behind her back. Although Dr. McGee's testimony regarding the acid phosphatase test results supported the conclusion a sexual assault occurred, it was by no means the only or definitive evidence.

Rather than any one piece of evidence acting as the lynchpin to the United States' argument that Dru Sjodin was sexually assaulted or kidnapped for the purpose of such an assault, the United States relied on the totality of the evidence presented. Considering the totality of the evidence was the methodology employed not only by the United States in presenting its case that Dru Sjodin was sexually assaulted, but also in Dr. McGee's findings generally.

Dr. McGee's testimony is telling;

57

─ at the <u>Daubert</u> Hearing:

Q:      And by the way when you're analyzing whether there's been a sexual assault or not, I think you said this at the beginning but this number, this acid phosphatase or the prostatic acid phosphatase number, without the presence of sperm sounds like this is just another indicator, one more indicator in the overall picture; is that correct?

A:      That's the way I interpret it.

Q:      What other information do you look at outside of just these lab results?

A:      Well, you can't do -- you can't examine a deceased individual just in the lab. I mean, you've got to examine it in the totality of the case.  I mean, that's what the county expects me to do.  So you have to consider the circumstances of how someone came to be dead.  Did -- were they found dead in their living room, whatever the case  is.  You have to consider the circumstances of how someone is found dead.  You have to consider the death scene:  Where are they found dead? How are they found?  Are they dressed?  Are they in bed?  Are they nude? whatever the case is.  You have to consider the external examination and how they are clothed when you're doing that.  You have to consider the results of the autopsy and then the lab results.  Those all have to be combined together if you want to get a proper picture.  You cannot segment out one from the other.  So the sexual assault examination is real important.  But I must be really honest with you. We've told the police we think someone died from a sex-related death when the sex results  are negative because based on the information from looking at the death scene, the condition of the body, the way they may have presented.  That's the way we conduct business.

Tr. 6547-6549.

─ And then at trial:

Q:      But when you're making an assessment about sexual assault, is this the only factor [the acid phosphatase test regarding a deposit of semen] you look at or what other things do you look at?

A:      The lab test is just what it purports to be.  It's a lab test and it's one thing that you use in making the diagnosis but it is not the only thing in making your diagnosis regarding a death that occurred during the commission of a sexual assault.

58

Q: How about in this case? What factors would you look at in this case to make your assessment [regarding sexual assault] when you were dealing with the police?

A: Same factors that we use on other cases in our office where deaths have occurred or may have occurred during commission of a sexual assault. What are the circumstances surrounding the death; that is, how did the person come to die? What is the evidence of the scene investigation? Where the person was found dead? Is there evidence of assault or not? What is the evidence of the external examination? Is there evidence of assault? How does a person present to you? Are they clothed or not clothed? What are the results of the autopsy and what are the results of the lab results? The lab results are important but you've got to consider it in continuity with everything else that is presented to you [in] trying to make an estimate of what is going on in the case.

Q: You do that in this case then?

A: Yes.

Q: You took all the factors into account as you were going along making your assessment?

A: Yes.

Q: And they're taken into account as you're interpreting your results from the lab as well?

A: Yes.

Q: Is that what you do in every case?

A: Yes.

Tr. 6724-6725.

Q: For just the moment just forget about acid phosphatase, everything else you know about this case. Do you have an opinion about whether Dru Sjodin was -- this was a sexual assault case of one nature or another?

59

A:     Yes.  I think this lady's death is a result of a sexual assault, yes.

Q:     (Mr. Wrigley continuing)  Whether there was a semen deposit or not?

A:     Doesn't matter if semen is there or not.

Tr. 6773.

It is reasonable to assume the jury similarly considered the totality of the evidence, and not just Dr. McGee's testimony on the acid phosphatase testing, when deciding whether a sexual assault occurred.  Thus, even if Dr. McGee's acid phosphatase testimony were excluded there is little reason to believe this would severely undermine the case that Dru Sjodin was sexually assaulted, as Rodriguez claims.  Mot. at 13.

Given the mass of independent evidence that Rodriguez committed the charged crime for purposes of sexual assault -- and the absence of evidence showing some other reason he would have stripped off Dru Sjodin's clothing from the waist down in the course of kidnapping and killing her -- it is not reasonably probable that excluding or challenging differently the acid phosphatase testimony would have made a difference to the outcome, Strickland, 466 U.S. at 694-96, nor is there a reasonable likelihood that that testimony could have had such an effect, Boyce, 564 F.3d at 918.

Considering Part II.E of Rodriguez' Motion in conjunction with Part II.A, he attempts to answer the foregoing by claiming that it was error to admit evidence of his prior sexual assaults under Rule 413 Mot. at 90-101. As discussed in this brief's response to Part II.E of the motion, this claim is groundless, merely reiterating arguments that he previously raised and that this Court soundly rejected in the earlier proceedings.  See

60

United States response to Issue II.E.  Moreover, as documented above and further discussed in United States response to Issue II.E., extensive evidence of Rodriguez' sexually violent crimes and proclivities was presented in the sentencing proceedings, and such evidence was properly admissible in those proceedings "as to any matter relevant to the sentence," 18 U.S.C. § 3593(c), regardless of its admissibility at the guilt phase.

It was unnecessary for the jury to find a sexual assault occurred in order to convict or sentence Rodriguez to death.  Proving the purpose behind the kidnapping was not an element of the crime charged and this was clearly reflected in the jury instructions.  The United States expressly stated that the jury could completely disregard the acid phosphatase testimony, or conclude that Dru Sjodin was not sexually assaulted at all, and still convict.  Tr. 6919.

Finally, it scarcely needs to be mentioned that the sexually assaultive nature of Rodriguez's crime against Dru Sjodin was not the only element in the case for his sentence.  The evidence established, among other things, Rodriguez's commission of a torture-murder in the course of a kidnapping following three prior convictions for serious violent felonies -- involving, respectively, the oral rape of the first victim, the kidnapping at knifepoint and vaginal rape of the second victim, and the attempted kidnapping at knifepoint and stabbing of the third victim.  See, e.g., Tr. 6187-94, 6205-10, 7194-95, 7340-43, 8054-57, 8503-04, 8522; United States v. Rodriguez, 581 F.3d at 783-84, 796, 804, 807-09.  No doubt this would have made a strong impression on the jury, even if he had not sexually assaulted his latest victim, in addition to kidnapping and killing her.

61

It was unnecessary for the United States to prove a sexual assault occurred, or for the jury to so find, in order to impose the death penalty. The threshold eligibility factors for a death penalty sentence did not require the jury find the victim was sexually assaulted. Special Verdict Form, Case 2:04-cr-55, pg. 1-2 (Sept 7, 2006), DKT 585. Nor did any of the statutory aggravating factors require such a finding. Id. at 3-5. The third statutory aggravating factor asked if Rodriguez killed Dru Sjodin "in an especially heinous, cruel, or depraved manner" but does not require or suggest sexual assault as part of this consideration. Id. at 3. Even assuming the jury found this aggravating factor because they believed Dru Sjodin was sexually assaulted; they based this finding on Dr. McGee's acid phosphatase testimony; and Rodriguez's challenge to this testimony is upheld, it would not disqualify the jury's determination that Rodriguez was eligible for the death penalty. His eligibility required that the jury find one threshold and one aggravating factor. Id. at 6. The jury found four of four threshold factors and three of four aggravating factors in determining Rodriguez's eligibility for the death penalty. Id. When considering the non-statutory aggravating and mitigating factors there was similarly no determination requested or made regarding whether Dru Sjodin was sexually assaulted. Special Findings Form, Case 2:04-cr-55 (Sept. 22, 2006), DKT 626.

Simply put, the jury was not required to find, nor the United States required to prove, that Dru Sjodin was sexually assaulted in order to convict and sentence Rodriguez to death. Moreover, there is no evidence the jury determined a sexual assault had or had not occurred, or that this conclusion, whatever it was, played any part in its decision to

62

sentence him to death.  Given the brutal and heinous nature of the crime outside any

sexual assault, it is reasonable to believe the jury imposed the death penalty for reasons

entirely unrelated to sexual assault.  To accept Rodriguez's assertions regarding the

importance of and reliance on Dr. McGee's testimony regarding the acid phosphatase

tests results requires speculation and assumptions for which he offers little or no

evidentiary support.  For these reasons, his claims regarding the relevance of and reliance

on Dr. McGee's acid phosphatase testimony should be rejected.

Insofar as Rodriguez' sexually violent behavior and proclivities were part of the

mix, they were adequately established by evidence of facts having nothing to do with the

acid phosphatase testimony -- including his obscene phone calls and stalking; his history

of escalating violence against women including multiple sexual assaults; the sexually

violent proclivities he admitted to in psychological interviews; and his binding Dru

Sjodin and stripping off the clothing from her lower body.  The obvious inference is that

further sexual violence was the motive for his final, lethal crime.  A fair view of the

totality of the evidence supporting Rodriguez's sentence accordingly provides further

confirmation that any alleged falsehood in the acid phosphatase testimony, or alleged

failure to challenge it sufficiently, did not affect the sentence.

## II.B.   Rodriguez's Trial Counsel Were Not Ineffective With Respect to Addressing the Neck Wounds.

Rodriguez raises two arguments related to the testimony of the medical examiner,

Dr. Michael McGee, regarding the neck wounds identified during the autopsy.  First, he

argues that Dr. McGee overdramatized his description of the wounds to inflame the jury and that the United States relied almost exclusively on that testimony to establish a statutory aggravating factor of 18 U.S.C. § 3592(c) (6).  Second, Rodriguez claims that Dr. McGee's testimony regarding Ms. Sjodin's neck wounds was materially false. Third, he asserts that his trial counsel were ineffective for not introducing evidence that Ms. Sjodin did not suffer a knife wound to her neck.  For the reasons set forth herein, neither of these avenues lead to a showing that Rodriguez's trial counsel provided ineffective assistance of counsel on this issue.

### 1.  Rodriguez's Trial Counsel Effectively Challenged Dr. McGee's Opinion Regarding the Neck Wounds.

Rodriguez kidnapped Dru Sjodin as she left the mall in Grand Forks, North Dakota, on the afternoon of November 22, 2003.  She was subsequently murdered and left in a drainage ditch outside of Crookston.  Dru's body was found on April 17, 2004. Her body was naked below the waist, and her hands were tied behind her back. Tr. 6686. A ligature (rope) and remnants of a K-Mart plastic bag encircled her neck.  Tr. 6686; 6701; Gov't Trial Ex. 78-11, 78-39.  A slash wound was observed to the front of Ms. Sjodin's neck.  Her upper-body garments were pulled down off her shoulders.

Dr. Michael McGee, the Ramsey County Medical Examiner, performed an autopsy on Mr. Sjodin.  Dr. McGee identified two slash wounds to the front of her neck caused by a knife drawn across the neck through the tissue in a fashion to cause notching. Tr. 6688–89, 6694–95. Dr. McGee also determined that there was a "defect" to Ms.

Sjodin's right side, between her ribs and pelvis, approximately eight centimeters deep, which may represent a stab wound. Tr. 6689, 6692, 6706. Dr. McGee concluded that Ms. Sjodin died from homicidal violence. Tr. 6726, 6728; Daubert Hearing, Gov't Exhibit 4; Exhibit D-69. No one single cause of death was identified by the autopsy, but the probable causes of Ms. Sjodin's death were asphyxiation or suffocation (Tr. 6727, 6728), death from the slash wound injury to the front of her neck (Tr. 6728), or possible death from exposure to the elements, having been left in the bitter cold of a November night in the manner she was found. Tr. 6728.

Rodriguez now alleges that he was prejudiced on two fronts arising out of this testimony. First, he challenges Dr. McGee's "description" of the state of the body and wounds, claiming that the medical examiner's testimony about the knife wounds was "extraordinarily inflammatory." Mot. at 39. Second, the indictment alleged a statutory aggravating factor found in 18 U.S.C. § 3592(c) (6)—that Rodriguez committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim. Rodriguez's counsel now argue that throughout the trial the United States "made special use of Dr. McGee's horrific [neck slash] testimony as proof that the crime was particularly heinous."

Both arguments are meritless. Contrary to Rodriguez's assertion, Dr. McGee testified about the knife wounds in a straightforward, unemotional, and appropriate manner. His testimony simply illustrated the wounds and possible cause of death.

65

Further, Rodriguez's trial counsel effectively addressed the testimony regarding the neck slash and the heinous nature of the crime.

Rodriguez's trial counsel extensively cross examined Dr. McGee during the guilt phase regarding the neck slash and posed questions to him that challenged the possible causes of death. Trial counsel does not have to retain or call an expert witness in every case for his assistance to be effective. See Cagle v. Norris, 474 F.3d 1090, 1097 (8th Cir. 2007) (finding no deficient performance or prejudice where defense counsel did not present expert testimony on the effects of the decedent's methamphetamine intoxication in support of defendant's self-defense claim). On cross examination Rodriguez's counsel developed the defense argument that there was not sufficient evidence to support the claim that the neck slash was the cause of death:

> Q. And decomposition of the body had occurred in many ways in this particular case but it results in a loss of soft tissues in different areas of the body, correct?
>
> A. True.
>
> Q. And specifically regarding the neck area, there was a complete loss of soft tissue in that area.
>
> A. True.
>
> Q. And there was also a loss or the absence of the major blood vessels that you would normally expect to find in that area if you hadn't -- if the body hadn't been subjected to decomposition.
>
> A. Also true.
>
> Q. Is it true then that as a result of that loss of soft tissue and as a result of the loss of the major vessels in that area of the neck that you are

66

simply not able to provide us opinions to any degree of medical certainty as to certain things about this case?

A.    True.

Tr. 6741–42.

Q.    Okay.  You also talked about the two sharp-force wounds to the neck area.

A.    Yes.

Q.    Now you've told us here that the soft tissues in the neck area were missing.

A.    True.

Q.    The internal  major vessels, the arteries and veins in that area were also missing.

A.    True.

Q.    So is it fair to say that you are not able to determine how deep that wound or those wounds penetrated?

A.    That's true.

Q.    So you don't really know as we sit here today because you weren't able to determine whether those were just skin deep or whether they were in fact deeper than that.

A.    That's true.

Q.    And if in fact they had been only skin deep, those wounds in and of themselves would not have been fatal.

A.    They may not have been, no.

Q.    If in fact they had penetrated the skin and served some of the internal arteries or veins, that then would have been a fatal  -- or could have been a fatal wound.

A.    True.

Tr. 6750–51.

Q.    Now you've talked about in your autopsy protocol that there's three
      possible causes of Ms. Sjodin's death and I think you've talked
      about them here as well, correct?

A.    True.

Q.    One of them -- well, before we get into that, you're not able to tell us
      with any reasonable degree of medical certainty exactly what the
      cause of her death was.

A.    Amongst those three?  No.

Q.    So it could be one of the three.  You're not sure which one.

A.    True.

Q.    And in all fairness there were soft tissues that were missing on this
      body at autopsy that prevented you from making those types of
      determinations.

A.    True.

Tr. 6757–58.

Q.    So because of the missing tissues and the decomposition of the body,
      you're not able to tell us the precise cause of death.

A.    True.

Tr. 6761.

Similarly, during closing argument, Rodriguez's trial counsel argued:

When you pin him down and ask him:  Do you really know to a reasonable
degree of medical certainty what the cause of death was?  His answer is no.

He had three possibilities that he narrowed it down to.  Could have been
suffocation from the bag over her head.  Could have been the wounds to her
neck if they in fact penetrated the skin and were deep enough, which he was
not able to determine if they were deep enough or not.  And it could have
been from exposure to the elements, being left where she was found, where

68

she was not dead and simply dying from exposure to the elements in the cold.

Tr. 6891.

[a]nd she had incisions on her neck.  He's not able to tell us whether those penetrated the skin or whether they did not.

Tr. 6804.

[t]he only one that testified about time and place and manner of death, was Dr. McGee. And he candidly admitted that he doesn't know the cause of death, he doesn't know how she died, and he certainly doesn't know when she died.

Tr. 6912.

Based on this extensive cross examination, Rodriguez's trial counsel argued at closing its position regarding the nature and place of the injuries.  It also addressed the emotional nature of the testimony, arguing that the government was simply trying to draw on the emotions of the jury without sufficient evidence:

You're being asked to make a very important decision, and that kind of obvious play to your emotions is inappropriate and does not help you get to the very root of the issues that you're being asked to decide.  What they're hoping is that you get so overborne by your emotional response to Dru Sjodin's death that you'll overlook the deficiencies in their evidence.  You won't notice or won't hold them to the burden of proof that the government has, that the judge tells you they have.

Tr. 6893.

And trial counsel made clear during the Eligibility Phase their position that the crime was not committed in an especially heinous, cruel, or depraved manner, and that the neck slash, even if it did exist, did not make the murder especially heinous for differing reasons:

69

> [b]ut the Court talks about it requiring torture or serious physical abuse. And that is above and beyond the killing itself.  This is, as the Court tells you, especially heinous, cruel and depraved, something that is outside the realm of other murders.

Tr. 7278.

> Now, the knife wounds to the neck, if those are the fatal acts, can't be considered by you as part of the torture or part of the serious physical abuse, if that is what caused the death because, as the Court . . . has told you . . . that these matters . . .  has to be something beyond what caused the homicide itself.

Tr. 7278–79.

In light of his trial counsel's determined advocacy on this issue, Rodriguez's claims of deficient performance and prejudice are groundless.

Further, the United States did not argue that the knife wound to the neck was either the sole cause of death or the sole reasons to find that Rodriguez killed Dru Sjodin in a heinous, cruel, or depraved manner.  The United States' arguments rested on all of the evidence presented in the case.  The evidence at trial demonstrated that Ms. Sjodin's death resulted from a combination of all of the facts and circumstances of the crime. Tr. 6324–26, 6685–87, 6701–06 (evidence regarding condition of victim's body including ligatures binding her hands behind her back and ligatures around her neck, plastic bag over her head, partial stripping of upper body, ripped clothing and nudity from the waist down).  See Merits Phase Evidence within Statement of Facts, *supra*.

From the United States' position, it mattered not whether a neck slash, asphyxiation, or brutal cold weather caused the death:  all indicated that Rodriguez killed her in a heinous, cruel, or depraved manner.  Specifically, in the Eligibility Phase, the

United States presented evidence and argument to prove that the evidence met the four

"statutory aggravating factors" of 18 U.S.C. § 3592(c).  See Eligibility Phase Evidence

within Statement of Facts, *supra*.  And as the United States succinctly pointed out in

rebuttal:

> And we don't have to prove which of the three ways [Dru died].  It's just
> got to be that the kidnapping resulted in Dru's death.  It could be as simple
> as the defendant is taking her from the place where he abducts her to his car
> and she dies of a heart attack on the spot.  That's death resulting from being
> kidnapped.  It could be she's in the car with him with her hands tied behind
> her back and she manages to jump out of the car and dies on the way to
> wherever he's taking her.  That's death resulting from a kidnapping.  We
> don't have to prove exactly how it happened.  She's dead, and it resulted
> from his kidnapping her.  There's no doubt about that.

Tr. 6923.

The district court correctly instructed the jury, and the jury was enabled to give

meaningful consideration and effect to the law and the facts presented to them.[11]  The

court instructed the jury:

> The third statutory aggravating factor alleged by the government is that the
> defendant killed Dru Sjodin in an especially heinous, cruel, or depraved
> manner, in that it involved torture or serious physical abuse to Dru Sjodin.
> In order for this statutory aggravating factor to exist you must unanimously
> find that the government has proved beyond a reasonable doubt that the
> defendant, Alfonso Rodriguez (1) killed Dru Sjodin; and (2) that the killing
> was committed in an especially heinous, cruel, or depraved manner in that
> it involved torture or serious physical abuse to Dru Sjodin.

DKT 584; Instruction No. 3.[12]  As the "Special Verdict Form" for the Eligibility Phase

(DKT 585) makes clear, the jury exercised its independent judgment on the "statutory

---

[11] See Instructions to the Jury - Final Eligibility Phase Instructions, DKT 584.

aggravating factors" and specifically on the question of whether the crime was committed in an especially heinous, cruel, or depraved manner. The jury considered all of the evidence[13] related to the cause of Ms. Sjodin's death. The jury unanimously found that the crime did involve the torture of Dru Sjodin, but did not involve serious physical abuse.

The record provides ample basis for the jury to conclude beyond a reasonable doubt that Rodriguez engaged in actions that were "especially heinous, cruel or depraved" as defined by the district court. Given this evidence, any rational juror could have concluded that the abuse in this case went beyond that necessary to cause death and, indeed, involved torture. Generally, a court reviews jury findings on aggravating factors by asking whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. United States v. Bernard, 299 F.3d 467, 481 (5th Cir. 2002).

Even if Rodriguez did not slash Ms. Sjodin's neck, there exists sufficient other evidence to support the jury's conclusion that the crime was committed in an especially heinous, cruel, or depraved manner. The fact remains that even if Rodriguez did not

---

[12] In addition, Instruction No. 5 provides further instruction to the jury that "all twelve of you must agree that it involved torture and was thus heinous, cruel, or depraved; or all twelve of you must agree that it involved serious physical abuse to the victim and was thus heinous, cruel, or depraved; or both" and the instruction went on to define all pertinent terms.

[13] See Statement of Facts (summarizing the evidence presented at trial), *supra*.

slash Ms. Sjodin's neck or slashed to a degree that would not have killed her—as argued by her counsel—the facts still bear out the torture to which Rodriguez subjected Dru Sjodin. She was kidnapped and held for some three hours. Ms. Sjodin's hands were bound behind her back. Rodriguez placed a plastic bag over her head and tied a ligature around her neck to hold the bag in place. The evidence indicated that Rodriguez sexually assaulted her. She was taken from a car in the dark, cold night, naked from the waist down, to a ravine. There, Rodriguez left her for dead. Viewing the evidence as a whole, the jury's finding that the murder was committed in an especially heinous, cruel, or depraved manner must stand.

But even if the evidence was not sufficient to prove the heinous, cruel and depraved aggravator, the error would be harmless. The court may inquire into ". . . whether, beyond a reasonable doubt, the death sentence would have been imposed absent the invalid aggravating factor." United States v. Jones, 132 F.3d 232, 251-52 (5th Cir. 1998) (citations omitted). Even if the Court concludes that the evidence does not support the existence of the aggravating circumstance beyond a reasonable doubt, Rodriguez suffered no prejudice because the indictment alleged two other statutory aggravating factors, both of which were found to exist beyond a reasonable doubt, and either of which standing alone was sufficient to support the imposition of the death penalty, even after considering the mitigating factors found by one or more jurors. DKT 585. Consequently, even if the alleged error existed—which it did not—it would have been harmless because

73

Case 2:04-cr-00055-RRE   Document 910   Filed 11/13/13   Page 87 of 417

the death sentence would have been imposed even if the aggravating factor regarding the heinous, cruel, or depraved manner of the murder had not been submitted to the jury.

### 2. Dr. McGee Did Not Provide Materially False or Inaccurate Testimony Regarding the Knife Wounds.

Rodriguez next argues that Dr. McGee provided "completely false" testimony regarding the knife wounds inflicted on Ms. Sjodin. The United States vigorously contests the assertion that Dr. McGee provided willfully false or inaccurate testimony.

None of Rodriguez's claims on this issue is persuasive. That Rodriguez's experts disagree with Dr. McGee's conclusions does not prove that his testimony was false. "Inconsistency of testimony among witnesses can as easily be explained as the result of faulty recollections or differences of opinions." United States v. Washington, 44 F.3d 1271, 1282 (5th Cir. 1995); see also Chambers v. Johnson, 218 F.3d 360, 364 (5th Cir. 2000) (affidavits of two forensic pathologists critical of the state's medical expert may generally support a conclusion that he did not utilize the most advanced techniques for retrieving, documenting, or preserving forensic evidence, but were insufficient to cast enough doubt to show they were materially untrue).

Rather, an attack on an expert's opinions or the methodology used to reach that opinion goes to the sufficiency of the evidence and the weight the jury should award that testimony, not the truth of it. Fuller v. Johnson, 114 F.3d 491, 496–97 (5th Cir.1997) (use of incorrect methods by expert does not demonstrate testimony was false). Likewise, the defendant's burden of proving indisputable falsity is not met with evidence

74

of a difference of opinion or merely a hypotheses or inference that testimony could be false. See Rosencrantz v. Lafler, 568 F.3d 577, 586 (6th Cir.2009) (hypothesis and inferences that during a pretrial meeting the prosecution procured testimony from a witness to change the time of the assault did not meet burden of proving indisputable falsity). Although experts may disagree, disagreement between experts does not transform an expert's opinion into a falsehood. See Hoover v. Newland, 307 Fed.Appx. 56 (9th Cir. Jan.6, 2009) (expert's opinion was not rendered false because it differed from testimony and opinions of all other experts in case); Sistrunk v. Armenakis, 292 F.3d 669, 675 & n.7 (9th Cir. 2002) (en banc) (clearly inaccurate testimony by expert was not found to be false); United States v. Workinger, 90 F.3d 1409, 1416 (9th Cir. 1996) (disagreement with analysis did not transform opinion into falsehood). The burden is on Rodriguez to demonstrate Dr. McGee's testimony was false. To show that Dr. McGee willfully testified falsely as to Ms. Sjodin's neck wounds, Rodriguez relies on the fact that his experts reach a different opinion on this issue.

The Eighth Circuit considered this issue in Campbell v. Gregory. See 867 F.2d 1146, 1148 (8th Cir.1989) (finding an expert's opinion which differed from that of another expert and the treatise cited by the other expert was not false). There, Campbell filed a motion for a new trial following the return of the jury's guilty verdict. She asserted that the verdict was induced and supported by false testimony on an issue that was central to the case. The motion referred to the testimony of Dr. W.F. Blankenship, an expert witness in the area of orthopedic surgery. When asked during cross-

examination about the effects of partial arterial blockage, Dr. Blankenship stated that a partial arterial blockage would not cause a serious medical problem.  Campbell contended that Dr. Blankenship's testimony was perjury because his opinion was in direct conflict with a learned medical treatise.  The district court denied the motion.  The Eighth Circuit found no abuse of discretion in denying the motion for new trial:

> Dr. Blankenship did not commit perjury. He merely testified as to his opinion, which opinion differed from that of Campbell's expert and the treatise cited by Campbell.  As the district court correctly stated, '[I]t was the responsibility of the jury to determine the credibility of the witnesses' under proper instructions regarding the evaluation of expert testimony.

Id. at 1148.  As Campbell shows, a difference in opinion and disagreement among the experts is not a legally sufficient basis to establish falsity of a fact.  Indeed, when an assertion that testimony is perjured rests on mere speculation—as it does in this case—it is insufficient to establish a claim.

The issue before the Court is not one of objective fact but of differences in experts' opinions that are based on subjective interpretations of several factors.  Simply because Rodriguez's experts now disagree with Dr. McGee's interpretation of the autopsy does not mean his testimony was false.  None of the experts that Rodriguez now offers opined that Dr. McGee's testimony was false or untrue.[14]  And, in fact, their

---

[14]Declaration of Dr. Mark Flomenbaum, Petitioner's Ex. B-03; Declaration of Dr. Jonathan Arden, Petitioner's Ex. B-02; Declaration of Dr. Michael Ferenc, Petitioner's Ex. B-04.  Although each of these forensic pathologists had different opinions about the nature of the neck wound and possible cause of death.  None of them would testify that Dr. McGee's testimony was "simply untrue" as Rodriguez claims.  Dr. Flomenbaum's opined that although the strip of neck referred to by Dr. McGee as a "slash wound across the neck, might even, at certain times resemble that" he believed it was caused by the

opinions as to the cause of death—asphyxiation—was, in fact, consistent with

Dr. McGee's.  Furthermore, Rodriguez's trial counsel consulted Dr. Garry Peterson

during the pre-trial phase of this case.[15]  There is no indication his opinion at that time—

---

ligature around the neck.  He states that Dr. McGee's observations, in his opinion, were "misinterpreted".   He was also of the opinion that "[t]he cause of death was 'ligature strangulation.'" Declaration of Dr. Mark Flomenbaum, Petitioner's Ex. B-03;  The United States notes that was one of the causes also opined by Dr. McGee.  Dr. Arden's opinion was "the observed features of the neck were all the result of postmortem processes."  Dr. Arden opined that the ligature around the neck may "provide a reasonable explanation for the cause of death."  Declaration of Dr. Jonathan Arden, Petitioner's Ex. B-02;  The United States notes that was one of the causes also opined by Dr. McGee.  Finally, Dr. Ferenc opined that "[t]he skin and tissue defects to [the] . . . neck . . . are consistent with decomposition and extensive postmortem animal/insect depredation.  The findings . . . do not support sharp force injuries."  However, he went on to say that the "possibility that sharp force injuries indeed occur . . . cannot be excluded with absolute certainty."  He did not say Dr. McGee's opinion was false or testimony untrue.  And Dr. Ferenc further opined that he "agree[d] with Dr. McGee that this lady's death is a homicide."  And he would certify the cause of death as: "homicidal violence consistent with complications of asphyxia.  The plastic bag over the head and neck, the tight cinched ligature around the neck, or both would be the source of asphyxia."  Declaration of Dr. Michael Ferenc, Petitioner's Ex. B-04.

Dr. Ljubisa Jovan Dragovic, M.D., FCAP, FAAFS the Chief Forensic Pathologist and Chief Medical Examiner at the Oakland County Medical Examiner's Office in Pontiac, Michigan has also reviewed the case and has opined that "[t]he loss of integrity of the skin and soft tissue on the victim's neck represents a post mortem aritifact."  He goes on to say "it is my opinion that Ms. Sjodin most likely died of asphyxia brought about by direct pressure on the front of her neck/voice box area . . . The concept of 'asphyxia by strangulation' is less likely, although it cannot be completely excluded as a possibility."  Report of Dr. Dragovic at 8-9, U.S. Exhibit 33.

[15]Declaration of Dr. Garry Peterson, Petitioner's Ex. B-01.  Although Dr. Peterson now agrees with other experts hired by Petitioner that "asphyxiation by the neck ligature is the most likely cause of death," he does not "believe that sharp force or other injuries . . . can be completely excluded."  Nowhere in his declaration does he assert that Dr. McGee's testimony is false, as Rodriguez claims.

formed after reviewing the autopsy report and photographs—was different from

Dr. McGee's.[16]

Opposing experts who criticize the prosecution's expert witness and the basis of

his testimony falls far short of proof of false testimony.  See Workinger, 90 F.3d at 1416

(holding that a disagreement between experts did not transform an expert's testimony into

a falsehood).  The record here reveals that determining an actual cause of death in a

situation presented under the facts of this case is not an exact science and that the

accuracy of that determination allows for different opinions and interpretations.

Accordingly, the conflicting expert opinions, which amounted to nothing more than a

mere disagreement among the experts, do not demonstrate Dr. McGee's testimony was

false.  Absent any evidence that Dr. McGee actually made any false statement of fact or

that he did not honestly and conscientiously arrive at the opinions he expressed at

Rodriguez's trial, however, habeas relief is not warranted.

### 3.  Rodriguez's Trial Counsel Did Not Render Ineffective Assistance of Counsel by Not Introducing Evidence that No Knife Wound Occurred.

The heart of Rodriguez's argument on this point is that his trial counsel failed to

properly investigate and dispute the testimony of Dr. McGee; that his counsel should

---

[16] Similarly, Rodriguez challenges Dr. McGee's opinion that the knife seized from his car could have been used to cause the wounds when he testified that the injuries were "consistent with that knife or one of similar configuration" being used.  Tr. 6734.  This argument is the same as discussed above and the simple fact that Rodriguez's experts now disagree with Dr. McGee's opinion does not mean he is inaccurate in his opinion nor that his testimony was false.

have called a forensic expert as a rebuttal witness to refute Dr. McGee's testimony as false; and that his trial counsel then fatally stipulated to the injuries.  But Rodriguez has failed to show that his counsel's performance was deficient or prejudicial on this point.  The record reflects that trial counsel did properly investigate the autopsy results.  They took a pretrial deposition of Dr. McGee. See Depo. of Dr. Michael McGee, May 31, 2006; U.S. Exhibit 1.  They consulted a forensic pathologist prior to trial. See Declaration of Dr. Garry Peterson, Petitioner's Ex. B-01.  And clearly, his opinion was similar to that of Dr. McGee's.  They therefore made a strategic decision, agreed to by Rodriguez, to "not contest that the flank wound and the two wounds to the neck were initially made by a sharp instrument."  DKT 448; Rodriguez Stipulation Ltr.  This strategic decision was made in order to limit the number of autopsy photographs from being admitted into evidence.  And the Court excluded any photographs of the wounds as a result.  Id.[17]

Strategic decisions made by counsel during the course of trial are entitled to substantial deference in the hindsight of federal habeas review when reviewing a claim of deficient performance. See Strickland, 466 U.S. at 689 (emphasizing that "[j]udicial scrutiny of counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight").  The decision not to call

---

[17] See also Pre-trial transcript, July 5, 2006, wherein Court discusses admission of autopsy photos in connection with Rodriguez's motion in limine (DKT 389; Pretrial Tr. July 7, 2006, pp.71-76); Order on Seventh Round of Pre-Trial Motions ruling that because the defense stipulated to the forensic examiner's opinion about the nature and cause of certain crucial wounds, to the neck and flank, the Court excluded any photographs of these wounds.  DKT 474.

a witness to testify, as a matter of trial strategy, is virtually unchallengeable.  Hanes v. Dormire, 240 F.3d 694, 698 (8th Cir. 2001) ("Decisions relating to witness selection are normally left to counsel's judgment, and this judgment will not be second-guessed by hindsight.") (citations omitted).  In ineffective assistance of counsel claims, there is a strong presumption that counsel's challenged strategic actions or omissions were, under the circumstances, sound trial strategy.  Id at 698.; see also Marcrum v. Luebbers, 509 F.3d 489, 502 (8th Cir. 2007) ("[T]he burden of proof is on the petitioner to show that 'his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.'") (quoting Kimmelman v. Morrison, 477 U.S. 365, 384 (1986)); Collins v. Dormire, 240 F.3d 724, 727 (8th Cir. 2001) (in determining whether counsel's performance was deficient, the court should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ....") (quoting Strickland, 466 U.S. at 689).  The defendant therefore must overcome the presumption that, under the circumstances, "the challenged action might be considered sound trial strategy."  Riley v. Dretke, 362 F.3d 302, 305 (5th Cir. 2004).  Conclusory allegations that counsel failed to call certain witnesses or that the outcome would have been different had a certain witness testified at trial are insufficient to demonstrate that counsel was ineffective or that a habeas petitioner was prejudiced. See United States v. Delgado, 162 F.3d 981, 983 (8th Cir. 1998) (concluding that naked assertions that an attorney failed to call exculpating witnesses are insufficient to show counsel was ineffective or that defendant was prejudiced).

Rodriguez has not shown that his trial counsels' decision not to contest Dr. McGee's opinion regarding Ms. Sjodin's neck wound was so ill-advised so as to constitute deficient performance under Strickland.  In this case, defense counsel interviewed witnesses, hired an investigator, interviewed and sought the expertise of expert witnesses, and exercised reasonable skill and diligence in making strategic decisions.  Counsel developed a theory of the case and strategized about how best to counter the United States' evidence.  At trial, counsel attempted to minimize the impact of the brutal nature of the injuries and circumstances of the kidnapping and murder of Dru Sjodin.  As shown above, defense counsel extensively cross-examined Dr. McGee on this issue at trial, (Tr. 6739–62, 6769–72), and aggressively argued that the cause of death may not have been from a slash of the neck, (Tr. 6887–6913, 7269–94), which supported the defendant's theory on the possible cause of death.  And trial counsel made clear the defendant's position to the jury during the Eligibility Phase that the crime was not committed in an especially heinous, cruel, or depraved manner, and that the neck slash, even if it did exist, did not make the murder especially heinous.  Finally, Rodriguez's counsel made suitable arguments and offered reasonable alternative explanations for Ms. Sjodin's injuries and made a reasonable argument that the crime was not committed in an especially heinous, cruel, or depraved manner.  There is no constitutional error in counsel's conduct or decisions.

Even if counsel's alleged errors fell below an "objective standard of reasonableness," Strickland, 466 U.S. at 687–88, Rodriguez's ineffective assistance of

81

counsel claim fails nevertheless.  To satisfy the second part of the <u>Strickland</u> test, a defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694. A "reasonable probability" means a "probability sufficient to undermine the confidence in the outcome."  <u>Id.</u>  Thus, under the prejudice prong, a defendant must show that counsel's errors 'actually' had an adverse effect in that but for the errors the result of the proceeding probably would have been different.  <u>Id.</u> at 693–94.

Rodriguez's claim fails under the prejudice prong of <u>Strickland</u> because he has not shown that he was prejudiced by his counsel's allegedly inadequate representation.  It is mere speculation that not stipulating to the nature of the injury to Dru Sjodin's neck would have helped the defense.  Their own consulted expert provided an opinion similar to that of Dr. McGee.  Their strategy to keep out more gruesome autopsy photos, if not employed, would have allowed Dr. McGee, a formidable witness, to explain his observations and conclusions to the jury in greater detail and with greater conviction.

And even if an opposing expert discounted the neck slash nothing would have affected the outcome of this case to any reasonable probability.  As discussed above, Rodriguez murdered Ms. Sjodin in a torturous manner.  She was in fact kidnapped and held for some three hours.  Ms. Sjodin's hands were bound behind her back.  He placed a plastic bag over her head and a ligature was tied around her neck to hold the bag in place. The circumstances clearly indicate a sexual assault took place.  She was, in fact, marched from a car in the dark, cold night, naked from the waist down to a ravine.  There she was

left for dead. It is as torturous to kill a person by ligature strangulation,[18] asphyxiation, or binding a person to leave her to die from the elements, given all of the circumstances shown by the evidence in this case, as it is to slash a neck. The jury considered all of this evidence. There is no reasonable probability that trial counsel's failure to call an expert to address the neck slash testimony or counsel's strategic decision to stipulate to it led to Rodriguez's conviction or capital sentence given the compelling circumstantial evidence that Rodriguez had murdered in some heinous manner. Rodriguez suffered no prejudice from his trial counsel's actions on this point.

Legal representation is an art, not a science. See Strickland, 466 U.S. at 693. Effective assistance of counsel, as mandated by the Constitution, is not violated merely when trial tactics that are providential for one defendant prove to be unfortunate for another. See id. ("[A]n act or omission that is unprofessional in one case may be sound

---

[18] Even Rodriguez's three new medical experts agree she died from strangulation or asphyxiation. See, n.4 above. Interestingly, the three defense experts' opinions on cause of death do not match the depiction of the killing described by Rodriguez to Dr. James Seward and Dr. Michael Welner. See Report of Dr. Welner, U.S. Exhibit 5; see also video and audio of Rodriguez interview with Dr. Welner, U.S. Exhibit 9. Report of Dr. Seward, U.S. Exhibit 6; see also video and audio of Rodriguez interview with Dr. Seward, U.S. Exhibit 8. The defense experts' opinions, however, do match the depiction of the killing as reflected in the Petition claiming "he cinched the cord around the neck of the person he thought was his abuser. Inadvertently, the cord was too tight, with tragic, unintended results." Mot. at 48 citing Dr. Pablo Stewart's Declaration. Petitioner's Exhibit D-17 at 156. Dr. Ljubisa Jovan Dragovic, M.D., FCAP, FAAFS the Chief Forensic Pathologist and Chief Medical Examiner at the Oakland County Medical Examiner's Office in Pontiac, Michigan and hired for further review by the United States (noted above) has opined that "it is my opinion that Ms. Sjodin most likely died of asphyxia brought about by direct pressure on the front of her neck/voice box area." Report of Dr. Dragovic U.S. Exhibit 33.

or even brilliant in another."). Heeding Strickland's admonition that "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged," it cannot be said that Rodriguez was deprived of his constitutional right to effective representation on these facts. Therefore, because trial counsel's conduct falls squarely within the wide range of reasonable professional assistance, and because Rodriguez suffered no prejudice from his counsels' actions, Rodriguez's ineffective assistance of counsel claim must fail.

## II.C. REDACTED per Court Order.

## II.D. Trial Counsel was Effective at the Culpability Phase: They Presented Effective Assistance Through Tactical and Strategic Decisions Which Were Reasonably Calculated to Assist in Rodriguez's Defense.

### 1. Standard for Reviewing a Claim of Ineffective Assistance of Counsel.

The Court is familiar with the standard of reviewing a claim of ineffective assistance of counsel.

In Strickland v. Washington:

When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

Strickland v. Washington, 466 U.S. 668, 687-88 (1984).

A defendant must show not only that counsel's conduct fell below an objective standard of reasonableness, but show:

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

84

> reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, 466 U.S. at 694.  The same deferential review applies to the "prejudice" portion of the test.  Sanders v. Trickey, 875 F.2d 205, 210 (8th Cir. 1989).  The failure to establish "prejudice" is dispositive of the case without consideration of the Strickland "performance" factor.  Sanders, 875 F.2d at 211 n.8.  Accordingly, the court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the Petitioner as a result of the alleged deficiency.  Strickland, 466 U.S. at 697.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, the court should do so.  Strickland, 466 U.S. at 697.  In order to show prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding."  Pfau v. Ault, 409 F.3d 933, 939 (8th Cir. 2005) (internal quotation and citation omitted).

### 2.  Trial Counsel Are Not Held to a Standard of Perfection.

The Sixth Amendment right to counsel does not guarantee criminal defendants perfect or errorless representation. See Brunson v. Higgins, 708 F.2d 1353, 1356 (8th Cir. 1983) ("Counsel need not perform perfectly, and will not be held ineffective for failure to raise every tangential issue which might have a bearing on his client's case.  "Lawyers, like other people, are not perfect, and the ingenuity that diligent [habeas] counsel bring to a case long after the fact cannot be the only measure of what a lawyer should have done under the pressure of trial."  Williams v. Nix, 751 F.2d 956, 962 (8th Cir. 1985).

85

### 3. Trial Counsel Was Not Ineffective at the Culpability Phase: Defense Counsel Presented Relevant Evidence and Developed a Coherent Theory of Rodriguez's Case.

Rodriguez claims his trial attorneys rendered ineffective assistance when they conceded to a "legally and factually unsustainable defense" in the culpability phase. He argues their failure to present a coherent defense theory unifying the trial phases could not support an outcome of life in prison. Mot. at 78. Rodriguez specifically references defense attorney, Robert Hoy's, legal defense, (i.e., no federal kidnapping offense, pursuant to 18 U.S.C. § 1201(a), occurred because the prosecution failed to prove each essential element as instructed by the district court), as an ill-fated, "unsustainable defense" consisting of no strategic or tactical reasoning. Id. Rodriguez argues that "[N]ot only was the guilt phase defense unsustainable in light of both the facts and the governing law, but during trial the defense tactics in furtherance of this defense made little sense." Mot. at 82. Rodriguez implies counsel wholly failed to subject the government's case to any meaningful testing by use of intelligible cross-examination of government witnesses and other proper legal tactics.

During the guilt phase of the trial, defense counsel presented one witness, an expert on acid phosphatase. However, defense counsel extensively attacked the credibility of the government's witnesses and evidence. Counsel in closing argument contended the United States had not proven guilt beyond a reasonable doubt. Following the jury's verdict of guilty and during the penalty phase, the defense called Dr. Karen Froming and Dr. Marilyn Hutchinson who testified regarding their findings on

86

Rodriguez's mental health.  Dr. Karen Froming, a neuropsychologist, testified that Rodriguez suffers from subcortical brain damage, the center of impulse control within the brain.  Tr. 7822-23.  Dr. Froming extensively tested Rodriguez over three days.  Dr. Froming had obtained a family history prior to her testing.  Dr. Froming's testing confirmed that the origin of Rodriguez's brain damage was likely neurotoxin exposure.  Tr. 7822.

She testified that "there are some mild symptoms of depression there as you would expect but not of the significant degree that you would expect to see these what are called frontal subcortical signs . . . Depression is implicated in these same regions but the presence of the motor problems, the impact of the motor problems on various tasks, the working memory deficit and then his acquired color vision loss, his absence of smell function, really all say to me that he has frontal subcortical brain damage and the etiology of that may be neurotoxin exposure."  Tr. 7822.

Dr. Froming further testified that these frontal lobe impairments affected his impulse control:  "[I]t's a very complex part of the brain.  It [has] . . . to do with problem solving, anticipating future events, executing a plan of action.  It also has a lot to do, particularly the orbital frontal cortex, with impulse control and being able to modulate or control one's emotions, also in inhibiting one's responses and emotions and impulses.  And so these impairments have a lot to do with his impulse control."  Tr. 7823.

Dr. Marilyn Hutchinson, a clinical psychologist, testified that Rodriguez was malnourished for most of the first year of life, and this had a biological importance

87

because of the growth of the brain in one's first year.  She testified that, as a teen, Rodriguez experienced terrible headaches.  Tr. 7988-89.  She testified he had a sexual preoccupation, often seen in victims of sexual abuse.  Tr. 8011-12.  She testified that she was aware of the prior sexual abuse that had been reported and testified to by Sylvia. Dr. Hutchinson testified that Rodriguez confirmed his memory of the sexual abuse at the school.  Tr. 7960, 7965, 8046–49.  Dr. Hutchinson diagnosed Rodriguez with dysthymia, a long-term depression.  Depression is one of the symptoms of exposure to the toxic chemicals used during Rodriguez' early life in the sugar beet fields.  Dr. Hutchinson testified Rodriguez's memory, mood, academic, and impulse control problems were related to toxic exposure.  Tr. 8031-32.  She also diagnosed him with substance abuse in remission, a general anxiety disorder and post-traumatic stress disorder due to the prior sexual abuse.  Tr. 8029-31.  *She did not find that he suffered from dissociative disorder.* Tr. 8007. (Emphasis added).

Dr. Hutchinson testified extensively about and then summarized the seven factors that negatively influenced Rodriguez's life and his psychological makeup:  childhood deprivation, poverty and malnutrition; sexual abuse; racism he experienced; failure in school; substance abuse; exposure to toxic chemicals; and the multiple mental health and neurological conditions he suffers.  Tr. 7944-8038.

During the penalty phase closing argument, defense counsel relied upon this testimony to support its arguments against imposing the death penalty.

Rodriguez now asserts counsel provided ineffective assistance by failing to present expert testimony during the guilt phase that Rodriguez was not guilty by reason of insanity.  Specifically, Rodriguez refers to a Declaration of Dr. Pablo Stewart who has opined that Rodriguez was "unable to appreciate the wrongfulness of his actions."[19]  He argues that an expert should have been called to testify during the guilt phase that Rodriguez lacked the ability to recognize the wrongfulness of his actions.  According to Rodriguez, presenting such evidence would have resulted in a more unified, consistent theme during the two phases of the trial, making it more likely the jury would have imposed a life sentence.

Here, counsel investigated this matter thoroughly as discussed below and at Issue IV, *infra*.  First, Rodriguez always asserted his innocence.  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."  Strickland, 466 U.S. at 691.  Second, the experts hired, widely known and death penalty experienced, did not provide any basis to believe Rodriguez lacked the ability to recognize the wrongfulness of his actions or form the criminal intent to commit the crime.  Courts give great deference to counsel's informed strategic decisions, and "must resist the temptation to second-guess a lawyer's trial strategy." Laws v. Armontrout, 863 F.2d 1377, 1393 (8th Cir. 1988).  "[S]tategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.

---

[19] Exhibit D-17.

Rodriguez, now, among many things, assails trial counsel for failing to engage in an investigation and litigation which could have yielded a viable, prudent defense theory and subsequently better outcome. The matter of the investigation and mitigation in this case is more thoroughly discussed in Issue IV of this Answer. Specifically, the United States discusses the investigation and retention of Drs. Froming and Hutchinson at Issue IV(B)(e). However, Rodriguez fails to recognize how well the record speaks of his counsels' skill and industry considering the facts of the case presented before them. The defense team was not merely reactive, they initiated actions early on and throughout the course of the investigation, litigation and trial, filing all manners of motions, including: a motion for additional discovery (DKT 62); ex parte motions including those for expert services, travel authorizations, and budget/funding requests (DKTs 15, 23, 24, 33, 37, 55, 96, 146, 149, 153, 154, 168, 169, 204); a motion to declare federal death penalty unconstitutional (DKT 58); motions for the production of documents (DKTs 66, 68); a motion to bar death penalty due to arbitrary and infrequent use and due to discrimination based on defendant's ethnic background (DKT 109); a motion for government to file witness list one-hundred-twenty days before trial (DKT 70); motion to trifurcate proceedings (DKT 120); a motion to require government follow federal rules of evidence during proceedings (DKT 122); a motion for order to file transcripts under seal (DKT 134); a motion for order requiring disclosure whether government intends to employ jury consultant (DKT 140); an expedited motion for expedited order to establish date certain for completion of reports on government testing (DKT 175); a motion for order to

90

determine procedure whereby defendant's prior convictions will be proven and/or submitted to jury (DKT 177); motions to dismiss the indictment (DKTs 231, 233, 235, 237, 285, 353); motions to suppress evidence (DKTs 135, 253, 255); a motion for relaxed evidentiary standard (DKT 60); motions to strike (DKTs 58, 88, 90, 92, 94, 111, 183, 185, 187, 191, 229, 280, 282); a motion to limit or exclude victim testimony (DKT 193); a motion for bill of particulars (DKT 179); motions for Daubert hearings (DKT 195); a motion to transfer trial (DKT 320); motions to depose various mitigation witnesses (DKTs 261, 328, 349), a motion for purposes of jury selection including the need for additional peremptory challenges (DKT 263) as well as alternating initial voir dire between government and defendant (DKT 265); a motion to allow defendant to introduce mitigating evidence regarding prior convictions alleged as aggravating factors (DKT 278); and motions for continuance of trial (DKTs 138, 349).  Counsel also filed proposed jury instructions. DKTs 540, 607.  A month prior to trial, trial counsel filed motions in limine to exclude evidence (DKT 388), and autopsy photographs (DKT 389); a motion in limine regarding victim impact evidence (DKT 390), a motion in limine to exclude expert testimony of Craig Thrane (DKT 392); a motion for Daubert hearing to exclude testimony of Dr. Michael McGee (DKT 393); a motion in limine to exclude testimony of prior victim Ardyce Whalen (DKTs 394, 441); a motion to suppress evidence (DKT 397); a motion for reconsideration of Order granting motion for mental health evidence (DKT 418), and a motion for reconsideration (DKT 444).  In short, trial counsel sought every

possible avenue of defense available, and obviously had a grasp on the relevant facts and legal issues presented in Rodriguez's case.

At trial, the defense team acquitted itself with equanimity and vigor.  Counsel quickly revealed its theory of defense:  a solid element defense holding the government to its burden of proof.  In its opening statement, counsel set out:  "This is the wrong charge in the wrong court" suggesting that the government would not be able to prove where or when Ms. Sjodin died or her precise cause of death. "We submit this failure of proof is critical when you are being asked to decide whether each and every legal element of a federal kidnapping charge has been proved beyond a reasonable doubt." Tr. 5509.   The defense further argued, "The jurisdictional element which the prosecution must prove in order for this to be a federal kidnapping instead of a state kidnapping is that she was transported across state lines or transported in interstate commerce, but I expect the court will instruct you that the prosecution must also prove beyond a reasonable doubt that Dru Sjodin was alive when the transportation began.  Therefore, if you have even a reasonable doubt about whether she had suffocated and expired before the transportation began, the prosecution has failed in its proof and a verdict of not guilty would be entirely proper." Id.  Continuing with this theme, in a strategy designed to show that the prosecution could not prove all elements of the federal kidnapping charge against Rodriguez, trial counsel continued to insinuate the government's lack of evidence in this case, "During the prosecution's opening statement they conceded there is no eyewitness to what happened." Tr. 5511.  Counsel further indicated the prosecution would likely rely on various

92

laboratory comparisons (i.e. fibers, mitochondrial DNA, nuclear DNA, blood found in Rodriguez's car) to connect Alfonso Rodriguez, Jr. to Dru Sjodin, however counsel also expected the prosecution to concede to certain evidentiary shortcomings of their case including the precise place of Dru Sjodin's death. Tr. 5512. "None of it will answer the critical question in this case: Was Dru Sjodin in fact alive when the transportation began?" Tr. 5513.

Working that theme, defense counsel continued to challenge the government's broader case. Trial counsel deposed numerous individuals one of which was forensic video analyst, Craig Thrane on May 26, 2006, and thereafter subsequently moved to exclude his expert testimony prior to trial by arguing such testimony would not "legitimately" assist the jury. DKT 392; Pretrial Tr., July 5, 2006 pp. 34-37. The district court granted, in part, and denied, in part, admission of certain areas of Thrane's testimony. DKT 475. At trial, counsel presented a cross-examination of Thrane which revealed to the jury that Rodriguez, indeed, was observed on video in the Target store located a block and a half away from the Columbia Mall on the afternoon of November 22, 2003 (Tr. 5972-83), however Ms. Sjodin was "no where to be seen" in the Target video surveillance. Id. at 5995. Counsel also cross-examined Thrane on the fact that Ms. Sjodin was last video recorded in Marshall Field's and Rodriguez was "no where to be seen" in that video surveillance. Id. Trial counsel successfully conveyed to the jury that there was never any video surveillance introduced of Rodriguez and Ms. Sjodin seen together on November 22, 2006, inside or outside of the Columbia Mall.

93

The defense further challenged the government's case and sought to exclude the opinion of Ramsey County Medical Examiner, Dr. Michael McGee, M.D. (DKTs 393, 394), who performed the autopsy on Dru Sjodin's body and who produced a detailed autopsy report, provided to Rodriguez as part of regular discovery, indicating Ms. Sjodin was sexually assaulted at or near the time of her death. DKT 596. The Court denied defense counsel's motion. DKT 596. On May 24, 2006, Mr. Hoy served notice to take Dr. McGee's deposition. See DKT 642. The defense deposition was held on May 31, 2006, and lasted approximately four hours and 15 minutes. Thereafter, defense counsel filed a motion seeking a Daubert hearing for the purpose of litigating Rodriguez's request to bar Dr. McGee from testifying at trial. DKT 393. A pretrial hearing was held July 5, 2006, addressing trial counsels' Motion to Exclude Dr. McGee's testimony. Pretrial Tr. July 5, 2006 p. 45.

Trial counsels' overall defense strategy was reasonably calculated to reduce the severity of a possible conviction and to save Rodriguez's life. Counsel contested the government's efforts to convict Rodriguez at trial, but preserved his credibility with the jury so he could advocate for Rodriguez's life at the sentencing phase.

The Supreme Court in Florida v. Nixon, 543 U.S. 175 (2004), pointed out that when capital defense attorneys are "[u]nable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course." Id., 543 U.S. at 191.

94

The district court held the <u>Daubert</u> hearing on August 28, 2006, and received testimony from Dr. McGee and Rodriguez's forensic science and biomedical sciences expert, Dr. George Sensabaugh.  Ultimately, the district court admitted Dr. McGee's scientific opinion that the reported levels of acid phosphatase evidenced sexual assault, and also admitted the opinion that there had been a semen deposit in Sjodin's body during the 24 to 36 hours preceding her death. Tr. 6554, 6664-70; Memorandum Opinion and Order Deny'g Motion to Exclude Testimony of Dr. McGee. DKT 596.  Unrelentless, defense counsel continued to press the government's case when they attacked Dr. McGee's testimony at trial.  Dr. McGee testified, over objection, that elevated levels of acid phosphatase were found in Ms. Sjodin's vagina and cervix which, in his opinion, evidenced sexual assault. Tr. 6523-55.  However, no male DNA was found on the vagina, anal, and cervical swabs taken from Ms. Sjodin or her clothing.  Tr. 6455-57.  Dr. McGee testified Ms. Sjodin died as a result of "homicidal violence"; that the probable causes of her death were asphyxiation or suffocation, death from sharp force injury to the front of the neck, or possible death from exposure to the elements if she had not died from either of the other two. Tr. 6726-31.  Dr. McGee conceded he was unable to determine the precise cause of death out of the three probable causes nor could he determine the precise location of Ms. Sjodin's death. <u>Id.</u> at 6760-62.  McGee's inability to determine where Ms. Sjodin died, and his testimony that one of the possible causes of her death was by asphyxiation, supported the defense's argument that Sjodin could have

95

died in the precise location she was first accosted in the mall parking lot prior to any transportation. Tr. 6909-6912.

The trial counsel's vigor to dutifully represent and defend Rodriguez did not rest there. During the trial, while defense counsel was seeking to exclude Dr. McGee's expert testimony, the defense had also moved to prohibit the government from introducing results of a phenolphthalein ("Luminal") test on the knife which was found on the floor of Rodriquez's car truck. DKT 456. The government opposed the defense motion (DKT 485), however the court granted said motion ruling that any probative value the phenolphthalein evidence had was substantially outweighed by the danger of unfair prejudice. DKT 508. Trial counsel successfully kept out this potentially damaging evidence from the jury.

The record shows that trial counsel's strategy was calculated to negate crucial elements of the government's capital case. Counsel filed proposed jury instructions on August 21, 2006 (DKT 540) specifically addressing the essential elements of the charged offense of kidnapping as well as the definition of "transportation." Id. Counsel filed a legal memorandum in support of defendant's proposed jury instructions with the district court on August 23, 2006. DKT 537. This memorandum was filed with the court after the *guilt-phase* of the trial had already started and it particularly requested that the jury be "correctly instructed as to all the elements of kidnapping as well as the parameters of each of those elements." Id. at 1. "Because the plain language of the statute [18 U.S.C. § 1201(a)] requires that the victim be alive when the transportation began, the defendant

96

requests that the Court so instruct the jury. 18 U.S.C. § 1201(a)(1)" Id. at 7.  This position

was entirely consistent with counsels' strategy of suggesting there was reason to believe

Ms. Sjodin was murdered in the mall parking lot at the precise point where she was

standing when Rodriguez accosted her and that he did not transport her against her will

prior to her death. Tr. 6828.  Hence, there was no interstate commerce which would

support a charge of 18 U.S.C. § 1201(a).

Furthermore, trial counsel was a solid advocate at trial, forcing the government to

meet its burden on each and every element of the crime charged.  Counsel focused their

efforts on establishing reasonable doubt through rigorous cross-examinations, witness

presentation, and continuous objections.  Counsel argued the government failed to

establish each element of the charged crime.

In closing arguments, as expected, defense counsel continued to hammer this

theme during their closing argument, "Let's talk about, for instance, Dr. McGee's

testimony.  Dr. McGee was the only government witness that in any way, shape or form

talked about the time and place of Dru Sjodin's death.  No one else did . . . . . [B]ut when

you really pinned him down on cross-examination and I asked him:  Do you know to a

reasonable degree of medical certainty where she died?  The answer is no.  When you pin

him down and ask him: Do you really know to a reasonable degree of medical certainty

when she died?  His answer was no.  When you pin him down and ask him:  Do you

really know to a reasonable degree of medical certainty what the cause of death was?  His

answer is no." Tr. 6890-91.  The defense highlighted points made in opening statements

along with the presentation of evidence and cross examination, namely, that the government could not prove that Dru Sjodin was alive at the time her transportation began.  Tr. 6887-6913.

Rodriguez has failed to establish that his trial counsels' representation fell below an objective standard or reasonableness given the overwhelming evidence of guilt in the disappearance, sexual assault, and brutal murder of Dru Sjodin.  (See Jackson v. United States, 638 F.Supp. 2d 514, 571 (W.D.N.C. 2009)).  Broadly speaking, Rodriguez had an experienced and industrious counsel throughout the case proceedings.  Saddled with a client who had mounting evidence against him, counsel investigated theories of the case, consulted with experts, and spoke to Rodriguez's family and former prison officials.  Trial counsel employed a reasonable defense strategy well within the constraints announced in Strickland.  Trial counsel's argument and concessions were designed to save Rodriguez from the death penalty by preserving counsel's credibility to seek a life verdict on his behalf.  The strategy was a reasonable way of dealing with the overwhelming weight of the evidence against Rodriguez.  Rodriguez has not established trial counsel's performance was deficient, according to Strickland.  The court should deny relief.

### 4. Trial Counsel Did Not Fail to Present the One Defense That Was Viable and Readily Available: That Mr. Rodriguez Was Not Guilty By Reason of Insanity.

Under Strickland, counsel is not "obligated" to take any particular course; he is required only to proceed reasonably.  In assessing reasonableness, the reasons for, and

circumstances surrounding an attorney's tactical decisions are unquestionably relevant. Far from imposing a per se obligation upon an attorney, Strickland requires an examination of all the circumstances, from counsel's perspective, and with a heavy measure of deference.

Although Strickland is routinely cited for the general two-part (performance and prejudice) standard for evaluating ineffectiveness claims, it has far more significance here. The "duty" at issue in Strickland was the very same duty at issue here: i.e., counsel's duty to investigate a potential defense. There, as here, the alleged ineffectiveness consisted of counsel's failure to conduct an investigation that, "a culturally competent, thorough investigation, with appropriate mental health experts properly deployed . . . would have learned that Alfonso Rodriguez was insane at the time of the offense." Mot. at 85. The issue of Rodriguez's mental health including possible insanity and Mental Retardation are thoroughly addressed in Issues IV and V, *infra*. Issue IV(B)(d) thoroughly discusses the fact that Rodriguez's claim of insanity is not meritorious. Rodriguez's assertion that counsel was obligated to uncover and present the readily available mitigating evidence surrounding Rodriguez's mental health and retardation claims and that "indeed, even if the jury did not find Mr. Rodriguez to be legally insane, it is undeniable that this evidence reveals a substantially less culpable actor than was depicted at trial by counsel's incoherent defense" (Mot. at 89) is a misapprehension of the standards laid down in Strickland.

99

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly so, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.  For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.  In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. (Citation omitted.)

Strickland, 466 U.S. at 691-92.

Rodriguez claims that his trial counsel failed to conduct an adequate investigation of his mental health, and assert an insanity defense.  The record completely defies this allegation.  Immediately upon being assigned to represent Rodriguez, trial counsel retained the services of one pharmacology (toxins) expert who rendered expertise in the area of neurotoxicology, and two mental health experts, each who examined and rendered reports on Rodriguez's mental health, none of whom indicated Rodriguez displayed

100

significant symptoms of mental illness and certainly not to the degree which would warrant a psychotic or insane diagnosis.  Defense experts' diagnosis, or lack thereof, of Rodriguez would have played a critical role in trial counsels' determination to rule out insanity as a viable defense.  Rodriguez was not psychotic or insane.  As noted above, one defense expert (Dr. Karen Froming) concluded Rodriguez suffered diffuse brain damage and the other defense expert (Dr. Hutchinson) concluded Rodriguez suffered dysthmia, general anxiety disorder, and Post-Traumatic Stress Disorder (PTSD).  No expert concluded Rodriguez was insane.  Trial counsels' decision not to present an insanity case did not reflect constitutional ineffectiveness.

### 5. Trial Counsel Conducted an Adequate Mental Health Investigation Which Conformed to Existing Standards of Professional Conduct.

One of the first steps taken by Rodriguez's trial attorneys was to retain and consult with experts.  DKTs 31, 32, 39.  By September 2005, trial counsel filed ex parte motions for a neurologist and a clinical psychologist to meet Rodriguez.  DKTs 153, 154.  The district court granted said motions, and provided travel authorizations for said experts to meet with Rodriguez.  DKTs 155, 156, 157, 158.  Defense expert Dr. Marilyn Hutchinson, clinical psychologist, met with Rodriguez for seven hours on October 20, 2005, and five hours on October 21, 2005.  Dr. Hutchinson examined him again for over six hours on March 2, 2006.  The final evaluation took place on May 12, 2006, for six hours (See Cass County Inmate Contact Log; Rpt. of Mitigation, August 6, 2003 - Dr. Marilyn Hutchinson), and during the course of this time Dr. Hutchinson's evaluation

101

consisted of "a lot of psychological testing," spending time talking to him about his history and administering various testing on Rodriguez.  Tr. 7947-48, 07954.  Dr. Hutchinson opined that Rodriguez suffered: 1) maladjustment; 2) a strong sense of personal inadequacy; 3) exhibits strong dependency; 4) lacks internal resources also defined as psychic regulation; 5) is sexually preoccupied; 6) has psychoticism; involves himself with tangential thinking; and 7) also has loosening of associations.  Tr. 8007-11; Rpt. of Mitigation, August 6, 2003 - Dr. Marilyn Hutchinson, Exhibit D-90.  She diagnosed Rodriguez with Axis I (clinical syndromes):  dysthymia - low grade, long term depression; substance abuse in remission; general anxiety and Post-Traumatic Stress Disorder (PTSD) (Tr. 8028-30); and Axis II (personality disorders): schizoid personality disorder; avoidant personality disorder; paranoia personality disorder; and anti-social personality disorder.  Id. at 8034-35.  See also Rpt. of Mitigation at 26-27, August 6, 2006 - Dr. Marilyn Hutchinson, Exhibit D-90.

At trial she testified that Rodriguez experiences "psychoticism" but further explained "that's not exactly the same as [saying] he's psychotic" (Tr. 8007-11) rather he exhibits traits which, generally, can be associated with psychosis.  Id.  She also testified that Rodriguez does not experience visual or auditory hallucinations.  Id. at 8014-15.  Dr. Hutchinson further testified, "[I]n straightforward, clear social interaction, he is capable of thinking logically and coherently and able to come to reasonable conclusion of others."  Id.  Dr. Hutchinson did not find that Rodriguez was psychotic.  Nor did Dr. Hutchinson

find Rodriguez insane.  Nor did she find that Rodriguez exhibited a prior history of either condition.

On August 4, 2006, expert for the United States, Dr. Steven Pitt, conducted a psychiatric evaluation on Rodriguez.  Nowhere in Dr. Pitt's evaluation of Rodriguez is there any indication that Rodriguez may be insane at the time he killed Dru Sjodin nor was he insane at the time Dr. Pitt evaluated him.  Furthermore, Rodriguez denies having a mental illness when questioned by Dr. Pitt. See Alfonso Rodriguez, Jr., Transcript of Psychiatric Evaluation by Dr. Steven Pitt at 7-8, dated August 4, 2006; Exhibit D-83.

In addition to the defense and government psych evaluations, trial counsel obtained Rodriguez's records from the Minnesota Department of Corrections (MN-DOC) for the period he was incarcerated in Minnesota.  Dr. Rita St. George, prison psychologist, diagnosed Rodriguez, in January 2003, with an anxious adjustment disorder, sexual abuse of an adult and adult antisocial behavior.  Dr. Hutchinson Mitigation Rpt., Aug. 6, 2006 at 14, Exhibit D-90; Tr.8021-23; Dr. Rita St. George Depo. p. 18, Exhibit D-123.  Dr. St. George did not diagnose, or otherwise find a possibility, that Rodriguez was insane, or psychotic, during the time of his incarceration with the MN-DOC.

In an attempt to establish that his trial counsel was ineffective, Rodriguez blurs the distinction between his mental problems and legal insanity. Here, the defense expert, Dr. Hutchinson diagnosed and testified Rodriguez suffers from dysthmia, general anxiety (disorder), PTSD, along with schizoid personality disorder, avoidant personality disorder,

103

paranoia personality disorder and anti-social personality disorder which could be exacerbated or influenced by his substance abuse problems.  Tr. 8028-30, 8034-35; See also Rpt. of Mitigation at 26-27, August 6, 2003 - Dr. Marilyn Hutchinson, Exhibit D-90. Such testimony did nothing more than establish that Rodriguez suffered from a mental disorder – not that he was legally insane at the time the sexual assault and murder was committed.  While defense experts may have referred to Rodriguez's childhood trauma due to sex abuse, and abuse of alcohol and drugs, none testified that Rodriguez was, in fact, insane when he committed the crime, after his arrest, during trial or for that matter at any time in his life.  Likewise, no mental health expert would have testified that Rodriguez did not know right from wrong, nor did he not know what he was doing on November 22, 2003, or lacked the ability to appreciate the consequences of his actions, or was acting under duress.

Furthermore, Rodriguez claims that trial counsel was ineffective in failing to investigate an insanity defense beyond the neuropsychological, and psychiatric evaluations.  Yet none of the experts who evaluated Rodriguez recommended any further testing.  Likewise, none of the experts who evaluated Rodriguez prior to trial indicated that they lacked sufficient background information to provide a professional opinion. Accordingly, nothing in Rodriguez's behavior or communication put his trial counsel on notice that he was dealing with less than a rational individual for whom the insanity defense was warranted.  *See* Ake v. Oklahoma, 470 U.S. 68, 90 (1985).

104

Counsel does not have the duty to investigate when they have good reason to think further investigation would be a waste. Rompilla v. Beard, 545 U.S. 374, 382-83 (2005); see also Wiggins v. Smith, 539 U.S. 510, 525 (2003) (further investigation excusable where counsel has evidence suggesting it would be fruitless); Strickland, 466 U.S. at 699 (counsel could reasonably surmise . . . that character and psychological evidence would be of little help).

Counsels' strategic course here, properly viewed under totality of circumstances, from counsel's perspective, and with deference to counsel – as required by Strickland – plainly was reasonably based. Indeed, to hold counsel ineffective for failure to further investigate the possibility of the insanity defense would completely ignore the reality of the hand that counsel was dealt.

The verdict speaks to the strength of the prosecution's case, rather than a failure of the defense team. Before trial, counsel worked diligently to challenge the government's case while at the same time preparing to offer a defense at each phase of trial. Once trial began, counsel continued to zealously advocate on Rodriguez's behalf. Far from conceding the case, as Rodriguez suggests, counsel dealt with the facts as presented and made strategic, tactical decisions as to what defense strategy to pursue. This Court should not be long detained by the Declaration of Dr. Stewart decrying the work of the trial counsel and the trial experts. Accordingly, Rodriguez has not and cannot meet his burden of establishing that trial counsel was deficient. Likewise, because Rodriguez has not alleged or offered any credible evidence showing he was, in fact, legally insane at the

105

time of the offense, he has failed to meet his burden of demonstrating prejudice as well.

This issue must be rejected in its entirety.

### II.E.    Counsel Made Appropriate Arguments in Resisting the Admissibility of Rodriguez's Prior Sexually Assaultive Conduct Under Federal Rule of Evidence 413.

Rodriguez claims that his trial and appellate counsel were ineffective based on

their alleged failure to raise two particular arguments against the admission of evidence

of his prior convictions under Rule 413 – an argument that the prior convictions were

inadmissible because sexually assaultive conduct was not a necessary element for

conviction of the charged offense, and an argument that the prior convictions were

inadmissible because there was insufficient evidence that the charged offense involved

sexually assaultive conduct.  He claims that he was prejudiced by this alleged omission

with respect to his conviction.  He further claims that he was prejudiced by this alleged

omission with respect to his sentence, on the theory that admission of his prior

convictions under Rule 413 at the guilt phase enabled the government to use them more

broadly at the penalty phase.  Mot. at 90-101, 327-28.

These claims are groundless because Rodriguez's counsel in fact raised these

arguments and this Court found them to be without merit.  See Memorandum in Support

of Defendant's Motion for a New Trial at 20-23 (Issue XIX), DKT 636; Memorandum

Opinion and Order Denying Defendant's Motion for a New Trial at 61-62, DKT 656,

2007 WL 466752.  Even if Rodriguez's counsel had not raised these arguments, or did

not do so at particular stages in the proceedings, there was no resulting prejudice or

ineffectiveness, because the arguments are without merit for the reasons stated by this court, see *id.,* and for additional reasons discussed below.  Rodriguez's claim of prejudice with respect to his sentence is absurd because -- beyond the speciousness of the claimed error in admitting the Rule 413 evidence at the guilt phase -- evidence of prior offenses is admissible in sentencing proceedings (both capital and non-capital) and properly considered "as to any matter relevant to the sentence," regardless of whether it was admissible at trial.  18 U.S.C. § 3593(c); see United States v. Rodriguez, 380 F. Supp. 2d 1041, 1052-54 (D.N.D. 2005); DKT 117; Memorandum Opinion and Order Denying Defendant's Motion for a New Trial at 14-17, DKT 656.

1.  **Rodriguez's Counsel Raised, and This Court Rejected As without Merit, the Arguments Relating to Rule 413 That Rodriguez Now Offers Again and Claims His Counsel Did Not Raise.**

In support of his motion for a new trial, Rodriguez argued that he was not accused of an offense of sexual assault as required by Rule 413, raising the same arguments that he now reiterates in his § 2255 motion.

In part, Rodriguez asserted that "Rule 413 [requires] that the current charge in the Indictment accuse Defendant of a sexual assault," and he noted that the government had observed in closing argument that commission of the charged kidnapping for a sexually assaultive purpose or the actual occurrence of a sexual assault in the kidnapping was not a necessary element for conviction.  He then argued: "The government cannot have this argument both ways.  On the one hand, the government argues to this Court that this is an offense of sexual assault in order to bring in two of Defendant's prior sexual assault

107

convictions under Rule 413.  On the other hand, the government argues to the jury that they could assume the Defendant did not sexually assault Ms. Sjodin and that he could have kidnapped her for any purpose.  There is no question that if the government had made the latter argument to the Court, the Defendant's prior convictions would never have been admitted pursuant to Rule 413."  DKT 636, 21-23.

In the same motion, Rodriguez also offered the second argument he now reiterates. Specifically, he claimed that "Rule 413 [requires] that the current charge . . . must involve conduct proscribed by chapter 109A" and that the evidence of sexually assaultive conduct in the kidnapping was insufficient for purposes of the Rule: "[T]here is little evidence that the offense in the present case was an offense of sexual assault . . . .  Due to the lack of any physical evidence that a sexual assault took place in this case, the admission of Defendant's prior convictions in 5438 and 5447 during the guilt phase was error. Defendant was prejudiced by this error because the government used the prior convictions to argue to the jury that the priors 'create a greater likelihood that the defendant did what he's accused of in this case.'"  DKT 636, 21-23.

In ruling on the new trial motion, this Court considered these arguments and found them to be without merit:

> Defendant's . . . argument is that there is insufficient evidence to conclude that a sexual assault took place during the kidnapping . . . .  Rule 413, however, merely requires that the Defendant be *accused* of a sexual assault . . . .  [This] element is satisfied in that the indictment states, in pertinent part, that Defendant kidnapped Ms. Sjodin 'for the purpose of sexually assaulting her.'" . . .  Defendant also argues that the government was inconsistent in arguing that the Defendant committed a sexual assault in order to have 5447 and 5438 admitted under Rule 413, but later

argued to the jury that the sexual assault need not be proven.  However there is nothing inconsistent about the United States arguing that the kidnapping could have been for any purpose, and arguing to the Court that a reasonable jury could find that a sexual assault occurred.  The Court did not err in admitting Defendant's prior convictions 5438 and 5447 under Rule 413.

DKT 656, 61-62.

Rodriguez's present claim that his counsel was ineffective in failing to raise these arguments is accordingly specious, because his counsel in fact did raise them in the motion for a new trial, and this court rejected them.  It further follows that there was no prejudice or ineffectiveness in failing to raise them at any other stage of the proceedings.  If they had been raised at additional times, they would have been rejected for the same reasons stated by this Court in rejecting the new trial motion, and for other reasons discussed below.

### 2. There Was No Ineffectiveness of Counsel Relating to Rule 413 in the Pretrial Litigation.

Rule 413 provides that "[i]n a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual assault is admissible, and may be considered for its bearing in any matter to which it is relevant."[20]  Paragraph (d) of Rule 413 defines the relevant notion of "offense of sexual assault":

---

[20] Rule 413 was revised, effective December 1, 2011, as part of a general stylistic revision of the Rules of Evidence .  References to Rule 413 and to other Rules of Evidence in this brief are to the versions in effect at the time of the earlier proceedings in this case.

109

(d) For purposes of this rule and Rule 415, "offense of sexual assault" means a crime under Federal law or the law of a State (as defined in section 513 of title 18, United States Code) that involved –

(1) any conduct proscribed by chapter 109A of title 18, United States Code;
(2) contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person;
(3) contact, without consent, between the genitals or anus of the defendant and any part of another person's body;
(4) deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person; or
(5) an attempt or conspiracy to engage in conduct described in paragraphs (1)-(4).

The issues concerning Rodriguez being "accused of an offense of sexual assault" as defined in the rule, which he is presently attempting to relitigate, were initially litigated in the pretrial proceedings. The government's Brief in Support of United States' First Motion in Limine, DKT 346, offered four arguments on this point:

First, the government's brief, at pp. 11-12, noted the Eighth Circuit's decision in United States v. Blazek, 431 F.3d 1104, 1108-09 (8th Cir. 2005). Blazek involved the admission of Rule 413 evidence against a defendant who was charged with (among other things) an offense under 18 U.S.C. 2423(b). On appeal, Blazek claimed that he was not accused of an offense of sexual assault as defined in Rule 413(d), arguing that lack of consent (as required by some clauses in the definition) was not an element of any charged offense, that there was no allegation of an attempt to derive gratification from the infliction of death, bodily injury, or physical pain, and that he was not charged with a crime under chapter 109A. Blazek, Appellant's Brief at 15-16, 2005 WL 5628772. The Court of Appeals disagreed, noting that "Rule 413(d) defines an 'offense of sexual assault'

110

to include any federal or state crime 'that involved . . . any conduct proscribed by chapter 109A,'" and finding that the Rule 413 prerequisite was satisfied because the § 2423(b) count of the indictment accused Blazek of traveling in interstate commerce for the purpose of engaging in conduct proscribed by chapter 109A.  Blazek, 431 F.3d at 1108-09.  Likewise, Rodriguez was accused of an offense of sexual assault as defined in Rule 413 because he was accused of a kidnapping that involved conduct proscribed by chapter 109A.

Second, the government's brief, at pp. 12-13, pointed out that Rule 413's definition of "offense of sexual assault" by its terms covers any offense that "involved" sexually assaultive conduct, and does not require that sexually assaultive conduct be an element of the offense.  The government noted in this connection United States v. Myers, 280 F.3d 407 (4th Cir. 2002), which construed identical language used in Fed. R. Crim. P. 32 in defining a covered class of violent offenses.  Addressing the defendant's contention that the use of force must be an element of the charged crime, the court in Myers found that the contention 'flies in the face of the plain language of the Rule, which uses the word 'involved' and is silent with respect to the elements of the crime." Myers, 280 F.3d at 416-17.

Third, the government's brief, at p. 13, noted that the Rule 413 requirement is that the defendant be "accused of an offense of sexual assault."  This requirement was satisfied by the terms of the indictment, which charged Rodriguez with kidnapping Dru Sjodin for the purpose of sexually assaulting her.

Fourth, the government's brief, at pp. 13-17, noted that -- even if it were assumed that more than the accusation required by the terms of Rule 413 is needed as a threshold matter -- whether Rodriguez's kidnapping of Dru Sjodin involved sexually assaultive conduct within the scope of Rule 413 would be a preliminary question of fact subject to the standards of Huddleston v. United States, 485 U.S. 681 (1988).  In Huddleston, the Supreme Court explained that in determining whether there is sufficient evidence to support such a preliminary factual determination, the court examines all the evidence in the case, including evidence of both charged and uncharged offenses, and decides whether the jury could reasonably find the conditional fact by a preponderance. Huddleston, 485 U.S. at 690-91.  This standard was easily satisfied in the present case with respect to the relevant conditional fact -- whether Rodriguez's kidnapping of Dru Sjodin involved a sexual assault or attempted sexual assault – considering his history of abducting women in order to sexually assault them and the fact that the victim's body was nude from the waist down.

In response, Rodriguez sought to distinguish Blazek on the alleged ground that he was not accused of committing the charged kidnapping with a sexually assaultive purpose, and he urged that his prior offenses could not be considered in determining whether he was accused of an offense of sexual assault for purposes of Rule 413.  DKT #365, 9-11.  The government noted in reply that the indictment did charge that Rodriguez kidnapped Dru Sjodin "for the purpose of sexually assaulting her," and that Huddleston directs consideration of all of the evidence in the case (including evidence of both

112

charged and uncharged crimes) in assessing whether there is adequate support for

admitting evidence dependent on preliminary factual determinations.  DKT 405, 4-6.[21]

This Court held a hearing on the matter on June 14, 2006, and issued an opinion "[b]ased

upon the briefing, the evidence submitted, and the arguments of counsel," which included

the following:

> The first requirement of Rule 413 is that the current case must accuse the
> defendant of an offense of sexual assault.  The defendant does not have to be
> charged with a chapter 109A offense, but the current charge must involve conduct
> proscribed by chapter 109A.  United States v. Blazek, 431 F.3d 1104, 1109 (8th
> Cir. 2003).  A court can examine the charging document to determine whether the
> offense involves conduct proscribed by chapter 109A.  See id. (examining the
> language of Count Two of the Indictment to determine the nature of the conduct).
> Chapter 109A proscribes conduct involving the use of threat or force to cause
> another person to engage in a sexual act.  The current indictment against
> Rodriguez states, in pertinent part, that he kidnapped Ms. Sjodin "for the purpose
> of sexually assaulting her."  The act of kidnapping involves threat or force,
> therefore the current charge involves conduct proscribed by chapter 109A.
> Blazek, 431 F.3d at 1109.  This criminal case does accuse Defendant of an offense
> of sexual assault.

Memorandum Opinion and Order on Rule 413 Motion in Limine at 1-2; DKT 424.

---

[21]It should be further noted that the rules of trial evidence are inapplicable to "[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104," Rule 1101(d) (1), and that a court in making such determinations "is not bound by the rules of evidence," Rule 104(a).  Had factual inquiry been necessary whether the charged offense involved sexually assaultive conduct, that would have been part of this Court's determination of a "[p]reliminary question[] concerning . . . the admissibility of evidence," Rule 104(a), and accordingly not subject to the strictures of Rule 404 limiting the consideration of evidence of prior offenses and propensity.  Hence, it would have been entirely proper to consider Rodriguez's prior offenses in determining whether the charged crime factually involved sexually assaultive conduct, though this Court found the terms of the indictment and the nature of the charged offense sufficient to resolve whether Rodriguez was "accused of an offense of sexual assault" without additional factual inquiry.  DKT 424, 1-2.

Rodriguez's current claim is that his trial counsel was ineffective in failing to include in the mix described above an argument that a defendant cannot be accused of an offense that involved sexually assaultive conduct for purposes of Rule 413 unless sexually assaultive conduct is an element of the charged crime.  Mot. at 94-98.  However such an argument would have been quite hopeless, considering the Eighth Circuit's decision in <u>Blazek</u>, the terms of Rule 413(d) -- covering offenses that "involved" sexually assaultive conduct, not speaking in terms of their elements -- and the fact that the indictment accused him of committing the kidnapping for the purpose of sexually assaulting the victim.  Moreover, as discussed above, Rodriguez's counsel did make the allegedly omitted argument in his motion for a new trial.  DKT 636, 21-23.  This Court rejected it for good reasons (DKT 656, 61-62), and would have done so for the same reasons had the same argument been raised in the pretrial proceedings.  There was accordingly no resulting prejudice and no ineffectiveness in any failure to make that particular argument in the pretrial proceedings.

In urging that this Court misconstrued Rule 413 on this point, Rodriguez states falsely that Rule 413(d) defines "an offense of sexual assault" to mean "'a crime that involves' the listed sexual conduct or attempts to commit such conduct."  Mot. at 97. The actual language of Rule 413(d) is in the past tense -- "involved" -- a choice of wording which makes perfect sense if it is understood to contemplate a retrospective look at what conduct was allegedly or factually involved in the offense at issue, but which would make no sense if the intent were to require that sexually assaultive conduct be a necessary

114

element required for conviction of the charged crime.  The inaptness of taking "involved" in Rule 413(d) to mean "has as an element" is further demonstrated by the definition's inclusion of a clause covering offenses "that involved . . . deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person."  Rule 413(d) (4).  Since the elements of criminal offenses are unlikely to be defined in these terms, the obvious intent is to reach cases in which sexually sadistic motivation was allegedly or factually present in the commission of an offense, not to confine the Rule's application based on paragraph (d) (4) to the practically nonexistent class of cases in which sadistic motivation is an element necessary for conviction of an offense.

Rodriguez also points to the decision in United States v. Courtright, 632 F.3d 363 (7th Cir. 2011), as supposedly supporting a contrary interpretation and confirming his theory that "[i]n failing to focus the Court's attention on the requirement that the defendant be accused of an offense that requires proof of a sexual element, trial counsel failed to provide constitutionally required effective assistance to Mr. Rodriguez."  Mot. at 98-99.  If Courtright had in fact interpreted Rule 413 to require a charged crime having sexually assaultive conduct as an element, it would "fl[y] in the face of the plain language of the Rule, which uses the word 'involved' and is silent with respect to the elements of the crime." United States v. Myers, 280 F.3d 407, 416-17 (4th Cir. 2002).  It would not have been ineffective assistance if Rodriguez's counsel failed to anticipate and rely on a

decision from another circuit lying five years in the future (Courtright) that endorsed an erroneously restrictive interpretation of Rule 413 on this point.

But in any event, the Seventh Circuit in Courtright did no such thing. The defendant in that case took sexually explicit photographs of a 15-year-old girl in 1998 and digitally penetrated the victim in the course of the photo shoot, resulting in his conviction for a state offense of aggravated sexual abuse and registration as a sex offender. He subsequently did more of the same, taking sexually explicit photographs of a 14-year-old girl, and digitally penetrating her during the shoot according to the victim's statement to the investigating officers. Convictions of federal crimes resulted for Courtright, including child pornography production, following a trial in which evidence of his prior conviction was admitted under Rule 413. See 632 F.3d at 365-67.

On appeal, Courtright argued that admission of the evidence of his prior conviction under Rule 413 was error. The court of appeals concluded that the trial court had interpreted Rule 413's requirement that the defendant be "accused" of an offense of sexual assault too broadly, to include situations in which "a defendant has been verbally accused of sexual assault during the course of an investigation into a separate offense." Courtright, 632 F.3d at 368-69. In light of other overwhelming evidence of guilt, any error in admitting the prior conviction under Rule 413 was found to be harmless, and the court of appeals did not need to decide whether Courtright had in fact been "accused of an offense of sexual assault" under a proper interpretation of the term "accused." Id. at 370-71. The court, however, neither stated nor suggested that that would be the case only

116

if sexually assaultive conduct was an element of the charged crime, but rather noted the breadth of Rule 413's definitional provisions in this connection:

> The more difficult question is whether Courtright was indeed charged with an "offense of sexual assault." Rule 413 defines "offense of sexual assault" quite expansively, stating that it includes a crime "that involved . . . contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person." We can imagine an argument that Courtright's charge of production of child pornography "involved" a sexual assault because S.J. initially reported that Courtright touched her vagina during the photo shoot. *Cf.* United States v. Julian, 427 F.3d 471, 486 (7th Cir. 2005) (noting the possible breadth of the "involved" language). But neither side made this argument, so we do not address it today.

Courtright, 632 F.3d at 369 n.2.

Hence, the court in Courtright suggested that Rule 413's requirement that the defendant be accused of an offense of sexual assault may be satisfied in a broader range of situations than those approved by the Eighth Circuit in Blazek and by this Court in the present case -- potentially including even cases in which the indictment did not charge a sexually assaultive crime and said nothing about sexually assaultive conduct and in which no evidence of such conduct appeared at trial. See Courtright, 632 F.3d at 366-67 (victim of charged child pornography production crime told investigators that Courtright had digitally penetrated her but did not reiterate that in her trial testimony).

Beyond the specious claim of ineffectiveness for failing to argue an "elements" interpretation of Rule 413(d)'s term "involved," Rodriguez argues that his counsel was ineffective in failing to argue in the pretrial litigation that "there was insufficient evidence of sexual assault . . . [a]lthough the defense was preparing to challenge the government's .

117

. . acid phosphatase testimony."  Mot. at 99.  Any such argument would have been unavailing for two reasons:  First, because the evidence available at the time -- independent of the later "acid phosphatase testimony" -- unquestionably was sufficient to support a jury's reasonably concluding that Rodriguez's kidnapping of Dru Sjodin involved sexually assaultive conduct under the Rule 413(d) definition, as the government explained in the brief supporting its first motion in limine.  DKT 346, 15-17.  Second, because this Court found it unnecessary to assess the evidentiary support for a preliminary factual determination, concluding that the indictment's accusing Rodriguez of committing the kidnapping for the purpose of sexually assaulting the victim satisfied the terms of Rule 413.  DKT 424, 1-2.

Indeed, as discussed above, in support of his motion for a new trial Rodriguez's counsel made precisely the argument Rodriguez now says he should have made, claiming that there was insufficient evidence that the offense in this case was an offense of sexual assault.  DKT  636, 21-23.  This Court's resolution of the issue was as follows:  "Defendant's . . . argument is that there is insufficient evidence to conclude that a sexual assault took place during the kidnapping . . . .  Rule 413, however, merely requires that the Defendant be *accused* of a sexual assault . . . .  [This] element is satisfied in that the indictment states, in pertinent part, that Defendant kidnapped Ms. Sjodin 'for the purpose of sexually assaulting her.'"  DKT 656, 61-62.

Had Rodriguez's counsel said more on the subject in the pretrial litigation, it would just have resulted in this Court's giving the same response at an earlier point.  Any

118

failure of trial counsel to do so accordingly resulted in no prejudice to Rodriguez's case and was not ineffective assistance.

### 3. There Was No Ineffectiveness of Counsel Relating to Rule 413 Following the Government's Closing Argument.

Rodriguez claims that his defense was ineffective in failing to "renew its argument related to Rule 413 following the government's closing argument, when it became clear that the government had conceded that proof of the sexual assault claim was in fact completely unnecessary." Mot. at 99-100.

The government, however, never claimed that Rodriguez's commission of a sexual assault against Dru Sjodin was necessary in order to convict him for kidnapping her. The effort to confuse what is necessary to bring the case within the scope of Rule 413 and what must be proven for conviction has been on the side of Rodriguez and his counsel.

Moreover, as discussed above, in supporting his motion for a new trial Rodriguez's counsel did precisely what Rodriguez now says he should have done. The defense renewed its argument relating to Rule 413, claiming that it was inconsistent to say that Rodriguez was accused of an offense of sexual assault for purposes of Rule 413 but that proof of sexually assaultive conduct or purpose was unnecessary for conviction, and claiming that there was insufficient evidence that the offense involved such conduct. DKT 636, 21-23.

Regarding Rodriguez's claim "that the government was inconsistent in arguing that the Defendant committed a sexual assault in order to have [the prior convictions] admitted under Rule 413, but later argued to the jury that the sexual assault need not be

119

proven," this Court found that "there is nothing inconsistent about the United States arguing that the kidnapping could have been for any purpose, and arguing to the Court that a reasonable jury could find that a sexual assault occurred."  Regarding Rodriguez's claim "that there is insufficient evidence to conclude that a sexual assault took place during the kidnapping," this Court ruled that "Rule 413 . . . merely requires that the Defendant be *accused* of a sexual assault" and that this requirement was satisfied because the indictment charged Rodriguez with kidnapping the victim for the purpose of sexually assaulting her.  DKT 656, 61-62.[22]

Had Rodriguez's counsel raised these arguments at some other time more closely following the government's closing argument, it would just have resulted in this Court's giving the same response at an earlier point.  Any failure of trial counsel to do so accordingly resulted in no prejudice to Rodriguez's case and was not ineffective assistance.

_____

[22] Of course Rodriguez's claim of insufficient evidence that he sexually assaulted Dru Sjodin was factually insupportable in light of the evidence presented at trial.  The evidence showed that Rodriguez had been convicted for two prior sexually assaultive crimes that were similar to the charged offense and that Rodriguez, in the course of kidnapping and killing Dru Sjodin, had bound her hands, partially stripped her upper body, and stripped off her clothing from the waist down.  See Tr. 6187-94, 6205-10 (testimony of Rodriguez's prior sexual assault victims), Tr. 6324-26, 6685-87, 6701-06 (evidence regarding condition of victim's body including binding of hands, partial stripping of upper body, and stripping of lower body), Tr. 6867-70 (related argument); United States v. Rodriguez, 581 F.3d at 795-96 (Rodriguez's prior convictions for sexually assaultive crimes "involved conduct similar to the charged offense"); id. at 804 (proper for the government to argue that the evidence showed Rodriguez raped Dru Sjodin before killing her in light of his criminal history).

**4. There Was No Ineffectiveness of Counsel Relating to Rule 413 in the Penalty Phase.**

Rodriguez's claims prejudice in relation to the sentencing proceedings in this case based on the alleged failure to raise his two present arguments against the admission of evidence under Rule 413. Mot. at 92-93, 100-01, 327. It is a sufficient response that these arguments were in fact raised and soundly rejected by this Court, as discussed above. DKT 656, 61-62. Since the evidence was properly admitted under Rule 413, and Rodriguez's present arguments to the contrary are without merit, there was no ineffectiveness and no prejudice resulting from the admission of this evidence.

An additional response is that Rodriguez's prior offenses would have been properly admitted and used in the sentencing proceedings in the same manner and to the same degree if they had not been admitted in the guilt phase under Rule 413. In trials of guilt or innocence, the general rule is that evidence of prior offenses and propensity is inadmissible. <u>See</u> Evidence Rule 404. Hence, the admissibility and use of such evidence at trial depends on its being within the scope of certain limited exceptions to the general rule of exclusion -- such as Rule 404(b)'s exception allowing the admission and use of evidence of other acts for purposes other than showing character, or Rule 413's exception allowing the admission and use of evidence of other offenses of sexual assault "for its bearing on any matter to which it is relevant."

In contrast, there is no general rule against disclosing a defendant's prior offenses in non-trial proceedings, including sentencing proceedings. In such proceedings, prior

121

offenses are routinely admitted and considered for their bearing on any matter in issue, including any propensities of the defendant relevant to determining the appropriate sentence.  See, e.g., 18 U.S.C. § 3553(a) (1) (history and characteristics of the defendant to be considered in imposing sentence); 18 U.S.C. § 3661 (no limitation on information concerning background, character, and conduct of a defendant that may be received and considered for the purpose of imposing an appropriate sentence); Evidence Rule 1101(d) (3) (rules of trial evidence inapplicable to sentencing proceedings).  For capital sentencing proceedings, in particular, the law provides:

> At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592 . . . .  The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death . . . .  The jury . . . shall consider all the information received during the hearing . . . .  [T]he jury . . . shall consider whether all the aggravating . . . factors found to exist sufficiently outweigh all the mitigating . . . factors found to exist to justify a sentence of death . . . .  Based upon this consideration, the jury . . . shall recommend whether the defendant should be sentenced to death . . . .

18 U.S.C. § 3593(c)-(e).

Hence, Rodriguez's prior sexually assaultive offenses were properly admissible in the sentencing proceedings "as to any matter relevant to the sentence," including proof of aggravating factors, rebuttal of mitigating factors, and determining the relative weight of aggravation and mitigation in considering "the appropriateness in the case of imposing a sentence of death."  Id.; see United States v. Lee, 274 F.3d 485, 494 (8th Cir. 2001) ("The

122

Federal Death Penalty Act (FDPA) erects very low barriers to the admission of evidence at capital sentencing hearings.  Since the need to regulate the scope of testimony is less at the penalty phase than at the guilt phase of trial, parties may present evidence 'as to any matter relevant to the sentence.'").

Rodriguez's present disregard of the black letter law on this issue amounts to an effort to relitigate three arguments he raised in the earlier proceedings, which were found to be without merit by this Court and the Court of Appeals:

First, Rodriguez argued that the rules of trial evidence must be applied to limit the information admissible in capital sentencing proceedings (e.g., DKT 636 at 2) notwithstanding 18 U.S.C. § 3593(c)'s provision that in capital sentencing proceedings "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials."  The Eighth Circuit had already rejected this notion and this court ruled accordingly.  United States v. Rodriguez, 380 F. Supp. 2d at 1053-54 (DKT 117) ("The FDPA provides for a relaxed evidentiary standard during the sentencing hearing in order to give the jury an opportunity to hear all relevant and reliable information, unrestrained by the Federal Rules of Evidence . . . .  [I]t is desirable for the jury to have as much information before it as possible when it makes the sentencing decision."); Memorandum Opinion and Order Denying Defendant's Motion for a New Trial at 14-17, 34-35, DKT 656; see United States v. Lee, 374 F.3d 637, 648 (8th Cir. 2004) ("the admission of more rather than less evidence during the penalty phase increases reliability by providing full and complete information about the

123

defendant and allowing for an individualized inquiry into the appropriate sentence for the offense").

Second, Rodriguez complained about references in the government's penalty phase argument to his criminal history, a complaint rejected by this Court and the Court of Appeals. *See* Memorandum Opinion and Order Denying Defendant's Motion for a New Trial at 82-83, DKT 656; United States v. Rodriguez, 581 F.3d at 804.

Third, the government provided notice of the statutory aggravating factor under 18 U.S.C. § 3592(c) (4) (among others), which is satisfied if the defendant has two or more felony convictions for offenses "involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person." In satisfaction of this sentencing factor, the government offered Rodriguez's two prior convictions for crimes involving sexual assaults (5438 and 5447) which were admitted under Rule 413 at the guilt phase. The government also offered Rodriguez's conviction for attempted kidnapping and stabbing of a third woman, 6192, which was excluded under Rule 413 at the guilt phase but admitted in the sentencing proceedings.

With respect to prior convictions 5438 and 5447, the sentencing matter in dispute was whether those offenses could be regarded as involving "serious bodily injury" for purposes of the § 3592(c) (4) aggravating factor. This Court concluded that they could be and submitted the matter to the jury, which so found, a decision upheld by the Court of Appeals. See, e.g., United States v. Rodriguez, 389 F.Supp.2d 1135, 1137, 1140-43 (D.N.D 2005), DKT 162; Tr. 7083-84, 7095-96, 7117 *et seq.*, 7148 *et seq.*, 7194-95,

124

7341-42; Memorandum Opinion and Order Denying Defendant's Motion for a New Trial at 59-61, DKT 656; United States v. Rodriguez, 581 F.3d at 805-09.

In his present motion, Rodriguez essentially argues that this court's admission of his earlier crimes (5438 and 5447) as relevant to establish the § 3592(c)(4) aggravating factor entails that they were not admissible for any other purpose in relation to the sentence, but for their admission under Rule 413 at the guilt phase. See Mot. at 92-93 n.261. However, this Court's determination that it was a jury matter whether 5438 and 5447 involved the infliction or attempted infliction of "serious bodily injury" as that term is used in § 3592(c) (4) cannot logically make them less admissible for the normal range of purposes allowed in sentencing proceedings (both capital and non-capital), as discussed above.

Moreover, the disclosure and consideration of Rodriguez's prior offenses in connection with the jury's determination of the sentence was not dependent on their admission under Rule 413 at the guilt phase or on their admission at the eligibility phase in relation to the § 3592(c) (4) aggravating factor. In the final, selection phase of the proceedings information was again presented which disclosed Rodriguez's commission of the prior sexual assaults against Shirley Seddon and Elizabeth Knudson, including disclosure of the following admissions by Rodriguez:

> Q: Mr. Rodriguez . . . told you that he was arrested for attempted rape of Shirley Seddon with whom he got a ride home from a bar, correct? A: That's correct . . . . He said that he got really angry . . . and forced her to perform oral sex . . . . Q: You go on to talk about the assault on Elizabeth Knudson . . . approximately one month later . . . . And again you talked with Mr. Rodriguez about that incident,

correct?  A: Yes, I did . . . .  Q:  And then you go on to say, he followed Miss Knudson from where he first saw her to a parking lot, confronted her with a knife and then raped her, correct?  A: That's correct.  Tr. 8054-57.

Q: In your interview . . . you were discussing the defendant's . . . prior sexual assaults with him, specifically with regard to Ms. Seddon, Ms. Knudson, and Ms. Whalen.  A: Right . . . .  He told me about Ms. Seddon, that . . . years earlier her and some other boys and other girls were involved in pulling his pants down in class in front of the class, and he said he took care [of] the guys but he never took care of the girls, and so the explanation here was that this was retribution for pulling his pants down when he was in grade school . . . .  He told me that the reason he perpetrated against Ms. Knudson was because he and his girlfriend . . . had gotten into a fight, and as a result of that fight he was upset and he went out and perpetrated.  Tr. 8503-04.

In light of the foregoing, Rodriguez's effort to entangle the question of his prior offenses' admission under Rule 413 at the guilt phase with their admissibility and use in determining the appropriate sentence is merely odd and adds nothing to his meritless claim that it was error to admit them at the guilt phase.

### 5.  There Was No Ineffectiveness of Counsel Relating to Rule 413 in the Appeal.

The Court of Appeals decided Rodriguez's appeal in United States v. Rodriguez, 581 F.3d 775 (8th Cir. 2009).  With respect to the Rule 413 issues, Rodriguez argued in the appeal that Rule 413 is unconstitutional, that this court failed to engage in Rule 403 balancing with respect to the Rule 413 evidence, and that it was error to allow evidence of similarities between the charged and uncharged offenses.  Appellant's Brief at 150-154.  The government noted in response that the Eighth Circuit had upheld the constitutionality of Rule 413, that Rodriguez's claim that this court failed to carry out Rule 403 analysis for the Rule 413 evidence was contrary to fact, and that Rodriguez's

126

proposed strictures on showing the similarity of charged and uncharged offenses were

inconsistent with the plain terms of Rule 413 and its judicial interpretation.  Appellee's

Brief at 150-160.  The Eighth Circuit agreed:

> United States v. Mound, 149 F.3d 799, 800-801 (8th Cir. 1998) . . . forecloses the constitutional challenge to Rule 413.
>
> Rodriguez also contends the district court abused its discretion by admitting evidence under Rule 413.  During the guilt phase, the government sought to introduce evidence of four prior sexual assaults . . . .  The government argued that all four incidents show a modus operandi of approaching young women, when alone, and using violence (or the threat of violence) in an actual or attempted sexual assault.
>
> Rule 413 permits evidence of relevant "sexual assaults."  A relevant sexual assault is one committed in a manner similar to the charged offense.  United States v. Crawford, 413 F.3d 873, 875-76 (8th Cir. 2005) . . . .  The court admitted the 5438 and 5447 convictions under Rule 413, allowing the victims to testify about Rodriguez's conduct.  In both cases, Rodriguez approached a young woman by herself, forced her into a vehicle under threat of violence, and sexually assaulted her.  Here, the government alleged Rodriguez approached Sjodin while alone in a parking lot, abducted her at knife point, forced her into a car, and sexually assaulted her before murdering her . . . .  [T]he 5438 and 5447 convictions involved conduct similar to the charged offense here.  The district court did not abuse its discretion by admitting convictions 5438 and 5447 under Rule 413.

581 F.3d at 795-96.[23]

Rodriguez claims that his appellate representation was ineffective for failing to

raise the particular arguments regarding Rule 413 evidence appearing in his present

motion, including that "counsel failed to argue that the kidnapping offense of which Mr.

---

[23] Regarding Rodriguez's allegation about Rule 403 balancing, the Court stated: "Rodriguez also alleges the district court did not evaluate the 5438 or 5447 convictions under Rule 403.  The district court's order discusses all four criminal charges the government sought to introduce under Rule 413, and strikes two under Rule 403.  The court's order sufficiently addresses the Rule 403 challenge."  581 F.3d at 796 n.7.

Rodriguez was 'accused' did not trigger application of Rule 413's propensity evidence because it lacked an element of sexual assault."  Mot. at 327-28.

However, counsel's failure to reiterate on appeal every meritless argument counsel unsuccessfully raised in the district court proceedings is not ineffectiveness.  Rodriguez's current arguments concerning Rule 413 are legally and factually groundless for the reasons previously stated by this Court in rejecting the same arguments, see Memorandum Opinion and Order Denying Defendant's Motion for a New Trial at 61-62; DKT 656, and for additional reasons explained above.  Any failure by Rodriguez's counsel to raise them in the appeal accordingly resulted in no prejudice to Rodriguez and was not ineffective assistance.

6. **Rodriguez Is Not Entitled to Relief Because It Is Not Reasonably Probable that Any Alleged Deficiency in Counsel's Performance Relating to Rule 413 Affected the Verdict or Sentence.**

Rodriguez's present claim that his counsel should have challenged the Rule 413 evidence differently, and that doing so would have resulted in the exclusion of that evidence, is groundless for the reasons explained above.  But even assuming the contrary for the sake of argument, it would entitle him to no relief.

Deficiencies in the performance of counsel are not grounds for reversal of a judgment unless it is reasonably probable that the alleged error affected the outcome.  See Strickland v. Washington, 466 U.S. 668, 694-96 (1984).  The jury was not required to find that Rodriguez sexually assaulted Dru Sjodin, or that he had previously sexually assaulted anyone, in order to convict him of the charged offense, i.e., an interstate

128

kidnapping resulting in death.  It is not reasonably probable that the jury would have

acquitted Rodriguez of the fatal kidnapping if the evidence of his prior sexual assaults

had been excluded because the independent evidence of guilt was overwhelming,

including the victim's blood in Rodriguez's car, his lies to the police when questioned

about the matter, and other physical and circumstantial evidence.  Rodriguez admits that

the undisputed facts established at trial include the following:

> On the night she was abducted, Ms. Sjodin left her job at Victoria's Secret at the
> Grand Forks mall at roughly 5:00 p.m. and placed a call to her boyfriend, Chris
> Lang.  The call ended abruptly a few minutes later when Ms. Sjodin said
> something like, "Okay, Okay."  The police later found her car parked in an unusual
> location, considerably removed from where she ordinarily parked.  Near the car,
> the police found the sheath for a knife.  Traces of Ms. Sjodin's blood were found
> in Mr. Rodriguez's car.  On questioning, Mr. Rodriguez provided the police with
> an alibi that proved untrue.  Nearly five months later, her body was discovered
> miles away, in Crookston, Minnesota.  Fibers found on her body and clothes were
> consistent with fibers found in Mr. Rodriguez's car; other fibers found on her body
> were consistent with a blanket seized from his home.  A hair found on Sjodin's
> body was a mitochondrial DNA match with Alfonso Rodriguez.

Mot. at 80-81 & n.217 (footnotes omitted) (citing to Tr. 5620-21, 5642-44, 5648, 6437-

44, 5826-29, 5854-55, 6715-16, 6396-97, 6405, 6408, 6392-95, 6400-02, 6484-87); Tr.

6848-67, 6871-85 (government's review of the evidence other than prior offenses);

United States v. Rodriguez, 581 F.3d at 783-84 (summarizing the evidence); id. at 804

(noting that the case was "long and filled with overwhelming evidence of Rodriguez's

guilt").

Indeed, Rodriguez admits that there was no viable factual defense and that he

kidnapped and killed Dru Sjodin.  Mot. at 85-87, 185-86.

129

There is accordingly no reasonable probability that any alleged deficiency in challenging the Rule 413 evidence affected the verdict in this case.  The verdict would have been the same if that evidence had not been admitted.  With respect to Rodriguez's sentence, it is also not reasonably probable that exclusion of the proffered evidence under Rule 413 at the guilt phase would have resulted in a different sentence, for reasons explained above in this section and further detailed in [cross-reference response to Part II.A of the Motion].

## II.F.   Counsel Appropriately Omitted an Objection to the Medical Examiner's Reliance on Lab Results Generated by Others.

Rodriguez claims that his trial attorneys ineffectively failed to interpose an objection to the testimony of the medical examiner, Dr. Michael McGee.  Specifically, Rodriguez contends that trial counsel should have challenged, under the Confrontation Clause, Dr. McGee's reliance on acid phosphatase testing conducted by other scientific experts.  Mot. at 101-03, cross-referencing Mot. at 319–21, which claims this Court erred in admitting the contested testimony.  Rodriguez is wrong:  the Confrontation Clause was not implicated in this instance, and any objection raised by counsel would have had no merit.

Generally, trial counsel is not ineffective for omitting an argument upon which there is no reasonable likelihood of success.  See Smith v. Armontrout, 888 F.2d 530, 545 (8th Cir. 1989); see also Garret v. United States, 78 F.3d 1296, 1304–06 (8th Cir. 1996) (holding that trial counsel have no burden to raise futile issues).  Trial attorneys therefore

bear no constitutional obligation to raise a futile objection.  See Juan H. v. Allen, 408

F.3d 1262, 1273 (9th Cir. 2005); Koch v. Puckett, 907 F.2d 524, 527 (5th Cir. 1990).

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal

prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

against him."  Crawford v. Washington, 541 U.S. 36, 42 (2004).  "A witness's testimony

against a defendant is thus inadmissible unless the witness appears at trial or, if the

witness is unavailable, the defendant had a prior opportunity for cross-examination."

Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309 (2009).  Testimonial statements

include the following:

> Various formulations of this core class of "testimonial" statements exist:
> "ex parte in-court testimony or its functional equivalent—that is, material
> such as affidavits, custodial examinations, prior testimony that the
> defendant was unable to cross-examine, or similar pretrial statements that
> declarants would reasonably expect to be used prosecutorially,"
> "extrajudicial statements . . . contained in formalized testimonial materials,
> such as affidavits, depositions, prior testimony, or confessions, White v.
> Illinois, 502 U.S. 346, 365, 112 S. Ct. 736 (1992) statements that were
> made under circumstances which would lead an objective witness
> reasonably, to believe that the statement would be available for use at a
> later trial . . . ."

Crawford, 541 U.S. at 51–52.

Federal Rule of Evidence 703 permits an expert witness to form and then testify as

to an opinion based on reports or data that are otherwise inadmissible, provided that the

reports or data are of a type "reasonably relied upon by experts in [this] field" in forming

opinions or inferences upon the subject."  See  Sosna v. Binnington, 321 F.3d 742, 746

(8th Cir. 2003).  The rule is unaffected by Crawford, as courts post-Crawford regularly

permit experts to base opinions on the work of people who are unavailable for cross-examination.  See e.g., United States v. Turner, 591 F.3d 928, 933 (7th Cir. 2010); United States v. De La Cruz, 514 F.3d 121, 132-34 (1st Cir. 2008) (medical examiner could testify as to his opinion on a cause of death when opinion was based on an autopsy report prepared by another person); United States v. Moon, 512 F.3d 359, 361 (7th Cir. 2008) (experts can base opinion on inadmissible evidence); Howard v. Walker, 406 F.3d 114, 126–27 (2d Cir. 2005) (experts may generally testify as to opinions based on hearsay and other inadmissible evidence where a defendant can cross-examine the expert about reliance on that information).  In light of this authority, Dr. McGee properly testified about the testing results produced by another person, and any Confrontation Clause objection would have been properly overruled.  See United States v. Cawthorn, 429 F.3d 793, 800 (8th Cir. 2005), *vacated and remanded on other grounds* 552 U.S. 1136 (2008) (an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge.)

Supreme Court jurisprudence that post-dates Rodriguez's trial reaffirm the rationale of these cases, and fails to assist him in showing that the admission of Dr. McGee's testimony violated the Constitution.  In Crawford, 541 U.S. at 68, the Supreme Court held that the admission of "testimonial" hearsay violates the Confrontation Clause of the Sixth Amendment unless the declarant is unavailable and the defendant had "a prior opportunity for cross-examination."  Subsequently, in Melendez–Diaz, 557 U.S. at 309, the Court held that a forensic laboratory report created to serve as

evidence in a criminal prosecution was testimonial for purposes of the Confrontation

Clause; thus, absent a stipulation, the prosecution could not introduce such a report into

evidence without offering a witness competent to testify as to its accuracy.  The Court

explained that the "testimonial statements" included three "certificates of analysis"

admitted by the prosecution to "show the results of . . . forensic analysis performed on . . .

substances" seized from the defendant and his codefendants.[241]  Melendez-Diaz, 557 U.S.

at 309.  Observing that the "certificates were sworn to before a notary public, the Court

noted that "[t]he documents . . . [we]re quite plainly affidavits:  'declaration[s] of facts

written down and sworn to by the declarant before an officer authorized to administer

oaths.'"  Id. at 310 (quoting Black's Law Dictionary 62 (8th ed. 2004)).  The Court

further concluded that "[t]hey [we]re incontrovertibly a solemn declaration or affirmation

made for the purpose of establishing or proving some fact"; specifically, "that the

substance found in the possession of [defendant] Melendez-Diaz and his codefendants

was, as the prosecution claimed, cocaine—the precise testimony the analysts would be

expected to provide if called at trial."  Id. at 310 (internal quotation marks and citation

omitted).  Thus, the Court found that "[t]he 'certificates' [we]re functionally identical to

live, in-court testimony."  Id. (quoting Davis v. Washington, 547 U.S. 813, 830 (2006)).

---

[24]As explained below, neither Melendez-Diaz nor Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011) control this issue.  Even if they did, however, trial counsel had no obligation to foresee the decisions and premise an objection upon it.  Rodriguez's trial was some three years prior to Melendez-Diaz and five years before Bullcoming.  See Parker v. Bowersox, 188 F.3d 923, 929 (8th Cir. 1999) (holding failure to anticipate developments in the law does not constitute ineffectiveness).

"In short," the Court held, "the analysts' affidavits were testimonial statements," and thus inadmissible. Id. at 311.

More recently, in Bullcoming v. New Mexico, 131 S. Ct. 2705, 2710 (2011), the Court considered whether the admission into evidence of a laboratory report certifying the results of a blood alcohol test through an analyst who was not the author of the report violated the Confrontation Clause. It held that the Confrontation Clause barred "the prosecution [from] introduc[ing] a forensic laboratory report containing a testimonial certification—made for the purpose of proving a particular fact—through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." In Bullcoming, Justice Sotomayor observed in a concurring opinion that the Court was not presented with "a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." Id. at 2722.

Williams v. Illinois squarely presented that situation, which mirrors the facts of this case. In Williams, the Supreme Court held that the prosecution does not violate the Confrontation Clause where a testifying expert relies on a laboratory analysis for the basis of an opinion, but does not offer the certificate or report itself in evidence. Williams, 132 S. Ct. 2221 (2012).

The acid phosphatase report about which Dr. McGee testifed bears no resemblance to the affidavits at issue in Melendez-Diaz, and thus did not include testimonial statements subject to exclusion. The report was not, by design, intended to function as

134

the equivalent of live testimony:  it was not sworn before an officer authorized to administer oaths, and is "in the nature of a business record," rather than testimonial. Crawford, 541 U.S. at 56; see also United States v. De La Cruz, 514 F.3d 121, 133 (1st Cir. 2008) (holding that autopsy reports are business records).  Indeed, the United States did not seek to introduce the report as the functional equivalent of live testimony when Dr. McGee was on the stand at trial.  Despite its admission during a Daubert hearing, Tr. 6511-6512, the report was not admitted as a trial exhibit.  Id. at 6512.  Rather, its contents were discussed by Dr. McGee, a witness subject to cross-examination.  Id. at 6739-6772.

Rather, Dr. McGee's testimony falls within the accepted testimony approved in Williams v. Illinois.[25]  As noted above, no effort was made to introduce the lab report from Regions Hospital as the functional equivalent of live testimony when Dr. McGee was on the stand at trial.  McGee testified regarding the results only to the extent he used them to one item he utilized to form his opinion as to whether a sexual assault occurred. The report was not admitted as a trial exhibit.  Tr. 6512.  This case is analogous to Williams.

The facts of this case are analogous to those in Williams.  Under with the analysis of the plurality or of the concurrence in Williams, the Supreme Court would find that Dr. McGee's testimony regarding the lab report did not violate Rodriguez's confrontation rights.  The four-Justice plurality in Williams likely would determine that Dr. McGee's

---

[25]The Supreme Court decided the factually analogous case of Williams v. Illinois after Rodriguez filed his Motion for Collateral Relief under Section 2255.

testimony concerning the report was offered not for the truth of the matter asserted in it, but rather was offered for the distinct purpose of establishing Dr. McGee's opinion and credibility as an expert under Federal Rule of Evidence Rule 703 and thus did not violate the Confrontation Clause.  See Williams, 132 S. Ct. at 2233–41 (plurality op. of Alito, J.). Although Justice Thomas would likely conclude that the testimony was offered for its truth, he would nonetheless find it admissible because the report was not sworn to, certified, or otherwise imbued with the "solemnity" required for the statements to be deemed " 'testimonial' for purposes of the Confrontation Clause."  Id. at 2259–60 (Thomas, J. concurring). Thus, after the Supreme Court's ruling in Williams, Rodriguez did not have a constitutional right to confront the author of the lab report referenced by Dr. McGee in his testimony.  See also United States v. Pablo, 696 F.3d 1280, 1287-1294 (10th Cir. Sept.6, 2012) (concluding that admission of expert testimony relating to lab analyst's DNA report, which was not introduced into evidence, did not constitute plain error under Williams).

Dr. McGee's expert testimony utilizing the acid phosphatase test was well within the bounds of the Confrontation Clause as interpreted by Crawford and its progeny. Accordingly, counsel did not act unreasonably or prejudicially in omitting to raise the issue by objection during trial.

### III.   Counsel Effectively Represented Rodriguez During the Eligibility Portion of the Penalty Phase Trial.

In a two-part claim, Rodriguez argues that his trial attorneys provided ineffective assistance during the eligibility segment of the penalty phase trial. Specifically, he claims that they failed to request a mistrial after the jury deliberated for what he characterizes as an inordinately long period of time, and that they failed to contest what he claims was an invalid statutory aggravator. Mot. at 103–05. As fully discussed below, neither of the omitted motions had any benefit and trial counsel therefore had no duty to make them.

**A. Counsel Appropriately Omitted Any Request for a Mistrial Premised on the Length of Deliberations.**

Rodriguez argues that his attorneys should have moved for a mistrial during the eligibility deliberations. He contends that the deliberations, which stretched over two days, were disproportionately long in comparison to the brief presentation of evidence that preceded them. Mot. at 103–04. Rodriguez is wrong, both as to the scope of the jury's task and to the likelihood of a mistrial under the circumstances of this case.

As a general matter, counsel is not ineffective for omitting an argument upon which there is no reasonable likelihood of success. See Smith v. Armontrout, 888 F.2d 530, 545 (8th Cir. 1989); see also Garret v. United States, 78 F.3d 1296, 1304–06 (8th Cir. 1996) (holding that trial counsel have no burden to raise futile issues). Thus, an attorney does not act ineffectively in omitting to seek a mistrial unsupported by the law. See United States v. Draves, 103 F.3d 1328, 1335 (7th Cir. 1997); United States v. Pierce, 959 F.2d 1297, 1303-04 (5th Cir. 1992).

A jury's failure to reach a verdict constitutes a "manifest necessity" that permits a judge to grant a mistrial and to permit a retrial. Richardson v. United States, 468 U.S. 317, 323-24 (1984). Such a situation has been "long considered the classic basis for a proper mistrial," removing any double jeopardy bar to retrial. Arizona v. Washington, 434 U.S. 497, 509 (1978). But a difficult—even a one-sided—debate in the jury room does not require the declaration of a mistrial. United States v. Knight, 58 F.3d 393, 396–97 (8th Cir. 1995). Significantly, retrial of a defendant is barred by the Double Jeopardy Clause if the trial court abuses its discretion in declaring a mistrial. See United States v. Dixon, 913 F.2d 1305 (8th Cir.1990); United States v. Bates, 917 F.2d 388 (9th Cir.1990).

In this case, circumstances did not support the granting of a mistrial on the basis of a deadlock. The jury had provided no express indication that it was deadlocked – the foremost reason why the declaration of a mistrial would have amounted to an abuse of discretion in this case. See Bates, 917 F.2d at 396 ("A trial court's abrupt declaration of a mistrial suggests that it failed to exercise sound discretion"). The jury's deliberations, moreover, were not disproportionate to the quantity of evidence it was required to analyze before reaching its eligibility verdict. The eligibility verdict included four threshold intent factors that necessarily contemplated the evidence of the underlying crime, developed during the two-week-long guilt phase trial. Likewise, the guilt phase evidence of the homicide informed three of the statutory aggravating factor allegations—that Rodriguez caused Ms. Sjodin's death during the commission of a kidnapping; that

138

Rodriguez killed Ms. Sjodin in an especially heinous, cruel or depraved manner; and that Rodriguez killed Ms. Sjodin after substantial planning and premeditation to cause her death. Indeed, even the fourth statutory aggravator, concerning Rodriguez's prior convictions, rested upon guilt phase evidence received by the jury under Federal Rule of Evidence 413.

Thus, the ten hours the jury spent deliberating its eligibility verdict were not disproportionate to the brief evidentiary portion of second phase of the trial, which merely supplemented other evidence of the heinous, cruel and depraved nature of the killing. To the contrary, the ten hours of deliberations were wholly consistent with the quantity of evidence the jury had received over more than two weeks of guilt and penalty phase testimony, virtually all of which was necessary to its eligibility findings. Ten hours of deliberations were also consonant with the considerable task confronting the jury, which was asked to make thirteen evidence-based factual findings in the eligibility phase verdict form. Under these circumstances, any decision to grant a mistrial, for a jury that had not even indicated it was deadlocked, would have been a clear abuse of discretion. See United States v. Razmilovic, 507 F.3d 130, 140 (2d Cir. 2007) ("[W]here the record does not indicate that there was a genuine deadlock, and the court has not provided an explanation for its conclusion or pointed to factors that might not be adequately reflected on a cold record, we are unable to satisfy ourselves that the trial judge exercised 'sound discretion' in declaring a mistrial"). Accordingly, counsel did not act ineffectively in omitting to seek such a ruling. Draves, 103 F.3d at 1335.

139

### B.  Counsel Properly Responded to the Government's Aggravating Factor Allegations.

Relying on his extensive arguments on the same subjects, Rodriguez asserts that trial counsel ineffectively failed to confront the evidence that he killed Ms. Sjodin in a heinous, cruel and depraved manner and that he had previously sexually assaulted other victims.  Mot. at 105 (expressly citing Mot. section II, A and referring by inference to Mot. section II, E).  Because Rodriguez's sub-claim adds no factual allegations or legal theories to his previously-stated arguments, the government makes no further effort to answer the contention, having fully explained above why these allegations should fail. See, *supra,* Answer II, A & E.

To the extent Rodriguez intended to supplement his prior contentions with additional facts and theories, his failure to actually do so renders this argument inadequately pled.  The Court should therefore disregard the contention, because a defendant undertaking a collateral attack on a criminal judgment must allege some factual basis for relief sought.  Rule 2(b)(2), Rules Gov'g § 2255 Proceedings; see United States v. Clingman, 288 F.3d 1183, 1186 (10th Cir. 2002) (petitioner must show—beyond mere allegations—that counsel's deficient performance "affected the outcome of the plea process") (citation and internal quotation marks omitted)); see also Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991) (holding that "conclusory allegations without

140

supporting factual averments are insufficient to state a claim on which relief can be based" (citations omitted)).

## IV.    Trial Counsel Effectively Presented Mitigating Evidence.

In his Motion, Rodriguez alleged his trial counsel ineffectively presented mitigating evidence during the penalty phase.  Rodriguez claimed that, although his attorneys were aware of some of this evidence and presented some of it at the penalty phase of trial, they should have done better.  Rodriguez claims that his constitutional rights were violated because counsel failed to investigate, develop, and present mitigating evidence.[26]  Specifically, Rodriguez argues that his trial counsel "did not uncover and present the readily available mitigating evidence" and "did not investigate and present his social and mental health history in its richness and detail."  He also argues that trial counsel failed to "properly challenge the government's mental health evidence" and "communicate his fundamental humanity."  Mot. at 106.

Essentially, Rodriguez claims that counsel rendered ineffective assistance of counsel by failing to conduct a timely and thorough mitigation investigation and by failing to present the jury with additional mitigating evidence.  Mot. at 106.  Those alleged additional facts (Mot. at 111–86), however, are merely cumulative of the type of evidence trial counsel developed in their investigation and presented during the penalty phase of the trial.  Trial counsel conducted an intensive investigation in anticipation of

---

[26] To the extent Rodriguez attempts to allege any substantive claims in this section, they are all procedurally defaulted for failure to raise them on direct appeal.  This Court is limited to reviewing any claims of ineffective assistance of counsel.

both phases of the trial.  Rodriguez cannot show either that counsel erred or that he was prejudiced by counsel's actions.

Counsel's performance was reasonable and effective, and none of Rodriguez's proffered evidence is of any value in a predictive weighing analysis.  The entirety of the record establishes that none of Rodriguez's proffered evidence or arguments detracts from the powerful aggravation presented in this case.  His claims may be dismissed without an evidentiary hearing based upon the record.

### A.  Standard of Review.

As previously discussed, to prevail on an ineffective assistance claim, Rodriguez must establish that counsel's performance "fell below an objective standard of reasonableness" and that in the absence of those errors a reasonable probability exists that "the result of the proceeding would have been different."  See Strickland, 466 U.S. at 688.  Rodriguez must not only show that his counsel's performance was deficient, but that he suffered prejudice as a result.  Purkey v. United States, 729 F.3d 860, 862 (8th Cir. 2013) (citing Paul v. United States, 534 F.3d 832, 836 (8th Cir.2008)).

Rodriguez must establish prejudice by showing "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  Id. (citing Wong v. Belmontes, 558 U.S. 15, 19 (2009) (quoting Strickland, 466 U.S. at 694)).  "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  Id. (citing Cullen v. Pinholster, 131 S. Ct. 1388, 1403

(2011) (quoting <u>Strickland</u>, 466 U.S. at 694).  "'That showing requires [Rodriguez] to establish 'a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at sentencing,' and 'that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.'"  <u>Id</u>. at 2 (citing <u>Wong</u> 558 U.S. at 19–20 (second and third alterations in original) (quoting <u>Wiggins v. Smith</u>, 539 U.S. 510, 535, 536, 123 S. Ct. 2527, 156 L.Ed.2d 471 (2003))).  There must be a "'substantial,' not just 'conceivable,' likelihood of a different result."  <u>Id</u>. (citing <u>Cullen</u>, 131 S. Ct. at 1403 (quoting <u>Harrington v. Richter</u>, 131 S. Ct. 770, 792 (2011))).

Counsel has a duty to adequately investigate and present evidence in mitigation. <u>Lovitt v. True</u>, 403 F.3d 171, 179 (4th Cir. 2005) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, (2000)).  However, "in assessing a lawyer's performance in this regard, the Supreme Court has emphasized that 'Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.'"  <u>True</u>, 403 F.3d at 179 (quoting <u>Wiggins v. Smith</u>, 539 U.S. at 533).  Decisions about what to do with the results of investigation are strategic decisions that are virtually immune to second-guessing by habeas courts. <u>Marcrum v. Luebbers</u>, 509 F.3d 489, 506 (8th Cir. 2007) (citing <u>Wiggins</u>, 539 U.S. at 522–23, 527–28 (2003)).  Indeed, in most cases, a counsel's decision not to pursue a particular approach at sentencing reflects a sound strategic choice.  <u>True</u>, 403 F.3d at 179. "In judging the defense's investigation, as in applying <u>Strickland</u> generally, hindsight is

143

discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made . . . and by giving a 'heavy measure of deference to counsel's judgments . . . .'"  Rompilla v. Beard, 545 U.S. 374, 381 (2005).  Given the strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one.  Kimmelman v. Morrison, 477 U.S. 365, 375 (1986). Further, when courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.  Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (citing Burger v. Kemp, 483 U.S. 776, 780 (1987)) (reciting counsel's impressive credentials in opinion finding that counsel rendered effective assistance).

### B. Trial Counsel Were Highly Experienced Criminal Defense Lawyers.

Trial counsel were experienced trial attorneys.  Robert G. Hoy has been a criminal defense attorney since 1991.  Before that, he served as an Assistant States Attorney in Cass County, North Dakota from 1978 to 1981, and was the Cass County States Attorney from 1981 until 1990.  Richard Ney, an experienced defense attorney, was specifically asked to take the case by the court because of his previous experience with approximately a dozen death penalty cases.  At the time of trial, he was in private practice in Wichita, Kansas.  Before that, he served as a public defender in various places in Illinois and Kansas, as well as serving as chief federal defender in the Districts of Hawaii and Guam. He had practiced law for close to 28 years.

### C. Counsel Conducted A Proper Mitigation Investigation And Presented An Adequate Mitigation Case At Trial.

#### 1. The Mitigation Investigation.

The record in this case reflects that Rodriguez's trial counsel began to prepare for their mitigation presentation well before trial which was begun on August 14, 2006. As early as November 22, 2004, mitigation specialist Ingrid Christiansen had been retained by trial counsel and had received "travel authorization" from this court "[to obtain information on behalf of the defendant relevant to mitigation."[27] She met Rodriguez at the Cass County jail as early as December 18, 2004 for mitigation purposes.[28] In an order from this Court dated August 3, 2005, the Court recognized trial counsel had already "retained Ingrid Christiansen as mitigation specialist" and that she had "completed much of her work." Further, "[s]he is regarded as one of the best mitigation specialists in the upper midwest."[29]

On this same date, August 3, 2005, the court approved of the hiring of a clinical psychologist, Dr. Hutchinson, as a mental health expert for mitigation purposes. Dr. Hutchinson had testified in "a number of capital cases."[30] The court also approved the hiring of a neuropsychologist, Dr. Froming, to conduct testing to assess brain damage or

---

[27]Petitioner's Exhibit D-77.

[28]U.S. Exhibit 3.

[29]DKT 169. Trial counsel presented testimony from Richard Burr, an attorney who since 1997 has served as a member of the Federal Death Penalty Resource Counsel Project. In his capacity he has tried federal death penalty cases and consulted on death penalty cases and budgets.

[30]Id.

dysfunction.[31]  The court approved the hiring of Dr. Cunningham to refute the

government's evidence of future dangerousness, an area of possible mitigation for the

defendant.[32]  Further, trial counsel hired Sister Dwyer concerning sex offender treatment

of the defendant, a possible mitigation area.[33]  The court approved an expert toxicologist,

Dr. Stallones, to address for mitigation purposes the defendant's theory that exposure to

pesticides resulted in brain injury.[34]  The court also approved the hiring of Dr. Rossby for

serotonin testing of the defendant.  The defendant's exposure to DDT may have induced

low serotonin level that may increase the risk of violent behavior.[35]

On April 3, 2006 trial counsel issued subpoenas to take depositions of Kevin

Goodno, Commissioner of the Minnesota Department of Human Services, and Joan

Fabian, Commissioner of the Minnesota Department of Corrections, together with

subpoenas duces tecum to provide the names of individuals who had worked or dealt with

Rodriguez during his stays in the Minnesota prison system in an effort to obtain

mitigation evidence.  The subpoenas sought the addresses of current or former Minnesota

State Security Hospital employees Anne Amundson, Sister Peggy Anderson, Bruce

Hawkinson, Greg McDunn, Charles Sheppard, and Maureen Walker.  They also sought

the addresses of current or former Minnesota Department of Corrections employees Mark

---

[31]Id. Mr. Burr testified that Dr. Froming would be "his first choice as an expert in
this narrow field.
[32]Id.
[33]Id.

[34]Id.
[35]Id.

Brooks, Connie Bush, Dwight Close, Don Engledinger, Steve Ergen, Christopher Esty, David Hall, Diana Lind, Jose Lopez, Ted Mickelson, Jill Rhoda, and Rita St. George.[36]

Thereafter, trial counsel took the depositions of numerous individuals for purposes of gathering mitigation evidence. Those individuals included Jill Tigner, May 17, 2006 (Petitioner's Exhibit D-116); Steve Ergen, May 17, 2006 (Petitioner's Exhibit D-117); Donald Engledinger, May 17, 2006 (Petitioner's Exhibit D-118); Mark Brooks, May 10, 2006 (Petitioner's Exhibit D-119); Connie Cushing, May 18, 2006 (Petitioner's Exhibit D-120); Diana Magaard, May 10, 2006 (Petitioner's Exhibit D-121); Ted Mickelson, May 10, 2006 (Petitioner's Exhibit D-122); Rita Saint George, May 10, 2006 (Petitioner's Exhibit D-123); and Dwight Close, May 17, 2006 (Petitioner's Exhibit D-124). They also deposed Bruce Hawkinson on May 18, 2006. See attached U.S. Exhibit 4; Trial counsel also took the deposition of Dolores Rodriguez on December 13, 2005. Ex. D-115.

They also had obtained all records for Alfonso Rodriguez, Jr. from the Minnesota Security Hospital and the Minnesota Department of Corrections. Petitioner's Exhibits D-66 and D-67. Dr. Karen Froming saw Rodriguez as early as November 11, 2005, conducted testing over three days, and provided a nine page report of mitigation to trial counsel. Petitioner's Exhibit D-107. Dr. Marilyn Hutchinson met Rodriguez on at least three occasions beginning on October 20, 2005. Dr. Hutchinson provided a thirty-seven

---

[36]DKTs 316, 317, 327, 328, 329, 330.

page report of mitigation to trial counsel.  Petitioner's Exhibit D-90.  She consulted Dolores Rodriguez and Ms. Rodriguez's daughters.

As this record shows, trial counsel directed and participated in an admirable effort to develop mitigation evidence.  They hired mitigation specialists and experts more than one and one half years prior to trial and began to develop mitigation evidence.  *Cf.* Williams v. Taylor, 529 U.S. 362 (2000) (counsel did not begin to prepare for the sentencing phase until a week prior to its start).

### 2.  The Mitigation Case at Trial.

Rodriguez also claims that trial counsel failed to present proper testimony from the witnesses during the penalty phase of the trial.  This claim, too, is refuted by the record.

During the penalty phase, trial counsel presented a lengthy and detailed mitigation case on his behalf.  The mitigation presentation spanned four days of testimony.  Trial counsel called a total of twenty-four mitigation witnesses, including his mother, two sisters, an aunt, a niece, a nephew, and two family friends, all of whom testified as to Rodriguez's love and kindness towards them and the emotional pain they would suffer if he were executed.  They further testified about his life experiences, including his troubled childhood until he was incarcerated.  Trial counsel also called a religious counselor who had seen Rodriguez at the jail on numerous visits and had developed a relationship with him.  Rodriguez called numerous witnesses employed by the Minnesota Department of Corrections regarding his conduct during his previous imprisonment.  They also called employees of the Cass County jail regarding his stay in the jail.  Trial counsel also called

148

four expert witnesses—doctors—who testified concerning his alleged exposure to toxins as a child, his addiction to drugs and alcohol as a child, his alleged mental disorders, and his concerns about being released from prison.  Tr. 7621-8454.

### a. The Evidence.

### 1. Dolores Rodriguez.

Rodriguez's mother, Dolores Rodriguez ("Dolores"), testified about Rodriguez's history, saying that Rodriguez was a good son, kind and loving. Tr. 7623.  This testimony encompasses seventy-nine pages. Tr. 7621-7700.  She testified that Alfonso Rodriguez, Sr. was a migrant farm worker who migrated from Laredo, Texas to Crookston, Minnesota.  She married him at seventeen and became a migrant farm worker.  She described having her children, five in all, including Rodriguez.  She testified to intermittently staying at a migrant farm house in Crookston for nine years.  Dolores said that, during these years of migrant farm work, fields were sprayed with chemicals in the spring.  She described how the fields were sprayed while she was pregnant with Rodriguez.

Dolores also testified about Rodriguez's developmental stages.  Rodriguez was a healthy baby, but he could not breast feed.  He would cry and get sick.  The doctor instructed her not to give him milk products, but rather to give him boiled rice water.  He was sick for about his first eight months.  Eventually, Rodriguez began to gain weight and to thrive a bit more.  He began walking at about two years and talking at about two-and-a-half years.

149

Dolores testified that at some point she and her husband decided to stay permanently in Crookston because the children were behind in school.  The children did not do well academically or socially in school.  There were only a few Hispanic or Chicano families in the Crookston area.

She also testified about the family's economic situation.  Alfonso Sr. lost his job because he had an accident driving a tractor and injured his spine.  The family did not have any income and started receiving welfare payments.  Dolores was hired at a restaurant washing pots and pans.  Sylvia, a daughter, took over mom's role in the evening.  Dolores continued to work and became head cook at the University of Minnesota–Crookston.  Alfonso Sr. eventually opened a radiator shop and worked there for a while, but eventually went back to farm work.

Dolores testified about the defendant's teen years.  She testified about phone calls he had gotten into trouble with at age 14 or 15.  She testified that he had heavily abused alcohol and narcotics at age 14, 15 or 16, but stated that she did not know about it at the time.  She testified he was doing well in school but had terrible headaches and put a cold washcloth around his head.  She had earlier testified that Alfonso Sr. had tremors, and that both Sylvia and Rodriguez have tremors as well.

Dolores testified that when Rodriguez was placed in prison Alfonso Sr., Rosa, and Dolores visited him at St. Peter and that she visited him regularly.  Rodriguez was transferred to Stillwater in 1980, and she would visit as often as possible.  Alfonso Sr. died during this incarceration.  All the defendant's sisters visited him in prison.

150

Dolores testified that when Rodriguez was released from prison in 2003, he moved back to Dolores's home in Crookston. He helped her with gardening and household chores and treated her and his family with respect. He had relationships with his sisters and nieces and nephews. He respected family members who welcomed him back into their lives. Rodriguez was also very tidy, meticulous, and clean. He tried to get a job after getting out of prison, but was unsuccessful. She discussed his ability to go back and forth from her home with a new 2002/2003 car. He liked to go fishing, and would go to Grand Forks on the weekends. In the fall of 2003, Dolores did not have any reason to question Rodriguez coming back into her home.

Since his arrest for the present offense, Dolores had visited him regularly at the jail and still considered him an important part of her life. She testified she would be impacted if he were executed and would be affected emotionally. In addition, several family photos and photos of the defendant were admitted into evidence through Mrs. Rodriguez. Tr. 7621–7700.

## 2. Rodriguez's Sisters.

Ileanna Noyes, Rodriguez's youngest sister who was seven years younger than Rodriguez, testified that she was married, had three children, lived on an eighty-acre farm, and worked as a family service worker. She testified that she remembered her brother in her youth as a "sweet caring . . . brother, funny. He could always make us laugh."

151

Tr. 8426. While he was in prison, she maintained contact with him by phone and personal visits. Her kids also had contact with him. Rodriguez sent her money from prison for her children for Christmas.

Prior to his release, she was concerned about the release. She testified that she made contacts with various correction personnel prior to Rodriguez's release from prison regarding probation, civil commitment, when he was going to be released, how he was going to be released, and where. She learned he was going to be released without supervision as he had served his sentence.

Ileanna testified that she had a good relationship with Rodriguez. He helped her plant her garden and canned with her. He helped with her children. Her children "adored him," and "loved him." They had a good relationship with him; they went places with him; they trusted him and looked up to him. She described the relationship between her mother and Rodriguez as "great." And she described numerous things he did for her mother. Ileanna testified she continued to visit Rodriguez after he was charged in this case. Tr. 8424–54.

Rosa Rodriguez, Rodriguez's other younger sister, testified she grew up in Laredo with her aunts. She graduated from high school a member of the National Honor Society. She later graduated from UND and received a Master's degree in counseling. She maintained employment as an administrator at a college. While growing up, she saw her family at least once a year. Rodriguez was "quiet" but "had a sense of humor." "He was always wonderful. He was funny. He was good-natured, teasing." As they grew older

152

into their teens she notice Rodriguez was more "assertive" when she visited him in Crookston.  She and her children visited Rodriguez in prison.  Her children were "close" to Rodriguez.  Tr. 8292–8304.

Rodriguez's older sister, Sylvia D'Angelo, testified about their life growing up. She testified that her family were migrant workers.  They moved to Crookston in 1963 and lived in a farmhouse with no running water, electricity or bathroom. Tr. 7902–07. She testified she remembered being hungry, scared, and alone.  She and her siblings were picked on because of their race.  Rodriguez was teased because of the color of his skin and for being small.  They both had difficulty in school.  She testified about her father being injured in the tractor accident and the family receiving welfare.  Sylvia acted as caretaker of her siblings throughout this period of time.  Tr. 7909–17.

Sylvia and her siblings would play out in the fields while planes sprayed crops. They would feel "sticky."  She has many health issues including headaches, blurred vision, dizzy spells, and tremors.  Tr. 7907-09.  She testified that she and Rodriguez went to migrant school run by a Catholic church when she was six.  She testified that she witnessed Rodriguez being sexually abused by a nun when he was four years old at the migrant school.  Tr. 7921.  On another occasion, both she and four-year-old Alfonso was forced to suck an older man's penis while their parents were working harvesting potatoes. Tr. 7927–28.  Sylvia tried to get Rodriguez "help" such as placement in a halfway house when he was released from prison in 2003.  Tr. 7936.

153

### 3. Other Family and Friends.

Rodriguez's aunt, Belia Flores, testified that he was a "very sick baby for a while" but was a "very lovable child" and attached to her. Tr. 8122–23. Ms. Flores was very close to the family. She testified about the family's poor lifestyle, including living in a farmhouse, working in the farm fields, and being exposed to "insecticide" spraying. Finally, she testified about Rodriguez's visit to her in Laredo, Texas in 2003 and recalled that he was the same nephew she knew, "respectful and caring." Tr. 8136.

Alina Noyes, a niece of Rodriguez and daughter of Illeana, testified that she and her brother would go to Rodriguez's house after school and that he would have a snack for them. They played games together with Rodriguez. He took her to a movie, and he took them fishing. She visited Rodriguez in prison. She believed he was a good uncle. Tr. 8409–16.

Josh Noyes, a nephew of Rodriguez and son of Illeana, testified that after school he would go to Rodriguez's house and that Rodriguez would have a snack for him and his sister. They played games together with Rodriguez. Rodriguez took him fishing and to the car races. He also helped clean his car with him. Josh saw Rodriguez almost every day. He visited Rodriguez in prison. He believed he was a good uncle. Tr. 8416–22.

A family friend, Martha Gonzalez, testified that she met Rodriguez after he was released from prison and lived with his mother. She was at the house most days and observed him doing various chores including laundry, cooking, baking, lawn work, and washing the car. He ran errands for his mother. He did not drink alcohol and did not

154

have a temper.  He helped his mother and treated her and others with respect.  Tr. 8137–46.

Clifford Hegg, another family friend, testified that he was a neighbor and met Rodriguez after his release from prison in 2003.  Rodriguez took over the household chores, taking out the garbage, running errands, and giving his mother rides.  Rodriguez was very friendly and he talked to him about fishing and the yard.  Hegg observed Rodriguez many times playing football, softball, and soccer with his nieces and nephew in the yard.  Rodriguez had a close relationship with his mother.  Tr. 8287–92.

### 4.  Expert Testimony.

Trial counsel offered expert testimony from a number of individuals.

They offered expert testimony from Dr. Donald Ecobichon that toxic chemicals, such as DDT and toxaphene, were used extensively on sugar beet crops in the Red River Valley during the time Dolores Rodriguez and her family were working in the fields and living nearby.  Tr. 7715-16.  He testified that toxaphene quickly evaporates when sprayed and can be easily absorbed through inhalation, dermal exposure and ingestion.  Tr. 7723-26.  He testified exposure to these chemicals can lead to persistent tremors, muscle weakness, poor learning skills, phobias, anxiety, depression, and aggressive behavior.  Tr. 7749-51.  Dr. Ecobichon's testimony corresponded with testimony that Rodriguez suffered from hand tremors.  Tr. 7642.  His testimony also corroborated other testimony relating to Rodriguez's learning problems and failures in school. Tr. 7988-89.

Dr. Karen Froming, a neuropsychologist, testified that Rodriguez suffers from subcortical brain damage, the center of impulse control within the brain. Tr. 7822-23.  Dr. Froming extensively tested Rodriguez over three days.  Dr. Froming had obtained a family history prior to her testing.  Dr. Froming's testing confirmed that the origin of Rodriguez's brain damage was likely neurotoxin exposure. Tr. 7822.

She testified that "there are some mild symptoms of depression there as you would expect but not of the significant degree that you would expect to see these what are called frontal subcortical signs . . . Depression is implicated in these same regions but the presence of the motor problems, the impact of the motor problems on various tasks, the working memory deficit and then his acquired color vision loss, his absence of smell function, really all say to me that he has frontal subcortical brain damage and the etiology of that may be neurotoxin exposure." Tr. 7822.

Dr. Froming further testified that these frontal lobe impairments affected his impulse control:  "[I]t's a very complex part of the brain.  It [has] . . . to do with problem solving, anticipating future events, executing a plan of action.  It also has a lot to do, particularly the orbital frontal cortex, with impulse control and being able to modulate or control one's emotions, also in inhibiting one's responses and emotions and impulses.  And so these impairments have a lot to do with his impulse control."  Tr. 7823.

Dr. Marilyn Hutchinson, a clinical psychologist, testified that Rodriguez was malnourished for most of the first year of life, and this had a biological importance because of the growth of the brain in one's first year.  She testified that, as a teen,

156

Rodriguez experienced terrible headaches.  Tr. 7988-89.  She testified he had a sexual preoccupation, often seen in victims of sexual abuse.  Tr. 8011-12.  She testified that she was aware of the prior sexual abuse that had been reported and testified to by Sylvia. Dr. Hutchinson testified that Rodriguez confirmed his memory of the sexual abuse at the school. Tr. 7960, 7965, 8046–49.  Dr. Hutchinson diagnosed Rodriguez with dysthymia, a long-term depression, coinciding with Dr. Ecobichon's testimony.  Depression is one of the symptoms of exposure to the toxic chemicals used during Rodriguez' early life in the sugar beet fields.  Dr. Hutchinson testified Rodriguez's memory, mood, academic, and impulse control problems were related to toxic exposure.  Tr. 8031-32.  She also diagnosed him with substance abuse in remission, a general anxiety disorder and post-traumatic stress disorder due to the prior sexual abuse.  Tr. 8029-31.  She did not find that he suffered from dissociative disorder. Tr. 8007.

Dr. Hutchinson testified extensively about and then summarized the seven factors that negatively influenced Rodriguez's life and his psychological makeup:  childhood deprivation, poverty and malnutrition; sexual abuse; racism he experienced; failure in school; substance abuse; exposure to toxic chemicals; and the multiple mental health and neurological conditions he suffers.  Tr. 7944-8038.

### 5.  Minnesota Correctional Officials.

Trial counsel also called several witnesses from the Minnesota correctional system who knew Rodriguez from his time in state prison.

Jill Tigner testified that she was Rodriguez's case manager from 1987-89. She provided testimony regarding his stay in prison during this time. He did well in prison, had employment within the prison, had no disciplinary problems, and had agreed to become involved in the Transitional Sex Offender Program. Tr. 8146–56.

Mark Brooks testified he worked at Oak Park Heights as a correctional officer. Rodriguez worked in the laundry and did a good job. He was respectful and was in the Honors Unit, as he was discipline free. Tr. 8160–69.

Connie Cushing is a Minnesota Department of Corrections employee worked with Rodriguez at Oak Park Heights and Stillwater. She testified that he was a "respectful" inmate and she did pat-down searches of him without incident. He followed the rules and was always "very quiet, very respectful"" and commended on his institutional behavior. Tr. 8170–82.

Diana Magaard is a Minnesota Department of Corrections employee worked at Moose Lake when Rodriguez was imprisoned in that facility. She was his case manager from 1994 through 1996. He was in the Honors Unit, was quiet, and worked in the print shop. He had above average evaluations. Tr. 8184–8203.

Steve Ergen was also a case manager at Moose Lake for Rodriguez in 1995. Rodriguez was a good, respectful inmate, although he had one disciplinary problem regarding throwing a rock at a fence. From 1998 through 2001, Ergen was the chairman of the review committee. Reports again indicated that Rodriguez was a good inmate with no disciplinary problems, above average job evaluations, good production, and good

158

attitude.  The 2001 report noted that the Minnesota Department of Corrections had determined that Rodriguez would not be civilly committed upon his release from prison in 2003.  Tr. 8204–18.

Ted Mickelson was Rodriguez's case manager at Moose Lake from 1997 until his release in 2003.  Mickelson testified Rodriguez kept to himself and out of trouble.  He did well on his job at the print shop and was respectful.  He was housed in the Honors Unit.  Moose Lake housed approximately 1100 inmates of which around 40-50% were sex offenders.  Rodriguez indicated he was not interested in the sexual offender treatment program or in meeting with a psychologist.  If he had taken advantage of that option, he may have been released seven months earlier.  Rodriguez expected to serve his sentence to "expiration."  Mickelson also testified Rodriguez had anxiety prior to release regarding a possible placement at a halfway house.  He also discussed with him the possibility of moving out of state.  He testified that he informed Dr. Rita St. George that Rodriguez should be civilly committed.  And that he had sent an e-mail regarding the fact that Rodriguez's case should be given close "scrutiny" regarding civil commitment. Tr. 8219–78.

Dr. Rita St. George, a clinical psychologist at the Moose Lake Prison, testified regarding her interactions with Rodriguez at the prison.  She testified that she met Rodriguez in January 2003 upon his request regarding a "mental health problem."  She testified he was experiencing anxiety about his pending release from prison.  He was having trouble sleeping, his appetite was erratic, and he talked to her about plans for his

159

upcoming release.  He was frightened about going back out into the community.  She testified that it gave her concerns but also that it was not unusual to for offenders to experience fears and anxiety prior to release after such a long prison term.  Due to this, she testified that she had concerns about his re-offending.  She testified he was "frightened of himself."  Trial counsel elicited the fact he may have been trying to tell her that he was afraid he may commit another offense if he were let out of prison.  She contacted her supervisor to see if "there were any transitional services" to offer Rodriguez.

She also testified about a conversation she had with Ted Mickelson regarding Rodriguez being civilly committed.  She also testified that in a later meeting with Rodriguez a month later his mood appeared "bright" and he was doing much better.  He had done some hands on planning about his release.  He had met with the transitional coordinator and worked on some practical matters, such as getting an ID, job applications, residential planning.  She testified he said he had no ideas of suicide or homicide.  Tr. 8320–78.

Mary Geller, a classification officer for the Cass County Jail, testified that Rodriguez was held in a segregated cell area for his protection pending trial in this matter.  She met with him at least once per week.  She testified that he read a lot and liked to do jigsaw puzzles.  She described him as "very social" and a "model inmate."  They talked about gardening and his nieces and nephews, among other things.  Rodriguez was "quiet," "very patient," and "likeable."  Tr. 8380–87.

Lyndon Worden, a shift supervisor at the Cass County Jail, testified Rodriguez was "quiet," "non-demanding," and "easy to manage." Tr. 8388–92.

LouAnne Honek testified she was a registered nurse with the Fargo Cass Public Health Department. She did routine testing and medical services at the jail with Rodriguez. In her contacts with him, Rodriguez was never a discipline problem or threatening. He was always respectful. Tr. 8393–98.

Sister Yvonne Nelson testified that she visited Rodriguez on numerous occasions, about once per week, while he was in the Cass County jail.[37] She visited with him about numerous subjects, including his interests, her interests, hobbies. She testified that they were both avid readers. They talked about gardening and recipes, his family, and his childhood. She provided him with a bible, and they talked about passages that Rodriguez would prepare to discuss. Sister Nelson felt that had the capacity to grow spiritually. Rodriguez was hesitant at first but it became very "pleasant . . . smiles and laugh and an openness." Tr. 8399–8406.

Ruth Johnson testified she worked for AMICUS, a company that helps people coming out of prison to get back into the community. She was in charge of the program that offered resources and referrals to those coming out of prison. Rodriguez's sisters had called and inquired of halfway house services in the Crookston area. Tr. 8280–86.

---

[37]U.S. Exhibit 3.

161

### b. Mitigating Factors.

Rodriguez requested, and the court submitted, thirty mitigating factors for consideration by the jury during its deliberations. On September 20, 2006, the jury heard the court's final instructions of law and closing arguments by counsel, and it retired to deliberate at 12:28 p.m. Tr. 8650–8753. On September 22, 2006, at 11:09 a.m., the jury returned with a verdict. The jury unanimously found that the United States had proved beyond a reasonable doubt that Rodriguez had caused loss, injury, and harm to Dru Sjodin and her family. The district court instructed the jury regarding, and at least one juror found, Petitioner's trial counsel proved the following mitigating factors:

1. If he is not put to death, Alfonso Rodriguez will live every day of the rest of his life incarcerated in a federal prison.

2. Alfonso Rodriguez was sexually abused as a child.

4. Alfonso Rodriguez suffers from brain damage.

5. Alfonso Rodriguez suffers from a mental disorder or impairment.

7. Alfonso Rodriguez was introduced to addictive drugs and alcohol at a young age and has suffered from alcoholism and drug addiction during his life.

8. Alfonso Rodriguez had learning problems in school because he grew up in a migrant family that moved from place to place during the school year.

9. Alfonso Rodriguez had learning problems in school because he was developmentally delayed as a child.

10. Alfonso Rodriguez has experienced racial prejudice during his lifetime.

11. Alfonso Rodriguez has shown love and kindness towards his mother Dolores.

12. Alfonso Rodriguez is loved by his mother, Dolores, and Dolores will suffer emotional pain if Alfonso is executed.

162

13. Alfonso Rodriguez has shown love and kindness towards his sister, Sylvia D 'Angelo.

14. Alfonso Rodriguez is loved by his sister, Sylvia D'Angelo, and Sylvia will suffer emotional pain if Alfonso is executed.

15. Alfonso Rodriguez has shown love and kindness towards his sister, Rosa Rodriguez.

16. Alfonso Rodriguez is loved by his sister, Rosa Rodriguez, and Rosa will suffer emotional pain if Alfonso is executed.

17. Alfonso Rodriguez has shown love and kindness towards his sister, Illeana Noyes.

18. Alfonso Rodriguez is loved by his sister, Illeana Noyes, and Illeana will suffer emotional pain if Alfonso is executed.

19. Alfonso Rodriguez has shown love and kindness towards his nephew, Joshua Noyes.

20. Alfonso Rodriguez is loved by his nephew, Joshua Noyes, and Joshua will suffer emotional pain if Alfonso is executed.

21. Alfonso Rodriguez has shown love and kindness towards his niece, Alina Noyes.

22. Alfonso Rodriguez is loved by his niece, Alina Noyes, and Alina will suffer emotional pain if Alfonso is executed.

25. Alfonso Rodriguez has responded well to structured environments and would likely make a good adaptation to prison if he were sentenced to life imprisonment.

26. Since his arrest on this charge, Alfonso Rodriguez has been a well-behaved inmate.

27. Alfonso Rodriguez raised concerns to prison officials about being released from prison in 2003.

29. Alfonso Rodriguez has the potential to grow spiritually.

30. Considerations of mercy support a sentence of life imprisonment without the possibility of parole.

Penalty Phase Special Findings Form; DKT 626, pp. 1-5.

Various jurors found that 25 of the 30 mitigating factors submitted had been proved by the greater weight of the evidence. More than one juror found 25 of Rodriguez's 30 mitigators.[38] Of those, the jury was unanimous on 19 of the mitigating factors.

### c. Rodriguez's Claims Are Cumulative.

Rodriguez raises a number of arguments that his trial counsel was ineffective for failure to present mitigation evidence. But much of the evidence that he now claims should have been presented is either cumulative of evidence that was actually presented at trial or actually undermines the mitigation cases presented at trial. His trial counsel was thus not ineffective with respect to the mitigation case put forward at trial.

At trial, Rodriguez was depicted as having been widely marginalized and rejected. More detail now available about Mr. Rodriguez reveals him to have developed and maintained numerous reliable and age-appropriate friendships and to have had both well-adjusted and antisocial peers with whom he maintained friendships.

---

[38] No juror found that Rodriguez suffered from the effects of his exposure to toxins (Mitigating Factor #3); that he had neurological or psychological problems which have impaired his ability to make good decisions (Mitigating Factor #6); no juror found the existence of other factors in his childhood, background, or character (Mitigating Factor #23); that he offered to plead guilty to causing Dru Sjodin's death, thereby accepting responsibility for his actions (Mitigating Factor #24); and the Minnesota Dept. of Corrections personnel failed to act on statements of concern from him and his family about his release from prison in 2003 (Mitigating Factor #28). However, at least 3, and as many as 12, found all 25 other mitigators.

At trial, Rodriguez was portrayed as a starving infant with failure to thrive. Dr. Hutchinson testified of malnourishment and how it affects individuals and causes possible brain damage. Additional information regarding his malnourishment in the Motion is cumulative. This matter was presented to the jury and submitted as Mitigation Factors #4 and #9.

At trial, the Rodriguez family and home were depicted as receptacles of pesticides and toxins. Experts testified at length about it and the possible damage it may have caused Rodriguez. Additional information regarding toxins in his Motion is cumulative. This matter was presented to the jury and submitted as Mitigation Factors #3 and #4.

The jury heard that Rodriguez was the subject of racial prejudice and that it may have affected his mental health. Dr. Hutchinson addressed this in her testimony. Additional information on racial prejudice if it exists is cumulative.[39] This matter was presented to the jury and submitted as Mitigating Factor #10.

---

[39] The jury did not hear that Rodriguez's best friend, Bill Mauer, was white or that his girlfriends were also white. For instance, Gale Vagle, a teenage girlfriend, says "Rodriguez was never teased about being a Mexican-American or for being short in stature."" Exhibit D-112 at 1. And the jury did not hear of the close relationship enjoyed by the Mendez, the Dominguez, the Moreno, and the Rodriguez families, and how the families shared, socialized and entertained together as large families. Report of Dr. Welner; U.S. Exhibit 5 at 198.

The jury heard testimony about the "poverty" Rodriguez grew up with and how it may have affected him mentally through Dr. Hutchinson's testimony.  Additional information on the family's lack of financial resources is cumulative.[40]

At trial the jury heard about multiple episodes of Rodriguez being sexually abused.  Dr. Hutchinson testified extensively with regard to its effects on the defendant including her assessment that he suffered post-traumatic stress disorder as a result. Although this was the first time in his life that he was diagnosed with PTSD, after having been treated for years in the Minnesota Security Hospital and seen by numerous counselors, psychiatrists, and psychologists, the effect of this alleged prior abuse was presented to the jury.  Counsel for Rodriguez now, through additional experts, present it

---

[40]The jury did not hear the jury that the family enjoyed support from a network of other migrant families living in Crookston at their most difficult time.  The jury likewise did not learn of the degree of support and diversity of benefits provided to the family through the Salvation Army.  Nor did the jury learn of how Rodriguez's father Alfonso Sr. refashioned himself as a radiator mechanic within a year, then moved his family into town to a home with full facilities, and parlayed a sizeable personal injury settlement into home ownership among families with a warm socially integrating environment.  The jury did not hear how his mother became a full time cook at the local college. Report of Dr. Welner, U.S. Exhibit 5 at 200.  His peers saw him as someone with money:  Dorothy Knutson, a/k/a Dotsie Dahl, one of his teenage girlfriends, recalled that Rodriguez's family was gainfully employed and took good care of themselves.  This is exemplified by the fact that Rodriguez's mother always had her hair styled nicely and that Rodriguez wore expensive, fancy clothes that were purchased from Logan's Men's Store in Crookston. Exhibit D-11 at 3.

166

in their Motion. To now say "no, we really mean it" is cumulative.[41] This matter was presented to the jury and submitted as Mitigation Factors #2, #4, and #5.

Dr. Froming testified at trial that Rodriguez suffered from frontal lobe syndrome or other brain damage causing him to have problems with impulse control. She testified that this syndrome is directly related to executive functioning. The jury heard that, on test after test, Rodriguez scored below the norms, sometimes astonishingly so.[42] Jumping on this, Dr. Pablo Stewart declares that this frontal lobe damage is directly related to executive functioning. This is again cumulative. This matter was presented to the jury and submitted as Mitigation Factors #3, 4, and 5.

Information on Rodriguez's tremor and headaches he suffered in his teen years is not new. It was presented to the jury at trial and is cumulative.

In addition, even factors that were presented at trial and counsel now argue should have been more fully presented, have no basis in fact. For example, the jury was told at

---

[41]Counsel also presents through the Declaration of Dr. Pablo Stewart that due to his PTSD, Rodriguez entered into a dissociative state in which he was legally insane causing him to kill Dru Sjodin. This will be addressed *infra*.

[42]Although presented at trial, Rodriguez does not have frontal lobe damage. His executive functioning is not impaired. His test scores are average to low average and even above average on occasion. As Dr. Seward notes in his report: "The scores produced in this evaluation do not reflect the presence of 'Frontal lobe syndrome' or other brain damage. Mr. Rodriguez did very well on some tests and less well on others as is typical of most people in the population who routinely exhibit relative strengths and weaknesses. However the vast majority of his scores were within normal limits and the constellation of scores did not fit any particular pattern of known or suspected brain damage." Report of Dr. Seward, U.S. Exhibit 6 at 44-45. See also the discussion as it relates to the claim of Mental Retardation in Issue V. *Infra*.

trial that Rodriguez's head was "swollen."  The jury was not told that any medical

assessment appraised his head to be of normal size.  In fact, the evidence presented to the

jury actually embellished the true facts of Rodriguez's cranium.  Psychiatrist Arturo

Silva, M.D., asserts in this Motion that Rodriguez was neurodevelopmentally

disadvantaged from birth, suggesting he possibly has a congenital Arnold Chiari

malformation.  The jury was not told that medical evidence demonstrates that he has no

"intracranial abnormality" and that he does not have water on the brain ("congenital

hydrocephalus"), an enlarged brain, or a herniation of the brain.  The findings "do not

constitute a Chiari malformation."[43]

Psychiatrist Arturo Silva, M.D. asserts that Mr. Rodriguez was

neurodevelopmentally disadvantaged from birth, suggesting he has a Fragile X

Chromosome.  Counsel therefore requested Rodriguez be tested for Fragile X Syndrome.

Subsequent genetic testing ruled this syndrome out.[44]

### d.  Rodriguez's Insanity Claims Are Not Meritorious.

Counsel for Rodriguez further claim ineffectiveness of trial counsel at both the

guilt phase and mitigation phase by pointing to newly minted evidence of insanity based

on a self-serving statement of Rodriguez himself concerning the crime.  Psychiatrist

Pablo Stewart, M.D., asserts that Rodriguez has post-traumatic stress disorder resulting

---

[43]Counsel for Rodriguez requested testing for such defects.  The examination by Dr. Susan Koslow determined he does not suffer from any of these maladies.  U.S. Exhibit 7.

[44]U.S. Exhibit 20.

from the aforementioned abuse, as well as frontal lobe syndrome, and killed Ms. Sjodin in a dissociative experience in which he was legally insane.[45]

In fact, the question of whether Rodriguez was suffering from a dissociative disorder was addressed at trial.  Dr. Hutchinson testified that she had tested Rodriguez during her examination.  She testified in particular as to any dissociative disorder: "Similarly there was a short test called the Dissociative Experience Survey which is looking for dissociative experiences.  That wasn't something that I found much of so it's not very relevant."[46]  The test results were so insignificant there was no more discussion of any dissociative disorder, and Rodriguez did not provide her or Dr. Froming, who also examined him, with any other dissociative experiences that would support such a diagnosis.  Neither of their reports even mentions it.[47]

In his review of Dr. Hutchinson's raw test data, Dr. Martell also found that Rodriguez's "score on the Dissociative Experiences Scale (DES) indicates that he is not suffering from a dissociative disorder."[48]  Nowhere in the record is there any indication Rodriguez ever suffered from any dissociative experience:  not in twenty-three years of

---

[45]Exhibit D-20.  Although he only supports this conclusion based upon his interview with Rodriguez wherein Rodriguez claims such a thing happened when he attacked and killed Dru Sjodin.  There is simply no history whatsoever that Rodriguez ever suffered any dissociative experience in his entire life.

[46]Tr. 8007.

[47]Exhibit D-90; D-107.

[48]Exhibit D-87 at 7.

prison, not in any medical records, not in any discussion with family, friends, counselors, psychologists, or psychiatrists. Dr. Silva, in his declaration, now claims that Rodriguez has a history of dissociative episodes.[49] There are no examples—not one—given. It can only be assumed he is simply accepting Rodriguez's statement to Dr. Stewart.

Counsel for Rodriguez now claims that it was ineffective assistance not to have raised this issue, although as noted above, trial counsel hired two expert witnesses who had performed numerous tests, spoke with Rodriguez at length, reviewed thousands of pages of history, and found no history of dissociative experiences. The simple fact is that no dissociative experience exists. As noted above, trial counsel does not have a duty to "shop around" for experts with more favorable opinions. Link v. Luebbers, 469 F.3d 1197, 1203–05 (8th Cir. 2006); Forsyth v. Ault, 537 F.3d 887, 892 (8th Cir. 2008); Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir. 1995). This is the case here. Trial counsel hired experts with much experience in the field, both of whom conducted a thorough investigation and examination of Rodriguez. They provided their professional opinion as to Rodriguez's mental health problems, and trial counsel presented that information to the jury for mitigation purposes.

Rodriguez now further complains that trial counsel should have allowed the experts to talk to him about the offense conduct. Had this occurred, counsel argues, the fact that Rodriguez suffers from dissociative order would have come to light and been presented to the jury, thereby making a difference in the outcome of the trial. And Dr.

---

[49]Exhibit D-20.

Hutchinson now also complains that she was denied the opportunity to discuss the offense itself with Rodriguez[50] and learn his "own description of his dissociative symptoms,"[51] and thus be more convincing on her assessment that he suffered from PTSD.

First, not discussing the offense conduct was trial strategy on the part of experienced death penalty trial counsel. Strategic decisions made by counsel during the course of trial are entitled to substantial deference in the hindsight of federal habeas review. See Strickland, 466 U.S. at 689 (emphasizing that "[j]udicial scrutiny of counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight"). In ineffective assistance of counsel claims, there is a strong presumption that counsel's challenged actions or omissions were, under the circumstances, sound trial strategy. Marcrum v. Luebbers, 509 F.3d 489, 502 (8th Cir. 2007) ("[T]he burden of proof is on the petitioner to show that 'his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.'") (quoting Kimmelman v. Morrison, 477 U.S.

---

[50] This was trial strategy by trial counsel. At trial Dr. Hutchinson explained: "I didn't talk [with Rodriguez] about the crime at all." Tr. 7954. And Q. " . . . you did not talk to him about this crime; is that correct?" A. "That's correct." Q. "Why not?" A. "Because I was instructed that the questions I was looking at were what would be factors that might relate to this particular hearing. I was instructed not to talk to him about the crime." Q. "Okay. By Mr. Ney?" A. "Yes." Tr. 8040–41. Pretrial motions were filed by trial counsel making sure that the government's experts could not question Rodriguez about the offense conduct. Trial counsel realized that the pursuit of asking Rodriguez the specifics of the offense conduct would be futile in the presentation of mental health evidence.
[51]Exhibit D-24.

365, 384 (1986)); Collins v. Dormire, 240 F.3d 724, 727 (8th Cir. 2001) (in determining whether counsel's performance was deficient, the court should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance") (quoting Strickland, 466 U.S. at 689). That is, the defendant must overcome the presumption that, under the circumstances, "the challenged action might be considered sound trial strategy." Riley v. Dretke, 362 F.3d 302, 305 (5th Cir. 2004). Counsel cannot be judged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy. Darden v. Wainwright, 477 U.S. 168, 178 (1986).

Rodriguez chose his position. He claimed he did not kidnap, rape, or murder Dru Sjodin. He did not admit to the crime. He pleaded not guilty and maintained his innocence throughout the trial. On its face, there is no indication Rodriguez made any admission that he had any knowledge of the offense, let alone that he was involved in it at all. Given this posture, questioning him about the offense likely would have been futile. It t is also obvious that trial counsel made a strategic decision to limit the experts' knowledge of the crime. The communications would not be in confidence and would lose any potential privileged status.

Similarly, in Jones v. Delo, 56 F.3d 878, 885 (8th Cir. 1995), Jones asserted that his trial was constitutionally defective in failing to adequately investigate his mental state and present an insanity defense. Because of this, he claimed, the jury was denied essential information about his mental illness that would have changed the result in his

172

case. Id. The record was clear, however, that counsel made a strategic decision to limit the examining doctor's knowledge of the crime because the communications would not be in confidence and would lose any potential privileged status. Id. at 885. Jones had "vehemently denied the alleged conduct." The Eighth Circuit rejected Jones's claim. Id. The appellate court found that, where the defendant did not admit to the offense, such a claim should be rejected. Id. (citing LaRette v. Delo, 44 F.3d 681, 685–86 (8th Cir. 1995)). In LaRette, the court denied a similar claim by the defendant, where the defendant actually denied committing the offense: "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant." LaRette, 44 F.3d at 686.

Second, the facts of the crime attest to a strong inference of deliberation and clear intent. As noted above, no other episodes of dissociation have been described by an objective party. What is now clearly a pattern of criminal behavior can be discerned even from the self-serving statement Rodriguez now gives about the offense conduct. The claim of dissociation is based on the interview of Pablo Stewart, M.D., who asserts that Rodriguez "dissociated" in his interview as well.[52] No history exists of Rodriguez "dissociating" on any other occasion in the manner above. And while Dr. Stewart created no record of his interview for objective analysis, Dr. Seward and Dr. Welner both interviewed Rodriguez about the events of Dru Sjodin's death in separate videotaped

---

[52] Exhibit D-17.

173

interviews.[53] He did not dissociate in either, despite a lengthy and self-serving recounting of the events of her disappearance and death. The sequence of Rodriguez's recreation of events bears no grounding to dissociation, its course, and criminal behavior in the context of dissociation.

By his owns words Rodriguez engaged in the following goal-directed behaviors:

- Following Dru Sjodin in the Columbia Mall;

- Following Dru Sjodin in the mall parking lot;

- Following Dru Sjodin in a manner that would not attract attention;

- Drawing a knife in approach of Dru Sjodin;

- Seizing Dru Sjodin at the point that she would be most vulnerable;

- Directing Dru Sjodin to hang up her phone call;

- Driving Dru Sjodin's car to where his was parked;

- Directing Dru Sjodin from her own car to his car;

- Tying Dru Sjodin with ligature that he knew to find in his pocket;

- Directing Dru Sjodin into the back seat of his car;

- Driving Dru Sjodin to a secluded place in the mall parking lot;

- Entering the back seat with her bound and laying and attempting to rape her;

- Deciding to leave the parking lot to proceed to a more isolated area;

- Attempting to reassure Ms. Sjodin when she became hysterical by telling her that he would return her to the place where he had kidnapped her;

---

[53] See video and audio of interview with Dr. Seward, U.S. Exhibit 8. See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

174

- Stopping the automobile in an isolated place to return to the back seat after she had kicked at him from the back seat of his car;

- Attempting to silence Ms. Sjodin when she became agitated;

- Physically controlling and striking Dru Sjodin despite her frantic agitation;

- Restraining her airway in the course of incapacitating her;

- Killing Dru Sjodin by severing her airway;

- Charting a driving course by taking back roads that would diminish his proximity to police on patrol;

- Driving to a site to dump her where he knew Ms. Sjodin would not be found;

- Endeavoring to keep blood from falling from her onto him or his car;

- Dragging Dru Sjodin from the car to a specific dumping location;

- Eliminating any traces of Dru Sjodin's clothing from his car upon noticing them.

Dr. Welner addresses dissociative disorders in his Report:

Dissociative disorders, by DSM, involve discontinuity of consciousness, memory, identity, emotion, perception, body representation, motor control, and behavior. These conditions involve fragmentation of one's sense of self or person and/or inability to access information to control mental functions that one would normally control (such as amnesia).

Dissociative disorders include **depersonalization** (persistent or recurrent episodes of detachment from one's body, mind, or self), **derealization** (experiences of unreality and detachment from one's surroundings), **dissociative amnesia** (inability to recall autobiographical information), **dissociative identity disorder** (multiple experiences of possession or recurrent episodes of amnesia), **identity disturbance due to prolonged and coercive persuasion** (brainwashing, thought reform., indoctrination, torture), **dissociative trance** (profound unresponsiveness or insensitivity to environmental stimuli, with stereotypes movements or loss consciousness), and **dissociative reactions to stressful events** (constriction of consciousness, perceptual disturbances such as time slowing, changes in the

175

size of object, stupor, loss of memory, paralysis, analgesia, and other alterations in sensory-motor function).[54]

As Dr. Welner notes, "What Mr. Rodriguez describes, even as an unreliable informant, does not demonstrate any of these constructs." His sense of reality was not reported to have been changed; it was his sense that Dru Sjodin was his molester.[55] Rodriguez undertook a range of actions with a sense of direction, of timing, of awareness of Dru Sjodin's reactions, such as in gauging threat both from her and being discovered, and of her attempts to redirect him; a sense of pain, such as when she was kicking him; a sense of place, such as where to take her in a parking lot, where to find a bag that he could place over her head, and where to dump her where she would not be found, and to go home and without a trace of nervousness about what he had done inform his mother he was going to McDonald's.

And even the description of events as depicted by Dr. Stewart does not match the events as told by Rodriguez to Dr. Welner and Dr. Seward. As argued by counsel in the Motion: "In a brief, panic-stricken moment, he cinched the cord around the neck of the person he thought was his abuser. He was angry at his abuser, not at Dru Sjodin. Inadvertently, the cord was too tight, with tragic, unintended results." Mot. at 48. Interestingly, although this depiction matches the forensic pathologists' opinions counsel has now hired, it does not match the videotaped depiction of events Rodriguez gave to

_____

[54] Report of Dr. Welner, U.S. Exhibit 5 at 175.
[55] Rodriguez was referring to the alleged sexual abuse from a college aged girl at summer camp when he was young. There is no record that he ever suffered any dissociation in the past when he was around women. This will be further discussed *infra*.

176

Dr. Welner and Dr. Seward.  In those interviews, Rodriguez describes another scenario about how he killed Dru Sjodin by crushing her throat with his forearm.  He says:

Rodriguez:         And crushed her- (Indicates to throat) in her throat something, and she couldn't't breathe, you know, so.

Dr. Weiner:        - - she - then she couldn't breathe, and then you said that - how long after that did she pass away?

Rodriguez:         After I heard -

Dr. Weiner:        The crack.

Rodriguez:         I heard the crack and then I heard a gush a gush, gush of air, and then she was gone.

Dr. Weiner:        And when you were - how did that happen? How did that crack happen?

Rodriguez:         I was turning her over down by my elbow and was trying to, uh trying to keep her from moving around so much, because she was jumping all over.  And when I went and fell she came up and I guess it was too much force, and something broke, because I heard a crack.

Dr. Weiner:        And what was her reaction to this crack?

Rodriguez:         She gasped. And that was it. There was no word, no nothing, no yelling, no nothing.

Dr. Weiner:        What was the expression on her face?

Rodriguez:         Shock. You know? And then after that I didn't look at her.

Dr. Weiner:        And so when you looked at her, you said she's bleeding -

Rodriguez:         Bleeding. That's why I put the bag over her head.

Dr. Weiner:        And where was the bag?

Rodriguez:         The backseat.

Dr. Weiner:        There was a K-Mart bag in the backseat.

177

Rodriguez:        Yeah, mm-hmm.[56]

Knowing that Rodriguez denied involvement and now considering his depiction of what occurred when he kidnapped and murdered Dru Sjodin, trial counsel's trial strategy decision not to allow any mental health professional to elicit this information from Rodriguez was the proper decision.

The jury would have learned:

- how Rodriguez seized the victim in her car;

- how Dru Sjodin begged Rodriguez to let her go;

- how Rodriguez acknowledges that he was going to rape the victim;

- the victim was conscious and restrained from the time Rodriguez exited the parking lot of the Columbia Mall;

- Rodriguez's own representations that the victim was in such frantic terror that she was kicking the rear seat window, attempting to break that window to call attention to a passerby to save her;

- in an effort to restrain the victim, Rodriguez was grasping her airway, while she was restrained already, and that he ultimately crushed her airway;

- such an injury comes only from force of front to back, or the amount of force necessary to create such a fatal injury;

- that Rodriguez was struggling with Dru Sjodin while on top of her;

- what it is like for a victim, rendered helpless by the ligature tied on her by an able and handy assailant who has learned from his previous rapes, to confront her last moments unable to move her arms while being throttled;

- to consider that even before her windpipe may have been crushed, Dru Sjodin was fighting to breathe and experienced the terror of a person who cannot breathe yet has her arms tied behind her back in the closed space of the back seat of an automobile surrounded by darkness.

---

[56] See video and audio of interview with Dr. Welner, U.S. Exhibit 10, p. 461.

Rodriguez has now spoken and made it clear that that reason he disposed of Ms. Sjodin in the location at which she was found was to render discovery difficult, and that he did so after deliberately traveling on low-trafficked roads that were unlikely to attract police officers on patrol. These are qualities of an organized, planned assault. In addition, his assertions about his actions during the crime now contradict medical evidence and interpretations by pathology examiners examining the case in response to both prosecution and defense request. This further undermines his credibility and value as a historian and limits the utility of opinions that derive exclusively from him as an informant.

At trial, Rodriguez had not yet spoken about his case to inform a sequence of events. Now there is videotaped documentation of his recollections that only speak to the callousness with which he acted, and his lack of remorse for a legacy of antisocial and sexually deviant behavior.

The simple fact is that Rodriguez does not suffer from dissociative disorder. And counsel for Rodriguez made a wise strategical decision at trial not to allow mental health experts for the defense and prosecution to question him about the offense conduct.

In the face of these facts and all the other relevant circumstances it cannot be said that trial counsel's investigation and decision "fell below an objective standard of reasonableness," Strickland, 466 U.S. at 688, and that any additional effort on this issue would have changed the jury's ultimate disposition of the case. The claims are simply without merit.

179

### e.  Trial Counsel Properly Retained Drs. Hutchinson and Froming.

Rodriguez further attempts to denigrate trial counsel for even hiring

Drs. Hutchinson and Froming.  It claims "when faced with multiple reports by

Mr. Rodriguez that he experienced traumatic responses to women who appeared a certain

way . . . they inexcusably failed to hire mitigators and experts appropriate to overcoming

these barriers and who could put Mr. Rodriguez at ease and elicit shameful information

from him.  Instead, they sent white female experts who intensified Mr. Rodriguez's sense

of anxiety and shame."[57]

In fact, history shows that Rodriguez does not have any intrusive and distressing

phenomena associated with people who ostensibly remind him of his "molester."  The

thought that he is so traumatized by women would lend one to believe he could not have

participated effectively with the evaluations by Drs. Hutchinson or Froming.  However,

as Dr. Hutchinson testified "I never had the sense, in any of those hours that I was

meeting with him, that I was in any way in danger or that his anger wasn't perfectly

under control."[58]

The notion that Rodriguez was compromised in his evaluation with females

undercuts another key defense assertion.  Specifically, Dr. Froming indicated that, in her

testing before the first trial, the defendant's Full Scale IQ score was 87.  If Rodriguez was

so "dissociated" by having testing done by a female, his low average IQ scores would

---

[57] Mot. at 202.
[58] Tr. at 7952.

180

reflect a significant under performance.  Further, Rodriguez had female friends and when he was in his teenage years.  None reported any dissociation or episodes as we are now told he suffers.  Rodriguez had both female and male therapists at the Minnesota Security Hospital and he was no less forthcoming with female evaluators or more forthcoming with males.  For years, Rodriguez had female correctional officers he dealt with in the Minnesota Prison system, and there is no report he dissociated or had any problems with any of them.[59]

The reality is that Rodriguez has had in Dr. Marilyn Hutchinson's opinion, "a long-standing habit of sexual fantasy regarding women that he would see in public . . . He indicated that he had these persistent sexual thoughts beginning as a teenager and they

---

[59] See, e.g., Statement of Connie Bush, U.S. Exhibit 12:  "Rodriguez was never inappropriate toward the many female employees of the prison or toward Bush."; Statement of Steve Ergen, U.S. Exhibit 13:  "Rodriguez did not have issues with female corrections officers or administrators as it would have been noted in the past and present Annual Reviews."; Statement of Christopher Esty, U.S. Exhibit 14:  "Rodriguez followed the rules of the prison and did not have problems with persons in authority to include female administrators."; Deposition of Diana Magaard, Exhibit D-121:  "I do not recall him ever being disrespectful to me."; Statement of Steve Johnson, Exhibit D-145:  "Rodriguez's interaction with female corrections officers and administrators was respectful and rational . . . [he] had no outward signs of strange behavior during these encounters."; Statement of Yvonne Kosloski, U.S. Exhibit 15:  "Rodriguez was a 'model inmate' . . . Rodriguez did not display any unusual behavior toward female corrections officers or administrators."; Statement of David Hall, U.S. Exhibit 16:  "Rodriguez did not have any problems or issues with female corrections officers or prison industry people.  Rodriguez would have been exposed to females on frequent occasions from day to day.  Rodriguez did not have any incidents related to his contact with these females."

181

would be triggered whenever he was angry, regardless of the target of his anger."[60]  This is his history.

1) On October 17, 1974, Al Rodriguez sexually assaulted Shirley Seddon.  He made no mention of dissociation for the reason but anger.  And opportunity.  He was given his freedom. Less than five weeks later, on November 19, 1974, he raped Elizabeth Knudson. There was no mention of dissociation but anger.  And opportunity.

2) On January 5, 1979, Al Rodriguez was released from MSH and moved into the Horizon Home halfway house in Mankato. On August 14, 1979, Nancy Carlson was raped. She identified him as her attacker and he was arrested shortly afterward.

3) Mr. Rodriguez was acquitted of this crime at a second trial and released on January 24, 1980. On April 13, 1980, Ardyce Whalen was attacked; Opportunity existed. Al Rodriguez was ultimately arrested for the attempted kidnapping, convicted, and incarcerated.

4) On May 1, 2003, Al Rodriguez was released from prison. On November 22, 2003, another opportunity presented itself.  He kidnapped, sexually assaulted, and killed Dru Sjodin.

The proposed explanation of dissociation is as baseless as the executive function impairment and mental retardation claims the defense has brought forth.  The accounted for history demonstrates Rodriguez is simply a recidivist rapist who offends when the opportunity presents itself.

---

[60] Exhibit D-90 at 23.  See also Dr. Hutchinson's trial testimony on this at Tr. 8079.

*    *    *

Trial counsel's performance was not deficient in presenting lay testimony about Rodriguez's alleged disadvantageous childhood.  The additional information habeas counsel has collected and claims should have been presented is simply cumulative.  See., e.g., Purkey v. United States,  729 F.3d 860, 862 (8th Cir. 2013) (holding, that newly proffered evidence in mitigation was entirely cumulative); Paul v. United States, 534 F.3d 832, 842 (8th Cir. 2008) (holding trial counsels' performance not deficient for failing to present additional mitigation evidence that was cumulative and duplicative); Winfield v. Roper, 460 F.3d 1026, 1033 (8th Cir. 2006) (holding that trial counsel's decision not to present cumulative evidence during penalty phase not deficient).

In fact, Rodriguez may have been the benefactor of mitigation that could have been even more extensively undermined with further investigation and presentation of additional rebuttal witnesses by the United States.[61]

Trial Counsels' presentation of mental health evidence was also not deficient. When, as here, trial counsel conducted an investigation into Rodriguez's mental health and hired experts for that purpose, counsels' performance cannot be deemed so deficient that it amounts to ineffective assistance of counsel.  In Cole v. Roper, 623 F.3d 1183,

---

[61] Since the filing of his Motion in this matter Rodriguez has been examined by Drs. Welner and Seward.  As Dr. Welner notes in his report: "the Al Rodriguez that was introduced to the jury in defense opening statements, defense closing arguments, through expert witnesses and through testimony of witnesses called by the defense liberally embellished his shortcomings and disadvantages, occasionally going beyond even that to fabricated mitigation."  Report of Dr. Welner, U.S. Exhibit 5 at 197.  See infra Issue V.

1189–90 (8th Cir. 2011), the Eighth Circuit Court of Appeals rejected a similar

ineffective assistance of counsel claim where habeas counsel hired a new expert who

would allegedly have testified the defendant was "suffering from extreme emotional

distress" at the time of the offense. The Court noted that trial counsel had hired experts

who evaluated the defendant and that "was enough of an investigation to clear

Strickland's performance prong." Id.

Similarly, in Ringo v. Roper, 472 F.3d 1001, 1003–06 (8th Cir. 2007), the Eighth

Circuit Court of Appeals rejected another claim of ineffective assistance of counsel.  The

Eighth Circuit panel opined that under the deferential Strickland standard the Court

concluded trial counsels' performance was not deficient.  Ringo, 472 F.3d at 1006.  The

Ringo court noted "that this is not a case where counsel failed to investigate the

defendant's family background or to consult with any mental health professionals."  Id.

In Link v. Luebbers, 469 F.3d 1197, 1203–05 (8th Cir. 2006), habeas counsel

hired new experts who purported to show the defendant suffered from mental health

illnesses not presented by trial counsel.  That Rodriguez's habeas counsel has since found

additional experts who would give a new diagnosis is not the test for effective assistance

of counsel.  See, e.g., Forsyth v. Ault, 537 F.3d 887, 892 (8th Cir. 2008) (holding the

Sixth Amendment does not require trial counsel to shop for favorable experts, and finding

no ineffective assistance of counsel where trial counsel hired a mental health expert and

chose to cut off the investigation without hiring additional experts or seeking further

opinions); Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir. 1995) (holding that mere fact

184

trial counsel did not shop around for experts with more favorable opinion does not mean trial counsel was ineffective).

### D. Rodriguez has Failed to Establish Prejudice.

Rodriguez has "significant obstacles" to prove he was prejudiced by trial counsels' decision to cut off further investigation of his mental health and not present mental health mitigation evidence at trial.  Ringo, 472 F.3d at 1006.  First, Rodriguez would have to show that it was reasonably probable that if counsel would have retained the type of experts he claims they should have, they would have reached the same diagnosis as his present experts opine.  Id.  Second, Rodriguez would have to establish there was a reasonable probability that the mental health evidence would have altered the outcome of the penalty phase.  Id.

Rodriguez fails to allege facts that would overcome those obstacles.  He further fails to allege that he was prejudiced by any alleged deficiencies.  The most habeas counsel does is make conclusory allegations that the failure to conduct a further investigation and present additional mental health mitigation evidence "there is a reasonable probability the result would have been different."  Mot. at 208.

As in Purkey, Rodriguez's "proffered evidence does nothing to establish prejudice required by Strickland because it is entirely cumulative."  Purkey, 729 F.3d at 865.  Rodriguez suffered no prejudice, even assuming trial counsel's representation was defective.  Id.; see also Hanegan v. Miller, 663 F.3d 349, 354–56 (8th Cir.2011), cert. denied, 566 U.S. ––––, 132 S. Ct. 2393 (2012) (assuming counsel's performance fell

185

below an objective standard of reasonableness but denying habeas relief because petitioner failed to establish prejudice); Cullen v. Pinholster, 131 S. Ct. at 1409 (2011) (finding no prejudice where "new" evidence largely duplicated the mitigation evidence presented at trial); Wong, 558 U.S. at 22–23 (concluding that additional evidence of the defendant's "humanizing" features would not have affected the sentencing jury's decision); Bobby v. Van Hook, 558 U.S. 4, 12 (2009) (finding no prejudice where "[n]either the Court of Appeals nor [the petitioner] has shown why the minor additional details the [fact finder] did not hear would have made any difference").

Finally, Rodriguez completely fails to consider the weight of the aggravating evidence. Even assuming for the purposes of argument that Rodriguez's filings did present new material evidence, this court must assess prejudice by "'reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence' to determine whether 'the result of the proceeding would have been different.'" Purkey, 729 F.3d at 866 (quoting Wiggins, 539 U.S. at 534 (citation omitted)). In assessing prejudice, the court must take into account the aggravating evidence presented at trial.

> We recognize that the jury's findings do not preclude the possibility that more detail about Paul's difficult and abusive childhood or his compassionate character may have caused the jury to give more weight to mitigating factors that some or all of the jurors already found, but we must consider the incremental benefit of the proffered evidence in the context of the entire record. Nothing that Paul offers detracts from the government's strong case in aggravation, and the weight of this evidence is a proper and significant factor in considering whether Paul has established prejudice.

Paul, 534 F.3d at 843.

186

The jury found that the United States proved the following statutory aggravating factors beyond a reasonable doubt:

1.    The defendant, Alfonso Rodriguez, Jr., caused Dru Katrina Sjodin's death during the commission of the offense of kidnapping by the defendant.

2.    The defendant, Alfonso Rodriguez, Jr., has previously been convicted of two or more federal or state offenses, each of which is punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury upon another person.

The jury found the following convictions involved the infliction of, or attempted infliction of, serious bodily injury:

A.    Attempted Aggravated Rape in Polk County Case No. 5438 (Shirley Seddon
Iverson);

B.    Aggravated Rape in Polk County Case No. 5447 (Elizabeth Knudson);

C.    Attempted Kidnapping and Assault in the 1st Degree in Polk County Case No. 6192 (Ardyce Whalen).

3.    The defendant, Alfonso Rodriguez, Jr., killed Dru Sjodin in an especially heinous, cruel, or depraved manner in that:

A.    It involved the torture of Dru Sjodin.

The jury found the United States proved the following non-statutory aggravating factor beyond a reasonable doubt:

1.    That the defendant, Alfonso Rodriguez, Jr. caused loss, injury, and harm to Dru Sjodin and Dru Sjodin's family.

The United States presented substantial incriminating evidence during the guilt phase of the case, which created context for the aggravation case it presented during the

187

penalty phase.  In addition to the details of Dru Sjodin's kidnapping, rape, and murder, the United States presented evidence of Rodriguez's prior rape and assault convictions. And Dru Sjodin's family and friends shared the impact of her death.

In this case, the aggravating evidence was overwhelming. In light of the heinous abduction, rape, and murder of Dru Sjodin, there is no reasonable likelihood that the additional mitigating evidence Rodriguez now claims his trial attorneys could have presented would have altered the outcome of the penalty phase of the trial.  "It is not substantially likely that the jury would have returned a different sentence had [Rodriguez's] proffered evidence been presented to it."  Purkey, 729 F.3d at 868; see Cullen, 131 S. Ct. at 1403 (requiring a habeas petitioner to show a "'substantial,' not just 'conceivable,' likelihood of a different result" to establish prejudice (quoting Harrington v. Richter, 131 S. Ct. 770, 792 (2011)).  The aggravating evidence is too overwhelming and the "new" mitigating evidence too redundant . . . to conclude that even "one juror would have struck a different balance."  See Wiggins, 539 U.S. at 537

The Court should deny this portion of Petitioner's motion without an evidentiary hearing.  No evidentiary hearing is required where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. . . ."  28 U.S.C. § 2255(b).  Purkey, 729 F.3d at 869 (citing Hill v. Lockhart, 474 U.S. 52, 60 (1985) ("Because petitioner in this case failed to allege the kind of 'prejudice' necessary to satisfy the second half of the Strickland v. Washington test, the District Court did not err

188

in declining to hold a hearing on petitioner's ineffective assistance of counsel claim.").

## V. Rodriguez Was Not and Is Not Mentally Retarded.

### A. Legal Standard for Atkins Claims.

Rodriguez claims his execution should be barred under the Eighth Amendment to the United States Constitution because he is mentally retarded. The Federal Death Penalty Act provides that a "sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c). In Atkins v. Virginia, 536 U.S. 304, 321 (2002), the United States Supreme Court held that the Eighth Amendment prohibits imposing the death penalty on mentally retarded persons because doing so would constitute a "cruel and unusual punishment."

Mental retardation is not a defense to—nor is the lack of mental retardation an element of—a crime that the government must prove beyond a reasonable doubt to impose the death penalty. See Walker v. True, 399 F.3d 315, 326 (4th Cir. 2005). Rather, it is a condition, the existence of which disqualifies a person from capital punishment. But it does not disqualify a person from all punishment, including life in prison. See Atkins, 536 U.S. at 306. ("Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes.")

189

Whether Rodriguez is mentally retarded for Atkins purposes is a factual determination.  Ortiz v. United States, 664 F.3d 1151, 1164 (8th Cir. 2011) (citing Walker v. Kelly, 593 F.3d 319, 323 (4th Cir. 2010)); see Maldonado v. Thaler, 625 F.3d 229, 236 (5th Cir. 2010).  The defendant bears the burden to prove that he is mentally retarded.  There is, however, no specific federal rule established by the Supreme Court regarding the burden of proof for mental retardation claims.  In fact, the Supreme Court in Atkins made no reference to, much less reached a holding on, the burden of proof.  The Supreme Court in Atkins noted that "to the extent there is a serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded . . . Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus."  536 U.S. at 317.  Atkins simply did not consider or reach the burden of proof issue, and neither has any subsequent Supreme Court opinion.  As part of its national consensus analysis, the Court was careful not to fix the burden of proof or to impose rigid definitions of mental retardation.  The Court expressly left to the states the task of developing procedural and substantive guides for determining who is mentally retarded for the purpose of the constitutional prohibition on executing the mentally retarded.

Atkins noted a lack of agreement as to the standard by which mental retardation is determined among the states for this purpose. Of the states that impose the death penalty, only one—Georgia—employs a reasonable doubt standard; twenty-two employ the

190

preponderance of the evidence standard (Alabama, Arkansas, California, Idaho, Indiana, Louisiana, Maryland, Mississippi, Missouri, Nebraska, Nevada, New Mexico, New York, North Carolina, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, Virginia, and Washington); four states employ the clear and convincing evidence standard (Arizona, Colorado, Florida, and Delaware); and three states plus the federal government do not set a standard of proof (Connecticut, Kansas, Kentucky).  See Hill v. Schofield, 608 F.3d 1272 (11th Cir. 2010) (reasonable doubt standard applied by the state of Georgia violated the Eighth Amendment), *rev'd en banc by* Hill v. Humphrey, 662 F.3d 1335 (11th Cir. 2011).

### B.  Definitions of "Mentally Retarded."

In referencing clinical definitions of mental retardation, the Supreme Court recognized they require "not only subaverage limitations in intellectual functioning, but also significant limitations in adaptive skills, such as communication, self-care, and self-direction that became manifest before age 18."  Atkins, 536 U.S. at 318.  The Atkins court cited two professional organizations for their definitions of mental retardation—the American Association On Mental Retardation ("AAMR"), and the American Psychiatric Association ("APA")—and noted that their definitions were "similar."  Id. at 308 n.3.[62]

---

[62] At the time of Atkins:

The American Association on Mental Retardation (AAMR) define[d] mental retardation as follows:  "*Mental retardation* refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related

Since Atkins, other federal courts have applied these same definitions, noting that the two definitions are essentially identical, including the Eighth Circuit.  See Jackson v. Norris, 615 F.3d 959, 962 (8th Cir. 2010).

Recently, the AAMR has changed its name to the American Association on Intellectual and Developmental Disabilities ("AAIDD").[63]  The AAIDD has also replaced the term "Mental Retardation" with "Intellectual Disability."[64]  The AAMR/AAIDD's definition of Intellectual Disability provides that:

> limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."  Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).
>
> The American Psychiatric Association's (APA) definition [was] similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."  Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000).  'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70.  Id., at 42–43.

536 U.S. at 309 n.3.

[63] For ease of reference. this brief will refer to AAMR and AAIDD as "AAMR/AAIDD."

[64] Because the Supreme Court issued its decision in Atkins prior to the recent change of terminology by the AAMR/AAIDD, the term "mental retardation" will be used

192

> Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18.

Intellectual Disability: Definition, Classification, and Systems of Supports (The 11th Edition of the AAIDD Definition Manual 2010) ("AAIDD 11th Ed.").

> The APA's definition states:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas:  communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV-TR").[65] In the case of capital defendants such as Rodriguez, who was assessed as part of a sentencing eligibility determination, a retrospective diagnosis is often required because the defendant usually did not receive a diagnosis of mental retardation during the developmental period.  And although the focus of the

---

when referring to the term "intellectual disability" as used in the 11th Ed. of the AAIDD Definition Manual 2010.

[65] This brief responds to Rodriguez's motion, which uses The 11th Edition of the AAIDD Definition Manual 2010 and the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (DSM-IV-TR) as does his expert, Dr. Stephen Greenspan.  In 2013, the APA published the Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-5").  The DSM-5 adopts many of the terms and criteria similar to The 11th Edition of the AAIDD Definition Manual 2010, including "Intellectual Disability."  Both Dr. James Seward and Dr. Michael Welner—experts for the United States—refer to the DSM-5 in their analyses of Rodriguez.  U.S. Exhibits 5 and 6.

definitions of mental retardation is the current level of functioning, Holladay v. Allen, 555 F.3d 1346, 1353 (11th Cir. 2009), courts have looked retrospectively at defendants' lives because mental retardation, if present, inhibits skills that emerge during the developmental period prior to age 18. United States v. Davis, 611 F. Supp. 2d 472, 476 (D. Md. 2009). There are unique challenges and modifications clinicians must make to their diagnostic protocol when conducting a retrospective assessment of a criminal defendant. Guidelines for clinicians have been developed for those charged with making these retrospective diagnoses, in which the ability to conduct a "standard" assessment is less than optimal, such as when a defendant has been incarcerated for a number of years prior to his evaluation. Clinical judgment is a key component rooted in a high level of clinical expertise and experience. The purpose is to enhance the quality, validity, and precision of decision in a particular case. A thorough history is essential for diagnosis in such situations and should include social, medical, and educational history. AAIDD 11th Ed. at 94. Heightened clinical judgment may be required when legal restrictions—such as imprisonment—may reduce the opportunity to view the individual in community environments. AAIDD 11th Ed. at 99.

The APA directs that clinicians evaluating an individual for mental retardation consider a number of factors under Criteria A, B, and C. The AAMR/AAIDD requires that clinicians evaluate intellectual functioning, adaptive behavior, and age at origination of the mental retardation. As part of this evaluation, the AAIDD 11th Edition directs that clinicians to consider a number of factors, including the following:

194

1) A social history must include more than just significant events in a person's life.  It should include functioning at home and in the community, and relationships at home, with neighbors and with others.  It should also explore contacts with agencies including out of home care, juvenile facilities, and social welfare systems.  Compiling a thorough social history is especially important when a retrospective diagnosis is sought.

2) A medical history should include a thorough review of all records related to health of the individual including prenatal, perinatal, and postnatal circumstances; any early concerns or diagnoses; all medical intervention including prescription drugs; injuries; involvement with alcohol or drugs; and exposure to toxins.  In addition, a review of all records related to family members and historical family medical information relating to developmental disorders; physical or mental disorders and challenging or dangerous behaviors must be conducted.

3) An educational history is also essential to look at.  School records are typically available across elementary, middle, and high school.  Such a history should include: mapping out school grades over time; summarizing teachers' social and behavior ratings; identifying periodic achievement assessment; searching for failure or performance measures that may trigger parent/teacher conferences or referral for special education; evidence of any difficulties in cognitive skills other than grades and test performances (e.g., tardiness to class, skipping class, failing driver education, difficulty following class schedule); evidence of difficulties in practical skills (e.g., poor grooming, unable to tell time, getting lost in school, inability to use money correctly); evidence of difficulties in social skills (e.g., lack of self direction, few friends, gullible, does not understand social humor).

See AAIDD 11th Ed. at 94-95.

In addition, a clinician conducting this analysis needs to be aware of those

evaluations made in the context of legal proceedings, be sensitive to language and culture

difference, testing norms, recognize that self ratings or reporting have risks of error.

Environmental factors such as educational deprivation, socioeconomic factors such as

language and subcultural bias may contribute to low test results.  Personal characteristics

and environmental factors can affect test results such as sensory motor or mental

195

disabilities, fatigue, illness or high anxiety levels and the person's motivation.  <u>See</u>

AAIDD 11th Ed. at 101.

### C.  Rodriguez Is Not Mentally Retarded.

The APA's Criterion A factor generally overlaps with the AAMR/AAIDD's

intellectual functioning factor, and the APA's Criterion B is similar to the

AAMR/AAIDD's adaptive behavior analysis.  The APA's Criterion C and the

AAMR/AAIDD's age of origination of mental retardation are the same.  For the reasons

set forth herein, Rodriguez does not meet the definition of "mentally retarded" under

either the APA or AAMR/AAIDD standards.

### 1.   Rodriguez Is Not Mentally Retarded Under the AAMR/AAIDD's Intellectual Functioning Analysis Or Under The APA's Criteria A Analysis.

### a.  Intellectual Functioning and Criteria A.

The AAMR/AAIDD's intellectual functioning factor is best conceptualized and

captured by a general factor of intelligence.  Intelligence is defined as "a general mental

ability."  Intelligence includes "reasoning, planning, solving problems, thinking

abstractly, comprehending complex ideas, learning quickly, and learning from

experience."  AAIDD 11th Ed. at 31.  In general, the first criterion for a diagnosis of

mental retardation requires "significant limitations . . . in intellectual functioning," or

"significantly subaverage general intellectual functioning."  AAIDD 11th Ed. at 5; DSM-

IV-TR at 49.  Both the AAMR/AAIDD and the APA define this to mean an IQ score of

approximately two standard deviations below the mean of 100, taking into consideration

196

the standard error of measurement of the test used.  This is a score of about 70.  The

standard error of measurement is approximately 5 points.[66]  This error of measurement

should be considered, resulting in a range of scores with a range of confidence.  Thus, it

is possible to diagnose Mental Retardation in individuals who have an IQ of between 70

and 75 if those individuals also " exhibit significant deficits of adaptive behavior."

DSM-IV-TR at 41–42, 48.

The Supreme Court in Atkins noted that an IQ score between 70 and 75 "is

typically considered the cut off IQ score for the intellectual function prong of the mental

retardation definition." Atkins, 536 U.S. at 309 n.5.  The Atkins Court also stated,

"'[mild]' mental retardation is typically used to describe people with an IQ level of 50–55

to approximately 70."  Id. at 308 n.3.  Recently the Eighth Circuit approved the use of the

APA and AAMR/AAIDD definitions in addressing a death penalty case in Ortiz, 664

F.3d at 1157–58.

Atkins, however, did not give a substantive Eighth Amendment right to a fixed

and rigid definition of "mentally retarded persons."  In fact, states use different

definitions of intellectual functioning (some draw the line at an IQ of 75 or below, some

at 70 or below, others at 65 or below) and consider different factors in assessing adaptive

---

[66] The AAMR/AAIDD notes that the standard error of measurement "is approximately 3 to 5 points" on well-standardized measures of general intellectual functioning.  AAIDD 11th Ed. at 36.  It should be noted that the AAIDD Manual "does not intend for a fixed cutoff point to be established for making the diagnosis of ID . . .[g]iven that the diagnostic process involves drawing a line of inclusion/exclusion, it is important to use a range as reflected in the test's standard error of measurement." AAIDD 11th Ed. at 40.

functioning.  <u>Atkins</u> acknowledged that the states' "statutory definitions of mental

retardation are not identical," though they "generally conform to the clinical definitions"

set forth by the APA and AAMR/AAIDD.[67] <u>Atkins</u>, 536 U.S. at 317 n.22.

### 2. Rodriguez's Intellectual Functioning Establishes that He Is Not Mentally Retarded.

### a. The Experts.

Under this matrix, psychologist Stephen Greenspan, Ph.D. supports defense

arguments that Rodriguez is mentally retarded and therefore not eligible for capital

---

[67] <u>See</u>, e.g., Ariz.Rev.Stat. Ann. § 13–753 (establishing procedure by which defendants in capital cases are pre-screened by psychological expert who administers IQ test; those with scores below 76 are tested further by mental retardation experts, and if the defendant then scores 70 or below on any IQ test, the court conducts a hearing at which the defendant must prove mental retardation by clear and convincing evidence; a "determination by the trial court that the defendant's intelligence quotient is sixty-five or lower establishes a rebuttable presumption that the defendant has mental retardation," but "a defendant with an intelligence quotient of seventy or below" can still prove mental retardation by the clear and convincing evidence standard), *amended by* 2011 Ariz. Legis. Serv. 89 (West) (replacing term "mental retardation" with "an intellectual disability"); Ark.Code Ann. § 5–4–618(a)(2) ("There is a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below."); 725 Ill. Comp. Stat. § 5/114–15(d) (2010) ("An intelligence quotient (IQ) of 75 or below is presumptive evidence of mental retardation."), *amended by* 2011 Ill. Legis. Serv. 97–227 (replacing terms "mentally retarded" and "mental retardation" with "intellectually disabled" and "an intellectual disability"); Ky. Rev. Stat. Ann. § 532.130 ("Significantly subaverage general intellectual functioning' is defined as an intelligence quotient (I.Q.) of seventy (70) or below."); Neb. Rev. Stat. § 28–105.01(3) ("An intelligence quotient of seventy or below on a reliably administered intelligence quotient test shall be presumptive evidence of mental retardation."); S.D. Codified Laws § 23A–27A–26.2 ("An intelligence quotient exceeding seventy on a reliable standardized measure of intelligence is presumptive evidence that the defendant does not have significant subaverage general intellectual functioning."); <u>Wiley v. Epps</u>, 668 F. Supp.2d 848, 897 (N.D.Miss.2009) ("In Mississippi, [an] IQ of 75 is the 'cutoff score' for assessing subaverage intellectual functioning for purposes of diagnosing mental retardation.").

198

punishment.  Dr. Greenspan's October 13, 2011 report asserted that Rodriguez had deficits in conceptual, social, and practical adaptive skills originating in childhood and persisting to adulthood.  Dr. Greenspan concluded, "to a reasonable degree of scientific certainty, that the evidence available at the time of his arrest indicates that Alfonso Rodriguez, Jr , was a person with mental retardation."[68]  Rodriguez is now 60 years of age and—despite having been evaluated numerous times in his life—this is the first time someone has determined that he is mentally retarded.  To support his opinion, Dr. Greenspan cited Rodriguez's poor academic performance, low scores on group IQ tests, and deficits in adaptive functioning.  Greenspan asserted that, notwithstanding Rodriguez's IQ testing in the mid-80's,[69] and despite the fact that his own experts at trial,

---

[68] Declaration of Dr. Greenspan, Ex. D-19, p.11

[69] Greenspan concluded that Rodriguez's IQ scores "could have qualified him for a MR (Mental Retardation) classification and placement," noting that during Rodriguez's childhood, "the IQ criterion in place in the clinical definition of MR . . . was 85."  Id. However, no explanation is given as to the eventual change in the scoring mechanism that provides us with today's cutoff.

    In 1959 the AAMR, at that time called the American Association on Mental Deficiency, published a definition of mental retardation that read as follows:  "Mental retardation refers to subaverage general intellectual functioning which originates during the developmental period and is associated with impairment in adaptive behavior." Heber, R. F. (1959).  A manual on terminology and classification in mental retardation. Monograph *Supplement, American Journal of Mental Deficiency ,62.*

    The definition was revised in 1961. That revision specified the meaning of the term *subaverage general intellectual functioning* in a manner that was to have considerable impact on the field of mental retardation.  It determined that one standard deviation below the mean on an intelligence test was delineated as the point at which intellectual functioning should be considered *subnormal.*  This specification meant that on an IQ test with a mean of 100 and a standard deviation of 15, any score below 85 would be diagnostic of mental retardation.  If the total population had been tested and classified on this basis, almost 16% would be diagnosed as having mental retardation.

Dr. Karen Froming and Dr. Marilyn Hutchinson, did not determine that he was mentally retarded,[70] Rodriguez's deficits would support a diagnosis of mental retardation.

Greenspan made his determination based solely on review of records provided to him. He did not examine Rodriguez or have him examined or tested. Although Rodriguez has the burden to prove he is mentally retarded, the United States, in response to other parts of the petition claiming mental deficits, did have Rodriguez fully examined and tested. The result of those evaluations show that he is not mentally retarded.

Dr. James Seward, Ph.D., ABPP is a Neuropsychologist and Forensic Psychologist. He is a Neuropsychologist at Banner Alzheimer's Institute in Phoenix, Arizona and an Adjunct Professor at A.T. Still University in Mesa, Arizona. He is also a member of The Forensic Panel, New York, New York. He received his Masters in Forensic Psychology at John Jay College of Criminal Justice in New York. He received his Ph.D. in Counseling Psychology at Temple University in Philadelphia, Pennsylvania.

---

Even higher percentages would be expected to be found in subpopulations where minority status, language factors, or socioeconomic background depresses intelligence test scores. Heber, R. F. (1961). A manual on terminology and classification in mental retardation. Monograph Supplement, *American Journal of Mental Deficiency, 63.*

In 1973 an AAMR committee again revised the definition. The committee constructed this revision with criticism of the 1961 definition in mind. It specified that significantly subaverage general intellectual functioning was to be determined by a score of at least *two standard deviations* below the mean on an intelligence test. This meant that the cutoff point for mental retardation was moved downward from 85 to 70. This change lowered the percentage of the population that might be identified as having mental retardation from 16% to approximately 2.25%. Grossman, H. J. (1973). *Classification in mental retardation.* Washington, DC: American Association on Mental Deficiency.

[70] See Tr. 7783-7871, 7944-8097, and Exhibits D-90 and D-107.

200

He was a Postdoctoral Fellow in Neuropsychology at Bryn Mawr Rehabilitation Hospital in Malvern, Pennsylvania and also a Fellow in Forensic Psychiatry at the University of Pennsylvania, Philadelphia, Pennsylvania.  He is a Diplomate and Board Certified in Clinical Neuropsychology and a Fellow of the National Academy of Neuropsychology.[71] Dr. Seward interviewed and examined Rodriguez on July 10, 11, and 12, 2013.  The interviews were audio and video recorded.[72]

Dr. Michael Welner, M.D., is a Clinical Professor at the New York University School of Medicine, New York, New York; an Adjunct Professor of Law at Duquesne University School of Law in Pittsburgh, Pennsylvania; and an Adjunct Professor at the Lagos State University School of Medicine in Lagos, Nigeria. He is also an attending physician of consultation psychiatry at Lenox Hill Hospital in New York, New York. Dr. Welner has a private practice in pharmacological and psychotherapeutic treatment of adults and in both civil and criminal forensic psychiatry.  He is Chairman of The Forensic Panel a peer-reviewed forensic consultation service.  He graduated from the University of Miami School of Medicine.  He served a residency in Psychiatry at Beth Israel Medical Center in New York, New York.  He also was a Fellow in Forensic Psychiatry at the University of Pennsylvania in Philadelphia, Pennsylvania.  He is a Diplomate in Psychiatry with the American Board of Psychiatry and Neurology.  He is a Diplomate in

---

[71] See Attached Curriculum Vitae of James D. Seward, Ph.D., ABPP, U.S. Exhibit 17.

[72] See video and audio of interview with Dr. Seward, U.S. Exhibit 8.

Forensic Psychiatry with the American Board of Psychiatry and Neurology.  He is Board

Certified in Advanced Clinical Psychopharmacology, with the American Society of

Clinical Psychopharmacology.  He is also a Diplomate in Disaster Medicine with the

American Board of Disaster Medicine.[73]  Dr. Welner interviewed and examined

Rodriguez in June 2013.  The interviews were audio and video recorded.[74]

Each was asked to exam Rodriguez and review all available records in this matter

and to address those areas now introduced into this case by Rodriguez in his Section 2255

motion, including whether he is mentally retarded.  Dr. Seward determined the collective

testing data, in conjunction with pertinent collateral history, does not reflect upon

Rodriguez as mentally retarded.[75]  Dr. Welner determined that Rodriguez does not meet

the criteria for mental retardation.[76]

### b. Drs. Froming and Seward Both Concluded That Rodriguez's Intellectual Functioning Is In the Low Average—Not Mentally Retarded—Range.

On various tests of intellectual functioning administered throughout his adulthood,

Rodriguez's scores have clustered in the low average to average range.  For instance,

---

[73] See Attached Curriculum Vitae of Michael Welner, M.D., U.S. Exhibit 18.

[74] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

[75] Report of Dr. Seward, U.S. Exhibit 6.

[76] Report of Dr. Welner, U. S. Exhibit 5.  As noted above, Intelligence includes "reasoning, planning, solving problems, thinking abstractly, comprehending complex ideas, learning quickly, and learning from experience."  Dr. Welner more fully develops how Rodriguez fits within these factors.  Id. at 96-110.

while receiving treatment at the Northwest Mental Health Center in Crookston, Minnesota and at the Minnesota Security Hospital, Rodriguez was seen for at least 9 psychological evaluations, although there are no records of a neuropsychological evaluation or administration of a comprehensive individually-administered intellectual measure, such as one of the Wechsler Scales. Some of the testing administered, however, was described as potentially relevant to his cognitive and neuropsychological status. In 1975, testing at the Minnesota Security Hospital resulted in an "Academic IQ Estimate" of 85.[77] In 1978, administration of the Shipley Institute of Living Scale[78] resulted in an "Estimated Academic Aptitude" in the "average range."[79] Further, test results of the California Psychological Inventory ("CPI"), which has an intelligent component within its test, as reflected in a March 19, 1980 evaluation report from the Minnesota Security Hospital were "fairly well within the normal limits . . . . There are indications that he seems to be functioning better in both the social and intellectual spheres."[80] In addition, others who examined him found Rodriguez's intellect to be average.[81]

---

[77] Exhibit D-66C, p. 74 (Minnesota Security Hospital records).

[78] Dr. Seward points out that the *The Shipley Institute of Living Scale* is designed to assess general intellectual functioning in adults and adolescents and to aid in detecting cognitive impairment in individuals with normal original intelligence. Report of Dr. Seward, U.S. Exhibit 6 at 1.

[79] Exhibit D-66C, pp. 57-58.

[80] Exhibit D-66C, p. 51.

[81] Exhibit D-66A, p. 13; D-66C. p. 42. Excerpts from report of interview by Delmer Eggert, M.D. (Minnesota Security Hospital records, p. 167). "The patient does

Rodriguez's results on two comprehensive individually administered IQ tests during the lengthy course of these proceedings have been in the low average—not the mental retardation/intellectual disability—range.  When evaluated by Dr. Froming in 2005 he received a score of 87 (later changed to 84), and Dr. Seward's 2013 evaluation resulted in an IQ of 86.  Even when adjusted for the "Flynn Effect," these scores are above any of the various cut-off s for Mental Retardation.

Before trial, Dr. Froming administered a complete neuropsychological test battery, including specialized tests of visual system functioning and malingering tasks.  She reported a Full-Scale IQ of 87.  In her report, Dr. Froming states "Mr. Rodriguez intellectual level is in the average to low average range.  His only deficient performance is on the working memory subscale of the test."[82]  At trial, Dr. Froming testified consistent with her findings and report with regard to her testing of Rodriguez:

Q.    Now this is a guy with an 87 IQ, right --

A.    Correct.[83]

Q.    And what did you find in relation to Mr. Rodriguez's IQ?

A.    His IQ scores – first of all, I should say again average is 100.  Any departure from 100 by 15 points is above or below average, and then you can be 30 points above or below and then you get into superior performance or mentally retarded performance.

not have a thought disorder.  Affectively he is neutral . . .The sensorium is clear.  I think that this man's intelligence is within the average range, but was compromised by language difficulties and difficulty with social acceptance."

[82] Exhibit D-107, p. 5.

[83] Tr. 7866.

He is in the low-average range on verbal IQ with a score of 86. He has a performance IQ, which differs from verbal IQ in terms of it mostly being – dealing with shapes and perception of shapes and motor ability, and he has a score of 89, again in the average range. There are four neuropsychological variables that are also part of the IQ test and these variables are verbal comprehension so generally speaking more focused on one's verbal skills and abilities. He has a 96, which is pretty spot on average.[84]

Dr. Froming went on to elaborate on Rodriguez's memory:

There are some striking findings with his memory performance. . . . Again there's a differentiation between verbal material and spacial material and how well you learn and remember those things. Mr. Rodriguez has a 92 on his verbal immediate memory, his ability to listen to a paragraph and remember the paragraph of material. So he's average ability in that.

His visual immediate memory, his ability to look at faces and remember faces to solve perceptual problems, visual problems, is 134. Again two standard deviations or the top two percent of most people.[85]

Dr. Seward, as did Dr. Froming, administered "a variety of psychological and neuropsychological tests" to Rodriguez. Dr. Seward explained that "[t]hese tests were chosen in order to provide a comprehensive assessment of his neuropsychological status, replicate the findings of previous evaluators, and assess his level of motivation and involvement in this evaluation."[86] Rodriguez was administered the Wechsler Adult

---

[84] Tr. 7794.

[85] Tr. 7798.

[86] Report of Dr. Seward, U.S. Exhibit 6 at 34.

205

Intelligence Scale, Fourth Ed. (WAIS-IV),[87] which showed that his full scale IQ was 86.

The test results are shown in the table below:

**Composite Score Summary**

| Scale | Sum of Scaled Scores | Composite Score | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|
| Verbal Comprehension | 27 | VCI  95 | 37 | 90-101 | Average |
| Perceptual Reasoning | 24 | PRI  88 | 21 | 82-95 | Low Average |
| Working Memory | 13 | WMI 80 | 9 | 74-88 | Low Average |
| Processing Speed | 16 | PSI   89 | 23 | 82-98 | Low Average |
| Full Scale | 80 | FSIQ 86 | 18 | 82-90 | Low Average |
| General Ability | 51 | GAl  91 | 27 | 86-96 | Average |

Report of Dr. Seward at 36.

From these results, Dr. Seward concluded that:

Mr. Rodriguez's overall level of intellectual functioning is judged to be in the Low Average range.  These scores are similar those that resulted from Dr. Froming's 2005 administration of an earlier version of this test, with the exception of an increase in his

---

[87] Id.  Dr. Froming administered the Wechsler Adult Intelligence Scale, Third Ed., Exhibit D-107, p. 1.

Working Memory Index from 69 (which is in the Extremely Low range, per the test manual) to 80.[88]

The test showed that Rodriguez's executive functions were average. Executive functions include:

Cognitive abilities necessary for complex goal-directed behavior and adaptation to a range of environment changes and demands. Executive function includes the ability to plan and anticipate outcomes (cognitive flexibility) and direct the attentional resources to meet the demands of nonroutine events.[89]

Rodriguez's scores were "average on task that required him to solve problems by systematically generating and testing hypotheses based upon feedback." Another component of executive functioning is the ability to focus and sustain attention, resist distracting stimuli, and inhibit impulsive responses. Dr. Seward reported that the "testing did not reveal any objective evidence of difficulties with attention and concentration." Ultimately, Dr. Seward determined that the examination did not reveal any objective evidence of difficulties with executive functioning.[90]

As set forth in the above chart, Rodriguez received a Verbal Comprehension Index of 95, which is in the Average range.[91] He received a score of 96 on the test administered

---

[88] Report of Dr. Seward, U.S. Exhibit 6 at 36.
[89] Report of Dr. Seward, U.S. Exhibit 6 at 38.
[90] Id. at 38.

[91] Id. at 39.

207

by Dr. Froming.[92]  Dr. Seward reports that "'the WAIS-IV Technical and Interpretive Manual, "the VCI is a measure of verbal concept formation, verbal reasoning, and knowledge acquired from one's environment.'"  He found no evidence of difficulties with language in spite of the fact that Spanish was his first language.[93]

On the Perceptual Reasoning Index ("PRI") Rodriguez received a score of 88 on the test administered by Dr. Seward.  This is Low Average.  He received a score of 91 on the test given by Dr. Froming.[94]  The PRI is "'a measure of perceptual and fluid reasoning, spatial processing and visual-motor integration.'" [95] His Perceptual Reasoning scores were "low average on subtests that contributed to the Perceptual Reasoning Index of the WAIS-IV."[96]

The Wechsler Memory Scale 3rd Ed. ("WMS-III") was administered by both Dr. Seward and Dr. Froming.  Dr. Seward reported he received a Total Memory Composite score of 99, which reflected an Immediate Memory Composite score of 91 and a Delayed Memory Composite score of 109.  All of these scores are average.[97] Dr. Froming's administration of the WMS-III resulted in a General Memory Index of

---

[92] Exhibit D-107, p. 1.
[93] Report of Dr. Seward, U.S. Exhibit 6 at 39.
[94] Exhibit D-107, p. 1.
[95] Id.
[96] Id.
[97] Id. at 40.

105, which is average.  Rodriguez received scores of 114 on Immediate Memory and 97 on Delayed Memory.[98]  These scores are also average.

Dr. Seward reports that his examination and testing took place in a private room at the Federal Bureau of Prisons, Federal Correctional Complex in Terre Haute, Indiana. Rodriguez is a short-statured Latino male who appears his stated age.  He wore prison clothes with good grooming and hygiene.  His hands were free for all testing.  He wore glasses as necessary.  He was mildly hard of hearing.  Dr. Seward reports "Rodriguez spoke fluent, unaccented English with occasional mispronunciations.  His conversational vocabulary was unremarkable, consistent with his average WAIS-IV Verbal Comprehension Index.  His speech was of normal tone, rate, and volume."[99]  Rodriguez denied sadness, but reported stress due to his legal situation.  And he readily provided information on symptoms which he attributed to his past history of abuse.  He denied thoughts of hurting himself or others.  He denied any appetite disturbance.  He denied sleep disturbance.  His affect was unremarkable with good social relatedness and displays of appropriate humor.  Rodriguez denied ever having any hallucinations.  He did not make any overtly delusional statements.

Dr. Seward reported Rodriguez was fully oriented.  He conversed knowledgeably regarding current events such as the Zimmerman trial, Edward Snowden, and problems

---

[98] Exhibit D-107, p. 1.
[99] Report of Dr. Seward, U.S. Exhibit 6 at 43.

with the 24-hour news cycle.  He obtains this knowledge by watching cable news.[100]  All

of these attributes are readily observable when viewing the audio and video recordings of

the examination by Dr. Seward.[101]

### c. Dr. Welner and Dr. Seward Concluded That Rodriguez's Poor Academic Performance Was Not Caused By Mental Retardation.

Despite both defense and government experts agreeing that Rodriguez has a low

average to average IQ, Dr. Greenspan concludes that Rodriguez is mentally retarded due

to his Rodriguez's early tests and failure in school.  He compares Rodriguez's academic

tests scores and grades with those of Rodriguez's siblings.  Dr. Greenspan concludes that

Rodriguez had significant problems with intellectual functioning and that "cultural

overshadowing" caused the schools to fail to recognize he was mentally retarded.[102]  But

Dr. Greenspan fails to acknowledge multiple factors that may have caused low grades

and Rodriguez's eventual dropping out of school[103] that had nothing to do with his

intellectual functioning.

---

[100] Id.

[101] U.S. Exhibit 8.

[102] Exhibit D-19 at 11-12.

[103] Rodriguez did later graduate from the St. Peter High School in Minnesota while incarcerated.  The petition states that, in her trial testimony, Dr. Froming "even asserted mistakenly that Mr. Rodriguez had graduated from high school."  Motion at 107–08.  The petition is in reality mistaken.  His Classification Summary with the Minnesota DOC states he graduated from St. Peter High School and indicates he has "below average" intelligence.  The rationale for this estimate was not provided.  Exhibit D-67C, p. 5, 12, D-67E, p. 27, D-67F, p. 48.  This will be discussed further below.

First, dropping out of high school is not unusual, and was not when Rodriguez dropped out in 1970.[104]  Many famous individuals have dropped out of high school.[105] As Dr. Welner noted:

> It would be reasonable to expect Mr. Rodriguez to score more poorly on tests normed on an American population, given his drop out from formal education, his expressions of alienation from the culture in which he was raised,  relative to the Mexican-American community of laborers in Laredo of his earliest years, and his demonstrated variable test performance and inaccurate history in the aim of enhancing his legal position . . . Even with these factors which could potentially depress his performance on intelligence testing, Mr. Rodriguez scored well above the range attached to intellectual disability denoted by Criterion A.[106]

---

[104] It is estimated 1.2 million students annually drop out of high school in the United States, where high school graduation rates rank nineteenth in the world.  Reasons students drop out are varied and may include: to find employment, avoid bullying, family emergency, poor grades, depression and other mental illnesses, unexpected pregnancy, bad environment, lack of freedom, and boredom from lack of lessons relevant to their desired occupations. *The Silent Epidemic: Perspectives of High School Dropouts* explores reasons students leave school without graduating.

[105] E.g., Harry Belafonte, Jr. (American singer, songwriter, actor);  Sir Richard Branson (born 18 July 1950; English business magnate and investor best known as the founder of Virgin Group, which encompasses more than 400 companies); Walt Disney (American business magnate, animator, producer, director, screenwriter, and voice actor); Albert Einstein (German-born theoretical physicist who developed the general theory of relativity, one of the two pillars of modern physics); Bobby Fischer (American chess grandmaster and the eleventh World Chess Champion); Peter Jennings (Canadian-American journalist and anchor of ABC's *World News Tonight*); Prince Rogers Nelson, known by his mononym Prince (American singer-songwriter, multi-instrumentalist, and actor who has produced ten platinum albums and thirty Top 40 singles during his career);Harold Robbins ( American author of popular novels who became one of the best-selling writers of all time, having penned over 25 best-sellers and sold over 750 million copies in 32 languages); Francis Albert "Frank" Sinatra (American singer and film actor; one of the best-selling artists of all time); and Dave Thomas (American businessman and philanthropist who was the founder and chief executive officer of Wendy's, a fast-food restaurant chain specializing in hamburgers).

[106] Report of Dr. Welner, U.S. Exhibit 5 at 95-96.

Rodriguez began schooling in Laredo, Texas, where, he relates, he was educated in Spanish. Spanish was the language of his family. His early school years were marked by his shifting seasonally between Laredo, Texas and Crookston, Minnesota. When he came to Crookston, he reports that he could not speak English. The rural Minnesota school system he attended was ill-equipped to effectively deal with a youngster in need of bi-lingual education. Further, he was only in the Minnesota schools for a few months before returning to Texas for the winter.

Eventually, when Rodriguez was in the third grade, his family moved permanently to Crookston, Minnesota. Rodriguez's difficulties with English again hampered his education. According to Rodriguez, he was in remedial education for English for his first two years of education in Crookston. He was held back in first and second grade, coinciding with his struggle to learn in English. He indicates this focused on his pronunciation.[107]

Rodriguez indicated to Dr. Seward he "hated going to school" due to the cultural differences he faced.[108] However, he recorded no grade failures on his report card until fifth grade arithmetic and sixth grade social studies.[109] In Grade 7, his grades were all "C" and "D" with no failures. His grades began to decline to failure in Grade 8.[110] He

---

[107] Report of Dr. Welner, U.S. Exhibit 5 at 112-13; see also video and audio of Rodriguez interview with Dr. Welner, U.S. Exhibit 9.

[108] Report of Dr. Seward, U.S. Exhibit 6 at 16; see also video and audio of Rodriguez interview with Dr. Seward, U.S. Exhibit 8.

[109] Exhibit D-34, p. 3-4.

[110] Id.

noted to Dr. Seward that he failed "[b]ecause I didn't care after a while . . . You know? Got to the point I didn't care."[111] Dr. Marilyn Hutchinson, a defense expert, testified at trial about Rodriguez reason for his school failure and dropping out:

Q. Did he tell you why he quit school?

A. He was 18 years old. He wasn't being very successful. His friends were all out of school and so he quit.

Q. Do you recall reading in the Minnesota state hospital records that he indicated that he had quit school because he was not working at it and thought most students were aware of his sexual behavior?

A. Yes, I do remember that. Thank you. I'd forgotten that piece of it right now.

Q. Okay. You do know that he did complete high school and receive a high school diploma while he was at St. Peter?

A. I do know that.

Q. Certainly there are a lot of people in this world that haven't completed high school, correct?

A. That's correct.

Q. And that could be for any number of reasons; isn't that correct?

A. Yes, it is.

Q. One of which could be like Mr. Rodriguez said, he wasn't working at it. He wasn't putting forth the full effort he could.

A. That's right.[112]

---

[111] Report of Dr. Seward, U.S. Exhibit 6 at 16; see also video and audio of Rodriguez interview with Dr. Seward, U.S. Exhibit 8.

[112] Tr. 8060-61.

213

This attitude was reflected in a Presentence Investigation Report done following his 1974 convictions.  The report noted "[t]he only complaint the school officials had was that defendant made little effort in regard to his academic work."[113]  When he dropped out of school in fall 1971, Rodriguez had failed Grade 9.  His father told therapist Robert Whalen, before he was arrested for the rapes of Shirley Seddon and Elizabeth Knudson, "He wasn't interested in school, so he left."[114]  Mr. Whalen noted that Rodriguez himself "described adjustments to school and school peer relationships, usually indicating language barriers and a resulting dislike for the education experience."[115]  By Rodriguez's account, "I should have tried more, but I was too lazy or too stubborn . . . . wanted to do my own thing."[116]  His own thing included drinking, smoking marijuana, and taking other drugs, which would have undermined the performance of any student who attended classes.

Dr. Welner's interview with Rodriguez on this point went as follows:

Dr. Welner:   It was - - - - uh, do you have any regrets about dropping out of school?

Rodriguez:   At the time I did it, no, no.  Later on, I did have regrets.

Dr. Welner:   And what was - can you tell me about those regrets?

---

[113] Exhibit D-63.

[114] U.S. Exhibit 5.

[115] Exhibit D-66G, p. 7.  (Letter from Northwestern Mental Health Center to MSH, 01/14/1975).

[116] See video and audio of Rodriguez interview with Dr. Welner, U.S. Exhibit 9.

Rodriguez:    - - - I should have tried more, you know? But, uh, but I was too lazy or too stubborn.

Dr. Welner:   When you say 'stubborn', what do you mean?

Rodriguez:    Well, I wanted to do my own thing.

Dr. Welner:   And your own thing was?

Rodriguez:    Drinking and smoking pot.

Dr. Welner:   And hanging out?

Rodriguez:    And hanging out.[117]

As Dr. Welner notes, the Motion specifies that Rodriguez took narcotics and drank alcohol before going to school.  According to a "Drug History" from the Minnesota Security Hospital, "[Rodriguez] attended school under the influence of drugs, and once overdosed in school on eight seconals, from which he passed out in school, was sent home where he passed out again and slept for 24 hours."[118]  Such a self-induced mental deficit does not constitute evidence for mental retardation.[119]

Rodriguez, by his own account, stopped attending classes.  He explains that he would sign into school but then leave and hang out with friends and drink and smoke.[120] In 1969–70, he was recorded to have missed 32 days of school.[121]  Rodriguez reports he

---

[117] See video and audio of Rodriguez interview with Dr. Welner, U.S. Exhibit 9.

[118] Report of Dr. Seward, U.S. Exhibit 6 at 17 quoting Exhibit 66-D at p. 7.

[119] Report of Dr. Welner, U.S. Exhibit 5 at 113.

[120] See video and audio of Rodriguez interview with Dr. Welner, U.S. Exhibit 9.

[121] Exhibit D-34, p. 4.

215

began drinking and using drugs heavily very early in his teens.  This was an activity he shared with peers and it facilitated his fitting in socially. He smoked marijuana frequently, drank heavily, liked LSD and, for a time, took amphetamines frequently.[122] His grades dropped in due course.

The family's migration between Laredo and Crookston caused school problems for each of the Rodriguez kids, and the cultural differences took their toll.  Rodriguez's older sister Sylvia reported "I struggled in school.  I got D's and F's. Even to this day, I struggle to read an article in a magazine or newspaper.  I have a whole bunch of dictionaries that I have to use to get through an article.  I can't read well, write well, I can't even add."[123]  Her school records reflect her poor grades.[124]  But although she did poorly in school, Sylvia became a productive member of society.  At the time of trial, Sylvia had worked for a physician doing public relations for nine years.[125]  No one has marked her as mentally retarded.

Likewise, Rodriguez's brother, Frank, failed to complete high school.  But his grades at Leyendecker in Laredo for the second grade included ten B's and an A.[126] When he attended Crookston schools, his school grades reflected, as did Alfonso Rodriguez's, C's and D's in the first six grades in Crookston, and D's and an F in the

---

[122] See video and audio of Rodriguez interview with Dr. Welner, U.S. Exhibit 9.
[123] Declaration of Sylvia D'Angelo, D-125
[124] Exhibit D-32.
[125] Tr. 7937.
[126] See video and audio of Rodriguez interview with Dr. Welner, U.S. Exhibit 9.

216

seventh grade with a continuous downward trend until he completely failed eleventh

grade with three F's.[127]  No one ever determined Frank to be mentally retarded.

Once in the Minnesota Correctional System, Rodriguez decided to complete his

high school classes.  When he wants to, he does well.  Rodriguez graduated from St.

Peter High School in 1979 while a resident at the Minnesota State Hospital.  As noted by

Dr. Seward, in contrast to his prior schooling, Rodriguez was motivated to do well, and

he benefitted from "one-on-one instruction."  Rodriguez clarified his attitude about

school to Dr. Seward:

> Dr. Seward:  It seems like you were doing really poorly in school, from what you were saying.
>
> Rodriguez:  Well it isn't that I was doing poorly.  If I pushed myself I could've done it but I didn't care.
>
>  . . .
>
> Dr. Seward:  Okay so did you have trouble with the academics there at St. Peter's?
>
> Rodriguez:  No, no, like I said if I put myself out there I could do it.[128]

And progress notes from the Minnesota Security Hospital clearly document how well

Rodriguez was capable of doing:

 March 29, 1976:

11th grade English - working on reading comprehension at the 8th grade level

using SRA material Mexican-American Literature and American Literature material. Al

---

[127] Exhibit D-28.

[128] See video and audio of Rodriguez interview with Dr. Seward, U.S. Exhibit 8.

was reluctant to start school but is conscientious about attending  now.  He is eager to finish school whereas a year ago he was content to quit. . . .[129]

April 1976:

8 hours math.   Multiplication and division of whole numbers, fractions, and operations with fractions.   Al's attitude is good. He shows an interest in learning by asking questions and trying to work through problems. Al's math level is rather low but I think he has at least average ability and should continue in school to bring his level up to his potential.[130]

January 1977:

> Al has concentrated on reading the historical series of American Adventure through Vol. II.  We are just starting "Between Two Wars." Although this is historical reading, Al's interests lie in non-fiction and he advances much faster in vocabulary and spelling while reading material he is interested in. Three days a week is devoted to spelling words covering words from our reading. . .   Al expresses  himself well verbally; has good  insight and deduction, but his vocabulary and spelling do limit his progress.
>
> . . .

Material: 8 hours - Review of percent problems and practical percents. Also did roots and powers of numbers. We also began algebra and discussed positive and negative numbers, algebraic representation of numbers and operations... *Al is often surprised at his ability to learn and do math. He never had much success at school and especially*

---

[129] Exhibit D-66C at p. 7.
[130] Exhibit D-66C at p. 6.

*math.* I think Al enjoys being able to work through math problems and gets a good

feeling when he knows he has learned something.[131]

(Emphasis added.)

December 29, 1977:

> Al completed 12th grade English in August and is presently completing
> classes in other areas.  Al's reading has risen to the 8th grade level and his
> verbal communication improved also.   Al enjoys reading, especially
> history, and continues to show interest in graduating while here.
>
> . . .
>
> Al is reliable about attendending [sic] class.   He is very interested and
> interesting as a student.  He is knowledgeable and contributes a lot to
> discussions of science. . . . *Al is a very good student, capable of dealing
> with very sophisticated ideas. He reads well.*

(Emphasis added.)

In June of 1979, Rodriguez earned a "C" in Math III, in which his teacher reported

they covered:

> Fundamentals of addition, subtraction, multiplication and division of
> positive and negative whole numbers, fractions and decimals.  Also, roots
> and powers were studied.  Algebraic evaluation, formulas and their use in
> math, science and business are studied.  Percents and their applications are
> studied.  The structure of the decimal system is studied and compared to the
> base two system.  Word problem solving methods were discussed and
> numerous word problems are solved.  We also spent a good deal of time
> studying measurement, ruler reading, and scale drawings.
>
> > Attitude: *Al was positive towards school.*[132]

(Emphasis added.)

---

[131] Exhibit D-66B at p. 47.
[132] Exhibit 66-B at p. 2.

219

In July 1978, his biology teacher said:

> Al should receive 1 credit for 42 hours work in Biology from 9/77 to 6/78. Material covered has included human anatomy, reproduction, respiration, genetics and evolution, plant photosynthesis and respiration, diversity of life, particularly animal; astronomy and the dependence of the future of the biosphere on man's actions. *Al reliably attended class and always sho[w]ed [sic] interest in every topic. He voluntarily introduced topics and brought his own reading material to class for discussion. Al showed very goo[d] [sic] retention of material.*

(Emphasis added.)

His social studies teacher Bob Idso said:

Al should receive ½ credit for 21 hours of 12th grade sociology and ½ credit for 21 hours of 12th grade American government. *Al maintained a good attitude and strong curiosity throughout our association.* In American government we examined the history and function of the federal, state and local levels of government. In sociology we dealt with families groups [sic], cities, natural resources, crime and war.[133]

(Emphasis added.)

In January 1979, regarding social studies:

In this course, Al reviewed reading editorial pages, basic forms of world governments, American government, our current representatives, major U.S. wars, Watergate, the depression and world climatic differences. *Al read extensively, participated fully and learned quickly.* He has now completed the course requirements for social studies.[134]

---

[133] Exhibit D-66B at p. 22.
[134] Exhibit D-66B at p. 6.

(Emphasis added.)

In January, 1979, his algebra reported:

Material Covered:  signed numbers and operations with signed numbers, formulas and evaluation, exponents, powers of 10, percent problems solved algebraically, equations and equation solving, polynomials.

Attitude:  *Al worked well in class and when outside work was assigned he did it and even asked for more.*  Al was working hard at the tasks involved in his treatment and often school and treatment conflicted in time.  Al wanted to get a job off campus and this is part of his treatment program.  Al has to attend class for 42 hours for one credit and all he needs to graduate is one more credit in math.  At this time he has these 24 hours plus another 8 hours earned before, leaving a balance of 10 hours of class to graduate.[135]

(Emphasis added.)

As noted above, Rodriguez was awarded his diploma from St. Peter High School. Ultimately, it becomes clear, Rodriguez does not meet Criterion A—his IQ and intelligence testing scored well above the range attached to intellectual disability. The testing of Rodriguez by experts for the United States and Rodriguez for the past 7 to 8 years show him to have a low average to average IQ.  Rodriguez thus does not meet the requirements under the AAMR/AAIDD Intellectual Functioning Analysis or under the APA's Criteria A analysis for mental retardation.

### 3. Rodriguez is Not Mentally Retarded Under the AAMR/AAIDD's Adaptive Functioning Analysis or Under the APA's Criteria B Analysis.

---

[135] Id.

"Adaptive functioning" are the skills required for people to function in their everyday lives.[136]  The APA defines "adaptive functioning" as "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting."  DSM-IV-TR at 42.  The AAMR/AAIDD defines "adaptive behavior" as "the collection of conceptual, social and practical skills that have been learned and performed by people in their everyday lives."  AAIDD 11th Ed. at 43.  Adaptive behavior may be influenced by a number of factors including education, motivation, personality, social and vocational opportunities, and mental disorders unrelated to any deficits caused by mental retardation.

The two major professional organizations assess adaptive behavior by two different constructs.  The APA's DSM-IV-TR requires "significant limitations in adaptive functioning" to conclude that an individual is mentally retarded.  The DSM-IV-TR measures adaptive functioning

> [C]oncurrent deficits or impairments in present adaptive functioning (i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group) in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

DSM-IV-TR at 49.

---

[136] Throughout this section, "adaptive behavior" and "adaptive functioning" are used interchangeably.

The AAMR/AAIDD's requires "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical adaptive skills" to support a finding of mental retardation. AAIDD 11th Ed. at 6. A diagnosis of mental retardation requires a significant limitation in one of the three categories: conceptual skills include "language; reading and writing; and money, time, and number concepts"; social skills include "interpersonal skills, social responsibility, self-esteem, gullibility, naiveté (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving"; and practical skills include "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone." AAIDD 11th Ed. at 44.

Determining whether an individual's adaptive functioning is significantly limited is inherently more difficult than determining if the person's intellectual functioning is significantly limited. This second prong involves considerably more subjective clinical judgment. Adaptive functioning "historically has been assessed on the inherently subjective bases of interviews, observations, and professional judgment." Wiley v. Epps, 625 F.3d 199, 218 (5th Cir. 2010). Adaptive functioning is a broader, more amorphous category than intellectual functioning. The best practices in assessing adaptive functioning are also broad. The two professional organizations approach the measurement of adaptive functioning in somewhat different fashions.

The DSM-IV-TR advises that "[i]t is useful to gather evidence for deficits in adaptive functioning from one or more reliable independent sources (e.g., teacher

223

evaluation and educational, developmental, and medical history).” DSM-IV-TR at 42.  In addition, the DSM-IV-TR also advises that “[s]everal scales have also been designed to measure adaptive functioning or behavior (e.g., the Vineland Adaptive Behavior Scales and the American Association of Mental Retardation Adaptive Behavior Scale).”  Id. “These scales generally provide a clinical cutoff score that is a composite of performance in a number of adaptive skill domains.”  Id.  Similar to the scores in intellectual functioning tests, the assessment should consider the “suitability of the instrument to the person’s socio-cultural background, education, associated handicaps, motivation, and cooperation.”  Id.  “In addition, behaviors that would normally be considered maladaptive (e.g., dependency, passivity) may be evidence of good adaptation in the context of a particular individual’s life (e.g., in some institutional settings).”  Id.

The AAMR/AAIDD advises that “significant limitations in adaptive behavior should be established through the use of standardized measures normed on the general population . . . as performance that is approximately two standard deviations below the mean of either (a) one of the following three types of adaptive behavior conceptual, social, or practical or (b) an overall score on a standardized measure of conceptual, social, and practical skills.”  AAIDD 11th Ed. at 43, 47.  The AAMR/AAID recommends that a person be evaluated using a standardized test.  And as with the test for IQ, the scores on these tests must be evaluated in light of the standard errors of measurement for the test.  AAIDD 11th Ed. at 47, 49–50.  Tests should be technically adequate, but also designed for particular individual.  Id. at 51.

224

None of the generally accepted scales of adaptive behavior rely on the person's self-reporting of what that person is capable of doing. As is done in the measure of intellectual functioning, the AAMR/AAIDD advises that the determination of significant limitations in adaptive behavior "usually involves obtaining information regarding the individual's adaptive behavior from a person or persons who know the individual well," i.e., from third parties. Id. These persons should be "very familiar with the person and have known him/her for some time and have had the opportunity to observe the person function across community settings and times." AAIDD 11th Ed. at 43-55. Information about the person's day to day level of functioning as well as on the amount of support the person needs in order to carry out any of the relevant functions should be obtained. Id. Obtaining information from multiple sources (e.g., school records, employment history, and previous evaluations) and individuals is essential to "providing corroborating information that provides a comprehensive picture of the individual's functioning." Id. Finally, the AAMR/AAIDD cautions "[b]ecause adaptive behavior assessment relies on third party respondents, it is important for clinicians to assess reliability of any respondent providing adaptive behavior information." Id.

For purposes of diagnosis, some factors that typically affect the performance of adaptive behavior skills should be analyzed, such as:

> 1) Opportunities. ("Opportunities to participate in community life must be considered in decisions about significant limitations in adaptive behavior. A person whose opportunities to learn adaptive skills has been restricted in comparison to same-age peers may have acquisition deficits unrelated to ID.")

225

2) Relevant context/environments.  ("Adaptive behavior needs to be evaluated in relation to contexts typical of the individual's age peers.  However, in some cases, typical behavior is observed in 'atypical' environments.")

3) Sociocultural considerations.  ("Clinicians considering a diagnosis of ID must take into account the cultural context of the individual. . .[b]ehavioral expectations may differ across cultural groups, along with education and training in adaptive skills.  Assessments, therefore, must consider relevant ethnic or cultural factors and expectations.")

AAIDD 11th Ed. at 52–53.

Essentially, a clinician should review the broadest set of data possibly available and look for consistency and convergence over time to make a best practice diagnosis.  The clinician must therefore review the entire record of the defendant to determine whether there is evidence of intellectual impairment that produced "real-world disabling effects" in the defendant's life.  AAIDD 11th Ed. of AAIDD Definition Manual 2010, User's Guide at 24–25.

### a.  Rodriguez's Adaptive Functioning Shows that He Is Not Mentally Retarded.

Rodriguez has been incarcerated for most of his adult life.  As noted by Dr. Greenspan, incarceration has provided some structure and limited Rodriguez's opportunity to participate in some activities expected in community living settings for any lengthy period.[137]  Despite the limitations in assessing Rodriguez's adaptive functioning caused by lengthy periods of incarceration, Dr. Greenspan's October 13,

---

[137] One benefit of Rodriguez's lengthy period of incarceration is that he has been subjected to long-term scrutiny of mental health and correctional professionals, especially during his stay at the Minnesota Security Hospital.  Based on all of the available records, Rodriguez was never diagnosed with mental retardation prior to these proceedings.

226

2011 report asserted that Rodriguez had deficits in conceptual, social, and practical adaptive skills originating in childhood and persisting to adulthood. He asserted that, notwithstanding his IQ testing in the mid-80's, Rodriguez's deficits would support a diagnosis of mental retardation.[138] Dr. Greenspan filed his original declaration[139] without having interviewed Rodriguez. He subsequently met with Rodriguez, and then filed a supplemental declaration on February 25, 2013 in which he conceded that it was "impossible to meaningfully assess his current adaptive functioning" because of almost forty years of continuous incarceration.[140]

During the times in which Rodriguez was living in the community, there is no evidence that he was in need of any particular support, with his living situation dictated by legal considerations rather than any functional deficits. Prior to the instant offense, Rodriguez and others describe him as not only managing his own affairs, but also providing support for his mother, taking responsibility for his young nieces and nephews, maintaining close, mutually beneficial relationships with his family members, making plans and proactively following up on them, and assertively seeking employment and maintaining employment once it was secured. Dr. Welner's report elaborate upon Rodriguez's adaptive functioning.[141]

---

[138] Exhibit D-19 at 58.
[139] Id.
[140] Supplemental Declaration of Dr. Greenspan dated February 25, 2013, at p. 2.
[141] Report of Dr. Welner, U.S. Exhibit 5 at 110-144.

227

While his academic functioning skills are set forth above, his adaptability within his the community, his social realm, and others areas are discussed below.  As this discussion shows, Rodriguez's adaptive functioning provides no basis to support a finding of mental retardation.

**Ability to Reason**

Multiple examples where Rodriguez showed an ability to reason have emerged from records and from interviews and analyses of Rodriguez.

For example, earlier in his incarceration, after his convictions for raping Shirley Seddon and Elizabeth Knudson, at Minnesota Security Hospital, Rodriguez reportedly gravitated to antisocial peers. Staff observed he chose friends in group that would maintain his "streetwise image."[142]  To this day, Rodriguez has concerned himself with fostering the right impressions among his fellow inmates.[143]

When discussing the burglaries in which he participated with friends in his teenage years, Rodriguez noted that they would not forcibly enter a residence to avoid tipping off victims that they had been burglarized.  To that end, he and his cohorts would not make a mess, and would focus on stealing a ring or other piece of jewelry that the victim might not miss.  They were careful "not to take TVs or stereos because they would be missed."

---

[142] Exhibit D-66C at 60.

[143] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

He reasoned that he and his friends could continue to burglarize as long as they did not call attention to what was happening.[144]

In his earlier incarceration as a sex offender in maximum security, Rodriguez was well aware of his vulnerability to predators targeting him because of his offense history. Beyond not speaking of his offenses, he emphasized the money he had waiting for him back in the free world, in order to foster the impression that he was a drug dealer.[145]

When he approached discharge in 2003 after completing his sentence for the assault on Ardyce Whalen, there was one place where Mr. Rodriguez could live, familiar to him, in which he would not have to register as a Level III sex offender. According to corrections records, Rodriguez applied to a consulate for asylum in Mexico, but was rejected because of his felony record.[146]

As for the instant offense, Rodriguez stated that he placed a bag over Dru Sjodin's head in order to contain her bleeding. It possible that Mr. Rodriguez placed a bag over her head in an effort to asphyxiate or suffocate her. If, however, he is providing an accurate explanation for why he tied a bag over the victim's head, this action demonstrates mature reasoning, because biological material was otherwise non-existent

---

[144] Id.
[145] Id.
[146] DKT-799-70.001, Gov't Trial Exhibit 90; see also Exhibit D-67E at 19; D-67I at 40, 43.

in the back seat of his car where Sjodin spent the final period of her life.  Rodriguez told

Dr. Silva that he was thinking at the time that he did not want to be arrested.[147]

Rodriguez's exchanges in several recorded telephone calls to relatives in late 2005

and early 2006 also displayed his mature, sage reasoning.  He offered advice on how his

mother could rid the home of squirrels that attacked bird feeders, and he counseled

another relative that she could file a joint tax return to the IRS even though she was

cohabitating but not married.  He directed his mother in January to call the insurance

company to pay for home improvements and to remedy a gas bill that was unacceptably

high.  He also advised his mother on another occasion that the family should sell a farm

before losing access to water on the property, which would diminish its value.[148]

As these examples over decades demonstrate, Rodriguez has the ability to reason capably

and instinctively, and without need for assistance.

**Ability to Plan**

Rodriguez has also shown the ability to plan effectively.  He immediately began

developing employment options for himself after dropping out of school at age 18 by

securing employment at school from which he dropped out.  Establishing a stream of

legal income—even, as he notes, he was able to meet his otherwise simple financial

needs—reflects a maturity in his planning from the period of his youth.

Rodriguez spoke at length about burglaries in which he participated in his younger

---

[147] Declaration of Pablo Stewart, Exhibit D-17.
[148] U.S. Exhibit 19.

230

years.  According to him, he and his partners, typically his best friend Bill Mauer, would case and choose homes that did not have children:  "[W]e were always looking for empty houses, not babysitters or kids or nothing . . . because they [the parents] would then be less likely to be home . . . there would be no babysitters" and the house would be more predictably empty.[149]

Anticipating his release from custody in 2003, the defendant sought residency in New York, Georgia, or Mexico in the hope that he could find work and support himself. He aimed to be away from his family so that his notoriety would not create problems for them.  He prioritized his employment search to engage areas that held promise for a career, rather than mere employment.[150]  For example, he sought out those who would welcome his experience in the print shop that he had long worked at in prison, such as the local newspaper.

Upon his release before he secured employment elsewhere, he renewed his Minnesota drivers' license. When Rodriguez moved into his mother's home in 2003, he intended it to be a transitional arrangement while he looked for work. He would need to transport himself to make this happen, and thus renewed his license.[151]

These exemplars shows that Rodriguez has the ability to develops plan to meet objectives.

**Ability to Think Abstractly**

---

[149] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

[150] Exhibit D-67I at p. 43.

[151] Exhibit D-67E at 19; D-67I at 40, 43.

231

Rodriguez also has a demonstrated his ability to think in the abstract. For example, in his interview with Dr. Seward the following exchange took place:

Rodriguez: The problem is – see, the problem they're having, and I don't know how come they don't realize it, is it don't work to have news 24 hours a day, because then your news becomes like - like The National Enquirer. They report everything, no matter if it's news or not. Like who cares if a guy is wrestling with a shark on the national news, or who cares about – about, uh, a crime that nobody knows about? But because there's – there's certain amount of time they need to put something in there, they'll put anything in there. So like right now, they've been talking about that Zimmerman case.

Dr. Seward: Yeah.

Rodriguez: And that should have never even been brought up. That shouldn't even have a trial. You know? But the only reason they're having the trial is because the blacks got all pissed off. It's political. You know? They're ruining a guy's life

just because – and they proved it yesterday that – that they've been saying that Martin was on the bottom, but they proved it yesterday that that wasn't so.

Dr. Seward: Uh-huh.

Rodriguez: That he was on top. You know? So but now they're all

backtracking that, oh, maybe we should ask for manslaughter and assault instead. And they're having a hard time admitting that they made a mistake. Like there's one of the lawyers that's so against Zimmerman that she's seeing a different trial than everybody else.[152]

Dr. Seward: What do you think about the Snowden guy? Have you been following that at all?

---

[152] See video and audio of interview with Dr. Seward, U.S. Exhibit 8.

232

Rodriguez:    Yeah, yeah, I've been following that.  I believe that they should charge him with treason.  You know?

Dr. Seward:  Where do you think he's going to end up?

Rodriguez:    I think he's going to end up in the United States.  They're going to get him.  Because I think a lot of these countries, they're talking bull.  But I think if he lands in Cuba, I think the Cubans are going to send him back to the United States.

Dr. Seward:  You think so?

Rodriguez:    Yeah.

Dr. Seward:  How come?

Rodriguez:    Because they – they don't want to piss off the United States.  You know?  And Venezuela, they're talking shit right now.  But just talk.  But when it comes right down to it, either they're going to refuse him, or they're going to ship him back here.  You know?  Because they have a lot more to lose.

Dr. Seward:   Venezuela?

Rodriguez:    Both Venezuela and Bolivia.

Dr. Seward:  Why Bolivia?  What would Bolivia have to lose?

Rodriguez:    Trade, for one.  You know?  Most of their trade is with the United

States.

Of his experience with the prejudice of others, Rodriguez told Dr. Welner:

Rodriguez:    Even some of the people I'd hang out with were racist you know?  But for some reason - that's just – we would never understand is why did they hang out with us if they were racist, you know?

Dr. Welner:  Mm-hmm.

Rodriguez:    See people become blinded – especially white people become blinded.  They say things like, this one friend (a couple of them actually).  This guy I knew- he would say, "God I hate

233

these god damned niggers," you know?  And I would look at him and I would wonder – if I wouldn't be here he would be saying the same thing about me, you know?  And I noticed that about a lot of the people I'd hang out with.[153]

In discussing his reading, he reflected on his tastes in this exchange:

Dr. Welner:    Does that mean you prefer to read fiction to non-fiction?

Rodriguez:    Well, it varies.  The stories ain't true it's just somebody's

interpretation of (history) he writes about a group of people; in each one is a series.  He

writes about a family going through the war, from World War II until today, you know?

So some of them are from World War II, some of them are now . . . .[154]

Rodriguez characterized religion to Dr. Seward as "a bunch of goop," adding, "if

He's so merciful you know so and if he doesn't want evil in the world why doesn't he get

rid of it if he's God?  You know?  So it's just a bunch of shit."[155]

Rodriguez's previous sexual assaults also demonstrated his ability to think

abstractly.  For example, approaching the darkened and abandoned house he had

represented as his own, Rodriguez preempted Shirley Seddon's concern by musing, "no

one was waiting up for me," referring to unseen family.[156]  And Rodriguez attempted to

kidnap Ardyce Whalen after disarming her with a stranger's request for directions, saying

"Is this 313 [Front]?"[157]

---

[153] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.
[154] Id.
[155] See video and audio of interview with Dr. Seward, U.S. Exhibit 8.
[156] Exhibit D-61.
[157] U.S. Exhibit 21.

The defense has invoked the <u>Atkins</u> decision to suggest that a person who is retarded is unable to abstract from experience. Rodriguez had the experience of seizing Shirley Seddon and Elizabeth Knudson in their own vehicles. He attempted to coerce Ardyce Whalen into his car, but she refused and escaped. When he kidnapped Dru Sjodin, he employed his previously successful method of seizing her in her own car, then transferring her to his vehicle for further elaboration of the crime. His modus operandi was refined from previous experience.

The Seddon attempted rape was committed by force and without a weapon, and the aim of intercourse did not happen. Rodriguez then used a weapon—a knife— to successfully and quickly gain control of Elizabeth Knudson, enabling him to complete the rape. A knife was successful in gaining control of the victim quickly. And so, learning from his past experiences, Rodriguez employed a knife when seizing Dru Sjodin, to quickly gain her compliance.

All of these examples show that Rodriguez has intact abstracting abilities and the capacity to employ abstract thinking and reasoning from experience.[158]

**Ability to Learn From Instruction and Experience**

Rodriguez was treated for anxiety at Minnesota Security Hospital with biofeedback, and he absorbed the protocols successfully enough that, by June 1978, he no longer needed equipment to treat himself effectively. The essence of biofeedback is self-

---

[158] Report of Dr. Welner, U.S. Exhibit 5 at 101.

management.  Rodriguez learned to respond to his body without support.[159]  Rodriguez also taught himself to monitor for signs of hypoglycemia resulting from the medicines he takes to treat diabetes.  In our discussion, he listed symptoms of feeling "clammy, a bit anxious, and lightheaded," which he correctly associates with his blood sugar dropping.[160]

Rodriguez also learned a number of trades in custody.  Most widely chronicled were the skills he learned from longstanding work in the print shop, for which he was positively evaluated.  According to Rodriguez, he also learned how to make things with leather, such as wallets, belts, and vests; how to use a wood lathe; how to make pottery, such as bowls, use a pottery wheel, and glaze pottery; and how to make different figurines, such as roosters, lilacs, and key chains.  While incarcerated, he also learned tiling, wall boarding, and furniture-making.  Even with a tremor, which worsens when he gets anxious, Rodriguez was able to execute a range of duties in a number of settings.  None of the evaluations that span decades of his confinement suggested that Rodriguez was unable to master the fine points of his instruction or that he needed supportive assistance.  He demonstrated that he learned from experience and teaching with evaluations as good or better than peers who were already select enough to be considered for similar detail.[161]

---

[159] Exhibit D-66A, D-66B, D-66C, D-66D, and D-66H.

[160] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

[161] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

Further, Rodriguez drove extensively after he was released from custody in 2003. But having been incarcerated for years, he was not used to the electronic demands of cars, saying, "I had to read the book." This is another example of his educating himself when necessary, without the need for assistance.[162]

Rodriguez also has a demonstrated ability to learn from experience. Before the instant offense, Rodriguez was arrested and convicted for three attacks. In each attack, the victim' testimony provided key evidence against him. Here, he killed the victim, who by his account in his interviews with Dr. Welner and Dr. Seward, and within the Statement of Dr. Silva, had done nothing to him and did nothing to warrant his animosity,[163] except that she would have been a witness against him had she survived. As Rodriguez noted in his interview with Dr. Silva, he did not want to be arrested, which he would have been had Ms. Sjodin survived.

Evidence refutes Mr. Rodriguez's account to interviewers that he planned to release Ms. Sjodin when he kidnapped her. He had every opportunity to do so and did not. Rodriguez learned to silence a witness to avoid arrest and prosecution.[164]

**Ability to Solve Problems and Strategize**

Upon his arrest for the 1974 rapes, Rodriguez met a counselor named Robert Whalen. There is no record of his having engaged in treatment to any degree. He did,

---

[162] See video and audio of interview with Dr. Seward, U.S. Exhibit 8.

[163] See video and audio of interview with Dr. Welner, U.S. Exhibit 9; see video and audio of interview with Dr. Seward, U.S. Exhibit 8; Exhibit D-20 at 38-39.

[164] Report of Dr. Welner, U.S. Exhibit 5 at 102.

however, successfully represent to the court in his plea colloquy that he was engaged in some form of psychiatric care.[165] He thus received a compassionate sentence on the 1974 rapes and routed him into the mental health system. This demonstrates his ability to strategize and to execute an effective plan.

This was Mr. Rodriguez' introduction to how one can exploit a connection to psychiatry for favorable treatment in the justice system. Mental health remains an active part of Rodriguez's legal planning, even though he has demonstrated a lack of interest in obtaining help for any psychiatric symptoms.

Investigative interviews of Shirley Seddon in the aftermath of Rodriguez's 1974 attack on her revealed him to be calm after the rape, even as she panicked. According to Ms. Seddon, Rodriguez guided her to fix her transmission and directed her away from a rut. Rodriguez then began manipulating her about needing help. He directed her to his "home," a residence that he knew to be abandoned.[166] He knew that driving to a specific location in the middle of a residential neighborhood would not arouse suspicion and that parking in a driveway would separate the car from attention of passerby's.

Rodriguez convinced Minnesota Security Hospital officials to readmit him in the wake of the Nancy Carlson rape, insisting that he was innocent, and thereby effectively hid from investigators looking for the perpetrator.[167] He did so by convincing and thus

---

[165] Exhibit D-64.
[166] Exhibit D-61.
[167] Exhibit D-66.

238

manipulating hospital officials that should another such rape happen, he wanted to be in the hospital to have an alibi that would remove him from suspicion.

He exhibited strategic thinking in his interview with Dr. Welner:

He emphasized aspects of his history that supported Dr. Stewart's conjuring of a posttraumatic stress disorder defense; he provided an account that, for the first time, gave emphasis to certain symptoms that one would associate with pathological effects of severe posttraumatic stress disorder, and he volunteered copious detail to underscore what a traumatic experience his reported trauma had been for him.  That so much of what he related to me was newly minted, and the initiative with which he directed the conversation to it, supported the impression of his bringing a plan to our encounter and admirably executing it, as one would a job interview.[168]

Rodriguez's criticism of Minnesota Security Hospital staff is clever and reflects his ability to strategize.  Rather, than assert the incompetence of all of those who cared for him and never experienced him to have PTSD (which would be unrealistic given the volume of documentation and range of professionals who examined and assessed him over the years), he emphasizes that all the professionals were concerned about was research funding, as opposed to their patients.[169] This attempt to undermine four years of Minnesota Security Hospital evaluation and care illustrates his street smarts.  And if his

---

[168] Report of Dr. Welner, U.S. Exhibit 5 at 104.

[169] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

position is a byproduct of coaching, he responds to coaching well and with good strategic application.

Rodriguez was able to secure and maintain highly favorable work arrangements during his incarceration in the 1990s. He represented to staff that he was interested in sex offender treatment, even though he was not obligated to participate in it. By affirming his willingness, he maintained his eligibility for the work assignments without having to enroll in such treatment because he was not poised to be released. As his 2003 release date approached, he declined to participate in treatment. While declining would prevent him from earning early release, serving his full term meant no parole monitoring upon release. As Rodriguez sought no psychiatric aftercare services upon release, and declined to be considered for a commitment that would restrict him from being in the community, he strategized effectively to maximize the quality of life of his incarceration and his ability to live without accountability upon his release.[170]

Rodriguez has never had difficulty adjusting to different corrections environments, whether it be maximum security, medium security, administrative segregation, general population, or death row. His track record in custody show he has been able to thrive in prison settings, even as he is a convicted rapist with notoriety attached to his name.

Finally, the circumstances of the instant case, as well as those of his previous attacks, show that Rodriguez is able to solve problems and develop a strategic plan.

---

[170] Report of Dr. Welner, U.S. Exhibit 5 at 105.

240

In each of the Seddon, Knudson and Sjodin attacks, for example, Rodriguez engaged the victims at a precise point from which escape would be most difficult. In the case of Ms. Sjodin, according to Rodriguez himself, she was on the telephone and she had placed her key in the ignition, with her drivers' side door open. In calculating the specific instant to strike in order to gain control of the victim, he demonstrates his perceptual organization.[171]

And Rodriguez by his own terms exhibited proficient problem solving and strategic skills when faced with possession of a dead woman. He could have left Ms. Sjodin's body at the death scene, as many might have. But Rodriguez chose to leave her body in a place where it was unlikely to be found quickly. Indeed, despite an intensive search, Ms. Sjodin was not found for months. Rodriguez's presence of mind produced choices that effectively solved his quandary of having to dispose of a dead body, and did so under considerable stress and with no assistance. Further, he was careful to leave no evidence traceable to him behind, despite the physicality of their final struggle. As Rodriguez told Dr. Welner, while committing the crime, he specifically chose to travel on back roads to avoid police attention. And then, upon returning home, Rodriguez displayed no suspicious behavior to his own mother, who saw him before he told her he was going out to get a hamburger. The defense's implication of Rodriguez's

---

[171] See video and audio of interview with Dr. Welner, U.S. Exhibit 9; Report of Dr. Welner, U.S. Exhibit 5 at 106.

cognitive "chaos" is grossly inconsistent with the organization and strategic planning reflected by his disposal of Ms. Sjodin's remains.[172]

**Practical Understanding Ability**

As Dr. Welner reports, Rodriguez has reflected proficient practical understanding of various aspects of his day-to-day life.

Rodriguez' exchanges in telephone calls[173] recorded in late 2005 and early 2006, while he detained pending trial on this matter, provide numerous examples of practical understanding in excess of that expected from someone suffering from mental retardation:

- In January 2006, his mother was concerned about her heating bills, and Rodriguez identified the windows in her house as causing the high bills. He directed his mother in to call the insurance company to pay for home improvements to remedy the gas bill.

- On January 29, 2006, for example, he identified a "finch" in a bird discussion with his family.

- On February 18, 2006, he advised his sister of the different species of birds that visit her home. He suggested that she leave apples for feeding birds, and directed his mother to Home of Economy for her own feeder purchase. Rodriguez, to his

---

[172] See video and audio of interview with Dr. Welner, U.S. Exhibit 9; Report of Dr. Welner, U.S. Exhibit 5 at 105.

[173] U.S. Exhibit 19.

sister on another occasion, pointed to an aggressive bird as a swallow (because it gathered mud and would chase other birds away).

- In a March 2006 discussion about a relative's farmhouse for sale, he advised his mother that the family should sell before losing access to water on the property, which would diminish the property's value.

- In April 2006, he offered advice on how to rid the home of squirrels that attacked bird feeders.

- In a May 2006 telephone call, he explained to his sister the purpose of a controlled burn of grass at a farm.

- In another recorded telephone conversation with his mother, Rodriguez advised her to use a stool softener and told her how frequently to take it.

- Learning of symptoms of a family friend in a July 2006 telephone call, Rodriguez reasonably appraised the history as consistent with Alzheimer's' disease.

- In another telephone call in July 2006, the defendant counseled a relative to be careful driving because of deer crossing.

These examples not only show that Rodriguez displays practical understanding of day-to-day life, but also that his family reaches out to him for his input to help them solve their day-to-day problems.

243

In his interview with Dr. Seward, Rodriguez showed a clear comfort level with maps, locations, and roads.[174]  Consistent with this, he provided corrections officer Jose Lopez with a detailed transportation route across Minnesota when Officer Lopez was charged with transporting him.[175]  He demonstrated familiarity with local roads in his interview with Dr. Seward when discussing transporting Ms. Sjodin on back roads to her final resting spot.[176]

Examples from before Rodriguez killed Ms. Sjodin are consistent with his demonstrated practical understanding after the murder.  For example, as an avid fisherman, Rodriguez cleaned his own fish.  He cleaned them where he caught them to avoid making a mess at home.[177]  And when preparing for his early 2003 release, sought renewal of his driver's license; he informed his caseworker that all he needed was to pass an eye exam.

When he returned to his mothers' home and acted as a caretaker to her, he started and planted a vegetable garden and flower beds and cared for the trees.  He and his mother reportedly baked together and canned vegetables.[178]  His sister Ileanna testified about his gardening and homemaking as well.[179]

---

[174] See video and audio of interview with Dr. Seward, U.S. Exhibit 8.

[175] Exhibit D-146.

[176] U.S. Exhibit 8.

[177] See video and audio of interview with Dr. Welner, U.S. Exhibit 9; Tr. 7695-96, 8144.

[178] Tr. 8140.

[179] See *supra*.

Together, these examples show that Rodriguez exhibited proficient practical understanding skills before and after his killed Dru Sjodin.

**Exercise of Judgment**

Rodriguez, who reports he possessed several guns, did not keep a gun with him outside the home, despite his reported drug purchasing and sales activity, because "[t]hat was too easy to pull the trigger. I didn't want to kill anybody . . . . Yeah it's too easy to pull a trigger."[180]

Even as he was using drugs and drinking heavily in his teens, Rodriguez was selective about what he took. He gave up stimulants, recalling of a friend, "I saw what it did to Vincent (Mendez) - he lost weight, and could not sleep. If you don't take it, you come down, and you come down hard. If it happened to me, I'd be tired at the wrong time." Once he overdosed on "downers," he "never touched them again."[181]

Further, Rodriguez was assigned and responsibilities in a Resident Assistance Program at Minnesota Security Hospital, a program in which he assumed responsibility for helping other residents. He served on the treatment unit's board of directors and took an active role in policymaking and enforcement. As part of his duties, for example, he accompanied and supervised another inmates on trips outside of the facility.[182]

**Acting in Legal Self-Interest**

---

[180] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.
[181] Id., Report of Dr. Welner, U.S. Exhibit 5 at 108.
[182] Exhibit D-66C at 65.

245

On multiple occasions when faced with the potential for incriminating himself, Rodriguez has acted in his own legal self-interest by requesting an attorney, denying culpability, and misdirecting authorities.

After his first arrests in 1974, Rodriguez admitted only that he was in the car with Ms. Seddon, and then asked for an attorney.[183] In the instant case, Rodriguez asserted his right to counsel when law enforcement confronted him with their determination that he had killed Ms. Sjodin. In both instances, he demonstrated decision-making that preserved his own legal self-interest in pressure-filled circumstances.

Further, in the plea colloquy resolving the two 1974 charges (the attacks on Ms. Seddon and Ms. Knudson), the defendant expressed remorse for the attacks.[184] But in videotaped interviews over twenty years later, Rodriguez defiantly showed lack of remorse and was openly contemptuous of the victims, especially of Ms. Seddon.[185] To this day, he denies responsibility for the attempted kidnapping of Ms. Whalen. The contrast between his presentation to the court to demonstrate acceptance of responsibility and remorse and his contempt of his victims and dismissal of his responsibility years later illustrates his capacity to advance his legal interest when the occasion demands it.

Over time, Rodriguez developed a strategy to try to thwart the authorities and to avoid conviction. In his interrogation in this case, Rodriguez misled interrogators regarding where he would have traveled to hide the body. He specifically directed them

---

[183] Exhibit D-62.
[184] Exhibit D-64.
[185] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

away from gravel roads by speaking of his concerns about hitting deer on those roads, and even suggested for them to look in Grand Forks.[186] Along the way, Mr. Rodriguez employed an interview strategy that has been successful for him on other occasions—adamant, intractable denial.

As pointedly put by Dr. Welner in his report:

Alfonso Rodriguez spoke about the Sjodin killing only when and to the extent he determined it suits him. And since he has, he has done so fully conversant of the implications of his statements on jurisdiction disputes, diagnoses considered, and the mitigation provided (claims of sex abuse). Just as he was protecting his legal risk when he was silent, he remains equally calculating even as he speaks, given that some of his account is physically impossible (the account of Dru Sjodin's last moments) but invariably self-serving.[187]

### Cognitive Flexibility

Rodriguez has consistently shown an ability to react flexibly to a situation to manipulate others to his own advantage. For example, after the attack on Ms. Seddon, as she panicked, he calmly guided her to fix her transmission and directed her away from a rut. He began telling her about how he needed help and how sorry he was.[188]

As Dr. Welner concluded:

---

[186] U.S. Exhibits 22 and 23.

[187] Report of Dr. Welner, U.S. Exhibit 5 at 110.

[188] Exhibit D-61.

247

This illustrates his ability to summon different attitudes and different ways of relating according to the demands of the moment. Rather than chaos or executive dysfunction, Mr. Rodriguez showed unusually adept cognitive control to shift from the intimidation of choking Ms. Seddon to refocusing his agenda on oral sex to reassuring her afterward when she was distraught and to solicit help from her pastor rather than accountability from the criminal justice system. The quality of Al Rodriguez's manipulation evokes the brazenness of psychopathy, but more importantly exemplifies cognitive flexibility.[189] His response to the circumstances of the rape of Ms. Seddon was not unique. After he attacked Ms. Knudson, he also told her that he "felt ridiculous" for what he had done.[190] Dr. Welner identified this pattern where:

[T]he examinee shifted from seizing the victim, raping her in an incident in which he was erect and ejaculated, to seeking her pity as he had of Ms. Seddon. In our interview, he made it clear he had no remorse for the Knudson rape. Thus his ploy was of his own flexible contrivance to satisfy the strategic demand of the moment – impact her willingness to report the crime.[191]

And, according to Rodriguez, when Ms. Sjodin began to bleed from the mouth, he placed a bag over her head to prevent blood from spilling from her into the car. In doing

---

[189] Report of Dr. Welner, U.S. Exhibit 5 at 111.
[190] Exhibit D-60.
[191] Report of Dr. Welner, U.S. Exhibit 5 at 111.

248

so, he displayed sufficient flexibility to use the materials at hand to protect himself from possible incrimination.[192]

When law enforcement initially approached Rodriguez to question him about Ms. Sjodin's disappearance because he was a Level III sex offender living in the area, Rodriguez provided them with a plausible story accounting for his whereabouts. And when his family asked where he had been the day of Dru Sjodin's disappearance, he told his sister Ileanna that he had been locked out of his car and needed to gain assistance from a locksmith. When Ileanna contacted the company whose name he provided and learned that he had not called them, he responded that he had gained entry to the locked vehicle with a hanger.[193]

Rodriguez has explained that he was in the Columbia Mall looking for a particular pair of pants. This is why, he points out, he went to Sears, JC Penney, Marshall Fields, and Target.[194] As Dr. Welner notes, "It is a plausible explanation. However, video from Target shows him only in the CD aisle. And when he followed a blonde female out of the Target, and then followed Dru Sjodin out of the mall was that the pair of pants he was looking for?"[195] Without videotaped evidence or other verifiable sources to confront his stories, Rodriguez has demonstrated the capability to create whatever narrative he needs. His capacity to out think questioning on his own reflects cognitive flexibility and agility.

---

[192] See video and audio of interview with Dr. Welner, U.S. Exhibit 9; see video and audio of interview with Dr. Seward, U.S. Exhibit 8.

[193] U.S. Exhibit 24; Grand Jury testimony of Illeanna Noyes, U.S. Exhibit 25.

[194] Exhibit D-86 at 77-78.

[195] Report of Dr. Welner, U.S. Exhibit 5 at 112.

**Short Term Memory**

Extensive testing was completed both by Dr. Froming and Dr. Seward.  Rodriguez demonstrates average to excellent short term memory. Dr. Froming elaborated on Rodriguez's memory:

> There are some striking findings with his memory performance. . . . Again there's a differentiation between verbal material and spacial material and how well you learn and remember those things.  Mr. Rodriguez has a 92 on his verbal immediate memory, his ability to listen to a paragraph and remember the paragraph of material.  So he's average ability in that.

His visual immediate memory, his ability to look at faces and remember faces to solve perceptual problems, visual problems, is 134.  Again two standard deviations or the top two percent of most people.[196]  Both Dr. Seward and Dr. Froming administered the Wechsler Memory Scale 3rd Ed. (WMS-III).  Dr. Seward reported that Rodriguez received an Immediate Memory Composite score of 91, and a composite score of 109. This score is average.[197]  Dr. Froming's administration of the WMS-III resulted in a score of 114 on Immediate Memory.[198]  Finally, Dr. Welner reports he met Rodriguez over three days and he carried reflections of the earlier sessions to subsequent discussions.[199]

**Regulation of Emotion**

In her Declaration, Rodriguez's mother said that Rodriguez "didn't show much emotion, he didn't get angry."[200]  In 1975, Rodriguez's parents, as part of a presentence

---

[196] Tr. 7798.

[197] Report of Dr. Seward, U.S. Exhibit 6 at 40.

[198] Exhibit D-107, p. 1.

[199] Report of Dr. Welner, U.S. Exhibit 5 at 115.

[200] Exhibit D-11; see also Exhibit D-14.

investigation, to the court that Rodriguez was quiet and reserved as a child.[201]

Investigative interviews of Ms. Seddon in the aftermath of Rodriguez's 1974 attack on

her revealed him to be calm after the rape, even as she panicked.[202]  Ms. Whalen, another

of his victims, recalled that he engaged her in a calm voice.[203]

At the time of his evaluation for purposes of determining whether he would be

referred for civil commitment, Rodriguez "pointed to his very good prison record as

proof that he can control his emotions."[204]  In close to forty years in custody, Rodriguez's

infraction history is negligible.  His behavior is so well-regulated that he earned favorable

housing assignments reserved for only an elite few, and enjoyed standing as a leader

among other Minnesota Security Hospital inmates.[205]

**Understanding of Risk in Social Settings**

Dr. Welner addressed a number of areas concerning Rodriguez's social settings

and the risks he averted:

> According to the examinee, he would sell drugs, but was not caught
> "because I knew who I was selling to," explaining that he was careful to
> maintain only a very small roster of customers.  Even as Mr. Rodriguez and
> his friends reportedly hosted beer parties, he recounts that drug sales were
> handled separately, in order to keep customer-seller relationships
> anonymous.  This in turn, he explains, lowered the likelihood that another's
> misfortune for selling to law enforcement would sweep him up.

---

[201] Exhibit D-67H.
[202] Exhibit D-61, D-86 at 21.
[203] U.S. Exhibit 21.
[204] Exhibit D-67C at 34.
[205] Report of Dr. Welner, U.S. Exhibit 5 at 115.

251

Another example of a drug sales niche targeted by Mr. Rodriguez, he reports, were nearby Indian reservations, with more relaxed drug enforcement.

The examinee spoke of avoiding prostitutes for concerns of safety. (He told Dr. Pitt in a pretrial interview that he was afraid of contracting AIDS.)

In custody, according to Mr. Rodriguez, he avoided gang involvement, even as he maintained cordial relations with all. His recent decades were also marked by his avoidance of drug use, in order to not bring proximity of more predatory elements who exploit debt to control an inmate. Moreover, explains Mr. Rodriguez, he would in particular avoid those who borrow money "because they are troublemakers."

According to the examinee, he has also nurtured the false impression among other inmates that he has monies on the outside, and an operation elsewhere, to insinuate to the curious that he was a drug trafficking offender. In so doing, he concealed his sexual predator history that would have rendered him vulnerable to those inmates who particularly terrorize the sex offender population.

In the community, Mr. Rodriguez was attentive to the conventions of others. He smoked outside his mother's house in order not to upset her sense of hygiene. He was altogether law-abiding in his months in the community, and specifically avoided putting himself in positions where his status as a released high risk sex offender could provoke an incident. No longer would he go to the bars of his earlier adult days.[206]

In his Motion, Rodriguez argues that others targeted him because of his retardation and that, due to his mental retardation, he "cannot understand the deep humiliation and

---

[206] Exhibit D-83B at 95. The statement to Dr. Pitt, that he avoided prostitutes is in direct conflict with Rodriguez's claimed erectile dysfunction problem with Dr. Dugan where he stated that he in fact hired a prostitute. Exhibit S-101. Report of Dr. Welner, U.S. Exhibit 5 at 116; see video and audio of interview with Dr. Welner, U.S. Exhibit 5. See video and audio of interview with Dr. Seward, U.S. Exhibit 6.

252

shame he feels."[207]  Yet most of what is known about his supposed humiliation and its

depth has been articulated by him.  He advances the notion that he experiences shame for

the notoriety of his actions on his family.  The evidence demonstrates, however, that

Rodriguez does not experience shame otherwise.  Remorse for his crimes is nonexistent;

as noted above, he expressed contempt for his victims, Ms. Seddon and Ms. Knudson, in

his interview with Dr. Welner.[208]

> As Dr. Welner notes:

> Were Al Rodriguez to experience shame, he would not have raped immediately upon moving in with his girlfriend Dotsie Dahl, and only one month after he had already been arrested for rape.  The examinee conveys no shame over the obscene calling; he suggests in our interview that one of his victims, a teacher, was an exhibitionist; he charges that his peers were also harassing others with obscene calling.  Were Al Rodriguez to experience shame, he would have readily expressed this in his group therapy experiences in [Minnesota Security Hospital].

> Examiners in this case have a heightened awareness of humiliations Mr. Rodriguez believes he has experienced.  That is because he conveys old humiliations with unrequited grudge and an entitlement to such explanation for his social deviance that has cost him his freedom.

> *The evidence demonstrates that Mr. Rodriguez understands and endeavors to avoid social risk. . . . He loves his mother and is loyal to her and to his family. However, he does not experience shame in the way of conscience towards others. This limitation is not an expression of intellectual disability, but rather a psychopathic trait.[209]*

**Maturity of Social Judgment**

---

[207] Mot. at 5.

[208] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

[209] Report of Dr. Welner, U.S. Exhibit 5 at 117.

Rodriguez had numerous friends and casual relationships in his teenage years. He listed both males and females in his lengthy discussion with Dr. Welner and Dr. Seward. He and his friends hung out at Sekulas, a local establishment, went to parties, and engaged in other activities. These activities demonstrate that he was socially capable enough to maintain a circle of friends. His closest female friend was Dotsie Dahl. They engaged in a more than two-year relationship that only ended upon his arrest in 1974. Rodriguez observed that "she was faithful" and "we wanted to do the same things."[210]

Rodriguez participated through the late 1970's in therapeutically geared programs. In 1980, Minnesota Security Hospital psychologist Dr. Bruce Hawkinson characterized Rodriguez as "more insightful." The results of the California Personality Inventory in March 1980 were within normal limits. Hawkinson described Rodriguez as "self-reliant," and "independent."[211] Jan Thompson, a psychologist who monitored his interactions in the therapeutic group, observed Rodriguez to be "attending well to needs of other small group residents."[212]

His youngest sister, Ileanna testified that Rodriguez helped with her children. Her children "adored him" and "loved him." They had a good relationship with him, went

---

[210] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.
[211] Exhibit D-66C at 51.
[212] Exhibit D-66C at 54.

254

places with him, and trusted and looked up to him.[213]  His mother testified he treated her with respect.  He treated his family with respect.[214]

In custody, he avoided gang involvement, even as he maintained cordial relations with all.  He stopped using drugs while in custody, to avoid being in debt to anyone so that no one else could control him.  In particular, he avoided those who borrowed money, observing,

> Just about everybody that was killed was because of that.  They owed money or they were snitches, you know?  So there was a lot of snitching going on back then so that jail.  See, I didn't stay in the limelight or the spotlight.  I was always in the shadows, you know, and that's the way I am.[215]

Dr. Welner concludes:

> Al Rodriguez exhibits unremarkable and adult social judgment. This has reflected in the overall ease of how he has managed various relationships, and types of relationships young and old, in custody and out, in his adult life. The comfort with which he socially adapts also reflects the maturity of his social judgment.[216]

**Absence of Gullibility**

Dr. Greenspan provides only one example of Rodriguez's gullibility, and it is a poor one.  Referring to a statement given to Dr. Pitt pretrial, Dr. Greenspan says:  "At age seven, Alfonso was molested by an older boy who offered to give him fruit."

Dr. Greenspan concludes that "[t]his incident reveals his inability to protect himself from

---

[213] Tr. 8424-54.
[214] Tr. 7621-7700.
[215] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.
[216] Report of Dr. Welner, U.S. Exhibit 5 at 118.

255

victimization as well as his gullibility."[217]  Over a span of some now sixty years, the best example of gullibility offered by Dr. Greenspan is that of a seven-year-old being molested by an older boy.  What seven year old has the ability to protect himself from such victimization?  This example offers no insight into Rodriguez's alleged gullibility.  Nor does the dramatic tale of the penis in the pickle jar, wherein a heavyset man began taking Rodriguez and his sister Sylvia into an outhouse.  The man made them fondle and touch him and would dip his penis in a jar of pickle juice and make them suck it.[218]  At times, when the man was coercing Sylvia into doing it, Rodriguez would step forward and volunteer to protect the sister that he loved so much.[219]  Given the emphasis the defense has played up of Rodriguez as gullible and naive, part of his being intellectually disabled, he certainly had caught on at age four and had stepped up in an uncommonly protective and suspicious way.

In his interview with Dr. Welner, even as Rodriguez sold marijuana and LSD, he was cautious about what drugs he accepted from the dealers who supplied him.  Even in his teenage years, he remembers, he felt that dealers were giving him drugs in order to addict him.

Rodriguez was also mindful to avoid being ripped off. He recalls one occasion in which he refused to purchase pot being dealt to him, recognizing that the dealer was

---

[217] Exhibit D-19.

[218] Mot. at 135; Sylvia Rodriguez, Tr. 7903, 7922, 7927-28; Dr. Marilyn Hutchinson, Tr. 7965; Report of mitigation by Dr. Marilyn Hutchinson, Exhibit D-90; Declaration of Dr. Pablo Stewart, Exhibit D-17.

[219] Id.; see also Declaration of Sylvia D'Angelo, Exhibit D-125.

trying to sell him tea. "I didn't pay him. I smelled it right off the bat. He told me to roll up a joint, and he lit it up and he says, 'Here.' And it tasted and smelled like – like weed, but it's tea you know?"[220]

Recognized as a leader by multiple clinicians at Minnesota Security Hospital, those who monitored Rodriguez for multiple years around antisocial peers did not observe Mr. Rodriguez to be led or tricked by them.[221] An independent mindedness and self-reliance manifests all the way through Mr. Rodriguez' incarceration. He is cautious about whom he accepts and regards as a friend.

The level of resistance to questioning from Detective Orie Senechal and Bill Macki regarding the disappearance of Dru Sjodin likewise refutes consideration of his being gullible.[222]

Dr. Greenspan asserts that the circumstances of his prior sexual assaults involve gullibility and naiveté. The psychologist references, for example, how Ms. Seddon told Rodriguez she had a sexually transmitted disease, and how this was sufficient to persuade him to redirect his agenda away from intercourse.[223] Yet no evidence established whether Ms. Seddon did or did not have a sexually transmitted disease. Owing to the possibility that she did, what sensible person (as Rodriguez was) would not be put off to the idea of sex with a person who left one with that thought?

---

[220] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.
[221] Exhibit D-66.
[222] See video and audio of interview with Dr. Welner, U.S. Exhibit 9; and see video and audio of interview with Dr. Seward, U.S. Exhibit 8.
[223] Exhibit D-19 at 24.

257

As for Elizabeth Knudson, Dr. Greenspan deems it naïve for the Rodriguez to have thrown his knife out the window when she asked him, promising Rodriguez she would have sex with him if he did.  Rodriguez threw the knife out the window; Elizabeth Knudson had sex with him. He believed her and achieved what he was after.

**Maturity of Communication and Conversation**

In the hours of video interviews of Rodriguez in this case alone, the maturity of his communication and conversation is obvious.[224]  Rodriguez is conversant in all areas of discussion.  Testimony at trial reflected this conversational ability.[225]

In the events immediately preceding the first rape for which he was arrested, Rodriguez engaged Shirley Seddon in unremarkable but perfectly appropriate conversation for five minutes, before forcing himself onto her when she arrived at the destination of his claimed "home."[226]  Following his convictions for that rape and for the rape of Ms. Knudson, Rodriguez engaged in appropriate colloquy prior to the sentencing on these 1974 rapes.[227]

Recorded telephone conversations demonstrate Rodriguez's mature, adult

---

[224] See video and audio of interview with Dr. Welner, U.S. Exhibit 9; and see video and audio of interview with Dr. Seward, U.S. Exhibit 8.
[225] For example, Sister Yvonne Nelson testified she visited Rodriguez on numerous occasions, about once per week, while he was in the Cass County jail.  She visited him about numerous subjects including his interests, her interests, and hobbies.  She testified they were both avid readers.  They talked about gardening and recipes, his family and his childhood.  She provided him a bible and they would talk about passages that Rodriguez would prepare to discuss.  Tr. 8399-8406
[226] Exhibit D-61.
[227] Exhibit D-64.

258

conversation.[228]  In her trial testimony, his sister Ileanna observed that "he could always get us to laugh about certain things even when there wasn't something to laugh about."[229] Rosa Rodriguez, his sister, testified Rodriguez was "quiet" but "had a sense of humor." "He was always wonderful.  He was funny.  He was good-natured, teasing."[230]  Dr. Bruce Hawkinson, a psychologist at the Minnesota Security Hospital, referred to the examinee on one occasion as "effective in his communication."[231]  On another, "[h]e seemed very straightforward and was spontaneous and specific in his responses to my questions."[232]

### Social Maturity and Perceiving Social Cues

As mentioned above, Rodriguez entertained himself with a circle of friends in the Crookston area as he grew up.  In his interviews with Dr. Welner and Dr. Seward he gave details of his teenage years and his social circle.

According to the defendant, his closest friend was Bill Mauer.

> I knew him from the age of fourteen until twenty-one . . .  we did a lot of things together you know . . .  me and him were always drinking and going out.  We'd go out on dates, you know, together, with our girlfriends and stuff. But the rest of them were just people I hanged out with.

Rodriguez listed a number of peers with whom he enjoyed different things.  As Rodriguez portrayed his lifestyle, it was based primarily away from his home and in a

---

[228] U.S. Exhibit 19.

[229] Tr. 8426.

[230] Tr. 8292-8304.

[231] Exhibit D-66C at 51.

[232] Exhibit D-66C at 49.

range of socializing, drinking, fishing, driving, and other activities with different small groups of people who were part of a bigger social circle.

Many of the teenagers, recalls Rodriguez, would meet at Sekula's, a local diner and café. Gail Vagle, one of those peers, who for a time was Rodriguez' girlfriend, recalls him to have been sociable among the peers, and to not have encountered racism within the Sekula's crowd. He was a "sociable guy" and his behavior with women was normal. Ms. Vagle was Rodriguez's girlfriend prior to Dotsie Dahl.[233]

Dotsie Dahl remembered Rodriguez walking her to her door when they dated. Rodriguez often paid for a cab fare for her when she needed transportation to or from his family's residence.[234]

On the night he raped Shirley Seddon, Rodriguez was out socializing with three age-appropriate friends—Ricky Simmons, Johnny Rocha, Gerald Nelson[235]—none of whom were represented as disabled, intellectually disabled, or any other form of social reject. He engaged Ms. Seddon in appropriate dialogue that included discussing his brother, to whom she had been close. At no time did Rodriguez reveal his intention to sexually assault her until their car was stopped in the driveway where he blitzed her at a time that she physically could not escape.

In prison, Rodriguez continued to exhibit mature social relationships among peers. Notes of Unit Director Richard Seely described Rodriguez as having "positive, close

---

[233] Exhibit D-112.
[234] Exhibit D-111.
[235] Exhibit D-61; D-62.

relationships with others."[236]  He obtained and maintained status among his group of

peers.  A psychology note in October 1976 appraised Mr. Rodriguez to be quite

socialized, and a positive leader among peers.[237]  Progress notes observed in July 1978

that he "appears to have an authority position in the community and other residents refer

to him as 'Rocket' at times."[238]  On October 5, 1978, Mr. Seely also observed the

defendant was "actively assuming responsibility and leadership on the unit."

Psychologist Lynn Pengelly chronicled that Mr. Rodriguez was appointed to the Intensive

Treatment Plan Board of Directors for his unit.[239]  In 1978, the Minnesota Security

Hospital Psychological Report stated that Rodriguez "possesses a significant degree of

socialization, maturity, and insight."[240]

In a March 20, 1980 Progress Report Richard Seely wrote:

Mr. Rodriguez has maintained ongoing involvement in small therapy and.

transition groups.  Mr. Rodriguez assumes an active, leadership role in group.  He

demonstrates a direct approach with others, yet, is seen as a sensitive, empathic, caring

person.  Mr. Rodriguez establishes positive, close relationships with others.[241]

---

[236] Exhibit D-66A at 57.
[237] Exhibit D-66C.
[238] Exhibit D-86 at 43.
[239] Exhibit D-66C at 65.
[240] Exhibit D-66C at 58.
[241] Exhibit D-66A at 58.

The assessment of Dr. Greenspan cites Rodriguez's watching, but not playing, jax and hopscotch in his youth as evidence of Rodriguez's deficits in "practical function." He was involved in softball and tennis while at the Minnesota Security Hospital.[242] It is informative, however, that Mr. Rodriguez volunteers in his interviews that he would play cards with gang members. As Dr. Welner notes, "[i]t is reasonable to conclude that these skills serve him better social standing than jax and hopscotch."[243]

**Personal Care**

In his interview with Dr. Welner, Rodriguez details his personal care.[244] He regularly addresses his diabetes by eating appropriately and exercising regularly. He gave details about how he assumed responsibility of his own day-to-day care as a teenager. Specifically, the defendant relates he purchased his own food, cooked for himself at home, and bought and laundered his own clothes.

Rodriguez is a clean, orderly individual. In his interview with Dr. Welner, he described his habit of cleaning his cell on a daily basis.[245] Photographs of his apartment in the basement of his mother's home show the large space to be clean and well-maintained, with items stored neatly in boxes.[246] The photos were taken shortly after his arrest, and the photographs demonstrate that he maintained himself and his surroundings even under these highly stressful circumstances.

---

[242] Exhibit D-66A at 77.

[243] Report of Dr. Welner, U.S. Exhibit 5 at 128.

[244] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

[245] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

[246] U.S. Exhibit 26.

His family recognized that he was clean and tidy. Sylvia said "He kept all of his things organized and neatly in order."[247] According to his sister Ileanna, he maintained his body cleanliness and smelled good. He used hair coloring on his graying hair.[248] His mother testified he was very tidy and meticulous and clean. And those who saw him on a daily basis described him as tidy. Martha Gonzalez, a family friend, testified that she was at the house most days and observed him doing various chores including laundry, cooking, baking, lawn work, and washing the car. He would run errands for his mother. He did not drink alcohol.[249] Clifford Hegg, another family friend, testified that after his release from prison in 2003, Rodriguez took over the household chores, taking out the garbage, running errands and giving his mother rides.[250] Rodriguez provided detail about how, after release from prison in 2003, he took daily care of his mother's home doing all of the cooking for him and his mother. What is most telling about him functionally is the degree to which he cared for his mother on her terms:

> Rodriguez: And that's the way she likes her eggs, overcooked. My mom likes everything overcooked, you know, and I don't, you know . . .
> Rodriguez has remained drug- and alcohol-free and recognizes the importance of staying so.

In a Minnesota Security Hospital Report interview, Rodriguez "appeared to be clean and well groomed, dressed in a brown knit shirt, brown jeans and well-polished

---

[247] Exhibit D-125.
[248] Exhibit D-114 at 5.
[249] Tr. 8137-46.
[250] Tr. 8287-92.

boots."[251]  According to Minnesota Department of Corrections, Officer David Hall,

Rodriguez awoke each day by 5:30 a.m. to shower and ready himself for the day.

Rodriguez had one of the cleanest units on the floor.  Rodriguez always had clean, finely

creased shirts and shoes that were well shined.[252]

Both in custody and in the community before his arrest, Rodriguez exhibited no

need for personal or material support for self-care. History consistently bears out that he

is self-reliant, independent.

### Health Care Decisions

Rodriguez has been discriminating about what procedures to which he provides

consent.  He has refused vaccinations for influenza, but gave consent for tooth extraction

and a colonoscopy.  None of those who have documented counseling him on health

related matters—including Kimberly Link, Hollie Bowman, Doug Shepherd, and clinical

director Thomas Webster, M.D.—have questioned whether Rodriguez is able to make

health care decisions.[253]  He has never required assistance from family or others

regarding his health care decisions.

### Nutrition

Rodriguez has never required support for his nutritional intake.  His ability to

manage his own nutrition is reflected both in prison and in the community.  He has

---

[251] Exhibit D-66C at 53.
[252] U.S. Exhibit 16.
[253] Exhibit D-127B; D-127D; D-127E.

followed nutritional counseling to manage his diabetes and weight to mitigate his risk for

heart disease and hypercholesterolemia.

In his interview with Dr. Welner, Rodriguez discussed his nutritional intake and

ability to watch it to manage the above:

> I have a hard time digesting protein. You know, like meat, especially like, chicken and beef. Pork, I don't have that much of a problem. But beef and chicken, I got problems. You know, I just can't digest it. It'll digest, but it takes a while . . . I can't eat them both at the same time, you know, like chicken at noon and beef in the afternoon.
>
> . . .
>
> I quit drinking pop and I avoid sweets . . . I don't drink coffee no more. I stay away from, uh, like rice, uh, stuff like that. Uh, the doctor said I can eat rice, but only about half a cup. I stay away from all kind of sweets. But sometimes I have to eat sweets because my sugar gets too low sometimes. Like one time I got, I checked it and it was, 80, 84. I like to keep it around 105. . . So I can keep a banana or an orange or an apple, whatever they gave me that morning at breakfast.[254]

In his interview with Dr. Seward he explained:

> Dr. Seward:  Now with your diabetes, do you like have to eat meals every so often to keep your blood sugar up?
>
> Rodriguez:   Yeah. Well, sometimes – that's the problem I have here is I got to eat meals at a certain time. And it goes pretty well, but a lot of times, like we eat breakfast at 6:00, so I'm all right there. But lunchtime is the problem because sometimes, like if we have to eat around 10:00, 10:30. If we go past 11:00, I start feeling it, you know? And these last couple months, sometimes they don't feed us until 12:30, almost 1:00 sometimes, and that causes a problem. But in my house, I got food, so I can eat my own food. Like I'll eat when I'm feeling a little weird. Cook up a thing of noodles or something, or sometimes I'll keep candy in there because sometimes, my sugar gets too low. So I have to bring it back up.[255]

---

[254] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

[255] See video and audio of interview with Dr. Seward, U.S. Exhibit 8.

265

As Dr. Welner notably points out, "[t]he above discussion is a telling example . . . of how [Rodriguez] reasons, plans, strategizes, manages his needs, uses the resources available to him, adapts to death row as a home, works with physicians, makes independent decisions that reflect good judgment, control impulses, and considers consequences."[256]

On the basis of his own decision-making, Rodriguez enjoys good physical health despite congenital risk for serious health conditions such as diabetes and heart disease that have plagued others in his family.

**Grocery Shopping**

As noted above, Rodriguez regularly went grocery shopping and ran other errands after his release from prison in 2003, both for his mother and himself. He was not questioned about his ability to do so and needed no support. He utilized his mother's credit card appropriately.

And per Minnesota Security Hospital progress notes[257] and his interview with Dr. Seward, Rodriguez was allowed to go into St. Peter and fill food orders for different people. He told Dr. Seward in their interview that over a three hour pass, he would pick up food from KFC, A&W, Hardee's, and Shakey's.[258]

**Transportation**

---

[256] Report of Dr. Welner, U.S. Exhibit 5 at 132.

[257] Exhibit D-66C.

[258] See video and audio of interview with Dr. Seward, U.S. Exhibit 8.

266

Although early in his life Rodriguez did not own an automobile, he utilized friends' vehicles on occasion. His ability to transport himself upon his release in 2003 is not in question. He traveled from Crookston to Grand Forks on a regular basis and traveled throughout the area running various errands. His mother testified about his ability to go back and forth from her home with a new 2002/2003 car. He liked to go fishing, and would go to Grand Forks on the weekends.[259]

Prior to his release in 2003, Rodriguez restored his drivers' license;[260] specifically to give him the latitude to drive wherever need be for his employment. His family helped him to purchase a late model Mercury Sable. His sister testified that she trusted her son in the car with Rodriguez when Rodriguez was driving.[261] His mother noted that he drove where he wished in the Sable. This included the 35–40 mile drive to his job site in McIntosh.

Rodriguez told Dr. Seward that he would drive his nephews to school and back, to movies, to amusement parks, to the Mall of America, to stock car races, and to the zoo. In his meeting with Dr. Seward, he demonstrated his comfort in reading a road map.[262] Ultimately his ability to transport found himself driving Dru Sjodin to her last resting place in the ravine he knew no one would find her. On the day he killed Dru Sjodin, he left home alone in the Sable. When he returned late, he was on his own schedule and

---

[259] Tr. 7621-7700.
[260] Exhibit D-67D; D-67I.
[261] Tr. 8424-54.
[262] See video and audio of interview with Dr. Seward, U.S. Exhibit 8.

267

preference. After he arrived he told his mother he left to get a hamburger. There is no history from any source that he was late because he lost his way. Rather, the defendant drove Dru Sjodin, without assistance, to where he chose to dump her body, alone and in pitch darkness, off of a road across a farm field. He quickly extracted himself and back home.

### Banking and Money Management

One of the "talking points" included in Dr. Greenspan's report indicated that Rodriguez never had a bank account. On June 28, 1979, Minnesota Security Hospital Unit Director Richard Seely noted that Rodriguez had "developed a realistic budget" prior to his release to the community to a halfway house, based upon a parole review of his application to move to independent living. He had obtained employment at Kato Engineering.[263]

He received money from his mother while in prison and also earned money for his prison jobs. His ability to purchase items at the commissary was never a problem, and there is no indication he gambled or owed anyone money. In fact, Rodriguez in his interviews noted he did not get involved in that activity. He took a smart approach knowing that those who owe money to inmates are in danger.

According to Rodriguez, he began selling drugs in his teenage years to gain himself the resources to be self-sufficient. His money management needs for such an activity would include identifying the resources he would need to pay an upstream

---

[263] Exhibit D-66 at 77.

268

supplier and learning how to break down the supply he had to produce an anticipated profit margin.  He opted for marijuana he states, because cocaine was too expensive.[264]

Along the way, according to the defendant, he joined his peers to rent an apartment for Andy Gallegos, an older friend.  Rodriguez reports that he and his younger peers would use the premises to stage parties and other activities in which they could sell drugs.  He also noted that they would stage parties elsewhere and would charge admission and provide alcohol.[265]

After his release from prison he obtained employment.  Upon his arrest, his mother told law enforcement that Rodriguez gets paid from his job in cash so he has his own money to spend on things for himself.[266]
In his interviews, Rodriguez spoke of how over time his savings were being depleted due to his inability to find sustained work.  He specifically mentioned the expense of car insurance.  His comments reflect that he was budgeting and saving, and was concerned about money.  On no occasion has anyone indicated that Rodriguez was ever taken advantage of financially, nor that he spent money unwisely or extravagantly.

### Work, Vocational Training and Learning

Before going to prison, Rodriguez worked at a variety of legitimate positions.  There is no record of him ever having been fired from a job in the community.

---

[264] See video and audio of interview with Dr. Seward, U.S. Exhibit 8; and see video and audio of interview with Dr. Welner, U.S. Exhibit 9.

[265] See video and audio of interview with Dr. Seward, U.S. Exhibit 8; and see video and audio of interview with Dr. Welner, U.S. Exhibit 9.

[266] Exhibit D-114.

Rodriguez's pre-incarceration work record was described in a presentence investigation associated with his 1974 conviction:

> Before quitting school in 1970, defendant was employed with the Crookston Public Schools as a maintenance worker earning $1.15 per hour. During the summer of 1972 defendant was employed with Roger Tolleson Farms of Beltrami, Minnesota, earning $2.00 per hour. From September of 1972 until March of 1973, defendant was employed with the American Crystal Sugar company as a laborer earning $3.02 per hour. During the summer of 1974 defendant was employed with the Red River Alfalfa Company earning $3.00 per hour. From September until the time of his arrest defendant was employed with the American Crystal Sugar Company earning $3.52 an hour.[267]

As noted above, in addition to his legitimate jobs, Rodriguez described his illicit source of income, "selling dope." He would sell at various places, including at colleges, Indian reservations, concerts, and dances.[268] In a Drug History from Minnesota Security Hospital dated March 26, 1980, he reported "some marijuana dealing" prior to his commitment.[269]

Early in his stay at the Minnesota Security Hospital, Rodriguez was employed at what was apparently an on-site workshop. In June 1975, Progress Notes state that "[h]e demonstrates a positive work attitude, gets along well with fellow workers, accepts supervision without difficulty, and would seemingly prove to be an asset to any employer. A good man to have aboard." In September 1975, it was noted, "[h]e

---

[267] Exhibit D-67H at 49.

[268] See video and audio of interview with Dr. Seward, U.S. Exhibit 8; and see video and audio of interview with Dr. Welner, U.S. Exhibit 9.

[269] Exhibit D-66D at 7.

270

continues to be one of the workshop's most dependable and reliable workers.  His quality

and quantity of work remains high."[270]

As his treatment progressed, Rodriguez was allowed to obtain employment in the

community.  According to July 11, 1979, correspondence from Minnesota Security

Hospital, Rodriguez was employed at Kato Engineering, Mankato, and maintained a good

work record.[271]

According to a July 14, 1981 Minnesota Security Hospital psychological

evaluation, Rodriguez was employed "in the prison industries assembling farm

machinery."[272]  He also held a job in the print shop for many years where his primary

duties included making signs.  There has been much information provided with regard to

this job.  Rodriguez spoke of it in depth during his interviews with Dr. Seward and

Dr. Welner.[273]

According to annual reviews, he consistently received above average reviews,

enjoyed the job, and demonstrated good production.  In one review:

> Alfonso is currently working in the Print Shop located in the Office Machine
> Repair section of the prison education department. He indicates that he enjoys the
> employment and is fully capable of maintaining that employment.[274]

---

[270] Exhibit D-66A at 14.
[271] Exhibit D-66A; D-66C.
[272] Exhibit D-66C at 47.
[273] See video and audio of interview with Dr. Seward, U.S. Exhibit 8; and see video and audio of interview with Dr. Welner, U.S. Exhibit 9.
[274] Exhibit D-67B.

271

The FBI interviewed supervisor Gordon Stoltz regarding Rodriguez's performance

at the print shop:

> Stoltz advised that today technical drawings obtained from customers are simply scanned via computer then reproduced into the larger plastic sign via a software program.  This process was not available at the time that Rodriguez was incarcerated at MLCF and worked in the print shop.  At that time Rodriguez's job was to interpret the technical drawings specifications and input the data into the computer.  Rodriguez was able to take the specifications as provided by the customer and use them in a software program to re-draw the technical images in the computer.

> Stoltz directed SA Brostrom to the plastic Conference Room sign which operates utilizing a single sliding plastic door to indicate a message of Open or In Use.  This is an example of a sign that was created and developed by Rodriguez while working in the prison industry print shop during his incarceration.  Stoltz advised that Rodriguez designed and created the sign after Stoltz observed a similar sign while attending a conference related to prison industry manufacturing. Rodriguez designed and manufactured a prototype of this same type of sign after receiving a detailed description of the sign that Stoltz observed at the conference.

> Rodriguez worked diligently to design this sign and was required to make numerous adjustments to the slider machine in order to create a product that worked properly.  Rodriguez made adjustments to the Slider Machine to include manufacturing letters that were both convex and concave engraved. Furthermore Rodriguez converted English letters into Braille and engraved the braille letters as part of the sign.

> Stoltz considered Rodriguez to be a very good worker as he was able to operate the various pieces of machinery with skill and consistency.  The various print shop jobs previously performed by Inmate Rodriguez require good hand to eye coordination to prevent injury and to create an acceptable final product.  As an example while operating the printing press machine at the SWCF Rodriguez was required to consider temperature, humidity and static electricity in producing an acceptable print job.  Due to these factors this job required a great deal of patience and an aptitude for making frequent changes to the various printing press settings based on the changes in atmosphere . . . .

272

Stoltz recalled that Rodriguez was skilled enough to train other inmates with the sophisticated computer software utilized in the prison print shop industry.[275]

Upon his release in 2003, Rodriguez's goal was to find a job in printing. When he did not find work in printing, he eventually took a job laying dry wall. For this assignment, Rodriguez had to be at a worksite 35–40 miles away, every day, before 8:00 a.m. He would work an 8–10 hour day. He was searching for work for all of the months of his time in the community before his arrest. When he was not working for someone else, Rodriguez was reportedly caretaking for his mother, reportedly doing yard work, laundry, dishwashing, dusting, shopping, window cleaning, cleaning of the garage, refrigerator and stove, driving, plumbing, electrical, vacuuming, sorting and discarding, and washing and waxing the floor.[276]

Rodriguez has, throughout his life, been a normal, functioning individual who has maintained multiple jobs without assistance. His ability to get a job and perform it well is well-documented. The vocational skills that he has mastered and for which he has been positively evaluated reflect upon the lack of support needed in competitive employment.

The range of the work he has performed and the skills therein would outpace an average sampling of his peers. The record reflects upon his ability to learn, his practical understanding, and his conceptual skills. From an adaptive skills standpoint, it is

---

[275] Exhibit D-110.

[276] See video and audio of interview with Dr. Seward, U.S. Exhibit 8; and video and audio of interview with Dr. Welner, U.S. Exhibit 9; and see also Tr. 76-21-7700; 8137-46; 8287-92; 8424-54.

improbable to have compiled the vocational track record of Rodriguez and be mentally retarded. Many of his responsibilities—whether they were janitorial in high school or the print shop—required the ability to work independently and with colleagues and to maintain responsibilities for oneself.

### Exaggeration of Abilities and the Cloak of Competence

Dr. Greenspan notes that a common trait of people with mental retardation is the length to which they go to hide their limitations. Such individuals may exaggerate their skills and capabilities and make efforts to appear more competent and independent than they are. Dr. Greenspan then gives a few examples of this in his review of the records in regard to Rodriguez. There are, however, plausible explanations for exaggerating on occasion. Rodriguez was known by the staff of the Minnesota Department of Corrections to brag about wealth and virility.[277] Using Gordon Stoltz, a prison industry manager, as his main example, Dr. Greenspan notes Stoltz said: "Rodriguez was a braggart regarding his financial status and his manhood. Rodriguez often spoke of having a large sum of money."[278]

But Rodriguez acknowledged embellishing his financial resources to other inmates and explained that he did so because inmates assume that those who have outside financial resources were involved in dealing drugs, and that inmates respect those

---

[277] Exhibit D-19 at 24.
[278] Exhibit D-110.

274

individuals and do not hassle them for money.  In his interview with Dr. Welner,

Rodriguez explained:

Rodriguez:   Well I would say in every prison you try to lie as much as possible.

Dr. Welner:   Okay.

Rodriguez:   So yeah, I told people that, I told people that.

Dr. Welner:   What would you say?

Rodriguez:   That I had money when I got out.

Dr. Welner:   What would be the reason you would do that?

Rodriguez:   Because they would always want to borrow money and I says, "No, when I get paid from here, I ship my money out," you know, and that was true but I would stretch it a little bit more, you know?

Dr. Welner:   What would you say?

Rodriguez:   I would say that I would send money home because I was selling drugs when I first got out of the prison.

Dr. Welner:   Mmm-hmm.

Rodriguez:   So I was making money there and I would tell them that I'm sending that home and I would, you know?  I would send all my money home.

Dr. Welner:   Understood.

Rodriguez:   So.

Dr. Welner:   How would that impress them or would it not?

Rodriguez:   Because that's what everybody said is when they're big drug dealers, you know?  When I'd come that's what I was doing and there was another guy from my hometown was in prison with me and he backed me up, you know?

275

Dr. Welner:    Understood.

Rodriguez:    Because it was true to a point but everybody was doing it, everybody was stretching the truth a little bit.

Dr. Welner:    In order to?

Rodriguez:    To think that you're better, you know, that you had money, you know, but they would quit hassling me for money, you know, because I said, "No, it's all home in a bank that I can't pick it up.

Dr. Welner:    Okay so you wanted people to feel impressed by because you had the money on the outside?

Rodriguez:    Yeah.[279]

In an all-male environment such as prison, bragging about achievements is adaptive, especially if it gains one respect, credibility and even safety.

Dr. Greenspan next turns to offhand comments Rodriguez made about his manhood—boasting about his penis size—again referencing Mr. Stoltz: "Rodriguez would utilize the men's restroom he informed Stoltz that he preferred using the lower urinal in order to avoid his penis being submerged in the water."[280]  This quote attributed to Rodriguez, that he had to use the lower urinal because his penis was so large, was presented by Dr. Greenspan as boastfulness that reflects mental retardation.  No effort was made to decipher the context, but the expression itself, to any male who has used a urinal, is locker room talk that reflects good natured banter.

---

[279] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.
[280] Exhibit D-110.

276

Dr. Greenspan next assumes Rodriguez exaggerates about the number of sexual partners he had. Relying on statements of Rodriguez's sisters, brother and mother, Dr. Greenspan declares Rodriguez's following statement to Drs. Pitt and Martell cannot be true:

Q:     How many sexual partners would you say you've had?

A:     Phew . . . counting one night stands? Um, I don't know, about thirty."[281]

It is impossible to discern whether his figures are embellished and to what degree. In his interview with Dr. Welner, Rodriguez admitted to rejection and provided other accounts of memorable sex, in ways that cannot be discerned one way or the other. He accounts having sex with certain named women and also estimates the total number to be similar to what he told Dr. Pitt.[282] As he told Dr. Welner:

Dr Welner:    . . . How many uh, how many girls would you say that you've had sex with?

Dr Welner:    Someone asked you this question – I guess uh, one of the other doctors did and you said, "30." And I was trying to break it down in my head where that number came from.

Rodriguez:    Well, it was mostly one night stands too. Women that I didn't know

Dr. Welner:   Do you feel like you've probably had sex with more people?

Rodriguez:    No, under. Probably – altogether, I probably had –

Dr. Welner:    You can count one night stands.

Rodriguez:    20 – 25.

---

[281] Exhibit D-19 at 25 citing Clinical interview of Alfonso Rodriguez by Drs. Pitt and Martell.

[282] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

Dr. Greenspan also discounts Rodriguez's love of reading as being embellished, even though it is well known to many.   Mary Geller, a classification officer for the Cass County Jail, testified that Rodriguez read a lot.[283]  Sister Yvonne Nelson testified they were both avid readers.[284]  Dr. Froming also recognized he was a reader.[285]  And his ability to recall authors, themes, and specifics as to characters does not support a finding of mental retardation.  Among the authors he cites are W.E.B. Griffin, William Johnston, and Dana Fuller Ross.  He in particular talked of *The Kent Chronicles* written by John Yates, a series of books about the Family Kent,[286] and he described the lengthy series of books entitled with state names by Dana Fuller Ross.[287]

Both Dr. Greenspan and Dr. Silva found relevance in an offhanded reference Rodriguez made to "decapitate."  There was no evidence to interpret this as anything more than a malapropism for "incapacitate," and neither expert followed up on it in their unrecorded interviews.  Yet Dr. Greenspan pointed to the use of this word as exaggeration.  But Dr. Welner in his interview followed up on this word misuse, and Rodriguez clarified his meaning:

Dr. Welner:   Okay do you know what the word "decapitate" means?

Rodriguez:    Decapitate?

Dr. Welner:   Yeah what does it mean?

---

[283] Tr. 8380-87.
[284] Tr. 8399-8406.
[285] Tr. 7871.
[286] See video and audio of interview with Dr. Seward, U.S. Exhibit 8.
[287] See video and audio of interview with Dr. Seward, U.S. Exhibit 8.

278

Rodriguez:    It means to cut somebody's head off.

Dr. Welner:   Okay.

Rodriguez:    Or cut something off.

Dr. Welner:   I understand. What does the word "incapacitate" meant?

Rodriguez:    To control somebody, you know? Like let's say you're fighting and I hold you where you can't move, that's what that means.

Dr. Welner:   Okay, understood so if you happened to say that, in another interview, that you could decapitate somebody by hitting them in the throat, would that be correct?

Rodriguez:    No.[288]

Rodriguez has a well-documented record of continuous observation spanning decades of adaptive communication, social skills and practical and conceptual skills. Rodriguez's fish stories are embellished achievements as fish stories are but his real achievements, however, are objectively well-documented, and not exaggerated.[289]

Rodriguez is open about how embellishment is goal-directed and adaptive in prison.  Forensic examination should recognize that in sixty years Rodriguez has many cloaks following him to death row, and that  they have concealed plenty to those unwilling to question.  Based upon certain claims the defense has now brought, including mental retardation, it is natural to consider that Rodriguez embellishes trauma history as well.  Dr Greenspan who countenances the idea of exaggeration has not considered whether the exaggeration relates to history with which he bases his conclusions.  There is

---

[288] See video and audio of interview with Dr. Welner, U.S. Exhibit 9.

[289] During his interview with Dr. Welner, Rodriguez said he had caught a 25 pound walleye.  The Minnesota state record is approximately 17 pounds.

279

no objective basis for dismissing what Rodriguez says as embellishment on one hand and adopting it wholesale on the other. His style of communication is that he does not acknowledge responsibility for anything he does not want to and that he is able to elude responsibility by having an answer for everything.

Dr. Welner summed it up best:

> A vivid example of this communication style is his explanation to his family that he was late returning from home because he had locked his keys in the car and had called a locksmith for help. This is a plausible explanation. How many close and supportive family members would then take the initiative to canvass local locksmiths to ascertain whether this explanation was true? Ileanna Noyes did. And she learned that he had not in fact called a locksmith. She confronted him. He responded that he obtained a hanger and gained entry into his car.
>
> This is the essence of listening to Al Rodriguez. Whatever cannot be externally corroborated is history he provides based upon what will advance his legal position. He is simply trying to advance his case as would be the expectations of any motivated defendant. It is incumbent upon the examiner to diligence at least as much as Ileanna would.[290]

Rodriguez has demonstrated over time that fabricating history can provide large and small yields when one is effectively convincing. Defense consultants call attention to him as someone who exaggerates about a variety of skills and successes but would not think that he, who makes it clear that he is at ease with lying to achieve secondary gain, would be embellishing his history to them in order to enhance his mitigation. Rather than

---

[290] Report of Dr. Welner, U.S. Exhibit 5 at 142.

demonstrating his retardation, any fabrications demonstrate his ability to strategize and to follow social cues.

Ultimately, Rodriguez does not meet Criterion B.  Rodriguez does not have any "significant limitations in adaptive functioning" or "adaptive behavior" that would support a finding of mental retardation.

### 4.  Rodriguez Fails the Criterion C Benchmark:  He Did Not Show Onset of Mental Retardation Before Age 18.

The third factor in determining whether an individual is mentally retarded is age of onset.  This refers to the age at which the disability began.  Because mental retardation is developmental, it typically originates close to the time of birth, either during fetal development, the birthing process, or soon after birth.  The purpose of the age of onset criterion is to distinguish mental retardation from other forms of disability that may occur later in life.  Both the AAMR/AAIDD and APA definitions require that the significant limitations relating to intellectual and adaptive functioning originate prior to the age of 18 years.  AAIDD 11th Ed. at 1, 27; DSM-IV-TR at 41, 49.

Rodriguez was not diagnosed with mental retardation before age 18; no factor now identified supports such a diagnosis.  The factors to which Rodriguez now points as demonstrating onset of mental retardation before age 18 arise not from mental retardation, but from the challenging circumstances in which he found himself at a young age.  In early years Rodriguez struggled in school, as did his siblings, because of the unstable family situation caused by migration from Texas to Minnesota and back, as well

281

as because of Rodriguez's inability to speak English. Once his family settled in Crookston and he became more fluent in English, he maintained passing grades. He maintained this level of achievement for several years with several different teachers until drug abuse and apathy lead to a collapse of his grades and eventual withdrawal from school. Later, while removed from drug use and subject to incentives to succeed during his incarceration at the Minnesota Security Hospital, Rodriguez displayed the scholastic ability to do well in school and received his high school diploma.

Further, any adaptive deficits he may have had as a youth were no different than those demonstrated by his peers. As the above discussions show, Rodriguez functioned at a level equal to his peers across social, communication, and practical domains. His history shows a competent young man who found jobs and worked hard at them his whole life, even within the prison system. He displayed an ability to navigate successfully through the world on a daily basis. There is simply insufficient evidence of adaptive skill deficits that would distinguish him to meet the criteria for mental retardation.

Defense expert Dr. Marilyn Hutchinson did not diagnose Rodriguez with mental retardation. Defense expert Dr. Karen Froming did not diagnose him with mental retardation. Over his lifetime Rodriguez has been observed and evaluated by countless counselors and psychiatrist and psychologists. Not one has ever suggested he suffered from mental retardation. Only now—in a last ditch effort to avoid the death penalty and

282

basing his opinion on the record without examining Rodriguez—does Dr. Greenspan step forward with such a diagnosis.

Alfonso Rodriguez is not now—nor has he ever been—mentally retarded.

## VI.    Counsel Effectively Represented Rodriguez During the Penalty Phase Trial.

In a five-part claim, Rodriguez contends that his trial attorneys acted ineffectively during the penalty phase when they allegedly failed to seek jury instructions more beneficial to him.  Specifically, Rodriguez argues that his attorneys should have sought an instruction that would have permitted the jury to find that the interstate quality of this crime was a "random" and therefore mitigating fact.  He further asserts that counsel should have requested an instruction to correct an allegedly erroneous prosecution argument about mitigation, and should have challenged an instruction concerning the weighing of mitigation.  Rodriguez, relying on an earlier argument, implies that his lawyers should have sought an instruction that the Tenth Amendment barred application of the death penalty against him.[291]  Finally, Rodriguez claims his attorneys should have cited constitutional principles when advocating for application of the reasonable doubt standard to the weighing of mitigation and aggravation.  Mot. at 210–36.  As discussed

---

[291] Rodriguez never expressly argues (Mot. at 235) that counsel should have sought a Tenth Amendment instruction, but he incorporates and reasserts his Tenth Amendment argument (id. at n.680) under the auspices of a point heading that asserts the lawyers were ineffective "with respect to the penalty phase jury instructions"  Mot. at 210.

below, Rodriguez has failed to show any such instructions were warranted or that his trial counsel was ineffective for not seeking them.

To demonstrate ineffective assistance of counsel, Rodriguez must show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. Judicial scrutiny of counsel's performance is "highly deferential," and courts indulge a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Thus, "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). Counsel have no burden to raise futile issues. See Garret v. United States, 78 F.3d 1296, 1304-06 (8th Cir. 1996).

### A. Counsel Properly Omitted a Request to Permit a Mitigation Theory Based on Geography.

Rodriguez contends that trial counsel ineffectively omitted to seek a penalty phase jury instruction that would have permitted him to rely in mitigation on the fact that federal jurisdiction, and his concomitant exposure to the death penalty, stemmed from an "accident of geography." Specifically, he argues that counsel failed to advance as mitigation the fact that the defendant transported Ms. Sjodin around twenty miles into the State of Minnesota and that the federal government could not have established

284

jurisdiction over the case had he abducted and murdered her in North Dakota.  Not only does Rodriguez fault counsel for failing to obtain an instruction to support this theory, but he claims his lawyers also failed in omitting the argument from the penalty phase summation.  Mot. at 211–14.  Because Rodriguez's putative theory of mitigation was unsupported by any published law at the time of trial, counsel had no duty to pursue it in argument or requests for instructions.

Rodriguez bases his argument on the recently-vacated Sixth Circuit opinion in United States v. Gabrion, 648 F.3d 307, 323 (6th Cir. 2011), *reh'g granted, opinion vacated*, (6th Cir. Nov. 17, 2011).  The Gabrion court reversed the death judgment that followed a conviction for murder within the special territorial jurisdiction of the United States.  It did so, in part, because the trial court prohibited the defendant from arguing in mitigation that the victim's body had been found just 227 feet inside a federal enclave and the death penalty was unavailable in the Michigan state court with jurisdiction over the adjoining area.  The Gabrion court—whose opinion was vacated pending en banc review—concluded that those facts could have convinced jurors that imposition of the death penalty would "treat life or death in a random and arbitrary way based on chance." Gabrion, 648 F.3d at 323.

On May 28, 2013, the Sixth Circuit reversed the Gabrion panel decision and rejected his argument that the murder's location, Michigan, a state that lacked the death penalty, should have counted as a mitigating factor under the Eighth Amendment and the Federal Death Penalty Act.

285

The Court found that while "[i]t is true, of course, that 'the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence . . .the question is what counts as 'constitutionally relevant mitigating evidence.'" United States v. Gabrion, 719 F.3d 511, 521 (6th Cir. 2013) (citing Buchanan v. Angelone, 522 U.S. 269, 276 (1998)).

The Court went on to discuss mitigation evidence and its admission at capital sentencings. As the Court noted Penry v. Lynaugh, 492 U.S. 302, 319 (1989), mitigation evidence is required to be admitted upon "'the principle that punishment should be directly related to the personal culpability of the criminal defendant.'" Gabrion at 521. The Court found that "most of the evidence the Supreme Court has deemed mitigating was evidence relevant to the defendant's personal culpability for his crime." Citing a list of cases the Sixth Circuit held that "to the extent relevant to the defendant's culpability, mitigation evidence includes evidence about the defendant's background and the circumstances of his crime." Id. "In addition to evidence concerning the defendant's culpability, evidence of the defendant's character can be mitigating." Id.

As in Gabrion, the fact that North Dakota or Minnesota do not have a death penalty has nothing to do with these things. It has nothing to do with Rodriguez's culpability, background or character. It has nothing to do with the reasons why Rodriguez chose to kidnap and kill Dru Sjodin. It has nothing to do with the fact that he killed Dru Sjodin in an especially heinous, cruel, or depraved manner that it involved the

286

torture of Dru Sjodin as found by the jury. And beyond that it clearly has nothing to do with any other consideration the Supreme Court has ever noted as mitigating. Id.

Mitigation under the Eighth Amendment is not a matter of geographic boundaries or coordinates. And it "is not an empty concept to be filled by whatever a lawyer or court thinks might persuade a single juror in a particular case." Gabrion, 719 F.3d at 522. The Court, following Penry, found that mitigation evidence case law "refers to evidence relevant to 'a reasoned moral response to the defendant's background, character and crime.'" Id. Thus the Court found the fact "[t]hat Michigan lacks a death penalty is irrelevant to a reasoned moral response to Gabrion's background, character, and crime." Id. at 523. Similarly here, as pointed out above, the fact that North Dakota and Minnesota lack the death penalty is irrelevant to any reasoned moral answer to Rodriguez's background, character, and crime. Any evidence concerning the fact that a death penalty is lacking in either state is not mitigation evidence under the Eighth Amendment. Id., see also, United States v. Higgs, 353 F.3d 281, 328 (4th Cir. 2003).

Further, the Court found that "[t]he same conclusion holds under the Federal Death Penalty Act." Gabrion, 719 F.3d at 524. The Court examined the Act's list of mitigating factors under Title 18 U.S.C. § 3592(a). It found the fact "[t]hat Michigan lacks a death penalty does not fall within any of these statutory mitigation factors." Id., citing United States v. Johnson, 223 F.3d 665, 675 (7th Cir. 2000) (§ 3592(a) includes "only factors specific to the defendant").

287

Each of the examples of mitigating evidence in § 3592(a) concern a defendant's background, character, and culpability and the crime itself. Id. The fact that neither North Dakota nor Minnesota has a death penalty is different in kind from any mitigating factor that is recognized as relevant to sentencing under § 3592(a).

Rodriguez's claim, as was Gabrion's, that the "accident of geography" should have been argued as a mitigating factor under either the constitution or the statute is meritless.

In fact, even at the time of Rodriguez's trial, the existing weight of authority augured strongly against the argument advanced here.[292] The Fourth Circuit held, three years prior to Rodriguez's trial, that a defendant could not rely in mitigation on the fact that his exposure to the death penalty stemmed solely from the vagaries of geography: "[The defendant] asserts that his unknowing presence within federal jurisdiction . . . mitigates against imposition of the death sentence. We disagree . . . An assertion that the death penalty is improper in one jurisdiction . . . [is] a matter of policy for the legislative branch. . . . [not] a mitigating factor in this case." Higgs, 353 F.3d at 328. In fact, the Seventh Circuit had more generally rejected the notion that a mitigator includes "an argument against the death penalty in general." Johnson, 223 F.3d at 675. Given the

---

[292] Assuming, arguendo, that the en banc court had revived the Gabrion panel's decision that geography can have mitigating effect, Rodriguez's counsel had no burden to forecast the ruling, and their omission of the argument does not constitute ineffective assistance as a matter of law. See Parker v. Bowersox, 188 F.3d 923, 929 (8th Cir. 1999) (holding failure to anticipate developments in the law does not constitute ineffectiveness); Johnson v. Armontrout, 923 F.2d 107, 108 (8th Cir. 1991).

legal landscape confronting trial counsel, they would have reasonably concluded that there was no reasonable basis for advocating an "accident of geography" theory of mitigation.

Indeed, Rodriguez marshals only a single inapposite district court verdict form as support for his contention that trial counsel should have sought a geography-based mitigator. See Mot. Exhibit F-03 at 13 (the verdict form from United States v. Mohamed, case no. 98-CR-1023 (S.D.N.Y.)). The verdict form in the Mohamed case instructed the penalty phase jury that it "should" consider in mitigation the fact that "[a]s a matter of South African law, [the defendant] should not have been released to American officials without assurances that he would not face the death penalty in the United States." Id. Thus, the mitigator submitted in the Mohamed appears to involve official error, if not intentional misconduct, by foreign officials, whereas Rodriguez asserts a theory of mitigation premised on his own knowing decision to abduct his victim across a well-marked state border demarcated by the Red River. As such, the verdict form – which is unsupported by any statement of reasoning – would not have led Rodriguez's attorneys to conclude that they could argue the current "accident of geography" theory of mitigation, especially given the existence of two circuit court decisions to the contrary.

Even if Rodriguez could show that the verdict form provided some small support for his theory of mitigation, he cannot show that trial counsel had any legal duty to discover it. Just as trial counsel have no duty to anticipate developments in the law, they also have no burden to research the law of other jurisdictions. Nelson v. Estelle, 642 F.2d

289

903, 908 (5th Cir.1981); <u>McQueen v. Garrison</u>, 619 F. Supp. 116, 137 (E.D.N.C. 1985).

Rodriguez fails to explain how or why his attorneys in a North Dakota kidnapping-

murder case might have come across a four-year-old unpublished verdict form from a

terrorism trial in New York City.  Assuming Rodriguez could demonstrate that his

lawyers did or should have found the <u>Mohammed</u> form, he cannot show that they had a

burden to rely on it to advocate for the geography mitigator to the court, given the weight

of authority against such a theory.  <u>Malone v. Vasquez</u>, 138 F.3d 711, 719 (8th Cir. 1998)

(holding that "[n]o duty exists to raise every nonfrivolous issue that is available").

Furthermore, counsel had substantial reasons to forgo any attempt to argue to the

jury that Rodriguez's interstate criminal activity was in any way mitigating.  A penalty

phase argument, however brief, does not constitute ineffective assistance when "there is

no reason to conclude that a longer or more passionate closing argument would have

resulted in an alternative sentence or that the brief dispassionate argument undermined

the reliability of the jury's sentence of death."  <u>Griffin v. Delo</u>, 33 F.3d 895, 903 (8th Cir.

1994).  Counsel has discretion to conclude that weak and groundless arguments will

merely subvert meritorious ones.  <u>Goins v. Lane</u>, 787, F.2d 248, 254 (7th Cir. 1986); <u>see</u>

<u>also</u> <u>United States v. Rezin</u>, 322 F.3d 443, 446 (7th Cir. 2003).  In this case, trial counsel

wisely omitted any effort to argue that Rodriguez was exposed to the death penalty by

dint of a so-called "accident of geography."  Rodriguez's entry into Minnesota was no

"accident."  He had lived in the area of the crime scene for years and could not have

possibly been unaware of the fact that Grand Forks, where he abducted Ms. Sjodin, and

290

Crookston, where he killed her, were in different states.  Unlike the line that separated

federal from state jurisdiction in *Gabrion*, Minnesota and North Dakota are not separated

by an invisible border, discoverable only by map, but by the Red River, which can be

crossed at only three points in Grand Forks.  Once Rodriguez had done so, he still drove

more than 20 miles to Crookston.  Any attempt to characterize this conduct as an accident

would have come across as groundless.  Indeed, the argument would have only lent

weight to the government's aggravating factor allegation that Sjodin's death had occurred

during the course of an interstate kidnapping.

Accordingly, Rodriguez has not shown that his attorneys acted unreasonably in

omitting any attempt to premise a theory of mitigation on his interstate travel.  Moreover,

he has failed to demonstrate a reasonable likelihood that he would have received a more

favorable verdict had his lawyers pursued this far-fetched, legally and factually

unsupportable theory.

**B.      Trial Counsel Did Not Fail to Seek Corrective
          Instructions During Mitigation Phase.**

Rodriguez complains that trial counsel was ineffective for failing to seek a

curative instruction, or to renew their objection when the error continued, when "the

government radically misstated the proper standard given to the jury to use in considering

the defense's proffered evidence" in mitigation, "suggesting that in order for the evidence

to be mitigating it had to lessen what Mr. Rodriguez did to Ms. Sjodin, to directly reduce

his responsibility."  Mot. at 214.  Rodriguez's characterization of the argument, however,

is incorrect. The government's argument was not improper, nor is there right or reason to revisit this particular issue at this time.

### 1. The Claim Is Barred By the Relitigation Doctrine.

Rodriguez raised a similar issue post-judgment in his Motion for New Trial (DKT 636) contending, in part, that the government had incorrectly argued that the defense had the burden to prove the existence and relevance of mitigators and that mitigators had to have a nexus to the crime. See id. at 33–42. This Court denied said motion and argument, concluding that "[a]lthough the government may have been walking close to the line in making some of its arguments, the Court does not believe the boundaries of proper argument were breached," because the government's statements dealt with the jurors' obligations to determine "the relevancy and weight of the [mitigating] factors." United States v. Rodriguez, No. 2:04-CR-00055, 2007 WL4266752, at *43 (D.N.D. Feb. 12, 2007).

Rodriguez unsuccessfully raised essentially the same claim in his initial appeal to the Eighth Circuit in 2009 when he argued that the comments made by the United States in the penalty phase closing argument improperly directed the jury to consider mitigation evidence only if it had a "nexus" to the crime. See Defendant's Appeal Brief, United States v. Rodriguez, Appeal Case No. 07-1316, Appellant Br. at 75, (8th Cir. April 21, 2008). The Eighth Circuit rejected this argument, after surveying all of the government's challenged remarks, and found that some of them "accurately state[d] the law: [Rodriguez] had to prove mitigating factors . . . by a preponderance of the evidence" and

292

"the jury could decide that any mitigating factors, even if proved, are sufficiently outweighed by aggravating factors." See United States v. Rodriguez, 581 F.3d 775, 799 (8th Cir. 2009). The government's remaining remarks "did not direct jurors to disregard mitigating factors because no nexus links them to the killing." Id. "Rather, the government permissibly argued that, 'despite [petitioner's] troubled past, he [was] capable of choosing for himself and [had] free will. This argument is permissible.'" Id.

Thereafter, Rodriguez filed a Petition for Rehearing and for Rehearing En Banc, November 23, 2009, again raising, unsuccessfully, this same issue. See Defendant/Appellant's Petitioner for Rehearing and For Rehearing En Banc Brief, United States v. Rodriguez, No. 07-1316 (8th Cir. November 23, 2009); United States' Response and Resistance to Defendant's Petition for Rehearing and Rehearing En Banc, United States v. Rodriguez, No. 07-1316 (8th Cir. January 11, 2010). The petition for rehearing was denied by the Court of Appeals on February 11, 2010. Thereafter, on June 10, 2010, Defendant/Appellant filed a Petition for Writ of Certiorari with the United States' Supreme Court, again, raising the same issue. The Supreme Court denied Writ of Certiorari on October 18, 2010. As such, the Eighth Circuit's September 22, 2009, opinion was correct under the laws of the United States and is controlling legal precedent as it applies to the facts of this case. See United States v. Rodriguez, 581 F.3d 775, 799 (8th Cir. 2009).

Because the appellate decision in Rodriguez remains the law of this Circuit, it also remains the law of the case. The law-of-the-case doctrine provides that circuit court

293

holdings bind the district court in subsequent proceedings in the same case. United States v. Bartsch, 69 F.3d 864, 866 (8th Cir. 1995) In the absence of "countervailing considerations, district courts may refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal." Withrow v. Williams, 507 U.S. 680, 720–21 (1993). Rodriguez has made no effort to establish exceptional circumstances that might justify overriding the doctrine in this instance. See United States vs. U.S. Smelting Refin'g & Min'g, Co., 339 U.S. 186, 198-99 (1950).

Furthermore, generally, a claim raised and rejected on direct appeal cannot be relitigated in a Section 2255 motion. United States v. Wiley, 245 F.3d 750, 752 (8th Cir. 2001) ("Issues raised and decided on direct appeal cannot ordinarily be relitigated in a collateral proceeding based on 28 U.S.C. § 2255"); Dall v. United States, 957 F.2d 571, 572 (8th Cir. 1992) (claims introduced and decided on direct appeal may not be relitigated in a Section 2255 motion to vacate); Dupont v. United States, 76 F.3d 108, 110-111 (6th Cir. 1996) ("A § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exceptional circumstances."). Relitigation of an appellate issue during Section 2255 proceedings may be proper when there has been an intervening change in the law of a circuit. Davis v. United States, 417 U.S. 333 (1974); see also English v. United States, 998 F.2d 609, 613 (8th Cir. 1993) ("In the absence of an intervening change in the law, or newly discovered evidence, we will not reconsider any claim that was resolved on direct appeal in a Section 2255 habeas proceeding.). Rodriguez has litigated this issue on direct appeal, and the Eighth Circuit clearly

294

addressed—and denied—said argument.  Rodriguez, thereafter, attempted to litigate said issue, again, in his Petition for Rehearing and for Rehearing En Banc, and in his Petition for Writ of Certiorari, and was denied in each instance.  There is no intervening change of law, or newly discovered evidence, that would apply to Rodriguez's argument rendering it reviewable now.  Rodriguez cannot attach a new label to this claim and relitigate it in his Section 2255 motion.  As such, Rodriguez cannot raise the contention of this argument again as it has been thoroughly litigated and decided by the Courts.  This Court should deny relief on Issue VI.B.

### 2. Counsel Acted Reasonably and Did Not Prejudice Rodriguez.

In an attempt to convince this Court that it should revisit an issue already foreclosed by the Eighth Circuit's opinion in this case, Rodriguez now contends his trial counsel failed to be effective in its use of renewed objections and request for curative instructions during the prosecutor's alleged "radically" misstated proper standard of use of mitigation evidence conveyed to the jury in government's penalty phase closing argument.  To the degree Rodriguez now attempts to raise claims of prosecutorial misconduct, those contentions are procedurally barred.  Under the guise of a supposed Sixth Amendment claim of ineffective assistance of counsel, Rodriguez attempts to smuggle in complaints of alleged prosecutorial misconduct, and for that matter Rodriguez's argument fares no better here than when he previously raised it.  To the extent that Rodriguez claims his trial attorneys provided ineffective assistance for failing

to seek a specific curative instruction or renew the objection when the error allegedly continued, he is mistaken.

Rodriguez begins by attacking his trial counsel for not requesting a curative instruction immediately after a sidebar argument during penalty phase closing arguments (Tr. 8672-8686), addressing trial counsel's objection to the government's "characterization of the law surrounding mitigation" wherein this court "initially overruled defense counsel's objection" but then later "agreed that the government was improperly trying to suggest a legal test that was not appropriate." Mot. at 215. Rodriguez further alleges that the United States "undeterred, repeated its impermissible nexus requirement at least three more times during closing argument" (id. at 216), and that his trial counsel neither sought a specific curative instruction nor renewed the objection when the error continued. (Id.) Rodriguez overlooks the fact, however, that the Court of Appeals upheld the curative instructions as sufficient to cure any error:

> Finally, Rodriguez alleges that errors in the government's penalty-phase closing argument, when aggregated, deprived him of a fair trial. When reviewing the denial of a mistrial motion, this court considers (1) the cumulative effect of the misconduct, (2) the strength of the properly admitted evidence of the defendant's guilt, and (3) the curative actions taken by the trial court. United States v. Chase, 451 F.3d 474, 481 (8th Cir. 2006).

Rodriguez, 581 F.3d at 804. The Court of Appeals further provided:

> The closing-argument errors found by this court had a small effect in this case, which was long and filled with overwhelming evidence of Rodriguez's guilt and the violence of Sjodin's abduction and murder. *See* United States v. Higgs, 353 F.3d 281, 331 (4th Cir. 2003) ("The complained-of comments were isolated, did not rise to the level of

296

argument that might mislead or inflame the jury concerning its duty or divert it from its task, and were made in the context of a case involving compelling evidence of numerous aggravating factors.")

Id. The Eighth Circuit's decision stems from the overarching presumption that jurors heed their instructions. Alexander v. United States, 271 F.2d 140, 145 (8th Cir. 1959). Rodriguez has done nothing to overcome the essential principle of law or the effect of the Eighth Circuit's opinion, though he has changed his focus of his arguments from prosecutorial misconduct itself to the actions of his trial counsel.

Insofar as Rodriguez now bases his claim of ineffective assistance of counsel upon his previously-raised claim, he cannot succeed. The Court of Appeals, in addition to finding that there was no error, also determined that the prosecutor's comments during closing arguments did not prejudice Rodriguez. Rodriguez, 581 F.3d at 802–03. The absence-of-prejudice finding forecloses Rodriguez's ability to satisfy the second prong of Strickland: Rodriguez cannot show that 'but for' counsel's alleged errors the result of the proceedings would have been different. Rodriguez cannot use this proceeding to revisit the Eighth Circuit's prejudice determination. See Williams, 507 U.S. at 720–21.

To prevail on an ineffective assistance of counsel claim, Rodriguez would have to establish that counsel's performance "fell below an objective standard of reasonableness," and that in the absence of those errors a reasonable probability exists that "the result of the proceeding would have been different." Strickland, 466 U.S. at 687-88, 694. In fact, "[I]f it is easier to dispose of an ineffective assistance claim on the

297

ground of lack of sufficient prejudice which we expect will often be so, that course should be followed." Id., 466 U.S. at 697.

Rodriguez cannot meet his burden to show prejudice, because the Eighth Circuit's opinion has disposed of the fundamental question of prejudice:

> This court concludes that, when read in context, the prosecutor's comments were not improper. Even if the first comment is taken in isolation, however, Rodriguez's right to a fair trial was not affected. In response to the objection, the court focused attention on the jury instructions, which directed the jury to consider each proposed mitigation factor and to balance all factors. Finally, the jury's verdict, which found six family-impact mitigation factors, indicates the jury did not erroneously disregard the factors as irrelevant "under the law."

Rodriguez, 581 F.3d at 801. Substantial rights are affected where there is "a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different." United States v. Dominguez Benitez, 542 U.S. 74, 75 (2004). As a matter of law then, the Eighth Circuit's substantial-rights analysis is coextensive with the issue of prejudice under Strickland. See Close v. United States, 679 F.3d 714, 720 (8th Cir. 2012) (The standard for prejudice under Strickland for an ineffective assistance of counsel claim is virtually identical to the showing required to establish that a defendant's substantial rights were affected under plain error analysis.). Simply stated, there exists no more reasonable probability that the prosecutor's comments prejudiced the outcome of this case under the present theory than under the one advanced on appeal. Because Rodriguez has previously litigated the prejudicial effect of the government's closing argument comments, he may not do so again under the auspices of a new theory. See

Peterson v. United States, 467 F.2d 892 (8th Cir. 1972) (post-conviction statute is not intended to provide a forum to relitigate the same issues previously decided on direct appeal and is not a substitute for an appeal.).

Rodriguez complains further about his attorneys' failure to renew the objection when the alleged prosecutorial error continued, but he cannot succeed in demonstrating his trial attorneys unreasonably omitted objections if his underlying claims of misconduct have no merit because defense counsel had no obligation to raise futile objections arguments on his behalf.  Middleton v. Ropert, 455 F.3d 838 (8th Cir. 2006).  Further, Rodriguez has failed to show that such failures to object brought defense counsel's performance below the standard of prevailing professional norms.  Such decisions about whether or not to object to testimony are well within the discretion allowed to a defense attorney to adopt a trial strategy he believes is best, and Rodriguez has given this Court no reason to avoid the general presumption that his attorneys provided effective assistance.  Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir. 1997) (stating that courts are to "presume attorneys provide effective assistance and [should] not second-guess strategic decisions.").

Moreover, any of the defense counsels' decisions not to object were not so prejudicial as to constitute ineffective assistance of counsel.  Rodriguez has the burden of demonstrating that, but for the alleged errors by defense counsel, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694.  These alleged mistakes are not sufficiently consequential to affect the jury's verdict, in light of the

299

significant evidence supporting his guilt.  See United States v. Villalpando, 259 F.3d 934, 939 (8th Cir. 2001) (stating that "[p]rejudice is not shown if the evidence is so strong that the outcome of the case could hardly have been other than a verdict of guilty.").

For the reasons stated above, Rodriguez has failed to demonstrate that his counsel was constitutionally deficient for its failure to object to the prosecutor's comments in his penalty phase closing argument.  As such, this Court should disregard Rodriguez's attempt to revive this argument in this context, and deny relief on Issue VI.B in its entirety.

**C.    Trial Counsel Acted Effectively With Respect to the "Three-Step" Process During The Selection Phase and on the Special Verdict Form.**

**1.  The Eighth Circuit Analysis of the Selection Phase Instructions.**

The penalty phase lasted from September 11 to September 20, 2006.  The jury returned a verdict on September 22, 2006.  On September 11, the district court gave preliminary penalty phase instructions to the jury.  As to mitigation evidence, the jury was instructed to consider whether Rodriguez had proven "by the greater weight of the evidence any 'mitigating factors.'"  Tr. 7444.  The jury was instructed that a "mitigating factor" was "any aspect of [Rodriguez's] character or background, any circumstance of the offense in question, or any other relevant fact or circumstances that might indicate that [Rodriguez] should receive a sentence of life imprisonment without the possibility of parole instead of a death sentence."  Id.  The jury was further instructed to determine

300

whether the statutory and nonstatutory aggravating factors "sufficiently outweigh" the mitigating factors "such that a sentence of death is justified." DKT 592 at 5.

Before closing arguments, the district court again instructed the jury on aggravating and mitigating factors, the weighing of aggravating and mitigating evidence, and the consequences of deliberations. Tr. 8652-59. It also instructed the jury that Rodriguez had submitted 30 mitigating factors for its consideration. Pursuant to 18 U.S.C. § 3592(a) (8), the jury also was told that it could "consider anything else about the commission of the crime or about the defendant's background or character that would mitigate against imposition of the death penalty." Tr. 8656–57.

With respect to the mitigating factors, the government argued that the jury had to consider three questions: first, whether Rodriguez had met his burden of proving any mitigating factor "to the greater weight of the evidence"; second, whether that factor "tend[ed] to lessen the severity [of the crime] in this case"; and, third, what weight any such factor should be given in the sentencing process. Tr. 8674-75. The prosecutor noted that if the jury decided either that a mitigating factor had not been sufficiently proven or that the factor did not mitigate the severity of Rodriguez's crime, then the jury was not required to give any weight to that proposed factor in the weighing process. Id.

The government stressed, however, that the jury was required to consider Rodriguez's mitigating factors: "You must consider them, and we encourage you, you must and you should consider them all fully. We'd argue that the closer that you inspect them together, deliberating, the more you will see how they fall short." Tr. 8687. The

301

prosecutor argued that the mitigating factors are entitled to little or no weight as weighed against the aggravating factors. Id. ("Even if you had found that every factor that he offered was . . . worthy of mitigation, in a case of this magnitude the scale has barely budged. . . . That's how overwhelming the aggravating factors and the evidence is against this defendant."). Tr. 8688.

In response, Rodriguez's counsel asked the jury not to return a death sentence in part because of the mitigating evidence. Tr. 8715-38. In rebuttal, the prosecutor told the jury to "read" and "look at" all of the defense mitigators and to "consider them fully". Tr. 8745; see id. ("Consider the mitigators. Please review them all. Read through them once before you even start we would suggest."). The government reiterated that the jury was required to determine whether the aggravating factors sufficiently outweighed the mitigating factors as to justify a death sentence. Tr. 8747–48. Finally, the prosecutor told the jury to "read those mitigators and look at them, all of them, and consider them. And when you get to the end of that analysis, the aggravating circumstances and the facts of this case so dramatically . . . outweigh any mitigating that under the law a sentence of death is justified." Tr. 8749.

Rodriguez now argues that trial counsel failed to properly object to this Court's three-step process with respect to the proposed mitigation. Specifically, Rodriguez objects to the second step of the process—requiring the jury to decide if the proffered evidence was actually mitigating—asserting "such a requirement was improper because the issue of whether proffered evidence constitutes relevant mitigation is a question of

302

law, not a question of fact." Mot. at 220. Rodriguez's Section VI.C argument presents claims strikingly similar to a mix of issues he has previously brought forth on direct appeal, and which were subsequently decided by the Eighth Circuit. (See United States v. Rodriguez, 2008 WL 1943877, No. 07-1316, April 17, 2008, Appellant's Brief, Issues VII and VIII.)

In its opinion, the Eighth Circuit correctly decided the fact-bound issues including that the Rodriguez had the burden of proving mitigating factors according to 18 U.S.C. § 3593(C), and that the government may dispute those factors and argue they should receive little or no weight. Rodriguez, 581 F.3d at 798. The Eighth Circuit held Rodriguez had to prove mitigating factors; the jury should consider only those mitigating factors proved by a preponderance of the evidence; and the jury could decide that any mitigating factors, even if proved, are sufficiently outweighed by aggravating factors. Id. at 799. Furthermore, the appellate court held that the Federal Death Penalty Act ("FDPA") does not mandate a two-step decision-making process of first deciding whether a sentence of death should actually be imposed. Id. at 813. Read in context, the Circuit affirmed that the district court's penalty phase instructions established that each juror was correctly instructed by this Court, and that the jury was able to give meaningful consideration and effect to Rodriguez's proposed mitigation. It also opined that the district court's instructions were unambiguous, and the contextual reading of the challenged instructions show they neither violated the Constitution or the FDPA. Id.

303

The Eighth Circuit's decision in <u>Rodriguez</u> remains the law of the case. The law-of-the-case doctrine provides that circuit court holdings bind the district court in subsequent proceedings in the same case. <u>United States v. Bartsch</u>, 69 F.3d 864, 866 (8th Cir. 1995). As such, in the absence of "countervailing considerations, district courts may refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal." <u>Withrow v. Williams</u>, 507 U.S. 680, 721 (1993). Rodriguez has made no effort to establish exceptional circumstances that might justify overriding the doctrine in this instance. <u>See</u> <u>United States vs. United States Smelting Refin'g & Min'g, Co.</u>, 339 U.S. 186, 199 (1950).

Furthermore, a claim raised and rejected on direct appeal, generally, cannot be relitigated in a Section 2255 motion. <u>United States v. Wiley</u>, 245 F.3d 750, 752 (8th Cir. 2001) ("Issues raised and decided on direct appeal cannot ordinarily be relitigated in a collateral proceeding based on 28 U.S.C. § 2255."); <u>Dall v. United States</u>, 957 F.2d 571, 572 (8th Cir. 1992) (claims introduced and decided on direct appeal may not be relitigated in a § 2255 motion to vacate); <u>Dupont v. United States</u>, 76 F.3d 108, 110 (6th Cir. 1996) ("A § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exceptional circumstances."). Relitigation of an appellate issue during Section 2255 proceedings may be proper when there has been an intervening change in the law of a circuit. <u>Davis v. United States</u>, 417 U.S. 333 (1974); <u>see also</u> <u>English v. United States</u>, 998 F.2d 609, 613 (8th Cir. 1993) ("In the absence of an

304

intervening change in the law, or newly discovered evidence, we will not reconsider any claim that was resolved on direct appeal in a Section 2255 habeas proceeding.").[293]

Rodriguez has litigated these issues on direct appeal, and the Eighth Circuit clearly addressed, and denied, Rodriguez's arguments. There is no intervening change of law, or newly discovered evidence, which would apply to Rodriguez's argument rendering it reviewable now. None of Rodriguez's arguments regarding the Court's Instructions provide a basis for contradicting the overwhelming weight this authority. Accordingly, Rodriguez's claim should fail on these grounds alone. However, as discussed more thoroughly below, the "three step process" was objective and reasonable.

## 2.    The "Three Step Process" was Objective and Reasonable.

In an attempt to convince this Court that it should revisit an issue already decided by the Eighth Circuit, Rodriguez now complains that trial counsel failed in its duty to ensure that the jury was properly instructed in the penalty phase. Under the guise of an Eighth Amendment violation, Rodriguez asserts that he was denied effective assistance of counsel by trial counsel's failure to make proper objections to the penalty phase jury instructions, to the special findings form, and to the prosecutor's closing arguments. Mot. at 222–23. This claim, too, falls short—trial counsel are not ineffective for failing to raise objections on an issue that would fail on appeal.

---

[293] See Federal Collateral Review of Presumptively Final Criminal Judgments, Section D, *supra*.

In assessing the effect of a challenged jury instruction, the court "accept[s] at the outset the well-established proposition that a single instruction to a jury may not be judged in isolation, but must be viewed in the context of the overall charge." Boyde v. California, 494 U.S. 370, 378 (1990) (quoting Cupp v. Naughten, 414 U.S. 141 (1973)). The legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Id. at 380. A capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility that the jury was impermissibly inhibited by the instruction. Id. Where the context of the proceedings would lead reasonable jurors to believe that evidence of a defendant's background could be considered in mitigation, even the absence of an instruction on the concept of mitigation and of instructions on particular statutorily-defined mitigating factors does not violate the Eighth Amendment. Buchanan v. Angelone, 522 U.S. 269, 278–79 (1998). A jury instruction that directs the jury to base its decision on all of the evidence satisfies the constitutional requirement that the sentencing jury has a full opportunity to consider mitigating evidence. Rodriguez, 581 F.3d at 812-814. This Court's instructions did exactly that.

The Court instructed the jury on the steps they were to use in deliberations. See District Court's penalty phase instructions at Tr. 8652–59; DKT 616. The Court instructed the jurors, in part:

306

In Step Two, you must consider whether the defendant has established the existence of any mitigating factors. Unlike aggravating factors, which you must find – unanimously find – which you must unanimously find proved beyond a reasonable doubt in order to consider them in your deliberations, the law does not require a unanimous agreement with regard to mitigating factors. *Any juror persuaded of the existence of a mitigating factor must consider it in this case. Furthermore, any juror may consider a mitigating factor found by another juror, even if the first juror did not initially find that factor to be mitigating.*

It is the defendant's burden to establish any mitigating factors, but only to the greater weight of the evidence. "Greater weight of the evidence" has been defined for you at Preliminary Instruction Number 3.

* * *

*You are also permitted to consider anything else about the commission of the crime or about the Defendant's background or character that would mitigate against imposition of the death penalty.* "Mitigating Factor" has been defined for you at preliminary instruction Number 2. *If there are any such mitigating factors, whether or not specifically argued by defense counsel, which are established by the greater weight of the evidence, you are free to consider them in your deliberations.*

On the Special Findings Form you will be asked to identify any mitigating factors any one of you find has been proved by the greater weight of the evidence.

Tr. 8655–57. The Court explained:

The law contemplates that different factors may be given different weight or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factors proved do not, standing alone, justify imposition of a sentence of death. If one or more of you so find, you must return a sentence of life in prison without the possibility of parole. Similarly, you may unanimously find that a particular aggravating factor sufficiently outweighs all mitigating factors combined to justify a sentence of death. *You are to decide what weight or what value is to be given to a particular aggravating or mitigating factor in your decision-making process.*

307

Tr. 8658-59 (emphasis added).  The Court's instructions directed the jury to base its decision on all of the evidence satisfying the constitutional requirement that the sentencing jury have a full opportunity to consider mitigating evidence.  See Boyd, 494 U.S. at 377–79.

Rodriguez claims the second-step requirement was improper because the issue of whether proffered evidence constitutes relevant mitigation is a question of law, not a question of fact, therefore, he alleges, the jury should not have been allowed to make such a finding rather the court should have made any such findings.  Mot. at 220. Rodriguez is engaging in hairsplitting.

It is clear from the Court's instructions, and the context of the proceedings that the jury instructions did not impermissibly inhibit the jury's consideration of relevant mitigating evidence.  Rodriguez's trial counsel spent more than seven days presenting testimony regarding Rodriguez's background of deprivation and abuse, his psychological condition, and his substance abuse.  See Boyde, 494 U.S. at 383 ("All of the defense evidence presented at the penalty phase - four days of testimony consuming over 400 pages of trial transcript - related to petitioner's background and character, and we think it unlikely that reasonable jurors would believe the court's instructions transformed all of this favorable testimony into a virtual charade.'").  For the jury to have believed it could not consider Rodriguez's mitigating evidence, it would have had to believe that the penalty phase served virtually no purpose.  See Brown v. Payton, 544 U.S. 133, 144 (2005).  Given this Court's instructions, the extensive trial time devoted to mitigating

308

evidence, and the results of the special findings, there is no possibility jurors screened out mitigating factors based on a belief that the jury instructions limited such consideration.

Rodriguez relies on the holding of <u>Tennard v. Dretke</u>, 542 U.S. 274 (2004), to support his argument that a basis existed for objection to this Court's jury instructions. The facts of <u>Tennard</u> are easily distinguishable from those of Rodriguez's case.

Unlike the trial court in <u>Tennard</u>, this Court instructed jurors they could consider any factor to be mitigating if the factor tended to suggest life in prison without parole and not death should be the appropriate sentence. Tr. 8657. Before trial, the Court explained to the jurors that the lawyers' closing arguments would be their summary of the evidence and how it should be interpreted. Tr. 5474-75. Prior to closing arguments, the Court explained to the jurors that "if there are any such mitigating factors, whether or not specifically argued by defense counsel, which are established by the greater weight of the evidence, you are free to consider them in your deliberations." Tr. 8657. Rodriguez's counsel argued at length and with fervor that the jury should show compassion by sentencing him to life imprisonment because so many forces in Rodriguez's life had worked against him. Tr. 8714-37. After closing arguments and prior to jury deliberations, the Court reviewed the Special Findings Form with jurors. Tr. 8749-53; DKT 616. The Court instructed: "Any juror who finds the existence of a mitigating factor must consider it in this case, regardless of the number of jurors who agree that the factor has been established." Tr. 7445. The Court charged the jury:

309

In making all determinations you are required to make in this selection phase of the trial, *you may consider any evidence that was presented during the merits phase of the trial, during the eligibility phase of the trial, as well as the evidence that is presented at this selection phase of the trial.*

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness has said, or only part of it, or none of it. In deciding what testimony of any witness to believe, consider the witness's intelligence, the opportunity the witness had to have seen or heard the things testified about, the witness's memory, any motives that the witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness has said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with other evidence that you believe.

Tr. 7448 (emphasis added).

The Court also instructed:

The defendant does not have the burden of disproving the existence of anything the government must prove beyond a reasonable doubt. The burden is wholly upon the government; the law does not require the defendant to produce any evidence at all.

It is the defendant's burden to establish any mitigating factors he asserts by the greater weight of the evidence. Any mitigating factor that you find on your own, which is not asserted by the defendant, must also be proved by the greater weight of the evidence. To prove something by the greater weight of the evidence is to prove that it is more likely true than not true. It is determined by considering all of the evidence and deciding which of the evidence is more believable. To prove something by the greater weight of the evidence is a lesser standard of proof than proof beyond a reasonable doubt.

Tr. 7447. In order for the jurors not to have considered the numerous mitigating factors

they found, they would have had to blatantly ignore the Court's verbal instructions and

310

written instructions.  Rodriguez has failed to show any such error by the jury or the Court in this regard.

In addition to this Court's instructions, Rodriguez's trial counsel spoke to the jury extensively in order to ensure the jurors were aware they could find and give effect to mitigating factors without finding that those factors caused Rodriguez to commit the crime of murder.  Trial counsel explained:  "It's clear – I don't blame them – that the government wants to focus on the pieces of the crime.  I'm not saying you shouldn't consider that.  To the extent it relates to those four aggravating factors only, however.  I'm not saying you shouldn't consider that.  But it would be wrong if that's all you considered because this is a bigger question, a bigger issue, and those are the questions you'll have to answer."  Tr. 8717.  Rodriguez's counsel proceeded to explain to the jury why all of the information about his childhood, sexual abuse, racism, education, exposure to toxins, brain damage, and up-bringing in poverty mattered and why it should be taken into account during jury deliberations.  Rodriguez's counsel argued at length and with fervor that the jury should show compassion by sentencing him to life imprisonment because so many forces in Rodriguez's life had worked against him.  Tr. 8717-43.

The second step of this Court's instruction involved the weight given to the finding of a particular mitigating circumstance.  Contrary to Rodriguez's assertion, how jurors weigh aggravating and mitigating factors is entirely for jurors to decide once they determine which factors were proven to exist.  A juror is free to give no weight to a factor, though proven, if that factor is not significant to the juror in determining whether

311

the death penalty or life in prison is the appropriate punishment.  Eddings v. Oklahoma, 455 U.S. 104, 114–15 (1982) ("The sentencer . . . may determine the weight to be given relevant mitigating evidence but they may give it no weight by excluding such evidence from their consideration.").  Thus, while a juror may find a particular factor to exist, if the juror gives it .01% weight as to all other considerations, it likely has no practical significance, though the juror has technically found the mitigating factor.

Besides the logical disconnect that would have been required, the jury's decision, itself, shows that it is unlikely jurors believed they were prohibited from using relevant evidence.  Many of the jurors, if not all 12 in instances, found various mitigators relevant to Rodriguez's background and character during their penalty phase deliberations.

Specifically, all of the jurors found that if Rodriguez is not put to death, he will live every day of the rest of this life incarcerated in a federal prison (Factor 1); seven jurors found defendant was sexually abused as a child (Factor 2); none of the jurors found Rodriguez suffers the effects of his exposure to toxins (Factor 3); three jurors found defendant suffers brain damage (Factor 4); all of the jurors found Rodriguez suffers from a mental disorder or impairment (Factor 5); none of the jurors found Rodriguez has a neurological or psychological problem which has impaired his ability to make good decisions (Factor 6); 12 jurors found Rodriguez was introduced to addictive drugs and alcohol at a young age and has suffered from such addictions during his life (Factor 7); six jurors found Rodriguez had learning problems because he grew up in a migrant family that moved from place to place during the school year (Factor 8); nine jurors found

312

Rodriguez had learning problem in school because he was developmentally delayed; nine found Rodriguez suffers from a mental disorder or impairment (Factor 9), all of jurors found Rodriguez has experienced racial prejudice during his life time (Factor 10). All jurors found Rodriguez has shown love and kindness towards his mother Delores, sisters Sylvia D'Angelo, Rosa Rodriguez, Illeana Noyes, nephew Joshua Noyes, and niece Alina Noyes (Factors 11, 13, 15, 17, 19, 21), and that all will suffer emotional pain if Rodriguez is executed (Factors 12, 14, 16, 18, 20, 22).

None of the jurors found other mitigating factors in Rodriguez's childhood, background or character (Factor 23), nor did any find he offered to plead guilty to causing Ms. Sjodin's death, thereby accepting responsibility for his actions in this matter (Factor 24). All jurors found Rodriguez responded well to a structured environment and would likely make a good adaptation to prison if he were sentenced to life imprisonment (Factor 25) and all 12 jurors found since his arrest on this charge, Rodriguez has been a well-behaved inmate (Factor 26), and all found the same in that Rodriguez raised concerns to prison officials about being released from prison in 2003 (Factor 27). None of the jurors found the MNDOC personnel failed to act on statements of concern from Rodriguez and his family about Rodriguez's release from prison in 2003 (Factor 28). Ten jurors found Rodriguez had potential to grow spiritually (Factor 29), and eight jurors found considerations of mercy supporting a sentence of life imprisonment without the possibility of parole (Factor 30). See DKT 626.

The record makes no mistake, this Court, the government, and trial counsel made certain the jurors understood the charge of instructions and had the opportunity to consider all of the mitigating evidence.  Even clearer, the jury considered the relevant evidence and applied the jury instructions to such evidence.  See Boyde, 494 U.S. at 378. The special findings form evidences that jurors took credence in the mitigating evidence, finding many of the factors were proven by the greater weight of the evidence.  See Special Findings Form-DKT 626.  No matter how badly Rodriguez wants to assert a claim of ineffective assistance of counsel on this issue, there is none.

### 3.    Counsel's Performance Did Not Result in Prejudice.

Rodriguez next complains that trial counsel's failure to properly object to the three step process affected the jury's deliberations with respect to the mitigating factors.  Mot. at 228.

Where a defendant argues that either jury instructions or a prosecutor's comments in summation unconstitutionally preclude the jury from considering his mitigating evidence,

> the proper inquiry . . . is whether there is a reasonable likelihood that the jury has applied the [jury instructions] in a way that prevents the consideration of constitutionally relevant evidence.

Boyde, 494 U.S. at 380.

A party may argue inferences from the evidence and point out weaknesses in his adversary's case to sharpen the issues for the jury.  See Herring v. United States, 422 U.S. 853, 862 (1975).  Moreover, a prosecutor is permitted to argue that the defendant's

314

mitigating evidence is minimal in relation to the aggravating factors or that the defendant

must take responsibility for his crimes despite a disadvantaged background, although a

prosecutor may not argue that the jury is forbidden from considering evidence of the

defendant's background and character.  Boyde, 494 U.S. at 385–86 (prosecutor

permissibly argued that defendant's mitigating evidence did not mean that the

defendant's crime was "less serious or that the gravity of the crime [was] any less.");

United States v. Fell, 531 F.3d 197, 221–23 & n.14 (2d Cir. 2008) (prosecutor

permissibly asked for "connection" between the defendant's mitigating evidence and his

crimes); Sims v. Brown, 425 F.3d 560, 580 (9th Cir. 2005) (prosecutor permissibly

argued that there was no "bridge" between the defendant's disadvantaged childhood and

his later crimes).

In the context of these proceedings, there is no reasonable likelihood the jury

believed it was required to disregard Rodriguez's mitigating evidence.   In United States

v. Allen, 247 F.3d 741, 780 (8th Cir. 2001), judgment vacated and remanded on other

grounds by 536 U.S. 953 (2002), the Eighth Circuit held that Instruction 12.01 and 12.11

(the weighing instruction) that the defendant had attacked as impermissibly mandatory in

nature, "accurately explained the jury's role in sentencing under FDPA."  The Eighth

Circuit concluded:

> Under the FDPA, the jury exercises complete discretion in its determination
> of whether the aggravating factors outweigh the mitigating factors.  The
> jury was informed that whether or not the circumstances justify a sentence
> of death was the decision left entirely to them . . . . The FDPA merely

315

precludes the jurors from arbitrarily disregarding its unanimous
determination that a sentence of death is justified.

Id. at 781.  The Eighth Circuit reaffirmed its holding in Allen in United States v. Ortiz,

315 F.3d 873 (8th Cir. 2002), and in United States v. Nelson, 347 F.3d 701, 712 (8th Cir.

2003).

Construing the FDPA consistently with its literal terms to require the jury to

determine whether a proffered factor is indeed mitigating would not violate the Eighth

Amendment and statutory requirement that juries not be prevented from considering and

giving effect to constitutionally relevant mitigating evidence.  Jones v. United States, 527

U.S. 373, 381, 390 & n.9 (1999).  Although the Supreme Court has stated that the

sentencer in a capital case may not "refuse to consider, as a matter of law, any relevant

mitigating evidence," Eddings, 455 U.S. at 113–14, this does not mean that a sentencer

may not decide for itself whether proffered evidence is indeed mitigating as a prerequisite

to weighing the evidence as a mitigating factor.

In Buchanan v. Angelone, 522 U.S. 269 (1998), the Supreme Court indicated that

a jury may be granted broad discretion to determine whether a proffered fact is

mitigating, as follows:

> In the selection phase, our cases have established that the sentencer may not
> be precluded from considering, and may not refuse to consider, any
> constitutionally relevant mitigating evidence. Penry v. Lynaugh, 492 U.S.
> 302, 317-318, 109 S. Ct. 2934, 2946-2947 (1989); Eddings v. Oklahoma,
> 455 U.S. 104, 113-114, 102 S. Ct. 869, 876-877 (1982); Lockett v. Ohio,
> 438 U.S. 586, 604, 98 S. Ct. 2954, 2964-2965 (1978).  However, the state
> may shape and structure the jury's consideration of mitigation so long as it
> does not preclude the jury from giving effect to any relevant mitigating

316

evidence.  Johnson v. Texas, 509 U.S. 350, 362, 113 S. Ct. 2658, 2666
(1993); Penry, *supra*, at 326, 109 S. Ct. at 2951; Franklin v. Lynaugh, 487
154, 181, 108 S. Ct. 2320, 2331 (1988).  Our consistent concern has been
that restrictions of the jury's sentencing determination not preclude the jury
from being able to give effect to mitigating evidence.  Thus, in Boyde v.
California, 494 U.S. 370, 110 S. Ct. 1190 (1990), we held that the standard
for determining whether jury instructions satisfy these principals was
"whether there is a reasonable likelihood that the jury has applied the
challenged instruction in a way that prevents the consideration of
constitutionally relevant evidence." Id., at 380, 110 S. Ct. at 1198; see also
Johnson, *supra*, at 367-368, 113 S. Ct. at 2669.

But we have never gone further and held that the state must affirmatively
structure in a particular way the manner in which juries consider mitigating
evidence.  And indeed, our decisions suggest that complete jury discretion
is constitutionally permissible.  See Tuilaepa v. [California, 512 U.S. 967,]
978-979, 114 S. Ct. [2630,] 2638-2639 [1994)](noting that at the selection
phase, the state is not confined to submitting specific propositional
questions to the jury and may indeed allow the jury unbridled discretion);
[Zant v.] Stephens, [462 U.S. 862,] 875, 103 S. Ct. [2733,] 2741-2742
[(1983)] (rejecting the argument that a scheme permitting the jury to
exercise "unbridled discretion" in determining whether to impose the death
penalty after it has found the defendant eligible is unconstitutional, and
noting that accepting that argument would require the Court to overrule
Gregg [v. Georgia, 428 U.S. 153, 96 S. Ct. 2909 (1976)]).

Buchanan, 522 U.S. at 276–77; see Weeks v. Angelone, 528 U.S. 225, 232 (2000).

Thus, a sentencer's decision not to give weight to proffered non-statutory

mitigating factors on the ground that the factors are not mitigating does not violate the

rule of Lockett and Eddings.  See United States v. Bernanrd, 299 F.3d 467, 485–86 (5th

Cir. 2002) (as long as jurors were free to give mitigating effect to defendants' ages, jurors

were not required to find that defendant's youthfulness was mitigating); United States v.

Paul, 217 F.3d 989, 1000 (8th Cir. 2000) (although defendant was 18 years old and his

co-defendant received a life sentence, jury not required to give mitigating effect to either

317

factor); <u>United States v. Hall</u>, 152 F.3d 381, 413 (5th Cir. 1998) ("jury was free to believe or disbelieve" testimony of family members that defendant experienced difficult upbringing that mitigated against imposition of a death sentence); <u>Johnson v. Wainwright</u>, 778 F.2d 623, 629 (11th Cir. 1985); *accord* <u>Graham v. Collins</u>, 506 U.S. 461, 490 (1993) (Thomas, J., concurring) ("By requiring that sentencers be allowed to 'consider' all 'relevant' mitigating circumstances, we cannot mean that the decision whether to impose the death penalty must be based upon all of the defendant's evidence or that such evidence must be considered the way the defendant wishes"); *cf.* <u>Tuileapa</u>, 512 U.S. at 975–80 (jury may consider defendant's age as either mitigating or aggravating seriousness of offense).  An instruction allowing the jury to determine whether a proffered factor is mitigating does not "prevent" the consideration of defense evidence, <u>Boyde</u>, 494 U.S. at 380, confers constitutionally permissible discretion on the jury, <u>Buchanan</u>, 522 U.S. at 276–77, and is consistent with the statutory requirement that the jury "consider" whether proffered evidence is indeed mitigating, Section 3592(a).

While the jury must consider relevant evidence submitted by the defendant, it need not conclude that such evidence is actually mitigating.  <u>Paul</u>, 217 F.3d at 1000–01.  Even defense counsel acknowledged the propriety of that proposition.  Tr. 8590.  "[A]s long as jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight."  <u>United States v. Johnson</u>, 495 F.3d 951, 966, 978 (8th Cir. 2007) (footnote omitted).  That mirrors the mitigation assessment framework suggested by the United States and supported by the

318

district court (Tr. 8590-91) during a hearing held the day before closing arguments of counsel in the penalty selection phase of Rodriguez's trial. Tr. 8569-8642. Defense counsel argued against such a construct, arguing that anything the defense proposed and proved had to be given weight. Tr. 8593-94. However, elsewhere, defense counsel agreed that some factors that are proven may still have "no weight at all." Tr. 8590.

The United States' argument urged the jury to consider the mitigation, but to reject it or give it little or no weight. Such arguments are clearly proper and defense counsel was not deficient in failing to object to said arguments. The Eighth Circuit has held that a jury engages in essentially a three step process when it comes to mitigators and considering mitigating evidence: first, the jury considers whether the alleged fact has been proven by a preponderance of the evidence; and second, the jury considers whether the fact, if proven, is mitigating in the context of the case. Only after the jury makes both of those findings does the jury weigh aggravators found against mitigators found. Paul, 217 F.3d at 1000. The Committee Comments to the Eighth Circuit Manual of Model Jury Instructions state that mitigating factors "may be factually true, and yet not be perceived by a juror as . . . mitigating." Instruction 12.12, Committee Comments (2003).

This Court ensured jurors understood they could consider any aspect of the evidence as mitigating and choose to sentence Rodriguez to life in prison without parole. While reviewing the mitigating factors, including each of the specific 30 factors which Rodriguez asserted mitigated a sentence of death, the Court instructed jurors:

319

> You are also permitted to consider anything else about the commission of the crime or about the defendant's background or character that would mitigate against imposition of the death penalty. 'Mitigating factor' has been defined for you at the preliminary instructions number 2. If there are any such mitigating factors, whether or not specifically argued by defense counsel, which are established by the greater weight of the evidence, you are free to consider them in your deliberations.
>
> On the special findings form you will be asked to identify any mitigating factors that any one of you finds has been proved by the greater weight of the evidence.

Tr. 8656-57. The Court instructed the jury what a mitigating factor is (Tr. 7444-45), and the Court further instructed, "In addition to these mitigating factors, you are permitted to consider anything else that is established by the greater weight of the evidence about the commission of the crime or about the defendant's background or character that would mitigate in favor of a sentence of life imprisonment without the possibility of parole and against the death penalty, whether or not specifically argued by defense counsel." Tr. 7445. Thus, the Court's instructions would have dispelled a belief by any juror that he/she could not consider any mitigating factors.

Furthermore, allegations that the special findings form and supporting instructions misapplied the law, easing the government's burden is senseless. See Lankford v. Arave, 468 F.3d 578, 585 (9th Cir. 2006). The instructions properly explained the weighing process and the government's burden of proof, informing the jury of the weighing process. Tr. 8652-59. Presumably, the jury heeded this Court's instructions and weighed the aggravators qualitatively, rather than quantitatively. United States v. Olano, 507 U.S.

320

725, 740 (1993) ("'[It is] the almost invariable assumption of the law that jurors follow their instructions.)

More importantly, any ambiguity on this point—either in the special findings form or in portions of the jury charge—"was clarified when considered in light of the entire jury instruction." Jones v. United States, 527 U.S. 373, 393 (1999) (holding the jury charge as a whole dispelled confusion caused by verdict forms standing alone). The Court's instructions explicitly and repeatedly instructed the jury that it could consider any mitigating factors established by the preponderance of the evidence, regardless of whether it was argued by the parties or listed on the special findings form. The last mitigating factor this Court gave the jury was a catch-all category that, when read in context with the jury instructions, reiterated to the jury that it could consider any factor it determined to be mitigating. Tr. 8656-57; DKT 626.

Trial counsel reinforced these instructions, defining "mitigating evidence" in his opening statement as "Well, what is mitigation?  Again, we're back to the definitions, aren't we?  The judge gave you a definition of that, but you know, mitigation in its expanse almost defies definition. This covers a great range of information about Alfonso's childhood, about his family, about his mental health, about his physical health, about the environment he lived in." Tr. 7460. Counsel further defines "mitigation is that evidence that's an indication in any way that Alfonso should spend the rest of this life in prison, not be put to death by your decision. They're reasons – mitigation, again, is

321

reasons he should be punished, be punished by one of the most extreme sanctions of the law, but not die, not be executed." Tr. 7461.

When read in context, the Court's instructions thus belie Rodriguez's assertion that the jury charge, combined with the special verdict form, "affected the outcome of the jury's deliberations regarding the mitigating factors." Mot. at 231. Indeed, it is counterintuitive to believe this Court would limit the jury's ability to consider an explicit mitigating factor while simultaneously giving it free rein to consider mitigating factors of its own creation. The court's instructions, therefore, "left no room for the jury to ignore constitutionally relevant evidence." United States v. Webster, 162 F.3d 308, 327 (5th Cir. 1998).

Even if the Court possesses the authority to review a special verdict on mitigating factors, it "must accept the jurors' factual determination unless no reasonable juror could have arrived at the conclusion reached by the juror in question." United States v. Jackson, 549 F.3d 963, 982 (5th Cir. 2008). In light of testimony by various mitigation witnesses addressing Rodriguez's childhood, family mental health, physical health, and environment, the jury reasonably could have disbelieved the defense's accounts of Rodriguez's allegedly unfortunate life. Alternatively, the jury may have believed Rodriguez's unfortunate life circumstances, but not to the degree of mitigating a death sentence. The jury's failure to find that any of the mitigating factors listed in the Special Findings form existed, therefore does not evince any confusion regarding what factors it could consider as mitigators.

Furthermore, as none of Rodriguez's foregone objections have any merit, trial counsel had no obligation to raise a futile objection. Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005); Hawkins v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999); Koch v. Puckett, 907 F.2d 524, 527 (5th Cir. 1990); see Scott v. Romero, 153 Fed. Appx. 495, 2005 WL 2865173, at ** 2 (10th Cir. November 2, 2005) ("Counsel is not ineffective for failing to advance a futile argument."). Rodriguez has not shown that trial counsel omitted any valid or meritorious objections, and there is no reasonable probability that the failure to interpose futile ones had a prejudicial impact on the verdict.

Finally, Rodriguez fails to acknowledge that trial counsel filed a Memorandum re Jury's Consideration of Mitigating Factors (DKT 515) on August 15, 2006; and a Motion in Limine Prohibiting Improper Argument By the Government (DKT 603/604) on September 18, 2006, wherein counsel argued the government be prohibited from making arguments to the jury that suggest the jury may reject, disregard, or not consider mitigating evidence that is introduced during the selection phase. Furthermore, trial counsel made 12 various objections during the prosecutor's closing penalty phase argument. Tr. 8661-8708. In response to those objections, this Court either sustained counsel's objections or provided a curative instruction to the jury. At the end of the day, the mitigation phase of the trial was handled properly and the district court did not misapply the law, and thus a reversal is not warranted, otherwise. Rodriguez, 581 F.3d 812–14.

323

To demonstrate the existence of prejudicial ineffectiveness, Rodriguez must establish "a reasonable probability that but for" his counsel's failure to object, "the result of the proceeding would have been different."  Strickland, 466 U.S. at 687.   He fails to do so.

### D.  Counsel Properly Omitted to Seek the Jury's Determination of the Kidnapping Act's Constitutionality.

Rodriguez contends that his attorneys did not challenge, under the Tenth Amendment, Congress's enactment of the death penalty provision of the Federal Kidnapping Act.  Mot. at 235.  To the extent Rodriguez implies his trial lawyers should have pressed this Court to permit jury consideration of the question, he is simply wrong. If he faults the attorneys for failing to raise the issue as a legal matter, he cannot show that the omission of that futile argument amounted to prejudicial ineffectiveness.

Trial counsel had no obligation to request that this Court instruct the jury to determine whether the federal Kidnapping Act violated the Tenth Amendment.  A purely legal matter, like the constitutionality of a statute, is an issue for the court, not the jury. United States v. Fincher, 538 F.3d 868, 872 (8th Cir. 2008); United States v. Hiland, 909 F.2d 1114, 1127 n.17 (8th Cir. 1990) (holding that the vagueness of the defendant's statute of conviction was a question for the court, not the jury).  As such, counsel appropriately omitted any attempt to present the issue of statutory constitutionality before the jury.  See Garret v. United States, 78 F.3d at 1304-06 (holding that attorneys have no obligation to raise futile claims).  Rodriguez cannot demonstrate a reasonable probability

324

that such a request would have been granted, much less that he would have received a more favorable outcome, had counsel made such a motion.  See Noe v. United States, 601 F.3d 784, 791 (8th Cir. 2010) (reciting the Strickland standard for evaluating the constitutional effectiveness of trial counsel).

Rodriguez also fails in any attempt to place blame on his trial lawyers for failing to raise the Tenth Amendment argument to the bench.  As fully explored below (see, *infra*, Arg. XIII), the Tenth Amendment issue is devoid of any merit, and trial counsel could not have acted ineffectively for omitting to raise a futile issue.  Garret v. United States, 78 F.3d at 1304–06.

### E.  Counsel Properly Omitted to Cite Ring and Apprendi in Support of the Request for a Reasonable Doubt Instruction Applicable to the Weighing of Penalty Phase Factors.

Rodriguez contends that his trial attorneys ineffectively failed to cite Apprendi v. New Jersey and its progeny, Ring v. Arizona,[294] in support of a request to instruct the jury that the reasonable doubt standard applied to the weighing of aggravators and mitigators.  Mot. at 235–36.  He cannot, however, demonstrate that the omission of any particular support for his futile motion would have meaningfully altered the likelihood of its success.  Accordingly, he cannot show that the alleged omission amounted to prejudicial ineffectiveness.

As explored below, the law does not require application of the reasonable doubt standard to the weighing of factors.  See *infra* Arg. XV.  Counsel's failure to cite

---

[294] Ring v. Arizona, 536 U.S. 584 (2002); Apprendi v. New Jersey, 530 U.S. 466 (2000).

authority in support of a futile motion does not constitute ineffective assistance. Counsel had no obligation to seek a ruling unsupported by the law. See Garret, 78 F.3d at 1304–06 (holding that attorneys have no obligation to raise futile claims). The Eighth Circuit had already effectively foreclosed reliance on Apprendi as a basis for the request for a reasonable doubt instruction when it determined that the weighing process did not result in fact finding that must be charged in an indictment. See United States v. Purkey, 428 F.3d 738, 750 (8th Cir. 2005) (noting that the weighing process is merely "the lens through which the jury must focus the facts that it has found to produce an individualized determination"). The Purkey decision would have bound this Court to reject any attempted reliance on Apprendi, which held that a fact that exposed a defendant to greater punishment must be proved beyond a reasonable doubt.

In fact, several courts have relied on Purkey to reject an argument that Apprendi requires application of the reasonable doubt standard to the weighing of factors. E.g., United States v. Sampson, 486 F.3d 13, 31–32 (1st Cir. 2007) (holding that an attempt to analogize between the "weighing determination and the sentencing determinations found unconstitutional in the Apprendi line of cases lacks force"); United States v. Aquart, Case no. 3:06cr160(JBA), 2010 WL 4363414, *9 (D. Conn. Oct. 26, 2010); United States v. Talik, 2007 WL 4570704, *15 n.6 (N.D. W.Va. Dec. 26, 2007); United States v. Gooch, 2006 WL 3780781, *5–8 (D.D.C. Dec. 20, 2006) ("the jury's weighing . . . does not constitute a factual finding . . . and, thus, is not subject to the reasonable doubt standard").

326

Given the weight of authority militating against Rodriguez's suggested extension of Apprendi, at least one court has held that trial attorneys have no constitutional obligation to make the argument. Higgs, 711 F. Supp. 2d at 539 (stating that "counsel did not act unreasonably by failing to raise an Apprendi objection to the penalty phase jury instruction" based on its lack of applicability to the weighing of factors). By extension, Rodriguez cannot demonstrate a reasonable probability that such a request would have been granted, much less that he would have received a more favorable outcome, had counsel made such a motion during his trial. See Noe, 601 F.3d at 791 (reciting the Strickland standard for evaluating the constitutional effectiveness of trial counsel).

## VII.   Trial Counsel Did Not Render Ineffective Assistance of Counsel by Failing to Secure a Settlement When It was Available.

In a brief over 300 pages long, Rodriguez devotes less than three full pages to his argument that counsel, Bob Hoy, was ineffective for "failing to secure a settlement when it was available." Now a short argument is not necessarily a bad one. But like any good argument, it must hang together if it is to have persuasive force. It must be fully and clearly developed, and cannot leave one guessing at how the argument might be supported by law and fact.

In December 2003, the state of North Dakota charged Rodriguez with kidnapping in the disappearance of Dru Sjodin. Law enforcement believed Ms. Sjodin might be found in Minnesota, which would create jurisdiction for a federal kidnapping charge. On January 31, 2004, following discussions between the Grand Forks County State's

327

Attorney, the United States Attorney's Office, and David Dusek, Rodriguez' court appointed lawyer in the state case, Mr. Dusek wrote a letter to the United States Attorney with a written proposal for settling the case.  In return for Rodriguez providing "significant information," including the location of Ms. Sjodin's body, Mr. Dusek asked the United States not to seek the death penalty.  In early February 2004, the United States told Rodriguez it would not seek the death penalty if he led law enforcement to Ms. Sjodin's body.  Under the terms of a written plea agreement, Rodriguez would plead guilty to federal kidnapping and be sentenced to mandatory life, but only if he showed law enforcement where the body was.  Shortly thereafter, on February 5, 2004, the United States District Court became involved and appointed Mr. Hoy to represent Rodriguez for the limited purposed of explaining the plea agreement to Rodriguez, with the assistance of Mr. Dusek and defense investigator Ross Rolshoven.  On April 2, 2004, Mr. Hoy filed a motion to withdraw as counsel for Rodriguez in connection with the potential federal criminal charges, stating he believed "there no longer remain[ed] a need for such continued representation."   U.S. Exhibit 27; Magistrate DKTs 8 & 9.  In a supporting affidavit, Mr. Hoy said he had met with Mr. Dusek and received a copy of law enforcement investigative reports, including lab reports.  Mr. Hoy also noted he had met with Rodriguez on three separate occasions to discuss the matter.  On April 7, 2004, the court granted the motion.

Rodriguez' argument that Mr. Hoy was ineffective in failing to secure a settlement when it was available starts with the blunt assertion that if he had been represented by

competent capital counsel, the case would have settled before indictment.  Mot. at 236–37.  After reading through the argument, the assertion proves to be entirely speculative, and what is more, the entire argument remains disconnected and incomplete.

Rodriguez cites no cases in his argument.  He simply references Guideline 10.5.A of the *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* for the proposition that "[c]ounsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client."  It is broadly phrased and couched in general terms.  It is a guide, wholly nonspecific about what exactly constitutes an "appropriate effort to establish a relationship of trust with the client."  A critical problem with its place in Rodriguez's argument, however, is that it is offered as if the ABA Guidelines are binding on the courts, which the Supreme Court has stated is absolutely not the case.  In Bobby v. Van Hook, 558 U.S. 4, 130 S. Ct. 13 (2009), the Court rejected the Sixth Circuit's view that ABA Guidelines are inexorable commands with which all capital counsel must fully comply, and not merely evidence of what a reasonably diligent attorney would do in a capital case. Id., at 558 U.S. 7-8.  Effective assistance of counsel under the Sixth Amendment means a criminal defendant is entitled to representation that does not fall below an objective standard of reasonableness.  Id., at 7, citing Strickland v. Washington, 466 U.S. 668, 686 (1984).  The Court in Van Hook, relying on Strickland, held that the standard is necessarily a general one.  Strickland stressed that:

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

Strickland, 466 U.S. at 688–89.

> In his concurring opinion in Van Hook, Justice Alito wrote to:

> [E]mphasize my understanding that the opinion in no way suggests that the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases . . . have special relevance in determining whether an attorney's performance meets the standard required by the Sixth Amendment.  The ABA is a venerable organization with a history of service to the bar, but it is, after all, a private group with limited membership.  The views of the association's members, not to mention the views of the members of the advisory committee that formulated the 2003 Guidelines, do not necessarily reflect the views of the American Bar as a whole.  It is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution, and I see no reason why the ABA Guidelines should be given a privileged position in making that determination.

Van Hook, 558 U.S. at 13-14.

According to Strickland and Van Hook, therefore, the ABA Guidelines are just that—"guides"—with no special relevance or privileged status.  Furthermore, it is not obvious that the Guidelines are even applicable, given the timing of Mr. Hoy's representation of Rodriguez.  On their face, the Guidelines apply in death penalty cases.  When Mr. Hoy was appointed for purposes of explaining the plea agreement to Rodriguez, there was no federal case against Rodriguez, let alone a death penalty case.

330

The only pending charge was the state kidnapping charge, which did not carry a sentence of death.

It is not hard to accept that a lawyer should work to establish a relationship of trust with a client, but it is hard to imagine that a lawyer's failure to make **every** appropriate effort to establish trust with a client could ever amount to ineffective assistance of counsel, especially here, where Mr. Hoy was appointed by the district court, in its own words, "for the limited purpose of explaining a plea agreement proposed by Plaintiff United States of America."  U.S. Exhibit 28; Magistrate DKT 11.

A bigger problem with Rodriguez' contention that Mr. Hoy violated Guideline 10.5.A is that he gives no specifics as to how Mr. Hoy failed to "make every appropriate effort" to establish trust with Rodriguez.  Rodriguez complains that Mr. Hoy did not enlist the assistance of an experienced death penalty lawyer or experienced mitigation specialist, and failed to understand or attempt to address Rodriguez' now-claimed "mental retardation and serious mental health problems."  Such complaints are largely misplaced in view of the fact that a death penalty case did not even exist at the time, and they have little if anything to do with Rodriguez' own issue of whether Mr. Hoy made every appropriate effort to create a feeling of trust in the mind of Rodriguez when explaining the government's proposed plea agreement.

Rodriguez claims that Mr. Hoy should have spent more time meeting with him and that five hours was not enough.  But he does not say why it was not enough time for Mr. Hoy to accomplish the assigned task of presenting the proposed plea agreement to

331

him.  Before Mr. Hoy was appointed, Mr. Dusek had already met with the government once in an unsuccessful attempt to settle the matter without the death penalty.  At the time Mr. Hoy became involved in the matter, the settlement discussions were not something new and unexpected for Rodriguez.  Rodriguez was already familiar with the terms of the proposed deal.  And the terms were not complicated or difficult to understand:  lead law enforcement to the body of Ms. Sjodin and get life imprisonment, or run the risk of facing the death penalty in a federal case.  To be sure, it was a weighty decision for Rodriguez, with grave consequences, but the choice was a simple one, and in the end it was his decision alone.  Nothing in Rodriguez' argument suggests Mr. Hoy did not do everything in his power to explain the plea offer to Rodriguez and what was at stake.  No facts are given otherwise, only the bare assertion that five hours was not enough time.  Nowhere does Rodriguez say how "competent capital counsel" would have done anything different in actually explaining the proposed offer to Rodriguez, or discussing it with him.

Besides, it was not as if Rodriguez had been sending signals that he wanted to work out a deal and disclose the location of Ms. Sjodin's body.  To the contrary, he gave every indication that he was not interested in cooperating with law enforcement or working out a deal.  For example, in early December 2003, just days after he was arrested, law enforcement officers interviewed Rodriguez at the Polk County Corrections Center, in Crookston, trying to convince him to tell them where Ms. Sjodin's body was.  They told Rodriguez he could be facing the death penalty in a federal case.  After

332

listening to most of what the officers had to say, Rodriguez told them "So you've already made up your mind that I'm guilty.  And there's a lot of ah scenarios how that blood could've got in my car."  U.S. Exhibit 29; Rodriguez Interview, Dec. 3, 2003, 9:26 AM, p. 8.  Later, when asked directly if he would help them find Ms. Sjodin's body, Rodriguez said "There's nothing I can help with.  I don't know where she is.  I didn't do this."  Id. at 18.  Rodriguez kept this same line when he talked to his sister Ileanna later the same day.  Ileanna asked her brother to do the right thing, to tell them where the girl was, and to let law enforcement know he was being cooperative.  Rodriguez' response was "[w]ell I can't do the right thing, and I can't cause I don't know."  U.S. Exhibit 30; Ileanna Noyes Interview with Rodriguez, Dec. 3, 2003, 11:13 AM, p. 4.  Ileanna also told her brother that their mom wanted him to let Dru's family know where Dru was so they could have some closure.  His response was "[l]ike I told them, I go, she has never, never been in my car."  Id. at 10.  After all their efforts, Rodriguez still chose not to cooperate.

There is nothing in the record to suggest Rodriguez had a change of heart at the time Mr. Hoy was explaining the proposed plea agreement to him.  And once Ms. Sjodin's body was found without Rodriguez's help, in a ravine near Crookston, Minnesota on April 17, 2004, Rodriguez obviously could no longer satisfy the linchpin of the proposed plea agreement by leading law enforcement to the body.

Rodriguez has fallen woefully short of showing that Mr. Hoy was ineffective at this juncture in his representation of Rodriguez.

**VIII.  There are No Errors to Accumulate.  Rodriguez's Claim of Cumulative Error has No Merit.**

Rodriguez argues that the cumulative effect of the trial counsel's errors entitle him to relief.  As the United States has demonstrated, none of Rodriguez's contentions of ineffective assistance of trial counsel have merit.  Moreover, Rodriguez has failed to establish prejudice as to any of his claims he raises.  The Eighth Circuit has repeatedly recognized " a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test."  Middleton v. Roper, 455 F.3d 838, 851 (8th Cir. 2006) (citing Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir.2002) (citation omitted)); see, e.g., United States v. Robinson, 301 F.3d 923, 925 n. 3 (8th Cir. 2002) (recognizing "the numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief," and noting the Eighth Circuit's rejection of cumulative error doctrine); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996) (Errors that are not unconstitutional individually cannot be added together to create a constitutional violation." (citation omitted)); Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir.1990) (holding cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own" (citation omitted)). Therefore, Rodriguez's argument should be rejected.  The cumulative effect of alleged trial counsel errors is not grounds for granting habeas relief.

**IX.     The United States Did Not Knowingly Present False and Misleading Testimony.**

**A.  There was No False Testimony about the Rape of Dru Sjodin or the Knife Wounds.**

Rodriguez now again re-presents his argument in Issue II of false testimony by Dr. McGee.  He simply attempts to rephrase the issue [of McGee's testimony] as a knowing presentation of false or misleading evidence by the United States, but the underlying claim is the same one that has already been addressed and has no merit.

McGee's training and experience qualified him to give the acid phosphatase, rape and neck slash opinion testimony.  Rodriguez has not demonstrated that any false testimony on acid phosphatase or testimony regarding the neck slash resulted in his conviction or a death sentence.

Rodriguez argued above that the acid phosphatase testimony and neck slash testimony was false.  He attacked the testimony regarding the acid phosphatase.  That issue was negated as shown in the response by the United States in Issue II.A above.

Attached to his petition for post-conviction relief are declarations from other forensic pathologists who reviewed the evidence presented at trial and reached a conclusion different from McGee's regarding the neck slash, which Rodriguez argues establishes the falsity of McGee's testimony.  Rodriguez based his assertion that McGee's testimony was false on these declarations.  That assertion was responded to by the United States in Issue II.B.  As noted above, although these experts disagree, disagreement between experts does not transform an expert's opinion into a falsehood.

335

To establish entitlement to habeas relief on this issue, Rodriguez must show that: (1) McGee's testimony was false or perjured; (2) McGee's testimony was material to Rodriguez's conviction or sentence; and (3) the prosecution knew that McGee's testimony was false or perjured. Giglio v. United States, 405 U.S. 150, 153-54 (1972). In other words, in order to be entitled to habeas corpus relief on a claim that a conviction was premised on perjured testimony, a defendant must show that the prosecution knowingly used perjured testimony and that "the false testimony could have affected the judgment of the jury," United States v. Agurs, 427 U.S. 97, 103 (1976). See also Johnson v. Trickey, 882 F.2d 316, 318 (8th Cir. 1989). Rodriguez fails to establish either of these requisite elements. As noted above, in II.A and II.B, none of Rodriguez's claims on this issue is persuasive. The fact that Rodriguez's experts disagree with McGee's conclusions does not establish that his testimony was false. Rather, an attack on an expert's opinions or the methodology used to reach that opinion goes to the sufficiency of the evidence and the weight the jury should award that testimony, not the truth of it. Fuller v. Johnson, 114 F.3d 491, 496–497 (5th Cir.1997) (use of incorrect methods by expert does not demonstrate testimony was false), cert. denied, 522 U.S. 963 (1997). Likewise, the burden of proving indisputable falsity is not fulfilled with evidence of a difference of opinion or merely a hypotheses or inference that testimony could be false. See Rosencrantz v. Lafler, 568 F.3d 577, 586 (6th Cir. 2009).

In addition, assuming arguendo that McGee's testimony was false, Rodriguez fails in establishing the prosecution knew it to be so and presented it anyway.

336

**B.     The Government Did Not Present False Testimony About the Minnesota Department of Corrections.**

Rodriguez claims the prosecution "knowingly" presented false testimony at trial regarding available treatment and subsequent release from the Minnesota Department of Corrections.  He claims this by use of a letter from the Minnesota Attorney General's Office (AG) to two county prosecutors that suggests Mr. Rodriguez should have been civilly committed.[295]  He, thereby, claims that Dr. St. George's testimony that "there was nothing we could do for him"[296] was false and that the government knew it to be so.  Trial counsel for Rodriguez, however, adduced mitigation testimony from Dr. Rita St. George, a doctor of clinical psychology, at the Moose Lake Prison, in Moose Lake, Minnesota, who treated Rodriguez twice in 2003 while incarcerated at the Moose Lake Correctional Facility.  Tr. 8320-78.  Much of the mitigation testimony was intended to demonstrate that Dr. St. George, and the Minnesota Department of Corrections, failed in their treatment and release of Rodriguez.  And the defense ultimately argued that the State of Minnesota should have committed Rodriguez but did not do so.  No false

---

[295] Exhibit F-01. Rodriguez also claims in Issue X. infra that the prosecution failed to disclose evidence, the letter, that Rodriguez should have been referred for civil commitment.  The United States, however, did not possess the letter at any time and his claim on Issue X. is meritless. (See Issue X. infra refuting Rodriguez's claim that the United States failed to disclose the letter pursuant to Brady.) Mot. at 260.
[296] This quote is taken completely out of context by Rodriguez in his claim.  As shown below, the statement made by Dr. Rita St. George was actually in regard to a call to her supervisor "to see if there were any transitional services that we could offer Mr. Rodriguez."  Tr. 8345.

testimony was presented.  These claims are meritless and should be dismissed.  The

United States denies these claims, and requests Petitioner's argument be dismissed.

### 1.  Procedurally Defaulted Claims.

Rodriguez attempts to smuggle a multi-part complaint that alleges prosecutorial

misconduct undermined his Fifth and Eighth Amendment rights to a fair trial and against

cruel and unusual punishment.  Indeed, in his Petition, Rodriguez relies almost entirely

on the Fifth and Eighth Amendment jurisprudence.

If a claim could have been raised on direct appeal, but was not, it cannot be raised

in a Section 2255 motion unless the petitioner can show both (1) a "cause" that excuses

the default, and (2) "actual prejudice" resulting from the errors of which he complains.

Matthews v. United States, 114 F.3d 112, 113 (8th Cir. 1997); Schneider v. United States,

981 F.2d 989, 990 (8th Cir. 1992).  If a petitioner is unable to show "cause" and "actual

prejudice," he must make a "substantial claim that constitutional error has caused the

conviction of an innocent person."  Schlup v. Delo, 513 U.S. 298, 299 (1995).

Procedural default is a complete bar to non-constitutional or non-jurisdictional

issues.  Anderson v. United States, 25 F.3d 704, 706 (8th Cir. 1994). Constitutional or

jurisdictional claims that could have been raised on direct appeal, but were not, are

procedurally defaulted unless the petitioner can demonstrate either cause for the default

and actual prejudice or actual innocence.  Bousley v. United States, 523 U.S. 614, 622

(1998); Matthews, 114 F.3d at 113.

338

The cause and prejudice standard requires Rodriguez to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. Frady, 456 U.S. 152, 170 (1982); Coleman v. Thompson, 501 U.S. 722, 753 (1991). If Rodriguez cannot show cause and prejudice with respect to a defaulted constitutional or jurisdictional claim, Rodriguez cannot have his claim considered unless he can satisfy the actual innocence exception. Bousley, 523 U.S. at 623. Here, as to his defaulted claims, Rodriguez cannot show that a factor external to the defense prevented trial counsel from raising his present constitutional claims. Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." Schlup, 513 U.S. at 323.

Because any claim of prosecutorial misconduct at trial relies on facts wholly within the ambit of the record, Rodriguez was required to raise the issue on direct appeal, and his failure to do so resulted in a procedural default of those requirements. See Frady, 456 U.S. at 167-68. Because these claims would have been futile if raised on appeal, Rodriguez cannot establish constitutionally-cognizable ineffectiveness or, by extension, cause and prejudice, Rodriguez makes no attempt to demonstrate actual innocence to excuse his default. Accordingly, Rodriguez cannot obtain collateral relief on the alleged prosecutorial misconduct at trial.

339

### 2. The Additional Information Proffered by Rodriguez Post-Conviction Is Cumulative, Is Not Material and Rodriguez Suffered No Prejudice.

Rodriguez makes a vague allegation that the United States knowingly presented false testimony from Dr. St. George regarding the Minnesota Department of Correction's ability to civilly commit Rodriguez prior to his release. However, in the body of his argument, Rodriguez fails to show Dr. St. George's testimony was false. He cites her testimony completely out of context. He fails to identify how the prosecution knowingly presented false testimony. In addition, the letter from the Minnesota Attorney General's Office to two county prosecutors that suggests Mr. Rodriguez should have been civilly committed is cumulative. Mot. at 259.

Since Rodriguez served the maximum term of imprisonment, governing his expiration date, he was not required to be released on parole or any type of supervised release, even though he was a sex offender. Had Rodriguez participated in a Sex Offender Program (SOP), he could have been released at a date prior to his expiration date, but would have been released under restrictions such as Community Notification, Residential Restrictions and parole. Rodriguez chose not to participate so he served his entire sentence. During the time Rodriguez was incarcerated, conditions or mandates would have been set for sex offenders. If those conditions were not met, the inmate would not be considered for early release (PRD) and would be required to serve to the expiration date. Exhibit D-124-006 at 18-21.

340

Notably, since 1991, MDOC has required that sex offenders, who are being referred for civil commitment, obtain sex offender screening prior to referral to the Risk Assessment Unit. The "civil commitment package" is then sent to the Risk Assessment Unit where an assessor prepares a report on the inmate and recommends whether the inmate should be forwarded to the AG or the county prosecuting attorney for civil commitment. A review team, consisting of three people, will meet to discuss the report. Exhibit D-124-008 at 28.

After screening and review by the Risk Assessment Unit, the inmate could then be referred to a county attorney's office or the Minnesota Attorney General's Office for civil commitment. Exhibit D-124-008 at 28-29.

Dwight Close, Minnesota Department of Corrections, is employed in the Correction's administration of inmate sex offenders which has included working as a case manager and behavior therapist for a number of years, and more recently working in management of sex offenders thru the Risk Assessment and Community Notification Unit (RACNU) at the MDC Central Office, in St. Paul, Minnesota. Exhibit D-124-003 at 6.

Since 2001, inmates who are being referred for civil commitment must have the file referred to the county prosecuting attorney or the Minnesota Attorney General's Office within twelve (12) months of being released in order to allow enough time for review of the case by the county prosecutor or the AG. Exhibit D-124-008 at 28-30 and D-124-010 at 35. Mr. Close was requested to review Rodriguez's Recommendation

341

Section of the Civil Commitment Determination Report.  Close advised that according to the report, Rodriguez was not being referred for civil commitment.  This is due to the fact that the committee and Close considered Rodriguez's age at the time of the review. Close noted that, statistically, as offenders get older they tend to commit fewer crimes. Exhibit D-124-010 at 33-35.  In addition, Close noted that over the period of twenty or more years of incarceration, Rodriguez demonstrated good institutional adjustment.

In consideration of a possible referral for civil commitment, Close said that other factors were considered.  Included in this was whether or not the offender was convicted of a crime involving "Harmful Sexual Behavior;" whether or not an offender has a psychological disorder that drives the harmful sexual behavior; consideration of the offender's risk of reoffending; whether or not there was no other options for placing the offender in less secure facility; and finally, "clear and convincing evidence" that the offender was not rehabilitated and would most likely re-offend.

In rare cases, during the interview process and in consideration of a referral for Civil Commitment, an offender may make a statement to the affect that they believe, or fear, that they will reoffend upon being released.  If an offender were to make such a statement, they would certainly be referred for civil commitment. Close stated that Rodriguez told him that he was not a risk for reoffending.  Mr. Close stated, "Mr. Rodriguez stated he has mellowed out and he does not expect a problem in the future with his anger as long as he maintains his sobriety.  Mr. Rodriguez pointed to his very good prison record as proof of his control of emotion."  Exhibit D-067E-019.

Close advises that in review of the Civil Commitment Referral Determination Report, dated February 28, 2001 (Exhibit D-067E-017); he was not the sole administrator who recommended that Rodriguez not be referred for Civil Commitment. The final decision was that there would not be a referral for Civil Commitment by the Risk Assessment Unit.

The jury heard testimony from Rodriguez's mitigation witness, Dr. St. George, who was examined about two occasions, in January and February 2003, when she met with Rodriguez. Dr. St. George testified that Rodriguez sent a "kite" on January 22, 2003, requesting to talk to someone about a mental health problem. Tr. 8323. Dr. St. George testified she met with Rodriguez on January 23, 2003, regarding his anxiety about his upcoming scheduled release. Rodriguez complained of trouble sleeping, and his erratic appetite. He also talked about trying to make plans for his anticipated release. Tr. 8325. According to Dr. St. George, Rodriguez told her "he wished he could find a place to go where he was locked up but not locked up." Tr. 8327. Dr. St. George testified "it's very common for offenders to experience these fears and anxiety when it's getting close to release, especially after they've been in for this amount of time." Id.

Trial counsel questioned Dr. St. George, "You felt he was expressing that he was afraid of himself and what he might do if he got out, right?" Dr. St. George responded, "Not so much of himself. I have concerns about all of the offenders when it comes time for release, so I don't know that my concerns were any more for Mr. Rodriguez than any other offender, though, that would come to the office with these same concerns up to

343

release." Dr. St. George further testified that, generally, "[t]here are quite a few offenders that don't want to leave" as their release dates approach. Tr. 8334-35.

After the January 23, 2003, consult, Dr. St. George contacted her supervisor to let him know that she had seen Rodriguez, about his anxiety with being released. Dr. St. George testified that she inquired about Rodriguez's probation status, and learned he would be released without probation, and no transitional services (i.e. half-way house) were available. Tr. 8344-45. St. George testified she was informed by her supervisor that "there was really nothing that we could do for him", meaning the MN-DOC, as Rodriguez completed his prison sentence and was not recommended for civil commitment, otherwise. Id. Rodriguez claims in his Motion that this statement was false regarding the Department of Corrections ability to civilly commit him. His claim is meritless. This quote is taken completely out of context by Rodriguez in his claim. The statement made by Dr. Rita St. George was actually in regard to a call to her supervisor "to see if there were any transitional services that we could offer Mr. Rodriguez." Tr. 8345. This statement had nothing to do with any possible civil commitment.

Dr. St. George saw Rodriguez, again, February 12, 2003, less than a month after his initial visit, and Rodriguez's mood appeared "bright." Tr. 8353. Rodriguez "was doing much better" (Tr. 08354) and that by this time he had started looking for possible places to live, as well as different job options upon release. Tr. 8355. St. George further testified Rodriguez's concerns were all practical concerns of an inmate facing their impending release, and the fact he was making progress on such issues reduced the

344

anxiety he was experiencing.  Tr. 8354.  Rodriguez indicated to Dr. St. George, at the second session, that he continued to struggle with some issues relating to his release, specifically, he indicated that he needed a driver's license with a picture ID, and he was also concerned about public notification of his sex offender status upon release.  Id.  Thereafter, Dr. St. George contacted the DOC Transitions Team, and spoke to its coordinator and requested follow-up with Rodriguez to help him achieve that goal.  Tr. 8355.  Dr. St. George explained that the prison transition program assisted offenders obtain Social Security cards, if needed, help offenders fill-out job applications, assist offenders with obtaining their driver's license, and get them prepared, generally, to go back into the community.  Id.

Rodriguez never told Dr. St. George that he wanted to be kept in prison, nor did he indicate he was afraid he was going to harm anyone upon release.  Tr. 8356.  Dr. St. George testified she specifically asked him if he had suicidal thoughts or homicidal ideation, and Rodriguez replied he had no thoughts about hurting himself or others.  Id.

Dr. St. George indicated she's always naturally concerned anytime an offender is going to be released from prison, including a repeat sex offender.  Tr. 8359-60.  However, Dr. St. George testified that there was nothing she could specifically point-out to say Rodriguez was a danger to himself or others.  Id.  Furthermore, Rodriguez never requested Dr. St. George's help to get into the sex offender treatment program at any time.  Id.  Rodriguez never told Dr. St. George at either session that he would like to have her set him up with some support group in the community where he was going.  Id.  Nor

345

did Rodriguez tell Dr. St. George that he was having any sort of sexual fantasies about raping anybody at the time. Id. Rodriguez's concerns were geared toward the "practical concerns about getting out and living in the real world." Tr. 8363. Dr. St. George testified that Rodriguez never requested to see her again after February 12, 2003. Dr. St. George's chart notes reflect that the last time she saw Rodriguez he appeared to be making good progress, and he was bright, logical and coherent, and that he had no ideas of suicide or homicide. Tr. 8364-65.

Mitigation witnesses, Steven Ergen and Ted Mickelson, case managers, Minnesota Department of Corrections (MDC), Moose Lake Correctional Facility (MLCF), testified. Ergen was Rodriguez's case manager and involved in his annual reviews. Tr. 8205-13. Ergen was questioned and testified that in 2001 his annual review reflected that the decision had been made by the Department of Corrections that Rodriguez would not be civilly committed. Trial counsel engaged in questioning of Mr. Ergen about the civil commitment and making a point that that decision was not part of the annual reviews. Tr. 8212-13.

Ted Mickelson was case manager for Rodriguez from 1997 to 2003. Tr. 8220. Months before May 2003, Rodriguez expressed to Mickelson anxiety regarding pending release. Tr. 8230. Specifically, Rodriguez was concerned about returning to Crookston as a sex offender and he didn't want to shame his mother upon his return. At no time did Rodriguez tell Mickelson he thought he shouldn't be released from prison. Tr. 8231. Rodriguez inquired about the availability of a half-way house upon release, (Tr. 08231;

346

see also EX-D-124-014 at 49) however, Mickelson told Rodriguez he did not qualify for such placement.  Mickelson also explained the process for treatment at the Psychopathic Personality Treatment Center (PPTC) at the State Hospital, and that under those conditions he would not have the ability to leave at his will.  Rodriguez immediately realized that he would not want to live with restrictions regarding his freedom to come and to go. Mickelson told Rodriguez that the State Hospital was reserved for inmates who have been referred and committed through Civil Commitment procedure. Id.  Rodriguez told Mickelson "I don't want that then."  Tr. 8232.  Mickelson referred Rodriguez to psych services for follow-up to his anxiety.  Tr. 8231.

Rodriguez never indicated to Mickelson that he had any intent to go out and harm anyone, that he was a danger, or that he felt he should be civilly committed.  Tr. 8250.  Mickelson testified, "[I]f  he had said that or the comment about hurting somebody, I'd have been on the phone right away to central office because that would be something that they would need to look at."  Id.  Rodriguez never requested sex offender treatment nor did he ask to get involved in a support group when he got back to Crookston.  Rodriguez did not want to stay in prison longer than his projected release date of May 2003, and he didn't want to have anybody supervise him when he was released.  Tr. 8253.  On the contrary, Rodriguez fought the idea of civil commitment.  Tr. 8256.  He told MN-DOC personnel that "he has mellowed out and he does not expect a problem in the future with his anger as long as he maintains his sobriety.  Mr. Rodriguez pointed to his good prison record as proof that he can control his emotions.  When asked why he did not pursue sex

347

offender treatment, Mr. Rodriguez indicated that he did not see a need to participate in additional treatment since he completed sex offender treatment while at St. Peter treatment center and has not reoffended since that time." Id. Rodriguez emphasized his good record when he fought civil commitment. Tr. 8266. Ultimately, Rodriguez was not referred for civil commitment. Tr. 8237-38.

The United States did not argue or adduce evidence that the State of Minnesota lacked the legal means to hold Rodriguez after his prison term expired. Rather, it showed that the state *refused* to hold Rodriguez. Along the same lines Rodriguez argued. The state's forgone ability to have held Rodriguez is irrelevant to the aggravating fact of his own dangerousness, and has no mitigating value.

At the sentencing phase closing, trial counsel argued that the State of Minnesota should have committed Rodriguez but did not do so:

> And Mr. Mickelson and she agreed he should be civilly committed, but they did nothing. Am I saying it is all their fault? No. But there was a system failure here. But what it tells you is, despite the inaction of the Department of Corrections, Alfonso, was trying to do the right thing, was grappling with these concerns.

Tr. 8721. Even without the Attorney General's letter, trial counsel made precisely the argument that Rodriguez claims was central to the missive – "that the Department of Corrections could and should have 'done something' to prevent Mr. Rodriguez's release." Mot. at 264.

Indeed, Dr. St. George, Mr. Ergen and Mr. Mickelson's testimony was material and relevant in showing the MN-DOC treatment services available to Rodriguez, as well

as his participation, general attitude, and eligibility, otherwise, for civil commitment. Furthermore, it cannot go unnoticed that Rodriguez's mitigation evidence was supported by the record. The Special Verdict Form indicates that the jury unanimously agreed mitigating factor: (#27) Alfonso Rodriguez raised concerns to prison officials about being released from prison in 2003. However, none of the jurors found mitigating factor: (#28) The Minnesota Department of Corrections personnel failed to act on statements of concern from Alfonso Rodriguez and his family about Alfonso Rodriguez's release from prison in 2003. DKT 626. As evidenced by the jury's findings in its Special Verdict, the raised concerns by Rodriguez were not lost on the jury.

Rodriguez's claims are without merit. Petitioner does not establish that Dr. St. George's or other Minnesota Department of Correction personnel's testimony was false or that it gave the jury a false impression of Rodriguez's available treatment, eligibility for civil commitment or conditions of release. On the contrary, the record shows the Minnesota Department of Corrections were governed to release Rodriguez on his expiration date. Rodriguez fails to adequately allege prejudice, let alone, allege facts demonstrating prejudice. "A section 2255 petitioner can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible or conclusions rather than statements of fact." Delgado v. United States, 162 F.3d 981, 983 (8th Cir. 1998) (quoting Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995)). Here, his claims are contradicted by the record, are

349

inherently incredible because they contradict prior sworn testimony and because they are bereft of sufficient factual detail to state a claim or make them believable. For the reasons set forth above, this Court should deny this portion of Rodriguez's Motion without an evidentiary hearing.

**X.    The Prosecution Honored Its Obligations to Disclose Exculpatory Material to the Defense and to Afford Rodriguez a Fair Trial.**

Rodriguez claims that the United States failed to disclose, to trial counsel, a letter from the Minnesota Attorney General's Office to two county prosecutors. The letter concludes that the Minnesota Department of Corrections should have referred Rodriguez for a civil commitment at the conclusion of his prison sentence. He claims that as a result of the omission, the government was able to falsely imply through defense witness, Rita St. George, that the State of Minnesota lacked the legal means to civilly commit Rodriguez. Mot. at 260-64 (citing Exhibit F-01). As detailed below, Rodriguez fails to demonstrate that the prosecution erred.

Prosecutors must disclose material evidence favorable to the defense, whether it relates to guilt, punishment, or the credibility of witnesses. Giglio v. United States, 405 U.S. 150, 154 (1972); Brady v. Maryland, 373 U.S. 83, 87 (1963). To establish a Brady violation, a defendant must show that "'(1) the evidence was favorable to the defendant, (2) the evidence was material . . . and (3) the government suppressed evidence.'" United States v. Jeanpierre, 636 F.3d 416, 422 (8th Cir. 2011) (quoting United States v. Ladoucer, 573 F.3d 628, 636 (8th Cir. 2009)). "[E]vidence is material only if there is a

350

reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Ladoucer, 573 F.3d at 636 (internal citation omitted). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." United States v. Ellefsen, 655 F.3d 769, 778 (8th Cir. 2011) (citing United States v. Bagley, 473 U.S. 667, 682 (1985).

Prosecutors bear no obligation to disclose information they do not possess or of which they are unaware. United States v. Heppner, 519 F.3d 744, 750 (8th Cir. 2008). Likewise, they need not compile or seek evidence favorable to the defense. United States v. Jones, 34 F.3d 596, 599 (8th Cir. 1994); United States v. Marashi, 913 F.2d 724, 734 (9th Cir. 1990). While federal prosecutors must disclose their own agents' information, they are not presumed to have constructive possession of documents in the hands of state officials involved in an unrelated investigation. United States v. Beers, 189 F.3d 1297, 1304 (10th Cir. 1999) (citing, *inter alia*, United States v. Kern, 12 F.3d 122, 126 (8th Cir. 1993) and United States v. Aichele, 941 F.2d 761, 764 (9th Cir. 1991)).

Furthermore, the Constitution does not compel disclosure if the defendant knew or should have known the essential facts permitting him to take advantage of the exculpatory evidence. Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998); United States v. Kelly, 35 F.3d 929, 937 (4th Cir. 1994). Indeed, the law does not require the disclosure of information available to the defense through other avenues, such as the Freedom of Information Act. United States v. Coplen, 565 F.3d 1094, 1097 (8th Cir. 2009); see United States v. Brothers Const. Co. of Ohio, 219 F.3d 300, 316 (4th Cir. 2000) (citing

351

United States v. Wilson, 901 F.2d 378, 380 (4th Cir.1990) and United States v. Davis, 787 F.2d 1501, 1505 (11th Cir.1986)).

In this case, the federal government did not possess the letter that Rodriguez claims it suppressed. The letter was mailed from a Minnesota Chief Deputy Attorney General to a pair of county attorneys in Minnesota, Amy Klobuchar of Hennepin County and Susan Gaertner of Ramsey County. See Exhibit F-01. Neither county was involved in the investigation of this case. While Minnesota state officials from the Bureau of Criminal Apprehension were involved in this matter, that agency is a component of the state of Minnesota's Department of Public Safety, not the Attorney General's Office.[297] The federal government had no correspondence with the Office of the Minnesota Attorney General during the pendency of this case and had no reason to know of its analysis of the Department of Corrections' actions or the letter it sent to memorialize its findings. Because the federal government did not have real or constructive possession of the document, it had no duty to disclose it. See Beers, 189 F.3d at 1304. By virtue of the letter's appearance in the Motion, it appears Rodriguez was able to obtain it through other channels, presumably Minnesota's Government Data Practices Act. His ability to secure

---

[297] Under the Minnesota Constitution, the attorney general and governor are independently elected executive branch officers. Minn. Const. Art. V, § 1. The governor appoints the Commissioner of Public Safety, who heads the Department of Public Safety (Minn. Stat. § 299A.01), which includes the Bureau of Criminal Apprehension (Minn. Stat. § 299C.01).

the document independent of discovery undermines his argument that the government had a duty to disclose it to him. Coplen, 565 F.3d at 1097.

Even if Rodriguez could show that the government had a burden to disclose the letter, he cannot show that it would have affected the outcome of his case. Relief would be required only if Rodriguez could show a reasonable probability that the letter's disclosure would have resulted in a different verdict. See United States v. Dominguez Benitez, 542 U.S. 74, 81-82 (2004). But even without the letter, the defense adduced extensive evidence about the foregone commitment, questioning Dr. St. George on the subject. See Tr. 8347-49, 8375-77; see also, supra, Argument IX (refuting Rodriguez's contention that the government adduced false testimony from St. George). She stated that she advised the defendant's unit manager to commit Rodriguez, only to have her "hand slapped" for doing so. Tr. 8347-49, 8375. She also conceded that she was aware of, Dwight Close, the Corrections Department official in charge of civil commitments, but did not call him in regard to Rodriguez. Tr. 8376. Furthermore, counsel engaged in an extended colloquy with Steven Ergen regarding the forgone option to commit Rodriguez as his time in prison came to an end. Tr. 8212-13.

Ultimately, the defense argued that the State of Minnesota should have committed Rodriguez but did not do so:

> And Mr. Mickelson and she agreed he should be civilly committed, but they did nothing. Am I saying it is all their fault? No. But there was a system failure here. But what it tells you is, despite the inaction of the Department of Corrections, Alfonso, was trying to do the right thing, was grappling with these concerns.

353

Tr. 8721. Even without the Attorney General's letter, trial counsel made precisely the argument that Rodriguez claims was central to the missive – "that the Department of Corrections could and should have 'done something' to prevent Mr. Rodriguez's release." Mot. at 264. Had the defense introduced the letter at trial, it would have been cumulative to the live testimony that formed the basis of the argument. In contrast to trial witnesses, who spoke to events in which they personally participated, the Attorney General's letter was a legal opinion premised on reported circumstances. In this regard, it did not even provide especially strong corroboration of the opinions of, among others, Dr. St. George. Brady does not compel disclosure if the defendant knew the essential facts that permitted him to take advantage of the exculpatory evidence, and Rodriguez therefore cannot demonstrate any suppression in this instance. See Coe, 161 F.3d at 344.

Tellingly, trial counsel recognized the limited value of arguing that the Department of Corrections' bureaucratic error of omission itself mitigated this killing. The attorney conceding that the state government was not responsible for the killing but that's its inaction was a foil for the defendant's attempt to constrain himself. See Tr. 8721. Any attempt to shift the blame for this homicide to corrections officials would have rung hollow: the inaction of state employees did not cause this crime; it merely created the circumstances in which Rodriguez perpetrated it. See generally Allen v. Woodford, 395 F.3d 979, 1005 (9th Cir. 2005) (holding that counsel does not err in failing to present as mitigation evidence "entirely bereft of explanatory or exculpatory

354

attributes"). Not only does the letter provide an opinion of limited value to the defense, it was fraught with content damaging to Rodriguez. For instance, the letter would have explained to the jury that Level-III sex offenders like Rodriguez "pose a serious public safety risk for Minnesota communities." Exhibit F-01 at 5; see also Tr. 5822 (eliciting the fact that the defendant was a Level III sex offender). The letter also would have explained to the jury that civil commitment was intended to secure individuals "found to be a 'sexual psychopathic personality' . . . or a 'sexually dangerous person.'" Id. at 2. Moreover, the letter strongly implies that Rodriguez's advancing age did not render him any less dangerous. Id. at 5.

In short, the letter provided would not have meaningfully enhanced the defense but would have personally damaged the defendant. As such it was immaterial and its omission from discovery was of no merit.

## XI.    The Jury Did Not Rely on Materially False and Inaccurate Information During the Penalty Phase.

Rodriguez now, as a follow up to his claims he has already argued in Issues II and IX, further argues the jury relied upon materially false and inaccurate information in the penalty phase of the trial. Again, he argues that the testimony of Dr. McGee regarding the acid phosphatase and the neck wounds was false and materially inaccurate and therefore the use of such information by the jury causes his sentence to be in violation of the Eighth Amendment. As noted above, in Issue II.A and II.B, none of Rodriguez's claims on this issue is persuasive. The fact that Rodriguez's experts disagree with Dr.

355

McGee's conclusions does not establish that his testimony was false or materially inaccurate. There is nothing new here. Rodriguez simply incorporates his prior arguments. The United States has addressed these arguments in its answers at Issues II and IX and also incorporates those answers here. The Jury did not rely on materially false and inaccurate information during the penalty phase of the case. His arguments have no merit.

## XII.  REDACTED per Court Order.

## XIII.  Congress Properly Exercised Its Legislative Authority in Enacting the Death Penalty Provisions of Interstate Kidnapping Act.

Rodriguez claims that the death penalty provisions of the Interstate Kidnapping Act violate the U.S. Constitution's Necessary and Proper Clause, as recently construed by the Supreme Court. Specifically, Rodriguez argues that recent Supreme Court jurisprudence has altered the meaning of the Necessary and Proper Clause. Under this purported new interpretation of the Necessary and Proper Clause, Rodriguez argues the State of North Dakota's Tenth Amendment interest in prohibiting capital punishment outweighs the federal government's interest in imposing it for this crime. Mot. at 290-304. As explained below, however, Rodriguez defaulted this claim by failing to raise it on appeal and he cannot show that it has any merit now.

### A.  Procedural Default.

In attacking the constitutionality of the Interstate Kidnapping Act, Rodriguez relies on facts within the four corners of the record that he could have raised on appeal.

356

*Cf*. Rodriguez, 581 F.3d at 784 (noting the charges against Rodriguez). Rodriguez makes

no attempt to explain his default on this issue, but elsewhere argues that ineffective

assistance of appellate counsel resulted in the omission of other record-based contentions.

See Mot. at 325-31.  Because Rodriguez's attack on the constitutionality of the Interstate

Kidnapping Act lacks merit, as shown below, appellate counsel had no obligation to raise

it and, therefore, Rodriguez cannot establish cause for his default.  See McCleskey v.

Zant, 499 U.S. 467, 493 (1991); Garrett v. United States, 78 F.3d 1296, 1303 n.11 (8th

Cir. 1996) (holding trial counsel has no obligation to raise fruitless issues).

Rodriguez may assert that his appellate counsel had no obligation to raise this

argument because the argument did not exist until the Supreme Court's decision in

United States v. Comstock, which was rendered after Rodriguez's appeal.  See United

States v. Comstock, 130 S. Ct. 1949 (2010).  To make such an argument, Rodriguez must

now show that his claim is "so novel that its legal basis [was] not reasonably available,"

to him when he filed his appeal.[298] Reed v. Ross, 468 U.S. 1, 16 (1984).  In other words,

he must demonstrate that his appellate lawyer did not have "a 'reasonable basis' upon

which to develop [this] legal theory."  Id. at 17; see United States v. Barajas-Diaz, 313

---

[298]As noted above, § 2255 petitioners are generally prohibited from relying on "new" rules.  See United States v. Ryan, 227 F.3d 1058, 1062 (8th Cir. 2000). However, the rule Rodriguez attempts to apply here alters the class of people punishable under a statute and may, as a result, apply retroactively.  Schriro v. Summerlin, 542 U.S. 348, 351-52 (2004); see Bilzerizn v. United States, 127 F.3d 237, 242 (2d Cir. 1997) (noting that "[c]ourts have repeatedly held that a substantive change in the law resulting in the possibility that a person might have been convicted for conduct that is not illegal is properly applied retroactively on collateral review").

357

F.3d 1242, 1248 (10th Cir. 2002).  Rodriguez's argument, however, is contradicted by the

fact that other federal defendants made essentially the same argument prior to the

Supreme Court's decision in Comstock. See, e.g., United States v. Tuck Chong, 123 F.

Supp. 2d 563 (D. Hawaii, Dec. 7, 1999); United States v. O'Reilly, No. CR. 98–416,

2007 WL 2421378 (E.D. Mich. Dec. 7, 2007); United States v. Loving, 34 M.J. 956,

(A.C.M.R. 1992).  As such, there clearly existed a "reasonable basis" upon which

Rodriguez's appellate counsel could have premised this claim, notwithstanding the fact

that it was ultimately without merit, a fact that deprives Rodriguez of the ability to show

prejudice from his default.

Having failed to show cause for his omission of his claim from the appeal,

Rodriguez makes no attempt to excuse his default through a showing of factual

innocence.  Thus, he has defaulted, without excuse, his claim that the Court omitted the

reasonable doubt standard from its jury instruction on the weighing of aggravating and

mitigating factors.

### B.  The Death Penalty Provisions of the Kidnapping Act Comport with the Constitution.

Rodriguez cannot show that Comstock permits a state's concern for abolishing

capital punishment to outweigh the federal government's interest in imposing it for

kidnapping.  Absent such a showing, he cannot establish that the death penalty provisions

of the Interstate Kidnapping Act are unconstitutional.  Broadly stated, Rodriguez has

failed to make the "clear showing" required to reject an act of Congress.  "[R]espect for a

358

coordinate branch of Government forbids striking down an Act of Congress except upon a clear showing of unconstitutionality." Salazar v. Buono, 559 U.S. 700, 702 (2010); see El Paso & N.E. Ry. v. Gutierrez, 215 U.S. 87, 97 (1909) (noting the Court's "duty, no less than its disposition, to sustain the enactments of the national legislature, except in clear cases of invalidity").

Indeed, Comstock is an unlikely vehicle for demonstrating the constitutional infirmity of the Kidnapping Act. In Comstock, the Supreme Court rejected a challenge under the Necessary and Proper Clause to 18 U.S.C. § 4248. Id., 130 S.Ct. at 1954. The statute provides for federal civil commitment of sexually-dangerous prisoners. Id. The Court pointed to "five considerations" that supported the law's constitutionality:

> (1) the breadth of the Necessary and Proper Clause, (2) the long history of federal involvement in this arena, (3) the sound reasons for the statute's enactment in light of the Government's custodial interest in safeguarding the public from dangers posed by those in federal custody, (4) the statute's accommodation of state interests, and (5) the statute's narrow scope.

Id. at 1965. Those "considerations" are not all factors required for a finding of constitutionality, "but rather an articulation of every reason supporting the Court's conclusion that the civil commitment at issue in Comstock was constitutional." United States v. Kebodeaux, 647 F.3d 137, 142, reh'g en banc granted, 647 F.3d 605 (5th Cir. 2011); see United States v. Carel, 668 F.3d 1211, 1220-1221 n.8 (10th Cir. 2011). Comstock did not overrule any prior jurisprudence concerning the Necessary and Proper Clause – it merely distilled and applied existing law. Keboadeaux, 647 F.3d at 143.

Only two of the Comstock considerations – the first and third – must be satisfied for a statute to pass muster under the Necessary and Proper Clause: the statute must "constitute[ ] a means that is rationally related to the implementation of a constitutionally enumerated power," and it must reflect a "means . . . reasonably adapted to the attainment of a legitimate end under" an enumerated power.  Comstock, 130 S. Ct. at 1956-57 (internal quotations omitted) (relying on M'Culloch v. Maryland, 17 U.S. 316, 421 (1819), Gonzales v. Raich, 545 U.S. 1, 37 (2005) (Scalia, J., concurring) and United States v. Darby, 312 U.S. 100, 121 (1941)).  The other considerations identified by Comstock merely informed the Court's analysis of the particular statute at issue in that case.  See Carel, 668 F.3d at 1221 n.8; Kebodeaux, 647 F.3d at 143. Thus, the government need not show that its interests outweigh those of any state to establish the constitutionality of its kidnapping statute (Comstock's fourth consideration), a fact that negates the central premise of Rodriguez's argument.

As to the first required element under Comstock, the kidnapping statute is a means rationally related to implementation of Congress's enumerated power "to prevent the misuse of channels of interstate or foreign commerce."  United States v. Horton, 321 F.3d 476, 479 (4th Cir. 2003) (citing Perez v. United States, 402 U.S. 146, 150 (1971), and United States v. Toledo, 985 F.2d 1462, 1466 (10th Cir. 1993)); see also United States v. Jacques, No. 08-CR-117, 2011 WL 3881033, *2 (D. Vt. Sept. 2, 2011) (noting that the Kidnapping Act is an "unremarkable and facially valid exercise of Congress's" power). Congress initially enacted the Kidnapping Act, in 1932, in response to "the difficulty of

360

relying upon state and local authorities to and prosecute interstate kidnaping." United States v. Jackson, 390 U.S. 570, 588 (1968).  The extension of the death penalty to those interstate kidnappings that result in death is likewise rationally-related to the government's valid goals of deterring and punishing heinous crimes.[299]  See Enmund v. Florida, 458 U.S. 782, 798 (1982) (observing that the death penalty serves the goals of deterrence and retribution); United States v. Bin Laden, 126 F. Supp. 2d 290, 296 (S.D.N.Y. 2001) (noting the government's valid interest in pursuing the death penalty).

As to the second required element, the Kidnapping Act and its death penalty provisions are "reasonably adapted" to Congress's power to regulate the channels of interstate commerce.  As noted above, the act itself is an "unremarkable" exercise of congressional power. Jacques, 2011 WL 3881033 at *2.  And the conduct prohibited by the Act does not merely have an interstate impact, but involves interstate activity and channels of commerce.  See Fell, 571 F.3d at 265 n.2 (observing that "[t]o the extent congressional authority to legislate in this area derives from the Commerce Clause, it is worth noting that Fell's [kidnapping] crime did not simply have an effect on interstate commerce; it was itself interstate activity made possible by a channel of interstate commerce").  Congress's more recent extension of capital punishment to kidnapping

---

[299]Congress first added a death penalty provision to the Kidnapping Act in 1934, but the procedure mandated by the statue was held unconstitutional in 1968. Jackson, 390 U.S. at 588 & 590; see United States v. Fell, 571 F.3d 264, 265 n.2 (2d Cir. 2009) (Raggi, J., concurring in order).  The death penalty provision presently at issue was enacted in 1994. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 60003(a) (6).

361

resulting in death was a response to recommendations from law enforcement groups concerned with deterring the most serious of violent crimes. Death Penalty: Hearings on S.32, S.1225 & S.1696 Before the Comm. on the Judiciary of the Senate, 101st Cong. 511 & 517 (1989); Federal Death Penalty Legislation: Hearings Before the Subcomm. on Crime of the House Comm. on the Judiciary, 101st Cong. 293-317 (1990); see also Enmund, 458 U.S. at 798. Given Congress's goal of deterring heinous crimes that involve interstate activity and channels of commerce, the Legislature acted reasonably in enacting a capital punishment provision for those interstate abductions that result in death.

The Kidnapping Act and its death penalty provisions also survive analysis under the remaining three considerations discussed in Comstock – the history of federal involvement in the arena, the law's accommodation of state interests, and its narrow scope. As noted above, the federal government has an 80-year history of criminalizing kidnapping and has extended capital punishment to the crime for much of that time. See Jackson, 390 U.S. at 588; see also Pub. L. 103-322, § 60003(a) (6). The federal kidnapping statute accommodates state interests, in that it does not tread upon state sovereignty under the Tenth Amendment. See Comstock, 130 S. Ct. at 1962-63 (holding that powers constitutionally extended to Congress are not "reserved to the states"). To the extent that the statute authorizes capital punishment, it narrowly reaches only those interstate abductions that result in death. Even then, the government can seek the death penalty only if it first satisfies the requirements of the FDPA, 18 U.S.C. §§ 3591 to 3599.

362

See United States v. Bolden, 545 F.3d 609, 617 (8th Cir. 2008) (noting that the FDPA adequately narrows the class of offenders subject to the death penalty).

Simply stated, Rodriguez cannot show that Congress offended the principals of federalism by enacting a death penalty provision that places no affirmative burden on any state, regardless of whether it has enacted its own capital punishment laws. The Tenth Amendment, as the Supreme Court has repeatedly emphasized, provides nothing more than a reminder that Congress's legislative powers are limited by the Constitution. See Comstock, 130 S. Ct. at 1962 (citing Darby, 312 U.S. at 123-24). Federal laws criminalizing conduct within traditional areas of state law, whether the states criminalize the same conduct or not, are commonplace under the dual-sovereign concept of our federalist system and involve no per se infringement of state authority. See, e.g., Cleveland v. United States, 329 U.S. 14, 19 (1946) (holding prohibition on interstate transportation for purposes of prostitution was not an invasion of traditional area of state regulation). The federal government need not defer to state interests in defining crimes, and Rodriguez's argument to the contrary relies on the "flawed premise" that the government lacks constitutional authority to punish federal crimes. Tuck Chong, 123 F. Supp. 2d at 567 (citing United States v. Davis, 906 F.2d 829 (2d Cir.1990)). "'[S]o long as there is a constitutionally authorized federal nexus, the federal government is free to act anywhere within the United States.'" Id., at 567 (quoting United States v. Lampley, 127 F.3d 1231, 1246 (10th Cir. 1997)).

363

Accordingly, even if Rodriguez had not defaulted his claim of Tenth Amendment error, he still could not succeed in raising it now for the first time.

## XIV.  The Federal Death Penalty is Not Sought on a Racially Discriminatory Basis.

Rodriguez, citing statistical studies and law review articles, claims that the federal death penalty is disproportionately sought and obtained on a race and gender biased basis. Specifically, he claims that the United States disproportionately seeks and obtains the death penalty in cases involving White women.[300]  Mot. at 304-15.  Rodriguez cannot obtain relief on his claim of racial bias, having premised it on bare statistical data.

If a prosecutor has probable cause to believe a defendant has committed a crime, "the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his [or her] discretion."  Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978).  The law presumes that prosecutors exercise their discretion in good faith and constitutional compliance.  See United States v. Armstrong, 517 U.S. 456, 465-66 (1996); United States v. Parham, 16 F.3d 844, 846 (8th Cir. 1994).

To prevail on a claim of selective prosecution, a defendant must demonstrate that the government acted with "discriminatory purpose" and that this purposeful discrimination had a "discriminatory effect" on him.  See McCleskey v. Kemp, 481 U.S. 279, 292 (1987); United States v. Patterson, 258 F.3d 788, 790 (8th Cir. 2001).  To demonstrate "discriminatory purpose" in a capital case, the defendant must show that the

---

[300] Rodriguez summarily asserts at the opening and closing of his argument that his own race is of some moment to his claim, but he makes no effort to develop that argument.

364

decision to seek the death penalty was motivated at least partially by race. See McCleskey, 481 U.S. at 298 ("It implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.").

To establish "discriminatory effect," the defendant must show that the government did not seek the death penalty against similarly situated individuals of a different race. See United States v. Armstrong, 517 U.S. 456, 465 (1996); Patterson, 258 F.3d at 790. To satisfy McCleskey's two-prong test, the defendant must present "evidence specific to" the case at bar. McCleskey, 481 U.S. at 292; see United States v. Lee, No. 97-CR-243-(2) GTE, 2008 WL 4079315, *58 (E.D. Ark. Aug. 28, 2008). In McCleskey, the defendant relied solely upon a statistical study in attempting to establish that the prosecutors in his case had acted with discriminatory purpose. The Supreme Court rejected this assertion, deeming statistical studies "clearly insufficient to support an inference that any of the decision makers in McCleskey's case acted with discriminatory purpose." McCleskey, 481 U.S. at 297 (requiring "exceptionally clear proof" to infer an abuse of discretion).

Like McCleskey, Rodriguez relies entirely on studies and statistics as a basis for his claim of constitutional error. Rodriguez's argument only briefly acknowledges the existence of McCleskey and makes no attempt to meet its burden with evidence specific to his case. Rodriguez's claim – which lacks any basis in facts specific to the case – must fail for lack of any factual support. Precisely the same flaw has led to the repeated

365

rejection of similar arguments in federal courts throughout the country.  See, e.g., United States v. Sampson, 486 F.3d 13, 26-27 (1st Cir. 2007); United States v. Barnes, 532 F. Supp. 2d 625, 635-36; United States v. Edelin, 134 F. Supp. 2d 59, 89 (D.D.C. 2001); United States v. Lee, 2008 WL 4079315, *58 (E.D. Ark. 2008).

Assuming, for the sake of argument, that Rodriguez's claim did not fail for failure to meet the burdens set forth by McCleskey; this Court still could not grant relief because it would require the application of a new rule of law.  Rodriguez's claim that statistical data will suffice to show a violation of the Constitution lacks any basis in existing law. As such, any relief would necessarily require the retroactive application of a new rule of law – something this Court may not do.  Schriro v. Summerlin, 542 U.S. 348, 351 (2004). Given the prevailing legal landscape, no rational jurist could now or have ever concluded that Rodriguez's statistics demonstrate a constitutional flaw in the federal death penalty system.  Accordingly, relief in this matter is forbidden.  Id.

For the foregoing reasons, this Court should reject Rodriguez's claim of racial discrimination in the federal government's administration of the death penalty.

## XV.   Rodriguez Cannot Litigate His Argument that the Constitution Requires Capital Juries to Apply a Reasonable Doubt Burden of Proof to the Penalty Phase Weighing Process.

In penalty phase jury instructions, this Court did not require application of the reasonable doubt standard to the weighing of aggravating and mitigating factors. According to Rodriguez, this omission violated the Constitution. Mot. at 315-19.

366

Rodriguez defaulted this contention by failing to raise it on appeal and he cannot show that it has any merit at this juncture.

### A. Procedural Default.

In attacking the jury instructions, Rodriguez relies on facts within the record to make a claim that he could have raised on appeal. *Cf.* Rodriguez, 581 F.3d at 813-15 (ruling on Rodriguez's challenges to penalty phase instructions). He attempts to explain his default by arguing that appellate counsel was ineffective. Mot. at 328-29. Because the claim lacks legal merit, as shown below, appellate counsel had no obligation to raise it, and Rodriguez cannot establish cause for his default. See McCleskey v. Zant, 499 U.S. at 493; Garrett v. United States, 78 F.3d 1296, 1303 n.11 (8th Cir. 1996) (holding trial counsel has no obligation to raise fruitless issues). Even if he could show cause, Rodriguez cannot establish prejudice: he cannot show that the omission of the instruction worked to his *actual* and substantial disadvantage, infecting his trial with errors of constitutional dimension. United States v. Daniels, 254 F.3d 1180, 1191 (10th Cir. 2001). Rodriguez makes no attempt to excuse his default through a showing of factual innocence. Thus, he cannot obtain collateral relief. He has defaulted, without excuse, his claim that the Court omitted the reasonable doubt standard from it jury instruction on the weighing of aggravating and mitigating factors. See Higgs v. United States, 711 F. Supp. 2d 479, 538-39 (D. Md. 2010) (finding default of claim that court did not instruct on reasonable doubt).

**B. The Jury Charge Properly Permitted the Weighing of Factors in the Absence of the Reasonable Doubt Standard.**

Assuming, arguendo, that Rodriguez had not defaulted his claimed instructional error; it still would not give rise to relief, as the jury charge properly reflected the applicable law.

Any factual finding necessary to increase "the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. 466, 490 (2000). As a natural extension of that rule, a jury must find the facts necessary to establish the statutory maximum penalty of death. Ring v. Arizona, 536 U.S. 584, 609 (2002).

The FDPA does not, however, require capital sentencing juries to employ the reasonable doubt standard in weighing aggravating and mitigating factors. 18 U.S.C. § 3593(e); see United States v. Hammer, 25 F. Supp. 2d 518, 530-31 (M.D. Penn. 1998). The statute only requires juries to find that the aggravating factors "sufficiently outweigh" the mitigating factors. Congress identified the standard it intended, and thereby excluded others, as further demonstrated by its employment of the reasonable doubt standard in other portions of the statute. Hammer, at 531 (citing 18 U.S.C. §§ 3591(a) (2) and 3593(c)). Rodriguez's argument that the Constitution nonetheless requires application of reasonable doubt has been considered and rejected by every circuit court that has looked the First, Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Circuits. United States v. Gabrion, 719 F.3d 511, 532-533 (6th Cir. 2013); United States v. Runyon, 707 F.3d 475,

368

516 (4th Cir. 2013); United States v. Fields, 516 F.3d 923, 950 (10th Cir. 2008); United

States v. Fields, 483 F.3d 313, 345-46 (5th Cir. 2007); United States v. Mitchell, 502

F.3d 931, 993 (9th Cir. 2007); United States v. Sampson, 486 F.3d 13, 31 (1st Cir. 2007);

United States v. Purkey, 428 F.3d 738, 750-51 (8th Cir. 2005); see also Harris v. Pulley,

692 F.2d 1189, 1195 (9th Cir. 1982) (observing, "If the Supreme Court had intended for

the burden in death-penalty cases to vary from the standard burden in all other criminal

sentencing, it would have said so"), overruled on other grounds, *sub nom*, Pulley v.

Harris, 465 U.S. 37, 43 (1984).

At the time of trial, the Eighth Circuit had already effectively foreclosed reliance

on Apprendi as a basis for the request for a reasonable doubt instruction when it

determined that the weighing process did not result in fact finding that must be charged in

an indictment.  See United States v. Purkey, 428 F.3d 738, 750 (8th Cir. 2005) (noting

that the weighing process is merely "the lens through which the jury must focus the facts

that it has found to produce an individualized determination").  The Purkey decision

would have bound this Court to reject any attempted reliance on Apprendi, which held

that a fact that exposed a defendant to greater punishment must be proved beyond a

reasonable doubt.

In fact, several courts have relied on Purkey to reject an argument that Apprendi

requires application of the reasonable doubt standard to the weighing of factors.  E.g.,

United States v. Sampson, 486 F.3d 13, 31–32 (1st Cir. 2007) (holding that an attempt to

analogize between the "weighing determination and the sentencing determinations found

369

unconstitutional in the <u>Apprendi</u> line of cases lacks force"); <u>United States v. Aquart</u>, Case no. 3:06cr160(JBA), 2010 WL 4363414, *9 (D. Conn. Oct. 26, 2010); <u>United States v. Talik</u>, 2007 WL 4570704, *15 n.6 (N.D. W.Va. Dec. 26, 2007); <u>United States v. Gooch</u>, 2006 WL 3780781, *5–8 (D.D.C. Dec. 20, 2006) ("the jury's weighing . . . does not constitute a factual finding . . . and, thus, is not subject to the reasonable doubt standard").

Rodriguez relies upon the opinion of a three-judge panel that found a reasonable doubt instruction required.  <u>United States v. Gabrion</u>, 648 F.3d 307, 326-27 (6th Cir. 2011). However, that decision was *reversed en banc* in <u>United States v. Gabrion</u>, 719 F.3d 511, 532-533 (6th Cir. 2013).  Gabrion argued that the jury was required to make the determination, that the aggravators outweigh the mitigators beyond a reasonable doubt. The Sixth Circuit in joining all of the other circuits to have addressed the issue opined that:

> "*Apprendi* does not apply to every 'determination' that increases a defendant's maximum sentence.  Instead it applies only to findings of 'fact' that have that effect . . . What § 3593(e) requires is a determination of *the sentence itself*, within a range for which the defendant is already eligible.  That makes this case different from any in which the Supreme Court has applied *Apprendi* . . . the jury did not need to find any additional facts in order to recommend that Gabrion be sentenced to death. It only needed to decide, pursuant to the weighing of factors described in the statute, that such a sentence was 'just[ ].' 18 U.S.C. §§ 3591(a), 3593(e). And in making that moral judgment, the jury did not need to be instructed as if it were making a finding of fact."

<u>Gabrion</u>, 719 F.3d at 532-33.

370

Significantly, "the Supreme Court has explicitly held that *judges* may do the weighing of aggravating and mitigating circumstances consistent with the Constitution." Fields, 483 F.3d at 346 (emphasis added). Indeed, the Supreme Court in Ring expressly preserved its prior jurisprudence permitting judges to weigh factors found by the jury. Ring, 536 U.S. at 597 n.4 (citing Clemons v. Mississippi, 494 U.S. 738, 745 (1990)); Proffitt v. Florida, 428 U.S. 242, 252 (1976) (plurality opinion)). Because the Constitution does not require juries to weigh aggravating and mitigating factors, the Fifth Circuit could not "conclude that the showing required must be proof beyond a reasonable doubt." Fields, 483 F.3d at 346; see also Purkey, 428 F.3d at 759 (holding that "it makes no sense to speak of the weighing process . . . as an elemental fact for which a grand jury must find probable cause. . . . [It is] a lens through which the jury must focus the facts").

The Fifth Circuit also reasoned that the Apprendi/Ring rule should not apply to the weighing of factors "because the jury's decision that the aggravating factors outweigh the mitigating factors is not a finding of fact. Instead, it is a 'highly subjective,' 'largely moral judgment' 'regarding the punishment that a particular person deserves . . . .'" and the Apprendi/Ring rule applies by its terms only to findings of fact, not to moral judgments. Fields, 483 F.3d at 346 (quoting Caldwell v. Mississippi, 472 U.S. 320, 340 n.7 (1985)); see Ford v. Strickland, 696 F.2d 804, 818 (11th Cir. 1983) (holding that application of a reasonable doubt standard to weighing "confuses proof of facts and the weighing of facts in sentencing").

371

Rather than requiring application of the reasonable doubt standard to the weighing of penalty phase factors, the Supreme Court has approved a "capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." Zant v. Stephens, 462 U.S. 862, 875 (1983) (citing Gregg v. Georgia, 428 U.S. 153, 189-95 (1976)).  The Court unambiguously stated that specific standards for balancing aggravating against mitigating circumstances are not constitutionally required. See also Tuilaepa v. California, 512 U.S. 967, 979 (1994) (a "capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision"); Franklin v. Lynaugh, 487 U.S. 164, 179 (1988) (noting, "we have never held that a specific method of balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required").  In fact, the Court has gone so far as to state that a "death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances."  Kansas v. Marsh, 548 U.S. 163, 173 (2006) (relying on Walton v. Arizona, 497 U.S. 639 (1990), overruled on other grounds, Ring v. Arizona, 536 U.S. at 596-97).  In short, the Constitution imposes no burden of proof on the government when the jury weighs factors it has found beyond a reasonable doubt, and it therefore cannot impose a burden of proof beyond a reasonable doubt.

Given the weight of authority militating against Rodriguez's suggested extension of Apprendi, at least one court has held that trial attorneys have no constitutional

372

obligation to make the argument.  Higgs, 711 F. Supp. 2d at 539 (stating that "counsel did not act unreasonably by failing to raise an Apprendi objection to the penalty phase jury instruction" based on its lack of applicability to the weighing of factors).  By extension, Rodriguez cannot demonstrate a reasonable probability that such a request would have been granted, much less that he would have received a more favorable outcome, had counsel made such a motion during his trial.  See Noe v. United States, 601 F.3d 784, 791 (8th Cir. 2010) (reciting the Strickland standard for evaluating the constitutional effectiveness of trial counsel).

In line with the great weight of authority, this Court should hold that the reasonable doubt standard had no place in the penalty jury's weighing process and that the jury charge therefore properly communicated the appropriate legal standard for determining the penalty in this case.  Of course, given that Rodriguez's claim lacks any basis in existing law, any relief would necessarily require the retroactive application of a new rule of law, in derogation of Supreme Court authority.  Schriro v. Summerlin, 542 U.S. 348 (2004).  Rodriguez's argument is meritless.

## XVI.    Rodriguez Failed to Raise His Confrontation Clause Claim on Direct Appeal and Has Therefore Procedurally Defaulted. Even So, It Fails on Its Merits.

As discussed above, if a defendant does not raise a claim on direct review, he has committed a "procedural default" and his claim is therefore procedurally barred.  The procedural default doctrine reflects the general rule that "claims not raised on direct

373

appeal may not be raised on collateral review." Massaro v. United States, 538 U.S. 500, 504 (2003).  A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the defendant omitted to appropriately raise on appeal.  United States v. Frady, 456 U.S. 152, 165 (1982); Dejan v. United States, 208 F.3d 682, 685 (8th Cir. 2000) (citing Bousley v. United States, 523 U.S. 614, 622 (1998)).  The doctrine of procedural default applies in death penalty cases. Nave v. Delo, 62 F.3d 1024, 1033 (8th Cir. 1995).

With two limited exceptions, the doctrine applies to all claims that are not raised and preserved during direct appeal, whether or not the failure was intentional or inadvertent.  United States v. Olano, 507 U.S. 725, 733 (1993).  In practice, the requirement to preserve a claim means that the defendant must raise it at trial and on direct appeal.  See Murray v. Carrier, 477 U.S. 478, 490-92 (1986) (claim not raised on direct appeal is procedurally defaulted); see also Bousley v. United States, 523 U.S. 614, 621 (1998) (same).  Rodriguez contends that, Dr. McGee's expert testimony and reliance on acid phosphatase test results conducted by other lab personnel, without their respective testimony, is a violation under the Confrontation Clause.  He claims this court erred in admitting the testimony.  (See also, Rodriguez's Claim II.F as cross-referenced, which claims his trial attorneys ineffectively failed to interpose an objection to the testimony).  Rodriguez failed to raise this challenge on direct appeal and he now offers no cause for that failure. The claim is not based on newly-discovered evidence or

374

intervening changes of law. Therefore, the claim is procedurally defaulted. See Frady, 456 U.S. at 167–68.

Courts may consider, in habeas, otherwise procedurally-defaulted claims which he failed to raise on direct review in two instances – if the defendant shows "cause and actual prejudice, or that he is actually innocent." Johnson v. United States, 278 F.3d 839, 844 (8th Cir. 2002) (quoting Bousley v. United States, 523 U.S. 614, 622 (1998)). In most cases a procedural default will bar consideration of the defendant's claim because the courts have construed these exceptions narrowly. Cause exists only if a factor external to the defense prevented counsel from raising the defaulted claim at an appropriate juncture. Carrier, 477 U.S. at 488. In addition to showing cause for his procedural default, a defendant must also demonstrate that he was "actually prejudiced" by the error. See Bousley, 523 U.S. at 62; Frady, 456 U.S. at 170. To establish prejudice, a petitioner must show that the claimed errors amount to more than the mere possibility of prejudice but "worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimension." Frady, 456 U.S. at 170; DeRoo v. United States, 223 F.3d 919, 925 (8th Cir. 2000) (defendant faces a heavy burden to establish ineffective assistance of counsel in a motion to vacate sentence). It requires the defendant who files the 2255 to bear a greater burden than he would under the plain error standard applicable to forfeited claims on direct review. See Frady, 456 U.S. at 166.

Rodriguez did not raise the issue of whether his conviction was obtained in violation of the Confrontation Clause on appeal. Moreover, he has offered no objective

375

evidence as to why he did not raise these claims on appeal. Therefore, such claims, standing alone, would properly be dismissed.  See Marone v. United States, 10 F.3d 65, 67 (2d Cir. 1993); United States v. Essig, 10 F.3d 968, 979 (3rd Cir. 1993) ("In procedural default cases, the cause standard requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim.") (quoting McCleskey v. Zant, 499 U.S. 467, 493 (1991)).

Second, a defendant can still have his defaulted claim heard on the merits on collateral review if he can establish "actual innocence."  Johnson v. United States, 278 F.3d 839, 844 (8th Cir. 2002) (quoting Bousley, 523 U.S. at 622 (1998)).  Rodriguez does not allege he is actually innocent.

Therefore, his Confrontation Clause claim, standing alone, is procedurally defaulted and should be dismissed.

An exception lies for claims of ineffective assistance of counsel, which should be raised in a collateral attack rather than a direct appeal.  See Massaro v. United States, 538 U.S. 500 (2003); United States v. Martin, 59 F.3d 767, 771 (8th Cir. 1995); United States v. Cain, 134 F.3d 1345, 1352 (8th Cir. 1998).  The Supreme Court in Massaro concluded that criminal defendants may raise ineffective assistance claims for the first time during a Section 2255 petition.

However, Rodriguez also raised an ineffective assistance of counsel claim in connection with this same allegation. (See Section II.F of Rodriguez's Motion for

376

Collateral Relief.)  Accordingly, although the substantive claim properly is procedurally defaulted, his related ineffective assistance of counsel claim is not.

Since the focus of Rodriguez's valid claim is the conduct of his counsel, he must demonstrate both ineffective assistance and prejudice under Strickland.  Arguably, this is a different showing than he would have to make if his substantive claim was not procedurally defaulted.  However, in the end, it makes no difference, because resolution of the merits of his substantive claim also resolves the claim itself.  For the reasons set forth at Section II.F, above, there is no merit in Rodriguez's Confrontation Clause claim and not his ineffective assistance of counsel claim regarding it.  The record conclusively shows that he is not entitled to relief under Section 2255.

## XVII. The Jury Did Not Consider and Rely Upon an Invalid Aggravating Factor in Violation of the Eighth Amendment.

Petitioner again argues there would have been no legitimate basis for the United States to offer the statutory aggravating factor that the crime was "especially heinous, cruel, or depravcd," or whether it involved "the torture of Dru Sjodin".  Relying on his extensive arguments on the same subjects, Rodriguez asserts that the evidence regarding sexual assault and the knife wounds testified to by Dr. McGee, if excluded, would not have allowed the United States to argue that he killed Ms. Sjodin in a heinous, cruel and depraved manner and that he had previously sexually assaulted other victims.  As previously discussed the district court did not commit error when it allowed Dr. McGee to testify to the matters Rodriguez now objects to again.  The Eighth Circuit found the

377

testimony and evidence of the acid phosphatase results admissible.  But as stated above, given the large amount of independent evidence that Rodriguez committed the kidnapping for purposes of committing a sexual assault -- and the absence of evidence showing some other reason he would have stripped off Dru Sjodin's pants and panties from the waist down and binding her hands behind her back in the course of kidnapping and killing her -- it is not reasonably probable that excluding the acid phosphatase testimony would have made a difference in the outcome.

Considering Part II.E of Rodriguez' § 2255 motion in conjunction with Issue II.A, he again attempts to claim that without the acid phosphatase testimony evidence of his prior sexual assaults would not have been admitted under Rule 413. Mot. at 90-101.  As discussed in this brief's response to Issue II.E of the motion, that claim is groundless, merely reiterating arguments that he previously raised and that this Court soundly rejected in the earlier proceedings.  Moreover, as documented above and further discussed in Issue II.E, extensive evidence of Rodriguez' sexually violent crimes and proclivities was presented in the sentencing proceedings, and such evidence was properly admissible in those proceedings "as to any matter relevant to the sentence," 18 U.S.C. 3593(c), regardless of its admissibility at the guilt phase.

Finally, the sexually assaultive nature of Rodriguez' crime against Dru Sjodin was not the only element in the case for his sentence.  The evidence clearly established Rodriguez' commission of a torture-murder in the course of a kidnapping following three prior convictions for serious violent felonies -- involving respectively the oral rape of the

378

first victim, the kidnapping at knifepoint and vaginal rape of the second victim, and the attempted kidnapping at knifepoint and stabbing of the third victim. See, e.g., Tr. 6187-94, 6205-10, 7194-95, 7340-43, 8054-57, 8503-04, 8522; Rodriguez, 581 F.3d at 783-84, 796, 804, 807-09. No doubt this obviously would have made a strong impression on the jury, even if he had not sexually assaulted his latest victim, in addition to kidnapping and killing her.

Rodriguez' sexually violent behavior and proclivities were adequately established by evidence of facts having nothing to do with the acid phosphatase testimony -- including his obscene phone calls and stalking; his history of escalating violence against women including multiple sexual assaults; the sexually violent proclivities he admitted to in psychological interviews; and his binding Dru Sjodin and stripping off the clothing from her lower body. The obvious inference is that further sexual violence was the motive for this offense. A fair view of the totality of the evidence supporting Rodriguez's sentence accordingly provides further confirmation that any alleged falsehood in the acid phosphatase testimony, did not affect the ability of the United States to argue that the crime was "especially heinous, cruel or depraved."

Further, the fact remains that even if her throat was not slashed or slashed to a degree that would have killed her as argued by her counsel; the facts still bear out the torture suffered by Dru Sjodin at the hands of Rodriguez. She was in fact kidnapped and held for some three hours. Her hands were bound behind her back. He placed a plastic bag over her head and a ligature was tied around her neck to hold the bag in place. As is

379

clear, the circumstances clearly indicate a sexual assault took place.  She was, in fact, marched from a car in the dark, cold night, naked from the waist down to a ravine.  There she was left for dead.  It is clearly as torturous to kill by ligature strangulation, asphyxiation or binding one to leave them to die from the elements as it is to slash her neck.  It may in fact be argued that it would be more torturous.  All of these facts and circumstances were presented to and taken into account by the jury.  The exclusion of Dr. McGee's testimony regarding the neck slash would not undermine in any way the overwhelming evidence of the heinous, cruel and depraved nature of the offense.

There is no reasonable probability that without the neck slash testimony Rodriguez's conviction or capital sentence would have changed given the compelling circumstantial evidence that Rodriguez had murdered in some heinous manner.  Because Rodriguez's claim adds no factual allegations or legal theories to his previously-stated arguments, the government makes no further effort to answer the contention, having fully explained above why these allegations should fail.  See, *supra*, Issue II, A, B & E; III, B; and IX, A.

**XVIII.**     **Rodriguez's Rights Under the Fifth, Sixth, and Eighth Amendments Were Not Violated Because the Jury was Improperly Asked to Determine Whether Certain Mitigating Evidence Put Forth By the Defense Was in Fact Mitigating Before Giving it Consideration.**

As Rodriguez incorporated Issue VI. C of the Motion into this particular issue, the United States respectfully incorporates by reference its written response to the issue presented in Section VI. C, *supra*, along with the argument below.

Rodriguez argues that the district court's jury instructions and verdict forms prevented the jury from fully considering the mitigating evidence, thereby violating Rodriguez's Fifth, Sixth, and Eighth Amendment rights. Mot. at 323. This argument is meritless, and must be denied.

The Eighth Amendment requires that, in a capital case, the sentencing jury be able to consider and give effect to the Petitioner's mitigating evidence. Penry v. Johnson, 532 U.S. 782, 797 (2001). In determining whether the jury instructions impermissibly limited consideration of mitigating evidence, an appellate court must ask whether there is "a reasonable likelihood that the jurors . . . understood the challenged instructions to preclude consideration of relevant mitigating evidence proffered by [the defendant]." Buchanan v. Angelone, 522 U.S. 269, 279 (1998) (quoting Boyde v. California, 494 U.S. 370, 386 (1990)). This is exactly what the Eighth Circuit Court of Appeals reviewed in this case, and affirmed in their opinion. United States v. Rodriguez, 581 F.3d 775, 798-99 (8th Cir. 2009).

The Eighth Circuit held, "'[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses.'" Id., 581 F.3d at 798 (citing Abdul-Kabir v. Quarterman, 550 U.S. 233, 127 S.Ct. 1654 (2007)). "'[T]he sentencer in capital cases must be permitted to consider any relevant mitigating factor . . . .'" Id. (citing Eddings v. Oklahoma, 455 U.S. 104, 112 (1982)). It is this exact consideration that the

381

court made clear in its instructions to the jury when it charged they had a wide discretion of consideration in Rodriguez's mitigating evidence.  Tr. 8653 - 8659.  At the outset of its instructions on mitigating factors, the district court told the jury that "[y]ou must consider whether the defendant has established the existence of any mitigating factors."  Id. at 8653.  (emphasis added).  The Court reiterated that "[t]he law does not require a unanimous agreement with regard to mitigating factors.  Any juror persuaded of the existence of a mitigating factor must consider it in this case" and the district court, thereafter, listed 30 categories of mitigating factors for the jurors to consider. Tr. 8653. The court further instructed the jury that:

> You are also permitted to consider *anything* else about the commission of the crime or about Defendant's background or character that would mitigate against imposition of the death penalty.  "Mitigating Factor" has been defined for you at Preliminary Instruction Number 2.[301]  If there are any such mitigating factors, whether or not specifically argued by defense counsel, which are established by the greater weight of the evidence, you are free to consider them in your deliberations.

Tr. 8656-8657.  (Emphasis added.).

The district court further instructed the jury that the presence of a mitigating factor was not even necessary for it to decline to impose the death penalty:

---

[301]The district court's Preliminary Jury Instructions included, in part: "A "mitigating factor' is any aspect of the defendant's character or background, any circumstance of the offense in question, or any other relevant fact or circumstance of the offense in question, or any other relevant factor or circumstance that might indicate that the defendant should receive a sentence of life imprisonment without the possibility of parole instead of a death sentence." Tr. 7444-7445.

Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factors proved do not, standing alone, justify imposition of a sentence of death. If one or more of you so find, you must return a sentence of life in prison without the possibility of parole. Similarly, you may unanimously find that a particular aggravating factor sufficiently outweighs all mitigating factors combined to justify a sentence of death. You are to decide what weight or what value is to be given to a particular aggravating or mitigating factor in your decision-making process.

If you unanimously conclude that the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors that any of you found to exist to justify a sentence of death, or in the absence of any mitigating factors, that the aggravating factors alone are sufficient to justify a sentence of death, and that therefore death is the appropriate sentence in this case, you must record your determination that a sentence of death shall be imposed on the special findings form. If you determine that death is not justified, you must record your determination that the defendant be sentenced to life imprisonment without the possibility of parole.

Tr. 8658-8659. (Emphasis added.). There is no reasonable likelihood that the jury, which heard these comprehensive, instructions, believed it was prevented from considering constitutionally relevant mitigating evidence. See United States v. Webster, 162 F.3d 308, 327 (5th Cir. 1998) (Jury charge that instructed jurors to consider any other mitigating factor, whether or not argued by defense counsel, "left no room for the jury to ignore constitutionally relevant evidence.").

Rodriguez was given appropriate leeway to propose mitigating factors, and the final "special verdict" form included 30 individual proposed mitigators, including one that "Considerations of mercy support a sentence of life imprisonment without the possibility of parole." DKT 626. Additionally, the jurors were instructed that they were free to find any other mitigators they themselves felt had been proven to the applicable

383

standard.  Id.  Also, in the district court's instructions prior to the penalty selection phase, the court instructed the jury on the essentially limitless universe of imaginable mitigation, all of which they were free to consider.  See DKT 592; Inst. No. 2.

Further, during the United States' closing argument and rebuttal, the government repeatedly told the jury that they were *obligated* to consider each of the defense's proposed mitigating factors.  See e.g., Tr. 8667-8669, 8671, 8682, 8687, 8704, 8749. Indeed, the United States' final words to the jury stressed the jury's duty to follow the law given to them by the district court, and to consider each mitigator proposed by Rodriguez. Tr, 8749.

Consistent with United States v. Paul, *supra*, the United States emphasized it was the jury's role in the two-step process to determine whether a proposed mitigator was factually proven and mitigating of punishment.  Unlike cases where the prosecutors were deemed to have impermissibly instructed jurors not to consider mitigation, Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007), the United States told this jury that "the decision on what is mitigation in this case is up to you."  Tr. 8677.

Rodriguez's primary challenge to the district court's instructions and verdict forms is that the Court instructed the jury that it had to find a mitigating factor to be true and find it to be mitigating before it could be given any weight in considering the propriety of a death sentence.  He contends this instruction improperly invited the jury to reject and ignore facts which the Court had determined to be mitigating as a matter of law. Motion at 323.  The Eighth Circuit said:

> Rodriguez had to prove mitigating factors; the jury should consider only those mitigating factors proved by a preponderance of the evidence; and the jury could decide that any mitigating factors, even if proved, are sufficiently outweighed by aggravating factors.

Rodriguez, 581 F.3d at 799.

While the jury must consider relevant evidence submitted by the defendant, it need not conclude that such evidence is actually mitigating. United States v. Paul, 217 F.3d 989, 1000-01 (8th Cir. 2000). Even defense counsel acknowledged the propriety of that proposition. Tr. 8590. "[A]s long as jurors are not told to ignore or disregard mitigators, a prosecutor may argue, based on the circumstances of the case, that they are entitled to little or no weight." United States v. Johnson, 495 F.3d 951, 966, 978 (8th Cir. 2007) (footnote omitted). That mirrors the mitigation assessment framework suggested by the United States and supported by the district court. Tr. 8590-91; 8569-8642, generally.

The Supreme Court has approved a "capital sentencing statute even though it clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." Zant v. Stephens, 462 U.S. at 875 (citing Gregg v. Georgia, 428 U.S. 153, 196-97 (1976)). The Supreme Court unambiguously stated that "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required." Id., 462 U.S. at 875 n.13. See also Tuilaepa v. California, 512 U.S. 967, 979 (1994) (A "capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."); Franklin v. Lynaugh, 487 U.S. 164, 179 (1988 )(noting "[w]e have never held that a specific

385

method of balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.").

Notwithstanding Rodriguez's argument to the contrary, the Eighth Amendment does not require juries to find mitigators that are based on uncontested defense evidence. In fact, the Supreme Court has held that the government may properly place a burden upon the defendant to prove mitigating circumstances. Kansas v. Marsh, 548 U.S. 163, 170-71 (2006) (quoting Walton v. Arizona, 497 U.S. 649, 650 (1990)). "So long as the sentencer is not precluded from considering relevant mitigating evidence, a capital sentencing statute cannot be said to impermissibly, much less automatically, impose death." Id. at 171. Drawing on this principle, the Supreme Court in Penry v. Lynaugh, 492 U.S. 302, 328 (1989), held that a capital sentencer must also be able to give effect to any mitigating evidence that is relevant to a defendant's background and character or the circumstances of his offense. Accord., Oregon v. Guzek, 546 U.S. 517, 526 (2006). In Mills v. Maryland, 486 U.S. 367 (1988), and McCoy v. North Carolina, 494 U.S. 433 (1990), the Court held that the Eighth Amendment requires that individual jurors be able to determine for themselves the existence and weight to be accorded any mitigating factor. These requirements did not, however, impede the ability of the federal government "to structure and shape consideration of mitigating evidence." Guzek, 546 U.S. at 526. As the Supreme Court noted at length in Buchanan v. Angelone, 522 U.S. 269, 276-77 (1998) (some internal citations omitted):

In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence . . . However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence  . . . . Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence.  Thus, in Boyde v. California, 494 U.S. 370 (1990), we held that the standard for determining whether jury instructions satisfied these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." Id. at 380.

But we have never gone further and held that the State must affirmatively structure in a particular way the manner in which juries consider mitigating evidence.  And, indeed our decisions suggest that complete jury discretion is constitutionally permissible. See Tuilaepa, [512 U.S.] at 978-79 (noting that at the selection phase, the state is not confined to submitting specific propositional questions to the jury and may indeed allow unbridled discretion); [Zant v.] Stephens, 462 U.S. 862, 875 (1983)] (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that acceptance of that argument would require the Court to overrule Gregg [v. Georgia,] 428 U.S. 153 (1976)]).

The Federal Death Penalty Act is consistent with these principles.  In particular, the FDPA does not require the jury to return "special findings" regarding the mitigating factors or the number of jurors who concurred in their existence.  Rather, § 3593(d) provides for different verdicts for aggravating and mitigating factors:

Return of special findings - The jury, or if there is no jury, the court, shall consider all the information received during the hearing.  It shall return special findings identifying any aggravating factor or factors set forth in section 3592 found to exist and any other aggravating factor for which notice has been provided under subsection (a) found to exist. A finding with respect to a mitigating factor may be made by 1 or more members of

387

the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established.

Rodriguez's verdict form and supporting instructions did not misapply the law; much less ease the government's burden. See Lankford v. Arave, 468 F.3d 578, 585 (9th Cir. 2006). The instructions properly explained the weighing process and the government's burden of proof, informing the jury it "is not a mechanical process" in other words, "you should not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater; you should consider the weight and the value of each factor." Tr. 8658. Presumably, the jury heeded those instructions and weighed the aggravators qualitatively, rather than quantitatively. United States v. Olano, 507 U.S. 725, 740 (1993) (noting presumption that jurors follow their instructions).

Finally, this court's penalty phase instructions were entirely proper as a court "may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." Buchanan, 522 U.S. at 276. This authority to "shape and structure" consideration of mitigating factors necessarily includes the discretion to decide how best to organize and describe proposed mitigating factors in presenting them to the jury.

When considered in the context of the jury instructions as a whole, the manner which the court presented its instructions on the relevance of mitigating factors did "not

388

preclude the jury from giving effect to any relevant mitigating evidence." Id.  At the

outset, we note that the court instructed the jury on the determination and consideration

of non-statutory aggravating factors and mitigating factors.  Tr. 8652-8653.  The court's

instructions provided the jury with a list of Rodriguez's mitigating factors that he asserted

had been proven by the greater weight of the evidence.  Tr. 8653-8657.  The court also

instructed the jury that, "[Y]ou are also permitted to consider anything else about the

commission of the crime or about the defendant's background or character that would

mitigate against imposition of the death penalty" thus undercutting Rodriguez's

contention that the jury would have believed that it must find the existence of all the

mitigating factors, or only those mitigating factors presented, before it could give

mitigating effect to any of them. Tr. 8656-8657.More importantly, any ambiguity on this

point-either in the verdict forms or in portions of the jury charge - "was clarified when

considered in light of the entire jury instruction." Jones v. United States, 527 U.S. 373,

393 (1999) (holding that jury charge as a whole dispelled confusion caused by verdict

forms standing alone).  The jury instructions explicitly and repeatedly instructed the jury

that it could consider any mitigating factor established by the preponderance of the

evidence, regardless of whether it was argued by the parties or listed on the verdict form.

See Tr. 8656-08657.  The last mitigating factor the district court gave the jury was a

catch-all category that it could consider any factor it determined to be mitigating.  Id.

The district court also instructed the jury that it possessed a wide discretion to

decline to impose the death penalty even if a death sentence was supported by the

389

evidence and could give credence to finding "that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factors proved do not, standing alone, justify imposition of a sentence of death." Rodriguez's counsel reinforced these instructions, defining mitigating circumstances in his opening statement as "the things the judge told you about, are the things that you come up with on your own, all of those factors, and those are the things you deal with here." Tr. 8712.

When read in context, the court's instructions thus belie Rodriguez's assertion that the jury charge established an invitation for the jury to "reject and ignore facts which the Court had determined to be mitigating as a matter of law." Mot. at 323. Indeed, it is counterintuitive to believe that the district court would limit the jury's ability to consider an explicit mitigating factor while simultaneously giving it free rein to consider mitigating factors of its own creation. The court's instructions, therefore, "left no room for the jury to ignore constitutionally relevant evidence." Webster, 162 F.3d at 327.

The district court's penalty phase jury instructions were proper in this case, as such Rodriguez's Motion seeking relief on this issue must be denied.

## XIX.   Trial Counsel Did Not Fail to Secure Transcription of Critical Portions of the Proceedings.

Rodriguez claims that trial counsel were ineffective for failing to "ensure that all aspects of Mr. Rodriguez's trial were transcribed" and as a result, appellate and habeas counsel are unable to properly raise all issues in this case. Mot. at 324. This claim lacks any meaningful basis in fact or merit.

390

Rodriguez's argument is based on a claim that his attorneys failed to ensure that all portions of the proceedings, including conferences regarding the jury questionnaire, voir dire, jury selection, and mental health firewall proceedings, as well as the Court's initial instructions to the jury panel before they completed their questionnaires were transcribed. Mot. at 324. He claims that, "[H]ad counsel ensured full transcription, Mr. Rodriguez would have been able to fully present his claims on appeal and the courts would have had a complete record to review." Id. Rodriguez specifically alleges missing transcripts, including but not limited to, the following dates: April 20, 2005; December 12, 2005; March 3, April 20, April 21, June 5, June 6, June 7, and June 8, 2006. Id.

In arguing this issue, Rodriguez presents only vague and cursory reasons for the need of these particular transcripts. Given the nature of the claim it is important to review the actual dates of the transcripts in question:

**April 20, 2005**: *Ex Parte* Conference before Hon. Judge Erickson re: proposed budget (See DKT Entry 56 (Minute Entry));

**December 12, 2005**: There is no record of any activity on this date[302];

**March 3, 2006**: *Ex Parte* Conference before Hon. Judge Erickson re: proposed budget (See DKT Entry 271 (Minute Entry));

**April 20, 2006**: Hearing in open court before Hon. Judge Erickson (Court reporter kk)(See DKT Entry 676 (Transcript)); In-Chamber Conference before Hon. Judge Erickson (See DKT Entry 325 (Minute Entry));

---

[302]Rodriguez does not mention this particular date, however the United States believes a hearing held on 12/05/2005 may be the date they intended to argue for this issue; **December 2, 2005**: *Ex Parte* Hearing via telephone before Hon. Judge Erickson re: DKT 201 Sealed Motion (Court Reporter bc) (See DKTs 213 (Minute Entry) & 672 (Transcript)).

**April 21, 2006**: Proceedings held before Hon. Judge Erickson re: various pending motions (Court Reporter kk) (See DKT. Entries 326 (Minute Entry) & 677 (Transcript));

**June 5, 2006**: Potential jurors complete juror questionnaires - no Minute Entry entered - event was recorded however no request for transcription has been made to date;

**June 6, 2006**: Potential jurors complete juror questionnaires - no Minute Entry entered - event was recorded however no request for transcription has been made to date.  Also, proceeding held before Hon. Judge Erickson (Court Reporter kk) (See DKT Entry 385 (SEALED - Minute Entry)) - Prospective firewall team/Defense (via telephone) In-Chamber conference;

**June 7, 2006**: Potential jurors complete juror questionnaires - no Minute Entry entered - event was recorded however no request for transcription has been made to date;

**June 8, 2006**: proceedings held before Hon. Judge Erickson (Court Reporter kk) (See DKT Entry 386 (SEALED - Minute Entry)) - Prospective firewall team/Defense (via telephone) In-Chamber Conference; and

Three of the alleged "missing" transcripts (April 20, 2005; December 2, 2005; and March 3, 2006) were *ex parte* matters addressing budgetary needs of Petitioner to defend his case.  By law, the government was not privy to the Court's budget discussions or final determinations with trial counsel, but it is noteworthy that Rodriguez's Motion is devoid of information which would support a determination of ineffectiveness on the part of trial counsel.  As this Court is aware, litigation over Rodriguez's proposed budget and request for funds for various investigative and expert services was ongoing.  Trial counsel vigorously sought and received a budget to trial counsels' satisfaction however the funding issues delayed preparation for this case.  Trial counsel was granted a trial

392

continuance (DKT 161) based upon budget issues as the timing of funding prevented trial counsel from retaining experts on schedule. Trial counsel was awarded additional funding on April 25, 2006. That funding related to experts who had already been retained and who had already performed substantial work. Because of the unique confidential nature of the facts on this point, the United States was not a party to these discussions. In the end, however, this Court approved final funding and Petitioner received nearly the entire amount of funding initially requested. The benefit or necessity of trial counsel obtaining copies of said transcripts regarding this particular issue is questionable. Rodriguez cannot establish prejudice because he has not identified, even generally, what was in the transcripts that would have changed the outcome of his case or his appeal. Garret v. United States, 78 F.3d 1296, 1306 (8th Cir. 1996). As a result, he cannot demonstrate any prejudice concerning the level of funding.

On April 20, 2006, an open court hearing, with all parties present, was conducted for "housekeeping" purposes in the case. A transcript of this hearing has been transcribed and is available. See DKT 676. However, there is no transcribed record available of the In-Chamber conference held after the hearing this date, a Minute Entry documents the In-Chamber conference. DKT 325.

The alleged "missing" transcript of April 21, 2006, is not "missing" at all. April 21, 2006, was one of many open court hearings on various pending motions in this case. A hearing transcript is available (See DKT 677), and each party received a copy of this transcript. Trial counsel cited from this particular transcript numerous times throughout

393

Appellant's Appeal Brief. See DKT 737.  Each of these transcripts have been at trial

counsel's and 2255 counsels'' disposal since August 30, 2007. See DKTs 676 & 677.

On June 5, 2006 thru June 8, 2006, groups of potential jurors were called in by the

U.S. District Court to fill out juror questionnaires in regards to the jury selection process.

This took place in the jury assembly room on the second floor of the Quentin N. Burdick

U.S. Courthouse.  Honorable Judge Ralph R. Erickson was present during each of these

sessions, and each session was recorded, however no transcripts were ordered or prepared

for said dates.

Rodriguez further alleges a "missing" transcript for June 6, 2006.  This particular

proceeding was an In-Chamber hearing between the trial counsel (who appeared via

telephone), former United States Attorney, Drew H. Wrigley, a support staff person from

the U.S. Attorney's Office, and Honorable Judge Ralph R. Erickson in re: a letter

received by Mr. Wrigley regarding firewall counsel.  This proceeding was recorded;

however no transcript was ordered or prepared in this matter.  See DKT 385 - Sealed

Minute Entry. Rodriguez cannot show that trial counsel erred in failing to request this

transcript as counsel.

On June 8, 2012, there was an In-Chamber conference involving Mr. Wrigley,

firewall counsel (Assistant United States Attorneys, Steve Holtshouser and Mike Reilly),

and Rodriguez's trial counsel (via telephone) before the Honorable Judge Ralph R.

Erickson. This conference involved the firewall protocol and related matters in relation to

394

Rule 12.2 issues.  Again, Rodriguez cannot he show that trial counsel erred in failing to request said transcript.

Undeniably, a criminal defendant has a due process right to a "record of sufficient completeness" to ensure meaningful appellate review.  Draper v. Washington, 372 U.S. 487, 499 (1963); Mayer v. City of Chicago, 404 U.S. 189 (1971).  However, in a federal habeas corpus case, the absence of a perfect transcript does not violate due process absent a showing of specific prejudice.  Mitchell v. Wyrick, 698 F.2d 940, 941-42 (8th Cir. 1983).  "Mere absence of a perfect transcript does not necessarily deny one due process law.  First a constitutional violation needs to be asserted." (internal citations omitted). See also Scott v. Elo, 302 F.3d 598, 604 (6th Cir. 2002) ("[F]ederal habeas relief based on a missing transcript will only be granted where the petitioner can show prejudice.").

"Mere speculations, entirely unsupported or contradicted by the record, that error may have been committed during an unrecorded part of the trial simply is not enough to support a finding that omissions are substantial and significant."  United States v. Preciado-Cordobas, 981 F.2d 1206, 1215-16 (11th Cir. 1993).

Rodriguez simply has not shown he was prejudiced by the failure to obtain a certain handful of un-transcribed records or unavailable records.  In order to demonstrate denial of a fair appeal, he must show prejudice resulting from the missing transcripts. Bransford v. Brown, 806 F.2d 83, 86 (6th Cir. 1987) (citing Mitchell v. Wyrick, 698 F.2d 940, 942 (8th Cir. 1983)).  He cannot establish prejudice because he has not identified, even generally, what was in the transcript that would have changed the outcome of his

appeal. Although courts recognize the difficulty in demonstrating prejudice where the transcripts are missing, Rodriguez "must present something more than gross speculation that the transcripts were requisite to a fair appeal." Id. at 86. He has not met his burden in this case. The record is clear that the full transcript of the trial was presented to the Eighth Circuit of Appeals (DKTs 644 - 730, 732-733), and Rodriguez has not produced any evidence, other than "gross speculation," Bransford v. Brown, *supra*, to support this claim that the content of the un-transcribed record reflected reversible error.

It is important to note that over the course of the litigation in this case, trial counsel, who also served as Rodriguez's appellate counsel, requested and received volumes of transcripts of the proceedings. See DKTs 664-729. Trial counsel made informed, strategic decisions in deciding whether particular transcripts were needed for litigation and appeal purposes, and there is a "strong presumption" that trial counsel's actions constitute a reasonable trial strategy.

Rodriguez's claim presents little more than "gross speculation" that the transcripts were requisite to a fair appeal. Rodriguez fails to indicate the actual value of the unavailable transcripts in his case. A habeas petitioner must establish prejudice from the lack of recordation to be entitled to habeas corpus relief. Rodriguez has filed to show how having the complete record that he now demands could have benefitted him. He has failed to allege any prejudice or harm which resulted from not having a complete transcript. Petitioner's claim must be denied.

396

**XX.    Rodriguez Received the Assistance of Constitutionally Adequate Appellate Counsel.**

In a separately enumerated ground, Rodriguez restates, from pertinent points in his Motion, a series of claims that his appellate counsel provided constitutionally deficient assistance for failing to raise a series of individual claims.  Because the United States has responded to those claims elsewhere in its Answer, it declines to repeat its arguments here.

Claims of ineffective appellate counsel are examined under Strickland in the same manner as claims of ineffective assistance of trial counsel. See Henderson v. Sargent, 926 F.2d 706 (8th Cir. 1991).  If a claim could have been raised on direct appeal, but was not, it cannot be raised in a Section 2255 motion unless the petitioner can show both (1) a "cause" that excuses the default, and (2) "actual prejudice" resulting from the errors of which he complains. United States v. Frady, 456 U.S. 152, 168 (1982); Matthews v. United States, 114 F.3d 112, 113 (8th Cir. 1997); Schneider v. United States, 981 F.2d 989, 990 (8th Cir. 1992).  If a petitioner is unable to show "cause" and "actual prejudice," he must make a "substantial claim that constitutional error has caused the conviction of an innocent person." Schlup v. Delo, 513 U.S. 298, 299 (1995).  A claim of actual innocence must be based on "new evidence," and must convince the court that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id. at 327.  See also, Embrey v. Hershberger, 131 F.3d 739 (8th Cir. 1997).  Moreover, this Court may not hold an evidentiary hearing to consider a

397

procedurally barred claim absent a showing that excuses the default. Fretwell v. Norris, 133 F.3d 621, 623 n.1 (8th Cir. 1998) (citing Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992)). Procedural default is a complete bar to non-constitutional or non-jurisdictional issues. Anderson v. United States, 25 F.3d 704, 706 (8th Cir. 1994). This doctrine applies even in death penalty cases. See Battle v. United States, 419 F.3d 1292, 1298 (11th Cir. 2005). Constitutional or jurisdictional claims that could have been raised on direct appeal, but were not, are procedurally defaulted unless the petitioner can demonstrate either cause for the default and actual prejudice or actual innocence. Bousley v. United States, 523 U.S. 614, 622 (1998); Matthews, 114 F.3d at 113. The cause and prejudice standard requires Rodriguez to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. Frady, 456 U.S. at 170; Coleman v. Thompson, 501 U.S. 722, 753 (1991). This is a "significantly higher hurdle" than the plain error standard required to overcome a default on direct appeal. United States v. Olano, 507 U.S. 725 (1983); Frady, 456 U.S. at 166. If Rodriguez cannot show cause and prejudice with respect to a defaulted constitutional or jurisdictional claim, he cannot have his claim considered unless he can satisfy the actual innocence exception. Bousley, 523 U.S. at 623. Here, as to his defaulted claims, Rodriguez cannot show that a factor external to the defense prevented trial counsel from raising his present constitutional claims. Further, he cannot show "by clear and convincing evidence that but

398

for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." Schlup, 513 U.S. at 323 (quoting Sawyer v. Whitney, 505 U.S. at 347, 336 (1992)).

Rodriguez's argument that appellate counsel failed to raise his Confrontation Clause argument, as set forth in Issues II.F, and XVI, have been responded to and have no merit. His argument that appellate counsel failed to raise a Rule 413 challenge as set forth at Issue II.E, has also been responded to and has no merit.  Rodriguez's argument that appellate counsel failed to argue that the jury should have been instructed that it had to find, beyond a reasonable doubt, that the aggravators outweighed the mitigators has also been responded to and has no merit.  The reasonable doubt standard had no place in the penalty jury's weighing process and the jury was properly charged with the appropriate legal standard.  Furthermore, his argument that appellate counsel should have raised the issue regarding the "Three-Step Process" on appeal also has no merit.  This argument is addressed supra at Issue VI.C, and will not be repeated here.  Finally, he argues that appellate counsel failed to argue that the court should give weight to the cumulative effect of the many errors it argued to the court.  As discussed throughout this brief, the claims allegedly omitted by appellate counsel were futile, unsupported by the record or raised and rejected. Accordingly, there would have been no prejudice to accumulate by the Court of Appeals had counsel raised the cumulative error argument Rodriguez now identifies. The omission of a futile argument, derived from other meritless arguments, did not constitute ineffective assistance.

399

One function of appellate counsel is to eliminate weak claims. Roe v. Delo, 160 F.3d 416, 418 (8th Cir. 1998). Thus, appellate attorneys are not ineffective simply by failing to present arguments that have already been rejected on numerous occasions or are otherwise without merit. See Kitt v. Clarke, 931 F.2d 1246, 1250 (8th Cir. 1991). Similarly, an appellate counsel's decision to forego raising issues that are reviewed only for plain error does not give rise to a claim of ineffective assistance of counsel. See Reese v. Delo, 94 F.3d 1177, 1185 (8th Cir.1996); Meyer v. Sargent, 854 F.2d 1110, 1115-16 (8th Cir. 1988) (no prejudice when appellate counsel does not raise meritless issues on appeal). And the omission of a viable issue does not in and of itself constitute ineffective assistance of counsel. The Sixth Amendment does not require an attorney to raise every nonfrivolous argument on appeal. "[The] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983)). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal. Therefore, absent contrary evidence, we assume that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy." United States v. Brown, 528 F.3d 1030, 1033 (8th Cir. 2008) (citations and quotation marks omitted).

Since all of Rodriguez's claims of ineffective assistance at the trial level are without merit, appellate counsel's failure to raise these arguments on appeal was not

400

deficient performance and therefore could not have prejudiced him.  The decision of Rodriguez's appellate counsel to focus on certain claims on appeal, to the exclusion of others, is presumed to be a valid exercise of strategic judgment.  Rodriguez fails to give any account of how the claims that he now faults appellate counsel for failing to raise were clearly more meritorious than the numerous claims that appellate counsel did raise on appeal.  For this reason, his allegations fall short of stating a cognizable claim, and the claims should be dismissed without a hearing.

## XXI.  The Cumulative Error Doctrine is Inapplicable.

Rodriguez argues that even if no single alleged error requires relief, the cumulative effect of the supposed errors does require the Court to grant his Motion.  Mot. at 331-32.  Rodriguez's reference to cumulative error is misplaced on collateral review.

Under the cumulative error doctrine, the Court of Appeals may, on direct appeal reverse a conviction if "the case as a whole presents an image of unfairness resulting in the deprivation of defendant's constitutional rights, even though none of the claimed errors is itself sufficient to require reversal."  United States v. Baldenegro-Valdez, 703 F.3d 1117, 1124-25 (8th Cir. 2013).  However, the Eighth Circuit Court of Appeals has repeatedly rejected "cumulative error" arguments as a basis for relief in relation to § 2255 petitions.  See, e.g., United States v. Brown, 528 F.3d 1030, 1034 (8th Cir. 2008) ("[W]e

have repeatedly rejected the cumulative-error theory of post-conviction relief."); Middleton v.Roper, 455 F.3d 838, 851 (8th Cir. 2006) ("We have repeatedly recognized 'a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test.'") (quoting Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002)).

Assuming, arguendo, that the cumulative error doctrine applied here, none of Rodriguez's contentions have merit, and many are procedurally defective.  Moreover, Rodriguez has failed to establish prejudice as to any claim, much less has he shown that the zealous representation of his counsel and the painstaking procedures employed by the Court and prosecution could possibly permit him to establish "an image of unfairness." Accordingly, his contention of cumulative error should be rejected.

## CONCLUSION

For the reasons stated herein the United States respectfully requests that this Court deny Petitioner's Motion For Collateral Relief, To Vacate, Set Aside, Or Correct Sentence, And For A New Trial pursuant to 28 U.S.C. § 2255 and dismiss all claims. The record in this case is sufficient for the purpose of adjudication of Rodriguez's claims, and an evidentiary hearing is not necessary.  See Purkey v. United States, 729 F.3d 860 (8th Cir. 2013).  Rodriguez's allegations in his 28 U.S.C. § 2255 Motion to For Collateral Relief, To Vacate, Set Aside, or Correct Sentence are without merit and should be denied.

Dated:  November 13, 2013.

LYNN C. JORDHEIM

402

Attorney for the United States Acting Under
Authority Conferred by 28 U.S.C. § 515

By:     /s/ *Keith W. Reisenauer*
        KEITH W. REISENAUER
        Assistant United States Attorney
        Quentin N. Burdick United States Courthouse
        655 First Avenue North - Suite 250
        Fargo, ND  58102-4932
        (701) 297-7400
        ND Bar Board ID No. 05434
        Keith.Reisenauer@usdoj.gov
        Attorney for United States

403

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

ALFONSO RODRIGUEZ, JR.,       )

          )   Case No. 2:04-cr-55

          Petitioner,     )

      v.              )   **CERTIFICATE OF SERVICE**

          )

UNITED STATES OF AMERICA,     )

          )

          Respondent.    )

I hereby certify that on November 13, 2013, the following document:

**UNITED STATES' ANSWER IN OPPOSITION TO MOTION UNDER 28 U.S.C. § 2255 FOR COLLATERAL RELIEF, TO VACATE, SET ASIDE, OR CORRECT SENTENCE, AND FOR A NEW TRIAL**

was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to the following:

**Joseph Margulies**
j-margulies@law.northwestern.edu

**Katherine M. Menendez**
Kate_Menendez@fd.org,wendi_tilden@fd.org

**Andrew H. Mohring**
andrew_mohring@fd.org

**Michael Wiseman**
wiseman_law@comcast.net

Exhibits 8 and 9 will be filed conventionally with the Court and mailed by first class mail to: Michael Wiseman, 406 N. Swarthmore, Swarthmore, PA  19081.

*/s/ Lori E. Daly*

LORI E. DALY
Office of the United States Attorney

404