**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**NORTHEASTERN DIVISION**

- - - - - - - - - - - - - - - -
                              )
United States of America,     )
                              )
    Plaintiff/Respondent,     )
                              )
        vs.                   )   **FILE NO. 2:04-cr-55**
                              )              **2:11-cv-88**
Alfonso Rodriguez Jr.,        )
                              )
    Defendant/Petitioner.     )
                              )
- - - - - - - - - - - - - - - -




**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**Evidentiary Hearing (Volume 1) September 8, 2015**

**Pages 1-169**




HELD AT:   QUENTIN BURDICK UNITED STATES COURTHOUSE
           655 FIRST AVENUE NORTH
           FARGO, NORTH DAKOTA  58102

BEFORE:   THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

A P P E A R A N C E S

**MR. KEITH W. REISENAUER**          COUNSEL FOR PLAINTIFF;
Office of US Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102


**MR. ANDREW H. MOHRING**          COUNSEL FOR DEFENDANT;
**MS. KATHERINE M. MENENDEZ**
Office of Federal Public Defender
300 South 4th Street, Ste. 107
Minneapolis, MN  55415
    AND
**MR. JOSEPH MARGULIES**
Cornell Law School
Myron Taylor Hall
Ithaca, NY  14853-4901
    AND
**MR. MICHAEL WISEMAN**
Attorney at Law
P.O. Box 120
Swarthmore, PA  19081

**I N D E X**

**W I T N E S S E S**

**DEFENDANT/PETITIONER:**                                     **PAGE NO.**

**REBECCA VETTEL**

Direct Examination by Mr. Mohring                            14
Cross-Examination by Mr. Reisenauer                         106
Redirect Examination by Mr. Mohring                         135

**PAULETTE COTNEY**

Direct Examination by Ms. Menendez                          146


**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
| --- | --- | --- | --- |
| Exhibit No. 100 | Rebecca Vettel Questionnaire | 11 | 12 |
| Exhibit No. 101 | Vettel: Voir Dire | 11 | 12 |
| Exhibit No. 102 | Vettel: Declaration July 24, 2011 | 11 | -- |
| Exhibit No. 103 | Vettel: Divorce Decree 2004 | 11 | 12 |
| Exhibit No. 104 | Vettel: 1992 Care Required Offense | 11 | 12 |
| Exhibit No. 105 | Vettel: 1992 Failure to Maintain Safe Distance Offense | 11 | 12 |
| Exhibit No. 106 | Vettel: 1990 Stop Sign Offense | 11 | 12 |
| Exhibit No. 107 | Vettel: 1998 Unrestrained Child Offense | 11 | 12 |
| Exhibit No. 108 | Vettel: 1997 No Registration Offense | 11 | 12 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Exhibit No. 109 | Vettel: 1989-2005 Speeding Offenses | 11 | 12 |
| Exhibit No. 110 | Vettel: 9/2/98 No Insurance Arrest | 11 | 12 |
| Exhibit No. 111 | Vettel: 3/7/99 No Insurance Arrest | 11 | 12 |
| Exhibit No. 112 | Vettel: 3/7/99 Add'l Documents re: Arrest and Conviction | 11 | 12 |
| Exhibit No. 113 | Vettel: 5/14/99 No Insurance, No License Offenses | 11 | 12 |
| Exhibit No. 114 | Vettel: 5/14/99 Add'l Documents re: Offenses | 11 | 12 |
| Exhibit No. 115 | Vettel: 4/20/96 Domestic Disturbance Victim Incident Report | 11 | 12 |
| Exhibit No. 116 | Vettel: 6/11/96 Domestic Disturbance Victim Incident Report | 11 | 12 |
| Exhibit No. 117 | Vettel: 7/11/96 Violation of Restraining Order Victim Report | 11 | 12 |
| Exhibit No. 118 | Vettel: 7/11/96 Violation of Restraining Order Police Department Detail | 11 | 12 |
| Exhibit No. 119 | Vettel: 8/24/96 Indecent Exposure Victim Incident Report | 11 | 12 |
| Exhibit No. 120 | Vettel: 10/25/96 Violation of Restraining Order Incident Report | 11 | 12 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Exhibit No. 121 | Vettel: 10/25/96 Violation of Restraining Order Police Department Detail | 11 | 12 |
| Exhibit No. 122 | Vettel: 12/28/96 Harassing Phone Calls Victim Incident Report | 11 | 12 |
| Exhibit No. 123 | Vettel: 12/28/96 Harassing Phone Calls Police Department Detail | 11 | 12 |
| Exhibit No. 124 | Vettel: 12/30/96 Domestic Disturbance Victim Incident Report | 11 | 12 |
| Exhibit No. 125 | Vettel: 4/17/97 Violation of Protection Order & Stalking Victim Incident Report | 11 | 12 |
| Exhibit No. 126 | Vettel: 4/17/97 Violation of Protection Order & Stalking Police Department Detail | 11 | 12 |
| Exhibit No. 127 | Vettel: Anger Management Assessment 11/16/04 | 11 | 12 |
| Exhibit No. 128 | Vettel: Affidavit in Support of Motion to Amend Judgment 2/7/05 | 11 | 12 |
| Exhibit No. 129 | Vettel: Summaries and Docket Sheets (Rebecca Zablotney v. Jason Zablotney, Rebecca Jensen v. Roy Jensen | 11 | 12 |
| Exhibit No. 130a | Vettel: Hospital Services, Inc. v. Rebecca Zablotney | 11 | 12 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Exhibit No. 130b | Vettel: Hospital Services, Inc. v. Rebecca Zablotney | 11 | 12 |
| Exhibit No. 131 | Vettel: Rebecca Zablotney v. Jason Zablotney, Ward County, Small Claims #98-S-038 | 11 | 12 |
| Exhibit No. 132 | Vettel: E-mail 11/28/03 | 11 | 12 |
| Exhibit No. 133 | Vettel: Corrective Action Form, Alpha Industries 10/25/04 | 11 | 12 |
| Exhibit No. 134 | Vettel: Order for Protection Register of Actions, 1996 | 11 | 12 |
| Exhibit No. 135 | Vettel: Jason Zablotney Violation of Protection Order Register of Actions, 1997 | 11 | 12 |
| Exhibit No. 136 | Vettel: Rebecca Zablotney v. Jason Zablotney, Ward County, Small Claims Court, 2002 | 11 | 12 |
| Exhibit No. 137 | Vettel: Failure to License Dog Offense 1/10/06 | 11 | 12 |
| Exhibit No. 138 | Jensen: Letter to Judge Simonson from Cynthia G. Schaar Re: Jensen v Jensen 11/5/04 | 77 | 77 |
| Exhibit No. 139 | Jensen: Letter to Judge Simonson from Mark S. Douglas Re: Jensen v Jensen 11/5/04 | 77 | 77 |

7

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Exhibit No. 140 | Jensen: Community Action Region VI Job Description | 77 | 78 |
| Exhibit No. 141 | Vettel: Article Re: Outraged over Juror Misconduct Claims, 8/9/15 | 169 | 169 |
| Exhibit No. 142 | Jensen: Custody Investigator Report Re: Jensen, 6/15/04 | 169 | 169 |
| Exhibit No. 200 | Paulette Cotney Questionnaire | 11 | 12 |
| Exhibit No. 201 | Cotney: Voir Dire | 11 | 12 |
| Exhibit No. 202 | Cotney: Declaration 7/29/11 | 11 | -- |
| Exhibit No. 300 | Connie Lillejord Questionnaire | 11 | 12 |
| Exhibit No. 301 | Lillejord: Voir Dire | 11 | 12 |
| Exhibit No. 400 | Terry Heuer Questionnaire | 11 | 12 |
| Exhibit No. 401 | Heuer: Voir Dire | 11 | 12 |
| Exhibit No. 402 | Heuer: Declaration 7/29/11 | 11 | -- |
| Exhibit No. 500 | David Janssen Questionnaire | 11 | 12 |
| Exhibit No. 501 | Janssen: Voir Dire | 11 | 12 |
| Exhibit No. 502 | Janssen: Declaration 7/29/11 | 11 | -- |

**P R O C E E D I N G S**

(September 8, 2015:  The following proceedings commenced at 8:57 a.m.:)

THE COURT:  We'll go on the record in a case entitled United States OF America versus Alfonso Rodriguez Jr.  The record should reflect that the -- why don't we do this.  Let's go ahead and have everybody note their appearances for the record because I understand that Mr. Rodriguez is appearing by telephone but let's start -- is that not true?

THE CLERK:  Hopefully by video but we're waiting for them to call into the conference center.

THE COURT:  We're not really ready yet.  Okay.  Why don't we -- well, why don't we just go ahead -- I just assumed that they'd be ready so we'll wait for the phone call.  Let me know when you've got everybody.

(Recess taken; 8:57 a.m. to 10:45 a.m.)

THE COURT:  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez Jr.  It's File No. 2:04-cr-55.  The record should reflect that Alfonso Rodriguez appears by video. He is with his counsel in Terra Haute, Mr. Mohring -- or Mr. Margulies.  Mr. Mohring appears here in the courtroom along with Ms. Menendez and Mr. Wiseman.

Appearing on behalf of the United States is Mr. Reisenauer.

A couple of items before we get started. This is the time and place set for an evidentiary hearing on issues related to juror misconduct. Under Rule 606(b) of the Rules of Evidence, a juror is prohibited usually from testifying as to statements made during deliberation. It's statements that go to the effect of anything -- or anyone on the decision to vote a certain way and also anything that goes to the jurors' mental processes in the course of deliberation.

There are some exceptions under Rule 606. The first is the extraneous material or evidence rule, which is something from outside the record that's brought to the jury's attention during the course of their deliberations. The second is an outside influence that's improperly brought to bear on the deliberative processes of the jury. And, finally, testimony is allowed to -- about the presence of a mistake in actually filling out the jury verdict form. The third one is not before the Court here today.

I suspect that there will be a number of objections as to the evidence that will be elicited in this hearing. Because of Rule 606, my initial thought is it might be just as easy for us to treat all evidence

that relates to any discussions, comments, conduct during the course of deliberations as having a standing objection under Rule 606, to let it all in for the purposes of developing a full record because even if I sustain the objection I suspect there will be an offer of proof and then rule on those in the course of the drafting of an opinion related to these issues. The alternative is just to make everyone object under Rule 606 every time they think that Rule 606 is implicated and then deal with it on a case-by-case basis.

Since I think all the evidence is going to be received for purposes of preserving the record in any event, I'm inclined just to have a standing objection on 606 as to anything that takes place during the deliberations and that if a 606 objection is to be raised for something that takes place outside the course of deliberations then you could raise it just for purposes of efficiency.

It affects you more than anyone else, Mr. Reisenauer. Do you have a position on that?

MR. REISENAUER: Certainly, Your Honor. I was going to bring this subject up. I'm glad the Court did. We are certainly going to have objections under Rule 606 and the decision in Warger that we previously filed a memo on. If the Court is saying that there will

be a standing objection under 606 based upon any testimony or declaration that includes jury deliberation information, I guess I can live with that knowing full well that the Court will address that in its final order. And if there is something other than what I guess I believe is covered by the standing objection, I will then bring a separate objection for the record to the Court if that will work.

THE COURT: Yeah. That works for me and I just think it would be more efficient to do it that way.

Mr. Mohring, does the defendant have a position on that?

MR. MOHRING: We have no objection, Your Honor. We think that that's an advisable way to proceed.

THE COURT: All right. Let's go ahead and do that. At this point does the defense intend to make any sort of an opening statement?

MR. MOHRING: No, Your Honor.

THE COURT: And does --

MR. MOHRING: I apologize. I would, in light of the path that you have laid out for us, move the admission of the exhibits that we've offered to the Court and to the prosecution. These would be Exhibits 100 through 137, 200 through 202, 300 through 301, 400

and 401 and 500 through 502.  These have all been provided to the Court and to counsel and have been a part -- most of them a part of the record already but I would offer them at this time.

THE COURT:  Any objection from the United States?

MR. REISENAUER:  Your Honor, again just going back to 606, then we would object to the admission of -- and I'm not going to continue to object, as I noted, but I'm going to object right now to the admission of exhibits separately and that would be to the entry of 102, the declaration of Miss Vettel; 202, the declaration of Miss Cotney; then would be four -- excuse me, I think -- 402, which would be the declaration of Mr. Heuer, and 502, the declaration of Mr. Janssen.  Other than that I have spoken with counsel on the other side.

The items regarding the other exhibits, I indicated I would have no objection to their entry and foundation witnesses are not necessary since most of them are documents from Court entries and it would not be necessary to bring those individuals in.  So we would have no objection to their admission in regard to foundation.

THE COURT:  The Court will receive all of

the exhibits.  I'll defer ruling on the objections on 102, 202, 402 and 502.  At this point the movants have -- the petitioners have waived their -- has waived his opening statement.  I assume that the United States has no opening statement to make?

MR. REISENAUER:  That's correct, Your Honor.

THE COURT:  You may call your first witness.

MR. MOHRING:  Your Honor, the petitioner calls Rebecca Vettel.

THE COURT:  Given the nature of the case, the rule on sequestration of witnesses is invoked.  If there's any potential witness to be called present in the courtroom, they should remove themselves.

MR. MOHRING:  Just for the Court's information, Your Honor, the witnesses are in a room outside.  They've been asked not to discuss the case but they are sitting together and have been this morning.

THE COURT:  All right.

MR. MOHRING:  And we have no objection to that.

THE COURT:  If you please would come forward and stand before the clerk, raise your right hand and take the oath.

THE CLERK:  Please state your name and spell your last name.

MS. VETTEL:  Rebecca Vettel, V-e-t-t-e-l.

(Witness sworn.)

THE COURT:  Mr. Mohring?

MR. MOHRING:  Thank you, Your Honor.

**REBECCA VETTEL,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. MOHRING:**

Q.  Good morning, Ms. Vettel.

A.  Hi.

Q.  We met once before, do you remember, before today you and I?

A.  Yes.

Q.  It was in July of 2011 at your home in Jamestown, North Dakota?

A.  Yes.

Q.  Right near the ballpark?

A.  Yes.

Q.  We met on an afternoon.  I had -- there was another person with me, Rebecca Ireland?

A.  Yes.

Q.  And you were kind enough to talk to us then.

A.  Yes.

Q.  We identified ourselves?

A.  Yes.

Q.  And who we were?

A.  Yes.

Q.  What do you remember -- what's your understanding of what we said then about who we were?

A.  About who you were?

Q.  And why we were there, right.

A.  You explained to me about -- you were just there kind of fact checking, I think, just to make sure that everything was the way it was supposed to be and that it was part of the appeals process.

Q.  So there was a discussion about the process and our place in it?

A.  Yes.

Q.  And you invited us in and we spoke for some time in your living room?

A.  Yes.

Q.  How long roughly?

A.  An hour, hour and a half.  I talk a lot so probably a long time.

Q.  And at a point in that conversation we worked together on a written statement?

A.  Yes.

          MR. MOHRING:  May I approach, Your Honor?

          THE COURT:  You may.

Q.   (Mr. Mohring continuing)  Showing you (indicating) -- I'm cautioned to make sure I speak into the microphone.  Showing you what's been marked as -- in this case the sticker is Plaintiff's Exhibit 102, the same as what has been provided (indicating).  Could you take a moment and look at that.

A.   (Witness examining.)  Yeah, I remember this. This is what we filled out at my house.

Q.   Okay.  And you were provided a copy --

A.   I was.

Q.   -- recently?

A.   Yes.

Q.   So you've had a chance to review it again before testifying today?

A.   Yes.

Q.   Your initials appear on the pages?

A.   (No response.)

Q.   Those are your initials?

A.   Yes.

Q.   And your signature at the end?

A.   (No response.)

Q.   That's your signature on the fourth page?

A.   Yes, mm-hmm.

Q.   Do you recall back in July of 2011 reviewing this before you signed it?

A.    Yes.

Q.    Carefully?

A.    Yes.

Q.    And there were some corrections and changes that are made.  There were some words crossed out.  You participated on that process?

A.    Yes.

Q.    And you signed under penalty of perjury?

A.    Yes.

Q.    I think the last actual statement in this document says, "These statements are true and correct." Do you see that, number 15?

A.    Yes.

Q.    Is that true?

A.    Yeah.

Q.    One of the things that's discussed in your declaration is your work at the Anne Carlsen Center for Children?

A.    Yes.

Q.    So I want to ask you some questions about that. What is the Anne Carlsen Center for Children?

A.    It is a place where handicapped, disabled children live full time, receive their education up until the age of 21.  I think things have changed a little bit since I've been there but until the age of

21.

Q.   And it's in Jamestown?

A.   Yes.

Q.   So children with physical disabilities?

A.   Yes.

Q.   Mental disabilities?

A.   Yes.

Q.   Emotional disabilities?

A.   Yes.

Q.   And over what time period did you work there?

A.   (No response.)

Q.   If it would help you remember, you can look at the declaration that you've got in front of you.

A.   Oh, from 1998 to about the very end of 2000.

Q.   So that's what's in your declaration?

A.   Right.

Q.   And that sounds right to you?

A.   Mm-hmm.

Q.   Your declaration talks about in your work there you gained experience working with children with various types of disabilities?

A.   I've always worked in healthcare for the most part, yes.

Q.   But at the Anne Carlsen Center specifically children with certain disabilities?

A.   Yes.

Q.   And those included children with histories of abuse?

A.   Yes.

Q.   And you already mentioned emotional disabilities. Did you have contact in your work at the Anne Carlsen Center for Children with children who had been victims of sexual abuse?

A.   I'm not sure about the sexual abuse.

Q.   Okay.

A.   I don't believe.

Q.   Okay.  Children who are victims of emotional abuse though?  Is that more clear?

A.   Yes, yeah.

Q.   Physical abuse?

A.   Yes.

Q.   Were any of the children that you worked with at the Anne Carlsen Center people who were -- kids who were suspected of being perpetrators of abuse, not just victims of abuse?

A.   I don't know if perpetrators, no.

Q.   Okay.  And your experience at the Anne Carlsen Center overlapped with some of the evidence in the trial.  Do you recall testimony and evidence in the trial about Mr. Rodriguez having been abused as a child?

A.   Yes, I recall that testimony.

Q.   Also evidence of childhood poverty that he experienced?

A.   Yes.

Q.   Is poverty one of the conditions that impacts the children at the Anne Carlsen Center as well?  Do they come from impoverished backgrounds?

