**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**NORTHEASTERN DIVISION**

- - - - - - - - - - - - - - - -
                                )
United States of America,       )
                                )
    Plaintiff/Respondent,        )
                                )
          vs.                    )    **FILE NO. 2:04-cr-55**
                                )                **2:11-cv-88**
Alfonso Rodriguez Jr.,          )
                                )
    Defendant/Petitioner.        )
                                )
- - - - - - - - - - - - - - - -


**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**Evidentiary Hearing (Volume 2) September 9, 2015**

**Pages 170-232**


HELD AT:   QUENTIN BURDICK UNITED STATES COURTHOUSE
           655 FIRST AVENUE NORTH
           FARGO, NORTH DAKOTA   58102

BEFORE:   THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:   KELLY A. KROKE

**A P P E A R A N C E S**

**MR. KEITH W. REISENAUER**                    COUNSEL FOR PLAINTIFF;
Office of US Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102


**MR. ANDREW H. MOHRING**                      COUNSEL FOR DEFENDANT;
**MS. KATHERINE M. MENENDEZ**
Office of Federal Public Defender
300 South 4th Street, Ste. 107
Minneapolis, MN  55415
     AND
**MR. JOSEPH MARGULIES**
Cornell Law School
Myron Taylor Hall
Ithaca, NY  14853-4901
     AND
**MR. MICHAEL WISEMAN**
Attorney at Law
P.O. Box 120
Swarthmore, PA  19081

**I N D E X**

**W I T N E S S E S**

**DEFENDANT/PETITIONER:**                                      **PAGE NO.**

**PAULETTE L. COTNEY**

Cross-Examination by Mr. Reisenauer                    173

**CONNIE J. LILLEJORD**

Direct Examination by Ms. Menendez                     190
Cross-Examination by Mr. Reisenauer                    211

**REBECCA A. IRELAND**

Direct Examination by Ms. Menendez                     216
Cross-Examination by Mr. Reisenauer                    226

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Exhibit No. 600 | Ireland: Declaration Of Rebecca Ireland 10/12/11 | 222 | 224 |

**P R O C E E D I N G S**

(September 9, 2015:  The following proceedings commenced at 9:00 a.m.:)

THE COURT:  We're back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:40-cr-55.  The record should reflect that the defendant appears by video along with his counsel in Indiana, Mr. Margulies.  Mr. Mohring, Ms. Menendez and Mr. Wiseman appear on behalf of the defendant here in court.  Mr. Reisenauer is present.

I hate to do this, ladies and gentlemen, but when we finished yesterday we had not completed the cross-examination of Ms. Cotney and we'll have to clear the courtroom.  I don't think it will take very long, just a few minutes, so if you just have a chair out in the hallway we'll let you know and we can recall the witness.

(The following closed proceedings were had:)

THE COURT:  Ms. Cotney, you remain under oath.  You may retake the stand.

Mr. Reisenauer, you may proceed.

MR. REISENAUER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Good morning, Ms. Cotney.  I just have a couple

of questions about what you talked about yesterday in regard to your sister's situation, okay?  I'm going to hand you what was previously entered as Exhibit 202 (indicating), okay?

A.   Yes.

Q.   And that's your declaration, you recall that?

A.   Yes.

Q.   And I believe when you testified yesterday you testified that you met with a couple people that represent Mr. Rodriguez, correct?

A.   Yes.

Q.   And on the back you signed your declaration. It's dated July 29th of 2011, correct?

A.   Yes.

Q.   So a little more than four years ago; is that right?

A.   Yes.

Q.   Okay.  And I take it at the time that you wrote this declaration out and at the time you signed it you signed it to the best of your memory at that time from --

A.   Yes.

Q.   -- prior to the time of the trial.

A.   But just to be clear I didn't write this.  They wrote this.  I initialed it.

Q.   Okay.   So you didn't write this out.   You initialed it?

A.   Yes.

Q.   Okay.   But you did review it, correct?

A.   Yes.

Q.   And was it correct as it was written?

A.   Yes.

Q.   All right.   Were you asked to write anything out yourself?

A.   No.

Q.   Okay.   If we could then let's turn to what is marked as paragraph 11.   And it says:   "During deliberations, several jurors discussed personal experiences they had with sexual assault, whether such violence had occurred to them or to a close friend or family member."   Did you read that?

A.   Yes.

Q.   Okay.   And since you didn't write this out, did you provide this information to the individuals you spoke to and they wrote it down?

A.   Yes.

Q.   Okay.   And so this is correct that when you got into jury deliberations several people talked about their personal experiences or knowledge of individuals that had been involved in sexual assault in one way or

another?

A.   Yes.

Q.   Okay.   And that I take it then, if you turn to paragraph 12, prompted as you testified yesterday then the incident with your sister when she was younger.

A.   Yes.

Q.   Okay.   And in paragraph 12 you say:   "I myself have never been victimized, but when I was very young my sister was abducted, but fortunately was able to escape. I have no memory of this, but was told about it by my family.   I discussed this experience in deliberations."

A.   Yes.

Q.   And that's true?

A.   Yes.

Q.   Okay.   And it was during deliberations and I just am clarifying I think you told us, yes, he did, that you hadn't thought about it at all until you got into the deliberations, correct?

A.   Yes.

Q.   Okay.   I just have one other thing I would like to ask you, ma'am.   I'm going to hand you Exhibit 200, which is the big long questionnaire that you filled out. And if you go to -- and that's Exhibit 202.   And if you go -- excuse me, 200.   Go to question 52, if you would. Fifty-two asks if you or any family member or anyone

else close to you had ever been a victim of a crime. And you did check "yes," correct?

A.   Yes.

Q.   Okay.  And you noted on there that your in-laws had been the victim of a home robbery, right?

A.   Yes.

Q.   Okay.  And apparently the suspect -- someone was caught?

A.   Yes.

Q.   Okay.  So when you read that question at the time you filled this out, that is the one incident that you recalled in your memory, correct?

A.   Yes.

Q.   And at the time your sister's situation just didn't enter your head.

A.   No.

Q.   And you weren't lying or trying to hide that from anybody, were you?

A.   Certainly not.

MR. REISENAUER:  Okay.  That's all the questions I have, Your Honor.

THE COURT:  Anything as a result of that?

MS. MENENDEZ:  No, Your Honor.

THE COURT:  All right.  Let's go ahead and let the public in.

(The following proceedings were had in open court:)

THE COURT:  All right.  Just so the members of the public are aware of what happened, there was some discussion that we took up that related to an incident involving a minor that we took testimony on, including both direct and cross-examination.  The remainder of the cross-examination and the redirect will relate to the other issues that were discussed while you were present.

You may proceed, Mr. Reisenauer.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Ms. Cotney, yesterday you also talked to counsel in regard to a number of other things, specifically your responses to the questionnaire and some answers to the Court and the attorneys when we were doing the jury selection.  Do you recall that?

