IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

| | |
|---|---|
| ALFONSO RODRIGUEZ, JR.,<br><br>   Defendant/Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>   Plaintiff/Respondent. | Case No. 2:04-cr-55<br><br>**POST-HEARING MEMORANDUM OF THE UNITED STATES REGARDING § 2255 JURY MISCONDUCT ALLEGATIONS** |

The United States of America, by Christopher C. Myers, Acting United States

Attorney for the District of North Dakota, and Keith W. Reisenauer, Assistant United

States Attorney, submits this Memorandum of Law for the purpose of addressing

Petitioner's juror misconduct claims following an evidentiary hearing on the claims held

before the Court on September 8-10, 2015.  Rodriguez's jury misconduct claims have

been extensively briefed by the parties in this matter.

### A.  INTRODUCTION

The United States' position is set forth in the "United States' Answer in

Opposition to Motion Under 28 U.S.C. § 2255 For Collateral Relief, To Vacate, Set

Aside, Or Correct Sentence, and For a New Trial" (DCD[1] 879), filed November 13,

2013; the "United States' Motion for Dismissal and/or Summary Disposition of 28

U.S.C. § 2255 Issue Regarding Alleged Juror Misconduct" (DCD 950) filed March 6,

2014; and the "United States' Memorandum of Law Regarding Alleged Juror

---

[1] Citations to pleadings filed with the U.S. District Court are referenced by a shortened pleading title followed by the docket number:  e.g. DCD 879.

Misconduct and Warger v. Shauers" (DCD 969), filed May 13, 2015. This memorandum responds to information received in connection with the hearing held on September 8-10, 2015.

The United States' maintains that Rodriguez's juror misconduct claims should fail, as the defendant has failed to show that any juror acted in an intentional or prejudicial manner. The lives of the jurors who returned the verdicts have been subjected to microscopic scrutiny. Rodriguez has spared no time or expense in examining the jurors' conduct, background and family lives. This extraordinary practice, years after trial, was initiated in the absence of any evidence of misconduct. It was, in short, a fishing expedition. The accusations Rodriguez brings against Jurors Rebecca Vettel, Paulette Cotney, and Connie Lillejord are based upon information first obtained more than five years after trial.

A fair trial requires a jury willing and able to decide a case "solely on the evidence before it." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984); *see* United States v. Stewart, 433 F.3d 273, 303 (2d Cir. 2006). But the law strongly presumes against overturning verdicts on the basis of juror misconduct. United States v. Greer, 998 F. Supp. 399, 405 (D.Vt. 1998) (citing Tanner v. United States, 483 U.S. 107, 120 (1987)).

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence

> thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation – to the destruction of all frankness and freedom of discussion and conference.

Tanner, 483 U.S. at 119; see also United States v. Escalera, 536 Fed. Appx. 27, 35 (2d Cir. 2013) (holding that courts should hesitate to "haul jurors in" to "probe for potential instances of bias, misconduct, or extraneous influences") (citation omitted); United States v. Diorguardi, 492 F.2d 70, 79-80 (2d Cir. 1974) (noting "many cogent reasons militating against post-verdict inquiry into jurors' motives for decision . . . . [including] 'inhibition of jury room deliberations, harassment of jurors, and increased incidence of jury tampering") (citation omitted).

Nonetheless, the final verdict in this case was "followed by an inquiry in the hope of discovering something which might invalidate the finding." Tanner, *supra*. Jurors have been "harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." Id. The effort, however invasive, is ultimately in vain, as discussed below.

## B. DISCUSSION

The Supreme Court has held that a new trial was not required in a product liability case when a juror failed to disclose, during voir dire, that an exploding tire had broken his son's leg. McDonough, 464 U.S. 555. Because the juror had not considered his son's injury to have involved "disability or prolonged pain and suffering," the matter involved mistake, not dishonesty, and the Court reasoned that invalidating a three-week trial because of

> . . . A juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give.  A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination.

464 U.S. at 555.

To obtain reversal of a judgment due to a juror's false statement "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." McDonough, 464 U.S. at 556; *see* United States v. Greer, 285 F.3d 158, 170 (2d Cir. 2002) (applying the standard to a criminal case).  "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."  McDonough, 464 U.S. at 556.

A lack of impartiality does not always require a juror's removal.  Challenges for cause allow removal only "on a narrowly specified, provable and legally cognizable basis of partiality."  Swain v. Alabama, 380 U.S. 202, 220 (1965), *overruled on separate grounds* by Batson v. Kentucky, 476 U.S. 79 (1986).  Thus, challenges for cause generally stem from actual bias, implied bias, or inferable bias.  *See* United States v. Torres, 128 F.3d 38, 43 (2d Cir. 1997).  *But see* United States v. Sampson, 724 F.3d 150, 165 (1st Cir. 2013) (finding the categorical distinction between biases "unhelpful" and noting that McDonough "saw no need to use pigeonholes of this sort").  Actual bias is "bias in fact."  Id.  Implied bias is presumed in "exceptional

situations" in which "an average person in the position of the juror in controversy would be prejudiced." Id. at 45-46. *But see* Johnson v. Luoma, 425 F.3d 318, 326 (6th Cir. 2005) (calling into question the legal viability of presumed prejudice). Such presumptions generally arise for "jurors who are related to the parties or who were victims of the alleged crime." Torres, 128 F.3d at 45; *see also* Smith v. Phillip, 455 U.S. 209, 222 (1982) (O'Connor, J., conc.) (providing examples that might give rise to a presumption of bias). As a third category, "Bias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for case, but not so great as to make mandatory a presumption of bias." Torres, 128 F.3d at 47.

As with actual bias, "the judge's determination [of inferred bias] must be grounded in facts developed at voir dire." Torres, 128 F.3d at 47. Whether a court can infer bias after trial remains an open question. Greer, 998 F.Supp. at 408. Assuming the availability of such inferences after trial, courts have recognized them only where a juror's experiences bear an extremely close relationship to the facts at issue during trial. *See* Torres, 128 F.3d at 47 (holding that "cases in which a juror has engaged in activities that closely approximate those of the defendant on trial are particularly apt" to provide an inference of bias.); *cf.* Greer, 998 F.Supp. at 409-09 (rejecting implied bias based on the attenuation between the juror's experience and the facts at trial.)

Courts require a showing of intentional juror dishonesty as a prerequisite to relief.[2] United States v. Shaoul, 41 F.3d 811, 815-16 (2d Cir. 1994).  In jurisdictions that permit inferences of bias from innocent omissions, courts demand a very high threshold showing.  For instance, the Sixth Circuit holds that only when a juror has deliberately concealed material information may a court infer bias; otherwise, "the movant must show actual bias."  See, e.g., Zerka v. Green, 49 F.3d 1181, 1186 (6th Cir. 1995).  Though the Fourth Circuit considers the possibility of inferred bias for unintentional nondisclosure, it held that a capital juror did not demonstrate bias when she innocently failed to reveal that her husband had been murdered. United States v. Fulk, 454 F.3d 410, 431-33 (4th Cir. 2006); see also Fields v. Green, 503 F.3d 755, 774 (9th Cir. 2007) (holding that the spouse of a rape victim is not an extreme or extraordinary situation that would require excusal of a potential juror).

1.      Juror Rebecca Vettel

Rodriguez claims certain jurors deliberately withheld material information on their juror questionnaire and answered questions falsely during voir dire.[3]  Rodriguez

---

[2] Rodriguez cannot establish dishonesty through a collective analysis of statements.  Each allegation of dishonesty is considered individually, and only those supported by evidence are considered when determining bias. See Stewart, 433 F.3d at 304 (rejecting consideration of "pattern of lies" allegation.)

[3]It is not clear from the Motion whether the information alleged by Rodriguez was known to him and his counsel at the time of the voir dire examinations.  If it were, he is barred from even raising the issue now when, in fact, he had chosen not to question the jurors further, upon receiving answers, on the questionnaire or during voir dire, which he thought to be factually incorrect. See Johnson v. Hill, 274 F.2d 110, 115-116 (8th Cir. 1960).

alleges that Juror Rebecca Vettel, formerly known as Rebecca Jensen, failed to disclose every infraction to which she has ever been a party.[4]

He claims that Rebecca Vettel's answers on her juror questionnaire amounted to egregious and blatant misconduct when in fact her answers were truthful. Even if some were incorrect, they were simply mistaken and inadvertent answers. Rodriguez's claims are exaggerated if not outlandish assertions and prevarications themselves.

