**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION**

UNITED STATES OF AMERICA,        :
                                   :

    Plaintiff/Respondent,        :

                                   : **Criminal Case No. 2:04-cr-55**

    vs.                               :

                                   :

ALFONSO RODRIGUEZ, JR.,        :

                                   :

    Defendant/Petitioner.        :

**PETITIONER'S MOTION FOR DISCOVERY
AND INCORPORATED MEMORANDUM IN SUPPORT**

"[I]t is established that conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*

Alfonso Rodriguez's death sentence rests on such false and uncorrected evidence. A longstanding dispute in these proceedings concerns medical examiner Dr. Michael McGee's assertion that semen was present on the vaginal and cervical swabs taken from the body of Dru Sjodin, based on allegedly "elevated" levels of acid phosphatase but without the benefit of other confirmatory lab results such as the identification of sperm cells, the presence of male DNA, or a finding of the prostate-specific antigen p30. *See United States v. Rodriguez*, 581 F.3d 775, 793-95 (8th Cir. 2009) (upholding the district court's *Daubert* ruling). At least one aspect of Dr. McGee's testimony was plainly and indisputably incorrect: Dr. McGee testified on cross-examination that the swabs were never tested for p30. Tr. 6570. In fact, BCA scientist Steven Fischer tested the swabs for p30 on April 23, 2004 – only six days after Ms. Sjodin's body was found near Crookston, Minnesota. *See* Exh. 1 (BCA Report 10 with case file documents), at 30.

1

The government did not disclose Mr. Fischer's p30 result until May 8, 2006, or about two months before trial. Exh. 2 (Letter – Drew Wrigley to Robert Hoy – May 8, 2006) (noting disclosure of documents bates-stamped 17661 through 20247). Defense counsel overlooked the disclosure, and the government allowed Dr. McGee's testimony to go uncorrected.

That non-correction subverted the truth. Dr. McGee was permitted to testify that semen was deposited into Ms. Sjodin during the 24 to 36 hours before her death, even though a negative p30 level conclusively proves otherwise. P30 is a more definitive indicator of semen than is acid phosphatase, and only the presence of sperm cells is more definitive than p30. Exh. 3 (Report of George F. Sensabaugh, dated Aug. 24, 2006), at 2. The Fischer p30 result conclusively disproves Dr. McGee's inference of semen: "The absence of p30, the absence of sperm, and the absence of male DNA from the Sjodin body orifice swabs all support the conclusion that no semen was present and completely undermine the contention that the detected AP activity was from semen," reports forensic scientist Alan Keel. Exh. 4 ("Review Report" dated Feb. 9, 2017), at 15; *see also* Exh. 5 (Addendum Declaration of Jonathan L. Arden, M.D., Jan. 30, 2017), at 3 ("Even if positive acid phosphatase testing is construed as a presumptive indicator of the presence of semen, the absence of both spermatozoa and p30 *constitute much more specific and conclusive evidence that semen was not detected* in those swabs taken at autopsy and that Dr. McGee's conclusion was incorrect.") (emphasis added). The government's own post-conviction expert agrees. Dr. Ljubisa Dragovic observes that the negative p30 finding "points to [the] unlikely presence of semen or seminal fluids in the areas that were tested." Exh. 6 (Deposition of Ljubisa Dragovic, M.D., dated Jan. 24, 2017), at 76. Having elicited Dr. McGee's incorrect testimony about the presence of semen, the prosecution went on to argue, at length, that Petitioner had "raped" Ms. Sjodin and carried out a depraved "rape fantasy" dating back to his previous sexual offenses. Tr. 8662-63, 8665, 8673, 8689-91, 8693-95, 8698, 8706-07.

Petitioner now seeks the following discovery to establish whether the government knowingly presented and/or failed to correct false testimony:

1. The deposition of lead prosecutor Drew Wrigley, who offered Dr. McGee's testimony during the *Daubert* hearing and the trial and who argued "rape" as a reason for the jury to impose death;

2. The deposition of former Assistant United States Attorney Norman Anderson, who presented Steven Fischer's testimony to the jury while avoiding any questions about Mr. Fischer's p30 or other testing of vaginal and cervical swabs from the victim (Tr. 6134-55, 6160-61); and

3. The disclosure of any and all correspondence between the various law enforcement entities in this case – including the FBI, the Minnesota Bureau of Criminal Apprehension, the United States Attorney's Office, the North Dakota Crime Laboratory, the Grand Forks Police Department and County Sheriff's Office, as well as Mr. Fischer and Dr. McGee – concerning the semen-related testing of swabs taken from Ms. Sjodin's body at the time of autopsy.

Petitioner has established "good cause" for the specified discovery. *Bracy v. Gramley*, 520 U.S. 899, 905-06 (1997). He offers "specific allegations" showing "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." *Id.* at 908-09. Post-conviction discovery requires nothing more. *See*, *e.g.*, *Payne v. Bell*, 89 F. Supp. 2d 967, 970, 975 (W.D. Tenn. 2000) (authorizing deposition of prosecutor in support of a *Brady* claim; observing that Petitioner "need not show that the additional discovery would definitely lead to relief" but need only show "good cause" that it would produce evidence relevant to his habeas corpus petition). The attorneys have conferred in good faith concerning these discovery requests. Petitioner moves the Court for relief because the government opposes the requests at issue and the parties have been unable to resolve their disagreement.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The government's theory and evidence at trial*

1. The government urged at trial that Petitioner raped Dru Sjodin after kidnapping her, that he thereafter led her – bound with her hands tied behind her back, naked from the waist

3

down, and with a plastic bag over her head – on a terminal "march" from his car to the place where her body was found, and that he killed her at the scene by slashing her throat with a knife. Tr. 5505-06, 6873-75, 6918-21, 7257-59, 7266-67, 8704-08; "United States' Disclosure of Expert Witnesses - Supplement II, filed May 5, 2006" (ECF Doc. 334) at 2-3. In urging the jury to impose the death penalty, lead prosecutor Drew Wrigley argued that Petitioner killed Ms. Sjodin in order to fulfill a sordid "rape fantasy" that continued from his previous sexual crimes. Tr. 8662-63, 8665, 8673, 8689-91, 8693-95, 8698, 8706-07. The government used the inflammatory language of "rape fantasy" or "fantasizing about rape" no fewer than ten times on closing. Tr. 8662, ln 7-8; 8663, ln 5-6; 8663 ln 13; 8688, ln 22; 8689, ln 1-2; 8689, ln 13-14; 8690, ln 2-3; 8690, ln 19-20; 8694, ln 19; 8707, ln 17.

