PHONE:  (510) 642-1271
FAX:     (510) 642-6350
E-Mail: SENSABA@uclink.berkeley.edu

24 August 2006

Robert G. Hoy
Ohnstad Twichell, P.C.
P.O. Box 458
West Fargo, ND 58078-0458

      RE:  U.S.A. vs. Alfonzo Rodriguez Jr.

Dear Mr Hoy,

I have reviewed the following documents with regard to the findings relating to the interpretation of the tests for semen performed on the samples collected from victim Dru Sjodin:

1.  Final Autopsy Protocol signed by Dr. Michael B. McGee, reference # 2004-0542, including supporting material from Regions Hospital (10 pages total)

2.  Acid Phosphatase test protocol (Beckman Dri-Stat) faxed from Regions Hospital to Kim Bossert, 6/5/06, (8 pages including fax cover sheet)

3.  Report on Examination of Physical Evidence, Minnesota Bureau of Criminal Apprehension, Lab. No. B03-11062, report # 27, dated 12/19/2005 (5 pages)

4.  Minnesota BCA Laboratory bench notes describing analysis of vaginal, anal, and cervical swabs collected from victim Dru Sjodin, reference # B03-11062, dated 10/17/05-11/15/05, paginated 18532-18552 (20 pages)

5.  Deposition of Dr. Michael McGee, May 31, 2006, pages 30-41, 55-66, 75-77, & 134-154.

This review has two sections.  The first section is a narrative summary of the lab reports and the bench notes (items 1, 3 & 4).  The second section contains my comments and conclusions.

Narrative summary describing lab findings

Item 1:   Sexual assault kit samples collected from victim's vagina, cervix, and rectal cavity were examined cytologically for sperm and tested for the enzyme acid phosphatase (ACP). No sperm were seen in any of the three samples.  ACP activity was detected in all three

*Review of materials - U.S.A. vs. Alfonzo Rodriguez Jr.*                                              *page 2*

samples. ACP activity is recorded as total ACP, non-prostatic ACP, and prostatic ACP. The autopsy report lists the prostatic ACP values: 47.4 units/liter for the vaginal sample, 130.7 units/liter for the cervical sample, and 7.5 units/liter for the rectal sample.

Item 3:     The Minnesota BCA lab reports that no male DNA was detected on the vaginal, cervical, or anal swabs.

Item 4:     The laboratory bench notes detail the analyses done in the effort to detect Y-chromosome (male) DNA in the three swab samples. It is apparent from the bench notes that these samples contained an inhibitor of the polymerase chain reaction (PCR) used to amplify the DNA but that nonetheless the vaginal and cervical samples contained amplifiable human DNA. However, no Y-chromosome DNA was detected in any of the three samples, even under conditions that nullified the effects of the PCR inhibitor.

Comment and Conclusions

My review of the findings in this case leads to three main conclusions:

1. **The failure to detect sperm, either cytologically or by the detection of male specific Y-chromosome DNA argues against the presence of semen in the vaginal, cervical, and rectal/anal swab samples, the ACP findings not withstanding.**

Semen contains several components that are regarded as specific to semen and several that are regarded as conditionally specific. Sperm qualify as the single component, the presence of which, distinguishes semen from any other body fluid. The prostate specific p30 antigen (PSA, p30) is the second most definitive; it is normally present only in prostatic secretions and there at very high levels. It is not present in vaginal fluids but has been detected at low levels in some female fluids under conditions of hormonal imbalance. ACP is less definitive than either sperm or PSA-p30. It is present in prostatic secretions at very high levels but is also normally present in vaginal and other fluids, albeit at much lower levels. Accordingly, inference of the presence of semen based on the detection of ACP requires that the level of ACP detected exceed a threshold value. In using the ACP test for the detection of semen on vaginal swabs, the threshold value is the upper boundary of the ACP level normally present in vaginal fluids. This value has been determined empirically for live women; I would question whether it is possible to define a threshold value for vaginal fluids from females dead for any period of time (see point 2 below).

