Forensic Analytical Sciences, Inc.

# Review Report

| | |
|---|---|
| Mr. Victor Abreu, Esq.<br>Federal Community Defenders<br>Eastern District of PA, Capital Habeas Unit<br>601 Walnut Street, Suite 545W<br>Philadelphia, PA  19106 | Report Date:  February 9, 2017<br>FAS Case #:   20160443<br>Client #:      19820<br>Client Case #: 2:04-CR-55 |

**Case Name:**   US v. Alfonso Rodriguez, Jr.

**Report Type:**  Review of the Detection and Identification of Semen Methodology and Testimony presented as Evidence in this Case

_____

## Purpose

In 2006, Alfonso Rodriguez, Jr. was convicted in United States District Court in North Dakota of the kidnapping, rape, and murder of Dru Kathrina Sjodin.  Part of the evidence presented on behalf of the government was medical test results and expert testimony that purported to prove there was semen in the vaginal vault of Sjodin – and that semen had been deposited in her vagina within 36 hours of her death.  I have been asked to review the test procedures, findings, and testimony in regard to the presence of semen in this case in light of the practices and policies of forensic serology and the forensic crime lab community at the time of this investigation and trial.  I was involved to a limited extent as a defense consultant prior to Rodriguez' trial and as such already have some familiarity with this matter.

I currently am the Forensic Biology/DNA Analysis Unit Supervisor and DNA Technical Lead Analyst for Forensic Analytical Sciences, Inc. (FAS), a private full-service crime lab in Hayward, California.  The FAS Forensic Biology/DNA Analysis Unit is fully-accredited by American National Standards Institute − American Society for Quality (ANSI-ASQ) National Accreditation Board (ANAB), the longest-established provider of ISO/IEC 17025 accreditations to forensic testing agencies in the United States.  FAS has provided DNA analysis and consulting services to law enforcement agencies, prosecutors, defense attorneys, and civil litigants since 1995.

I earned my B.S from Texas A & M University in 1978.  I hold individual certification by the American Board of Criminalistics as Fellow in Molecular Biology.  I am also a member of the American Academy of Forensic Sciences and California Association of Criminalists.  My entire career of 34 years of experience has been in forensic serological and DNA analysis.  I have been involved with and have personally conducted forensic serology – the identification of human body fluids – since 1982.  I have been involved with and have conducted PCR-based DNA analysis since 1991.

3777 Depot Road Suite #403, Hayward, CA  94545-2761 • Telephone:  510/266-8100  Fax:  510/887-4451

For the first 15 years of my career, I worked in state and police crime laboratories, including the North Louisiana Crime Laboratory in Shreveport, Louisiana; the Oakland, California Police Department Crime Laboratory; the Tulsa, Oklahoma Police Crime Laboratory; and the San Francisco, California Police Department Crime Laboratory.  From 1999 to 2011, I was in private practice as a forensic serologist/DNA analyst at Forensic Science Associates (FSA), a private California forensic laboratory which merged with FAS in 2011.  I have testified as an expert in Forensic Serology/DNA Analysis over 70 times in 17 states and the District of Columbia.  My resume is attached as Exhibit 1.

My review includes the following documents:

a.  the October 16, 2011 Motion for Collateral Relief, in *United States v. Alphonso Rodriguez, Jr.*, 2:04-CR-55,

b.  the December 1, 2003 Minnesota Department of Public Safety BCA Crime Lab (BCA) DNA report of Steven Fischer (BCA Report No. 1),

c.  the January 28, 2004 BCA DNA report of Steven Fischer (BCA Report No. 5),

d.  the February 20, 2004 North Dakota Attorney General Crime Laboratory at Bismark (NDCL) Supplemental Laboratory Report No. C03-2539 of Keith Henninkamp,

e.  the undated Ramsey County, Minnesota Office of the Medical Examiner (RCME) <u>Provisional</u> Report of the April 18, 2004 Autopsy of Dru Kathrina Sjodin by Dr. Michael McGee,

f.  the April 19, 2004 Regions Hospital Cytopathology records (three pages, Bates redacted) documenting the microscopical examination of the Sjodin cervical, vaginal, and anal/rectal autopsy specimens provided by Dr. Michael McGee on April 18, 2004,

g.  the April 16-24, 2004 handwritten bench notes of Steven Fischer (Bates 18395-18418),

h.  the April 26, 2004 Regions Hospital, St. Paul, MN Interim Reports documenting the results of their acid phosphatase assays of the cervical, vaginal, and rectal specimens,

i.  the April 29, 2004 BCA Crime Scene Team report of Nathaniel Pearlson (BCA Report No. 7),

j.  the May 28, 2004 BCA DNA report of Steven Fischer (BCA Report No. 10),

k.  the June 3, 2004 Ramsey County Medical Examiner Toxicology Report documenting the results of the Regions Hospital Sexual Assault analysis of the cervical, vaginal, and rectal specimens provided by Dr. Michael McGee on April 18, 2004,

l.  the undated Ramsey County, Minnesota Office of the Medical Examiner <u>Final</u> Report of the April 18, 2004 Autopsy of Dru Kathrina Sjodin by Dr. Michael McGee, with a July 15, 2004 facsimile cover sheet,

m.  the April 25, 2005 NDCL Supplemental Revised report of Keith Henninkamp,

n.  the June 20-November 19, 2005 handwritten and computer-generated bench notes of Ann Marie Gross (Bates 18457-18598),

o.  the December 19, 2005 BCA Nuclear DNA report of Anne Marie Gross (BCA Report No. 27),

p.  the January 31, 2006 BCA Nuclear DNA report of Anne Marie Gross (BCA Report No.29),

q.  the May 16, 2006 (erroneously dated 2005) Forensic Science Associates (FSA) Received Evidence report of Dr. Edward Blake,

r.  the June 20, 2006 FSA Withdrawal letter of Dr. Edward Blake and Alan Keel,

s.  the August 21, 2006 trial testimony of BCA Criminalist Steven Fischer,

t.  the August 28, 2006 Daubert hearing testimony of Dr. Michael McGee,

u.  the August 28, 2006 Daubert hearing testimony of Dr. George Sensabaugh,

v.  the August 28, 2006 trial testimony of Dr. Michael McGee,

w.  the August 28, 2006 trial testimony of Dr. George Sensabaugh, and

x.  the September 15, 2001 Declaration of Dr. Jonathan Arden.

