# ARDENFORENSICS

Arden Forensics, PC
1390 Chain Bridge Road #105
McLean, VA 22101

703.749.0227 Office
703.563.6059 Fax
jlardenmd@ardenforensics.com
www.ardenforensics.com

**Jonathan L. Arden, MD**
President

### *Addendum Declaration of Jonathan L. Arden, MD*
### *Re: USA v. Alfonso Rodriguez (Post-conviction Proceedings)*

I have been asked to review materials and provide consultation in the field of forensic pathology for the above-captioned matter. I previously filed a Declaration in this matter of 9/15/2011, which remains in effect and is incorporated herein in its entirety by reference, other than any exceptions noted below.

Since I authored my original Declaration, I have subsequently reviewed the following additional materials:
- Excerpts of an expert report containing various accounts of the circumstances of death of Ms. Sjodin provided by Alfonso Rodriguez (pages Bates numbered US EXHIBIT – 5 – 013 through US EXHIBIT – 5 – 021, inclusive);
- Minnesota Bureau of Criminal Apprehension, Forensic Science Laboratory – Bemidji, Report on the Examination of Physical Evidence, DNA 05/28/2004, Lab No. B03-11062, Report No. 10 by Steven G. Fischer, with notes and worksheet;
- Minnesota Bureau of Criminal Apprehension, Forensic Science Laboratory – St. Paul, Report on the Examination of Physical Evidence, Nuclear DNA 12/19/2005, Lab No. B03-11062, Report No. 27 by Ann Marie Gross;
- Report of Mark Flomenbaum, MD, PhD, of 9/14/2011, with Addendum of 12/3/2016;
- Report of Michael J. Ferenc, MD, JD, of 9/15/2011;
- Report letter of Garry F. Peterson, MD, JD, of 10/9/2011; and
- Report of Ljubisa J. Dragovic, MD, of 9/18/2013.

In my original Declaration, I addressed the ligature recovered from around the neck of Ms. Sjodin, which had a circumference smaller than that of an adult neck, indicating that it could have been the method of asphyxia that caused the death of Ms. Sjodin. I still hold the opinion that the most likely cause of death of Ms. Sjodin was some mechanism of asphyxia, including, but not limited to use of that ligature. I also note that as portrayed in the photographs, no knot is evident in the ligature which would have fastened it around the neck at the circumference as shown after removal from the body. However, the strands of rope forming the ligature are, in places, wrapped and twisted around each other, which may have cinched it in place, exerting tension on the neck even in the absence of a knot. Alternatively, that ligature could have been held in place manually to cause asphyxia by strangulation, and upon release was held substantially in place by tension and the twisting noted. In addition, I have since been made aware of various accounts of the death as provided by Mr. Rodriguez, which include potential asphyxial mechanisms of placing and tying the plastic bag over her head, or effecting neck and/or chest compression during a struggle while holding her down or by pressing an elbow on the front of her neck (and subsequently placing the bag over her head). These alternative

Re: USA v. A. Rodriguez, Post-conviction Proceedings, Addendum Declaration of Dr. Arden, 1/30/2017

explanations are also consistent with the available evidence. The accounts offered by Mr. Rodriguez are not entirely consistent with each other as to the mechanism of asphyxia. Her body was recovered with a ligature about the neck, and the condition of her body precluded recognition of injuries that would have corroborated one of these accounts over the others. Given the advanced state of decomposition of the body, all of these scenarios of death by asphyxia (including the use of the ligature) remain possible, but no single one can be determined to have occurred to the reasonable exclusion of the others. Therefore, I still hold the opinion that Ms. Sjodin died as a result of asphyxia. The only positive, objective evidence to indicate a mechanism of asphyxia is the ligature around her neck, although I acknowledge that this does not preclude that her death was caused by neck or torso compression.

