**Ptr. Exh. 6**

UNITED STATES DISTRICT COURT

PEOPLE OF THE UNITED STATES
                Plaintiff,

                                Case No.  2:04-CR-00055
                                Hon.  RALPH ERICKSON

      v.

ALFONSO RODRIGUEZ, JR.
                Defendant.
_____/



DEPOSITION OF DR. LJUBISA JOVAN DRAGOVIC

Taken by the Defendant held and

testimony given in the above-entitled matter before on

Tuesday, January 24, 2017, 1200 N. Telegraph, Building 28E,

Pontiac, Michigan 48341.


APPEARANCES:

Attorney for People:      KEITH REISENAUER
                          655 First Avenue North – Suite 250
                          Fargo, ND  58102-4932
                          (701) 297-7400

Attorneys for Defendant:  JOSEPH LUBY
                          VICTOR ABREU
                          ERIC MONTROY
                          Suite 545 West – Curtis Building
                          601 Walnut Street
                          Philadelphia, PA  19106
                          (215) 928-0520



RECORDED BY:              REGENCY COURT REPORTING
                          3133 Union Lake Road, Suite A
                          Commerce Township, MI 48382
                          (248) 360-2145

Ptr. Exh. 6

                          TABLE OF CONTENTS


WITNESSES:      Plaintiff                              PAGE

      None.



WITNESSES:      DEFENDANT

Dr. Dragovic
Direct Examination by Mr. Luby                            3
Cross-Examination by Mr. Reisenauer                      79
Redirect Examination by Mr. Luby                         83



EXHIBITS:                          IDENTIFIED        RECEIVED

Deposition 1                          75

**Ptr. Exh. 6**

Detroit, Michigan

January 24, 2017 at 4:15 p.m.

**** PROCEEDINGS ****

COURT RECORDER:  Raise your right hand for me please, sir.

Do you swear or affirm to tell the truth in this matter?

THE DEPONENT:  I do.

COURT RECORDER:  Thank you.

LJUBISA JOVAN DRAGOVIC, M.D.

Having been first duly sworn by the Court Recorder, testified under oath as follows:

DIRECT EXAMINATION

BY MR. LUBY:

Q    If I could ask you to state and spell your name for the record please.

A    Sure. The usual letter spelling is Ljubisa Jovan Dragovic.  L-j-u-b-i-s-a, middle J-o-v-a-n and last D-r-a-g-o-v-i-c.

Q    And Doctor, where are you currently employed?

A    I'm employed in this building actually.  I've been employed here 26 years now, more than 26 years.

Q    What is your office's official name?

A    The agency is the Oakland County Medical Examiner's Office.  As counties, State medical examiner system

Ptr. Exh. 6

defined by the Michigan statute, that the Medical Examiners Act that we force as independent law enforcement agencies.

Q  What do you mean by independent law enforcement agencies?

A  We function independently of police agencies and other law enforcement entities. We are only dependent to budget from the political leadership of the Oakland County. I mean, they hold the purses and we are forced some time to kneel down and beg, but otherwise they do not interfere with our activities in the letter of the law or otherwise. I have experienced that in over 26 years working here.

Q  You have not experienced that?

A  That' correct.  Overall, I have seen that in action elsewhere where I worked.

Q  And where else have you seen that in action?

A  Oh, just south of 8 mile when I worked in Detroit.

Q  What sorts of things happened there?

A  Well, the political turmoil of changes that, in my opinion, were not merited but came from the political circles and that was a long time ago. It seems to be perpetual somehow in some areas.

Q  Perpetual in Detroit or in the field of forensic pathology?

4

Ptr. Exh. 6

A    There are some areas that are more prone to it than others just in my general experience.

Q    Are the other specific areas that come to mind as being problematic in this regard, any specific jurisdictions?

A    Well, any jurisdiction on earth is subject to political realities and that from time to time turmoil happens. I don't know necessarily the exact causes, but there are probably conflicting interests among certain groups and circles of people. So, that happens. It just happens historically.

Q    How large is the community now nationwide?  If there is a community, how large is the community of the forensic pathologists who do work similar to what you do?

A    I think there are just 800 or so practicing forensic pathologists being actually employed in government, like myself, or quasi-government like some other jurisdictions. When I say quasi-government, meaning that they are employed in different entities that may create some conflicting interests and things like that, so. That's the reality of North America, or the greater Union if you want.

Q    The reality is that you all communicate with each other --

5

**Ptr. Exh. 6**

A    Yes, yes, yes. There is a National Association of Medical Examiners and that encompasses the Coroners Association and coroners as well and general endeavors to improve the standards of professional functions. So, we do meet and interact.

Q    In the course of improving the standards of your profession, I assume sometimes there are discussions about some offices that are independent of law enforcement as what you've just described?

A    Yes, that happens from time to time. This is why we have over time introduced the accreditation of offices nationwide and it's a slow process and I'm kind of an active part of it because I serve as an inspector. I go around help those assigned jurisdictions to put their acts together, you know work as we all should.

Q    And again, Doctor, are there certain jurisdictions that don't have their acts together as they should come to mind?

A    Well, practice teaches that because through the process of reviewing products of actual products of offices, meaning the quality of reports, the backup with facts and evidence and things like that. Those are the critical areas that we are trying to work through the systematic approach through National

6

Association of Medical Examiners and through the Academy of Forensic Sciences.

Q   As an individual scientist or through the work with the National Association, do you have any experience with the Ramsey County, Minnesota Medical Examiners Office or the Hennepin County, Minnesota Medical Examiner's Office; that would be Minneapolis-St. Paul?

A   Yes, I know Hennepin. Hennepin is under very, very good leadership currently. Sandy Baker, who is the person in charge has been over past, I would say seven, eight years, maybe even longer. And before him was Gary Peterson. Hennepin office has been one of those training centers.

Other counties, or other jurisdictions are not necessarily teaching rounds. They're functioning as just doing their work rather than being burdened by any qualifying quandary to deliver around the state or beyond the state elsewhere. So, there are different profiles, different offices and it depends, of course, on the population. The smaller populations have offices that they are supposed to meet immediately needs of the population that they serve. Larger offices from larger populations have the opportunity to be the teaching grounds. That's

Minneapolis-St. Paul area, Cook County and other places.

There are occasional ups and downs in those that they place as one can imagine. Some offices are always good, traditionally good. Other offices get in turmoil, change of administration, change in leadership. All of these things come in to scrutiny when one is inspecting the office and making the required recommendations for steps to be accomplished in order for someone to qualify. This is why we put even larger offices on probation or not give the certification.

Q    Do you have any specific experience or recollections or specific views about the medical examiner's office in Ramsey County, which would be Minneapolis-St. Paul, Minnesota?

A    No. I have just from –

Q    Prior experience?

A    Yes, but not this specific issue because I do not –– I do not think – no, I do not go to any place in Minnesota or that area, Dakota, for the purposes of inspection.  So, I don't have the firsthand experience.

Q    Doctor, a few more questions about you. How much of the work that you do is in a private capacity as

8

opposed to your work for the medical examiner's office here?

A    Well, I work full-time here. As far as private consultations, I do on my after hours and/or weekends. The system here is such that clearly designates the taxpayers' time and the time I testify in a case as a private consultant somewhere during the regular working hours, I don't get a penny from that.  My County collects, that's the system.  What I do in my private time, and obviously I cannot testify in the evenings somewhere other than form of deposition.

So, from that I may or not be compensated. It depends on the arrangements. In this case, I guess the Panel is going to compensate something. I don't even know what the rates are. But in civil cases, I do all the depositions after 4 o'clock. So that they can give me the opportunity for sense of capitalism, in words here in this great Country.

Q    How much of the private work that you described, you said some of it is in civil cases –

A    Yes.

Q    -- such as it is in this case you are a consultant for law enforcement; do you still work sometimes as a consultant on behalf, not on behalf of, but are

9

retained by criminal defense counsel?

A    I'm not retained. I am contacted because I do all criminal cases pro bono whether they're for AG or for the other forms of government, US attorney's office, except they have to cover the time that I am in court.

This county, Oakland County, goes after all the entities very, very firmly. I mean, no one escapes. That's the principle and I have to respect that, but I do consult as, in special arrangements like occasionally an attorney general's office or a special prosecutor from a jurisdiction from out of state will get into an agreement with a County, get me for the time to do some investigation of something. It has happened occasionally.

Q    What exactly is the Forensic Panel?

A    Forensic Panel is an entity that, you know, I'm really not familiar where the business of it and how it works, the mechanics. But I know that they contact individual forensic pathologists that are a part of the working system countrywide and they call for assembling a team to evaluate cases that come in question. I, from time to time do those and the principle is to assign one person to review the case. Then there is peer review by at least two individuals

10

of the same experience or of similar or comparable in the professional field.

Q  What is your relationship with the Forensic Panel; how does it work?

A  I am contacted by, I think a young lady, I don't think I've ever met her.  This Emily Davy who from time to time calls me and says, they would like me to, if I am available to, send me some material to review. And that's the relationship. Then they, I don't really remember, what and how they compensate on an hourly basis, what exactly it is. It is probably the equivalent of what our County collects as hourly rates for, somewhere there.  It's not even about that.

Q  Doctor, you've mentioned peer review?

A  Yes.

Q  Just for the record I'm holding your report which is in evidence, Exhibit 33. I don't plan on making it a separate exhibit here –

MR. REISENAUER:  We can use that Number 33.  That's, I assume the exhibit number from our answer to the petition.

