**Garry F. Peterson, M.D., J.D.**
**2940 West River Parkway South**
**Minneapolis, MN 55406**
**612-721-4333**

February 2, 2017

Victor J. Abreu and Joseph Luby
Assistant Federal Defenders
Federal Community Defender
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
601 Walnut St., Suite 545 West
Philadelphia, PA 19106

RE: *United States v. Alfonso Rodriguez*

Dear Messrs. Abreu and Luby:

I am writing to provide you with a follow-up to the letter I sent Professor Joseph
Margulies on October 9, 2011, regarding Mr. Rodriguez's case.

In addition to the materials I previously reviewed, I have had an opportunity to
review the additional materials your office has provided, including: the November
13, 2013 report by Dr. Ljubisa Dragovic and the Forensic Panel; December 3, 2016
addendum by Dr. Mark Flomenbaum; partial interview of Alfonso Rodriguez by
Dr. Michael Welner; August 28 and August 29, 2006 testimony by Dr. George
Sensabaugh; and the May 28, 2004 report, bench notes, and p30 testing results by
Mr. Steven G. Fischer of the Minnesota Bureau of Criminal Apprehension (BCA).

Based on my review of these additional materials, I continue to agree with Drs.
Arden, Flomenbaum, and Ferenc, and the Government's expert Dr. Dragovic, that
the defects to Dru Sjodin's neck and flank were the result of postmortem
decomposition and animal, insect and microbial feeding. Given the extensive
postmortem depredation and tissue loss, I do not believe there is sufficient
evidence upon which a forensic pathologist could conclude that Ms. Sjodin
suffered pre or postmortem sharp force injuries to her neck, flank or other region of
her body. I see insufficient evidence to confirm Dr. Michael McGee's trial
testimony that the defects to Ms. Sjodin's neck or flank were caused by a sharp
force.

1

The manner of Ms. Sjodin's death was homicide. I previously stated that I agreed with Drs. Arden, Flomenbaum and Ferenc that the most likely cause of death was asphyxiation by ligature. Asphyxiation by ligature remains a possible cause of death. Given the lack of neck tissue for evaluation, I also cannot rule out the possibility of Dr. Dragovic's conclusion that the cause of death was "asphyxia brought about by direct pressure on the front part of the neck/voice box area."

At trial, Dr. McGee also testified that he obtained vaginal, cervical and anal swabs during his autopsy of Ms. Sjodin. According to his testimony, although the tested swabs contained no sperm cells or male DNA, he concluded that elevated acid phosphatase (AP) levels on vaginal and cervical swabs confirmed the presence of semen. Dr. McGee also testified that no p30 testing had been performed on any of the swabs. However, I have now reviewed Minnesota BCA forensic analyst Steven Fischer's May 28, 2004 report and test results which show that p30 testing was conducted on April 23, 2004, and that the vaginal, cervical and anal swabs all tested negative for the presence of p30.

Attorney Robert Hoy first contacted me about Mr. Rodriguez's case in 2004, not 2005 as I had previously indicated. Mr. Hoy provided me several documents and informed me that the "sexual assault examination was negative for sperm but acid phosphatase was found in varying levels at the three locations." Mr. Hoy did not provide me with Minnesota BCA lab report No. 10 by Mr. Fischer or the results of the BCA p30 testing. Had I been provided with the p30 results and all of the relevant documents I have now reviewed, I would have told Mr. Hoy that in light of the negative DNA results, including the negative Y chromosomal DNA, the negative sperm search, and the negative p30 results, there was an insufficient scientific basis upon which a forensic pathologist, relying on AP levels alone, could conclude that semen was definitively present on any of the tested swabs.

Had I been provided Mr. Fischer's p30 results during my consultation with Mr. Hoy, I would have also urged him to provide those results, and all available testing data, to Dr. George Sensabaugh, with whose work I was familiar, or another qualified forensic scientist. As a highly regarded forensic scientist and known p30 expert, Dr. Sensabaugh would have been able to provide additional insight regarding the negative p30 results and their significance as they related to the allegations that semen was detected on the tested swabs.

2

I also received a portion of my anatomic and clinical pathology specialty training at St. Paul-Ramsey Hospital (as Regions Hospital was formerly known) and am familiar with AP testing as it was performed at Regions Hospital in St. Paul, Minnesota. Regions Hospital used elevated AP levels as presumptive evidence of the presence of semen for the purpose of evaluating and providing treatment and medical advice to living victims of sexual assault. I do not believe that Regions Hospital's protocols would have permitted the conclusion that semen was definitely present on the basis of the elevated AP levels obtained in this case, on swabs from a non-living source, and even more so in light of the negative sperm searches, negative DNA and Y chromosomal DNA results, and negative p30 results.

Had I been called as an expert witness in 2006, I would have testified consistently with the information set forth above and in my letter to Professor Margulies dated October 9, 2011.

Executed on February 2, 2017

Garry F. Peterson, M.D.

3