**THE FORENSIC PANEL**

224 W. 30ᵀᴴ ST., SUITE 806  NEW YORK, NY 10001  TEL: 212.535.9286  FAX: 212.535.3259  MICHAEL WELNER, M.D., CHAIRMAN

AUSA Keith Reisenauer
United States Attorney's Office, District of North Dakota
655 First Avenue North
Fargo, North Dakota 58102

Re: **United States v Alfonso Rodriguez, Jr.**

September 18, 2013

Dear Mr. Reisenauer:

Pursuant to your request, I have conducted a peer-reviewed forensic pathology evaluation of the death and alleged sexual assault of Dru Katerina Sjodin with respect to the above-referenced case.  Ms. Sjodin was a 22-year old University of North Dakota college student when she disappeared from a Grand Forks, ND parking lot on November 22, 2003.  Her body was discovered on April 17, 2004 in a ravine close to Crookston, Minnesota.

Police investigators canvassed high risk sex offenders in the area, and interviewed Alfonso Rodriguez, Jr., a 50-year old Crookston resident.  Mr. Rodriguez had previously been identified as a suspect due to his status as a Level III sex offender, recently released from a 23-year prison term. DNA from Mr. Rodriguez' vehicle matched to Ms. Sjodin, and he was arrested and charged with her disappearance and then, her murder.

Ramsey County Medical Examiner Michael McGee, M.D., performed the autopsy.  At trial, Dr. McGee testified that he believed the likely cause of death to be a slash wound to her neck, adding that asphyxia from the plastic bag being placed over her head and exposure to the elements were alternate possibilities.  He further testified that results from enzyme prostatic acid phosphatase testing suggested that the victim had been subjected to sexual assault prior to her death.

Alfonso Rodriguez was convicted of the murder of Dru Sjodin in September 2006 and subsequently sentenced to death.  His defense team has recently filed a *Motion for Collateral Relief, to Vacate, Set Aside, or Correct Sentence, and for a New Trial* on October 16, 2011.  The defense motion raises a number of issues regarding the findings and testimony of Dr. McGee, asserting that the victim was not raped and did not die of a slash wound to the neck.  This motion was supplemented by declarations from forensic pathologists Jonathon Arden, M.D., Mark Flomenbaum, M.D., Ph.D., and Michael Ferenc, M.D., J.D.  Garry Peterson, M.D., J.D., the expert retained by Mr. Rodriguez' 2006 defense counsel, submitted an additional declaration expressing agreement with the findings of Drs. Arden, Flomenbaum and Ferenc.

BEHAVIORAL SCIENCES   •   FORENSIC SCIENCES   •   PEER REVIEWED ®
WWW.FORENSICPANEL.COM    EMAIL: INFO@FORENSICPANEL.COM

US EXHIBIT-33-01

Re: **Alfonso Rodriguez, Jr.**
*The Forensic Panel – Ljubisa Dragovic, M.D.*
September 18, 2013

Page 2 of 10

This matter was referred to The Forensic Panel to address the following questions:

*1)   What is the evidence, including acid phosphatase test results and material evidence recovered from the victim and crime scene, to determine with a reasonable degree of scientific certainty whether the victim was sexually assaulted? If so, can it be determined with a reasonable degree of scientific certainty whether Alfonso Rodriguez was the perpetrator of sexual assault?*

*2)   Can method of injury be determined with respect to the wound on the victim's neck? If so, what caused this neck wound? Can method of injury be determined with respect to the wound on the victim's flank? If so, what caused this flank wound?*

*3)   What, in your opinion, caused Ms. Sjodin's death?*

*4)   Based on the likely cause(s) of death, what evidence is available about the experience of her final moments?*


