Michael Joseph Ferenc
Forensic Pathologist
470 Woodford Street
Portland, Maine 04013
15 September 2011

Joseph Margulies, Clinical Professor of Law
Roderick MacArthur Justice Center
Northwestern University School of Law
Chicago, IL 60611

Re:    Review of the following concerning the death of **Dru Kathrina Sjodin**:

1. Autopsy jpegs (164 images; P-785 to P-890 & P-1126 to P-1183)
2. Crime Scene jpegs (120 images; P-911 to P-1030)
3. Autopsy report ME 2004-0542 (13 pages)
4. McGee Testimony - Culpability Phase -8.28.06 (106 pages)
5. McGee Testimony - Punishment Phase - 9.05.06 (25 pages)
6. Provisional Autopsy Report ME 2004-0542 (2 pages)
7. US Government Filing Criminal No. 2:04-cr-55 (7 pages)

## Overview

As per your request, I have reviewed the above materials concerning Ms. Sjodin. Respectfully, I disagree with certain conclusions and portions of the testimony by the examining forensic pathologist, Dr. Michael McGee. For the purposes of this review, I will narrow my comments and my focus only to issues concerning the major "wounds." Particularly whether the "wounds" to the neck and right flank represent sharp force injury as Dr. McGee concluded. I hope I can demonstrate to your satisfaction that these findings are not sharp force injuries and are primarily postmortem artifact related to decomposition and postmortem animal/insect depredation.

### Background, the autopsy, and Dr. McGee's opinion about sharp force injuries

The following is a limited summary of this lady's initial history, the autopsy findings, and Dr. McGee's opinions: Ms. Sjodin went missing in North Dakota during November 2003, and her decomposed body was found prone and partially undressed in a grassy ditch near cultivated fields in Minnesota in mid April 2004. Dr. McGee concluded she died from homicidal violence.

Each wrist was bound by loops of synthetic cord that were joined behind her back and secured with fixed knots. Only upper garments were still on the body, and these were partially pulled off her shoulders. Her neck was encircled twice by similar cord that was not knotted but appeared cinched in place. Beneath the neck ligature was frayed plastic consistent with remnants of a plastic bag. A fragment of similar plastic was near the left eye socket.

The forensic pathologist acknowledged significant artifact due to decomposition and postmortem animal/insect depredation (Postmortem means after death, and depredation means mechanical damage caused by insect and animal scavengers. Dr. McGee's phrase was "anthropophagy."). This included skin and soft tissue defects to the left face, entire front of the neck, lower abdomen to pubic area, right flank, right thigh, right knee, right ankle, and right buttock. The pathologist characterized

almost all of these defects as having irregular-shaped edges/margins. The pathologist stated the lower margin on the left side of the neck defect, which included a skin flap, showed "notching" indicative of at least 2 cutting motions by a sharp object.

None of the defects showed any evidence of definite antemortem (before death) bleeding or bruising. He did describe discoloration associated with the lower abdominal wound and also vaginal "erythema" (This term usually refers to skin redness in a living person.). Dr. McGee also described minor apparently antemortem bruising beneath the right eye, on the right cheek, and on each forearm. Dr. McGee's subsequent histology (That is the examination of tissue on glass slides under the microscope.) failed to reveal any evidence of antemortem bleeding.

In subsequent testimony, Dr. McGee elaborated that the neck "wound" and right flank "wound" were antemortem sharp force injuries consistent with a knife (In his opinion, they were consistent with a 4" folding knife.). Particular emphasis was placed by Dr. McGee's on notching of the neck "wound" and the depth of the right flank "wound" as being indicative of sharp force injury (Dr. McGee's deposition, pages 84-88 and pages 106-109, give the best details of his opinion. This testimony referred heavily to photographs P-858 through P-863.).

The following 2 paragraphs concern details of Dr. McGee's description of these "wounds" and are derived from pages 6 and 7 of Ms. Sjodin's autopsy report.

In the autopsy report, Dr. McGee described the neck "wound." This "wound" was continuous with the marked tissue loss to the left face and neck. That included the postmortem loss of the floor of the mouth with the tongue and the loss of all the neck structures in front of the spine including the larynx (voice box), blood vessels, and trachea (windpipe). He stated "[t]he superior margin…is unavailable…[due to]…tissue loss…. The inferior margin…[begins] 9.5 cm [~3-3/4"] right of the anterior mid-sagittal line and 5.0 cm [~2"] [below the right ear and extending across the front of the neck] …13.5 cm [~5-5/16"] with a distinct margin that exhibits notching and ends on an elongated and separate portion of tissue [a skin flap]." The skin flap was 0.8 x 8 cm (~1/3 x 3-1/8"). On the right side of the skin flap was another area of missing tissue measuring 2.5 x 4.5 cm (~1 x 1-3/4").

