Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION

-----------------------------------------------------

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ALFONSO RODRIGUEZ, JR.,

Defendant.

-----------------------------------------------------

-----------------------------------------------------

DEPOSITION

OF

MICHAEL B. MCGEE, M.D.

-----------------------------------------------------

January 4, 2017        By:  Christine M. Clark, RPR

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 2

APPEARANCES:


UNITED STATES DEPARTMENT OF JUSTICE
DISTRICT OF NORTH DAKOTA
Quentin N. Burdick United States Courthouse
655 First Avenue North
Suite 250
Fargo, North Dakota 58102
Phone:  701.297.7400
Fax:  701.297.7405
Email:  keith.reisenauer@usdoj.gov
        michelle.meyer@usdoj.gov

By:  Mr. Keith Reisenauer
     Ms. Michelle Meyer
     For Plaintiff




FEDERAL COMMUNITY DEFENDER OFFICE
CAPITAL HABEAS UNIT
Suite 545 West - Curtis Building
Independence Square West
601 Walnut Street
Philadelphia, Pennsylvania 19106
Phone:  215.928.0520
Fax:  215.928.0826
Email:  victor_abreu@fd.org
        joseph_luby@fd.org
        eric_montroy@fd.org
By:  Mr. Victor Abreu
     Mr. Joseph Luby
     Mr. Eric Montroy
     For Defendant

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 3

INDEX

WITNESS NAME:

MICHAEL B. MCGEE, M.D.

Examination By Mr. Abreu, Page 4

Examination by Mr. Reisenauer, Page 96

Reexamination by Mr. Abreu, Page 100


INDEX OF EXHIBITS

NUMBER    DESCRIPTION

P1        Minnesota Department of Public Safety
          BCA Report on the Examination of Physical
          Evidence, 18389 - 18418, Page 58

P2        9/18/13 Report of The Forensic Panel -
          Ljubisa Dragovic, M.D.
          US Exhibit-33-01 - 33-11, Page 80

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 4

The Deposition of Michael B. McGee, M.D., is taken

at Benchmark Reporting Agency, 222 South Ninth

Street, Suite 450, Minneapolis, Minnesota, on

January 4th, 2017, commencing at 9:42 a.m.

MICHAEL B. MCGEE, M.D.,

a witness in the above-entitled action,

after having been first duly sworn,

deposes and testifies as follows:

EXAMINATION

BY MR. ABREU:

Q.  Good morning, Doctor.

A.  Good morning, sir.

Q.  Good morning.  Will you please just state and spell
your name for the record?

A.  Michael B. McGee, M-c-G-e-e.

Q.  And, Dr. McGee, what is your current position,
please?

A.  Medical Examiner of Ramsey County, State of
Minnesota.

Q.  Okay.  And what was your position at the time of
Mr. Rodriguez's trial in 2006?

A.  Same thing.

Q.  Okay.  Doctor, do you have an updated copy of your
CV?

A.  I do.  I don't have one with me.

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 5

Q. Okay.

A. But we have one. We can provide that to you.

Q. Okay. Great. Thank you. Since your testimony in 2006, have you taken any additional training or continued education courses in the field of forensic pathology?

A. Yes.

Q. Okay. Can you please just, if you can, outline that? I know that may not be easy without your CV, but. . .

A. Well, there's the annual meetings that you go to, National Association of Medical Examiners. International Association of Coroners & Medical Examiners have their continuing education as part of the annual meetings. The readings that they do, we do in the office. The updates that we do in office regarding changes that have been noted in forensic pathology, the state meetings that you go to. Those are how you keep track of it.

Q. Okay. And are you board certified in forensic pathology?

A. Yes, sir.

Q. Okay. And is that continuing training a requirement of board certification?

A. It is a requirement for maintaining your

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 6

certification for state licensure. Once you're board certified under the existing -- the old rules, your certification remained. The new rules require, I think, it's recertification every 10 years. I think. That -- I think that has gone into effect a couple years ago.

Q. Okay. And have you had any specific additional training in the field of serology since your testimony in 2006?

A. No.

Q. How about any additional training in the identification of semen specifically?

A. No.

Q. Okay. Any additional training in the use of acid phosphatase, the identification of acid phosphatase as an identifier of semen?

A. No.

Q. Okay. Any additional training on P30 as an identifier of semen?

A. No.

Q. Okay. As I -- and let me just say that we were not Mr. Rodriguez's original lawyers, so we're catching up here.

A. I understand.

Q. And I know you've testified before, so I'll try not

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 7

to repeat things, but some of this is new to us.

A. Sure, I understand.

Q. All right. Thank you. And as I understand your prior testimony, you were involved in Mr. -- in this case before you actually conducted the autopsy; is that correct?

A. True.

Q. Can you tell us a little bit about what involvement you had before you actually conducted the autopsy?

A. We were contact -- I was contacted by -- the state police had called Minnesota BCA, or Bureau of Criminal Apprehension, regarding evidence that they had found in the back of a car that they thought may be related to her abduction. She had been missing for a number of months, and of course people had been looking for her and that was pretty much taking place with the North Dakota authorities. The car was really the first time that they contacted me and said they had found this material. I think that was about the first time.

Q. Okay. And by her, you mean Dru Sjodin?

A. I'm sorry. Dru Sjodin. That's right.

Q. And before that autopsy, had you reviewed any written materials, or just those conversations?

A. Just the conversations.

**Ptr. Ex. 17**

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 8

Q.  Okay.  You also testified at a deposition.  I believe it was May 31st, 2006.

A.  Correct.

Q.  And prior to your deposition testimony, were there any written materials specific that you reviewed prior to that?

A.  No.  I don't think.  To the best of my knowledge, no.  I don't think that I -- no, no.

Q.  By then you would have had your autopsy report?

A.  I was going to say I had the written report, the autopsy report.  But as far as a written report from the police, I don't think I had that to review.

Q.  Okay.

A.  No.

Q.  And then you also testified at a Daubert hearing on August 28th of 2006, and also there was trial testimony on the same day of August 28, 2006?

A.  Both true.

Q.  Do you know if by that point you had been provided with any written materials, other than what you had, which was your autopsy report and your own investigation report?

A.  By that time I believe I had received a report.  It was a summary report.  It was about two pages long. It summarized the -- really from the time of her --

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 9

the circumstances surrounding her abduction and absence, until the time her body was found, and I cannot remember who produced that. I don't know if that was produced by the North Dakota people or the FBI, but there was a two page summary.

Q. And it was a summary, as you recall, but it was a law enforcement summary?

A. It was, yes.

Q. It was not a document that was provided to you by the government or the U.S. Attorney's Office?

A. No, no.

Q. Okay. Was it a summary of -- what was it a summary of, actually, if you recall?

A. Basically, the investigation up to that point, how she had become missing, where she was found, the steps that had taken place during her recovery, the recovery of her clothing and then the recovery of her body, and it went through and kind of gave you basically a summarized timeline from her abduction until the time she was found.

Q. Okay. Did it provide any results of any forensic testing in the case?

A. No.

Q. Okay. In preparation for your testimony in 2006 at the deposition, the Daubert hearing and the trial,

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 10

who did you work with from the U.S. Attorney's Office?  Was it Mr. Wrigley or Mr. Reisenauer, Mr. Anderson?  Who was your primary contact there?

A.  Well, Mr. Wrigley was present at the deposition and certainly the trial, but I didn't have a -- I had some contact with him.  I guess I had even contact with all of them.  I don't know if there was one that was more than the others.

Q.  Okay.  And in preparation for your testimony back in 2006, were there any other experts who were present while you were preparing for your testimony?

A.  No.

Q.  Were there any -- anybody, any experts or forensic analysts from the North Dakota Crime Lab?

A.  No.

Q.  Any from the Minnesota BCA?

A.  None that -- none that I talked with.

Q.  Okay.

A.  Their office may have called them.  But did I talk to them prior to testimony?  No.

Q.  Okay.  Do you recall if you ever spoke with a Minnesota BCA forensic analyst by the name of Steven Fischer?

A.  If I did, I have no memory of that, but, if he said I did, then I'm sure I did.

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 11

Q.  Okay.  In preparation for today's deposition, have you had an opportunity to review any documents?

A.  I have.

Q.  Can you tell us what you reviewed?

A.  Tried to review the transcript of the deposition, of the Daubert hearing, of the trial.  I tried to go through the documents that were submitted by the U.S. Attorney's Office.  I cannot sit here and tell you I read every one, every page of every one, but I tried to review the majority of them, yes.

Q.  Okay.  Do you know if you specifically reviewed the claims that Mr. Rodriguez has raised in his 2255 petition?

A.  I reviewed them, but I cannot sit here and recite those to you.  But did I review those?  Yes.

Q.  I don't think any of us can, for the record.  All right.  Doctor, if I can, maybe we can begin with the autopsy generally.

A.  Sure.

Q.  Who, if you recall, was present during the actual autopsy?

A.  Well, there was a number of law enforcement.  This case generated a lot of attention.  So, when her body finally did come to the office, there was a lot of law enforcement.  That's not unusual.  It was

someone from the -- it would be from the -- if I remember correctly, the Grand Forks Police Department; the North Dakota, it would be Sheriff's Office, and that would probably be Grand Forks County I would imagine.  So it would be Polk County Sheriff's Office where her body was discovered. There would have been someone, I believe, from the Minnesota Bureau of Criminal Apprehension.  That's the state police in Minnesota.  There was someone from the FBI.  I think that's about it.

Q.  Okay.

A.  There were a number of people.

Q.  Is that unusual to have that number of people involved in an actual autopsy?

A.  Actually, in our office it isn't.  We're a training facility for the state police, so having police come to autopsies is not unusual.  There were probably a few more there, but, given the attention the case had gotten, that wasn't unusual.

Q.  Sure.  And was there somebody from the medical examiner's office who was directly assisting you? Is there some sort of technician?  And I apologize, but I don't know the terms.  Is it technician?

A.  That's right.  We call them autopsy techs.  Yeah. They assist in all the autopsies, yes.

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 13

Q.  Do you recall who that person was?

A.  Yeah.  Just give me a second.

Q.  Sure.

A.  I believe it was Anthony.  I'm blocking on his last name, but I think Anthony was the technician that day.  I had been asked it before and I couldn't remember, but I believe it was Anthony.

Q.  Is that something that might be documented somewhere?

A.  Oh, absolutely.

Q.  And where would that be documented?

A.  Probably in the office.

Q.  Probably in the office.  And let me ask you about that.  As the autopsy is being conducted, are there written notes that are being taken while the autopsy is being conducted?

A.  Every pathologist does it differently.  Some dictate during the autopsy.  Some take notes.  At the time she was done, if I remember correctly, we had in-house dictation.  So we're wearing, essentially, a headset, and as the autopsy is going along you're dictating.  That isn't how it's done now, but at that time I believe that's how we were doing it.

Q.  Okay.  And so, if the dictation was being used, does that mean notes were not being taken, or is it

Ptr. Ex. 17

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 14

possible they were both happening at the same time?

A. I don't think notes were taken, no.

Q. Okay. Okay. And in terms of the dictation, I think you said that -- is this happening contemporaneously with the autopsy itself?

A. That's right.

Q. Are you the person who is speaking directly into it?

A. I am.

Q. And does anybody else speak?

A. No.

Q. Okay. Is that recording preserved in any way?

A. No.

Q. What happens to that recording once it's made?

A. It's erased and replaced with the other dictations that are coming along. A rough draft of the dictation then is provided to the pathologist and then every pathologist is in charge of making their own changes.

Q. Okay. So it's used to prepare your report?

A. That's right.

Q. And then it's destroyed or not saved or taped over?

A. Right.

Q. Before that recording is destroyed, does anybody else have an opportunity to listen to it, other than the pathologist, for instance?

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 15

A.  No.

Q.  Do you know if anybody from law enforcement in this case ever had an opportunity to listen to that recording?

A.  No.

Q.  Or if it was made available at any point to anybody from law enforcement?

A.  It was not made available to anybody, no.

Q.  Okay.  Let me ask you about the photographs that are taken during an autopsy, and I know that you took a number of photographs.

A.  Mm-hmm.

Q.  I also read, and I just want some clarity, was the sheriff's department also taking photographs at the same time?

A.  I don't know if the sheriff's office was taking photographs or not.  I know the BCA was taking photographs, state police were taking photographs.  Whether the sheriff's office or the FBI took photographs, I'm not sure.  I don't know the answer to that.

Q.  Okay.  And of the agencies that were taking photographs, what -- were those photographs then provided to you as well?

A.  No.  Usually what happens is we tell the agencies

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 16

we're working with we're going to shoot the photographs we need for our purposes of rendering a report.  If you want to take photographs, fine, but then, when they take photographs, that's their property and they house them however they house them.  So I haven't seen those.

Q.  Okay.  And is that standard practice usually for the other agencies to also take photographs during the autopsy?

A.  Standard operating procedure, yep.

Q.  Okay.  Do you recall any photographs you took?

A.  How many I took?

Q.  Yeah.  Do you recall?

A.  Oh, no.  I'm sorry, I don't.

Q.  Okay.  And all the photographs that you take though would have been provided to the government?

A.  Right.  That was -- there would be -- at that time we were shooting digital I believe, so they were given to the government on disc, right.

Q.  Okay.  And as I understand it also, Doctor, there were x-rays that were taken?

A.  Yes.

Q.  Of the body?

A.  Yes.

Q.  Is that standard procedure in every autopsy?

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 17

A.  Yes.  Not every autopsy, but in a case like this, yes.

Q.  Okay.

A.  If she's decomposed or partially decomposed, we always x-ray bodies.

Q.  Do you recall how many x-rays were taken?

A.  If I remember, I think three.

Q.  Okay.  And what parts of the body are typically x-rayed and which ones were done in this case?

A.  If I remember correctly, head and neck, or the upper head, upper torso, torso, lower torso.  So, basically, from the top of the head down to the upper leg region.

Q.  Okay.  And those were the ones that were done in this particular case?

A.  That's right.

Q.  Okay.  And who maintains copies of those x-rays?

A.  Our office does.

Q.  And so would they still be in your office today?

A.  Yeah.  If I remember correctly, I think those -- that was at the time when the x-rays were digitized.  So they're not -- you don't -- in the old days you used to have a physical film you would hold onto.  Now x-rays are digitized, so they should have been provided to the U.S. Attorney's Office as part of

Ptr. Ex. 17
**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 18

the photographs.

Q. Okay. And who reviews those x-rays?

A. I do.

Q. Okay. Do you consult with the radiologist in reviewing those x-rays, or do you make your own assessment of what you see?

A. On a case like this, I would rely on my own assessment. Depending on the kind of case, you may consult with the radiologist, but it depends on the case. In this particular case, just myself.

Q. Okay. And when you say it depends on the kind of case, what kind of case is it that you would rely on a radiologist?

A. Child abuse and identifications.

Q. And my own ignorance, why those categories of cases and not others?

A. Oh, for identification. You can do identification pretty much yourself for antemortem and postmortem dental x-rays, but sometimes, given people's lack of dentition, you do need a dentist on some cases. So they're called with some regularity. With regard to child fractures, that's extremely important for timing. Sometimes you can see them, but we like to have our x-rays, especially on physical abuse cases. You want those reviewed by a radiologist to see if

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 19

you're missing any fractures in the extremities. That's a fairly common practice.

Q. Are fractures the kind of thing that are easily missed in reviewing x-rays?

A. They can be easily missed if you're talking about a child. What you're concerned about are called chip fractures or joint fractures. Fractures -- you can obviously have a shaft fracture with a callus formation. You can pretty much see that. We're concerned about small fractures in the joint area that can come from shaking, if you subscribe to that theory, and you're looking for that kind of -- and sometimes those fractures can be extremely small, so we try to have a pediatric radiologist look at them to make sure we're not missing anything.

Q. And is that -- is it uncommon or common to miss fractures in adults that you're. . .

A. In adults, not really. And she was x-rayed for the purposes of seeing if there were any fractures, acute or old. That was one of the reasons. The other reason is we do it on decomposed bodies. In her particular case, we're looking for projectiles.

Q. Okay. As part of your autopsy you also swabbed a number of regions?

A. Mm-hmm, yes.

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 20

Q. And as I understand, they were the vaginal region, the cervical region and the anal region?

A. Right.

Q. Were the swabs prepared of any other regions?

A. No.

Q. And this was not clear to me from reading the transcripts. Were there two swabs of each of the three regions for six total swabs, or were there six swabs of each of the three regions for 18 swabs total?

A. The latter.

Q. So there were swabs of the vaginal cavity, six swabs of the cervical region and six swabs of the anal region, for a total of 18 swabs?

A. Processing, processing protocol calls for that, yes.

Q. Glad I got my math right. Okay. Thank you. So that is standard procedure?

A. That's standard procedure.

Q. All right. That was not clear to me before. Okay. Thank you. And how were those 18 swabs then distributed?

A. Well, the protocol calls -- or the protocol I developed in the office is, once you collect the specimens or sampled the site with the six swabs, and basically you take the swabs and divide them

Ptr. Ex. 17

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 21

into two separate packages of three.  One set of three you're going to package and you're going to freeze in an ultra cold.  The other three you're going to work with.  You're going to smear them on to a glass side and prepare it.  That's for cytology because you're going to look at through the microscope.  Same swabs are swished around in saline and that is sent to the laboratory.  They do that at the laboratory and they analyze the material on the swabs to see if they have any acid phosphatase present.

Q.  Okay.  Have all swabs been used at this point as far as you know, or do any swabs remain is what I'm asking I guess?

A.  Well, the swabs we used, the three swabs from each site that we used in the -- they used in the hospital laboratory to do their testing, those have been destroyed.  The three swabs from each of the sites that we subsequently gave to the BCA, I actually don't know.  I know they've been tested.  Did they retain them?  I don't know the answer to that.

Q.  Okay.  Now, during your autopsy, as I understand, that one of the things that you observed was -- and I think this was a term that was used -- a mucoid

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 22

like globule.

A. Right.

Q. In the cervix region?

A. That's right.

Q. And according to your testimony in 2006, that had the appearance of semen in your opinion?

A. It did.

Q. Okay. Can you tell me, Doctor, where specifically in the cervix that was observed or recovered I guess?

A. It's actually covering the cervix. When you do the autopsy, you -- in a case like this, you examine the entire length of the vaginal canal because you're looking for any evidence of injuries. While that's being done at the dissecting table, you encounter the base of the uterus or the cervix, and around the cervix and in the upper vaginal wall area was this large globule of material that you're talking about.

Q. Okay. And, again, excuse my ignorance. But is that the front, the rear of the cervix, or is that not a term that is used? What is the front or what is the rear I guess?

A. You normally don't use that in the terminology of the cervix. The cervix is the cervix. You're looking at -- if you want a more anatomic

Case 2:04-cr-00055-RRE   Document 1032-17   Filed 03/08/17   Page 23 of 116

Ptr. Ex. 17

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 23

definition, you'd be looking at the external cervical os, or opening.

Q.  Okay.  So near the opening I guess is probably the better term that I was looking for.

A.  Correct.

Q.  Thank you.  Was the recovery of that globule reflected anywhere in writing as far as you recall?

A.  No.

Q.  Is that something that you would have mentioned contemporaneously in the recorded dictation that was happening?

A.  If it isn't in the writing, I probably didn't mention it in the recording, no.

Q.  Okay.  Do you recall when you first mentioned the globule to the government, when you told them about it?

A.  Well, I don't know when I told the U.S. Attorney's Office, but, if memory serves me, I think I probably told the officers that were standing there because they were virtually there for the entire autopsy and it would be somewhat important.  That is something that -- that's one of the reasons you're doing the autopsy.  So you're trying to tell them if there's anything there that would be important that would affect their investigation, and, when you would find

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

this, I can't imagine I did not tell them. Do I have an exact memory of that? Actually, I don't. But I can't imagine I would keep that secret. I would probably tell them.

Q. Sure. Do you recall if any of those other individuals that were present during the autopsy were also taking notes as the autopsy is happening?

A. I can't imagine they weren't. Usually that's kind of standard operating procedure. They take notes. Every department we work with takes notes and they produce some kind of report. Whether they did or not, actually, I don't know that. And the next question is going to be have I seen any of those notes. I actually haven't seen any of those notes either. So they may exist, but I've never seen them.

Q. And do you know if the existence of the globule was documented in any final written report from any other agency as far as you know?

A. Same answer. They may have put it down. I didn't. They may have. That's as much as I know.

Q. Okay. And I don't know if there's an easy way to do this, but is there -- can you tell us about the size, I guess, of the globule? Like how much volume we're talking about in lay terms, I guess, if as

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 25

much as possible?

A.  See, I don't have a good answer for you.  I mean it's normal to see slight secretions in a vaginal canal, even in a decomposed.  So that is not unusual at an autopsy.  The amount of it and its consistency is what was of concern to us here given the type of case it was.  The actual amount, I don't have a physical -- I don't know if I can give you an actual physical description.  I didn't -- I didn't measure it, but it was enough that caused me to stop the autopsy and collect that site.

Q.  Let me ask you this, Doctor.  Would it be more or less than the volume of a teaspoon as --

A.  Probably about the amount of a tablespoon, or more than that.

Q.  Okay.  And when you talk about consistency, what -- how would you describe the consistency?

A.  Almost gelatinous in nature.

Q.  Clear or cloudy?

A.  Kind of a whitish, clear color.

Q.  Okay.  Had you ever seen anything similar to that particular globule in prior autopsies?

A.  Exactly.  That had been seen before in other cases we've done that had deposition of material that turned out to be positive for seminal fluid.  That

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 26

was why it was such a big deal.

