IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:04-cr-55 |
| Plaintiff/Respondent, | |
| v. | **UNITED STATES' RESPONSE IN OPPOSITION TO PETITIONER'S MOTION FOR DISCOVERY** |
| ALFONSO RODRIGUEZ, JR., | |
| Defendant/Petitioner. | |

The United States of America, by Christopher C. Myers, United States Attorney for the District of North Dakota, Keith W. Reisenauer, First Assistant United States Attorney, and Melissa Burkland, Assistant United States Attorney, opposes Alfonso Rodriguez, Jr.'s Motion for Discovery. The United States respectfully requests that this Court deny Rodriguez's motion on the following grounds: (1) The requests fail to show the requisite "good cause" under Rule 6 of the Rules governing 28 U.S.C. § 2255 proceedings because they would not uncover any facts to aide Rodriguez's claims; (2) The requests are impermissible attempts to obtain testimony from opposing counsel in violation of Eighth Circuit precedent; and (3) The requests are not compliant with the Department of Justice's Touhy regulations.

## BACKGROUND

This Court is deeply familiar with the facts of this case and the United States only restates relevant facts herein. Dru Sjodin left a mall in Grand Forks, North Dakota, on the afternoon of November 22, 2003.[1] Tr. 5589-5594. After she missed work that evening, a friend reported her

---

[1] Throughout this response, the following abbreviation and citation conventions are employed: "Tr." Refers to pages from the trial transcript; "DKT" refers to the U.S. District Court docket entry; and "Doc." refers to the bates numbered discovery disclosed during the proceedings in this case.

absence to the police, who discovered her car in the mall's parking lot with a knife sheath beside it. Tr. 5642-5646.  Sjodin's phone-service provider, when contacted, told police her phone was "bouncing" off a cell tower near Crookston, Minnesota.  Tr. 5635-37, 5746-54.  Three days later, investigators found one of Sjodin's shoes under a bypass near Crookston.  Tr. 5712-17.

Investigators interviewed persons in the surrounding area with convictions for kidnapping or sex offenses.  Tr. 5822-26.  Rodriguez, Crookston resident and a Level III sex offender released from prison six months earlier told police he traveled to Grand Forks on November 22 to visit the mall and see a movie.  Tr. 5825-27. The movie Rodriguez claimed to have watched on November 22 was not playing at the mall's movie theater that day.  Tr. 5827.

Following extensive searches in the area by local law enforcement and community members, Sjodin's body was found on April 17, 2004, in a ravine outside of Crookston; her phone was nearby. Tr. 6221-41.  Her body was naked below the waist, and her hands were tied behind her back. Rope and remnants of a plastic bag encircled her neck.  Her upper-body garments were pulled down off her shoulders.  Police recovered hair and fiber samples from the body, which matched Rodriguez and his possessions.  Ms. Sjodin's body was transported for an autopsy (Tr. 6253-55), which was performed by Dr. Michael McGee, M.D., the day after Ms. Sjodin's body was found.  Tr. 6683-85.

Testing of samples seized in the investigation was done by the Minnesota BCA, North Dakota BCI, and FBI Laboratories.  The blood observed in Rodriguez's car on the back window, back seat, and back seat belt was Dru Sjodin's.  Tr. 6146-51, 6442-45.

A hair found on Ms. Sjodin's coat, which she still had on when her body was found, was tested by the FBI Laboratory.  Tr. 6341-43.  It was compared to the saliva sample obtained from

2

Rodriguez.  Tr. 6441, 6453.  The mitochondrial DNA profile obtained from this particular hair matched Rodriguez's mitochondrial DNA profile obtained from his saliva sample.  Tr. 6452-53.

Minnesota BCA analyzed the numerous fibers obtained from several items during the investigation.  Tr. 6374-6415.  The pink cotton blouse which Ms. Sjodin had been wearing the day she disappeared contained cotton fibers matching fibers found in Rodriguez's vehicle, on Rodriguez's boots, and on a pair of his gloves seized from his residence.  Tr. 6405.  Ms. Sjodin's black-and-blue pea coat contained certain wool fibers that were matching in type and color to fibers found in Rodriguez's vehicle.  Tr. 6408-10.

