IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NORTH DAKOTA, EASTERN DIVISION

- - -

_____

                              )

UNITED STATES OF AMERICA, )

            Petitioner,       )

vs.                           )   Case No. 2:04-cr-55

ALFONSO RODRIGUEZ, JR.,       )

            Respondent.       )

_____)


DEPOSITION OF GEORGE SENSABAUGH, D.Crim

701 Battery Street, Second Floor Conference Room

San Francisco, California

Wednesday, August 16, 2017


REPORTED BY:

CARRIE HEWERDINE, RDR, CSR #4579


**Exhibit 1**

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                    2

I N D E X

                                                  Page

Examination by Mr. Abreu                             6

Examination by Ms. Burkland                         71

Examination by Mr. Abreu                            77


Reporter's Certificate                              80


PETITIONER'S EXHIBITS MARKED:                     PAGE

P4        Report on the Examination of             39

          Physical Evidence, DNA 05/28/2004

P5        Report on the Examination of             61

          Physical Evidence, DNA 01/28/2004

P62       Sensabaugh Curriculum Vitae               9

P63       Sensabaugh Letter to Hoy,                24

          24 August 2006

P64       Handwritten Notes                        42

P65       George F. Sensabaugh E-mail, To:         47

          Robert Hoy, Sent: Thursday,

          July 06, 2006

P66       Handwritten Notes                        50

**Exhibit 1**

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                                      3

BE IT REMEMBERED that, pursuant to Notice of Taking Deposition, on Wednesday, August 16, 2017, commencing at the hour of 10:30 a.m., at the offices of 701 Battery Street, Second Floor Conference Room, San Francisco, California, before me, Carrie Hewerdine, RDR, a Certified Shorthand Reporter in the state of California, there personally appeared

GEORGE SENSABAUGH, D.Crim, called as a witness by the Respondent, and who, being by me first duly sworn, was thereupon examined and interrogated as herein set forth.

--o0o--

A P P E A R A N C E S

VICTOR ABREU, Supervisory Assistant Federal Defender, of the FEDERAL COMMUNITY DEFENDER OFFICE FOR THE EASTERN DISTRICT OF PENNSYLVANIA, Capital Habeas Unit, The Curtis Center, Independence Square West, Suite 545 West, Philadelphia, Pennsylvania 19106, appeared as counsel on behalf of the Petitioner.

Telephone:  (215) 928-0520

E-mail:  Victor_abreu@fd.org

ERIC MONTROY, Assistant Federal Defender, of the FEDERAL COMMUNITY DEFENDER OFFICE FOR THE EASTERN DISTRICT OF PENNSYLVANIA, Capital Habeas Unit, The Curtis Center, Independence Square West, Suite 545 West, Philadelphia, Pennsylvania 19106, appeared as counsel on behalf of the Petitioner.

Telephone:  (215) 928-0520

E-mail:  Eric_Montroy@fd.org

A P P E A R A N C E S   (Continued)


        KEITH REISENAUER, First Assistant U.S.

Attorney, of the DEPARTMENT OF JUSTICE, UNITED STATES

ATTORNEY'S OFFICE, DISTRICT OF NORTH DAKOTA,

Quentin N. Burdick United States Courthouse,

655 First Avenue North, Suite 250, Fargo,

North Dakota 58102, appeared as counsel on behalf of

the Respondent.

Telephone:  (701) 297-7400

E-mail:  Keith.Reisenauer@usdoj.gov


        MELISSA BURKLAND, Assistant U.S. Attorney,

of the DEPARTMENT OF JUSTICE, UNITED STATES

ATTORNEY'S OFFICE, DISTRICT OF NORTH DAKOTA,

Quentin N. Burdick United States Courthouse,

655 First Avenue North, Suite 250, Fargo,

North Dakota 58102, appeared as counsel on behalf

of the Respondent.

Telephone:  (701) 297-7400

E-mail:  Melissa.Burkland@usdoj.gov


ALSO PRESENT:

MICHELLE MEYER, Paralegal

AUGUST 16, 2017                          10:30 A.M.

P R O C E E D I N G S

-- o0o --


GEORGE SENSABAUGH, D.Crim,

having previously been duly sworn,

was examined and testified as follows:

THE WITNESS:  Yes.


EXAMINATION

BY MR. ABREU:

Q    Good morning, Doctor.

A    Good morning.

Q    Would you kindly state and spell your
name for the record, please.

A    George F. Sensabaugh.  You may add the
junior -- (sotto voce)

And the spelling is S-E-N-S-A-B-A-U-G-H.

Q    Great.

Dr. Sensabaugh, have you previously
testified in a case of the United States versus
Alfonso Rodriguez?

A    Yes.

Q    And was that at both the
August 28th, 2006, Daubert hearing and at the

August 29th 2006, trial in Mr. Rodriguez's case?

A     Yes.

Q     And were you qualified to give expert testimony at both the Daubert hearing and the trial?

A     Yes.

Q     And, Dr. Sensabaugh, how are you currently employed, sir?

A     I'm retired faculty from the University of California at Berkeley, in the School of Public Health.

Q     And prior to your retirement, how long had you held that position?

A     Forty years.

And I do still have an appointment as a professor of the graduate school, which means that I can advise students.  I can teach classes.

But I'm now on the retirement system rather than on the university state budget.

Q     Okay.

A     Which is important for the university these days.

Q     And I know -- are you currently teaching classes or advising students?

A     I'm advising one student at this time. I'm not currently teaching, and I won't be teaching

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                        8

at -- (sotto voce)

THE REPORTER:  I'm sorry.  You won't be teaching at?

THE WITNESS:  Further, except on an informal basis.

BY MR. ABREU:

Q    Was there some reason you stopped teaching other than wanting to retire?

A    Yes.  First, I have, for the last 15 years or so, also taught a course at Davis -- which is not part of my official duties, university duties, but I did it nonetheless -- on forensic science.

The -- and then, I taught a course at Berkeley, a laboratory course in, basically, molecular diagnostics.

When this -- about a year ago at this time, I was diagnosed with a reoccurrence of a lymphoma, and so through the fall, I was on chemo.

This spring, I had a stem cell replacement procedure, and so I've been more or less inactive.  I was not able to go into the university this spring.  So I taught my spring course remotely.

Q    Are you doing better now, Doctor?

A    With cancer, you're okay until you're

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                    9

not.  So -- and I'm okay.

(Petitioner's Exhibit No. P62

marked for identification)

BY MR. ABREU:

Q    Let me show what I've now marked for
identification purposes as P62.

"P" for Petitioner's, Exhibit 62.

MS. BURKLAND:  Is that the CV?

MR. ABREU:  Yes.  I have a copy for you
guys as well.

BY MR. ABREU:

Q    Do you recognize that document,
Dr. Sensabaugh?

A    Yes.  It is -- it is my CV, and -- which
includes a list of publications.

Q    Okay.  Is that the most recent version of
your CV?

A    It's the most recent one that I have
recorded on the computer.  I have one additional
publication this past spring, which I've not added
onto the CV.

BY MR. ABREU:

Q    I'll ask you about that momentarily, if I
can.

MR. ABREU:  At this time, I would move

for the admission of Petitioner's Exhibit 62.

MR. REISENHAUER:  Melissa is going to --

MS. BURKLAND:  No objection.

MR. REISENHAUER:  -- be handling everything today.

MR. ABREU:  Okay.

MS. BURKLAND:  You said it was the most recent one on your computer.

Do you have an approximate date that ...

THE WITNESS:  I think it was in April or May that it was published.

MS. BURKLAND:  Okay.  Thanks.

BY MR. ABREU:

Q    And, Dr. Sensabaugh --

MR. ABREU:  And, Melissa, just for the record, if you need that, I'm happy to provide that. I don't have it here.  But I'm happy to provide it.

BY MR. ABREU:

Q    Can you briefly tell us about your education background?

A    I did an undergraduate degree at Princeton University.  I was a philosophy major, because that gave me the flexibility to take a lot of courses.  I was pre-med at that time.

But I, for a variety of reasons, became

interested in forensic science.  The University of California at Berkeley had a program in forensic science, and so I came to Berkeley and was situated in the school of criminology, which accounts for my professional degree, Doctor of Criminology.

