**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                              )
United States of America,     )
                              )
            Plaintiff,        )
                              )
        vs.                   )    **FILE NO. 2:04-cr-55**
                              )               **2:11-cv-88**
Alfonso Rodriguez,            )
                              )
            Defendant.        )
                              )
- - - - - - - - - - - - - - - -


**P A R T I A L**

**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**EVIDENTIARY HEARING (TESTIMONY OF ROBERT G. HOY)**

**JUNE 22, 2017**

**Pages 1-212**


HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
         655 FIRST AVENUE NORTH
         FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

A P P E A R A N C E S

**MR. KEITH REISENAUER**                    **COUNSEL FOR PLAINTIFF;**
**MS. MELISSA BURKLAND**
Office of US Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102


**MR. ERIC J. MONTROY**                    **COUNSEL FOR DEFENDANT;**
**MR JOSEPH W. LUBY**
**MR. VICTOR J. ABREAU**
Federal Community Defender
601 Walnut Street Suite 545 West
Philadelphia, PA  19106

**I N D E X**

**W I T N E S S E S**

**PLAINTIFF'S:**                                                    **PAGE NO.**

**ROBERT G. HOY**

Direct Examination by Mr. Luby                            7
Cross-Examination by Mr. Reisenauer                    107


**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Petitioner's 26 | CV of Dr. Dragovic | 6 | 6 |
| Petitioner's 27 | Report of Dr. Dragovic | 6 | 6 |
| Petitioner's 28 | MN BCA Lab Report #10 w/o notes attached | 106 | 106 |
| Petitioner's 29 | Cover etter from USA | 106 | 106 |
| Petitioner's 30 | MN BCA Lab Report #27 | 106 | 106 |
| Petitioner's 31 | Cover letter from USA 6/9/2004 | 106 | 106 |
| Petitioner's 32 | Expedited Motion for Disclosure of Government Expert Witness | 106 | 106 |
| Petitioner's 33 | USA Disclosure of Expert Witnesses 4/19/2006 | 106 | 106 |
| Petitioner's 34 | USA Disclosure Supplement 1 4/28/2006 | 106 | 106 |
| Petitioner's 35 | USA Disclosure Supplement 2 5/5/2006 | 106 | 106 |
| Petitioner's 36 | Expedited Motions for Sanctions and Brief in Support 5/5/2006 | 106 | 106 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Petitioner's 37 | Order Granting Motion for Sanctions | 106 | 106 |
| Petitioner's 38 | USA Supplemental Disclosure re: Order | 106 | 106 |
| Petitioner's 39 | Cover letter from USA to Robert Hoy 5/8/2006 | 106 | 106 |
| Petitioner's 40 | Supplemental lab report ND State Crime Lab 2/20/2004 | 106 | 106 |
| Petitioner's 41 | Quality Assurance Manual - ND Crime Lab | 106 | 106 |
| Petitioner's 42 | Deposition transcript of Dr. McGee 5/31/2006 | 106 | 106 |
| Petitioner's 43 | E-mail correspondence between Mr. Hoy and Mr. O'Keefe | 106 | 106 |
| Petitioner's 44 | Letter from Dr. Blake to Mr. Hoy received 5/15/2006 (DNA) | 106 | 106 |
| Petitioner's 45 | Letter dated 6/9/06 from Mr. Hoy to Dr. Blake (AP assistance) | 106 | 106 |
| Petitioner's 46 | E-mail to Mr. Hoy from Dr. Blake 6/13/06 | 106 | 106 |
| Petitioner's 47 | Email from Mr. Hoy to Dr. Sensabaugh | 106 | 106 |
| Petitioner's 48 | E-mail response 6/28/06 Dr. Sensabaugh | 106 | 106 |
| Petitioner's 49 | Report of Dr. Sensabaugh Dated 8/24/06 | 106 | 106 |
| Petitioner's 50 | Bench notes from Ann Marie Gross | 106 | 106 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Petitioner's 51 | Handrwitten notes of Mr. Hoy 4/15/05 Meeting with Dr. Peterson | 106 | 106 |
| Petitioner's 52 | Letter to Dr. Peterson from Mr. Hoy 5/11/06 | 106 | 106 |
| Petitioner's 53 | Letter from Mr. Hoy to the Court 7/6/06 | 106 | 106 |

**P R O C E E D I N G S**

(June 22, 2017:  The following proceedings commenced at 9:10 a.m.:)

THE COURT:  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55 and 2:11-cv-88. Mr. Rodriguez has waived his right to appear.  Present on his behalf are Mr. Montroy, Mr. Luby and Mr. Abreu. Present on behalf of the United States are Mr. Reisenauer and Ms. Burkland.  When we broke the petitioner was about to call its next witness.

MR. MONTROY:  Good morning, Your Honor. Before we call our next witness, I neglected yesterday to move Exhibits 26 and 27 into the record so I would just make that motion now, Your Honor.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Twenty-six and 27 are received.

MR. MONTROY:  Thank you, Your Honor.

MR. LUBY:  And, Your Honor, the petitioner next calls Robert Hoy.

THE COURT:  Mr. Hoy, if you would please come forward, stand before the clerk and take the oath.

(Oath administered.)

THE CLERK:  Thank you, sir.  Be seated.

THE COURT:  Mr. Montroy.

**ROBERT G. HOY,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. LUBY:**

Q.  Good morning, Mr. Hoy.

A.  Good morning.

Q.  Can you tell the Court what you do for a living, sir?

A.  I practice law.

Q.  And what's the nature of your practice?

A.  It's a litigation practice, primarily criminal work and civil work both.

Q.  And what balance of your work is criminal as opposed to civil?

A.  That probably depends upon when you ask me the question.  Sometimes you're involved in a case and you're a hundred percent working on a criminal case or a civil case.  Overall probably about a -- roughly a fifty-fifty split.

Q.  And for your criminal work how much of that is in state court as opposed to Federal Court?

A.  The bulk of my criminal work generally is in state court.  I handle an occasional federal case.

Q.   You represented Alfonso Rodriguez at his trial in 2006?

A.   I did, with co-counsel, Mr. Ney.

Q.   Can you tell us a little bit about your role in the defense as compared to Mr. Ney's role in the defense?

A.   This was the very first death penalty case in the state of North Dakota so no one, myself included, had any particular expertise in federal death penalty cases. Mr. Ney was brought on as learned counsel, if you will, on death penalty issues.  He and I worked together on the case.  I tried to follow his lead because he had been down the road before.

We divided the case.  Primarily I was working on the guilt or innocence phase of the case and Mr. Ney was working on the death penalty phase, the sentencing phase of the case; although, there was some overlap.  I tried to help him when I could on his part and he certainly tried to help me when he could on the guilt or innocence phases.

Q.   Following the trial in this matter, did you represent Mr. Rodriguez on direct appeal in the Eighth Circuit?

A.   With Mr. Ney we did, yes.

Q.   And you argued the case?

A.    I believe I argued it at the Eighth Circuit.

Q.    Mr. Hoy, was this your first death penalty case as an attorney?

A.    Yes.

Q.    Have you done other capital cases since that time?

A.    No.   Although, I think I was involved in a case where there was a question of whether it was going to be authorized and I think I was involved preauthorization and the case did not get authorized.

Q.    And do you remember the name of that case?

A.    Off the top of my head, I do not.

Q.    Was that particular case before or after Mr. Rodriguez's case?

A.    Would have been after.

Q.    Thank you.   Mr. Hoy, from the time of trial do you recall the prosecution's theory that Mr. Rodriguez had raped Ms. Sjodin around the time of her death?

A.    State your question again.

Q.    Do you recall the prosecution's theory that Mr. Rodriguez had committed a rape of Ms. Sjodin around the time of her death?

A.    I know that that was their theory at trial, yes.

Q.    And you recall Dr. McGee's testimony relating to that topic?

A.   In general terms, yes.

Q.   And again in general terms, Mr. Hoy, why was that topic or issue of concern to you or why did you consider it to be an important one?

A.   Mr. Rodriguez was charged with kidnapping resulting in death.  The idea that there was a rape involved changed the presentation of the case, changed the jury effect of the case so if there was a rape or was not a rape was an important issue from my perspective in the case.  It also ultimately, I believe, had a ripple effect down through into the sentencing phase as well with other witnesses that were called.

Q.   When you say that the issue "changed the presentation of the case," can you explain what you mean?

A.   In a capital case you essentially have jury sentencing, which is different than the typical run-of-the-mill state case where the guilt or innocence is decided by a jury and the penalty's imposed by the judge.  Because of that, the jury hears all of the evidence and how the case is presented and the evidence that they hear is all very important.  And the idea that you may be dealing with a rape in addition to the charged kidnapping simply changed the focus of the case.

Q.   Thank you.  Now, Mr. Hoy, in meeting with -- in

the course of meeting with Mr. Rodriguez's current attorneys as well as being deposed by counsel for the government, you've been made aware of certain forensic evidence that did not come out at the time of trial?

A.   Yes.

Q.   And specifically that includes the bench notes from Steven Fischer's Report No. 10 concerning p30 testing on the swabs that were taken from Ms. Sjodin at the time of autopsy?

A.   Yes.

Q.   Now before we go through the details of that evidence and before we go through a whole lot of documents from your file, sir, can you please explain for the Court how your defense would have been different if you had known about that evidence at the time.

A.   You're referring to the fact that Mr. Fischer, the Minnesota crime lab individual, actually did a p30 antigen test as part of his early testing?

Q.   Yes, sir.

A.   Had I known that that test existed, I think that that would certainly have been a centerpiece of the Daubert hearing evidence that I would have put on because Dr. McGee's opinions were based solely on the acid phosphatase levels, which seemed to be presumptive rather than definitive.  And even he agreed that a p30

test would have been more definitive and if we had known or I had realized at the time that the p30 test had been done, was available, was negative, we would have certainly put that on during the Daubert hearing, which hopefully would have helped the judge keep that evidence away from the jury; that is, his opinions based on the acid phosphatase out of the trial.  Completely barring that we would have certainly put it on in front of the jury even if his opinions had come in.

Q.  If you had succeeded in excluding Dr. McGee's evidence concerning the semen evidence from trial, do you believe -- or would there have been a different treatment from the defense concerning Mr. Rodriguez's prior offenses that were described for the jury in both phases?

A.  I think it could have had a dramatic impact.  I think that the lynchpin of the government's case alleging that there was a rape was the opinions expressed by Dr. McGee.  Certainly she was disrobed partially when she was found and they could argue that there was sexual assault, but there was no proof of that and it was his opinions primarily that allowed them to make that leap and make that argument.

Q.  How, if at all, would your preparation for the guilt phase defense have been different if you had known

about this evidence beforehand?

A.    I would have probably slept a whole lot better. The idea that the opinions by Dr. McGee based on his interpretation of acid phosphatase levels was a very important part of the trial, and when I found out about those were only about a month away from the trial itself so I spent a lot of time trying to learn about the science of acid phosphatase, hiring expert witnesses like Dr. Sensabaugh to try and rebut that.  And had the p30 testing been available or I had realized it was available or had been done by Mr. Fischer, it would have helped considerably in our presentation both at the Daubert hearing and at trial, if necessary, on that issue.

Q.    And, of course, at trial Dr. McGee addressed forensic issues other than the acid phosphatase question?

A.    He offered a number of opinions.  I'm not sure which one you're referring to.

Q.    Specifically concerning whether Mr. Rodriguez had slashed Ms. Sjodin's neck and her flank, sir, do you believe if you had known about the semen evidence at an earlier stage of the defense that you might have been in a different or a better position to dispute the government's theory of a slashing wound to the victim?

A.   I'm not sure that that would have made much difference from my perspective.

Q.   Mr. Hoy, if I may, I'd like to talk about some of the documents that came to you in the course of your preparation for trial.  And, Your Honor, may I approach the witness?

THE COURT:  You may.

Q.   Mr. Hoy, I'm handing you what's been previously marked and admitted into evidence as Petitioner's Exhibits 15 and 16 (indicating).  Could you please describe these two documents in general terms, Mr. Hoy.

A.   Petitioner's 15 is the professional report issued by Dr. McGee or his office following his autopsy in the case.  And Petitioner's Exhibit 16 is all the final autopsy protocol issued by Dr. McGee or his office sometime after the autopsy as well.  Both of these were disclosed to myself during the course of discovery in the case.

Q.   And turning to the provisional autopsy report, sir, have you reviewed this document in the recent past?

A.   I believe I have, yes.

Q.   Does this document offer any conclusion concerning whether the victim in this case had been raped?

A.   No, none.

Q.   And also not about the presence of semen?

A.   There's nothing about that in this provisional report.

Q.   And concerning Petitioner's Exhibit 15?

A.   Which is the one we just were talking about.

Q.   Oh, thank you.  Exhibit -- Exhibit 16 I believe then would be the final autopsy report?

A.   Yes.

Q.   Thank you.  If you would refer, please, to page 1.

A.   I'm there.

Q.   And what specifically does this document tell us about the issue of semen or sexual assault?

A.   At paragraph 3B it talks about sexual assault examination and it refers to then the three different swabs that were taken and reports all of them as sperm negative and then assigns an acid phosphatase level to each of the three swab areas.

Q.   And by "sperm negative" at the time of your trial preparation, sir, did you understand that to mean that the lab had reviewed some slides for the presence of sperm and not found them?

A.   I wasn't sure at the time I got this report whether a laboratory had done that work or whether Dr. McGee had done it or someone on his staff had done

it.  It just simply gave a reported result.  I didn't find out who had actually done some of that work until we took his deposition.

Q.  At some point you were provided the laboratory results themselves from Regions Hospital?

A.  Yes.

MR. LUBY:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  (Mr. Luby continuing)  And, Mr. Hoy, I'm now handing you what's marked as Petitioner's Exhibit 28 and Petitioner's Exhibit 29 (indicating).  If you would, please, tell the Court what these two exhibits are, sir.

A.  Exhibit No. 28 is a Minnesota BCA lab report. It's designated Report No. 10.  It consists of three pages and it contains what I recognize as the government's Bates stamp number in the upper right-hand corner.  Looks like it's computer-generated at 10775.

Exhibit 29 is a cover letter from the U.S. Attorney's office to me enclosing discovery documents and photographs.  They've identified which ones they are and the series of documents disclosed includes a Bates number for Exhibit 28 and their letter is dated June 9 of 2004.  So from that I would assume that on June 9 of 2004 the U.S. Attorney's office mailed me discovery

documents which included Exhibit 28, the Lab Report No. 10 from BCA.

Q. Thank you, Mr. Hoy. And what does Report No. 10, or Exhibit 28, tell us about the vaginal, cervical and anal swabs that were taken at the time of autopsy?

A. They list the swabs as Exhibit 86 in the first part of the report, and then on the second to last paragraph on page 2 of 3 they talk about those with other exhibits and they indicate examination of the following items did not detect the presence of semen. And in there they list vaginal swabs, Item 86A, anal swabs, Item 86B, and cervical swabs, Item 86C.

Q. Are there any explanations for that particular finding or any documentation of what tests were run in order for that finding to be reached?

A. No.

Q. At the time you received this report, Mr. Hoy, was it accompanied by any other papers that would have explained that finding?

A. I'm sorry, say that again, please.

Q. At the time you received this particular report in 2004, was it accompanied by any additional notes that would have explained that particular finding?

A. No.

MR. LUBY: Your Honor, may I approach?

THE COURT:  You may.

Q.  (Mr. Luby continuing)  Mr. Hoy, I'm now handing you what's been marked as Petitioner's Exhibits 30 and 31 (indicating).  Could you please tell us in general terms what these documents are.

A.  Exhibit 30 I recognize as Minnesota BCA Lab Report No. 27 consisting of five pages.  It has the government's Bates stamp No. 17489 generated in the upper right-hand corner.

Exhibit 31 is a cover letter from the U.S. Attorney's office to myself indicating that they were sending me discovery materials in the case.  The sequence of numbers is inclusive of Report No. 27.  They're letters dated January 4 of 2006 and again from that I would take that on January 4 of 2006 the U.S. Attorney's office mailed me a copy of Lab Report No. 27 or Exhibit 30 here.

Q.  And the date January 4, 2006, sir, when was that in relation to the beginning of the trial in this matter?

A.  Trial was scheduled to begin January 5 I think. We actually started -- excuse me, July 5.  We started July 6 of 2006 so we're roughly six months before trial.

Q.  If I could refer you to the third page of Report No. 27, three paragraphs from the bottom, do you see

where it says, "No male DNA was obtained from Items 86A, (vaginal swabs), 86B, (anal swabs), or 86C (cervical swabs"?

A.   Yes.

Q.   Do you recall receiving and reviewing that disclosure around the time that this was sent to you?

A.   Yes.

Q.   And how did this particular disclosure affect the defense?

A.   From where I was seated, this was good news. They had examined the swabs that they had taken at autopsy and there was no male DNA found on them, which led me to believe that from where they were taken very unlikely that there had been a rape.

Q.   Did you believe that the government was going to attempt to prove that there had been a rape after you had reviewed this document?

A.   No, I did not think they were going to.

Q.   In the meantime were you certain as to -- certain or reasonably certain as to what the medical examiner, Dr. McGee, might testify to at the time of trial at this time frame?

A.   In January of 2006 the only information I had from Dr. McGee ws his Provisional Report, which is Petitioner's 15, and his Final Autopsy Protocol, which

is Petitioner's 16, none of which talk about rape or attempting to offer opinions in that regard.

Q.   And, sir, is that why you filed a motion under Rule 16 for discovery of the government's expert evidence?

A.   In part.  The Court had set a deadline for the government to disclose who its expert witnesses were and what the opinions were that they were going to express and the factual basis and conclusions that they were relying on for those opinions.  And my recollection is that that deadline was sometime in February of 2006. And it's also my recollection that that day came and passed without much being received from the government about that and which ultimately led to my -- well, that led to me writing a letter to Dr. McGee asking him if he had any other opinions besides what was expressed in his two reports.

Q.   What came of that letter, sir?

A.   My office informed me that Dr. McGee had called my office in response to my letter and said that he had no other written reports but that he was willing to talk with me if I wanted to call him.

Q.   And did you follow up on that particular offer?

A.   I did not, not in the sense of calling him.  I followed up with another letter after that telling him

that to avoid misunderstandings I would rather have his opinions in writing rather than him and I talking privately on the phone without other witnesses present.

Q.   And following that second letter, what happened? Did you hear anything from Dr. McGee thereafter?

A.   No.

Q.   Is there a particular reason that you might have been concerned with talking to Dr. McGee without documentation, written documentation?

A.   Through prior experience practicing law, I've discovered that it's not good to be the only person that talks to a witness.  You end up with a dispute over what was said and there are no witnesses to be called to prove it one way or the other.  So I've made it a practice not to do that, and I certainly would not have done that with an expert witness like Dr. McGee.  And I prefer that he give me his opinions in writing so I could rely on what he said and deal with it rather than engage in what at trial may become:  Well, that's not what I told you two months ago on the phone kind of a response.

MR. LUBY:  Your Honor, might I approach the witness?

THE COURT:  You may.

Q.   (Mr. Luby continuing)  Mr. Hoy, I'm now handing

you what's been marked as Petitioner's Exhibits 32, 33, 34 and 35 (indicating).  Can you please describe these four documents for us, Mr. Hoy.

A.   Exhibit 32 is an Expedited Motion for Disclosure of Government Experts which I filed with the Court on or about March 21 of 2006 seeking to have the Court direct the government to disclose its experts as well as the details of the expert opinions that they intended to present together with the other supporting factual information that they were going to rely on, which I believe is required by the Federal Rules of Procedure.

Exhibit 33 was the United States' Disclosure of Expert Witnesses dated April 19 of 2006.

Exhibit 34 is the United States' Disclosure of Expert Witnesses-Supplement I dated April 28 of 2006.

And Exhibit 35 is the United States' Disclosure of Expert Witnesses-Supplement II dated May 5 of 2006.

Q.   If I could direct your attention to Exhibit 33, sir, on page 3 of this particular exhibit, do you notice a section concerning the initial disclosure about Dr. McGee?

A.   Yes, paragraph 7.

Q.   And what does it say?

A.   It discloses Michael McGee as the Ramsey County

Medical Examiner, his address, describes him as the medical examiner, says, "Will testify as to findings and conclusions from his autopsy and scene and evidence review; see reports.  Qualified by education and experience, including prior designation as court expert."

Q.  Did you find this particular disclosure particularly helpful to you?

A.  No.

Q.  And why not?

A.  It doesn't tell me very much at all.  I knew he was the medical examiner.  I knew he had done the autopsy.  I had read both of his reports and it still didn't tell me what his opinions were.

Q.  And again the date of this disclosure would have been April 19, 2006; is that correct?

A.  Yes.

Q.  Some, what, two and a half months before trial?

A.  Yes.

Q.  If I could next direct your attention to Petitioner's Exhibit 34, the first supplemental disclosure, if you could please turn to page 2.  And do you see where it says concerning the issue of semen and I quote, "Lab results indicate likelihood of seminal deposit at the time of death or within the preceding 24

hours"?

A.    Yes, I see that.

Q.    And that was disclosed April 28th of '06?

A.    Yes.   That's the date the document is signed, yes.

Q.    And did that particular disclosure tell you what you needed to know?

A.    I believe that was the first time that I was aware that Dr. McGee was intending to offer opinions that he thought there was a seminal deposit at the time of death or within 24 hours so it was helpful to at least know that.   But it doesn't tell me what lab report -- excuse me, lab results he's relying on to get that opinion or how he arrived at his conclusions.

Q.    And to that, Mr. Hoy, I'd like to refer you to Petitioner's Exhibit 35, specifically paragraph 5 on page 3.   Does it say, "Acid phosphatase levels in the vaginal and cervical tests are elevated beyond the normal range expected under the circumstances of decomposition.   The lab results indicate the likelihood of seminal deposit at the time of death or within the preceding 24 hours"?

A.    I see that.

Q.    And between this disclosure and the previous one, that was around the first time you understood the

significance of the acid phosphatase tests that were described in the autopsy report?

A. Yes.

Q. And this particular disclosure was May 5th of '06?

A. Yes.

Q. Two months before trial?

A. Yes.

Q. And at that point were you satisfied with what you knew about this question?

A. No, I was not.

Q. And can you explain why not, please.

A. The language used talks about the likelihood of a seminal deposit. I'm not sure at that point if he holds that to a degree of medical certainty or not or if this is just a guess. More importantly he talks about the acid phosphatase levels are being elevated beyond the normal range expected under the circumstances of decomposition.

As I researched acid phosphatase, it became relatively clear to me that there are no expected levels of acid phosphatase under circumstances of decomposition. It's present naturally in the body. Decomposition causes it to come out of the cells, and there are no standard tests that I could find in any of

the literature that I read that would substantiate anything like that. So I was even more concerned about how he was getting to the opinions that he was intending to express based on the acid phosphatase levels. And also as I researched acid phosphatase, it became evident that that was a presumptive test only and was not definitive for the presence of acid phosphatase that originated in the male prostate.

Q. The concerns that you've just described, are those what motivated you to file a motion for sanctions with the Court?

A. Yes.

MR. LUBY: And, Your Honor, may I approach the witness?

THE COURT: You may.

Q. (Mr. Luby continuing) Mr. Hoy, I'm handing you what's been marked as Petitioner's Exhibits 36, 37 and 38 (indicating). And can you tell us in general terms what -- I apologize.

A. Exhibit 36 is an Expedited Motion for Sanctions Concerning United States' Expert Disclosures and a brief in support of that motion that I filed with the Court on or about May 5 of 2006.

Exhibit 37 is the Court's Order Granting Motion for Sanctions, and Exhibit 38 is the United

States' Supplement in Compliance to the Court's May 12, 2006 Order, which was Exhibit 37.

Q.    Thank you.    Turning to Exhibit No. 38, this as you say was the government's responses to the Court's order granting your Motion for Sanctions?

A.    Yes.    The Court had ordered them to provide a fuller explanation of the opinions to be offered by Dr. McGee.

Q.    And to that effect if I could please refer you to page 3 of this particular disclosure, paragraph 5, which reads as follows:    "Acid phosphatase levels in the vaginal and cervical tests are elevated beyond the normal range expected under circumstances of decomposition.    The lab results indicate the likelihood of seminal deposit at the time of death or within the preceding 24 hours, because of absorption for deposits more than 24 hours prior to death."

A.    I see that.

Q.    And did that information provide everything the defense required in order to be prepared for trial?

A.    No.    This is substantially I believe a recitation of the supplemental disclosure No. 2 with the added clause at the end that talks about "because of absorption for deposits more than 24 hours prior to death."

