**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                                )
United States of America,       )
                                )
   Plaintiff/Respondent,    )
                                )
       vs.                )   **FILE NO. 2:04-cr-55**
                                )                **2:11-cv-88**
Alfonso Rodriguez, Jr.,         )
                                )
   Defendant/Petitioner.    )
                                )
- - - - - - - - - - - - - - - -


**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**EVIDENTIARY HEARING - JUNE 20, 2017**

**Pages 1-191**


HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
       655 FIRST AVENUE NORTH
       FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

**A P P E A R A N C E S**

**KEITH W. REISENAUER        COUNSEL FOR PLAINTIFF/RESPONDENT;**
**MELISSA H. BURKLAND**
Office of United States Attorney
655 1st Avenue North, Ste. 250
Fargo, ND  58102

**ERIC J. MONTROY          COUNSEL FOR DEFENDANT/PETITIONER;**
**VICTOR J. ABREU**
**JOSEPH W. LUBY**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

**I N D E X**

**W I T N E S S E S**

**DEFENDANT/PETITIONER'S:**                                    **PAGE NO.**

**CHARLES A. KEEL**

Direct Examination by Mr. Luby                                    7
Cross-Examination by Mr. Reisenauer                             43
Redirect Examination by Mr. Luby                               65
Recross-Examination by Mr. Reisenauer                          72
Redirect Examination by Mr. Luby                               75
Recross-Examination by Mr. Reisenauer                          76

**MARK FLOMENBAUM**

Direct Examination by Mr. Montroy                              79
Cross-Examination by Mr. Reisenauer                            153
Redirect Examination by Mr. Montroy                            183

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Petitioner's 1 | Curriculum Vitae of Charles A. Keel | 42 | 43 |
| Petitioner's 2 | Withdrawal Letter of FSA to Mr. Hoy | 42 | 43 |
| Petitioner's 3 | Review Report of Charles A. Keel | 42 | 43 |
| Petitioner's 4 | Report No. 10 - Steven Fischer's Report and Attachments | 42 | 43 |
| Petitioner's 5 | Report No. 5 - MN BCA (Steven Fischer) Dated 1/28/04 | 42 | 43 |
| Petitioner's 6 | Semen/Saliva Summary | 42 | 43 |
| Petitioner's 7 | Report No. 27 - MN BCA (Ann Marie Gross) Dated 12/19/05 | 42 | 43 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
| --- | --- | --- | --- |
| Petitioner's 8 | Semen/Saliva Summary Dated 11/22/05 | 42 | 43 |
| Petitioner's 9 | Curriculum Vitae of Mark A. Flomenbaum, MD | 152 | 152 |
| Petitioner's 10 | Report of Mark A. Flomenbaum to Joseph Margulies Dated 9/14/11 | 152 | 152 |
| Petitioner's 11 | Addendum Report of Mark A. Flomenbaum Dated 12/2/16 | 152 | 152 |
| Petitioner's 12 | Autopsy Photograph | 152 | 152 |
| Petitioner's 13 | Photograph | 152 | 152 |
| Petitioner's 14 | Photograph | 152 | 152 |
| Petitioner's 15 | Provisional Autopsy Report of Michael B. McGee Dated April 2004 | 152 | 152 |
| Petitioner's 16 | Final Autopsy Protocol of Michael B. McGee | 152 | 152 |
| Petitioner's 17 | Photograph of Knife | 152 | 152 |
| Petitioner's 18 | Photograph of Right Flank Defect | 152 | 152 |
| Government's A | E-mail Correspondence Between Edward T. Blake and Robert G. Hoy | 51 | 52 |
| Government's B | Letter from Robert G. Hoy to Edward T. Blake Dated 8/23/04 | 77 | 78 |

**P R O C E E D I N G S**

(June 20, 2017:  The following proceedings commenced at 9:00 a.m.:)

THE COURT:  Good morning.  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez, Jr.  The record should reflect that Mr. Rodriguez has waived his right to appear at this hearing.  That's at Document No. 1048 which was filed on June 14th.

Mr. Abreu, if you would note your appearance for the record and identify each one of Mr. Rodriguez's counsel who appears, I'd appreciate it.

MR. ABREU:  Yes.  Good morning, Your Honor, Victor Abreu, A-b-r-e-u, on behalf of Mr. Rodriguez. Thank you, Your Honor.  Also with me today is Joseph Luby to my left and Eric Montroy.  Your Honor, and if I may, LaToya Hampton is sitting to the right.  She's a paralegal and will be helping assist us with documents today.

THE COURT:  Mr. Reisenauer, if you would like to note your appearance and who else is at counsel table.

MR. REISENAUER:  Thank you, Your Honor. Good morning.  Keith Reisenauer for the United States. With me this morning is Melissa Burkland, also an AUSA

in our office, and Michelle Myer, who is our paralegal specialist on the case.

THE COURT:  Thank you.  This is the time and place for a continuing hearing on the 2255 petition of the defendant.

Mr. Abreu, does the defendant wish to make an opening statement?

MR. ABREU:  Not at this time, Your Honor.

THE COURT:  All right.  Mr. Reisenauer, does the government wish to present an opening statement?

MR. REISENAUER:  No, Your Honor.  We'll waive that this morning.

THE COURT:  Thank you.  Mr. Abreu, you may call your first witness.

MR. ABREU:  Your Honor, Mr. Luby will be presenting the first witness.

THE COURT:  Okay.

MR. LUBY:  Petitioner calls Alan Keel.

THE COURT:  Could you come forward, stand before the clerk, state your full name and spell your name as well, please.

(Oath administered.)

THE CLERK:  Thank you.  Would you state your full name, please.

MR. KEEL:  Charles Alan, A-l-a-n, Keel,

K-e-e-l.

MR. LUBY:  Your Honor, is it acceptable if we examine the witness from counsel table?

THE COURT:  That is fine as long as you stay close enough to the microphone that it gets picked up.

MR. LUBY:  Thank you.

THE COURT:  And if you wonder, I don't care whether you sit or stand.  Either is fine with me.

MR. ABREU:  Thank you, Your Honor.

**CHARLES A. KEEL,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. LUBY:**

Q.  Good morning, Mr. Keel.

A.  Good morning.

Q.  How are you employed, sir?

A.  I'm a forensic scientist at Forensic Analytical Sciences in Hayward, California.

Q.  And what are your responsibilities there?

A.  I supervise the forensic biology and DNA analysis unit, and I am the DNA technical lead analyst pursuant to the 1994 DNA Identification Act.

Q.  And how long have you been employed in that capacity, Mr. Keel?

A.   Since about July of 2011.

Q.   Over the course of your career, what other positions have you held in the same field?

A.   I began my career in 1982 with the North Louisiana Crime Laboratory in Shreveport, Louisiana, which was a crime lab that serviced the 23 northernmost parishes of the state.

In regard to law enforcement, I worked for about nine and a half years with the Oakland, California Police Department Crime Laboratory until 1993.  I worked very briefly with the Tulsa, Oklahoma Police Department Crime Laboratory before taking a position with the San Francisco Police Department Crime Laboratory in 1996.

Then in 1999 I went into private practice with Forensic Science Associates in Richmond, California and I worked there until that laboratory merged with Forensic Analytical Sciences where I am employed today.

Q.   And in your work with Forensic Analytical Sciences, how much of your work focuses on criminal cases as opposed to civil cases?

A.   I would say 90 percent of our work is criminal in nature.

Q.   And have you testified in other death penalty cases before?

A.   Yes.

Q.   And on how many occasions?

A.   I would say at least seven or eight times.

Q.   And on how many of those occasions was that for the prosecution?

A.   I believe they were all for the prosecution.

Q.   Over the course of your career, Mr. Keel, how many times have you testified in court in the area of forensic serology and DNA testing?

A.   Over 70 times in over -- in 17 different states and the District of Columbia.

Q.   And can you tell us a little bit about your educational background, please.

A.   Yes.  I have a Bachelor of Science degree in zoology from Texas A & M University.  I have approximately 23 credits towards a Master's degree in human food science and human physiology also at Texas A & M University, and I have three graduate credits in nucleic acid biochemistry from the University of California at Berkley.

MR. LUBY:  Your Honor, may I approach the witness?

THE COURT:  You may.

MR. LUBY:  For the record I'm handing the witness what's been marked as Petitioner's Exhibit 1 (indicating).

Q.   (Mr. Luby continuing)  Is this your Curriculum Vitae, Mr. Keel?

A.   Yes, it is.  It's been revised, updated a little since, but this is effectively my resume.

Q.   And can you tell us what's different about your qualifications now than when this document was produced?

A.   Oh, nothing in regard to qualifications.  There have just been some presentations that have been added since January of 2016.

Q.   Mr. Keel, just a few general questions if I may about the science involved in detecting semen from biological samples.  Can you outline for us the general methods or tests by which serology experts try to detect the presence of semen from a biological standpoint?

A.   Of course.  It depends upon the nature of the specimen but typically if we are examining a large item, such as a garment or a bed sheet or, you know, that sort of thing, we would begin by a visual examination for visible stains.  And then we would likely move to a visual examination with filtered light or using an instrument referred to as an alternate light source to narrow the scope of those visible stains to ones that fluoresced, which means they might hold proteinaceous material and there might be semen in those stains.

And then we would test interesting stains

for presence of an enzyme called acid phosphatase, which is found in high concentrations in semen.  And upon finding detectable acid phosphatase activity, we would then likely sample those stains and look for sperm.

Q.   And of the methods that you've just described, which one is the most definitive for detecting semen?

A.   Really the only one that is proof of the presence of semen is the microscopic observation of sperm.  Given the presence of an elevated amount of acid phosphatase and the absence of sperm, we might then also use another test called p30 or PSA, prostate-specific antigen, which is an immunological test.  And depending upon those results we might then also look for the presence of male DNA to help us determine or to establish whether or not there might be semen present in the absence of sperm or aspermic semen from a vasectomized semen donor.

Q.   For what reasons might a sample end up testing positive for semen if there are no sperm present? You've mentioned the possibility of an aspermic donor. Are there any other possibilities?

A.   Of having an elevated acid phosphatase activity?

Q.   No, sir.  Under what circumstances can a -- might a biological sample contain semen but not have detectable sperm cells?

A.   Well, you would simply have a person who is not

capable of producing sperm or you would have a person who has been vasectomized.

Q. Can you please explain the process by which an examiner would search a sample microscopically for the presence of sperm cells?

A. Anytime that I have a specimen that has been collected onto a swab, I'm going to examine that specimen microscopically for sperm cells. If it is a stain, I would likely restrict my search of the particular debris from stains to those that gave me a presumptive indication of the presence of semen, either a strong fluorescence or a detectable level of acid phosphatase or, if it had been employed, a detectable level of p30.

Q. Mr. Keel, you're aware that this case involves samples taken from somebody who was already deceased at the time. How long generally speaking do sperm cells persist in the vagina of a living person as compared to a deceased person?

A. Well, sperm can persist -- just a few sperm cells can persist in the vagina of a living person anywhere from -- for three to five days. I mean, that simply means that one might observe a sperm or two. It doesn't mean that there would be sufficient semen to basically do any kind of genetic analysis with that semen.

Q.   And why is that?

A.   Simply because there would not be enough sperm cells that you could isolate to get enough male DNA.

Q.   And, Mr. Keel, what exactly can you tell us are nucleated epithelial cells?

A.   Nucleated epithelial cells are the cells that line the surfaces of the body cavity such as the vagina, the mouth, the nasal passages, the rectum.  Any body cavity that is basically kept wet is lined with nucleated epithelial cells, and those cells are sloughed to a certain extent into the fluid that keeps those body cavities moist.

Q.   What is the significance of the presence or absence of nucleated epithelial cells from a sample in which sperm are searched for?

A.   Well, sperm are very tough, hearty cells so if one is able to recover intact nucleated epithelial cells then one would certainly expect to recover intact sperm that were also commingled in that body orifice.

Q.   And you've mentioned earlier in your testimony the possibility of testing a sample for the presence of male DNA.  What is the purpose of that testing?

A.   The purpose of testing samples collected from body orifices for male DNA is to attempt to establish whose male DNA that might be, whether it's coming from

semen or some other body fluid.

Q. And how does one go about testing for male DNA in a sample?

A. Are we talking about a body orifice specimen where we're looking for semen?

Q. Yes.

A. Well, the first thing we would do is to attempt to isolate the sperm cells to recover as concentrated or as pure an amount of male DNA as possible. Because typically of the overwhelming amount of female DNA that is associated with these specimens, and because sperm cells are much -- a much tougher cell just by nature, we are able to digest away all of the nonsperm cells or all of the female epithelial cells and isolate sperm through centrifugation. And so in that way we can produce a male-rich sperm fraction is what it's referred to and then be able to concentrate male DNA from those sperm and then exploit it genetically through DNA testing.

Q. You mentioned earlier, Mr. Keel, the concept of p30 testing, and could you please explain for the Court what p30 is?

A. Certainly. P30 is a molecule, an enzyme that's present in very high concentrations in the seminal fluid fraction of semen. Semen is sperm and seminal fluid, and most of the seminal fluid comes from the prostate

gland and that fluid is very rich in a protein, an enzyme called p30 or prostate-specific antigen.  And because that enzyme is present -- or that protein is present in such high concentrations in seminal fluid, we can use it as well as a presumptive indicator for the presence of semen.

Q.   And how definitive is a p30 test result for the presence of semen as compared to the detection of sperm cells or a positive acid phosphatase test?

A.   Well, because p30 is also found in other body fluids and also in female body fluid.  It is not specific to men.  It is not even specific to semen.  So it must be considered a presumptive test as well.  There are instances such as when you do not have sperm.  You have an aspermic semen source and you have an overwhelming amount of acid phosphatase activity and a lot of p30 activity and you have male DNA, then you can use dilutions of p30 to determine whether or not you have enough p30 in your sample such that that amount of p30 could exist no where else in nature other than in semen and use that to not necessarily prove but certainly indicate that the results you're getting from the male DNA is likely attributable to semen.

Q.   And is p30 then a more definitive test than acid phosphatase?

A.   Oh, of course.

Q.   And why is that?

A.   Well, for several reasons.  Acid phosphatase is an enzyme that is present in every cell in your body.  It's present in all of the vaginal epithelial cells that line the vagina so there is an endogenous level of acid phosphatase within the vaginal vault that can give a presumptive indication of the presence of semen.

Also p30 is detected immunologically such that it is a much more stable source or a much more stable enzyme than p30.  And again it's basically due to the fact that endogenous levels of p30 in the female are extremely low and once we have a sample and we attempt to recover the p30 from that sample our extraction efficiency is relatively low such that when we detect p30 even though it's a presumptive indication it's unlikely that p30 that we are detecting is coming from a female source.

MR. LUBY:  Thank you, Mr. Keel.  And before I move on to some questions about acid phosphatase, it occurs to me that I neglected to offer Mr. Keel as an expert, which I do at this time?

MR. REISENAUER:  We have no objection, Your Honor.  We also have no objection to the CV exhibit if that's being offered.

MR. LUBY:  I was just going to wait till the end to offer the exhibits.

THE COURT:  He may testify as an expert and I'm not quite sure whether 1 has been offered, has it?

MR. LUBY:  It has not yet, Your Honor.

THE COURT:  Very good.

Q.  (Mr. Luby continuing)  As I said, Mr. Keel, a few questions -- more general questions about acid phosphatase.  You've discussed it before.  Can you tell us exactly what acid phosphatase is?

A.  Yes.  Acid phosphatase is an enzyme that's -- are we going to focus specifically on ACP3 or the acid phosphatase that's typically associated with semen and vaginal fluid as opposed to red cell acid phosphatase or nonprostatic acid phosphatase?

Q.  Well, generally I was talking about the kind of acid phosphatase that we're discussing within the context of testing a sample for semen.

A.  Okay.

Q.  But if you think it would aid the Court's understanding to talk about and define and describe other types of acid phosphatase, then please.

A.  Well, I mean, they're both relevant in the context of this case because of the particular assay that was done.  Obviously there are acid phosphatases

such as the red cell acid phosphatases that are present in your red blood cells, and those are considered nonprostatic acid phosphatases.  And we used to use that acid phosphatase to help us characterize blood stains because there's a lot of red cell acid phosphatase in blood and it's polymorphic so we could discriminate people using that particular acid phosphatase.  But that technology is now basically obsolete in light of DNA testing.

The other acid phosphatases that are interesting are the prostatic -- what's called prostatic acid phosphatase.  It's an acid phosphatase molecule enzyme that's on chromosome No. 3 and its job is to produce free phosphate for living cells from which to produce energy.  So it's a very important enzyme. Without it we wouldn't be able to produce energy nearly as efficiently at the cellular level.  And so that is the acid phosphatase that's present in semen, and that's of forensic use in regards to sexual assault investigations.

There's also other nonprostatic acid phosphatases that are held within the lysosomes of every cell and those acid phosphatases basically do the same job when they're needed to produce energy.

Q.  Mr. Keel, are you familiar with a type of testing

called BCIP?

A.   Yes.

Q.   And can you please tell us what that is.

A.   That's a test for acid phosphatase activity. It's simply using a different substrate. Methodologically it's a different way of testing for the same enzyme activity.

Q.   And other than BCIP what other methods or tests do laboratories use in order to assess an acid phosphatase level from an orifice sample?

A.   Well, the other test is simply referred to as an acid phosphatase test.  The BCIP, that's basically the initials of the substrate that's being used to produce a colored product.  And then the acid phosphatase activity is a different substrate which produces a different colored product.  So basically they're the same test. They're just done differently.  And the difference is that in the acid phosphatase test one normally takes a small cutting or a swab and tests the cutting or the swab directly and looks for color change.  Whereas, the BCIP test one produces a dilute -- a liquid form of the test and looks for a color change in that way.

Q.   When we speak of an acid phosphatase result being presumptive for semen, what does that mean?

A.   Well, as I stated earlier acid phosphatase exists

in virtually every cell in your body.  It also exists in bacteria and in other animal tissues and also some commercial products such as some feminine hygiene products will produce an acid phosphatase-like result. So because it's not specific to semen, it has to be getting -- a positive result is a presumptive indication, not proof of the presence of semen.

Q.  And is that also true when the sample is taken from a deceased body as opposed to a living one?

A.  Of course.  Except one would need to be more cautious because there's likely to be a more elevated level of acid phosphatase from a deceased individual because of the proliferation of bacteria and because as one dies the body begins to basically dump acid phosphatases to try to generate more energy to keep the cell alive.

Q.  And that dumping process is what we refer to as lysosomal acid phosphatase?

A.  That certainly is another source of acid phosphatase activity, yes.  But simply the production of acid phosphatase and then the -- basically it's called dumping.  The making of acid phosphatase available for the production of energy simply increases as one dies.

Q.  So acid phosphatase and p30 are both proteins?

A.  Yes.

Q.    And as between the two of them, which is heartier and tends to hold up better under the conditions of postmortem decay that you've been talking about this morning?

A.    Well, really irrespective of the conditions but certainly postmortem decay would increase the rate at which both of these proteins were degraded.  But acid phosphatase is detected by its activity, by the work that it does.  And so we detect its activity by looking for its product.  And once a protein or an enzyme is subjected to environmental insult then its shape -- it loses its secondary and tertiary shape and it needs that shape in order to do its job.  So once it more or less loses that shape it can no longer do its job.  So then we would not be able to detect it.

Whereas, p30 is also a protein and an enzyme but it's not detected by the job that it does, by the product that it produces.  It's detected antigenically with an antibody so it's not -- the detection of that protein is not dependent upon its secondary and tertiary structure.  It's simply dependent upon the antibody being able to recognize a particular site on that molecule, and those sites aren't degraded unless the entire molecule is cut up into pieces.  And so we can detect p30 much longer than we can detect acid

phosphatase under the same insults.

Q.   You've testified earlier this morning that sperm cells are likelier to survive these kinds of postmortem insults for a longer time than nucleated epithelial cells?

A.   Absolutely.

Q.   Can you explain why that is.

A.   That's so that our species will survive. Basically sperm cells have a tough row to hoe.  They have a long way to go from -- after ejaculation to fertilize an egg, and there's lots of things trying to prevent them from doing that.  So they are endowed with a very tough cellular membrane so that environmental insults that will lyse or destroy a normal nucleated cell will not have the same effect on sperm.  They're much tougher.  They'll survive much more difficult environmental insults than an ordinary cell.  That's why we're able to -- and we're able to exploit that process to isolate them from other cells by literally insulting all the other cells to the point that they're gone and the sperm cells survive.  And we do that in the laboratory.  There's no reason that's not going to happen in nature or in the vaginal vault or wherever these cell types are commingled.

Q.   And as a serology expert, Mr. Keel, what could

you or would you infer from a sample that is negative for sperm cells, negative for male DNA, negative for p30 but positive for the presence of acid phosphatase and also positive for the presence of nucleated epithelial cells?

A.    I would -- from that really the only logical explanation for the acid phosphatase activity is simply an elevated endogenous level or a microbial acid phosphatase.  There's certainly no evidence of any semen.

Q.    I should have asked you this earlier but could you please tell us what you mean by "endogenous acid phosphatase"?

A.    Just from the source like from the vaginal vault or whatever the sample is taken from and in this context it's typically the vagina.

Q.    Thank you, Mr. Keel.  Could you please tell us how you first came to be involved in the Alfonso Rodriguez case.

A.    Yes.  We were hired by Mr. Hoy back in 2005 I believe to assist him in reviewing the case pretrial.

Q.    I'm sorry?

A.    Pretrial.

Q.    What was Dr. Blake's role in the case as compared to your role in the case?

A.   Well, Dr. Blake, FSA, was my employer.  He was a partner in the firm.  So his role typically would be to receive discovery and review that material and my role was to receive physical evidence and to conduct the examination and testing of the physical evidence.  And then together we would collaboratively produce a report as to our findings.  He would discuss his review with me and I would present my work product to him and together we would write a report.

