**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                                )
United States of America,       )
                                )
      Plaintiff/Respondent,     )
                                )
            vs.                 )   **FILE NO. 2:04-cr-55**
                                )              **2:11-cv-88**
Alfonso Rodriguez, Jr.,         )
                                )
      Defendant/Petitioner.     )
                                )
- - - - - - - - - - - - - - - -

**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**EVIDENTIARY HEARING - JUNE 21, 2017**

**Pages 192-378**

HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
         655 FIRST AVENUE NORTH
         FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

**A P P E A R A N C E S**

**KEITH W. REISENAUER      COUNSEL FOR PLAINTIFF/RESPONDENT;**
**MELISSA H. BURKLAND**
Office of United States Attorney
655 1st Avenue North, Ste. 250
Fargo, ND   58102


**ERIC J. MONTROY         COUNSEL FOR DEFENDANT/PETITIONER;**
**VICTOR J. ABREU**
**JOSEPH W. LUBY**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA   19106

**I N D E X**

**W I T N E S S E S**

DEFENDANT/PETITIONER'S:                                    PAGE NO.

**JONATHAN L. ARDEN**

Direct Examination by Mr. Abreu                            197
Cross-Examination by Mr. Reisenauer                        271
Redirect Examination by Mr. Abreu                          321
Recross-Examination by Mr. Reisenauer                      324

**LJUBISA J. DRAGOVIC**

Direct Examination by Mr. Montroy                          326
Cross-Examination by Mr. Reisenauer                        354
Redirect Examination by Mr. Montroy                        372
Recross-Examination by Mr. Reisenauer                      374

**E X H I B I T S**

| EXHIBIT NO. | | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|---|
| Petitioner's | 19 | Curriculum Vitae of Jonathan L. Arden, MD | 197 | 197 |
| Petitioner's | 20 | Declaration of Jonathan L. Arden, MD | 210 | 210 |
| Petitioner's | 21 | Photograph | 231 | 232 |
| Petitioner's | 22 | Photograph | 231 | 232 |
| Petitioner's | 24 | Autopsy Photograph | 326 | 326 |
| Petitioner's | 25 | Autopsy Photograph | 326 | 326 |
| Government's | E | Transcript of trial testimony of Dr. McGee | 296 | 296 |
| Government's | F | Report of The Forensic Panel, Dr. Welner | 363 | 364 |

**P R O C E E D I N G S**

(JUNE 21, 2017:  The following proceedings commenced at 9:00 a.m.:)

THE COURT:  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55 and 2:11-cv-88. The record should reflect that the defendant has waived his appearance at Document No. 1048 -- or the petitioner has, and the petitioner appears through his counsel, Mr. Abreu, Mr. Montroy and Mr. Luby.  Mr. Reisenauer and Miss Burkland appear on behalf of the United States.

When we broke the petitioner was about to call their next witness.

MR. ABREU:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. ABREU:  Petitioner would call Dr. Jonathan Arden.

THE COURT:  Sir, if you please would come forward, stand before the clerk, raise your right hand and take the oath.

THE WITNESS:  Yes, Your Honor.

THE CLERK:  Please raise your right hand. State your full name and spell your full name.

MR. ARDEN:  Dr. Jonathan L. Arden, J-o-n-a-t-h-a-n, middle initial L, A-r-d-e-n.

(Witness sworn.)

THE COURT:  Mr. Abreu.

MR. ABREU:  Yes.

**JONATHAN L. ARDEN,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. ABREU:**

Q.  Good morning, Dr. Arden.

A.  Morning, sir.

Q.  Dr. Arden, will you please tell us your profession.

A.  I'm a physician and in particular I am a forensic pathologist.

MR. ABREU:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  (Mr. Abreu continuing)  Dr. Arden, let me show you what I am marking as Petitioner's Exhibit 19 (indicating).  Do you recognize that document?

A.  Yes, sir, I do.

Q.  What is that document?

A.  What you've handed me marked Petitioner's 19 is a five-page document, which is a copy of my Curriculum Vitae or professional resume.

Q.   And is that Curriculum Vitae up-to-date?

A.   Yes, sir.

MR. ABREU:  Your Honor, petitioner would move for the admission of P-19.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Nineteen is received.

Q.   (Mr. Abreu continuing)  Dr. Arden, can you briefly tell us about your educational background.

A.   Yes.  After I graduated from college I attended and graduated from the University of Michigan Medical School in 1980 receiving my M.D. or doctor of medicine degree.  I then served in two medical specialty training programs, the first a three-year program in the field of anatomic pathology in the New York University Medical Center in New York City.  I then served one additional training year in forensic pathology at the office of the chief medical examiner for the State of Maryland located in Baltimore.  At the completion of my training --

Q.   Dr. Arden, I think I noticed yesterday if you move too close to the microphone it makes a squealing noise.  It'll pick you up from where you're sitting so you can be just naturally from there.

A.   Thank you.  At the completion of my training actually in 1985 I became board certified by the

American Board of Pathology in both anatomic and forensic pathology. I've been licensed to practice medicine since 1982 I believe. I think -- even I have to check my CV. My first medical license was in 1982 and I've acquired several others since and then I embarked on my career.

Q. And where are you licensed to practice medicine?

A. I'm currently licensed to practice medicine in Virginia, West Virginia, Maryland and New York. I have previously been licensed to practice in Delaware and the District of Columbia.

Q. Doctor, you mentioned having board certifications and training in both anatomic and forensic pathology.

A. Yes, sir.

Q. Can you tell us, what is "anatomic pathology"?

A. Yes. First of all, "pathology" in general is the medical specialty that studies the changes in the form or the function of the human body or its components. By "changes" I'm talking about the effects of diseases or injuries. So anatomic pathology is one of the first two major divisions in that broad definition. Anatomic pathology studies the changes of the anatomy so you're talking about the effects of diseases or injuries on the anatomy, and that includes things you can see with a naked eye, holding your hand as well as other features

that require the microscope for examination.

Q.   And forensic pathology?

A.   "Forensic pathology" is the subspecialty that takes the broad general background of general medicine and anatomic pathology and then applies it primarily to the investigation and certification of certain types of deaths.

The types of deaths that are the primary focus, if you will, of forensic pathology are first of all any type of violent death.  And we define a violent death to mean any death where any kind of injury causes or contributes to causing that death.  The other broad area that forensic pathology addresses is deaths that are sudden, unexpected, unexplained.  So, for instance, people who die in public or people who die without medical attention.

Q.   And other than the board certifications in anatomic and forensic pathology, do you hold any other board certifications?

A.   No, sir.

Q.   Are you affiliated with any professional organizations?

A.   Yes.  I am a member or have been a member for many years of the National Association of Medical Examiners, a group that goes by its acronym of NAME.

Q.   And what are -- are you part of any committees?

A.   Yes.  I've served on a number of committees and I continue to do so.  I spent six years on the board of directors of NAME.  Three of those years I was elected by my peers to the executive committee.  I've served on a number of committees.  Currently I'm on the standards committee, the membership and credentials committee, the ad hoc government affairs committee and I currently chair the strategic planning committee and I chair the bylaws committee.

Q.   What specifically does the standards committee do?

A.   The standards committee is part of the broader umbrella they have for standards and accreditation.  The standards committee promulgates and assesses proposed autopsy standards, forensic autopsy standards, which NAME promulgates and maintains.  Those are practice standards that are considered at least minimum for appropriate practice of forensic pathology and those, in fact, are voted by the membership of NAME to be in effect.

Q.   And, Dr. Arden, how are you currently employed?

A.   I am predominantly employed as an independent consultant in forensic pathology and medicine.  I have a practice that is incorporated under the name of Arden

Forensics, PC, and in that guise I consult with attorneys in both civil and criminal matters. I also have a part-time appointment in the office of the chief medical examiner for the State of West Virginia under the title of forensic pathologist. And in that role I essentially perform the functions of a medical examiner for that system except that I only do it part time.

Q. And how do you balance that part-time work in -- West Virginia I take it?

A. Yes.

Q. -- with your consulting practice?

A. Well, actually the consulting practice is the vast majority of what I do these days. It's probably in the neighborhood of 90 percent of my work, and I -- we block out periods of time for me to go to West Virginia, work in their office for several days or a week at a time during which time I participate in their investigations. I conduct autopsies. I write reports. But the majority of the time is in the consulting practice.

Q. And have you held the position of medical examiner or assistant medical examiner in other jurisdictions?

A. Yes, sir, I have.

Q. Where?

A.    I had full-time medical examiner positions in four different agencies for a total block of 20 years to begin my career.  I was a deputy medical examiner in Suffolk County, New York.  I was an assistant medical examiner in the -- for the State of Delaware.  I spent about nine years working for the Office of Chief Medical Examiner for the City of New York and I rose through several titles there.  When I finished I was the first deputy chief medical examiner which made me the second in command in the system.

I then spent about five and a half years as the chief medical examiner for Washington, DC.  When I left that position and began my consulting practice, I overlapped with that about 18 months where I had a part-time appointment as a medical examiner in the northern Virginia region, the area where I live, and for the past roughly nine years I have now held the part-time position that we just discussed in West Virginia.

Q.    And you mentioned Washington, DC.  During what years were you working as a medical examiner in Washington, DC?

A.    I was there from early 1998 till about October of 2003.

Q.    Did you eventually resign that position?

A.   I did.

Q.   That would have been in 2003 you mentioned?

A.   Yes, sir.

Q.   What was the reason for your resignation from that office, Dr. Arden?

A.   I ended up coming under administrative and political fire.  I had worked very hard to reform an office that had been quite in chaos for about 20 years before I got there.  After making some substantial improvements and holding people accountable, you could say I didn't make any friends in the agency and there was administrative review of management.  I hadn't cured 20 years of chaos in five years.  There were people who were eager to see me depart and basically hurled lots of false allegations at me.  At that point I lost the political support of the mayor.  The only thing that was viable for me was to resign and move on.

Q.   Doctor, you mentioned false allegations.  Were there ever any adjudications against you in reference to those allegations?

A.   I'm sorry, were there any --

Q.   Were there ever any adjudications against you in reference to those --

A.   No, none of those were adjudicated and basically I left and moved on.

Q.   By the way, what were those allegations?

A.   Oh, people made all kinds of allegations about harassment, that I was creating -- they thought I wasn't nice to them.  Some of them even pretty much inflated some workplace encounters to try to claim sexual harassment.  It was a lot of nonsense but I moved on.

Q.   Were any of the allegations that were made against you in regards to your medical practice or your competency as a forensic pathologist?

A.   No, nothing involved my competency to practice medicine, my ability as a forensic pathologist, none of that.

Q.   And subsequent to your departure from Washington, DC medical examiner's office, were you hired by other states in your capacity as a forensic pathologist?

A.   Yes.  I was hired by the Commonwealth of Virginia for the part-time position and I was subsequently after that hired by the State of West Virginia for the position that I still hold.

Q.   Thank you, Doctor.  You mentioned earlier performing autopsies in your current capacity as a part-time medical examiner in West Virginia.  Over the course of your career, Doctor, how many autopsies would you estimate you performed?

A.   I've personally performed about 3,000 forensic

autopsies.  I believe I've probably certified deaths with external examinations where you examine but don't do the autopsy I'd say at a minimum another 500 times besides that.

Q.  Does part of your duties as a forensic pathologist encompass determining both the cause and manner of death?

A.  Yes, sir.

Q.  Can you just briefly describe the difference between those two.

A.  The cause of death is the specific medical process, be that disease or injury, that sets in motion or initiates an unbroken sequence of causal events that culminate in the death of the person.  So the proper definition of "cause of death" you can see gets you to an underlying or proximate cause for that cause of death statement to be thorough, accurate and competent.

The manner of death is the circumstantial explanation for how the cause of death came about.  So the manner of death is -- usually the easiest way is to just give you the choices.  The choices are homicide, suicide, accident, natural and undetermined.  So they explain how the cause occurred.

Q.  Does a medical examiner sometimes render opinions regarding cause and manner of death without conducting

the actual autopsy themselves?

A.  Yes.  Actually there are circumstances under which that occurs quite commonly.  So the premise of your question was without conducting the autopsy themselves.  To be a little more inclusive medical examiners, forensic pathologists determine and certify cause and manner of death under many circumstances, many of which do not include an autopsy.  There's no statutory requirement in most places to do an autopsy under any circumstances even though it is overwhelming common practice.

For instance, homicides would always get autopsies.  So there are many cases that come to the jurisdiction of the medical examiner where performing an autopsy is not necessary to arrive at sufficient evidence on which to base the conclusions, and so that's one common circumstance where a medical examiner may issue a cause and death statement -- cause and manner of death statement, excuse me, without doing an autopsy.

There are some other less common circumstances.  I've had the circumstance of being presented with a person who was missing and we were left with nothing more than bloodstains and tissue bits that circumstantially added up to the death of the person.  I issued a death certificate there.

I had a case brought to me by the authorities where the person had been buried a year before in a different jurisdiction and through the investigation I was able to certify that death without exhumation or autopsy.  So those things do occur.

Q.   And have you been qualified as an expert witness in both state and federal courts?

A.   Yes, sir.

Q.   Can you estimate how many state and federal courts?

A.   I haven't counted up recently but I'm in the neighborhood of 25 to 30 state court jurisdictions including the District of Columbia.  Probably I think a minimum of a half a dozen federal courts, several military court martials -- courts martial, sorry.

Q.   And how many times, Doctor, would you estimate you've testified as an expert in the field of forensic and anatomic pathology?

A.   Including my entire career and inclusive of trial, depositions, hearings, in the neighborhood of 900 times.

Q.   And of those 900 times have there been occasions that you've testified on behalf of the prosecution or on behalf of prosecutorial entities?

A.   Yes.  I've been called to testify by the

prosecution hundreds of times, especially during the 20 years I was a government medical examiner, and even on occasions as an outside consultant these days.

Q.   And have you testified as an expert on behalf of the prosecution in capital cases?

A.   Yes, sir.

MR. ABREU:  Subject to any voir dire by the government, Your Honor, I would offer Dr. Arden as an expert in the field of forensic and anatomic pathology.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  You may go ahead.

MR. ABREU:  Thank you.

Q.   (Mr. Abreu continuing)  Dr. Arden, in 2011 were you asked to consult in the case of the United States versus Alfonso Rodriguez?

A.   Yes, sir.

Q.   And who were you contacted by at that time in 2011?

A.   It was a law clinic out of Northwestern University.  I believe Professor Joseph Margulies was my point of contact.

Q.   And what specifically did Dr. Margulies ask you to do?

A.   He asked me to review materials regarding the death and the autopsy of Ms. Sjodin and the subsequent

legal proceedings that had derived from that.  And he asked me to -- in particular to review the autopsy and the opinions provided by the medical examiner and to advise him as to whether I agreed or disagreed with the interpretations and the opinions derived from the autopsy.

Q.  And who was that medical examiner you made reference to?

A.  Dr. Michael McGee.

Q.  As part of your consultation in 2011, did you prepare a report?

A.  Yes, sir, I did.

MR. ABREU:  Your Honor, may I?

THE COURT:  You may.

Q.  (Mr. Abreu continuing)  Dr. Arden, let me show you what I am marking as Petitioner's Exhibit No. 20 (indicating).

A.  Yes, sir.

Q.  Do you recognize that document?

A.  I do.

Q.  Let me ask you to turn to the final page of that document.  I believe it's page 4 of 4.

A.  Yes, sir.

Q.  Is that your signature on the signature line of that document?

A.   It is.

Q.   When is that document dated?

A.   September 15 of 2011.

Q.   And is this the report you prepared in relation to your consultation back in 2011?

A.   It is.

MR. ABREU:  Your Honor, I would offer Petitioner's Exhibit No. 20.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Twenty is received.

Q.   (Mr. Abreu continuing)  Doctor, let me ask you to refer back to the first page of that report and ask you if you were provided materials to review as part of your 2011 consultation.

A.   I was provided materials and they are, in fact, listed in the middle of the first page of Petitioner's 20 under the heading of "Materials Reviewed."

Q.   Can you just for the record note what materials you were provided, please.

A.   Yes.  There's a list of bullet points there and to summarize I received the autopsy reports for Dru Sjodin.  Those are the provisional and final reports provided by Dr. McGee.  I also had photographs of the autopsy as well as the crime scene, which is the scene of recovery of the body.  I received various government

documents, law enforcement documents that related to the investigation of the crime scene and the recovery of her body.  There were also government documents concerning the summary of opinions from Dr. McGee.  I received and reviewed transcripts of both the deposition of Dr. McGee as well as trial testimony from Dr. McGee and testimony of Dr. Sensabaugh.  And I also received laboratory reports from the hospital that Dr. McGee used to conduct some of the laboratory testing related to this autopsy.

Q.  And, Doctor, I note that it's not separately listed but did you also receive and review materials of Dr. McGee's testimony at the August 28th of '06 Daubert hearing that took place I believe during the time of trial or on the same day of his trial testimony as I recall?

A.  Yes.  The transcript that I received included both the Daubert hearing as well as the actual trial.

Q.  And you make reference to that specifically in terms of the trial testimony of Dr. McGee there on page 1.

A.  Yes.  That's what I intended there.

Q.  As part of your consultation in 2011, Dr. Arden, did you provide counsel for Mr. Rodriguez, then Professor Margulies, with your opinions?  And I'm speaking broadly now regarding, one, the defects on Miss

Sjodin's body, her cause and manner of death, and the evidence of the alleged semen Dr. McGee claimed to have identified?

A.   Yes, I did.

Q.   And are those opinions contained in your report?

A.   They are.

Q.   Dr. Arden, yesterday we heard extensive testimony from Dr. Flomenbaum with specific references to trial transcripts regarding Dr. McGee's prior testimony.  And rather than take you back through that testimony in detail, what I'm going to ask you to do is just focus on the opinions that you provided and then you can provide us regarding those three areas that we just discussed. Is that okay?

A.   Yes, sir.

Q.   And I may by the way ask you about some specifics of Dr. McGee's testimony but I won't take you back to the transcript pages if that's okay.

A.   Very good, sir.

Q.   And let me ask you this though, Doctor.  In formulating your opinions, did you review and consider Dr. McGee's opinions as contained in his provisional and final autopsy reports?

A.   Yes, sir, I did.

Q.   In formulating your opinions, did you consider

and review Dr. McGee's opinions as contained in his May 31, 2006 pretrial deposition testimony?

A.  Yes, sir, I did.

Q.  In formulating your opinions, did you review and consider Dr. McGee's opinions as contained in his August 28, 2006 Daubert hearing testimony?

A.  Yes, sir.

Q.  And finally in formulating your opinions, did you review and consider Dr. McGee's opinions as contained in his August 28, 2006 trial testimony?

A.  Yes, sir.

Q.  Actually there's one more thing I wanted to ask you about.  In formulating your opinions, did you review and consider Dr. McGee's opinions as contained in his January 4, 2017 post-conviction deposition testimony?

A.  Yes, sir, I did.

MR. REISENAUER:  We're talking about the 2011 report; is that correct?

MR. ABREU:  No, not just the 2011 report.  Just generally.

MR. REISENAUER:  Okay.  Thank you.

MR. ABREU:  Thank you.

Q.  (Mr. Abreu continuing)  Doctor, let me ask you specifically about the defects that you observed as they relate to Miss Sjodin's neck.

A.  Yes, sir.

Q.  Let me show you what was previously marked as Petitioner's Exhibit 12.

MR. ABREU:  Your Honor, do you still have your copy?

THE COURT:  Oh, I sure do.

MR. ABREU:  Thank you (indicating).

THE WITNESS:  Thank you.

Q.  (Mr. Abreu continuing)  Dr. McGee, is P-12 familiar to you?

A.  I'm not Dr. McGee.

Q.  My apologies, Dr. Arden.

A.  Yes, sir, it is.

Q.  Could you describe what's depicted in P-12, please.

A.  Yes.  P-12 is one of the autopsy photographs of Miss Sjodin, and it depicts the front and right side area of her neck and the lower face, including the jaw. It also includes a little bit of the surrounding areas, upper front of the chest and the side of the head, including the right ear.  And in particular it depicts the findings that were observed and described at the autopsy in these parts of the body, including the strip of tissue running across the front of the neck toward the left side and the effects of decomposition and

animal depredation.

Q.   And, Doctor, is P-12 consistent with the evidence that you reviewed that formed the basis of your opinions regarding the neck defect?

A.   Yes, sir.

Q.   In your opinion, Dr. Arden, to what would you attribute the defects visible in Ms. Sjodin's neck as depicted in P-12?

A.   In my opinion the defects in the tissues of the neck, which includes absence of many of the structures internally especially, is due to postmortem changes. This is a combination of postmortem decomposition, the breakdown of the tissues that occurs after death by multiple mechanisms, and it also includes additional tissue loss caused by the actions of animals eating the tissues.  That's what we subsume under the general heading of animal depredation.

Q.   And, Doctor, based on your review of the opinions of Dr. McGee and your own evaluation, did you see any evidence that supports the conclusion that sharp force injury was applied to any part of Miss Sjodin's neck?

