**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                  )
United States of America,  )
                  )
    Plaintiff/Respondent,  )
                  )
       vs.         )   **FILE NO. 2:04-cr-55**
                  )            **2:11-cv-88**
Alfonso Rodriguez, Jr.,   )
                  )
    Defendant/Petitioner.  )
                  )
- - - - - - - - - - - - - - - -

**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**EVIDENTIARY HEARING - JUNE 23, 2017**

**Pages 636-771**

HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
        655 FIRST AVENUE NORTH
        FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

**A P P E A R A N C E S**

**KEITH W. REISENAUER    COUNSEL FOR PLAINTIFF/RESPONDENT;**
**MELISSA H. BURKLAND**
Office of United States Attorney
655 1st Avenue North, Ste. 250
Fargo, ND  58102


**ERIC J. MONTROY    COUNSEL FOR DEFENDANT/PETITIONER;**
**VICTOR J. ABREU**
**JOSEPH W. LUBY**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

**I N D E X**

**W I T N E S S E S**

| DEFENDANT/PETITIONER'S: | PAGE NO. |
|---|---|

**GARRY F. PETERSON**

| | |
|---|---|
| Direct Examination by Mr. Abreu | 644 |
| Cross-Examination by Mr. Reisenauer | 709 |
| Redirect Examination by Mr. Abreu | 738 |
| Recross-Examination by Mr. Reisenauer | 741 |

**STEVEN FISCHER**

| | |
|---|---|
| Direct Examination by Mr. Abreu | 745 |
| Cross-Examination by Mr. Reisenauer | 762 |
| Redirect Examination by Mr. Abreu | 767 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Petitioner's 56 | Curriculum Vitae of Garry F. Peterson | 646 | 646 |
| Petitioner's 57 | Letter from Mr. Hoy to Dr. Peterson | 660 | 660 |
| Petitioner's 59 | Letter from Dr. Peterson to Professor Margulies 2/2/17 | 674 | 674 |
| Petitioner's 60 | Letter from Dr. Peterson to Mr. Abreu & Mr. Luby 2/2/17 | 679 | 680 |
| Petitioner's 61 | Converstions/Messages/ Notes from BCA | 768 | 768 |
| Government's  G | Notes of Mr. Hoy 6/21/04 & 6/26/04 | 643 | 644 |
| Government's  H | Letter to Mr. Hoy from Mr. Wrigley 2/10/05 | 643 | 644 |
| Government's  I | Letter to Dr. Blake from Mr. Hoy 3/10/05 | 643 | 644 |

**E X H I B I T S**

| EXHIBIT NO. | | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|---|
| Government's | J | E-mail Exchange between Dr. Blake and Mr. Hoy 5/27/05 | 643 | 644 |
| Government's | K | E-mail Exchange between Mr. Anderson and Mr. Hoy | 643 | 644 |
| Government's | L | E-mail Exchange between Dr. Blake and Mr. Hoy 10/25/05 | 643 | 644 |
| Government's | M | E-mail Exchange between Dr. Blake and Mr. Hoy | 643 | 644 |
| Government's | N | Letter from Mr. Hoy to Dr. Blake 2/7/16 | 643 | 644 |
| Government's | O | Letter from Mr. Hoy to Mr. Anderson 4/10/06 | 643 | 644 |
| Government's | P | Letter from Mr. Hoy to Dr. Blake 4/10/06 | 643 | 644 |
| Government's | Q | Response from Mr. Anderson to Mr. Hoy re: Fiber Samples & DNA Samples 5/3/06 | 643 | 644 |
| Government's | R | Evidence Release Form - MN Dept of Public Safety | 643 | 644 |
| Government's | S | Letter from Mr. Hoy to Dr. Blake 6/9/06 | 643 | 644 |
| Government's | T | E-mail from Dr. Blake to Mr. Hoy 6/13/06 | 643 | 644 |
| Government's | U | Letter from Mr. Hoy to Dr. Blake 6/15/06 | 643 | 644 |
| Government's | V | Notes of Mr. Hoy of Phone Conference with Dr. Stetler 6/6/06 | 643 | 644 |
| Government's | W | Letter from Mr. Hoy to Dr. Stetler 6/6/06 | 643 | 644 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's  X | Letter from Dr. Stetler to Mr. Hoy 7/19/06 | 643 | 644 |
| Government's  Y | Handwritten Notes of Mr. Hoy | 643 | 644 |
| Government's  Z | Letter from Dr. Stetler To Mr. Hoy 7/27/06 | 643 | 644 |
| Government's AA | Curriculum Vitae of Dean A. Stetler | 643 | 644 |
| Government's BB | Notes of Mr. Hoy | 643 | 644 |
| Government's CC | Notes of Mr. Hoy | 643 | 644 |
| Government's DD | Internal Reports of Regions Hospital St. Paul AP Levels | 643 | 644 |
| Government's EE | Notes of Mr. Hoy Preparing for Suppression Hearing | 643 | 644 |
| Government's FF | E-mail Exchange from Mr. Hoy to Dr. Sensabaugh 6/28/06 | 643 | 644 |
| Government's GG | Notes of Mr. Hoy re: Phone Conference with Dr. Sensabaugh 8/19/06 | 643 | 644 |
| Government's HH | Letter from Dr. Sensabaugh to Mr. Hoy 8/24/06 | 643 | 644 |
| Government's II | Summary Chart generated by Mr. Hoy re: Tests & Results | 643 | 644 |
| Government's JJ | E-mail from Mr. Hoy to Dr. Melton re: Initial Consultation | 643 | 644 |
| Government's KK | E-mail Exchange Between Mr. Hoy and Dr. Melton | 643 | 644 |
| Government's LL | Curriculum Vitae of Terry Melton | 643 | 644 |

641

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's MM | Notes of Mr. Hoy re: Items to send Dr. Melton | 643 | 644 |
| Government's NN | Letter from Mr. Hoy to Dr. Melton 4/5/06 | 643 | 644 |
| Government's OO | Letter from Mr. Hoy to Mr. Anderson 4/5/06 | 643 | 644 |
| Government's PP | Letter from Mr. Hoy to Dr. Melton 5/10/06 | 643 | 644 |
| Government's QQ | Letter from Mr. Hoy to Dr. Melton 6/6/06 | 643 | 644 |
| Government's RR | Letter from Dr. Melton to Mr. Hoy re: Case Review/Conclusions | 643 | 644 |
| Government's SS | Letter from Mr. Hoy to Microtrace Scientific 2/2/06 | 643 | 644 |
| Government's TT | Transcript of Testimony of Steven Fischer 8/21/06 | 767 | 767 |
| Government's UU | Notes of Mr. Hoy re: Fiber Evidence to be sent to Microtrace Scientific 2/2/06 | 643 | 644 |
| Government's VV | Letter from Mr. Hoy to Mr. Skip Palenik 4/6/06 | 643 | 644 |
| Government's WW | Letter from Mr. Hoy to Mr. Anderson 4/6/06 | 643 | 644 |
| Government's XX | Letter from Mr. Hoy to Mr. Skip Palenik 5/10/06 | 643 | 644 |
| Government's YY | Notes of Mr. Hoy re: Phone Conference with Mr. Palenik 7/5/06 | 643 | 644 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's ZZ | Report from Microtrace to Mr. Hoy re: Acrylic Fibers 7/20/06 | 643 | 644 |
| Government's AAA | Letter from Microtrace to Mr. Hoy re: Polyester Fiber Review 7/8/06 | 643 | 644 |
| Government's BBB | Notes of Mr. Hoy re: Contacting Dr. Peterson | 643 | 644 |
| Government's CCC | Letter from Mr. Hoy to Dr. Peterson 7/27/06 | 643 | 644 |
| Government's DDD | Curriculum Vitae of Garry F. Peterson | 643 | 644 |
| Government's EEE | Notes of Mr. Hoy re: Conference with Mr. Dusek and Mr. Rodriguez 2/9/04 | 643 | 644 |
| Government's FFF | Notes of Mr. Hoy re: Meeting at Jail, Ney, Hoy & Rodriguez | 643 | 644 |
| Government's GGG | Notes of Mr. Hoy re: Jail Conference 5/17/05 (Ney, Rodriguez, Christensen) | 643 | 644 |
| Government's HHH | Notes of Mr. Hoy re: Jail Conference 3/1/06 (Ney & Hoy) | 643 | 644 |

**P R O C E E D I N G S**

(June 23, 2017:  The following proceedings commenced at 9:00 a.m.:)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's Criminal File No. 2:04-55 and Civil No. 2:11-88.  The record should reflect that the petitioner has waived his right to be present.  He appears through his counsel, Mr. Abreu, Mr. Luby and Mr. Montroy. Mr. Reisenauer and Ms. Burkland appear on behalf of the United States.  When we broke the petitioner was about to call its next witness or his next witness.

MR. ABREU:  Good morning, Your Honor.  The petitioner would call Dr. Garry Peterson.  I believe the government has one quick issue they want to clarify in terms of their exhibits.

MR. REISENAUER:  Thank you, Mr. Abreu.  Your Honor, at one point yesterday I was going to offer all of our exhibits but counsel was walking out of the courtroom and I forgot when they returned.

So we would offer I believe what has not been entered is Exhibit G through triple H, government's exhibits, and so we would offer those as well as any other exhibits we hadn't offered at this point.

THE COURT:  Any objection?

MR. ABREU:  No objection, Your Honor, with one brief explanation, if I may.  Yesterday as Your Honor is aware Mr. Reisenauer made reference to some of the documents being redacted and I just wanted to point out why that was.  Your Honor ordered discovery relative to the issues that were currently before the Court and so those are redacted according with those issues that are currently before the Court and I suspect some of them will be unredacted for the next part of the hearing so I want the Court to know why those were redacted as such.

MR. ABREU:  No objection, Your Honor.

THE COURT:  The exhibits are received.

Dr. Peterson, if you please would come forward, stand before the clerk, raise your right hand and take the oath.

THE CLERK:  Please state your name and spell your name.

MR. PETERSON:  Garry, G-a-r-r-y, Freeman, F-r-e-e-m-a-n, Peterson, P-e-t-e-r-s-o-n.

(Witness sworn.)

THE COURT:  Mr. Abreu.

MR. ABREU:  Thank you, Your Honor.

**GARRY F. PETERSON,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO

SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. ABREU:**

Q.   Dr. Peterson, I see you're pouring yourself some water.

A.   Always a good thing to have.

Q.   Always.  Good morning, sir.

A.   Good morning.

Q.   Dr. Peterson, how are you currently employed, sir?

A.   I'm retired.  I've been retired since 2004.

Q.   What did you retire from?  What profession did you retire?

A.   I -- I'm a physician.  I was in medicine practicing as a forensic pathologist.

MR. ABREU:  May I approach, Your Honor?

THE COURT:  You may.

Q.   (Mr. Abreu continuing)  Dr. Peterson, let me show you what I have marked as Petitioner's Exhibit 56 (indicating).  Do you recognize that document, Dr. Peterson?

A.   It's a copy of my Curriculum Vitae I think dating back to the early 2000s.

Q.   Has that been updated anytime recently, sir?

A.   No.  I'm retired.

MR. ABREU:  Your Honor, at this time I would offer Petitioner's 56.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Fifty-six is received.

Q.  (Mr. Abreu continuing)  Dr. Peterson, will you briefly tell us about your educational background, please.

A.  I grew up in Minneapolis, Minnesota, attended public schools there.  I went --

Q.  Doctor, let me just stop you for one second, Dr. Peterson, and ask you not to be so close to the microphone so it creates feedback.  It will pick you up right from there.

A.  Okay.  It this better?  I grew up in Minneapolis and attended public schools there.  I went to college at the -- at Hamline University in St. Paul for one year and then at the University of Minnesota in Minneapolis and graduated with a B.A. degree in 1964.  I worked for a year and then began medical school at the University of Minnesota Medical School and graduated there in 1969 with an M.D. degree.

Following that I took a rotating internship at St. Paul Ramsey Hospital, which is now known as Regions Hospital.  It was the city/county hospital in St. Paul.  And then following that I took five years of

residency training in pathology.  The first three were in clinical and anatomic pathology at St. Paul Ramsey Hospital.  The fourth year was in forensic pathology at the Hennepin County Medical Examiner's Office in Minneapolis and then the fifth year was in clinical and anatomic pathology at Hennepin County Medical Center, which is the city/county hospital for Minneapolis and the surrounding area.

Q.   And would you kind of, Doctor, tell us briefly about your employment history after you completed your education.

A.   I should stop and back up.  Are you talking about educational background?

Q.   Yes, sir?

A.   Following my residency training, I worked at some hospitals in St. Paul and then during the -- I guess the first four years I was in practice I attended night law school at William Mitchell College of Law and received a J.D. degree so I failed to include that in my earlier answer.  You asked another question then.

Q.   If you would highlight your employment history after you completed your education.

A.   I first worked at St. Paul Ramsey Hospital in the pathology department there.  I very shortly thereafter became a pathologist at Mounds Park Hospital, formerly a

hospital in St. Paul.  It's now closed.  And during that time I was a deputy medical examiner in Hennepin County and worked there part-time as well during the time I was attending law school.

Following that, or actually overlapping a bit with my completion of law school, I went to Hennepin County Medical Center into the Hennepin County Medical Examiner's Office.  The two were located at the same place and took a position there as a pathologist in the pathology department and as an assistant medical examiner in the Hennepin County Medical Examiner's Office.

Then in 1984 the current medical examiner under whom I had trained retired and I became chief medical examiner of Hennepin County.  Then I held that position until 2004 when I retired.

Q.  Did you ever practice law, Dr. Peterson?

A.  I did a couple of things you need to be an attorney to do.  Interestingly a good friend of mine was the U.S. Attorney for Minnesota and was about to become a federal district court judge and wanted to try one more case and have me as co-counsel.  And so I was co-counsel with him on a case.

Q.  First and last I suspect.

A.  Well, I have a 1,000 percent batting average.

And then I think a few times -- because I was admitted to courts, I moved admission of friends to the Court but other than that I did not practice law actively.

Q.   And since your retirement, Doctor, have you worked as a forensic pathologist at all?

A.   I've been -- early on I took a few cases, this one being one of them.  But very soon after that my wife said, you know, they just -- they just kind of tear you up too much.  You know, I prefer you don't do that and I said:  You know, I think I agree with you.

So every now and then an old case will come back that I'll have to go give testimony in but I don't actively seek cases or take cases.

Q.   And when you say you took cases, you mean as a consultant on those cases?

A.   As a consultant.  There was a time -- probably a couple of years after I retired there was a staff shortage at the medical examiner's office where I'd retired and I went back for a few weeks to give some coverage and to give a hand but other than that I've been fully retired.

Q.   And before your retirement, Doctor, did you perform autopsies as part of your duties as a medical examiner?

A.   I did, yes.

Q.   Could you estimate how many?

A.   I really -- I just lost track of them.  It was --

Q.   And I take it --

A.   And I supervised and oversaw because we had one of the training programs where one goes to take training to become a forensic pathologist.  So I supervised cases.  It's in the thousands.

Q.   And after your retirement in that capacity that you returned to assist as a -- in the medical examiner's office, did you perform autopsies then?

A.   I did a few, not too many at that time.

Q.   Have you maintained affiliation with any professional organizations since your retirement?

A.   I am still a member of the American Academy of Forensic Sciences.  I'm a fellow of that organization. I'm a retired member of the National Association of Medical Examiners and a past president of that organization.

