**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                                )
United States of America,       )
                                )
     Plaintiff/Respondent,      )
                                )
          vs.                   )   **FILE NO. 2:04-cr-55**
                                )              **2:11-cv-88**
Alfonso Rodriguez, Jr.,         )
                                )
     Defendant/Petitioner.      )
                                )
- - - - - - - - - - - - - - - -


**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**EVIDENTIARY HEARING - SEPTEMBER 11, 2017**

**Pages 772-935**


HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
         655 FIRST AVENUE NORTH
         FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

**A P P E A R A N C E S**

**KEITH W. REISENAUER     COUNSEL FOR PLAINTIFF/RESPONDENT;**
**MELISSA H. BURKLAND**
Office of United States Attorney
655 1st Avenue North, Ste. 250
Fargo, ND  58102


**VICTOR J. ABREU          COUNSEL FOR DEFENDANT/PETITIONER;**
**JOSEPH W. LUBY**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

**I N D E X**

**W I T N E S S E S**

<u>DEFENDANT/PETITIONER'S</u>:                                    <u>PAGE NO.</u>

<u>RICHARD NEY</u>

Direct Examination by Mr. Abreu                       776
Cross-Examination by Mr. Reisenauer                  882
Redirect Examination by Mr. Abreu                    928
Recross-Examination by Mr. Reisenauer                933

**E X H I B I T S**

| <u>EXHIBIT NO.</u> | <u>DESCRIPTION</u> | <u>OFR'D</u> | <u>REC'D</u> |
|---|---|---|---|
| Petitioner's 67 | Curriculum Vitae of Richard Ney | 778 | 778 |
| Petitioner's 68 | Letter written by Mr. Ney to Mr. Wrigley Re: Argument Against Seeking Death Penalty 8/6/04 | 848 | 848 |
| Petitioner's 69 | Letter Written by Mr. Ney to Mr. Wrigley Offer to Plead Guilty 3/8/06 | 854 | 854 |
| Petitioner's 70 | Defendant's Motion in Limine to Exclude Results of Luminol Testing 7/10/06 | 857 | 858 |
| Petitioner's 71 | Order Granting Motion to Exclude Luminol Testing Results 8/11/06 | 859 | 859 |

**P R O C E E D I N G S**

(September 11, 2017:  The following proceedings commenced at 9:15 a.m.:)

THE COURT:  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's Criminal Case No. 2:04-cr-55.  It's Civil Case No. 2:11-cv-88.  The record will reflect that the defendant is not present, having waived his right to appear in writing.

Why don't we have counsel for the United States note their appearances, then counsel for the defense.

MR. REISENAUER:  Good morning, Your Honor. Keith Reisenauer for the United States.  With me this morning is Melissa Burkland and Michelle Myer from our office.

THE COURT:  Thank you.

MR. ABREU:  Good morning, Your Honor. Victor Abreu on behalf of Mr. Rodriguez along with Mr. Joseph Luby and Miss Latoya Hampton.

THE COURT:  Thank you.

MR. ABREU:  Thank you, Your Honor.

THE COURT:  The purpose of this continued hearing is to continue on issues related to forensics. When we had our last hearing in this matter in June,

Mr. Ney was unavailable and he's about to be called as a witness and so, Mr. Abreu.

MR. ABREU:  Your Honor, we would call Mr. Ney.  Just for clarification, I think he was available.  I think the parties agreed to do some depositions and some other things that slowed down the process a bit but, thank you, Your Honor.

THE COURT:  Mr. Ney, if you please would come forward, raise your right hand and take the oath.

MR. NEY:  Yes, Your Honor.

THE CLERK:  Please raise your right hand. State your full name and spell your last name.

MR. NEY:  Richard Ney, N-e-y.

(Witness sworn.)

MR. ABREU:  Your Honor, is it okay if I proceed from counsel table?

THE COURT:  You may.

MR. ABREU:  Thank you.

**RICHARD NEY,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. ABREU:**

Q.  Good morning, Mr. Ney.

A.  Good morning.

Q.   Mr. Ney, how are you employed, sir?

A.   I am an attorney in private practice in Wichita, Kansas.

Q.   And in 2004 how were you employed?

A.   In the same capacity.

Q.   And in 2004 were you appointed to represent Mr. Alfonso Rodriguez in the case that is currently before the Court?

A.   I was.

Q.   And were you his attorney in 2006 at the time of trial?

A.   I was one of his attorneys, yes.

Q.   And who was that other attorney?

A.   Robert Hoy.

MR. ABREU:   Your Honor, may I approach the witness?

THE COURT:   You may.

Q.   (Mr. Abreu continuing)   Mr. Ney, let me show you what I have marked as Petitioner's Exhibit 67 (indicating).   Do you recognize that document?

A.   I do.

Q.   What is that document?

A.   It's a resume I use for appointment in capital cases when I'm being considered for appointment.

Q.   And is that currently up-to-date?

A.   It isn't to the extent that I've recently been appointed to a capital case in the District of Iowa -- or a potential capital case I should say.  There has not been an Indictment yet but other than that, yes.

MR. ABREU:  Your Honor, I would move for admission of Petitioner's 67.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Sixty-seven is received.

Q.   (Mr. Abreu continuing)  At the time that you were appointed to represent Mr. Rodriguez in 2004, how long had you been practicing law at that time?

A.   I've been licensed to practice law since 1978.  Although, I had not begun practicing law until 1980.  I worked as a reporter and editor for a newspaper from '78 to early '80.

Q.   And could you tell us a little bit about your professional experience until the time you came to be appointed in 2004.

A.   Yes.  After my graduation, as I said, I worked for a newspaper as an editor and reporter.  In 1980 I was hired as a first assistant public defender in Vermillion County, Illinois, Danville.  I later became chief public defender in that county.

I then was hired to start and had the public

defender's office in Sedgwick County, Kansas, Wichita, and I did that for the time as noted here from 1984 to 1991.

I was then appointed to become federal -- chief federal public defender for the District of Hawaii. Later I was also named concurrently to the position of chief federal defender for Guam. They were joint offices at the time.

I then left that position in 1996 to begin my own private practice in Wichita and have maintained that practice with various partners since that day.

Q. And that's the practice you've maintained from the time of Mr. Rodriguez as to the current date?

A. It is.

Q. And then would it be fair to say that with the exception of the two years as a reporter you've spent your career as a criminal defense attorney?

A. Yes.

Q. In those years as a criminal defense attorney, Mr. Ney, how many murder cases have you handled?

A. It's well over a hundred.

Q. And how many of those have been capital cases?

A. I handled seven state capital cases, and the capital cases listed here as federal capital cases I think there are nine excluding the Iowa -- Southern

District of Iowa case.

Q. I'm sorry, did you mention the federal capital cases?

A. Right.

Q. Okay.

A. Those are listed on Exhibit 67.

Q. On page 2 of 67.

A. Right.

Q. And those are nine federal capital cases you recall?

A. Yes.

Q. And how many of those clients that you represented in capital cases received the death penalty?

A. In the federal or state?

Q. Tell us both, if you will.

A. All right. In state one, in federal one.

Q. And obviously the one we're talking about in federal would be Mr. Rodriguez?

A. That's correct.

Q. At the time that you were appointed to represent Mr. Rodriguez in 2004, did you have experience with rape cases?

A. Yes.

Q. Any idea how many rape cases?

A. Again probably well in excess of a hundred as a

public defender in both Illinois and Kansas.

Q.   And at the time of your appointment in 2004, did you have experience with cases involving DNA?

A.   Yes, I did.

Q.   And cases involving the specific identification of semen?

A.   I had, yes.

Q.   Any experience with cases involving the identification of semen using enzyme-specific testing like acid phosphatase testing and/or protein-specific testing like p30 testing?

A.   Yes.  I'm old enough to predate DNA typing in my practice so for years that's the kind of evidence we had in rape cases, serology as opposed to DNA.

Q.   And by those kinds of cases, you mean cases that involve as you mentioned serology but more specifically acid phosphatase and p30 testing and things of that nature?

A.   Yes.  I was familiar with them.

Q.   Okay.  So it would be fair to say that at the time of trial you were aware that p30 was specifically used as a marker for the identification of semen or for the lack thereof?

A.   Yes.

Q.   Did you have experience with cases involving the

identification of pre and postmortem defects to a body?

A.  Yes.

Q.  Cases involving knife wounds to a body?

A.  Yes.

Q.  And cases that involve significant amounts of or any amount of animal depredation to a body?

A.  I can at least think of one.

Q.  Mr. Ney, how did you come to be involved in this particular case?  How did you come to be appointed?

A.  I was contacted by Kevin McNally, who was then and I think still is head of the Capital Representation Project.  He'd asked if I would be involved.  I had been involved in a previous case in the District of North Dakota.

Q.  What was that case, I'm sorry?

A.  Michael Gianakos.

Q.  Okay.

A.  It was a case that was considered for capital prosecution but was not authorized.  So Mr. McNally I think told me he had some contact from the district or in some way.  There was not a public defender here and usually this goes through the public defender, federal public defender, and asked if I would be considered and I said that I would.

Q.  Did you know Mr. Hoy at the time that you got

appointed in the case?

A.   I don't believe I ever met him.  Although, he was I think involved as an attorney for the co-defendant in the Gianakos case but I don't remember meeting him before my involvement in Mr. Rodriguez's case.

Q.   And this would be the first time you'd worked with him then?

A.   Yes.

Q.   And who else was part of the legal team?

A.   The Rodriguez legal team?

Q.   Yes, sir?

A.   My paralegal at the time and now law partner, David Miller.  Mr. Hoy had a number of paralegals and I think Sara Sorenson, for example, is a lawyer with the Ohnstad Twichell firm who had various involvements with the case.

Q.   What is -- what's learned counsel on a cap -- on a federal capital case?

A.   Well, it speaks to the statute that says -- the federal statute that says that in a capital prosecution learned counsel must be appointed.  It means someone, as I take that term, experienced in capital litigation.

Q.   And is that how you -- or under the umbrella you came to be appointed in this particular case as learned counsel?

A.   Yes.

Q.   At the time that you came to be appointed as learned counsel, did you know if this was Mr. Hoy's first capital case or if he had any capital experience?

A.   I was aware this was his first capital case.

Q.   And as learned counsel working on this capital case, were you appointed to represent Mr. Rodriguez in any one particular aspect or phase of the litigation? And specifically I'm asking the guilt/innocence phase versus the penalty phase.

A.   No.   That's not the nature of the appointment but obviously my knowledge would go in great deal to the capital elements of the case, the mitigation proceeding.

Q.   So tell us a little bit about how responsibilities were shared between you and Mr. Ney in terms of the guilt/innocence phase versus the penalty phase.

A.   Mr. Hoy.

Q.   I mean, Mr. Hoy.   Mr. Ney, tell us about Mr. Hoy. My apology.

A.   Well, it's always been my practice not to necessarily split that up to say this is your part of the store and this is mine.   From the beginning we worked on the case fairly much in tandem, looking at the evidence, reviewing the reports, discussing all various

aspects of the case.

There are certain things that he made primary contact with people on, witnesses if you will, and other areas where I did.  You could sort of say that it was between the guilt phase and the penalty phase but that lapped over greatly.

Q.  Okay.  And because as a capital litigator you considered it your role to be involved in both parts of the case, did you then familiarize yourself with all of the evidence in the case regardless of whether it went necessarily to the guilt phase or to the penalty phase?

A.  I certainly attempted to do that, yes.

Q.  In your experience as evidence that is presented during the guilt phase evidence that could have relevance at the penalty phase as well?

A.  Absolutely.

Q.  When one is reviewing evidence in a capital case pretrial, does one know at the time that you're initially reviewing it whether it's going to be most relevant or most useful to you at the penalty phase or at the guilt phase?  Is that always evident?

A.  No, it's not.

Q.  Did you in this case review the forensic evidence that was disclosed by the government?

A.  Yes, I did.

Q. How was discovery that was provided by the government usually shared between you and Mr. Hoy? How did you come to get it and how did he come to get it as you recall?

A. Well, we got a fair amount of discovery very early on from Mr. Rodriguez's state lawyer, Mr. Dusek, so we both had copies of that. Subsequent filings or whatever filings were made by the government I think I was copied on by the government I believe and if not then certainly received it from Mr. Hoy if there was something I had not received. I don't specifically remember that I did not receive anything, but we made very clear and certain that we both had duplicate sets of discovery.

Q. And did you and Mr. Hoy consult with each other regarding both phases of the trial?

A. Yes, very much so.

Q. And did you assist in the preparation of motions that were related to both phases of the trial?

A. Yes.

Q. Did you assist in pretrial hearings related to motions regarding both phases of the trial?

A. There were hearings where I handled and Mr. Hoy did, but we certainly talked about those hearings and consulted with each other on numerous occasions.

Q.   And at trial do you recall whether you presented witnesses and made arguments that related to both phases of the trial?

A.   Yes.   I know during the guilt phase I dealt with the other crime evidence, if you will, the prior offenses of Mr. Rodriguez.   Mr. Hoy I know did some of the mitigation witnesses.   So, yeah, we did parts in both trials -- both parts of the trial.

Q.   Were strategy decisions related to the litigation in the case made jointly with Mr. Hoy?

A.   Almost always, yes.

Q.   And again that would be as it related to both phases of trial that strategy decisions were made jointly?

A.   Yes.   Obviously I relied on Mr. Hoy a great deal because he was from North Dakota, understood the people and issues here, jury selection.   He was incredibly helpful.   Although I did the questioning for the most part of the prospective jurors, he contributed constantly to that and every other phase of the trial as well.

Q.   As an experienced capital litigator at that time and learned counsel as we've now learned, working with an attorney who is trying his first capital case, was there any additional weight that was given to your

opinions, your recommendations or your strategic decisions?

A.   I think that's a question better answered I guess by Mr. Hoy if he gave greater weight.  I think in areas of my experience -- I won't say expertise but my experience, I assume that Bob deferred in some degree to that, you know, on litigating capital -- strictly capital issues.

Q.   I'll talk about some of the experts in particular just a little bit.  But when it came to decisions about which experts would be consulted, hired and ultimately called as witnesses, were those decisions made jointly as well?

A.   Yes, in almost every case.

Q.   Let me ask you about some of the specific evidence in this case if I may, Mr. Ney.  Do you recall Dr. McGee's testimony at a pretrial Daubert hearing and at trial asserting that the acid phosphatase, the AP levels on the vaginal and cervical swabs were in his opinion elevated?

A.   Yes.

Q.   And do you recall testimony from Dr. McGee at the pretrial Daubert hearing and at trial alleging that the elevated or supposedly elevated acid phosphatase levels indicated that there had been a semen deposit within 24

hours of Miss Sjodin's death?

A.   I do recall that.

Q.   And do you recall the government, on the basis of that evidence from Dr. McGee, alleging that Miss Sjodin had been raped prior to her murder?

A.   Yes.

Q.   At both sentencing and at trial on the guilt phase?

A.   Yes.

Q.   Was evidence that the acid phosphatase was elevated, that there had been a seminal deposit, vaginal and cervical seminal deposit within 24 hours of Ms. Sjodin's death and that she had been raped, evidence that you and Mr. Hoy wanted to exclude from the jury?

A.   Yes.

Q.   Is it evidence that you attempted to exclude through pretrial litigation?

A.   The Daubert hearing, yes.

Q.   And if it could not be excluded, as it was not in this case, after the Daubert hearing is it evidence that you wanted to counter and undermine at trial and at sentencing?

A.   Yes.

Q.   Why, Mr. Ney, was it important for you to try to counter that evidence of the semen and the rape?

A.   Well, I mean, to begin with we questioned the validity of that evidence.  My experience with acid phosphatase was that it was certainly a piece of something but it was never ever, at least at that point in time, considered definitive for seminal fluid.

So, one, it was wrong.  Two, it obviously was damaging to our case.  The specter of Miss Sjodin's death was certainly horrible but add onto that the fact that there was a rape, a completed rape, made it far worse.

Q.   When did you first come to learn that the government was alleging that there had been a cervical and vaginal seminal deposit within 24 hours of Miss Sjodin's death?

A.   By my recollection it was a filing made about Dr. McGee's opinion in May before the July 1st basically trial.

Q.   Does May 8, 2006 sound familiar?

A.   That sounds correct, yes.

Q.   And that would have been in the government's supplemental disclosures about expert opinions?

A.   Yes.  Regarding Dr. McGee, yes.

Q.   Yes.

A.   Not just the seminal fluid but other matters as well, yes.

MR. ABREU:  Your Honor, may I ask if the previous admitted exhibits are in the courtroom?

THE CLERK:  I didn't bring them.

THE COURT:  Why don't you get them.

MR. ABREU:  I'm just going to rely on a few of those if that's all right.

THE COURT:  It will just take a minute.

(Off the record.)

THE COURT:  All right.

MR. ABREU:  May I, Your Honor?

THE COURT:  You may.

Q.  (Mr. Abreu continuing)  Mr. Ney, let me show you what's been previously marked as Petitioner's Exhibit 16 (indicating).

A.  Yes.

Q.  That document has been marked and admitted already and tell us what that is, please.

A.  It's what's labeled as Dr. McGee's Final Autopsy Report.

Q.  And do you recall receiving and reviewing that document before trial?

A.  Yes, I do.

Q.  And have you seen and reviewed it since that time?

A.  I have, yes.

Q.   Does the autopsy report, as you recall reviewing it at the time of trial and since then, does it give you any indication upon which you could have determined that the government intended to argue that there had been a seminal deposit within 24 hours of Miss Sjodin's death?

A.   Not by my reading, no.

Q.   Do you see on the first page where it makes reference to the acid phosphatase levels?

A.   Give me one second.  My eyes are getting back to normal.  Yes, I do.

Q.   Do the acid phosphatase levels as reported on page 1 of that report give you any indication upon which you could have determined that the government intended to argue that there had been a seminal deposit within 24 hours of Miss Sjodin's death?

A.   No.  I think as I said acid phosphatase is a very crude instrument relating to sexual assault, at least at this time had been considered such, and there are various -- as I think was in the literature at the time, various possibilities of where acid phosphatase could come from.

Q.   And at the time of trial were you also aware that Regions Hospital had conducted sperm searches on each of the swabs and that they all had been negative?

A.   Yes.  You're saying negative for?

Q.   For the presence of sperm?

A.   Yes.

Q.   Okay.  Thank you for clarifying that.  Let me show you what has previously been marked as Government's Exhibit CCC.

Your Honor, is it okay if I don't request permission to approach the witness every time?

