# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff/Respondent,** | : | |
| | : | **Criminal Case No. 2:04-cr-55** |
| **vs.** | : | |
| | : | |
| **ALFONSO RODRIGUEZ, JR.,** | : | |
| | : | |
| **Defendant/Petitioner.** | : | |

_____

## PETITIONER'S POST-HEARING BRIEF ON
## FORENSIC CLAIMS

_____

Respectfully submitted,

Victor J. Abreu
Joseph W. Luby
Eric J. Montroy
Assistant Federal Defenders
Federal Community Defender Office for the
    Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

*Counsel for Petitioner*

Dated:    June 21, 2018

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL AND FACTUAL HISTORY.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.    The Trial Record.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The semen-related evidence at trial. . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    The neck and flank "wounds" as described at trial. . . . . . . . . . . . . . 9

    C.    The prosecution's use of the forensic evidence. . . . . . . . . . . . . . . . 10

        1.    The guilt-or-innocence phase.. . . . . . . . . . . . . . . . . . . . . . . 11
        2.    The eligibility phase.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        3.    The selection phase.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.   The Post-Conviction Record.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A.    The semen-related evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1.    Steven Fischer's full test results.. . . . . . . . . . . . . . . . . . . . 18
        2.    Trial counsel's oversight. . . . . . . . . . . . . . . . . . . . . . . . . . 21
        3.    The consequences of trial counsel's oversight.. . . . . . . . . . . . 27
        4.    The experts' consensus.. . . . . . . . . . . . . . . . . . . . . . . . . . 30

    B.    The neck and flank defects. . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        1.    Trial counsel's inadequate investigation. . . . . . . . . . . . . . . . 34
        2.    The results of trial counsel's limited investigation. . . . . . . . . 38
        3.    The post-conviction experts.. . . . . . . . . . . . . . . . . . . . . . . 42

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

I.    The Court should vacate Petitioner's conviction and sentence under Giglio v. United States, 405 U.S. 150 (1972), and Napue v. Illinois, 360 U.S. 264 (1959), because the prosecution knew or should have known that Dr. McGee testified falsely about the testing for, and presence of, semen on the autopsy swabs, and the prosecution failed to correct that testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    A.    The prosecution knew or should have known that Dr. McGee's testimony was false.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

        1.    The prosecution had ample notice that Dr. McGee's testimony was false, based on numerous items in its file. . . . 50
            a.    The Fischer bench notes themselves. . . . . . . . . . . . . . . 51
            b.    Mr. Fischer's dealings with the prosecutors . . . . . . . . 52
            c.    Additional p30 testing conducted by Mr. Fischer. . . . . 54
            d.    P30 testing on the victim's underwear.. . . . . . . . . . . . 55
            e.    Additional p30 tests in the Report 10 bench notes. . . . 56
            f.    Pretrial events.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        2.    Alternatively, Mr. Fischer's knowledge is imputable to the prosecutors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    B.    The government cannot show that the error was harmless beyond a reasonable doubt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

        1.    The forensic evidence of a completed rape was a key issue at trial, and the Fischer bench notes definitively disprove such a rape in a manner that defense counsel's trial evidence could not. . . . . . . . . . . . . . . . . . . . . . . . . . 61
            a.    Counsel's statements. . . . . . . . . . . . . . . . . . . . . . . . . . 61
            b.    The Fischer bench notes resolve the semen issue and are not merely cumulative of the defense's trial evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
        2.    The government impaired Petitioner's guilt phase defense by allowing Dr. McGee's false testimony to go uncorrected. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
        3.    Dr. McGee's false testimony prejudiced the determination of Petitioner's sentence. . . . . . . . . . . . . . . . . . . . . . . . . . 70

II.    Trial counsel rendered prejudicially ineffective assistance by overlooking exculpatory semen-test results that the government had disclosed to them, by failing to provide that evidence to their forensic expert, and by failing to challenge the cause of the victim's death in light of that evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    A.    Counsel performed deficiently by neglecting critical semen-related evidence from within their own files. . . . . . . . . . . . . 73

        1.    Counsel performed deficiently by overlooking the Fischer bench notes despite ample notice of their importance and contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
            a.    The importance of the forensic-based rape evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
            b.    The bench notes for BCA Report 10. . . . . . . . . . . . . . 78
            c.    BCA Report 10 itself. . . . . . . . . . . . . . . . . . . . . . . . 79
            d.    Prior notice of p30. . . . . . . . . . . . . . . . . . . . . . . . . 80
            e.    The disclosure of Dr. McGee's anticipated testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
        2.    Counsel deficiently failed to provide the Fischer bench notes to Dr. Sensabaugh, their semen identification expert. . . 83
            a.    Failure to inform the expert. . . . . . . . . . . . . . . . . . . 83
            b.    Reputation of the expert. . . . . . . . . . . . . . . . . . . . . 85
            c.    The numerosity of experts. . . . . . . . . . . . . . . . . . . . 86

    B.    Counsel failed to adequately investigate the manner of Ms. Sjodin's death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

        1.    As a result of their deficient performance in failing to disprove Dr. McGee's opinion of a completed rape, counsel failed to adequately investigate the cause and nature of the victim's death. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
        2.    Counsel failed to reasonably investigate the question of knife wounds in the wake of pretrial disclosures describing Dr. McGee's trial testimony. . . . . . . . . . . . . . . 92

    C.    Counsel's forensic errors prejudiced the defense. . . . . . . . . . . . . 95

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

## TABLE OF AUTHORITIES

**Cases**

*Alcorta v. Texas*, 355 U.S. 28 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Bragg v. Norris*, 128 F. Supp. 2d 587 (E.D. Ark. 2000).. . . . . . . . . . . . . . . . . . 58

*Browning v. Baker*, 875 F.3d 444 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . 58

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . 83-84

*Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993). . . . . . . . . . . *passim*

*DeMarco v. United States*, 928 F.2d 1074 (11th Cir. 1991).. . . . . . . . . . . . . . . . 50

*Foster v. United States*, 874 F.2d 491 (8th Cir. 1988). . . . . . . . . . . . . . . . . . 49-51

*Giglio v. United States*, 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Guzman v. Sec'y, Dept. of Corr.*, 663 F.3d 1336
    (11th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58-60, 67-68

*Harrington v. Richter*, 562 U.S. 86 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Harris v. Cotton*, 365 F.3d 552 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005).. . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 58

*Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Johnson v. United States*, 860 F. Supp. 2d 663 (N.D. Iowa 2012).. . . . . . . . . . 75, 78

*Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . 92

*Kyles v. Whitley*, 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . 50-51, 60

*Longus v. United States*, 52 A.3d 836 (D.C. 2012). . . . . . . . . . . . . . . . . . . . . 56

*Mesarosh v. United States*, 352 U.S. 1 (1956). . . . . . . . . . . . . . . . . . . . . . . . 50

*Mooney v. Holohan*, 294 U.S. 103 (1935). . . . . . . . . . . . . . . . . . . . . . . . . 48

*Napue v. Illinois*, 360 U.S. 264 (1959). . . . . . . . . . . . . . . . . . . . . 47-50, 58, 67

*Reis-Campos v. Biter*, 832 F.3d 968 (9th Cir. 2016). . . . . . . . . . . . . . . . . . . . 58

*Rhoden v. Rowland*, 172 F.3d 633 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . 72

*Rompilla v. Beard*, 545 U.S. 374 (2005). . . . . . . . . . . . . . . . . . . 73-74, 86-88

*Sanders v. Sullivan*, 863 F. 2d 218 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . 58-59

*Showers v. Beard*, 635 F.3d 625 (3d Cir. 2011). . . . . . . . . . . . . . . 75-76, 78, 83

*Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . 57

*Smith v. State*, 492 So.2d 260 (Miss. 1986). . . . . . . . . . . . . . . . . . . . . . . . 51

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . 60, 73-74, 92-94, 96

*Tokar v. Bowersox*, 1 F. Supp. 2d 986 (E.D. Mo. 1998). . . . . . . . . . . . . . . . . . 72

*United States v. Agurs*, 427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . 2, 49, 51, 60-61

*United States v. Alli*, 344 F.3d 1002 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . 49

*United States v. Bagley*, 473 U.S. 667 (1985). . . . . . . . . . . . . . . . . . . 60-61, 67

*United States v. Barkett*, 530 F.2d 189 (8th Cir. 1976). . . . . . . . . . . . . . . . . . . 56

*United States v. Gonzales*, 90 F.3d 1363 (8th Cir. 1996). . . . . . . . . . . . . . . . . . 60

*United States v. Mason*, 293 F.3d 826 (5th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . 4

*United States v. Rodriguez*, 766 F.3d 970 (9th Cir. 2014). . . . . . . . . . . . . . . . . . 60

*United States v. Tierney*, 947 F.2d 854 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . 49

*United States v. Wallach*, 935 F.2d 445 (2d Cir.1991). . . . . . . . . . . . . . . . . . . . 60

*White v. Roper*, 416 F.3d 728 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . 95

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 98

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . 83, 85

## Statutes and Rules

18 U.S.C. § 1201(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11

28 U.S.C. § 2254(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 99

28 U.S.C. § 2255(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## Other Authorities

American Bar Association, *Guidelines for the Appointment and
    Performance of Counsel in Death Penalty Cases* (2003). . . . . . . . . . . . 74, 88

American Bar Association, *Standards for Criminal Justice*,
    (2d ed. 1982 Supp.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73-74

## **INTRODUCTION**

The prosecution sought and obtained Alfonso Rodriguez's conviction and death sentence based on false forensic evidence that semen was deposited into the body of Dru Sjodin in the 24 hours before death, and that her neck was slashed at least twice. Relying on that evidence to argue that Petitioner "raped" Ms. Sjodin to satisfy his years-long "rape fantasies" and cut her throat to avoid detection  – Trial Tr. 6552, 672, 8662-63, 8665, 8673, 8689-91, 8693-95, 8698, 8706-07 – the prosecution urged jurors to consider the dubious testimony of Dr. Michael McGee when deciding Petitioner's sentence:

> Dru Sjodin was marched, she was shivering, she was cold, she was scared, and everything else that goes along with the torture that you found. She was marched down that embankment into the night, into the freezing night and over to the point where her death occurred …
>
> [T]he defendant secured her somehow and he prepared to do what he had to do to ensure that he would not be caught after living out his rape fantasies. Somehow he held her and he plunged the knife into her neck and he drew it across her neck, and it got stopped, as Dr. McGee said, by tissue and had to be repositioned again and again and again. Ear to ear. And then again 8 more centimeters. Left to die bleeding for how long? A minute? Two minutes or three?

Trial Tr. 8706-07. "You need, when you're weighing, to think about that act," the prosecutor argued. Trial Tr. 8707.

We now know that the very "facts" the jurors were asked to weigh were untrue, as was material evidence that persuaded the Court to admit Dr. McGee's testimony at the *Daubert* hearing. Much of the untruth was known to the

government, and all of it could have been prevented and otherwise remedied if defense counsel had reasonably investigated the evidence provided to them. *See* Arguments I-II, below. We know that the autopsy swabs taken from Ms. Sjodin's body did not and could not contain semen, based on the government's own testing – knowledge that is imputed to the prosecution because the evidence was in its file. *United States v. Agurs*, 427 U.S. 97, 110 (1976); Hrg. Tr. 21-23, 30-31, 68, 265-69, 346-47, 690-91, 750-53; Sensabaugh Depo. 54-55, 64-69; Pet. Ex. 3 (Keel report) at 13-15; Pet. Ex. 4(BCA Report 10 with Fischer bench notes) at 30; Pet. Ex. 23 (Arden addendum report) at 3.

We know that there is "no evidence" that Ms. Sjodin was slashed on the throat or anywhere else. Hrg. Tr. 130, 144, 148, 216-17, 285-86, 349-51, 372, 451, 454, 460; Pet. Ex. 10 (Flomenbaum report) at 9; Pet. Ex. 20(Arden report) at 3; Pet. Ex. 23 at 2; Pet. Ex. 55(Ferenc report) at 2-3; Pet. Ex. 27 (Dragovic report) at 8. And we know that defense counsel could and would have challenged the government's contentions about slash wounds and the cause of Ms. Sjodin's death if they could have definitively proven the absence of a completed rape – and with it, the likelihood of an attempted rape, a frenzied struggle, and a comparatively less aggravated and plausibly unintentional death by asphyxiation. Hrg. Tr. 841-46, 869-72, 928-31. "[I]f there isn't a completed rape," defense counsel explained, the "death march" and terminal throat-slashing described by Mr. Wrigley's closing argument simply "doesn't make sense," and the defense would argue "that the

2

death took place before anything else could happen." Hrg. Tr. 842.

The forensic evidence Petitioner has now presented conclusively proves that Dru Sjodin did not die in the manner alleged by the government at trial. She was *not* raped, marched naked through a field with a bag over her head, laid on the ground or nearly decapitated. There was no semen, no completed rape, and no slashing of her neck. Instead, the evidence suggests that Ms. Sjodin most likely died of asphyxiation, after a brief struggle and attempted rape in Petitioner's car. While the forensic evidence does not excuse Petitioner's conduct, it would have provided counsel the evidentiary support to argue that no death-eligible federal crime had occurred. Moreover, at sentencing, the evidence would have dramatically altered the government's horrifying narrative and, on a jury already struggling with its decision, led at least one juror to vote for life.

## PROCEDURAL AND FACTUAL HISTORY

Undersigned counsel assume the Court's familiarity with prior proceedings and the circumstances of the offense. As relevant here, the trial evidence was that Ms. Sjodin disappeared from the Columbia Mall in Grand Forks, N.D., on November 22, 2003. Her body was found five months later near Crookston, Minn., where Petitioner lived. At the time the body was found, Ms. Sjodin's clothing had been removed below the waist, her hands were tied behind her back, a rope was wrapped but not tied or knotted around her neck, and portions or remains of a plastic bag were situated underneath the rope. Trial Tr. 6686-87; Pet. Ex. 16 at 1,3,

6. Autopsy photographs showed a gaping "defect" in the neck area, with the underlying tissues and structures all but absent on account of post-mortem changes. Pet. Ex. 16 at 6, 11. Findings at autopsy included a death from "homicidal violence," remnants of a "slash" wound to the neck, and the presence of acid phosphatase (but the absence of sperm cells) in swabs taken from Ms. Sjodin's vaginal and cervical areas. Pet. Ex. 16 at 1, 6.

Petitioner was convicted of, and capitally sentenced for, the offense of kidnapping Ms. Sjodin across a state line, resulting in her death. *See* 18 U.S.C. § 1201(a)(1). At trial in this Court, Petitioner was represented by Robert Hoy of Fargo and Richard Ney of Wichita, Kan. The Eighth Circuit affirmed Petitioner's conviction and sentence on direct appeal. *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), *cert. denied*, 562 U.S. 981 (2010). Petitioner thereafter moved for post-conviction relief under 28 U.S.C. § 2255. *See* ECF Doc. No. 752. The Court recently held an evidentiary hearing on Petitioner's forensic-related claims – *see* ECF Docs.1051, 1058 – and this brief follows.

## I.    The Trial Record

### A.    The Semen-Related Evidence at Trial

In support of its contention that Petitioner raped Ms. Sjodin, the government relied heavily on the findings of Ramsey County Medical Examiner Michael B. McGee. Dr. McGee testified that swabs taken from Ms. Sjodin's cervix and vagina showed "elevated" levels of acid phosphatase, an enzyme produced by the prostate

gland and present in semen. Dr. McGee testified that the levels of acid phosphatase from the cervical and vaginal swabs – specifically, 130.7 and 47.4 units per liter – meant that semen was deposited into the victim during the 24 to 36 hours before her death. Trial Tr. 6720-23. Examination of the swabs did not reveal the presence of sperm cells, and the samples tested negative for male DNA. Trial Tr. 6721, 6754. It was undisputed that Ms. Sjodin's body remained outside for five months after her death and underwent substantial decay. Dr. McGee asserted, however, that sperm cells degrade over time inside of a dead body and that the "extremely cold" weather preserved the acid phosphatase. Trial Tr. 6736-37.

The defense disputed the government's claim that Ms. Sjodin had been raped. Dr. George Sensabaugh, a professor of forensic and biological sciences at the University of California, explained that acid phosphatase is not unique to the human prostate and can be produced by post-mortem decay. Trial Tr. 6800-02. Dr. Sensabaugh testified that the test used by Regions Hospital and relied on by Dr. McGee – specifically, the Beckman Dri-Stat – cannot distinguish prostatic acid phosphatase from lysosomal acid phosphatase produced by postmortem cell breakdown. Trial Tr. 6804-09. He also testified that there are no known tests for assessing the significance of acid phosphatase levels from a deceased body, and thus, for inferring that a particular post-mortem level of acid phosphatase indicates the presence of semen. Trial Tr. 6806-09.

Drs. McGee and Sensabaugh gave similarly conflicting testimony when the Court held an in-trial hearing to consider the admissibility, under *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993), of Dr. McGee's conclusion that the observed levels of acid phosphatase suggested a seminal deposit even though no spermatozoa or male DNA were present. Trial Tr. 6529-32, 6544-47, 6552-55, 6614-43. Of particular dispute was the measure employed by Dr. McGee to assess the presence of semen from acid phosphatase. Dr. McGee testified that he relied on a decades-old study performed by Regions Hospital, as well as training conducted subsequent to the study, to discern that prostatic acid phosphatase levels above 25 units per liter suggest semen. Trial Tr. 6535-39, 6571-74. Dr. McGee denied that any national standard established such a threshold level in the field of forensic pathology, and he explained that each laboratory establishes its own level based on its own experience and case reports. Trial Tr. 6561-62, 6574-76, 6582-83, 6590-91, 6595-96. Dr. Sensabaugh, however, testified that the presence of acid phosphatase in the absence of other indicia of semen is only "uncertain" or "ambiguous," and that no scientific consensus or studies justify the inference of semen based on acid phosphatase readings taken under conditions of post-mortem decay. Trial Tr. 6622-24, 6633-38, 6657, 6660-61.

Both doctors and the Court itself discussed the significance of p30 testing during the *Daubert* hearing. The enzyme p30 is a "prostate specific" antigen, which, as described in Dr. Sensabaugh's report, "is normally present only in

prostatic secretions and there at very high levels." Pet. Ex. 49 at 2. "It is not present in vaginal fluids but has been detected at low levels in some female fluids under conditions of hormonal imbalance." *Id.* On cross examination Dr. McGee agreed that p30 is produced "only by the male prostate," *and he falsely stated that no testing for p30 had been undertaken in this case.* Trial Tr. 6570. During its own questioning of Dr. McGee, the Court stated its understanding that p30 testing "can be dispositive if you have those certain levels," and that acid phosphatase is less definitive, or "basically ... a presumptive test" requiring corroboration in order to infer the presence of semen. Trial Tr. 6597. Dr. McGee agreed. Trial Tr. 6597. Later the Court confirmed its understanding that a considerably higher level of acid phosphatase – 400 units per liter or above – would itself be considered "dispositive" so that "really you don't have to go and do the p30 test." Trial Tr. 6598-99. Again Dr. McGee concurred. Trial Tr. 6599.

