IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

UNITED STATES OF AMERICA,

        Plaintiff/Respondent,

        v.

ALFONSO RODRIGUEZ, JR.,

        Defendant/Respondent.

Case No. 2:04-cr-55

## UNITED STATES' POST-HEARING RESPONSE BRIEF ON FORENSIC CLAIMS

TABLE OF CONTENTS

Introduction ......................................................................................................................1

Procedural History...........................................................................................................3

Trial Procedure ................................................................................................................5

    A.  Merits Phase Evidence...........................................................................................5

        1.  Disappearance of Dru Sjodin .........................................................................5
        2.  Investigation of Alfonso Rodriguez, Jr. ........................................................7
        3.  Recovering the Body of Dru Sjodin ..............................................................10
        4.  Evidence Testing ...........................................................................................11

    B.  Eligibility Phase Evidence ...................................................................................14

The Post-Conviction Record and Forensic Claims .........................................................16

Argument .........................................................................................................................29

    I.       The United States Did Not Offer Perjured Testimony, or Fail to Correct
            Perjured Testimony, and Rodriguez Cannot Establish That He is Entitled to
            Relief Under <u>Giglio</u> or <u>Napue</u>..........................................................................29

      A.  Dr. McGee's Testimony Was Not False...........................................................33

        1.  The p30 Test Results Do Not Make Dr. McGee's Testimony
            Inadmissible or False....................................................................................33
        2.  Mr. Fisher's Knowledge is Not Imputable to the Prosecution
            Team ..............................................................................................................36
            a.  Rodriguez is Unable to Show That the Innocent Use of Incorrect
            Testimony Would Result in an Acquittal on Retrial ...................................38

    II.      Trial Counsel Effectively Assisted Rodriguez Regarding the Semen Related
            Issues and Sexual Assault Evidence and Had an Appropriate Strategy to Not
            Challenge the Cause of Ms. Sjodin's Death .....................................................47

      A.  Rodriguez Cannot Relitigate on Collateral Review His Objection to the
         Admission of Acid Phosphatase Testing .......................................................51
      B.  Trial Counsel Properly Challenged the Acid Phosphatase Testing at the
         <u>Daubert</u> Hearing, the Trial and Appeal .........................................................55

C.  Rodriguez's Trial Counsel Were Not Ineffective with Respect to
Addressing the Neck Wounds .............................................................. 72

1.  Rodriguez's Trial Counsel Effectively Challenged Dr. McGee's
Opinion Regarding the Neck Wounds ............................................. 72

Conclusion .......................................................................................................... 89

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:04-cr-55 |
| Plaintiff/Respondent, | |
| v. | **UNITED STATES' POST-HEARING RESPONSE BRIEF ON FORENSIC CLAIMS** |
| ALFONSO RODRIGUEZ, JR., | |
| Defendant/Petitioner. | |

The United States of America, by Christopher C. Myers, United States Attorney

for the District of North Dakota, Keith W. Reisenauer, First Assistant United States

Attorney, and Melissa Burkland, Assistant United States Attorney, hereby submit the

United States' Post-Hearing Response Brief on Petitioner Alfonso Rodriguez's

("Rodriguez") Forensic Claims.

## INTRODUCTION

The United States' position is set forth in the United States' Answer in Opposition

to Motion under 28 U.S.C. § 2255 For Collateral Relief to Vacate, Set Aside, Or Correct

Sentence, and For a New Trial (DKT 879), filed November 13, 2013.  This Brief

responds to information received in connection with evidentiary hearings held June 20-

24, 2017, and September 11, 2017,[1] and Petitioner's Post-Hearing Brief on Forensic

---

[1] Citation form throughout the United States' Post-Hearing Response are, generally, in conformity with traditional legal citations and the *Blue Book*. However, throughout this Response the following abbreviations and citation conventions are employed:

Citations to Rodriguez's Motion for Collateral Relief, To Vacate, Set Aside or Correct Sentence and for a New Trial will be referenced by a shortened pleading reference:  e.g., Mot. at 21.

1

Claims.  This Brief supplements the United States' Answer in Opposition to Motion under 28 U.S.C. § 2255 For Collateral Relief to Vacate, Set Aside, Or Correct Sentence, and For a New Trial.

The United States maintains that Rodriguez's forensic-based claims should fail, as he has failed to show any intervening law that would allow him to revisit serological and forensic-based claims that were resolved at the District Court level and affirmed on appeal.  He alleges that information previously overlooked – results of a p30 test conducted on three pieces of evidence – changes the analysis in his favor, but he grossly overstates this evidence's relevance and impact.  Additionally, despite Rodriguez's allegations, there are no facts to indicate that the United States knowingly presented false testimony, nor any facts that could demonstrate the United States violated its duties under Giglio, Napue, and their progenies.

---

Citations to exhibits filed with the United States' Answer to Petition include a description of the exhibit and exhibit number:  e.g., Deposition of Dr. Michael McGee, U.S. Exhibit 1.

Citations to the Forensic Claims Evidentiary Hearing transcripts on June 20-23, 2017, and September 11, 2017, are formatted "Evid. Hrg." followed by the transcript volume and page number:  e.g., Evid. Hrg., vol. 4, 754.

Citations to exhibits received at the Forensic Claims Evidentiary Hearing on June 20-23, 2017, and September 11, 2017, will be referenced by party ("Pet." for Petitioner and "Gov." for United States) followed by a number (for Pet. exhibit) or a letter (for Gov. exhibit):  e.g., Pet. 1 or Gov. A.

Citations to all three phases of the trial transcripts are formatted "Tr." followed by the transcript volume and page number:  e.g., Tr., vol. 29, 6553.

Citations to trial exhibits are referenced as they were at the appellate level:  e.g., Gov't. Ex. 22-2.

Citations to pleadings filed with the Court are referenced by a shortened pleading title followed by the docket number:  e.g., Jury Verdict – Phase II (Eligibility Phase), DKT 585.

Rodriguez failed to establish that his trial attorneys – who at the time of trial collectively possessed nearly sixty years of criminal practice experience in state and federal courts – were ineffective.  Trial counsel worked a difficult case with a difficult client, and represented him zealously.  Trial counsel conducted a thorough investigation, vigorously cross-examined the government's witnesses at each stage of the trial, challenged and attempted to dismantle the government's evidence, and mounted a compelling, albeit unsuccessful, defense.

## PROCEDURAL HISTORY

On May 11, 2004, a federal grand jury for the District of North Dakota returned a one-count Indictment that charged Alfonso Rodriguez, Jr. (hereinafter "Rodriguez") with kidnapping Dru Sjodin and transporting her from North Dakota to Minnesota for the purpose of sexual assault, and otherwise, resulting in the death of Dru Sjodin in violation of 18 U.S.C. § 1201(a)(1).  Indictment, DKT 1.  As required by the Federal Death Penalty Act, 18 U.S.C. §§ 3591–98 ("FDPA"), to justify a death sentence, the Indictment alleged that Rodriguez was eighteen years of age or older at the time of the offense, had acted with the mental states described in 18 U.S.C. § 3591(a)(2), and that four statutory aggravators applied:  (1) Rodriguez caused Sjodin's death during the commission of another crime, namely, a kidnapping (18 U.S.C. § 3592(c)(1)); (2) Rodriguez had previously been convicted of two or more violent felonies (18 U.S.C. § 3592(c)(4)); (3) Rodriguez killed Dru Sjodin in an especially heinous, cruel, and depraved manner (18 U.S.C. § 3592(c)(6)); and (4) Rodriguez killed Dru Sjodin after substantial planning and premeditation (18 U.S.C. § 3592(c)(9)).  Indictment, DKT 1.  On October 28, 2004, the

3

United States filed a Notice of Intent to Seek a Sentence of Death, re-alleging the grand jury's FDPA findings and adding non-statutory aggravators, including victim impact. Notice of Intent to Seek Sentence of Death, DKT 34.

Jury selection began on July 7, 2006, and a panel was sworn on August 14, 2006. On August 30, 2006, the jury found Rodriguez guilty as charged in the Indictment.  On September 7, 2006, the jury found Rodriguez "eligible" for consideration of the death penalty and found true all but one FDPA allegations, rejecting only the assertion that Rodriguez substantially planned and premeditated the murder.  Jury Verdict – Phase II (Eligibility Phase), DKT 585.  On September 22, 2006, the jury returned Special Findings, including a unanimous determination finding the non-statutory victim impact aggravator applicable.  Special Findings Form (Jury Verdict) Phase II, DKT 626.

Additionally, the jury, or individual jurors, found twenty-five alleged mitigators true; the jury unanimously rejected five other mitigators.  Id.  The jury unanimously found that the aggravators sufficiently outweighed the mitigators to justify the imposition of a death sentence.  Id.  On February 8, 2007, following the denial of Rodriguez's motion for a new trial, United States v. Rodriguez, No. 2:04 CR 55, 2007 WL 466752 (D.N.D. Feb. 12, 2007), aff'd, 581 F.3d 775 (8th Cir. 2009), the District Court formally sentenced Rodriguez to death.  Judgment, DKT 652.

Rodriguez appealed the Judgment to the Eighth Circuit Court of Appeals raising 20 claims of error including a claim that the trial court improperly admitted expert opinions from the pathologist; a claim Rodriguez now raises again in his Motion under

4

28 U.S.C. § 2255 For Collateral Relief to Vacate, Set Aside, Or Correct Sentence, and For a New Trial and Post-Hearing Brief on Forensic Claims.

The Eighth Circuit affirmed the conviction and sentence. United States v. Rodriguez, 581 F.3d 775 (8th Cir. 2009), reh'g and reh'g en banc denied, (Feb. 11, 2010). The United States Supreme Court denied Rodriguez's Petition for a Writ of Certiorari. Rodriguez v. United States, 131 S. Ct. 413 (2010).

## TRIAL PROCEDURE

The Court "trifurcated" the trial proceedings in this case, granting Rodriguez's request. The Court viewed the trial as a three-phase procedure: a "merits" (guilt) phase, "eligibility" phase, and "selection" phase. See, e.g., United States v. Johnson, 362 F. Supp. 2d 1043, 1111 (N.D. Iowa 2005); United States v. Jordan, 357 F. Supp. 2d 889, 903–04 (E.D. Va. 2005); United States v. Davis, 912 F. Supp. 938, 949 (E.D. La. 1996). Order granting Motion to Trifurcate Trial, DKT 200.

### A. Merits Phase Evidence.

1. Disappearance of Dru Sjodin.

On November 22, 2003, Dru Sjodin was a 22-year-old college student at the University of North Dakota. She also worked at Victoria's Secret in the Columbia Mall, Grand Forks, North Dakota. Tr., vol. 24, 5589-5594.

That day Ms. Sjodin worked at Victoria's Secret from approximately noon to 4:00 p.m. (Tr., vol. 24, 5591-94), then shopped in the Columbia Mall. Ms. Sjodin was at

5

Marshall Fields in the mall, at approximately 5:00 p.m., where she bought a purse. Tr., vol. 24, 5606.

As she was leaving Marshall Fields, Ms. Sjodin called her boyfriend, Chris Lang (Tr., vol. 24, 5615), on her cell phone. Id. at 5619. The conversation between Ms. Sjodin and Mr. Lang lasted about four minutes, at which time Mr. Lang heard Ms. Sjodin say, "Okay, okay." Tr., vol. 24, 5621. The call ended abruptly at approximately 5:04 p.m. Tr., vol. 24, 5621-22; Tr., vol. 25, 5758-59.

Mr. Lang tried to call Ms. Sjodin several times within the two to three hours after their call was interrupted. Tr. vol. 24, 5622-23. She never answered. Id.

At 7:42 p.m., Mr. Lang's cell phone rang. Tr., vol. 24, 5623. He heard no voices; nobody spoke. Tr., vol. 24, 5623. This call came from Ms. Sjodin's cell phone, number (218) 330-4000. Sprint later informed law enforcement that Ms. Sjodin's cell was "bouncing" off a cell tower near Crookston, Minnesota. Tr., vol. 24, 5635-37; Tr., vol. 25, 5746-54.

At approximately 11:00 p.m., Ms. Sjodin's car was found at the Columbia Mall parking lot. Tr., vol. 24, 5642-44, 5653. A search of her car revealed a Marshall Fields bag containing the purse she had purchased. Id. at 5644-45. A knife sheath, bearing the logo "Tool Shop," was found next to her car. Id. at 5646. Ms. Sjodin was nowhere to be found.

On November 25, 2003, one of Ms. Sjodin's shoes was found underneath the bridge on Highway 75, near Crookston, Minnesota. Tr., vol. 24, 5712-17; vol. 25, 5794-95. Ms. Sjodin was still not found.

6

2.   <u>Investigation of Alfonso Rodriguez, Jr.</u>

Law enforcement began conducting the investigation into Ms. Sjodin's disappearance.  Tr., vol. 25, 5822-26.  Rodriguez, among others, became a person of interest because he was a Level III sex offender who had been released from prison in May 2003.  Id. at 5823-24.  Rodriguez was living in Crookston, Minnesota, at the time of Ms. Sjodin's disappearance.  Id. at 5822.

On November 26, 2003, Minnesota Bureau of Criminal Apprehension Special Agent Dan Ahlquist went to a job site where Rodriguez was employed by Jose Hernandez as a sheetrock worker.  Tr., vol. 25, 5824-25; Tr., vol. 27, 6175-78.  Rodriguez told Ahlquist that on November 22, 2003, he had gone to Grand Forks, North Dakota, from his Crookston, Minnesota, home. Tr., vol. 25, 5825-27.  Rodriguez reported going to a number of stores in Grand Forks, including Sam's Club, Wal-Mart, Target, the Columbia Mall, and then to a movie.  Id.  Rodriguez claimed that after the movie he went to the McDonald's restaurant in East Grand Forks, Minnesota.  Id. at 5828-29.  Rodriguez said he went to J.C. Penney's, Sears, and Marshall Fields while at the Columbia Mall.  Rodriguez said he did not buy anything at the mall.  He said he was wearing blue jeans, a black shirt, a baseball-style cap, and a black leather jacket.  Gov't. Ex. 21, 21-1 (at Bates Nos. 11, 191-95).

Rodriguez recalled the name of the movie was "Once Upon A Time in Mexico," starring Antonio Banderas, a movie he said was about shooting and drugs.  He could not elaborate about the details of the movie.  Tr., vol. 25, 5827.  Rodriguez reported he left

the movie and went to McDonald's at approximately 8:00 p.m., and then drove straight home to Crookston.  Id. at 5828-29.

Rodriguez consented to a search of his car.  Tr., vol. 25, 5829-30.  In the trunk of Rodriguez's car, Ahlquist observed a knife in a small pan lying in a liquid solution. Id. at 5830-31.  Ahlquist did not take the knife at that time.  Id. at 5831.  Rodriguez told his employer, Mr. Hernandez, that law enforcement were searching for drugs in his car. Tr., vol. 27, 6178-79.

Ahlquist learned the "Tool Shop" knife sheath, recovered from the Columbia Mall parking lot near Ms. Sjodin's car, was sold with a knife matching the knife observed in the trunk of Rodriguez's car.  Tr., vol. 25, 5855-56.

The movie, "Once Upon A Time In Mexico," was not showing at any theater in Grand Forks on November 22, 2003.  Tr., vol. 25, 5854-55.  However, Alfonso Rodriguez, Jr., was in Grand Forks, North Dakota on November 22, 2003.  Tr., vol. 25, 5826; Gov't. Ex. 21-1 (at Bates No. 11,187).  He was observed at the Target store near the Columbia Mall at approximately 4:00 p.m. that afternoon.  Tr., vol. 25, 5798-5804. The video tape from the McDonald's restaurant did not show Rodriguez at the establishment on the evening of November 22, 2003.  Id. at 5853-54, 5883-86.

Ahlquist asked Rodriguez to come to the Crookston Police Department to straighten out the discrepancies.  Tr., vol. 25, 5856-58.  Rodriguez went to the Police Department and provided additional claims about his trip to the Columbia Mall on November 22, 2003.  Id. at 5857-58.

Previously, Rodriguez had emphatically told law enforcement that he had parked near the Marshall Fields area of the Columbia Mall parking lot on November 22, 2003. Now Rodriguez said he parked near the Royal Fork Restaurant, which was located on the opposite side of the mall from Marshall Fields. Gov't. Ex. 22-2, 22-3 (at Bates No. 11,213-14). Rodriguez said he walked through the Marshall Fields store mistakenly, as he thought he parked on that side of the mall. Gov't. Ex. 22-2, 22-3 (at Bates Nos. 11,219, 11,234-36). Rodriguez said he wasn't sure what time he entered the Columbia Mall, but he did say that he was at the mall for approximately one hour. Tr., vol. 25, 5838; Gov't Ex. 22-2, 22-3 (at Bates No. 11,221).

When Rodriguez was questioned about the knife in his car, he said he had bought it approximately four months earlier. Gov't. Ex. 22-2, 22-3 (at Bates No. 11,258). Rodriguez told Ahlquist that he had thrown the knife's sheath away. Gov't. Ex. 22-2, 22-3 (at Bates Nos. 11,251, 11,258). Rodriguez also stated that this particular knife was used for work. Id.

Mr. Hernandez, Rodriguez's employer, later told law enforcement that Rodriguez did not have a knife or use a knife when he worked for Mr. Hernandez. Hernandez stated that Rodriguez was not a sheetrock cutter. Tr., vol. 27, 6182. In fact, if Rodriguez had used a knife at work, it wouldn't be the type of knife which was seized from Rodriguez's car. He explained that a "sheetrock" knife would be needed to do the type of cutting involved in sheetrock work. The knife seized from Rodriguez's trunk was not a sheetrock knife. Id.

