# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff/Respondent,** | : | |
| | : | **Criminal Case No. 2:04-cr-55** |
| **vs.** | : | |
| | : | |
| **ALFONSO RODRIGUEZ, JR.,** | : | |
| | : | |
| **Defendant/Petitioner.** | : | |

_____

## PETITIONER'S POST-HEARING REPLY BRIEF
## ON FORENSIC CLAIMS

_____

Respectfully submitted,

Victor J. Abreu
Joseph W. Luby
Eric J. Montroy
Jahaan Shaheed
Assistant Federal Defenders
Federal Community Defender Office for the
        Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

*Counsel for Petitioner*

Dated:      November 7, 2018

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

REPLY ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.      The government fails to refute Petitioner's showing that the
        prosecution offered testimony that it knew or should have known
        to be false, and Petitioner is entitled to post-conviction relief
        under *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v.
        Illinois*, 360 U.S. 264 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      Petitioner does not seek to relitigate the Daubert claim from
                trial and direct appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.      Dr. McGee testified falsely about the existence of p30
                testing that conclusively disproves his finding of semen
                on the autopsy swabs, and the government knew or should
                have known that Dr. McGee's testimony was false. . . . . . . . . . . . . 11

                1.      Dr. McGee testified that the autopsy swabs were
                        positive for semen that was deposited within 24-36
                        hours of Ms. Sjodin's death, and not merely that the
                        swabs were "presumptive" for semen. . . . . . . . . . . . . . . . . . 11
                2.      Dr. McGee's testimony about p30 and semen was false. . . . . 12
                3.      The government did not "innocently" use Dr. McGee's
                        false testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
                4.      Mr. Fischer's knowledge is imputable to the
                        prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
                        a.      The Fischer results were present in the
                                prosecution's file. . . . . . . . . . . . . . . . . . . . . . . . . . 14
                        b.      Even without the presence of Mr. Fischer's results
                                in the prosecution's file, his knowledge must be
                                imputed to the prosecutors because he was part of
                                the prosecution team that investigated and developed
                                the government's case. . . . . . . . . . . . . . . . . . . . . . . . 17

C.     The government cannot show that its use of Dr. McGee's false testimony, and its failure to correct that testimony, were harmless beyond a reasonable doubt.. . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1.     The undisputed showing of a "sexual assault" does not cure Dr. McGee's false testimony about p30 and semen, which allowed the prosecution to argue a misleading account of Ms. Sjodin's death and which hampered the defense's investigation about the cause and manner of that death. . . . . . . . . . . . . . . . . . . . . . . . . . 19

        2.     Dr. McGee's denial of p30 testing left the trial record materially and misleadingly incomplete, as he wrongly denied the existence of conclusive evidence that semen was absent.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        3.     Petitioner need not show that the p30 and NEC results make Dr. McGee's testimony inadmissible under *Daubert*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

II.    Trial counsel performed ineffectively by failing to make use of the exculpatory forensic evidence that was disclosed to them.. . . . . . . . . . . . . . 25

     A.     Petitioner's ineffective-assistance claim is not a relitigation of the *Daubert* issue from trial and direct appeal.. . . . . . . . . . . . . . 26

     B.     Counsel performed deficiently by failing to notice and develop the exculpatory forensic evidence within their file. . . . . . . 28

     C.     Counsel's failure to disprove Dr. McGee's finding of semen prejudiced the defense, even though the evidence otherwise demonstrated a "sexual assault".. . . . . . . . . . . . . . . . . . . 31

     D.     Counsel performed deficiently by failing to adequately investigate the cause of Ms. Sjodin's death. . . . . . . . . . . . . . . . . . 32

        1.     Counsel's chosen strategy was based on ignorance.. . . . . . . . 33

        2.     The manner of death was an important issue at trial, and counsel's failure to challenge it through available facts was prejudicially deficient.. . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

**Cases**

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Bruton v. United States*, 391 U.S. 123 (1968).. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Chapman v. California*, 386 U.S. 18 (1967).. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Crismon v. United States*, 510 F.2d 356 (8th Cir. 1975). . . . . . . . . . . . . . . . . . . . 9

*Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993). . . . . . . . . . *passim*

*Davis v. United States*, 673 F.3d 849 (8th Cir. 2012).. . . . . . . . . . . . . . . . . 8, 9, 28

*Giglio v. United States*, 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . *passim*

*Griffith v. United States*, 535 F.2d 320 (5th Cir. 1976). . . . . . . . . . . . . . . . . . . . 9

*Kimmelman v. Morrison*, 477 U.S. 365 (1986).. . . . . . . . . . . . . . . . . . . . . . 27, 28

*Kyles v. Whitley*, 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Longus v. United States*, 52 A.3d 836 (D.C. 2012). . . . . . . . . . . . . . . . . . . . . . . 2

*McCormick v. Parker*, 821 F.3d 1240 (10th Cir. 2016). . . . . . . . . . . . . . . . . . . . 18

*Napue v. Illinois*, 360 U.S. 264 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*People v. Uribe*, 76 Cal. Rptr. 3d 829 (Cal. Ct. App. 2008).. . . . . . . . . . . . . . . . 18

*Rompilla v. Beard*, 545 U.S. 374 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*State ex rel. Griffin v. Denney*, 347 S.W.3d 73 (Mo. 2011). . . . . . . . . . . . . . . . . 18

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Agurs*, 427 U.S. 97 (1976). . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Bagley*, 473 U.S. 667 (1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19

*United States v. Foster*, 874 F.2d 491 (8th Cir. 1988). . . . . . . . . . . . . . . . . . 15, 16

*United States v. Gonzalez*, 98 Fed. App'x 825 (10th Cir. 2004). . . . . . . . . . . . . . 28

*United States v. McClintic*, 570 F.2d 685 (8th Cir. 1978). . . . . . . . . . . . . . . . . . . 2

*United States v. Rodriguez*, 766 F.3d 970 (9th Cir. 2014). . . . . . . . . . . . . . . . . . 19

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006).. . . . . . . . . . . . . . . . . 17, 18

*United States v. Tierney*, 947 F.2d 854 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . 13

*United States v. Wallach*, 935 F.2d 445 (2d Cir.1991).. . . . . . . . . . . . . . . . 2, 3, 19

*Washington v. State*, 989 P.2d 960 (Okla. Crim. App. 1999).. . . . . . . . . . . . . 35, 36

*Wiggins v. Smith*, 539 U.S. 510 (2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**Statutes and Rules**

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 28

Fed. R. Evid. 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**Other Authorities**

American Bar Association, *Guidelines for the Appointment and
        Performance of Counsel in Death Penalty Cases* (2003).. . . . . . . . . . . . . 29

# <u>INTRODUCTION</u>

Despite repeated efforts to recast Petitioner's evidence and claims, nothing in the government's response undermines these uncontroverted truths: *there was no semen recovered from Ms. Sjodin's body, and there were no knife wounds to her neck*. Eight expert forensic scientists and pathologists evaluated the evidence in this case and testified at the 2255 hearing. Every one of them who was asked to opine on either matter – including the government's own expert, Dr. Ljubisa Dragovic – concluded that there was no semen recovered from Ms. Sjodin's body, and there were no knife wounds to her neck. Hrg. Tr. 217-29, 235-37, 266-69, 285 and Pet. Ex. 20 at 3, Pet. Ex. 23 at 3 (per Dr. Arden); Hrg. Tr. 346-52, 364-65, 370-77 and Pet. Ex. 27 at 8-9 (per Dr. Dragovic); Hrg. Tr. 23 and Pet. Ex. 3 at 15 (per Mr. Keel); Sensabaugh Depo. at 54-55 (per Dr. Sensabaugh); Hrg. Tr. 757 (per Mr. Fischer); Hrg. Tr. 113-17, 119-21, 134-45 and Pet. Ex. 10 at 8-9 (per Dr. Flomenbaum); Hrg. Tr. 451-57, 465, 477 and Pet. Ex. 55 at 4 (per Dr. Ferenc); Hrg. Tr. 676-79, 690-91 (per Dr. Peterson).

