# *HUTCHINSON & ASSOCIATES*

*222 WEST GREGORY, SUITE 100 • KANSAS CITY, MO 64114 • PHONE (816) 361-0664 • FAX (816) 361-0677*

Marilyn A. Hutchinson, Ph.D.
Michael W. Anderson, Ph.D.
Lester E. Blue, Jr., Ph.D.
Denise L. Gulledge, Ph.D.
Lucinda L. Herman, LSCSW
Lucy Lauer, M.A., R.D.
Roseanne M. Middleton, Ph.D.
Connie Sweeney, Ph.D.
Karen L. Willing, Ph.D.

## REPORT OF MITIGATION
### CASE NO: C2-04-55
### UNITED STATES vs. ALFONSO RODRIGUEZ, JR.

| | |
|---|---|
| Name: | Alfonso Rodriguez, Jr. (DOB: February 19, 1953) |
| Evaluator: | Marilyn A. Hutchinson, Ph.D. |
| Dates of Evaluation: | October, 2005; March, 2006; May, 2006 |
| Date of Report: | August 6, 2006 |
| | |
| Records Reviewed: | See Appendix A |
| Consultations: | See Appendix B |
| Tests Administered: | See Appendix C |

## REFERRAL

Mr. Alfonso Rodriguez was referred to this examiner for the purpose of evaluating possible mitigating factors for his current charge of Murder of Dru Sjodin on or near November 22, 2003. Mr. Rodriguez is charged in Federal Court and has been incarcerated since his arrest in late December 2003. He is currently being held in the local detention center in Fargo, North Dakota. All visits with him were conducted at that facility.

Mr. Rodriguez met with this examiner for seven hours on October 20, 2005, and five hours on October 21, 2005. This examiner evaluated him again for over six hours on March 2, 2006. The final evaluation took place on May 12, 2006 for six hours.

Consultation with his mother was conducted at her home in Crookston, Minnesota. Consultations with sisters Illeanna, Rosa and Sylvia were conducted respectively in a Minneapolis airport conference room, an attorney's conference room and by telephone.

All of the opinions of this report are rendered to a reasonable degree of psychological certainty and are provided for the Court's review.

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr. _____ 2

## SOCIAL HISTORY

*Family*

Alfonso Rodriguez is the second child of his mother, Dolores Rodriguez, and father, Alfonso (Poncho) Rodriguez, Sr. Alfonso's paternal grandparents were born in Mexico in the 1880's and his maternal grandparents were born in Mexico in 1892 and 1912. His father and mother were born in Dolores, Texas in 1929 and 1933, respectively.

Alfonso's mother was the third of nine children and moved from Texas to Colorado in 1941, when she was eight years old. Her mother was married at age 13 or 14, and suffered from blindness beginning at age 26 (1938), a nervous breakdown in 1939 and diabetes. Dolores described her mother as "very bitter" and her father was an alcoholic. Dolores and all of her siblings have diabetes except one who died from heart disease.

Alfonso Rodriguez, Sr. had three older sisters and another "adopted" sister who was taken in by their family. One of his sisters had twelve children and the other two have never had children. Mr. Rodriguez, Sr. died in 1993, during a second onset of cancer. His father also died of cancer and his mother died of a heart attack.

Dolores and "Poncho" Rodriguez were married in 1950, when Dolores was 16 and Poncho was 21. Mr. and Mrs. Rodriguez had their first child, Sylvia, in 1951. She has been married for 27 years and lives in New Jersey. Likely due to prior chemical exposure, she has never had children. Alfonso was born in February 1953. Francisco was born in June 1955. He is living with a common-law wife and her children and works in Colorado. Rosa Rodriguez, born in June 1958, is married and lives in Minneapolis with her husband and children and is employed as a professional. Illeanna, born in March 1960, is married with three children and lives in Crookston, Minnesota.

The family life of the Rodriguez's and their children was dictated by the harvest season, the migration north every summer and the return to Texas for the winter. Both parents did field work, hoeing sugar beets in Minnesota and potatoes in late summer in North Dakota. The parents were initially employed on the Roland Breed farm along with Alfonso Rodriguez, Sr.'s parents, three unmarried sisters, their "adopted" sister and her children. In the early years of their marriage, these six adults (and some additional relatives during some years) and the children lived in a farmhouse with no running water or electricity. They used kerosene lanterns. Crop dusting was common at this time and it was done regularly to spray DDT and fungicides. Often the workers and children were outside when this occurred. Clothes, including diapers, were hung out to dry and were "sticky" from the spray. Field water ran into the well.

Sylvia was conceived in September and was born in June. Her in utereo experience would have been free from the direct exposure of the crop dusting. Alfonso was conceived in May and his

Exhibit 2

REPORT OF M!TIGATION:  Alfonso Rodriguez, Jr.                                                    3

mother worked the fields during her early pregnancy when crop dusting was most commonly done. Francisco and Rosa were born in June so, like Sylvia, (were) conceived in September.

Mr. Poncho Rodriguez's mother, Maria Del Refugio, was the primary babysitter for the very young Rodriguez family. However, she became ill and the children often went to the fields with their parents, playing at the end of the sugar beet rows. Ms. Del Refugio died of a heart attack in 1957, and her husband died of cancer in 1963. They had always lived with Alfonso, Sr. and his family: together in the summer and next door in Texas.

Mrs. Dolores Rodriguez described her husband as very strict. He was a firm believer that he was the head of the household and was quite demanding of personal attention from his wife and children until late in life. Illeanna recalled her father as a hothead and reported that her older brothers were disciplined with a belt. He physically hit her on a few occasions. Alfonso remembers being physically disciplined by his father. He also remembers his father hitting his mother, being impatient with Alfonso and calling him stupid. His *words* were recalled as more painful than the hitting.

*Young Childhood*

Alfonso Rodriguez was born while the family was in Laredo, Texas in February, 1953. Mrs. Dolores Rodriguez does not recall any specific birth difficulties but indicated all of her children were born by natural vaginal delivery and labor was usually about twelve hours. She further recalled she did not nurse her oldest daughter who was born in June because she went right back to work. She did attempt to nurse Alfonso when he was born in February but after one month she quit because he was so "fussy" and had gastrointestinal problems. A medical clinic doctor suggested he be fed the water used to boil rice. Mrs. Rodriguez fed Alfonso rice water until he was four months old. Due to continuing medical difficulties, a subsequent doctor indicated that Alfonso was malnourished from this diet and switched him to canned milk. At the age of four and five months old, he returned to Minnesota with his parents and lived in the home where the crop dusting was done regularly.

Mrs. Rodriguez recalled that her son, Alfonso, did not walk until he was almost two years old and that he was slower than his brothers and sisters in learning most things. The family's language at home was Spanish and Alfonso did not learn English until he was enrolled in a speech therapy group in a Minnesota school.

Their grandmother died in the spring of 1957, so in 1957 and 1958, when Alfonso was only four/five, he and his older sister, Sylvia, (and perhaps Francisco) went to a camp for migrant children at Cathedral of Immaculate Conception in Crookston where childcare was offered along with religious education. The children spent Sunday afternoon until Friday afternoon for four consecutive weeks at the school. It is likely that in 1959 they attended a day school for part of

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                                    4

the summer run by the Council of Churches, migrant committee.  Subsequent summers were spent at other similar schools.  Since the children left their Texas schools in April, before the end of the school year, and returned to Texas after Halloween of the next school year, the summer migrant schools were an attempt by the parents and Northern churches and agencies to provide some additional education for the children.  Dolores Rodriguez and her children stayed in Texas for the summer of 1960 following the birth of Illeanna in March.

Alfonso Rodriguez failed the first grade and repeated it.  Life at home was also trying.  He recalled carrying water into the house in coffee cans for cooking and baths.  He also helped keep the wood bin full for the cooking stove.  His memories include the truck that the family used to drive from Texas to Minnesota every year -- lined with bunks for the children as they drove straight through for three days.  They took with them their food and gasoline as many places along the way were not hospitable to Mexican–Americans.  Mr. Rodriguez recalled that his adopted aunt had perhaps as many as ten children with different fathers present in different years.  Although they lived with the Rodriguez family during the initial years, they lived at a nearby farm in subsequent years.  Mr. Rodriguez and his siblings recall they were never close to these "adopted" cousins despite their close proximity and attributed some of the distance between themselves and their cousins to the selfishness of their adopted aunt.

Mr. Rodriguez believes that at about age five or six he developed enuresis that lasted for about a year.  Mr. Rodriguez remembered he attended his first confession at one of the migrant schools and had communion when he was only six or seven.  He recalled that attending confession in a dark booth with the priest was very frightening to him.

Another memory Mr. Rodriguez holds of this time period was staying alone during the day with his sister, Sylvia, while his parents were in the fields.  He recalled being afraid when he could hear rodents in the walls of their farm house.  A good memory was Saturday morning when his mother would be home and the family would have breakfast together.

*Sexual Abuse*

Sylvia Rodriguez, the oldest of the Rodriguez children, reported that she has maternal feelings for her younger siblings since she was often responsible for their care.  She took over when her grandmother died even though she was only six years old at the time.  Sylvia reported several memories of sexual abuse that included her brother, Alfonso.

First are the memories from the migrant overnight camp.  Sylvia recalled that the boys slept in one room and the girls slept in another large room on cots.  She could hear her brother cry at night and she positioned herself so that she could see out the door to the boys' room.  She recalled the presence of an adult woman going to him and images that appear to be sexual abuse of her younger brother.  She also remembered her brother would sneak across the hall and

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.             5

sometimes sleeps in the cot with her and that an adult woman would come and get him in the night and then bring him back later.  Alfonso's memories of this same time are understandably more vague given his younger age and his involvement in the abuse.  He recalled one time when a woman came to him when he was crying and touched him sexually.

Another sexual abuse memory is of an older cousin who assaulted Sylvia in a potato storage Quonset hut.  She also saw him abuse her brother, Alfonso, and several cousins.  He would force them to put their penis in a pickle jar prior to the assault.  Alfonso does not have memories of sexual abuse in that particular setting but remembers a man in l ng johns who abused him.

Sylvia indicated that a few years later when the family lived in an apartment, a man named Mr. Johnson would come upstairs and sexually assault her.  Her brothers were often involved in trying to help her hide and telling him that she was not home in an effort to protect her.

Alfonso Rodriguez recalled a sexual assault from a teenager when he was about six.  He remembered this took place on a cot in a storage shed and the boy tried to sodomize him after previous instances of exposing himself and masturbating in front of Alfonso.  The teenager's father worked for a vending machine company and had boxes of candy and oranges that he gave to Alfonso.  Alfonso also witnessed him have sexual contact with another teenage male. Alfonso's parents and the teenager's parents were friends.

