**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                                )
United States of America,       )
                                )
        Plaintiff/Respondent,   )
                                )
            vs.                 )      **FILE NO. 2:04-cr-55**
                                )
Alfonso Rodriguez, Jr.,         )
                                )
        Defendant/Petitioner.   )
                                )
- - - - - - - - - - - - - - - -

**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**Evidentiary Hearing - Volume 1 of 9**

**January 28, 2019**

**Pages 1-187**

HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
         655 FIRST AVENUE NORTH
         FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

**A P P E A R A N C E S**

**MR. KEITH W. REISENAUER**          **COUNSEL FOR PLAINTIFF;**
**MS. MELISSA H. BURKLAND**
Office of U.S. Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102

**MR. JOSEPH W. LUBY**          **COUNSEL FOR DEFENDANT;**
**MR. ERIC J. MONTROY**
**MS. JAHAAN AKILAH RUTH SHAHEED**
**MS. ANNE FISHER**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

**I N D E X**

**W I T N E S S E S**

**DEFENDANT'S:**                                                    **PAGE NO.**

**RICHARD NEY**

Direct Examination by Mr. Luby                               15
Cross-Examination by Mr. Reisenauer                         112
Redirect Examination by Mr. Luby                            175
Recross-Examination by Mr. Reisenauer                       181


**E X H I B I T S**

| EXHIBIT NO. | | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|---|
| Defendant's | 1 | Mental Retardation 10th Edition AAMR | 24 | 25 |
| Defendant's | 2 | Psychology, Public Policy And Law Vol. 12 | 31 | 31 |
| Defendant's | 3 | Affidavit of Ingrid Christiansen | 35 | 35 |
| Defendant's | 4 | Mitigation Themes | 37 | 37 |
| Defendant's | 5 | Potential Witnesses | 40 | 40 |
| Defendant's | 6 | Alfonso Rodriguez's Neurological Concerns | 42 | 42 |
| Defendant's | 7 | Chronology | 43 | 43 |
| Defendant's | 8 | Memorandum from Angela Daniel dated 7/13/04 Re: Interview of Delores Rodriguez on 6/29/04 | 53 | 53 |
| Defendant's | 9 | Memorandum from Angela Daniel dated 7/13/04 Re: Interview of Sylvia Rodriguez on 7/8/04 | 53 | 53 |

## E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's 10 | Memorandum from Angela Daniel dated 7/22/04 Re: Interview of Sylvia Rodriguez | 55 | 55 |
| Defendant's 11 | Transcript of Jury Trial Vol. 37 dated 9/12/06 | 56 | 56 |
| Defendant's 12 | Special Findings Form Filed on 9/22/06 | 58 | 59 |
| Defendant's 13 | Crookston School Records | 61 | 61 |
| Defendant's 14 | Classification Summary Dated: 9/8/80 | 64 | 65 |
| Defendant's 15 | State Parole and Probation Agent's Report Dated: 2/24/1975 | 67 | 67 |
| Defendant's 16 | Minnesota Security Hospital Medical & Social History Questionnaire | 69 | 69 |
| Defendant's 17 | Minnesota Security Hospital Psychological Report Dated: 12/1/76 | 69 | 69 |
| Defendant's 18 | Minnesota Security Hospital Progress Notes Dated: 1/15/79 through 2/3/79 | 71 | 71 |
| Defendant's 19 | Minnesota Security Hospital Progress Notes Dated: 4/10/80 through 4/19/80 and 1/29/80 | 71 | 71 |
| Defendant's 20 | General Assessment Questions, Source of Information: Ted Mickelson | 74 | 74 |
| Defendant's 21 | General Assessment Questions, Soure of Information: Gordy Stoltz | 74 | 74 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's 22 | General Assessment Questions, Sources of Information: Illeana Noyes & Delores Rodriguez | 74 | 74 |
| Defendant's 23 | Declaration of Karen B. Froming, Ph.D Re: Neurological Testing | 80 | 80 |
| Defendant's 24 | Karen Bronk Froming, Ph.D ABPP Dated: 6/27/06 | 82 | 82 |
| Defendant's 25 | Affidavit of Marilyn A. Hutchinson, Ph.D | 89 | 89 |
| Defendant's 26 | Report of Mitigation by Marilyn A. Hutchinson, Ph.D Dated: 8/6/06 | 92 | 92 |
| Defendant's 27 | Letter to Dr. Donald Ecobichon Dated: 12/9/05 | 98 | 98 |
| Defendant's 28 | Letter to Mr. Ney from Dr. Ecobichon Dated: 1/3/06 | 99 | 99 |
| Defendant's 29 | Letter to Dr. Ecobichon Dated: 5/3/06 | 102 | 102 |
| Defendant's 30 | Letter to Mr. Ney from Dr. Ecobichon Dated: 6/16/06 | 104 | 104 |
| Defendant's 31 | Letter to Dr. Ecobichon Dated: 6/24/06 | 105 | 105 |
| Defendant's 32 | Letter to Mr. Ney from Dr. Ecobichon Dated: 7/10/06 | 106 | 106 |
| Defendant's 33 | Letter to Dr. Ecobichon From Mr. Ney Dated: 8/7/06 | 107 | 107 |
| Defendant's 34 | Transcript of Jury Trial, Vol. 37, Dated: 9/12/06 | 112 | 112 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 500 | Pleading - A Mitigation & Social History Report Re: Alfonso Rodriguez, Jr. | 118 | 118 |
| Government's 501 | Transcript of Ex Parte Hearing Dated: 7/6/05 | 118 | 118 |
| Government's 502 | Letter to Mr. Ney & Mr. Hoy from Lisa Rickert Dated: 8/31/05 | 122 | 122 |
| Government's 503 | Letter to Mr. Ney & Ms. Christiansen from Joshua D. Roaldson Dated: 2/24/06 | 124 | 124,155 |
| Government's 504 | Letter to Mr. Ney from Mr. Hoy Dated: 4/12/05 Re: Ag Pesticides, DDT | 125 | 125 |
| Government's 505 | Letter to Mr. Hoy from Gary Braaten Dated: 10/19/06 | 125 | 126 |
| Government's 506 | Letter to Mr. Ney from Ingrid Christiansen Dated: 1/14/05 | 127 | 127 |
| Government's 507 | Curriculum Vitae of Ingrid Christiansen | 127 | 127 |
| Government's 508 | Email/attached memo to Mr. Ney from Ingrid Christiansen Dated: 12/5/05 | 127 | 127 |
| Government's 509 | Email to Mr. Hoy & Mr Ney from Ingrid Christiansen Dated: 5/8/06 Subject: Institutional Interviews | 127 | 127 |
| Government's 510 | Email to Mr. Hoy from Ingrid Christiansen Dated: 5/6/05 Subject: Neurological Concerns | 127 | 127 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 511 | Email to Mr. Ney from Ingrid Christiansen Dated: 2/28/05 Subject: Pesticides | 127 | 127 |
| Government's 512 | Email to Mr. Ney and Mr. Hoy from Ingrid Christiansen Dated: 2/28/05 Subject: Main562737 | 127 | 127 |
| Government's 513 | Email to Mr. Ney, Mr. Hoy & Ms. Daniel Dated: 4/19/05 Subject: This sounds like our guy. | 127 | 127 |
| Government's 514 | Curriculum Vitae of John F. Edens, Ph.D. | 146 | 147 |
| Government's 515 | Psychology Today: Dr. Robert A. Karlin, Ph.D. Psychologist, Princton,NJ | 146 | 147 |
| Government's 516 | Curriculum Vitae of Michael H. Miner | 146 | 147 |
| Government's 517 | Curriculum Vitae of D. Wayne Osgood, Pennsylvania State University | 146 | 147 |
| Government's 518 | Letter to Professor Peters from Robert G. Hoy Dated: 11/1/04 | 150 | 150 |
| Government's 519 | Curriculum Vitae of Paul S. Rossby, Ph.D. | 153 | 153 |
| Government's 520 | Letter to Mr. Hoy from Paul S. Rossby, Ph.D Dated: 12/2/05 | 155 | 155 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 521 | Memorandum to Rodriguez Team from Angela D. Daniel Dated: 3/10/05 Subject: Dr. Herbert Needleman | 156 | 156 |
| Government's 522 | Memorandum to Rodriguez Team from Angela D. Daniel Dated: 4/4/05 Subject: Ballpark Figure for Bone Lead Test | 156 | 156 |
| Government's 523 | Email from Daniel Symonik to Angela Daniel Dated: 3/31/05 Subject: Testing for Lead in Bone | 156 | 156 |
| Government's 524 | Intellectual Disability Definition, Classification and Systems of Support 11th Edition of the AAIDD Definition Manual | 168 | 168 |
| Government's 525 | DSM-5 5th Edition Copyright 2013 | 171 | 171 |

**P R O C E E D I N G S**

(January 28, 2019:  The following in-chambers proceedings commenced at 9:30 a.m., all counsel present:)

THE COURT:  All right.  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez.  We're operating under Case No. 2:04-cr-55.  Why don't we go ahead and have counsel note their appearances of record here.

MR. MONTROY:  Eric Montroy for Mr. Rodriguez.

MR. LUBY:  Joe Luby on behalf of Mr. Rodriguez.

MS. SHAHEED:  Jahaan Shaheed for Mr. Rodriguez.

MR. REISENAUER:  Keith Reisenauer for the United States.

MS. BURKLAND:  Melissa Burkland for the United States.

THE COURT:  All right.  Mr. Reisenauer said there was something that the United States wished to bring before the Court.

MR. REISENAUER:  We just wanted to, for the Court's convenience I guess, Your Honor, explain at least our thoughts on the hearing in terms of timing and

the exhibits just so the Court is at least at this point aware of what we anticipate.

I think defense counsel has seven witnesses they've informed us that they are going to call. We, I think, collectively have thoughts that we will get through those witnesses this week. United States will have two witnesses, and we anticipate that we would start those witnesses next Monday and finish no later than Wednesday at noon. I would guess hopefully we'll be done on Tuesday but I'm hedging a little bit and saying Wednesday by noon at the latest, I think.

And then as far as exhibits are concerned, Your Honor, because there are -- frankly we have a couple excuses. We don't have exhibit lists. We've been taking depositions up until last week and so we -- I think all of us apologize to the Court that we don't have witness lists -- or exhibit lists, excuse me, but I think it will go fairly smoothly.

There may be repetitions. Not may be, there will be repetitions in some of the exhibits and so we would ask the Court for deference in terms of putting in exhibits more than once as we go along because there will be numerous exhibits and we have not gotten together to make an exhibit list for the Court. I think we will start at number 500 and counsel for

Mr. Rodriguez will start at number 1.

THE COURT:  Anything that anyone from the Rodriguez team wants to add to that?

MR. MONTROY:  I don't think so, Your Honor. I think that about sums it up.

THE COURT:  All right.  Let's do this.  I have no problem with taking the exhibits up as they come in.  The one issue that I would like to do is I'd like to clean up the references to exhibits at the end so that the transcript is plain.  And so I'm going to reserve the right to -- I'm not sure how the clerk wants to deal with it.

Would you just as soon have them in twice as cleaning it up so if we have 500 and 4 of the same just refer to the exhibits when we get it all worked out as 500/4 or --

MR. REISENAUER:  That would be a lot of work, Your Honor.

THE COURT:  Too much work?  Is that what you're saying, Kelly?

THE REPORTER:  Doesn't matter to me.

THE COURT:  Does it matter to you?

THE CLERK:  No.

THE COURT:  I'll figure that out at the end. The problem we've got, of course, is if the exhibits are

Case 2:04-cr-00055-RRE    Document 1118    Filed 01/31/20    Page 12 of 187

12

referred to differently and nobody bothers to figure it out that it can become problematic on appeal but we'll sort it out at the end.

MR. REISENAUER:  Okay, thank you.

THE COURT:  Anything else?

MR. MONTROY:  I don't think so.

MR. LUBY:  Nothing comes to mind.

THE COURT:  All right.  My ordinary schedule would be to go an hour and 20 minutes and then break for 20 minutes and then take an hour and 15 minutes for lunch, which usually goes to an hour and 20 minutes.

Does anybody have an objection to that type of a schedule?

MR. LUBY:  I wouldn't say an objection but I did want to say something about Mr. Ney's schedule.  I anticipate -- and again, of course, I can only -- I can't know with precision how long Mr. Reisenauer is going to cross Mr. Ney, but essentially I anticipate Mr. Ney's testimony between both parties will take approximately all of today.  He would very much like to return to Wichita at the crack of dawn tomorrow morning. He's got some pressing legal business there.

And so it may be -- depending on how long things take and where we are, it may be well to either -- to think about perhaps somewhat truncating

some of the recesses today or perhaps going even a bit into the later afternoon or early evening as opposed to tomorrow morning, if that is possible.  If that's not possible certainly we understand but I just thought I would throw that out for Mr. Ney's sake.

THE COURT:  I think what we'll do is we'll try and figure out where we are by midafternoon and see whether we'll go late or what we'll do, all right? Thanks.  All right.  Let's go.

(In-chambers proceedings concluded.)

(In open court, all counsel present.)

THE COURT:  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that the defendant has waived his right to be personally present and appears through his counsel. Let's have counsel note their appearances for the record.  We'll start with counsel for Mr. Rodriguez.

MR. LUBY:  Joseph Luby on behalf of the defendant, Mr. Rodriguez.

MR. MONTROY:  Eric Montroy on behalf of Mr. Rodriguez.

MS. SHAHEED:  Jahaan Shaheed for Mr. Rodriguez.

THE COURT:  Thank you.  For the United

14

States?

MR. REISENAUER:  Good morning, Your Honor. Keith Reisenauer for the United States this morning.

MS. BURKLAND:  Good morning, your Honor. Melissa Burkland on behalf of the United States.

THE COURT:  This is the time and place set for an evidentiary hearing on a petition under 28, United States Code, Section 2255.  The record reflects counsel are present.

Does counsel for Mr. Rodriguez have an opening statement to make?

MR. LUBY:  We do not, Your Honor.

THE COURT:  All right.  Does the United States intend to make an opening statement?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Very good.  Counsel for Mr. Rodriguez may call their first witness.

MR. LUBY:  Thank you, Your Honor.  The defense calls Richard Ney.

THE COURT:  Thank you, Mr. Luby.

Mr. Ney, if you please would come forward, would you raise your right hand and take the oath.

MR. NEY:  Yes, Your Honor.

THE CLERK:  Please raise your right hand. State your name and spell your name.

MR. NEY:  Richard Ney, N-e-y.

(Witness sworn.)

THE COURT:  Mr. Luby.

MR. LUBY:  Thank you, Your Honor.  If I could just begin, may we have the Court's indulgence to conduct our examinations from counsel table?

THE COURT:  You certainly may.  I have no rules about where examination of witnesses will take place except if you wander away from a microphone you'll need to put on a lapel mic, okay?

MR. LUBY:  Fair enough.

THE COURT:  Thank you.

**RICHARD NEY,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. LUBY:**

Q.  Please state your name for the record.

A.  Richard Ney.

Q.  And you were one of the defense attorneys for the trial in this case, Mr. Ney?

A.  I was.

Q.  You previously testified in these post-conviction proceedings?

A.  I have.

Q.   Do you remember about when you first became involved in this case?

A.   It was shortly after the federal Indictment was handed down.

Q.   Do you remember what year that would have been?

A.   I believe 2004.

Q.   About how long was that before trial started?

A.   Two and a half years.

Q.   And who was your co-counsel in this matter?

A.   Robert Hoy.

Q.   How did you and Mr. Hoy go about dividing up the bulk of the defense as between the two of you?

A.   Well, since I was the designated learned counsel, I took responsibility for those things that were fairly unique to a death penalty prosecution, which would be jury selection and basically the mitigation or the sentencing phase; although there was some crossover in both of that.  Mr. Hoy took control over -- primary control over the guilt phase.

Q.   Would it be fair to say that you took primary control over the penalty phase and issues of mitigation?

A.   That would be correct.

Q.   Did you retain a mitigation specialist?

A.   We did.

Q.   And who was that?

A.    Ingrid Christiansen.

Q.    How did you go about selecting Ms. Christiansen for that role?

A.    We, as would be standard, consulted with the Federal Death Penalty Project.  They gave us suggestions or names of mitigation specialists.  I talked to several.  Ingrid was we felt qualified, most qualified because of her experience.  She was out of Chicago, which made her relatively close to the area here but also Ingrid grew up in this area.  Her father had been president of the university in Moorhead so she also knew the area, which was a unique qualification for her.

Q.    And what was her role in the case relative to yours and that of Mr. Hoy's?

A.    Well, mitigation specialist is to do mitigation investigation, talk to witnesses, make suggestions to the team about areas to pursue.  Obviously she's not an attorney so in a sense it's almost polite to call her a mitigation investigator.  We say specialist but that's her function.

Q.    I think you earlier testified there was some collaboration or occasional crossover between you and Mr. Hoy on some guilt phase issues and some penalty phase issues.  Could you explain the nature of that crossover or collaboration.

A.  Well, certainly.  A capital defense team is just that, it's a team.  We talk about all the issues, mitigation and guilt phase.  We're both aware of what the other is doing.  While there may be primary responsibilities, there certainly was crossover in my involvement in the guilt phase.  For example, the other crime witnesses was my responsibility.  Mr. Hoy did some of the mitigation questioning at trial, questioning mitigation witnesses, but in essence it's a collaborative effort of the entire team.

Q.  Thank you.  You've described earlier that you served as learned counsel in this case?

A.  Yes.

Q.  Can you explain what that is, please.

A.  Well, it's just a term.  I don't think it has any significance of my intelligence but it's a term in the federal code which actually says counsel learned in the trial of death penalty matters or capital cases.  So in each capital case there are almost always two or more attorneys and one of them must be under the statute learned in capital cases.  And that's the function I had.  I had tried and prepared capital cases previously.  Mr. Hoy had not.

Q.  Do you recall about how many such capital cases you either tried or prepared for trial prior to this

one?

A.  Prepared, was involved in representation, probably a dozen, close to that.

Q.  And do I understand correctly you also served as federal resource counsel in addition to just being learned counsel?

A.  I was named a federal resource counsel about a year and a half after the Rodriguez case was completed.

Q.  And what did that work involve?

A.  Federal resource counsel are a group of lawyers that are assigned to assist trial teams.  They're not actually in most cases counsel appearing in court but they act as the term would note, resource, an advisor to the teams that are trying cases.

Q.  For how many years did you serve as a resource counsel for trial teams?

A.  I believe six or seven.

Q.  And between your role in direct representation of clients in this case and other cases as well as serving as resource counsel, Mr. Ney, had you had involvement with claims of mental retardation over those years?

A.  I have and in noncapital cases as well of course.

Q.  Was Mr. Rodriguez's case the first such case where you came across that issue?

A.  The first such criminal case?

Q.   Yes.

A.   No.

Q.   How many cases before this one were there?

A.   I think there was at least two capital cases where that was an issue or at least we explored that as a potential issue.

Q.   How many cases subsequent to this trial issue that you've worked on, either to develop it, to assist other attorneys or to present in court?

A.   As resource counsel probably there were eight to a dozen cases that at least the teams were exploring that possible defense or aspect of the case.

Q.   And as you've said that was an issue you considered presenting in this particular case?

A.   Yes.

Q.   Later in your examination, Mr. Ney, we'll go through a whole bunch of documents in your file.  Before we do that can you just give us a general description of why it was that you elected not to present a defense of mental retardation in this matter.

A.   Yes.  Well, obviously an Atkins claim is a critical issue in capital cases.  If someone is mentally retarded, as the Supreme Court has said, he cannot receive the death penalty.  So it's something which is, if you will, the silver bullet that takes capital

punishment out of the case.  So it's something that I think almost in every case consideration is given to.

We looked at it in this case after looking at Mr. Rodriguez's school history, prior IQ scores, as certainly something we wanted to closely investigate and think about.  We hired experts to test Mr. Rodriguez, both a neuropsychologist and a clinical psychologist.

Eventually to get to the short answer here, based on their information we concluded it was not a viable <u>Atkins</u> claim.

Q.   And by "information," what information specifically are you referring to, Mr. Ney?

A.   Well, their testing, the IQ testing that was done along with the other psychological information they gave us.  I talked with both experts at some length about this issue, and at the conclusion of those consultations we felt it was a claim we could not make.

Q.   Do you recall offhand what Mr. Rodriguez's IQ score was reported as by your expert at that time?

A.   It was in the mid to high 80s.

Q.   If I said it was 87, would you quarrel with that?

A.   I would not.

Q.   You've spoken about having worked on mental retardation issues subsequent to this case.  It is your understanding the law and circumstances and the facts

covered in <u>Atkins</u> cases the same today as it was at the time you represented Mr. Rodriguez at trial?

A. I don't want to say what the law is. I think the law certainly is the same in general terms but the way that that issue is determined -- and in fact we don't even use the term "mental retardation" anymore. Intellectual disability is determined -- has changed significantly since Mr. -- at least in my practice and my understanding since Mr. Rodriguez's case.

Q. And can you explain what that change is?

A. Certainly. It was a time where the numbers meant a lot prior or at the time of Mr. Rodriguez's case. In other words we were looking for IQ numbers that at least put us in a clear range of lower functioning with 70 tends to being the magic number, if you will.