A.   Some.  They come from everywhere.

Q.   And you indicated that your experience at the Anne Carlsen Center affected your consideration of the evidence in the trial of Mr. Rodriguez, including the evidence of him having experienced abuse as a child?

A.   I don't think it affected it in any way.  I mean, it was my experience but I don't think it --

Q.   It wasn't valuable in your consideration of the evidence?

A.   I don't think I understood anything any differently that was presented to us because of -- really because of my profession.  I --

Q.   Your declaration indicates that you shared your experiences you had learned, experiences that you had had at the Anne Carlsen Center with other jurors in the case.

A.   Right.

Q.   And you talked about how based on your experience

and your expertise, I think is the word in the declaration, it was your belief that disabilities and compulsions are things that can't just be turned off?

A.   Right.  I do remember making that comment, yes.

Q.   And that was information that you obtained and understand that you had that developed through your experiences at the Anne Carlsen Center.  Fair?

A.   Right.

Q.   And that was information that you thought about? Those experiences were things that you thought about as you were considering the evidence?

A.   Yeah, yes.

Q.   And you shared that experience?  You shared that expertise with the other jurors?

A.   Yes.

Q.   And I think this is clear but let me just ask, this played out in discussions about Mr. Rodriguez' positive behavior and positive adjustment to prison life; is that right?

A.    I made the comment at that time that behavioral issues and emotional issues and -- I felt that things that were being claimed and presented to us just because you -- that you cannot -- you cannot shut that off.  If you are in jail you are a model citizen.  You do not have behavioral problems and emotional issues and

outbursts and impulses.  You would still have them regardless if you're in jail or not and they were trying to claim that he had these issues but yet when you -- when you're in jail you did not have these issues.  So you don't shut it off if you have those kinds of disabilities and problems in your life.

Q.   Based on your knowledge and experience --

A.   Right, those behaviors.

Q.   Again based on your knowledge and experience coming from your expertise, your experiences, you work at the Anne Carlsen Center.

A.   Right, because when I'm holding ice cream in front of an emotional child they can be good, you know. If they're -- you know, in my experience if they were in the middle of the behavior and you hold up ice cream in front of them it's a reward to them and they're still having all of these behaviors.  I mean, it's not something you can always control.  So using -- using ice cream as a reward isn't going to work with somebody that has those impulses.  You don't shut it off to get -- to get what you want.

Q.   And so you also indicate in your declaration that you think that the other jurors appreciated your expertise, that it helped them in their consideration?

A.   Well, I brought that comment to light and I think

it made everybody realize that, you know -- that, you know, you don't just shut it off.

Q.   And so your work at the Anne Carlsen Center, 1998 to 2000, I understand we're not talking exact dates and times but that's the time frame of your work?

A.   Yes.

Q.   And so those experiences and that employment were things that were known to you in 2006 during the time of the trial?

A.   Yes.

Q.   Okay.  I want to take you back a little further to the beginnings of this case.  It's certainly no secret to anybody in the courtroom that there was extensive media coverage that began with the disappearance of Ms. Sjodin on November 22nd of 2003.

Do you recall, when did you first become aware of these events?

A.   I'm not sure exactly how I knew or how I heard it that this event had happened.  I would assume the news but I couldn't tell you if it was print or on TV or -- I don't know.

Q.   The question that I have though is when -- do you recall when you first -- how long after --

A.   After she was missing?

Q.   Right, did you first hear about it.

A.    I'd say within the week.

Q.    And there was suspicions of abduction that were present from the very beginning.  Do you recall that?

A.    Yes.

Q.    And suspicions of possible sexual assault and homicide also present pretty much from the beginning, do you recall those?

A.    If it came out in -- not in the beginning.  I knew she was missing but -- missing from the parking lot but I don't recall -- I mean, I had three young kids and I worked full time and it really didn't concern me.

Q.    You recall the extensive media coverage of the case continued though after that?

A.    Yes.

Q.    Involving discussions about searches for the victim's body, for Ms. Sjodin's body?

A.    Yes.

Q.    And also at a certain point the identification of Mr. Rodriguez as the suspect?

A.    Yes.

Q.    And all of that was -- those things were covered in the media and you saw at least some discussions of that?

A.    Yes.

Q.    And you participated in at least some internet

interaction about the case in that time period.  I want to ask you some questions about that.

A.  Maybe not during that time.  I'm not -- I'm not sure.  I really -- I don't even remember if I had a computer at home at that time.

Q.  Do you recall then in the early stages of the case and in the investigation what types of internet discussions you might have participated in?  Internet? E-mail?  Social media?

A.  At that time?  Maybe e-mail.  I -- I don't recall.  I don't remember when I got Facebook.  I don't know.

Q.  Do you remember forwarding information specifically about the search for Dru Sjodin to people that you knew?

A.  I could have.

MR. MOHRING:  May I approach, Your Honor?

THE COURT:  You may.

Q.  (Mr. Mohring continuing)  Showing you what's been -- what's been marked as Petitioner's Exhibit 132, also S-19, this is the unredacted version, this is a document that actually was an exhibit in a divorce proceeding that you participated in.  Do you see the exhibit sticker, Defendant's Exhibit --

A.  Okay.

Q.   -- in the lower left-hand corner?

A.   Okay.

Q.   And also the stamp of clerk of the district court in Stutsman County?

A.   Right.  In '04?

Q.   Right.

A.   Or '03 or --

Q.   Do you see the date -- so the clerk of court's stamp says July 6, 2004, right?

A.   And it looks like this was printed on the 5th of December of '03.

Q.   And if you look in the caption of the e-mail itself there's a date.

A.   December 28, 2003.

Q.   And if you look right above there's a salutation, starts out "Hey Rebecca."  Do you see the date above that?

A.   Oh, November 27, 2003.

Q.   Okay.  If you look just two lines up above that I'm not going to ask you in the public courtroom but there's an e-mail address "rebecca_jensen" and then the rest of an e-mail address.  Was that your e-mail?

A.   A million years ago, yeah.

Q.   Was that your e-mail a million years ago like November 2003?

A.   Yeah.

Q.   And if you look at the first paragraph of that e-mail -- this is an e-mail that was sent to you, right?

A.   Right.

Q.   If you look at the first paragraph, there's a discussion about the missing UND student?

A.   Yes.

Q.   And the e-mail that was sent to you also talks about three pictures and if you look up above there's an attachment that shows three pictures?

A.   Yeah.  Not pictures, just the attachment, yup.

Q.   Pictures are listed as attachments though, right?

A.   Mm-hmm.

Q.   And so this e-mail indicates that you had forwarded to the person who was writing back to you an e-mail about the missing UND student?

A.   Well, it was a message to me.

Q.   Right.

A.   I don't believe it's from -- I forwarded it to anyone.

Q.   Well, the first -- the first sentence "I know you forwarded me e-mail about this UND missing" --

A.   Oh, okay.

Q.   Does that help you remember?  Do you think that you might have forwarded e mail about the missing

student?

A.    I could have forwarded it on to --

Q.    Looking at this do you believe that you did?

A.    Yeah.

Q.    And then it looks like the three pictures, the attachments, were sent back by this person to you.  Does that sound right?

A.    It says there's attachments but, yeah, I would --

Q.    And the second sentence in the e-mail says, "Now it comes out with an 3 pictures and I want to share that with you."

A.    Yes.

Q.    So you had forwarded an e-mail and received some pictures in return?

A.    It looks like he, yeah, sent this to -- forwarded something on to me that had pictures about Dru, her weight, when she went missing and what she looked like and the information from the reports in Grand Forks.

Q.    Okay.  And it looks like on the second page there's a section that appears to be the e-mail that you forwarded.  You see it begins "first of all I must say"?

A.    Yes.

Q.    Do you believe -- is that -- now having had an opportunity to look at this, is that the e-mail that you think you forwarded on November 27th?

A.   I don't know if I forwarded this or not.  I'm not saying that I didn't but I can't tell you if I forwarded this or not.

Q.   From the e-mail though you believe that you did forward something.  You're just not positive that it's what appears right at the tail end of this e-mail.  Is that a fair statement?

A.   I cannot tell from this.  I know this was used in my court case and stuff was forwarded from my e-mail to my ex-husband's e-mail so he could print it off and bring it to court, which just shows a conversation with somebody else other than him.  So -- but I can't tell by this if I forwarded this to anybody.

Q.   So that we're clear then between the two of us here this morning when -- the statement at the beginning of the e-mail "I know you forwarded me e-mail about this UND missing student," you believe that you forwarded something.  You're just not positive that it was what's here at the tail end?

A.   Right.  Yeah, I can't remember.  I'm not saying I did not but I don't remember if I indeed did.

Q.   If you look at the -- just a couple more questions about this.  If you look at the e-mail that's at the very tail end of this e-mail on the second page.

A.   Yup.

Q.   The second sentence asks, "Please forward this to everyone you know..."

A.   Yeah.  That was sent to me so that her picture could get out I'm assuming so we could find her.

Q.   Apart from the individual that this e-mail exchange is with, how many other people do you think you forwarded information about the UND missing student to?

A.   I couldn't tell you but, I mean, if we were trying to look for her and people were trying to look for her, you know, I would gather I sent it to the people I knew.

Q.   Other than forwarding e-mail to people that you knew about the disappearance, did you have any other involvement in the search?

A.   No.

Q.   Did you ever attend a memorial for the victim, Miss Sjodin?

A.   No.  I was going to go to a -- I was going to go to some event that they had for her and I drove to Grand Forks and I got sick and I could not go so I ended up driving home so I did not attend.

Q.   Did you bring or send flowers to any of the memorial events?

A.   I don't believe so, no.

Q.   And do you think that you posted anything about

the memorial events or your possible attendance at them or thinking about attending them on any social media: MySpace, Facebook, anything like that?

A.   Yeah.   I mean, I haven't hidden the fact that I'd like to go to some memorials or something.

Q.   The memorials have gone on for a while.   Can you give us the time frame of the memorial that you almost made it to?   When was that?

A.   Six years ago maybe.   I think it was a golf tournament.

MR. REISENAUER:   Your Honor, I object to this line of questioning.   It's irrelevant to what we're here for.   Frankly, it's after the trial.   It doesn't matter if she held her own memorial.   We're talking about things that affected the jurors during the trial or during jury deliberation.   Nothing is relevant as to what occurred since then.

MR. MOHRING:   Your Honor, I would ask if we're going to have an extended colloquy that that not happen in the presence of the witness.   But the question was when.   That is the very question.

THE COURT:   The objection's overruled.   I don't think it's plain from anything that's been said as to when it occurred.

Q.   (Mr. Mohring continuing)   So let me ask again.

You were starting to answer --

A.   Probably about six years ago, eight.

Q.   Okay.  I had been asking you some questions about your work at the Anne Carlsen Center.  I want to briefly ask you a few about -- you also had done work at Head Start?

A.   Yes.

Q.   Roughly when?

A.   Is it in here?

Q.   I'm not sure.  Before or after Anne Carlsen?

A.   It was after Anne Carlsen.

Q.   And did you ever function as a mandatory reporter in your work at Head Start?  Did you ever have to call the police about a situation?

A.   Yes.

Q.   Can you describe for us the first training that you had -- actually let me step back for a minute.  You work at Head Start.  Was that before or after the trial, do you remember?

A.   After.

Q.   Let's talk a while, Ms. Vettel, about the information about -- actually bear with me.

A.   I worked at Head Start and also preschool.

THE COURT:  Okay, hold on.  You can only answer a question when there's actually a question.

THE WITNESS:  Sorry.

THE COURT:  I'm sorry, it's just kind of the rules, okay?

Q.  (Mr. Mohring continuing)  Ms. Vettel, I've given you some documents from Head Start that include -- I've opened it to a page, although you're welcome to look at the other ones.  That shows a start date and an end date.

A.  Okay.

Q.  Does that help refresh your memory about when it is that you started working at Head Start?

A.  Yes.

Q.  When did you start?

A.  11/12/04.

Q.  Okay.  And when did you end?

A.  3/18/05.

Q.  And have you looked at those -- that information, does that sound accurate to you?

A.  Yes.

Q.  As far as beginning and end dates?

A.  Yeah.

Q.  Okay.  So your work at Head Start, that happened before the trial and before jury selection, right?

A.  Yes.

Q.  Okay.  I realize we're talking about things that

happened some time ago.  All right.  So we were talking about mandatory reporting.  What kind of training did you receive at Head Start for how to do that and when to do that?

A.  I don't think I got the training at Head Start. There was no training for that but being in healthcare I've always been a mandatory reporter and not that we've went through any classes but if we see anything.  They let us know about our chain of command and we are mandated reporters.  You need to say something whether -- without fear of retribution because it's -- you know, it's my job and I don't -- I can come back and get in trouble.  If I see something and don't report it, then they can come after me for not reporting it.

Q.  And so what types of situations trigger that responsibility?  What types of things would --

A.  Well, in healthcare obviously it's abuse, staff being too rough, even patient to patient, patient to staff.  Nothing's really too small.  As in Head Start, when I was at Head Start then I did report.  There was an incident that happened that was definitely a no-brainer.

Q.  But do I understand it right?  The trigger is abuse of Head Start, Anne Carlsen Center of children --

A.  Right.

Q.   -- by anybody?  Is that fair?

A.   By anyone.  By family, by anyone.

Q.   And abuse physical, emotional?

A.   Verbal, yes.

Q.   Obviously sexual would be included as well?

A.   If I came across that, yes.

Q.   You were starting to tell us about a situation while you were at Head Start where actually your mandatory reporting responsibilities kicked in.

A.   Yes.

Q.   Do you remember that?  Tell us what happened.

A.   Oh, yeah.  I ended up at a residence in a -- in a different town other than Jamestown where I was based out of.  And when I got there at my specified time the door was locked.  The children were inside.  They said that Mom was gone and I eventually did get in.  They did let me in.  I ended up calling my boss, searched the apartment, called the police department where I was at. They came and they found the mom and her boyfriend in a locked room in that apartment and they took it from there.

Q.   And did you -- I mean, that was -- you did what you were supposed to do?

A.   Yes.

Q.   That's how it's supposed to work?

A.   Yes.

Q.   Okay.   I want to switch the focus and ask you about situations where you were the victim.

A.   Okay.

Q.   And one -- one of the things that we discussed when we met some years ago and that's discussed in your declaration also was a time when you worked at State Fairs?

A.   Yes, for one summer after I graduated high school.

Q.   So that anticipates the question.   How old were you?

A.   Nineteen, 18.

Q.   And was it just one summer that you worked for the State Fairs?

A.   Just one summer.   If you don't drink and you don't do drugs, you make a lot of money and you sleep in a nice hotel and not on the grounds.

Q.   So were these State Fairs that were in multiple locations?

A.   Milwaukee, Wisconsin; Sedalia, Missouri; Denver, Colorado and Albuquerque, New Mexico.

Q.   And what type of work did you do?

A.   I worked in games for a little bit.   I worked in food for a while.

Q.   So games, the games of skill, win a stuffed animal?

A.   There's no skill.  It's all chance.

Q.   What types of games?

A.   Pool, where you play pool.

Q.   Okay.  And food serving, selling?

A.   Yeah.  That's how I made my money for school clothes when I was -- so I worked for these certain people for -- since the sixth grade until graduation, whenever they came to Minot, and then I traveled for a summer.  It was not for me.

Q.   Your declaration mentions that you had exposure to people who experienced unwanted sexual advances from men?

A.   Yeah.

Q.   While you were working in the State Fair circuit?

A.   Yes.

Q.   And you told us about one more serious incident that you were directly involved in.

A.   Mm-hmm.

Q.   I want to ask you some questions about that.

A.   Okay.

Q.   I guess let me just start.  Tell us what happened.

A.   Someone that I ended up traveling with, we ended

up in Texas, ended up coming up here for the fair and came up from behind me and basically told me I was going with him and if he couldn't have me nobody would.  And I kind of called him out on it and friends, the people I was with I believe, helped me, you know, get away.  He didn't get very far.  It was way more of a threat than actual actions.

Q.   Because other people intervened?

A.   Mm-hmm.

Q.   I'm sorry --

A.   Yes.

Q.   That's a yes.  Thank you.  It was an attempted sexual assault then?

A.   Yes.

Q.   And you said if -- he said words "If I can't have you no one will"?

A.   Yes.

Q.   Your declaration talks about a death threat.

A.   Yes.

Q.   And in the trial that was an experience that you shared with the other jurors?

A.   Yes.  When we could talk about it, yes.

Q.   And I think that your declaration says that you "told other jurors about this...during deliberations to help put myself in the shoes of Dru."

A.   Yes.   I said I can't imagine the fear.

Q.   So when you -- the phrase put yourself "in the shoes of Dru," what does that mean?

A.   Well, there was a lot of things that we, you know, had to consider and a lot of things we talked about.  Obviously we talked about, you know, those last final moments, you know, what opportunities she had or didn't have during that time.

Q.   And so this was an experience that you had that kind of -- that matched at least in some ways what you thought might have happened there?

A.   Yes.   You know, the experience I had was, yes, more threatening but not so much extremely physical so --

Q.   Because you got help, correct?

A.   Right.

Q.   And so you told other jurors about this attempted assault, the threat, as a part of helping put yourself in her place?

A.   Yes.

Q.   Did other jurors also share similar experiences in the same way?

A.   Yes.   We all talked about experiences that would help us.  Finally being able to talk about it brought up a lot of emotion for -- we had to be quiet and not even

talk to each other for so long that when we actually could talk about it there was a lot of personal experience.

Q.   But you recall talking about this particular personal experience?

A.   Yes.

Q.   You said this was the summer after you graduated from high school?

A.   Yes.

Q.   So roughly you were class of 1990?

A.   Yes.

Q.   So we're talking summer of '91 or summer of '90?

A.   Would have been the summer of '90.

Q.   Right.

A.   Yeah.

Q.   And so this crime, this assault on you, happened summer of '90.  You were aware of it in 2006 at the time of the Rodriguez trial?

A.   Yes.

Q.   I want to ask you now about your experience of violence in a couple of relationships before -- that happened before the time of the trial in this case.