A.  Yes.

Q.  Okay.  I'm going to ask you a few follow-up questions in regard to that, if I may.  And we're going to start with that jury questionnaire again.  I guess I could have left it up here.  It's Exhibit 200 (indicating.)  If you would turn to questions 88 and 89 there initially.

Question 88 asked about your knowledge in regard

to the case and if you had heard about the case in various aspects from TV, radio, newspapers, magazines, et cetera, correct?

A.  Yes.

Q.  Can you answer that?

A.  Yes.

Q.  Okay.  And you checked you had heard about the case on TV, video, newspapers, the internet and conversations with other individuals or other people and you heard other people discussing it, correct?

A.  Yes.

Q.  Okay.  And question 89 asks in reference to the case would you say, and you checked "Followed the case occasionally/know something about it," correct?

A.  Yes.

Q.  And that was true at the time that you filled it out?

A.  Yes.

Q.  Okay.  Do you remember the Court asking you questions at all about that when you were in here for jury selection or not?

A.  I really don't remember anything they asked me.

Q.  But at the time that you arrived here you had heard something about the case at least from the various outlets and the people that you mentioned, correct?

A.   Yes.

Q.   Okay.  Let me turn back to your declaration if we could for a second, and that's Exhibit 202.

Just previously you told us that you signed that declaration back in 2011; is that right?

A.   Yes.

Q.   Okay.  And you didn't write this out.  Somebody representing Mr. Rodriguez did but you reviewed it and signed it, correct?

A.   Yes.

Q.   Okay.  Would you turn to paragraph seven, Miss Cotney.  Okay.  Now again if I can ask you, you said you didn't write this out so are these your words specifically or is this paraphrased?  Do you recall?

A.   I'd say it's paraphrased.

Q.   Okay.  The first sentence does say that during the penalty phase deliberation you felt like -- it actually says:  "I felt like I never wanted the defendant to get out of prison;" is that correct?

A.   Yes.

Q.   Okay.  And at the time you talked with defense counsel or their investigators you told them then that during the penalty phase this was a concern of yours?

A.   I don't remember.

Q.   Okay.  The statement says that this was your

thought during the penalty phase.  Would that have been a correct statement when it was written down?

A.  Yes.

Q.  Okay.  And if you would drop then down to the last couple sentences, as a matter of fact the last sentence.  It starts with the words "I felt that our Judge wouldn't always be available to ensure the defendant stay in prison."  Do you see that sentence?

A.  Yes.

Q.  Okay.  And then the next sentence says:  "This was an important issue in our deliberations and was a large part of our decision to impose death."  Do you see that?

A.  Yes.

Q.  Okay.  My question first is:  Is that a correct statement?  Did you tell counsel or investigators that and is that written down correctly?

A.  I would assume so, yes.

Q.  You don't exactly recall what you told them?

A.  No.

Q.  But do you recall that during the deliberations with the other jurors that this was discussed?

A.  Yes.

Q.  Okay.  And as part of the deliberations process and part of your mental process as you were deciding

what the penalty should be; is that right?

A.  Yes.

Q.  Okay.  Why don't you go back to that questionnaire if you could for a second.  And if you could let's just go to question 62 first.  And this is your handwriting, correct?

A.  Yes.

Q.  Okay.  Question 62 says:  "Please describe your feelings about the death penalty in your own words."  And if you would tell us what you wrote there.

A.  "I feel that if the crime is severe enough, I would be behind it.  I also feel it may be hard to do it when it would come down to deciding someone's fate.  I'm kind of on the middle."

Q.  And that was your feelings at the time that you filled out the questionnaire?

A.  Yes.

Q.  And those were truthful feelings I take it?

A.  Yes.

Q.  Okay.  And then just drop down to question 65 if you would.  That question asks:  "Do you believe the government should impose the death penalty upon everyone who for any reason:" and there's -- excuse me, there's three places to check there, correct?

A.  Yes.

Q.   And you didn't check any of them, correct?

A.   I did not.

Q.   But you did write something there.

A.   Yes.

Q.   What did you write?

A.   "I can't say every case on any of them."

Q.   Okay.  And they were "Kills another human being?" "Intentionally kills another?"  "Intentionally kills a police officer?"  Correct?

A.   Yes.

Q.   And then the very next question, question 66 says:  "Do you believe you should hear and review all of the circumstances surrounding the killing before you decide whether the government should impose the death penalty?"  And you checked "yes."

A.   I did.

Q.   And was that your feeling at the time also?

A.   Yes.

Q.   And then let's turn to question 112.  Question 112 reads:  "If you are selected as a juror in this case, will you set aside any personal feelings you may have about the defendant, positive or negative, and rely solely and exclusively on the evidence presented to you in court to decide this case?"  And you checked "yes," correct?

A.   I did.

Q.   And then you also wrote something in there.  What was that?

A.   "I feel he deserves a fair trial.  Everyone does."

Q.   And was that actually your feeling at the time?

A.   Yes.

Q.   Counsel that talked to you yesterday asked you some questions in regard to the jury selection process when you were present here and the Court asked you some questions and counsel asked you some questions.

I understand that it's hard to remember that so I've handed you Exhibit 201 and if you would turn to page 893, please.  The Court was asking you some questions at this time about the process and Judge Erickson asked you -- I'm going to have you look at line 14, please.  "My question is, when you get to that point would you be open to consider the imposition of a life sentence without the possibility of parole?"  And your answer was what?

A.   "Yes."

Q.   And then the next question was:  "And would you be open to the imposition of the death sentence?"  And your answer was what?

A.   "Yes."

Q.   Okay.   And was that a truthful answer at the time?

A.   Yes.

Q.   To both of those questions?

A.   Yes.

Q.   And then, if you would, turn to page 895, please. And at this point in the questioning one of Mr. Rodriguez' attorneys, Mr. Ney, was asking you questions and his name is at the top of that page.   Do you see that?

A.   Yes.

Q.   Okay.   And we're going to go through what was discussed there.   Mr. Ney asked you a question:   "On page 14, question 62, you talked about your feelings about the death penalty," and we just previously talked about this question.

A.   Yup.

Q.   And he says:   "And we limited you to a few lines there so I wanted to give you a chance maybe to expand on this issue if you like.   You said, 'I feel that if the crime is severe enough, I would be behind it.'"   And he asked:   "Can you maybe explain that a little more, that thought for me?"   And your answer was what?

A.   "I think I would be open to deciding that the death penalty would be what would be right."

Q.   And he just said:  "Okay."  And you said?

A.   "I don't know what else to say."

Q.   And then he said:  "You talked about 'if the crime is severe enough.'"  And then he said:  "You understand that, from what the judge told you, severity of the crime is not the only thing you look at?"  And what was your answer?

A.   "Yes."

Q.   Okay.  And then Mr. Ney said:  "Okay.  You look at, one, look at the circumstance of the offense, but you also look at the circumstances of Alfonso Rodriguez.'"  And your answer was what?