Rebecca Vettel was interviewed five years after the trial by members of Rodriguez's 2255 team. Rodriguez's counsel interviewed five jurors. According to all available information, Rodriguez's 2255 team had no reason to suspect any juror misconduct by Rebecca Vettel prior to her interview. On July 24, 2011, members of Rodriguez's 2255 team asked Vettel to sign a sworn declaration, which she did. (JM EVID HR'G[5] 00014-15)

a. Expertise

Rodriguez nitpicks Vettel's juror questionnaire answers regarding her prior employment. Question 4 of the Juror Questionnaire asked to state present and past employment for the past ten years. The questionnaire form had spaces to list 5 prior employers. Ms. Vettel filled in all five spaces listing her employment starting with her present employer - Agricover. However, Ms. Vettel had 6 jobs in the ten year period and

---

[4] Declaration of Rebecca Jensen, Exhibit S-01. At the time her Declaration was prepared, the Affiant's name was Rebecca Jensen. Rebecca Jensen's legal name, currently, is Ms. Rebecca Vettel. The United States will refer to her as either "Ms. Vettel" or "Vettel" throughout this brief.

[5] The United States cites to the Juror Evidentiary Hearing Transcript from September 8-10, 2015, as "JM EVID HR'G" followed by the cited page number.

her employment with the Anne Carlsen Center for Children[6], as later stated in her declaration, was not initially mentioned in the space provided on the questionnaire. (JM EVID HR'G 00109)

Vettel does not deny her previous employment at the Anne Carlsen Center for Children.  (Id. at 00017) Vettel testified that while employed at the Center she worked with children who suffered various disabilities (Id.), and a few children who also suffered from prior physical and mental abuse. (Id.)  Vettel testified that some, but not all, of the children at the Center came from impoverished homes. (Id. at 00020)

At the evidentiary hearing before this Court, Rebecca Vettel explained, on direct examination:

> Q.    And you indicated that your experience at the Anne Carlsen Center affected your consideration of the evidence in the trial of Mr. Rodriguez, including the evidence of him having experienced abuse as a child?
>
> A.    I don't think it affected it in any way.  I mean, it was my experience but I don't think –
>
> Q.    It wasn't valuable in your consideration of the evidence?
>
> A.    I don't think I understood anything any differently that was presented to us because of – really because of my profession. I –
>
> Q.    Your declaration indicates that you shared your experiences you had learned, experiences that you had had at the Anne Carlsen Center with other jurors in the case.
>
> A.    Right.

---

[6]  The Anne Carlsen Center for Children is an educational, residential, and therapeutic institution in Jamestown, North Dakota which provides care and support for children, up to 21 years of age, with physical, emotional, and mental disabilities. (JM EVID HR'G 00017-18)

Q.    And you talked about how based on your experience and your
      expertise, I think is the word in the declaration, it was your belief
      that disabilities and compulsions are things that can't just be turned
      off?

A.    Right. I do remember making that comment, yes.

Q.    And that was information that you obtained and understand that you
      had that developed through your experiences at the Anne Carlsen
      Center.  Fair?

A.    Right.

(JM EVID HR'G 00019-21)

Vettel further testified that when she filled out the juror questionnaire form, she filled it out to the best of her ability. (Id.) She explained that the Anne Carlsen employment was prior to any of the employment listed on her form, and she completed the questionnaire to the best of her ability based upon the space provided on the form. (Id. 00109-110) She stated that it was an oversight on her part and her inadvertent failure to disclose the Anne Carlsen employment was not an attempt to hide said employment. (Id. 00110)

Rodriguez implied Vettel lied about the date of her employment with Alpha Opportunities.  Vettel testified that her dates of employment at Alpha Opportunities were mistakenly put down as being completed in October 2005, instead of October 2004. Vettel never denied her employment at Alpha Opportunities, and she clarified that her employment with Alpha Opportunities was terminated on October 25, 2004. (Id. 00073) Rodriguez has failed to show that Ms. Vettel answered dishonestly, not just inaccurately. Nor that she was motivated by partiality. No bias has been shown by Rodriguez here.

Neither of these two employment discrepancies gives rise to challenges for cause.  See

Fuller v. Bowersox, 202 F.3d 1053, 1057-1058 (8th Cir. 2000) (juror's failure to disclose

juror worked at one time for county or state law enforcement agency did not give rise to

presumption that juror harbored bias in favor of prosecution). Likewise, the voir dire did

not focus on prior employment, generally, or work experience, specifically. Given the

lack of prompts during jury selection, and remoteness of the prior employment, it appears

clear that Ms. Vettel did not purposely conceal this employment. Accordingly, no relief

should lie.

> b. Victimization

In paragraph 12 of Rebecca Vettel's Declaration she states that she told the jury

during deliberations of an experience she encountered earlier in her life:

> When I was younger working for the state fairs I was exposed to people
> who experienced unwanted sexual advances by men. I once, while working
> at a fair, was approached by a man who threatened me, saying that if he
> couldn't have me, no one could. He threatened to kill me. I told the other
> jurors about this experience during deliberations to help put myself in the
> shoes of Dru.

(DCD 780, para. 12)

Based upon the foregoing, Rodriguez claims that Vettel had been a "victim" of

several "crimes" and had deliberately withheld that fact.[7]  At the September 2015 hearing,

Ms. Vettel clarified the state fair incident was "more of a threat than actual actions" (JM

EVID HR'G 00038), and the whole incident lasted "about six seconds and it was over

and done." (Id. 00102, 00114) Vettel described this event as an incident where she and

---

[7]  Petitioner's 2255 Motion (DCD752) at 269.

her high school friends were walking the midway at the North Dakota State Fair in Minot (Id. at 00115, 00140-42) when a former state fair co-worker approached her from between two fair booths (Id. 00142). She testified that this former co-worker came up from behind, tried to pull her his direction and "basically told me I was going with him and if he couldn't have me nobody would." (Id. at 00038, 00142-143)  Vettel further testified, "I kind of called him out on it and friends, the people I was with I believe, helped me, you know, get away." (Id.) Vettel testified that her friends pulled her the opposite direction and the man left after a brief struggle between the group.  (Id. 00143) The entire incident lasted merely seconds before it was over (Id. 00102, 00114), and Vettel and her friends continued to walk the fair midway after the brief altercation without calling for assistance or reporting the incident. (Id. 00143)

The United States asked Ms. Vettel about the fair incident on cross-examination:

Q.   Can you tell me exactly what happened in those six seconds? Were other people present? I got that impression from you.

A.   Yes, other people were present. I was just walking down on the midway with some friends and he came up behind me and grabbed me and tried to pull me away and said that to me and they kind of just pulled harder and – and then he left.

Q.   And that was the end of it?

A.   That was the end of it.

Q.   But you did bring that up or mention it during jury deliberation. You recall that?

A.   I did. It was a moment of panic.

Q.   And then you put it in your declaration.

A.    Yeah.

(JM EVID HR'G 00114-115)

Vettel did not call law enforcement or authorities regarding the incident.  (Id. 00143) The juror's perpetrator was never arrested, prosecuted or accused of any offense nor did Vettel indicate she thought she was a victim of a crime.  The underlying conduct occurred well over a decade before Rodriguez's trial. Vettel did not see this incident as her being a victim of a crime. And due to the remoteness of the incident, it appears clear that Juror Vettel did not purposely conceal the state fair incident.  Following the juror inquiry, it is now pointedly clear that Rebecca Vettel did not intentionally conceal the state fair incident nor did she actually consider herself a "victim" as a result of it.

Rodriguez further claims that because Vettel indicated in her divorce[8] that her husband was verbally and physically abusive, she was a "victim of domestic violence"[9]. Vettel explained at the hearing that she answered "no" to Question 52 of the Juror Questionnaire, "Have you or any family member or anyone close to you ever been a victim of a crime?" because "No one ever shot me. Nobody ever put me in the hospital. Nobody – I mean, I don't know. Crime was a more severe thing to me I guess. I mean, I - I wrote, "No." (JM EVID HR'G 00100-101) Vettel further elaborated, "I didn't purposely withhold it. I mean, those were things that happened in my divorce. They

---

[8]  She was candid about being in court for her divorce proceedings, Jensen/Vettel Questionnaire, Question 59, p. 13.

[9]  These are terms used by Rodriguez's counsel.  Nowhere does Ms. Vettel use the terms "victim", "crime", "crime victim", or "domestic violence" in describing the incidents.

weren't – I mean, I would probably truthfully still write "no" today if I had to fill this sheet out." (Id. 00101-00102)  Vettel further testified that she did answer "yes" to Juror Questionnaire Question 95:  "Have you ever been in a situation where you feared being hurt or killed as a result of violence of any type?" (Id. 00118-119). She elaborated that she responded affirmatively to this question because she "had a very brief few month marriage in 1996 to [an] abusive man [Mr. Zablotney] who I have made amends for the sake of our son and he no longer…drinks" (Id.) Ms. Vettel testified that her marriage to Zablotney was from July 1995 to the beginning of 1996, and though it was brief it was also emotional. (Id. 00116-117)

Rodriguez attempts to criminalize Ms. Vettel's omission to disclose the nature of her relationships to her ex-husbands Jason Zablotney and Roy Jensen.  At the September 2015 evidentiary hearing Ms. Vettel explained that on one occasion she did seek a restraining order against ex-husband Jason Zablotney (JM EVID HR'G 00050) for breaking into her home and damaging her furniture and belongings however no criminal charges were brought against Mr. Zablotney in that matter.  Ms. Vettel did not testify or assert that she sought a restraining order against her former spouse due to or for fear of physical harm, bodily injury, rape or assault.  Ms. Vettel testified that she called the police regarding her ex-husband, and one call to police did result in an arrest. (Id. 00052) As a matter of fact, the Court and trial counsel were aware Ms. Vettel contacted police on Mr. Zablotney as far back as June 2006 during jury selection. (See Petitioner Ex. 100, Vettel Juror Questionnaire, Question 97) Question 97 of the Juror Questionnaire, specifically states:

97.    Have you ever called police?  ( ) Yes     ( ) No
        If yes, please explain the circumstances:

Ms. Vettel responded affirmatively to Question 97, and provided the

following explanation:

In a parental abuse case while working for Head Start and during a divorce
from 1st husband.