2.      In support of its contention that Petitioner raped Ms. Sjodin, the government relied heavily on the findings of medical examiner Michael B. McGee. Dr. McGee testified that swabs taken from Ms. Sjodin's cervix and vagina showed "elevated" levels of acid phosphatase, an enzyme produced by the prostate gland and present in semen. Dr. McGee testified that the levels of acid phosphatase from the cervical and vaginal swabs – specifically, 130.7 and 47.4 units per liter – meant that semen was deposited into the victim during the 24 to 36 hours before her death. Tr. 6720-23. Examination of the swabs did not reveal the presence of sperm cells, and the samples tested negative for male DNA. Tr. 6721, 6754. It was undisputed that Ms. Sjodin's body remained outside for five months after her death and underwent substantial decay. Nevertheless, Dr. McGee testified that sperm cells degrade over time inside of a dead body and that the "extremely cold" weather preserved the acid phosphatase. Tr. 6736-37.[1]

3.      Dr. McGee also concluded that defects on the victim's neck and side were sharp-

---

[1] Quite inconsistently, Dr. McGee stated that enzymes degrade "more rapidly" than sperm cells. Tr. 6736. He did not explain why the cold weather would preserve the rapidly-degrading enzyme acid phosphatase but not the more slowly-degrading sperm cells.

4

force injuries rather than the result of decay or animal depredation. The neck area, Dr. McGee testified, showed two cutting injuries across the front of the neck; one of the wounds was 13.5 cm in length, and the other was 8 cm. Tr. 6688-90. The neck defect showed a "scalloping" pattern that Dr. McGee described as "consistent with" someone slashing with a knife, repositioning it, and continuing the slashing. Tr. 6694-95. The physical characteristics and "notching" of the injury made the wound "consistent with" the type of knife that police seized from Petitioner's car. Tr. 6733-34. Dr. McGee attributed Ms. Sjodin's death to "homicidal violence" with a slash wound to the neck as the single likeliest cause and asphyxia or exposure as other possibilities. Tr. 6728-29. In light of the absence of drag marks on the back of Ms. Sjodin's heels and the relative paucity of blood on her clothes, Dr. McGee opined that Ms. Sjodin might have had her neck slashed while situated in a face-down position with her neck facing the ground near the place of her burial. Tr. 6733.

4.       The defense vigorously disputed the government's claim that Ms. Sjodin had been raped. Dr. George Sensabaugh, a professor of forensic and biological sciences at the University of California, explained that acid phosphatase is not unique to the human prostate and can be produced by post-mortem decay. Tr. 6800-02. The allegedly prostate-based acid phosphatase levels relied on by Dr. McGee were reported by the laboratory at Regions Hospital. Dr. Sensabaugh testified that the test used by Regions – specifically, the Beckman Dri-Stat – cannot distinguish prostatic acid phosphatase from lysosomal acid phosphatase produced by postmortem decay. Tr. 6804-09. He also testified that there are no known tests for assessing the significance of acid phosphatase levels from a deceased body, and thus, for inferring that a particular post-mortem level of acid phosphatase indicates the presence of semen. Tr. 6806-09.

### *The <u>Daubert</u> hearing*

5.       Drs. McGee and Sensabaugh gave similarly conflicting testimony when the Court

5

held an in-trial hearing to consider the admissibility, under *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993), of Dr. McGee's conclusion that the observed levels of acid phosphatase suggested a seminal deposit even though no spermatozoa or DNA were present. Tr. 6529-32, 6544-47, 6552-55, 6614-43. Of particular dispute was the measure employed by Dr. McGee to assess the presence of semen from acid phosphatase. Dr. McGee testified that he relied on a decades-old study performed by Regions Hospital, as well as training conducted subsequent to the study, to discern that prostatic acid phosphatase levels above 25 units per liter suggest semen. Tr. 6535-39, 6571-74. Dr. McGee denied that any national standard established such a threshold level in the field of forensic pathology, and he explained that each laboratory establishes its own level based on its own experience and case reports. Tr. 6561-62, 6574-76, 6582-83, 6590-91, 6595-96. Dr. Sensabaugh, however, explained that the presence of acid phosphatase in the absence of other indicia of semen is only "uncertain" or "ambiguous," and that no scientific consensus or studies justify the inference of semen based on acid phosphatase readings taken under conditions of post-mortem decay. Tr. 6622-24, 6633-38, 6657, 6660-61.

6.      Both doctors and the Court itself discussed the significance of p30 testing during the *Daubert* hearing. The enzyme p30 is a "prostate specific" antigen, which, as described in Dr. Sensabaugh's report, "is normally present only in prostatic secretions and there at very high levels." Exh. 3 at 2. "It is not present in vaginal fluids but has been detected at low levels in some female fluids under conditions of hormonal imbalance." *Id.*[2]  On cross examination Dr.

---

[2] Subsequent to the time of trial and the filing of Petitioner's section 2255 motion, intervening scientific developments recognize that p30 may indeed be present in vaginal fluids, but at levels much lower than in semen. Post-conviction expert Dr. Jonathan Arden explains as follows: "The terms p30 and PSA are different names for the same protein that is found in high concentrations in semen and prostatic fluids. PSA/p30 was originally thought to be a male-specific protein, with no female sources of origin . . . which made it a very valuable tool for such forensic laboratory testing to detect the presence of semen. However, subsequent investigation has determined that PSA/p30 may be detected in some other tissues, including some of female

6

McGee agreed with defense counsel that p30 is produced "only by the male prostate," and he stated that no testing for p30 had been undertaken in this case. Tr. 6570. During its own questioning of Dr. McGee, the Court stated its understanding that p30 testing "can be dispositive if you have those certain levels," and that acid phosphatase is less definitive, or "basically ... a presumptive test" requiring corroboration in order to infer the presence of semen. Tr. 6597. Dr. McGee agreed. Tr. 6597. Later the Court confirmed its understanding that a considerably higher level of acid phosphatase – 400 units per liter or above – would itself be considered "dispositive" so that "really you don't have to go and do the p30 test." Tr. 6598-99. Again Dr. McGee concurred. Tr. 6599.