Overall, then, the detection of sperm is regarded intrinsically to be a more reliable indicator of semen than the ACP test. There is more to it than this, however. There is also an existing body of empirical evidence indicating that sperm persist longer at sites of sexual contact (e.g., the vagina) than the elevated levels of prostatic ACP required to presume the presence of semen. Accordingly, detection of sperm in a vaginal sample may or may not be accompanied

by an elevated ACP level; in either case, the presence of semen would be indicated. However, detection of an elevated ACP level in the absence of sperm can be interpreted only conditionally. One possible explanation is that semen is present and that it originated from an aspermic male. An alternative explanation is that the ACP activity originates from some other source. Testing for the PSA-p30 marker would help distinguish the two alternatives: Detection of PSA-p30 at levels commensurate with the detected ACP would support the hypothesis of aspermic semen whereas failure to detect PSA-p30 would argue for an exogenous source. Since PSA-p30 testing was not done in this case, the alternative explanations cannot be distinguished by direct test. We can, however, assess the possibility of an exogenous source based on the circumstances of the case.

2. **ACP levels in post-mortem vaginal samples may be artificially elevated due to tissue breakdown or microbial contamination or some combination of the two. The ACP test used in this case does not distinguish prostatic ACP from some ACPs originating from other sources. Hence it is plausible that the elevated ACP detected in the victim's vaginal and cervical samples might have originated from a source other than semen.**

After death, tissues break down and release their contents into the body fluids. One of the enzymes involved in tissue break down is lysosomal ACP; as the tissues degrade, lysosomal ACP is released into the body fluids as well. Lysosomal ACP is present in many tissues and is indistinguishable from prostatic ACP in its enzymatic properties; that is, any test that detects prostatic ACP will also detect lysosomal ACP indistinguishably. The endogenous ACP present in vaginal fluids may, in fact, be lysosomal ACP released by the normal break down of vaginal and/or cervical tissue; this question has not been answered empirically.

The foregoing begs the question of the specificity of the Beckman Dri-Stat ACP test protocol used by Regions Hospital and by many other clinical laboratories. This test protocol is designed primarily for the clinical detection of prostatic ACP in blood serum; the test is commonly used in screening for and in monitoring the progression of prostate cancer. The test protocol employs $\alpha$-napthyl phosphate as the enzyme substrate; this substrate is active with several ACPs. To distinguish prostatic ACP from other reactive ACPs that may be present in blood serum, the test is run in the absence and presence of L-tartrate; prostatic ACP is inhibited by L-tartrate whereas ACP from red cells and some other tissue sources is not. The ACP activity detected in the absence of the inhibitor is reported as total ACP, the ACP activity detected in the presence of the inhibitor is reported as non-prostatic ACP, and the difference is reported as prostatic acid phosphatase. As noted above, however, lysosomal ACP, is indistinguishable from prostatic ACP in its enzymatic properties, including acting on the substrate $\alpha$-napthyl phosphate and being inhibited by tartrate. Because lysosomal ACP is not normally present in blood serum at significant levels, it is not regarded as an interference to the test for "prostatic" ACP. If an individual has significant damage to the liver or other tissues, the serum "prostatic" ACP may appear elevated.

Microbes are a possible alternative source of ACP activity. The vagina naturally contains a

*Review of materials - U.S.A. vs. Alfonzo Rodriguez Jr.*                                        *page 4*

variety of bacterial species and after death these bacteria as well as other microbes proliferate. Many microbes make ACPs. There have been reported cases of elevated ACP levels in post-mortem  material that appears to be non-human in origin. No tests were done in this case to determine whether the ACP activity found on the sexual assault kit samples was consistent with human origin and hence the possibility that this activity originated from a microbial source cannot be excluded as an explanation for the elevated ACP detected.

Given that the body of the victim was found some months after her presumed data of death amplifies the plausibility that alternative sources of ACP might account for the ACP activity detected on the sex kit samples.

3.  **The failure to detect semen is non-informative as to whether or not a sexual contact occurred.**

This is well recognized and needs no elaboration.

Respectfully submitted,

George F. Sensabaugh
Professor of Biomedical and Forensic Sciences
Division of Infectious Diseases