## Introduction

### Forensic Tests for the Presence of Semen:
### Acid Phosphatase, p30/PSA, and Sperm[1]

The Acid Phosphatases

The acid phosphatases are a family of enzymes found widely in nature (animals, plants, and bacteria) that catalyze the removal of phosphate groups from various compounds under acidic conditions to form phosphoric acid (free phosphate). This reaction is particularly important for the production of energy in living cells. In man, acid phosphatase [AP] is found in virtually every cell of every tissue, stored in lysosomes. Of five major categories of acid phosphatases, two are of forensic interest: erythrocyte acid phosphatase [EAP], or ACP1 and "prostatic" acid phosphatase [PAP], or ACP3. EAP is present in high concentration in red blood cells, and because it is polymorphic and ethnically variable, it was useful in discriminating potential sources of bloodstain evidence and in paternity testing. Today and in 2004, using proteins such as EAP to discriminate potential sources of body-fluid evidence has been supplanted by DNA analysis. EAP is the "non-prostatic" acid phosphatase activity that is subtracted out of the Regions Hospital quantitative acid phosphatase assay described below. ACP3 is produced widely throughout the human body, primarily in the prostate, liver, spleen, brain, vagina, and bladder. These "high molecular weight" acid phosphatases are the product of the same gene, mapped to the short arm of chromosome three (Li and Sharif, 1995). Different forms of this same gene product exist due to secondary/post-translational modifications, particularly in the number of attached sialic acid residues, but the protein's antigenicity is not altered. ACP3 is found in many of the body fluids of forensic interest including semen, vaginal fluid, feces, serum, urine, and pus.

ACP3 is often referred to as prostatic acid phosphatase because it is found in high concentration in semen. And the fact that it is found in high concentration in semen makes it extremely useful **qualitatively** as a presumptive test for the presence of semen in evidence stain. This rapid qualitative test allows the forensic investigator to sift through numerous stains, for example that might be on a bed sheet, and focus only on those that reveal AP activity as potential semen evidence. In the forensic context, ACP3 activity was useful **quantitatively** to provide an

---

[1] Unless otherwise attributed, the references incorporated herein are cited from Sensabaugh, 1979 and 1983 and the references incorporated therein, or Gaensslen, 1983 and the references incorporated therein.

Ptr. Exh. 4 - Page 4
FAS Case No. 20160443

estimate of the amount of semen, or "semen dilution", present in an aqueous extract from an evidence swab or stain in which the presence of semen had been established, so that one could judge whether any soluble ABO blood group substance from the semen should be detectable (Sensabaugh, 1983; Gaensslen, 1983).

However, it has long been recognized that AP testing of body fluid evidence from the post-mortem female must be interpreted more cautiously than from living persons. This is due to cadaveric tissue breakdown and bacterial proliferation producing high levels of ACP3 that result in "positive" AP test results that can easily be mistakenly interpreted as prostatic AP (Sensabaugh, 1983; Shaler, 1983). These quantitative acid phosphatase assays alone provide no scientific basis for discrimination between AP produced by the prostate or any other ACP3 source that might be present in the sample. This is so because [1] all ACP3 substrates are substrates for lysosomal and bacterial AP; [2] all high molecular weight APs (e.g., vaginal AP) are the same gene product as prostatic AP; [3] body orifice AP levels, especially in the post-mortem female, can produce positive/elevated AP results; [4] bacterial AP activity, especially in the post-mortem female, can produce positive/elevated AP results; [5] a variety of feminine hygiene products give "false" AP results. This is why acid phosphatase activity is generally accepted by the scientific community as only a presumptive indication of the presence of semen in body fluid evidence.

The first reports of using AP activity as a tool to locate and identify semen in the forensic context date back to 1945. These reports used the quantitative assay approach. Some early investigators (Rasmussen, 1945; Riisfeldt, 1946; Kay, 1947) felt that because semen typically possessed such a high level of AP that quantitative AP results over a minimum threshold amount could be regarded as proof of the presence of semen – without the need for demonstrating the presence of sperm. But as early as 1946, Hansen cautioned that even a quantitative AP assay result demonstrating levels of AP generally found only in semen should be supplemented by the microscopical observation of sperm as proof of the presence of semen.

In the 1950's the quantitative approach to locating/identifying semen gave way to a qualitative spot test approach (Walker, 1950; Leithoff, 1956; Berg, 1957). But in 1959 in an extensive review of this subject Hauck and Leithoff cautioned that a qualitative AP test was not conclusive identification of semen. Kind (1964) also reviewed this subject and recommended that AP be used only as a screening device. Since then, it has been generally accepted that the AP spot test is also useful only as a presumptive screening tool (see also Nakamura *et al*, 1959; Walther and Hohn, 1971; Gomez *et al*, 1975; Sensabaugh, 1979; 1983).

## p30/Prostate-Specific Antigen/PSA

p30 is a protease produced by the prostate gland whose primary function is to liquefy semen to increase the motility of sperm. Seminal fluids from the prostate and other glands are mixed with sperm at ejaculation. Semen is liquefied by p30 within a few minutes of ejaculation, particularly in the acidic environment of the vagina.