I have reviewed the reports submitted by the other forensic pathologists. I concur with the opinions and conclusions offered by Drs. Flomenbaum, Ferenc and Peterson, including that the purported sharp injuries were the result of postmortem decomposition and depredation, that there was no evidence in this case of any antemortem sharp injuries, and that the cause of death was some form of asphyxia, including, but not limited to the use of a ligature. I further agree with Dr. Flomenbaum that the testimony offered by Dr. McGee regarding the comparison of an exemplar knife with the "wounds" of the body was inappropriate and misleading. I note that Dr. Dragovic agreed that the damage to the neck and right flank resulted from postmortem decomposition and depredation. He further agreed that the cause of death was asphyxia, although he credited the accounts given by Mr. Rodriguez as to applying pressure to the front of her neck as being more likely than ligature strangulation; Dr. Flomenbaum also adopted a similar position in his Addendum.

I shall next address the evidence regarding sexual assault. In my original Declaration, I discussed that the acid phosphatase evidence, which formed the basis of the opinion offered by Dr. McGee that semen had been deposited in the vaginal and cervical swabs, was unreliable. (See prior Declaration for detailed discussion of why the acid phosphatase test is not definitive for the presence of semen, and specifically why the weak "positive" result in this instance is inconclusive, at best, which will not be repeated here.) I have since been provided the report from the MN Forensic Science Laboratory examination of the vaginal, cervical and anal swabs; those examinations did not detect the presence of semen. The worksheet attached to that report indicated that by microscopic examination, all three swabs were negative for spermatozoa, and that by chemical testing all three were also negative for p30. (The vaginal and cervical swabs were designated as showing "heavy NEC," which indicates to me that they contained many nucleated epithelial cells. This reflects that the swabs picked up significant numbers of cells, i.e. the swabs successfully recovered biological material, which favors that they would have detected semen or Y-chromosomal DNA, if either had been present.) As discussed in my prior Declaration, definitive laboratory evidence of the presence of semen includes detecting spermatozoa and/or prostate specific antigen ("PSA"). The terms p30 and PSA are different names for the same protein that is found in high concentrations in semen and prostatic fluids. PSA/p30 was originally thought to be a male-specific protein, with no female sources of origin (as indicated in my Declaration), which made it a very valuable tool for such forensic laboratory testing to detect the presence of semen. However, subsequent investigation has determined that PSA/p30 may be detected in some other tissues, including some of female origin, but that the concentrations of PSA/p30 in these other sources is orders of magnitude lower than is found in semen and prostatic sources. (I became aware of the literature that described detection of PSA/p30 in alternative and even female sources after I wrote my original Declaration.) Because the concentrations of PSA/p30 in these alternative sources is so low, it is not detected by the usual testing methods employed in the forensic laboratory performing the type of work at issue in this matter. Therefore, in the practical application of forensic laboratory

2

Re: USA v. A. Rodriguez, Post-conviction Proceedings, Addendum Declaration of Dr. Arden, 1/30/2017

testing as was done here, the presence of PSA/p30 remains a conclusive indicator for the presence of semen. The import of these newly provided results is that they conclusively affirm my prior opinion that the acid phosphatase testing relied upon by Dr. McGee was unreliable and inconclusive. Even if positive acid phosphatase testing is construed as a presumptive indicator of the presence of semen, the absence of both spermatozoa and of p30 constitute much more specific and conclusive evidence that semen was not detected in those swabs taken at autopsy, and that Dr. McGee's conclusion was incorrect. Finally, Dr. Dragovic concluded that a sexual assault had occurred, based largely on circumstantial factors and reliance on the accounts of the events given by Mr. Rodriguez. In this regard, he did rely on the presence of acid phosphatase as laboratory evidence in support of sexual assault, but as discussed both in my original Declaration and this Addendum, this evidence was neither dispositive nor reliable. The laboratory testing showing the absence of spermatozoa and p30 confirms my opinion that there was no evidence of the presence of semen in the swabs taken from Ms. Sjodin at autopsy. As a corollary to the absence of detectable semen, the swabs also did not contain any DNA that originated from Mr. Rodriguez or from any male source. As was discussed in my original Affidavit, this demonstrated the absence of another type of highly specific evidence that, if it were present, would have been consistent with sexual contact.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on 1/30/2017.

_____

Signature of Jonathan L. Arden, MD