MR. LUBY:  Correct.

MR. REISENAUER:  That's fine.  We can use that document 33.

**Ptr. Exh. 6**

MR. LUBY:  So, otherwise when you see document, Exhibit 933-5.

BY MR. LUBY:

Q    Doctor, you have a copy of the report in front of you, Doctor, great. The last page of the report is signed by you and two peer reviewers, Dr. DeAlwis, Dr. Weedn?

A    That's correct.

Q    Okay. Did you consult with those two in the course of the peer review, or did they simply review your conclusions?

A    No, no.  There is a process of meeting, telephone conferencing, discussing various aspects of the case or any case. I mean there are all kinds of cases, at least in my experience came to be viewed. I know there are other people that are reviewing, I'm not involved in every case, but in those cases that I've been involved, it's a process where the panelists meet by phone. I mean it's impossible to meet in person physically because it's not cost effective but lengthy teleconferences leading to analysis presentation of the basic case. Everybody has the same amount of information, the same physical evidence that is to be reviewed.

Then it goes through a process of basically

challenging the, each other's on the issues and crystallizing those because in the process of peer review, objective peer review, there is an opportunity to see with six eyes at a minimum or even if there are broader peer reviews essentially about five or more individuals.

So many eyes and so many thoughts and a combination of those points, is very helpful, I think, to come to reasonable conclusions and to challenge those conclusions in the first place.

Q    Were specific there conclusions of yours that were challenged in this case as you recall during the process of peer review?

A    I know – you know what, but I remember having a discussion with Dr. Weedn as an offer of authenticity said, well, there should have been some more DNA testing.  The argument back and forth because the material was limited to start with and we couldn't do anything about it.  He said that was – struck in my mind because he kept on repeating ah, there should have been more DNA testing, more DNA testing.  Where are the samples?

There are some indications every time you are looking at the availability of the physical samples of the materials that is to be tested and we don't

even --.  The consideration in this case and the decomposition, the timespan and the recovery of the remains, you know, there were some limitations.

So, I remember that.  I'm sure they have comments and asking questions both of Drs. Garry Peterson and Weedn, they are eager types. That essentially brings about the kind of crystallization of some of the – there are following the logical path.

I think that the objectivity of the meeting of individuals along those lines brings about some final, most straightforward answers if you want.

Q   Do you remember any conclusions that were different from what they would be had you not consulted these two either in terms of being a different conclusion or something crystallized or more refined or something differently?

A   Well, I'm sure the syntax and the grammar were a part of it and everybody helps because English is not my native tongue. You can see that I am an immigrant. The gist of the matter is basically the same as I originally gathered with some editing that, you know, went as we discussed the materials.

So, that's what I remember. This was a long time ago and I did not maintain the exact memory of how

14

many times we discussed this, but I know it was a couple of times at least and the process was relatively lengthier than on some other cases or different, different cases that came to for our consideration, of course, different setup, different participants.

Q    Your curriculum vitae, I did receive an updated version of it that what was filed in the court. It reflects a number of presentations of the role of medical examiner in the community and the role of the medical examiner in law enforcement?

A    I'm holding out so that over the years.

Q    I understand. But what is the basic tenets and contents of those presentations?

A    Well, they take no sense from the idea that attracted me to this Country in the first place. The regard for the Constitution and the need for logical accuracy in anything that we do. Also the care against the over-interpretation because sometimes people get into a trap being impressed by certain things that they get over-interpreted and straightening those lines is very important.

My message to law enforcement members who wear uniforms or non-uniformed or otherwise or attorneys that I give seminars to, is second opinion is very

15

important or the opinion may be critical and, of course, you can't have hundreds of opinions, but it's the critical assessment because in medicine, and this is part of medicine, this is public medicine. One has to be concerned about the outcome very carefully and there's the possibility is the integral part of everything.

So, that's the message if there is not enough explained by someone as a source, as a technical source, and particularly the medical examiner says, are you questioning me?  Then you have this situation of the conflict of evidence versus eminent and evidence must prevail at all times. It doesn't matter how eminent or preeminent, you can call individuals unique, because evidence is the only real thing that's the truth of the matter.  And coming to that is a process, of course.  So, that's what I'm trying to promote. Sometimes it's easy, other times it's pretty hard but reality teaches these lessons.

Q    What do you mean by the concept of over-interpretation?

A    Well, you have and taking a look at something and imputing and imposing your beliefs into the diagnosis rather than assessing evidence objectively. We are all human beings and humans have the tendency to be

16

guided by emotions.  And, as a matter of fact, I'm not trying to be philosophical, but humans make decisions, the most important, critical decisions in their lives based on emotions, not based on solid knowledge and proper understanding of causes and consequences.

So, I think that explains for everyone, I mean for all the people on this planet. You know, it's easy to be older and look back and say, hi, I can say that now, but, you know.

I got married and we have seven children. I must -- critically, turn back and say, well, we could have been smarter.  The three elder ones of our kids became lawyers. Someone among the medical circles ask me have you disowned them and I said no, they disowned me. I paid for their schooling.  Some things are little issues.  I mean, they come to every house, unit and jurisdiction on that --

MR. REISENAUER:  We'll all going to go home a lot wiser.

THE WITNESS:  No.  No.

Q  A number of these presentations have been given to prosecutors and police officers, criminal investigators.  Have you ever run across --

presentations, discussions, and educational programs to criminal defense attorneys?

A    Sure. Yes. I think just recently I had some, it should be in there.  I guess that was the reason that they awarded me this Liberty Bell award by Oakland Bar because of the work that I do with the defense bar and the plaintiffs and prosecutors part of bar. Yes.

I mean, there are jurisdictions that accusing me of siding with defense. They are always making a great effort to undermine – it's important to understand that in science there are no sides. Science is to be interpreted to people equally and adequately so that everyone understands.  Whether one side prevails and the other doesn't, if it happens within the realm of the Constitution, then everybody is safe.  Unfortunately, things have been outside of the realm of Constitution, that is a dangerous process. I mean, adjudication and I witnessed it. Pretty much.

Q    How did you become to be involved in this particular process of adjudication of case?

A    Of this particular case?

Q    Yes.

Ptr. Exh. 6

A    I was just called by the, Emily Davy, who said that well, we have a case, we have a situation and that was, it was a while ago.  This was like, I don't remember when this all started right now but it was quite a while ago, probably two years ago so maybe even longer.

Q    If I say 2013 would you quarrel with that?

A    No. No. No, I wouldn't.  Years get kind of pushed together when you get old.  So, that's my fault but it was like that, question of being part of the panel that would review this and they said if you have the time. I said yes, I have the time. I didn't even know what the case was about at the time.  But they said if you have the time, we'll send you the materials.  That's how it works.  Now, you don't get to choose or say well, I don't like a case or you do argue on occasions with your colleagues about cases that are being reviewed, you know, that's the process.

Q    In your report on the second page the sources that you considered at that time in 2013, and can you tell me, Doctor, what additional sources you've considered since that time?  In other words, anything you might have considered in the last few months and in preparation of your deposition today?

A    I didn't. I did furnish the report and beyond that I did not get any more materials. I did not, of course, once you reach the process of review, you ask for any additional material may be in existence and we were told that was it.  Whatever was received, whatever photographic evidence existed, so that was it. I did not – I didn't even have the time to think about this because there are other things that are constantly falling off the ceiling or off-the-wall.

Q    Of course, as it is with most. Have you had occasion to recently review the materials that you relied upon for your report?  Or have you not looked at those since –

A    I did read the report before I took off to the trip just because to, at least, refresh my memory. Although if you ask me anything I would have to take a look at the report again and say, oh, okay.  Yes, yes. That's it. Because so much I can keep in my head.

Q    The report said that you considered Dr. McGee's autopsy report plus supporting documents. Do you know what supporting documents those were?

A    The evidence would be the photographs they provided from the time he performed the autopsy, the scene photographs that were obviously taking by other

20

investigators involved in the case. So, the objective
evidence that was available.

Q    In light of the evidence you listed partial
investigation records, you happen to know what
records those were or which ones you've got and why
there were partial?

A    They were partial because I don't think that is what
it is and it might have been some more investigation
material that we didn't get. I'm talking about what
we have or not but was given to us. By the general
amount of material I looked at them and the
transcripts and stuff, there might have been some
additional materials. But how relevant it might have
been in comparison to the critical evidence, physical
evidence, objective evidence that's what I was
referring to in reference to Dr. McGee's conclusions
and things, you know. He did offer several mechanisms
and several opinions about the cause of the demise of
Ms. Sjodin.

That's in the realm of forensic interpretation
and I also know that my other esteemed colleagues
wrote very critically about it but, you know, it all
boils down that if we agree objectively about certain
things that this is a death by, as a result of
purposeful act and in our realm that constitutes a

21

homicide. That's the definition of homicide as a manner of death.

There was some reconsideration about the mechanism of death and the mechanism of asphyxia too, in the process of review and arguing. In looking at some of the opinions, I had to disagree with the significance of the so-called noose around the victim's neck because you have to put a little more common sense in there in order to get to the objectivity. The whole logical pattern as I expressed in the report was obviously questioned by my peers, why that why that?

I told them more frankly, well give me more logical suggestion and I will incorporate it. I mean, this should be in general the principle of work in forensic pathology; that the more logical explanation of things take place and not everyone may be instantaneously familiar or capable of visualizing that kind of situation.