## SOURCES OF INFORMATION

1.   Investigation records (partial)
2.   Motion to Vacate, October 16, 2011
3.   Michael McGee, M.D. autopsy report, April 18, 2004 and supporting documents
4.   Deposition of Michael McGee, M.D., May 31, 2006
5.   Autopsy photographs
6.   Crime scene photographs
7.   Evidence photographs
8.   Trial exhibits
9.   Transcript, Michael McGee, M.D., Daubert hearing & trial testimony, August 28, 2006 & September 5, 2006
10.   Declaration of Michael Ferenc, M.D., September 15, 2011
11.   Declaration of Gary Peterson, M.D., J.D., October 9, 2011
12.   Declaration of Jonathan Arden, M.D., October, 17, 2011
13.   Declaration of Mark Flomenbaum, M.D., Ph.D., September 14, 2011
14.   Declaration of James Dugan, M.D., October 17, 2011
15.   Declaration of Pablo Stewart, M.D., October 17, 2011
16.   Declaration of J. Arturo Silva, M.D., October 14, 2011
17.   Declaration of James Dugan, M.D., October 12, 2011
18.   Excerpt from interview of Alfonso Rodriguez Jr. by Michael Welner, M.D., June 28, 2013

US EXHIBIT-33-02

Re: Alfonso Rodriguez, Jr.
*The Forensic Panel – Ljubisa Dragovic, M.D.*
September 18, 2013

Page 3 of 10

19. Excerpt from interview of Alfonso Rodriguez Jr. by James Seward, Ph.D., July 11, 2013
20. "Interpretation of Postmortem Vaginal Acid Phosphatase Determinations", by Chiasson DA, Vigorito R, Lee YS, Smialek JE. *The American Journal of Forensic Medicine and Pathology.*
21. "Persistence of Spermatozoa and Prostatic Acid Phosphatase in Specimens from Deceased Individuals during Varied Postmortem Intervals", by Collins K & Bennett AT. *The American Journal of Forensic Medicine and Pathology.*

## DEATH INVESTIGATION

Dru Kathrina Sjodin, a 22-year-old white female of Grand Forks, N.D., was reported missing to the police by a friend after failing to report to work on November 22, 2003. The police discovered Ms. Sjodin's car in the Grand Forks mall parking lot. An empty knife sheath was found next to her vehicle. Her mobile phone signal was detected near Crookston, MN.

Shortly after her disappearance, investigators interviewed area suspects with history of sexual offenses and abduction. Their focus included a Crookston, M.N., resident, Alfonso Rodriguez, Jr., a Level III sex offender who had served prison sentences for violent sexual assaults. Mr. Rodriguez had been recently released following a 23-year term.

Traces of spattered blood were discovered on the back seat upholstery of Mr. Rodriguez' vehicle. DNA of this blood spatter matched a sample from Ms. Sjodin's toothbrush.

A knife was found in the trunk of Mr. Rodriguez' car matching the knife sheath found next to Ms. Sjodin's car at the mall parking structure. There was no blood found on the knife or the knife sheath. An aroma of cleanser was noted on the knife and in the trunk where it was found.

The victim's partly decomposed, partly undressed (from waist down, with only her left sock on) body and her mobile phone were found on April 17, 2004. Hair and fiber samples from Ms. Sjodin's body matched Mr. Rodriguez.

The victim's body was clad in a pea coat, a pink-color sweater, a pink-color top and a bra only, with her hands tied behind her back and remnants of a rope and a K-Mart-type plastic bag around her neck. Her body was naked below the waist and her hands were tied behind her back. Rope and remnants of a plastic bag encircled her neck. Her pea coat was pulled down off her shoulders, further restraining her arms.

US EXHIBIT-33-03

Re: **Alfonso Rodriguez, Jr.**
*The Forensic Panel – Ljubisa Dragovic, M.D.*
September 18, 2013

Page 4 of 10

One of her shoes was found below a bridge a short distance away. Pants found at another site in the area had fiber evidence that matched to Ms. Sjodin. Her panties were not recovered.