The right flank "wound" was 1.5 x 5.0 cm (~3/5 x 2"), had irregular-shaped edges, and was on the side of the abdomen at the level of the umbilicus (navel). This defect extended distally (toward the feet) and medially (toward the body's center) 8 cm (~3-1/8") internally without evidence of bleeding and without reaching the internal organs in the abdominal cavity.

## Reasoning and opinion

After reviewing the autopsy pictures, I see no evidence of sharp force injury, including no evidence of notching by a weapon. A sharp object typically cleaves the skin evenly without irregularities and without abrading (scraping) or undermining the adjacent skin. Tearing of the skin, with irregular edges, abrasions, and undermining is typical of blunt injuries. It is also typical of postmortem animal depredation. Skin notching in sharp force injuries, depending upon the pathologist's intended meaning for that term, may refer to the effects of a serrated knife, a knife with a imperfection along it's blade (This could include but not be limited to a ding, a chip, a break, etc.), or re-directing a sharp object while in a wound (As example, due to twisting or turning a moving knife. Or, another way would be to partially pull out and re-insert a knife at a slightly different angle.).

The edges and margins I see in the pictures shows predator-type teeth scalloping, areas with relatively smooth margins, and areas with patchy irregular-shaped margins. I do not see any edges or

Case 2:04-cr-00055-RRE    Document 1032-16    Filed 03/08/17    Page 3 of 7
**Ptr. Exh. 16 - Page 3**
Sjodin forensic pathology review/mjf

margins that I have not seen before due to postmortem depredation and none indicating sharp force injury.

Postmortem animal/insect depredation of a decomposing body is consistent with the autopsy findings. In my own experience I have seen the results of postmortem animal depredation varying from small rodents to medium-sized carnivores to large omnivores (such as bears). Insects and the smaller animals preferentially begin postmortem depredation at exposed body surfaces, mucus membranes, moist surfaces, and broken surfaces. Decomposition increases the output of putrefied liquids and often causes/speeds up the breakdown of skin barriers. In my experience, the eyes, mouth, and pubic/anal regions are common areas for early postmortem depredation.

Insect depredation can easily create new defects and dramatically enlarge existing defect. During animal depredation gnawing, biting, clawing, and/or tearing of the skin and tissues also creates and enlarges any defect. Animal depredation is often associated with scalloped or "notched" edges resulting from disruption by the varying sizes of teeth and claws (And, a similar effect would be consistent with the fraying seen on the plastic remnants.). The effects of teeth and claws that I have seen vary from closely grouped scalloping to subtle irregularities along the tissue margins (Producing edges that might be described as notched.). Furthermore, many of the medium to larger animals will pull off or tear off strips or flaps of tissue giving the edge a relatively smooth margin. And, of course, further decomposition and insect activity continues to alter the edges even more.

The cord ligature around this 5'4" 138 lbs lady's neck appears to have been cinched tight to less than a circumference of 10-3/4 to 11-3/4 inches. This restricted circumference may have been associated with disruption/abrasion of the skin. Such a disruption would invite further destruction by postmortem depredation. The presence of a plastic bag under the cord and over the head as suggested by the remnants of frayed plastic would increase moisture retention and speed up decomposition, again increasing the likelihood of depredation in this area.

In short, I see nothing in the pictures and nothing in the autopsy report or testimony that is inconsistent with postmortem depredation causing the "wounds" seen. Sharp force injuries are not required to explain the "wounds," and evidence to support a sharp instrument is lacking.

Dr. McGee's testimony suggests he found the depth of the right flank "wound" inconsistent with postmortem depredation and indicative of an inflicted probably sharp force wound. I agree with Dr. McGee that decomposition and postmortem depredation could obscure any antemortem bleeding or bruising associated with a stab wound. However, I have seen this kind of burrowing or deep tissue defect as the result of postmortem depredation. It does not require a pre-existing antemortem wound.

Dr. McGee has actually documented another similar deep tissue defect that he implicitly considered postmortem: In the autopsy report, he indicates the upper left lung was missing. No antemortem bleeding or bruising was found (And, if this were an acute antemortem lesion, at least residual hemorrhage would be identifiable.). This was right below the skin defect to the left of the neck skin flap he had described. This must have represented a decomposition and postmortem depredation-related deep cul-de-sac extending several inches from the neck, under the collar bone, and into the top of the left chest cavity.