Q. So that tipped you off that perhaps it could be seminal fluid in this particular case?

A. Yes, sir.

Q. Okay. And that it was significant to you for that reason?

A. Yes.

Q. Okay. Doctor, as a physician, can you tell me does the cervix itself produce any mucous -- produce any mucous?

A. It does.

Q. As part of the menstrual cycle is my understanding?

A. You can produce -- the cervix can produce material as part of the menstrual cycle. It can also produce it when the menstrual cycle is not present. Yes.

Q. Okay. And the purpose of that mucous is to facilitate, as I understand it, the passage of sperm from the vagina through the cervix, or is that correct?

A. That's true, yes.

Q. And is it also true that that also -- that mucous changes consistency and color depending on where a woman is in the menstrual cycle?

A. That's true.

Q. Now, I'm assuming, Doctor, that all bodily function,

Page 27

including, you know, menstrual cycles cease to move forward once somebody dies?

A.  True.

Q.  Okay.  Do you, Doctor, have any information about where Ms. Sjodin was in her menstrual cycle when she disappeared on November 22nd of 2003?

A.  No.

Q.  When you created the swabs of the cervix, did you swab the cervix itself or the actual globule itself or both?

A.  Second choice.  The globule itself.

Q.  Okay.  So it would have been after removal of the cervix that this swab was produced because you observed it after you removed the cervix?

A.  That's right.

Q.  Okay.

A.  After the internal -- let me correct that.

Q.  Yes.

A.  The internal genitalia were removed in their entirety with the vaginal canal, and, during the inspection of the vaginal canal, that's when the globule was seen.  So, to answer the question, was the cervix removed, actually, the entire uterus and internal genitalia were removed.  That's the correct answer.

**Ptr. Ex. 17**

Page 28

Q. And the swab was then of just the globule itself?

A. That's right.

Q. Is swabbing of the cervix something that could have happened prior to removal of the entire genital system I guess?

A. It is. The entire internal genitalia is not normally removed at an autopsy as it was in this case. This would be something that was done almost exclusively in sex related cases, when you're concerned about seeing the entire internal and external genitalia at one time. But normally the swabbing you go through in the office for processing doesn't remove it. You just do -- you would swab the vaginal canal for deposit of material and you'd let it go at that. But given the type of case and given my experience with these kind of cases, you want to remove the entire internal genitalia. You remove it in block so you can do a careful dissection. And one of the reasons you do is so that if there's any deposited material that may have been missed on your initial swab, you can collect it. That's the reason you do it that way.

Q. So it gives you an opportunity to do a more thorough collection of material?

A. That's right.

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 29

Q.  Okay.  Okay.  One of the tests that you ordered from the swabs was a sperm search?

A.  Yes.

Q.  And where is that done?

A.  It was done at the hospital that also did the testing for the acid phosphatase.

Q.  Okay.  Who prepares the slides that go off then to the hospital for those searches?

A.  They're prepared right at the autopsy table.

Q.  By you or by the technician?  Like who actually does that?

A.  The technician usually does that.

Q.  Okay.

A.  He'll do the swabs.  Although I may have done the swabs on the globule from the cervix, but for purposes of this, generally, it's the technician who's doing the swabbing and fixing them right there at the table.

Q.  And the reason you ordered a sperm search to be done at the hospital -- by the way, was that Regions Hospital?

A.  That's right.

Q.  Okay.  Was because sperm is a component, obviously, of semen?

A.  Correct.

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 30

Q.  It's actually one of the, if not the most, definitive components of semen?

A.  Correct.

Q.  Okay.  Can sperm, can semen also contain epithelial cells?

A.  Yes.

Q.  What are epithelial cells?

A.  Usually the lining of the vaginal cavity from the external portions of the cervix, so epithelial cells clearly can be seen in cytology.

Q.  Can they be seen, can they be present from the -- the exterior portion of a penis for instance?

A.  It's conceivable, yes.

Q.  Okay.  And is that the kind of thing that can be transferred from the penis to the vagina, for instance, during intercourse, epithelial cells?

A.  That seems reasonable, yes.

Q.  Now, in this particular case, as I understand the testimony, there were no sperm cells that were observed in any of the tested samples?

A.  True.

Q.  No sperm cells in the cervix?

A.  True.

Q.  Or the globule as we'll say?

A.  True.

Ptr. Ex. 17

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 31

Q.  No sperm cells in the vagina?

A.  True.

Q.  And none in the anal regions as well, right?

A.  True.

Q.  And I don't know if I made this clear, but because it was the globule that was swabbed, was the cervix also separately swabbed, or not at all?

A.  No.  Just the globule.

Q.  Just the globule.  Okay.  And when I say that there were no sperm cells that were detected, is it accurate to say that there were also no dead or live sperm cells that were detected?

A.  They would have looked -- they would have been looking -- in this particular case, given the postmortem interval, the amount of time that she had been on -- from the time of her disappearance until her finding, we would -- they would be looking for nonmotile, intact sperm or sperm heads.  And so when you give this, when the slides are taken to the cytologist, they understand that.  They're simply looking for the presence of sperm in any state.

Q.  Particularly in a case with this much time elapsed, because likely the possibility is that the sperm are all dead by then?

A.  True.

Q. And that there may be sperm parts?  And when we say parts, we mean the heads and the tails.

A. They can be.  I'm not exactly sure how well the cytologist is able to see a tail.  Heads can be seen.

Q. Okay.

A. Tails I think would be more difficult to see because they're so small.

Q. Okay.  But, as far as you know, there were neither intact or no sperm heads visible, alive or dead, in this particular case?

A. True.

Q. Okay.  And how quickly would you estimate, Doctor, that those sperm begin to die, as we talk about the amount of time that elapsed between the time she disappeared and the time that she was found?

A. Well, once -- in a living person, sperm really probably don't exist much more than 24 hours.  They have a fairly short half life in a living vagina. They're going to -- it depends on who you read, but actual motile sperm, they can exist as a motile sperm, you can actually see moving about three to four hours after deposition.

Q. And just for the record, we're not talking about deposition here?  You mean the deposit of?

Page 33

A.  I mean the deposited material.  I'm sorry.

Q.  Thank you.

A.  Three to four hours.  And then you can see the intact sperm with tails up to about 12 hours as an estimate.  Generally, after about a day or so they start to lose their -- their tails, and then you can see the heads.  And to a practiced cytologist they can see heads sometimes up to seven to ten days afterwards.  Now, some literature goes out farther, but that's the general rule.

Q.  And it's also accurate that, perhaps, nonliving or dead sperm heads can be found much longer after that?

A.  Yeah.  Actually, the literature does report about cases where people have found sperm heads going out multiple days.  One report actually goes out months, but, yes, that's right.

Q.  Let me ask you this, Doctor.  In the cases that we as lay people kind of read about in the paper where they go back and test old rape kits and either identify a perpetrator or exonerate somebody.

A.  Sure.

Q.  Do they find old, dead sperm cells in those cases?

A.  What you're looking for in an untested rape kit is that very thing.  You're looking for evidence of

deposited seminal fluid.  You may have enzyme activity, but they're looking for the sperm because the sperm will allow you to do DNA analysis.  That's what they're looking for.  Whether they're intact or the heads, that's what you're looking for because from that you can extract the DNA profile from the depositor or the person that placed the sperm there.

Q.  Right.  And as we know from reading the paper, sometimes those things can be tested 20, 25 years later.  They'll find evidence of that?

A.  If you -- as long as you have retained sperm. Whatever their state is, as long as you have retained sperm in nucleic acid, yes.

Q.  Okay.  And is it possible also that what they find for DNA testing could be epithelial cells?

A.  That's possible.  If you have epithelial cells that have a different DNA component than the victim, yes.

Q.  And as you mentioned, sometimes there's an enzymatic component of semen that can also be tested for acid phosphatase or P30 or what have you?

A.  True.

Q.  Okay.  And for my own edification, Doctor, is there a difference between regular DNA testing and what is called Y-chromosomal DNA testing?

A.  I am not your DNA expert.  But is there a difference

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 35

of basically -- I'm sure there is in the laboratory for the Y chromosome when they're looking to see if it represents a male deposition, and I think that's about as much definition as I can give you. I don't think I can sit here and tell you, if you're asking for the mechanism that's used in testing or differentiating between those two types of tests, yeah, I can't do that.

Q.  I guess my question is even much more basic than that. Sperm -- can you do Y-chromosomal testing on sperm cells and epithelial cells or any other cell to determine if it's a male or female?

A.  Reason would tell me you could do any cell that has nucleic acid that you would be able to extract and be able to identify, you should be able to do Y chromosome, but you need to ask a serologist to see if that's true.

Q.  Okay.

A.  That's my own reasoning.

Q.  Okay. Thank you. And one of the areas where Y-chromosomal testing might be particularly helpful is when you're testing a region that contains known male and female DNA, or material I should say?

A.  True.

Q.  For instance, the vaginal region, which we know is

going to contain female --

A. True.

Q. -- DNA or material. And so the Y-chromosomal DNA can then differentiate between what is male and female in that tested sample?

A. True.

Q. Okay. And at the time that you testified in 2006, your understanding was based on the testimony that the Y-chromosomal DNA testing in this case was also negative?

A. It was my understanding.

Q. And by negative I mean that Mr. Rodriguez's DNA was not detected in any of the tested samples?

A. That's my understanding.

Q. It was not in the anal sample?

A. True.

Q. The vaginal sample?

A. Yes.

Q. Or the cervical sample?

A. True.

Q. And that there was also no Y-chromosomal DNA detected in any of those three samples?

A. That's my understanding.

Q. As a pathologist who is evaluating this evidence, what role, if any, did that play when you made your

Ptr. Ex. 17

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 37

conclusion that this in fact was semen?  What role did the negative sperm search and the negative DNA evidence play in your evaluation?  What factor I guess is a better question?

A.  What factor?  It's important, but given the fact that this subject's body had been laying out in the open in an unprotected area for a prolonged period of time, that's not terribly surprising.

Q.  Was it unusual to have AP, acid phosphatase levels this high and not have any of those other two things that we're talking about?

A.  Yes.

Q.  It was unusual?

A.  Yes.

Q.  And you factored that unusual circumstance into your opinion --

A.  Yes.

Q.  -- in those circumstances?  Let me ask you, Doctor, about acid phosphatase, if I may.  That is one of the components, as we mentioned, of semen?

A.  Correct.

Q.  As is P30?

A.  Yes.

Q.  Okay.  Your prior testimony that the tested materials in the cervix and the vagina were in fact

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 38

semen was based on the AP levels, the acid phosphatase levels?

A.  That's right.

Q.  Okay.  Since you testified in 2006, have you done any additional research, or are you aware of any additional research that calls that particular testimony that you gave in 2006 into question in any way?

A.  No.

Q.  Okay.  Has your practice regarding the use of acid phosphatase in determining the presence or absence of semen changed in any way since 2006?

A.  Our practice has changed in the office in that the laboratory that does the acid phosphatase stopped offering that test.  Probably in the late 2000s they discontinued the analysis of phosphatase.

Q.  And when you say the office, is that Regions Hospital?

A.  That's right, yes.

Q.  Okay.  And do you know why they discontinued using that test?

A.  It's a private hospital.  It had been a county hospital, became a private hospital, and they were making a number of changes in the lab tests they were offering.  And the lab, as I said, that was one

test they were going to be dropping.  So that

testing was stopped.  I don't have an exact date.

It was after 2006, in the late 2000s.

Q.  Do they do any semen testing there at all?

A.  That's a good question.  I'm not sure they do any

more testing or not.  I'm not sure they do any semen

testing for sexual assault exams in their ER.

Q.  Do you know if they now -- because I think they did

not at the time.  Do you know if they now do P30

testing there?

A.  Unknown.

Q.  Unknown.  Okay.  Where is, Doctor, acid phophatase,

AP, typically found?

A.  Prostate is the highest part.  It's found in -- it

can be found in multiple parts of the body.

Multiple areas of the body produce acid phophatase,

but the largest, obviously, prostatic acid

phosphatase is the highest concentration in the

body.

Q.  And as I understand, it also does exist, however, in

female fluids, for lack of a better term?

A.  True.

Q.  And female regions like the vagina?

A.  The vagina is reported to produce it in low levels.

That's right.

**Ptr. Ex. 17**

Page 40

Q.  Okay.  Do you know what area of the female body produces the highest amount of acid phosphatase?

A.  I don't.

Q.  Okay.  And where is it produced most in the male body?

A.  Prostate.

Q.  In the prostate.  Okay.  Is acid phophatase that is produced in the prostate chemically different than acid phophatase that is produced in other parts of the body or in the female body?

A.  Don't know.

Q.  Okay.  As far as your understanding of acid phosphatase is what is -- the primary difference in what you use in your evaluation is the amount or the concentration of acid phosphatase that tells you where it might be from?

A.  Correct.

Q.  Not necessarily that there's a significant chemical difference that's observable to anybody or testable, so much as the concentration levels is what determines where it might be from?

A.  Correct.

Q.  Okay.  Acid phosphatase testing, that is not something that pathologists typically do?

A.  True.

**Ptr. Ex. 17**

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 41

Q. And as you mentioned, that's something that goes out to a lab?

A. Correct.

Q. And that's done by a technician there. The preparation of the swabs from which acid phosphatase testing is done, is that something the pathologist does?

A. Ask me that again.

Q. Yeah. The preparation of the swabs, the -- I guess the creation of the solution.

A. Oh, it depends on -- it depends on the office you're working in. And if you have an office that doesn't do a lot of sexual assault exams, they may use what is called a rape kit and the rape kit is developed by a laboratory to collect the specimens. If you're in an office that does a lot of them, you may have your own protocol that you set up that basically is just like a rape kit, but you're preparing the material yourself. That's what we did in our office.

Q. Maybe I jumped ahead because I knew that from some prior testimony. But did you actually prepare the dilution that then gets tested for acid phosphatase?

A. Yes. We do that actually in the labora -- in the office at the time of the autopsy, at the same time

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 42

the slides are being prepared, yes.

Q.  Okay.  And when we say we, I'm just trying to clarify.  Is it you or the technician or somebody there?

A.  Both of us.  The technician and myself would both be doing that at the time of the sexual assault examination.

Q.  Okay.  And can you just describe for me how that is done, please?

A.  Sure.  The protocol we used to use at that time is you would take three cc of saline that's in the office.  The swabs, after they had been used to prepare the slides, would then be swished around in the saline.  And those would be sent, the swabs and saline would be sent to the laboratory for further testing.

Q.  Is there some reason that that part of the preparation of the dilution that gets sent off is done there rather than at Regions for instance?

A.  The only reason that we used to do it in that case is so it would guard against losing anything in transport.

Q.  And how would it be lost in transport?

A.  It all -- that's just the protocol that we did.  We always did it at the table, right away at the table

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 43

to ensure that the material that we had collected was adequately collected in saline that the swabs were put in.

Q. And how was it then transported to Regions so as to avoid any compromise of what you created and then subsequently tested at Regions?

A. What happens is, once the slides are prepared and once the -- the solution is prepared, it's taken directly over to the lab by the technician.

Q. The same day typically?

A. Usually within the hour.

Q. Oh, and maybe that's my own misunderstanding of geography. I didn't realize you were that close to Regions. What is the distance there?

A. About 100 yards.

Q. That would explain it. Okay. And that was -- the way it was done in this case was completely in keeping with typical protocol in how it was done in every other case?

A. Yeah. Everything described so far is normal practice that we do in all cases or examine for sexual assaults.

Q. And since Regions is no longer doing that testing, how has your practice changed in terms of preparing of testing for acid phophatase?

**Ptr. Ex. 17**

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 44

A.  We no longer test for acid phosphatase.  But how is the examination done?  Exactly the same way.  The same thing that we've described before, but instead of preparing a dilution, all of the slides are now air dried in the office using a standard drying procedure.  Then, once the material has been collected and dried, it's all containerized and sent to the state crime lab for their evaluation.

Q.  Is that the Minnesota BCA?

A.  That's right.

Q.  And is the testing that they do at Minnesota BCA acid phosphatase testing, or are they doing something in addition to that?  Are they doing P30 testing as well?

A.  You will have to talk to the serology section about what testing they actually perform on a regular basis.  We let them decide what they want to do on the specimens.

Q.  So you no longer say, hey, would you do AP testing on the following sample?  You send the sample off and let them do what they're going to do?

A.  In all fairness, when we did the autopsy on Dru Sjodin and going forward now, we never tell the serology lab what to order.  They order that on their own.  Since those specimen are collected and

**Ptr. Ex. 17**

Page 45

they're provided them, we let the serology section determine what's going to be tested on each individual case.  That's what was done in her case and actually that's what's done today.

Q.  So do you still rely on acid phosphatase as a determining factor in whether something is or isn't semen, and where do you get those results from?

A.  If the testing is done by the serology lab and those numbers are available, yes, we'd rely on it.

Q.  Okay.  How often now would you say you're seeing acid phosphatase results?

A.  Not very often now.  It usually is going -- with the advance of DNA and the ability of the lab to collect it, more work is spent in that regard.

Q.  Do you have cases that you're seeing now where the determination of something being or not being semen is made on the basis of acid phosphatase levels alone?

A.  If they -- from my -- from my perspective, on our perspective, no.  We are rely on the results from the serology lab, from their results at the serology lab.

Q.  And, again, the lab that's now being used is the Minnesota Bureau of Criminal Apprehension, BCA?

A.  That's right.

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 46

Q.  Okay.  The swabs that were made of the cervix, the vaginal region and the anal cavity, were they done at more or less the same time, or at what process in the autopsy does that happen?

A.  The processing takes place before the autopsy begins, and that would have been on the vaginal and the anal regions.  The cervical material was collected probably about an hour or so later because then you're actually into the autopsy as previously described.

Q.  Could you estimate how much time elapsed from the time that Ms. Sjodin was brought onto the autopsy table to the time that the swabs were actually taken?

A.  It would be -- it would be a little time because she was dressed and we had to go through some detail in undressing her.  I would imagine the swabs -- she would have been processed probably within an hour or two from the time she was initially brought on the table.

Q.  Okay.  As I understood your testimony back in 2006, Doctor, elevated levels of acid phosphatase would have been levels above 25 units per liter?

A.  Correct.

Q.  Has your opinion of what is considered an elevated

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 47

acid phosphatase level changed at all since your testimony in 2006?

A.  No.

Q.  Are you aware of any new research in the field that would cause you to question the scientific validity of using 25 units per liter as a figure for determining what is an elevated acid phosphatase level?

A.  No.

Q.  Okay.  Is it fair to say, Doctor, that when you have higher phosphatase levels that is usually accompanied also by the -- you know, the presence of sperm or some DNA or some other identifiable component of semen?

A.  It can on regular cases in living individuals or some where we have a short postmortem interval, yes.

Q.  And you may not recall this.  But what is the highest level of acid phosphatase that you've seen that has no sperm, no DNA, no -- nothing else accompanied with it?

A.  I don't have an answer for that.

Q.  Okay.

A.  The highest levels of acid phosphatase are usually in the thousands, and sometimes they're accompanied by sperm and sometimes they weren't.  This is on

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 48

living individuals.

Q.  Sure.

A.  Sometimes they were accompanied by sperm and sometimes they weren't.  And you have to account how do I account for that.  Probably a sampling error.  Can I give you an exact case?  I'm sorry, I can't.

Q.  Okay.  And I guess I was asking also about in your experience doing autopsies.  Not so much as living individuals.

A.  Oh, I'm sorry.  Okay.

Q.  Yeah.  What you've seen in your practice in terms of, hey, I've got this very really elevated AP level, but there's nothing else here.  What's the highest AP level you've seen?

A.  I don't think I can answer that.  I don't have a number that comes to me.  I'm sorry.

Q.  Okay.  What about the converse, the lowest AP level that you've seen where in fact you've seen then sperm, or. . .

A.  That's actually more common where you see you have -- you have an enzyme level that would be really low, but the cytology comes back and say they've recovered sperm heads.  That did happen.  But can I give you an actual citation?  I can't do that either.

Page 49

Q.  Okay.  Again, as I understood the 2006 testimony, Regions Hospital uses a different concentration level for determining what is an elevated level.  I think they use 10 units per liter?

A.  They did at that time, yes.

Q.  Okay.  And when you said at that time it's because they don't do it anymore?

A.  That's my understanding, yes.

Q.  Okay.  And that number that they arrived at was based on some internal study that they had done?

A.  Also true.

Q.  Do you recall, Doctor, how old the study was when you testified about it in 2006?

A.  It was -- as near as I can -- it's my understanding it was done in the '90s.  It was done as an internal study by the hospital lab for purposes of their analyzing sexual assault exams on living individuals in their emergency room.

Q.  Okay.  You say internal study.  Does that mean that it was not published?

A.  That's my understanding.  It was not published.

Q.  Do you know if it was peer reviewed in any way?

A.  To my knowledge, no.

Q.  Now, when we talk about publishing, there's two ways to publish something.  Obviously, one is to publish

Case 2:04-cr-00055-RRE    Document 1032-17    Filed 03/08/17    Page 50 of 116
**Ptr. Ex. 17**
Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 50

it to the outside world.