A blanket seized from Rodriguez's bed in his residence was the source of red and fuchsia acrylic fibers.  Tr. 6371-72.  Matching red acrylic fibers were found on the knife sheath located outside of Ms. Sjodin's vehicle, and were also found inside Rodriguez's vehicle, on Rodriguez's boots, on Ms. Sjodin's coat, on Rodriguez's gloves, as well as on Ms. Sjodin's black pants.  Tr. 6253-55, 6390-99.

Dr. McGee observed that Ms. Sjodin had a bruise or contusion to her upper right arm. Tr. 6689.  She had a bruise or contusion on the back of her right forearm. Tr. 6689.  Ms. Sjodin also had a bruise or contusion beneath her right eye, and a bruise or contusion to her lower right cheek.  Tr. 6688.  A large gaping and notched slash wound was observed to the front of Ms. Sjodin's neck.  There were actually two slash wounds to the front of her neck that were caused by a knife drawn across the neck through the tissue in a fashion to cause notching. Tr. 6688-89, 6694-95.  Dr. McGee also determined that there was a "defect" to Ms. Sjodin's right side, between her ribs and pelvis, approximately eight centimeters deep, which may represent a stab wound.  Tr. 6689, 6692, 6706.

Dr. McGee concluded that Ms. Sjodin died due to homicidal violence (Tr. 6726, 6728); that the probable cause of Ms. Sjodin's death was asphyxiation or suffocation (Tr. 6727, 6728), death from the slash wound injury to the front of her neck (Tr. 6728), or possible death from exposure to the elements, having been left in the bitter cold of a November day in the manner she was found, bound and half-naked. Id. It was his opinion that the slash wounds to Ms. Sjodin's neck took place where her body was found. Tr. 6729-33.

A sexual assault examination and laboratory testing revealed an elevated level of prostatic acid phosphatase ("AP"), an enzyme, in the vaginal and cervical areas. This enzyme is produced in high levels in the male prostate. The elevated levels were considered a presumptive positive for seminal deposit. Tr. 6716-23.

On May 11, 2004, a federal grand jury for the District of North Dakota returned a one-count Indictment that charged Alfonso Rodriguez, Jr. (hereinafter "Rodriguez") with kidnapping Dru Sjodin and transporting her from North Dakota to Minnesota for the purpose of sexual assault, and otherwise, resulting in the death of Dru Sjodin in violation of 18 U.S.C. § 1201(a) (1). DKT 1.

Jury selection began on July 7, 2006, and a panel was sworn on August 14, 2006. On August 30, 2006, the jury found Rodriguez guilty as charged in the Indictment. On September 7, 2006, the jury found Rodriguez "eligible" for consideration of the death penalty and found true all but one FDPA allegations, rejecting only the assertion that Rodriguez substantially planned and premeditated the murder. DKT 585. On September 22, 2006, the jury returned special findings, including a unanimous determination finding Rodriguez liable for the non-statutory victim impact aggravator. DKT 626.

Additionally, the jury, or individual jurors, found twenty-five alleged mitigators true; the jury unanimously rejected five other mitigators.  Id.  The jury unanimously found that the aggravators sufficiently outweighed the mitigators to justify the imposition of a death sentence. Id.  On February 8, 2007, following the denial of Rodriguez's motion for a new trial, United States v. Rodriguez, 2007 WL 466752 (D.N.D. Feb., 12, 2007), the district court formally sentenced Rodriguez to death.  DKT 652.

Rodriguez appealed the judgment to the Eighth Circuit Court of Appeals for the, raising twenty claims of error.  The Eighth Circuit affirmed the conviction and sentence.  United States v. Rodriguez, 581 F.3d 775 (8th Cir. 2009), *reh'g and reh'g en banc denied* (Feb 11, 2010).  The Supreme Court denied Rodriguez's petition for a writ of certiorari.  Rodriguez v. United States, 562 U.S. 981 (2010).

Rodriguez filed his Petition under 28 U.S.C. § 2255, alleging 20 enumerated claims of error.  The United States filed its Answer and this matter is currently pending before the Court.