I did my research work in the Biochemistry Department at Berkeley, and -- on the physical chemistry of proteins and bloodstains, if that's of interest.

And then following my degree, I did a two-year post doctoral fellowship in the Chemistry Department at the University of California at San Diego, another post doctoral fellowship, one year, in the Genetics Division of the National Institute for Medical Research in London.

And then I came back and joined the faculty of the School of Criminology in 2000 -- I'm sorry -- in 1972.

The School of Criminology was disestablished in 1975 or '76, and I moved into the School of Public Health at that time, where I was until my official retirement.

Q    And because you've testified twice before, Dr. Sensabaugh -- as an expert twice before, I should say -- I think we're just going to touch on

a couple of highlights that, perhaps, have come since the time of your testimony in 2006, if that's okay.

A    Fine.

Q    With one exception, which I'll ask you about now -- because I don't think it was brought up before -- but I noticed that -- in terms of honors and awards, you were awarded a Fulbright Scholarship in 1993?

A    Yes.

Q    Can you tell us about that and what work you did?

A    That was to do work at the London Metropolitan Police Laboratory.  This was in the -- the beginnings of the DNA era in forensic science.

The Metropolitan Police Lab -- Scotland Yard Laboratory was doing DNA testing using kind of restriction fragment length polymorphism -- which is commonly abbreviated "RFLP."  Tech -- they were using that technology to look at sexual assault cases.

And I -- the objective of my work was to review the sexual assault cases that had come -- been submitted to the laboratory and assess how useful the DNA profiling was using that technology.

Q    Okay.  Since 2006, Doctor, have you

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                    13

maintained any professional associations with
professional organizations in your field?

A    Since --

Q    Since 2006, since you -- since the time
you previously testified?

A    I think probably the only thing that I
would note from that time, I served on the
National Research Council Committee to review the
research program of the National Institute of
Justice, which -- that committee existed from 2007
through 2010.  That's at the very bottom of the
second page.

MR. MONTROY:  Mel, can I change copies
with you?

MS. BURKLAND:  Yes.

MR. ABREU:  I was trying to look for my
little stuff on the back.

MR. REISENHAUER:  Oh, I thought you were
helping us.

MS. BURKLAND:  I know.

MR. ABREU:  That was a little note I
made.

THE WITNESS:  And then in 2000 -- let me
make sure where it's indicated here.

The indication is -- 2015, I received the

honor of -- honorary membership in the International Society of Forensic Genetics.  This is a long-standing membership in that organization.

Basically, honorary membership means that I'm absolved from paying dues in the future years.

BY MR. ABREU:

Q    And I noticed, Doctor, that you were -- have been involved with several scientific journals; is that correct?

A    Yes.  No more -- I think -- I have -- over the last number of years, I've reviewed articles for various journals, but I've not been actively involved on an editorial board.

Q    Okay.  And lastly, Doctor, I think at the time you testified at trial in 2006, you had noted that you had published approximately 179 different scientific research papers at that time.

And I notice on your most current CV, it's now about 197; is that accurate?

A    Right.  It would be 198 when I add the paper that is not listed on there yet.

Q    Okay.  And what is the -- what is the topic of the paper that's not listed on there yet?

A    It's a study of the properties of staphylococcus saprophyticus -- (sotto voce)

**Exhibit 1**

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                    15

THE REPORTER:  I'm way over here, so you have to keep your voice up.

THE WITNESS:  It is a study of the properties of staphylococcus saprophyticus -- and I can spell that for you afterwards -- in Brazil.  That was a research collaboration with a Brazilian group.

BY MR. ABREU:

Q    And were you, as part of your time at Berkeley, doing work on infections diseases?

A    Yes.

Q    You were affiliated with the program there, in what way?

A    My appointment in the School of Public Health was in -- originally, in the Department of Biomedical and Environmental Health Sciences, which was dissolved in 1992 or '3, I think, and broken up into various divisions.

And I was with the Division of Infections Disease.

Q    Okay.

A    And the molecular diagnostics course that I taught was associated with that program.

Q    And I notice that most of the publications since your last -- since the last time you testified, have been in the area of microbiology

and -- as it relates to infectious diseases as well?

A    Yes.  I've had a couple of very good students who have done work in my laboratory.

Q    And two, in particular, I wanted to ask you about are listed at Number 195 and 196.

A    Okay.

Q    195 is titled "Hospital wet mount examination for the presence of sperm in sexual assault cases is of questionable value."

A    Yes.

Q    Okay.  What was the ultimate conclusion there in that paper?

A    Well, to provide the backgrounds, it is routine practice or -- in many jurisdictions, it is routine practice for the hospital examining sexual assault victims to collect a wet mount slide and test for motile sperm, and -- with the rationale that if motile sperm are present, that indicates recent sexual activity.

We reviewed records from, I think, something on the order of 900 cases all from California, in which wet mount examinations had been done and ascertained that very -- there were few cases where motile sperm were actually observed in the first -- the first main point.

And the second main point, very often, the sperm were misidentified.  They were either found to be present, when they subsequently weren't and -- upon subsequent examination, or they were not observed at the hospital laboratory, but they were detected in the crime laboratory.

And so our recommendation was that since the crime laboratory used more specific techniques for the detection of sperm, that the hospitals not spend time trying to do microscopy in a context where they don't do microscopy on a regular basis, and let the crime laboratory deal with the question of whether or not sperm were present.

The presence of motility was found to be pretty much unrelated to the presence of recent -- of recent sexual activity.  So there was nothing to be gained by looking at motile --

Q    And that was --

A    -- sperm.

Q    Sorry.

That was a 2014 paper?

A    Yes.  That was based upon a student's work which was done in 2012.

Q    And then I notice that in 2015, it looks like you -- as I say, wrote the chapter on forensic

serology and overview for publication?

A    Yes.  This is an enclyclopedia of forensic and legal medicine.

And I basically did an overview -- I wrote an overview of the methods used for the detection of blood, the detection of semen, and various bodily fluids that are relevant to the forensic laboratory work.

Q    One other question about the publications, Doctor.

I noticed that in many of your early publications, Edward or E. Blake is listed as a coauthor?

A    Yes, E.T. Blake.

Q    Is that Dr. Edward Blake?

A    Yes, it is.

Q    And what is your relationship with Dr. Edward Blake -- or what was your relationship with Dr. Edward Blake?

A    It was the -- the relationship is still good.

Q    Keith is laughing.  I'm sorry.

MR. REISENHAUER:  I'm not going to object.  I could.

THE WITNESS:  The -- he was my first

graduate student when I came back to Berkeley.  And he got his degree, also a Doctor of Criminology degree, working in my laboratory in the early -- mid-70s.

And then he went off into private practice, and -- and over the course of the many years that we interacted, he fed me information about a lot of the cases upon which he worked, which I then could use as teaching -- for teaching purposes.

BY MR. ABREU:

Q    Okay.

A    Suitably -- (sotto voce)

THE REPORTER:  I'm sorry.  Suitably?

THE WITNESS:  Suitably made anonymous.

BY MR. ABREU:

Q    Do you --

A    I'm not sure how to spell anonymous.

Q    Have you spoken with Dr. Blake about this particular case?

A    No, I have not.

Q    What's "forensic biology"?

A    Forensic biology is that component of forensic science that deals with the analysis of biological material.

Q    Have you been previously been qualified

as an expert in the field of forensic biology?

A    Yes.

Q    And have you testified as an expert as it relates to field of forensic biology?

A    Yes.

Q    And have you testified as an expert as it relates to the identification of semen?

A    Yes, in a few cases.  Not very many.

Most of the testimony that I've given -- at least from the period of about 1987 or '88 through the mid-'90s dealt with DNA admissibility.

Q    And this case, United States versus Alfonso Rodriguez, is one of the cases you testified to about the identification of semen?

A    Yes.

Q    Okay.  And have you also testified as an expert in the use of acid phosphatase and p30 in the identification of semen?

A    Yes, and have been involved in research along -- in both of those.

Q    Yes.  And I didn't cover that now because testified to that previously in 2006.

So -- and again, this particular case, United States versus Alfonso Rodriguez is one the cases where you testified about acid phosphatase

and p30?

A    Yes.

Q    And have you been qualified as an expert in both state and federal courts?

A    State, I don't know.

This was a federal case.