MR. LUBY:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  (Mr. Luby continuing)  Mr. Hoy, I'm handing you what's been marked and received into evidence as Petitioner's Exhibit 4 and also what has been marked as Petitioner's Exhibit 39 (indicating).  And can you please tell us in general terms what these two particular documents are, Mr. Hoy.

A.  Petitioner's 4 is a Minnesota BCA Lab Report No. 10 with attached bench notes related to that report. The lab report itself is identical to the lab report you showed me earlier, Exhibit No. 28.  The lab reports are the new information that I was receiving. Petitioner's 4 has the government's Bates number 18389 in the upper right-hand corner of the first page and they go on sequentially after that.

Exhibit 39 is a cover letter from the U.S. Attorney's office to myself dated May 8 of 2006 enclosing discovery materials, the range of which would include Petitioner's Exhibit 4.  So from that I would believe that on or about May 8 of 2006 the government sent me Petitioner's 4, which is a repeat of Lab Report No. 10 but this time enclosing all of the bench notes.

Q.  Thank you, sir.  And if I could direct your

attention to the last page of Petitioner's Exhibit 4.

A.   Okay.

Q.   And these are the -- am I correct that these are the p30 results that we were discussing earlier in your testimony, Mr. Hoy?

A.   Yes.

Q.   And according to this document, what was the date on which this testing was performed?

A.   It looks like it was performed on April 23 of 2004.

Q.   And would you agree with me this form describes both p30 testing and some microscopic analysis of the swabs?

A.   I believe that's correct.  I'm not a lab scientist but they show negative results for the p30 and then they talk about a description in the "micro" section of it, which I assume means that they're looking at it under a microscope for some purpose.

Q.   And do you see the designations or the language "very heavy NEC" for 86A?

A.   Yes.

Q.   "Light NEC" and "heavy debris" for 86B?

A.   Yes.

Q.   And "heavy NEC" for 86C?

A.   Yes.

Q.  Do you happen to know what those terms mean?

A.  I've since come to understand what they mean.  I think NEC is nucleated epithelial cells.

Q.  And when did you come to that understanding?

A.  Just recently in preparation for this hearing.

Q.  Understood.  Also under the column of where it says "micro," do you notice where it says minus or dash "sp" and then a slash and then the word "slide"?

A.  Yes.

Q.  On each of the three items?

A.  Yes.

Q.  And do you happen to know what that means?

A.  I don't.  I could guess but I don't know what it means.

Q.  And what is your best understanding of what it might mean?

A.  It my be negative for sperm.

Q.  And again on all three of the -- of these items the test documents a negative p30 finding?

A.  Yes.  Both 86A, 86B and 86C all show a negative p30 finding.

Q.  And do you know whether this particular microscopic testing for sperm cells is separate from the one that was conducted at Regions Hospital and disclosed to you shortly at the beginning of the case?

A.  Say that again.  I was looking at another document, I'm sorry.

Q.  Quite all right.  Concerning the last page of Petitioner's Exhibit 4 and microscopic findings that are described there, are these microscopic findings separate and apart from the ones that were performed at Regions Hospital and disclosed to you during your early stages of your representation of Mr. Rodriguez?

A.  I believe that they are.  I believe these -- this testing would have been done by the Minnesota crime lab.

Q.  To the best of your recollection, Mr. Hoy, what did you do with this document at the time that you received it?

A.  I would have read it.  I made a point to read every page of all of the discovery materials that we received.  At the time that I was reviewing this, I wasn't particularly concerned about the bench notes for Lab Report 10 because the essence that they had reported in Lab Report 10 as it applied to these swabs was that they had found -- they'd failed to detect the presence of semen.  And so I assumed that their lab notes would simply verify that or corroborate that.  And the lack of them finding semen was not harmful to the defense.  It was helpful to the defense.

With hindsight I wish they would have reported

their p30 finding as part of the lab report because I think that goes beyond just not finding semen. Not finding the p30 antigen would have been important to know.

At the time that I received these, if you'll notice the dates it's about the same time that we were arguing over the government's disclosures on their experts. So for whatever reason it didn't register with me that the p30 test that they had performed here was relevant to the acid phosphatase issue. And so as the acid phosphatase issue became more important I simply had -- it hadn't registered with me that the p30 had been done. I wish I had realized that it had been.

Q. Did it later occur to you that p30 testing is or would be relevant to the acid phosphatase question?

A. Yes. After taking Dr. McGee's deposition and finding out what he was basing his opinions on, which was the acid phosphatase level, the research I did trying to find out answers to that information and then consulting other experts, particularly Dr. Sensabaugh, it became clear that a p30 test would have been much more definitive than the presumptive acid phosphatase that Dr. McGee was relying upon. And so, as we talked about earlier, that would have been very important had I been able to present that at the Daubert hearing or at

trial, if necessary.

Q.   When you came to that realization or at any point after you came to that realization of the potential relevance of a p30 test, did you have occasion to go back and look through your old documents, including the ones that had been disclosed to you on or about May 8, 2006?

A.   Meaning Petitioner's 4?

Q.   Correct.

A.   I did not.

Q.   Do you happen to know how long it was that the government had the bench notes to this particular report concerning the basis of the findings and BCA report 10 before this document was disclosed to you?

A.   I have no way of knowing how long the U.S. Attorney's office had it.  The report indicates that Mr. Fischer did the testing on April 23 of 2004.  I got it about May 8 of 2006.  Where it was in the interim I don't know.

Q.   If I could please refer you to the second to last page of Petitioner's Exhibit 4.

A.   Okay.

Q.   If you would just take a moment to review this particular page.  Specifically I'm directing you to discovery page No. 18417.

A.  Yes.

Q.  And does this appear to be a document that describes some testing on an Item No. 73?

A.  Yes.  I would take it as sub-portions of Exhibit 73.

Q.  And if you would please refer to the front page of Petitioner's Exhibit 4, what does it list as the description of Item No. 73?

A.  "One brown paper bag containing evidence classified as a jacket," and then in the description it describes it as a "black Old Navy brand P-coat wrapped in brown paper with debris.  Agency Item A1."

Q.  This would have been the coat that Ms. Sjodin was wearing at the time of her death?

A.  That's my understanding, yes.

Q.  On page 18417 specifically, the second to last page of Petitioner's Exhibit 4, does it appear that Mr. Fischer ran a p30 sample -- a p30 test on all of the samples taken from this coat?

A.  It appears that he did.

Q.  And does it also appear that he performed -- or someone performed a microscopic examination of those same areas?

A.  That appears to be similar notes, yes.

Q.  And do you see similar markings or denotations in

this set of findings as compared to on the following page concerning the three swabs?

A.   Yes.   The p30 appears to be negative on all the Item 73 samples and they've got similar descriptions of debris or the NEC, and the negative sp on the slide appears to be consistent.

Q.   And these two pages would have been disclosed to you at the same time?

A.   Yes, they would come -- yes.

MR. LUBY:  Your Honor, may I approach the witness?

THE COURT:  You may.  But why don't we take five minutes here given the kind of strange schedule we're on and what's -- the fact that we're going to take up the testimony at noon, and I'd just as soon not have my court reporter work straight through for two hours so we'll take a break here for five minutes.

(Recess taken; 10:05 a.m. to 10:20 a.m.)

THE COURT:  We are back on the record in a case entitled United States versus Rodriguez.  All counsel of record are present.  When we broke Mr. Montroy was conducting a direct examination. Mr. Hoy's on the stand.  You may continue, sir.

MR. LUBY:  Thank you, Your Honor.  If I might just clarify, Mr. Luby's conducting the

cross-examination.

THE COURT:  Indeed, I'm sorry.  Okay.

MR. LUBY:  May I approach the bench, Your Honor?

THE COURT:  You may.  I'm sorry.

MR. LUBY:  I've been called much worse, thank you.

THE COURT:  Me too.  Probably in the last 24 hours.

Q.    (Mr. Luby continuing)  For the record I'm handing the witness what's been marked as Petitioner's Exhibits 40 and 41 (indicating).

If you would, please turn first to the smaller of these two documents, Exhibit 40.  Can you describe for the Court what this document is, Mr. Hoy?

A.    Exhibit 40 is labeled a Supplemental Laboratory Report.  The date it was reported was 20 February 2004.  It's from the North Dakota state crime lab.  It appears to be about eight pages or so.

Q.    And can you tell us what discovery number this document bears at the upper right-hand corner?

A.    Would be 09021.

Q.    If I could please refer you back to Petitioner's Exhibit 28.

A.    Twenty-eight?

Q.   Yes, please.  And the number on that document I believe is 10775?

A.   That's correct.

Q.   So can you infer is it fair to say that you got Exhibit 40 at some point at the same time or before you got Exhibit 28?

MR. REISENAUER:  Objection, Your Honor.  That would be pure speculation.

THE COURT:  Well, it's asking him when he received it and so I think he can testify as to whether he knows or not, right?

MR. REISENAUER:  Okay, thank you.

THE COURT:  Overruled.

A.   Twenty-eight is Bates No. 10775 and you provided me Exhibit 29 which is the cover letter dated June 9 of 2004 which provides the discovery for that.  That provided documents No. 10743 through 11146.

Exhibit 40, the North Dakota Crime Bureau report, has Bates No. 9021 which obviously precedes or predates or pre-numbers Exhibit 28.  And it was not provided with the same cover letter of June 9 so I'm assuming that I probably received it before the June 9, 2004 date.

Q.   (Mr. Luby continuing)  Thank you, Mr. Hoy.  Counsel, do you remember from the time of trial that Dru

Sjodin's roommate, Meg Murphy, had delivered some items to the police in order to help them get some DNA samples?

A.   Now that you remind me of that I do.

Q.   Specifically a toothbrush?

A.   I believe that was one of the items, yes.

Q.   And some underwear from a dirty clothes basket?

A.   That sounds familiar.

Q.   And do you recall it was the North Dakota authorities who tested those items?

A.   I believe that's true.  Early on I think that the North Dakota crime lab was involved.

Q.   And do you recall that one of those items tested positive for semen or I can specifically refer you to page 5 of Petitioner's Exhibit 40 under "Summary of Screening Results"?

A.   Yes.  It appears as though they found semen on Item 1-VA.

Q.   And would you please read the first paragraph under the heading of "Summary of Screening Results."

A.   "The crotch area of the underwear (Item 1-VA) tested positive for the presence of acid phosphatase (an enzyme present in semen and other bodily fluids).  Further examination of this area detected the presence of p30, (a semen specific protein).  Therefore, it is my

opinion that there was semen present on the crotch of the underwear (Item 1-VA)."

Q.   And do you notice that there is a further discussion in the next paragraph of some other items that they tested with some of the same tests?

A.   Yes.

Q.   And could you please read those few sentences for the Court.

A.   "The cotton swab (Item 7) tested negative for the presence of acid phosphatase.  The underwear (Item 1-VS) did not detect the presence of p30.  Therefore, it is my opinion that there is no semen present on the cotton swab (Item 7) or on the area tested on the underwear (Item 1-VS)."

Q.   Thank you, sir.  And concerning Petitioner's Exhibit 41, if I could please ask you to refer to page -- well, first of all, could you please tell us what number appears at the bottom of this page?

A.   The Bates No. 3820.

Q.   And what does that number signify as you recall?

A.   Usually the party disclosing documents in discovery will Bates number them so that they know exactly what they've disclosed and all parties can refer to a specific document later in the case if they need to.  This has got documents -- or document numbers at

the bottom of the document and that is not how I recall the documents that I received from the U.S. Attorney's office being Bates numbered.  They were vertically in the upper right-hand corner as the other documents that we've talked about here this morning have been.

Q.   And is it your understanding that these documents were disclosed by the North Dakota criminal authorities in the state court case?

A.   The cover sheet on Exhibit 41 indicates it's from the State of North Dakota, their crime lab division.  At least it's got the North Dakota seal in the upper left-hand corner.

MR. LUBY:  If I could refer -- may I approach, Your Honor?

THE COURT:  You may.

Q.   (Mr. Luby continuing)  If I could refer your attention to what's been marked as Government Exhibit B (indicating), does this appear to be a letter that you would have written to a Dr. Ed Blake, Edward Blake?

A.   Yes, that looks like a letter that I wrote.

Q.   And what's the date of that letter?

A.   August 23 of 2004.

Q.   Could you please refer to the third page of that letter and it describes some document that you disclosed to Mr. Blake -- Dr. Blake, excuse me.

A.  Yes.

Q.  And that includes North Dakota laboratory documents or words to that effect?

A.  No, North Dakota lab information.

Q.  Followed by certain numbers?

A.  Preceded actually but, yes, the Bates numbers that I'm referring to in my letter, Government Exhibit B, would be inclusive of what appears to be Exhibit 41.

MR. REISENAUER:  Excuse me, Joe, what exhibit is he looking at?

MR. LUBY:  This is Government's Exhibit B.

MR. REISENAUER:  B.

Q.  (Mr. Luby continuing)  Is it your understanding then that you would have had the substance of Petitioner's Exhibit 40 and Petitioner's Exhibit 41 on or before August 23, 2004, your letter to Dr. Blake?

A.  I certainly think I had Exhibit 41 having seen that and I'd have to refresh myself to know whether I had Exhibit 40 or not.

MR. LUBY:  May I approach?

THE COURT:  You may.

Q.  (Mr. Luby continuing)  Again Government Exhibit B lists for North Dakota lab information pages 3560 through 4089; is that correct?

A.   Yes, that's what it says.  Now after having refreshed myself, I did have Exhibit 40.

Q.   And how about Exhibit 41, does that appear to fall within that span of pages as well?

A.   Yes, it does.

Q.   And from that is it your understanding that you would have had these documents on or before August 23, 2004?

A.   Yes.

Q.   Thank you.  Concerning Petitioner's Exhibit 41, sir, if I could please direct your attention please to page 3857.  Actually before we do that if you could just tell me what this document appears to be.

A.   Well, on the front page of Exhibit 41 it says it's from the Crime Laboratory Division.  It says it's "DNA Testing Quality Assurance Manual."

Q.   And, Mr. Hoy, if you would please turn to page 3857.

A.   Okay.

Q.   And do you notice the top of the page where it says, "Methods Flow Chart"?

A.   Yes.

Q.   Then there's a heading that says how to test for suspected stains about halfway down the page?

A.   Yes.

Q.   And then a subheading for "possible semen"?

A.   Yes.

Q.   And can you please tell -- say what it says to do in the event of a negative acid -- or a negative AP test as you understand it from this form?

A.   "Negative AP Test?"

Q.   Yes, please.  "AP Spot Test" the test is negative?

A.   It says, "Negative," and to the right it says, "Acid Phosphatase not detected (no semen detected)."

Q.   And if it's positive?

A.   If it's positive it says, "Acid Phosphatase detected (semen or other bodily fluids may be present)."

Q.   And below that there's a similar set of instructions for p30?

A.   Yes.  If it's negative it says, "No p30 detected" and if it's positive it says, "p30 detected (semen detected) DNA extraction procedure."

Q.   Mr. Hoy, if you could please turn to page 3966 of the same document.

A.   I'm there.

Q.   And what does this page and the several that follow appear to be?

A.   It's headed as the "AP Spot Test."  It looks to tell you a little bit what it is and how to do it looks

like.

Q.  I think we may be on the wrong page, sir.  Are you on 3966?

A.  I'm sorry, I'm on 3866.

Q.  Does this appear to be some instructions on the task of report writing?

A.  Yes.  Now that I'm there that's what the heading is, "Report Writing."

Q.  And if you would please turn two pages later to 3968.

A.  All right.

Q.  Toward the bottom of the page, second to the last paragraph, do you see some instructions on how to write a report based on semen tests?

A.  Yes, "Semen Reports."

Q.  And it says, "Examination of the vaginal swabs (Item X), the underwear (Item X), and the oral swabs (Item X) detected the presence of acid phosphatase (an enzyme found in semen or other bodily fluids).  Further examination of the vaginal swabs (Item X), the underwear (Item X), and the oral swabs (Item X) detected the presence of p30 (a semen specific protein).  Therefore, it is my opinion that there is semen present on the vaginal swabs (Item X), the underwear, (Item X), and the oral swabs (Item X).

Sir, does that appear roughly parallel to the findings in the laboratory report that we talked about in Petitioner's Exhibit 40?

A.    Yes.

MR. LUBY:    Your Honor, may I approach the witness?

THE COURT:    You may.

MR. LUBY:    If I may just have a moment, Your Honor?

THE COURT:    You may.

MR. LUBY:    For the record I'm handing the witness what's been previously marked and admitted into evidence as Petitioner's Exhibit 5 and Petitioner's Exhibit 6 (indicating).

Q.    (Mr. Luby continuing)    Mr. Hoy, what does Exhibit 5 appear to be?

A.    Petitioner's 5 appears to be a Minnesota BCA lab report.    They call it Report No. 5.

Q.    And what discovery number does this report bear on the upper right-hand corner?

A.    09549.

Q.    And if I could please refer you back to Petitioner's Exhibit No. 29, that I believe is Mr. Wrigley's letter dated June 9, 2004?

A.    Correct.    The Bates number on this document

Petitioner's 5 would predate or presequence the discovery materials I was provided with their letter of June 9. Again I would presume I got this sometime prior to June 9 of 2004.

Q. Thank you, sir. On the first page of Exhibit 5, do you see where it describes Item 4 as a pair of pants or jeans from Mr. Rodriguez?

A. Yes. "One paper bag containing evidence classified as pants," and then they call it "jeans from Mr. Rodriguez."

Q. Do you recall where those jeans came from?

A. As I sit here right now, I do not.

Q. Would you quarrel with me if I said they were recovered from Mr. Rodriguez's bedroom?

A. No, that's entirely possible. They did a search warrant on the house.

Q. Do you recall that the jeans were tested for the presence of semen?

A. I believe they were.

Q. Do you recall what the result of that test was?

A. Not with certainty. I believe they found semen but I'm not positive of that.

Q. If I could refer you to the third page of Petitioner's Exhibit 5, under the heading of "Results." Do you see where it says, "Semen was identified on the

pants (Item 4-four areas: Items 4-1, 4-2, 4-3 and 4-4) said to have been collected from the Alfonso Rodriguez Jr."?

A.   I see that, yes.

Q.   And if I could refer you to page 4 of this particular exhibit on, oh, about three-fourths of the way down the page, do you see the sentence that says further examination of various items?

A.   Yes.

Q.   And it lists Items 3, 36A, 36B, 41, 42, 44, 45, 46, 48 and 51?

A.   I see that.

Q.   And notes that those did not detect the presence of semen?

A.   Correct.

Q.   And if I could please refer you back to the first page of this particular report, can you tell me what is described as Item 3?

A.   Item 3 is described as "One brown paper bag containing evidence classified as a jacket."  And then the description describes it as a "leather jacket from Mr. Rodriguez."

Q.   How about Item No. 36?

A.   Thirty-six?

Q.   Yes, please.

A.   Is listed as "One white bag containing evidence classified as an item of evidence" and the description of it is "nylon stockings from dumpster near Mall - GFPD Item 195."

Q.   And how about Item 41?

A.   Item 41 is "one brown paper bag containing evidence classified as an item of evidence."  The description is a "black 'Strike King' baseball style cap - GFPD Item 224."

Q.   And Item 42, please?

A.   Item 42 is "One white bag containing evidence classified as an item of evidence," description, "black leather belt - GFPD Item 225."

Q.   And Item 45?

A.   Item 45 is "One brown paper bag containing evidence classified as an item of evidence," description, "blue 'NY Yankees' baseball style cap collected from Rodriguez's bedroom - GFPD Item 241."

Q.   And would you agree with me Items 46 and 48 are representatively a green Dockers coat collected from your client's bedroom and a short sleeve shirt also collected from Mr. Rodriguez's bedroom?

A.   That appears to be correct, yes.

Q.   Mr. Hoy, if you could please refer to Petitioner's Exhibit 6 and specifically page 9732.

A.   Okay.

Q.   This appear to be a series of tests that were run on the pants in order to determine the presence or absence of semen?

A.   That appears to be correct, yes.

Q.   And on the top row of the page do you notice a column heading for "BCIP"?

A.   I do.

Q.   And one for "AP"?

A.   Yes.

Q.   And for "p30"?

A.   Yes.

Q.   For "Micro"?

A.   Yes.

Q.   And "Amylase"?

A.   Yes.

Q.   And on this form it indicates that the pants tested positive for BCIP?

A.   Yes.

Q.   And under "Micro" the form documents that the examiner -- does it appear that the examiner found the presence of sperm cells?

A.   If I interpret that correctly, that's true.

Q.   And does the form document p30 results?

A.   There's a hash through each of the boxes, which I

would assume meant that they did not do p30 testing.

Q.   And, Mr. Hoy, if you please would turn to page 9733 of Petitioner's Exhibit 6.

A.   All right.

Q.   Does this appear to be the same form as the one we were just discussing but on some different items?

A.   Same form, yes.

Q.   And the items being tested here are three baseball caps, two coats and a shirt?

A.   That appears to be correct.

Q.   If I could direct your attention specifically to the row for Item 41-1.

A.   All right.

Q.   And what item is being tested there?

A.   It says a cap.

Q.   And what does it say in the "BCIP" column?

A.   Plus 2 and 2 is in parentheses.

Q.   And then under "p30" what does it say?

A.   There's a negative sign.

Q.   And does it indicate a date that that particular test was run?

A.   Looks like that was run on January -- well, looks like the BCIP may have been run on December 18 of '03.

Q.   And when does it suggest that the p30 was run?

A.   Looks like that was done on January 2nd of 2004.

Q.   And what do you see under the heading of "Micro"?

A.   There's another date.  Looks like that's January 2, 2004.

Q.   And what is the result there for Item 41-1, the baseball cap?

A.   Under "Micro" it's got a negative sp back slash slide and then it says "light NEC."

Q.   Thank you.  Mr. Hoy, do you recall if the Court allowed you to take Dr. McGee's deposition before the trial in this case?

A.   Yes.  That was part of the sanctions imposed by the Court.

MR. LUBY:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.   (Mr. Luby continuing)  Mr. Hoy, I'm now handing you what's been marked as Petitioner's Exhibit 42 (indicating).  Does that appear to be a transcript of the deposition you took of Dr. McGee?

A.   Yes.

Q.   And what's the date of that deposition?

A.   May 31, 2006.

Q.   And do you recall asking Dr. McGee questions about p30 testing?

A.   Yes.

Q.   If I could refer you to pages 152 to 54, do you see where you had asked him, "Have you ever heard of the p30 antigen?"

A.   The bottom of page --

Q.   152?

A.   Yes, I see that.

Q.   And what is his answer to that question?

A.   His answer was yes.

Q.   Then you asked, "What is it?"

A.   I did.

Q.   And his response is?

A.   "If I remember correctly, p30 antigen is also observed in seminal fluid and can be tested for the presence or to confirm the presence of deposited material, deposited seminal material."

Q.   And you asked him if it was specific to the male prostate?

A.   I did.

Q.   And his response was?

A.   "That's my understanding."

Q.   Later on line 16 you ask him whether --

A.   On which page?

Q.   On line 16 of the same page?

A.   Okay.

Q.   "Was that test done on this acid phosphatase?"

And what is his response?

A.   His response was, "No."

Q.   And on the next page, page 154, you asked him, "Is there any lab in the state of Minnesota that does that testing?"

A.   I did.

Q.   And what is his response to that?

A.   His answer was, "I don't know."

Q.   At that point are you trying to find out whether the BCA itself either does or had performed p30 testing in general or had done so on any of the samples in this case?

A.   I think I might have had multiple reasons for asking the question, one of which you just described.

Q.   What might have some of the other reasons been?

A.   The other would be to find out if he even knew that they offered p30 testing in Minnesota since he'd indicated that he didn't know.

Q.   Now at this point just so we're clear, Mr. Hoy, you already knew that the swabs had tested negative for sperm and that there was no male DNA detected; is that correct?

A.   That's correct.

Q.   And at this point you understood that Mr. -- Dr. McGee, excuse me, was going to testify to the likelihood

of a seminal deposit within the last 24 to 36 hours of Ms. Sjodin's life?

A.   Yes.

Q.   And in order to disprove that testimony, is it fair to say that p30 was one of the angles that you were investigating at the time?

A.   Yes.

MR. LUBY:   Your Honor, may I approach the witness?

THE COURT:   You may.

Q.   (Mr. Luby continuing)   Mr. Hoy, I'm now handing you what's been marked as Petitioner's Exhibit 43 (indicating).   Does this appear to be a collection of -- and I'm sorry, sir, does this appear to be a set of e-mail correspondence between you and a Bill O'Keefe?

A.   Yes.

Q.   Can you tell us who Bill O'Keefe is, please.

A.   Mr. O'Keefe was an investigator officed out of the Minneapolis-St. Paul area that we retained to do some basic legwork for us fairly early in the case and then I followed up with him at a later point as well.