Q.   And at that time your firm was known as Forensic Science Associates?

A.   Correct.

Q.   How did your firm's involvement in the case come to an end?

A.   Well, we could not get the materials that we needed to effectively assist Mr. Hoy so we withdrew.

MR. LUBY:  Your Honor, may I approach the witness?

THE COURT:  You may.

MR. REISENAUER:  Your Honor, if I may I didn't hear Mr. Keel's last answer.

THE COURT:  Do you want to read the answer back, Ms. Kroke.

THE REPORTER:  Answer:  "Well, we could not get the materials that we needed to effectively assist

Mr. Hoy so we withdrew."

MR. REISENAUER:  Thank you.

MR. LUBY:  Your Honor, I'm going to now provide the witness with Petitioner's Exhibit 2.

Q.  (Mr. Luby continuing)  Could you please tell us what this document is, Mr. Keel.

A.  This is our withdrawal letter to Mr. Hoy of June 20, 2006.

Q.  And who is it signed by?

A.  It's signed both by myself and by Dr. Blake.

Q.  And it states that you agree with the assessment that you needed to withdraw from the case?

A.  Yes.

Q.  Can you explain again all the reasons underlying why you needed to withdraw, sir?

A.  Yes.  We simply could not get the materials that we needed to provide Mr. Hoy with an effective assessment of the state's evidence.  They sent us some specimens but the specimens were basically worthless. There was nothing there to test.  The envelopes were either empty or the specimen that was there was consumed.  It had already been tested and consumed by the State.

And we never received any of the -- at least to my knowledge we never received any of the electronic

data associated with their DNA testing so there was no way we could review that material.  And as far as the materials necessary to review their findings that were described in a number of different reports, at least to my knowledge we never even received the bench notes that supported those conclusions that were expressed in their bench notes -- or in their report so we had no way of assessing the findings that were expressed in their reports.

Q.  If I might clarify, Mr. Keel, what area were you and Dr. Blake asked to provide expertise in?  As DNA experts or on the semen issue or both?

A.  Both.

Q.  At what point were you tasked with examining the acid phosphatase issue?

A.  I'm not really sure.  That's probably an issue that would have been dealt with by Dr. Blake.

Q.  But when you're talking about the samples that were to be sent to your lab from the Minnesota lab, were those to be sent in order for DNA testing to be conducted?

A.  Well, yes.  I mean, each of those samples would have been taken through the normal process of is there semen here and can we do DNA testing on any sperm that's recoverable from this semen.

Q.   Next, Mr. Keel, I have so many questions about your work with current counsel and about -- can you give us an idea about the time you were retained by our office?

A.   Yes.  That was in late 2016.

Q.   And can you tell us the materials that you've been provided in order to form your opinions in this case?

A.   Yes.  I have been provided with the bench notes and the reports of I think both the BCA laboratory and I think a North Dakota laboratory as well, all of the testimony from the Daubert hearing and the trial, relevant transcripts, and there's a list of things that are listed in the report that I provided you.

MR. LUBY:  And, Your Honor, may I approach the witness?

THE COURT:  You may.

MR. LUBY:  For the record I'm now handing the witness what's been marked as Petitioner's Exhibit 3 (indicating).

Q.   (Mr. Luby continuing)  Mr. Keel, you mentioned your report.  Does that appear to be the report that you provided in this case?

A.   Yes.

Q.   And it lists the materials that you've considered

in forming your opinion?

A.   Yes.

Q.   Your report discusses the significance of findings made by a forensic scientist by the name of Steven Fischer; is that correct?

A.   Correct.

MR. LUBY:  And, Your Honor, may I approach the witness?

THE COURT:  You may.

MR. LUBY:  For the record I'm now handing the witness what's been marked as Petitioner's Exhibit 4 (indicating).

Q.   (Mr. Luby continuing)  And can you tell us what this document is, Mr. Keel?

A.   Well, Exhibit 3 is the Review Report that I produced dated February 9, 2017.  Exhibit 4 is Report No. 10, which is a report produced by Steven Fischer of the Minnesota BCA laboratory in Bemidji with attachments of bench notes that relate to the findings described in the report.

Q.   And if you would note, Mr. Keel, there is a number that appears at the upper right-hand corner of the front page of Exhibit 4.  Could you please tell the Court what that number is.

A.   The report number is Report No. 10.

Q.   And I apologize, I meant a number that is running vertically along the upper right-hand corner of the page.

A.   18389.

Q.   And can you please tell us the number on the last page of this exhibit?

A.   18418.

Q.   And turning to the last page, sir, I've got a few questions about the form itself that is used here. There are a number of columns with headings for "BCIP, AP, p30, micro, amylase."  Can you tell us what those columns mean?

A.   Of course.  This is a table in which one records various items that one is examining, various tests that one is conducting on those items and then a simple notation as to the findings or the result of the test at each heading.

Q.   And what does this bench note document concerning the testing of p30?

A.   It documents the fact that on April 24, 2004 Mr. Fischer did both a positive and a negative control test on his test materials, which as far as p30 is concerned is a commercial product.  So each time that we use that particular test we do both what's called a positive and a negative where we test it with known

semen and something we know doesn't have semen associated with it to confirm that the test itself is working properly before we then use it on the evidence specimens. And he records a positive finding with the positive control and a negative finding with the negative control.

And then he goes on to document testing the victim's vaginal swab, anal swab and cervical swabs for p30, and in the "p30" column he notes that all three test results are negative and then in the column that's dated "micro" or microscopic which means he has prepared a stained microscope slide to examine the cellular debris that was recovered from each specimen. He notes that all three, the vaginal, anal and cervical, specimens are negative for sperm, which means he does not see any sperm on the slide and he also notes the presence of either heavy or light deposits of intact nucleated epithelial cells associated with each specimen.

Q. The results that you've just described, what do they tell us about the presence or absence of semen on these three swabs?

A. They tell us there's no evidence of the presence of semen on any of these specimens.

Q. You've already explained, Mr. Keel, that you

reviewed the trial testimony in this case.

A.   Yes.

Q.   So you're aware that at the time of trial there was testimony to the effect that -- there was already testimony I should say to the effect that there was no male DNA found on the swabs and also that the swabs did not reveal the presence of any sperm cells under microscopic examination?

A.   That's correct.

Q.   So we already know that the swabs have no male DNA and that there's no sperm cells.  What do Mr. Fischer's results here tell us beyond what was already explained to the jury and to the Court?

A.   Well, they tell us that p30 testing was done, which in the line of testing is again more specific and more sensitive than the acid phosphatase test which was negative, which indicates there was no semen present. And then the fact that there are numerous nucleated epithelial cells present also tells us that sperm would not have preferentially degraded through the same environmental insults and simply been absent for that reason.

So given the presence of nucleated epithelial cells if there were sperm cells there would be sperm cells present as well if there were semen here.

Q.   If you could please refer to page 2 of this particular exhibit, sir, what does the report itself as opposed to the bench notes say about the presence or absence of semen on the vaginal, cervical and anal swabs?

A.   The report simply states examination did not detect the presence of semen.

Q.   So the details and basis of that examination are not explained in the report itself?

A.   That's correct.   If I could expand upon that?

Q.   Please do.

A.   Basically there's no difference here in Mr. Fischer's explanation of not detecting semen between a simple -- I tested this garment for acid phosphatase and it was negative.   Therefore, I did not detect the presence of semen.   Whereas, his tests go much further. He tests also for the presence of p30.   He tests for the presence of sperm and he assesses the overall condition of the specimen microscopically.   So there's a big disparity between the information that one has at their disposal as to what the presence of semen actually means.

MR. LUBY:   And, Your Honor, may I approach the witness?

THE COURT:   You may.

MR. LUBY:  For the record I'm now handing the witness Petitioner's Exhibits 5 through 8 (indicating).

Q.  (Mr. Luby continuing)  If you could just take a look at those four documents, Mr. Keel, and tell us generally what they are.

A.  Exhibit 5 is Report No. 5 from the Minnesota BCA. It's a report of Steven Fischer dated January 28, 2004. It is numbered 09549 through 09553.

Exhibit 6 is a Semen/Saliva Summary worksheet very similar to the last page of the -- of Exhibit 4 that we just discussed.  It's actually two such worksheet pages and then descriptive bench notes, handwritten bench notes of the examination of a pair of pants and it's numbered 09733 through 09735.

Exhibit 7 is Report No. 27 from the Minnesota BCA dated December 19, 2005 and authored by Ann Marie Gross, and it is numbered 18420 through 18424.

Eight 8 is a Semen/Saliva Summary form dated November 22, 2005, and it's initialed by Miss Gross. It's numbered 18493.

Q.  If you could please turn to Petitioner's Exhibit 6.  The first page, I believe that's No. 9733.  Could you please tell us what items are being tested here?

A.  Yes.  We -- in the column called "item" we're

testing item 41-1 which is a cap, item 44 which is a cap, and item 45 which is a cap. We're also testing item 46 which is a coat, 48 which is a shirt, and 51 which is a coat.

Q. And based on your review of the records in this case, are you aware that those items were seized from Mr. Rodriguez's bedroom?

A. Yes, I believe so.

Q. Mr. Keel, what are specifically the results that were reached with respect to the three baseball caps, items 41, 44 and 45?

A. Each of the caps was tested for acid phosphatase using the BCIP reagent. An acid phosphatase activity was detected somewhere on the cap but a -- and then a sample was taken from that particular stain and it was tested, both -- an aqueous extract of that stain was prepared and a particular -- or cellular portion from that stain was prepared. The aqueous fraction was tested for p30 and that result was negative and no sperm were observed microscopically on the slide prepared from that stain and a low number or a light number of nucleated epithelial cells were observed.

So essentially one would conclude from this that this particular stain was an epithelial cell-bearing stain or a body fluid stain which had no

detectable semen, no sperm.  So it was abandoned.

The other tests, the other two stains on the cap had no acid phosphatase activity detected and there was no p30 or microscopy done on those two samples. They were simply abandoned at that point.

And then similarly for the coat and the shirt and the second coat, again no evidence of acid phosphatase using the BCIP test was detected.  And so simply at that point that investigation -- those investigations were abandoned.

Q.   And why would an examiner abandon the test after finding a negative acid phosphatase result?

A.   Well, I mean, that is the test that we use to help us focus our examination on interesting samples. So if we test a stain and it's negative for acid phosphatase then we're going to move on to something more interesting for the most part.  And that is evident -- if you look at the -- below on this sheet -- on this piece of paper he simply examines several items. We don't really know what they are without referring to another document but he lists them as 3, 36A, 36B and 42.  And with these items he simply examines them with the alternate light source looking for stains that might fluoresce, that might be interesting.  He finds nothing interesting so doesn't even bother with an acid

phosphatase test.  So in that way that's how we screen physical evidence to examine it efficiently so that we're not wasting time with fruitless stains.

Q.  Those items that were examined under the light, they have numbers, am I correct?  Are you referring to items 3, 36A, 36B?

A.  Yes.

Q.  Sir, if you refer to Petitioner's Exhibit 5, the report, does it list what the items in question are?

A.  Yes.  I believe so, yes.  Item 3 is a jacket. 36A is probably one of two nylon stockings -- or A and B are the stockings and 42 is a black leather belt.

Q.  If I could then direct your attention to the second page of Petitioner's Exhibit 6 numbered 9732.

A.  Okay.

Q.  Could you explain what items are being tested in this document, sir.

A.  Yes.  This is Mr. Fischer's examination of a pair of pants that are described on Exhibit 5 as "jeans from Rodriguez."  So here Mr. Fischer is examining Mr. Rodriguez's pants.  He's examining them for semen essentially.  He tests four different areas on the pants.  All four of them give a fairly rigorous to rigorous result for acid phosphatase using BCIP.

So in light of that he goes ahead and

samples all four stains.  He bypasses the p30 test at this particular point in time and does -- takes a cutting from each interesting stain, recovers the particulate debris, the cellular debris from each stain, makes a microscope slide, stains it appropriately and observes numerous sperm on three of the samples and -- only I think he says one sperm on the fourth sample.

So he identifies a semen in light of the moderate to strong acid phosphatase indications from all three -- all four cuttings from Mr. Rodriguez's pants.

Q.   Can you interpret for us under the column "micro" the markings that say 10 to 20 SP slash times 200 and similar markings under the next two boxes?

A.   Yes.  So for 4-1 Mr. Fischer indicates that he sees 10 to 20 sperm when he's examining this particular microscope slide specimen at 200X, which means he's magnifying it 200 times.  And then he also sees a few nucleated epithelial cells among the cell debris on the slide.

For 4-2 it's very similar.  He sees 20 to 30 sperm on the slide also at 200 power and again sees a few what he calls light nucleated epithelial cells.

For stain No. 3 he says five to 10 sperm at 200 power and light nucleated epithelial cells.  And then for 4-4 he sees only one sperm on the slide and

also a low number of nucleated epithelial cells.

Q.   And how definitively or conclusively do these results indicate the presence of semen on Mr. Rodriguez's pants?

A.   The microscopical observation of sperm is proof of the presence of semen.

Q.   And if the pants, in fact, are Mr. Rodriguez's and if he -- and assuming that he is the contributor of the semen, does that indicate that Mr. Rodriguez is not aspermic?

A.   That's correct.

Q.   If I could next direct your attention to Exhibit 7 and 8, do you recognize these two documents, Mr. Keel?

A.   Yes.

Q.   And concerning Exhibit 8, number 18493, what are the two items that are being tested on this particular form?

A.   Exhibit 8 is a Semen/Saliva Summary bench note worksheet of Ms. Gross dated November 22nd of 2005. She's indicating that she's testing items 102 and 111. 102 is described in her report, which is Exhibit 7, as a pair of black underwear and then 111 is described as a pair of pink underwear.

Q.   And what testing was performed on those two pairs

of underwear?

A.   She examined -- or tested two areas on the black underwear for acid phosphatase and four areas on the pink underwear and all of them were negative and so she abandoned her examination of the panties, the underwear.

Q.   And is that why the column under "p30" is blank to your understanding?

A.   Well, certainly I believe that had she done any other testing on these two garments she would have made notations to that effect on this worksheet.

Q.   But normally when one tests for acid phosphatase and it's negative, is there an indication or any reason to go on and then test for p30 afterward?

A.   It just depends.  I certainly have examined -- further examined stains that were negative for acid phosphatase, but typically when one is screening a number of specimens or a large specimen like a bed sheet if I don't find any acid phosphatase activity on it I'm going to move on to something more interesting.

Q.   Finally, Mr. Keel, having reviewed Dr. McGee's testimony in this case, are you familiar with his description of a mucoid area or globule that he discerned at the time of autopsy?

A.   Yes.

Q.   In the area of Ms. Sjodin's cervix?

A.    Correct.

Q.    And you're aware of his testimony that he thought at the time of autopsy that that globule was a deposit of semen?

A.    Yes.

Q.    What is your scientific opinion of that particular assessment?

MR. REISENAUER:  Objection, Your Honor. That's speculation as to what -- whether he can answer that question.  This particular globule was observed by the doctor.  This expert hasn't seen that globule.  It wasn't present.  There was no photograph of it.  How can he give an answer as to what he thinks it may be?

MR. LUBY:  I can rephrase the question.

THE COURT:  You may.

Q.    (Mr. Luby continuing)  If one is examining the vaginal vault five months postmortem and -- could one observe the persistence of a mucoid-like area that is, in fact, semen?

A.    Not in my opinion, no.

Q.    And why is that, sir?

A.    That is because there is a tremendous amount of p30 in semen and p30's specific role is to liquify semen and it does so within minutes of ejaculation.  So semen is rendered from a thick viscous substance which might

initially be characterized as a mucoid mass but certainly within minutes it would be rendered into liquid form and could not have persisted more than a few minutes.

Q.    Mr. Reisenauer mentioned in his objection that there was no photograph taken of the mass?

A.    That is what he said, yes.

Q.    And you have not seen a photograph of it?

A.    No.

Q.    You've reviewed the autopsy report in this case, sir?

A.    Yes.

Q.    And are you aware of any mention of this mass in the autopsy report?

A.    No.

Q.    In your experience as a serology and DNA expert, when there is significant features on which scientific conclusions are drawn, such as the presence of semen, would you normally expect this kind of finding to be documented by a photograph or in an autopsy report?

A.    Certainly that is my practice.  Whenever I discover something interesting I virtually always photograph it or at least note it in my contemporaneous bench notes.

Q.    And if the globule were semen, Mr. Keel, one

would have expected I assume to find sperm or p30 or male DNA from a sample taken from it?

A.  Of course.  If there were an intact mass of semen, it should have an abundance of p30 associated with it and an enormous number of sperm and a large amount of male DNA should have been recoverable from it.

MR. LUBY:  And thank you, Mr. Keel.  Those are all of my questions.

THE COURT:  All right.  We'll go ahead and we'll break at this point.  We'll start again at 20 to 11:00 and so we'll stand in recess until 10:40.

(Recess taken; 10:20 a.m. to 10:40 a.m.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The counsel who noted their previous appearances are all still present.

The petitioner never offered any of the exhibits that were actually testified.  Do you intend to offer them?

MR. LUBY:  I did intend to but I forgot that intention.

THE COURT:  Why don't you go ahead and -- do you intend to offer all of them, including the CV?

MR. LUBY:  Yes, sir.  I would hereby offer Petitioner's Exhibits 1 through 8.

THE COURT:  Any objection to any of them?

MR. REISENAUER:  No, Your Honor.

THE COURT:  One through 8 are received.

MR. LUBY:  Thank you, Your Honor.

THE COURT:  All right.  Mr. Reisenauer, it's your witness.

MR. REISENAUER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Mr. Keel, we have talked briefly at a deposition, correct?

A.  Yes, sir.

Q.  And you recall that, correct?

A.  Yes.

Q.  I want to touch on a couple of things and also include information that we discussed at the time of the deposition.

Now this morning Exhibit No. 1 -- is it marked Petitioner's Exhibit No. 1, Your Honor?

THE COURT:  I don't know.  The only ones I've seen are photocopies without exhibit stickers on them so I'm not sure.

MR. REISENAUER:  Is that what it is, Todd?

THE CLERK:  Yes.

MR. REISENAUER:  I'll refer to it as

Petitioner's Exhibit No. 1 then.  Thank you.

Q.  (Mr. Reisenauer continuing)  Mr. Keel, Petitioner's Exhibit No. 1 was your CV, correct?

A.  Yes, sir.

Q.  And you noted there's a date on the bottom.  It says revised January 6, 2016, correct?

A.  Yes, sir.

Q.  Okay.  And you noted early in your testimony that there have been some additions to it that aren't included?

A.  Yes.  There's a more recent version of it that incorporates a couple more presentations that I have done in the interim between January 2016 and today.

Q.  Okay.  And can you just briefly tell us what those may be, if you remember?

A.  Certainly.  One of them would be a presentation that I did just last month for the California Association of Criminalists where I presented basically a historical chronology of the investigation of the rape, kidnap and murder of a young woman in Hawaii.  And there would be the presentation that I gave at a conference in Prague, Czechoslovakia in regard to beta testing of a new product that's coming out on the market for -- as a more sensitive way of detecting DNA.  And those are probably the only two additions.

Q.   Okay.

A.   Nothing else.

Q.   I note that on the bottom of the third page you've presented at the National Innocence Network Conference a couple times, correct?

A.   Yes.

Q.   And have you continued to do that since 2015?

A.   No.

Q.   Okay.  And how about the Federal Habeas Corpus Resource Center?

A.   No.  That was just a one-time presentation.

Q.   Okay.  And if I'm correct from your earlier testimony and my recollection from the deposition, you have a Bachelor of Science from Texas A & M, correct?

A.   That's correct.

Q.   And you've worked on your Master's but you didn't complete it?

A.   That's correct.  I do not have a Master's degree.

Q.   Okay.  And as far as your work history as it relates to this particular case, when the company you worked for at the time that Mr. Hoy hired -- hired that company, that company was called Forensic Science Associates, correct?

A.   That's correct.

Q.   And a Mr. Edward Blake you referred to earlier,

he was the main individual that Mr. Hoy dealt with; is that correct?

A.   Yes.  Dr. Blake, yes.

Q.   Dr. Edward Blake is his name?

A.   Yes, sir.

Q.   Okay.  Did you ever have discussions with Mr. Hoy or correspondence with Mr. Hoy yourself?

A.   Not that I recall, no, sir.

Q.   That was all between Mr. Hoy and Dr. Blake, correct?

A.   That's correct.

Q.   And Forensic Science Associates was by my recollection just a two-person lab back at the time of this case, correct?

A.   Three person.  There were two partners, Dr. Blake and Mr. Peter Barnett, and then I worked for them.

Q.   Okay.  It was a three-person lab then and Dr. Barnett, I don't recall his name, he wasn't involved in this case at all, was he?

A.   No, sir, Mr. Barnett was not.

Q.   Okay.  And then apparently according to your testimony that company merged with another company called Forensic Analytical Sciences in 2011?

A.   That's correct.

Q.   And that's where you're employed at the present

time?

A.  Yes, sir.

Q.  Is Dr. Blake a part of that company?

A.  He was for a few years.  He left in 2014.

Q.  Okay.  And as part of Forensic Science Associates, most of your work was criminal type work; is that correct?

A.  That's correct.

Q.  Okay.  And that was -- when did that company start?

A.  Forensic Science Associates?

Q.  Yes.

A.  I believe Dr. Blake and Mr. Barnett formed that company in 1978.

Q.  1978?

A.  Yes, sir.

Q.  When did you begin working there?

A.  In 1999.

Q.  Okay.  And I believe we -- I asked you this at the time of the deposition but was Dr. Blake kind of a temperamental person would you say?