A.   No, sir.  In my opinion I see no evidence in this photograph, Petitioner's 12, or in any of the other materials that I reviewed that indicate to me or cause me to conclude that there was sharp injury to her neck.

Q.   And in particular sharp injury caused by a knife?

A.   Correct, sharp injury caused by a knife or any other sharp implement that would cause similar injuries. I see no evidence whatsoever to support that conclusion.

Q.   Given your opinion regarding the postmortem decomposition and animal depredation, what is your opinion regarding Dr. McGee's or any forensic pathologist's ability to conclude with any medical certainty that Miss Sjodin's neck was slashed with a sharp force instrument?

A.   My opinion is that the tissues have been substantially altered and destroyed by the postmortem processes that has obscured any possibility really of detecting a sharp injury in this area of her body. There is no evidence here whatsoever of a feature of the tissues or the edges of the tissues that is strongly indicative or suggestive of a sharp or sharp force injury.  The features of the tissue have been severely altered by the postmortem processes.  Most of the underlying tissues, what would be the internal structures of the neck, in this region are in fact gone. They're absent so they are not available for examination of any features that would be indicative of any sort of injury, sharp or otherwise.  So the evidence here really renders this entirely inadequate to make any such

conclusion as to sharp injuries, and there is indeed positive evidence of other processes, namely, the postmortem processes on which to draw conclusions.

Q.   What is that evidence that you're seeing, positive evidence of postmortem processes as you describe, Doctor?

A.   There are several features here that are very clear that are conclusive as to the postmortem processes that I was referring to.  First of all, you can see in a broad general sense that the tissues are discolored.  I can recognize from the photograph, having the experience of having examined many bodies like this, that there is tissue loss.  The superficial layers of the tissue have slipped away.  You can even glean from having the firsthand knowledge looking at a photograph like this I can tell you that these tissues are moist and slippery and softened.

There are areas where the tissue is gone.  It has disappeared, which is another common aspect of various postmortem processes.  There are areas where the margins of the tissue between what is remaining and what -- and what is absent have some irregularity, some notching.  Sometimes you might use the term "scalloping."  Those are highly characteristic of tissue that has broken down postmortem.  And some of those

features, ears especially, the irregularity along the edge of the missing tissue and the right ear, some of the repetitive notching along the bottom of the jaw, those are features of animal feeding and typical of small rodents, for instance, and their incisor teeth in the front.

So the tissue breakdown, the discoloration, the absence, the margins as I've described, those are all positive features that are evident in this photograph and in the totality of the evidence provided to me to review that are highly consistent and suggestive and I guess I should just say it outright diagnostic of postmortem decomposition with animal depredation.

On the contrary there are no positive features in this photograph or the other evidence that I examined that are specifically indicative of the effect of a sharp implement like a knife.  There's no stab wound.  There's no configuration.  There's nothing here that reflects the use of a knife at all.

Q.  Let me just stop you there for a second, Doctor, if I may and ask you specifically about what you identified as that strip of tissue that's observable in P-12.

A.  Yes, sir.

Q.   Now Dr. McGee described what you call notching --
what he called and what you called notching and/or
scalloping along the lower margin of that strip of
tissue which he opined was consistent with a knife being
repositioned and plunged into the neck.  Do you recall
that testimony?

A.   Yes, sir.

Q.   Do you agree with Dr. McGee?

A.   I do not.

Q.   And why not?

A.   First of all, the phenomenon of a knife that is
being repositioned during the infliction of injuries
more commonly applies to stab wounds than cutting
wounds, although you can apply it to either.  And I
would expect to see some really jagged cut marks going
in different directions with some intersections to
fulfill the opinion that you've just described from
Dr. McGee concerning repositioning.

We don't have any of those jagged
intersecting angulated marks here.  We have kind of a
gentle undulation of the lower margin of that strip of
tissue --

Q.   Doctor, let me stop you for a second.  By "jagged
intersecting marks" are you referring to almost like Vs
or Xs?  What would you be talking about?

A.   More like Vs, Vs and Ys, those kinds of shapes.

Q.   Okay.

A.   And we have nothing that looks like that.  And also if we're discussing the lower margin of that strip of tissue, and just for the record I know the Court has the photograph, P-12, there's a -- there's a hand with a forceps holding that strip of tissue up so that it is separated from the rest of the body so you can see its features better.  And you can also see at the lower corner of where that strip now joins up with the remaining tissues on the front and side of the neck.  There's a very rounded corner to the bottom margin of where it is separated from the tissue below it, which again is blunted and has some notching to it.

This again is all the types of features you expect to see in postmortem breakdown.  So this strip of tissue not only doesn't have the features that are indicative of a sharp edge or repositioning of a sharp edge but its junction with the lower corner, which is just slightly to the right, our right of the center of the photograph, itself has features that are typical of postmortem processes.

Q.   Doctor, you mentioned that the features visible regarding the defect in P-12 are attributable to postmortem processes and animal depredation, and would

that be accurate in regard to specifically the strip of tissue and what you're describing, a long strip of tissue as well?

A.   Yes, sir.

Q.   Okay.  Doctor, I believe you testified that the notching that's visible there or the scalloping visible in P-12 is not consistent with a knife that is being plunged or repositioned as Dr. McGee testified.  And in your experience and expertise, Doctor, is that notching in fact inconsistent or is it inconsistent with the act of plunging and repositioning the knife as Dr. McGee testified?

A.   Yes, it is.

Q.   And could you just tell us why that is.

A.   Well, again it doesn't have any of the features of a wound caused by a knife being repositioned and plunged.  You tend to see those intersecting sharp wounds and margins like V shapes and Y shapes under those circumstances.  If you're talking about repositioning of a blade that's actually being plunged in as opposed to cutting the surface, one of the classic appearances there is referred to as a swallow tail.  You get a wound that has a main body and then two projections coming from it much like the bird tail.  That's really the most classic appearance of a

repositioning of a knife during a thrust, whether it's going in or coming out.  And, of course, we see none of that here.

Q.  And I meant to ask you about that, Doctor.  Is there a significant -- or is there a difference of significance to a pathologist when you're talking about stabs or slashes versus -- stabs versus slices or cuts versus stabs?  Did that make sense what I just asked?

A.  My understanding is you're asking about stabbing versus cutting?

Q.  Yes, or slashing.

A.  Yes.  I'm going to include slashing with cutting.

Q.  Yes.

A.  Yes.  There is very much an important distinction between those two to a forensic pathologist.

Q.  What is that important distinction?

A.  A stabbing wound by a sharp object is generally defined to be deeper than it is long on the skin surface because you're inserting the blade of the knife, it's usually a knife, into the body or that part of the body. So you get a defect in the skin surface that recapitulates at least a portion of the size of the knife blade.  It does not have to be a perfect reproduction because again you can move that blade but the majority of that wound is the track that enters into

the body by the insertion of the knife.

And then the defect on the skin surface very commonly will have features that reproduce the configuration of that portion of the blade. Most importantly, since we almost always see single-edged blades used in common practice, you will commonly find that the two edges of the defect are smooth along the sides of the blade. One corner of the defect is blunted, which would be the dull back of the blade, and one corner is sharp where the sharpened blade -- sharpened edge is.

In contrast a cutting or slashing wound involves taking a sharp implement, knife. Could be anything that's substantially sharp. You could have broken glass, but we usually think of knives. And you take the sharp edge and you draw it across the surface, cutting into the surface. So cutting wounds by definition then are typically longer on the skin surface than they are deep, and they usually do not have any of those other specific features because the sharp edge of the blade cuts through the tissue and the knife doesn't get thrust inward so you don't have the issue of the sharp corner and the blunt corner.

And you also don't have the relationship typically between the blade and the injury in terms of

configuration because it pretty much doesn't matter what size blade you have.  You can draw it across a small amount of tissue or a very great length of tissue and cause a cut.  So I can create a 10-inch cut on the skin surface with a one-inch scalpel blade, and I can create a 10-inch cut with a 10-inch chef's knife and you typically can't tell the difference when you examine the wound.

Q.   Doctor, based on your review of P-12 and the other evidence in this case, did you observe any features consistent with either a stabbing or cutting slash wound in any of the evidence?

A.   No, sir, I did not.

MR. ABREU:  May I approach, Your Honor?

THE COURT:  You may.

Q.   (Mr. Abreu continuing)  Doctor, let me show you what was previously marked as Petitioner's 13 and 14 if I may (indicating).

A.   (Witness examining.)  Yes, sir.

MR. ABREU:  May I have a moment, Your Honor?

THE COURT:  You may.

MR. ABREU:  Thank you.

Q.   (Mr. Abreu continuing)  Doctor, can you describe for us -- well, let me ask you this.  Have you seen Petitioner's 13 and 14 before?

A.   Yes, sir.

Q.   Can you describe what is depicted in Petitioner's 13 and 14.

A.   Yes.  These are both postmortem pictures during the examination of Ms. Sjodin.  P-13 is a picture that shows more of the left side of the neck and face and upper back.  The pertinent feature in P-13 is that you can see a portion of the rope ligature that is around her neck and directly underneath that ligature, meaning between the ligature and the skin, is a portion of a plastic bag.

And then P-14 is a similar photo showing more of the front to the left side of the face and neck and upper chest area, which also shows a portion in particular of the ligature going across the front and the left side of the neck, part of which is also including the plastic bag beneath the ligature.

Q.   Doctor, based on P-13 and 14 as well as the other evidence you reviewed in this case, can you tell us where the remnant of tissue is relative to what is depicted in P-13 and 14?

A.   I assume you mean the strip of tissue we have been discussing?

Q.   Correct.

A.   Yes.  The strip of tissue that was particularly

demonstrated in P-12 is located underneath the course of the ligature on the front and left side of the neck.  In other words the ligature appears to be right overlying that strip of tissue.

Q.   And based on the evidence that you reviewed, Doctor, do you have an opinion on whether the ligature and the plastic bag, which is depicted in P-13 and 14, played any role in preserving that strip of tissue which is depicted in P-12 which we previously discussed?

A.   Yes, sir.

Q.   Can you tell us what role that is.

A.   The ligature with the bag underneath it appears to be directly overlying that strip of tissue that was highlighted in the photograph in P-12.  It appears to me that the ligature and the plastic bag were providing some degree of cover or protection to that strip of tissue.  So it is very logical to me that they likely prevented animals from getting to that strip of tissue so they -- those structures more likely provided some preservation, if you will, or at least prevented animals from getting to that part.  So it's very likely that the strip of tissue remained because it was protected by the rope and the ligature.

Q.   Doctor, does the width of the remnant of tissue that remained as visible in P-12 as compared to the

circumference of the ligature that's visible there in P-13 and 14 support your conclusion that you just testified to regarding the preservation of that strip of tissue?

A.   Yes.   The widths are similar.   Of course, they're not perfect down to the hundredth of an inch but the widths are actually quite similar and consistent.   So that is indeed supportive of that opinion.

MR. ABREU:   Your Honor, may I approach?

THE COURT:   You may.

MR. ABREU:   The witness, that is.

Q.   (Mr. Abreu continuing)   Doctor, let me show you what was previously marked as Petitioner's 18 (indicating).

A.   Thank you.   (Witness examining.)

Q.   Do you recognize Petitioner's 18, Doctor?

A.   Yes, sir.

Q.   And what is depicted in Petitioner's 18?

A.   Petitioner's 18 is another one of the autopsy photographs of Ms. Sjodin and it is a fairly close-up view of a defect in the right side of her torso, an area that's been referred to as the right flank.

Q.   Is P-18 consistent with the other evidence you reviewed that formed the basis of your opinions regarding that flank defect?

A.   Yes, sir.

Q.   In your opinion, Dr. Arden, to what do you attribute the defect in the flank region that is depicted in P-18?

A.   In my opinion this is another example of the postmortem processes that have caused breakdown of various parts of the body, and again I include both decomposition as well as animal depredation when I use the general term "postmortem processes."

Q.   Based on your review, Dr. Arden, of Dr. McGee's opinions and your own evaluation, did you see any evidence that supports the conclusion that sharp force injury was applied to any part of Miss Sjodin's flank or the flank defect that's depicted in P-18?

A.   No, sir.

Q.   Given the amount of postmortem decomposition, animal depredation that you previously described, Doctor, what is your opinion regarding Dr. McGee's or any forensic pathologist's ability to conclude with any medical certainty that there was sharp force trauma to Miss Sjodin's flank?

A.   In my opinion, based on this evidence and the other evidence related to this defect of the right flank, there is not sufficient evidence on which to base an opinion with reasonable medical certainty that the

sharp or sharp force injury occurred in this location.

Q.  Doctor, were there other defects in Miss Sjodin's body that Dr. McGee did not attribute to sharp force injury that were similar to that particular flank defect depicted in P-18?

A.  Yes.  Actually there were various areas on the body that had similar defects and similar appearances that were not attributed by Dr. McGee to being actual injuries incurred during life.  One example is a defect on her knee.  And now I'm getting confused as I think it was the left knee, but definitely one of her knees had a defect that had extremely similar appearances to what's shown in the flank in P-18 and yet that was not interpreted or diagnosed by Dr. McGee as being an injury that occurred during life or being a sharp force injury.

MR. ABREU:  Your Honor, may I approach again?

THE COURT:  You may.

MR. ABREU:  Thank you.

Q.  (Mr. Abreu continuing)  Doctor, let me show you what I am marking as Petitioner's Exhibit 20 and Petitioner's Exhibit 21 (indicating).

A.  (Witness examining.)

THE COURT:  We already have 20 so it's going to have to be 21 and 22.

MR. ABREU:  Thank you.

Q.  (Mr. Abreu continuing)  Doctor, what is depicted in Petitioner's 20 and 21?

A.  Twenty-one and 22.

Q.  Twenty-one and 22.  I gotta change my notations here on my outline.  Twenty-one and 22, my apologies.

A.  P-21 and P-22 are also autopsy photographs of Ms. Sjodin.  P-21 is taken from a slightly farther view. You get more of the context of what we're looking at and it is her lower legs predominantly with her face down in the position, and primarily this is demonstrating a defect on the outside of her left knee area.  P-22 is then a close-up photograph of that same defect.

Q.  And regarding those defects that are visible there in P-21 and 22, Doctor, are they -- do you notice similarities between those defects and the defect that we just discussed regarding the flank injury, P-18?

A.  Yes, I do.

Q.  How are they similar and how is that significant to you as a forensic pathologist?

A.  Quite simply these are both basically oval defects in the skin surface that extend into the underlying tissues.  They have relatively smooth margins with a few areas of irregularity.  There is no feature here that would be any of the things I mentioned earlier

as specific for a knife such as a stab wound.  There's no evidence -- notwithstanding the severe decomposition which alters the appearances, but there is no evidence of any hemorrhage associated with either of these wounds which would be -- if it could be determined would be an indication of a wound incurred during life.  So these really for all practical purposes have extremely similar appearances.  They are very slightly different size and shape.  They are in two different locations on the body, and interestingly they were interpreted differently by Dr. McGee.

MR. ABREU:  Your Honor, I would move for the admission of Petitioner's Exhibits 21 and 22.

THE COURT:  Any objection?

MR. REISENAUER:  Most likely not, Your Honor, but I would like to take a look at them.

THE COURT:  Oh, haven't you seen them?

MR. REISENAUER:  Well, I was given numbers but I didn't get copies so if I could just take a look.

THE COURT:  You may.

MR. ABREU:  Your Honor, when we take a break I will get him photocopies.  Those are the only hard copies I have.  I'll get some additional copies.

THE COURT:  Any objection, Mr. Reisenauer?

MR. REISENAUER:  No, Your Honor.  Thank you.

THE COURT:  Twenty-one and 22 are received.

MR. ABREU:  Thank you, Your Honor.

Q.  (Mr. Abreu continuing)  Dr. Arden, does Dr. McGee's autopsy report describe any dissection or other action in that flank defect that would allow him to observe characteristics from within that defect that are consistent -- that would lead him to opine that there was a knife wound at that defect?

A.  In my interpretation of the report, the answer is no, sir.  There is a description -- to be fair, there is a description kind of tucked into a part of the internal examination section of the autopsy report that does describe what is characterized as a track from that flank wound into the pelvic region.  It is described in very limited and broad or generic terms.

There is insufficient detail that would lead me to conclude, given the totality of the evidence and the condition of her body, that this was indeed a penetrating wound track.  There is absent any specific finding or feature described that would indicate the causation by a sharp implement such as a knife.  For instance, there's no indication of specific organs or structures that are damaged.  There's no indication of damage with a configuration of a knife blade such as a knife would cause or a stab wound would cause, excuse

me.   There's no indication of evidence of prior hemorrhage at the location, which would be corroborative of an antemortem injury, namely, one that occurred during life.

So there is -- and I can add there's no documentation of that purported injury track other than the few highly general statements kind of hidden in the internal examination.

Q.   And let me ask you about that documentation you just mentioned, Doctor.   Were there any photographs taken by Dr. McGee at the time of the autopsy or at any time that depicted the inside of that flank defect or any characteristic consistent with a knife wound?

A.   No, sir.   And that's exactly what I was alluding to.   If this is purportedly evidence of a penetrating injury such as a stab wound, it would have been a critically important piece of that autopsy, and there was no photographic documentation of those purported findings.

Q.   As a forensic pathologist, if you had observed evidence of what you believed to be a knife wound, what would have been proper procedure for documenting what you saw there?

A.   Proper procedure would include two components. The first is a detailed verbal description in the

autopsy report set out from other components of the autopsy report.  So you would have it set aside specifically as part of the description of injuries and it should be of sufficient detail even by just reading the words to suggest or support the conclusion that it had those features that could be diagnostic.

The other component of documentation that in my opinion is required is photographic documentation of all of the components of that purported wound, both externally and internally, to demonstrate whatever it was that you had verbally described in the written report.

Q.    Thank you, Doctor.  Doctor, let me move on and ask you about testimony at trial regarding the consistency between a knife that was recovered in Mr. Rodriguez's car or a duplicate thereof and the wounds or the defects visible in Miss Sjodin's body.

A.    Yes, sir.

Q.    You mentioned earlier differences between cuts or slashes and stabs and you began describing some of the process of identifying those type of injuries on a body, correct?

A.    Yes, sir.

Q.    Generally speaking as a forensic pathologist, how difficult is it to make an assessment of whether any

particular cutting instrument or knife, any one particular cutting instrument or knife is responsible for any one particular wound?

A.  It is generally somewhere between extremely difficult to impossible to identify a particular cutting implement or sharp implement with a given wound.  There are rare examples where you may have features or evidence that supports a conclusion that one specific knife caused one specific wound.  That is extraordinarily the exception in the practice of forensic pathology.

Ordinarily and very commonly it is possible to opine as to whether a given knife is consistent with a given injury or inconsistent.  And in actual practice most knives are consistent with most stab wounds, and almost any sharp implement is consistent with virtually every cutting wound.  So it is almost never feasible or reasonable to associate a given knife with a given wound to any degree of medical certainty, other than the broad term of consistency.

Q.  Were there any features, Doctor, on the neck defect or the flank defect on Miss Sjodin's body that would allow you to draw conclusions regarding the consistency of those defects and the knife that was recovered in Mr. Rodriguez's car or the duplicate

thereof?

A. No, there were not.

Q. In your opinion, Doctor, given the amount of postmortem decomposition and animal depredation in the neck and flank defects, were there sufficient evidence from which a forensic pathologist could conclude with a reasonable degree of medical certainty that the knife recovered from Mr. Rodriguez's car or its duplicate was consistent with the neck wound or flank wound in Ms. Sjodin's body?

A. Well, I have to preface my answer with -- first of all, I hope it's clear that in my opinion those are not wounds, the neck and the flank. They are not wounds. They are not knife wounds. There are absolutely no features whatsoever to permit such a conclusion to a reasonable medical certainty.

If I assume for the sake of your question that those are or at least could be knife wounds, first of all, there are no features of the neck wound which would be a cut or a slash that can allow you to associate it with any particular knife or sharp implement. And we've already gone over why that is the case so I won't belabor that point.

Even if I turn my attention to the flank defect and again for the question assume it is a stab

wound, it does not have any of the features at the time of autopsy that allow you to associate it with a particular knife or a particular type of knife. It is probably fair and the best I can do is say "probably fair" to say that the knife recovered or the duplicate of the knife recovered could possibly have caused that if it were indeed a stab wound. However, the size and configuration of the skin defect no longer allow you to diagnose it as a stab wound much less associate it with a knife of a particular size.

And I don't have the autopsy report in front of me but my recollection is that the supposed track described by Dr. McGee extended a substantial distance, I think it was eight inches into the body, which is substantially longer than the blade of the knife recovered or its duplicate. You can create a stab wound in the body that is deeper than the length of the blade because you can indent the body's surface to some degree, but I believe the purported depth of the supposed track we're talking about is twice the size of that blade if I recall the numbers correctly. And so that really isn't consistent either.

So the answer is no, there is no good way to relate any of those findings with that knife or its duplicate.

Q.   And thank you for the clarification, Doctor.   My question was presupposing a hypothetical wound, not an actual wound because we know you've opined that there was no wound.   Thank you for that though.

Let me ask you, Doctor, about your opinions regarding the cause of death and the opinions contained in your 2011 report regarding the cause of death in this case.