Q.   That's an acronym NAME, N-A-M-E?

A.   It's basically known as NAME, yes.

Q.   Prior to your retirement in 2004, Doctor, were you qualified as an expert in forensic pathology?

A.   I testified in many cases and was recognized.

Q.   Can you estimate how many times you were qualified and how many times you testified?

A.   Well, it was often two, three times a month so it was dozens of cases a year probably.

Q.   Since your retirement in 2004, have you been qualified in any court of law as an expert in forensic pathology?

A.   I have.  I don't specifically remember the cases but there are a handful of them, yes.

Q.   And over the course of your career, Dr. Peterson, have you testified as an expert witness in forensic pathology in both civil and criminal cases?

A.   I have, yes.

Q.   And over the course of your career, have you testified as an expert witness in forensic pathology on behalf of the prosecution as well as the defense?

A.   I have testified on behalf of both.

Q.   And have you testified on behalf of the prosecution in capital cases?

A.   I think -- yes, I think I have, yes.

Q.   Have you maintained your license to practice medicine?

A.   I have.  I'm licensed in both Minnesota and Wisconsin.  I haven't really used those licenses and I may let them lapse but I do currently keep those licensures.

Q.   And do you continue to hold any board

certifications?

A.   I'm still certified by the American Board of Pathology in clinical pathology, anatomic pathology and forensic pathology.  I'm one of the lucky physicians who took board certification before you had to recertify so mine is a lifetime certification.

Q.   Doctor, could I refer you quickly to page 3 of your Curriculum Vitae and the area where it says, "Areas of Special Interest and Concern."  Do you see that, Doctor?

A.   I do, yes.

Q.   Could you tell the Court what it means to have an area of special interest and concern.

A.   Well, it was something that I worked on or studied or had given presentations on or had cases that caused me to delve more deeply into some of those areas.

Q.   And I note there, Doctor, it says that one of those areas of special interest and concern is the interpretation of laboratory evidence in cases of sexual assault.

A.   That was an area that I was quite involved in for a good many years and I'm not sure I can cite the exact years.  I did the interpretations of the sexual assault testing both at St. Paul Ramsey Hospital and at Hennepin County Medical Center, those two city/county hospitals

in the Twin Cities area.  So I was the person who oversaw the testing and did the interpretations of the results.

Q.   And we'll talk about that in a little bit but is St. Paul Ramsey now considered Regions or called Regions Hospital?

A.   That's right.  It's the same institution.  It changed its name.  I'm not sure of the exact year.

Q.   I also note that there's an area there of forensic anthropology.  What is forensic anthropology?

A.   That's looking at skeletal material, and I did take a training course at the Smithsonian.  And we for the last good many years of my working at the medical examiner's office had a forensic anthropologist so I didn't really attempt do the anthropology myself but I think was able to communicate with her and discuss that kind of material with her, and that was aid in that respect but just an area that I was interested in.

MR. ABREU:  Your Honor, subject to any voir dire by the government, I would offer Dr. Peterson as an expert in the area of forensic pathology.

MR. REISENAUER:  We have no objection, Your Honor.

THE COURT:  He may testify.

MR. ABREU:  Thank you.

Q.    (Mr. Abreu continuing)  Dr. Peterson, in 2004 were you contacted about consulting in the case of the United States versus Alfonso Rodriguez?

A.    Yes, I was.

Q.    And do you recall who first contacted you?

A.    It was a Mr. Robert Hoy.

MR. ABREU:  Let me -- Your Honor, may I approach?

THE COURT:  You may.

Q.    (Mr. Abreu continuing)  I'll show you what was previously marked and admitted as Government's Exhibit CCC.

Does Your Honor have a copy?

THE COURT:  No, I don't.

MR. ABREU:  Do you mind if I share yours?

Q.    (Mr. Abreu continuing)  Doctor, do you recognize Government's Exhibit CCC?

A.    Yes.

Q.    What is that?

A.    That's a copy of the letter that Mr. Hoy sent me. It's dated July 27, 2004.

Q.    Okay.  Who else is copied -- if you look at page 2 of that letter -- or I should apologize, page 3, who else is copied on that letter?

A.    There's a CC for a Mr. Richard Ney, who is an

attorney in Wichita, Kansas.

Q.   Do you recall any separate conversations with Mr. Ney that did not involve Mr. Hoy?

A.   I don't.

Q.   Do you recall any written correspondence directly to or from Mr. Ney that did not involve Mr. Hoy?

A.   No.

Q.   Doctor, does Government's Exhibit CCC appear to be the letter wherein Mr. Hoy only retained your services and sent you materials to review?

A.   Yes.

Q.   Let me ask you to take a look at paragraph two of that, Doctor, of that letter on the first page.

A.   Yes.

Q.   Does the letter make reference to your fee rate for services?

A.   Yes.

Q.   And what is that, sir?

A.   My rate was $400 per hour at that time.

Q.   Does the letter make reference to items that were provided to you for review?

A.   Yes.

Q.   And are those set forth in paragraphs one, two, three -- or numbered I should say subparagraphs one, two, three, four, five and six?

A.   Yes.

Q.   Directing your attention to four, five and six, Doctor, is it accurate to say that you received the autopsy report of Dr. McGee?

A.   I'm looking for the number.

Q.   Four, take a look at No. 4.  On page 2, No. 4.

A.   There it is, yes, No. 4.

Q.   That would be listed as "Final Autopsy Protocol by Ramsey County Medical Examiner M.B. McGee"?

A.   Yes, I did receive that.

Q.   And you received photographs numbers P929 through P1037 as described in paragraph No. 5 or subparagraph No. 5?

A.   1037, 929 to 1037.

Q.   And photographs numbered 1126 through 1183 as set forth in subparagraph No. 6?

A.   Those are listed there too, yes.

Q.   Did you, Doctor, maintain any of the original materials that were provided to you by Mr. Hoy?

A.   No.  I either returned them or destroyed them.  I can't remember which.

Q.   Did you, Doctor, maintain any notes or recordings in any way in relation to your initial 2004 consultation in this case?

A.   No.

Q.   Doctor, can you take a look at the next set of subparagraphs which are numbered one through five?

A.   Yes.

Q.   Would those appear to be the referral questions that Mr. Hoy was posing to you?

A.   Yes.

Q.   And do the subparagraphs one through five accurately capture your recollection at least of what you were asked at that particular time?

A.   I really don't have a separate recollection at this point in time but they would appear to be, yes.

Q.   Okay.  It appears that Mr. Hoy was referring to you the question of whether it can be determined which injuries or defects found by the medical examiner were incurred pre-death or post-mortem; is that correct? That's in subparagraph one.

A.   Yes.

Q.   And whether there's a means of determining which resulted from the effects of nature, be it rodents, insects or natural decomposition, correct?

A.   Correct.  That's part of that question, yes.

Q.   Yes.  The question related to -- subparagraph two relates to "What can be learned from the 'slash wound' in her neck region as identified by the medical examiner?"  Do you see that?

A.    I do, yes.

Q.    And "Does the identified 'flap' mean she was slashed on more than one occasion?"  Do you see that?

A.    I see that question.

Q.    He also asked you whether that could "have been a fatal wound?"

A.    Yes.

Q.    And "Are the autopsy findings...explainable by natural decomposition or rodent activity?"  Do see that as well?

A.    Yes.

Q.    He asks in paragraph three whether the sexual assault examination -- of what he tells you by the way that the sexual assault examination was negative for sperm?  Do you see that.

A.    Yes.

Q.    But that acid phosphatase was found in varying levels at three locations?

A.    Yes.

Q.    And as far as you knew at that point the three locations were the cervix, vagina and anal regions; is that correct?

A.    Yes.

Q.    Okay.  And he asked you what the significance of those findings are?

A.   Yes.

Q.   He wants to know as well about the other defects for injuries found on the body at the time of autopsy?

A.   Yes.

Q.   And lastly he asks you whether there's any way to determine the time of death or whether Miss Sjodin was moved or the body was moved at any point?

A.   Yes.

Q.   Doctor, do you recall about a month after receiving -- let me stop you there for a second or stop myself there I should say.

Did you have any conversations or meetings with Mr. Hoy and/or Mr. Ney before receiving this particular letter?

A.   Well, I just don't remember.  I think we talked on the phone but I just don't have a recollection of those.

Q.   And as far as you recall this would have been the first time you received any substantive information about the case?

A.   Yes, other than some verbal summary he might have given me on the phone.

Q.   Okay.  About a month after receiving this letter do you recall getting a follow-up letter from Mr. Hoy letting you know that the Court had authorized them to

retain you to provide expert services?

A.  I think so, yes.

Q.  Let me show you, Doctor, what I'm going to mark as P-57 (indicating).  Dr. Peterson, when -- what is that document?

A.  That's a letter from Mr. Hoy dated August 19, 2004.

Q.  Okay.  And who's the letter from?

A.  It's from Robert Hoy.

Q.  And is it to you?

A.  It is, yes.

Q.  Again who else is copied on that letter?

A.  Mr. Richard Ney.

MR. ABREU:  Your Honor, at this time I would offer Petitioner's 57.

MR. REISENAUER:  No objection.

THE COURT:  Fifty-seven is received.

Q.  (Mr. Abreu continuing)  Doctor, in the very first paragraph it makes reference to -- well, I'll read it if I may.  "I write as a follow-up to my letter to you of July 27, 2004, which enclosed a variety of materials in connection with this case.  I have now obtained an Order of the Court authorizing us to retain your services as a forensic pathologist."

Do you see that?

A.  Yes, I do.

Q.  And would that be consistent with your recollection about the notification you received from Mr. Hoy?

A.  Well, the letter is.

Q.  Let me ask you about the -- what would be the second paragraph there.  Does the letter indicate the amount that the Court is authorized as payment for your services?

A.  Yes.

Q.  What does it indicate there?

A.  That there was an allocation of $800.

Q.  And does the letter make reference to a document called a CJA 31 voucher?

A.  Yes.

Q.  And does it make reference to you needing to submit that particular voucher in order to receive payment for your services?

A.  It does, yes.

Q.  Let me ask you to read, Doctor, in that middle paragraph the sentence with "This Voucher has been approved..."  Do you see that?

A.  Yes.

Q.  Can you read that, please.

A.  "This Voucher has been approved by the Court for

a maximum expenditure of $800, and if additional appropriations are required, I will need to make application to the District Court."

Q.   Is that in keeping with your recollection about what the maximum amount was that was authorized in this particular case?

A.   Yes.

Q.   And, Doctor, based on your hourly rate of $400 an hour, is it fair to say that you were authorized for a maximum of two hours of service in this case or consultation?

A.   My rate would have provided two hours.  I accepted the $800 limit at that time.

Q.   Doctor, going back to the first paragraph, it also makes reference to some additional materials that are being provided to you; is that correct?

A.   Yes.

Q.   Do you recall if those materials related to any substantive information about the case?

A.   I don't remember.

Q.   Between the time of this -- of the initial letter that you received in July 2004 and this follow-up letter a month later on August 19, 2004, do you recall any phone calls or meetings with Mr. Hoy or Mr. Ney?

A.   Not specifically, no, I don't.

Q.   Doctor, do you recall a meeting with Mr. Hoy on April 15, 2005?

A.   In general I do, yes.  I don't have any specific recollection of the content of the meeting really but I remember having the meeting.

Q.   And where did that meeting take place?

A.   When?

Q.   Where?

A.   Oh, at my home.

Q.   Your home in Minneapolis?

A.   Yes, I was retired.  I didn't have an office.  I didn't feel I could use my former office so we met there.

Q.   Do you recall who else was present at that meeting?

A.   I don't.  I've been told that Mr. Ney was there but I don't remember that.

Q.   You don't have an independent recollection of Mr. Ney being there?

A.   I don't.

Q.   Okay.  Do you have any notes or reports from that meeting yourself, sir?

A.   No.

Q.   Do you recall the purpose of that meeting?

A.   As best I can say it was just to go through the

material and help him -- help Mr. Hoy understand the material, maybe address some of those questions that he'd asked.

Q.   Do you recall how long the meeting went?

A.   No, I don't.

Q.   Between the dates you received the August 19th letter informing you of your authorization by the Court to assist in this case and that April 15th '05 meeting, do you recall any other meetings between you, Mr. Hoy and/or Mr. Ney?

A.   No.  There may have been phone calls but I don't recall any other meetings.

Q.   So do you have any specific recollection of any phone calls between August 19th of '04 and April 15th of '05?

A.   No.  I assume there were calls to set up the meeting and maybe some calls intervening but I don't remember them.

Q.   Okay.  I'll get back to that meeting shortly if I may, Doctor.

After that meeting on April 15th of '05, do you recall meeting with Mr. Hoy or Mr. Ney?

A.   No.

Q.   After that meeting on April 15th of 2005, do you recall speaking to Mr. Hoy or Mr. Ney on the phone?

A.   Not specifically but I assume I did.

Q.   Doctor, let me show you what I'm going to mark as Petitioner's 58.  Your Honor, may I?

THE COURT:  You may.

MR. ABREU:  Thank you.

Q.   (Mr. Abreu continuing)  Dr. Peterson, do you recognize Petitioner's 58?

A.   Yes.  That's a copy of my invoice.  It's dated April 15, 2005.

Q.   Okay.  And that would be the same day as the meeting with Mr. Hoy and Mr. Ney if he was present?

A.   I think that's the date, yes.

Q.   If I told you it was the day, would you have any reason to doubt it?

A.   No, I wouldn't doubt it.  I haven't memorized it.

Q.   Okay.  And who was the invoice to?

A.   It was to Robert Hoy.

Q.   Under the description -- or the area labeled "Description," Doctor, can you tell us what is written there?

A.   It says, "Time for review of photographs, autopsy report, and other materials, and consultation meeting (4/15/05), in United States v. Alfonso Rodriguez."  So the date 4/15 is actually noted in that --

Q.   Okay.

A.    -- exhibit.

Q.    And how many hours are billed there on the invoice?

A.    Two.

Q.    And what is listed under the rate?

A.    $400.

Q.    And what's listed under the total amount?

A.    $800.

Q.    And that would be consistent with the approval by the Court and your understanding of what you were going to be paid for?

A.    Yes.

Q.    Doctor, let me show you what's been previously marked as Petitioner's 52, if I may, Your Honor?

THE COURT:    You may.

MR. ABREU:    Thank you.

Q.    (Mr. Abreu continuing)  That's marked and admitted as Petitioner's 52 (indicating)?

A.    Yes.

Q.    What does that appear to you to be, Doctor?

A.    It's described as a follow-up to a telephone conversation enclosing a Supplemental Expert Disclosure regarding trial testimony by Dr. McGee.

Q.    And the letter makes reference to a recent phone call, correct?

A.    It does, yes.

Q.    Do you recall the substance of that phone call?

A.    No.

Q.    And you just mentioned it references a Supplemental Expert Disclosure; is that correct?

A.    Yes.

Q.    Let me ask you to turn to page -- well, the attachment to that particular letter, do you see that?

A.    I do, yes.

Q.    And does that attachment appear to be that Supplemental Expert Disclosure?

A.    It would appear to be, yes.

Q.    And if you'd go to page No. 2 of that Supplemental Expert Disclosure?

A.    Yes.

Q.    Do you see a section where it's entitled "United States' Summary of Opinions Dr. McGee has shared in Addition to the Information in his Reports, which are Incorporated Herein by Reference"?

A.    Yes.

Q.    And do you see seven subparagraphs that run all the way through page 3?

A.    I do, yes.

Q.    And in subparagraph one do one of those opinions that Dr. McGee shares to be -- is it to be whether Dru

Sjodin's -- well, his opinion is that "Dru Sjodin's neck was cut at least twice with a sharp-edged instrument resulting in elongated slash-type injury"?