THE COURT:  It's fine.

MR. ABREU:  Thank you.

Q.   (Mr. Abreu continuing)  Have you had an opportunity to look at that, Mr. Ney?

A.   I have, yes.

Q.   And what is Government's CCC?

A.   CCC is a letter from Bob Hoy to Dr. Garry Peterson dated July 27th of 2004.

Q.   And July 27, 2004, that would be about three months after the autopsy report that was P16; is that correct?

A.   I think that's correct, yes.

Q.   I don't think I asked you the date on that report but can you tell us now, if you will?

A.   I'm looking for it, May 27th at least -- there's a number of fax dates.

Q.   If you looked at the -- there's a box on the very first page.

A.   Yes.

Q.   And it says, "Date of Exam," April 18th of '04?

A.   I see it, April 18, 2004.

Q.   So this letter to Dr. Peterson would be about three months after that autopsy examination?

A.   Yes.

Q.   Okay.  And are you copied on that letter of -- to Dr. Peterson from Mr. Hoy?

A.   Yes.

Q.   If I can refer you please to page 2 of that letter to Dr. Peterson, the second paragraph there, second full paragraph that reads:  "At this point in time, Mr. Ney and I continue to get acquainted with the facts of the case and have questions about the autopsy findings which may assist in guiding our further efforts.  In that regard, I will list some of those questions in general form for your consideration.  For instance..."

     Do you see that?

A.   Yes.

Q.   And down in sub No. 3 there can you tell us what it is that you had listed for his consideration?

A.   Mr. Hoy wrote:  "The sexual assault examination was negative for sperm, but acid phosphatase was found in varying levels in the three locations.  What is the

significance of such finding?"

Q. So would it be fair to say that even though the autopsy report did not provide you with any indication upon which you could have determined that the government was going to allege that there had been a semen deposit within 24 hours of Miss Sjodin's death, you were experienced enough to know that the acid phosphatase levels as reported on the autopsy report were something you wanted to look into and at least be prepared to address?

A. Certainly.

Q. Let me show you, Mr. Ney, if I can what's been previously marked and admitted as Petitioner's 28 (indicating).

MR. REISENAUER: What number, Victor?

MR. ABREU: Twenty-eight.

MR. REISENAUER: Thank you.

A. Yes.

Q. (Mr. Abreu continuing) And what is P28, Mr. Ney?

A. This is a Report on the Examination of Physical Evidence from Minnesota Department of Public Safety.

Q. What report number is it, if you look at the first page?

A. Report No. 10.

Q. Okay, thank you. And who is the author of that

particular report on the final page of that?

A.   Mr. Fischer, Steven Fischer.

Q.   And when is that report dated?

A.   This report?

Q.   First page right under the title of the report where it says --

A.   It's May 28, 2004.

Q.   Okay.  Thank you.  And I'm going to ask you to put your glasses back on so you can tell me what the corresponding Bates numbers are on the upper right-hand corner of that document.

A.   The lab number?

Q.   No.  There are -- there's a small Bates number.  I'll come up if that's okay.

A.   Oh, I see the Bates stamp number.

Q.   Yes.

A.   10775.

Q.   And what does that go to?  What's the last page of that, the Bates number of the last page?

A.   10777.

Q.   Okay.  Do you recall receiving and reviewing P28 before during trial?

A.   Yes.

Q.   And given your practice of reviewing all evidence, if P28 had been provided to the defense via

discovery you would have obviously read it, correct?

A.   Yes, I would have.

Q.   And let me ask you about page 2, the second paragraph.

A.   All right.

Q.   Second paragraph from the bottom that is and it reads:  "Examinations of the following items did not detect the presence of semen..."  And right towards the middle of that same paragraph it says:  "Vaginal swabs (Item 86A), anal swabs (Item 86B) and cervical swabs (Item 86C), all said to have been collected from the body of Dru Kathrina Sjodin..."

Do you see that?

A.   I do.

Q.   And do you recall reading that passage in a report knowing about those findings at the time of trial?

A.   I do.

Q.   And how many total pages is Report No. 10?

A.   Three.

Q.   Does Report No. 10 as it is in front of you now, Petitioner's 28, does it include the bench notes or the bases for Mr. Fischer's conclusion that there was no semen detected on the swabs?

A.   It does not.

Q.  So if you look at Report No. 10, is it fair to say that on the basis of that document and its statement that no semen was detected that you and Mr. Hoy assumed that the government would not be making any allegations about the presence of semen at the time of trial at the time you received this document or at the time that you reviewed this document for the first time?

A.  That was certainly my belief, yes.

Q.  Let me show you, Mr. Ney, what was previously marked and admitted as Petitioner's 29 (indicating).

A.  (Witness examining.)

Q.  Can you identify that document?

A.  I can.

Q.  What is that?  What is P29?

A.  It's a letter from the U.S. Attorney's office to Mr. Hoy dated June 9, 2004.

Q.  Are you CC'd on that letter as well?

A.  I'm not.

Q.  And what is P29 a letter in reference to?

A.  It's a discovery disclosure.  Just talks about it looks like about 4- or 500 pages of discovery that was handed over along with 1,183 photographs.

Q.  And if you look at the one paragraph of that letter, the only paragraph of that letter, it says that they're disclosing Bates numbers 10,743 through 11,146,

correct?

A.   Yes.

Q.   And would those numbers then encompass P28, which would have been Report No. 10 without the bench notes?

A.   Correct.

Q.   And on what date is this letter indicating that those documents are being disclosed to you?

A.   The letter is dated June 9, 2004.

Q.   By the way, that letter does not make reference to whether bench notes are being included with those documents specifically or not, does it?

A.   It doesn't say what the documents are, no.

Q.   Let me show you, Mr. Ney, what was previously marked and admitted as Petitioner's Exhibit 7 (indicating).

A.   (Witness examining.)  Yes.

Q.   Would you kindly identify that document, please.

A.   This is also from the Department of Public Safety.  It's a "REPORT ON THE EXAMINATION OF PHYSICAL EVIDENCE," another report.

Q.   And what is that report number?

A.   Twenty-seven.

Q.   And when is it dated?

A.   It's dated December 19th of 2005.

Q.   Okay.  And who, according to the final page, is

author of that particular report?

A.    This is listed as Ann Marie Gross.

Q.    Do you recall receiving and reviewing P27 before or during trial?

A.    Yes, before trial.

Q.    Before trial.  And by "reviewing," I mean, you also read it, correct?

A.    Yes.

Q.    And if I can refer you to the third -- page 3 out of 5, the third paragraph from the bottom where it indicates:  "No male DNA was obtained from Items 74, 86A (vaginal swabs), 86B (anal swabs), and 86C, (cervical swabs)."

Do you see that?

A.    I do.

Q.    Would it be fair to say then that on the basis of this document, Report 27, Petitioner's Exhibit 7, on the basis of this document and Report No. 10 that indicated no semen found, you and Mr. Hoy had no basis upon which to conclude that the government was going to allege that there was a semen deposit within 24 hours of Miss Sjodin's death?

A.    I agree with that.  And even more so we were obviously waiting for this report to see if any DNA taken from the victim or from the scene matched our

client.  It took quite a while in coming, as you can tell by the date, and sort of we were relieved, if you will, and certainly commented and talked about the significance of this report.

Q.  Let me show you what has been previously marked as Petitioner's Exhibit 4 (indicating).

A.  (Witness examining.)

Q.  Can you identify Petitioner's Exhibit No. 4, please, Mr. Ney?

A.  I can at least in part, yes.

Q.  Yes.

A.  This is -- at least begins as a duplicate to Exhibit 28.

Q.  Yes, sir.

A.  It's the same lab report, Report 10, same date, 5/28 of 2004.

Q.  And can you tell us, looking at the Bates numbers in the upper right-hand corner, what the first Bates number is for that document and then what the final Bates number is?

A.  This begins at Bates No. 1839 -- excuse me, let me start again 18389 and concludes at 18418.

Q.  Do the pages that accompany what was the original P28 appear to be the bench notes related to Report No. 10?

A.    That's what I would say, yes.

Q.    Let me show you what was previously marked as Petitioner's 39 (indicating).

A.    (Witness examining.)

Q.    Can you tell us what P39 is.

A.    P39 is a letter from the U.S. Attorney's office that's signed by Drew Wrigley.  It's dated May 8th of 2006.

Q.    And it is to who?

A.    It's to Bob Hoy.

Q.    And does it make reference to in paragraph one pages -- discovery pages numbers 17661 through 20247?

A.    Yes.

Q.    And would that encompass the discovery Bates numbers in P4, or Report No. 10, with the bench notes?

A.    Yes.

Q.    And on what day is the date of the letter?  I apologize, did you say the date of the letter?

A.    May 8th of 2006.

Q.    Do you recall whether at the time of trial you specifically saw the bench notes related to Report No. 10?

A.    I've been thinking about that.  I certainly had them because I would have received a CD that contained this material either from the government or from

Mr. Hoy.  Whether I looked at them or not, I certainly don't recall.

What I could tell you is this is two months before trial.  We were obviously scurrying on a lot of things.  I remember this discovery, close to 3,000 pages of discovery.  A great deal of it was not new.  It was from the file from the Department of Safety which we'd received previously.  It frankly, at least in part, looked like material we already had and had gone through.

So I can't tell you having seen this document, Exhibit 7, as part of that discovery that I went through it minutely and looked at all the bench notes thinking we've been there.  We've seen this.

Q.  And just for clarification you mean Exhibit 4, P4?

A.  I'm sorry, four, yes.

Q.  And you made reference to 3,000 pages and are those delineated in that letter of May 8, 2006?

A.  Correct.  But what -- if you look at paragraph four, what was generally done is we'd get a CD not with just the new 3,000 pages but with all 20,349 pages up to that point.  Certainly we were being told this was additional material in a sense but paragraph one says these are documents from the BCA case file and so it

talks about a separate CD.

So again we'd seen I think in large part, or we thought we had, the BCA case file. So it seemed like a repetitive discovery submission, at least to me it did.

Q. And by the way May 8, 2006, the date that this letter is dated, is that the same day that the government made the disclosures regarding Dr. McGee and his supplemental findings?

A. Yes.

Q. Well, let me ask you to take a look at the last page of P4 if you will, please.

A. Yes, I have it.

Q. The very final page?

A. Yes.

Q. Okay. Do those appear to be the p30 testing results and additional testing results related to items 86A, B and C?

A. Yes.

Q. Okay. Do you recall specifically about this one page with these testing results -- do you have any recollection about whether you saw this particular document or knew about the contents of this particular document?

A. My strong belief is that I did not see this. And

not that I did not have it but for whatever reason as being a duplicative or whatever I did not read this carefully and I did not see this document, as it would have been fairly significant.

Q.   But you had it.

A.   That is my belief, yes, that I had all the discovery.

Q.   Okay.  Let me if I may ask you about a couple of the specifics on that very last page of P4.  If you look under the section that says "MICRO" to the right, do you see that?

A.   Yes.

Q.   Down along where it makes reference to Item 86A which is the vaginal swabs, 86B which is the anal swab, and 86C which is the cervical swab, under the "MICRO" section there's a notation that says negative -- or slash mark SP slash slide.  Do you see that?

A.   Yes.

Q.   And do you see that similar notation for each one of the swabs?

A.   Yes.

Q.   Do those in your estimation make reference to a sperm search conducted that was negative?

A.   Yes.  Although, we knew that that had been done.

Q.   Well, let me ask you about that.

A. Yeah.

Q. Is it your understanding that this is the same sperm search that Regions Hospital did or is this a second sperm search conducted by Mr. Fischer on April 23rd of '04 as depicted here?

A. You're correct. This should have been one done by Mr. Fischer.

Q. Okay. And at the time of trial were you, in fact, aware that there had been a second sperm search conducted by the Minnesota BCA that is in addition to the Regions Hospital sperm search in that it too was negative?

A. You're asking me personally?

Q. Yes, sir.

A. I should have been but I wasn't because this page had not impinged itself. I had either not looked -- I had not looked at it. That's the only explanation I can give.

Q. And had you been aware that there was a second negative sperm search, is that information that you would have provided to an expert?

A. Yes.

Q. And if an expert opined that the existence of a second separate sperm search which was also negative was a significant factor in determining whether something

was or was not semen, is that information you would have wanted to know?

A.  Yes.

Q.  And is it information that you would have presented at the pretrial Daubert hearing, trial and sentencing to undermine the government's assertion that semen was present on the swabs?

A.  It's my belief we would have presented that, yes.

Q.  Is it information you would have presented to specifically undermine the government's contention that there had been a semen deposit, a vaginal/cervical semen deposit within 24 hours of Miss Sjodin's death?

A.  Yes.

Q.  And is it information you would have used to undermine the government's contention that Miss Sjodin had been raped before she died?

A.  The negative sperm, yes.

Q.  Did you have a tactical or strategic reason for not providing evidence of the second negative sperm to an expert?

A.  To Dr. Sensabaugh?  No.

Q.  Or any expert?

A.  Any expert, no.

Q.  And did you have a tactical or strategical reason for not presenting evidence of the second sperm search

at the Daubert hearing, trial or sentencing?

A.   No reason whatsoever.

Q.   I'd like to, Mr. Ney, if I can direct you to a portion of Dr. Sensabaugh's testimony at trial and then ask you a couple questions about it, if I may.

A.   Certainly.

MR. ABREU:   And I'm referring, for counsel and the Court, to the transcript of August 29, 2006 at pages 6810 and 6811 specifically and I do have an excerpt of it here if anybody would like (indicating).

Q.   (Mr. Abreu continuing)  I'm showing you the transcript record there and it's -- I didn't -- doesn't have the page before but this is actually Mr. Reisenauer who is questioning Mr. -- Dr. Sensabaugh at trial.

And directing on page 6810 beginning on line 5 of 6810 Mr. Reisenauer asks:  Question:  "And there would be maybe a number of factors in sexual assault cases where semen was found but no sperm as to why there wasn't any sperm present; is that correct?"

Answer:  "That is occasionally found. Generally in cases where the male is aspermic, that is, does not produce sperm, and hence one then has to use other indicators to detect the presence of semen, those are typically protein markers that originate either from the prostate gland or from other glands within the male

reproductive tract."

Question:  "And in the same sense then if no DNA was found it could be for the same reason.  Would that be correct?"

Answer:  "If -- that is correct.  Most of the DNA in seminal plaza or in semen, I'm sorry, most of the DNA in semen is present in the sperm.  There are some male epithelial cells which are in semen as well but they're present at lower concentrations and would contribute much less DNA to the overall DNA profile."

Question:  "And there is a distinct possibility that no DNA would be found or no DNA profile could be arrived at.  Wouldn't that be true?"

Answer:  "If there are no sperm present and if there are no epithelial cells, male epithelial cells, then there would be no male DNA and hence no DNA profile could be obtained."

Do you see that?

A.  Yes.

Q.  To summarize Dr. Sensabaugh's testimony there then he has indicated that there is a potential for finding male epithelial cells in semen but if no sperm and no male epithelial cells are present you may not be able to obtain a DNA profile.

A.  Yes.

Q. Now returning to P4 and the final page of P4 if you will, please, do you see where again under the testing that was done on April 23rd of '04 on the final page of P4 Mr. Fischer also indicates that there is the presence of NEC as it relates to each of the slides?

A. Yes.

Q. Do you know what the notation "NEC" makes reference to?

A. Epithelial cells.

Q. Are they nucleated epithelial cells?

A. Yes.

Q. And more specifically do you see where in reference to the vaginal swabs, 86A, it notes the "very heavy NEC"?

A. Yes.

Q. And with reference to the cervical swab it also notes "heavy NEC"?

A. Yes.

Q. And those two swabs, the vaginal swab and the cervical swab, are the two swabs that were alleged to contain semen; is that correct?

A. By Dr. McGee.

Q. By Dr. McGee, correct?

A. That's correct.

Q. Thank you. At the time of the Daubert hearing,

trial or sentencing, were you aware that there had been the heavy presence of nucleated epithelial cells observed on the swabs?

A.    Should have been but did not have that knowledge in my mind because I had not read this one page of the report.

Q.    And so obviously you were not aware that the vaginal and cervical swabs were observed to have a heavy and very heavy presence of nucleated epithelial cells?

A.    No, I was not aware because if you look at the actual report, the first three pages, if you will, it doesn't talk about the NEC at all.  So, no, without reading this page -- again no excuse for that.  Without reading this page, I did not have that in my mind.

Q.    And it makes no reference to any of the bases for Mr. Fischer's conclusion that no semen was detected, the report, the original three-page report that is?

A.    It doesn't.  And I think we just assumed wrongly, obviously very wrongly, that it was just microscopic review when he said no semen, which clearly the bench notes tells us it was something much more than that.

Q.    Had you been aware of the nucleated epithelial observations, is it information that you would have provided to an expert like Dr. Sensabaugh?

A.    Absolutely.

Q.   And if Dr. Sensabaugh opined that the presence of observable nucleated epithelial cells made it more likely that sperm cells would have also been observed had this, in fact, been semen, is that information you would have wanted to know?

A.   Definitely, and I think it also affects that DNA report.

Q.   I was going to ask you about that.  That DNA report, the one you indicated says that there was no male DNA, correct?

A.   Right.

Q.   No male DNA present, correct?

A.   Right.

Q.   And if Dr. Sensabaugh opines -- or an expert like Dr. Sensabaugh or Dr. Sensabaugh opines that the heavy presence of nucleated epithelial cells made it more likely that some male DNA would have been detected if, in fact, this was semen given the heavy presence of nucleated epithelial cells, is that information you would have wanted to know?

A.   Absolutely.  But, in fact, if I had seen this I knew that.  I knew that there should be DNA in cells in the NEC and if we're not -- it's not just something is missing.  It's that something is there and not male DNA, I mean, which I think is different in my mind at least.

Q.   Correct.  Is it -- is that information as it relates to the nucleated epithelial cells that you just spoke about, is that information that you would have presented at the Daubert hearing, trial and sentencing to undermine the government's assertion that semen was present on the swabs?

A.   Yes, or that -- even that Mr. Rodriguez's DNA was there.  Not that they said that but it's not just it's missing.  We're finding where it should be in these cells and it's not in these cells so it's not his DNA.

Q.   Is it information you would have used then to undermine the government's contention at trial and sentencing that Miss Sjodin had been raped?

A.   Yes.

Q.   Did you have a tactical or strategic reason for not providing the information about the nucleated epithelial cells observed by Mr. Fischer through an expert?