Dr. Sensabaugh explained that many forensic laboratories would hesitate to infer the presence of semen from the acid phosphatase testing undertaken at Regions Hospital, and that many laboratories would seek corroboration through p30 testing because factors other than ejaculation may produce acid phosphatase. Trial Tr. 6628. Dr. Sensabaugh explained that p30 is a "more specific test" than acid phosphatase, that its presence is "highly indicative" of semen because p30 is not found in vaginal fluids, and only the presence of actual sperm cells is more definitive than p30 testing. Trial Tr. 6628-31. He echoed Dr. McGee's

7

understanding that no p30 test had been performed. Trial Tr. 6639. At no point during the *Daubert* hearing did the government correct or otherwise contradict Dr. McGee's and Dr. Sensabaugh's testimony that the samples taken from Dru Sjodin were never tested for p30.

The Court rejected the *Daubert* challenge. It reasoned that the dispute between Drs. McGee and Sensabaugh was between two different scientific communities – practitioners in the field as opposed to "data-driven" scientists – and that the dispute informed the weight of Dr. McGee's testimony rather than undermining its reliability. *See* ECF Doc. 596 at 4.

The government also elicited testimony from forensic scientist Steven Fischer, formerly of the Minnesota Bureau of Criminal Apprehension. Mr. Fischer described the forensic processing of Petitioner's car and the DNA testing he performed on blood splatter stains from the car. Trial Tr. 6134-52. The stains tested positive for Ms. Sjodin's DNA. Trial Tr. 6147-52. Mr. Fischer also conducted a serology examination and collected numerous hairs from Ms. Sjodin's clothing, and the hairs were sent to the FBI for mitochondrial DNA testing. Trial Tr. 6153-54. On cross-examination, the defense elicited the fact that Mr. Fischer had tested the clothes that Ms. Sjodin was wearing when her body was found – including a pink blouse, a pink bra, and a black pea coat – and that the clothes tested negative for semen. Trial Tr. 6159-60; Pet. Ex. 28 (BCA Report 10 without bench notes) at 2. Mr. Fischer also testified that the cervical, vaginal, and anal

8

swabs taken from Ms. Sjodin were negative for semen, but without explaining the basis of his finding or specifying the tests he had conducted. Trial Tr. 6160 ("Q: Did you also examine those swabs for the presence of semen? A: Yes, I did. Q: And you found none, no semen on any of them? A: That's correct").

The government avoided the swab-testing issue on redirect, just as it had on Mr. Fischer's direct examination. Then-Assistant U.S. Attorney Norman Anderson asked whether semen on Ms. Sjodin's clothing might degrade during the five months that her body was outside. Trial Tr. 6160-61 (concerning Ms. Sjodin's clothing). Mr. Fischer responded that such degradation was possible. Trial Tr. 6161. At no point did the government elicit from Mr. Fischer the fact that he had tested the three swabs for p30 and found none. To the contrary, it offered testimony suggesting that any semen deposited by Petitioner could have decayed and thereby evaded Mr. Fischer's testing. Trial Tr. 6160-61. Defense counsel Hoy understood the inference, and he confirmed on re-cross that Mr. Fischer knew about the five-month period that the body spent outside, and nevertheless, Mr. Fischer still troubled to "check" the swabs and clothing "for the presence of semen." Trial Tr. 6162. Neither Mr. Hoy, nor the Court, nor the jury accurately understood what manner of "checks" Mr. Fischer had performed.

**B.    The Neck and Flank "Wounds" as Described at Trial**

Dr. McGee also concluded that defects on the victim's neck and side were sharp-force injuries rather than the result of decay or animal depredation. The neck

area, Dr. McGee testified, showed two cutting injuries across the front; one of the wounds was 13.5 cm in length, and the other was 8 cm. Trial Tr. 6688-90. The neck defect showed a "scalloping" pattern that Dr. McGee described as "consistent with" someone slashing with a knife, repositioning it, and continuing the slashing. Trial Tr. 6694-95. The physical characteristics and "notching" of the injury made the wound "consistent with" the type of knife that police seized from Petitioner's car. Trial Tr. 6733-34. Dr. McGee attributed Ms. Sjodin's death to "homicidal violence" with a slash wound to the neck as the single likeliest cause, and asphyxia or exposure as other possibilities. Trial Tr. 6728-29. In light of the absence of drag marks on the back of Ms. Sjodin's heels and the relative paucity of blood on her clothes, Dr. McGee theorized that Ms. Sjodin had her neck slashed while situated in a face-down position with her neck facing the ground near the place of her discovery. Trial Tr. 6733.

The defense did not dispute that the defects pictured at autopsy began as sharp-force injuries, and counsel offered no expert evidence on the question. *See* Pet. Ex. 53 (letter from Mr. Hoy to Judge Erickson). The Court therefore agreed to exclude any autopsy photos showing the defects. *Id.*; Trial Tr. 6245-47, 6297-6302, 7009-31, 7066-75; Hrg. Tr. 527; ECF Doc. 474 at 3.

### C.    The Prosecution's Use of the Forensic Evidence

The forensic evidence provided critical support for the government's arguments for conviction and the ultimate punishment.

10

**1.      The guilt-or-innocence phase** – The offense of kidnapping resulting

in death required the government to prove that Petitioner "willfully, knowingly,

and unlawfully transported Dru Katrina Sjodin in interstate commerce while she

was … kidnapped." (Instruction 4); 18 U.S.C. § 1201(a)(1). The Court instructed

the jury as follows:

> The victim is willfully transported in interstate commerce, regardless of whether the victim was alive when transported across a State boundary, if the victim was alive at the moment the transportation began. The transportation of the victim began when she was willfully moved any distance whatsoever from the precise point or place of her abduction so long as that movement was not merely incidental to an offense other than the kidnapping charged in this Indictment.

Instruction 4. The government argued that Petitioner kidnapped Dru Sjodin in

order to sexually assault her, that the two may have struggled in Petitioner's car as

evidenced by the blood spatter, and that Petitioner used his knife to slash Ms.

Sjodin's neck after driving her 33 miles from the shopping mall and across the

Minnesota border. Trial Tr. 6864-66, 6872-80. Based on Dr. McGee's testimony,

the prosecutor urged, "We know exactly what the defendant did with that knife."

Trial Tr. 6865.

The defense denied the allegation of an interstate kidnapping. Mr. Hoy

argued that Petitioner could have suffocated Ms. Sjodin in the back of his car at the

mall, while trying to sexually assault her. Trial Tr. 6909-11. Any act of

"transportation" from the victim's car to Petitioner's car within the same parking

11

lot could have been solely to carry out a sexual assault. Such movement was, thus, "merely incidental to an offense other than the kidnapping." Trial Tr. 6910-11.

The government replied that even a brief movement of a few feet from one car to another was part of the kidnapping itself, which ended when "he transports her from that spot to the car out into the country 30 miles away." Trial Tr. 6924-25. The prosecutor insisted that the offense could not have occurred as the defense theorized. Given Dr. McGee's uncontradicted testimony that Ms. Sjodin was slashed in the neck and side – an issue the defense had chosen not to contest – the government pointed to the small amount of blood in the car, the fact that slashing wounds could not have taken place there, and the unlikelihood that Petitioner would slash Ms. Sjodin's neck at some later point if she were already dead:

> Now Mr. Hoy also suggested that Dru could already be dead in the parking lot. He didn't explain though if she's already dead then why the defendant would have cut her throat. If she's already dead from suffocating in the car, then why does he cut her throat? There's no reason to at that point, absolutely none. … If she's already dead it doesn't do anything to cut her throat. That's not how it happened. And you know he didn't cut her throat in his car. Mr. Wrigley already talked about that. There would have been way too much blood. It did not happen that way. The evidence doesn't support that one bit.

Trial Tr. 6921-22.

**2.** **The eligibility phase** – The first half of the bifurcated penalty phase required the jury to determine whether the government had proven, among other things, any statutory aggravating factors beyond a reasonable doubt. The government alleged four such aggravators: that Petitioner caused Ms. Sjodin's

12

death during the commission of a kidnapping; that Petitioner had previously been convicted of two or more offenses punishable by more than one year of imprisonment and which involved "the infliction or attempted infliction of serious bodily injury or death"; that Petitioner killed Ms. Sjodin in an "especially heinous, cruel or depraved manner in that it involved torture or serious physical abuse"; and that Petitioner killed Ms. Sjodin "after substantial planning and premeditation." Trial Tr. 7245-47.[1]

Pertinent to the "especially heinous" aggravating circumstance was whether Petitioner inflicted "gratuitous violence beyond that necessary to commit the killing." Trial Tr. 7250. The term "heinous" meant "extremely wicked or shockingly evil, where the killing was accompanied by such acts of torture or serious physical abuse of the victim as to set it apart from other killings." Trial Tr. 7249. "Cruel" meant that Petitioner "intended to inflict a high degree of pain by torturing the victim in addition to killing the victim." Trial Tr. 7249. "Depraved" meant that Petitioner "relished the killing or showed indifference to the suffering of the victim, as evidence by torture or serious physical abuse of the victim." Trial Tr. 7250. The Court defined "torture" as "severe mental as well as physical abuse

---

[1] Also alleged by the government were four "threshold eligibility factors." The jury was required to find at least one of those factors in order to consider a death sentence. The four factors were a) whether the defendant intentionally killed Dru Sjodin; b) whether he intentionally inflicted serious bodily injury resulting in death; c) whether he intentionally participated in an act that directly resulted in Ms. Sjodin's death while the defendant contemplated that life would be taken or intended that lethal force would be used; and d) whether he engaged in an act of violence that directly resulted in Ms. Sjodin's death while acting with a reckless disregard for human life and knowing that his act created a grave risk of death. Trial Tr. 7243-44. The jury found all four mental states. Trial Tr. 7338.

of the victim" of which the victim was conscious at the time and through which the defendant "specifically intended to inflict severe mental or physical pain" in addition to killing the victim. Trial Tr. 7250. And "serious physical abuse" was defined as "a significant or considerable amount of injury or damage to victim's body" such that the defendant "specifically intended" the abuse in addition to the killing. Trial Tr. 7250.

The government again invoked the forensic evidence to satisfy its burden. Pointing out that Petitioner had spent 23 years in prison for earlier sex crimes, it urged that he intentionally killed Ms. Sjodin to avoid re-incarceration after raping her. Petitioner twice slashed Ms. Sjodin's neck "to ensure that Dru Sjodin would never breathe a word of this." Trial Tr. 7259. The murder was "set apart from other killings," the government argued, because Ms. Sjodin was kidnapped, sexually assaulted, abducted, stripped nude below the waste, "hauled around in her attacker's vehicle for hours, then snuffed out with two vicious knife cuts to her neck." Trial Tr. 7266. The killing was therefore "shockingly evil" and "extremely wicked." Trial Tr. 7266. The defense argued that the killing of Ms. Sjodin lacks the "hallmarks" of a "planned or intentional killing." Trial Tr. 7292. Mr. Ney described the homicide as "a disorganized act" instead of a "cold-blooded" one. Trial Tr. 7293 ("If this was a death that was caused unintentionally in the midst of a struggle, it's not cold-blooded, it's not deliberate, it's not intentional.").

14

After a full afternoon and a full morning of deliberation, the jury found Petitioner to be death-eligible. It declined to find "substantial planning and premeditation" unanimously and beyond a reasonable doubt, but it found the other three aggravating circumstances. Trial Tr. 7300, 7325-26, 7338-44.

3.    **The selection phase** –The government made broader use of its rape theory at the selection phase, relating it to the three aggravating circumstances found by the jury: killing during a kidnapping, an "especially heinous" killing, and Petitioner's prior sex offenses. Trial Tr. 8661-71. The prosecutor argued that Petitioner raped Dru Sjodin after kidnapping her, that he thereafter led her – bound with her hands tied behind her back, naked from the waist down, and with a plastic bag over her head – on a terminal "march" from his car to the place where her body was found, and that he killed her at the scene by slashing her throat with a knife. Trial Tr. 8695-96, 8705-07. The prosecutor pointed to the "terror and acute mental anguish" that marked "Dru's last hours and her last minutes" as the government had reconstructed them. Trial Tr. 8665 ("The raw fear of what would be her fate as the defendant drove her into the night, stopped to strip off her clothes, battled her in the back seat of his car where the blood is found, sexually assaulted her, and drove her to a ravine and directed her to the ground on which her body would lie.").

In urging the jury to impose the death penalty, the prosecutor argued that Petitioner killed Ms. Sjodin in order to fulfill a sordid "rape fantasy" that continued

15

from his previous sexual crimes. Trial Tr. 8662-63, 8665, 8673, 8689-91, 8693-95, 8698, 8706-07. Prior to encountering Ms. Sjodin, Petitioner spent "23 1/2 years of biding his time, controlling his impulses day in and day out, and waiting for the chance to rape again when he could avoid the consequences." Trial Tr. 8690. The government used the inflammatory language of "rape fantasy" or "fantasizing about rape" no fewer than ten times in its selection phase closing. Trial Tr. 8662, ln 7-8; 8663, ln 5-6; 8663 ln 13; 8688, ln 22; 8689, ln 1-2; 8689, ln 13-14; 8690, ln 2-3; 8690, ln 19-20; 8694, ln 19; 8707, ln 17.

Seeking a life sentence, the defense urged a broad number of mitigating circumstances. These included Petitioner's favorable conduct in prison, the institutional failure of Minnesota correctional authorities in releasing Petitioner without adequately supervising him, Petitioner's history of toxin exposure, evidence of post-traumatic stress disorder and brain damage, and Petitioner's impoverished upbringing among a family of migrant farmworkers. Trial Tr. 8709-43. Mr. Ney argued that the question of punishment was "much bigger" than simply the crime. Trial Tr. 8711. The prosecutor challenged the defense's mitigation case as unproven and insufficient even to "barely budge" the scale in a "case of this magnitude" – a case in which the defendant "has a preoccupation with sex," entertains and acts on "rape fantasies," and is "a multiple rape defendant and now an intentional killer." Trial Tr. 8688-89.

The jury deliberated for 13 hours over the course of three days before

16

sentencing Petitioner to death. Trial Tr. 8753, 8758-59, 8763-65, 8769-80. In reaching their decisions, different numbers of jurors found different mitigating circumstances to exist. Trial Tr. 8771-75. For example, all twelve jurors found that Petitioner "has responded well to structured environments and would likely make a good adaptation to prison if he were sentenced to life imprisonment" and that Petitioner had behaved well during pretrial confinement. Trial Tr. 8775. Although all jurors found that Petitioner "suffers from a mental disorder or impairment," only three jurors found that Petitioner "suffers from brain damage," and none found that Petitioner "has neurological or psychological problems, which have impaired his ability to make good decisions." Trial Tr. 8772. All twelve jurors found that Petitioner raised concerns about his release from the Minnesota prison, but none found that Minnesota officials failed to act on the concerns raised by Petitioner and his family. Trial Tr. 8775. Eight jurors found that generalized "considerations of mercy support a sentence of life imprisonment without the possibility of parole." Trial Tr. 8775. The Court later imposed the jury's chosen sentence. Sentencing Tr. 64-68.

## II.    The Post-Conviction Record

The hearing evidence contradicted the prosecution's theories in material respects, while also showing that defense counsel's failure to challenge those theories more fully or at all was unreasonable attorney conduct that prejudiced Petitioner.

17

### A.    The Semen-Related Evidence

**1.    Steven Fischer's full test results** – On May 28, 2004 – some six weeks after Ms. Sjodin's body was found – forensic scientist Steven Fischer completed one of the Minnesota BCA's several forensic reports in the case. Pet. Ex. 28 (BCA Report 10 as disclosed without bench notes). Mr. Fischer performed unspecified "examinations" of the cervical, vaginal, and anal swabs that were taken at autopsy by Dr. McGee and shipped to BCA. *Id.* at 2. The examination of all three swabs was negative for the presence of "semen," as opposed to sperm cells. *Id.* Report 10 itself did not describe the basis for Mr. Fischer's negative finding or the nature of his examination or tests. *Id.* at 2-3. The report did not document any DNA results, other than noting that DNA profiling on "selected items of evidence" would take place at a later date. *Id.* at 2. The government disclosed Report 10, without additional documentation or explanation of Mr. Fischer's results, on June 9, 2004. *See* Pet. Ex. 29 (Letter from Mr. Wrigley to Mr. Hoy - June 9, 2004) (noting disclosure of documents bates-stamped 10743 through 11146); Pet. Ex.28 (showing Report 10 as bates-stamped 10775-77); Hrg. Tr. 394-95.

On May 8, 2006, or two months before the start of voir dire for trial, the government disclosed the "case file," bench notes, and other documentation for numerous BCA forensic reports, including Mr. Fischer's Report 10. *See* Pet. Ex. 39 (letter from Mr. Wrigley to Mr. Hoy - May 8, 2006); Pet. Ex. 4 (Report 10 with bench notes, stamped 18389-18418); Hrg. Tr. 406. The case file for BCA Report

10 revealed that Mr. Fischer had conducted p30 testing on the cervical, vaginal, and anal swabs that were taken from Ms. Sjodin at autopsy. Pet. Ex. 4 at 30. All three swabs tested negative for p30. *Id.* Mr. Fischer had conducted the p30 test on April 23, 2004, or six days after Ms. Sjodin's body was discovered in Minnesota. *Id.* An image of Mr. Fischer's test results appears below:

**Form 105-BI**

**SEMEN/SALIVA SUMMARY**

CASE NUMBER B03 -11062          SCIENTIST

| ITEM | BCIP | AP | p30 | MICRO | AMYLASE |
|---|---|---|---|---|---|
| DATE TEST PERFORMED | | | 4/23/04 | 4/23/04 | |
| POSITIVE CONTROL | | | + | | |
| NEGATIVE CONTROL | | | − | | |
| | | | | | |
| Item 06A (V·S) | | | − | −sp / slide Very Heavy NEC | |
| Item 06B (Anal S) | | | − | −sp / slide Light NEC, Heavy debris | |
| Item 06C (Cervical S.) | | | − | −sp / slide Heavy NEC | |
| | | | | | |

Mr. Fischer explained at the hearing that he tested the swabs for p30 instead of acid phosphatase; when a biological sample is "very small," it is often run with the more "confirmatory" testing of p30 in order to conserve the sample. Hrg. Tr. 751. Mr. Fischer also undertook a microscopic examination from each swab, all three of which revealed no sperm cells. Hrg. Tr.751-52. He documented that result

with the notation "– sperm/slide" for each of the three swabs. Pet. Ex. 4 at 30; Hrg. Tr. 752. The bench notes also document "very heavy NEC" for the vaginal swab and "heavy NEC" for the cervical swab. Pet. Ex. 4 at 30; Hrg. Tr. 752. Mr. Fischer said that he recorded the presence of nucleated epithelial cells in order to document "the facts" of what he observed in the microscope, and he said that nucleated epithelial cells can be used to obtain a DNA profile or to search for male DNA. Hrg. Tr. 752-53. As explained below, the presence of intact nucleated epithelial cells all but precludes the presence of semen under the known circumstances. Sperm cells are more resistant to post-mortem decay than epithelial cells, and yet they were absent from the swabs; in addition, the swabs tested negative for any male DNA. *See* Hrg. Tr. 22; Pet. Ex. 3 (Keel report) at 6.