9

Ahlquist obtained a search warrant to search and seize Rodriguez's vehicle. Tr. 5866. Ahlquist seized the knife in the trunk. Tr., vol. 25, 5861. BCA located small spots of blood on the interior of the rear window, the back-rear seat cushion, sections of seat belts removed from the back seat, rear passenger-side window and adjacent door area, and the seat frame of the passenger seat. Tr., vol. 27, 6088-90, 6099-6109, 6126-46.

Another search warrant was obtained for Rodriguez's house. Tr., vol. 25, 5866. Items were seized from his residence, including boots, gloves, and a blanket. Id.

Mr. Hernandez also explained that prior to November 22, 2003, he picked up Rodriguez on his way to the job site each day. Tr., vol. 27, 6181. The Monday after November 22, 2003, Rodriguez told Mr. Hernandez that he would drive himself and did so for the next three days. Id.

3. Recovering the Body of Dru Sjodin.

Law enforcement, friends and family, and hundreds of people from the surrounding communities participated in the search for Ms. Sjodin. They went the winter without finding her. Their efforts were futile until April 17, 2004.

After four-and-one-half months of searching, Dru Sjodin's body was found by a ravine on the north side of Polk County No. 61 just northwest of Crookston, Minnesota. Tr., vol. 27, 6221-41.

Ms. Sjodin's body lay face down (Tr., vol. 27, 6233) with her hands and wrists bound behind her back with white woven cord. Tr., vol. 28, 6326. She was partially covered with grass that had been pulled and placed over her. Tr., vol. 27, 6237-6238. Ms. Sjodin was naked from the waist down but for one sock on her left foot, and a

10

ligature of cord or rope tied around her neck with what appeared to be some plastic remnants underneath the rope.  Id. at 6236.  She was wearing a dark coat, a pink blouse or sweater, pink tank top, and pink bra.  The coat and blouse were pulled down off her shoulders with her arms still in them.  The blouse was ripped.  Tr., vol. 27, 6236; Tr., vol. 29, 6686, 6691.

Ms. Sjodin's body was found approximately 30 miles from the Columbia Mall, where she had last been seen. Tr., vol. 27, 6263-64.  Her body was approximately two miles from the cell tower that her phone had "bounced" off.  Her body was approximately 2.1 miles from where her shoe had been found underneath the Highway 75 Bridge, only 4.2 miles from Rodriguez's house.  Id. at 6260-62.  Ms. Sjodin's cell phone was found a few feet away from her body.  Her second shoe was also found nearby.  Tr., vol. 28, 6326-34.

Ms. Sjodin's pants were found approximately two weeks later just south of Crookston, approximately two miles south of Rodriguez's residence and approximately six miles from where her body was found.  Tr., vol. 27, 6275-79; 6283-89.

4. Evidence Testing.

Testing of samples seized in the investigation was done by the Minnesota BCA, North Dakota BCI, and FBI Laboratories.  The blood observed in Rodriguez's car on the back window, back seat, and back seat belt was Dru Sjodin's.  Tr., vol. 27, 6146-51; Tr., vol. 28, 6442-45.

A hair found on Ms. Sjodin's coat, which she still had on when her body was found, was tested by the FBI Laboratory.  Tr., vol. 28, 6341-43.  It was compared to the

11

saliva sample obtained from Rodriguez.  Id. at 6441, 6453.  The mitochondrial DNA profile obtained from this particular hair matched Rodriguez's mitochondrial DNA profile obtained from his saliva sample.  Id. at 6452-53.

Minnesota BCA analyzed the numerous fibers obtained from several items during the investigation.  Tr., vol. 28, 6374-6415.  The pink cotton blouse which Ms. Sjodin had been wearing the day she disappeared contained cotton fibers matching fibers found in Rodriguez's vehicle, on Rodriguez's boots, and on a pair of his gloves seized from his residence.  Id. at 6405.

Ms. Sjodin's black-and-blue pea coat contained certain wool fibers that were matching in type and color to fibers found in Rodriguez's vehicle.  Tr., vol. 28, 6408-10.

A blanket seized from Rodriguez's bed in his residence was the source of red and fuchsia acrylic fibers.  Tr., vol. 28, 6371-72.  Matching red acrylic fibers were found on the knife sheath located outside of Ms. Sjodin's vehicle, and were also found inside Rodriguez's vehicle, on Rodriguez's boots, on Ms. Sjodin's coat, on Rodriguez's gloves, as well as on Ms. Sjodin's black pants.  Tr., vol. 27, 6253-55; Tr., vol. 28, 6390-99.

Ms. Sjodin's body was transported for an autopsy (Tr., vol. 27, 6253-55), which was performed by Dr. Michael McGee, M.D., the day after Ms. Sjodin's body was found.  Tr., vol. 29, 6683-85.

The autopsy revealed that Ms. Sjodin's hands were bound behind her back, as noted above.  Tr. 6686.  Ms. Sjodin was nude from the waist down, and a ligature was observed around her neck with remnants of a K-Mart plastic bag.  Tr., vol. 29, 6686, 6701; Gov't Ex. 78-11 (Bates No. P-0812), 78-39 (Bates No. P-0834a).

12

Dr. McGee observed that Ms. Sjodin had a bruise or contusion to her upper right arm. Tr., vol. 29, 6689. She had a bruise or contusion on the back of her right forearm. Id. at 6689. Ms. Sjodin also had a bruise or contusion beneath her right eye, and a bruise or contusion to her lower right cheek. Id. at 6688.

A large gaping and notched slash wound was observed to the front of Ms. Sjodin's neck. There were actually two slash wounds to the front of her neck that were caused by a knife drawn across the neck through the tissue in a fashion to cause notching. Tr., vol. 29, 6688-89, 6694-95. Dr. McGee also determined that there was a defect to Ms. Sjodin's right side, between her ribs and pelvis, approximately eight centimeters deep, which may represent a stab wound. Id. at 6689, 6692, 6706.

A sexual assault examination and laboratory testing revealed an elevated level of prostatic acid phosphatase, an enzyme, in the vaginal and cervical areas. This enzyme is produced in high levels in the male prostate. The elevated levels were considered a presumptive positive for seminal deposit. Tr., vol. 29, 6716-23.

Dr. McGee concluded that Ms. Sjodin died due to homicidal violence (Tr., vol. 29, 6726, 6728); that the probable cause of Ms. Sjodin's death was asphyxiation or suffocation, strangulation from the cord around her neck, (Id. at 6727, 6728), death from the slash wound injury to the front of her neck (Id. at 6728), or possible death from exposure to the elements, having been left in the bitter cold of a November day in the manner she was found, bound and half-naked. Id. It was his opinion that the slash wounds to Ms. Sjodin's neck took place where her body was found. Id. at 6729-33.

13

At the conclusion of the evidence, the jury delivered a guilty verdict on August 30, 2006, on the sole count of the Indictment, Kidnapping Resulting in Death.  Tr., vol. 31, 6946.

### B.  Eligibility Phase Evidence.

In the "eligibility" phase the jury determined whether the defendant was 18 years of age or older when the offense occurred, whether he committed any intentional act listed in 18 U.S.C. § 3591(a)(2), and whether an aggravating factor under 18 U.S.C. § 3592(c) exists. 18 U.S.C. § 3593(e)(2).  Jury Verdict – Phase II (Eligibility Phase), DKT 585; Appendix 276.

The United States called three witnesses during the eligibility phase.  Tr., vol. 33, 7117-94.  Elizabeth Knudson-Volker and Shirley Seddon Iverson each testified regarding prior attacks by Rodriguez upon them.  Rodriguez had been convicted of aggravated rape of Elizabeth Knudson in Polk County, Minnesota. Tr., vol. 27, 6209-10, 6217.  Elizabeth Knudson-Volker testified the rape attack caused her to suffer serious bodily injury.  After the rape, she felt there was no meaning to her life.  She stopped eating, and thought about killing herself.  She continued to suffer with depression, insomnia, eating problems, and issues of self-worth.  Tr., vol. 33, 7147-70.

Rodriguez was also convicted of the attempted aggravated rape of Shirley Seddon, in Polk County, Minnesota.  Tr., vol. 27, 6199.  Shirley Seddon Iverson testified the rape attack caused her to suffer serious bodily injury.  She testified that she re-experiences the rape through bad dreams or nightmares of the assault; suffers recurring flashbacks of the rape; and experiences physical sensations during these flashbacks.  She continues to

experience medical and emotional problems.  Tr., vol. 33, 7117-43.  Ms. Seddon Iverson

and Ms. Knudson-Volker sought, and continue to seek counseling, treatment or other

assistance for the psychological trauma they still experience as a result of the attacks by

Rodriguez.  Id.

The United States and Rodriguez entered into a stipulation regarding a third prior

conviction that read:

> On June 24, 1980, the defendant, Alfonso Rodriguez, Jr, was convicted of
> the offense of Attempted Kidnapping and Assault in the 1st Degree, in
> violation of Sections 609.25 and 609.17 and 609.221 of the Minnesota
> Statutes in a case entitled State of Minnesota v. Alfonso Rodriguez, Jr. in
> the 9th Judicial District Court, Polk County, Minnesota, case number 6192.
> During this incident, the victim was confronted by the defendant and
> directed into his car, an altercation ensued during which the victim was
> stabbed once in the left elbow and once in the abdominal area on her right
> side. These injuries required medical attention including stitches to close
> the wounds.

Tr., vol. 33, 7194-95. Dr. McGee testified as to his findings on the injuries suffered by

Dru Sjodin during the attack by Rodriguez.  Id. at 7170-93.

The jury determined the United States proved beyond a reasonable doubt each of

the four-threshold eligibility factors of mental state alleged in the Notice of Special

Findings, specifically, that Rodriguez intentionally killed or committed acts resulting in

the death of Dru Sjodin.  Jury Verdict – Phase II (Eligibility Phase), DKT 585.  The jury

further determined that the United States proved beyond a reasonable doubt three

statutory aggravating factors:  (1) Rodriguez caused the death of Dru Sjodin during the

commission of a violation of 18 U.S.C. § 1201 (kidnapping) (18 U.S.C. § 3592(c)(1));

(2) Rodriguez has previously been convicted of two or more federal or state offenses

15

punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, and attempted infliction of, serious bodily injury or death upon another person (18 U.S.C. § 3592(c)(4)); (3) Rodriguez killed Dru Sjodin in an especially heinous, cruel, and depraved manner, in that it involved torture to Dru Sjodin (18 U.S.C. § 3592(c)(6)); however, the jury determined that the United States did not prove beyond a reasonable doubt that Rodriguez killed Dru Sjodin after substantial planning and premeditation to cause the death of Dru Sjodin.  18 U.S.C. § 3592(c)(9); Jury Verdict – Phase II (Eligibility Phase), DKT 585.

## THE POST-CONVICTION RECORD AND FORENSIC CLAIMS

Rodriguez's categorization of the post-conviction record is unsupported, and he makes sweeping conclusions regarding documents and evidence that would have had no impact on the results at trial.  Rodriguez attempts to revisit and attack Daubert related decisions that were vigorously challenged at the trial level and upheld by the Eighth Circuit.  No intervening laws have been enacted that would alter this result, and Rodriguez's attempts to relitigate these issues are contrary to habeas jurisprudence.  He masks his revisited claims by claiming Dr. McGee testified falsely about the testing for the presence of semen.  In addition, Rodriguez claims trial counsel performed deficiently regarding the semen related testing and the investigation into the manner of Dru Sjodin's death.

The Forensic Hearing testimony and evidence once again makes clear that Dr. McGee's opinions regarding the sexual assault of Dru Sjodin and manner of possible death as a homicidal violence were not only admissible but sound.  There is absolutely no

16

evidence Dr. McGee testified falsely.  The record now further makes it evident that trial

counsel made not only exceptional but extraordinary efforts in their representation of

Rodriguez.  They consulted some of the world's experts regarding DNA analyses, acid

phosphatase, fiber analyses, and pathology.  Based upon their consultations they made

sound pretrial and trial decisions bringing numerous motions along with excellent trial

strategy decisions.  Cross-examination by Rodriguez's seasoned trial counsel of the

experts called by the United States was meticulous, organized, and based upon the

opinions provided by the consulted experts.  Counsel made sound legal decisions and

their conduct falls squarely within the wide range of reasonable assistance contemplated

by the law.

At the evidentiary hearing, Rodriguez offered testimony from five pathologists:

Dr. Mark Flomenbaum,[2] Dr. Jonathan Arden,[3] Dr. Ljubisa Dragovic,[4] Dr. Michael

Ferenc,[5] and Dr. Garry Peterson.[6]  They testified regarding the serological and forensic

trial evidence. Collectively, the forensic pathologists testified that Ms. Sjodin's death was

a homicide.  Charles A. Keel[7] and Steven Fischer[8] also testified regarding laboratory

analyses of certain items.  Trial attorneys Robert Hoy[9] and Richard Ney[10] offered

---

[2] Evid. Hrg., vol.1, 79-189.

[3] Evid. Hrg., vol 2, 197-326.

[4] Evid. Hrg., vol 2, 326-377.

[5] Evid. Hrg., vol 3, 441-485.

[6] Evid. Hrg., vol 4, 644-743.

[7] Evid. Hrg., vol 1, 7-77.

[8] Evid. Hrg., vol 4, 745-768

[9] Evid. Hrg., vol 3, 385-440, 486-634.

[10] Evid. Hrg., vol 5, 776-935.

17

testimony.  In addition, the parties agreed to submit a deposition of Dr. George

Sensabaugh[11] to the Court for its review in lieu of live testimony.

Robert Hoy, a criminal defense attorney of 26, and former prosecutor for 11 years,

was appointed to represent Rodriguez in February of 2004.  Dru Sjodin's body was still

missing.  Negotiations to resolve the case and find Ms. Sjodin's body failed and later

Rodriguez was indicted.  Evid. Hrg. vol. 3, 616-619.

Thereafter, Richard Ney, learned counsel, criminal defense attorney in over 100

murder cases and 16 capital cases, joined Mr. Hoy in representing Rodriguez.  Evid. Hrg.

vol. 5, 779, 783.  Trial counsel set about collecting discovery, reviewing evidence, and

hiring experts to consult on various aspects of testing and evidence.

Dr. Garry Peterson (Evid. Hrg., vol 4, 644-743.) was retained to review evidence

regarding the death of Ms. Sjodin and answer questions for the trial team pertaining to a

possible cause of death and sexual assault.  Trial counsel, as a strategic decision,

informed Dr. Peterson not to provide a written report.  Evid. Hrg., vol. 3, 606.  Dr.

Peterson provided counsel with his expert opinions on the injuries and death of Dru

Sjodin.[12]  Dr. Peterson essentially agreed with Dr. McGee's opinions.

In discussing the autopsy report and photos, Dr. Peterson opined that the "hole in

front of throat area" was "probably [from a] knife."  Specifically, in viewing Photo P-

1180, he said the photo clearly shows a cut of throat area, probably two times.  Evid.

Hrg., vol. 3, 611-612.  Dr. Peterson further agreed with Dr. McGee that the right flank

---

[11] Motion Granted Allowing Deposition Testimony of Dr. Sensabaugh, DKT 1057. (Sensabaugh Depo.)
[12] Mr. Hoy took meticulous notes of counsel's discussions of Dr. Peterson's opinions.

18

defect was, in his opinion, an incised wound.  Id. at 614.  Dr. Peterson held these opinions to a "reasonable medical certainty."  Id. at 615.  Peterson told trial counsel that if he had to opine a cause of death, he would say the neck was incised but he was not certain.  It could have been strangulation with the ligature.  Evid. Hrg., vol. 3, 613.  For obvious strategy reasons, Dr. Peterson was not called as a witness at trial.[13]

During trial, counsel filed a Motion in Limine to exclude autopsy photographs. Subsequently, knowing the opinions of Dr. Peterson, counsel, with the agreement of Rodriguez, and in an effort to exclude the autopsy photographs, informed the Court it would not "contest at trial the nature and causation of these wounds [the neck and flank] . . .  Specifically, the defense will not contest that the flank wound and the two wounds to the neck were initially made by a sharp instrument."  Evid. Hrg., vol. 3, 631-633; vol. 5, 842-844. Pet. 53.  All trial strategy based upon the damning evidence presented to them by Dr. Peterson, knowing there was "nothing [trial counsel] could do to contest Dr. McGee's opinion."  Evid. Hrg., vol. 3, 633.

Trial counsel engaged other experts as well.  The Minnesota BCA lab had determined that certain fibers collected in the investigation connected Rodriguez and Dru Sjodin.  Counsel retained Microtrace Scientific to review the fiber evidence examination of the BCA lab and to conduct reanalysis of the evidence.  Evid. Hrg., vol. 3, 593-602. Upon examination and reanalysis of the fiber evidence, Microtrace issued two reports

---

[13] Dr. Peterson testified at the evidentiary hearing.  His recall of his conversations with trial counsel was sketchy however he deferred to counsel's recollection of his opinions prior to trial.  Evid. Hrg., vol 4, 644-743.

summarizing their analyses:  "Based on our review of BCA reports and our own re-analysis of the fiber evidence we find that our results are in overall agreement with the conclusions drawn by the BCA."  Gov. ZZ, AAA.  Based upon this expert analysis, no one from Microtrace testified at trial.  Evid. Hrg., vol. 3, 602.