The government has not presented any evidence or post-conviction witness to refute these truths. It instead denies that the false evidence it presented at trial was actually false. Gov't Br. at 16-17 ("There is absolutely no evidence Dr. McGee testified falsely."). Perhaps the government means that Dr. McGee did not commit perjury, but that is not the issue. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) (due process forbids the use of "false evidence, known to be such by

representatives of the State"); *Giglio v. United States*, 405 U.S. 150, 153 (1972) (failing to correct false testimony violates due process). "Regardless of the lack of intent to lie on the part of the witness, *Giglio* and *Napue* require that the prosecutor apprise the court when he knows that his witness is giving testimony that is substantially misleading." *United States v. McClintic*, 570 F.2d 685, 692 n.13 (8th Cir. 1978); *Longus v. United States*, 52 A.3d 836, 847-48 (D.C. 2012) ("It is well established that the government's obligation extends to the correction of not only perjurious testimony, but also to testimony that is false or misleading.").

In this case, it was false for Dr. McGee to testify that p30 testing had not been performed in the case. *See* Pet. Ex. 4 at 30; Hrg. Tr. 750-51. And it was false for Dr. McGee to testify that semen was present on the autopsy swabs, in light of the Fischer results that conclusively prove otherwise. Hrg. Tr. 23, 266-69, 346-48, 757; Sensabaugh Depo. at 54-55; Pet. Ex. 3 at 15; Pet. Ex. 4 at 30; Pet. Ex. 23 at 3. The prosecution cannot deny that it knew Dr. McGee's testimony to be false, because the Fischer results were present in its file. "If evidence highly probative of innocence is in his file, [the prosecutor] should be presumed to recognize its significance even if he has actually overlooked it." *United States v. Agur*s, 427 U.S. 97, 110 (1976). Petitioner has therefore shown that the prosecution knowingly presented false testimony, and failed to correct it, under *Giglio* and *Napue*.

The only remaining question is whether the government has proven the error to be harmless beyond a reasonable doubt. "[I]f it is established that the

government knowingly permitted the introduction of false testimony, reversal is virtually automatic." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991). The government fails to make that difficult showing. Dr. McGee's claim of semen was "the linchpin of the government's case alleging that there was a rape" and a "very important part of the trial." Hrg. Tr. 388, 390-91, 501 (per Mr. Hoy). The issue of rape "changed the presentation of the case," with a "ripple effect through sentencing." Hrg. Tr. 388, 501-02. The effects on the defense were several:

●*First*, Dr. McGee falsely claimed that semen was present on the autopsy swabs, which was the key factual dispute at trial and the only issue on which the defense presented any testimony during the entire guilt phase. The government now seeks to walk back Dr. McGee's findings. It urges that Dr. McGee testified that the acid phosphatase results were merely "presumptive" for semen, Gov't Br. at 13, 35, 46, but that is not all he said. In fact, Dr. McGee testified that semen was present on the vaginal and cervical swabs. Trial Tr. 6720-23. Dr. McGee swabbed a "large deposit of mucoid-like material" that "looks like seminal fluid." Trial Tr. 6720-21. The acid phosphatase levels were "above what we consider [the] cutoff" as "positive" for semen, and the testing thus "suggests that deposition has occurred in a time period 24 to 36 hours prior to the subject's death." Trial Tr. 6722-23.

All the while, the trier of fact knew nothing of Steven Fischer's findings that definitively preclude the presence of semen. The government argues that the trial testimony covered "essentially all" of the semen-related testing. Gov't Br. at 25.

3

But the trial testimony omitted evidence showing (a) the negative p30 result that is "highly dispositive" and definitively proves the absence of semen, (b) the presence of "heavy" and "very heavy" nucleated epithelial cells that cannot out-survive comparably hardy sperm cells under post-mortem conditions, and (c) that Mr. Fischer searched the swabs for sperm cells and found none, separately and apart from the Regions Hospital sperm-search results. Hrg. Tr. 15-16, 21-23, 31, 266-67, 746; Sensabaugh Depo. at 55, 64-67; Pet. Ex. 3 at 6, 15; Pet. Ex. 4 at 30.

Because sperm cells and male DNA were absent from the swabs, it is "inconceivable that AP from commingled semen would be present in the absence of sperm or p30 from that semen." Pet. Ex. 3 at 6. The findings of nucleated epithelial cells are significant for another reason: ejaculation fluid includes male epithelial cells that "slough off" from the urogenital tract. Sensabaugh Depo. at 66-67. Nevertheless, out of the millions of intact epithelial cells that were heavily present on the vaginal and cervical swabs, none contained male DNA – as they would if semen had ever been present. *Id.*; *see also* Pet. Ex. 23 at 2 (Per Dr. Arden: "[T]he swabs picked up significant numbers of cells, … which favors that they would have detected semen or Y-chromosomal DNA, if either had been present."). There is a "big disparity" between the scientific conclusions made available by the Fischer bench notes and the conclusions available without them. Hrg. Tr. 32.

●*Second*, Dr. McGee testified to a highly prejudicial factor that we now know was untrue. "The specter of Miss Sjodin's death was certainly horrible," Mr.

Ney explained, "[B]ut add onto that the fact that there was a rape, a completed rape, made it far worse." Hrg. Tr. 790. To be sure, the "sexual assault" that the government now invokes does not require a deposit of semen. *See* Gov't Br. at 39-46. But without Dr. McGee's counter-factual findings, there is no evidence of sexual penetration, as opposed to a violent struggle in which Ms. Sjodin was restrained and partially disrobed. Hrg. Tr. 344-45 (per Dr. Dragovic). Capitalizing on Dr. McGee's finding of semen, the prosecutor argued ten separate times that Petitioner committed a "rape" and satisfied his "rape fantasies." Trial Tr. 8662-63, 8688-90, 8707. He urged that Petitioner slashed Ms. Sjodin's neck in order to avoid detection "after living out his rape fantasies." Trial Tr. 8707.

●*Third*, the prosecution's failure to correct Dr. McGee's false testimony led the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *United States v. Bagley*, 473 U.S. 667, 682-83 (1985). If defense counsel had known about the p30 findings, those results would have been the "centerpiece" of efforts to exclude Dr. McGee's semen testimony under *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993), or failing that, to disprove that testimony to the jury. Hrg. Tr. 389-90.

Dr. McGee's false testimony of a semen deposit also hampered the defense from challenging the manner of Ms. Sjodin's death. Pet. Br. at 66-69. Without the semen testimony – which is conclusively disproven by the Fischer results – the prosecution's theory of a terminal "death march" across a frozen field, and a neck-

5

slashing where the body was found, simply "doesn't make sense." Hrg. Tr. 842 (per Mr. Ney). The lack of a completed rape suggests "that the death took place before anything else could happen" and it implies a possible "strangulation, accidental or purposeful, in the vehicle before any completion of a sexual act could have taken place." Hrg. Tr. 842. Defense counsel would have presented such a defense if they had been aware of the p30 results. Hrg. Tr. 841-42, 846, 930-31.