Alfonso had his first "consensual" sex when he was eleven with a nineteen-year-old female.  The girl agreed to have successive sexual contact with four or five boys.  Alfonso was the youngest of the group.  He does not consider this to be sexual abuse although he recalled it as a shameful and embarrassing experience given the girl's response to him.

*Middle Childhood*

Mr. Rodriguez has a positive memory of his only childhood birthday party when he was eight years old.  In 1961, the Rodriguez family moved to a different farm and his father secured work as a "hired hand" which was more stable and of higher status than being a migrant worker.  This was on the Kiewel Farm in Fisher, Minnesota.  The owner, Mr. Ed Ross, recalled that Mr. Rodriguez, Sr. was arrested for poaching a deer out of season to feed his family.  His wife walked ten miles to town to post bail for him.  Mrs. Rodriguez began working in a migrant childcare facility and no longer worked in the fields when Rosa and Illeanna were infants.

After repeating the first grade, Alfonso Rodriguez was administered an IQ test at school and earned a 77.  This placed him only a couple points above a retarded designation at that time.

In 1962, several major life events occurred in the family.  Rosa, then four years old, was labeled as "depressed" by a doctor and she was returned to Texas to live with her grandparents and aunts

Exhibit 2

whom she missed. Alfonso Rodriguez recalled being very upset at that time as he also wished to live in Texas. He did not like the culture of Minnesota and the racism that was sometimes subtle and sometimes overt. Alfonso Rodriguez recalled having the mother of a white schoolmate say to her daughter that she should wash her hands after she had been Alfonso's dance partner in a school performance. Some white neighbor children were not allowed to have any contact with the Rodriguez children. As a preadolescent, Alfonso was invited to a birthday sleepover for a white classmate. A number of other students were not allowed by their parents to come when they learned that Alfonso would be in attendance. He stated he was much darker skinned than Sylvia or his younger brother, Francisco, and received more racist actions and teasing from others. One incident that he and his siblings recalled was when four boys and two girls surrounded him and pulled his pants down and laughed. He still experiences the incident with shame and says he does not know for sure if the incident was racially motivated.

In 1962, their father, Poncho Rodriguez, was injured in an accident when a drunken railroad employee failed to stop a hand car on a train track and ran into Mr. Rodriguez who was driving a tractor at the time. It broke his back in several places and he was unable to return to work for the next couple of years. He underwent three back surgeries. The family moved from the Kiewel Farm into Crookston and the children changed schools mid-year. Mrs. Rodriguez began working the 4:30 p.m. to midnight shift at a local café.

In 1962, Alfonso Rodriguez began abusing substances: stealing beer and cigarettes from adults. In 1963, he passed 2nd grade with C's and D's with a notation of a language problem. His grades were similar in 3rd and 4th grade. In 4th grade (1964) he was placed in speech therapy as he was not fluent in speaking English. He was in a small group with four others although he was the only one with English as a second language. Others had problems such as stuttering or difficulty with pronunciation. The speech class was taught by Dr. Ruth, a retired volunteer speech therapist at his school.

Pictures of young Alfonso document what siblings recall: he had a big head. His head was (and still is) unusually large. This is more pronounced due to his small stature. This was a source of teasing when he was a child and even his siblings called him "tack head".

Alfonso Rodriguez suffers from an undiagnosed neurological problem that is manifested in trembling hands. This dates back to childhood and is recalled by a sister when seeing him try to put a worm on a fish hook. His hand trembled enough that he could not accomplish the task. No doctor has ever been consulted.

*Teenage Years*

Beginning at age thirteen, Alfonso Rodriguez began regular weekend drinking, smoking marijuana, using LSD and other drugs. He recalled that he was a member of a group of about

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr.                                                    7

twenty teenagers who drank on weekends and then began to drink and use drugs during the week also. He remembered being grounded once for coming home drunk but doesn't think that his parents knew he was regularly using drugs. Alfonso Rodriguez and his mother recalled that in the 9th grade he was sent home from school after he passed out. Dolores Rodriguez said she thought he was "just tired." Mr. Rodriguez said he had accidentally taken too many downers and went home and slept for twenty-four hours. He stated that he believes that peer pressure was the primary driving force in his use of drugs but he had a clear preference for acid and cocaine. He worked at a truck farm, cut grass and fixed up old cars to have money for the various substances he abused. These included cigarettes, marijuana, speed, LSD, glue, mushrooms, lighter fluid, paint, and alcohol.

Alfonso Rodriguez was charged and pled guilty to making obscene phone calls as a teenager. He said it initially started as a joke between him and a girlfriend. He then stated that he called a young woman who was a ticket taker at the school lunch room. Sometimes she would flirt with the high school boys but sometimes she was strict. He said he felt attracted to her but did not think at the time he was angry with her. He was referred for an evaluation and had a few counseling sessions. He does not recall going more than a few times and his mother does not recall going at all. The reported treatment may be the same as the treatment identified below at Glenmore.

Alfonso recalled that between the ages of 14-15, he decreased his alcohol and drug use. He passed the 7th grade with mostly D's and passed the 8th grade with mostly F's. He failed the 9th grade in June 1970 when he was 17 years old.

In July 1969, Crookston Police talked to Dolores Rodriguez regarding her son, Alfonso. Police reports document her concerns that he had terrific headaches that had been unsuccessfully treated by a couple of doctors. She reported she had found women's panties in his room and a personal writing in which he said he was going to kill himself or someone else. She also reported that the back of his head periodically swelled and she was afraid he had a brain tumor. She indicated he had been acting strangely for the past year. She said she could not discuss these issues with her husband because he became too upset. Neither Mrs. Rodriguez nor Alfonso Rodriguez reported any recollection of the incidents involved in this report or the reporting incident. There are no records to indicate any follow-up or medical or psychological consultation after this discussion with the police officer.

Alfonso Rodriguez attempted, along with several friends, to enlist in the military service when he was 18 years old. He said he wanted a ticket out of their small town. He was rejected due to his shorter left leg and having two kneecaps on one leg.

When Alfonso Rodriguez was 19 years old, he is reported to have sought treatment at Glenmore Hospital in Crookston. Medical records indicate he had unexplained hives on the back of his neck, a left leg that had been shorter than his right since birth, that he drank to excess every

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr.                                8

weekend, the presence of a ¾ inch scar on his forehead and that he had several relatives who had died of cancer. Mr. Rodriguez does not recall treatment for more than three or four sessions and no medical intervention.

The summer he was 19 years old, Alfonso Rodriguez began working in alfalfa fields and then in beet plants. During the fall he was employed in janitorial service by the school district.

*Young Adulthood*

At age 20, Mr. Rodriguez worked at a variety of short-term employments. He dated Lisa La Bue for two school years. She was a Sioux Indian and was a junior and senior in a boarding high school. He saw her only on Friday nights. Although he asked her to marry him, they lost contact after her return home following her senior year. He began a relationship with Dotsie Dahl with whom he continued an on and off relationship for several years. They lived together on several different occasions beginning in 1974. During one of their break–ups in October 1973, Mr. Rodriguez had a one night stand with a woman he had admired upon first glance. She remains his ideal and the "love of his life" despite their brief acquaintance. He worked that summer in the alfalfa field and for the American Crystal Sugar Company in the fall of 1973. He worked for them every fall for the next three years. He wintered in Texas with his extended family. He had lived with and become engaged to his girlfriend Ms. Dahl but difficulties continued due in part to the disapproval of the relationship by her father. Dotsie's father was reported to have confronted Mr. Rodriguez with a butcher knife in a public restaurant to express his disapproval of their relationship. In October 1974, they were again temporarily separated.

In October 1974, Mr. Rodriguez was arrested for attempted rape of Shirley Seddon with whom he got a ride home from a bar. He recalled that he was very drunk and then became angry at Ms. Seddon when she asked him why he had never asked her out. He recalled her as a racist during high school. After his charge his parents observed he appeared ashamed. He sought help at the local mental health center and continued his relationship with Ms. Dahl during the next year in anticipation that he might receive probation.

However, one month later, he assaulted Elizabeth Jean Knudson. His current recollection is that he saw her and believed by the way she looked at him that she knew about the charges related to Ms. Seddon with whom she was friends. He reported that Ms. Seddon had told him that she would not tell anyone except a priest. He followed Ms. Knudson from where he first saw her to a parking lot, confronted her with a knife and then raped her. He threw away the knife when she expressed her fear and she then drove him back to Crookston after the assault. Both women were acquaintances from high school and he now states that he had experienced racist attitudes from them during high school.

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodríguez, Jr. _____  9

Mental health intervention during his initial pre-trial incarceration noted strong feelings of guilt and the desire to either go to prison and/or get psychiatric assistance.  He pled guilty to aggravated rape and was sentenced to fifteen years.  He was incarcerated from 1975 until December 1978 and participated in the Intensive Treatment Program for Sexual Aggressives.  He lived in a half-way house in Mankato for six months before moving to independent living.  In April 1980, he allegedly confronted a woman and stabbed her when she resisted.  He returned to the ITPSA Unit prior to his trial.  He was found guilty in June 1980 of attempted kidnapping and assault in the first degree.  He has always maintained his innocence but was sentenced to two terms, to be served consecutively, of 0-20 and 0-15 years.

After multiple transfers to various prisons, Mr. Rodriguez turned 50 years old and was released in May 2003 as a Level 3 Sex Offender.  Mr. Rodriguez lived with his mother in Crookston when he could not find an apartment due to his release status as a Level 3 Sex Offender.  He was unsuccessful in securing employment until just before his arrest when a friend of his sister offered him a construction position.

On November 22, 2003, Dru Sjodin was reported missing and Mr. Rodriguez was arrested on December 1, 2003.

*Treatment and Psychological Prison Record*

During his initial evaluations in January and February 1975, Mr. Rodriguez indicated a remote history of making obscene phone calls and while on bail from the first charge he made obscene phone calls and stalked some women on the street.  He indicated to those evaluators that he had quit school in part because of his peers' response to his initial charges for making obscene phone calls.  He confessed to prior overly aggressive (not explained) behavior to females and stated that he finds his behavior to be uncontrollable.  A particularly strong trigger was noted to be racist remarks.  He was strongly identified with a small group of Latin young adults and seemed to be primarily motivated by his desire to be accepted by them.  He was diagnosed with an adjustment reaction of adult life with minimal anxiety symptoms and episodic excessive alcoholic drinking.  Dr. Eggert said he did not think Mr. Rodriguez was a criminal sexual psychopath and stated he did not appear to be a habitual sexual offender.  Therefore, he did not think that Mr. Rodriguez had a treatable condition and thought that he would not get in trouble if put on probation.  Dr. Eggert recommended that Mr. Rodriguez move to a state where he could participate in a larger Latin community as a way to reduce his anger that was acted out in sexual aggression.  Mr. Rodriguez did not receive probation and was incarcerated.  In May 1975, Mr. Rodriguez wrote a letter to his attorney requesting to receive treatment and in June he started a chemical dependency program.  One week later he was sent to a different ward for the Intensive Treatment of Sexual Aggressives.  He had just been elected ward officer in his old unit.