That is not the case now. If we were looking at Mr. Rodriguez's case today or even three or four years after the case was tried, the numbers would have not been the driving factor based on adaptive functioning review. That would be another issue that we would look at. Not that it wasn't part of the science or the discipline at the time Mr. Rodriguez was tried, it's become now much more an aspect of the review of intellectual disability.

Q. And when you say that the claim is something you

would look at, you mean you would investigate it further or what other measures would you take?

A.   Right.   Well, in cases that I've dealt with since, at least with other trial teams, obviously if we're talking an IQ score in the 80s or the high 70s that would be the starting point.   We then would hire an expert in what's called adaptive functioning or adaptive behavior to take a closer look at the individual based on that specialty, if you will, in relation to what those IQ scores mean.   And IQ scores themselves, of course, have fluctuation and always have or at least since I've been practicing law.

But beyond the IQ scores is the issue of how the person is functioning because intellectual disability really is, one, the intellectual testing and, two, how the person is functioning in the world.

Q.   Thank you.   Mr. Ney, you testified you became involved in this case did you say 2003 or 2004?

A.   Yes.

Q.   At that time would you have been familiar with the manual of the American Association of Mental Retardation or the so-called red book from 2002?

A.   Yes, I was familiar.

MR. LUBY:   Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  (Mr. Luby continuing)  Let the record reflect that I'm handing the witness what's been marked as Defendant's Exhibit 1 (indicating).

Is that the manual we were just discussing, Mr. Ney?

A.  Yes, it is.

Q.  Exhibit 1?  And could I first ask you to refer to Roman Numeral -- page 1?

A.  Yes.

Q.  There's a -- do you see a box that says "MENTAL RETARDATION"?

A.  I'm sorry, Roman Numeral I?

Q.  I'm sorry, page 1.

A.  I have it, yes.

Q.  And can you read the definition of "mental retardation"?

A.  Yes.  "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18."

THE COURT:  Excuse me, do you intend to offer 1?

MR. LUBY:  I do, Your Honor.

THE COURT:  One is received.  I assume you have no objection.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  One's received.

Q.  (Mr. Luby continuing)  Does that definition approximate your understanding of the issue of mental retardation at the time that you were representing Mr. Rodriguez?

A.  Yes, it does.

Q.  And if I could refer you to the text under the definition, do you see a list of five ongoing assumptions concerning this issue?  And assumption No. 3 it says, am I correct, "Within an individual, limitations often coexist with stress"?

A.  Yes, that's what it says.

Q.  And then number -- assumption No. 5, "With appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation generally will improve."

A.  Yes.

Q.  Was that a concept that you were familiar with at the time of this case as well?

A.  Yes, I was familiar with that concept.

Q.  If you could please turn to page 14.  I think there's only an Arabic No. 14.  And do you see that

there's a two-part box there and the lower box discusses adaptive behavior?

A.   Yes.

Q.   And the first sentence seems to be something of a definition.  "Adaptive behavior is the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives."

Is that how you understood adaptive behavior at the time that you were preparing for trial?

A.   It is.  I mean, this was the Bible of mental retardation at the time so, yes, I mean, this is what was accepted.

Q.   In the box above that where it says "INTELLIGENCE," the final sentence where it talks about the criterion for meeting the intellectual functioning, "The criteria for diagnosis is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations."

And is that also consistent with your understanding of this issue at the time of trial?

A.   With the limitations that I'm not 100 percent sure that I can interpret this on a mathematical basis

but, yes, it is.

Q.  Could you clarify what you mean by "mathematical basis"?

A.  Well, standard deviation.  When it says, "The criteria for diagnosis is approximately two standard deviations below the mean," in other words as I interpreted it and below what would be normal in the population.

Q.  If I could refer you to page 58, please.

MR. REISENAUER:  What page, Joe?

MR. LUBY:  Fifty-eight.

THE WITNESS:  Fifty-eight?

Q.  (Mr. Luby continuing)  Yes.

A.  I have it.

Q.  Do you see a box and below that there's a paragraph in that text that talks about the views of the AAMR that produces this book and the ABA which produces the -- another manual, the DSM?  Are you familiar with that, sir?

A.  Yes.

Q.  It says, "It is clear that neither of these organizations intends for a fixed cutoff point for making the diagnosis of mental retardation.  Both specify consideration of adaptive behavior skills and the use of clinical judgment."

Was that your understanding at the time of trial or is that the later understanding that you came to and have since described?

A.   This was my understanding.  I think what changed was the issue of what adaptive behavior, adaptive functioning could be.

Q.   And can you explain again how it is at least in your practice and in your understanding that the definition of "adaptive behavior" changed as between this case and when you would have dealt with this issue in some subsequent cases?

A.   Well, I think at the time at least I'll talk about myself.  When I looked at this it was a combination of the two, in other words the IQ scores and the ability for the person to function in society, adapt in society.

Now, I think, it's not a question of both and.  It's either or.  And I think that's a significance issue.  The scores became less important or become less important as the adaptive functioning became more important if there are adaptive deficits.

Q.   Thank you.  Finally if I could refer you to page 127.

A.   Yes.

Q.   Does this appear to be a table of risk factors

for mental retardation?

A.  I have it, yes.

Q.  And the risk factors include family poverty?

A.  Yes.

Q.  Malnutrition?

A.  Right.

Q.  Traumatic brain injury?

A.  Yes.

Q.  Child abuse and neglect?

A.  Yes.

Q.  Domestic violence?

A.  Yes.

Q.  Social deprivation?

A.  Yes.

Q.  Inadequate early intervention services?

A.  Yes, I see it.

Q.  And inadequate special education services as well as inadequate family support?

A.  Yes.

Q.  Based on your investigation of Mr. Rodriguez's social history, did you believe some of those factors to be present?

A.  Yes, I believe some of them did.

        MR. LUBY:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  (Mr. Luby continuing)  I'm handing the witness what's been marked as Defense Exhibit 2 (indicating). Mr. Ney, could you please identify this document for us.

A.  It is an article from "Psychology, Public Policy and Law," which is a journal.

Q.  Was this article in the case file in your representation of Mr. Rodriguez?

A.  Yes, I've learned that it was.

Q.  And the author of this article is?

A.  James Flynn, sorry.

Q.  And this article discusses the Flynn Effect?

A.  Yes.

Q.  Could you tell us in general terms what the Flynn Effect is at least as you understand it?

A.  Well, it is basically -- in the terms as I can put it you have to score IQ tests in a -- with a variation based on the length of time since the last -- since the test was taken.  In other words the Flynn Effect would be that one subtracts points from an IQ test due to the ability to improve -- the improvement is made over the taking of the test, if you will.

Q.  Does this affect something that you were familiar with at the time of trial and during your preparations?

A.  Yes.

Q.   Do you happen to recall which IQ instrument was administered to your client?

A.   By Dr. Froming?

Q.   Yes.

A.   I'm not sure what version of the WAIS it was.  I know -- was it the IV or --

Q.   If I said it was the WAIS-III, would you quarrel with that?

A.   No, I wouldn't.

Q.   And that's the test on which she reported a full scale IQ of 87?

A.   Yes.

Q.   Sir, if you could please turn to page 177 of this article.

THE COURT:  Do you intend to offer it?

MR. LUBY:  I do, Your Honor.  I would offer Defendant's Exhibit 2.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Two is received.

MR. LUBY:  Thank you.

THE WITNESS:  Yes, I have it.

Q.   (Mr. Luby continuing)  And do you see Table 1 at the top of that page?

A.   Yes.

Q.   And then there's some text right under the table

and it says, "All dates assigned to tests refer to the date at which the test was normed"?

A.  Yes.

Q.  And if I could refer you to one line above that, do you see where it says "WAIS-III" and in parentheses "1995"?

A.  I see it.

Q.  Would that suggest to you that the WAIS-III was normed in 1995?

A.  Yes.

Q.  And when is it --

A.  There's also a WAIS-III -- no, you're right, WAIS is 1995, right.

Q.  And when was it, as best you recall, that Dr. Froming administered the WAIS-III to your client?

A.  I think it was late 2005 -- or 2006, I'm sorry.

Q.  Ten or 11 years later?

A.  Yes.

Q.  If I could direct your attention to page 179.

A.  Yes.

Q.  Do you see some text in the first full paragraph that's been underlined?

A.  Yes.

Q.  Is that your understanding?

A.  This would be, yes.

Q.   It says, "Deduct 0.3 IQ points per year from the scores of defendants for every year that passed between when the test was normed and when the test was taken." And is that your understanding of how the Flynn Effect was?

A.   Yes.

Q.   And the next sentence says it's also suggested to "deduct an extra 2.34 points from WAIS-III scores on the grounds that it gave inflated IQs even in the year in which it was normed"?

A.   Yes.

Q.   If you could please turn to page 184 and I'd like to direct your attention to some text at the bottom of that page that's underlined.

A.   Yes.

Q.   And there's a star in the margin.  And is that star and underlining from you?

A.   It is.

Q.   And does that text appear to be essentially the same as the text that we just read from the other page?

A.   Yes, it is the same text.

Q.   And finally if I could direct you to page 171?

A.   I'm sorry?

Q.   171.

A.   Okay.

Q.  There's a heading.

A.  Yes.

Q.  "Relevance of IQ Gains Over Time," and in the middle of the second paragraph under that heading you see a sentence that says, "Second, the AAMR," referring to the red book, "castigates states such as Connecticut for adopting fixed IQ scores as cutoff points for MR and stresses that IQ scores can be overridden by poor adaptive behavior and clinical judgment"?

A.  I see it.

Q.  Thank you, Mr. Ney.  If the Court would give me just a moment here.  The record should reflect that I'm handing the witness exhibit -- Defense Exhibits 3 through 7 (indicating).  If you could take a look at Exhibit 3, Mr. Ney.  Can you tell us what this document is?

A.  It's an affidavit from Ingrid Christiansen.

Q.  And for what purpose was this document prepared?

A.  I believe this was done for budgeting purposes.

Q.  In other words Ms. Christiansen is trying to explain to the Court what services may be needed for the defense?

A.  Yes.

Q.  Specifically expert services?

A.  Yes.

Q.   Did you have a hand in preparing this document or was that prepared solely by her?

A.   I think that the writing is certainly hers.  We probably discussed -- I'm certain we discussed what should be included in it.

Q.   And so this document then spells out some of the investigation that had been discovered by the defense in support of your request for expert services?

A.   Yes.

Q.   I don't want to go through the entire document with you, Mr. Ney.  If I could direct you to paragraph 5 on page 1.

THE COURT:  Do you intend to offer?

MR. LUBY:  I do, Your Honor.  I'm sorry, Your Honor, defense does offer Exhibit 3.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Three is received.

THE WITNESS:  Yes, paragraph 5.

Q.   (Mr. Luby continuing)  Very good.  And there Miss Christiansen talks about Mr. Rodriguez's family history, migrant farm working and that sort of thing?

A.   I see it, yes.

Q.   If you would turn to paragraph 6 and in that paragraph Ms. Christiansen is advising the Court of evidence that you've gathered about exposure to toxins,

specifically pesticides?

A.   Yes.

Q.   And in paragraph 9 there's a remark about earlier references to mental illness, some concerns about Mr. Rodriguez being, quote, not right and that sort of issue?

A.   Yes.

Q.   Paragraph 10 there's a discussion of some reports of sexual abuse that Mr. Rodriguez would have suffered during his childhood?

A.   Yes.

Q.   Paragraph 11 talks about learning disability, headaches, dizziness and other symptoms?

A.   Yes, I see it.

Q.   And she goes on to discuss alcohol, drugs, memory loss?

A.   Yes.  I'm familiar with it.

Q.   If you could please turn to Exhibit 4.

A.   (Witness complies.)  I have it.

Q.   Can you tell us what this document is.

A.   This is a document prepared talking about the issues of -- the mitigation themes we were working on.

Q.   And did you prepare this document or was this also a collaborative effort?

A.   This was a collaborative effort and I'm thinking

it may have been prepared by my legal assistant.

Q.   Would that have been Miss Daniel, your legal assistant, that you referred to?

A.   Yeah.  I mean, in a sense that she's the one who put it together but obviously it came from all -- the individuals working on the case, experts, lay witnesses, the material in it.

Q.   What is the purpose of the various themes that are discussed in this document?

A.   Well, this is something that's ongoing, done on an ongoing basis in a capital case.  Very early on attorneys and mitigation specialists start writing out what the potential themes are to investigate.  And "themes" may be a poor word but the issues.  It gets revised.  It gets refined.  It gets changed.  So at some point this document would reflect where we were at the point in time it was written as far as what issues we were investigating.

MR. LUBY:  I'll go ahead and offer Defendant's Exhibit 4.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Four is received.

MR. LUBY:  Thank you, Judge.

Q.   (Mr. Luby continuing)  Could you just take a minute to look over the document if you haven't already?

A.  Yeah.  I've looked at it, yes.  I'm familiar with it.

Q.  Is it fair to say that the document discusses some of the same sorts of issues as the funding affidavit that we were just looking at before?

A.  Yes, it does.

Q.  So in the first few pages it discusses poverty, migrant farming, problems in school, sexual abuse?

A.  Yes.

Q.  And in section 5 on page 4, drug and alcohol abuse, and section 6 goes on about toxin exposure for about, what, two full pages?

A.  Yes.

Q.  At the top of page 6 it talks about the means by which Mr. Rodriguez may have been exposed so there's a discussion there of pesticides being sprayed, well water, the diapers being on the clothesline, the children playing in the drainage ditches.  Are those facts that you were familiar with as you were preparing this case?

A.  Yes.  We learned those facts from the family.

Q.  And who would have developed those facts or discovered those facts from the family?

A.  Probably initially myself but also Ingrid Christiansen.

Q.   And would your legal assistant or paralegal have done any of that investigation as well?

A.   She had some conversations with the family members so, yes, Ms. Daniels could have also.

Q.   Thank you.  If you could please refer to Exhibit 5.

A.   Yes.

Q.   And, Mr. Ney, what is Exhibit 5?

A.   It's a witness list, potential witness list. This would be mitigation witnesses and what they would be potentially testifying to.

Q.   Notice there's a column that says "Theme"?

A.   Yes.

Q.   And what is that referring to?

A.   That's referring back to Exhibit 4.  For example, No. 1 on Exhibit 4 is "Poverty - Migrants."  And, of course, Delores Rodriguez, for example, on page 2 says that she would testify about that and what she would -- and then in the column -- the next column is what she would say on that, those issues.

Q.   So, for example, I think what you referred to is on the second page under "Delores Rodriguez" describing the family's history, poverty, farming, and that sort of thing?

A.   Yes.  And then it goes on, she'd also testify on

issue two, four, five, six, 10, 11, 12 and three I guess.

Q.   And again I don't want to go through every single piece of information.  If you could turn to page 3 under "Francisco Rodriguez."

A.   Yes.

Q.   Do you remember who Francisco is?

A.   His brother.

Q.   Frank, or Paco?

A.   Right.  Paco, right.

Q.   And the second from the bottom entry on page 3 there's a reference to Frank "accidentally hit Tito on the head with the door from the basement and knocked him out unconscious"?

A.   I see it.

THE COURT:  Do you intend to offer 5?

MR. LUBY:  Oh, I'm sorry, Your Honor.  Yes, I do.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Five is received.

MR. LUBY:  Thank you.

Q.   (Mr. Luby continuing)  And the next page under "Rosa Rodriguez," the third entry from the bottom, do you see a similar entry but describing a different exhibit where Paco hit Mr. Rodriguez with a toy gun and

knocked him out on one occasion?

A.   Right.

Q.   And then on page 5 with respect to Sylvia Rodriguez or Sylvia D'Angelo, do you see the issue of sexual abuse discussed under theme three?

A.   Yes, I do.

Q.   On the next page, page 6 I believe, that appears to be Sylvia's account of the toxins being sprayed?

A.   Yes.

Q.   And three entries down from that there was a comment:  "Al would take the blame for other people so there wouldn't be arguments."

A.   I'm sorry.

Q.   Category 10, the first --

A.   Category 10, okay.  Yes, I see it.

Q.   And next if we could look at Exhibit 6.

A.   Yes.

Q.   Do you recall what this document is, Mr. Ney?

A.   It's a -- as it's titled, it's a listing of neurological concerns.

Q.   Do you remember who put this list together?

A.   Who actually formed it, I'm thinking it might have been either myself or Miss Daniels.

Q.   Is it possible that it might have been your mitigation specialist?

A.   Ingrid?

Q.   Yeah.

A.   That's possible, yes.

Q.   And this document also was in your file?

A.   Yes.

MR. LUBY:  At this point, Your Honor, we'd offer Defendant's Exhibit 6.

MR. REISENAUER:  No objection.

THE COURT:  Six is received.

MR. LUBY:  Thank you.

Q.   (Mr. Luby continuing)  And this document discusses some of the same issues that we've been talking about this morning?

A.   Yes.

Q.   Specifically learning disabilities, memory problems, headaches?

A.   Right.  Tremors, palsey, yes.

Q.   And could you please turn to Defense Exhibit 7.

A.   Yes.

Q.   What is this document, Mr. Ney?

A.   This is the chronology.

Q.   What is a chronology?

A.   Chronology is something, at least in my practice in capital cases, that's done of every significant event in the person's life or things that relate to the

person, and it's put together over time by the various team members.

Q. What was your role in putting this document together or overseeing it?

A. Well, in assigning someone to start it and then it would get passed on to the various people to add to the chronology.

MR. LUBY: And Mr. Rodriguez offers Defendant's Exhibit 7.

MR. REISENAUER: No objection, Your Honor.

THE COURT: Seven is received.

Q. (Mr. Luby continuing) Mr. Ney, it's a rather lengthy document, if you could just take a couple few moments to look it over.

A. (Witness complies.) Yes. I would have been familiar with this, yes.

Q. Excuse me?

A. I was familiar with this, yes.

Q. Could I direct you to page 3 of the chronology under the year 1953.

A. Yes.

Q. And that's the year that Mr. Rodriguez was born?

A. Correct.

Q. And under that do you see two entries that describe the family's migration first from the lower

area of Laredo, Texas up to Minnesota and then six months later back from Minnesota to Laredo?

A.   I do.

Q.   And that continued -- do you remember for how long the family lived that way after this entry at least?

A.   How long they lived as migrant workers?

Q.   Yes.

A.   At least till about, what, 1960, '61.

Q.   Thank you.  If I could direct you to page 7, please.

A.   Sure.

Q.   Under the heading of "1961."

A.   Yes.

Q.   There's a notation about first grade, two notations actually.

A.   Yes.  It says:  "AR fails 1st grade in Texas."

Q.   And then what does the second one say?

A.   "AR repeats 1st grade in Crookston, Minnesota."

Q.   Okay.  And then there's an entry for 9/19 of '61 that talks about a scholastic aptitude test showing an IQ of 77?

A.   Yes.

Q.   And what does it say after that?

A.   There's a question:  "When was it normed?  .3%

rise in IQ level of the population for each year since it was normed, so after 10 years it would call his IQ at 3 points too high."

Q. And that's describing the possible Flynn Effect?

A. Yes.

Q. Do you remember who wrote that boldface language?

A. I do not.

Q. It could have been you or it could have been another member of the team?

A. Right. I mean, there sort of was a football that would go back and forth for other people to add to. The fact that it's in boldface may have been an indication that someone was adding something, whether it was Ingrid or whoever. There's entries and then there's an additional part of the entry in boldface. That may lead me to believe that that was being added to the chronology at some point.

Q. Could you please turn to page 9 under where it says "1964."

A. Yes.

Q. And do you see a reference to Mr. Rodriguez beginning to use alcohol on a regular basis?

A. Right.

Q. This is when he was 11 years old?

A. Yes. We had that history, yes.

Q.   And also beginning to use marijuana, amphetamines and apparently LSD on about 20 occasions?

A.   Yes.

Q.   If you could turn a couple pages later to page 10 under the year "1966."

A.   Yes.

Q.   The boldface statement saying:  "AR is drinking to intoxication every weekend."

A.   Right.

Q.   That would have been at age 13?

A.   Yes.  He was in the sixth grade, age 13.

Q.   And if you could please turn to page 14 of the years 1967 and '68.

A.   Yes.

Q.   Tell us what it says about Mr. Rodriguez's performance in seventh and eighth grade.

A.   In seventh and eighth?

Q.   Yes.

A.   In 1968 it says:  "AR passes 7th grade with mostly D's."

Q.   And how about eighth grade?

A.   He "passes 8th grade with mostly F's."

Q.   And at that point he's 16 years old?

A.   Yes.

Q.   Okay.  If you could flip forward to page 31,

please.

A.  Which is obviously pretty old to be in the eighth grade.

Q.  Yes.

A.  What page?

Q.  Thirty-one.

MR. REISENAUER:  Thirty-one, Joe?

MR. LUBY:  Yes, sir.

MR. REISENAUER:  Thank you.

Q.  (Mr. Luby continuing)  At the bottom of that page do you see an entry that begins on December 1, 1976?

A.  Yes.

Q.  And it continues on the rest of that page, the next page and the page after that?

A.  Right.

Q.  And at that point Mr. Rodriguez is in custody?

A.  Right.

Q.  So on page 32, oh, about a fourth of the way down the page, do you see a notation:  "He appears to be a withdrawn, inhibited individual who spends a good deal of time in personal fantasy and daydreams"?