A.   Okay.

Q.   Specifically Roy Jensen and Jason Zablotney.  These are two men with whom you had been married?

A.   Yes.

Q.   And let me start by asking you some questions about your marriage with Mr. Jensen.

A.   Mm-hmm.

Q.   Violence in that relationship was a part of the divorce litigation and the custody litigation.

A.   Yes.

Q.   When were you married?

A.   To Roy December 29, 2000.

Q.   And do you recall who filed for divorce?

A.   I did.  I'm the plaintiff in that case.

Q.   And do you recall roughly when, or maybe not even roughly, when you filed for divorce?

A.   Middle of '03.  I'm not sure.

Q.   Okay.  So anyway married late 2000, filed for divorce sometime in 2003; is that --

A.   Yes.

Q.   And there was a trial?

A.   There's been many trials, yes.

Q.   A number of hearings?

A.   Yes.

Q.   What has the focus of those hearings been?

A.   In our divorce it was about the same thing when you're both fighting for custody, stability, history, responsibility.  You know, that's our divorce.

Q.   Custody so you have -- I don't want to ask your child's name and I'm not going to ask for the actual birthdate.

A.   You can.  Her name is Rena.

Q.   And how old -- how many years old was Rena let's say in 2003 when the divorce was first getting started?

A.   Three, two.  She was born at the end of '01.

Q.   You said there had been lots of hearings.  The hearings and litigation in and around your marriage to Mr. Jensen extended I think as recently as just a month ago?  It's kind of still --

A.   Yeah.  And it was closed at the end of August and he's already reopened it again so this week.

Q.   Moving back though to when the divorce proceedings were just starting, his violence was something that was discussed in the litigation in the documents of the divorce?

A.   Yes, it -- yeah, he took it to the Supreme Court. It's everywhere online.

Q.   Do you recall discussions in connection with that case about him tampering with your car and preventing you from leaving?

A.   Yes.

Q.   What -- tell us about that.

A.   He has stolen car keys.  He did some mechanical

things underneath my hood when I was in the bathroom so I couldn't leave.  I worked with handicapped adults and was parked in handicapped parking, had somebody at a medical appointment.  When we went back out to the car he -- with my handicapped individual he had used the key code to move my vehicle to the very end of IAC parking lot so that is while we were married so I had no idea where my car was at.

Q.  And these were things that were going on at the time that you filed for divorce?  I'm trying to get a time frame for these events.

A.  Before.

Q.  Was he violent with your dog?

A.  Yes.  He would come home and open up the back door and throw the dog off of the steps, over the sidewalk, into the fence.  I gave that dog away.

Q.  Do you recall providing the information in connection with the divorce that he often beat our dog when he was angry?

A.  Yes.

Q.  That's what we're talking about, right?

A.  Yes.

Q.  You also recall providing the information that he would tell you to leave and then block the door so that you couldn't?

A.    Yes.

Q.    And that arguments would escalate?

A.    Yes.

Q.    Did you talk to friends about your concern for your safety in that relationship?

A.    Yes.

Q.    And, in fact, the Court found as a part of the divorce decree that you were the victim of domestic violence in that relationship?

A.    Yes.

Q.    There's a finding that he pulled your arms, poured or swished hot water on you.  That was a part of the Court's findings?

A.    Yes.

Q.    That he pushed and shoved you, part of the Court's findings?

A.    Yes.

Q.    I want to ask about now domestic violence in your earlier relationship with Mr. Zablotney --

A.    Yes.

Q.    -- okay?  You also experienced domestic violence in connection with that?

A.    Yes.

Q.    As a part of -- and there were divorce proceedings that ended your marriage with Mr. Zablotney

also?

A.   Yes.

Q.   And that was before your marriage to Mr. Jensen?

A.   Yes.

Q.   In connection with those divorce proceedings, I guess in connection with the divorce proceedings with Mr. Jensen, do you recall doing an Anger Management Assessment?

A.   I did.  I went and did the assessment.  I drove to Fargo here and I can't remember if I was ordered to go or not.  I know that I did go just because I was being accused of so many things.

Q.   At a certain point have you ever seen the report?

A.   I'm sure I did.

        MR. MOHRING:  May I approach, Your Honor?

        THE COURT:  You may.

        MR. MOHRING:  Do you wish that I ask each time?

        THE COURT:  It doesn't matter.

Q.   (Mr. Mohring continuing)  Showing you what's been marked as Petitioner's Exhibit 127 (indicating), is --

A.   This is where I went here in Fargo.

Q.   Okay.  And so looking at this does this help you remember when you did the Anger Management Assessment?

A.   Yes.

Q.   When did that happen?

A.   November 16, 2004 it's dated.

Q.   And it actually -- in the first paragraph it reflects when you actually did the assessment.

A.   The day before.

Q.   And in the assessment you talked to them about the verbal and physical abuses that you experienced in your first -- in your relationship with your first husband.  That would be Mr. Zablotney?

A.   Can you repeat that question again?

Q.   So in the report and in the evaluation, you discussed the verbal and physical abuse that you experienced in your relationship with your first husband?

A.   Yes.

Q.   And that you reported that abuse to the police?

A.   Yes.

Q.   And that you never responded with violence?

A.   I don't believe so.

Q.   Do you see that in the --

A.   Yeah.

Q.   Do you see where I am?

A.   Yes.

Q.   So in November of 2004 you spoke with the anger management evaluators and this report includes things

that you told them?

A.  Yes.

Q.  And you were truthful?

A.  Yes, of course.

Q.  These things happened?

A.  Yes.

Q.  All right.  I want to ask you some questions about calls to the police.  The police reports reflect discussion -- calls to the police in connection with your relationship with Mr. Zablotney.

A.  Okay.

Q.  The police reports mention restraining orders. Did you ever get a restraining order against Mr. Zablotney?

A.  Oh, yes, yup.

Q.  There was mention somewhere about you being a fan of Law & Order, that you never miss an episode.  Is that a show that you watch?

A.  Every one.

Q.  And has that been true since the outset?

A.  Yes, since day one until the very last episode.

Q.  Originals and spin-offs?

A.  All of them.

Q.  Okay.  All right.  So let me ask you about --just tell us what the restraining order process looks

like for you as you got restraining orders against Mr. Zablotney.  What do you have to do?

A.   Write down your affidavit, file it with the Court.  The defendant then has time to respond.  There's a temporary order for like 10 days or something, has time to respond and then you can go to court and get it extended or dropped, I believe.

Q.   Those are steps that you went through in connection with your relationship with Mr. Zablotney?

A.   Yes.

Q.   How many times?  How many restraining orders did you get?

A.   I don't know.  Maybe one, two.  I don't know.

Q.   Okay.  So there's a written application that you submitted?

A.   Mm-hmm.

Q.   Yes?

A.   Yes, sorry.

Q.   And you said "affidavit" so you make -- you have to spell out facts that justify what you're asking for?

A.   Yes.

Q.   And those facts have to relate to domestic violence?

A.   Yes.

Q.   "Domestic violence" is defined as physical harm,

bodily injury, rape, assault, or the infliction of fear or imminent harm.  Does that sound --

A.  Yes.

Q.  -- right?  And so to get an order that's what you have to show?

A.  Yes.

Q.  And in receiving one or two orders, your documentation was sufficient?

A.  Yes.

Q.  A court hearing -- so you submit the application. A court hearing happens sometime after that?

A.  Yes.

Q.  So you went to court on one or two occasions?

A.  Yes.

Q.  And at the court hearing the judge -- you appeared in front of a judge?

A.  Yes.

Q.  And the judge granted your request, issued a restraining order?

A.  Right, a judicial referee.

Q.  Okay.  The form talks about actual or imminent violence.  What did you describe?

MR. REISENAUER:  Your Honor, if we could, could we have Mr. Mohring present a document to the witness so that she's not just guessing about what she

was putting on the form or what actually occurred?

THE COURT:  Do you recall what information you placed on the form?

THE WITNESS:  For the most part, yes.  He had broken into my house and damaged furniture and belongings.  He left a note on my living room floor impaled into a piece of candle that he had totally whittled into a whole bunch of pieces and it was all over and just said that "I'm watching you."

Q.   (Mr. Mohring continuing)  That was what the note said?

A.   Yes.

Q.   I think you mentioned a temporary order.  So it's possible in some situations that what you file is enough for you to get a restraining order even between the time period that you file it and the Court hearing.

A.   Yes.

Q.   Do you recall whether that happened in your case?

A.   I don't remember.

Q.   If it would help I can show you the exhibits, but the exhibits and police reports show that the police were involved eight times it looks like at your request in connection with your concerns about this man.

A.   I didn't know it was eight but I believe you.

Q.   And the -- again I can show you the reports if

that would help, but generally when you would call in the police would respond?

A.   Yes.

Q.   Generally pretty quickly?

A.   Yes.

Q.   It looks like the first call was on April 20th of 1996, a domestic disturbance incident report in which you walked into the police department and completed a domestic violence report.  Did you ever do that?

A.   Yes.

Q.   Actually let me -- so I've handed you copies of what have been marked as Petitioner's Exhibits 115 through 126 and is 115 on top?  Do you see 115, Ms. Vettel?

A.   Yes.

Q.   And if you look at "Incident Date/Time" on the first page, that talks about April 20th of 1996, 1:18 a.m.

A.   Yes.

Q.   If you look on the second page the report says, "Walk-in reports being involved in a domestic at the above location.  Domestic Violence Report filled out." Do you see that?

A.   Yes.

Q.   Based on this do you believe that you went into

the police on April 20th and filled out a report?

A.   Yes.

Q.   And the address -- I won't state it for the record but the address that it talks about is where you lived?

A.   Yes.

Q.   The next call was June 1st of 1996.   That appears that you called in.   I'm looking --

A.   June 11th.

Q.   -- at 116, June 11th, yes.

A.   June 11th, yes.

Q.   This was a call to the police?

A.   Yes.

Q.   In which you reported that he was there and won't leave?

A.   Yes.

Q.   Exhibits 116 and -- I'm sorry, 117 and 118 talk about a call on July 11th of 1996?

A.   Yes.

Q.   And if you look at the first page, but look at the rest of it too if you'd like, but the nature of the call talks about violation of a restraining order?

A.   Yes.

Q.   So at least by July of 1996 you had gotten a restraining order?

A.   Yes.

Q.   And they requested -- looks like what the police did was to request extra patrol?

A.   Yes.

Q.   Exhibit 119 talks about an indecent exposure call.  Do you see that?

A.   Yes.

Q.   Is this an unrelated incident, different --

A.   That is not me.  Wait, no.

Q.   If you look on the first page at the address --

A.   Hang on a minute.

Q.   Do you see on the first page there's a name Rebecca Jensen?  There's also a birthdate.  I won't state it for the record.

A.   Yes, that's me.

Q.   That is you, okay.  In any event this is not a call -- is this a call that relates to Mr. Zablotney?

A.   No.

Q.   Exhibit 120 though, October 25, 1998, this is you and him, right?

A.   Yes.

Q.   You called and reported that he was at your door and that there was a restraining order?

A.   Yes.

Q.   At one point then he was actually arrested?  Do

you recall him being arrested?

A. Yes.

Q. If you look at Exhibit 123, on the fourth page it identifies an arrest number and the person that was arrested?

A. Yes.

Q. That's him, right?

A. Yes.

Q. Exhibit 124 talks about a call on December 30th of '96?

A. Yes.

Q. Exhibit 125 talks about a call and charge of stalking from April 17, '97. Does that sound right?

A. I don't have 125.

Q. I apologize. Here, I've got it. Sorry (indicating).

A. Yes.

Q. Actually I think this one talks about a violation of a protective order and stalking.

A. Yes.

Q. And that came -- this is another time that you called in, that you had to call in?

A. No.

Q. So I count at least eight contacts with police between April '96 and June of '97. Does that sound

roughly right?

A.  Yes.

Q.  The violence that you experienced at the hands of Roy Jensen we've discussed in connection with the divorce that was filed in 2003 and discussions about that continue?

A.  Yes.

Q.  This is something that happened before the 2006 trial?

A.  Yes.

Q.  And so these were things that you were aware of that you knew of at the time of the trial?

A.  Yes.

Q.  And the trial proceedings?

A.  Yes.

Q.  Same questions for Jason Zablotney.  We talked about things that happened between '96 and '97.  These were obviously things that happened before the trial?

A.  Yes.

Q.  And things that you knew and were aware of at the time of the trial?

A.  Yes.

        MR. MOHRING:  Your Honor, may we approach very briefly about the next line of questioning?

        THE COURT:  You may.

THE WITNESS:  Can I get some Kleenex from over here?

THE COURT:  What?

THE WITNESS:  Can I get some Kleenex from over here?

THE COURT:  Yeah.

(The following sidebar was had:)

MR. MOHRING:  Your Honor, I apologize, I meant to bring this up at the very beginning but as we indicated in some communication with the Court -- is that loud enough?

THE REPORTER:  Yes.

MR. MOHRING:  With each of the three witnesses that we'll be calling today, there are some questions that relate to juveniles.  And so I want to ask her some questions about violence that her daughter, Rena, experienced in connection with that relationship. And I'm just asking for the Court's guidance about whether -- we had suggested the possibility of doing that type of questioning at sidebar or in a closed courtroom.  Section 3509 gives the Court complete discretion about what to do.  It's quite particular about what is done with documents but not what's done with testimony.  But this is where I'd like to go next and I didn't want to wander into that before finding out

what your wishes were.

MS. MENENDEZ:  In all three lines that -- well, two of the three people there are still minors and one person is now an adult but was a minor at the time. It's a fairly discreet portion of the Anderson query. It's also not a big portion of the other two but there's much less with respect to the other two so they might be almost entirely that type of questioning.

THE COURT:  Mr. Reisenauer, do you have a position?

MR. REISENAUER:  Well, Your Honor, I guess my position, and I did inform counsel of this, is to inform the witness -- just as the Court always does when we do voir dire is to inform the witness that if they want to speak at sidebar about it then they can but I think it's up to them.  She's already given the name of this daughter and didn't seem concerned about it, but I would I give the Court leave to inquire of the witness.

THE COURT:  Why don't we break for lunch at this point and then I'll make inquiry, once the courtroom's cleared, of her how she'd like to proceed, okay?

MS. MENENDEZ:  Thank you, Your Honor.

(Sidebar concluded.)

THE COURT:  All right.  We're going to break

at this point for lunch.  We'll start again at 1:15.  So we'll stand in recess until 1:15.  Could you just stay there for a moment?  There's something we have to take up outside the presence of the public on the record so if everybody would just leave the courtroom at this point I'd appreciate it.  It's a procedural matter.

(The following closed proceedings were had:)

THE COURT:  All right.  The next line of questioning is actually going to involve some questions about your daughter and claims of experiences of violence that she's been subjected to.  Because of her status as a minor, we can handle this one of two ways. We can take up the testimony in private without the members of the public or the press being present, or we can go ahead and just take the evidence in open court. And frankly I'm going to defer to you as to how you'd prefer to do it.  You volunteered your daughter's name and so her identity is kind of already out here.  And so it's really up to you how you feel about that.

THE WITNESS:  Well, all of our Supreme Court documents are already out there with all the information in it I would assume so --

THE COURT:  We'll take it up in open court then.  That seems appropriate, all right?

THE WITNESS:  Okay.

THE COURT: I just wanted to make sure that it was something that was sort of --

THE WITNESS: He's made it quite public so there's nothing I could say that's going to change that.

THE COURT: Very good. Thank you.

MR. MOHRING: Thank you, Your Honor.

(Recess taken; 11:58 a.m. to 1:15 p.m.)

THE COURT: We're back on the record in a case entitled United States of America versus Alfonso Rodriguez. The record should reflect that Mr. Rodriguez appears by video. He is in Terre Haute along with his counsel, Mr. Margulies. Mr. Mohring, Ms. Menendez and Mr. Wiseman are also here on his behalf. On behalf of the United States is Mr. Reisenauer.

When we broke Ms. Vettel was on the stand. Mr. Mohring was conducting a direct examination. You may proceed.

MR. MOHRING: Thank you, Your Honor.

Q. (Mr. Mohring continuing) Ms. Vettel, we have been talking about your exposure to crime and violence and I want to ask just a few questions about someone close to you.

A. Okay.

Q. Changing the focus, I want to ask about violence against children and particularly your daughter, Rena.

His treatment of her was also -- as well as his treatment of you was also a subject of the divorce proceedings and the custody proceedings.

A. Yes.

Q. Divorce and custody proceedings that again have continued or at least restarted a number of times, including very recently, correct?

A. Yes.

Q. Do you recall a connection with the original divorce, in the initial divorce proceedings, a child custody evaluation report being done?

A. Yes.

Q. And the report detailed some violence by him against your daughter?

A. Yes.

Q. In 2004 roughly how old would your daughter have been?

A. About three. Just about to turn three.

Q. And what -- can you just describe for us what she experienced?

A. Is that when she had the marks around her arms and her feet?

Q. Would it help to see the report? I can certainly --

THE COURT: Why don't you show her the

report.

MR. MOHRING:  I'm getting there.

MR. REISENAUER:  What exhibit number is this?

THE COURT:  Ms. Vettel, that's been shown to you for purposes of refreshing your recollection. You're free to read it as long as you want.  You can't read anything off of it.  It's not been received, okay?

THE WITNESS:  Okay.

Q.  (Mr. Mohring continuing)  And I'm not -- you can look at as much as you want but if you look on the third page from the end.

MR. REISENAUER:  Your Honor, I don't have a copy of this.  If I could --

THE WITNESS:  I have two.

MR. MOHRING:  Oh, you do.  I thought I had an extra.  Thank you.

Q.  (Mr. Mohring continuing)  The first full paragraph on that page, the third page from the end?

A.  Right.

Q.  It contains some information.  Does that refresh your memory of at least some of the violence that she experienced?

A.  Yeah, some.

Q.  Can you tell us about that.

A.   One is actually her brother, his son, and one is with Rena.

Q.   As far as Rena is concerned, I just want the Court to know what she experienced.  If this helps you remember that's --

A.   Right.  Hitting her so hard that he left hand prints, full complete handprints on her at such a young age.

Q.   When you say "such a young age," how old are we talking about?  I think the report --

A.   She was not even three yet.

Q.   And in this instance does the report narrow in the time frame of her age?

A.   (Witness examining.)

Q.   If it refreshes your memory, the first full paragraph on that page that we were looking at.

A.   Well, the first one says that her brother was approximately the age of three but then when she was about that same age is when he left marks on her and a lot of unexplained bruising.