A.   "Yes."

Q.   And he asked:  "Would you be open to do that?"  And your answer was?

A.   "Of course."

Q.   And was that a truthful answer?

A.   Yes.

Q.   And, Miss Cotney, when you went into deliberations you were given a whole list of items called mitigating factors.  Do you recall that?

A.   Vaguely, yes.

Q.   And do you recall deliberating and talking about all those factors when you were in deliberation with the other jurors?

A.    Yes.

Q.    You made decisions on those mitigating factors, correct?

A.    Yes.

Q.    And you were part of that process?

A.    Yes.

Q.    Turn to page 900 if you would, please.

A.    (Witness complies.)

Q.    And, if you would, go down to just line 20.  And here Mr. Ney is asking about the appropriate punishment and the sentence is a little jumbled but he says: "Okay.  And did that previous opinion, did you make any opinion about the appropriate punishment in this case?" And your answer was?

A.    "No."

Q.    You didn't have any punishment in mind when you answered the questionnaire, did you?

A.    No.  I didn't even really know facts so, no.

Q.    Okay.  And the Court and the attorneys in the case, when they were asking you these questions, they asked whether or not you had an opinion, as Mr. Ney just did, about what the punishment should be and you didn't have any idea what it should be at that time.

A.    No.

Q.    Did you understand that you were supposed to look

at all the facts and circumstances in the case, including information about Mr. Rodriguez, prior to making your decision?

A.   Yes.

Q.   Can you tell me if that occurred during your deliberations?

A.   Yes.

Q.   You did not go into deliberations with any preconceived idea of what the answer should be, did you?

A.   No.

MR. REISENAUER:  That's all I have, Your Honor.

THE COURT:  Thank you, Mr. Reisenauer. Ms. Menendez?

MS. MENENDEZ:  No further questions, Your Honor.

THE COURT:  You may step down, madam.  Did the witness appear pursuant to a subpoena and does the defense -- does the petitioner wish to release her?

MS. MENENDEZ:  Yes, Your Honor.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  You're free to leave.  Thank you very much for your time.  The petitioner will call their next witness.

MS. MENENDEZ:  Your Honor, may we approach?

THE COURT:  Yes.

(The following sidebar discussion was had:)

MS. MENENDEZ:  The entire subject I'm going for with her -- the entire subject of our examination with Ms. Lillejord is going to be the sexual abuse of her foster children.

THE COURT:  Were you able to get that?

THE REPORTER:  Yes.

THE COURT:  And do you have any objection?

MR. REISENAUER:  Well, Your Honor, I have the same position as we did previously.  And I don't know what Miss Lillejord's position is in regard to, you know, I mean, to take the testimony in private as we just did or open to the public.  I have no idea the age of the foster children at the time or now.

THE COURT:  I think they're still minors because I think they were like three or four.

MS. MENENDEZ:  Your Honor, I believe they were seven and eight but I believe that still makes them minors.  My concern is that Jamestown is a small town. I will be eliciting testimony that she had, by her words, two Hispanic sexually abused foster children living with her at the time of the trial.  It would take very little to identify those kids.

THE COURT:  All right.  Okay.  I think consistent with what we've done before, I'll clear the courtroom and we'll take this testimony.

MS. MENENDEZ:  Thank you.

THE COURT:  You may administer the oath.

THE CLERK:  Please raise your right hand. State your full name and spell your last name.

MS. LILLEJORD:  Connie Jean Lillejord, L-i-l-l-e-j-o-r-d.

(Witness sworn.)

THE COURT:  Once again the testimony that we're about to take up involves minors and, in the interest of protecting the identity of these minors who reside in a small community, the Court is going to ask that the courtroom be cleared.

MS. MENENDEZ:  Thank you, Your Honor.

(The following closed proceedings were had:)

THE COURT:  You may proceed.

**CONNIE J. LILLEJORD,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MS. MENENDEZ:**

Q.  Thank you.  Good morning, Ms. Lillejord.

A.  Morning.

Q.   The subject I'd like to speak to you about is your experience as a foster parent.

A.   Okay.

Q.   And I'd like you to share with us a little bit about -- you and your husband have been foster parents over time?

A.   Fifteen, 16 years.  We were licensed in May of 2000.

Q.   And do you have any foster children right now?

A.   I do.

Q.   I'm going to focus in in a moment on the foster children that were living with you around the time of the trial, but I'm hoping you can share a little bit generally about how many kids you've fostered over the years.

A.   Twenty-two.

Q.   And what's the longest period of time that foster children have lived -- one child has lived with you during that time?

A.   The foster kids we have currently will be with us three years in November.  And then the other ones that were the longest -- we had a brother and sister and the sister was with us for two and a half years and the brother was with us for three.  So those are the four longest terms, times.

Q.   When you became licensed originally as a foster parent, did you receive any special training about foster parenting?

A.   Yes.

Q.   Did you learn what sort of circumstances bring children into your home or into the foster parent system?

A.   I guess I knew that.

Q.   How about you share that with us.  What brings kids to you as a foster parent?  What in their life leads to that?

A.   Neglect, deprivation, parents -- alcoholic parents, parents on meth, parents attempting suicide in front of their kids, being physically abusive.

Q.   And you've had children who were victims of physical abuse in your home over time?

A.   When you're a foster parent you never know everything, okay?  So definitely neglect and deprivation.  I suspect there was some physical abuse but most of our kids that have come in have been emotionally neglected, deprived.  Most of my kids have been under the age of five so they can't come in and tell you the whole story.

Q.   They can what?  I'm sorry.

A.   Under the age of five.  I've had a lot of infants

and toddlers, lots of two and three-year-olds.  So they're not verbal and telling you all kinds of things.  It's just their behaviors that you get.

Q.  To the extent that things are known to child protection at the time a child is removed from their home and placed in foster care, are those things shared with you to help you prepare to welcome the children into your home?

A.  Before the child comes to my home?

Q.  Yes.

A.  Nope.  Sometimes you get a call at midnight and the kid comes in at 2 a.m.

Q.  In a case like that is there a point then over the next days or weeks where you learn more about the circumstances that the child is coming from and what caused him or her to be removed from the home?

A.  Some.  I never know a hundred percent, never.

Q.  Do you take the children to court sometimes?

A.  Never.

Q.  Do you ever attend any court appearances?

A.  Never.

Q.  Do you meet --

A.  We are informed of court appearances but I've never attended a single one.

Q.  Okay.  Let's use as an example just the kids that

you're fostering right now.  Are you aware of the circumstances that bring them to your care?

A.  Yes.

Q.  And what they've maybe experienced in their home life that required them to be removed?

A.  Yes.

Q.  And I rec- --

A.  Some.

Q.  I recognize you're saying you don't know it all.

A.  No.  I don't know everything and some of it quite honestly is just if you have parents who are transient with their children there's a lot of things, a lot of people don't know about what has happened to them as they've moved from town to town and stayed on people's couches and stuff like that.  You'll never know everything.