(Vettel Juror Questionnaire, Question 97)  Her disclosure here was truthful and in

no manner deceitful.

Finally, Rodriguez egregiously claims Ms. Vettel's daughter was a "crime victim"

another term used solely by Rodriguez.  Again this information was gleaned from

statements made as part of a divorce custody dispute. The juror question posed was:

52.   Have you or any family member or anyone else close to you ever been
a victim of a crime?

        ( ) Yes   ( ) No

If yes, please provide the following details:

| Year | Relationship | Crime | Suspect caught/convicted[10] |
|------|-------------|-------|------------------------------|

Literally read, this question poses requests for information on cases where

individuals were victims of crime and a suspect was caught and convicted.  Of course,

Rodriguez reads it otherwise.  At the evidentiary hearing, Ms. Vettel testified and

clarified:

---

[10]  This question was on the Jury Questionnaire filled out by each potential juror
prior to voir dire.  Counsel had opportunity to follow-up with further questioning of any
question/answer during voir dire.

Q.   And question 52 on page 11 asks if you or any family member or anyone close to you has ever been the victim of a crime.

A.   Right. I wrote "no."

Q.   And you wrote "no" when at the time you had been the victim of an attempted rape in which there was a death threat, right?

A.   Yeah, yes.

Q.   At a time when you yourself had been the victim of domestic violence in two marriages, violence that had been found by a Court to exist?

A.   Yes.

Q.   You answered "no."

A.   I did.

Q.   Did you answer "no" because you were afraid that a truthful answer and that information would result in you being struck from the jury, you not being able –

A.   No.

Q.   -- to participate in this case?

A.   No. No one ever shot me. Nobody ever put me in the hospital. Nobody – I mean, I don't know. Crime was a more severe thing to me I guess. I mean, I – I wrote "no."

Q.   The question asks: "Have you . . . or anyone close to you ever been a victim of crime?"

A.   Yes, you asked that question.

Q.   (Mr. Mohring continuing) And it gives you an opportunity to give a year and the relationship of you to the person that was the victim, a discussion of the crime and the opportunity to provide information about whether someone was caught or convicted. Do you see that question 52, page 11?

A.    I do. I do see that.

Q.    As you sit here today, do you remember why you decided to withhold that information from this questionnaire?

A.    I didn't purposely withhold it. I mean, those were things that happened in my divorce. They weren't --- I mean, I would probably truthfully still write "no" today if I had to fill this sheet out.

(JM EVID HR'G 00101-102)

On none of the above occasions mentioned by Rodriguez as "being withheld" by Ms. Vettel was anyone charged with a crime, nor did Ms. Vettel sign a complaint. No one was convicted of a crime.  Nor was anyone ever arrested.  In her mind, Ms. Vettel answered the question truthfully. (JM EVID HR'G 00107)  See Johnson v. Luoma, 425 F.3d 318, 325 (6th Cir. 2005) (no new trial required in prosecution for domestic violence and kidnapping where juror failed to disclose she was a victim of sexual assault because she honestly answered all questions posed on voir dire without actively concealing her victim status).

Nonetheless, counsel has gone to great lengths to suggest that Ms. Vettel's daughter was the victim of "possible sexual violence" at the hands of her daughter's father, Roy Jensen, and his new family.  (DCD 998 at 9) This is a completely irreprehensible and unfounded allegation made by Petitioner.  Ms. Vettel indicated in her juror questionnaire that she was engaged in extensive, and sometimes contentious, divorce and custody proceedings, especially as it relates to Mr. Roy Jensen. (JM EVID HR'G 00068) Vettel testified that her daughter told her on an occasion that Mr. Jensen's third wife took a bath with her.  Ms. Vettel indicated she wasn't sure how to

approach the situation so she sought the help of a counselor to inquire how to approach the matter "without putting anything into her [daughter's] mind or making her – I didn't want what I say for that to be her belief because she was so young.  I wanted to know how to talk to her and then that lady reported it."  (Id. 00064) This incident did not result in a criminal investigation, findings or criminal charges against Roy Jensen, his new wife or her family.  Ms. Vettel's daughter never implicated or suggested to anyone, including her mother, that she was sexually abused, inappropriately touched or felt a sexual threat by father, step-mother or new step-family.  This allegation is completely baseless.

Vettel testified that when her daughter was visiting her ex-husband, Roy Jensen, there was not always adequate sleeping space available for her daughter to have her own room and as a result she would sometimes have to sleep in the same room as her dad. (JM EVID HR'G 00064) Vettel testified that her ex-husband's new wife's three boys; a girl and Vettel's daughter often shared the same sleeping space which included sharing a bunk bed. (Id. at 00067) Vettel also answered in Juror Question 79 that she felt the divorce court judge did not rule fairly in one instance as it related to her divorce.  As was the case with her state fair incident, no one was prosecuted for sexual or physical abuse committed against her child. There is no reason to doubt Juror Vettel's testimony that she simply did not recall this incident when responding to her juror questionnaire when she was otherwise completely forthcoming with her responses.

In any event, Rodriguez has not offered proof of actual bias that Ms. Vettel might have harbored against him or his case. While Rodriguez has presented voluminous records concerning Juror Vettel's life history not a word of it connects her to him, his victim, or his crime. Rodriguez cannot identify any aspect of Juror Vettel's questionnaire, voir dire, or testimony that proves she had fixed attitudes or beliefs that prevented her from fairly judging the evidence in this case. *Cf.* McDonough, 464 U.S. at 554 (characterizing impartial jurors as those "capable and willing to decide the case solely on the evidence.") As such, there exists no basis upon which to find Juror Vettel was actually prejudiced. Indeed, none of the facts developed during this litigation show that Ms. Vettel had any bias with regard to criminal prosecutions or the death penalty, generally. For want of any proof of actual bias, there exists no legal theory upon which to grant Rodriguez any relief.

c. Criminal History

In another attempt to disparage Ms. Vettel, Rodriguez claims she failed to truthfully disclose her own "criminal past". Again he perverts the truth and the actual question asked. Rodriguez asserts "[t]he questionnaire asked whether she had been convicted of a crime. She answered 'No'. In fact, a truthful answer would have been 'Yes, fifteen times'".[11] Question 55 really asked:

> 55. Have you ever been convicted, either by your guilty or nolo contendere plea or by a court or jury trial, of a state or federal crime, *excluding any simple traffic violations*?[12]

---

[11] Petitioner's 2255 Motion (DCD 752) at 270.
[12] (Emphasis added.)

( ) Yes     ( ) No

If yes, explain:

        a. What was the crime?

        b. ( ) Felony  ( ) Misdemeanor

        c. What punishment did you receive (including probation)

In fact, Ms. Vettel truthfully answered the Question 55 posed in the Questionnaire. (JM EVID HR'G 00134) *Excluding traffic violations*, Ms. Vettel has no convictions of a state or federal crime.  Each and every violation cited by Rodriguez in his Motion, and offered or referenced at the evidentiary hearing, is a *traffic violation*. (JM EVID HR'G 00131-00135) His references to those even exaggerate the actual violations.[13] Rodriguez's claim that Ms. Vettel was convicted of reckless driving resulting in an accident is incorrect.  In fact, on the incident he references, she was issued a ticket for care required a $30 fee.  See Ward County Municipal Court Records, February 3, 1992, at Petitioner's Exhibit 104 (S-06).  His claim that she was convicted of "failure to maintain a safe distance resulting in an accident" is also wrong.  In fact, she was cited simply for "failure to maintain a safe following distance," and fined a $20 fee.  See Ward County Municipal Court Records, March 19, 1992, at Petitioner's Exhibit 105 (S-07). These are, by law, infractions.  Rodriguez offered these infractions as hearing exhibits but did not challenge the legal status of these infractions as anything more than traffic violations.  In addition, Vettel's other infractions resulted in $20 fees on four occasions.

---

[13]  Petitioner's 2255 Motion (DCD 752) at 270-271 is replete with incorrect statements about the violations.