7.      Dr. Sensabaugh explained that many forensic laboratories would hesitate to infer the presence of semen from the acid phosphatase testing undertaken at Regions Hospital, and that many laboratories would seek corroboration through p30 testing because factors other than ejaculation may produce acid phosphatase. Tr. 6628. Dr. Sensabaugh explained that p30 is a "more specific test" than acid phosphatase, that its presence is "highly indicative" of semen because p30 is not found in vaginal fluids, and that p30 is less definitive only than the presence of actual sperm cells. Tr. 6628-31. He echoed Dr. McGee's understanding that no p30 test had been performed. Tr. 6639.

8.      At no point during the *Daubert* hearing did the government correct or otherwise contradict Dr. McGee's and Dr. Sensabaugh's testimony that the samples taken from Dru Sjodin were never tested for p30.

---

origin, but that the concentrations of PSA/p30 in these other sources is orders of magnitude lower than is found in semen and prostatic sources . . . Because the concentrations of PSA/p30 in these alternative sources is so low, it is not detected by the usual testing methods employed in the forensic laboratory performing the type of work at issue in this matter. Therefore, in the practical application of forensic laboratory testing as was done here, the presence of PSA/p30 remains a conclusive indicator for the presence of semen." Exh. 5 (Arden Addendum Declaration), at 2-3.

*Steven Fischer's negative p30 result and its delayed disclosure*

9.      On May 28, 2004 – some six weeks after Ms. Sjodin's body was found – forensic scientist Steven Fischer of the Minnesota Bureau of Criminal Apprehension completed one of BCA's several forensic reports in the case. *See* Exh. 7 (BCA Report 10 as disclosed without bench notes, May 28, 2004). Mr. Fischer examined the cervical, vaginal, and anal swabs that were taken at autopsy by Dr. McGee and shipped to BCA. *Id.* at 2. The examination of all three swabs was negative for the presence of semen. *Id.* Report 10 itself did not describe the basis for Mr. Fischer's negative finding or the nature of his examination or tests. *Id.* at 2-3. The report did not document any DNA results, other than noting that DNA profiling of the swabs would take place at a later date. *Id.* at 2.

10.     The government disclosed Report 10, without additional documentation or explanation of Mr. Fischer's results, on June 9, 2004. *See* Exh. 8 (Letter – Drew Wrigley to Robert Hoy – June 9, 2004) (noting disclosure of documents bates-stamped 10743 through 11146); Exh. 7 (showing Report 10 as bates-stamped 10775-77).

11.     On December 19, 2005, a separate BCA report from Ann Marie Gross documented numerous DNA testing results. *See* Exh. 9 (BCA Report 27 - Dec. 19, 2005). Ms. Gross reported that the cervical, vaginal, and anal swabs from Ms. Sjodin all tested negative for the presence of male DNA. *Id.* at 3. Report 27 was revealed to the defense on January 4, 2006. *See* Exh. 10 (Letter – Drew Wrigley to Robert Hoy – Jan. 4, 2006) (noting disclosure of documents bates-stamped 17485 to 17500); Exh. 9 (showing Report 27 as bates-stamped 17489-9ex3).

12.     On May 8, 2006, or two months before the start of voir dire for trial, the government disclosed the "case file," bench notes, and other documentation for numerous BCA forensic reports, including Steven Fischer's Report 10 and Ann Marie Gross's Report 27. *See*

Exh. 2 (Wrigley letter noting disclosure of documents bates-stamped 17661 through 20247).

13. The case file for BCA Report 10 revealed that Mr. Fischer had conducted p30 testing on the cervical, vaginal, and anal swabs that were taken from Ms. Sjodin at autopsy. *See* Exh. 1 (BCA Report 10 with case file documents), at 30. All three swabs tested negative for p30. *Id.* Mr. Fischer had conducted the p30 test on April 23, 2004, or six days after Ms. Sjodin's body was discovered in Minnesota. *Id.* An image of Mr. Fischer's P30 results appears below:

14. Undersigned counsel have consulted with Petitioner's trial attorneys concerning their handling the forensic issues that are the subject of the upcoming evidentiary hearing in this case. We anticipate that trial counsel will testify to having overlooked or otherwise having failed to notice Mr. Fischer's p30 results.

### *The discovery dispute during the months preceding trial*

15. The government's disclosure of the p30 results – coming two years after Mr.

Fischer documented them – coincided with the parties' protracted discovery dispute concerning the government's expert witnesses and their anticipated trial testimony. Dr. McGee's autopsy report from May 2004 mentioned acid phosphatase levels from the swabs of Ms. Sjodin's body but did not state that the levels were elevated, and the report did not otherwise opine that Ms. Sjodin had been raped. *See* Exh. 11 ("Final Autopsy Protocol") at 1, 12.

16.    As the trial date approached, the government was not forthcoming with additional details concerning Dr. McGee's opinions on a rape of Ms. Sjodin or the manner of her death. Defense counsel moved for a Rule 16 disclosure, and the government provided only the names of its experts and referred counsel to the experts' reports. *See* "United States' Disclosure of Expert Witnesses," dated April 19, 2006 (ECF Doc. 322). Defense counsel objected to the response as insufficient, and on April 28, 2006, the government disclosed for the first time that Dr. McGee would testify that he found semen in Ms. Sjodin's body and that the defect on Ms. Sjodin's neck revealed a "notching" pattern that was "consistent with" the type of knife found in Petitioner's car. *See* "United States' Disclosure of Expert Witnesses, Supplement I," dated April 28, 2006 (ECF Doc. 331). Defense counsel moved for sanctions on May 5, 2006. On the same date, the Government provided a second "Supplement" to its Rule 16 disclosures, explaining for the first time that the acid phosphatase levels led Dr. McGee to his conclusion that there was a seminal deposit in Ms. Sjodin's body. *See* ECF Doc. 334 at 3.

17.    On May 12, 2006, the Court granted the motion for sanctions and ordered the depositions of Dr. McGee and two other experts, observing that the government had violated the Court's discovery order and that its untimely disclosures created "some prejudice" to the defense. ECF Doc. 343 at 3. It ordered the government to supplement its reports. *Id.* The government then issued a supplement describing Dr. McGee's conclusions in further detail. *See* "United States Supplement in Compliance to the Court's May 12, 2006, Order," May 16, 2006

10

(ECF Doc. 345).