After its initial discovery in the 1970's, p30 was thought to be specific to the prostate gland, and thus was a diagnostic and confirmatory test for the presence of semen. As with acid phosphatase, clinical tests to detect PSA in circulating blood were developed as an indication of prostate cancer. These clinical tests were adapted to the forensic arena for the detection of semen. It is now known that p30 is neither semen-specific nor even male specific, and as such must be

considered a presumptive indication of the presence of semen.  Even the detection of low levels of AP and p30 from a sample in the absence of sperm is suspect as proof of the presence of semen. Detection of elevated levels of AP and p30 in the absence of detectable sperm signals the likely presence of aspermic semen and warrants additional investigation to quantify the AP and/or p30, or conduct a polyclonal immunological p30 Ouchterlony assay.  Detection of elevated levels of AP and p30 from semen in the absence of sperm is rare because the incidence of aspermia, from vasectomy or otherwise, is found in less than 5% of the adult male population.

Graves, et al, (1985) reported that p30 detection was more sensitive and persisted longer than AP in the detection of semen in the living sexual assault victim.  Also, since p30 and AP are both proteins and are both susceptible to the same insults in the living or postmortem vagina, the detection of AP in the absence of p30 and sperm indicates the AP activity is more likely endogenous from postmortem tissue leakage from the victim than from semen.

Detection of Spermatozoa

The observation of sperm is the only definitive proof of the presence of semen.  The average human male ejaculate contains 2-5 milliliters of semen.  Human semen contains 20-100 million spermatozoa per milliliter, or about 40-500 million sperm per ejaculate.  Because of the sheer numbers of sperm, the recovery and observation of sperm from a specimen containing semen is much more sensitive than either the detection of AP or p30.

It is generally recognized that sperm persist longer in a deceased person's vagina than in a living person's vagina.  This is due to the fact that living people are active and generally upright after intercourse, and gravity and movement expel most of the excess liquid from the vagina almost immediately.  In addition, foreign substances in the vagina are diluted by vaginal fluid and cleared by phagocytosis and bacterial catabolism such that the large majority of semen is lost from the vagina within a few hours, whereas in the deceased person, all of the above, with the exception of catabolic activity, essentially cease at the time of death.  The scientific literature documents that sperm begin to degenerate in the vagina within hours of ejaculation and finding any sperm in a living victim after 72 hours is a 50/50 proposition (Soules, et. al., 1978).  Studies on deceased persons are fewer, for obvious reasons, but Collins and Bennett (2001) reviewed and studied the persistence of sperm in postmortem specimens.[2]  They confirm the fact that sperm do persist longer in the vagina of the deceased individual.

When oral, vaginal, and rectal body orifice swabs are first taken at autopsy, "smear" slides are prepared by broadly smearing, or painting, the surface of a microscope slide with the wet body orifice swab.  In this way, some of the wet fluid and cell debris on the swab is transferred to the slide; the majority of the captured fluid and cellular material remains on each swab.  The wet swabs are then dried.  In the crime lab, slides are prepared from the dried body orifice swab by re-hydrating a portion of the swabs, then removing the cellular debris, and concentrating the particulate debris by centrifugation.  A small portion, typically about five percent of the cell pellet in 2-3µl (microliters, or millionth of a liter) volume, is then transferred to a microscope slide as a small

---

[2] The Collins study comments only on the "finding" of sperm relative to a minimum postmortem interval. The relative numbers of sperm found is not generally documented.  The authors conclude by stating "An understanding of both the laboratory evidence and its limitations is mandatory when evaluating and interpreting the results."

**Ptr. Exh. 4 - Page 6**
FAS Case No. 20160443

discrete spot (rather than as a broad smear).  The relative number and condition of cell types, particularly nucleated epithelial cells from the lining of the body orifice and sperm from any semen in the orifice, should be fairly homogeneous for either the smear slide or the spot slide.

Sperm cells possess a natural resistance of the sperm cell membrane to digestion by proteinase, a hardiness not possessed by other nucleated cells.  This means that sperm cells survive environmental insult much longer than other nucleated cells such as epithelial cells or white blood cells.  By default, vaginal, cervical, anal, and oral swabs capture numerous nucleated epithelial cells along with any sperm cells present in the body cavity.  The presence of intact and numerous nucleated epithelial cells on body orifice swabs is a testament to the fact that these cells survived any environmental and catabolic insults experienced by a cadaver from the time of death to autopsy.  It is axiomatic then, that any sperm cells in semen present in the body cavity at the time of death would persist even better.

The DNA analysis process for body orifice swabs (and semen stains) with naturally commingled epithelial cells and sperm exploits this natural hardiness of sperm cells to isolate sperm DNA from the DNA of other less hardy cells.  Regardless of the number of sperm present, if any, the amount of male DNA present in a "sperm fraction" will be optimized and should be detected by routine DNA quantification procedures.  Both the DNA quantification technology and the DNA analysis technology present in 2005 were capable of detecting a few picograms (billionths of a gram, or a dozen and fewer sperm) of DNA.  The detection and amplification of female epithelial cell DNA from a sample is proof that any DNA in a "sperm fraction" from "unobserved sperm" from that same sample would be detected at quantification, STR amplification, or both – particularly Y chromosome-specific amplification.