We all try to be what as Louis Brandeis defined as an ideal witness back in, I think, 1910 or something like that.  That was the investigation of the Department of Interior. But we are all human beings at the same time. So there ought to be some

differences some angles of seeing and for interpretation.

So, all in all I don't think there's all that much difference in all the forensic experts that put their opinions forward although there might have been some more personal criticisms from certain ends than from the other sides.  It happens; that's the way it is.

Q    Have you had experience with these particular esteemed colleagues outside the complex of this case? do you know them, have you worked with them or have had occasion to review their work before; by that I specifically mean Dr. McGee, Dr. Arden, Dr. Flomenbaum, Dr. Ferenc and Dr. Garry Peterson?

A    McGee, I don't know personally. I might have seen him at some meeting but I don't know him. I cannot tell you if I met. Arden I know quite well. We were involved in several instances even correctly on the behalf of defense and there were some situations and controversies out in Maryland and elsewhere.

Garry Peterson, I've known and is still owed him some jars of phyla because he asked me to do that and I can't send it safely in glass jars. So, you know, things slip. Flomenbaum, I know from meetings and that we've talked.  Dr. Ferenc I think is somewhere

in Maine. I might have come across or read some opinions here and there but I think he's a very reputable, very solid person just from what he writes and things like that.

Q   Do you know anything about, aside from Dr. Ferenc of what you described of the other individuals are reputed in the field?

A   They are all prominent. They are all people, I mean, there's the little bit of age difference there. I think Garry is a little bit older than myself and Jonathan and Mark, but they have done some major contributions to the national level of forensic science and forensic pathology in particular. So, yes, they are recognized.

Q   Do you know specifics, if we talk about the defect to the neck area that's described in –

A   Dr. McGee.

Q   Dr. McGee's – thank you – report and I know have been discussed a lot by other parties and the report --

A   Sure.

Q   -- what is the basis of your conclusion that the defect of the neck and the flank area postmortem artifacts rather than the results of knife wounds?

A   The, first of all, they look like postmortem than artifacts. They are commonly found in people who have

the misfortune of enjoying substantial and misery of decomposing remains. That's one point.

The other consideration is the evaluation of what happens inside at the organ level beyond this point. Now, can one be 100% certain that all those are artifacts, you cannot. But they are very, very and highly likely postmortem artifacts because you can have a situation where the original injury offers itself for easy access for the anthropophagic activity by rodents, by insects, by anything that's feeding and that's hungry out there.

So, in my estimation, looking at the physical evidence I would not consider those as the result of sharp force injury. I consider them as I've indicated as the result of gnawing by the animals and associated decomposition and the weather change over period from November through March, of which is a span of months, and offers the extreme variation in temperature.

Although, I think it doesn't gets any warmer anytime up there except in August and July when it's not frozen up there. That has been my impression because I haven't been to that part of the country.

**Ptr. Exh. 6**

Q    We can return to that later. I don't want to take up your time, Doctor.  I'll come back to concerning weather patterns, if I may later.

You've described, essentially that the first thing you mentioned is the appearance of the wounds?

A    Yes.

Q    What other evidence did you rely on to reach that conclusion, circumstantial evidence or is your conclusion solely based on how the wounds appeared to you?

A    Well, the circumstantial evidence helps because of the environment and obviously changing of the environment and the logical situation that resulted from placing the Kmart type of plastic bag over the head and affixing it with the rest of the rope that was handy because the hands were already tied in the back.

You see, this whole pattern indicates to me that the body was removed and placed there. There were no injuries rendered at the scene of recovery of the remains, but rather injuries happening in the car. They were of limited blunt force stab wounds to these areas would have bled significantly if they were to be blamed for causing demise, that no matter how hard the cleanup of that vehicle, the red vehicle that the

26

**Ptr. Exh. 6**

perpetrator had and that not being able to eliminate that type of bleeding in any logical way, of course. You know, because the imagination working, but what is there, what is the evidence.

There were some traces of blood which is a significant finding for the case obviously, but also a significant finding pointing that there was limited bleeding and limited bleeding coming likely from the nostrils, from the mouth, rather than from a stab wound to the neck. If you were, having stab wound to the neck in that particular area by either slashing or reported stab injuring any of the blood vessels that even the venous arteries, not necessarily carotid artery, there would be a lot of bleeding. And a lot of bleeding occurring in the vehicle where it appears logically to me that that actually took place in the vehicle.

Q    Whether it took place in the vehicle or somewhere else, with a stab wound of that nature would you also expect to see a good deal of bleeding on the victim's clothes?

A    Soaking of at least of the –

Q    Clothes that were at least still on the body, course?

A    Yes, and that that was not the case. Neither did the primary scene nor the garments were saturated with blood under those circumstances.

So, these are, like, bits and pieces that you have to put together.  If you have something that militates against that concept you have to find an exclamation for that. Otherwise, you have to say, hey, I don't know. Under these circumstances things come up to a logical sequence as everything is put together minus the major stab wounds.

Also I have very, very high reservation against the concept of ligature strangulation because it is not fitting. It's offered as a theory rather than a plausible evidence-based concept. Then combine with that there are some statements that were elicited from the perpetrator -- I don't like perpetrator -- that seem to logically fit the sequence of events in the victim trying to overpower the victim because of the kicking.  Those little details kind of give additional dimension.

Q    I'm not sure what you mean by little details. This is was what I was referring to you earlier. Just for the record, this is page 26 of the Section 22.55 petition.  I understand that our predecessor

**Ptr. Exh. 6**

attorneys wrote about the weather pattern was like for those five months.

I'd like your opinion on the implications of that assuming for the moment that this is an accurate summary of the weather pattern between the day on Ms. Sjodin's disappearance and the day of the body was found.  The high was above freezing on 50 days including 17 of the previous 18 days. It was a warm spring. In fact, the high was above 50 degrees for 11 of the preceding 17 days including the day the body was found and the three days before.  Ten days earlier, the highs were above 60 degrees for two consecutive days. You referred earlier to the weather patterns.

What are the implications of the weather patterns described by our predecessors?

A   The important implication is without heavy coverage with snow and ice for a substantial period of time the body is exposed to, access active anthropophagy and, you know, that's the benefit.  Because in extreme low temperatures it's not as easy to get to, through the body, first of all because the body is covered with snow and ice and then there is no insect activity. Yet insect activity tends to be the

29

significant part when the temperatures are higher,

above freezing for any period of time.

So, it's a combination of effects and to no

surprise there is partial preservation of – with

parchment-like changes of the skin of some exposed

areas, but there is significant damage to the areas

that are generally preferred, like the oral cavity.

Once they gain access there, you'll work through

until there is basically nothing in the neck left.

Q    Does the weather pattern as described in your opinion

Doctor, makes it any more likely or less likely that

the cause of death was by virtue of the slashing to

the neck?

A    No. No. The weather pattern is important to

understand the decompositional changes and that

critical variation of relatively high temperatures

during the relatively long period might have -- but

as far as the cause of death, the mechanism of death

under the circumstances, there is no evidence of

sharp force injury, you know, it's a moot issue. In

mean, it's a moot point as far as how cause of death

is affected.

Q    When you say there is no evidence of sharp force

injury that's based on your review of the

photographs, the testimony, the reports?

A    Correct.

Q    Obviously, you didn't have the opportunity to conduct the autopsy on Miss Sjodin.

A    How is it pronounced, Sjodin?

Q    Sjodin.

A    I shifted the accent

               MR. REISENAUER:  Sjodin. Just concerned about the pronunciation.

A    I've learned.  It is the - where was I – I lost my train.  I'm sorry.

Q    Let me be asked the question. Could you reach your conclusions without the benefit of an autopsy of the victim?

A    Yes, based on the actual information from the autopsy, based on the supporting physical evidence in the form of photographs from the body, from the scene, from all the evidence together. I reached a most likely cause of method and I am certainly open to any more logical suggestions here.

     But I do believe that asphyxia occurred as a result of pressure on the neck, not in the form of ligature, but in the form of either the back of the hand or the forearm being applied directly to the neck and that the subsequent happenings there were just the elements of disposing of the remains.

31

Q    Do you observe, I understand that you're familiar with Dr. McGee's testimony concerning the notching that he described along the neck defect?

A    The notching is like if you see some -- some crevices and some -- something that you believe is a gnaw, you can tie it into interpretation of possible sharp force being applied. But you have to remember that the rodents have sharp teeth and they're more impressive, more likely, more reasonable source of those changes on the neck of the victim than the notching caused by a knife.

I think the knife obviously was cleaned and according to the results, if I remember correctly but with or without that, there is no evidence that would support definitively the type of injury that was proffered as one of the possibilities.

I don't think that Dr. McGee locked himself solely into the sharp force injury just the presence of things where the extensive defects and led to believe that that's one of the possibilities, because I think that he had all the rest.  And he had also to understand that if you have the benefits of reviewing and re-reviewing at leisure certain things, you can get a little more critical about anything.

32

So, I don't think that it's a -- I didn't get the impression that it was a firm kind of - I wasn't at the trial.  So I couldn't read his expressions on his face when he testified, but I think from the transcript it gave me the idea that he was considering other things.

Q	Is it logical or reasonable to suppose that there would be evidence of additional notching or different notching beyond what was visible in the photographs than considered on autopsy?

A	It is logical if you're looking at the freshly damaged skin or skin that has been preserved from any decomposition or any animal activity.