The postmortem examination of the remains of Dru Sjodin was performed by Dr. McGee on April 18, 2004. The positive autopsy findings/final anatomic diagnoses included the following:

1.  Homicidal violence
    a.  Bound upper extremities over dorsal aspect of body
    b.  Nude from waist down
    c.  Ligature present about neck region
    d.  "Remnants of slash wound-neck region"
    e.  "Defect to right flank region"
2.  Postmortem decomposition
    a.  Postmortem anthropophagy

The positive laboratory results included "sexual assault examination" with:

1.  Vaginal sperm-negative, Acid Phosphatase-47.4 U/L
2.  Rectal sperm-negative, Acid Phosphatase-7.5 U/L
3.  Cervical sperm-negative, Acid Phosphatase-130.7 U/L

**TRIAL OPINIONS ON CAUSE OF DEATH**

Consistent with his published autopsy findings listed above, Dr. McGee provided testimony about the cause(s) of death and the manner of death at trial on August 28, 2006. He identified a large wound to the victim's neck, opining that it was "caused by a sharp-edged instrument." With respect to an injury to the right flank area of the body, he stated that he "was concerned that it was caused by a knife."

Dr. McGee further testified about ligature found around the victim's neck that secured a plastic bag over her head, stating

> …It appeared to me to be the same type of cord that was around her wrists and goes around the neck twice. It is open. You'll note the edges are open. It is not tied and lies on top of this brown and red plastic-like material that's – that is present underneath the ligature and applied to the surface of her neck region.

He determined two additional possibilities for Ms. Sjodin's cause of death; ligature strangulation and/or smothering by the plastic bag, and environmental exposure. He

Case 2:04-cr-00055-RRE   Document 1032-14   Filed 03/08/17   Page 5 of 11
Case 2:04-cr-00055-RRE   Document 933-5   Filed 11/13/13   Page 5 of 11

Ptr. Exh. 14 - Page 5

Re: **Alfonso Rodriguez, Jr.**
*The Forensic Panel – Ljubisa Dragovic, M.D.*
September 18, 2013

Page 5 of 10

noted, "given its location and the plastic that's present on her eyes at the time of the autopsy, I believe her head was in a bag that was secured by the ligature so an asphyxial death is also possible." Additionally, he stated that "strangulation is certainly possible. The cord that was around her neck could have been used to strangle her."

## TRIAL OPINIONS ON SEXUAL ASSAULT

To provide evidence for sexual assault, the government coupled the physical condition of Ms. Sjodin's dumped body (hands bound behind her back and the victim found nude from waist down), with the positive (quantifiable) results of Acid Phosphatase in the samples obtained from the victim's vagina, rectum and uterine cervix.

Dr. McGee testified that the finding of (prostatic) Acid Phosphatase was evidence of the presence of seminal fluid, to further support an impression of sexual assault. He elaborated,

> The analysis that is done is in excess – for two of the sites is in excess of what we consider our normal cutoff. That is, the laboratory has established and our office uses numbers in excess of 25 units per liter as positive. Therefore, using that and that's the criteria we've used in the past. Using that criteria the vaginal level of 47.4 and the cervical level of 130.7 are considered positive for seminal through the deposition and that information was supplied to the police.

Additionally, Dr. McGee testified that he was not basing his opinion on the test results alone:

> Q. ...So just so we're clear we're talking about with respect to this test anyway the deposit of semen in the body. But when you're making an assessment about sexual assault, is this the only factor you look at or what other things do you look at?
> A. The lab test is just what it purports to be. It's a lab test and it's one thing that you use in making the diagnosis but it is not the only thing in making your diagnosis regarding a death that occurred during the commission of a sexual assault.
> Q. How about in this case? What factors would you look at in this case to make your assessment when you were dealing with the police?
> A. Same factors that we use on other cases in our office where deaths have occurred or may have occurred during commission of a sexual assault. What are the circumstances surrounding the death; that is, how did the person come to die? What is the evidence of the scene investigation? Where the person was found dead? Is there evidence of an assault or not?