Furthermore, there are inconsistencies with the clothing over the right flank "wound." No fabric stab defects are described in the area that would cover the "wound." Of course, clothing can be displaced during a struggle, and that could be the explanation. But, the clothing was at least later in contact with this body area, and there is no description and no evidence in the pictures of focal blood staining

Case 2:04-cr-00055-RRE     Document 1032-16     Filed 03/08/17     Page 4 of 7
**Ptr. Exh. 16 - Page 4**
Sjodin forensic pathology review/mjf

of the fabric that I would expect to see. The lack of these findings is not dispositive of the issue but is inconsistent with the right flank defect being an antemortem wound.

Another point is why would the lower margin of the neck "wound" be preserved at all? The clothing in its presumed original position or as it was found in the ditch did not and would not have prevented or blocked postmortem depredation. The position of this lady's body in the ditch would not protect the lower neck. In my opinion, there is no reason to believe the lower margin of the neck defect was in some way privileged and preserved against postmortem depredation.

Dr. McGee opined that this lady's throat might have been cut in the ditch where she was found. He commented that a vehicle linked to this case lacked sufficient blood for a slashed neck. I agree with Dr. McGee that the type of wounding of the throat he suggested would be associated with copious bleeding. However, there is not the typical spatter or soaking of her upper garments consistent with such a neck wound (I have seen neck wounds similar to the one proposed by Dr. McGee, the most recent about 2 years ago. The assailant cut her throat from behind while he held her face and neck close to the carpeted floor. This prevented projected arterial blood patterns on her clothes [as Dr. McGee suggested might happen], but at the scene I observed the sheer volume of blood caused the front of her garments to be soaked.). This again is not dispositive of the issue but is inconsistent with the neck wound suggested by Dr. McGee.

### Summary

The skin and soft tissue defects to this lady's neck and right flank are consistent with decomposition and extensive postmortem animal/insect depredation. The findings in these regions do not support sharp force injuries. The remote possibility that sharp force injuries indeed did occur in these regions cannot be excluded with absolute certainty. Of course, neither can the possibility of firearm injuries, crossbow darts, chainsaws, meat cleavers, or scissors (All of which I have seen cause antemortem neck wounds.). The hyperbole expressed in this last sentence is only intended to emphasis that, with the absence of characteristic skin and tissue findings, one can never absolutely exclude speculation of what might have been there (Or, of course, what was never there to start with.).

**Based upon my knowledge and training, as well as my own direct observations of decomposed remains with postmortem depredation (Including from urban jurisdictions, the woods of Maine, the Arizonan desert, and the agricultural regions of central/northern Californian), and to a reasonable degree of medical certainty, the findings to this lady's neck and right flank are not characteristic of sharp force injuries. Neither are any of the other autopsy findings.**

I agree with Dr. McGee that this lady's death is a homicide. I would have certified the cause of death as follows: homicidal violence consistent with complications of asphyxia. The plastic bag over the head and neck, the tight cinched ligature around the neck, or both would be the source of asphyxia.

**I declare, under penalty of perjury, that the foregoing is true and accurate.
Executed on 15 September 2011.**

Michael Joseph Ferenc, M.D.

MJF/MJF
Cc: files
Enc: cv

Michael Joseph Ferenc, Forensic Pathologist

CONTACT INFORMATION

Work: Deputy chief medical examiner
Office of Chief Medical Examiner, 37 State House Station, Augusta, ME 04333
207-624-7180, fax 207-624-7178, Michael.Ferenc@maine.gov

Personal:  470 Woodford Street, Portland, ME 04103

EDUCATION

1977-1981 (M.D.):  University of Texas Southwestern Medical Center
5323 Harry Hines Blvd, Dallas, TX 75235-0924

1974-1977 (B.S.):  University of Texas at Arlington
1500 South Cooper St, Arlington, TX 76019

1972-1974:  Richland High School
5201 Holiday Lane East, North Richland Hills, TX 76180

1993-1997 (J.D.):  University of San Francisco, School of Law
2130 Fulton St, San Francisco, CA 94117

WORK/TRAINING

2011-present: Deputy chief medical examiner
Office of Chief Medical Examiner, 37 State House Station, Augusta, ME 04333

2008-2010:  Coroner's pathologist, Marin County Coroner

2010 (January-September):  Chief forensic pathologist
Alameda County Sheriff's Office, Coroner's Bureau
480 Fourth Street, Oakland, CA 94607

2008 (January-August):  Forensic pathologist
Kern County Sheriff-Coroner Office, 1832 Flower St, Bakersfield, CA 93305

2005-2007:  Forensic pathologist
Forensic Science Center, 2825 East District St, Tucson, AZ 85714

1998-2005:  Deputy chief medical examiner
Office of Chief Medical Examiner, 37 State House Station, Augusta, ME 04333