A. Correct.

Q. And the other is an internal publishing.

A. Correct.

Q. Was this a physical report that you saw at one point?

A. I never saw a physical report. I was informed of it orally.

Q. Okay. Do you know if there ever was an actual physical report created, produced by somebody?

A. No.

Q. As a result of that study? Sorry.

A. Actually, I don't know that, no.

Q. Okay. When you say you were informed of it, how did that transfer of information come to you? Was it --

A. It was an assignment I was given when I joined the hospital, which would have been in 1979. The head of the department said this is going to be one of your assignments, and I said, okay, and I was verbally informed of the results of their internal study and given that assignment.

Q. This was a study you mentioned, I believe, of live women?

A. Yes.

Q. Do you know if Regions had conducted any studies of

Ptr. Ex. 17

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 51

corpses as far as you know or dead people?

A.  To my knowledge, no.

Q.  Since your testimony in 2006, are you aware of any acid phosphatase level studies on corpses?

A.  No.

Q.  Given that you used a 25 units per liter, let's say cutoff, I guess is what you would call it, and Regions used 10 units per liter, did you have discussions with anybody there about the discrepancy and why one would -- you chose to use one figure and they used another?

A.  No.

Q.  Why did you choose to use 25 rather than 10?

A.  Safety.

Q.  You mean -- can you explain that to me?

A.  They felt comfortable using 10 for living people and I thought, in order to be safe, the number should be increased to 25, and so that was done arbitrarily.

Q.  And when you say arbitrarily, do you mean you specifically, or was that a practice of the medical examiner's office to 25?

A.  That was a practice of the medical examiner's office to 25.  That's the level I told people we should start using.

Q.  Were you the person who implemented that level --

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 52

A. Yes.

Q. -- 25? Prior to you implementing the 25 units per liter cutoff level, had a prior number been used?

A. Other than the 10 at the hospital, I don't think so.

Q. Now, as I understand the way you got reports back from Regions at the time, they would report to you the total acid phosphatase level, the amount of prostatic acid phosphatase and the amount of nonprostatic acid phosphatase?

A. That's right.

Q. Okay. And based on your 2006 testimony, it's my understanding that the testing that Regions did at the time allowed them to differentiate between what was prostatic acid phosphatase and perhaps acid phosphatase that was produced as a remnant of decomposition or bacterial activity or anything else?

A. True.

Q. Okay. Is there anything that you've come to learn since your testimony in 2006 that would cause you to question that particular aspect of your testimony regarding how Regions can differentiate different types of acid phosphatase?

A. No.

Q. Here's what I'm trying to understand, Doctor. If --

**Ptr. Ex. 17**

Page 53

if Regions can differentiate between different types of acid phosphatase and isolate prostatic acid phosphatase, why does one need any cutoff level when Regions reports acid phosphatase as being prostatic? Couldn't, for example, Regions say we have .0001 units per liter of prostatic acid phosphatase, and why wouldn't that be conclusive for it being from a seminal source?

A.  Because you have to be concerned that the -- that the number that's being produced as prostatic acid phosphatase may contain remnants of something else, may contain sources other than the male prostate, possibly from the vagina or from the subject themselves.  The levels may be low.  It's my understanding that it's done for safety.  I don't think it's fair to say finding any positive prostatic -- it's not fair to say finding any positive acid phosphatase in a woman's vaginal tract means she's had deposition there.  So I think that's why -- to answer the question, I think that's why they didn't go just with its presence or absence. They actually had a cutoff number to account for any deposition that may not have been from the prostate.

Q.  So I guess, in other words, to account for the fact that the test may not completely differentiate

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 54

between prostatic acid phosphatase and other kinds
of acid phosphatase?

A.  Exactly, yes.  That's my interpretation of why they
did that.  Did I ever have anybody tell me why
they're doing that?  No.  No one's ever told me
that, but my reasoning is that that was probably why
they did that.

Q.  Okay.  Thank you.  Since your testimony in 2006,
have you testified in other cases where you have
identified as semen a substance where there was no
sperm cells, no male DNA and only the AP level above
25?

A.  No.

Q.  This was the only case since 2006 where you've said
that something is semen based on the elevated AP, no
sperm and no male DNA?

A.  To my knowledge, yes.  And one of the reasons is is
because, basically, after 2006, the lab quit
offering that testing to our office.  And so all
testing was done by the serology section at BCA.
So, if there was acid phosphatase testing on cases
that we testified, they would have extracted that
testimony from the serologist and not from our
office.  So the answer, from my -- from my
perspective is, no.  Does that mean that acid

phosphatase wasn't done on cases we testified in?  I can't say that.  It may have been done, but that would have been extracted from the serologist.

Q.  Okay.  And I guess I'll ask the converse.  Are there cases since 2006 where you said something was not semen on the basis of an elevated AP, but no sperm and no male DNA?

A.  Same answer.  Same answer.

Q.  Now, you mentioned that Regions stopped doing acid phosphatase testing.  Do you know if they produced any additional studies after 2006 regarding acid phosphatase?

A.  Unknown.

Q.  When results were reported to you from Regions back in -- prior to 2006 I should say, was there one person who was responsible for reporting that back to you, or how did that work?

A.  Usually the cytology -- you would send over the glass slides that you had prepared at the autopsy table were sent over to the laboratory, and those you sent them over with the request slip.  It was a lab order, lab order form.  The cytologist would actually write on the form whether she saw sperm or not, and if she did or he did, she'd indicate sperm heads, entire sperm, so forth.  So you would get a

Page 56

written report back from them on your submitted specimen.  The acid phophatase came back as computer hard copy, and that was usually faxed back to the office within 24 to 48 hours.

Q.  Now, I think you mentioned earlier that P30 was also an enzymatic component of semen?

A.  That's right.

Q.  And is it also known, as far as you know, PSA or prostate specific antigen?

A.  It may be the same, yes.

Q.  Okay.  And is it accurate to say that P30 is found in higher concentrations in semen than even acid phosphatase is?

A.  I don't know the answer to that.  My reason would say yes, but -- reason would tell me, yes, it would be.

Q.  Okay.  I believe you previously testified that acid phosphatase is considered a presumptive test for the presence of semen, but P30 testing can be specific for the presence of semen?

A.  True.

Q.  And is that still your opinion?

A.  It is.

Q.  Okay.  Now, there are AP levels at which they get so high that it becomes less presumptive and more

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 57

definitive I suspect?

A. That's true.

Q. I think some of the studies that were discussed
during your prior testimony are those studies that
show where the acid phophatase level were above 400
units per liter?

A. True.

Q. Okay. In a case like this one where you had less
than 400 units per liter, P30 testing is something
that might have helped you make your determination
about whether something was or was not semen?

A. Yes.

Q. About whether the tested samples of the swabs that
were created of the cervix, the vagina and the --
the cervix and vagina I should say specifically had
semen?

A. Yes.

Q. Okay. And as I understand at the time, 2006, and
2004, when this case was under investigation, there
was no P30 testing at Regions Hospital?

A. That's my understanding.

Q. Okay. And I think you mentioned this. But you
don't know if they do P30 testing now?

A. I don't know. I'm sorry.

Q. Do you currently rely on P30 testing in your

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 58

assessment of something, whether something is or is not semen?

A. We don't. I mean do we rely on it in making our final analysis? We can. Again, it depends on what the serology lab is going to order at the BCA. So do they do it on some cases? They do. Do they do it in all cases? I think that's something you'll have to ask them.

Q. Okay. And as far as your prior testimony -- and I think not just yours, but I think several other indications in the record, there was, as far as you know, no P30 prior, previously done in this case; P30 testing previously done in this case?

A. That's my understanding.

MR. ABREU: Let me show you what I'm going to mark as exhibit Number 1. I guess I'll call it P1, for Petitioner's 1. Is that okay?

(Document is marked as Exhibit No. P1 for identification.)

MR. ABREU: And I'll ask you to take a look at that for a second and we'll talk about that in a second. Keith, here's a copy for you as well.

MR. REISENAUER: Thank you.

MR. ABREU: You're welcome.

Q. (MR. ABREU:) Take a minute to take a look at that

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 59

document, Doctor, if you may.

A.  Okay.

Q.  Okay.  What is the -- I guess the title of that document there?

A.  The title of the report is Report on the Examination of Physical Evidence.

Q.  And who is it produced by?

A.  Produced by the Minnesota Department of Public Safety.  This would be the BCA crime laboratory.

Q.  And what is the lab number?

A.  The lab number is BO3-11062.

Q.  Okay.  And what -- under the principals, you see that on the top page?  Who is it relating to there?

A.  The principals, Dru Kathrina Sjodin, S-j-o-d-i-n; Alfonso Rodriguez, Junior; Linda Janet Walker, Allan K. Sjodin and Margaret Murphy.

Q.  Okay.  And that is the same parties we're talking about in this particular case?

A.  Yes.

Q.  Okay.  And when was this document produced?

A.  Give me a second.

Q.  Right -- it's the first page, right under Report on Examination of Physical Evidence.

A.  Oh, 5/28/04.

Q.  Okay.  Have you seen this document before?

**Ptr. Ex. 17**

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 60

A.  If I have, it has been some time.

Q.  Okay.  Let me ask you to turn to on the second page. Before we get there, actually, my apologies.  The document appears to have a Bates number in the upper right-hand corner.  18389; is that correct?

A.  Correct.

Q.  And can you just tell us how many pages the entire document contains, if that's okay?  You can just count them all for me.

A.  Thirty by my count.

Q.  And what's the Bates number on the very last page?

A.  18418.

Q.  Do those appear to be sequential from the -- from the very first page in the document?

A.  They do.

Q.  Okay.  And if you turn to the third page, can you tell me who produced this document?

A.  Steven Fischer.

Q.  Okay.  And I recall earlier today you said you don't remember if you specifically had any conversations with Mr. Fischer?

A.  I don't.

Q.  Okay.  Going to page two of this document, it lists, continues to list the items that were tested, correct?

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 61

A.  Yes.

Q.  And let me ask you about item 86.  What does it say item 86 was?

A.  One plastic bag containing evidence classified as a biological sample.

Q.  And over to the right, how does if identify biological sample?

A.  Vaginal, anal, and cervical swabs collected from the body of Dru Kathrina Sjodin.

Q.  And as far as you know, those would have been the same cervical swabs that you produced at the time or that you created at the time of your autopsy, correct?

A.  That's right.

Q.  Okay.  Let me ask you to turn to the very last page, if you will, Doctor.  That is the page that's identified as Bates number 18418.

A.  18418.

Q.  The very last page of this document.

A.  Yes.

Q.  What is the case number referred to at the top of that particular page?

A.  BO3-11062.

Q.  And is that the same case number that was made reference to in the very beginning of this report?

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

A.  Yes.

Q.  Okay.  And on the left-hand side, it seems to delineate three things that were tested there.  One is item 86A?

A.  Correct.

Q.  One is item 86B?

A.  Right.

Q.  And the other is item 86C, correct?

A.  Correct.

Q.  And 86A is identified as V.S.  Presumably, vaginal swab?

A.  Yes.

Q.  Item 86B is anal S.  Anal swab?

A.  Yes.

Q.  And 86C appears to be cervical S.  Cervical swab?

A.  Yes.

Q.  And over to the right there are three, it looks like different tests that can be run on those particular swabs.  One is BCIP?

A.  Yes.

Q.  Do you know what BCIP is?

A.  No.

Q.  Okay.  I believe it's blood testing by the way, but. . .

A.  Okay.

Q.  The other appears to be AP.

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 63

A.  Okay.

Q.  Do you see that?

A.  I do.

Q.  Acid phosphatase?

A.  I would assume that's what that means.

Q.  Okay.  And in the very third category it says P30, correct?

A.  Correct.

Q.  And it says test date performed.  What does it say there?

A.  4/23/04.

Q.  Okay.  Great.  And under the delineation of each of those swabs it gives a result of P30 testing; is that correct?

A.  It does.

Q.  And for 86A, the vaginal swab, it denotes that the test was negative, correct?

A.  Either negative or not run.  I'm not sure what the line means.

Q.  Okay.  But you would agree that in the very first -- let me ask you to go up a little bit higher.

A.  Mm-hmm.

Q.  Under the -- under where it says Date Test Performed, it says Positive Control?

A.  It does.

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 64

Q.  And they use a little positive mark there?

A.  A plus, right.

Q.  A plus sign, correct.  And under negative control, it uses a negative sign?

A.  Correct.

Q.  Okay.  And you would agree that the negative sign that's used there is the same as is used under 86A, 86B and 86C?

A.  Yes.

Q.  Okay.  So for 86A it has that same negative sign?

A.  Correct.

Q.  For 86B it has the same negative sign?

A.  Correct.

Q.  And for 86C it also has the same negative sign?

A.  Correct.

Q.  So, based on this document, Doctor, would it appear to you now that in fact P30 testing had been done in this case?

A.  Yes.

Q.  And that the results of that P30 testing was negative?

A.  Yes.

Q.  Okay.  I'll ask you, Doctor, you mentioned that you had not seen this document before, correct?

A.  True.

Case 2:04-cr-00055-RRE    Document 1032-17    Filed 03/08/17    Page 65 of 116

**Ptr. Ex. 17**

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 65

Q. Is this something that you would have liked to have seen at the time that you made your determination and testimony in 2006?

A. It would have been nice to see it before I offered my testimony, yes.

Q. Had you been made aware that BCA had determined that there was no semen present in this case?

A. I believe I had been told that, yes.

Q. And were you present when Steven Fischer testified at trial?

A. No.

Q. Okay. Did anybody tell you that he in fact was going to testify at trial?

A. I'm sorry, I didn't know that.

Q. Okay. Did anybody ask you to reconcile your positive semen conclusion with BNA's (sic) determination that there was no semen present?

A. No.

Q. Did anybody tell you what the basis for BNA's determination that there was no semen present was, what their basis for determining that was?

A. No.

Q. As far as you knew at the time, you believed that was based on the negative sperm and the negative DNA?

Case 2:04-cr-00055-RRE    Document 1032-17    Filed 03/08/17    Page 66 of 116

**Ptr. Ex. 17**

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 66

A.  True.

Q.  And not the P30 testing because you didn't know about the P30 testing?

A.  True.

Q.  Let me ask you, Doctor, to consider what we believe to know now, I guess, about the testing in this particular case of the swabs and ask you to consider it now.  The negative sperm search, the negative DNA, including the Y-chromosomal DNA negative result and now the negative P30 result in this particular case and ask you if that changes your conclusion about whether there's sufficient scientific evidence upon which you could testify that this in fact was semen on these tested swabs?

A.  I am just going to stay with the previous testimony. I think it's -- the acid phosphatase was an elevated level.  There was a presumptive test that was positive and that's what was reported to the police, and that's what we'll stay with.

Q.  That all you have here is a presumptive positive for the presence of semen?

A.  Right.

Q.  Okay.  The Minnesota BCA, where the testing is done now, the semen testing that you use in your cases now, since 2006 is done, if they send you a report

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 67

now that says semen -- no semen detected --

A.  Correct.

Q.  -- that is something you would rely on in your
testimony?

A.  Yes.

Q.  And you would testify that, based on what BCA's
telling you, there is no semen?

A.  That would depend on the individual case and what we
saw at the autopsy.  If you were going strictly by
autopsy -- if you were going strictly by laboratory
results, the answer would be yes, but you have to
compare the lab results into what you're actually
seeing physical on the body.

Q.  Agree.  But I guess my question is you had
previously mentioned that when BCA reports results
to you --

A.  Right.

Q.  -- that's what you testify about.  The results in
terms of whether you have scientific evidence of
semen, what BCA reports to you is what you testify
to?

A.  What BCA reports is what they testify to in court.
Usually the results of the BCA's serologic -- today,
the results of the serology are usually not made to
us.  They're made directly to the court or to the

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 68

prosecuting attorneys, and that may be made available to us either to confirm or refute our testimony, but it's incorrect to say that they provide testimony to us, to the office, that we rely on in our testimony because actually that's not the case.  We may see the reports, but many times we don't.

Q.  And maybe I wasn't clear.  They don't really provide you testimony, but they provide you with test results?

A.  Exactly.

Q.  That you then can rely on?

A.  Correct.

Q.  And you have no reason to doubt the efficacy of the testing by the Minnesota BCA?

A.  Oh, no, no.

Q.  I don't have a lot left, Doctor.  Can we take a five minute break?  Is that okay with you?

A.  Yeah.

(Break at 11:00 a.m. - 11:12 a.m.)

Q.  (MR. ABREU:)  Thank you, Doctor.  A couple of follow-up questions, Doctor, if I may, on the report P1 that I asked you about.  Do you have a copy still in front of you?

A.  Oh, yes.

**Ptr. Ex. 17**

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 69

Q.  Can you tell us who the report was sent to?

A.  Grand Forks Police Department in Grand Folks, North Dakota.

Q.  Okay.  And it seems to be Attention, Sergeant Jim Remer?

A.  Yes.

Q.  Okay.  Do you know Sergeant Remer?

A.  No.

Q.  Okay.  You did not speak to Sergeant Remer about the contents of this report at any point?

A.  If I talked to Sergeant Remer, I have no memory of that, no.

MR. ABREU:  Okay.

MR. REISENAUER:  Let me interrupt for a second.  It's Reemer (phonetic pronunciation), just so you know hereon out.

MR. ABREU:  Thank you.

Q.  (MR. ABREU:)  I had asked you, Doctor, whether you had any reason to doubt the efficacy of the testing done by the Minnesota BCA regarding semen.  Would it be fair to say that you wouldn't have reason to doubt the accuracy of that testing as well?

A.  No.

Q.  Okay.  And you had mentioned that if you got results from Minnesota BCA indicating that something was

Page 70

negative for the presence of semen, you would have no reason to doubt, to doubt those results, but that you would conduct or take into account what you observed as part of your autopsy as well?

A.  I think you have to do that.  I think you have to consider the lab results.  And do I think the lab does a correct job?  Yes.  But I think you have to take it in context with what you're seeing at the scene and at the autopsy.

Q.  And I guess what I'm asking, Doctor, is a slightly different question.  Not whether or not there was a sexual assault, which seems to me something you would want to take in everything you would see at the autopsy.

A.  Correct.

Q.  But whether or not in fact a tested substance is semen, that is something that you would rely on the Minnesota BCA to determine?

A.  Yes.

Q.  Okay.  And what you observe at the autopsy may give you an indication of a sexual assault, but wouldn't necessarily undermine Minnesota BCA's determination that something is or is not semen?

A.  True.

Q.  Okay.  Regarding the globule, other than the swabs

**Ptr. Ex. 17**

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 71

of the globule, was that itself preserved in any
way?

A.  No.

Q.  Okay.  Doctor, let me ask you some questions about
the cause of death in this case if I may.

A.  Yes.

Q.  As I understand the testimony back in 2006, there
were three possible causes of death.  There was a --
lack of a better term - slash wound to the neck?

A.  I believe so.

Q.  Asphyxiation was a possibility?

A.  Yes.

Q.  As was exposure?

A.  Yes.

Q.  And you previously testified that the slash wound to
the neck was the most likely cause of death, but you
could not rule out the other two?

A.  True.

Q.  Okay.  Have you had an opportunity to review the
reports by the other pathologists in this particular
case who have come on, some of them, most of them,
all of them since you testified in 2006 actually?

A.  I have read them briefly.  I have not studied them.
But have I read them briefly?  Yes.

Q.  Specifically Dr. Jonathan Arden?

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 72

A.  Yes.

Q.  Dr. Michael Ferenc or Ferenc, I should say?

A.  Yes.

Q.  Dr. Mark Flomenbaum?

A.  Yes.

Q.  Dr. Garry Peterson?

A.  Yes.

Q.  And Dr. Ljubisa Dragovic?

A.  Yes.

Q.  Okay.  And after reviewing those reports, has your opinion regarding the cause of the neck defect -- I'll call it that.  Again, I apologize for my lack of scientific acumen here.  Has your opinion changed regarding the cause of the neck defect and the defect in the flank that was observed changed in any way since your testimony in 2006?

A.  No.

Q.  After reviewing their reports?

A.  No.

Q.  Okay.  So your opinion is still that both of those defects, the flank defect and the neck defect were caused by a sharp instrument or knife of some sort?

A.  Yes.

Q.  Okay.  Has your opinion, after reviewing those reports, changed at all regarding the cause of death

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 73

that you see as most likely?

A.  No.

Q.  Still then the slashing of the neck as the most likely?

A.  Probably the most likely, yes.

Q.  Is there anything that you've read to rule out the possibility or discount the other two possibilities, asphyxiation or exposure as possible causes of death?

A.  No.  I'm staying with the original testimony.  Those are also a possibility.

Q.  Okay.  Regarding the flank defect, in your 2006 deposition you testified that the location and the -- the location of the defect in the flank and other changes made it more likely to be a wound than animal depredation.  Can you explain what it is about the location of that particular defect that made you believe that it made it more likely to be a wound than animal depredation?

A.  Given its appearance, given its location and given the penetrating track into the flank region, I thought it represented a stab wound.

Q.  And maybe I'm just not understanding what you mean by location.  You mean physical location on the body?

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 74

A.  Right.

Q.  And so what is it specifically about its location on the body that makes it less likely to be animal depredation than a wound?

A.  Because the other areas that may have been animal depredation did not have that same appearance.

Q.  And if we're talking about location, we're saying it's separated from the other areas that have animal depredation?

A.  Separated from the other areas that had animal depredation and did not have the same appearance as the other areas of animal depredation.

Q.  What was, if you recall, Doctor, specifically different about the appearance in that wound than the other defects that had, as you call it, animal depredation?

A.  The animal depredation areas that I think exhibited animal depredation had a tendency to be surface injuries, with the exception of the tissue loss in the neck area, and did not have a tunnelling effect as this one did.