### DISCOVERY RELATED BACKGROUND AND EXPERT EVIDENCE

Rodriguez now seeks three separate requests for discovery:

1.  The deposition of lead prosecutor and then-United States Attorney for the District of North Dakota Drew Wrigley;
2.  The deposition of former Assistant United States Attorney, now District Court Judge Norman G. Anderson (hereinafter "Judge Anderson");
3.  The disclosure of any and all correspondence between "various law enforcement entities in this case"

DKT 1030.  Rodriguez asserts that this discovery will uncover facts to support Claim IX of his § 2255 Petition, that the "government knowingly presented false and misleading testimony." Rodriguez's motion sets forth a number of facts that the record flatly contradicts.  The defense attempts to impugn not only the integrity of the United States Attorney's Office, but specifically the integrity of former U.S. Attorney Drew Wrigley and Judge Anderson.  However, Rodriguez's

own, albeit incomplete, recitation of the discovery production in this case even suggests that the United States timely complied and disclosed relevant discovery. The United States provided timely discovery of over 20,000 pages of documents in this matter prior to trial beyond that required under the Rules of Criminal Procedure. The United States supplements important missing facts below.

### A. Pretrial Discovery

Discovery was substantial and ongoing for this case. The relevant reports to this motion are Bureau of Criminal Apprehension ("BCA") Report 10 and BCA Report 27, both of which show the absence of male DNA, semen, and the prostate-specific p30 protein found in seminal fluid ("p30"). The BCA Reports 10 and 27 also showed the samples tested positive for AP.

The United States provided Mr. Hoy discovery relating to the results of the laboratory examination in Lab Report 10 on June 9, 2004. Doc. 10775-10777, DKT 1032-8. Mr. Hoy received this document from the U.S. Attorney's Office just weeks after the crime lab conducted testing and over two years before trial. Lab Report 10 indicates that Steven G. Fisher conducted the testing and found presumptive tests indicating the presence of blood on many of the inventory items, and that "DNA profiling will be performed on selected items of evidence as well as on the known samples said to have been collected from the body of Dru Kathrina Sjodin." Doc. 10776. The Lab Report 10 summary report indicates that "vaginal swabs (Item 86A), anal swabs (Item 86B) and cervical swabs (Item 86C), all said to have been collected from the body of Dru Kathrina Sjodin" did not detect semen. Doc. 10776.

On February 10, 2005, shortly after receipt, the United States alerted Mr. Hoy that biological samples from Ms. Sjodin would be sent for further testing (Item 86). Exhibit A. The BCA conducted testing on December 19, 2005. The United States disclosed Lab Report 27 to

6

Mr. Hoy on January 4, 2006.  Docs. 17489 – 17493, DKT 1032-10.  On that date, and in a letter to Mr. Hoy, the United States disclosed Docs. 17485-17500.  The results of Lab Report 27 show that "no male DNA was obtained from Items 74, 86A (vaginal swabs), 86B (anal swabs) or 86C (cervical swabs)."  Doc. 17491.

The United States disclosed the same BCA Report 27 and supplements (Docs. 18420-18424) on May 8, 2006.  DKT 1032-2.  On this date, and in a letter to Mr. Hoy, the United States disclosed discovery bates nos. 17761 through 20349.  These documents included the bench notes from BCA Report 10, which included, among other tests (Doc. 18418), that p30 tests on items 86A (vaginal swabs), 86B (anal swabs) or 86C (cervical swabs) were negative.  Regrettably, it appears that all parties overlooked the document referencing the p30 test.  However, as Rodriguez notes, the United States produced the document to Mr. Hoy months before trial commenced.  Mr. Hoy had the document in his possession prior to the trial and Daubert hearing, and certainly could have given the test results to his expert Dr. George Sensabaugh, a nationally acclaimed and leading forensic science expert, prior to the hearings and trial.  At best, Mr. Hoy's failure to do so is a non-prejudicial oversight.

### B. Expert evidence and the Daubert Hearing

Rodriguez moved to exclude Dr. McGee from testifying at trial as to his opinions regarding the elevated AP levels in Ms. Sjodin's cervix and vagina, which he believed indicated evidence of a semen deposit made within 24 to 36 hours preceding her death.  DKT 393.  At the time of the Daubert hearing, Dr. McGee had served as the Ramsey County Medical Examiner for over 20 years.  Tr. 6517.  He had also served as the Assistant Medical Examiner there for five years, as well as staff pathologist at the St. Paul-Ramsey Medical Center.  Id.  He is board certified as an anatomic and forensic pathologist.  Tr. 6518.  By the time of the hearing, he

estimated he had conducted between 4,000 and 4,500 autopsies.  Tr. 6520.  He also spent approximately ten years studying living victims while working at Regions Hospital, for the purpose of interpreting "laboratory results on sexual assault victims coming from the ER." Tr. 6521.