Q    Yes.

A    Yes, so it would have been in the federal court as well.

Q    Okay.  And have you testified as an expert on behalf of prosecutorial entities?

A    Yes.

Q    And have you testified as an expert on behalf of prosecutorial entities in capital cases?

A    I am sure so.  I don't really track the cases in which I've testified, but -- since some number of them are homicides, I'm sure that there were some capital cases included in there.

Q    Okay.  I'm just going to move this to the side over here because it will be part of the record now.

A    Okay.

MR. ABREU:  At this time, I'd offer Dr. Sensabaugh as an expert in the field of forensic biology.

MS. BURKLAND:  No objection.

MR. ABREU:  Thank you.

BY MR. ABREU:

Q   Dr. Sensabaugh, do you recall who first contacted you in 2006 to consult on this case?

A   I believe it was Mr. Hoy, but I'm not sure of that.  Most of my communications were with Mr. Hoy.

Q   Okay.  That actually brings up a question.

Do you recall having any conversations or communications with cocounsel Richard Ney?

A   Not that I can recall.

Q   Okay.  As far as you can recall, do you recall any e-mail exchanges with Mr. Ney?

A   No, I can't.  I think all my e-mail exchanges were with Mr. Hoy, although I -- I cannot be sure without going back and looking at the e-mail records.

Q   And any known calls with Mr. Hoy that you can recall?

A   We did have phone calls, yes.

Q   I'm sorry.  My apologies.

With Mr. Ney.?

A   Not that I recall.

Q    Or any meetings, any face-to-face meetings with Mr. Ney?

A    No face-to-face meetings with anyone else.

Q    Okay.  And I was just going to ask you about Mr. Hoy and what the nature of your communications was with Mr. Hoy, as far as you recall.

A    He provided the materials to me to -- for review, for which I wrote a summary report.

He -- we had -- as I recall -- or I read one of my notes from -- in my file on this case, that we had a conversation about the meaning of the evidence and, specifically, the meaning of the acid phosphatase determination that was done on the case.

And then there was a question of how I was going to be able to get to Fargo to testify, and I ended up not being able to get to Fargo.  And so it was done by video from the federal building in Oakland.

Q    Did you ever meet face-to-face with Mr. Hoy?

A    No.  Certainly not that I can recall.  I think everything was done by e-mail or -- and phone conversations.

**Exhibit 1**

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017    24

Q    Okay.  And as part of your consultation in 2006, did you prepare a report?

A    Yes.

MR. ABREU:  Let me show you what I am going to mark as P63.

(Petitioner's Exhibit No. P63 marked for identification)

MS. BURKLAND:  Is that August 24th?

MR. ABREU:  Yes.

MS. BURKLAND:  We have an extra copy for you.

MR. ABREU:  Thank you.

BY MR. ABREU:

Q    Dr. Sensabaugh, taking a look at P63, do you recognize that document?

A    Yes.  This is the report I wrote to Mr. Hoy outlining my conclusions and the rationale behind them, for the evidence that I was shown in this case.

Q    And when is that report dated?

A    24 August 2006.

MR. ABREU:  Okay.  At this time, we would offer Petitioner's Exhibit 63.

MS. BURKLAND:  No objection.

MR. ABREU:  Thank you.

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                25

BY MR. ABREU:

Q    At the time of your 2006 consultation with Mr. Hoy on this case, what materials were you provided?

A    I had five materials which are listed in the report.

Do you wish me to --

Q    Please.

A    -- sum -- detail them?

First, Number 1, a Final Autopsy Protocol signed by Dr. Michael B. McGee, reference 2004-0542, which included supporting material from Regions Hospital.  That was a 10-page report.

Number 2, the Acid Phosphatase Test Protocol that was used by Regions Hospital, which was faxed from Regions Hospital to Kim Bossert on June 5th, 2006, which is eight pages.

Item Number 3, a Report on Examination of Physical Evidence from the Minnesota Bureau of Criminal Apprehension, Lab Number B03-11062, Report Number 27, dated December 19th, 2005.  And that's five pages.

Item Number 4, the Minnesota BCA -- that's Bureau of Criminal Apprehension -- Laboratory bench notes describing the analysis of vaginal, anal,

and cervical swabs collected from the victim,
Dru Sjodin.

Q    Sjodin.

A    Sjodin?

Q    Sjodin.

A    Okay.  Reference number B03-11062, dated
October 17th, 2005, and 11 -- or to 11/15/2005 --
November 15th, 2005, paginated 18532 to 18552, a
20-page report.

And lastly, Item Number 5, the deposition
of Dr. Michael McGee, made on May 31st, 2006,
pages 10 to 41 -- I'm sorry -- pages 30 to 41,
pages 55 to 66, pages 75 to 77, and pages 134 to 154.

Q    And for the record, Doctor, are you
referring to these items which are listed on page 1
of your August 24th, 2006, report?

A    Yes.

Q    Okay.  By the way, who is Kim Bossert?

A    I am not sure who Kim Bossert is.

Q    Did she work for you at some time?
Do you recall if she --

A    No, she was -- no, she was -- I had not
heard of her before.

Q    Okay.  As part of your consultation, did
you provide counsel for Mr. Rodriguez with your

opinions based on the materials that you were provided at the time regarding the evidence of alleged semen Dr. McGee claimed to have identified?

A    This is included in the report to Mr. Hoy.

Q    And have you had an opportunity to review that report since it was drafted or written in 2006?

A    Yes.

Q    Okay.  And have you -- you reviewed it prior to your testimony here today?

A    Yes.

Q    Okay.  And to the best of your knowledge, are the opinions contained in that 2006 report still scientifically valid, based on the information you were provided at that time?

A    Yes.

Q    And are those opinions contained in that report, still scientifically valid without the caveat of -- of adding "based on the information you were provided at that time"?

A    Yes, I believe so.

Q    Okay.  You also mentioned previously that you testified, in 2006, at both the Daubert hearing and at trial, correct?

A    Yes.

Q    And have you had an opportunity to review your testimony from 2006?

A    I've looked at snatches of it but not read through it in detail.

Q    And to the best of your knowledge, are the opinions contained in that 2006 testimony -- which you have reviewed -- thus far, still scientifically valid?

A    Yes.

Q    Okay.  If I may, Doctor, let's talk a little bit about what you concluded back in 2006.

And at the time of the 2006 consultation, report, and testimony, you concluded that acid phosphatase levels, as reported by Regions Hospital, on the vaginal and cervical swabs, were not sufficient to conclude that semen was present on those swabs; is that correct?

A    Those findings, in the context in which they were determined, I considered not to be valid evidence of semen.

Q    And that was based, in part -- and maybe I can summarize it here.  That was based, in part, on the possibility that the reported levels of acid phosphatase could be the result of the use of the Beckman dry stat test, which was actually designed

for use in the interpretation of acid phosphatase

levels in blood plasma of living individuals, not

postmortem samples, in part?

A    In -- in part, but more fundamentally

that that test had not -- as the information I was

provided about that test, as used by the

Regions Hospital, the test had not been validated and

properly calibrated.

Q    Okay.

A    So the -- there are laboratories --

forensic laboratories, primarily pathology

laboratories that did use that -- the tartrate

inhibition test to test for prostate acid

phosphatase.

But -- and that test is -- is fine.  It's

just that it doesn't cover all the possibilities that

are appropriate for a forensic concern.

Q    And let me ask you about those other

possibilities.

Your opinions, back in 2006, were based

also on the possibility that the reported,

quote/unquote, elevated acid phosphatase levels were

the result of lysosomal acid phosphatase and/or

microbial activity?

A    Yes.  And the lysosomal acid phosphatase

**Exhibit 1**

would be from tissue breakdown, which -- more specifically -- because it could also be vaginal acid phosphatase which were released from the tissue as the tissue broke down.

Q    Let me ask you about the term I used, "elevated acid phosphatase level."

Is it, in fact, possible, based on the information that you reviewed back in 2006, to determine if the -- if the acid phosphatase levels that were obtained at Regions were, in fact, elevated acid phosphatase levels?

A    That was one of the -- you pointed out one of the questions that I had.

To determine whether a particular test is giving an insignificant value or a significant value, depends upon the threshold of the test, the sensitivity threshold or an operational threshold, and that is determined empirically.