Q.   Sir, what is the date of the e-mail string that's shown in the first two pages of this particular exhibit?

A.   Looks like July 3 through July 6 of 2006.

Q.   Right about the time the trial was beginning?

A.   We would have been in jury selection on the 6th for sure.

Q.   And turning to the first paragraph on the first page of Petitioner's Exhibit 43, does it appear that you were asking Mr. O'Keefe to look into the issue of whether Regions Hospital does or did perform any p30 testing?

A.   Yes.

Q.   And if I could direct your attention to the last page of Petitioner's Exhibit 43, what does Mr. O'Keefe report to you in that e-mail concerning p30 testing?

A.   The substance of it was that he had spoken with somebody, a forensic scientist, from the Minnesota BCA lab and the Minnesota BCA lab indicated they'd offered the p30 antigen test in one form or another for the 11 years that he'd worked there, perhaps longer.

Q.   So you inquired about BCA's methods and Regions Hospital's methods and you earlier in your testimony described some of the methods in the North Dakota crime lab.

Mr. Hoy, were there other crime labs whose protocols or methods you remember seeking out or investigating concerning the proper means of testing a sample for semen, acid phosphatase testing, p30 testing, et cetera?

A.   No.

Q.   And specifically you didn't inquire whether other crime labs in other jurisdictions would report a finding of semen based on an acid phosphatase test without some other positive test such as the detection of sperm or a positive p30?

A.   At the time that I was doing this, I was attempting to address the acid phosphatase-based opinions to be offered by Dr. McGee.  I wasn't trying to figure out what other crime labs would do at that time. By researching the acid phosphatase and talking with Dr. Sensabaugh is when I became aware of the p30 antigen test which was definitive as opposed to the presumptive acid phosphatase.

Q.   When you say you were aware of p30 testing, do you mean the concept of p30 testing as opposed to whether any p30 testing had been specifically done in this case?

A.   Yes.

MR. LUBY:  If the Court will bear with me for just a moment, may I approach the witness, Your Honor?

THE COURT:  You may.

Q.   (Mr. Luby continuing)  Mr. Hoy, I'm now handing you what's been marked as Plaintiff's Exhibit 2 --

excuse me, Petitioner's Exhibit 2 previously admitted into evidence, Petitioner's Exhibit 44, 45 and 46 (indicating). And in addition, Mr. Hoy, I'm handing you a copy of what's been previously marked as Government's Exhibit B (indicating). And if you would please refer to Government's Exhibit B.

A. Yes.

Q. We've discussed this document earlier in your testimony, sir?

A. Yes.

Q. And this is a -- can you please describe what this letter is.

A. Government Exhibit B is a letter on my letterhead, or our firm's letterhead that I wrote to Dr. Edward Blake of Forensic Science Associates in California. It's dated August 23 of 2004. I was furnishing him documents pertinent to the case at that time. Dr. Blake has expertise, among other things, with DNA testing and we were soliciting his views and assistance on how we might engage in a defense testing of samples that the government or investigators had obtained during the course of the case, particularly those that indicated that Ms. Sjodin's blood had been found inside of Mr. Rodriguez's car.

Q. The first paragraph I believe you stated that you

had obtained an order of the Court authorizing us to obtain his services as a forensic DNA expert?

A.   Yes.

Q.   At this time were you seeking Dr. Blake's assistance with the question of whether any semen was present in this case in the autopsy swabs that we've been talking about earlier?

A.   No.   We were strictly dealing with him on DNA at that point.

Q.   Thank you.   If I could please refer you to Plaintiff's Exhibit 44.

A.   Okay.

Q.   This appear to be a later you received from Dr. Blake?

A.   Yes.

Q.   Do you notice there are two possible dates on the front of this letter?

A.   Yes.

Q.   And what date is stamped by your law firm?

A.   We received it on May 15 of 2006.

Q.   Do you notice in the heading the letter says, "May 8, 2005"?

A.   Yes.

Q.   Which of those dates do you believe to be correct?

A.   The first sentence of his letter to me says he receives my fax letter dated May 4 of 2006 so I'm assuming that my -- the office stamp is correct and his letter is misdated.

Q.   If I could direct your attention to page 3 of this letter -- or, excuse me, the first page of this letter, do you see the heading under the name of the case?

A.   He's headed it "Concerns."

Q.   And at page 3 do you see the heading that says, "Prosecution Reports"?

A.   Yes.

Q.   And do you recall that as being one of Dr. Blake's areas of concerns?

A.   As I sit here I don't have specific recollection. I've seen this letter recently and I've reviewed it again, yes.

Q.   As of today's date you provided us 10 reports from the BCA laboratory.  These reports are numbered 1, 2, 4, 5, 6, 7, 9, 10, 27 and 29 and then he goes on and says later that the "reports contain nothing but conclusory assertions unsupported by scientific documentation, observation, data, logic, or any other basic element of scientific proof."

Is it your understanding that -- or was it your

understanding Dr. Blake was asking you for further documentation beyond the BCA reports themselves?

A. In a roundabout way, yes. I think he was dissatisfied with what was made available to him and he thought that there should be additional documentation available that he wanted to look at and review.

Q. If you could please turn next to Petitioner's Exhibit 45.

A. Yes.

Q. And what is the date on this particular letter?

A. June 9, 2006.

Q. And to whom did you write this letter?

A. This is a letter I wrote to Dr. Blake.

Q. And if you could review it for just a minute or so, does this appear to be a document in which you're seeking Dr. Blake's assistance to assist with acid phosphatase issues?

A. Yes.

Q. And if you could please turn to page 2.

A. All right.

Q. The second to the last paragraph or the last full paragraph you see there's a description that you've given of BCA Lab Report 27?

A. Yes.

Q. And you discussed to some degree the possible

implications of the fact that that particular report found an absence of male DNA on the autopsy swabs?

A. Yes.

Q. And you said, "It strikes me that such DNA testing is more sophisticated and male specific than is the acid phosphatase testing conducted by Regions Hospital"?

A. Yes, I said that.

Q. And would you agree with me that you do not mention in that context BCA report 10?

A. Correct.

Q. If I could just refer you to the last paragraph of this letter on page 3 and it says, "Frankly, this opinion is the bases for the Government's contention that she was sexually assaulted. Consequently, this is a very important issue for the defense and one which I believe we should be successful on if the science can be properly presented."

Does that statement, Mr. Hoy, accurately reflect your view of the semen testing issue at the time?

A. Yes.

Q. And if I could then refer you to Petitioner's Exhibit 46, does this appear to be an e-mail to you from Dr. Blake?

A.   Yes.

Q.   And he refers this issue to Dr. Sensabaugh?

A.   Tells me I should refer the acid phosphatase issue to Dr. Sensabaugh, yes.

Q.   And thereafter is that what you did, i.e., pursued it through Dr. Sensabaugh rather than through Dr. Blake?

A.   Yes.

Q.   And again the date of this e-mail is?

A.   June 13 of 2006.

MR. LUBY:  Your Honor had previously indicated that the Court would want to take a break at 11:00 to initiate the examination of --

THE COURT:  Give us time to arrange the video conference and given the fact that we've estimated that the testimony commencing at noon will take a couple of hours we'll break for an hour at this point so we'll reconvene at noon.  Thank you.

(Recess taken; 11:00 a.m. to 12:00 noon.)

THE COURT:  We're on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's Case No. 2:04-cr-55 and 2:11-cv-88. Mr. Rodriguez has waived his right to appear.  The petitioner is represented here by Mr. Montroy, Mr. Luby and Mr. Abreu.  The United States is represented by

Ms. Burkland and Mr. Reisenauer.  When we broke we were about to call the next witness.  And I believe Mr. Luby is about to call that witness and so --

MR. MONTROY:  Mr. Luby was calling and now we're --

THE COURT:  Mr. Montroy.

MR. MONTROY:  You're going to start to think we're playing games.

THE COURT:  I just can't remember what I'm doing.

MR. MONTROY:  Your Honor, if I could have one second to consult with Mr. Reisenauer?

THE COURT:  So now if we can get this all right Mr. Montroy is about to call a witness.

MR. MONTROY:  That's right, Your Honor.

THE COURT:  All right.

MR. MONTROY:  And, Your Honor, the petitioner would call Dr. Michael Ferenc to the stand. I guess not the stand.

THE COURT:  Doctor, if you please could raise your right hand and take the oath.

(FURTHER PROCEEDINGS REPORTED BUT NOT TRANSCRIBED HEREIN; TESTIMONY OF DR. MICHAEL FERENC.)

THE COURT:  All right.  Mr. Hoy may retake the stand, I assume, or Mr. Abreu?

MR. ABREU:  I was going to suggest that we -- I didn't know Mr. Hoy was behind me.

THE COURT:  Mr. Luby.

MR. MONTROY:  If I could have just one second, Your Honor, to get out of Mr. Luby's way.

MR. REISENAUER:  I need a second as well, Your Honor, to get out of my own way.

THE COURT:  Mr. Luby, do you want to switch positions because we can take five minutes if you want to move?

MR. LUBY:  No, I think this position's fine if it's fine with the Court.

THE COURT:  Fine with me.

Q.   (Mr. Luby continuing)  Mr. Hoy, during your testimony -- when your testimony ended -- before your testimony was temporarily ended you recall we were discussing some correspondence between you and Dr. Blake?

A.   Yes.

Q.   And Dr. Blake is the expert that you reached out to assist you with DNA evidence?

A.   Yes.

Q.   Later you asked him for some help on the acid phosphatase issue?

A.   Correct.

Q.   And, sir, if you would please refer to Petitioner's Exhibit -- yes, Petitioner's Exhibit 2.

A.   I have that.

Q.   Bear with me for just a moment.  Can you tell us what this document is, Mr. Hoy?

A.   Petitioner's Exhibit 2 is a letter I received from Dr. Blake on his office stationary.  It's dated June 20 of 2006.  In essence it's a follow-up to an e-mail that he sent me a few days earlier where he told me that he was withdrawing from this case and would not be able to assist us.

Q.   And who is that letter signed by?

A.   It contains a dual signature, both Edward Blake and also Alan Keel.

Q.   And if you could turn to page 2 of that letter, sir, do you see where Dr. Blake makes a reference to the government having sent various items that were not usable for testing?

A.   Yes, first paragraph at the top of the page.

Q.   Can you tell us what events -- can you describe the events Dr. Blake is referring to as you remember them?

A.   We had requested that the government allow our experts, Dr. Blake among them, to test some of the evidence and the agreement was that they were going to

do that and arrangements were made for the Minnesota crime bureau lab to send samples after they had been tested by their lab directly to Dr. Blake for his testing and they arranged that between themselves after much discussion between the U.S. Attorney's office and myself. Eventually those -- some of that stuff was sent to Dr. Blake and my understanding is that much of what he received were Q-tip swabs, one end of which had been completely removed and he basically had nothing to test. And I think that there was four or five of those like that that he -- the sticks if you will, nothing, no swab containing anything that he could test. He was not pleased about that and that's not frankly what I expected that he would receive either.

Q.   So then you were not pleased with this development either?

A.   No.

Q.   And what did you do as a result?

A.   As I sit here today, I don't recall the details of what I did but I believe at some point I made a motion to the Court seeking some sort of a sanction for the destruction of evidence.

Q.   If I told you that you moved alternatively to suppress the evidence or to dismiss the charges, would that -- does that differ with your memory?

A.   Yes, that sounds correct.

MR. LUBY:   Thank you, Mr. Hoy.   And, Your Honor, may I approach the witness?

THE COURT:   You may.

Q.   (Mr. Luby continuing)   Mr. Hoy, I'm now handing you what's marked Petitioner's Exhibits 47, 48, 49 and 50 (indicating).   And can you please take a look at Petitioner's Exhibit 47.

A.   (Witness examining.)   Yes, I have it.

Q.   Is this one of those e-mail chains in reverse order.   What is the date of the original e-mail on this document?

A.   It appears as though I e-mailed Dr. Sensabaugh on June 22, 2006.

Q.   And is this the e-mail in which you reached out to Dr. Sensabaugh and sought his help concerning the acid phosphatase and related issues?

A.   Yes.   I may have contacted Dr. Sensabaugh by phone prior to this just to find out if he would be receptive, but this I believe was the first written correspondence outlining the situation.

Q.   And if you reached out to Dr. Sensabaugh by phone, do you recall approximately when that might have been in relation to this e-mail?

A.   It would have probably been shortly before this.

I have no recollection of the exact date but it couldn't have been -- I would -- if he was receptive, which he obviously was, I would have written to him as soon as I had the opportunity to marshal the information and get it to him.

Q.   And here as with Dr. Blake you discussed the fact that no male DNA was detected and the possibility that that may or may not tell us more about those samples than the acid phosphatase results?

A.   I haven't read this again here just recently but I'll take your word for it.  I wouldn't be surprised if I included that.

Q.   If you had discussed that with Dr. Blake, that would be the sort of thing you would bring up with Dr. Sensabaugh as well?

A.   Yes, certainly.

Q.   If I could refer you to the last paragraph, it notes that this is a significant issue for the defendant.  "If we can keep the government from proving she was sexually assaulted, in addition to kidnapped and killed, it would be a major victory in the case."

     Does that accurately state your views of the importance of this issue at the time?

A.   Yes.

Q.   And if you'd please refer next to Petitioner's

Exhibit 48.

A. All right.

Q. And can you tell us what this document is, Mr. Hoy?

A. This appears to be an e-mail and a response. It looks like on June 28th of 2006 I wrote to Dr. Sensabaugh by e-mail and it looks like he responded on July 6.

Q. And in the first paragraph of the portion written by Dr. Sensabaugh, he talks about the BCA test results?

A. Yes.

Q. And he can't tell at this point, based on what you said, whether BCA also did a search for sperm cells?

A. Yes. He was wondering about that, yes.

Q. And he raises the possibility of getting a sample and running a p30 test?

A. Yes.

Q. In other words if they had run a search for sperm cells, "they might have a little of the aqueous extract from which it might be possible to do a p30 test."

A. Yes, that was his language.

Q. Did you ask Dr. Sensabaugh to prepare a report for you or a summary of his findings?

A. I'm sorry?

Q. Did you ask Dr. Sensabaugh to summarize his

findings in writing?

A.   Eventually he did, yes, just prior to the Daubert hearing I believe.

Q.   If I could just refer you back to the last exhibit for a moment and that would be Exhibit 48.

A.   Okay.

Q.   Just so we're clear on the timeline here, that e-mail is dated July 6, 2006?

A.   The one from Dr. Sensabaugh to me is dated July 6, 2006.

Q.   And you testified earlier today that you would have received the p30 results from the government on or about May 8, 2006 in the form of the bench notes from Mr. Fischer's test results?

A.   Yes.  May 8th it would have been in the bench notes to report 10, yes.

Q.   Thank you.  And if you'd please refer to Petitioner's Exhibit 49, does this appear to be Dr. Sensabaugh's report?

A.   Yes.

Q.   And you said that you had this prepared and presented for purposes of the Daubert hearing?

A.   Yes.

Q.   And it was your intention at this point to have Dr. McGee's testimony excluded concerning the acid

phosphatase issue?

A.   That was my hope, yes.

Q.   Or maybe at least to contradict his testimony at the next phase with the jury.

A.   Yes.

Q.   And does Exhibit 49 appear to be the report that Dr. Sensabaugh provided for you?

A.   It is.

Q.   And what is the date of that report?

A.   24 August 2006.

Q.   And if I could refer you to page 2, is that where Dr. Sensabaugh begins his conclusions?

A.   Yes.

Q.   And does he note the following about p30 as opposed to acid phosphatase.  I'd refer you specifically to the first full paragraph under the bold printed heading No. 1.  "The prostate specific p30 antigen (PSA, p30) is the second most definitive; it is normally present only in prostatic secretions and there at very high levels.  It is not present in vaginal fluids but has been detected at low levels in some female fluids under conditions of hormonal imbalance.  ACP is less definitive than either sperm or PSA-p30."

And was that an issue that you had asked Dr. Sensabaugh to help you examine?

A.   Yes.

Q.   Turning to the first page of Dr. Sensabaugh's report, does that appear to be a list of items or materials that he considered in reaching his conclusions?

A.   Yes.

Q.   And one of the items on that list is -- the third item on that list is BCA Report 27?

A.   That's correct.

Q.   And is that the report that discusses the finding of no male DNA in the cervical, vaginal and anal swabs?

A.   I believe that's true.

Q.   Dr. McGee also mentions as Item No. 4 some bench notes that he considered, 18532 to 18552.

A.   I see that.

THE COURT:   For the record it's Dr. Sensabaugh.

MR. LUBY:   Thank you, Your Honor, I apologize.

Q.   (Mr. Luby continuing)   And could you please refer to -- turn to Petitioner's Exhibit 50.

A.   I have that.

Q.   And does this document have Bates stamp numbers 18532 through 18552?

A.   It does.

Q.   Does that appear to be the same document that Dr. Sensabaugh referred to in his report?

A.   At paragraph 4, yes.

Q.   And does plaintiff's -- excuse me, Petitioner's Exhibit 50 appear to be some bench notes from Ann Marie Gross concerning DNA issues?

A.   That's what I believe they would be, yes.

Q.   So these are not the bench notes accompanying BCA report 10 and detailing or documenting p30 testing on the cervical, vaginal and anal swabs?

A.   That's correct.

Q.   And, in fact, Dr. Sensabaugh doesn't list a BCA report 10 or its bench notes as among the materials that were provided to him.

A.   That's correct.

Q.   If you could please refer to page 3 of Dr. Sensabaugh's report.  In the first paragraph on page 3, Dr. Sensabaugh discusses the implications of a sample that tests positive for acid phosphatase but negative for sperm cells.  If you could just take a minute to review that paragraph.

A.   Which paragraph are you referring to?

Q.   The first paragraph at the top of page 3 beginning with the word "however" in the second line.

A.   Okay.  (Witness examining.)  I've reviewed it.

Q.   Thank you.   And so one possible explanation for that that is a positive AP test but negative sperm findings is that the individual is aspermic?

A.   Correct.

Q.   Another possibility is that the acid phosphatase is coming from somewhere else and it's not semen?

A.   That's correct.

Q.   And he postulates, as a way to figure this out, p30 testing.

A.   Correct.

Q.   And specifically, "Detection of PSA-p30 at levels commensurate with the detected ACP would support the hypothesis of aspermic semen whereas failure to detect PSA-p30 would argue for an exogenous source."

A.   That's what he wrote.

Q.   And were you aware at this time that the government or different police agencies had conducted some testing on some of Mr. Rodriguez's clothes and found them to contain sperm?

A.   Yes.

Q.   You mentioned earlier, Mr. Hoy, you were talking about a Daubert hearing that was held by the Court?

A.   Yes.

Q.   In response to a motion that you had filed to exclude Dr. McGee's testimony concerning the acid

phosphatase issue?

A.    That's correct.

Q.    And both Dr. McGee and Dr. Sensabaugh testified at the hearing; is that correct?

A.    That's true.

Q.    Do you recall them both testifying that no p30 testing had been done in this case?

A.    I don't have a specific recollection as I sit here today of that testimony but I know that that's what both of them believed at the time and I'm not surprised that they both would testify to that.

Q.    And do you recall calling Dr. Sensabaugh as a witness -- following the Daubert hearing, do you recall calling Dr. Sensabaugh as a witness during the guilt or innocence phase of Mr. Rodriguez's trial?

A.    I do.

MR. REISENAUER:    I'm sorry, I didn't hear that question.  Could we have it read back, please?

THE COURT:    Yeah, you can go ahead and read that back.  To summarize it though the question was just you recall Dr. Sensabaugh testifying at the trial.

MR. REISENAUER:    That's what it was?  Okay. Thank you.

Q.    (Mr. Luby continuing)  Was he, in fact, the only witness that you called at the guilt or innocence phase

of the trial?

A.    As I sit here I can't tell you one way or the other.  That may well be.

Q.    You wouldn't quarrel with me if I said he was, in fact, the only witness that was called by the defense in the guilt or innocence phase?

A.    I would not quarrel with you, no.

Q.    Thank you.  Just so we understand the chronology, you would have received the bench notes describing the p30 result on or about May 8, 2006?

A.    Yes.

Q.    And your recollection is -- you testified earlier today that you would have, in fact, read that at the time that your office -- that it came to your office or shortly afterwards?

A.    Yes.

Q.    And at the time you saw that document, you didn't appreciate the significance of p30 testing?

A.    That's correct.

Q.    Some weeks later you came to understand that, whether through your own research or through your work with Dr. Sensabaugh?

A.    Come to appreciate?

Q.    The significance of the p30 testing.

A.    Yes.

Q.   And at that point you didn't go back and review the document that had been disclosed to you on May 8th?

A.   I did not.  I had about 20,000 pages of discovery materials and I did not go back through them.

Q.   Did you have occasion to interview Mr. Fischer and ask him about the basis for his findings?

A.   I did not.

Q.   And do you recall cross-examining him at trial concerning his conclusions?

A.   Again as I sit here today I couldn't describe that for you.  I know that he did testify.

MR. LUBY:  Your Honor, may I approach?

THE COURT:  You may.

Q.   (Mr. Luby continuing)  Mr. Hoy, I'm now handing you a copy of Volume 27 of the trial transcript dated August 21, 2006 (indicating).  If I could please direct your attention to page 6160 of the transcript.

THE COURT:  Just for the record that's document No. 710 in the Court's docket.

MR. LUBY:  Thank you, Your Honor.

THE WITNESS:  6160?

Q.   (Mr. Luby continuing)  6160.

A.   I'm there.

Q.   If you begin at line 2 you ask Mr. Fischer: "Were you also furnished a series of swabs that's also

referred to in the same paragraph, the vaginal stab, the anal swab, and the cervical swab?"  And you see that question?

A.  Yes.

Q.  And his response is?

A.  "Yes, I was."

Q.  And then you asked:  "Did you also examine those swabs for the presence of semen?"  And what is his response there?

A.  "Yes, I did."

Q.  "And you found none, no semen on any of them?" And his response is:  "That's correct"?

A.  That's correct.

Q.  So when cross-examining him you did not cross-examine concerning the basis of his finding of the semen?

A.  That's correct.

Q.  Would you have cross-examined him about the basis of his results if you had known about his p30 findings at the time?

A.  Yes.

Q.  And you've testified earlier this morning that other aspects of your defense would have been different if you had had that evidence if it was known to you.

A.  If we had -- if I had realized that the testing

had been done, it would have been useful both with Dr. McGee's Daubert hearing, his testimony at trial if his opinions came in, yes.

Q.   You mentioned the Daubert hearing as a place where that would have been useful.  You also testified earlier today, I believe, that if you could have removed Dr. McGee's testimony about semen from the trial or contradicted it that that would also have assisted at sentencing?

A.   Would have assisted?

Q.   At sentencing.

A.   Yes.  During the sentencing phase you mean of the trial?  Yes, I think it would have been.

Q.   And in what respect would this have made, in your view, the offense in question seem less aggravated?

A.   I think it's probably commonly agreed that a kidnapping is less heinous than a kidnapping and a rape.

Q.   Is it fair to say, Mr. Hoy, that you spent a considerable amount of time in the two months before the trial investigating and working up this issue of acid phosphatase and semen testing?

A.   I spent a considerable amount of time as soon as I realized that that was going to be an issue with Dr. McGee's intended testimony at trial, yes.  I can't tell you what the time frame is.

Q.   You earlier pointed to the government's disclosure of about May 16, 2006 as the first time that Dr. -- it was explained to you that Dr. McGee was going to testify about a seminal deposit within the last 24 hours of Ms. Sjodin's life based upon the level of acid phosphatase detected?

A.   I forget the exact date but it would have been in those expert disclosures that we've already talked about, yes, and the supplements.

Q.   So again we'd be talking about the last two months before trial, May and June of 2006?

A.   Yes.

Q.   Even into July?  All that time that you spent investigating this issue, Mr. Hoy, is it fair to say that that left you with less time to investigate other possible aspects of Mr. Rodriguez's defense?

A.   That's true.

Q.   So, for example, you would have had less time to understand, counter-test and perhaps even rebut the government's DNA evidence?

A.   I've not tried to figure out exactly what I would have done with my extra time but I did spend a considerable amount of time on this issue because I thought it was important.  And if I had not had to work on the acid phosphatase issue I would have spent it on

something else, yes.

THE COURT:  Why don't we go ahead and take a break at this time and we'll sort through what we've got.  We'll break for 20 minutes.  We'll start again at 2 o'clock.

(Recess taken; 1:40 p.m. to 2:00 p.m.)

THE COURT:  We're back on the record in a case entitled United States versus Rodriguez.  When we broke -- all counsel of record are still present.  When we broke Mr. Luby was conducting a direct examination of Mr. Hoy.  You may continue.