A.  Yes, sir.  That's fair.

Q.  Thank you.  You, on February 9th of this year, did a report for counsel for Mr. Rodriguez, correct?

A.  Yes, sir.

Q.   Okay.  And earlier you alluded to a number of items that you reviewed.  They are listed on page 2 and 3 of your report, correct?

A.   Yes, sir.

Q.   I'm going to touch on a couple of those if we could.  You indicate that in -- and these are I guess listed by letter of alphabet A through X, correct?

A.   Yes.

Q.   Okay.  And so letter F says that you received the Regions Hospital cytopathology records, correct?

A.   Yes.

Q.   The handwritten bench notes of Mr. Fischer that I believe you've already testified in regard to, correct?

A.   Well, a certain date range, yes, uh-huh.

Q.   Okay.  And that would be in letter G, correct?

A.   Correct.

Q.   And then again let's jump down briefly to letter N, and that would be the bench notes of Ann Marie Gross, correct?

A.   Yes.

Q.   And coupled with those bench notes are the reports that were referred to earlier, BCA Report No. 10 and BCA Report No. 27; is that correct?

A.   Yes, sir.

Q.   And then on page 3 you indicate that you reviewed

the trial testimony of Mr. Fischer, correct?

A.   Yes.

Q.   And the Daubert hearing it's called, testimony of Dr. McGee and Dr. George Sensabaugh, correct?

A.   Yes.

Q.   And the trial testimony of Dr. McGee and Dr. George Sensabaugh; is that correct?

A.   Yes.

Q.   Okay.  And if we could I just want to talk briefly about the testing that Mr. Luby was asking you about earlier and I'm just going to touch base very quickly on these things.

First, the acid phosphatase testing, you told us earlier that acid phosphatase is an enzyme; is that right?

A.   Yes.

Q.   And testing for that is generally accepted by the scientific community as a presumptive test; is that correct?

A.   That's correct.

Q.   And in your review of Dr. McGee's testimony, he recognized that this was a presumptive test.  Do you recall that?

A.   Yes.

Q.   Okay.  And Dr. George Sensabaugh, he also

testified at the Daubert hearing and the trial about the limitation of an acid phosphatase test and, in fact, that it was just a presumptive test, correct?

A.    Correct.

Q.    Do you know Dr. Sensabaugh at all?

A.    Yes, sir.

Q.    How do you know him?

A.    I know him through my former work at the Oakland, California Police Department.  We worked closely with him at the University of California Berkley.  I know him through my membership with the California Association of Criminalists.  I know him through a symposium where he was the primary expert, if you will, back in 1983.  I know him from his involvement with both National Research Council reports on forensic DNA technology.  He is one of the preeminent forensic scientists in the country.

Q.    And preeminent forensic scientists in regard to acid phosphatase?

A.    Yes, sir.

Q.    And as we just noted he testified in this trial, correct?

A.    Yes.

Q.    And Dr. Blake, is he well-known in this field as well?

A.   Yes, sir.

Q.   And I assume that Dr. Blake and Dr. Sensabaugh know of each other, correct?

A.   Yes.  Dr. Blake was Dr. Sensabaugh's doctoral student.

Q.   Pardon?

A.   Dr. Blake got his Ph.D. working under Dr. Sensabaugh at Cal.

MR. REISENAUER:  May I approach, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  Thank you.

Q.   (Mr. Reisenauer continuing)  Mr. Keel, I'm going to hand you what's been now marked as Government's Exhibit No. 1.  That is a letter -- or, excuse me, an e-mail conversation between Dr. Blake and Mr. Hoy; is that correct?

A.   Yes.

MR. REISENAUER:  Counsel, it is number 03978 and 79.

Q.   (Mr. Reisenauer continuing)  If you could, Mr. Keel, turn to the second page.

I would offer Government's Exhibit 1, Your Honor.

THE COURT:  Any objection?

MR. LUBY:  If you'll allow me -- I'm having

trouble getting a copy of the document here if you'll bear with me.

I have no objection, Your Honor.

THE COURT:  Government 1 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  And, Mr. Keel, if you'd just turn to the second page of that exhibit, it would be the -- oh, I believe the third paragraph down. The paragraph starts with, "With regard to acid phosphatase."  Do you see that?

A.  Yes, sir.

Q.  It says with regard to acid phosphatase in a post-coital vagina the two most knowledgeable -- most knowledge individuals, paren, in the world, end paren, are myself and Dr. George Sensabaugh.  Correct?

A.  Yes.

Q.  Would you agree with that statement?

A.  Yes.

Q.  Okay.  And did you become aware ever at any time that Dr. Blake referred Dr. Sensabaugh to Mr. Hoy in regard to acid phosphatase and the question that you've been testifying about this morning?

A.  I am aware of that.  I was -- I wasn't really aware of the mechanism but I recall that he had mentioned referring Mr. Hoy to Mr. Sensabaugh, to

Dr. Sensabaugh.

Q. Okay. Well, let's touch on a couple of things in regard to that then. Earlier I asked you whether or not you were aware that Dr. Sensabaugh testified in regard to the limitations of the acid phosphatase and you indicated that you had. And in this particular case there was a lengthy Daubert hearing and a lengthy discussion through testimony of Dr. Sensabaugh at the time of the trial as well. You read through that; is that correct?

A. I did read Dr. Sensabaugh's hearing transcript, yes.

Q. Okay. So let's touch on a couple of other things then. You testified about the p30, test which is also a test for the enzyme; is that correct?

A. It's a test for the presence of the p30 enzyme, yes.

Q. Okay. And that is also as you indicated a presumptive indication of the presence of semen, correct?

A. Correct.

Q. And as I listened to your testimony the observation of sperm itself is the only definitive proof of the presence of semen.

A. Correct.

Q.   So as a scientist if I take a sample and put it under a microscope and I see sperm cells I know there's semen present.

A.   Correct.

Q.   And the other tests we've been talking about are presumptive tests based upon frankly this is my statement and nobody else's scientific evidence over time and extrapolating information to give a percentage chance so to speak as to whether or not semen may be present.

A.   No, that's not correct.

Q.   That's not correct?

A.   No.

Q.   Explain that to me then.

A.   Whether or not you've got a positive acid phosphatase result there's no way to quantify that as, oh, there's a fifty-fifty chance here that I might have semen.  It simply means that there is presumptive evidence of semen and one should pursue that investigation further.

Q.   Okay.  All right.  And the same goes with the p30 result test.

A.   Correct.

Q.   So in this particular case the Regions Hospital did an acid phosphatase test, correct?

A.   Yes.

Q.   And they provided the results and Dr. McGee testified in regard to those results, correct?

A.   Yes.

Q.   They also in their particular lab found no sperm. You're aware of that?

A.   Yes.

Q.   Okay.  And Dr. McGee testified to that effect as well.

A.   Yes.

Q.   And we talked briefly about your review of Ann Gross's Report No. 27 and her bench notes, and at some point she did tests with regard to trying to discover male DNA on what was Exhibit 86, correct?

A.   Correct.

Q.   And she found no male DNA in her testing, correct?

A.   Yes.

Q.   And you're aware that there was testimony at the trial with regard to that?

A.   Yes.

Q.   And then you testified about Mr. Fischer's report, which was Report No. 10, where he did the examinations also of Exhibit 86, correct?

A.   Yes.

Q.    And you testified earlier about those examinations and his report that indicated that the examinations of those items did not detect the presence of semen, correct?

A.    That's correct.

Q.    And are you aware that at the time that Mr. Fischer testified at trial that he testified that, in fact, in his examinations there was no detection of the presence of semen on Exhibit 86?

A.    Yes.

Q.    You would agree, wouldn't you, that the fact that all of this testimony in regard to the presence of semen or the lack of the presence of semen or sperm cells, that's not determinative of whether a sexual assault occurred in this particular case, is it?

A.    That's correct.

Q.    There was a letter that was submitted showing that your company back at the time withdrew from its involvement in this case.  Do you recall that?

A.    Yes, sir.

Q.    And that letter was dated June 20th of 2006.  Do you recall that?

A.    Yes.

Q.    Do you recall when your company was hired in this case?

A.   I know that it was -- in 2005 was when Mr. Hoy first contacted Dr. Blake because that is the year that our case file was initiated, but I couldn't tell you the exact date that Mr. Hoy first retained Forensic Science Associates.

MR. REISENAUER:  If you'd give me one second, here.  May I approach, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  Thank you.

Q.   (Mr. Reisenauer continuing)  Mr. Keel, I'm going to hand you what's been marked now as Government's Exhibit No. 2 (indicating).  It is a letter I believe from Mr. Hoy to Dr. Blake; is that correct?

A.   Yes.

Q.   And it contains a number of pages, correct?

A.   Yes, three pages.

Q.   And that letter is dated when?

A.   August 23, 2004.

Q.   And if you would just look at that letter, it does indicate that Mr. Hoy obviously has already retained your company and he is sending a number of items to the lab; is that correct?

A.   Yes.

Q.   And in your testimony earlier you indicated that you did not receive any items for testing at any point,

correct?

A.   No, that's not what I said.  We did receive physical evidence specimens in 2006 but there was nothing there that was amenable to be tested.  It was simply either empty envelopes or it was specimens that -- from which the interesting stain material had been consumed, had been removed.  So there was nothing there for us to test.  It was in my estimation a silly exercise.

Q.   Okay.  You're aware, in fact, that the United States had informed defense counsel that a number of items may be consumed in the testing process?

A.   Sure, yes.

Q.   Okay.  And are you aware that defense counsel filed motions in regard to various items being consumed in this case?

A.   I'm not sure I understand what you mean.

Q.   Did you ever become aware that defense counsel had filed motions pertaining to these items being consumed?

A.   No.

Q.   Okay.  Do you know a Dr. Dean Stetler, S-t-e-t-l-e-r?

A.   I do.

Q.   How do you know Dr. Stetler?

A.   I know him from his involvement in a case in which I was recently involved.  That's my only knowledge of him.

Q.   Okay.  Back at the time of this particular case you didn't know Dr. Stetler?

A.   I don't think so, no.

Q.   Okay.  So you never became aware Dr. Stetler after your withdrawal became involved in this case as far as the DNA evidence and testing was concerned?

A.   I did not know that, no.

Q.   You do testing in your lab, correct?

A.   Yes, sir.

Q.   Have you ever worked in a medical examiner's office?

A.   Yes.  I worked for the Caddo Parish Medical Examiner's Office in Shreveport, Louisiana.

Q.   And when was that, Mr. Keel?

A.   That was in -- let me look at my -- that was from -- in 1994 through 1996.

Q.   Okay.  So would you agree with me that -- and I assume, maybe I'm assuming incorrectly, that you observed autopsies?

A.   Yes.  I assisted in autopsies as well.

Q.   Okay.  So can I assume then that sometimes you saw things that you like wondered what they were or what

may have happened here?

A.   I think that's fair.

Q.   So would it not also be fair that in this particular case when Dr. McGee was doing his autopsy and he saw this globule that maybe he wanted to pursue a further investigation of it?

A.   I'm not sure I understand the question.  Is it fair that he might have seen this?

Q.   And asked for further investigation or testing of this area?

A.   Of course.  But --

Q.   That's fine.

A.   Okay.

Q.   Thank you.  I have a couple of questions about some of the other exhibits that you testified in regard to earlier.  Do you have the exhibits in front of you, Mr. Keel?

A.   Yes, sir.

Q.   Okay.  Thank you.  If you would first refer back to lab Report No. 27, which is Petitioner's Exhibit 7, and then also grab No. 8 at the same time.

A.   Okay.

Q.   Here you testified in regard to Exhibits 102 and 111, correct?

A.   Yes.

Q.   And basically your testimony is -- in regard to Petitioner's Exhibit No. 8 is a form there that Ann Gross filled out with regard to some BCIP testing, correct?

A.   Yes, sir.

Q.   And would you say that that testing results in a negative finding?

A.   Yes.

Q.   And these two pieces of evidence, 102 and 111, are referred to in Petitioner's Exhibit 7, which is Report No. 27, correct?

A.   Yes.

Q.   You have no idea whose underwear those were, do you?

A.   I don't think so, no.

Q.   Okay.  Thank you.  And then if you would, Mr. Keel, go back to --

A.   If I could just clarify my last answer.  I think I remember reading in one of the reports that I read that there was a pair of panties recovered from a ditch but I don't know whose panties those might have been. That's why I say I don't know whose but I do know of some of the history.

Q.   Okay.  Thank you.  In reviewing all the exhibits that were sent to the lab, there were a number of

exhibits sent to the lab that were found by various law enforcement officers or submitted to law enforcement that were sent for testing that law enforcement never determined who they belonged to.  Would that be a correct statement?

A.  I don't really know.

Q.  So you don't know -- like I asked you earlier, you don't know whose underwear these are and you don't know whether or not they belonged to any individual person.

A.  I don't think so, no.

Q.  Thank you.  And then, if you would, let's talk about Petitioner's Exhibit No. 5 and No. 6.  You testified earlier in regard to the items on -- and I refer to Petitioner's Exhibit No. 6, items on the first page and the second page, correct?

A.  Correct.

Q.  Let's in particular then turn to the second page and again this is a chart from some testing that Mr. Fischer did apparently.  Is that how you read that?

A.  Yes, sir.

Q.  And again this BCIP test was done, correct?

A.  Yes.

Q.  And it was done on item No. 4 in four different spots as I read that; is that correct?

A.   Yes.

Q.   And item No. 4, according to the report, are jeans from Mr. Rodriguez?

A.   Yes.

Q.   And page 3 of Petitioner's Exhibit No. 6 has a diagram on it, correct?

A.   Yes.

Q.   And Mr. Fischer draws a diagram of the jeans, correct?

A.   Yes.

Q.   And he has four spots marked 4-1, 4-2, 4-3 and 4-4, correct?

A.   Yes.

Q.   On the outside and the inside of the jeans he has a diagram.

A.   Yes.  There is a diagram of the inside and outside surfaces where he did his testing.  I believe that all of the samples that he collected were on the outside.

Q.   On the outside of the jeans?

A.   Yes.

Q.   And that testing then resulted in a positive BCIP result, correct?

A.   Correct.

Q.   There's some numbers next to the positive signs,

correct?

A.   Yes.

Q.   Can you tell us what those mean?

A.   They are a semi quantitative evaluation of the strength or the intensity of the test result.  Basically negative meaning no color production and a plus four meaning quite a strong vivid and usually quick color production and then graded between zero and four in that regard.

Q.   So four being the highest.

A.   Yes.

Q.   Okay.  And then according to the chart we're looking at here Mr. Fischer did some microscopy checking?

A.   Yes.

Q.   And what were the results there?

A.   Basically on his samples from areas one, two and three he sees a number of sperm associated with the cellular debris that he recovered from those.  And then from area No. 4 he notes seeing only one sperm head on the slide.

Q.   So when these jeans were tested there were at least four spots on them that had semen, correct?

A.   Correct.

Q.   Mr. Keel, let's jump back to the consumption of

the evidence subject.  And earlier I asked you whether you became aware that there was going to be consumption of evidence and I believe you indicated that you did become aware of that, correct?

A.  Yes.

Q.  Do you recall that Dr. Blake was asked by Mr. Hoy and Dr. Blake provided a number of answers for Mr. Hoy on how to address that particular subject?

A.  No.

Q.  You don't recall that?

A.  I'm not even aware of it.

MR. REISENAUER:  That's all the questions I have, Your Honor.

THE COURT:  Thank you.  Anything further from the petitioner?

MR. LUBY:  Thank you, Your Honor.  Your Honor, may I approach the witness?

THE COURT:  (No response.)

MR. LUBY:  Your Honor, may I approach the witness?

THE COURT:  You may, Mr. Luby.

**REDIRECT EXAMINATION**

**BY MR. LUBY:**

Q.  For the record I'm handing you what is a volume of the trial -- a portion of the trial transcript in

this matter, Volume 29 (indicating).  Mr. Keel, do you recall Mr. Reisenauer asking you about Dr. McGee's testing during the trial of this matter on your cross-examination?

A.  His testing?

Q.  Do you recall Mr. Reisenauer asking you about Mr. McGee's -- or Dr. McGee's trial testimony?

A.  Oh, testimony, yes.  I'm sorry, I thought you said "testing."

Q.  And Dr. McGee's testimony that the acid phosphatase result was presumptive as well as his acknowledgment that there was no sperm cells detected by either lab and no male DNA?

A.  Correct.

Q.  If I could please direct your attention to pages 6722 through 6723 of the transcript.

A.  Okay.

Q.  At the bottom of the page do you see Dr. McGee at line 22?  Could you please read the sentence that begins with the words "that is"?

A.  "That is, the laboratory has established and our office uses numbers in excess of 25 units per liter as positive.  Therefore, using that -- and that's the criteria we've used in the past.  Using that criteria --" continue?

Q.   Please.

A.   "The vaginal level of 47.4 and the cervical level of 103.7 are considered positive for seminal through the deposition and that information was supplied to the police."

Q.   Thank you.  And later on that same page what does Dr. McGee say about the time frame of a possible seminal deposition, if I could refer you to lines 7 through 14?

A.   You want me to read that?

Q.   Yes, please.

A.   "All I can say for an elevated level like this is it's above what we consider cutoff level and it suggests that deposition has occurred in a time period 24 to 36 hours prior to the subject's death.  Some authorities will go back longer in a deceased individual but that's generally the information we've given to the police as they have to consider deposition in that 24 to 36-hour time frame prior to the subject's death."

Q.   Thank you.  And if I could also refer you to pages 6720 through 6721 and I believe you've testified about this before beginning with line 24 on page 6720 and what it was that Dr. McGee observed in the cervical area at autopsy.

A.   Do you want me to read from line 24 on page 6720?

Q.   Yes, please.

A.   "It isn't until we open it up that I can see there's a large deposit of mucoid-like material that I think looks like seminal fluid surrounding the uterus."

Q.   Thank you.  And do you also recall Dr. McGee's testimony that notwithstanding his acknowledgment that there were no sperm and no DNA, that semen was nevertheless present and sperm and DNA absent because of the cold weather conditions?

A.   Yes.

Q.   The results you've described from Mr. Fischer's bench notes, both as to nucleated epithelial cells and p30, what do those results say about that particular testimony from Dr. McGee?

A.   Well, it would -- in my opinion the conditions that this victim's body was subjected to, the semen, the sperm would have survived preferentially to the nucleated epithelial cells and in that way had this material that he collected from the cervical area it would have been teaming -- it would have had an abundance of p30 and an abundance of sperm.

Q.   Thank you.  I'd like to refer you to Government's Exhibit 1 and that is specifically some e-mail correspondence between Dr. Blake and Mr. Hoy.  Do you have that in front of you still, Mr. Keel?

A.   Yes.

Q.   And that is the e-mail in which Mr. Reisenauer pointed out Dr. Blake and Dr. Sensabaugh are the two most knowledgeable individuals out there concerning acid phosphatase in the post-coital vagina, correct?

A.   Correct.

Q.   Could you please refer to the next paragraph of that e-mail and what does that paragraph say concerning the documents that your office has been provided as of the date of this e-mail?

A.   It says, "You have not provided any detailed report notes or anything else concerning the acid phosphatase analysis of the vagina specimens in your case."

Q.   And what does the preceding sentence say about BCA reports and their accompanying bench notes in particular?

A.   The preceding -- or the following?  Preceding --

THE COURT:  Perhaps you can refer him to a line.

Q.   (Mr. Luby continuing)  The language where it says, "You have also not provided either notes."

A.   Right.  "You have not provided any detailed report notes or anything else concerning the acid phosphatase analysis of the vagina specimens in your case."

Q.   I think we're looking at -- I'm looking at the paragraph that begins, "I am still missing BCA report number 30."

A.   Okay.

Q.   Okay.  The next sentence reads, "I'm missing page two from various BCA reports."

A.   Correct.

Q.   And the following sentence, "You also have not provided either notes or the electronic data files for the other BCA or ND BCI reports other than reports 27, 29 and 30."

A.   That's what it says.

Q.   Thank you.  That's all I was inquiring about there.  In other words Dr. Blake is saying that there are bench notes and reports still missing as of the date of this e-mail?

A.   That's correct.

Q.   And what is the date of this e-mail?

A.   June 1, 2006.

Q.   And how -- how does that date relate to -- how many days is that before you all withdrew from the case?

A.   We withdraw on June 20th so that's 20 days.

Q.   If you would please refer to Government's Exhibit 2.  Do you have that in front of you?

A.   Yes.

Q.   And do you notice the opening paragraph in which Mr. Hoy explains that he wishes to have Dr. Blake's services as a forensic DNA expert?

A.   Yes.

Q.   And it doesn't mention acid phosphatase analysis, sperm testing, semen testing and so forth?

A.   No.

Q.   And you clarified I believe on direct examination that it was Dr. Blake who actually referred Mr. Hoy to Dr. Sensabaugh for that purpose?

A.   Yes.

Q.   And did you -- at that time -- at the time that that referral was made, did you have any professional affiliation with Dr. Sensabaugh?  Was he in your same firm?

A.   Oh, no, he was a professor at Cal.

Q.   So you don't have any knowledge of whatever documents Mr. Hoy did or didn't send to Dr. Sensabaugh?

A.   No.

MR. LUBY:  Those are all my questions. Thank you.

THE WITNESS:  Thank you.

THE COURT:  Thank you.  Mr. Reisenauer.

MR. REISENAUER:  Thank you, Your Honor.  I just have a couple of questions.

**RECROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.   Mr. Keel, if you still have that trial transcript in front of you, would you pick that up, please.  I believe there was some reference for you previously in regard to the pages around 6720 through 23.  If you would turn to page 6721, please.

A.   Okay.

Q.   And down on line 14 there was a question to Dr. McGee that says, "And -- okay.  On any of the sites that you tested in this case, was the sperm absent or present?"  What was his answer?

A.   "Sperm were absent on all sites."

Q.   And then the next question says, "Is there any other test that you can then do to determine whether there's been a semen deposit of some kind?"  What was his answer then?