Based on the evidence you reviewed, Doctor, including Dr. McGee's opinions, what was your opinion regarding the most likely cause of death -- Miss Sjodin's cause of death, the most likely cause of death for Miss Sjodin?   And I'm talking about 2011 at the time of your initial consultation.

A.   Yes, sir.   As of 2011 and contained in my declaration or report, which is P-20, in my opinion then the most likely cause of her death was a form of asphyxiation and in my opinion most likely ligature strangulation.

Q.   Can you tell us how you arrived at those conclusions, please.

A.   Yes.   There is a combination of positive evidence allowing me to make an affirmative conclusion and negative evidence that allows me to exclude other potential causes of death.   The negative evidence is

that again notwithstanding the severe postmortem breakdown of the body, which unfortunately obscures many of the features, we had no evidence of a penetrating or perforating injury and I'm getting kind of opaque. Usually what we're talking about is gunshot or stab wounds. I've already spoken at length about the issues of stab wounds, and suffice it to say that there were no defects in the skin suggestive of bullet wounds. Postmortem x-rays did not reveal any projectiles retained in the body so we didn't have any corroborative -- or I should say conclusive evidence, excuse me, of stabbing or cutting or gunshot wounds. We didn't have any broken bones to suggest severe blunt impact trauma such as a head injury that would allow me to go down that road and conclude that would be the cause of death.

In a circumstance such as that if you have reasonably excluded things like blunt trauma, stabbing, cutting, gunshot wounds, you are pretty much left with the only other injury mechanism that becomes probable and reasonable is some form of asphyxiation. And I think it's fair to say that we've -- I think we've all excluded -- reasonably excluded consideration of a sudden natural death. So under those circumstances asphyxiation of some form is the most likely cause or

mechanism of death.

In this instance I then moved to the affirmative or positive evidence and, in fact, we have a person who was bound, who was naked from the waist down. Her body was dumped. Those are all circumstances that are again commonly associated with asphyxial deaths such as strangulation. And then most importantly she is recovered with a ligature around her neck, which indeed is one of the common methods by which asphyxiation or strangulation can be affective.

So I have enough negative evidence and enough positive evidence to support a conclusion that her cause of death was some form of asphyxia, most likely ligature strangulation.

Q. Doctor, you just mentioned that I believe you said we all agree that this was not a natural death. Did you just testify to that?

A. I did.

Q. And I take it that you would agree with Dr. McGee that this was homicidal violence. She died as a result of homicidal violence?

A. Yes, sir.

Q. Was there something, Doctor, in the circumference of the ligature that supported your conclusion regarding the cause of death?

A.   Yes, there was.

Q.   Can you tell us what that was.

A.   Yes.  The ligature was removed and photographed in its same configuration, in other words to reproduce the size it had been when it was around her neck prior to removal.  And based on my measurements I actually blew up the photograph on the screen, the computer screen, and I did measurements around the circumference.  There's different ways you can approach that including -- if you can assume it's a circle you can use the radius or the diameter to calculate the circumference.  But after I tried various methods I felt most comfortable actually measuring it with a flexible tape and then taking the measurement on my screen and comparing it to the internal ruler scale so I could make the conversion.  And so by measuring the actual circumference on the photograph -- and it's not a perfectly precise process so I did come up with several different measurements but my measurements were all roughly in the nine to 10-inch range for the circumference.

Q.   And what is significant, Doctor, in terms of your opinion regarding the cause of death?  What is significant about that nine or 10-inch circumference as you measured?

A.   It's smaller than your average human neck.  So it is tight enough to be applying pressure at that circumference, and that certainly raises the strong consideration that a ligature around the neck that is tight enough to apply pressure could well be the mechanism by which a person had been strangled.

Q.   Thank you, Doctor.  Doctor, I'd like to move on if I may to your opinions regarding the alleged semen in this case.

A.   Yes, sir.

Q.   And that was something that you opined about in your 2011 report as I recall?

A.   Yes, sir.

Q.   Doctor, do you recall Dr. McGee -- Your Honor, there's been a suggestion that perhaps this is a good opportunity to take a quick break if it's okay with the Court.

THE COURT:  That would be good.  We'll go ahead and we'll break at this point.  We'll start again at 10:30 -- 10:35.  I was about to admonish a jury that's not here so we'll go ahead and break for 20 minutes.

MR. ABREU:  Thank you, Your Honor.

(Recess taken; 10:15 a.m. to 10:35 a.m.)

THE COURT:  We are back on the record in a

case entitled United States versus Rodriguez.  It's 2:04-cr-55 and 2:11-cv-88.  The record should reflect that all counsel that previously appeared are present. When we broke Mr. Abreu was about to begin a new line of questioning.

You may proceed, sir.

MR. ABREU:  Thank you, Your Honor.

Q.  (Mr. Abreu continuing)  Dr. Arden, before we broke we were getting ready to discuss the evidence of the alleged semen in this particular case.  Do you recall that?

A.  Yes, sir.

Q.  And I'd like to ask you specifically about Dr. McGee's testimony that the levels of acid phosphatase in this particular case on the cervical/vaginal swabs indicated the presence of semen deposited within 24 to 36 hours of Ms. Sjodin's death.

A.  Yes, sir.

Q.  First let me ask you, are you familiar with acid phosphatase, also known as AP?

A.  Yes, I am.

Q.  And where is acid phosphatase found?

A.  Well, acid phosphatase is an enzyme that may be found in various parts of the body but especially in the forensic setting it is particularly of interest as a

component of semen.

Q.   And is acid phosphatase present in both male and female bodies?

A.   Yes, it is.

Q.   And you mentioned that it's of particular interest in a forensic setting in the detection of semen.  How is acid phosphatase used in a forensic setting in the detection of semen?

A.   Acid phosphatase is one of the components of human semen and therefore it is one of the components that can be detected when you are looking to see if semen is present in a location or a stain or that sort of thing.  So you can do swabs, for instance, oral, anal and vaginal swabs being very common in the forensic setting in a sexual assault workup or a so-called rape kit.  And one of the things you can do as a first line screening test is to see if the -- if the swab contains an elevated concentration of acid phosphatase which would be a good first order indicator that you may have semen.  It is not uniquely specific to semen.  It is not by itself diagnostic of the presence of semen but it was for many years a very good first step screening test which would then cause you, if it were positive, to look further for something more specific to confirm that.

Q.   In other words, Doctor, AP testing is only

presumptive for the presence of semen?

A. Yes. As the word is used in laboratory and forensic settings, that's exactly right. It's a presumptive test. It gives you reason to go further. It gives you reason to look more specifically. It is not diagnostic or conclusive on its own.

Q. As a forensic pathologist do you yourself interpret the results of acid phosphatase testing in your effort to identify the potential presence of semen?

A. I have during the course of my career as a forensic pathologist interpreted acid phosphatase specifically for that purpose. Frankly I have not done so in many years because it has largely been superseded by other better tests but, yes, I have done that as a part of my professional activities.

Q. And we'll get to those other better tests shortly, Doctor. Based on your knowledge and experience, is there a level of acid phosphatase that would in your opinion likely be determinative for the presence of semen?

A. Well, in my opinion determinative as in a positive diagnostic feature on which I could rely by itself?

Q. Correct.

A. No. There are certainly higher and lower levels

or concentrations which may have different implications, but acid phosphatase alone at any level being determinative of a conclusion that semen is present?  In my opinion, no.

Q.  And let me ask you this.  Is there a level of acid phosphatase at which you could conclude that more likely than not you have semen?

A.  No.  I wouldn't even go that far.  Again if you had a very high level it is a stronger indication of the likelihood of semen being present.  Absent some more specific confirmatory test result, I would never use the AP level by itself to say there was or there more likely than not was semen present.

Q.  And you've used the term on a couple of occasions now, Doctor, "very high level."  What would you consider a very high level?

A.  Well, I'm only familiar with one piece of literature that directly addressed this issue and goes back to I think 1994.  In that publication they talked about levels of 400 units and higher as being highly suggestive that semen was present.

Q.  And that particular study is cited in your 2011 report?

A.  Yes, it is.

Q.  Are you familiar with the AP levels that were

detected on the vagina, anal and cervical swabs in this particular case?

A.   I am.  I haven't committed all of them to memory. I particularly recall the cervical supposed prostatic acid phosphatase being at about 130.

Q.   130.7, does that refresh your recollection?

A.   Yes, sir.

Q.   47.4 for the vaginal swab, does that refresh your recollection?

A.   Yes, it does.

Q.   And 7.5 units per liter for the anal swab, does that refresh your recollection?

A.   Yes, sir.

Q.   Based on your knowledge and experience, Dr. Arden, as well as the published study which you just referenced, do you have an opinion regarding Dr. McGee's testimony that the acid phosphatase levels above 25 units per liter indicate the presence of semen?

A.   I have such an opinion.

Q.   What is that opinion?

A.   My opinion is that that is not supported by any literature and it is not scientifically valid.  Using a level of 25 and above to be determinative, to use your term, of presence of semen I believe is incorrect and inappropriate.

Q.   At the time of your initial review in 2011, Doctor, were you aware that Regions Hospital had conducted sperm searches of the vaginal, anal and cervical swabs or samples?

A.   Yes, I was.

Q.   And what, Doctor, do you recall were the results of those sperm searches?

A.   That they were all negative.  No sperm were found.

Q.   As a forensic pathologist, Doctor, who is evaluating a case with negative sperm searches, how do you factor that in relation to perhaps an elevated or -- an elevated level of acid phosphatase?

A.   Well, first of all, sperm is the single-most characteristic or diagnostic feature to determine whether semen is present.  So the absence of sperm under any circumstances already raises some serious doubts about whether there is semen present.  Of course, I recognize that you can have semen without sperm.  There are men who do not produce sperm.  There are men who have had successful vasectomies.  So the absence of sperm cannot be considered a 100 percent exclusion of semen.

But the absence of sperm is a very strong piece of evidence that semen is not present.  If I take

the absence of sperm and factor it in with what I think is best called a supposedly elevated acid phosphatase in this case, the acid phosphatase is not conclusive.  To me under any circumstances by itself it is not conclusive.  It is certainly not strong enough evidence that would allow me to conclude that semen was present in the absence of sperm.

Q.  And that actually was going to be my follow-up question, Doctor, which is how would you factor in the negative sperm search in relation to the actual numbers obtained in this case of acid phosphatase?

A.  Well, again as a broad general rule the absence of sperm will not permit me to take any acid phosphatase number and conclude that semen was present.  In this case the acid phosphatase levels were not elevated to the level where the only piece of literature I have found that addresses this directly on point would give you reason to start considering that this was semen in the absence of sperm.  So I think the acid phosphatase evidence has been superseded or overruled by the other evidence.

Q.  And we'll talk about some of that in a second as well, Doctor.  At the time of your initial review, were you aware that Y STR DNA testing had been conducted by the Minnesota BCA in search for any male DNA on the

vaginal, anal and cervical swabs?

A.  I was.

Q.  And as you recall what were the results of those searches for male DNA on those swabs?

A.  The testing for male DNA on those swabs was negative.

Q.  And I would ask you again, Doctor, considering the negative male DNA searches and the negative sperm searches how a forensic pathologist would weigh those results versus what someone might label elevated acid phosphatase levels in determining the presence or absence of semen?

A.  The presence of male DNA and presence of sperm are much more highly specific and dispositive of the question at hand here, namely, the presence of semen. Those are two factors which if they are positive are conclusive, especially the sperm conclusive in and of itself for the presence of semen.  The absence of both of those in my opinion is highly compelling evidence for the absence of semen.  And even in the presence of a supposedly elevated acid phosphatase, the negative male DNA and the negative sperm search I think are much more important and much more specific and still lead me to conclude that no semen was present.

Q.  Doctor, based on the evidence that was known to

you in 2011, and I'm not asking you yet about the p30 results, just the negative sperm searches, the negative male DNA testing and the acid phosphatase levels, what is your opinion regarding whether a forensic pathologist could conclude with a reasonable degree of medical certainty that semen was present on any of the tested swabs with those known quantities that we discussed?

A.   Based upon the evidence you've just summarized in the question, in my opinion a forensic pathologist could not conclude with reasonable medical certainty that semen was present on any of those swabs.

Q.   And given those same known factors, what is your opinion regarding Dr. McGee's specific testimony that the AP levels indicated the presence of semen deposited within 24 to 36 hours of Miss Sjodin's death?

A.   I strongly disagree with his opinion that those AP levels indicated the presence of semen, both for the general reasons as I've summarized here already that those levels alone, that finding alone is not sufficient and specifically because the opinion was offered in the presence of negative male DNA and negative sperm search. So I believe that that opinion is incorrect.

Q.   Doctor, let me just clarify, your opinion that there was no semen present based on those known factors in 2011 is not conclusive of whether there was, in fact,

a sexual assault in this particular case.

A.   Right.   That's a related but different question. The issue of sexual assault is based on many other aspects of the case and the evidence, but you're asking me to address specifically the question of whether there is scientific evidence that allows one to conclude that semen was deposited and the answer to that question is no.

Q.   Do you recall Dr. McGee's testimony regarding what he described as a globule he claims to have observed and recovered from Miss Sjodin's cervix?

A.   Yes, sir.

Q.   And do you recall Dr. McGee's testimony that he believed that globule to be semen?

A.   Yes, sir.

Q.   Did Dr. McGee mention this particular globule in his autopsy report?

A.   No, it appears no where in the autopsy report.

Q.   Based on your experience and expertise as a forensic pathologist, what would have been the proper procedure for documenting what a pathologist believed to be a globule of semen recovered from the victim of a suspected murder?

A.   First and foremost if he did see such a thing he needed to document it in his autopsy report.   So a

description of what he saw -- what he saw, where he found it, what it was, and then at some point later in the report how he interpreted that had to have been included in the report for it to have been documented in such a way to demonstrate that such a thing did occur and that he did see it.

The other thing, given the importance of that described -- or I should say testified to finding at a later date, if at all possible, it should have been photographed as well.

Q.   Did Dr. McGee undertake any of these procedures you just described?

A.   No, sir.

Q.   Dr. Arden, what's your opinion regarding whether -- if, in fact, this was a globule of semen whether, in fact, this globule would have remained in its viscous state or in a viscous state five months after being ejaculated from a body and deposited into a vaginal cavity?

A.   Yes.  If you look at the broadest context of the state of decomposition and postmortem breakdown of her body, clearly all of the tissues had been severely affected and altered and many of them had literally disappeared as a result of the postmortem processes.  I would expect the same effect on any semen deposition in

the sense that I would not expect it to survive that entire process, that time frame intact anatomically.

So the finding of the globule raises great question in my mind, first, because it wasn't documented, second, because it's a description of something that does not sound realistic to me.  I would not expect it to still be there in that location and with that appearance and that viscosity five months later when the rest of the body has severely decomposed. So that in and of itself raises great question in my mind.

The semen, if it had been semen, if it had been a globule of semen, would have lost its viscosity over time.  This happens in the body anyway with enzymes, with body temperature if it's deposited during intercourse and then the decomposition would take over. So even if it were possible to detect components of semen by swabbing, I would -- I still would not expect it to have remained as an intact globule of viscous material five months later in the face of severe decomposition.

Q.   And, Doctor, are you familiar with what happens to the viscosity of semen within minutes of its ejaculation from the body?  And I'm not asking a personal question.  I'm asking from a science basis,

Doctor.

A.   Yes.  Not an area in which I practice every day but the whole point of the deposition of ejaculated semen in the vagina and hopefully at the cervix, the opening of the cervix, is to promote impregnation.  And so the semen has to acquire a lesser degree of viscosity.  It has to become thinner and more liquid.  It has to allow the sperm cells to try to mobilize upstream, if you will, and do what they do.

Q.   Doctor, are you familiar with or did you read and review Dr. McGee's January 4, 2017 deposition testimony?

A.   Yes, sir.

Q.   Do you recall Dr. McGee testifying at that deposition that he believed the volume of the globule to be a tablespoon or more?

A.   Yes, sir.

Q.   If the globule that Dr. McGee testified to, in fact, was semen and its volume was a tablespoon or more, would, Doctor, you expect to find sperm in a sperm search in a quantity of semen of that level?

A.   Yes, I would.  I mean, that would actually be a large volume of ejaculate and so the expectation very much is that there would be sperm there.  And again if that were a globule of semen it would be relatively easy to recover them.

Q.   And what about male DNA?

A.   Same answer.  There should be.  If there's that much biological material, it should be easy to recover male DNA.

Q.   Do you recall if Dr. McGee swabbed that globule or testified that he swabbed that globule and that that served as the basis for the cervical swabs that were later tested?

A.   That is exactly what I recall.

Q.   And again, Doctor, the results of the sperm searches and the male DNA searches for that -- for those swabs of the cervix were what?

A.   Negative.

Q.   In your 2011 report, Doctor, you also make reference to the fact that Dr. McGee obtained the cervical swabs after removal of the internal genital organs at autopsy.

A.   Yes, sir.

Q.   What is the significance of that in your opinion?

A.   The significance of that is that the sample was taken after there had been manipulation and removal. We're talking about dissection, manipulation of the tissues in order to get them out of there.  The landscape has been disturbed, if you will, and the proper procedure is to take those swabs prior to

dissection and evisceration of the body.

I'm very concerned that there could have been movement of things internally if they were there. There could have been contamination of things during the course of the removal. I think that's highly problematic actually that this was not noticed prior to that exam and that it wasn't sampled until it had all been dissected, manipulated and removed.

Q. Subsequent, Doctor, to your 2011 review in this case, were you contacted in 2016 by my office and asked to provide additional opinions in this matter?

A. Yes, sir.

Q. Were you provided additional materials to review?

A. I was.

Q. And were you asked to prepare a report?

A. I was.

MR. ABREU: Your Honor, may I approach?

THE COURT: You may.

Q. (Mr. Abreu continuing) Dr. Arden, let me show you what I've marked as Petitioner's Exhibit 23 (indicating).

A. (Witness examining.) Yes, sir.

Q. Do you recognize that document?

A. I do.

Q. What is that document?

A.   Exhibit P-23 you've handed me is a copy of my Addendum Declaration in this matter.  It is a three-page document.

Q.   Making reference to I believe again the first page of that document, what additional materials were you provided as part of your review in 2016?

A.   You can see the list of bullet points near the top and middle of the first page of P-23 which I can summarize.  At this point I had also been provided two more of the Forensic Science Laboratory reports from the Minnesota Bureau of Criminal Apprehension, or BCA, those relating to some of the sexual assault workup lab testing.  I had been provided excerpts of an expert report which contained various versions or accounts of the circumstances of death of Ms. Sjodin that had been provided by Mr. Rodriguez.  I'd also been provided at this point reports from other experts, including Dr. Flomenbaum, Dr. Ferenc, Dr. Peterson and Dr. Dragovic.

Q.   Okay, Doctor, and based on those additional materials were you asked to provide additional opinions and are those contained in your January 30, 2017 supplemental report?

A.   Yes, sir.

Q.   And let me ask you now, Doctor, about whether

those additional materials resulted in a change of opinion in three particular areas or in a couple particular areas.  Let me just start with the defects on Miss Sjodin's body.

Did the review of the additional materials change your opinion regarding the nature and causes of the defects in Miss Sjodin's neck, flank or elsewhere on her body?

A.   No, they did not.

Q.   Did the review of the additional materials change your opinion regarding any evidence of sharp force injury to Miss Sjodin's body?

A.   No, they did not.

Q.   Did the review of the additional materials change your opinion regarding the postmortem processes and/or animal depredation that you testified account for all of the defects in Miss Sjodin's body?

A.   No, sir.

Q.   Regarding the cause of death, Dr. Arden, did the additional materials you were provided impact your opinion regarding Miss Sjodin's cause and manner of death?

A.   The additional materials that I was provided impacted my consideration of the cause of death but not the manner of death.

Q.   Can you describe -- tell us what you mean by that.

A.   Some of the additional materials that I received included those varying accounts of the circumstances of death that were provided when Mr. Rodriguez was interviewed.  In his accounts, which are not all perfectly internally consistent, he provides several different versions of causation of death of Miss Sjodin, all of which are types of asphyxiation.

So having those accounts to consider, first of all, is consistent with my prior opinion as to cause of death being an asphyxiation of some sort and in my opinion most likely ligature strangulation.  His accounts provided some alternative mechanisms of asphyxia which were also at least in broad terms consistent with the evidence that we have.  So the impact was that I'm now willing to consider that other versions of asphyxiation might have occurred and might have either caused her death or had been a contributory cause to her asphyxiation.

Q.   And are you aware, Doctor, that other pathologists have, in fact, opined that the mechanism of asphyxiation in this case was most likely some sort of force applied to the front or the side of Miss Sjodin's neck?

A.   I am so aware.

Q.   In particular Dr. Flomenbaum and Dr. Dragovic.

A.   Yes, sir.

Q.   How do you reconcile, Doctor, your opinions regarding the ligature as remaining the primary mechanism versus the other doctors who have opined about the force to the front and/or side of Miss Sjodin's neck?

A.   Well, Mr. Rodriguez provided an account of activity that involved pressing on the front or side of the neck as a way of causing asphyxiation.  That account, that mechanism, is again in a broad sense consistent with the evidence we have.