A.   Yes.

Q.   He further opines that "These are substantially severe injuries, visually inconsistent with natural decomposition and/or animal activity."  Do you see that?

A.   Yes.

Q.   And he indicates that "These cuts were likely inflicted at the scene where the victim's body was later located."  Do you see that?

A.   I do.

Q.   And "Blood patterns and quantities on the victim's clothing and in the defendant's car are inconsistent with these injuries having been inflicted prior to transport from another location."

A.   Yes.

Q.   Do these supplemental opinions by Dr. McGee, are they consistent with the original questions that were referred to you by Mr. Hoy?

A.   I believe they are.  I could go back and compare them.  They may be further elaborations of those.

Q.   But generally they cover the exact -- well, they cover the same or similar topics you and Mr. Hoy covered previously in your 4/15/05 meeting; is that correct?

A.   That's correct.

Q.   Okay.  And No. 2 he indicates that "The slash-type cuts to the neck include notching consistent in type, size, and appearance with causation by an instrument such as" a knife.

Do you recall if you ever discussed that specifically with Mr. Hoy in your April 15th meeting?

A.   I don't.

Q.   "The right flank defect referred to in Dr. McGee's reports is inconsistent with animal activity alone due to location, depth, and directional tunneling characteristics and was initialized by sharp-object trauma."

Do you see that note in paragraph 3?

A.   Yes.

Q.   Do you recall if you discussed those issues with Mr. Hoy?

A.   I don't have an independent recollection of that.

Q.   Skip down to No. 5 where it says, "Acid phosphatase levels in the vaginal and cervical tests are elevated beyond the normal range expected under the circumstances of decomposition.  The lab results indicate the likelihood of seminal deposit at the time of death or within the preceding 24 hours."

Do you see that?

A.  Yes.

Q.  Do you recall discussing those issues?

A.  No.  I'm confident we did because that was one of the issues that I was familiar with, but I don't remember the specifics of it.

Q.  And it is consistent, however, with the referral questions that were sent to you on July 24th of 2004; is that correct?

A.  Yes.

Q.  He goes on to opine about "Defects to Dru Sjodin's lower abdomen and extremity area are only partially consistent with natural decomposition and/or animal activity.  Visual analysis of the nature of the defects, accompanying tissue, and borders does provide adequate basis for definitively concluding what initiated these defects."

Do you recall discussing the anthropophagy, or animal activity, and decomposition versus injuries that may have been inflicted otherwise at the time of your meeting with Mr. Hoy on April 15th of 2005?

A.  I don't but I expect that we did.

Q.  Do you recall that being one of the referral questions or something that was encompassed by at least one of the referral questions?

A.  Yes.

Q.   And that the "Cause of death is homicidal violence."  Do you see that?

A.   I do.

Q.   And that she "died as a direct result of the slash-type wounds inflicted to her throat, suffocation, or exposure in combination with injuries and conditions inflicted on her by her killer."  Do you see that?

A.   I see that.

Q.   And do you recall the cause of death and the manner of death being something you discussed with Mr. Hoy on April 15, 2005?

A.   Not specifically but I would assume we did.

Q.   Do you recall the cause and manner of death being one of the referral questions Mr. Hoy posed to you?

A.   Yes.

Q.   Do you, Dr. Peterson, have any documentation that establishes whether or not you ever responded to this letter sent to you on May 11, 2006?

A.   No.

Q.   Prior to receiving the letter, were you notified that the Court had ever authorized additional funding for your expert services?

A.   No.

Q.   Did you ever receive another CJA 31 form?

A.   I don't think so, no.

Q.   Do you know if anyone ever submitted another CJA 31 form on your behalf?

A.   No.

Q.   Do you have any record that reflects that you submitted another invoice for payment to Mr. Hoy?

A.   No.

Q.   Do you have any recollection of submitting any additional billing in relation to your services in this case at all?

A.   I do.  Later on I was contacted by other attorneys involved in the case but not at this phase of the case.

Q.   After trial.

A.   After the trial was over.

Q.   Okay.  Do you recall speaking to Mr. Hoy or Mr. Ney after this correspondence on May 11th of 2006?

A.   I don't have an independent recollection of it but I would assume that we made contact probably by phone.

Q.   Do you recall meeting with Mr. Hoy or Mr. Ney after this correspondence?

A.   No.

Q.   Were you called as a witness in Mr. Rodriguez's trial?

A.   No.

Q.   Doctor, in 2011 were you again contacted in relation to this case?

A.   I was, yes.

Q.   And who contacted you at that time?

A.   It was a Joseph Margulies I believe is his name. He was at I think the University of Chicago.

Q.   Okay.  And were you again provided materials to review?

A.   I was, yes.

Q.   And based on your review of those materials, did you prepare a report or a letter that you sent Professor Margulies?

A.   I did, yes.

Q.   Doctor, let me show you what I have now marked as Petitioner's Exhibit 59.  Your Honor, may I?

THE COURT:  You may.

MR. ABREU:  Thank you.

Q.   (Mr. Abreu continuing)  Dr. Peterson, do you recognize that document (indicating)?

A.   I do.  And in looking at it I notice that Joseph Margulies was at Northwestern University School of Law, not the University of Chicago.

Q.   And when is that document dated, sir?

A.   October 9, 2011.

Q.   And is that your signature on the second page?

A.   Yes.

MR. ABREU:  Your Honor, I would offer Petitioner's Exhibit 59.

MR. REISENAUER:  No objection.

THE COURT:  Fifty-nine is received.

Q.   (Mr. Abreu continuing)  Dr. Peterson, in -- in your I guess letter or report or letter to Professor Margulies, do you discuss your prior involvement in this case?

A.   I do, yes.

Q.   And would that be reflected in paragraph two of the letter?

A.   Yes.

Q.   Where it states, "I have had a very limited prior involvement with this case"?

A.   Yes.

Q.   "In 2005, I was contacted by Robert Hoy who was then representing Mr. Rodriguez"?

A.   Yes.

Q.   "He asked me to review some materials that included photographs and the autopsy report of Dru Sjodin."

A.   Yes.

Q.   "I did not retain any of the materials that I was provided.  My records indicate that I met with Mr. Hoy

on April 15, 2005.  He did not ask me to provide him with a written report and my only written correspondence to him addressed only the limited funding that was available to him for consultation, and my request that he seek additional funding if he needed any further services from me."  Do you see that?

A.  I do, yes.

Q.  Is that in keeping with your testimony here today and your recollection as far as you can --

A.  I think it is, yes.  I think the date may be wrong and I think -- it was clear that he contacted me in 2004.  So I think I was looking at probably the other material from 2005 when I put that date into the report.

Q.  Okay.  And, Doctor, as part of your consultation then in 2011 with Professor Margulies, what materials were provided to you, sir?

A.  I was given written reports of Drs. Arden, Flomenbaum and Ferenc and a disc that had autopsy photos, scene photos and autopsy report, Dr. McGee's deposition, his testimony, his Provisional Autopsy Report and a U.S. government filing it's described there.

Q.  And based on your review of those materials, Doctor, and those documents, did you provide Professor Margulies with an opinion regarding the cause and manner

of Miss Sjodin's death?

A.   Yes.

Q.   And are those opinions contained in that 2011 letter that you wrote Professor Margulies?

A.   Yes, they are.

Q.   Doctor, in that 2011 letter to Professor Margulies, to what do you attribute the defects in Miss Sjodin's body?

A.   I felt that looking at the other doctor's reports that I came into general agreement with them asphyxiation was the most likely cause of death.

Q.   And I wasn't necessarily asking yet about the cause of death, Doctor, but I was asking about the defects on Miss Sjodin's body.

A.   I'm sorry.

Q.   That's okay.

A.   I felt that they could be attributed to postmortem deterioration and animal activity.

Q.   And in your 2011 letter, Doctor, now can you tell us to what you attribute the cause and manner of her death?

A.   I agreed that the cause of death -- or the manner of death was a homicide, and asphyxiation by neck ligature was the most likely cause of death.

Q.   And, Doctor, you mentioned having read the other

expert reports and let me ask you if in formulating your opinion was it helpful to you to have the opinions of those other experts?

A.   It was.

Q.   Can you tell us why and tell the Court why?

A.   Well, they're eminent people and looking at their opinions and their way of working through it I think was very helpful.  And I think the reports were more extensive and involved more time than I was able to spend initially.

Q.   Let me ask you this, Doctor.  Is it uncommon for forensic pathologists to confer with peers in order to formulate opinions?

A.   It depends.  Sometimes the attorneys involved ask you not to talk to someone.  Other times you will contact other colleagues and ask them their interpretation or how they take a particular finding or question.

Q.   Well, let me ask you in terms of your practice as a medical examiner when you were practicing is really what I was asking, whether you -- was it a normal part of your practice to confer with colleagues in formulating opinions?

A.   Yes.  We had a signout activity where we would sign the cases, basically confer.  Difficult cases we'd

have a special conference where we would review them together and arrive at a consensus on them.

Q.   Doctor, I also note that in your 2011 report you could not and did not completely exclude the possibility of sharp force injury; is that correct?

A.   Yes.  Can you help me find that?

Q.   Yes.

A.   I've read it recently but --

Q.   Second page, the top -- partial paragraph at the top of the second page.

A.   I see it now.

Q.   The last sentence there, do you see it?

A.   Yes.

Q.   It says, "I do not believe that sharp force or other injuries at these sites can be completely excluded, but postmortem depredation and extensive tissue loss would make the existence of any such injuries no more than speculation."

          Do you see that?

A.   I see that.

Q.   Doctor, why is it that you could not completely exclude the possibility of sharp force injuries according to this letter?

A.   There's a great deal of tissue loss there.  There are structures that are not present.  There are areas

that just cannot be evaluated because they're not there or they've been altered by the various processes.

Q. Doctor, in 2016 were you again contacted about this case?

A. Yes.

Q. And who were you contacted by at that time?

A. I received a phone call from Mr. Luby.

Q. Okay. Mr. Luby to my right here?

A. Yes.

Q. And were you again provided materials to review?

A. I was, yes.

Q. Doctor, let me show you what I am now marking as Petitioner's Exhibit 60.

MR. ABREU: Your Honor, may I?

THE COURT: You may.

Q. (Mr. Abreu continuing) Do you recognize that document (indicating)?

A. I do, yes.

Q. When is it dated?

A. February 2, 2017.

Q. And what is that document?

A. It's a letter from me to you and to Mr. Luby.

MR. ABREU: Petitioner would offer Exhibit 60, Your Honor.

MR. REISENAUER: No objection.

THE COURT:  Sixty is received.

MR. ABREU:  Thank you.

Q.  (Mr. Abreu continuing)  Dr. Peterson, in the second paragraph there, there's the -- the document indicates what materials were provided for your review?

A.  Yes.

Q.  Can you tell us what you were provided at that time?

A.  That the previously reviewed material was made available and then you provided additional material, a report by Dr. Dragovic and The Forensic Panel, an addendum by Dr. Flomenbaum, a portion of an interview with a Dr. Michael Welner, and testimony by Dr. George Sensabaugh, and some laboratory reports from a Steven Fischer of the Minnesota Bureau of Criminal Apprehension.

Q.  Does the letter indicate that they were bench notes accompanying that lab report from Mr. Fischer?

A.  Yes.

Q.  And based on your review of those materials, Doctor, were you able to provide opinions to Mr. Luby and myself and are they contained in that February 2, 2017 letter?

A.  Yes, they are.

Q.  Let me just briefly ask you about those

conclusions if I may, Doctor, and in particular when you talk about the defects to Miss Sjodin's body. Based on your review of those additional materials, did your opinion regarding the cause of those defects in Miss Sjodin's body change at all?

A. I don't think so, no.

Q. Okay. Based on your review of those materials, Doctor, did your opinion change regarding the cause and manner of Miss Sjodin's death?

A. No, I don't think so. I continued and always believed it to be a homicide. And I said that the asphyxiation by ligature remained a possible cause of death and I could not rule out Dr. Dragovic's conclusion that there was asphyxia brought on by direct pressure and that I -- I don't think I could also rule out the possibility of sharp force injury. I'm not sure it's stated there specifically but I've never totally rejected that.

Q. Okay. Doctor, let me ask you about an area in the 2017 letter that is not addressed in the 2011 letter or in your -- in the 2011 letter, should I say, and that's the evidence of the alleged semen.

A. Yes.

Q. And Dr. McGee's testimony that the AP levels indicated on the cervical and vaginal swabs supported

the presence of semen or established the presence of semen which was deposited within 24 to 36 hours of Miss Sjodin's death.

A.   Could you help me find that?

Q.   I'm sorry?

A.   That's on page 3, isn't it?

Q.   That is beginning on -- well, beginning on page 2, if I may, and concluding on page 3.

But before we go there, Doctor, let me ask you, are you familiar with acid phosphatase or also known as AP?

A.   Yes.

Q.   And where is AP, acid phosphatase, found?

A.   "Acid phosphatase" is a term that refers to actually several enzymes.  There are enzymes that split phosphate groups from phosphates in biochemical reactions, acid phosphatase being one that does it in an acid environment.

Q.   And I apologize, Your Honor, I was distracted for a second but did you mention if -- Doctor, if acid phosphatase is found in both men and women?

A.   I didn't address that yet.  One of the major sources is the prostate gland of the male but acid phosphatase activity is present in both male and female but in a much, much higher -- to a much higher degree in

the male in the seminal fluid.

Q.   Doctor, you mentioned that -- your CV states that you had a special interest in the use of different tests to determine the presence of and/or, you know, their relativeness in terms of identifying sexual assault cases; is that correct?

A.   Yes.

Q.   And what particular interest -- or of what value is acid phosphatase in determining whether or not there was a sexual assault?

A.   Acid phosphatase is often helpful.  It's present in semen.  Semen is made up of the male sperm cells but the fluid in which they're suspended has a number of constituents, among which is acid phosphatase.  And so that's often used as a marker to identify seminal stains.

Q.   And when you say it's identified "as a marker," is that a presumptive or definitive marker?

A.   Generally it's presumptive.  In very, very high levels it's pretty definitive.

MR. REISENAUER:  I didn't hear that answer, if that could be --

THE WITNESS:  I'm sorry.  In very, very high levels it's -- I think would be considered definitive in very high levels.

Q.    (Mr. Abreu continuing)  What would you consider, Doctor, very high levels?

A.    Hundreds or thousands of units.  I don't remember the specific numerical values anymore, but you would get to certain values that were so high that the testing would no longer be linear and so at those levels it would be a reasonable assumption that it was male secretion.

Q.    At the time of your initial consultation with Mr. Hoy in 2004 and 2005, were you informed that Regions Hospital had conducted sperm searches on the vaginal, anal and cervical swabs and that those were negative?

A.    I don't have a specific recollection.  I just don't remember.  It's likely I was, that that was discussed.

MR. ABREU:  Let me go back and show you -- may I have a second, Your Honor?

THE COURT:  You may.

MR. ABREU:  Thank you.

THE WITNESS:  If I might, I think I found the areas.  It's CCC and page 2 and it's No. 3.  It does address that.

Q.    (Mr. Abreu continuing)  Okay.  Thank you.  As a forensic pathologist, Dr. Peterson, how would you factor in a negative sperm search when attempting to identify

semen in a sample with elevated acid phosphatase levels?