A.   No reason whatsoever.

Q.   Did you have a tactical or strategic reason for not presenting evidence of the nucleated epithelial cells observed by Mr. Fischer at the Daubert hearing, trial or sentencing?

A.   This was a mistake on our part.  There was no strategy involved.

Q.   Let me ask you about the p30 testing reflected on the final page of P4 as well.  Do you see where under the "p30" column there is a negative slash or hash mark I guess, a slash mark, as it relates to 86A, the vaginal swabs, 86B, the anal swab, and 86C, the cervical swabs?

A.   Yes.

Q.   At the time of the Daubert hearing, trial and sentencing, were you aware that p30 testing had, in fact, been performed on the swabs?

A.   Should have been but I was not aware of it because I did not see this.

Q.   So you were obviously not aware that the results of that testing were negative?

A.   No.

Q.   And as a matter of fact what was your understanding about whether, in fact, p30 testing had or had not been done at the time of trial or before trial should I say?

A.   Well, we had the sworn testimony of Dr. McGee that no p30 testing was done, period.  Not that he didn't know, not that he hadn't seen it.  He was asked I think directly was there p30 done by I guess Regions Hospital or the BCA?  Just in general was it done?  He said no.

Q.   And he said no and that would have been at the

deposition, the May I believe 31st, 2006 deposition of Dr. McGee?

A.   Yes.

Q.   And had you been aware of the p30 results, is that information you would have provided to an expert?

A.   If it was negative of this sort, yes, clearly.

Q.   Obviously negative or positive you would have provided it to an expert.

A.   Yes.

Q.   But obviously, even more obvious, the negative result would have been provided to an expert?

A.   Well, Dr. Sensabaugh I think testified that the gold standard, if you will, or at least a standard was p30 testing and unfortunately it hadn't been done.  So it's obviously something we didn't tell Dr. Sensabaugh because it slipped by us.

Q.   And it's also obvious when I asked whether you would have used that information at the Daubert hearing, the trial and sentencing to undermine the government's assertion that there was semen on those swabs?

A.   Yes, we would have.

Q.   Is it information you would have used to undermine the government's assertion that there was a seminal deposit within 24 hours of Miss Sjodin's death?

A.   Not only undermine.  I think completely refute.

Q.   Well, I was going to ask you about that as well. And is it information that you would have used obviously to undermine the government's assertion that there had been a rape in this case?

A.   Yes.

Q.   If an expert opined that negative p30 results by themselves -- if an expert opined that the p30 results by themselves supported a conclusion that, in fact, no semen was detected, is that information you would have wanted to know?

A.   Yes, and I think that is the standard.

Q.   And if an expert opined that the negative p30 results in combination with the two separate negative sperm searches and the finding of no male DNA despite the presence of heavy nucleated epithelial cells, the heavy presence of those cells, conclusively established that, in fact, there was no semen on those swabs, is that information you would have wanted to know?

A.   Yes.

Q.   And is that information you would have used at the Daubert hearing, trial and sentencing to counter the government's assertions that there had been a seminal deposit within 24 hours of Miss Sjodin's death and that she was raped?

A.   Well, let me put it like this.  I'm not sure -- I

think the answer is yes.

MR. REISENAUER:  Your Honor, I'm going object to Mr. Ney just going off on another tangent. The question was a yes-or-no question.

Q.   (Mr. Abreu continuing)  Well, what is the answer to your question?

A.   Well, you asked --

Q.   Yes or no?

A.   Yes.

Q.   Can you explain why?

A.   Well, my position would be that this information having been disclosed either Dr. McGee would have had to withdraw that opinion or explain how you can have semen with a negative p30.  I don't know that there would have been a Daubert hearing is what I was sort of getting to. I'm not sure what we would have been arguing about at a Daubert hearing.  I'm not even sure Dr. McGee could sustain that opinion faced with this evidence.  I guess that's a question for him.

Q.   Did you have a tactical or strategic reason for not providing the negative p30 testing results to an expert?

A.   No.

Q.   And did you have a tactical or strategic reason for not presenting evidence of the negative p30 testing

results in Mr. Fischer's bench notes at the <u>Daubert</u> hearing, the trial and sentencing?

A.  It wasn't a strategy.  It was a mistake.

Q.  Let me ask you about Dr. Blake.  Did you know Dr. Edward Blake at the time that he was retained to consult in this particular case?

A.  Yes.  I had consulted with him professionally on several occasions.

Q.  On what kinds of issues had you consulted with him?

A.  Serology, DNA.

Q.  At the time that you consulted with him and retained him in this particular case, did you consider him to be a competent scientist and an expert in his field for which you retained him?

A.  Yes.

Q.  Is it fair to say Dr. Blake also had a reputation as being a bit of an ornery fellow?

A.  I hadn't had that experience with him but, yes, I guess.  I mean, he was a little prickly at times.

Q.  Did you continue to use Dr. Blake after this case?

A.  Never.

Q.  Why not?

A.  Because of his withdrawal in this case.

Q.   And when you say "his withdrawal," you mean his notification to you and Mr. Hoy that he was not going to be assisting any further with this particular case?

A.   Yes.

Q.   And he did that via letter to you and Mr. Hoy?

A.   Yes.

Q.   Did the tone of Dr. Blake's communications or his prickliness as you say, did that prevent you in any way from sending him any of the materials and the documents that he ever requested?

A.   No.

Q.   Let me show you what's previously been marked as Petitioner's 45 (indicating).

A.   (Witness examining.)  Yes, I'm familiar with 45.

Q.   Okay.  And what is P45, sir?

A.   It's a letter from Bob Hoy which I'm copied on. It's dated June 9, 2006, three pages to Dr. Blake.

Q.   And June 9, 2006, so that's about a month before trial?

A.   Yes.

Q.   And it's about a month after you had received Mr. Fischer's bench notes in P4, correct?

A.   Yes.

Q.   Let me refer you to the second page, the second full paragraph on page 2 of that letter to Dr. Blake

where it indicates:  "During the deposition, Dr. McGee testified he did not know the precise testing methodology utilized by Regions Hospital in reaching the acid phosphatase quantities.  He also was uncertain whether the acid phosphatase levels reported were actually male prostate specific, although he understood that the AP 'prost' reported would be male prostate-specific because the AP total and AP 'non-prost'" testing would certainly be specific for male prostatic AP.

A.  I think you skipped a line.

Q.  I did, huh?

A.  After "non-prost were also reported.  He also acknowledged" -- okay, I guess you didn't.

Q.  Yes.

A.  That there were current tests.  I see, yes.

Q.  I missed an important line.  Where he says:  "He also acknowledged that there were current tests for the p30 antigen and DNA testing that would certainly be specific for male prostatic AP."

A.  Yes.

Q.  Okay.  So it's fair to say that about a month before trial and a month after you'd received the P4 bench notes, albeit unbeknownst to you at the time, you or Mr. Hoy were relaying to Dr. Blake what Dr. McGee

testified to at the deposition regarding p30 specifically.

A. Right.

Q. And relaying to Dr. Blake that Dr. McGee -- that, in fact, p30 testing might have been dispositive for the presence of semen at the deposition that he admitted that.

A. I agree.

Q. Let me -- on the final page, page 3 of that same document, the final paragraph states: "I am presently working on, and will file early next week, a Daubert challenge to the opinions of the medical examiner. Although the government will then be obligated to establish the scientific bases and processes justifying the opinions, in response, I want to be able to provide the court with the affirmative evidence attacking the lack of scientific basis for the opinions. I would sincerely appreciate your assistance in making that scientific challenge. In that regard, it may well be sufficient to do so by your affidavit and the attachment of pertinent articles from scientific journals. If you think a second affidavit from Dr. Sensabaugh may also be useful and perhaps would avoid the need of live testimony in Fargo, I am amenable to discussing that as well. Frankly, this opinion is the bases for the

Government's contention that she was sexually assaulted. Consequently, this is a very important issue for the defense and one which I believe we should be successful on if the science can be properly presented."

Do you see that in the last paragraph of that letter?

A.   I do.

Q.   Based on that passage, is it fair to say that about a month before trial you and Mr. Hoy were still seeking and still soliciting Dr. Blake's assistance on what you termed or that Mr. Hoy termed in the letter a very important issue for the defense?

A.   Yes.

Q.   And that issue would be whether the reported AP level was, in fact, signifying the presence of semen?

A.   Yes.

Q.   If you had known about the bench notes in Mr. Fischer's testing at the time of the solicitation on June 9 of 2006, would you have sent them to Dr. Blake?

A.   Yes.

Q.   And if, based on that review, Dr. Blake concluded that there was no semen present on any of the swabs, would you have called him as a witness at the Daubert hearing, trial or sentencing?

A.   Yes.

Q.   Do you recall that Steven Fischer also testified at the time of the trial?

A.   I do.

Q.   And he testified on behalf of the government?

A.   Yes.

Q.   Do you recall that neither the government nor Mr. Hoy asked Mr. Fischer the basis for his conclusions that no semen was present on the swabs?

A.   I think that's correct, yes.

MR. REISENAUER:  I didn't hear that, Your Honor.

THE WITNESS:  Yes, I think that's correct.

MR. REISENAUER:  Thank you.

Q.   (Mr. Abreu continuing)  If you had been aware that Mr. Fischer conducted the second sperm search which was negative, would you have asked Mr. Fischer about that at trial?

A.   Yes.

Q.   If you were aware Mr. Fischer had observed the heavy presence of nucleated epithelial cells, would you have asked him about that at trial?

A.   Yes.

Q.   And if you were aware that Mr. Fischer had conducted p30 testing on all the swabs and that the results were all negative, would you have asked him

about that at trial as well?

A. Definitely.

Q. And the significance of those determinations -- in his determination that no semen was detected?

A. Yes.

Q. Did you have a tactical or strategic reason for not asking Mr. Fischer about the information in his bench notes?

A. No.

Q. The semen testing he conducted?

A. No.

Q. His testing results and the basis of his conclusions that no semen was present?

A. No reason.

MR. ABREU: Your Honor, I'm going to switch topics.

THE COURT: We'll go ahead and take a break at this point. We'll break for 20 minutes. We'll start again at 10 to 11:00.

(Recess taken; 10:30 a.m. to 10:50 a.m.)

THE COURT: We are back on the record. When we broke Mr. Ney was on the stand. Mr. Abreu was conducting a direct examination.

You may continue, sir.

MR. ABREU: Thank you, Your Honor.

Q.   (Mr. Abreu continuing)   Mr. Ney, do you recall Dr. McGee's testimony that Miss Sjodin suffered two slash wounds to the neck and a stab wound to the right abdomen or flank?

A.   Yes.

Q.   Was determining the nature and the cause of the defects to Miss Sjodin's body and the cause of death something that was of interest to you and Mr. Hoy before trial?

A.   Very much so.

Q.   Would you say that making those determinations was something of importance to you?

A.   Yes.

Q.   When did it become apparent to you that the government was asserting that Miss Sjodin's neck and flank had been cut?

A.   Not until the revelation in May of 2006.

Q.   That would have been the May government disclosures in response to your request for those disclosures?

A.   Yes.

Q.   Did you know Dr. Peterson prior to your involvement -- his involvement with Mr. Rodriguez's case?

A.   I did.

Q.   How did you know Dr. Peterson?

A.   We had -- I had been involved in the Gianakos case and Rick Henderson, the attorney in that case, and I consulted with Dr. Peterson involving the forensics in that matter.

Q.   And was Dr. Peterson an expert that you recommended for consultation in this particular case, Mr. Rodriguez's case?

A.   I believe that's true.  Certainly Mr. Hoy could have talked to Mr. Henderson as well but I believe I brought Dr. Peterson's name up.

Q.   Let me ask you again to take a look at what was Government's CCC, that July 27th of '04 letter to Dr. Peterson.

A.   I see it.

Q.   If you go back to the second page under the numbers of the items that you and Mr. Hoy were looking for assistance with, do you see those there?

A.   Yes.

Q.   And No. 1 specifically says:  "Can it be determined which injuries or 'defects' found by the medical examiner were incurred pre-death, caused the death, or are post-mortem?  Of the post-mortem 'defects,' is there a means of determining which may have resulted from the effects of nature, be it rodents,

insects, natural decomposition, etc?"

Do you see that?

A.   Yes.

Q.   And I believe under No. 2 you inquired of Dr. Peterson:  "What can be learned from the 'slash wound' in her neck region as identified by the medical examiner?  Does the identified 'flap' mean she was slashed on more than one occasion?  Could this have been a fatal wound?  Are the autopsy findings in any way explainable by natural decomposition or rodent activity?"

And then in No. 4 you inquire of Dr. Peterson:  "What is the significance of the findings concerning the other 'defects' or injuries found to the body at autopsy?"

Do you see those?

A.   Yes, I do.

Q.   Are those queries of Dr. Peterson consistent with your testimony here today that determining the cause of the defect and the cause of death was of importance to you and Mr. Hoy?

A.   Yes.  I remember Mr. Hoy and I discussing what we really wanted to find out from Dr. Peterson.  He composed this letter but it was based on our consultation.

Q.   And as a matter of fact as we noted earlier you're also CC'd on that letter, correct?

A.   Yes.

Q.   Were you present for an April 16th of '05 meeting with Dr. Peterson at his home in Minnesota?

A.   I was.

Q.   And who else was present?

A.   Mr. Hoy.  There may have been a family member there or his wife in and out or in the house but I don't remember that.

Q.   And by "family member" you mean one of Dr. Peterson's family members, not one of yours and Mr. Hoy's?

A.   Yes, I believe there was briefly that we met someone.

Q.   As you can recall it today, what was the purpose of that meeting?

A.   It was to answer these questions, to interview Dr. Peterson.  He'd examined photographs and the reports we had at that time and to get basic answers to these questions we proposed to him.

Q.   And based on your recollection, what opinions did Dr. Peterson express regarding the defects to Miss Sjodin's body and the cause of death?

A.   He was very clear that he was unclear.  He could

not make a determination.  Could it have been a wound from an object, a knife?  Yes.  Could it have been decomposition, natural causes by nature, rodents?  Yes, possible.  I walked away from -- on that issue and frankly the other issues was he really couldn't make a determination based on the evidence he had before him.

Q.  At any point during that meeting, as far as you recall, did he commit to a cause of death or a cause of the defects?  Did he commit to any one definitive cause?

A.  No.  He talked about possibilities.  Could be this, could be that.  But, no, he could not to any kind of medical certainty or even reasonable certainty come up with a cause of death.

Q.  Let me show you what was previously marked as Petitioner's Exhibit 51 (indicating).

A.  (Witness examining.)

Q.  Have you seen that document before?

A.  I have, yes.

Q.  And what -- just tell us what that is?

A.  It's been represented these to be Mr. Hoy's notes of that interview with Dr. Peterson.

Q.  And that was going to be my follow-up.  Those are not your notes?

A.  They are not.

Q.  Do you, Mr. Ney, have any notes from the meeting

with Dr. Peterson on April 15th of 2005 or any other meeting with him?

A. I did not take notes, no. And that's the only meeting that I had with Dr. Peterson on this case.

Q. Let me ask you about a couple entries on these notes, if I may.

A. Certainly.

Q. On the very first page towards the bottom, there's an underline where it says "neck ligature."

A. I see it.

Q. Okay. And then it reads: Calculates circumference around 10 inches plus or minus, question mark. Pretty small, exclamation point. May have been some neck compression elements in this, exclamation point.

Do you see that?

A. Yes.

Q. Is that entry consistent with your recollection of your conversations with Dr. Peterson at that meeting and his, as you say, inability to commit one way or another to the cause of the defects or the cause of death?

A. Yeah. These certainly -- we discussed with him the ligature and the possibilities with the ligature, yes.

Q.   Turn to page 2, if you will.

A.   Yes.

Q.   At the very top it says:  Nothing definite to say whether she died from asphyxiation or slashed throat, exclamation point.  Quote, betting, unquote, perhaps asphyxiated, question mark.

Is that entry consistent with your recollection of the conversation you had with Dr. Peterson that day?

A.   It's certainly consistent with his back and forth on the possibilities there.

Q.   Let me ask you on page 3 of those notes.

A.   Yes.

Q.   It's in the upper third there of the page where it starts and says:  "If he had to opine a cause of death, he would say 'incised neck' but not certain. Could have been strangulation with ligature"?

A.   Yes.

Q.   Again is that consistent with what you've described as his noncommittal to a cause of death in this particular case?

A.   Yes.  And he, in fact, discussed how the ligature itself -- the wound from the ligature could, through decomposition and other causes, create a possibility of something that looked like a wound, a knife wound, if

you will.

Q.   And let me ask you to turn then to what would be the fifth page of these notes.

A.   Okay.

Q.   There's a section there where it says:  "Opinions to a 'reasonable medical certainty'."  Do you see that?

A.   Yes.

Q.   And No. 1, throat, and it's got 2 in parentheses. And then the No. 2 says right flank, No. 3, right upper thigh, No. 4, perhaps pubis and off to the right it says:  "All incised wounds"?

A.   Yes.

Q.   And then below that it says:  "Throat cut - pre-mortem (but he'd like to know circumference of neck ligature."

         Do you see that?

A.   Yes.

Q.   And then lastly it says below that:  "Flank wound upper thigh" and "pubis" with a notation relating to all three of those.  It says:  "Not enough information to know how, when" ellipsis.

         Do you see that?

A.   Yes, I do.

Q.   In your recollection about that meeting on April 15th of '05, did Dr. Peterson ever provide you

with his opinions about the defects or the cause of death to a reasonable degree of medical certainty?

A.   He never did.

Q.   What, in your recollection of these -- of that meeting, was Dr. Peterson referring to in this particular entry on page 5?

A.   Well, I mean, Mr. Hoy would have to explain I think his notes.  But as I recall that conversation we went through with him with the photographs the wound -- the defects and we talked about them.  To the extent that he could make an opinion, he said he could not.  He talked about the various possibilities.  He never said that these were incised wounds to a reasonable degree of certainty.  I don't know if Mr. Hoy -- if that was his question, you know, are these incised wounds, all incised wounds?  And if you look later he is saying they're not when he talks about the flank, the upper thigh, the pubis area.

So clearly that's not what he's saying.  But it is my strong recollection that he never said it was one thing or the other.

Q.   Let me just ask you on the last page of that document.

A.   Yes.

Q.   It says:  "Dr. McGee considers himself an expert

on knife wounds.  (May not be as good as he thinks.)"