Mr. Fischer met with prosecutors on multiple occasions to discuss his semen-related findings, primarily with former Assistant U.S. Attorney Norm Anderson, but also "once or twice" with then-U.S. Attorney Drew Wrigley and Assistant U.S. Attorney Keith Reisenauer. Hrg. Tr. 753. He did not recall the specifics of those conversations, but "they did ask me a lot of questions to try and understand the testing that was done." Hrg. Tr. 754. To that end, the prosecutors provided Mr. Fischer with his report and bench notes. Hrg. Tr. 754.

On one occasion – June 30, 2004 – Mr. Fischer spoke with Mr. Anderson and summarized the call in writing. Hrg. Tr. 758-61; Pet. Ex. 61 (communications log). Mr. Fischer's entry states that the two discussed "the semen search results of

20

the vaginal, cervical and rectal swabs." Hrg. Tr. 760. Mr. Anderson requested "that DNA testing be performed on the vaginal and cervical swabs even though no semen was detected on them." Hrg. Tr. 761. On that particular occasion Mr. Fischer did not specifically discuss p30 testing or his microscopic examination – specifics that lab personnel generally do not describe for prosecutors unless they are asked. Hrg. Tr. 762. Several months later, Mr. Fischer's colleague Ann Marie Gross tested the swabs for male DNA and found none. *See* Pet. Ex. 30 (BCA Lab Report 27) at 3.

2.      **Trial counsel's oversight** – On the same day that the government disclosed Mr. Fischer's bench notes to the defense – May 8, 2006 – Mr. Hoy's office received an updated disclosure describing Dr. McGee's anticipated trial testimony. *See* Pet. Ex. 35 ("United States' Disclosure of Expert Witnesses – Supplement II"); Pet. Ex. 39 (discovery letter from Mr. Wrigley). That disclosure served as defense counsel's first notice of Dr. McGee's basis for opining that semen was present. Hrg. Tr. 402. The document stated that the acid phosphatase levels from the vaginal and cervical swabs were "elevated beyond the normal range expected under the circumstances of decomposition." Ex. 35 at 3. The results indicated "the likelihood of seminal deposit at the time of death or within the preceding 24 hours." *Id.*

Defense counsel had earlier believed that no such testimony would be offered. Although Dr. McGee's autopsy report listed the acid phosphatase levels,

21

the same report disclosed the negative sperm results obtained by Regions Hospital. *See* Pet. Ex. 16 at 1. Counsel had also obtained, in May 2004, Mr. Fischer's report stating that his own "examinations" of the vaginal, cervical, and anal swabs "did not detect the presence of semen." Pet. Ex. 28 at 2. In January 2006, counsel learned that the swabs had tested negative for male DNA, based on findings from forensic scientist Ann Marie Gross of the Minnesota BCA. *See* Pet. Ex. 30 (BCA Lab Report 27), at 3; Pet. Ex. 31 (Letter from Mr. Wrigley to Mr. Hoy, Jan. 4, 2006); Hrg. Tr. 396-97. Mr. Hoy greeted the negative DNA finding as "good news" that made it "very unlikely that there had been a rape." Hrg. Tr. 397. Faced with the May 8 disclosure of Dr. McGee's trial testimony, Mr. Hoy researched the issue of acid phosphatase, retained Dr. Sensabaugh on the advice of DNA expert Dr. James Blake, and took Dr. McGee's deposition as permitted by the Court on account of the government's late disclosures. *See* Hrg. Tr. 391, 402-06, 439-40; Pet. Ex. 42 (McGee pretrial depo.); Pet. Ex.37 (order granting motion for sanctions); Pet. Ex. 46 (Email from Dr. Blake to Mr. Hoy).

Nevertheless, counsel completely overlooked the significance of Mr. Fischer's results from the same date. Mr. Hoy "made it a point to read all of the discovery materials." Hrg. Tr. 409. Nevertheless, when Mr. Hoy read the May 8 materials, he "wasn't particularly concerned" about the bench notes for Mr. Fischer's report, because the report itself noted the absence of semen and was helpful to the defense. Hrg. Tr. 409. Mr. Hoy "assumed" that the bench notes

would simply corroborate what he already knew. Hrg. Tr. 409. He did not grasp the full significance of p30 until after his semen-related research and his consultations with Dr. Sensabaugh, and at that point, he did not review the May 8 discovery materials to ascertain what tests Mr. Fischer had conducted. Hrg. Tr. 410-11. Neither did Mr. Hoy learn that Mr. Fischer had conducted a sperm search that was separate and distinct from those described in Dr. McGee's autopsy report, or that Mr. Fischer had found nucleated epithelial cells on the vaginal and cervical swabs. And never did Mr. Hoy send the results to Dr. Sensabaugh. Hrg. Tr. 494-95; Sensabaugh Depo. at 38-42.[2]

Co-counsel Richard Ney testified to similar effect. Mr. Ney explained that he took primary responsibility for the penalty phase of trial, but there was substantial overlap between the two attorneys and the different phases of trial. Hrg. Tr. 784-85. Both attorneys consulted with each other and prepared both cases, and Mr. Ney independently reviewed all of the forensic discovery materials. Hrg. Tr. 784-87. Strategy decisions were "almost always" made jointly by both attorneys. Hrg. Tr. 787.

Mr. Ney shared Mr. Hoy's understanding from the negative semen finding in Mr. Fischer's report as well as the negative male DNA finding from Ms. Gross, i.e., that the government did not plan to allege that semen was present in Ms.

---

[2] Dr. Sensabaugh's post-conviction deposition was filed with the Court as ECF Doc. 10531-1. The Court granted Petitioner's motion to admit the deposition in lieu of Dr. Sensabaugh's live testimony. ECF Doc. 1057 (Order of Sept. 10, 2017).

Sjodin's body. Hrg. Tr. 800-01. He received the May 8 discovery materials but did not examine the bench notes "minutely" because it appeared to him that the documents duplicated previous disclosures. Hrg. Tr. 802-04. Mr. Ney testified that he likely did not look at the page of bench notes that described Mr. Fischer's semen-related testing. Hrg. Tr. 804-05, 813-14. Mr. Ney described the incident as "a mistake on our part; [t]here was no strategy involved." Hrg. Tr. 813, 818.

Although Mr. Hoy claimed to be unfamiliar with p30 testing when he reviewed Mr. Fischer's bench notes following their disclosure on May 8, 2006, the government had earlier disclosed numerous documents that discussed or made use of p30 testing. Hrg. Tr. 414-29. Chief among these were documents showing that a pair of jeans seized from Petitioner's bedroom tested positive for semen. Hrg. Tr. 423-29; Pet. Ex. 5 (BCA Report 5, Jan. 28, 2004); Pet. Ex. 6 (summaries of tests performed on jeans and other items recovered from Petitioner's home). Defense counsel received those documents on or before June 9, 2004. Hrg. Tr. 423-24.

Mr. Fischer evaluated four different areas from the jeans, finding positive results for BCIP (a type of acid phosphatase testing), positive sperm searches, and "light" nucleated epithelial cells. Pet. Ex. 6 at 2 (regarding Items 4-1, 4-2, 4-3, and 4-4); Hrg. Tr. 18-19 (regarding BCIP testing). The form included a column for p30 testing but showed that none was performed. Pet. Ex. 6 at 2. Mr. Fischer found acid phosphatase and, five days later, conducted a microscopic examination that revealed the presence of sperm cells. Pet. Ex. 6 at 2; Hrg. Tr. 36-37, 425. DNA

testing from the sperm cells matched Petitioner – proving not only that the semen came from him, but, more importantly, that he is not aspermic. Hrg. Tr. 37-38; Pet. Ex. 5 at 3; Trial Tr. 6658-59 (Mr. Wrigley cross-examining Dr. Sensabaugh, during *Daubert* hearing, about the possibility of an ejaculation with no sperm). The record establishes that counsel were aware of the jeans-testing, because they successfully moved the Court to exclude the results from trial under Fed. R. Evid. 403. *See* ECF Doc. 474 (Order dated July 26, 2006), at 1-2.

Similar tests were run on other items seized from Petitioner's home, including three baseball caps, two coats, and a shirt. Pet. Ex. 5 at 4; Pet. Ex. 6 at 1. All six items were negative for semen and saliva. Pet. Ex. 5 at 4. In order to reach that conclusion on all but one of the baseball caps, Mr. Fischer tested for BCIP (or acid phosphatase) and ran no further tests because the result was negative. Pet. Ex. 6 at 1; Hrg. Tr. 33-36. The remaining baseball cap, however, tested positive for BCIP (or acid phosphatase) on December 18, 2003. Pet. Ex. 6 at 1; Hrg. Tr. 33-36. Two weeks later the cap was tested for p30 and examined microscopically for sperm cells, both of which were negative. Pet. Ex. 6 at 1. The cap also revealed "light" nucleated epithelial cells. *Id.* Mr. Hoy was able to understand and describe these findings at the hearing. Hrg. Tr. 427-29.

Also disclosed to the defense was a semen analysis on two pairs of underwear from Ms. Sjodin's apartment. Hrg. Tr. 416-17; Pet. Ex. 40 (North Dakota "Supplemental Laboratory Report" of Feb. 20, 2004), at 5. The report

25

stated that one of the pairs of underwear contained semen, while the other was negative. Examiners tested both pairs of underwear for p30:

> The crotch area of the underwear (Item 1-VA) tested positive for the presence of acid phosphatase (an enzyme present in semen and other body fluids). Further examination of this area detected the presence of p30 (a semen specific protein). Therefore, It is my opinion that there is semen present on the crotch area of the underwear (Item 1-VA). ...
>
> The [other] underwear (Item 1-VS) did not detect the presence of p30. Therefore, it is my opinion that there is no semen present ... on the area tested on the underwear (Item 1-VS).

Pet. Ex. 40 at 5. The report was provided to Mr. Hoy on or before August 23, 2004, or some two years before trial. Hrg. Tr. 419-20.

At that time Mr. Hoy had also received the "DNA Testing Quality Assurance Manual" from the North Dakota crime lab. Hrg. Tr. 420-21; Pet. Ex. 41.The Manual includes a "Methods Flow Chart" that explains the interplay between acid phosphatase and p30 testing. Hrg. Tr. 420-21; Pet. Ex. 41 at 37 (Bates Stamp 3857). A negative acid phosphatase reading means that semen is not present in a sample, while a positive reading means that "semen or other bodily fluids may be present." Pet. Ex. 41 at 37. The results for p30 testing are more definitive: a negative p30 result means that semen is absent, while a positive p30 result means that semen is present and that the examiner may proceed to the "DNA extraction procedure." *Id.*; Hrg. Tr. 421.

Considering Mr. Fischer's bench notes, the entirety of forensic testing, and the stated methodology of one of the government's laboratories, the prosecution

26

disclosed documents that disproved its own theory of a seminal deposit immediately before Ms. Sjodin's death. Trial counsel did not recognize the importance of those documents and did not send Mr. Fischer's bench notes to Dr. Sensabaugh. Hrg. Tr. 494-95 (describing items that Dr. Sensabaugh had reviewed for his report); Sensabaugh Depo. at 38-42. Dr. Sensabaugh remained ignorant of the p30 results on the autopsy swabs. Trial Tr. 6639.

3.       **The consequences of trial counsel's oversight** – Counsel testified that the presence or absence of semen was an important issue at trial, and indeed, the defense called Dr. Sensabaugh as its sole guilt-phase witness. Trial Tr. 6797-6826; Hrg. Tr. 388. The question of a rape "changed the presentation of the case," with a "ripple effect through sentencing," Mr. Hoy observed. Hrg. Tr. 388, 501-02. Dr. McGee's testimony was "the linchpin of the government's case alleging that there was a rape" and a "very important part of the trial." Hrg. Tr. 390-91. Mr. Hoy explained as much to his experts. The opinion of Dr. McGee "is the basis for the Government's contention that [Ms. Sjodin] was sexually assaulted," Mr. Hoy wrote to Dr. Blake. Pet. Ex. 45 (Letter of June 9, 2006), at 3. "Consequently, this is a very important issue for the defense and one which I believe we should be successful on if the science can be properly presented." *Id.* Mr. Hoy similarly advised Dr. Sensabaugh: "If we can keep the government from proving she was sexually assaulted, in addition to kidnapped and killed, it would be a major victory in the case." Hrg. Tr. 490-91.

Mr. Ney shared his co-counsel's assessment. Evidence of a rape "obviously was damaging to our case," he explained. Hrg. Tr. 790. "The specter of Miss Sjodin's death was certainly horrible but add onto that the fact that there was a rape, a completed rape, made it far worse." Hrg. Tr. 790. A completed rape would suggest that Petitioner killed Ms. Sjodin after finishing the sexual assault – instead of during an attempt to rape her – which would imply that the rape itself was "a form of torture or abuse of the victim." Hrg. Tr. 930.

Both attorneys would have defended Petitioner differently if they had been aware of Mr. Fischer's testing. The negative p30 result would have been "the centerpiece" of Mr. Hoy's effort to exclude Dr. McGee's testimony at the *Daubert* hearing, and if necessary, the defense would have "certainly put [it] on in front of the jury" because evidence disproving a completed rape "could have had a dramatic impact." Hrg. Tr. 389-90, 410. Among other measures, Mr. Hoy would have cross-examined Mr. Fischer concerning his p30 and related findings. Hrg. Tr. 500-01. Unfortunately for the defense, counsel overlooked the p30 results or other definitive evidence to resolve the semen issue, and as a result, Mr. Hoy was left with little time and resources to develop other evidence as the trial neared. Hrg. Tr. 528 ("I don't know what I could have developed, [b]ut as it was I was busy with the acid phosphatase issue on that last month or two just before trial.").

Mr. Ney likewise clarified that, if counsel had realized the significance of Mr. Fischer's test results, they would have furnished that evidence to Dr.

28

Sensabaugh or another expert, and would have presented it at the *Daubert* hearing and thereafter to the jury – including efforts to dispute the government's contention that the killing of Ms. Sjodin was especially heinous, cruel, and/or depraved. Hrg. Tr. 806-09, 815-18, 822-24, 852-54, 862-63, 857-71, 930. Even the findings "heavy" and "very heavy" nucleated epithelial cells would have provided strong evidence that no semen was present, and Mr. Ney understood the significance of that evidence based on his previous experience in sexual assault cases. Hrg. Tr. 780-81, 811-13.

The Fischer results would have aided the defense in a more fundamental respect as well: the lack of a completed rape would have led the defense to challenge the manner of Ms. Sjodin's death. Hrg. Tr. 841-46, 869-72, 930-31. The victim was found with her pants removed and her arms tied behind her back. Pet. Ex. 16 at 1. Mr. Ney explained that the definitive absence of semen would suggest that Petitioner did not complete his apparent objective of raping the victim, and instead that Ms. Sjodin died from a struggle during the attempt, which is what ended the attempt. Hrg. Tr. 842-43, 930-31. "[I]f there isn't a completed rape," Mr. Ney explained, the "death march" and terminal throat-slashing described by Mr. Wrigley's closing argument simply "doesn't make sense," and the defense would argue "that the death took place before anything else could happen." Hrg. Tr. 842.

The defense had argued at trial that the killing was "disorganized," unintentional, and the result of a struggle between Petitioner and Ms. Sjodin. Trial

29

Tr. 7276, 7282, 7293. The p30 evidence would have greatly strengthened that

theory, in Mr. Ney's view:

> If we had had the p30 results saying this was not a sexual assault,
> there was no rape, there was no semen on her body, that certainly
> would have led us even further to believe that the killing was, as we
> argued, at a time before the disposal of the body at the site. And so
> there was no neck wounds perpetrated there. And we know it wasn't
> in the car because of the state of the car. … Then there's the argument
> that the death took place before an assault, but it didn't happen at the
> site either so that leads us, I think, logically to believe that the neck
> defects were not knifewounds.

Hrg. Tr. 930-31.

　　　**4.**　　　**The experts' consensus** – The experts agreed that Mr. Fischer's test

results conclusively prove the absence of semen on the autopsy swabs. Forensic

scientist Charles "Alan" Keel explained that p30 is a more definitive and specific

indicator of semen than is acid phosphatase, which is present in every body cell.

Hrg. Tr. 15-16, 31. The vaginal and cervical samples in this case bore the acid

phosphatase readings described in Dr. McGee's report, but they also tested

negative for sperm, negative for male DNA, negative for p30, and positive for the

presence of nucleated epithelial cells. The only "logical explanation" for the acid

phosphatase is that it was endogenous to the vagina and not from semen. Hrg. Tr.

23; *see also* Pet. Ex. 3 (Keel report) at 15 ("The absence of p30, the absence of

sperm, and the absence of male DNA from the Sjodin body orifice swabs all

support the conclusion that no semen was present and completely undermine the

contention that the detected AP activity was from semen.").

Aside from the definitive p30 reading, the presence of nucleated epithelial cells is telling because those cells are less sturdy than sperm cells and less resistant to post-mortem decay. Hrg. Tr. 22; Pet. Ex. 3 at 6 ("[S]perm cells survive environmental insult much longer than other nucleated cells such as epithelial cells or white blood cells."). Thus, if sperm cells had been present in the vagina at the time of death, they would remain present alongside the nucleated epithelial cells. Hrg. Tr. 31. Because Mr. Fischer's bench notes disclose p30 testing and the presence of nucleated epithelial cells, there is a "big disparity" between the scientific information described by the bench notes and the information available without them. Hrg. Tr. 31-32.

Forensic pathologist Jonathan Arden, M.D., explained that p30 is a "very precise" test because it is found in such uniquely high concentrations in seminal fluid. Hrg. Tr. 266. The negative p30 result is therefore "highly dispositive of the question of whether there is or is not semen present." Hrg. Tr. 266-67. Even before he became aware of the p30 results, Dr. Arden disagreed with Dr. McGee's opinion that the observed post-mortem acid phosphatase levels indicated the presence of semen – a conclusion that is not "supported by any literature and is not scientifically valid." Hrg. Tr. 247. The absence of observed sperm cells or male DNA constitute "highly compelling evidence" that semen was absent. Hrg. Tr. 250. Dr. Arden also criticized Dr. McGee's reliance on the supposed "globule" of semen-like material described at trial. A deposit of semen would not survive five

31

months of post-mortem decomposition that affected the surrounding tissues; it would lose its viscosity over time, and the deposit would contain sperm cells and male DNA if it were semen and as large as the tablespoon described by Dr. McGee. Hrg. Tr. 253-56; *see also* Pet. Ex. 3 (Keel report) at 13; Sensabaugh Depo. at 58-59.

The p30 result strengthened Dr. Arden's conclusion to the point of certainty because it is a more precise test. Hrg. Tr. 265-66. "Even if positive acid phosphatase testing is construed as a presumptive indicator of the presence of semen, the absence of both spermatozoa and of p30 constitute much more specific and conclusive evidence that semen was not detected in those swabs taken at autopsy, and that Dr. McGee's conclusion was incorrect." Pet. Ex. 23 (Arden supplemental report) at 3. There is simply no evidence of semen from the autopsy swabs – "none whatsoever." Hrg. Tr. 269.