The FBI laboratory had done mitochondrial DNA analysis on a hair taken from the coat of Dru Sjodin.  The FBI laboratory determined that the mitochondrial DNA sequence from the hair was the same as the mitochondrial DNA sequence determined from a known sample of Rodriguez.  Tr., vol. 28, 6487.  Trial counsel retained Dr. Terry Melton, an expert in mitochondrial DNA testing, to do a case review of the FBI testing and to complete her own tests.  Evid. Hrg., vol. 3, 585-593.  Dr. Melton issued a report concurring with the FBI lab result: "I concur with the final conclusions of the FBI lab which are that 1) Rodriguez (and any known maternal relatives) is not excluded as the contributor of the Q7.1 hair and 2) that Dru Sjodin (and her maternal relatives) are excluded as the contributor of the questioned hair."  Gov. RR.  Again, based upon this expert analysis, Dr. Melton was not called to testify at trial.  Evid. Hrg., vol. 3, 593.

Counsel retained two additional experts regarding DNA testing performed by the Minnesota BCA lab.  Initially, Dr. Edward Blake was retained, followed by Dr. Dean Stetler.  Evid. Hrg., vol. 3, 532-566.  Dr. Blake, a well known expert in forensic DNA analysis, was initially retained in the summer of 2004.  Numerous materials were sent to Dr. Blake for his review, suggestions on contemplated DNA analysis by the BCA lab, and possible retesting.  Dr. Blake provided his opinions on the possible consumption of samples being tested by the BCA lab. Evid. Hrg., vol. 3, 542-544.  He recommended an

20

expert on mitochondrial DNA, Dr. Terry Melton. Evid. Hrg., vol. 3, 546. He recommended an expert with regard to acid phosphatase, Dr. George Sensabaugh. Evid. Hrg., vol. 3, 556. Blake withdrew his services, a surprise to counsel, and did not provide a report. Evid. Hrg., vol. 3, 558-559, Pet. 2, Gov. G-U.

Despite Dr. Blake's withdrawal, counsel pushed on and retained Dr. Dean Stetler, another expert in DNA analysis. Mr. Ney had worked with Dr. Stetler on several prior cases. Evid. Hrg., vol. 3, 561-565, vol. 5, 899. Counsel provided materials to Dr. Stetler for his review and consideration on the BCA DNA testing and the sample consumption. Gov. W. Counsel had filed a Motion to Suppress the DNA testing results due to the consumption. Defendant's Motion to Suppress, DKT 353. Dr. Stetler provided his opinion concerning the DNA profiling of several items tested by BCA and testified at the Suppression Hearing. Gov. X, Z. Evidentiary Hearing on July 28, 2006 (Dr. Stetler) TR-TT-072806-VOL-03349.

Dr. George Sensabaugh, a world renowned expert on acid phosphatase, was retained. Dr. Sensabaugh received his doctorate in criminology and was a professor of forensic science and biomedical sciences, and also head of the Division of Infectious Diseases, at the School of Public Health, at the University of California Berkeley. The central focus of his research from the time he joined the faculty at Berkeley until 1985 related to extending the scope of analysis and interpretation of sexual assault evidence. This included research on acid phosphatase data. Dr. Sensabaugh conducted quantitative analyses of acid phosphatase levels found in vaginal samples, scientific research

21

concerning the comparison of acid phosphatase from seminal fluids and endogenous acid phosphatase found in vaginal fluids as well as with acid phosphatases in other tissues.

Acid phosphatase testing, in this case, was completed on samples collected from Ms. Sjodin's vagina, cervix, and rectal cavity. The results indicated an elevated level of acid phosphatase suggesting the presence of semen. After review of the documentation provided to him regarding the testing done on the samples, Dr. Sensabaugh provided a report with his conclusions: "1. The failure to detect sperm either cytologically or by the detection of male DNA argues against the presence of semen" despite the acid phosphatase findings. "2. ACP [Acid Phosphatase] levels in post-mortem vaginal samples may be artificially elevated." Gov. HH. He opined that the ACP test finding was an artifact. Gov. FF. However, he did recognize that "3. [t]he failure to detect semen is non-informative as to whether or not a sexual contact occurred." Gov. HH.

Before trial, Rodriguez filed a motion seeking a Daubert hearing in an attempt to prevent Dr. McGee, the medical examiner in this matter, from testifying as to—among other things—his opinion that elevated acid phosphatase levels in Dru Sjodin's cervix and vagina suggested there may have been a semen deposit within the 24 to 36 hours preceding her death. DKT 393.

Dr. Sensabaugh provided his expert opinions regarding the acid phosphatase test results both at a Daubert hearing and the trial. Based upon the facts, including his knowledge that there was a negative sperm search and negative Y chromosomal DNA findings, he did not consider the acid phosphatase test reliable for the inference of the

22

presence of semen.  Tr., vol. 29, 6604-6663; vol. 30, 6797-6817.  Evid. Hrg., vol. 3, 581-583.

The parties agreed to submit Dr. Sensabaugh's deposition to this Court for purposes of the forensic evidentiary hearing.  Motion Granted Allowing Deposition Testimony of Dr. Sensabaugh, DKT 1057.  Dr. Sensabaugh's deposition, again, reflected his same opinions regarding the acid phosphatase testing results.  Prior to his deposition, Dr. Sensabaugh learned that p30 testing had been done prior to trial.[14]  P30, another presumptive test for semen, was a test he had suggested be completed during his testimony the Daubert hearing and trial.  Dr. Sensabaugh testified that this knowledge provided further indication that in his opinion the acid phosphatase test was an artifact.  Sensabaugh Depo. 54.

As noted above, Steve Fisher, a forensic scientist at the Minnesota BCA lab, conducted testing on several Evidence Items including items 86-A, 85-B, and 86-C, samples collected from Ms. Sjodin's vagina, cervix, and rectal cavity and reported it on Lab Report #10.  Pet. 4.  His report on page 2 stated: "Examinatons of the following items of evidence did not detect the presence of semen . . . vaginal swabs (Item 86A), anal swabs (86B), and cervical swabs (86C), all said to have been collected from the body of Dru Sjodin.  Pet. 4 at 2.  Keeping with BCA protocols, the independent bases for the conclusions are not in the Report, but are contained in the bench notes.  Evid. Hrg.,

---

[14] Fisher conducted p30 testing on the samples and Reported it on Lab Report #10 (Pet. 4) Although he was not asked about p30 testing his testimony reflected the negative results.  He testified at trial that there was no semen detected on the items he tested, which included Evidence Items 86-A, 85-B, and 86-C.  Tr., vol. 27, 6124-6163.

23

vol. 4, 749.[15]  He testified at trial that there was no semen detected on the items he tested, which included Evidence Items 86-A, 85-B, and 86-C.  And, specifically on cross-examination by trial counsel, Mr. Fisher was questioned:

> Q.  Okay. Were you also furnished a series of swabs that's also referred to in the same paragraph, vaginal swabs, Item 86-A, anal swabs, Item 86-B, and cervical swabs, Item 86-C?
>
> A.  Yes, I was.
>
> Q.  Did you also examine those swabs for the presence of semen?
>
> A.  Yes, I did.
>
> Q.  And you found none, no semen on any of them?
>
> A.  That's correct.

Tr., vol. 27, 6160.

Although he was not asked about p30 testing at trial, his testimony reflected the negative results.[16]  Mr. Fisher testified at the evidentiary hearing that his testimony at the trial was that there was no semen detected on the items he tested, which included Evidence Items 86-A, 85-B, and 86-C.  Evid. Hrg., vol. 4, 764-67.

Charles Keel, a former lab employee of Dr. Edward Blake, testified regarding the testing of samples of evidence.  Mr. Keel Evid. Hrg., vol. 1., 7-77.  Mr. Keel recognized

---

[15] Mr. Fisher testified at the evidentiary hearing that the bench notes reflected he had conducted p30 testing and a sperm search.  Both were negative.  Evid. Hrg., vol. 4, 750-752.

[16] It is clear from the record that neither the prosecution nor Rodriguez's trial counsel became aware of the p30 testing and he did not recall discussing it with anyone prior to trial.  Mr. Fisher testified at the evidentiary hearing that he did not discuss the p30 testing because "[u]sually we don't unless we're asked specific questions about it." Counsel asked Mr. Fisher, "Had he asked you about the bases for your conclusion that no semen was detected would you have told him at that time?"  Fisher responded, "I would have explained to him what the basis was." Id. at 761-762.

that Dr. Sensabaugh was one of the preeminent forensic scientists regarding acid phosphatase in the country and had testified in the Daubert hearing and at trial on the subject of acid phosphatase and p30. Id. at 50. Mr. Keel testified that the only real test for "proof of the presence of semen is the microscopic observation of sperm." Id. at 11, 53. Mr. Keel testified that the test for acid phosphatase is a presumptive test, basically reiterating Dr. McGee's trial testimony. Id. at 20. He also testified that p30 testing can also be used "as a presumptive indicator for the presence of semen . . . [but] because p30 is also found in other body fluids and also in female body fluid. It is not specific to men. It is not even specific to semen. So it must be considered a presumptive test as well." Id. at 15, 53. Mr. Keel testified that whether acid phosphatase testing or p30 testing results in a positive result, it simply means that there is a presumptive evidence of semen and further investigation of that specimen should be pursued. Id. at 54, 74-75. Essentially all potential investigation regarding a deposit of semen was completed and testified to at trial. When questioned about the tests on the samples taken from Dru Sjodin in this case, Mr. Keel recognized that the Regions Hospital had done an acid phosphatase test and Dr. McGee testified in regard to those results. He knew that the Regions Hospital lab found no sperm. He was aware that Dr. McGee testified to that effect as well. He testified that he was aware of the testing results of Mr. Fischer at the BCA lab; that his testing did not detect the presence of semen, and that Mr. Fischer testified that, in fact, his examinations resulted in no detection of the presence of semen. He was further aware that the BCA lab did tests to discover whether male DNA was on the samples. Mr. Keel was aware the lab found no male DNA and there was testimony at trial on the negative results. Id. at 54-56.

25

Mr. Keel further agreed that the absence of semen was not determinative as to whether a sexual assault occurred.  Evid Hr., vol. 1., 56.

At the time of trial Dr. McGee offered testimony that, in addition to a knife slash to the neck, Ms. Sjodin could have died due to ligature strangulation, asphyxia, or exposure.  Tr., vol. 29, 6726-6728.  As noted above, Rodriguez offered testimony from five pathologists at the evidentiary hearing:  Dr. Mark Flomenbaum, Dr. Jonathan Arden, Dr. Ljubisa Dragovic, Dr. Michael Ferenc, and Dr. Garry Peterson.

Dr. Mark Flomenbaum offered testimony that his original report opined the cause of death of Ms. Sjodin was ligature strangulation.  Evid. Hrg., vol. 1, 163.  Pet. 10.  He agreed that, as Dr. McGee testified, she died as a result of homicidal violence.  Id. at 167, 171.  After his original report was completed, Dr. Flomenbaum, based upon Rodriguez's account,[17] "amended" his report and it was now his opinion that there was some type of asphyxiation due to application of blunt force.  Id. at 167-168.  Dr. Flomenbaum opined that there is no anatomical finding for asphyxia deaths, so she, may in fact, have been asphyxiated by the bag that had been place over her head.  Id. at 170.  And, he also agreed that she could have died from exposure.  Id. at 172-173.

Dr. Jonathan Arden offered testimony that his original report opined the cause of death of Ms. Sjodin was ligature strangulation.  Evid. Hrg., vol. 2, 307.  Pet. 20.  He testified, "If I were certifying this death I would certify the cause of death as ligature strangulation . . . this was a homicide."  Evid. Hrg., vol. 2, 314.

_____

[17] Rodriguez, never before having admitted the offense, provided an account of the murder claiming she died as a result of some type of arm pressure to her neck.

Dr. Arden did, however, agree that it was possible that there was a slash to Ms. Sjodin's neck, but he opined that it was not a slash wound. Evid. Hrg., vol. 2, 285. He also testified it was possible that the wound to the right flank was a knife wound, but he opined that it was not. Id. at 302. He also testified that the ligature "could have caused the asphyxiation by closing off the plastic bag" and that "one could die from exposure in that time frame in that location." Id. at 313. When asked about serological evidence, Dr. Arden testified that although semen was not present in the tested areas, the absence of semen isn't determinative as to whether or not a sexual assault occurred. Evid. Hrg. vol. 2, 320.

Dr. Michael Ferenc's report and testimony noted that he would classify the death as caused by homicidal violence consistent with complications of asphyxia. In his opinion, "[t]he plastic bag over the head and neck the tight cinched ligature around the neck or both would be the source of asphyxia." Evid. Hrg. vol. 3, 466. Pet. 55. However, he further testified that there was no way of knowing whether Ms. Sjodin was strangled from the ligature or from the bag placed over her head. Id. at 467. Either the strangulation or asphyxiation from the bag would have killed her in a few minutes. Id. at 468-469.

Dr. Ferenc testified that the autopsy report and photos did not "preclude the possibility that some sharp force object was used," but he opined there was "no positive evidence" of such. Id. at 465. He also recognized that it was possible that she could have died of exposure. Id. at 468.

27

Dr. Ljubisa Dragovich testified that a sexual assault occurred based on a number of different factors, namely the "physical finding" that Ms. Sjodin was "overpowered, bound, and forcibly undressed." Evid. Hrg., vol. 2, 343, 355. Pet. 27. Discussing the serology, Dr. Dragovic, recognizing that Dr. McGee testified at trial that the acid phosphatase test was a presumptive test, testified the acid phosphatase test results in this case were suggestive of sexual assault but are only of presumptive value rather than definitive and that this is universally known. Id. at 356-357. However, Dr. Dragovich also testified that "sexual assault can be carried out with or without intercourse" or penetration. He testified that all evidence must be taken into account when making the determination and in this case, Miss Sjodin was found bound and forcibly undressed, with no pants on, no underwear on, her blouse pulled down off of her shoulders. Id. The acid phosphatase levels were suggestive of a sexual assault, but only presumptive and not definitive. Id. at 355-356.

Dr. Dragovich opined that the cause of death was asphyxiation. Evid. Hrg., vol. 2., 351, 360. Initially, he testified that his opinion was that Ms. Sjodin "was rendered dead through the process of asphyxiation that most likely resulted from application of force to the front part of the neck" relying on Rodriguez's statement. Id. at 351. He testified that "asphyxiation is a diagnosis of exclusion" and even without Rodriguez's statement, his opinion would remain asphyxiation, "[w]ithout the specific mechanism of direct compression on the front part of the neck. Id. at 366. Dr. Dragovich agreed with his report that, "the concept of asphyxia by ligature strangulation is less likely, although it cannot be completed excluded as a possibility." Id. at 371.

28

Ultimately Dr. Dragovic was asked about Dr. McGee's testimony at trial where he opined that Ms. Sjodin may have died from the slash on her neck, she may have died from ligature strangulation, she may have died from asphyxiation, or she may have died from exposure. He responded "it was a fair approach at the time he was given the situation to examine the body." Evid. Hrg., vol. 2., 368.

Dr. Garry Peterson's testimony at the evidentiary hearing was incredibly suspect. He testified he could not recall opinions he provided to trial counsel but deferred to their notes and testimony. But he now had "new" opinions regarding the injuries and cause of death of Ms. Sjodin upon reading the reports of the other pathologists. Evid. Hrg., vol 4., 644-743.

<strong>ARGUMENT</strong>

**I. The United States Did Not Offer Perjured Testimony, or Fail to Correct Perjured Testimony, and Rodriguez Cannot Establish That He is Entitled to Relief Under <u>Giglio</u> or <u>Napue</u>.**

Rodriguez now again re-presents his argument regarding false testimony by Dr. McGee. He simply attempts to rephrase the issue of McGee's testimony as a knowing presentation of false or misleading evidence by the United States, but the underlying claim – that McGee's testimony regarding the presence of semen – is the same one that has already been addressed and Rodriguez should not be allowed to relitigate this issue.

McGee's training and experience qualified him to give the acid phosphatase testimony at trial. Rodriguez has not demonstrated that any false testimony on acid phosphatase resulted in his conviction or a death sentence. Rodriguez continuously overstates the p30 evidence. The p30 finding does not change Dr. McGee's theory and

29

testimony regarding acid phosphatase.  That theory was challenged by the defense during a <u>Daubert</u> hearing and affirmed by the Eighth Circuit on appeal.  <u>United States v. Rodriguez</u>, 581 F.3d 775 (8th Cir. 2009), <u>reh'g and reh'g en banc denied</u>, (Feb. 11, 2010).

On direct appeal, Rodriguez challenged the admission of the acid phosphatase testing.  The Eighth Circuit found the testimony and evidence of the acid phosphatase results admissible.  There has been no intervening change in the law as it relates to the admission of the testimony regarding the acid phosphatase testing in this case.  Rodriguez thus cannot now attempt to relitigate this challenge in this Section 2255 proceeding.  Rodriguez attempts to do what many defendants often try - to raise claims that would not ordinarily be cognizable on collateral review by couching them as ineffective assistance claims.