What is more, counsel would have known about the results if the prosecution had corrected Dr. McGee's false testimony that the results did not exist, or, alternatively, if counsel had managed to review and ascertain Mr. Fischer's bench notes as disclosed to them in discovery. *See* Pet. Br. at 73-83, 88-95. The prosecutor's misconduct and defense counsel's deficient performance independently led to the same outcome: counsel failed to disprove the presence of semen and declined to dispute Dr. McGee's finding of a fatal neck-slashing, which left the jury to consider the "shockingly evil" and "extremely wicked" killing described by the prosecutor's closing. Trial Tr. 7265-66, 8706-07.

The government does not even contest the point in its brief. It is true that "counsel was faced with a strategy decision regarding the cause of Ms. Sjodin's death," and that the defense managed to exclude disturbing autopsy photos by not disputing Dr. McGee's finding of neck wounds as the likeliest cause of death. Gov't Br. at 83-86. But the circumstances underlying counsel's "strategy decision" were created by the prosecution, as well as counsel's own oversight. If not for Dr.

McGee's uncorrected testimony, the defense would have proceeded differently: "If we had had the p30 results saying this was not a sexual assault, there was no rape, there was no semen on her body, that certainly would have led us even further to believe that the killing was, as we argued, at a time before the disposal of the body at the site." Hrg. Tr. 930-31. Although the defense successfully excluded the photographs by not contesting the supposed slash wounds, "This was us taking what we could get, but as a trade-off we would much rather contest that these were wounds." Hrg. Tr. 846. The defense was left in a "no-contest situation" on critical facts. Hrg. Tr. 846.

Petitioner's factually-impaired defense resulted *both* from the prosecution's offering of testimony that it knew or should have known to be false under *Giglio* and *Napue*, *and* from trial counsel's ineffective assistance in failing to grasp and employ the discovery materials in their own file. Both claims entitle Petitioner to relief.

### **REPLY ARGUMENT**

I.     **The government fails to refute Petitioner's showing that the prosecution offered testimony that it knew or should have known to be false, and Petitioner is entitled to post-conviction relief under *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959).**

Dr. McGee falsely denied that any p30 testing had been performed on the autopsy swabs, and he claimed that semen was present even though Steven Fischer's p30 and related test results absolutely preclude the presence of semen.

Dr. McGee's identification of semen was material to Petitioner's conviction and sentence, and the prosecution knew or should have known about the conclusive test results in its own file. *See* Pet. Br. at 47-73. The government's arguments to the contrary are insubstantial.

### A.   Petitioner Does Not Seek to Relitigate the *Daubert* Claim from Trial and Direct Appeal.

There is no merit in the government's contention that Petitioner's claim was resolved on direct appeal under *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993). *See* Gov't Br. at 2, 16, 29-31. Even when a post-conviction claim is related to a trial claim, section 2255 allows the claim when it proceeds from a different legal theory and is based on facts outside the trial record. The Eighth Circuit's ruling in *Davis v. United States*, 673 F.3d 849 (8th Cir. 2012), illustrates the principle. The prisoner in *Davis* argued that the prosecutor's use of a demonstrative exhibit at closing argument violated the rule of *Bruton v. United States*, 391 U.S. 123 (1968), which prohibits the admission of a non-testifying co-defendant's statement implicating the defendant. The Eighth Circuit rejected that claim on direct appeal, finding no *Bruton* error. On later review under section 2255, the prisoner argued that trial counsel performed ineffectively by failing to object to the exhibit, which had not been admitted by the trial court. The Eighth Circuit reviewed the ineffective-assistance claim on the merits, because it had not resolved the issue on direct appeal. *See Davis*, 673 F.3d at 852-53 (finding no

prejudice from failure to object).

A similar analysis governs Petitioner's *Giglio* and *Napue* claim. Just as the ineffectiveness claim in *Davis* depended on extra-record evidence of trial counsel's strategies, the present claim is based on facts beyond the trial record. The extra-record facts include (a) the test results from Mr. Fischer's bench notes, which disprove Dr. McGee's testimony that the government did not test the autopsy swabs for p30, (b) undisputed expert testimony describing the significance of those results and conclusively disproving Dr. McGee's testimony that semen was present on the swabs, and (c) evidence describing the prosecutors' dealings with Mr. Fischer and their use of his findings. *See* Pet. Br. at 18-34, 48-59. If the government's view were correct, the prosecution would be free to present false evidence on any litigated material issue, so long as the falsity goes undiscovered at trial and on direct appeal. That is not the law. *See*, *e.g.*, *Crismon v. United States*, 510 F.2d 356, 357 (8th Cir. 1975) (prisoner could not claim that the trial court wrongly admitted testimony but could assert that the prosecution knowingly presented perjury); *Griffith v. United States*, 535 F.2d 320, 321 (5th Cir. 1976) (claim that prosecution knowingly presented false evidence under *Giglio* was "sufficiently distinct" from appellate claim that key witness committed perjury).

Petitioner's legal theory also differs from the direct appeal claim. The government insists that Dr. McGee's testimony remains admissible under *Daubert* because the Court already ruled that it was and the Eighth Circuit affirmed. *See*

9

Gov't Br. at 16, 29-31. But Petitioner's claim does not require a showing that Dr. McGee's testimony is *inadmissible* under *Daubert*. It suffices to show that that the testimony is false and that the prosecution knew or should have known that it was: Dr. McGee testified that the autopsy swabs were not tested for p30, his finding of semen is conclusively disproven by evidence within the prosecution's file, and a reasonable jury would not credit that finding even if the Court were to allow its admission. *See United States v. Agurs*, 427 U.S. 97, 103, 110 (1976) (test is whether prosecution "knew or should have known" of the falsity, and prosecution is on notice of its file); *Giglio v. United States*, 405 U.S. 150, 153 (1972) (knowing use of false evidence); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (failing to correct false testimony); Hrg. Tr. 266-69 and Pet. Ex. 23 at 3 (per Dr. Arden); Hrg. Tr. 346-48 (per Dr. Dragovic); Hrg. Tr. 23 and Pet. Ex. 3 at 15 (per Mr. Keel); Sensabaugh Depo. at 54-55 (per Dr. Sensabaugh); Hrg. Tr. 757 (per Mr. Fischer).

"There was no semen," explained government-retained expert Dr. Dragovic. Hrg. Tr. 347. "The negative results took care of that as an issue." Hrg. Tr. 348. That ultimate showing is distinct from the issue at trial and and on direct appeal. The issue at trial and appeal was whether Dr. McGee's finding of semen from acid phosphatase levels was scientifically valid in the absence of confirmatory testing, so as to be admissible under *Daubert*. The present issue, by contrast, is that the prosecution possessed p30 testing conclusively proving that there was no semen present, and despite this evidence, the government elicited false testimony from

10

Dr. McGee that semen was present and that no p30 testing even existed.

Petitioner's claim is properly brought under 28 U.S.C . § 2255.

> **B.     Dr. McGee Testified Falsely about the Existence of p30 Testing that Conclusively Disproves His Finding of Semen on the Autopsy Swabs, and the Government Knew or Should Have Known that Dr. McGee's Testimony was False.**

The government contests the merits of Petitioner's *Napue* and *Giglio* claim

on numerous grounds, most of which simply misstate the record.