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                                              10

Treatment records indicate Mr. Rodriguez had an active involvement in leadership and recreational activities but was initially a very reluctant participant in therapy.  He was successful in his employment and was rated one of the most dependable workers.  He participated in ward governance and was granted a number of off campus passes to work and visit family.  He reached the insight that hostility and loneliness in conjunction with his drunken state were responsible for his illegal behavior.  Prior to his release he began expressing concerns about there being "something wrong with me" because he got "depressed real fast and my temper comes up real fast."  In March 1976, a psychological evaluation by Lyn Pengelly and Bruce Beltt, Ph.D. indicated depression, feelings of inadequacy, sexual conflict, insomnia with cyclic anxiety, fatigue and tension.  They postulated Mr. Rodriguez had problems around the control and expression of hostile feelings and could be overtly anti-social in behavior.  He was noted to be cynical, distrustful and someone who protected himself by whatever means available.  He was noted to be undercontrolled, impulsive and unpredictable.  A neurological screening test indicated the likelihood of a neurological problem and it was recommended he receive a full neurological examination.  [That was never completed.]  He briefly took medication for his depression but stopped due to his belief that he should control his own emotions.  A follow-up in July noted some improvement but noted a strong likelihood of suicide due to his continuing high level of depression.

In April 1976, Mr. Rodriguez continued to express his concerns about a possible pending release during a treatment team meeting and noted he was not proud of himself or his history.  It was also noted he had quit a prized employment position due to his guilt for missing one day of work.  Progress notes indicate that he had the awareness that alcohol was the only treatment he had to reduce his physical tremors and that he had increased sleep difficulties due to his guilt about the prior sexual assault.  In September 1976, Mr. Rodriguez admitted his long-standing problems with alcohol and drugs and the blackouts that accompanied their use.  A sustained committed effort to his treatment continued in 1976, but he remained depressed, unstable and suspicious according to a November 1976 evaluation.  He was withdrawn into fantasy and noted to have unconventional thinking.  The possibility of aggressive or impulsive behavior was again noted.  December 1976 records note organic impairment, childhood sexual abuse and the awareness that, "I was always being a person who people like, but when I was drunk I was a difference (sic) person I would hate people I liked, I always trying to prove I was okay."  It was ordered in 1976 that he should complete the full term of his sentence for the protection of the public.

Treatment continued in 1977 and Mr. Rodriguez continued to identify the critical behaviors he experienced as a child, his difficulties in relating to others, anger control problems and chemical dependency.  He worked on his high school diploma.  He knew he tried to "get even" for things he perceived others did to slight him.  He observed in March 1977 that his temper was continuing to feel out of control.  In February 1978, there is continued notation of problems with his hand tremors and he continued to benefit (according to treatment summaries) from the program for Sexual Aggressives.  Problems with inappropriate sexual behavior, chemical dependency, inadequate social interaction and confused thinking were still target symptoms or

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr. _____ 11

problems.  Paranoia and alcoholism were also still noted.  Staff remained concerned that he minimized his problems and was not trusting of the therapy process or the mental health personnel.  His only serious infraction during treatment occurred when he threw a rock against an outside security wall.  In March 1978, Mr. Rodriguez and another inmate violated their pass conditions when they stopped at a bar enroute home from the other inmate's sister's wedding.

Plans for release troubled Mr. Rodriguez and he contemplated moving to Texas.  He continued to have off campus work releases and family visits.  In November 1978, he still self-described as a sexual aggressive but was largely unwilling to acknowledge other personal faults.  His re' ase summary said that he has felt rejected and defensive for most of his early life due to his small stature, Hispanic background and language problems.  His peer group use of alcohol and drugs was a way to join the group and to self-medicate his neurological tremors.

He was paroled in January 1979 to Horizon House in Mankato, Minnesota.  Employment frustrations due to his history of incarceration seemed to increase his level of anger and he soon had reduced his psychological participation in the outpatient treatment.  He attended AA regularly and spent weekends returning to the treatment program.  He did date briefly and was sexually active.  He was frustrated at the control still required of his behavior but he appears from the records to have been compliant with all demands made of him.  In June 1979, he was approved to move to independent living.

Mr. Rodriguez completed another MMPI in early 1980, and it was interpreted as he presented with a failure to acknowledge faults and excessive use of denial and repression.  The evaluation concluded that Mr. Rodriguez had strong dependency needs, was resentful over real and imagined wrongs, and had difficulty expressing hostility but showed improvement in insight, communication and social interest.

The many prior MMPI's are recorded in this March 1980 evaluation.  Over time, they show a decrease in depression and increased emotionality and anger along with more ordered thinking.  His level of energy remained high throughout the period of this incarceration.  Ongoing concerns about his alcohol history and propensity to use substances were clearly noted in this report.  In a psychiatric consultation of 3/29/80, Dr. William Erickson stated he believed Mr. Rodriguez to be free of hostility that would be acted out in rape.  It was recommended that he continue in the outpatient program for another year and that upon release he not return to Crookston.

While on pass to Crookston, Mr. Rodriguez allegedly confronted a woman in a car and stabbed her with a knife.  He was found guilty in June and sentenced to two consecutive sentences of 0-15 years and 0-20 years.  He denied the charges.  He was sent to Stillwater Minnesota Correctional Facility.  A medical history compiled in May 1980 is congruent with the foregoing summary.  It was determined that further psychiatric treatment would not be helpful but Mr. Rodriguez could *not* be released until all psychological/psychiatric data indicated he would be safe due to newly enacted "not dangerous" legislation.

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                                    12

Mr. Rodriguez stayed at Stillwater until May 1983 and then was transferred to Oak Park Heights for five years.  He had a positive prison adjustment.  He decided to give up all chemical use.  He had unusually strong job performances.  Prison records indicate some confusion between "denies need for sexual offender treatment," that he wished to have treatment closer to the end of his incarceration, and that treatment was not available to him.  He continued to maintain his innocence for the 1980 charge and appealed that conviction to the Minnesota Supreme Court where it was denied.  He requested that if he was to be placed in sex offender treatment as a condition of his release he did not want to be placed in the Oak Park Heights program.  He cited confidentiality concerns about that program.  He was willing to go to the TSOP program but it required admission of guilt so he was ineligible.

In 1993, Mr. Rodriguez was moved to a medium security facility, Lino Lakes, in order to complete training in printing.  His contract for that facility included participation in a sexual offender program.  There are no records for this treatment and Mr. Rodriguez says it was not implemented at that facility.  In 1994, he was transferred to Moose Lake and was told to undergo Sex Offense counseling and a substance abuse assessment.  No records report his participation in that and Mr. Rodriguez said that the program was never available to him until right before his release.

In 2001, more than a year before his release, Mr. Rodriguez was rated as a "13" on the MsSOST-R.  This is an instrument used by the State of Minnesota that is to help assess the risk of reoffending.  This placed him in the high risk category that requires public notification of his residence.  On the positive side of that same evaluation report, it was noted that he had not used chemicals since 1985, he had completed the previous treatment program at St. Peter Security Hospital, he had not sexually offended since that time (maintaining innocence of the 1980 charge) and he planned to move to Mexico upon his release.  It was further stated that he did not pose the level of risk indicated by the proposed Level III due to his advancing age and the fact that he had good institutional adjustment.  Despite those positives, he was deemed a high risk due to his criminal history and the 1980 charge that he maintains he did not commit.  He received the following points on this system:

MsSOT-R for Rodriguez

| | |
|---|---|
| 2 | number of previous offenses |
| 3 | offending history lasted more than six years |
| 2 | offense committed while under supervision (1980 charge disputed) |
| 1 | multiple acts on a single victim |
| 3 | victim was stranger – disputed 1980, knew previous victims |
| 1 | alcohol or drug use prior to instant offense – disputed charge |
| **12** | **Subtotal -- Historical/Static** |

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr. 13

| | |
|---|---|
| 1 | major discipline infraction (throwing a rock at the outside yard fence) |
| 1 | did not pursue chemical dependency treatment (during his first incarceration he was in a different program and he was not using after 1985) |
| -1 | age of offender |
| **1** | **Subtotal -- Institutional/Dynamic** |

**13** **Total -- Historical and Institutional**

His end of confinement review (done almost two years before his release) highlighted this risk assessment and affirmed his "high risk" assessment. His counsel argued that this was over-scored: His victims were not strangers, he was almost fifty years old, and the jury trial in 1980 was suspect since the witness identified him while under hypnosis. Although scoring a +1 (highest level) for prison violations was appropriately scored, that had actually been one incident of throwing a rock at a fence nearly two decades earlier. [Mr. Mickelson concurred that his violation history was extremely minimal.] A further argument was the state had not provided him with any treatment since the 1980 offense and he was being punished for maintaining his innocence (a constitutional right) of that charge. He was not allowed admission to one program unless he admitted guilt. He admitted that he had done the offenses in 1974 out of anger and the committee then noted he had not had any "anger training." [That was, however, very likely a strong component of the sexual offender program that he did complete.] He summarized for the committee his treatment after the first offense and the changes he believed he had made. The committee stated that because he did not have a stable, well-supervised living arrangement that would minimize his risk of re-offending, a broader notification of his sexual offender status was necessary. [Because he had completed his full sentence, no transitional program, parole, or aftercare was available to him. He and his family exercised diligent efforts to try to find such an accommodation and none were available, even on a self-pay basis.] Mr. Rodriguez was at a higher risk because he would not be supervised but no supervision was available from the state or on a fee-for-service basis.

Mr. Ted Mickelson, Case Manager for Mr. Rodriguez testified in a recent deposition that Mr. Rodriguez gestured to the facility where civil commitments were housed while making a remark that he wished he could go someplace "where [he] was locked up, but not locked up."  Mr. Mickelson was concerned enough that he talked to Dr. Saint George and sent Mr. Rodriguez's file to the Department of Corrections ten months before the due date because he believed that the appropriate committee should take a "close look" before granting release status.