A.  Yes.

Q.  And about halfway down the page in bold:  "He appears to have problems establishing close personal relationships"?

A.   I see it, yes.

Q.   Then the next boldfaced passage is:  "At this time there appears to be some impairment of his ability to think straight."

A.   Yes.

Q.   And at the end of that boldface language he indicates that he was sexually attacked when he was younger?

A.   Right.

Q.   And at the bottom of that page and on to the next:  He seems to have serious difficulty in thinking and communication, be overly suspicious of other people, and have poor impulse control."

A.   Yes.

Q.   And that was by a psychological report it says by a Lyn Pengelly, P-e-n-g-e-l-l-y?

A.   Right.  That was -- these are quotes from that report.

Q.   Thank you.  If we could go forward to page 37.

A.   Yes.

Q.   Just about the entry of March 17, 1978, there's a discussion of some test results?

A.   Yes.

Q.   Second to last sentence on that page:  "Test results suggest Mr. Rodriguez is a rather active,

impulsive individual who seeks excitement and arousal"?

A.   I see it, yes.

Q.   And on the next page there's some boldface language:  "Inadequate social interaction and confused thinking patterns" and manipulates people to make it seem like he has few problems?

A.   Yes.   These were -- although they're both dated the 17th, these are two separate reports that were done at the State Hospital.

Q.   And that's why they are separate entries in the chronology?

A.   Yes.

Q.   More generally, Mr. Ney, I'd like to go through the approximate timeline --

A.   Okay.

Q.   -- of Mr. Rodriguez's various incarcerations over the years.  You've testified he was born in 1953?

A.   Yes.

Q.   Do you recall that the first significant assault crime he was prosecuted for would have been the attempted rape of Shirley Seddon?

A.   Yes.

Q.   Would you quarrel with me if I said that was October 1974?

A.   No.

Q.   Does that sound about right?

A.   That seems right.

Q.   He would have been 21 years old?

A.   I think that's correct, yes.

Q.   And then the crime against Elizabeth Knutson would have been about one month later?

A.   Yes.

Q.   And do you recall that he was released after the arrest for the Seddon crime and then was arrested and stayed arrested after the Knutson offense?

A.   I recall that.

Q.   Would that have been in 1974?

A.   Yes.

Q.   And then he remained in state custody -- was incarcerated and remained in state custody and at least in prison or the state mental hospital until, what, approximately 1980?

A.   Yes.  '80, yes.

Q.   And do you recall that there was a period in 1980 where Mr. Rodriguez was sent to a halfway house kind of situation in the intensive training program and was occasionally given a pass during that time to spend some time in Crookston?

A.   Right.  I remember he was furloughed at various times.

Q.   But he's still technically in state custody?

A.   Right.

Q.   And during one of those furloughs that is when in 1980 the assault against Ardyce Whalen occurs?

A.   I believe that's correct.

Q.   And from that time, 1980 until 2003, he is in the Minnesota Department of Corrections because of that offense?

A.   Yes.

Q.   He's then released in May of 2003?

A.   I believe that would be the day or close to that, yes.

Q.   And the offense against Ms. Sjodin occurred in November of 2003?

A.   Yes.

Q.   Is it fair to say he's incarcerated for essentially all of his life after age 21 except for the short stint of being in a halfway house type situation in 1980 and then for the six months in 2003?

A.   That was his history, yes.

MR. LUBY:  Did I move for admission of Exhibit 7?

THE COURT:  You did.

MR. LUBY:  Thank you.  Your Honor, might I approach the witness?

THE COURT:  You may.

MR. LUBY:  For the record I'm now handing the witness what's been marked as Defense Exhibits 8, 9 and 10 (indicating).

Q.  (Mr. Luby continuing)  Mr. Ney, what is Exhibit 8?

A.  It's a memo from my legal assistant, Angela Daniel.  It's dated July 13, 2004.

Q.  And that was based on her interview of Delores Rodriguez?

A.  Yes.

Q.  And she is your client's mother?

A.  She is.

Q.  If I could direct you to the last paragraph of that page, do you see the discussion about Alfonso being very fussy as an infant?

A.  Yes.

Q.  And his mother having to feed him rice water?

A.  I see it.

Q.  And then she stated that her child was starving to death as a result?

A.  Yes.

Q.  On the next page, the first paragraph, do you see discussion of Alfonso being late in certain developmental milestones, which is talking, walking and

toilet training?

A.   Yes.

Q.   And in the next paragraph Mrs. Rodriguez discusses the sexual abuse issues and also the family's experience with racism?

A.   Right.

MR. LUBY:   The defense offers Exhibit 8.

MR. REISENAUER:   No objection.

THE COURT:   Eight is received.

Q.   (Mr. Luby continuing)   And, Mr. Ney, can you please describe Exhibit 9.

A.   It's an interview.   It's a report of an interview that Miss Daniel did with Sylvia Rodriguez on June 8th of 2004.

Q.   And this too would have been in your file?

A.   Yes.

Q.   And shared with the rest of the defense team?

A.   Yes.

MR. LUBY:   We also offer Defense Exhibit 9.

MR. REISENAUER:   No objection.

THE COURT:   Nine is received.

MR. LUBY:   Thank you.

Q.   (Mr. Luby continuing)   About halfway through that first paragraph do you see where Sylvia Rodriguez discusses issues of sexual abuse?

A.    Yes.    She witnessed the sexual abuse, describes that.

Q.    And you eventually elicited similar testimony from her at trial?

A.    We did, yes.

Q.    If I could direct you to the next page, the first full paragraph, she says:    "When the family moved to Crookston permanently, the kids were picked on mercilessly by the white children."    They were called spiks?

A.    Yes.

Q.    And it may have been worse for Alfonso because he was the darkest one in the family?

A.    Yes.

Q.    And could you please turn to Exhibit 10 and tell us what that one is.

A.    This is also a memorandum from Angela Daniel of her interview with Sylvia Rodriguez, at least the memo is dated July 22nd of 2004.

Q.    That appears to have been a follow-up interview of some kind?

A.    Yes.    It indicates that's the date of the interview as well.

Q.    And this, too, would have been in your file and shared with the rest of the defense team?

A.   It would have been.

MR. LUBY:  And, Your Honor, we offer Defendant's Exhibit 10.

MR. REISENAUER:  No objection.

THE COURT:  Ten is received.

MR. LUBY:  Thank you.

Q.  (Mr. Luby continuing)  And this document tells us more about migrant farmwork, pesticide exposure and Sylvia's accounts of sexual abuse?

A.   Yes.  I think this is the other -- one of the other episodes of sexual abuse that was discussed here.

MR. LUBY:  Thank you.  Your Honor, may I approach the witness?

THE COURT:  You may.

MR. LUBY:  For the record I'm handing the witness what's been marked as Defendant's Exhibits 11 and 12 (indicating).

Q.  (Mr. Luby continuing)  Mr. Ney, could you please take a look at Defendant's Exhibit 11.

A.   (Witness examining.)  Yes, I have.

Q.  Does this appear to be a transcript of Delores Rodriguez's trial testimony?

A.   Yes.

Q.  If I could please refer you to 7642, the bottom of that page and the top of the next, 7643.  If you

could review what she describes there.

A.   Mrs. Rodriguez is talking about Alfonso when he was a baby saying he was healthy at birth but would not -- after about three weeks would cry and he would not take her breast milk.  Then he was always sick, throwing up, diarrhea.

Q.   And then a doctor told me "just to boil rice and that's the water I would use to give him instead of milk"?

A.   Yes.

Q.   And then at the bottom of the page, "...he told me that what I was giving him wasn't enough so he was starving and then he told me to give him some formulas and some Gerber's cereal"?

A.   Yes.

Q.   And if you could please refer to Defendant's Exhibit --

MR. LUBY:  I'm sorry, I offer Defendant's Exhibit 11.

MR. REISENAUER:  No objection.

THE COURT:  Received.

Q.   (Mr. Luby continuing)  And if you could please refer to Defense Exhibit 12.

A.   Yes.

Q.   This appear to be a selection phase verdict form?

A.   Yes.

Q.   And this form lists a number of mitigating circumstances?

A.   It does.

Q.   And those were circumstances that the defense attempted to prove at trial?

A.   Yes.

Q.   And then in this form the jury indicates how many jurors found that circumstance to exist?

A.   Correct.

Q.   And the standard of proof was by the greater weight of the evidence?

A.   Yes.

Q.   Turning to page 2 how many jurors found that Mr. Rodriguez was sexually abused as a child?

A.   Seven.

Q.   And how many found that Mr. Rodriguez suffers from brain damage?

A.   Three.

Q.   How many found that he suffers from a mental disorder or impairment?

A.   All 12.

Q.   And how about that he was introduced to addictive drugs and alcohol at a young age and suffered from alcoholism and drug addiction during his life?

A.   Again all 12.

Q.   How about No. 9, that he had learning problems in school because he was developmentally delayed as a child?

A.   Nine jurors found that.

Q.   And how many found that Alfonso Rodriguez has experienced racial prejudice during his lifetime?

A.   All 12 jurors found that mitigating factor.

Q.   We could go on a couple pages later to number 25.

A.   Yes.

Q.   How many found the circumstance:  "Alfonso Rodriguez has responded well to structured environments and would likely make a good adaptation to prison if he were sentenced to life imprisonment"?

A.   All 12.

MR. LUBY:  Your Honor, I can continue going but I'm moving on to another area.  So if and when the Court wants to take a recess, this might be a good time but I'm happy to continue.

THE COURT:  Let's go ahead and break for 15 minutes at this point.  Twelve has not been offered or received at this point.

MR. LUBY:  Thank you, Your Honor.  The defense offers Exhibit 12.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Twelve is received.

MR. LUBY:  Thank you, Judge.

THE COURT:  We'll go ahead and recess for 15 minutes.  We'll start at 11:05.

(Recess taken; 10:48 a.m. to 11:05 a.m.)

(In open court, all counsel present.)

THE COURT:  We're back on the record in a case entitled United States of America versus Alfonso Rodriguez.  All counsel of record are present.  When we broke Mr. Luby was conducting a direct examination of Mr. Ney.

You may proceed, sir.

MR. LUBY:  Thank you, Your Honor.

Q.  (Mr. Luby continuing)  Mr. Ney, in your previous testimony you were describing some of the witness interviews that were conducted by your defense team?

A.  Yeah.

Q.  Specifically either by you or by your assistants or your mitigation specialist or even co-counsel?

A.  Yeah.

Q.  In addition to witness interviews, did the defense also have a large task to investigate -- not to investigate but to gather records about Mr. Rodriguez?

A.  Yes.

Q.  What types of records did the defense seek to

gather in this case as part of the development of mitigation?

A. Well, certainly any medical records, any school records, any records from the state Department of Corrections and/or the State Hospital. We also obtained, as we could, records relating to the sugar beet industry, sugar beet farming in the valley.

Q. And what was your role in gathering or overseeing the collection of records?

A. Well, some I did personally, some my legal assistant did, and some Miss Christiansen did.

Q. It sounds as though that too was something of a collaboration?

A. It was. Ingrid Christiansen was not hired on to the team for a number of months so at that point Angela Daniel was really doing more of the heavy lifting and I was directing her to get records that we could. We did not want to wait until we had a mitigation specialist in place. So, yes.

MR. LUBY: Thank you, Mr. Ney. Your Honor, may I approach the witness?

THE COURT: You may.

MR. LUBY: For the record I'm now handing the witness what's been marked as Defendant's Exhibits 13 through 19 (indicating).

Q.   (Mr. Luby continuing)  If you could please refer to Defense Exhibit 13, does that appear to be a set of school records about Mr. Rodriguez?

A.   Yes.  These are the Crookston school records.

Q.   And would these have been in your file as defense counsel and shared with your team and experts?

A.   Yes.

MR. LUBY:  Your Honor, we offer Defendant's Exhibit 13.

MR. REISENAUER:  No objection.

THE COURT:  Thirteen is received.

Q.   (Mr. Luby continuing)  At the top of the first page, Mr. Ney, do you see a reference to an IQ score?

A.   Yes, I do.

Q.   And what specifically does it say?

A.   It shows that first grade score in 1967 was a 77 -- I'm sorry, actually 79.

Q.   It's hard to make out.

A.   Yeah, I think it's 77.  I think that's what we did.  The second seven is a little loopy but I think it's a seven.  That's what we assumed.

Q.   In the first column under "Scholastic Aptitude," do you see the words "Kuhl-And"?

A.   I'm sorry, where are we?

Q.   In the first column under the -- do you see where

it says "Scholastic Aptitude" and it's written K-u-h-l hyphen A-n-d?

A.   Oh, I -- yes, sorry, I do see that.

Q.   What does that language mean to you?

A.   It's a type of test I understand.  Again -- or frankly we had some difficulty I remember with some of the terminology because of the age of the tests.

Q.   Kuhlmann-Anderson, does that sound familiar?

A.   Yeah.  As I said, it's a test, one which I personally was not familiar with.

Q.   And if you could please refer to the next page of these records, do you see three subsequent IQ tests on Mr. Rodriguez?

A.   Yes.  They show for the -- apparently K.A., it's the same testing being done.  For grade two an IQ score of 80, for grade three an IQ score of 79.  I think that one is a nine.  And for grade five an IQ score of 74.

Q.   And for grade -- that grade the 74 there is a date October 4th of '65?

A.   Yes, that's correct.

Q.   And at that point Mr. Rodriguez would have been 12 years old?

A.   Yes.  Twelve, yes.

Q.   If you could please refer to the next page --

A.   In fact, the chronological age is there, 12 years

eight months.

Q.   Thank you.

A.   Okay.

Q.   Do you see a heading under "Junior Secondary School Achievement Record"?

A.   Yes.

Q.   And what does this tell us about Mr. Rodriguez's efforts in the 9th grade?

A.   In 9th grade he received F's except at math -- he received F's in English, social studies and science. Math is a zero it looks like.  Health is an F.  Physical ed he got a C.

Q.   And then there's another column for 9th grade. Does that suggest to you that he failed in the first attempt?

A.   Right.  This is the next semester:  science F, health D, grammar D, phys ed C again.

Q.   Looking at these four columns, there's a column for 7th grade, for 8th grade, for 9th grade and then another column for 9th grade?

A.   Yes.

Q.   Does that suggest to you that each column is its own year instead of its own semester?

A.   Yeah.  It's year ending '68, '69, '70 and '71. We were aware he repeated the 9th grade.

Q.   And that last attempt at the 9th grade do you see at the bottom of each of these cells it records the number of days that Mr. Rodriguez attended school, the number of days there were in the school year?

A.   Yes.

Q.   And he attended that last time 172 out of the 177 days?

A.   Right.

Q.   If you could please turn to Exhibit 14, does this appear to be another document from your file?

A.   Yes.

Q.   And specifically a document from the Minnesota Department of Corrections?

A.   Right.

Q.   And a "Classification Summary"?

A.   Yes, dated 1980, September of 1980.

MR. LUBY:  Your Honor, we offer defense Exhibit 14.

THE COURT:  Any objection?

MR. REISENAUER:  Pardon me, Your Honor? Where is this from did he testify?

MR. LUBY:  This would be the MSH records I believe.

THE COURT:  He said it was from the Department of Corrections but I haven't seen the exhibit

because it's sitting right there.

MR. REISENAUER:  We have no objection, Your Honor.

THE COURT:  Is it from the State Hospital or is it from the Department of Corrections?

MR. LUBY:  I believe the Department of Corrections.

THE COURT:  All right.  Very good.  In any event, it's received.

Q.  (Mr. Luby continuing)  I'd like to refer you to a heading toward the upper left hand portion of that page where it says "ACHIEVEMENT LEVEL."

A.  Yes.

Q.  And then the letters W-R-A-T?

A.  Yes.

Q.  Do those letters mean anything to you?

A.  They're the grade level -- it's a test for the grade level of reading and math.

Q.  For the term Wide Range Achievement Test?

A.  Yes.

Q.  And what are the numbers indicated under that -- the achievement level?

A.  It shows that he's reading at 6.7 and math at 4.3.

Q.  And that was in 1980 so he'd be 27 years old?

A.   Yes.

Q.   Thank you.   Could I direct your attention, please, to Defendant's Exhibit 15.   Does this appear to be some kind of PSI or PSR or whatever it may be called depending on where you practice?

A.   It's a report.   I don't know if I would call it a PSI but it says "STATE PAROLE AND PROBATION AGENT'S REPORT," yes.

Q.   And what's the date on this report?

A.   It's February 24th of 1975.

Q.   And Mr. Rodriguez's offenses against -- that we discussed earlier first against Ms. Seddon and the subsequent one were in 1974; is that correct?

A.   Yes.   Yes, I mean, I always understood this is what's prepared for the Court prior to sentencing.

Q.   Thank you.   If I could refer you to page 3 of this document under the heading "FAMILY HISTORY."

A.   Yes.

Q.   And the third paragraph under that heading do you see where it says:   "Both the parents agree that defendant was not a disciplinary problem and that he was very quiet and reserved during his childhood, oftentimes accepting the blame for things he was not involved with"?

A.   Yes.

Q.   And turning to the last page of this document, page 5, the end of that second paragraph do you see where it says:  "In this writer's opinion defendant has a very low opinion of himself, feeling sorry for himself, and unable to accept himself for what he is"?

A.   I see that, yes.

Q.   And then the next sentence goes on to say that he was described as a loner in school.

A.   Right.  And there was also disparity in the reports if you'll see there that it said he did not graduate and Exhibit 14 says that he's a high school grad.

Q.   And how did the defense resolve that disparity?

A.   Well, we did not have proof that he had graduated.

Q.   Have you ever seen a piece of paper memorializing Mr. Rodriguez's graduation from high school?

A.   No.

Q.   If you could please turn to Exhibit 16.

A.   Yes.

THE COURT:  Did we receive 15?

MR. LUBY:  I neglected to offer it, Your Honor.

MR. REISENAUER:  No objection.

THE COURT:  Fifteen is received.

MR. LUBY:  Thank you.

Q.  (Mr. Luby continuing)  And could you identify Exhibit 16 for us, please.

A.  This is a document that was produced from the Minnesota Security Hospital.  It's from January of 1975.

Q.  And do you see the caption "MEDICAL AND SOCIAL HISTORY QUESTIONNAIRE"?

A.  Yes.

Q.  I'd like -- if you could please turn to page 5, you'll see a series of entries and questions regarding birth and childhood?

A.  Right.

Q.  Question 4 asks whether the patient was a fussy eater?

A.  Says yes.

Q.  Question 5 is:  Was the patient slow in growing up?

A.  It also says yes.

Q.  And question 6:  Was the patient hard to train in toilet habits?

A.  Also yes.

Q.  And question 7 is:  "Controlled bowels at what age?"

A.  Two years of age.

Q.  And then:  "Stopped bedwetting at what age?"

A.   Thirteen.

Q.   Then question 27 asks:  "How was patient disciplined as a child?"  And "By whom?"

A.   By his father "with belts."

Q.   Thank you.

THE COURT:  Do you offer 16?

MR. LUBY:  I'm sorry, I keep forgetting. Yes, Your Honor, we do.

MR. REISENAUER:  No objection.

THE COURT:  Sixteen is received.

Q.   (Mr. Luby continuing)  If you could please turn to Exhibit 17 and tell us what this appears to be.

A.   This is a Psychological Report dated December 1, 1975 from the Minnesota Security Hospital.

Q.   And if you could turn to the last page of this, I believe that it's signed by Lyn Pengelly?

A.   Yes.

Q.   Does that appear to be the same report that we described earlier in your examination as was described in the mitigation chronology?

A.   Yes, it's the report.

MR. LUBY:  Your Honor, we offer Defense Exhibit 17.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Seventeen is received.

Q.    (Mr. Luby continuing)   If you'll turn to the bottom of page 2, please, do you see the last sentence: "He appears to have problems establishing close personal relationships"?   I believe we described that in your earlier testimony.

A.    Yes.

Q.    And if you would please refer to the first full paragraph on page 4, you can see the second sentence of that paragraph --

A.    I'm sorry, the third --

Q.    Page 4, first full paragraph.

A.    First full paragraph.

Q.    The second sentence.

A.    Yes.

Q.    "He seems to have serious difficulty in thinking and communication, be overly suspicious of other people, and have poor impulse control."

A.    I see that, yes.

Q.    If you could please take a look at Exhibit 18.

A.    Yes.

Q.    Does this appear to be another document from the Minnesota Security Hospital?

A.    Yes.   It appears to be a chronology sheet of some sort.

Q.    And was this document also in your files?

A.   Yes.

MR. LUBY:   The defense offers Exhibit 18.

MR. REISENAUER:   No objection.

THE COURT:   Eighteen is received.

Q.   (Mr. Luby continuing)  Do you see that there's an entry for the date January 21, 1979?

A.   I see it, yes.

Q.   Because the handwriting is a little difficult to read so you tell me if I'm reading it correctly.  "I get the impression that Mr. Rodriguez is divorcing himself from the rest of the men on the unit."