Q.   If you look at this report, did it extend to younger than age three?

A.   Says she was a little more than a year old at that time.

Q.   Okay.  So hitting her hard enough to leave hand

prints.  What other violence did she experience?

A.  A lot of manipulation and control but pushing her face down into a couch when she was crying when she couldn't roll over yet because she was disturbing him.

Q.  She was too young to roll over at that point?

A.  Yeah.  Some unexplained physical stuff but a lot of -- a lot of mental and verbal issues.

Q.  Unexplained physical stuff.  Were there marks on her body that were --

A.  Yes.

Q.  -- of concern?  Can you tell us about those?

A.  She had some marks around her feet and marks around her ankles that he says were caused from hair ties but the story I got from Rena was different.  She was about four.

Q.  Was there physical mistreatment?  There's discussion of at a custody exchange her being returned to you in a condition that was of concern?

A.  Yeah, a few times.  She was completely soaked, and he just handed her off, through her snowsuit and her car seat and everything and she said:  Dad wouldn't stop for me.  And she's crying and --

Q.  Soaked, soaked through her clothes?

A.  Completely wet through her clothes, her snowsuit, her car seat.

Q.   And not because of --

A.   And he just left her there like that.  There were times when she -- he would yell at me and she would -- during exchanges she would start to cry and say:  Stop yelling at my mom.  So I think a lot more -- just there's a lot more mental stuff.

Q.   In addition to the physical?

A.   Right.

Q.   Did concern ever develop that she was, in fact, the victim of sexual abuse while in his care?

A.   She told me that his third wife was -- took a bath with her.  And I didn't know how to approach her so I went to a counselor on my own to see how I was supposed to ask my daughter anything without -- without putting anything into her mind or making her -- I didn't want what I say for that to be her belief because she was so young.  I wanted to know how to talk to her and then that lady reported it.

Q.   And was that a counselor at work, an EAP person?

A.   Yes.  I used my Employee Assistance Program.

Q.   Was there also concern about the possibility of sexual abuse in connection with the sleeping arrangements that she experienced?

A.   I know she didn't have a room when she was at her dads a lot so she would sleep with her dad.

Q.    And were there other children in his home?

A.    At times there were.  There's been a lot of change so --

THE COURT:  Hold on.  Did we lose -- hold on, we lost your client.

MS. MENENDEZ:  Your Honor, for what it's worth, if the sound can be restored even with imperfect video that's fine with us.

(Off the record.)

THE COURT:  Okay.  Here's as I understand what the situation is.  The internet has crashed in Terre Haute and so they don't have any internet into their building and so they're not going to be able to reconnect by video.  They don't have a phone in the space that has the ability to be put on speaker phone and so we said perhaps we could put a conference call together with two separate phone lines into that space. They don't have two phone lines into that space. They're in the process of trying to locate a phone in their facility with a speaker on it and they believe they have such a phone but it will take them some time.

And so what we will do at this point is stand in recess until either their internet comes back and we can reconnect or they find a phone with a speaker in it, which really shouldn't be that complicated in

this day and age I wouldn't think but who knows.  So we'll stand in recess at this point.  You may step down.

(Recess taken; 1:34 p.m. to 1:41 p.m.)

THE COURT:  We're back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that Mr. Rodriguez appears by telephone along with his counsel, Mr. Margulies.  Mr. Mohring, Ms. Menendez and Mr. Wiseman appear here in the courtroom.  Mr. Reisenauer's here on behalf of the United States.  Ms. Vettel is on the stand.

Mr. Margulies, can you hear me?  This is Judge Erickson.

MR. MARGULIES:  I can, Your Honor.

THE COURT:  Very good.  And, Mr. Margulies, the lawyers here represent Mr. Rodriguez is prepared to go forward by telephone at this time.  Have you had a chance to discuss that with Mr. Rodriguez?

MR. MARGULIES:  Yes, I have, Your Honor, and I can authorize that we are prepared to go forward this way.

THE COURT:  Very good.  And do the lawyers know what's the last thing that they heard out there in Terre Haute?

MR. MOHRING:  We discussed that, Your Honor.

THE COURT:  You may pick up where we lost them.

Q.  (Mr. Mohring continuing)  Let me show you -- I was asking you some questions about -- concerns about possible sexual abuse of your daughter.

A.  Right.

Q.  And concerns about sleeping arrangements at Mr. Jensen's house.  Let me show you what has been marked as Petitioner's Exhibit 128 (indicating.)  And focusing your attention on the second page, let me just ask you to review that yourself and see if that helps you remember what the sleeping arrangements were that were of concern.

A.  (Witness examining.)

Q.  Does it?

A.  Yes.

Q.  So can you tell us about those, please.

A.  There was bunk beds that kids were sleeping in and there was five children that were all sleeping in the same bunk bed and three of them were boys, one of them was a girl.

Q.  Your daughter?

A.  No.  Three of them are boys, one was a girl, and then Rena.

Q.  And the ages ranged from?

A.    At that time I'm not sure how old two of them were.  Around 10 I believe and then 10 and 13.

Q.    Exhibit 128 that we're just looking at now is an affidavit that you filed?

A.    Yes.

Q.    That's your signature on the back page?

A.    Yes.

Q.    And it was -- the affidavit's dated February 7, 2005?

A.    Yes.

Q.    Concerns that your daughter had been victimized -- that she had been the victim of physical violence concerns that she may have actually been the possible target of sexual abuse existed then as late as 2005?

A.    Yes.

Q.    Well before the beginning of the trial.

A.    Yes.

Q.    And same is also true for the physical abuse that happened before the trial in this case?

A.    Yes.

Q.    We had talked a little bit and you mentioned just in passing that the divorce litigation, particularly with respect to Mr. Jensen, has been quite extensive.  I just want to ask you some questions about how involved

the litigation has been.

Showing you -- bringing to you what's been marked as Exhibit 129 (indicating), these are records of the proceedings in the Zablotney divorce matter and the Jensen divorce matter.  And I'm not going to ask you about everything but I do want to just ask you about hearings specifically.

In the Jason Zablotney case, there were hearings for -- a motion for a change of venue in -- I'm sorry, a hearing in -- on October 7th of 1996, a divorce hearing.

A.   Yes.

Q.   Another hearing on June 14th of 2000, a motion to modify judgment?

A.   Yes.  That was --

Q.   The divorce -- sorry.

A.   Yes.

Q.   The divorce was initially filed in one county and then transferred to another.  Is that --

A.   Yes.

Q.   First in Ward County but then it picked up again in Stutsman County, correct?

A.   Right.  The child support was reviewed so that was the motion.

Q.   So we said the divorce hearing was in October '96, a motion to modify judgment in June of 2000,

another motion to modify judgment -- a hearing on a motion to modify judgment in August, August 29 of 2006.

A.   Yes.

Q.   And it looks like that one was rescheduled and continued on October 3rd of 2006?

A.   Yes, the child support stuff.

Q.   Right.

A.   Yup.

Q.   And the trial in this case was in -- extended into September of 2006.  Does that sound right?  In the Rodriguez case, I mean?

A.   Yes.

Q.   So we just looked -- I count four hearings that happened before or during the trial in the Rodriguez case in the Zablotney proceeding?

A.   Yes.

Q.   I won't take you through all the motions but there were a lot of motions that were filed in between the hearings back and forth, right?

A.   Yes.

Q.   And that's even more true of the Jensen matter?

A.   There's been 12 years of court there nonstop.

Q.   I'm just going to ask you about hearings in the Jensen case.  There was a hearing on October 3rd of 2003 on a motion for change of venue.

A.    Mm-hmm.

Q.    So looking at a Register of Actions you're listed as the plaintiff.  Roy Jensen is listed as the defendant.

A.    Yes.

Q.    Do you see a hearing on a motion for change of venue?

A.    Yes.

Q.    October 3rd, 2003.  Okay.  Then continuing on into the Stutsman County proceedings because that started in one county and changed to another one too, right?

A.    I moved, yes.

Q.    Looks like there was a hearing on December 8, 2003 on an application and motion for interim order?

A.    Yes.

Q.    A court trial on March 2, 2004?

A.    Yes.

Q.    A motion hearing on February 29, 2000 --

A.    Yes, 2004.

Q.    2004, okay.  Then a court trial that was on July 6th and again on July 14, 2004?

A.    Yes.

Q.    And a motion hearing on March 17, 2005?

A.    Yes.

Q.   And finally a hearing on a motion to amend the judgment on March 20, 2005?

A.   March 19th.

Q.   May 17, 2005?

A.   March 17th.

Q.   I understand the litigation continued after that but these are all things that happened before the trial in the Rodriguez case, right?

A.   Yes.

Q.   So I count eight hearings --

A.   Yes.

Q.   -- in the Jensen matter before the Rodriguez trial.  Okay.  Okay.  I want to just pin down a little bit of your employment and the terms of your employment, the time frame of your employment.  Let me start with two places I want to ask about.  Let me start with Alpha Opportunities.  Alpha Opportunities is what type of an operation?

A.   It's a day program for physically and mentally handicapped adults.

Q.   And you worked there?

A.   Yes.

Q.   Do you remember the day that you started what day it was?

A.   August of '03 maybe.

Q.   Do you think the documents from Alpha would help?

A.   Yeah, they'd pinpoint it.

Q.   Petitioner's Exhibit 133 (indicating), showing you a collection of documents, this is paperwork that discusses your employment at Alpha Opportunities, right?

A.   Yes.

Q.   And if you look on the second page it provides a start date at item No. 4?

A.   9/16/03.

Q.   Does that sound right?

A.   Yes.

Q.   And then two pages back do you see a Corrective Action Form?

A.   Yes.

Q.   And on the second page of that that lists a termination date?

A.   Yes.

Q.   Does that termination date sound right to you?

A.   Yes.

Q.   And what date did you leave Alpha Opportunities?

A.   It says final 8/27/04 -- nope, 10/25/04.

Q.   Yeah, the second page of that document?

A.   Yup.

Q.   Okay.   There was some stuff that happened before that, a verbal warning, a written warning, a final

something, but the termination was October 25th of 2004?

A. Yes.

Q. And that termination played out some in the divorce proceedings, didn't it?

A. I would assume they did. I don't recall how it played out.

Q. Do you recall the -- a period of time where the State treated that termination as a voluntary reduction in income on your part?

A. I don't -- I don't recall.

Q. I've placed before you two letters, both dated November 4th of 2004, right?

A. Yes.

Q. One is from --

MR. REISENAUER: Your Honor, I'm going to object at this point. We've been kind of doing this a few times here talking about items that are not exhibits, are not into evidence, and if we're going to talk about them I guess I would at least ask that we have them marked and put into evidence so frankly the Court is aware of what is on the record later and I can use the items if I need to later.

THE COURT: That seems reasonable. At this point the last thing that was referred to was Exhibit 133. I don't know what the two items are. They haven't

yet been identified.  I presume that Mr. Mohring was about to do that and then if they're not in evidence we should just make sure that they're made available to the opposing counsel.

MR. REISENAUER:  Thank you, Your Honor.

MR. MOHRING:  I think our list stopped at 137, Your Honor.  I'm marking these at 138, the letter from Merrick & Schaar, and 139, the letter from Mark S. Douglas.  So you have these letters in front of you.

My question is only going to be if these help refresh your memory about how your termination from Alpha Opportunities impacted the custody and support litigation in your divorce.  Merrick & Schaar, is that a law firm?  Do you recognize the name?

A.  Yes.

Q.  And who are they to you?

A.  One of them was my attorney.

Q.  Okay.  In the divorce proceeding?

A.  Yes.

Q.  And on the first page the third paragraph in the letter discusses your termination.  Do you see that?

A.  Yes.

Q.  Does that refresh your memory about how the termination played out in the divorce -- in support litigation?

A.   I don't know how that affected any child support issues.

Q.   Do you recall that it was an issue though in the calculations?

A.   Child support doesn't go off of my income I don't believe.  I'm not sure how.

Q.   Let me ask --

A.   It may have but --

Q.   Let me just ask this question and I'll move on. Do you recall now having seen these letters that your termination, at least for a time, was treated in your -- in the divorce litigation as a voluntary reduction in income on your part?  Do you remember that now?

A.   It -- I see where you have highlighted here.  It just says something about it's not voluntary reduction in income and that I made a voluntary change of employment.

Q.   And my question is just does that ring any bell? Does that remind you about how your termination --

A.   It happened.  I'm not at Alpha anymore.

Q.   But do you recall that being an aspect of the divorce litigation?

A.   I guess I don't remember it to be that big of an issue.

Q.   Okay.  I want to ask you some questions -- I

guess if the Court wishes I'd move the admission of Exhibits 138 and 139?

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.  I did not receive a copy of 138 however.

THE COURT:  Can I see them?

THE WITNESS:  (Handing.)

THE COURT:  Any objection to 138 or 139?

MR. REISENAUER:  No, Your Honor.

THE COURT:  138 and 139 are received.

These are copies.  You must have the original still.

MR. MOHRING:  Yes.

THE COURT:  Very good.

Q.  (Mr. Mohring continuing)  We spoke this morning, Ms. Vettel, about your term of employment at Head Start and I believe that you testified that you were hired there in November 2004 and discharged on March 18, 2005. Do you recall that?

A.  Yes.

MR. MOHRING:  And I showed you a collection of documents.  Those have not been marked as an exhibit, Your Honor, but I have marked those as Plaintiff's Exhibit 140, documents that relate to her employment at Head Start, and I would offer that in light of the

prosecution's request at this time.

THE COURT:  Any objection to 140?

MR. REISENAUER:  No, Your Honor.

THE COURT:  One hundred forty is received.

Q.  (Mr. Mohring continuing)  The termination at Alpha then happened in October 2004, right?

A.  Yes.

Q.  And at Head Start in March of 2004 -- March of 2005.

A.  Yes.

Q.  So these were also things that had happened and that you knew had happened before the trial in the Rodriguez case.

A.  Yes.

Q.  All right.  I want to ask you a few questions about your contact with law enforcement yourself.  Have you ever been arrested?

A.  Yes.

Q.  Do you recall an arrest in or around September of 1998 involving a charge for operating a motor vehicle without a -- without insurance in an accident?

A.  Yes.

Q.  Can you tell us what happened?

A.  I was stopped at a stop sign and there was a police officer ahead of me at the stop sign and I leaned

over to read something in my car and bumped into him at about a half mile an hour and then asked him why he backed into me like that but, yeah, and I did not have insurance at that time.

Q.   And a warrant was issued?

A.   I don't know that -- I had to go in and he said come in at a certain time and bring bond money and I went -- had somebody drive me there.  I went in and then paid my money and did the paperwork and went home.

Q.   I want to ask you some questions about the actual procedure that you went through in the course of that case.  Do you think that looking at the documents might help you remember?

A.   Yeah.  Can I have that, please?

Q.   That's Exhibit 110 (indicating).  So directing your attention to the third page, do you see a discussion of warrants, a warrant date and a warrant type?

A.   The Sheriff's Return?

Q.   Actually I'm on the third page of the exhibit.  Kind of a computer printout.

A.   Yeah, I see it.  There was a warrant but nobody like came to my house and took me away and --

Q.   Let me take you two pages back.  Do you see the Sheriff's Return?

A.   I did see the Sheriff's Return, yes.

Q.   And that reflects an arrest and a time of that arrest?

A.   I went in.  Called them, made the appointment, told them what time I'd be there so I -- I don't recall getting a warrant or anything along this line.

Q.   So where it says, "I have arrested the within named defendant on 9/2/98 at 3:30 p.m. and have Rebecca Zablotney now before the Court in custody," you're saying that's not accurate?

A.   Unless -- I walked in there myself so that's what I was told to do, no.

Q.   How long after the accident did you walk in?

A.   I'm not sure.  I'm sure it's on here.

Q.   Same day?  Different day?

A.   (No response.)

Q.   Let me ask you to go further into the document one more page from the Sheriff's Return.  Do you see a document that has the caption "Booking Card?"

A.   Yes.

Q.   You were booked.

A.   Yes.  I went in, I paid, they made me sit and wait for paperwork and I went home.

Q.   You posted a bail bond with a bonding company, next page?

A.   Yes.

Q.   All right.  So when you said you'd been arrested before, was this one of the arrests that you had in mind?

A.   Yes.

Q.   Let me ask you about another one.  Do you recall an arrest in March of 1999 looks like for the same charge, driving without insurance?

A.   (No response.)

Q.   Exhibit 111?

A.   This might be the one I'm thinking of.

Q.   If you look on the very last page, there's the officer's account of what happened on this one.  Maybe that will help remind you.

A.   Okay.  I guess I don't remember this.

Q.   The document indicates that you were placed under arrest, read your Miranda warnings and transported to the police department.  You don't remember that happening?

A.   No, actually I don't.

Q.   If you look the fourth page down there's a document that bears the caption "Notification of Rights and Acknowledgment."  Do you see that?

A.   Yes.

Q.   There's a bunch of information but it includes

that you have the right against self-incrimination.  You have the right to remain silent.  Do you see that at paragraph four?

A.  Yes.

Q.  The right to assistance of an attorney at paragraph five?

A.  Yes.

Q.  To be admitted to bail pending trial -- to be admitted to bail pending trial at paragraph six?

A.  Yes.

Q.  And the signature at the bottom of the page, is that yours?

A.  That's mine.

Q.  Next page there's a caption "Guilty Plea" and a date?

A.  Yes.

Q.  And a signature also?

A.  Yes.

Q.  Yours?

A.  Yes.

Q.  On the first page there's a series of -- at the bottom of the page there's notations that reflect a series of counter payments from -- looks like the first payment March 12, '99 through August 20th of '99.  Do you see that?

A.   Yes.

Q.   Do you recall making payments on a case like this?

A.   (No response.)

Q.   The amounts range from $9 to $50?

A.   Yes.  I obviously made them.

Q.   You have no memory of any of this?

A.   I mean, I know I -- I know that I was driving without insurance when I was -- all these years ago but I don't -- I don't recall the specifics of that.

Q.   Don't recall signing the form?

A.   I see I signed it.

Q.   And these are events, one in '98, one in '99, that obviously happened before the trial in the Rodriguez case in 2006.

A.   Yes.

Q.   At least one of them you remember?

A.   Hard to forget that one.

Q.   Now I asked if you've ever been arrested before -- focusing on the period before, either during or before the trial in 2006.  Have you been arrested on other occasions?