Q.  Of course.  One of the things that they talk about in at least the foster parent handbook and things like that are the idea of a team of people helping these children.  Is that something that you're familiar with as a foster parent?

A.  Sure.

Q.  That you're working cooperatively -- who would be on that team?

A.  It depends.  A lot of my kids that have come into

our care have received early intervention services.  Is it okay to talk about my current --

THE COURT:  It is.

A.  Are we good?  My current foster son, for instance, is in special needs preschool.  He and his brother received early intervention services.  We're all part of a team.  The IEP members from the school, special needs preschool teacher, speech therapist, OT, social worker, guardian ad litem, we're all part of that team.

Q.  Is that -- perhaps not the special education component but the other members that you mentioned on the team, the social worker, the guardian ad litem, the foster parents, is that a normal team approach to fostering to keep you in communication with the other people responsible for those kids through child protection?

A.  Is it a normal team?

Q.  Yeah.  Is it ordinary for you to work as a team when you're a foster parent?

A.  Yeah.  I'm in pretty close connection with their guardian almost.  I mean, I've got her phone number.  I can call her at any time day or night if anything comes up.

Q.  Do all the children that you foster have guardian

ad litems?

A.   They're supposed to have a representative, yes.

Q.   Do you remember meeting with members of the Rodriguez defense team in 2011?  Do you remember when two of my colleagues came to visit you and talk to you about your experiences in the trial?

A.   Yes.

Q.   And do you remember one of those was a young woman named Rebecca?  You might not remember that.

A.   I don't -- I do not remember.

Q.   And you spent some time talking to them about both your experiences as a juror and your perceptions. Do you remember those conversations?

A.   I remember talking to them.

Q.   Do you remember telling them that at the time of the trial the two foster children that were residing with you had been sexually abused?

A.   No.

Q.   Were the two foster children residing with you at the time of the trial victims of sexual abuse?

A.   I do not know that.

Q.   Okay.  Just to focus in a little bit, do you remember saying that you, at the time of the trial, had two Hispanic foster children who had been sexually abused?

A.   Say the question again.

Q.   That when you visited with our team members you told them that at the time of the trial you had two Hispanic foster children who had been sexually abused. Do you remember sharing that with us -- with my colleagues?

A.   No.

Q.   Did you have two Hispanic foster children in your home during the time of the trial?

A.   They were part Hispanic.

Q.   Would you have described them as Hispanic at the time?

A.   They were part Hispanic and part white.

Q.   Okay.  They were roughly seven and nine at the time of the trial?

A.   I'd have to -- I've had 22 kids.  I'd have to count back and figure it out.

Q.   Might I -- if --

A.   He's -- I know that the boy right now is 18 so if somebody can do the math you can figure out how old they were at the time.

Q.   Okay.  And would it refresh your recollection to know that you told His Honor when you were talking about juggling the schedules that would be required from the lengthy trial that you said they're not infants, they're

seven and nine?

A.    Okay.  Yeah, I remember asking if it was going to be a -- I'm not sure what the word is but where all the jurors would be sequestered.  Is that the correct -- and along with the foster kids I was starting a master's program and working full time so that was a concern of mine.

Q.    And, in fact, the judge -- one of the things you talked about was having a supportive husband who could help juggle the schedules.  Do you remember that conversation during the voir dire process here in the courtroom?

A.    I do have a supportive husband.

Q.    Okay.  So what was your understanding of what brought the children to you?  And we're going to focus from now on on the two kids that were living with you at the time of the trial.

A.    Okay, neglect.

Q.    You don't recall knowing anything about their status as victims of sexual abuse?

A.    At some point the younger one, the girl, told me a story of something she had witnessed.

Q.    Something of a nature that you might associate with sexual abuse?

A.    What she -- she was in a bedroom.  It wasn't what

she did.  It was what she witnessed.  It wasn't what was done to her; although, they made her stay in the bedroom and watch.

Q.  Just to --

A.  I mean, it was still done to her because she was there.

Q.  So she vicariously experienced that?

A.  Well, any young child who's made to, yeah, see things that are inappropriate.

Q.  Just to assure you this is going to -- this is an empty courtroom and this conversation will remain under seal.  Can you share with us what she shared with you?

A.  Is it -- I mean, is it okay?

THE COURT:  I don't believe there's any guarantee that this conversation will be under seal forever.  I mean, it will be part of a transcript and identifying information will be redacted, but it is highly probable that this will eventually be part of a transcript that's filed.

MS. MENENDEZ:  Okay.

THE WITNESS:  I'm not feeling really comfortable.

MS. MENENDEZ:  I would like to fight very hard to avoid that, Your Honor, so that we can get at the truth here and I would ask to have this portion of

the transcript redacted.  We would refer not even by Ms. Lillejord's name when we brief this matter.  As the Court did in both Sampson and Fell, the Court's orders cannot name her and therefore keep her identity secret. That's what we have tried to preserve for privacy and also to get to the truth of this matter.

THE WITNESS:  I'm still the only foster mom that I'm aware of that was on the trial.

MS. MENENDEZ:  I recognize that but with due respect, Your Honor, I don't know that anybody even knows who the foster parents might have been on this case.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  Well, Your Honor, I agree with the Court.  I understand trying to protect the minors but these children's names have not been revealed.  This is a public case.  It, as the Court just noted, is going -- there's going to be a transcript and it will be made public at some point.  I understand the concern here and frankly I think we've gone already to a point of no return in terms of talking about what the story is that the little girl had told Miss Lillejord so I don't understand what else we're going to accomplish here.

THE COURT:  I'm going to order you to answer

the question.

THE WITNESS:  Repeat the question.

Q.  (Ms. Menendez continuing)  I was just asking you to share the details of what she had shared with you, what her experience was?

A.  She was made to -- her mom was in a lesbian relationship and she was in the bedroom and watched.

Q.  And you viewed that as abuse of her because she was made to watch something so sexual and inappropriate. Is that fair to say?

A.  I view that as completely inappropriate.  I would not -- I don't know if I would say it's what emotionally affected her like if you would say was she sexually abused.  That to me is not sexual abuse.

Q.  And it's your testimony that the children that were living with you at the time of the trial had in your knowledge not experienced other sexual abuse?

A.  I'm just thinking back.

Q.  Sure.

A.  To my knowledge, no.

Q.  And you don't recall telling us that the two children residing with you during the trial had been sexually abused?

A.  No.

Q.  And as you sit today thinking -- and I recognize

22 children and a lot of experiences. You would not agree that those children that you were with at the time of this trial had been victims of sexual abuse?

A. And the time frame when you came and talked to me I'd had those kids for three years. At the time of the trial I believe I'd only had them for 12 months and so the story that came out at some point over the two and a half years that I had the girl did not come out in the early stages even maybe by the time of the trial.