(See Petitioner's Exhibits 106, 107, 108, 112) Her speeding citations resulted in fees of $12, $13, $15, $20 and $34 (Petitioner Exhibit 109 (S-11)).  His references to her being arrested ended up with those charges of driving with no liability insurance and driving under suspension being dismissed. (JM EVID HR'G 00132; Petitioner's Exhibit 110 (S-13)) Rodriguez has not shown Ms. Vettel answered the juror questionnaire or juror inquiry dishonestly.  See Ward County Municipal Court Records, March 8, 1990, at Petitioner's Exhibit 106 (S-08); Ward County Municipal Court Records, May 23, 1998, at Petitioner's Exhibit 107 (S-09); Ward County Municipal Court Records, February 25, 1997, March 7, 1999, at Petitioner's Exhibit 108 (S-10); Ward County Municipal Court Records, April 29 1989 - September 5 2005, at Petitioner's Exhibit 109 (S-11).  Even so, failure to divulge prior arrests or convictions does not give rise to a new trial.  See United States v. Langford, 990 F.2d 65, 68-70 (2d Cir. 1993) (no new trial required where juror intentionally failed to disclose prior prostitution arrests because no evidence that juror was biased against the defendant); United States v. Bishop, 264 F.3d 535, 556 (5th Cir. 2001) (no new trial in tax evasion case where juror failed to disclose her deferred adjudication that was equivalent to pending charge because no demonstration juror was biased).

Vettel testified that she plead guilty to a Liability Insurance Required violation and paid a $150 fine. (Petitioner's Ex. 111 (S-14). She testified that this was a traffic violation. (JM EVID HR'G 00133) She also testified that she pled guilty to violations of Possession of License Required, and paid a $20 fine; and Liability Insurance Required and paid a $300 fine. (Petitioner's Ex. 113 (S-15); JM EVID HR'G 00133-134) Vettel

explained that she believed she was being truthful when she answered the Juror

Questionnaire, specifically Question 55, asking "Have you ever been convicted, either by

your guilty or nolo contendere plea or by a court or a jury trial, or a state or federal crime,

excluding any simple traffic violations?" because the only violations she ever had were in

regard to driving a motor vehicle. (Id. 00134) Rodriguez then claims Ms. Vettel's answer

to Question 58[14] of the Juror questionnaire shows she knew she had essentially lied in her

answer to Question 55 as she had indicated her "oldest daughter [']s dad got into a car

accident, reckless driving [he] served a few weekends in jail and paid restitution".  A

clear distinction can be observed in her answer here compared to her answer to Question

55.  This conviction resulted in jail time. Even if fully answered according to Rodriguez's

claim, the information regarding her prior *traffic violations* do not give rise to a valid

basis for a challenge for cause.[15]

Rodriguez further claims Ms. Vettel had been involved in "exceptional

litigiousness."  He belittles her because she did not, in Question 54; say she had been

---

[14]  Question 58 read:  Do you personally know or have you ever personally known anyone who has been convicted or pleaded guilty to a crime?

( ) Yes   ( ) No

If yes, for each such person, state that person's relationship to you and the name of the crime and sentence imposed, including probation:

[15]  Rodriguez spends an inordinate amount of time dealing with Ms. Vettel's traffic violations but, if anything, the information may have given rise to a peremptory challenge by the United States. Generally, people with prior convictions or violations of the law tend to be "bumped" by the government not the defense. United States v. McConnel, 464 F.3d 1152, 1157 (10th Cir. 2006) (no new trial required in prosecution for dealing firearms without a license where juror failed to disclose prior criminal charge because any presumptive bias would be against prosecution).

involved in a lawsuit; however she said she had been in a courtroom for divorce proceedings in Question 59.[16] Ms. Vettel clarified at the evidentiary hearing that she answered "no" to Question 54 because she "didn't realize that divorce was really a lawsuit. I didn't understand." (JM EVID HR'G 00099)  She further clarified that her answer to Question 59 referred to the number of times she had actually been in a courtroom physically. Each of the three times that she mentioned were in regards to her divorce litigation. (Id. 00118)  Even the other two court proceedings she was a part of involved only collection of monies owed, one by her and one to her.[17] Ms. Vettel testified that when she filled out the Questionnaire she filled it out as completely to the best of her recollection and honestly. (Id. 00107) Clearly, these nondisclosures were inadvertent. Either way the fact she was involved in these courtroom proceedings do not give rise to a valid basis for a challenge for cause.  Similarly, Rodriguez turns this ill-conceived criticism on Juror Luke Lillehaugen for having denied being involved in lawsuits during jury selection.[18] Lillehaugen was the subject of a collection action.[19]  Could it be these jurors simply did not understand the full nature of the question?  The different responses to the questions regarding lawsuits testify to the fact jurors are not necessarily experts in legal terms.  "Called as they are from all walks of life, many [jurors] may be uncertain as

---

[16] Compare Jensen/Vettel Questionnaire, Question 54, p.11 to Question 59, p. 13.

[17] See Hospital Services, Inc. v. Rebecca Zablotney, Stutsman Co., Civil No 00-C-302 at Exhibit S-17; Rebecca J Zablotney v. Jason F. Zablotney, Ward Co. Small Claims No 98-5-038, Exhibit S-18.

[18] Rodriguez did not call Mr. Lillehaugen as a witness at the juror evidentiary hearing to substantiate his argument regarding this juror misconduct allegation.

[19] Discover Card v. Luke J. Lillehaugen, Cass County, District Court, Civil No. 09-04-C-03761, Exhibit S-28.

to the meaning of terms which are relatively easily understood by lawyers and judges." McDonough, 464 U.S. at 555.

Finally, Rodriguez contends obscurely that Ms. Vettel had heard about this case from TV, radio, newspapers, and various conversations she overheard. (Vettel Juror Questionnaire, Ex. 100, at 19, Q. 88) Rodriguez notes, "[b]ut, ever concerned that she [Vettel] appear the picture of fairness, she added that she rarely discussed the case, and could not remember the specifics about the victim's disappearance." (DCD 998 at 23) He argues Vetttel specifically denied participating in, or knowing anyone who had participated in the search. (Vettel Juror Questionnaire, Ex. 100 at 6, Q. 29) He further asserts Ms. Vettel was e-mailing information and pictures she had received about Ms. Sjodin's disappearance within days of the crime. (DCD 998 at 23)

Vettel's testimony during the juror inquiry made clear that she harbored no intent to hide information from the Court.  Vettel testified, and admitted at the evidentiary hearing that she heard via media outlets of Dru Sjodin's disappearance. (JM EVID HR'G 00112-113) Vettel's evidentiary testimony is no different than her voir dire testimony from nearly ten years ago. (See Vettel Voir Dire Testimony, TR-TT-072506-VOL11-02627 thru 02655)

The Court routinely asked the jurors whether they had been exposed to any publicity on this case.  In fact, when asked during individual voir dire whether Ms. Vettel knew anything about the Sjodin case, she responded as follows:

COURT:          Have you read any newspaper reports or paid any
                attention to radio or television on the case?

VETTEL:         I don't read the paper.

COURT:          I assume you've heard something about this case at
                some time.

VETTEL:         Right.

COURT:          Whatever you have heard, could you set it aside?

VETTEL:         Yes.

COURT:          As you're sitting here right now, do you have an
                opinion on the guilt or innocence?

VETTEL:         No.

(TR-TT-072506-VOL11-02628 thru 02629).  No intent to deceive can be inferred from

Vettel's responses. During voir dire she disclosed what little information she remembered

at that time.

Rodriguez further exaggerates Ms. Vettel's "failing to disclose her prior

discussions about and internet exposure to the matter." He provides an email (Petitioner

Exhibit 132) in which she forwarded a forwarded message about the disappearance of

Dru Sjodin. Ms. Vettel explained at the evidentiary hearing that this e-mail was likely

sent to her as it contains her former e-mail address listed as the recipient. (Id. 00026) The

e-mail, dated November 27, 2003, was about a missing UND student. (Id. 00027) The

original author of the e-mail was a "Julian White, UND Flight Operations." (Id. 00112)

Vettel testified that she did not know a Julian White then or now. (Id.) She further

testified that she could not recall if she forwarded that same e-mail to anyone else. (Id.

00029), however if she did pass it on it was out of concern for the individual that went missing. (Petitioner Ex. 100, at 19, Q. 88, JM EVID HR'G 00112)  Indeed, on Juror Questionnaire, Question 88, Vettel indicated that she, in fact, heard about the case on TV, radio, newspapers and others discussing it. (Id. 00113) The evidence does not establish that Vettel deliberately withheld information from the Court. Rodriguez has not shown that she answered dishonestly.