18.    Defense counsel took the deposition of Dr. McGee on May 31, 2006. Dr. McGee testified that no p30 testing had been performed on the swabs from Ms. Sjodin's body. *See* Deposition of Michael B. McGee, M.D., May 31, 2006 (ECF Doc. 621) at 153. The government did not correct Dr. McGee's statement, just as it would later fail to do during the *Daubert* hearing at trial. *Id.*

### Steven Fischer's trial testimony

19.    On direct examination, the government did not elicit any testimony concerning Mr. Fischer's semen-related findings. Mr. Fischer instead described the forensic processing of Petitioner's car and the DNA testing he performed on blood splatter stains from the car. Tr. 6134-52. The stains tested positive for Ms. Sjodin's DNA. Tr. 6147 -52. Mr. Fischer also conducted a serology examination and collected numerous hairs from Ms. Sjodin's clothing, and the hairs were sent to the FBI for mitochondrial DNA testing. Tr. 6153-54. On cross-examination, defense counsel elicited the fact that Mr. Fischer had tested the clothes that Ms. Sjodin was wearing when her body was found – including a pink blouse, a pink bra, and a black pea coat – and that the clothes tested negative for semen. Tr. 6159-60; *see also* Exh. 7 at 2. Mr. Fischer likewise testified that the cervical, vaginal, and anal swabs taken from Ms. Sjodin were negative for semen, but without explaining the basis of his finding or specifying the tests he had conducted. Tr. 6160 ("Q: Did you also examine those swabs for the presence of semen? A: Yes, I did. Q: And you found none, no semen on any of them? A: That's correct"). The government again avoided the swab-testing on redirect. Then-Assistant U.S. Attorney Norman Anderson asked whether semen on Ms. Sjodin's clothing might degrade during the five months that her body was outside. Tr. 6160-61. Mr. Fischer responded that such degradation was possible. Tr. 6161.

20.    At no point did the government elicit from Mr. Fischer the fact that he had tested the three swabs for p30 and found none. To the contrary, it offered testimony suggesting that any semen deposited by Petitioner could have decayed and thereby evaded Mr. Fischer's testing. Tr. 6160-61. Defense counsel understood the inference, and he confirmed on re-cross that Mr. Fischer knew about the five-month period that the body spent outside and nevertheless troubled to "check" the swabs and clothing "for the presence of semen." Tr. 6162. Neither defense counsel, nor the Court, nor the jury accurately understood what manner of "checks" Mr. Fischer had performed.

### *The consensus of post-conviction experts*

21.    Post-conviction experts retained by Petitioner and the government agree that the swabs collected from Dru Sjodin contained no semen – a conclusion made certain by the negative p30 result. Forensic pathologist Jonathan Arden, M.D., explained in his 2011 report (which accompanied Petitioner's section 2255 pleading) that the weakly positive acid phosphatase result relied upon by Dr. McGee "cannot independently establish or verify the presence of seminal fluid." Exh. 12 (Declaration of Jonathan L. Arden, M.D., Sept. 15, 2011), at 4. Unless acid phosphatase levels exceed 400 units per liter, the presence of semen cannot be established without corroboration by DNA testing, the identification of sperm cells, or the presence of p30. *Id.* Dr. Arden offered further observations after he was made aware of Mr. Fischer's p30 results. *See* Exh. 5 (Addendum Declaration). The p30 results "conclusively affirm" Dr. Arden's opinion that the acid phosphatase testing relied on by Dr. McGee "was unreliable and inconclusive." *Id.* at 3. Even if it were sound to construe an acid phosphatase level as a presumptive indicator of semen, "the absence of both spermatozoa and p30 constitute much more specific and conclusive evidence that semen was not detected in those swabs taken at autopsy and that Dr. McGee's conclusion was incorrect." *Id.*

12

22.    Dr. Arden also pointed out Mr. Fischer's finding of "heavy NEC" from the cervical and vaginal swabs. *Id.* at 2; *see also* Exh. 1 at 30 (Fischer's bench notes). "NEC" stands for "nucleated epithelial cells," and their abundance on the swabs offers further disproof of semen: "[T]he swabs picked up significant numbers of cells, i.e., the swabs successfully removed biological material, which favors that they would have detected semen or Y-chromosomal DNA, if either had been present." Exh. 5 at 2.

23.    Forensic scientist Alan Keel will offer similar testimony at the evidentiary hearing. *See* Exh. 4 (report). He describes Dr. McGee's finding of semen based on acid phosphatase as "not scientifically supportable." *Id.* at 13. Even the white-colored "mucoid globule" described by Dr. McGee does not suggest semen: "Semen is liquefied by p30 within minutes at room temperature and even faster in the vaginal vault. It is not possible that an organized 'globule' of semen persisted for months in the Sjodin vagina, even if deposited at the time of her death." *Id.*

24.    Mr. Keel observes not only that sperm cells and p30 are "more sensitive" as indicators of semen than is acid phosphatase, but that both survive longer than acid phosphatase – debunking Dr. McGee's conclusion that acid phosphatase somehow survived "preferentially to sperm cells." *Id.* at 14. The nucleated epithelial cells from the swabs of Ms. Sjodin's orifices further disproves Dr. McGee's claim of long-persisting acid phosphatase from a seminal deposit. *Id.* Mr. Keel explains as follows:

> Sperm cells possess a natural resistance of the sperm cell membrane to digestion by proteinase, a hardiness not possessed by other nucleated cells. This means that *sperm cells survive environmental insult much longer than other nucleated cells such as epithelial cells or white blood cells*. By default, vaginal, cervical, anal, and oral swabs capture numerous nucleated epithelial cells along with any sperm cells present in the body cavity. The presence of intact and numerous nucleated epithelial cells on body orifice swabs is a testament to the fact that these cells survived any environmental and catabolic insults experienced by a cadaver from the time of death to autopsy. It is axiomatic then, that any sperm cells in semen

present in the body cavity at the time of death would persist even better.