Introduction Summary

In terms of specificity, only the visual observation of sperm is proof of the presence of semen.  Both AP and p30 testing must be considered presumptive tests.  In terms of sensitivity per unit volume of semen, the detection of sperm is more sensitive than detection of p30, which is more sensitive than the detection of AP.  Sperm will persist much longer after p30 and AP have been degraded, and numerous sperm should be recoverable well after p30 and AP have been diluted beyond detection.  This is due not only to the number of sperm cells per unit volume of semen, but also to the hardiness of the sperm cell relative to the vulnerability of p30 and AP as molecules.  Sperm will survive environmental insults that p30 and AP will not.  AP detection is based upon its activity as an enzyme which is dependent upon both the intactness of the primary, secondary, and likely tertiary structure of the molecule; p30 detection is not based on its activity, but rather on the recognition of one or more areas of the molecule by an antibody.   For these reasons, AP activity, particularly in the absence of p30 and sperm, should never be advanced as proof of the presence of semen.

Further, under the same environmental conditions sperm cells will not degrade preferentially to other cells.  Rather, the opposite is true:  other cells will degrade before sperm cells.  When numerous intact nucleated epithelial cells are recovered from a vaginal swab specimen, it is inconceivable that AP from commingled semen would be present in the absence of sperm or p30 from that semen.  AP activity at any level in the face of the combination of the absence of p30, the absence of sperm, and the absence of any detectable male DNA from a vaginal specimen in the presence of viable DNA from numerous intact nucleated epithelial cells should never be advanced as proof of the presence of semen.

# Pertinent Chronology of the Sjodin death Investigation
# and Trial of Rodriguez

1. The BCA investigation in this case began as the kidnapping of Dru Sjodin. In his December 1, 2003 Steven Fischer of the Bemidji BCA lab documents, among other items, the testing and DNA analysis of three of four bloodstain samples from the Sable vehicle back seat (#14-1, 14-2, and 14-4). Vehicle seat bloodstain specimen #14-3 was not tested.

2. The highly decomposed body of Dru Sjodin was found Polk County, Minnesota on April 17, 2004. She had been missing for several months. At autopsy on April 18, 2004 Dr. Michael McGee collected the usual set of six each "sexual assault, or SA" protocol vaginal and rectal[3] body orifice swabs; oral swab collection was not possible. In addition to the usual set of swabs, after dissection of the genitalia, Dr. McGee discovered what he later testified was "a large accumulation of **clear white-appearing** mucoid-like material" at the cervix that he believed to be a discrete deposit of semen which he collected as a specimen in and of itself (as opposed to a generalized swabs collected from the vagina and rectum). Smear slides from each orifice sample were made. According to McGee's testimony, each swab set was divided in half: three for police use, three for use by the medical examiner and hospital laboratories.

3. On April 19, 2004 the SA vaginal and rectal swab smears, and the SA cervical liquid deposit smear slide, prepared the previous day by Dr. McGee, were examined at Regions Hospital. The slides were stained with Papanicolaou stain, a staining procedure that uses several dyes in which sperm cells are differentially stained from the various epithelial cell and white blood cell populations and are clearly visualized. On each respective Cytopathology worksheet, KP noted "No sperm seen" on any of the vaginal, anal, or cervical specimen smear slides.

4. On April 23, 2004 Fischer examined the dried Sjodin body SA vaginal and anal swabs, and the Sjodin body SA cervical liquid deposit swabs, collected just five days previous. The vaginal and anal swabs were packaged together in separate envelopes in a heat-sealed bag; the cervical liquid deposit swabs were packaged in an envelope in a separate heat-sealed bag. Fischer noted three "SA vaginal" swabs were present, all stained red/brown. Fischer removed approximately 1/8 of one of the three vaginal swabs for semen identification testing. Fischer noted four "SA anal" swabs were present, all stained brown with particulate debris, apparently feces, adhering to them. Fischer removed and combined approximately 1/8 of each of two of the four anal swabs for semen identification testing. Fischer noted four "SA cervical" swabs were present, all stained **red/brown**. Fischer removed and combined approximately 1/8 of each of two of the four cervical liquid deposit swabs for semen identification testing. Fischer did not conduct testing for AP activity on the body orifice swabs.

5. Also on April 23, 2004 Fischer processed all three of his Sjodin body orifice swab samples, preparing a particulate/cell debris portion and an aqueous soluble protein portion. Fischer prepared microscope slides from the cell debris from each Sjodin body orifice swab. His notes document the presence of "very heavy" (numerous per microscope field) nucleated epithelial cells from the vaginal and "heavy" nucleated epithelial cells from the cervical swab samples, and "light" (relatively fewer per microscope field) nucleated epithelial cells and "heavy" debris from the anal swab samples. He documents that no sperm were observed on any of the three

---

[3] The distinction between the anus and rectum is blurred – "rectal" and "anal" appear to be used interchangeably by Dr. McGee.

slides he prepared.  That same day, Fischer tested each of the vaginal, anal, and cervical swabs aqueous extracts for the presence of p30, or PSA, using the commercial Abacus Diagnostics ABAcard p30® immunochromatographic assay.  He documented that no p30 was detected from either the vaginal, anal, or cervical swab extracts.

6. On April 26, 2004 in an Interim Report, Regions Hospital documents their findings in regard to the levels (Units/Liter) of acid phosphatase activity detected from the Sjodin body SA vaginal and anal swabs and the Sjodin body SA cervical liquid deposit swabs, and their findings in regard to their search for sperm on the respective smear slides.  As was documented by KP on April 19, 2004, the April 26, 2004 Interim Reports state that no sperm were seen on any of the vaginal, anal, or cervical swab smears.  The prostatic acid phosphatase activity reported was 130.7 U/L for the cervical specimen, 47.4 U/L for the vaginal specimen, and 7.5 U/L for the rectal specimen.