Under those circumstances it would be completely logical to look for the little defects along the line to compose a possible stabbing and/or slashing neck. But under these circumstances, you know, we can say, can I exclude it 100%? No. But then you have to say, I don't know and it's unlikely because of other factors that are into play there.

Q	It's not so much the notching is not visible, it's that it is, in your opinion, attributable to something other than slashing?

A	It is. It is, too small animals, too some rodents that might have been available in the area because

this is an open space there and a ravine, that's
where the natural habitat to the small animals would
be.

Q    By small animals as opposed to larger predators or
insects?

A    Well, insects are never excluded because they can be
very active if the temperature is right and if they
are available in the environment. Larger animals are
have the tendency to gnaw very fast and would not
stop at the initial areas of damage or the moisture
areas that are typical for more -- I mean, that's the
pattern that you see in evaluation where there -- if
someone found in the woods and there are larger
animals that come to feed about like a dog in the
back. I mean we can include, in Michigan, we have
some cougars up in the U.P.

Q    Turning to the flank defect you also attributed that
to decomposition and animal predation is the most
likely explanation.  What other explanations did you
consider for the flank and/or did you discount them?

A    Well, again the logic of unlikely sharp force injury
being there and not creating the associated pattern
of saturation because you know that she had a peacoat
that was pulled down, the victim I'm talking about,
pulled down to her elbows and stopped because of the

34

knotted back tied hands. So, that position did not change. So it was actual bleeding from the flank area within so the -- to at least some extent the residual clothing.  In particular that the peacoat that was out there and the lower back and to the hips, whatever combination there was before the reported remains were found.

Q    In Dr. McGee's report describes a number of other defects other than the neck defect and the flank defect, and he attributes them to anthropophagy. What difference is it, if any, do you see between those wounds and that these two?

A    In size, obviously, you know, the general pattern is anything that feeds on the remains of a carcass will go for the moisture first. The moist areas are the greater attraction. Of course, blood, as is, would be an attraction and it bleeds blood there is inside the Kmart plastic bag and that gets ripped very fast for access because that's the attraction. Generally, moist areas are part of the targets and the damage of greater dimension occur in those areas and in the victim's body too.

Q    You reviewed Dr. Flomenbaum's written report in his assessment concerning the neck defect being parallel to the lines of Langer's?

**Ptr. Exh. 6**

A    I have a, complete review, opportunity. I don't have Mark's written report.

Q    Why don't we take a break?

MR. ABREU:  Why don't you ask him anyway?

MR. LUBY: Okay.

Q    Well, in your opinion either, do the flank wound artifact or the defect is either parallel to the lines of Langer?

A    You're looking at -- one thing is important to consider, if you're having an intact body.  Then you're talking about lines of Langer involve a retraction upon some fresh injury. If you're looking at the decomposing body, then this concept is not as applicable although one has to consider it, but can something occur or damage of different kind occur following the distribution of traumatic distribution lines of Langer so that there is retraction of the scan in such a way.

Again, I wouldn't apply firmly that concept on a decomposing body. On a fresh body, yes, by all means, I think Mark is right on the top of it. In the decomposed body you have to have some reservation about that.

Q    So your conclusion at least in the terms of the

cause of death is that Ms. Sjodin died as a result of asphyxia from direct pressure?

A    Pressure of the neck or either the combined striking and pressure on the neck. This seems very logical as a result of a struggle that took place in the back of the vehicle.  But that was, first of all, supported by the claim there in the car by the finding of some blood and particularly by the stories that were provided during the interviews with the -- Mr. Rodriguez himself.

Q    Would your conclusions be the same if you didn't have the benefit of Mr. Rodriguez's statements in terms of the most likely cause of death?

A    Well, asphyxia is the diagnosis to exclude.  So if you do not have evidence of some blunt trauma to the head or evidence that some sharp force injuries that would cause exsanguination, then you run into the circumstances of diagnosis exclusion which in this case is either asphyxia or hyperthermia because the exposure to weather, the unprotected body in the weather. That it seems that at least to me and that is my conclusion that death occurred in the vehicle rather than outside. It is not too logical that death occurred as a result of simple exposure to the low environmental temperatures.

Q    And with or without the statements that you relied upon there is no evidence of a knife wound in either of them?

A    That's correct. There is no evidence of knife wound. Yes.

Q    In your report you state that Mr. Rodriguez at one point described a whoosh sound as pressure was being applied to the victim's neck. Can you explain the significance of the whoosh sound and medically what that may signify?

A    Well, this came from the interviews of Mr. Rodriguez with other people who reported it and that was provided to us. We did talk extensively particularly with Dr. DeAlwis who felt that this whoosh sound was very, very strong indicator of cracking of the voice box and/or the wind pipe because the kind of damage where there is a mixture of air and fluid and fluid being the damage from any point within the oral cavity or below the tissues or of the blood vessels.

We went back and forth and I felt this was an important thing to include because of the peer suggestion and that biological observation of something that is reported. Something that is not or can be invented or fabricated to match the logic. It's rather a logical match of the report itself to

the situation where there is hard pressure pushed with the forearm or the elbow against the voice box and the windpipe.

So that's the results, I mean, we spent quite a bit of time discussing this possibility and why would that be a significant finding because you don't hear it if there is simple manual strangulation because manual strangulation, the mechanism is different.

It's the pressure upon the carotid circulation on both sides. It's the deprivation of oxygen bringing blood to the brain, you know, it occurs in a relatively clean fashion. There are no sounds of the kind. If there is pressure on the front part of the neck with damage to the structures, the cartilaginous structures of the neck or the airway, then you actually can have whoosh sound.

The whoosh sound might have come from her also being subjected to the force while she was inhaling from the nosebleed because I think there was an account of the striking that there were some strikes delivered to her in order to control the victim's behavior.

Q    This striking, just for the record I have a copy of this is Government's Exhibit 5-021 ECF document 881. This is a summary of the statements that Mr.

Rodriguez had made to Dr. Seward and there to Dr. Welner. I'd like to direct your attention to that last paragraph at the bottom of the page there, you have a copy.

You see where it says, I slapped her.

A    Uh-huh.

Q    And that, she still kept on fighting. I was

holding her by the neck and -- in twisting and

squeezing her I heard a crack and she stopped

moving.

So, he speaks about a crack as opposed to a whoosh, a whooshing type sound. Does that carry any kind of different diagnostic significance since?

A    Well, it is the expression that is different, but as he describes it as at this point as a crack, which would be reflective of the cracking of the cartilage because that's the cracks upon pressure in the front part of the neck.

As far as slapping and he slapped her across the face to prevent her, the victim, from further fighting or resisting, that would have caused some bleeding from either the mouth or the lips or the oral cavity to start with because of the teeth underneath or from the nostrils because a slap across the nose with easily provoked bleeding without

necessarily breaking the nasal bones or a upper
facial bones or anything like that.

The statement, I heard a crack and that she
stopped moving.

Is there a possibility of breaking the victim's
neck under the circumstances of this case as you
–

A   It would be unlikely the neck would be broken unless
there was some major twisting and the opportunity to
displace the head, vis-à-vis, the upper parts of the
neck. If there was pressure, you have to remember
that this is a 22-year-old individual which brings in
significant elasticity to all the structures in the
neck. So, involving bony structures, the cervical
spine is not as brittle as in the elderly.

For example, if the elderly individual is
subjected to some force that may be actual cracking
in the form of dislocating or breaking the vertebrae.
So, I would think that the, whatever crack was heard
or whooshing by another account was the result of
breaking the thyroid cartilage and/or mixing of the –
– some blood, some fluid in that area with the air is
going through because that will give you that kind of
sound. Not the crack sound. The crack is just the
feeling, feeling in contact with the neck and that

41

something breaking. It has some logical merit but do I know for sure these accounts are completely truthful, no. I wouldn't take them as such but I'm sharing it here because they are logically matching the rest of the larger scenario under the circumstances.

Q    Would it be helpful or probative to have a qualified examiner review x-rays of the neck area, to view the spine and of the cartilage as you described?

A    Well, if the soft tissues including the upper part of the airway were gone, that there was nothing there. But that's a great feed, obviously for whatever was happening to the neck and anthropophagy process.

Evaluating of the overall skeleton by x-rays is always something if available is a good idea because it gives you some account of any changes in the body structure. So, dichotomy, I don't remember saying anything along those lines. We sort of had our inclination to do as in any suspicious circumstances evaluation of the bony skeleton, decomposing body or the preserved, that's kind of standard procedure.

Q    You seem to be talking about two different means of two different unrelated means of asphyxiation, one being pressure to the front of the neck area whether by an elbow or forearm and the other one or a series

of blows to that area?

A    Oh, no. No. No. The blow if there was one blow that created the compromised airway I would have expected some significant aggregate happening because that in and of itself, does not result in immediate demise. The continued pressure would do it over a period of over a minute or so.

If you're using other mechanisms for example, squeezing of the neck that's blocked carotid circulation, the victim would be, properly applied, would be unconscious in 7 to 8 seconds. That's what's the basis for carotid sleep, that is applied in martial arts where you can render someone, if you know how, you have to be capable of doing that, you could render someone unconscious very fast.

If you continue with the pressure they would be dead after or nonrecoverable after a relatively short period of time. But if there is a strike to the front of the neck with associated crack, whoosh, those kinds of things, there will be a short period of agony unless there is continued pressure.  Pressure on the upper airway, the upper part of the airway meaning the voice box or the outer part of the windpipe associated with it because it comes out to the lower neck, is blocking the flow of air so that

the lungs cannot adequately oxygenate that air and send it to the brain.