US EXHIBIT-33-05

Case 2:04-cr-00055-RRE    Document 933-5    Filed 11/13/13    Page 6 of 11

Re: **Alfonso Rodriguez, Jr.**
*The Forensic Panel – Ljubisa Dragovic, M.D.*
September 18, 2013

Page 6 of 10

> What is the evidence of the external examination? Is there any evidence of
> assault? How does a person present to you? Are they clothed or not
> clothed? What are the results of the autopsy and what are the results of
> the lab results? The lab results are important but you've got to consider it
> in continuity with everything else that is presented to you trying to make
> an estimate of what is going on in the case.

During the Evidentiary Hearing, the defense introduced a rebuttal by Dr. George
Sensabaugh, who pointed out the interpretative limits of (prostatic) Acid Phosphatase
and dismissed its reliability. Dr. Sensabaugh testified on August 28, 2006 that, "given...
that we know in postmortem samples that there are potential alternative sources of acid
phosphatase activity, I would say that – I would not consider it a reliable test absent
independent corroboration using other tests."

## OPINIONS ACCOMPANYING MOTION TO VACATE

Drs. Arden, Ferenc, Flomenbaum and Peterson focused on two criticisms of the
prosecution's expert testimony. The consultants asserted that Dr. McGee mistook
extensive post-mortem artifacts (decomposition combined with animal gnawing activity)
in the neck and right flank area for sharp force injuries, and contested Dr. McGee's
opinion of sharp force injuries as the most plausible cause of death of Dru Sjodin.

Furthermore, Drs. Arden, Ferenc, Flomenbaum and Peterson rejected the diagnostic
significance of the detected/quantified values of (prostatic) Acid Phosphatase values in
the samples obtained from the victim's vagina, rectum and uterine cervix.

All four experts (Dr. Arden, Dr. Ferenc, Dr. Flomenbaum and Dr. Peterson) concurred
that the manner of Dru Sjodin's death was homicide and that asphyxiation by the neck
ligature was the most likely cause of death:

In his September 15, 2011 declaration, Dr. Arden asserts that the ligature around the
victim's neck could have caused death by strangulation and additionally explains the
damage of the neck:

> Based on the included ruler scales in the photographs of the ligature after
> removal, I measured its circumference to be approximately 9-10 inches,
> which is clearly smaller than the circumference of an adult neck. A ligature
> of this size about the neck would cause significant compression, which
> could easily cause fatal strangulation.

Re: **Alfonso Rodriguez, Jr.**
*The Forensic Panel – Ljubisa Dragovic, M.D.*
September 18, 2013

Page 7 of 10

In his September 14, 2011 declaration, Dr. Flomenbaum reaches several conclusions regarding cause of death, including that "the cause of death was 'ligature strangulation'," and "there was no 'slashing' wound to the neck."

Dr. Ferenc additionally concurs that no sharp instrument played a role in the death of Ms. Sjodin in his declaration dated September 15, 2011, concluding that asphyxia from the plastic bag or the ligature was the cause of death:

> I agree with Dr. McGee that this lady's death is a homicide. I would have certified the cause of death as follows: homicidal violence consistent with complications of asphyxia. The plastic bag over the head and neck, the tight cinched ligature around the neck, or both would be the source of asphyxia.

## FORENSIC ASSESSMENT:

*1) What is the evidence, including acid phosphatase test results and material evidence recovered from the victim and crime scene, to determine with a reasonable degree of scientific certainty whether the victim was sexually assaulted? If so, can it be determined with a reasonable degree of scientific certainty whether Mr. Alfonso Rodriguez, Jr. was the perpetrator of sexual assault?*

Evidence that the victim was sexually assaulted resides in the physical finding of the victim being overpowered, bound and forcibly undressed. The acid phosphatase test results in this case are suggestive of sexual assault, but are only of presumptive value rather than definitive, even though the method has been in use for many years in suspected live victims of sexual assault. A positive result with quantifiable level of (prostatic) acid phosphatase is highly suggestive of a recent sexual intercourse; it is not, however, definitive proof of a sexual assault. It is my understanding that material is not currently available for DNA testing, which would have been useful here.