2005 Medical examiner (contract)
Office of Chief Medical Examiner, 720 Albany St, Boston, MA 02118

1991-1998:  Assistant medical examiner/coroner
Medical Examiner/Coroner Office, Hall of Justice, 850 Bryant St
San Francisco, CA 94103

1989-1991:  Deputy medical examiner
Office of Chief Medical Examiner, 520 First Ave, New York, NY 10016

1989:  Anesthesia resident
Parkland Memorial Hospital, 5201 Harry Hines Blvd, Dallas, TX 75235

1986-1989:  Junior and Associate medical examiner
Office of Chief Medical Examiner, 520 First Ave, New York, NY 10016

1985-1986:  Pathology basic research fellow
The New York Hospital/Cornell University Medical Center

1982-1985:  Anatomic pathology residency
(1985 Chief Resident /American Cancer Society Fellow)
The New York Hospital/Cornell University Medical Center
525 East 68th St, New York, NY 10021

1981-1982:  Family practice internship
St Paul Hospital, 5909 Harry Hines Blvd, Dallas, TX 75235

1980-198:  Obstetrics/Gynecology anesthesia extern
Parkland Memorial Hospital, 5201 Harry Hines Blvd, Dallas, TX 75235

1975-1980:  Blood bank technician
John Peter Smith Hospital, 1500 South Main St, Fort Worth, TX 76104

APPOINTMENTS/TEACHING POSITIONS

1998-2005:  Instructor (Death Investigations)
Maine Criminal Justice Academy, 15 Oak Grove Rd, Vassalboro, ME 04989

1998-2003:  Faculty in Forensic Science Seminars
Colby College, 4730 Mayflower Hill, Waterville, ME 04901-8847

1993-1998:  Clinical assistant professor, Department of Pathology
University of California at San Francisco, 505 Parnassus St
San Francisco, CA 94143

1987-1991:  Clinical assistant professor, Department of Pathology
Cornell University Medical Center, 1300 York Ave, New York, NY 10021

1989-1991:  Assistant professor, Department of Pathology
State University of New York at Brooklyn, 451 Clarkson Ave, Brooklyn, NY 11201

LICENSES/CERTIFICATES/ASSOCIATIONS/TRAINING SESSIONS

1989:  Certification Forensic Pathology by American Board of Pathology

1986:  Certification Anatomic Pathology by American Board of Pathology

1991-present:  California medical license C042914

2005-2008:  Arizona medical license 34550

2005-2006:  Massachusetts medical license 223751

1995-2011:  Delaware medical license CI 0004437

1998-2010; 2011-present:  Maine medical license 014892

1981-2000:  Texas medical license  F9414

1982-1991:  New York medical license 150091

2003-present:  Associate Member, American Academy of Forensic Sciences

2007-present:  Member, National Association of Medical Examiners

2003-2005:  Associate Member, Maine State Police Evidence Response Team

2003:  Advanced Bloodstain Pattern Analysis (40 hours)
TBI Forensic Education, Mass. State Police Crime Laboratory

2003:  Law Enforcement Photography Seminar (40 hours)

2001:  Basic Bloodstain Pattern Analysis (40 hours)
TBI Forensic Education, Maine Criminal Justice Academy

2001-present:  Provisional Member
International Association of Bloodstain Pattern Analysts

2000:  Certificate for Bloodspatter Workshop (40 hours)
Midwestern Association of Forensic Scientists

1996:  Bloodstain Evidence Workshop II (40 hours)
J.L. Bunker & Associates/San Francisco Police Department

1993:  California powers of arrest / firearms familiarization &
safety certificates 59050 / 58808

PUBLICATIONS/ABSTRACTS

Ferenc, M, Chapter 6, "Anatomical Considerations in Bloodstain Pattern Analysis," Bevel, T and Gardner, R.M., Blood Pattern Analysis, With an Introduction to Crime Scene Reconstruction, 3rd Ed., 2008, CRC Press.

Lockshin, MD, Druzin, ML, Goel, S, Qamar, T, Magid MS, Jananovic, L, and Ferenc, M, "Antibody to Cardiolipin as a Predictor of Fetal Distress or Death in Pregnant Patients with Systemic Lupus Erythematosus," New England Journal of Medicine, July 18, 1985, 313(3): 152-6.

Ferenc, M, and Naus, G, "Flow Cytometric DNA Analysis of Paraffin Embedded Sections of Carcinoma of the Breast," Abstract 1986 IAP meeting.

Falcone, DJ, and Ferenc, MJ, "Acetyl-LDL Stimulates Macrophage-Dependent Plasminogen Activation and Degradation of Extracellular Matrix," Journal Cellular Physiology, June 1986; 135(3): 387-96.