Q.  Is it possible, as I believe you've testified before, that the tunnelling was in fact though created by animal activity?

A.  I cannot rule out it may have been accentuated by

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 75

animal activity or by insect activity.  I can't rule that possibility out.  I don't think it is to exclusively to that.

Q.  So the notching, or the notching that was visible in your opinion on that wound, in addition to its depth, I guess, is what you're considering different?

A.  Its -- its depth.  Its location.  Its depth and its physical appearance, yes.

Q.  Is that flank defect the kind of -- likely to be accompanied by significant bleeding if it happened while she was alive?

A.  There should be hemorrhage involved, yes.

Q.  Is there any way in your opinion, Doctor, to determine what the actual sharp instrument may have been that produced the flank injury or the neck defect?

A.  No.

Q.  Okay.  Regarding the neck specifically, from what I was able to observe in the photographs, what appear to remain of the neck area was just a strip, or strip of tissue if you can call it that?

A.  Yes.

Q.  Is that accurate?

A.  It's the inferior margin of the wound, yes.

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 76

Q.  And that strip that remained was under the ligature that was present and the plastic bag that remained?

A.  True.

Q.  Is it your opinion, Doctor, that that strip of tissue remained or was preserved by the existence of that ligature and bag?

A.  It may have been.  That's a possibility.  Do I know that for a fact?  No, I don't.  But I guess that's a possibility, yes.

Q.  I guess I'm trying to figure out why that remained and everything else was gone.

A.  That's a hard answer to give you because you're dealing with a body that's laying out in the North Dakota prairie in the middle of the winter.  And so can I sit here and tell you why some tissue is absent and some tissue isn't?  I can't do that.  I'm not able to do that in this case or really any other decomposed cases we see that come from the outside.

Q.  But it is possible that that ligature and bag prevented any animal activity or discouraged animal activity?

A.  I guess.  I guess that's possible.  Sure, yes.

Q.  Do you recall, Doctor, how long that strip of tissue was that remained?

A.  I think it's -- I think it's 13.5 centimeters in

length, if I remember correctly.

Q.  Okay.  Would it be helpful to look at your autopsy report?  Would it help?  If it doesn't, it's fine, but just asking.  I have a copy if you need one.

A.  I think I need to look.  If you want the exact amount, the exact number, I can look it up.

Q.  And maybe my next question will help determine that.

A.  Okay.

Q.  I'm trying to determine how much of that, if it is 13.5, how much of that presented with the notching that you identified as having been caused by a sharp instrument.

A.  I don't know if I can give you the amount of how much of the notching was present on the inferior margin.  It was there.  Was it the entire length of it?  I'm not sure that it was or not, but it was on part of it.

Q.  On part of it.  Okay.  And do you recall if part of that inferior margin also had any animal depredation evidence?

A.  I didn't think it had animal depredation on it.

Q.  At all on the --

A.  On the surface of the skin, I didn't think that was animal depredation, no.

Q.  Did you see anything along the top of that strip of

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 78

tissue that showed evidence of anthropophagy?

A. North, above the inferior margin, that entire amount of tissue is absent and I think it's probably due to the anthropophagy from the animal, yes, or the insects that were present.

Q. In your opinion, Doctor, in order to see that notching along the inferior ridge, I guess is what we'll call it --

A. The margin.

Q. Margin.

A. Inferior margin.

Q. Inferior margin of that strip of tissue. Would the knife or whatever sharp instrument that you opine was used, would that have to have traveled along the length of the rope, of the ligature in order for it to remain?

A. Well, assuming that the ligature is already present around her neck area.

Q. If it's there for first and --

A. If it's there first, then the answer would be yes, but that's under the assumption that it's there first.

Q. Okay. Are you familiar with the lines of Langer?

A. I am.

Q. Can you tell us what they are?

**Ptr. Ex. 17**

Page 79

A.  Lines of Langer are elastic connections within the soft tissue beneath the layer of the skin.  You can't see them.  That allow the skin to basically hang on your body in the -- and give it your body's configuration.  And it's important because sharp force injuries delivered to the body, if they are delivered at -- depending upon how the wound is delivered with relation to the underlying lines of Langer can effect the appearance of the wound.

Q.  And did you see any evidence in any of the defects that you have observed in Ms. Sjodin that were consistent with separation of the skin along the lines of Langer?

A.  There may have been some evidence of lines of Langer deformation in the flank wound.  That's possible.  In the neck wound, probably not.

Q.  And the existence of deformation along the lines of Langer in the flesh, in the flank wound, does not change your opinion about the possible cause of that flank wound?

A.  No.

Q.  Okay.  Can you tell us why?

A.  Same answer as before.  Its location and appearance externally and internally.

          MR. ABREU:  Okay.  I'm going to show you,

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 80

Doctor, what I'm going to mark as Petitioner's Exhibit 2, if I may, and I think -- sorry, Keith. It's just the Dragovic report.

(Document is marked as Exhibit No. P2 for identification.)

Q.  You indicated that that's something that you had reviewed.  Perhaps, not studied it, but you had reviewed it?

A.  Correct.

Q.  Okay.  Can you tell us what that is just so I can identify it for the record?  Sorry.

A.  This is a report from the forensic panel, written to Mr. -- it's a letter and a report written to Mr. Reisenauer regarding U.S. versus Alfonso Rodriguez, Junior, September 18, 2013.

Q.  Can you turn to the next to the last page, what would be identified as page 10 of 11, and tell us who are the signatories of this document?

A.  Dr. -- those who appear, Dr. Dragovic; coming down, Dr. DeAlwis, I believe, and then finally, Dr. Weedn.

Q.  Okay.  Thank you.  And when is that dated?  It's on the first page.

A.  September 18th, 2013.

Q.  Okay.  Let me ask you to turn to what is page eight of 11, as denoted at the top.

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 81

A.  Okay.

Q.  And towards the bottom of the page there's a sub-number 2 there.  Can you see that?

A.  I can.

Q.  And it reads, Can method of injury be determined with respect to the wound on the victim's neck?  If so, what caused this neck wound?  Can method of injury be determined with respect to the wound on the victim's flank?  If so, what caused the flank wound?

Below that it says, The loss of integrity of the skin and soft tissue on the victim's neck represents a postmortem artifact, resulting from combined effects of decomposition and most likely, smaller rodents feeding on the victim's remains.  The very same mechanism of destruction is the most logical explanation for the change/loss of integrity of the right flank.  Do you see that?

A.  I do.

Q.  And you had previously seen that before?

A.  Yes.

Q.  And does that in any way change your opinion in this case?

A.  No.

Q.  And I'm assuming you disagree with this conclusion?

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 82

A.  Yes.

Q.  And can you just tell us why you disagree with this conclusion?

A.  Because I was the one that examined the body and I spent a lot of time looking at her.  These are excellent reports and I'm sure these people all have strong opinions, but the answer is the only person that actually physically examined her was me.  And do I hold the opinion now that I did then?  Yes.

Q.  And you're basing that, as I understand your answer, on the fact that you were able to observe the body, physically observe the body?

A.  In person, yes.

Q.  Do pathologists rely on photographs in making determinations on cause of death or cause of defect or injury?

A.  The ones that do defense work and have to review them, yes.

Q.  And it's not something that you do in your practice?

A.  I don't do defense work.

Q.  Has the prosecution ever asked you to look at photographs and make a determination, from a pathological standpoint, based on photographs?

A.  When it comes to injuries, no.  They're usually showing my photographs that I've examined of the

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 83

body personally.

Q.  That's because you testify about autopsies that you perform yourself?

A.  That's right.  That's right.

Q.  Okay.  Going down to Number 3, if you may, Doctor.

A.  Yes.

Q.  It says, What, in your opinion, caused Ms. Sjodin's death.  And Number 3 being in the report by Dr. Dragovic and the forensic panel.  It says, Taking into consideration the totality of available information provided to me to this date, it is my opinion that Ms. Sjodin most likely died of asphyxia brought about by direct pressure on the front part of the neck/voice box area.

I take it, Doctor, you also disagree with that?

A.  Yes.

Q.  Okay.  And, again, can you just tell us the reasons for your disagreement with that particular point?

A.  One, he didn't see the body.  He only saw photographs of it.  Two, I did see the body and internal neck organs.  Can you die from pressure on the neck?  Oh, most assuredly.  But in this particular case there are no organs to examine, at least soft tissue.  So this is an interesting finding that is a hypothesis.

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 84

Q. Okay. And as I recall, I think your testimony back in 2006, you had some trouble determining the amount asphyxia or strangulation might have played, the role it might have played in her cause of death because of the lack of petechiae I think?

A. That's right.

Q. And is that still the reason why that is the case in your opinion?

A. Yes.

Q. And I just don't remember how this was. But as I recall, there was one side of her face that had significant anthropophagy -- or anthropophagy?

A. Left side of her face.

Q. Left side of her face. That would have been the side that was down towards the ground?

A. Yes. I believe that's true.

Q. And was the soft tissue around the eye preserved in the part that was not subject to that depredation?

A. It was preserved.

Q. Okay. And that was what you were able to observe and studied that?

A. Yes.

Q. Okay. And you saw no evidence of petechiae in that region of her body, I should say, of her face?

A. No.

Ptr. Ex. 17

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 85

Q.  Okay.  Was the eye -- and from the photos, I couldn't tell.  Was her eye intact below the closed eyelid?

A.  Yes.

Q.  Okay.  Is petechiae something that might be less visible with the passage of time?

A.  It depends on how much tissue you have available. In this particular case I think the petechiae still could have been seen since her eye was visible, as was the periorbital region.

Q.  Given the lack of petechiae, why could you not completely rule out asphyxiation as a cause of death?

A.  You can't rule it out completely because she does have a bag over her head.  There are only remnants of the bag left, but, from the appearance of the bag under the ligature and the material that was recovered, bag remnants that were recovered off her face, it does suggest that she had her bag -- her head enclosed in a bag.  Now, when the head -- when was the bag placed over her head and the rope put around her neck?  I don't know that.  But assuming that that was the case, is it possible that she could have died from an asphyxial death from that bag, occluding her ability to breathe?  That is a

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 86

possibility. That's why I can't exclude that as being a possible cause of death because I think a bag was over her head. I just don't know when exactly it was placed there in relationship to the wounds she received to her neck.

Q. And in order for her to have died of asphyxia as a result of that bag, how tightly would the rope, the ligature had to have been placed?

A. Well, it would have been -- the ligature around the neck would have had to have been applied with enough tightness to secure the bag around the neck so that no air could escape and asphyxia would result. So the answer is it would have to have some tightness. However, the ligature that was around her neck was not knotted. It was not tied. It was lying loose. So, if pressure was applied to exclude breathing with the bag over her head, it would have had to be held by the hands because no knot was visible.

Q. Let me ask you, Doctor, about manual strangulation and whether -- is there a different set of physical characteristics that one would see from manual strangulation versus ligature strangulation?

A. Yes.

Q. What would be some of the things that you would look for in a case of manual strangulation?

Page 87

A.  Well, manual strangulation, as the name implies, is generally with the hands about someone's neck.  So surface injuries.  You're looking for surface injuries.  That may be fingerprint injuries, nail injuries, injuries to the surface of the skin that would occur when pressure is being applied on the outside of the body.  And some people have -- these can be readily seen.  Some are not as easily visible.  And then internally, inside you would see evidence of soft tissue hemorrhage in the soft tissues beneath those spots, in the muscle tissue or any of the soft tissue.  That's what you're looking for, and then you may have damage to the actual internal neck organs themselves.  Not only the -- not only the soft tissue, but the cartilage, the hyoid bone and so forth.  That's what you would be looking for.

Q.  Okay.  So, in this particular case, evidence of manual strangulation that you might be looking for in terms of soft tissue damage, organ damage, fingerprint markings to the neck, all of those things would have been not possible to observe because of the amount of depredation to her neck?

A.  Well, the amount of depredation that was present on the left side.  On the right side her neck tissue

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 88

was intact.  So assuming, if she did have manual strangulation to her neck, I would expect to have seen some kind of injuries possibly on the right side of her neck with the underlying soft tissues may have shown something that looked like hemorrhage.

Q.  Which part of her neck region remained?  Was it the part that's closer to her face or closer to her torso?

A.  Closer to her torso.

Q.  What I will call then the lower part of her neck I guess?

A.  Lower part of the neck.

Q.  Okay.  The upper part of the neck, that did not have -- that did not have sufficient tissue present for you to observe some of the things that you were talking about?

A.  That's right.

MR. ABREU:  Okay.  That's all I have, Doctor.  Can we just stay for two minutes and let me see if these guys have any follow-up?  I can ask them.  Just two minutes consultation with these guys.

(Break at 11:38 a.m. - 11:57 a.m.)

Q.  (MR. ABREU:)  Doctor, just so we can be clear on the

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 89

strip of tissue that was -- that you were able to observe, was that strip of tissue directly under the ligature and the plastic bag?

A. I cannot say it would -- for the record, let's say the strip of tissue, retained tissue was under the plastic bag and ligature. Whether it was directly under it or not, I can't say that, but it was -- it was -- the tissue was under the bag and the ligature. That's about as much as I can say.

Q. Was it observable, this strip of tissue, before you removed the ligature and the bag?

A. Yeah. The tissue may have been visible before he removed the ligature and the bag because the bag is basically -- if you look at the photographs, you can tell the bag is disintegrated down to what is literally just under the ligature. And can you see the strip of tissue above that? Without looking at the photographs, I don't think I can answer that.

Q. Okay. Of course I don't have the photographs.

A. Nor I.

Q. Well, we can look at them. Certainly. You mentioned, Doctor, that you were able to observe -- observe things during your autopsy that perhaps might not be visible to others who are examining photos and/or reading reports. Is that a fair

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 90

assessment of what you testified to earlier?

A.  Yes.

Q.  Can you tell us what kinds of things you might be able to observe more clearly from your autopsy than from specifically looking at photos or reading from your report?

A.  Your photos, you're looking at a still object or a still cap.  You're looking at a rendition of tissue that's being held in a certain position, but you're not getting a chance to move the tissue around, looking at the outside and the inside.  You try to capture as much of that with a photograph, but it is incorrect to assume that you can learn as much from looking at a photograph as you can from actually examining the body and holding the tissue in your hands.

Q.  Is it fair to say that your practice would entail photographing those things which you consider to be significant when you're conducting your autopsies?

A.  Autopsies are always performed, and I was trained you always take photographs of significant things to capture as much as you can of what you're observing, with the understanding you can never completely recapture or reproduce what you're actually physically examining in your hands.

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 91

Q.  Right.  Thank you, Doctor.  I'm contemplating something, Doctor.  Can you point to anything specifically in this case that you saw regarding the neck defect and the flank defect that is not visible in the photographs or described in your report?

A.  The appearance of the wound margin externally and internally on the neck, and probably the same for the flank injury.

Q.  Is that it?

A.  Yes.

Q.  Okay.  Referring back to the acid phosphatase levels, Doctor, you mentioned that acid phosphatase exist in lower levels in the vagina than it does in the prostate?

A.  That has been reported, yes.

Q.  Do you know, when you say low, what would you consider a low level?

A.  I don't have a number for you.  It's just it's been reported that the vagina does produce acid phosphatase at lower levels.  Do I have a number? No.

Q.  Okay.  Doctor, in your autopsy report you do not specifically denote your determination that semen was present on the swabs; is that correct?

A.  True.

**Ptr. Ex. 17**

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 92

Q.  What you do note is the acid phosphatase levels on the first page; is that correct?

A.  Correct.

Q.  Is it your practice, your standard practice to specifically say in an autopsy report I determine that this, these acid phosphatase levels are consistent with presence of semen, or is it your standard practice to issue reports that just say the acid phophatase levels?

A.  Only list the laboratory results.

Q.  So this, what you did in this report is consistent with what you do in every other case?

A.  The report in front of you on Ms. Sjodin is an example of the standard practice performed on sex related homicides that we did in the office, yes.

Q.  Is there a reason that the conclusion of semen is not specifically denoted in the autopsy report?

A.  Semen is not -- the presence or absence of semen or that language is not noted in her report or in any other reports produced by the office.

Q.  I guess my question, is there a reason why you don't specifically do that in the report, why you don't put the conclusion in?

A.  Because that's the way I was trained.  You just didn't use that language.  Some people may use it.

Page 93

I don't.

Q.  If the acid phophatase numbers had not been as they are recorded here, would they have been included at all in this report?

A.  All laboratory results performed on an examination are included whether positive, negative or whatever the results may be, yes.

Q.  Okay.  Got you.  Do you recall when it was that you mentioned to Mr. Wrigley, the U.S. Attorney, or anybody from the government for that reason, when you -- when it was that you were first asked to interpret these findings as being conclusive for the presence of semen?

A.  When I first told them that?

Q.  Yes.

A.  I don't have an exact date.  I would imagine it would predate the first deposition given to Mr. Hoy, whenever that was.  I would imagine it would have to predate that.  But can I give you a date when it was before that?  I can't.  I'm sorry.

Q.  If Mr. Wrigley had asked you on the first time or anybody from the government had asked you on the first time they had met with you to interpret these results, you would have said, To me, that's consistent with semen, had they asked you that at

**Ptr. Ex. 17**

Page 94

that point?

A.  No.  What we would have told them is we would have told them that the test levels that are present, based on our other cases we had done in our previous work at the laboratory, that those tests were presumptively positive and that the police should conduct their investigation accordingly.

Q.  Would you have also told them that, perhaps, some additional testing of the swabs might have been -- provide conclusive evidence of whether it was or was not semen?

A.  Would we have told them that?  We may.  We may.  We may not have.  For our purposes, what we were asked to do was to examine a body of a woman who had been missing for a number of months, and we did.  We were asked to determine, you know, the cause of death to the best of our ability and if it was a sex related homicide, and that's basically what we did.  The levels are present.  In all fairness, we probably would have called it the same case if we hadn't done any testing at all or if the test results were all negative.  I think it's a sex related homicide.

Q.  And at some point I suspect though that the government asked you to say more than whether it was a sex related homicide.  They asked you to determine

Page 95

if in fact semen was present on those swabs.

A.  I don't know if they ever asked me the question if semen was present.  Did I think -- if I remember the testimony correctly, did they ask me if it was -- the numbers were consistent with deposition based on the acid phosphatase level.  I'm trying to remember the exact terminology here.  And the answer was yes. Based on our experience and that elevated number, that was consistent with the deposition of prostatic acid phosphatase.

Q.  And at some point the government asked you to testify to that?

A.  That's right, yeah.

Q.  And you did so in 2006?

A.  That's right.

Q.  But you don't recall when you first told them the substance of your testimony as concluded by the acid phosphatase testing that's present in your autopsy report?

A.  No.  I'm sure -- I'm sure I must have talked to Mr. Wrigley or somebody before the deposition.  But do I have an exact date?  No, no.

MR. ABREU:  Okay.  That's all I have. Thank you, Doctor.

MR. REISENAUER:  Good try.  I'm next.

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 96

THE WITNESS:  I know.

MR. REISENAUER:  Okay.  I'm going to be quick.

THE WITNESS:  Oh, mercifully.

MR. REISENAUER:  Yeah.  I'll do the best I can.  I have a couple follow-up questions.

EXAMINATION BY MR. REISENAUER:

Q.  Let's just go very quickly back to Exhibit 1, Doctor, and that's the report, the Examination of Physical Evidence by the Minnesota BCA Lab.  Do you have that in front of you?

A.  I do.

Q.  Just to make sure that I understood correctly, you don't believe that you had seen this report prior to today; is that right?

A.  True.

Q.  Okay.  And so you were not aware of their test results when you testified at the time of trial? That's your testimony today, correct?

A.  True.

Q.  Okay.  If you would turn to the second page, which would be 18390, and the second to the last paragraph on the bottom it talks about the results of testing for semen of the vaginal swab, 86A; the anal swab, 86B, and the cervical swab, 86C.  Do you see that?

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 97

A.  I do.

Q.  Okay.  And it says that the examination of the following items, which includes those three, did not detect the presence of semen, correct?

A.  True.

Q.  Okay.  And you weren't aware of that at the time of the testimony at trial?  Is that what you're telling us?

A.  Yes.

Q.  Okay.  Okay.  Then, if we could, let's just turn to your autopsy report which hasn't been marked, but it is 11569 in terms of its marking.  The front page of that report basically has a sexual assault examination listed there, and it does list the three areas; the vaginal, rectal and cervical area that were swabbed that you testified about, correct?

A.  True.

Q.  Okay.  And it lists the acid phosphatase levels that you've been testifying to this morning, correct?

A.  Yes.

Q.  Okay.  And it also indicates that in each of those areas the test for sperm was negative, correct?

A.  True.

Q.  Okay.  And you did testify about that at the time of trial; is that correct?

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 98

A.  True.

Q.  Okay.  Let's move ahead here quickly.  The cause of death -- excuse me.  The cause of death that you have in your autopsy report says homicidal violence; is that correct?

A.  True.

Q.  And that's, again, on the front page, correct?

A.  True.

Q.  And at the time of trial, I believe you testified that in your opinion the cause of death was in those exact terms, homicidal violence.  Do you recall that?

A.  I do.

Q.  Okay.  And you talked briefly earlier today about what your opinion was at the time of trial.  And that remains the same today in terms of the cause, the actual cause of death, correct?

A.  Yes.

Q.  And I believe you said -- and these are my words, slash wound to the neck, asphyxiation and exposure, correct?

A.  True.

Q.  And you testified, you recall, to those three things at the time of trial as well?

A.  Yes.

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 99

Q.  And that's still your opinion today?

A.  It is.

Q.  There was, I believe, a fourth possibility that we've talked about here this morning, and that was possible strangulation; is that correct?