Dr. McGee testified at the Daubert hearing that he and the other doctors at the Ramsey County Medical Center had established a more conservative baseline cutoff for presumptive positive tests for all cases at 25 U/L.  Tr. 6536–37.  Contrary to Rodriguez's arguments, this was not done "arbitrarily"; the 25 U/L cutoff is based on the analysis of the hospital study that involved approximately 1,200 known sexual assault victims. Tr. 6541.  Forensic labs across the nation typically rely on a baseline cutoff of between 25 U/L and 50 U/L, beyond which they would deem the sample presumptively positive for semen.  Tr. 6595–97.  Thus, the AP levels in this case were elevated compared to the baseline average noted above.  It was Dr. McGee's opinion, therefore, that there had been a semen deposit in Dru Sjodin's body during the 24 to 36 hours preceding her death. Tr. 6554.

Dr. McGee had testified to this type of analysis and rendered derivative opinions "between 12 and 20 times a year" since approximately 1980.  Tr. 6553.  Dr. McGee testified that he had taken continuing education courses touching on the subject matter relevant to his assessment and baseline cutoff opinion for the isolation of the acid phosphatase enzyme and his interpretation of the results along those lines, discussed this topic with colleagues at national meetings, attended seminars, and read medical literature on the subject, and that nothing had come to his attention that seriously calls into question the Ramsey County Medical Center AP cutoff of 25 U/L.  Tr. 6558–60.

The jury also heard testimony from Rodriguez's expert, who vigorously called into question the validity of the AP test. Dr. Sensabaugh testified that the test done on the swabs in this case could have included vaginally endogenous AP and/or lysosomal AP. And it was therefore impossible to distinguish between them with the Beckman Dri-STAT test. Tr. 6626. Dr. Sensabaugh testified that the AP test is only a presumptive test for semen. Tr. 6629–32.

This Court denied Rodriguez's motion to exclude Dr. McGee's testimony under Daubert, and in a written opinion following the ruling noted the competing experts' disputed testimony "does not go to the reliability of Dr. McGee's opinion; instead it goes to the weight of his opinion." DKT 596, p. 4; See United States v. Rodriguez, 581 F.3d 775, 795 (2009).

Rodriguez now again ignores Dr. McGee's testimony that irrespective of any serological tests, it was his expert opinion that Rodriguez sexually assaulted Sjodin:

> Q:    For just the moment just forget about acid phosphatase, everything you know about this case. Do you have an opinion about whether Dru Sjodin was – this was a sexual assault case of one nature or another?
>
> A:    Yes. I think this lady's death is a result of a sexual assault, yes.
>
> Q:    Whether there was a semen deposit or not?
>
> A:    Doesn't matter if semen is there or not.

Tr. 6773. Dr. McGee based this opinion on a number of factors, including conditions surrounding the death, how and where the body was found, external examination, and the fact that Ms. Sjodin was found naked from the waist down. Tr. 6724-25.

**C. Post-conviction Experts**

Rodriguez attempts to conflate the question of whether experts found semen deposits on any of the tested evidence in this case and whether or not a sexual assault had occurred. At best, the many new experts Rodriguez now presents are merely cumulative and redundant positions of

Dr. Sensabaugh's opinion that the AP results could not conclusively determine the presence of semen, where the finding of actual spermatozoa, p30, or male DNA would have done so.

Echoing Dr. McGee's testimony, the government's post-conviction expert, Dr. Ljubisa Dragovic notes, positive serological findings, such as spermatozoa, p30, male DNA, and AP, can all be absent in known sexual assaults. DKT 1032-6 at 68-69. Dr. Dragovic's conclusion that Rodriguez sexually assaulted Ms. Sjodin was not based entirely on the AP test; rather, it was based upon the condition of Ms. Sjodin's body as she was found as he testified that "[u]ndressing clearly is indicative of sexual assault." DKT 1032-6 at 64. Again, Dr. Dragovic, as did Dr. McGee, opined that Rodriguez sexually assaulted Ms. Sjodin, and his opinion was based on the conditions surrounding the death and crime scene, not on serological tests.