And the threshold that was given to me that -- used by Dr. McGee, did not have any basis -- or no evidence was -- no information was presented as to how that threshold had been determined.

I know a moderate amount of -- actually, quite a lot amount about how the thresholds are determined for the assessment of acid phosphatase

activity in sexual assault cases involving live victims, but with -- in postmortem situations, there are a number of questions that are not relevant for live victims.

Q    Okay.

A    And -- and there is -- in fact, there's one paper which indicates that the threshold for post -- in postmortem cases is higher than the threshold for live victims -- live individuals.

And so the consequence of that was:  I did not consider the test to be a valid test for -- or a reliable test for the detection of semen --

Q    Okay.

A     -- or for the inference of the presence of semen, properly put.

Q    And as I recall your 2006 testimony, Doctor, your conclusions were also based on some known negatives in this particular case.

And in particular, I'm speaking about the negative sperm search conducted by Regions Hospital.

A    Yes.

Q    And also the negative Y chromosomal DNA findings on the swabs tested by the Minnesota BCA?

A    Yes.

Q    And can you briefly explain, Doctor, why

those two known negatives were significant in your conclusions at that time in 2006.

A    Sperm is the most definitive indicator of the presence of semen.  Sperm generally survive longer than a number of the chemical tests.  The acid phosphatase test is one.

The -- if the acid phosphatase test was indicating semen, the presence of semen, then I would have expected sperm to be found also.

And the -- that no sperm were found, then it suggests that maybe the acid phosphatase test -- just for that reason alone, much less the questions I had about the -- the reliability of the test as used -- was -- the acid phosphatase test would have been misleading.

Q    Based, Doctor, on the evidence that was known to you at the time of your initial report, consultation, and testimony in this case in 2006 -- and I'm talking about the known acid phosphatase levels as well as the negative sperm search by Regions, and the negative male DNA findings by the Minnesota BCA -- is your opinion still, today, that based on those known factors, there is still insufficient evidence to conclude that semen was present on any of those tested swabs?

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                33

A    Yes.

Q    In 2006, did you also provide opinions and testimony regarding more specific protein testing that could have been done to determine if, in fact, the swabs contained semen?

A    Yes.  I recommended the test for what in the forensic community was called "p30," and which is more broadly known as "a Prostate Specific Antigen" or "PSA."

That -- that test is a more sensitive test than the acid phosphatase test, and it is more reliable as an indicator of the presence of semen than the acid phosphatase test.

Q    And we'll talk about that a little bit more, just shortly, Doctor.

Earlier this year, were you then contacted by my office and asked to review materials and provide additional opinions in this matter?

A    Yes.

Q    And were you, in fact, provided additional materials?

A    Actually, I don't recall whether I was -- oh, yes, I was provided additional materials.  The -- this came in just when I was going into the hospital, and so this huge package arrived --

Q    Sorry.

MR. REISENHAUER:  Not unusual for these guys.

THE WITNESS:  Yeah.  And I -- I didn't have time to mess with it, so I just laid it on a work table and went off and did my hospital business.

And it wasn't really until a month ago or so -- I'm not quite sure when -- when it was that I got back in contact with you and said that I was now in a position to be able to think about this particular case.  So ...

BY MR. ABREU:

Q    Thank you, Doctor.

Let me ask you about whether you had an opportunity to review Alan Keel's February 9th, 2017, report, which was previously marked and admitted as Petitioner's Exhibit 3?

A    Yes.  I have.

Q    And do you agree with the opinions expressed in Mr. Keel's report?

A    Yes.

Q    Okay.  Do you disagree with any part of his report?

A    No.

Q    Do you know Mr. Keel?

A    Yes.  I've known him for a number of years now -- 30 years, I should think, or -- (sotto voce)

THE REPORTER:  I'm sorry?  How many years?

THE WITNESS:  30 years or something on that order.

BY MR. ABREU:

Q    Okay.  Let's go back and talk a little bit about p30, if we can.

Doctor, what is "p30"?

A    "p30" is an enzyme that is present at high levels in seminal plasma.  It is secreted by the prostate gland.  It is called "p30" by us because it has a molecular weight of approximately 30,000.

We did not know what the function of the protein was, but we do know what the function of the protein is now.  It's a proteinase called Kallikrein -- (sotto voce)

THE REPORTER:  I'm sorry?  Proteinase?

THE WITNESS:  Called Kallikrein 3.  K-A-L-L-I-K-R-E-I-N, I think is Kallikrein.

The -- the protein is -- is present in semen at about 1 milligram per mill levels, which is quite high, relatively speaking, compared to most of

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                    36

the other proteins that are present in seminal plasma. And so we latched onto it as a potential test for semen.

We demonstrated that we could not detect it immunologically in a number of other tissues, and so put it forward as a test for semen.

BY MR. ABREU:

Q    Doctor, you've several times now mentioned "we" and "us" as you've described what "p30" is.

Can you briefly tell us what role you played in the initial identification of the protein p30 as a marker in semen or as a potential marker in semen?

A    The work was done in my laboratory. It involved some of my students and a technician that I had at the time.

Q    How long ago was that?

A    That's going to be about 1976, I think; '76, '77. I'm not sure when the paper on it was published.

1978. It's on the CV. It's Item 24.

Q    Okay. Was your lab, and the work that you did in 1978, was that the first time p30 was identified as a marker in semen, or was someone else

doing work elsewhere as well?

A    No.  In fact, the protein had been discovered by different groups looking at different problems at different points in time.

I discovered after the publication of my paper, that several years earlier, it had been published in the Japanese forensic literature under the name of Gama Semeno Protein.  It had been researched -- or the protein had been recognized by a group that was looking at immunological methods for contraception, and they called it "E1 Protein."

And then simultaneous to the work that I was doing, a researcher at Roswell Park Cancer Institute -- that's got all the right words, but in the wrong order -- identified it also.  And he called it "PSA" and developed it as a test for prostatic cancer.

Q    What does "PSA" stand for?

A    Prostate Specific Antigen.

Q    And the nomenclature, "p30," you indicated that was based on the molecular weight of the -- of the enzyme?

A    Yes.

Q    And that nomenclature was based on the work that you did here?

A    Yes.

Q    And it's still used today?

A    Basically, the PSA test is -- is used today.  Only old folks will call it "p30."

MS. BURKLAND:  Good to know.

MR. ABREU:  So when you're having conversations at home with the relatives --

MR. REISENHAUER:  I won't call it p30 any more.

THE WITNESS:  No.  Please do.  But you do need to put the PSA along with it so that people do not think that it's something completely different --

MR. ABREU:  Okay.

THE WITNESS:  -- which was a bone of contention for a while since there were some patent issued involved.

MR. MONTROY:  I refuse to call it anything but "p30."  I'm taking a stand.

MR. REISENHAUER:  You're not old enough.

MR. MONTROY:  Thanks.

BY MR. ABREU:

Q    Doctor, as part of your consultation with my office earlier this year, were you provided with the results of p30 testing that had been done by the Minnesota BCA in 2004?

A    Yes, I was informed of that information.

MR. ABREU:  Okay.  Let me show, Doctor, if I may, what has been previously marked as admitted as Petitioner's Exhibit 4.

(Petitioner's Exhibit No. P4 referenced)

MR. ABREU:  Melissa, you guys have that?

MS. BURKLAND:  Yes.  Never enough copies.

(Discussion off the record)

BY MR. ABREU:

Q    What is -- Doctor, if you look at the page 1 of P4, when is that report dated?

I'm just going to direct you right to it.

A    May 28th, 2004.

Q    Okay.  So that obviously would have been before your 2006 involvement in this particular case?

A    Yes.

Q    Had you seen this document, P4 -- and I'll give you a second to look through the pages, if you will -- prior to your testimony in 2006?

A    No.  The only materials that I was provided in 2006 were the five items that are listed in my report of August 24th.

Q    And let me just ask you quickly about that.

What is the very first reference --
Bates Number on the top of P4?

A    18389.

Q    If you turn to the very last page, what
is the Bates Number up in the upper right-hand corner
there?

A    18418.

Q    And going back to your initial report on
August 24th, 2006, where you listed the bench notes
that were provided to you, in subparagraph
number 4 --

A    Yes.