MR. LUBY:  Thank you, Your Honor.

Q.  (Mr. Luby continuing)  Mr. Hoy, before we broke you were talking about the fact that you spent a good deal of time in the last couple of months before the trial working on the question of acid phosphatase and semen testing.

A.  That's true.

Q.  And you explained that had you been able to put that issue to rest earlier you could have spent some of that time on other issues on the defense?

A.  I think that's true.

Q.  And we talked a little bit about the DNA evidence?

A.  Yes.

Q.  And you testified earlier I believe that the government's DNA evidence tended to show that there were some bloodstains from Ms. Sjodin in the back seat of Mr. Rodriguez's car?

A.  Inside the car.  I couldn't tell you whether it was the front seat or back seat but it was inside the vehicle, yes.

Q.  Is it your memory or do you recall that those particular bloodstains were in the pattern of what we would call blood spatter as opposed to large piles or large surface stains of blood?

A.  In general terms, yes, I think it was a mist or a spray, not drops.

Q.  And do you recall that that was suggestive of the possibility that Mr. Rodriguez and Ms. Sjodin would have had a struggle in the back of the car where the blood spatter was found?

A.  I think that was one possibility that was discussed, yes.

Q.  The car itself was -- of Mr. Rodriguez would have been in the parking lot of the Columbia Mall in Grand Forks?

A.  I believe that's where it was located, yes.

Q.  And one of your theories of defense if I'm not mistaken, Mr. Hoy, was that the evidence didn't show an

interstate kidnapping resulting in death?

A.    That's true.  No one could ever testify as to the exact location where the death occurred.

Q.    Thank you.  I'd like to turn to the issue of the defect on Ms. Sjodin's neck.  As we did with the question of the semen evidence, Mr. Hoy, I'd like to go through what the government -- some things the government disclosed to you over the course of your preparations.

If you could please refer to the autopsy reports, which are Petitioner's Exhibits 15 and 16?

A.    I have those.

Q.    And specifically Exhibit 16, Final Autopsy Protocol.

A.    Yes.

Q.    And what do you see on the first page of this document concerning the wounds to the neck region?

A.    Well, under the general category of "Final Anatomic Diagnosis," the first paragraph talks about homicidal violence and lists A through E as findings.

Q.    And do you see under section I subsection D where it says, "Remnants of slash wound - neck region"?

A.    Yes.

Q.    And if I could direct your attention to page 6 of the final autopsy report, page number bottom of the page

rather than the top.

A.   I'm following.

Q.   I know you've reviewed this document before but in so many words at this point Dr. McGee is saying that there's a slash wound across the neck some 13 and a half centimeters in length and another slash wound, on the next page -- or, excuse me, on that same page, to the flank area, right flank area of Miss Sjodin's body.

A.   I believe that he refers to the remnants of an elongated slash-type wound on the anterior surface of the neck region.  And as to the flank he simply calls it, "A defect can be observed to the right lateral flank..." and then he locates it, talks about the size.

Q.   Did you understand from the autopsy protocol at the time you received it what the government's theory was going to be concerning the cause of Miss Sjodin's death?

A.   No.  His Final Autopsy Protocol probably gives a little cause of death that he calls homicidal violence, but there's never a reference or description of what the medical cause of death is.

Q.   And beyond that you had no particular understanding of the term "homicidal violence" beyond what you've just described?

A.   No.  As to how or means, no, that was not

provided in the document.

Q.   And is that also a part of why you filed a motion for expert disclosure under Rule 16?

A.   Yes.

Q.   I'm sorry, I didn't mean to cut you off.

A.   I was just going to say from the information that was provided in the autopsy protocols it was very general in nature and you could not determine what his actual opinions might be.  And as we got closer to trial I became concerned that he was going to attempt to offer opinions that were not contained in his report, and that was one of the reasons I wanted to press the government to identify their experts and comply with the rules and tell us what their testimony was expected to be.

Q.   And if I could refer you back to one of the documents that was filed in an attempt to make that compliance that would -- if you could please look at Petitioner's Exhibit 34.  Do you have that in front of you, Mr. Hoy, a document entitled "United States' Disclosure of Expert Witnesses - Supplement I"?

A.   Yes.

Q.   What does the last page of this document indicate as to the date of service?

A.   April 28, 2006.

Q.   And on the second page of this document

concerning the injuries to Ms. Sjodin, I'd like to ask you about some language where it says, "Dru Sjodin's neck was cut at least twice with a sharp-edged instrument resulting in elongated slash-type injuries. These are substantially severe injuries.

"The cuts to the neck include notching consistent with an instrument such as the knife found in defendant Rodriguez's car.

"The right flank defect referred to in Dr. McGee's reports is inconsistent with animal activity alone, and was initialized by a sharp-object trauma."

Did that information, Mr. Hoy, provide what you needed to know to be prepared for trial and to answer the government's case?

A.   It didn't provide everything I needed to know, no.   It was the first time I believe that I had actually seen written down what the anticipated testimony in that regard was intended to be, but it doesn't -- certainly doesn't answer the questions that defense counsel would have in order to prepare adequately for trial.

Q.   If you could please turn to plaintiff's -- excuse me, Petitioner's Exhibit 35.

A.   All right.

Q.   And you have in front of you a document captioned "United States' Disclosure of Expert Witnesses -

Supplement II"?

A.   I do.

Q.   We've previously discussed this same document with respect to the semen evidence?

A.   Yes.

Q.   And on the front of this document, what date is indicated as to when your office received it?

A.   It's stamped by our office in the upper right-hand corner "Received May 08, 2006."

Q.   And if you could please refer to the bottom of page 2, and then page 3 is it fair to say that the government provides a little bit more elaboration on what it believes to be the cause of Miss Sjodin's fatal injuries?

A.   Yes, additional information is provided.

Q.   Including, and I'm reading from the first paragraph there:  "These cuts were likely inflicted at the scene where the victim's body was later located"?

A.   I see that.

Q.   Is that the first time you were aware of that particular allegation?

A.   Yes.

Q.   And then the sentence, "blood patterns and quantities on the victim's clothing and in the defendant's car are inconsistent with these injuries

having been inflicted prior to transport..."?

A.   I see that.

Q.   And do you understand from that that the government's theory was going to be that a fatal slash wound was inflicted at or near the place that Miss Sjodin's body was recovered in Minnesota?

A.   That seems to be the import of that paragraph, yes.

Q.   And in the next paragraph:  "The slash-type cuts to the neck include notching consistent in type, size, and appearance with causation by an instrument such as the knife found in Defendant Rodriguez's car," was that also a new piece of information for you?

A.   Yes.   I believe this is the first time that we'd seen the opinion regarding notching and making the opinion that it was consistent with the knife.

Q.   And concerning the alleged flank injury, not only that it was inconsistent with animal activity alone but due to the location, depth, and directional tunneling characteristics and then was initialized by sharp-object trauma.

A.   That's paragraph 3, yes.

Q.   Mr. Hoy, aside from the government's disclosures about the possibility of knife wounds to the neck and flank areas, I'd like to ask you just a few questions

about your own investigation of that issue.

In investigating the cause of death here as in any other case, Mr. Hoy, I assume you talked to your client, correct?

A. Yes.

Q. And do I understand correctly you represented Mr. Rodriguez both before as well as after Miss Sjodin's body was recovered?

A. That's true.

Q. And you've discussed the case with your client both before and after that discovery?

A. I attempted to, yes.

Q. And during some of those discussions Mr. Rodriguez denied involvement in Ms. Sjodin's disappearance?

A. That's true.

Q. And he didn't tell you anything about Ms. Sjodin's injuries or the manner in which they were inflicted?

A. The general response, and I have to paraphrase, that I got from Mr. Rodriguez was that he couldn't help us or couldn't help them locate the body because he wasn't involved or he can't plead guilty to something that he didn't do, words to that effect.

Q. Did you consider noninvolvement as a reasonable

possibility?

A.    In most cases it can be.  By the time I was involved, I was given access to some of the early investigative reports from the scene, some of the early analysis of blood spatter that had been done by the North Dakota crime lab and investigative reports that reflected interviews law enforcement had done directly with Mr. Rodriguez before I was involved and, in fact, before he was arrested as well as their follow-up investigation of his statements.  And from that information I believed that there was a very high likelihood that he was involved and that he would likely be convicted, if tried.

Q.    And if there was a high likelihood of his involvement and likely conviction, was there a low likelihood that you were going to present a defense that he was not involved?

A.    Say that again, please.

Q.    Was there any likelihood of you presenting a defense that Mr. Rodriguez was not involved or responsible for Ms. Sjodin's disappearance and ultimately her death?

A.    It was my opinion that at least -- it was my opinion at the time of trial, which I likely had before that time, that it would be futile to attempt to

disprove his involvement and, in fact, would likely be counterproductive.

Q.   Am I correct, Mr. Hoy, that you've represented a number of other criminal defendants both before Mr. Rodriguez and after Mr. Rodriguez?

A.   I've done a number of criminal cases, yes.

Q.   And in your experience is it unusual for a defendant to minimize his involvement in the alleged offense or otherwise to be less than forthcoming with his attorney?

A.   I think all people are different and I've certainly had clients that minimized or were not forthcoming.  I've also had clients that are brutally honest and tell you exactly what's going on and ask you to help them if you can.

Q.   But the first category of defendants is not something that is unusual in your practice and experience?

A.   No, I don't think it's unusual at all.

Q.   As for expert assistance you retained Dr. Garry Peterson from Minneapolis; is that correct?

A.   Yes.

Q.   And you sent Dr. Peterson some materials from the case, including some of the ones that we've been reviewing with you this morning?

A.   Yes.

Q.   So that would have been, for example, the autopsy report, some -- quite a number of photographs, crime scene photos and the like?

A.   I forget as I sit here exactly what I sent him, but when we first got him involved it was fairly early in the case and I would have sent him whatever I had that dealt with the autopsy or the early lab reports and that sort of stuff that was available, yes.

Q.   And what issues were you hoping that Dr. Peterson would assist you in?

A.   I knew Dr. Peterson to be the retired medical examiner from Hennepin County, Minnesota so I knew he had experience in the area.  I was interested in his expertise on what he might have for opinions by looking at either the autopsy reports or the photographs that were taken at the autopsy, help me understand what Dr. McGee was calling a defect, which is a term that I had not run across before in autopsy reports, and anything else that he could help me with to either understand what the allegations might be that Dr. McGee had found or anything that he could assist us with in looking elsewhere to find evidence that would be helpful to our case generally in the context of the autopsy that was done and the findings from the body.

Q.   Do I understand correctly that you asked Dr. Peterson specifically not to write a report?

A.   I probably did early on, yes.

Q.   And would that -- can you explain why that would be?

A.   We had requested discovery in the case and that triggers an obligation of reciprocal discovery.  And in this situation I didn't know whether I was going to utilize Dr. Peterson as a trial witness or not or if he was simply going to advise us, and so I simply asked him not to write a report until we could make that determination.

Q.   Do you recall on one occasion meeting with Dr. Peterson at his home where you discussed the case with him?

A.   I do.

Q.   And approximately when did that meeting occur as you recall?  And just for the record can you explain what you're referring to there, Mr. Hoy?

A.   Over time I have had questions asked and I have to go back and relearn a lot of this again, and so I've put together a couple of time lines for my own benefit, one about the case generally and one about some of the forensic issues.  And I know I've shared it with both counsel so it's not a surprise, but in there I think I

had written down when Mr. Ney and myself had met with Dr. Peterson and that would have been on April 15 of 2005.

MR. LUBY:  And, Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  (Mr. Luby continuing)  Mr. Hoy, I'm now handing you what's been marked as Petitioner's Exhibit 51 (indicating), and can you tell us what this document is, please.

A.  This is a photocopy of my handwritten notes of my meeting with Dr. Peterson at his home in Minneapolis on April 15 of 2005.  Would have been both myself and Mr. Ney met with him there in his dining room.

Q.  And do you recall during that meeting asking Dr. Peterson some questions about acid phosphatase as well as the defect to the victim's neck?

A.  Yes.  I've got some notes that I took regarding the acid phosphatase issue.

Q.  If we could discuss those notes for a bit, are you referring to page 3 of Petitioner's Exhibit 51?

A.  I am.

Q.  And do you see in about the -- just slightly below halfway down the page the words "acid phosphatase" underlined?

A.   Yes.

Q.   And there's a statement there as to acid phosphatase, "both men and women have acid phosphatase"?

A.   Yes.

Q.   And by you writing it does that -- are you reflecting there what Dr. Peterson told you or is that your own assessment?

A.   Generally when I take notes of a meeting like that it would be of the information that I was provided by Dr. Peterson.  So I may have asked him questions about that to prompt his response but I would have written down his response or the essence of it.

Q.   And then at the bottom of that page, I apologize if I can't read your handwriting, sir.

A.   That's okay.  I have trouble sometimes myself.

Q.   Does it say, "Postmortem cell breakdown will cause increase in acid phosphatase levels"?

A.   That's what it says, yes.

Q.   And then to the left of that with an asterisk "Regions Hospital the numbers can be higher than other labs"?

A.   Yes.  That would have been something Dr. Peterson told us, and again he worked in Hennepin County so I'm sure he was familiar with the Regions Hospital.

Q.   And just so it's clear for the record, Dr. McGee

is from Ramsey County which would be St. Paul?

A.   The adjoining county to Hennepin, yes.

Q.   Thank you.  If I could ask you to turn to the next page, please.

A.   All right.

Q.   And again I apologize if I'm not reading your handwriting correctly but does it say about a couple notes down, "Sources shown are within expected levels in post-mortem samples"?

A.   That's what I wrote, yes.

Q.   What was your understanding of what that means or can you tell us what you meant by that?

A.   Just reading that I can't tell you exactly what I meant by that.  There's a sub-indent under that that talks about "inconclusive results now."  And that may be related to that note and the one above it.

Q.   And to the left of that some kind of distinction being drawn between prostatic sources and red blood cell sources of acid phosphatase?

A.   Yes, that's how I interpret that.

Q.   And finally just a little bit further down something about DNA analysis and it appears to be "DNA analysis may not be possible..." but then I can't read the rest of that.  If you could tell us what that says, please?

A.    I think the note you're referring to says, "DNA analysis may be possible and may show if it arises from him or her."

Q.    Thank you.  Mr. Hoy, as to these various observations of Dr. Peterson concerning acid phosphatase and semen, are they basically consistent with the evidence you were later trying to develop through Dr. Sensabaugh?

A.    Yes.  In substantial terms, yes.

Q.    But you didn't consult with Dr. Sensabaugh, if I recall from your testimony, until June of 2006?

A.    I did not know who Dr. Sensabaugh was until shortly before I contacted him.  So to --

Q.    And these are -- I'm sorry, I didn't mean to cut you off.

A.    So to answer your question, I did not.

Q.    These observations from Dr. Peterson were from April 15th of 2005.

A.    Yes.

Q.    And, sir, if I could -- moving on to Dr. Peterson's views of the neck defect, am I correct at the top of page 2 there's a note from you, "Nothing definite to say whether she died from asphyxiation or slashed throat," and then "betting perhaps asphyxiation."  Have I read that correctly?

A.   You have.

Q.   Okay.

A.   And that would have been again trying to put down the essence of what Dr. Peterson was telling us at the time.

Q.   And then there's a note next to the words "photo 1182-shows hole in front of throat area, probably knife" --

A.   Yes.

Q.   -- is that correct?  And then the next paragraph as to photo 1180 your notes say, among other things, "clearly shows cut of throat area probably two times"?

A.   Yes.

Q.   And if I could refer you to the top of the next page, sir, concerning photo 1165, "exactly where throat is cut or location of ligatures is not very clear."  Is that what you've written there?

A.   Yes.

Q.   And beneath that a little bit, "If he had to opine on the cause of death, it would be incised neck but not certain.  Could have been strangulation with ligature"?

A.   You've read that correctly.

Q.   Okay.  Thank you.  And then on page 5 of this same document there's a heading you have written with

"Opinions to reasonable medical certainty"?

A. Yes.

Q. And your notes then reflect incised wounds to the throat, the right flank, the right upper thigh and perhaps the pubis?

A. Yes.

Q. Now, Mr. Hoy, following your meeting with Dr. Peterson on -- in April of -- following your meeting with Dr. Peterson April 2005, what was your thinking based on following what he told you on how to address the question of whether there's a knife wound to Miss Sjodin's neck and the cause of death?

A. My takeaway was that the opinions that he was willing to express to a reasonable degree of medical certainty and indeed his betting, if you will, all pointed to a cause of death that was not helpful to the defense. There was nothing that he was going to offer that would be helpful to us in attempting to rebut those allegations if that was, in fact, the government's evidence at trial.

MR. LUBY: Your Honor, may I approach the witness?

THE COURT: You may.

Q. (Mr. Luby continuing) Mr. Hoy, I'm now handing you what's been marked as Petitioner's Exhibit 52

(indicating).  Does that appear to be a letter that you wrote to Dr. Peterson some 13 months later, May 11, 2006?

A.  Yes.

Q.  And there's an enclosure with that letter?

A.  Yes.

Q.  And what did you send Dr. Peterson?

A.  I sent Dr. Peterson the United States' Disclosure of Expert Witnesses - Supplement II which I'd received on May 8 of 2006.

Q.  And on the front page of that letter you say that you would very much appreciate Dr. Peterson's review of the opinions described in that particular document?

A.  Yes.

Q.  And one of those opinions in that document, which I believe you've testified to earlier, is the summary concerning again on page 2 to 3 of the enclosure. Ms. Sjodin's neck was cut at least twice with a sharp-edged instrument resulting in elongated slash-type injuries and the details about the injuries being inflicted, where the victim's body was later located, inconsistent with the injuries in the car, and the wounds having a notching pattern that was consistent with a knife that would match a sheath that was found -- excuse me, that would match a knife such as that found

in the defendant's car and also that the right flank defect was inconsistent with animal activity alone?

A.   Yes.

Q.   These are issues on which you sought Dr. Peterson's views as of May 11, 2006 and notwithstanding what he had told you on April 15, 2005.

A.   That's true.  When we met with him in May of 2005, we had only the two autopsy reports and the autopsy photographs to work with, and we provided those to him and tried to get his thoughts and insights that he had at the time.

Over time it became evident finally that the government was going to try and offer a number of opinions through Dr. McGee, and when I finally got the Supplement II it became the greatest explanation of what his opinions were until I could take his deposition a couple weeks later.

I fired those off to Dr. McGee -- or, excuse me, off to Dr. Peterson hoping that he could help us in some way regarding these.  I didn't expect that his overall opinion was going to change much from what he had told us before, but I was concerned that perhaps Dr. McGee was attempting to offer opinions that were not supported by the evidence and maybe he could help us in that area particularly.

Q.   As between this particular outreach to Dr. Peterson as well as the deposition of Dr. McGee that you've just discussed, is it fair to say that at this point you were still at least trying to investigate the nature of Ms. Sjodin's injuries and the cause of her death?

A.   To that extent, yes.  Again I was concerned that Dr. McGee may be going beyond the accepted standards of professional practice in offering some of the opinions that he was offering about the neck wounds and some of the other defects as he called them, just as I was concerned that he was offering opinions that were not supportable simply by the acid phosphatase levels that were found.

Q.   Those are matters and possibilities that you took up with Dr. McGee at his deposition?

A.   I have a better recollection of my discussions with Dr. McGee at his deposition regarding the acid phosphatase than I do about the neck wounds, but I suspect I talked with him about that as well.

Q.   Well, to that end, Mr. Hoy, if I could refer you back to Petitioner's Exhibit 42?

A.   Would be his deposition testimony.

Q.   Correct.  If you could please turn to page 82 and if you'd take a minute or so to review that page and the

few pages that follow.

A.   (Witness examining.)

Q.   Is it fair to say that at this point you're asking questions and getting answers from Dr. McGee concerning what he believes to be sharp-force injuries to the neck and flank area?

A.   Without reading all of this it looks like -- yeah, it looks like I asked him about the bruising on her lower right cheek and then we talked about the slash wound to the anterior surface of the neck.  And I haven't read the rest of it where I talked about the flank defects.  I suspect I probably did.

Q.   If you could take a look at pages 104 through 108, you'll see some questions there that you asked Dr. McGee about a supposed flank injury?

A.   Yes.  I seem to be asking him about the -- what he called the defect to the right flank.

Q.   And later, sir, if you'd please refer to pages 127 to 128 and the several pages that follow.

A.   (Witness examining.)

Q.   Is it fair to say that the questions and answers in those pages discuss the neck defect, the possibility of a slashing injury and the notching pattern that is supposedly consistent with the knife in question?

A.   Yes.

Q.   This deposition is May 31, 2006?

A.   Yes.

MR. LUBY:  Your Honor, may I approach the witness?

THE COURT:  You may.

MR. LUBY:  For the record I'm handing the witness what's been marked as Petitioner's Exhibit 53 (indicating).

Q.   (Mr. Luby continuing)  And could you please describe this document for the Court.

A.   This was a letter that I wrote to the Court, copies to Mr. Wrigley and Mr. Ney, basically confirming a sidebar discussion that happened.  It says, "yesterday's motion hearing" and my letter's dated July 6 so I'm assuming the sidebar would have been July 5, which would have probably been at or about the time of the initial jury selection.

The purpose of the letter was simply to confirm what we had told the Court and U.S. Attorney's office at that time, which was that in connection with a motion in limine that the defense had made attempting to keep out of evidence the gory autopsy photos, the Court had indicated that there didn't seem to be much reason to put some of those in unless there was a -- unless the defense was going to contest the nature of the wounds to

the neck.  And so we had told the Court at that time that we would not contest that, and this letter simply confirmed that in writing for the record.

Q.   And in return for not contesting the nature and causation of the wounds, did the Court, in fact, exclude some of these autopsy photos?

A.   My recollection is that most all of them were excluded.  There may have been some that came in but I don't recall for sure.  But my understanding -- my recollection is that most of them were excluded, yes.

Q.   And is it your recollection that the jury was not shown these photos of the victim's neck and the flank areas?

A.   My recollection is that that's true.  I'm not positive but that's my recollection.

Q.   And not to belabor the point, Mr. Hoy, but that indeed is -- am I correct in saying that that is why you were not contesting the nature and causation of the wounds at this particular time?

A.   At the time I wrote the letter?

Q.   Correct.

A.   We weren't contesting the nature of them because we had no other expert that was going to testify contrary to that, and we felt that if we -- we felt that the autopsy photographs of Ms. Sjodin going in would be

much more harmful to the defense than would not contesting the nature of the wounds as described by Dr. McGee.

Q.   And I believe you just said as part of that decision was that you had no expert evidence that would contradict the expected testimony of Dr. McGee at this time.

A.   That's true.

Q.   But you might have been able to develop such evidence under different circumstances?

A.   I don't know how to answer that.  If I had had time to work on that further, I don't know what I could have developed.  But as it was I was busy with the acid phosphatase issue on the last month or two just before trial.

MR. LUBY:  Thank you, Mr. Hoy.  Those are all my questions, and I would move the Court for the admission of Plaintiff's -- excuse me, Petitioner's Exhibits 28 through 53.

THE COURT:  Any objection?

MR. REISENAUER:  No objection.

THE COURT:  Twenty-eight through 53 are received.

MR. REISENAUER:  Your Honor, I have numerous questions of Mr. Hoy and if you give me seven minutes to

get organized I would appreciate that.  And frankly to be honest with the Court I don't know if we're going to finish with him today if we finish at 5 o'clock and I just wanted you and Mr. Hoy to be aware of that mostly because Mr. Hoy has informed us that he's not available tomorrow.

THE COURT:  Well, I have to give the GSA notice that we'll be in this courtroom after 5:15 if that's a possibility and so what we'll do is why don't we take seven minutes and we'll see where we're at at like 4:15 and if we need some help with the GSA we'll let them know then.

MR. REISENAUER:  Thank you.  All right.

THE COURT:  All right.

(Recess taken; 2:52 p.m. to 3:07 p.m.)

THE COURT:  We are back on the record in a case entitled United States versus Rodriguez.  All counsel previously noted are present.  When we broke Mr. Hoy was about to be cross examined by Mr. Reisenauer.

You may proceed, Mr. Reisenauer.

MR. REISENAUER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Mr. Hoy, let's start here.  How long have you --

you're at Ohnstad Twichell Law Firm, correct?