A.   "You test for the enzyme prostatic acid phosphatase."

Q.   And he was asked if that was done and he said yes, correct?

A.   That's correct.

Q.   Then if you'd turn to the transcript page 6597 if you would, please.

A.   Okay.

Q.   Thank you, sir.   Line --

MR. LUBY:   I'm going to object and ask opposing counsel to please clarify the stages of which proceedings he's referring to for this portion of the transcript that is the Daubert hearing.

THE COURT:   Let me just take a look.   We're looking at 6597 did you say of the same volume?

MR. REISENAUER:   Yes, Your Honor.

THE COURT:   Okay.   And do you clarify what's going on there?

MR. REISENAUER:   Well, I'll certainly try.

THE COURT:   I believe those are actually questions that I posed to the witness at that time.

MR. REISENAUER:   That's correct, Your Honor. If I may?

THE COURT:   You may.

MR. REISENAUER:   Thank you.

Q.   (Mr. Reisenauer continuing)   Then, Mr. Keel, if you'd just look at the top there, line 1, the question was, "The p30 test is actually -- can be dispositive if you have those certain levels.   But if you look at just acid phosphatase generally that's divided into nonprostatic and prostatic using the system that's been described herein, basically that's a presumptive test, right?"   And his answer was "yes," correct?

A.   Correct.

MR. REISENAUER:  Thank you.  That's all I had in that regard, Your Honor.

THE COURT:  All right.  I do have one question and I think that it's just a clarification of I think what is use of jargon or terminology.

In the law when we talk about presumptive evidence we talk about evidence that gives rise to a presumption that a fact is true until it's proven otherwise.  We talk about tests as screening tests, which are tests that can be used to rule out the existence of a fact and to make it more likely that a fact may be true but it's not presumption that the evidence is in fact been -- that that fact's been proven.  I think that's a fair statement, right?  Did you follow what I'm saying?

THE WITNESS:  Yes, sir.

THE COURT:  Now I think in science that we use presumptive evidence differently than lawyers do because -- and I just want to make sure that you explain for everybody here and for the record what do you mean when you say something is presumptive evidence?

THE WITNESS:  Certainly it's not the legal definition.  What "presumptive" means is that there is an indication that the evidence of interest may be

present.  It may not be but it may be.  And so one should pursue investigating that particular specimen further.  That's all it means.

THE COURT:  And so for us in the law we would use -- call that -- ordinarily we'd describe it as a screening test that would just give rise to more detailed confirmatory testing; is that true?

THE WITNESS:  Absolutely.

THE COURT:  Any questions as a result of my questions, Mr. Luby?

MR. LUBY:  Apparently Mr. Abreu does.

THE COURT:  Mr. Abreu, you want to talk to Mr. Luby?

MR. ABREU:  Yeah, Your Honor.

THE COURT:  You may.

**REDIRECT EXAMINATION**

**BY MR. LUBY:**

Q.   When we say "presumptive" in the scientific sense and further investigation being warranted, what type of investigation would be warranted upon finding a positive acid phosphatase result?  By investigation do you mean p30 testing, cytology, searches for male DNA and the like?

A.   Well, depending upon the nature of the specimen, one would simply go to the next -- or to the

confirmatory test, and that is to look for sperm associated with your test specimen that was presumptively positive.  So that's -- that would be -- the next step is to look for something conclusive or something absolute to prove up the presumption.

Q.   Was there any such absolute evidence in this case?

A.   Oh, none, no.

MR. LUBY:  Thank you, sir.

THE COURT:  Mr. Reisenauer, any questions?

MR. REISENAUER:  Just to clarify, Your Honor, if I may.

**RECROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.   Mr. Keel, you were aware then as you've been asked numerous times this morning that there was all these other tests done and no sperm was found.  No test for semen was positive in terms of the DNA, the male DNA test and so forth, correct?

A.   Correct.

Q.   There's no other test that you would have done that you can think of?

A.   No, there isn't any other test that one could do to prove that there might have been semen present here. The only issue was that there was never any association

between the presumptive presence of semen and then the fact that there were all of these other tests that were done that did not affirm the presence of any semen whatsoever.

MR. REISENAUER:  I understand that.  Thank you.

THE COURT:  You may step down, sir.

THE WITNESS:  Thank you.  May I leave all these right --

THE COURT:  Yes, you should.  Did the witness appear pursuant to a subpoena?

MR. ABREU:  He did not, Your Honor.

THE COURT:  You're free to leave then. Thank you.

THE WITNESS:  Thank you.

THE COURT:  Here's our choice.  You can call your next witness or we can break until 1 o'clock and so whatever you prefer.

MR. ABREU:  I think if it's okay with the Court we'd prefer to break.

THE COURT:  All right.  We'll go ahead and break until 1 o'clock this afternoon.  Thank you.

Mr. Reisenauer, did you intend to offer Exhibit No. 2?

MR. REISENAUER:  If I didn't yes, Your

Honor.

THE COURT:  All right.  Any objection?

MR. ABREU:  No.

THE COURT:  Two is received.  And I hate to do this but I want to renumber the government exhibits and have them be letters so that we don't have two 1s, two 2s, two 3s, because it becomes a problem.  And so I'll just direct the clerk to renumber 1 and 2 to A and B, and then you can start your next exhibits with C if that's okay.  And I don't care if you just scribble out the number and write C next to it, okay?

MR. ABREU:  And, Your Honor, just for clarification sake, our intention is at the end of the hearing to provide the Court with a disc with an electronic version with all of these exhibits so that you have them in one place as well.

THE COURT:  Thank you.

MR. ABREU:  You're welcome.

(Recess taken; 11:45 a.m. to 1:00 p.m.)

THE COURT:  We're back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's Criminal Case No 2:04-cr-55 and Civil Case No. 2:11-cv-88.  The record should reflect that each of the counsel that were previously noted continue to appear.  When we broke the petitioner was about to

call its next witness.

MR. MONTROY:  Thank you, Your Honor. Petitioner would call Dr. Mark Flomenbaum as the next witness.

THE COURT:  Thank you.  If you please would stand before the clerk and take the oath.

(Oath administered.)

THE WITNESS:  Can I affirm?

(Witness affirmation given.)

THE CLERK:  Thank you.  Would you state your full name for the record and spell your last name for the reporter, please.

MR. FLOMENBAUM:  Dr. Mark Flomenbaum, Mark with a K, F-l-o-m-e-n-b-a-u-m.

**MARK FLOMENBAUM,**

HAVING AFFIRMED TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. MONTROY:**

Q.  Good afternoon, Dr. Flomenbaum.

A.  Good afternoon.

Q.  Dr. Flomenbaum, could you please tell the Court what your occupation is.

A.  I'm currently the chief medical examiner for the State of Maine.

Q.   And what does being the chief medical examiner for the State of Maine entail in terms of your responsibilities?

A.   Well, it involves certainly all the duties of a regular medical examiner but the administrative chief is the person who's singularly responsible for making sure that all the functions of the office get accomplished.

Q.   During the course of your duties as a medical examiner, do you perform autopsies?

A.   I do, yes.

Q.   Would you like to get a glass of water?

A.   No, that's okay, sorry.

Q.   And in your position as the medical examiner of Maine, about how many autopsies have you performed?

A.   Oh, I've only been chief for about two and a half years.  It's several hundred autopsies in that capacity but I've had a long career as a medical examiner before moving to Maine.  I have done many more autopsies than that.

MR. MONTROY:  Your Honor, may I approach the witness?

THE COURT:  You may.

MR. MONTROY:  Your Honor, for the record I'm marking this as Petitioner's Exhibit 9.

Q.   (Mr. Montroy continuing)  Dr. Flomenbaum, do you

have Petitioner's Exhibit 9 in front of you?

A.   Yes, I do.

Q.   And could you identify that document for the record.

A.   This is a copy of my CV, my Curriculum Vitae, which basically lists my entire professional career and references some of the accomplishments.

Q.   Okay.  You had said that you have been the medical examiner for the State of Maine for the past two and a half years.  Have you held the position of medical examiner at other locations?

A.   I've been chief medical examiner for the Commonwealth of Massachusetts for two years between '05 and '07, and prior to that for 14 years I worked in New York City, the last five years of which I was the first deputy chief medical examiner.

Q.   And as the first deputy chief medical examiner for New York City, what did your duties entail?

A.   Well, New York City has five boroughs and each borough has a deputy chief.  I was chief in New York County, which was Manhattan, and therefore was the senior or first deputy chief.  The chief medical examiner in New York was more administrative and did not do autopsies so I essentially was the most senior autopsy pathologist for New York City.  I held that

position for five years.  I directed all the activities of medical examiner work within New York County, or Manhattan, and the other boroughs were -- the chiefs from the other boroughs were responsible to me for their activities and I would then relate it to the administrative chief.

Q.   And what years did you hold that position in New York?

A.   First deputy chief -- I'm going to have to refer to my notes here because for a while it was just an acting position.  From -- I'm sorry, from the year 2000 to 2005 I was officially the first deputy chief and I held chief position -- deputy chief positions before that as well.

Q.   Okay.  In terms of -- I'm sorry, strike that.

In addition to performing autopsies, does a medical examiner have a role in determining the cause and manner of death?

A.   That's really the primary function of the medical examiner's office.  Most statutes, state statutes or municipal statutes which give authority to the medical examiner want to find out why, which is cause of death, and how, which is manner of death.  They need to know why people are dying.  The autopsy is one of our best tools to come up with those answers.

So, yes, we do them.  But we also certify -- or certify deaths meaning filling out death certificates.  Lots of times when either autopsies are not done or they're done in other jurisdictions or there's reason for us to not do the autopsy ourself, just based on medical history we can determine the cause or manner of death.

Q.  So are you saying that there's instances where you have to determine cause and/or manner of death without performing an autopsy?

A.  Yes.  In fact, I've done more of those than I have done autopsies and I have done a lot of autopsies in my career.

Q.  And how does that work?  Does that involve you reviewing autopsies that other people have done?  Does it involve reviewing records?

A.  If there were autopsies performed and we need to have a review of it, then I will certainly review all the material that's at hand, including their autopsy reports.  If they're microscope slides I'll look at those, photographs, the medical history if they exist. But a good number of times no autopsy was done, and I will review all the records as well trying to understand the case in its entirety in order to make those determinations of cause and manner of death.

Q.   Can you make an approximation in about how many cases you've been asked to determine the cause and manner of death?

A.   Well over 8,000 easily.

Q.   And about how many cases have you performed autopsies?

A.   I stopped counting when I reached 2,000 and that was ten years ago so I don't have an exact number.

Q.   And is it fair to say that you've -- you've continued to perform autopsies and continued to determine the cause and manner of death in your current position as the medical examiner for the State of Maine?

A.   Yes.  I do more autopsies than any other of the medical examiners for this state.

Q.   Could you tell the Court a little bit about your educational background.

A.   Certainly.  After finishing college I went to graduate school, did a Ph.D. studying the development of the nervous system.  And as a graduate student I was working at the medical school teaching future doctors anatomy, neuroanatomy, microscopic anatomy, developmental anatomy.  And when I completed my Ph.D. I did advanced research and took a position at the medical school at Albert Einstein as a faculty member in the anatomy department.

I then entered the medical school as a student and graduated four years later with my second doctorate, this one in medicine, went off to Boston to do my residency in pathology.  There I joined the faculty of Harvard Medical System so was on the faculty there, completed three years of residency, including chief resident as well as advanced cardiac or heart pathology training, and went down to -- back down to New York City to do advanced training in forensic pathology.

So I spent a year doing that and stayed in New York City, worked my way up from lower level student sort of through junior level medical examiner, senior level medical examiner, deputy chief and then became first deputy chief.

Q.   You just mentioned studying in the field of forensic pathology.  Could you describe what forensic pathology is.

A.   Forensic pathology is a subspecialty of pathology.  Pathology is one of the specialities in medicine such as or equivalent to surgery, pediatrics, psychiatry, obstetrics, whatever.  Pathology is a medical specialty, and what the pathologist does in the hospital is basically make diagnoses and render opinions of disease and gives those opinions to other doctors to treat the patients.

For example, we as a pathologist will look at a specimen that a surgeon will give us and we'll tell the surgeon whether it's benign or malignant, whether it's infectious or not.  We'll look under the microscope at pap smears, biopsies, whatever.  We render the diagnoses for other doctors.

If a person dies in the hospital of natural causes, we'll do the autopsy in the hospital.  There are other branches of pathology where they specialize in many of those medical areas.  I'm fully cert- -- one needs to be first fully certified and board certified in pathology in order to take advanced training in forensic pathology.

Now to answer your question, in forensic pathology we take all those tools that are available to us, the microscope, the gross exam, the different testing, and apply that medical knowledge in the forensic setting.  I'm putting that in quotes because "forensic" refers to anything dealing with the public at large.

So whereas a normal doctor has an obligation to their patient, a forensic doctor -- my patient is the public at large.  So I'm doing the autopsy and I'm trying to find out why this person died, not for the sake of the person who died but for the sake of the

public at large who wants to know why this person died hopefully to save future lives.

Q.   Have you been qualified as an expert in courts in the area of forensic pathology?

A.   Yes.

Q.   Could you give us an example of the locations or the Courts where you've been qualified as an expert?

A.   Certainly.  The state jurisdictions, multiple within New York City.  Each county has its own.  States of Connecticut, Ohio, certainly Massachusetts, certainly Maine, and then federal jurisdictions in Eastern District of New York, Southern District of New York and I don't know what the name of it is but the one in Newark, New Jersey.  It's the Federal Court there as well.  In total I've done well over 200 trials in probably close to a dozen, if not more, different jurisdictions.

Q.   Have you been -- and you mentioned trials.  In those cases have you been called as a witness for the prosecution?  For the defense?  Both?

A.   Both.  Mostly been called up by the prosecution mostly because they are most anxious to hear what I have to say, but on multiple occasions I've been brought up when my expertise was valuable to a defense issue I guess.

Q.    Are you board certified in forensic pathology?

A.    Yes, I am.

MR. MONTROY:  Your Honor, I don't have anymore questions concerning Dr. Flomenbaum's qualifications in the area of forensic pathology so I would just offer him as a witness to the government.

MR. REISENAUER:  We have no objection, Your Honor.

THE COURT:  You may testify.

MR. MONTROY:  Thank you.

THE WITNESS:  Thank you, Judge.

Q.    (Mr. Montroy continuing)  Doctor, I have some initial questions how you became involved in this particular case.  You're familiar with the case of United States versus Alfonso Rodriguez; is that correct?

A.    Yes, I am.

Q.    And do you recall how you first became involved in this case or what brought this case to your attention?

A.    Professor Margulies was involved with this case heavily and he e-mailed me and then we spoke by phone. He had requested -- or asked whether I felt comfortable or would undertake reviewing material which included an autopsy and some other material related to it and asked if I could render an opinion as to the opinions that

were set forth by the original autopsy pathologist.

Q.   And did you ultimately prepare a report based on the questions that Professor Margulies asked you?

A.   Yes, I did.

MR. MONTROY:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.   (Mr. Montroy continuing)  Dr. Flomenbaum, do you recognize the document that's in front of you?

A.   Yes.  This is a copy of the report I issued to Dr. Margulies hopefully answering the questions that he posed to me.

Q.   If I could just ask you, when did you offer this report?

A.   This final copy was dated September 14, 2011.

Q.   And if I could just ask you to turn your attention to page 10, which is the last page of your report; is that correct?

A.   Yes.

Q.   That's your signature there?

A.   Yes, it is.

Q.   And I just want to direct your attention to the lone paragraph that appears on page 10.  You write, "The opinions reported herein are based on the information contained in the material cited above.  If additional

material is provided some or all of these opinions may be amended to reflect that new information."

A.   That is what I wrote.

Q.   You wrote that, okay.  So when you prepared this report, you were basing your opinions and your conclusions based on the materials that you had been given at that point by Dr. -- or by Professor Margulies?

A.   Yes.  And they're itemized on page 1 of my report.

Q.   Okay.  And if I could turn your attention back to page 1, you just testified that Professor Margulies posed some questions that he wanted to see if you could resolve by evaluating the materials that he was sending you; is that right?

A.   Yes.

Q.   And if you could look at the third line.  And just backing up a second this report is actually addressed to Professor Margulies; is that right?

A.   Yes.

Q.   So looking at the third line in the first paragraph, you indicate for Professor Margulies, quote, You asked me specifically to opine on the nature and source of damage to the neck and throat region of the victim's body which had been discovered in a Northern Minnesota field after a postmortem interval of

approximately five months spanning winter and spring.

So does that reflect the first question that you were asked by Professor Margulies?

A.   Yes.

Q.   And then you continue, quote, and to comment on the interpretations and opinions of the Government's expert, Dr. Michael McGee, who performed the autopsy and testified that the injuries were due to slash wounds produced by a sharp object that was consistent with a particular knife shown him by the police.

That was the second question that you were asked by Professor Margulies?

A.   Yes.

Q.   And then lastly, quote, you also asked whether I would comment on whether Dr. McGee's testimony was appropriate for his interpretations of the injuries.  Is that correct?

A.   Yes.

Q.   Was that your understanding of the questions that Professor Margulies was asking of you when he asked you to participate in this case?

A.   Those are the questions he asked of me, yes.

Q.   And when Dr. -- I'm sorry, when Professor Margulies posed these questions to you, did you indicate to him that you thought you'd be able to render opinions

and conclusions based on the materials that he was providing to you?

A.   I didn't tell him at that point.  I told him I would have to look at the material he provided and see whether I would be able to render opinions based on it. So I was willing to look at the material he sent me and then answer those questions if I could.

Q.   Okay.  And the questions that Professor Margulies posed to you, are these questions that you typically encounter in the field of forensic pathology?

A.   It's basically asking to evaluate the opinions of another person and, yes, I do that all the time.  We all do that all the time.  It's not something bad or, you know, needing to be -- it shouldn't be taken as a negative statement.

When an autopsy is performed, there is incredible amounts of detail presented, the measurements, the weights, the photographs.  That's not opinion.  That's all very objective information.  At the very end of an autopsy a report is generated like Dr. McGee did or any of us, and the opinions then come is how to interpret those findings.  And he did render opinions.  He saw some findings on the body, for example.  He listed them as injuries.  That is an opinion.  He had other interpretations of those

injuries.

I read his material.  I actually do congratulate him for writing some pretty good detailed information.  A lot of very good photographs were taken. I looked at that with an independent view and told Dr. Margulies verbally, before I even started writing, I can answer your questions.  I believe on a first blush that there was a lot of misinterpretation and then asked if he wanted me to proceed.  I will then go ahead and itemize those findings which I disagreed with and provide what I thought was a fairly reasonable detailed explanation of why my opinions -- of how I came to my conclusions.

Q.   Okay.  All right.  Thank you, Doctor.  We'll get to those.  So you mentioned Dr. Margulies -- I'm sorry, I keep calling him Dr. Margulies.

Professor Margulies provided you some materials to review before you rendered any opinion; is that right?

A.   That's correct, yes.

Q.   And do the materials that you reviewed, do they appear on the first page of your report?

A.   Yes.  I listed specifically what he sent to me.

Q.   Okay.  And specifically reviewed the autopsy photographs?

A.    Correct, and I indicate 164 of them.

Q.    The crime scene photographs?

A.    One hundred twenty of those.

Q.    Two reports from Dr. McGee?

A.    No, one -- well, first was a Provisional Report, which is two pages, and then his final report, which was 13 pages, yes.

Q.    And you reviewed a filing by the United States government?

A.    Yes.

Q.    And you reviewed several transcripts of Dr. McGee's testimony, including his deposition, his trial testimony at the penalty phase and the guilt phase; is that right?

A.    Punishment -- yes.

Q.    And then lastly you said you reviewed crime scene written reports and associated interviews?

A.    Right, because that came separately so this was sent at a later date.  There were crime scene -- the written report and there was another 49 pages of that.

Q.    And just to be clear did you actually review all of these materials?

A.    Yes.

Q.    I next want to ask you about -- well, strike that.

After you prepared this report in 2011 for Professor Margulies, at some point in time were you contacted by my office, the Capital Habeas Unit from Philadelphia?

A.   Yes.

Q.   And was that in the late fall, early winter of 2016?

A.   Yeah.  I think it was almost August, September. I might have my dates wrong but it was around then, 2016, yes.

Q.   And when you were contacted by -- when you were contacted on that occasion, at some point following that contact were you provided additional items to review that you had not previously seen?

A.   Yes, I was.

MR. MONTROY:  May I approach, Your Honor?

THE COURT:  You may.

Q.   (Mr. Montroy continuing)  Dr. Flomenbaum, can you identify that document that's now been marked as Petitioner's Exhibit 11?

A.   This is a copy of the report that I wrote back to you folks after you showed me the additional information.  So I'm labeling this as an "Addendum to Original Report" and the date of this is December 2, 2016.

Q.   And what were the additional items that you reviewed in preparation of this addendum that you had not previously seen?

A.   I indicate that on page 2 that you had supplied me with Mr. Rodriguez's account of the crime, which were pages -- I listed the specific pages.  It was a much larger document.  And the other document I reviewed was an opinion report that was authored by Dr. Dragovic.

Q.   The first item it was -- do you recall that it was a transcript of an interview that Mr. Rodriguez had given to Dr. Welner?

A.   Yes.

Q.   And do you know or do you recall who Dr. Welner is?

A.   I never met the gentleman, no.

Q.   If I told you that Dr. Welner was a mental health expert and psychiatrist who was retained by the government during these post-conviction proceedings, would that refresh your recollection?