Due to the postmortem breakdown and animal depredation, the structures in the neck and the throat that might have been affected by application of force in that way are no longer available for examination.  And the remaining structure is the portions of the skin, for instance, have degraded to the point where it is not surprising that any subtle findings that might have been present to reflect that action or mechanism are no longer discernible.

So it is a reasonable way in which someone could cause asphyxial death, and here is a death that I have already opined I believe was caused by

asphyxiation.  So it is not contradicted by any of the evidence that we have so I think it has to be kept under consideration as one of several reasonable ways in which the asphyxiation did occur.

To my mind it still doesn't exclude the positive evidence that we have of the ligature being present, and I think that gives -- in my opinion gives the ligature more importance.  I think those other two forensic pathologists were crediting his account a little more than I am as being the definitive factor, and I'm crediting the ligature which we saw was present as being a more important factor.  But when all is said and done we're all in agreement of an asphyxial death by some form of neck compression.

Q.  Okay.  And, Doctor, based on the evidence you reviewed, including all of Dr. McGee's prior opinions and the materials you reviewed in 2011 and 2016, did you see any evidence to support the opinion that a slash to the neck was the most likely cause of Miss Sjodin's death?

A.  No, sir, none whatsoever.

Q.  Let me ask you, Doctor, about any changes to your opinions regarding the alleged evidence of semen in this case based on the materials you reviewed in 2016.

Let me show you what has been previously

marked as Petitioner's Exhibit 4 and, Your Honor, may I approach?

THE COURT:  You may.

MR. ABREU:  (Handing Petitioner's Exhibit 4 to the witness.)

THE WITNESS:  Thank you.

Q.  (Mr. Abreu continuing)  Doctor, just take a minute to take a look at Petitioner's Exhibit 4 and its multiple pages.

A.  (Witness examining.)  Yes, sir.

Q.  And if I may, Dr. Arden, draw your particular attention to the very final page of Petitioner's Exhibit 4.

A.  Yes, sir.  I have it.

Q.  Okay.  Were you provided Petitioner's Exhibit 4 as part of the materials you reviewed in 2016?

A.  I was provided -- I think the most important parts of 4 -- actually I don't recall if I was provided all of the pages of Exhibit 4.  Most of the pages of Exhibit 4 are the bench notes from the BCA laboratory. I was provided the actual final report, and I was provided the last page of Exhibit 4 which is a worksheet concerning some of the laboratory testing.

Q.  Okay.  And that final page regarding that worksheet of laboratory testing, what is the item that

is being tested for on that sheet as you understand it, Doctor?

A.   This is a worksheet describing the testing of the vaginal, anal and cervical swabs taken from the autopsy in this matter, and specifically the test results reflected here concern a substance called p30.  It also reflects a search for sperm and whatever else was found microscopically.

Q.   And, Doctor, what is your understanding of what p30 is?

A.   P30 is an enzyme.  It's a protein that is mostly found in the prostate gland and it is also -- the same enzyme that we call p30 in some places is called PSA or prostate-specific antigen, which is sometimes more familiar terminology to people from clinical laboratory work.

Q.   At the time that you prepared your initial report and did your initial evaluation in 2011 in this case, were you aware that p30 testing had been done in this particular case?

A.   No, sir.

Q.   When did you first learn that p30 testing had been done?

A.   I raised the issue in my original report.  The actual knowledge that the testing had been done and what

the results were was provided to me later when I was consulting with your team in 2016 and leading up to my addendum report.

Q.   And let me just ask you about those results, Doctor, as reflected in that very final page of Petitioner's Exhibit 4.  When you look at that third column related to p30 and you scroll down in reference to item 86A being the vaginal swab, 86B being the anal swab and 86C being the cervical swab, what were the results of that p30 testing, Doctor?

A.   The results of the p30 testing on all three of those swabs was negative.

Q.   Given the negative p30 results reflected in Petitioner's Exhibit 4, Doctor, does that impact your conclusions regarding the presence of semen on 86A, B and C?

A.   Yes, sir, it does.

Q.   In what way?

A.   It impacts my conclusions that there was no semen present because this is another very specific and conclusive piece of evidence that supports that conclusion.

Q.   Does the p30 result alone, not taking into account the negative male DNA testing and the negative sperm searches, does that impact your opinion regarding

whether there was any semen detected on 86A, B and C, the cervical, anal and vaginal swabs?

A.   Yes, it does.

Q.   In what way?

A.   P30 is a product that is found in high concentrations in the prostate gland.  It is -- to be very precise it is not unique to the prostate gland. When it was first discovered it was thought that it might be unique to males and unique to the prostate gland.  As it turns out with so many things in medicine and biology, the straight black-and-white yes-and-no things don't always work in biology.

As it turns out p30 or PSA can be found in some other tissues including much less commonly and in very, very low concentrations in occasional sources from females.  But in a practical sense in terms of the concentrations of p30 in semen and the prostate gland versus any of these other sources, those locations, prostate gland and semen, the concentrations are orders of magnitude higher.  So from a practical sense in terms of using the test systems that are employed for forensic laboratory work, p30 is practically truly a male-specific and prostate-specific product notwithstanding the caveats I just laid out.

So to get back to your question having a

negative p30 in each of the swabs to me is highly dispositive of the question of whether there is or is not semen present.  So if I consider that absent the other evidence that we have to bear on this question, negative p30 by itself indeed I think can be conclusive of the absence of semen.

Q.  And given, Doctor, all the known factors in this case, the negative sperm search, the negative male DNA and the now known negative p30 results, is there any basis upon which a forensic pathologist could conclude with a reasonable degree of medical certainty that there was semen on any of the tested swabs?

A.  Absolutely not.

Q.  And this is so, Doctor, despite the AP levels that were detected on the swabs in this case?

A.  Absolutely.  The AP levels do not overrule negative p30 and negative male DNA and a negative sperm search.

Q.  Doctor, maintaining your attention on the final page of Petitioner's Exhibit 4 and the column labeled "micro" over to the right, do you see that?

A.  Yes, sir.

Q.  Does that indicate whether there were sperm searches conducted by the Minnesota BCA as well?

A.  Yes, it does.

Q.   And what were the results of those sperm searches?

A.   For each of the swabs it shows a negative sperm.

Q.   And those would be separate and distinct sperm searches than the sperm searches conducted by Regions Hospital; am I correct?

A.   Yes, sir.

Q.   And, Doctor, do you see a notation in that very same column with respect to each of the tested items with respect to "NEC"?

A.   I do.

Q.   What is your understanding of what "NEC" is -- or are?

A.   That is an abbreviation for nucleated epithelial cells.

Q.   And as a forensic pathologist, Dr. Arden, does the presence, on occasion here very heavy to light to heavy, presence of NEC support your conclusion that there was no semen detected on any of the swabs?

A.   It does support my conclusion.

Q.   In what way, Doctor?

A.   The fact that the swabs all recovered these other cells, the epithelial cells which are from the lining of the area, is indicative that the swabs worked.  So the swabs actually did come in contact with the biological

material.  The swabs actually did pick up cells when they were swabbed in those locations so this is -- it's like an internal control to say that the swabs didn't miss.  The swabs actually did pick up material and there was material available for analysis and in that context no sperm were found and no p30 was found.

Q.  Doctor, based on all the evidence reviewed, including all of Dr. McGee's prior opinions, both at the time of the year 2011 report and the more recent consultation, did you see any evidence to support the opinion that semen was detected on any of the swabs?

A.  None whatsoever.

Q.  And based on the evidence you reviewed, including all of Dr. McGee's prior opinions both in 2011 and more recently in 2016, if you were asked to opine, Doctor, whether there was any semen on any of the swabs in your professional capacity, Doctor, what would you say?

A.  My answer to that question is no semen was detected in any of those swabs.

Q.  Dr. Arden, were you deposed by the government on March 13, 2017?

A.  Yes, sir.

Q.  Did you have an opportunity to review that transcript of that deposition?

A.  I did.

Q.  And is your testimony accurate to the best of your recollection in that deposition?

A.  Yes.  I think there was an issue of repeated misspelling of the word "depredation" for "degradation" but other than that substantively the answer is yes.

Q.  Okay.  And, Doctor, finally are all of the opinions you've expressed today in your two reports and in your deposition testimony expressed to a reasonable degree of medical certainty?

A.  Yes, sir.

Q.  Could you have provided the opinions you provided today and in your reports to Mr. Rodriguez's trial attorneys had they consulted with you in 2004?

A.  Yes, sir.

Q.  2005?

A.  Yes, sir.

Q.  Or 2006?

A.  Yes, sir.

Q.  Had you been called as a witness in 2006 -- at the 2006 Daubert hearing I should say in this particular case, would you have provided Judge Erickson with the opinions expressed today and those contained in your two reports and in your deposition testimony?

A.  Yes, sir.

Q.  And finally, Doctor, had you been called to

testify at Mr. Rodriguez's trial in 2006, would you have provided the jury with the same opinions and conclusions that you provided in your deposition testimony, your two reports and in your testimony here today?

A.  Yes, sir.

MR. ABREU:  That's all I have, Your Honor.

THE COURT:  Thank you, Mr. Abreu.

MR. REISENAUER:  Could we take five, Your Honor?

THE COURT:  We may.

MR. REISENAUER:  Thank you.

(Recess taken; 11:15 a.m. to 11:25 a.m.)

THE COURT:  We're back on the record in a case entitled United States versus Rodriguez.  All counsel previously noted of record are present.  Dr. Arden remains on the stand.  Mr. Reisenauer's about to commence his cross-examination.

You may proceed.

MR. REISENAUER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Dr. Arden, counsel just asked you about a deposition that we took earlier this year.  You recall that?

A.  Yes, sir.

Q.   And there were a number of questions posed to you, I would say probably 99 percent of them from me. You recall that?

A.   Yes, sir.

Q.   We talked about a number of the subjects that Mr. Abreu asked you about this morning at that time, correct?

A.   Yes, sir.

Q.   Let me touch on a couple of things here.  If you would take a look at your initial report.

A.   Yes, sir.  I have it here, P-20.

Q.   Thank you.  And earlier you talked with Mr. Abreu about the items that you received there.  They're listed on page 1 and you went through those, correct?

A.   Yes, sir.

Q.   At that time you weren't provided the lab reports that you referred to this morning, correct?

A.   That is correct.

Q.   But you were provided the autopsy reports from Dr. McGee and the testimony you referred to regarding his testimony at the trial, a deposition as well as the Daubert hearing?

A.   That is correct, sir.

Q.   And you also received testimony of a Dr. George Sensabaugh; is that right?

A.   Yes, sir.

Q.   Do you know Dr. Sensabaugh at all?

A.   Not personally no, sir.

Q.   Do you know of him?

A.   I do.

Q.   And do you know about his work?

A.   I know a little about his work.  I mean, I am familiar with the name in large part because of the literature on p30.

Q.   Okay.  And earlier -- and I'm going offline here, but earlier you testified about a single report that you're aware of regarding acid phosphatase and certain levels.  You recall that?

A.   Yes, an article in the literature.

Q.   Do you know Dr. Sensabaugh's history in regard to acid phosphatase?

A.   Well, I don't know his history in that regard in great detail.  Of course, I could infer that he had done extensive work on acid phosphatase prior to his involvement in this case.

Q.   Okay.  But you're not familiar with the numerous articles that he's written in regard to that subject?

A.   I do not have them in my possession.  I cannot quote from any of them.  I'm aware that he has published on the topic.  I'm not intimately familiar with his

publications on acid phosphatase.

Q.   Do you know a gentleman by the name of Alan Keel, K-e-e-l?

A.   I know of Mr. Keel through his involvement in this matter.

Q.   How about Dr. Edward Blake?

A.   I do not know Dr. Blake.

Q.   Okay.  Do you know his involvement in this particular case at all?

A.   Actually I do not recall his involvement in this matter.

Q.   And since you don't know him I take it you don't know about any research or articles he may have been involved in in the field of acid phosphatase either?

A.   Correct.

Q.   Thank you.  And you did though review Dr. Sensabaugh's testimony in this case, correct?

A.   Yes, sir.

Q.   And when you were consulted in 2011 and you produced a report, that's marked P-20, correct?

A.   Yes, sir.

Q.   And it contains four pages, right?

A.   Correct.

Q.   And then subsequently now counsel to my right here asked you to produce an addendum after supplying

you with additional information; is that correct?

A.   Yes, sir.

Q.   And you have that in front of you as well?

A.   I do, sir.

Q.   That has three pages to it?

A.   It is marked P-23.

Q.   Okay.  Thank you.  You testified earlier this morning that -- and I know these numbers are probably estimates, but you've testified in cases of maybe upwards of 800 times?

A.   I'm in the neighborhood of 900 times now.

Q.   900 now?

A.   Yes, sir.  I think that's what I testified to earlier today.

Q.   Okay.  I guess I'm going off my deposition notes you said 800 then.  Somewhere in that neighborhood; is that right?

A.   I don't think I said 800 in the deposition.  I would have been quoting the same number.

Q.   Okay.  Either way you've testified hundreds of times, correct?

A.   Yes, sir.

Q.   Okay.  And on each of those occasions were you testifying as an expert witness in forensic pathology?

A.   Yes, sir.

Q.   And I take it from Mr. Abreu's questioning that sometimes you testified and were called as a witness for the state or the federal government and sometimes for the defendant, correct?

A.   Yes, sir.  That's correct.

Q.   Those would be in criminal cases, correct?

A.   I've been called by -- sorry, I've been called by both the prosecution and defense in criminal cases. I've been called by both sides in civil cases which overlaps your question because I had been called by both the government and opposing parties in civil matters as well.

Q.   Okay.  Thank you.  And I take it on a number of those occasions there was an expert or more than one expert I suppose on some occasions that testified for the other side in the case; is that correct?

A.   That has happened on many occasions, yes, sir.

Q.   And I take it that on many occasions there was disagreement as to the opinions that were put forth by you and the other experts, correct?

A.   Yes.  Not in every occasion but on many, yes, sir.

Q.   Okay.  Thank you.  And in the addendum here that I referred to, you had been then also provided the reports Dr. Flomenbaum, Dr. Ferenc, Dr. Peterson and

Dr. Dragovic, correct?

A.   Yes, sir.

Q.   And you did refer to Dr. Dragovic's report early in your testimony and briefly Dr. Flomenbaum's; is that correct?

A.   Yes, sir.

Q.   In your review you noted earlier that Dr. Dragovic and Dr. Flomenbaum had agreed that after reviewing Mr. Rodriguez's statement that the asphyxiation was caused from some type of pressure to the neck by Mr. Rodriguez; is that right?

A.   Yes, sir.

Q.   There was a -- there was, my recollection at the time we took the deposition, a discussion about Mr. Flomenbaum's original report wherein he noted that it was possible that there was a neck slash as well.  Do you recall that?

A.   I do not recall specifically.  I mean, you'd have to show me the excerpt in Dr. Flomenbaum's testimony in that regard.

Q.   Okay.  We'll get back to that.

A.   Can I ask you a clarification, sir?

Q.   I said we'll get back to that.

A.   Oh.

Q.   Let's talk about Dr. McGee's opinion about the

neck slash then.  Earlier -- and if you would grab P-12.
Do you have that in front of you?

A.  Yes, sir.

Q.  Okay.  Thank you.  Dr. McGee testified about what
I believe he said was this smooth piece of skin that is
pretty clear in this photograph being held up by some
type of small tweezers.  You follow me?

A.  I do.

Q.  Okay.  And you I believe testified that you
believe that this defect so to speak is caused by
postmortem changes being animal depredation; is that
right?

A.  Let's be clear.  You're talking about the defect
versus the strip of skin?

Q.  Well, okay, let's clarify that.  The defect, if
you could, describe the defect for us.

A.  The defect is the area where there is an opening
and in this case underneath it missing tissue.  And,
yes, I did opine and I will continue to opine that the
changes we are seeing in P-12 and the other photographs,
in particular this defect, are the result of postmortem
processes, both decomposition and animal depredation.

Q.  Okay.  Let's, if we could, be specific about this
particular photo, okay?

A.  Yes.

Q.   If you look up on the top left-hand corner there is part of an ear, correct?

A.   Yes, sir.

Q.   Okay.  And there is maybe, if you would agree with me, decomposition and possibly animal depredation to that portion of the ear; is that right?

A.   The right ear is what is visible in the upper left corner of this photograph when you hold it horizontally with the numbers properly oriented at the bottom.  There are features here of both.  There is decomposition and there is animal depredation of that right ear.

Q.   Okay.  Thank you.  And so let's move on to the center of the photograph which includes the neck area; is that right?

A.   Yes, sir.

Q.   Okay.  And would you agree that that neck area basically has a loss of most of all of the items that would normally be within the neck almost all the way to the back where the spinal cord is?

A.   There is indeed absence of virtually all of the internal structures of the front of the neck or the throat area and it does indeed go back to the front surface of -- it's actually the spinal column or the vertebral column rather than the spinal cord.

Q.   Thank you for clarifying that.  You're aware that there were x-rays done in this particular case?

A.   Yes, sir.

Q.   Okay.  And you're aware that the spinal column was not broken, correct?

A.   Yes, sir.

Q.   Okay.  However, what bones may be there such as the hyoid bone is missing, correct?

A.   I'm not sure about what other bones you might be referring to but it is correct the hyoid bone is missing.

Q.   Okay.  That's what I was actually concentrating on.  Thank you.  And in the photograph the part that we are talking about that is missing begins at the what I would call the lower part of the jaw; is that right?

A.   Well, the surface structures, the skin and the tissue immediately beneath it is missing beginning at the lower edge of the mandible, the lower jaw.  It looks to me like the internal structures are missing pretty much the entire front of the neck or throat, which includes some areas lower down on the neck where there still is skin showing.

Q.   Okay.  Well, let's talk about that mandible area if we could because there's a lot of -- there's a lot of testimony about the depredation by the animals and

rodents or insects that we've heard.  That jaw area, is that the part where you're referring to the animal depredation that's fairly clear?

A.  That's part of it, yes, sir.

Q.  Okay.  And this open neck area goes pretty much from the right side of the neck all the way over to the left side of the neck; is that right?

A.  The upper half of the front of the neck includes most of the right front and left, yes.

Q.  Okay.  Thank you.  And then let's talk about this smooth piece of skin or this strip that's being held up, okay?

A.  Yes, sir.

Q.  And specifically looking at this particular photo would you agree that it appears that that smooth piece of skin goes all the way from the right side and by looking at the photo may pretty much go all the way to the left side of the neck, at least the top part of it?

A.  Yes.  The top part does go from the right side across the front and goes -- you can't tell precisely from this photograph but it goes substantially to the left side as well.

Q.  Okay.  Thank you.  And when we're talking about smooth would you agree with me that the top part of that piece of skin is fairly smooth?

A.   Yes, it is fairly smooth.

Q.   Okay.  There is no gnawing that is clearly observed on that piece of skin; is that right?

A.   (No response.)

Q.   At least on the top part we're talking about here.

A.   Yes, I understood that, sir.  And the vast majority of it I agree, there's no clear evidence in this photograph of gnawing.  If you look at the part that's the farthest to her right of that bottom border, there is some irregularity that might be.  I cannot say with certainty from this photograph alone but that might be gnawing.  But for the vast majority of it you're correct.

MR. REISENAUER:  Okay.  Thank you.  May I approach, Your Honor?

THE COURT:  You may.

Q.   (Mr. Reisenauer continuing)  I just want to make sure that I'm looking at the same thing you are, Doctor. You just said on the -- on her right side so you're looking way on the right side on the top part of that skin, correct?

A.   Yes.  To make a record here the top edge of the flap of skin which simultaneously forms the bottom edge of the large defect below the jaw extends across the

photograph to her right and then there's a portion where the edge then goes pretty much upward toward the jaw. So if you look at the area on the horizontal part that's going from her left to right just about where you get to the part where it turns vertical or roughly vertical on her right side, that's what I was referring to.

Q. Okay. So that may be an animal depredation right in that little corner there is what you're saying?

A. In terms -- there may be depredation throughout the entirety of this. But in terms of you specifically asked about gnawing --

Q. Right.

A. -- that's the only area in that surface that I see that might be.

Q. Thank you. How about the vertical end of that part? That looks pretty smooth as well, doesn't it?

A. Yes, sir.

Q. Okay. Thank you. Then if we could let's look at the bottom of that piece of skin. That's a little more jagged, isn't it?

A. It's a little more irregular, yes.

Q. And the piece of flap skin itself doesn't appear to be gnawed. It appears to be just a little more jagged as you put it.

A. No, you put it as jagged. I said irregular. I

284

actually wouldn't use the term "jagged" here because it has some undulations in it which is irregular but it's not jagged as in angulated.

And again if you look at the part that's to her right, it's just above the right side as we view it of the label, there's a corner there where the strip of skin goes in.  The bottom edge goes in and makes a U-turn and goes back off toward her left.  If you look at that part of the margin, some of which is on that flap of skin and some of which is below it, that's got a distinctly notched area.  That really very much looks like animal depredation.