A.  Well, you have to look at the time interval and other factors and then try to come to a conclusion about whether male secretion is there I guess you could say with reasonable medical certainty or you can't tell or that the test is negative.

Q.  It would be fair to say that you would not be able to conclude necessarily one way or another for certain if semen was present just on the absence of sperm.

A.  Well, again it depends on the time, the condition, whether it's postmortem.  All those other factors would be taken into consideration.

Q.  Let me show you, Doctor, what was previously marked and admitted as Petitioner's 7.  May I, Your Honor?

THE COURT:  You may.

Q.  (Mr. Abreu continuing)  Doctor, I've shown you a copy of a report dated December 19, 2005?

A.  Yes.

Q.  Related to -- from the Minnesota Department of -- the Minnesota BCA, Criminal Apprehension, Bureau of Criminal Apprehension (indicating).  Do you see that?

A.  I do, yes.

Q.  And let me ask you to turn to the third of five

pages.

A.   Yes.

Q.   Towards the bottom it indicates -- third from the bottom, paragraph third from the bottom, that "No male DNA was obtained from Items 74, 86A (vaginal swabs), 86B (anal swabs) or 86C (cervical swabs)."  Do you see that?

A.   Do I see that?  Yes.

Q.   Now as this report was dated December 19th of 2005, it's fair to say you didn't have this report at the time of your meeting with Mr. Hoy on April 15th of 2005.

A.   I would not have had that.

Q.   And did you not have this report at the time that you conducted -- that you first received materials in July of 2004?

A.   I did not receive it, yes.

Q.   Do you recall if at any point during your involvement in 2004-2005 you came to learn that testing from male DNA was negative on all the samples?

A.   In 2004 or '5?  I don't recall that, no.

Q.   Are the findings, Doctor, that the sperm search was negative and that the search for any male DNA on either the vaginal, cervical or anal swabs, are those factors significant to you as a forensic pathologist in determining the presence or absence of semen?

A.   Yes.

Q.   Can you explain that, please.

A.   The negativity of the male DNA would indicate that male sperm cells were not there.

Q.   Could it also indicate the absence of male epithelial cells?

A.   It could, yes.

Q.   Based on the evidence that was mailed to you at the time of your consultation in 2004 and 2005, Doctor -- again I'm going to ask you to put aside any reference to p30 which we'll talk about in a second, just based on what was known to you in -- or what was known I shouldn't say "to you," what was known in 2004-2005 that there was a negative sperm search and a negative male DNA search, what's your opinion on whether a forensic pathologist could conclude with a reasonable degree of medical certainty that semen was present on the tested swabs under those circumstances?

A.   I would disagree that you could make that conclusion.

Q.   Doctor, you mentioned earlier that you did some training at St. Paul Ramsey Hospital?

A.   I did, yes.

Q.   And you indicated as well that that is now known as Regions Hospital; is that correct?

A.  That's right.

Q.  Do you know how long ago it became Regions Hospital?

A.  I don't.  It was a good many years ago but I don't know the specific year.

Q.  Doctor, during the time at Regions Hospital, did you have some familiarity with acid phosphatase testing there?

A.  Yes.

Q.  And in what manner and what capacity?

A.  There was a time when I was involved in signing out sexual assault laboratory testing for patients who came to the hospital complaining of sexual assault.

Q.  So based on your understanding of how acid phosphatase was used at Regions Hospital, then St. Paul Ramsey Hospital, and how those results were interpreted, do you have an opinion about Dr. McGee's conclusion that the elevated acid phosphatase levels alone, based on Regions Hospital testing, indicated the presence of semen?

A.  I do.

Q.  Can you tell us what that is?

A.  In postmortem specimens those levels go up and so the test becomes unreliable and does not permit you to make that conclusion.

Q.   Was the AP testing done at Regions Hospital, or St. Paul Ramsey as it was known when you were there, was that meant to be used on nonliving bodies or individuals?

A.   No, it was a hospital test.  It was a test used to guide the physicians who were treating those patients.

Q.   As part of your consultation with my office in 2016 and 2017, Doctor, were you provided with the results of p30 testing done by the Minnesota Bureau of Criminal Apprehension in 2004?

A.   Yes.

Q.   Prior to receiving it in 2016 from my office, had you ever been provided with a copy of p30 results from the Minnesota BCA?

A.   I don't think so.  I don't remember seeing those.

Q.   Let me show you, Doctor, what is previously marked as Petitioner's Exhibit 4.  Your Honor, may I?

THE COURT:  You may.

Q.   (Mr. Abreu continuing)  Dr. Peterson, do you recognize that document (indicating)?

A.   It's the physical evidence examination report from the BCA.

Q.   What's the report numbered there?  Is it Report No. 10?

A.    No. 10, yes.

Q.    And before we discuss that report, Doctor, what is p30?

A.    P30 is a biological substance.  It's also known as prostate-specific antigen.  It's used as a hospital test and as an identifier for male secretion.

Q.    Let me ask you, Doctor, to turn to the final page in that Petitioner's Exhibit 4.  Are you there, Doctor?

A.    I'm on the last page.

Q.    My apologies.  Under the column that's listed for "p30," do you see that?

A.    I do.

Q.    Do you see what the results of the testing are in relation to 86A, 86B and 86C?

A.    I do.

Q.    And what is that?

A.    They're indicated as being negative.

Q.    Okay.  Doctor, how do the p30 results or the negative p30 results impact your opinion regarding the allegation that semen was detected on any of these swabs?

A.    Again they provide the information.  P30 is a more specific test that has better stability and so again they support the negativity.

Q.    And given, Doctor, the negative sperm search, the

negative male DNA testing and the negative p30 results which are now known to you, is there any basis in your opinion upon which a forensic pathologist could conclude that there was semen on any of the tested swabs?

A.   No, I don't think so.

Q.   And is that so despite the acid phosphatase levels that were detected in this case?

A.   Yes.

Q.   Let me ask you about the -- do you recall testimony from Dr. McGee indicating that he had observed a globule which he claimed was semen?

A.   I remember reading that, yes.

Q.   What's your opinion, Dr. Peterson, regarding whether a globule of semen, as described by Dr. McGee, would maintain its viscosity five months after being ejaculated and deposited in a vaginal cavity?

A.   I'm confident it wouldn't remain in globular form.   It would just liquify and disappear.

Q.   Can you explain that?

A.   What?

Q.   Can you explain that?

A.   Semen very quickly liquifies.   In fact, I believe it's related to this prostate-specific antigen that allows that to liquify and helps in the process of conception.

Q.   Doctor, let me go back and touch on the April 15, 2005 meeting, if I may.

A.   Yes.

Q.   You indicated that you didn't have any independent recollection of the specifics that you discussed with Mr. Hoy and Mr. Ney at that meeting.  Do you recall that?

A.   Yes, I do.

Q.   And I believe you also indicated that the purpose of the meeting was to familiarize Mr. Hoy with the reports as they existed at that time?

A.   That's my general recollection, yes.

Q.   Do you recall the specific questions that were posed to you by Mr. Hoy or Mr. Ney, if he was present?

A.   No, I don't.

Q.   Given the amount of time that you were authorized to work on the case, could you have rendered at that time complete and final opinions with regard to -- with any degree of medical certainty?

A.   I don't think so, no.

Q.   Were you expecting, Doctor, that you would have further consultations and review if you were going to be asked to issue any final conclusions?

A.   Yes.

Q.   Did you at that time, Doctor, see any evidence in

the photos upon which you could definitively conclude that the defects on Miss Sjodin's body were incised wounds?

A.    There were photos that were suggestive of incised wounds and I basically accepted Dr. McGee's interpretation based on what those photos showed.

Q.    And I guess what I'm asking is could you definitively conclude that the injuries or defects were caused by a sharp force or incised wounds at that time?

A.    Well, there was a lot of damage there and so I don't remember specifically how I would have expressed it at that meeting.

Q.    Do you remember being deposed earlier this year by the government?

A.    I do, yes.

Q.    And do you remember being asked some specific questions about notes related to that April 15, 2005 meeting with Mr. Hoy?

A.    Yes, there were some notes that he had made apparently.

Q.    Let me show you what has been previously marked and admitted as Petitioner's 51 (indicating).  Your Honor?

THE COURT:  You may.

MR. ABREU:  Thank you.

Q.   (Mr. Abreu continuing)  That's not your handwriting, is it, Doctor?

A.   No.

Q.   Do you remember being asked about these particular notes at that deposition?

A.   I do, yes.

Q.   Let me just ask you a few questions based on these notes.  If you look at page 1 there, Doctor, at the very top, and I'll do my best to read these as well, it says, "Use of 'homicidal violence' perhaps code word for 'killed' but we're not really sure how."  Do you see that?

A.   I do see that, yes.

Q.   Right under where it says "Review of Autopsy Report"?

A.   Yes.

Q.   Do you have an independent recollection of telling that to Mr. Hoy?

A.   No, I don't.

Q.   Do you recall the question from Mr. Hoy or Mr. Ney that may have prompted that particular response?

A.   No.

Q.   Slightly below that there's a notation that says, "Dr. McGee" underlined, "a little egotistical, perhaps defensive but will get more certain if challenged."  Do

you see that?

A. Yes.

Q. Do you recall -- do you have an independent recollection of telling that to Mr. Hoy?

A. No, I don't.

Q. Do you recall the question from Mr. Hoy or Mr. Ney that may have prompted that response?

A. No, I don't.

Q. Further down the page there's a reference to "neck ligature" and it's underlined.

A. Yes.

Q. Do you see that?  And it says, "calculate circumference" around 10 inches plus or minus, "pretty small" exclamation point.  "May have been some neck compression element in this" exclamation point.  Do you see that?

A. I do, yes.

Q. Doctor, why is that significant, the fact that there may have been some neck compression here?

A. Well, that in itself could be the cause of death.

Q. And do you have any independent recollection of telling that to Mr. Hoy?

A. No, I don't.

Q. Or any independent recollection of the question that may have prompted that response?

A.   No.

Q.   Turning to the second page, Doctor, the very top, it says, "Nothing definite to say whether she died from asphyxiation or a slashed throat.  Betting..." and "betting" is in quotations, "perhaps asphyxiated."  Do you see that?

A.   I do, yes.

Q.   Is that, Doctor, consistent with your opinions as they stand today?

A.   Yes, they are -- yes, it is.

Q.   And do you have any independent recollection of telling that to Mr. Hoy?

A.   No, I don't.

Q.   Or any independent recollection of the question that may have prompted that response?

A.   No.

Q.   Further down it says regarding "photo 1182 shows hole in throat or throat area.  Probably knife."  Do you see that?

A.   I do.

Q.   Any independent recollection of telling that to Mr. Hoy?

A.   No.

Q.   Or the question that may have prompted that response?

A.    No.

Q.    Further down it says regarding "photo 1180" I believe.

A.    I see that, yes.

Q.    "Upside down.  Clearly shows cut of throat area, probably two times."  See that?

A.    I see that, yes.

Q.    Do you have an independent recollection of telling that to Mr. Hoy?

A.    No.

Q.    Or of the question that may have prompted that response?

A.    No.

Q.    Let me ask you this, Doctor.  The indication that states "probably two times," is that based on materials that were provided to you for your review?  Did you see any indications in the photos that her throat might have been cut two times?

A.    There was a strip, some irregularity in sharp edges and that's probably -- I recollect that and that may have been what prompted that.

Q.    Is there anything in Dr. McGee's autopsy report that suggests more than one cut or the number of cuts?

A.    I think there is a paragraph in there that it's a little difficult to understand.  I think the photos

probably are more helpful than his description.

Q.   And do you recall reading Dr. McGee's trial testimony?

A.   I did.

Q.   And if I can refer everyone to page 6688 which would be Dr. McGee's trial testimony on August 28 of 2006, Volume 29.  And on page 6688, Doctor, it states starting at line 24:  "She has a large gaping wound to her neck area caused by a sharp-edged instrument that extends across her entire anterior neck region measuring 13.5 centimeters in length.  That is about five and a half, five and a quarter inches.  A second possible incision wound was observed to the left neck region measuring eight centimeters in length, about three inches in length."

A.   Yes.

Q.   Do you recall that testimony?

A.   Yes.

Q.   Two different incisions according to Dr. McGee, one about 13 and a half centimeters in length and the other measuring eight centimeters in length.  Do you recall that?

A.   Yes.

Q.   Let me show you, Doctor, if I may what was previously marked and admitted as Petitioner's Exhibit

16.  Your Honor?

THE COURT:  You may.

MR. ABREU:  Thank you.

Q.  (Mr. Abreu continuing)  And let me refer you, if I may, to page 6 of that document.  By the way, what is that document, sir?

A.  That's the Final Autopsy Protocol from the Ramsey County Medical Examiner's Office.

Q.  And let me read to you, if I may, under the area where it says "neck."  Do you see that?

A.  I do.

Q.  Page 6 it states:  "Remnants of an elongated slash-type wound can be observed on the anterior surface of the neck region.  The superior margin of this wound is unavailable for examination with tissue loss observed and extends superiorly to the inferior margin of the mandible.  The inferior margin of this wound can be observed beginning at a point 9.5 centimeters to the right of the anterior mid-sagital line and five centimeters distal to the right external auditory canal and extends in an elliptical path across the anterior surface of the neck for a distance of 13.5 centimeters."  Do you see that?

A.  Yes.

Q.  And would that be consistent with what Dr. McGee

testified to was the first slash wound?

A.  Yes.

Q.  Let me continue reading, "...with a distinct margin that exhibits notching at and ends on an elongated and separated portion of tissue that can be extended onto the left lateral aspect of the neck region.  This portion of tissue measures 0.8 centimeters in width with second parallel appearing margin that extends distally over the left lateral aspect of the neck region for a length of 8.0 centimeters before ending at the base of the neck on the left side in an area of tissue loss that measures 2.5 x 4.5 centimeters."

Doctor, my question is:  Would that be consistent with what Dr. McGee describes as the second slash wound?

A.  I think so.  That's my interpretation.

Q.  And that's in his 2004 autopsy report, correct?  Or it's actually not dated but it is in his autopsy report?

A.  I see the date of the exam.  I'm just looking at the date of the report, if there's a report date on here.

Q.  I'm not sure it's dated, but is that the autopsy report that you had at the time of your initial

consultation and evaluation --

A.   It would be, yes.  And I would assume that this was prepared in 2004.  I just don't see a date on it at my fingertips.

Q.   And we're almost done, Doctor.  Let me just ask you a few more questions about the notes in your meeting back on April 15th, if I may.

Turning to what would be page 3 now of those notes, do you see where it mentions photo 1165 at the top of what was page 3?

A.   Yes, I do.

Q.   And it says, "Exactly where throat cut the laceration or ligature is not very clear."  Do you see that?

A.   I see that.

Q.   Do you recall the question from Mr. Hoy that prompted that response?

A.   No.

Q.   And do you have any independent recollection of telling that to Mr. Hoy?

A.   This does not refresh my recollection.

Q.   A little further down it says, "If he had to opine a cause of death, he would say incised the neck but not certain; could have been strangulation with ligature."  Do you see that?

A.  I see that, yes.

Q.  Is that consistent with your opinions today?

A.  It would be, yes.

Q.  And do you have any independent recollection of telling that to Mr. Hoy?

A.  Except that, you know, it says my -- that I would have chosen incised wound to the neck first.  I mean, I still include that as a possibility.  I think at this point in time I believe that asphyxia is a more likely explanation but I don't think I've ever excluded either one.