A.  Yes.

Q.  Do you recall him telling you that as well?

A.  Yes.

Q.  Did you and Mr. Hoy discuss the meeting with Dr. Peterson or how the meeting went after the meeting? Did you have a conversation about that?

A.  We did.  Actually when we left we were in a car together and we talked about it.  I think we had a subsequent conversation as well.  And the tenor of the conversation certainly on my part and I think on Mr. Hoy's part was this:  It did not give us anything.

If you remember, of course, Dr. McGee had not made any definitive statements that these were knife wounds at that point in time so we were kind of left with the same place we -- at the same place we thought that Dr. McGee was, that he just didn't know.  I mean, it wasn't definitive at least.

Q.  That it could have been this or could have been that but nothing definitive?

A.  Yes, just because of the state of decomposition and various other issues.

Q.  By the way, do you recall at that point how long Dr. Peterson had had to review those documents or how many -- how many hours had been approved to work on the

case?

A. It wasn't very much so I think he was given a couple of hours.

Q. Does two hours sound accurate?

A. That does sound accurate. I think he probably took more and certainly he spent at least 90 minutes with us.

Q. Okay. Let me show you what was previously marked and admitted as Petitioner's Exhibit 52 (indicating).

A. (Witness examining.) Yes.

Q. Can you please tell us what that is, Petitioner's 52?

A. This is a letter from Bob Hoy to Dr. Peterson dated May 11th of 2006. I was copied on that letter. The attachment is the May 8th disclosure by the government of Dr. McGee's new statements.

Q. So this letter is dated after your meeting with Dr. Peterson on May 15th of '05. The letter is dated May 11th of '06.

A. Right. It's a year later.

Q. Okay. And if I could just clarify about the attachment which you've made reference to, it says it's received on May 8, 2006. Do you see that by the stamp on the upper right-hand corner of that?

A. Yes.

Q.   But it was filed -- actually appears to be filed on May 5th of '06.  Do you see that?

A.   I do.

Q.   Okay.  According to the letter, what is it that is attached?  What is it that was provided to Dr. Peterson in that letter on May 11, 2006?

A.   The letter states it's a supplemental expert disclosure relating to the anticipated trial testimony of Dr. McGee.

Q.   Okay.

A.   And then Mr. Hoy says, as you can see, Dr. McGee apparently holds at least seven specific opinions which were not contained in either of his autopsy reports.

Q.   Let me ask you about some of those opinions, if I may.  On that supplemental expert disclosure we're referring to supplement No. 1, do you see that?

A.   I do.

Q.   On page 2 of that document?

A.   Yes.

Q.   It says:  "Dru Sjodin's neck was cut at least twice with a sharp-edged instrument resulting in elongated slash-type injuries.  These are substantially severe injuries, visually inconsistent with natural decomposition and/or animal activity.  These cuts were likely inflicted at the scene where the victim's body

was later located.  Blood patterns and quantities on the victim's clothing and in the defendant's car are inconsistent with these injuries having been inflicted prior to transport from another location."

Do you see that?

A.   Yes.

Q.   Let me ask you, Mr. Ney, if at the April 15, '05 meeting with Dr. Peterson he had expressed an opinion to a reasonable degree of medical certainty about the defects and the cause of death as set out in this supplemental disclosure here by Dr. McGee, would there have been any reason to send him a letter on May 11th of '06 asking for his assistance in addressing those opinions?

A.   No.  If he'd already -- if Dr. Peterson already said those were his opinions, we wouldn't really have a reason to write him and ask him if McGee's opinions were correct.

Q.   Look at No. 2, if you will.

A.   Yes.

Q.   It says:  "The slash-type cuts to the neck include notching consistent in type, size, and appearance with causation by an instrument such as the knife found in Defendant Rodriguez's car (Bates Nos. 17489 through 17491 of discovery material; BCA Item

No. 2)."

          Do you see that?

A.  Yes.

Q.  Again if he had issued or given you opinions to a medical degree of certainty about the cause of death and what instrument might have caused that death, would there have been any reason to send that letter on May 11th of '06?

A.  None at all.

Q.  Take a look at No. 6.  "Defects to Dru Sjodin's lower abdomen and extremity area are only partially consistent with natural decomposition and/or animal activity.  Visual analysis of the nature of the defects, accompanying tissue, and borders does not provide adequate basis for definitively concluding what initiated these defects."

          Do you see that?

A.  Yes.

Q.  And again I ask the same question.  If he had given you opinions that were to a reasonable degree of medical certainty on April 15th of 2005, would these same queries have been made on May 11th of '06?

A.  No.

Q.  And lastly take a look at No. 7.  "Cause of death is homicidal violence.  Victim died as a result of the

slash-type wounds inflicted to her throat, suffocation, or exposure in combination with the injuries and conditions inflicted on her by her killer.  Each homicidal factor here is self-sufficient, though a combination of any/all of the factors cannot be ruled out."

Do you see that?

A.  Yes.

Q.  And again same question, if he had given you opinions regarding these matters -- and by "he" I mean Dr. Peterson, had given you opinions regarding these matters to a reasonable degree of medical certainty on April 15th of 2005, would these same queries have been made of him on May 11, 2006?

A.  I know of no reason why we would.

Q.  Is it fair to assume, Mr. Ney, that you wrote to Dr. Peterson -- you and Mr. Hoy wrote to Dr. Peterson on May 11, 2006 because you thought he could assist you with these particular queries that you wrote him about?

A.  I think that was Mr. Hoy's belief.  I think I was less convinced that that would be helpful but that's the reason for the letter.

Q.  Did you ever personally have any follow-up communication with Dr. Peterson after the May 11th of '06 letter?

A.   I didn't.

Q.   Do you know if Mr. Hoy ever had any follow-up communication with Dr. Peterson after the May 11th of '06 letter?

A.   I don't believe that Dr. Peterson responded to this letter.  There may have been a conversation Mr. Hoy had but I'm not aware of it.

Q.   So a follow-up with Mr. Hoy was not reported to you?

A.   No, it was not.

Q.   And do you know if Dr. Peterson ever responded? Do you know?

A.   I do not know.

Q.   Okay.  Did you ever consult a pathologist other than Dr. Peterson before or after the May 11, 2006 letter seeking his assistance?

A.   We discussed that possibility but it was not done.

Q.   And assuming that the information and assistance you sought from Dr. Peterson on May 11, 2006 was important to the defense and assuming that Dr. Peterson did not respond to that letter, did you have or would you have had a tactical or strategic reason for not seeking the assistance of another pathologist with those queries?

A.   No.   In fact, we should have consulted a pathologist after our first meeting with Dr. Peterson in my opinion.

Q.   Can you explain what you mean by that?

A.   Well, when we walked away from Dr. Peterson and sort of shrugged our shoulders that this doesn't tell us anything, it could be this, it could be that, we -- Mr. Hoy and I at least discussed consulting other pathologists.   We talked about a couple of names.   But at that point we still hadn't gotten Dr. McGee's statement that he was going to say anything different than Dr. Peterson.   Could be this, could be that.   So again it was a serious discussion but we did not do it. And -- no, that's fine.

Q.   Let me ask you this, Mr. Ney:   Would knowing about the p30 results and the evidence that established that there was no semen present, would that have caused you -- had you known that at the time of trial, would that have caused you to take a different look at or take a different course in terms of the investigation of the alleged neck wound or any of the defects to the body?

A.   Yes.

Q.   In what way or how?

A.   Well, the government's theory was this is a rape. That's then followed by this murder by Miss Sjodin's

throat being slashed.  If there is no rape one has to believe, or at least it's arguable, that the death took place before that could happen as we at least argued and tried to show as a possibility that there was a strangulation, accidental or purposeful, in the vehicle before any completion of a sexual act could have taken place.

So if it's not rape, if there isn't a completed rape, then the fact that she is, as I think Mr. Wrigley portrayed, marched out to the place where her body is found and her throat's slashed doesn't make sense.  The argument would be that the death took place before anything else could happen.  So the lack of evidence of a rape by the p30 would argue against the government's statement this was a throat being slashed as opposed to asphyxiation and later decomposition or other factors.

Q.  Do you recall that you and Mr. Hoy decided to concede to Dr. McGee's assertions that Miss Sjodin had her neck cut and that there was a knife wound to her flank, that there was a concession regarding that?

A.  Yes.

Q.  And that in exchange for that concession you requested that the photos of Miss Sjodin's body that depicted the neck and flank not be published to the

jury?

A.   Yes.   At the point where we were, we had no contrary evidence.   We had Dr. Peterson who if we put him on the stand would say, yeah, it could be a knife wound.   It could be something else.   So we took what we could get out of that and asked that the photographs be excluded.

Q.   Let me show you what was previously marked and admitted as Petitioner's 53 (indicating).

A.   (Witness examining.)

Q.   Can you quickly identify that, please.

A.   Yes.   It's a letter from Bob Hoy dated July 6, 2006 to Judge Erickson stating our concession, if you will, that we were not going to contest Dr. McGee's opinion on the knife wound.

Q.   And let me ask you specifically about paragraph two.   By the way, are you CC'd on that letter?

A.   I am.

Q.   Let me ask you specifically about paragraph two where it states:   "After consultation with our client, defense counsel can advise the Court" -- it says "he" but I think we meant "the" as a typo there, "...advise the Court and prosecution that the defense does not intend to contest at trial the nature and causation of these wounds as described by Dr. McGee during his

deposition.  Specifically, the defense will not contest that the flank wound and the two wounds to the neck were initially made by a sharp instrument.  We trust this narrowing of the contested issues at trial will assist the Court in excluding autopsy photographs as irrelevant, as well as upon the grounds previously articulated in the Defendant's Motion in Limine."

          Do you see that?

A.   I do.

Q.   And does that accurately reflect the concession you entered into in this case?

A.   It does.

Q.   And does that concession say that you and/or Mr. Rodriguez agree or concur with Dr. McGee's allegations about what happened regarding her neck and her flank?

A.   No, that we were not contesting.

Q.   And, as you stated, you did not contest it at that time because you didn't have the evidence to contest it.

A.   Right.  I mean, frankly when we got the May report obtaining another pathologist it was probably at that point a time issue and Dr. Peterson -- as I said, I don't know that he replied to that letter but we didn't have anything else.

Q.   And as you mentioned you did not seek the assistance of another pathologist.

A.   Well, we didn't specifically.  We asked for a continuance in order to further our investigation into these new statements of Dr. McGee, but we did not -- were not granted the time to do that.

Q.   Okay.  Have you had an opportunity to review the reports of the pathologist who reviewed this case on post-conviction?

A.   Yes.

Q.   And I'm speaking specifically of Dr. Jonathan Arden, Dr. Mark Flomenbaum, Dr. Michael Ferenc and the expert retained by the government and The Forensic Panel, Dr. Dragovic?

A.   Yes.  You've supplied those to me and I've reviewed them.

MR. REISENAUER:  Excuse me, I didn't hear.

THE WITNESS:  I'm sorry.  I said you supplied them to me and I reviewed them.

MR. REISENAUER:  Thank you.

THE WITNESS:  Sorry.

Q.   (Mr. Abreu continuing)  If you had developed the evidence presented in those reports regarding the nature of the defects to Miss Sjodin's body, would you have conceded the alleged neck wounds or flank wounds at the

time of trial?

A.   No.  We wouldn't be in a no-contest situation. We would have contested those if we had a pathologist who would testify these were not knife wounds.

Q.   And would you have contested that even if it meant that you potentially could not have kept out the photographs?

A.   Of course.  I mean, that was much more important than the photographs.  This was us taking what we could get, but as a trade-off we would much rather contest that these were wounds.

Q.   Mr. Ney, in your assessment of this particular case and the evidence against Mr. Rodriguez at the time of trial, was it your belief that he would be found guilty and convicted of kidnapping that resulted in death?

A.   Yes.

Q.   And if he was convicted was it your belief that he was going to also be sentenced to death?

A.   One always hopes but we certainly felt that was a distinct possibility.

Q.   So let me ask you that.  When you compare one to the other, his conviction versus a death sentence, which was more likely in your opinion?

A.   Well, the conviction was a certainty in my

opinion.

Q.   So in other words there was a better chance that he would get a life sentence versus a chance that he would be acquitted of these charges?

A.   Yes.

Q.   Did you and Mr. Hoy agree in that assessment of the case?

A.   Yes.

Q.   By the way, he was convicted and sentenced to life.   A sentence he would have received was life without parole, mandatory life without parole, correct?

A.   That's correct.

Q.   Let me ask you about the use of some of this forensic evidence we've been talking about here today at a couple different pretrial and trial stages, if I may.

Do you recall, Mr. Ney, making a request to the government and Mr. Wrigley that they not authorize a death penalty prosecution in this case?

A.   Yes, I did.

Q.   Let me show you what I'm going to mark as Petitioner's 68 (indicating).

A.   (Witness examining.)

Q.   Let me know when you've had an opportunity to look at that document, Mr. Ney.

A.   I have.

Q.   And can you identify that document, please, sir.

A.   This is dated August 6, 2004.  It's a letter, if you will, a submission to the U.S. Attorney.  It's kind of called a mitigation submission to the Department of Justice under DOJ protocol.  It is an argument, if you will, of why the government should not authorize this case for capital prosecution.

Q.   And who is the letter from?

A.   I wrote the letter.

Q.   Okay.

A.   And I signed it.  There's a signature spot for Mr. Hoy.  I don't know that he actually signed it but obviously it was a letter from him as well but I was the author of this.

Q.   And as you indicated the purpose of the letter was an argument to the government, the Department of Justice, against the death penalty?

A.   Yes.

Q.   Or against seeking the death penalty?

A.   Yes.

MR. ABREU:  Your Honor, we'd move for admission of Petitioner's 68.

MR. REISENAUER:  No objection.

THE COURT:  Sixty-eight is received.

MR. ABREU:  Thank you.

Q.   (Mr. Abreu continuing)   Beginning on page 9 of that document?

A.   Yes.

Q.   It appears that that's where you begin to address the aggravating factors as you know that have been alleged in this case?

A.   Yes.

Q.   And the arguments against those aggravating factors that you had at that time?

A.   Correct.

Q.   And then specifically on page 11 it appears that you address the aggravating circumstance of the heinous, cruel, and depraved manner.  Do you see that?

A.   I do.

Q.   And specifically you write to the government: "The report of the autopsy on Miss Sjodin reveals little about the nature of the homicide.  The pathologist notes the 'remnants of an elongated slash-type wound' on the front of Miss Sjodin's neck.  While the pathologist describes 'defects' on various external and internal portions of the body, none of those can be distinguished as wounds, and are most likely post-mortem artifacts of decomposition and exposure."

And then at the beginning of the next paragraph you note, "Little can be definitively

concluded about the specific nature of the violence suffered by the victim here.  It cannot reasonably be determined even whether the slash to the neck, if that is what the wound is, took place before or after Miss Sjodin's death."

Do you see that?

A.  Yes.

Q.  And subsequent to that on page it looks like 13 you begin to address what is the substantial planning aggravating circumstance?

A.  Yes.

Q.  And towards the bottom of that page in the middle of that last paragraph you state that "Even if an argument can be made that the kidnapping or sexual assault was planned, no evidence exists to show that the homicide here was other than an unplanned occurrence which took place in the heat of the moment or from panic."  Do you see that?

A.  Yes.

Q.  If you had had evidence at the time that you wrote this particular letter that there was no semen, that Miss Sjodin had not been raped, that her neck had not been cut and that she had no knife wounds to her body, would you have included that as part of your request to the government for them not to authorize the

death penalty in this case?

A. Most certainly. And, Mr. Abreu, I'm sorry.

Q. Yes.

A. I should have noted that there's also an attachment. This is not just my handiwork, sorry. I've written 22 pages but there's also an attachment.

Q. Can you tell us what the attachment is?

A. It's a statement of the Roman Catholic Bishop of North Dakota and Minnesota asking that this case not be authorized for death.

Q. And that was sent along with your request to the government and Mr. Wrigley?

A. It was.

Q. Okay.

A. I just wanted to be clear about that. I said I was the author but not of that document.

Q. The final page of this document is signatures by the bishop and not your signature as we noted earlier.

A. That's correct.

Q. Okay, great. Thank you. The evidence that we just discussed that you did not have, that being that there was no semen, that she had not been raped, that she had not had her neck cut and that there were no knife wounds, is that evidence that would have gone directly to counter the heinous, cruel, and depraved

manner aggravator which you addressed in your letter to the government?

A.   Yes.

Q.   And the substantial planning aggravator?

A.   Yes.   But let me be clear about something else.

Q.   Please.

A.   The DOJ protocols allow us to request de-authorization --

Q.   I was just going to ask you about that.   Thank you for bringing that up.

A.   Go ahead, I'm sorry.

Q.   When you sent this particular letter, obviously you didn't know about the p30 results.

A.   No.

Q.   And you had no expert information about the cause of the defects on her body.

A.   Just what was in the initial autopsy report by Dr. McGee, yes.

Q.   And your meeting with Dr. Peterson?

A.   And our meeting with Dr. -- no.

Q.   No, sorry, that would have been before that.   My apologies.

A.   This is before.

Q.   That's all you had was the --

A.   That's what we had.

Q. Okay. I was just going to ask you is there a protocol in place within the DOJ for seeking de-authorization of a death penalty prosecution once it has been authorized?

A. Yes.

Q. I'm sorry, please.

A. Well, just at any time a defendant is allowed to ask the Department of Justice to de-authorize can be based on new information or new circumstances. In fact, it was done in this case. Mr. Rodriguez made an offer to plead guilty to the offense in exchange for a life sentence. So we submitted under protocol a request for de-authorization.

If we had had the information you're talking about, the information from the pathologists who have now reviewed the case, the p30 results, what have you, we would have submitted those with our de-authorization request in changing the complexion of the crime, if you will. That's done fairly routinely if new evidence or contradictory evidence becomes available to the defendant.

Q. Great, thank you. Let me ask you about some other pretrial negotiations with the government, if I may, and show you what I'm now going to mark as Petitioner's 69 (indicating).

A.   (Witness examining.)

Q.   Can you please identify P69, please.

A.   Yes.  This is my letter to Mr. Wrigley dated March 8, 2006.  It is in essence a de-authorization request but it is the offer from Mr. Rodriguez to plead guilty to the offense in exchange for a life-without-parole sentence.

Q.   And when is that letter dated?

A.   March 8, 2006.

MR. ABREU:  Move for the admission of P69, Your Honor.