Dr. Sensabaugh agreed that the totality of results prove that no semen was present. Sensabaugh Depo. 54-55. During his pretrial consultation with defense counsel, Dr. Sensabaugh was never provided or made aware of Mr. Fischer's report, bench notes, or findings. *Id.* at 24-26, 38-42. He recommended that trial counsel undertake p30 testing because it is more definitive than acid phosphatase testing. *Id.* at 33, 49-51 ("[I]f I knew the p30 test would have been done, then I wouldn't have recommended that it be done."). He was similarly unaware that Mr. Fischer had found nucleated epithelial cells, which "degrade more rapidly than

sperm do," meaning that sperm cells would have been detected if they had ever been present. *Id.* at 64-66. Moreover, the fact that the swabs were negative for male DNA means that the epithelial cells did not originate from semen. *Id.* at 67. Tests on Petitioner's jeans demonstrated that he is not aspermic – yet another fact that trial counsel did not share with Dr. Sensabaugh. *Id.* at 61-63. Therefore, the absence of sperm cells from the autopsy swabs means that no semen was ever present. *Id.* at 64.

The government's own witnesses agreed. Having not been asked about his p30 testing during the trial, Mr. Fischer explained at the hearing that p30 is a more "confirmatory" test than acid phosphatase. Hrg. Tr. 751. If the defense had asked him during the *Daubert* hearing or trial, Mr. Fischer would have testified that he conducted a p30 test, undertook an independent microscopic examination, found nucleated epithelial cells, and that his test results were negative for semen. Hrg. Tr. 756-57.

Government-retained forensic pathologist Ljubisa J. Dragovic, M.D., reached the same conclusion. Although the circumstances of the offense satisfy the legal definition of a "sexual assault," the negative p30 result proves that "there was no semen." Hrg. Tr. 346-47; Pet. Ex. 27 at 7-8. The acid phosphatase readings may have given Dr. McGee the "impression" of a seminal deposit at the time of autopsy, but "the negative results took care of that as an issue." Hrg. Tr. 347-48. "You certainly cannot base it on prostatic acid phosphatase that was found during

33

testing because beyond that everything else was negative as far as sampling was concerned," Dr. Dragovic testified. Hrg. Tr. 348.

### B.    The Neck and Flank Defects

**1.    Trial counsel's inadequate investigation** – As with the semen evidence, Dr. McGee's opinions on the cause of death became clearer as the trial approached and after defense counsel sought disclosure from the government and assistance from the Court. *See* Pet. Ex. 16 (autopsy report) at 1, 6; Pet. Ex. 34 (supplemental expert disclosure of April 28, 2006) at 2; Pet. Ex. 35 (supplemental expert disclosure of May 5, 2006) at 2-3; Pet. Ex. 38 (supplemental expert disclosure of May 16, 2006) at 2-4; Pet. Ex. 42 (pretrial McGee deposition) at 127-32. Dr. McGee's autopsy report was not a model of clarity, attributing Ms. Sjodin's death to "homicidal violence." Pet. Ex. 16 at 1. Under the heading of "homicidal violence," the report listed five relevant findings: "A. Bound upper extremities over dorsal aspect of body[;] B. Nude from waist down [;] C. ligature present about neck region[;] D. Remnants of slash wound - neck region[;] E Defect to right flank region." *Id.* Several pages later the report described the remnants of two parallel "slash wounds" to the neck. *Id.* at 6. The lower such wound measured 13.5 cm across, and the upper such wound was 8 cm in length. *Id.* (describing the "distinct margin" of 13.5 cm and the "parallel appearing margin" of 8.0 cm); *accord* Trial Tr. 6688-89.

Dr. McGee's opinions on the cause and manner of death remained largely

34

unknown until the government's disclosure of May 5, 2006 – the same document in which the government revealed Dr. McGee would testify that there was a seminal deposit within 24 hours of death. Pet. Ex. 35 at 2-3; Hrg. Tr. 825. The disclosure stated that Ms. Sjodin suffered at least two "elongated slash-type injuries" to her neck, that the defects were "visually inconsistent" with post-mortem decay or animal activity, that the wounds were "consistent with" a knife found in Petitioner's car, and that the neck wounds were "likely inflicted" at the place where Ms. Sjodin's body was found. *Id.* The document stated that the flank defect was "initialized by sharp-object trauma" and was inconsistent with "animal activity alone." *Id.* at 3. And it stated that Ms. Sjodin died "as a result of the slash-type wounds inflicted to her throat, suffocation, or exposure in combination with the injuries and conditions inflicted on her by her killer." *Id.*

By the time of trial, counsel chose not to contest Dr. McGee's opinion that Ms. Sjodin suffered sharp-force injuries to her neck and flank. Hrg. Tr. 526-28; Pet. Ex. 53 (letter from Mr. Hoy to Judge Erickson - July 6, 2006). Counsel elected not to contest the point because they had no expert evidence with which to contest it, and, in addition, they persuaded the Court to refuse admission of disturbing autopsy photographs showing the defects that might otherwise shed light on how the defects began. Hrg. Tr. 526-28, 633, 842-46.

Both lawyers described earlier efforts to determine the cause of the neck and flank defects. The defense consulted with forensic pathologist Garry F. Peterson,

35

M.D., who had recently retired as Hennepin County Medical Examiner. Hrg. Tr. 513-15, 604-05. The Court pre-approved reimbursement for a total of two hours' worth of Dr. Peterson's time. Hrg. Tr. 660-62, 834-35. Dr. Peterson reviewed the materials that counsel sent to him, including Dr. McGee's report and various autopsy photos. Hrg. Tr. 654-56. Mr. Hoy asked Dr. Peterson not to prepare a written report, and he and Mr. Ney met with Dr. Peterson at his home on April 15, 2005 – more than one year before the government's key disclosure of May 2006. Hrg. Tr. 515-16, 828, 902-03.

The attorneys disagree about exactly what took place at the meeting. According to Mr. Hoy, Dr. Peterson "pointed to a cause of death that wasn't helpful to the defense." Hrg. Tr. 521. Mr. Hoy's notes from the meeting suggest a view that Ms. Sjodin's neck had been "incised" or "slashed," and that an "incised neck" was the likeliest cause of death. Hrg. Tr. 520-21, 611-15. Mr. Ney remembered the meeting differently. Dr. Peterson "was very clear that he was unclear," Mr. Ney explained. Hrg. Tr. 828. Dr. Peterson could not make a determination on the cause of death, and he consistently spoke in terms of "it could be this, or it could be that." Hrg. Tr. 828-29. It was Mr. Ney's "strong recollection" that Dr. Peterson "never said it was one thing or another," and that he never opined on the cause of death to any degree of medical certainty. Hrg. Tr. 832-33, 905. For his part, Dr. Peterson explained that he could not have rendered any opinions with medical certainty in the limited time that he was authorized to spend. Hrg. Tr. 692.

The autopsy report described two slash wounds, and Dr. Peterson had "basically accepted" Dr. McGee's interpretations of the photos. Hrg. Tr. 693-97, 722-24.

Regardless of their disagreement about the April 2005 meeting, counsel agreed that they continued to investigate the cause of death after the meeting and that the issue was not resolved by whatever Dr. Peterson had said. Hrg. Tr. 522-25, 837-41. Mr. Hoy followed up with Dr. Peterson following the government's disclosure of May 5, 2006. Three days after receiving that disclosure, Mr. Hoy wrote to Dr. Peterson to seek guidance on the medical opinions that were attributed to Dr. McGee – including the origin of the supposed neck "wounds." Hrg. Tr. 523-24, 835-39 (per Mr. Ney, "[I]f Dr. Peterson already said those were his opinions, we wouldn't really have a reason to write him and ask him if McGee's opinions were correct."). Counsel received no response to the letter. Hrg. Tr. 671-72, 840. Mr. Hoy also asked Dr. McGee about the same subject during the deposition of May 31, 2006. Hrg. Tr. 525. Counsel discussed the possibility of consulting an additional pathologist and exchanged "a couple of names," but they failed to pursue the issue any further. Hrg. Tr. 841-47.

Petitioner's own statements about the crime also did not cause counsel to drop the investigation of the cause of Ms. Sjodin's death. Counsel repeatedly met with Petitioner before as well as after Ms. Sjodin's body was found. Hrg. Tr. 511-13, 911-14. Petitioner denied any involvement in the crime and said that he could not plead guilty to a crime he did not commit. Hrg. Tr. 511-12, 538, 623-28, 913-

14. Mr. Hoy nevertheless believed, based on his review of the forensic and other evidence, that there was a "very high likelihood" that Petitioner was responsible for Ms. Sjodin's disappearance and death, and that Petitioner would be convicted at a trial. Hrg. Tr. 512. Mr. Hoy continued to investigate the cause of death despite Petitioner's denials, and indeed, he consulted a forensic pathologist as described above. Hrg. Tr. 513-14. Mr. Ney confirmed that that counsel did not rely on Petitioner's denials and did not truncate their investigation as a result of them. Hrg. Tr. 931-32.

Counsel eventually persuaded Petitioner to agree to plead to "the elements" of the offense, but without describing how the offense occurred. Hrg. Tr. 628-29, 914-15. Following Petitioner's agreement, counsel formally offered for their client to plead guilty in exchange for a life sentence, but the government rejected the proposal. Hrg. Tr. 854-55; Pet. Ex. 69 (letter from Mr. Ney to Mr. Wrigley - March 8, 2006). At no point did Petitioner provide details of the crime to his attorneys, and at no point did he admit to raping Ms. Sjodin or cutting her with a knife. Hrg. Tr. 629-30, 931-32.

**2.    The results of trial counsel's limited investigation** – Counsel lacked evidence to contest Dr. McGee's opinions that Ms. Sjodin suffered sharp-force injuries to her neck and flank. Hrg. Tr. 527-28, 633, 843-46. That fact seriously weakened their defense at all stages of trial. If counsel had had "a pathologist who would testify these were not knife wounds," they would have contested the cause

of death. Hrg. Tr. 846. The issue of the cause of death "was much more important than the photographs." Hrg. Tr. 846. Although the defense managed to exclude the photographs by not contesting the supposed knife wounds, "This was us taking what we could get, but as a trade-off we would much rather contest that these were wounds." Hrg. Tr. 846. Counsel's limited evidence placed the defense in "a no-contest situation" on critical facts. Hrg. Tr. 846.

The defense was likewise limited in the death-eligibility phase. In an effort to contest the government's contention that the killing involved "substantial planning," Mr. Ney argued that the evidence showed "disorganized activity" by a "disorganized mind, not a homicidal mind." Trial Tr. 7275. At the hearing, Mr. Ney agreed that the omitted forensic evidence would have strengthened his argument. Hrg. Tr. 863-65. Evidence that the Ms. Sjodin was not slashed or raped would support the theory that she died during a struggle. Hrg. Tr. 864. There would be "no downside" to such evidence. Hrg. Tr. 865. In any event, one or more jurors may have found that the killing involved "substantial planning." Hrg. Tr. 865. The eligibility phase verdict meant only that the jurors did not make such a finding unanimously and beyond a reasonable doubt, and thus, the question resonated into the selection phase. Hrg. Tr. 865. Similar resonant was the culpability-based issue of whether Petitioner carried out an intentional killing. Hrg. Tr. 871-72. As with the "substantial planning" aggravator, the defense argued that Ms. Sjodin's death "was caused unintentionally and in the midst of a struggle" and

39

was "disorganized" rather than "cold-blooded" or intentional. Trial Tr. 7292-93. Although the jury found all four *mens rea* factors, the question of intentionality remained relevant for the selection phase. Hrg. Tr. 871-73.

The defense also argued that the killing was not "heinous" and "cruel" as alleged because the evidence did not show torture or significant violence beyond the act of killing itself. Trial Tr. 7277-81. Mr. Ney suggested that Ms. Sjodin could have struggled with Petitioner, could have asphyxiated "fairly quickly" from the bag over her head, and could have been killed "right there at the scene" instead of being "driven around for hours and hours." Trial Tr. 7280. "It could have all happened right there in the parking lot," Mr. Ney argued. Trial Tr. 7280.

This contention, too, would have been aided by the available evidence. Mr. Ney explained that the government's allegation of a slashing death following a rape was critical to the contention that the killing was "heinous, cruel and depraved." Hrg. Tr. 867. If there was no slashing attack – which would have left a great deal of blood in Petitioner's car – Mr. Ney's argument about a fatal struggle in the parking lot would have been much stronger. The missing forensic evidence "would have made a great deal of difference" on that question, both on whether the Court should strike the aggravator and whether the jurors would unanimously find it. Hrg. Tr. 867. Mr. Ney disclaimed any strategic reason for omitting such evidence. Hrg. Tr. 868.

Still another eligibility phase issue was whether Petitioner "caused" Ms.

40

Sjodin's death, as opposed to the guilt-phase question of whether Petitioner committed a kidnapping that "resulted" in death. Trial Tr. 7290-91. The defense invoked "the issue about the plastic bag" and argued that "this was an accidental asphyxiation" that might not satisfy the aggravating circumstance, even though it justified Petitioner's conviction. Trial Tr. 7291. Here as elsewhere, the omitted forensic evidence would have assisted Mr. Ney's theory as he agreed. Hrg. Tr. 868-70.

Counsel were also hamstrung in the selection phase defense. Evidence disproving a slash wound and a rape would "change the narrative … completely of what happened and what the government could argue reasonably." Hrg. Tr. 872. On that score, Mr. Wrigley's death-march script – *see* Trial Tr. 8706-07 – was "highly damaging" and "Anybody reading this or hearing at the time would agree." Hrg. Tr. 879-80. The forensic evidence could have been used to object to – and if need be, rebut – Mr. Wrigley's argument that no facts could possibly mitigate a killing that followed the death-march script. Hrg. Tr. 880-81 ("[H]e tells this narrative very well and it's very damaging."). Mr. Ney explained that the forensic evidence would also have diminished the force of the government's victim impact testimony. Although evidence describing a less depraved killing would not negate the family's loss, the manner of death impacted "what the family had to be thinking or the harm to their well-being about thinking about that happening." Hrg. Tr. 874-75.

41

**3.      The post-conviction experts** – The evidentiary hearing illustrated the type of evidence that trial counsel could have presented with a professionally reasonable investigation.

Forensic pathologist Mark Flomenbaum, M.D., Ph.D., testified that there was no slashing or other knife wound to Ms. Sjodin's neck or flank. Hrg. Tr. 113, 141; Pet. Ex. 10 (report) at 9. The large amount of missing tissue from the neck area is a "post-mortem artifact" – specifically, predation from small animals. Hrg. Tr. 113-15; Pet. Ex. 10 at 9. The boundaries of the defect show scalloping patterns that are teeth marks, and indeed, the appearance is "almost pathognomonic" for rodent activity. Hrg. Tr. 116. The boundaries are inconsistent with a cutting injury from a knife, which would leave comparatively "nice and straight" lines. Hrg. Tr. 116-17, 134-35. In addition, the flap of skin displayed in the autopsy photos aligns with the placement of the rope and bag around Ms. Sjodin's neck. Hrg. Tr. 118-19. Compared to the surrounding tissues, the band of skin under the rope was protected from decomposition and rodent activity. Hrg. Tr. 119-21. The flap does not, then, demark the boundaries of two parallel knife-wounds as claimed by Dr. McGee. Hrg. Tr. 119-21; Ex. 10 at 8. Rather, the flap of skin would not exist but for the rope having been tightened over it. Hrg. Tr. 121. Although it is theoretically possible that Ms. Sjodin could have been stabbed along two lines matching perfectly with the rope's placement, "the likelihood of that occurring is minuscule." Hrg. Tr. 135.

42

Dr. Flomenbaum pointed to still other evidence that disproves Dr. McGee's conclusions. First, he explained that any slash wound across the victim's neck would have caused "massive" bleeding to the point of exsanguination, even if Ms. Sjodin were in a face-down position as suggested at trial. Hrg. Tr. 137-38, 143-45. One would expect Ms. Sjodin's clothes to be "drenched" with blood, but they featured only "blood-tinged decomposition fluid." Hrg. Tr. 137-38, 143-45; Ex. 10 at 9. Second, one would expect to see notching or defects on the rope-ligature if Petitioner had slashed Ms. Sjodin's neck after placing a plastic bag over her head and tightening it with a rope, and yet the rope does not show "notching or cut injuries" comparable to the slash-wounds imputed by Dr. McGee. Hrg. Tr. 138-39. Third, a cutting injury to the neck would likely leave a mark in the underlying cartilage or bone, but there is no evidence of such defects. Hrg. Tr. 136-37.

Similar evidence undermines the claim of a flank wound. The flank defect is the result of post-mortem decomposition, and it reflects the splitting of skin along a medically familiar cleavage pattern in accordance with the anatomical grain of the skin. Hrg. Tr. 146-49. There is no evidence that a knife wound caused or began the defect, and it would be "highly unusual" for a knife to follow the "Langer's lines" so perfectly. Hrg. Tr. 151-52; Pet. Ex. 10 at 9. Neither is there any evidence of the profuse bleeding that such a cutting injury would produce. Hrg. Tr. 150. All told, "There is no indication that a knife or any other sharp instrument caused any injury to this body." Pet. Ex. 10 at 9.

Similar testimony was given by Oakland-based forensic pathologist Michael J. Ferenc, M.D. A knife wound to Ms. Sjodin's neck is a "theoretical possibility," but "there's nothing that tells me that something started out as a sharp force injury." Hrg. Tr. 451-52, 454-55, 465, 477 ("There's nothing to support it."); Pet. Ex. 55 (report) at 2 ("no evidence of sharp force injury, including no evidence of notching by a weapon."). Dr. Ferenc testified that scalloping along the edge of the neck defect looked like "little tooth marks" that "strongly" suggested animal activity. Hrg. Tr. 453-54. A wound produced by a knife – even a serrated one – would be "much more pristine." Hrg. Tr. 454; Pet. Ex. 55 at 2-3.

According to Dr. Ferenc, Dr. McGee's testimony about the flap of skin bordered by two slash wounds "doesn't even make sense, to be quite honest." Hrg. Tr. 455. If the skin flap were evidence of a sharp force injury, then the animals somehow "ate all around it and left it alone." Hrg. Tr. 455. Dr. Ferenc also agreed with Dr. Flomenbaum's testimony about the rope. He found it "very unlikely" that the rope would not be notched or otherwise damaged during the infliction of adjacent slash wounds. Hrg. Tr. 456 ("It's rather amazing serendipity that the rope didn't get at least notched or affected by a slashing wound."). Dr. Ferenc likewise agreed about the relative absence of blood. He noted some red and brownish stains on Ms. Sjodin's clothing, but there were no blood stains in a volume that sharp-force injuries would produce. Hrg. Tr. 457; Pet. Ex. 55 at 4.

Once more agreeing with Dr. Flomenbaum, Dr. Ferenc testified that there

44

was no sharp force wound to Ms. Sjodin's flank. Pet. Ex. 55 at 4. The flank defect was simply one area on Ms. Sjodin's body that showed post-mortem depredation as other areas did. Hrg. Tr. 458. The photos showed a "scalloping or gnawing-like marks along the side" of the defect. Hrg. Tr. 458. The evidence cannot definitively exclude the possibility of a knife wound to the flank, "but there's just absolutely nothing I saw that raises it beyond speculation." Hrg. Tr. 460.