The District Court held the <u>Daubert</u> hearing on August 28, 2006.  Tr., vol. 29, 6516–6670.  The United States called Dr. Michael McGee as its only witness.  He was examined and cross-examined extensively, including by the District Court.  <u>Id.</u> at 6516–6601.  The defense called Dr. George Sensabaugh, a distinguished college professor at the University of California Berkeley.  The central focus of his research from the time he joined the faculty at Berkeley until 1985 related to extending the scope of analysis and interpretation of sexual assault evidence.  This included research on acid phosphatase data.  Dr. Sensabaugh conducted quantitative analyses of acid phosphatase levels found in vaginal samples, scientific research concerning the comparison of acid phosphatase from seminal fluids and endogenous acid phosphatase found in vaginal fluids as well as

with acid phosphatases in other tissues.  He was also examined and cross-examined thoroughly.  Id. at 6604–63.

Following the Daubert hearing, the District Court ruled that Dr. McGee would be allowed to testify as to his opinion regarding the acid phosphatase levels.  Id. at 6664–70. On direct appeal, the Eighth Circuit agreed with the District Court's decision finding "the district court did not abuse its discretion by admitting the acid-phosphatase test results." Rodriguez, 581 F.3d at 794.  Further, Rodriguez's challenge to the conclusion that the acid phosphatase test showed semen deposits were made within 24 to 36 hours of Dru Sjodin's death was also denied by the District Court and Eighth Circuit.  The Circuit stated, "Rodriguez's challenge – developed with thorough cross-examination – goes to credibility, not admissibility.  The court did not abuse its discretion by allowing the testimony." Id. at 794–95.

Rodriguez claims the negative p30 test renders Dr. McGee's testimony not only inadmissible, but also false.  At most, Dr. McGee mistakenly testified that no p30 testing had been conducted because he was unaware of any such testing.  As to the admissibility of the acid phosphatase testing, just as the Eighth Circuit held for Rodriguez's initial Daubert challenges, this "goes to credibility, not admissibility."

To establish entitlement to habeas relief on this issue, Rodriguez must show that: (1) McGee's testimony was false or perjured; (2) McGee's testimony was material to Rodriguez's conviction or sentence; and (3) the prosecution knew that McGee's testimony was false or perjured.  Giglio v. United States, 405 U.S. 150, 153-54 (1972). Thus, in order to be entitled to habeas corpus relief on a claim that a conviction was

31

premised on perjured testimony, a defendant must show that the prosecution knowingly used perjured testimony and that "the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). See also Johnson v. Trickey, 882 F.2d 316, 318 (8th Cir. 1989). Rodriguez fails to establish any of these requisite elements.

The fact that Rodriguez's experts disagree with McGee's conclusions does not establish his testimony was false. Rather, an attack on an expert's opinions or the methodology used to reach that opinion goes to the sufficiency of the evidence and the weight the jury should award that testimony, not the truth of it. Fuller v. Johnson, 114 F.3d 491, 496–497 (5th Cir.1997) (use of incorrect methods by expert does not demonstrate testimony was false), cert. denied, 522 U.S. 963 (1997). Likewise, the burden of proving indisputable falsity is not fulfilled with evidence of a difference of opinion or merely a hypotheses or inference that testimony could be false. See Rosencrantz v. Lafler, 568 F.3d 577, 586 (6th Cir. 2009).

More importantly, Rodriguez's arguments that McGee committed perjury regarding his testimony about the p30 testing must fail because he has no evidence that McGee was ever aware that any such testing had been conducted. Indeed, the record plainly shows that neither the prosecutors for United States nor Rodriguez's trial counsel were actually aware of the p30 testing results.

32

### A. Dr. McGee's Testimony Was Not false.

#### 1. The p30 Test Results Do Not Make Dr. McGee's Testimony Inadmissible or False.

The United States does not dispute that, under a <u>Brady</u> analysis for the nondisclosure of exculpatory or impeaching information, prosecutors have "a duty to learn of any favorable evidence known to others acting on the government's behalf to the case, including the police." <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995). What the United States does dispute was that there was any <u>Brady</u> violation or Dr. McGee's testimony was false.

Most significantly, the discovery at issue, the p30 test results and bench notes, were disclosed by the United States, a fact Rodriguez emphasizes only in an ineffective assistance of counsel analysis. Discovery was substantial and ongoing in this case. The relevant reports to this issue are Bureau of Criminal Apprehension ("BCA") Report 10 and BCA Report 27 on the analysis of Items 86A, 86B, and 86C, both of which show the absence of male DNA, semen, and the prostate-specific p30 protein found in seminal fluid ("p30"). The BCA Reports 10 and 27 also showed the samples tested positive for acid phosphatase (AP).

The United States provided defense counsel discovery relating to the results of the laboratory examination in Lab Report 10 on June 9, 2004. Pet. 28-29. Defense counsel received this document from the U.S. Attorney's Office within weeks after the Crime Lab conducted testing and over two years before trial. Lab Report 10 indicates that Steven G. Fisher conducted the testing and found presumptive tests indicating the presence of blood

33

on many of the inventory items, and that "DNA profiling will be performed on selected items of evidence as well as on the known samples said to have been collected from the body of Dru Kathrina Sjodin." Pet. 28. The Lab Report 10 summary report indicates that "vaginal swabs (Item 86A), anal swabs (Item 86B) and cervical swabs (Item 86C), all said to have been collected from the body of Dru Kathrina Sjodin" did not detect semen. Pet. 28, Bates Nos. 10775-10777.

On February 10, 2005, shortly after receipt, the United States alerted Mr. Hoy that biological samples from Ms. Sjodin would be sent for further testing (Item 86). The BCA conducted testing on December 19, 2005. The United States disclosed Lab Report 27 to defense counsel on January 4, 2006. Pet. 31. On that date, and in a letter to Mr. Robert Hoy, the United States disclosed Docs. 17485-17500. The results of Lab Report 27 show that "no male DNA was obtained from Items . . . 86A (vaginal swabs), 86B (anal swabs) or 86C (cervical swabs)." Pet. 30, Bates Nos. 17489-17493.

In fact, BCA Lab Reports 10 and 27 were provided to trial counsel twice. The United States disclosed the same BCA Lab Report 27 and supplements on May 8, 2006. Pet. 7, Bates Nos. 18420-18424. On this date, and in a letter to Mr. Hoy, the United States disclosed discovery Bates Nos. 17761 through 20349. Pet. 39. These documents included the bench notes on BCA Report 10. Although the "Results of the Laboratory Examination" as described on pages 2 and 3 of Lab Report 10 do not indicate that p30 tests were done, the last page of the bench notes indicated that p30 tests on items 86A (vaginal swabs), 86B (anal swabs) or 86C (cervical swabs) were negative. Pet. 4 at Bates Nos. 18418.

34

The fact that the BCA lab completed p30 tests on Item 86 is easily understood. The Report, Lab Report 10, did not reflect the test and its results in the Report. One had to look closely at the Bench Notes to discern that p30 tests had occurred. The United States provided over 20,000 pages of discovery and almost 2000 photographs to the defendant. No counsel recognized that the p30 test results were within the Bench Notes to Lab Report 10. And although the parties did not appreciate the page referencing the p30 test result performed by the BCA lab, both the United States and Rodriguez's trial counsel were very much aware of the results of the negative sperm and male DNA tests. However, as Rodriguez notes, the United States produced the full document to trial counsel months before trial commenced. Counsel had the document in possession prior to the trial and Daubert hearing, and certainly could have given the test results to their expert Dr. George Sensabaugh prior to the hearings and trial. As will be discussed further infra, at best, trial counsel's failure to do so is a non-prejudicial oversight.

Despite all of this, the p30 test results do not make Dr. McGee's testimony about the acid phosphatase or the sexual assault itself false. Petitioner takes a short leap off of a tall building. His argument falls completely flat.

There is absolutely no indication that Dr. McGee ever became aware that p30 tests were ever conducted by the BCA lab. Mr. Fischer's knowledge certainly cannot be imputed to Dr. McGee. Dr. McGee knew that no semen was detected on Item 86 and no male DNA was obtained from Item 86. And, despite the p30 results, his testimony regarding the acid phosphatase results and his opinion regarding them was properly admitted. He testified at trial that it was a presumptive test. His testimony was not false.

35

### 2. Mr. Fisher's Knowledge is Not Imputable to the Prosecution Team.

Rodriguez is also unable to establish that Mr. Fisher's knowledge is imputed to the United States.  Rodriguez cites to the inapposite Eleventh Circuit case Guzman v. Sec'y, Dep't of Corr., 663 F.3d 1336 (11th Cir. 2011).  In Guzman, a key witness and lead investigator falsely testified about key components of the case.  Id. at 1349.  The Eleventh Circuit appropriately held that they were a part of the team.  Id.  The trial rested upon the credibility of the defendant and the State's witness, and when the State knowingly failed to correct the false testimony, the court found this Giglio error was not harmless.  Id. at 1355–56.

The case before the Court is readily distinguishable, and Mr. Fischer's role is analogous to the expert in United States v. Stewart, 433 F.3d 273 (2d Cir. 2006).  In Stewart, the expert witness was a civilian employee of the United States Secret Service serving as its Laboratory Director and Chief Forensic Scientist.  Id. at 295.  The expert's role in the prosecution "was limited to matters concerning his area of expertise [.]"  Id. at 298.  He analyzed a document, explained to prosecutors the forensic tests that had been performed, discussed potential defense expert testimony, assisted prosecutors in developing cross-examination questions on technical aspects of the forensic tests at issue, participated in a mock examination as part of trial preparations, and testified at trial concerning the forensic tests that were performed and his conclusions from those tests.  Id.  The Second Circuit agreed with the district court that "[n]one of this suggests that [the expert] was in any way involved with the investigation or presentation of the case to

36

the grand jury.  He did not interview witnesses or gather facts, nor, with the exception of the [single document relevant to these forensic issues], did he review documents or develop prosecutorial strategy." Id. at 298–99.  Moreover, the Stewart Court noted that "[t]he fact that [the expert] was a government employee does not alter [the] conclusion" that he "acted only in the capacity of an expert witness ... and not as a fully functioning member of the prosecution team."  Id. at 299.  This conclusion "applies with even more force to the other laboratory employees whose participation was similarly limited in scope and less extensive than" the particular expert at issue.  Id. (emphasis added).  "These circumstances, therefore, do not justify attributing to the prosecutors, as if it was their own, knowledge that [this expert] or other ... personnel [in his lab] possessed."  Id.

Far from a key cooperating witness or lead investigator, Mr. Fisher was an expert witness.  His knowledge of the case was narrow and discrete and he was called solely to testify about tests he conducted while working in the Minnesota laboratory.  He simply answered questions put to him by the United States and Rodriguez's trial counsel.  His knowledge regarding epithelial cells or the p30 results, which he was not asked about, cannot be imputed to the United States.

The Supreme Court's holding in Agurs, is not on point to the analysis before this Court.  United States v. Agurs, 427 U.S. 97, 114 (1976).  Agurs dealt exclusively with the failure to turn over records and is not applicable to the p30 testing issue.  Id.  Unlike the prosecution in Agurs, there was no withholding, and the United States timely produced and shared the evidence at issue.

37

Prosecutors bear no obligation to disclose information they do not possess or of which they are unaware. United States v. Heppner, 519 F.3d 744, 750 (8th Cir. 2008). It is clear from the record that the prosecutors for the United States were unaware of the Fischer p30 test results during trial. Likewise, they need not compile or seek evidence favorable to the defense. United States v. Jones, 34 F.3d 596, 599 (8th Cir. 1994); United States v. Marashi, 913 F.2d 724, 733–34 (9th Cir. 1990). Furthermore, the Constitution does not compel disclosure if the defendant knew or should have known the essential facts permitting him to take advantage of the exculpatory evidence. Coe v. Bell, 161 F.3d 320, 344 (6th Cir. 1998); United States v. Kelly, 35 F.3d 929, 937 (4th Cir. 1994).

### a. Rodriguez is Unable to Show That the Innocent Use of Incorrect Testimony Would Result in an Acquittal on Retrial.

Even though Dr. McGee's testimony was not false nor incorrect, assuming for argument's sake that it was, Rodriguez cannot show that the innocent use of incorrect testimony would result in an acquittal on retrial. The Eighth Circuit has held that "when the government innocently uses false testimony, the defendant must establish that an acquittal would probably result on retrial." United States v. Tierney, 947 F.2d 854, 861 (8th Cir. 1991). In Tierney, a prosecution witness testified regarding a telephone call, and the information provided by the witness was later found to be in error. Id. at 860. The Court held that because this was not a knowing, reckless, or negligent use of false testimony, it was not appropriate to use the test that the "false testimony could have affected the judgment of the jury." Id. at 860-61. Rather, when the government innocently uses false testimony, the defendant must meet the more stringent test and

38

show "that an acquittal would probably result on retrial. Id. at 861; see also United States v. Torres, 128 F.3d 38, 49 (2d Cir.1997), cert. denied, 523 U.S. 1065, 118 S.Ct. 1399, 140 L.Ed.2d 657 (1998); United States v. Sinclair, 109 F.3d 1527, 1532 (10th Cir. 1997); United States v. Huddleston, 194 F.3d 214 (1st Cir. 1999).

Even if this Court considers the more defendant-friendly standard Rodriguez proposes – that he need only show that there was a likelihood such evidence affected the judgment of the jury – the United States submits there was not a likelihood this evidence would affect the jury's decision. See Giglio, 405 U.S. at 154.

Rodriguez continuously overstates the p30 evidence, and ignores testimony from McGee and others that the determination that Ms. Sjodin had been sexually assaulted was drawn not from serological evidence – but from other evidence.[18] It was Dr. McGee's testimony that irrespective of any serological tests, it was his expert opinion that Rodriguez sexually assaulted Sjodin:

> Q:    For just the moment just forget about acid phosphatase, everything you know about this case. Do you have an opinion about whether Dru Sjodin was – this was a sexual assault case of one nature or another?
>
> A:    Yes. I think this lady's death is a result of a sexual assault, yes.
>
> Q:    Whether there was a semen deposit or not?
>
> A:    Doesn't matter if semen is there or not.

---

[18] Rodriguez continuously refers to the United States not proving a "completed rape" occurred. Clearly, sexual assault can be "completed" without penetration of the female vagina. Even trial counsel agreed. Evid. Hrg., vol. 3 at 531.

Tr., vol. 29, 677-73.  Dr. McGee based this opinion on a number of factors, including conditions surrounding the death, how and where the body was found, external examination, and the fact that Ms. Sjodin was found naked from the waist down. Id. at 6724-25.

Rodriguez's own experts agreed.  For example, Charles Keel testified:

Q:      You would agree, wouldn't you, that the fact that all of this testimony in regard to the presence of semen or the lack of the presence of semen or sperm cells, that's not determinative of whether a sexual assault occurred in this particular case, is it?

A:      That's correct.

Evid. Hrg., vol. 1, 56.

Echoing Dr. McGee's testimony, Dr. Ljubisa Dragovic notes, positive serological findings, such as spermatozoa, p30, male DNA, and AP, can all be absent in known sexual assaults.  Dr. Dragovic's conclusion that Rodriguez sexually assaulted Ms. Sjodin was not based on the AP test; rather, it was based upon the condition of Ms. Sjodin's body as she was found.  Dr. Dragovic's hearing testimony further confirmed his position:

Q:      Okay. As to the first part of the question, do you believe that there was evidence of a sexual assault here?

A:      Yes, sir.

Q:      And is it fair to say that the basis for your belief that there was a sexual assault is indicated in the very first line under subsection one of "FORENSIC ASSESSMENT"?

A:      Yes, sir. That is correct.

Q:      "Evidence that the victim was sexually assaulted resides in the physical finding of the victim being overpowered, bound, and forcibly undressed."

40

A:    Correct.

Q:    Is that correct?

A:    Yes.

Q.    And is that your basis for concluding that there
      was a sexual assault here?

A. Yes.

Q:    Okay.  And then I just want – if we could go down to the next
      paragraph, you make a notation that "Sexual assault can be carried
      out with or without intercourse (i.e. penetration); is that right?

A:    Yes, sir.

Evid. Hrg., vol. 2, 343.

Again, Dr. Dragovic, as did Dr. McGee, opined that Rodriguez sexually assaulted

Ms. Sjodin, and his opinion was based on the conditions surrounding the death and crime

scene, not on serological tests:

Q.    Okay. So it would be correct wouldn't it that when you were making a
      determination of a possible sexual assault you take all of the evidence that's
      gathered in the case to make a determination?

A.    Yes sir.

Q.    And that would include in this particular case how Miss Sjodin was found
      at the scene correct?

A.    That's correct.

Q.    And she was found as you note bound and forcibly undressed correct?

A.    That's correct sir.

Q.    She had no pants on correct?

A.    That's correct.

Q. She had no underwear on correct?

A. That's correct.

Q. And do you recall that also her top her blouse and I believe there was a piece of clothing underneath that blouse was pulled down off of her shoulders?

A. That's correct sir.

Evid. Hrg., vol. 2, 355.

And certainly, a sexual assault can occur without sexual intercourse or penetration:

Q. And as you noted I believe -- lets go down to the second paragraph. You note and I quote your statement Sexual assault can be carried out with or without intercourse correct?

A. That is correct sir.

Q. So you don't have to have penetration to an individual to a female to accomplish a sexual assault. Wouldn't that be true?

A. That is correct sir.

Evid. Hrg., vol. 2, 356.

In fact, virtually every one of Rodriguez's 2255 witnesses who contemplated the serological evidence opined that serological evidence was not determinate of whether or not there was a sexual assault. For example, Dr. Jonathan Arden also opined that although he disagreed that the acid phosphatase levels indicated the presence of semen, that conclusion was not determinative as to whether or not a sexual assault occurred.