> **1.     Dr. McGee testified that the autopsy swabs were positive for semen that was deposited within 24-36 hours of Ms. Sjodin's death, and not merely that the swabs were "presumptive" for semen.**

The government repeatedly argues that Dr. McGee testified only that the

acid phosphatase results were "presumptive" for the presence of semen. Gov't Br.

at 13, 35, 46. That description of Dr. McGee's testimony is, at best, incomplete –

as the government appears to concede elsewhere. *See* Gov't Br. at 67 (describing

"Dr. McGee's conclusion that seminal fluid was deposited within 24 to 36 hours of

Dru Sjodin's death").

Lest there be any confusion on the point, Dr. McGee opined that the vaginal

and cervical autopsy swabs contained semen. The observed levels were "above

what we consider [the] cutoff" as "positive" for semen, and the acid phosphatase

testing therefore "suggests that deposition has occurred in a time period 24 to 36

hours prior to the subject's death." Trial Tr. 6722-23. Dr. McGee also described "a

large deposit of mucoid-like material that I think looks like seminal fluid

11

surrounding the uterus." Trial Tr. 6720-21. At the time of autopsy, Dr. McGee believed the globule "was a seminal fluid deposition." Trial Tr. 6721. The prosecution capitalized on that observation. Mr. Wrigley explained that "an educated, trained and experienced forensic pathologist" observed a "white mass" and "globule" that he "believed was a seminal deposit looking at it there in this girl's cervix." Trial Tr. 6658 (on cross-examination of Dr. Sensabaugh at *Daubert* hearing). He went on to argue, ten separate times, that Petitioner had "raped" Dru Sjodin. Trial Tr. 8662-63, 8688-90, 8694, 8707 (selection phase arguments).

### 2.    Dr. McGee's testimony about p30 and semen was false.

The government urges that "[t]here is absolutely no evidence that Dr. McGee testified falsely." Gov't Br. at 16-17. But Dr. McGee's testimony was plainly false in two critical respects. First, Dr. McGee testified that p30 testing had not been performed in the case, when in fact it had. Trial Tr. 6570. Second, Dr. McGee testified that the autopsy swabs contained seminal fluid, Trial Tr. 6721-23, which the p30 and accompanying results conclusively disprove. *See* Hrg. Tr. 266-69 and Pet. Ex. 23 at 3 (per Dr. Arden); Hrg. Tr. 346-48 (per Dr. Dragovic); Hrg. Tr. 23 and Pet. Ex. 3 at 15 (per Mr. Keel); Sensabaugh Depo. at 54-55 (per Dr. Sensabaugh); Hrg. Tr. 757 (per Mr. Fischer). The government offered no evidence to the contrary at the evidentiary hearing.

The government goes on to argue that Dr. McGee did not commit "perjury" because he did not know about Mr. Fischer's p30 results. *See* Gov't Br. at 32. That

12

is beside the point. Petitioner's claim requires only a showing that Dr. McGee's testimony was false and that the government knew or should have known that it was false, which is to say that the the prosecution "knowingly, recklessly or negligently used the false testimony." *Giglio*, 405 U.S. at 153-54 (1972); *Agurs,* 427 U.S. at 103; *United States v. Tierney*, 947 F.2d 854, 860-61 (8th Cir. 1991). Those showings have already been made at length. *See* Pet. Br. at 48-59.

### 3. The government did not "innocently" use Dr. McGee's false testimony.

Likewise unavailing is the government's unsupported suggestion that it "innocently" used false testimony. Gov't Br. at 38-39. The government offers no explanation of why its presentation of false evidence was not "knowing, reckless, or negligent." *Id.* at 38. Steven Fischer's bench notes were in the prosecution's file. They revealed his negative p30 test as well as the fact that the samples contained "very heavy" and "heavy" levels of nucleated epithelial cells – cells that cannot out-survive sperm cells during post-mortem decomposition. Hrg. Tr. 31, 268-69, 752; Sensabaugh Depo. at 67-68; Pet. Ex. 4 at 30; Pet. Ex. 3 at 6. As previously explained, the government knew of p30 results in a wide range of the lab reports. Pet. Br. at 54-56. It knew that Dr. McGee and Mr. Fischer disagreed about the presence of semen. *See* Trial Tr. 6720-23 (per Dr. McGee); Pet. Ex. 34 (Supplemental Expert Disclosure dated Apr. 28, 2006) (per Dr. McGee, "Lab results indicate likelihood of seminal deposit at the time of death or within the

13

preceding 24 hours."); Trial Tr. 6160 (per Mr. Fischer); Pet. Ex. 28 (BCA Report 10 without Mr. Fischer's bench notes), at 2.

Even if the prosecutors were ignorant of Mr. Fischer's results – as the government insists they were – the prosecutors did not trouble to inquire why their own witnesses disagreed on an important issue that the parties fiercely disputed at trial. A prosecutor's office must "insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio*, 405 U.S. 154. The government breached that duty in this case.

### 4.    Mr. Fischer's knowledge is imputable to the prosecution.

The controlling facts are not contested. The government does not dispute that Mr. Fischer's test results disprove (a) Dr. McGee's testimony that the government had not conducted p30 testing on the autopsy swabs and (b) Dr. McGee's testimony that the swabs revealed the presence of a seminal deposit within 24-36 hours of Ms. Sjodin's death. Nevertheless, the government argues that knowledge of Mr. Fischer's tests cannot be attributed to the prosecutors who elicited Dr. McGee's testimony and relied on it when asking the jury to impose death. *See* Gov't Br. at 36-37. The government is wrong for two separate reasons.

### a.    The Fischer results were present in the prosecution's file

The exculpatory Fischer results were within the prosecution's file, which places the prosecutors on notice of that material. "If evidence highly probative of innocence is in his file, he should be presumed to recognize its significance even if

14

he has actually overlooked it." *Agurs*, 427 U.S. at 110. The government tries to distinguish *Agurs*, arguing that the case involved the prosecution's withholding of favorable evidence instead of the knowing use of false evidence. *See* Gov't Br. at 37. That is not an accurate distinction. Far from limiting its imputation rationale to suppressed evidence, the Court in *Agurs* cited the portion of *Giglio* that describes the prosecution's duty to "insure communication of all relevant information on each case to every lawyer who deals with it." *See Agurs*, 427 U.S. at 110, citing *Giglio*, 405 U.S. at 154.