In January 2003, Mr. Rodriguez self-referred to a prison psychologist, expressing anxiety about his upcoming release in May. Dr. Saint George had two appointments at Mr. Rodriguez's request. In her recent deposition she stated that he had an unusual amount of anxiety compared to others who are waiting to be released. She indicated that she was concerned about him but in

Exhibit 2

her position was not allowed to do a risk assessment or express her concerns because the department did not have the resources to provide treatment. Mr. Rodriguez at that time was diagnosed with an Anxious Adjustment Disorder, sexual abuse of an adult and adult antisocial behavior. Dr. Saint George explained the former as appetite and sleep disturbances manifesting an anxiety that was greater than would be expected for the adjustment he was about to make. The latter two are "V codes" in the DSM IV and are not considered to be mental diseases or defects. They discussed him seeking information from the Chamber of Commerce for some communities out of state where he might relocate. In a subsequent appointment, Mr. Rodriguez told Dr. Saint George that he could not get a picture ID, that he could not emigrate to Mexico because of his felonies and he was not going to move to live with his sister because of his sexual offender classification. He offered the insight that he was feeling objectified by staff that did not appear to be interested in offering him assistance in this transition and this was how his victims must have felt. Although there are notes that he was to be seen again, no further appointments were conducted. Dr. Saint George further stated in her recent deposition that if she had concerns about another inmate that were similar to the ones she had about Mr. Rodriguez, she would now risk a personal reprimand and make a report that some further psychological intervention was necessary and that release should not proceed on schedule.

Prior to his release, Mr. Rodriguez attempted to get an apartment in Minneapolis but could not get one due to his sexual offender status. His mother offered her home. His sisters agreed to deed him the family home upon the death of their mother and he moved there because he had no other choice. [Note: Previous evaluation had recommended he not return to Crookston.]

Mr. Rodriguez returned to Crookston and lived a quiet life with his mother. He was unable to find employment and reported repeated instances of overt discrimination against him. Once he saw in the glass window reflection an employer in a printing shop throw his resume into the trash as he walked out the front door. He enjoyed cooking for his mother and he often worked in the garden. After months of looking, he was successful in finding employment through a friend of his sister. He had money saved from his work in the prison and he purchased a car and provided his mother reimbursement for his living expenses. Mr. Rodriguez and his mother were targeted by many acts of vandalism and harassment during the time he lived there.

## HISTORY DISCUSSION

### Childhood

Although Dolores and Poncho were present in the home, it appears that a great deal of the parenting was left first to the ailing grandmother and then to the oldest sibling. While many parents work, the hardship of the migrant life cannot be overestimated in the toll it would take on the energy and available time for the parenting tasks of several small children in a home without gas, water, or electricity. After a day of hoeing plants in the long sugar beet field rows, children

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr.                                            15

would be met by tired parents who still had all the household tasks to perform. We can imagine that the family togetherness of the extended family would have provided some mitigation of the lack of parenting, but nothing can replace the sense of security that comes from having a reliable and available competent non-exhausted parent. Multiple births in close succession would have taxed even the strongest of parenting units.

The first four months of Alfonso Rodriguez's life were marked not only by the deprivation that his family felt in general; he was starving to death. The first month he was unable to tolerate his mothers' milk. One possibility for this is that his mother's sustenance was tainted with the DDT or fungicides in her system. Alfonso is the only one of her children she tried to nurse. It was such a failure that she never tried again. When the breast milk was incompatible, she was unwisely advised to feed him rice water. Its nutritional value would barely exceed sugar water. Finally, at four months she began to give him other food. This early malnutrition may provide the reason for his seeming lower intelligence than his siblings, his developmental slowness and perhaps other brain anomalies.

The sexual abuse that occurred with some frequency during his youngest years was manifested in a number of ways in his recollection. He described that he felt afraid of many adults, male and female, and that he was overly sexually oriented. He indicated even kisses from his father felt awkward to him and he began to shy away from contact with him. Hugs from aunts felt uncomfortable as he found himself breast high in their embrace as a preadolescent. When he was thirteen, a slightly older girl who was his girlfriend would move against him in a sexual way and he felt uncomfortable and wanted to get away. He said he thought he often misinterpreted innocent touch and recalled that when he was about twenty an old man casually touched him on the leg and he did not know what it meant but still recalls how uncomfortable he was.

He indicated that the sexual flashbacks come primarily as smells: the smell of the barn, oranges and a musky, moldy smell of old blankets prompt memories of the teenager. The scents of lemon pledge and incense from the church, the sight of a nun in a habit and the smell of some perfumes will trigger feelings of claustrophobia.

There is some lack of consensus about Mr. Rodriguez's enuresis when he was young. His mother did not recall that he had ever achieved night time control, whereas Mr. Rodriguez recalled that he *began* wetting the bed when he was five or six. He attributed it to being afraid to go to the outhouse in the night. That might be the correct reason. It is also a common regressive behavior that develops, particularly in boys, when they are sexually abused at a young age. His recall of this stage of his life coincides with the remembered sexual abuse at the migrant school.

Erik Erikson, a noted developmental psychologist, writes that the developmental tasks of a young child are of primary importance to his or her lifetime development. During the first five years of life many, if not most, of our personality traits and intrinsic beliefs are formed. In our social and emotional development, *trust vs. distrust* is the first and most likely the most

Exhibit 2

important developmental task.  It is learned in the first one or two years of life.  A child who is nurtured, loved, and has a secure, reliable caregiver develops trust and security and an optimistic point of view.  Those who do not get such secure care, develop insecure and mistrustful attitudes. Erik Erikson postulates our second developmental task is to learn *autonomy vs. shame*.  A child from eighteen months to about three years old who has been well parented learns to be proud and self-assured.  This period is navigated through the terrible two's where watchful and attentive parenting allows the child to take appropriate risks while remaining safe.  A failure at this stage leaves the child vulnerable to a lifetime of shame for their very existence.  A third developmental stage precedes school:  learning *initiative vs. guilt*.  This includes the accomplishment of skills through imagination, cooperation, and leading and following in a group.  A child who fails this developmental stage will be fearful, hang on the fringes of groups, depend unduly on adults and be restricted in play skills and imagination.  In other words, our personality, the sense of self, coping mechanisms, and coping strategies are formed before we ever go to school.  Our beliefs about the right to exist and take up space in the universe, and whether the world is a safe or unsafe place, are also established.

By the time Mr. Rodriguez was ready for school he had learned that the world would be a harsh and scary place.  Trust, autonomy and initiative would not be learned in his personality.  Distrust, shame and guilt had quite a foothold before he ever entered school.  He had been sexually abused, was often left in the care of an only slightly older sibling and nearly starved.  Not a secure foundation for his life.  He did not find an improvement after entering the larger world.

*Middle Childhood*

As his early childhood was insecure, we find Mr. Rodriguez's middle childhood to be prejudicial.  His entry to the greater community exposed him to greater external assaults. Without a foundation of trust in the world outside, these would have been bitter blows to his tenuous sense of stability and safety.  It is quite likely he developed a very tough exterior to cope with these assaults and insults.  There does not appear to be any haven of safety or security:  he had been assaulted in church so it could not be safe; he failed at school; his peers teased and rejected him for his color; his mother wasn't home and his father was harsh and best avoided. Every child has instances in which they are not accepted by peers or feel singled out as different or unacceptable.  Mr. Rodriguez appears to have been the target of racism.

During these middle childhood years, the fourth developmental task is learning *industry* vs. *inferiority*, i.e. competence.  The child learns to play by rules, begins to master a variety of school subjects and with the foundation of the early periods begins to have initiative towards life tasks.  If the child did not previously learn trust as an infant, we can expect that he will be mistrusting.  If the child did not learn autonomy and initiative during this period, he will experience defeat and inferiority.  To accomplish the tasks of this age, the child needs adults who *play* and *interact* with them to build a sense that he is special and cared about.  The child still

Exhibit 2

needs help in solving problems but wants a sense that he is accomplishing things on his own. They are beginning to have a sense of another person's point of view but the needs and feelings of others (empathy) are still difficult. These children need a parent who will help them express feelings in appropriate ways and need more approval than criticism. Young Alfonso must have certainly felt that others did not play by the rules and that he was the master of almost nothing. It was a time of great frustration for him and he turned to a way of coping that he observed in the adults in the community: nicotine and alcohol. Although these substances "help" in a moment, they stymie the emotional and intellectual growth of the young person. They are anesthetized during critical emotional and social experiences. They never mature "through" the years. Interestingly, two of Mr. Rodriguez's sisters report that they experience Alfonso as a person who is emotionally about 10 - 13 years old. Mr. Rodriguez offered the independent observation that when he was in young adulthood he criticized himself for acting like a 13-year-old but felt unable to behave differently. He began using chemicals in second grade.

## Teenage Years

The clearest summary of Mr. Rodriguez's adolescence is that he failed school and did drugs. Although it is obvious that doing drugs will lead to school failure, it is also quite likely that his school failure also prompted his drug use. His IQ, language deficits and poor academic history provided no preparation for success. It appears that there was no school, parental or legal intervention into this pattern of failure and disengagement. No one appears to have taken much notice. He quit school with a minimal education, despite having attended until he was almost eighteen years old. His life, quite literally, was to be with his friends and avoid his father at home.

The teenager is faced with the fifth developmental task (Eric Erickson) of *identity* vs. *identity diffusion*. The storm of these years for all adolescents is manifested in rebellion, self-doubts and a lot of confusion. The development of a healthy identity (rather than a negative one) will lead to the expectation of accomplishments rather than the paralysis of inferiority. The sexual/gender identity coalesces and the teen experiments with dating and relationships. A set of ideals, goals of life and places for leadership ideally begin to accrue.

Mr. Rodriguez certainly lacked the foundation to begin to tackle the developmental tasks to proceed into adulthood. Although he dated in high school, it appears that his life was focused on substance consumption and primarily group relationships. He indicated he was not as successful socially as his next younger brother, Francisco, who was lighter skinned and good with girls. Francisco cultivated and was successful at the "James Dean look" but his older, less successful brother, Alfonso, had neither the charisma nor stature to carry off such a look.

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                                    18

*Young Adulthood*

Mr. Rodriguez worked in a variety of seasonal employment positions that were in many ways similar to his father's early employment.  He indicated he did not seek a full time position because he liked to return to Texas in the winter to visit his aunts, sister and cousins.  He felt more at home culturally in Texas and continued to feel misplaced and disconnected in Minnesota.  By the age of twenty-three he began his incarceration which has occupied almost all of his adulthood.  Although he had some treatment and social programs connected to his incarceration, it appears that he never trusted anyone and was never able to bridge the gap between himself and others.

The developmental tasks of young adulthood are *intimacy vs. isolation.*  This is the foundation of a good marriage and good friendships.  Prison life never fosters the setting in which others are trusted and emotional intimacy is possible.

The next task of *generativity vs. self-absorption* begins in early to middle adulthood and is usually represented in parenthood or working productively and creatively.  Mr. Rodriguez has never approached this development task.