A.   Yes, I see it.

Q.   Thank you.  And could you please take a look at Exhibit 19.

A.   Yes.

Q.   And what does this document appear to be?

A.   I believe it's another page of this chronology. It is progress notes from the State Hospital I believe or some institution.

MR. LUBY:   The defense offers Exhibit 19.

MR. REISENAUER:   No objection.

THE COURT:   Nineteen is received.

MR. LUBY:   Thank you, Your Honor.

Q.   (Mr. Luby continuing)  Do you see that there's an entry for April 16th of 1980?

A.  Yes.

Q.  And do you recall your earlier testimony in which we were discussing some of the events of 1980 and Mr. Rodriguez being allowed the occasional pass to spend time in Crookston?

A.  Yes.

Q.  And the entry of 4/16/80, do you see that it's signed by a Mr. Clancy, a social worker?

A.  Yes.

Q.  And again the handwriting is difficult to read here though, if you can tell me if I've read it correctly or if it seems that I've read it correctly. "Al Rodriguez was contacted on 4/15/80 and 4/16/80 by telephone relative to his adjustment on community pass. Mr. Rodriguez reports constant fear of his vulnerability in the community.  He is not socializing and is apparently isolating himself in his parents' home.  He states he only feels safe and comfortable at Minnesota Security Hospital and desires to return early from pass. His parents have encouraged him to remain in the community for several more days.  Mr. Rodriguez is presenting reluctant to pursue his release plan, wanting to return full time to MSH until he is able to deal with fears."

Did I read that more or less correctly?

A.   Yes.  I was aware of this entry, yes.

MR. LUBY:  I'm not certain whether I offered Exhibit 19.

THE COURT:  I think 19 is in.

MR. LUBY:  Thank you.  And, Your Honor, may I approach the witness?

THE COURT:  You may.

MR. LUBY:  I'd like the record to reflect that I'm handing the witness what's been marked as Defendant's Exhibits 20, 21 and 22 (indicating).

Q.   (Mr. Luby continuing)  Mr. Ney, what do these three exhibits appear to be, specifically 20, 21 and 22?

A.   They're titled "GENERAL ASSESSMENT QUESTIONS." These were done prior to Mr. Rodriguez's release for the time he's at the hospital -- or at the -- I'm sorry, in prison.  The first one's by his case manager, second by his supervisor where he worked, and the third from two of his family members, sister and mother.

Q.   Turning to specifically Exhibit 21, do you see on the upper right hand part of the page a number --

MR. REISENAUER:  Excuse me, Joe, you're on 21?

MR. LUBY:  Considering them together but we'll go back to -- I apologize.

MR. REISENAUER:  That's okay.  Do you want

to offer them?  No objection.

MR. LUBY:  In which case they're offered.

THE COURT:  All right.  Twenty, 21 and 22 are received.

MR. LUBY:  Thank you, Your Honor.

Q.  (Mr. Luby continuing)  Are these three documents -- on the first page of each, do you see a number that goes vertically on the upper right-hand page?

A.  Yes.

Q.  And does that indicate to you that they would have been -- these documents were provided to the defense in discovery by the prosecution?

A.  I believe that's the dates on these.

Q.  Going back to Exhibit 20, you said Mr. Mickelson described himself as the case manager for Mr. Rodriguez?

A.  Yes, for six years.

Q.  And you eventually presented his testimony at trial?

A.  We did.

Q.  If you could please turn to page 5 of Exhibit 20, specifically question 33 where it asks:  "How does subject relate to co-workers?"

A.  Yes, and he signified "loner."

Q.  Later in the document if we could look at

question 50:  "Does subject seem to have friends?"

A.  Again he writes:  "Mostly a loner."

Q.  Question 64:  "What events seem to shake subject's self-confidence?"

A.  You said 54?

Q.  Sixty-four.

A.  Sixty-four:  "He didn't seem to have much self-confidence," Mr. Mickelson wrote.

Q.  And question 67 asks:  "What are the subject's weaknesses?"

A.  And Mr. Mickelson wrote:  "Low self-image."

Q.  And then you'll notice questions 69 and 70 ask respectively:  What are his greatest life successes and greatest life failures, and what does Mr. Mickelson indicate?

A.  His success was, quote, he got used to prison life and generally stayed out of trouble.  And when asked on question 70:  "What are his life failures?" "Spending his life in prison."

Q.  And finally on the second to last page, Mr. Mickelson is asked to provide a narrative.  And do you see the third sentence and again I'll read it simply because it's handwriting:  "He seemed to have low self-esteem and found it difficult to trust anyone or get close to anyone."

A.   Yes.

Q.   If you could please then refer to Defendant's Exhibit 21.

A.   Yes.

Q.   The same question there but filled out by a Gordy Stoltz?

A.   Yes.

Q.   And how does Mr. Stoltz describe himself?

A.   He was the production supervisor for Minncor Printing.  That's where Mr. Alfonso worked, M-i-n-n-c-o-r, I think that's how it's spelled.

Q.   And could you please again refer to question 33 concerning how does the subject relate to co-workers and how does Mr. Stoltz answer that question?

A.   He replies:  "Loner.  He liked to work alone."

Q.   And then on the second to last page what is the narrative description that Mr. Stoltz gives of Mr. Rodriguez of his personality?

A.   He says:  "My name is Gordy Stoltz.  I have supervised the subject since March of 1993.  He thinks he is better than he really is.  He is very lazy.  He liked food.  I terminated him for scanning a picture of LeAnn Rhimes on his computer about 18 months before his release.  He never put much effort into any of his work. He wanted other offenders to think he was great."

Q.   And if you could please refer to Defense Exhibit 22.

A.   Yes.

Q.   It is the same questionnaire but this one's filled out by Ileanna Noyes and Delores Rodriguez?

A.   Yes.

Q.   And those are respectively Mr. Rodriguez's sister and mother?

A.   Correct.

Q.   And in their questionnaire as well if we could -- you could please refer to question 33:  "How does subject relate to co-workers?"  What is their response?

A.   They write:  "Normal - would engage in small talk but somewhat loner."

Q.   And if you could please turn to question 41.

A.   Yes.

Q.   "What are the subject's current hobbies/interests?"

A.   They wrote -- or which of the other two wrote it and I'm assuming it was Ileanna frankly but "pornographic movies & magazines, watching nephew's hockey games, shopping."

Q.   And then question 47 asks:  "What type of reading material does the subject prefer?"

A.   Yes.  It's written "pornography."

Q.   And question 50:  "Does subject seem to have friends?"  And what is circled?

A.   There's choices and the choice they circled was "None."

Q.   And if you would please turn to the last page of Exhibit 22.

A.   Yes.

Q.   Do you see a series of scales for personality characteristics?

A.   I see them.

Q.   And the second characteristic is on one end of the scale a loner, on the other end of the scale social, and where do they place Mr. Rodriguez on the scale?

A.   Right.  It's 1 to 5 with 5 being social and 1 being loner and they've circled "1 loner."

MR. LUBY:  Thank you, Mr. Ney.

Your Honor, may I approach the witness?

THE COURT:  You may.

MR. LUBY:  May the record reflect that I'm now handing the witness what's been marked as Defendant's Exhibits 23 and 24 (indicating).

Q.   (Mr. Luby continuing)  Mr. Ney, could you please explain what Exhibit 23 is.

A.   Twenty-three is a declaration or affidavit from Karen Froming.  Dr. Froming is a neuropsychologist.

Q.   And what is the purpose of this affidavit?

A.   It was to have the Court authorize funding for her work in the case.  She was stating why her expertise was needed basically and what she intended to do.

Q.   Would this be somewhat analogous to the funding affidavit that we discussed earlier from your mitigation specialist?

A.   Yes.

Q.   In the course of describing for the Court why the services of a neuropsychologist are needed, in particular hers, if you would please -- what types of information were you and/or Dr. Froming hoping to provide?

A.   Well, basically we were looking for deficits that he had, neurological deficits, brain damage, intellectual deficits, literally anything she can tell us about his neurological makeup.

Q.   What would have been your involvement with putting this document together?

A.   Well, probably with an expert like Dr. Froming we'd given her some of the information we had, the chronology, some of the perhaps interviews with family.  So she knew something about Mr. Rodriguez as you can tell from the filing here so it would be to supply her with that, discuss with her what she thought was

necessary, what we were looking for and then ask her to prepare this document basically.  She certainly was capable of doing this on her own.

Q.   And you would have then reviewed it before submitting it to the Court?

A.   Yes.

MR. LUBY:  The defense offers Exhibit 23.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Twenty-three is received.

Q.   (Mr. Luby continuing)  If you could please turn to page 2, the very --

A.   I'm sorry?

Q.   To page 2, the very first complete sentence.

A.   Yes.

Q.   "Mr. Rodriguez has compromised functioning that was characterized in young adulthood as possible organic brain damage, significant exposure to neurotoxins during major portions of his life, sustained repeated head injuries, and demonstrates symptoms characteristic of prolonged exposure to life threatening trauma during critical stages of childhood development."

A.   Yes.

Q.   And that's essentially what you're asking her to explore, you're asking the Court's authorization to

bring her in to explore?

A. Right. That's the history we developed and that she was aware of, yes.

Q. If you'd please turn to paragraph 5 on page 3.

A. Yes.

Q. In that text is it fair to say that Dr. Froming is summarizing some of the evidence and accounts of Mr. Rodriguez's exposure to pesticides and the possible consequences of that exposure?

A. Right.

Q. I don't mean to belabor this point but where did this information come from? How did Dr. Froming come to get this information and who was it developed by in the first instance?

A. It would have come from us, from the chronology. I think a lot of this is included in the chronology, the statements of his family members as well.

Q. And that in turn could have been developed through your mitigation specialist or by you or co-counsel or your assistant?

A. Yes.

Q. If you could take a look at paragraphs 12 and 13 on page 6, please. Is that essentially where Dr. Froming describes some of the things she'd like to test for that you've described earlier for us?

A.   Yes.

Q.   In terms of neuropsych testing, cognitive function testing, et cetera?

A.   Right.

Q.   In paragraph 13 she describes some of the effects of -- the possible effects of neuropsychological impairments.  Do you see where it says "...disordered thinking, altered consciousness, disturbed emotions, abnormalities in motor behavior, disturbed speech and language, impaired judgment and reasoning, distorted perceptions of reality, compromised intellectual functioning, impaired memory, and maladaptive social functioning"?

A.   Yes.

Q.   Mr. Ney, would you please turn to Exhibit 24.

A.   I have it.

Q.   And this is Dr. Froming's trial report?

A.   Yes.

          MR. LUBY:  At this point we offer Defendant's Exhibit 24.

          MR. REISENAUER:  No objection, Your Honor.

          THE COURT:  Twenty-four is received.

Q.   (Mr. Luby continuing)  What is the date of this report?

A.   I'm sorry?

Q.    What is the date on the top of this report?

A.    The date is June 27th of 2006.

Q.    When was the -- when is that date in relation to when the trial started in this matter as best you can recall?

A.    Days before.  I mean, a week, something like that.

Q.    You'll notice some scores --

A.    Yes.

Q.    -- reported on the first page, specifically from the Wide Range Achievement Test and the WAIS-III or Wechsler Adult Intelligence Scales-3rd Edition?

A.    Yes.

Q.    At what point did you become aware of those scores relative to the date on this report?

A.    Before this time.  Certainly we were -- there had been some delay I should say in Dr. Froming's testing. She had done some work as a volunteer in Africa and contracted malaria.  So although she basically had flown out at one time to do the testing she was too ill to do it so it had to be rescheduled.  But we were fairly anxious obviously to get whatever the raw data was going to tell us especially about intellectual functioning.

So I want to say that she actually did the testing in November or December before this date, and

probably shortly after that she and I spoke and we talked about what this data would be potentially.

Q. And what was your reaction at first when you heard the scores from Dr. Froming, specifically that the full-scale IQ was 87?

A. Sort of really? In the sense that -- that I was surprised.

Q. What were you expecting instead?

A. Seventies.

Q. On what basis were you expecting something in the 70s?

A. Well, a couple of reasons. The past scores --

MR. REISENAUER: Your Honor, I'm going to object. This is beyond the scope of this witness's expertise.

THE COURT: It's a bench matter and he's speaking about his expectations. I'll let him go ahead and answer the question. I can weigh it appropriately.

A. Okay. Again the past scores that we had seen, the school scores if you will, showed 70s, depending a range from 74 at the lowest up to 80. And my interactions, which at that point had been fairly significant with Alfonso, was my guess would have been he was not functioning at a low average intelligence level which these kind of scores would indicate. So on

both those bases I was surprised that we were seeing a score this high.

Q. (Mr. Luby continuing) You've testified that you had some discussions with Dr. Froming after she reported these scores to you.

A. Yes.

Q. What was the nature of those discussions?

A. Well, one was why -- I mean, why are we seeing scores like this as opposed to what the scores were in the past? And, secondly, I wanted to make sure -- I think I asked her about so these have been -- the Flynn adjustments had been made and she said yes, they had. Again I don't -- it was a significant discussion because of my being surprised by these numbers.

Q. When you discussed whether Dr. Froming had adjusted the scores for the Flynn Effect, are you discussing the general Flynn Effect; that is, the deduction of .3 years for every year since the test has been normed as opposed to the additional 2.34 points discussed in Dr. Flynn's article that we talked about in your testimony earlier today?

A. Well, in reality I probably just said Flynn and I was thinking the whole -- how it had to be adjusted. I would -- my recollection at least we did not get into the weeds that deeply that I didn't say: What's your

arithmetic?  Is this the .3?  Is this the two-point plus reduction?  I guess I assumed that Dr. Froming after years of experience knew how to do the Flynn adjustment. So I think that -- I know we talked about it.  Is this with Flynn?  Yes.  I think that was pretty much the extent of it.

Q.  Was it your understanding that the 87 already reflected the Flynn Effect or that if the Flynn Effect were applied it was still above what you were expecting?

A.  I think -- no, okay.  I think these were her raw -- this was her data.  I think the Flynn was -- the adjustment was less than this, made the scores less than this.

Q.  Thank you.

A.  Yeah.

Q.  At any point did you have any indication that there were any errors that had been made by Dr. Froming in the course of her scoring Mr. Rodriguez's IQ test?

A.  No.

Q.  Did you ever have occasion to review Dr. Froming's raw data or testing materials?

A.  No.  I wouldn't have understood it probably if I had but, no, I didn't.

Q.  To your knowledge did anyone else on the defense team have occasion to review Dr. Froming's raw data or

testing materials?

A. The only person who might have been supplied that would be Dr. Hutchinson but I don't know that that's true.

Q. But nobody on the legal team?

A. No. I was really the only direct contact that Dr. Froming was having with the legal team.

Q. And what did you do or decide to do following your discussions with Dr. Froming concerning her testing and the data?

A. Well, after talking with her about these numbers, we then talked about -- mental retardation would have been the subject at the time, and the answer she gave me in short term would be no, he isn't. Low average is how she defined him.

Q. And what did you do on the basis of that statement from Dr. Froming?

A. Well, we did not pursue an Atkins claim obviously.

Q. Thank you. And the numerical score was the reason that you did not pursue an Atkins claim?

A. And her confirmation along with confirmation of our other expert as well that they did not either -- I'm talking about Dr. Froming or Dr. Hutchinson, that they did not believe that Mr. Rodriguez fit the intellectual

disability standard.

MR. LUBY:  Thank you.  Your Honor, may I approach the witness?

THE COURT:  You may.

MR. LUBY:  For the record I'm now handing the witness what's been marked as Defendant's Exhibits 25 and 26 (indicating).

Q.  (Mr. Luby continuing)  Mr. Ney, you talked about Dr. Hutchinson?

A.  Yes.

Q.  Do I understand correctly she's a clinical psychologist?

A.  She is.

Q.  And Dr. Froming by contrast is a neuropsychologist?

A.  Yes.

Q.  And can you explain to us why you felt the need to retain both?

A.  Well, they were dealing with different aspects of the psychological profile.  Neuropsychology is the functioning of the brain in the sense like a machine functions, you know, the deficits, the problems. Dr. Hutchinson was looking past that, although including that, to how his behavior had been affected by his growing up, his environment, and other mental issues he

might have.

Q.    How did you come to select Dr. Hutchinson as the clinical psychologist to retain in this case?

A.    I had worked with her previously on numerous occasions, including in capital cases.

Q.    And she's out of Kansas City, Missouri?

A.    She is.

Q.    If I could direct your attention to Exhibit 25.

A.    Yes.

Q.    Could you please describe for us what this document is in general terms.

A.    Yes.  Like Dr. Froming and Ingrid Christiansen, Dr. Hutchinson did an affidavit or a statement that indicates the kind of work she would be doing on the case, the type of hours that would be necessary to do that.  This was for funding purposes again.

            MR. LUBY:  Your Honor, defense offers Exhibit 25.

            MR. REISENAUER:  No objection, Your Honor.

            THE COURT:  Twenty-five is received.

            MR. LUBY:  Thank you.

Q.    (Mr. Luby continuing)  So in other words this is the funding affidavit that largely parallels that of Dr. Froming?

A.    Yes.

Q. And it describes a number of the same symptoms and aspects of Mr. Rodriguez's life history?

A. Yes, which we had supplied her at this time. Obviously she hadn't seen him.

Q. In other words sexual abuse, toxin exposure, racial discrimination, previous IQ scores, essentially the same types of issues?

A. Yes.

Q. If you could please turn to Exhibit 26.

A. Yes.

Q. And is this Dr. Hutchinson's report from the time of trial?

A. It is.

Q. And when is this report dated? It's in the middle of the first page.

A. Right. August 6th of 2006.

Q. And I'll ask you the same question with this report that I asked you about Dr. Froming's report. How long before that date did you come to know of Dr. Hutchinson's conclusions as described in her report?

A. Probably a month or two before this. She had seen Alfonso in May. She'd seen him various dates, October, March, May, prior to this report. Shortly after the May interview that she had with Alfonso or testing she and I talked about what her findings would

be formally when -- would be when I saw this report but I certainly had the broad strokes before the report was written.

Q. The actual date of the report, August 6th of '06, do you remember when during the trial that would have been as opposed to -- in terms of which phase of the trial?

A. (No response.)

Q. I know it's been a long time.

A. Not exactly where it would fit in, no.

Q. Is it fair to say you were in trial?

A. Yeah. Jury selection -- in August jury selection had been completed or close to it.

Q. This report in general like Dr. Hutchinson's affidavit I assume discusses some of the same aspects of Mr. Rodriguez's history?

A. I'm sorry, the question again?

Q. Does this report discuss some of the same aspects of Mr. Rodriguez's personal and social history?

A. Some of it but Dr. Hutchinson at this point had done work on her own talking to the family members, talking to Alfonso himself. So, yes, it's the same areas but the source of this information in a lot of cases would come directly from her work as opposed to our work.

Q.   Is she relying on your work and her work?

A.   I would assume so.  But again we gave her the records so she was relying on the records but these interviews were interviews really that she did.

Q.   Thank you.  If you could please turn to the bottom of page 2 and the top of page 3.

A.   Yes.

MR. LUBY:  I'm sorry, have we offered Exhibit 26?

MR. REISENAUER:  No objection.

"THE COURT:  Twenty-six is received.

MR. LUBY:  Thank you.

Q.   (Mr. Luby continuing)  At the end of page 2 do you see a sentence that begins:  "Alfonso was conceived in May..."?

A.   Yes.

Q.   "And his mother worked the fields during her early pregnancy when crop dusting was most commonly done"?

A.   Yes.

Q.   And then later on that page the end of the second full paragraph:  "Alfonso remembers being physically disciplined by his father.  He also remembers his father hitting his mother, being impatient with Alfonso and calling him stupid.  His words were recalled as more

painful than the hitting."

A.  Yes.

Q.  At the bottom of page 4 do you see the heading that says "Sexual Abuse"?

A.  Yes.

Q.  And Dr. Hutchinson goes on to describe the events for several paragraphs?

A.  I see that, yes.

Q.  If you could turn to page 6, do you see the heading that says "Teenage Years"?

A.  Yes.

Q.  Then she describes Mr. Rodriguez's abuse of alcohol and drugs?

A.  I see that, yes.

Q.  The middle of page 7 she discusses his academic performance.  Do you see where she says:  "He failed the 9th grade in June 1970 when he was 17 years old"?

A.  Yes.

Q.  Mr. Ney, if you could go down to page 21 under the heading "MENTAL STATUS."

A.  Okay.

Q.  About six lines down the sentence that says:  "He said" -- what is your understanding of what a mental status examination is, Mr. Ney?

A.  Well, different psychologists see it differently

but basically how he is perceiving the world at that point in time, is he being receptive, answering questions, seeing or hearing things that aren't there, just a sort of a gauge of where he is in the sense of the professional'S viewpoint.

Q.    And about six lines under that heading do you see a sentence that says:  "He said he is a loner who has difficulty being around people because he always feels on guard"?

A.    Yes.

Q.    On page 23 if you could please refer to the second full paragraph.  Do you see where it begins: "Mr. Rodriguez indicated he is generally disengaged from other people"?

A.    I see that, yes.

Q.    And if you'd please look at page 25 -- or the bottom of page 24 there's a heading that says "TESTING RESULTS."

A.    I'm sorry, yes.

Q.    Then on the next page Dr. Hutchinson -- she's reproduced Dr. Froming's testing scores on the WAIS-III and also on the WRAT?