            MR. REISENAUER:  Objection, Your Honor. Irrelevant.

            THE COURT:  Perhaps you want to tie in the

relevance because if it's after what relevance --

MR. MOHRING:  I'm sorry, I must have misspoke.

Q.  (Mr. Mohring continuing)  I'm focusing on the time period either during or before the trial in the Rodriguez case.  We've talked about one arrest that you clearly remember.

A.  Right.

Q.  Are there any others that you remember in that time frame anytime that --

A.  No.

Q.  Okay.  We've been talking about arrests.  I want to ask you about convictions.  As you've seen from the documents in Exhibit 110, the September 1998 incident resulted in a conviction for operating a vehicle without insurance in an accident?

A.  Yes.

Q.  And do you recall was there a guilty plea in that case?  Do you recall how you -- did you stand trial?

A.  It said I just plead guilty with no trial.

Q.  I'm asking, does that refresh your memory?

A.  Yeah, yes.

Q.  So there was a guilty plea and you were convicted and that's a misdemeanor offense.

A.  Yes.

Q.   The March 7 one you've been looking at that reflects making payments, that also resulted in a conviction for driving without insurance.

A.   Yes.

Q.   Let me ask you just about one more.  This is Exhibit 113.  We have been talking about March 7th, 1999.  On May 14th, 1999, you were charged again with among other things driving -- well, driving under suspension and driving without insurance; is that right?

A.   Yes.

Q.   And if you go two pages back from -- I'm sorry, three pages back from the end the officer's notes appear.  Do you see that?

A.   Yes.

Q.   Maybe that will help you remember what happened on that day.  Do you remember this incident now?

A.   I can't tell you that I remember this -- the specifics of this.  I just don't.

Q.   The second page also reflects a series of payments?

A.   Yes.

Q.   Further down there's an Advice of Rights form signed by you also?

A.   Yes.

Q.   And the next page after the Advice of Rights form

a guilty plea also signed by you?

A.   Yes.

Q.   And the second to the last page appears to be a schedule of payments?

A.   Yes.

Q.   Your name and birthdate at the top?

A.   Yes.

Q.   Based on this do you believe that you were again convicted in May of 1999 of driving without insurance?

A.   Yes.

Q.   All right.  I want to ask you some questions about the process of the trial and the jury selection process itself.  Do you recall initially being -- receiving information that you were potentially a juror in a federal case?

A.   I didn't know what case.  I just received some paperwork in the mail that I was to fill out.  There were no specifics.

Q.   And was that paperwork extensive or fairly brief?

A.   It was on green paper and probably, I don't know, three pages maybe.  This is of the --

Q.   I don't know about the green but you see the first -- first couple pages of Exhibit 100?  So the top three pages appear to be a form generated by the United States District Court in Bismarck?

A.   I don't recall this being the first thing that I filled out but --

Q.   Do you see a signature and a date on the first page of the --

A.   April 11th of '06.

Q.   In any event you received some -- was the first communication about what led to your involvement on the jury in this case, did you get that by mail?

A.   I did.

Q.   And it was a form that you filled out and sent back?

A.   Yes.

Q.   And a relatively short form?  You said a few pages?

A.   Yes.

Q.   All right.  And then at some time after that did you come in for a longer written --

A.   Yes.

Q.   And if you look further down on -- into Exhibit 100, can you tell me does this appear to be a copy of that longer document that you filled out?

A.   Yes.

Q.   And on the very last page there's a date.

A.   June 6, 2006.

Q.   Does that sound like about the time that you

filled out the longer form?

A.   Yes.

Q.   And tell us about how that came about, the longer questionnaire.

A.   I got a letter after we filled out the first one and told me what time to be here, what day to be here to continue through the selection process.

Q.   And when you say "here," you're talking about the federal courthouse in Fargo?

A.   Yes.

Q.   Were you the only one who came in that day?

A.   No.   There was a whole room full of people.

Q.   And that room full of people, did they receive instructions about -- were they told anything as they filled out the forms?   Were you told anything as you filled out the form?

A.   Yes, we were, but I don't -- I couldn't tell you what that was.

Q.   It's a long form.   Do you remember being told anything about the importance of being accurate?

A.   Yes, and truthful.

Q.   And were you told that if there was anything personal that you could just -- you could make some notation of that and you'd be given an opportunity to communicate in private?

A.    I don't remember being told that we could communicate in private.

Q.    Okay.  Twenty-eight pages, how long did it take?

A.    Over an hour.

Q.    And as you filled out the form, did you take as long as you needed?

A.    Yes.

Q.    So the letter came in sometime before June of 2006.  The questionnaire was on June 6th of 2006.

A.    Yes.

Q.    Sometime after that did you come in again a third time?

A.    Yes.

Q.    And was that for actual questioning?

A.    Yes.  We came into this courtroom with counsel.

Q.    And with the judge, Judge Erickson?

A.    Yes.

Q.    And did he provide you with some instructions then about the process?

A.    Be truthful.

Q.    Do you recall him giving you a copy of the questionnaire and asking to verify in fact this was the questionnaire that you filled out?

A.    I don't recall if I got a copy of this for verification.

Q.    Exhibit 101 (indicating).  So having shown you what's been marked as Petitioner's Exhibit 101, do you see in the middle of the first page "Examination of Rebecca J. Jensen," that's you?

A.    Yes.

Q.    And if you look on the next page, let me just ask you to review to yourself, you're asked a question about questionnaires?

A.    Yes.

Q.    And you were asked about if there was anything that you wanted to update further down on that page?

A.    Right.

Q.    And you had answered:  "No, I wrote exactly what I thought."  When -- so we've been talking about it.  On several steps in this process you got a letter, you did a questionnaire, and then you came in for questioning.

At what point in that whole process did it become clear to you that this was the case about Alfonso Rodriguez and Ms. Sjodin?

A.    There was some speculation.  When I first filled out that green sheet I just filled it out and sent it back in like I was supposed to, like I do with -- you know, when you get called for jury duty for other cases then -- I guess I really didn't pay attention to it so I'd say a few weeks after I -- you know, that I got

picked for the second -- by the time I got picked to fill out this questionnaire I think that everyone had a pretty good idea but still no confirmation.

Q.  Certainly by the time that you're in court answering questions though it's clear what this case is about.

A.  Right.

Q.  And that this is a -- this is the Rodriguez case that you were being considered for?

A.  Yes.

Q.  At that point you wanted to be on the jury, right?

A.  It's not that I really wanted to be on the jury but I think that I just stressed that I wanted to tell the truth.  And I remember making a comment that if -- if there are everybody else except just for me and I don't agree I'm the one that has to sleep with that decision at night and I'm not going to be pressured into making a choice.  And I don't know -- I mean, I -- there's no way I could have been pressured into making that decision so I -- I mean, I remember saying that when we were sitting at those tables.  So I don't know if that had something to do with it or not.  I do say a lot.

Q.  Do you recall speaking with a reporter in the

days after the trial was done and telling them that at first you were excited by the prospect of sitting on the Rodriguez story?

A.  It is a little bit exciting I guess.  You just don't -- not everyone is going to have an experience like that.  I'm glad I could share that with my kids.  I think, you know, they're proud of what their mom accomplished.

Q.  Excited at the prospect of sitting on the Rodriguez jury, what did you mean?

A.  It was interesting to think that I was going to be a part of that I guess.  I mean, I was scared but it was exciting to --

Q.  Do you recall in a time frame of jury selection that it was possible that you would be selected to be on this jury e-mails or social media posts about jury selection and the possibility that you might be chosen and your interest in being chosen?

A.  I couldn't tell you what I said but I'm sure I talked to people about it.

Q.  And you were asked -- do you have the questionnaire there?

A.  I do.

Q.  You were asked the -- one of the questions was: "Do you want to serve as a juror on this case?"  I'm

looking at question 114 on page 25.  Do you see that?

A.  Yes, that I -- I am proud and I want my kids to be proud of me and, you know, I'm -- I'm not a liar so if -- you can call me many things that's not one of them.  That's -- you know, I think of myself to be truthful.  So that's what I wrote.

Q.  And so when you were asked "Do you want to serve as a juror on this case?" you truthfully answered "yes."

A.  Yes.

Q.  And you added some additional explanation along the lines that you were just saying that if you were called to serve "and it happens to be this case" you'd consider that an honor.  And then you also volunteered the information that you believe that you're qualified, "have an ability to be fair and nonjudgmental.  I am a leader need be and also work well in a group.  Unafraid to say exactly what I believe and teach my kids the same."  That's all information that you provided in the questionnaire?

A.  That is what I wrote for the answer to that question.

Q.  You were asked questions about whether you could be fair and open-minded.  If you look at question 62 on page 14 asks about your feelings about the death penalty and you wrote that you have no personal feelings, that

94

you would need to hear the facts and what the options are?

A.   Yes.

Q.   Question 69 on page 15 you were asked a bunch of yes-or-no questions but that focused in various ways on the death penalty, right?  The very next page.

A.   Yes.

Q.   And you indicated in the last two questions that you have no opinion on the death penalty, that you could base the decision to impose it based on the facts and the law in this case -- in the case.

A.   Right.  I wrote "yes" to that.

Q.   Yes.  And similar on page 24, question 111, you were asked if you would base your feelings -- base your decision on guilt or innocence solely on the evidence presented to you during the trial and you answered "yes"?

A.   Yes.

Q.   And finally you were given an opportunity to add anything else that you wanted to say, page 27, question 120.

A.   Yes.  Some of it is cut off.  It looks like I wrote on the back of a page or in the side or something so some of it's cut off.

Q.   So in the margin comment you mention that you

live -- used to live next to a registered offender. You're talking about a registered sex offender, right?

A.   Yes.

Q.   And you offered the information that you weren't leary, that you asked him directly, were not concerned to have your kids home after school, didn't believe that he would hurt you or your children.  And that was information that you volunteered?

A.   I did.

Q.   And then in your answer at 120 you talk about your general availability --

A.   Yes.

Q.   -- to serve on the jury.

A.   We were basically told there are no excuses.

Q.   Beg your pardon?

A.   We were told really that there are no excuses.

Q.   All right.  I just have a few more questions about the questionnaire.  On the first page of the questionnaire, question 4 asks for a 10-year period employment summary.  Do you see that?

A.   Yes.

Q.   Your employment at the Anne Carlsen Center for Children does not appear in that list, right?

A.   Right.

Q.   Question 57 on page 12 asks if you, any member of

your family, or a close friend had ever been arrested and you answered "no."

A.    Right.

Q.    Now the correct answer, based on at least as you remember it today, would have been yes.

A.    Well, now I don't remember.

Q.    Question 55 on page 11 asks if you have ever been convicted of a state or federal crime, excluding any simple traffic violations, and then gives the opportunity to talk about whether it was a felony, a misdemeanor and what punishment you received and you answered "no" there.

A.    I did.

Q.    We talked, Ms. Vettel, about your divorce litigation.  I want to ask you a couple questions about other lawsuits that you had participated in.

Did you in a civil lawsuit sue Jason Zablotney for something having to do with the wedding dress and the cost of the wedding dress?

A.    I don't know if it was about the wedding dress.

Q.    Do you recall suing him?

A.    There was some back medical that he owed me for. I recall that.

MR. MOHRING:  Could I have a moment, Your Honor?  I apologize.

THE COURT:  You may.

Q.  (Mr. Mohring continuing)  Showing you what's been marked as Petitioner's Exhibit 131 (indicating), on the first page it lists a plaintiff and a defendant.  Do you see that?

A.  Yes.

Q.  And there's a notice of the hearing on that page that talks about March 16, 1998.  Do you see that, same page?

A.  Yes.

Q.  This document reflects a lawsuit in which you sued Jason Zablotney?

A.  Yes, for not --

Q.  And if you look on the second page there's a discussion about the amount.

A.  Yes.

Q.  And if you look on the very last page in paragraph Roman Numeral VIII on the very top of that page, do you see discussion of that amount?

A.  Yes.

Q.  And it talks about payment of a wedding dress?

A.  There were -- fees that he owed me for that were included in this.

Q.  Okay.

A.  That he was required to reimburse me for.

Q.   So there were a number of things that he owed you money for and you sued him to get it?

A.   Yes.

Q.   Sometime in 1998.

A.   Yes.

Q.   And ultimately were you successful?  Did you get --

A.   Yes.

Q.   Do you recall suing him again?  Was that the only lawsuit?

A.   This was -- there was some medical bills that he was responsible for that he did not pay.

Q.   And you sued him as well?

A.   I did.  I went through the court system to resolve that.

Q.   Exhibit 136 (indicating), Exhibit 136 is -- reflects a suit by you against Jason Zablotney?

A.   Yes.

Q.   And what date, what time frame are we talking about?

A.   In '02.

Q.   Okay.  And finally you had been sued in a collection action Hospital Services suing you for medical expenses?

A.   Yes.

Q.   And you recall that?

A.   Yes.

Q.   And all of these things are lawsuits, two by you against Mr. Zablotney and one by a collection action against you.  These are all things that happened before the trial.

A.   Yes.

Q.   Question 54 on page 11 asks if you or any member of your immediate family had ever been involved in a lawsuit.

A.   I did answer "no."

Q.   You answered "no."

A.   Yeah.  I guess I didn't realize that divorce was really a lawsuit.  I didn't understand.

Q.   You did realize that suing somebody for money was a lawsuit though, right?

A.   It was enforcing the Divorce Decree.  I understand now how it works but --

Q.   In 2006 though you were aware that you had sued Mr. Zablotney twice?

A.   Yes.

Q.   And you were aware that you had been sued at least once in a collection action for medical services?

A.   There was a judgment, yes.

Q.   Question 73 on page 16 asks if the fact that this

case involves allegations of kidnapping resulting in death interfere in any way with your ability to serve as a juror.  You answered "no"?

A.  Yes.

Q.  And question 52 on page 11 asks if you or any family member or anyone close to you has ever been the victim of a crime.

A.  Right.  I wrote "no."

Q.  And you wrote "no" when at the time you had been the victim of an attempted rape in which there was a death threat, right?

A.  Yeah, yes.

Q.  At a time when you yourself had been the victim of domestic violence in two marriages, violence that had been found by a Court to exist?

A.  Yes.

Q.  At a time when your daughter had been a victim of domestic violence and possible sexual abuse?

A.  Yes.

Q.  You answered "no."

A.  I did.

Q.  Did you answer "no" because you were afraid that a truthful answer and that information would result in you being struck from the jury, you not being able --

A.  No.

Q.    -- to participate in this case?

A.    No.    No one ever shot me.    Nobody ever put me in the hospital.    Nobody -- I mean, I don't know.    Crime was a more severe thing to me I guess.    I mean, I -- I wrote "no."

Q.    The question asks:    "Have you...or anyone close to you ever been a victim of a crime?"

MR. REISENAUER:    Asked and answered, Your Honor.

THE COURT:    Overruled.

MR. MOHRING:    You can answer.

A.    Yes, you asked that question.

Q.    (Mr. Mohring continuing)    And it gives you an opportunity to give a year and the relationship of you to the person that was the victim, a discussion of the crime and the opportunity to provide information about whether someone was caught or convicted.    Do you see that question 52, page 11?

A.    I do.    I do see that.

Q.    As you sit here today, do you remember why you decided to withhold that information from this questionnaire?

A.    I didn't purposely withhold it.    I mean, those were things that happened in my divorce.    They weren't -- I mean, I would probably truthfully still

write "no" today if I had to fill this sheet out.

Q.  You testified earlier today that you were yourself the victim of an attempted sexual assault in which there was a threat of death.  That had nothing to do with the divorce, right?

A.  Right, it didn't.  It lasted about six seconds and it was over and done.

Q.  It was significant enough that it was included in your declaration.

A.  Right.

Q.  You reviewed it, you signed it?

A.  Yes.

Q.  How can we reconcile the truth of your testimony today with your answer in the questionnaire?

MR. REISENAUER:  Your Honor, I'm going to object.  That's not in the form of a question.  It's an accusation frankly.

THE COURT:  It's argumentative.  Sustained.

Q.  (Mr. Mohring continuing)  I asked you about a statement you made to the press in the days after the verdict, in the days after the case was done.  You have made some comments since then and I want to ask you just about one.

MR. REISENAUER:  Your Honor, can we approach, please?

THE COURT:  You may.

(The following sidebar discussion was had:)

MR. REISENAUER:  Your Honor, I was just handed a copy of a newspaper article which talks about this particular hearing.  This witness was interviewed by the press.  She indicated her thoughts about their verdict.  She has a right to do so.  It has nothing to do with what we're here for today.  It has nothing to do with frankly what occurred in the jury deliberation room or in, you know, her answers to the questions to the Court during voir dire, anything of the like.  It's just an attempt to frankly do what we're trying not to do and that is make this a press case.

MR. MOHRING:  The question -- you done?

MR. REISENAUER:  Yes.

MR. MOHRING:  The question that I was going to ask is the story quote provides this quote:  "What makes me angry is the whole stupid process.  I said this from day one.  I did not put him there.  He put himself there.  We just made it legal."

The time frame of the statement relates it back to the beginning of the case and therefore I think it's relevant.  And my question is going to be what did she mean by that.

THE COURT:  The objection's overruled.

(Sidebar concluded.)

Q. (Mr. Mohring continuing)  I'm going to ask you about this in just a second, Ms. Vettel.  There's one other question I meant to ask.

Question 39 on page 8, do you still have the questionnaire there?

A. Yeah.

Q. Question 39, page 8, asks about television shows you watch regularly.

A. Yup.

Q. Law & Order does not appear there, right?

A. No.

Q. You did not write down anything about Law & Order?

A. No.

Q. All right.  One question that I have about the newspaper story.  You have a copy of the newspaper article?

A. Yes.

Q. And we'll mark that as 141.  At the top of the second page you were quoted as saying:  "What makes me angry is the whole stupid process.  I said this from day one.  I did not put him there.  He put himself there.  We just made it legal."

A. Yes.

Q.   What do you mean?

A.   About him being on death row?

Q.   About the whole stupid process from day one.

A.   Well, there was other stuff written in there.

Q.   Go ahead, read what's the whole quote.

A.   That's the whole quote, the quote that's printed, but it obviously shows that some is missing.

Q.   What have you felt from day one about the whole process that you were talking about?

A.   I was talking about the appeals process and then what I've said from, you know, the day that -- when we were finished from that day saying it wasn't my -- it wasn't my opinion.  I did not put him on death row.  I did not -- he did it.  He put himself on death row.  He knew what he did.  He knew the consequences and we just had to go through the process.