When you came and talked to me -- or whoever did in 2011, I was a couple years past having had those kids and so there would have been a whole story about the three years I had those kids. At the time of the trial they were pretty new within my home and I did not find things out right away.

Q. I want to focus a little bit on the questionnaire that you completed. Do you recall filling out the questionnaire as part of the jury selection process?

A. Prior to the jury.

Q. And you have a copy right there in front of you if you don't mind taking a look while we talk about a few questions.

A. Okay.

Q. This is probably bringing back some memories, but do you remember being asked a lot of questions both

about your background and about experiences that happened to people that you know?

A.  I'll take your word for it.

Q.  Take a look.

A.  If you can refer me to a page of a question you're referring to.

Q.  Let's start with page 12, question 57.

A.  Okay.

Q.  As an example you were asked whether you or any member of your family had ever been arrested.

A.  Yes.

Q.  And you answered about a sibling's family member in saying yes that you knew somebody who had been.  Is that fair to say?

A.  Yes.

Q.  And you put some details about that experience and your understanding of it and what kind of impact it had on your family.  Is that fair to say?

A.  I put my impression of it.  I wouldn't talk for the rest of my family.

Q.  Okay.  Well, you talked about how you felt like it affected the young man in question, that you felt like it was a lesson for him.

A.  Yes.

Q.  And the next page paragraph 58 you were again

asked whether you knew someone or had personally knew someone who had ever pleaded guilty to a crime and you checked "yes" there as well; is that right?

A.   Yes.

Q.   And in this case you were talking about a friend and you specified that they had in the past been in trouble for something related to drugs.

A.   Yes.

Q.   On paragraph -- skipping ahead -- I'm sorry, we might be skipping back actually.  Go back a couple pages to page 11, paragraph 52.  You were asked whether you or any family member or anyone else close to you had ever been the victim of a crime; is that right?

A.   Yes.

Q.   And you checked "no" there.

A.   Yes.

Q.   Now as of 2006, when you were filling this out, you had foster children in your home who had been victims of crime; is that right?

A.   I've not had -- I mean, if I'm thinking about my foster children, I would not use the words "victims of crime."  That's just not in my head what I would be thinking about.

Q.   Even though --

A.   They would be -- they would have suffered

emotional neglect, deprivation.  Parents didn't spend time in jail for what they had done to the kids.

Q.   So none of your -- just to clarify none of the children who had been in your home at least up until 2006 had ever had a parent face charges of a criminal nature for abuse, neglect or anything like that that you knew of?

A.   No, I -- no.

Q.   But they'd certainly been victims of abuse or neglect or deprivation enough to have the children removed from the home.

A.   They had suffered neglect, yes, deprivation, mm-hmm.

Q.   And as of 2006, when you were filling this out, were you aware of any of the children that had been with you, either the two that had been with you for a year at this point or ones that you had had in the earlier years, who had been the victims of actual physical abuse?

A.   No.  I was not aware.

Q.   Physical --

A.   I had -- almost all of my kids have been severely neglected, you know, lack of food, lack of love, lack of holding, lack of touching, parents were drunk, parents couldn't provide for their kids.  That is what -- and

I've made that comment.  That is what the majority of my kids have come to me as infants and two and three -- all ages.  I guess I shouldn't just pick on the younger ones but, I mean, there's significant brain changes that happen with all of that, you know, the emotional neglect and stuff.  So, you know, you can use the word "crime."  I don't use the word "crime."  I just say that they've suffered.

Q.  Just to be clear this doesn't specify that an arrest had to happen or charges had to be brought on this question, right, when you take a look at that, No. 52, on the form?

A.  If they've been arrested -- oh, it doesn't say if they've been arrested or --

Q.  Just had been --

A.  Well, it said -- if I would have filled it out I would have said:  Was the suspect caught or convicted?  And what was the crime?  Like what would they have been charged with?  That's also listed.

Q.  So let me ask just a stepping back question so that I understand how you perceive this question.

A.  Mm-hmm.

Q.  If -- let's use as an example one of your children had been the victim of sexual abuse.  Regardless of whether charges were brought, would you

have viewed that as a crime?

A.  I would say that if somebody has sexually abused a child, yes, I would consider that a crime for that person to be brought up on charges.

Q.  But you would view that as a crime what happened to that child regardless of whether the criminal justice system did its job or not.  It was a crime what happened to that child.

A.  Well, now we're playing with words.

Q.  And I'm not trying to.  I'm trying to understand where you draw the line around the word "crime."  Is it only a crime if it goes to court or it's the severity that makes it a crime?

A.  To me I'm thinking who has been charged with whatever crime they have committed.  That's what I'm thinking.  I view the kids as victims of things that have happened to them.

Q.  But not victims of crime?

A.  I don't know, maybe it's just a play on words.  I view the kids as having suffered horrific things and I just -- I think of the person who's done it as, I don't know, the perpetrator, the person who's committed the crime.  In speaking I would never say "a crime has been committed against that child."  I would -- I don't use those words.

Q.   You're certainly not suggesting that if you did feel that way, if these kids had been victims of what you perceived as a crime, you would have listed them here.  Is that what you're saying?  You wouldn't have said, for instance, that they're not close to you or that they're not a family member, right?

A.   (No response.)

Q.   I'm not asking --

A.   Actually at the time I don't know if I considered my foster kids -- like I read the word "Have you or any family member."  I mean, I guess I was thinking about, you know, my -- you know, my best friend, college roommates, family members, aunts, uncles, grandparents. At the time that's who I was thinking about when I answered those questions.

Q.   Certainly.

A.   Did I think about my foster kids or -- I don't -- I probably did not think of foster kids answering that particular question.

Q.   Even though it says "anyone else close to you"?

A.   Well, some of my foster kids come and go in a weekend and I don't consider that -- you know, I've had some long-term foster kids.  I've had kids that have been with me a year.  I've had kids two and a half years.  I've had kids over a weekend.  I've had kids a

week.  I've had kids three months.  And so I don't know --

Q.  I hear that.  These kids had been with you about a year at this point.

A.  They came -- yeah, I don't know.  Hard to remember because they had come one other time before and stayed for a whole 24 hours in my care and then the judge -- they were three and five at the time and the judge sent them back.  And they came to my house then two or three years later so I know the one time was around Thanksgiving that they came because I had a Christmas tree up but I don't remember which time that was.  I mean, they could have come in November the year before the trial started but I could be thinking about the first time they came to my house.  I mean, literally 22 kids, I don't remember when they came but I know they were with me two and a half -- the girl two and a half and the boy three years because they were -- they went up for adoption.

Q.  Do you remember when they left?

A.  I know they came when they were six and eight.

Q.  Six and eight?

A.  And then the boy was -- three years later he left at 11.

Q.  So if you said seven and nine during the voir

dire --

A.   Probably -- they could have because their birthdays were January and June 11th and so the trial started in August and so he could have been -- he just would have turned nine.  He could have come in May for all I know and turned nine in June.