Moreover, even if Vettel had disclosed the alleged information, it would not have been eligible for a challenge for cause. As stated above, Vettel's remaining answers during voir dire reflect complete impartiality. It is settled that mere familiarity of a case does not demonstrate a presumption of bias.  Irvin v. Dowd, 366 U.S. 717, 722-23 (1961).  Her failure to recollect this one very brief email does not prejudice Rodriguez

### 2.    Juror Charmayne Owan

And in an extreme display of ineptness, Rodriguez accuses Juror Charmayne Owen of omitting the fact that she was in a foreclosure action in her answer to Question 54. She, in fact, was truthful in her answer.  A closer look at the action shows that the "foreclosure" referred to by Rodriguez was, in fact, a result of a family dispute as Juror Owen described in her answer to the question.[20]  Rodriguez did not call Ms. Owen as a witness at the juror misconduct evidentiary hearing to further substantiate his argument.

---

[20]  See American State Bank v. Mark M. Owan et. al., Williams County District Court, Civil No 53-00-C-00477, Findings of Fact, Conclusions of Law, and Order for Judgment, U.S. Exhibit 31; Affidavit of Charmayne C. Owan, U.S. Exhibit 32.

Rodriguez has not shown that the answers are dishonest.  His accusations are troublesome, and should be dismissed.

Further the fact a potential juror conceals prior judgments does not automatically require a new trial as it does not automatically give rise to a challenge for cause.  These "lawsuits" would not show any bias in fact, which would prevent Rodriguez from getting a fair trial.  United States v. Stewart, 433 F.3d 273, 305-06 (2d Cir. 2006) (no new trial required in prosecution for making false statements; even if defendant could prove juror intentionally concealed judgments against self and family, dismissal for cause not required).

        3.      Juror Paulette Cotney

This Court conducted an extensive and thorough voir dire process in this case. Prior to the beginning of voir dire, prospective jurors completed two questionnaires, including a lengthy 28-page questionnaire. The parties had the opportunity to review completed questionnaires in advance of voir dire. Each prospective juror was then individually questioned first by the Court and then by attorneys for the parties.  As a preliminary matter, the record contains a thorough voir dire including questions to help determine whether a juror would automatically vote to impose the death penalty as required by the Sixth Amendment.  See Morgan v. Illinois, 504 U.S. 719 (1992).

        a. Juror Bias

On July 12, 2006, Ms. Cotney was summoned for individual voir dire.  This Court began by asking her if she had heard anything about the case and she responded that she had in fact heard about the case.  (TR-TT-071206-VOL04-00885) The Court asked

Cotney if whatever she had heard before had caused her to form an opinion in the case. Ms. Cotney replied, "[w]hat I have heard was exactly what you had read when we came in this morning, and I guess you form somewhat of an opinion but it's not --- nothing is ground in my mind one way or the other." (Id.) The Court then asked Cotney if she had an opinion about the case, whether she could set it aside. Cotney affirmatively responded, "Yes." (Id. at 008856)

The Court then got into the presumption of innocence of a defendant followed by a number of questions for Ms. Cotney relating to such presumption. The Court specifically asked Ms. Cotney:

> COURT:      [I]f I tell you to presume Mr. Rodriguez is innocent, how would you react to that?
>
> COTNEY:    I would presume he's innocent.
>
> COURT:      Could you do that?
>
> COTNEY:    Yes.
>
> COURT:      Fairly?
>
> COTNEY:    Yes.

(Id. at 00888) The Court then explained the burden which needs to be met to prove each essential element of the offense charged with proof beyond a reasonable doubt. (Id. at 00889) The Court asked Cotney, "Can you hold the Government to that burden?" Cotney replied, "Yes." (Id.) The Court went onto explain a death penalty trial and the various phases involved in such a case. (Id. at 00890). The Court specifically described the

process for the guilt, eligibility and penalty phases of a death penalty trial. (Id. at 00889-

00891)  The Court then asked Cotney:

COURT:  [N]ow let's assume that the jury unanimously finds that one or more of the eligibility factors are present in this case and then we move on to the third phase. The third phase of the trial is really a selection phase.  The jury will have before it at that point two possible punishments.  One penalty would be life in prison without the possibility of parole or release. All right? The second possible punishment would be the death penalty. There are no other options.

COTNEY:  Okay.

COURT:  Do you understand that so far?

COTNEY:  Yes, I do.

COURT:  Evidence will be, once again, admitted to the Court or to the - -- presented to the jury.  I know. The evidence will include evidence of certain things that we call aggravating factors and circumstances. Those are factors that tend to point towards the imposition of the death penalty. There will also be evidence or likely be evidence of mitigating factors and circumstances brought to the jury's attention. Those are things that tend to point to the application of a life sentence without the possibility of parole. Okay?

COTNEY:  Okay.

* * *

COURT:  In the course of your deliberations you'll be asked to fill out a form that sort of checks off the aggravators you find and the mitigators you find and the vote totals and then they go on the form. But that doesn't end it.  Then you have a discussion, deliberation where you discuss the weighing and balancing of all those factors and decide what's the appropriate penalty. Okay?

Now, I want you to assume for the purpose of this question that you've already found the defendant guilty beyond a

> reasonable doubt, that you've already found the presence of aggravating – of an eligibility factor beyond a reasonable doubt unanimously, and you're sitting in the jury and you are now discussing the question of is the death penalty the right penalty or is a life sentence the right penalty. Okay?
>
> My question is, when you get to that point would you be open to consider the imposition of a life sentence without the possibility of parole?

COTNEY:   Yes.

COURT:   And would you be open to the imposition of the death sentence?

COTNEY:   Yes.

COURT:   And, you know, once you've weighed – if you've weighed all the evidence and you've weighed all the law that's been given to you and you've had the discussion and you've made a decision, and if you arrive at the conclusion that the appropriate penalty is a life sentence, and you'll be required to sign a verdict form personally that says the sentence is life without the possibility of parole, if you think that's the right sentence, could you sign that form?

COTNEY:   Yes.

COURT:   You'd also be asked to consider all those things we've talked about, and if after all of that you arrive at the conclusion that the appropriate penalty is the death penalty, could you sign a verdict form that imposes a death sentence?

COTNEY:   Yes.

(Id. at 00891-00894)

During voir dire defense counsel asked Ms. Cotney about her responses in her juror questionnaire. Specifically, defense counsel asked about Juror Questionnaire, Question 62, which states, "Please describe your feelings about the death penalty in your

own words." (Id. at 00895) Ms. Cotney's written response to Juror Questionnaire,

Question 62 is as follows:

> I feel that if the crime is severe enough, I would be behind it. I also feel it may be hard to do it when it would come down to deciding someone's fate. I'm kind of on the middle.

(Petitioner Ex. 200, Cotney Juror Questionnaire at 14, Q. 62)  Defense counsel

asked Cotney during voir dire:

COUNSEL: On Page 14, Question 62, you talked about your feelings about the death penalty and we limited you to a few lines there so I wanted to give you a chance maybe to expand on this issue if you like, you said, "I feel that if the crime is severe enough, I would be behind it." Can you maybe explain that a little more, that thought for me?

COTNEY: I think I would be open to deciding that the death penalty would be what would be right.

COUNSEL: You talked about, "If the crime is severe enough." You understand that, from what the Judge told you, severity of the crime is not the only thing you look at?

COTNEY: Yes.

COUNSEL: Okay.  You look at, one, look at the circumstances of the offense, but you also look at the circumstances of Alfonso Rodriguez.

COTNEY: Yes.

COUNSEL: Would you be open to do that?

COTNEY: Yes.

(TR-TT-071206-VOL04-00895).  Defense counsel then asked Ms. Cotney if she

would be "comfortable" with making the "ultimate decision for yourself

individually" (Id. at 00897). Ms. Cotney replied affirmatively, "yes." (Id.)

Defense counsel specifically asked Cotney about her consideration of mitigating evidence in this case:

COUNSEL: And if you decided this was important to me, just the fact that maybe the majority of the other jurors didn't think it was important, that wouldn't make you necessarily change your mind about it, would you?

COTNEY: No.

COUNSEL: If you sincerely felt that that was important mitigation evidence, you'd be able to hold onto it?

COTNEY: Yes.

COUNSEL: Okay. Also, the decision in the case is a little bit different. All 12 jurors have to decide beyond a reasonable doubt that the aggravating factors exist and that they outweigh the mitigating factors and that death is the appropriate punishment –

COTNEY: Yes.

COUNSEL: -- to have a death sentence.

COTNEY: Yes.

COUNSEL: But one juror could say, you know, for me, I don't think death is the appropriate punishment. I think life without – life in prison without the possibility of parole is sufficient in this case. That would decide the case.

COTNEY: Okay.

COUNSEL: Do you understand that?

COTNEY: Yes.

COUNSEL: Okay. Again, so it's one person, each person sort of individually deciding this issue for themselves. Are you comfortable with that?

COTNEY:    Yes.

COUNSEL:    Okay.  And if you were that juror, I'm not saying it would be one, but if that happened that 11 said here's where we are, and you said, I'm not there, I'm for life without parole, would you be able to stick to that if you felt that was the appropriate verdict?

COTNEY:    If that's what I felt would be right, then that's what I would stick with.