*Id.* at 6 (emphasis added). All told, "The absence of p30, the absence of sperm, and the absence of male DNA from the Sjodin body orifice swabs all support the conclusion that no semen was present and completely undermine the contention that the detected AP activity was from semen." *Id.* at 15.[3]

25.    To similar effect are the observations of Dr. Garry Peterson, who, like Mr. Keel, consulted with counsel before trial. *See* Exh. 13 (Supplemental Report of Garry F. Peterson, M.D., J.D., dated Feb. 2, 2017). Had Dr. Peterson been informed about Mr. Fischer's negative p30 result, he would have found an insufficient basis from which a forensic pathologist could definitively infer the presence of semen from the observed levels of acid phosphatase, in light of the negative results of the sperm searches, p30 testing, and male DNA assessment. *Id.* at 2. Dr. Peterson is independently familiar with the protocols used by Regions Hospital from his professional training. *Id.* at 3. He concludes that the Regions protocols would not have permitted an inference of semen based on the observed acid phosphatase levels from a deceased body, and especially in light of the other negative findings. *Id.* at 3.

26.    Even the government's post-conviction expert agrees that no semen was present. The report of medical examiner Ljubisa Dragovic, M.D., accompanies the government's opposition to the section 2255 motion as Exhibit 33 and is docketed as ECF Doc. 933-5. It is attached to this motion as Exhibit 14. Rather than inferring a seminal deposit, Dr. Dragovic concluded that Ms. Sjodin was the victim of a "sexual assault," which, he observed, "can be carried out with or without intercourse (i.e. penetration)." Exh. 14 at 7-8. His report states that

---

[3] Mr. Keel and his colleague, Dr. Edward Blake, consulted with defense counsel prior to trial. He regrets that defense counsel did not provide him or Dr. Blake with the bench notes accompanying Steven Fischer's report and documenting his negative findings of p30 and sperm cells. *Id.* at 14.

acid phosphatase is a presumptive test for the presence of semen and even "highly suggestive" of recent intercourse. *Id.* at 7. In his recent deposition, however, Dr. Dragovic clarified that acid phosphatase has only "presumptive value" and requires additional "identification of definable DNA material from a person in order to make some definitive conclusion." *See* Exh. 6 at 66. Without additional DNA testing desired by Dr. Dragovic and his colleagues, and in light of the negative DNA findings documented by the BCA, "I can't say anything." *Id.* at 68. In his own practice Dr. Dragovic would not use an acid phosphatase level even as a "reference point" without supportive DNA evidence. *Id.* at 70. More importantly, Dr. Dragovic did not know of Mr. Fischer's p30 result until January's deposition. *Id.* at 75-76. The negative p30 finding "points to [the] unlikely presence of semen or seminal fluids in the areas that were tested." *Id.* at 76.

27.     Dr. Dragovic rejects Dr. McGee's findings in another respect: the alleged "injury" to Ms. Sjodin's neck area is not an injury at all, but rather, "a post mortem artifact, resulting from combined effects of decomposition and most likely, smaller rodents feeding on the victim's remains." Exh. 14 (report) at 8; Government's Answer (ECF Doc. 879) at 77 n.14. There is simply "no evidence of sharp force injury" and "no evidence of knife wound." Exh. 6 (deposition) at 30, 38. Drs. Arden and Peterson concur, as do forensic pathologists Mark Flomenbaum and Michael J. Ferenc. *See* Exh. 5 at 2 (per Dr. Arden, Ms. Sjodin died from asphyxia, and there is "no evidence in this case of any antemortem sharp injuries"); Exh. 12 at 3 (per Dr. Arden, diagnosis of slash or stab wounds are "not supported by the evidence" and "are at best highly speculative"; the observed features of the neck resulted from "postmortem processes"); Exh. 13 at 1 (Dr. Peterson concurs that "the defects to Dru Sjodin's neck and flank were the result of postmortem decomposition and animal, insect and microbial feeding" and observes that the post-mortem changes preclude sufficient evidence of sharp force injuries); Exh.

15 ("Addendum to Original Report" by Mark Flomenbaum, M.D., Ph.D., dated Dec. 2, 2016), at 2 ("There is no indication that a knife or any other sharp instrument caused any injury to this body."); Exh. 16 (Report of Michal J. Ferenc, M.D., dated Sept. 15, 2011), at 4 (the defects in neck and flank areas "do not support sharp force injuries" and are instead "consistent with decomposition and extensive postmortem animal/insect depredation").

28. To this date Dr. McGee stands alone in his conclusions, including those about the presence or absence of semen. Exh. 17 (Deposition of Michael B. McGee, M.D., dated Jan. 4, 2017), at 66. Although Dr. McGee adheres to his previous testimony despite the negative p30 finding, the negative male-DNA finding, and the negative search for sperm cells, he now characterizes the acid phosphatase levels as merely "presumptive," and he describes them less definitively than he did at trial. *Id.*; *cf.* Tr. 6552 (stating that a prostatic acid phosphatase level of 130.7 "signifies to me that seminal deposit is present"); Tr. 6723 ("All I can say for an elevated level like this is it's above what we consider cutoff level and it suggests that deposition has occurred in a time period 24 to 36 hours prior to the subject's death."). Moreover, the lab at Regions Hospital discontinued its testing for acid phosphatase "in the late 2000s," and Dr. McGee's current practice is to abide by the conclusions of the Minnesota BCA – a practice that would have led him to a different conclusion about the alleged "semen" in Petitioner's case. Exh. 17 at 38-39, 43-45, 66-68. Never in Dr. McGee's practice is the presence of semen inferred from acid phosphatase without other corroborating laboratory tests. *Id.* at 45. And never, since Petitioner's case, has Dr. McGee concluded that a substance is semen based on elevated acid phosphatase and in the absence of sperm cells or male DNA. *Id.* at 54-55. Dr. McGee denied having seen Mr. Fischer's p30 testing at any time before his recent deposition. *Id.* 64-65. Nevertheless, he observed, "It would have been nice to see it before I offered my testimony." *Id.* at 65.

29.     Dr. McGee all but admitted that he lacked any scientific basis for a cut-off level above which acid phosphatase implies semen inside of a deceased victim. *Id.* at 51-52. Regions Hospital used a level of 10 units per liter for living people, and Dr. McGee chose the level of 25 units per liter "arbitrarily":

Q.      Why did you choose to use 25 rather than 10?

A.      Safety.

Q.      You mean -- can you explain that to me?

A.      They felt comfortable using 10 for living people and I thought, in order to be safe, the number should be increased to 25, *and so that was done arbitrarily*.

Q.      And when you say arbitrarily, do you mean you specifically, or was that a practice of the medical examiner's office to 25?

A.      That was a practice of the medical examiner's office to 25. That's the level I told people we should start using.