7. On April 27, 2004 Fischer began his examinations of the victim's clothing collected at autopsy.  The following table summarizes his sampling and testing for semen on her clothing:

| Item | Tests for AP Activity (BCIP) | Tests for p30 (ABAcard immunoassay) | Microscopy for sperm | Final Report Determination |
|---|---|---|---|---|
| #73 Old Navy pea coat | 11 of 31 stains:  BCIP + (wk) sampled "for semen ID"; all others were negative for AP with BCIP and were abandoned | 11 of 11 No p30 detected | 11 of 11 No sperm observed; NECs present | No semen detected. |
| #74 Pink blouse | 6 of 6 stains:  all BCIP negative, all abandoned | No test | No microscopy | No semen detected |
| #75 Pink tank top | 18 of 18 stains:  all BCIP negative, all abandoned | No test | No microscopy | No semen detected |
| #76 Pink bra | 2 of 2 stains:  all BCIP negative, all abandoned | No test | No microscopy | No semen detected |
| #77 Black sock | 1 stain:  BCIP negative, abandoned | No test | No microscopy | No semen detected |

8. On May 28, 2004 Fischer reported his findings in regard to his examination of the Sjodin body SA swab specimens and clothing.  The Fischer BCA report summarized the body orifice swabs and clothing examinations under the same conclusory statement:   "Examinations of the following items did not detect the presence of semen:  the black Old Navy pea coat (Item 73)" through "cervical swabs (Item 86C)".  No distinction is made in the report between the extensive survey of 31 stains on the pea coat and the test of one stain on the sock.  No distinction is made between a presumptive test for acid phosphatase activity alone and the combination of AP testing, p30 testing, and microscopy for sperm to conclude "No semen

Ptr. Exh. 4 - Page 9
FAS Case No. 20160443

detected" for any item.   The Fischer BCA report does not describe any of the particular analytical methods employed by Fischer in his search for semen on the Sjodin body SA swab specimens or any of the other numerous items he examined for semen.

9.  On June 3, 2004 the Ramsey County Medical Examiner Toxicology Report is published documenting the results of Sjodin liver various drug screen tests as "Negative" and the Regions Hospital Sexual Assault analysis of the cervical, vaginal, and rectal specimens for sperm as "Negative."   This report also lists the acid phosphatase assay values determined from the Sjodin body SA vaginal and anal swabs and the Sjodin body SA cervical liquid deposit swabs and provided by Regions Hospital in its Interim Report (described in paragraph 5).

10. On July 15, 2004 the undated Ramsey County, Minnesota Office of the Medical Examiner Final Report of the April 18, 2004 Autopsy of Dru Kathrina Sjodin by Dr. Michael McGee, was faxed to ASA Tom Hefflefinger.

11. On March 17, 2005 Ann Marie Gross of the BCA St. Paul lab removed two additional bloodstain cuttings, #14-5 and #14-6, from the Sable vehicle rear seat "for transfer to St. Paul." She began her examinations and sampling for DNA testing on June 20, 2005, documenting the consumption of the #14-5 and #14-6 vehicle bloodstain specimens.  On July 13, 2005 Gross recovered about 475ng of DNA from a bloodstain on the victim's black pea coat previously collected by Fischer.  On August 15, 2005 she documented the consumption of #15-1 and #15-2 bloodstain specimens from the vehicle seatbelt.  On September 16, 2005 Gross recovered substantial amounts of female DNA[4] from the Sjodin #83D right hand fingernail and #83E left hand fingernail specimens.

12. On October 17, 2005 Gross documented consuming one and one-half of three #86A vaginal swabs, two of four #86B anal swabs, and two of four #86C cervical swabs from the victim.  The Sjodin body orifice swabs were digested wholesale - no differential digestion to attempt to isolate sperm DNA was attempted.  Gross recovered over 119,000ng of female DNA from the vaginal swabs sample and over 295,000ng of female DNA from the cervical swabs sample. Upon detecting no male DNA among the female DNA recovered, analysis of the body orifice swab DNA extracts was discontinued.  On November 22, 2005 Gross tested two pair of panties, #102 and #111, for acid phosphatase activity, as summarized below.

| Item | Tests for AP Activity (BCIP) | Tests for p30 (ABAcard) | Microscopy for sperm | Final Report Determination |
|---|---|---|---|---|
| #102 Black panties from ditch | 2 of 2 areas in crotch: both negative, all abandoned | No test | No microscopy | No semen detected. |
| #111 Pink thong panties | 4 of 4 areas:  crotch and front panel, all negative, all abandoned | No test | No microscopy | No semen detected |

[4] Gross recovered about 3.9ng/µl female DNA and about 27.8ng/µl female DNA from the right and left hand fingernail specimens.  The volume (µl) of these extracts was not documented, so the total amount of DNA recovered could not be determined.

**Ptr. Exh. 4 - Page 10**
FAS Case No. 20160443

13. On December 2, 2005 Gross recovered over 2,200ng of DNA from the Sjodin reference lymph node.

14. On December 19, 2005 Ann Gross of the St. Paul BCA lab reported that "No male DNA was obtained from Items 74 [Sjodin's pink blouse], 86A (vaginal swabs), 86B (anal swabs), or 86C (cervical swabs). Gross also reported that "No DNA types unlike those obtained from Dru Kathrina Sjodin were obtained from Items 73 [her coat], 75 [her tank top], 76 [her bra], 83D, 83E [her fingernail scrapings]." The victim's complete 15 gene Identifiler STR profile was obtained from her left hand fingernail DNA; her DNA from the right hand fingernail specimen, the lymph node specimen, and from her blood on her coat was somewhat degraded.