If the process is much longer because the heart keeps pumping and it's in comparison to and actual blockage of the carotid circulation.  This is a longer process.

On the other hand, if there is a fracture of the voice box because of the severe punching is going to be a lot of gurgling there for a period of time and that account is not there.

Q    Would there be, if there were a distinct blow to crush the windpipe area, would we expect to see long lasting physical manifestations of that you would observed at autopsy?

A    It depends on the preservation of the remains. Clearly in a freshly, injured individual you have to have all the elements there to do a proper dissection of the neck. You can elicit all of those changes that are as a result of crushing of the structures.

If this is damaged, crushed and then there is nothing in the neck to be found because it is all saturated with bleeding from the broken structures because when you are breaking inside structures, you are breaking the blood vessels too. It's the amount of blood within that would attract or attempt by the

feeders to get into that area.

I think the neck injury itself was sort of a modulator to enhance anthropophagy in the neck area. So that there was no structures found. It is not even hyoid bone recovered which is at the base of the tongue, which means the base of the mouth including the tongue and the remaining soft tissues of the neck including the cartilage or bone. It wouldn't have been gone unless it was somehow injured unless there was – I think there was - should've been or must have been some blood in that plastic bag to attract the feeders to go to it and fragment the bag because they had the bag completely over her face. The bag was damaged. It was gone by that time, but the whole area down there was gone as well. In order to have that, you have to have some opportunity for the gnawing of the rodents or anything that feed there.

Q   Do you expect the hyoid bone to have been broken because of the direct pressure placed either by the forearm or elbow on it?

A   No. No. If there was pressure on the front of the neck, no. The hyoid bone, generally you can see, if I may – see where the hyoid bone is right here. It's a horseshoe shape with the curvature in the front.

So, hyoid bone generally breaks unless there is

complete crushing of the neck structures. But hyoid bone breaks from side to side pressure. Hyoid bone is a telltale sign of manual strangulation. Ligature strangulation doesn't do anything to the hyoid bone because its distribution forces are very equal around the neck with the ultimate expect pressure.

Q    How about manual strangulation?

A    Manual strangulation would break the hyoid bone, it is more likely than not. In some instances, the elasticity of the bone is going to be brittle.  You have manual strangulation without fracturing hyoid. It's generally a telltale sign. It's not that you cannot survive without hyoid bone, it's the telltale injury that has been so specific that indicates the delivery of right or left hand that are the bilaterally critical areas of the neck.  Squeezing it side to side so that the hyoid bone is at the base of the tongue, flips and cracks on one side or the other or even in the middle depending how much pressure is applied

Q    In order to crush the hyoid structure of the neck by direct pressure, how much pressure or what type of pressure would be required in order to probably, are we talking about the perpetrator simply applying his weight to the area or is it necessarily a good deal

46

**Ptr. Exh. 6**

of more force with the arm, the ability required in order to crush the windpipe?

A    Well, the application of force in that situation in the account of the perpetrator jumping on top of the victim trying to control her, then brings into account some, at least in part, body weight and then the rest of it is muscle strength that is applied. How much exactly is quite variable because you're not – it's individual. Some small individuals can succumb to that pressure faster than, for example, the types of Sylvester Stallone with the double size neck and coming from thickness of his neck muscles.

So, there is tremendous individual variation there that there is no standard measure to say, well this is the amount is expressed in kilopond.  There are no experimental studies along those lines. Obviously, there are some ethical boundaries –

Q    It also depends on the force inflicted by the focal point such as the elbow as opposed to a surface area?

A    That's the very important point that you did bring. It can be done by the outer aspect of the hand by pressure there. It can be the outer aspect of the forearm because of the -- that's supported by long bones and the muscles or a focal point like the tip of the elbow.  Yes.

Q    And that you described force being applied against the front of the victim's neck or pushing down with one's arms around the neck. I'm not sure what you mean by the latter phraseology. That's on the last page of your report, I believe.

The first full paragraph page 10, the mechanism of death based on the account of Mr. Rodriguez results from his purposeful force to the front of the neck.  This force could be applied by pushing down with one's arms around the neck –

A    With one's hands around the neck, you see? It says,

applied by pushing down with one's hands around the neck.

Then that's the theoretical consideration, if there are hands squeezing the neck. This is not going to be the proposed mechanism, but the option of how the force may be applied. Or with the elbow, either which may have caused structural damage to the voice box so.

Q    When you speak of hands around the neck, can you please differentiate that from manual strangulation?

A    Like, instead of using the outer aspect of the forearm which, I think, is more likely the inner aspect of the forearm. It's the similar mechanism of

**Ptr. Exh. 6**

the bar – but it's a --

Q    I won't ask you to demonstrate on me.

A    But there are all kinds of ways of inflicting injuries to people's neck.  The neck is a very, very sensitive area and for centuries people have lift up various concepts of subduing others by application of force to the neck with different parts of the forearms and hands.

So, that's what I was trying to mention to allow for different directions, if you want, in application of force from behind or from the front with – from the front with the inner aspect of the forearm or from the front with the outer aspect of the forearm. I can demonstrate.

MR. MONTROY:  I'll vote for him.

MR. REISENAUER:  Sitting here --

A    I'm just trying to clarify some of the points. But there are certainly nuances in how the force may be applied to the neck from different directions.  One has to be there to actually witness the process rather than -- I have to believe that because I wasn't there.  I mean, it's important to give that kind of consideration, of course.

If you can reenact something in order to demonstrate and I have done that in a courts on

49

Ptr. Exh. 6

occasions.  It is the most impressive thing to would be -- actually witnessing the change of the volunteer victim. Usually it's either the defense attorney or the prosecutor.

Q    Doctor, I don't wish that on anyone in here.

A    As and an adult here, I was to demonstrate how someone was smothered with a pillow and the defense attorney wanted me to show with a cushion, because it came out that the cushion was, or that was my suspicion originally; but it came out in the second trial of the accomplice that the cushion was used.

So, I asked the judge how far should I go and the judge was very cautious and said, not too far. Of course, the defense attorney is now head of triers in the neighboring county, Macomb, a good friend of mine.

Q    Whenever talking about pressure to the front of the area for around it, if you look –

A    It is the same mechanism but the position of the arm is different.  Depending on the position of the victim, whether the victim is – you see, I could not exclude the possibility that the victim might have been turned and at that point in time during the struggle and being held from behind –

Q    Right.

50

A    I'm sorry – in this fashion rather than being held with the right forearm from the front or left forearm from the front, where the victim is struggling and kicking and the perpetrator has two arms and would use one to try to control the movement and the other, the easiest control would be application and the force to the neck under the circumstances.

Q    And that would be sufficient to subdue the victim?

A    Well, that would be sufficient to subdue the victim, but also if it goes too far, it is sufficient to eliminate the vital function of breathing which results in demise.

Q    With or without the intent to cause a demise?

A    Well, the intent, I'm not a psychiatrist to measure the intent. But I'm looking at it from my vantage point as a forensic pathologist, there is purposeful act of application of blunt force of the neck and that's the critical point which goes into homicide rather than untoward intent of someone act or actions that would qualify as accidental, manslaughter.

Q    Right.  So, you've described as a forensic scientist is a purposeful act of compressing or collapse of the airway –

A    Right.

Q    That as opposed to what would say the vernacular of

intentionally causing the death?

A    That's the legalese that I'm not versed.  I'm not an attorney, but it is essential to, in our line of work to provide demonstrable evidence of purposeful act. In other words, to say this is a homicide because that's a homicide by definition. Oftentimes, people say homicide is death at the hands of another. No, that's very vulgar and unspecified notion.

Homicide is death that results from purposeful act by another. Just like suicide is death resulting from purposeful act of self, but self only because if anyone else is involved it changes.

Q    So, I think I understand. I like to know a little bit more about ligature strangulation.

A    Yes.

Q    I want to know more about why it is that you discount that as possibility or do you eliminate it as possibility?

A    I think I indicated that it would be highly unlikely based on the physical evidence. They put the ruler next to the ligature –

Q    I understand.

A    -- and that was very helpful. I think Jonathan talked about the likelihood of ligature strangulation. I didn't think that it made sense because when you

calculate the circumference of the ligature, that puts you over 12 inches.  Where we're talking about a younger person's neck this is – and I took the smaller diameter which is 4 inches, I think, 4, 4½. I think it's in there. I calculated the circumference considering that it would be a circle based on the smaller diameter.

Q    Right.

A    That pushed it forward 12 inches because the diameter mathematically is time pi and pi is 3.14.

So, you were out here.  If you consider that the image of the ligature was more elliptical and includes the greater diameter of that ellipse, then you were even farther out there.

I think it's a simple knot, it's not a slipknot. Had it been a slipknot, it might have done some other thing. If the perpetrator created a slipknot there, then that would have been a totally different consideration and I would go with Jonathan Arden's comments. But here I don't see some of the evidence of that despite the fact that I respect him very much. We speak the same language, if you want, in general.

Q    I appreciate it.  The ligature rope around the circumference of the neck, at least was where it had

**Ptr. Exh. 6**

fragments of the plastic bag still frayed —

A    Yes.

Q    -- could the position of the rope and the bag under it influenced the pattern of animal predation and if so how?