Sexual assault can be carried out with or without intercourse (i.e. penetration). James Dugan, M.D. submitted a report dated October 12, 2011 denoting Mr. Rodriguez to have erectile dysfunction.

Hence, it can be determined with a reasonable degree of scientific probability that Mr. Alfonso Rodriguez, Jr. was the perpetrator of sexual assault in this case based on the following facts in evidence:

- The knife sheath found near Dru Sjodin's car parked at the Grand Fork mall matched the knife discovered in the trunk of the car of Mr. Rodriguez

US EXHIBIT-33-07

Re: **Alfonso Rodriguez, Jr.**
*The Forensic Panel – Ljubisa Dragovic, M.D.*
September 18, 2013

Page 8 of 10

- Mr. Rodriguez' statements in multiple interviews in which he asserts that he pulled a knife on the victim to gain entry into her vehicle
- The blood spatter pattern found at the upholstery of the back seat of Rodriguez' car was determined a complete match with Dru Sjodin DNA
- Mr. Rodriguez' statements in interview that he attempted to rape the victim
- Mr. Rodriguez' statements in interview that he pulled the victim's clothes off her, while she was alive and restrained
- Mr. Rodriguez' statements in interview that the victim told him that she had herpes is reflective of a confrontation in which she was attempting to dissuade him from sexual contact
- Mr. Rodriguez described in interview that the victim was relatively compliant at first, but became increasingly distressed to the point of being frantic as time passed
- Bound and nude from waist down body of Dru Sjodin, found dumped near Crookston, MN

The above circumstantial, physical and laboratory evidence latch inseparably into a sexually violent encounter between Dru Sjodin and Alfonso Rodriguez, Jr.

2) *Can method of injury be determined with respect to the wound on the victim's neck? If so, what caused this neck wound? Can method of injury be determined with respect to the wound on the victim's flank? If so, what caused the flank wound?*

The loss of integrity of the skin and soft tissue on the victim's neck represents a post mortem artifact, resulting from combined effects of decomposition and most likely, smaller rodents feeding on the victim's remains. The very same mechanism of destruction is the most logical explanation for the damage/loss of integrity of the right flank.

3) *What, in your opinion, caused Ms. Sjodin's death?*

Taking into consideration the totality of available information provided to me to this date, it is my opinion that Ms. Sjodin most likely died of asphyxia brought about by direct pressure on the front part of her neck/voice box area. My opinion is based on the process of diagnostic exclusion of other potential mechanisms and inclusion of the information obtained from the interviews of Alfonso Rodriguez, Jr.

US EXHIBIT-33-08

Re: **Alfonso Rodriguez, Jr.**
*The Forensic Panel – Ljubisa Dragovic, M.D.*
September 18, 2013

Page 9 of 10

Mr. Rodriguez provided the distinctive account of hearing a "whoosh" sound as he was applying pressure on the front part of the victim's neck with his elbow and further described the victim turning limp and purging blood from her mouth and her nostrils.

Given the finding of the victim's blood in the back seat of Mr. Rodriguez' car, the bleeding had to have predated the placement of the K-Mart plastic bag over her head and wrapping of the rope around the victim's neck to affix the bag on the head and prevent further spilling of the victim's blood coming exclusively from her mouth/nostrils.

The concept of "asphyxia by ligature strangulation" is less likely, although it cannot be completely excluded as a possibility. The smallest diameter of the noose (rope found around the victim's neck placed for photographing fashioned like an ellipse) was 4", thus the minimum circumference of the noose would have been 12.5", which would not have been likely sufficient to create a compromise in carotid circulation of the young victim without a slip-knot present.

Remains of the voice box and windpipe were not available for examination. However, the rope around the neck fashioned as found on the victim would not as likely cause damage to these organs in the killing Mr. Rodriguez that describes as direct, front to back force from Mr. Rodriguez himself.