A.  Yes.

Q.  And do you recall also testifying about that at the time of trial?

A.  I do.

Q.  Okay.  And so, as we sit here today, would it be still your testimony that one of those four causes would still in your opinion be the cause of death of Ms. Sjodin?

A.  Yes.

Q.  The flank defect, you, I believe, testified that you observed that wound from the inside as well?

A.  Yes.

Q.  Okay.  Let's just clarify one thing for the record. Just if I can find the neck injury.  I believe Mr. Abreu asked you how long that was.  If you would look, it's on page six of your report.  And it says what?

A.  13.5 centimeters.

Q.  Okay.  And I believe that was your recollection earlier this morning; is that right?

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 100

A.  Yes.

MR. REISENAUER:  Okay.  That's all the questions I have.  Victor?

MR. ABREU:  Just a brief follow-up.

REEXAMINATION BY MR. ABREU:

Q.  At any point did Mr. Wrigley or anyone from the government tell you that the BCA had determined that there was no semen present?

A.  Prior to when?

Q.  Prior to your 2006 testimony.

A.  To the best of my recollection, they probably did tell me the results of the BCA were -- were negative, but I can't remember the -- if I remember correctly, they told me they were un -- the lab was unable to find DNA.  I believe I was told that before I testified, but -- but that's about as much as I can remember and it was a verbal report.  I don't have anything in writing.

Q.  Sure.

A.  Yeah.

Q.  About the DNA specifically, but nothing about the P30?

A.  Correct.

Q.  And the other thing you knew was negative at that time was the cytology, the sperm search?

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 101

A.  Yep.  We knew that from our own knowledge.

Q.  From your own?

A.  That's right.  Yep, right.

MR. ABREU:  That's all I have.  That's all I have.  Keith?

MR. REISENAUER:  I don't have anything further.

MR. ABREU:  Doctor, thank you.

THE WITNESS:  Thank you.

(The deposition adjourns at 12:14 p.m.)

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 102

ERRATA SHEET

Page/Ln Correction          Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 103

I, Michael B. McGee, M.D., have read this transcript, pages 1 - 101, and acknowledge herein its accuracy except as noted on the errata sheet.

_____

Signature

_____

Notary Public

Page 104

STATE OF MINNESOTA
                    CERTIFICATE
COUNTY OF CARVER

        I, Christine M. Clark, RPR, hereby certify that I reported the Deposition of Michael B. McGee, M.D., on this 4th day of January, 2017, in Minneapolis, Minnesota, and that the witness was by me first duly sworn to tell the truth and nothing but the truth concerning the matter in controversy aforesaid.

        That I was then and there a notary public in and for the County of Carver, State of Minnesota; that by virtue thereof I was duly authorized to administer an oath.
        That the foregoing transcript is a true and correct transcript of my stenographic notes in said matter, transcribed under my direction and control.

        That the cost of the original has been charged to the party who noticed the deposition and that all parties who ordered copies have been charged at the same rate for such copies.
        That the reading and signing of the deposition was not waived.

        That I am not related to any of the parties hereto, nor interested in the outcome of the action and have no contract with any parties, attorneys or persons with an interest in the action that has a substantial tendency to affect my impartiality.
        WITNESS MY HAND AND SEAL this 11th day of January, 2017.


                        -----------------------
                        Christine M. Clark, RPR
                        Notary Public

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 105

**A**

**abduction** 7:14 9:1,19
**ability** 45:13 85:25 94:17
**able** 32:4 35:14 35:15,15 75:20 76:17 82:11 84:20 89:1,22 90:4
**above-entitled** 4:6
**Abreu** 2:19 3:5 3:6 4:10 58:15,20,24 58:25 68:21 69:13,17,18 79:25 88:19 88:25 95:23 99:20 100:4 100:5 101:4 101:8
**absence** 9:2 38:11 53:21 92:18
**absent** 76:16 78:3
**absolutely** 13:10
**abuse** 18:14,24
**accentuated** 74:25
**accompanied** 47:12,20,24 48:3 75:11
**account** 48:4,5 53:22,24 70:3
**accuracy** 69:22 103:3
**accurate** 31:11 33:11 56:11 75:24
**acid** 6:14,15 21:10 29:6 34:13,19 35:14 37:9 37:19 38:1 38:10,14 39:12,16,17 40:2,7,9,12 40:15,23 41:5,23 43:25 44:1 44:12 45:5 45:11,17 46:22 47:1,7 47:18,23 51:4 52:7,8,9 52:14,14,23 53:2,2,4,6,10 53:18 54:1,2 54:21,25

55:9,11 56:2 56:12,17 57:5 63:4 66:16 91:11 91:12,19 92:1,6,9 93:2 95:6,10,17 97:18
**acknowledge** 103:2
**action** 4:6 104:17,18
**activity** 34:2 52:16 74:24 75:1,1 76:20 76:21
**actual** 11:20 12:14 25:7,8 27:9 32:21 48:24 50:9 75:15 87:13 98:17
**acumen** 72:13
**acute** 19:20
**addition** 44:13 75:5
**additional** 5:4 6:7,11,14,18 38:5,6 55:11 94:9
**adequately** 43:2
**adjourns** 101:10
**administer** 104:9
**adults** 19:17,18
**advance** 45:13
**affect** 23:25 104:18
**aforesaid** 104:6
**agencies** 15:22 15:25 16:8
**agency** 4:2 24:19
**ago** 6:6
**agree** 63:20 64:6 67:14
**ahead** 41:21 98:2
**air** 44:5 86:12
**Alfonso** 1:6 59:15 80:14
**alive** 32:10 75:12
**Allan** 59:15
**allow** 34:3 79:3
**allowed** 52:13
**AMERICA** 1:3
**amount** 25:5,7 25:14 31:15 32:15 40:2

40:14 52:7,8 77:6,13 78:2 84:2 87:23 87:24
**anal** 20:2,13 31:3 36:15 46:2,7 61:8 62:13,13 96:24
**analysis** 34:3 38:16 58:4
**analyst** 10:22
**analysts** 10:14
**analyze** 21:9
**analyzing** 49:17
**anatomic** 22:25
**Anderson** 10:3
**and/or** 89:25
**animal** 73:16 73:19 74:3,5 74:8,10,12,15 74:17,18,24 75:1 76:20 76:20 77:19 77:21,24 78:4
**annual** 5:11,15
**answer** 15:20 21:21 24:20 25:2 27:22 27:25 47:21 48:15 53:20 54:24 55:8,8 56:14 67:11 76:12 78:20 79:23 82:7 82:10 86:13 89:18 95:7
**antemortem** 18:18
**Anthony** 13:4,5 13:7
**anthropopha...** 78:1,4 84:12 84:12
**antigen** 56:9
**anybody** 10:13 14:9,23 15:2 15:6,8 40:19 51:9 54:4 65:12,15,19 93:10,22
**anymore** 49:7
**AP** 37:9 38:1 39:13 44:19 48:12,14,17 54:11,15 55:6 56:24 62:25
**apologies** 60:3
**apologize** 12:22 72:12

**appear** 60:13 64:16 75:20 80:19
**appearance** 22:6 73:20 74:6,11,14 75:9 79:9,23 85:16 91:6
**APPEARANCES** 2:1
**appears** 60:4 62:15,25
**applied** 86:10 86:16 87:6
**Apprehension** 7:12 12:8 45:24
**arbitrarily** 51:18,19
**Arden** 71:25
**area** 19:10 22:17 37:7 40:1 74:20 75:21 78:18 83:14 97:15
**areas** 35:20 39:16 74:5,8 74:10,12,17 97:15,22
**arrived** 49:9
**artifact** 81:13
**asked** 13:6 68:23 69:18 82:21 93:11 93:21,22,25 94:13,16,24 94:25 95:2 95:11 99:20
**asking** 21:14 35:5 48:7 70:10 77:4
**aspect** 52:21
**asphyxia** 83:12 84:3 86:6,12
**asphyxial** 85:24
**asphyxiation** 71:11 73:8 85:12 98:20
**assault** 39:7 41:13 42:6 49:17 70:12 70:21 97:13
**assaults** 43:22
**assessment** 18:6,8 58:1 90:1
**assignment** 50:16,21
**assignments** 50:19
**assist** 12:25
**assisting** 12:21

**Association** 5:12,13
**assume** 63:5 90:13
**assuming** 26:25 78:17 81:25 85:22 88:1
**assumption** 78:21
**assuredly** 83:22
**attention** 11:23 12:18 69:4
**Attorney** 93:9
**attorneys** 68:1 104:18
**Attorney's** 9:10 10:1 11:8 17:25 23:17
**August** 8:16,17
**authorities** 7:17
**authorized** 104:8
**autopsies** 12:17,25 25:22 48:8 83:2 90:19 90:20
**autopsy** 7:5,9 7:23 8:9,11 8:21 11:18 11:21 12:14 12:24 13:14 13:15,18,21 14:5 15:10 16:9,25 17:1 19:23 21:23 22:12 23:20 23:23 24:6,7 25:5,11 28:7 29:9 41:25 44:22 46:4,5 46:9,12 55:19 61:12 67:9,10 70:4 70:9,14,20 77:2 89:23 90:4 91:22 92:5,17 95:18 97:11 98:4
**available** 15:6 15:8 45:9 68:2 83:10 85:7
**Avenue** 2:4
**avoid** 43:5
**aware** 38:5 47:4 51:3 65:6 96:17

97:6
**a.m** 4:4 68:20 68:20 88:24 88:24

**B**

**B** 1:17 3:4 4:1 4:5,15 103:1 104:4
**back** 7:13 10:9 33:20 46:21 48:22 52:5 55:14,16 56:1,2,3 71:7 84:1 91:11 96:8
**bacterial** 52:16
**bag** 61:4 76:2,6 76:19 85:15 85:16,16,18 85:19,20,21 85:25 86:3,7 86:11,17 89:3,6,8,11 89:13,13,15
**base** 22:16
**based** 36:8 38:1 49:10 52:11 54:15 64:16 65:24 67:6 82:23 94:4 95:5,8
**basic** 35:9
**basically** 9:14 9:19 17:12 20:25 35:1 41:17 54:18 79:3 89:14 94:18 97:13
**basing** 82:10
**basis** 44:17 45:17 55:6 65:19,21
**Bates** 60:4,11 61:17
**BCA** 3:10 7:11 10:16,22 15:17 21:19 44:9,11 45:24 54:20 58:5 59:9 65:6 66:23 67:15,20,22 68:15 69:20 69:25 70:18 96:10 100:7 100:12
**BCA's** 67:6,23 70:22
**BCIP** 62:19,21
**beginning** 61:25
**begins** 46:6

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 106

**believe** 8:2,23 12:7 13:4,7 13:23 16:18 50:22 56:17 62:23 65:8 66:5 71:10 73:18 74:22 80:20 84:16 96:14 98:9 98:19 99:3 99:15,19,24 100:15
**believed** 65:23
**Benchmark** 4:2
**beneath** 79:2 87:11
**best** 8:7 94:17 96:5 100:11
**better** 23:4 37:4 39:21 71:9
**big** 26:1
**biological** 61:5 61:7
**bit** 7:8 63:21
**bleeding** 75:11
**block** 28:18
**blocking** 13:4
**blood** 62:23
**BNA's** 65:16,19
**board** 5:20,24 6:2
**bodies** 17:5 19:21
**bodily** 26:25
**body** 9:2,18 11:24 12:6 16:23 17:8 37:6 39:15 39:16,19 40:1,5,10,10 61:9 67:13 73:25 74:3 76:13 79:4,6 82:4,11,12 83:1,19,20 84:24 87:7 90:15 94:14
**body's** 79:4
**bone** 87:16
**bottom** 81:2 96:23
**box** 83:14
**BO3-11062** 59:11 61:23
**break** 68:18,20 88:24
**breathe** 85:25
**breathing** 86:16
**brief** 100:4
**briefly** 71:23 71:24 98:14

**brought** 46:12 46:19 83:13
**Building** 2:14
**Burdick** 2:4
**Bureau** 7:11 12:8 45:24

—————
**C**
**call** 12:24 51:7 58:16 72:12 74:15 75:22 78:8 88:11
**called** 7:11 10:19 18:21 19:6 34:24 41:14 94:20
**calls** 20:15,22 38:6
**callus** 19:8
**canal** 22:13 25:4 27:20 27:21 28:14
**cap** 90:8
**CAPITAL** 2:13
**capture** 90:12 90:22
**car** 7:13,17
**careful** 28:18
**cartilage** 87:15
**Carver** 104:2,8
**case** 7:5 9:22 11:23 12:18 15:3 17:1,9 17:15 18:7,8 18:10,10,12 18:12 19:22 22:12 25:7 26:3 28:8,15 30:18 31:14 31:22 32:11 36:9 42:20 43:17,19 45:3,3 48:6 54:14 57:8 57:19 58:12 58:13 59:18 61:21,24 64:18 65:7 66:7,11 67:8 68:6 71:5,21 76:17 81:23 83:23 84:7 85:8,23 86:25 87:18 91:3 92:12 94:20
**cases** 18:15,20 18:24 25:23 28:9,16 33:15,18,23 43:21 45:15 47:15 54:9 54:21 55:1,5

58:6,7 66:24 76:18 94:4
**catching** 6:22
**categories** 18:15
**category** 63:6
**cause** 47:5 52:20 71:5 71:16 72:11 72:14,25 79:19 82:15 82:15 84:4 85:12 86:2 94:16 98:2,3 98:10,16,17 99:12
**caused** 25:10 72:22 77:11 81:7,9 83:7
**causes** 71:8 73:8 99:11
**cavity** 20:12 30:8 46:2
**cc** 42:11
**cease** 27:1
**cell** 35:11,13
**cells** 30:5,7,9 30:16,19,22 31:1,10,12 33:23 34:15 34:16 35:11 35:11 54:11
**centimeters** 76:25 99:23
**certain** 90:9
**certainly** 10:5 89:21
**CERTIFICATE** 104:2
**certification** 5:24 6:1,3
**certified** 5:20 6:2
**certify** 104:3
**cervical** 20:2 20:13 23:2 36:19 46:7 61:8,11 62:15,15 96:25 97:15
**cervix** 22:3,9 22:11,16,17 22:20,24,24 22:24 26:9 26:13,18 27:8,9,13,14 27:23 28:3 29:15 30:9 30:22 31:6 37:25 46:1 57:14,15
**chance** 90:10
**change** 79:19

81:22
**changed** 38:12 38:13 43:24 47:1 72:13 72:15,25
**changes** 5:17 14:18 26:22 38:24 66:11 73:15
**change/loss** 81:17
**characteristics** 86:21
**charge** 14:17
**charged** 104:13 104:14
**chemical** 40:18
**chemically** 40:8
**child** 18:14,22 19:6
**chip** 19:6
**choice** 27:11
**choose** 51:13
**chose** 51:10
**Christine** 1:25 104:3,23
**chromosome** 35:2,16
**circumstance** 37:15
**circumstances** 9:1 37:18
**citation** 48:24
**claims** 11:12
**clarify** 42:3 99:18
**clarity** 15:13
**Clark** 1:25 104:3,23
**classified** 61:4
**clear** 20:6,19 25:19,20 31:5 68:8 88:25
**clearly** 30:10 90:4
**close** 43:13
**closed** 85:2
**closer** 88:8,8 88:10
**clothing** 9:17
**cloudy** 25:19
**cold** 21:3
**collect** 20:23 25:11 28:21 41:15 45:13
**collected** 43:1 43:2 44:7,25 46:8 61:8
**collection** 28:24
**color** 25:20

26:22
**combined** 81:13
**come** 11:24 12:16 19:11 50:15 52:19 71:21 76:18
**comes** 48:16 48:22 82:24
**comfortable** 51:16
**coming** 14:15 80:19
**commencing** 4:4
**common** 19:2 19:16 48:20
**COMMUNITY** 2:13
**compare** 67:12
**completely** 43:17 53:25 85:12,14 90:23
**component** 29:23 34:17 34:19 47:14 56:6
**components** 30:2 37:20
**compromise** 43:5
**computer** 56:2
**conceivable** 30:13
**concentration** 39:18 40:15 40:20 49:2
**concentrations** 56:12
**concern** 25:6
**concerned** 19:6 19:10 28:10 53:9
**concerning** 104:6
**concluded** 95:17
**conclusion** 37:1 65:16 66:11 81:25 82:3 92:16 92:23
**conclusive** 53:7 93:12 94:10
**conduct** 70:3 94:7
**conducted** 7:5 7:9 13:14,16 50:25
**conducting** 90:19

**configuration** 79:5
**confirm** 68:2
**connections** 79:1
**consider** 66:5,7 70:6 90:18 91:17
**consideration** 83:10
**considered** 46:25 56:18
**considering** 75:6
**consistency** 25:5,16,17 26:22
**consistent** 79:12 92:7 92:11 93:25 95:5,9
**consult** 18:4,9
**consultation** 88:22
**contact** 7:10 10:3,6,6
**contacted** 7:10 7:18
**contain** 30:4 36:1 53:11 53:12
**containerized** 44:7
**containing** 61:4
**contains** 35:22 60:8
**contemplating** 91:1
**contempora...** 14:4 23:10
**contents** 69:10
**context** 70:8
**continued** 5:5
**continues** 60:24
**continuing** 5:14,23
**contract** 104:17
**control** 63:24 64:3 104:11
**controversy** 104:6
**conversations** 7:24,25 60:20
**converse** 48:17 55:4
**copies** 17:17 104:13,14
**copy** 4:23 56:3 58:22 68:23

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 107

77:4
**corner** 60:5
**Coroners** 5:13
**corpses** 51:1,4
**correct** 7:6 8:3
23:5 26:19
27:17,24
29:25 30:3
37:21 40:17
40:22 41:3
46:24 50:2,4
60:5,6,25
61:13 62:5,8
62:9 63:7,8
63:14,17
64:3,5,11,13
64:15,24
67:2 68:13
70:7,15 80:9
91:24 92:2,3
96:19 97:4
97:16,19,22
97:25 98:5,7
98:17,21
99:5 100:23
104:10
**Correction**
102:2
**correctly** 12:2
13:19 17:10
17:20 77:1
95:4 96:13
100:14
**cost** 104:12
**count** 60:9,10
**county** 4:18
12:5,5 38:22
104:2,8
**couple** 6:6
68:21 96:6
**course** 7:15
89:19
**courses** 5:5
**court** 1:1 67:22
67:25
**Courthouse** 2:4
**covering** 22:11
**created** 27:8
43:5 50:10
57:14 61:12
74:24
**creation** 41:10
**crime** 10:14
44:8 59:9
**Criminal** 7:12
12:8 45:24
**current** 4:16
**currently** 57:25
**Curtis** 2:14
**cutoff** 51:7
52:3 53:3,22
**CV** 4:24 5:9
**cycle** 26:12,14

26:15,23
27:5
**cycles** 27:1
**cytologist**
31:20 32:4
33:7 55:22
**cytology** 21:5
30:10 48:22
55:18 100:25

—— **D** ——

**Dakota** 1:1 2:3
2:5 7:17 9:4
10:14 12:3
69:3 76:14
**damage** 87:13
87:20,20
**date** 39:2 63:9
63:23 83:11
93:16,19
95:22
**dated** 80:21
**Daubert** 8:15
9:25 11:6
**day** 8:17 13:6
33:5 43:10
104:4,20
**days** 17:22
33:8,16
**dead** 31:11,24
32:10 33:12
33:23 51:1
**deal** 26:1
**dealing** 76:13
**DeAlwis** 80:20
**death** 71:5,8
71:16 72:25
73:9 82:15
83:8 84:4
85:13,24
86:2 94:16
98:3,3,10,17
99:12
**decide** 44:17
**decomposed**
17:4,4 19:21
25:4 76:18
**decomposition**
52:16 81:14
**defect** 72:11,14
72:15,21,21
73:12,14,17
75:10,17
82:15 91:4,4
99:15
**defects** 72:21
74:15 79:10
**Defendant** 1:7
2:20
**DEFENDER**
2:13
**defense** 82:17
82:20

**definition** 23:1
35:4
**definitive** 30:2
57:1
**deformation**
79:15,17
**delineate** 62:3
**delineation**
63:12
**delivered** 79:6
79:7,8
**denote** 91:23
**denoted** 80:25
92:17
**denotes** 63:16
**dental** 18:19
**dentist** 18:20
**dentition** 18:20
**department**
2:3 3:10 12:3
15:14 24:10
50:18 59:8
69:2
**depend** 67:8
**depending**
18:8 26:22
79:7
**depends** 18:9
18:11 32:20
41:11,11
58:4 85:7
**deposes** 4:8
**deposit** 28:14
32:25
**deposited**
28:20 33:1
34:1
**deposition**
1:16 4:1 8:1
8:4 9:25 10:4
11:1,5 25:24
32:23,25
35:3 53:19
53:23 73:13
93:17 95:5,9
95:21 101:10
104:4,13,15
**depositor** 34:7
**depredation**
73:16,19
74:4,6,9,11
74:12,16,17
74:18 77:19
77:21,24
84:18 87:23
87:24
**depth** 75:6,8,8
**describe** 25:17
42:8
**described**
43:20 44:3
46:10 91:5
**description** 3:9