## ARGUMENT

**I.      Rodriguez has not shown good cause to conduct the requested discovery.**

In the context of a habeas corpus proceeding, a district court has discretion to grant discovery upon a showing of "good cause." Rule 6(a) of the Rules Governing Section 2255 Proceedings. The party making the discovery request "must provide reasons for the request." Id. at 6(b). Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." Bracy v. Gamley, 520 U.S. 899, 909 (1997); see also United States v. Hull, No. 02-CV-2, 2006 WL 752481, at *8 (N.D. Ind. Mar. 21, 2006). The petitioner bears the burden of demonstrating the materiality of the discovery he requests. Stanford v. Parker, 266 F.3d 442, 460 (6th Cir. 2001); Hull, 2006 WL 752481 at *8. In the absence of a showing of good cause for discovery, the motion is properly denied. Smith v. United States, 618 F.2d 507 (8th Cir. 1980).

Rodriguez ties his discovery requests to Claim IX of his § 2255 Petition, that the government "knowingly presented false and misleading testimony," and argues that the requested discovery will uncover information to support his claim.  Rodriguez now again re-presents his argument of false testimony by Dr. McGee, arguing that the United States' failure to correct Dr. McGee's testimony that p30 testing had not been conducted supports his claim.  In essence, Rodriguez simply attempts to rephrase the issue of Dr. McGee's testimony as a knowing presentation of false or misleading evidence by the United States, but the underlying claim is the same one that this Court and the Eighth Circuit have addressed and foreclosed.

Under the standards set forth in Giglio v. United States, 405 U.S. 150, 153-54 (1972), to establish entitlement to habeas relief on this issue, Rodriguez must show that: (1) the testimony was false or perjured; (2) the testimony was material to Rodriguez's conviction or sentence; and (3) the prosecution knew that the testimony was false or perjured.  Id.  In other words, in order to be entitled to habeas corpus relief on a claim that a conviction was premised on perjured testimony, Rodriguez must show that the prosecution knowingly used perjured testimony and that "the false testimony could have affected the judgment of the jury."  United States v. Agurs, 427 U.S. 97,103 (1976); See also Johnson v. Trickey, 882 F.2d 316, 318 (8th Cir. 1989).  The Agurs Court further instructed that the evidence or testimony "must be evaluated in the context of the entire record."  Agurs at 112.

If the Court evaluates his requests in the context of materiality against the backdrop of the entire record, the absence of the accurate p30 testing testimony is insignificant.  Independent of that testimony, the United States' argument concerning Rodriguez's sexually violent tendencies and sexual assault on Ms. Sjodin was abundantly supported by other evidence in the record.  The relevant evidence included his history of similar, sexually violent crimes against

11

other women.  See Rodriguez, 581 F.3d 775, 795-96 (Rodriguez's prior convictions "involved conduct similar to the charged offense"); id. at 804 ("Rodriguez objects to references in the government's closing argument to his criminal history . . . .  [T]he government was permitted to argue that the evidence here shows Rodriguez raped Sjodin before killing her."); id. at 807-10 (facts of earlier offenses).  The relevant evidence also included the fact that Ms. Sjodin was found naked from the waist down with her hands bound behind her back with her coat and blouse pulled down off of her shoulders, and the testimony presented regarding Rodriguez's sexually violent thoughts and feelings.  The record in this case includes evidence of this nature at all stages of the proceedings -- in the guilt phase, the eligibility phase, and the selection phase.

In the guilt phase, the United States, at the outset, explained the grounds for concluding that Rodriguez kidnapped Ms. Sjodin in order to sexually assault her were, based on information independent of the AP testimony, including his history of committing similar sexual assaults and the condition of the Ms. Sjodin's body, which was naked from the waist down with her hands bound.  Brief in Support of United States' First Motion in Limine at 9-10, 14-17, DKT 346.  The testimony of Dr. McGee on AP testing was not crucial for the jury to find Rodriguez guilty or to determine the punishment.

Furthermore, it was unnecessary for the jury to find a sexual assault occurred in order to convict or sentence Rodriguez to death.  Proving the purpose behind the kidnapping was not an element of the crime charged and this was clearly reflected in the jury instructions.  In fact, the United States expressly stated that the jury could completely disregard the AP testimony, or conclude that Dru Sjodin was not sexually assaulted at all, and still convict.  Tr. 6919.

To accept Rodriguez's assertions regarding the significance of and reliance on Dr. McGee's testimony regarding his knowledge of the p30 tests results requires speculation and

12

assumptions for which he offers little or no evidentiary support.  Most importantly, any reliance was superfluous since determining that Ms. Sjodin was sexually assaulted was unnecessary to convict or sentence Rodriguez.  As such, Dr. McGee's inaccurate testimony regarding the p30 testing notwithstanding, there is no basis to believe it would change the jury's verdict or sentence.