Q    -- and this had pagination page 18532
through 18552, 20 pages --

A    Mm-hmm.

Q    -- would these numbers, as they relate
to P4, have been included in those page numbers that
were provided to you in 2006?

A    No, they precede those page numbers.

Q    Okay.  Were you aware, at the time of
your 2006 report and testimony, that the government
had, in fact, performed p30 testing on the swabs?

And when I say "the government" I mean
the Minnesota BCA, actually.

A    No, I was not.

And, as a matter of fact, in my report, I recommended that that be done as a test -- as a further test that could be used to assess the presence of semen.

Q    Let me direct you specifically to page 3 of your August 24th, '06, report, if I may.

And what is -- the very first paragraph there, next to last sentence reads:

"Since PSA/p30 testing was not done in this case.  The alternative explanations cannot be distinguished by direct test."

Do you see that?

A    Yes.

Q    So is that consistent with your testimony and your recollection that at the time of your testimony in 2006, you were -- it was your understanding that p30 testing had not been done in this case?

A    That is correct.

Q    Do you recall whether you spoke with Mr. Hoy about the significance of p30 testing before your 2006 report and testimony?

A    I don't recall the details of that conversation.  I would have to look at maybe an e-mail exchange.  Whether I included that in the

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                    42

e-mail exchange, I'm not -- I don't think I have
notes on my conversation with him prior to -- which
was around the -- maybe the Saturday before the
Monday of the testimony.

        Q    Okay.  Let me stop you there --

        A    Okay.

        Q    -- and see if I can show you some things
to refresh your recollection, if that's okay.

             Let me show you what I'm going to now
mark as Petitioner's 64.

                    (Petitioner's Exhibit No. P64

                     marked for identification)

        MR. ABREU:  Is that correct?

        MS. BURKLAND:  I think that's right.

        MR. ABREU:  Yes.

        MS. BURKLAND:  Yes.

        MR. ABREU:  Hold that there.

        THE WITNESS:  Mm-hmm.

BY MR. ABREU:

        Q    If you look, Doctor, at the upper
right-hand corner of Petitioner's 64, it makes
reference to what these -- these notes reflect.

             Can you tell us what it says?

        A    "PH conf," which I assume is --

(sotto voce)

THE REPORTER:  I'm sorry.  I can't hear when you --

THE WITNESS:  Which I assume is phone conference, uh, "6/28/06, with Dr. Geo Sensabaugh," and it has my office phone number there.

BY MR. ABREU:

Q    Okay.  And by the way, these are not your notes; is that correct?

A    This is not my writing.

MR. ABREU:  For the record, Melissa, I'm referring to Bob Hoy's notes.

MS. BURKLAND:  Yeah.  I'm just trying to find them with the Bates number.

MR. ABREU:  That's a good question.

MS. BURKLAND:  4344 -- (sotto voce) Oh, no, that's different because the one we have -- could you direct us to a Bates number because I --

MR. ABREU:  We need Lubey here for that.

MS. BURKLAND:  I can keep digging.

MR. ABREU:  Can we use the copy I just gave you, and then when we take a break, I'll see if I can pull --

MS. BURKLAND:  Sure.

MR. ABREU:  -- up the Bates Number if that's okay.

THE WITNESS:  Should I --

MR. ABREU:  You can use that one.  She has a copy.

MS. BURKLAND:  We have a copy.

MR. ABREU:  You can hold onto that one.

MS. BURKLAND:  Okay.  Got it.

6263 is where it starts.

MR. ABREU:  Will you -- Melissa, for the record, can you just read in the Bates numbers so that they're a part of the record here, for the first, second, and third pages --

MS. BURKLAND:  Wait, wait, wait.  I'm jumping the gun again.  Please don't -- it's still not a match.

6262 is where it starts.

And then I must have had this -- oh, yeah.  I just had that -- okay.  Sorry.

They start at 6262.

And how many pages did you give us?

MR. ABREU:  Three pages.

MS. BURKLAND:  Three.  And then I believe it ends 6264.

MR. ABREU:  I apologize.  My version

doesn't have Bates numbers.

MS. BURKLAND:  That's okay.

BY MR. ABREU:

Q    Okay.  So -- Doctor, if I can refer you down -- a little more than three-quarters down the page --

A    Mm-hmm.

Q    -- and I will read for you what it says there.  It says:

"p30 testing would be more specific and more sensitive."

Do you see that?

A    Yes.

Q    Okay.  Is that, Doctor, consistent with your understanding of p30 at that time, and would that be reflective of a conversation that you would have had with trial counsel, Mr. Hoy?

A    Yes, that -- basically that the sensitivity, as indicated here, was -- with p30 would be up to 1 in a million versus 1 in, plus or minus, 200 for the AP testing.

Q    Okay.  And referring to what is page 2 of that document, where it says -- starting there -- I'll read it:

"No reason to believe that AP in vaginal

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                    46

vault is any more stable than semen or p30.  All
should have diminished as similar rate over five
months outdoors."

          Do you see that?

     A    Yes.  This is under the box that's
labeled "His Opinion."

     Q    Again, is that consistent with
information would you have provided to trial counsel
at the time of your consultation in 2006?

     A    Yes.

     Q    And going to the final page there, where
it says, "p30 present in large quantities in semen,
would still be present on swabs if" -- something I
can't decipher.

          But do you see what I'm talking about
there?

     A    Yes, and I can't decipher it, either.

          MR. ABREU:  Melissa, can you decipher --
Bob?

          MR. REISENHAUER:  I can.

          MR. ABREU:  Keith speaks Bob.

          MR. REISENHAUER:  I think it says either
"dried or frozen or both."

          MR. ABREU:  Okay.  Thank you.

          THE WITNESS:  And that would make sense.

BY MR. ABREU:

Q    Okay.  So I'll just reread that for the record again, where it says:

"p30 present in large quantities in semen would still be present on swabs if either dry or frozen or both."

Do you see that?

A    Yes.

Q    Again, is that consistent with information that you would have reported to trial counsel in 2006?

A    Yes.

MR. ABREU:  Let me show you what I'm going to now mark as Petitioner's 65.

(Petitioner's Exhibit No. P65 marked for identification)

THE WITNESS:  Do we have a paperclip or stapler?

MR. ABREU:  We'll grab one in a moment, yeah.

MS. BURKLAND:  Thank you.  65?

MR. ABREU:  65.

MS. BURKLAND:  Okay.

MR. ABREU:  By the way, if there's no objection, we would move for the admission of

Petitioner's 64.

MS. BURKLAND:  No objection.

MR. ABREU:  Thank you.

BY MR. ABREU:

Q    Doctor, do you recognize P65?

MR. ABREU:  And before you answer that, Melissa, do you want to check on the Bates Number?

MS. BURKLAND:  Yeah.

MR. REISENHAUER:  That it is.

MS. BURKLAND:  All right.  6244.

MR. ABREU:  Thank you.

MS. BURKLAND:  Sure.

BY MR. ABREU:

Q    Doctor, returning now to P65, do you recognize that?

A    Yes.

Q    And what -- what is P65, if you will?

A    It is an e-mail exchange from me to Mr. Hoy, July 6th of 2006.

Q    Okay.  And let me, if I may, ask you about this entry of the e-mail from you to Mr. Hoy on July 6th, 2006, that you just mentioned, where it says:

"I have looked over the BCA notes, and it appears that no male Y DNA was present in any of the

Number 86 samples.  It is not clear whether they did a sperm search at BCA, and they might be queried to that effect.  If they did, they might have a little more of the acquiesce extract remaining from which it might be possible to do a p30 test.  In any case, I am pretty confident that the ACP test finding is an artifact."

And by "ACP," does that mean acid phosphatase, AP --

A    Yes.

Q    Okay.  Do you see what I'm referring to there, Doc?

A    Yes.

Q    Is that consistent with information you would have provided to Mr. Hoy about the significance of potential p30 testing in this case?

A    Yes, it is.

Q    Is that also indicative of whether you knew or did not know whether p30 testing had been done by the Minnesota BCA in 2004?

A    If I knew the p30 test would have been done, I wouldn't have recommended that it be done.

Q    Let me ask you if, I may, Doctor, about what I'm now going to mark as Petitioner's 66.