A.   Yes.

Q.   How long have you been there?

A.   January 1, 1991.

Q.   And would it be correct to say that you have been doing both your criminal and civil practice since that time?

A.   Yes.  I did criminal prosecution before that but criminal defense after I went to Ohnstad, yes.

Q.   So you've been basically doing criminal defense for the last 26 or so years?

A.   That sounds right.

Q.   Prior to that you just mentioned that you were a prosecutor, correct?

A.   Yes.

Q.   You were the state's attorney in Cass County here; is that right?

A.   Yes.

Q.   How long were you in that office?

A.   A little over 11 years.

Q.   And so it would be correct to say that you have presented cases and asked juries to find defendants guilty as well as defending individuals and asking juries to find individuals not guilty, correct?

A.   That's true.

Q.   Did you prosecute any murder cases?

A.   Yes.

Q.   Did you prosecute any assault cases?

A.   Yes.

Q.   Did you prosecute any sexual assault cases?

A.   Yes.

Q.   And have you defended those three types of cases as well?

A.   Yes.

Q.   And earlier the term "rape" was used.  Would you agree with me that there can be a sexual assault without penetration of a female's vagina?

A.   Under the law, yes.

Q.   And in this particular case Mr. Rodriguez was charged with kidnapping resulting in death, correct?

A.   Yes.

Q.   And would you agree with me that as far as the guilt of Mr. Rodriguez under that charge there was no burden on the government to prove that Ms. Sjodin was sexually assaulted to the point that there had to be semen found in her vagina or anus and her cervix?

A.   To prove the crime charged, I agree there was no burden to prove that.

Q.   Do you recall the deposition that we took of you previously this year?

A.   Hard to forget.

Q.   Okay.  It was a long day, wasn't it?

Let's talk about your relationship, as counsel did, with Mr. Edward Blake if we could initially here. Counsel put in some exhibits that I'm going to try to not duplicate but pardon me if I do that on a couple.

I'm going to first hand you what's been marked now as Government's Exhibit G.

Gentlemen, this is your discovery 5863 and also Government's Exhibit B which I believe you talked earlier about.

Government's Exhibit G, can you tell us what that appears to be?

A.   Government Exhibit G is a photocopy of my handwritten notes which it looks like I took on July 21st of '04 and maybe also later on July 26, '04.

Q.   Okay.  And then Government's Exhibit B is the letter dated August 23rd of '04 to Mr. Blake; is that correct?

A.   Yes.

Q.   Okay.  Let's talk about G first if we could.  You said these are your notes, correct?

A.   Yes.

Q.   And you provided your notes from your file to counsel for Mr. Rodriguez today?

A.   Sometime after I withdrew, which was after the writ of certiorari was denied, then appointed defense counsel who I think was out of Minneapolis at that time came and got my entire file.  So I haven't seen it since then.

Q.   Okay.

A.   And so these would have been notes that would have been contained in that file, yes.

Q.   Okay.  And this note here you're looking at, does that -- to the best of your recollection does that reflect the first time you talked with Mr. Blake in regard to this particular case?

A.   I believe it is.

Q.   Okay.  And it's dated July 21, '04, correct?

A.   Well, the note at the top of the page on the right says July 21 of '04 and I've got a couple of other notes.  It looks like I was doing some research trying to find somebody that could help us with DNA and I came up with a couple of different alternatives, Mr. Blake at Forensic Science Associates being one of them.  And it looks like on the 26th then down on the left side lower part of the page I would have actually called Dr. Blake and these are notes I would have taken during our phone call.

Q.   Okay.  And so I just want to take you back to the

beginning of this particular case, if you would.  Miss Sjodin was kidnapped in November of 2003 and her body was found in April of 2004.  This note is July of 2004.  And when if you recall, Mr. Hoy, did you become involved in the case?

A.  I was involved twice.  I assume you're referring to after the federal Indictment?

Q.  Well, let's start at the beginning.

A.  Okay.

Q.  Do you recall when you first became involved in the case?

A.  I can't tell you the date that I was first involved but it was before the federal Indictment.  Mr. Rodriguez had been charged in state court in Grand Forks with kidnapping, and the U.S. Attorney's office wanted to convey a plea offer to Mr. Rodriguez and I got appointed by the Court to represent him in connection with that offer.  And that would have been like in February of 2004 is my belief.

Q.  Okay.  And we'll get back to that but between when you were appointed to convey that information to Mr. Rodriguez and when you were later appointed on the -- on this case itself, you I take it had discussions with Mr. Rodriguez about the state court charges and then the conveyance of a potential offer,

would that be correct?

A.   I was appointed by the Federal Court because the offer being made was from the U.S. Attorney's office concerning potential federal charges and the death penalty.  Mr. Rodriguez was at that time represented by Attorney David Dusek out of Grand Forks on the state kidnapping charges that they had brought.  I was not involved in that; although, I talked with him about that and the potential penalties and that sort of thing.

Q.   When you spoke with Mr. Rodriguez about the offer that you referred to, was Mr. Ney involved in the case at that time?

A.   No, he was not.

Q.   When you spoke with Mr. Rodriguez about the offer, was Mr. Dusek, Dave Dusek who was representing him on the state charges, was he a part of that discussion or present?

A.   Yes and no.  Mr. Dusek had been representing him and continued to represent him at that time on the state charges so he had a relationship with Mr. Rodriguez.  I had just been appointed sort of out of the blue and so Mr. Rodriguez did not know who I was.  And I didn't know very much about the case so I contacted Mr. Dusek, got access to his records and files that he'd had, discovery materials if you will that he'd been provided by the

State so I could get up to speed on kind of what the status of things were and what the evidence might be against Mr. Rodriguez.  And then I had Mr. Dusek introduce me to Mr. Rodriguez and I think he accompanied me at least once, if not maybe even a couple times, at the jail when I met with Mr. Rodriguez.  But Mr. Dusek wasn't involved necessarily in the -- in conveying the offer from the U.S. Attorney's office, although he was aware of it because I had to tell him why I was involved.

Q.  And when you met with Mr. Rodriguez in regard to this offer that you referred to, nothing came of that essentially, correct?

A.  That's correct.

Q.  Can you explain what transpired in regard to that particular situation?

A.  Well, in general terms after getting up to speed on reviewing the discovery materials I saw in Mr. Dusek's office about the case and about the early laboratory work that had been done by the North Dakota crime lab, the statements that Mr. Rodriguez had given to investigating officers, their follow-up investigation of his statements, I came to the conclusion that if he were charged in Federal Court that a conviction would likely occur and given his prior record that if the

government wanted to pursue the death penalty that that had to be something that he would take seriously and that there would be a likelihood that that could happen.

I explained to him that under the North Dakota statutes if he plead guilty to or was found guilty of what he was charged with, which was kidnapping, the worst thing that could happen to him under North Dakota state law was a life sentence to the penitentiary. North Dakota did not have the death penalty. Neither did the state of Minnesota. And I conveyed to him that so far the body had not been located. It was wintertime. Spring was coming. The search was continuing. I told him I believed in my opinion it was inevitable that they would find the body at some point. I had no idea where it was but if he knew where it was and it was going to be found in or east of the Red River that he was going to get indicted federally and would face the death penalty. And it would be in his best interest to take the offer that was being made to him, which was tell them where the body was and he would be indicted and would get sentenced to life without parole and not the death penalty.

Q.   And he basically told you that he hadn't been involved and he didn't know where the body was, correct?

A.   In essence, yes.

Q.    Okay.    So eventually Miss Sjodin's body was found in April and there did become a federal Indictment on the charge that I referred to earlier, correct?

A.    Yes.

Q.    And then you in the meantime had I believe withdrawn from your appointment because the discussion that we just talked about did not go anywhere and then after Mr. Rodriguez was indicted the Court appointed you again, correct?

A.    Yes.

Q.    And did Mr. Ney get appointed approximately the same time then?

A.    About the same time.  I think I was allowed input into that decision to some extent and Mr. Ney was appointed shortly after I was involved, yes.

Q.    And as I believe was pointed out earlier, Mr. Ney is known as learned counsel in the area of death penalty cases, correct?

A.    Yes.

Q.    Let's refer then back to Exhibit B and G if we could.  Do you know, do you recall where you got Mr. Blake's name from?

A.    I don't for sure.  I may have done some general searching of my own to try and find DNA experts.  By July Mr. Ney, I believe, was on board.  He may have had

some ideas.  I don't honestly know where I got his name from.

Q.  Okay.  But at least we know from your notes here that you talked to him July 26th.  You had a phone conference and discussed DNA matters, mitochondrial versus nuclear I think you have in a note here, correct?

A.  Yes.

Q.  And to your knowledge had you learned that Mr. Blake was one of the individuals that was very reputable in regard to this area?

A.  My understanding was Dr. Blake was an expert in the area of DNA analysis.  I later found out that he had expertise with acid phosphatase as well but I didn't know that at the time.

Q.  Okay.  And we'll get to that later.

A.  Okay.

Q.  And so Exhibit B indicates that on August 23rd you sent Dr. Blake a letter.  You have that in front of you?

A.  Government Exhibit B, yes.

Q.  And it's three pages, correct?

A.  Yes.

Q.  And within those three pages you enclosed -- you indicate you have enclosed 16 different items; is that correct?

A.    Yes.

Q.    They included affidavits in regard to search warrants, lab numbers one, two, four, five, six, seven, nine, 10, the autopsy protocol, government's discovery photographs, a letter from scientist Steven Fischer to the U.S. Attorney indicating they were going to do some DNA testing, a letter to you from Mr. Wrigley regarding information, and your letter back to him about further DNA testing, correct?

A.    Yes.

Q.    And so your relationship with Dr. Blake continued from then right up until he withdrew on June 20th of 2006, correct?

A.    Yes.

Q.    Now over a period of time here there were many discussions about the consumption of some of these samples that had been obtained and lengthy discussions and eventually a motion pertaining to the consumption of several of the samples, correct?

A.    Yes.

Q.    Okay.  Let's talk about that if we could.  I'm going to hand you, Mr. Hoy, what's been marked as Government's Exhibits H and I (indicating).  If you would review H there, that is a letter to you, correct?

A.    Yes.

Q.   And who's that from?

A.   Mr. Wrigley, U.S. Attorney's office.

Q.   And what does that pertain to?

A.   He's informing me that the BCA lab in Minnesota would do DNA testing on the following samples and then he lists a number of them.  Tells me the testing will be performed in St. Paul by Ann Gross.  It's okay if we send a DNA expert to watch, and the very first paragraph importantly says that they may be consumed during testing.

Q.   And if you would what's the date of that letter, sir?

A.   February 10, 2005.

Q.   And if you could then turn to the other exhibit I provided you.  That's I, I believe; is that correct?

A.   Yes.

Q.   Can you tell us what that is?

A.   Exhibit I is my letter of March 10, 2005 to Dr. Edward Blake regarding this case and I'm conveying to him the information I'm getting from the U.S. Attorney's office about the possible consumption of evidence through DNA testing by their labs and asking him basically for his expertise on whether they need to consume all that, all the evidence, or isn't there a way that it can be divided so we can test it as well, how

would we go about doing that, those kinds of practical issues.

Q.   And do you recall having further discussions with Dr. Blake in that regard by e-mail?

A.   As I sit here, I don't have any recall of that but I'm sure that we did.  This was a significant issue and trying to get evidence that we could test without it all being consumed by the BCA was important to us.

Q.   Let me hand you what I'm going to mark then as Exhibit J (indicating).

Mr. Hoy, can you tell us what Exhibit J is.

A.   Exhibit J is a series of three e-mails that were exchanged on May 27, 2005.  I initially received an e-mail from Dr. Blake with his thoughts on some of the questions I'd posed.  I wrote him back on the same day asking him about the suggestion that the BCA lab may consume the entire sample.  He responded to me and it looks like there's a fourth one at the top I overlooked.  There's four of them actually, four e-mails between Dr. Blake and I.

Q.   If you would, Mr. Hoy, go down to the bottom of the page where Dr. Blake is e-mailing you at 1:22 p.m. on May 27th.  Do you see that?

A.   Yes.

Q.   And if you would just look at the top part of

that e-mail, what does he inform you as to what he believes should be done?

A. He writes, "Dear Bob, I think the best you can hope for at this point is to require that the FBI do the following:

"1. Remove no more than half of any biological deposit.

"2. Document with color photography the appearance of the sampled biological deposits before and after removal.

"3. Provide to you a complete scientifically competent report of all their examinations with appropriate scientific documentation."

Q. And you respond. If you would go then up to the next e-mail you ask, "What do we do when they say their testing will 'consume the entire sample'"? You say, "Again, I suspect we either have to send someone there to observe or reserve our right to critique the cold paperwork that follows." And he responds in the e-mail right above that, what does he tell you?

A. "Again, under the circumstances, the best you can do is get them to document what they do with color photography. If they consume an entire specimen, at least that will be memorialized for potential cross examination. I have serious reservations whether it is

worth the expense to have someone observe what they are going to do no matter what."

Q.   Okay, thank you.   There were further discussions in regard to this subject.   I'm going to hand you what's now been marked as Government's Exhibit K (indicating). If you could tell us what that is, Mr. Hoy.

A.   This is a series of e-mails exchanged between Assistant U.S. Attorney Norm Anderson in your office and myself regarding the testing and the possibility that evidence could be preserved for defense testing or whether it was going to be consumed.

Q.   And this is in regards to what in particular, if you could tell?

A.   Particularly it looks like they're talking about a single dark brown hair that the FBI wanted to do mitochondrial DNA testing on and they expected that it would consume the hair.

Q.   And that particular hair is referred to as Item 73, which was a hair taken from Miss Sjodin's black pea coat, do you recall that?

A.   I don't recall it but it says it here and I think that's accurate.

Q.   Okay.   And Mr. Anderson, he was an AUSA working in our office on this case at the time, correct?

A.   Yes.

Q.   And then, Mr. Hoy, I'm going to hand you what's been marked as Government's Exhibit L (indicating) and, if you can, tell us what that is, please.

A.   Exhibit L is kind of a combination.  It looks like it's an e-mail that I -- a series of e-mails that I exchanged with Dr. Blake.  And I led off with an e-mail to him of October 26, 2005 which I believe I attached -- I misspoke.  That wasn't the first one.

It's a series of e-mails.  It starts out with my letter -- my e-mail to Dr. Blake of October 25, 2005 when I attached for him some -- my e-mail exchange with Mr. Anderson regarding possible consumption by the FBI of the one brown hair from the pea coat and explained to him what the status of it is.  And I also talked about some blood spatter DNA, some of that sort of stuff, and then he responds and we exchange a couple more e-mails back and forth here.

Q.   And you talk about this hair and what -- if you would refer yourself to the front page there.  What does he tell you to do in essence with regard to that, which is the first e-mail at the top?

A.   Dr. Blake gets back to me and says, "Dear Bob, simply ask them to take photomicrographs of the rooted end of the hair, the distal tip, and several representative shots along the shaft of each hair.  The

idea here is to document the appearance of the hair before it is destroyed.

Q. And did you eventually hire another expert in regard to that particular hair itself that was being looked at? Do you recall that?

A. All this happened a long time ago so my current memory's a little fuzzy on some of that stuff. But I believe we did hire a mitochondrial DNA expert to look at that.

Q. And that would have been Dr. Terry Melton; is that correct? Do you recall that?

A. That sounds correct.

Q. And at the time that we took your deposition, Mr. Hoy, I believe your recollection was that, in fact, Dr. Blake directed you to Dr. Melton for that purpose. Do you recall that?

A. I do not but that's entirely possible.

Q. Well, maybe this will jog your memory. I'm going to hand you Government's Exhibit M -- sorry, gentlemen, 5682.

Would you review that, Mr. Hoy?

A. Yes. Looks like a series of e-mails exchanged between Dr. Blake and myself, one of which is near the bottom of the first page, February 6, 2006 e-mail from Dr. Blake. He recommends I contact Dr. Terry Melton for

the hair retesting and mitochondrial DNA review and gives me her e-mail address.

Q.   Okay.  Thank you.  Your relationship continued with Dr. Blake.  I'm going to hand you what's been marked as Government's Exhibit N (indicating).

4359, gentlemen.

And would you take a look at that.  That appears to be a letter from you, correct?

A.   Yes.  February 17, 2006 letter from myself to Dr. Blake.

Q.   And what is that about?

A.   We'd been told by this point that the government's lab work was now complete and I was furnishing him a complete set of all the lab reports and then gave him some background information again about the case to sort of put his work in context if I could and then identified for him some of the DNA evidence and the identifying exhibit numbers or item numbers that he would probably come in contact with in doing his work.

Q.   And this is a three-page letter to him, correct?

A.   Yes.

Q.   And if you would turn to the last page, Mr. Hoy, the first paragraph up there.  What does that say?

A.   "Your assistance is requested in reviewing the DNA testing already performed by the Minnesota BCA Lab,

as well as in performing independent DNA testing of the evidence.  Please advise of the Minnesota BCA Lab documentation you will need, as well as any other materials or information you may require.  I will obtain and forward a Buccal swab from Alfonso Rodriguez, Jr., which you can utilize as a 'known' in your efforts.  I seek your guidance on how a 'known' sample of DNA from Dru Sjodin can be provided.

Thank you for your assistance.  I will look forward to hearing from you."

Q.   And that's dated February 17, 2006.

A.   Yes.

Q.   Mr. Hoy, I'm going to hand you two exhibits, Government's Exhibit O first and then P.  If you would look at O first (indicating).  What is that?

A.   Exhibit O is a letter of April 10, 2006 that I would have sent to Mr. Norm Anderson, Assistant U.S. Attorney here in town, regarding the case and the DNA testing asking -- or telling them who our DNA expert was, namely Mr. Blake, giving them his address and contact information, attached a list of the evidentiary samples that we wished to have them forward to Dr. Blake for testing.

Q.   And that is a three-page letter, correct?

A.   Right.  And on page 2 -- I should say on page 2

and over onto page 3 it's an outline of the documentation that Dr. Blake had requested be provided to him from the BCA lab concerning their work.

Q.   That is what's attached to the letter?

A.   That's pages 2 and part of page 3 of my letter, and then Exhibit A that's attached is a list of the evidentiary samples that we were asking be forwarded to Dr. Blake.

Q.   Okay.  And then if you would turn to the next exhibit there, that's a letter dated the same date, April 10, 2006, to Dr. Blake, correct?

A.   Yes.

Q.   And tell us what you're informing him at that time?

A.   This is another letter to Dr. Blake where I indicate that I've now asked the government to forward the evidentiary samples to him directly, tell them when the trial date is, July 6, 2006, remind him I've provided him various documents and prior letters and correspondence, tell him what I know about the government's DNA testing and refer him to lab reports 1, 27 and 29 which I thought were their -- excuse me, their DNA lab work, told him that if he needed to contact the BCA lab directly to get information feel free to do that, give him a little bit of information about what I

understand the known samples were, tell him that we'll send him a known sample from Mr. Rodriguez for his comparison purposes, ask him to let us know when he's done with his work and we can talk about it and I sent him a voucher.

Q.   Okay.  Government's Exhibit Q, Mr. Hoy, is I believe a response by Mr. Anderson for your request for the samples that you sent; is that correct?

A.   Yes, letter to myself and Mr. Ney from Mr. Anderson at the U.S. Attorney's office indicating some of the basic information about the exhibits that they were going to be sending, both the fiber stuff which was going to go to Terry Melton -- or, excuse me, Mr. Palenik for fiber analysis and also talking about the DNA that there was evidence that they were sending to Dr. Blake.

Q.   Okay.

A.   The mitochondrial DNA that they're sending to Dr. Melton.

Q.   Okay.  Let's talk about those in particular. This letter is dated May 3rd, correct, of 2006?

A.   Yes.

Q.   And this is from Mr. Anderson, correct?

A.   Yes.

Q.   If you turn to the second page, you just

mentioned fiber evidence.  There was some testimony in this particular case in regard to fibers that were located in this case, correct?

A.  Yes.

Q.  And you had hired an expert in regard to that and that would be the individual mentioned on the second page, Mr. Skip Palenik, correct?

A.  Correct.

Q.  Okay.  And we'll get back to Mr. Palenik later. So turn to the third page and at the top of the third page Mr. Anderson refers to the nuclear DNA evidence and indicates that a packet will be sent to Dr. Blake and he lists a number of items, correct?

A.  Yes.

Q.  And on the bottom of that page in a separate heading titled "Mitochondrial DNA," Mr. Anderson indicates that items were to be sent to Dr. Melton?

A.  Correct.

Q.  And then very briefly, Mr. Hoy, this is an item that you provided to counsel.  It's been marked Government's Exhibit R.  Can you tell us what that appears to be?

A.  This appears to be an Evidence Release Form on the letterhead of the Minnesota Department of Public Safety, their crime lab division, and it looks like

they're talking about the item being 0.3A, "manila envelope containing evidence classified as a case packet" that they were sending out to the defense expert and it looks like it's signed by Patti Williams, who I assume is at the BCA lab.  And then in the lower left-hand corner there's indication Edward Blake would be who it was being sent to.  Looks like it's being sent by certified mail and I can't read the bottom of it.

Q.   Okay.  And the date that it was sent is under Miss Williams' signature, May 2nd, '06, correct?

A.   That's the date that's there, yes.

Q.   And, in fact, that's the day before the letter Mr. Anderson wrote to you indicating that items were going to be sent, correct?

A.   Correct.

Q.   And on the third page where we talked about the information being sent or the items sent to Dr. Blake, that is noted as "DNA case packet 0.3A," correct?

A.   Yes, on Exhibit Q.

Q.   And that is the same item number that you were just looking at on this last exhibit.

A.   Exhibit R, that's correct.

Q.   Thank you.  Mr. Hoy, earlier you testified in regard to the acid phosphatase in this particular case and you initially had a discussion with Dr. Blake,

correct?

A.   Yes.

Q.   And I'm going to hand you what's been marked previously as Government's A (indicating).  Do you recall that particular e-mail chain in which you brought that subject up?

A.   Remind me of your question again, please?

Q.   Do you remember this particular chain of e-mails in regard to that subject?

A.   I remember reviewing this again, yes.

Q.   Okay.  And earlier counsel I believe asked you a few questions about it, if you could turn to the second page there.  It would be the second to the last paragraph that starts with the word "with."  Could you read that to us?

A.   "With regard to acid phosphatase in the post-coital vagina the two most knowledgeable individuals (in the world) are myself and Dr. George Sensabaugh.  Sensabaugh's phone number at UC Berkley is" and he provides me the number.  "You have not provided any detailed reports, notes, or anything else concerning the acid phosphatase analysis of the vaginal specimens in your case."

Q.   Okay.  Thank you.  And you thereafter then proceeded to contact Dr. Sensabaugh in regard to the

acid phosphatase question, correct?

A.   That's correct.

Q.   Because Dr. Blake referred this particular issue to him as far as involvement in the acid phosphatase area, correct?

A.   That's correct.

Q.   If you turn to the first page --

A.   Okay.

Q.   Let me ask you this.  When you were dealing with Mr. Blake, did he seem like the temperamental kind of sort?

A.   You could say that, yeah.  He wasn't warm and fuzzy.

Q.   Okay.  You became familiar with the acid phosphatase levels in this particular case that were found in the cervix and the anal region and the vaginal area, correct?

A.   Yes.

Q.   Do you recall a time when you received an e-mail from him where he was basically, these are my words, being snide about those particular measurements?

A.   I don't have a specific recall as I sit here, no.

Q.   Do you recall that he said vaginas and anuses and cervixes weren't measured in units per liter?

A.   Weren't measured in liters, I think.  Yes, I do

remember that.

Q.   You wrote Dr. Blake a letter on June 9th of 2006 and it's marked as Government's Exhibit S, Mr. Hoy (indicating).  Can you tell us what that pertains to?

A.   This is a letter dated June 9 of 2006 that I would have written to Dr. Blake regarding this case. And I was telling him that acid phosphatase issues had arisen in the case and I was hoping to get his expert assistance on that.  I'd read some scientific literature on it and found that he and Dr. Sensabaugh had done a lot of publishing on that topic in the learned journals so I was asking him for his help.

I enclosed a series of documents to him trying to give him an understanding of how the acid phosphatase issues came up, what the quantities were, what Dr. McGee intended to testify to about that.  I don't know if I had a copy of the -- I'd taken Dr. McGee's deposition at that time.  In fact, I think I take it May 31st but I had not yet gotten the hard transcript or e-transcript that I could send him.

Q.   Right.

A.   So I tried to outline for him in general terms what my recollection of Dr. McGee's testimony was about the acid phosphatase and what he was wanting to offer opinions about to try put it into context.

Q.   And --

A.   And solicited his help on those issues.

Q.   So this letter was after the e-mail discussion on June 1st where he told you that him and Dr. Sensabaugh were the two leading people in that particular field, correct?

A.   Yes.

Q.   Okay.  I'm going to hand you Government's Exhibit T (indicating), which is 5632, gentlemen, and if I could, Mr. Hoy, direct you just to the bottom part of the page, the e-mail from Dr. Blake to you.  What is he telling you to do there in regards to this particular issue?