A.   Yes.  The question was certainly of that nature.

Q.   Are you familiar with Dr. Dragovic?

A.   I know Dr. Dragovic from professional meetings.

Q.   And is Dr. Dragovic a medical examiner and forensic pathologist?

A.   Yes, he is.

Q.   Like you?

A.   Well, not like me but, yes, he is.

Q.   Do you recall how Dr. Dragovic was involved in this particular case?

A.   I believe he was the primary author of the two other or three other authors who was requested by the people to review some material and render opinions on questions that they had asked of him.

Q.   And when you say "people," do you recall that the government of the United States --

A.   Government.

Q.   -- hired Dr. Dragovic to -- during these post-conviction proceedings to do an evaluation, a forensic pathological evaluation?

A.   Yes, the government, referring to the people of the United States.  I'm sorry.

Q.   So you reviewed Dr. Welner's transcript and Dr. Dragovic's report; is that correct?

A.   That's correct, yes.

Q.   And you were deposed in this case; is that right?

A.   Yes, I was.

Q.   And that deposition occurred in December 2016?

A.   Yes.

Q.   And is it fair to say that both your report and your addendum to the original report were prepared prior

to your deposition?

A.   Yes, the deposition -- yes.

Q.   If I could just direct your attention, Doctor, back to your original report which is -- I'm not sure if --

A.   Peoples No. 10.

Q.   Ten, that's right.  Petitioner's No. 10?

A.   I'm sorry, P for petitioner, I'm sorry.

Q.   That's okay.  And I want to just direct your attention to page 2.  You have a section here that's entitled "description of body;" is that correct?

A.   Yes.

Q.   And the body that you're discussing is the body of the victim in this case; is that right?

A.   Yes.

Q.   And that person's name was Dru Sjodin; is that correct?

A.   Yes.

Q.   The third paragraph down under that title you summarize the condition of the body; is that correct?

A.   Yes.

Q.   And you write, "The overall condition of the body was moderate to advanced decomposition with partial putrefaction, partial mummification, animal feeding (anthropophagy), and maggot infestation;" is that

correct?

A.   Yes.   That's basically right out of Dr. McGee's autopsy report.

Q.   Is that how Dr. McGee described the condition of the body more or less?

A.   Yes.   I don't have quotes around it but it's in his report basically saying the same thing.

Q.   So I just want to ask you a couple questions about the terminology that you used here and that Dr. McGee used as well.

Concerning advanced decomposition, what does that mean to be moderately or advanced decomposition?

A.   Once the -- once a body is dead or stops living all the mechanisms of the body to protect itself against changes from environment cease.   All the defense mechanisms cease so many things start happening.   The effects of -- the physical effects, the biochemical effects, there's temperature effects.   The body is biological material and it can be affected by bacteria. It can be affected by dehydration.   It could be affected by other animals doing predatory activity.   Anything that changes the state of a body from pristine to breaking it down, recycling it into nature, all of that is called decomposition.

There are different paths the body can

decompose.  In a very dry arid atmosphere the body will mummify.  Basically it will dehydrate and become dry leathery skin like a mummy.  If the temperature is warm and a lot of humidity, the bacteria tend to win out and they're going to start breaking down the body the way you might see food that was left out of the refrigerator, same process.  If other animals like flies drop eggs on it so that there eggs can eat, maggot, that's a different type of decomposition.  If the body's in water, cold and anaerobic, no oxygen, it's yet a different type.

So there are all different sorts of factors which can make the body undergo changes, and rating it advanced to moderate to minimal is basically an opinion of how much has changed since it was pristine.  There are many steps I don't think I need to get into in how we can relate minimal activity to more and more and more.

By calling it moderate means that there was at least some indication, especially in the soft tissue, that not all of it was decomposed.  We might be able to make some meaningful interpretation of it.  When it's more advanced, there is less of the soft tissue around to make any meaningful opinions until you can get ultimately a skeletonized remains, which would be the

end product, but even in skeletonized remains sometimes you could see fractures of the bones and sometimes you could see other indications.  So it's a huge spectrum of changes a body undergoes after life ceases and it can take many directions.

Q.  And I think you've touched upon this but generally speaking in forensic pathology does the varying states -- or does an advanced state of decomposition, could that affect your investigation into the cause and manner of death?

A.  It can.  It can compromise the exactness of our opinions or it can totally obliterate some of the information.

Q.  You -- just describe -- you touched on a variety of different forms of degradation or decomposition that can occur.  In this particular case generally speaking, did you observe different forms of decomposition on different portions of the body?

A.  Yes.  The report and the photograph indicated different types of postmortem changes.

Q.  And what can cause that?

A.  As I sort of mentioned, these are environmental factors.  We indicate putrefaction.  That is the cascade that occurs when bacteria start decomposing the body. The liquid -- the solids change to liquids.  Gases form

so there could be an expansion of the tissues due to the gases that are formed when the bacteria break down the body.  And part of their process of breaking down makes the broken down tissue more easily accessible to other forms of decomposition.  So the bacteria break down the body.  With a little bit of putrefaction it makes it easier for flies to come to lay eggs or other types of insects.

Q.  So is it fair to say the positioning of a certain portion of the body in relationship to the ground or the air can cause a different form of decomposition than, say, a different portion of the body?

A.  Correct.  That's the whole point of interpreting the findings in relation to the environment or how it was found, yes, sir.

Q.  And before I ask you some questions about your conclusions and opinions, you discuss in your report distinguishing between what you term premortem lesions and postmortem changes and could you just define for the Court what those mean.

A.  "Premortem" lesion would be an injury or -- well, usually an injury, any lesion that occurred while the person is still alive.  "Premortem" is before death.  "Postmortem" is the changes that occur after death, and many of the observations we have of the body after it's

been dead for a while sometimes it's difficult to determine whether those observations represent something that happened before death occurred or represent some of the changes that occurred after death.

Q.   When you reviewed the materials in this case, were you able to make a determination between premortem injuries and postmortem artifacts?

A.   To a degree, yes.  I mean, most of the defects, physical defects on the body, most if not all of them could easily be related to postmortem changes.  And here is where I differed in opinion.

Dr. McGee referred to many of those as being inflicted by a sharp object implying premortem, before the victim was dead.  Almost every single one of those show absolutely no indication of being an antemortem or premortem injury, and almost every single one of them is easily explained by the postmortem changes of decomposition.

Q.   And before we get into that in detail, were you -- did you render an opinion or can you render an opinion as to the cause of death in this case?

A.   I -- yes.  The answer is yes.  Based on the original material I believe that there was soft tissue injury around her neck which I believed at that time was due to strangulation because when the body was found

there was a rope around her neck, a plastic bag over the head under the neck -- under the rope.  There were no other traumatic injuries to the body and because of that I believe that the death was due to an asphyxial process, asphyxiation.

And after reading more of the supplementary material I still believe the cause of death is likely asphyxial.  There's no other injuries to the body.  But I've learned from reading that material that the plastic bag might have been applied after she was technically already dead.  But the asphyxial process is what killed her even before the bag was on.  The description of what was provided, what Mr. Rodriguez said, indicated that the asphyxiation did occur but before the bag was put over her head.

Q.  And if we could just step back a second.  What is "asphyxiation," if you could describe the term?

A.  Yes.  I think I'm going to have to get pedantic about it.  The word "asphyxia" means without -- without pulse.  So technically it just means without pulse. Medically it really refers to without functional pulse, which means either the pulse is not able to get to the brain.  You're blocking the arteries so you can't bring the blood up or you're blocking the veins which prevents it from coming down so there's no circulation.  That's

one form.  Or if you deprive the person of air, oxygen. Then even though you might be having a pulse it's not a functional pulse because there's oxygen in it.  So either obstructing the circulatory system or preventing air from getting into the circulatory system, either way of preventing functional pulse to the brain is technically asphyxiation.

Q.  And your first -- in your first report you testified that you believed the asphyxiation was caused by ligature strangulation or manual strangulation?

A.  Ligature.  "Ligature" refers to the rope that was tied around her neck.

Q.  And your basis for that was essentially the rope that was found?

A.  It wasn't just a rope found around her neck.  It was really tight.  I measured it -- I didn't measure it. I didn't have it.  It was never particularly measured. I compared it to a ruler and it looked to me as if it was about 11 inches in circumference.  Some of my other colleagues thought it was less.  But even if it's 11, an adult neck collar size, 12, 13, 14, that would be enough to constrict it.

In addition to which there was a furrow where the skin was beneath the rope.  If it were just loosely tied, you wouldn't see any markings on the skin.

But here the skin markings, the dried out mummification of that strip of skin, in the context of everything else around it going a different direction is clearly indicative that the rope was around her neck and it was tight.  And we cannot discern whether the rope was -- I could not discern now in retrospect whether the rope was the cause of her dying or whether it was placed very, very shortly after she died.  Either way we're going to get those same findings.

Q.  And the furrowing that you described, that was on an area of skin where the rope was on top of; is that correct?

A.  Correct.  When a person -- when a person dies as a result of a ligature strangulation, whether it's someone else doing it or just hanging, suicidal hanging, when the body -- the weight of the -- either the pressure of whatever is applying pressure on the rope, the pressure is going to squeeze the skin under it.  It's going to have to.  In order to affect death it's going to have to squeeze hard enough to prevent either circulation or breathing.

So there's a lot of pressure.  That amount of pressure is going squeeze the skin and essentially push the blood out of the skin.  If you push on your hand you make it go from red to white.  You push all the

blood out of the skin and if it stays that way it's going to dry up. There's no moisture there. So if we come look at that skin under the rope it's going to be dry, usually tan, leathery. And it will take a different path of decomposition because it is not moist and it's not fluid. It leaves a very distinct mark which we call a furrow on the skin.

Q. And how was it that you were able to discern that there was furrowing?

A. Well, for many reasons. Once the rope was measured so -- the circumference is so tight I was basically expecting it. And sure enough in Dr. McGee's photographs there's indication of the neck where the strip of skin which would have been right under the rope is preserved as intact skin. Whereas, the animal activity completely ate up everything above and below. And that would make absolutely no sense if the skin were there. Even if it's dry that can go above and below a strip. They'll take everything out.

But if it's protected because it's pasted so tightly by plastic against the rope, it makes perfectly logical sense that that's going to be one area that's protected from in this case rodents who are basically taking out all the soft tissue from the neck, part of the face, and the only thing left behind was that thin

furrow, which measured exactly the diameter of the rope and the exact same location where the rope was.

Q.   And how was it that you were able to do a measurement of the rope?

A.   There was a photograph of the rope with a ruler alongside of it.  Usually we actually measure it at an autopsy and say this is the circumference.  That was not done by Dr. McGee.  But he did have a ruler in one part of the picture and the rope partially curved in another part and I tried to measure it as best I could.

Q.   And in your addendum you still conclude that it was asphyxiation but you conclude that it was asphyxiation by blunt force to the neck region?

A.   I do, and that is what I said in the report. There is absolutely no question now, especially after re-reading Mr. Rodriguez's account of it, absolutely no question there was blunt force trauma to the neck which caused her to die.

Q.   And that is -- in addition to reviewing Dr. Welner's transcript of his interview with Mr. Rodriguez, you also reviewed the conclusions of Dr. Dragovic, the government's witness; is that right?

A.   I did, yes.  And it's I think -- you know, the more and more I think about it the more it's -- it's clearly blunt force to the neck, and Dr. Dragovic's

reports indicate it to be more towards the front of the neck.

I know there's blunt impact but as I read and re-read and re-read the description, I hate to be so graphic here, Your Honor, but the details of what he gave almost indicate that the blunt trauma might not have been entirely to the front of the neck because the description that he gives of his observation of being alive, hearing a snap and then being dead, almost like lights on, lights off, is less consistent with what Dr. Dragovic reports as direct pressure on the front of the neck.  Although, there might have been some pressure there but I believe as he reported her neck going up when his hands were coming down, a snap like that is not going to be heard if it's only on the front.  And it might have involved more than just that but it was clearly blunt force trauma.

Q.  And Dr. Dragovic's conclusion was essentially similar in that he also found asphyxiation by blunt force trauma?

A.  Correct.  And with Dr. Dragovic's report, he having had the benefit of Mr. Rodriguez's report which I did not have, it was clear that the plastic bag and the rope was put on around her head after she had died, which was not obvious to me at the original report.

Q.   Is there a concern on your part -- and I know that you just testified Dr. Dragovic relied on the same information essentially that you did in coming to the conclusion of asphyxiation by blunt force trauma, but is there a concern that you're relying on the words of Alfonso Rodriguez and he might not be the most credible source of information here?

A.   I agree he might not be the most credible source, but I do comment that most of what he did report was certainly consistent with all of the findings.  So it's not like totally made up out of thin air.  There are things that he had to have known about that nobody else would have.

Q.   If you -- strike that.  If Mr. Rodriguez -- if you would never have been provided with Mr. Rodriguez's statement, would your conclusion be the conclusion that you reached in the original report which was asphyxiation but by ligature strangulation?

A.   Correct.  I mean, if you find a body that's been dead for a while clearly of not a natural death, someone else inflicted this death, you see a rope around her neck that's tight enough to kill somebody and you find no other -- really no other blunt force injury, the logical conclusion is that it was that rope that did it.

Here we're finding out much later that the

rope and plastic bag were applied for other reasons after she was already dead, but still the lack of any other injury to the body must indicate it was something going on around her neck.

Q.   And do you recall what those other reasons were concerning the plastic bag?

A.   According to the report, before she died there was a struggle or some blows exchanged.  She was struck in the face, perhaps in the lips, and started bleeding.  And in order to protect his vehicle from having blood on it he put the bag over her head and then tied it off.

Q.   And do you recall whether or not there was some blood that was recovered from his vehicle?

A.   I perhaps remember reading it.  I cannot state at this point that I spent a lot of time on the vehicle, the report.

Q.   Okay.  Based on your expert opinion and based on the evidence that you reviewed, do you see any other reasonable alternative cause of death other than asphyxiation either by blunt force trauma, which your opinion is, or by ligature strangulation?

A.   I'd like to state that her cause of death is the result of blunt force either to or around her neck.  Asphyxiation is the common mechanism for that, but I'm not going to exclude other possibilities of blunt force

that's not asphyxial.

Q.   Is there -- based on your expert review, is there any evidence that you observed that would reasonably support another conclusion as to the cause of death?

A.   I cannot see any other, no.  I do not see any other cause of death other than something going on around her neck either with a lot of pressure or a hard strike or both.

Q.   Okay.  You were asked by Professor Margulies to specifically opine on the nature and the source of the damage to the neck and throat region of Miss Sjodin; is that correct?

A.   Yes.

Q.   I'd like to just ask you some questions about that.  If you could look back to Exhibit No. 10, P-10, your initial report, and please turn to page 9.

A.   Yes.

Q.   You're there?

A.   I'm here, page 9.

Q.   And you see the section entitled "conclusions and opinions" at the bottom of page 9?

A.   Yes.

Q.   I'd like to turn your attention to first point No. 2.

A.   Yes.

Q.   You conclude, "There was no 'slashing' wound to the neck; it was a misinterpretation of a post-mortem artifact"?

A.   Yes.

Q.   And No. 3, "None of the areas of skin defects on the body represent pre-mortem injury; they are all misinterpretations of post-mortem artifacts"?

A.   Yes, I wrote that.

Q.   "There is no indication that a knife or any other sharp instrument caused any injury to this body"?

A.   That's correct.

Q.   And lastly, "The testimony of Dr. McGee concerning a possible weapon was misleading"?

A.   Yes.

Q.   Do you stand by these conclusions today as you testify?

A.   Absolutely.

Q.   Generally speaking -- well, stepping back, you've identified some of this already in your testimony but did you identify degradation, decomposition to the neck, throat and face area?

A.   There was a lot of that, yes.

Q.   And could you describe the level of decomposition or degradation that you say?

A.   The term that was used by Dr. McGee,

"exenteration," which is basically removal of tissue, animals did that, mostly rodents in this case.  There was tissue completely missing from the neck area, from parts of the face.  Bone was exposed.  Yes, bacteria can start the process and, yes, insects can have some beginning on this process.  But here there were clearly evident notching at the periphery of the skin, which is the notching produced by the teeth of rodents.  There are several pictures where I believe I referred to them, and some of them are just classic for rodent activity. And I believe Dr. McGee looked at that notching and referred to it as some scalloping of a knife which I can talk about later, but this is rodent activity.

MR. MONTROY:  May I approach the witness, Your Honor?

THE COURT:  You may.

MR. MONTROY:  Your Honor, I just want to give the government a chance to be on the same page.

THE COURT:  You may.

MR. MONTROY:  Thank you.

Q.   (Mr. Montroy continuing)  Dr. Flomenbaum, do you recognize the document that's in front of you?

A.   Yes, I do.

Q.   And could you describe what that document is for the Court, please.

A.   This is a photograph taken at the autopsy, basically a close-up photograph of the neck region which shows significant postmortem artifact.  Most of the internal structures of the neck are missing.  A lot of the skin on the head is missing.  The prosector, or person involved in doing this case, is holding up a flap of skin across the neck which was being described I believe erroneously, and it does indicate a lot of other what I'm referring to later as rodent activity.

Q.   And I was just going to ask you to do that. Could you describe for the Court what -- the type of degradation that you observe here and what you believe the cause of that degradation is.

A.   I believe the cause of degradation is rodent activity for removal of the tissue, and I think the surface skin where the bone is exposed around the jaw need not be due to rodents but the bacteria or the insects easily could have done that.

I'd like to draw your attention first to the -- if we're all holding the picture in the same direction in the very upper left corner is a remnant of her right ear.  The intact part is clear but the part that's removed, that's missing, the edges have the scalloping effect which when I looked at higher power in my copies of the photograph clearly had the indications

of teeth marks.  Those identical marks are present on the border of the flap of skin where the skin is being held -- that flap of skin across the neck is being held up.  And where there is still part of the neck skin left and forms like a circle where it's continuing from the base of the flap to the area, you see that scalloping again.  And that too is almost pathognomonic for rodent activity.

Q.  Let me just stop you there for one second.  When you say "scalloping," what do you mean by scalloping?

A.  Scalloping or like very shallow semicircle letter Cs.  They're just grooving for -- not sharp grooving, very gentle grooving.  Its distinction like smooth line, if there was a very sharp line such as a knife we'd see a very straight edge.  But if you see on that edge that's not on the skin edge but on the other edges I talked about, instead of being smooth we see almost the imprint you'd get like if you bite into an apple and you see your teeth imprints.  That's a scalloped imprint.

Q.  And generally when you see "scalloping" as a forensic pathologist what is that indicative of to you?

A.  When I see this type of scalloping in a situation where there's a great deal of decomposition and animal activity, they're teeth marks.

Q.  This type of scalloping that you're observing

here in this photograph, is it consistent with a sharp force injury caused by a knife?

A.  It's not only not consistent.  It's inconsistent. It can't be a knife if it's scalloped.  The scalloped edge should be nice and straight.  I'm sorry, the knife edge should be nice and straight.  Even if you take a serrated knife and you cut with it, you're not going to see those serrations.  A stab wound or a straight cut with a serrated knife is not going to show the serrations.  You have to take a serrated knife and actually rub it across the skin in order to get those shallow imprints.  And that's abrasions which never would have existed in a person this decomposed.

Q.  So your opinion is that the degradation that is observed in P-12 is caused primarily by animal activity; is that correct?

A.  Yes.

Q.  And you'd agree that in that photograph there's almost no soft tissue remaining; is that right?

A.  No soft tissue in the structures of the front of the neck and base of the mouth, yeah.  I mean, there's certainly a lot of soft tissue on the rest of the body.

Q.  However, looking at that picture you would agree that someone is holding up a piece of skin; is that correct?

A.   Correct.  They're suspending a flap of skin which anatomically would have bridged right across the center of marked exenteration above and marked exenteration below and a little bridge of skin crossing it, which biologically you need to explain why that skin is there when you have so much activity.

And then I recall looking at the police pictures before it was cleaned up.  That exact area shows the rope and the plastic bag right where that skin is.  So when you take the bag and rope off we're left with the skin and it just makes perfect sense to me.

MR. MONTROY:  May I approach, Your Honor?

THE COURT:  You may.

Q.   (Mr. Montroy continuing)  Dr. Flomenbaum, have you had a chance to look at the two photographs that I've just provided to you?

A.   Yes, I have.

Q.   One is marked Petitioner's Exhibit 13 and one is marked Petitioner's Exhibit 14?

A.   Yes, that's correct.

Q.   You had just referenced in your testimony before I marked those exhibits that you had an opportunity to observe some what you referred to as police photographs; is that right?

A.   Yes.  That's what I'm referring to is these.  I'm

not sure if it was police or who did the investigation. That's a generic term, "police photos."

Q.   Are those two exhibits demonstrative of what you were referring to?

A.   Yes, absolutely.

Q.   Okay.  When you look at those pictures, what is the significance of those pictures in relationship to P-12 which you were just looking at a moment ago?

A.   If I looked at these same photographs, P-13 and 14, first all I would see really is complete exenteration, complete removal of all the tissue from the entire neck area, and right across the middle is a rope.  And then when I look at the autopsy photograph I see the complete removal of all that tissue.  The rope has been removed and now we have that little strip of skin.

Q.   That strip of skin that you're referring to, is that where you observed the furrowing that you described earlier?

A.   That is the furrow.  That is the skin.  It's intact because it was compressed by the rope under the plastic bag and it's almost like a before and after picture.  Here's the neck before they took the rope off and here it is afterwards, and exactly where the rope is is where the skin is.

Q.    In the -- in P-12 other than the rope and the underlying plastic -- portion of the plastic bag that were removed, was there anything else that you can tell that was done during the autopsy that altered the condition of the body?

A.    Cleaned off.  There was a lot of straw-type material, debris from the outside environment that she was found in.  That was all washed off when P-12 was taken.  The rope was removed.  The plastic bag was removed so now we're looking at the body without anything else near it.

Q.    Concerning the piece of skin that you described as the furrowing, what is the significance on that piece of skin by the plastic bag and the rope that were covering it when the body was found?  In other words -- let me rephrase that.