Q.  That could be some gnawing there is what you're saying.

A.  Yes, sir.

Q.  Okay.  Thank you.

A.  Yes, sir.

Q.  So you've read Dr. McGee's testimony in regards to his opinion about this being a neck slash, correct?

A.  Yes, sir.

Q.  And your opinion, based upon looking at the photographs that you were provided, was that this area here in the neck that we've just talked about could not be a slash wound; is that right?

A.  I did not phrase it as "could not be a slash

wound."  I gave the opinion that it is not a slash wound.  I gave the opinion more specifically that there is no positive evidence on which to draw a conclusion with reasonable medical certainty that there was a slash wound there.

Q.  Okay.  So if I'm hearing you correctly it's possible that it's a slash wound, but in your opinion in looking at what you received you have determined -- or it's your opinion that it isn't a slash wound.

A.  Right.  The first half of your question is it possible?  Is there any possibility in the universe that there was a slash wound in that location?  Sure.  Almost anything is possible.  Is there any evidence to support that conclusion or to make that conclusion?  Absolutely not.

So in my opinion this is not a slash wound and my opinion, even if hypothetically there were one there, you could not conclude it based on the available evidence.

Q.  Okay.  Thank you.  And now let's go back to Dr. Flomenbaum.  Do you recall him basically saying that it was possible that it was a slash wound as well?

A.  I don't recall the colloquy exactly but my recollection is that he probably gave you a similar answer to what I just gave you.  Is there a possibility?

Sure.  Is there any evidence for it?  No.

Q.  Okay.  Thank you.  And would you agree with me that in listening -- excuse me, in reading Dr. McGee's testimony and in looking at his report that he certainly opined that the body itself had decomposition and possible animal depredation?

A.  Yes, sir.

Q.  You testified earlier that you don't believe that there is sufficient evidence to opine not only that there was a slash wound to the neck but that there was not a -- and I'll call it a stab wound or some type of cut to that flank as well, correct?

A.  That is correct.

Q.  Let's just briefly talk about this slash versus stab wound subject.  I think I understand what you told us and I just want to make sure that I guess I understand.  A slash wound would -- and these are my words so pardon me, but a slash wound would be if I took a knife and basically sliced open my hand this way (indicating), is that right, in a left to right manner?

A.  Any elongated cut into the surface is a cut or incision.  Frankly I'm trying to stay away from the word "slash" because it's kind of Hollywood.  It's not really medical.  But accepting your use of the term slash, cut, incision are all the same thing.  You draw the sharp

edge along the surface.  You cut open the surface.  The wound is longer than it is deep.

Q.  Okay.  So pardon me but what would be your term to use for what we're talking about?

A.  A cut.

Q.  A cut, okay.  And a stab wound is I guess what we all would think would be where you would take the knife and force it into something; is that right?

A.  Right.  If you take a knife, thrust it or insert it through the point into the body, you have a more of a penetrating wound rather than cutting open the surface type of wound.  That is a stab wound.

Q.  And you agree that in Dr. McGee's testimony he didn't use the word "cut" I guess.  He was using the word "slash."  And that's when he was talking about the neck injury.

A.  Yes, sir.

Q.  Okay.  Thank you.  And do you recall in his testimony that he agreed with counsel that he had no way of determining how deep that cut or slash was?

A.  Assuming there were a cut or slash there, of course, he has no way to determine how deep because all of the tissue beneath it is now missing.

Q.  Okay.  And you recall him testifying to that degree?

A.   Not specifically but it certainly makes sense.

Q.   Okay.  Thank you.  In fact, you recall him testifying that he had no way of knowing because he did not know how deep that slash wound was, whether or not it was deep enough to actually cause the death of Miss Sjodin?

A.   Yes.  And that's, of course, also logically consistent with the first opinion.

Q.   Okay.  Thank you.  I have a couple of questions about Exhibit P-13 and P-14 if you would.

A.   Yes, sir.

Q.   You testified earlier in regard to these two exhibits noting that you believed it showed that that flap of skin that we were talking about is being held underneath the ligature, correct?

A.   I said that the location of the ligature and the bag is consistent with the location of the flap of skin, yes.

Q.   Okay.  And so pardon me but I'm having a hard time seeing that.  Let's look at P-13 first, okay?

A.   Yes.

Q.   If you would, P-13 you have to hold vertically. Do you see what I'm looking at now?

A.   I see.

Q.   Yeah.

A.   I'm holding it --

Q.   Hold it vertically if you would.  That'll help me because we'll be both on the same page.

A.   Sure, very good.

Q.   Okay.  Thank you.  So on the left side of that photograph is the -- her face.  It shows her teeth and the jaw, the lower jaw area, correct?

A.   Yes, sir.

Q.   Okay.  And then you see on the right portion of the photograph a ligature with a piece of plastic bag, correct?

A.   Yes, sir.

Q.   Okay.  And there you can't see this flap of skin at all.  Would you agree with me?

A.   Yes, sir.

Q.   Okay.  Thank you.  And then if you go to P-14.

A.   Yes, sir.

Q.   Okay.  Now we're looking at it horizontally, right?

A.   Yes, sir.

Q.   Okay.  And if I describe this photograph here we're looking more at the front part of the neck area with the upper part of the photograph being her face and teeth and jaw, correct?

A.   Yes, sir.

Q.   And then that open gap area that we've been discussing, correct?

A.   Yes, sir.

Q.   And then the bottom part of the photograph is more of her torso, agreed?

A.   Yes, sir.

Q.   Okay.  So in the middle of that open gap area what we see is part of the ligature.  Would you agree with that?

A.   Yes, sir.

Q.   Okay.  On the right side of the photograph would be her left side where there is part of the ligature and part of that plastic bag sticking out.  Do you agree with me there?

A.   I do.

Q.   Okay.  And if you would turn back to P-13.

A.   Yes, sir.

Q.   Okay.  Would you agree with me that that is most likely that same piece of plastic bag that we're looking at now on P-14 on the right side?

A.   Yes, sir.

Q.   Okay.  Thank you.  All right.  Go back to P-14 then if you would.

A.   I'm with you.

Q.   Thank you.  So the ligature in the middle of this

open neck area on P-14 I do not see a flap of skin.  Do you see a flap of skin?

A.  No.  The flap of skin was shown better in the other photographs after this had been removed and cleaned and manipulated.

Q.  Okay.  And I understand what you're saying.  This is taken prior to cleaning of Miss Sjodin, correct?

A.  Yes, sir.

Q.  Okay.  So could that flap of skin that we've been talking about be at the bottom of this open neck area?  And I'm going to point to you right down here (indicating).

Could that be the flap of skin that we're talking about that was being held up by that forceps previously in the prior photograph we were talking about?

A.  No, sir.  It is not.

Q.  You don't believe so?

A.  It's not a belief.  It isn't.

Q.  How do you know that?

A.  It's a different part of the anatomy and it's not attached in the same way.  The free end of the flap of skin we were discussing earlier is to her left.  The part you're pointing me to here is connected at her left.  This is not the same structure.

Q.   Could that flap of skin be inside there?

A.   Where?

Q.   Inside that open neck area.

A.   The flap of skin is somewhere around the middle of the photograph in the area where the ligature is.  It could be still right underneath the ligature.  It could be below.

Q.   But you don't see it right behind the ligature, do you?

A.   Oh, no, you don't see it behind the ligature.  This area that's really pretty much right in the center, perhaps I should be pointing for the Court, too, this area here (indicating).

THE COURT:  Mm-hmm.

A.   Looks much more like the flap of skin.  I still can't say with certainty because it's not cleaned up and it's not being held up.  But you are correct.  If the question is do I see the flap of skin directly beneath the ligature?  You are correct.  I do not.

Q.   Thank you.  So, Doctor, if you would pick up then I believe what's P-18.  That's that right flank wound?

A.   Yes, sir.  I have it.

Q.   Okay.  I have a few questions about this.  You are clearly aware that Dr. McGee's testimony about that was that he believed that was a stab wound to the right

flank.  Agreed?

A.  Yes, sir.

Q.  And this photograph in P-18 that is a very close or blown-up photograph of the wound to the right flank. Would you agree with that?

A.  Yes.  It is a fairly close-up view of that injury, or I should actually say "defect" since I disagreed with it being an injury.

Q.  Correct.  Are you aware of the size of that particular defect or wound as described by Dr. McGee?

A.  I have not committed to memory the size as described by Dr. McGee.  There's no ruler scale included in this photograph P-18 for me to make an estimate or comparison.  I'm sure I was aware of it upon reading the report but I don't have it memorized.

Q.  Okay.  Let me help you.  Exhibit P-16, do you have that in front of you?  That's his autopsy report.

A.  I do not.

Q.  You do not.  Well, let's get it in front of you.

A.  Thank you.

Q.  You don't have it?

A.  No, sir, I do not.  And I didn't bring my own copy of that either.

Q.  I have it (indicating).  I'll hand you P-16 (indicating).  Then if you would turn to page 6.

A.    Thank you, sir.

Q.    And there's a reference there to the flank injury as he notes it.  Can you tell us what that says?

A.    The reference to the flank injury describes the external appearances of the flank injury and I assume from your prior questioning you're interested in size. He reports that the defect measures 1.5 by 5.0 centimeters.

Q.    Okay.  And so can you help us out, if you can, how many centimeters are there in an inch?  Any idea?

A.    I do.  I can help you, 2.54 centimeters in an inch so a 5 centimeter, which is the longer axis of this defect, is just about two inches.

Q.    And so two inches long by?

A.    Five-eighths or three-quarters.  Let's just say for round numbers roughly three-quarters of an inch.

Q.    Okay.  So it's not a very big wound, would you agree?

A.    It's a relative term.  Depends upon --

Q.    All right.  Let's do this.

A.    Where it is and what it is as far as big or little.

Q.    Let's do this.

THE COURT:  Would this be a convenient time to break or would you --

MR. REISENAUER:  That's fine, Your Honor.

THE COURT:  What I'm really asking is how long will this particular line of questioning go?

MR. REISENAUER:  We got a ways.

THE COURT:  Why don't we go ahead and break then.  We'll start again at 1:15 and we will start again.  We'll stand in recess until 1:15.

(Recess taken; 12 o'clock noon to 1:15 p.m.)

THE COURT:  We'll go back on the record in a case entitled United States of America versus Alfonso Rodriguez, Jr.  The record should reflect that the petitioner appears through his counsel, Mr. Abreu, Mr. Montroy and Mr. Luby.  Mr. Reisenauer and Ms. Burkland appear on behalf of the United States. When we broke Dr. Arden was on the stand and Mr. Reisenauer was conducting a cross-examination.

You may continue, sir.

MR. REISENAUER:  Thank you, Your Honor.

Dr. Arden, I want to grab a couple of the exhibits for you here.

If I could have a moment, Your Honor?  Your Honor, I'll clarify what I'm attempting here.  We had yesterday some testimony from a transcript that wasn't offered and I was just going to mark it so it is clear in the record and offer it.  And counsel's okay with

that.  And so Government's Exhibit E is the testimony Dr. McGee and Dr. Sensabaugh partially of the Daubert hearing and trial, and I would offer that.

MR. ABREU:  Without objection, Your Honor.

THE COURT:  E is received.  Is it all of Volume 29 or just --

MR. REISENAUER:  I can include all of Volume 29.  They were separated yesterday.

THE COURT:  That's fine.  I don't really care.  I mean, I just want to know what it is.

MR. REISENAUER:  Thank you.

MR. ABREU:  And, Your Honor, for the record it's okay to mark it.  I don't have a problem admitting and marking it for identification purposes here.  It's already part of the record of the trial transcript.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Let me hand you what's been marked as Government's Exhibit D as well, Doctor (indicating).  If you recall earlier this morning I'm going to hand you what was marked as Petitioner's Exhibit I think it's 22?

A.  Yes, sir, 22.

Q.  Okay.  Thank you.  And we'll talk about that exhibit as well as Exhibit D and partially Exhibit E then if we could.  And this pertains to the right flank

area that we were just getting to when we broke before lunch, okay?

A. Yes, sir.

Q. So this morning you testified in regard to Petitioner's Exhibit 22, correct?

A. I did.

Q. And that is the defect or the wound as Dr. McGee testified to that right flank area, correct?

A. Yes, sir.

Q. And when we broke I asked you to look at his autopsy report and you told us the size of that particular defect or wound that he had set forth in his report. You recall that?

A. I recall that but I don't think you heard the answer to my last question about P-22. The answer was, no, sir. That is not the picture of that defect.

Q. Oh, I see. Okay. I got the wrong one. Is that the knee?

A. Yes, sir.

Q. Okay. I'll get the right one. Thank you for pointing that out.

MR. ABREU: Eighteen, Mr. Reisenauer.

THE COURT: I have it right here if you -- if you want to --

MR. REISENAUER: Here it is.

THE COURT:  Oh, okay.

MR. REISENAUER:  Starting off well, aren't we?

Q.  (Mr. Reisenauer continuing)  All right. Petitioner's Exhibit 18, sorry about that (indicating).

A.  Yes.  Now you correctly have handed me 18, which is indeed a fairly close-up view of the defect in the right flank.

Q.  Okay.  Thank you.  And so Exhibit D is a view of more of the entire body; is that correct?

A.  It is a view on the autopsy table of the majority of the front of the body.

Q.  Okay.  And that right flank defect or wound is pictured in it; is that correct?

A.  Yes, sir.

Q.  Okay.  And would it be correct that it appears to be the only defect or wound on the right side of the torso and hip and leg area?

A.  Yes, sir.

Q.  Okay.  Thank you.  Let's talk about what Dr. McGee then said in regard to that wound and if you would take the transcript there I want to refer you to a couple of pages if we could.  If you would first turn to page 6689.

A.  I have it.

Q. Thank you. And on that particular page I'm going to refer you to line 12. The question there posed to Dr. McGee is: "Did you observe any injuries of any kind or defects to her waist region on either side of her body?" And if you would just tell us what he answers there?

A. The answer to that question starts at line 14. Did you want me to read the entire answer?

Q. Yes, if you would.

A. Certainly. Quote, she has an elliptical defect, a perforation type wound present on the right lateral flank region that was described measuring 1.5 by 5.0 centimeters and has a somewhat oval to elliptical shape. It's at the level of the umbilicus on the right side, closed quote.

Q. Thank you. Earlier this morning when we were talking about this particular defect or wound your recollection was that he had testified that it was eight inches deep, correct?

A. Yes. As I said this morning, I believe that's what it was but I also mentioned I don't have the autopsy report in front -- or I didn't at the time have the autopsy report in front of me to confirm.

Q. Okay. Let's turn to page 6692 if we could.

A. Yes, sir.

Q. And then if you would I'll direct your attention to line 10 and I will read that to you. It says: "Could you please -- you've gone through that first part of the autopsy. Could you please describe for us in summary form the results of your internal examination of Dru Sjodin's body." And if you would please read his answer to us.

A. Yes. This one also beginning at line 14, quote, The internal examination shows evidence of decomposition change to the internal neck area associated with the decomposition change previously described of the facial area. There is a single penetrating -- I think a penetrating wound that's present to the subject's right internal abdominal region that extends from the elliptical shaped injury on her right flank and extends into the abdomen cavity for a depth of eight centimeters. It's about three inches. You can see those findings present. Those were the traumatic injuries that were observed, closed quote.

Q. Okay. So he testified it was eight centimeters, not eight inches, correct?

A. Correct.

Q. Okay. Eight centimeters, according to what he's testifying, then is about three inches. Would that be correct?

A.   Yes.  That's reasonably accurate.

Q.   Okay.  Thank you.  And then if you would turn to page 6706, please.

A.   Yes, sir.

Q.   I'll direct you to line 5 first.  Question posed to Dr. McGee says:  "And did you have an opinion about what kind of an object would have caused that injury to her side?"  And he says what?

A.   He answers, quote, I was concerned that it was caused by a knife, unquote.

Q.   And then he's asked:  "And what led you to that conclusion?"  And what does he answer?

A.   His answer to that question is:  "Its appearance. It has an oval-shaped appearance that knife wounds can appear like and the internal wound track or the tunnel that it caused inside the body appeared to me as a wound track," end of answer.

Q.   Okay.  Thank you.  If you would then, Doctor, just take a look back at those last two photos of that particular defect or wound and let's --

A.   Wrong one, sorry.  Here they are.

Q.   My fault.

A.   Yes, sir.

Q.   And would you agree that the outside of that particular wound may have suffered from animal

depredation?

A.   Yes, I think it did.

Q.   Okay.  Okay.  It is possible, is it not, that there was a knife wound there that the animals were attracted to due to the opening caused by the wound?

A.   That is indeed a possibility.

Q.   Okay.  Thank you.

A.   It has no positive evidence to support the claim but it is a possibility.

Q.   Thank you.  And now back to the photo, I mistakenly gave you P-22, correct?

A.   Yes, sir.

Q.   That is a photo of the wound on the knee, correct?

A.   No.  I have to take issue with one of the words you've used in your question.

Q.   Yeah.  I take it the word "wound," right?

A.   Very much so.

Q.   Let's just then refer to it as you would of a defect to that right knee.  That's a close-up of that; is that right?

A.   It's a fairly close-up photo of a defect.  If I recall that's the left knee.

Q.   The left knee?

A.   Yes, sir.

Q.   Okay.   Now that to you looks like animal depredation as well?

A.   Yes, sir.

Q.   Okay.

A.   Well, again as I phrased all of my prior answers, combination of decomposition and animal depredation.

Q.   So would it be correct, and I think you told me this when we did our deposition, that animal depredation by small rodents and even probably insects begins primarily in areas that are, first of all, susceptible, right?

A.   Well, they must be accessible to the animal, yes.

Q.   Okay.   And in areas that they are attracted to, primarily moist type areas of our body?

A.   I don't want to just give the blanket "primarily."   It depends upon what is exposed and what animals we're talking about.   With insects, yes, it is much more so that insects tend to go for the softer and moister areas primarily or I should say first.   Not really primarily because eventually they'll go everywhere.   But the first place they go tends to be the moist places.   With other predators or other scavengers, I guess is a better word, they may go for flesh regardless of whether it's moist or not.

Q.   Okay.   And in this particular instance there's

decomposition of the body.  And we haven't talked about this but you are aware that Miss Sjodin went missing in November of 2003 and her body was not discovered until April of 2004, correct?

A.  Yes, sir.

Q.  So she was out in the elements for a lengthy period of time, correct?

A.  Yes, five months or so.

Q.  Okay.  And how the body is presented we've talked extensively about the neck area that has the large amount of depredation.  The pubis area as well had a large amount of depredation, correct?

A.  Yes, sir.

Q.  Okay.  And that would be an area that would be attracted by rodents and insects, correct?

A.  Yes, particularly the insects in terms of a first place they would go to.

Q.  And in reviewing the information that you were provided, there isn't any indication of any large animal biting or gnawing on the body; is that right?

A.  That is correct.  I mean, I think we do have some rodent activity but large animals I saw none of that.

Q.  Okay.  So the attraction that we were talking about, that would be unusual for like this left knee area, would it not?

A.    I'm sorry, did you say the left ear?

Q.    The left knee area.

A.    Oh, the left knee, I'm sorry.  No, that would not be unusual.  We're looking at a body that has been exposed for an extended period of time.  There's clear-cut evidence of advanced decomposition and widespread animal depredation.  By the time you get to that stage, it's not unusual for the animals to go to any part of the body.  We're well past the first step kind of thing.  We don't really need to worry about where they go first because they've had lots of opportunity to go wherever they want.

Q.    Okay.  I understand what you're saying.  If there was a wound on that left knee that had been opened somehow, a cut or a scrape, would you agree with me that that would attract the insects or rodents in a fashion that would occur prior to whether it was not a wound or open?

A.    If there's an open wound, especially with blood and/or an opening to the surface, it preferentially attracts the animals that conduct the postmortem depredation.  Again that is -- it increases the likelihood of them finding that place first.  It doesn't really affect the idea that farther down the line they could find the entire body.

Q.   Okay.  I understand that.  So in looking at the exhibit of the body that is on the table and to your recollection the rest of the exhibits, we are talking about primarily animal depredation here in the neck area, part of the facial area.  We talked about the ears earlier, the face area, including the -- which you can't see on this table photo but your recollection of the face area would include the nose area and the pubis area, correct?

A.   Yes.  And there's an area near the pubic region on the right thigh that's also similarly affected and then there's the spot on the left knee and spot on the flank.  They all have very similar appearances.

Q.   Okay.  Thank you.  The rest of the body does not seem to be -- it is certainly decomposed but not depredated by animals, correct?

A.   Correct.

Q.   Thank you.  You would agree that Dr. McGee when he was talking about these wounds that he believed were caused possibly by a knife in the area of the neck and the right flank, that he did not testify that this was in fact the knife that did the slash wound to the neck or the stab to the right flank.  Would you agree with that?

A.   No, I don't think so.  I think he definitively

diagnosed a slash wound.

Q.   I understand.  He did not say that it was caused by this particular knife though, did he?

A.   Oh.

Q.   That it was consistent but he didn't say it was the knife, did he?

A.   Well, no, he actually testified as to having examined what was represented to him as being another example of the same knife so he couldn't have said with this knife at all.  But I think you're right.  I think he testified in terms of it was consistent with.