Q.  And do you recall the question from Mr. Hoy that -- or Mr. Ney that may have prompted that particular response?

A.  No.

Q.  Okay.  A little further down on that page, Doctor, you discuss acid phosphatase.  Do you see that?

A.  Yes.

Q.  And there's an area that's blocked off to the left that says, "Regions Hospital the numbers can be higher than other labs."  Do you see that?

A.  Yes.

Q.  Is that consistent with your experience having worked at then St. Paul Ramsey Hospital, which was subsequently renamed Regions Hospital?

A.   Yes.   The laboratory at St. Paul Ramsey and Regions to my recollection used a different substrate in the testing and so the numbers were not interchangeable. They were higher in the testing method used at Ramsey.

Q.   And would -- generally talking about the area here where it says "acid phosphatase" and right at the very bottom of that page, Doctor, there's a notation that says:   "Postmortem cell breakdown will cause increase in acid phosphatase levels."

Do you see that?

A.   I do.

Q.   Is that consistent with your understanding of the -- with acid phosphatase and how it responds in human bodies?

A.   Yes.   Lysosomes in the cells contain acid phosphatase.   That's one of the pitfalls in making those determinations.

Q.   Turning to the next page, Doctor, do you see that?

A.   Yes.

Q.   There is again toward the top a section that seems to be blocked off by two lines that says "Sources shown are w/in expected levels in post-mortem sample. 'Inconclusive' result now."

Do you see that?

A.  I'm missing that, I'm sorry.

MR. ABREU:  May I approach, Your Honor?

THE COURT:  Yeah, you can.  If you look at it, it's about the sixth line down from the top.

THE WITNESS:  Okay.  And I'm just hoping I'm on the right page here.

(Mr. Abreu indicating.)

A.  Yeah, I see it now.

Q.  And I'll repeat it for you, Doctor.

A.  Okay.

Q.  It says, "Sources shown are w/in expected levels in post-mortem samples.  'Inconclusive' results now."  Do you see that?

A.  I see that now, yes.

Q.  And is that consistent with your understanding of acid phosphatase?

A.  It is, yes.

Q.  And that "inconclusive results now" would be before you learned that there were negative sperm searches, negative male chrom- -- male DNA searches and negative p30; is that correct?

A.  Yes.

Q.  Going down a little further, Doctor, it mentions a photo 1183 I believe.

A.  Yes.

Q. And it says, "Right flank defect unknown origin pointy ends mean probably incised, rounded edges mean possible animal activity.  His opinion is 'incised wound.'"  Do you see that?

A. Yes.

Q. Do you have any independent recollection of telling that to Mr. Hoy?

A. No.

Q. Do you recall the question from Mr. Hoy and Mr. Ney that may have prompted that particular response?

A. No.

Q. Turning to the next page, Doctor, right towards the middle of that page it says, "Opinions to 'Reasonable Medical Certainty.'"  Do you see that?

A. Yes.

Q. It says, "1) throat" and then in parentheses "(2)" and then there's a number 2 below that and it says, "right flank" and below that there's a number 3 that says, "right upper thigh," and then number 4 which says, "perhaps pubis."  And it's all bracketed but then two lines which say, "All incised wounds" exclamation point.  Do you see that?

A. Yes.

Q. Do you, Dr. Peterson, have any independent recollection of telling that to Mr. Hoy?

A.   No.

Q.   Do you recall the question from Mr. Hoy or Mr. Ney that may have prompted that response?

A.   No.

Q.   Do you believe at that time, Doctor, you had enough information and/or time to draw conclusions with any reasonable medical certainty?

A.   I don't know the question.  It could have been: Is it consistent with that?  I don't know the basis of those statements, if indeed they're mine.

Q.   Turning to the last page, Doctor, if I may, it says, "Dr. Mike McGee considers himself an expert on knife wounds (may not be as good as he thinks)."  Do you see that?

A.   Yes.

Q.   Do you have any independent recollection of telling that to Mr. Hoy?

A.   Not specifically but that was one of my beliefs. I still believe that.

Q.   And any independent recollection of the question that may have prompted that response?

A.   No.

Q.   Doctor, taking a look at these notes on whole, you start on page 2 with "betting on asphyxiation" and then what appears to be you opining with medical

certainty about incised wounds on page 5.  How do you reconcile those two things?

A.   Well, again the question -- it depends on the structure of the question.  Are these consistent with, I just don't know the question.  And all these notes do not refresh my recollection.  I just see them as something someone else wrote.

Q.   And as you testified, Doctor, after this particular meeting where these notes were made, Mr. Hoy reached out to you again seeking your assistance on this matter, correct?

A.   He sent a follow-up, yes.

Q.   Doctor, you've already told us that had you been provided all of the materials you have now reviewed and had you been called as a witness -- no, my apology.  We have -- you have not told us that yet.

Let me ask this question.  Are all the opinions, Doctor, expressed today and in two reports and in your deposition testimony earlier this year expressed to a reasonable degree of medical certainty?

A.   Yes.

Q.   And had you been called as a witness at the 2006 Daubert hearing in this case, would you have provided Judge Erickson with the opinions expressed today and in your report and in your deposition, two reports I should

say and in your deposition testimony?

A.   Yes.

Q.   And had you been called to testify at Mr. Rodriguez's trial in 2006, would you have provided the jury with the same opinions and conclusions you provided in your deposition testimony, your two reports and your testimony here today?

A.   I would have if I'd have had all the information that I later had.

Q.   After reviewing these notes, Mr. Hoy's notes, which are not your notes, about that 2005 consultation, are these things still true that you would provide the jury with the same information you provided in your deposition testimony, your two reports and your testimony here today?

A.   I've never testified to a jury on this.

Q.   No.  I'm saying if you had been called.

A.   Oh, I think so.  The best I can -- the best I can imagine, yes.

MR. ABREU:  That's all I have, Your Honor.

THE COURT:  All right.  We'll break at this point for 20 minutes.  We'll stand in recess until 10 to 11:00.

(Recess taken; 10:30 a.m. to 10:50 a.m.)

THE COURT:  We are back on the record in a

case entitled United States of America versus Rodriguez. The counsel of record are all still present. Dr. Peterson remains on the stand.  Mr. Reisenauer is about to commence with a cross-examination.

You may proceed, sir.

MR. REISENAUER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Doctor, could you find Petitioner's 56 in front of you?  That's your CV I believe.

A.  Yes.

Q.  Do you have it there?

A.  I do, yes.

Q.  Okay.  Just on the front page you talk about your occupation and counsel earlier asked you the questions. You've said that you had worked at St. Paul Ramsey Hospital; is that correct?

A.  Yes.

Q.  Okay.  And that's called Regions Hospital now?

A.  The name was changed, yes.

Q.  Okay.  And you worked there in 1975 through '78. Am I reading that correctly?

A.  (No response.)

Q.  Towards the bottom of the page?

A.  '75-76, yes.

Q.   It says '75 to '76 you were a pathologist at the hospital and '76 to '78 you were an attending pathologist, correct?

A.   That's right, yes.

Q.   That's when you worked there?

A.   That's what?

Q.   That's when you worked there, correct?

A.   During those years, yes.  '75-76 that was my main position and then when I went to Mounds Park Hospital, which is shown up at the top of that column.  I was the pathologist there but I also had responsibilities at St. Paul Ramsey.

Q.   Okay.  So back in 1976 to '78, that's when you were working at the hospital.

A.   Yes.

Q.   Okay.

A.   I did have responsibilities signing out sexual assault exams after that.  I don't think that's listed on there and I don't remember those years but that extended for a while beyond that.  I did some testimony and so on.

Q.   Thank you, Doctor.  Let's talk about a couple of other exhibits I think that are in front of you.

A.   Okay.

Q.   If you would pull CCC.  Is that in front of you?

A.    I have it here.

Q.    Okay.  And then Petitioner's 59?

A.    I have them both.

Q.    Okay.  Let's look at CCC first, if we could.  And that's the letter from Mr. Hoy to you sending you various documents for review, correct?

A.    Yes.

Q.    Okay.  And let's just run through that here. No. 1 is a federal Indictment charging Mr. Rodriguez. You see that?

A.    I do.

Q.    And a Lab Report No. 7, correct?

A.    I see that, yes.

Q.    Okay.  And then turn to the next page, No. 4, the Final Autopsy Protocol, correct?

A.    Yes.

Q.    No. 5, a number of photographs from the crime scene, correct?

A.    Correct.

Q.    And then No. 6, a number of photographs from the Ramsey County Medical Examiner's Office that pertain to the autopsy; is that correct?

A.    Yes.

Q.    And then if you would just go to Petitioner's 59, okay?

A.   Yes.

Q.   And this is a letter that apparently you wrote, correct?

A.   Yes.

Q.   And you were writing to Professor Margulies and you indicate there at the -- towards the bottom of the first page that apparently Mr. Margulies, about two or three weeks before that, had sent you a number of items. Do you see that?

A.   I do, yes.

Q.   Okay.  And there you were provided under No. 2 the autopsy photos, the crime scene photos, the autopsy report, and apparently you also then received Dr. McGee's deposition and testimony, correct?

A.   Yes.

Q.   So would you agree with me that essentially you were provided the same information by Mr. Margulies that Mr. Hoy had given you other than obviously Dr. McGee's deposition and testimony; is that right?

A.   Well, I had the reports of Drs. Arden, Flomenbaum and Ferenc, too.

Q.   All right.  You had those reports provided to you and obviously they weren't part of this case back in 2004 when Mr. Hoy sent you the documents.

A.   No.

Q.   Okay.  Thank you.  Counsel asked you a number of questions about acid phosphatase and some questions about p30.  Do you know Dr. George Sensabaugh?

A.   I do.  Yes, I do.

Q.   Would you agree that he is a very well-known scientist in this particular area?

A.   I have a great deal of respect for him.

Q.   And you're aware he testified in the Daubert hearing and the trial in this case?

A.   Yes.  I haven't reviewed it recently but I think I read that testimony at some point.

Q.   Okay.  Do you know Mr. -- or Dr. Edward Blake?

A.   I do, yes.

Q.   Okay.  And would you agree he's a well-known scientist in this field as well?

A.   Yes.

Q.   Do you know Dr. Dean Stetler?

A.   I don't think so.

Q.   Okay.

A.   I'm not sure that I do.  I don't think so.

Q.   Let's do this, Dr. Peterson.  Do you recall when you first were contacted by Mr. Hoy about possibly being a consultant on this case at all?

A.   I don't have a specific recollection.  I think only what's reflected in the information.  I don't

recall the telephone call.

Q. And you -- whatever notes or materials you had in this case you've destroyed; is that correct?

A. I did. When the case was finished, and it probably was maybe a couple, three years later, I was cleaning things up and probably shredded those things. I either discarded them at that time, shredded them, or I may have sent them to Mr. Hoy. But I think I probably shredded them. I didn't want to have them in my possession.

Q. So you have no notes or documents to provide to us in regard to your consultation with Mr. Hoy, correct?

A. I don't, no.

Q. I'm going to hand you, Doctor, what's been previously entered as Government's Exhibit BBB. These are notes of Mr. Hoy's that he testified to yesterday.

A. Okay.

Q. And if you could in the middle of that paper page, and I'll help you here, there's a notation of a phone conference on July 23rd of 2004 and says with "Dr. Garry Peterson." Do you see that?

A. I do, yes.

Q. Okay. And there's a notation there that reads: "Wants to think on it over the weekend." Do you see that?

A.    I do.

Q.    Okay.  And so from your recollection that's July 23rd of '04.  If you recall would that have been around the time that you were first contacted by Mr. Hoy?

A.    Yes, I think so.

Q.    Okay.  And then right after that there's another notation and that says phone conference July 26 of '04 and it says, "OK to go."  Do you see that?

A.    Yes.

Q.    And do you recall, Doctor, that you had a conversation with Mr. Hoy and that you did, in fact, want to think about the consultation and then you agreed to do so?

A.    I don't remember that but I guess I wouldn't refute it.

Q.    Okay.  And then shortly thereafter, as a matter of fact the next day if I refer you back to triple C, Mr. Hoy sent you a number of items that are reflected in that letter in Government's Exhibit CCC, correct?

A.    Yes.  The 26th was when I apparently agreed to look at the case and the 27th is the date of the letter.

Q.    So he was very prompt on getting you the materials, correct?

A.    He was.

Q.   And then, as counsel asked you, Mr. Hoy asked you to review those items and he posed a number of questions to you in regard to the particular case for your review, correct?

A.   Right.  I do want to add because I just spotted that he said, "At this point, there is no immediacy required..."  So I think he sent the materials but didn't insist that I -- that I had time or some latitude in taking the time to look at them.

Q.   In fact, if you turn to the third page there he says, "At this point, I would prefer not to receive any written reports following your evaluation.  Instead, I would prefer a telephone call once you have had an opportunity to assemble your thoughts, so we could be informed of your impressions and decide how best to proceed hereafter."  You see that?

A.   I do.

Q.   Did you ever to your recollection provide Mr. Hoy with a written report of your evaluation?

A.   I'm confident I never did.

Q.   You're confident that you never did?

A.   I don't think I did, no.

Q.   So if you would, Doctor, find Petitioner's 51 and if we could let's talk about that briefly, okay?

A.   I'm looking for it.  Got it.

Q.   Okay.   Those are notes from your meeting of April 15th of 2005 with Mr. Hoy and Mr. Ney, correct?

A.   Apparently, yes.   I didn't make them.

Q.   Okay.   Did you take notes that day to your recollection?

A.   I don't think so.   I don't recall taking any.   I don't know.   I don't have any.

Q.   Okay.   So counsel went through this but I have a few more questions, if I could.   Initially counsel asked you about the second line there that says, "Use of 'homicidal violence' perhaps code word for 'killed' but we're not really sure how."

        Would that be something you would have told Mr. Hoy?

A.   It's quite likely it was.

Q.   Have you not used that term in your pathology experience?

A.   I think I've used it occasionally.   Not very often but occasionally, yes.

Q.   Okay.   And you received the reports of Dr. Arden and Dr. Flomenbaum and Dr. Ferenc and also Dr. Dragovic at this point, correct?

A.   I have, yes.

Q.   Okay.   And do you recall that one or more of those doctors had also used the term "homicidal

violence" in this case?

A.  I don't remember.

Q.  Let's go to the bottom part of that page where it says "neck ligature."  You see that?

A.  I do, yes.

Q.  And you've talked there about the calculation of the circumference; is that right?

A.  He does.  That's mentioned there.

Q.  Okay.  Well, did you calculate the circumference of the neck ligature?  Do you recall that?

A.  I probably did.  I don't specifically remember it.  I don't have an independent recollection of it.

Q.  Okay.  And then it says, "May have been some neck compression element in this."  You see that note?

A.  I do.

Q.  Would that be something you would have told Mr. Hoy?

A.  It's quite likely.

Q.  And if he testified about that yesterday, you would agree with that?

A.  I wouldn't challenge that, no.

Q.  And the next note says, "Three minutes to unconsciousness if bag is airtight."  You see that?

A.  I do.

Q.  Do you recall telling Mr. Hoy or having a

discussion with him about the bag over Miss Sjodin's head?

A.   I don't.

Q.   Okay.  Would that be something that you would have taken into account in arriving at your determination of asphyxiation?

A.   Quite likely, yes.

Q.   And would a three-minute time frame, would that be something that you would have told him?

A.   It might have been.  It would be a rough estimate.

Q.   Okay.  In your opinion would that be a good estimate as to the time it would take to cause unconsciousness if the bag was airtight?