THE COURT:  Is there any --

MR. REISENAUER:  I have no objection, Your Honor.  I think that might have been offered previously but we have no objection to it.

THE COURT:  Sixty-nine is received.

MR. ABREU:  My apologies for the double numbering.

Q.   (Mr. Abreu continuing)  In that letter you specifically state that "The purpose of this letter is to inform you that my client, Alfonso Rodriguez, Jr., wishes to plead guilty to the crime of kidnapping Dru Sjodin with death resulting, as charged in the indictment and, thereby, end this case.  He's willing to make this plea without any concessions from the

government, except an agreement that the government not seek his death.

Mr. Rodriguez is willing to plead guilty to the crime charged knowing that the sentence he will receive is life in prison without the possibility of parole.  He would plead guilty with the understanding that he would not contest a sentence of life without parole in any way and would file no appeal from any proceedings in the case.

While Mr. Rodriguez acknowledges that a plea would not end the pain caused to Miss Sjodin's family or his own mother and siblings, a plea would spare both families the agony of a long and distressing trial in this matter.

I ask that you consider this offer from Mr. Rodriguez seriously and in the spirit with which it is made.  Mr. Hoy and I are, of course, willing to meet with you and discuss this matter at any time."

Is that what you wrote the government at that time?

A.   It is.

Q.   And obviously, because we're sitting here today, is it fair to say that your plea offer was not accepted by the government?

A.   That's what I would understand.  Again the filing

of this letter would require the -- under protocol at least that the U.S. Attorney forward it to the Attorney General and the Attorney General would make the final call on this as a sense of de-authorization.  So that's my assumption.

Q.   And this is the letter that you previously indicated that if you had had information about the p30, a lack of semen and the lack of knife wounds to her body, you would have included that information in this particular letter?

A.   Yes, which again the Attorney General under protocol would have received and made a new determination or a redetermination.

Q.   Given your belief and your assessment of the case that it was likely that Mr. Rodriguez was going to be convicted and that his best chance was at sentencing and that sentence would be life without parole, is there -- or was there any tactical or strategic reason why you would not have used the evidence that there was no semen and Ms. Sjodin was not raped, that her neck had not been cut, that she had no knife wounds, in pursuit of a guilty plea in exchange for a life sentence?

A.   None at all.

Q.   As you previously mentioned, you -- or as you previously discussed as well I think you and Mr. Hoy

filed a pretrial <u>Daubert</u> motion to preclude the government from admitting into evidence of the acid phosphatase levels as indicative for the presence of semen?

A.   Yes.

Q.   Do you recall that you and Mr. Hoy also litigated a pretrial motion to preclude the results of luminol testing or luminol testing on a knife because the luminol testing was only presumptive for the presence of blood?

A.   I do.

Q.   Let me show you what I'll mark as P70 and P71 (indicating).

A.   (Witness examining.)

Q.   Can you tell us what P70 is.  You can take a minute to look at it.

A.   Right.  I'm familiar with this.

Q.   Okay.

A.   This is defendant's filing No. 176.  It's a motion in limine to exclude the luminol testing.

Q.   When -- what is the date on P70 by the way?  When was it filed?

A.   It shows it being filed and served on July 10th of 2006.

MR. ABREU:  Your Honor, I would move for the

admission of P70.  I think it's probably part of the record.  It's a filed document but --

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  P70 is received.

Q.  (Mr. Abreu continuing)  Mr. Ney, in that motion you argue:  "Luminol cannot definitively detect the presence of blood because a 'positive' result cannot distinguish between certain metals, vegetable matter, human blood, or animal blood.  While luminol reacted with the knife in this case, subsequent lab tests revealed nothing, not even the presence of DNA."

Do you see that?

A.  I do.

Q.  And subsequent to that in the briefing part of the motion it appears that you are quoting a case by the name of Brenk v. State, which is an Arkansas 1993 case, and quoted for the proposition that "luminol is only a preliminary test which indicates the possible presence of blood," and emphasis in the original for the word "possible."

"Luminol testing is unable to indicate the definitive presence of blood, much less...to give off a light blue luminescence similar to a luminescent watch dial.  It is impossible to tell without follow-up testing which of the possible reactants is causing the

reaction."

Do you see that?

A. Yes.

Q. Do you recall if the motion was granted?

A. It was granted.

Q. It was granted. And let me ask you to take a look at P71.

A. Yes.

Q. Can you identify that document?

A. I can. It's Judge Erickson's Order of August 11, 2006 granting the motion in limine.

MR. ABREU: Okay. And I would move for the admission of P71 as well, Your Honor.

THE COURT: Any objection?

MR. REISENAUER: I have no objection, Your Honor.

THE COURT: Seventy-one is received.

MR. ABREU: Thank you.

THE COURT: Just for the record --

MR. ABREU: Yes, Your Honor.

THE COURT: -- we should note that 71 is also Docket No. 508.

MR. ABREU: Thank you, Your Honor.

Q. (Mr. Abreu continuing) As we previously discussed in this case, there was a second sperm search

that was negative.  The NEC were present in heavy amounts making it likely that no male DNA was found. And the p30 testing was negative as well.  And this is all evidence that was on the final page of Report No. 10 on P4, correct?

A.  Yes.

Q.  So in addition to the argument and evidence you did --

A.  Not in the report.  It's in the lab notes, yes.

Q.  Clarification.  Thank you very much.  The final page of the lab notes.

A.  Yes.

Q.  So in addition to the arguments and evidence that you did present in support of your Daubert motion, if you had been aware of that information at the time you litigated the Daubert motion, would you have presented it in support of the Daubert motion?

A.  Certainly.

Q.  Okay.

A.  Our position was that the acid phosphatase was like the luminol, only presumptive, if that, frankly. Most pathologists and serologists have not even found it presumptive at that time.  But the rest of this certainly would have argued against using acid phosphatase alone in contradiction of this evidence as

meaning anything.

Q.   And that really takes me to my follow-up question that could you not then have argued that actually the Daubert motion or the motion to preclude the semen was actually stronger than the luminol motion that was granted because all the subsequent testing related to the semen established that, in fact, it was not semen and was all negative?

A.   Yes.

Q.   Had you been aware of the results of the p30 testing and the other semen results, would you have had any tactical or strategic basis for not advancing that evidence in arguments as we discussed in support of the Daubert motion?

A.   No, not at all.

Q.   Let me ask you about the penalty phase of this case, Mr. Ney.  There are two stages to the penalty phase.  There's eligibility and selection, correct?

A.   Yes.

Q.   And we'll talk about some specifics about each of those momentarily.  But generally speaking is the evidence that there was no semen, that Miss Sjodin was not raped, that she had no cut wounds and she did not die by having her neck -- her throat cut, evidence that would have been helpful to you at sentencing?

A.   Absolutely.

Q.   Had it been developed, is it evidence you would have presented?

A.   Yes.  I think it would have been presented in the guilt phase but it's certainly evidence we would have reemphasized in the penalty phase.

Q.   Yes, sir.  And is it evidence that you would have used in arguments at both the eligibility and selection phases of the penalty phase?

A.   Yes.

Q.   Do you recall that at the eligibility phase of the case, in addition to the threshold intent requirement, the government looked to establish four different aggravating factors or statutory aggravating factors and they were, one, substantial planning?

A.   Yes.

Q.   Two, that the crime was committed -- murder was committed in a heinous, cruel, and depraved manner; three, that Mr. Rodriguez had two or more prior crimes of violence; and, four, that the killing -- that this was a killing caused during the course of a kidnapping?

A.   Yes.

Q.   Those were the four statutory aggravating factors.  Let me ask you about substantial planning, which I know, by the way, the jury did not find; is that

correct?

A.   That's correct.

Q.   The jury rejected that substantial planning aggravating factor?

A.   Right.   They did not find that beyond a reasonable doubt.

MR. ABREU:   Could I have a moment, Your Honor?

THE COURT:   You may.

Q.   (Mr. Abreu continuing)  I'm going to hand you, Mr. Ney, if I may, a copy of that transcript and ask you a couple questions about some of the arguments you made to the jury.

A.   Yes.

Q.   Let me refer you specifically to page 7276.

A.   Okay, I'm there.

Q.   And 7277.   Towards the bottom of 7276 you told the jury:  "When you look at all the factors here, this is a disorganized event.  If it were not so, would there be all of the evidence you had before you in this trial, fibers and blood and DNA?  I suggest to you, like crimes of this nature, this is a crime of immediacy, impulse, without planning, and certainly without planning of a homicide.  The bag itself speaks to that.  There's no other reason for it.

So as you look at this aggravating factor, you must ask yourself, can you find beyond a reasonable doubt that Alfonso Rodriguez planned the murder of Miss Sjodin, premeditated, planned it in a substantial way, or did it happen in the course of the struggle and the course of the assault that took place here?  And I suggest to you the evidence talked to the latter."

Do you see that?

A.   Yes.

Q.   Is evidence that there was no semen, that Miss Sjodin was not raped, that she had no cuts, and she did not die by having her throat cut, evidence that would have supported the arguments that there was no substantial planning and that she died, as you say, in the course of a struggle?

A.   Yes.  And remember this is substantial planning of the murder, not of the kidnapping.

Q.   Why is that significant?

A.   Because that's what the aggravator is.  If the jury would find there's substantial planning let's say of a bank robbery and a guard gets accidentally shot during the robbery, it's not substantial planning of the murder of the guard but this goes to the murder itself, the substantial planning aggravator.

Q.   Is there anything about the evidence that you

could have presented in terms of the fact that there was no semen, that Miss Sjodin was not raped, that she had no cut wounds, that she did not die by having her throat cut, that would have prevented you from making your ultimately successful argument against the substantial planning?

A. No. I think it would have assisted it.

Q. And, by the way, if some but not all of the jurors found that there had been substantial planning, let's say some jurors found substantial planning and some jurors did not, is the evidence that there was no semen, that Miss Sjodin was not raped, had no cut wounds and did not die by having her throat cut, evidence that could have been used to persuade those jurors who did -- that there was no substantial planning?

A. Certainly, yes. That evidence only helps us. There's no downside to that evidence in any part of this case.

Q. And let me ask you about the heinous, cruel, and depraved aggravating circumstance and specifically you start to address that with the jury right at page 7277 right in the middle of that page -- or toward the bottom I should say.

A. Yes.

Q. And you say: "Now, the government then talks

also about this is a heinous, cruel and depraved crime. Again, we talked about that yesterday. And I just want to touch on it for a moment that nowhere do we say that the murder is not horrible. At its most simple, least violent state, it is horrible. That's where we start out. But the Court is instructing you, and has instructed you, that we're talking about something different here, and we're talking about heinous, atrocious -- heinous, cruel and depraved killing."

Next page: "It is a matter of legal definition. And I won't repeat it all, but the Court talks about it requiring torture and serious physical abuse. And that is above and beyond the killing itself. This is, as the Court tells you, especially heinous, cruel and depraved, something that is outside the realm of other murders."

Do you see that argument you made to the jury?

A. I do.

Q. Is evidence that there was no semen and Miss Sjodin was not raped, that she had no cut wounds, that she did not die by having her throat cut, evidence that would have supported your argument that this was not a heinous, cruel and depraved killing as you defined it for the jury?

A.    It would.  Obviously this is the government's burden here and the government argued that it was the taking of Miss Sjodin into the car, removing her clothing, the sexual assault in the car, that was part of that heinous, cruel and depraved.

Then the march, as Mr. Wrigley described it, out to the place where she was murdered, her throat was slashed, that's part of the heinous, cruel and depraved. He went into I think her state of mind, her mental torture as that went on.

If the evidence were she was not raped, her throat was not slashed, that it was an asphyxial death, as I think we know now, then none of that would apply. He might have made different arguments --

MR. REISENAUER:  Your Honor, I'm going to object to this statement.  We don't know now, as Mr. Ney put it.  We have tons of testimony and evidence in this particular case, and to say that we know now what happened is not consistent with the testimony, and Mr. Ney is not aware of that testimony.

THE COURT:  It's in the nature of an opinion.  Overruled.  It's a bench proceeding.

A.    So it would have made a great deal of difference to that argument on the government's reliance of heinous, cruel and depraved in my opinion.

Q.   (Mr. Abreu continuing)  And this question seems repetitive but it's not.  It's important.  And had you developed that evidence, would you have had a tactical or strategic reason for not presenting it to the jury to account for the heinous, cruel and depraved aggravating circumstances?

A.   Not at all.

Q.   Is there any basis upon which you could have undermined the aggravating circumstance that the -- that Mr. Rodriguez had two violent priors using the evidence that we've been discussing here today?

A.   Not that readily comes to mind.

Q.   Okay.

A.   I mean, we did attack those but not based on this evidence.

Q.   And not this evidence as far as you can think about.

A.   Not that I can think.

Q.   And the government also had to prove that the killing was caused during a kidnapping; is that correct?

A.   Yes.

Q.   And in that regard if I can refer you to page 7290 and 7291 of your closing you state towards the middle of the page there:  "Let me touch on the last aggravator for a moment, and that's, as the Court

instructed you here, that Alfonso Rodriguez caused Dru Sjodin's death and caused an injury resulting in her death during the commission of the kidnapping.  Is that different from what you decided last week?  Yes.  Even it's words are different.

Last week you were talked to about was there a death -- was there a kidnapping that resulted in death?  A kidnapping that resulted in death.  Here you're being talked about whether Alfonso Rodriguez caused Dru Sjodin's death in the course of the kidnapping.  Think about those two words.  Result and cause.  Resulted in and caused.  They are different."

And then slightly further down on page 7291 right in the middle you pick up again and say:  "This is a more direct issue.  Did Alfonso Rodriguez cause her death?  Again, we're going to submit to you that the issue about the plastic bag, again, that this was an accidental asphyxiation.  May be sufficient for what you decided lasted week, would not be sufficient for this aggravator here today because there is not the intention or direct causation.  And that is something for you to look at as you consider these two issues."

Do you see that argument there?

A.  Yes.

Q.  Is evidence that there was no semen, that Miss

Sjodin was not raped, that she had no cut wounds and that she did not die by having her throat cut, evidence that would have supported your argument that this was not a death caused during a kidnapping and instead was, as you told the jury, accidental asphyxiation without direct causation between the death and the kidnapping?

A.   Yes, I believe it would.

Q.   Can you just explain briefly.

A.   Well, the argument at trial was not a not guilty argument but it was that this was caused accidentally when the bag and the ligature was placed over Miss Sjodin's head.  If that's the case -- and again now we would have forensic evidence that said there was no rape so it didn't go past some initial phase.  There was no slashing so that wasn't the cause of death that helped support the accidental asphyxiation argument.  And then as we argued that would not be in the course of the kidnapping as an aggravator.

Q.   You also, Mr. Ney, addressed the mens rea requirements and those are the threshold intentionality findings that the jury was required to make?

A.   Yes.

Q.   And if I can refer you to pages 7292 and 7293, towards the top of 7292 you state:  "Now let me just touch briefly on the state of mind issues.  We call them

mens rea under the law.  That's a Latin term.  We're asking you to learn so much, maybe a little Latin won't be an issue.

How do you determine what's in someone's mind?  Well, the government says, well, there's something in mind.  There's something in his mind.  Well, yes.  But they have to prove to you beyond a reasonable doubt what it is.  The government's argument is this is obviously intentional.  He learned his lessons from years past.  I think I've dealt with that.  I think if you really look at that, that this was not -- and look at what happened here, this was hardly a planned or intentional killing.  It just doesn't have the hallmarks of that."

And then on the very next page, 7293, you pick up again towards the top and say:  "Again, we'd suggest to you this is a disorganized act, that this was not -- if this was a death that was caused unintentionally in the midst of a struggle, it's not cold-blooded, it's not deliberate, it's not intentional.  You might look at all of those factors as you view this."

Q.  Do you see that argument?

A.  Yes, I do.

Q.  Is evidence that there was no semen, that Miss

Sjodin was not raped, had no cut wounds and she did not die by having her throat cut, evidence that would have supported your argument that the mens rea requirement had not been met because this was, as you told the jury, a disorganized, unplanned, unintentional death that occurred in the middle of a struggle?

A.    This changes the narrative I think completely of what happened and what the government could argue reasonably.

Q.    And we'll talk about that in just a moment, but had you developed the evidence that we've been talking about here today, would you have had any tactical or strategic reason for not using it as a means to counter the mens rea requirement or, should I say, argue against the government's having proved those beyond a reasonable doubt?

A.    No reason at all.

Q.    One of the things you stated a couple minutes ago, Mr. Ney, was that you could not conceive of an argument that would have assisted you -- that this evidence would have assisted you with respect to the two prior crimes of violence aggravator.  Do you recall that?

A.    Right.  But I'm talking about the aggravator.

Q.    At sentencing that's why I'm asking only about

the aggravator, correct?

A.   Right, at the eligibility phase.

Q.   At the eligibility phase.

A.   That would be my testimony at this point.

Q.   Yes.  And as an experienced capital litigator, would the fact that you could counter one aggravator preclude you from presenting evidence and making arguments that would counter the other three aggravators?

A.   Not at all.

Q.   Why not?

A.   Well, in fact, we did counter one of the aggravators, the substantial planning, in the jury's mind.  If we go to the selection phase with one aggravator as opposed to three or four, we are by far in better position to argue our mitigation, at least in my opinion, that the government is limited to arguing that aggravator and the nonstatutory aggravators, of course, as part of their case.  And it weakens their presentation to the jury.

          Imagine Mr. Wrigley's argument at the selection phase without heinous, cruel and depraved. That's a very different case than Mr. Wrigley would be arguing to the jury at the selection phase.

Q.   And I will just momentarily ask about

Mr. Wrigley's argument, if I may.  But let me ask you before I get to that spot, if I can, ask about the selection phase quickly.

The government also presented four nonstatutory aggravators at the selection phase.  There were three that had already been found at the eligibility phase and those were the killing during a kidnapping, two prior crimes of violence, and the heinous, cruel and depraved.  And they also presented evidence of victim impact at the selection phase.

A.  Yes.

Q.  So victim impact is actually the only new aggravator presented at the selection phase.

A.  Right.  The only nonstatutory, yes.

Q.  And I'm assuming the answer to this is no as well, but is there any basis upon which you would have challenged the victim impact evidence with the new evidence that we've been talking about here today?