Dr. Arden testified similarly. He found "no evidence" of a knife wound to Ms. Sjodin's neck or flank, and no basis to match any defects on Ms. Sjodin's body with any particular instrument. Hrg. Tr. 224-25, 228-29, 235-37, 285. The missing neck tissues reflect "post-mortem processes" such as feeding from small rodents, as shown by "repetitive notching." Hrg. Tr. 217-18; Pet. Ex. 20 (report) at 3. The margins of the neck defect were "outright diagnostic of" post-mortem decomposition and depredation and inconsistent with knife wounds. Hrg. Tr. 218, 220-21, 224-25. Dr. Arden noted that the strip of skin described by Dr. McGee coincided with the ligature's placement on Ms. Sjodin's neck. Hrg. Tr. 225-27, 323-24. In comparison to the surrounding tissue, the area under the rope was protected from decomposition and predation. Hrg. Tr. 225-27. The flank defect, meanwhile, was "extremely similar" to other defects that Dr. McGee did not attribute to sharp force injuries, including a defect on Ms. Sjodin's knee. Hrg. Tr. 229-31. The flank defect's "irregular margins" are "much more consistent with animal activity than with a knife wound." Pet. Ex. 20 at 3.

45

Notably, Dr. Dragovic, the government's expert in these post-conviction proceedings, found "no evidence" of a neck slash, a flank slash, or any other sharp force injury. Hrg. Tr. 349-50, 372. The neck defect is a post-mortem artifact "resulting from the combined effects of decomposition and most likely, smaller rodents feeding on the victim's remains." Hrg. Tr. 349; Pet. Ex. 27 (report) at 8. A slash to the neck would result in liters of blood "spewing" out, which is not evidenced on Ms. Sjodin's clothes. Hrg. Tr. 373, 375-77. The flank defect, too, resulted from decomposition and "gnawing" by animals. Hrg. Tr. 350.

In deciding the most likely cause of Ms. Sjodin's death, Dr. Dragovic also considered a series of admissions that Petitioner made to government-retained psychiatrist Michael Welner in 2013 – statements that current counsel do not rely on as support for Petitioner's claims because they were not available to trial counsel or the prosecutors. Dr. Dragovic concluded that Ms. Sjodin died from asphyxiation when Petitioner applied force to the front of her neck. Hrg. Tr. 350; Pet. Ex. 27 at 8-9 ("Mr. Rodriguez provided the distinctive account of hearing a 'whoosh' sound as he was applying pressure on the front part of the victim's neck with his elbow and further described the victim turning limp and purging blood from her mouth and her nostrils.").

Without the benefit of Petitioner's 2013 statements, Dr. Dragovic would still attribute the death to asphyxia because there is no evidence of a sharp force injury or other trauma. Hrg. Tr. 351-52, 370-72. Even without Petitioner's statements; Dr.

46

McGee's theory "that the victim was slashed outside at the place of disposal of the body does not hold water." Hrg. Tr. 364-65.

## ARGUMENT

**I.     The Court should vacate Petitioner's conviction and sentence under *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959), because the prosecution knew or should have known that Dr. McGee testified falsely about the testing for, and presence of, semen on the autopsy swabs, and the prosecution failed to correct that testimony.**

"[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*

Dr. McGee's testimony was indisputably false. He denied that the swabs from Ms. Sjodin's vaginal and cervical areas had been tested for p30. Trial Tr. 6570. But p30 testing was conducted by Mr. Fischer. The results of that testing obliterate Dr. McGee's claim that acid phosphatase readings from the autopsy swabs suggest a deposit of semen. Pet. Ex. 4 at 30 (Fischer results). That claim is now proven unworthy of admission under *Daubert*: there is no scientific basis to infer the presence of semen from post-mortem acid phosphatase readings that are contradicted by a negative p30 result, two negative sperm cell searches, a negative male DNA finding, and the persistence of intact nucleated epithelial cells that

47

could not out-survive sperm cells through five months of outdoor exposure. *See* Hrg. Tr. 266-69 and Pet. Ex. 23 at 3 (per Dr. Arden); Hrg. Tr. 346-48 (per Dr. Dragovic); Hrg. Tr. 23 and Pet. Ex. 3 at 15 (per Mr. Keel); Sensabaugh Depo. at 54-55 (per Dr. Sensabaugh); Hrg. Tr. 757 (per Mr. Fischer). The same claim is unworthy of belief by any jury, even if the Court would somehow admit Dr. McGee's testimony. And it is unworthy of reliance by the government and the sentencer as a basis for the ultimate punishment – particularly when the government's own testing disproved its theory for death. *See*, *e.g.*, Trial Tr. 8707 ("[T]he defendant secured her somehow and he prepared to do what he had to do to ensure that he would not be caught *after* living out his rape fantasies.").

### A.    The Prosecution Knew or Should Have Known that Dr. McGee's Testimony Was False.

Prosecutors violate due process by presenting material testimony that is false, by presenting material testimony that creates a false impression, or by allowing false or misleading testimony to stand uncorrected. *See Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935) (knowingly presenting false testimony violates due process); *Giglio v. United States*, 405 U.S. 150, 153 (1972) (failing to correct false testimony violates due process); *Napue*, 360 U.S. at 269 ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go

48

uncorrected when it appears."). Due process is likewise offended by direct statements that are untrue and by testimony which, "taken as a whole," gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957).

The individual prosecutor need not subjectively know that the government's evidence is false or misleading in order for the ensuing conviction and/or sentence to violate due process. *See*, *e.g.*, *Giglio*, 405 U.S. at 154 (due process violated by witness's false denial of a promise of immunity, where falsity was unknown to the trial prosecutor but known to another prosecutor in the same office). It suffices to show that the government "knew or should have known" of the false testimony, or, otherwise stated, if the prosecution "knowingly, recklessly or negligently used the false testimony." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *United States v. Tierney*, 947 F.2d 854, 860-61 (8th Cir. 1991). A conviction obtained with such testimony is "fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103.

It is irrelevant to this claim whether defense counsel knew or should have known that the testimony was false. *But see* Argument II (ineffective assistance of counsel claim). The prosecution has an "independent obligation immediately to take steps to correct known misstatements of its witnesses." *United States v. Alli*, 344 F.3d 1002, 1007 (9th Cir. 2003). Defense counsel's dereliction does not relieve the sovereign of that duty. *See*, *e.g.*, *Foster v. United States*, 874 F.2d 491,

49

495 (8th Cir. 1988) (prosecutor had duty to correct false testimony of its witness and "[t]he fact that defense counsel was also aware of [evidence revealing the falsity] is of no consequence."); *United States v. Mason*, 293 F.3d 826, 829 (5th Cir. 2002) ("[D]efense counsel's failure to avail himself of the policy making the plea agreement available does not relieve the government of its affirmative responsibility to correct false testimony."); *DeMarco v. United States*, 928 F.2d 1074, 1075-77 (11th Cir. 1991) (granting relief even though defense knew of deal with witness, where witness denied deal and prosecution did not correct the false testimony).

Neither does Petitioner need to show that Dr. McGee perjured himself. *Mesarosh v. United States*, 352 U.S. 1, 9 (1956) (irrelevant whether witness's untruthfulness "constituted perjury" or resulted from mental illness). By its own terms, *Napue* "addresses the presentation of false *evidence*, not just subornation of perjury." *Hayes v. Brown*, 399 F.3d 972, 981 (9th Cir. 2005) (emphasis in original); *accord Napue*, 360 U.S. at 269. It is therefore "well established that the government's obligation extends to the correction of not only perjurious testimony, but also to testimony that is false, or misleading." *Longus v. United States*, 52 A.3d 836, 847-48 (D.C. 2012).

1.    **The prosecution had ample notice that Dr. McGee's testimony was false, based on numerous items in its file.**

The prosecutor "has a duty to learn of any favorable evidence known to

50

others acting on the Government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). In this case, however, evidence disproving the government's key forensic witness was readily available from the prosecution's own file. That evidence took several forms:

a.    __The Fischer bench notes themselves__ – The prosecution is imputed with knowledge of exculpatory evidence in its own file. *Agurs*, 427 U.S. at 110; *Foster*, 874 F.2d at 495; *Smith v. State*, 492 So.2d 260, 267 (Miss. 1986). Petitioner need not show that his individual prosecutor acted willfully in failing to correct Dr. McGee's testimony: "If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if he has actually overlooked it." *Agurs*, 427 U.S. at 110.

The issue is easily resolved from the undisputed evidence. We know that Mr. Fischer's bench notes were within the prosecution's file, because we know that the prosecution disclosed the bench notes to defense counsel Hoy on May 8, 2006. Hrg. Tr. 406. The bench notes, in turn, show that the autopsy swabs tested negative for p30 – the more "precise" and "definitive" test that Drs. Sensabaugh and McGee had described at trial, and which the Court had inquired about at the *Daubert* hearing. Trial Tr. 6570, 6597-99, 6628-31, 6639; Pet. Ex. 49 (Sensabaugh trial report) at 2; Pet. Ex. 4 at 30. The absence of p30 rules out any possibility that the acid phosphatase found by Regions Hospital reflected the presence of semen. Hrg. Tr. 21-22, 266-67.

The bench notes also show that Mr. Fischer performed a microscopic sperm examination separate and apart from the negative one performed by Dr. McGee's colleagues at Regions Hospital. Pet. Ex. 4 at 30. And they show the "heavy" and "very heavy" presence of nucleated epithelial cells that could not have survived preferentially to sperm cells during the five months that Ms. Sjodin's body was exposed to the elements. *Id.*; Hrg. Tr. 31, 268-69; Pet. Ex. 3 at 6 (Keel report) ("When numerous intact nucleated epithelial cells are recovered from a vaginal swab specimen, it is inconceivable that AP from commingled semen would be present in the absence of sperm or p30 from that semen."). Moreover, the fact that the swabs were negative for male DNA means that the "heavy" and "very heavy" epithelial cells did not originate from semen. Sensabaugh Depo. at 67. Those facts make it impossible for semen to have been present. Hrg. Tr. 31-32, 268-72, 347-48; Sensabaugh Depo. at 64.

   b.   **Mr. Fischer's dealings with the prosecutors** – Mr. Fischer dealt extensively with former prosecutor Mr. Anderson, and less so with Mr. Wrigley or Mr. Reisenauer. Hrg. Tr. 753. He testified that the prosecutors asked "a lot of questions to try and understand the testing that was done." Hrg. Tr. 754. It does not appear that Mr. Anderson discussed p30 or other specific tests during the one conversation of June 30, 2004. Hrg. Tr. 760-62. Nevertheless, at some other point a prosecutor or prosecutors gave Mr. Fischer his bench notes while asking "a lot of questions" about the tests he had run. Hrg. Tr. 754. That fact suggests that the

prosecutors knew about the tests, which were described in the very documents that they handed over.

Leaving aside the meeting that featured "a lot of questions," the log from June 30, 2004, shows that Mr. Anderson requested DNA testing on the swabs "even though no semen was detected on them." Hrg. Tr. 760. That fact suggests that Mr. Anderson knew about the "heavy" and "very heavy" nucleated epithelial cells found by Mr. Fischer. *See* Pet. Ex. 4 at 30. Mr. Fischer testified that nucleated epithelial cells can be used to obtain a DNA profile or to search for male DNA. Hrg. Tr. 752-53. That is the very purpose for which they were used in this case. Mr. Anderson requested the DNA testing, and Ann Marie Gross later tested the swabs for male DNA and found none. Hrg. Tr. 760; Pet. Ex. 7 (BCA Report 27), at 3.

At the least, Mr. Anderson would have known that Mr. Fischer found "very heavy" and "heavy" nucleated epithelial cells on the vaginal and cervical swabs. Pet. Ex. 4 at 30. He also knew that the swabs were negative for sperm cells. *Id.*; Pet. Ex. 16 at 1. And he knew that Petitioner's semen contains sperm, based on Mr. Fischer's testing of Petitioner's jeans. Pet. Ex. 5 at 3; Pet. Ex. 6 at 2. Taken together, those facts show that semen was not present on the swabs. *See* Pet. Ex. 3 (Keel report) at 6 ("[U]nder the same environmental conditions sperm cells will not degrade preferentially to other cells. Rather, the opposite is true: other cells will degrade before sperm cells."). Dr. McGee's testimony to the contrary "is not

scientifically supportable." *Id.* at 13.

By the time of trial in July 2006, Mr. Anderson may well have forgotten what he learned from Mr. Fischer in June 2004. But that possibility does not diminish Petitioner's claim, as Mr. Anderson is presumed to recognize the significance of evidence in his file "even if he has actually overlooked it." *Agurs*, 427 U.S. at 110. Petitioner's claim depends on "the character of the evidence, not the character of the prosecutor." *Id.*

c.      **Additional p30 testing conducted by Mr. Fischer** – The government knew of other p30 testing conducted by Mr. Fischer, which was described in BCA Report 5 and disclosed to the defense on or before June 9, 2004. Hrg. Tr. 423-25; Pet. Ex. 5 (BCA Report 5, Jan. 28, 2004); Pet. Ex. 6 (summaries of tests performed on jeans and other items recovered from Petitioner's home). Mr. Fischer tested three baseball caps, two coats, and a shirt from Petitioner's home. Pet. Ex. 5 at 4 (Items 41, 44, 45, 46, 48, and 51); Pet. Ex. 6 at 1. A stain on one of the baseball caps tested positive for acid phosphatase, and two weeks later, Mr. Fischer tested it for p30 and examined it microscopically for sperm cells. Pet Ex. 6 at 1. The baseball cap also revealed "light" nucleated epithelial cells, but it was negative for p30 and sperm. *Id.*

The same report evaluated four stains on a pair of Petitioner's jeans, which revealed the presence of semen through acid phosphatase testing followed by a confirmatory sperm search that itself showed "light" nucleated epithelial cells. Pet.

54

Ex. 6 at 2; Pet Ex. 5 at 3. DNA testing on the semen matched Petitioner and showed that he was not aspermic, as might otherwise explain the negative sperm readings on the autopsy swabs. Pet. Ex. 5 at 3. The question of aspermic males was discussed at the *Daubert* hearing; when the prosecution was cross-examining Dr. Sensabaugh, the government suggested that sperm could be absent from the swabs even if an ejaculation occurred. Trial Tr. 6658-65. Dr. Sensabaugh responded that the incidence of aspermic males is "not terribly high." Trial Tr. 6659; *see also* Trial Tr. 6810-11, 6815-16 (similar exchange during jury trial). Mr. Fischer's results from BCA Report 5 eliminated that possibility. It is reasonable to assume that prosecutors knew about Report 5 and its underlying data, because they litigated the question of its admissibility. *See* ECF Doc. 474 at 1-3 (order granting motion to exclude jeans).

d.      **P30 testing on the victim's underwear** – North Dakota officials ran p30 tests on two pairs of underwear that police seized from Ms. Sjodin's apartment. Hrg. Tr. 416-17; Pet. Ex. 40 (North Dakota "Supplemental Laboratory Report" of Feb. 20, 2004), at 5. One pair tested positive for p30, which led the laboratory to conclude that it contained semen. Pet. Ex. 40 at 5. The other tested negative for p30, which led to the conclusion that it lacked semen. *Id.* What is more, the report's p30 analysis was consistent with the North Dakota "methods flowchart" that the government disclosed to the defense. Hrg. Tr. 420-21; Pet. Ex. 41 at 37. Thus, prosecutors knew that p30 testing is a prominent means of

55

determining whether a biological sample contains semen, and that p30 was used

for that purpose by two separate crime labs that were involved in the investigation

and prosecution of Petitioner's case.

  **e.**  **Additional p30 tests in the Report 10 bench notes** – The bench

notes accompanying BCA Report 10 document p30 testing beyond the three

autopsy swabs. *See* Pet. Ex. 4 at 29. Mr. Fischer tested 11 different areas on the

black pea-coat that Ms. Sjodin was wearing at the time of her death. *Id.*; Hrg. Tr.

412-13. All 11 stains tested mildly positive for acid phosphatase but negative for

p30 and negative on microscopic searching for sperm. Pet. Ex. 4 at 29. Mr.

Fischer's p30 results on the three autopsy swabs, then, were not an isolated event

in demonstrating p30's significance. Because the government's scientists tested so

many evidentiary items for p30, the prosecution would presumably believe that the

autopsy swabs were tested as well. At a minimum, someone should have asked

why no such testing was performed. *See*, *e.g.*, *United States v. Barkett*, 530 F.2d

189, 195 (8th Cir. 1976) ("[O]ne office within a single federal agency must know

what another office of the same agency is doing."). That inquiry would lead to the

answer that Mr. Fischer in fact performed such testing and it was negative. *See* Pet.

Ex. 4 at 30.

  **f.**  **Pretrial events** – The government disclosed Mr. Fischer's bench

notes on May 8, 2006. Hrg. Tr. 406; Pet. Ex. 39. Three days earlier, the

government disclosed the purportedly scientific basis for Dr. McGee's opinion that

semen was present on the autopsy slides: "Acid phosphatase levels in the vaginal and cervical tests are elevated beyond the normal range expected under the circumstances of decomposition." Pet. Ex. 35 at 3. The government would produce yet another supplemental disclosure one week later, and it defended Dr. McGee's deposition fifteen days after that. Pet. Ex. 38; Pet. Ex. 42. Semen-related issues dominated the immediate pre-trial litigation.

It beggars belief that the prosecution would be unaware of all the results on the most disputed item of trial; at the very least, the government *should* be aware of the tests carried out by its own witnesses. Prosecutors are entrusted with the duty to pursue fairness and "search for truth." *Smith v. Groose*, 205 F.3d 1045, 1051 (8th Cir. 2000). Their offices are expected to "insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio*, 405 U.S. at 154. The prosecution's witnesses reached conflicting findings on the vaginal and cervical swabs: Dr. McGee found that semen was present, and Mr. Fischer found that it was absent. As the prosecutors approached the weightiest of trials, they were confronted with contradictory findings of their own experts. We can therefore expect that the prosecutors would at least *ask* their witnesses about the basis of their conflicting findings – an inquiry that would have alerted the prosecutors to the fact that Mr. Fischer found no p30 and heavy levels of nucleated epithelial cells so as to refute Dr. McGee's claim of a recent seminal deposit.

**2.    Alternatively, Mr. Fischer's knowledge is imputable to the prosecutors.**

Even if the prosecution were not imputed with knowledge of documents in its file, and even if the prosecution somehow lacked reasonable notice of Mr. Fischer's bench notes, a prosecutor is nevertheless deemed to have knowledge of any exculpatory evidence known to any member of the "prosecution team" for purposes of *Napue* and *Giglio*. *See Guzman v. Sec'y, Dept. of Corr.*, 663 F.3d 1336, 1349 (11th Cir. 2011); *Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir. 2008); *Bragg v. Norris*, 128 F. Supp. 2d 587, 605 (E.D. Ark. 2000).