Evid. Hrg., vol. 2, 251-252, 320-21.

Q. Doctor let me just clarify your opinion that there was no semen present based on those known factors in 2011 is not conclusive of whether there was in fact a sexual assault in this particular case.

42

A.    Right. That's a related but different question.  The issue of sexual assault is based on many other aspects of the case and the evidence . . .

Evid. Hrg., vol. 2, 251-252.

Q.    Okay. That certainly isn't determinative as to whether a sexual assault occurred in this case is it?

A.    Correct.

Evid. Hrg., vol. 2, 320-21.

When asked about serological evidence, Dr. Arden testified that although semen was not present in the tested areas, the absence of semen isn't determinative as to whether or not a sexual assault occurred.  Evid. Hrg. vol. 2, 320.

Dr. Sensabaugh recognized that "[t]he failure to detect semen is non-informative as to whether or not a sexual contact occurred."  Gov. HH.  Mr. Keel also further agreed that the absence of semen was not determinative as to whether a sexual assault occurred. Evid Hr., vol. 1., 56.

Dr. Dragovic testified that all evidence must be taken into account when making the determination as to whether a sexual assault occurred and in this case, Miss Sjodin was found bound and forcibly undressed, with no pants on, no underwear on, her blouse pulled down off of her shoulders.  Id.  The acid phosphatase levels were suggestive of a sexual assault, but only presumptive and not definitive.  Id. at 355-356.

If the Court evaluates his requests in the context of materiality against the backdrop of the entire record, the absence of any p30 testing testimony is insignificant. Independent of that testimony, the United States' argument concerning Rodriguez's sexually violent tendencies and sexual assault on Ms. Sjodin was abundantly supported

43

by other evidence in the record.  The relevant evidence included his history of similar, sexually violent crimes against other women.  See Rodriguez, 581 F.3d at 795–96 (Rodriguez's prior convictions "involved conduct similar to the charged offense"); Id. at 804 ("Rodriguez objects to references in the government's closing argument to his criminal history . . . .  [T]he government was permitted to argue that the evidence here shows Rodriguez raped Sjodin before killing her."); Id. at 807–10 (facts of earlier offenses).  The relevant evidence also included the fact that Ms. Sjodin was found naked from the waist down with her hands bound behind her back with her coat and blouse pulled down off her shoulders, and testimony regarding Rodriguez's sexually violent thoughts and feelings.  The record in this case includes evidence of this nature at all stages of the proceedings -- in the guilt phase, the eligibility phase, and the selection phase.

In the guilt phase, the United States explained the grounds for concluding that Rodriguez kidnapped Ms. Sjodin in order to sexually assault her were, based on information independent of the AP testimony, including his history of committing similar sexual assaults and the condition of Ms. Sjodin's body.  The testimony of Dr. McGee on AP testing was not crucial for the jury to find Rodriguez guilty or to determine the punishment.  During closing argument the United States reiterated:

> When you consider that Dru Sjodin was found stripped nude from the waist down with her sweater torn down the front to expose her to expose her undergarments, her hands bound tightly behind her back . . . you probably didn't need to be told that this crime involved sexual assault.  Sexual assault is a sexual act or a sexual touching.  Sometimes people just think of it as sexual penetration but it can be many things touching of a sexual nature to obtain gratification of some kind.  You probably didn't need to be told that it was a sexual assault.  But because the facts

in this case so obviously indicate sexual assault in addition to the kidnapping, the law allows the United States to present evidence and we did that in this case of certain other sexual assaults that were committed by Alfonso Rodriguez Jr. Evidence of these convictions shows that Alfonso Rodriguez has a propensity for committing sexual assaults and you are allowed to consider that in arriving at your conclusions in this case.

Tr., vol. 30, 6867-6868.

And in its rebuttal argument, the United States again pointed out that the sexual assault took place based upon all of the circumstances presented:

We also have the facts in this case, and the facts as Mr. Wrigley pointed out in his original opening  -- closing argument was that Dru was found naked from the waist down. Now what does that tell you? That tells you that he sexually assaulted her. We don't have to prove that he raped her. We don't have to prove how he sexually assaulted her . . .

But again understanding why he did what he did helps you answer some of the other questions in this case.  He sexually assaulted her. She's nude from the waist down.  Dru Sjodin didn't take her own pants off.  She didn't take her own underwear off. She had her hands tied behind her back.  She was helpless.  The defendant could do whatever he wanted to do to her and we know that the defendant forced Shirley Seddon to have sex with him to perform oral sex on him and we know that the defendant forced Elizabeth Knudson at knifepoint to have sex with him.  So you think if he's got Dru Sjodin helpless with her hands tied behind her back that he's not going to do something like that with her?

He sexually assaulted Dru Sjodin when she was completely helpless and nothing she could do about it.

Tr., vol. 30, 6918-6919.

Furthermore, it was unnecessary for the jury to find a sexual assault occurred in order to convict or sentence Rodriguez to death.  Proving the purpose behind the kidnapping was not an element of the crime charged and this was clearly reflected in the jury instructions.  In fact, the United States expressly stated that the jury could

45

completely disregard the AP testimony, or conclude that Dru Sjodin was not sexually assaulted at all, and still convict:

> But again keep in mind that we don't need to prove any of that. The kidnapping can be for any purpose. The judge has already told you that. It doesn't have to be for sexual assault. It can be for any purpose that benefits the defendant.

> So don't think that **--** I know Mr. Hoy was up here talking earlier about what the acid phosphatase actually shows. Who cares what it shows? It doesn't make that big a difference. He may not have sexually assaulted her at all. Assume that and it doesn't make any difference. He still kidnapped her for some purpose or some reason of his own and he transported her across state lines and that's enough.

Tr., vol. 30, 6919.

Moreover, contrary to Rodriguez's arguments, the negative p30 test does not undermine the scientific validity or basis for Dr. McGee's sexual assault testimony. This Court and the Eighth Circuit both determined that Dr. McGee's testimony was admissible under Daubert, and the analysis would hold regardless of any p30 test results.

The potential limitations of Dr. McGee's reliance on the AP testing for a finding of semen was thoroughly developed at trial. On cross-examination, defense counsel raised numerous questions and concerns regarding the AP testing. Trial counsel elicited from Dr. McGee the fact that decomposing bodies may produce AP. Trial counsel also elicited that no sperm was found to be present at any of the swabbed sites and that duplicate swabs were also negative for the presence of male DNA. Tr., vol. 29, 6563, 6566, 6632, 6570. Although Dr. McGee was unaware of the p30 testing, the jury heard testimony that the AP test was not conclusive, only presumptive, and that no male DNA or spermatozoa was found on any of the tested samples.

46

The Eighth Circuit agreed with the District Court in admitting the expert testimony:

> The district court conducted a <u>Daubert</u> hearing on acid-phosphate testing. Permitting the pathologist's testimony, the court noted that Rodriguez's own expert acknowledged that the government pathologist's test properly detects the presence of acid phosphate; that forensic labs across the country use acid-phosphate levels to indicate semen, and use the same cut-off levels as the government pathologist; and that while there is uncertainty about what acid-phosphate levels would be normal for a corpse, many pathologists share the government pathologist's view of the reliability of the test, and any doubts go to the weight, not reliability, of the opinion.

<u>Rodriguez</u>, 581 F.3d at 794.  Rodriguez has continuously opposed Dr. McGee's testimony and AP cut-offs, but under the <u>Daubert</u> standards, Dr. McGee's testimony "go[es]to the weight, not reliability." <u>Id.</u>

## II.    Trial Counsel Effectively Assisted Rodriguez Regarding the Semen Related Issues and Sexual Assault Evidence and Had an Appropriate Strategy to Not Challenge the Cause of Ms. Sjodin's Death.

The Sixth Amendment to the United States Constitution provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his [or her] defen[s]e." U.S. Const., amend. VI.  The Supreme Court "has recognized that 'the right to counsel is the right to effective assistance of counsel.'" <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984) (quoting <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970)).  The defendant "faces a heavy burden" to establish ineffective assistance of counsel under 28 U.S.C. § 2255.  <u>DeRoo v. United States</u>, 223 F.3d 919, 925 (8th Cir. 2000).  A defendant must meet the two-part test established in <u>Strickland</u> to substantiate a claim of ineffective assistance of counsel.  The

47

"[f]ailure to establish either prong is fatal to a claim of ineffective assistance." Morelos v. United States, 709 F.3d 1246, 1250 (8th Cir. 2013).

First, a defendant must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." Strickland, 466 U.S. at 687. To make this "deficient performance" showing, the defendant must establish that counsel's performance "fell below an objective standard of reasonableness." Wiggins v. Smith, 539 U.S. 510, 521 (2003). When evaluating attorney performance, "[c]ourts should avoid 'the distorting effects of hindsight' and try to evaluate counsel's conduct by looking at the circumstances as they must have appeared to counsel at the time." United States v. Staples, 410 F.3d 484, 488 (8th Cir. 2005) (quoting United States v. Sera, 267 F.3d 872, 874 (8th Cir. 2001), in turn quoting Strickland, 466 U.S. at 689).

The benchmark for judging whether an attorney's conduct "fell below an objective standard of reasonableness" is whether the conduct so undermined the proper functioning of the process that it "cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. In other words, Rodriguez must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687.

> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were

48

outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Strickland, 466 U.S. at 690.

In scrutinizing counsel's performance, a court is to be highly deferential. Strickland, 466 U.S. at 689. The Court should exercise a strong presumption that the representation was within a wide range of reasonable assistance. See, e.g., Strickland, 466 U.S. at 687; Johnson v. United States, 278 F.3d 839, 842 (8th Cir. 2002); Collins v. Dormire, 240 F.3d 724, 727 (8th Cir. 2001). "Strategic choices made after thorough investigation of law and facts relevant to the plausible options are virtually unchallengeable." Knowles v. Mirzayance, 556 U.S. 111, 124 (2009) (internal quotation omitted); United States v. Rice, 449 F.3d 887, 897 (8th Cir. 2006) (same). A defendant bears a heavy burden in overcoming the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689; Lawrence v. Lockhart, 767 F.2d 449, 450 (8th Cir. 1985). The presumption exists to "eliminate the distorting effects of hindsight" and recognizes that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland, 466 U.S. at 689.

The Sixth Amendment right to counsel does not guarantee criminal defendants perfect or errorless representation. See Brunson v. Higgins, 708 F.2d 1353, 1356 (8th Cir. 1983) ("Counsel need not perform perfectly, and will not be held ineffective for

49

failure to raise every tangential issue which might have a bearing on his client's case."). "Lawyers, like other people, are not perfect, and the ingenuity that diligent [habeas] counsel bring to a case long after the fact cannot be the only measure of what a lawyer should have done under the pressure of trial." Williams v. Nix, 751 F.2d 956, 962 (8th Cir. 1985). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688.

Second, a defendant must also show that he suffered prejudice by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see, e.g., United States v. Ledezma-Rodriguez, 423 F.3d 830, 836 (8th Cir. 2005) (holding that a defendant cannot establish ineffective assistance of counsel unless defendant shows that his counsel's deficient performance prejudiced his defense). Actual prejudice is not present where a defendant shows, at most, the mere possibility of prejudice. See Wainwright v. Torna, 455 U.S. 586, 587–88 (1982). Further, not every error undermines the reliability of a conviction; it is not sufficient to show that an error had only a "conceivable effect" on the result of the proceeding. See Morales v. Ault, 476 F.3d 545, 550 (8th Cir. 2007) (citing Odem v. Hopkins, 382 F.3d 846, 851 (8th Cir. 2004)); see also Pfau v. Ault, 409 F.3d 933, 939 (8th Cir. 2005) (internal quotation and citation omitted). Rather, a defendant must establish "'a probability sufficient to undermine confidence in the outcome.'" Rice, 449 F.3d at 897 (quoting Strickland, 466 U.S. at 694). In a case, such as this, where a conviction has been the result of a trial, the defendant must demonstrate that but for counsel's errors, there is a reasonable probability that he would

50

not have been convicted.  See United States v. Orr, 636 F.3d 944, 950 (8th Cir. 2011).

Moreover, when the allegation of ineffective assistance of counsel pertains to conduct of

counsel in the penalty phase of a capital trial, a defendant must demonstrate that, absent

counsel's deficient performance, at least one juror would have voted for life.  Wiggins,

539 U.S. at 536.

The court need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the Petitioner as a result of the alleged deficiency.

Strickland, 466 U.S. at 697.  A defendant must show not only that counsel's conduct fell

below an objective standard of reasonableness, but also show that:

> [T]here is a reasonable probability that, but for counsel's unprofessional
> errors, the result of the proceeding would have been different.  A
> reasonable probability is a probability sufficient to undermine confidence in
> the outcome.

Strickland, 466 U.S. at 694.  The same deferential review applies to the "prejudice"

portion of the test.  Sanders v. Trickey, 875 F.2d 205, 210 (8th Cir. 1989).  The failure to

establish "prejudice" is dispositive of the case without consideration of the Strickland

"performance" factor.  Sanders, 875 F.2d at 211 n.8.  If it is easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient prejudice, the Court should do

so.  Strickland, 466 U.S. at 697.

### A. Rodriguez Cannot Relitigate on Collateral Review His Objection to the Admission of Acid Phosphatase Testing.

Section 2255 does not require a federal court to second-guess itself.  When a

federal prisoner raises a claim that has been previously decided on direct review, he

51

ordinarily cannot later attempt to relitigate that claim in a Section 2255 proceeding. Thompson v. United States, 7 F.3d 1377, 1378–79 (8th Cir. 1993) (*per curiam*); see Sun Bear v. United States, 644 F.3d 700, 702 (8th Cir. 2011) (noting that with "rare exceptions, § 2255 may not be used to relitigate matters decided on direct appeal"); Dall v. United States, 957 F.2d 571, 572 (8th Cir. 1992) (citing United States v. Shabazz, 657 F.2d 189, 190 (8th Cir. 1981)) (finding that a claim raised and decided on direct appeal may not be relitigated in a Section 2255 proceeding). This approach to federal prisoner collateral litigation is an extension of the law-of-the-case doctrine to the federal-prisoner habeas context.

The only notable and recurring exception to this rule is when there has been an intervening change in the law, usually a new judicial decision narrowly construing the statute of conviction. See Davis v. United States, 417 U.S. 333 (1974). Relitigation of an appellate issue during Section 2255 proceedings may be proper when there has been an intervening change in the law of a circuit. Baranski v. United States, 515 F.3d 857, 861 (8th Cir. 2008). In the overwhelming majority of cases, however, a direct-appeal decision rejecting a claim will preclude the defendant from obtaining a merits review of the same claim under Section 2255.

On direct appeal, Rodriguez challenged the admission of the acid phosphatase testing. The Eighth Circuit found the testimony and evidence of the acid phosphatase results admissible. There has been no intervening change in the law as it relates to the admission of the testimony regarding the acid phosphatase testing in this case. Rodriguez thus cannot now attempt to relitigate this challenge in this Section 2255 proceeding.

52

Rodriguez attempts to do what many defendants often try— to raise claims that would not ordinarily be cognizable on collateral review by couching them as ineffective assistance claims.

Before trial, Rodriguez filed a motion seeking a Daubert hearing in an attempt to bar Dr. McGee, the medical examiner in this matter, from testifying as to—among other things—his opinion that elevated acid phosphatase levels in Dru Sjodin's cervix and vagina indicated a semen deposit within the 24 to 36 hours preceding her death.  Motion for Daubert Hearing and Motion In Limine to Exclude Testimony of Dr. Michael McGee, DKT 393.

As noted above, the District Court held the Daubert hearing on August 28, 2006.  Tr., vol. 29, 6516–6670.  The United States called Dr. Michael McGee as its only witness.  He was examined and cross-examined extensively, including by the District Court.  Id. at 6516–6601.  The defense called Dr. George Sensabaugh, a distinguished college professor at the University of California Berkeley.[19]  Dr. Sensabaugh testified that he had conducted quantitative analysis of acid phosphatase levels found in vaginal samples, scientific research concerning the comparison of acid phosphatase from seminal fluids and endogenous acid phosphatase found in vaginal fluids as well as with acid phosphatases in other tissues.  He was also examined and cross-examined thoroughly.  Id. at 6604–63.

---

[19] Trial counsel had hired Dr. Sensabaugh  and Dr. Edward Blake, the preeminent forensic scientists in regard to acid phosphatase.  Evid. Hrg., vol. 1 at 50-52.

Following the <u>Daubert</u> hearing, the District Court ruled that Dr. McGee would be allowed to testify as to his opinion regarding the acid phosphatase levels.  Tr., vol. 29, 6664–70.  The District Court later issued a written opinion memorializing its decision.[20]  On direct appeal, the Eighth Circuit agreed with the District Court's decision finding "the district court did not abuse its discretion by admitting the acid-phosphatase test results."  <u>Rodriguez</u>, 581 F.3d at 794.  Further, Rodriguez's challenge to the conclusion that the acid phosphatase test showed semen deposits were made within 24 to 36 hours of Dru Sjodin's death was also denied by the District Court and Eighth Circuit.  The Circuit stated, "Rodriguez's challenge – developed with thorough cross-examination – goes to credibility, not admissibility.  The court did not abuse its discretion by allowing the testimony."  <u>Id.</u> at 794–95.