Nothing in *Agurs* or any other authority limits imputation of the prosecutor's file to *Brady*-type suppression cases. In *Giglio* itself the Court recognized that a prosecutor's office is a single "entity." *Giglio*, 405 U.S. at 154. As a result, the trial prosecutor had constructive knowledge that an earlier prosecutor had promised leniency to a key witness, and thus, constructive knowledge that the witness lied when he denied such leniency at trial. *Id.* To similar effect is the Eighth Circuit's opinion in *United States v. Foster*, 874 F.2d 491 (8th Cir. 1988). In that case, multiple witnesses falsely testified that no promises had been made to them in exchange for their testimony. The prosecutor not only failed to correct the testimony, but later, when the jury asked whether the witnesses had been given immunity, the prosecutor advised the judge to answer that no immunity had been granted. The Eighth Circuit reversed Foster's conviction because the prosecutor knew of the witnesses' falsity. The promises of immunity "were all reflected by

15

letters in the prosecutor's file, and she is charged with the awareness of them." *Id.* at 495. It made no difference that the prosecution had not suppressed the evidence, as the government insists here: "The fact that defense counsel was also aware of the letters but failed to correct the prosecutor's misrepresentation is of no consequence. This did not relieve the prosecutor of her overriding duty of candor to the court, and to seek justice rather than convictions." *Id.*

*Agurs* and *Giglio* govern Petitioner's claim. The prosecutors were on notice of Mr. Fischer's test results because the information was in their file. It is no excuse that the pretrial discovery spanned some 20,000 pages, that the p30 and NEC results were listed only in Mr. Fischer's bench notes instead of the body of his report, that "one had to look closely" at the bench notes in order to see the results, or that defense counsel obtained the results in discovery but overlooked them. Gov't Br. at 35. The United States Attorney's Office is obliged to "insure communication of all relevant information on each case to every lawyer who deals with it." *Giglio*, 405 U.S. at 154. The prosecutors knew that their two forensic witnesses – Dr. McGee and Mr. Fischer – disagreed about the presence of semen on the autopsy swabs. *See* Pet. Ex. 34 (Expert Disclosure of Apr. 28, 2006) (per Dr. McGee, "Lab results indicate likelihood of seminal deposit at the time of death or within the preceding 24 hours."); Pet. Ex. 28 (BCA Report 10 without bench notes), at 2 (no semen detected on vaginal, cervical, or anal swabs). At the very least, the government should have inquired into the basis for that disagreement, so

16

as to avoid presenting false testimony on the chief factual dispute at trial.

> **b.** **Even without the presence of Mr. Fischer's results in the prosecution's file, his knowledge must be imputed to the prosecutors because he was part of the prosecution team that investigated and developed the government's case.**

Leaving aside the notice provided by the prosecution's file, a prosecutor has an independent duty to "learn of any favorable evidence known to others acting on the Government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The government nevertheless denies that Mr. Fischer was a member of the prosecution team. Citing *United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006), the government argues that Mr. Fischer was an expert witness rather than a "fully functioning member of the prosecution team" who helped investigate the case and present it in court. Gov't Br. at 36-37.

Once again the government misreads the record. Mr. Fischer's investigative role in this case was far different from that of the expert witness in *Stewart*. Beyond serving as an expert witness, Mr. Fischer actively investigated the case:

Q:    Now, you were involved in *the investigation* into the disappearance of Dru Sjodin, is that correct?

A:    That's correct.

Trial Tr. 6125-26 (emphasis added). Mr. Fischer was present as a member of the "crime scene team" when Ms. Sjodin's body was recovered, and among other things, he searched Petitioner's car for stains and found Ms. Sjodin's blood inside. Trial Tr. 6125-26, 6134-36, 6152. The ink-identification expert in *Stewart*, by

17

contrast, "acted only in the capacity of an expert witness" and "did not interview witnesses or gather facts." *Stewart*, 433 F.3d at 299. That limited role meant that the ink-identification expert was not an "arm of the prosecutor." *Id.* at 298-99.

It is not Mr. Fischer's status as "government official" that makes him part of the prosecution team. *Cf. Stewart*, 433 F.3d at 298-99. Rather, it is his role in investigating and developing primary facts at the prosecution's behest.  As a result, the facts he developed may fairly be imputed to the prosecutors themselves. Courts routinely impute such knowledge to the prosecution under similar circumstances. *See*, *e.g.*, *McCormick v. Parker*, 821 F.3d 1240, 1246-47 (10th Cir. 2016) (sexual assault nurse examiner was "part of the prosecution team for *Brady* purposes," and therefore, nurse's knowledge that she was not properly certified was imputed to the prosecutor); *People v. Uribe*, 76 Cal. Rptr. 3d 829, 845-46 (Cal. Ct. App. 2008) (hospital was acting on government's behalf and was part of the "prosecution team" when performing a "Sexual Assault Response Team" examination of alleged victim); *State ex rel. Griffin v. Denney*, 347 S.W.3d 73, 78 (Mo. 2011) (murder occurred in prison, guards seized a sharpened screwdriver from an alternative suspect shortly after the murder, and therefore "the State had a duty to discover and disclose any material evidence known to the prison guards").

C.      **The Government Cannot Show that Its Use of Dr. McGee's False Testimony, and Its Failure to Correct that Testimony, Were Harmless Beyond a Reasonable Doubt.**

Petitioner is entitled to relief on his claim if he shows that "the false

testimony could … in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154. As the beneficiary of a *Giglio* error, the government must show that it was harmless beyond a reasonable doubt. *See United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985) ("[T]his Court's precedents indicate that the standard of review applicable to the knowing use of perjured testimony is equivalent to the *Chapman* harmless-error standard."). "[I]f it is established that the government knowingly permitted the introduction of false testimony, reversal is virtually automatic." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991); *United States v. Rodriguez*, 766 F.3d 970, 990 (9th Cir. 2014). The Court must evaluate the error "in the context of the entire record," *Agurs,* 427 U.S. at 112, but the government serially misstates the record in its brief.

> **1.     The undisputed showing of a "sexual assault" does not cure Dr. McGee's false testimony about p30 and semen, which allowed the prosecution to argue a misleading account of Ms. Sjodin's death and which hampered the defense's investigation about the cause and manner of that death.**

The government insists that Mr. Fischer's test results do not affect whether Petitioner committed a "sexual assault." Gov't Br. at 39-46. From this undisputed premise, the government urges that Dr. McGee did not testify falsely in finding a "sexual assault" and that the Fischer results cannot have been material to Petitioner's conviction and sentence. *Id.* 32, 35, 39-46. But the government does not dispute that the p30 and NEC findings disprove the presence of semen. Even its own expert testified to that effect. Hrg. Tr. 347 (per Dr. Dragovic, "There was no

19

semen."). Without a deposit of semen, there is no affirmative evidence that Ms. Sjodin was vaginally raped. Dr. Dragovic testified as follows:

> Q.    So if you were called to testify at a trial involving this case, would you be able to conclude that there was a sexual assault that occurred that involved penetration of a sexual nature?
>
> A.    No. I would just stop at the sexual assault being carried out because for that I can see evidence. For whatever I cannot see evidence, I can only give an it's possible.

Hrg. Tr. 344-45.

Despite its current emphasis on a "sexual assault," the prosecution at trial argued at length that Ms. Sjodin was raped, and that that Petitioner deserved death because he killed the victim "*after* living out his rape fantasies." Trial Tr. 8662, ln 7-8; 8663, ln 5-6; 8663 ln 13; 8688, ln 22; 8689, ln 1-2; 8689, ln 13-14; 8690, ln 2-3; 8690, ln 19-20; 8694, ln 19; 8707, ln 17. Trial counsel Hoy is right: the question of a rape "changed the presentation of the case," with a "ripple effect through sentencing." Hrg. Tr. 388, 501-02. Dr. McGee's testimony was "the linchpin of the government's case alleging that there was a rape" and a "very important part of the trial." Hrg. Tr. 390-91. Unfortunately for Petitioner, the jury weighed that "very important" evidence without aid of the evidence disproving it.

The government does not even address trial counsels' testimony about the impact on their own defense, including their truncated defense on the cause of Ms. Sjodin's death. Counsel explained that the p30 evidence would have allowed them to affirmatively disprove a deposit of semen. Hrg. Tr. 501-02, 841-42, 930-31.

Aided by evidence disproving a completed rape, the defense would have challenged the government's theory Petitioner moved Ms. Sjodin to the burial site after raping her, that he marched her across a frozen field, and most importantly, that he slashed her throat where he left the body. *See* Trial Tr. 8706-07 (penalty phase closing); Hrg. Tr. 842, 930-31; Pet. Br. at 68-69.