*Adulthood*

Mr. Rodriguez has made a satisfactory adaptation to prison.  He mostly stays alone, reads and reported an acceptance of his life and his situation.  He avoids contact with most inmates when he is in prison and now appreciates the solitary confinement in which he is currently housed.  He reported that he is angered when he experiences or witnesses racism but has learned to walk away.

Mr. Rodriguez re-entered the free community in a difficult way.  He was unable to find housing in Minneapolis, was unwilling to subject his sisters to his sexual offender listing, and was unable to emigrate to Mexico. He returned to small town Crookston where his long incarceration history was known to many and he was unable to find employment.  He maintained a somewhat secluded and isolated life with his mother, cooking and working in the garden.  He felt very defeated: he had spent two decades in prison for a crime he maintains he did not commit; he was found guilty using illegal methods; he was fifty years old and was repeatedly denied any chance of making a transition to meaningful employment.   Given the multitude of possible discrimination foci (race, age, felon and sexual offender) it is not surprising that without assistance, this transition was not likely to be a successful experience. Mr. Rodriguez said that during the six months he lived with his mother they received harassing phone calls, his car was damaged, and his tires flattened multiple times. Messages were left on his car to leave town.

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                        19

Mr. Rodriguez was charged in December 2003, after the disappearance of Dru Sjodin in November.

## FAMILY CONSULTATIONS

The following information is summarized from the interview notes of Angela D. Daniel, investigator; this examiner's interviews, and the deposition of Mrs. Rodriguez as noted specifically in the Appendices.

Mrs. Rodriguez and Sylvia Rodriguez recalled the crop spraying that was done while they were in the fields and in their home. Mrs. Rodriguez indicated that during her pregnancy with her son Alfonso she was very depressed for the first five months. They were very poor and she was working in the fields pulling sugar beets. She recalled it as a particularly cold and rainy spring. Mrs. Rodriguez detailed the health problems that Alfonso Rodriguez had in his first year of life that resulted in a diagnosis of malnutrition.

The family moved to Minnesota in 1962 and stopped their yearly transition back and forth for migrant work. This preceded Alfonso Rodriguez, Sr.'s back injury in 1963, and the severe emotional and financial strain that was placed on the family. Sylvia Rodriguez recalled that they were often hungry during this period. It was during this time that her father was arrested for poaching a deer. Mrs. Rodriguez knew that her children suffered discrimination but was powerless to change the situations for them. Sylvia said that at school the teachers required them to sit in the back of the room and treated them differently than they treated the white students.

Francisco Rodriguez recalled his brother being taken away during the night when they were at the migrant school but he does not know any details. He further said that due to the differences in his skin color and his brother's color, he was called "the white one" and Alfonso was called "the black one". He recalled that his brother suffered teasing regarding his big head, walking with a limp and shaky hands. Ms. Sylvia Rodriguez recalled sexual abuse of herself and her brother as noted in the history section under "sexual abuse." Ms. Sylvia Rodriguez said that her brother Francisco had a learning disability; and Rosa Rodriguez said that Francisco is very immature and "goofy" ---like a kid.

Ms. Sylvia Rodriguez said that she was "mother" to Alfonso. She recalled he never complained and was always seemingly satisfied with whatever was available to him. She indicated he was very devoted to his own mother despite her lack of presence when they were children. She said that to her, her brother has always been very sweet and nice.

Mrs. Rodriguez recalled her son Alfonso had a good deal of difficulty in school, particularly with writing and spelling. She thought that he completed the ninth grade before dropping out. She did not attend any school meetings with the teachers because she did not drive. She recalled

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr.                                    20

Alfonso as a quiet, polite child, slow to make developmental markers.  She was unaware of any drug or alcohol abuse by Alfonso as a teen.

Ms. Rosa Rodriguez said that she recalled a great difference in her brother Alfonso when he was with his friends in Texas:  he did not drink and laughed more.  This was a culture that was 90% Hispanic and there was not the "class system" between whites and Hispanics.  She said she has never seen her brother lose control of his anger but has seen him angry when there were issues of unfair treatment; e.g., when he saw an older child bullying a younger child.  When she has seen his anger flash across his face, he always walked away from the situation.  She further recalled when she was about sixteen (Alfonso would have been early twenties), they both lived at home.  She remembered her brother as kind to her but very withdrawn as he spent most of his time in a basement bedroom alone.

Mrs. Dolores Rodriguez indicated her daughter Rosa was returned to Texas to live with grandparents and aunts at age four because she was unhappy in their family in Minnesota.  This was in 1962, and Alfonso was upset that he was not allowed to go also.  Mrs. Rodriguez went to work on an evening shift at a local restaurant in Crookston when her husband was ill and she supported the family.  She subsequently was employed by the local university in food services for 28 years.  Mr. Rodriguez, Sr. opened a small radiator repair shop in about 1965 due to his inability to return to the field work he had done before his back injury.  However, when a white man opened another radiator shop in town, his business failed and he had to return to the fields as an older worker.  He died of a brain tumor.

Ms. Sylvia Rodriguez, the sibling closest in age to Alfonso Rodriguez, indicated she has a host of neurological problems that are similar to her brother's.  She has been told that these are likely related to her exposure to DDT.  She has never been able to carry a child to term.  In 2006, she was diagnosed with bi-polar disorder.  She indicated she was hyper and unable to sleep.  She noted that she has an extreme response to both nicotine and alcohol and also attributed that to her chemical exposure.

Ms. Sylvia Rodriguez detailed the many efforts she made to get post incarceration assistance for her brother. He had told her that he did not feel ready to leave the institution and she tried to find some kind of assistance but nothing was available.  The family offered to pay for him to be placed in some kind of transitional program but none were available since he had completed his sentence.

Mrs. Rodriguez has been a faithful visitor to her son throughout his many years of incarceration.  When her husband was alive they went on a weekly basis but she has been unable to get rides quite that often since her husband's death.  She never learned to drive.  Since his incarceration in Fargo, Mrs. Rodriguez has been able to see her son almost weekly except when her health prevented her traveling.

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr.                                                    21

Mrs. Rodriguez reported that when Alfonso lived with her he spent a good deal of time with his nieces and nephews who lived in Crookston. His social life was minimal as most of his friends were no longer in the area. He spent most of the summer canning fruits, spaghetti sauce and salsa made from produce from the garden. Mrs. Rodriguez further recalled that he drank coffee continuously and she guessed he consumed fifteen cups per day. She indicated she has greatly curtailed her church and social activities since Alfonso's most recent charge, noting that most of her Hispanic friends seemed reluctant to associate with her. She surprisingly contrasted this to her Caucasian friends who did not seem to falter. When I was visiting, she had a vast array of foods fixed and stated that someone comes by on a daily basis and she provides them lunch. She is known for her excellent cooking.

Ms. Rosa Rodriguez is very close to her mother and talks to her by telephone two times a day. However, she said that her recollections are that her mother was not warm and affectionate to her children. She knew of some mental health and alcoholism history in her extended family. She described Dotsie Dahl as talkative but meek, taller than Mr. Rodriguez, "chunky" and a nice girl. Rosa worked in social services in Crookston for many years and reported her personal observations of racism against her family and other Hispanic families.

## MENTAL STATUS

Mr. Alfonso Rodriguez, Jr. was interviewed in the Cass County Detention Facility in Fargo, North Dakota on all occasions. He presented as his stated chronological age of fifty-two, was neat in appearance and cooperative. He seemed familiar with the evaluation process and was forthcoming with the interview. He indicated that as an adult he was generally viewed by others as a well-liked, well-mannered, nice guy. He said he is a loner who has difficulty being around people because he always feels on guard. He likes gardening, cooking, working outdoors and fishing. He indicated he has never trusted anyone and thinks it is dangerous to be truthful because people will betray you. He said that he did not believe that applied to his conversations with me because the repercussions of my work did not matter to him: he was not trying to convince me of anything. He stated that he does not get lonely because he lives his life in a world of fantasy. In this fantasy he lives with a family, is successful at work in a print shop and is married to a teacher. His make-believe family goes on vacation to visit his sister.

Mr. Rodriguez displayed no unusual mannerisms, gestures of compulsion or anxiety. His hands have a significant tremor. His other psychomotor activity was within normal limits with no evidence of agitation or retardation. Similarly, his speech was within normal limits.

Mr. Rodriguez was moderately flat in his affect. This did not appear to be just the result of depression or conscious or unconscious blunting, but rather the expression of a very modulated and controlled personal presentation. Again, this seemed very natural to him and not an "act" for

Exhibit 2

the examiner. He has spent many hours in thought and in avoidance of thought and nothing appeared to make much impact on his emotional state.

Mr. Rodriguez was quite able to present logically and coherently with a continuity of thought processes. He was not particularly given to rambling or distractibility. He was almost always able to elaborate on the questions I asked although he lacked memory for a number of details that other family members or records suggested. There did not appear to be any general evasiveness as he readily talked about thoughts, actions and motivations that were not necessarily self-serving. Although he speaks with a pronounced accent, it is easy to understand him and he did not appear to have difficulty communicating in English.

Mr. Rodriguez expressed no preoccupations at the present time but did admit to previous preoccupations with sexual fantasies as noted below. He has had some gastrointestinal difficulties but those are not significant at this time. He indicated that he periodically becomes angry when he witnesses or experiences racism or unfair treatment of himself or others. He is successful in walking away and putting his feelings aside in almost all circumstances. He could recall easily, however, instances in which he had been angry in the recent past. He admitted to a number of thought distortions historically. Those have largely concerned what he perceived as others wanting something from him, others being sexually inappropriate with him, and others being discriminatory to him. At the present time he acknowledges that while all of those categories of behavior have happened to him frequently in his past, he now also believes that sometimes he perceived slights when they did not occur. He has no validation at this time if they were true or not. [It is consistent with his disordered thinking that he would misperceive in paranoid ways, the behavior of others when they related to race or sex. These distorted perceptions could be the basis of aggression that he then believes is justified.]

Mr. Rodriguez has no expressed current homicidal or suicidal thoughts. Although he has a minimal desire to live, his compassion for his mother will prevent suicidal actions for as long as his mother is alive. He has no positive history of suicide attempts except for risky behavior as a teen and young adult.

Mr. Rodriguez was oriented to person, place and time. He is fully aware of the charges and consequences of those charges that he currently faces. His immediate, short-term and recent memory all appeared intact. His long-term memory appears spotty but it has been the subject of intense scrutiny by examiners and his recall may not be different than others of his age, intellect and position.