A.    Yes.

Q.    If you could turn to page 31, please.

A.    Okay.

Q.   Do you see a heading that reads "Sexual Abuse"?

A.   Yes.

Q.   And in that first paragraph Dr. Hutchinson describes some of the effects of sexual abuse?

A.   Yes.

Q.   And the second sentence says:  "Survivors are more likely to have problems with trust, boundaries, limits, responsibility, control, denial, projection, idealization and motivation.  They will present with a variety of developmental mediated manifestations of that trauma that includes anxiety, compulsive repetitions, sleep disturbances, depression, ego constriction and disturbed expressions of anger."

A.   Yes.

Q.   And then in the last paragraph under that heading she notes:  "As a general rule, the younger the subject at the time of the abuse, the greater the harm; the more perpetrators, the greater the harm; the greater the abuse in duration, the greater the harm."

A.   Yes.

Q.   In terms of the effects of sexual abuse.

A.   I see that, yes.

Q.   On page 33 do you see a heading that says "Mental Health Diagnosis"?

A.   Yes.

Q.    And the second of two paragraphs under that heading do you see where it says:  "Mr. Rodriguez cannot tolerate the normal stressors of everyday life"?

A.    I see that, yes.

Q.    And she goes on later:  "He is like a child who is trying to pretend to be an adult and with some frequency his ability to pretend breaks down."

A.    Yes.

Q.    She continues:  "Mr. Rodriguez does not have the adult capability of being successful in the world.  His minimal attempts to be in the larger social community have not been happy or successful experiences for him. He has done very well within the structure, isolation and rigidity of incarceration.  It is here that he does not have to understand more complex social situations. It is here that he can find a sufficiently small niche in which to feel somewhat safe."

A.    Yes.  That's how we perceived him as well.

MR. LUBY:  Your Honor, might I approach the witness?

THE COURT:  You may.

MR. LUBY:  I'd like the record to reflect that I'm handing the witness our last batch of exhibits, Defendant's Exhibit 27 through 34.  I should clarify, our last batch of exhibits with respect to this

witness's direct examination.

Q.   (Mr. Luby continuing)  Mr. Ney, in addition to retaining a neuropsychologist and a clinical psychologist, you also retained an expert in the area of toxin exposure?

A.   Yes.

Q.   And who was that expert?

A.   The expert we ended up using was Donald Ecobichon.

Q.   Were there other experts that you used or considered using besides Dr. Ecobichon?

A.   Yes.  The original approval for funding, and I'm sorry, I'm blanking out her name, was a professor from the University of Iowa or from Iowa who in the end just didn't have time to work the case with us so we had switched to Dr. Ecobichon.

Q.   How did you come to select Dr. Ecobichon?

A.   I think I had received his name, along with the other doctors from Iowa, from David Freedman.  He's with the project, the federal project.

Q.   What is the project?

A.   I'm sorry, the Federal Death Penalty Project, which later I was a resource counsel for, the group of lawyers and professionals.  And David's expertise was mitigation and he had worked on a prior neurotoxin case

I believe so I talked to David.  I got a name or names which eventually led me to Dr. Ecobichon.

Q.   Could you please take a look at Defendant's Exhibit 27.

A.   Yes.

Q.   And tell the Court what that is.

A.   It's a letter from myself to Dr. Ecobichon dated December 9, 2005.

Q.   So again that's about six or seven months or so before trial?

A.   Yes.

Q.   And what is the purpose of this letter or what were you hoping to achieve by writing it?

A.   Well, it was just to -- that I was -- Dr. Ecobichon and I had talked.  I was giving him background information or information we had, you know, with this letter.  There were six enclosures of various reports or information for him to review so I could get his initial thoughts about it.

MR. LUBY:  And, Your Honor, I offer defense Exhibit 27.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Twenty-seven is received.

Q.   (Mr. Luby continuing)  At this time had you made

a formal decision to retain Dr. Ecobichon had he accepted or was it something that you all were looking into?

A.  Well, I think we had made -- I had made the decision.  Obviously I don't know that he had made the decision yet, but based on the recommendations I had about Dr. Ecobichon he seemed like the person to retain. He literally wrote the book on effects on humans of toxin exposures of this sort.

Q.  And could you please refer to Exhibit 28.

A.  Yes.

Q.  And could you tell us generally what this exhibit is.

A.  This is the letter I got -- I received January 3rd of 2006 from Dr. Ecobichon.

MR. LUBY:  The defense offers Exhibit 28.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Twenty-eight's received.

Q.  (Mr. Luby continuing)  At this point Dr. Ecobichon has considered and evaluated certain materials that were sent by you or your office?

A.  Yes.

Q.  If you could turn to page 2?

A.  Yes.

Q.   First full paragraph where he says the signs and symptoms described by Miss Christiansen for Alfonso and his sister are, quote, more consistent with periodic exposure to organophosphorus/carbamate insecticides, particularly those associated with the central and peripheral nervous systems, the latter having significant GI effects."  "GI" meaning gastrointestinal?

A.   That's as I understood it.

Q.   And when he uses this term "organophosphorus/carbamate insecticides," does that include DDT?

A.   Yes.

Q.   Were there other insecticides that you believe were -- could have possibly been implicated?

A.   Yes, we did -- I spent a couple of days in a dusty room at the Farm Bureau here going through records of what pesticides were used at various times.  So we had a range of things, herbicides and -- pesticides I should say and submitted all that to Dr. Ecobichon.  I think what he is saying is that the bread crumbs in a sense of what Alfonso was suffering from would lead him to believe that it was the toxin, the DDT.

Q.   And the bread crumbs that are placed before him, he's talking about Miss Christiansen's account of Mr. Rodriguez's symptoms?

A.    Yes.

Q.    In addition to other materials that your office would have sent him?

A.    Yes.

Q.    And what is the nature of the materials that you would have sent to Dr. Ecobichon in order to assess which toxins were at issue with which possible effects?

A.    Well, some of it was the material I was talking about that they had pretty good records actually in the Red River Valley and the beet harvest what was being used.  So he had access to those.  That's something I would send him.

        But the other thing would be the reports about -- from Sylvia about her illness, about her father's illness.  He had tremors and various other diseases.  Sylvia had multiple miscarriages.  So the family history of illness, if you will.

Q.    And that history would have been documented by the defense team through Miss Christiansen or your assistants?

A.    Yes.

Q.    And it was their summaries rather than the underlying medical or historical documents that would have been sent to Dr. Ecobichon?

A.    Yes.

Q.   So he wouldn't have necessarily been sent prison records, mental health records, primary medical records and the like?

A.   No.   Though he eventually received reports -- the reports of Dr. Froming I know.

Q.   If I could direct your attention to the last paragraph on this letter.

A.   Yes.

Q.   That is Exhibit 28.   It says -- or he makes a point that both he and Dr. Froming are only Ph.D's and that the other side may throw up a physician or psychiatrist in order to rebut him.

A.   Yes, I see it.

Q.   If you could please refer to Exhibit 29.

A.   Yes.

Q.   And tell us what this document is.

A.   It's a letter that I wrote to Dr. Ecobichon. It's dated May 3rd of 2006.

MR. LUBY:   The defense offers Exhibit 29.

MR. REISENAUER:   No objection, Your Honor.

THE COURT:   Twenty-nine is received.

Q.   (Mr. Luby continuing)   All right.   In this letter, Mr. Ney, you provide a number of details to Mr. Ecobichon -- excuse me, to Dr. Ecobichon concerning your client's exposure to pesticides both as a child in

the fields and later when he was working in the American Crystal Sugar plant.

A. Yes.

Q. Does this letter accurately state your understanding of the nature of Mr. Rodriguez's exposure?

A. Yes. I think Dr. Ecobichon had been -- Ecobichon and I were talking via telephone and he had some questions and I laid this out for him, some additional information I think he desired.

Q. And what you laid out specifically deals with Mr. Rodriguez's experience as a child growing up on a migrant farm, in a migrant farm family, and then later his experience working in the Crystal Sugar beet plant?

A. Yes. I think Dr. Ecobichon wanted his history, where he worked, how he might have been exposed.

Q. At any point in your representation of Mr. Rodriguez, were you aware of the possibility of him being exposed to neurotoxins during his work in prison at the print shop?

A. No.

Q. And at any point did you provide such information to Dr. Ecobichon?

A. I did not.

Q. And could you please turn to Exhibit 30.

A. Yes.

Q.   And tell us what this document is, please.

A.   This is a letter from Dr. Ecobichon to me dated June 16th of 2006.

MR. LUBY:   The defense offers Exhibit 30.

MR. REISENAUER:   No objection, Your Honor.

THE COURT:   Exhibit 30 is received.

MR. LUBY:   Thank you.

Q.   (Mr. Luby continuing)   This is dated June 16th of '06.   At this point how certain is it that Dr. Ecobichon would be testifying, at least from his perspective, although you've already testified it was certain from yours?

A.   Well, I can't speak for him but it was from my perspective certain.

Q.   Was it your understanding that his testimony was a certainty at some point before this letter?

A.   Yes.

Q.   About how long would you say?

A.   I think probably in early spring at least, maybe March, April.

Q.   If you could please turn to page 3 of this exhibit, that second paragraph.   I note at the end of it Dr. Ecobichon discusses some possible effects of exposure to again organophosphorus and carbamate esters.

A.   Yes.

Q.   Do you see where he says:  "Marked central nervous system signs and symptoms" in parentheses, "(memory deficits, loss of cognitive functions or comprehension, and behavioral abnormalities)"?

A.   Yes, I see it.

Q.   Thank you.  And then if you could please refer to Exhibit 31.

A.   Yes.  This is a letter from myself to Dr. Ecobichon dated June 24th of 2006.

MR. LUBY:  The defense offers Exhibit 31.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Thirty-one is received.

Q.   (Mr. Luby continuing)  The second page of this letter you described some trial logistics?

A.   Yes.

Q.   And you say his testimony is tentatively scheduled for the week of August 24th of '06?

A.   Yes.

Q.   And this is written June 24th of '06 so is it fair to say it's a certainty at this point that he's testifying?

A.   Yes.  Although, I was optimistic about when he would be testifying.

Q.   Of course.  And Exhibit 32, if you could turn to that, please, and tell us what it is.

A.   Yes.   This is Dr. Ecobichon's letter dated July 10th of 2006.

MR. LUBY:   The defense offers Exhibit 32.

THE COURT:   Any objection?

MR. REISENAUER:   No, Your Honor.   Did you offer 31?

MR. LUBY:   Perhaps I neglected to.

THE COURT:   I think 31 was offered and received.

MR. REISENAUER:   Thank you.

THE COURT:   At least my records show that.

MR. REISENAUER:   Thank you.

THE COURT:   If it wasn't plain, 32 is received.

MR. LUBY:   Thank you, Your Honor.

Q.   (Mr. Luby continuing)   So he opens the letter discussing a time period 1953 to 1974?

A.   Yes.

Q.   And at this point had you provided to Dr. Ecobichon the documents you've described that you developed in the dusty library concerning which pesticides were used in which areas and at what times?

A.   Yes.

Q.   If you'd please turn to page 2 of the letter, if I could direct your attention to the middle paragraph.

A.   Yes.

Q.   And Dr. Ecobichon is again discussing the effects of exposure to organophosphorus and carbamate esters.

A.   Yes.

Q.   And he describes various effects to the central nervous system, including memory deficits?

A.   Yes.

Q.   Emotional lability?

A.   Right.

Q.   Inability to concentrate?

A.   Yes.

Q.   Restlessness, loss of judgment and personality changes?

A.   Yes.

Q.   And if you would then please refer to Defendant's Exhibit 33.

A.   Yes.   This is a letter I wrote to Dr. Ecobichon on August 7th of 2006.

MR. LUBY:   And, Your Honor, the defense offers Exhibit 33.

MR. REISENAUER:   No objection, Your Honor.

THE COURT:   Thirty-three is received.

Q.   (Mr. Luby continuing)   Mr. Ney, you earlier testified that you were optimistic before or maybe too optimistic about how quickly the trial would proceed.

A.   Yes.

Q.   I notice this letter says:  "The trial of our case has gone slower than we anticipated."

A.   Right.

Q.   And at this time you're advising Dr. Ecobichon that he would most likely be testifying September 6th or 7th?

A.   Yes.

Q.   And this letter is about a month before that?

A.   It is.

Q.   Mr. Ney, we've described a number of letters, detailed letters that you and Dr. Ecobichon shared and exchanged.  At any point did Mr. Ecobichon offer an actual written expert report?

A.   No.

Q.   At any point did you ask Dr. Ecobichon to physically examine your client, Mr. Rodriguez?

A.   No.

Q.   Can you tell us why not?

A.   Well, it was my belief at that time that Dr. Froming had done the sort of evaluation that we needed to show the deficits that Alfonso had based on the exposure to neurotoxins.  So, I mean, I just didn't consider a second examination necessary.  That's one reason.

The second reason is if Dr. Ecobichon had examined Alfonso and was going to testify to his findings about Alfonso's physical or mental state, that we would have had to disclose that examination, file a report, go through 12.2 protocol.

Q.   And so by not having Dr. Ecobichon evaluate your client, you avoided having to disclose his report beforehand under Rule 12.2?

A.   Yes.

Q.   And what matter of disclosure did you give to the prosecution instead of a 12.2 disclosure with respect to Dr. Ecobichon's testifying?

A.   Pretty much none.  Day before we told the Court and counsel that he was going to testify.

Q.   And the last exhibit, if you would please turn to it, is Exhibit 34.

A.   Yes.

Q.   If you could take a look at it.  Does this appear to be a copy Dr. Ecobichon's trial testimony?

A.   It does.

Q.   And do you recall that some of that testimony concerns the possible effects of the types of toxin exposure that we've been discussing and that you had developed with Dr. Ecobichon?

A.   Yes.

Q.   If you could please turn to 7749.

A.   7740 --

Q.   Forty-nine, 7749.

A.   All right.  I have it.

Q.   The last paragraph on that page do you see where Dr. Ecobichon says:  "For instance, you'll have poor learning skills, sleeping disorders"?

A.   Yes.

Q.   Then on page 7750, the next page.

A.   Yes.

Q.   Down in the middle he describes loss of comprehension and reduced levels of concentration?

A.   Yes.

Q.   Then on the next page, 7751, toward the first full paragraph, Dr. Ecobichon describes hyperexcitability and then in the next paragraph impaired judgment?

A.   Right.

Q.   Now, Mr. Ney, you testified earlier that you've either litigated, oversaw or assisted with the development of a number of Atkins claims over the years of your practice?

A.   Yes.  More so after this trial than before but, yes.

Q.   And can you give us an idea of an approximate

number of such cases where you've been involved either as an advocate or in your role as resource counsel?

A.   Atkins claims specifically, I had not had an Atkins claim prior to this.  I had worked either with other trial teams as resource counsel with, as I said, maybe eight to 10 teams.  I had just completed work on a capital case in Iowa last year.  We were certainly contemplating getting the initial ball rolling on an Atkins claim but the state -- I'm sorry, the federal government declined to indict since our client had already been convicted of the same crime in state court.  So it didn't go any further than that.

Probably two that I have worked on to some degree personally as trial counsel since Rodriguez and again another eight to 10 that I've worked with trial teams.

Q.   Thank you.  Now these symptoms that Dr. Ecobichon described that we just looked at, poor learning skills, loss of comprehension, reduced concentration, impaired judgment, are those effects consistent with the types of adaptive deficits that you have developed or proven in other cases with either assisting or litigating Atkins claims?

A.   Yes.

MR. LUBY:  And those are all my questions,

Your Honor.

THE COURT:  Thank you.  We'll go ahead and we'll break at this point.  We'll start again, let's say 1:35 and we'll stand in recess until 1:35.  Thank you.

Did we receive 34?  It has not been offered.

MR. LUBY:  In which case I offer it.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Thirty-four is received.

MR. LUBY:  Thank you, Your Honor.

(Recess taken; 12:25 p.m. to 1:35 p.m.)

(In open court, all counsel present.)

THE COURT:  We'll go back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  Mr. Rodriguez has waived his right to be present.  All counsel of record are present.  Mr. Ney is on the stand.  He's under oath.

Mr. Reisenauer was about to commence with a cross-examination.  Mr. Reisenauer?

MR. REISENAUER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Mr. Ney, I'm going to go back to the beginning here of the case when you got involved.  Miss Sjodin was abducted in November of 2003 and Mr. Rodriguez was arrested a short time after that and charged in state

court initially in Grand Forks County.  I believe one of the local attorneys in Grand Forks by the name of David Dusek was originally representing Mr. Rodriguez.

Did you meet Mr. Dusek at all?

A.  I did, yes.

Q.  Okay.  And that was obviously after you were involved in the case after he was indicted.

A.  Right.  The federal Indictment was filed. Mr. Hoy was appointed.  I was eventually appointed and the two of us met with Mr. Dusek, yes.

Q.  Okay.  And prior to your involvement, had you become aware that Mr. Hoy had actually been appointed by the Court while Mr. Rodriguez was charged in state court?

A.  Well, when I was contacted by Kevin McNally, the head of the Federal Death Penalty Project, I learned that, yeah.  But that's the first I'd known about it and then a day or two later I was appointed.

Q.  Okay.  And my point is that while Mr. Rodriguez was charged in state court you weren't involved in the case at all but Mr. Hoy was to a certain degree.

A.  That's correct.

Q.  And I take it from your meetings with Mr. Dusek that he apprised you as to what had been learned by him and his investigator or his office up to that point?

A.   Well, Mr. Hoy may have had meetings and I'm sure he did as a matter of fact with Mr. Dusek.  I had one actually substantive meeting with Mr. Dusek maybe 30 minutes.  I met him a second time when we were picking up files so to that extent, yes.

Q.   Okay.  Did you ever become aware that Mr. Dusek in his capacity had had Mr. Rodriguez, for lack of a better word, evaluated by anyone?

A.   Yes, I was aware.

Q.   Okay.  And you received that documentation I assume somewhere along the line, either you or Mr. Hoy did, from Mr. Dusek?

A.   I don't know that it was a report or documentation.  I just don't recall it.

Q.   Okay.  And then let's just touch on the team that you had when you entered the case.  Can you tell us who from your office in Wichita was involved in the case?  Who was employed in your office who became involved in it?

A.   Yes.  Well, myself, my paralegal Angela Daniel, and then a second paralegal, he's now an attorney but at that time was a paralegal, David Miller.

Q.   Anybody else in your office?

A.   No.

Q.   Okay.  Would -- let me ask it this way.  Would

Ms. Daniel or Mr. Miller have also had the job of secretary/legal assistant or do you have a separate individual?

A.   Angela Daniel was my secretary.  I do a lot of my own word processing, et cetera, but yes.

Q.   Okay.

A.   Mr. Miller, no.  He was just strictly -- and Mr. Miller was mainly research and writing as opposed to Miss Daniel was not.  She was doing interviews, timelines, et cetera.

Q.   Okay.  So if Miss Daniel put a document together, she would have either written or typed it up herself.

A.   Yes.

Q.   Okay.  And then I believe Mr. Hoy will be a witness tomorrow possibly but do you know who from his firm was on the team?

A.   Well, his paralegal Robin -- I'm sorry, I'm blanking on the last name but Robin.  Sara Sorinson did some work on the case.

Q.   Okay.  Anybody else that you can think of?

A.   Those are the ones I had contact with.  He may have certainly had other people working on aspects of it but not that I was familiar with.

Q.   Is there an individual that rings a bell by the name of Josh Roaldson at all?

A.    Name rings a bell.

Q.    Didn't work for you.  Maybe Mr. Hoy?

A.    Yes, would have been Mr. Hoy.

Q.    Okay.

THE COURT:  Mr. Reisenauer, I didn't catch Josh's last name.

MR. REISENAUER:  I believe it's Roaldson, Your Honor.  I would spell it R-o-a-l-d-s-o-n.

THE COURT:  Thank you.

MR. REISENAUER:  I'm not sure if that's correct.

Your Honor, as we noted in chambers, we are going to start at No. 500 with our exhibit numbers.

THE COURT:  Yes.

MR. REISENAUER:  So this would be No. 500 and, excuse me, I don't have it on there.

Q.    (Mr. Reisenauer continuing)  Mr. Ney, I'm going to hand you what's been marked as Government's Exhibit No. 500 (indicating).  If you would look at that quick and tell us what that is.

A.    Yeah.  It's a document prepared by Miss Daniel.

Q.    And in reviewing that that's basically -- I think it's titled "Mitigation and Social History Report;" is that correct?

A.    Yes.

Q.   And that would be something she would have put together based upon information that your team had learned as a result of the investigation and the various reports it received, correct?

A.   Right.  Though this may be more her product as I said.  Angela's fulfilling the role of a mitigation specialist almost before Ingrid got on board.

Q.   Is there a date on that document at all?

A.   I'm not seeing one.  This seems to be somewhat of a work in progress and may have been turned over to Ingrid.

Q.   Okay.  And you mentioned Ingrid here.  Do you recall when she came on board?

A.   The exact date, no.  We had some issues about funding.

Q.   We had some documentation this morning where there were some letters going back and forth, and I think Miss Christiansen's going to be a witness as well in this hearing.  She certainly would be able to tell us when she came on board, correct?