Q.   You said this from day one.  What did you say from day one?

A.   From the day that we've been -- from the day that we've been done he did this to -- he did it.  He knew the consequences.  I am not responsible for sentencing him to death row.  He is responsible for that.  He did this.  He knew the consequences.

Q.   You just made it legal.

A.   We just made it legal.

MR. MOHRING: Your Honor, I tender the witness at this point.

THE COURT: Why don't we go ahead and take a break at this point. We'll break for 15 minutes. We'll reconvene at 3:10 p.m.

(Recess taken; 2:55 p.m. to 3:15 p.m.)

THE COURT: We'll go back on the record in a case entitled United States of America versus Rodriguez. It's 2:04-cr-55. Mr. Rodriguez appears by telephone along with his counsel, Mr. Margulies. Mr. Mohring, Ms. Menendez and Mr. Wiseman appear on behalf of the defendant. The United States appears through their counsel, Mr. Reisenauer.

Ms. Vettel's on the stand. When we broke Mr. Reisenauer was about to conduct a cross-examination. You may proceed.

MR. REISENAUER: Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q. Ms. Vettel, I have a few follow-up questions from the earlier questioning by Mr. Rodriguez' attorney. I'm going to touch on a few things. I'm not sure we'll take them in the same order that they were brought up earlier but the questionnaire that you filled out in this matter that Mr. Mohring asked you about, where did you do that?

A.   Here.

Q.   Here in the courthouse?

A.   Yes.

Q.   And there were other individuals also filling out forms at the time?

A.   Yes.

Q.   And when you filled out the form to the best of your recollection did you fill it out as completely as you could?

A.   Yes.

Q.   And did you believe at the time that you answered the questions as honestly as you could?

A.   I do.

Q.   I'm going to talk about a few things that were brought up in regard to that questionnaire.  Prior to doing that though you also talked with Mr. Mohring about a declaration that you had signed and I believe he showed it to you earlier.  Do you recall that?

A.   Yes.

Q.   Where did that take place?

A.   In my living room in Jamestown.

Q.   And Mr. Mohring was present; is that right?

A.   Yes.

Q.   And was there anybody else with Mr. Mohring at the time?

A.   Yes.

Q.   Do you recall how many other individuals?

A.   Just one, just one woman.

Q.   And I take it during the discussion with Mr. Mohring and this other woman that they inquired about what had occurred during the jury deliberations with you?

A.   I'm not sure.  I know we discussed a lot of things.

Q.   You wrote some things down in your declaration about what happened during jury deliberations.  Do you recall that?

A.   Yes.

Q.   Okay.  And I assume that that was brought up as part of the discussions.

A.   Yes.

Q.   Okay.  The information wasn't provided to you by them, correct?

A.   No, it wasn't.

Q.   Okay.  Let's talk about then a few things in regard to the questionnaire that you were asked to fill out, and towards the end of your discussion here with Mr. Mohring he asked you a few questions about that in your answers.  Part of your declaration indicated that you discussed this -- this information you obtained when

you worked at the various places and on your questionnaire you answered that you had worked at Head Start and you had worked at a couple other places, Alpha Opportunities and the Anne Carlsen Center where you dealt with disabled children.  Do you recall that?

A.  Yes.

Q.  And you talked about that during your deliberations, correct?

A.  Yes.

Q.  Okay.  And you mentioned that in your declaration.

A.  Yes.

Q.  And then Mr. Mohring asked you about your employment at the Anne Carlsen and you indicated that that was between 1998 and 2000, correct?

A.  Yes.

Q.  When you filled out the form, you just indicated you filled it out the best you could; is that right?

A.  Yes.

Q.  Okay.  I'm going to hand you that particular jury questionnaire form and basically question No. 4 relates to your prior employment, correct?

A.  Yes.

Q.  And you filled that form out on question 4 to the extent that there was room; is that right?

A.   Yes.

Q.   Okay.   The Anne Carlsen employment was prior to any of those items that you listed timewise; is that right?

A.   Yes.

Q.   So it just didn't get placed on the form; is that correct?

A.   Yes.

Q.   You didn't not put it on there because you were trying to hide your employment?

A.   No.

Q.   And when you discussed your knowledge of disabled children during jury deliberations, I think you said that other individuals also commented about their experience with individuals of that sort or other matters of that sort; is that right?

A.   Yes.

Q.   And so you all discussed your prior experiences with employment and life experiences that may have had something to do with this discussion; is that right?

A.   Yes.

Q.   Exhibit 132 is the e-mail that was discussed with you where -- I'll hand you Exhibit 132, where in that e-mail there was -- there appears to me at least a forwarding of a message that you had previously received

about the disappearance of Dru Sjodin.  Is that what that is?

A.  Yes.

Q.  Okay.  And what was the date of that, if you would look at it?

A.  November 27th.

Q.  Of 2003?

A.  2003.

Q.  Okay.  So that was shortly after Ms. Sjodin's disappearance; is that correct?

A.  Yes.

Q.  If you turn to the second page there there's a discussion about her disappearance and is it -- does it look to you like you had received that and that's what you forwarded on?

A.  I would assume that's what I got forwarded.  I'm not --

Q.  Well, let me ask you a couple questions about it.

A.  Okay.

Q.  At the top of that little message it says: "First of all, I must say this is the hardest email I have ever written and it is no joke."  And it goes on to discuss the disappearance of Dru Sjodin, correct?

A.  Yes.

Q.  And it is signed by an individual.  It says:

"Thank you, Julian White, UND "Flight Operations"?

A.   I don't know who that is.

Q.   You don't know Julian White?

A.   No.

Q.   And you didn't at the time, did you?

A.   No.

            MR. MOHRING:   I missed the last question.

Q.   (Mr. Reisenauer continuing)   Would I be correct in saying that you would have passed this on just out of concern for an individual that was missing?

A.   Yes.

Q.   And there's not a question that you knew about this case though, correct?

A.   (No response.)

Q.   You knew about --

A.   Yes.

Q.   And when you came in to jury selection and were questioned by Judge Erickson, you obviously knew about it then, correct?

A.   Yes.

Q.   And you had seen articles in the paper, maybe on TV and radio, correct?

A.   Yes.

Q.   Let's just briefly go back to that questionnaire that you filled out.   I believe question 88 indicates

that you said you did hear about this case on TV, radio, newspapers, heard other people discussing it.  You checked those marks.  Does that sound correct and accurate?

A.  Yes.

Q.  Mr. Mohring asked you about when you worked at Head Start and the regulations there about mandatory reporting.  Do you recall that?

A.  Yes, I do.

Q.  I believe you testified in answer to him that you had actually reported an individual for some type of abuse that you thought was occurring when you worked there; is that correct?

A.  Yes.

Q.  Do you recall if you mentioned that on your jury questionnaire?

A.  I don't recall if I mentioned that or not.

Q.  Okay.

A.  Maybe not that specific instance about being a mandated reporter.  I've always had to do that.

Q.  I'm going to hand you what's a copy of your jury questionnaire (indicating).

A.  Mm-hmm.

Q.  And it would be the question there on the bottom of the page.  That is your answer to question No. 96.

Do you see that?

A.   Yes.

Q.   And what was that question?

A.   If I "ever witnessed a crime, please tell us the type of crime, whether you talked to the police, and whether you tried to identify the suspect."

Q.   And you actually did say yes, correct?

A.   Yes, about that instance.

Q.   And what did you write in regard to that?

A.   I was working for Head Start.  It was when -- when a -- and was a mandated reporter and had to call the police and supervisors about a situation which resulted in this mother losing her children and having her parental rights terminated.

Q.   You might not recall writing that today but that is your writing?

A.   Yes.

Q.   At the end of Mr. Mohring's discussion with you he brought up the incident that occurred with the State Fair worker.  Do you recall that?

A.   Yes.

Q.   You said that took about six seconds?

A.   Yes.

Q.   Can you tell me exactly what happened in those six seconds?  Were other people present?  I got that

impression from you.

A.   Yes, other people were present.  I was just walking down on the midway with some friends and he came up behind me and grabbed me and tried to pull me away and said that to me and they kind of just pulled harder and -- and then he left.

Q.   And that was the end of it?

A.   That was the end of it.

Q.   But you did bring that up or mention it during jury deliberation.  You recall that?

A.   I did.  It was a moment of panic.

Q.   And then you put it in your declaration.

A.   Yeah.

Q.   Okay.  Now Mr. Mohring also asked you I guess a number of questions and there are a number of exhibits that have been put into evidence pertaining to your divorces with Mr. Zablotney and Mr. Jensen, correct?

A.   Yes.

Q.   And I take it that each one of those was a pretty emotional situation with you and with them, correct?

A.   Yes.

Q.   Just to clarify a couple things here, Mr. Zablotney was your first husband?

A.   Yes.

Q.   When did you marry him?

A.    '95.

Q.    1995?

A.    Yes, July of '95.

Q.    All right.  And when did the divorce begin, do you recall?

A.    Beginning of '96, mid '96.

Q.    Okay.  And then you married Mr. Jensen I believe you said in the year 2000?

A.    Yup, the last few days of 2000.

Q.    And you weren't married too long with Mr. --

A.    About three years.

Q.    So that divorce began in 2002, three?

A.    2003.

Q.    Okay.  So the trial in this case was in the summer of -- began in the summer so your divorce started prior to that, correct?

A.    Yeah.

Q.    And there has been an ongoing custody dispute of your daughter with Mr. Jensen, correct?

A.    Yes.

Q.    And is that still ongoing?

A.    It will continue for the next five years.

Q.    And there have been a number of incidents with Mr. Jensen as the result of the dispute and there was also a number of incidents with Mr. Zablotney, correct?

A.   Yes.

Q.   Let's go back to your questionnaire if we could just for a second.  I'm going to hand you the whole questionnaire and it's Exhibit No. 100.  I'm going to just turn to a few of the questions if we could in a second.

So if you turn to question No. 3 real quick, that just asks your present marital status, correct?

A.   Yes.

Q.   And you indicate that you were divorced.

A.   Yes.

Q.   So at the time you filled this out at least you had filed for the divorce with regard to Mr. Jensen, correct?

A.   I think our divorce was final.  It's just never ended since then.

Q.   Okay.  Now Mr. Mohring asked you a lot of questions about the divorce proceedings and the different hearings that you had, the Court trials and the motions and even the change of venue and all that.

Now question 59 asks if you'd ever been in a courtroom and you indicated that you had for your divorce.  Do you see that?

A.   Yes.

Q.   Okay.  And you said, "...3 times for issues

related to divorce and custody."

A.   Yes.

Q.   Do you see that?  Okay.  Now I'm sure Mr. Mohring would argue with you that you'd only been there three times since he brought up a number of different motions and hearing dates and all that stuff.  So can I ask why did you write three times?  What were you thinking there?

A.   Well, like for the -- says there was a hearing for a change of venue.  I didn't have to appear in court for a change of venue.  And some of them that were highlighted were court dates that then got changed to a different day and so those were highlighted as well.  I didn't appear in court all of those times.

Q.   But when you answered this question that you'd been in court for divorce three times, that was the best recollection you had about being in court physically?

A.   Yes.

Q.   Okay.  Let's get back to the question.  You were asked in regard to, you know, the incidents of abuse and the like that were brought up as part of your divorce proceedings, which included some indication with regard to your daughter.

Question 95, if you would, that question asks you if you've ever been in a situation where you

feared being hurt or killed as a result of violence of any type and you did check "yes."  Do you see that?

A.  I did.

Q.  And what did you say about that?

A.  "I had a very brief few month marriage in 1996 to abusive man" who I "have made amends for the sake of our son and he no longer..." -- I believe it says, "He no longer drinks."

Q.  Okay.

A.  But it is cut off.  I have a few letters there.

Q.  Yeah, it's cut off.  So I take it you were referring there to I guess your first marriage with Mr. Zablotney?

A.  Yes.

Q.  And, if you would, turn to the bottom of the page there, question 97.

A.  Yes.

Q.  It also asks if you've called the police and you say "yes" there, correct?

A.  Yes.

Q.  And again first you talk about the Head Start experience and then you say that you called during a divorce from your first husband in 1997, correct?

A.  Yes.

Q.  Now we did hear that there were some restraining

orders that had been obtained and filed.  And during the time of the restraining orders you called the police in regard to those also --

A.  Yes.

Q.  -- is that right?  Okay.  Now when you have gone through the divorces and all of the various motions, I assume that you had an attorney representing you?

A.  I did.

Q.  Okay.  For each of the two divorces?

A.  Yes.

Q.  Okay.  And they would file various motions on your behalf I take it?

A.  Yes.

Q.  And sometimes when motions were pending I assume you met with your attorney and tried to make an agreement so things didn't end up in court?

A.  Yes, I try.

Q.  Okay.  And part of your dispute I guess that probably came up was not just child custody but also child support?

A.  Yes.

Q.  Okay.  And so I take it at times there were issues regarding that that the attorneys worked on with the Court and the judge?

A.  Yes.

Q.   Okay.   Mr. Mohring presented you with an exhibit earlier that was later marked as Exhibit 139 and he asked you some questions about your job at Alpha Industries and how much money you made there.   You recall that?

A.   Like $8 an hour something.

Q.   And he showed you this Exhibit 139.   I'm going to stay right here and ask you a question about it because it's my only copy.

Do you know who Mark Douglas is?

A.   He's a child support attorney so he works for their office.

Q.   For child support?

A.   Child support office.

Q.   And this is a letter I believe from Mr. Douglas to Judge Simonson; is that correct?

A.   Yes.

Q.   You weren't involved in making that letter or writing that letter, were you?

A.   No.

Q.   You never saw that before?

A.   No, the stuff behind it but not the -- not that letter.

Q.   Not the letter itself, okay.   I'm going to have you keep that.

Let's look at that questionnaire a little bit more, Ms. Vettel.  Mr. Mohring asked about question No. 114, if you would take a look at that again.

Question 114 basically asked you frankly straight out:  "Do you want to serve as a juror on this case?"  And you checked "yes," right?

A.  Yes.

Q.  Okay.  And what did you write right directly below that in the space?

A.  "I was called to serve jury duty for a court case and it happens to be this case.  I have always taught my kids, so have their teachers in school, that it's an honor."

Q.  Okay.  And down below then you wrote some more, correct?

A.  Yes.

Q.  What did you write there?

A.  "I believe I'm qualified and I have an ability to be fair and nonjudgmental.  I am a leader when need be and also work very well in a group.  I am unafraid to say exactly what I believe and teach my kids the same."

Q.  And when you wrote that you were being honest about what you said?

A.  Yes.

Q.  Turn back to question 62, if you would.  And

there the questionnaire asks you to describe your feelings about the death penalty in your own words. And can you tell us what you wrote there?

A. "I guess I have no personal feelings with this issue. I have never been in a position or been involved in topics concerning this issue. I would need to hear the facts and what the options are."

Q. Okay. And then Mr. Mohring actually asked you what your answer to question 69 was. Let's turn to that once more, if you would.

And there's a number of questions there in regard to the death penalty where you are asked to answer "yes" or "no" and you checked two yeses, correct?

A. Yes.

Q. And those are on the bottom, correct?

A. Yes.

Q. And the first "yes" is: "I have no opinion either for or against the death penalty, and I could base a decision to impose it based on the facts and the law in the case," correct?

A. Yes.

Q. And was that your opinion at the time?

A. Yes.

Q. And then the second question you answered yes to said: "In all fairness, I believe I can put aside my

feelings about the death penalty and impose the death penalty based on the facts and the law in the case," correct?

A.   Yes.

Q.   And was that your feeling at the time?

A.   Yes.

Q.   There's questions up above there that ask if you favor the death penalty or strongly in favor of the death penalty or if you're opposed to the death penalty. Do you see all those?

A.   Yes.

Q.   And you answered "no" to each one of those, correct?

A.   Yes.

Q.   Was that your opinion at the time?

A.   Yes.

Q.   Exhibit 101, Ms. Vettel, is that jury selection process that you talked about earlier and the questions when you came into the court that the judge had and that the other attorneys had.

That is a transcript of the questions and your answers. Do you understand that?

A.   Yes.

Q.   Okay. Could you just turn to -- on the top I believe there's a page number 2635. Do you see that?

A.   Yes.

Q.   And there Judge Erickson is asking you some questions in regard to the case, and if you look up on line seven the judge is asking about if you have any fixed views on the death penalty.  Do you see that?

A.   Yes.

Q.   And he says:  "And do you have any fixed views on the death penalty?"  And what was your answer?

A.   "No."

Q.   And he asks:  "Do you have any fixed views on what the appropriate punishment ought to be in this case right now?"  And what was your answer?

A.   "None."

Q.   And was that the truth at the time?

A.   Yes.

Q.   In your declaration you talk about the deliberations and that sort of thing.  And the Court asked you some questions about that when you were here. Turn to page 2637, if you would.

A.   (Witness complies.)

Q.   The Court is asking you questions about you being able to either give the death penalty as a verdict or life in prison as a verdict.  Do you recall that?

A.   Yes.

Q.   And at the bottom the judge asks you if you had

to, "I mean, I would have to feel comfortable with my own decision." You say that. Do you recall that?

A. Yes.

Q. I misspoke there. It was you saying that, not the judge. Do you see that?

A. Yes.

Q. And then you go on to say: "I mean, I don't know if I could just kind of go along with the group. If it's not something I don't believe in doing, I'm not going to do it." Do you recall that?

A. Yes.

Q. And was that your position at the time?

A. Yes.

Q. And would that have been your position with regard to either of the sentences at the time?

A. Yes.

Q. Mr. Ney, who was one of the defense counsel at the time, also asked you some questions. Do you recall that?

A. Yes.

Q. And shortly after the judge got done Mr. Ney asked you some questions. And if you would turn to page 2640 there, line 7, Mr. Ney says: "Since that time though, this sort of maybe was an impetus to start your thinking. Have you had any other thoughts about capital

punishment" or the death penalty and I'm sure he's referring there to your answers in the questionnaire. And what did you answer there.

A.   "I guess I feel the same way.  I mean, I don't have an opinion one way or the other.  I just don't. You know, I -- am I for if it?  I don't know.  Am I against it?  I don't know."