Q.   But when I first asked you about this -- I'm not trying to belabor the point but when we talked a few minutes ago your estimate was about a year?

A.   If they were seven and nine and they came when they were six and eight.  I know they came when they were six and eight.

Q.   Okay.

A.   But I just -- I can't tell you the month.

Q.   Okay.

A.   Her birthday was in January.  It would have had to be -- it would have been before January, the middle of January.  So they could have come in November that second time.

Q.   Okay.

A.   I don't know.

          MS. MENENDEZ:   Might I have a moment, Your Honor?

          THE COURT:   You may.

          MS. MENENDEZ:   Thank you.  Nothing further.

THE COURT:  Thank you.  Mr. Reisenauer?

MR. REISENAUER:  Just a very brief couple questions, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Is it LILL-a-jord or yord (phonetic)?

A.  LILL-a-yord.  It's Norwegian.

Q.  Okay.  You have a couple of exhibits up there, ma'am.  I just want to ask you a couple questions just to clarify, okay?

A.  Sure.

Q.  The time the Court had you in here to ask questions, that particular exhibit there is in front of you, correct?

A.  Is this where we were being interviewed down here?

Q.  Yes, the typed-up transcript there.

A.  Yeah.

Q.  You have that in front of you, correct?

A.  I think so.

Q.  Okay.  Just turn to page 148 just briefly.  And at that point you had just begun the process here as you just described sitting in front of the Court here and Judge Erickson just asked to have you give a little information about yourself and if you turn to line 14.

A.  Mm-hmm.

Q.  "I am from Jamestown and my husband and I live there.  I have two kids and two foster kids right now."

A.  Mm-hmm.

Q.  Do you see that?  And so that's what you were just talking about with counsel, correct?

A.  Correct.

Q.  Those same two foster kids that you related to the Court about, correct?

A.  Correct.

Q.  Okay.  And I believe you have testified that they were seven and nine at the time, right?

A.  They were six and eight when they came to my house.

Q.  Okay.

A.  I mean, I literally could give you the birthdate I guess if you want to figure out how old.

Q.  No, that's fine.

A.  Boy was --

Q.  And then you also said that you had been working at the Anne Carlsen Center for Children, correct?

A.  Correct.

Q.  And what was your position there?

A.  Director of therapy services.

Q.  Okay.  And you informed the Court and counsel

about that at that time also --

A.   Yes.

Q.   -- correct?  Just turn back over then to that jury questionnaire if you would to your right and on the very front page it asks what your occupation is, correct?

A.   Yup.

Q.   And you also there said you're the director of rehab services --

A.   Yup.

Q.   -- at the Anne Carlsen Center?

A.   Mm-hmm.

Q.   Okay.  In your discussion just a minute ago with counsel, she asked you a number of questions about the two foster children and your information in regard to the one girl.  And if I'm correct you said that the story about the information she related to you came after the trial.  That's to your best recollection; is that correct?

A.   I'm sorry, you have to repeat that.

Q.   The information that was related to you from that foster child about her viewing --

A.   Oh, what I said is that I had those kids for two and a half and three years.  And when they first came into my care I knew about the neglect and everything but

at some point later, and it was much later, that she told me this story about what had happened to her.

Q.   Okay.   And you don't recall anything about that coming up during this case, correct?

A.   No.

MR. REISENAUER:   That's all I have, Your Honor.

THE COURT:   Ms. Menendez?

MS. MENENDEZ:   No, no further questions, Your Honor.

THE COURT:   You may step down, madam.   And you may bring in the members of the public.

THE WITNESS:   Am I --

THE COURT:   Do you wish to release her from her subpoena?

MS. MENENDEZ:   Yes.

THE COURT:   Any objection from the government?

MR. REISENAUER:   No, Your Honor.

THE COURT:   You're free to leave.   Thank you very much for your time.

MR. MOHRING:   Can we have a moment, Your Honor?

THE COURT:   You may.

(Pause.)

THE COURT:  Petitioner will call their next witness.

MS. MENENDEZ:  Your Honor, might we ask for a brief recess?  And we could approach if Your Honor would like.

THE COURT:  That's fine.  We'll go ahead and we'll break for 15 minutes.  We'll start again at 10:20.

MS. MENENDEZ:  Thank you.

MR. MOHRING:  Thank you, Your Honor.

(Recess taken; 10:05 a.m. to 10:20 a.m.)

(The following proceedings were had in open court:)

THE COURT:  We're back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that Mr. Rodriguez is appearing by video along with his counsel in Indiana, Mr. Margulies.
Mr. Mohring, Ms. Menendez and Mr. Wiseman appear here.
Mr. Reisenauer appears on behalf of the United States.

When we broke the petitioner was about to call their next witness.

MS. MENENDEZ:  Thank you, Your Honor.  Just to advise the Court, we will have a single remaining witness, a very brief impeachment matter related to minors, and then we will be resting.

THE COURT:  Okay.  You may call your witness.

MS. MENENDEZ:  Thank you, Your Honor.  We would call Rebecca Ireland.

THE CLERK:  Please raise your right hand.  State your full name and spell your last name.

MS. IRELAND:  Rebecca Ann Ireland, I-r-e-l-a-n-d.

**REBECCA A. IRELAND,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MS. MENENDEZ:**

Q.   Good morning, Ms. Ireland.

A.   Good morning.

Q.   Can you tell us where you work?

A.   I work as an assistant public defender in Ramsey County, Minnesota.

Q.   And how long have you been in that position?

A.   About one year and a half.

Q.   Can you just briefly tell us a little bit about what you did prior to becoming an assistant public defender in Ramsey County?

A.   Certainly.  Immediately prior to working as a public defender, I worked as a judicial law clerk in the

Minnesota Court of Appeals for Judge Hallbrooks,
H-a-l-l-b-r-o-o-k-s.

Q. And prior to that where did you work?

A. Prior to that as a law student at William Mitchell College of Law I worked in a number of places. One, the Minnesota State Public Defender's Office, which was the appellate office. After that I worked as an intern in the office of the Minnesota Federal Defender.

Q. And were you working in our office in the summer of 2011?

A. I was.

Q. Were you a participant in some interviews that the team representing Mr. Rodriguez did that summer?

A. I was. I was involved in a couple of interviews.

Q. Okay. And can you just tell us briefly who the subjects of the interviews were, not by name but just what kind of people were we interviewing?

A. Sure. We were interviewing individuals who sat on the jury for the trial of United States versus Alfonso Rodriguez.

Q. Okay. And when you would attend the interviews was it your practice to -- did you go by yourself?

A. No. The practice was to go in pairs so I was always with another member of the team, whether an investigator or another attorney on the defense team.