(Id. at 00897–00899)  Cotney affirmed that anything she might have heard in the media, or otherwise, had not given her an opinion about the appropriate punishment in this case.  (Id. at 00901)  Defense counsel then specifically questioned Cotney during voir dire about her response to Juror Questionnaire, Question 93 which asks:

Do you have any opinion about the guilt or innocence of the defendant or appropriate punishment for the defendant?  (  ) Yes     (  ) No

Ms. Cotney's written response to Question 93 is as follows:

If he is guilty I wouldn't want him released into the public again.

(Petitioner Ex. 200, Cotney Juror Questionnaire at 20, Q. 93)  During voir dire defense counsel specifically asked Ms. Cotney about her response to Question 93:

COUNSEL:    I think you said in your form – I want to read Question 93: 'If he is guilty, I wouldn't want him released into the public again.'

COTNEY:    Yes.

COUNSEL:    And the Judge explained to you the two possible penalties here.

COTNEY:    Yes.

COUNSEL:   Are you comfortable with that? Do you accept that [*sic*] we're saying here?

COTNEY:   Yes.

COUNSEL:   Neither of those options –

COTNEY:   It's not an option.

COUNSEL:   -- Would Mr. Rodriguez be released.

COTNEY:   Right. Yes.

(TR-TT-071206-VOL04-00901). This entire colloquy during voir dire was designed to ensure that Cotney would give individualized consideration to this crime and this defendant before voting to impose a sentence. Additionally, the colloquy alerted the juror to the possibility of a sentence of life without the possibility of parole.

A review of Ms. Cotney's juror questionnaire and voir dire transcript reveals she answered all questions posed to the best of her ability. Her answers taken together indicate that she could be a fair and impartial juror.  Her responses during voir dire affirmed this conclusion.  Ms. Cotney quickly grasped the complex issues that govern capital sentencing proceedings and demonstrated a sincere willingness to consider all evidence before reaching a decision. (TR-TT-071206-VOL04-00891 thru 00894) Notably, her responses in voir dire made clear that she would want to hear all evidence, particularly all mitigating evidence before reaching a decision. (Id. at 00895) They also made clear that Cotney would carefully weigh the evidence and would not take her responsibilities as a juror lightly.  (Id. at 00897–00899)  She was asked several times

whether she could fairly and impartially consider the evidence presented and she

unequivocally responded "yes." (Id. at 00891-00895, 00897–00899)  Moreover, during

the juror inquiry hearing in September 2015, Ms. Cotney stated firmly that she had

indeed been fair and impartial in considering the evidence presented at Petitioner's trial.

(JM EVID HR'G 00182 – 00188)

Rodriguez now claims that this juror "misrepresented her views about the death

penalty…. [F]or Ms. Cotney, death was always automatic." (DCD 998 at 23)  According

to Rodriguez, Cotney portrayed herself prior to trial counsel as a person who could

follow the Court's instructions, consider the mitigating evidence, and impose a sentence

less than death. (Id.) During a post-conviction interview conducted by 2255 counsel,

Cotney was asked about her deliberative process and reasons for voting for death.  Her

response was paraphrased and written into a declaration prepared by 2255 counsel and

signed by Cotney. (JM EVID HR'G 00180-00181)  Paragraph 7 of the sworn declaration

contains Cotney's description of her feelings during deliberations:

> During the penalty phase deliberation, I felt like I never wanted the
> defendant to get out of prison.  For me, the most important factor in my
> decision to vote for the death penalty was to make sure the defendant never
> would be released from prison in the future. I understood that the Judge told
> us he would never be released if life without parole was imposed, but I
> couldn't take that risk. None of the jurors wanted the defendant to get out
> of prison, ever. I felt that our Judge wouldn't always be able or available to
> ensure the defendant stay in prison. This was an important issue in our
> deliberations and was a large part of our decision to impose death.

(Petitioner Ex. 202 (S-25), Cotney Declaration para 7, pg. 2)

Rodriguez further asserts that after the trial, Cotney stated:

> Ultimately, it was most important to me that there be no chance that the defendant could do this, or another crime, to someone else. The death penalty ensured that.

(Id. at para. 9, pg. 3)

All jurors, including Cotney, filled out jury questionnaires prior to trial, and answered questions relevant to their views on the death penalty. In fact, Cotney's testimony at the evidentiary hearing shows that she didn't feel the government should impose the death penalty upon everyone for any reason. On cross-examination of Ms. Cotney, the United States asked her about her juror questionnaire and position on the death penalty:

PROSECUTOR: [D]rop down to Question 65[21] if you would. That question asks: 'Do you believe the government should impose the death penalty upon everyone for any reason:' and there's – excuse me, there's three places to check there, correct?

COTNEY: Yes.

PROSECUTOR: And you didn't check any of them, correct?

COTNEY: I did not.

PROSECUTOR: But you did write something there.

COTNEY: Yes.

PROSECUTOR: What did you write?

---

[21] Juror Questionnaire, Question 65, provided:

Do you believe the government should impose the death penalty upon everyone who for any reason:
   ( ) Kills another human being?
   ( ) Intentionally kills another?
   ( ) Intentionally kills a police officer?

COTNEY:            "I can't say every case on any of them."

PROSECUTOR:       Okay. And they were "Kills another human being?" "Intentionally kills another?" "Intentionally kills a police officer?" Correct?

COTNEY:            Yes.

PROSECUTOR:       And then the very next question, Question 66 says: "Do you believe you should hear and review all of the circumstances surrounding the killing before you decide whether the government should impose the death penalty?" And you checked "yes."

COTNEY:            I did.

PROSECUTOR:       And was that your feeling at the time also?

COTNEY:            Yes.

PROSECUTOR:       And then let's turn to Question 112. Question 112 reads: "If you are selected as a juror in this case, will you set aside any personal feelings you may have about the defendant, positive or negative, and rely solely and exclusively on the evidence present to you in court to decide this case?" And you checked "yes," correct?

COTNEY:            I did.

PROSECUTOR:       And then you also wrote something in there. What was that?

COTNEY:            "I feel he deserves a fair trial.  Everyone does."

(JM EVID HR'G 00182 – 00184).  Ms. Cotney affirmed at the evidentiary hearing

that she and the other jurors went into deliberations with a list of mitigating factors

and they deliberated the case based on those mitigating factors.  (Id. at 00186-

00187)  Cotney affirmed the jury made decisions based on those mitigating

factors. (Id.) Cotney further affirmed that she understood that she was supposed to look at all the facts and circumstances in the case, including information about Rodriguez, prior to make her decision. (Id. at 00188) Cotney did not go into deliberations with any preconceived idea of what Rodriguez's punishment should be. (Id.) Rodriguez's claim fails as a matter of law because he cannot establish that the jury convicted that him and sentenced him to death was not impartial.

The Sixth Amendment guarantees defendants the right to an impartial jury in all criminal prosecutions. "[D]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." Morgan, 504 U.S. at 727. This right is violated if "even one [partial] juror is empaneled and the death sentence is imposed." Id. at 728. In capital cases, "a juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." Id. at 729.

Rodriguez claims that Juror Cotney was Morgan-impaired at his trial and sentencing, accusing her of misleading answers in her questionnaire because he says, among other things, that no amount of mitigating evidence could have changed her mind to impose the death penalty. Rodriguez's claim is governed by McDough Power Equip., Inc. v. Greenwood, 464 U.S. 548 (1984).

In McDonough, the Supreme Court established a two-part test for determining whether a new trial is required in the context of juror deceit during

voir dire or on jury questionnaires.  To prevail, Rodriguez must "first demonstrate that a juror failed to answer honestly a material question…and then further show that a correct response would have provided a valid basis for a challenge for cause. Id. at 556.  This test applies equally to a deliberate concealment and an innocent non-disclosure. Jones v. Cooper, 311 F.3d 306, 313 (4th Cir. 2002).

Additionally, where a court considers post-verdict statements of jurors, courts are reticent to impeach verdicts based on post-trial juror statements, even where the statements are admissible under Federal Rule of Evidence 606(b).  See Tanner, 483 U.S. at 118, citing and quoting Dioguardi, 492 F.2d at 79 n. 12. Indeed, "[c]onsideration of statements made by trial jurors after they experienced the entire trial and sentencing hearing and after deliberation of the verdict are not reasonably probative of . . . whether [jurors] could consider the evidence with open minds and follow the court's instructions on the law." Neil v. Gibson, 278 F.3d 1044, 1056 (10th Cir. 2001) (quoting United States v. McVeigh, 118 F.Supp.2d 1137, 1153 (D. Colo. 2000)).

Rodriguez's claims fail because Cotney's Declaration is consistent with the answers she gave during voir dire. As an initial matter, Rodriguez cannot establish that Cotney "failed to answer honestly a material question." See McDonough, 464 U.S. at 556.  The responses in the questionnaire, during voir dire and in the declaration submitted by Rodriguez (as well as the alleged post-trial declarations of the other jurors) are consistent with one another for three reasons.