Q.      Were you the person who implemented that level –

A.      Yes.

Q.      -- 25? Prior to you implementing the 25 units per liter cutoff level, had a prior number been used?

A.      Other than the 10 at the hospital, I don't think so.

*Id.* at 51-52 (emphasis added).

30.     Dr. McGee's recent admission stands in marked contrast to his testimony at the *Daubert* hearing and before the jury, and under which the Court allowed Dr. McGee to testify about semen in the first place:

Dr. McGee testified that his lab had arrived at a cutoff number of 25 U/L, which meant that any test results above 25 U/L indicated the presence of semen. Forensic laboratories across the country generally use a range of between 25 U/L and 50 U/L as the cutoff for the presence of semen. Therefore, Dr. McGee's opinion was that semen was present in Ms. Sjodin's body based on the vaginal and cervical swab results.

17

"Memorandum Opinion and Order Denying Motion to Exclude Testimony of Dr. Michael McGee" (ECF Doc. 596), at 2-3. It similarly contradicts the Court's reasons for denying Petitioner's motion for new trial. *See* ECF Doc. 656 at 65 ("In Dr. McGee's scientific community, a level of approximately 25 µL or slightly higher is sufficient to support this conclusion. These levels have been reached through these pathologists' years of experience in the field, and it has been generally accepted.").

**STANDARDS GOVERNING DISCOVERY**

When a prisoner makes a showing of "good cause," Rule 6(a) of the Rules Governing Section 2255 Cases permits discovery "under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Leave to conduct discovery should be granted when "there is a sound basis for concluding that the requested discovery might allow the [petitioner] to demonstrate" he is entitled to relief. *Johnston v. Love*, 165 F.R.D. 444, 445 (E.D. Pa. 1996); *Gaitan-Campanioni v. Thornburgh*, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991). "Petitioner need not show that the additional discovery would definitely lead to relief. Rather, he need only show good cause that evidence sought would lead to relevant evidence regarding his petition." *Payne v. Bell*, 89 F. Supp. 2d 967, 970 (W.D. Tenn. 2000); *accord Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (discovery "essential" when it "may well contain favorable, material information that would tend to" support the prisoner's claim). Appropriate discovery is especially important in capital cases, and particularly under section 2255, which represents a federal prisoner's first and generally last opportunity to develop the facts in support of his claims. Indeed, "more liberal discovery is appropriate in capital cases where the stakes for petitioner are so high." *Payne*, 89 F. Supp. 2d at 971.

A habeas petitioner has shown "good cause" for a discovery request when "specific allegations before the court show reason to believe that the petitioner may, if the facts

are fully developed, be able to demonstrate that he is ... entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997). Under such circumstances, discovery must be allowed – "it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." *Id.* at 909. "The very nature of [habeas proceedings] demands that [they] be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris v. Nelson*, 394 U.S. 286, 291 (1969).

**<u>Argument</u>:    The Court should authorize discovery in support of Petitioner's claim that the prosecution knowingly presented and failed to correct false testimony (Claim IX)**

Petitioner has shown "good cause" for the discovery he requests. His ninth claim for post-conviction relief asserts that the prosecution knowingly presented and failed to correct false testimony under *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959). *See* Motion for Collateral Relief (ECF Doc. 752) at 239-58. Claim IX asserts that the government "knew, or should have known, that Dr. McGee's testimony that a positive AP test was confirmatory of the presence of semen was materially false, inaccurate and substantially misleading." ECF Doc. 752 at 243. The government's above-described handling of p30 evidence lends further support to the pleaded claim that Petitioner's sentence rests upon materially false and misleading testimony: both on the question of whether any p30 testing had been performed and on the related question of whether the swabs taken from Dru Sjodin's body contained semen when they tested negative for sperm cells, male DNA, and p30.

The Supreme Court consistently recognizes the "special role played by the American prosecutor in the search for truth in criminal trials." *Banks v. Dretke*, 540 U.S. 668, 696 (2004) (listing cases). Prosecutors violate due process by presenting material testimony that is false, by presenting material testimony that creates a false impression, or allowing false or misleading testimony to stand uncorrected. *See*, *e.g.*, *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935)

(presenting knowingly false testimony violates due process); *Giglio*, 405 U.S. at 153 (failing to correct false testimony violates due process); *Napue*, 360 U.S. at 269 ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."). Due process is likewise offended by direct statements that are untrue and by testimony which, "taken as a whole," gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957). This is true even where the particular prosecutor does not know the testimony is false or misleading. *See*, *e.g.*, *Giglio*, 405 U.S. at 154.

In *United States v. Agurs*, 427 U.S. 97 (1976), the Supreme Court held that in cases where the government "knew or should have known" of false testimony, a conviction obtained with such testimony is "fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 103 (footnotes omitted); see also *United States v. Kaufmann*, 803 F.2d 289, 291 (7th Cir. 1986) (following "knew or should have known" standard); *Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir. 2008) (same). Petitioner need not show that Dr. McGee intentionally testified falsely, but only that the prosecutors knew *or should have known* that his testimony was false. *See Mesarosh v. United States*, 352 U.S. 1, 9 (1956) ("[t]he question of whether the witness's 'untruthfulness . . . constituted perjury' makes no material difference where the issue is a conviction "on tainted testimony"); *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005) ("*Napue*, by its terms, addresses the presentation of false *evidence*, not just subornation of perjury.") (emphasis in original). "It is well established that the government's obligation extends to the correction of not only perjurious testimony, but also to testimony that is false, or misleading." *Longus v. United States*, 52 A.3d 836, 847-48 (D.C. 2012).

Petitioner is entitled to relief on his claim if he shows that "the false testimony could … in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154. This standard is easier for a defendant to satisfy than is a showing of materiality under *Brady v. Maryland*, 373 U.S. 83 (1963), or of prejudice from counsel's ineffective assistance, both of which require a "reasonable probability" of a different verdict but for the error. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Strickland v. Washington*, 466 U.S. 668, 694 (1984). As the beneficiary of a *Giglio* error, the government must show that it was harmless beyond a reasonable doubt. *See United States v. Bagley*, 473 U.S. 667, 679 n. 9(1985) ("[T]his Court's precedents indicate that the standard of review applicable to the knowing use of perjured testimony is equivalent to the *Chapman* harmless-error standard."); *accord United States v. Gonzales*, 90 F.3d 1363, 1368 n.2 (8th Cir. 1996) (noting that "a standard of materiality more favorable to the accused" applies when the prosecution knowingly presents perjured testimony); *Guzman v. State*, 868 So.2d 498, 507 (Fla. 2003) ("[W]hile materiality is a component of both a *Giglio* and a *Brady* claim, the *Giglio* standard of materiality is more defense friendly.").