15. On May 8, 2006 specimens purported to be physical evidence in this case are received at Forensic Science Associates (FSA) in Richmond, CA from Patti Williams of the MN BCA lab at Bemidji. Other than reference specimens from Sjodin and Rodriguez, the ten "evidence" specimens provided were empty envelopes and previously-consumed swabs and fabric remnants from the Mercury Sable vehicle that held no biological material. Included among the evidence provided to FSA were the #14-1, 14-2, 14-4, 14-5, and 14-6 vehicle bloodstain specimen packages which the BCA knew had been consumed. Notably absent were the #14-3 vehicle bloodstain specimen that had not been tested by the government and the remaining body orifice swab specimen(s) from the victim. We formally reported to defense counsel on May 16, 2005 that no meaningful analysis of this "evidence" was possible and re-iterated our recommendation that useable samples of the evidence from the vehicle and body of Sjodin be provided.

16. On June 20, 2006 Dr. Edward Blake and I formally withdrew as consultants assisting defense counsel in this case. The absence of testable physical evidence and the failure to provide the requested documentation supporting the findings and conclusions regarding the presence or absence of semen described in any of the BCA, NDCL, and RCME reports precluded us from providing any measure of effective assistance.

## Trial and *Daubert* Hearing Testimony

17. On August 21, 2006 Fischer testified on direct examination that he found blood on the back seat of the Mercury Sable vehicle, which he collected and was "thoroughly documented in my diagrams" [TT p. 6136-37], that he tested specimens 14-1, 14-2, and 14-4 and preserved 14-3 for "any testing that needed to be done in the future" [TT. p 6141-42] and that this blood[5] was shown to be the victim's blood [TT p. 6149]. Fischer was not asked on direct about his efforts to find semen on any of at least ten different specimens associated with the victim he examined and described in his May 28, 2004 report: the victim's black pea coat, pink blouse, pink shirt, pink bra, and black stocking; the victim's vaginal, anal, and cervical swabs; or the black Sears underwear and sanitary napkin from the crime scene believed to be the victim's. When the prosecutor asked Fischer if he examined the victim's clothing, and Fischer responded that he "conducted a serological examination" of the clothing, the prosecutor immediately diverted Fischer's testimony from serology[6] to trace evidence:

---

[5] Specimens 14-1, 14-2, and 14-4 were three of 10 empty or consumed specimens provided to FSA; specimen 14-3 which was specifically preserved for re-testing purposes was not provided.
[6] Forensic serology refers to the examination for human body fluids such as blood, semen, and saliva.

Q. And once the clothing got back to the lab in Bemidji, did you do any examinations of the clothing?

A. Yes, I did.  Conducted a <u>serological examination</u> of the articles of clothing that were found on her body.

Q. How about trace, did you attempt to collect any trace evidence from the clothing?

A. I did attempt- well, I did collect hairs… [TT p. 6153].

The prosecutor then elicits testimony as to how some hairs collected from the victim's clothing made their way to the FBI for further testing.  The nature of the serological examination of the victim clothing is not elicited.

18. On cross-examination Fischer was questioned about his serological examination of the victim's clothing and body orifice swabs.  Fischer testified that he found no evidence of semen "on any of them" [TT p. 6159-60].  Fischer was not asked by defense counsel, nor was there any testimony as to the <u>specific</u> tests for semen employed by Fischer.  On re-direct the prosecutor posited, assuming semen had been present on the victim's clothing at the time of her disappearance, would Fischer expect semen to persist on her clothing exposed to North Dakota weather until it was recovered at her autopsy, to which Fischer was equivocal and unsure.  Testimony as to whether any semen might have persisted in the vaginal vault or rectum of the victim was not elicited from Fischer by either the prosecutor or defense counsel.

19. On August 28, 2006 in a *Daubert* hearing during the trial Dr. Michael McGee testified:

a. that finding sperm was confirmation that semen was present but the absence of sperm was not proof semen was absent – that there could be seminal fluid present in which the sperm count was low and the sperm were overlooked, that seminal fluid minus the normally-intrinsic sperm could somehow be collected, or the semen source did not produce sperm as the result of disease or did not ejaculate sperm as the result of vasectomy [HT p. 6524-25],

b. that sperm heads can persist for several days, but "generally speaking sperm break down probably within a day, day and a half from the time of deposition in a living person"  and similarly in a deceased person the average persistence of sperm "is like four to five days" [HT p. 6526],

c. that "other testing to determine whether there's evidence of a semen deposit" in the absence of sperm is to "analyze the specimen for the <u>presence</u> of the enzyme prostatic acid phosphatase (PAP)" and "the amount of (PAP) <u>elevation</u> correlates with the amount of enzyme that's present." [HT p. 6529-30, emphasis added],

d. that his office includes "elevated" values of prostatic acid phosphatase in the autopsy report so that police agencies "can elect to have additional studying done if they think it's necessary."  [HT p. 6533],

e. that his baseline value of PAP is so conservative as to the presence of semen that he "might miss some, if anything" but "in any event it wouldn't be over-inclusive" [HT p. 6537-38],

f. that "in our office we think it's about two days where the enzyme returns to normal in a deceased individual" under normal environmental conditions, that a cold environment would slow the degradation of the enzyme [HT p. 6544] and in his office he has never seen

FAS Case No. 20160443

an instance of elevated (acid phosphatase) level due to post-mortem decomposition and there was nothing "to suggest in this case that (post-mortem acid phosphatase elevation due to decomposition) was a possibility" [HT p. 6545].