A    With the frame of the bag itself, it allows the gradual preservation of moisture in the - it is kind of a little depth to it in between the skin of the frayed plastic bag that is covered by the rope.  That would enhance, in my opinion, the activity of either insects or small animals because it kind of get there, because the moisture is kept there.  And the more moisture, the more attraction to it. That's just something that I feel that would be more along the physical preservation of moisture and activity.

Q    I'm not sure I understand. Do you think that the animals, insects, et cetera would have easier access to the area just under the rope and bag or would you have more difficult access to the area because of the pressure being applied or either?

A    Oh, no. No. It's that little space, that corner that little angle that preserves the moisture but not, I don't think that the rope itself had any effect on the neck other than to keep the bag around for easier disposal without spilling of blood and further

54

contaminating the primary scene.

Q    Would a death either by ligature strangulation or direct pressure as you've just described, would we expect to see any petechiae as a result?

A    No, if there is preservation tissue, if there is gradual application of –

Q    Ligature?

A    -- or intermittent application or manual strangulation then you have pinpoint bleeds. Which are defects. Those are the results of change in intraluminal pressure and the gradient, the pressure gradients that are created by intermittence allows for stretching and collapsing and stretching and collapsing and it happens very fast.

Of course, as far as the defect is concerned and it is the smaller blood vessels, the venues that come to yield and creates these noticeable pinpoint bleeds. But if things are happening suddenly, for example, if someone applies a wire around the neck and does strangulation, you won't see pinpoint bleeds.  People that do direct hanging – if you don't see anything there, people are partially suspended and actually are kind of continuing the agony because of that intermittence, you will find pinpoint bleeds.

In the areas of weaker tissues in the

conjunctiva of the eyes and in the eyelids, it may be quite severe if there is more opportunity to that. You can see in the mouth areas or the upper parts of the face pinpoint bleeds, even in the forehead.

But pinpoint bleeds, petechiae, are phenomena associated with the degree of intermittence and pressure where there is opportunity to struggle to either by contracting the neck muscles or as releasing to some extent the pressure. Then the pressure is reapplied, then you will find those. That's the telltale signs of continuum pressure and the intermittence.

Q    And that is obviously more difficult to discern five months postmortem?

A    If there are decomposed eyes and a decomposed skin, the skin has partially undergone parchment-like change or falling apart and there are defects in the eye sockets and the soft tissues are gone, you can't appreciate that. There is limitation there, obviously.

Q    On the last paragraph of your report, you're speaking about the length of time that this struggle would have happened, you speak of a process lasting for a minimum of 30 seconds to any number of minutes, depending upon the actual ability of the victim to

struggle.

A    That's correct.

Q    At this point it's your understanding that the victim's hands were tied behind her back?

A    Yes.

Q    And that that would have eliminated, I assume her ability to struggle?

A    Well, if it obviously eliminates the ability to struggle, but it also depends on the degree of pressure and on the effectiveness of pressure during the process.

Again, I'm not a mind reader but why and how this all happened is not particularly logical, just like it's not logical why an assault happens in the first place. I cannot exclude the possibility that it went on for more than the basic period needed to create the airflow abolishment.

Q    And by basic period, you mean 30 seconds?

A    Yes, if the continued pressure on the neck to abolish the flow of air and then getting into the area at the time where without immediate resuscitation attempt, one cannot come back. That's that critical zone. Because if you put the pressure on somebody's neck, if you're not crushing the upper airway then they lose consciousness after half a minute or so.

If you release the pressure and if you start resuscitation effort, you may actually bring the person back. If you continue, the window of opportunity for revival is gone.

Q    How about the timeframe for the loss of consciousness itself?

A    I am talking about the loss of consciousness is based on lack of carotid oxygenation. It is longer with pressure on the airway that the interval is longer, it takes longer to render someone unconscious than when you're directly applying pressure on the carotid arteries which is more of an effective, manual strangulation interestingly.

Q    Excuse my lack of knowledge if you have, but the carotid arteries are here in front?

A    No. In the grooves on the side of the neck, both sides of the neck. So, that's the big difference, of course. You're abolishing the majority supply of blood through the carotid circulation because there is additional supply of blood through the vertebral arteries circulation which basically covers the lower part of the brain stem.

But one can see that with the elimination of flow on both sides, the carotid circulation is the guaranteed unconsciousness and the unconsciousness

goes beyond that critical hypoxic state without

active resuscitation, the person is gone.

Q    You want to move on to another topic or you folks

want to take a break?

MR. REISENAUER:  Yes, I need a

break.  We can do that.

MR. ABREU:  We can do that.

(Break at about 6:05 p.m.)

(On the record 6:15 p.m.)

BY MR. LUBY:

Q    Doctor, I apologize.  I said I'd move on to a

different subject. There are a few other things I

like to clarify about the cause and manner of death

of strangulation/pressure.

Do I understand correctly that one would expect,

discounting for a moment the effects of

decomposition, animal predation, and so forth, but do

I understand correctly that one would expect to see

petechiae with an instance of a prolonged application

of pressure to the neck as in manual strangulation as

opposed to something that is not as prolonged, that's

relatively short, say something you were describing

in an area of 30 seconds?

A    There is some misunderstanding, obviously. If one is

applying pressure to the neck intermittently in the

form of manual strangulation being the side to side of the neck, it's critical how one applies that and what kind of defense posturing the subject.  With the victim in the case would be reacting with because it's the intermittence and the pressure on the blood vessels that gives the opportunity for petechial hemorrhage.

The application of force to the front part of the neck generally does not result in any significant manifestation of anything including pinpoint bleeds because there is no direct pressure on the blood vessels.  Now, there may be transfer pressure through the, for example, extreme pressure on the chest may result in petechial hemorrhages.  But it is generally found in traumatic compression asphyxia rather than someone just pushing, putting pressure on the chest from above unless you have multiple individuals doing that or something like that.

So there are some differences there but direct pressure on the front part of the neck is unlikely to cause pinpoint bleeds or petechiae.

Q   Whether prolonged –

A   Whether prolonged or short. I mean the damage that is experiencing as a result of that is blockage of transfer of air through the airway. If it is

**Ptr. Exh. 6**

prolonged enough it will result in asphyxia. Now, if there is actual question of the part of the airway that may shorten the interval, of course.

Q    Based on the evidence you considered and the statements from Mr. Rodriguez, is there a scenario that you considered under which the victim could have had her neck turned and pressure applied to the side of the neck as opposed to in front of the neck to impinge the carotid artery?

A    Unilateral impingement would not result in effective strangulation. Strangulation means cut off of bilateral blood supply. You see if you keep the pressure on one side, there is anatomical structure at the base of the brain because it's all about the brain being deprived of oxygenated blood. The anatomical structures at the base of the brain is called the Circle of Willis.

Q    I'm sorry, Circle of -

A    Willis.  Willis was the anatomist that described it back a couple of centuries ago. If you have a major feeder, vascular feeder to the Circle, it easily redistributes rather than create the cutoff. If you have the both sides cut off, there is no opportunity for the Circle of Willis to play a major role in making that shutdown of blood flow.

61

Q    Could the cartilage structure of the neck be fatally
compressed by pressure applied to both sides as
opposed to the front?

A    Sure. It can be, manual strangulation can result in
fracture, side fractures of even the front part
thyroid cartilage or other smaller cartilages in
there equally and the hyoid bone.

It depends, how hard, where the positioning is
and, you know, but it – those are all theoretical
possibilities that are easily explorable in otherwise
fresh remains examined rather than you have a
situation where you don't have neck organs.

So, we are all talking about structures missing
and not really being able to pinpoint both to what
degree they might have been damaged or not.

Q    You still have your report in front of you, Doctor?

A    Yes, this is one.

Q    We'll review another topic.

A    Okay.

Q    Turn to page 7 please, and that is where you set out,
in the middle of the page, the referral question the
evidence and whether you can determine with a
reasonable degree of scientific certainty whether the
victim was sexually assaulted and/or whether Mr.
Rodriguez was the perpetrator of a sexual assault.

In this context, can you define for me the concept of reasonable degree of scientific or medical certainty?

A    Well, that's a great philosophical question and I do not pretend I have answers to all of the questions. I think it's the attempt to formulate some reference point of general acceptable of knowledge and logic in explaining something along the lines of forensic medicine, forensic pathology in this case. So, that would be reasonable medical certainty.

Q    A treating physician, for example, might say that there is a reasonable degree of medical certainty if something is established with enough confidence that they can act upon and treat accordingly.  For a non-treating physician, I don't know how that translates?

A    Well, it translates very easily. There is a division between the world of the living and the world of the dead. The threshold for reasonable medical certainty is much lower in the world of the living.

The threshold for the reasonable medical certainty in the world of the dead is higher because of the ability to take whatever is left of the body apart and to make certain defined for conclusions, of course, depending on how intact the remains are.

So, there is a little bit more to it than the

threshold is higher.  You have to meet it with some sort of physical evidence that everybody can accept as such. Going back to the question that you just read, we know all that the victim's body was found undressed and bound.

So, the assault existed and if there was no evidence of undressing, one could not infer that there is sexual assault.  Undressing clearly is indicative of sexual assault. Whether there is advanced physical contact or penetration there, that's a completely different ballgame. But I think logically, this constitutes a sexual assault because it's not implied in the bound remains that someone asked for or consent and that this was a consensual type of happening, as far as undressing is concerned. So, I think that that's the basic answer there regardless of the degree of physical invasion into the victim's body.