### 4) Based on the likely cause(s) of death, what evidence is available about the experience of her approaching death?

The victim was described by the assailant as relatively compliant at first, but frantic later. What prompted Dru Sjodin to advance from being tied up and compliant, by Mr. Rodriguez' account, to tied up and frantic, is unclear. Mr. Rodriguez asserts that he drove by a police officer, but as he states that he was driving, it is unclear why her being frantic continued after the police car had passed. Furthermore, Mr. Rodriguez also states that Dru kicked him in the head while he was on top of her, so her agitation was not confined to when he was allegedly operating the vehicle or allegedly drove by a police officer.

He has described attempting to further restrain her, this included, by his account to Dr. Seward, holding her by the neck and squeezing. In his interview with Dr. Welner, Mr. Rodriguez relates that he applied direct pressure to the front of the victim's neck using his elbow.

The horror of being unable to breathe with the neck being compressed in either fashion could have continued for an extended period in a struggle between Mr. Rodriguez and

US EXHIBIT-33-09

Re: **Alfonso Rodriguez, Jr.**
*The Forensic Panel – Ljubisa Dragovic, M.D.*
September 18, 2013

Page 10 of 10

Ms. Sjodin. The helplessness of being physically restrained would only contribute to a struggle for air with the neck being restrained.

The mechanism of death based on the account of Mr. Rodriguez resulted from his purposeful application of force to the front of the victim's neck. This force could be applied by pushing down with one's arm around the neck or by forcing the elbow/forearm against the front of the victim's neck, either of which may have caused structural damage to the voice box. Blockage of the airway by continuous pressure applied longer than a minute will likely result in death.

With the obstruction of the voice box/windpipe, the horror of inability to breathe is perceived only until consciousness starts to diminish, which with this mechanism of asphyxia may be of a variable interval starting at about 30 seconds. Such a process may last from a minimum of about 30 seconds to any number of minutes, depending upon the actual ability of the victim to struggle.

Sincerely yours,

Ljubisa Jovan Dragovic, M.D.
*Diplomate*, American Board of Pathology: Forensic Pathology, Anatomical Pathology, Neuropathology

The above report has been peer reviewed and reflects objectivity, diligence, and adherence to updated standards in appraisal of death investigation, forensic pathology assessment, and sexual homicide.

Kanthi DeAlwis, M.D.
*Diplomate*, American Board of Pathology: Forensic Pathology, Anatomical and Clinical Pathology

Victor W. Weedn, M.D., J.D.
*Diplomate*, American Board of Pathology: Forensic Pathology, Anatomical and Clinical Pathology

US EXHIBIT-33-10

Re: Alfonso Rodriguez, Jr.
*The Forensic Panel – Ljubisa Dragovic, M.D.*
September 18, 2013

Page 10 of 10

Ms. Sjodin. The helplessness of being physically restrained would only contribute to a struggle for air with the neck being restrained.

The mechanism of death based on the account of Mr. Rodriguez resulted from his purposeful application of force to the front of the victim's neck. This force could be applied by pushing down with one's arm around the neck or by forcing the elbow/forearm against the front of the victim's neck, either of which may have caused structural damage to the voice box. Blockage of the airway by continuous pressure applied longer than a minute will likely result in death.

With the obstruction of the voice box/windpipe, the horror of inability to breathe is perceived only until consciousness starts to diminish, which with this mechanism of asphyxia may be of a variable interval starting at about 30 seconds. Such a process may last from a minimum of about 30 seconds to any number of minutes, depending upon the actual ability of the victim to struggle.

Sincerely yours,

Ljubisa Jovan Dragovic, M.D.
*Diplomate*, American Board of Pathology: Forensic Pathology, Anatomical Pathology, Neuropathology

The above report has been peer reviewed and reflects objectivity, diligence, and adherence to updated standards in appraisal of death investigation, forensic pathology assessment, and sexual homicide.

Kanthi DeAlwis, M.D.
*Diplomate*, American Board of Pathology: Forensic Pathology, Anatomical and Clinical Pathology

Victor W. Weedn, M.D., J.D.
*Diplomate*, American Board of Pathology: Forensic Pathology, Anatomical and Clinical Pathology

US EXHIBIT-33-11