25:9
**destroyed**
14:21,23
21:18
**destruction**
81:16
**detail** 46:16
**detect** 97:4
**detected** 31:10
31:12 36:13
36:22 67:1
**determination**
45:16 57:10
65:2,17,20
70:22 82:22
91:23
**determinatio…**
82:15
**determine**
35:12 45:2
70:18 75:15
77:7,9 92:5
94:16,25
**determined**
65:6 81:5,8
100:7
**determines**
40:21
**determining**
38:11 45:6
47:7 49:3
65:21 84:2
**developed**
20:23 41:14
**dictate** 13:17
**dictating** 13:22
**dictation** 13:20
13:24 14:3
14:16 23:10
**dictations**
14:14
**die** 32:14 83:21
**died** 83:12
85:24 86:6
**dies** 27:2
**difference**
34:23,25
40:13,19
**different** 34:17
40:8 49:2
52:22 53:1
62:18 70:11
74:14 75:7
86:20
**differentiate**
36:4 52:13
52:22 53:1
53:25
**differentiating**
35:7
**differently**
13:17
**difficult** 32:7

**digital** 16:18
**digitized** 17:21
17:24
**dilution** 41:23
42:18 44:4
**direct** 83:13
**detail** 46:16
**direction**
104:11
**directly** 12:21
14:7 43:9
67:25 89:2,6
**disagree** 81:25
82:2 83:15
**disagreement**
83:18
**disappearance**
31:16
**disappeared**
27:6 32:16
**disc** 16:19
**discontinued**
38:16,20
**discount** 73:7
**discouraged**
76:20
**discovered**
12:6
**discrepancy**
51:9
**discussed** 57:3
**discussions**
51:9
**disintegrated**
89:15
**dissecting**
22:15
**dissection**
28:19
**distance** 43:14
**distributed**
20:21
**DISTRICT** 1:1
1:1 2:3
**divide** 20:25
**DIVISION** 1:2
**DNA** 34:3,6,15
34:17,23,24
34:25 35:23
36:3,3,9,12
36:21 37:2
45:13 47:13
47:19 54:11
54:16 55:7
65:25 66:9,9
100:15,21
**Doctor** 4:11,23
11:17 16:20
22:8 25:12
26:8,25 27:4
32:13 33:18
34:22 37:18
39:12 46:22
47:10 49:12

52:25 59:1
61:16 64:16
64:23 66:5
68:17,21,22
69:18 70:10
71:4 74:13
75:14 76:4
76:23 78:6
80:1 83:5,15
86:19 88:20
88:25 89:22
91:1,2,12,22
95:24 96:9
101:8
**document** 9:9
58:18 59:1,4
59:20,25
60:4,8,14,17
60:23 61:19
64:16,24
80:4,18
**documented**
13:8,11
24:18
**documents**
11:2,7
**doing** 13:23
23:22 29:17
42:6 43:23
44:12,13
48:8 54:5
55:9
**doubt** 68:14
69:19,22
70:2,2
**Dr** 4:16 71:25
72:2,4,6,8
80:19,19,20
80:20 83:9
**draft** 14:15
**Dragovic** 3:12
72:8 80:3,19
83:9
**dressed** 46:16
**dried** 44:5,7
**dropping** 39:1
**Dru** 7:21,22
44:22 59:14
61:9
**drying** 44:5
**due** 78:3
**duly** 4:7 104:5
104:8

—— **E** ——

**earlier** 56:5
60:19 90:1
98:14 99:25
**easily** 19:3,5
87:8
**easy** 5:9 24:22
**edification**
34:22

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 108

education 5:5
  5:14
effect 6:5
  74:20 79:9
effects 81:14
efficacy 68:14
  69:19
eight 80:24
either 24:15
  33:20 48:25
  63:18 68:2
elapsed 31:22
  32:15 46:11
elastic 79:1
elevated 46:22
  46:25 47:7
  48:12 49:3
  54:15 55:6
  66:16 95:8
Email 2:7,17
emergency
  49:18
enclosed 85:20
encounter
  22:15
enforcement
  9:7 11:22,25
  15:2,7
ensure 43:1
entail 90:17
entire 22:13
  23:20 27:23
  28:4,6,10,17
  55:25 60:7
  77:15 78:2
entirety 27:20
enzymatic
  34:18 56:6
enzyme 34:1
  48:21
epithelial 30:4
  30:7,9,16
  34:15,16
  35:11
ER 39:7
erased 14:14
Eric 2:20
eric_montro...
  2:18
errata 102:1
  103:3
error 48:5
escape 86:12
especially
  18:24
essentially
  13:20
estimate 32:13
  33:5 46:11
evaluating
  36:24
evaluation
  37:3 40:14

44:8
evidence 3:11
  7:12 22:14
  33:25 34:10
  36:24 37:3
  59:6,23 61:4
  66:12 67:19
  77:20 78:1
  79:10,14
  84:23 87:10
  87:18 94:10
  96:10
exact 24:2 39:2
  48:6 77:5,6
  93:16 95:7
  95:22 98:11
exactly 25:23
  32:3 44:2
  54:3 68:11
  86:4
examination
  3:5,5,10 4:9
  42:7 44:2
  59:5,23 93:5
  96:7,9 97:2
  97:14
examine 22:12
  43:21 83:23
  94:14
examined 82:4
  82:8,25
Examiner 4:18
Examiners
  5:12,14
examiner's
  12:21 51:21
  51:22
examining
  89:24 90:15
  90:25
example 53:5
  92:14
exams 39:7
  41:13 49:17
excellent 82:6
exception
  74:19
exclude 86:1
  86:16
exclusively
  28:9 75:3
excuse 22:19
  98:3
exhibit 58:16
  58:18 80:2,4
  96:8
exhibited
  74:17
EXHIBITS 3:8
Exhibit-33-01
  3:13
exist 24:15
  32:18,21

39:20 91:13
existence
  24:17 76:5
  79:17
existing 6:2
exonerate
  33:21
expect 88:2
experience
  28:16 48:8
  95:8
expert 34:25
experts 10:10
  10:13
explain 43:16
  51:15 73:16
explanation
  81:17
exposure 71:13
  73:8 98:20
exterior 30:12
external 23:1
  28:11 30:9
externally
  79:24 91:6
extract 34:6
  35:14
extracted
  54:22 55:3
extremely
  18:22 19:13
extremities
  19:1
eye 84:17 85:1
  85:2,9
eyelid 85:3

_____
**F**
_____

face 84:11,13
  84:14,24
  85:19 88:8
facilitate 26:17
facility 12:16
fact 37:1,5,25
  48:18 53:24
  64:17 65:12
  66:13 70:16
  74:23 76:8
  82:11 95:1
factor 37:3,5
  45:6
factored 37:15
fair 47:10
  53:16,17
  69:21 89:25
  90:17
fairly 19:2
  32:19
fairness 44:22
  94:14
familiar 78:23
far 8:11 21:12
  23:7 24:19

32:9 40:12
  43:20 51:1
  56:8 58:9,11
  61:10 65:23
Fargo 2:5
farther 33:9
Fax 2:6,16
faxed 56:3
FBI 9:5 12:10
  15:19
FEDERAL 2:13
feeding 81:15
felt 51:16
female 35:12
  35:23 36:1,5
  39:21,23
  40:1,10
Ferenc 72:2,2
field 5:5 6:8
  47:4
figure 47:6
  51:10 76:10
film 17:23
final 24:18
  58:4
finally 11:24
  80:20
find 23:25
  33:23 34:10
  34:14 99:19
  100:15
finding 31:17
  53:16,17
  83:25
findings 93:12
fine 16:3 77:3
fingerprint
  87:4,21
first 2:4 4:7
  7:18,20
  23:14 59:22
  60:14 63:20
  78:19,20,22
  80:22 92:2
  93:11,14,17
  93:21,23
  95:16 104:5
Fischer 10:23
  60:18,21
  65:9
five 68:17
fixing 29:17
flank 72:15,21
  73:12,14,21
  75:10,16
  79:15,18,20
  81:9,9,18
  91:4,8 99:15
flesh 79:18
Flomenbaum
  72:4
fluid 25:25
  26:3 34:1

fluids 39:21
Folks 69:2
following
  44:20 97:3
follows 4:8
follow-up
  68:22 88:21
  96:6 100:4
force 79:6
foregoing
  104:10
forensic 3:12
  5:5,17,20
  9:21 10:13
  10:22 80:12
  83:9
Forks 12:2,4
  69:2
form 55:22,23
formation 19:9
forth 55:25
  87:16
forward 27:2
  44:23
found 7:13,19
  9:2,15,20
  32:16 33:12
  33:15 39:13
  39:14,15
  56:11
four 32:23 33:3
  99:11
fourth 99:3
fracture 19:8
fractures 18:22
  19:1,3,7,7,7
  19:10,13,17
  19:19
freeze 21:3
front 22:20,21
  68:24 83:13
  92:13 96:11
  97:12 98:7
function 26:25
further 42:15
  101:7

_____
**G**
_____

Garry 72:6
gelatinous
  25:18
general 33:10
generally
  11:18 29:16
  33:5 87:2
generated
  11:23
genital 28:4
genitalia 27:19
  27:24 28:6
  28:11,17
geography
  43:13

getting 90:10
give 13:2 25:8
  31:19 35:4
  48:6,24
  59:21 70:20
  76:12 77:13
  79:4 93:19
given 12:18
  16:19 18:19
  25:6 28:15
  28:16 31:14
  37:5 50:16
  50:21 51:6
  73:20,20,20
  85:11 93:17
gives 28:23
  63:13
Glad 20:16
glass 21:5
  55:19
globule 22:1,18
  23:6,15
  24:17,24
  25:22 27:9
  27:11,22
  28:1 29:15
  30:24 31:6,8
  31:9 70:25
  71:1
go 5:11,18 11:6
  28:12,15
  29:7 33:20
  46:16 53:21
  63:21 96:8
goes 33:9,16
  41:1
going 8:10
  13:21 16:1
  21:2,2,4,4,6
  24:13 32:20
  33:15 36:1
  39:1 44:21
  44:23 45:2
  45:12 50:18
  58:5,15
  60:23 65:13
  66:15 67:9
  67:10 79:25
  80:1 83:5
  96:2
good 4:11,12
  4:13 25:2
  39:5 95:25
gotten 12:19
government
  9:10 16:16
  16:19 23:15
  93:10,22
  94:24 95:11
  100:7
Grand 12:2,4
  69:2,2
Great 5:3 63:12

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 109

**ground** 84:15
**guard** 42:21
**guess** 10:6
  21:14 22:10
  22:22 23:3
  24:24,25
  28:5 35:9
  37:4 41:9
  48:7 51:7
  53:24 55:4
  58:16 59:3
  66:6 67:14
  70:10 75:6
  76:8,10,22,22
  78:7 88:12
  92:21
**guys** 88:21,23

——————— H ———————
**HABEAS** 2:13
**half** 32:19
**HAND** 104:20
**hands** 86:18
  87:2 90:16
  90:25
**hang** 79:4
**happen** 46:4
  48:23
**happened** 28:4
  75:11
**happening**
  14:1,4 23:11
  24:7
**happens** 14:13
  15:25 43:7
**hard** 56:3
  76:12
**head** 17:10,11
  17:12 50:17
  85:15,20,20
  85:21 86:3
  86:17
**heads** 31:18
  32:2,4,10
  33:7,8,12,15
  34:5 48:23
  55:25
**headset** 13:21
**hearing** 8:15
  9:25 11:6
**held** 86:18 90:9
**help** 77:3,7
**helped** 57:10
**helpful** 35:21
  77:2
**hemorrhage**
  75:13 87:10
  88:6
**hereon** 69:16
**hereto** 104:17
**hey** 44:19
  48:12
**He'll** 29:14

**high** 37:10
  56:25
**higher** 47:11
  56:12 63:21
**highest** 39:14
  39:18 40:2
  47:18,23
  48:14
**hold** 17:23 82:9
**holding** 90:15
**homicidal** 98:4
  98:11
**homicide** 94:18
  94:22,25
**homicides**
  92:15
**hospital** 21:17
  29:5,8,20,21
  38:18,22,23
  38:23 49:2
  49:16 50:17
  52:4 57:20
**hour** 43:11
  46:8,18
**hours** 32:18,23
  33:3,4 56:4
**house** 16:5,5
**Hoy** 93:17
**hyoid** 87:16
**hypothesis**
  83:25

——————— I ———————
**identifiable**
  47:13
**identification**
  6:12,15
  18:17,17
  58:19 80:5
**identifications**
  18:14
**identified**
  54:10 61:17
  62:10 77:11
  80:17
**identifier** 6:16
  6:19
**identify** 33:21
  35:15 61:6
  80:11
**ignorance**
  18:15 22:19
**imagine** 12:5
  24:1,3,8
  46:17 93:16
  93:18
**impartiality**
  104:19
**implemented**
  51:25
**implementing**
  52:2
**implies** 87:1

**important**
  18:22 23:21
  23:24 37:5
  79:5
**included** 93:3,6
**includes** 97:3
**including** 27:1
  66:9
**incorrect** 68:3
  90:13
**increased**
  51:18
**Independence**
  2:14
**INDEX** 3:1,8
**indicate** 55:24
**indicated** 80:6
**indicates** 97:21
**indicating**
  69:25
**indication**
  70:21
**indications**
  58:11
**individual** 45:3
  67:8
**individuals**
  24:6 47:15
  48:1,9 49:17
**inferior** 75:25
  77:14,19
  78:2,7,11,12
**information**
  27:4 50:15
  83:11
**informed** 50:7
  50:14,20
**initial** 28:21
**initially** 46:19
**injuries** 22:14
  74:19 79:6
  82:24 87:3,4
  87:4,5,5 88:3
**injury** 75:16
  81:5,8 82:16
  91:8 99:19
**insect** 75:1
**insects** 78:5
**inside** 87:9
  90:11 99:16
**inspection**
  27:21
**instance** 14:25
  30:12,16
  35:25 42:19
**instrument**
  72:22 75:15
  77:12 78:13
**intact** 31:18
  32:10 33:4
  34:4 85:2
  88:1
**integrity** 81:11

  81:17
**intercourse**
  30:16
**interest** 104:18
**interested**
  104:17
**interesting**
  83:24
**internal** 27:17
  27:19,24
  28:6,10,17
  49:10,15,19
  50:3,20
  83:21 87:14
**internally**
  79:24 87:9
  91:7
**International**
  5:13
**interpret** 93:12
  93:23
**interpretation**
  54:3
**interrupt** 69:14
**interval** 31:15
  47:16
**investigation**
  8:22 9:14
  23:25 57:19
  94:7
**involved** 7:4
  12:14 75:13
**involvement**
  7:8
**in-house** 13:20
**isolate** 53:2
**issue** 92:8
**item** 61:2,3
  62:4,6,8,13
**items** 60:24
  97:3

——————— J ———————
**Janet** 59:15
**January** 1:25
  4:4 104:4,20
**Jim** 69:4
**job** 70:7
**joined** 50:16
**joint** 19:7,10
**Jonathan** 71:25
**Joseph** 2:19
**joseph_luby…**
  2:17
**JR** 1:6
**jumped** 41:21
**Junior** 59:15
  80:15
**JUSTICE** 2:3

——————— K ———————
**K** 59:16
**Kathrina** 59:14

  61:9
**keep** 5:19 24:3
**keeping** 43:18
**Keith** 2:8 58:22
  80:2 101:5
**keith.reisena…**
  2:7
**kind** 9:18 18:8
  18:11,12
  19:3,12 24:8
  24:11 25:20
  28:16 30:14
  33:19 75:10
  88:3
**kinds** 54:1 90:3
**kit** 33:24 41:14
  41:14,18
**kits** 33:20
**knew** 41:21
  65:23 100:24
  101:1
**knife** 72:22
  78:13
**knot** 86:18
**knotted** 86:15
**know** 5:9 6:25
  8:19 9:3 10:7
  11:11 12:23
  15:2,10,16,17
  15:20 21:13
  21:20,20,21
  23:17 24:12
  24:17,19,21
  24:22 25:8
  27:1 31:5
  32:9 34:8
  35:25 38:20
  39:8,9 40:1
  40:11 47:12
  49:22 50:9
  50:13,25
  51:1 55:10
  56:8,14
  57:23,24
  58:12 61:10
  62:21 65:14
  66:2,6 69:7
  69:16 76:7
  77:13 85:22
  86:3 91:16
  94:16 95:2
  96:1
**knowledge** 8:7
  49:23 51:2
  54:17 101:1
**known** 35:22
  56:8

——————— L ———————
**lab** 10:14 38:24
  38:25 41:2
  43:9 44:8,24
  45:8,13,21,22

  45:23 49:16
  54:18 55:22
  55:22 58:5
  59:10,11
  67:12 70:6,6
  96:10 100:14
**labora** 41:24
**laboratory**
  21:8,9,17
  35:1 38:14
  41:15 42:15
  55:20 59:9
  67:10 92:10
  93:5 94:5
**lack** 18:19
  39:21 71:9
  72:12 84:5
  85:11
**Langer** 78:23
  79:1,9,13,14
  79:18
**language** 92:19
  92:25
**large** 22:18
**largest** 39:17
**late** 38:15 39:3
**law** 9:7 11:22
  11:25 15:2,7
**lawyers** 6:22
**lay** 24:25 33:19
**layer** 79:2
**laying** 37:6
  76:13
**learn** 52:19
  90:13
**left** 68:17
  84:13,14
  85:16 87:25
**left-hand** 62:2
**leg** 17:13
**length** 22:13
  77:1,15
  78:15
**letter** 80:13
**let's** 51:6 89:4
  96:8 97:10
  98:2 99:18
**level** 47:1,8,18
  48:13,14,17
  48:21 49:3,3
  51:4,23,25
  52:3,7 53:3
  54:11 57:5
  66:17 91:17
  95:6
**levels** 37:9
  38:1,2 39:24
  40:20 45:17
  46:22,23
  47:11,23
  53:14 56:24
  91:12,13,20
  92:1,6,9 94:3

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 110

94:19 97:18
**licensure** 6:1
**life** 32:19
**ligature** 76:1,6
  76:19 78:15
  78:17 85:17
  86:8,9,14,22
  89:3,6,9,11
  89:13,16
**liked** 65:1
**Linda** 59:15
**line** 63:19
**lines** 78:23
  79:1,8,13,14
  79:17
**lining** 30:8
**list** 60:24 92:10
  97:14
**listed** 97:14
**listen** 14:24
  15:3
**lists** 60:23
  97:18
**liter** 46:23 47:6
  49:4 51:6,8
  52:3 53:6
  57:6,9
**literally** 89:16
**literature** 33:9
  33:14
**little** 7:8 46:15
  63:21 64:1
**live** 31:11
  50:22
**living** 32:17,19
  47:15 48:1,8
  49:17 51:16
**Ljubisa** 3:12
  72:8
**location** 73:13
  73:14,17,20
  73:24,24
  74:2,7 75:8
  79:23
**logical** 81:16
**long** 8:24 34:11
  34:12 76:23
  99:20
**longer** 33:12
  43:23 44:1
  44:19
**look** 19:14 21:6
  58:21,25
  77:2,5,6
  82:21 86:24
  89:14,21
  99:21
**looked** 31:13
  88:5
**looking** 7:16
  19:12,22
  22:14,25
  23:1,4 31:14

31:17,21
  33:24,25
  34:2,4,5 35:2
  82:5 87:3,12
  87:17,19
  89:17 90:5,7
  90:8,11,14
**looks** 62:17
**loose** 86:15
**lose** 33:6
**losing** 42:21
**loss** 74:19
  81:11
**lost** 42:23
**lot** 11:23,24
  41:13,16
  68:17 82:5
**low** 39:24
  48:22 53:14
  91:16,17
**lower** 17:11
  88:11,13
  91:13,20
**lowest** 48:17
**Luby** 2:19
**lying** 86:15

_____ M _____

**M** 1:25 104:3
  104:23
**maintaining**
  5:25
**maintains**
  17:17
**majority** 11:10
**making** 14:17
  38:24 58:3
  82:14
**male** 35:3,12
  35:23 36:4
  40:4 53:12
  54:11,16
  55:7
**manual** 86:19
  86:21,25
  87:1,19 88:1
**Margaret** 59:16
**margin** 75:25
  77:15,19
  78:2,9,10,11
  78:12 91:6
**mark** 58:16
  64:1 72:4
  80:1
**marked** 58:18
  80:4 97:11
**marking** 97:12
**markings**
  87:21
**material** 7:19
  21:9 22:18
  25:24 26:13
  28:14,20,24

33:1 35:23
  36:3 41:19
  43:1 44:6
  46:7 85:17
**materials** 7:24
  8:5,20 37:25
**math** 20:16
**matter** 104:6
  104:11
**McGee** 1:17 3:4
  4:1,5,15,16
  103:1 104:4
**mean** 7:21
  13:25 25:2
  32:2,25 33:1
  36:12 49:19
  51:15,19
  54:25 58:3
  73:23,24
**means** 53:19
  63:5,19
**measure** 25:9
**mechanism**
  35:6 81:16
**medical** 4:18
  5:12,13
  12:20 51:20
  51:22
**meetings** 5:11
  5:15,18
**memory** 10:24
  23:18 24:2
  69:11
**menstrual**
  26:12,14,15
  26:23 27:1,5
**mention** 23:13
**mentioned**
  23:9,14
  34:18 37:20
  41:1 50:22
  55:9 56:5
  57:22 64:23
  67:15 69:24
  89:22 91:12
  93:9
**mercifully** 96:4
**met** 93:23
**method** 81:5,7
**Meyer** 2:9
**Michael** 1:17
  3:4 4:1,5,15
  72:2 103:1
  104:4
**Michelle** 2:9
**michelle.me...**
  2:7
**microscope**
  21:7
**middle** 76:14
**Minneapolis**
  4:3 104:5
**Minnesota** 3:10