Moreover, contrary to Rodriguez's arguments, the negative p30 test does not undermine the scientific validity or basis for Dr. McGee's testimony.  This Court and the Eighth Circuit both determined that Dr. McGee's testimony was admissible under Daubert, and the analysis would hold regardless of any p30 test results.

The potential limitations of Dr. McGee's reliance on the AP testing for a finding of semen was thoroughly developed at trial.  On cross examination, defense counsel raised numerous questions and concerns regarding the AP testing.  Trial counsel elicited from Dr. McGee the fact that decomposing bodies may produce AP. Trial counsel also elicited that no sperm was found to be present at any of the swabbed sites and that duplicate swabs were also negative for the presence of male DNA.  Tr. 6563, 6566, 6632, 6570.  Although Dr. McGee incorrectly testified with regards to the p30 tests because he was unaware of such testing, the jury had heard testimony that the AP test was not conclusive, only presumptive, and that no male DNA or spermatozoa was found on any of the tested samples.

The Eighth Circuit agreed with the district court in admitting the expert testimony:

The district court conducted a Daubert hearing on acid-phosphate testing. Permitting the pathologist's testimony, the court noted that Rodriguez's own expert acknowledged that the government pathologist's test properly detects the presence of acid phosphate; that forensic labs across the country use acid-phosphate levels to indicate semen, and use the same cut-off levels as the government pathologist; and that while there is uncertainty about what acid-phosphate levels would be normal for a corpse, many pathologists share the

13

> government pathologist's view of the reliability of the test, and any doubts go to the weight, not reliability, of the opinion.

Rodriguez, 581 F.3d at 794. Rodriguez has continuously opposed Dr. McGee's testimony and AP cut-offs, but under the Daubert standards, Dr. McGee's testimony "go to the weight, not reliability." Id.

Agurs also supports that any testimony from the United States would be irrelevant to a determination of whether or not Rodriguez prevails on his claim. "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." United States v. Agurs, 427 U.S. at 110. Thus, the Court only needs to look to the character of the p30 evidence to make a determination of whether it affected the jury's verdict: any testimony Mr. Wrigley or Judge Anderson would offer is entirely irrelevant to this Court's Giglio analysis.

Indeed, the cases Rodriguez cites to support his discovery request are inapposite to the matter before the Court. Payne allowed discovery where the petitioner alleged a Brady claim, and only the prosecutor was aware of what was in his file at the time. Payne v. Bell, 89 F. Supp. 2d 967, 975 (W.D. Tenn. 2000). Foster v. Chatman, 136 S. Ct. 1737, 1754-55 (2016), involved a Batson claim, where the subjective intent of the prosecutor would have been highly relevant. Id. Here, the Court need not evaluate the subjective knowledge or intent of the United States; determining that the p30 evidence was immaterial alone defeats Rodriguez's false testimony allegations. See Agurs, 427 U.S. at 110.

More importantly, Rodriguez does not point to any facts in the record that show the United States was aware of Dr. McGee's unknowing testimony regarding the p30 test. As noted above, the United States' disclosure of the BCA lab reports undermines this argument, and

Rodriguez cannot now be permitted to conduct what would amount to a fishing expedition in the absence of any valid reason to do so.

None of the cases Rodriguez cites can be applied to his arguments that Judge Anderson elicited false or misleading testimony from Mr. Fisher because Mr. Fisher's testimony was not false, it was not misleading, and it did not present any false impressions to the jury. Thus, Rodriguez's request for deposition testimony from Judge Anderson has no legal basis because he cannot satisfy the first requirement for a Giglio analysis.

As Rodriguez himself sets forth, Judge Anderson directly examined Mr. Fischer at trial. Mr. Fisher testified that he found blood on the back seat of Rodriguez's car and that following testing, he confirmed this was Ms. Sjodin's blood. Tr. 6136-37. Judge Anderson further questioned Mr. Fisher regarding trace evidence conducted on Ms. Sjodin's clothing. Tr. 6153. On cross-examination, Mr. Hoy questioned Mr. Fisher about the serological testing of Ms. Sjodin's clothing and body orifice swabs, and Mr. Fisher testified that he found no evidence of semen "on any of them" and established the absence of male DNA found on the specimens. Tr. 6159-60. To be sure, there was nothing false or misleading about Mr. Fisher's testimony. Judge Anderson should not be subjected to a deposition.