                     (Petitioner's Exhibit No. P66

                     marked for identification)

          MS. BURKLAND:  I don't know if this is
the same one.  I don't have this one.  I won't know
the Bates Number.

          Wait.  It's right here.  All right.

          It starts 6219 through 62- --

          MR. REISENHAUER:  No.  Here, here, here.
You grabbed too fast.

          MS. BURKLAND:  Did I grab too fast?
Okay.

          6218 through 6219.

          MR. ABREU:  Thank you, Melissa.

          MS. BURKLAND:  Yeah.

BY MR. ABREU:

     Q    Dr. Sensabaugh, let me ask you about
these particular notes as they are set out in
Petitioner's Exhibit 66.

          Can you see what they -- those notes are
dated?

     A    Yes.  This is August 19th, 2006, just a
few days before my testimony in this case.

     Q    And what does P66 profess to be based on
the notation right to the right of that date?

     A    Phone conversation with Dr. Sensabaugh.

Q     Okay.

A     That is, with me.

Q     Okay.  Again, these are not your notes?

A     Correct.

Q     And referring to subparagraph 1 there --
in the last sentence of subparagraph 1, where it
says:

     "In order to be certain, further more
specific indicators must be found, such as the
p30 protein which is only found in seminal fluid."

     Do you see that?

A     Yes.

Q     Again, is that consistent with the
information would you have provided to trial counsel
about the significance of p30 testing as a method to
determine whether, in fact, semen was present on the
swabs?

A     Yes.

Q     And, again, is that sentence of
subparagraph 1, indicative of whether you knew or did
not know that p30 testing had been done?

A     It -- it indicates that I did not believe
that p30 testing had been done.  I did not know that
p30 testing had been done.

Q     Okay.  Doctor, as you look at P64, P65,

and P66, are those documents, as we just indicated,

consistent with your recollection regarding

information you provided to Mr. Hoy in 2006?

A    Yes.

Q    Okay.  Let me -- let's go back to P4, if

we can, Doctor.

And let me ask you to --

A    Oh.

Q    Yes, thank you.

I'd ask you to look at the very last page

of P4.

Do you see that now, Doctor?

A    Yes.

Q    And what is reflected on that very last

page of P4?

A    This is page number 18418, and it

indicates that p30 testing was done on -- I think

April 23rd or 28th of '04.

Q    23rd, I believe.

MR. ABREU:  Would you agree, Melissa?

MS. BURKLAND:  Yes.

THE WITNESS:  Yes.

MR. ABREU:  Thank you.

THE WITNESS:  As well as micro- -- a

microscopic analysis.  Basically, a sperm search.

BY MR. ABREU:

Q    I'll ask you about that momentarily.  Let me just ask you about the p30 results.

What does that last page of P4 reflect was the result of p30 testing on Item 86A, the vaginal swabs?

A    Well, first note that the positive control was positive and the negative control was negative, as appropriate.

Q    What does that mean?

A    That indicates that the test was performing as it should.

And so with regard to your question, then, for Item 86A, it indicates negative.

Q    Okay.  And in terms of Item 86B, the anal swabs?

A    Similarly, negative.

Q    Okay.  And in terms of 86C, the cervical swabs?

A    Again, negative.

Q    At the time you testified in 2006, were you aware of these p30 results?

A    No, I was not.

Q    How do these p30 results impact your opinions, Doctor, regarding the allegation that semen

was detected on any of the tested swabs?

A    It -- it provides a further indication to me that the acid phosphatase test was an artifact, that it was not a consequence of the deposition of semen.

Q    Okay.  Let me ask you now, Doctor, given the negative sperm search that you testified to earlier and at the time of trial in 2006, the negative male DNA searches, and the negative p30 results which are now known to you, is there a reasonable scientific basis upon which one could conclude that there was semen on any of those tested swabs?

A    The conclusion would be that there is no semen on any of those swabs.

Q    And that is despite the acid phosphatase levels that were obtained in this particular case?

A    That is correct.

Q    Okay.  Going back, Doctor, if we can, to the last page of P4, do you see an indication right to the right of the p30 results that say "Negative SP/slide"?

A    Yes.

Q    What does that indicate to you?

A    That would indicate negative sperm on a

slide test, the microscopy test, and the same results were obtained for 86A, 86B, and 86C.

Q    At the time of your consultation with Mr. Hoy in 2006, your report in 2006, and your testimony in 2006, were you aware that the Minnesota BCA had conducted its own independent sperm search?

A    No.  I think I knew only about the -- the hospital sperm search.  The -- and that would be indicated by my statement in one of the phone conversations that if the BCA had done a sperm search, they should be asked about it.

Q    Yes.  And you obviously did not have this particular document?

A    That is correct.

Q    Okay.  In terms, Doctor, of trying to identify the semen or whether something is or isn't semen, is there any significance to the fact that two separate laboratories conducted sperm searches and they were both negative?

A    It would provide confirmatory evidence that -- that there was a negative sperm -- no sperm was detected -- or no sperm were present in the sample.

Q    Does the second negative sperm search,

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                    56

conducted by the Minnesota BCA, support the opinions and testimony that you provided to the court and to the jury in 2006?

A    It would be a confirmation that the earlier sperm search was a correct sperm search; and so, yes.

Q    And in terms of the accuracy of your testimony in 2006, does it support the accuracy of your testimony in 2006 -- I guess, is what I'm asking?

A    Yes.

Q    Do you recall, Dr. Sensabaugh, reading about a -- what Dr. McGee called a "globule of semen" in his testimony in 2006?

A    Yes; but really, I only recall it upon rereading, because I --

Q    Sure.

A    I'm not sure that it made any impression on me at the original time.

Q    Okay.  Does -- do the negative sperm searches, one -- both the one conducted by Regions and the one conducted by the Minnesota BCA, do they offer any evidence regarding whether or not the globule that Dr. McGee alleged to have seen, was, in fact, semen?

A    It would suggest that it is not semen; that it was something else.

Q    And is that information that you would have been -- would have been helpful for you to have at the time of your 2006 consultation, report, and testimony?

A    I think I was just looking at the -- at the items -- the 86s, as I referred to them.

The -- I may have been asked at the trial about the globular material, but I don't recall whether I was or not.

But it -- it wouldn't have -- it wouldn't have made any difference in my conclusions that 86C, which would have been the cervical swab, that was allegedly the globular material, was not semen.

Q    Okay.  Let me refer you to your testimony of August 28th, 2006 -- at page 6658 -- Melissa -- where you were being cross-examined by the government attorney.  That would have been the Daubert hearing testimony.

A    Okay.

MR. REISENHAUER:  I've got it.

BY MR. ABREU:

Q    And you were asked (as read):

"QUESTION:  In the assessment of whether

there is a seminal deposit, would you say it is corroborative or not corroborative that Dr. McGee found the white mass, the globule in the cervix, that he, an educated, trained, and experienced forensic pathologist -- that he offered and believed was a seminal deposit, looking at it there in the -- in this girl's cervix?  Would that be a corroborative point to you or just not corroborative?

"ANSWER:  I had not known about that before.  I think that's very interesting information, and if there was a globular mass there -- and there was, according to his observations -- I think that I would have had wanted to look at it directly under the microscope for the presence of sperm because if -- if [sic] was a residual of an ejaculate, then I really would expect -- in something so substantial, I think I really would expect to find sperm in it if it was, in fact, semen."

Do you see that -- well, does -- you don't see that, but --

A    No, I don't see it, but I'm reading -- I'm listening to you, yes.

Q    And does that -- is that consistent with your recollection about what you were asked about and the significance of that globule as you were asked

about it?

A    I'll take the trial record as indicating that that's what happened, yes, and what I said.

Q    And, in fact, then, is the negative sperm searches on those globules, then, corroborative of what you have expected to find, in fact, if this was semen?

A    If it was -- if it was semen, I would have expected to see positive sperm -- positive sperm, positive p30, maybe positive acid phosphatase as well.

Q    And the fact that both sperm searches were negative, is that supportive of your conclusion that this was not semen?

A    That is correct.

Q    Okay.  In 2006, Doctor, you mentioned that finding no sperm in ejaculate is uncommon, and that aspermic males are very rare?

A    Yes.

MR. ABREU:  And just for the record, I'm referring to page 6658 to 6659 of the Daubert hearing testimony on August 28th, 2006, and page 6815 of the trial testimony on August 29th, 2016 [sic].