A.   His e-mail to me is dated June 13, 2006, four days after my last letter here, Exhibit S.  What he says is, "Please refer the acid phosphatase issue to Dr. George Sensabaugh."

Q.   Okay.  Thank you.  And, Mr. Hoy, you wrote Dr. Blake another letter on June 15th of 2006.  That's been marked as Government's Exhibit U.  Can you tell us what that was about?

A.   This was a letter June 15, 2006 that I wrote to Dr. Blake.  I enclosed a bunch of documents.

Q.   What documents did you enclose?

A.   I enclosed documents, briefs and affidavits

regarding the defense motion to the Court to dismiss the charges or, alternatively, suppress evidence that was destroyed by the government.  I believe that between the time of my earlier letter to him and this letter of June 15 he had already received the chopped up Q-tips that were sent to him by the BCA lab.  And there was nothing for him to test and he was upset about that, as I was.

And I'd made the motion to suppress and I was sending him both our motion and also the government's response, especially the affidavits from their lab people, Ann Marie Gross and James Dougherty, and then some correspondence back and forth because I wanted him to know the arguments that the government and the Minnesota BCA lab were making, essentially arguing that they needed to consume it all.  And I was hoping that he could respond to that or provide me some assistance on that issue.

Q.  Okay.  And so prior to writing this letter obviously you had filed a Motion to Dismiss the charges or, alternatively, to suppress evidence that had been in your terms destroyed by the government or in the government's terms consumed in testing, correct?

A.  Yes.

Q.  Okay.  And there, in fact, was a hearing in

regard to that and the Court ruled on that motion, correct?

A. Yes.

Q. And earlier counsel I believe showed you the withdrawal letter. Do you have that in front of you?

A. I think I do.

MR. LUBY: It's Exhibit 2.

THE WITNESS: Two or 42?

MR. REISENAUER: What number?

MR. LUBY: I believe it's Petitioner Exhibit 2, the withdrawal letter.

Q. (Mr. Reisenauer continuing) Okay. If you'd take a look at that just very briefly, Mr. Hoy, that -- earlier you said you were surprised at receiving that as well as an e-mail from Dr. Blake at the time that he indicated he was going to withdraw; is that correct?

A. Yes. I was surprised when I received this.

Q. Did you ever receive any type of report from Dr. Blake about any work he may or may not have done from the items that you had provided to him?

A. I don't believe I ever received any report from Dr. Blake.

Q. At the bottom of the second page there, the last paragraph, he says, "Over the next week I will complete the documentation of the BCA DNA typing runs from report

#27 that I had previously started and I will summarize those typing results in a table."

But you never received anything from him as far as your recollection is concerned?

A.   To my recollection I don't think I ever received anything by way of report or summary from Dr. Blake.

Q.   And you provided to counsel about 6300 pages of documents and discovery, correct?

A.   I didn't catch the first part of your question. I provided that to.

Q.   To counsel?

A.   They came and got my entire file, not these counsel but previous counsel came and got my entire file so whatever was in there was taken.

Q.   Okay.  And nothing in that file contained any reports from Dr. Blake as far as you're aware?

A.   Again to my recollection I never received any report or summary from Dr. Blake.

Q.   Okay.  Thank you.

THE COURT:  How much longer do you have, Mr. Reisenauer?

MR. REISENAUER:  Quite a bit, Your Honor.

THE COURT:  Why don't we take another break here.  There are a couple of things that I need to get done before the close of business and then we'll start

again in, say, ten minutes.

MR. REISENAUER:  Thank you.

(Recess taken; 4:10 p.m. to 4:20 p.m.)

THE COURT:  All right.  We're back on the record in a case entitled United States versus Rodriguez.  All counsel of record are present.

Mr. Reisenauer was conducting a cross-examination.  You may continue.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Mr. Hoy, at the bottom of that withdrawal letter on the last page where it's signed, it includes the signature of a gentleman by the name of Alan Keel.  Do you see that?

A.  Petitioner's 2, yes, signed by both Mr. Blake and Alan Keel.

Q.  Did you ever speak with Mr. Keel about this case at all to your recollection?

A.  I don't think I had any substantive conversations.  I may have spoken with him on the phone. No substantive conversation about this to my recollection though.

Q.  Okay.  So following Dr. Blake and his company's withdrawal, then you retained another doctor to help you in regard to this particular matter and the issues of DNA and the consumption as well, correct?

A.   I believe we worked with Dr. Stetler I think out of Kansas.

Q.   Okay.  Let me -- I'm going to hand you three documents, Mr. Hoy, Government's Exhibits V, W and X, and if you could talk about V first.  Can you tell us what that is?

A.   Government Exhibit V is a copy of my handwritten notes from my file, looks like of a phone conference on June 26, 2006 that I had with Dr. Stetler.  He was in Lawrence, Kansas.  My recollection is that when Dr. Blake withdrew on us on June 20th we're within two weeks certainly of starting trial and we need somebody on short notice.  Mr. Ney, I believe, had worked with Mr. Stetler, Dr. Stetler, before and that's how we got ahold of him.  And so I talked with him and apparently told him what I would overnight to him as quickly as I could.

Q.   Okay.  And then if you would turn to Exhibit W.

A.   Exhibit W is a letter are that I send out UPS on June 26, 2006.

Q.   That would be the same day that you had the phone conference with him?

A.   Yes.

Q.   And --

A.   Sending it to Dr. Stetler, giving him a little

bit of information about where the case stood, that we had an evidentiary hearing scheduled for July 14, and enclosing documentation for his review and basically trying to give him what information he needed to begin work and giving him an update on the status of things.

Q.    And you had enclosed lab reports Nos. 1 and 29 together with lab notes and other DNA-related testing information?

A.    Right.

Q.    And then the third exhibit I handed you, what is that?

A.    Government Exhibit X.

Q.    Yes.  Tell us what that is.

A.    This is a letter from Dr. Stetler dated July 19 of 2006.

Q.    And that's written to you, correct?

A.    Yes, it's to me.  I'm just looking at it and in offering his comments on several of the items for DNA testing.

Q.    Correct.  And the items there that he lists are 2, 7, 14, 15, 25 and 26, 54, 73, 74, 75, 76, 79, 81, 82, 83 and 112, correct?

A.    Yes.

Q.    And he reviewed the analysis that had been done on each of those particular items; is that correct?

A.   Yes, as well as offering his thoughts on some of them.

Q.   Then, Mr. Hoy, I'm going to hand you two additional exhibits.  They are Exhibits Y and Z (indicating).  Let's talk about Exhibit Y first.

Those appear to be notes from a conversation you had with Dr. Stetler; is that correct?

A.   It doesn't indicate on here exactly who I was speaking with, but it does appear that I had a couple of different phone calls with someone.  And the topics look like they would be topics that I would be discussing with Dr. Stetler in view of his letter of July 19.

Q.   It talks about the same exhibits that were in his previous letter, correct?

A.   Yes.

Q.   Okay.

A.   Some of them, yup.

Q.   And then if you would turn to the next Exhibit Z, which is a letter also from Dr. Stetler to you, correct?

A.   Correct, dated July 27, 2006.

Q.   And there he reports on his findings on the items that were previously talked about by us from the earlier letter as well, correct?

A.   Yes.

Q.   Do you recall filing this letter with the Court

prior to a suppression hearing in this matter?

A.   I don't have a present recollection of that but in looking at this I see where he indicates that several of the samples could have been divided before testing by the BCA lab so there would have been half of it available for our testing that wasn't done so I wouldn't be surprised if I attached this as part of my motion.

Q.   And you recall filing a suppression motion in regard to that and we discussed that previously, correct?

A.   Yes.

Q.   And I take it you met with Dr. Stetler prior to the suppression hearing?

A.   In general terms, yes.  He was from Kansas.  He had to come up here for the hearing.  I'm sure I would have spoken with him on the phone and would have tried to meet with him here before his testimony, but I don't have a specific recollection of that.

Q.   Okay.  And, Mr. Hoy, let me help your recollection here.  I'm out of order here, I'm sorry, but Government's Exhibit EE appear to be notes of yours, do they?

A.   Yes, they do.

Q.   And those appear to be notes of examination or notes preparing for the suppression hearing; is that

right?

A.   Yes.  This appears to be basically witness outlines that I would have done primarily for Dr. Stetler and also a rough direct exam or maybe my notes of the direct exam of Ann Gross.

Q.   And she testified at the suppression hearing as far as your recollection?

A.   Probably did.  She would have been the BCA examiner that did the DNA.

Q.   Okay.  I'm going to hand you what's been marked as Government's Exhibit AA and that appears to be Dr. Stetler's CV; is that correct?

A.   Yes, that appears to be true.

Q.   Do you recall receiving that from him?

A.   Not really but I would have asked him for one, probably offered it as an exhibit at the hearing.

Q.   Your recollection is he did, in fact, testify at that suppression hearing, correct?

A.   I believe he did, yes.

Q.   Then following the suppression hearing the Court issued its ruling in regard to the motion that we had previously been talking about in regard to the consumption of the samples when they were tested; is that right?

A.   Yes.

Q.   If we could, Mr. Hoy, after you had the conversation with Dr. Blake about the acid phosphatase and the fact that he referred it to Dr. Sensabaugh, you ended up contacting Dr. Sensabaugh, correct?

A.   Yes.

        MR. REISENAUER:  Could I have one second, Your Honor?

        THE COURT:  You may.

Q.   (Mr. Reisenauer continuing)  Mr. Hoy, do you have 47, 48 and 49?

A.   Yes.

Q.   If you would look at 47 first, Mr. Hoy.  Would that have been your initial contact with Dr. Sensabaugh do you believe?

A.   As I indicated this morning, I may have called him first but I don't recall.  And if I would have called him it would have been -- I would have sent this follow-up e-mail directly after that call.  So this is either the first or very nearly the first contact with him, yes.

Q.   Government's Exhibit BB, Mr. Hoy, those appear to be some notes from you; is that correct?

A.   Yes, those are my notes.

Q.   Do they reflect Dr. Sensabaugh's name, correct?

A.   Yes, and phone number at the UC Berkley and also

an e-mail address at UC Berkley and a -- looks like a mailing address at the college as well.

Q.   And there's no date on there however; is that right?

A.   That's correct.

Q.   But would it be fair to say that that's probably the original information you got in regard to contacting him?

A.   Very likely, yes.  I recall the earlier exhibits. I think Dr. Blake gave me contact information.  I forget if he gave me his e-mail address or his phone number.

Q.   Okay.  Government's Exhibit CC, Mr. Hoy, can you tell us if, in fact, those are notes of yours in regard to a discussion with Dr. Sensabaugh?

A.   Exhibit CC are my notes of a phone conversation with Dr. Sensabaugh on June 28 of 2006 regarding acid phosphatase and some of his thoughts and observations based on the information that I had already sent him.

Q.   Okay.  And can you tell us what those thoughts and observations are?

A.   It looks like on the first page I'm writing down my education on acid phosphatase and how it works and p30 testing and the significance and those sorts of things and some of the questions he had about Exhibits 86A, B and C.

Q.   And in regard to Exhibits 86A, B and C, what do your notes indicate?

A.   He was inquiring if the exhibits still exist, thought perhaps you could do DNA testing on that.

Q.   He was wondering if there could be DNA testing on those --

A.   He talks about Y chromosomal testing on those. He also notes that there was no male DNA located on those three exhibits.

Q.   And do you recall if that was the determination in Lab Report No. 27?

A.   Yes, that's true.

Q.   So, in fact, you were able to inform Dr. Sensabaugh that there was testing, in fact, for male DNA on Exhibits 86A, B and C and the results were that there were no male DNA located, correct?

A.   Yes.

Q.   Mr. Hoy, I'm going to hand you what's been marked as Government's Exhibit DD (indicating) and those are additional notes of yours, correct?

A.   Yes, these are my notes.

Q.   And do they reflect a conversation with Dr. Sensabaugh about the fact that there was no male DNA discovered in Report No. 27?

THE COURT:  Hold on just a second.  I want

to make sure we don't have two DDs.

THE WITNESS:  That's what I was just looking at.

THE COURT:  Because I think we had -- the first DD was the call contact information with Dr. Sensabaugh.

THE WITNESS:  I think BB and DD are the same.

THE COURT:  Oh, is that what it is?

MR. REISENAUER:  My fault.  Do we have a DD?

THE CLERK:  I didn't have one.  I have CC as the notes --

THE COURT:  I must have heard DD when you said BB, sorry.

MR. REISENAUER:  That's okay.

Q.  (Mr. Reisenauer continuing)  But Mr. Hoy has BB, which is what we just talked about, correct?

A.  Yes.

Q.  Okay.  Thank you.

THE COURT:  Sorry.  Didn't mean to create a crisis.

Q.  (Mr. Reisenauer continuing)  Mr. Hoy, you recall receiving Regions Hospital lab reports at some point?

A.  Yes.

Q.  And I hand you Government's Exhibit DD if we

could.  This contains three pages.  Can you tell us what those are.

A.  These appear to be -- they call them an interim report from the Regions Hospital in St. Paul and appeared to report acid phosphatase levels on three different locations.  The first page, Government Bates No. 20462, talks about the rectum, government Bates 20463 talks about the vaginal area, and 20464 is the cervical report.  They provide their acid phosphatase levels the way they compute them or calculate them.

Q.  Okay.  And so each one of those pages reflects the testing in a certain area, correct?

A.  Yes.

Q.  Okay.  And the front page is the rectal testing of that swab; is that correct?

A.  Yes, appears to be.  They don't correlate this to what we later know as 86A, B and C, but I think that's what they're testing.

Q.  Okay.  And I just for the record want to make clear that --

A.  The duplicate set.

Q.  I understand what you're saying.  So page 1 is the testing of the rectal swab, correct?

A.  Yes.

Q.  And page 2 is the testing of the vaginal swab?

A.   Yes.

Q.   And then the third page is what?

A.   Cervical swabs.

Q.   And the results of the acid phosphatase testing are listed there, correct?

A.   Yes.

Q.   On each of the three swabs, correct?

A.   Yes.

Q.   And is there any indication in regard to the examination for spermatozoa?

A.   At the third report on each of the three pages, it talks about sperm motility, and on the rectal swabs they say, "No sperm seen."  And that's the same for the second page on the vaginal and also the same for the cervical swabs.

Q.   Okay.  And you received copies of those reports as part of discovery, correct?

A.   Yes.  I think I got this after taking Dr. McGee's deposition.

Q.   Okay.  You were able to provide that information to Dr. Sensabaugh?

A.   I would have been able to provide it to him, yes. I have no recollection if I did or not.  If I didn't provide him the documents, I would have told him what the findings were I believe.

Q.   Okay.   You provided him Lab Report No. 27.   I believe we discussed that earlier, correct?

A.   Yes.

Q.   And you also did provide him Lab Report No. 10; is that correct?

A.   I don't recall.

Q.   Do you have that in front of you?

A.   Do I have what?   Lab Report 10?

Q.   Yes.

A.   I'm sure I do here someplace.   It's Exhibit 28. That's without the lab notes.   Are you looking for the one with the lab notes attached?

Q.   You can't find it?   It's 28 without attached?

A.   Right.   I have that, yes.

Q.   Okay.   That's fine.   My question to you is:   You were aware of Lab Report No. 10 and even bench notes at the time that you had then hired Dr. Sensabaugh, correct?

A.   I had received Lab Report No. 10 and the bench notes prior to working with Dr. Sensabaugh, yes.

Q.   Okay.   And you were aware of those results at the time that you took Dr. McGee's deposition as well, correct?

A.   I would have received the lab reports and the bench notes before I took Dr. McGee's deposition, yes.

MR. LUBY:  If I may object and request that the witness clarify which results from Lab Report 10 we're discussing; that is, whether it's the report itself or the resulting accompanying bench notes.  Could you please clarify whether when the witness speaks of having --

THE REPORTER:  Could you step closer to the mic, please?

MR. LUBY:  I'm sorry.  I would just ask that the witness clarify whether the results of Report 10 that he's discussing concern the result of the report itself as opposed to the results described in the bench notes that were disclosed later.

MR. REISENAUER:  That's fine, Your Honor, if Mr. Hoy can answer that question.

A.  I had received Minnesota BCA Lab Report No. 10 early on in the case and I was aware of the findings there regarding the swabs that we're talking about, Item 86 swabs, that they had not detected the presence of semen on those swabs.  I later got, in probably April or May of -- on May 8th of 2006 or thereabouts, I received a copy of BCA Report No. 10 with the attached lab report -- excuse me, with the attached bench notes I should say.

So I had it, as I indicated, but I was not aware

of the p30 testing that had been done by the BCA lab, which was contained only in the bench notes and was not reported in their main body of their report.  So I was not aware of that at the time that I took Dr. McGee's deposition on May 31st of 2006, nor was I aware that it had been done when I was working with Dr. Sensabaugh.

Q.   (Mr. Reisenauer continuing)  Would you refer back to Government's Exhibit CC, Mr. Hoy, if you would?

A.   I have it.

Q.   And you have three pages of handwritten notes there, correct?

A.   Yes.

Q.   And this was the result of a phone conference with Dr. Sensabaugh on June 28th, correct?

A.   Correct.

Q.   Can you -- and I know we talked briefly about this, but can you tell us your discussion there with him?  You have very extensive notes and so if you would start -- you start there re: Acid phosphatase, correct?

A.   Yes.

Q.   And you discuss with him various aspects of that as well?

A.   Yes.

Q.   And do you indicate there that you have discussed the result of the acid phosphatase and the uses of that?

Do you see that there?

A.   I don't.  Can you tell me which page you're on, please?

Q.   The first page.

A.   Okay.

Q.   You're discussing with him the acceptability of that in regard to the results here.  I believe, in fact, Dr. Sensabaugh -- if you would go down three-fourths down to the bottom of the page there is a note there that starts with the word "no."  Do you see that?

A.   Yes, yup.

Q.   And what does that say?

A.   "No known testing of vaginal swabs from deceased. Therefore, where does the 25 units per liter come from, especially as to deceased victims."

Q.   And then the next line your note says what?

A.   "P30 testing would be more specific and more sensitive."

Q.   And so you're having a discussion with him about whether or not Dr. Sensabaugh's opinion matches Dr. McGee's essentially and it appears to me that you learned that it doesn't.  In fact, he has an opinion as to whether or not this source of acid phosphatase would be correct due to the fact that Miss Sjodin is deceased, would that be correct?

A.   Not exactly.  My interpretation of the notes would have indicated that Dr. Sensabaugh was talking in general terms about the levels that Dr. McGee had called elevated, and what Sensabaugh was saying is that there are studies in living victims but there are no known studies in deceased victims.  So if there are no studies there can be no accepted levels and if there's no accepted levels nobody can legitimately say that some level is elevated.  And that's what he's saying.  That's what my notes, I think, are talking about.

Q.   Turn to the next page if you would, Bob, and there in a box you say "his opinion."

A.   Yes.

Q.   Tell us what he reflected there.

A.   What I've written is, "No reason to believe that acid phosphatase in vaginal vault is any more stable than semen or p30.  All should deteriorate at similar rate over five months outdoors.  Therefore, if sperm had been deposited, there should have been something (resilient sperm heads) should have been present as well.  They weren't.  Result, the acid phosphatase levels found, not corroborated by lack of sperm found, (and contradicted by lack of male DNA found on duplicate swabs?)  There is an alternative explanation for levels of acid phosphatase found in deceased vagina, i.e.

primarily attribute to decay (autolysis of tissues)."

Q.   And he goes on to talk about other classes of acid phosphatase as well, correct?

A.   Correct.

Q.   This is information that he presented at the time of the Daubert hearing, do you recall that?

A.   It would have been evidence that I would have attempted to put on at that time, yes.

Q.   And you recall Dr. Sensabaugh also testified at the trial itself in this particular case; is that correct?

A.   That's true.

Q.   And he similarly would have been asked to provide his opinions about the acid phosphatase levels in this particular case at that time, correct?

A.   I'm sure we had discussions about that, yes.

Q.   I'll direct your attention to the top of that page just briefly.  There you did have a discussion with him about the fact that no male DNA was located on Exhibit 86A through C, correct?

A.   Yes.

Q.   Mr. Hoy, I'm going to now I think offer correctly Government's Exhibit No. DD.  Maybe not.  That's not right.  We'll try that again.  We did an E already.  DD is the Regions Hospital report so I screwed this up.

THE COURT:  I believe we're at double F.

MR. REISENAUER:  I agree.

THE WITNESS:  I think he should have to stop at Z myself.

Q.  (Mr. Reisenauer continuing)  Okay.  Government's Exhibit FF, double F, that is an e-mail; is that right?

A.  Yes.  Looks like there was some exchange of e-mails.  I would have e-mailed Dr. Sensabaugh on June 28th of 2006.

Q.  Is there a number on the top of that page, Bob, that you can read?

A.  Like?

Q.  A very small number?

A.  Right, discovery 6244.

MR. LUBY:  Thank you.

Q.  (Mr. Reisenauer continuing)  And what is that e-mail in regard to?

A.  They're both printed on the same page but they're talking about two different things.

Q.  Is the e-mail from Dr. Sensabaugh?

A.  The note -- or the e-mail's from Dr. Sensabaugh dated Thursday July 6, 2006, says he "looked over the BCA notes and it appears that no male (Y) DNA was present in any of the #86 samples.  It is not clear whether they did a sperm search at BCA and they might be

queried to that effect.  If they did, they might have a little of the aqueous extract remaining from which it might be possible to do a p30 test.  In any case, I am pretty confident that the ACP test finding is an artifact."

Q.  Okay.  So he's recognizing that there is no male DNA.  He may not recognize that the sperm search done by Mr. Fischer resulted in a finding of no semen, but he is questioning again the result of the acid phosphatase in terms of frankly its credibility in regards to Dr. McGee's testimony essentially, correct?

A.  I think that's fair, yes.

Q.  I'm going to hand you then, if I don't screw this up, Exhibit GG (indicating).  And it's three pages but in particular I'm going to direct your attention to page 2 and 3 and it reflects I believe a phone conference you had with Dr. Sensabaugh again, correct?

MR. LUBY:  Mr. Reisenauer, I don't --

MR. REISENAUER:  I'm sorry.

THE WITNESS:  This is Government's discovery 6217 if that helps.

MR. REISENAUER:  Thank you.

MR. LUBY:  Thank you, Mr. Hoy.

A.  Yes.  Page 2 that you've turned me to on Exhibit GG are my notes of a phone call I had with

Dr. Sensabaugh on August 19 of 2006.

Q.    (Mr. Reisenauer continuing)  And what was that in regard to, Mr. Hoy?

A.    In essence I think I was asking him and trying to catalog for myself his opinions about the acid phosphatase testing that was done, the results that were found, their meaning, their significance and what the problems with that were from a scientific standpoint. And this is August 19 of 2006.  We're into trial at this point and I think we're coming up on a Daubert hearing that, if I recall correctly, may have gotten moved a little bit.

Q.    Okay.  Let me direct you to a couple items. There is indication that he says to you, at least reflected in your notes, that the presence of acid phosphatase alone is not definitive of the presence of semen, correct?

A.    Yes.  For seminal fluid, yes.

Q.    And again there is that indication that there was no sperm or male DNA found; is that right?

A.    Yes.  Down in paragraph 2 I've got that, yes.

Q.    And I believe your notes also reflect that any reliance or a reliance on the Regions Hospital acid phosphatase test is -- I believe your word is "misplaced;" is that right?

A.   Yes.

Q.   And I think your note also says that he informs you that Dr. McGee's opinions are not based upon reliable scientific principles in his opinion?

A.   Yes.

Q.   Did you -- strike that.

I'll hand you what's been marked as Government's Exhibit HH, Mr. Hoy (indicating).  That is a letter to you from Dr. Sensabaugh; is that correct?

A.   Yes, dated August 24 of 2006.  I think this is essentially his written report that we had available and used or submitted to the Court at the time of the Daubert hearing.  In fact, I think I've seen it here in one of the other exhibits today.

Q.   Yeah, I think you might have as well.  Let's use that one if we could.  That essentially provides you with his review and opinion.  It's a five-page letter or report; is that correct?

A.   I think I've got four pages.

Q.   Okay.

A.   And, yes, he outlines what he's -- kind of what he's looked at, what the findings are that are reported in his comments, and then his comments and conclusions on that.

Q.   And essentially his conclusions, and I guess I'll

refer you to those conclusions, No. 1, the failure to detect sperm, either cytologically or by the detection of male DNA argues against the presence of semen" despite the acid phosphatase findings, correct?

A.   Yes.

Q.   And the acid phosphatase "levels in post-mortem vaginal samples may be artificially elevated."  Do you see that?

A.   Yes, that's his second point.

Q.   But he does also say that the failure to detect semen is not informative as to whether or not a sexual -- he called it sexual contact occurred, correct?