A.    Please.

Q.    What was -- what impact, if any, did the rope and the plastic bag have on the preservation or degradation of that strip of skin?

A.    The plastic bag and rope essentially caused the skin to be tightly adherent to the underside of the plastic bag and the pressure from the rope is what kept it tight and squeezed, kept the skin squeezed.  And it protected that strip of skin that was tightly adherent

just there, protected that skin from the rodent activity that completely removed all the soft tissue from the rest of her neck.

Q.   So is it your opinion that if that rope and plastic bag were not there, if that had been removed, that strip of skin would not exist?

A.   Absolutely.

Q.   What would have happened to that strip of skin if not for the --

A.   Would have gone by where all the other skin went above and below it.

Q.   Do you recall reviewing some evidence that there had been a plastic bag placed over Miss Sjodin's head?

A.   Yes.

Q.   And is that evidence corroborated by the plastic bag that was underneath the -- the plastic that was underneath the rope?

A.   It's certainly consistent with exactly what was described.

Q.   And you testified earlier that Mr. Rodriguez told Dr. Welner that he placed the bag over the head to stop bleeding in the back of his car; is that correct?

A.   That's correct.

Q.   What would -- what, if any, would the impact of the bag being over the head containing blood, containing

bodily fluids, have on degradation of tissue in the face and neck area?

A. That's a loaded question because if the bag were completely sealed and tight it would prevent bacteria from getting in and insects. That would be a barrier. On the other hand, I believe he described it, the bag, as being partially open on top. He wasn't using it to suffocate. He just wanted to stop the bleeding and the bag was ripped. So now we have it doing almost the opposite. It's acting like almost like a blanket keeping the humidity in that area, keeping everything moist. Plus if she had any spit-up or blood as he talked about it's going to keep it there. So that's going to provide more incentive for the insects, bacteria and animals to get there. That would be the, quote, the hot spot.

Q. And when the body was recovered, am I right that most of the plastic bag was no longer -- was no longer there. It was no longer covering the head?

A. That's correct.

Q. And does that indicate anything to you?

A. Well, some of the plastic bag that still remains some of it you could still see the same gnawing-type teeth activity. All I could say is if there was a plastic bag, and I've got no reason to doubt it, most of

it is gone.  That's what happens.

Q.  And would that be the result of animal degradation?

A.  Could be the result most likely that but any reason for the bag to be gone is just as good as any other.

Q.  I'd like to just direct your attention to Dr. McGee and some of his conclusions and interpretations.  You recall you were specifically asked by Professor Margulies to evaluate Dr. McGee's conclusions and interpretations; is that correct?

A.  Yes.

Q.  And just to refresh, Dr. McGee, he conducted the autopsy --

A.  Yes.

Q.  -- is that right?  And he issued two reports that you reviewed before arriving at your own opinions and conclusions; is that right?

A.  Yes.

Q.  One was entitled Provisional Report?

A.  Yes.

Q.  And one was entitled a Final Autopsy Report?

A.  Yes.

Q.  And you reviewed both of those reports; am I right?

A.    Yes.

Q.    And you also reviewed Dr. McGee's testimony from his trial and his deposition; is that correct?

A.    Yes.

Q.    His pretrial deposition; is that right?

A.    Correct.

Q.    Do you recall -- strike that.

May I approach the witness, Your Honor?

THE COURT:    You may.

MR. MONTROY:    Thank you.

Q.    (Mr. Montroy continuing)  Dr. Flomenbaum, do you recognize what's been marked as P-15?

A.    Yes.  This is the Provisional Report that Dr. McGee issued.

Q.    And this Provisional Report was produced on either April 18th or April 19th, 2004; is that correct? If you look at the bottom of the page, there's a date that's associated with the fax, April 19, 2004?

A.    The fax was sent April 19, '04.

Q.    And so this -- well, let me ask you this.  Are you familiar with a Provisional Autopsy Report?

A.    Some agencies do it.  Almost all the hospital autopsies put out a Provisional Report just to have something in writing as to cause and manner and then the final report usually the conclusion after all the

studies are completed.  And often they change.

Q.  And I'd like to direct your attention to the fourth paragraph on the Provisional Report, on P-15. And Dr. McGee indicates, "At the time of the external examination the body of a normally developed Caucasian female could be observed that had entered the late postmortem interval and exhibited signs consistent with advanced -- "

THE REPORTER:  Excuse me, could you slow down, please?

MR. MONTROY:  Yes, I apologize.

Q.  (Mr. Montroy continuing)  "Could be observed that had entered the late postmortem interval and exhibited signs consistent with advanced postmortem decomposition. An elongated defect could be observed to the neck region with pronounced soft tissue loss noted to the left lateral facial and neck regions."

Do you interpret Dr. McGee's reference to "An elongated defect could be observed to the neck region" as the furrowed skin that you described?

A.  The defect usually refers to something that's not there.  The skin is basically the border above it and below it is the defect.  So I'm not sure what the elongated defect is that he's talking about.  I mean, the whole neck was missing almost everything except for

that remnant of skin.

Q.   Would you agree with me that there's no reference to any sharp force injury in the Provisional Autopsy Report?

A.   That is correct.  That is correct.

Q.   So it just discusses pronounced soft tissue loss?

A.   Yes.

Q.   And elongated defect?

A.   Yes.

Q.   And what is your understanding in forensic pathology as to what a "defect" means?

A.   A "defect" means something that's either not there or missing, a defect.  It's in reference to everything around it that's not defective or what's intact.

Q.   And is a defect distinguishable from an injury or --

A.   I'm sorry, a defect is just a catch-all term like a lesion or a problem or a hole.  It's a defect.

Q.   Okay.  It doesn't indicate any premortem injury though.  Is that fair to say?

A.   Correct.  It's just saying it's a defect.

        MR. MONTROY:  Your Honor, may I approach the witness?

        THE COURT:  You may.

Q.   (Mr. Montroy continuing)  Dr. Flomenbaum, do you have what's been marked as P-16?

A.   Yes.

Q.   And was this a document that was provided to you by Professor Margulies?

A.   Yes.

Q.   And what do you recognize that document to be?

A.   This is labeled as the "Final Autopsy Protocol."

Q.   I'd direct your attention to page 4 and I'm going to specifically direct your attention to the fifth paragraph.  And in the fifth paragraph Dr. McGee writes: "A ligature composed of similar appearing cord, as described in the --"

A.   I'm sorry, I'm not following you.

Q.   I'm sorry.

A.   What page?  Four?

Q.   Yeah, it's page 4.  Actually it's the third page but it's -- if you look at the top -- oh, you know what? I'm sorry, that's the fax number.  You're right, page 3. I apologize.  I'm sorry.

A.   I see it.

Q.   The fifth paragraph down.

A.   Yes.

Q.   "A ligature composed of similar appearing cord, as described in the above dictation, can be observed

encircling the subject's neck region a minimum of two times.  Present beneath this ligature and applied to the outer surface of the subject's neck region are remnants of brown and red colored plastic material."

A.  Yes.

Q.  And that description of the ligature and the remnants of the plastic bag, is that consistent with your observations of the autopsy photos?

A.  Yes.  Ligature -- here he's referring to it, clearly referring to the flap of skin as the furrow of skin beneath the ligature.  That's what the photographs indicate.  He's not indicating why it's there.  He's just indicating that it does correspond with -- that flap of skin corresponds to where the ligature was.

Q.  And if you turn to page 12 of that same document and look at "Section VIII PROVISIONAL ANATOMIC DIAGNOSES."

A.  Yes.

Q.  Dr. McGee indicates, "D.  Remnants of slash wound - neck region."

A.  Yes.

Q.  And then "E.  Defect to right flank region."

A.  Correct.

Q.  Is that correct?

A.  Yes.

MR. REISENAUER:  I didn't get that.  Can you read that back, please?

THE COURT:  You may, Kelly.

THE REPORTER:  The question and the answer or the answer?

THE COURT:  Read the question and the answer.

THE REPORTER:  Question:  "E.  Defect to right flank region."  Answer:  "Yes."

MR. REISENAUER:  Thank you.

THE COURT:  Just so the record's plain, Mr. Reisenauer, he made reference to subsection VIII -- or Section VIII, subsection I. C and E.  So there was actually two questions and answers.

MR. REISENAUER:  Thank you.

Q.   (Mr. Montroy continuing)  Dr. Flomenbaum, based on Section VIII D. and E. Dr. McGee is indicating here that he believes that there is sharp force injury to the neck region and the flank region.  Is that your interpretation?

A.   Where he states specifically under "homicidal violence" is that there's remnants of a slash wound. That I agree with you.  But then he says, "Defect to right flank region."  He's not indicating -- he's indicating it's part of homicidal violence but he's not

indicating how it occurred.

Q.   So are you -- you're saying you agree.  You're agreeing with homicidal violence; is that right?

A.   I think the cause of death is absolutely homicidal violence.

Q.   And are you agreeing with whether there was a slash wound to the neck?

A.   There was no slash wound to the neck is my interpretation.

Q.   I just wanted to clarify that.  Dr. Flomenbaum, there was a transcript that I believe is up on the witness stand.

A.   Yes.

Q.   And for the record this is the transcript of August 28, 2006.  It's Volume 29.

A.   Sorry, this says Volume 30.  Am I reading the right one?

THE CLERK:  Counsel, is this the one you want?

MR. MONTROY:  I apologize.

THE COURT:  Do you know what page you're referring to?

MR. MONTROY:  I'm referring to page 6693 which would be here (indicating).  Thank you.

MR. REISENAUER:  So are we on Volume 29?

MR. MONTROY:  Yes, page 6693.

Q.  (Mr. Montroy continuing)  And this, Dr. Flomenbaum, is the trial testimony of Dr. McGee which you reviewed prior to your rendering your opinions and conclusions.  And I would just direct your attention to the second half of the page.  If you look at line 13, it's part of the question from Mr. Wrigley.  "I'm going to ask you if you could describe for us two, I think to use your words, slash-type wounds to Dru Sjodin's neck. I'm going to ask you to please describe those for us on this diagram and then if you can take that pen and sketch out those injuries for the jury, please."

And then the answer, Dr. McGee answers: "The largest slash wound begins in this area and extends across.  The other slash wound is 13.5 centimeters. That's just over five inches, five and an eighth inches."

THE COURT:  Do you see it there?

THE WITNESS:  It's 6693.

THE COURT:  Oh, 6693, okay.  Thanks.

A.  Yes, I see that now that you read it.

Q.  (Mr. Montroy continuing)  So you'd agree that Dr. McGee is describing two slashes to the neck region; is that correct?

A.  Yes.

Q.   And he refers to it as a sharp force injury?

A.   Referring to it as a slash-type injury.  That's a cut.  A sharp object makes cuts and slash wounds, yes.

Q.   And I'm going to ask you to refer to page -- the next page, 6694, looking at line 8.

A.   Line which?  I'm sorry.

Q.   6694, the next page.

A.   Correct.  Line which?

Q.   Line 8.

A.   I'm sorry, go ahead.

Q.   He's asked to describe what he observes in the neck.  He says:  "It's a sharp-force injury; that is, you classify injuries on bodies due to sharp-force instruments as a sharp-force injury, in this case a cut or a slash.  It has a sharp well-formed edge that is notched and has a scalloping to it."

And then going down to 15, line 15, when asked to describe what he means by the term "notched" or "scalloping," "If you look at the edge of the wound, it will -- instead of going across the subject's neck in a uniform straight pattern, it will go and then stop and slightly scallop and then begin again and then slightly scallop and again begin again.  So it almost looks like gentle waves on the edge of the wound."

Do you see that, Dr. Flomenbaum?

A.   I see it, yes.

Q.   And then finally on that page 22 -- line 22 after he's asked what that signifies Dr. McGee answers:  "The weapon that was causing the slash of the neck was being plunged into her neck."

A.   I see that, yes.

Q.   And then I just want to cite one last -- one last portion of Dr. McGee's testimony concerning this.  On the top of page 6695, Dr. McGee testifies:  "I believe the waves or the notching, whatever term you wish to use, is consistent with repositioning the knife so as the knife is plunged inside the neck it's going to cut to that depth and being drawn across it will cause one in which as it's repositioned and you're moving across the neck it will get that notched or hesitation-like mark instead of making a uniform draw all the way across the body."

A.   I see that.

Q.   Do you believe, based on your review of the materials in this case, that the defect in the neck area was caused by a sharp-force injury or the slashing of the knife or the plunging of the knife as Dr. McGee has testified here?

A.   I not only disagree with it being caused by a sharp injury but his description of notching is not

correct from my understanding of how slash wounds and hesitation marks occur. This is just not right is my opinion. I'm sorry. I can explain it if you'd like.

Q. Yes. I would actually like you to explain why Dr. McGee's opinions are -- on the defect is --

A. For one thing the sharp slash or cut can be caused by any sharp objects, a knife, a broken bottle or anything. The only time we can talk about what the weapon was is if it's a stab wound, not a cut wound.

If a sharp object causes a cut, the edges will be very straight as he did indicate, but even if there's hesitation or gentle going back and forth you're not going to get casual scalloping. You're going to get very sharp -- almost like sharp Vs cutting in and out. I'm sorry I can't indicate this better for the Court, but it will be very sharp angles where you cut, come back, cut again, cut, come back again if it's not a singular sweeping motion.

Notching does not occur as hesitation or broken injuries. You do get things to look at but not this. Notching almost never -- real notching is -- the notching that looks like rodent teeth, that type of notching will not occur in cut wounds. It just doesn't.

Hesitation marks are different and repositioning the knife is a possibility. If it's a

stab wound you go in one direction, twist the knife, come out another, yes, you will get funny sorts of patterns but not notching and not this.  And I hear what he says.  I just totally disagree with his interpretation.

Q.  Does the evidence as it exists support a finding or conclusion that this was caused by a sharp-force injury by slashing or stabbing?

A.  Again, as I said earlier, the photographs and the measurements are all fairly accurate.  The interpretation I disagree with.  I believe in my opinion everything supports my opinion.  I think Dr. McGee believes they support his.  I just disagree with it.

Q.  And the strip of skin that was preserved, if this was a sharp-force injury caused by slashing would you anticipate that furrowed skin to remain intact?

A.  Basically what he's suggesting is that if there were slashes that caused a strip of skin then that rope which was around the plastic bag would have been sitting perfectly on that slashing.  I can't say it's impossible but the likelihood of that occurring is minuscule.  It's just no.

Q.  Could you please turn to page 6727.

THE COURT:  Are we going to move on to a different topic at this point?  And if that's the case

this might be a good place for us to take a break.

MR. MONTROY:  That's fine, Your Honor. Yeah, we can break.

THE COURT:  We'll go ahead and break at this point for 20 minutes.

(Recess taken; 2:35 p.m. to 2:55 p.m.)

THE COURT:  We'll go back on the record in a case entitled United States versus Rodriguez.  It's File No. 2:04-cr-55 and 2:11-cv-88.  The record should reflect that all counsel who previously noted their appearances are present, and when we broke we were about to undergo the next line of questioning.  You may proceed.

MR. MONTROY:  Thank you, Your Honor.

Q.  (Mr. Montroy continuing)  Dr. Flomenbaum, I just have a couple more questions about the defects of the neck.  If Dr. McGee is correct in that the -- there was a knife wound to the neck, would you expect to see any injury to the remaining neck structures if it was caused by plunging and repositioning as Dr. McGee described?

A.  If it were deep enough to go beyond the tissue that has been exenterated, the answer is yes.  I mean, in theory it could have been a shallow stab and then it's all eaten by the rodents and I would see nothing. But a stab wound to the neck, a stab wound usually goes

deep enough into either the cartilage or the bone and probably would have left a mark if it were a stab wound. He did not describe it as having happened.

Q. Are there any such injuries present in either the photographs or Dr. McGee's autopsy report?

A. No, there are none.

Q. Would the type of stabbing described by Dr. McGee result in blood loss?

A. If it truly slashed from across the sides, as he is indicating by those paragraphs, it absolutely would have cut at least both veins and perhaps both arteries as well on the sides of the neck.

Q. And in that scenario what type of blood loss would you expect to see?

A. In that scenario that would have been the cause of death. It would have been a total exsanguination where blood is lost completely from the body. That could be the cause of death if the major vessels in the neck were cut.

Q. And what I'm getting at is would you expect to see evidence of blood loss if Dr. McGee's theory was accurate?

A. Not so much evidence of blood loss, expect to find evidence of the blood. I mean, you'd expect her clothing would have been drenched with it. I mean, not

a couple of drops that a plastic bag's going to do. This is violent, pulsating, arterial blood.  It could also stain the inner tissue.  And granted most of it's gone, but there is nothing here showing anything that looks like there ever had been more than the usual amounts of blood in the body.

Q.  So would you agree then that there was no evidence of massive blood loss that you would expect to see if Dr. McGee's theory was correct on Miss Sjodin's clothing or body?

A.  I don't see anything here consistent with the blood loss from a sharp injury to the blood vessels.

Q.  The type of plunging and repositioning that Dr. McGee describes, would you expect to see damage to the ligature if Dr. McGee's theory is accurate?

A.  If the ligature is applied before the plunging? Yes.  But I'm assuming the ligature would have occurred after any homicidal violence using a sharp object, which did not happen.

Q.  Of course.  These questions are all assuming that Dr. McGee's theory is an accurate one or is one that --

A.  I'm not sure Dr. McGee is postulating that the knife or sharp injuries occurred after the ligature was applied.  Certainly that's not the case.  But I thought you were asking would I expect to find any marks on the

ligature.  I'm sorry, maybe you should rephrase the question.

Q.   Assuming that the ligature was -- strike that. This is all again assuming that Dr. McGee -- Dr. McGee's theory is -- assuming that the context of Dr. McGee's theory that this was -- that there was a slash wound or plunging wound to the neck.

So placing it in that context, if Dr. McGee's theory is accurate would you expect -- if the ligature was already around the neck, would you expect to see damage to that ligature, that rope, given the description of the plunging and repositioning?

A.   Right.  That ligature was placed -- I don't want to say "placed."  The skin was placed perfectly adherent to the rope.  Now if he's postulating that the skin exists because it was separated by a sharp object and there were multiple hesitations and, quote, notching indicative of multiple strokes, then absolutely I would have expected the rope to have some degree of comparable notching or cut injuries, none of which was there.

Q.   If you could turn to the transcript of August -- Volume 29, I guess that's August 29th, the one that you were looking at, page 6727.

A.   Yes, I have it.

Q.   And, Dr. Flomenbaum, I'm sorry but could you just

flip to the front page of that and verify what the date is?

A.   August -- or the Volume 29, August 28, 2006.

MR. MONTROY:  Thank you.

THE COURT:  So the record'S plain we are talking about document No. 712 in the Court's docket.

MR. MONTROY:  Thank you, Your Honor.

Q.   (Mr. Montroy continuing)  So if you could turn to page 6727.

A.   Yes, I have it.

Q.   Dr. McGee indicates on line -- on lines 13 through 16 -- strike that, I'm sorry.  On line 18, beginning on line 18 the answer is, quote, well, she has -- you have to consider how she's found.  She's found bound.  Her hands are not movable --"

THE COURT:  Page 6727, line 18?

MR. MONTROY:  I'm sorry, I apologize.  I wrote down the wrong page number.  If I could just have the Court's indulgence for one second.  Okay.  I'm sorry, I was looking at the wrong page.

Q.   (Mr. Montroy continuing)  If you could turn to 6728, line 16, Dr. McGee is asked what he believes to be the likely cause of death and on line 16 Dr. McGee answers:  "I think the likely cause of death is a slashwound to her neck."  Do you see that?

A.   I see that, yes.

Q.   Based on your expertise in forensic pathology, does the evidence support Dr. McGee's opinion that Ms. Sjodin was killed by a slash wound to the neck?

A.   In my opinion, no, not at all.  I don't see any evidence of a slash wound let alone causing her death.

MR. MONTROY:  If you could turn your attention to page 6734 of that same transcript, and before we get to that -- Your Honor, may I approach the witness, please?

THE COURT:  You may.

Q.   (Mr. Montroy continuing)  Looking at page 6734 -- well, for starters do you recognize P-17 that I've just marked and provided to you, Dr. Flomenbaum?

A.   The photograph of the knife.

Q.   Okay.  Thank you.  Now I'll direct your attention to page 6734 and on line 12 Dr. McGee is asked the following question:  "So you have had an opportunity to assess those injuries in light of this weapon, this four-inch lock-blade knife?"  And Dr. McGee answered: "Yes."

Do you see that, Dr. Flomenbaum.

A.   Yes, I do see it.

Q.   And continuing on line 16 Dr. McGee is asked the following question:  "Can you tell us, were you able to

reach a conclusion about whether you thought that was consistent with the infliction of the injuries you described on Miss Sjodin's neck?"  And Dr. McGee starts to answer:  "I think --"

And then he's asked the question:  "This thirteen-and-a-half centimeter cut as well as the other?"  To which Dr. McGee answers on line 23:  "I think they are consistent with that knife or one of similar configuration, blade configurations, yes."

Question:  "Why do you say that they are consistent for a knife with similar configuration? " And the answer, this is on the top of page 6735, "Because of the width of the blade and the appearance of the notching, the depth of the blade, the depth of the wound tracks could have been caused by that knife or one of similar blade configuration."  And do you see that testimony?

A.  I see that testimony.

Q.  And looking at P-17, this is an exhibit that was introduced by the government at trial as a demonstrative of a knife that Mr. Rodriguez was alleged to have.  So I'm showing you that just for the context of the following questions.  Are you with me?

A.  Yes, I am.

Q.  Okay, great.  Based on your expertise in forensic

pathology, does the evidence support Dr. McGee's opinion that this knife pictured in P-17 was consistent with the defect to the neck?