Q.   Okay.  Thank you.  Let's turn to your opinion as to the cause of death if we could, Doctor.

A.   Yes, sir.

Q.   Your report opined that you believed it was caused from the ligature and it was ligature strangulation; is that correct?

A.   Yes, sir.

Q.   And that I gathered from your testimony this morning is still your opinion?

A.   Yes, sir.

Q.   Okay.  And would it be safe to say that you arrived at that decision based upon all of the evidence that's been presented to you?

A.   Yes, sir.

Q.   And I think you've noted that at one point that was the only positive objective evidence to actually indicate a mechanism of asphyxia of the ligature around the neck?

A.   Yes, sir.

Q.   And earlier when you were testifying you talked about the process of eliminating -- eliminating certain things as to the possible cause of death or the manner of death including gunshot wounds and so forth and so on.  Can you run through that list for me again?

A.   I think what I said was that I had reasonably excluded several other major categories based on the evidence.  We have no -- in my opinion we have no evidence of a fatal wound with a knife.  We have no evidence of any wound, fatal or otherwise, with a gun.  We have no major blunt impact trauma such as skull fractures that would represent or suggest fatal blunt trauma.  I think I said that I was, under the circumstances, reasonably excluding sudden natural death.

So while I don't think my list excludes every other possible cause of death or even every other possible category of death, I think I've hit the most important alternative choices.  And under that kind of circumstance you are left with the greater likelihood

being a form of asphyxiation.

Q. And obviously you take everything into account, including how the body is found and the other information as far as the criminal investigation is concerned I take it?

A. Yes, sir.

Q. And in this case Miss Sjodin was found with this ligature around her neck, correct?

A. She was.

Q. And do you recall exactly from reading the information how that ligature was placed around her neck?

A. I'm not sure I understand the question.

Q. Well, can you describe for us from your recollection what you learned about how it was -- how it was found placed around her neck?

A. The rope that formed the ligature was around the neck and there are several strands or winds of it and at some points it is twisted such that it is -- you know, one side of the rope is engaged with the other side but not tied into a knot.

Q. Okay. And it was actually wrapped around twice, do you recall that?

A. That sounds correct, yes.

Q. And it wasn't tied in a knot, was it?

A.  Correct.

Q.  But there were two ends to that ligature that were loose in a way that could have been pulled tight by an individual; is that correct?

A.  Yes.  There were free ends that could have been used to pull tight.

Q.  Now when you did your calculation about the circumference of the ligature -- have you been shown the ligature at all today?

A.  Not today.  I've seen the photographs.

Q.  I found it.  It's Government's Exhibit C (indicating).

A.  Thank you, sir.

Q.  You're welcome.  Does that appear to be the ligature?

A.  Yes, sir.

Q.  And what was the circumference you came up with, sir?

A.  Approximately nine to 10 inches.

Q.  And if we have some other testimony that it would have been 11 or 12, does that make any difference in your opinion as to whether or not it could have been used for ligature strangulation?

A.  No.  I mean, the fact that it is found around her neck under these circumstances gets you to the point of

it could have been used as the ligature that was the mechanism of strangulation and cause of death. If somebody else has estimated it as a slightly different circumference, that might affect the issue of how tight we think it was or wasn't. From having measured directly around the circumference since this is not a perfect circle, I'm confident that my measurements are accurate though.

Q. Okay. Thank you. You were provided by counsel the later reports of Dr. Flomenbaum and Dr. Ferenc, Dr. Dragovic, correct?

A. Yes, sir.

Q. And you talked about that a little bit this morning. And with regard to that information I believe you testified that that did not change your opinion about the ligature strangulation, correct?

A. Correct. I think I testified that the new information and their opinions had an impact on mine but didn't actually change it.

Q. Okay. And, in fact, I believe you told us that Mr. Rodriguez's accounts -- you recognize that his accounts were not consistent with each other, correct?

A. Not perfectly consistent.

Q. Now you are also aware that, as we discussed earlier when we were looking at a couple of the photos,

that a -- there were remnants of a K-Mart bag that were still attached to that ligature underneath part of the ligature.  Do you recall that?

A.  I recall the remnants of a plastic bag.  Frankly I had forgotten whether it was K-Mart or other.

Q.  Okay.  And have you learned through your readings of the materials provided to you that a plastic bag had been placed over Miss Sjodin's head?

A.  Yes, sir.

Q.  That could have also caused this asphyxiation death if it was placed over her head and she was not able to breathe as a result of that.  Would that be correct?

A.  Yes.  That's among the other possibilities of how asphyxiation could have been caused.  It could have been caused by one or multiple of those mechanisms but a plastic bag can be a method of asphyxiation.  I should say a plastic bag over the head but you'd need to cinch it with something.  If it's open at the bottom you'd generally get enough air flow it shouldn't kill you.

Q.  Okay.  So if this plastic bag was put over her head while she was alive, the ligature put around her neck and held to a degree could have caused her to asphyxiate.

A.  Yes.  The ligature could have caused her to

asphyxiate independently by a mechanism of neck compressions.  It could have caused the asphyxiation by closing off the plastic bag or a combination of both.

Q.  You haven't made a determination that another possible cause of death would have been her being left out in the elements of November in northern Minnesota to just simply die of exposure; is that correct?

A.  I haven't rendered any opinions or conclusions as possibles.  I'm not here to deal in possibles.  I'm held to the standard of probability and reasonable medical certainty.  I certainly acknowledge that that is among the possibilities of things that could happen to a person, and one could die from exposure in that time frame in that location.  But given the totality of the evidence, I don't have evidence to support that as an affirmative conclusion with reasonable medical certainty.  And I do have other evidence that appears to me to be much more likely or probable as the cause of death.

Q.  Okay.  I understand what you're saying, Doctor, but we weren't present to know whether or not in fact she was dead when she was left in that ravine, correct?

A.  I certainly was not present.

Q.  The way she was found at the scene, would you agree with me that if she wasn't deceased when she was

left there that the elements would have eventually caused her death?

A. No. I can agree with you that the way she was found there is again still a possibility that the elements would have caused her death if she were not dead when placed there. I can't give you an opinion that it would have because there are too many variables and too many things that could have happened, could have ensued that I can't predict or control. So to say definitively it would have happened? No.

Q. Okay. So the bottom line is that you believe this is homicidal violence caused by ligature strangulation.

A. I don't actually adopt -- when you ask I believe, in other words if I were writing the death certificate I would not adopt the homicidal violence terminology. I did agree earlier to a question that that was -- the phraseology that Dr. McGee used I agreed with was substantively appropriate of homicidal violence. If I were certifying this death, I would certify the cause of death as ligature strangulation.

Q. Okay. And it certainly wasn't suicide, correct?

A. No. I've already testified here today that I agreed this was a homicide.

Q. Okay. Thank you. I think we're agreeing. We're

just disagreeing on the words we're using.  Let's move on to the subject of the semen testing.  You weren't originally provided the lab reports in this case, correct?

A.  Correct.

Q.  We talked a little bit earlier so I don't want to rehash everything, but counsel did talk to you about Petitioner's Exhibit 4.  I'll get that for you again. If you'd just take a look at that for me (indicating).

A.  Thank you.  (Witness examining.)

Q.  Thank you.  You did talk about the last page of the exhibit.  You recall that?

A.  Yes, sir.

Q.  Okay.  Let's turn to the report itself.  Would you agree that that last page is part of the bench notes in this particular case?

A.  Yes, sir.

Q.  Okay.  Thank you.  The report itself contains I believe three pages, the first three pages of this exhibit, correct?

A.  Yes, sir.

Q.  Okay.  And it's signed by Steven G. Fischer, forensic scientist, right?

A.  It is.

Q.  And I just want to reference Exhibit 86 and

Exhibit 86, Doctor, you're aware are the vaginal, anal and cervical swabs collected as you've testified to earlier by Dr. McGee, correct?

A. Yes, sir.

Q. And if you would on page 2 of this report, in the second to the last paragraph I would refer you to, that reads: "Examinations of the following items did not detect the presence of semen." And one of those items listed -- I guess three of the items listed are vaginal swabs, item 86A, anal swabs item 86B, and cervical swabs item 86C. You see that?

A. I do.

Q. Do you recall now in reviewing all of the information provided to you that Dr. McGee testified that, in fact, there was no semen found as a result of the tests in this case?

A. I do not recall that.

Q. Okay. Do you recall that he testified or that there was testimony or did you know -- excuse me, I'll start over.

Do you know that there was testimony that there was no male DNA found as a result of testing of these three swabs?

A. Yes, sir.

Q. Okay. And you I believe testified earlier that

you were aware that no spermatozoa was discovered microscopically in this particular case, correct?

A.   Yes, sir.

Q.   And were you aware that that was testified to by Dr. McGee at the time of the trial?

A.   Yes, sir.

Q.   And did you ever receive Mr. Fischer's testimony in this particular case for review?

A.   No, sir.

Q.   So you're not aware that Mr. Fischer testified that his testing resulted in no detection of the presence of semen on those three swabs?

A.   I am not aware of the testimony.

Q.   Okay.   Thank you.   And earlier you testified, in fact, that the acid phosphatase test is a presumptive test, correct?

A.   Yes, sir.

Q.   And isn't it correct that the p30 test is also a presumptive test?

A.   (No response.)

Q.   You testified that it was a conclusive test.

A.   I testified that I believe you can make a conclusion that semen is present from p30 under the circumstances, forensic circumstances such as we are dealing with here.

Q.   Well, let me ask you it this way.   If the p30 test in this case had to have been positive when Mr. Fischer did his test, are you telling us that you would have concluded that there was semen present?

A.   I think I would still offer more of an equivocal analysis of that.   I testified this morning that it may suffice under some circumstances.   I didn't say in this case I would.   In this case in the absence of spermatozoa and the absence of male DNA and really a not very elevated or not elevated at all acid phosphatase, I would be curious about a positive p30 because it would seem to conflict with the other results.

So I can't tell you sitting here today whether I would or would not conclude that was semen because actually in that circumstance if I were doing the work I would explore that result further.

Q.   Okay.   So it's not a conclusive test then?

A.   I said it may be under some circumstances.

Q.   Okay.

A.   The hypothetical you just gave me, it probably would not be conclusive on its own.

Q.   If we had other testimony that a p30 test was a presumptive test similar to the acid phosphatase test, you wouldn't disagree with that?

A.   I don't think I would give you a blanket

agreement.  I understand that there is a school of thought of making p30 a presumptive test and I think that's more the forensic scientist than the forensic pathologist.  I would not agree with the premise of your question as posed that it's a presumptive test like the acid phosphatase.  It clearly has a much greater degree of specificity for semen than acid phosphatase does so I can't go along with the question as posed.

Q.  Okay.  So in this particular case you're now aware that there was acid phosphatase testing.  There was p30 testing.  There was a microscopic view looking for spermatozoa.  There was DNA male testing.  If you were handling this case there's no other testing that you can think of I take it that should have been done to make a determination as to the possibility of semen being present, correct?

A.  Again I'm sorry I can't go with the way you're wording your questions.  The possibility thing is not what's in play here and it's not how physicians and scientists work.

Q.  Let me ask you this.

A.  If you're asking me is there any other test that I would ask for or look for to assess whether semen was or was not present, then the answer is no.

Q.  Thank you.  If you were doing the autopsy and you

came upon this globule that Dr. McGee referred to and he thought it may be semen, I take it you would do the same thing he did and get a swab of it and submit it for the testing at the lab.  Would that be correct?

A.  I would swab it and have it submitted for testing.  I wouldn't have done -- I wouldn't have left it at that.  I would have described it in the report and I would have photographed it.

Q.  But you would have swabbed it and submitted it for testing just as he did.

A.  Yes, sir.

Q.  Okay.  Thank you.  Now what we've been talking about here is just the areas -- the vaginal area, the anal area and the cervix as far as this testing result is concerned, correct?

A.  Yes, sir.

Q.  And basically, if I'm following you correctly, would it be your opinion then that although there was this positive acid phosphatase test that your conclusion would be that there was not semen present in these three areas?

A.  Yes, sir.

Q.  Okay.  That certainly isn't determinative as to whether a sexual assault occurred in this case, is it?

A.  Correct.  And I think I addressed that on direct

examination.

MR. REISENAUER:  If I can have one second, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  That's all I have, Your Honor.

THE COURT:  Thank you.  Mr. Abreu?

MR. ABREU:  Yes, very briefly, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. ABREU:**

Q.  Doctor, do you have P-12 in front of you there?

A.  No, sir.

MR. ABREU:  May I, Your Honor?

THE COURT:  You may.

MR. ABREU:  (Handing Petitioner's Exhibit No. 12 to the witness.)

THE WITNESS:  Thank you.

Q.  (Mr. Abreu continuing)  Doctor, I'm showing you what has previously been marked as Petitioner's 12 and the government asked you about the smooth edges that are visible along the strip of tissue that is depicted in P-12.  Do you recall that?

A.  Yes, sir.

Q.  Are any of those smooth edges consistent -- or do they reflect -- I should say do they reflect evidence of

sharp force applied to that part of the neck?

A.   No, sir.

Q.   Do they reflect evidence of a knife along that part of the neck?

A.   No, sir.

Q.   Let me just show you what's been marked as Petitioner's -- I'm going to mark as Petitioner's 24 and 25.  May I, Your Honor?

THE COURT:   You may.

MR. ABREU:   (Handing Petitioner's Exhibit Nos. 24 and 25 to the witness.)

THE WITNESS:   Thank you.

Q.   (Mr. Abreu continuing)  Could you just very, very quickly, Doctor, tell us what's depicted in Petitioner's 24 and 25?

A.   Petitioner's 24 and 25 are autopsy photographs of Ms. Sjodin.  Twenty-four is predominantly -- she's lying face down on the autopsy table in both of these.  Twenty-four is the back of the head, neck and upper shoulder, back area.  Twenty-five is a slightly more close-up view that has a better depiction of the ligature and the plastic bag across the back of the neck.

Q.   Do Petitioner's 24 and 25 both depict the ligature and the remnant of the bag beneath the

ligature?

A. They do.

Q. Do they depict both the ligature and the remnant of the bag from what would be the left side to the right side or from the back to the right side of Miss Sjodin's neck?

A. Yes. Twenty-four is closer to overhead so it really is the back, including some of the left and right sides. Twenty-five is taken from a little more of an angle from her right side so it's showing more of the back and the right side of the neck.

Q. Which would include the area where that strip of tissue is located; is that correct?

A. No. The strip of tissue is more center and left center on the front. It's not really in either of these photos.

Q. The strip of tissue is not, but my question I guess is whether the bag and the ligature depicted there would cover that area if you would turn the body over.

A. Oh, yes, I think that's a fair conclusion from this and the other photographs that I've seen and the ones that were marked as evidence that the location of the ligature and the location of the so-called strip of tissue are very much in the same area and so it's reasonable to think that the ligature would have been

overlying that strip of tissue at some point.

MR. ABREU:  That's all I have.  Thank you, Your Honor.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  If I could, Your Honor, make sure I'm looking at the right photographs?

THE WITNESS:  Twenty-four and 25 (indicating).

MR. REISENAUER:  If I may, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  Thank you.

**RECROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.   (Mr. Reisenauer continuing)  In looking at the two photographs, Petitioner's 24 and 25, Doctor, what you can actually visibly see here are the -- what we talked about before, the ligature is wrapped around the neck it appears a couple times, correct?

A.   Yes, sir.

Q.   Okay.  And those -- I think you said -- you called them free ends are partially seen there; is that correct?

A.   Yes, sir.

Q.   Okay.  And then what we also actually see is part of the plastic bag that was apparently placed over her

head, correct?

A.    Well, I can see the remnants or fragments of the plastic bag that are trapped underneath the ligature, between the ligature and the neck.

Q.    Right.  Okay.  We can't see any front of Miss Sjodin's neck at all, can we?

A.    Not in these two photographs.

Q.    Okay.  So it is not possible, is it, to determine whether or not this particular ligature is covering that strip of skin from these two photographs; is that correct?

A.    That's correct.  As I pointed out I was using these and the other photographs in the totality of the evidence as to the locations of the ligature and the strip of skin.  But you are correct.  That area is not depicted in either P-24 or P-25.

Q.    Okay.  And we earlier today talked about that open area in other photographs in regard to that piece of skin.  You recall that?

A.    Yes, sir.

        MR. REISENAUER:  Okay.  Thank you.  That's all I had, Your Honor.

        THE COURT:  Thank you.

        MR. ABREU:  Yes, Your Honor.

        THE COURT:  I just want to make sure that

there wasn't something new raised there.  You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  And you may call your next witness, Mr. Montroy.

MR. MONTROY:  Yes, Your Honor.  Thank you.

MR. ABREU:  I'll interrupt.  The only two exhibits that I did not move into evidence, Your Honor, were P-24 and P-25 and I would move for those at this time, Your Honor.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Twenty-four and 25 are received.

MR. ABREU:  Thank you, Your Honor.

MR. MONTROY:  Thanks, Your Honor, and with that the petitioner would call Dr. Dragovic.

THE CLERK:  Please raise your right hand. State your full name and spell your full name.

MR. DRAGOVIC:  I'm Ljubisa Jovan Dragovic, L-j-u-b-i-s-a, middle J-o-v-a-n, last D-r-a-g-o-v-i-c.

(Witness sworn.)

THE COURT:  Mr. Montroy, you may.

MR. MONTROY:  Thank you.

**LJUBISA J. DRAGOVIC,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO

SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. MONTROY:**

Q.  Dr. Dragovic, good afternoon.

A.  Good afternoon, sir.

Q.  Dr. Dragovic, what is your occupation?

A.  I'm a forensic pathologist and a neuropathologist, sir.

Q.  Forensic pathologist and what was the second thing you said?

A.  Neuropathologist.

Q.  And what is your current occupation?  Where are you currently employed I should say?

A.  Currently work in the capacity of chief forensic pathologist and chief medical examiner for County of Oakland in Michigan, sir.

Q.  And how long have you been employed in that position?

A.  In that position I've been almost 27 years.

Q.  And that's been 27 years as the chief?

A.  That's correct.

Q.  Can you tell the Court a little bit about what a neuropathologist is.

A.  Neuropathologist is a specialist -- a sub-specialist in the field of medicine, pathology that

deals primarily with understanding conditions and diseases of the central nervous system and trauma of the central nervous system, peripheral nerves and skeletal muscle.

Q. Dr. Dragovic, in your experience as a forensic pathologist, have you had occasion to perform autopsies?

A. Sure.

Q. Do you have any idea of how many autopsies approximately you've performed during the course of your career?

A. Over the past 39 years of being a pathologist, thousands.

Q. And have you had the opportunity during the course of your work as a forensic pathologist to determine the cause and manner of death in cases?

A. Yes, sir.

Q. And would you say that that also ranges in the thousands in terms of occasions that you've done that?

A. That would be generally reflected in the number of autopsies that I carried out over my lifetime if you want my professional lifetime, yes.

Q. And has there been occasions where you've determined the cause and manner of death without actually having personally performed an autopsy in that case?

A.   Oh, yes.  Upon being called to review someone else's work elsewhere or even locally overseeing my forensic pathologists that work for me or any other comparable situation where a consultation is called for by anyone anywhere.

MR. MONTROY:  Okay.  Your Honor, may I approach?

THE COURT:  You may.

MR. MONTROY:  Thank you.

Q.   (Mr. Montroy continuing)  I'm going to mark this document as P-26.  Dr. Dragovic, have you had a chance to look at P-26?

A.   Yes.  The Exhibit P-26 is a photostatic copy of my Curriculum Vitae that was prepared something like June 6th or so of this year or whenever the most recent one updated by my secretary.

Q.   And does this generally contain all of your work experience, your education experience that led you to your current position as a forensic pathologist?

A.   Yes.  That reflects the professional activities and publications and so on.

Q.   I see that you're board certified in forensic pathology, neuropathology and anatomical pathology?

A.   That is correct, sir.

Q.   And if you could just briefly describe your

education.

A.    Well, I graduated from medical school 42 years ago I believe.  Yeah, that's the calculation because it happened in 1975 so I was -- then I did the rotating internship at the University Hospitals back in Belgrade in former Yugoslavia, a country that doesn't exist anymore but the city is there and the university is there still.

Then I was in general practice together with my wife for about less than a year after doing compulsory military service as a regimental officer for what was then called Yugoslav National Army.  It doesn't exist anymore of course.  And then I did some general practice of medicine together with my wife for just less than a year before I joined the department of pathology, Queen's University in Kingston in Canada where I specialized first anatomical pathology, then part of my neuropathology training.  Then I did my senior fellowship in neuropathology, senior year of my fellowship in neuropathology at the University of Toronto in Toronto, Canada.  And then there came a time where my wife was recruited by major hospital system in Michigan because of her knowledge and skills and I had no choice but to come along with her and our children.  And then I started working as a neuropathology

consultant and somehow I was recognized suitable recipient of an award.  This was a fellowship award that took me to Baltimore, Maryland, and that's how I started doing forensic pathology.  And that was back in 1986 when I joined the state office in Maryland -- in Baltimore, Maryland.