A.   It would vary from person to person but it would be in that range.

Q.   Okay.  If you go to page 2, Doctor, and I'll refer you to the area where it says, "photo 1182."  You see that?

A.   I do, yes.

Q.   And it says, "Shows hole in front of throat area."  You see that?

A.   Yes.

Q.   And then the next line says in quotes, "'probably' knife."  You see that?

A.  I do.

Q.  If Mr. Hoy testified that you provided that information to him, would that be correct?

A.  I would rely on his recollection, not mine.

Q.  Okay.  Would it have been your opinion at that time that that hole in the throat was caused probably by a knife?

A.  It says "probably."  I don't know.  I guess I probably said it was consistent with or maybe probably. I don't have a recollection of it.

Q.  Okay.  That's information that you would have told him though, correct?

A.  Apparently, yes.

Q.  And then go down to where it says "photo 1180."

A.  Yes.

Q.  You see that?

A.  Yes.

Q.  And the second line says, "Clearly shows cut of throat area, probably two times."  You see that?

A.  I see that.

Q.  And again if Mr. Hoy testified yesterday that you informed him that that was your opinion, would you agree with that?

A.  I wouldn't challenge it.  It's his note though.

Q.  Okay.  And it says "two times" there; is that

right?

A.  Yes, it does.

Q.  Doctor, if you'd find the exhibit with the final autopsy.  Do you have that in front of you?

A.  I have it.

Q.  Thank you.

A.  Number 4 is it?  P-16, excuse me.

Q.  P-16, yes.  Thank you.  The Final Autopsy Protocol it does mention under Roman Numeral I it says, "Homicidal violence," correct?

A.  Yes.

Q.  And that's where that phrase came from that we talked about earlier that is on the beginning of Mr. Hoy's notes; is that right?

A.  I think that would be a reasonable conclusion.

Q.  Okay.  And under that it has five letters, correct?

A.  Yes.

Q.  And it says -- under D it says, "Remnants of slash wound - neck region."  Do you see that?

A.  Yes.

Q.  It doesn't say how many times the neck was slashed, does it?

A.  No.

Q.  And if you turn to page 6, counsel asked you

about the description of the neck injuries.  You recall that?

A.  I have it here.

Q.  Okay.  And you remember Mr. Abreu asking you about the description there?

A.  Yes.

Q.  Okay.  It does not say anywhere in there that the neck was slashed two times, does it?

A.  It says that there's "a second parallel appearing margin."

Q.  Okay.

A.  I think that was --

Q.  And on the first sentence it says, "Remnants of an elongated slash-type wound can be observed on the anterior surface of the neck region," correct?

A.  It does, yes.

Q.  If you go back to Mr. Hoy's notes and back to 1180 then.

A.  Yes.

Q.  Earlier you testified that there was a strip of skin in the photos that appeared to be caused by the knife; is that right.  You recall that?

A.  Yes.

Q.  And then at the time of trial Dr. McGee explains these two cuts that he said he believed he observed.  Do

you recall that?  That was Mr. Abreu's question regarding the testimony that he showed you.  You remember that?

A.  Do you have an exhibit number on that?

Q.  It was in the transcript that he presented to you.  You don't recall that?

A.  I'm looking for the --

Q.  There's no exhibit number.

A.  Oh, oh, I'm sorry.

Q.  It was just in the transcript.  Do you recall him showing you Dr. McGee's testimony about his description of the two slash cuts?  Do you recall that?

MR. ABREU:  Your Honor, just for clarification I read it to him and didn't show it to him.  That may be causing the confusion.

MR. REISENAUER:  If I may approach?

THE COURT:  You may.

Q.  (Mr. Reisenauer continuing)  Earlier this morning, Doctor, Mr. Abreu read a portion of the transcript of Dr. McGee's testimony wherein he did testify that there were two slashes.  Do you recall that?

A.  Yes.

Q.  Okay.  Had you previously read that before you came here today?

A.   I did but it's a long time ago.

Q.   Okay.  And back in 2005 when you met Mr. Hoy, essentially you agreed that there were two cuts or slash wounds to the neck, correct?

A.   Apparently I did, yes.

Q.   If you turn to the next page then, Doctor, of Mr. Hoy's notes and at the top of that page to make sure we're on the same page here it says "photo 1165."  Do you see that?

A.   I have it here, yes.

Q.   And then do you see about almost halfway down it starts with the word "if"?

A.   Yes.

Q.   And can you read that to us?

A.   I'm not sure I can.  "If he had to opine a cause of death, he would say 'incised the neck' but not certain; could have been strangulation," and then there's some things crossed out.  Then the word "ligature."

Q.   Okay.  And those are Mr. Hoy's notes, correct?

A.   Apparently, yes.

Q.   And if Mr. Hoy testified yesterday that you had opined, which is the word he wrote down there, a cause of death you would say, "'Incised the neck' but not certain; could have been strangulation with a ligature,"

correct?

A.    I guess I'd agree with that, sure.

Q.    Okay.    And having read Dr. McGee's testimony at trial, do you recall that Dr. McGee, in fact, testified that similar to your opinion here that she may have died from the slash wound to her neck, she may have died from asphyxiation or strangulation from the ligature.    She also may have died from the bag over her head and may have died from exposure.    Do you recall that?

A.    I don't remember them specifically but I've read that.    It's a long time ago.

Q.    Okay.    If you turn to the next page then, Doctor, and again I'm going to refer you to -- towards the bottom of the page where it says "photo 1183."    You see that?

A.    Yes.

Q.    And Mr. Hoy again testified yesterday that you told him that it was your opinion that the right flank defect was a, quote, incised wound, end quote.    You see that notation?

A.    (No response.)

Q.    There's a dash there that says his opinion is, quote, incised wound, end quote.

A.    I'm looking at it.    It says possibly incised or probably.    I'm -- his writing is difficult but he does

conclude with "His opinion is incised..."

Q.   Okay.  And that would have been your opinion at the time of your meeting, correct?

A.   Apparently, yes.

Q.   And then turn to the next page and here Mr. Hoy has notes that say, "Opinions to 'Reasonable Medical Certainty,' end quote.  Do you see that?

A.   Yes.

Q.   Okay.  And if Mr. Hoy testified yesterday that you gave him these opinions to a reasonable medical certainty, would you agree with that?

A.   Well, I think it came out in the direct questioning.  I don't know.  The real form of the question might have been:  Are these consistent with.  I don't know if they were -- you know, are these specific things and only these things.  I don't know the question.

Q.   Okay.

A.   But this is apparently the impression that Mr. Hoy got from talking with me.

Q.   Correct.  Now we've had the term "reasonable medical certainty" thrown out here quite a bit this week and, in fact, that was asked of you this morning a number of times.

Mr. Hoy testified yesterday and if he told

us that you told him that these were your opinions to a reasonable medical certainty, would you disagree with that?

A. No.

Q. Now you have four opinions according to Mr. Hoy's notes. No. 1 it says "throat (2)," which is a reflection of his earlier note where you said you believed the throat was cut two times. Would that be correct?

A. I don't know.

Q. You don't recall that?

A. Well, I -- I do. I just -- I don't have a specific recollection of this.

Q. And No. 2 has an R with a circle around it and the word "flank." That would most likely mean right flank to you; is that right?

A. Yes.

Q. Okay. And if Mr. Hoy testified yesterday that you told him that it was your opinion to a reasonable medical certainty that the right flank was an incised wound, would you disagree with that?

A. On the basis of the note, no, I wouldn't.

Q. Okay. Thank you. And again No. 3 similarly, the right upper thigh, he has a similar note there and again as counsel pointed out earlier Mr. Hoy's note says, "All

incised wounds," correct?

A. Right. With the proviso that I may have been responding to if it is inconsistent with or I may have specified is consistent with.

Q. And then No. 4 he says, "Perhaps pubis" with a question mark, which isn't as clear as the first three but he also has that as part of the bracketed incised wound note. You see that?

A. I do.

Q. Okay. And if he testified in regard to that yesterday, would you disagree with that?

A. No.

Q. In fact -- excuse me. After your discussion with Mr. Hoy in April of 2015, you had some continued conversations with him?

A. Apparently so, yes.

Q. Okay. At some time later he, in fact, wrote you another letter with regard to some questions he had. You recall that?

A. Yes. I think it's one of the exhibits here.

Q. You have that exhibit in front of you?

A. I do. It's 52 I believe.

Q. Let's, if we could, just talk about that for a second. That contains -- excuse me, Exhibit 52 contains the letter and then that supplement that counsel

referred to, correct?

A.    Yes.

Q.    And the supplement now provides some more detailed information that Mr. Hoy had received from Dr. McGee, correct?

A.    (No response.)

Q.    Let me help you.

A.    Yeah, please do.

Q.    Okay.  On the second page here that you were actually looking at in bold print it says, "United States' Summary of Opinions Dr. McGee has Shared in Addition to the Information in his Reports, which are Incorporated Herein by Reference."

A.    Okay.  I see that.

Q.    You see that?  And No. 1 says, "Dru Sjodin's neck was cut at least twice with a sharp-edged instrument resulting in elongated slash-type injuries."  Do you see that?

A.    I do.

Q.    Okay.  And No. 3 says, "The right flank defect referred to in Dr. McGee's reports is inconsistent with animal activity alone due to location, depth, and directional tunneling characteristics and was initialized by sharp-object trauma," correct?

A.    I see that.

Q. Okay. And that letter is dated from Mr. Drew Wrigley on May 5th of 2006, correct?

A. Yes.

Q. That was a year after your meeting with Mr. Hoy; is that right?

A. Approximately, yes.

Q. Dr. Peterson, if you would, let's go back to Exhibit P59, which is your report to Mr. Margulies. Can you find that?

A. I'm sure it's here. I got it. I have it.

Q. Thank you. This was written by you on October 9th of 2011, correct?

A. Yes.

Q. And according to your letter here you received the information from Mr. Margulies on September 19th of 2011; is that right?

A. Yes.

Q. And now in this report on the bottom of the page you say, "I am in general agreement with the opinions given in the reports of Drs. Arden, Flomenbaum, and Ferenc." Do you see that?

A. I do.

Q. And then if you go to the second page, Doctor.

A. Yes.

Q. You say, "I too believe that all of the defects

or disruptions on the body can be attributed to postmortem deterioration and animal, insect, and microbial activity."  Do you see that?

A.  Yes.

Q.  You do however say, "I do not believe that sharp force or other injuries at these sites can be completely excluded," correct?

A.  Yes.

Q.  When you met with Mr. Hoy, his notes reflect basically that you believed to a reasonable degree of medical certainty that, in fact, there were cuts on the neck and on the right flank?

A.  I must have changed my mind.

Q.  You changed your mind?

A.  Well, I don't know.  I just -- I've got his notes.  It reflects impressions I had at two different points in my life.

Q.  So at the point prior to trial with the information you had you informed Mr. Hoy of what your opinions were, correct?

A.  That's right.

Q.  Okay.  You do however still agree in 2011 that this was a homicide, right?

A.  Absolutely.

Q.  And you at that time believed that the cause of

death, or according to your terms the most likely cause of death, was asphyxiation by the neck ligature.

A.   At that point that was what my opinion was.

Q.   Okay.  Doctor, can you find your most recent letter to Mr. Abreu and Mr. Luby.  I believe it's P60.

A.   I have it, yes.

Q.   Thank you.  And this is a three-page letter that you sent to Mr. Abreu and Mr. Luby; is that correct?

A.   Yes.

Q.   And it is dated on the third page February 2nd of 2017, correct?

A.   On the first page, yes.

Q.   Okay.  It's also signed on the third page with that date.

A.   It is, yes.

Q.   And you wrote this letter?

A.   Yes.

Q.   And this is after being provided additional information by counsel, including Dr. Dragovic's report, an addendum by Dr. Flomenbaum and an interview of Mr. Rodriguez, testimony of Dr. Sensabaugh and some information in regard to p30 testing and bench notes of Mr. Fischer from BCA, correct?

A.   Yes.

Q.   When Mr. Hoy contacted you in 2004, you had a

brief discussion, according to his notes there, about acid phosphatase. Do you recall that in the notes?

A. I think they're in there, yes.

Q. If you look back on Petitioner's 51 at the bottom of the third page he has "acid phosphatase" in quotes and there is -- there's a few notes there?

A. I see them, yes.

Q. That was all the discussion you ever had with him about acid phosphatase for p30, correct?

A. I don't know. We contacted -- we were in contact later. I may have referred him to Dr. Sensabaugh.

Q. Okay.

A. I at that time thought Dr. Sensabaugh was the go-to person on that subject.

Q. Okay. So you didn't have any further involvement on that subject then, correct?

A. I don't think so.

Q. And in this report or letter that you sent to counsel, if you turn to page 2, the first paragraph there says, "The manner of Miss Sjodin's death was homicide."

So your opinion still hasn't changed, correct?

A. Hasn't changed.

Q. Okay. "I previously stated that I agreed with

Drs. Arden, Flomenbaum and Ferenc that the most likely cause of death was asphyxiation by ligature."

That remains, according to you, a possible cause of death, correct?

A.   Yes.

Q.   "Given the lack of neck tissue for evaluation, I also cannot rule out the possibility Dr. Dragovic's conclusion that the cause of death was 'asphyxia' brought about by direct pressure on the front part of the neck/voice box area."

Do you see that?

A.   Yes.

Q.   And so are you telling us now that after reviewing Dr. Dragovic's report that there may even have been another possible cause of death of Miss Sjodin?

A.   Yes.

Q.   But when you reviewed the autopsy report and the photographs, when you met with Mr. Hoy that is not reflected in any of his notes, correct?

A.   (No response.)

Q.   You've just arrived at that conclusion after Dr. Dragovic's report was sent to you?

A.   I think so, yes.  I just don't remember mentioning it.  I don't remember the meeting.  Can I just have a minute because I want to clarify something

here?

Q.   Doctor, we'll just move on.  That's fine.

A.   Okay.  I thought I may have -- there may be a mention of strangulation.  It may have been mentioned during that meeting with Mr. Hoy.

Q.   You certainly did, yes.

A.   That was what my pause was for.

Q.   Yes.  You did mention ligature strangulation to Mr. Hoy.  I think we covered that.  Thank you.

You were a pathologist for many, many years. Any idea how many autopsies you may have performed?

A.   I just -- I lost track of them when I was supervising.  I ran a program where people took training to qualify as forensic pathologists and often worked very closely with them, and you include those but the office did many hundreds every year and I was involved in most of those.

Q.   And I assume that throughout the course of your career when you've testified in trial sometimes there were medical examiners or forensic pathologists that testified on the other side of the case?

A.   Absolutely, yes.

Q.   And I assume that on occasion they either agreed or disagreed with your conclusions or your opinions, correct?

A.   I'd like to think that most of the time they agreed but I know there were times of disagreement.

Q.   And when you do autopsies you obviously are looking for everything you can find in regard to what occurred to the individual, correct?

A.   You collect all the information you can.  You don't always know what the questions will ultimately be.

Q.   Right.  And so but when you're collecting the information as in this particular case, Dr. McGee collected that globule he called it.  Do you recall that?

A.   I do, yes.

Q.   And if you had observed that globule while you were doing the autopsy, I assume you would have collected it as well and had some tests done on it, correct?

A.   I probably would have, yes.

Q.   If you hadn't there may be some evidence there that would not come to light, correct?

A.   Yes.

Q.   And in your review of Dr. McGee's testimony, do you recall him testifying, in fact, about those possible causes of death that I referred to earlier?