A.  As admissible?

Q.  No, as arguments about why it didn't actually have that impact.

A.  Well, obviously we would concede that Miss Sjodin's death had a huge impact on her family.  But again Mr. Wrigley's argument came down to what her family had to be thinking about, the marching out to the

site, the rape.  I think it plays on victim impact.  I'm not so callous to say that it would negate it at all, but it certainly had a play on that and what the family had to be thinking or the harm to their well-being about thinking about that happening.  If that didn't happen it's still horrible and tragic but it perhaps is a different victim impact case being presented.

Q.  And would it be fair to say that you could have advanced the same arguments against the statutory -- against the nonstatutory aggravators at the selection phase that you would advance against the statutory aggravators at the eligibility phase?

A.  Give me that question again.  I'm sorry.

Q.  The three nonstatutory aggravators that the government asserted at the selection phase --

A.  Yeah.

Q.  -- that were the same as the statutory aggravators asserted at the eligibility phase, could you have made the same arguments against those aggravating factors with the new evidence that you would have made at the eligibility phase?

A.  Yes, we could have if they still existed.  And please remember we attacked legally the heinous, cruel and depraved aggravating factor.  If we'd had that evidence that we've been talking about, the forensic

evidence, the p30, the new arguments about the nature of the wounds, I can't speak for the Court obviously but it would be something we would present to try and eliminate that as a statutory aggravator.  What's heinous, cruel and depraved about a kidnap/murder, our argument would have been without those factors, without that subsequent evidence that the state put on -- or the government put on.

Q.  I have just one more very brief area to cover with, Mr. Ney, and Your Honor, just to give everybody an update on the schedule.

I'd like to end this morning, Mr. Ney, by asking you a little bit about the government's closing argument at sentencing and its theory about how Miss Sjodin died.  And I'll refer everyone to the transcripts of September 20th of '06.  I do have an excerpted version here (indicating).

Let me, Mr. Ney, refer you to pages 8661 and 8662.

A.  Yes.  (Witness examining.)

Q.  And this is Mr. Wrigley's closing argument at the selection phase.  Towards the bottom he begins:  "This is the most serious and somber end to your journey.  You must determine what is the appropriate punishment for such intentional acts, such intentional acts by a

defendant with a proven record of repeatedly picking out women to victimize for his own sexual gratification, brutalizing them in the process, threatening, choking, stabbing, damaging them for life, and he was just getting warmed up.  All that before he chose to ready his knife, locate some cord, drive his car to Grand Forks in search of someone to drag kicking and screaming into his sordid rape fantasies."

Do you see that?

A.  Yes, I do.

Q.  Let me refer you to page 8665.

A.  Yes.

Q.  In the middle of that page Mr. Wrigley argues: "To reach a just punishment for this defendant, ladies and gentlemen, you must do so.  Terror and acute mental anguish.  The raw fear of what would be her fate as the defendant drove her into the night, stopped to strip off her clothes, battled her in the back seat of his car where the blood is found, sexually assaulted her, and drove her to a ravine and directed her to the ground on which her body would lie."

Do you see that argument by Mr. Wrigley?

A.  I do.

Q.  And then let me take you to page starting on page 8705.  Towards the bottom it begins:  "When Dr. McGee

testified, you may or may not recall me asking, but I did, when you did your complete body autopsy, Dr. McGee, and assessed each of the defects -- everything is so clinical, isn't it, when we talk about these things -- did you see a single drag wound of any kind or injury to Dru Sjodin at all consistent with dragging of any kind? None.

Ladies and gentlemen, Dru Sjodin walked -- she was forced to walk down that embankment.  She was not dragged down there off of that road where only a car could go and dragged down through there over the point, over the hump and in there.  She walked with her hands bound behind her back, naked from the waist down.  She had already been sexually assaulted, physically assaulted.  She had a bag over her head.  You saw the little cord on that by the way, little cord, not tied, not secured in any way, just over holding the bag in place.  She had the knife wound to her side.  Dr. McGee told you that didn't happen in that car.  There was no blood pattern to be consistent with that, and that makes sense.  You know that.  You saw the blood.  You don't need a medical examiner to tell you that.

Dru Sjodin was marched, she was shivering, she was cold, she was scared, and everything else that goes along with the torture that you found.  She was

marched down that embankment into the night, into the freezing night and over to the point where her death occurred.

We've all come to agree, I think, she didn't freeze to death out there.  It's as simple as this:  She would be all bundled up, wouldn't she, if she were lying there, all incapacitated, can't move because of her arms.  She would be all bundled up.  Circumstantial evidence.  Nobody believes that's what happened in this case.  It's obvious.

You also don't slit the throat in the fashion twice that Dr. McGee described to a dead body as some have postulated somewhere along the line in this case.  That's how Dru Sjodin died.  The grave ear-to-ear knife wounds.  Dr. McGee described them for you.  I'm not going to do it again.  You know enough about this case, you've seen enough, there's already too much. It's not going to be erased, as I said earlier."

Q.  Do you see that argument?

A.  Yes, by Mr. Wrigley.

Q.  Would it be fair to say, Mr. Ney, that the scenario painted by Mr. Wrigley about how Miss Sjodin died, that being that she was marched half naked bound by the wrists with a bag over her head after being raped and then having her throat slit twice after she's laid

on the ground was highly damaging to your case and arguments against the death penalty?

A.   Yes.   I think anybody reading this or hearing at the time could agree with that.

Q.   By the way, were Mr. Wrigley's arguments heavily relied on, if not exclusively relied on, Dr. McGee's testimony about the semen and the alleged wounds; is that correct?

A.   Yes.

MR. REISENAUER:   Objection, Your Honor. That would be his opinion.

THE COURT:   Overruled.

A.   Well, Mr. Wrigley is repeating what Dr. McGee is saying.   He's saying she was sexually assaulted.   That evidence came only from Dr. McGee.   He is saying that she had, I think he says, a knife drawn across her throat, if you continue on 8707.   "A hand had to draw that knife across her throat.   The defendant's."

I think that comes from Dr. McGee's testifying about that these are knife wounds.   The government's thrust of this case in my opinion was that no matter how much mitigation we had -- and I think Mr. Wrigley argued this.   I think I objected.   But what the argument was no matter how much mitigation we had it didn't mitigate this act.   And now we're at a point

where we don't know that what Mr. Wrigley described was the act. I think the evidence says it's not.

Q. (Mr. Abreu continuing) Is it fair to say, Mr. Ney, that the evidence that there was no semen, that she was not raped, that her -- she had no cut wounds and she did not die by having her throat cut, was evidence that -- is evidence that would have undermined and even possibly prevented or precluded Mr. Wrigley from making those arguments?

A. If that evidence had come in, I certainly would have objected to this argument as not being based on reasonable evidence. I don't know how else to say it. And, frankly, I think this was important evidence to the government's case to get Mr. Rodriguez a sentence of death. This march, I mean, as he described it he tells this narrative very well and it's very damaging.

MR. ABREU: That's all I have, Your Honor.

THE COURT: We'll go ahead and we'll break at this time. We'll start again at 1:30, and so we'll stand in recess for an hour and 15 minutes.

(Recess taken; 12:10 p.m. to 1:35 p.m.)

THE COURT: We are back on the record in a case entitled United States of America versus Alfonso Rodriguez. The record should reflect that everyone who appeared previously is still present. When we broke

Mr. Ney was on the stand.  Mr. Reisenauer was about to start with his cross-examination.

Mr. Reisenauer?

MR. REISENAUER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Mr. Ney, I just have a few preliminary questions and back to your -- if you look at I'll call it your resume?

A.  Okay.

Q.  P67.

A.  Okay.  I'm familiar with it.

Q.  You told us this morning that you had been involved in approximately a hundred murder cases, correct?

A.  Yes.

Q.  And am I correct, did I hear you right that you said seven state capital cases?

A.  I believe that's correct, yes.

Q.  And then the nine federal cases that are listed on the second page of P67?

A.  Yes, correct.

Q.  Okay.  And we took your deposition a few weeks ago.  I think it was August 30th.  Do you recall that?

A.  Yes.

Q.   Okay.  And you told us at that time that you were recently assigned a new federal death penalty case; is that correct?

A.   Well, I've been appointed as learned counsel in a case in the Southern District of Iowa for a case that at least there's a federal grand jury meeting on.  There's been no Indictment so it's not a federal case yet.  It's still a state case.

Q.   Okay.  But that process is the same process you went through in this particular case, correct?

A.   Somewhat but there is no federal pending case in this case, the Southern District of Iowa.  When I was appointed here there was a pending case against Mr. Rodriguez.

Q.   I see.  Okay.  And earlier you testified that you became involved in this case at the request -- or through a contact with Kevin McNally?

A.   Yes.

Q.   And can you tell us who he is?

A.   Well, he is -- there's a federal resource project made up of defense attorneys who consult in capital cases.  You'll note from my resume I was part of that project from 2008 to 2013.  Kevin McNally is the director of that project.  He gets contacts from public defenders or courts around the country when there's a

pending or prospective federal capital case.  Then he finds learned counsel.

Q.   Okay.  And you became learned counsel initially. When would that be, if you recall?

A.   Well, the first case I was learned counsel on was in the Southern District of Iowa in 1997.

Q.   Okay.

A.   U.S. v. Christopher Kauffman.

Q.   Okay.  And then tell us what position that you would be in if you were part of the federal capital resource counsel.  What difference is that?

A.   Learned counsel is obviously -- well, not obviously but learned counsel is trial counsel, a person assigned to the case to litigate it.  Resource counsel is counsel that gives resources, gives advice, I don't want to say supervision because that's too strong a word but is there to provide information and assistance to trial teams trying cases.

Q.   Okay.  So if -- well, I'll use Mr. Abreu as an example.  If he was in private practice and was appointed to a federal death penalty case as a member of the federal capital resource counsel, he could contact you and basically get some advice, get some information on different aspects of the case?

A.   Yes.  But more formally actually probably I or

someone else would be assigned to his case.

Q.   Okay.

A.   Not that he couldn't contact other resource counsel, have them available to him, but generally there's a resource counsel that sort of staffs or is assigned to a particular case.

Q.   Okay.  And so according to P67 you were on that from 2008 until 2013.

A.   Yes.

Q.   Okay.  And I assume you provided advice and counsel on a number of cases to other attorneys.

A.   Yeah, probably a couple of dozen, several dozen, yes.

Q.   Okay.  Thank you for clarifying that.  And you noted earlier that this was Mr. Hoy's first capital case, correct?

A.   Yes.

Q.   Okay.  You're aware that this was the first capital case in this district or in North Dakota for approximately a hundred years prior to this case?

A.   I'm aware of that.  I think that's perhaps in my request to nonauthorize this case.  I think I probably pointed that out, yes.

Q.   Correct.  If you would look at then I think it's P16 which is the Final Autopsy Protocol?

A.   Is it 16?

Q.   Sixteen, yes.

A.   Okay.  I don't --

Q.   You don't have 16 there?

A.   I don't think so.  I'm looking at them.  Oh, I'm sorry, I have it.  The exhibit sticker from the trial apparently says 4 or from a deposition but if I look lower it is P16.

Q.   Okay, thank you.  And you testified this morning that you had received this document as part of the discovery, correct?

A.   Yes.

Q.   Okay.  And in reference to a couple things that counsel asked you, on the very first page let's just take a brief look at that.  In Roman Numeral III B. it talks about "Sexual assault examination."  You see that?

A.   I do.

Q.   Okay.  And it lists there three items:  "Vaginal sperm - negative."  Do you see that?

A.   Yes.

Q.   Okay.  And then the acid phosphatase number 47.4 units per liter.  Do you see that?

A.   I do.

Q.   And then No. 2, rectal sperm is negative, correct?

A.   Correct.

Q.   And acid phosphatase is 7.5 units per liter, correct?

A.   That's correct.

Q.   And then No. 3, cervical sperm is also negative?

A.   Yes.

Q.   And acid phosphatase is at 130.7 units per liter, correct?

A.   Right.

Q.   Okay.  And you're aware I take it from the trial and all the discovery that was provided that the acid phosphatase numbers were arrived at by some testing done at Regions Hospital?

A.   That's as I understood it, yes.

Q.   Okay.  And would it be your understanding that this negative sperm result that is also on the protocol here was arrived at at a viewing microscopically at Regions Hospital?

A.   That was my belief, yes.

Q.   Okay.  And there's no indication in this report that there was any p30 testing done, correct?

A.   No, there is not.

Q.   And I'll just refer you back up above to Roman Numeral I, capital letter D it says:  "Remnants of a slash wound - neck region," correct?

A.   Yes.

Q.   Roman Numeral E. says:  "Defect to right flank region," correct?

A.   Yes.

Q.   And this Final Autopsy Protocol was sent at some point to Dr. Garry Peterson, correct?

A.   By us, yes.

Q.   Okay.  Thank you.  In fact, if you then would refer to Government's Exhibit CCC, Mr. Ney?

A.   Yes, I have it.

Q.   Okay.  The second page, No. 4 there indicates that the Final Autopsy Protocol was sent to him by Mr. Hoy, correct?

A.   Yes.

Q.   And earlier counsel asked you about a number of items that you were inquiring about, and those are listed on the bottom of the page 1 through 5; is that correct?

A.   Correct.

Q.   And again there's a question about slash wound to the neck and the defects and the acid phosphatase levels; is that correct?

A.   Yes.

Q.   And this was provided to Dr. Peterson long before Dr. McGee's deposition; is that right?

A.  Yes.

Q.  And, if you would, I'll refer you to the third page.  Mr. Hoy says:  "At this point, I would prefer not to receive any written reports from your evaluation."

Do you see that?

A.  Yes.

Q.  You never did receive a written report from Dr. Peterson, did you?

A.  We did not.

Q.  Take a look at P28, Mr. Ney.

A.  I have it.

Q.  P28 is a Lab Report No. 10, correct?

A.  Yes.  This is the three-page version, yes.

Q.  Correct.

A.  Okay.

Q.  And on the second page there again at the bottom it says:  "Examinations of the following items did not detect the presence of semen."

Do you see that?

A.  The --

Q.  Second to the last paragraph?

A.  Yes, I see it.

Q.  And it refers to vaginal swabs, anal swabs and the cervical swabs; is that correct?

A.  Yes.

Q. And you were aware of that lab report?

A. I was.

Q. And so you were aware that the BCA lab had done tests and had determined -- or did not detect the presence of semen, correct?

A. No. This is examinations. Doesn't say test.

Q. It says: "Did not detect the presence of semen," correct?

A. Your question was, was I aware that they did tests --

Q. I'll reask the question, Mr. Ney.

A. All right. Sure.

Q. Were you aware that the report said that the BCA lab "did not detect the presence of semen?"

A. Yes.

Q. Okay, thank you. And do you recall that there was testimony at trial from Mr. Fischer that he did not detect the presence of semen?

A. Yes.

Q. And that was a result of cross-examination by Mr. Hoy, correct?

A. I believe that's correct.

Q. And if you would look at Plaintiff's Exhibit 7.

A. Okay.

Q. Do you have that in front of you?

A.   I do.

Q.   Thank you.  Plaintiff's Exhibit 7 is Lab Report 27, correct?

A.   It is.

Q.   And that particular report, I think that has five pages?

A.   Yes.

Q.   And if you again turn to page 3 and the third to the last paragraph says:  "No male DNA was obtained from items" that include 74 but specifically 86A, the vaginal swabs, 86B, the anal swabs, or 86C, the cervical swabs.

A.   Yes.

Q.   And you were aware of what was in that report in that regard?

A.   I was.

Q.   And do you recall that there was testimony at the trial that no male DNA was obtained from those items?

A.   I believe that's correct, yes.

Q.   Mr. Ney, I'm going to hand you the transcript from the trial.  It's Volume 29.  Specifically this is testimony of Dr. McGee during the trial, Mr. Ney.  If you would -- this is the direct testimony of Dr. McGee, if you would turn to page 6721, 6721.  Can you find that?

A.   Yeah, I'm almost there.

Q.   A lot of pages there, sorry.

A.   Okay.

Q.   And then if you would just go to -- I'll refer you to line 8, question:  "When you got the results back -- actually what is the result -- what's it called that you get back?"

Answer:  "The result you get back is the level -- the printout from the laboratory listing the acid phosphatase and listing the sperm that's present or absent."

Question:  "And -- okay.  On any of the sites that you tested in this case, was the sperm absent or present?"

Answer:  "Sperm were absent on all sites."

Is that correct?

A.   That's what he testified to, yes.

Q.   And you recall that?

A.   Generally, yes.

Q.   And if you would turn to 6753, this is on cross-examination Dr. McGee, if you would go down to line 21 when you get there.

A.   Okay, all right.

Q.   Line 21?

A.   Got it.

Q.   Question:   "Now my understanding is that the

slides that your lab prepared from those swabs and sent to the Ramsey County -- or, excuse me, the Regions Medical Center lab, they found no sperm present on those slides, correct?"

Answer:  "No sperm found."

A.   Yes.

Q.   Do you recall that testimony?

A.   Yes, generally I do.

Q.   And then if you would turn to the very next page, and at the top of the page there line 1, question: "Okay.  And are you also aware that the other swabs that you gave to the Minnesota Crime Bureau people that they took to their lab, and I think they've been talked about here during this case earlier as BCA items numbers 86A, 86B and 86C, which are the samples from the three areas of her body, that they DNA tested those and found no male DNA present.  Are you aware of that?"

And he answers:  "That's my understanding."

Do you see that?

A.   I do.

Q.   And you recall that testimony?

A.   I do.

Q.   Mr. Ney, I'm going to hand you what was previously entered as Government's Exhibit TT (indicating).  That's the testimony of Mr. Steven

Fischer.  It's Volume 27 from the trial.  And if you would turn to page 6160.

A.  Yes.

Q.  Give me one second, Your Honor.  I guess I didn't bring myself a copy.  It's already highlighted for you I guess.

A.  I've read it, if that's your question.

Q.  Well, I'll ask my question.

A.  Sure.

Q.  Line 2, this is a question on cross-examination of Mr. Fischer.  "Okay.  Were you also furnished a series of swabs that were also referred to in the same paragraph, vaginal swabs, Item 86A, anal swabs, Item 86B, and cervical swabs, Item 86C?"

Answer:  "Yes, I was."

Question:  "Did you also examine those swabs for the presence of semen?"

Answer:  "Yes, I did."

Question:  "And you found none, no semen on any of them?"

"That's correct."

Do you recall that testimony of Mr. Fischer?

A.  I do.

Q.  Now this information that we've just been talking about, the fact that no sperm cells were found in the

cervix, the vagina, the anal region, no semen was detected per Mr. Fischer's testimony, no male DNA was found, all that information was apparent to you and Mr. Hoy, correct?