Such imputation stems from the prosecutor's duty "to learn of any favorable evidence known to others acting on the Government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). *See Guzman*, 663 F.3d at 1349; *Jackson*, 513 F.3d at 1075 ("If the prosecutor has a duty to investigate and disclose favorable evidence known only to the police, he 'should know' when a witness testifies falsely about such evidence.").[3] More generally, "There is no logical reason to limit a due process violation to state action defined as prosecutorial knowledge of perjured testimony or even false testimony by witnesses with some affiliation with a government agency." *Sanders v. Sullivan*,

---

[3] The Ninth Circuit recently observed that the Supreme Court has not squarely held, for purposes of determining "clearly established federal law" under 28 U.S.C. § 2254(d)(1), that "a police officer's knowledge of false testimony may be attributed to the prosecution under *Napue*." *Browning v. Baker*, 875 F.3d 444, 460 (9th Cir. 2017); *Reis-Campos v. Biter*, 832 F.3d 968, 977 (9th Cir. 2016). Section 2254(d)(1), however, has no application to a federal collateral attack on a federal conviction and sentence, which assesses only whether the prisoner's custody violates "the Constitution or laws of the United States." 28 U.S.C. § 2255(a). *Jackson* remains the law of the Ninth Circuit on the substantive constitutional question.

863 F. 2d 218, 224 (2d Cir. 1988). "Such a rule elevates form over substance." *Id.*

The Eleventh Circuit's opinion in *Guzman* illustrates the principle of imputation. There, the court affirmed the grant of guilt phase relief in a Florida capital case, holding that the state violated *Giglio* when its key witness (Cronin) and its lead investigator (Sylvester) testified falsely about the existence of a deal between the state and Cronin, and did not disclose that Sylvester had paid Cronin a $500 reward shortly before she testified to the grand jury that indicted Guzman. Although Sylvester testified at the post-conviction hearing that she never informed the prosecutor of the payment (and the prosecutor corroborated that assertion), the Eleventh Circuit agreed with the Florida Supreme Court that, pursuant to *Kyles*, "Sylvester's knowledge of this evidence was imputed to the prosecutor." 663 F.3d at 1349.

As with the investigator in *Guzman*, Steven Fischer was a member of the prosecution team. He evaluated and helped develop the prosecution's evidence, consulted with the prosecution on numerous occasions, and testified on the prosecution's behalf at trial. Mr. Fischer knew that the autopsy swabs tested negative for p30, and, for that matter, that his independent microscopic examination revealed no sperm cells as well as "heavy" nucleated epithelial cells. That knowledge is imputed to the trial prosecutors, who failed to correct Dr. McGee's false statement that no p30 testing had been performed.

59

## B.    The Government Cannot Show that the Error Was Harmless Beyond a Reasonable Doubt.

Petitioner is entitled to relief on his claim if he shows that "the false testimony could … in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154. This standard is easier for a defendant to satisfy than is a showing of materiality under *Brady v. Maryland*, 373 U.S. 83 (1963), or of prejudice from counsel's ineffective assistance, both of which require a "reasonable probability" of a different verdict but for the error. *Kyles*, 514 U.S. at 419; *Strickland v. Washington*, 466 U.S. 668, 694 (1984). As the beneficiary of a *Giglio* error, the government must show that it was harmless beyond a reasonable doubt. *See United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985) ("[T]his Court's precedents indicate that the standard of review applicable to the knowing use of perjured testimony is equivalent to the *Chapman* harmless-error standard."); *accord United States v. Gonzales*, 90 F.3d 1363, 1368 n.2 (8th Cir. 1996) (noting that "a standard of materiality more favorable to the accused" applies when the prosecution knowingly presents perjured testimony); *Guzman*, 663 F.3d at 1348.

The government cannot sustain its burden of proof on materiality. "[I]f it is established that the government knowingly permitted the introduction of false testimony, reversal is virtually automatic." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991); *United States v. Rodriguez*, 766 F.3d 970, 990 (9th Cir. 2014). The Court must evaluate the error "in the context of the entire record." *Agurs*, 427

60

U.S. at 112. The Court should assess not only the error's effect on the trial evidence, but also "any adverse effect … on the preparation or presentation of the defendant's case." *Bagley*, 473 U.S. at 683. Just as with a prosecutor's failure to disclose exculpatory evidence, a failure to correct false testimony may lead the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *Id.* at 682-83.

> **1.      The forensic evidence of a completed rape was a key issue at trial, and the Fischer bench notes definitively disprove such a rape in a manner that defense counsel's trial evidence could not.**

**a.      <u>Counsel's statements</u>** – The question of a completed rape was a critical issue at trial, even though the jury's instructions did not require the government to prove it. Mr. Hoy explained that the question of a rape "changed the presentation of the case," with a "ripple effect through sentencing." Hrg. Tr. 388, 501-02. He described Dr. McGee's testimony as "the linchpin of the government's case alleging that there was a rape" and a "very important part of the trial." Hrg. Tr. 390-91. Mr. Ney agreed. Evidence of a rape "obviously was damaging to our case," he observed. Hrg. Tr. 790. "The specter of Miss Sjodin's death was certainly horrible but add onto that the fact that there was a rape, a completed rape, made it far worse." Hrg. Tr. 790.

The prosecution knew that a completed rape was an important issue, because it went to substantial trouble to present Dr. McGee's testimony. It urged the Court to admit that testimony because it would help the jury determine Petitioner's guilt

and proper punishment:

> He will also testify, to a reasonable degree of medical certainty that semen was deposited in Dru Sjodin's vagina and cervix within 24 hours of her death. (Deposition of Dr. McGee, p. 143). Dr. McGee's testimony will assist the jury to understand the forensic tests and evidence and help them determine the cause of Dru Sjodin's death, the evidence supporting the related portions of the Special Findings section of the Indictment, the guilt or innocence of the defendant, and the appropriate punishment in the event Defendant is convicted.

United States Brief Opposing *Daubert* Motion (ECF Doc. 412), at 12-13. The government also presented otherwise irrelevant testimony from Ms. Sjodin's boyfriend (Christopher Lang) that the two last had intercourse six days before Ms. Sjodin disappeared. Trial Tr. 5625-28. Other evidence was that acid phosphatase breaks down within 24 to 36 hours in a living person's vagina. Trial Tr. 6578 (per Dr. McGee). The government's implication, then, was that the alleged semen from the autopsy swabs was not deposited by Ms. Sjodin's boyfriend.

The prosecution capitalized on the semen evidence that it elicited from Dr. McGee. It repeatedly argued that Petitioner had "raped" Ms. Sjodin and acted out of a "rape fantasy" connecting her to his previous sexual offenses. Trial Tr. 8662-63, 8665, 8673, 8689-91, 8693-95, 8698, 8706-07. Notwithstanding its current argument that the evidence demonstrates a "sexual assault" regardless of penile penetration or semen,[4] the government used the inflammatory language of "rape fantasy" or "fantasizing about rape" ten separate times in its selection phase

---

[4] *See* Response in Opposition to Motion for Discovery (ECF Doc. 1039), at 9-12; Hrg. Tr. 56, 320-21, 343-44, 531-32, 925-26 (cross-examinations).

closing. Trial Tr. 8662, ln 7-8; 8663, ln 5-6; 8663 ln 13; 8688, ln 22; 8689, ln 1-2; 8689, ln 13-14; 8690, ln 2-3; 8690, ln 19-20; 8694, ln 19; 8707, ln 17.

**b.** **The Fischer bench notes resolve the semen issue and are not merely cumulative of the defense's trial evidence** – Mr. Fischer's p30 and related findings dispose of the semen issue. There is no scientific basis to infer the presence of semen from post-mortem acid phosphatase readings that are contradicted by a negative p30 result, two negative sperm cell searches, negative male DNA findings, and the persistence of intact nucleated epithelial cells that could not out-survive sperm cells if Petitioner (who is known to produce sperm) had deposited semen as Dr. McGee claimed. *See* Hrg. Tr. 266-69 and Pet. Ex. 23 at 3 (per Dr. Arden); Hrg. Tr. 346-48 (per Dr. Dragovic); Hrg. Tr. 23 and Pet. Ex. 3 at 15 (per Mr. Keel); Sensabaugh Depo. at 54-55 (per Dr. Sensabaugh); Hrg. Tr. 757 (per Mr. Fischer). "There was no semen," observes the government-retained Dr. Dragovic. Hrg. Tr. 347. "The negative results took care of that as an issue." Hrg. Tr. 348. Even standing alone, the negative p30 result on all swabs "is highly dispositive of the question of whether there is or is not semen present." Hrg. Tr. 267 (Dr. Arden). There is simply no evidence that semen was present – "none whatsoever." Hrg. Tr. 269; *accord* Hrg Tr. 23 (per Mr. Keel: "There's certainly no evidence of any semen.").

It is doubtful that the Court would admit contrary evidence under *Daubert*, and more doubtful still that a reasonable jury would credit it. "If you're the only

63

guy in the world saying X is true because we saw Y, you're going to have a hard time getting that to satisfy *Daubert*," the Court explained shortly before Petitioner's trial. Tr. Pretrial Conf., July 5, 2006, at 60. In order to be admissible, an expert's opinion must reflect "sufficient facts or data" as well as "reliable principles and methods." ECF Doc. 596 (*Daubert* ruling) at 2. The government has presented no evidence, and undersigned counsel are aware of none, that any accepted scientific method would allow the examiner to infer the presence of semen under the circumstances disclosed by Mr. Fischer's bench notes. "You certainly cannot base it on prostatic acid phosphatase that was found during testing because beyond that everything else was negative as far as sampling was concerned," Dr. Dragovic explained. Hrg. Tr. 348.

The Court concluded as much when it excluded luminal/phenolphthalein results during trial. *See* ECF Doc. 508 (Order of Aug. 11, 2006). A knife recovered from the trunk of Petitioner's vehicle indicated a positive reading for blood; nevertheless, the pink phenolphthalein reaction cannot distinguish human blood from animal blood, and the Minnesota BCA could not obtain a DNA profile in order to identify the blood's source. *Id.* at 1. The Court concluded that the phenolphthalein result had "minimal probative value" in the absence of other confirmatory testing. *Id.* at 2. Jurors might "impermissibly" reach the conclusion that the merely "presumptive test for blood means that the blood on the knife belongs to Ms. Sjodin," the Court observed. *Id.* at 3. It therefore excluded the

evidence – just as it would likely exclude evidence from which jurors might "impermissibly" conclude that the acid phosphatase on the autopsy swabs reflects a deposit of Petitioner's semen. That conclusion about acid phosphatase is untenable because "beyond that everything else was negative as far as sampling was concerned," Dr. Dragovic explained. Hrg. Tr. 348.

Neither can Mr. Fischer's results be written off as "cumulative" or "redundant" of the trial defense evidence, as the government has elsewhere argued. *See* Opposition to Motion for Discovery (ECF Doc. 1039), at 9-10. Mr. Keel described the "big disparity" between the scientific information revealed by the bench notes and the information available without them. Hrg. Tr. 32. A negative p30 test is more precise than a positive acid phosphatase, and it carries dispositive weight in the scientific community. Hrg. Tr. 15-16, 31, 266-67. The Court itself recognized the independent significance of p30 testing at the *Daubert* hearing, when it discussed whether and when a p30 test is "dispositive" and confirmed that an AP result is generally "presumptive." Trial Tr. 6596-99. The Fischer findings do not merely mean that Dr. McGee is wrong; they mean that his opinions are "not scientifically supportable" in light of all the evidence. Pet. Ex. 3 at 13. Defense counsel Hoy would have made the p30 finding the "centerpiece" of his effort to exclude Dr. McGee's testimony under *Daubert* and to contest it before the jury if necessary. Hrg. Tr. 389-90, 410-11.

Furthermore, the Fischer results explain the acid phosphatase readings on

which Dr. McGee relied: we know that nucleated epithelial cells survived the five-month post-mortem period, we know that those cells are more fragile and less hardy than sperm cells, we know that Petitioner's semen includes sperm, we know that no sperm or male DNA was present, and we know that p30 was absent. "[T]he only logical explanation for the acid phosphatase activity is simply an elevated endogenous level or a microbial acid phosphatase" from post-mortem decay. Hrg. Tr. 23 (per Mr. Keel). By failing to correct Dr. McGee's testimony, the government left a "big disparity" between the actual evidence and the evidence that the jury heard. That disparity harmed the defense.

### 2. The government impaired Petitioner's guilt phase defense by allowing Dr. McGee's false testimony to go uncorrected.

During the guilt phase, the defense disputed whether Petitioner had committed an interstate kidnapping. Trial Tr. 5513, 6887-97, 6908-11. Mr. Hoy argued that Petitioner could have suffocated Ms. Sjodin in the back of his car at the mall, while trying to sexually assault her. Trial Tr. 6909-11; *see also* Trial Tr. 5513 (opening statement) (arguing that forensic evidence did not contradict the defense's belief that "Dru Sjodin expired from suffocation within a matter of minutes in the mall parking lot and before any transportation across state lines ever began"). Any act of "transportation" from the victim's car to Petitioner's car within the same parking lot could have been carried out solely to attempt a sexual assault. Such movement was, thus, "merely incidental to an offense other than the

66

kidnapping" under the jury's instructions, and a jury that accepted this argument would have to acquit Petitioner of an interstate kidnapping. Trial Tr. 6910-11; Instruction 4.

The problem with Mr. Hoy's theory was that it did not explain the alleged neck wounds described by Dr. McGee. Any such wounds could not have been inflicted in Petitioner's car, where only small amounts of blood were found. Trial Tr. 6086-95; Hrg. Tr. 504-05. Moreover, the defense had agreed not to contest the neck and flank wounds, so that the Court would exclude autopsy photographs of those areas. *See* Pet. Ex. 53; Trial Tr. 6245-47, 6297-6302, 7009-31, 7066-75; Hrg. Tr. 527-28. The shortcoming in Mr. Hoy's defense theory was readily apparent:

> If she's already dead from suffocating in the car, then why does he cut her throat? There's no reason to at that point, absolutely none. … If she's already dead it doesn't do anything to cut her throat. That's not how it happened. And you know he didn't cut her throat in his car. Mr. Wrigley already talked about that. There would have been way too much blood. It did not happen that way. The evidence doesn't support that one bit.

Trial Tr. 6921-22 (government's rebuttal).

A *Giglio* or *Napue* error may harm the defense in any number of ways, including when the defense "abandon[s] lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *Bagley*, 473 U.S. at 682-83. In the *Guzman* case, for example, the Eleventh Circuit described numerous arguments that defense counsel could have made to undermine the key eyewitness's testimony – but for the witness's false denial of a $500 payment from

the prosecution's lead investigator. *See Guzman*, 663 F.3d at 1352. Among other possibilities, "Guzman's defense attorney could have argued to the factfinder that Cronin was motivated to change her story and first implicated Guzman in November 1991 for the reward money." *Id.*

That type of harm is present here, and it implicates Petitioner's conviction of an interstate kidnapping resulting in death. If the government had corrected Dr. McGee's false testimony about p30, the defense could have disproven the allegation of a completed rape. That disproof, in turn, would have led the defense to challenge the cause of Ms. Sjodin's death for the reasons explained by Mr. Ney. Hrg. Tr. 841-46, 869-72, 930-31. Mr. Ney explained that the absence of a completed rape – accompanied by the fact that Ms. Sjodin's pants had been removed and her arms were tied behind her back – would suggest that Ms. Sjodin was killed during a struggle and that her death terminated the rape attempt. Hrg. Tr. 842-43. "[I]f there isn't a completed rape," Mr. Ney testified, the "death march" and terminal throat-slashing described by Mr. Wrigley's closing argument simply "doesn't make sense." Hrg. Tr. 842. In that event, the defense would argue "that the death took place before anything else could happen," and at a time well before "the disposal of the body at the site." Hrg. Tr. 842, 930-31. With no knife wounds inflicted at the site and none inflicted in Petitioner's car, "[T]hat leads us, I think, logically to believe that the neck defects were not knifewounds." Hrg. Tr. 931.

68

If counsel had been able to dispute the cause of death, that issue was "much more important than the photographs." Hrg. Tr. 846. It would have provided the defense with a much stronger argument for the theory that it was already pursuing: that Ms. Sjodin was not "transported … in interstate commerce" while being kidnapped, and instead, she was only transported after her death. Trial Tr. 5513, 6887-97, 6908-11. There would be no slash-wounds for the defense to explain, because there is "no evidence" that any were inflicted. Hrg. Tr. 130, 144, 148, 216-17, 285-86, 349-51, 372, 451, 454, 460; Pet. Ex. 10 (Flomenbaum report) at 9; Pet. Ex. 20(Arden report) at 3; Pet. Ex. 23 at 2; Pet. Ex. 55(Ferenc report) at 2-3.

By failing to correct Dr. McGee's false testimony, the prosecution tangibly impaired a viable defense. It is true, of course, that the prosecution disclaimed any importance in proving a completed rape or even a sexual assault during its guilt-phase rebuttal argument. Trial Tr. 6919. ("Mr. Hoy was up here talking earlier about what the acid phosphatase actually shows. Who cares what it shows? … He may not have sexually assaulted her at all. Assume that and it doesn't make any difference."). But the issue impacted the guilt *defense* whether or not it was important to the guilt phase prosecution. Had the government corrected Dr. McGee's false testimony about p30, it would have led the defense to contest the manner of Ms. Sjodin's death, and along with it, the potentially dispositive question of where and when that death occurred. The error is not harmless.

### 3.    Dr. McGee's false testimony prejudiced the determination of Petitioner's sentence.

The question of rape was essential to the government's argument for death, and the prosecution serially invoked the issue on closing. Trial Tr. 8662-63, 8665, 8673, 8689-91, 8693-95, 8698, 8706-07. Beyond the generally aggravating effect of a rape, though, the government argued that the *completed* rape at issue here made the killing especially death-worthy:

> [T]he defendant secured her somehow and he prepared to do what he had to do to ensure that he would not be caught ***after living out his rape fantasies***. Somehow he held her and he plunged the knife into her neck and he drew it across her neck, and it got stopped, as Dr. McGee said, by tissue and had to be repositioned again and again and again.

Trial Tr. 8707 (emphasis added).

Mr. Wrigley described an almost unspeakably sinister crime – or, as he and the jury instructions termed it, a "shockingly evil" and "extremely wicked" one. Trial Tr. 7266. In the government's rendition of the events, Petitioner harbored rape fantasies throughout his 23 years of imprisonment, directed those fantasies at Dru Sjodin, lived them out by raping her, and, once having accomplished the long-fantasized act of forcible sexual intercourse, killed her off afterward to avoid going back to prison. But that rendition depends on the completion of a rape – an event that is disproven by Mr. Fischer's bench notes, but as to which Dr. McGee testified untruthfully by denying the existence of negative p30 testing. Attorney Ney is right: without evidence of a completed rape, Mr. Wrigley's narrative simply

70

"doesn't make sense." Hrg. Tr. 842. The lack of a rape, as proven by the negative p30 result, would suggest "that the death took place before anything else could happen" and would suggest a possible "strangulation, accidental or purposeful, in the vehicle before any completion of a sexual act could have taken place." Hrg. Tr. 842.

The government's key argument for death was the crime itself, which it characterized as all but mitigation-proof:

> Your job is a lot easier, though, ladies and gentlemen, when you recognize that even if the defendant had been able to prove every single one of his mitigating factors that he alleges … in a case of this magnitude the scale has barely budged. Barely budged. That's how overwhelming the aggravating factors and the evidence is against this defendant.

Trial Tr. 8688-89, 8706-07. That argument was materially aided by false testimony that the prosecution failed to correct. The government thereby inflated its showing that the killing of Ms. Sjodin was "especially heinous, cruel or depraved." Trial Tr. 8664, 8673, 8696, 8699, 8706-07.