Rodriguez now claims there was available evidence demonstrating that Dr. McGee's testimony had no support in the established practices and protocols of forensic crime laboratories.  He claims that his trial counsel's failure to investigate and present such information was deficient considering that the dispositive issue to be decided at the <u>Daubert</u> hearing was whether use of the acid phosphatase test was consistent with the relevant community of experts.  Rodriguez claims counsel should have investigated the practices of the forensic pathology community to learn what conclusions can properly be drawn from an acid phosphatase test.  Rodriguez argues had trial counsel done so, they would have been able to present evidence to the Court that the

---

[20] Memorandum Opinion and Order Denying Motion to Exclude Testimony of Dr. Michael McGee, September 14, 2006, DKT 596.

54

experts' differing testimony about the proper conclusions to be drawn from the AP test were not simply a "textbook case" of "different opinions" held by "differing scientific communities." He also argues that trial counsel failed to challenge the use of the Beckman Dri-stat acid phosphatase test itself as it was designed to be used with serums and not dry stains. This claim also fails.

This issue was raised competently by trial counsel, and was ruled upon by the District Court and by the Eighth Circuit. The direct-appeal decision rejecting the claim precludes the defendant from obtaining a merits review of the same claim under Section 2255 in this petition. There has been no intervening change in the law as it relates to Rodriguez's challenge to the admission of the testimony regarding the acid phosphatase testing in this case. His claim raised and decided on direct appeal may not be relitigated in this proceeding. Even if the Court decides to review this claim, it fails for the same reasons the Court originally found.

### B. Trial Counsel Properly Challenged the Acid Phosphatase Testing at the Daubert Hearing, the Trial and Appeal.

At the time of the Daubert hearing, Dr. McGee had served as the Ramsey County Medical Examiner for over 20 years. Tr., vol. 29, 6517. He had also served as the Assistant Medical Examiner there for five years, as well as staff pathologist at the St. Paul-Ramsey Medical Center. Id. He is board certified as an anatomic and forensic pathologist. Tr. 6518. By the time of the hearing, he estimated he had conducted between 4,000 and 4,500 autopsies. Id. at 6520. He also spent approximately ten years

55

studying living victims while working at Regions Hospital, for the purpose of interpreting "laboratory results on sexual assault victims coming from the ER." Id. at 6521.

The acid phosphatase test (hereinafter also referred as "AP  test"), as it is usually called, is one of the best known and most widely employed techniques for semen identification, apart from sperm cell identification itself.  It is based, in its many variations, on the presence in human semen of high levels of a non-specific phosphohydrolase with acid pH optimum.  This acid phosphatase is of prostatic origin. Dr. McGee testified that the presence or absence of semen deposits is just one factor that he considers helpful when determining whether there was sexual assault in a given case. Tr., vol. 29, 6522.  The Regions Medical Center lab in this case used the Beckman Dri-STAT test to measure the acid phosphatase levels in swabbed samples, per the lab protocol; the samples were collected from Dru Sjodin's vagina and cervix during autopsy. Id. at 6530–31, 6545–52.  The vaginal swab result was 47.4 units per liter ("U/L") of acid phosphatase. Id. at 6546–47.  The cervical swab result was 130.7 U/L. Id. at 6551–52.  A positive reading means that the measured U/L exceeds an established baseline level of U/L that would be expected in bodily sites such as the vagina, the rectum, or the mouth. Id. at 6535-37.  If the U/L measurement exceeds the baseline, that is deemed a presumptive positive for semen deposit. Id. at 6597.[21]  A historical internal study performed by the Regions Medical Center hospital, where the swabs in this case

---

[21] Rodriguez spends pages making the point that this could only be deemed a presumptive test.  This was recognized clearly by the Court and Dr. McGee.

were tested, had a vaginal baseline acid phosphatase cutoff of 10 U/L (Id. at 6535), and

an oral and anal baseline of less than 10 U/L.  Id. at 6536.  (The hospital actually

employed a 15 U/L cutoff just to maximize confidence in the analysis.)

Dr. McGee testified at the Daubert hearing that he and the other doctors at the

Ramsey County Medical Center had established a more conservative baseline cutoff for

presumptive positive tests for all cases at 25 U/L.  Tr., vol. 29, 6536–37.  The 25 U/L

cutoff is based on the analysis of the hospital study that involved approximately 1,200

known sexual assault victims.  Id. at 6541.  Forensic labs across the nation typically rely

on a baseline cutoff of between 25 U/L and 50 U/L, beyond which they would deem the

sample presumptively positive for semen.  Id. at 6595–97.  Thus, the acid phosphatase

levels in this case were elevated compared to the baseline average noted above.  It was

Dr. McGee's opinion, therefore, that there had been a semen deposit in Dru Sjodin's

body during the 24 to 36 hours preceding her death.  Id. at 6554.

Dr. McGee had testified to this type of analysis and rendered derivative opinions

"between 12 and 20 times a year" since approximately 1980.  Tr., vol. 29, 6553.  No

courts have ever disallowed Dr. McGee's opinion testimony on this subject.  Id.

Dr. McGee testified that he had taken continuing education courses touching on the

subject matter relevant to his assessment and baseline cutoff opinion for the isolation of

the acid phosphatase enzyme and his interpretation of the results along those lines,

discussed this topic with colleagues at national meetings, attended seminars, and read

medical literature on the subject, and that nothing had come to his attention that seriously

57

calls into question the Ramsey County Medical Center acid phosphatase cutoff of 25 U/L. Id. at 6558–60.

On cross-examination, defense counsel raised numerous questions and concerns regarding the acid phosphatase testing. They elicited from Dr. McGee the fact that decomposing bodies may produce acid phosphatase; that no sperm was found to be present at any of the swabbed sites; that duplicate swabs were also negative for the presence of male DNA; and that the acid phosphatase testing was not followed up by a p30 test for the antigen produced by the male prostate found in seminal fluid. Tr., vol. 29, 6563, 6566, 6632, 6570.

The District Court made several inquiries of Dr. McGee, noting that the test results were presumptive. The Court's inquiry went as follows:

> Q. But if you look at just acid phosphatase generally that's divided into nonprostatic and prostatic using the system that's been described herein, basically that's a presumptive test, right?
>
> A. Yes.
>
> Q. And ordinarily to get a confirmatory test you'd look for the presence of sperm?
>
> A. Yes.
>
> Q. And if you don't have the presence of sperm then you could look at the levels.
>
> A. Yes.
>
> Q. And I think that one of the articles that was produced says that levels 50 and below –
>
> A. Yes.

58

Q.    -- are inconclusive?

A.    Right.

Q.    Levels of 100 to 400 are likely indicators of sexual intercourse?

A.    Right.

Q.    And levels at 400 and above are not to be found in the absence of intercourse under any circumstance.  That's how I read the literature as a layperson. Does that sound like what you saw as well?

A.    Yes.

Q.    All right. And we have a test here that's at 134?

A.    Right.

Q.    Which puts you kind of in that -- appears to be evidence of but not dispositive of the question.

A.    True.

Q.    In the absence of something anomalous happening as the result of decomposition.

A.    Correct.

Q.    Is that what your understanding is?

A.    Using the article you're referring to?  Yes, sir.

Q.    And does that seem consistent with what forensic pathologists that you deal with, that they use?

A.    Yes.

Tr., vol. 29, 6597–98.

The defense called Dr. George Sensabaugh as its expert during the Daubert

hearing.  Dr. Sensabaugh and defense counsel were very familiar with the Beckman Dri-

59

STAT test and clearly brought out the problems counsel now implore the Court to reevaluate. Tr., vol. 29, 6612–14. He acknowledged the accuracy of the Beckman Dri-STAT test for measuring the acid phosphatase levels when applied to blood serum commonly used with male cancer patients (Id. at 6612–14), and noted that "this is a fairly standard acid phosphatase protocol used in clinical laboratories." Id. at 6613. He testified that "[t]he Beckman Dri-Stat test is one of several very routine assays for prostatic acid phosphatase that is used by clinical laboratories." (Id. at 6652) and that "[t]he test is also used for--in the analysis of sexual assault evidence." Id. at 6614.[22] He claimed, however, that the test measures tartrate-inhibited acid phosphatase and he questioned the test's ability to isolate prostatic acid phosphatase. Id. Dr. Sensabaugh testified that the test done on the swabs in this case could have included vaginally endogenous acid phosphatase and/or lysosomal acid phosphatase. And it was therefore impossible to distinguish between them with the Beckman Dri-STAT test. Id. at 6626. Dr. Sensabaugh testified that the acid phosphatase test is a presumptive test for semen, but in this case, the arguably positive test results should result in further testing for the male specific p30 antigen or Y-chromosomal DNA. Id. at 6629–32.

Dr. Sensabaugh admitted, however, that the measure of endogenous acid phosphatase could be eliminated as a concern simply by establishing a "normal

---

[22] The Protocol from the Regions Hospital regarding the acid phosphatase test clearly indicates that the test is used for the investigation of sexual assaults. "During Sexual Assault examination a specimen is collected for acid phosphatase determinations from each site examined (vaginal, oral, anal or miscellaneous)." Counsel for defendant offered the protocol as Defendant's Exhibit 3 at the Daubert hearing. Tr., vol. 29, 6613.

background level" of acid phosphatase "in the interpretation of any acid phosphatase test done on test material." Tr., vol. 29, 6617.  While Dr. McGee testified to such an assessment having been affixed at 10 U/L (Id. at 6535), Dr. Sensabaugh could not suggest a U/L level of what he would expect to see endogenously in a woman's vagina. Id. at 6617–29.  He even agreed that "once one determines the distribution of acid phosphatase activity present in vaginal fluids in females that have not had sexual contact or have not been--have not engaged in sexual activity, then one can use statistics to define a threshold above which the detection of acid phosphatase is indicative of the presence of semen."  Id. at 6621–22.

Dr. Sensabaugh could not testify to a level of lysosomal acid phosphatase that he would expect in a corpse, and he was aware of no studies on the subject.  Tr., vol. 29, 6624.  Additionally, he knew of no study that had ever assessed the rate of increase in U/L measurement in a decomposing body.  Id. at 6621–23.  Further, he acknowledged that he had no information regarding the conditions encountered by Dru Sjodin's body during the time between November 22, 2003, and the date it was discovered, April 17, 2004.  Tr., vol. 29, 6647.  He recognized this information "would have considerable impact upon rates of . . . tissue breakdown" leading to the release of acid phosphatase and the degradation of acid phosphatase, and that he would have no way to predict the rate of lysosomal acid phosphatase creation due to decomposition, in any event.  Id. at 6650-51. At one point, he even admitted he had no way of knowing whether the acid phosphatase levels in this case represented *any* measure of lysosomal acid phosphatase at all.  Id. at 6654.  He did acknowledge that acid phosphatase is present in high levels in the male

prostate, so a high level of that enzyme in a woman's body under the circumstances present in this case would be—in his words—"interesting" but not "definitive," and that high levels of acid phosphatase provide "circumstantial evidence of a seminal deposit." Tr., vol. 29, 6655, 6658–61.

Dr. Sensabaugh's testimony proved to be precisely the type that would be offered with the proponent's hope of challenging the weight of the opposing expert—Dr. McGee's—testimony. See, e.g., Tr., vol. 29, 6625–29, esp. 6629, lines 4-12.

The district court concluded in its written opinion regarding the acid phosphatase measurements in this case:

> The only dispute between these two experts is whether an acid phosphatase level that exceeds 25 U/L is sufficient evidence to prove the presence of semen. In Dr. McGee's scientific community, a level of approximately 25 U/L or slightly higher is sufficient to support this conclusion. These levels have been reached through these pathologists' years of experience in the field, and it has been generally accepted. Dr. Sensabaugh's scientific community, which is more data-driven, would require more proof than an elevated acid phosphatase test result to reach the conclusion that semen was present. This dispute does not go to the reliability of Dr. McGee's opinion; instead it goes to the weight of his opinion.

Order denying Motion In Limine to Exclude Testimony of Dr. Michael McGee, DKT 596, p.4.

The District Court added, while refusing to grant Rodriguez a new trial, "[t]he jury was free to accept or reject the testimony of Dr. McGee, and, if accepted, the testimony could assist the trier of fact. The Court did not commit error in admitting the testimony of Dr. McGee." Order denying Motion for New Trial, DKT 656, p. 65.

62

Rodriguez directly appealed the District Court's decision.  Rodriguez argued the acid phosphate testimony was based on Dr. McGee's own experience, rather than peer-reviewed research.  He argued that the Daubert hearing demonstrated that the theory, whether the levels of acid phosphatase was reliably reported, was invalid so as not to allow an opinion that there was a sexual assault.  The Eighth Circuit stated, "Rodriguez's challenge – developed with thorough cross-examination – goes to credibility, not admissibility.  The court did not abuse its discretion by allowing the testimony." Rodriguez, 581 F.3d at 794–95.

Dr. McGee's testimony regarding his reliance on such tests was properly admitted as the acid phosphatase test was routinely used in rape cases and the methodology employed in performing these tests was considered reliable.  The acid phosphate test is a regularly accepted procedure for determining whether sexual activity has occurred.  It has been routinely used in rape cases for years.  See Bradley v. Dretke, No. 3:03CV616M, 2005 WL 955909 (N.D. Tex. Apr. 25, 2005) (positive test for acid phosphatase suggests the existence of semen); Ross v. Vaughn, No. CIVA00-CV-4902, 2001 WL 818359 (E.D. Pa. July 16, 2001) (high acid phosphatase levels were consistent with intercourse occurring 2-4 hours prior); Reeves v. Hopkins, 871 F. Supp. 1182 (D. Neb. 1994) (victim's vaginal acid phosphatase consistent with having intercourse); United States v. Aburahmah, 827 F. Supp. 612, 613 (D. Ariz. 1993), aff'd, 34 F.3d 1074 (9th Cir. 1994) (acid phosphatase was present in her vaginal vault, indicative of recent sexual intercourse); State v. Lord, 822 P.2d 177, 190 (Wash. 1991) (the expert witness from the crime lab testified extensively about her testing methods and their general acceptability in

63

the scientific community); <u>Crout v. Kelly</u>, No. CIV-88-333E, 1989 WL 117103

(W.D.N.Y. Oct. 2, 1989) (positive for prostatic acid phosphatase indicating the presence

of seminal fluid); <u>Evans v. State</u>, 547 So. 2d 38, 39 (Miss. 1989) (acid phosphate test part

of rape evidence kit collected by examining physician); <u>State v. Neal</u>, 535 So. 2d 757,

760 (La. Ct. App. 1988) (testimony of criminalist); <u>Com. v. Willie</u>, 400 Mass. 427, 430,

510 N.E.2d 258 (1987) (testimony of serologist); <u>Andrade v. State</u>, 700 S.W.2d 585, 586

(Tex. Crim. App. 1985) (testimony of county medical examiner), <u>cert. denied</u>, 475 U.S.

1112, 106 S. Ct. 1524, 89 L.Ed.2d 921 (1986); <u>Baden v. Koch</u>, No. 79 CIV. 4296-CSH,

1984 WL 664 (S.D.N.Y. July 25, 1984) (presence of acid phosphatase was some

evidence that a rape had been committed); <u>State v. Singleton</u>, 1984-NMCA-110, 102

N.M. 66, 68, 691 P.2d 67 (testimony of forensic serologist); <u>State v. Harper</u>, 637 S.W.2d

170, 171, 173 (Mo. Ct. App. 1982) (court ordered defendant to submit to acid phosphate

test and a police serologist testified as to the results); <u>State v. Perry</u>, 275 N.C. 565, 169

S.E.2d 839 (1969) (N.C. 1969) (test showed the presence of acid phosphatase in large

quantity, indicating sexual intercourse).

In this proceeding, Rodriguez advances arguments that both the District Court and

the Eighth Circuit have already rejected.

First, Rodriguez now argues there was readily available evidence demonstrating

that Dr. McGee's testimony had no support in the established practices and protocols of

the forensic crime laboratories.  He argues that trial counsel's failure to investigate and

present such information was deficient considering that the Court put trial counsel on

notice that the dispositive issue to be decided at the <u>Daubert</u> hearing was whether

Dr. McGee's use of the acid phosphatase test was consistent with the relevant community of experts. As the above cases show, that is not correct. Acid phosphatase testing has been approved and presented as testimony for years. Further, counsel did properly investigate the issue and presented testimony from the leading expert in quantification of acid phosphatase. Trial counsel presented compelling evidence to the Court with regard to the science. The experts' differing testimony about the proper conclusions to be drawn from the acid phosphatase test was, in fact, a "textbook case" of "different opinions" held by "differing scientific communities."

The United States argued Rodriguez's Rule 702 objection must be overruled because the application and interpretation of reliable test methodology goes to the weight of this evidence, not the admissibility. See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc., 125 F.3d 1176, 1183 (8th Cir. 1997); Hose v. Chicago Nw. Transp. Co., 70 F.3d 968, 974 (8th Cir. 1995) (same); United States v. Gipson, 383 F.3d 689, 696 (8th Cir. 2004). Dr. McGee's testimony was therefore properly admitted.

With regard to the threshold at which the level of acid phosphatase is significant enough to reach a conclusion with regard to seminal deposits, Dr. McGee testified that there was no national standard that applied and that each laboratory was compelled to consider the results it reached in the context of the experience of its scientists, the literature available, and the individual case at issue. Tr., vol. 29, 6535, 6575. See Deposition of Dr. Michael McGee, p. 140, U.S. Exhibit 1. Consequently, interpretation of the acid phosphatase level is the very type of medical issue requiring the analysis by one who possesses forensic pathology field experience. Id. at 140. Dr. McGee's

65

extensive experience in performing forensic pathology examinations on victims of

alleged sexual assault provided the foundation necessary to meet Rule 702's reliability

standards.  See Arkwright Mut. Ins. Co., 125 F.3d at 1183 ("'Only if an expert's opinion

is so fundamentally unsupported that it can offer no assistance to the jury must such

testimony be excluded.'" (citation omitted)).  The United States argued that the fact there

are other forensic pathologists who might employ other threshold standards (most of

them substantially lower), was a credibility issue going to the weight of Dr. McGee's

opinions, not to admissibility.