The Fischer evidence would have materially aided the defense in both phases of trial. It would have supported the defense theory that Ms. Sjodin was killed during a frenzied struggle in Petitioner's car at or near the point of her abduction – in other words that the homicide was "disorganized" instead of "cold-blooded," that Ms. Sjodin's death may have resulted from "accidental asphyxiation," and that Ms. Sjodin was transported only after her death instead of being kidnapped "in interstate commerce." Trial Tr. 5513, 6887-97, 6908-11, 7275-76, 7280, 7291-93; Hrg. Tr. 501-03, 841-46, 869-72, 928-31. "[I]f there isn't a completed rape," Mr. Ney testified, the "death march" and terminal throat-slashing described by Mr. Wrigley's closing argument simply "doesn't make sense" and the defense would have argued "that the death took place before anything else could happen." Hrg. Tr. 842.

> **2.    Dr. McGee's denial of p30 testing left the trial record materially and misleadingly incomplete, as he wrongly denied the existence of conclusive evidence that semen was absent.**

Neither is the government correct in arguing that the trial testimony covered "essentially all" of the semen-related testing that was conducted. Gov't Br. at 25.

21

The government cites Mr. Keel's testimony for the proposition that a positive p30 or acid phosphatase test is merely "presumptive" for semen, which it likens to Dr. McGee's testimony that the acid phosphatase levels were "presumptive." *Id.* This suggestion misses the mark in numerous respects.

First, as explained above, Dr. McGee did not merely state that the tests were "presumptive" for semen; he testified that the substance was in fact semen and was deposited within 24-36 hours of Ms. Sjodin's death. Trial Tr. 6720-23.

Second, the government overlooks the fact that a *negative* p30 result disproves any presumption from a positive acid phosphatase test, because the p30 result is more definitive and "highly dispositive." Hrg. Tr. 15-16, 21-23, 31, 266-67; Pet. Ex. 3 (Keel Report) at 15.

Third, the trial evidence omitted any mention of Mr. Fischer's findings of "heavy" and "very heavy" nucleated epithelial cells on the vaginal and cervical swabs. Mr. Keel and Dr. Sensabaugh explained that sperm cells are more resistant to post-mortem decay than epithelial cells, and yet they were absent from the autopsy swabs. Hrg. Tr. 22-23; Sensabaugh Depo. at 64-67. Unaware of Mr. Fischer's findings, the jury was left with Dr. McGee's testimony that sperm cells degrade over time inside of a dead body and that the "extremely cold" weather somehow preserved the acid phosphatase. Trial Tr. 6736-37. The Fischer results prove otherwise: "When numerous intact nucleated epithelial cells are recovered from a vaginal swab specimen, it is inconceivable that AP from commingled

22

semen would be present in the absence of sperm or p30 from that semen." Pet. Ex. 3 at 6 (Keel report). Mr. Keel therefore described the "big disparity" between the scientific conclusions made available by the Fischer bench notes and those available without them. Hrg. Tr. 32.

The government similarly contends that the jury heard evidence that the autopsy swabs were negative for sperm cells, that sperm cells are the "most conclusive evidence" of semen, and therefore, the p30 results "do not alter [the] analysis." Gov't Br. at 71. This argument, too, is counter-factual. For one thing, it is only the *presence* of sperm cells that is "conclusive" of semen. Trial Tr. 6628, 6630-31 (per Dr. Sensabaugh). The *absence* of sperm cells is not conclusive – as the government elicited from Dr. McGee, who explained that sperm cells decompose over time. Trial Tr. 6524-26. Dr. McGee testified that sperm cells remain intact for only four or five days inside of a living or dead person. Trial Tr. 6526. The government elicited similar testimony when cross-examining Dr. Sensabaugh. Trial Tr. 6816-17.

Precisely because sperm cells were absent, it is the negative p30 results and "heavy" nucleated epithelial cells that definitively disprove the absence of semen. *See* Hrg. Tr. 266-69 and Pet. Ex. 23 at 3 (per Dr. Arden); Hrg. Tr. 346-48 (per Dr. Dragovic); Hrg. Tr. 23 and Pet. Ex. 3 at 15 (per Mr. Keel); Sensabaugh Depo. at 54-55 (per Dr. Sensabaugh); Hrg. Tr. 757 (per Mr. Fischer). Hence the "big disparity" in scientific information between the trial testimony and Mr. Fischer's

23

full test results. Hrg. Tr. 32.

### 3. Petitioner need not show that the p30 and NEC results make Dr. McGee's testimony inadmissible under *Daubert*.

The government contends that Mr. Fischer's results do not make Dr. McGee's testimony about acid phosphatase inadmissible, presumably including Dr. McGee's conclusion that acid phosphatase levels above a particular threshold suggest the presence of semen. Gov't Br. at 33-35, 46-47. This argument fails for two reasons.

First, Dr. McGee's testimony *would* be inadmissible if offered at a trial today. *Daubert* requires a trial judge to "ensur[e]" that an expert's testimony "rests on a reliable foundation," which is satisfied by admission of "[p]ertinent evidence based on scientifically valid principles." *Daubert*, 509 U.S. at 597. The evidence of record is undisputed: a negative p30 result is more definitive than a merely presumptive acid phosphatase reading, and therefore, there is no scientific basis from which to find the presence of semen from the autopsy swabs – particularly in the presence of the "heavy" and "very heavy" nucleated epithelial cells described in Mr. Fischer's bench notes, and in the absence of sperm cells or male DNA. Hrg. Tr. 266-69 and Pet. Ex. 23 at 3 (per Dr. Arden); Hrg. Tr. 346-48 (per Dr. Dragovic); Hrg. Tr. 23 and Pet. Ex. 3 at 15 (per Mr. Keel); Sensabaugh Depo. at 54-55 (per Dr. Sensabaugh); Hrg. Tr. 757 (per Mr. Fischer). The government offers no evidence or authority to the contrary.

24

Second, it is inconceivable that a reasonable jury would credit semen-identifying testimony on this record even if the government were allowed to offer it. Even if acid phosphatase were a "presumptive indicator" of semen, the absence of p30 is "much more specific and conclusive evidence that semen was not detected in those swabs taken at autopsy, and that Dr. McGee's conclusion was incorrect." Pet. Ex. 23 (Arden supplemental report) at 3. There is simply no evidence of semen from the autopsy swabs – "none whatsoever." Hrg. Tr. 269. Dr. Dragovic similarly explained that Dr. McGee's earlier finding is a non-starter. "You certainly cannot base it on prostatic acid phosphatase that was found during testing because beyond that everything else was negative as far as sampling was concerned," he testified. Hrg. Tr. 348. "There was no semen." Hrg. Tr. 347.

The government insists that Dr. McGee's conclusions are a question of "weight" instead of admissibility. Gov't Br. at 46-47. But it does not explain how or why a jury would accord any weight to such testimony if offered alongside *all* of the government's testing, when that testing scientifically precludes the presence of semen. A reasonable jury would not credit untenable evidence.

## II.    Trial counsel performed ineffectively by failing to make use of the exculpatory forensic evidence that was disclosed to them.