Mr. Rodriguez has some insight into the actions in his past. His treatment in the past indicated that although he initially resisted participating in the psychologically oriented program and examining himself, he did eventually engage in that process with some increase in insight. At the present time, some of his insight appears to be largely impacted by the host of evaluations

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                    23

and interviews in which he has been involved.  Some of the "insight" he expressed may be the result of learning from others that may or may not yet be internalized.

His judgment at the present time appears reasonably good.  He indicated he wishes to withdraw into a complete shell but because of feelings for his family he stays somewhat engaged with them.  His successful incarceration history would indicate that in a prison setting he is able to control his actions and behaviors to meet acceptable behavioral standards.

Mr. Rodriguez indicated he is generally disengaged from other people.  This began with his family when he thought that his Aunt Santos was (or he wished she was) his mother.  He indicated that after his father's accident his mother was always working after school; and after the age of thirteen he was never home until bedtime, avoiding his father and staying with his friends.  He recalled feeling angry with his mother for most of his childhood because he believed she required them to live in Minnesota -- away from their extended family and an Hispanic culture -- because she wished to be away from her family.  He never confirmed with her that this was true.  He recalled holding a childhood dream that when he got out of high school he would return to Texas and live in the tiny family home next to his paternal grandparents and aunts.  He was devastated when his parents sold their home for $2,000 when he was fifteen.  He remarked that they did not even consult the children.  He said that he learned early in life that people were a disappointment.  Although he remembered this initially confused him, he said by the time he was a teenager he was disappointed and committed to never trusting anyone.  He finds solace in being alone, being in nature, and escaping into his own fantasies or the fantasy of a novel.  He indicated that being with groups larger than three or four people was very stressful for him and that solitary confinement had been a relief for the past two years.

Mr. Rodriguez reported a long-standing preoccupation of sexual thought.  He reported very contradictory ideas:  (1) once he was in a relationship, sexual activity was not that important to him and he was angered by women's desire for him; and (2) a long-standing habit of sexual fantasy regarding women that he would see in public.  They were usually tall and blonde.  He indicated that he had these persistent sexual thoughts beginning as a teenager and they would be triggered whenever he was angry, regardless of the target of his anger.  It appeared that his fantasies had the theme of women who were unavailable.  Again in contrast, he was angered that his sexual feelings were aroused by women, be they buxom aunts or teenage girls.  He felt like these women had some kind of power or control of him and he hated his own response to them.  However, he liked engaging in sex but greatly disliked the feelings that came before and after he was sexual.  He said on one occasion that women only wanted sex and he wanted a relationship.  Another time he said that he only thought of women as sexual partners and never thought of them as potential friends.  He recalled he learned in treatment that he should focus his fantasies on being sexual within a relationship instead of one-night stands.  Distorted thinking was evident in these sexual preoccupations.

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                                24

Although not overtly evident from his social presentation, Mr. Rodriguez admitted to a long-standing issue with anger.  Like other victims of sexual abuse, racism and poverty, he experienced a sense of powerlessness to his many perpetrators.  This sense of victimization continued when he was convicted of the 1980 assault for which he maintains his innocence. Growing up in an angry household, Mr. Rodriguez had the goal to not be like his father. Whenever he does lose his temper, he becomes angry with himself for being angry.  He has struggled as an adult to find ways to control his temper and when he has been incarcerated he has been largely successful.  He learned early in life to deny his feelings, trust no one as a confidant. As a young adult, he tried to use alcohol to moderate his feelings but found it often resulted in increased anger when his inhibitions were lowered.  As an adult, his goal has been to walk away from any situation in which he became angry.  His family has observed that behavior.  In the past, he has used masturbation and exercise to also give him additional anger control.  He currently has a variety of obsessive-compulsive rituals that may be new coping mechanisms although he did not note any connection between them.

Mr. Rodriguez stated that previous psychological evaluations usually involved meeting with the examiner for a very short period of time (he recalled fifteen minutes) and that he hated the previous psychological testing and did not take its administration seriously.  He also indicated on his testing by this examiner that he finds the wording of test items to be confusing; e.g., "I loved my mother" means to him that he loved her only in the past and no longer did.  He questioned if that would be a correct interpretation of that test item.  It may be a language translation issue, a language perception issue, or desire to be as accurate as possible.

Mr. Rodriguez indicated a steady and persistent use of substances from the age of eleven until 1983.  He recalled that the use of drugs in prison was common and was largely ignored by staff at that time.  "As long as we didn't kill each other, they didn't care."  On the morning of his commitment to sobriety, Mr. Rodriguez gave away a couple hundred dollars worth of drugs and never had any again.  He said that as a young man it was the only way he knew to control his hand tremors.  However, during the alcohol withdrawal that followed, the tremors were increased in intensity.

## TESTING RESULTS

*Neurological and Intellectual*

Dr. Karen Fromming evaluated Mr. Rodriguez with a host of neurological and intellectual measures.  In a preliminary report dated June 27, 2006, she opined he has diffuse brain impairments, some of which can be linked to toxic exposure.  She noted specifically that when processing emotional content through multi-channels (e.g., more than one of facial expression, tone of voice and content at a time) he had a compromised performance.

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                                    25

His intelligence was rated at an overall score of 87, the 19th percentile. Other composite scores were in the 18-39 percentile rank except for working memory which was at the 2nd percentile. This is his ability to hold information for a short period of time to use that information during a conversation or to perform a short task. This same problem of working memory was evident on the Wechsler Memory scales where he performed at the 4th percentile.

Dr. Fromming scored Mr. Rodriguez's achievement of basic learning skills using the Wide Range Achievement test and found his reading at the 5th percentile (6th grade equivalent), spelling at the 2nd percentile ( 4th grade equivalent) and arithmetic at the 19th percentile (7th grade equivalent.)

She concluded that he has cognitive impairments in a variety of intellectual and emotional tasks that are related to diffuse brain damage. His lack of smell helped her to identify that as orbitofrontal impairments. She found that the deficits Mr. Rodriguez has are unrelated to the tremor that is present in both hands. Toxic exposure is a suggested etiology for these neurological findings.

*Psychological Testing*

The results of Mr. Rodriquez's psychological testing indicate that he is a person experiencing a significant degree of psychological maladjustment. On the one hand, testing suggests he is a narcissistic, grandiose, self-indulgent individual who has little ability to relate to others. In contrast, testing also indicates he is a man who experiences marked personal inadequacy, particularly with respect to his masculinity. He is significantly sexually preoccupied. His testing profile is consistent with individuals who are very sensitive to rejection and criticism. He is likely to exhibit strong dependency traits. However, since he has such insufficient social skills, his need to attach to others is probably often frustrated.

He is a very socially uncomfortable individual who sees the world as a threatening place and views himself as, essentially, helpless in this world. He has an expectation that he will consistently fail and be humiliated in social interactions. In order to combat his own sense of inferiority and inadequacy, he is likely to compensate with a defensive posture of narcissism and grandiosity. This posture may result in some antisocial, aggressive and impulsive acting out behavior.

Mr. Rodriquez's testing suggests he does not possess the internal resources to adequately tolerate even the basic stressors of daily living and human interaction. He does not possess the emotional, and perhaps intellectual, foundation to maintain effective and consistent intrapsychic regulation. Testing suggests he has experienced a history of trauma and this may have contributed to his inability to establish sufficient ego resources. This lack is likely to result in unpredictable behavior because the foundation for such regulation is lacking.

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr. _____ 26

Because social interactions are so discomfiting and potentially threatening to Mr. Rodriquez, he would like to withdraw from social interplay. However, his strong dependency needs and his fear of autonomy conflict with this withdrawal wish. He is a man who doubts himself and mistrusts others. Consequently, his only refuge is a withdrawal into fantasy. This withdrawal may lead to magical thinking and depersonalization, concurrent with impaired reality testing and a difficulty separating fantasy from reality.

Although not frankly psychotic, testing suggests Mr. Rodriguez may experience impaired reality testing, particularly in confusing or emotionally ambiguous situations. In straightforward, clear social interaction, he is capable of thinking logically and coherently and able to come to reasonable conclusions about others. In more ambiguous or stress-laden interactions, he is likely to decompensate. This unraveling is likely to lead to a misperception and misunderstanding of social interactions and, consequently, result in persecutory and/or paranoid ideation. In these situations a thought disorder is likely to be present. [Note the consistency of ambiguous social situations malfunction with the neurological findings of inability to process emotions in multi-channel inputs.]

Diagnoses consistent with this testing profile range from Axis I disorders of Delusional (Paranoid), Dysthmia and Anxiety. Possible Axis II disorders suggested by this testing profile are Personality Disorder with Schizoid, Passive-Aggressive, Paranoid and/or Antisocial features.

## DIAGNOSES:  USING DSM IV

Axis I:        Clinical Syndromes
                  Dysthmia
                  Substance Abuse, in remission
                  General Anxiety Disorder
                  Post-Traumatic Stress Disorder, Subsequent to repeated childhood
                        sexual abuse
                  Rule out Delusional Disorder, Persecutory Type
                  Mental Disorder Not Otherwise Specified, due to toxin exposure

Axis II:       Personality Disorders
                  Schizoid Personality Disorder with Avoidant, Paranoid, Anti-
                  Social traits

Axis III:      Medical Problems
                  Prior exposure to Toxins leading to Neurological impairment
                  History of headaches and abnormal cranial swelling

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr.                                          27

Axis IV:       Stressors
                       Legal charges
                       Incarceration

Axis V:        Global Assessment of Functioning (Scaled 1-100)
                       40: some impairment in reality testing or communication
                       Functions well in social isolation

## DIAGNOSIS DISCUSSION

*Axis I*

When someone presents with a great number of psychological symptoms and long-standing defensive behaviors, it is a challenge to determine appropriate diagnoses.   Additionally, incarceration is an abnormal human state and accommodation occurs by any person who has been in prison for a number of years.  Despite those difficulties, it is clear that Mr. Rodriguez has a number of symptoms that are appropriately diagnosed with Axis I diagnoses.  Axis I diagnoses are for the clinical symptoms that are currently presented by a patient.  Mr. Rodriguez has a plethora of depressive and anxiety symptoms.  His diagnosis of Dysthmia is long standing but has somewhat less severe presentation than Major Depression.  Mr. Rodriguez likely has had periods of major depression but currently he is at a lesser intensity.  His anxiety is pervasive enough and consistent enough that it does not appear to be secondary to any situation or stimuli. In addition, he has symptoms that are reactive to victimization that denotes Post-Traumatic Stress Disorder.  PTSD has both anxiety and depressive symptoms that are a reaction to exposure (internal or external) to traumatic events.

Historically, Mr. Rodriguez has abused substances in and out of prison but no longer uses any substances.  His diagnosis is labeled as in remission due to his current abstinence.