A.   She should.  Again Judge Lokken had some issues about funding so we were -- our ability to get funding was a lot later.  It was later than we'd hoped so not as early as one would usually have a mitigation specialist.

Q.   Okay.  You were probably appointed in the early

summer of 2004, correct?

A.   Right.   I'm thinking yeah, that seems correct.

MR. REISENAUER:   Okay.   I have Government's Exhibit 501, Your Honor.

THE COURT:   Do you intend to offer 500?

MR. REISENAUER:   I do.   So moved, Your Honor.

MR. LUBY:   No objection.

THE COURT:   500 is received.

Q.   (Mr. Reisenauer continuing)   Mr. Ney, Exhibit 501 is a transcript of an ex parte hearing on July 6th of 2005, if you'll look at that real quick.

We would move 501, Your Honor.

A.   Yes.

THE COURT:   Any objection to 501?

MR. LUBY:   If I may just have a moment --

THE COURT:   You may.

MR. LUBY:   -- to review it?   No objection, Your Honor.

THE COURT:   501 is received.

MR. REISENAUER:   Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)   Mr. Ney, if you would look at that, that is -- or was an ex parte hearing.   This is a transcript of that hearing before Judge Erickson and that is in regard to the budget

matters I guess you've kind of just brought up, correct?

A.   Yes.

Q.   Okay.  And within that hearing if you recall there was an attorney by the name of Richard Burr that testified.  Do you recall Mr. Burr?

A.   Oh, I do, yes.

Q.   How do you know Mr. Burr?

A.   I've known Mr. Burr for probably 30 years.

Q.   Mr. Burr is an attorney and he is, in terms of this type of work, learned counsel and has represented a number of individuals that were facing the death penalty, correct?

A.   That's correct.  And he was resource counsel at the time of this hearing.

Q.   Okay.  And he appeared at this ex parte hearing. You called him as a witness in regard to these budget issues, correct?

A.   Yes.

Q.   So if you would first -- since we're talking about Ingrid Christiansen, if you'd turn to page 18 of the transcript.

A.   Yes.

Q.   On the bottom there on line 20 you asked Mr. Burr:  "Okay.  You've already touched on the necessity for a mitigation specialist.  Are you familiar

with at least the reputation of Ingrid Christiansen, our mitigation specialist in this case?"

If you would, what is Mr. Burr's answer?  If you'd read that for us.

A.  Certainly.  He says:  "I am.  I've worked with cases where Ingrid was the mitigation specialist before. I helped do a training that she was involved in two or three years ago involving doing outreach to victim family members in death cases so I've known Ingrid for some time."

Q.  Okay.  And then you ask Mr. Burr:  "And you consider her a competent mitigation specialist?"  And what's his answer there?

A.  Says:  "Oh, Ingrid, in the sort of upper midwest, Ingrid is one of the best.  She's certainly at the top of her profession in this part of the country.  There are two or three other folks whose work is as good as Ingrid's, but I don't think there's anybody who does better work than she does."

Q.  Okay.  And then as we learned this morning you did end up getting Ingrid Christiansen involved as your mitigation specialist in this case, correct?

A.  Yes.

Q.  Does the name Lisa Rickert ring a bell?

A.  Yes.

Q.   And can you tell us who she is.

A.   Lisa Rickert is an individual who I think has worked -- works as a mitigation specialist but has also worked as a DIVO specialist, which is defense-initiated victim outreach.

Q.   And what would a victim outreach person or person in that capacity do?

A.   She would try make contact with the victim's family, answer questions for them, open up lines of communication between the defense and the family.

Q.   And were you aware of Miss Rickert prior to this case?

A.   I was.

Q.   And how is that?

A.   Just being in the death penalty community.  I'd never used her for DIVO before but she had been recommended by Tammy Krause.

Q.   And who's that?

A.   Tammy is -- again works with the federal defender project and her -- one of her roles is to resource and advise on DIVO matters.

Q.   Okay.  This would be Government's Exhibit 502, Mr. Ney, and if you can look at that what does that appear to be to you (indicating)?

A.   Yes.  This is a letter sent by Lisa Rickert

August 31st of 2005.

Q.   Okay.  And she is the individual you ended up hiring as the victim liaison; is that correct?

A.   Yes.

Q.   And if you would while you're there -- I will move 502, Your Honor.

MR. LUBY:  No objection.

THE COURT:  502 is received.

Q.   (Mr. Reisenauer continuing)  And if you look back at the transcript, Mr. Ney, on page 71 if you would?

A.   Yes.

Q.   The top line there, there's a question from you: "One last issue relating to experts.  The defense proposed a victim liaison in this case, Lisa Rickert.  I just want to have you talk about that for a moment. You're familiar with Miss Rickert?"

And if you would read the answer?

A.   Mr. Burr said he was, yes.

Q.   And then you asked:  "Have you worked with her on cases?"  And he said?

A.   He said yes, he had.

Q.   And you asked:  "Could you just describe a bit about the purposes of what we've labeled here as a victim liaison?"

A.   It says:  "Yes.  The work that has evolved.  That

is sort of characterized as defense-based victim outreach.  Actually, the modern effort developed initially in the McVeigh case where we began to do that kind of work in relation to victim impact witnesses in the McVeigh case.  There were 40 victim impact witnesses in the penalty phase that the government put on.  We felt like we needed to talk to as many of those folks as we could.  We had some perfunctory 302's for those witnesses, but we really did not know from the 302's what the context of their testimony would be."

Q.   Mr. Burr is talking about Timothy McVeigh there?

A.   Yes.

Q.   Did he represent Mr. McVeigh?

A.   He was one of the attorneys that represented Mr. McVeigh.

Q.   And so Miss Rickert worked as the victim liaison in that case?

A.   I don't know the answer to that question, sorry.

Q.   Mr. Ney, this morning as we finished basically you were talking about Dr. Ecobichon.  There were a number of letters that were put into evidence.  We're not going to go through all those again, but as we have received the various documentations and records that your office and Mr. Hoy's office maintained, would it be correct that there was a lot of research done on this

pesticide toxin issue besides what Dr. Ecobichon provided to you?

A.   A lot of research by me or --

Q.   Members of the team?

A.   We certainly researched the issue, yes.

Q.   Okay.  I asked you a little bit ago about Mr. Roaldson.

MR. REISENAUER:  This would be Government's Exhibit 503.  We would offer 503, Your Honor.

THE COURT:  Any objection to 503?

MR. LUBY:  No objection.

THE COURT:  Received.

Q.   (Mr. Reisenauer continuing)  If you would look at Exhibit 503, Mr. Ney, and tell us what that appears to be.

A.   It's a letter from Bob Hoy -- I'm sorry, from Joshua Roaldson, who's a paralegal at Bob Hoy's office at Ohnstad Twichell, listing some of the articles he had found relating to migrant labor in the beet harvest and other assorted articles.

Q.   There's a couple page chart of articles regarding the farming practices and the sugar beets and the pesticides that were used, correct?

A.   Yes, that's correct.

Q.   Do you recall a gentleman by the name of Gary

Braaten, B-r-a-a-t-e-n?

A.   Sorry, I don't.

MR. REISENAUER:  We'd move 504, Your Honor.

MR. LUBY:  No objection.

THE COURT:  504 is received.

Q.   (Mr. Reisenauer continuing)  Take a look at that, Mr. Ney.  That is another letter regarding pesticides; is that correct?

A.   Yes.

Q.   Can you tell us what that says?

A.   It's -- this is Mr. Hoy relating a conversation he had with Mr. Braaten.

Q.   And Mr. Braaten provided him information in regard to pesticides, correct?

A.   Apparently so, yes.

Q.   What's the date of that letter?

A.   Date of the letter is April 12, 2005.

Q.   Did you ever speak to or work with Mr. Braaten on the pesticide issue?

A.   I don't believe I did.

MR. REISENAUER:  Okay.  I'm going to hand you what's been marked as Government's Exhibit 505 (indicating).  And we would offer that.

THE COURT:  Any objection to 505?

MR. LUBY:  No, Your Honor.

THE COURT:  505 is received.

Q.  (Mr. Reisenauer continuing)  And this is a letter from Mr. Braaten to Mr. Hoy, correct?

A.  That's what it appears to be, yes.

Q.  And he's talking to Mr. Hoy again about this pesticide issue, correct?

A.  Yes, it appears so.

Q.  And what's the date of that letter?

A.  It's dated October 19th of 2006.

Q.  So this is after the trial is over, correct?

A.  Yes.

Q.  And Mr. Braaten is still providing information on the pesticides; is that right?

A.  I guess so, yes.

Q.  Okay.  You didn't deal with Mr. Braaten yourself though.

A.  No.  We discussed him.  Mr. Hoy and I discussed him at least one time but, no, I never dealt with him.

Q.  There were a number of letters put in this morning, Mr. Ney, in regard to Miss Christiansen's getting on board and becoming involved in the case.  Do you recall those?  Do you recall those letters that Mr. Luby put in regarding Miss Christiansen's employment in the case?

A.  I recall the affidavit she wrote for submission.

If you can refer me to whatever other exhibit maybe I'm --

MR. REISENAUER:  Well, let's do it this way. Your Honor, I'm going ask Mr. Ney to look at 506 through 513 and we would move those into admission.

MR. LUBY:  No objection, Your Honor.

THE COURT:  505, 506, 507, 508, 509, 510, 511, 512 and 513 are each received.

MR. REISENAUER:  Thank you, Your Honor.  And with permission, Your Honor, I would like to stay with Mr. Ney up here as we talk through these.

THE COURT:  Any objection?

MR. LUBY:  So long as Mr. Reisenauer projects his voice.  It's a little bit hard to hear back here.

MR. REISENAUER:  I'll do the best I can, Your Honor.

THE COURT:  All right.

MR. REISENAUER:  Thank you.

Q.  (Mr. Reisenauer continuing)  Mr. Ney, if you'd look at Exhibit 506 and tell us what that is.

A.  It's a letter from Ingrid Christiansen dated January 14, 2005 to me.

Q.  And that's to you and is that in regard to her getting on board in this case?

A.   Yes.

Q.   So that was January of 2005; is that correct?

A.   Yes.

Q.   Okay.   So that's some maybe six, seven months after you got on the case, correct?

A.   Yes.   And I should say, Mr. Reisenauer, we had some -- I don't want to say temporary money but the Court is allowed to disburse a certain amount of money without the chief judge of the circuit's approval and that we were using that for Miss Christiansen in fairly early times but it wasn't much.

Q.   Okay.   And so you just answered another question that I was going to have.   So she was already on board prior to that budget hearing you had with Judge Erickson that we talked about that's in the transcript, correct?

A.   Yes, in a limited way.

Q.   Okay.

A.   And this letter really is about getting a DIVO person on board.

Q.   Which is what?

A.   The defense-initiated victim outreach.

Q.   Okay.   Then I'm going to hand you what's been marked as 507 (indicating).   That appears to be basically Miss Christiansen's CV; is that correct?

A.   Yes.

Q.   And how many pages is that, if you can tell us?

A.   Six pages.

Q.   Okay.  And she was involved in prior death penalty cases; is that correct?

A.   Yes.  She had worked in state cases in Illinois, Cook County.  That's what this shows.

Q.   Okay.  And then Government's Exhibit 508, just look at that quick.  I think we might have seen that earlier this morning and tell us what that is.

A.   Appears to be notes of Ingrid Christiansen's interviews.

Q.   With various individuals, family members and so forth in the case, correct?

A.   Yes.

Q.   Doing her mitigation work, correct?

A.   Yes.

Q.   And what's the date on that?

A.   December 5th of 2005.

Q.   Okay.  Then I'm going to hand you what's been marked as Government's Exhibit 509 -- excuse me, I'm going to go back to 508 for a second.  That's an e-mail sent to who from her?

A.   It's sent to me from Ingrid Christiansen.

Q.   And then 509, can you tell us what that is.

A.   Again an e-mail from Ingrid to Bob, me -- to Bob

Hoy, I'm sorry, and me both, dated May 8th of 2006.

Q.   Okay.  And what does that entail?

A.   It's again a report for contact.  One with Sister Margretta Dwyer.

Q.   Do you recall who Sister Margretta Dwyer is?

A.   Yes, I do.

Q.   Who's that?

A.   Sister Margretta is a -- was a therapist, sex offender therapist besides being a nun who we were considering using to talk about sex offender treatment programs.

Q.   And specifically that was the sex offender treatment program in Minnesota, correct?

A.   Well, that's where she worked.

Q.   Okay.

A.   So she had had experience there so she would have talked about the type of treatment that was or was not provided in Minnesota but also talked about sex offender treatment in general as well.

Q.   Okay.  And we'll get back to her in a little bit. Do you recall if she testified at trial?

A.   No, I don't believe she did.

Q.   Okay.  We'll get back to her in a little bit here.  Anybody else she talks about in that e-mail?

A.   Well, she mentions Dick Seely who is deceased at

that time.

Q.  And who is he?

A.  Who ran the program at St. Peter.

Q.  When Mr. Rodriguez was at the Minnesota State Hospital, correct?

A.  Yes.

Q.  Okay.

A.  Roger Robb.

Q.  Who was he?

A.  He was at the ISPA program in Moose Lake, then at St. Peters.

Q.  So he knew Mr. Rodriguez.

A.  Right.  Presumably, yes.

Q.  Okay.  Anybody else?

A.  But understand he was an inmate.

Q.  Mr. Robb was an inmate?

A.  Yes.

Q.  Okay.  So he provided information in regard to Mr. Rodriguez?

A.  To Miss Christiansen, yes.

Q.  Okay.

A.  That is what is indicated here.

Q.  Okay.

A.  There's mention of Dr. Jennifer Service.

Q.  Who's she?

A.    Ingrid says she's the head psychiatrist at Moose Lake and there's an ombudsman at Moose Lake, Michael Woods.

Q.    So this one e-mail from her basically indicates she had done some work doing some investigative work, interviewing of individuals that knew or worked with Mr. Rodriguez while he was at the Minnesota State Hospital.  Is that essentially correct?

A.    Well, not completely.  Some of them did know him potentially.  Sister Dwyer I spoke to, it's not that she knew him.  She just knew of the program.

Q.    Okay.  Let's move on to the next exhibit.  It's Government's Exhibit 510, another e-mail.  This is to Mr. Hoy.  I think we saw that in a different form this morning.  Can you tell us what that is.

A.    It's Ingrid's statement about the neurological concerns relating to Alfonso and his sister, Sylvia.

Q.    And there is a list of she calls them concerns for each of the two individuals, correct?

A.    Yes.

Q.    And this would be something that Miss Christiansen had put together do you believe?

A.    I believe that's correct.

Q.    Based upon what?

A.    Her interviews.

Q.   Okay.  And let me ask you this.  From her interviews did she do reports of those interviews that you received, do you recall?

A.   Some.  Not a vast number but some, yes.

Q.   If she did reports you would have received them, correct?

A.   Yes, as you've seen some of them.  Basically they were e-mails like this as I recall.

Q.   Okay.  Government's Exhibit 511, this is an e-mail to you from Miss Christiansen.  It pertains to somebody by the name of Vincent Garry.  Does that name ring a bell?

A.   Yes.

Q.   Who's he?

A.   He was an individual from the University of Minnesota that I spoke with about pesticides.

Q.   Okay.  So this was a separate individual besides Dr. Ecobichon that you spoke to?

A.   Yeah.  I think you'll see reference in one of the Ecobichon letters that I said I spoke to Mr. Garry.

Q.   Okay.  And did he provide you any information in regard to these pesticide talks in issue that you took into account?

A.   It's not something we used.

Q.   He didn't testify.

A.   He did not testify.  We didn't use any material.

Q.   But you did talk with him.

A.   Yes, I did.

Q.   And then Government's Exhibit 512, this is another e-mail from Miss Christiansen to you dated February 28th of 2005, and this also pertains to some research she did in regard to pesticides I believe. Could you take a look at that.

A.   Yes.  And this mentions, I think, Dr. Garry's findings.  He's mentioned in here.

Q.   Okay.

A.   So, yes.

Q.   So probably as a result of that research you contacted Dr. Garry I take it.

A.   Well, based on one of these two -- these e-mails are on the same day so based on one or both I contacted Dr. Garry, yes.

Q.   And then Government's Exhibit 513, that is another e-mail and again it has to do with toxins, pesticides and potential crime, correct?

A.   Yes.

Q.   As for Miss Christiansen?

A.   It's from Miss Christiansen to myself and Mr. Hoy and Angela Daniel.

Q.   So she would I take it as the mitigation

specialist not only interview people but also do some investigation as asked by yourself or Mr. Hoy.

A.    She was probably doing this on her own but, yes, I mean, this is similar to how teams operate, yes.

Q.    Okay.  So this is -- what Miss Christiansen did is, as you just noted, similar to how teams operate.  So have you used her since that case?

A.    Yes.

Q.    Okay.  And I take it as the mitigation specialist?

A.    Yes.

Q.    Turn to page 51 of that transcript, Mr. Ney.

A.    Okay (witness complies).

Q.    And if you would at the top there you say, line 3:  "I wanted to turn to one other expert we've talked about here.  The government has declared as an aggravator the fact that Alfonso Rodriguez did not avail himself of sexual offender treatment his last 20 years in prison and we suggested to the Court the need to hire a sex offender treatment expert, Sister Dwyer."

A.    Yes.

Q.    And you're asking Mr. Burr if he'd reviewed the budget in regard to that, correct?

A.    I am, yes.

Q.    And then you say:  "Let me ask you about that.

Did you think it's necessary for us to have an expert in this area?"  And what does he say?

A.   He says:  "Given that allegation as to an aggravating factor and given his history and given that he, himself, apparently felt uneasy being released at the time he was released some months before this offense occurred, I think it's mandatory to have somebody who understands, particularly the Minnesota Department of Corrections system, for evaluating, providing treatment for aftercare, as it were, for somebody who's released who is deemed to be sexually impulsive."

Q.   So Sister Dwyer did get on board and did provide information in regard to that, correct?

A.   No.

Q.   You don't believe she did?

A.   I spoke with her but we -- I don't believe we ever retained her or paid her any money to --

Q.   Okay.  So she provided you some information in regard to the sex offender treatment program in Minnesota but she wasn't retained.

A.   Right.

Q.   Okay.  Now there came a time, Mr. Ney, when I believe yourself, Mr. Hoy or either you or Mr. Hoy and Miss Christiansen did a number of depositions from individuals -- or of individuals with the Minnesota

Department of Corrections or the Minnesota Security Hospital; is that correct?

A.   Yes.  It was just me.

Q.   It was just you?

A.   Yes.

Q.   Okay.  Was Miss Christiansen with you?

A.   No.

Q.   Do you remember about how many depositions you took of individuals?

A.   At least three I'm thinking.  May have been more.

Q.   Was -- and Miss Christiansen wasn't involved in any of that?

A.   As far as being at the deposition and -- no.

Q.   Just you?

A.   Me.

Q.   Okay.  And were these people's depositions taken because they weren't cooperative when somebody tried to interview them or unable to be reached or what?

A.   The former.  They just -- Minnesota Department of Corrections was just not willing to let us interview them.

Q.   Okay.  And what was -- a number of those individuals were called as witnesses at trial?

A.   Yes.

Q.   What was the purpose of that, do you recall?

A.   Well, at trial at the mitigation phase, yes, to show that Mr. Rodriguez had attempted to prevent his own release from prison, had asked that he be referred to the security hospital, the sexual offender program, but that was denied him.

Q.   There was a time during the case that future dangerousness may have been an issue.  Do you recall that?

A.   Yes.

Q.   Okay.  And was any of the -- I take it some of the investigation with the Department of Corrections went to that?

A.   Well, yes.  I mean, as far as Mr. Rodriguez's amenability to live a crime-free life, an offense-free life in prison, do what he was told, yes, it went to that.

Q.   Do you know Dr. Mark Cunningham?

A.   I do.

Q.   And who was he?

A.   Well, Mark Cunningham kind of had a cottage industry basically testifying in cases regarding future dangerousness.  Mark's background was that he had done research and studies on the federal penal system and the programs available and the housing available and how inmates would be kept or controlled once they were in

the system.

Q.   Okay.  So that -- Dr. Cunningham's expertise so to speak was in this future dangerousness area.

A.   Yes.

Q.   Turn to page 39 if you would of the transcript, Mr. Ney.

A.   Okay (witness complies).

Q.   And down on line 17 there you asked Mr. Burr: "Let me just turn to sort of a last, if you want to call it a mental health individual, Dr. Mark Cunningham and future dangerousness.  You're aware that future dangerousness was listed as an aggravating factor in this case?"  And he says:  "Yes."  And you go on to have a conversation with him about Dr. Cunningham, correct?

A.   Yes.

Q.   Was Dr. Cunningham retained in this case?

A.   No.

Q.   But there was thought of that at the time that you met with the Court, correct?

A.   Yes, but future dangerousness was basically withdrawn as an aggravator.

Q.   So it wasn't necessary to hire Dr. Cunningham?

A.   Was not.

THE COURT:  Just for the record what's the exhibit number on the transcript?

THE WITNESS:  501, Your Honor.