Q.   And was that a truthful answer at the time?

A.   Yes.

Q.   And then Mr. Ney continues and he asks you about your answer on question 65 in the questionnaire.  And you say you didn't have an answer for that question because you didn't answer it.  And he asked you why. And what was your answer there if you turn to line 22?

A.   "I just didn't feel like I could just pick one. There are circumstances for everything."

Q.   Now that question asked about whether or not there were certain circumstances or situations that would cause you always to impose the death penalty and you didn't answer it and your answer was it depends on the circumstances, correct?

A.   Yes.

Q.   And you were asked that several times about whether or not you were willing to listen to the evidence and the circumstances of the case, correct?

A.   Yes.

Q.   And did you indicate on each occasion that you would be willing to?

A.   Yes.

Q.   And when you listened to the evidence and you made your deliberations, did you take into account all the circumstances and evidence in the case?

A.   Yes.

Q.   Let's go back to the questionnaire if we could. Mr. Mohring asked you a question about your answers to whether or not you had been involved in lawsuits.  You recall that?

A.   Yes.

Q.   And on the questionnaire you said that you had not, right?

A.   I did.

Q.   Okay.  And then Mr. Mohring asked you about a couple cases you were involved in and I think you testified that two of them pertained to your ex-husband, collecting some money, correct?

A.   Yes.

Q.   I'm going to hand you two of those exhibits (indicating).  The first one is 131, okay?

A.   Mm-hmm.

Q.   And the second one is 136.  We'll look at 131

first.  At 131, Miss Vettel, is -- there's a claim you filed in small claims court in Ward County.  Would that have been in Minot, right?

A.  Yes.

Q.  And I think you talked with Mr. Mohring about that.  And this occurred way back in 1998; is that right?

A.  Yes.

Q.  And you put in a claim for $600, correct?

A.  Yes.

Q.  Okay.  And that partially was for a wedding dress and then some other miscellaneous items?

A.  Yes.

Q.  And if you turn to the second page there it says "Defendant's Answer," correct --

A.  Yes.

Q.  -- up on the top?  And in answer to your complaint that he owed you $600, you checked the second box, correct?

A.  Yes.

Q.  And he says:  "I owe the Plaintiff only part of what is claimed, as explained below."  And then he says: "Yes, I owe $600 for a charge card and would be glad to pay it," correct?

A.  Yes.

Q.   And then there was apparently some other dispute you had about something else that is mentioned there but the judgment that you received, which is on page four, was for $600, correct?

A.   615.

Q.   $600 plus a $15 cost.

A.   Yes.

Q.   And that was the extent of this whole thing?

A.   Yes.

Q.   Okay.  Why don't we turn then to Exhibit 136, if you would, and this was a small claims court action also --

A.   Yes.

Q.   -- is that right?  And that document says that the case was just dismissed --

A.   Yes.

Q.   -- is that right?

A.   Yes.

Q.   Okay.  Nothing happened.

A.   No.

Q.   And then I'm going to turn your attention to the lawsuit that was brought up in regard to the hospital bill.  You recall that?

A.   Yes.

Q.   Okay.  That's Exhibit 138 and I don't know if

Mr. Mohring showed you that but take a look at it if you would quick.  Do you recall that?

A.  Yes.

Q.  Okay.  And that says that you owe $308, correct?

A.  Yes.

Q.  And I take it that was some type of hospital bill?

A.  Yes.

Q.  You didn't contest it, correct?  There wasn't a trial or anything?

A.  No.

Q.  Mr. Mohring asked you about your convictions for no liability insurance.  Do you recall that?

A.  Yes.

Q.  And I think he brought to your attention three exhibits, Exhibits 110, 111 and 113.  I might be a little confused and maybe it really doesn't matter but I would like to straighten myself out on a couple answers if we could.

On the first one, Exhibit 110, Mr. Mohring asked you about being arrested and I think you described a situation where you got a call and then you went and reported I assume to the PD or sheriff's office.

A.  About?

Q.  About the ticket.

A.   Oh, yeah, they told me that I could call and make an appointment to go in and then bring money and --

Q.   And is that what happened?  You went in on your own and brought some money and then you were -- you were probably booked in and you left?

A.   Yeah.

Q.   That was Exhibit 110 I think.  And there was a citation issued which is on the very back page of the exhibit that says -- I believe it was a ticket that says "operating a motor vehicle without liability insurance," right?

A.   Yes.

Q.   So I take it you were driving a car and you got stopped and you didn't have liability insurance on your car?

A.   Right, I didn't have liability.

Q.   In the Register of Actions here on the first page, it does have a disposition of the case and it says it was dismissed.

A.   Yes.

Q.   Do you recall that?

A.   I see that.

Q.   Do you recall that or not?

A.   I don't recall ever going into a courtroom for that.

Q.   Okay.  And then I believe you got a couple other citations for the same thing, correct?

A.   Yes.

Q.   And you did pay a fine on those.  Do you remember that?

A.   Yeah, like $300 or something.

Q.   I think Mr. Mohring asked you about that and you said you weren't -- your recollection wasn't very good about it, correct?

A.   No.

Q.   Okay.  Well, let's take a quick look.  This is Exhibit 111 and it does say that you plead guilty to liability insurance required I think it says here, correct?

A.   Yes.

Q.   And you were ordered to pay a $150 fine; is that right?

A.   Yes.

Q.   Okay.  And that was again, as you recall from driving a motor vehicle, a traffic violation?

A.   Yes.

Q.   Similarly then let's look at 113 if we could for a second.  113 is actually two dispositions.  The first one says what?

A.   "Possession of license required."

Q.   Okay.   And there was a $20 fee there, correct?

A.   Yes.

Q.   So apparently you were driving and you didn't have your license with you.

A.   Yes.

Q.   And then there is again as Mr. Mohring pointed out no liability insurance required?

A.   Yes.

Q.   And you paid a $300 fine.

A.   Yes.

Q.   Go back to your questionnaire, if you would. Question No. 55, if you would find that.  Question 55 asks you:  "Have you ever been convicted, either by your guilty or nolo contendere plea or by a court or a jury trial, of a state or federal crime, excluding any simple traffic violations?"  Do you see that?

A.   Yes.

Q.   And you checked "no."

A.   Yes.

Q.   And you believed you were telling the truth at the time?

A.   Yes.

Q.   And is it correct that the only violations you had had been in regard to driving a motor vehicle?

A.   Yes.

MR. REISENAUER:  If I could have one second, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  That's all the questions I have at this time, Your Honor.

THE COURT:  Thank you, Mr. Reisenauer.

Mr. Mohring?

MR. MOHRING:  Thank you, Your Honor.

### REDIRECT EXAMINATION

**BY MR. MOHRING:**

Q.  Ms. Vettel, the prosecutor was just now asking you some questions about your answers in voir dire to questions like if you had any fixed views about the death penalty or the punishment in this case.  You remember those questions?

A.  Yes.

Q.  Now had you indicated in your answers that you had fixed views, you understand that that would make it much less likely that you'll be selected as a juror?

A.  It could.

Q.  He was asking you questions about statements from you that you wouldn't just go along with the group in your decisions in this case.

A.  No.  I have to live with the decision that is being made.

Q.    And so you wouldn't just go along with the group.

A.    No.

Q.    You understand that if you had answered that question that you probably would go along with the group that would have made it much less likely that you would have sat on a jury in this case?

A.    It could have.

Q.    Do you still have the questionnaire in front of you?

A.    I do.

Q.    Question 95 you were just asked about.  I think we're on page 20.

A.    Yes.

Q.    And in question 95 the question asked about if you've "ever been in a situation where you feared being hurt or killed as a result of violence of any type." And in that you talked about your few month relationship in 1996 to an abusive man.  You're talking about Mr. Zablotney?

A.    Yes.

Q.    You don't say anything about Mr. Jensen in your answer to that question?

A.    No.

Q.    The prosecutor asked you some questions about the first of your civil lawsuits against Mr. Zablotney,

Exhibit 131.  Do you still have that?

A.  No.

Q.  He asked you some questions about the answer on the second page.

A.  Yes.

Q.  Do you have that in front of you?

A.  I do.

Q.  The answer makes it clear that the lawsuit was -- actually looks like for $600 and $500 for emotional damages.  Is that what you sued for?

A.  Yes.

Q.  And it was settled.  It was ultimately resolved with a $615 payment?

A.  Yes.

Q.  Finally he asked you some questions about your driving without liability insurance convictions.  Do you still -- do you have Exhibit 111?

A.  No.

Q.  Exhibit 111 talks about your citation on -- well, in March of 1999, and he asked you about the Register of Actions page.  The Register of Actions page, the first page of this, indicates this is a misdemeanor conviction, right?

A.  Yes.

Q.  Question one -- I'm sorry, question 55 of the

questionnaire asks about if you're ever been convicted. Are you with me?

A. Yes, yup.

Q. And it asks whether the crime was a felony or a misdemeanor. Your answer to that question was just plain "no," correct?

A. Right.

Q. That's question 55. Three questions later, question 58 asks about if you have known anybody who's been convicted or pleaded guilty to a crime. Same question just somebody else, right?

A. Right.

Q. And in that you talk about "Over 10 years ago your oldest daughter's dad got into a car accident, reckless driving, served a few weekends in jail and paid restitution."

A. Yes.

Q. And question 5 -- you admitted your convictions in question 58. You talk about a 10-year-old reckless driving accident conviction of your ex-husband, right?

A. In question what? I'm sorry.

Q. Question 58. Fifty-five you say nothing about your misdemeanors. Fifty-eight you talk about a 10-year-old reckless driving of your ex?

A. Well, he committed a crime. He went to jail.

He, I mean, served time and that was a crime.

MR. MOHRING:  Nothing further, Your Honor.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  No questions, Your Honor.

THE COURT:  I've got just a couple.  Exhibit 131 I'm looking at -- do you have 131 in front of you still?

THE WITNESS:  Which one's 131?

THE COURT:  That's the small claims.

THE WITNESS:  Yeah, I have that.

THE COURT:  What I'm looking at would be the third page.  The judge made Findings of Fact.

Mr. Mohring asked if the case settled at 600.  Looks to me there was actually Findings of Fact that it was 600 and so it went to a hearing and the judge decided on 600; is that right?

THE WITNESS:  Yes.

THE COURT:  And so you didn't actually just settle the case when you got there.  There was a hearing held in front of Referee Portscheller?

THE WITNESS:  Yes.

THE COURT:  The second issue I just want -- I'm not really quite sure on this -- this whole incident at the State Fair so I want to just kind of step through that and walk through it kind of step by step.  Let's

start at the beginning.

What year was that, do you recall?

THE WITNESS:  '91.

THE COURT:  Okay.  And how old were you?

THE WITNESS:  Nineteen.

THE COURT:  And where did this incident take place?

THE WITNESS:  Minot.

THE COURT:  At the State Fairgrounds in Minot.  What time of day was it?

THE WITNESS:  Sometime afternoon.

THE COURT:  So was it light or was it dark?

THE WITNESS:  It was light.

THE COURT:  And you said you indicated it took place on the midway?

THE WITNESS:  Yes.

THE COURT:  Do you have any recollection of where on the midway essentially where you were when it happened?

THE WITNESS:  Just on the midway.  He came out between two -- came out from between two --

THE COURT:  Like booths?

THE WITNESS:  Yeah, booth, that's what I'm looking for.  Came out from between those two when we were walking by.

THE COURT:  Who were you all with?

THE WITNESS:  Just some friends from high school.

THE COURT:  Okay.  And the person that approached you and threatened you, who was he?

THE WITNESS:  Someone that I was traveling with when -- and we lived in Texas the previous year.

THE COURT:  And was he with -- was he with your group?

THE WITNESS:  That I traveled with?

THE COURT:  No.

THE WITNESS:  Was he with my group of friends?  No.

THE COURT:  You and your high school friends are walking.  Where did this guy come from?  That's what I want to know.

THE WITNESS:  He lived in Texas and he obviously traveled that year and came up and was here for the fair and so he was somebody that --

THE COURT:  He was working on the fair.

THE WITNESS:  Yeah.

THE COURT:  And so how did he come to -- how did you come to his attention or him come to your attention.

THE WITNESS:  I had worked the previous

summer traveling with the fair.

THE COURT: I got that part.

THE WITNESS: He was traveling again the second --

THE COURT: I got that part.

THE WITNESS: -- summer.

THE COURT: Okay. You traveled with him one summer. He's traveling a second summer. You're not traveling the second summer. You're with your friends. You're at the State Fairgrounds. This guy somehow somewhere along the line approaches you. Where did he come from? When did you first notice him and what did he say? That's a series of compound questions. I'm just trying to see what happened.

THE WITNESS: He just came out from in between the two booths as we were walking by. I lived there. He grabbed on and tried to pull me back in between those two booths and my friends grabbed me.

THE COURT: So the first time you realized he was there is he had grabbed you?

THE WITNESS: Right.

THE COURT: And what happened next?

THE WITNESS: Started to pull me away from where my friends were and make me go with him.

THE COURT: And what happened after that?

THE WITNESS:  He made the comment --

THE COURT:  What was the comment exactly?  What did he say?

THE WITNESS:  If I can't have you -- you know, you're coming with me and if I can't have you nobody can.  And my friends grabbed onto me and pulled me harder than he did and I didn't see him again.

THE COURT:  Did he run away?  Did he say anything?  What happened?

THE WITNESS:  He was -- he was gone.  He went in between those two -- in the back where -- you know, into the back of those booths and I've never -- I've never seen him again.

THE COURT:  And what happened after that?

THE WITNESS:  We continued walking.  I mean, it --

THE COURT:  And did you report that to the authorities?

THE WITNESS:  No.

THE COURT:  Anything as a result of my questions, Mr. Mohring?

MR. MOHRING:  No.  Thank you, Your Honor.

THE COURT:  Anything as a result of my questions, Mr. Reisenauer?

MR. REISENAUER:  No, Your Honor.

THE COURT:  You may step down, madam.  I'm going to ask you not to discuss this matter with anyone -- any one of the other jurors pending the resolution of these matter, okay?

THE WITNESS:  Am I allowed to sit in here or do I need to leave?

THE COURT:  Well, the rule on sequestration of witnesses has been invoked and all potential witnesses have been excluded.  And so the only reason you'll get to stay here is if the parties will say that there's no possibility that you'll be recalled as a witness and so it's really not up to me to decide that part of it.

The question is:  Does the -- well, first of all, does the United States have any objection to releasing her at this point?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Does the defense?

MR. MOHRING:  No, Your Honor.

THE COURT:  All right.  You're free to stay if you wish.  Okay.  You may step down.  Do you want to call your next witness?

MS. MENENDEZ:  Yes, Your Honor.  Your Honor, may we briefly approach before we do so?

THE COURT:  You may.

(The following sidebar discussion was had:)

MS. MENENDEZ:  Your Honor, our next witness is Ms. Cotney.  We have two topics to discuss with her, one of which I believe will be of the sensitive type. She won't know what it's about until I open the door though and opening the door is what would make it public.  I wonder if Your Honor would prefer that I do the first topic, which has nothing to do with it.  I'll do that topic first, whatever Your Honor wants.  We could clear the Court at the end of the day.  That might be the easiest way.  I don't think we'll get to our next witness, which is Ms. Lillejord, until tomorrow morning but that's just a guess.  We might because they're both short.

THE COURT:  Mr. Reisenauer, do you have a preference?

MR. REISENAUER:  I don't, Your Honor.  I don't know how long she's going to take so I have no objection to, you know, waiting till the end to ask her the same thing the Court asked Miss Vettel.  It's up to her.

THE COURT:  Why don't you go ahead and take the nonsensitive matter first.  When you get done ask if we can have a conversation at sidebar.  I'll take that as a cue to bring Ms. Cotney over as well and ask her at

sidebar.

Ms. Cotney, please come forward, raise your right hand and take the oath.

THE CLERK:  Please raise your right hand. State your full name and spell your last name.

MS. COTNEY:  Paulette Laverne Cotney.

THE CLERK:  Can you spell your last name, please.

MS. COTNEY:  C-o-t-n-e-y.

(Witness sworn.)

MS. MENENDEZ:  Good afternoon.  May I approach, Your Honor?

THE COURT:  You may.  Miss Cotney, I want you to pull that microphone in front of you and speak directly into it.  It's directional so if you turn away from it it won't pick you up very well, okay?

(Witness nods head.)

THE COURT:  Thank you.  You have to answer the questions that are put to you out loud because it's hard to take down nods and things like uh-huh, okay? Very good.

**PAULETTE L. COTNEY,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MS. MENENDEZ:**

Q.   Ms. Cotney, do you recall that you and I met a few years ago in 2011?

A.   Yes.

Q.   And that was I think on a Friday evening and my colleague and I came to interview you and talk to you about this case.  Do you remember that?

A.   Yes.

Q.   Okay.  And then the next day my colleague, Chad, came along with a young intern from our office, Rebecca. Do you remember that?

A.   I didn't remember there were two days I guess.

Q.   I kind of merged into one in your memory?

A.   Maybe, yeah.

Q.   Do you remember that Rebecca and Chad talked to you about some of your experiences related to the trial?

A.   Yes.

Q.   Okay.  And at the end of that conversation that Rebecca wrote out some of your thoughts in the document that's in front of you and then you went over it with them.  Do you remember that?

A.   Yes.

Q.   Can you take a look at that document and tell me if you believe that's the document that you looked at that day and that you initialed and signed?

A.   Yes.

Q.   Okay.  And do you remember during that process that they -- after Rebecca wrote it out, she asked you to take a look and make any corrections or initial each page.  Do you remember that?

A.   Yes.

Q.   And then to sign at the end that you acknowledge that those things were true?

A.   Yes.

Q.   And do you remember or you might notice on the last page that that was signed under penalty of perjury meaning that's lawyer ease for you understood it was important to tell the truth?

A.   Yes.

Q.   And have you had an opportunity to review a copy of that document over the last couple of weeks?

A.   Yes.

Q.   Okay.  And when you did that were you reminded of the things that you had said and the topics that were discussed?

A.   Yes.

Q.   And everything you said in that was true to the best of your knowledge?

A.   Yes.

Q.   Okay.  Prior to coming here for the jury

selection, you were aware that this case was about a kidnapping.  Is that fair to say?