Q.    Okay.  And would you take notes?

A.    I would take notes.

Q.    And in some cases declarations were prepared. Can you describe a little bit about what that process was like?

A.    Certainly.  In speaking with some of the jurors, we asked if we could memorialize some of their statements in a declaration in their words which they could review and sign.  We did that in a number of the interviews so the process often was that one of the two members on the defense team would prepare the declaration and present it to the juror and they would review it.

Q.    And you personally prepared at least a couple of declarations during this investigation; is that right?

A.    I did.  I believe it was two declarations that I prepared.

Q.    And what was your goal when you would write a declaration in terms of the content?

A.    Again to memorialize what the juror was relating in terms of key aspects of their experience serving as a juror.  It could involve their opinions about the weight of the evidence, what they would have liked to have heard but didn't hear, their own personal experiences that relate to some of the topics in the case.

Q.   Was your goal just generally to phrase things in your words or in the words of the person you were interviewing?

A.   The words of the person interviewed.

Q.   After you had prepared one of these handwritten declarations, what happened next in general?

A.   I would review it with the juror.  We would read it aloud together line by line and often would make corrections along the way.  Sometimes crossing things out, rewriting them entirely, initialing any changes to ensure that what was being taken down in the declaration was true to that person's words.

Q.   I want to focus in a little bit -- actually, Your Honor, at this point we would ask to have the courtroom cleared.

MR. REISENAUER:  Could we have a sidebar?

(The following sidebar discussion was had:)

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  Well, Your Honor, it's my understanding that there's going to be questions of this witness in regard to her interview with the last witness, Miss Lillejord, in regard to her statement about her foster children and I assume that's why the request is being made.

That said, again, you know, we're going to

be in a position where this is going to be public.  This witness frankly is going to provide simple hearsay testimony, which I'm going to object to, and then there's going to be a declaration that's going to be offered, which I'm also going to object to.  Miss Lillejord didn't sign a declaration.  She was here and testified as to what her recollection was and I think that the record is clean in terms of her memory and so I'm going to object to closing the courtroom for the purpose of the testimony.

MS. MENENDEZ:  Your Honor, I intend to ask her about two questions and they will be whether she was present at the interview with Ms. Lillejord and whether she recalls Miss Lillejord telling us that she had in her home at the time two sexually abused Hispanic foster children.  That's the entire subject.  It's classic impeachment of her testimony that she didn't tell us that.  And that's all we intend to do with her, but I do think that brings squarely into view the question about the minor issue.

I will also be offering her own declaration memorializing that.  It's her own out-of-court statement but that's it.  We're not doing anything else so that's why I think it's important to be outside the presence of the public.  I understand that we continually say that

this will be eventually made public but that's actually Your Honor's decision.

THE COURT:  Well, you know, I have deep regrets about what I've done so far to be perfectly blunt.  I think that we have tried this thing in secret.  None of it should have been.  I don't think there's anything particularly damaging.  I don't think that there's anything particularly embarrassing.  I don't think there's anything that exposes any of these children to any untoward circumstances.  They couldn't have been identified from any of the testimony that's actually been deduced and I -- I have real regrets about having done this but I think having gone down this path I'll go ahead and finish it with these two things but this is not going to be secret.  This is not the kind of stuff that exposes anyone to public humiliation or harm.  It just isn't.

MS. MENENDEZ:  Thank you, Your Honor.

(Sidebar concluded.)

THE COURT:  We'll go ahead and clear the courtroom at this point.  Once again it involves minors and that's our purpose here.

(The following closed proceedings were had:)

THE COURT:  You may proceed.

MS. MENENDEZ:  Thank you, Your Honor.

Q.   (Ms. Menendez continuing)  Ms. Ireland, I'd like to show you what's been marked Plaintiff's Exhibit 600 (indicating).  Do you recognize that document?

A.   I do.

Q.   Can you describe it for the Court?

A.   It's a sworn declaration that I've composed and signed in 2011 encapsulating some of my recollections of interviews with Miss Connie Lillejord and Ms. Rebecca Jensen.

Q.   And unlike the declarations that we just spoke about, this is your declaration that you signed of your memories and your words?

A.   That's correct.

MS. MENENDEZ:  We'd offer Plaintiff's Exhibit 600, Your Honor.

MR. REISENAUER:  Your Honor, the United States is going to object for a couple of reasons to Plaintiff's Exhibit 600.  First of all, I guess the standing objection that we made before we started to the declarations in this matter being entered pursuant to Rule 606.  And this was not an exhibit that was on the original list so I make that objection now.

Secondly, this declaration contains information regarding a prior witness who already testified, Miss Jensen, and certainly none of the

information in the declaration with regard to Miss Jensen should be admitted. She already testified under oath and answered questions so that should be stricken from this declaration in the beginning.

And then finally, Your Honor, this declaration is clearly hearsay. There's no exception to the hearsay rule in regard to this declaration. Again the witness just got done testifying. She was questioned extensively by counsel in regard to her memory, specifically about the sexual abuse of her foster children, which I assume is where we're going with this. So we would object to the entry of the declaration for that reason.

The hearsay that's contained in this declaration has no exception as far as I can tell. Miss Lillejord is not a party to the action. She was a simple witness to this particular case and so we would object on all of those grounds.

THE COURT: Ms. Menendez?

MS. MENENDEZ: Your Honor, we are open to certainly redacting any portions of this that don't go to our purpose in introducing it. It is a classic prior inconsistent statement. Miss Lillejord testified today that she had not told us that her foster children had been the victims of sexual abuse and Ms. Ireland will

testify in the declaration documents that she did tell us that, "us" being the team. Not me personally, I apologize.

THE COURT: Okay. Here's my first question. Is this actually the statement of Miss Ireland or is this the statement of Miss Lillejord?

MS. MENENDEZ: The declaration is the statement of Miss Ireland describing what Miss Lillejord told her. The hearsay -- it is I guess in the most technical hearsay as to Ms. Ireland because it's an out-of-court statement of Ms. Ireland but she is going to adopt it right now. It is -- to the extent it is hearsay as to Ms. Lillejord, it's classic impeachment, Your Honor.

THE COURT: The objection's overruled.

Q. (Ms. Menendez continuing) Ms. Ireland, I'd like to talk to you briefly about your interview, your participation in the interview of Ms. Lillejord. Do you recall interviewing Ms. Lillejord?

A. I do.

Q. Do you recall who attended that interview with you?

A. Yes, myself and Ruth -- I'm sorry, I'm a little nervous and I'm forgetting her last name. Freeman.

Q. That's okay.

A.   Sorry, Ruth Freeman.   And I visited the home of Ms. Lillejord and we both talked to her.

Q.   And do you recall the conversation turning to Ms. Lillejord's foster children?

A.   I do.   We were both speaking with Miss Lillejord for some time and she talked a little bit just about her family background and said that she had two children of her own and two, as she put it, Hispanic foster children living with her at the time of the trial.   And she volunteered that they had been previously sexually abused children both of them.