First, the statements contained in Cotney's Declaration, and the declarations of any of the jurors for that matter, were made by the juror after they listened to the evidence at the guilt phase, voted Mr. Rodriguez guilty, listened to aggravating and mitigating evidence, and finally voted to impose the death penalty. As the Tenth Circuit recognized in Neil, statements of the jurors "after they experience the entire trial and sentencing hearing and after deliberation of the verdict are not reasonably probative of . . . whether [jurors] could consider the evidence with open minds and follow the court's instructions on the law." Neil, 278 F.3d at 1056.

Second, the jurors in their declarations do not claim to have answered questions prior to the trial inaccurately, and none of the statements in Cotney's, or any of the other jurors' declarations, contradict any of the statements made during voir dire or in their questionnaires. A juror's statement that the evidence offered during the guilt phase of trial was so persuasive and the crime so egregious that the death penalty was warranted in no way establish that the juror would impose the death penalty in every capital case – which is consistent with the Sixth Amendment. See Morgan, 504 U.S. at 727. It is consistent with the Sixth Amendment for a juror, after listening to the evidence, to state that they were convinced that death was the appropriate sentence. It is inconsistent with the Sixth Amendment for a juror to state they formed an opinion before hearing the evidence in the case. Neither Cotney nor any of the other jurors stated they formed an opinion prior to hearing the evidence. Cotney's Declaration does not

contradict her respective statements in voir dire nor does it indicate that she was incapable of considering all of the evidence, mitigators, or life imprisonment as a potential sentence.

Third, the post-trial statements attributed to the jurors are not objective in nature; therefore, the accuracy of the statements is not readily verifiable. The circumstances presented by the statements in this case are therefore distinguishable from many cases dealing with juror dishonesty involving statements that are objective in nature – where the accuracy of the statement is easily corroborated or disproven. For example, such cases include: where a juror lies about being a relative of a prosecution witness, Williams v. Taylor, 529 U.S. 420 (2000); where a juror fails to disclose during voir dire that their spouse was murdered, United States v. Fulks, 454 F.3d 410 (4th Cir. 2006); or where a juror fails to disclose a blood relation to a co-defendant in the case, Conaway v. Polk, 453 F.3d 567 (4th Cir. 2006). All instances involve objective voir dire questions, and the facts which proved that the responses were dishonest were clear. On the other hand, the statements in the Rodriguez jury declarations are subjective in nature concerning jurors' feelings about the specific sentencing made in light of evidence considered and weighed during deliberations. Because of the subjective, nebulous nature of the statements, one cannot make an objective assessment of its accuracy.

When presented with similar evidence of alleged juror dishonesty, the Fourth Circuit found similar declarations lacking. Jones, 311 F.3d at 313. In

<u>Jones</u>, a petitioner sentenced to death claimed that a sentencing juror lied on a juror questionnaire. <u>Id.</u> at 308. The Jones juror failed to accurately respond to a question about whether any family members had been arrested or convicted of a crime, but in addition, according to an investigator's affidavit, the juror stated that she believed the "the Bible mandates imposition of the death penalty in every case of first degree murder." <u>Id.</u> at 312. The Fourth Circuit held that the alleged statements, while troubling, did not prove juror bias. <u>Id.</u> The Court concluded that her statement was "fully consistent with the juror's voir dire responses, wherein she declared her support for the death penalty 'when appropriate,' . . . and where she stated that she could fairly balance aggravating and mitigating factors." <u>Id.</u> The <u>Jones</u> Court concluded that "[i]t cannot be inferred from any statement in the affidavit that the juror could not disregard her personal feelings about the death penalty or apply the law as written, or that the juror lied when she stated she could be a fair juror." <u>Id.</u> The Court also stated, "That the juror strongly supported the death penalty does not raise an inference that she could not follow the court's instructions properly." <u>Id.</u> at 313. <u>See also</u>, <u>Nicholson v. Branker</u>, 739 F.Supp.2d 839, 870-71 (E.D.N.C. 2010) ("even if petitioner could show that with different questioning [a juror] would now indicate she could not fully consider the mitigators or consider a life sentence, that would not establish he is entitled to relief. Even if petitioner could establish …that [a juror] had some misunderstanding of the application of the law, it would not establish she was not impartial.")

Mr. Rodriguez's claims fail because the evidence offered for juror misconduct does not establish that Ms. Cotney, or any other juror, was substantially impaired. The declarations submitted by Rodriguez discuss particularities of Rodriguez's offense and each juror's consideration of the evidence presented at trial. Indeed Cotney's Declaration states that it was important for her that there was no chance that Rodriguez could commit this crime, or any other crime, again against someone else, and that she felt the death penalty was the appropriate sentence. (Petitioner Ex. 202 (S-25), Cotney Declaration, para. 9, pg. 3) Juror Cotney did not state that death is the appropriate sentence for *every* death eligible crime. Quite the contrary, Cotney states – given the nature of the crime and weight of the evidence proving Mr. Rodriguez committed it – that death was the appropriate sentence. Therefore, Cotney's Declaration does not disqualify Juror Cotney.

Moreover, the post-trial statements are not indicative of jurors who had their minds made up before the first witness was sworn. On the contrary, the post-trial statements paint a picture of jurors who were actively listening and weighing evidence. Indeed, the statements show that each juror gave particularized consideration to Rodriguez's offense and his individual circumstances.

Ms. Cotney's post-trial statement is a far cry from any substantial impairment for three reasons: 1) It specifically states that each juror listened and considered the evidence; 2) The statement refers to an opinion formed specifically about Rodriguez's crime (not a categorical belief about capital crimes that applied

generally) and most importantly; 3) The statement in no way indicates that Cotney, or any other juror for that matter, was unable to follow the instructions given by the Court.  In sum, the post-trial juror statements do not indicate that Cotney, or other jurors, could not disregard their personal feelings about the death penalty, or apply the law as written. Rodriguez has failed to establish that Cotney, or the other jurors, denied him his constitutional right to an impartial jury.  See, Jones, 311 F.3d at 312-313.

> b. Victimization

Finally, Rodriguez claims Ms. Cotney did not fully disclose during jury selection that her sister had been abducted as a child but had escaped her abductor.[22]  This incident occurred when Ms. Cotney was a young child.  She has no memory of it.[23] (JM EVID HR'G 00162, 00176) United States v. Edmond, 43 F.3d 472, 474 (9th Cir. 1994) (no new trial in armed robbery prosecution where juror simply forgot about being a victim of armed robbery 26 years earlier; "forgetfulness does not indicate a lack of impartiality"). Cotney testified that she "hadn't really thought about it [sister's ordeal] for a long time until we were in deliberations. (Id. 00163-164, 00175) Cotney further testified that she "wouldn't call it…a kidnapping. I thought 'abduction's' probably a bit of a harsh word for that. She [Cotney sister] happened to be passing by a backyard and he pulled her into that backyard...He didn't put her in a car or anything like that so I guess I'm not really

---

[22]  Petitioner's Motion (DCD 752) at 275.

[23]  Petitioner Ex. 202 (S-25), para. 12, p.4.

sure what to refer to it as." (Id. 00164) The underlying conduct occurred more than three decades before Rodriguez's trial.  When counsel asked if her sister's ordeal was an experience that shaped Cotney as a parent, Cotney responded, "no." Cotney indicated that after this incident her parents weren't any more vigilant with their children nor did her parents make the incident a part of their family conversations.  (Id. 00165-166)  Cotney explained that her and her sister continued to be out until dark as children running around their neighborhood even after this incident. (Id. 00165) There is no indication there were any suspects, anyone was charged or anyone was convicted. (Id. 00162) Cotney was unsure if her sister ever went to court about the ordeal. (Id. 00164)  Cotney explains she did not disclose this information during voir dire because "it never crossed my mind." (Id. 00165) Cotney testified "I just hadn't thought about it. I mean, I think – I guess we've all kind of been victims of crimes but I guess it just didn't cross my mind at that time." (Id.) Cotney states she hadn't thought about her sister's situation until she got into Rodriguez's trial deliberations. (Id. 00176)  In response to Juror Questionnaire, Question 52 – "Have you or any family member or anyone close to you been a victim of a crime," Ms. Cotney responded, "yes." (Id. 00176-177) She disclosed that her in-laws had been robbed in their home. (Id. 00177) Someone had been caught, charged and convicted in that case.[24] Cotney stated at the time she filled the Juror Questionnaire, specifically Question 52, she instantly recalled her in-laws situation of victimization, and the suspect was apprehended. (Id.)  She testified at the time she completed the Juror Questionnaire

_____

[24]  See Petitioner Ex. 202 (S-25).

her sister's childhood situation never entered her head. She further testifies that she was not lying or trying to hide that incident from anybody. (Id.)  Similarly to Ms. Vettel, Ms. Cotney literally answered the question, and correctly.  Juror Cotney bore no bias against Rodriguez, real, inferred, or implied, and the fact that she overlooked to mention her sister's childhood incident during voir dire or jury selection does not justify relief from the instant judgment.