It will be difficult for the government to sustain its burden of proof on materiality. "[I]f it is established that the government knowingly permitted the introduction of false testimony, reversal is virtually automatic." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991); *United States v. Rodriguez*, 766 F.3d 970, 990 (9th Cir. 2014). The prosecution repeatedly argued that Petitioner had "raped" Ms. Sjodin and acted out of a "rape fantasy" connecting her to his previous sexual offenses. Tr. 8662-63, 8665, 8673, 8689-91, 8693-95, 8698, 8706-07. It argued that the "rape" of Ms. Sjodin supported the aggravating circumstance of committing the offense in an especially heinous, cruel, or depraved manner. Tr. 7266 ("As this aggravating factor requires, the defendant's acts were shockingly evil . . . Bleeding, beaten, raped, threatened, terrorized, and fearing for her life. That is what she endured. And that is what Alfonso Rodriguez

21

inflicted on her."). And it urged the Court to admit Dr. McGee's semen-related testimony because it would help the jury determine Petitioner's guilt and proper punishment:

> He will also testify, to a reasonable degree of medical certainty that semen was deposited in Dru Sjodin's vagina and cervix within 24 hours of her death. (Deposition of Dr. McGee, p. 143). Dr. McGee's testimony will assist the jury to understand the forensic tests and evidence and help them determine the cause of Dru Sjodin's death, the evidence supporting the related portions of the Special Findings section of the Indictment, the guilt or innocence of the defendant, and the appropriate punishment in the event Defendant is convicted.

United States Brief Opposing *Daubert* Motion (ECF Doc. 412), at 12-13.

The government should not now be heard to argue that Dr. McGee's testimony was immaterial. With admission of Mr. Fischer's negative p30 results, there would be no scientific basis for the Court to admit any testimony that the acid phosphatase levels suggest the presence of semen, let alone for the jury to be persuaded of such a suggestion. As the Court explained in its *Daubert* ruling, "To be admissible, the expert's opinion needs to reflect a scientifically valid method." ECF Doc. 596 at 4. Whatever "presumptive" value Dr. McGee continues to ascribe to the acid phosphatase levels taken from the autopsy swabs, that value disappears in the face of the negative p30 results, the absence of male DNA, the absence of sperm cells, and the abundance of nucleated epithelial cells. Exh. 4 at 15 (per Alan Keel, the totality of negative findings "completely undermine[s] the contention that the detected AP activity was from semen"); *see also* Order Granting Motion to Exclude Luminol Testing Results (ECF Doc. 508), at 2-3 (excluding luminol results because they are only "presumptive" for blood, and following authorities holding such results inadmissible "without other testing that demonstrates that the substance is human blood").

Moreover, defense counsels' access to evidence demonstrating the falsity of the prosecution's testimony does not defeat a *Napue - Giglio* claim, even though Petitioner's counsel performed ineffectively by overlooking Mr. Fischer's p30 results and failing to use them at trial.

*See*, *e.g.*, *United States v. Mason*, 293 F.3d 826, 829 (5th Cir. 2002) ("[D]efense counsel's failure to avail himself of the policy making the plea agreement available does not relieve the government of its affirmative responsibility to correct false testimony."); *DeMarco v. United States*, 928 F.2d 1074, 1075-77 (11th Cir. 1991) (granting relief even though defense knew of deal with witness, where witness denied deal and prosecution did not correct the false testimony). The prosecution, after all, has an "independent obligation immediately to take steps to correct known misstatements of its witnesses." *United States v. Alli*, 344 F.3d 1002, 1007 (9th Cir. 2003).

The prosecution is imputed with Mr. Fischer's knowledge that the swabs from Ms. Sjodin's body tested negative for p30, and thus, the "known misstatement" by Dr. McGee that the swabs were never tested for p30. For one thing, a prosecutor "has a duty to learn of any favorable evidence known to others acting on the Government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. For another, it is a well-settled principle of law that the government is responsible for the knowledge of a government agent who actually testifies as a witness. *See*, *e.g.*, *Schneider v. Estelle*, 552 F.2d 593, 595 (5th Cir. 1977); *Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir. 1982); *Curran v. State of Delaware*, 259 F.2d 707, 712-13 (3d Cir. 1958); *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995); *United States v. Andrews*, 824 F. Supp. 1273, 1289 (N.D. Ill. 1993).

Of course, the fact that Petitioner need not prove that the prosecutors subjectively knew Dr. McGee's testimony to be false does not mean that the prosecutors' knowledge is irrelevant, and courts routinely allow discovery of the prosecutor's state of mind when it informs a colorable claim for relief. *See*, *e.g.*, *Thompson v. Calderon*, 120 F.3d 1045, 1058 n.12 (9th Cir. 1997) ("Given that a prosecutor may not 'knowingly' introduce false testimony . . . [w]e think that the prosecutor's knowledge and beliefs . . . regarding this crime are entirely probative of

whether the prosecutor presented at the trial a theory and set of facts that he knew contradicted the theory and facts that he planned to advance, and eventually advanced, at [the accomplice's] trial."), *rev'd on other grounds*, 523 U.S. 538 (1998); *Lindsey v. Bradshaw*, No. 1:03CV702, 2006 WL 840383, at *4-*5 (S.D. Ohio Mar. 30, 2006) (good cause to depose prosecutor concerning undisclosed grant of immunity to witness, where the prisoner had otherwise made "a sufficient showing of a constitutional violation"). A prosecutor's testimony is "often highly relevant to the district court's ability to rule on constitutional claims presented in the petition." *Payne*, 89 F. Supp. 2d at 975 (allowing deposition of prosecutor in light of the prisoner's "quite serious" *Brady* claims that were supported by affidavits and other evidence); *accord Foster v. Chatman*, 136 S. Ct. 1737, 1754-55 (2016) (granting relief under *Batson v. Kentucky*, 476 U.S. 79 (1986), and observing that "The contents of the prosecution's file [obtained from an open records request]. . . plainly belie the State's claim that it exercised its strikes in a 'color-blind' manner").