g.  that he "would be concerned" an elevated PAP level would be indicative of the presence of semen in the absence of sperm and may represent a sexual assault and that he would inform the jurisdictional law enforcement agency to "conduct your investigation accordingly." [HT p. 6549-50],

h.  that the cervix is not examined normally, but in cases of suspected sexual assault he carefully examines the internal genitalia via dissection. In this case during his examination of the dissected genitalia, he discovered what he described as "a large accumulation of clear white-appearing mucoid-like material" at the cervix that he believed to be seminal fluid. The prosecutor then referred to this material as a "globule." Dr. McGee testified this material was sampled and sent to the lab for processing along with the vaginal and rectal specimens. According to the hospital assay, the amount of PAP detected from the cervical specimen was over seven times the minimal elevated value demonstrative of the presence of semen and Dr. McGee testified "It signifies to me that seminal deposit is present". [HT p. 6550-52 emphasis added],

i.  that this semen was deposited at the time of death or up to 36 hours prior to Sjodin's death. [HT p. 6555],

j.  and, that the cold North Dakota winter environment preserved the activity of the SAP enzyme in the semen he believed he found in the victim's vagina. [HT p. 6557]

20. On cross-examination in the *Daubert* hearing phase of the trial Dr. McGee testified:

a.  that endogenous acid phosphatase levels rise after death and during decomposition [HT p. 6563],

b.  that no sperm were present on the vaginal, rectal, and cervical smear slide specimens from the body of Dru Sjodin [HT p. 6566],

c.  that it was his belief that acid phosphatases other than red cell acid phosphatase (e.g., lysosomal) would not contribute to the measurement of PAP activity, in general [HT p. 6567],

d.  that if acid phosphatases other than PAP did contribute to the measurement of activity attributed to only PAP activity, then the measured level of PAP may not reflect PAP at all, and his opinion as to the presence of semen based on presumed PAP activity would be inaccurate [HT p. 6568-69; 6576-77],

e.  that there was no testing for the p30 antigen in this case[7] [HT p. 6570],

f.  that he could cite no published study or scholarly treatise to support his stated threshold of PAP as proof of the presence of semen, particularly in the absence of sperm [HT p. 6571-76; 6582],

---

[7] There was p30 testing of the vaginal, rectal, and cervical specimens and clothing in this case by Fischer.

g. that the elevated level of PAP measured from the vaginal and cervical specimens indicative of the presence of semen demonstrate the semen was deposited within 36 hrs of the victim's death [HT p, 6578],

21. On re-direct examination, Dr. McGee testified:

a. that in all of the thousands of autopsies he performed over the years he has never found sperm in a case in which the PAP measurement was below his threshold for the presence of semen [HT p. 6589].

22. When questioned by the Court during the *Daubert* hearing, Dr. McGee testified:

a. that some acid phosphatase tests are presumptive and some are specific [HT p. 6596],

b. that the p30 test results, at certain levels, can be considered as proof of the presence of semen, but that the non-prostatic and prostatic "system that's been described herein" is a presumptive test [HT p. 6597],

c. that the scientific literature overall required acid phosphatase levels four to sixteen times the level cited by McGee as indicative of the presence of semen [HT p. 6597].

23. In his testimony before the jury, Dr. McGee's testimony in regard to the detection and identification of semen in this case essentially reflects his *Daubert* hearing testimony earlier that same day.  Dr. McGee testified that he found "a large deposit of mucoid-like material that I think looks like seminal fluid surrounding the uterus" [TT p. 6721]; he limited his explanation of how an enzyme like acid phosphatase persisted longer than sperm to the possibility that "the sperm have degraded over time and they're just not available for examination" [TT p. 6735] and that (the cold environmental) "conditions that the subject's body was in at the time she died and at the time she was kept – remained in that area – it was extremely cold.  The temperatures were low." [TT p. 6736]  Dr. McGee testified that he was aware that no male DNA was detected on the vaginal, anal, and cervical swab collected from the victim at autopsy.  [TT p. 6754]  Ultimately Dr. McGee testified that the victim's death "is a result of sexual assault" irrespective of whether semen was present in her vagina or not.  [TT p. 6773]

## Conclusions

24. Dr. McGee's testimony a) that he observed and collected an apparent semen deposit around the victim's cervix, b) that the level of AP activity present in this cervical specimen, as well as the vaginal specimen, is attributable to semen and only to semen[8] and c) that AP activity from semen in the cervical and vaginal specimens survived preferentially to sperm cells, is not scientifically supportable.  His testimony there was no p30 testing in this case was, at best, uninformed, and not true.

a. Semen is liquefied by p30 within minutes at room temperature and even faster in the vaginal vault.  It is not possible that an organized "globule" of semen persisted for months in the Sjodin vagina, even if deposited at the time of her death.

---

[8] He testified his threshold level for AP activity that can be explained only by the presence of semen is so conservative that no other explanation is possible.

Ptr. Exh. 4 - Page 14
FAS Case No. 20160443

b.  The visual observation of sperm and the detection of p30 are both more sensitive than AP detection. Neither was found. Also, two separate laboratories using independent samples, from the same specimens, collected in two different manners failed to observe any sperm from any of the body orifice swabs. This demonstrates the AP activity detected by the Regions Hospital assay is attributable to non-semen AP activity. Further, the Regions Hospital assay is a clinical assay designed to detect circulating AP as a diagnostic indication of prostate cancer. I am not aware of any forensic crime laboratory that has used this clinical instrument and assay as a test, be it presumptive or confirmatory, for semen.

c.  Sperm cells (and p30) from semen survive longer than AP, irrespective of the conditions to which the semen is exposed.

Had I been provided in 2006 with the materials requested, which I now possess, I would have been able to assist defense counsel in his cross-examination of Dr. McGee and if necessary I could have provided rebuttal testimony in regard to Dr. McGee's claims of the presence of semen in this case.