Discussion on the prostatic -- there was some issue of the acid phosphatase test results. I could tell you one thing, this finding is kind of enhancing the likelihood, but it's a presumptive test for evidence of sexual intercourse and it's not the definitive thing.

So I can't go beyond the presumptiveness there.

The fact that the latter part of the question is what latches Mr. Rodriguez to the victim is quite well supported. Her blood was found in the vehicle of Mr. Rodriguez' and there was some transfer of Mr. Rodriguez' DNA on the body of the victim or the items that were there.

There was also some -- there was evidence of, circumstantial evidence of a sheath of the knife that was found behind the victim's car. There are many matching points that leaves no doubt that Mr. Rodriguez was in direct physical contact with the victim, in my mind. Give me any evidence that is different, and I haven't encountered it anywhere. So my answer is yes, Mr. Rodriguez had direct physical contact with the victim.

Q    And as direct physical contact, how are you defining the term sexual assault or do you define it in some other way?

A    By both. Part of it was the sexual assault and the rest of it was the actual physical contact with subduing and forcing victim into the vehicle and then rendering the victim dead.

Q    Just so that we clear I believe it says in the report the sexual assault as you've defined here does not require sexual penetration?

**Ptr. Exh. 6**

A    That's correct.

Q    And it doesn't require deposition of semen?

A    That's correct.

Q    So, what you concluded to a reasonable degree of medical certainty that there is a sexual assault and that you've not concluded that there's been a deposition of semen?

A    That's correct because there is no evidence to that other than in some generally accepted presumptive likelihood through testing of or through relatively significant levels of prostatic acid phosphatase obtained from sampling of the cervix area.

Q    And by significant, how can you tell me what you mean by significant levels or why you consider them significant?

A    Well, one has to consider it significant but not conclusive. That's the whole difference here because testing to this enzyme is a presumptive test.  I mean it has presumptive value that further requires identification of definable DNA material from a person in order to make some definitive conclusion.

Q    And I believe you said that it's your understanding that the material that was recovered from Ms. Sjodin was not currently available for DNA testing which would have been useful?

**Ptr. Exh. 6**

A    Absolutely. And that was the discussion went on during the peer review because obviously there was valid comment by Dr. Weedn saying that, we need, we need more material to confirm.  If there is available material, fine, but we're stuck with no evidence or there were samples that could be pursued. That became a moot point in discussion.

Q    Doctor, were you aware that the Minnesota authorities have tested the samples for male DNA and found none?

A    I think so, yes.

Q    And if there was the finding of absence of male DNA in the cervical sample and the vaginal sample, why is it that further DNA testing something that was needed?

A    I didn't believe it was needed but the discussion went along those lines that one of the reviewers continued on insisting on trying to get the sample for further testing. If it was found not to be there, DNA was not available, that means that the seminal fluid if it was there it either underwent significant decay and as a result -- or it never been. Then there are other theoretical possibilities of the acid phosphatase can be construed to come from a different source in the first place.

Q    Those sources could be the decay of tissues –

**Ptr. Exh. 6**

A    Tissues or even and theoretical consideration one may not have -- there is no associated DNA material in the form of identifiable seminal fluid. I can't say anything. But if there is something there that is detectable may - may not be from the perpetrator of the assault in the first place.

So it has to be very, very specifically identified type to a perpetrator under the circumstances. None of this was available. We have no information. Negative information was available only period. That's it.

Q    And based on negative information that is in the absence of sperm cells that were detected and the absence of DNA coupled with the presence of acid phosphatase, you can't say anything?

A    I can't say anything conclusive. I think it brings about the higher suspicion that there might have been something, only might because there is no physical evidence to definitively support that claim.

So, regardless of what you take as acceptable result in a given lab, this is, the bottom line is this is presumptive methodology and it is not a conclusive methodology without confirmation by DNA. But it still does not eliminate the fact that there was sexual assault.

Q   Sexual assault, relatively speaking as you defined it as opposed to necessarily a deposit of semen?

A   Yes. That's because it is not necessary a component to whole process of assault.

Q   To what degree is positive acid phosphatase is still presumptive for semen in a dead body that wasn't recovered for five months with the weather patterns that were described earlier?

A   The results of that like most of the people pointed out has to be taken with some salt, some grain of salt there.  Simply because of the fact of decomposition, changing things and even though one may be an important value closer to quote unquote conclusiveness of the past 60 or 70 years that prostatic acid phosphatase has been used for the purpose of demonstrating evidence of rape.  Of course, that has been the past buildup of things and the evidence that is evidence for itself in an attempt to try to define what is certain and what is suggestive. You know, the prostatic acid phosphatase identification is in the realm of what is suggestive, not conclusive.

Q   In your practice do you still use prostatic acid phosphatase to determine suggestive semen?

A   We refer all our standard sampling to the crime lab.

We do not have a crime lab here. I generally have reservation with reporting this beyond the presumptive value.

Q     But do you even use it for presumptive value; is it something you ask the crime lab to measure?

A     Whatever they do, whatever they have available for their target is identifying in general, identifying DNA material. I would not take it as a reference point and evidence in any given case without the supported finding of DNA component mentioned.

Q     And is that true as regardless of the level of the acid phosphatase, 400, 800 or 1,000?

A     In extreme this is still kind of increased likelihood but not -- nothing that they can come up and stand without the definitive confirmation because it's not providing the identifier.

It is, once again, just a biochemical test that doesn't go beyond that point into specificity of relating it to a suspect in a given case, just enhancing the idea that there is - or there has been sexual intercourse.  It doesn't have to be violent in the first place and it all depends when this happening occurs. I mean, because the validity is, you know, four days plus, who knows 12 to 15 days or whatnot because a breakdown because it's an enzyme

and an enzyme goes down. Now, what helps is possibly protected area and/or other issues there and the decomposition, anything is possible because anthropologically, the uterus in particular the cervix area are related to the prostate in males.

So, there is always the potential of enzymes breaking down that are endogenous enzymes and are from various tissues that are similar in endogenous origin. I don't know much about that beyond that. Again, I don't think there is convincing definitive value of, diagnostic value of acid phosphatase in defining something as a metaphor or anything along those lines unless they are 100% to be sure.

Q    Under certain circumstances to be – you spoke of the possibility of acid phosphatase becoming endogenously decay or otherwise?

A    Right.

Q    What is your view of the ability to test a sample and discern whether the acid phosphatase is prostatic in origin as opposed to from some other process?

A    Generally, there are features that are set aside prostatic origin but these are not exclusive theories acid phosphatase is generated by other tissues in the human body.  It depends on the labs and the reporting for the way that their methodology – but I don't do

routinely.

First of all, in my practice I haven't done in who knows how many years, probably about 35 years when I rotated through clinical path. But then as far as my assessment goes I would be very reserved to hanging my hat on value of prostatic acid phosphatase in any case without verification and confirmation with a positive DNA match.

Acid phosphatase being an enzyme and subject to decay, biological decay of DNA from the possible semen deposit subject to biological decay, is one in your opinion, more likely to decay than the other?

A   Well, it depends on the circumstances but I think that even though the acid phosphatase is a hydrolase enzyme, it may actually have longer tendency to be preserved, just on biochemical grounds and the breakdown of nuclear elements or cellular elements because of the – or the decomposition in particular contents of seminal fluid including sperm. So, I've never run those comparisons in the first place.

Q   I suspect nobody has or could?

A   Well, you have to design the proper experiment to carry that through.  But I'm not aware that there is anything that's particularly defining any specific differences. I would think that biochemical

preservation of the enzyme would probably be greater than cellular elements contained in DNA. But again, this is not my bailiwick. I don't test for that. I read someone else's reports because that's the domain of the crime lab and DNA labs, different sources. They all do it.

I do things basically with knives and documentation so there is limitation.

Q   Is the same true of enzyme p30 that you just told us is perhaps the case about acid phosphatase that could possible persist longer than DNA?

A   It's possible. I'd have to look that up because I can't keep everything in my head. I don't know for sure that it's, there is actual specific defined evidence that that's the case. But I would think that the biochemical changes would kind of last longer in the more preserved areas, with less exposure to air or whatnot.

Q   Just as with DNA, p30 can be also be a method to corroborate or to debunk a presumption of positive acid phosphatase reading?

A   I am not sure that it can enhance the value or undermine the value one way or another. I am on soft grounds here.

Q   That's not your area of expertise?

A    That's right.

Q    Are you aware of literature in the field and one way
     to corroborate, obviously there are different ways to
     corroborate, a presumption of when you have a
     positive AP test?  We have discussed DNA and we've
     discussed evidence of sperm cells and that would be
     the enzyme p30?

A    Yes. Those are biochemical methods of how far we've
     come along in a decomposed body applying all those
     modalities.  You can't say without looking at
     specific results or the specific comments, otherwise
     that is doing that. Generally, come up with the
     identification, visual verification of spermatozoa in
     the sample under the microscope and specific
     identification of a particular source of DNA
     material, is the ultimate.

Q    Of course, and you haven't been made aware that the
     Minnesota authorities also tested for p30 in the
     samples and came out with a negative finding?

A    I don't remember, but I – had it been anything of
     significance I would have paid attention to it.

Q    Sure.

A    But I know that the DNA was not established and the
     testing was negative.

Q    I just asked because you mentioned. You want to see

the results of the labs, I would be happy to show them to you, forgive my lack of organization. You already have this.