4:3,19 7:11
  10:16,22
  12:8,9 44:9
  44:11 45:24
  59:8 66:23
  68:15 69:20
  69:25 70:18
  70:22 96:10
  104:1,5,8
**minute** 58:25
  68:18
**minutes** 88:20
  88:22
**missed** 19:4,5
  28:21
**missing** 7:14
  9:15 19:1,15
  94:15
**misundersta...**
  43:12
**Mm-hmm**
  15:12 19:25
  63:22
**months** 7:15
  33:16 94:15
**Montroy** 2:20
**morning** 4:11
  4:12,13
  97:19 99:4
  99:25
**motile** 32:21,21
**move** 27:1
  90:10 98:2
**moving** 32:22
**mucoid** 21:25
**mucous** 26:9
  26:10,16,21
**multiple** 33:16
  39:15,16
**Murphy** 59:16
**muscle** 87:11
**M-c-G-e-e** 4:15
**M.D** 1:17 3:4
  3:12 4:1,5
  103:1 104:4

_____ N _____

**N** 2:4
**nail** 87:4
**name** 3:3 4:14
  10:22 13:5
  87:1
**National** 5:12
**nature** 25:18
**near** 23:3
  49:14
**necessarily**
  40:18 70:22
**neck** 17:10
  71:9,16
  72:11,14,21
  73:3 74:20
  75:16,19,21

78:18 79:16
  81:6,7,12
  83:21,22
  85:22 86:5
  86:10,11,14
  87:2,14,21,23
  87:25 88:2,4
  88:7,11,13,14
  91:4,7 98:20
  99:19
**neck/voice**
  83:14
**need** 16:2
  18:20 35:16
  53:3 77:4,5
**negative** 36:10
  36:12 37:2,2
  63:17,18
  64:3,4,6,10
  64:12,14,21
  65:24,24
  66:8,8,9,10
  70:1 93:6
  94:22 97:22
  100:13,24
**neither** 32:9
**never** 24:15
  44:23 50:7
  90:23
**new** 6:3 7:1
  47:4
**nice** 65:4
**Ninth** 4:2
**nonliving**
  33:11
**nonmotile**
  31:18
**nonprostatic**
  52:9
**normal** 25:3
  43:20
**normally** 22:23
  28:7,11
**North** 1:1 2:3,4
  2:5 7:17 9:4
  10:14 12:3
  69:2 76:13
  78:2
**NORTHEAST...**
  1:2
**notary** 103:14
  104:7,23
**notching** 75:4
  75:4 77:10
  77:14 78:7
**note** 92:1
**noted** 5:17
  92:19 103:3
**notes** 13:15,18
  13:25 14:2
  24:7,9,10,14
  24:14 104:10
**noticed** 104:13

**November** 27:6
**nucleic** 34:13
  35:14
**number** 3:9
  7:15 11:22
  12:12,13
  15:11 19:24
  38:24 48:16
  49:9 51:17
  52:3 53:10
  53:22 58:16
  59:10,11
  60:4,11
  61:17,21,24
  77:6 83:5,8
  91:18,20
  94:15 95:8
**numbers** 45:9
  93:2 95:5

_____ O _____

**oath** 104:9
**object** 90:7
**observable**
  40:19 89:10
**observe** 70:20
  75:20 82:11
  82:12 84:20
  87:22 88:16
  89:2,22,23
  90:4
**observed** 21:24
  22:9 27:14
  30:20 70:4
  72:15 79:11
  99:16
**observing**
  90:22
**obviously** 19:8
  29:23 39:17
  49:25
**occluding**
  85:25
**occur** 87:6
**offered** 65:4
**offering** 38:15
  38:25 54:19
**office** 2:13
  5:16,16 9:10
  10:2,19 11:8
  11:24 12:4,6
  12:15,21
  13:12,13
  15:16,19
  17:18,19,25
  20:23 23:18
  28:12 38:13
  38:17 41:11
  41:12,16,20
  41:25 42:12
  44:5 51:21
  51:22 54:19
  54:24 56:4

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 111

68:4 92:15 92:20
**officers** 23:19
**Oh** 13:10 16:14 18:17 41:11 43:12 48:10 59:24 68:16 68:25 83:22 96:4
**okay** 4:20,23 5:1,3,8,20,23 6:7,14,18,21 7:21 8:1,13 9:12,21,24 10:9,18,21 11:1,11 12:11 13:24 14:3,3,11,19 15:9,22 16:7 16:11,15,20 17:3,8,14,17 18:2,4,11 19:23 20:16 20:19 21:12 21:23 22:8 22:19 23:3 23:14 24:22 25:16,21 26:5,8,16 27:4,12,16 29:1,1,7,13 29:23 30:4 30:14 31:9 32:6,9,13 34:14,22 35:18,20 36:7 37:24 38:4,10,20 39:12 40:1,4 40:7,12,23 42:2,8 43:16 45:10 46:1 46:21 47:10 47:22 48:7 48:10,17 49:1,6,9,19 50:9,14,19 52:11,19 54:8 55:4 56:11,17,24 57:8,18,22 58:9,17 59:2 59:3,12,17,20 59:25 60:2,8 60:16,19,23 61:15 62:2 62:23,24 63:1,6,12,20 64:6,10,23 65:12,15 66:23 68:18 69:4,7,9,13 69:24 70:20

70:25 71:4 71:19 72:10 72:20,24 73:12 75:19 77:2,8,18 78:23 79:22 79:25 80:10 80:21,24 81:1 83:5,17 84:1,20,23 85:1,5 87:18 88:14,19 89:19 91:11 91:22 93:8 95:23 96:2 96:17,21 97:2,6,10,10 97:18,21,24 98:2,14 99:10,18,24 100:2
**old** 6:2 17:22 19:20 33:20 33:23 49:12
**once** 6:1 14:13 20:23 27:2 32:17 43:7,8 44:6
**ones** 17:9,14 82:17
**one's** 54:5
**open** 37:7
**opening** 23:2,3
**operating** 16:10 24:9
**opine** 78:13
**opinion** 22:6 37:16 46:25 56:22 72:11 72:13,20,24 75:5,14 76:4 78:6 79:19 81:22 82:9 83:7,12 84:8 98:10,15 99:1,12
**opinions** 82:7
**opportunity** 11:2 14:24 15:3 28:23 71:19
**orally** 50:8
**order** 44:24,24 51:17 55:22 55:22 58:5 78:6,15 86:6
**ordered** 29:1 29:19 104:13
**organ** 87:20
**organs** 83:21 83:23 87:14
**original** 6:22 73:10 104:12

**os** 23:2
**outcome** 104:17
**outline** 5:8
**outside** 50:1 76:18 87:7 90:11

_____
**P**
_____

**package** 21:2
**packages** 21:1
**page** 3:5,5,6,11 3:13 9:5 11:9 59:13,22 60:2,11,14,16 60:23 61:15 61:16,19,22 80:16,17,22 80:24 81:2 92:2 96:21 97:12 98:7 99:21
**pages** 8:24 60:7 103:2
**Page/Ln** 102:2
**panel** 3:12 80:12 83:9
**paper** 33:19 34:8
**paragraph** 96:22
**part** 5:14 17:25 19:23 26:12 26:14 39:14 42:17 70:4 77:17,18,18 83:13 84:18 88:7,8,11,13 88:14
**partially** 17:4
**particular** 17:15 18:10 19:22 25:22 26:3 30:18 31:14 32:11 38:6 52:21 59:18 61:22 62:18 66:7 66:10 71:20 73:17 83:18 83:23 85:8 87:18
**particularly** 31:22 35:21
**parties** 59:17 104:13,17,17
**parts** 17:8 32:1 32:2 39:15 40:9
**party** 104:13
**passage** 26:17 85:6
**pathological**

82:23
**pathologist** 13:17 14:16 14:17,25 36:24 41:6
**pathologists** 40:24 71:20 82:14
**pathology** 5:6 5:18,21
**pediatric** 19:14
**peer** 49:22
**penetrating** 73:21
**penis** 30:12,15
**Pennsylvania** 2:15
**people** 7:15 9:4 12:12,13 33:15,19 51:1,16,23 82:6 87:7 92:25
**people's** 18:19
**perform** 44:16 83:3
**performed** 63:9,24 90:20 92:14 93:5
**period** 37:7
**periorbital** 85:10
**perpetrator** 33:21
**person** 13:1 14:7 32:17 34:7 51:25 55:16 82:7 82:13
**personally** 83:1
**persons** 104:18
**perspective** 45:19,20 54:25
**petechiae** 84:5 84:23 85:5,8 85:11
**Peterson** 72:6
**petition** 11:13
**Petitioner's** 58:17 80:1
**Philadelphia** 2:15
**Phone** 2:6,16
**phonetic** 69:15
**phophatase** 39:12,16 40:7,9 43:25 56:2 57:5 92:9 93:2
**phosphatase**

6:15,15 21:10 29:6 34:20 37:9 37:19 38:2 38:11,14,16 39:18 40:2 40:13,15,23 41:5,23 44:1 44:12 45:5 45:11,17 46:22 47:1,7 47:11,18,23 51:4 52:7,8,9 52:14,15,23 53:2,3,4,6,11 53:18 54:1,2 54:21 55:1 55:10,12 56:13,18 63:4 66:16 91:11,12,20 92:1,6 95:6 95:10,18 97:18
**photograph** 90:12,14
**photographing** 90:18
**photographs** 15:9,11,14,17 15:18,18,20 15:23,23 16:2,3,4,8,11 16:15 18:1 75:20 82:14 82:22,23,25 83:20 89:14 89:18,19 90:21 91:5
**photos** 85:1 89:25 90:5,7
**physical** 3:10 17:23 18:24 25:8,9 50:5,7 50:10 59:6 59:23 67:13 73:24 75:9 86:20 96:10
**physically** 82:8 82:12 90:25
**physician** 26:8
**place** 7:17 9:16 46:5
**placed** 34:7 85:21 86:4,8
**Plaintiff** 1:4 2:9
**plastic** 61:4 76:2 89:3,6
**play** 36:25 37:3
**played** 84:3,4
**please** 4:13,17 5:8 42:9

**plus** 64:2,3
**point** 8:19 9:14 15:6 21:12 50:6 69:10 83:18 91:2 94:1,23 95:11 100:6
**police** 7:11 8:12 12:2,9 12:16,16 15:18 66:18 69:2 94:6
**Polk** 12:5
**portion** 30:12
**portions** 30:9
**position** 4:16 4:20 90:9
**positive** 25:25 53:16,18 63:24 64:1 65:16 66:18 66:20 93:6 94:6
**possibilities** 73:7
**possibility** 31:23 71:11 73:7,11 75:2 76:7,9 86:1 99:3
**possible** 14:1 25:1 34:14 34:16 71:8 73:8 74:22 76:19,22 79:15,19 85:23 86:2 87:22 99:5
**possibly** 53:13 88:3
**postmortem** 18:18 31:15 47:16 81:13
**practice** 16:7 19:2 38:10 38:13 43:21 43:24 48:11 51:20,22 82:19 90:17 92:4,4,8,14
**practiced** 33:7
**prairie** 76:14
**predate** 93:17 93:19
**preparation** 9:24 10:9 11:1 41:5,9 42:18
**prepare** 14:19 21:5 41:22 42:13
**prepared** 20:4 29:9 42:1

**Benchmark Reporting Agency**
**612.338.3376**

Deposition of Michael B. McGee, M.D. - 1/4/2017
United States of America v. Alfonso Rodriguez, Jr.

Page 112

43:7,8 55:19
**prepares** 29:7
**preparing**
10:11 41:18
43:24 44:4
**presence** 31:21
38:11 47:12
53:21 56:19
56:20 66:21
70:1 92:7,18
93:13 97:4
**present** 10:4
10:10 11:20
21:11 24:6
26:15 30:11
65:7,9,17,20
76:2 77:14
78:5,17
87:24 88:15
91:24 94:3
94:19 95:1,3
95:18 100:8
**presented**
77:10
**preserved**
14:11 71:1
76:5 84:17
84:19
**pressure** 83:13
83:21 86:16
87:6
**Presumably**
62:10
**presumptive**
56:18,25
66:17,20
**presumptively**
94:6
**pretty** 7:16
18:18 19:9
**prevented**
76:20
**previous** 66:15
94:4
**previously**
46:9 56:17
58:12,13
67:15 71:15
81:20
**primary** 10:3
40:13
**principals**
59:12,14
**prior** 7:4 8:4,6
10:20 25:22
28:4 37:24
41:22 52:2,3
55:15 57:4
58:9,12
96:14 100:9
100:10
**private** 38:22
38:23

**probably** 12:4
12:17 13:12
13:13 23:3
23:12,18
24:4 25:14
32:18 38:15
46:8,18 48:5
54:6 73:5
78:3 79:16
91:7 94:19
100:11
**procedure**
16:10,25
20:17,18
24:9 44:6
**process** 46:3
**processed**
46:18
**processing**
20:15,15
28:12 46:5
**produce** 24:11
26:9,9,13,13
26:14 39:16
39:24 91:19
**produced** 9:3,4
27:13 40:4,8
40:9 50:10
52:15 53:10
55:10 59:7,8
59:20 60:17
61:11 75:16
92:20
**produces** 40:2
**profile** 34:6
**projectiles**
19:22
**prolonged** 37:7
**pronunciation**
69:15
**property** 16:5
**prosecuting**
68:1
**prosecution**
82:21
**prostate** 39:14
40:6,7,8
53:12,23
56:9 91:14
**prostatic** 39:17
52:8,14 53:2
53:4,6,10,17
54:1 95:9
**protocol** 20:15
20:22,22
41:17 42:10
42:24 43:18
**provide** 5:2
9:21 68:4,8,9
94:10
**provided** 8:19
9:9 14:16
15:24 16:16

17:25 45:1
83:11
**PSA** 56:8
**public** 3:10
59:8 103:14
104:7,23
**publish** 49:25
49:25
**published**
49:20,21
**publishing**
49:24 50:3
**purpose** 26:16
**purposes** 16:2
19:19 29:16
49:16 94:13
**put** 24:20 43:3
85:21 92:23
**p.m** 101:10
**P1** 3:10 58:17
58:18 68:23
**P2** 3:12 80:4
**P30** 6:18 34:20
37:22 39:9
44:13 56:5
56:11,19
57:9,20,23,25
58:12,13
63:6,13
64:17,20
66:2,3,10
100:22

_____
**Q**

**Quentin** 2:4
**question** 24:13
27:22 35:9
37:4 38:7
39:5 47:5
52:21 53:20
67:14 70:11
77:7 92:21
95:2
**questions**
68:22 71:4
96:6 100:3
**quick** 96:3
**quickly** 32:13
96:8 98:2
**quit** 54:18

_____
**R**

**radiologist**
18:4,9,13,25
19:14
**raised** 11:12
**Ramsey** 4:18
**rape** 33:20,24
41:14,14,18
**rate** 104:14
**read** 11:9
15:13 32:20
33:19 71:23

71:24 73:6
103:1
**readily** 87:8
**reading** 20:6
34:8 89:25
90:5 104:15
**readings** 5:15
**reads** 81:5
**realize** 43:13
**really** 7:18
8:25 19:18
32:17 48:12
48:21 68:8
76:17
**rear** 22:20,22
**reason** 19:21
26:6 28:22
29:19 35:13
42:17,20
56:14,15
68:14 69:19
69:21 70:2
84:7 92:16
92:21 93:10
102:2
**reasonable**
30:17
**reasoning**
35:19 54:6
**reasons** 19:20
23:22 28:19
54:17 83:17
**recall** 9:6,13
10:21 11:20
13:1 16:11
16:13 17:6
23:7,14 24:5
47:17 49:12
60:19 74:13
76:23 77:18
84:1,11 93:8
95:16 98:11
98:23 99:7
**recapture**
90:24
**received** 8:23
86:5
**recertification**
6:4
**recite** 11:14
**recollection**
99:24 100:11
**reconcile** 65:15
**record** 4:14
11:16 32:24
58:11 80:11
89:4 99:18
**recorded** 23:10
93:3
**recording**
14:11,13,23
15:4 23:13
**recovered** 22:9

48:23 85:18
85:18
**recovery** 9:16
9:17,17 23:6
**rectal** 97:15
**Reemer** 69:15
**Reexamination**
3:6 100:5
**reference**
61:25
**referred** 61:21
**Referring**
91:11
**reflected** 23:7
**refute** 68:2
**regard** 18:21
45:14
**regarding** 5:17
7:12 38:10
52:22 55:11
69:20 70:25
72:11,14,25
73:12 75:19
80:14 91:3
**region** 17:13
20:1,2,2,13
20:14 22:3
35:22,25
46:2 73:21
84:24 85:10
88:7
**regions** 19:24
20:4,8,9
29:20 31:3
38:17 39:23
42:19 43:4,6
43:14,23
46:7 49:2
50:25 51:8
52:6,12,22
53:1,4,5 55:9
55:14 57:20
**regular** 34:23
44:16 47:15
**regularity**
18:21
**Reisenauer** 2:8
3:5 10:2
58:23 69:14
80:14 95:25
96:2,5,7
100:2 101:6
**related** 7:14
28:9 92:15
94:17,22,25
104:16
**relating** 59:13
**relation** 79:8
**relationship**
86:4
**rely** 18:7,12
45:5,9,20
57:25 58:3

67:3 68:4,12
70:17 82:14
**remain** 21:13
75:21 78:16
**remained** 6:3
76:1,2,5,10
76:24 88:7
**remains** 81:15
98:16
**remember** 9:3
12:2 13:7,19
17:7,10,20
60:20 77:1
84:10 95:3,6
100:13,13,17
**Remer** 69:5,7,9
69:11
**remnant** 52:15
**remnants**
53:11 85:15
85:18
**removal** 27:12
28:4
**remove** 28:13
28:17,18
**removed** 27:14
27:19,23,24
28:7 89:11
89:13
**rendering** 16:2
**rendition** 90:8
**repeat** 7:1
**replaced** 14:14
**report** 3:10,12
8:9,10,11,11
8:21,22,23,24
14:19 16:3
24:11,18
33:14,16
50:5,7,10
52:6 56:1
59:5,5,22
61:25 66:25
68:22 69:1
69:10 77:3
80:3,12,13
83:8 90:6
91:5,22 92:5
92:11,13,17
92:19,22
93:4 95:19
96:9,14
97:11,13
98:4 99:21
100:17
**reported** 39:24
55:14 66:18
91:15,19
104:4
**reporting** 4:2
55:16
**reports** 52:5
53:4 67:15

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 113

67:20,22
68:6 71:20
72:10,18,25
82:6 89:25
92:8,20
**represented** 73:22
**represents** 35:3 81:12
**reproduce** 90:24
**request** 55:21
**require** 6:3
**requirement** 5:23,25
**research** 38:5 38:6 47:4
**respect** 81:6,8
**responsible** 55:16
**result** 50:12 63:13 66:9 66:10 86:7 86:12
**resulting** 81:13
**results** 9:21 45:7,11,20,21 50:20 55:14 64:20 67:11 67:12,15,18 67:23,24 68:10 69:24 70:2,6 92:10 93:5,7,24 94:21 96:18 96:23 100:12
**retain** 21:21
**retained** 34:11 34:13 89:5
**review** 8:12 11:2,5,10,15 71:19 82:17
**reviewed** 7:23 8:5 11:4,11 11:14 18:25 49:22 80:7,8
**reviewing** 18:5 19:4 72:10 72:18,24
**reviews** 18:2
**ridge** 78:7
**right** 7:3,22 11:17 12:24 14:6,20,22 16:17,19 17:16 20:3 20:16,19 22:2,4 27:15 28:2,25 29:9 29:17,22 31:3 33:17 34:8 38:3,19 39:25 42:25

44:10 45:25
52:10 56:7
59:22,22
61:6,14 62:7
62:17 64:2
66:22 67:17
74:1 81:18
83:4,4 84:6
87:25 88:3
88:18 91:1
95:13,15
96:15 99:25
101:3,3
**right-hand** 60:5
**rodents** 81:15
**Rodriguez** 1:6 11:12 59:15 80:15
**Rodriguez's** 4:21 6:22 36:12
**role** 36:25 37:1 84:4
**room** 49:18
**rope** 78:15 85:21 86:7
**rough** 14:15
**RPR** 1:25 104:3 104:23
**rule** 33:10 71:17 73:6 74:25 75:1 85:12,14
**rules** 6:2,3
**run** 62:18 63:18

——————
S
——————
**S** 62:13,15
**safe** 51:17
**safety** 3:10 51:14 53:15 59:9
**saline** 21:7 42:11,14,15 43:2
**sample** 36:5,15 36:17,19 44:20,20 61:5,7
**sampled** 20:24
**samples** 30:20 36:13,22 57:13
**sampling** 48:5
**saved** 14:21
**saw** 50:5,7 55:23 67:9 83:19 84:23 91:3
**saying** 74:7
**says** 63:6,9,23