Rodriguez's final request, "all correspondence between the several prosecutorial entities concerning the semen-related testing of all biological samples from Ms. Sjodin's body" similarly cannot satisfy Rule 6's "good cause" standards. Rodriguez's argument that such evidence will "reasonably likely demonstrate the government's own discomfort with or disapproval of Dr. McGee's method and findings" has simply no grounding in facts or evidence in the record. Moreover, Mr. Hoy's deposition is likely to elucidate some of the questions Rodriguez has with regards to the pretrial discovery, such that this document request should not be granted when

15

Rodriguez has other avenues to pursue his requested information.  Similarly to his deposition requests, the information he seeks does not support a "good cause" finding when the Court can simply determine the p30 evidence was immaterial in the context of the entire record.

**II.    Rodriguez's Requests to depose former United States Attorney Drew Wrigley and Judge Anderson are impermissible attempts to depose opposing counsel.**

The United States is Rodriguez's opposition in this proceeding, and any requests to depose the United States' former attorneys is an improper request to depose opposing counsel. Discovery from an opposing counsel is "limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information ...; (2) the information sought is relevant and non-privileged; and (3) the information is crucial to the preparation of the case." Shelton v. Am. Motors Corp., 805 F.2d 1323, 1327 (8th Cir. 1986).  Rodriguez cannot satisfy any of the Shelton requirements.

**A.  Rodriguez does not need deposition testimony to elicit the sought after information.**

Even if the request were appropriate under Rule 6's good cause standards, Rodriguez's depositions requests are the most onerous, expensive, time consuming and perhaps least effective method of obtaining the sought after evidence.  Mr. Hoy himself is likely to have far more information regarding the p30 tests and disclosures than the United States, because he was in possession of this information and would have been working, for over two years, with the United States in his discovery endeavors.

Furthermore, district courts have recognized the Federal Rule's admonition on discovery and one noted, "[a court] must, *sua sponte* if necessary, prevent discovery whenever it, among other things, 'can be obtained from some other source that is more convenient, less burdensome, or less expensive' or the burden of obtaining the information 'outweighs its likely benefit.'" Phillips v. Indianapolis Life Ins. Co., No. 1:060-CV-1544-WTL-JMS, 2009 WL 1564384, at *2

16

(S.D. Ind. June 3, 2009) (quoting Fed. R. Civ. Pro. 26(b)(2)(C)).  Mr. Rodriguez's deposition requests should be denied on the grounds that they overly burdensome requests not justified by the time and money expenditures they would create.

### B. The requested deposition testimony is protected by the work-product doctrine.

The information Mr. Rodriguez seeks also falls squarely under privileged attorney work-product, particularly with regard to his requests to depose Mr. Wrigley and Judge Anderson.  At a minimum, the information he requests from Mr. Wrigley would ask questions related to Mr. Wrigley's trial strategy and preparation and would be barred from discovery.  Sullivan v. Stepfanik, 605 F. Supp. 258, 260 (N.D. Ill. 1985) (generally improper to depose prosecutor concerning mental processes or opinions).  Similarly, any questions relating to Mr. Wrigley's preparation and strategy for the Daubert hearing would similarly be protected by the attorney work-product doctrine.  See id.  Such testimony must not be allowed.  Rodriguez's request to depose Mr. Wrigley on a trial strategy he "oversaw, developed, and best understood" would be an improper intrusion of the attorney-work product.

As courts have held repeatedly, "the mental processes of prosecuting attorneys should be afforded protection from discovery."  Gomez v. City of Nashua, N.H., 126 F.R.D. 432, 435 (1989) (noting it is improper to probe the mental processes of the prosecutor where the plaintiff established no compelling need for his deposition testimony and there were alternative, less onerous, sources for the information); Thompson v. Lynbrook Police Dept., 172 F.R.D. 23, 27 (E.D.N.Y. 1997) (prohibiting disclosure of memoranda that refers to prosecutors' investigatory techniques , professional opinions, and recommendations as disclosure "may impede the agency's ability to effectively prosecute cases.")

To an even greater degree, the same is true with regards to seeking Judge Anderson's deposition.  Mr. Rodriguez cites Mr. Fisher's trial testimony and criticizes the lines of questioning Judge Anderson asked of Mr. Fisher.  It appears as though the only questions Mr. Rodriguez's counsel would ask would be why Judge Anderson asked Mr. Fisher questions relating to the blood and hair evidence while forgoing serological evidence.  Here too, the questions would be impermissibly questioning a prosecutor with respect to his trial preparation and strategy.  See Sullivan, 605 F. Supp. at 260.