BY MR. ABREU:

Q    What is, Doctor, an "aspermic male"?

A    That is a male that produces no sperm in the testes, and so the ejaculate, which is made up of fluids from the prostate and seminal vesicles, would contain no sperm.

Q    Okay.  In determining whether or not something is semen, would it be helpful to know whether or not the potential source of the alleged semen is or is not an aspermic male?

A    Yes.  That -- because the -- if we have tests -- both the p30 test and the acid phosphatase test are essentially tests for seminal plasma proteins, which are made in the prostate, and there -- it's another test that is now used as well, for commercially available, a test for what's called "semenogelin."  S-E-M-E-N-O-G-E-L-I-N, I think is the spelling for it.

Q    That's correct.

A    That those are -- all of those are tests for proteins that are present in seminal plasma.

If one got positive results for all of those tests, but negative results on a sperm search, then one would postulate that the individual, who donated the semen, was aspermic.

If the individual was found not to be aspermic, then that would raise questions as to

whether it's -- it's the same individual.

Q    Okay.  And back in 2006, were you provided any information about whether or not Mr. Rodriguez, himself, was an aspermic male?

A    No.

MR. ABREU:  Let me show you, if I may, what was previously marked and admitted as Petitioner's Exhibit Number 5.

(Petitioner's Exhibit No. P5
referenced)

BY MR. ABREU:

Q    It is Minnesota BCA Lab Report Number 5, dated 1/28 of '04.

Do you see that?

A    Yes.

Q    Again, would that have been prior to your 2006 consultation, report, and testimony?

A    Yes.

Q    Let me refer you, if I may, to Item 4 on the first page.  It says, "One paper bag containing evidence classified as pants."

You see that?

A    Yes.

Q    And then to the right of that, it says, "Jeans from Rodriguez."

A    Yes.

Q    Okay.  And let me refer you to -- now to -- did I give you my copy again?

MR. REISENHAUER:  Probably.

MR. ABREU:  Yeah.  Let me switch with you.  This way I can find stuff in that.

Thank you.

BY MR. ABREU:

Q    I'd refer you to page 3 of 5, where it says, "Results of Laboratory Examination."

A    Yeah.

Q    The very first paragraph there indicates that "Semen was identified on the pants, Item 4, in four areas:  Items 4-1, 4-2, 4-3, and 4-4, said to have been collected from Alfonso Rodriguez, Junior."

Do you see that?

A    Yes.

Q    And the very last paragraph on that page 3 of 5 of P5, where the first sentence states: "The male DNA profile obtained from the sperm cell and nonsperm cell fractions of Item 4-1, 4-2, and 4-3, and 4-4 matches the DNA profile obtained from the known sample of Alfonso Rodriguez, Junior."

Do you see that?

A    Yes.

Q    Does -- do those results, as they were indicated on Lab Report Number 5, indicate to you whether sperm were, in fact, detected on the semen found on those jeans, and whether Mr. Rodriguez is or is not an aspermic male?

A    This would indicate that he's not an aspermic male.

Q    Okay.

A    It identifies that the profile was obtained from both the sperm cell and nonsperm cell fraction.  And the presence of a sperm cell is -- that's indicated.

Q    Were you provided with P5 at the time of your consultation report and 2006 testimony in this case?

A    No, I was not.

Q    Would P5 have been helpful to you in making your assessment about whether this was -- was or was not semen, knowing that Mr. Rodriguez was not an aspermic male?

A    Yes, because it would exclude the possibility of semen being present that was lacking in sperm, which is one of the possibilities that has to be considered when you get -- have a negative sperm search but a positive test for an acid

phosphatase or p30 or what have you.

Q    Would it have supported your conclusion in the circumstances of this case if, in fact, this was semen, you would have expected to find sperm cells?

A    Yes.

Q    Okay.  Can we go back to P4, if we may, Doctor.

And referring, again, to the very last page of P4, do you see the references to the letters N, as in Nancy, E, as in Edward, C, as in cat, where Items 86A, 86B, and 86C are listed to the right of that?

A    Yes.

Q    Doctor, what's your understanding of what NEC are?

A    Nucleated epithelial cell.

Q    And at the time that you testified in 2006, were you aware that the Minnesota BCA had detected the very heavy presence of NEC or nucleated epithelial cells on Items 86A and light nucleated epithelial cells on Item 86B, the anal swabs, and heavy nucleated epithelial cells on Item 86C, the cervical swabs?

A    No, I was not aware of that.

Q    And, again, Doctor, just to be clear, you were not provided with this report in 2006?

A    Correct.

Q    Does the presence of heavy NEC on the vaginal swabs, and heavy -- I should say very heavy NEC on the vaginal swabs, and heavy NEC on the cervical swabs, that were alleged to have been semen -- does the presence of those nucleated epithelial cells support your conclusion that there was no semen detected on those swabs?

A    Not directly, but indirectly.

Q    Can you explain that, please.

A    That if the -- if the epithelial cells were highly degraded, then one might argue that the sperm had been degraded as well.

Generally speaking, the epithelial cells degrade more rapidly than sperm do, sperm being pretty resistant to a lot of the degradative reactions.

And so if these cells showed nucleated cells, it indicated that -- it would have indicated that the semen -- or I'm sorry -- that what the -- the cellular material that was present was not heavily degraded.

Q    So if I'm understanding this right,

Doctor, because there was this heavy presence of nucleated epithelial cells, had there been sperm cells, you would have expected to see those there?

A    Yes.

Q    And because there were no sperm cells, and there was heavy nucleated epithelial cells, that supports your conclusion -- or does it support your conclusion that, in fact, this was not semen?

A    It -- it -- it supports the conclusion that there were no sperm present there --

Q    Okay.

A    -- which would be consistent with no semen.

Q    And does semen -- or can semen contain male nucleated epithelial cells?

A    Yes, it can, much lower concentration than sperm cells --

Q    What is --

A    -- generally.

Q    I'm sorry.

What is the source of those nucleated epithelial cells in semen?

A    To the best of my knowledge, they're cells that slough off from a urogenital tract as the -- and are just part of what comes out with the

**Exhibit 1**

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                    67

semen.

Q    Does the fact that there was Y DNA
testing that was negative, despite the heavy presence
of nucleated epithelial cells, does that support your
conclusions in this case that, in fact, this was not
semen?

A    Well, if the nucleated cells in the
83s -- is it 83s or 86s -- 86s?

Q    86s, yes.

A    86.

If the -- if any of the nucleated cells
in the 86s had originated from semen, then one would
expect to have found Y DNA.

Q    And from Y DNA, it could be determined,
one, who the -- who the source of that potential
semen would be?

A    Yes, once you get genetic information,
Y chromo- -- technically, it's Y chromosomal DNA --
one could get genetic information from the Y
chromosome, which would be fairly definitive as to
the identification of the source individual but not
absolutely.

Q    And, again, in this case, we know that
was all negative for Y chromosomal DNA?

A    Yes.

**Exhibit 1**

Q    And I don't recall if I asked you this, but were you aware, in 2006, that -- that NEC, nucleated epithelial cells, had been found on these swabs, a significant number of them -- or heavy NEC, or very heavy NEC?

A    No.  I did not know about those.

Q    Let me wrap up here, Doctor, if I may.

Based on the evidence that you've reviewed, both in 2006 and to date now in 2017, do you see any evidence to support the opinion that semen was detected on any of the swabs, 86A, 86B, and 86C?

A    I see no evidence of semen being on either swab.

Q    If you were asked to opine, Doctor, based on the evidence that you reviewed so far, whether there was semen on any of the swabs, what would you say, Dr. Sensabaugh?

A    I would say that there is no evidence of the presence of semen on any of the swabs.

Q    Are all the opinions you've expressed today based a reasonable degree of scientific certainty?

A    Best scientific information, yes.

Q    Okay.  And had you been provided with all

of the documents you have now reviewed, including the
p30 results, the information about the second sperm
search, and the presence of nucleated epithelial
cells, could you have provided the opinions you
provided to Mr. Rodriguez's trial attorney -- could
you have provided the opinions you've provided here
today to Mr. Rodriguez's trial attorneys in 2006?