A.   Yes.

Q.   And he would have been asked to present those conclusions at the Daubert hearing and the trial if your recollection is correct?

A.   I believe that we presented at least points one and two at the Daubert hearing and probably at trial.  I don't believe I would have asked the third point but that may have come up on cross-examination.  I don't know.

Q.   Okay.  But that third point he makes is bolded in his report, correct?

A.   Yes.

Q.   And he says it is "well recognized and needs no

elaboration;" is that right?

A.   That's correct.

Q.   That's what he says, correct?

A.   Yes.

Q.   Mr. Hoy, you put together a chart yourself of the exhibits and lab reports to keep track of what you had received.  Do you recall that?

A.   I believe I did, yes.

Q.   I would hand you what's been marked as Government's Exhibit II, Mr. Hoy (indicating).  Take a look at that if you would.

A.   Yes.  This consists of several pages.  This would have been a summary that I would have generated in my office trying to keep track of the various lab reports and the different evidentiary items given by the different agencies involved and in essence what was tested and what was found.

Q.   And if you would on page 11, Mr. Hoy, of your chart.

A.   Okay.

Q.   If you'd turn to where you have I believe in your chart Minnesota BCA Item 86?

A.   Yes.

Q.   Do you see that?

A.   Yes.

Q.   And can you tell us what you have reflected in the chart in regard to BCA Item 86?

A.   BCA Item 86 I show a description and source being "Vaginal, anal, and cervical swabs said to be from the body of Dru Sjodin."  Key lab report numbers would be 7, 10 and 27 and my notes show at autopsy.  And then that's broken out below in the next three lines as to 86A, 86B and 86C.

Q.   Okay.  And do your notes there acknowledge that there is a finding of no semen?

A.   86A, 86B and 86C all show no semen in my notes and they all also show no male DNA.  I've got references to the page numbers in the discovery materials where I got that information.

Q.   Okay.

THE COURT:  Just a second, we're going to go ahead and adjust the shade right now so we don't blind anybody.

MR. HOY:  I'm not complaining.

THE CLERK:  The one that's not working is the one that's shining in his face.

THE WITNESS:  I'm okay.  I'm good.

MR. REISENAUER:  There's a sign maybe.

Q.   (Mr. Reisenauer continuing)  Earlier, Mr. Hoy, you indicated that you had hired -- as a result of

Dr. Blake's recommendation you had hired a Dr. Terry Melton.  You recall that?

A.  Yes.

Q.  Let's talk about that particular hiring if we could.  I'm going to hand you two exhibits.  They are double J and double K, Mr. Hoy.  Let's look at double J first.  Tell us what that reflects?

A.  (No response.)

Q.  Would the first e-mail be an initial e-mail from you requesting a consult from Dr. Melton?

A.  Yes, giving her just a little bit of information, asking if she would be willing to assist us on this, on the mitochondrial DNA issues.

Q.  And basically you're asking her to do a profile on this hair that was found on Miss Sjodin's coat; is that correct?

A.  Yes.  That would have been the item that we were concerned with, yes.

Q.  And that is also reflected, if you would look at the other exhibit, in that exhibit as well?

A.  I'm sorry, I was reading.  What was the first part of your question?

Q.  That request and item to be sent to her for review is reflected in that second exhibit?

A.  KK?

Q. Yes.

A. Yes. This is sort of a -- some of the same e-mails here that are also present in Exhibit JJ but these are follow-up to that and ultimately she's agreed to help us and we're trying to coordinate how the sample should be delivered to her and those sorts of things.

Q. Okay. And she indicates -- in the first paragraph there on KK, she requests a copy of the case file including chain of custody documentation, bench notes, database searches, standard operating procedures and quality manual and raw DNA data on a disc?

A. Yes.

Q. You would have received her CV I expect, correct?

A. I would have requested that, yes.

Q. Mr. Hoy, I'm going to hand you Government's Exhibits LL and MM. Double L appears to be Dr. Melton's CV; is that correct?

A. That's what it appears to be, yes.

Q. And you learned that, in fact, her specialty was mitochondrial DNA. Would that be fair to say?

A. Yes. That's what she does almost exclusively now I think.

Q. And then the second exhibit there, those are notes of yours again, correct?

A. Yes.

Q.   And what do they entail?

THE COURT:   Is that Exhibit double M?

THE WITNESS:   Yes.

MR. REISENAUER:   Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Is she there, Mr. Hoy, requesting certain materials to be sent to her?

A.   Right.  I was just trying to decide how this got generated.  This is in my handwriting.  They're my handwritten notes.  And some of this information is directly out of her e-mail when she told me what she wanted and how to send it and stuff.  And I'm just wondering if I maybe was in trial or busy with something else and I left this note for one of my staff as to what we needed to get done and what exactly she needed.

Q.   Okay.  And No. 7 there says that the FBI is to send samples, Q7.1 hair, and K5, a saliva sample from Mr. Rodriguez, correct?

A.   Yes.

Q.   Mr. Hoy, I again am going to hand you two exhibits.  First one is Government's Exhibit double N, the second one is double O.  Can you tell us what double N is?

A.   Double N is a letter on my letterhead dated April 5, 2006 directed to Terry Melton, Mitotyping Technologies, regarding this case, giving her a little

bit of information, thanking her for her willingness to help us and talking about the fact we were going to have the -- have the evidence sent directly to her from the FBI Lab and also enclosing a voucher for her services.

Q.   Okay.  The front page of that letter, do you see where the sentence starts with the word "because"?

A.   The last sentence on the first page?

Q.   Well, it's essentially the last paragraph?

A.   I'm sorry, last paragraph on the first page?

Q.   Yup.  Could you read that to us?

A.   "Because the FBI lab will be forwarding the materials directly to your lab, your involvement on behalf of the defense in this case will not be a secret. Nevertheless, we do wish your results to remain confidential with the defense team.  Should you need specific information from the FBI lab, feel free to contact them directly to request what you need.  We ask, however, that your written findings and results remain confidential and reported to Mr. Ney and me at the letterhead address.  Additionally, I intend to have a new buccal swab obtained from Alfonso Rodriguez, Jr., and will have that overnighted to your laboratory for your use.  That seems to be the only way to verify that the prosecution's known sample (K5) has not been contaminated."

Q.   And so similarly as you answered previously today, your wish was to try to keep whatever results you obtained to yourself; is that --

A.   We intended to keep her findings confidential until we made the decision whether to use them at trial.

Q.   And that was the same with all of the experts essentially, correct?

A.   Yes.   I'm holding double O if that helps.

Q.   I'm getting there.   Can you tell us what that is, Mr. Hoy?

A.   It's a letter dated April 5, 2006 on my letterhead to Mr. Norm Anderson regarding this case essentially telling him that we'd like the mitochondrial DNA to be tested by our expert, Terry Melton, giving him the contact information and indicating which items we thought should be sent to her and requesting that they also provide her the documentation that she requested from me.

Q.   Okay.   And again that was Exhibit Q7.1, the hair, correct?

A.   Yes.   And intentionally or not there's another letter, a third page attached.

Q.   Yeah, and let's talk about that.   That was intentional.   That's a letter to Dr. Melton in regard to providing a buccal swab from Mr. Rodriguez, correct?

A.    Correct.

Q.    And do you recall obtaining that and sending that to her?

A.    Yes, we obtained that.  A deputy did it for us at the county jail where he was residing at the time and we forwarded that to her as a known sample.

Q.    And previously we talked about that letter from Mr. Anderson to you indicating that, in fact, he had made arrangements to have certain items and samples sent to the experts that you had hired.  Do you recall that?

A.    Yes.  Dr. Melton was one of them.

Q.    And within that particular letter Mr. Anderson tells you that the following items were identified for submission to Terry Melton, Ph.D., of Mitotyping Technologies.  I take it that's her company; is that correct?

A.    Yes.

Q.    And they were Item 43A1, a known sample of Mr. Rodriguez, as well as the hair, Item 73, which is reflected as FBI Item Q7.1.  Do you recall that?

A.    In essence, yes.

Q.    I'll hand you two more exhibits, Mr. Hoy, double P and double Q.  If you could, could you tell us what double P is?

A.    Double P is a letter on my letterhead dated

May 10 of 2006 to Dr. Melton regarding this case.

Q.   Can you tell us what in particular that you're referring to there or talking about there?

A.   Looks like I'm forwarding to her an FBI disc that I'd received for her use, told her also that the FBI lab had apparently been sent a second hair to be examined but I'd asked them not to withhold any data right away, send whatever they had on the first hair that was tested so she could begin her work.

I also sent her a second disc from the Minnesota BCA lab which talked in part about the FBI photos of Q41.  Q41 is the -- apparently the second or final hair submitted for DNA analysis at the FBI lab.

Q.   Okay.  And then the second letter?

A.   Exhibit QQ is a June 6, 2006 letter to Terry Melton on my stationary regarding this case indicating that I just received additional information from the government and I was sending her a disc with additional information from the FBI lab, Mr. McCurdy.

Q.   Mr. McCurdy was the FBI lab scientist; is that correct?

A.   That was my understanding, yes.

Q.   Do you recall him testifying at the time of the trial?

A.   I honestly don't but he probably did.

Q.   Okay.  I'm going to hand you one more exhibit in regard to Dr. Melton.  It is double R.  And that is a letter to you from Dr. Melton; is that correct?

A.   Yes.

Q.   Does that reflect her review and conclusions of her case review in regard to that particular hair, Q7.1; is that correct?

A.   Yes.

Q.   And she affirms that the chain of custody and analysis with regard to that hair was complete, correct?

A.   I'm having trouble locating that on here.

Q.   It is the last paragraph on the first page of that first sentence of the paragraph.  Would you read that to us?

A.   Oh, there you go.  "Chain of custody documentation appears complete, as well as documentation of the need for the FBI lab to consume the 1.5 centimeter hair."

Q.   And then if you can find -- I should have probably stayed up there, if you can find her conclusions?

A.   I think what you're referring to is the second full paragraph on the second page where it says, "I concur with the final conclusions of the FBI lab, which are that 1) Rodriguez (and any known maternal relatives)

is not excluded as the contributor of the Q7.1 hair, and 2) that Dru Sjodin (and her maternal relatives) are excluded as the contributor of the questioned hair."

Q.   Okay.  Thank you, Mr. Hoy.  And Dr. Melton was not called as a witness at the trial; is that correct?

A.   That's correct.

Q.   Earlier we looked at that letter from Mr. Anderson to you about certain items that were going to be sent.  We just talked about --

A.   Yes.

Q.   And so I want to direct your attention to a company called Microtrace, two gentlemen, somebody named Skip Palenik and Chris Palenik.  Are you familiar with them?

A.   Yes.

Q.   And you retained their services in regard to the fiber evidence in this case; is that correct?

A.   Right.  They were -- have expertise in examination of fibers or comparison of fibers.  I believe they're in the Chicago area.

Q.   Okay.  Do you recall at all, Mr. Hoy, how you came about hiring this company?

A.   I honestly do not.  I had not used them before and I don't know how I located them.

Q.   Okay.  I'm going to hand you two exhibits,

double S and double U (indicating).  And double S is a letter.  Can you tell us about that?

A.   Double S is a letter, discovery 6167.  It's a letter dated February 2, 2006 which I've faxed to Mr. Skip Palenik at Microtrace Scientific in Elgin, Illinois regarding the case.  Apparently I'd already talked to him on the phone.  I was sending him BCA Report on the Examination of Physical Evidence dated January 12 of 2006, obviously dealt with finer comparisons, and I was asking to have them do a comparison for us.

Q.   And you sent him the BCA report in regard to the fibers; is that right?

A.   Right.

Q.   If you would turn to the next exhibit then.  Those are notes of yours, correct?

A.   Yes, they're my handwritten notes or photocopies of them.

Q.   Okay.

        MR. LUBY:  I apologize, Mr. Reisenauer, I don't have the document.

        MR. REISENAUER:  It's 6158, I'm sorry.

        THE REPORTER:  6158?

        MR. REISENAUER:  Yes.

Q.   (Mr. Reisenauer continuing)  Mr. Hoy, those notes

are dated April 4th of 2006, correct?

A.   (No response.)

Q.   I believe it's reflected on the front page.

A.   I was just making sure there weren't other notes but, yes, on the front page it's dated April 4 of 2006.

Q.   Thank you.  And initially your note there says, "Fiber evidence to be sent to Mr. Skip Palenik, Microtrace Scientific," correct?

A.   Yes.

Q.   And then it lists a number of pages of reports; is that right?

A.   Yes.

Q.   And on the second to the last page, could you turn to that?

A.   Second to the last page?

Q.   Yes, second to the last page.

A.   Okay, yes.

Q.   There's again a lengthy list of items that are to be sent, correct?

A.   If we're on the same page, yeah, there's like three lab reports are referenced.

Q.   Yup.  And the page before that is another lengthy list?

A.   Yes.

Q.   And then the last page again you talk about

another lengthy list of items to be sent to Mr. Palenik, correct?

A.   Yes.

Q.   Okay.

A.   Just to clarify, I'm not sure -- I'm not sure I was seeking to send all of those that are listed on the last three pages of this exhibit.  It looks like I may have been trying to figure out for myself what trace evidence there was and which ones we needed to have compared and which we did not.

Q.   Okay.  Maybe we could clarify that.  Mr. Hoy, I'm going to hand you what's been marked as Government's Exhibits double V and double W (indicating).  They're two letters dated the same date, April 6th.  Can you tell us what they refer to?

A.   Double V is a letter on my letterhead dated April 6 of 2006 to Mr. Skip Palenik at Microtrace Scientific, enclosing to him some information about the trial date, the schedule here, but also enclosing him copies of Minnesota BCA lab reports that identify and for the most part they deal with the fiber evidence that had been tested by the Minnesota BCA lab, tell him that the BCA lab will be sending samples directly to him, asking him to report his findings to us and not to others and sending him along a voucher.

Q.   And then the next exhibit, what is that?

A.   Exhibit WW is a letter dated April 6, 2006 on my letterhead to Norm Anderson, assistant U.S. Attorney here, regarding the case and giving him information about who the fibers expert was that we had retained, Mr. Palenik, and asking that the government or the BCA lab forward specific items of evidence on to Mr. Palenik, together with photographs and the other file documents, lab report documents possessed by the Minnesota BCA lab regarding that.

Q.   Okay.  And included in those are the Old Navy P-coat, the pink blouse, and a red blanket, correct?

A.   Yes.

Q.   And then individual evidentiary fibers that are listed on there, a number of those as well, correct?

A.   Yes.

Q.   Mr. Hoy, I'm going to hand you two more exhibits. Double X and double Y, Government's Exhibits (indicating).  The first one is a letter dated May 10th of 2006 I believe also from you; is that correct?

A.   Discovery 6131 and 32.

Q.   That letter is to Mr. Palenik; is that right?

A.   Yes.  Exhibit double X is a May 10, 2006 letter from myself to Mr. Skip Palenik enclosing the Minnesota BCA lab case file documentation for the various lab

reports that I had received in discovery as well as a curriculum vitae for Susan Gross, the Minnesota BCA lab analyst, and to tell him that they were going to be sending, my understanding, slides in the materials directly from the BCA lab at Bemidji directly to him.

Q.   Okay.  And then if you would then turn to the next exhibit.

A.   Exhibit double Y are handwritten notes of my own.

Q.   Okay.  And those are dated July 5th of 2006, correct?

A.   Yes, appear to be a phone conference I had on that date with Mr. Palenik.

Q.   Okay.  And if we could just discuss that, you have in quotes there "big picture" with a colon?

A.   Right.  Would have been -- looking at this it looks like he had already completed his analysis and was sort of giving me his big picture report of what he had found.

Q.   Okay.  And let's just run down through that.  The first line says, "Agree with virtually everything," correct?

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   And then "Susan Gross," quote, very thorough job,

end quote, correct?

A. Yes.

Q. And then as we go down you have asterisks "will issue 2 reports to us on poly fibers and all others"?

A. Correct.

Q. Okay. I'm going to hand you two more exhibits, Mr. Hoy. Now we're going to get into triple letters I guess.

A. I didn't think that was lawful.

Q. It might not be. Government's Exhibit double Z and triple A, and I got the dates backwards so let's go to triple A first.

That is a letter to you dated what date?

A. 8 July 2006.

Q. And that's from?

A. From --

Q. From Microtrace, correct?

A. From Microtrace, yes.

Q. And that is a report pertaining to the red polyester fibers I believe if you look at that?

A. Of the polyester fiber evidence, yes.

Q. And there is indication there that the red polyester fibers are consistent I believe, correct?

A. I was reading his conclusions on the fourth page of his report where it talks about that. They found two

fibers that didn't correlate with the others but most of them I believe did appear to be, I forget the term of art, perhaps of the same origin I think is how they say that.

Q.   All but two are -- were consistent with the polyester fibers of the same origin, correct?

A.   Yes.

Q.   Okay.  And then if you'd turn to the second report there, that is double Z.

A.   Yes.  That's a report from Microtrace directed to me dated 20 July 2006.

Q.   Okay.  And their conclusion there -- if you'd turn to page 6, maybe that will help you.  There is a conclusion there, do you see that, regarding the acrylic fibers?

A.   At the top of page 6, yes.

Q.   And what does that say?

A.   "Together, the infrared and visible spectroscopy as well as fluorescence and microsopical analysis confirm that all of the unknown red acrylic fibers listed in Tables 1, 2 and 3 are consistent with having originated from the red blanket (Item 113).  One caveat to this conclusion is that the BCA sub-categorization of this data into the sub-groups 'red', 'fuchsia' and 'delustrant' is not warranted as differences among

fibers within any BCA designated group can be identified (Table 40."

Q.   Okay.   And then if you would turn your attention to the wool fiber evidence.

A.   Okay.

Q.   And it says this:   "The BCA analysis of the black and blue wool fibers concluded that a total of 5 blue wool fibers and 5 black wool fibers from Item 20 are consistent with having originated from Item 73," the P-coat.   Do you see that?

A.   Yes.

Q.   And then in regard to the blue and black wool fiber, their conclusion is that the unknown blue and black wool fibers listed in Tables 5 and 6 are analytically consistent with the known wool fibers collected from the P-coat, Item 73 --

A.   Yes.

Q.   -- correct?   And then if you'd turn to page 9 of the report, Mr. Hoy.

A.   I'm there.

Q.   They are talking about the pink cotton fibers. Do you see that?

A.   Yes.

Q.   Okay.   And their conclusion is, "The known and unknown pink cotton fibers examined are analytically

indistinguishable from each other based on light microscopic and visible microspectroscopy, suggesting that the pink blouse (Item 74) can not be ruled out as the source of these fibers," correct?  Do you see that?

A.  Yes.

Q.  And they have what they call a "Grand Summary of Conclusions."  Do you see that at the bottom of the page?

A.  I do.

Q.  And it says this:  "Based on our review of BCA reports and our own re-analysis of the fiber evidence we find that our result are in overall agreement with the conclusions drawn by the BCA."  Do you see that?

A.  Yes.

Q.  Okay.  And neither Mr. Skip Palenik nor Chris Palenik were then called at the time of trial, correct?

A.  Correct.

THE COURT:  We need to take a break here but the real question is how much longer do you have?

MR. REISENAUER:  I have, Your Honor, Dr. Peterson's information and I have information pertaining to Mr. Rodriguez himself with Mr. Hoy and Mr. Ney.

THE COURT:  How long do you think that will take?

MR. REISENAUER:  I would say at least an hour, approximately an hour.

THE COURT:  How long will your redirect go?

MR. LUBY:  My philosophy is to redirect as little as possible so it will probably be relatively brief, but I can't say for certain because I haven't heard the entirety of Mr. Reisenauer's cross.

THE COURT:  Can we record it?

THE REPORTER:  No.

THE COURT:  What have you got going tomorrow, Bob?

THE WITNESS:  I've blocked the day off to move my son.  Gotta move him from medical school to Bismarck.

THE COURT:  How long a break do you want?

THE REPORTER:  Twenty minutes.

THE COURT:  We'll take 20.

(Recess taken; 6:00 p.m. to 6:20 p.m.)

THE COURT:  We're back on the record in a case entitled United States of America versus Rodriguez. It's File No. 2:04-cr-55.  The record should reflect that the defendant has waived his appearance.  All counsel are present.  Mr. Hoy is on the stand.

Mr. Reisenauer, you may.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Mr. Hoy, I'm going to hand you three exhibits.  Maybe we can finish up here.  They are triple B, triple C and triple D.  Let's start with triple B.  Does this appear to be some --

A.   Triple B is a copy of my handwritten notes.

Q.   Is there a number on the top there?

A.   I'm sorry, discovery 6013.

Q.   Okay.  And those are notes of yours in regard to contacting Dr. Peterson; is that correct?

A.   Yes.  It looks like I'm trying to locate a pathologist that can help us with this.  Looks like I probably talked to a local attorney here about who is involved in his case.  He gave me the name of Dr. Peterson.  I was familiar with Dr. Peterson by reputation from my prior experience as a prosecutor.

Q.   Okay.  Let me stop you there.  Mr. Henderson gave you Mr. Peterson's name after he was involved in the United States versus Gianakos.  Your notes reflect that, correct?

A.   That's what I think they say, yes.

Q.   Okay.  And then you contacted Dr. Peterson.  You reflect a phone call on July 23rd of '04, correct?

A.   Yes.  And again on July 26 of '04.

Q.   Okay.  And there's a notation on the July 26th conversation that you say, "ok to go."

A.   Yes.

Q.   Okay.  Would that reflect his agreement to work with you on this matter?

A.   Yes.  I talked to him on the 23rd.  He wanted to think it over whether he was willing to be involved and then we spoke again after the weekend and he said he was willing to be involved.

Q.   Okay.  And then if you would turn to the next exhibit there and tell us -- discovery is 4393; is that right?

A.   Yes.  That's Exhibit CCC, my letter July 27, 2004 to Garry Peterson, M.D.

Q.   Okay.  And that contains three pages; is that correct?

A.   Yes.

Q.   And you sent him a number of items that you had received in discovery at that time, correct?

A.   Yes, background information, some of the autopsy documents, autopsy photographs.

Q.   Okay.  And if you would turn to the second page?

A.   Yes.

Q.   You also provide him a list of some questions in general form that you are asking him to consider, correct?

A.   Yes, questions I had after reading the autopsy

report and still had questions.

Q.   Okay.  And some of those questions pertained to the -- what you'd termed earlier the defects.

A.   Yes.

Q.   And what you could learn from the slash wound and the sexual assault examination, correct?

A.   Yes.

Q.   And if you turn to the third page then quickly.

A.   Yes.

Q.   And read that first paragraph to us.

A.   "At this point, I would prefer not to receive any written reports following your evaluation.  Instead, I would prefer a telephone call once you have had an opportunity to assemble your thoughts, so we could be informed of your impressions and decide how best to proceed hereafter.  Naturally, if there is additional information you need or would be desirable, please let me know and we'll do our best to provide it to you."  I'm holding document DDD as well.

Q.   Okay, if you would give me a second.  Can you tell us what DDD is, Mr. Hoy?

A.   Discovery document 6005.  It's the curriculum vitae of Dr. Peterson that he would have furnished to me in connection with his work for us.

Q.   Okay.  Let's turn then, Mr. Hoy, if you would I

believe you already received your notes that you took from your discussion with Dr. Peterson.  They are over here, Exhibit 51, correct?

A.   Yes.

Q.   Let's talk about that.  This discussion you had with Dr. Peterson took place at his home in Minneapolis; is that correct?

A.   Yes.

Q.   That was on April 15th of 2005; is that correct?

A.   Yes.

Q.   And at that time you had provided him with a number of exhibits and discovery reports that he had reviewed I take it, correct?

A.   Yes.  I'd provided -- certainly received the documents that I identified on exhibit triple C and I believe that's all that he had requested so I think that's all that perhaps he had seen.

Q.   And that would have included the autopsy photographs together with also the Final Autopsy Protocol; is that right?

A.   Yes.  And we also sent photographs that were taken at the scene in Polk County.

Q.   Okay.  And is there -- we'll get back to that. You took Dr. McGee's deposition on May 31st of 2006, correct?

A.   Correct.

Q.   And you had been provided some of his conclusions as a result of your discovery request earlier in 2006 as a result of your motion to the Court.  You recall that discussion earlier?

A.   Yes.  And I sent some of that information to Dr. Peterson, Exhibit 52, if that helps.

Q.   And that was subsequently to this -- subsequent to this discussion, correct?

A.   Oh, yes, over a year later almost.

Q.   Okay.  In Dr. McGee's autopsy report, you noted that although it did talk about -- if you could pull that up.  Do you have that in front of you?