A.   Based on my opinion, no, there was no sharp injury to the neck.  No knife would be consistent with it.

Q.   Would this type of knife cause the sort of scalloping that Dr. McGee testified to?

A.   No, it would not.

Q.   If you could turn to page 6732 of that transcript, Dr. McGee is asked -- is asked his opinion about where the alleged neck wounds were likely to have been inflicted and Dr. McGee answers that question on line 15 of that page.  Answer:  "I think they were inflicted at the site where she was found."

Question:  "And why is that?"  Answer: "Well, because the clothing -- the BCA tells me that the lab tells me that there are no large deposits of blood found inside the car that we have seen when people have had neck injuries or head injuries in our office.  You don't see that.  And, two, the blood that's present on her clothing, the deposited material that you can see on her clothing I don't think is the amount that you would expect from someone having their neck cut and having the blood come down and covering the clothing.  But I think

could be possible if she was lying in a face-down position bound with her neck on the ground.  If a wound was inflicted there, I think you could minimize the amount of blood going on the clothing."

"So absent the finding in the car, absent the finding on the clothes, given her location at the death scene, I would think that's the most probable location where the wounds were inflicted."

And here's the question, Dr. Flomenbaum. Based on your expertise in forensic pathology, does the evidence support Dr. McGee's opinion that Miss Sjodin was killed by a knife wound to her neck at the location where she was found.

A.  No.  There was no knife wound that caused her death.  There was no sharp object involved in her death at all.  And his discussion of the bleeding is exactly what I said before.  Had it been a knife wound in the car or anywhere else, yes, we would have expected to see a lot of blood.  That I agree with him totally.

We don't see the blood.  We don't see any indication that there was ever any bleeding.  It's just not there.  All those injuries to the neck are postmortem, and none of them had anything to do with a knife or any sharp object.

Q.  So is it your opinion that the evidence that

actually does exist contradicts his theory that there was a stab wound that took place at the scene where the body was found?

A.   It does contradict it, yes.

Q.   Dr. Flomenbaum, do you recall Dr. McGee's discussion of what he referred to as an injury to the flank region?

A.   Yes.

Q.   And if I could just have you refer yourself back to the Provisional Autopsy Report, which is P-15.

A.   Yes, I have it.

Q.   Is it fair to say that in the Provisional Autopsy Report there is no mention of any injury to the flank region of Ms. Sjodin; is that correct?

A.   That is correct.  There's no indication of it in the Provisional Report, P-15.  But in the reference to the Provisional Report in P-16 and the final report where he's referring back to the Provisional Report, he does refer to it.  So, yes, the document labeled "Provisional Report" does not.  I agree with it.  But then in the final report, we talked about this earlier, the section on --

Q.   On page 6?

A.   No, on the -- it's labeled, page 12, "PROVISIONAL ANATOMICAL DIAGNOSES" Roman numeral VIII and then under

I.E. he says, "Defect to right flank region."  So, yes, in the actual report that's not there, but then when he's referring to the report in the final copy he is making reference to it.

Q.   Okay.  If I can just draw your attention back to page 12 that you just referenced.

A.   Where are you referring?

Q.   Page 12 of the final report.

A.   Okay.  Yes, got it.

Q.   You noted that under VIII I.E., it says, quote, defect to the right flank region; is that right?

A.   Yes.

Q.   You would agree that there's no indication under E. of a knife wound to the right flank region; is that right?

A.   Correct.  He's listing E. under "homicidal violence."  Whereas, the next Roman Numeral II, "postmortem decomposition," that's where I would put the defect.  Its postmortem defect is my opinion part of decomposition.  It has nothing to do with homicidal violence.

Q.   And I'm going to actually ask you to explain that in one second.  If you could just turn to page 6706 of that same transcript.  And are you there?

A.   I'm working on it.  I got a little --

Q.   Take your time.

A.   Oh, I see.  I have it upside down.  Okay.  I'm sorry, 6707, have it.

Q.   And look to line 7.

A.   Okay.

Q.   And there Dr. McGee is being asked about the injury to the side, the flank?

A.   Yes.

Q.   And he's asked before on line 5:  "And did you have an opinion about what kind of an object would have caused that injury to her side?"

Answer:  "I was concerned that it was caused by a knife."

Question:  "And what led you to that conclusion?"

Answer:  "Its appearance.  It has an oval-shaped appearance that knife wounds can appear like and the internal wound track or the tunnel that" appeared -- "inside the body appeared to me as a wound track."

Do you see that?

A.   I see that, yes.

Q.   Do you agree with Dr. McGee's opinion that the injury to the side, the defect in the side, was caused by a knife wound?

A.   I disagree totally.

MR. MONTROY:  Your Honor, may I approach the witness?

THE COURT:  You may.

MR. MONTROY:  Thank you.  It's Exhibit 18, I apologize.

Q.   (Mr. Montroy continuing)  Dr. Flomenbaum, do you have a document before you that's been marked as Petitioner's Exhibit 18?

A.   Yes, I do.

Q.   And do you recognize that document?

A.   It's a photograph of the defect on her right flank.

Q.   And that's the defect that Dr. McGee has identified as a knife wound; is that correct?

A.   Yes.

Q.   All right.  And you just testified that you disagreed that it's a knife wound.

A.   Correct.

Q.   Could you explain to the Court why you do not believe that it's a knife wound.

A.   Because to me this represents part of the decompositional process where the skin splits.  There is really no evidence of anything sharp having caused it. But much more importantly the orientation of this split,

as well as the orientation of the splits in the body, are following very closely the anatomical lines of skin. There are elastic properties to skin which are well-known and well-documented, and if the skin splits from nonviolent reasons it's going to follow a certain path.  It's going to follow the graininess of the skin and this is doing exactly that.

We can see in this photograph that above and below the long defect lines it's absolutely parallel to the miniscule folds in the skin, and this is how we expect the skin to split when it's done so by decomposition.  Had it been oriented perpendicularly as the knife cut through those lines, it would have been gaping obviously in the other direction and would have looked very different than this.  This is very parallel to the lines in the body where we expect postmortem changes to occur, as is the case in many of the other ones he described.

Q.  Do you recall from your reading of the autopsy reports and your review of the materials whether or not there were any stab wounds to any of the clothing that Miss Sjodin was wearing?

A.  I remember specifically commenting that all the injuries he referred to, none of them had either defects in the fabric if there should have been any overlying

the body and certainly no bleeding visible in any overlying clothing.  And, granted, she was missing a lot of clothing but where there should have been some she had clothing on her upper body.  There were no knife -- there's no defects in there and no blood on the clothing either.

Q.  Would you expect to see blood on clothing for this type of wound if it were, in fact, a stab wound?

A.  Absolutely.

Q.  Did the autopsy report refer to any injuries to the bone structure where this wound appears?

A.  Did not.

Q.  Would you expect to see that?

A.  Well, it depends where in the body.  A strike in the abdomen like this could have -- in this part of the body could have missed all the bones but I would have expected to see some internal bleeding.  Certainly it's not exactly where the kidneys are but it could have been close to the liver.  Certainly parts of the bowel would have been under that.  And in his description there was no trauma to any of the internal organs.  So, you know, this is a splitting.  This is not a stab wound.

Q.  If I could turn your attention to page 6737.

A.  Okay.

Q.  And this is referring back to the exhibit with

the photograph of the four-inch knife.  Dr. McGee is asked the question on line 9:  "Can you tell us whether a sharp object of that size and dimension, is that consistent with the injuries to Dru Sjodin's side, the sharp-force trauma that you describe for us?"  "It is" is the answer on line 13.

Based on your expertise in forensic pathology, does the evidence support Dr. McGee's opinion that the knife was consistent with the injuries to the -- I'm sorry, strike that.

Based on your expertise in forensic pathology, does the evidence support Dr. McGee's opinion that the knife was consistent with the defect to the flank area?

A.    Not in my opinion.  I don't believe this was inflicted by a sharp object at all.

Q.    What do you believe caused the injury to the flank?

A.    Part of the decompositional process.  There are going to be multiple parts in the body which are going to become exposed before other parts of the body depending on what position she was in, what branches or twigs overlie her, whether the body was up or down, which particular insect got there first.  Once it gets started it gets filled out and gets bigger and bigger.

There's no vital reaction.  There's no bleeding.  And in addition to it the splitting is all perfectly parallel to those cleavage planes in the skin, which would be highly unusual for a knife to follow.

Q.  Dr. Flomenbaum, concerning the conclusions and the opinions that you testified about here today, would you have been able to testify to these same conclusions at the time of Mr. Rodriguez's trial in 2006?

A.  Yes.

Q.  Are the opinions and the conclusions that you reached in your reports and to which you testified here today based on a reasonable degree of scientific certainty?

A.  Yes.

Q.  And medical certainty?

A.  Yes, that too.

MR. MONTROY:  Your Honor, I don't have any further questions.

THE COURT:  Thank you.

MR. MONTROY:  I'm sorry, Your Honor, at this time I would ask to move in the exhibits that were marked during the direct examination of Dr. Flomenbaum.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  So we will have received at this point all exhibits through Exhibit 18, plaintiff's

side -- petitioner's side, I'm sorry.

Mr. Reisenauer, they are received.

MR. REISENAUER:  Can we take five minutes, Your Honor --

THE COURT:  Yes.

MR. REISENAUER:  -- so I could get organized if I could?

THE COURT:  Sure.

(Recess taken; 3:20 p.m. to 3:26 p.m.)

THE COURT:  We'll go on the record in a case entitled United States versus Rodriguez.  It's File No. 2:04-cr-55 and 2:11-cv-88.  The record should reflect that all counsel of record have appeared.  When we broke Dr. Flomenbaum was on the stand and Mr. Reisenauer was about to conduct a cross-examination.

You may proceed, Mr. Reisenauer.

MR. REISENAUER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Dr. Flomenbaum, if I could, I want to go through your whole work history again.  You have a very lengthy resume.  Obviously you've testified on many occasions in regard to what you do for a living, and I take it that there have been times when you've testified in criminal cases where there is an expert or even most likely a

medical examiner that testifies for the other side that disagrees with your opinions?

A. Yes, indeed.

Q. Does that happen often?

A. Not very often but it does happen.

Q. Okay. And certainly you hold your opinion based upon what your review of the evidence is and the other individual holds theirs based upon what their view of the evidence is; is that correct?

A. That's correct, yes.

Q. And that's why it's called an opinion I assume.

A. Exactly. Thank you.

Q. You've been at the medical examiner's office in Maine for a few years now. I think according to your CV you started in 2013, correct?

A. Yes.

Q. And you were initially the deputy chief and now you're, according to your CV that we received, the acting chief but this was only up until 2014.

A. Correct.

Q. Are you the chief now?

A. No. I am -- I was acting chief when the former chief retired and then when the governor formally appointed me I became chief. I received that appointment in August, I believe, 2014 and it's a

seven-year appointment so I am still chief medical examiner.

Q.   Okay.  And then you were the chief medical examiner in Massachusetts for a period of time from 2005 to 2007, correct?

A.   Correct.

Q.   When you were asked by Professor Margulies to get involved in this case back in -- your report is dated September 14th of 2011, you were no longer in the medical examiner's office in Massachusetts and you were not yet at the medical examiner's office in Maine, correct?

A.   Correct, yes.

Q.   So I'm looking at your CV.  It appears to me that you were working at a medical center in Boston, Massachusetts and you must have been doing this forensic pathology consultation on the side, correct?

A.   Correct, yes.

Q.   Did you work with anybody else or was this your sole consultation business?

A.   Well, no, I've done lots of consultations since 1994 maybe, something around then.  I started basically doing consulting on evenings, weekends, personal time.

Q.   So this is a separate -- if I call it a business, a separate side business is what you're telling us.

A.   Correct.  I formed an LLC a few years after this was done because I was doing a lot more of it than I thought I would originally.  But when I started with this it was just, Doc, you're an expert.  What do you think of this?  How much time do you think it will take and what should we reimburse you?  That's all it was.

Q.   So when you were working in the medical examiner's office in New York and Massachusetts and now Maine, one of my questions is does the -- do those states -- obviously they did.  They allow you to like -- I'll call it moonlighting work on the side in this same field that you're employed to work in by the State?

A.   That is correct.  In Maine I personally insisted that all the doctors who are doing this besides me do not get involved with any cases within Maine itself.  I think that's a conflict, period.  And I've been maintaining that throughout my entire life as well. It's not worth getting involved with anything which might look like there's conflict.

Q.   Well, yeah, I guess I would agree.  It would be difficult for your office to do an autopsy and you to be the medical examiner and one of your other doctors testify differently for the other side of the case, wouldn't it?

A.   That's obviously correct.  But we're talking

about civil cases as well, things that don't involve the ME's office.  I think it's just not appropriate to be rendering opinions within the jurisdiction that you're receiving your payroll from.

Q.   Why did you leave the medical examiner's office from Massachusetts?  You were the chief there.

A.   I left in 2007 I believe.

Q.   Yeah.  Why did you leave?

A.   I was dismissed by the governor.

Q.   Okay.  Can you tell us why that happened?

A.   It was purely administrative reasons as he had in his letter.  The back story is one party took over.  He got elected and they just got rid of all the appointments from the previous party.  After he was elected about three weeks, he started dismissing all the appointees from then governor Mitt Romney, who appointed me.  Mitt Romney decided to run for president.  The new governor took over and they were not at all happy with what I was doing to the office.

When I was appointed chief medical examiner, I was given a directive to clean it up.  It was a horrible place.  It still is.  I made some indents but there was a lot of back door political things and I didn't fit their plan I guess.  So he went forward with dismissal and in his dismissal letter he indicated

specifically that this was for administrative reasons only.  Your credentials as a pathologist have never been questioned.  And I was out as chief medical examiner so I went back to Boston.  I went back to doing some clinical work and some teaching.

Q.   Was there any particular reason that you were dismissed?  You say administrative reasons.  Was there a problem with the running of the office or anything like that?

A.   The whole office was run horribly.  There was a five-year plan of what I was going to do to correct it and I was ahead of the plan.  Part of the reason I took the position specifically writing not to be blamed for preexisting conditions, and some of those preexisting conditions were still there.  They pointed to those and said:  This is unacceptable.  I said:  It's -- I'm sorry, I'm working on it.  Just haven't gotten to all of them.  That was their pretext essentially.

Q.   And one of those problems was, for lack of a better term, losing of bodies in the office?

A.   It wasn't that per se.  A body -- one of the morgue attendants released the wrong body.  This happens nationally.  It happens rarely but it does happen.  I had a protocol in place of specifically you should do this and this and this.  They all knew that.  There was

a camera showing that the guy did not follow the instructions. Yet it was -- you know, let's blame the chief on it because the low man didn't follow the order. So the body went to the wrong place and whose fault was it? There it goes.

Q. Okay. When you become involved in your consulting business and are contacted, I assume from what you testified to that you check to see if you have any conflicts or your office and what you -- I think what you said earlier is that you don't take any cases from within the state of Maine; correct?

A. Now I won't. That's correct, yes.

Q. Okay. And besides being here today on this case, when was the last time you were involved in consulting on a case outside of your medical examiner's office?

A. I have about four or five open cases which I'm still consulting. The last time I was in a trial, is that what you're asking?

Q. Well, you can tell us that, too.

A. Probably in the winter sometime. It was in Atlanta. I think it was more of a medical malpractice case.

Q. Okay. How about a criminal case where you testified outside of you being a medical examiner as part of your State job?

A.   Most of the cases I get involved with do not wind up in trial.  I usually get to review other material or to review cases on a civil matter.  I'm involved currently in a criminal matter which might bring me to court but it's in a different state.

Q.   Do you recall testifying in a case entitled State of Connecticut v. Carroll Baumgarner-Ramos?

A.   Yes, yes, yes.

Q.   And that was a little more than a year ago, correct?

A.   Correct.

Q.   Okay.  That was a criminal case, right?

A.   Yes.

Q.   And Mr. Ramos was charged in a murder, correct?

A.   Yes.

Q.   Your testimony in that case was that the victim died as a result of natural causes?

A.   Yes.

Q.   And Mr. Baumgarner was convicted of the murder, correct?

A.   Yes.

Q.   And the Court there rejected your conclusions and said they were not credible; is that correct?

A.   That's correct.

Q.   The Court found that the death was due to blunt

abdominal trauma caused by the defendant, correct?

A.   That's what the Court found, yes.  I disagreed with that.

Q.   Let's talk if we can about your opinions here, Doctor, if we can coupled with Dr. McGee's opinions. Much of what you've testified today I believe, and correct me if I'm wrong, basically is that Miss Sjodin's body had a number of postmortem changes, decomposition. Some caused by I believe you said rodents, possibly insects I take it?

A.   Yes.

Q.   You're aware that Miss Sjodin was kidnapped in November of 2003?

A.   I indicated the dates that I knew about, yes.

Q.   And her body wasn't found until the next spring, I believe it was in April of 2004, correct?

A.   Correct.

Q.   And you recall we did take a deposition in your office I believe it was -- or it was not.  It was in Maine though, correct?

A.   Yes.

Q.   And we talked about I believe the changes that can be caused in a body such as Miss Sjodin's that had been out in the elements for a period of time.  You recall that?

A.   Yes.

Q.   And we also I think talked about the weather a little bit that is up in this northern part of the country, correct?

A.   Yes, we did.

Q.   And I believe we discussed how cold it was during that winter.  Do you recall that?

A.   Yes.

Q.   So would you agree with me that postmortem changes are dependent on the nature and the conditions of, No. 1, the body itself and then especially on the nature and conditions of the environment surrounding the body?

A.   Absolutely, yes.

Q.   Okay.  And you would agree that colder temperatures would tend to retard the reactions of decomposition more so than if the body was in a hot temperate area.

A.   Most of the decomposition, yes.  Some of them not but most of them, yes.

Q.   And we talked, Doctor, also about various aspects of open wounds and also moist areas of the body, that those areas would generally have accelerated changes due to the openness of the wound and the moist area causes the decomposition to occur in a quicker manner, correct?

A.   Yes.

Q.   And then is it not correct also that there are certain parts of the body, these moist areas, that would attract insects and rodents more likely?

A.   That is correct, yes.

Q.   And would you agree that in particular the pubis area and then our facial area where we have a lot of moisture in our nose and in our mouth, in our throat, would attract those things more?

A.   That's correct, yes.

Q.   Now earlier you discussed your report and your conclusions.  You submitted an original report to Dr. -- excuse me, Professor Margulies and then an addendum to counsel sitting to the right of me, correct?

A.   Yes.

Q.   Let's, if we could, talk about those just a little bit.  You testified in regard to ligature strangulation and in your original report you opined that you believed that that was the cause of death, correct?

A.   Yes.

Q.   And I take it that you arrived at that opinion based upon all of the information and evidence that was presented to you at the time by Professor Margulies.

A.   Correct.  It was based on the material as cited

in the report.

Q.   And on the front page of your report you have the items I believe that counsel asked you about that you agreed that you had reviewed, correct?

A.   Yes.

Q.   Autopsy photographs, crime scene photographs, Dr. McGee's reports, his transcripts from the trial and deposition and some other crime scene reports, correct?

A.   Yes.

Q.   Okay.  And the ligature strangulation question frankly isn't a very difficult opinion to arrive at looking at the situation that was very clear when Miss Sjodin's body was found, would you agree?

A.   Correct.  I was able to rule out any other trauma to the body.  We have a rope around her neck so I concluded that that was probably the cause of death.

MR. REISENAUER:  What letter are we on?

THE CLERK:  C.

MR. REISENAUER:  C.  Thank you.

THE CLERK:  You're welcome.

MR. REISENAUER:  May I approach?

THE COURT:  You may.

Q.   (Mr. Reisenauer continuing)  I'm going to hand you what's been marked as Government's Exhibit C (indicating).  Do you recall seeing that photograph?

A.   I do.

Q.   And that is a photograph of the ligature after it was removed from Miss Sjodin, correct?

A.   Correct.

Q.   Earlier you testified about the circumference, at least your estimate of the circumference of that ligature that had been placed around her neck, correct?

A.   Yes.

Q.   And I believe you testified that you arrived at a measurement of 11 inches?

A.   I estimated it would be about 11 inches, yes.

Q.   It could be 12 possibly?

A.   Possibly, yeah.

Q.   Either way your testimony is that from your review of the photographs, Dr. McGee's reports, and I assume also his testimony, that that ligature was tight around her neck, correct?

A.   Yeah.  It was tightly tied.  There was a tight knot in it.  It wasn't a loose knot but a lot of skin had already been -- a lot of the flesh was removed from her neck so I'm not sure whether the tightness referred to, you know, what would have been tight had she had a full neck there but she didn't have a neck.

Q.   I understand that.  But the circumference there was arrived at because that ligature was around her neck

in a manner that was easily able to be measured if 11 inches is correct, right?

A. I'm not sure what you're asking.

Q. Well, can you tell from the evidence that was submitted to you whether or not it was tight around her neck or would have been based upon what you observed?

A. Based on my observation the circumference was approximately 11 inches, which would have been very tight around an adult neck.

Q. Okay. If I tell you that that ligature actually wasn't tied but was wrapped around the neck twice in a manner that could have been to pull the ends and strangle her, do you recall that?

A. I recall you asking me that? I don't recall if you had but I'll answer it now. Yes, that could have happened.

Q. Okay. So just a minute ago you testified that it was tied around her neck and in my brain I'm thinking you're talking about a knot. That wasn't the case but it was wrapped around her neck with the two ends hanging out. Do you recall that?

A. It was wrapped around her neck with two ends hanging off, but the fact that it was cut indicated that they were trying to preserve the circumference. They just didn't measure it.

Q.   Okay.  And when you arrived at your opinion that this was ligature strangulation, you were aware then that these two ends were in such a place that they could have been pulled tight to, in fact, strangle her; is that correct?

A.   I said they could have been tied tight and knotted to strangle her or pulled tight, the same thing.  It's just a matter of -- it's both ligature strangulation.