Q.   And you've been practicing forensic pathology since 1986 then; is that right?

A.   Full time, yes.

Q.   And do you give presentations and trainings in the field of neuro and forensic pathology?

A.   I do.

Q.   Have you been qualified as an expert in court before?

A.   Yes, sir.

Q.   Do you have any idea how many times you've been qualified as an expert?

A.   Hopefully second time this week because I had a trial on Monday afternoon.  But I don't count.  I don't have the way to keep track of things but sometimes it's once a week.  Sometimes it's -- when I worked in Detroit my maximum number of separate court testimonies in different courts was seven in a given day.  But that was a busy time in Detroit and a lot of murder cases.  But that was a long time ago.  I mean, it fluctuates.

Q.   So you've been qualified, am I right, in a variety of state and federal courts as an expert in forensic pathology?

A.   Basically across the nation and beyond.

Q.   Okay.  Do you testify for both the government and the defense?

A.   Yes, sir.  Actually by the nature of my work I do -- majority is interpretations and testimonies for the government because I am part independent law enforcement agency within the county government in Michigan as structured according to the Medical Examiners Act of the state of Michigan.

MR. MONTROY:  Your Honor, I don't have any additional questions concerning qualifications at this time of the witness.

THE COURT:  Mr. Reisenauer, do you have any questions or any objections?

MR. REISENAUER:  I do not have any questions nor do I object to Dr. Dragovic testifying, Your Honor.

THE COURT:  He may be allowed to testify.  You may proceed.

THE WITNESS:  Thank you, Your Honor.

MR. MONTROY:  Thank you.

Q.   (Mr. Montroy continuing)  Dr. Dragovic, do you recall being contacted in 2011 about the possibility of

being involved in the case of the United States versus Alfonso Rodriguez?

A.   I don't remember exactly when but it would be in that range 2011, 2012 that the people from The Forensic Panel of New York contacted me asking for availability to review, which they do from time to time under those circumstances when they have a case that should be peer-reviewed through the panel approach.  So that's the principle of functioning and operation of that body there.

Q.   And so when you get a referral, for lack of a better word, for a particular consulting case it goes through an entity known as The Forensic Panel?

A.   That's correct.

Q.   And you are a member of The Forensic Panel and are there other forensic pathologists that are members of The Forensic Panel?

A.   Yes.  Mostly senior forensic pathologists are part of that -- or members of the panel.  You don't get involved every time, of course, because there's a whole group of people nationwide that may be contacted depending on their particular expertise or availability after all.

Q.   So essentially you get a call from The Forensic Panel in New York and they say to you, you know, we have

a case for you.  You know, will you take a look at it?

A.   That is correct.

Q.   And in this particular case the government of the United States was interested in seeking your services in evaluating forensic issues in the case of the United States versus Alfonso Rodriguez; is that right?

A.   That was my understanding.

Q.   And you ultimately prepared a report based on your evaluations; is that right?

A.   That is correct, sir.

MR. MONTROY:  Your Honor, may I approach, please?

THE COURT:  You may.

Q.   (Mr. Montroy continuing)  Dr. Dragovic, do you recognize the document that has been marked as P-27?

A.   Yes, sir.  This is the -- Exhibit P-27 is a photostatic copy of the original report that I signed. And my reviewers, Dr. DeAlwis and Dr. Weedn, countersigned upon completion of the review.

Q.   Okay.  And I'll get to that in a second.  So the report is addressed -- who is the report addressed to?

A.   The report was addressed to Mr. Reisenauer. That's Keith Reisenauer.

Q.   Mr. Reisenauer, who's present in the courtroom representing the government; is that right?

A.    Yes, sir.

Q.    And it's dated September 18, 2013?

A.    That's correct, sir.

Q.    And you -- is it fair to say you were preparing this report for Mr. Reisenauer; is that correct?

A.    That's whose name I was given as the requester of the review.

Q.    Okay.  And if you could turn to the last page, page 10?

A.    Yes, sir.

Q.    That is -- do you recognize your signature on that page?

A.    Yeah, that's my signature there.  And then there are two additional signatures of the members of the panel that were involved in the review and critiquing the particular issues there.

Q.    Okay.  And so one of the signatures is Kanthi DeAlwis?

A.    DeAlwis.

Q.    And the other one is Victor Weedn?

A.    Yeah.  The other one is Dr. Weedn.

Q.    And could you just explain how the process works with The Forensic Panel starting with I guess who these two individuals -- strike that, who these two individuals are and what their participation was in this

evaluation?

A.    Well, these are -- all of the people that are -- whose signatures appear here are forensic pathologists, obviously recognized board certified, experienced forensic pathologists.  The process goes like this.

Like in this case I agreed to review this as a primary reviewer.  I am to prepare all the salient points in the review and the cosigners of the -- or co-reviewers receive the same amount of material as I do.  They review it on their own and we have several telephone conferences depending on the complexity of the case.  In this case there were several -- at the minimum several telephone conferences where all of us participate and discuss the details of the case.

Q.    Okay.  And when you say you "discuss the details," are the conclusions that are represented, the conclusions and opinions that are contained in this document, in this report, is it fair to say that they're the conclusions that sort of the three of you arrived at together?

A.    Well, yes, because if there was a special dissent then it is noted on the report.  Just like I'll give you an example.  We did a review on a case from Great Britain.  In one setting I did it with a different group of people, with different colleagues, and I dissented

certain points that were answered in the report.  I disagreed and I made sure that that was entered.  So if there is no special paragraph there of dissent that means that all of the people agreed upon the scope of the report, the details in the report and the conclusions of the report.

Q.  Do you find it advantageous to work in this sort of group or panel scenario as opposed to just doing an evaluation on your own?

A.  Well, it is a tremendous value because people look at different issues that are under consideration from different vantage points and different levels of experience and understanding of the problem.  So it is -- it is a more indepth analysis with certainly far more -- many more details than presented at the original process of adjudication at the original trial.  So, yes, it has some special advantages along those lines.

Q.  Okay.  If I could -- if you could take a look at page 1 of your report.

A.  Yes, sir.

Q.  I just want to direct your attention first to the third paragraph.

A.  Yes, sir.

Q.  Where you summarize the findings of Dr. Michael McGee.

A.   Yes.

Q.   And Dr. McGee was the -- was the medical examiner who performed the autopsy in this particular case; is that right?

A.   That is correct, sir.

Q.   And authored the autopsy report in this case?

A.   That's correct.

Q.   And you write, "Dr. McGee testified that he believed the likely cause of death to be a slash wound to her neck, adding that asphyxia from the plastic bag being placed over her head and exposure to the elements were alternate possibilities.  He further testified that results from enzyme prostatic acid phosphatase testing suggested that the victim had been subjected to sexual assault prior to death."

Is that sort of a summary of Dr. McGee's findings as you sit here today?

A.   Yes.  As I saw it then and as I see it now, yes.

Q.   And did you recognize those as important issues in the case?

A.   Yes.

Q.   The next paragraph, if you just go down one more, you appear to summarize the defense position and you write, and this is the fourth line down, "The defense motion raises a number of issues regarding the findings

and testimony Dr. McGee, asserting that the victim was not raped and did not die of a slash wound to the neck."

Is that a fair summary of some of the defense issues as you sit here today?

A.   That was my understanding then and I believe it's the same understanding today.

Q.   If you could turn to the next page, Dr. Dragovic. So when you received this case from The Forensic Panel, was it your understanding that Mr. Reisenauer and the government were posing four questions that they wanted you to look into and evaluate?

A.   Yes.   They were specifically listed in the request and that's why we simply included them in the response in the report.

Q.   And those four questions are set forth on page 2; is that correct?

A.   That is correct.

Q.   And in addition to that you list all the sources of information on page 2 and going on to page 3?

A.   That is correct, sir.

Q.   Those were the sources of information that were supplied to you by the government in this case; is that right?

A.   I believe it all came from the same source.   I mean, it came to me from Forensic Panel so I did not

specifically verify individual origin or where it came from but that was the assumption, yes.

Q.   Okay.  And at this point in time you weren't having -- you hadn't had any communication with any defense lawyers concerning this case; is that right?

A.   That is correct, sir.

Q.   After you issued this report -- four years actually after you issued this report you -- there was a deposition that took place at your office in Michigan; is that right?

A.   I believe that was in January or February, something like that, or end of January.

Q.   That's correct.  If I told you January 24, 2017, would that sound about right?

A.   That will be right, yes.

Q.   So after the deposition in January of 2017, did you learn from Mr. Reisenauer that the government didn't intend to call you as a witness at this evidentiary hearing?

A.   I didn't learn anything from anybody.

Q.   Okay.

A.   I didn't hear from anyone over several months.

Q.   The first person that you heard from in terms of testifying here today was me?

A.   No.  Actually it was the lady from The Forensic

Panel, the coordinator, Miss Davy, who contacted me and asked me to reserve a slot of a couple of days for this particular week -- actually it was set up earlier and then it was corrected and I was informed that this week of June I would be needed but I didn't know who or how.

Q.   And shortly after that conversation did you have a conversation with me about a specific day that you would be testifying here?

A.   That is correct.  You gave me a phone call I believe and then followed up with some e-mail messages sending me some more material to take a look at.

Q.   Okay.  That's right.  I provided you with some additional information, additional materials; is that correct?

A.   That's correct.

Q.   And specifically I provided you with transcripts of several other recent depositions that had been taken; is that right?

A.   That is correct.

Q.   Depositions of Dr. Flomenbaum, Dr. Peterson, Dr. Arden, Dr. Ferenc and Dr. McGee?

A.   That's correct, sir.

Q.   And did I also provide you with the addenda to the reports that were prepared by Drs. Flomenbaum and Arden?

A.    That's correct, sir.

Q.    And did you have an opportunity to review the -- these materials prior to your testimony here today?

A.    I did.

Q.    And that's in addition to the materials that had been previously provided to you by either the government or The Forensic Panel?

A.    That's correct.

Q.    If I could direct your attention, Dr. Dragovic, to page 7 of your report.

A.    Sure.

Q.    And I just want to ask you some questions about the opinions and conclusions that you reached in response to the government's questions.  So just taking a look at the first question there and I'm talking about the section under "FORENSIC ASSESSMENT" on page 7.

A.    I'm following, yes, sir.

Q.    Okay.  Thank you.  So in the first question you were asked to give an opinion on whether there's evidence of sexual assault in this particular case and you were asked to evaluate the detection of acid phosphatase as proof of the presence of semen and then indication of a sexual assault.  Is that a fair summary of what you were asked to evaluate?

A.    Yes.

Q.   Okay.   As to the first part of the question, do you believe that there was evidence of a sexual assault here?

A.   Yes, sir.

Q.   And is it fair to say that the basis for your belief that there was a sexual assault is indicated in the very first line under subsection one of "FORENSIC ASSESSMENT"?

A.   Yes, sir.   That is correct.

Q.   "Evidence that the victim was sexually assaulted resides in the physical finding of the victim being overpowered, bound and forcibly undressed."

A.   Correct.

Q.   Is that correct?

A.   Yes.

Q.   And is that your basis for concluding that there was a sexual assault here?

A.   Yes.

Q.   Okay.   And then I just want -- if we could go down to the next paragraph, you make a notation that "Sexual assault can be carried out with or without intercourse (i.e. penetration);" is that right?

A.   Yes, sir.

Q.   And just to clarify is that -- is that determination -- or is that opinion of yours based on

your earlier definition of what constitutes a sexual assault, overpowered, bound, forcibly undressed?

A.   Yes, sir.

Q.   And would you agree that in this particular case, having looked at the materials, there is no evidence confirming a sexual assault that includes penetration of a sexual nature; is that right?

A.   Well, there is no evidence to prove that but there is no evidence to exclude it either.  So either way it's possible.  That remains one of those unanswered questions that can only be theorized about without support -- without being supported by evidence.

Q.   So evidence confirming that there was a sexual assault that involved penetration of a sexual nature, that could include evidence of semen?

A.   Yes, in certain instances.  In other instances that may not be the case either.  So it's a moot issue as far as the scientific capability to address that question is concerned.  We cannot provide the answer to that question.

Q.   Okay.  So if you were called to testify at a trial involving this case, would you be able to conclude that there was a sexual assault that occurred that involved penetration of a sexual nature?

A.   No.  I would just stop at the sexual assault

being carried out because for that I can see evidence. For whatever I cannot see evidence, I can only give an it's possible.

Q. Sure.

A. That's the reality and the scope of the answering that should be there.

Q. Okay. Just moving on concerning the issue of the presence of acid phosphatase as evidence of semen, you note in your report that acid phosphatase has presumptive value. And you use the word "presumptive value."

A. That's correct.

Q. Could you explain what you mean by "presumptive value."

A. It's a hint in simple terminology that there is -- there may be something there but it needs to be -- remains to be proven. And if it cannot be proven it's not there. But that's all there is.

Q. Okay.

A. So you cannot in simple terminology hang your hat on that information. That's the bottom line.

Q. So in terms of acid phosphatase you can't, quote unquote, hang your hat on acid phosphatase as being evidence of the presence of semen.

A. Correct, because there is no semen detected.

Q.   Okay.

A.   There's only enzyme activity detected.

MR. MONTROY:  Sorry, Your Honor, if I could just have a moment?

THE COURT:  Why don't we break here.  We'll break for 20 minutes.  We'll start again at 3 o'clock. So we'll stand in recess until 3:00.

MR. MONTROY:  Thank you.

(Recess taken; 2:40 p.m. to 3:08 p.m.)

THE COURT:  We'll go back on the record in a case entitled United States versus Rodriguez.  Each of the counsel who have previously noted their appearances are present here.  When we broke Dr. Dragovic was on the stand and Mr. Montroy was conducting a direct examination.

You may proceed, sir.

MR. MONTROY:  Thank you, Your Honor.

Q.   (Mr. Montroy continuing)  Dr. Dragovic, at the time that you provided this report on September 18, 2013, you were aware from the materials that no male DNA had been recovered from the testing that was done; is that correct?

A.   Yes, sir.

Q.   And you were also aware at that time that no sperm had been recovered in the testing?

A.   Yes.

Q.   At the deposition this past January do you recall my colleague, Mr. Luby, providing you with a document from the Minnesota BCA indicating that there was testing that was done, p30 testing that was done that was -- that proved negative?

A.   Yes, sir.

Q.   And you recall that was the first time that you had seen that document?

A.   That's correct.

Q.   Based on your expertise in forensic pathology and as a medical examiner, confronted with the evidence in this case where there was a hint as you indicated earlier based on elevated acid phosphatase levels but no presence of sperm, no male DNA, a negative p30 test, what could you conclude to a reasonable degree of scientific certainty regarding the presence of semen?

A.   There was no semen.

Q.   Do you agree or disagree with Dr. McGee's opinion that semen was recovered from the body of Miss Sjodin at the time of the autopsy?

A.   Well, that might have been Dr. McGee's impression at the time of performing the autopsy that he's dealing with a specimen that might have been or he considered it to be likely semen, but it proved out not to be positive

so there is no more issue there.  It took care of itself.  The negative results took care of that as an issue.

Q.  So if there was testimony at trial that there was the presence of semen in Miss Sjodin's body, you would have disagreed with that conclusion.  Is that fair to say?

A.  I don't know what evidence was that based on.  You certainly cannot base it on prostatic acid phosphatase that was found during testing because beyond that everything else was negative as far as sampling was concerned.

Q.  So as far as you're concerned, based on the evidence that you reviewed, there is no indication that -- for the presence of semen?

A.  That's correct, sir.

Q.  If I could direct your attention back to your report, Doctor.

A.  Yes, sir.

Q.  If you could turn your attention to page 8.  Are you with me?

A.  Yes, sir.

Q.  And do you see Section 2 about halfway down the page?

A.  Yes, sir.

Q.   And the government asked you to provide an opinion on the following question:  "Can method of injury be determined with respect to the wound on the victim's neck?  If so, what caused this neck wound?  Can method of injury be determined with respect to the wound on the victim's flank?  If so, what caused the flank wound?"

That was the question that was posed to you?

A.   That is correct, sir.

Q.   And what was your opinion regarding that -- regarding that question?

A.   Actually I put my opinion in the following paragraphs that "The loss of integrity of the skin and soft tissue on the victim's neck represents a post mortem artifact, resulting from combined effects of decomposition and most likely, smaller rodents feeding on the victim's remains.  The very same mechanism of destruction is the most logical explanation for the damage/loss of integrity of the right flank."

Q.   Did you see any indication from your review of the neck region to indicate that the defect to the neck area was caused by a slashing knife wound?

A.   No, sir.

Q.   Did you observe any indication in the neck area that the degradation there was caused by a stabbing

wound?

A.    No, sir.    There was no evidence of sharp force injury anywhere on the remains as presented in the photographs or any other material, the scene photographs, that I reviewed.

Q.    You're familiar that Dr. McGee opined that there is sharp force injuries to the neck, including what he referred to as a slash wound and a plunging wound.  Do you recall that opinion on his behalf?

A.    Yes, sir.

Q.    Is it fair to say that based on your review of the evidence and your expertise in forensic pathology that you disagree with the opinions of Dr. McGee concerning the defect that you observed in the neck?

A.    Well, I disagree with the interpretation of the damage that was found on the body of the victim.  I don't necessarily disagree with some other options that, I'm sorry, Dr. McGee proffered there as far as the mechanism of death.  So that's how far I can go.

Q.    Let's turn your attention to the flank area.

A.    Yes, sir.

Q.    The depredation that you observed in the flank area, what was -- what caused that depredation?

A.    It was a combination of decomposition and activity of small animals that gnawed on the remains.

Q.   Did you see any evidence to support the opinion that the flank area defect was caused by sharp force injury?

A.   No, sir.

Q.   Dr. Dragovic, do you have an opinion as to the cause of death in this case?

A.   Yes.  I believe that the victim was rendered dead through the process of asphyxiation that most likely resulted from application of force to the front part of the neck.  And that was derived by looking at some collateral information from interviews with the perpetrator and the information that was gained after the process of adjudication, the original process of adjudication.

Q.   When you -- your opinion regarding cause of death as being caused by asphyxiation, in part you rely on a statement given by Mr. Rodriguez; is that correct?

A.   Well, that's in part, but the notion of asphyxia officially is a diagnosis of exclusion.  And since there was no other evidence of particular trauma to the body other than the actual decomposition and knowing animal depredation changes, this is what you're ending up with.  It also takes into consideration the fact that the physical encounter occurred within the vehicle as it became known through the whole process and I believe

that the remains were just disposed of at the secondary location at the scene where the remains were found.

MR. MONTROY:  Could I have the Court's indulgence for just one second?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  Dr. Dragovic, concerning the conclusions and opinions that you've testified here today, would you have been able to reach and testify to those same conclusions and opinions at the time of Mr. Rodriguez's trial?

A.  Well, I have to say that some information came after the fact, after the trial.  So if I tried to sit in a time machine and go back to 2006, my process of thinking would be the same minus the information that was provided subsequently through the interviews with the perpetrator.

Q.  So if you had all of the information that you have here today back at the time of trial in 2006, would you have been able to reach the same conclusions?

A.  Yes, of course.  I mean, how could I come up with another conclusion?  You see, I have to explain this. Forensic pathology is not a democratic process.  It's a situation with findings.  Facts and findings dictate the diagnosis, and that's how it works.  That's the scientific approach.  There is no democracy in science.

Majority votes this way, minority votes this way. No. It's conceptually the method that has established itself through centuries and this is what we have. And in the end it's not a hundred percent exact science because not all the facts are known at any given time.

Q. So is it fair to say that you come to a particular case without an agenda or without a predetermined idea of how the facts --

A. That's the most dangerous approach that one can take in any medical/legal investigation of death with an agenda, with an advanced theory. No, that's wrong.

At first you put the facts together and then you start considering theories. Certainly you're fortified by your team and always make an effort to have as many critical eyes and minds as possible. That's the principle that I try to promote.

Q. Are the opinions and the conclusions that you've reached in your report and that you've testified to here today based on a reasonable degree of scientific and medical certainty?

A. Yes, and of the reasonable knowledge and understanding of facts in evidence.

MR. MONTROY: Your Honor, I don't have any further questions.

THE COURT: Thank you. Mr. Reisenauer?

MR. REISENAUER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Doctor, you still have your report in front of you?

A.  Yes, sir.

Q.  I believe it's Petitioner's 27, correct?

A.  Yes, sir.

Q.  If we could I want to follow up on a few items in regard to that.  Your document or your report is 11 pages long; is that correct?

A.  Let me just take a look.  I think it should be 10 pages.  I think there -- there is one more page that's the same so there are two pages 10.

Q.  I see.

A.  In my copy at least.

Q.  That's okay.  So 10 pages with your signature and at the top of that it says page 10 of 10, correct?

A.  Yes, sir.

Q.  So if you turn back then to -- I believe counsel did talk to you about your assessment with regard to the sexual assault.  Let's talk about that, okay?

A.  Yes, sir.

Q.  And I believe he talked to you about page 33-07 so if you'd go back to that page if you would.

A.   33-07?  Yes, sir.

Q.   Okay.  You state there that the "Evidence that the victim was sexually assaulted resides in the physical finding of the victim being overpowered, bound and forcibly undressed."  Do you see that?