A.   I just -- I can't specifically without the report enumerate what that would be.

Q. Okay. You've talked earlier with counsel about the fact that there was no male DNA found on those swabs, that there was no spermatozoa observed and the testing of Mr. Fischer on that Lab Report No. 10 showed that there was no semen. Do you recall that?

A. Yes.

Q. Are you aware that Dr. McGee, in fact, at the time of trial testified that there were no sperm cells found in the cervix and the vagina and the anal region?

A. Yes.

Q. And you're aware that no male DNA was found and that Dr. McGee had testified in regard to that?

A. I don't remember his testimony with respect to that but that may be the case, yes.

Q. And earlier I believe there was presented to you Lab Report No. 10. Do you have that in front of you? I believe it's Petitioner's 4.

A. There's a lot of stuff here. I've got one that's got a four at the top that's got a P16. Is that the one? No, that's the final autopsy. I have it. Thanks.

Q. Doctor, if you could turn to the second page of that report and on the second to the last paragraph do you see where it says, "Examinations of the following items did not detect the presence of semen"?

A. Yes.

Q.   And in the middle of that paragraph it says, "vaginal swabs (Item 86A), anal swabs (Item 86B) and cervical swabs (Item 86C)."  Do you see that?

A.   Yes.

Q.   And that reflects, in fact, what is -- what is set forth in the chart is the test and the microscopy that's on the last page of that document.

A.   That's consistent, yeah.  That correlates with that.

MR REISENAUER:  That's all I have, Your Honor.

THE COURT:  Mr. Abreu?

MR. ABREU:  Very briefly, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. ABREU:**

Q.   Dr. Peterson, counsel asked you about the globule that Dr. McGee testified to.  Do you recall that?

A.   Yes.

Q.   And he asked you whether you would have collected it had you performed the autopsy in this case.

A.   Yes.

Q.   Would you also have documented the existence of that globule had you performed the autopsy in this case?

A.   I probably would have, yes.

Q.   Would you have mentioned it in your report?

A.   I think so, yeah.

Q.   Would you have mentioned it before learning that, in fact, there was no male DNA and no sperm?  Would you have brought it up at some point before those dates?

A.   It would have been noted before that.

Q.   And, in fact, the first time you mentioned it wouldn't be at some deposition a year and a half after your autopsy report, correct?

A.   I don't remember the specific timing but it was later.

Q.   Counsel asked you about Dr. Dragovic and his conclusion regarding pressure on the neck.  Do you recall that as well?

A.   Yes.

Q.   Do you know if Mr. Dragovic had information available to him that you did not have in 2004 and 2005?

A.   He had that report by Dr. -- was it Werner or Welner?

Q.   Correct.  Dr. Welner's report?

A.   Yes.

Q.   Discussing statements by Mr. Rodriguez?

A.   Yes.

Q.   And is it also accurate that it was based on those statements by Mr. Rodriguez that Dr. Dragovic reached his conclusions?

A.   I didn't talk to him about that but that would be consistent with that.

Q.   And you could not have had those statements in 2004 and 2005 because they hadn't been made yet.

A.   Yes.

Q.   You've already told us that you could not recall telling Mr. Hoy the statements that are reflected in his notes, correct?

A.   Yes.

Q.   And you could not recall the questions posed by Mr. Hoy that might have led to those responses?

A.   I just don't have any specific recollection of the meeting.  I know the meeting took place but I just can't recreate it in my mind.

Q.   And based on the responses, is it fair to say that you don't know if he was asking you to comment on Dr. McGee's opinions or give your own?

A.   I guess I don't, no.

Q.   And you don't know whether he was asking you whether you could definitively rule something out or whether something was consistent with those opinions.

A.   That's correct.

            MR. ABREU:  That's all I have, Your Honor.

            MR. REISENAUER:  Just a couple follow-up, Your Honor, if I may?

THE COURT:  You may.

**RECROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Dr. Peterson, counsel just asked you about receiving Dr. Dragovic's report which was aided by the receipt of Mr. Rodriguez's statement, correct?

A.  Yes.

Q.  And he asked you whether or not you had -- you told him just a minute ago that you did not have that information at the time you formed your previous opinions, correct?

A.  The earlier ones, yes, that's right.

MR. ABREU:  Objection, Your Honor.  I would clarify when you say "previous opinions" if counsel would just clarify he means 2004 or 2011.

THE COURT:  Sustained.

Q.  (Mr. Reisenauer continuing)  In 2005 when you met Mr. Hoy, you did not have Mr. Rodriguez's statement, correct?

A.  No, I did not.

Q.  And even in 2011 when you issued your opinion or letter to Mr. Margulies, you didn't have Mr. Rodriguez's statement, did you?

A.  No.

Q.  And wouldn't it be true then that at the time

that Dr. McGee did his autopsy and did his findings and testified in this case he did not have access to Mr. Rodriguez's statement either?

A.   He wouldn't either -- he would not have had that either.

Q.   Thank you.  And when you met with Mr. Hoy, the information you had obtained by April 15th of 2005 were those documents that we talked about in a letter Mr. Hoy sent you; is that right?

A.   Yes, I think that's correct.

Q.   And at that time the autopsy protocol was provided to you, correct?

A.   Yes.  I think there was a preliminary and a final one and I don't remember which --

Q.   Okay.

A.   Either one or both.  I'm not sure.

Q.   Yeah.  And that's what you had provided to you, correct?

A.   Yes.

Q.   Okay.  You did not have at that time the supplemental information that was later provided as a result of that letter we talked about earlier from Mr. Wrigley, did you?

A.   No.

Q.   And you did not have Dr. McGee's deposition

testimony at that time, did you?

A. No.

Q. And you didn't have his trial testimony at that time, did you?

A. It hadn't been given yet.

MR. REISENAUER: That's all I have, Your Honor.

THE COURT: You may step down, Dr. Peterson.

THE WITNESS: Thank you, Your Honor.

THE COURT: By the way, was it Jim Rosenbaum that you second chaired that with?

THE WITNESS: It was Jim.

THE COURT: Is he still a friend of yours?

THE WITNESS: He's still a good friend.

THE COURT: Tell him hi when you see him, okay?

THE WITNESS: I will, yes.

THE COURT: Thank you. How long do you anticipate the next witness will go?

MR. ABREU: Substantially shorter, Your Honor. I can't vision my direct going much more than half an hour I would say.

MR. REISENAUER: I would suggest we break for lunch now, Your Honor, and come back in an hour.

THE COURT: Why don't we start at -- should

we start at 1:00?  Is that okay?

MR. ABREU:  That's fine with me, Your Honor.

THE COURT:  Thank you.

MR. ABREU:  Thank you.

(Recess taken; 11:45 a.m. to 1:00 p.m.)

THE COURT:  All right.  We'll go back on the record in United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55 and 2:11-cv-88. The record should reflect that Mr. Abreu, Mr. Luby and Mr. Montroy are present.  Mr. Reisenauer and Ms. Burkland are present for the United States.  When we broke the petitioner was about to call their next witness.

MR. ABREU:  Good afternoon, Your Honor. Petitioner would call Mr. Steven Fischer.

THE COURT:  Would you come forward, stand before the clerk, raise your right hand and take the oath.

(Witness sworn.)

THE CLERK:  Will you be seated, please.

THE COURT:  Just to make sure we've got the right spelling, Mr. Fischer, could you spell both your first and last name.

MR. FISCHER:  It's S-t-e-v-e-n, and the last name is F-i-s-c-h-e-r.

THE COURT:  Thank you.  Mr. Abreu.

MR. ABREU:  Thank you, Your Honor.

**STEVEN FISCHER,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. ABREU:**

Q.  Good afternoon, Mr. Fischer.

A.  Good afternoon.

Q.  Sir, how are you currently employed?

A.  I'm an analytical chemist with a small start-up company in the Twin Cities.

Q.  And back in 2004 how were you employed?

A.  With the BCA.

Q.  That would be the Minnesota Bureau of Criminal Apprehension?

A.  That's correct.

Q.  And in 2006 how were you employed?

A.  I went to work for Mass Tech, a company with my brother.

Q.  And what year did you leave the Minnesota BCA?

A.  2004.

Q.  And can you briefly describe for us what your responsibilities were at BCA?

A.  I was a forensic scientist in the DNA section so

I conducted serology examinations and did some STR DNA testing and also was a part of the crime scene team.

Q.   And did part of that testing include testing of biological samples?

A.   Yeah.  That would be serology testing, yes.

Q.   And did that include testing some -- did that serology testing include testing for the presence of semen?

A.   Yes, it does.

Q.   And is that part of -- that's part of criminal investigations?

A.   Yes.

Q.   Does that semen testing include acid phosphatase testing?

A.   I don't know if it was acid phosphatase or alkaline phosphatase.  I can't remember.  One of the two, yeah.

Q.   And you did a sperm search?

A.   Yes.

Q.   In an attempt to identify semen?

A.   Yes.

Q.   Did you do p30 testing in an attempt to identify semen?

A.   Yes.

Q.   In 2004, sir, were you assigned to work on

evidence related to the murder of Miss Dru Sjodin?

A.   Yes, I was.

Q.   What BCA office were you working on at that time?

A.   I was in the Bemidji satellite lab.

Q.   And as part of your work as a BCA analyst in 2004, were you given the responsibility of testing various biological samples in that case related to Ms. Sjodin's murder?

A.   Yes, I was.

Q.   And did that include testing of anal, cervical and vaginal swabs for the presence of semen?

A.   Yes, it did.

Q.   After you conducted your testing, did you report -- did you prepare a report of your conclusions and your findings?

A.   Yes, I did.

MR. ABREU:   Your Honor, may I approach the witness?

THE COURT:   You may.

Q.   (Mr. Abreu continuing)   Mr. Fischer, let me show you what was previously admitted as Petitioner's Exhibit No. 4, if I might (indicating).

Do you recognize this document, sir?

A.   Yes, I do.

Q.   And can you just tell us briefly what that

document is.

A.   It's a report that I wrote back in -- it's dated I think it was 2004, yeah, about the evidence that I had tested at that time.

Q.   If you look right under the title where it says, "REPORT ON THE EXAMINATION OF PHYSICAL EVIDENCE."

A.   Yup.

Q.   Do you see that?

A.   Yup.

Q.   It's dated May 28th of 2004?

A.   Yup.

Q.   Would that be accurate?

A.   That would be accurate.

Q.   Okay.  And if I asked you to turn to what is the third page in that document?

A.   Mm-hmm.

Q.   Is that your signature there?

A.   That is, yes.

Q.   And if you turn to page 2 of that document, the next to last paragraph?

A.   Mm-hmm.

Q.   Can you look there and tell me what it is that you concluded regarding the presence of semen on items 86A, 86B and 86C, which would be the vaginal, anal and cervical swabs related to the investigation of the

murder of Dru Sjodin?

A.   The first part of the first sentence in that paragraph states, "Examinations of the following items did not detect the presence of semen."

Q.   Okay.  Do those -- does that paragraph indicate or state the bases for your conclusion that no semen was detected on either of those swabs or samples?

A.   What do you mean by "bases"?

Q.   Does it say what test you ran in order to determine no semen was present?

A.   Not specifically, no.

Q.   Was that in keeping with BCA protocols at the time to include the conclusions but not the independent bases for the conclusions in the report?

A.   That was their practice, yeah.

Q.   Are the bases for your conclusion contained in the bench notes to this report or to your reports generally?

A.   Yeah.  We take other notes that would include what testing we actually performed.

Q.   Okay.  Would you kindly look through the rest of the document, if you would for me, please.

A.   Yup.  (Witness examining.)

Q.   Mr. Fischer, are those the bench notes related to the testing that you did and the conclusions that you

reached as set out in Report No. 10?

A.   It's my signature on my initials so, yes.

Q.   Okay.  And let me ask you to turn to the very last page of those bench notes.  Can you identify that page, sir?

A.   Yup.  That's a page, a form that I filled out for a semen/saliva summary and it's my initials on there.

Q.   And that -- those initials would be located under the section where it says "scientist"?

A.   That's correct.

Q.   And does the presence of your initials on that page indicate that you yourself performed these particular tests that are listed on this document?

A.   It would, yes.

Q.   Regarding the p30 testing that you conducted, sir, does this document indicate that it was on samples 86A, 86B and 86C?

A.   It does, yes.

Q.   And those would be the very same 86A, B and C that you concluded in the beginning of the report no semen was detected on them?

A.   That's correct.

Q.   And what were the results of the p30 testing on each of those samples individually?

A.   They were negative for 86A, 86B, as well as 86C.

Q.    Does this document indicate whether you did any acid phosphatase testing?

A.    It indicates that there's a column for it and we didn't perform any on it, yes.

Q.    Is there a reason you did p30 testing and not acid phosphatase testing?

A.    Usually when -- sometimes I remember from years ago that if you have a small sample size sometimes you just move right to the confirmatory-type testing or testing like that to conserve the sample.

Q.    So if I'm understanding your answer correctly it was because the p30 testing would have given you a more reliable answer than the acid phosphatase testing?

A.    Yes.  It's considered to be more confirmatory than acid phosphatase.

Q.    At the time that you conducted this testing, were you aware that Regions Hospital had also conducted a sperm search on this very same sample?

A.    No, I wasn't.

Q.    Did this document, the last page of your bench notes, indicate whether you conducted a sperm search?

A.    On here it's my initials so, yes, I would have done that.

Q.    And that would be indicated on the column labeled "MICRO"?

A.   That's correct.

Q.   And it would be indicated by the negative SP/slide?

A.   Yes.

Q.   And would that be indicative of the fact that you yourself prepared a slide from the sample and then microscopically examined those slides?

A.   That's correct.

Q.   And those results for 86A, B and C would be what, sir?

A.   They were negative for all three samples.

Q.   Does your report indicate that you observed the presence of nucleated epithelial cells?

A.   Yes, it does.

Q.   How would that be indicated on this report?

A.   I left notes in there that say, "Very heavy NEC," which stands for nucleated epithelial cell.

Q.   Why would that be informative to note in a report or a test of samples for semen the presence of NEC? What's important about noting that in your report?

A.   It's just an observation that you make through the microscope so you're documenting what you see, the facts of it.

Q.   Are there tests that can be performed subsequent to a p30 semen test that might give some additional

information based on the presence of NEC, or nucleated epithelial cells?

A.   This micro test, yeah.

Q.   What about DNA testing?

A.   Yeah, that could be used as well to try and get a profile.

Q.   And perhaps Y STR DNA testing to determine if there are any male DNA cells available?

A.   Possible.

Q.   Do you recall testifying in 2006 in the case of United States versus Alfonso Rodriguez?

A.   I do, yes.

Q.   And prior to your testimony in that case, sir, did you meet with members of the prosecution to discuss your testimony?

A.   I did, yes.

Q.   Do you recall who you met with?

A.   It was -- Norm Anderson was the main one.  Drew Wrigley and Keith Reisenauer once I believe or twice.

Q.   Primarily it was Mr. Anderson?

A.   Primarily Mr. Anderson, yup.

Q.   And as part of those meetings do you recall whether you informed them of the basis for your conclusion that there was no semen present on those samples?

A.    We talked about all of the evidence I believe or a lot of it.  I don't recall the specific conversations at that time, exactly what was talked about, but they did ask me a lot of questions to try and understand the testing that was done.

Q.    Do you recall, when you were preparing to testify and meeting with them, whether you reviewed your actual report with them?

A.    We did go through some of the stuff in the reports, yes.

Q.    And would you have had your bench notes at the time that you met with them?

A.    I believe, yeah, they supplied those to me, yup.

Q.    At any time during your preparations for trial did you learn that Dr. Michael McGee, the medical examiner who performed the autopsy in this case, was prepared to testify that there, in fact, was semen on swabs 86A, B and C?