A.  Well, you're using the word "detected" and Mr. Fischer said "examined," his examination showed. So, yes, I'm aware using the word "examination" that no semen or sperm were found.

Q.  All this information was provided to Dr. Sensabaugh as part of your presentation at the Daubert hearing and for preparation for his testimony at the trial, correct?

A.  All what information?  I'm sorry.

Q.  The information that I just alluded to, the fact that there was no sperm cells or no sperm found in the cervix, the vagina, the anal region, the fact that there was no semen detected by examination, the fact that there was no male DNA found on Exhibit 86?

A.  That information was provided to Dr. Sensabaugh as we had it at that time, yes.

Q.  Okay.  And a motion for a Daubert hearing was filed by you and Mr. Hoy, correct?

A.  Yes.

Q.  And that was pertaining to the acid phosphatase results, correct?

A.   That's correct.

Q.   And you had originally retained Dr. Edward Blake for the purpose of reviewing DNA results in this case, correct?

A.   Not just DNA.  That was part of it but also the serology.

Q.   Okay.  And would the serology have included the acid phosphatase?

A.   It would have.  Dr. Blake is an expert in that field, as is Dr. Sensabaugh.

Q.   Okay.  We've heard some testimony from other individuals regarding their expertise.  You had previously -- I believe you testified this morning you had previously hired Dr. Blake as an expert in prior cases?

A.   Yes.

Q.   What kinds of cases were those?

A.   I think one was a rape case.  One was a murder case.  I used his testimony via stipulation in the murder case --

Q.   Okay.

A.   -- prior to this case.  He did not testify as an actual live witness but we stipulated to his testing and results.

Q.   Okay.  And had you used Dr. Sensabaugh

previously?

A.   I had never used Dr. Sensabaugh.

Q.   Okay.   Dr. Sensabaugh was actually referred to you and Mr. Hoy by Dr. Blake, correct?

A.   Yes, that is correct.

Q.   Okay.   And we have heard testimony and I believe you just testified that both of these gentlemen are experts in these fields, correct?

A.   Well, yes.   I mean, Dr. Blake said Dr. Sensabaugh was as good as he was in acid phosphatase and I took his word at that.   We took his word at that.   I knew Dr. Blake to have been an expert before that time.

Q.   Okay.   Did you become aware at any point that, in fact, Dr. Sensabaugh was a professor of Dr. Blake's when Dr. Blake was in college?

A.   I may have known that.   It sounds familiar but I don't know.   I know they had some connection.

Q.   Okay.   Did you become aware that each of those individuals were basically world renowned, maybe the top two individuals in this field?

A.   Yes, I believe -- I knew Dr. Blake to be and I found Dr. Sensabaugh was as well, yes.

Q.   Okay.   And obviously Dr. Sensabaugh testified at the Daubert hearing in regard to this acid phosphatase question, correct?

A.    Yes.

Q.    And then he also testified during the trial in regard to that particular question as it pertained to this case.

A.    He did.

Q.    Besides Dr. McGee and Dr. Sensabaugh, you and Mr. Hoy also retained other experts on this particular case; is that correct?

A.    Many, yes.

Q.    Dr. Dean Stetler?

A.    Yes.

Q.    And he was retained in regard to the DNA question after Dr. Blake withdrew, correct?

A.    That is correct.

Q.    And, in fact, he testified at a motion hearing regarding the DNA and the destruction of evidence in this case.  Do you recall that?

A.    I think that's correct, yes.

Q.    And you know Dr. Stetler from prior cases?

A.    I did.

Q.    How do you know him?

A.    Well, Dr. Stetler is a professor at the University of Kansas in Lawrence.  His expertise, or one of them, is in the field of DNA analysis.  He is not an analyst like Dr. Blake.  In other words he doesn't have

a lab to do testing but he knows the science.

Q.  Okay.  And had you used him previously as an expert?

A.  Yes, and since.

Q.  What types of cases?  Any murder cases?

A.  Actually the last case I used him on was a robbery case when we were talking about mitochondrial DNA and when that testing came into -- it was a post-conviction case when that testing came into use. I'm sure there were murder cases and sexual assault cases.  That's what I would use him on though.  That one was a robbery case.

Q.  And then you and Mr. Hoy retained Dr. Terri Melton.  Do you know her?

A.  Yes.

Q.  And she is a mitochondrial DNA expert, correct?

A.  She is.

Q.  How do you know her?  Had you retained her previously?

A.  I have.  She has testified in a murder case that I had prior to this case and I've consulted her -- we're involved in a case right now together, in fact.

Q.  Okay.  And Mr. Chris and Skip -- I pronounce it PELL-a-nik (phonetic).  I know that's wrong.

A.  Pa-LEN-ik (phonetic) is how I pronounce it.

Q.   Okay.  And do you know them?

A.   I know Skip.  I have never had any major contact at all with Chris but I do know Skip Palenik.

Q.   And you have prior cases with them?

A.   Yes, with Skip.

Q.   Okay.

A.   Sorry.

Q.   And they did some analysis with regard to the fiber evidence in this case for you, correct?

A.   Yeah.  Skip Palenik's area of expertise is fiber analysis, yes.

Q.   Okay.  Any other experts I'm missing that you had retained?

A.   For the -- relating to the forensics in the guilt phase?

Q.   Yes.

A.   I don't believe so.

Q.   Okay.  So each of the experts --

A.   Well, there was Dr. Peterson, of course.

Q.   Dr. Peterson we've talked about?

A.   Yeah.  I wanted to make sure he was on that list.

Q.   Okay.

A.   But yes.

Q.   And so each of the experts that were retained by you and Mr. Hoy you had had prior dealings with.

A.   Not Dr. Sensabaugh to be clear.

Q.   Okay.

A.   The others.  Although Chris Palenik, again I really hadn't had dealings with him but he works with Skip.

Q.   Okay.

A.   So other than that, yes, the answer to your question is yes.

Q.   All right.  Thank you.  Mr. Ney, you recall testimony at the trial that Miss Sjodin when she was found was found with her hands bound behind her back?

A.   With her -- I'm sorry, hands?

Q.   Hands.

A.   Yes.

Q.   And that she was found naked from the waist down?

A.   Yes, I'm aware of that.

Q.   Her top was partially pulled down over her shoulders, you recall that?

A.   I think so.

Q.   And then there were the remnants of the plastic bag with the ligature attached to them?

A.   Correct.

Q.   Do you recall that one of her shoes was found underneath a bridge?

A.   I do.

Q. And that was a few miles away?

A. Yes.

Q. Let's go to Plaintiff's Exhibit 51. Those are the notes of Mr. Hoy from your meeting with Dr. Peterson.

A. I have them.

Q. Okay, thank you. And again there's a number of pages here. I'm counting six.

A. Yes, I have six pages.

Q. Thank you. Now this meeting, according to Mr. Hoy's note, was on April 15th of 2005, correct?

A. Yes.

Q. This was prior to any deposition of Dr. McGee, correct?

A. More than a year before, yes.

Q. But the autopsy protocol had been provided to him.

A. The opinions in the autopsy, yes. That we had at that time, yes.

Q. That we talked about earlier.

A. Right.

Q. Okay.

A. And photographs as well.

Q. And photographs.

A. Yup.

Q.   And within the notes here there were some photographs that were reviewed with Dr. Peterson by you and Mr. Hoy, correct?

A.   Yeah.  We looked at a number of photographs.

Q.   And you testified earlier that you didn't take any notes of the meeting, correct?

A.   I did not.

Q.   Okay.  If you would turn to the second page.

A.   Okay.

Q.   It refers there to, in the middle of the page, "photo 1180."  Do you see that?

A.   I do.

Q.   And it says:  "Upside down," which I assume means the photo was upside down?  I don't know.  Mr. Hoy would be the answer to that question, huh?

A.   I'm not sure what that note means frankly but that's my assumption, too.

Q.   Okay.  The next line says:  "Clearly shows cut" and that's underlined "of throat area, probably two times."  Correct?

A.   That's what it says.

Q.   Turn to the next page.  Again towards the middle of the page there the sentence starts with the word "if."

Do you see that?

A.   Yes.

Q.   It says:  "If he <u>had</u> to opine a cause of death, he would say 'incised the neck' but not <u>certain</u>."

Do you see that?

A.   Yes, I do.

Q.   And then there's a semi colon and it says: "Could have been strangulation with ligature."

Do you see that?

A.   I do.

Q.   Okay.  And if you turn to the second to the last page.

A.   All right.

Q.   Again here these are Mr. Hoy's notes, correct?

A.   These are all Mr. Hoy's notes, yes.

Q.   And it says in the middle of the page and it's underlined it says:  Opinions to, quote, reasonable medical certainty, end quote.

Do you see that?

A.   Yes.

Q.   Again a list of four items.  The first says "throat" and after that there's a number 2 in parentheses.  Do you see that?

A.   I see what's there, yes.

Q.   Okay.  And then the second item has an R circled and it says "flank" beside it?

A.   Yeah.

Q.   No. 3 says R circled and it says "upper thigh" beside it?

A.   I do see it.

Q.   And No. 4 says:  "Perhaps pubis" with a question mark, correct?

A.   I see that, yes.

Q.   And then besides all four of those the words "all incised wounds" exclamation point is written, correct?

A.   That's what the notes reflect.  I mean, you're reading the notes correctly.

Q.   Okay, thank you.  I'm glad I could read correctly.

A.   Well, okay.

Q.   If this were Dr. Peterson's opinion at the time, that would certainly not have been helpful to your case in terms of the possible wounds or injuries to Miss Sjodin; is that right?

A.   If it were, but it wasn't.

Q.   No, that wasn't my question.

A.   Well, okay.  Hypothetically if this were his opinion, no, it wouldn't be helpful.

Q.   Thank you.

A.   Okay.

Q.   I'm going to refer you back to Plaintiff's

Exhibit 16, if you would.

A.   All right.

Q.   Which is the Final Autopsy Protocol.

A.   Got it.

Q.   So on that front page there in Roman Numeral I, capital C, it says:  "Ligature present about neck region."  You see that?

A.   I do.

Q.   Under D: "Remnants of slash wound - neck region."

A.   Yes.

Q.   Correct?  It does not say that it was slashed two times, does it?

A.   It does not.

Q.   Okay.

A.   It's "wound," singular, yes.

Q.   And letter E. says:  "Defect to right flank region," correct?

A.   Yes.

Q.   It doesn't say that that was an incised wound there, does it?

A.   No.

Q.   You recall Dr. McGee testifying at the time of trial with regard to these various wounds that we've just been talking about?

A.   Yes.

Q.   And do you recall at the time of trial that Dr. McGee did testify that, in fact, there was a neck slash?

A.   Yes.  Two I think he testified to.  At least that's my recollection.

Q.   Why don't you grab that transcript of Dr. McGee's testimony again if you could?

A.   Okay.  Volume 29?

Q.   I believe so.

A.   All right.  I think I've got it.

Q.   Yes, 29.

A.   Okay.

Q.   And if you would let's just cover all of this at one time.

A.   Sure.

Q.   Turn to page 6727.

A.   Okay.

Q.   Turn to page 6726.  We'll just start there, okay?

A.   All right.

Q.   Thank you.  Go to line 13.  And line 13 there was a question:  "Okay.  And when you say 'homicidal violence...' -- prior to that in the answer to the question right before that, Dr. McGee testified that this was a result of homicidal violence.  You recall that?

A.   Yes.

Q.   Let me ask you this now that I've got it on top of my head, Mr. Ney.  Earlier today you testified in response to counsel's question they have provided you reports of other pathologists that had been retained since the trial.  You recall that?

A.   I do.

Q.   And you've read then Dr. Flomenbaum's report, I believe Dr. Arden, there's Dr. Ferenc, you recall reading those?

A.   I recall reading reports.  The names probably escape me as I sit here.  It's been a while.

Q.   Do you recall in their records that they agreed that this death was a result of homicidal violence?

A.   That specific language?

Q.   Yes.

A.   I don't recall whether they said that or not. I'm sorry.

Q.   Okay.  Well, let's go back to this.

A.   Okay.

Q.   So then on line 13 the next question says: "Okay.  And when you say 'homicidal violence,' even with all the decomposition and everything else are you able to ascertain that?"  And he says:  "Yes."

Question:  "How is that?"

Answer:  "Well, that she has a -- you have to consider how she's found.  She's found bound so her hands are not movable but she has a slash wound to her neck that goes across almost the entire length of her neck.  She has remnants of a plastic bag about her neck region.  The material that was underneath her ligature mark when it is removed and identified, police at the autopsy identified it as a plastic bag.  I think it was from some store."

Do you see that?

A.   I do.

Q.   Do you recall that testimony?

A.   Yes, I do.

Q.   And then if you then turn to the next page and again on the first line he finishes:  "So given its location and the plastic that's present on her eyes at the time of the autopsy, I believe her head was in a bag that was secured by the ligature so an asphyxial death is also possible."

Do you see that?

A.   Yes.

Q.   Do you recall that testimony?

A.   Yes.

Q.   And then the next question, line 5:  "How about strangulation?"

And he testifies:  "Strangulation is certainly possible.  The cord that was around her neck could have been used to strangle her.  There was no soft tissue that could be identified.  No petechiae were noted in the eye."

Do you see that?

A.   Yes.

Q.   And you recall that testimony from trial?

A.   Yes.

Q.   And if you would turn to page 6728, which is the next page, go to line 14.

A.   All right.

Q.   And the question is:  "And tell me, if you could, within that what you believe to be the likely cause of death."

And he answers:  "I think the likely cause of death is a slashwound to her neck."

Do you see that?

A.   Yes.

Q.   And you recall that testimony?

A.   I do.

Q.   And then the next question is:  "Are there other possible causes of her death?"

And he answers:  "A possibility is asphyxia; that is, being unable to breathe because the bag is

being placed over her head.  That is a possibility.  The third possibility is she died from exposure; that is, the slashwound to her neck was not fatal and that she laid in the area and died from exposure to cold."

Do you see that?

A.  I do.

Q.  And you recall that testimony from the trial?

A.  I do recall it.

Q.  So essentially would you agree, Mr. Ney, that Dr. McGee testified that there are, in fact, four possibilities of cause of death in this case:  the neck slash, asphyxia, strangulation, and then finally possible exposure to the elements?

A.  Right, four possible causes of death.  But he did testify that the slashwound is being from a knife like Mr. Rodriguez, yeah.  But, yes, the ultimate cause of death, yes.

Q.  Okay.  Thank you.  Hang on a second.  Sorry about that, Mr. Ney.  I'm going to hand you from a prior hearing Government's Exhibit HHH (indicating).

Mr. Ney, these are notes of Mr. Hoy from a meeting on March 1st of 2006 meeting with Mr. Rodriguez.  Do you recall this meeting?

A.  Yes.  Without recalling the date specifically, I recall the meeting that you're referring to.

Q.   Okay.  And these are Mr. Hoy's notes and it does reflect that you were present, right?

A.   Yes.

Q.   This would be on the top left-hand side of the page.

A.   I was present.

Q.   And do you have any notes from this meeting?

A.   I don't.

Q.   There were discussions per Mr. Hoy's note at least about four different subjects.  No. 1, a motion to suppress that had been decided on a brief, do you see that?

A.   I'm sorry, I must be missing this.

Q.   No. 1?

A.   Okay.  At the top?

Q.   Yes.

A.   I'm sorry.

Q.   It says:  "Motion to suppress decided on brief"?

A.   I'm sorry, the second, yes.

Q.   Okay.  "Recent order on pretrial motions," No. 2, you see that?

A.   Yes.

Q.   And then No. 3 it is discussion regarding the government's forensic evidence, mitochondrial DNA, DNA, her blood in his car, and the fiber evidence.  You see

that?

A.   I do.

Q.   And would you agree that these were all items discussed with Mr. Rodriguez on that date?

A.   I don't remember the discussions about the motions which I think he would have known.  But that aside, I remember talking about the forensic evidence with him as we did.

Q.   Okay.  And earlier this morning you in answer to counsel's questions indicated that based upon all the evidence you were convinced that the defendant, Mr. Rodriguez, would be found guilty, correct?

A.   Yes.

Q.   And on No. 4, Mr. Hoy's notes, there you in fact had a discussion in regard to his chances at trial on that date, correct?

A.   Yes.

Q.   And he writes:  "Our opinion will be conviction, death penalty very possible."  Do you see that?

A.   Yes.

Q.   Do you recall informing Mr. Rodriguez of that?

A.   Yes.  I don't think this is the first time we've -- we told him that but, yes.

Q.   Okay.  And then there are some continued notes there and then there's an asterisk in front of the word

"finally." It says: Finally, comma, he's willing to take a plea, but when asked, quote, didn't do it, end quote. Do you see that?

A. Yes.

Q. And then finally it says: "More discussion of need to admit. Then he's willing to do it." You see that?

A. Yeah.

Q. And then at the bottom of the page again says: "Finally, he admits elements to us & wants to plea bargain." Do you see that?

A. Yes.

Q. And so as a result of that I take it that is what prompted the letter to Mr. Wrigley on March 8th that you talked with counsel earlier today about indicating Mr. Rodriguez was willing to plead guilty to the crime; is that correct?

A. Yes. I mean, understand this has been ongoing discussion with Mr. Rodriguez.

Q. Okay.

A. And either at this meeting or maybe a subsequent meeting we locked in that he would plead.

Q. Okay. Well, this says -- this meeting is March 1st and your letter to Mr. Wrigley is March 8th so --

A.   Could have been the next day or something like that but, yes.

Q.   Okay.

A.   Your timing is correct, yes.

Q.   Okay.  So at this meeting or any other meeting at any time did Mr. Rodriguez inform you as to what had occurred in the meeting with Miss Sjodin that caused this case to come to this Court?

MR. NEY:  Your Honor, I would ask for a waiver of Mr. Rodriguez's counsel on privileged information.

MR. ABREU:  Your Honor, we would absolutely waive the privilege as it relates to the issues we're discussing and the subject of this hearing.

THE COURT:  His waiver -- the defendant waived his right to be personally present and delegated the authority to waive privilege to his counsel.

You may answer the question.

THE WITNESS:  Your answer was did he admit -- or your question was did he detail what had happened?