Contrary evidence "would have made a great deal of difference" to the defense on that question. Hrg. Tr. 867. It would have strengthened the defense's argument that the killing was a "disorganized and unintentional act" instead of a "cold-blooded" and deliberate one – an argument that would have been important at the selection phase even after the jury declined to unanimously find the "substantial planning" aggravator at the eligibility phase. Trial Tr. 7276, 7282,

7292-93; Hrg. Tr. 863-65, 930-31. And it would "change the narrative … completely of what happened and what the government could argue reasonably." Hrg. Tr. 872. The defense instead acquiesced to a cause of death that it lacked evidence to rebut. Hrg. Tr. 528, 846; Pet. Ex. 53. It could not disprove the "especially heinous" aggravator without aid of the evidence that proved Dr. McGee to be wrong about p30 – and by extension, wrong about the location, time, and manner of Ms. Sjodin's death. Hrg. Tr. 841-46, 869-72, 930-31.

On the issue of prejudice, it also bears mention that the question of penalty was a close one for the jury. The jurors deliberated for more than 13 hours over the course of three days before sentencing Petitioner to death. Trial Tr. 8753, 8758-59, 8763-65, 8769-80; *compare*, *e.g.*, *Tokar v. Bowersox*, 1 F. Supp. 2d 986, 999 (E.D. Mo. 1998) (no prejudice from allegedly improper closing argument, where the jury took "a little over two hours" to return a death verdict), *with Rhoden v. Rowland*, 172 F.3d 633, 637 (9th Cir. 1999) (deliberations of nine hours over three days indicated that the jury "did not find the case to be clear cut"). Numerous mitigating circumstances were found by all twelve jurors, including Petitioner's adaptability and safety in confinement, varying degrees of mental illness, and the fact that Petitioner raised concerns about his suitability for release from the Minnesota prison system. Trial Tr. 8771-75. Evidentiary manipulation – or at the least, evidentiary mismanagement – led the prosecution to exaggerate the "overwhelming" aggravation that it invoked as a basis for death. Trial Tr. 8688-89.

72

Even with that distortion, the jury reached its decision with considerable difficulty. The government cannot prove its error to be harmless beyond a reasonable doubt.

**II.     Trial counsel rendered prejudicially ineffective assistance by overlooking exculpatory semen-test results that the government had disclosed to them, by failing to provide that evidence to their forensic expert, and by failing to challenge the cause of the victim's death in light of that evidence.**

Much as the prosecution failed to correct its own witness's false testimony, so too did defense counsel fail to disprove that same testimony with readily available evidence. They failed to grasp key test results that informed the most contested issue of trial. They failed to provide that same data to the expert who served as their only guilt-phase witness. And they failed to contest the cause of the victim's death, which a simple disproof of the prosecution's semen evidence would have led them to do. Those failures prejudiced the defense throughout the trial.

**A.     Counsel Performed Deficiently by Neglecting Critical Semen-Related Evidence from Within Their Own Files.**

Counsel's inattention to key forensic evidence "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Petitioner's claim requires a showing that counsel's performance was objectively deficient under prevailing professional norms and that the defense was thereby prejudiced. *Id.* Those norms require that counsel "explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (quoting 1 ABA Standards for

73

Criminal Justice 4–4.1 (2d ed. 1982 Supp.)). Counsel must "make reasonable investigations or … make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

The duty to investigate encompasses forensic evidence. Counsel must "aggressively re-examine all of the government's forensic evidence, and conduct appropriate analyses of all other available forensic evidence." American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, § 10.7, comment. (2003). That task is all but impossible without proper expert assistance. "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence." *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 106 (2011)). *Hinton* was such a case because of what counsel knew of the prosecution's evidence: the state's case was that six bullets had been fired from Mr. Hinton's revolver. *Id.* In this case, as in *Hinton*, counsel knew that the prosecution's case rested on forensic evidence, and specifically from Dr. McGee. The government's disclosures explained that Dr. McGee would testify that the acid phosphatase detected on the autopsy swabs indicated a deposit of semen and that the victim was most likely killed by being slashed across the neck at the place where her body was found. *See* Pet. Ex. 34-35, 38.

Counsel's duty to investigate is especially pronounced when the issue

74

concerns matters that counsel recognize or strategize as "pivotal," "critical,"

"absolutely critical," or, as here, "the single most critical element in this case."

*Showers v. Beard*, 635 F.3d 625, 633 (3d Cir. 2011); *Harris v. Cotton*, 365 F.3d

552, 556 (7th Cir. 2004); *Johnson v. United States*, 860 F. Supp. 2d 663, 820 (N.D.

Iowa 2012). Judge Bennett's reasoning in *Johnson* illustrates the point. In *Johnson*

the government theorized that the defendant had aided and abetted the murder of

her ex-boyfriend – who worked as a drug dealer for her co-defendant and later

boyfriend – out of "revenge" for abuse he had inflicted on her. Counsel

nevertheless failed to investigate the possibility that Johnson suffered from

battered woman's syndrome. Indeed, counsel unreasonably refused to allow any

expert to ask Johnson about the crime, and thus, to develop any opinion about her

mental state at the time. *Id.* at 820, 884-86. Counsel performed deficiently by

withholding relevant information from the chosen experts. *Id.*at 820. In this respect

and others, counsel prevented the experts from considering and reaching

appropriate conclusions. *See id.* at 872-73 (counsel retained the appropriate

pharmacologist but failed to provide him with defendant's history of

methamphetamine use); *id.* at 885-86 (counsel refused neuropsychologist's advice

of further testing for brain damage).

More fundamentally, counsel must review and grasp the underlying facts

that inform an expert's diagnosis and a reasonable defense. In *Showers*, for

example, the victim died from ingesting a large amount of liquid morphine, or

75

Roxanol. The prosecution alleged that the defendant administered the morphine to her husband surreptitiously, but the defense contended that the husband committed suicide. Liquid morphine has a strongly bitter taste, making it difficult to administer a fatal dose without the victim's knowledge. Defense counsel failed, however, "to establish that a large dose of Roxanol cannot be masked without a large amount of liquid or food, if at all, and that no such substance was found in the deceased's stomach." *Showers*, 635 F.3d at 632.

Among other deficiencies, counsel in *Showers* misunderstood the autopsy report. Counsel wrongly believed that the report established that the victim's stomach revealed "some other type of fluid" instead of a recognized masking agent, when, in fact, "[t]here was no such evidence." *Id.* Counsel therefore declined to cross-examine the prosecution's expert on the issue of the volume of the decedent's stomach contents. The Third Circuit characterized that error as ineffective: counsel failed to "understand key, undisputed facts in the record." *Id.*

Petitioner's counsel committed similar errors as detailed below.

**1.    Counsel performed deficiently by overlooking the Fischer bench notes despite ample notice of their importance and contents.**

**a.    <u>The importance of the forensic-based rape evidence</u>** – Trial counsel failed to notice a document that would disprove a completed rape and place the entire crime in a different and less aggravated light. There is no question that the issue of rape in general, and a completed rape in particular, was of critical

importance to the defense. The question of a rape "changed the presentation of the case," with Dr. McGee's testimony serving as the "linchpin of the government's case alleging that there was a rape" and a "very important part of the trial." Hrg. Tr. 388, 390-91, 501, 790. The presence or absence of semen on the autopsy swabs was "a very important issue for the defense," for which it would be a "major victory" if "we can keep the government from proving that [the victim] was sexually assaulted, in addition to being kidnapped and killed." Pet. Ex. 45 (Letter of June 9, 2006), at 3; Hr. Tr. 490-91. Dr. Sensabaugh was the only defense witness in the entire guilt-or-innocence phase of trial. Trial Tr. 6797-6826.

The government's evidence of a rape "obviously was damaging" to the defense. Hrg. Tr. 790. Dr. McGee did not testify merely that there *could have been* a completed rape or that the acid phosphatase levels were merely "presumptive" for that possibility. Rather, he told the jury that the observed levels from the vaginal and cervical swabs were "above what we consider cutoff level, and *it suggests that deposition has occurred* in a time period 24 to 36 hours prior to the subject's death." Trial Tr. 6723 (emphasis added). Dr. McGee also described "a large deposit of mucoid-like material that I think looks like seminal fluid surrounding the uterus." Trial Tr. 6720-21. At the time of autopsy, Dr. McGee thought the globule "was a seminal fluid deposition." Trial Tr. 6721. The government characterized Dr. McGee's findings the same way before trial, i.e., that they indicated semen. *See* Pet. Ex. 34 (pretrial disclosure of Apr. 28, 2006) at

2; Pet. Ex. 35 (disclosure of May 5, 2006) at 3; Pet. Ex. 38 (disclosure of May 16, 2006) at 3 (all stating that "Lab results indicate the likelihood of seminal deposit at the time of death or within the preceding 24 hours").

Dr. McGee's testimony was indeed "damaging," and counsel knew that it would be. In light of the prosecution's use of that evidence and defense counsel's choice of strategy, the issue of a seminal deposit was "pivotal" and "especially critical" to the case. *Johnson*, 860 F. Supp. 2d at 820. Counsel at least needed to "understand key, undisputed facts in the record." *Showers*, 635 F.3d at 632.

**b.**     __The bench notes for BCA Report 10__ – Mr. Fischer's bench notes made clear that he obtained p30 results on the vaginal, cervical, and anal autopsy swabs; that he performed an independent microscopic examination and found no sperm cells; and that the cervical and vaginal swabs showed "heavy" and "very heavy" nucleated epithelial cells. Pet. Ex. 4 at 30. Both defense attorneys overlooked the document. Although Mr. Hoy "made it a point to read all of the discovery materials," Hrg. Tr. 409, when he read the May 8 materials, he "wasn't particularly concerned" about the bench notes for Mr. Fischer's report, because the report itself noted the absence of "semen" and was helpful to the defense. Hrg. Tr. 409. Mr. Hoy did not fully understand the significance of p30 testing until some days or weeks later, but even after studying the issue and consulting with Dr. Sensabaugh, he did not review the government's previous disclosures in order to ascertain what testing Mr. Fischer had performed. Hrg. Tr. 410-11. Dr. Sensabaugh

78

suggested that Mr. Hoy should try to obtain p30 testing if there remained any "aqueous extract" to test. Sensabaugh Depo. at 48-49; Pet. Ex. 65 (email). At no point was Dr. Sensabaugh provided with Mr. Fischer's bench notes or otherwise informed that negative p30 results had been obtained. Hrg. Tr. 494-95; Sensabaugh Depo. at 38-42; Trial Tr. 6639.

Co-counsel Mr. Ney independently failed to recognize and develop the available forensic evidence. He separately reviewed all forensic discovery materials and jointly made strategic decisions with Mr. Hoy. Hrg. Tr. 784-87. Nevertheless, Mr. Ney did not review the Fischer bench notes "minutely" or otherwise because he thought they merely duplicated earlier disclosures. Hrg. Tr. 802-05, 813-14. "This was a mistake on our part," Mr. Ney observed. Hrg. Tr. 813. "There was no strategy involved." Hrg. Tr. 813.

c.      **BCA Report 10 itself** – Mr. Fischer's report, which the defense received and reviewed two years before trial, stated that the vaginal, cervical, and anal slides were examined for "semen" instead of "sperm." *See* Pet. Ex. 28 at 2 ("Examinations of the following items did not detect the presence of semen…"); Pet. Ex. 29 (discovery disclosure letter); Hr. Tr. 393. Because the result was negative for "semen" instead of simply "sperm," it was not reasonable for defense counsel to surmise that Report 10 merely duplicated the negative sperm-search from Regions Hospital as reported at autopsy. *See* Pet. Ex. 16 ("Final Autopsy Protocol") at 1. The Fischer report stated that there was no "semen," and counsel

well knew that "semen" and "sperm" are not the same thing. *See* Pet. Ex. 63

(Sensabaugh trial report) at 2 ("Semen contains several components that are

regarded as specific to semen and several that are regarded as conditionally

specific. Sperm qualify as the single component, the presence of which,

distinguishes semen from any other body fluid.").

Counsel nevertheless failed to ascertain – or even ask – which tests Mr.

Fischer had run and how he knew that no *semen* was present. Trial Tr. 6160.

Cross-examination of Mr. Fischer was altogether unilluminating on the point:

> Q: Okay. Were you also furnished a series of swabs that's also referred to in the same paragraph, vaginal swabs, item 86-a, anal swabs, item 86-b, and cervical swabs, item 86-c?
>
> A: Yes, I was.
>
> Q: Did you also examine those swabs for the presence of semen?
>
> A: Yes, I did.
>
> Q: And you found none, no semen on any of them?
>
> A: That's correct.

Trial Tr. 6160.

**d.** **Prior notice of p30** – Well before obtaining Mr. Fischer's bench

notes in May 2006, defense counsel were on notice of p30 testing for the same

reasons that the prosecutors had such notice. *See supra* Argument I.A.1(c)-(f) (pp.

54-57). As previously explained, Mr. Fischer tested multiple baseball caps

recovered from Petitioner's home. Pet. Ex. 5 (BCA Report 5); Pet. Ex. 6

(summaries of tests performed). One of the caps tested positive for acid phosphatase, which led Mr. Fischer to test the cap for p30 and examine it for sperm cells; both of these follow-up tests were negative, although microscopy revealed "light" epithelial cells. Pet. Ex.6 at 1. The report and bench notes memorializing that testing were disclosed to defense counsel on or before June 9, 2004. Hrg. Tr. 423-25.

The same report evaluated four stains on a pair of Petitioner's jeans, which revealed the presence of semen through acid phosphatase (BCIP) testing and a subsequent sperm search that also showed "light" nucleated epithelial cells. Pet. Ex. 6 at 2; Pet Ex. 5 at 3. The form included a column for p30 testing but indicated that none was run on the stains from the jeans. Pet. Ex. 6 at 2. DNA testing on the semen matched Petitioner and showed that he was not aspermic, as might otherwise explain the absence of sperm on the autopsy swabs. Pet. Ex. 5 at 3; *see also* Trial Tr. 6658-59, 6810-11, 6815-16 (*Daubert* and trial testimony concerning aspermic and vasectomized males). The defense later persuaded the Court to exclude the jeans results from trial. *See* ECF Doc. 474 at 1-3.

Counsel's records also included North Dakota-based tests on two pairs of underwear that were recovered from Ms. Sjodin's apartment, as well as the "Methods Flow Chart" explaining the significance of acid phosphatase and p30 testing. Hrg. Tr. 416-17, 420-21; Pet. Ex. 40 (North Dakota "Supplemental Laboratory Report" of Feb. 20, 2004), at 5; Pet. Ex. 41 (Quality Assurance

81

Manual) at 37. One pair of underwear tested positive for p30, which led the

laboratory to conclude that it contained semen:

> The crotch area of the underwear (Item 1-VA) tested positive for the presence of acid phosphatase (an enzyme present in semen and other body fluids). Further examination of this area detected the presence of p30 (a semen specific protein). Therefore, it is my opinion that there is semen present on the crotch area of the underwear.

Pet. Ex. 40 at 5. The other underwear tested negative for p30, which led to the

conclusion that it lacked semen. *Id.*

Mr. Hoy testified that he did not fully understand the significance of p30 at

the time he reviewed Mr. Fischer's bench notes in May 2006. Hrg. Tr. 410-11.

Nevertheless, the underwear report and the "Methods Flow Chart" were disclosed

to the defense on or before August 23, 2004. Hrg. Tr. 419-20. Mr. Fischer's report

on the baseball cap was disclosed even earlier. Moreover, the Fischer bench notes

from the May 2006 disclosure included p30 results on additional items beyond the

autopsy swabs – specifically, 11 negative results on stains from the pea-coat that

Ms. Sjodin was wearing when she died. *See* Pet. Ex. 4 at 29; Hrg. Tr. 412-13.

Considering how "very important" the identification of semen evidence was to

counsel themselves – Hrg. Tr. 388-91, 501-02, 790; Pet. Ex. 45 at 3 – their failure

to notice or revisit their own file documents that would have explained Mr.

Fischer's findings was unreasonable.

**e.      The disclosure of Dr. McGee's anticipated testimony** – The

government disclosed Mr. Fischer's bench notes on May 8, 2006. Hrg. Tr. 406;

Pet. Ex. 39. That same day, the defense received the purportedly scientific basis for

Dr. McGee's opinion that semen was present on the autopsy slides: "Acid

phosphatase levels in the vaginal and cervical tests are elevated beyond the normal

range expected under the circumstances of decomposition." Pet. Ex. 35 at 3.

Whether or not Mr. Hoy fully grasped p30 on May 8, 2006, he at least knew

that the government intended to prove a semen deposit, that it intended to rely on

the acid phosphatase levels, and that the new documents from the same date related

to the same issue. When forensic documents directly relate to the key issue in the

case, professionally reasonable capital attorneys should carefully review those

documents or at least forward them to counsel's chosen expert. Counsel simply

misunderstood what the evidence was or failed to review it altogether. Hrg. Tr.

409-11, 802-05, 813-14. Counsel's subsequent investigation, strategy, and defense

in all phases of trial reflected a basic "failure to … understand key, undisputed

facts in the record." *Showers*, 635 F.3d at 632.

> ### 2. Counsel deficiently failed to provide the Fischer bench notes to Dr. Sensabaugh, their semen identification expert.

a. <u>**Failing to inform the expert**</u> – Simply retaining an expert when one

is warranted does not, in and of itself, fulfill trial counsel's duty of diligence.

Counsel has the obligation to investigate and provide the expert with relevant

information. *See*, *e.g.*, *Wilson v. Sirmons*, 536 F.3d 1064, 1089-90 (10th Cir.

2008); *Jacobs v. Horn*, 395 F.3d 92, 102-03 (3d Cir. 2005). "Counsel have an

obligation to conduct an investigation which will allow a determination of what sort of experts to consult." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999). "Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert." *Id.*

In this case, defense counsel received the Fischer bench notes on or about May 8, 2006. Hrg. Tr. 406. On the same date, counsel became aware that Dr. McGee would testify that the acid phosphatase readings from the autopsy swabs suggested a deposit of semen because the levels were inconsistent with post-mortem processes. Pet. Ex. 35 at 3. Some six weeks later, Mr. Hoy consulted Dr. Sensabaugh on the advice of his DNA expert, Dr. Blake. Hrg. Tr. 439-40, 489-90. There is no dispute that Dr. Sensabaugh was never furnished with Mr. Fischer's bench notes and was never made aware of his negative p30 findings, the negative sperm search, the finding of "heavy" and "very heavy" nucleated epithelial cells, or separate evidence proving that Petitioner is not aspermic. Sensabaugh Depo. at 38-42, 48-49, 59-64; Hrg. Tr. 494-95. Dr. Sensabaugh recommended, unsuccessfully, that the defense try to arrange for p30 testing, and he testified at trial that none had been performed. Pet. Ex. 65 (email from Dr. Sensabaugh to Mr. Hoy); Trial Tr. 6639.