The Eighth Circuit agreed with the district court in admitting the expert testimony:

> The district court conducted a Daubert hearing on acid-phosphate testing.
> Permitting the pathologist's testimony, the court noted that Rodriguez's
> own expert acknowledged that the government pathologist's test properly
> detects the presence of acid phosphate; that forensic labs across the country
> use acid-phosphate levels to indicate semen, and use the same cut-off levels
> as the government pathologist; and that while there is uncertainty about
> what acid-phosphate levels would be normal for a corpse, many
> pathologists share the government pathologist's view of the reliability of
> the test, and any doubts go to the weight, not reliability, of the opinion.

Rodriguez, 581 F.3d at 794.

The Court of Appeals found:

> Daubert emphasizes that while peer-reviewed publication is a factor, "in
> some instances well-grounded but innovative theories will not have been
> published."  Id. at 593, 113 S. Ct. 2786. The government's expert, a
> licensed medical doctor with three decades' experience, became the chief
> examiner of the Hennepin County Medical Examiner's office in 1985.  He
> regularly participates in criminal investigations, including sex crimes, and
> testifies at trials.  The pathologist did not invent acid-phosphate testing; he
> testified to attending national medical conferences and reviewing scientific
> literature on the topic.  The test results are based on scientific methods and

data, and assist the jury in its fact-finding.  The district court did not abuse its discretion by admitting the acid-phosphate test results.

Id. at 794–95.

Because this issue was litigated at both the trial stage and on direct appeal, and because no exception exists that would support relitigating it in these proceedings, Rodriguez's argument here must fail.

Second, Rodriguez also challenges Dr. McGee's conclusion that seminal fluid was deposited within 24 to 36 hours of Dru Sjodin's death.  Specifically, Rodriguez contends that Dr. McGee provided no authority for this proposition.

Regarding his opinion that seminal fluid was deposited within 24 to 36 hours of Dru Sjodin's death, Dr. McGee testified that "[b]ased on the experience in our office and the reports from the literature, seminal fluid, the enzyme prostatic acid phosphatase is generally broken down within the first 24 hours after decomposition."  See Deposition of Dr. Michael McGee, pp. 140, 141, 144, U.S. Exhibit 1.  He also testified that "from the time seminal fluid is deposited in the vagina it generally breaks down within 24 hours.  Sometimes people will extend it off to 36 [hours].  Some people will say 48 hours.  It depends on who you read."  Tr., vol. 29, 6543.  See also Id. at 6554, 6555, 6561, 6577, 6578, 6723, 6736, 6755, 6756.

The defense expert, Dr. George Sensabaugh, who is one of the leading researchers in this area, agreed.  Tr., vol. 30, 6816–17.  There has long been an interest in the medicolegal community in establishing the time of persistence of acid phosphatase activity in the vagina following sexual intercourse, and relating the residual activity to

67

elapsed time if possible.  Research on the quantification of acid phosphatase in the vagina

and the time of sexual intercourse has been done for decades.[23]  The time of the

deposition of the ejaculate in the vagina is based not only upon sperm motility and their

morphologic survival but also on quantitative levels of acid phosphatase.  In fact, Dr.

Sensabaugh wrote one of the leading papers on this subject in 1979.[24]  Sensabaugh found

that:

> Statistical analysis of the data shows that both endogenous and postcoital
> levels of ACP (acid phosphatase) in the vagina follow predictable
> distributions.  Moreover, it appears that there are in fact regularities in the
> decline of postcoital levels of ACP activity that allow, within limits,
> estimates of postcoital intervals.  These results thus provide some
> guidelines for the interpretation of the quantitative ACP test.

Sensabaugh, G.F., "The Quantitative Acid Phosphatase Test: A Statistical Analysis of

Endogenous and Postcoital AP Levels of the Vagina."  J. For. Sci., Vol. 24, No. 2, p. 346,

347 (1979).  See also, e.g., Hartman v. Bagley, 333 F. Supp. 2d 632 (N.D. Ohio 2004),

aff'd, 492 F.3d 347 (6th Cir. 2007) (coroner testimony that the penetration of the victim

based upon elevated levels of acid phosphatase in the vagina and anal cavity were

consistent with the time of the victim's death).

---

[23] Findley, T.P., "Quantification of Vaginal Acid Phosphatase and Its Relationship to Time of Coitus", Amer. J. Clin. Pathology, Vol. 68, p. 238 (1977); McCloskey, K.L., et. al., "Prostatic Acid Phosphatase Activity in the Postcoital Vagina", J. For Sci., Vol. 20, p. 630 (1975); Gomez, R.R., et. al., "Determination of Acid Phosphatase Activity in Vaginal Washings", Amer. J. Clin. Pathology, Vol. 64, p. 423 (1975); Davies, A. And Wilson, E., "The Persistence of Seminal Constituents in the Human Vagina", Forensic Science, Vol. 3 p. 45 (1974)

[24] Sensabaugh, G.F., "The Quantitative Acid Phosphatase Test: A Statistical Analysis of Endogenous and Postcoital AP Levels of the Vagina."  J. For. Sci., Vol. 24, No. 2, p. 346 (1979), U.S. Exhibit 2.

Dr. McGee was questioned on direct and cross-examination with regard to how a cold environment, like Dru Sjodin was in from her death in late November until she was found, would affect the dissipation of acid phosphatase. Dr. McGee testified:

It's a chemical process and all chemical processes in the body are speeded up by heat and they're slowed down by cold. So if you're [in] a cold environment you have to take into effect that that may be slowing it down. The colder the environment the more slow that you have to consider may affect the degradation of the enzyme.

Tr., vol. 29, 6544.

When asked how there could still be acid phosphatase left in the body so many months after death, Dr. McGee explained,

And how do I account for it in this case? The day this lady was abducted and is -- the average temperature is 20 degrees for the first month that she is missing. It does not get above freeze on the average. An average day temperature doesn't get above freezing. I would submit that this lady died and was deposited in an extremely cold environment and was kept in that state basically until almost up to the time she was discovered. Some days prior to her discovery it starts to warm up. But for the first days she's literally, if I understand what the police are telling me, she's covered with snow and she's in an extremely cold environment. And I think that may explain why the enzyme is still able to be tested.

Tr., vol. 29, 6557. See also Id. at 6736–37, 6754.

Counsel's cross-examination of Dr. McGee evidenced sufficient understanding of the acid phosphatase evidence against Rodriguez and its potential weaknesses. In fact, defense counsel elicited testimony from Dr. McGee that the body of Dru Sjodin had been exposed to temperatures and conditions that would result in the decomposition of a human body. Tr., vol. 29, 6564–65. Something Rodriguez now claims should have been done. Defense counsel also elicited from Dr. McGee that it was possible the acid

69

phosphatase may have originated as a result of decomposition and may not reflect only

prostatic acid phosphatase.

The Eighth Circuit also upheld the district court's denial of the challenge to the

admissibility of this testimony:

> [T]he factual basis of an expert opinion goes to the credibility of the
> testimony, not the admissibility, and it is up to the opposing party to
> examine the factual basis for the opinion in cross-examination. Questions
> of an expert's credibility and the weight accorded to his testimony are
> ultimately for the trier of fact to determine. Only if an expert's opinion is so
> fundamentally unsupported that it can offer no assistance to the jury must
> such testimony be excluded . . . Rodriguez's challenge—developed with
> thorough cross-examination—goes to credibility, not admissibility. The
> court did not abuse its discretion by allowing the testimony.

Rodriguez, 581 F.3d at 795.

Claims that Dr. McGee did not follow the Regions Hospital protocol because he

submitted the fluid for testing after 48 hours after it was deposited do not give cause to

exclude the scientific evidence because he deviated from the test protocol under these

circumstances.  It was, after all, a kidnaping resulting in murder.  What would counsel

argue if the testing had not been done?  This argument, again, simply goes to the weight

of the evidence, not the admissibility.

Finally, Rodriguez also argues that trial counsel failed to challenge the use of the

Beckman Dri-stat acid phosphatase test itself because it was designed to be used with

serums and not dry stains.  This argument is ill conceived and inapplicable to this case.

The test in this case was not done on dry stains.  The test was done on serous fluid

specimen collected from the vaginal, rectal and cervical areas conducted pursuant to the

protocol at Regions Hospital.

70

The District Court did not commit error when it allowed Dr. McGee to testify to the matters Rodriguez now objects to again. The Eighth Circuit found the testimony and evidence of the acid phosphatase results admissible. There has been no intervening change in the law as it relates to Rodriguez's challenge to the admission of the testimony regarding the acid phosphatase testing in this case.

The post-conviction found p30 test results do not alter this analysis. The jury repeatedly heard testimony that the most conclusive evidence of semen were not found in any of the relevant samples, 86A, 86B, and 86C. Mr. Fisher, who tested each of these items personally, testified at trial that there was no semen and no male DNA found in the samples. Evid. Hrg., vol. 3, 764-66. Moreover, this testimony came as a result of the careful and thoughtful cross-examination of trial counsel. Rather than the misapprehension Rodriguez claims trial counsel had, the record evidences a deep appreciation and understanding of the science at place and a powerful, albeit unsuccessful, strategy to overcome the government's evidence.

Regardless, his challenges now do not rise to the level of ineffective assistance of counsel. As previously noted, the defendant bears a heavy burden in overcoming the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689; Lawrence, 767 F.2d at 450. Petitioner has failed to demonstrate ineffective assistance of trial counsel. Counsel's conduct falls within the wide range of reasonable professional assistance. The same deferential review applies to the "prejudice" portion of the Strickland test. Sanders, 875

71

F.2d at 210.  The failure to establish "prejudice" is dispositive of the case without consideration of the Strickland "performance" factor.  Sanders, 875 F.2d at 211 n.8.

Additionally, the claimed prejudice, that admitting these expert opinions allowed the United States to argue there was a scientific basis to believe Ms. Sjodin had been raped, was—if error at all—harmless because the other evidence of sexual assault and/or rape in this case was overwhelming.

### C. Rodriguez's Trial Counsel Were Not Ineffective with Respect to Addressing the Neck Wounds.

Rodriguez raises arguments related to the testimony of the medical examiner, Dr. Michael McGee, regarding the neck wounds identified during the autopsy.  First, he argues that Dr. McGee overdramatized his description of the wounds to inflame the jury and that the United States relied almost exclusively on that testimony to establish a statutory aggravating factor of 18 U.S.C. § 3592(c)(6).  Second, Rodriguez claims that Dr. McGee's testimony regarding Ms. Sjodin's neck wounds was materially false. Third, he asserts that his trial counsel were ineffective for not introducing evidence that Ms. Sjodin did not suffer a knife wound to her neck.  For the reasons set forth herein, none of these avenues lead to a showing that Rodriguez's trial counsel provided ineffective assistance of counsel on this issue.

### 1. Rodriguez's Trial Counsel Effectively Challenged Dr. McGee's Opinion Regarding the Neck Wounds.

Rodriguez kidnapped Dru Sjodin as she left the mall in Grand Forks, North Dakota, on the afternoon of November 22, 2003.  She was subsequently murdered and left in a drainage ditch outside of Crookston.  Dru's body was found on April 17, 2004.

72

Her body was naked below the waist, and her hands were tied behind her back. Tr., vol. 29, 6686.  A ligature (rope) and remnants of a K-Mart plastic bag encircled her neck. Id. at 6686, 6701; Gov't Trial Ex. 78-11 (Bates No. P-0812), 78-39 (Bates No. P-0834a).  A slash wound was observed to the front of Ms. Sjodin's neck.  Her upper-body garments were pulled down off her shoulders.

Dr. Michael McGee, the Ramsey County Medical Examiner, performed an autopsy on Ms. Sjodin.  Dr. McGee identified two slash wounds to the front of her neck caused by a knife drawn across the neck through the tissue in a fashion to cause notching. Tr., vol. 29, 6688–89, 6694–95.  Dr. McGee also determined that there was a "defect" to Ms. Sjodin's right side, between her ribs and pelvis, approximately eight centimeters deep, which may represent a stab wound.  Id. at 6689, 6692, 6706.  Dr. McGee concluded that Ms. Sjodin died from homicidal violence.  Id. at 6726, 6728; Daubert Hearing, Gov't Exhibit 4; Exhibit D-69.  No one single cause of death was identified by the autopsy, but the probable causes of Ms. Sjodin's death were asphyxiation or suffocation, strangulation from the cord wrapped around her neck (Id. at 6727, 6728), death from the slash wound injury to the front of her neck (Id. at 6728), or possible death from exposure to the elements, having been left in the bitter cold of a November night in the manner she was found.  Id. at 6728.

Rodriguez now alleges that he was prejudiced on two fronts arising out of this testimony.  First, he challenges Dr. McGee's "description" of the state of the body and wounds, claiming that the medical examiner's testimony about the knife wounds was "extraordinarily inflammatory."  Mot. at 39.  Second, the Indictment alleged a statutory

73

aggravating factor found in 18 U.S.C. § 3592(c)(6)—that Rodriguez committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim. Rodriguez's counsel now argue that throughout the trial the United States "made special use of Dr. McGee's horrific [neck slash] testimony as proof that the crime was particularly heinous."

Both arguments are meritless. Contrary to Rodriguez's assertion, Dr. McGee testified about the knife wounds in a straightforward, unemotional, and appropriate manner. His testimony simply illustrated the wounds and possible cause of death. Further, Rodriguez's trial counsel effectively addressed the testimony regarding the neck slash and the heinous nature of the crime.

Rodriguez's trial counsel extensively cross examined Dr. McGee during the guilt phase regarding the neck slash and posed questions to him that challenged the possible causes of death. Trial counsel does not have to retain or call an expert witness in every case for his assistance to be effective. See Cagle v. Norris, 474 F.3d 1090, 1097 (8th Cir. 2007) (finding no deficient performance or prejudice where defense counsel did not present expert testimony on the effects of the decedent's methamphetamine intoxication in support of defendant's self-defense claim). On cross-examination Rodriguez's counsel developed the defense argument that there was not sufficient evidence to support the claim that the neck slash was the cause of death:

> Q.   And decomposition of the body had occurred in many ways in this particular case but it results in a loss of soft tissues in different areas of the body, correct?
>
> A.   True.

74

Q.    And specifically regarding the neck area, there was a complete loss of soft tissue in that area.

A.    True.

Q.    And there was also a loss or the absence of the major blood vessels that you would normally expect to find in that area if you hadn't -- if the body hadn't been subjected to decomposition.

A.    Also true.

Q.    Is it true then that as a result of that loss of soft tissue and as a result of the loss of the major vessels in that area of the neck that you are simply not able to provide us opinions to any degree of medical certainty as to certain things about this case?

A.    True.

Tr., vol. 29, 6741–42.

Q.    Okay.  You also talked about the two sharp-force wounds to the neck area.

A.    Yes.

Q.    Now you've told us here that the soft tissues in the neck area were missing.

A.    True.

Q.    The internal major vessels, the arteries and veins in that area were also missing.

A.    True.

Q.    So is it fair to say that you are not able to determine how deep that wound or those wounds penetrated?

A.    That's true.

Q.    So you don't really know as we sit here today because you weren't able to determine whether those were just skin deep or whether they were in fact deeper than that.

A.    That's true.

Q. And if in fact, they had been only skin deep, those wounds in and of themselves would not have been fatal.

A. They may not have been, no.

Q. If in fact they had penetrated the skin and severed some of the internal arteries or veins, that then would have been a fatal -- or could have been a fatal wound.

A. True.

Tr., vol. 29, 6750–51.

Q. Now you've talked about in your autopsy protocol that there's three possible causes of Ms. Sjodin's death and I think you've talked about them here as well, correct?

A. True.

Q. One of them -- well, before we get into that, you're not able to tell us with any reasonable degree of medical certainty exactly what the cause of her death was.

A. Amongst those three? No.

Q. So it could be one of the three. You're not sure which one.

A. True.

Q. And in all fairness there were soft tissues that were missing on this body at autopsy that prevented you from making those types of determinations.

A. True.

Tr., vol. 29, 6757–58.

Q. So because of the missing tissues and the decomposition of the body, you're not able to tell us the precise cause of death.

A. True.

Tr., vol. 29, 6761.

Similarly, during closing argument, Rodriguez's trial counsel argued:

When you pin him down and ask him:  Do you really know to a reasonable degree of medical certainty what the cause of death was?  His answer is no.

He had three possibilities that he narrowed it down to.  Could have been suffocation from the bag over her head.  Could have been the wounds to her neck if they in fact penetrated the skin and were deep enough, which he was not able to determine if they were deep enough or not.  And it could have been from exposure to the elements, being left where she was found, where she was not dead and simply dying from exposure to the elements in the cold.

Tr., vol. 30, 6891.

[a]nd she had incisions on her neck.  He's not able to tell us whether those penetrated the skin or whether they did not.

Tr., vol. 30, 6904.

[t]he only one that testified about time and place and manner of death, was Dr. McGee. And he candidly admitted that he doesn't know the cause of death, he doesn't know how she died, and he certainly doesn't know when she died.