Petitioner's attorneys rendered prejudicially ineffective assistance. They failed to grasp semen-related results that informed the most contested issue of trial, and they failed to provide those results to their expert witness. Moreover, having

25

failed to employ evidence in their own file to disprove the government's theory of a completed rape, counsel unreasonably withdrew their challenge to the government's theory on the cause of death: that Petitioner first "lived out his rape fantasies," then transported Ms. Sjodin to the burial site, marched her to the ravine in the winter weather while she had a bag over her head and was naked below the waist, and slashed her throat at least twice in order to avoid a rape prosecution.

Defense counsel now acknowledge their error and its effect. The lack of a rape, as proven by the negative p30 result, would suggest "that the death took place before anything else could happen" and would suggest a possible "strangulation, accidental or purposeful, in the vehicle before any completion of a sexual act could have taken place." Hrg. Tr. 842. Not aware of Mr. Fischer's results, the defense disabled itself from proving a less aggravated killing than that described by the prosecutor, and even a killing that took place at the point of Ms. Sjodin's abduction and without transportation in interstate commerce. *See* Pet. Br. at 90-92, 96-98.

The government tries to impute various purportedly "reasonable" strategies to trial counsel. The attempt fails because counsel's theories cannot be "reasonable" if based on ignorance of the most important forensic evidence in their file. Petitioner is entitled to a new and fair trial.

## A.    Petitioner's Ineffective-Assistance Claim Is Not a Relitigation of the *Daubert* Issue from Trial and Direct Appeal.

The government argues that Petitioner's ineffective-assistance claim is

26

barred as previously litigated. *See* Gov't Br. at 51-53, 64, 71. The government's

chief contention is that Petitioner reasserts the *Daubert* issue from trial and direct

appeal by repackaging it as a claim of ineffective assistance of counsel. As with the

*Giglio*/*Napue* claim, the government overlooks the factual and legal difference

between the post-conviction claim and the earlier issue.

Factually, the present claim relies on evidence beyond the trial record. That

evidence includes the Fischer test results that were absent from trial after defense

counsel overlooked them, the circumstances under which counsel failed to notice

the exculpatory forensic evidence within their own file, and the extent to which

counsel's ignorance of the Fischer result affected their trial strategy and hampered

the defense. *See* Pet. Br. at 73-88, 95-98. Legally, the claim arises under the Sixth

Amendment right to the effective assistance of counsel rather than *Daubert* or

Federal Rule of Evidence 702.

The post-conviction claim is not that the Court erred at trial by admitting Dr.

McGee's testimony over a *Daubert* objection. It is that counsel erred at trial by not

apprising the Court or their expert of evidence that conclusively disproved Dr.

McGee's testimony, and would have led a fully-informed jury to reject a finding of

semen even if Dr. McGee were allowed to testify to one. *See* Pet. Br. at 73-88, 97-

98; *cf. Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (ineffectiveness claim is

cognizable on habeas corpus even though the underlying suppression claim is not;

"[W]hile respondent's defaulted Fourth Amendment claim is one element of proof

27

of his Sixth Amendment claim, the two claims have separate identities and reflect different constitutional values."). Petitioner has not merely "repackaged" the *Daubert* claim as the government suggests. He need not even show that the Court would or should exclude Dr. McGee's testimony under *Daubert¸* but only that a reasonable jury would have rejected that testimony but for trial counsel's failure to ascertain and present the evidence disproving it.

To be sure, the section 2255 claim *relates* to an issue that Petitioner previously litigated. But that fact does not preclude Petitioner from showing that counsel litigated the issue ineffectively based on extra-record evidence. *See*, *e.g.*, *Davis v. United States*, 673 F.3d 849, 852-53 (8th Cir. 2012) (prisoner on post-conviction may not relitigate the propriety of the prosecutor's closing argument, but may litigate counsel's ineffectiveness in failing to object to the argument); *United States v. Gonzalez*, 98 Fed. App'x 825, 828-29 (10th Cir. 2004) (prisoner could attack validity of guilty plea under claim of ineffective assistance of counsel based on extra-record evidence of trial counsel's erroneous legal advice, despite direct appeal ruling that plea was voluntary). The government's procedural defense is without merit.

**B.    Counsel Performed Deficiently By Failing to Notice and Develop the Exculpatory Forensic Evidence Within Their File.**

Failing to ascertain the p30 results "was a mistake on our part," Mr. Ney observed. Hrg. Tr. 813. "There was no strategy involved." Hrg. Tr. 813. The

28

government nevertheless retraces the protracted trial dispute over Dr. McGee's testimony that semen was present on the autopsy swabs and was deposited into Ms. Sjodin shortly before her death – as if the length of the dispute were sufficient to establish effective performance. Gov't Br. at 55-71. The government overlooks counsel's obligation to investigate the relevant facts, including the facts within counsel's file. Defense counsel must "explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). That duty encompasses the need to "aggressively re-examine all of the government's forensic evidence." American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases,* § 10.7, comment. (2003). In *Rompilla*, capital defense counsel were found ineffective for failing to review their client's post-conviction file. *Rompilla*, 545 U.S. at 389-90. *A fortiori*, counsel here had the duty to thoroughly review forensic evidence provided to them in discovery.

Counsel cannot reasonably "re-examine" the government's forensic evidence if they fail to notice and comprehend the evidence in their possession and fail to provide it to their chosen expert. A case in point is Dr. McGee's testimony that acid phosphatase remained intact within Ms. Sjodin's body, and that sperm cells were absent, because "she's in an extremely cold environment." Trial Tr. 6557; Gov't Br. at 69. If defense counsel had known about Mr. Fischer's test results, they could have proven otherwise. The bench notes revealed "heavy" and

"very heavy" levels of nucleated epithelial cells on the autopsy swabs. Pet. Ex. 4 at 30; Hrg. Tr. 752. Those cells prove that sperm were never present at any point, because sperm cells are hardier than epithelial cells and will outlast them in a post-mortem environment. Hrg. Tr. 22-23, 31-32; Pet. Ex. 3 at 6. Remarkably, the government argues: "Counsel's cross-examination of Dr. McGee evidenced sufficient understanding of the acid phosphatase evidence against Rodriguez and its potential weaknesses." Gov't Br. at 69. To the contrary, counsel were ignorant of evidence that would have obliterated Dr. McGee's critical finding of semen.

The government fares no better urging that the p30 evidence (and presumably the NEC results) do not "alter the analysis" because the jury already knew that sperm cells were absent from the autopsy swabs, which the government describes as "the most conclusive evidence of semen." Gov't Br. at 71. This contention fails for the reasons already explained. *See* Section I.C.2, *supra* p. 23. The *presence* of sperm cells is "the most conclusive" evidence of semen, but the *absence* of sperm cells does not conclusively establish the absence of semen, particularly weeks or months after alleged ejaculation. *Id.* Notably, Dr. McGee testified that acid phosphatase survived intact even though sperm cells did not. Trial Tr. 6557.

Counsel, then, failed to grasp the evidence in their file despite the importance of the semen issue and despite ample notice of p30 testing throughout the case. *See* Pet. Br. at 73-83. Beyond that, counsel did not investigate why the

government's two examiners – Dr. McGee and Mr. Fischer – reached opposite results on the presence of semen, and thus, which specific tests were run by the two examiners. *Id.* at 79-80. The fact that counsel litigated the semen issue fiercely does not mean that they litigated it effectively. Counsel's performance fell outside "the wide range of reasonable professional assistance," Gov't Br. at 71 (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)), because counsel failed to investigate key forensic evidence at their fingertips. The government urges "deference" to trial counsel, Gov't Br. at 49, 51, 71, and yet both attorneys acknowledge that they erred and that their chosen strategy lacked the benefit of critical evidence. Hrg. Tr. 388-90, 410-11, 500-01, 813.