Mr. Rodriguez must be considered for a Delusional Disorder.  This is primarily in the form of paranoid ideation of persecution.  This diagnosis notes that small slights may be exaggerated and become the focus of the delusional system.  Mr. Rodriguez has some insight that his perception of victimization in the recent past might be distorted although he does not know how to determine if he is perceptive, i.e., accurately perceiving his world or delusional.  Since this examiner was not present at any of the events he described, they may have been racism or he may be delusional.  A "rule out" notation on this diagnosis of Delusional Disorder indicates that it must be considered but could not be confirmed.  If delusions are not present, the presence of a thought disorder is confirmed.

Mr. Rodriguez was also diagnosed with a rule out Mental Disorder Not Otherwise Specified, due to toxic exposure.    The toxic exposure has been identified as the basis of many of his

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr.                                                                    28

neurological problems. They appear to be also related to his anxiety. Chronic levels of exposure to organophosphorus insecticides have been reported in professional medical literature but most studies deal with one-time exposure such as occurs when an insecticide is used in a poisoning suicide.   However, some studies of insecticide handles noted loss of reflexes, tremors and equilibrium difficulties.   Another study indicated neuropsychiatric symptoms were present at three years after an occurrence of poisoning. One report notes a man who slept in a room for ten days after treating it for fleas had symptoms after two years. The neurological damage from exposure to organophosphorus affects all aspects of functioning.   In a study that compared exposed and non exposed subjects, damage was shown on memory, moods, academic skills, abstraction and flexibility of thinking and simple motor skills.

The effect of slow-developing persistent psychological lesions of the brain were first described in 1947.    At that time tremulousness, insomnia and confusion were noted as the primary symptoms. Agricultural workers who were exposed for longer periods as adults exhibited a host of language, emotional, intellectual and mood disorders.   Schizophrenic-like symptoms were noted but not explained. In over 400 agricultural workers, headaches were the most commonly noted problem, followed by sleep difficulties, fatigability, irritability, nervousness, dizziness, tremor, fasciculation and parenthesis. Other studies have noted obsessive compulsive behaviors, phobias, outbursts of anger, depression and acute anxiety spells.   Since studies often test for different outcome measures, there is no "general list" of symptoms that are supported in most of the studies. However, in combining studies, the following have been found most often: impaired vigilance and reduced concentration, reduced information processing, memory deficit, linguistic disturbances, depression and anxiety/irritability.

It is clear that many of the possible diagnostic criteria for diagnoses given to Mr. Rodriguez overlap with known effects of exposure to insecticides.   It is possible that *all* of his Axis I diagnoses except PTSD are, in fact, attributable to his early exposure to toxins.

A diagnosis of Post-Traumatic Stress Disorder is noted for the multiple instances of sexual abuse he suffered.  As a teen and young adult Mr. Rodriguez was very reactive in situations that were confrontational and/or sexual.  It is highly likely that his PTSD provided the stimulus for that reactivity.  Frontal lobe damage from the toxins could have lowered his impulse control, leading to greater expression of that reactivity.

*Axis II*

Personality Disorders are an "enduring pattern of inner experience and behavior that deviates markedly from the expectation of the individual's culture. This pattern is manifested in two or more of the following:

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                    29

Cognition—perception of self, other people and events
Affectivity—range. lability. intensity and appropriateness of emotions
Interpersonal functioning
Impulse control

These enduring patterns are inflexible and pervasive across contexts and lead to clinically significant distress or impairment. The pattern must begin in adolescence or early adulthood and not be the manifestation of another mental disorder (DSM IV).  Personality disorders are grouped into three categories.  Each of the three has distinguishing characteristics noted as: odd-eccentric, dramatic-emotional and anxious- fearful.  Each of these distinguishing characteristic and the disorders within each of the three categories represents different ego weaknesses that are present in the person.  For example, schizoid is in the odd-eccentric category and represents those persons who have a pattern of detachment from social relationship and a restricted range of emotional expression.  Paranoid personality disorder also fits in the odd-eccentric category and is a pattern of distrust and suspiciousness such that others' motives are interpreted as malevolent. Anti-social is an example of the dramatic-emotional category and is described as a pattern of disregard for, and violation of the rights of others.  Lastly, avoidant is an example of the anxious-fearful type and is a pattern of social inhibition, feeling of inadequacy, and hypersensitivity to negative evaluation.

Many persons with a serious level of any one personality disorder will likely also meet the criteria for two or more additional disorders.  When all three categories are represented, as they are in Mr. Rodriguez's diagnosis, there is the implication of widespread personality dysfunction and internal psychic weaknesses that will be manifest in almost all interactions and life functions.

Personality disorders are believed to be the combination of inherited traits and nurturing failures that occurred before the age of three.  These nurturing failures can be single or multiple instances of trauma and or lack of reliability in the daily care of the infant/toddler.  Personality disordered individuals are often "young" in their emotional deve'opment; that is, failing to have adequate intrapsychic structures and mechanisms that allow them to function successfully in the world. The greater the compromise in the ego or self, the greater the dysfunction that is expected.

Mr. Rodriguez has a great number of traits that distinguish him from a mentally healthy adult and a portion of those traits are reflected in the personality disordered diagnoses.  By convention, it is customary to diagnose the personality disorder that represents the greatest portion of the person's functioning (in this case, Schizoid) and note those other disorders that are also present in the personality.

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr. _____  30

## MITIGATING FACTORS

Jury Instructions for Death Penalty Sentencing in Federally charged crimes read that mitigating factors are any factors that suggest that a sentence of death is not the most appropriate punishment or that a lesser sentence is the more appropriate punishment. These factors do not have to be unanimously endorsed by all jurors as the aggravating factors must be and mitigating factors must be proved only to a preponderance of evidence standard. It is common to consider childhood conditions, prior abuse, intellect, prison adjustment or any other serious difficulty the person has encountered that likely influenced his or her behavior in the commission of the crime. As this report has made clear, there are many such factors in Mr. Rodriguez's history and mental health condition.    These include, but are not limited to, childhood deprivation and malnourishment; childhood sexual abuse; childhood racism; failure in school due to language problems, poverty, and aptitude; substance abuse history; exposure to toxic substances; neurological problems; many mental health diagnoses; and his expressed wish to prison personnel that he did not feel ready or competent to re-enter society at the time of his release. Lastly, his family is supportive of him and wishes for him to continue to live.

### Childhood Deprivation

As detailed in the previous discussion of his childhood history, as an infant Mr. Rodriguez was fed milk he could not digest. That led to several additional months of malnourishment that came from poor healthcare advice. The development of the brain and development of one's most basic ideas of the world are all crucially formed in the first months of life. Those months were tragic for Mr. Rodriguez. These may provide the foundation of his slower intellect and perhaps his short stature. They certainly provided the foundation for his mistrust of the world. His care was largely provided by an ailing grandmother who was responsible for a large number of children. Their home conditions were harsh and deprived: lacking water, electricity, and freedom from exposure to toxic substances. Mr. Rodriguez presents as a person who did not have a secure, reliable early childhood such that he could develop trust and security in the world. The historical record documents this.

His second developmental task of autonomy vs. shame is to be learned before the age of three. Unreliable parenting or trauma during this period can leave the person with a life of shame. Mr. Rodriguez presents with immeasurable shame that encompasses most aspects of his physical and emotional self. This translates to lacking the knowledge of one's value as a person and a right to exist in the world. Mr. Rodriguez has extraordinary defensive protests about his right to exist which are indicative of reservations and doubts about his self and his rights as a person to be present in the world.

Even before he went to school, Mr. Rodriguez was supposed to learn initiative vs. guilt. These are the self-initiating skills that make social relationships and group participation possible. If

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                                 31

there is no trust and there is shame, these tasks are avoided and not fulfilled.  In school and early adulthood we see a failure of initiative that is the manifestation of this developmental task.

*Sexual Abuse*

Many survivors of childhood sexual abuse report, and research supports, the difficulties that result in the ways they perceive the world, the ways they adapt to the world, and the consequences for these survivors in their emotional, cognitive, behavioral and interpersonal lives.  Survivors are more likely to have problems with trust, boundaries, limits, responsibility, control, denial, projection, idealization and motivation.  They will present with a variety of developmental mediated manifestations of that trauma that includes anxiety, compulsive repetitions, sleep disturbances, depression, ego constriction and disturbed expressions of anger.  There is often a dysregulation of the hypothalamic-pituitary-adrenal axis so that they have an exaggerated sensitization to stress, resulting in higher reactivity and lack of behavioral controls.  These difficulties are often manifested in teenagers and adults in alcohol and drug consumption as well as other self-harming behaviors.  Abuse histories often lead to negative self-beliefs.  Mental health diagnoses are almost assured.

A recent large national sample found that childhood maltreatment (of all kinds) doubles the likelihood that an adult will commit subsequent criminal acts.  Low socioeconomic status and male gender further increases that likelihood.  Childhood sexual abuse has the largest negative effect of any variable on predicting crime.  Mr. Rodriguez was lower class, male and sexually abused.

As detailed in the middle childhood history and teenage history, Mr. Rodriguez was subjected to several experiences of sexual abuse that ranged from age four to eleven with both male and female perpetrators.  As a general rule, the younger the subject at the time of abuse, the greater the harm; the more perpetrators, the greater the harm; the greater the abuse in duration, the greater the harm.  Mr. Rodriguez had abuse when he was young, from four or five perpetrators across multiple years.

*Racism*

The world of the 1950's was generally highly segregated and separate.  In the Midwest, the intermingling of racial groups was infrequent.  Unfortunately, Mr. Rodriguez was a social minority beginning in early elementary school.  The cruelty of children and the disregard of Caucasian adults that was directed at him because of his race contributed to a pervasive shame, anger and alienation for Mr. Rodriguez.  He could not change his race.  He could not be proud of his race.  He could not move to Texas.  He could only fight back in his mind and sometimes with his fists.  When others were not respectful of his race, he felt compelled to fight.

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                                    32

The developmental task of middle childhood is to learn industry vs. inferiority or a sense of competence in the world.  This was not accomplished for Mr. Rodriguez until he had been in prison for several years when he began to feel like he could do well as a printer.  Racism, sexual abuse, and poverty contradicted any inclination he might have had about a sense of competence earlier in his life.

*Failure in School*

Mr. Rodriguez did not have access to Kindergarten and failed the first grade.  He could not speak English, he was low in aptitude and he missed the beginning and end of the school year because of his parents' migrant status.  Educators are now more cognizant of the social and psychological problems that develop when students fail and must repeat a grade.  Mr. Rodriguez had to add failure to the list of items for which he was teased.  School never was a place of success, socially or academically.  Although it provided some structure that was missing in other aspects of his life, the lack of success made it an aversive situation and he left as soon as he could.  His current reading level of sixth grade (after years of reading in prison) shows the lack of skill he would have had for being successful in school.  Although his low aptitude is noted as a prime contributor to his lack of school success, the low aptitude is likely the product of early malnutrition, lack of early stimulation from caregivers, and exposure to toxic chemicals and lack of fluency.