THE COURT:  Very good.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Let's do this, Mr. Ney.  Instead of trying to duplicate let me try to find some of the exhibits from this morning.

A.  Sure.  They're all here.

Q.  If you'd turn to Defendant's Exhibit 23, Mr. Ney, this is the affidavit of Dr. Froming; is that correct?

A.  Yes.  I have it, yes.

Q.  Okay.  This affidavit was put together for the purpose of getting monies to retain her for this case, correct?

A.  Yes.

Q.  And as I'm reading through this affidavit, obviously she has been provided some of the materials that you had gathered up to that point in regard to Mr. Rodriguez's life, correct?

A.  Yes.

Q.  And this is dated June 10th of 2005; is that correct?

A.  Yes.

Q.  Now if you go back to I believe it's 501, the transcript from the budget hearing.

A.  Yes.

Q.   And if you'd turn to page 34.

A.   Okay.

Q.   And on line 15 you say:  "Okay.  Are you familiar with Dr. Karen Froming?"  If you could just read Mr. Burr's answers.

A.   He says:  "I am.  I've worked with Dr. Froming on a number of cases."

Q.   And then you say:  "You consider her to be a qualified neuropsychologist?"  And what does he say?

A.   He says:  "She is very highly qualified.  Among neuropsychologists who practice in death penalty cases around the country, she is in the top two."

Q.   "In the top two," he says.

A.   Yes.

Q.   And then your next question is:  "Okay.  And are you aware from your working with her or other knowledge that she has had experience in cases where there have been neurotoxins or toxins exposure?"  What does he say?

A.   He says:  "In fact, the last case I worked directly with her on was a case of a Texas client that I now represent in habeas proceedings, and I -- she has become involved in the case because of the exposure of my client to a toxin earlier in his life.  So, yeah, she is -- she -- every neuropsychologist doesn't have that expertise, but she in the course of her work has become

familiar with the effects of neurotoxins on somebody's brain."

Q.   And then you say:  "Okay.  So I guess it's fair to say then when you had a choice of a neuropsychologist in a case where there was toxins evidence, you chose Karen Froming?"  And what is his answer?

A.   He said:  "She was my first choice."

Q.   And then you say:  "And, of course, you're aware of the record in this case of the potential exposure to neurotoxins?"  And he says what?

A.   "Yes."

Q.   And then Dr. Froming was retained in this case, correct?

A.   Yes.

Q.   And she became aware of all the information that your team accumulated in regard to this issue of toxins, correct?

A.   I don't know that I could say "all" but we certainly sent her what we thought was the relevant material.

Q.   Okay.  And she testified at the trial, correct?

A.   At the penalty phase, yes.

Q.   Pardon?

A.   At the penalty phase, yes.

Q.   And she testified in regard to her findings in

regard to Mr. Rodriguez, correct?

A. Yes.

Q. And do you recall she testified about how in her opinion the toxins or pesticides that were presented to her as far as concerned Mr. Rodriguez how they would have affected him?

A. Yes.

Q. We'll get back to her in a little bit. If you would then turn to Defendant's Exhibit 25.

A. Okay.

Q. And this is the affidavit that you talked with Mr. Luby about with regard to Dr. Hutchinson, correct?

A. Yes.

Q. And again this was put together and provided for the purpose of retaining her, correct?

A. That's correct.

Q. And if you look on what would be the second to the last page I guess of the document that's dated June 14th of 2005, correct?

A. Yes, it is.

Q. Okay. And if you would, Mr. Ney, go back to the transcript that we've been looking at and specifically refer you to page 23.

A. Yes.

Q. And in the middle of that page, line 16, you

asked Mr. Burr:  "Now, we've proposed Dr. Marilyn Hutchinson to serve as our clinical psychologist in this case.  Are you familiar with Dr. Hutchinson?"  And he says what?

A.  "I am."

Q.  And then you ask him:  "What is your opinion of her abilities?"  And if you would read his answer to us.

A.  He says:  "I have been -- I haven't known Dr. Hutchinson very long.  I'm consulting in another case in the Western District of Missouri where she's involved.  And in a couple of extended meetings that I've been a part of directly, she has impressed me very much as a person who knows how to see patterns in a client's life and is able to develop hypotheses that are far beyond what we as lay folks can develop and then lead to very fruitful, deeper investigation.  She is as good as any expert I've seen in the country at doing that."

Q.  This is Mr. Burr, correct?

A.  Yes.  That's Mr. Burr, correct.

Q.  And he said:  "She is as good as any expert I've seen in the country at doing that."

A.  Yes.

Q.  And then you ask:  "And you're aware that she has served as an expert in a number of federal capital

cases?"

A. And he says: "Yes."

Q. And then one final question asked: "Including the Angela Johnson case in the 8th" -- I guess you asked 8th District. You meant Eighth Circuit; is that correct?

A. I corrected it you'll see on line 12, "Eighth Circuit, I should say," yes.

Q. And what does he say?

A. He says: "Yes, I'm aware of that."

Q. And again then after this budget meeting with the Court Dr. Hutchinson was retained, correct?

A. She was.

Q. And Defendant's Exhibit 26 was the report she filed and provided you in this case?

A. Yes.

Q. And she testified at the trial; is that right?

A. She did.

Q. Mr. Ney, if you would look at Defendant's Exhibits 27 through 34.

A. Yes.

Q. These are all the exhibits that we first viewed this morning in regard to Dr. Ecobichon; is that correct?

A. Yes.

Q.   And he testified at trial, correct?

A.   He did.

Q.   And he testified about his knowledge in regard to the pesticide toxin issue that was presented in this case; is that correct?

A.   Yes.

Q.   And I believe, correct me if I'm wrong, this morning you testified that you hired him because -- and I'm going to try to quote you.  He literally wrote the book on the effects of toxins on people; is that correct?

A.   Yes.  There's a book that's basically titled that --

Q.   Okay.

A.   -- and he wrote it -- or he's one of the two authors I think.

Q.   All right.  Thank you.  Are you aware Dr. Ecobichon is no longer with us, that he passed away?

A.   I've been told that, yes.

Q.   In you and your team's efforts to retain various experts, I take it that you contacted more than the people that you ended up retaining; is that correct?

A.   In some cases, yes.

          MR. REISENAUER:  Your Honor, we would move Government's Exhibits 514 through 517.

MR. LUBY:  No objection, Your Honor.

THE COURT:  514, 515, 516 and 517 are received.

Q.  (Mr. Reisenauer continuing)  Mr. Ney, I'm going to hand you Defendant's Exhibit 514 (indicating).  What does that appear to be?

A.  It's the curriculum vitae of John Edens, Dr. John Edens.

Q.  And Dr. Edens, what is his specialty?

A.  Well, I guess he's the anti-Mark Cunningham.

Q.  And what do you mean by that?

A.  Dr. Edens does not believe that there can be such a thing as predictions of future dangerousness.

Q.  Okay.

A.  So we asked for a Daubert hearing, if you recall, on the issue of future dangerousness.  If we had had the hearing, Dr. Edens would have testified that it's junk science or that it's just not predictable in order to have it excluded.

Q.  So Dr. Edens, if necessary, would have testified in that hearing, correct?

A.  In the Daubert hearing but not at trial.

Q.  Right.

A.  Right.

Q.  Okay.  Then I'm going to hand you what's been

marked as Government's Exhibit 515 and ask you to take a look at that (indicating).  That's just one page and who does that pertain to?

A.   Dr. Robert Karlin.

Q.   And do you recall Dr. Karlin at all?

A.   (No response.)

Q.   What is his specialty according to that page?

A.   Looks like psychotherapy.

Q.   Okay.  He wasn't retained.  You don't recall him?

A.   I do not.

Q.   Okay.

A.   I don't know if this -- well, I'd just be speculating.  We were talking to some individuals that related to hypnosis.

Q.   Okay.

A.   I don't believe that was Dr. Karlin but I'm not sure because we litigated the issue of the hypnotically refreshed recollection that was the basis for one of Alfonso's prior convictions.

Q.   Okay.  So it's possible you talked with Dr. Karlin.  You don't recall?

A.   Yeah.  He's certainly someone we -- we never retained this individual.

Q.   Okay.  I'll hand you Government's Exhibit 516 then (indicating).  This pertains to a Dr. Michael

Miner, if you take a look at that.  Does he ring a bell?

A.   Yes.

Q.   Who is Dr. Miner?

A.   Again he ran a program on human sexuality, University of Minnesota Medical School.

Q.   Okay.  And did you speak with Dr. Miner in regard to anything pertaining to this case?

A.   I honestly don't remember speaking with him. This fax, Exhibit 516, is a fax to Ohnstad Twichell. And maybe it's someone Bob talked to, but obviously when we were talking to people about sexual offender and sexual offender treatment that would have been potentially someone we spoke with.  But I just don't remember speaking with him.

Q.   Okay.  And then finally Government's Exhibit 517, this is a curriculum vitae of a Dr. D. Wayne Osgood at Pennsylvania State University, professor of crime.  Does that ring a bell?

A.   It does.  Again this may have been on the issue of the Daubert issue on future dangerousness.  He's not someone obviously we called or retained for whatever reason.

Q.   Okay, thank you.  Mr. Ney, I'm going to hand you what's been marked as Government's Exhibit 518 (indicating).  It appears to be a letter from Mr. Hoy to

a Professor Douglas Peters.

We would move 518, Your Honor.

MR. LUBY:  No objection.

THE COURT:  518 is received.

Q.  (Mr. Reisenauer continuing)  Professor Douglas Peters' name ring a bell at all?

A.  Yes.

Q.  And who was Professor Peters?

A.  Professor Peters did a jury survey about the case early on, and again I think before either Mr. Hoy and I got involved in the case frankly, and had some results that we were interested in.

Q.  Okay.  And that would have been pertaining, let me take a guess, to possible change of venue issues?

A.  Yes.

Q.  Okay.

A.  This is not who we used for our change of venue study but he had done one prior to our involvement.

Q.  Do you recall who you used for your study?

A.  Doctor --

Q.  Bronstein?

A.  Well, sorry, that may or not be correct.

Q.  How about Bronson?

A.  How about that, yeah.  Ed Bronson, okay, sorry.

Q.  Why don't you turn to page 59 of that transcript

if you would.

A.    (Witness complies.)    Exhibit 501, 59, yes.

MR. LUBY:    Excuse me, what page, Mr. Reisenauer?

MR. REISENAUER:    Page 59.

MR. LUBY:    Thank you.

Q.    (Mr. Reisenauer continuing)    And, Mr. Ney, on page 59 you're having a discussion in regard to Dr. Bronson if you look at line 15 there.    You say: "You've looked at Dr. Bronson's proposed costs?"    Do you see that?

A.    Yes.

Q.    And he indicates that he did and then on line 20 you ask:    "Anything unreasonable you see about that?" And what does he say?

A.    He says:    "No, it's exceedingly reasonable.    I should say Dr. Bronson assisted in the venue challenges in the McVeigh case, and among all the witnesses who testified, I was most impressed by him.    He has a very down-to-earth, grounded quality.    He understands, I think, how publicity affects people and is able to construct questionnaires and surveys that are very, very perceptive at getting information.    And his part of the cost is the very small part of the cost.    Administration of the survey is the large part.    And the per respondent

costs of the administration of the survey looks very reasonable to me based on the other surveys I've seen over my career."

Q. Okay. And then you're on page 60 there. Let's talk about what you bring up next. You say: "You actually used litigation consultants in the McVeigh case or not?" And what does he say?

A. He misunderstands me I guess. "Lawyer Litigation Consultants?" he asks.

Q. You're talking about jury selection consultants?

A. Litigation Consultants is the name of a firm.

Q. Okay.

A. So I said: "Litigation Consultants." And he says: "Oh, the firm." And I said: "Right."

Q. So turn to the next page, Mr. Ney. On line 4 you say: "Let me then turn, Mr. Burr, to jury selection consultant."

A. Yes.

Q. Were those utilized in this case?

A. The Court denied funding for jury consultants for selection of the jury.

Q. But you requested that.

A. Yes.

Q. Okay. Government's Exhibit 519, Mr. Ney, this appears to be the Curriculum Vitae of a Dr. Paul Rossby?

A.   Yes.

MR. REISENAUER:  We would move 519, Your Honor.

MR. LUBY:  No objection to 519.

THE COURT:  519 is received.

Q.   (Mr. Reisenauer continuing)  Dr. Rossby ring a bell at all?

A.   Yes, he does.

Q.   And who is he?

A.   He's a Ph.D., doctor of psychology, in I guess forensic neurobiology would be the correct --

Q.   Do you recall talking to Dr. Rossby at all?

A.   Yes, I do.

Q.   Okay.  And what was that in regard to?

A.   Doing serotonin testing.

Q.   What's serotonin testing?

A.   Well, serotonin is a chemical in the body and the levels of serotonin can affect impulse control and behavior.

Q.   Okay.  And I take it the serotonin testing was suggested by somebody?

A.   By me I guess.  I'd done it before.

Q.   Okay.  Would you have sought that out on your own or would that have been something Dr. Hutchinson or Dr. Froming would have recommended?

A.   On my own.

Q.   Okay.  And if you'd turn to page 69 of that transcript we've been talking about, 501.

A.   Yes.

Q.   I believe there's a lengthy discussion there actually starting on the previous page, excuse me.  In the middle there on line 12 of page 68 you say:  "Let me just touch on a couple more items and then we'll try and sum up.  One thing we listed in our -- the filing that we put together for this hearing was serotonin testing.  Are you familiar with serotonin testing?"  And Mr. Burr says he is, correct?

A.   Yes.

Q.   And again there is a lengthy discussion following a question from you by Mr. Burr and then if you turn to page 70.

A.   Yes.

Q.   There on line 13 you refer to retaining Dr. Rossby for the purpose of the serotonin testing, correct?

A.   Yes.

Q.   And that did occur, correct?

A.   The serotonin testing?

Q.   Yes.

A.   Yes, it did.

THE COURT:  Well, why don't we go ahead and break at this point since it's convenient.  We'll go ahead and break until 3:15.  We'll stand in recess.

(Recess taken; 2:56 p.m. to 3:15 p.m.)

(In open court, all counsel present.)

THE COURT:  503 is received.  We're back on the record.  Mr. Ney is on the stand.  All of the counsel of record remain present.  Mr. Reisenauer was conducting a cross-examination.  Apparently I forgot to receive 503 when it was offered.  Although, I have it marked down on my list as being received.  Anyhow I'll say "received" now.

Mr. Reisenauer?

MR. REISENAUER:  Thank you, Your Honor.

Q.    (Mr. Reisenauer continuing)  Mr. Ney, I'm going to hand you what's been marked as Government's Exhibit 520 (indicating).  It is a report from Dr. Rossby who we were just talking about.  We would offer 520, Your Honor.

THE COURT:  Any objection?

MR. LUBY:  No, sir.

THE COURT:  520 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.    (Mr. Reisenauer continuing)  Mr. Ney, if you'd turn to the second page, there is a final sentence there

Dr. Rossby has his conclusion to this test.  What does he say?

A.  He says:  "Statistically this means that the serotonin activity in Mr. Rodriguez's brain is normal."

Q.  And so Dr. Rossby, although retained and did some testing, as a result of his test results wasn't called at trial, correct?

A.  Correct.

MR. REISENAUER:  That was 520, correct?

THE COURT:  Yes.

Q.  (Mr. Reisenauer continuing)  Mr. Ney, I'm going to hand you what's been marked as Government's Exhibit 521, 522 and 523 (indicating).  I think those three exhibits pertain to the possibility of lead poisoning with Mr. Rodriguez; is that correct?

A.  Yes.

Q.  And if you would look -- I would move 521, 522 and 523, Your Honor.

MR. LUBY:  No objection.

THE COURT:  521, 522 and 523 are received.

Q.  (Mr. Reisenauer continuing)  Look at Government's Exhibit 521 and 522 and 523, Mr. Ney, if you could. Tell us -- 521, that is I believe information on Dr. Needleman; is that correct?

A.  Yes.

Q.   And what does that entail?

A.   It is a discussion -- it's a memorandum from my assistant, Angela Daniel, regarding lead testing.

Q.   Okay.  And within that document there's basically an informative -- information from a Dr. Needleman; is that correct?

A.   Yes.

Q.   And what does Dr. Needleman do?

A.   Well, he has testified previously about lead poisoning.

Q.   And how would that pertain to this particular case?

A.   Well, whether one of the possible causes of the deficits in Alfonso Rodriguez was from lead poisoning as a child.

Q.   And so you contacted -- or someone, Miss Daniel, contacted Dr. Needleman in regard to that?

A.   Yes.

Q.   The next exhibit, what is that?

A.   Exhibit 522 is a memo from Angela Daniel.  She spoke with an individual Neeta, N-e-e-t-a, Ginde, G-i-n-d-e, of Mount Sinai Hospital in New York and said that the cost of bone testing for lead poisoning would be 50- to $100,000.

Q.   And this would be a test of Mr. Rodriguez's bones

to determine if he has lead poisoning; is that correct?

A.   Yes.   That would be the only repository -- long-term repository in the human body.

Q.   And then the next exhibit is what?

A.   An e-mail from a Daniel Symonik, S-y-m-o-n-i-k, to Angela Daniel.

Q.   That's in regard to what?

A.   To again bone lead testing.

Q.   Okay.   And what does that say?

A.   It talks about testing, that there's -- a common method for determining lead exposure currently is blood lead testing.   It says:   "Methods have been developed whereby lead can be measured in bone to examine past exposure patterns" and about the bone being the long-term repository for lead in the body.

Q.   Okay.   This type of bone testing wasn't done, correct?

A.   Correct.

Q.   And that was because of the expense, do you recall?

A.   No.   I don't think it was because of the expense.

Q.   You did some other testing though with regard to possible lead poisoning of Mr. Rodriguez, correct?

A.   Yes.

Q.   And that was -- that was done with Mr. Hoy's

help; is that correct?

A.  Yes.

Q.  And Mr. Hoy's going to testify tomorrow.  I'll ask him more specifically in regard to that.  But is it your understanding that the test results of that testing basically came back that there wasn't a lead-leaching problem, do you know that?

A.  Are you talking about the test of the pottery?

Q.  Yes.

A.  Yes, that's correct.

Q.  Maybe I should explain that better.  There was some pottery that was tested for the leaching of lead, correct?

A.  Yes.

Q.  And the test results came back basically negative that that wasn't occurring, correct?

A.  That's as I understand it.

Q.  Okay.  We talked about all the work that Angela Daniel did basically as kind of a mitigation individual for you prior to Ingrid Christiansen coming on board and then we talked about Ingrid Christiansen's involvement. You also hired an investigator; is that correct?

A.  A fact investigator, yes.

Q.  Yes.  Bill O'Keefe?

A.  Yes.

Q.   And you mentioned fact investigator.  What does that individual do?

A.   Well, as opposed to investigating mitigation issues, he was investigating as in any criminal case an investigator would investigate.  Bob had used him before and Bob had contacts with him I believe and O'Keefe was hired.

Q.   I'm going to touch on a couple of other things here.  Mr. Ney, I have a question about there were some general assessment questions and documents put in this morning, I think three documents.  I have Defendant's Exhibit 22 here with me.  It would be 20, 21, 22.

A.   The general assessment questions, 20, 21 22, yes.

Q.   Twenty-one, 22?

A.   Right.

Q.   And 20?

A.   Twenty, 21, 22.

Q.   Okay.  Maybe I misunderstood this morning but these general assessment questions or questionnaires, these were done after Mr. Rodriguez was arrested in this case, correct?

A.   That's not my understanding.

Q.   Okay.  Well, maybe I can help you.

A.   Okay.

Q.   There's no date listed.  If you look at 22, just

take 22 because that's the one I have in front of me here.

A.   Okay.

Q.   There's no date listed on there, correct?

A.   No, I don't see one.

Q.   Okay.  So let's just, for instance, turn to, oh -- well, question 41.

THE COURT:  On which document, sir?

MR. REISENAUER:  This would be 22, Your Honor.

THE COURT:  Thank you.

Q.   (Mr. Reisenauer continuing)  Okay.  That question says:  "What are the subject's current hobbies/interests?"  And the answer that Ileanna and Delores wrote down were:  "Pornographic movies & magazines, watching nephew's hockey games" and "shopping."

That seems to me that that is information that was provided after he was released from prison and maybe most likely after he was arrested in this case, correct?

A.   (No response.)

Q.   Doesn't that seem logical?

A.   I agree, yes.

Q.   Okay, thank you.  Go to Exhibit 7, Mr. Ney, if you could.

A.   Okay.

Q.   Do you have that?  This is rather thick.  It's called "CHRONOLOGY" on the front page, correct?

A.   Yes.

Q.   Mr. Luby went through part of this with you so turn to page 7 of that exhibit, if you would.

A.   Okay.

Q.   There was indication -- Mr. Luby asked you about his failure of first grade in Texas.  Do you see that up there on the date of 6/61?