A.  Yes.

Q.  Had you heard in the very beginning when Ms. Sjodin was missing about her disappearance?

A.  I think I recall hearing a little bit about it. I more recall hearing when they found her.

Q.  Okay.

A.  It was a long time ago so I don't really fully remember any of it.

Q.  That's fine.  And I'm not going to ask you to guess at anything.  Tell me if you don't remember.  You knew certainly from the time they found her that this was a suspected kidnapping and eventual murder; is that right?

A.  I maybe assumed that.  I don't know.  I don't remember for sure if I knew that or thought that or I guess it was just a long time ago.

Q.  Okay.  By the time that you were summoned with the first part of your jury questionnaire, did you know that Mr. Rodriguez was being tried for a kidnapping and murder?

A.  You know, I really don't know for sure.  I don't remember fully.  I knew that there was a case coming up and I knew when I got papers in the mail saying I had

jury duty that there was something big going on but I didn't know the specifics of it or -- that's about all I can recall.

Q.    So you don't recall following it very closely or knowing the various stages between when they found Ms. Sjodin's body and when you came for the jury selection?

A.    I did not follow it.  I didn't even know major details or anything of it, no.

Q.    Okay.  You do recall coming to fill out the fairly lengthy questionnaire; is that true?

A.    Yes.

Q.    And by that point or maybe on that day you learned that this was a case involving a kidnapping; is that right?

A.    I knew then, yes, and --

Q.    And the death penalty, you learned that it was a case involving the death penalty?

A.    I don't know if I remember -- I don't remember if I knew that ahead of time or not.  I guess I just showed up the date they told me to come and filled out a big questionnaire.

Q.    Yes.  Certainly by the time you got to the second half of the questionnaire, which goes on at length about the death penalty, you knew what was going on here in

terms of the death penalty, that this was going to be a capital case?

A.   It's -- well, and I didn't understand that it was, as you say, a capital case.  I didn't understand any of that.  I think probably by then I maybe knew it was a possible death penalty case but I can't even say for sure.

Q.   One of the things I want to talk to you about is it must have -- actually may I approach, Your Honor?

THE COURT:  You may.

MS. MENENDEZ:  Thank you.

Q.   (Ms. Menendez continuing)  I want to show you a copy of that questionnaire which you've probably not seen in a while but take just a second to look through that (indicating).  I'll direct your attention to specifics so don't worry about that, but just take a second to kind of refresh your recollection about the type of questions that were asked and things like that. I want to just ask briefly about the couple of steps that went into your being on this jury.

(Witness examining.)

Q.   Do you remember coming in to fill out that packet?

A.   I do.

Q.   And, do you remember, where did that take place?

A.   I think I was in this building.

Q.   Okay.

A.   It's been a long time.  I think I maybe was possibly downstairs or something I guess.  I can't even tell you.

Q.   That's fine.  Did you understand at the time the importance of being honest on that form?

A.   Yes.

Q.   Okay.  Why did you think it was -- why do you remember being told it was important to be honest?

A.   Because this was a big deal.  It's somebody's life.

Q.   And did you try to be as honest and complete as you could when you answered those questions?

A.   Yes.

Q.   Okay.  Did it take you a while to fill out that mini biography?

A.   I know I was here for a while.  I don't remember how long but I was here for a while.

Q.   Do you recall some of those questions and maybe starting around page 20 really focusing on the death penalty and what your feelings were about the death penalty and if you thought about the death penalty before?

A.   I don't recall any of the questions on this.  I

haven't seen this since I filled it out.

Q.   Do you want to take a look and maybe page back a little bit toward the second half of that document?

A.   Okay.  (Witness examining.)

Q.   And they were trying to get you to put to words maybe some previously unexplored feelings you had about the death penalty.  Is that fair to say?

A.   (No response.)

Q.   Like, for instance, on page 15 there's a whole list of questions that describe different ways people might feel about the death penalty ranging from being strongly in favor of it to being generally opposed, and you were asked to try to check which ones applied to you.  Do you remember that?

A.   No, but I have it here.

Q.   I'll quit trying to get you to remember this if you don't.  I do want to focus a little bit on page 20, the question at the very top, question 93.

You wrote there that one of your concerns related to -- your opinion about the death penalty was that you wouldn't want the person released to the public again if he was guilty; is that right?

A.   Yes.

Q.   And is it fair to say, Miss Cotney, that that was an overriding concern for you throughout this whole

experience?

A.   The concern of death penalty or not getting out?

Q.   Not getting out?

A.   Yes.

Q.   That your experience of this was that you didn't want anybody else to go through what Ms. Sjodin's family had gone through and frankly Mr. Rodriguez' family also?

A.   Yes.

Q.   And you felt very strongly that part of the solution had to keep that from happening?

A.   Yes.

Q.   If he was found guilty and you did mention that if he was found guilty.  Do you remember that during your jury selection that was one of the things that the judge talked to you about?

A.   You mean when we met in here?

Q.   Just you and the attorneys and the judge to ask questions about your background and your answers on the questionnaire?

A.   I really don't remember what we even spoke about in here.  I know I was in here for a very short period of time and I don't remember what we even talked about.

MS. MENENDEZ:  Okay.  Your Honor, might I approach again?

THE COURT:  You might.

Q.   (Ms. Menendez continuing)   So I guess I'd like to start with -- let's step back and be a little bit more broad instead of me trying to focus in on voir dire.

Do you remember during the trial being told by His Honor that the only two possibilities once you found Mr. Rodriguez guilty were life without parole and the death sentence?

A.   Yes, yes.

Q.   And that he would never be released?

A.   Yes.

Q.   And it's fair to say that you had some real concerns about the reality of that promise; is that right?

A.   Yes.

Q.   You were very concerned that His Honor might not be around forever and that we couldn't prevent a future release?

MR. REISENAUER:   Your Honor, I'm going to object to leading questions here.   You know, she's -- on direct she can ask her what she thought but to lead her around is improper.

THE COURT:   Perhaps you would want to put a more direct question to the witness.

MS. MENENDEZ:   Thank you, Your Honor.

Q.   (Ms. Menendez continuing)   Okay.   I really don't

want to put the words in your mouth.  It's a habit.
Tell me what your thoughts were about what we've just
been talking about.

A.  I would -- if he were found guilty, I would just
never want the possibility of him getting out or anyone
if they were found guilty.  And I've heard of, you know,
people higher up turning -- overturning decisions in
courts in the past.  Not necessarily any certain
decision but people being released from jail that maybe
shouldn't be.

Q.  Well, let's focus on that a little bit because
what I'm actually asking is not the possibility that
something might be overturned but did you have a concern
that even if your verdict was life in prison without
parole that it might not mean that?

A.  Yes.

Q.  Okay.  And that was -- at least as you shared
with us a few years ago, that was one of the most
important overarching things in your experience of this
trial.

A.  Yes.

Q.  And in you reaching the verdict of death.  Is
that fair to say?

A.  Yes.

Q.  And if you could just take a peek at that

declaration, the one with the scrubby edges from the notebook, page 3, and paragraph nine it says: "Ultimately, it was most important to me that there be no chance that the defendant could do this, or another crime, to someone else.  The death penalty ensured that."

Is that an accurate description of how you felt?

A.  Yes.

Q.  I want on jump back now a little more specifically to the voir dire process.  And you say you don't have a lot of memories about the things that the judge asked you.

Do you remember that one of the sets of questions was asked to you by defense counsel, Mr. Ney, during the voir dire?

A.  I don't remember.

Q.  Do you remember that you said -- you were asked specifically about that question where you said that you were concerned that he might be released into the public?  Do you remember being asked about that?

A.  No.

Q.  Okay.  Let me put it like this because I have a feeling you won't remember even if I read it to you, but you were asked if that accurately described how you felt

and you said yes.  And then His Honor explained that actually that wouldn't happen.  If he was convicted it would be life without parole and you were asked if you could accept that and you said yes.  Do you remember that?

A.  No.

Q.  Can I show you the transcript from the voir dire that might help you remember?

A.  You can show it but I'm probably not going to remember.

Q.  It's just right up here (indicating) and if it doesn't help you remember the conversation that's understandable.

A.  What was this conversation from?

Q.  That's from the voir dire when you were questioned by the judge in -- I think it was in this room before -- during the jury selection process.

THE COURT:  Ms. Cotney, if you'll recall --

MS. MENENDEZ:  Thank you, Your Honor.

THE COURT:  -- there was a table that was in the middle of the courtroom and we all sat around the table that was in the center of the courtroom.  And you were asked questions first by me, then you were asked questions by Mr. Ney and then you were asked questions by Mr. Wrigley.  So that's a transcript of what was said

when we were all sitting at that table that -- sitting right kind of in between where those tables are right now because we had moved all the other tables away and were sitting at a single conference table that was larger than any of these tables.  Do you remember that?

THE WITNESS:  Yes.  I didn't know what that was called, sorry.

MS. MENENDEZ:  Oh, that's okay.  I apologize.  And I wasn't here so I can't bring it to light as visibly as Your Honor can.

Q.  (Ms. Menendez continuing)  Do you remember that experience?

A.  I do.

Q.  Okay.  Does that refresh your recollection of being asked about the release question?

A.  No.

Q.  Okay.  Do you remember any specifics from your conversation with the judge that day?

A.  No.

Q.  Okay.  Let me ask you this:  Reading that you told the judge that you were able -- or Mr. Ney, I'm sorry.  You told Mr. Ney that you were able to accept that those were the only two choices.  Sounds like the truth is you weren't able to accept that those were the only two choices; is that fair?

A.    I think through the process of serving and hearing everything, I was not comfortable with that unassurance (sic) of it.  So it's not that I maybe wasn't sure or was sure at one point.  I just know how I felt after we heard everything.

Q.    And at the end of the day despite what His Honor told you, you couldn't -- you couldn't give up the thought that life without parole might not be permanent.

A.    Right.

MS. MENENDEZ:    Thank you.  Your Honor, at this point might we approach?

THE COURT:    Ms. Cotney, if you would go over here.  If you could come here.  You can just step over here.

(The following sidebar discussion was had:)

THE COURT:    My court reporter wants you to speak up because she's having a hard time hearing you.

MS. MENENDEZ:    Oh, that's so unusual. Usually I'm loud.  The reason we're here is because I want to ask you a few questions about the experience. The reason that we're up here is that I want to ask you a few questions about what you shared with me about your sister's attempted abduction when you were both very small.  Since that seemed private about children, the judge has allowed us to ask that at sidebar.

THE WITNESS:  Okay.

THE COURT:  And there's a couple of questions here that we'll cover.  If you'd prefer to have it on the record openly you can sure do that.  If you'd prefer to do it here --

THE WITNESS:  This will be good.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  Well, Your Honor, this is a public forum.  I would not believe that this individual is any longer a minor.  That said, I certainly respect the juror's wishes.  If we're going to I guess do that I think it's easier to close the courtroom instead of standing here.

THE COURT:  I'm fine with that.

MS. MENENDEZ:  And it is my final topic for Ms. Cotney.

THE COURT:  Okay.

MS. MENENDEZ:  So it might be a convenient approach anyway.

THE COURT:  Why don't you go ahead and retake the stand.

(Sidebar concluded.)

THE COURT:  All right.  At this point there is going to be some testimony about incidents that happened to a juvenile a number of years ago and the law

allows the Court to take up these matters that involve assaults against juveniles not to be discussed in open court.

And so I'm going to clear the courtroom at this point to take up these issues and what time -- it's a quarter to 5:00.  We will not reconvene with the government's cross-examination until tomorrow morning at 9 o'clock and so we'll start again tomorrow morning at 9:00, okay?  At this point though I would like the members of the public to please leave the courtroom.

(The following closed proceedings were had:)

THE COURT:  Ms. Menendez?

MS. MENENDEZ:  Thank you, Your Honor.

Q.  (Ms. Menendez continuing)  Ms. Cotney, I want to talk to you a little bit more about something that you shared when we spoke several years ago now.  Your older sister was kidnapped when you were both very small or attempted kidnapped; is that right?

A.  She was grabbed, yes.

Q.  Okay.  Your recollection when we spoke was that she was six and you were two?

A.  Approximately.  I don't actually know for sure our ages.  I was too young to remember.

Q.  How about we start by you telling me what you know about that?  Tell us what happened, what you know.

A.   Sure.  She was walking home from school and a guy grabbed her and pulled her into the backyard that she was passing.  And it wasn't his yard.  And I don't know what his plan was with her but the lady that lived in the house heard her scream, happened to look out her window, called the police and my sister was fine.  And I really don't remember anything.  I was too little.  It's not something that was ever really talked much about or I don't really know whatever came of it, if anything.

Q.   I want to break that down a little bit.  But I understand that you -- much of what you know you said you didn't remember.  So how do you know what you just shared with me?

A.   Just a little bit of what my mom has told me.  My sister's not really ever talked about it.  I think it happened so long ago it's not something that sits on her mind all the time or we weren't paranoid as kids or anything.  I mean, we still always ran around the neighborhood and --

Q.   Something I wanted to ask.  How do you remember your mom sharing it with you?  How did you first learn that this had happened?

A.   I don't know when I first remembered it.  Actually I hadn't really thought about it for a long time until we were in deliberations and people were kind

of talking about different experiences and whatever and that's when that kind of popped back into my head and --

Q.   So the fact that this was a kidnapping, that you were hearing all about it being a kidnapping even during jury selection, that didn't make it pop into your head?

A.   No, not even -- I just had never really thought about it.  It was -- I guess I wouldn't call it as a kidnapping and I probably should have -- whenever I talked to whoever it was that wrote that down when I read that again I thought abduction's probably a bit of a harsh word for that.  She just happened to be passing by a backyard and he pulled her into that backyard and --

Q.   So do you think "abduction" is an overstatement because it didn't last for very long?

A.   I don't know.  I guess I'm not -- I don't really know what to call it, you know.  A nabbing, I don't know.  He didn't put her in a car or anything like that so I guess I'm not really sure what to refer to it as.

Q.   And the police were called.  You know that much?

A.   Yes, yeah.  They were called.

Q.   Are you aware whether charges were pressed or court happened?

A.   You know, she may have had to go to court for it. I can't 100 percent tell you that.  If any of that

happened I was so little that I don't -- I don't recall any of it.

Q. In the voir dire -- I'm sorry, in the jury questionnaire that we've talked about a little bit, you were asked whether anybody that you knew was a victim of a crime and you didn't mention this.

A. It never crossed my mind. I just hadn't thought about it. I mean, I think -- I guess we've all kind of been victims of crime but I guess it just didn't cross my mind at that time.

Q. Thankfully we've not been almost nabbed.

A. I hope not.

Q. Would you say that it's an experience that shaped you as a parent at all thinking about what your sister experienced and thinking about what could happen to your own children?

A. No. It just --

Q. Or your parents, did you feel like they were extra --

A. No.

Q. -- vigilant?

A. No. We were always out till dark and running around. And I grew up right in this area and oftentimes down on our bikes even right down to this area so, no.

Q. You don't feel like it was something that was

part of your family conversations?

A.  Never.

Q.  But it was enough that you knew about it.  That's how you learned.

A.  Yeah, but I don't think I knew about it when I was a child even.

Q.  You learned maybe as an adult?

A.  Maybe, yeah.

Q.  But from what you're sharing once you got to deliberations this started to be something that you thought about, the experience, what it must have been like?

A.  Just trying to relate to what it may have been like for Dru.  And I know ours wasn't nearly anything like that but just trying to throw all the stuff around in my head, a lot of information.

Q.  And in some ways that connection must have remained because when we came to speak with you several years later you brought that up, that experience.  We didn't know about it, right?

A.  Well, I guess I'm not sure but -- that we had discussed it, yes.

Q.  And you discussed it during the deliberations?

A.  Yes.

MS. MENENDEZ:  Might I have just a moment,

Your Honor?

THE COURT:  You may.

MS. MENENDEZ:  Thank you, Your Honor.
Nothing further.

THE COURT:  Mr. Reisenauer, I would prefer
you not cross-examine on anything except the second
incident if you would if you have any questions about
it.  Do you follow what I'm saying?

MR. REISENAUER:  Yup.  I wasn't expecting to
go, Your Honor, since the Court said we were coming back
at 9:00.  If you can just give me a second.

THE COURT:  And it would only be about this
particular issue because if we do the cross -- or would
you just as soon --

MS. MENENDEZ:  I'm sorry, Your Honor, are
you suggesting that Miss Cotney would come back in open
court for the other half of his cross?

THE COURT:  Yeah.  I've got a conference
call at 5 o'clock with the Tribal Issues Advisory Group
for the Sentencing Commission and so since I'm the chair
I gotta show up.  And so if you have any questions
related to this or if you'd rather -- we could do it
first thing in the morning before we bring the press in.

MR. REISENAUER:  That's fine, Your Honor.
Sure, let's do it that way.

THE COURT:  Would you prefer to do it that way?

MR. REISENAUER:  Sure, thank you.

THE COURT:  Do you have any objection to that?

MS. MENENDEZ:  None, Your Honor.

THE COURT:  Why don't we do this.  I can't imagine it will take very long.  Why don't we start here at 8:50, keep the press out and then we'll -- right?

MS. MENENDEZ:  And, Your Honor, we expect the need to do the same one more time tomorrow but that will be the entirety of the examination.  We could talk about that at Your Honor's discretion but I think that the last -- well, not the entirety but most of it would need to be likely done like this.  Our remaining juror raises the same concerns, actually the most acute concerns in the case.  Our remaining juror raises the most acute concerns of protecting the privacy of minors, just to flag that for the Court.  Thank you.

THE COURT:  Mr. Mohring, you look like you have something you want to tell me.

MR. MOHRING:  Just briefly, Your Honor, as a matter of housekeeping, during my examination of Ms. Vettel Exhibits 138 through 142 are additional to the exhibits with the Court.  142 was the custody

investigation report.  We'll clean up copies and get copies to the Court and to the prosecution first thing in the morning.

THE COURT:  Very good.

MR. MOHRING:  But I would officially offer those since they weren't a part of the initial offer.

THE COURT:  We received some of those and we didn't receive others I think if I recall.  So we'll just receive them all at this point unless the government has an objection.

MR. REISENAUER:  No objections, Your Honor.

THE COURT:  They're received.

MR. MOHRING:  We'll get a full set to everybody.

MS. MENENDEZ:  Thank you, Your Honor.

(Recess taken; 4:55 p.m.)