Q.   Did you ask whether they had been sexually abused or was that something that came from Miss Lillejord?

A.   I did not ask it.   She volunteered it.   She just spoke about how the fact that they had been both previously sexually abused.

Q.   You use the term "Hispanic."   Did you inquire as to their ethnicity or was that from Miss Lillejord?

A.   That was from Ms. Lillejord.   She was just speaking about her home life and described them as Hispanic foster children.

Q.   And it was your understanding that they had been her foster children at the time of the trial?

A.   She said that expressly.

Q.   Did she provide any details about the sexual

abuse of those children?

A.   She didn't.

Q.   Did you understand her to suggest that just one of the children had been the victims of abuse or both?

A.   No.   She indicated that they had been previously sexually abused.

MS. MENENDEZ:   Thank you.   Nothing further, Your Honor.

THE COURT:   Mr. Reisenauer?

MR. REISENAUER:   Just a couple questions, Your Honor.   Thank you.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.   Miss Ireland, you said you interviewed some of the other jurors also; is that correct?

A.   Yes.

Q.   One of them was Miss Jensen, correct?

A.   Yes.

Q.   Miss Jensen filled out a declaration and signed it?

A.   Yes.

Q.   Do you recall that?

A.   I do.

Q.   Okay.   Miss Lillejord did not, correct?

A.   That's correct.

Q.   Okay.

A.   We didn't ask her to.

Q.   You didn't ask her to?

A.   No.

Q.   Okay.  Did she tell you that she didn't -- that she would talk to you but she didn't want her name used?

A.   That's correct.

Q.   And so in your declaration you say that Miss Lillejord said she had two children of her own and two Hispanic foster children living at home during the trial, correct?

A.   Correct.

Q.   And did you know at the time that she had informed the Court during jury selection and her answers to the jury questionnaire of that fact?

A.   I don't know anything about that because I never reviewed the questionnaires.

Q.   Okay.  And you're telling us that she told you that the two foster children had been previously sexually abused?

A.   That's right.

Q.   Okay.  She didn't tell you when that happened, did she?

A.   No.

MR. REISENAUER:  That's all I have, Your

Honor.

THE COURT:  Ms. Menendez?

MS. MENENDEZ:  No, Your Honor.

THE COURT:  Thank you.  Let's go ahead and bring the public in.  You may step down, madam.

THE WITNESS:  Thank you.

(The following proceedings were had in open court:)

THE COURT:  You may call your next witness, Mr. Mohring.

MR. MOHRING:  Your Honor, we have no further witnesses.  The petitioner rests.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  We have no witnesses, Your Honor.

THE COURT:  All right.  Argument, Mr. Mohring?

MR. MOHRING:  Your Honor, we'd like to reserve argument for briefing.  I'm happy to try to answer any questions that the Court has.

THE COURT:  How long do you think you need to brief it?

MR. MOHRING:  Your Honor, I would -- I recognize it's a long time but I'm asking the Court for two months.  I do that not because of the length of the

evidentiary record but because quite frankly the law in this area is a mess, the area of omissions from the selection process and the area of extraneous information.  Is McDonough test two parts or four or five?  What is the overlap between McDonough and actual implied or implicit bias?  What is the potential impact of omissions on the exercise of peremptory strikes are all areas about which the law is unresolved and particularly unresolved in the Eighth Circuit.  So I would ask the Court to allow us two months for an opening brief.  There are scheduling reasons in terms of the three of us as well that I can offer in support of that as well.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  Well, Your Honor, we would take a little different position as to the law that governs these particular issues.  I don't believe it's a mess.  I think it's fairly clear and certainly we've talked about that in our previous briefs on Warger and our Motion to Dismiss originally.

That said, we're going to need a transcript of the hearing and the testimony that we've obtained the last couple days and I have no objection to that sort of time frame.  Six weeks to two months is probably appropriate considering the fact that we need to get the

transcript from your court reporter.

THE COURT:  We'll set the petitioner's brief for Friday, November 6th, by the close of business.  The respondent's brief will be due according to the rule, replies according to the rule.

Next question, is an evidentiary hearing necessary on the mental health issues?

MR. MOHRING:  We believe so.

THE COURT:  All right.  And I'd intend to set that for the week of January 18th.

MR. REISENAUER:  January what, Your Honor?

THE COURT:  18th, 2016.  There's nothing on the calendar.  Is there something in your paper calendar, Shelley?

THE CLERK:  No, just a civil trial.

THE COURT:  There's a civil trial set for that date?  It's a criminal trial week it says.

THE CLERK:  Yeah.  But that's been scheduled for 18 months.  I have no idea what that trial is.

THE COURT:  We'll set this as the leadoff matter on the 18th of January.

MR. MOHRING:  Understood.

THE COURT:  All right.  Anything else that we need to take up?

MR. MOHRING:  Two other matters, Your Honor.

I'll distribute clean copies of the supplemental exhibits that have come in.  I should be able to get those around to everybody within a day.  I would ask that the Court give us a week to 10 days to do the Rule 49.1 redactions, personal identification information, from the exhibits before those are unsealed.  And we'll need to do the same thing for the -- this section of the petition as well.

THE COURT:  Any objection to that from the United States?

MR. REISENAUER:  No, Your Honor.  I believe the rule is pretty clear on that.

THE COURT:  And that's fine.  You think 10 days is enough time for you?

MR. MOHRING:  Could we have two weeks for that, Your Honor?  That would be great.

THE COURT:  Fourteen days from today's date?  Is that what you're looking for?  That's fine.

MR. MOHRING:  And I've looked.  I didn't see anything in the local rules that modifies 49.1 which provides a list of what should be redacted.  Is there anything in the local practice or the local rules that goes beyond that?

THE COURT:  I don't believe our local practice goes beyond what's in Rule 49.1.

MR. MOHRING:  Okay.  We'll take care of that.

THE COURT:  I'll look to make sure there's not some vague standing order that's floating around from before my time here, which may be in fact the case, and if there is I'll let you know but I don't think there is.

MR. MOHRING:  Appreciate it.

THE COURT:  All right.

MR. MOHRING:  That's all we have.

THE COURT:  All right.  Thank you.  The matter is submitted.

(Adjourned at 10:45 a.m.)

**CERTIFICATE OF REPORTER**

I, Kelly A. Kroke, a duly appointed Registered Professional Reporter;

DO HEREBY CERTIFY that I reported in shorthand the foregoing proceedings had and made a record at the time and place indicated.

I DO HEREBY FURTHER CERTIFY that the foregoing and attached (232) typewritten pages contain an accurate transcript of my shorthand notes then and there taken.

Dated this 2nd day of October, 2015.

/s/ Kelly A. Kroke
KELLY A. KROKE - RPR, RMR
United States District Court Reporter
District of North Dakota
Southeastern Division