      4.      <u>Juror Connie Lillejord</u>

In addition, Rodriguez also claims Juror Connie Lillejord failed to truthfully answer during voir dire, or jury selection, that she had two foster children residing in her home that had been previously sexually abused.[25] Connie Lillejord addressed this allegation at the evidentiary hearing and testified that she did not recall telling Rodriguez's counsel or his investigators that her foster children, at the time of Rodriguez's trial, were sexually abused children. (JM EVID HR'G 00196-198, 00201) Ms. Lillejord testified that sometime after the Rodriguez verdict one of her foster children disclosed to Lillejord a story that she was forced to witness an inappropriate sexual incident between two adults (one being the child's biological mother). (Id. 00201) Lillejord stated this incident occurred before the child was placed in Lillejord's foster care (Id. 00199) but the foster child had not brought this incident to Lillejord's attention until after she had served as a juror. (Id.) She also explained that her foster child did not personally physically experience a sexual assault during this incident. (Id.) The act itself was not done to the foster child. (JM EVID HR'G 00198)  In point of fact, the question

---

[25]  Petitioner Ex. 600 (S-23) Declaration of Rebecca Ireland.

asked of the jurors, "[h]ave you or any family member or anyone else close to you ever been a victim of a crime?" was truthfully answered by Juror Lillejord.

### C.  THERE IS NO VALID BASIS FOR A CHALLENGE FOR CAUSE

Rodriguez's burden is not only to show that a juror failed to disclose a material fact during voir dire, McDonough, 464 U.S. at 556, but also to establish that the juror was in fact biased, Smith v. Phillips, 455 U.S. 209, 215 (1982).  In other words, "a juror's [apparent] dishonesty is not a [sufficient] predicate to obtaining a new trial."  Cannon v. Lockhart, 850 F.2d 437, 440 (8th Cir. 1988).  Instead, because the "central concern" in habeas cases is "the fundamental fairness of the proceeding," Strickland, 466 U.S. at 697, "[t]he focus is on bias," Cannon, 850 F.2d at 440, and "only those reasons [for failing to disclose information] that affect a juror's impartiality can truly be said to affect the [fundamental] fairness of a trial," McDonough, 464 U.S. at 556.  For habeas corpus purposes, such "bias may be found either by an express admission, or by proof of specific facts which show such a close connection to the facts at trial that bias is presumed." Burton v. Johnson, 948 F.2d 1150, 1158 n.10 (10th Cir. 1991).

The Eighth Circuit has applied McDonough to a number of criminal cases.  In Williams v. Norris, 612 F.3d 941, 954-955 (8th Cir. 2010), following affirmance of his capital murder conviction and death sentence, petitioner filed a federal habeas petition. The Court of Appeals held that habeas relief was not warranted on the juror bias claim. A demonstration of actual bias by a juror requires an impermissible affirmative statement; an equivocal statement is insufficient.  See also, Mack v. Caspari, 92 F.3d 637, 642 (8th Cir. 1996).

In <u>Fuller v. Bowersox</u>, 202 F.3d 1053, 1057-1058 (8th Cir. 2000), after his convictions for murder, assault, and armed criminal action were affirmed on direct appeal petitioner sought federal habeas corpus relief.  The Court of Appeals held that juror's failure to disclose his and his mother's connections to law enforcement agencies did not violate petitioner's rights to due process and impartial jury.  That the juror worked at one time for county or state law enforcement agency did not give rise to a presumption that the juror harbored bias in favor of prosecution, notwithstanding defendant's contention that such employment likely resulted in specialized knowledge of state law enforcement procedures.

In <u>United States v. McMahan</u>, 744 F.2d 647, 652 (8th Cir. 1984), a juror said he lived in Kansas City, Missouri, whereas he actually lived in Kansas.  Defense counsel asserted that he would have stricken the juror by use of a peremptory challenge. The conviction was affirmed.

Other circuits have likewise applied <u>McDonough</u> in reviewing criminal trials. <u>See</u> <u>Stewart</u>, 433 F.3d at 305-06 (no new trial required in prosecution for making false statements to federal officials because, even if defendant could prove juror intentionally concealed judgments against self and family, dismissal for cause not required); <u>United States v. Langford</u>, 990 F.2d 65, 68-70 (2d Cir. 1993) (no new trial required where juror intentionally failed to disclose prior prostitution arrests because no evidence that juror was biased against the defendant); <u>United States v. Hodge</u>, 321 F.3d 429, 441 (3d Cir. 2003) (no new trial required in prosecution for drug trafficking and weapons violations where juror failed to disclose familiarity with defendant during voir dire because failure

was honest mistake and did not materially affect fairness of the trial); Billings v. Polk, 441 F.3d 238, 244-45 (4th Cir. 2006) (no new trial required in prosecution for multiple crimes where juror concealed prior dealings with prosecutor and defense counsel because questions only asked about potential for bias generally and juror truthfully answered that she would be unbiased); United States v. Bishop, 264 F.3d 535, 556 (5th Cir. 2001) (no new trial required in tax evasion case where juror failed to disclose her deferred adjudication that was equivalent to pending charge because no demonstration juror was biased); Johnson v. Luoma, 425 F.3d 318, 325 (6th Cir. 2005) (no new trial required in prosecution for domestic violence and kidnapping where juror failed to disclose she was a victim of sexual assault because she honestly answered all questions posed on voir dire without actively concealing her victim status); United States v. Reynolds, 64 F.3d 292, 296 (7th Cir. 1995) (no new trial required where juror was asked, but did not answer, whether she knew agents working on case, though she knew agent's sister); United States v. Edmond, 43 F.3d 472, 473-474 (9th Cir. 1994) (no new trial in armed robbery prosecution where juror simply forgot about being a victim of armed robbery 26 years earlier; "forgetfulness does not indicate a lack of impartiality"); United States v. McConnel, 464 F.3d 1152, 1157 (10th Cir. 2006) (no new trial required in prosecution for dealing firearms without a license where juror failed to disclose prior criminal charge because any presumptive bias would be against prosecution); Baca v. Sullivan, 821 F.2d 1480, 1482-83 (10th Cir. 1987) (habeas corpus relief denied state prisoner; in response to questioning juror failed to mention brother had been police officer); United States v. Casamayor, 837 F.2d 1509, 1515 (11th Cir. 1988) (per curiam) (no new trial required

because juror's failure to disclose brief acquaintance with defendant 23 years earlier did not indicate bias); United States v. O'Neill, 767 F.2d 780, 785 (11th Cir. 1985) (no new trial and drug conviction affirmed, where juror failed to mention two of his friends were narcotics agents); United States v. Brown, 26 F.3d 1124, 1127 (D.C. Cir. 1994) (no new trial required in prosecution for assaulting police officer because juror truthfully reported law enforcement background on jury questionnaire but failed to raise hand during voir dire when prospective jurors were asked about law enforcement backgrounds).

A demonstration of actual bias requires an impermissible affirmative statement; an "equivocal" statement is insufficient. Mack v. Caspari, 92 F.3d 637, 642 (8th Cir. 1996). Specific to this claim, Rodriguez must show that a juror was impermissibly biased against him, and that inclusion of the juror resulted in an unfair trial. In determining whether jurors'' nondisclosure of information during voir dire warrants a new trial, the issue is not whether the nondisclosure was intentional or unintentional, but whether the juror was biased. Rodriguez's attempt to disparage the jurors because of possible mistaken though honest responses on the juror questionnaire is misguided. His characterization that any of the jurors were dishonest is also disingenuous. Rodriguez has not shown that the jurors failed to answer honestly a material question as part of the jury selection process. Even so, any of the answers he now presents as the truthful answers do not show any juror held any bias against him and that a correct response would have provided a valid basis for a challenge for cause. No bias has been shown by Rodriguez here. None of the discrepancies give rise to challenges for cause. He has not demonstrated that any juror was actually biased or that he was tried by a jury not "capable and willing to decide the

case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217.  Even if the

jurors' answers were dishonest, Rodriguez's claim cannot succeed because he cannot

show that any juror was biased, or that empaneling them deprived him of a fair trial.

### CONCLUSION

The record built by the Court through its juror inquiry, taken together with the

record established at trial leads to the inevitable conclusion that no juror in this case

engaged in any misconduct that would warrant vacating Rodriguez's conviction and

sentence.

Wherefore, the United States respectfully requests that Rodriguez's post-

conviction claims based on juror misconduct be denied.

Dated:  January 8, 2016

> CHRISTOPHER C. MYERS
> United States Attorney


> By:    _/s/ Keith W. Reisenauer_____
> KEITH W. REISENAUER
> First Assistant United States Attorney
> Quentin N. Burdick United States Courthouse
> 655 First Avenue North - Suite 250
> Fargo, ND  58102-4932
> (701) 297-7400
> ND Bar Board ID No. 05434
> Keith.Reisenauer@usdoj.gov
> Attorney for United States