Petitioner's discovery requests reflect documented and "specific allegations" in support of his claim that the government presented false testimony, *Bracy*, 520 U.S. at 908, and his requests are "narrowly focused on the circumstances surrounding the testimony of [Dr. McGee.]" *Lindsey*, 2006 WL 840383, at *5. First, Petitioner asks to depose lead prosecutor Drew Wrigley. It was Mr. Wrigley who failed to correct Dr. McGee when he testified that the swabs from the victim's body were never tested for p30, and who continued to offer Dr. McGee's finding of semen notwithstanding Mr. Fischer's disproof of that finding from two years before. It was Mr. Wrigley who issued the discovery letter accompanying the disclosure of Mr. Fischer's negative p30 findings. *See* Exh. 2. And it was Mr. Wrigley who oversaw, developed, and best understood the government's semen-related evidence. Petitioner is entitled to ask Mr. Wrigley what he knew about the semen-related evidence when he offered it and failed to correct its patent inaccuracy.

24

Petitioner has amply made a "preliminary showing" that the discovery he seeks may aid his claim that the prosecution offered evidence that it knew or should have known to be false. *Hall v. United States*, 30 F. Supp. 2d 883, 889 (E.D. Va. 1998), citing *United States v. Roach*, 28 F.3d 729, 734 (8th Cir. 1994) (standard governing Rule 16). Petitioner need not show that the requested discovery will prove his claim, but only that it will elucidate it. "[I]t is a court's obligation to allow discovery in cases in which a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief." *Johnson v. Love*, 165 F.R.D. 444, 445 (E.D. Pa. 1996). In this instance, the most obvious source of the prosecutor's state of mind is the prosecutor himself. *See Payne*, 89 F. Supp. 2d at 974 ("Only Mr. Henderson knows what information was in his possession at the time of Payne's trial.").

Petitioner makes a similarly reasonable request to depose Mr. Anderson, who presented Mr. Fischer's testimony at trial. Mr. Anderson avoided asking Mr. Fischer about the vaginal swabs, including the fact that they had tested negative for p30. Tr. 6134-55, 6160-61. When Mr. Fischer started discussing items and tests of "forensic value" beyond the DNA tests that Mr. Anderson had inquired about, Mr. Anderson cut him off. Tr. 6152-53.[4] On redirect, Mr. Anderson addressed the degradation of semen on Ms. Sjodin's clothes on account of months-

---

[4] Q : And that's pretty much all the DNA testing that you did in this case, is that correct? We've covered it?

A: There was a few other things that were tested later on.

Q: But these are the items that had forensic value in this case?

A: Well, maybe it would be considered more forensic value. Everything has forensic value, but --

Q: Okay. At some point – you mentioned earlier that you were – helped process the crime scene where Dru Sjodin's body was found, is that correct?

A: Yes, I did.

Q: And at some point after that did you receive Dru Sjodin's clothing back at the lab in Bemidji?

A: Yes, I did. (Tr. 6152-53)

long exposure to the weather – a possibility that invited the jury to infer that the since-degraded sperm cells could have been deposited in Ms. Sjodin's body just before her death. Tr. 6159-61. The transcript reflects that Mr. Anderson knew about Mr. Fischer's finding of no semen but blunted the effect of that finding. It is therefore reasonable for Petitioner to ask whether Mr. Anderson knew the *basis* for Mr. Fischer's finding, i.e., that swabs were tested for p30 and came back negative as the prosecutors had disclosed two months before trial. *See* Exh. 2 (letter from Mr. Wrigley to Mr. Hoy, dated May 8, 2006).

Petitioner also requests all correspondence between the several prosecutorial entities concerning the semen-related testing of biological samples from Ms. Sjodin's body. Those entities include the FBI, the United States Attorney's Office, the Bureau of Criminal Apprehension, the North Dakota Crime Laboratory, the Grand Forks Police Department and County Sheriff's Office, as well as Mr. Fischer and Dr. McGee. The requested correspondence is reasonably likely to demonstrate the government's own discomfort with or disapproval of Dr. McGee's methods and findings. The Serology Manual of the FBI, for example, prohibits the identification of semen from acid phosphatase without "a confirmatory testing procedure" such as DNA or p30. *See* Exh. 18 (FBI Serology Manual, § 10.1), at 13. North Dakota's protocol is similar. A finding of acid phosphatase means only that "semen or other body fluids may be present." *See* Exh. 19 (North Dakota Crime Laboratory Division, "Methods Flowchart" concerning acid phosphatase and p30 testing).

It is reasonable to assume that the numerous crime laboratories, experts, and technicians in this case were speaking with each other, either directly or through the prosecuting attorneys. *See United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) ("The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right hand is doing."); *United States v. Barkett*, 530 F.2d 189, 195 (8th Cir. 1976)

("[O]ne office within a single federal agency must know what another office of the same agency is doing."). Even without the p30 results, Dr. McGee's methods were atypical in his field – both in the inferences he drew from the presence of acid phosphatase as well as the means by which his laboratory measured the enzyme. *See* Exh. 4 at 14 (per Alan Keel, "[T]he Regions Hospital assay is a clinical assay designed to detect circulating AP as a diagnostic indication of prostate cancer. I am not aware of any forensic crime laboratory that has used this clinical instrument and assay as a test, be it presumptive or confirmatory, for semen.").

If indeed "the left hand … [knew] what the right hand [was] doing," *Kattar*, 840 F.2d at 127, the left hand was likely to register its concern or disapproval. *See United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties"). Such communication informs Petitioner's claim of prosecutorial misconduct whether or not it made its way from police departments or crime laboratories into the prosecution's trial file. *See Kyles*, 514 U.S. at 438 ("[A]ny argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials."). Petitioner's substantiated claim justifies the reasonable discovery he requests.

WHEREFORE, for all the foregoing reasons, Petitioner respectfully requests that the Court grant the discovery specified herein.

Respectfully submitted,

/s/ Victor J. Abreu
VICTOR J. ABREU (PA Bar No. 71635)
JOSEPH W. LUBY (PA Bar No. 321759)
FEDERAL COMMUNITY DEFENDER FOR THE
EASTERN DISTRICT OF PENNSYLVANIA
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
victor_abreu@fd.org
joseph_luby@fd.org

Dated:       March 7, 2017
             Philadelphia, PA

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2017, the foregoing document was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to the following:

Keith Reisenauer
keith.reisenauer@usdoj.gov

/s/ Victor J. Abreu
*Counsel for Defendant-Petitioner*