25. Steven Fischer's testimony that no semen was found on the victim's clothing or body orifice swabs was incomplete. At minimum, defense counsel should have elicited from Fischer the fact that his search for semen included both the microscopical examination for sperm and the immunological assay for p30 and that both of these tests are more sensitive and more specific to semen than the AP test. Fischer testimony should have included the fact that he observed numerous nucleated epithelial cells from all of the Sjodin body orifice swabs which would have impeached Dr. McGee's claim that AP from semen persisted preferentially over sperm cells. After Dr. McGee testified, Fischer should have been called as a rebuttal witness in regard to his work as direct scientific contradiction of Dr. McGee's claim of the presence of semen in the victim's body.

26. Had I been provided in 2006 with the materials requested, which I now possess, I would have been able to alert defense counsel to the complete details of Fischer's work - the tests for p30, the search for sperm, and the implications of the presence of numerous nucleated epithelial cells – which would have undermined Dr. McGee's claims. I would have been able to assist defense counsel in his cross-examination of Fischer. If necessary I could have provided rebuttal testimony in regard Dr. McGee's claims of the presence of semen in this case. Had I been provided with testable evidence specimens I would have been able to provide direct evidence in regard to the presence of any semen associated with the victim and her clothing.

27. Fischer's testimony (see ¶ 12) in regard to his testing of specimens from the Sable vehicle and his preservation of similar evidence for additional or re-testing belies the fact that he knew this evidence had been requested by the defense and it was not provided. In this sense Fischer's testimony mislead the jury. No questions were asked on cross-examination as to why the vehicle bloodstain specimen 14-3 was not provided to FSA, or why the ten "specimens" that were provided were either empty packages or consumed, when both Fischer and defense counsel knew this evidence had been requested and was not provided.

28. Ann Marie Gross sampled and tested the Sjodin body orifice swabs in an attempt to recover any DNA from male biology commingled with that of the victim. At the quantification step of the analytical process, huge amounts of female DNA were recovered, but no male DNA was detected in the wholesale digests of any of the body orifice swabs. In light of the absence of any detectable male DNA from the Sjodin body orifice swabs Gross did not attempt DNA analysis

Ptr. Exh. 4 - Page 15

FAS Case No. 20160443

of these specimens. This is likely due to her belief that the absence of any p30, sperm, and male DNA from the Sjodin body orifice swabs was dispositive of the absence of semen associated with these specimens. No testimony was elicited as to the enormous quantity of female DNA recovered from the victim's vaginal and cervical swabs, and what that meant relative to the absence of detectable male DNA on these specimens. Had I been provided with the remaining portions of each of the Sjodin body orifice swabs I would have been able to provide direct evidence in regard to the presence of any semen associated with theses swabs. The absence of p30, the absence of sperm, and the absence of male DNA from the Sjodin body orifice swabs all support the conclusion that no semen was present and completely undermine the contention that the detected AP activity was from semen.

29. In 2005 Gross sampled and tested the Sjodin right and left hand fingernail scrapings in an attempt to recover any DNA from male biology commingled with that of the victim. Abundant amounts of female DNA were recovered – no male DNA was detected. Nevertheless, Gross attempted both autosomal STR and Y STR analysis on both the right and left hand fingernail DNA samples. No testimony was elicited from Gross why she attempted both autosomal and Y STR DNA analyses from the fingernail specimens but neither DNA analysis from the body orifice swabs. No testimony was elicited from Gross that she recovered a complete autosomal STR DNA profile for the victim from tissue from her fingernails and no DNA foreign to the victim and no Y STRs were detected.

30. In 2005-2006 defense counsel asked Forensic Science Associates (Dr. Edward Blake and me) to independently examine the physical evidence in this case, including the Sjodin body orifice swabs and specimens from the Mercury Sable vehicle. In May 2006, we received only empty envelopes and consumed swabs and cuttings from the vehicle and no body orifice specimen whatsoever. The BCA crime lab staff and the government were fully aware the material provided was not testable evidence and that testable evidence was withheld. Had we been provided with testable physical evidence specimens I would have been able to provide direct evidence in regard to the presence of any semen associated with the victim and her clothing.

Submitted by

Alan Keel

**Ptr. Exh. 4 - Page 16**
FAS Case No. 20160443

## Literature Cited

Collins and Bennett. 2001.  Persistence of spermatozoa and prostatic acid phosphatase in specimens from deceased individuals during varied postmortem intervals, *Am. J. Forensic Med. Pathol.* 22: 228-232

Gaensslen, R. E. 1983. <u>Sourcebook in Forensic Serology, Immunology, and Biochemistry.</u>  US DOJ National Institute of Justice Press. 149-180.

Graves, Sensabaugh, and Blake. 1985.  Postcoital detection of a male-specific semen protein: Application to the investigation of Rape, *N. Engl. J. Med.* 312:338-343

Kind, S.S. 1964.  The acid phosphatase test, in A. Curry (ed.), <u>Methods of Forensic Science,</u> Interscience, London 3:267-287

Li, S.S. and F.S. Sharief. 1993. The prostatic acid phosphatase (ACPP) gene is localized to human chromosome 3q21-q23. *Genomics* 17 (3): 765–766.

Sensabaugh, G. F. 1979. The Quantitative Acid Phosphatase Test. A Statistical Analysis of Endogenous and Postcoital Acid Phosphatase Levels in the Vagina. *J. Forensic Sci.* 24: 346-365

Sensabaugh, G. F. 1983. The Acid Phosphatase Test, in *Proceedings of A Forensic Science Symposium on the Analysis of Sexual Assault Evidence*, U.S. DOJ BFI Laboratory Press. 65-81.

Shaler, R. C. 1983. The Components of Total Acid Phosphatase Activity in Post- Mortem Vaginal Specimens Determined Using Inhibitors, in *Proceedings of A Forensic Science Symposium on the Analysis of Sexual Assault Evidence*, U.S. DOJ BFI Laboratory Press. 125.