Thank you.  If I could have this marked as Exhibit 1.

COURT RECORDER:  Sure.

(Deposition Exhibit 1 mark for identification)

Q    I assume, Doctor, you don't have specific memory. Why don't you take a few minutes to review it?

COURT RECORDER:  We can go off the record.

MR. LUBY:  All right.

(Off the record 6:56 PM)

(On the record 6:58 PM)

COURT RECORDER:  We're back on.

A    I don't remember seeing these. Maybe I looked at them, but that's all.

Q    As you reviewed the list of documents that you said in your report that you considered, would you confirm for me that this isn't among them?

A    That's correct.

Q    If I could direct your attention, Doctor, to the second page, second to last page of this document?

A    The one that you gave me?

**Ptr. Exh. 6**

Q     Yes. And the second to the last paragraph do you see where it says that the vaginal swap item 86A, the anal swab 86B, and cervical swap 86C, that detect the presence for semen on examination?

A     Yes.

Q     And I'd refer your attention to the very last page, second to the last page of this document and that's the one, page number 18418.  Is that the one --

A     18418.

Q     The upper right-hand side, second to the last page.

                    MR. REISENAUER:  This page.

A     Okay.  I was looking for the page.  I had the wrong the corner. Okay, yes.

Q     Does this appear to be an examiner's bench notes?

A     As negative except for positive control?

Q     Right.

A     Yes.

Q     Showing a negative p30 reading for the vaginal sample and the cervical sample as well as the anal sample, right?  What does that tell us about the presence or absence of semen in the samples that were taken from Ms. Sjodin's body?

A     Well, this negative result points to unlikely presence of semen or seminal fluids in the areas that were tested, that was sent.

Q    A likely presence of semen?

A    Unlikely

Q    And Doctor, would you have made that same conclusion in considering this information in 2006 specifically the absence of DNA and the absence of detected sperm cells and the negative p30 reading?

MR. REISENAUER: I object to the form of the question. Frankly, I don't understand the question itself.  So, if you would rephrase it.

Q    What, I understand your testimony to be and correct me if I'm wrong, is that the test results as far as you can discern show that it is unlikely that the samples that were taken from Ms. Sjodin's body contained semen.  And the question is whether you would have made that same conclusion in 2006 with the benefit of the information described specifically, the DNA finding, the negative sperm finding and the negative p30 finding?

A    The results are the same today in 2017 as they were in 2006. So, nothing has changed. So, based on those tests, one can conclude there was no, enough evidence to consider the possibility of seminal fluid being in there.

Whether it might have been or not, I cannot tell. But I cannot on the basis of these results, you

cannot make any conclusion about the presence or positivity or presence of seminal fluid at any point in time, at least in my view.

People have the right to suspect or to believe that there were some indicators and or different strengths or suggestive results just based on acid phosphatase. I don't think that there is any confirming of those and there is basically no evidence of that.

MR. LUBY:  And those are probably all my questions.  I just need a few minutes to consult with my colleagues and see if we have anything else.

THE WITNESS:  Okay.

(Off the record 7:00 PM)

(On the record 7:10 PM)

MR. LUBY: Doctor, thank you for your time.  I have nothing else.

THE WITNESS: You're welcome, sir.

MR. REISENAUER:  I have a couple of follow-up. If you could hang in there for a second, Doc, and I won't take very long.

THE WITNESS: I don't see about 50 pages.

MR. REISENAUER:  I won't be too

long here.

CROSS-EXAMINATION

BY MR. REISENAUER:

Q   Doctor, I just want to follow up on a couple of things. We talked about a number of possibilities that may have caused Ms. Sjodin's death here today. You had a very lengthy discussion in regard to strangulation in a number of different ways that you described and actually showed us a number of those.

In making your determination that that was probably the – would that be the right term to use that you believe that that might be the most likely cause of death in this case or that's one of the likely causes together with the other ones that Drs. McGee, Arden and Flomenbaum and Ferenc provided, the neck or ligature strangulation of the neck, asphyxiation, possibility with the bag over the head, the neck slash and of the exposure to the elements?

A   Well, although all of these enumerated possible mechanisms are reasonable as a consideration. My logic is that this situation resulted from direct pressure on the neck and it occurred at the time while the victim was in the vehicle.

Q   Okay.

A   And again, I'm gladly putting this out if there is a

more logical explanation supported by any evidence that, that is here in these materials, I would take it. But I cannot find it in my – in the extent of my assessment of the case.

Q    So, would it be correct that you basically come to the conclusion that based upon all of the information and evidence that you reviewed, that you were provided that in your opinion if you were to rate these things as to possibilities, the force to the neck that you described earlier, whichever way it was accomplished is the highest on your list of possibilities?

A    Yes, that is pretty accurate and I do believe that it happened among that mechanism rather than the other mechanisms considered, but not supported by physical evidence here.

Q    Okay. And part of your conclusion or opinion that you came to was also based upon the information that Mr. Rodriguez provided in his statement that was given to you, correct?  There were more than one statement?

A    Yes.  There were several interviews by various specialists, different kind, I believe psychologist, and psychiatrist that provided the information from those interviews it –

Q    That's fine. You have no way of actually knowing

80

those statements made by Mr. Rodriguez are truthful and I think that you indicated that earlier, correct?

A  That's correct. They are taken at the face value of just because there is some logical match with the overall circumstances.  I'm more of in favor of these because they are basic logical accounts rather than some phantasmagoric concept that it is being reported there without matching the actual evidence.

Q  Okay. And can you give reason, you were asked about this earlier there's one time when Mr. Rodriguez indicates and that you have it in your report, that there was this whoosh sound. Do you recall that?

A  Yes, right.

Q  Counsel asked you about this other statement where he says that he was holding her by the neck and he says in our twisting and he's squeezing her and I heard a crack and she stopped moving. Then I think there was some questioning about whether or not that crack may have been her neck breaking; is that correct?

Would that have been a possibility from that statement that if you didn't know any of the other facts in terms of the autopsy and the x-rays, would that would have been a possibility that maybe her neck had been broken as a result?

A  Well, I cannot state beyond any doubt, but it's my

understanding that the neck was examined at the time of autopsy and there was no evidence of displaced cervical vertebrae.

So, if there are no displaced cervical vertebrae and I earlier described that was a younger individual with unlikely opportunity for simple motion or pressure on the neck to create the fracturing of the cervical vertebrae, meaning the bony structure of the neck.

I think we are mixing these considerations with breaking of cartilaginous or soft tissues in general component that are in the front part of the neck which are likely and would have happened if it was direct pressure.

Q    And that would have made some type of noise, that could have been apparently, if that would have happened?

A    Yes. In direct contact one would have been able to perceive that as a sound of a specific noise, a specific thing that they would recall and report.

Q    Okay. The petechiae, I don't think we need to – hang on a second. That's all I have. Thanks.

THE WITNESS: Thanks.

MR. LUBY:  For your consideration, a few questions.

                    REDIRECT EXAMINATION

BY MR. LUBY:

Q    Doctor, based on the evidence that you observed and
     described as to cause of death, is a sharp force
     injury a reasonable conclusion as opposed to a more
     blunt force injury?

A    I think it's not as reasonable, but it is still a
     consideration, not in my mind, but an optional
     consideration in evaluation of decompose body given
     the circumstances.

          So, it should not be taken as something that
     that is, that it has a preponderance based on
     evidence, but rather an impression and – I do not
     take it as a reasonable, plausible mechanism.

Q    So, would it be fair to say that less likely?

A    It is less likely.

Q    -- a fracture. And less likely than that is death by
     a slashing wound and that you were describing as a
     phantasmagoric concept?

A    Well, anything that cannot be really substantiated by
     either the facts and evidence or logical accounts
     that is matching those facts in evidence to a degree,
     that is reasonable.

Q    We talked some about Mr. Rodriguez' statements to the
     other specialists on the Forensic Panel. If you were

to exclude consideration of those statements and have you not had the benefit of considering them, would it be your belief that the most likely cause of death is asphyxia?

A    Yes. Under the circumstances it is not necessarily in the pattern and direct mechanism as accounted, but asphyxia is always a consideration in a case like this with lack of demonstrable other skeletal damage and physical damage. I'm talking about fracturing of the skull about, damage within the head or the actual fracturing of the bony skeleton or the reasonable demonstrative evidence of open wounds on the body. The reasonable demonstrable evidence, not the artifacts.

MR. LUBY:  I don't have any further questions. Thank you, Doctor.

THE WITNESS: You're welcome.

MR. REISENAUER: Nothing further. Thank you.

THE WITNESS: Thank you.

Great meeting you all. Keep up the good work.

(Deposition concluded 7:20 PM)

Ptr. Exh. 6

STATE OF MICHIGAN    )
                     )
COUNTY OF OAKLAND    )


                    I certify that this transcript

recorded and transcribed by Karen Barner consisting

of eighty-five (85) pages, is a complete, true, and

correct transcript of the deposition of Dr. Dragovic

taken in this case on January 24, 2017.

                     I also certify that prior to taking

 this deposition, Dr. Dragovic was duly sworn to tell

 the truth.

                     I also certify that I am not a

relative of, employee of, or an attorney for a party;

nor am I financially interested in the action.


_____
 Karen Barner, CER 3204
 Certified Electronic Reporter
 3133 Union Lake Road
 Commerce Twp., Michigan 48324
 (248)360-2145

 February 3, 2017