63:24 67:1
81:11 83:7,9
97:2 98:4
99:21
**scene** 70:9
**scientific** 47:5 66:12 67:19 72:13
**SEAL** 104:20
**search** 29:2,19 37:2 66:8 100:25
**searches** 29:8
**second** 13:2 27:11 58:21 58:22 59:21 60:2 69:15 96:21,22
**secret** 24:3
**secretions** 25:3
**section** 44:15 45:1 54:20
**secure** 86:11
**see** 18:6,23,25 19:9 21:10 25:2,3 32:4,7 32:22 33:3,7 33:8 35:2,16 48:20 59:12 63:2 65:4 68:6 70:13 73:1 76:18 77:25 78:6 79:3,10 81:3 81:18 83:19 83:20 86:21 87:9 88:21 89:16 96:25
**seeing** 19:19 28:10 45:10 45:15 67:13 70:8
**seen** 16:6 24:13,14,15 25:21,23 27:22 30:10 30:11 32:5 47:18 48:11 48:14,18,18 59:25 64:24 65:2 81:20 85:9 87:8 88:3 96:14
**semen** 6:12,16 6:19 22:6 29:24 30:2,4 34:19 37:1 37:20 38:1 38:12 39:4,6 45:7,16 47:14 54:10 54:15 55:6 56:6,12,19,20

57:11,16
58:2 65:7,16
65:17,20
66:14,21,24
67:1,1,7,20
69:20 70:1
70:17,23
91:23 92:7
92:16,18,18
93:13,25
94:11 95:1,3
96:24 97:4
100:8
**seminal** 25:25 26:3 34:1 53:8
**send** 44:20 55:18 66:25
**sent** 21:8 42:14 42:15,18 44:7 55:20 55:21 69:1
**separate** 21:1
**separated** 74:8 74:10
**separately** 31:7
**separation** 79:12
**September** 80:15,23
**sequential** 60:13
**Sergeant** 69:4 69:7,9,11
**serologic** 67:23
**serologist** 35:16 54:23 55:3
**serology** 6:8 44:15,24 45:1,8,21,21 54:20 58:5 67:24
**serves** 23:18
**set** 21:1 41:17 86:20
**seven** 33:8
**sex** 28:9 92:14 94:17,22,25
**sexual** 39:7 41:13 42:6 43:22 49:17 70:12,21 97:13
**shaft** 19:8
**shaking** 19:11
**sharp** 72:22 75:15 77:11 78:13 79:5
**sheet** 102:1 103:3
**sheriff's** 12:3,6

15:14,16,19
**she'd** 55:24
**shoot** 16:1
**shooting** 16:18
**short** 32:19 47:16
**show** 57:5 58:15 79:25
**showed** 78:1
**showing** 82:25
**shown** 88:5
**sic** 65:16
**side** 21:5 62:2 84:11,13,14 84:15 87:25 87:25 88:4
**sign** 64:3,4,6 64:10,12,14
**signatories** 80:18
**Signature** 103:7
**significant** 26:5 40:18 75:11 84:12 90:19,21
**signing** 104:15
**similar** 25:21
**simply** 31:20
**sir** 4:12 5:22 26:4
**sit** 11:8,14 35:5 76:15 99:10
**site** 20:24 21:16 25:11
**sites** 21:19
**six** 20:8,8,12 20:13,24 99:21
**size** 24:24
**Sjodin** 7:21,22 27:5 44:23 46:12 59:14 59:16 61:9 79:11 83:12 92:13 99:13
**Sjodin's** 83:7
**skin** 77:23 79:2 79:3,12 81:12 87:5
**slash** 71:9,15 98:20
**slashing** 73:3
**slides** 29:7 31:19 42:1 42:13 43:7 44:4 55:19
**slight** 25:3
**slightly** 70:10
**slip** 55:21
**small** 19:10,13 32:8
**smaller** 81:14

**smear** 21:4
**soft** 79:2 81:12 83:24 84:17 87:10,10,12 87:15,20 88:4
**solution** 41:10 43:8
**somebody** 12:20 27:2 33:21 42:3 50:10 95:21
**someone's** 87:2
**somewhat** 23:21
**sorry** 7:22 16:14 33:1 48:6,10,16 50:12 57:24 65:14 80:2 80:11 93:20
**sort** 12:22 72:22
**source** 53:8
**sources** 53:12
**South** 4:2
**speak** 14:9 69:9
**speaking** 14:7
**specific** 6:7 8:5 56:9,19
**specifically** 6:12 11:11 22:8 51:20 57:15 60:20 71:25 74:2 74:13 75:19 90:5 91:3,23 92:5,17,22 100:21
**specimen** 44:25 56:2
**specimens** 20:24 41:15 44:18
**spell** 4:13
**spent** 45:14 82:5
**sperm** 26:17 29:2,19,23 30:4,19,22 31:1,10,12,18 31:18,21,23 32:1,10,14,17 32:21,22 33:4,12,15,23 34:2,3,7,11 34:13 35:10 35:11 37:2 47:13,19,25 48:3,19,23 54:11,16

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 114

55:6,23,24,25
65:24 66:8
97:22 100:25
**spoke** 10:21
**spots** 87:11
**Square** 2:14
**stab** 73:22
**standard** 16:7
16:10,25
20:17,18
24:9 44:5
92:4,8,14
**standing** 23:19
**standpoint**
82:23
**start** 33:6
51:24
**state** 4:13,18
5:18 6:1 7:10
12:9,16
15:18 31:21
34:12 44:8
104:1,8
**States** 1:1,3
2:3,4
**stay** 66:15,19
88:20
**staying** 73:10
**stenographic**
104:10
**steps** 9:16
**Steven** 10:22
60:18 65:9
**stop** 25:10
**stopped** 38:14
39:2 55:9
**strangulation**
84:3 86:19
86:22,22,25
87:1,19 88:2
99:5
**Street** 2:15 4:3
**strictly** 67:9,10
**strip** 75:21,22
76:1,4,23
77:25 78:12
89:1,2,5,10
89:17
**strong** 82:7
**studied** 71:23
80:7 84:21
**studies** 50:25
51:4 55:11
57:3,4
**study** 49:10,12
49:16,19
50:12,21,22
**subject** 53:13
84:18
**subject's** 37:6
**submitted** 11:7
56:1
**subscribe**

19:11
**subsequently**
21:19 43:6
**substance**
54:10 70:16
95:17
**substantial**
104:18
**sub-number**
81:3
**sufficient**
66:12 88:15
**suggest** 85:19
**Suite** 2:5,14
4:3
**summarized**
8:25 9:19
**summary** 8:24
9:5,6,7,12,12
**sure** 7:2 10:25
11:19 12:20
13:3 15:20
19:15 24:5
32:3 33:22
35:1 39:5,6
42:10 48:2
63:18 76:22
77:16 82:6
95:20,20
96:13 100:19
**surface** 74:18
77:23 87:3,3
87:5
**surprising** 37:8
**surrounding**
9:1
**suspect** 57:1
94:23
**swab** 27:9,13
28:1,13,21
62:11,13,15
63:16 96:24
96:24,25
**swabbed** 19:23
31:6,7 97:16
**swabbing** 28:3
28:12 29:17
**swabs** 20:4,7,8
20:9,9,12,12
20:13,14,20
20:24,25
21:7,10,12,13
21:15,15,18
27:8 29:2,14
29:15 41:5,9
42:12,14
43:2 46:1,13
46:17 57:13
61:8,11
62:19 63:13
66:7,14
70:25 91:24
94:9 95:1

**swished** 21:7
42:13
**sworn** 4:7
104:5
**system** 28:5
**S-j-o-d-i-n**
59:14

_____

T
_____

**table** 22:15
29:9,18
42:25,25
46:13,20
55:20
**tablespoon**
25:14
**tail** 32:4
**tails** 32:2,7
33:4,6
**take** 13:18 16:3
16:4,8,15
20:25 24:9
42:11 58:20
58:25,25
68:17 70:3,8
70:13 83:15
90:21
**taken** 4:1 5:4
9:16 13:15
13:25 14:2
15:10 16:21
17:6 31:19
43:8 46:14
**takes** 24:10
46:5
**talk** 10:19
25:16 32:14
44:15 49:24
58:21
**talked** 10:17
69:11 95:20
98:14 99:4
**talking** 19:5
22:18 24:25
32:24 37:11
59:17 74:7
88:17
**talks** 96:23
**taped** 14:21
**teaspoon** 25:13
**technician**
12:22,23
13:5 29:10
29:12,16
41:4 42:3,5
43:9
**techs** 12:24
**tell** 7:8 11:4,8
15:25 22:8
23:23 24:1,4
24:23 26:8
35:5,13
44:23 54:4

56:15 60:7
60:17 65:12
65:19 69:1
76:15 78:25
79:22 80:10
80:17 82:2
83:17 85:2
89:15 90:3
100:7,12
104:5
**telling** 67:7
97:7
**tells** 40:15
**ten** 33:8
**tendency** 74:18
104:18
**term** 21:25
22:21 23:4
39:21 71:9
**terminology**
22:23 95:7
**terms** 12:23
14:3 24:25
43:24 48:11
67:19 87:20
97:12 98:11
98:16
**terribly** 37:8
**test** 33:20
38:15,21
39:1 44:1
53:25 56:18
63:9,17,23
66:17 68:9
94:3,21
96:17 97:22
**testable** 40:19
**tested** 21:20
30:20 34:9
34:19 36:5
36:13 37:24
41:23 43:6
45:2 57:13
60:24 62:3
66:14 70:16
**testified** 6:25
8:1,15 36:7
38:4 49:13
54:9,22 55:1
56:17 65:9
71:15,22
73:13 74:22
90:1 96:18
97:16 98:9
98:23 99:15
100:16
**testifies** 4:8
**testify** 65:13
66:13 67:6
67:18,20,22
83:2 95:12
97:24
**testifying**

97:19 99:7
**testimony** 5:3
6:9 7:4 8:4
8:17 9:24
10:9,11,20
22:5 30:19
36:8 37:24
38:7 41:22
46:21 47:2
49:1 51:3
52:11,20,21
54:8,23 57:4
58:9 65:3,5
66:15 67:4
68:3,4,5,9
71:7 72:16
73:10 84:1
95:4,17
96:19 97:7
99:11 100:10
**testing** 9:22
21:17 29:6
34:15,23,24
35:6,10,21,22
36:9 39:2,4,6
39:7,10
40:23 41:6
42:16 43:23
43:25 44:11
44:12,14,16
44:19 45:8
52:12 54:19
54:20,21
55:10 56:19
57:9,20,23,25
58:13 62:23
63:13 64:17
64:20 66:2,3
66:6,23,24
68:15 69:19
69:22 94:9
94:21 95:18
96:23
**tests** 29:1 35:7
38:24 62:18
94:5
**thank** 5:3 7:3
20:16,20
23:6 33:2
35:20 54:8
58:23 68:21
69:17 80:21
91:1 95:24
101:8,9
**theory** 19:12
**thereof** 104:8
**thing** 4:22 19:3
30:14 33:25
44:3 99:18
100:24
**things** 7:1
21:24 34:9
37:10 62:3

86:24 87:22
88:16 89:23
90:3,18,21
98:23
**think** 6:4,5,5
7:19 8:7,8,12
11:16 12:10
13:5 14:2,3
17:7,20
21:25 23:18
32:7 35:3,5
39:8 48:15
49:4 52:4
53:16,19,20
56:5 57:3,22
58:7,10,10
66:16 70:5,5
70:6,7 74:17
75:2 76:25
76:25 77:5
77:21,23
78:3 80:2
84:1,5 85:8
86:2 89:18
94:22 95:3
**third** 60:16
63:6
**Thirty** 60:10
**thorough** 28:23
**thought** 7:13
51:17 73:22
**thousands**
47:24
**three** 17:7 20:8
20:9 21:1,2,3
21:15,18
32:22 33:3
36:22 42:11
62:3,17 71:8
97:3,14
98:23
**tied** 86:15
**tightly** 86:7
**tightness**
86:11,13
**time** 4:20 7:18
7:20 8:23,25
9:2,20 13:18
13:23 14:1
15:15 16:17
17:21 28:11
31:15,16,22
32:15,15,16
36:7 37:8
39:9 41:25
41:25 42:6
42:10 46:3
46:11,12,13
46:15,19
49:5,6 52:6
52:13 57:18
60:1 61:11
61:12 65:2

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 115

65:23 82:5
85:6 93:21
93:23 96:18
97:6,24 98:9
98:15,24
99:8 100:25
**timeline** 9:19
**times** 68:6
**timing** 18:23
**tipped** 26:2
**tissue** 74:19
75:22 76:5
76:15,16,23
78:1,3,12
79:2 81:12
83:24 84:17
85:7 87:10
87:11,12,15
87:20,25
88:15 89:1,2
89:5,5,8,10
89:12,17
90:8,10,15
**tissues** 87:11
88:4
**title** 59:3,5
**today** 17:19
45:4 60:19
67:23 96:15
96:19 98:14
98:16 99:1
99:10
**today's** 11:1
**told** 23:15,17
23:19 51:23
54:5 65:8
93:14 94:2,3
94:8,12
95:16 100:14
100:15
**top** 17:12
59:13 61:21
77:25 80:25
**torso** 17:11,11
17:11 88:9
88:10
**total** 20:8,10
20:14 52:7
**totality** 83:10
**track** 5:19
73:21
**tract** 53:18
**trained** 90:20
92:24
**training** 5:4,23
6:8,11,14,18
12:15
**transcribed**
104:11
**transcript** 11:5
103:2 104:10
104:10
**transcripts**

20:7
**transfer** 50:15
**transferred**
30:15
**transport**
42:22,23
**transported**
43:4
**traveled** 78:14
**trial** 4:21 8:16
9:25 10:5
11:6 65:10
65:13 96:18
97:7,25 98:9
98:15,24
99:8
**tried** 11:5,6,10
**trouble** 84:2
**true** 7:7 8:18
26:20,21,24
27:3 30:21
30:23,25
31:2,4,25
32:12 34:21
35:17,24
36:2,6,16,20
39:22 40:25
49:11 52:18
56:21 57:2,7
64:25 66:1,4
70:24 71:18
76:3 84:16
91:25 96:16
96:20 97:5
97:17,23
98:1,6,8,22
104:10
**truth** 104:5,6
**try** 6:25 19:14
90:11 95:25
**trying** 23:23
42:2 52:25
76:10 77:9
95:6
**tunnelling**
74:20,23
**turn** 60:2,16
61:15 80:16
80:24 96:21
97:10
**turned** 25:25
**two** 8:24 9:5
20:7 21:1
35:7 37:10
46:19 49:24
60:23 71:17
73:7 83:20
88:20,22
**type** 25:6
28:15
**types** 35:7
52:23 53:1
**typical** 43:18

**typically** 17:8
39:13 40:24
43:10

_____ **U** _____

**ultra** 21:3
**un** 100:14
**unable** 100:15
**uncommon**
19:16
**underlying**
79:8 88:4
**undermine**
70:22
**understand**
6:24 7:2,3
16:20 20:1
21:23 26:17
30:18 31:20
39:20 52:5
52:25 57:18
71:7 82:10
**understanding**
26:12 36:8
36:11,14,23
40:12 49:8
49:14,21
52:12 53:15
57:21 58:14
73:23 90:23
**understood**
46:21 49:1
96:13
**undressing**
46:17
**UNIT** 2:13
**United** 1:1,3
2:3,4
**units** 46:23
47:6 49:4
51:6,8 52:2
53:6 57:6,9
**Unknown**
39:11,12
55:13
**unprotected**
37:7
**untested** 33:24
**unusual** 11:25
12:13,17,19
25:4 37:9,13
37:15
**updated** 4:23
**updates** 5:16
**upper** 17:10,11
17:13 22:17
60:4 88:14
**use** 6:14 22:23
38:10 40:14
41:13 42:10
49:4 51:10
51:13 64:1
66:24 92:25

92:25
**uses** 49:2 64:4
**usually** 15:25
16:7 24:8
29:12 30:8
43:11 45:12
47:11,23
55:18 56:3
67:23,24
82:24
**uterus** 22:16
27:23
**U.S** 9:10 10:1
11:8 17:25
23:17 80:14
93:9

_____ **V** _____

**vagina** 26:18
30:15 31:1
32:19 37:25
39:23,24
53:13 57:14
57:15 91:13
91:19
**vaginal** 20:1,12
22:13,17
25:3 27:20
27:21 28:14
30:8 35:25
36:17 46:2,6
53:18 61:8
62:10 63:16
96:24 97:15
**validity** 47:5
**verbal** 100:17
**verbally** 50:20
**versus** 80:14
86:22
**victim** 34:17
**victim's** 81:6,9
81:12,15
**Victor** 2:19
100:3
**victor_abreu...**
2:17
**violence** 98:4
98:11
**virtually** 23:20
**virtue** 104:8
**visible** 32:10
75:4 85:6,9
86:18 87:9
89:12,24
91:4
**volume** 24:24
25:13
**vs** 1:5
**V.S** 62:10

_____ **W** _____

**waived** 104:15
**Walker** 59:15

**wall** 22:17
**Walnut** 2:15
**want** 15:13
16:3 18:25
22:25 28:17
44:17 70:13
77:5
**wasn't** 12:19
55:1 68:8
**way** 14:11
24:22 28:22
29:20 38:8
38:12 43:17
44:2 49:22
52:5 62:23
71:2 72:16
75:14 81:22
92:24
**ways** 49:24
**wearing** 13:20
**Weedn** 80:20
**welcome** 58:24
**went** 9:18
**weren't** 24:8
47:25 48:4
97:6
**West** 2:14,14
**we'll** 30:24
58:21 66:19
78:8
**we're** 6:22
12:15 13:20
16:1,1 19:9
19:15,22
24:25 32:24
37:11 59:17
74:7,7
**we've** 25:24
44:3 99:4
**whitish** 25:20
**winter** 76:14
**witness** 3:3 4:6
96:1,4 101:9
104:5,20
**woman** 26:23
94:14
**woman's** 53:18
**women** 50:23
**words** 53:24
98:19
**work** 10:1 21:4
24:10 45:14
55:17 82:17
82:20 94:5
**working** 16:1
41:12
**world** 50:1
**wouldn't** 53:7
69:21 70:21
**wound** 71:9,15
73:15,19,22
74:4,14 75:5
75:25 79:7,9

79:15,16,18
79:20 81:6,7
81:8,10 91:6
98:20 99:16
**wounds** 86:5
**Wrigley** 10:2,4
93:9,21
95:21 100:6
**write** 55:23
**writing** 23:7,12
100:18
**written** 7:24
8:5,10,11,20
13:15 24:18
56:1 80:12
80:13

_____ **X** _____

**x-ray** 17:5
**x-rayed** 17:9
19:18
**x-rays** 16:21
17:6,17,21,24
18:2,5,19,24
19:4

_____ **Y** _____

**Y** 35:2,15
**yards** 43:15
**yeah** 12:24
13:2 16:13
17:20 33:14
35:8 41:9
43:20 48:11
68:19 89:12
95:13 96:5
100:20
**years** 6:4,6
34:9
**yep** 16:10
101:1,3
**Y-chromoso...**
34:24 35:10
35:21 36:3,9
36:21 66:9

_____ **0** _____

**0001** 53:6

_____ **1** _____

**1** 58:16,17 96:8
103:2
**10** 6:4 49:4
51:8,13,16
52:4 80:17
**100** 3:6 43:15
**101** 103:2
**11** 80:17,25
**11th** 104:20
**11:00** 68:20
**11:12** 68:20
**11:38** 88:24

**Ptr. Ex. 17**

**Deposition of Michael B. McGee, M.D. - 1/4/2017**
**United States of America v. Alfonso Rodriguez, Jr.**

Page 116

**11:57** 88:24
**11569** 97:12
**12** 33:4
**12:14** 101:10
**13.5** 76:25
  77:10 99:23
**18** 20:9,14,20
  80:15
**18th** 80:23
**18389** 3:11
  60:5
**18390** 96:22
**18418** 3:11
  60:12 61:17
  61:18
**19106** 2:15
**1979** 50:17

___ **2** ___
**2** 80:2 81:3
**20** 34:9
**2000s** 38:15
  39:3
**2003** 27:6
**2004** 57:19
**2006** 4:21 5:4
  6:9 8:2,16,17
  9:24 10:10
  22:5 36:7
  38:4,7,12
  39:3 46:21
  47:2 49:1,13
  51:3 52:11
  52:20 54:8
  54:14,18
  55:5,11,15
  57:18 65:3
  66:25 71:7
  71:22 72:16
  73:12 84:2
  95:14 100:10
**2013** 80:15,23
**2017** 1:25 4:4
  104:4,20
**215.928.0520**
  2:16
**215.928.0826**
  2:16
**22nd** 27:6
**222** 4:2
**2255** 11:12
**24** 32:18 56:4
**25** 34:9 46:23
  47:6 51:6,13
  51:18,21,23
  52:2,2 54:12
**250** 2:5
**28** 8:17
**28th** 8:16

___ **3** ___
**3** 83:5,8
**31st** 8:2

**33-11** 3:13

___ **4** ___
**4** 1:25 3:5
**4th** 4:4 104:4
**4/23/04** 63:11
**400** 57:5,9
**450** 4:3
**48** 56:4

___ **5** ___
**5/28/04** 59:24
**545** 2:14
**58** 3:11
**58102** 2:5

___ **6** ___
**601** 2:15
**655** 2:4

___ **7** ___
**701.297.7400**
  2:6
**701.297.7405**
  2:6

___ **8** ___
**80** 3:13
**86** 61:2,3
**86A** 62:4,10
  63:16 64:7
  64:10 96:24
**86B** 62:6,13
  64:8,12
  96:25
**86C** 62:8,15
  64:8,14
  96:25

___ **9** ___
**9/18/13** 3:12
**9:42** 4:4
**90s** 49:15
**96** 3:5