### C.  The material sought is not crucial to Rodriguez's Petition

The United States incorporates its entire argument regarding the Rodriguez's failure to meet the "good cause" standard and show that p30 testimony was material to his claim.  Simply put, Rodriguez incorrectly oversimplifies and exaggerates the significance of the p30 testing.  He claims, "there is no scientific basis for the Court to admit any testimony that the acid phosphatase levels suggest the presence of semen," but the p30 test does not now wholly undermine Dr. McGee's testimony.  The Court, through a Daubert hearing and trial, and the Eighth Circuit on appeal, found that Dr. McGee's testimony withstood the expert evidentiary standards.  Rodriguez, 581 F.3d at 795.  In addition, counsel for Rodriguez presented a world-renowned expert, Dr. Sensabaugh, rebutting Dr. McGee's testimony.  The jury was free to assign whatever weight it deemed appropriate to Dr. McGee's evidence in reaching its verdict.  As noted above, the United States addressed the jury in closing and expressly told the jury it could completely disregard the AP testimony, or even conclude that Ms. Sjodin had not been sexually assaulted, yet find Rodriguez guilty of the charged crime.  Tr. 6919.

**III.    Rodriguez's requests are exempt from disclosure under 28 C.F.R. § 16.21 et seq.**

As the United States detailed above, this Court should deny all three of Rodriguez's discovery requests.  In addition to being incompatible with Rule 6 of the Rules Governing § 2255 proceedings and the Eight Circuit precedent, when requesting the testimony of a United States employee or former employee for a hearing, the party requesting the information must comply with the provisions of 28 C.F.R. § 16.21 *et seq.*  Under the Housekeeping Statute, 5 U.S.C. § 301, federal agencies may establish regulations pertaining to the disclosure of information.  Therefore, in accordance with 5 U.S.C. § 301, the Department of Justice promulgated the regulations which establish the procedure for the disclosure of records kept by the Department of Justice.  These regulations, codified in 28 C.F.R. § 16.21 et seq., are also known as the Touhy regulations and establish the procedure to request information from the Department of Justice or any of its components.  In federal cases, courts have held that it is not error to require the defendant to comply with agency Touhy regulations in order to obtain testimony of United States employees.  United States v. Soriano-Jarquin, 492 F.3d 495, 504-505 (4th Cir. 2007); see United States ex rel. Touhy v. Ragen, 340 U.S. 462, 468 (1951).

Here, the relevant regulations require Rodriguez to conform to regulations he has not yet taken steps to address.  Rodriguez should clarify his demand as much as possible and set forth in an affidavit a summary of the testimony sought.  28 C.F.R. § 16.320.  The Department of Justice does authorize disclosure, provided disclosure is appropriate under the rules of procedure and the law of privilege.  28 C.F.R. § 16.23.  Here, as noted above, it is the United States' position is that the discovery requests for Mr. Wrigley's and Judge Anderson's depositions are inconsistent with the procedural rules governing § 2255 proceedings and protected by privilege.  The Touhy regulations also prohibit disclosure where "disclosure would reveal investigatory records

19

compiled for law enforcement purposes." 28 C.F.R. § 16.26(b)(5).  The broad scope of

Rodriguez's final discovery request would likely reveal such information, and as it stands, is

protected from disclosure under this regulation.

**CONCLUSION**

The United States, therefore, respectfully requests that Rodriguez's Motion for Discovery

be denied.

Dated:   March 24, 2017

CHRISTOPHER C. MYERS
United States Attorney


By:     /s/ *Keith W. Reisenauer*
KEITH W. REISENAUER
First Assistant United States Attorney
Quentin N. Burdick United States Courthouse
655 First Avenue North - Suite 250
Fargo, ND  58102-4932
(701) 297-7400
ND Bar Board ID No. 05434
Keith.Reisenauer@usdoj.gov
Attorney for United States


By:     /s/ Melissa Helen Burkland
MELISSA HELEN BURKLAND
Assistant United States Attorney
Quentin N. Burdick United States Courthouse
655 First Avenue North - Suite 250
Fargo, ND  58102-4932
(701) 297-7427
WI Bar Board ID No. 1071443
Melissa.Burkland@usdoj.gov
Attorney for United States