A    I would say that they would be
corroborative, but not as definitive as the p30 test.

Q    So let's take -- take all the information
that you now have, and had you been provided that
information in 2006, would you have told it to
Mr. Rodriguez's attorneys in 2006, and could you have
given him the information that you gave us today?

A    Certainly, with regard to the sperm
searches, I would have.  The nucleated cell part, I'm
not sure that I would have made that connection --

Q    Okay.

A    -- unless I had been posed the
question:  Could it be that the sperm had degraded?

And then my response would be if the
sperm degraded, then the nucleated -- one would not
have found nucleated cells.

Q    And if the record reflected that you, in
fact, were asked by the government about the

possibility that the sperm degraded, would that be consistent then with information you would have given trial counsel?

A    Yes.

Q    Okay.

A    Yes.  So I -- I mean, I can't exactly say what I would have said at some point in time based on information that I now know.

Q    Well --

A    Yeah.

Q    And that's a little bit of a post conviction dilemma.

But I guess the question I'm asking is: Is -- is the testimony you've given today, is it based on some science that was not available in 2006?

A    No.

Q    Or was it available in 2006?

A    No, those -- all of those observations were well established, particularly to people who do sexual assault evidence analysis.

Q    And had you provided -- had you been provided with all the documents that you've now reviewed, including the p30 results, would you have testified similar to your testimony today at the 2006 Daubert hearing?

A    Yes.

Q    And, finally, had you been provided with all the documents and evidence you've reviewed to date would you have provided the jury in Mr. Rodriguez's trial, the same opinions and conclusions you provided here today?

A    Yes, I would.

MR. ABREU:  That's all I have at the moment.

MR. REISENHAUER:  Okay.

MR. ABREU:  Can we take five?

MR. REISENHAUER:  We can take ten.

(Proceedings recessed from 11:55 a.m. until 12:08 p.m.)

EXAMINATION

BY MS. BURKLAND:

Q    Dr. Sensabaugh, earlier you testified that you had records on this case.  You mentioned some sort of notes or records.

A    Mm-hmm.

Q    And then would that be from both 2006 and 2017, when you were reconsulted on this matter?

A    Yes.  I have -- I have my notes from 2006, just -- regular case notes --

Q    Okay.

A    -- which also have the var- -- have the various correspondences that I had, the report that I wrote, administrative information.

Q    Okay.  And then did you -- do you have a similar file for the 2017 contact you had with this case?

A    I went to a folder this morning.

Q    You threw it into the one folder.

We would ask that you provide those to Mr. Abreu.

MR. ABREU:  I actually don't have them.

Can I look at them?

THE WITNESS:  Oh, okay.  This is -- this is the original.  They may be a little bit commingled.

MR. ABREU:  Okay.

MR. REISENHAUER:  Everything is in this case.

MS. BURKLAND:  Yeah.

MR. MONTROY:  Give us a chance to mix everything up.

MR. REISENHAUER:  That's Joe's job.

MR. MONTROY:  Joe is good at that.

BY MS. BURKLAND:

Q    Yeah.  We'd just ask that you -- we could have that copied and provided and probably just Bates-numbered as --

MR. ABREU:  I should have it, too.  It looks like the C.J. voucher.

And would you make a copy for me?  And then I'll forward it.

THE WITNESS:  I can scan it and send it to you electronically.

MR. ABREU:  That's totally fine.

BY MS. BURKLAND:

Q    And then, finally, you testified that in about the mid-to-late '70s, you were spearheading an effort to identify this -- what you yourself named "p30"?

A    Mm-hmm.

Q    And there was only a couple other labs in the world that were also doing the same thing around the same time?

A    Well, for different reasons.

Q    But for different reasons, yes?

A    Yes.

Q    To your knowledge, were you the only lab doing it for the specific reasons that you were

**Exhibit 1**

trying to isolate p30 for?

A    You mean as an investigation of alternative markers to the acid phosphatase test for semen?

Q    Yes.

A    As far as I know, I was the only one doing it.

Q    Okay.  And do you consider anybody else to be sort of the same caliber of expertise as you are, as identifying and isolating p30?

A    Several people, from a forensic standpoint.  Dr. Robert Gaensslen. G-A-E-N-S-S-L-E-N, I think is the proper spelling of his name.

Q    Okay.

A    Dr. Robert Shailer (phonetic).

Q    Okay.

A    Both are retired now.

Q    Okay.

A    Dr. Blake, who was in --

Q    Who was your student, though, correct?

A    Who was my student at that time.

Q    Okay.

A    I would hazard that the three of us, at -- at least at the academic level, would have been

the main people who were doing research in the area of semen work.

There were -- there was more work being done abroad.  There were people in -- for example, in the Metropolitan Police Laboratory who were doing work -- doing research work.  This is from the glory days of that laboratory, when they had an active research program.

Q    Okay.

A    Before Margaret Thatcher.

Q    Okay.

A    Oh, and Home Office Forensic Science Service, which was --

Q    Was that abroad, too?

A    That's in England.

Q    In England.

A    And now whoever the last Tory government privatized.

Q    All right.  But -- and you really only identified two other doctors in the United States.

So would it be correct to say that you were one of the leading experts on p30 in the United States -- now PSA?

A    Yeah.  I -- although once -- you know, I'll qualify that because my interest was finding a

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                76

marker that could be useful, and we identified the marker.

We had a nice paper in the New England Journal of Medicine around 1985 or so.  I can look up the -- the number in my CV, if you wish.

Q    And then also, as far as your testing for acid phosphatase and trying to identify --

A    Wait.  Let me --

Q    Now I'm asking you about acid phosphatase.

A    No, no.  I -- I want to, though, follow up.

Q    Yeah.

A    My -- my work with p30 was largely from an academic and foundational base.

Quite a few people started using it in practice, and there are now commercial kits that employ it in practice.

And those people have far more experience with the vicissitudes of working with evidence items than I do.  I only get back reports occasionally from them.

Q    All right.  But as far as -- all right.

But would you agree that as far as testing to determine whether or not, in a forensic

case, semen is or is not present, you were one of the leading experts to be able to make these types of determination and testimony?

A    I would hazard, yes.

MS. BURKLAND:  Okay.  Thanks.

MR. ABREU:  It's okay, Doctor.  You can toot your own horn.

MS. BURKLAND:  Yes.  All right.  I don't have anything further.

MR. ABREU:  Just one quick follow-up, if I may, Doctor.

FURTHER EXAMINATION

BY MR. ABREU:

Q    By the time of 2006 at the time of trial, was p30 testing being performed, as far as you know, at forensic labs around the country?

A    Mm-hmm.  Yes.

Q    Anything else?

A    Yeah.  By that time, commercial kits had been developed -- and I don't recall when the first commercial kits appeared -- but it was in the '90s, I believe.

And so that -- that made it a lot easier to do than the tests that had been done previously.

MR. ABREU:  That's all I have.

Thank you.

MR. REISENHAUER:  Thank you.

MR. ABREU:  Thank you, guys.

THE REPORTER:  You guys, remind me:
Where does original go?

And I'm assuming you guys want a
transcript?

MR. REISENHAUER:  Yes.

MR. ABREU:  You can send the original to
us, and let's make sure you have the exhibits.

THE REPORTER:  I do.

(Proceedings concluded at 12:17 p.m.)

---o0o---

ACKNOWLEDGMENT OF DEPONENT


        I declare under penalty of perjury that

the foregoing is true and correct.  Subscribed at

_____, California, this _____ day of

_____, 2017.


                        _____

                        GEORGE SENSABAUGH, D.Crim

**Exhibit 1**

Transcript of George Sensabaugh, D. Crim
Conducted on August 16, 2017                    80

(STATE OF CALIFORNIA )        SS.

I do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify to the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was correctly reported by me, a certified shorthand reporter and disinterested person, and was under my supervision thereafter transcribed and when so transcribed was carefully read to or by the said witness, and, being in every desire, was thereafter by the said witness duly subscribed; that if unsigned by the witness, signature has not been waived in accordance with stipulation between counsel for the respective parties.

And I further certify that I am not of counsel or attorney for either or any of the parties to said deposition nor in any way interested in the outcome of the cause named in said caption.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 22nd day of August, 2017.

_____

CARRIE HEWERDINE, RDR, CSR #4579