A.   The autopsy report?

Q.   Yes.

A.   Yes.  I thought I did.

Q.   And let's just take a look at that.  Earlier you answered questions from Mr. Luby about that.  In 1D it says:  Remnants of a slash wound - neck region."  You recall that?

A.   Yes.

Q.   Okay.  And then as to recent injuries, page 6, it talks about that neck injury again, correct?

A.   Yes.

Q.   And it says, "Remnants of an elongated slash-type

wound can be observed on the anterior surface of the neck region;" is that correct?

A.   Yes.

THE COURT:   Just a second.   I don't believe that we really need any security here so if your shift is up and you're free to leave you are free to leave.

COURT SECURITY OFFICER WYCOR:   They're going to have us at the front door or here.

THE COURT:   Very good.

MR. REISENAUER:   Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)   Mr. Hoy, then let's turn to your notes back again on April 15th of '05.

A.   Exhibit 51.

Q.   Pardon?

A.   Exhibit 51.

Q.   Yes, yes, yes.   So if we could run through those notes.   The first thing up on the top there talks about "Review of Autopsy Report and photos."   Do you see that?

A.   Yes.

Q.   Okay.   And in regards to the -- the notes there, let's turn down to the bottom of the page where it says "neck ligature."

A.   Yes.

Q.   And can you just read your notes there for us?

A.   "Neck ligature - calculate circumference @ 10"

inches plus or minus, not sure. "Pretty small. May have been some neck compression element in this." Three minutes "to unconsciousness if bag is airtight or bag is blindfold only," question mark, "with tear to breathe," question mark, and then I've got an aside, "unknown."

Q. Okay. And just to make sure that the record reflects, Mr. Ney is with you during these conversations with Dr. Peterson, correct?

A. Yes. We met together with Mr. Peterson there by prearrangement.

Q. Okay. Turn to the next page.

A. Yes.

Q. You have an asterisk and again I believe you mentioned this earlier. It says, "Nothing definite to say whether she died from asphyxiation or slashed throat," exclamation point, correct?

A. Yes.

Q. And then you have, I believe you told us this earlier, in quotes "bedding" end quote, "perhaps asphyxiated," correct?

A. Yes.

Q. And you have a question mark in parentheses.

A. Yes.

Q. And then you reviewed with Dr. Peterson a number of photos; is that right?

A.   Yes.

Q.   And those are reflected in your notes as well; is that correct?

A.   Yes.  Some of them are, yup.  I think the photo number that I'm using would have been the number on them in the discovery materials I think.

Q.   Correct.  And the first photo that you mention there is 1182; is that correct?

A.   Yes.

Q.   And your note there says what?

A.   "Shows hole in front of throat area," 'probably' knife."

Q.   And so would these be -- these notes would be as a result of Dr. Peterson telling you his opinion about what may have caused that hole?

A.   Yes.  I'm not -- when I'm taking these notes I'm not trying to get them verbatim unless I, you know, like put in quotations like "betting."  That would have been a term that he used if I had to bet I'd say.

Q.   So in this particular note here you have "probably" in quotes so he --

A.   Yes.

Q.   He said that to you and you put it in quotes, probably a knife.

A.   Yes.

Q.   Okay.  And then the next photo was 1180, is that correct, P-1180?

A.   Yes.

Q.   And if you'd just go to the second note there, what do you reflect there that he has informed you?

A.   "Clearly shows cut of throat area, probably two times.  Much vascular in that area (carotid artery) will bleed to death."

Q.   So Dr. Peterson informed you that this photo 1180 clearly shows "cut of throat area," correct?

A.   Yes.

Q.   "Probably two times."

A.   Yes.

Q.   This was before Dr. McGee had provided you with information about the fact that he thought that the throat was cut two times, correct?

A.   Yes.

Q.   And then if you would turn to the bottom of that page, Mr. Hoy, where you talked to him about photo P-1165.

A.   Yes.

Q.   Tell us what you wrote there?

A.   "Edges of 'cuts'" in quotation "probably also 'gnawed' by animals.  Made bigger in distinct size/shape."

Q.   Okay.   And if you turn the page and if you go to I guess the upper half there where you start out a note with the word "if," do you see that?

A.   Yes.

Q.   Can you read that to us?

A.   "If he had to opine a cause of death, he would say 'incised the neck' but not certain.   Could have been strangulation with ligature."

Q.   You then had a brief discussion with him about the acid phosphatase question.   You see that at the bottom of that page?

A.   Yes, we talked about that.

Q.   And then if you'd turn to the next page, please.

A.   Okay.

Q.   And you go on to discuss two additional photos, 1168 and 1169?

A.   Yes.

Q.   Do you see that?

A.   Yup.

Q.   And can you read your note there right after the colon.

A.   "He suspects some of the vaginal redness may be either a wound or animal activity...wound," question mark.   "Could have been post-mortem - lack of blood," question mark.

Q.   Okay.  And then if you move down to photo 1183.

A.   My note says, "Right flank defect - unknown origin," question mark.  "'Pointy' ends mean probably incised, rounded edges mean possible animal activity.  His opinion is 'incised wound.'"

Q.   And that is of the defect on the right flank, correct?

A.   Yes.

Q.   And you have "incised wound" in quotes, correct?

A.   Yes.

Q.   And that would be a statement from Dr. Peterson; is that correct?

A.   Yes.

Q.   And then you have a note at the bottom of that page, however, there is "no tangible way of determining time of death;" is that right?

A.   Yes.  It goes on to say, "Although, intuitively, close to time of disappearance," but that's at the bottom, yes.

Q.   Okay.  If you turn to the next page then, Mr. Hoy.

A.   Yes.

Q.   In the middle of that page you note, "Opinions to 'Reasonable Medical Certainty.'"  Do you see that?

A.   Yes.

Q.   You have that underlined?

A.   Yes.

Q.   And then underneath there are four listed items. Do you see that?

A.   Yes.

Q.   Okay.  Can you read each one to us?

A.   No. 1 is "throat (2)," the second one is "right flank," third one is "right upper thigh," and the fourth is "perhaps pubis" question mark.  Out to the right I've got a notation that all of those are "all incised wounds."

Q.   "Incised wounds" with an exclamation point, correct?

A.   Yes.  The exclamation point is mine.

Q.   I see that.  Thank you.  And then subsequent -- I believe we heard earlier, subsequent to your receipt of the additional information from Dr. McGee and his deposition, you wrote another letter to Dr. Peterson and I believe that was presented earlier by opposing counsel.  Do you have that in front of you?

A.   I think you're referring to Exhibit 52.  Would have been my letter of May 11, 2006 to Dr. Peterson, which would have been after I got additional expert disclosures from the government but before I had a chance to take his deposition.

Q.   And did you ever receive any written report from Dr. Peterson that you recall, Mr. Hoy?

A.   No.  I don't recall ever receiving one and I don't believe I ever did.  I may have spoken to him by phone after he saw that but I don't recall specifically.

Q.   And you didn't call Dr. Peterson at the time of the trial as a witness, correct?

A.   Correct.

Q.   Let's turn back if we could, Mr. Hoy, to your representation of Mr. Rodriguez.  And you told us earlier that it started sometime in the winter of 2003-2004, correct?

A.   Yes.  I believe probably February 2004 would be my guess.

Q.   And you indicated earlier that you had conversation while he was also still represented by Mr. Dusek when you were appointed by the Court in regards to the attempt to find Miss Sjodin.  Do you recall that?

A.   Yes.

Q.   I'm going to hand you what's been marked, I hope correctly, triple E and are those notes of yours?

A.   Yes, these are handwritten notes of mine.

Q.   Are they 4282?

A.   Yes, that's the first page.

Q.   Okay.   Thank you.

A.   4283 is blacked out so I can't see what's on there.

Q.   Okay.   It's redacted, the second page?

A.   Most of it is, yes.

Q.   Well, let's talk about just the first page.   That was a conversation you had or a conference in the jail with Mr. Rodriguez and Mr. Dusek?

A.   Yes, on February 9 of 2004.

Q.   And, if you could, just read that first notation that you have there for us.

A.   I have in quotations, "I'm not going to admit to doing something I didn't do even if it saves my life."

Q.   And do you recall discussing with him the facts that you had already learned in regard to the case in an effort to try to talk Mr. Rodriguez into providing information about where Miss Sjodin's body was?

A.   If this was the very first time that I spoke with him, I probably did not talk with him about all the details.   It was the first time he'd ever met me.   He didn't know me from Superman and I wanted to try and build some kind of rapport, talk with him a little bit, listen to what he had to say before I started telling him what I thought was important about the case.   So I eventually had that conversation, but I don't think it

was at the first time.

Q.  Okay.  But I believe you told us earlier that you saw it as at least your obligation to advise Mr. Rodriguez on the law in regard to the difference between the state sentencing and the federal possible sentencing and I believe something to the effect that from the reports that you had read earlier you at least at some point told him that in your opinion that he may likely be convicted and possibly receive the death penalty based upon his prior convictions?

A.  I did have that discussion with him on more than one occasion.  I eventually sent him a letter to that effect.  But, again, I don't think I had that discussion with him the very first time that we met.

Q.  Okay.  And at some point though you did end up having a discussion and it was also in regard to providing information to find Miss Sjodin's body?

A.  Yes.  I conveyed the offer that was made.

Q.  And he denied involvement and basically said he didn't know anything about where she was.

A.  Yes.  And that is -- that reference is on the bottom of the second page of Exhibit triple E that's not redacted.

Q.  Can you read that to us?

A.  "I have a problem.  Can't help them.  Don't know

where she is.  Then I can't help you much now."

Q.  Okay.  And do you believe that that was also a note from that same meeting on February 9th?

A.  I don't know the answer to that.

Q.  Okay.

A.  Mr. Reisenauer, as I sit here and look at triple E, at the bottom I did make a note that I told him pretty bluntly that I thought he would be convicted and executed based on the facts that I knew and that's at the bottom of triple E.  So I did have that conversation with him at least to some degree on February 9.

Q.  Okay.  Thank you.  I'm going to hand you what's been marked triple F.  It appears to contain four pages and they appear to be notes of yours; is that correct?

A.  Yes.  These are my -- yes, these are my notes.

Q.  And they reflect the meeting that you had at the jail with Mr. Rodriguez, you and Mr. Ney, on July 15th of 2004; is that correct?

A.  Yes.

Q.  And then let's talk about that for a second.  If you go down past -- there's a part that's redacted again; is that correct?

A.  Yes.

Q.  And just go down below that to -- you have a slash there across the middle of the page.

A.   Yup, I'm with you.

Q.   And can you read that next line to us.

A.   "He didn't want to admit he was with prostitute 'Julie.'"

Q.   Okay.  And can you tell us what information you learned about that statement?

A.   Early on Mr. Rodriguez would tell us that he met this person that he called Julie, was dressed in gothic clothing and that he had a sexual encounter with her at the mall and that that would account for his whereabouts when he was at the mall or in the parking lot.  And that's -- and that's kind of what I was taking a note on there is that he didn't want to admit that he was with her and that's why he was apparently untruthful with the investigators when they asked him about it.

Q.   Okay.  He also initially denied being at the mall in Grand Forks.  Do you recall that?

A.   I think that's true.  Very early on I think that's true.

Q.   Okay.  And then as this discussion with this apparent prostitute came up, he admitted then being at the mall.  Do you recall that?

A.   Yes.  I know that he admitted being at the mall.

Q.   Look at your notes if you would on that page.

A.   Okay.

Q.    After the initial discussion of this prostitute, Julie, the second line it says "1st."  Do you see that?

A.    Right.

Q.    Read that to us.

A.    "1st met her outside mall crying."  She had a problem.  "Talked, exchanged names."

Q.    Okay.  And you go on to have quite a lengthy discussion about this apparent prostitute and Julie and how he told you a story about how her boyfriend beat her up and she was crying.  She had apparently received bleeding in the mouth and so forth.  Do you recall that?

A.    I don't have a specific recollection of it but I recorded that in my notes so I'm sure that's what he told us.

Q.    And it's recorded on that page and much of the next page; is that correct?

A.    Certainly all of the second page of Exhibit triple F, yes.

Q.    Okay.  And then he goes on to try to explain to you that there wasn't enough blood around and the blood around her mouth wasn't sufficient and he talks about why he was in town that day because he had a discussion with his boss and so forth.  Do you see all that?

A.    Yes.

Q.    And he continued at that time to deny that he had

any involvement with the kidnapping of Miss Sjodin, correct?

A.   Correct.

Q.   Mr. Hoy, I'm going to hand you what's been marked as triple G.  It contains two pages reflecting a jail conference on May 17th of 2005; is that correct?

A.   Yes.

Q.   And those are your notes?

A.   Two pages, yes, my notes.  Would have been myself, Richard Ney and our mitigation expert, Ingrid Christianson, would have met with Mr. Rodriguez at that time.

Q.   Okay.  And this was on May 17th, correct?

A.   Of 2005.

Q.   And again you have a discussion with him about, I take it, the evidence and the discovery that you've reviewed; is that right?

A.   Yes.  I think that's kind of how we got into some of the information we were talking about just previously on my notes, Exhibit triple F as well, that we told him there was some things that -- you know, some evidence that we were aware of that we needed his explanation of and that's how we got talking about the prostitute and all the other things.

Q.   And in the middle that page -- and again some of

it's redacted, but in the middle of that page you say, "He now claims to have been at mall after 5 p.m.  Must be on videotape," end quote.

A.  Yes.

Q.  And that's a statement after you guys talked to him about being at the mall or do you recall at all why all of a sudden he admitted being at the mall?

A.  I think the importance of this here is that he was admitting being at the mall after 5 p.m.  I think he admitted being at the mall before that and now he was saying he was there after 5 p.m. and suggesting it had to be on videotape.  Exactly why that came up on that date I don't recall.

Q.  You don't recall?  Okay.  And then the next notation you have on that same front page says what?

A.  I've got it in quotes -- I'm sorry.

Q.  You have it in quotes?

A.  Yeah, it's in quotes.  Essentially what he was telling us, "I wish it was that easy, just plead guilty, but it's not, deep down, I know I didn't do it."

Q.  Turn to the next page.

A.  Yes.

Q.  At this point he didn't admit to having done anything, correct?

A.  Correct.  As far as being responsible for the

kidnapping?  No.

Q.  I take it you and Mr. Ney were having conversations with him about all of the discovery evidence that you had been provided and had been reading through; is that right?

A.  Yes.

Q.  Go in the middle of that page if you would.

A.  On page 2?

Q.  Yes.

A.  Yes.

Q.  And you have a dash and then the first word I think says, "telling"?

A.  Yes.

Q.  Can you read that to us.

A.  "Telling police" he was "@ theater was a lie." We asked him why?  He said, "No alibi."

Q.  He said he had no alibi?

A.  Yup.  "Didn't remember he went to K-Mart to buy cap."  I've got a question mark.  "Also lied to Illeana about locksmith."

Q.  And is it at this point then you have written down, "Now claims he was in the mall after 5:00 p.m."?

A.  Yes.  And I think 5 p.m. was important.  As I recall I think that's when Ms. Sjodin got off her shift and was expected to be leaving the mall at that time.

Q.   Mr. Hoy, I'm going to hand you triple -- hand you Government's Exhibit triple H and it is two pages (indicating).   The second page is fully redacted so we're not going to talk about that but those appear to be notes of yours again, correct?

A.   Yes.   My handwritten notes of the jail conference with Mr. Rodriguez on March 1st of 2006 would have been myself and Mr. Ney meeting with him.

Q.   March 1st of 2006?

A.   Yes.

Q.   And it was just you and Mr. Ney and Mr. Rodriguez?

A.   Yes.

Q.   Okay.   Let's talk about those notes, if we could, from that conference.   You have them -- you have them numbered No. 1, correct?

A.   Yes, I've got sort of a -- yes, one through four sort of an outline format.

Q.   Okay.   Just tell us what No. 1 says.

A.   "No hearing on Friday.   Motions to suppress decided on brief."   We're just updating him on what the status of those motions were.

Q.   Okay.   No. 2, what does that say?

A.   "Recent order on pretrial motions, lost all but 'acquittal' evidence."   And so we were updating him on

the status of the decisions that the Court had made on pending motions.

Q. Okay. And then No. 3, what does that say?

A. "Government's forensic evidence" indented "mitochondrial DNA on his hair found on her body." Next line, "DNA - her blood in his car." Next line is "Fibers - from her clothing in his car and on his clothing," and then, "His blanket is a common fiber."

Q. Okay. And so you're basically discussing evidence that you received lab reports on basically?

A. Yes.

Q. Okay. And then No. 4 is headed "Chances at trial," correct?

A. Yes.

Q. And tell us what it says under that.

A. "Our opinion: Will be conviction - death penalty very possible."

Q. Okay. And then the next line?

A. Next one says, "Offer of plea to life without parole," question mark. And we explained to him that would save his life if it's acceptable -- if it's accepted I should say. But it's also usable in mitigation if it's not accepted and we encouraged him very strongly to consider that to help himself.

Q. Up until this point Mr. Rodriguez had not told

you that he had been involved in this abduction of Miss Sjodin at all, correct?

A.   That's correct.

Q.   And so the next line that you have is an asterisk and what do you write there?

A.   "Finally, he's willing to take a plea, but when asked" he says he "didn't do it."

Q.   And you have "didn't do it" in quotes, correct?

A.   Right.

Q.   And then the next line you have an arrow to what you wrote there and what is that?

A.   "More discussion of need to admit.  Then he's willing to do it."  We explained to him what the Court would require if he was to tender a plea.  In other words he couldn't plead guilty and say he didn't do it at the same time.  After that then he's finally willing to admit the elements to us and wants to accept the plea bargain if we can get it.

Q.   You have written that down, "Finally, he admits elements to us and wants to plea bargain"?

A.   Yes.

Q.   So that's the extent of your notes there, right?

A.   On the first page, yes.  There must have been something on the second page but it's been redacted.

Q.   Okay.  Well, let me ask you a couple of

questions.  Once Mr. Rodriguez, by your terms here, admitted the elements to you and wanted to plea bargain, did he describe to you what he had done?

A.  Not in detail, no.

Q.  Not in detail --

A.  I think that's why I used the term "elements." He was willing to admit that he had kidnapped her and that she had died but that's, you know -- but we didn't get details from him.

Q.  Okay.  So he didn't tell you the story about what happened at this point?

A.  He did not.

Q.  Okay.  Did he tell you how he killed her at this point?

A.  No.  We had -- as I said, we got no details.  He was willing to admit the elements that he had kidnapped her, that she had died.

Q.  Okay.  Did he tell you that he cut her throat?

A.  My recollection is we had no details like that at all.

Q.  Or that he stabbed her in the right side in the flank?

A.  No.

Q.  Nothing, no information about what actually happened, is that what you're telling me?

A.  Correct.

Q.  That was on March 1st of 2006, correct?

A.  Yes.

Q.  Between March 1st of 2006 and the time the trial began, Mr. Hoy, did you have discussions with Mr. Rodriguez about what he had done?

A.  I don't believe that I did, no.

Q.  Do you recall that someone else had a discussion with him about what he had done?

A.  I don't recall that anyone in my presence had those discussions with him to get any details from him. What I'm thinking here is that there came a time where there was going to be a mental evaluation of him.  And I know that Mr. Ney worked with him and our experts regarding that on occasions when I was not present and I don't know whether he ever sought or obtained details from him or not but I'm pretty sure that I never did.

Q.  Okay.  Did you ever -- if you recall, did you ever see any notes reflecting anytime when Mr. Rodriguez informed Mr. Ney or anyone else that was working for you on this case about what he had done?

A.  No.

Q.  So would it be correct to say that to your knowledge you never learned by way of statement from Mr. Rodriguez or from any notes or reports that you have

seen prior to the time of trial of what Mr. Rodriguez had done to Miss Sjodin?

A.  I believe that's true.

Q.  Okay.  Let's move on then.  I believe we talked earlier about a pretrial conference and a motion that you had filed in this case with regard to the autopsy photos.  You recall that discussion earlier today?

A.  Yes.

Q.  And I think there's an exhibit up there reflecting a letter that you wrote to the Court dated July 6th?

A.  It's Exhibit 53.

Q.  Okay.  You got that in front of you?

A.  Yes.

Q.  And let's talk about that if we would.  You have filed a motion to -- a motion in limine regarding autopsy photos in an effort to not have those admitted into evidence, correct?

A.  Yes.

Q.  In this letter dated July 6th, there's two paragraphs to Judge Erickson; is that right?

A.  Yes.

Q.  And if we could it's very brief, why don't you just read it to us, please.

A.  The entire letter?

Q.   Yes.

A.   "Dear Judge Erickson:  At the sidebar conference during yesterday's motion hearing, the Court inquired as to the position of the defense on the issues of the nature and causation of the wounds to the neck and flank of Ms. Sjodin as identified at autopsy.  The Court raised this issue in connection with it's [sic] consideration of Defendant's Motion in Limine regarding autopsy photos.  The Court having indicated that few autopsy photos would be relevant if the nature and causation of these wounds would not be contested at trial.

"After consultation with our client, defense counsel can advise he Court," I misspelled, "and prosecution that the defense does not intend to contest at trial the nature and causation of these wounds as described by Dr. McGee during his deposition.  Specifically, the defense will not contest that the flank wound and the two wounds to the neck were initially made by a sharp instrument.  We trust this narrowing of the contested issues at trial will assist the Court in excluding autopsy photographs as irrelevant, as well as upon the grounds previously articulated in Defendant's Motion in Limine."

Q.   Thank you, Mr. Hoy.  At the beginning of the

second paragraph you say, "After consultation with our client..." that was Mr. Rodriguez, correct?

A. Yes.

Q. So you informed him about this stipulation and he agreed to it; is that correct?

A. One of us or both of us would have had a conversation with him about that. And I note my letter's July 6th. I think we were going to start jury selection on that day so we may have talked to him when he was here at the courthouse about that.

Q. Okay. But in essence to answer my question he was consulted and he agreed to this stipulation.

A. Yes.

Q. Do you recall whether or not at that time he admitted that he had sliced or cut Miss Sjodin's neck?

A. My recollection is that there was no discussion about that.

Q. Okay. It was just a discussion about whether he would agree to the stipulation?

A. Yes.

Q. And so this was part of your trial strategy in terms of keeping out the autopsy photos; is that correct?

A. That's correct.

Q. Was it also obviously with the knowledge of

Dr. Peterson's opinion about the prior conversation you had with him about the neck being cut?

A.   We certainly took that into account when we realized there was nothing we could do to contest Dr. McGee's opinions on that.

MR. REISENAUER:  Okay.  Thank you.  Your Honor, I apologize for the length of time but that's all I have.

THE COURT:  Mr. Luby?

MR. LUBY:  Your Honor, with the Court's indulgence if I could just have a few minutes to confer with my colleagues here?

THE COURT:  You may.

MR. LUBY:  Thank you.

MR. REISENAUER:  Your Honor, while -- never mind.  I was going to offer all the exhibits that I drug up there.

(Off the record.)

(Defense counsel exits the courtroom and returns.)

THE COURT:  All right.  We're back on the record.

MR. LUBY:  And, Your Honor, we have no redirect.

THE COURT:  Well, we will stand adjourned at

this point.  You may step down, Mr. Hoy.  Do we have some sense about what we have tomorrow?

MR. ABREU:  We do, Your Honor.  We have Dr. Peterson who is here an extra night ready to go tomorrow morning and we have one Mr. Fischer who is scheduled to arrive sometime during Dr. Peterson's testimony and prepared to go right after that.  And that's what we have for tomorrow.

THE COURT:  All right.  Does the government at this point anticipate calling any witnesses?

MR. REISENAUER:  Not at this point, Your Honor.  And I think Dr. Peterson and Mr. Fischer will not last anywhere near almost any of our witnesses.

MR. ABREU:  That's correct.

THE COURT:  9:00?

MR. ABREU:  Sure, Your Honor.  Whatever the Court wants is fine.

THE COURT:  We'll start tomorrow morning at 9 o'clock.  Thank you very much.

MR. ABREU:  Thank you, Your Honor.

(Adjourned at 7:15 p.m.)

**CERTIFICATE OF REPORTER**

I, Kelly A. Kroke, a duly appointed Registered Professional Reporter;

DO HEREBY CERTIFY that I reported in shorthand the foregoing proceedings had and made a record at the time and place indicated.

I DO HEREBY FURTHER CERTIFY that the foregoing and attached (212) typewritten pages contain an accurate partial transcript of my shorthand notes then and there taken.

Dated this 5th day of September, 2017.

/s/ Kelly A. Kroke
KELLY A. KROKE - RPR, RMR
United States District Court Reporter
District of North Dakota
Southeastern Division