Q.   Okay.  The opinion then that you arrived at would then lead you to agree with Dr. McGee's opinion that this was homicidal violence, correct?

A.   Absolutely.

Q.   So we'll get back to the neck furrow in a little bit, but when you were contacted by counsel that is present today you were provided then Mr. Rodriguez's account of what occurred and also Dr. Dragovic's opinion, correct?

A.   Yes.

Q.   And if I understand you correctly that you are now saying that you believe that based upon Mr. Rodriguez's account that, in fact, there was not a ligature strangulation but that there was some type of asphyxiation due to application of blunt force?

A.   Yes.

Q.   And counsel did ask you in regard to Mr. Rodriguez whether or not that statement is somehow leading you to a different opinion just because he said this happened?

A.   Well, in the context of everything he said, yes, he talked about there was bleeding and that he put a plastic bag over her head to prevent the bleeding from getting into the car and then tied it around.  And before that was done he talked about applying pressure on her neck.  She was struggling.  He was fighting.

So, yes, the answer is I believe now that -- I always believe there was some sort of force around the neck.  I amended my opinion as to whether it was the rope around it that caused the strangulation.  I believe now the rope was applied afterwards, but I still believe it was blunt force around the neck which caused her death.  I'm not denying that.  I'm just saying it was not the rope that did it.  It was blunt force around the neck and --

Q.   Well, would you not agree with me that Mr. Rodriguez could have said:  I strangled her with the ligature?  And then your opinion would have been golden from the beginning.

A.   If he said that I would stand as I did, but he did not say that and I've got no reason to belief he was

making up a story which was absolutely consistent with all the findings.

Q.   Well, how --

A.   People -- if I may, people who usually strangle other people with ligatures do not put their head in a plastic bag first.  That's very unusual.  But he explained it away in a way that made sense to me.

Q.   Okay.  I have a few questions about that.  There are no -- if I could approach, Your Honor?

THE COURT:  You may.

Q.   (Mr. Reisenauer continuing)  Let's talk about Exhibit P-12 if we could, Doctor.

Could I remain up here, Your Honor?

THE COURT:  What?

MR. REISENAUER:  Could I remain here?

THE COURT:  Yeah, that's fine.

MR. REISENAUER:  Thank you.

Q.   (Mr. Reisenauer continuing)  So Exhibit P-12, Doctor, it basically shows that furrow that you testified to about earlier, correct?

A.   Yes.

Q.   But it also shows the lack of frankly any -- anything pretty much left in the neck area; is that right?

A.   Correct, anterior neck.

Q.   It is an open area, correct?

A.   Yes.

Q.   Okay.   There are, in fact, no highlight wounds to be seen, correct?

A.   That's correct.

Q.   And so we have here a victim that's found with a ligature around her neck with a bag over her head and certainly she could have been asphyxiated by the bag, correct?

A.   Yes.

Q.   She could have been strangled by the ligature, correct?

A.   Yes.

Q.   She could have been strangled by grabbing her throat with a hand and breaking those hyoid bones, correct?

A.   Breaking those bones did not cause death. They're usually a marker of the pressure that's blocking the blood vessel --

Q.   Correct.   But we don't have those there so we don't know that, correct?

A.   That's correct, yes.

Q.   And so when Mr. Rodriguez says he used blunt force on her neck with I think he said his arm, what evidence exists here that would say to you ever that's

what occurred?  There isn't any evidence of any blunt-force trauma, is there?

A.  Well, let me answer your first question of what evidence there is.  Asphyxial deaths are usually deaths that -- we have to eliminate all other causes of death before we come to asphyxia.  There's no anatomical finding for lack of oxygen to the brain.  There just isn't.  Sometimes we can see injuries which can account for it, but if there's another cause of death we should find it.  If there were sharp injuries we should find them.  They just aren't here.  If there's bullet holes we should find them.  If we have homicidal violence, which we do, and we don't have any other form of it, it's most likely going to be some sort of asphyxial mechanism.

My original thinking was it was the rope.  You're asking me whether he could have used his elbow?  The answer is yes.  Could he have broken her hyoid bone?  The answer is yes.  That all could have happened.  They all would have been blunt-force trauma causing an asphyxial death.  I misinterpreted the rope.  I thought that was part of the mechanism.  It was afterwards.  But it's still blunt-force trauma around the neck and no sharp instruments were used.

Q.  So when you just testified that it was

afterwards, that is based upon what Mr. Rodriguez said, correct?

A.   Having read his report, that is correct, yes.

Q.   We don't know if that really happened, do we?

A.   We'll never know if it really happened but it is absolutely consistent with all of the findings. Whereas, the sharp injuries, none are consistent with the findings.

Q.   Okay.  Thank you.  It could have happened that Mr. Rodriguez put the bag over her head to try to asphyxiate her, correct?

A.   Could have, yes.

Q.   And when maybe that didn't work he put the ligature around her neck and tried to asphyxiate her that way by holding it, correct?

A.   That's possible, yes.

Q.   And then he could have pulled that ligature tight and strangled her to death after the first two ways didn't work, correct?

A.   That would be a possibility, yes.

Q.   And he could have left her laying out in the cold in November the way she was left with her hands tied behind her back and she could have died from exposure.

A.   I'm thinking about that one.  Again like asphyxia exposure is not going to have any sort of anatomical

finding.

Q.   I understand that.

A.   So, yeah, that's possible, sure.

Q.   Okay.  Thank you.  You talked with counsel about the neck wound itself as Dr. McGee testified in his opinion was a neck slash.  You recall that?

A.   Yes.

Q.   Counsel kept calling it a stab wound and there is a difference, correct?

A.   Yes.  He referred to them both in his report as a stab and a slash.  There's a big difference.

Q.   Okay.  And do you recall in Dr. McGee's testimony, in fact, that he agreed with counsel that the neck slash -- he could not opine as to the depth of that.  Do you recall that?

A.   Yes, but -- yes.

Q.   And earlier counsel asked you about if she had been stabbed in the neck would there be other injuries to the neck and so forth.  And I believe you testified that there could be.  Although, we just talked about the lack of anything left inside the neck, but you also indicated that there might be some wounds to the back of the neck itself, correct?

A.   Correct.

Q.   Okay.  But would you agree that Dr. McGee didn't

testify to any of that sort of thing; that he even testified that he didn't know how deep this slash wound was?

A. Yes. But then he said, you know, that the knife was consistent with creating those because of the depth and the size of it. So, yeah, that's what he said. Not disagreeing with that.

Q. Thank you. And, Doctor, there was some questioning about the cutting or the slashing of the neck and why -- if that occurred why the ligature hadn't been cut. Do you recall that?

A. That there would be some markings indicative of the cut, yes.

Q. Well, wouldn't it be easy to cut above the ligature or below the ligature without cutting the ligature itself?

A. Not the way he's describing it. I mean, yes, with the surgical scalpel and a lot of time you can make a very precise cut.

But he's talking about those rodent marks as being hesitation and if you're going to have chop, chop, slash, break, stop, you're bound to have some sort of injury or some sort of cut mark to the rope itself. If it's that tight that the only skin that's spared is what's cut above it and cut below it, I think that's

just a ridiculous hypothesis.

Q. Well, I understand what you're trying to say. But it is possible to cut above the line or below the line without cutting the ligature itself, isn't it?

A. That's possible, too.

Q. Let's talk about the flank wound a bit if we could. You don't believe that that was caused by a sharp object either, correct?

A. Correct.

Q. Dr. McGee though testified that he did and he testified as to the length and the width of it. Do you recall that?

A. Yes.

Q. Give me one second. If you could look at his Final Autopsy Protocol, Doctor, it's P-16.

A. Oh, yes, I have it, I'm sorry. P-16 I have it.

Q. You have it there?

A. Yes.

Q. Okay. Thank you. And then just if you would turn to page 5.

A. Okay.

Q. And on page 5 there's an area called "RECENT INJURIES" and then it talks about the flank. You see that?

A. No.

Q.   And can you tell us --

A.   "RECENT INJURIES" that's on page 6 -- or there's two page 5s, I'm sorry.

Q.   I guess it's 6.  It looks like 5 on my copy.

A.   Me too.  That's why I saw two page 5s.  All right.  Page 6, got it.

Q.   Okay.  You see there where it says "FLANK"?

A.   Yes.

Q.   Could you read that to us, please.

A.   "A defect can be observed to the right lateral flank region lying at a point 15.0 centimeters to the right of the anterior mid-sagittal line at the level of the umbilicus.  This defect exhibits an elliptical appearance and measures 1.5 x 5.0 centimeters and lies in a 10 to 4 o'clock axis.  Wound margins are irregular in nature."

Q.   Okay.  And earlier you were asked about that by counsel.  If you would take the trial transcript there that was provided to you earlier and turn to page 6692.

A.   I have it now.

Q.   That's not the right page.  6706, excuse me.

A.   I have it.

Q.   On page 8 Dr. McGee is -- excuse me, not page 8, line 8, he's talking about his opinion in regard to that injury and he's asked:  "What led you to that

conclusion?"  And what does he say there?

A.  On line 9 it says:  "Its appearance.  It has an oval-shaped appearance that knife wounds can appear like and the internal wound track or the tunnel that it caused inside the body appeared to me as a wound track."

Q.  Okay.  So he's describing what he observed as a wound track; is that correct?

A.  Except he didn't describe it.  He just said it looks like a wound track.  He didn't describe any -- the track, I mean, under the skin or organs and nothing is injured.  He didn't describe -- all he described was there's a depth to it and it looks like what a knife would make is what he said.

Q.  And in your opinion in looking at a photograph of that right flank, that's not a wound and there's no wound track?

A.  I think it's a postmortem artifact of skin splitting.

Q.  And earlier we talked about the parts of the body that insects and rodents go to.  This is a side wound, correct?

A.  Correct.

Q.  And counsel asked you about any other injuries inside of the body and I believe you testified that this area could have been cut or stabbed without any other

injuries to any internal parts of the body, correct?

A.   Correct.

Q.   And if -- did you testify or do you believe that this wound here is as a result of insects or rodents?

A.   As opposed to sharp objects?

Q.   Yes.

A.   Absolutely.

Q.   Is it possible that this injury was caused by the sharp object, in this particular case a knife, and the wound could have been further opened by the insects or the rodents?

A.   Nothing is impossible but if you look at where this is located on the body I grant you fully it's not in a place that's normally moist but it's right on the border between where the body was on the ground and where it might have been somewhat off.  You could actually even see where the postmortem blood was pooling marking that dark green line right nearby.  No, it's not a moist part of the body but it's in a perfect location to give all these other postmortem artifacts an excellent opportunity to respond.

Yes, she could have had a knife wound there which started it.  Yes, she could have been dragged and scraped.  Yes, she could have had a pimple that she itched.  Why that spot and not a spot an inch above it,

they're all possible.  But there is right on the border between where animals can get to.  You can see the imprint of the hay around it and then nothing above it. And to me way more important is that the split is directly on those cleavage lines of the skin, which is the exact lines the body is going to take if it's going to split rather than be injured.

Q.  Were you ever made aware, Doctor, that this particular knife that is in evidence at this point was seized from Mr. Rodriguez?

A.  I was aware that that knife was his knife.  It might have been in his possession.  That I do know, yes.

MR. MONTROY:  And, Your Honor, I would just object to the characterization as this particular knife being in the possession of Mr. Rodriguez.  I believe there was a sheath that was recovered from Mr. Rodriguez.

MR. REISENAUER:  Well, there was a knife recovered from the trunk of his car, Your Honor, if the Court recalls.

THE COURT:  I recall.

MR. REISENAUER:  Thank you.

Q.  (Mr. Reisenauer continuing)  And, Dr. Flomenbaum, were you ever informed of any of Mr. Rodriguez's prior criminal history?

A.   I was when I read the interview where he talked about what he did in the car.  He was being interviewed about his past so, yes, I was aware of that.

Q.   So you're aware that he used knives in his prior crimes?

A.   In this I believe he was threatening to use the knife.  Although, I don't -- that's all I know about this.

Q.   That's what he said, right?

A.   That's what he said, yup.

Q.   Doctor, you're then aware not only of Dr. McGee's conclusion in his autopsy protocol that says homicidal violence with the five items listed underneath but you indicated that you had read his testimony from trial in regards to his opinions on the cause of death, correct?

A.   Yes.

Q.   And so if you would turn to page 6727.

A.   I have it.

Q.   Do you have that?

A.   Yes.

Q.   And on line 5 he's asked:  "How about strangulation?"

And his answer is:  "Strangulation is certainly possible.  The cord that was around her neck could have been used to strangle her."

Do you see that?

A.   Yes.

Q.   So your original opinion he agreed with as well, correct?

A.   He agrees that was a possibility and I certainly agree with that --

Q.   Okay.

A.   -- possibility.

Q.   And then if you turn to the next page, 6728.

A.   I have it.

Q.   I believe counsel may have asked you about this earlier but go down to line 14 and the question is: "And tell me, if you could, within that what you believe to be the likely cause of death."

And there he says:  "I think the likely cause of death is a slashwound to her neck."  Correct?

A.   That's what it says, yes.

Q.   And that's the one you disagree with, correct?

A.   Correct.

Q.   But then the next question on line 18 it asks him:  "Are there other possible causes of her death?"

And on line 19 says:  "A possibility is asphyxia."  Correct?

A.   Correct.

Q.   And now you believe that that's a possibility

based upon his statement but you also I believe thought that it may have been a possibility previous to Mr. Rodriguez's statement being sent to you based upon the bag over her head or not?

A.  Asphyxia basically because of the ligature, which is what Dr. McGee was referring to.

Q.  Okay.  But earlier when I asked you you said that that's a possibility.

A.  Oh, it is possible, yes.

Q.  Okay.

A.  I don't believe I --

Q.  And then he continued by stating:  "The third possibility is she died from exposure."  And although you think that that probably is the least possible, you would agree that is possible, correct?

A.  Correct.

Q.  Okay.

A.  The least of the three, yes.

MR. REISENAUER:  If I could have one second, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  That's all the questions I have, Your Honor.

THE COURT:  Redirect?

MR. MONTROY:  Yes, Your Honor, if I could

have just one second?

THE COURT:  You may.

MR. MONTROY:  Thank you.

**REDIRECT EXAMINATION**

**BY MR. MONTROY:**

Q.  Dr. Flomenbaum, both you and Dr. McGee agreed that portions of the body had experienced either advanced or moderate decomposition; is that right?

A.  Yes.

Q.  So regardless of potential cold temperatures or changes in the temperatures, there was still significant decomposition in this particular case; is that right?

A.  Yes.

Q.  When you were asked about Mr. Rodriguez's statement to Dr. Welner which you considered in forming your opinions and conclusions, you said that his statement was, quote, consistent with the findings; is that correct?

A.  Yes.

Q.  And what do you mean by "consistent with the findings" exactly?

A.  He described a scene of what happened at the final moments of her life as he described them, which made sense with all the autopsy findings.  He talked about why there was a bag over her head, why there was a

rope around her neck, which we did find.  He also talked about the mechanisms of her last moments where he had his hands around her neck, whether it was his elbow in the back or his hand squeezing the front.  None of them would have left any other marks on the body.  They're all consistent with blunt-force trauma and/or asphyxial mechanisms, okay?

He didn't describe a knife and that's okay. Not that he would have but there were no knife injuries that I saw, all right?  The reason he put the bag on he explained very nicely.  He even talked about the fact that the bag might not have been sealed tight.  It might have been a split on the top which he said he didn't care if it kept the blood off the car.  That split on the top would make all of this even more consistent and perfect because it wasn't a tight bag.

So the way he described it and the way he was describing the -- excuse me, the death throes, the throttling of the air, those were very real and it's so consistent with that type of death, not an exposure to cold weather, not a stabbing.  It's due to the sound. The gurgling, the last whooshes of air, is all related to struggling for breathing or having an obstruction of the airway.

So to me that seemed plausible.  And I agree

there was nothing he said in there which was inconsistent with the finding.  Didn't say he punched her and broke a tooth.  There were no broken teeth. That he said he slapped her in the face and it was bleeding.  Because of the bleeding, he wanted to cover it with the bag.  To me that all -- that was reasonable.

Q.  You also testified that -- on cross-examination that sharp-force injuries have, quote, anatomical findings.  Can you describe what you mean by "anatomical findings"?

A.  In an intact body that's not decomposed, it would be a very sharp outline of what the knife looked like or what -- unless it was a slash it would be clearly a sharp outline.  Not here.  There would be bleeding if the person were alive when it happened.  Especially over parts of the body which might have clothes.

Dr. McGee agreed there was no bleeding on the clothing or on the ground and so he summarized or hypothesized if she did get slashed it happened over there in the place where they found her body because you gotta explain away where the blood was.  There isn't any so he had to say, yeah, in the field that's where it happened.

Those are the sorts of findings.  You want to see things like that.  If it were a stab wound you

can find features of the blade. You can mention -- measure the depth. I agree totally that this level of decomposition will not -- I mean, could in a sense hide sharp injury if there were any. But everything that was being pointed to in this case as having occurred by sharp injury is not just more consistent with but incredibly more likely and logically consistent with postmortem artifacts.

In the report I indicated in very detail what causes these artifacts, those stretch lines. They're not an accident. Every place in her body where he described the possibility of being a stabbed wound or a sharp injury, every one of those places lines up perfectly with the grain pattern of the skin, those Langer's lines that the surgeons use.

Is it possible that a knife could have created all those? I think I indicated in my report it is possible, but it's also possible that it could have been caused by any sharp object and that the wielder of those injuries it's possible would have had to have been a learned anatomist or surgeon who knew the anatomy of the body so well that every slash he made was perfectly lined up with those lines on the body. I find that to be very not possible even though it's possible. It's so not likely it's just beyond reason. Could a knife have

been used?  Yes.  Is there anything here to indicate it?  No.  But everything that is here is indicative of post-mortem artifacts, at least the defect in the body.

So we are stuck with asphyxial death.  Everything makes sense.  Yes, the rope could have done it.  Turns out it didn't.  I was wrong, I'm sorry.  They found a rope around her neck.  Could it have been the plastic bag?  Yes.  But was it force around her neck?  Absolutely.  And that is what -- I'm sticking with my opinion as it was amended to.

Q.  And on that point the tracking or the tunneling that Dr. McGee described in his discussion of the flank wound, can that tracking or tunneling, can that be caused by some form of degradation or decomposition?

A.  There is no tracking or tunneling.  He has a hole in the outside of the body which goes in.  He did the internal examination, did not describe any injury to any of the internal organs so there is no track.  It's just a hole in the body.

Q.  Are you referring to -- I'm sorry, you're referring to his autopsy reports?

A.  Yes.

Q.  And no description of the tracking or tunneling or the size.

A.  Correct.

Q.   Okay.

A.   If you have an injury that's created by a sharp object or any object, in your injury description you're going to talk about what it did to the body internally. That's part of a report.

Q.   Is that a standard practice in your experience in forensic pathology?

A.   It is standard and the way he's presenting his material is very standard.  He's aware of what to do. This was not a naive person describing it.  Just the interpretations I think were off but this was -- the protocol was done well.  He described in great detail the things which needed to be described, left off a few but that's okay.  He just says the tunneling was consistent but he never described any tunneling.  And when you read the internal report there is no tunneling. There's a hole in the body wall.  Yes, it connects to the inside.  You can take a flag pole and stick it in there.  It's consistent.  Once you break the skin anything is consistent with going in.  There's nothing indicative of a sharp object or anything that -- I'm sorry.

Q.   And your opinion is that defect is caused by some form of degradation or decomposition?

A.   Yes.

MR. MONTROY:  I don't have any further questions, Your Honor.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  If I could have a second, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  We have nothing further, Your Honor.  Thank you.

THE COURT:  Thank you.  You may step down, Doctor.

THE WITNESS:  Thank you.

THE COURT:  Thank you very much for your time.

MR. MONTROY:  And, Your Honor, I just wanted to clarify my objection.  I misspoke about the -- my understanding could be wrong was that Dr. McGee -- in the photograph that was a replica of the knife that was recovered so I'm not sure if that's accurate or not but that was actually the basis of my objection as opposed to, you know, the knife itself.

MR. REISENAUER:  Your Honor, I think we know the stage of the evidence so that's fine.

THE COURT:  Yeah.  I will just tell you I don't know whether the photograph of the knife was the knife that was actually found in the trunk or if it's

a -- some other knife that was there that was based on the -- there's packaging for a knife that was found and there was a knife sheath that was found at the mall. And so what the photograph is exactly of I'm just not sure. I just don't recall.

MR. MONTROY: And it's probably a minor point. I think it actually in retrospect is but I just wanted to clarify the nature of my objection.

THE COURT: Like I said, I just don't know but it's in the record. I can certainly figure it out, and if at some point it becomes a determinative issue I will figure it out. Thank you very much. You're free to leave. And given the hour I assume that you don't want to call your next witness, Mr. Abreu.

MR. ABREU: That is correct, Your Honor. If it's okay with the Court we'd like to pick up again tomorrow morning. That will also give the government and us an opportunity to discuss some of the issues we discussed about Friday's witnesses and perhaps come to some agreement regarding that matter and we can report back to the Court on tomorrow morning, Your Honor.

THE COURT: All right. We'll start at 9 o'clock tomorrow morning. Thank you.

MR. ABREU: Thank you, Your Honor. Your Honor, may I ask if the courtroom is closed and whether

we can leave some boxes here or not?

THE COURT:  You can leave anything in here and it will be secured and locked up and no one will be able to get in here, including you, until like 8:30 or 8:45 tomorrow morning.

MR. ABREU:  That's fine.  Thank you very much.

THE COURT:  Actually at any time after 8:00 you can stop by my chambers and I have a key so I can get you in.

MR. ABREU:  That won't be necessary but thank you, Your Honor.

(Adjourned at 4:30 p.m.)