A.   Yes, sir.

Q.   Okay.  So it would be correct, wouldn't it, that when you were making a determination of a possible sexual assault you take all of the evidence that's gathered in the case to make a determination?

A.   Yes, sir.

Q.   And that would include in this particular case how Miss Sjodin was found at the scene, correct?

A.   That's correct.

Q.   And she was found, as you note, bound and forcibly undressed, correct?

A.   That's correct, sir.

Q.   She had no pants on, correct?

A.   That's correct.

Q.   She had no underwear on, correct?

A.   That's correct.

Q.   And do you recall that also her top, her blouse and I believe there was a piece of clothing underneath that blouse was pulled down off of her shoulders?

A.   That's correct, sir.

Q.   And you talked earlier about -- and we'll get to the cause of death but you talked earlier that you reviewed Mr. Rodriguez's statement as well in your review of the case.

A.   Yes.   That was sent to me as additional material.

Q.   Okay.   And do you recall Mr. Rodriguez saying that he took those pants and panties off and intended on raping Miss Sjodin?

A.   That's correct.

Q.   And as you noted I believe -- let's go down to the second paragraph.   You note and I quote your statement, "Sexual assault can be carried out with or without intercourse," correct?

A.   That is correct, sir.

Q.   So you don't have to have penetration to an individual, to a female, to accomplish a sexual assault. Wouldn't that be true?

A.   That is correct, sir.

Q.   And would you agree -- let me turn you back up to the first paragraph, the second sentence.   You say, "The acid phosphatase test results in this case are suggestive of sexual assault, but are only of presumptive value rather than definitive."   Do you see that?

A.   Yes, sir.

Q.   And you know that Dr. McGee testified that, in fact, the acid phosphatase test was a presumptive test. Are you aware of that?

A.   Yes, and that's universally known actually.

Q.   Okay.  And then you say in the next sentence, "A positive result with quantifiable levels of acid phosphatase is highly suggestive of a recent sexual intercourse; it is not, however, definitive proof of a sexual assault," correct?

A.   In and of itself.  By itself it is not.  But in conjunction with other findings it may or may not be again.

Q.   Okay.  And if you as the forensic examiner had testing done -- let me jump back.  Do you do testing for acid phosphatase yourself?

A.   No.  We have crime laboratories.

Q.   Pardon?

A.   We have crime laboratories, Michigan State Police crime laboratories, and we use the standard kits and delivered those directly to the laboratories.

Q.   And so they do do acid phosphatase testing in the state of Michigan for you.

A.   I don't know if they're doing it now but back in the olden years they did.

Q.   Okay.  And you receive those results I take it in

your cases?

A.   It depends.  On certain occasions they send those to us.  On other occasions they send it directly to the prosecutor's office if this is a criminal matter or if there is positivity of a degree or depending on the case.  But it's not a standard routine that they send all the reports that they generate to us.

Q.   Okay.  Well, let me go down to the bottom of that page in your report if you would.  You list a number of things that you took a look at in making your determination of sexual assault, correct?

A.   Yes, sir.

Q.   Okay.  If you would start at the bottom of that page and tell us what things that you reviewed.

A.   Which page are we talking about?

Q.   Seven still.

A.   Oh, page 7, okay.  Oh, yeah, it starts at the bottom that that was the knife sheath that was found near the victim's car parked at the Grand Forks mall that matched the knife discovered in the trunk of the car of the perpetrator, Mr. Rodriguez; and then the statements that were subsequently available by Mr. Rodriguez; the blood spatter pattern that was found on the upholstery of the back seat of the car of the perpetrator that was determined a complete match with

the victim's DNA; then Mr. Rodriguez's statements in interview that he attempted to rape the victim; Mr. Rodriguez statements in the interview that he pulled the victim's clothes off her while she was alive and restrained; Mr. Rodriguez's statements in interview that the victim told him that she had herpes and that is reflective of a confrontation in which she was attempting to dissuade him from sexual contact. Mr. Rodriguez described in interview that the victim was relatively compliant at first but became increasingly distressed to the point of being frantic as time passed, and bound and nude from waist down, body of the victim found dumped near Crookston, Minnesota.

Q.    Okay.  So you take all those circumstances and facts into account in making your assessment, correct?

A.    That is correct.  You have to.  You have to take everything into account, whether something is particular -- some finding is particularly relevant or not is a totally different question.

Q.    Okay.  Thank you.

A.    You're welcome, sir.

Q.    Let's talk about a couple things.  You told counsel that, and in your report I believe, you have the opinion that the neck and flank wounds that Dr. McGee testified to, you don't believe that there's sufficient

material there to make that determination; is that correct?

A. That's correct. There is no preservation, structural preservation that gives itself a way in the form of evidence of sharp force injury.

Q. Okay. So would you say that that is due to the decomposition that occurred over this lengthy period of time that she laid out in the environment?

A. It's not only the decomposition but it's also the destructive effects of postmortem gnawing or feeding of small animals on the remains that gives you the critical change on the surface of the skin.

Q. Okay. The cause of death that you have opined is asphyxiation, correct?

A. That is correct.

Q. And specifically I believe your report says that -- and I believe you testified earlier today that you believe it was an application of force to the neck, correct?

A. That is correct, sir.

Q. Okay. And counsel asked you earlier that question with regard to whether your conclusions would be the same if you were not aware of Mr. Rodriguez's statement. Do you recall that?

A. Yes, sir.

Q.   Okay.  And what would your answer be to that?

A.   If I didn't have that type of information, I would not have been able to integrate that piece into the jigsaw puzzle.  But I would still believe that asphyxia was the mechanism of demise of the victim because that's the only reasonable bloodless process.  If you remember there was no contamination of the garments of the victim by her own blood.  There was no evidence of blood on the victim's garments that were still present on her.  And extensive sharp force injury particularly to the neck area would result no matter what in exsanguination.  "Exsanguination" means a lot of blood.

So one can safely exclude the possibility of sharp force injuries being inflicted upon the victim.  So that's the logic that I'm following.  If someone offers me a better, smarter logic anytime I'm forced to accept it, but I have not heard of anything along those lines yet in whatever materials I viewed.

Q.   Okay.  So let me just ask you a couple follow-up questions about Dr. McGee's testimony.

A.   Yes, sir.

Q.   As we have already discussed, Dr. McGee opined that there was a neck slash, correct?

A.   Correct.

Q.   And do you recall his testimony as to how he opined as to how that may have been done without the amount of blood that you are talking about being displaced onto her clothing?  Do you recall that?

A.   Not specifically.  I mean --

Q.   He opined that it was possible that this neck slash occurred while she laid on the ground with her face towards the ground.  The neck was slashed at that point.  The amount of blood that you're talking about and that you believe should have occurred would not have gone onto her clothing.  You don't recall that?

A.   Well, I don't recall a lot of things that I read but I don't see that as a particularly logical concept. And, you know, had the victim been completely naked, yes, but we all remember that the victim had a K-Mart type plastic bag over her head and the string around it that was actually in that nearby location.  And there was nothing there as well.

Q.   Okay.  Let me touch on something that you just brought up and that was that K-Mart bag.  You reviewed his statements, meaning Mr. Rodriguez's statements, that were given to Dr. Welner and Dr. Stewart, correct?

A.   That's correct, sir.

Q.   Do you recall the discussion in regards to that plastic bag and when it was put over her head?

A.   I believe that it was put over the victim's head in the car.

MR. REISENAUER:  Okay.  If I may, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  If I could, Your Honor, approach the witness?

THE COURT:  You may.

MR. REISENAUER:  Thank you.

Q.   (Mr. Reisenauer continuing)  And you just testified that you reviewed Dr. Welner's report, correct?

A.   Whatever was given to me.  You mean the report of the interview?

Q.   Yes.

A.   Yes.

Q.   And Dr. Wellner's report itself.

A.   Correct.

MR. REISENAUER:  I'm going to hand you what's been marked as Government's Exhibit F.  And I would offer Government's Exhibit F, Your Honor, which includes United States Exhibit 5-11 through 23 which was filed as part of our petition in this matter.

THE COURT:  Any objection?

MR. MONTROY:  Your Honor, no.  Most likely

no objection.  I'm just waiting to see what it's being offered for and also just trying to find it on our computer here to follow along.  So if we could just hold off on admitting it momentarily that would be great.  And, I'm sorry, it's -- counsel, are you just asking to mark it at this point?  Are you offering?

MR. REISENAUER:  No, I offered it.

MR. MONTROY:  No objection, Your Honor.

THE COURT:  F is received.

MR. REISENAUER:  Thank you.

Q.  (Mr. Reisenauer continuing)  You mention the bag over the head, Doctor, and I'm going to refer you then to page 22 of the exhibit if we could, and if you could just read the second paragraph out loud to us.

A.  Thank you.

Q.  Could you read that out loud, please?

A.  Oh, aloud, yes.  "According to Dr. Stewart's account, Mr. Rodriguez knocked her out from hitting her, and she was bleeding from the head, which prompted him to place a bag over her head while she was alive, and to secure it in place sufficiently that no blood could seep through a crack.  In Dr. Silva's account and in our interview, Mr. Rodriguez placed the bag over her head after he noticed she was dead.  In my interview, he indicated he placed the bag on her head when he was

about to remove her from the car."

Q.    Okay.    Would that information whether or not --
and obviously there's a discrepancy between the --

A.    No, this is yours.

Q.    Whether she was alive or not.    Does that make any
difference in your determination as to whether she was
asphyxiated?

A.    Well, it's contradictory information and I
cannot -- out of that paragraph I can only extract the
information that the bag -- the plastic bag was placed
while the victim's body was in the car and that's for me
the important part of information because we're looking
at the presence of any major bleeding as a result of
injuries occurring in the vehicle.    The proposed theory
that the victim was slashed outside at the place of
disposal of the body does not hold water in view of
that.

Q.    Well, it certainly would be clear that the neck
wasn't slashed in the vehicle, correct?

A.    Yes.

Q.    Okay.    So let's go back to your opinion about the
asphyxiation.

A.    Yes.

Q.    And you testified that your opinion would be the
same whether or not you had Mr. Rodriguez's statement as

to how that asphyxiation was done, correct?

A.   Correct.

Q.   Okay.

A.   Without -- if I can explain.  Without the specific mechanism of direct compression on the front part of the neck.

Q.   Okay.  And can you explain to us how you would have arrived at the same conclusion of asphyxiation?

A.   By exclusion of all other potential mechanisms.

Q.   Okay.  And by that you mean -- and I take it you mean there weren't any bullet wounds found, correct?

A.   Well, not only bullet wounds but there were no fractures of the skeleton because Dr. McGee performed the x-ray evaluation and that helps too, particularly in a decomposed body.

Q.   And so there weren't any bullet wounds.  There weren't any fractures.  Her neck wasn't broken, correct?

A.   That's correct.

Q.   And so what you're telling us is that that leaves you with asphyxiation.

A.   Yes.  And I pointed out earlier asphyxiation is a diagnosis of exclusion just like death resulting from exposure to low temperatures or extremely high temperatures is a diagnosis of exclusion.  But given the circumstances here we know that the victim's body is

taken out of the car and placed outside after being rendered dead.  We have come to know that because that emanated from the statements there.

Q.  Well, but that conclusion is based upon the fact that one would have to believe Mr. Rodriguez, correct?

A.  Well, it's at least to take some information into account because there is no explanation to the contrary, and if something is there as explanation to the contrary I will gladly consider it.

Q.  Okay.  Well, how about this to the contrary. What if she was still alive when he left her in that ravine in the state she was in bound with the hands tied behind her back and left out in the elements?  Could she have died of exposure?

A.  It's possible if she was unconscious, if she was rendered unconscious.  But if she was conscious -- if the victim was conscious at the time the victim had no reason not to stand up and try to ambulate, to walk somewhere to seek help.

Q.  Okay.  And you know that she was found lying in the state she was found and there was some debris and grass put over her body, correct?

A.  That's correct.

Q.  Okay.  But we don't know for a fact whether she was actually dead or unconscious when she was placed

there, do we?

A.   Well, I for one was not there so -- and there is no video documentation of anything like that.  And what we are doing here as consultants is simply trying to, based on our experience, bridge that gap of unknown in any given circumstance starting from a colleague like Dr. McGee and everybody else that so far testified and that may testify subsequently.

Q.   Okay.  And you are aware that when Dr. McGee testified that he opined that she may have died from the slash on her neck, she may have died from ligature strangulation, she may have died from asphyxiation or she may have died from exposure, correct?

A.   Yes.  And it was a fair approach at the time he was given the situation to examine the body.

Q.   Okay.  So I just have one more area.  You haven't talked about -- although you opined that it was asphyxiation, you haven't addressed the possibility of -- without -- excuse me, without Mr. Rodriguez's statement, you haven't opined as to what may have caused the asphyxiation.  And in particular I want to refer you to ligature strangulation or asphyxiation due to the bag that was put over her head.

What is your opinion about that?

A.   My opinion is that the bag was placed to avoid

contamination by the blood leaching either from the mouth, from slapping across the mouth or from the nostrils, the primary injuries during the assault that occurred in the back seat of the vehicle.

Q.   Let me stop you there, Doctor.

A.   Yes, sir.

Q.   If we could would that -- that would have not been known to you if you were in Dr. McGee's position, correct?

A.   That is correct.

Q.   Okay.  So all you do is you find Miss Sjodin with the remnants of this plastic bag, correct?

A.   That is correct.

Q.   Okay.  So you wouldn't have known why it was put over her head, would have you?

A.   That's correct.

Q.   So that could have caused asphyxiation if it had been placed there with the ligature around her neck with no way to breathe, correct?

A.   It could have but as far as I remember Dr. McGee testified that there was no knot, that the rope around the neck was just around the neck.  And then the measurements that were offered of the noose itself -- or not the noose but the wrapping around the neck reflected four inch smaller diameter, which would bring the

circumference of the supposed noose to over 12 inches.

And I also know that there were some comments about measurements of being 10 to 11 inches. Well, an inch is two and a half centimeters. That's a lot, a lot of difference in there in the circumference. And the young person's neck is pretty narrow. We, of course, do not have the exact measurement of the victim's neck because the neck was -- the soft tissues of the neck were gone in the process of decomposition and animal depredation.

So I would think that it was unlikely. It just -- that is my logic but only my personal logic. Can I exclude that possibility? No. And that's why I think that Dr. McGee offered multiple propositions at the time based on the information that he had at the time.

Q. Okay. You were provided the reports I believe or depositions of the other doctors in this case, Dr. Flomenbaum, Dr. Ferenc, Dr. Arden. Do you recall that?

A. Yes, sir.

Q. Okay. And they opined that it was the ligature strangulation that was most likely the cause of death. Do you recall that?

A. Yes.

Q.   Okay.  And you just said that that's a possibility but you don't believe, based upon what you've looked at, that that was the most likely cause of the asphyxiation?

A.   That's correct.

Q.   But you would agree that the ligature that was placed around the neck could have been used to strangle her?

A.   Could have, yes.  I said I cannot exclude that possibility.

MR. REISENAUER:  If I could have one minute Your Honor?

Q.   (Mr. Reisenauer continuing)  Just to go back to what you just told us, Doctor, your report actually talks about the asphyxia by ligature strangulation question; is that correct?

A.   I believe so.

Q.   If you -- I'll direct you to page 9 and the -- I believe you addressed that in paragraph four -- three and four, correct?

A.   That's correct.

Q.   And you note that "The concept of 'asphyxia by ligature strangulation' is less likely, although it cannot be completely excluded as a possibility."

A.   That's exactly.

Q.   And that's what you just told us?

A.   That's correct, sir.

MR. REISENAUER:  That's all the questions I have, Your Honor.

THE COURT:  Thank you.  Mr. Montroy?

MR. MONTROY:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. MONTROY:**

Q.   Dr. Dragovic, assuming that you don't have the statements of Mr. Rodriguez and you're evaluating the evidence based on the photographs and the autopsy reports, the same evidence that Dr. McGee had when he evaluated this case, is there any evidence to support a conclusion that Miss Sjodin died of sharp force injury?

A.   No, sir.

Q.   Is there any evidence that there was sharp force injury to the neck area?

A.   No, sir, not that I could find.

Q.   And is there any evidence to support a conclusion that there was sharp force injury to the flank area?

A.   No, sir.

Q.   On cross-examination you were -- you mentioned that in response to a question a possible scenario that Miss Sjodin was -- had her neck slashed while she was out of the car and on the ground and that's why there

was no indication of blood anywhere.  You started to indicate that she was partially clothed when her body was recovered.  If the neck had been slashed or stabbed, would you expect to see blood on her clothes?

A.   Of course if the victim was alive at the time there would have been tremendous bleeding because sharp force injury in order to cause death result in exsanguination.  That means blood loss, volumes of blood loss.  And there will be a couple of liters of blood leaching out of the body or spraying out of the body if there was a slash in the neck because the proximity of carotid arteries being under the skin is offering that as a possibility.  So it would be spewing blood, not only pouring blood.

So none of that is there simply because there was some clothing and there is no contamination by the victim's blood of any of the clothing found.

MR. MONTROY:  I have no further questions, Your Honor.

THE COURT:  Mr. Reisenauer, anything further?

MR. REISENAUER:  Yes, Your Honor, just a couple.

**RECROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.   Doctor, if we could let's look at Petitioner's Exhibit 12 for a second.  Does that look familiar?  Did you review all the autopsy photos in this case?

A.   Yes, sir.

Q.   And that particular photo is of the front of Miss Sjodin's neck, correct?

A.   Yes, the upper part of the neck, right side.

Q.   Okay.  And there is a strip of skin being held by a forceps, correct?

A.   Yes, sir.

Q.   And the top of that strip of skin is fairly smooth would you say?

A.   Well, it doesn't reflect a cut.  It's relatively smooth in comparison to this part.

Q.   You're talking about the lower mandible area?

A.   Yeah, the edge of the right angle of the mandible.

Q.   That mandible area and, you know, more so even up towards the right ear there, that's obviously been chewed or gnawed on, correct?

A.   Yes.

Q.   Okay.

A.   And there is similar appearance here but, you

know, these are the artifacts that are commonly seen in situations like that.

MR. REISENAUER:  Okay.  Thank you.  If I could have one second, Your Honor?

THE COURT:  You may.

Q.   (Mr. Reisenauer continuing)  You testified that you reviewed Dr. McGee's testimony from trial, correct?

A.   Yes, sir.

Q.   Okay.  Do you recall him being asked on cross-examination, Dr. Dragovic, about the depth of the slash wound he was testifying to with regard to the neck?

A.   Do I recall a particular question or line?  If you read it to me that will refresh my memory, sir.  Otherwise I'm 67 so, you know, my memory is not as good as let's say 10, 15, 20 years ago.

Q.   Well, I'm getting there myself so I know what you're talking about.  Well, let me try to help you.

Counsel asked you about the fact of the amount of blood that would occur if the neck was slashed and you said in your testimony that in order to kill the individual that the neck slash would have to have caused a large amount of blood to be drawn out, correct?

A.   That's correct.

Q.   Okay.  If I were to tell you that Dr. McGee

testified that he -- as he was sitting in the chair that you're in, that he was not able to determine whether or not the slash was skin deep or, in fact, deeper than that and he agreed to that.  Do you recall that at all?

A.   Vaguely, but that just shows that the -- there is an objective limitation of assessment of a suspected injury in the neck per se in this case because of advanced decomposition and animal depredation.

Q.   And you would agree that -- let's assume there was a neck slash.  You would agree that you would not be able to tell, based upon the decomposition of that neck area, how deep the slash would have been.

A.   No, but if the body was completely unclad.  But with the body being partly clad the amount of blood coming out from a living person that is injured is variable obviously.  If it is just coming from a venous source it will be leaching and following the gravity. But if it involves any of the arteries in the neck area it would be squirting also, and if it involved the carotid arteries that are right here in between the -- in the grove underneath the sternocleidomastoid muscle, you know, if a cut in that area occurred there will be significant squirting because the heart propels the blood and the carotid circulation is right there coming off the arch of the aorta so there would be an

opportunity for significant contamination with blood.

Q.  If it was more of a superficial slash that didn't cut those arteries, it would be a lot lesser amount of blood, correct?

A.  Well, but eventually it has to be a lot of blood to effectuate death.  A person with a superficial slash on the skin takes hours to bleed out because that's the nature of the anatomy and physiology of human body.

MR. REISENAUER:  Okay.  Thank you.  That's all I have, Your Honor.

THE COURT:  You may step down, Doctor. Thank you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Petitioner will call its next witness.

MR. REISENAUER:  Your Honor, could we approach?

THE COURT:  You may.  Does it need to be on the record?

MR. REISENAUER:  No, it doesn't.

(Off the record.)

THE COURT:  We'll recess until 9 o'clock tomorrow morning given the logistics and so we'll stand in recess.  If you leave anything in here it's okay. The courtroom will be locked.

MR. MONTROY:  Thank you, Your Honor.

MR. REISENAUER:  Thank you, Your Honor.

THE COURT:  Thank you.

(Adjourned at 4:10 p.m.)