A.    I don't recall ever being told that.

Q.    Were you aware that the government had filed documents with the Court stating that Dr. McGee intended to testify that there was semen detected on 86A, B and C and that it was deposited within 24 to 36 hours of Ms. Sjodin's death?

A.    I don't recall ever being told that.

Q.   When you testified in United States versus Alfonso Rodriguez, who called you as a witness at trial?

A.   The prosecution did.

Q.   The government did?

A.   Yes.

Q.   And have you had an opportunity to review your testimony from that trial?

A.   Yes, briefly.

Q.   And was that provided to you by me or my office?

A.   That's correct.

Q.   And at trial were you ever asked by the government about the bases for your conclusion that there was no semen on the tested swabs?

A.   I don't recall any specific questions about what bases I used to generate those results I guess.

Q.   Were you asked by the government's attorney whether you ran a p30 test?

A.   I mean, just from briefly what I scanned through I don't recall seeing that, no.

Q.   Do you recall if you were ever asked by the defense attorney, Mr. Bob Hoy, what the bases for your conclusions were that no semen was detected on the swabs?

A.   I don't recall being asked that.

Q.   Okay.  Do you recall whether Mr. Hoy asked you if

you conducted p30 testing?

A.   I don't think he did but I don't recall that, yeah.

Q.   Had you been asked at trial by Mr. Hoy whether you, in fact, had conducted p30 testing, would you have testified consistent with your report that, in fact, you had conducted p30 testing?

A.   I would have, yes.

Q.   And had you been asked by Mr. Hoy at trial what the results of that p30 testing was, would you have told the Court and the jury what the results were?

A.   Yes.

Q.   Do you know if your report and your bench notes were at any point shared with Dr. McGee or provided to any other agencies or members of the prosecution team?

A.   They never shared any of the information with me like that, no.

Q.   Were you aware that Dr. McGee testified at a pretrial hearing, a Daubert hearing, that no p30 testing had been done in this case?

A.   I'm aware that he testified at the trial but I'm not aware of what he testified to.

Q.   If you had been called as a witness at the Daubert hearing, would you have testified consistent with your report that you had performed p30 testing?

A.   Yes, I would have.

Q.   And had you been called as a witness at the Daubert hearing, would you have testified consistent with your report that the p30 testing results were negative for the presence of semen on 86A, 86B and 86C?

A.   Yes.

Q.   I think you mentioned this but I just want to make sure, were you aware that Dr. McGee testified at trial on behalf of the government and told the jury that the AP levels in this case, the acid phosphatase levels in this case, on the swabs meant that the semen -- meant that semen had been detected?

A.   I was aware he testified but not about the content of what he was testifying to.

Q.   Had you been asked at trial whether your testing revealed the presence of semen on any of the swabs, what would you have testified?

A.   My answer is no.

Q.   Do you know Ann Marie Gross?

A.   I do, yes.

Q.   And who is she?

A.   She, at the time I was employed at the BCA, was the technical leader in the DNA section.

Q.   Were you aware at the time that you testified that Miss Gross had conducted Y STR DNA testing on the

same biological samples that you tested for p30?

A.   No.   They told me that she was doing testing on some of the items I tested but not specifically which ones or what was being done.

Q.   At the time that she did her DNA testing -- and I should tell you she did her DNA testing in 2005, I believe, after you did your p30 testing.

A.   Mm-hmm.

Q.   Would it have been BCA protocol for her to have the results of your examination at the time she conducted DNA testing in 2005?

A.   If I performed them previously to her testing, she would have had access to them, yeah.

MR. ABREU:   Just a few more questions if I may.  Your Honor, may I approach the witness?

THE COURT:   You may.

MR. ABREU:   Thank you.

Q.   (Mr. Abreu continuing)  Mr. Fischer, let me show you what I am now marking as Petitioner's Exhibit 61 and ask you to just take a look at that document, please (indicating).

A.   (Witness examining.)

Q.   Do you know what that document is?

A.   It looks like correspondence that various people at the BCA had had with people, phone conversations and

e-mail.

Q.   And what is the narrative numbering labeled at the top?

A.   It is B03-11062.

Q.   And would that be the case number that it refers to?

A.   Yes.

Q.   And if I ask you to take a look at your report again, Petitioner's No. 4, where it says "Laboratory Number" --

A.   Mm-hmm.

Q.   -- do you see that?  What number is listed there?

A.   It's the same number that's listed on the exhibit you just gave me.

Q.   B03-11062?

A.   That's correct.

Q.   Let me ask you to turn to the one, two, three, four, fifth page -- sixth page, and there's a number on the upper right-hand side running top to bottom.  Do you see that?

A.   Yes.

Q.   It would be the page labeled "FORENSICS 00032." You see that?

A.   Yes, I do.

Q.   And let me ask you about an entry a little

less -- a little over a third down the way.

A.   Mm-hmm.

Q.   Where it says under June 30, 2004, do you see that?

A.   Yes.

Q.   And it says analyst Steven Fischer?

A.   Yup.

Q.   And to the right it says, "Type:  Phone Conversation/message"?

A.   Yup.

Q.   And it says, "I spoke with Norm Anderson of the US Attorney's office about the semen search results of the vaginal, cervical and rectal swabs.  They requested that DNA testing be performed on the vaginal and cervical swabs even though no semen was detected on them."  Do you see that?

A.   I do, yes.

Q.   That entry on June 30th of '04 would have been after you performed your p30 testing, correct?

A.   Yes, it would.

Q.   And I don't think I asked you that but if you look at the last page of P4, you're at the document?

A.   Mm-hmm.

Q.   Under the "MICRO" section does it indicate what date you performed your p30 testing?

A.   Sorry, what was the question?

Q.   What date did you perform the p30 testing?

A.   The p30 testing was 4/23 of 2004.

Q.   So this entry on June 30th of 2004 would have been after that, correct, sir?

A.   That's correct.

Q.   So when you spoke to Mr. Anderson on June 30th of '04, it's fair to say that you knew the results of your p30 testing.

A.   Yes.

Q.   And you knew that the results were negative.

A.   Yes.

Q.   Is that something that you would have told Mr. Anderson during your conversation with him on June 30th of 2004?

A.   I did indicate that there was -- no semen was detected but didn't specifically go into p30 testing or microscope examinations.  Usually we don't unless we're asked specific questions about it I guess.

Q.   Okay.  When he said to you that he wanted you to do DNA testing even though no semen was detected, did he ask you why you were indicating that no semen was detected?

A.   I don't recall.

Q.   Had he asked you about the bases for your

conclusion that no semen was detected, would you have told him at that time?

A.  I would have explained to him what the basis was.

MR. ABREU:  That's all I have, Your Honor.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  Just a couple follow-up questions, Your Honor.  Thank you.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Mr. Fischer, you indicated to Mr. Abreu that you had read through your trial testimony that he had provided you; is that correct?

A.  That's correct.

Q.  And you recall that you were requested by both the U.S. Attorney's office and the defense in that case?

A.  That's correct.

Q.  And your direct testimony involved testifying about a number of items that you had done DNA testing with regard to, correct?

A.  Correct.

Q.  And some of those items were items that were set forth in your original Lab Report No. 10, correct?

A.  Correct, if that's the -- yup, that's correct.

MR. REISENAUER:  If I may approach, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  This is Mr. Fischer's testimony.  It is Volume 27, pages 6061 through 6303.

Q.  (Mr. Reisenauer continuing)  Mr. Fischer, we can just take a brief look at that first page, a cover page, and if we go to the third page it lists your name.  You see that?

A.  Yes, it does.

Q.  It's highlighted and there is direct examination by Mr. Anderson, cross by Mr. Hoy, some redirect by Mr. Anderson and cross by Mr. Hoy.  You see that?

A.  That's correct, yes.

Q.  And it goes from page 6124 and then Mr. Hoy does his recross starting at 6162, correct?

A.  That's correct.

Q.  And then if we could a number of exhibits were entered that are mentioned on 6065 and 6066; is that correct?

A.  That is correct.

Q.  Okay.  And in your review of your testimony, you testified about some of those exhibits, correct?

A.  That is correct.

Q.  And a number of those were drawings that you had made as a result of some DNA testing and swabs that were taken from Mr. Rodriguez's car; is that correct?

A.   That is correct.

Q.   And you testified about the DNA testing you did on those samples.  You recall that?

A.   I do recall that, yes.

Q.   And then, if I may, as part of the cross-examination in this case Mr. Hoy asked you about the testing that Mr. Abreu just mentioned, your testing of items 86A, B and C.  Do you recall that?

A.   I believe so, yes.

Q.   Okay.  And let me just refer you, if I could, to page 6160.  There's a question from Mr. Hoy.  It says: "Okay.  Were you also furnished a series of swabs that's also referred to in the same paragraph, vaginal swabs item 86-A, anal swabs 85-B, and cervical swabs, 86-C?"

Do you see that?

A.   I do, yes.

Q.   And you answered what?

A.   "Yes, I was."

Q.   And then he asked:  "Did you also examine those swabs for the presence of semen?"  And your answer was what?

A.   "Yes, I did."

Q.   And he asked:  "And you found none, no semen on any of them?"  And you answered?

A.   "That's correct."

Q.   And that would reflect your findings that you set forth in Lab Report No. 10, correct?

A.   That's correct.

Q.   Mr. Abreu asked about Ann Gross.  Miss Gross worked in the lab in St. Paul, Minnesota?

A.   That's correct.

Q.   And let me refer you back to your note here regarding your discussion with Mr. Anderson.  He requested that DNA testing be performed on the vaginal/cervical swabs even though semen -- even though no semen was detected on them.  You recall that?

A.   I do, yes.

Q.   Okay.  And do you know for a fact that there was additional testing done on those items by Ms. Gross?

A.   I knew she was doing additional testing.  It was never explained to me exactly which ones she was doing it on.

Q.   Mr. Fischer, I'm going to hand you what was previously marked as Petitioner's Exhibit 30 and ask if you could take a look at that, please (indicating).

A.   (Witness examining.)

Q.   Does that appear to be a report of nuclear DNA done by Ms. Gross?

A.   That's what it says on the first page, "Nuclear DNA" with a date of 12/19/2005 and she signed the -- I

believe the second to the last page is her signature so, yes.

Q. And do you recognize that as her signature?

A. I believe it would be, yes.

Q. Okay. I want to have you turn to the second page, if you would.

A. Mm-hmm.

Q. And on the top there it lists item 86, correct?

A. That is correct.

Q. And it says on the right-hand side, "Vaginal, anal, and cervical swabs collected from the body of Dru Katrina Sjodin;" is that correct?

A. That's correct.

Q. And that would be the same item 86 that you did your testing on; is that correct?

A. It would be, yes.

Q. And then if you would turn to page 3, and on page 3 the third to the last sentence -- or paragraph there it says: "No male DNA was obtained from Items 74, 86A, 86B or 86C." Do you see that?

A. I do, yes.

Q. Okay. Are you aware that Miss Gross testified in the trial at all?

A. I was aware she did, yes.

Q. Were you aware that she testified that she found

no male DNA on Exhibits 86A, B or C at all?

A.   No, I don't believe I was.

Q.   Would you agree with me, Mr. Fischer, that your conclusion that is set forth on the second page of your report that no semen was detected was the testimony you provided at the time of trial?

A.   Yes, it was.

Q.   Did I leave that testimony up there with you? Did I take it back with me?

A.   I think I just have the reports here.

MR. REISENAUER:  Your Honor, I marked the testimony of Mr. Fischer as Government's Exhibit TT and I would offer that at this time.

MR. ABREU:  Without objection, Your Honor.

THE COURT:  It's received.

MR. REISENAUER:  That's all the questions I have.

**REDIRECT EXAMINATION**

**BY MR. ABREU:**

Q.   Mr. Fischer, when you testified that there was no semen on 86A, B or C at the time of trial, no one asked you why or how you arrived at that conclusion; is that correct?

A.   I don't believe they did was my recollection of it, yeah.

Q.   And no one asked you about your p30 test.

A.   I don't think they did, no.

MR. ABREU:  Your Honor, we would offer Petitioner's Exhibit 61.

THE COURT:  Any objection?  Those are the notes.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Sixty-one is received.

MR. ABREU:  And with that we would have no further questions, Your Honor.

THE COURT:  Anything further, Mr. Reisenauer?

MR. REISENAUER:  No, Your Honor.  Thank you.

THE COURT:  You may step down, Mr. Fischer. Thank you very much for your time.

Did he appear pursuant to a subpoena?

MR. ABREU:  He did.

THE COURT:  Let's release him then.

MR. ABREU:  Thank you.

THE COURT:  All right.  You're released. Thanks.  The petitioner will call their next witness.

MR. ABREU:  Your Honor, we don't have any additional witnesses at this time.

THE COURT:  Does the United States have any witnesses to call this afternoon?

MR. REISENAUER:  Not at this time, Your Honor.

THE COURT:  The Court will hold open the record for the further testimony of Mr. Ney, which is still up in the air.  Did we get a date in September yet?

MR. REISENAUER:  We have not discussed that, Your Honor.

THE COURT:  Okay.  Well, why don't you guys find out when you're available and let us know and so we'll see what we can make work in our calendar.

MR. ABREU:  That's fine with us, Your Honor.

THE COURT:  And if -- if there's any additional sort of brief written closing argument that the parties wish to present, I'm open to having you hold the record open and do it after Mr. Ney testifies.  I'm also open if you want to file it first I can read what you've got so far, and then I'll allow you to supplement it after you've got Mr. Ney's testimony put together.  That's fine, too.  It doesn't make any difference to me.

The real risk is that at some point I may be confirmed and may no longer be sitting in this court and if that's the case I will write the opinions for everything that we've taken up so far but, you know, holding it open for months and months may become

problematical.

MR. ABREU:  Your Honor, I think our preference obviously given the considerations Your Honor's just discussed and the time constraints, perhaps after Mr. Ney testifies we could do argument before the Court if that's okay with the Court in resolving those issues.

THE COURT:  Okay.  That's fine.  Whatever you prefer is fine with me.

MR. ABREU:  And again depending on time, Your Honor, we may submit a post-hearing brief of some sort if that aids the Court before the argument if that's helpful.

THE COURT:  Very good.  Thank you.

MR. MONTROY:  Your Honor, one small matter, if I may.  Yesterday I inadvertently admitted -- or handed up the wrong CV of Dr. Ferenc, which is Petitioner's Exhibit 54.  So I would just -- I mentioned this to counsel.  I would just move to resubmit the right CV.

THE COURT:  You want to substitute the correct 54 for the one that was submitted?

MR. MONTROY:  Exactly.

THE COURT:  That's fine.  Any objection, Mr. Reisenauer?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Let's get that done.

MR. MONTROY:  Thank you very much.  Do you want the original 54 kept in the record for purposes -- for any reason if it's just a clerical error?

MR. REISENAUER:  No, Your Honor.  I know what he's referring to.  It's just an update of the CV. It's fine.

THE COURT:  All right.  Then we'll just substitute the correct 54 for the one that was offered yesterday.

Is there anything further from the United States?

MR. REISENAUER:  Not at this time, Your Honor.

THE COURT:  Anything further from the petitioner?

MR. ABREU:  Not at this time, Your Honor.

THE COURT:  Thank you.

MR. ABREU:  Thank you very much.

THE COURT:  Have a safe trip home everyone.

MR. MONTROY:  Thank you very much.

(Adjourned at 1:40 p.m.)