Q.   (Mr. Reisenauer continuing)  Yes.  Did he tell you what happened?

A.   Well, maybe I'm not understanding the question. In anytime ever or in relation to this, to Exhibit HHH?

Q. Well, we can go step by step I guess but on March 1st did he tell you or did he give you details of what happened?

A. No, he did not.

Q. Prior to sending the letter on March 8th of 2006, did he give you any details about what happened?

A. Did he make any admissions prior to March 1st about committing the crime? Is that --

Q. No, that's not my question.

A. Okay.

Q. Okay. The note from Mr. Hoy indicates that on the last line or last two lines he says: "Finally, he admits elements to us & wants to plea bargain." See that?

A. Yes.

Q. Okay. I'm not asking whether he's willing to admit elements. I'm asking if he informed you as to the details of what happened?

A. In killing Miss Sjodin?

Q. Yes.

A. No.

Q. And that was on March 1st.

A. That's correct.

Q. Did he do that prior to your sending the letter on March 8th?

A.   No.   Mr. Reisenauer, I'm not trying to fence here.  He admitted when we -- when I think Mr. Hoy says "the elements" he admitted he killed her.  But you're asking details of how it happened?

Q.   Correct.

A.   The answer is no, he did not.  I just want to be clear.

Q.   Okay.  Well, let me ask it specifically this way then.  Did he inform you that he had slashed her throat?

A.   No, he never told us that.

Q.   Did he inform you that he had cut her throat?

A.   No, never.

Q.   So let's -- hang on a second.  Could you then go to P53.  Do you have that in front of you?

A.   I'm looking.

Q.   Okay.  P53 is a one-page letter.  It's the letter to the Court stipulating to the nature and causation of the wounds.

A.   I have P53.  I disagree with that characterization of what this is.

Q.   Okay.  Well, we'll just ask questions then.

A.   All right.

Q.   Okay.  Plaintiff's Exhibit 53, you have it in front of you?

A.   Yes.

Q.   Okay.  Go to the second paragraph.

A.   Yes.

Q.   And it reads:  "After consultation with our client, defense counsel can advise," and as counsel stated there's a typo there, "the Court and prosecution that the defense does not intend to contest at trial the nature and causation of these wounds as described by Dr. McGee during his deposition."

Do you see that?

A.   Yes.

Q.   You and Mr. Hoy sent that letter to the Court, correct?

A.   Mr. Hoy sent it but I was aware of it and involved.

Q.   And you were CC'd on it?

A.   Yes.

Q.   And this was a decision made by you and Mr. Hoy?

A.   Yes.

Q.   And it says:  "After consultation with our client," that would be Mr. Rodriguez, correct?

A.   It is.

Q.   Okay.  So he was aware of this and you discussed it with him?

A.   Yes.

Q.   Okay.

A.   My disagreement is the term "stipulation" is all. I'm sorry, I don't consider this a stipulation.

Q.   I don't want to argue with you, Mr. Ney.

A.   All right.

Q.   I'm just reading what's written there.

A.   All right.

Q.   I didn't write the letter.

A.   All right.

Q.   Okay.  Mr. Ney, I'm going to hand you Volume 30 from the trial transcript (indicating).  Mr. Ney, these are the closing arguments at trial.  I would refer you first to page 6853, if you would.

A.   Okay.

Q.   And this is Mr. Wrigley's closing argument. Start down on line 21.  It says:  "Judge Erickson told you that there are just four elements or parts of what we were required to prove.  The defendant abducted Dru Katrina Sjodin.  The defendant did so for the purpose of sexually assaulting Dru Sjodin or for some other purpose known only to him."  And then on the next page:  "No. 3, the defendant transported Dru Sjodin in interstate commerce, whether she was alive or dead at the point that she crossed the state line.  And, No. 4, the defendant's actions resulted in the death of Dru Sjodin."

Do you recall that statement of Mr. Wrigley?

A.   Yes.   This is the closing argument in the guilt phase?

Q.   Correct.

A.   Yes.   I generally recall that.

Q.   And then it goes on to say on line 6:  "Now it's important that you all recognize you are not required to be unanimous about how a certain element is proven.  For instance, on element No. 1 that we just talked about, you might each have different theories about how the defendant was able to abduct Dru.  That's okay.  The law does not require your agreement on that.  And you may agree or some part of you may agree, but the law does not require your agreement on how it was accomplished. The law simply requires that you agree the defendant was the person responsible."

He says:  "Similarly for element No. 2, you may each find that the defendant's purpose was something different and that's perfectly permissible as well.  The law allows you to have those differences of opinions, ladies and gentlemen.  Keep that in mind.  The law simply requires that you agree that there was some purpose, whether it was sexual assault or otherwise.  If you agree that he had a purpose, this element is proven. You need not agree on what the purpose was."

You recall that statement?

A.   Generally, yes.

Q.   If you turn to the next page then, 6855, and there on line 6 Mr. Wrigley says:  "Finally element No. 4, you do not need to agree on the manner in which the defendant's acts resulted in Dru's death.  Rather, you simply need to agree that the defendant's actions resulted in Dru's death.  You may agree in the end, all 12 of you, about what it was that caused it precisely or you may break into groups and say:  Well, some think it was the bag.  Some think it was a strangulation of some form.  Some think it was the throat.  You need not agree on the method.  You only need to be unanimous that he did it and that his actions resulted in her death."

You recall that?

A.   Yes.

Q.   And if you would turn to page 6867, line 15.

A.   All right.

Q.   Are you there?

A.   Yes.

Q.   Mr. Wrigley says:  "Ladies and gentlemen, the investigators had their man.  When you consider that Dru Sjodin was found stripped nude from the waist down with her sweater torn down the front to expose her undergarments, her hands bound tightly behind her back,

she's laying face down in the ditch with her throat sliced open, you probably didn't need to be told that this crime involved sexual assault.  Sexual assault is a sexual act or a sexual touching.  Sometimes people just think of it as sexual penetration but it can be many things, touching of a sexual nature to obtain gratification of some kind."

        Turn to the next page.

A.  Yes.

Q.  He goes on:  "You probably didn't need to be told that it was a sexual assault.  But because the facts in this case so obviously indicate sexual assault in addition to the kidnapping, the law allows the United States to present evidence, and we did that in this case, of certain other sexual assaults that were committed by Alfonso Rodriguez, Jr.  Evidence of these convictions shows that Alfonso Rodriguez has a propensity for committing sexual assaults and you are allowed to consider that in arriving at your conclusions in this case."

        Do you recall this?

A.  I do.

Q.  Nowhere here does Mr. Wrigley bring up anything regarding acid phosphatase, does he?

A.  Not from what I've read here, no.

Q.   And, in fact, do you recall he did not bring up acid phosphatase at all in his closing statement?

A.   Well, let's be clear, this closing statement?

Q.   That's what I'm asking.

A.   Okay, understand.   There were several closing statements so I want to make sure what we're talking about.

Q.   Yeah.

A.   I don't remember him using the words "acid phosphatase" offhand.

Q.   Okay.   Thank you.   Mr. Hoy did the closing argument for the defense, correct, in this phase?

A.   Yes.

Q.   I'm going to have you turn to page 6898 and then go down to line 17.

A.   Okay.

Q.   And here Mr. Hoy is the one who brings up the acid phosphatase question.   He says:   "The government has, as I indicated earlier, suggested that this was a sexual assault case but their proof that there was an actual sexual assault falls short.   That's not critical for the case, but the forensic evidence that they themselves offered does not demonstrate that there was an actual sexual assault.   The labs tested all of her clothing and found no sperm.   The cytology lab at

Regions Hospital tested the slides that were sent from Dru Sjodin's body that was sent there by the medical examiner and they in fact found no sperm present either."

The next paragraph says:  "The duplicate set of swabs taken at autopsy were also sent to the Minnesota Crime Bureau lab.  They tested those and found that there was no male DNA present on those samples as well.  The only basis, any evidence at all, for the government to stand here and argue that there was in fact a sexual assault that actually occurred was the testimony of Dr. McGee.  And Dr. McGee told us that he interpreted the acid phosphatase results that he got back from the lab to mean that there would have been a sexual assault because he believed that the acid phosphatase levels that were reported were in fact elevated, okay?"

Do you see that?

A.   I do.

Q.   And do you recall Mr. Hoy making that argument?

A.   Yes.

Q.   Mr. Anderson did the rebuttal argument for the United States and I would have you turn to page 6918.

A.   Okay.

Q.   And go to line 12.  Mr. Anderson says:  "But

again understanding why he did what he did helps you answer some of the other questions in this case.  He sexually assaulted her.  She's nude from the waist down.  Dru Sjodin didn't take her own pants off.  She didn't take her own underwear off.  She had her hands tied behind her back.  She was helpless.  The defendant could do whatever he wanted to do to her and we know that the defendant forced Shirley Seddon to have sex with him, to perform oral sex on him, and we know that the defendant forced Elizabeth Knudson at knifepoint to have sex with him.  So you think if he's got Dru Sjodin helpless with her hands tied behind her back that he's not going to do something like that with her?"

Next page:  "He sexually assaulted Dru Sjodin when she was completely helpless and nothing she could do about it.  But again keep in mind that we don't need to prove any of that.  The kidnapping can be for any purpose.  The judge has already told you that.  It doesn't have to be for sexual assault.  It can be for any purpose that benefits the defendant.

So don't think that -- I know Mr. Hoy was up here talking earlier about what the acid phosphatase actually shows.  Who cares what it shows?  It doesn't make that big a difference.  He may not have sexually assaulted her at all.  Assume that and it doesn't make

any difference.  He still kidnapped her for some purpose or for some reason of his own and he transported her across state lines and that's enough."

Do you see that, Mr. Ney?

A.  I do see it.

Q.  Do you recall Mr. Anderson making that argument?

A.  I generally recall that, yes.

Q.  And wouldn't it be correct, Mr. Ney, that despite the fact that there's a p30 test result that came back negative that there are now experts that have been hired by counsel that say that maybe the neck was not slashed, that the United States could have made the exact same arguments about Miss Sjodin being sexually assaulted or that Miss Sjodin was killed by a neck slash or asphyxiated or strangled or left to be exposed to the elements and died from those elements?  Couldn't the government have made the exact same arguments?  Wouldn't you agree to that?

A.  Not to part of what you just said I would not agree.

MR. REISENAUER:  That's all the questions I have, Your Honor.

THE COURT:  Mr. Abreu?

MR. ABREU:  Your Honor, can I indulge the Court for five minutes, quick five-minute break to

consult with counsel and go to the bathroom very quickly?

THE COURT:  You may.

(Recess taken; 2:55 p.m. to 3:03 p.m.)

THE COURT:  Gentlemen, are you going to redirect Mr. --

MR. ABREU:  Very briefly, Your Honor.

THE COURT:  Very briefly?

MR. ABREU:  Yes.

THE COURT:  How very briefly is very briefly?

MR. ABREU:  I would suspect no more than ten minutes.

THE COURT:  Okay.

MR. ABREU:  Are you okay?

THE REPORTER:  Yes.

MR. REISENAUER:  I might take an hour after that.

THE COURT:  Don't worry.  Why would you take an hour since you barely took an hour with this?

(Off the record.)

MR. ABREU:  Whenever you're ready, Your Honor.

THE COURT:  We're good.  We'll go back on the record.  Mr. Ney remains on the stand.  Counsel have

noted their appearances.  They're all present.

Mr. Abreu.

MR. ABREU:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. ABREU:**

Q.  Mr. Ney, at the end of your cross-examination by the government there was a question about whether the government could have relied on the evidence and the allegations in the closing arguments without the semen evidence and the evidence related to the semen.  Do you recall that question?

A.  Yes.

Q.  And you indicated that you agreed partially with what the government had asked you.

A.  Yes.

Q.  But you did not agree completely.

A.  I did not.

Q.  Why is that?

A.  I think that the term "sexual assault" has to be proven by something.  Whether the purpose of this act was a sexual assault maybe we don't have that much dispute with.  But the repeatedly -- even in the guilt phase the argument was, well, it doesn't have to be but this was a sexual assault.  And without the evidence of the semen, if the p30 had been in, I think it would have

been objectionable to argue that it was a completed sexual assault.  Maybe for the purpose of but the argument was that she was sexually assaulted.

Q.  And as a criminal defense attorney dealing with allegations of a sexual assault case and trying to preclude evidence of it, is your job considerably harder when there are allegations or evidence of semen as opposed to just evidence of someone being found, let's say, with no clothes on or naked from the waist down?  Let's say that.

A.  Certainly.  I mean, if there is seminal fluid found, I mean, it's certainly an argument that that's -- that the victim was sexually assaulted by the perpetrator unless there's some other evidence of a previous sexual encounter.  DNA makes it, of course, nearly impossible.

But again our argument -- Mr. Hoy's argument in the guilt phase closing was it didn't get to that point and the government's argument was so what?  But actually it did and here's the evidence.  She's naked.  She's bound.  That's what this -- that's what happened here, a sexual assault.

Q.  And separate and apart from the guilt phase, as a lawyer in a capital case is there some significance to the allegations that there was semen proving a rape as

opposed to general allegation about sexual assault?

A.   Certainly.

Q.   Can you explain that, please.

A.   Well, the whole heinous, cruel, and depraved if it's a crime perpetrated after a sexual assault obviously that's a form of -- could be argued as a form of torture or abuse of the victim.  If it happens, if the death happens before that by accident or even intentionally before that, that aggravator certainly has some doubt standing on its own.

Q.   Earlier you were asked about whether the p30 evidence would have led you to question the evidence of the neck wound or the defects to the body in any way. And I don't know if you answered this question but would it have affected the investigation of the neck wound, of the alleged neck wound and the defects to the body separate and apart of how it might have been used at the time of trial?

A.   I believe it would have.  Indeed Mr. Hoy and I discussed, after our meeting with Dr. Peterson, retaining another pathologist.  We didn't get a lot of hours to do Dr. Peterson and that may have been some question but we talked seriously about that.  If we had had the p30 results saying this was not a sexual assault, there was no rape, there was no semen on her

body, that certainly would have led us even further to believe that the killing was, as we argued, at a time before the disposal of the body at the site.  And so there was no neck wounds perpetrated there.  And we know it wasn't in the car because of the state of the car.

Q.  And by that you mean the lack of blood in the car?

A.  The lack of blood.  So we know it couldn't have happened in the car.  Then there's the argument that the death took place before an assault, but it didn't happen at the site either so that leads us, I think, logically to believe that the neck defects were not knifewounds.

Q.  And lastly the government asked you about your conversations with Mr. Rodriguez and admissions he may or may not have made during your meeting.  Do you recall those questions?

A.  Yes.

Q.  And is it fair to say generally that Mr. Rodriguez was not forthcoming in this regard?

A.  No.

Q.  In the regard of telling you what happened on that day?

A.  Well, originally he wasn't and we frankly -- I frankly stopped asking him those questions.

Q.  Which leads me to these questions.  At any time

during your communications with Mr. Rodriguez did he ever say that he cut Miss Sjodin's neck?

A.   Never.

Q.   Did he ever say he used a knife on any part of her body?

A.   No.

Q.   Did he ever say that he raped Miss Sjodin?

A.   No.

Q.   At any time during your communications with Mr. Rodriguez, did he say anything that prompted you to forego your investigation of whether, in fact, she was or was not raped or whether it was or was not semen?

A.   No.

Q.   Did he prompt anything -- during your communications, did he say anything that prompted you to stop your investigation of the defects to Miss Sjodin's body?  In other words is that what prompted you to not follow up with Dr. Peterson or seek out another pathologist?

A.   Something he said?

Q.   Yes.

A.   No.

MR. ABREU:  That's all I have, Your Honor.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  Thank you, Your Honor.

**RECROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.   Mr. Ney, earlier today you said that you have -- you've basically been a criminal defense attorney your whole career, correct?

A.   My whole legal career, yes.

Q.   And you have represented people on approximately a hundred murder cases and I believe you also used the word "rape" when you testified earlier today, that you've represented people on about a hundred rape cases; is that correct?

A.   I'm sure that's true.  I probably said more than a hundred on both and I think that's true.  In my offices I've run have represented -- offices I've run, hundreds more.

Q.   So I don't want to get in an argument about different terms but we haven't really agreed on some of the terms today.  But you are aware that sexual assault does not mean rape, correct?

A.   Of course.

Q.   And you don't have to have penetration to commit a sexual assault, correct?

A.   I agree with that.

Q.   And would you agree that sexual assault can be a mere touching?

A.   It can be.

Q.   And you've represented people that have been accused of sexual assault based upon touching of some type of female parts, whether it's a breast or genitalia I assume?

A.   When the victim was alive to say that, yes.

Q.   Okay.  And it's possible to even have a sexual assault where there is penetration but not penetration by the penis, correct?

A.   Yes.

Q.   In other words you can have penetration with a finger, correct?

A.   Certainly.

Q.   You can have penetration with an inanimate object, another item, correct?

A.   If there's evidence of that, yes.

Q.   Okay.  And for the United States to argue that the purpose of this was a sexual assault, you would agree that the purpose does not have to be completed, wouldn't you?

A.   I'm sorry, in this case?

Q.   Yes, in this case.

A.   When you put on the evidence that there's semen, then you're arguing it is completed and that is my point.  Why does the United States put on evidence from

Dr. McGee that --

Q. Let me stop you here. If you would just answer the question.

A. Well --

Q. Would the United States be able to argue that a sexual assault occurred whether the purpose was completed or not?

A. Would you be able to argue that?

Q. Yes.

A. You could but that's not what was argued here.

MR. REISENAUER: That's all I have, Your Honor.

THE COURT: Anything as a result of that?

MR. ABREU: That's all we have, Your Honor.

THE COURT: The matter will be taken under advisement. I'll issue the briefing order consistent with the stipulation of the parties.

Thank you very much for your time here today, Mr. Ney. You may step down. Have a safe trip home.

MR. NEY: Thank you, Your Honor. Good to see you.

THE COURT: You folks have a safe trip home.

MR. ABREU: Thank you very much, Your Honor.

(Adjourned at 3:15 p.m.)

**CERTIFICATE OF REPORTER**

I, Kelly A. Kroke, a duly appointed Registered Professional Reporter;

DO HEREBY CERTIFY that I reported in shorthand the foregoing proceedings had and made a record at the time and place indicated.

I DO HEREBY FURTHER CERTIFY that the foregoing and attached (935) typewritten pages contain an accurate transcript of my shorthand notes then and there taken.

Dated this 6th day of April, 2018.

_____
KELLY A. KROKE - RPR, RMR
United States District Court Reporter
District of North Dakota
Southeastern Division