Worse than withholding evidence that was merely "relevant to the conclusion of the expert," *Caro*, 165 F.3d at 1226, Mr. Hoy failed to provide data that was "highly dispositive of the question of whether there is or is not semen

84

present." Hrg. Tr. 266-67 (per Dr. Arden); Hrg. Tr. 409-10. The record offers no adequate excuse for that failure. Mr. Hoy "wasn't particularly concerned" about the bench notes when he first saw them, because he knew that Mr. Fischer's report noted the absence of semen. Hrg. Tr. 409. Mr. Hoy therefore knew that the bench notes related to the presence or absence of semen. That, indeed, was the very issue for which Dr. Sensabaugh was being consulted and as to which he testified as the defense's only guilt-phase witness. Reasonable counsel would have found out whether the bench notes were relevant to the expert, who was counsel's only witness on this admittedly crucial issue.

     **b.**    **<u>Reputation of the expert</u>** – It does not salvage counsel's performance to postulate that Drs. Sensabaugh and Blake are "the two most knowledgeable individuals in the world" concerning "acid phosphatase in the post coital vagina," as the government seemed to suggest at the hearing. *See* Govt. Ex. A (Email from Dr. Blake to Mr. Hoy – June 1, 2006) at 2; Hrg. Tr. 52, 553-54, 897. Even when counsel chooses "the appropriate expert," it remains for counsel to elicit from that expert the "appropriate, available testimony" to support the defense. *Johnson*, 860 F. Supp. 2d at 872. Counsel failed to provide Dr. Sensabaugh with critical evidence, which precluded the defense from eliciting that evidence and its implications at trial. "Only once either the expert or counsel has consulted all readily available sources can counsel's reliance on the expert's opinion be reasonable." *Wilson*, 536 F.3d at 1089-90.

     **c.**      **<u>The numerosity of experts</u>** - Neither are counsel deemed "effective" simply because they consulted several other forensic experts, including DNA experts, a mitochondrial DNA expert, an expert in fabric and trace evidence, and a forensic pathologist – another of the government's suggestions at the hearing. *See* Hrg. Tr. 532-34, 539-66, 585-616, 896-907 (cross-examinations of Mr. Hoy and Mr. Ney). Even where much of counsel's performance is reasonable, deficient performance in a single area may result in ineffective assistance. *See*, *e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 381 (2005). Counsel in *Rompilla* were ineffective for a particularized failure in their investigation and despite their substantial overall efforts. "This is not a case in which defense counsel simply ignored their obligation to find mitigating evidence," the Supreme Court remarked. *Id.* Counsel's efforts included consulting their unhelpful and "uninterested" client, interviewing his relatives, and employing "a cadre of three mental health witnesses who were asked to look into Rompilla's mental state as of the time of the offense and his competency to stand trial." *Id.* at 381-82.

     Despite otherwise thorough preparations, counsel in *Rompilla* were ineffective because they failed to take a modest and obvious step: they did not obtain and review the court file on one of the defendant's prior convictions, which would have led them to a wealth of mitigating evidence about his troubled background and impaired mental state as described in a prison file. *Id.* at 383-93. Counsel knew that the prosecution would rely on Rompilla's conviction for rape

and assault in order to prove the aggravating circumstance of felony convictions involving the use or threat of violence. The file of the prior offense was a public document. It was "readily available for the asking at the very courthouse where Rompilla was to be tried." *Id.* at 384. Counsel's failure to obtain and review the file was deficient under the circumstances, including the choice of counsel's strategy, the prosecution's anticipated theory, and the ease of locating the item:

> Counsel fell short here because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case. The unreasonableness of attempting no more than they did was heightened by the easy availability of the file at the trial courthouse, and the great risk that testimony about a similar violent crime would hamstring counsel's chosen defense of residual doubt.

*Id.* at 389-90.

Defense counsel's failure in *Rompilla* resembles the one at issue here. Mr. Hoy and Mr. Ney consulted a number of different experts, interviewed the client without learning any helpful details about the nature and manner of the killing, and offered numerous factual and expert witnesses in mitigation. Nevertheless, counsel knew that the prosecution would present evidence of a completed rape, including evidence that the acid phosphatase levels from the autopsy swabs suggested a deposit of semen. Hrg. Tr. 401-03; Pet. Ex. 35 at 3. Counsel also had readily available evidence to demolish that allegation. The prosecution turned it over on the same date that counsel learned the purportedly scientific basis of Dr. McGee's

87

opinion, but counsel neither took the time to understand the evidence nor provided it to Dr. Sensabaugh.

More than "readily available for the asking," *Rompilla*, 545 U.S. at 384, the evidence at issue here was already at counsel's fingertips. Defense counsel knew that the question of rape was a "very important" issue implicating Petitioner's guilt or innocence as well as the jury's choice of sentence, and they litigated the question to the Court as well as the jury. Hrg. Tr. 388-91, 501-02, 790. Counsel knew that the bench notes related to that "very important" question, even though Mr. Hoy "wasn't particularly concerned" about the bench notes at the time. Hrg. Tr. 409. Whatever the sum total of their efforts to represent Petitioner, counsel performed deficiently by failing to furnish their semen expert with critical and available evidence. Mr. Ney is right: "This was a mistake on our part. There was no strategy involved." Hrg. Tr. 813.

### B.    Counsel Failed to Adequately Investigate the Manner of Ms. Sjodin's Death.

Prevailing norms require that capital counsel "independently investigate the circumstances of the crime and all evidence – whether testimonial, forensic, or otherwise – purporting to inculpate the client" and "subject[] all forensic evidence to rigorous independent scrutiny." ABA Guidelines, *supra* § 1.1, comment. (2003). As with the semen issue, the question of neck wounds was important to the defense. Early during the representation, defense counsel urged the government not

88

to seek the death penalty because the neck defects that Dr. McGee described at autopsy were inconclusive. Pet. Ex. 68 (Letter from Mr. Ney and Mr. Hoy to Mr. Wrigley – Aug. 6, 2004) at 11-12. Various observed defects were "most likely post-mortem artifacts of decomposition and exposure." *Id.* at 11. Even if Ms. Sjodin's neck were slashed, "It cannot reasonably be determined … whether the slash … took place before or after Ms. Sjodin's death." *Id.*

Counsel knew the issue would be significant at trial based on the government's disclosures. *See* Pet. Ex. 34 at 2; Pet. Ex. 35 at 2-3; Pet. Ex. 38 at 2-4. Those documents disclosed Dr. McGee's opinion that Ms. Sjodin had been slashed in the neck at least twice, that the cuts were likely inflicted at the site where her body was found, that the slash injuries to the neck were "consistent" with a knife found in Petitioner's car, and that the defect in Ms. Sjodin's flank was "initialized" by sharp force trauma. Pet. Ex. 38 at 2-3. Counsel's arguments at trial reflect still further notice that the manner of death was an important issue. The defense contended, for example, that Ms. Sjodin may have died moments after encountering Petitioner in the mall parking lot, that the killing was "disorganized" instead of "cold-blooded," and that it may have been the result of an "accidental" asphyxiation. Trial Tr. 5513, 6887-97, 6908-11, 7275-76, 7280, 7291-93.

What trial counsel lacked was an explanation for the gaping neck "wounds," which could not have taken place in Petitioner's car because too little blood was found there. Pet. Ex. 53; Trial Tr. 6921-22. If counsel had chosen to contest the

89

issue, they could have consulted any of numerous forensic pathologists to disprove Dr. McGee's conjecture about slash wounds – a conjecture that no objective evidence supports, because the observed defects are the result of post-mortem gnawing by small animals. Hrg. Tr. 130, 144, 148, 216-17, 285-86, 349-51, 372, 451, 454, 460; Pet. Ex. 10 (Flomenbaum report) at 9; Pet. Ex. 20(Arden declaration) at 3; Pet. Ex. 23 (Arden addendum) at 2; Pet. Ex. 55(Ferenc report) at 2-3; Pet. Ex. 27 (Dragovic report) at 8.

By overlooking Mr. Fischer's bench notes, counsel forwent easy disproof of the government's claim of a rape. But for that failure, counsel would have vigorously challenged Dr. McGee's strained testimony describing slash wounds to Ms. Sjodin's neck. Hrg. Tr. 841-42, 846, 930-31. And even aside from that failure, counsel unreasonably abandoned their investigation of the alleged knife wounds just as the specifics of Dr. McGee's damning testimony became clear over the course of pretrial disclosures.

**1.    As a result of their deficient performance in failing to disprove Dr. McGee's opinion of a completed rape, counsel failed to adequately investigate the cause and nature of the victim's death.**

Counsel's failure to disprove a rape led to their failure to challenge the manner of Ms. Sjodin's death. The victim in this case was found with her clothing partly removed, nude below the waste, with her hands tied behind her back, and with a rope or apparent ligature around her neck. Trial Tr. 6686-87. Under the circumstances, Mr. Ney explained, the absence of a completed rape would suggest

90

that Ms. Sjodin was killed during a struggle and an attempted rape rather than being slashed across the throat after a rape. Hrg. Tr. 841-42. Counsel testified that the p30 evidence would have led to a further investigation:

> If we had had the p30 results saying this was not a sexual assault, there was no rape, there was no semen on her body, that certainly would have led us even further to believe that the killing was, as we argued, at a time before the disposal of the body at the site. And so there was no neck wounds perpetrated there. And we know it wasn't in the car because of the state of the car. … Then there's the argument that the death took place before an assault, but it didn't happen at the site either so that leads us, I think, logically to believe that the neck defects were not knifewounds.

Hrg. Tr. 930-31.

If counsel had had "a pathologist who would testify these were not knife wounds," they would have contested the cause of death. Hrg. Tr. 846. The issue of the cause of death "was much more important than the [autopsy] photographs". Hrg. Tr. 846. Although the defense managed to exclude the photographs by not contesting the supposed knife wounds, "This was us taking what we could get, but as a trade-off we would much rather contest that these were wounds." Hrg. Tr. 846. Counsel's limited evidence placed the defense in "a no-contest situation" on critical facts. Hrg. Tr. 846.

Counsel's failure to contest the question of knife wounds, then, was the direct consequence of their professionally deficient failure to review the Fischer bench notes with adequate care, or at least to share that evidence with Dr. Sensabaugh. As a result, Dr. McGee offered uncontradicted testimony that a slash

91

wound to the neck was the single likeliest cause of Ms. Sjodin's death. Trial Tr. 6728-29. The prosecution capitalized on that testimony. *E.g.*, Trial Tr. 8707 ("Somehow he held her and he plunged the knife into her neck and he drew it across her neck, and it got stopped, as Dr. McGee said, by tissue and had to be repositioned again and again and again. Ear to ear. And then again 8 more centimeters. Left to die bleeding for how long?").

"[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Having lacked the p30 and other evidence that would have justified a challenge to the alleged slash wounds, counsel could not reasonably decide to limit the forensic investigation as they did. "Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Kenley v. Armontrout*, 937 F.2d 1298, 1308 (8th Cir. 1991).

> **2.      Counsel failed to reasonably investigate the question of knife wounds in the wake of pretrial disclosures describing Dr. McGee's trial testimony.**

The nature of Ms. Sjodin's death was a critical issue throughout all phases of trial, as counsel knew it would be. Counsel nevertheless failed to develop a counter-narrative to Mr. Wrigley's "death march," even as the government's theory became clear over the course of its expert disclosures. *See* Pet. Ex. 34, 35,

38.

At the outset, Petitioner anticipates the government's argument that counsel "reasonably" relied on Dr. Peterson's insights concerning the neck and flank defects, and, in particular, Dr. Peterson's observations as described by Mr. Hoy's testimony and hand-written notes reflecting a meeting at Dr. Peterson's home in April 2005. Mr. Hoy and Mr. Ney remembered the meeting differently. Mr. Hoy recalled Dr. Peterson making a number of observations consistent with sharp force injuries, while Mr. Ney testified that Dr. Peterson was thoroughly non-committal on the neck defects and cause of death. *Compare* Hrg. Tr. 520-21, 611-15 (Mr. Hoy's testimony), *with* Hrg. Tr. 828-34, 905 (Mr. Ney's testimony).

The Court need not resolve the conflict between the attorneys' testimony. For one thing, the Court approved funding for a total of two hours of Dr. Peterson's time. Hrg. Tr. 661-62, 834-35. Dr. Peterson had "very limited" involvement with the case, and the available hours were not sufficient to reach any medically certain opinions. Hrg. Tr. 674, 692. A two-hour consultation in a forensics-heavy case does not satisfy counsel's duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

But more importantly, the consistent testimony of both attorneys is that they did not rely on Dr. Peterson's observations – whatever those may have been – to truncate their investigation of forensic issues. Hrg. Tr. 522-25, 836-41. Mr. Hoy

followed up with Dr. Peterson following the government's disclosure of May 5, 2006. Three days after receiving that disclosure, Mr. Hoy wrote to Dr. Peterson for guidance on the medical opinions that were attributed to Dr. McGee – including the origin of the supposed neck "wounds." Hrg. Tr. 523-24, 835-39 (per Mr. Ney, "[I]f Dr. Peterson already said those were his opinions, we wouldn't really have a reason to write him and ask him if McGee's opinions were correct."). Counsel received no response to the letter. Hrg. Tr. 671-72, 840. Mr. Hoy also asked Dr. McGee about the same subject during the deposition of May 31, 2006. Hrg. Tr. 525. Counsel discussed the possibility of consulting an additional pathologist and exchanged "a couple of names," but they failed to pursue the issue any further. Hrg. Tr. 840-41, 845.

Counsel's failure to pursue this important issue further was deficient performance: they knew that the manner of Ms. Sjodin's death was a critical issue, but they stopped investigating for evidence to rebut Dr. McGee's theory of a probable slashing-wound even while counsel theorized and ultimately argued that Ms. Sjodin died from asphyxiation in Petitioner's car. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. No such judgment supports counsel's actions here. Once they understood Dr. McGee's expected testimony, counsel never managed to obtain a response to their follow-up with Dr. Peterson and never sought out another

pathologist – even as Mr. Hoy squandered his hours on the semen issue that he could have promptly resolved by understanding the Fischer bench notes or sending them to Dr. Sensabaugh. *See* Hrg. Tr. 538 ("But as it was I was busy with the acid phosphatase issue on the last month or two just before trial.").

To be sure, counsel chose not to contest the "wounds" at trial, and they managed to exclude disturbing autopsy photos from the jury's consideration. *See* Pet. Ex. 53; Hrg. Tr. 527-28. But that decision reflects counsel's mishandling of the Fischer bench notes and their subsequent failure to investigate the neck and flank defects adequately. Counsel elected not to contest Dr. McGee's neck-wound testimony because they lacked evidence to contradict it. Hrg. Tr. 528, 633, 843-46. "[T]he presumption of sound trial strategy founders in this case on the rocks of ignorance[.]" *White v. Roper*, 416 F.3d 728, 732 (8th Cir. 2005).

### C.   Counsel's Forensic Errors Prejudiced the Defense.

Defense counsel's failure left Dr. McGee's testimony intact. The prosecution built on that testimony to exaggerate the cruelty of the Dru Sjodin's final moments. With a bag over her head and her hands tied behind her back, Ms. Sjodin was "shivering" and "scared" and was "marched down that embankment … into the freezing night." Trial Tr. 8706. Having completed his pent-up and decades-long fantasies by raping Ms. Sjodin, and needing to eliminate her as a witness, Petitioner "plunged the knife into her neck and he drew it across her neck, and it got stopped, as Dr. McGee said, by tissue and had to be repositioned again and

again and again." Trial Tr. 8707.  The prosecutor argued that the "overwhelming" crime was all but impervious to mitigation. Trial Tr. 8688-89. The defense's many mitigating circumstances would "barely budge" the scale. Trial Tr. 8688-89.

A showing of prejudice requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is less than a preponderance of the evidence. *Id.* at 693-94. It is a probability sufficient to undermine the court's confidence in the trial's outcome. *Id.* at 694. The prejudice standard incorporates whatever outcome is being challenged. Thus, when the prisoner challenges his or her conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. When a death sentence is challenged, the question is generally "whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* When, as here, a death sentence requires a unanimous jury verdict, a reviewing court must decide if there is a reasonable probability that, but for counsel's deficient performance, at least one juror would have voted for life. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

Petitioner was prejudiced by counsel's forensic errors for essentially the same reasons that he was prejudiced by the prosecutions' failure to correct Dr.

McGee's false testimony. Petitioner incorporates his previous arguments instead of repeating them. *See supra* Argument I.B. (pp. 60-73). To summarize, the question of a rape in general, and a completed rape in particular, was a "very important" issue to the defense and was argued by the prosecution. *See supra* pp. 61-63. The issue "changed the presentation of the case," even though the government was not required to prove that Petitioner raped Ms. Sjodin. Hrg. Tr. 388. "I think it's probably commonly agreed that a kidnapping is less heinous than a kidnapping and a rape," Mr. Hoy observed. Hrg. Tr. 501.

Counsel, the expert witnesses, and the jury were oblivious to Mr. Fischer's bench notes. That evidence would have dispositively disproven Dr. McGee's opinion of a seminal deposit – even if the Court were to admit Dr. McGee's opinion under *Daubert*. *See supra* pp. 63-66. That certain disproof undermines Petitioner's conviction; it casts substantial doubt on a kidnapping in which the victim was "transported … in interstate commerce." *See id.* at 66-69. The Fischer evidence would have led counsel to contest the cause of Ms. Sjodin's neck and flank defects, and counsel would have had considerable evidentiary support for their own theory that (1) Ms. Sjodin died in the mall parking lot before any interstate transportation began, and (2) she was moved from the point of her abduction only as an "incident" to the crime of attempted rape. *Id.*

At sentencing, the forensic evidence would have disarmed the prosecution's key argument for death: that Petitioner first "lived out his rape fantasies" and

97

afterward slashed Ms. Sjodin's throat to ensure that she could not testify. *Id.* at 70-73. The government argued that Petitioner's crime was so aggravated that the mitigating circumstances could only "barely budge" its overwhelming weight. Trial Tr. 8688-89, 8706-07. The omitted forensic evidence would have discredited the government's exaggeration of the crime as "especially heinous" and "shockingly evil," while supporting the defense's description of a "disorganized" killing instead of a "cold-blooded" one. *See supra*, pp. 70-73. And it would have led the jurors to give greater consideration to the numerous mitigating circumstances they found during the multiple days they spent deciding Petitioner's sentence. *Id.* If the sentencer had been accurately informed about the nature of Petitioner's crime, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. Petitioner has met his burden, and the Court should grant him a new and fair trial.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Petitioner respectfully requests

that the Court grant his motion under 28 U.S.C. § 2255, that it vacate his

unconstitutional conviction and sentence, and it that grant such other and further

relief as law and justice require.

Respectfully submitted,


/s/ Joseph W. Luby
VICTOR J. ABREU (PA Bar No. 71635)
JOSEPH W. LUBY (PA Bar No. 321759)
ERIC J. MONTROY (PA Bar No. 90949)
FEDERAL COMMUNITY DEFENDER
FOR THE EASTERN DISTRICT OF
PENNSYLVANIA
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
victor_abreu@fd.org
joseph_luby@fd.org
eric_montry@fd.org


Dated:      June 21, 2018
            Philadelphia, PA

99

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2018, the foregoing document was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to the following:

Keith Reisenauer
keith.reisenauer@usdoj.gov

Melissa H. Burkland
melissa.burkland@usdoj.gov

/s/ Joseph W. Luby
*Counsel for Defendant-Petitioner*