Tr., vol. 30, 6912.

Based on this extensive cross-examination, Rodriguez's trial counsel argued at closing its position regarding the nature and place of the injuries.  It also addressed the emotional nature of the testimony, arguing that the government was simply trying to draw on the emotions of the jury without sufficient evidence:

You're being asked to make a very important decision, and that kind of obvious play to your emotions is inappropriate and does not help you get to the very root of the issues that you're being asked to decide. What they're hoping is that you get so overborne by your emotional response to Dru Sjodin's death that you'll overlook the deficiencies in their evidence. You won't notice or won't hold them to the burden of proof that the government has, that the judge tells you they have.

Tr., vol. 30, 6893.

77

In addition, trial counsel made clear during the Eligibility Phase their position that the crime was not committed in an especially heinous, cruel, or depraved manner, and that the neck slash, even if it did exist, did not make the murder especially heinous for differing reasons:

> [b]ut the Court talks about it requiring torture or serious physical abuse. And that is above and beyond the killing itself.  This is, as the Court tells you, especially heinous, cruel and depraved, something that is outside the realm of other murders.

Tr., vol. 34, 7278.

> Now, the knife wounds to the neck, if those are the fatal acts, can't be considered by you as part of the torture or part of the serious physical abuse, if that is what caused the death because, as the Court . . . has told you . . . that these matters . . .  has to be something beyond what caused the homicide itself.

Tr., vol. 34, 7278–79.

In light of his trial counsel's determined advocacy on this issue, Rodriguez's claims of deficient performance and prejudice are groundless.

Further, the United States did not argue that the knife wound to the neck was either the sole cause of death or the sole reasons to find that Rodriguez killed Dru Sjodin in a heinous, cruel, or depraved manner.  The United States' arguments rested on all of the evidence presented in the case.  The evidence at trial demonstrated that Ms. Sjodin's death resulted from a combination of all of the facts and circumstances of the crime. Tr., vol. 28, 6324–26; vol. 29, 6685–87, 6701–06 (evidence regarding condition of victim's body including ligatures binding her hands behind her back and ligatures around her

78

neck, plastic bag over her head, partial stripping of upper body, ripped clothing and nudity from the waist down).

From the United States' position, it mattered not whether a neck slash, asphyxiation, or brutal cold weather caused the death:  all indicated that Rodriguez killed her in a heinous, cruel, or depraved manner.  Specifically, in the Eligibility Phase, the United States presented evidence and argument to prove that the evidence met the four "statutory aggravating factors" of 18 U.S.C. § 3592(c).  See Eligibility Phase Evidence within Statement of Facts, supra.  And, as the United States succinctly pointed out in rebuttal:

> And we don't have to prove which of the three ways [Dru died].  It's just got to be that the kidnapping resulted in Dru's death.  It could be as simple as the defendant is taking her from the place where he abducts her to his car and she dies of a heart attack on the spot.  That's death resulting from being kidnapped.  It could be she's in the car with him with her hands tied behind her back and she manages to jump out of the car and dies on the way to wherever he's taking her.  That's death resulting from a kidnapping.  We don't have to prove exactly how it happened.  She's dead, and it resulted from his kidnapping her.  There's no doubt about that.

Tr., vol. 30, 6923.

The District Court correctly instructed the jury, and the jury was enabled to give meaningful consideration and effect to the law and the facts presented to them.[25]  The Court instructed the jury:

> The third statutory aggravating factor alleged by the government is that the defendant killed Dru Sjodin in an especially heinous, cruel, or depraved manner, in that it involved torture or serious physical abuse to Dru Sjodin. In order for this statutory aggravating factor to exist you must unanimously

---

[25] See Final Jury Instructions – Eligibility Phase, DKT 584.

> find that the government has proved beyond a reasonable doubt that the defendant, Alfonso Rodriguez (1) killed Dru Sjodin; and (2) that the killing was committed in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Dru Sjodin.

Final Jury Instructions – Eligibility Phase, DKT 584; Instruction No. 3.[26] As the "Special Verdict Form" for the Eligibility Phase (Jury Verdict – Phase II (Eligibility Phase), DKT 585) makes clear, the jury exercised its independent judgment on the "statutory aggravating factors" and specifically on the question of whether the crime was committed in an especially heinous, cruel, or depraved manner. The jury considered all of the evidence[27] related to the cause of Ms. Sjodin's death. The jury unanimously found that the crime did involve the torture of Dru Sjodin, but did not involve serious physical abuse.

The record provides ample basis for the jury to conclude beyond a reasonable doubt that Rodriguez engaged in actions that were "especially heinous, cruel or depraved" as defined by the District Court. Given this evidence, any rational juror could have concluded that the abuse in this case went beyond that necessary to cause death and, indeed, involved torture. Generally, a court reviews jury findings on aggravating factors by asking whether, after viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the existence of the aggravating

---

[26] In addition, Instruction No. 5 provides further instruction to the jury that "all twelve of you must agree that it involved torture and was thus heinous, cruel, or depraved; or all twelve of you must agree that it involved serious physical abuse to the victim and was thus heinous, cruel, or depraved; or both" and the instruction went on to define all pertinent terms.

[27] See Statement of Facts (summarizing the evidence presented at trial), supra.

circumstance beyond a reasonable doubt.  United States v. Bernard, 299 F.3d 467, 481 (5th Cir. 2002).

Even if Rodriguez did not slash Ms. Sjodin's neck, there exists sufficient other evidence to support the jury's conclusion that the crime was committed in an especially heinous, cruel, or depraved manner.  The fact remains that even if Rodriguez did not slash Ms. Sjodin's neck or slashed it to a degree that would not have killed her—as argued by her counsel—the facts still bear out the torture to which Rodriguez subjected Dru Sjodin.  She was kidnapped and held for some three hours.  Ms. Sjodin's hands were bound behind her back.  Rodriguez placed a plastic bag over her head and tied a ligature around her neck to hold the bag in place.  The evidence indicated that Rodriguez sexually assaulted her.  She was taken from a car in the dark, cold night, naked from the waist down, to a ravine.  There, Rodriguez left her for dead.  Viewing the evidence as a whole, the jury's finding that the murder was committed in an especially heinous, cruel, or depraved manner must stand.

Even if the alleged error existed—which it did not—it would have been harmless because the death sentence would have been imposed even if the aggravating factor regarding the heinous, cruel, or depraved manner of the murder had not been submitted to the jury.  The court may inquire into ". . . whether, beyond a reasonable doubt, the death sentence would have been imposed absent the invalid aggravating factor."  United States v. Jones, 132 F.3d 232, 251–52 (5th Cir. 1998), aff'd, 527 U.S. 373, 119 S. Ct. 2090, 144 L. Ed. 2d 370 (1999) (citations omitted).  Consequently, even if the Court concludes that the evidence does not support the existence of the aggravating circumstance beyond a

reasonable doubt, Rodriguez suffered no prejudice because the two other statutory aggravating factors, both of which were found to exist beyond a reasonable doubt, are sufficient to support the imposition of the death penalty. Jury Verdict – Phase II (Eligibility Phase), DKT 585.

Evidentiary hearing testimony substantiates the record that trial counsel adequately investigated the cause of Ms. Sjodin's death.  As noted above, trial counsel retained numerous experts for consultation on several issues regarding the death of Ms. Sjodin.

Dr. Garry Peterson (Evid. Hrg., vol 4, 644-743.) was retained to review evidence regarding the death of Ms. Sjodin and answer questions for the trial team pertaining to a possible cause of death and sexual assault.  Dr. Peterson provided counsel with his expert opinions on the injuries and death of Dru Sjodin.  Dr. Peterson essentially agreed with Dr. McGee's opinions.

In discussing the autopsy report and photos, Dr. Peterson opined that the "hole in front of throat area" was "probably [from a] knife."  Specifically, in viewing Photo P-1180, he said the photo clearly shows a cut of throat area, probably two times.  Evid. Hrg., vol. 3, 611-612.  Dr. Peterson further agreed with Dr. McGee that the right flank defect was, in his opinion, an incised wound.  Id. at 614.  Dr. Peterson held these opinions to a "reasonable medical certainty."  Id. at 615.  Peterson told trial counsel that if he had to opine a cause of death, he would say the neck had been incised but he was not certain.  It could have been strangulation with the ligature.  Evid. Hrg., vol. 3, 613.  For obvious strategy reasons, Dr. Peterson was not called as a witness at trial.

Upon review of the autopsy report and photos, in addition to a consultation with a forensic pathologist, trial counsel was faced with a strategy decision regarding the cause of Ms. Sjodin's death.  Counsel knew the evidence that connected Rodriguez to the crime was overwhelming and the expert they consulted also opined that the death may have been caused by a knife slash to the throat.  Evid. Hrg., vol. 3, 613.  Counsel knew that if they challenged the cause of death, this would necessitate sharing autopsy photographs with the jury – gruesome, detailed, and horrifying pictures depicting Ms. Sjodin's body. The autopsy photographs, although probative of death, would be so prejudicial that they made the sound strategy decision to stipulate not to challenge the cause of death in an effort to keep the photographs out of the jury.  Indeed, at the evidentiary hearing counsel explained they discussed this issue with Rodriguez:

> Q:    Okay.  It was just a discussion about whether he would agree to the stipulation?
>
> A:    Yes
>
> Q:    And so this was part of your trial strategy in terms of keeping out the autopsy photos; is that correct?
>
> A:    That's correct.

Evid. Hrg., vol. 3, 632-33. Strategic decisions made by counsel during the course of trial are entitled to substantial deference in the hindsight of federal habeas review when reviewing a claim of deficient performance.  See Strickland, 466 U.S. at 689 (emphasizing that "[j]udicial scrutiny of counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight"); see also Camacho v. Kelley, 888 F.3d 389, 395 (8th Cir. 2018).  The

decision not to call a witness to testify, as a matter of trial strategy, is virtually unchallengeable. Hanes v. Dormire, 240 F.3d 694, 698 (8th Cir. 2001) ("Decisions relating to witness selection are normally left to counsel's judgment, and this judgment will not be second-guessed by hindsight.") (citations omitted). In ineffective assistance of counsel claims, there is a strong presumption that counsel's challenged strategic actions or omissions were, under the circumstances, sound trial strategy. Id. at 698; see also Marcrum v. Luebbers, 509 F.3d 489, 502 (8th Cir. 2007) ("[T]he burden of proof is on the petitioner to show that 'his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.'") (quoting Kimmelman v. Morrison, 477 U.S. 365, 384 (1986)); Collins v. Dormire, 240 F.3d 724, 727 (8th Cir. 2001) (in determining whether counsel's performance was deficient, the court should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ....") (quoting Strickland, 466 U.S. at 689). The defendant therefore must overcome the presumption that, under the circumstances, "the challenged action might be considered sound trial strategy." Riley v. Dretke, 362 F.3d 302, 305 (5th Cir. 2004). Conclusory allegations that counsel failed to call certain witnesses or that the outcome would have been different had a certain witness testified at trial are insufficient to demonstrate that counsel was ineffective or that a habeas petitioner was prejudiced. See Delgado v. United States, 162 F.3d 981, 983 (8th Cir. 1998) (concluding that naked assertions that an attorney failed to call exculpating witnesses are insufficient to show counsel was ineffective or that defendant was prejudiced).

Rodriguez has not shown that his trial counsels' decision not to contest Dr. McGee's opinion regarding Ms. Sjodin's neck wound was so ill advised so as to constitute deficient performance under Strickland.  In this case, defense counsel interviewed witnesses, hired an investigator, interviewed and sought the expertise of expert witnesses, and exercised reasonable skill and diligence in making strategic decisions.  Counsel developed a theory of the case and strategized about how best to counter the United States' evidence.  At trial, counsel attempted to minimize the impact of the brutal nature of the injuries and circumstances of the kidnapping and murder of Dru Sjodin.  As shown above, defense counsel extensively cross-examined Dr. McGee on this issue at trial, (Tr., vol. 29, 6739–62, 6769–72), and aggressively argued that the cause of death may not have been from a slash of the neck, (Tr., vol. 30, 6887–6913; Tr. vol. 34, 7269–94), which supported the defendant's theory on the possible cause of death.  Moreover, trial counsel made clear the defendant's position to the jury during the Eligibility Phase that the crime was not committed in an especially heinous, cruel, or depraved manner, and that the neck slash, even if it did exist, did not make the murder especially heinous.  Finally, Rodriguez's counsel made suitable arguments and offered reasonable alternative explanations for Ms. Sjodin's injuries and made a reasonable argument that the crime was not committed in an especially heinous, cruel, or depraved manner.  There is no constitutional error in counsel's conduct or decisions.

To be sure, this was a sound strategy.  Testimony at the evidentiary hearing demonstrates that the defendant's retained expert, Dr. Peterson, told trial counsel that he believed the cause of death was an incision of the neck.  However, it could have been

strangulation with the ligature.  Evid. Hrg., vol. 3, 613.  For obvious strategy reasons, Dr. Peterson was not called as a witness at trial.  Basically, agreeing with the opinions of Dr. McGee.  If the other pathologists who testified at the evidentiary hearing would have testified at trial, all would have confirmed that Ms. Sjodin died as a result of a homicide.  They would have supported Dr. McGee's suggestion that Ms. Sjodin could have also died as a result of strangulation or asphyxia.  Moreover, the cost of only being able to offer an alternative method of homicide would have been numerous autopsy pictures.  Photos that showed Ms. Sjodin's decomposing body, remnants of the rope that was around her neck and bound her arms, the plastic bag that was over her head, and tomes of photographs of her neck and head area.  The photos alone could have solidified in the jurors' minds the aggravating factor; Rodriguez killed Ms. Sjodin in an especially heinous, cruel, or depraved manner.

Trial counsel did not fail to properly investigate the death of Dru Sjodin.  But even if counsel's alleged errors fell below an "objective standard of reasonableness," Strickland, 466 U.S. at 687–88, Rodriguez's ineffective assistance of counsel claim fails nevertheless.  To satisfy the second part of the Strickland test, a defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694. A "reasonable probability" means a "probability sufficient to undermine the confidence in the outcome." Id.  Thus, under the prejudice prong, a defendant must show that counsel's errors 'actually' had an adverse effect in that but for the errors, the result of the proceeding probably would have been different.  Id. at 693–94.

86

Rodriguez's claim fails under the prejudice prong of Strickland because he has not shown that he was prejudiced by his counsel's allegedly inadequate representation. It is mere speculation that not stipulating to the nature of the injury to Dru Sjodin's neck would have helped the defense. Their own consulted expert provided an opinion similar to that of Dr. McGee. Their strategy to keep out more gruesome autopsy photos, if not employed, would have allowed Dr. McGee, to explain his observations and conclusions to the jury in greater detail and with greater conviction.

In addition, even if an opposing expert discounted the neck slash nothing would have affected the outcome of this case to any reasonable probability. As discussed above, Rodriguez murdered Ms. Sjodin in a torturous manner. She was in fact kidnapped and held for some three hours. Ms. Sjodin's hands were bound behind her back. He placed a plastic bag over her head and a ligature was tied around her neck to hold the bag in place. The circumstances clearly indicate a sexual assault took place. She was left for dead in a ravine, naked from the waist down. It is as torturous to kill a person by ligature strangulation, asphyxiation, suffocation or binding a person to leave her to die from the freezing elements of nature, given all of the circumstances shown by the evidence in this case, as it is to slash a neck. The jury considered all of this evidence. There is no reasonable probability that trial counsel's failure to call an expert to address the neck slash testimony or counsel's strategic decision to stipulate to it led to Rodriguez's conviction or capital sentence given the compelling circumstantial evidence that Rodriguez had murdered in some heinous manner. Rodriguez suffered no prejudice from his trial counsel's actions on this point.

Legal representation is an art, not a science. <u>See</u> <u>Strickland</u>, 466 U.S. at 693. Effective assistance of counsel, as mandated by the Constitution, is not violated merely when trial tactics that are providential for one defendant prove to be unfortunate for another. <u>See</u> <u>Id.</u> ("[A]n act or omission that is unprofessional in one case may be sound or even brilliant in another."). Heeding <u>Strickland</u>'s admonition that "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged," it cannot be said that Rodriguez was deprived of his constitutional right to effective representation on these facts. Therefore, because trial counsel's conduct falls squarely within the wide range of reasonable professional assistance, and because Rodriguez suffered no prejudice from his counsels' actions, Rodriguez's ineffective assistance of counsel claim must fail.

## CONCLUSION

For all of the foregoing reasons, the United States respectfully requests that the

Court deny Rodriguez's petition under 28 U.S.C. § 2255 for any of the above forensics-

related and Sixth Amendment grounds.

Dated:  October 4, 2018

CHRISTOPHER C. MYERS
United States Attorney


By:    /s/ Keith W. Reisenauer
       KEITH W. REISENAUER
       First Assistant United States Attorney
       Quentin N. Burdick United States Courthouse
       655 First Avenue North - Suite 250
       Fargo, ND  58102-4932
       (701) 297-7400
       ND Bar Board ID No. 05434
       Keith.Reisenauer@usdoj.gov
       Attorney for United States


By:    /s/ Melissa Helen Burkland
       MELISSA HELEN BURKLAND
       Assistant United States Attorney
       Quentin N. Burdick United States Courthouse
       655 First Avenue North - Suite 250
       Fargo, ND  58102-4932
       (701) 297-7427
       WI Bar Board ID No. 1071443
       Melissa.Burkland@usdoj.gov
       Attorney for United States