### C. Counsel's Failure to Disprove Dr. McGee's Finding of Semen Prejudiced the Defense, Even Though the Evidence Otherwise Demonstrated a "Sexual Assault."

As with the claim of prosecutorial misconduct, the government argues that Petitioner was not prejudiced by the semen-related error, because the totality of evidence proved a "sexual assault" regardless of Mr. Fischer's findings. Gov't Br. at 72. This argument fails for the reasons that Petitioner has already explained. *See* Section I.C.1, *supra* pp. 19-21. Here as elsewhere, the government overlooks the prosecutor's argument of a "rape," the supposed completion of Petitioner's "rape fantasies," and the importance of the issue at sentencing. *Id*. The government likewise ignores the fact that evidence disproving a completed rape would have led defense counsel to investigate more fully the cause of Ms. Sjodin's death and to

31

challenge Dr. McGee's and Mr. Wrigley's narrative of a "death march" culminating in fatal slash-wounds to Ms. Sjodin's neck. *See id.* at 20-21, and Section D, below.

> **D.    Counsel Performed Deficiently by Failing to Adequately Investigate the Cause of Ms. Sjodin's Death.**

By their own admission, counsel failed to challenge the cause of Ms. Sjodin's death – and to develop and present evidence to contradict Dr. McGee's slash-wound theory – precisely because they failed to disprove Dr. McGee's semen-deposit theory. The p30 evidence would have allowed counsel to affirmatively disprove a deposit of semen. Hrg. Tr. 501-02, 841-42, 930-31. Aided by such disproof, the defense would have challenged the government's theory Petitioner moved Ms. Sjodin to the burial site after raping her, that he marched her across a frozen field, and that he slashed her throat where he left the body. *See* Trial Tr. 8706-07 (penalty phase closing); Hrg. Tr. 842, 930-31; Pet. Br. at 68-69. "[I]f there isn't a completed rape," Mr. Ney testified, the "death march" and terminal throat-slashing described by Mr. Wrigley's closing argument simply "doesn't make sense." Hrg. Tr. 842. The absence of semen, then, suggests "that the death took place before anything else could happen" and implies a possible "strangulation, accidental or purposeful, in the vehicle before any completion of a sexual act could have taken place." Hrg. Tr. 842.

32

## 1.      Counsel's chosen strategy was based on ignorance.

The government insists that trial counsel followed a "reasonable" strategy: they chose not to contradict Dr. McGee's testimony about slash-wounds, and as a result, the Court agreed to limit the prosecution's use of autopsy photographs. Gov't Br. at 83-86. It is true that counsel followed such a "strategy." Nevertheless, counsel admit that the strategy was ill-informed, that it lacked the benefit of Mr. Fischer's bench notes that disprove the presence of semen, and that counsel would have refuted the government's slash-wound theory if they had been aware of Mr. Fischer's findings. The issue of the cause of death "was much more important than the photographs," counsel explained. Hrg. Tr. 846. Excluding the photos was simply "us taking what we could get, but as a trade-off we would much rather contest that these were wounds." Hrg. Tr. 846. Counsel truncated their investigation based on ignorance of the evidence in their own file. Counsel's failure, then, "stemmed from inattention, not reasoned strategic judgment." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

## 2.      The manner of death was an important issue at trial, and counsel's failure to challenge it through available facts was deficient.

Once again retreating from Mr. Wrigley's spirited "death march" speech on penalty phase closing, the government contends that the manner of Ms. Sjodin's death was not important to the prosecution, that the government theorized multiple ways that Ms. Sjodin could have died, and that trial counsel "extensively" cross-

33

examined Dr. McGee on the issue and argued it to the jury. Gov't Br. at 74-86. The contention fails for numerous reasons.

First, we know that the manner of death was an important issue because the prosecutor forcefully argued that it was. Mr. Wrigley argued that Petitioner finished off Ms. Sjodin in order to avoid detection after satisfying his "rape fantasies," that he "plunged" the knife into her neck, and that the killing was "shockingly evil" and "extremely wicked." Trial Tr. 7266, 8706-07.

Second, Dr. McGee identified slash wounds to the neck as the single likeliest cause of death, even though exposure and asphyxia were also possibilities. Trial Tr. 6728-29. Consistent with Mr. Wrigley's impassioned "death march" script, Dr. McGee testified that Ms. Sjodin was slashed while in a face-down position at or near the place that her body was found. Trial Tr. 6733.

Third, the fact that defense counsel cross-examined Dr. McGee on his lack of certainty – *see* Gov't Br. at 74-77 – does not mean that counsel provided effective assistance. However "extensive" the cross-examination may have been, it lacked the benefit of Mr. Fischer's test results and the implications of those results. It is one thing for counsel to suggest that Dr. McGee was speculating from the known trial evidence, but quite another to prove that McGee based his conclusions on the false assumption of a semen deposit and a completed rape. Counsel failed to grasp key evidence within their files, leaving a misinformed jury to decide all phases of trial.

34

The government also argues that Ms. Sjodin's death was "torturous" and qualifies as "especially heinous, cruel, or depraved" whether or not her neck was slashed because, among other things, Petitioner detained her for some "three hours" before she was killed. Gov't Br. at 81, 87. The government cites no evidence for the proposition it urges, which is unsupported on the trial and post-conviction record. Indeed, trial counsel Ney explained that the definitive absence of semen suggests that Petitioner did not complete his apparent objective of raping the victim, and instead that Ms. Sjodin died from a struggle during the attempt, shortly after the abduction in the mall parking lot. Hrg. Tr. 842, 930-31.

The jury instead sentenced petitioner based on the prosecutor's counter-factual "death march" script, which culminated in Ms. Sjodin's death by multiple slash wounds across the neck so that Petitioner could eliminate her as the only witness to her rape. Trial Tr. 8706-07. Needless to say, the manner of death that defense counsel could have proven is considerably less aggravated than that presented. Counsel's deficient performance allowed the prosecutor and the sentencer to exaggerate how "shockingly evil" and "extremely wicked" the murder in question actually was. *See*, *e.g.*, *Washington v. State*, 989 P.2d 960, 977 (Okla. Crim. App. 1999) (although evidence was sufficient to show that murder was "heinous, atrocious or cruel," counsel deficiently failed to demonstrate that the victim could not have suffered for more than one minute and that the victim could not have sustained gunshot wounds to her front if she were crawling away from the

35

defendant as the prosecution argued). At the very least, Petitioner should be re-sentenced by an accurately informed jury.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Petitioner respectfully requests that the Court grant his motion under 28 U.S.C. § 2255, that it vacate his unconstitutional conviction and sentence, and it that grant such other and further relief as law and justice require.

Respectfully submitted,

/s/ Joseph W. Luby
VICTOR J. ABREU
JOSEPH W. LUBY
ERIC J. MONTROY
JAHAAN SHAHEED
FEDERAL COMMUNITY DEFENDER
FOR THE EASTERN DISTRICT OF
PENNSYLVANIA
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

Dated:    November 7, 2018
          Philadelphia, PA

36

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2018, the foregoing document was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to the following:

Keith Reisenauer
keith.reisenauer@usdoj.gov

Melissa H. Burkland
melissa.burkland@usdoj.gov

/s/ Joseph W. Luby
*Counsel for Defendant-Petitioner*