*Substance Abuse*

Adults can exercise considerable control and power regarding their personal decisions to drink or use chemicals but it is different when a child of thirteen turns to these chemicals to cope with his or her life.  A child of thirteen lacks the maturity to make such decisions and certainly lacks the knowledge of the consequences of the use of these substances.  Mr. Rodriguez began regular use of alcohol and other chemicals by this young age.  (He began occasional use at age seven!)  Teens with an anxiety or depressive disorder and abuse histories are often attracted to street drugs or alcohol to self-medicate the mental disturbances they experience.  This is quite likely the case with Mr. Rodriguez.  It was only within the safety and structure of a prison that after many years Mr. Rodriguez could stop his substance abuse and gain some control of his own psychological state through strategies he had learned in treatment.

Teenagers are confronted with the tasks of figuring out their identity.  When they have a base of trust, autonomy, initiative and industry from successfully maneuvering through childhood, they are able to use life's experiences to clarify their values and find a place for themselves in the world.   When those bases are not present, and when the experiences of adolescence are anesthetized through drugs and alcohol, there is little or no chance that the young person can find

Exhibit 2

a stable identity from which they can establish relationships and an adult life.  It is easy to see that the previous developmental failures and the lack of social success Mr. Rodriguez had as a teenager would have clearly promoted a pervasive identity diffusion.  Identity diffusion means that there are no principles, values, history or goals that can consistently define the behaviors of today or the path for tomorrow.  This is part of the unpredictable behavior that is noted in the testing section.

*Mental Health Diagnoses*

Mr. Rodriguez's mental health difficulties are clearly presented in a host of Axis I and Axis II levels.  His Axis I symptoms of anxiety and depression (including Post-Traumatic Stress Disorder, an anxiety-based diagnosis) are likely the result of biological inheritance, childhood trauma and/or toxic exposure.  These symptoms have often controlled his mood and his day to day reactions.  His substance abuse has been used to control these mood states.  He has suffered with these all of his life.  These biologically based mood states have reduced his tolerance for day-to-day interactions, impacted his self-esteem, and prompted his impulsive and angry behavior as a teen and young adult.  They are configured on top of his personality difficulties of Axis II.

On the Axis II level, his psychological dysfunction is well documented in the testing and mental status sections.  Mr. Rodriguez cannot tolerate the normal stressors of everyday life.  He attempts to withdraw from people and the stress he experiences when he interacts with others, but that prompts a reduced grounding in reality, a flight to fantasy and an increased frustration of his dependency needs.  He is like a child who is trying to pretend to be an adult and with some frequency his ability to pretend breaks down.  When it breaks down, he may become grandiose and/or perceive persecution from others.  Mr. Rodriguez does not have the adult capability of being successful in the world.  His minimal attempts to be in the larger social community have not been happy or successful experiences for him.  He has done very well within the structure, isolation and rigidity of incarceration.  It is here that he does not have to understand more complex social situations.  It is here that he can find a sufficiently small niche in which to feel somewhat safe.

*Toxicity and Neurological Difficulties*

As noted in the diagnosis section, and more completely in the report of Dr. Fromming, Mr. Rodriguez has many neurological difficulties that can be directly traced to toxic exposure.  That exposure likely impaired his ability to learn, caused or contributed to life-long anxiety and depression, impaired his memory, and caused tremors in his hands.  He had intense headaches and a cranial abnormality as a teen.  All of these symptoms made day-to-day life more difficult and in turn led Mr. Rodriguez to become more isolated, more depressed, and more disturbed.

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr. _____ 34

His difficulties made him think less well of himself and grandiosity and defensiveness developed to compensate for his psychological disturbance as well as substance use to control his moods.

*Desire to Remain Institutionalized*

When Mr. Rodriguez was completing his incarceration, he expressed the concern that he did not feel competent to handle himself in the world.  He even suggested that someone -- any professional would do -- institute proceedings to deem him unfit.  He knew it was going to be extraordinarily hard and he did not feel he was adequately prepared for the challenge.  His case worker discouraged him from the path of continued institutionalization.  While well meaning, it failed to take seriously the awareness that Mr. Rodriguez was expressing about his ability to survive in the world.  A psychologist knew it was a problem for him to be released but had no mechanism to express those concerns without risking her own career path.

After years of institutionalization, when we would expect him to be so excited about being free, he wanted someone to help him be accountable.  Unlike prior sex offenders who initiate court proceedings to prove they are safe, Mr. Rodriguez asked for someone to keep him and those around him safe.  He wanted to be able to control his behavior and had the wisdom to know he was at risk.  He asked for help.

His concern may also have been the frustration and helplessness he experienced in trying to make the transition to life outside of prison.  Perhaps institutions and society do not owe inmates assistance in that process, but recidivism rates for repeat offenders would caution that not doing so is to the detriment of many, not only the inmates.  After years of incarceration, little socialization with how the outside world worked and even less success in that world, Mr. Rodriguez re-entered life as a labeled person in his small town.  His many ideas of what else he might do were thwarted.  Perhaps his own fear of being ostracized and rejected increased the rejection that he did experience.  However, it is not hard to imagine that many knew his name and knew his crimes.  Many did not want him there and made that known.

**CONCLUSION**

The criminal statutes are clear that when there is reason to spare a life, those reasons should be given attention.  They require a lower level of proof and they do not have to be unanimously endorsed by all jurors.  The statutes, as they are interpreted in jury instructions, present a bias toward lesser sentences than the death penalty if reasonable reasons exist.  Many reasons do exist for Mr. Rodriguez.

Mr. Rodriguez nearly starved to death at four months old.  From there he was neglected due to poverty, sexually abused, exposed to toxic chemicals, victimized by racism, failed in school,

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                         35

used drugs to cope and committed two crimes as a very young adult within a month of each other.  He was incarcerated most of his adult life and in middle age tried to start all over as an adult.  He had understandably failed to achieve the developmental tasks of childhood and youth. He is, and likely has been most of his life, plagued by a variety of mental health diagnoses in addition to neurological problems.  These have been substantially influenced by exposure to toxicity and his childhood experiences of racism, sexual abuse and poverty.  He lacked the psychological internal structure that would make success in the world possible.  He has failed at general living but he has been successful in prison.  When he was ready to have his adult freedom, he wished that someone would intervene to retain him in a confined life.  Continuing to live in that setting is a reasonable choice.

Respectfully submitted

Marilyn A. Hutchinson, Ph.D.
Licensed Psychologist

MAH/clh

Exhibit 2

REPORT OF MITIGATION:  Alfonso Rodriguez, Jr.                                    36

## APPENDIX A

**RECORDS REVIEWED**

Chronology of Rodriguez Jr. produced by Ingrid Christiansen
Listing and record highlights, Minnesota Security Hospital Records, 15 pages

File Memorandum:  Interview Notes, Angela Daniel
    Dolores Rodriguez:  June 29, 2004; July 13, 22, 24, 2004
    Illeanna Rodriguez Noyes:  June 29, 2004
    Sylvia Rodriguez:  July 13, 22, 2004
    Francisco Rodriguez:  July 27, 2004

Affidavit, Ingrid Christiansen, Mitigation Expert
Deposition of Rita Saint George, Ph.D., Psychologist, Moose Lake Prison
Deposition of Ted Mickelson, Case Manager, Moose Lake Prison

State of Minnesota Treatment and Incarceration Records:
    Interview Report, February, 3, 1975
    Psychological Report, March 22, 1976
    Psychiatric Consultation, April 1, 1976
    Psychological Report, December 1, 1976
    Group Progress Notes, February 14, 1977
    Psychological Report, March 17, 1978
    I.T.P.S.A. Mini Team Report, August 30, 1978
    Psychological Report, November 28, 1978
    Psychological Report, March 17, 1978
    Psychological Report, April 2, 1979
    Psychological Report, March 19, 1980
    Psychiatric Consultation, March 29, 1980
    Psychiatric Consultation, April 29, 1980
    Medical Summary, May 15, 1980
    Psychological Report, March 19, 1980
    Psychiatric Consultation, March 29, 1980
    Admission Interview, July 15, 1980
    Psychological Report, July 15, 1981
    Sex Offender Assessment Committee Memo, March 29, 1988
    Annual Review, April, 9, 2001
    Civil Commitment Referral Determination, February, 28, 2001
    MnSOST-R Score Recording Sheet, January 10, 2003
    End of Confinement Review, Assessment Recommendation, January 10, 2003
    End of Confinement Review, Transcript of Hearing and Risk Assessment Report,
        January 23, 2003
    Transcript of Video Taped Deposition, Dolores Rodriguez, December 13, 2005

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr.                                                    37

# APPENDIX B

## CONSULTATIONS

| | | | |
|---|---|---|---|
| Dolores Rodriguez | Mother | May 12, 2006 | 5.75 hours |
| Rosa Rodriguez | Younger Sister | May 10, 2006 | 2.00 hours |
| Sylvia Rodriguez Santos | Older Sister | May 6, 2006 | 1.66 hours |
| Illeanna Rodriguez | Youngest Sister | March 3, 2006 | 4.75 hours |

Exhibit 2

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr.                                    38

## APPENDIX C

### TESTS ADMINISTERED

Dissociative Experience Scale
Hare Psychopath Checklist-Revised
Millon Clinical Multiaxial Inventory-III
Minnesota Multiphasic Personality Inventory II
Rorschach
Sentence Completion Inventory
Sex History Questionnaire
SIRS
State-Trait Anger Expression Inventory-2
Thematic Apperception Test
Trauma Symptom Inventory
Yale-Brown Obsessive Compulsive Scale

### PROFESSIONAL LITERATURE

Overview and summary articles regarding pesticides and the relationship to developmental difficulties and aggression

Exhibit 2

ê

REPORT OF MITIGATION:   Alfonso Rodriguez, Jr.                                                        38

## APPENDIX C

**TESTS ADMINISTERED**

Dissociative Experience Scale
Hare Psychopath Checklist-Revised
Millon Clinical Multiaxial Inventory-III
Minnesota Multiphasic Personality Inventory II
Rorschach
Sentence Completion Inventory
Sex History Questionnaire
SIRS
State-Trait Anger Expression Inventory-2
Thematic Apperception Test
Trauma Symptom Inventory
Yale-Brown Obsessive Compulsive Scale

**PROFESSIONAL LITERATURE**

Overview and summary articles regarding pesticides and the relationship to developmental difficulties and aggression

Exhibit 2