A.   Yes.

Q.   Okay.  And then on 9/61 apparently had an IQ aptitude test of 77, correct?

A.   Yes.

Q.   Doesn't indicate where that test was taken, does it?

A.   No.  But this coincides with the 77 on the Crookston.

Q.   Pardon?

A.   In Exhibit 13.

Q.   Yes.

A.   The top line of the first page written in talks about the IQ of 77.

Q.   Mm-hmm.

A.   On 9/19 so it's the Crookston school records.

Q.   Okay.

A.   So you're right.  No, it doesn't say there but --

Q.   Okay.  So we don't know if he took that particular test in English or Spanish, do we?

A.   We don't.  I mean, there's nothing that says that but -- well, okay.

Q.   Okay.  English is his preferred language right now, correct?

A.   Yes.

Q.   Okay.  And it was when you represented him, correct?

A.   Yes.

Q.   But when he was in the first grade Spanish was probably his preferred language at that time, wouldn't that be true?

A.   Well, his family I think spoke Spanish at that time.

Q.   Okay.

A.   But in the school system obviously whether it was Texas or Crookston I think the language spoken was English.

Q.   And if you had -- you recall information you received that he had help in his younger years in school with his English?

A.   That as he was younger English was potentially a

challenge, yeah.

Q.   Okay, thank you.  That same exhibit, Mr. Ney, just if you would on page 31.

A.   Okay.

Q.   The very last notation there on 12/1/76 says: "Mr. Rodriguez does not appear to have any previous criminal convictions for inappropriate sexual behavior, however, he does appear to have a long history of chronic anxiety and depression."  Do you see that?

A.   Yes.

Q.   Do you recall that there were police reports of obscene phone calls that he had been making prior to this particular date?

A.   I do, yes.

Q.   Okay.

A.   But this is a quote.  This is not us saying this, understand.

Q.   Yes.

A.   Okay.

Q.   Mr. Luby asked you about high school graduation. Mr. Rodriguez quit school when he was in the 9th grade, correct?

A.   Yes.

Q.   Okay.  And so I'm a little confused.  Are you saying that he didn't graduate from high school once he

got into the Minnesota Security Hospital?

A.  Well, it doesn't say GED.  It says graduated from high school, high school grad.

Q.  Okay.  So do you think he got his GED but didn't get his high school diploma?

A.  I'm just saying it's an inconsistency.

Q.  Okay.  But let's put it this way.

A.  Okay.

Q.  Is it your understanding that he either got a GED or his diploma at some point while he was at the Minnesota Security Hospital?

A.  You know, I actually don't recall that.  I know he didn't in the traditional way graduate from high school.  That's what I could tell you.

Q.  Okay, thanks.  Okay.  Let's -- if you would if you'd turn to -- I guess it was Exhibit 1.

A.  And, I'm sorry, Mr. Reisenauer.  Exhibit 14, just so we're clear, says:  "SCHOOL COMPLETED:  High school grad St. Peter, Minnesota."

Q.  Okay.

A.  So I guess if they're saying he graduated at the institution that would be -- you seem to be right that if it's St. Peter it's certainly not Crookston that they're saying.

Q.  Okay.

A.   Okay.

Q.   Do you know -- not that it really matters but do you know that St. Peter is a town in Minnesota?

A.   Yes, I do.

Q.   Okay.

A.   But I know from knowing his high school -- his school records he didn't actually attend school in St. Peter in the sense that, you know, United States School District, U.S. School District, or whatever, 125. That's not --

Q.   I got it.

A.   Okay.

Q.   Thank you.  So let's move on to Defendant's Exhibit 1, if you would.

A.   Yes.

Q.   Counsel asked you about that and this is the AAMR, American Association on Mental Retardation 10th Edition, correct?

A.   Yes.

Q.   So the next -- the very next page at least on my exhibit shows a copyright of 2002.

A.   Yes.

Q.   Do you see that?

A.   I do.

Q.   Okay.  So this would have been at least this

association's edition at the time of the trial in this case; is that what you think?

A.  I don't know that I could testify to that but --

Q.  Okay.

A.  -- I'm familiar with this book and its various editions.

Q.  Okay.  So then turn to page -- would be No. 1, as Joe would say Arabic No. 1.

A.  Yes, got it.

Q.  Okay.  Right there there's a big block that says "MENTAL RETARDATION," correct?

A.  Yes.

Q.  And I will read it.  "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills," correct?

A.  Yes.

Q.  Okay.  And based upon that with all the information that your team received, including the expert opinions of Dr. Froming and Dr. Hutchinson, they did not find that Mr. Rodriguez was mentally retarded, correct?

A.  Well, I don't know what they based it on if they were looking at this definition.  But it is correct that

in their reports to me that that's correct.  They did not diagnose him to be mentally retarded.

Q.  Okay.  And they testified at trial, correct?

A.  Yes, they did.

MR. REISENAUER:  Shelley, what number are we on?

THE CLERK:  524.

Q.  (Mr. Reisenauer continuing)  Mr. Ney, I'm going to hand you Government's Exhibit 5- -- excuse me, I gave you the book.  This will be Government's Exhibit 524. I'll give you the page (indicating).  I'll look at the book.

A.  All right, thanks.

MR. REISENAUER:  This book is entitled "Intellectual disability."  I would so move the document in, Your Honor.

MR. LUBY:  No objection.

THE COURT:  524 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  And the first page of 524, Mr. Ney, is the cover of this book and it's entitled "Intellectual Disability" and it is "The 11th Edition of the AAIDD Definition Manual."  Do you see that?

A.  Yes.

Q.   And are you aware that the AAIDD was the -- is the name of the former American Association on Mental Retardation?

A.   I am.   The term "mental retardation" went out of favor so "intellectual disability" is now what we call it.

Q.   So Defendant's Exhibit 1 was the 10th Edition essentially and now this is the 11th Edition, correct?

A.   Yes.

Q.   Okay.   And this particular -- this particular edition is copyrighted 2010 if you see that on the second page.

A.   I do.

Q.   And then the next page is what number?   Five?

A.   The next page of the exhibit is page 5, yes.

Q.   Okay.   And at the top of page 5 it says: "Intellectual disability is characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills," correct?

A.   Yes.

Q.   If you look back at Defendant's Exhibit 1, Mr. Ney, on page 1.

A.   I'm there.

Q.   It lists five assumptions essential to the

application of that definition, correct?

A.   Yes.

Q.   I'm going to show you page 1 of the exhibit I just offered (indicating).

A.   Yes.

Q.   And those are the exact same five assumptions, correct?

A.   They seem to be, yeah.

Q.   Thank you.  Earlier when Mr. Luby was questioning you I believe the DSM was mentioned?  Do you know what that is?

A.   Diagnostic Statistical Manual, yeah.

Q.   And what is that?

A.   It's a handbook used by mental health professionals to I guess make consistent diagnoses.

Q.   And that is the manual of the American Psychiatric Association, correct?

A.   Yes.

Q.   That's another manual used to diagnose mental disorders?

A.   Another.

Q.   Well, we were just talking about the Association of Mental Retardation.  The DSM is another manual that is utilized in arriving at whether or not somebody may or may not be intellectually disabled or mentally

retarded, correct?

A.   I think that's in the DSM, yes.

Q.   Mr. Ney, I'm going to hand you what is marked as Government's Exhibit 525 (indicating).  It is the DSM-5 and again there are editions of the DSM; is that correct?

A.   Yes.

MR. REISENAUER:  I would offer Exhibit 525, Your Honor.

MR. LUBY:  No objection.

THE COURT:  525 is received.

Q.   (Mr. Reisenauer continuing)  And how many pages does that exhibit contain, Mr. Ney?

A.   Three.

Q.   And the second page is the copyright, correct?

A.   Yes.

Q.   And that is a copyright 2013; is that right?

A.   It is.

Q.   And then the third page, if you take a look at that, what does that have on it?

A.   It's page 33 and talks about intellectual disabilities.

Q.   Okay.  And there are diagnostic criteria listed, correct?

A.   Yes.

Q.   And that reads as follows:  "Intellectual disability is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains."  Do you see that?

A.   Yes.

Q.   That's similar to the definition that we read in the 10th and 11th editions of the other two exhibits, correct?

A.   Well, with this proviso.  We don't see the word or the phrase "IQ" here.

Q.   No, we don't.

A.   Where -- your Exhibit 524, what's called the blue book because that's what it's now called, and the -- as opposed to the red book.

Q.   Correct.

A.   The blue book does list IQ.

Q.   Yes.  Are you aware that as this is discussed that IQ is discussed within the section that you're looking at?

A.   Right.  But it's not a definition.  It's not part of the definition.

Q.   I understand.

A.   That's why I'm saying this is what I would consider a significant difference between the DSM and

the red or blue book.

Q.   Okay, thank you.   I have a few more questions here for you.

A.   Sure.

Q.   The verdict form that you looked at earlier, I believe it's Exhibit 12?

A.   Yes.

Q.   Those were mitigators that you requested during the trial; is that correct?

A.   Yes.

Q.   And as reflected I think in your -- in the question of Mr. Luby and your answers, the jury findings are set forth in terms of the number of jurors that found for that mitigator, correct?

A.   Yes.

Q.   During the mitigation or penalty phase of the case, Mr. Ney, the defense called a number of witnesses. I believe we discussed some of them:  Dr. Froming, Dr. Hutchinson, Dr. Ecobichon, a number of family members, his mother, Sylvia his sister, Ileanna, a couple of the nephews or a niece and a nephew, people from the Department of Corrections, people from the Cass County Jail.

A.   Yes.

Q.   There was a Sister Yvonne Nelson I think.

A.   Yes.

Q.   Sister Nelson, do you recall what she testified in regard to?

A.   Well, early on after Alfonso was arrested on this offense Sister Yvonne became his spiritual advisor and met with Alfonso I think at least once a week during the two plus years the case went on.  So she talked about his spiritual growth.

Q.   And that was one of the mitigators as well if I recall?

A.   Yes.

Q.   Okay.  Did she also testify about her conversations she had with him in regard to other subjects?

A.   I'm sure that some of that --

Q.   My recollection is that -- maybe I'm getting off on a tangent here but my recollection is that they -- they discussed reading books quite a bit between the two of them and conversed about the various subjects of the books.  Do you recall that?

A.   Yes.

MR. REISENAUER:  That's all I have, Your Honor.

THE COURT:  Thank you.  Mr. Luby?

MR. LUBY:  Your Honor, if I could have about

say ten minutes to confer with my colleagues?

THE COURT:  You may.

MR. LUBY:  Thank you.

(Recess taken; 3:50 p.m. to 4:00 p.m.)

(In open court, all counsel present.)

THE COURT:  Thank you.  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  When we broke Mr. Ney was on the stand.  Mr. Luby was about to commence with a redirect.

Mr. Luby?

MR. LUBY:  Thank you, Judge.

### REDIRECT EXAMINATION

**BY MR. LUBY:**

Q.  Mr. Ney, could you please refer to Defendant's Exhibit 13, which are the school records from Crookston.

A.  Yes, I have them.

Q.  If we can just discuss the dates on these scores. The first one, the 77 from page 1, is based on administration in grade one and that would be 1961?

A.  Yes.

Q.  And at that point Mr. Rodriguez is how old?

A.  In '61 he's seven years old -- I'm sorry, eight years and seven months to be exact.

Q.  And then if you would please refer to the scores

on the next page, the score of 74 reflects what date?

A.   The date is 10 -- looks like a 10/4 of '65.

Q.   And that would be when Mr. Rodriguez was 12 years old?

A.   Twelve years and eight months.

Q.   And is it your understanding that Mr. Rodriguez and his family permanently moved to Crookston around the time he was eight or nine years old?

A.   Yes.

Q.   And during the time then that he's learning English, do you -- strike the question.

Did you or your experts attribute Mr. Rodriguez's IQ scores to language difficulties?

A.   That was one thing that was discussed, but in talking with Alfonso certainly he said all of his classes up till those times were in English.  He was not getting English as a second language at that time.  At least that was a theory that one or both of the experts put out that that could be a difference, but obviously it doesn't explain why his IQ scores would go down as he's learning English better.  So it was at least a conversation.  That's what I can tell you.

Q.   Thank you, Mr. Ney.  Mr. Reisenauer asked you some questions about the general assessment questionnaires.  I think those were Defense Exhibits 20,

21 and 22.

A.   Yes.

Q.   And there was some question about where those originated and when they originated.  Do you recall that discussion on your cross-examination?

A.   Yes, I do.

Q.   Mr. Ney, can you tell us generally about what was called the government's firewall team and the nature of their investigation in this case?

A.   Well, they were brought in ostensibly to deal with the mental health issues where the government could not be privy to those directly, to the reports and the knowledge of what our mental health case would be.  They were part of the 12.2 disclosure team.

Q.   And were they also conducting investigations?

A.   We found out that they were doing anti-mitigation investigations, yes.

Q.   And did some of that investigation involve talking to witnesses and getting their, the witnesses', assessments of Mr. Rodriguez?

A.   We found that it did, yes.

Q.   And would it surprise you to learn that these general assessment questionnaires originate from the FBI and/or the firewall team?

A.   No.

Q.   Moving to another issue, Mr. Ney, you were asked some questions about your dealings with Drs. Ecobichon and Froming concerning toxin exposure.

A.   Yes.

Q.   Did either Dr. Ecobichon or Dr. Froming travel to the areas in which Mr. Rodriguez was exposed to toxins?

A.   I don't believe so.  I know Dr. Ecobichon did not and I don't believe Dr. Froming did either.

Q.   Do you recall asking either of them to do so?

A.   No.

Q.   And did either of them conduct their own interviews relating to the family or other people who could describe such exposures?

A.   Dr. Ecobichon did not.  I don't know if Dr. Froming had any contact with the family members. That may have happened but I'm not aware of it as I am with Dr. Hutchinson, for example.

Q.   You've described earlier in your testimony -- going back to the question of IQ, intellectual disability and mental retardation, if we may, you described earlier in your testimony today that you had a different understanding of the concept of mental retardation or intellectual disability in the years subsequent to this trial than you did at the time that you were representing Mr. Rodriguez.

A.   That's correct.

Q.   And, in fact, do you recall Dr. Hutchinson testified that the observed IQ score of 77 was above the, quote unquote, cutoff for IQ?

A.   Yes.

Q.   Can you give me an idea of about how many years would have passed between Mr. Rodriguez's trial and your subsequent experiences so as to give you a different understanding of the intellectual disability framework?

A.   I am putting it about two or three years.  There were cases that were being tried at that time, although I can't remember the defendant's name.  One was tried by Michael Borth, a capital lawyer from San Francisco, where the client tested out high 70s, 80s but was found to be found ineligible for the death penalty under Atkins once adaptive functioning was applied.  I think it's just significant that there was sort of a cliff we -- at least I fell off of several years after this case that said IQ scores really don't mean as much as we thought they did and they don't mean very much at all in a lot of cases.

If you look, in fact, as a testament to that Government's Exhibit 525 which we talked -- it's -- the DSM-5 talks about intellectual disabilities.  The last paragraph on the page, the last page says specifiers.

"The various levels of severity are defined on the basis of adaptive functioning, and not IQ scores, because it is adaptive functioning that determines the level of supports required.  Moreover, IQ measures are less valid in the lower end of the IQ range."

I guarantee you that was not in the DSM-4 or 3, whatever was in next when we did the trial.  That's where the science now is, that these scores perhaps are a guide but they are not determinative of intellectual disability or mental retardation, however we want to phrase it.  And that's the kind of language.  We have the blue book which still talks about IQ scores but I guarantee you the world of this science is moving away from that as determinative.

Q.  You described falling off of something of a cliff in the two or three years after this trial on this particular issue.

A.  Yes.

Q.  If you had fallen off that cliff before this trial, would you have taken a different approach to the question of mental retardation?

A.  Yes.

Q.  And how so?

A.  Knowing what I know now about intellectual disability or even knowing what I knew three or four

years after this trial, I would have made an Atkins claim.

MR. LUBY:  Those are all my questions. Thank you.

THE COURT:  Mr. Reisenauer, anything further?

MR. REISENAUER:  Yes, Your Honor.  Thank you.

**RECROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Let's start with the toxin stuff first, Mr. Ney. Whatever information that you and your team had gleaned about Mr. Rodriguez's exposure to the pesticides and the toxins, certainly that was something that you would have provided to the experts, to Dr. Ecobichon or Dr. Froming or Dr. Hutchinson, correct?

A.  Well, let me qualify that.  Everything we thought --

Q.  Well, let me stop you.

A.  All right.

Q.  I don't want you to qualify it for me.

A.  Then no.

Q.  Would you have provided whatever information you had to them?

A.  No.

Q.   You wouldn't have?

A.   Every article we read?  Every person we talked to?  No.

Q.   Were they aware of what Mr. Rodriguez provided you about his exposure?  They would have been, correct?

A.   Yes, I believe so.

Q.   They would have been provided whatever Sylvia D'Angelo provided you about his exposure, correct?

A.   And hers, yes.

Q.   And they would have been provided whatever Mr. Rodriguez's mother Delores informed you about the exposure, correct?

A.   Yes.

Q.   So let's talk about the intellectual disability part of this in terms of what the AAIDD or the DSM-5 says about the IQ tests which you brought up.

So would you agree with me at one point when Atkins first came out that there might have been a belief that there was a hard line number which would designate somebody as mentally retarded?

A.   I think it was grayer than that but, yes.  I mean, were we number driven at that time?  Yes.

Q.   Okay.  And so you're agreeing with me basically that it wasn't a hard line number.  It wasn't 65, or if you're a 66 you're not.  If you're a 64 you are,

correct?

A. Right.

Q. Okay. And that's evolved a little more is what you're trying to tell us; isn't that correct?

A. Well, it was still in the -- even then, even when this trial was tried, we knew that the Flynn Effect was an issue. So what really is a 75? Is a 75 a 75 or is it actually a 70? You know, what are we talking about?

Q. Okay. And there has been new case law since then is what you're telling us, correct?

A. Yes.

Q. Okay. And the adaptive functioning and adaptive deficits, those have always been in existence, right? We read what Mr. Luby gave you and that included adaptive deficits, correct?

A. Yes.

Q. Okay. And then we read the 2010 AAIDD 11th Edition and that included them as well, correct?

A. It does.

Q. And I presented you with the DSM-5 and that includes the adaptive functioning deficits, correct?

A. Yes.

Q. Okay. You said that it didn't include or it didn't mention the IQ and then you read at the bottom of the page, which obviously you found when we were on

break, where it referred to the IQ, right?

A.   Yes.   I actually found it while we were talking about it.

Q.   Okay.

A.   But, yeah, I mean, it talks about why IQ is -- shouldn't be used as a hard and fast tool.

Q.   Right.   And so as a rule we look at the IQ and then we also are supposed to look at the adaptive functioning deficits, correct?

A.   We are, yes.

Q.   Okay.   I'm going to refer you to page 37 of that DSM.

A.   Okay.

Q.   If you would just read the top two paragraphs if you would out loud.

A.   Okay.   It's titled:   "Diagnostic Features.   The essential features of intellectual disability (intellectual developmental disorder) are deficits in mental abilities (criterion A) and impairment in everyday adaptive functioning in comparison to individual's age, gender and social cultural matched peers."   Criterion B it says:   "Onset is during the developmental period, criterion C.   Diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and

adaptive functions."

The next paragraph as well?

Q.   Yes:

A.   Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience and practical understanding.  Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought and cognitive efficacy.  Intellectual functioning is typically measured with individually administered and psychometrically valid comprehensive, culturally appropriate, psychometrically sound tests in intelligence.  Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement generally plus five points.  On tests with the standard deviation of 15 and a mean of a hundred, this involves a score of 65 to 75."  Seventy plus five it has in parentheses.  "Clinical training and judgment are required to interpret test results and assess intellectual performance."

Q.   Okay.  So that gives us exactly what we've been talking about all day here.  We have intellectual functioning which is defined here in two ways.  No. 1,

the test results itself, correct?  And then, No. 2, they look at these other critical components they call them by a clinician involving reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience and practical understanding, correct?

A.    That's --

Q.    That's criterion A.

A.    Right.  But that's not what we did is the problem.

Q.    I understand what you're saying, okay?  I'm not talking about what anybody did.

A.    Okay.

Q.    These are the rules today, correct?

A.    Yes.

Q.    Okay.  And back then it was just the one component is what you're telling us regarding the IQ testing.  That's what you looked at?

A.    No.

Q.    No.

A.    I mean, if we were to go with the red book the red book says it's both.  It's basically the IQ -- disability characterized by significant limitations both in intellectual functioning and adaptive behavior.

Q.    Correct.

A.   The problem is we looked at those numbers, Karen Froming's 80, whatever it came down to, and said:  Okay.  And we didn't look at adaptive functioning.  We didn't say:  No matter what the number is let's look at criteria two.

Q.   There was a determination that because his IQ was high enough that you didn't have to look any further, correct?

A.   Substantially that was it, yes.

MR. REISENAUER:  Okay, thank you.  That's all I have, Your Honor.

THE COURT:  All right.  Did you have anything as a result of that because that would ordinarily end it?

MR. LUBY:  No, Your Honor.

THE COURT:  You may step down, Mr. Ney.

MR. NEY:  Thank you, Your Honor.

THE COURT:  Thank you for your time.  Have a safe trip home.  I don't suppose anyone's got a 10-minute witness they want to call.

MR. LUBY:  I suppose not.

THE COURT:  We'll go ahead and break for the day.  We'll start again tomorrow morning at 9:00.  All right.  Thank you.

(Adjourned at 4:20 p.m.)