**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                                    )
United States of America,    )
                                    )
    Plaintiff/Respondent, )
                                    )
       vs.          )   **FILE NO. 2:04-cr-55**
                                    )
Alfonso Rodriguez, Jr.,      )
                                    )
    Defendant/Petitioner. )
                                    )
- - - - - - - - - - - - - - - -

**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**Evidentiary Hearing - Volume 2 of 9**

**January 29, 2019**

**Pages 188-367**

HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
         655 FIRST AVENUE NORTH
         FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

**A P P E A R A N C E S**

**MR. KEITH W. REISENAUER**                    **COUNSEL FOR PLAINTIFF;**
**MS. MELISSA H. BURKLAND**
Office of U.S. Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102

**MR. JOSEPH W. LUBY**                        **COUNSEL FOR DEFENDANT;**
**MR. ERIC J. MONTROY**
**MS. JAHAAN AKILAH RUTH SHAHEED**
**MS. ANNE FISHER**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

# I N D E X

## W I T N E S S E S

**DEFENDANT'S:**                                                   **PAGE NO.**

**INGRID CHRISTIANSEN KRETZMANN**

Direct Examination by Ms. Shaheed                              199
Cross-Examination by Mr. Reisenauer                           241


**ROBERT HOY**

Direct Examination by Mr. Luby                                353


## E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's 35 | Curriculum Vitae of Ingrid Christiansen | 200 | 200 |
| Defendant's 36 | American Bar Association Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases - Revised Edition February 2003 | 206 | 206 |
| Defendant's 37 | Crime Times - Article Linking Brain Dysfunction to Disordered/Criminal/ Psychopathic Behavior, Volume 11 | 218 | 218 |
| Defendant's 38 | Memorandum to Robert Hoy & Richard Ney from Ingrid Christiansen Re: Interview with Norm Ellingson | 227 | 228 |
| Defendant's 39 | List of individuals that might remember Mr. Rodriguez from school | 228 | 229 |
| Defendant's 40 | Letter from Delores Rodriguez Dated: 1/2/75 | 237 | 237 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's 41 | Notes: Mitigation Themes of Robert Hoy | 359 | 359 |
| Defendant's 42 | Transcript of Jury Trial Vol. 40 Dated: 9/18/06 | 365 | 365 |
| Government's 526 | Email from Ingrid Christiansen to Mr. Ney Resume of Ingrid Christiansen | 243 | 243 |
| Government's 527 | Letter to Mr. Ney from Ingrid Christiansen Dated: 11/8/04 | 243 | 243 |
| Government's 528 | Letter to Mr. Ney and Mr. Hoy from Lisa Rickert Dated: 8/31/05 | 249 | 249 |
| Government's 529 | Email to Mr. Ney from Dhyana Fernandez Dated: 10/6/04 Subject: Rodriguez Mitigation | 250 | 250 |
| Government's 530 | Report of Mitigation Appendix A | 254 | 254 |
| Government's 531 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interviews with Client | 256 | 256 |
| Government's 532 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Marilyn Moe Cuchan | 257 | 257 |
| Government's 533 | Memorandum to Mr. Hoy from Ingrid Christiansen Dated: 12/29/04 Re: Partial Interview with Ileanna Noyes | 258 | 258 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 534 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interviews with Ileanna Rodriguez | 259 | 259 |
| Government's 535 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Daniel Noyes 12/15/04 | 260 | 260 |
| Government's 536 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Stephen Noyes with his parents | 261 | 261 |
| Government's 537 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Josh Noyes with his parents | 262 | 262 |
| Government's 538 | Note dated 1/1975 by Charles Beck, Supervisor, ATS | 264 | 264 |
| Government's 539 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Alina Noyes, 12/15/04 | 266 | 266 |
| Government's 540 | Possible Mitigation Themes Dated: 2/10/15 | 267 | 267 |
| Government's 541 | Memorandum to Ingrid Christiansen from Angela D. Daniel Dated: 1/10/05 Subject: Initial list of witnesses' names found in records | 269 | 269 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 542 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Raenelle Simmons | 270 | 270 |
| Government's 543 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Kathy Garcia 2/22/05 | 270 | 270 |
| Government's 544 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Jose DeLeon 2/22/05 | 274 | 274 |
| Government's 545 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Dale Steiner 2/22/05 | 276 | 276 |
| Government's 546 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Martha Gonzales 2/23/05 | 277 | 277 |
| Government's 547 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Johnny Rocha 2/23/05 | 279 | 279 |
| Government's 548 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Ricky Simmons 2/23/05 | 280 | 280 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 549 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Jim Stordahl 2/23/05 | 284 | 284 |
| Government's 550 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Bellia Rodriguez 5/2005 | 286 | 286 |
| Government's 551 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Ed Ross 5/11/05 | 288 | 288 |
| Government's 552 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Gail Vogley 6/23/05 | 291 | 291 |
| Government's 553 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Debbie Hasbrook & Ronald Thompson 6/23/05 | 293 | 293 |
| Government's 554 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Elba Chavez 10/31/05 | 294 | 294 |
| Government's 555 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Gregoria Chavez 10/31/05 | 296 | 296 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 556 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Genaro Rodriguez 10/31/05 | 297 | 297 |
| Government's 557 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Delores Rodriguez 12/15/05 & 12/16/05 | 299 | 299 |
| Government's 558 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Jan Jackson 11/30/05 | 301 | 301 |
| Government's 559 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Clifford Hegg Summer 2005 | 303 | 303 |
| Government's 560 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Billy Mauer 1/20/06 | 305 | 305 |
| Government's 561 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Sister Margretta Dwyer 1/25/06 | 308 | 308 |
| Government's 562 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Bruce Bomier 1/31/06 | 309 | 309 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 563 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Jim Stordahl 2/23/05 | 310 | 310 |
| Government's 564 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Dotsie Dahl 3/29/05 | 311 | 311 |
| Government's 565 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Rosa Rodriguez 4/8/05 | 315 | 315 |
| Government's 566 | Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Rosa Rodriguez 4/8/05 | 318 | 318 |
| Government's 567 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Wayne Brule 4/9/05 | 320 | 320 |
| Government's 568 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Gail Alterpeper 4/13/06 | 323 | 323 |
| Government's 569 | Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Frank Rodriguez | 325 | 325 |
| Government's 570 | Confidential Memorandum to Mr. Hoy & Mr. Ney from Ingrid Christiansen Re: Interview with Gary Braaten Summer 2005 | 326 | 326 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 571 | Plan for Minnesota Department of Corrections | 330 | 331 |
| Government's 572 | Mitigation Plan | 333 | 333 |
| Government's 573 | Mitigation Themes | 335 | 335 |

**P R O C E E D I N G S**

(January 29, 2019, the following proceedings commenced at 9:00 a.m., in open court, all counsel present.)

THE COURT:  We're back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that Mr. Rodriguez has waived his right to be present.  He appears through his counsel of record.  The United States appears through its counsel of record.

When we broke Mr. Rodriguez was about to call its next witness.  Mr. Luby?  Oh, I'm sorry.

MS. SHAHEED:  Miss Shaheed.

THE COURT:  What?

MS. SHAHEED:  Shaheed.  Jahaan Shaheed.

THE COURT:  Shaheed, Ms. Shaheed, thanks.  I'm sorry.

MS. SHAHEED:  Counsel for Mr. Rodriguez would call Ingrid Christiansen.

THE COURT:  I am so terribly sorry, Miss Shaheed.

THE CLERK:  Please raise your right hand.  State your full name and spell your name.

MS. CHRISTIANSEN KRETZMANN:  Ingrid Christiansen Kretzmann, I-n-g-r-i-d,

C-h-r-i-s-t-i-a-n-s-e-n, K-r-e-t-z-m-a-n-n.

(Witness sworn.)

THE COURT:  Ms. Shaheed, it's your witness.

**INGRID CHRISTIANSEN KRETZMANN,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MS. SHAHEED:**

Q.  Good morning.  Can you please state your name for the record.

A.  Ingrid Christiansen Kretzmann.

Q.  And what is your occupation?

A.  Capital litigation specialist.

Q.  And can you tell us your educational background.

A.  I have a high school diploma from Moorhead High School and an undergraduate degree from Concordia College in Moorhead and a graduate degree in English from Southern Illinois University.

I then taught first English at Valparaiso University and then Urban Studies for 35 years or something for the Associated Colleges of the Midwest where I focused on public policy, poverty and family studies and women's studies.  It was an emersion program where I used a lot of speakers from the neighborhoods to help me educate my students.  And I resigned from

that -- and I was also the director of that program. Then I resigned from that in 2000 and became a capital mitigation specialist in 2001.

MS. SHAHEED:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  (Ms. Shaheed continuing)  And I am handing Miss Christiansen or I handed Miss Christiansen what has previously been marked as Defense Exhibit 35.  Can you please describe the document.

A.  It's my resume.

MS. SHAHEED:  And I'm offering Exhibit 35 into evidence.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Thirty-five is received.

Q.  (Ms. Shaheed continuing)  How did you become involved in capital mitigation work?

A.  I had always focused in the area of poverty in my teaching and I spent a lot of time, 15 years, volunteering on the streets with sex workers so I knew quite a bit about poverty.  And a friend of mine who was a Lutheran pastor half time and was doing mitigation half time because in Cook County at that time in Chicago it was an unfunded position to try to educate people about the background of people that the state of

Illinois was trying to kill.  So pastors frequently volunteered to explore the background of such people. And she and I were friends and she said to me over and over again:  Ingrid, you'd be really good at this because you can do the research and you're comfortable with people on the margins and the poor and you love justice.

So when I resigned my position at Urban Studies she took me to meet the capital case coordinator in the Cook County Public Defender's Office and I met him and we talked for a couple hours and he said:  When can you start?  So I've always been self-employed.  I didn't work for him but he gave me cases.

Q.   And how many death penalty cases have you worked on?

A.   Forty-five.

Q.   And are you a member of any professional organizations related to mitigation?

A.   National Organization of Sentencing Advocates and Mitigation Specialists.

Q.   I'd like to discuss the role of the mitigation specialist.  So as a capital mitigation specialist what do you do?

A.   It's our job to develop the biopsychosocial history of the defendant.

Q.    And can you explain each element of that.

A.    Yeah.  The bio part is what about his biology might be mitigating.  The Court's have said that anything is mitigating that we find mitigating so we can bring into the case anything that would engender sympathy or understanding on the part of a jury or that would explain his deviant behavior or anything, really anything.

So the bio part, you know, does he have -- in his family -- we develop family trees.  In his family is there alcoholism or mental illness.  You go back three generations and find out what's there and put it all out in a family tree, if he has brain anomalies or has had brain damage, or she.  I've had five women clients.  So it's a -- how does the biology of the situation enter into this case.

Q.    And what about the psycho?

A.    Obviously you wonder about mental illness and you wonder about the -- both the biological part of mental illness, you know, how is the brain affected or damaged, and the developmental, sort of the nature/nurture question.  But you have to investigate the psychological status of the defendant and his loved ones, people he grew up with, people around him and how that affected him or her.

Q.   And what about the social history?

A.   You know, that's again the nature/nurture.  What was his birth like and what was his growing up?  What was his infancy and toddlerhood and growing-up years and how did all of his surroundings, the social environment that he was in, affect him in terms of who he became as an adult?

Q.   And how do you create this biopsychosocial history?

A.   Well, it's a lot of work.  I start with -- normally when I begin a case I meet with the lawyers and then I go and interview the defendant multiple times.  But then you start to develop a widening set of concentric circles around the defendant so you go and see the immediate family if they're available and you spend a lot of time in one-on-one face-to-face interviews with each of those people.  You get from each person you interview suggestions of other people who might know something that would be relevant.  So you keep a growing list of more and more people that you should probably go see and talk to.

          And the guidelines that we use for our work, the ABA, American Bar Association, guidelines for doing mitigation work say that these interviews should be one-on-one face-to-face and multiple.  But you can't

always do multiple but sometimes you can get one interview with somebody, especially somebody who's far away or who's angry or who's ill or something.

But insofar as it's possible you talk to as many people as you can about -- people who have known him, people who were his teachers, his pastors or priests, his -- all of his -- as many friends as you can find from his childhood and his teenage years and his years as an adult and then cousins and aunts and uncles, and you try to find spokespeople for the family who are good historians and know a lot about what happened in the family.  And every time you learn something of interest you try to cross-check it from two or three other people's point of view.

So you're constantly refining what you know. And, you know, everybody has -- everybody has a different version of a story.  You sit around at a funeral in your family and three brothers and sisters will all tell you the same incident with a very different take on it.  So you have to put common sense in there at some point.  And then I would go back and check with the defendant and see what he has to say about whatever incident we're talking about or whatever history we're talking about.

Q.  Miss Christiansen, do you also gather records?

A.   I gather records.  I guess birth -- his birth records and birth and death certificates for his extended family and I get all of his school records and, you know, military records.  Any record that has his name on it I want so I get lots of records.

Q.   And how do you organize this information?

A.   A number of ways.  You want to make it easy for the attorneys to use so I do a chronology which starts three generations back when people were born, what they did for a living, where they are, what they died of, any incidents in their life that have bearing, and so chronology which is very detailed and is often a hundred pages long or something of his life history.

And then I also do a document that's called who would say what, which is, you know, just what witnesses would testify to, what themes that we're finding emerging from the story.

MS. SHAHEED:  May I approach?

THE COURT:  You may.

MS. SHAHEED:  And I've just handed Miss Christiansen what's been previously marked as Defense Exhibit 36 (indicating).

Q.   (Ms. Shaheed continuing)  Miss Christiansen, can you describe this document.

A.   Yes.  It's a printout of the American Bar

Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases which was published in its revised form in 2003.

MS. SHAHEED:  And I'm offering Exhibit 36 into evidence.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Thirty-six is received.

Q.  (Ms. Shaheed continuing)  Miss Christiansen, can you turn to page 959.  It's the second to the last page.

A.  Sure (witness complies).

Q.  Can you read the first paragraph.

A.  Yeah.  "A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings.  Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have.  They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g. family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf.  Moreover, they may be critical

to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case."

Q.   And what year were these guidelines published?

A.   2003.

Q.   And that was prior to Mr. Rodriguez's trial?

A.   Yes.

Q.   And were you familiar with these guidelines before the trial?

A.   I was.

Q.   And is there a supplement to these guidelines?

A.   Yes.  A supplement was put out in 2008.

Q.   And what are the differences between that supplement and these guidelines?

A.   The supplement is a much more fulsome, complete description and expanded description of what a mitigation specialist might do.

Q.   And at the time of Mr. Rodriguez's trial, were you applying the standards that were codified in the 2008 supplemental guidelines?

A.   Not really.  We -- mitigation was a very new field at that point and we were sort of stumbling around trying to figure out how to be responsible and do our best work.  But we hadn't -- no, we were just making it up as we went along more or less.

Q.   I'd like to discuss how you began working on Mr. Rodriguez's case.  So when did you begin working on this case?

A.   I don't remember.  He was arrested in 2004 maybe.

Q.   I believe it was three.

A.   Three, okay.  Well, probably in 2004 because he had a different lawyer for a while and I don't know what all was happening.  But at some point Richard Ney called me and said that I'd been recommended as a possible mitigation specialist on the case so I talked to him.  I think he interviewed a couple other people and then he asked me to come on the case.

Q.   And were you working on other cases at the same time as this one?

A.   Yeah.  I had a -- I typically kept five cases cooking along in my office so a couple at the beginning stages, a couple in the sort of middle stages and one case toward the end.  A lot of my cases were Cook County cases where the prosecutors, it seemed to us, brought capital charges because they wanted to use that as a tool to get the guy or a woman to accept a plea.  So most of my cases ended up pleading out.  It worked.  But, you know, I tried to do a conscientious job on all cases because you never knew.  Maybe they wouldn't plead out and you'd go trial.

Q.   And you mentioned Mr. Ney.  Who else did you work with on this case?

A.   Robert Hoy, who was the Fargo attorney on the case.

Q.   And did you regularly meet with Mr. Hoy and Mr. Ney?

A.   Yes.  I often flew to Wichita where Ney's office is or we would all meet in Fargo.  I think we may have met in Minneapolis a time in 2004 -- no, I don't think we did on this case.  I worked a different case with Ney where we were in Minneapolis.  But, yeah, we met a lot. We talked a lot.

Q.   And whose responsibility was it to identify which records to request?

A.   Normally it would have been mine but in this case Richard Ney and his assistant, Angela Daniel, did that.

Q.   And whose responsibility or decision was it to decide who to interview?

A.   Mine.

Q.   And whose decision -- who made strategic decisions on the case?

A.   Mr. Ney.

Q.   And as you gathered information in this case, how did you present it to the attorneys?

A.   Every time I did an interview I typed it up and

sent it to them.  And when I worked on -- another kind of document that I would produce for them is the themes, mitigation themes.  When I would revise the mitigation themes document, I would send it to them or bring it to the next team meeting.  I did -- you know, I tried to systematize the information enough so that they could find it and make use of it when they needed it.  But we also talked a lot so we talked about some of these things.

Q.   And you previously mentioned chronology.  I'd like to draw your attention to what has previously been marked and entered as Petitioner's Exhibit 4.

A.   I found it.

Q.   And do you recognize that document?

A.   Yes.

Q.   Can you describe that document.

A.   This is one iteration of the mitigation themes document, which is the -- I'm sorry, you want to ask?

Q.   Oh, no, continue.

A.   Well, the themes are things that emerge sort of organically from a case.  The more time you spend interviewing people the more you begin to discern that there are themes in this person's life.  And so this document lays out what some of the themes are in Alfonso's life which began to emerge as we spent more

time with him and with his family and friends and teachers and preachers and stuff.

Q.   And did you create that document?

A.   Yeah.

Q.   Is one of the themes on that document intellectual disabilities?

A.   I see learning disabilities in here but I don't see intellectual disability.  But learning disabilities is here.

Q.   Okay.  And I'd like to direct your attention to what has previously been marked as Petitioner's Exhibit 7.

A.   Okay.  I have that.

Q.   Can you describe this document.

A.   This is a chronology.

Q.   And did you make this document?

A.   Yes.  This chronology is 68 pages long -- 69.

Q.   And were there several versions of this chronology as you worked on the case?

A.   Oh, yes.  Every time you run across a new date attached to a fact of his life in any way, you enter it into the chronology so you don't lose the overall picture.  And then in your chronology you start to see synchronicity, is that the word?  You start to see things that fit together like he lost his favorite uncle

at a time when he might have done something stupid as a 13-year-old or -- the facts of his life affect his behavior.

Q.   What was your understanding of "mental retardation" at the time of trial?

A.   Very limited.  I obviously knew that that was a term and that some people were affected by it and I figured that people who were affected by it were really obvious, you know, people who looked dumb.  But I didn't know much about it.

Q.   And I'd like to direct your attention to what has previously been marked as Petitioner's Exhibit 3.

A.   Okay.

Q.   Can you describe this document.

A.   It's an affidavit from me.

Q.   And did you draft this document?

A.   Yeah.

Q.   Can you please look at the last page and go to paragraph 16.

A.   Mm-hmm.

Q.   Can you read that paragraph.

A.   Okay.  So the last page is -- the items in the affidavit start with one and this one is No. 16.  There are 19 altogether.  And this one says:  "Intelligence. His IQ has been reported to be around 75..." someone

tested up to 88.  "What is his IQ, is it connected to any other brain anomalies that he may have, is it connected to his memory difficulties, is he in a low enough category of intelligence that he is ineligible for the death penalty?"  Those are all questions.

Q.  And based on your understanding of mental retardation at that time, what steps did you conduct to investigate intellectual disability?

A.  I didn't conduct anything.  I didn't look into this at all.  We did talk about it as a team a little.  It's the shortest -- I think it's the shortest entry in this whole -- no, it's not quite the shortest entry but it's pretty short.  You know, we hired a psychologist and a psychiatrist so they -- we asked them to think about it and explore it.

Q.  And has your understanding of mental retardation or intellectual disability changed since you worked on Mr. Rodriguez's case?

A.  Yes.  And I think the field has changed.  I think a lot more is known about it.

Q.  And today are you familiar with any of the risk factors for intellectual disability?

A.  Yes.

Q.  Can you please refer to Petitioner's Exhibit 1.

A.  Yes.

Q.   Can you please turn to page 127.

A.   Yup.

Q.   And can you describe the chart that's on that page?

A.   It's "Risk Factors for Mental Retardation."  It's got three sections:  prenatal, perinatal and postnatal.

Q.   And let's discuss some of the prenatal respecters in Mr. Rodriguez's case.  Is poverty a respecter on that charge?

A.   Yes.  It's number one in the social department.

Q.   So can you please describe Mr. Rodriguez's familial background.

A.   In terms of poverty?

Q.   In terms of poverty, yes.

A.   Well, his parents were married when he was -- when his mother was 16 and his father was 20 and they were farm workers who worked the fields.  They lived in Laredo, Texas.  They were U.S. citizens.  They lived in Laredo, Texas from November to April and then they migrated to Minnesota to the Red River Valley from April to November.

But during the time they were in Texas they often could not find work so they had no income.  And while they were in the Red River Valley they worked as farm workers.  It mostly involved hands and knees hoeing

up and down long rows of fields in the fields working in the sugar beets.   Then toward the end of every summer they would work in the white potatoes in Grafton, North Dakota.

So their days were basically 12-hour days and they worked very hard for very little compensation. And they had -- you know, they grew some vegetables. They didn't have any discretionary money to do anything. The first baby came when I think Mrs. Rodriguez was 18. That was Sylvia.   And then when she was 20 she had Alfonso.

Q.   And so in your investigation of Alfonso's background, did you learn anything about his parents' education?

A.   Yes.

Q.   What did you learn?

A.   His father never got beyond third grade or something, and he never learned to read.   He couldn't read to his dying day.   His mother went through fifth grade and she taught herself to read and had no further education after fifth grade.

Q.   And are you aware of whether either of them received support for their lack of education or educational issues?

A.   No, they didn't.

Q.   And on Exhibit 1 is parental cognitive disability without support a risk factor?

A.   Yes.

Q.   You also discussed how Mr. -- Mrs. Rodriguez became pregnant at 20.  Did you interview Mrs. Rodriguez over the course of your investigation?

A.   Multiple times.

Q.   And did she describe her prenatal care when she was pregnant with Mr. Rodriguez?

A.   She didn't have any.

Q.   And is that a risk factor for intellectual disability?

A.   Yes.

Q.   I'd like to move on to the postnatal respecters. So can you please describe Alfonso's first year of life.

A.   He was born in February and his first month of life he was ill.  He was a tiny infant and he was ill and he screamed and cried through that month and appeared to be allergic or reacted badly to Delores Rodriguez's milk.

So after a month of really trying times she took him to a clinic where they said:  Don't give him your own milk because it's obviously making him sick but give him rice water, which is the water left over after you cook rice.  So she would cook her rice with extra

water and then take that water that was left and put it in a bottle and give it to him.  And she gave him nothing but rice water for three months so until he was four months.  And during that time he was a failure-to-thrive baby.  He was getting smaller and he was crying and miserable, uncomfortable at all times.

And at four months a doctor -- she took him back to some doctor, a clinic, and they said:  He's starving to death.  So he's not -- he's in the failure-to-thrive category and he's starving to death.  So then she bought sweetened condensed milk and watered it down and give him that.

MS. SHAHEED:  May I approach?

THE COURT:  You may.

Q.  (Ms. Shaheed continuing)  And I've just handed Miss Christiansen what has been previously marked as Exhibit 37.  Can you please describe this document.

A.  It's a document published by an outfit called Crime Times and it's "Linking Brain Dysfunction to Disordered/Criminal/Psychopathic behavior."  And the first article is "Early malnutrition linked to later aggression, hyperactivity."

Q.  And do you recognize this document as a document that was in your file?

A.  Yes.

MS. SHAHEED:  I'd like to offer Exhibit 37 into evidence.

THE COURT:  Any objection?

MR. REISENAUER:  If I can have a moment, Your Honor.  No objection, Your Honor.

THE COURT:  Thirty-seven is received.

Q.  (Ms. Shaheed continuing)  Can you please refer to the third column and towards the bottom of the page there's a sentence that starts with "The researchers."

A.  "The researchers also found that at 8 and 11, low IQ mediated the link between malnutrition and behavior problems."

Q.  Can you continue reading?

A.  Yeah.  "This indicates" the researcher says "that 'malnutrition predisposes children to a lower IQ, which in turn predisposes them to externalizing behavior problems.'  They note, however, that malnutrition was associated with externalizing behavior problems at age 17 even when they controlled for IQ."

Q.  And is malnutrition a risk factor for intellectual disability?

A.  Yes.

Q.  You're just describing Alfonso's first year of life.  Can you describe the conditions where he lived during his early childhood?

A.   Yeah.   Outside of Crookston they lived on a farm in a farmhouse where it was in the middle of a field, and they did not have running water.   They did not have electricity.   They had kerosene lanterns and they did not have plumbing.   So they went to the privy outside, which was I learned later about 30 or 40 feet away from the well they used, the well they, you know, pumped water.   And then they worked in the fields that were surrounding that house.

The heat was provided by wood-burning stove, which meant that after their 12-hour day they had to gather wood somewhere and fire up the stove and then cook.   They washed the diapers by hauling well water in and they washed their clothes and scrubbing them on a washboard and then hanging them on the line.   So the diapers were hung out there.

Q.   And while Mrs. Rodriguez was working, where were the children or where was Mr. Rodriguez?

A.   Mr. Rodriguez was also working in the fields.

Q.   Mr. Rodriguez, Jr.?

A.   Oh, Alfonso?

Q.   Yes.

A.   Yes.   He was -- he was a late walker.   He didn't walk till he was almost two and he -- so for the first couple years of his life was -- he laid in the ditch at

the end of each row.  And his older sister, Sylvia, was a toddler and she would toddle around I guess.  And Delores Rodriguez would work up one row, all the way down the field I suppose -- I don't know how far but, you know, how long fields are and then she'd work back the next row.  And then she would take her babies and move them over to the next row and then she'd work down the row and back again.

And when they cried she had to keep working so she didn't respond to their tears but they sometimes weren't there at the end of the row but Mrs. Rodriguez's mother -- Mr. Rodriguez's mother was supposed to be caring for the kids.  That was the theory.  But she was very ill.  Her bladder was apparently hanging out and she had cancer.  So she was so ill that she couldn't care really for the kids.  So she would often stay in the house and the children would be brought to the fields.  I don't know how they fed them.  I don't know how he got a bottle but I suppose they brought the bottle.

MR. REISENAUER:  Your Honor, this is nonresponsive to the question.

THE COURT:  At this point put a new question to the witness, please.

Q.  (Ms. Shaheed continuing)  Miss Christiansen, was

Mr. Rodriguez -- were his parents able to stimulate him when he was a child?

A. Well, they did have one day off a week. I'm not sure if they had a day off a week when they were farm workers but they had almost no time. I mean, if you worked 12 hours in the fields you were exhausted. And then you had to pump water and wash clothes and start up a wood burning stove and cook dinner so, no.

Q. And is lack of stimulation a respecter for intellectual disability?

A. Yes.

Q. And I'd like to direct you to what has been previously marked as Petitioner's Exhibit 6.

A. Okay.

Q. Do you recognize this document?

A. Yeah.

Q. And can you describe some of Mr. Rodriguez's physical impairments as a child and as a young person?

A. This document is called "Alfonso's Neurological Concerns." So it talks about his gastric distress as an infant, diagnosed with failure to thrive, near to starvation, reacting to his mother's milk, which we imagine had DDT in it but, of course, there's no way to know, fed rice water. He had dizzy spells from very early on. He had constant rashes and discomfort on his

skin, very sensitive skin.

Q. And was there anything distinctive about his appearance?

A. He's very short. Reports of his adult height vary between five two-and-a-half and five-four, and he has very dark skin compared to other Mexican Americans in his extended family, and he has what everyone reported as a very big head.

Q. And is cephalitis a respecter for intellectual disability?

A. Yes.

Q. So you discussed Mr. Rodriguez's supervision while he was an infant. When Mr. Rodriguez was in elementary school, were his parents able to supervise him?

A. No. Well, I mean, some. Elementary school -- they moved to Crookston and stayed year-round starting when he was nine years old. Prior to that time they had the migrating pattern November to April. I suppose in Texas he got -- they stayed around the extended family.

Q. And when he was in Crookston after he returned to school, who was in the house with him?

A. His mother had a job when they moved to Crookston in a kitchen in a restaurant. Her job started at 4:00 and the school got out at 3:30. So the children would

come together down a street and meet their mother on a certain corner.  She was walking to work and they were walking home from school.  And they would all hug and then she would say:  The house is clean.  I've cooked dinner.  You must go home, do your homework and eat your dinner and take a bath and go to bed.  The father got home about 8 o'clock but by then they were in bed.  So the supervision was, you know, a five-minute encounter on the street corner.

Q.  And is neglect a respecter for intellectual disability?

A.  Yeah.

Q.  So what are some of the consequences of Alfonso's lack of supervision?

A.  Well, he was a very poor student for a variety of reasons, but every year he was in school he fell further behind.

Q.  And is a lack of adequate early intervention a respecter for intellectual disability?

A.  Yes.

Q.  And what are some of the other consequences of the lack of supervision?

MR. REISENAUER:  Your Honor, I'm going to object.  This is beyond the scope of this witness to testify about what her opinion is or what the

consequences were.  I don't think she's capable of answering that question.

THE COURT:  Sounds like a foundation objection.

MS. SHAHEED:  I can rephrase the question.

THE COURT:  You may.

Q.  (Ms. Shaheed continuing)  Because Alfonso's parents were not able to supervise him, did he ever experience any abuse?

A.  Yes, he did.

Q.  And what type of abuse?

A.  Sexual.

Q.  And how did you learn of this sexual abuse?

A.  I learned it first from his sister, Sylvia, and then from Alfonso and then -- those were the main informants.

Q.  And is child abuse a risk factor for intellectual disability?

A.  Yes.

Q.  And during the course of your investigation, did you find out information about illnesses in Alfonso's family?

A.  Yes.

Q.  And what, if any, chronic illnesses were present in the Rodriguez family?

A.   Dementia, premature dementia, a lot of cancer in many of his relatives, including is mother has had cancer at least twice, and then alcoholism, male pattern alcoholism.  So on his mother's side practically every man going back three generations was an alcoholic.

Q.   And is chronic illness a risk factor for intellectual disability?

A.   Yes.

Q.   And were you aware of all of these facts at the time of the trial?

A.   I was.

Q.   And you shared all of this information with Mr. Rodriguez's attorneys?

A.   Yes.

Q.   And, Miss Christiansen, did you review any school records in this case?

A.   Yes.

Q.   Can you please review what has previously been marked and entered as Petitioner's Exhibit 13.

A.   (Witness examining.)  Okay.

Q.   Are these records that you reviewed?

A.   Yes.

Q.   And can you describe Mr. Rodriguez's early educational experiences.

A.   Well, in his first year in school in Laredo he

got Cs and Bs.  He didn't go to kindergarten but he got Cs and Bs in Laredo and then he -- but he was asked to repeat first grade in Crookston and he got --

Q.    Do you know when Mr. Rodriguez learned how to read?

A.    Yeah, he was nine years old.

Q.    How to read English?

A.    How to read English and speak English.  Not until he was nine and moved year-round.

Q.    And are you aware of how he learned how to read English?

A.    Yeah.  There was a teacher in Crookston named Mrs. Ruth who had a little class of eight children who had disabilities of various sorts, a variety of kinds of things, and the eight children met with her daily during what would have been music class or art class and they helped -- she helped with whatever problems they were having.  And during that year with her he learned to read.

Q.    And do you recall reviewing the test scores in that document before trial?

A.    Yeah.

Q.    And do you remember reading his reported IQ scores from elementary school?

A.    They varied between 70 and 80 so the current

thought is that they could be plus or minus five points.

Q.   And in the course of your investigation, did you speak with any of Mr. Rodriguez's teachers?

A.   They were very hard to find because of his age. He's -- he was 50 when this was started but I did talk to at least one of his teachers.

MS. SHAHEED:  And may I approach?

THE COURT:  You may.

THE WITNESS:  His grades -- I can't find his first grade in Crookston, his grades there.

MR. REISENAUER:  Your Honor, there's no question posed.

THE WITNESS:  Oh, sorry.  I've never done this before.

Q.   (Ms. Shaheed continuing)  And I've just handed the witness what has been previously marked as Petitioner's Exhibit -- I believe it's 38?

A.   Yup.

Q.   Do you recognize this document?

A.   Yes.

Q.   And can you describe what the document is.

A.   It's my report of talking with Norm Ellingson.

MS. SHAHEED:  And I'd like to offer this exhibit into evidence.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Thirty-eight is received.

Q.  (Ms. Shaheed continuing)  During your interview with Mr. Ellingson, what did you learn about Alfonso's ability to learn?

A.  His sister, Sylvia, went to Norm Ellingson who did not know Alfonso and said:  My brother needs help reading and learning.  Can you help him?  Because she'd heard that he was a person who could do that.  He had a method.  He would read a book to kids.  I don't know what his whole method was but he was aware of Alfonso because he had been asked to help him but he wasn't able to.

MS. SHAHEED:  May I approach?

THE COURT:  You may.

MS. SHAHEED:  I've just handed Miss Christiansen what has been previously marked as Defense Exhibit 39.

THE WITNESS:  Thank you.

Q.  (Ms. Shaheed continuing)  Can you describe this document.

A.  It's a list of potential witnesses that I should interview and they were people that I attempted to locate in order to interview.  They were mostly his friends.

MS. SHAHEED:  I'd offer Exhibit 39 into

evidence.

MR. REISENAUER:  No objection.

THE COURT:  Thirty-nine is received.

Q.  (Ms. Shaheed continuing)  And were you able to interview any of these individuals?

A.  Yes.

Q.  Who were you able to interview?

A.  Morris Nelson, Wayne Brule, Dotsie Dahl, Johnny Rocha, Cruz Moreno, I think Marilyn Kuchan, Kathy Garcia, Raenelle Simmons and her husband Richie, Johnny Rocha, Cruz Moreno.  I already said that.

Q.  And did you ask any of these witnesses questions that were specific to Mr. Rodriguez's adaptive functioning?

A.  No.

Q.  And with the teachers that you were able to locate, did you ask any of those teachers questions that were specific to Mr. Rodriguez's adaptive functioning?

A.  No.

MS. SHAHEED:  Your Honor, can we take a break, please?

THE COURT:  Sure.  We'll go ahead and we'll break for 15 minutes.  We'll stand in recess until 10:10.

(Recess taken; 9:53 a.m. to 10:16 a.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that all counsel of record are present.  Miss Christiansen is on the stand.  Miss Shaheed was conducting a direct examination.

Ms. Shaheed?

Q.  (Ms. Shaheed continuing)  Miss Christiansen, I wanted to discuss some of the prenatal respecters again.  So when Mrs. Rodriguez was pregnant with Mr. Rodriguez, was she working?

A.  Yes.

Q.  And can you describe the conditions when she was working while she was pregnant with him.

A.  She would have gotten pregnant at the end of April or early May and she was working in the sugar beet fields.

Q.  And was she in contact with the ground in any way?

A.  She worked up and down the rows mostly on her hands and knees.  She had a 14-inch hoe.

Q.  And so I also wanted to discuss malnutrition again which we've previously discussed.  Is it your understanding that rice water does not have nutritional

value?

A.  I'm not an expert in this.  I don't know.  I can't imagine it has much.

Q.  But just to your understanding.

A.  Yeah.

Q.  And can you describe the available healthcare that the Rodriguez family would have had for their family or can you describe the clinic that Mrs. Rodriguez took Mr. Rodriguez, Jr. to?

A.  No.

Q.  And did you attempt to get any medical records for Alfonso when he was a baby?

A.  Yes.

Q.  Were you able to?

A.  No.  Every place that she described or mentioned we tried to find but places had closed or didn't have the records.

Q.  And you said earlier that intellectual disability was not a defense that you pursued in this case.

A.  That's true.

Q.  If the attorneys had directed you to pursue an intellectual disability defense, what would you have done to investigate?

A.  I would have spent a lot of time trying to figure out his what's called adaptive functioning, which is how

a person gets along in the world on a day-to-day basis. And to do that I would have done focused adaptive functioning interviews with his friends and family, tried to figure out how well he processed stuff on the ground day-to-day, what he could do, what he couldn't do.  And then, of course, we would have hired an expert in intellectual disability.

Q.   And since this case have you worked on any cases where intellectual disability was a defense?

A.   Yes.

Q.   And did you spend a lot of time with Alfonso Rodriguez?

A.   Yes.

Q.   And can you describe his demeanor during your interviews and meetings with him.

A.   He was cautious but he was extremely polite and kind and always asked about my well-being and the well-being of my family.  He was -- tried to be forthcoming.  He has a very poor memory so his answers to questions would vary depending on what he was remembering and not remembering.  He was always very cooperative.

Q.   And during your meetings with Mr. Rodriguez, did you discuss his social life in high school?

A.   Endlessly and his -- do you want me to go on?

Q.  How did he describe his social life in high school?

A.  It was as though you were talking to a third grader.  He obsessed about who was dating who and who went to Secula's Bar with who and just rehashing the things that the kids did and who was in and who was out and it was very immature.  I mean, he was 50 years old and he still cared, you know, who was dating who and who was stealing whose girlfriend and those -- it was astonishing to me.

Q.  And in the course of your investigation, did you speak with some of Alfonso's friends from high school?

A.  I did.

Q.  And can you describe how -- or can you tell us how they described Alfonso during high school.

A.  They said that he was very clean and well dressed and careful about his appearance and that he was a nice guy meaning that he would do ordinary friendly things with them.  Most of them liked him and felt that he was a decent person.

Q.  Were there ever times when Mr. Rodriguez's account of the things that happened in high school varied from the individuals that you interviewed?

A.  I'm sure there were.  He had a more vivid memory of those things than they did for one thing.  I mean,

they were all 50 also.

Q.   Were there ever times when Mr. Rodriguez exaggerated about the things that had happened in high school?

A.   Yes.

Q.   Can you recall any examples of that?

A.   He wanted to convey that he was a dandy or that he was popular and the girls all wanted to go out with him and that kind of thing, which was not the case according to his friends.  I mean, he was mad because a lot of his -- the girls that he dated, their parents wouldn't allow him to come to their house.

Q.   And during your conversations with Mr. Rodriguez, how did he discuss his ability to learn?

A.   He said it was very hard for him to learn things and that he had no memory for names or numbers and that he didn't -- he said every year in school it was harder and harder.

Q.   And did you and Mr. Rodriguez ever discuss any books that he read?

A.   Books that he at least said he'd read.  We never discussed -- he never seemed to be able to discuss anything content-wise.

Q.   Going back to some of the developmental milestones that Mr. Rodriguez had as a child, can you

describe his siblings' progress in comparison to his progress.

A.   Well, he and Sylvia were the first two children in the family and were both born in Texas and were conceived in Minnesota and they both had learning disabilities.  They both seemed to have a tough time in school and tough time learning things, and they both had physical problems that were very similar.

But his younger brother, Frank, who was two or three years younger than he is, probably four years even, soon passed him in height and passed him in ability.  Alfonso was called Easy Out by the kids in Crookston because he was not coordinated and couldn't play baseball and so when he came up -- his turn came he was -- Easy Out was the refrain.  But Frank was a good athlete and, you know, played successfully on teams.

Q.   And during your investigation did you discover any accounts of Mr. Rodriguez being bullied as a child?

A.   Yes.

Q.   Can you describe those incidents.

A.   Yeah.  There was an incident when he was in third or fourth grade where he was thrown down to the ground and the kids took his pants off and made fun of him.  There were numerous times, he said every week, when he was punched or pinched or he'd come home black and blue.

He was made fun of at school.  The teacher asked him to sit in the back row.  He always felt like an outsider because -- well, of course, his language was poor and his -- he already had a tremor and so his hands were -- would tremor.

Q.  And going back to his experiences in high school, do you recall a relationship that Mr. Rodriguez had?

A.  He had several but he had a primary one.

Q.  And who was that primary relationship with?

A.  A woman called Dotsie Dahl.

Q.  And was there ever a time where Mr. Rodriguez lived with Miss Dahl?

A.  He lived with Miss Dahl for the last two weeks before he was arrested.

MS. SHAHEED:  And, Your Honor, may I approach?

THE COURT:  Yes.

MS. SHAHEED:  And I've just handed Miss Christiansen what was previously marked as Defense Exhibit 40.

Q.  (Ms. Shaheed continuing)  Do you recognize this document?

A.  Yeah.

Q.  Can you describe the document.

A.  It is a document that Delores Rodriguez wrote

about her son.

MS. SHAHEED:  And I'd like to offer Exhibit 40 into evidence.

MR. REISENAUER:  No objection.

THE COURT:  Forty is received.

Q.  (Ms. Shaheed continuing)  On the second page of this document -- well, actually first, who was the author of this document?

A.  Delores Rodriguez.

Q.  On the second page can you read the first two sentences.

A.  There are only two sentences on the second page, aren't there?

Q.  Well, the first page is the cover page.

A.  Oh, I see what you mean.  Yes.  "On November 19, 1974 he called home to have his clothes washed.  His father went to his apartment at approximately 6 p.m."

Q.  And who is the "his" that Mrs. Rodriguez is referring to?

A.  Alfonso.

Q.  And so what age would Alfonso have been in 1974?

A.  He was born in '53 so he would have been 21.

Q.  And at 21, based on this document, was Mr. Rodriguez still getting his clothes washed by his parents?

A.   Yes.

Q.   During your investigation did you ever uncover evidence that Mr. Rodriguez lived independently?

A.   He never lived independently.

Q.   During your investigation were there other behaviors that Mr. Rodriguez participated in that you believed were not appropriate for his age?

A.   He couldn't support himself.  He couldn't feed himself.  I mean, he couldn't buy groceries and make a meal and he didn't do his laundry.  He really didn't seem to understand how to manage independently.

Q.   And when you say he didn't "feed himself" or go grocery shopping, what exactly do you mean?  Who was making his meals?

A.   Oh, his mother, or when he was living with a girl it would be the girl.

Q.   And do you recall if Mr. Rodriguez had a job at this time?

A.   What time was that?

Q.   When he was living with Miss Dahl?

A.   Oh, I don't think he did.

MR. REISENAUER:  Excuse me, Your Honor, I didn't hear the question.

MS. SHAHEED:  It was:  Do you recall if Mr. Rodriguez had a job while he was living with Miss

Dahl?

MR. REISENAUER:  Thank you.  And your answer, ma'am?

THE WITNESS:  I said no.

Q.  (Ms. Shaheed continuing)  No, you don't recall?

A.  I don't recall, right.

Q.  Do you recall any of the jobs that Mr. Rodriguez had outside of prison?

A.  He worked as a farm worker in the beet fields. He worked in alfalfa.  It was a different farmer.  He worked at a gas station for a short period of time.

Q.  And what is your understanding of the requirements of any of these jobs?

A.  That they were very simple.  There were very few -- there was not complex thought required to get through any of those jobs.  He always wanted to have a job.

Q.  Were you ever directed by Mr. Hoy to investigate adaptive functioning?

A.  No.

Q.  And were you ever directed by Mr. Ney to investigate adaptive functioning?

A.  No.

Q.  And based on the facts that you uncovered at the time of trial, are there examples of adaptive deficits

in Mr. Rodriguez's history?

A.  Yes.

Q.  And I think I asked a variation of this, but based on what you know now about intellectual disability when you read the record, what do you think about Mr. Rodriguez's history?

MR. REISENAUER:  Objection, Your Honor. That question is so open-ended it can't even have an answer if we sit here for a week.  I would ask that she rephrase that and be more specific.

THE COURT:  Do you wish to rephrase it or do you want me to rule on the objection?

MS. SHAHEED:  I'll rephrase the question.

Q.  (Ms. Shaheed continuing)  So based on your understanding of intellectual disability now and your reading of the record in this case, are there red flags or risk factors present for intellectual disability?

A.  Oh, my God, I mean, I hadn't looked at the records for, what, 13 years but when I read through them now they're -- practically every other page has a red flag, intellectual disability over and over again.  I was just horrified that I didn't catch it the first time around because it seemed so obvious now.

MS. SHAHEED:  I don't have any further questions.

MR. REISENAUER:  Can we take 10 minutes, Your Honor?

THE COURT:  Sure.

MR. REISENAUER:  Thank you.

(Recess taken; 10:34 a.m. to 10:49 a.m.)

(In open court, all counsel present.)

THE COURT:  We'll go back on the record in a case entitled United States of America versus Alfonso Rodriguez.  When we broke Miss Christiansen was on the stand.  Mr. Reisenauer was about to conduct a cross-examination.

Mr. Reisenauer?

MR. REISENAUER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Ma'am, we've spoken once before today, correct?

A.  Yes.

Q.  And that was during a deposition that took place in Chicago, correct?

A.  That's correct.

Q.  And that's where you reside?

A.  That's correct.

Q.  How long have you lived there?

A.  Since 1970.

Q.  You grew up in the Fargo-Moorhead area?

A.    In Moorhead.

Q.    And you went to school in Moorhead?

A.    I did.

Q.    And went to Concordia College?

A.    I did.

Q.    And then you furthered your education after that, correct?

A.    Yes.

Q.    And I think earlier this morning you testified that you became a professor at a university or college?

A.    At an Urban Studies program, an off-campus program that was experiential in nature in Chicago.

Q.    And what college or university was that affiliated?

A.    The Associated Colleges of the Midwest.

Q.    And how long did you teach there?

A.    From 1970 until 2000.

Q.    Okay.

A.    Thirty years.

Q.    And then in 2000 you stopped that profession and began working as a mitigation specialist, correct?

A.    No, in 2001.

Q.    And you testified earlier that you became involved in this particular case after Mr. Ney contacted you?

A.   Yes.

Q.   I'm going to hand you two exhibits, Government's Exhibit 526 and 527, and if you would take a quick look at those (indicating).  Do you recognize those?

A.   (Witness examining.)  Yes.

MR. REISENAUER:  And Government's Exhibit -- excuse me, Your Honor, I will move 526 and 527.

THE COURT:  Any objection, Miss Shaheed?

MS. SHAHEED:  No objection.

THE COURT:  526 and 527 are received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  526, ma'am, that appears to be an e-mail from you to Mr. Ney; is that correct?

A.   Yes.

Q.   And that is dated October 6th of 2004?

A.   Yes.

Q.   Do you see that?

A.   Yup.

Q.   Okay.  Would that, I assume, be about the time that Mr. Ney contacted you to get involved in this case?

A.   I suppose so.

Q.   Okay.  And then if you turn to the next exhibit, that is a letter from you, correct?

A.   Mm-hmm.

Q.   And that is dated what date?

A.   November 8, 2004.

Q.   Okay.  And the first paragraph that -- that letter is from you to Mr. Ney, correct?

A.   Yes.

Q.   And the first paragraph there says:  "I look forward to working with you on the case of Alfonso Rodriguez, Jr.," correct?

A.   Yes.

Q.   Okay.  So that is about the time that you became involved in the case?

A.   Yes, it would appear so.

Q.   Okay.  Let's do this.  Why don't you just turn to Exhibit 35, Defendant's Exhibit 35, if you would.

A.   Okay.

Q.   Do you have it?

A.   Yup.

Q.   Okay.  That's your CV, correct?

A.   Yeah.

Q.   Okay.  Now let's take a look at that real quick if we could.  From what I have it's about eight pages; is that right?

A.   Yup.

Q.   Okay.  And on the first page you have a list of capital cases that you have been mitigation specialist

on; is that right?

A.   First, second and third pages.

Q.   Okay.  And that would be -- I think you told us earlier that you've been involved in about 45 capital cases, correct?

A.   That's correct.

Q.   Okay.  And I presume then that somebody thinks you do good work since they continued to hire you, correct?

A.   I don't know.

Q.   Okay.  Well, how about this.  Do you think they would continue to hire you if you didn't do good work?

A.   Probably not.

Q.   And then at the bottom of what would be the third page you have "TRAINER IN CAPITAL MITIGATION."  Do you see that?

A.   I do see it.

Q.   Okay.  And tell us what that is.

A.   We all go to trainings, national trainings every year through a couple different organizations.  And at those -- I was the -- on the board of one of those organizations and I was asked to do some training.

Q.   Okay.  And what organization is that that you were on the board of?

A.   The National Association of Sentencing Advocates

and Mitigation Specialists.

Q.   And you have then, according to your resume here, done some training for that organization?

A.   Yes.

Q.   When you began testifying this morning, you talked about what you do as a mitigation specialist and you used the term "biopsychosocial history."  Remember that?

A.   I do remember that.

Q.   Okay.  And it would be then your job to put together this biopsychosocial history of the defendant, correct?

A.   Yes.

Q.   Okay.  And the purpose of that is to enable not only yourself but the attorneys in the case and the other people that are on the team to understand the defendant's history and present it to the Court, correct?

A.   Yes.

Q.   Okay.  And that's what you did in this case, correct?

A.   Yes.

Q.   And that would entail, as you I think testified this morning, that you interview individuals who know the defendant, including his family and friends, school

teachers, employers, whatever information you can find, correct?

A.   Yeah.

Q.   And then as part of your job you would I presume make some recommendations to the team based upon your interviews and your findings and your reading of the record, correct?

A.   What sort of recommendations do you mean?

Q.   Well, whatever recommendations come to your mind. You did that in this case, correct?

A.   I developed some mitigation themes.

Q.   Okay.  And you would provide those to the team, correct?

A.   Yes.

Q.   And you did that in this case.

A.   Yes.

Q.   And that is the process that you typically go through in your capital litigation cases, correct?

A.   Yeah, that's the routine.

Q.   Okay.  And you've done that in the 45 cases that you've worked on, correct?

A.   I expect so.  I can't remember if -- some of them may have plead out before it got to that stage.

Q.   Okay.  But this development of mitigation themes, that's part of your normal process and how you arrive at

giving ideas to the defense counsel, correct?

A.   Yes.

Q.   There are a lot of other working parts in the case besides the mitigation specialist, experts that are hired, correct?

A.   Yes.

Q.   Sometimes there are fact investigators?

A.   Yes.

Q.   There would be maybe jury consultants, correct?

A.   There would be.

Q.   Okay.

A.   Or could be.

Q.   Sometimes there are victim liaisons that are hired?

A.   Yes.

Q.   In this particular case, ma'am, do you recall a victim liaison that participated in the case?

A.   Yes, Lisa Rickert.

Q.   Do you know Miss Rickert?

A.   I do.

Q.   And how did you know her?

A.   We go to the same conferences.

Q.   I'll hand you what's been marked as Government's Exhibit 528 (indicating).  This appears to be a letter from Miss Rickert.  Is this the individual you just

spoke of?

A.   Yes.

MR. REISENAUER:  We would offer 528, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  Thank you, Miss Shaheed.  It's received.

Q.   (Mr. Reisenauer continuing)  Ma'am, did you know Miss Rickert prior to this case?

A.   Yes.

Q.   Okay.  And that was through the conferences?

A.   Yes.

Q.   And what would have been her job in this particular case or in any case as the victim liaison?

A.   It was a new field but it was thought that often the victim's family would appreciate having a liaison directly to the defense team to keep them informed of whatever was legally appropriate for the defense team to share with the family.

Q.   Okay.  And that was her job in this case?

A.   Yes.

Q.   Do you recall an individual by the name of Dhyana Fernandez?

A.   Yes.

Q.   And do you know Miss Fernandez?

A.   I do.

Q.   And how do you know her?

A.   We go to the same conferences and she lived in Chicago when I was first starting in this work and I formed a mitigation discussion group that met monthly so we could brainstorm our cases with each other and teach each other what we're learning.  And she was in the mitigation discussion group.

Q.   Okay.  Do you know if she became involved in this case?

A.   I don't think she did, no.  I think she did not.

Q.   I'm going to hand you what's been marked as Government's Exhibit 529, ma'am (indicating), and ask you to take a look at that.

A.   (Witness examining.)

MR. REISENAUER:  And I would offer 529, Your Honor.

THE COURT:  Any objection?

MS. SHAHEED:  No objection.

THE COURT:  529 is received.

Q.   (Mr. Reisenauer continuing)  Ma'am, this is an e-mail from Miss Fernandez to Mr. Ney; is that correct?

A.   Yes.

Q.   And what's the date of that?

A.   October 6, 2004.

Q.    And does it appear that this particular e-mail was forwarded from you with some information?

A.    It says it's from Dhyana to Richard.

Q.    If you go down below the first paragraph there, it does have your name there; is that right?

A.    Yes.

Q.    Okay.  Do you recall talking to her about this case?

A.    I don't but that doesn't mean I didn't talk to her.

Q.    Okay.  It appears to me that this particular individual, Miss Fernandez, may have been contacted about working on this case by Mr. Ney at the same time you were, correct?

A.    Yes.  Would have made a lot of sense because she was bilingual, Spanish and English.

Q.    So you just mentioned she was bilingual. Mr. Rodriguez's family is Hispanic, correct?

A.    That's correct.

Q.    And when he was young his parents spoke Spanish within the house, correct?

A.    Yes.

Q.    And so the idea originally may have been that a bilingual mitigation specialist may be somebody that would help out on the case, correct?

A.   Yes.

Q.   And within this particular document here if you'd pick it up again, that paragraph, the first paragraph up there, would you read that first sentence to us.

A.   "I have given this potential case more thought and for several reasons I have decided to take a pass - especially if Spanish-language requirements are not an issue."

Q.   So she didn't get involved because the Spanish requirement wasn't an issue and wasn't necessary, correct?

A.   I think her caseload was too heavy at that point. We try not to take too many cases and Richard would have told her that Delores Rodriguez and her daughters and son and Alfonso could all speak English but we didn't know what we were going to run into in the widening concentric circles.

Q.   So in that first sentence she says, in fact, that she's going "to take a pass - especially if the Spanish-language requirements are not an issue."

A.   Mm-hmm.

Q.   And in your work you didn't need to speak Spanish to anyone in this particular case, correct?

A.   (No response.)

Q.   Let me ask it this way.  When you spoke to

Delores you spoke English to her, correct?

A.   Yes.

Q.   And when you spoke to Ileanna you spoke English to her, correct?

A.   Yes.

Q.   And Sylvia?

A.   Yes.

Q.   And Frank?

A.   Yes.

Q.   And especially Alfonso.

A.   Yes.

Q.   Okay.

A.   I think there were some aunts that I talked to on the phone that I had to have an interpreter for.

Q.   Okay.  Well, we'll maybe get to that.  In your capacity I take it you do speak with some of the experts that get involved in the case like in this case Dr. Hutchinson or Dr. Froming, other experts that may partake in cases?

A.   I didn't prepare either of them.  I might have -- I mean, I'm certain I was civil to them but I don't remember talking indepth about the case with them.

Q.   Okay.  Do you remember talking to Dr. Vincent Garry by any chance?

A.   I did.  I think I had a phone conversation with

him.  I don't think I met with him in person, but my memory's not good so, you know, I could be wrong.

Q.  Would you have provided information that you received to the experts in this case?

A.  No.  I think Richard would have done that.

Q.  Okay.  So stuff you provided to Mr. Ney or Mr. Hoy they would have provided?

A.  I would expect so.

Q.  Okay.  Let me hand you what's been marked as Government's Exhibit 530 (indicating).  This is a page to help you out, ma'am.  This is a page from Dr. Froming's report.

Do you see on the top there -- I'll offer 530, Your Honor, sorry.

MS. SHAHEED:  No objection.

THE COURT:  Received.

Q.  (Mr. Reisenauer continuing)  On the top of the page there, ma'am, it says "RECORDS REVIEWED."  These are records Dr. Froming reviewed in her evaluation and I just have one question.

The very first line says:  "Chronology of Rodriguez, Jr. produced by Ingrid Christiansen."  Do you see that?

A.  I do.

Q.  And then down below there a little ways it says,

"Affidavit, Ingrid Christiansen, Mitigation Expert."

A.   I do.

Q.   These are documents that you put together, correct?

A.   Yes.

Q.   Okay.  You didn't provide those to Dr. Froming but somebody did; is that my understanding?

A.   That's my memory of it, yeah.

Q.   Okay.  You testified this morning that you had conversations with the defendant in this case, Mr. Rodriguez, correct?

A.   That's correct.

Q.   Do you have any idea how many times you spoke with Mr. Rodriguez?

A.   No.

Q.   You also testified this morning that when you did interviews of individuals in the case that you did either a memo or a report of the interviews, correct?

A.   That's correct.

Q.   And you interviewed several people in this particular case, correct?

A.   I interviewed a lot of people.

Q.   Okay.  This may take a while but we're going to touch on some of those.  First, I'm going to hand you what's been marked as Government's Exhibit 531

(indicating) which appears to be a several-page document. At the top it says: "CONFIDENTIAL MEMORANDUM Interviews with Clients." Do you see that?

A. Yes.

MR. REISENAUER: We would offer 531, Your Honor.

MS. SHAHEED: No objection.

THE COURT: 531 is received.

Q. (Mr. Reisenauer continuing) And we're going to get back to this later, ma'am, but within 531 you include several different meetings or interviews with Mr. Rodriguez; is that right?

A. I think so, yes.

Q. And they're dated within the document, correct?

A. Yeah.

Q. We'll get back to that. I'm going to hand you what's been marked as Government's Exhibit 532 (indicating). This is a memo that you made, correct?

A. Yes.

Q. And this is -- reflects an interview with a Marilyn Moe Kuchan, K-u-c-h-a-n, correct?

A. That's correct.

Q. That memo was sent to who?

A. Richard Hoy -- I mean, Robert Hoy and Richard Ney.

Q.   Okay.  So that would be your practice, ma'am, to provide your interviews of individuals to counsel, Mr. Hoy and Mr. Ney?

A.   Yes.

Q.   You worked with both of them, correct?  Not just Mr. Ney?

A.   Yes, we were a team.

MR. REISENAUER:  I would move 532 in.

MS. SHAHEED:  No objection.

THE COURT:  532 is received.

Q.   (Mr. Reisenauer continuing)  If you look at that document, ma'am, just for a second there is in the middle of the page a sentence that says:  "We were all close friends."  Do you see that?

A.   I do.

Q.   "It was not a sexual thing."

A.   Right.

Q.   And down below within your report you have a few notations.  There's somebody named Gail Vogley, V-o-g-l-e-y.  Do you see that?

A.   I do.

Q.   And what does it say there?  "Al went to the prom with Gail Vogley"?

A.   Yup.

Q.   And then, "my girlfriend."

A.   Yes.

Q.   And then if you'd read the next sentence to us.

A.   "They dated from the 7th to the 11th grade."

Q.   Okay.  And she says -- in your next highlighted portion about Mr. Rodriguez, you say:  -- can you read that first sentence?

A.   "Al was talkative, smiley, a happy guy.  He liked to brag.  He always dressed neat, and he was clean and smiling."

Q.   And then the last sentence says:  "He was short."

A.   Mm-hmm.

MR. REISENAUER:  Okay.  Thank you.  The next exhibit, ma'am, is Government's Exhibit 533.

I would move that into evidence, Your Honor.

THE COURT:  Any objection to 533?

MS. SHAHEED:  No objection.

THE COURT:  533 is received.

MR. REISENAUER:  Thank you.  Your Honor.

Q.   (Mr. Reisenauer continuing)  And if you'd take a look at that, ma'am, what does that reflect?

A.   An interview with Ileanna.

Q.   And again this is a memo that you wrote in regard to an interview with her?

A.   Yes.

Q.   It says "Partial Interview"?

A.    It does.  I don't know why.

Q.    Okay.  You probably had more than one, correct?

A.    Oh, I did have more than one.

Q.    Okay.  And this is dated when?

A.    December 29, 2004.

Q.    And it regards an interview you did with her on December 18th of 2004?

A.    Yes.

Q.    And this is his sister, correct?

A.    Yeah.

Q.    Thank you.  I'll hand you what's been marked Government's Exhibit 534 (indicating).  And I would move this into evidence, Your Honor.

THE COURT:  Any objection, Miss Shaheed?

MS. SHAHEED:  No objection.

THE COURT:  534 is received.

Q.    (Mr. Reisenauer continuing)  If you would look on that first page, ma'am, towards the bottom she mentions Marilyn Moe Kuchan, correct?

A.    Yup.

Q.    And if you'd read that paragraph to us.

A.    "Her friend Marilyn Moe Cuchin works with her." This is a memo written by -- about my interview with Ileanna.  Marilyn Moe Kuchan works with her.  "Marilyn was in the class of 1972, a year or two ahead of

Alfonso.  She and Alfonso hung out with each other in high-school.  They had the same crowd of friends, (the Bandaleros)."

Q.  Thank you.  I'll hand you Government's Exhibit 535, ma'am (indicating), and we would move that into evidence, Your Honor.

THE COURT:  Any objection, Miss Shaheed?

MS. SHAHEED:  No objection.

THE COURT:  535 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  This is a memo of an interview with Daniel Noyes; is that correct?

A.  That's correct.

Q.  And Daniel is Ileanna's husband, correct?

A.  Yes.

Q.  Your interview with him basically entailed the investigation of this case basically, right?

A.  I don't remember.  I'd have to re-read the memo. The investigation -- I'm --

Q.  Regarding this particular case; is that right?

A.  Yeah.

Q.  You talked to him about finding Miss Sjodin, correct?

A.  Yes.

Q.  Okay.  I'm going to hand you what's been marked

as Government's Exhibit 536 (indicating).  This is another memo regarding an interview you did with a Stephen Noyes; is that correct?

A.  Yes.

MR. REISENAUER:  We would move 536 into evidence, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  536 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Who is Stephen Noyes, ma'am?

A.  Ileanna and Dan's son.

Q.  And within your report of interview there he says:  "Tito gave me rides when I needed them - to the high school to lift weights, to the grocery store, to a friend's house, and to the movies."  Do you see that?

A.  Yup.

Q.  "If I needed something from the store he picked it up for me."  You see that?

A.  Yeah.  "He helped my grandma out a lot."

Q.  Okay.  Hang on.  Your next paragraph there it's fairly short.  The second sentence says:  "He would send Mom money to buy us presents."  Do you see that?

A.  Yup.

Q.  "Each year, our best present was from Tito."

Tito is his nickname, correct?

A.   That's correct.

Q.   And if you go to your last paragraph, he says: "He'd play catch with a football in the back yard."  Do you see that?

A.   Yup.

Q.   "He's funny, and he was good to me"?

A.   "But the main thing was how it effected my Grandma, how she felt, how she was happier."

Q.   Okay, thank you.  I'm going to hand you Government's Exhibit 537 (indicating).  This is a memo from you, interview with Josh Noyes; is that correct?

A.   Yeah.

MR. REISENAUER:  We would move in 537, Your Honor.

THE COURT:  Any objection?

MS. SHAHEED:  No objection.

THE COURT:  537 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  And Josh Noyes, who is that?

A.   That's the youngest son of Ileanna and Dan.

Q.   And he also talks about things he did with Alfonso Rodriguez, correct?

A.   Yes.

Q.   As a matter of fact, he talks about they went fishing.  Do you see that second paragraph you wrote there?

A.   Yup.

Q.   What does it say there?

A.   "We were fishing and Alfonso caught a real big fish.  He caught it but he told everyone that I caught it.  Afterwards, we went up the hill to the restaurant and had hot dogs, corn dogs, and fries.  And we played arcade games."

Q.   And the next paragraph, would you read that, please.

A.   "All the time, he would play catch with me in the front yard or the back yard with a football or a baseball.  He's not good at hockey, he's good at soccer, but he would play hockey if I wanted to play it.  Lots of times he would take me to Whitman's candy store."

Q.   Earlier, ma'am, you talked about this when he was young that I think you used the word he was an easy out playing baseball?

A.   Yeah.

Q.   Now this is a younger nephew talking -- or a couple nephews talking about what he did with them and how at least this last young nephew thought he was good at soccer but not good at hockey, correct?

A.    "He's not good at hockey, he's good at soccer, but he would play hockey if I wanted to play it."

Q.    You received some -- you received information from the Department of Corrections and the security -- Minnesota Security Hospital when you were doing this case, correct?

A.    Yes.

Q.    And you, in fact, interviewed a number of people from those two agencies, correct?

A.    Yes.

Q.    I'm going to hand you what's marked as Government's Exhibit 538 (indicating).  This is a record from the hospital, Minnesota Security Hospital.

         We would so move, Your Honor.

         THE COURT:  Any objection to 538?

         MS. SHAHEED:  No objection.

         THE COURT:  538 is received.

Q.    (Mr. Reisenauer continuing)  Ma'am, this is a notation by a Charles Beck.  Do you see that on the bottom of that paragraph?

A.    Yes.

Q.    Can you read that paragraph to us starting at the top there?  It's dated January 1975, correct?

A.    Yes.

Q.    Okay.  Could you read that to us.

A.   "Alphonso RODRIGUEZ 2305 At the request of Lyn Pengelly, B-1/C-1, I involved Mr. Rodriguez in bank-shot shuffleboard as a means of making some determination of his motor skills and coordination.  (Bank-shop shuffleboard involves sliding a metal disc over a nine foot waxed surface.  The disc must be 'banked' from a rubber rail on each shot.  Three skill and coordination factors are mainly involved:  Eye/hand for accurate placing (sliding) of the puck (disc), the control required for distance, and the ability to judge the angles required for the placement of the puck.  As far as is known, Mr. Rodriguez has never played this game before and his initial play indicated this fact.  After being initiated into play Mr. Rodriguez very quickly acquired information to play the game well.  He learned very quickly; his general coordination was average or above as compared to other residents who play this game. I saw no coordination difficulties at any time during Mr. Rodrigues's play.  Summation:  Mr. Rodriguez learns more quickly than most residents, appears to have no difficulties which might be attributed to inadequate coordination or muscle control, he could, in fact, be a superior player within a short time (with practice)."

Q.   And then that has been typed by a Charles Beck, supervisor, correct?

A.   Yeah.   I don't know what "ATS" stands for.

Q.   Okay.   Thank you.   I'm going to hand you Government's Exhibit 539 (indicating).   This is another report you did regarding an interview with Alina, A-l-i-n-a, Noyes, N-o-y-e-s; is that correct?

A.   Yup.

MR. REISENAUER:   We would move Exhibit 539 into evidence, Your Honor.

MS. SHAHEED:   No objection.

THE COURT:   539 is received.

MR. REISENAUER:   Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)   Alina Noyes, that is one of Ileanna's daughters; is that correct?

A.   It's her only daughter.

Q.   Now within this memorandum -- this is one page; is that right?

A.   Yeah.

Q.   Within this memo she relates to you about certain things that she did with Alfonso; is that right?

A.   Yes.

Q.   And in the first paragraph he took her to movies, he would play catch with her, they hit a ball over the house with a tennis racket.   You see that?

A.   Yup.

Q.   And then she played various games with him:

Sorry, Monopoly, Uno, Candyland, correct?

A. "High Ho Cheerio, Memory. He was good at games."

Q. Okay, thank you. He took her fishing as well, correct?

A. Yes.

Q. And in the second sentence on paragraph three she says: "We caught a small fish and then we let it go," correct?

A. Yeah.

Q. Let's go down to the very last paragraph there. Would you read that to us.

A. "My grandma was tired and we were hungry after school. He would say, don't get angry, I'll fix something for them to eat. He often made us grilled cheese."

Q. Okay, thank you. Ma'am, I'm going to hand you what's been marked as Government's Exhibit 540 (indicating). This is a list I take it you put together on February 10th of 2005 of possible mitigation themes, correct?

A. Yup.

MR. REISENAUER: We would so move Exhibit 540, Your Honor.

MS. SHAHEED: No objection.

THE COURT: 540 is received.

Q. (Mr. Reisenauer continuing) If you could take a look at that, ma'am, that's just a two-page document, correct?

A. Yes.

Q. And this is dated February 10th of 2005; is that correct?

A. Yes.

Q. And earlier we talked about you coming into the case I think in November of 2004. Do you recall that?

A. Yes.

Q. Okay. And so this is after being involved in the case just for a couple months, correct?

A. Yeah.

Q. Okay. And so No. 1 you have listed as future dangerousness, correct?

A. That's correct.

Q. And then No. 2 you're talking about finding sex offender personnel in the Department of Corrections in Minnesota, correct?

A. Yes.

Q. Okay. No. 3, you have mental health issues listed?

A. Mm-hmm.

Q. And within No. 3 you have five subheadings. Do you see that?

A.   Yup.

Q.   Okay.  And here you're talking about mental illness, dementia, impact on migrant workers, sexual molestation and then other mental health issues.  Do you see that?

A.   I do.

Q.   Okay.  And No. 4 you write:  "Nice guy, good son;" is that right?

A.   Yup.

Q.   I'm going hand you what's been marked as Government's Exhibit 541, ma'am (indicating).  This is actually a memo to you from Angela Daniel dated January 10th of 2005 regarding a list of possible witnesses, correct?

A.   Yes.

MR. REISENAUER:  We would move 541 into evidence, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  541 is received.

Q.   (Mr. Reisenauer continuing)  So, ma'am, at this point at the beginning of the case you have a lot of different avenues to look at as mentioned in your previous memo, and then this particular memo to you lists a number of individuals.  Some are potential experts and some are friends, acquaintances of

Mr. Rodriguez; is that right?

A.   Some of them are and some of them appear to be professional people.

Q.   And she sent you this in an effort for you to possibly either get some information about these individuals or interview them, correct?

A.   Yes.

Q.   I'm going to first hand you Government's Exhibit 542 (indicating).  That is an interview with a Raenelle Simmons?

A.   Yes, it is.

Q.   And the second one is Government's Exhibit 543 (indicating).  It's an interview with a Kathy Garcia, correct?

A.   Yup.

MR. REISENAUER:  We'd move in 542 and 543.

MS. SHAHEED:  No objection.

THE COURT:  542 is received.  543 is received.

Q.   (Mr. Reisenauer continuing)  Ma'am, if you would -- do you recall Raenelle Simmons at all?

A.   No.

Q.   Okay.  So some of these individuals don't ring a bell to you?

A.   I mean, I recognize her name.  I probably talked

to her but I don't have a memory of her.

Q.   Okay.  If you look at towards the bottom part of the page there it says "Contacts."  "Dotsie works at a florist shop in Fargo.  Dave Knutson has a plumbing business."  Her "brother-in-law is Rick Simmons."  There's a Bill Mauer mentioned there.  You see those names?

A.   I do.

Q.   And so part of your job, as you described this morning, was that as you interview people you further your investigation, find other individuals to talk to in your interview, and that's what you're doing here.

A.   Yes.

Q.   Okay.  So if you look at the paragraph right before that where it starts with the word "then," will you read that to us?

A.   "Then he started sniffing glue when he was 18 or 20 and he started getting in trouble.  He couldn't go into the military for a medical reason, and neither could Rhino.  Rhino was deaf in one ear."

Q.   Alfonso didn't get in the military because of his leg, correct?

A.   Yes.  I don't know if he had a height restriction.

Q.   I don't think so but I guess we can talk about

that some other day.

A.  I don't know.

Q.  If you look at the next exhibit, ma'am?

A.  Mm-hmm.

Q.  This is the one pertaining to Kathy Garcia.  Just bear me with me for one second.  Do you recall Miss Garcia at all?

A.  No, I'm sorry.

Q.  Okay.  Miss Garcia, you say at the very first paragraph, says she was married to Mike.  Do you see that?

A.  Yup.

Q.  "They met when they were twelve years old"?

A.  Yes.

Q.  And then she does say that Al used to call them from St. Peter.  I take it that was when he was at the Minnesota Security Hospital?

A.  Mm-hmm.

Q.  Okay.  The third paragraph says:  "When he came back to our home he asked us to lie for him."  That was in regard to one of the earlier rapes, you recall that?

A.  I imagine that's what that was about.  It doesn't say here.

Q.  Okay.  Turn to the second page if you would, ma'am.

A.    (Witness complies.)

Q.    Where it says "Girlfriends" there, you see that?

A.    Yes.

Q.    And the second paragraph it says:  "I don't know why he broke up with Gail Vogley, but he started going with Dotsie when I got back."  You see that?

A.    I do see it.

Q.    So is it your understanding he went out with Gail Vogley for those number of years we talked about earlier and then he started going out with Dotsie Dahl?

A.    Yeah.  I mean, his romantic history is not crystal clear.

Q.    Okay.  So the next paragraph she tells you:  "I remember nothing bad about Al, and I remember nothing about phone calls."  You know that as a teenager he got in trouble for making obscene phone calls?

A.    I do know that.

Q.    Okay.  And if you go down to where you entitle that paragraph "Racism" --

A.    Uh-huh.

Q.    -- you wrote:  "We had no Hispanic leaders or teachers.  My step-dad was prejudiced.  Al's family was a little better off than the Viegas', Garcia's, Rocha's, Inocencio's."  Do you see that?

A.    I do.

Q.   Next exhibit I'm going to hand you is Government's Exhibit 544, ma'am.  It's an interview you had with a Jose DeLeon.

A.   Mm-hmm.

Q.   You see that?

A.   Mm-hmm.

MR. REISENAUER:  We would move Government's Exhibit 544 into evidence, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  544 is received.

Q.   (Mr. Reisenauer continuing)  Mr. DeLeon was Mr. Rodriguez's employer in 2003; is that right?

A.   That's correct.

Q.   And within this memo he says that Mr. Rodriguez was a good worker?

A.   Yes.

Q.   And he did drywall, correct?  He hung drywall?

A.   Yeah.  It says:  "He was not strong enough to hold up a piece of sheet rock."

Q.   Yeah.  Do you know how big a piece of Sheetrock is?

A.   Excuse me?

Q.   Do you know how big a piece of Sheetrock is?

A.   I imagine it's eight feet by something, four feet.

Q.   Okay.   This morning you testified earlier that when Mr. Rodriguez was living with Dotsie Dahl you weren't sure if he was employed, but you did talk about a couple of the other jobs he had.   Do you recall that?

A.   Yeah.

Q.   And you said they were simple jobs, correct?

A.   Mm-hmm.

Q.   He was a laborer; is that right?

A.   Yeah, right.

Q.   He was never fired from any of those jobs, correct?

A.   I don't know that.

Q.   Okay.

A.   Jose DeLeon --

Q.   Hang on, ma'am.   Go to page -- or to paragraph three if you would.

A.   Okay.

Q.   And read that first sentence.

A.   "He was not strong enough to hold up a piece of sheet rock" or do you mean "He never said anything objectionable, he was always willing and pleasant."

Q.   And then read the next sentence.

A.   "When we were in stores together, he never flirted.   Sometimes on a hot day after work, I would buy my crew a six-pack.   Tito would never have a beer."

Q.   Okay, thank you.   Government's Exhibit 545, ma'am, that's an interview again you did with another individual by the name of Dale Steiner; is that right?

A.   Yes.

MR. REISENAUER:   We would move in 545, Your Honor.

MS. SHAHEED:   No objection.

THE COURT:   545 is received.

Q.   (Mr. Reisenauer continuing)   And, ma'am, Mr. Steiner was a teacher and counselor in the Crookston School District; is that correct?

A.   That's what it says here.

Q.   Do you recall Mr. Steiner at all?

A.   Nope.

Q.   And first paragraph there he says the Rodriguez's lived a block from him; is that right?

A.   Yes.   "Hispanic families rambled in and out. Some became established."

Q.   And read the next sentence, please.

A.   "Their family was committed to getting the kids educated."

Q.   Okay.   And then the next sentence?

A.   "From the outside view they looked good, healthy, proper, and immaculate - normal.   At school they were well behaved.   They were good kids."

Q.   Let me stop you there.

A.   Okay, thank you.

Q.   I'm going to hand you Government's Exhibit 546, ma'am (indicating).  This is a memorandum of an interview you had with Martha Gonzales, correct?

A.   Yes.

MR. REISENAUER:  We would move 546 into evidence, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  546 is received.

Q.   (Mr. Reisenauer continuing)  You recall this individual, Martha Gonzales, at all?

A.   I do.

Q.   Okay.  She was a friend of the family, correct?

A.   Yes.

Q.   And within your report there she tells you that she went out to lunch and dinner with Mr. Rodriguez after he was released?

A.   With Delores and Alfonso.  She was Delores's friend.

Q.   Correct.  And then if you would go to the fourth paragraph there, could you read that to us?

A.   "Alfonso would do errands for her.  All three of them, Delores, Martha, and Tito would have lunch or supper."

Q.   And read the next sentence, please.

A.   "On her birthday, Alfonso baked her a casserole."

Q.   And skip down to where it says:  "He cooked a lot."

A.   "He cooked a lot - and canned a lot - hot peppers and plums.  He did laundry, and groceries.  He was a kind man.  He liked to go fishing.  He seemed happy."

Q.   And the next sentence?

A.   "He didn't talk that much.  Just about what he did."

Q.   And the next sentence?

A.   "He was very nice to me.  At first he was shy - he would go to the basement, or go outside.  I said, 'Why don't you stay at the table.'  Then he would stay with us more.  He talked about Christmas shopping - for his nephews."

Q.   Okay, thank you.  Would it be correct, ma'am, that some of the people you interviewed weren't able to provide much information for you?

A.   Yes.

Q.   And that's not unusual, correct?

A.   Right.

Q.   But you would have done reports and sent those also to Mr. Hoy and Mr. Ney?

A.   Yes.

Q.   I'm going hand you Government's Exhibit 547 (indicating).  This is a memorandum of yours from an interview with Johnny Rocha; is that correct?

A.   Yeah.

Q.   R-o-c-h-a, correct?

A.   Yes.

MR. REISENAUER:  We would move 547 into evidence, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  547 is received.

Q.   (Mr. Reisenauer continuing)  Do you recall Mr. Rocha at all?

A.   I do.

Q.   He was a friend of Mr. Rodriguez, correct?

A.   Yes.

Q.   If you go to the middle of that first page there, you have a paragraph -- or a number of paragraphs there, a section called "Alfonso," correct?

A.   Yeah.

Q.   And if you'd read the second paragraph.  It starts with "At first."

A.   "At first, Al hung around with my older brother Tom at the Secula Hotel.  (He identified Robert James in a photo.)"

Q.   Okay.  And read the rest of the paragraph if you

would.

A.  "We were party friends, and we went fishing.  Al was quiet.  He dated a lot of women.  Everybody liked him back then."

Q.  And the next paragraph?

A.  "Al is good with people.  He got along with me. We never fought.  Well, we got in a couple of fights over a girl a couple of times, but there were no weapons."

Q.  And then the next sentence?

A.  "When he was with Dottsie he was faithful to her."

Q.  And then the next two sentences?

A.  "He liked to dress well.  He was not secretive."

Q.  Thank you.  I'll hand you next, ma'am, Government's Exhibit 548 (indicating).  This appears to be a memo you did regarding an interviewed with a Ricky Simmons, correct?

A.  Yes.

MR. REISENAUER:  Okay.  We would offer Exhibit 548, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  548 is received.

Q.  (Mr. Reisenauer continuing)  Do you recall Mr. Simmons, ma'am?

A.   I do.

Q.   Okay.   And Mr. Simmons, he was another friend of Mr. Rodriguez; is that right?

A.   Yeah.

Q.   Okay.   And Mr. Simmons is -- I think earlier there was mention of somebody by the name of Rhino.

A.   That was his nickname.

Q.   That's this person?

A.   Yes.

Q.   Okay.   And as we just noted he was a good friend of Mr. Rodriguez when they were young, correct?

A.   Yup.

Q.   Go down to the portion again you have it bolded with the name "Al."   You see that?

A.   I do.

Q.   And he says -- in the first paragraph you say: "He was a good friend."   You see that?

A.   Yes.

Q.   And then the second paragraph, will you read that to us?

A.   "He was with us all the time, we partied a lot, but he never drank much.   I'd drink ten beers, he'd drink two.   He'd get buzzed once in a while but not goofy like the rest of us.   The family were good people - Sylvia and Frank.   His folks were fine."

Q.  And then the next sentence he says:  "We did everything together."  Do you see that?

A.  Mm-hmm.

Q.  The next line there's a sentence that says:  "He had no temper, he was quiet."  Do you see that?

A.  I do.

Q.  Okay.  And then he refers to Secula's, which is a place that they went to?

A.  Mm-hmm.

Q.  And then the next paragraph, the first sentence there says:  "He was a good friend and loyal," correct?

A.  That's correct.

Q.  And then as far as girlfriends he told you that he had dated Dotsie?

A.  Yes.

Q.  And said they were good to each other, correct?

A.  Yup.

Q.  In the area where you have "Drugs/Alcohol" listed, read those first two sentences.

A.  "I don't know of any drugs.  I don't even know if he smoked pot."

Q.  And then if you turn the page if you would, you have "Criminal Activity" listed there?

A.  Mm-hmm.

Q.  And what does he say about that?

A.   "He never really wanted to get wilder.  He backed out and got in the background when we were raiding gardens, pushing over garbage cans, breaking into cars. He stayed away from that.  He didn't want to do it."

Q.   Okay, thank you.

THE COURT:  How much longer do you have, Mr. Reisenauer?

MR. REISENAUER:  I have quite a bit, Your Honor.

THE COURT:  We'll go ahead and break for lunch at this time.  We'll go ahead and we'll start again at 1:30 this afternoon.

(Recess taken; 12 o'clock noon to 1:30 p.m.)

(In open court, all counsel present.)

THE COURT:  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  All counsel of record are present.  We're missing somebody.

MR. LUBY:  I believe Mr. Montroy, I advise the Court that he won't be with us the rest of the afternoon.

THE COURT:  He did, I'm sorry.

MR. LUBY:  And we will be joined shortly by Miss Fisher who it appears we neglected to note this morning.  I apologize.

THE COURT:  Okay.

MR. LUBY:  But we certainly can continue without her.

THE COURT:  Ms. Christiansen's back on the stand.  Mr. Reisenauer was conducting a cross-examination.  Let's see how many other things I can get wrong this afternoon.

MR. REISENAUER:  Would you like me to start, Your Honor?

THE COURT:  I would.

MR. REISENAUER:  Okay, thank you.

Q.  (Mr. Reisenauer continuing)  Miss Christiansen, when we broke for lunch we were going through a number of your interview memorandums.  I want to continue in that vein.

I'll hand you Government's Exhibit 549 (indicating).  I believe that's a memo you put together from an interview of Jim Stordahl; is that correct?

A.  That's correct.

MR. REISENAUER:  We would offer 549, Your Honor.

THE COURT:  Any objection?

MS. SHAHEED:  No objection.

THE COURT:  549 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  And, Miss Christiansen, Mr. Stordahl was neither a relative nor a friend.  He apparently provided -- or you talked to him about toxins, correct?

A.   That's correct.

Q.   And what kind of information was he able to provide you or did he want to provide you?

A.   Well, he worked for Polk County Extension Services and worked with farmers in Polk County.

Q.   Okay.  And he recommended Dr. Vincent Garry; is that right?

A.   Yes.

Q.   Did you ever meet or talk with Dr. Garry yourself?

A.   I don't remember.  I know I wanted to talk to him.  I think I probably did but I don't -- if there isn't a memo, I didn't.

Q.   And certainly whatever information that you gained or gleaned from Mr. Stordahl, including information about Dr. Garry, you would have provided to Mr. Ney and Mr. Hoy?

A.   That's correct.

Q.   Next, ma'am, I'm going to hand you Government's Exhibit 550 (indicating), and that is a memo pertaining to an interview you had with Belia Rodriguez, correct?

A.   Yes.

MR. REISENAUER:  We would offer 550, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  550 is received.

Q.   (Mr. Reisenauer continuing)  And Belia Rodriguez, do you recall her?

A.   Yes.

Q.   And who's she, ma'am?

A.   She is Alfonso's paternal aunt and Ileanna's godmother.

Q.   Okay.  And so she would be Alfonso Rodriguez Sr.'s sister; is that correct?

A.   I guess.  Although I have some memory that she was adopted.

Q.   Okay.  And Belia lived in Laredo, Texas; is that right?

A.   Yeah.

Q.   At the time you interviewed her, she was how old?

A.   Sixty-five.

Q.   I want to just direct you to part of your memorandum.  If you go down to -- on the first page.

A.   Mm-hmm.

Q.   If you go down to the third paragraph, it starts with "Alfonso's children."  Can you read that sentence.

A.   Yeah.   The Alfonso she's referring to here is senior.  "Alfonso's children were very attached to me when they were small, and Rosa stayed with me (and Aunt Santos) while she was growing up.  I would buy them small gifts and they were always very grateful and happy, not like children now.  I was close with Alfonso, and the others."

Q.   Okay.  And then the next paragraph in the middle of that paragraph it says:  "He was very obedient.  He said no bad words.  I never needed to scold him.  He was just a plain, happy kid;" is that right?

A.   That's what it says.

Q.   Okay.  If you turn to the next page, you have a section there called "Holidays."  You see that?

A.   Yes.

Q.   And if you'd read the first line there.

A.   "Alfonso is a very caring person."

Q.   Okay.  The whole line, please.

A.   "He always wanted to celebrate holidays - Christmas, Thanksgiving.  He loved holidays, and really appreciated them.  He was joyful on holidays.  For Thanksgiving, everyone else wanted mole, but Alfonso wanted a roasted turkey.  He wanted to do holidays right.  At Christmas time, he wanted to see a Christmas tree."

Q.  Okay.  And then the next paragraph.

A.  "We never argued.  We did without, but we never argued in that family.  In their family (Delores and Alfonso Sr.) everything made them happy.  I would give them socks; it would make them so happy.  Now I buy expensive things for children and they are not happy."

Q.  And then the very next paragraph says:  "The best things about Alfonso, he shows affection."  Do you see that?

A.  I do.

Q.  Okay, thank you.  Ma'am, I'm going to hand you next Government's Exhibit 551 (indicating).  This is a memo you wrote regarding an interview of Ed Ross, correct?

A.  Correct.

MR. REISENAUER:  We would move 551, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  551 is received.

Q.  (Mr. Reisenauer continuing)  And Mr. Ross, do you recall him at all?

A.  I do.

Q.  And he was an employer of Alfonso Rodriguez Sr., correct?

A.  Mm-hmm.

Q.   And this is when Mr. Rodriguez worked on Mr. Ross's farm as a migrant worker; is that right?

A.   He worked there as a hired hand.

Q.   Okay.  And there's no date mentioned when he worked for Mr. Ross on your memo; is that correct?

A.   That's correct.

Q.   And so he wasn't considered a migrant worker but a hired hand; is that right?

A.   Yeah.  Mr. Ross hired him as a hired hand.  He had been a migrant worker up until that time.

Q.   Okay.  Do you have -- the first paragraph is in italics.  If you read the last sentence to us, please.

A.   "The job of hired hand paid better and was considered more prestigious than the duties assigned to migrant workers."

Q.   The sentence before that talks about Delores at this time.  Can you read that?

A.   "Delores was, by this time, not working in the fields but staying home to care for the children."

Q.   Okay.

A.   I'm not sure that's true.  I wrote it but I'm not sure it's true.  I think she was working at a restaurant.

Q.   Okay.  Well, I take it at the time you wrote it you were informed of that by Mr. Ross.

A.   Mm-hmm.

Q.   Okay.  And then go down where it says "Alfonso Sr."  Read those next two sentences.

A.   "Ed Ross employed Alfonso Sr.  He worked full time as a hired man.  He wasn't regarded as a migrant.  Al Sr. was stubborn and good to work with, reliable, on time.  He drove a car out.  He was allowed to drive the tractor and truck, do shop work, and repair things.  I don't remember his hands trembling.  I vaguely remember the kids."

Q.   And this was the time when Mr. Rodriguez hurt his back working for Mr. Ross, correct?

A.   Yup.

Q.   And then go down to the bottom there where you have in bold the name of "Delores."  Can you read that for us.

A.   "Delores his wife was very nice.  I took her to help her get on welfare after that," that being the broken back of her husband.  "I knew Alfonso couldn't read.  It didn't matter in our work.  He was honest, I could trust him.  He wouldn't take anything.  I tried to treat them right.  That was my policy."

Q.   Okay, thank you.  Ma'am, I'm going to hand you the next exhibit, 552 (indicating).  This is a memo of an interview you had with Gail Vogley; is that correct?

A.    VOG-lee (phonetic), yeah.

Q.    VOG-lee (phonetic)?

A.    I think that's how she pronounced it.

MR. REISENAUER:  We would move 552 into evidence, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  552 is received.

Q.    (Mr. Reisenauer continuing)  And do you recall who Gail Vogley is?

A.    Yes.

Q.    And who was she?

A.    She was someone that they all -- that was in his social group through junior high and high school.

Q.    Okay.  And she, in fact, was at least according to your memo his girlfriend for five years starting when he was 13 years old, correct?

A.    That's what it says.

Q.    Let's go down to the middle of that first page where you have it titled "Dating Al."  Do you see that?

A.    Yup.

Q.    Can you read that first sentence.

A.    "I dated Al from 7th-11th grade."

Q.    Okay.  And then you can skip the next sentence but then read the last sentence in that first paragraph.

A.    "Al was nice and easy-going and quiet as a

teenager."

Q.   And if you would then read the next sentence.

A.   "He didn't get mad that I can remember.  Well, one time he got mad."

Q.   And then there's a sentence here that reads:  "He never forced himself on me sexually.  He was very respectful."  Do you see that?

A.   Yup.

Q.   And if you would then read the next sentence.

A.   "The thing that sticks out we never even had sex."

Q.   And the sentence after that?

A.   "Al was a good kisser."

Q.   Turn to the next page, if you would.  And then there's a section entitled "Families."  Do you see that?

A.   I do.

Q.   And in that section the last sentence says:  "In the Rodriguez family, you were accepted."  Do you see that?

A.   Mm-hmm.

Q.   The next section you talk about or you title, excuse me, "Friends/Teenage Years," correct?

A.   Mm-hmm.

Q.   If you would read that for me.

A.   "We hung out at Secula's.  We would drink and go

parking in the country."  Do you want me to go on?

Q.  Yes.

A.  "Marilyn, Wayne, Morris and Raenelle, me and Al. We were all from the same social class.  Our families were average.  They had homes.  I started working at 13."

Q.  And then you have something listed as "Other Girlfriends."  Can you read those two sentences?

A.  "Al was going out more with other girls.  I remember he got a big hickey from Darlene Kvamme.  Then he was dating Dotsie Dahl."

Q.  Okay, thank you.

THE WITNESS:  Judge, may I go get the Diet Coke out of my brother's hand?

THE COURT:  You may.

THE WITNESS:  Thank you.

Q.  (Mr. Reisenauer continuing)  Ma'am, I'm going to hand you Government's Exhibit 553.  This is another memo in regard to an interview of two individuals, a Debbie Hasbrook and a Ronald Thompson, correct?

A.  Yes.

MR. REISENAUER:  Offer 553, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  553 is received.

Q.  (Mr. Reisenauer continuing)  Do you recall that,

ma'am, at all?

A.   Vaguely.  I couldn't -- I wouldn't know them if they walked in this room but I remember doing an interview in the school with them.

Q.   Okay.  And she worked at the high school; is that right?

A.   Yup.

Q.   It was -- information she provided to you, was that from the records of the high school?

A.   Yes, or from the records -- yeah.

Q.   Okay.  They didn't recall Mr. Rodriguez; is that right?

A.   That's right.  She points out that Al was 13 in the fifth grade.

Q.   Yeah.  Those are from the records though, right?

A.   Mm-hmm.

Q.   Okay.  Ma'am, I'm going to hand you Government's Exhibit 554 (indicating).  This is a memo you did from an interview with Elba Chavez; is that correct?

A.   Yes.

          MR. REISENAUER:  We would offer 554, Your Honor.

          MS. SHAHEED:  No objection.

          THE COURT:  554 is received.

          MR. LUBY:  If I could just request that

Mr. Reisenauer speak up when he's at the witness table. I have difficulty --

MR. REISENAUER:  I will try.

THE COURT:  Thank you.

Q.  (Mr. Reisenauer continuing)  Elba Chavez, ma'am, do you recall her at all?

A.  I don't.

Q.  You don't?

A.  No.

Q.  Okay.  Your report here says that she "lives with her mother, Golla Chavez.  She is Tito's," meaning Mr. Rodriguez's, "cousin."  Do you see that?

A.  I do.

Q.  You don't recall talking to her?

A.  No, I don't.

Q.  Do you remember where she lived by any chance?

A.  She was in Texas I think.

Q.  Okay.

A.  This was a telephone interview.  She talks a lot about the Alzheimer's in the family.

Q.  Ma'am, I'm going hand you Government's Exhibit 555 (indicating).  This is a memo you did regarding an interview of Gregoria Chavez.  I believe this is Golla. Do you remember this interview?

A.  I have a vague memory of this interview.

MR. REISENAUER:  Okay.  We would offer Government's Exhibit 555, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  555 is received.

Q.  (Mr. Reisenauer continuing)  If you would look at that exhibit, ma'am, Gregoria indicates -- well, let's have you do this.  Read the first paragraph there.

A.  "I interviewed Gregoria Chavez via telephone. She is starting to lose her memory.  Her daughter Elba lives with her in Laredo, Texas.  She gave me her son Antonio's phone number, her sister Bellia's phone number" also in Texas.

Q.  And then the next paragraph starting with "I knew Tito..."

A.  "...since he was born.  He's a very nice boy.  In Crookston, we lived together in the same farmhouse for several years.  We shared space, but we did not share food."

Q.  Okay.  And then if you go down to the very last paragraph, if you would -- also starts with the word "Tito."

A.  "Tito was a very nice boy.  I know he didn't do this cause he was such a nice boy.  There's racism in Crookston, they're probably accusing him 'cause he's not white.  One time in Crookston, someone came to my house

and accused one of my nephews of insulting a white woman and the police got involved.  And to show you about racism, at that time my nephew wasn't even in Minnesota, he was in Texas."

Q.  Thank you.  Government's Exhibit 556, ma'am, is a memo that you wrote regarding an interview with Genaro, G-e-n-a-r-o, Rodriguez; is that correct?

A.  Yes.

MR. REISENAUER:  We would offer 556, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  556 is received.

Q.  (Mr. Reisenauer continuing)  Do you recall Genaro Rodriguez at all, ma'am?

A.  I recall that I had a phone conversation with him.  I think he had Alzheimer's and he was not a very good reporter.

Q.  Okay.  But he did recall Mr. Rodriguez, correct?

A.  Apparently.

Q.  The second paragraph there says:  "He mostly saw him when he was young."  Do you see that?

A.  Mm-hmm.

Q.  The third paragraph says:  "When Delores' children were kids, he was a kid, in Laredo.  They would see each other on Sundays.  He said Tito was a very

quiet boy.  He played with us, but I was six years older than him."  Do you see that?

A.  I do.

Q.  Then on the very bottom of the page it reads: "When Tito was older and we were at the funeral, we probably talked a half hour.  It was like a different person.  I sometimes talk to him on the phone - about what he was canning, of his vegetables."  Do you see that?

A.  I do.

Q.  Do you recall that after Mr. Rodriguez was released from prison his family took a trip back down to Texas for a funeral?

A.  Yes.

Q.  That's most likely what Mr. Rodriguez, Genaro, was speaking of there?

A.  Yeah.

Q.  You spoke with Delores Rodriguez on a number of occasions in this case, correct?

A.  That's correct.

Q.  I'm going to hand you Government's Exhibit 557 (indicating).  It's a memo to Mr. Hoy from you regarding a number of interviews or at least a couple of interviews.  Just take a look at that and tell me if that's right.

A.   That's what it says.

MR. REISENAUER:  We would offer Government's Exhibit 557, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  557 is received.

Q.   (Mr. Reisenauer continuing)  This contains a number of pages, is that correct, Miss Christiansen?

A.   Yes.

Q.   The very first sentence says what?

A.   "Alfonso is the kindest person."

Q.   And it goes on to say:  "He never talked back to me.  My other children get angry more but he doesn't get angry;" is that right?

A.   That's right.

Q.   If you'd turn to page 5 of your report there, ma'am, towards the bottom third of the page you have something called "Part II."  Do you see that?

A.   Mm-hmm, I do.

Q.   Okay.  The second paragraph says:  "Tito is not a mean person.  It's a sickness.  Something had to snap."  Do you see that?

A.   I do.

Q.   These are her words or yours?

A.   They were her words.

Q.   Okay.  And then if you turn to page 6.

A.   (Witness complies.)

Q.   It says:  "Second interview with Delores Rodriguez 2/23/05."  Do you see that?

A.   I do.

Q.   And the first paragraph says:  "Tito's education: Al had a hard time learning how to read, and doing his school work."  Do you see that?

A.   I do.

Q.   In that paragraph further down, it says:  "Al was never a trouble-maker in school."  Do you see that?

A.   Mm-hmm.

Q.   And if you'd turn the page.

A.   Next page?

Q.   Yes, page 7, ma'am.

A.   Mm-hmm.

Q.   Very first line says:  "Sylvia was not as bright as the others."  Do you see that?

A.   I do.

Q.   "She was 18 when she graduated."  Do you see that?

A.   Yes.

Q.   When you interviewed Sylvia in this particular matter, did you learn that in fact she became a public relations director out in Washington, DC?  Do you recall that?

A.   I don't remember what her work was but I remember that she did something like that, yes.

Q.   Okay, thank you.  I'm going hand you Government's Exhibit 558 (indicating).  Ma'am, this is a memo that you wrote regarding an interview of Janet Jackson; is that right?

A.   That's right.

MR. REISENAUER:  We would move in 558.

MS. SHAHEED:  No objection.

THE COURT:  558 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Do you remember Janet Jackson at all, ma'am?

A.   I do.

Q.   And Miss Jackson, who was she?

A.   She was a friend of Delores.

Q.   Okay.  And that was up in Crookston; is that right?

A.   Yes.

Q.   She didn't live in Crookston when you interviewed her any longer; is that right?

A.   No.  She was in Washington state.

Q.   The first sentence in the second paragraph says: "Janet said Al has never been a real aggressive person." Do you see that?

A.   I do.

Q.   If you go down to middle of that page, you have a section called "Alfonso"?

A.   Mm-hmm.

Q.   The first sentence says:  "When Al got into trouble the first time, I thought he was innocent," correct?

A.   Yup.

Q.   "I thought he was set up," correct?

A.   Yup.

Q.   To continue in that paragraph she does say in your memo:  "But when he raped those two girls who knew him, I realized he hadn't been set up," correct?

A.   That's right.

Q.   And then the next sentence says:  "He was sly," s-l-y, "compared to the other kids," correct?

A.   That's what it says.

Q.   And the next sentence says:  "He never joined in. He couldn't act silly and goofy like normal kids.  He was watchful," correct?

A.   That's what it says.

Q.   And then the last sentence says:  "He was good looking, although he was short," correct?

A.   Yup.

Q.   As to Sylvia she said:  "Sylvia was normal.  She

graduated from high school.  She called me once to borrow money...she was a very sharp little gal, Sylvia."  See that?

A.  I do.

Q.  Turn to the next page.  You have a section regarding Delores, right?

A.  Yes.

Q.  The first sentence says:  "Delores and I are real good friends.  I love her to death.  Alfonso has always worried her to death."  You see that?

A.  Yup.

Q.  And she does say however:  "She dressed her kids very nicely and Al always dressed nicely."  Do you see that?

A.  Yes.

Q.  Thank you.  Next exhibit, ma'am, is 559 and this is a memo from you to Mr. Hoy and Mr. Ney in regard to an interview of a Clifford Hegg, H-e-g-g; is that correct?

A.  Yes.

MR. REISENAUER:  We would offer 559, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  559 is received.

Q.  (Mr. Reisenauer continuing)  Do you remember

Mr. Hegg, ma'am?

A.   I do remember him.

Q.   Mr. Hegg was a neighbor and a friend of Delores Rodriguez, right?

A.   Yup.

Q.   And in your memo Mr. Hegg told you that he met Alfonso in May.  This would have been in 2003 after his release, right?

A.   Yes.

Q.   And in that paragraph there in the second line you wrote:  "We have good talks.  We talk about the weather, about what you're going to do today, about fishing, about what you're gonna fix, about painting, about what ever comes to your mind."  Do you see that?

A.   I do.

Q.   Then later you wrote:  "He's very sociable.  He treated his mom very good.  He'd take her shopping at Grand Forks.  He'd fix things.  If he needed a part he'd go get it.  He'd do whatever he was supposed to be doing."  Do you see that?

A.   Yes.

Q.   "He was always out in the yard, just like a clock, a little after 8:00 a.m.  He'd water the flowers and the grass."  Do you see that?

A.   Yup.

Q.   And then in the last paragraph he talks about Mr. Rodriguez playing with the kids?

A.   Yup.

Q.   The next line he says:  "All I could say about him is everything good."  Do you see that?

A.   Yup, I do.

Q.   Thank you.  Ma'am, I'm going to hand you Government's Exhibit 560 (indicating).  This is a memo you did again to Mr. Hoy and Mr. Ney about an interview with a Billy Mauer, correct?

A.   Yes.

MR. REISENAUER:  We would offer 560, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  560 is received.

Q.   (Mr. Reisenauer continuing)  Bill Mauer was one of Mr. Rodriguez's boyhood friends; is that right?

A.   That's correct.

Q.   Do you remember Mr. Mauer?

A.   I only could do a telephone interview with him because he wouldn't come back to -- he was in Colorado and he couldn't come back to Minnesota because he had a DUI.

Q.   He had a DUI?

A.   Yeah.

Q.   Okay.  But you recall him -- or speaking with him?

A.   Yeah.  We had a good telephone interview.

Q.   Okay.  The last sentence on the first paragraph says:  "He agreed that he and Tito were best friends for many years in high school;" is that right?

A.   Yes.

Q.   Where you have the heading "DUI" that's referring to Mr. Mauer, right?

A.   Yes.

Q.   Okay.  But in that section in the last small paragraph he said:  "Al was pretty quiet back then, he stayed out of trouble.  He would not want to run around with us and be crazy when we were doing bad stuff.  He stayed out of trouble."  Do you see that?

A.   I do.

Q.   If you turn to page 2, ma'am, here there's a little section entitled "Racism in Crookston."

A.   Mm-hmm.

Q.   Do you see that?

A.   Yeah.

Q.   Mr. Mauer said:  "Racism was not a problem."  Do you see that?

A.   Yeah, I do.

Q.   "Mexicans and whites had no differences."  Do you

see that?

A.   Yes.  Mr. Mauer was white.

Q.   And then the section you entitled "Al's Character," do you see that?

A.   Mm-hmm.

Q.   He said Al was subdued.  Do you see that?

A.   Yup.

Q.   And in the third line down you have:  "Al was pretty good and pretty faithful to his girlfriends."  Do you see that?

A.   Yes.

Q.   And then in the third paragraph the first sentence says:  "Al is not a fighter."  Do you see that?

A.   Yes.

Q.   And in the next paragraph in the second line you wrote:  "Al had a low tolerance for alcohol."  Do you see that?

A.   I do.

Q.   The next sentence says:  "He said, 'we hit it off right away, and were always good friends.  I'm a short guy too.'"  Do you see that?

A.   Yup.

Q.   In the next paragraph you write:  "He said he was loyal, you could count on him, he had his home open for me.  He was hard working, he always had a job."  Do you

see that?

A.   Yup.

Q.   Thank you.  Ma'am, you remember Sister Margretta Dwyer?

A.   I do.

Q.   Okay.  And who was she?

A.   I might not -- I think she was the nun from Fargo who came to visit Al every Friday and they read the Bible together and prayed.

Q.   Well --

A.   Am I wrong?

Q.   You are.  Earlier you said you didn't have a good memory but I actually think you have a great memory except for this particular person.  Government's Exhibit 561 --

A.   And she was the sister who knew about the sex offenders in the Minnesota prison system.

Q.   There you go.  And this is your memo to Mr. Hoy and Mr. Ney about your interview with her, correct?

A.   Yes.

        MR. REISENAUER:  Okay.  We would offer 561 Your Honor.

        MS. SHAHEED:  No objection.

        THE COURT:  561 is received.

Q.   (Mr. Reisenauer continuing)  And as you just

recalled, she was knowledgeable about the Minnesota sex offender treatment program; is that right?

A.  Yup.

Q.  And you say that in the very first line of your memo.  "She is an expert in the Minnesota Sex Offender programs," correct?

A.  I do.

Q.  Ma'am, Government's Exhibit 562, I'm going to hand you that (indicating).  This is a memo you wrote regarding an interview of a Bruce Bomier.  Do you see that?

A.  Mm-hmm.

Q.  Earlier I think we talked about Mr. Stordahl --

A.  Mm-hmm.

Q.  -- do you recall that?  Mr. Stordahl provided you Mr. Bomier's name.  Do you recall Mr. Bomier?

A.  No.

MR. REISENAUER:  We would offer 562, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  562 is received.

Q.  (Mr. Reisenauer continuing)  If you look at your memo here, ma'am, the third paragraph you say:  "He referred me on to the former Dean of Environmental Medicine at the University of Minnesota, Vincent Gerry."

Earlier we talked about Dr. Vincent Garry. Do you recall that?

A.   Yes.

Q.   Okay.  And you did talk with Dr. Garry, correct?

A.   I think -- I think that's one I don't remember if I talked to him or not.

Q.   Okay.

A.   No.  I think if there isn't a memo about him I didn't talk to him.

Q.   Ma'am, I'm going to hand you Government's Exhibit 563 (indicating).  This is a memo from you in regard to an interview you had with Mr. Stordahl who we just talked about.  Do you see that?

A.   Mm-hmm.

MR. REISENAUER:  We would offer 563, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  563 is received.

Q.   (Mr. Reisenauer continuing)  Ma'am, this was in regard to the pesticide issue that the team was working on, correct?

A.   That's correct.

Q.   And the last paragraph of your memo there starts with a sentence that says:  "Pesticide applicators have a three times greater birth defect rate than other

people in that population."  Do you see that?

A.  I do.

Q.  Obviously this memo was given to Mr. Ney and Mr. Hoy, correct?

A.  Yeah.

Q.  And do you know a Dr. Ecobichon at all?

A.  No.

Q.  Do you know anything about his testimony at the trial?

A.  I wasn't there for it.

Q.  You interviewed Dotsie Dahl, correct?

A.  Yes.

Q.  564, ma'am, is a memo that you wrote in regard to your interview with Dotsie Dahl; is that right?

A.  Yes.

MR. REISENAUER:  We would offer 564, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  564 is received.

Q.  (Mr. Reisenauer continuing)  To talk about your report on Dotsie Dahl, if we could, ma'am, the very first page you start out with a section titled "Racism;" is that right?

A.  The first couple paragraphs are --

Q.  Let's get down to the section called "Racism."  I

misspoke.

A.   Right.

Q.   You see that there?

A.   I do.

Q.   And you write:  "She talked about prejudice in Crookston.  She said in Crookston many people were prejudiced against the Mexican-Americans."  Do you see that?

A.   I do.

Q.   Do you remember Dotsie Dahl is Caucasian, white?

A.   She's white.

Q.   Okay.  And she said and you say in your report: "She said her parents were particularly prejudiced."  Do you see that?

A.   Yup.

Q.   And her parents were alcoholics, do you see that?

A.   That's what she said.

Q.   If you'd turn to page 2, ma'am.  At the top you have a section entitled "Relationship with Alfonso."  Do you see that?

A.   I do.

Q.   And it starts out:  "Al emotionally hurt me.  He went out with other women."  Do you see that?

A.   Yes.

Q.   "He would deny it, he would say, 'I didn't do

it.'"  Do you see that?

A.  Yup.

Q.  And then you go on to write:  "We broke up, but he'd call up and talk to me.  So for a while, for two weeks, we lived in an apartment together," correct?

A.  Yes.

Q.  You again write:  "It hurt me when he went out with other women."  Do you see that?

A.  Yes.

Q.  "He was never violent and he never hit me"?

A.  Yes.

Q.  "Toward the end he was dating Lisa from the Mount."  Do you see that?

A.  Yup.

Q.  Do you know what "the Mount" is?

A.  I think it was a sleep away school for teenagers, probably troubled teens.

Q.  Okay.  And then you go on to write toward the end:  "He was dating Lisa from the Mount," as we just discussed, and "One day he was driving around with Lisa and some girls and he tried to duck down in the back seat when he saw me."  Do you see that?

A.  Mm-hmm.

Q.  "He denied it when we talked on the phone later, and I could hear Lana," who must be his sister Ileanna,

"in the background yelling at him, "Tito, tell Dotsie where you were."  Do you see that?

A.  Yeah.

Q.  And then the next two sentences say:  "Al never hit me or forced me to have sex.  He would bring me over to his house and show me off to his family."

A.  Yes.

Q.  And further on on that page you have a section entitled "Darlene Kvamme Folkedahl."  Do you see that?

A.  Yes.

Q.  And she says:  "Before we started dating, he had been dating my cousin Darlene Kvamme Folkedahl," correct?

A.  Yes.

Q.  If you'd turn to page 3, ma'am.  Earlier we talked a little bit about the time that her and Mr. Rodriguez lived together.  Do you recall that discussion --

A.  Yes.

Q.  -- with counsel?  And in the middle of that page there you have a section called "Rape."  Do you see that?

A.  Yes.

Q.  And this is when she's talking to you about when they lived together and he got involved in raping

Elizabeth Knudson, correct?

A.   Yes.

Q.   And it says here:  "I was at the theater and the police came.  They took my set of steak knives.  There were only seven of them there and the set had had eight when we moved there two weeks earlier.  So Al took one of my knives."  Do you see that?

A.   Yup.

Q.   She said:  "I was out delivering Tupperware when it happened.  We had not had a fight that night."  Do you see that?

A.   Yup.

Q.   Do you recall Mr. Rodriguez stating that him and Dotsie Dahl had had a fight that night?

A.   I don't recall.

Q.   Down in the second to the last paragraph it starts:  "Al loved knives."  Do you see that?

A.   Yes, that's what it says.

Q.   "He had a switchblade and stiletto."  Do you see that?

A.   Yup.

Q.   Government's Exhibit 565 is an interview you had with Rosa Rodriguez.  This is your memorandum; is that correct?

A.   Yes.

MR. REISENAUER:  We would offer 565.

MS. SHAHEED:  No objection.

THE COURT:  565 is received.

Q.  (Mr. Reisenauer continuing)  Do you recall Rosa Rodriguez, ma'am?

A.  Yes.

Q.  And this was an in-person interview; is that right?

A.  Yes.

Q.  Rosa lives in -- or lived in Minneapolis at the time?

A.  In a suburb.

Q.  And Rosa is Mr. Rodriguez's sister; is that right?

A.  Yes.

Q.  Now you recall that Rosa didn't participate in the migrant trips.  She stayed in Texas; is that right?

A.  Yeah, after the first four years probably.  I think at first she did migrate.

Q.  On the very first page you have a section here "Childhood."  Do you see that?

A.  Yeah.

Q.  And just the first two lines says:  "My memories when he was little:  He hated cheese.  Paco cried a lot. Sylvia was a mother hen."  Do you see that?

A.   I see that, yes.

Q.   And then if you would turn -- if you would to page -- there's not a page number here.  If you look on the top of that page it has MH-66, the front page.  If you turn to page 69, okay?

A.   Yup.

Q.   In the middle of that page you have a heading you call "Girlfriends."  You see that?

A.   Yes.

Q.   It says:  "Tito dated chubby girls.  He always had a lot of girlfriends.  Dotsie was there all the time - arguing with him for cheating on her.  One girl he dated was Lisa, the Indian."  Do you see that?

A.   I do.

Q.   Okay.  In the next section you have titled "Fighting."  Do you see that?

A.   Yes.

Q.   It says:  "He gets uncomfortable with arguing - he doesn't enter into arguments."

A.   Yup.

Q.   Okay.  If you turn to the next page on the bottom you have a section just -- you call it "Tito"?

A.   Mm-hmm.

Q.   And one part is called "Tito's strengths."  Do you see that?

A.   I do.

Q.   And his strengths are listed by Rosa as "patience, loving nature, sense of honor, story teller. Ability to make the most of a bad situation."  Do you see that?

A.   I do.

Q.   However, your next section you entitled "Tito's Weaknesses" and she also says "patience."  Do you see that?

A.   Yeah, I know.

Q.   "In a way to protect us, he becomes dishonest." Do you see that?

A.   Yeah.

Q.   Okay, thank you.  Ma'am, Government's Exhibit 566, this is another report of an interview with Rosa Rodriguez.  Do you see that?

A.   Mm-hmm.

Q.   She sent this to Mr. Hoy and Mr. Ney?

A.   I did.

MR. REISENAUER:  We would offer 566, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  566 is received.

Q.   (Mr. Reisenauer continuing)  While I'm here, ma'am, this particular document has a list of questions

for Rosa --

A.    Mm-hmm.

Q.    -- correct?

A.    Yes.

Q.    And who developed these questions?

A.    Me.

Q.    You did?

A.    Mm-hmm.

Q.    Okay.  On your own?

A.    Yes.

Q.    Okay.  And this is common in your interviews with the various individuals when you do your mitigation work?

A.    It is.  It's not common for me to enter the questions into the report but I suppose I had a reason for doing it here.

Q.    Okay.  So this is a little different in terms of how you usually write your report you mean?

A.    Yeah.  I usually don't include my written questions that I go into the interview into my report.

Q.    Okay.  But it does include what you had in your report, what are his strengths and weaknesses, who understands him best, what makes him mad, those kinds of things?

A.    Yeah.

Q.   Okay, thank you.  I'm going to hand you Government's Exhibit 567 (indicating).  This is another memo you did regarding an interview with a Wayne Brule, B-r-u-l-e, correct?

A.   Yes.

MR. REISENAUER:  We would offer 567, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  567 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  And Mr. Brule married Dotsie Dahl at some point, correct?

A.   He did.

Q.   At the time that you interviewed him he was no longer her husband; is that right?

A.   That's correct.

Q.   And do you recall Miss Dahl had been married once or twice before or since?

A.   I don't remember.

Q.   Okay.  But he was also a friend of Mr. Rodriguez when they were young, correct?

A.   That's correct.

Q.   As a matter of fact, after Mr. Rodriguez was sentenced to prison and Miss Dahl then ended up breaking up with him, she started going out with Mr. Brule,

correct?

A.  Yes.

Q.  And on the first page here you have a couple of different sections.  One called "Racism," do you see that?

A.  I do.

Q.  And you write, according to Mr. Brule:  "All us kids played together with no problems"?

A.  That's what he said.

Q.  He says:  "There were only Mexican kids playing with us.  They were the only Mexican kids playing with us.  There was no noticeable prejudice."  Do you see that?

A.  Yes.

Q.  Down below you have a section called "Rodriguez Family"?

A.  Uh-huh.

Q.  And you write:  "Al's dad was a really nice guy"?

A.  Mm-hmm.

Q.  And then next paragraph:  "I didn't know of them until my sophomore year, when I met Morris.  We married sisters.  Al kept to himself a lot.  We did not have big talks.  He never caused any problems.  He never got in a fight with anybody."  Do you see that?

A.  It does say that.

Q.   And then the last paragraph there on that page it says:  "They were a close family.  He stuck up for his family."  Do you see that?

A.   Yeah.

Q.   And on the second page, ma'am, if you go to the section that is called "Girlfriends."

A.   Okay.

Q.   Here you wrote:  "I know at Secula's, he would walk Gail Vogley home, and be gone for the evening."  Do you see that?

A.   Yes.

Q.   The next line you wrote:  "Morris had a car, but Al chose to walk her home.  The six of us had a good time together."  Do you see that?

A.   Yup.

Q.   And then you have a section called "Al's Temperament."  Do you see that?

A.   Yes.

Q.   And you wrote:  "He was always quite.  I never seen him angry.  He was not depressed"?

A.   That's what I have written here.

Q.   Ma'am, I'm going to hand you Government's Exhibit 568 (indicating).  This is a memo you did regarding an interview of a person by the name of Gail Alterpeter; is that correct?

A.   That's correct.

Q.   A-l-t-e-r-p-e-t-e-r?

A.   Yup.

MR. REISENAUER:  We would offer Exhibit 568, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  568 is received.

Q.   (Mr. Reisenauer continuing)  Do you recall Gail Alterpeter, ma'am?

A.   It was a telephone interview.  She lives in Colorado.  I don't really remember it, no.

Q.   Okay.  They were friends when they were young?

A.   Yes.

Q.   And on the front page you have:  "The Case and Prior Cases."  Do you see that?

A.   Yes.

Q.   She said:  "He was the one person who stayed out of trouble."  Do you see that?

A.   I do see it.

Q.   And within that paragraph she also says she doesn't "trust the police to tell the truth"?

A.   Yes.

Q.   And "She is skeptical of all of Alfonso's charges."  Do you see that?

A.   I do see it.

Q.   Then in the next section you entitle it "Mental Illness and the Death Penalty."  "Some people are mentally ill.  They have bad brains."  Do you see that?

A.   Yup.

Q.   If you turn the page you have a section entitled "Friends"?

A.   Mm-hmm.

Q.   Within that there's three paragraphs.  Go to the second paragraph.  You say:  "I asked her if there was anything obviously wrong with Al when she knew him and she said, 'No, I don't think so.'"  Do you see that?

A.   I do.

Q.   Thank you.

A.   Earlier though she said:  "I don't know if Al is mentally ill so" --

Q.   Thank you.

A.   Mm-hmm.

Q.   Let's turn back to the second page then --

A.   Okay.

Q.   -- okay?  If you would, right before the section called "Friends" you see that?

A.   I do.

Q.   And the second to the last sentence she told you:  "I really don't like the death penalty.  I hope it all works out for the best."  Do you see that?

A.   I do.

Q.   Thank you.  Ma'am, I'm going to hand you Government's Exhibit 569 (indicating).  This is a report you sent to Mr. Hoy and Mr. Ney about an interview with Frank Rodriguez; is that right?

A.   That's correct.

MR. REISENAUER:  We would offer 569, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  569 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Ma'am, Frank is Alfonso's brother; is that right?

A.   That's correct.

Q.   And you interviewed him in person or by phone?

A.   In person.

Q.   If you would look at that first page at the very bottom of that page?

A.   Uh-huh.

Q.   On page 1, the second to the last paragraph, it says:  "I was never afraid of him.  I was bigger, lifting weights, stronger.  He did not show a temper.  I never saw his anger."  Do you see that?

A.   I do see it.

Q.   Okay, thank you.  Exhibit 570, ma'am, this is a

memo you wrote regarding an interview with a Gary Braaten; is that correct?

A.   That's correct.

MR. REISENAUER:  We would offer 570, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  570 is received.

Q.   (Mr. Reisenauer continuing)  I'm not sure if we talked about Mr. Braaten at all earlier today, ma'am.

A.   No, we didn't.

Q.   Okay.  Do you recall who he is?

A.   I do.

Q.   And who is Mr. Braaten?

A.   He is a -- was, he's dead now, a layperson, I think pretty uneducated who was according to his own narrative and I guess his doctor's narrative very affected by DDT.  He was a railroad worker and he became obsessed with the study of DDT and its affects on people.  And in his obsession he gathered files and files full of information, government reports, Environmental Protection Agency reports, farm -- agricultural reports, reports from the sugar beet companies.  So he knew a tremendous amount about DDT but he was so obsessed that he was not a reliable witness. I mean, he was a -- seemed like sort of a crazy person

but he did have a tremendous amount of written material about the effects of DDT.

Q. Okay. And he provided that to you or to the team somehow; is that right?

A. He did.

Q. Thank you.

A. He must have had a good copy machine.

MR. REISENAUER: Your Honor, now might be an appropriate time to take a 15-minute break.

THE COURT: Very good. We'll go ahead and we'll break at this point until 3 o'clock. We'll stand in recess till 3:00.

(Recess taken; 2:42 p.m. to 3:10 p.m.)

(In open court, all counsel present.)

THE COURT: We're back on the record in a case entitled United States of America versus Alfonso Rodriguez. Counsel of record are still present. Mr. Reisenauer was conducting a cross-examination of Ms. Christiansen, who is on the stand.

Mr. Reisenauer, you may proceed.

MR. REISENAUER: Thank you, Your Honor.

Q. (Mr. Reisenauer continuing) Ma'am, can you find Petitioner's No. 3 by any chance or is that over there?

THE CLERK: No.

MR. REISENAUER: Let's try over here. Or

let's do it the way I was going to.

Q.   (Mr. Reisenauer continuing)  Now we're back on. I found it.  Actually Shelley found it for me.

Okay.  This is your affidavit?

A.   Yeah.

Q.   Do you recall that?

A.   Mm-hmm.

Q.   I want to ask you a couple questions about it. Do you recall, ma'am, the purpose of putting that affidavit together?

A.   It had to do with funding.

Q.   How many pages is the affidavit that you have in your hand?

A.   Four.

Q.   And on the bottom of the fourth page, what's the language at the very end?

A.   "In short, if this capital defendant is not a candidate for a panoply of mental health experts, it is difficult to imagine who would be.  It is my professional opinion that in order to properly prepare for the penalty phase of the trial we will require a specialist in treatment of sexual offenders, a neurologist, a bio-chemist or other specialist in neurotoxins, a psychologist, a neurological neonatologist, a specialist in juvenile victims of

molestation and rape, possibly one who knows a good bit about memory loss in such a person, a specialist in race and racism, particularly one who knows the Mexican-American migrant experience, an addiction specialist, and a specialist in future dangerousness."

Q.   Okay.  And is it dated by any chance?

A.   No, I don't think it is.

Q.   Okay.  If I told you that there were more pages to this that's dated in June of 2005, would you disagree with me?

A.   I wouldn't, no.

Q.   Would you have attached any documents to your affidavit?

A.   I don't think so.

Q.   Are you aware of any hearing that was had as a result of the affidavit that you filed?

A.   I don't remember it.  There may have been.

Q.   You said it had to do with getting a budget or money you believed?

A.   Yes.

Q.   Okay.

A.   Right.

Q.   And you were retained in this case, correct?

A.   Mm-hmm.

Q.   Was that affidavit made for the purpose of

getting monies for your retention or for the other types of individuals you mention in that paragraph?

A.   For the experts that I listed out there.

Q.   Okay.

A.   We didn't get them all but we got some.

Q.   And you're aware that Dr. Hutchinson and Dr. Froming were retained in this case?

A.   Yes.

Q.   And they were the neuropsychologist and clinical psychologist, right?

A.   That's correct.

Q.   We talked about providing them your information and you weren't sure if you provided that or if counsel did.

A.   I think counsel did.

Q.   Okay.

A.   That would be my routine.

Q.   Okay.  I'm going to hand you what's been marked now as Government's Exhibit 571.  It has a title up on the top:  "Plan for Minnesota Department of Corrections."  Do you see that?

A.   Yup.

Q.   Did you put that together?

A.   Yeah.

MR. REISENAUER:  Okay.  We would move into

evidence 571, Your Honor.

THE COURT:  Any objection to 571?

MS. SHAHEED:  No objection.

THE COURT:  571 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  And, ma'am, if you would take a look at 571 for a second there.  As I just indicated it's titled:  "Plan for Minnesota Department of Corrections," and then you have a number of subheadings in the document.  I believe I have four pages.  Do you have four pages there?

A.  Yes.

Q.  Okay.  First subheading is:  "Find's People for Cunningham for Future Dangerousness," correct?

A.  Yes.

Q.  And you say letter A:  "Administrative people." These are people that worked at the Department of Corrections; is that right?

A.  Yes.

Q.  Okay.  Number B -- or letter B:  "Employers who hired him" and "supervised him," correct?

A.  Yes.

Q.  And that was within the prison or --

A.  Yes.

Q.  In or out of prison?

A.   It was most likely within the prison because that's where he spent most of his life, adult life.

Q.   Okay.  And then if you turn the page.

A.   Mm-hmm.

Q.   Roman Numeral II you say:  "For me, find counselors, mental health people who treated/evaluated him."  Do you see that?

A.   Yup.

Q.   Okay.  And you collected -- you interviewed some people and you collected records from the Department of Corrections and the Minnesota State Hospital -- Security Hospital; is that right?

A.   Yes.

Q.   And then No. 3 you have listed here:  "For level three sex offender stuff:  Talk to Sister Margretta Dwyer."  And you did that, correct?

A.   Yes.

Q.   And then the next two pages list a number of individuals to I take it to try to talk to?

A.   Mm-hmm.

Q.   Okay.  And this you do as a routine in your mitigation specialist position; is that right?

A.   That's right.

Q.   Ma'am, I'm going to hand you Government's Exhibit 572 (indicating).  This is entitled:  "Mitigation Plan."

Did you put that together as well?

A.   Most likely, yeah.

MR. REISENAUER:   We would offer Government's Exhibit 572, Your Honor.

MS. SHAHEED:   No objection.

THE COURT:   572 is received.

Q.   (Mr. Reisenauer continuing)  Ma'am, let's take a look at that for a second if we could.  This is a document which also entails a number of pages.  I'd say about 19 pages or so?

A.   Mm-hmm.

Q.   Let's just talk about that for a second.  On the first page you have a list of family members to provide information, correct?

A.   Yes.

Q.   Second page on the bottom you have a list of friends, correct?

A.   Yes.

Q.   And you write:  "To introduce client background including 'good guy' info."

A.   Yup.

Q.   Okay.  If you'd turn the page there's a number of people listed on the next page and the following page and if you go to I guess what is on the bottom it says page 5.

A.   Mm-hmm.

Q.   Okay.  At the very top, No. 3, you have "Girlfriends."  Do you see that?

A.   Yes.

Q.   Okay.  And we talked about a number of those that you interviewed today; is that right?

A.   That's right.

Q.   I count nine girlfriends.  Can you count those?

A.   That's what it is.  That's the number that's on that page, yes.

Q.   Okay.  And the next page has "School Faculty" listed, correct?

A.   Yes.

Q.   And then No. 5, "Prison," these are people that knew or worked at the prison at least when Mr. Rodriguez was there?

A.   Yes.

Q.   Okay.  And that goes on for a number of pages, correct?

A.   Yeah.

Q.   And then on page -- I guess what's number page 9, No. 6 you have listed "Doctors and Professionals."  Do you see that?

A.   I do.

Q.   Okay.  And the next page, No. 7, you have

"Clergy," correct?

A.  Yes.

Q.  No. 8, "Employers/Co-workers"?

A.  Yup.

Q.  And I guess we talked about -- we talked in regard to your reports on those two people, Mr. DeLeon and Mr. Ross, right?

A.  Mm-hmm.

Q.  And then No. 9 you have "Expert Witnesses" but that's blank.

A.  Right.

Q.  Yup.  And you did this as part of your job in this case, right?

A.  That's correct.

Q.  Back to 573, I'm going to hand Government's Exhibit 573 to you, ma'am (indicating).  This is entitled "Mitigation Themes."  Did you put that together?

A.  I did.

MR. REISENAUER:  I would offer 573, Your Honor.

MS. SHAHEED:  No objection.

THE COURT:  573 is received.

Q.  (Mr. Reisenauer continuing)  If we could, ma'am, this has some experts listed on the very top.  Do you

see that?

A.   Yes.

Q.   And one of them is David Freedman.  We haven't talked about him in this case today I don't believe, did we?

A.   No.

Q.   Okay.  Do you know if he was retained in this matter?

A.   I don't think he was.

Q.   Okay.  And it says:  "Texas expert on toxins," and I think we did allude to Dr. Ecobichon earlier.  He became the expert on toxins and testified in this case.

A.   That's correct.

Q.   Okay.  And then we just talked about Sister Margretta Dwyer, Dr. Hutchinson, Dr. Froming.  Bill O'Keefe, he was a private investigator in this case?

A.   Yes.

Q.   And he did some fact investigation?

A.   I had nothing to do with him but that's what most private investigators would do.

Q.   Okay.  He didn't work with you at all?

A.   No.

Q.   Okay.  And then Mark Cunningham?

A.   Right.

Q.   And I think we talked about him earlier, correct?

A.   I don't think we did.  Not that I recall.

Q.   Okay.  Maybe I'm getting my witnesses mixed up.
Mr. Cunningham was a future dangerousness --

A.   It was future dangerousness.  That's exactly
right.

Q.   So let's just briefly talk about what you have in
this document.  You have a number of mitigation themes.
The first one you entitled "Poverty;" is that right?

A.   Yes, "Poverty - Migrants."

Q.   Okay.  And the next one is "Race and Community
Violence."  Do you see that?

A.   Yes.

Q.   And then if you turn the page and you have a
number of witnesses that I gather may testify in regard
to these particular themes; is that right?

A.   Yes.  Mitigation themes documents expand and
contract as the case proceeds.

Q.   Okay.  This particular document, I don't see a
date on it.

A.   I don't either, no.

Q.   Obviously this is after you have done some
extensive work on contacting or at least getting
information on these witnesses, correct?

A.   Yes.

Q.   No. 3 is "Sexual Assault."  Do you have that

listed there, page 3?

A.   Yes.

Q.   Okay.   Page 4 -- or, excuse me, No. 4 says "Mental Illness - Brain Damage - Learning Disabilities," correct?

A.   Yes.

Q.   Okay.   Let's talk about that a little bit.   You have two experts listed:   Dr. Hutchinson and Dr. Froming; is that right?

A.   (No response.)

Q.   On No. 4, ma'am?

A.   Yeah, mm-hmm.

Q.   They're listed as the experts in mental illness, brain damage and learning disabilities, correct?

A.   That's correct.

Q.   Okay.   And if you turn the page to No. 5, ma'am?

A.   Yup.

Q.   You have "Drug - Alcohol"?

A.   Yes.

Q.   And then turn the page to No. 6.   Here you have the toxins from the fields and other health issues?

A.   Yes.

Q.   And No. 7, if you turn that page to page 7, you have "Fear of Release," correct?

A.   Yes.

Q.   No. 8, "Institutional Adjustment," No. 9, "Institutional Failure," No. 10, "Good Person Mitigation."  Do you see that?

A.   Yes.

Q.   And on letter F you write:  "Criminal behavior seems 'out of character.'"  Do you see that?

A.   Yes.  Had he not had to carry this huge chemical burden, he would have been your average guy next door, kind, hard working, good to his family, et cetera.

Q.   And then No. 11, "Cost to His Family of Tito's Behavior" and No. 12, "Family History."  Do you see that?

A.   Yes.

Q.   And the last page, No. 13, you entitled "Death Penalty," correct?

A.   Yeah.

Q.   Okay, thank you.

A.   I'm tidying up.

Q.   Okay.  That's good.  Give me one second.  Can you find 531, ma'am, by any chance?

A.   It's right here.

Q.   The top one, perfect.  Let's take a look at that. 531 is your memorandum regarding interviews with Mr. Rodriguez; is that right?

A.   Yes, that's correct.

Q.   And the first interview you have on there is November 21 of 2004; is that right?

A.   Yes.

Q.   And this would have been the first time you talked to him?

A.   I would imagine, yes.  I'm not a hundred percent sure but I think so.

Q.   Earlier we talked about you being retained.  I think there was an e-mail or letter from you in October of 2004 to Mr. Ney and shortly thereafter I believe there was a letter wherein you said you were happy to get on the case and get working on this.  Remember that?

A.   I do.

Q.   Okay.  And so it didn't take you long to get to work.  November 21st of 2004 you interviewed Mr. Rodriguez according to your report here.  Was that in the Cass County Jail or --

A.   Yes.

Q.   Cass County?

A.   Yeah.

Q.   Okay.  And it wasn't by phone, was it?

A.   No.

Q.   Okay.  This particular report here talks about several items.  First you have listed "Places," some family history.  The next page he tells you who his

brothers and sisters are, correct?

A. Yup.

Q. And then there's further discussion about him, his family, medical history on the next page, his childhood and the following page alcohol and drugs and then he gets into -- on page 6 you talk about Dorothy (Dotsie) Dahl with him, correct? Do you see that on page 6?

A. Going too fast for me. Yeah, I see Dotsie Dahl.

Q. And here you talked to him about Dotsie Dahl, correct?

A. Apparently so.

Q. And you write, according to Mr. Rodriguez he told you: "We stayed together after I was arrested for a few years, she still loved me"?

A. Mm-hmm.

Q. "The two girls I raped I was having revenge on the two girls. They laughed at me in school. I was angry and drunk and I didn't care. I had just gotten into a big fight with Dotsie." Do you see that?

A. I do.

Q. Turn to the next page. You have something titled "Women I Dated." Do you see that?

A. Yup.

Q. And he lists a number of names that you put in

this paragraph:  "Gail Vogley, Gail Alterpeter, Darlene Kvamme," and he tells you when he dated Miss Vogley and Miss Kvamme, Lisa LaBow, a Cookie McWaters?

A.    Mm-hmm.

Q.    Do you see all those?

A.    Yup.

Q.    Kathy Felix?

A.    Mm-hmm.

Q.    Okay.  If you go down to the third full paragraph there then?

A.    Yes.

Q.    Within that paragraph on the third line you write he told you:  "Shirley was my first victim.  She hurt me the most.  I thought we were friends, buddies.  Elizabeth was from a different group."  Do you see that?

A.    Yup.

Q.    If you turn the page to page 8, here you have a section of "Child Sexual Abuse."  Do you see that?

A.    I do.

Q.    And then on the next page you have a second interview dated December 18th of 2004, correct?

A.    Yes.

Q.    If you would turn to what's page 15 in your document, ma'am?

A.    Okay.

Q.  If you go to the first full paragraph up on the top, it reads:  "The first person I had sex with was 18 years old - I was 12 or 13 and we were in Texas.  I don't know her name.  She had sex with four of us that day."  Do you see that?

A.  I do see it.

Q.  And then later on that page you have a heading titled "About the Case."  Do you see that?

A.  Mm-hmm.

Q.  And you write:  "I feel guilty about saying I didn't do this."  This is him telling you that?

A.  Yeah.

Q.  He says:  "I went Christmas shopping.  I didn't hit or cut or strangle.  I don't look at it like you guys do, I don't see it, why you think I'm guilty."  Do you see that?

A.  Yes.

Q.  And then later in that paragraph he says:  "There was nothing of me on her.  No semen, no sexual assault and where's the blood?  There's no blood on me."  He told you that?

A.  Yes.

Q.  If you turn to the next page, ma'am, do you recall him telling you about a prostitute he said he had been with?

A.   Yes.

Q.   That was a lie, correct?

A.   It was what?

Q.   It was a lie; is that right?

A.   I don't have any way of knowing that.

Q.   Okay.  Well, go to the page before this if you would and in that last full paragraph in the middle there he said:  "Sometimes it looked like her - (Dru) - sometimes not.  Julie is her name."  Do you see that?

A.   Yes.

Q.   Did you not learn later that this story about a prostitute was a lie?

A.   No.

Q.   You never learned that?

A.   No.

Q.   Mr. Hoy or Mr. Ney never told you that that was --

A.   I think we talked about it, but I don't think any of us had any way of knowing about that for sure.

Q.   Okay.  Well, turn to the next page, 16, then if you would.  And the first full paragraph says:  "That day every spot was full.  A lot of people.  When Julie left and I lost her, I did because of all the people. I'd be surprised if they found my hair on her.  There would be no semen."  Do you see that?

A.    Yup.

Q.    Are you aware that Mr. Rodriguez has admitted to committing this offense?

A.    There's a good question.  I think I -- I think I -- I don't remember.  I think so.

Q.    Okay.

A.    He certainly resisted that for a long time.

Q.    If you would turn to page 18, ma'am, and again here in the middle of the page you have listed:  "Liz Knutsen."  Do you see that?

A.    Yup.

Q.    And on the first sentence you write:  "On the day Liz Knutsen was raped I remember me and Dotsie having an argument."  Do you see that?

A.    Yeah, I do.

Q.    This particular incident, this rape occurred after Shirley Seddon's rape, correct?

A.    I don't remember which one came first.

Q.    Okay.  Well, let's say he raped Shirley Seddon first, okay?

A.    Okay.

Q.    You have her listed second on that page.  Do you see that?

A.    Yes.

Q.    And you write, according to him:  "We were in a

bar, drinking liquor, gin and tonic.  It was late.  We hanged out together.  I asked her for a ride home.  I was angry already, about Dotsie and her."

Do you know what he was talking about there?

A.  No.

Q.  And then you write:  "She always called me names as kids."  Do you see that?

A.  Yup.

Q.  Do you have any recollection of Mr. Rodriguez saying that he raped Miss Seddon because she teased him when he was younger and she laughed when he was pantsed?  I think you referred to him being pantsed earlier today.  You remember that?

A.  Yes.

Q.  Do you remember him saying that was why he raped Shirley Seddon?

A.  I think -- I mean, if I wrote that here it's certainly what he told me.

Q.  Okay.

A.  I didn't make stuff up in these memos.

Q.  Okay, thank you.  And then let's go back up to the Elizabeth Knudson incident.  Here he told you that him and Dotsie had had an argument.  Do you recall earlier that Dotsie said they didn't have an argument?

A.  Yeah.

Q.  Do you know that at some other time Mr. Rodriguez said that he raped Elizabeth Knudson because he thought that she knew about the Shirley Seddon rape?

A.  I don't remember that, no.  I mean, if I wrote it down it's most likely true that he said that.

Q.  Okay, thank you.  Turn to the next page if you would, ma'am.  And towards the bottom of that page you have something you call "Blackouts."

A.  Yes, yup.

Q.  And the second paragraph there you write -- and this is him talking to you, correct?

A.  Yes.

Q.  You write:  "I don't get angry.  Arguments I hate - I don't like confrontation.  When I get angry I don't see that as myself, I see it like yourself, like outside myself looking in.  I don't see myself doing these rapes."  Do you see that?

A.  Yeah, I do.

Q.  And then further on in the paragraph you write: "I don't remember doing them.  With Shirley, I see it as voluntary sex."  Do you see that?

A.  Yeah.  But he goes on to say:  "...I really don't remember too much about it."

Q.  That's not really what he told you on the page before though, correct?

A.   Consistency was not his strength.

Q.   Turn to page 22, ma'am.

A.   Mm-hmm.

Q.   Here on the bottom of page 22 you have:  "Client Interview:  March 31, 2005."  So this is another sit-down with Mr. Rodriguez?

A.   Yes.

Q.   And here you entitle the second paragraph "Julie."  This is the prostitute, correct?

A.   Yes.

Q.   Okay.  Let's talk about that for a second.  In the middle of that paragraph you write he said to you: "I watched adult videos and masturbated."  Do you see that?

A.   I do.

Q.   Okay.  Turn to page -- excuse me, turn to page 24 if you would.

A.   Okay.

Q.   This is another interview you have on page 23. You say it occurred on June 17th of 2005.  Do you see that?

A.   I do.

Q.   And there's a heading on that page called "Pleading Guilty."  Do you see that?

A.   Yes.

Q.   This is another conversation you had with Mr. Rodriguez, correct?

A.   Yes.

Q.   And he said:  "Pleading guilty makes me nauseous - it's hard for me to just give up."  Do you see that?

A.   Yup.

Q.   And in the middle of that paragraph you write: "The only thing I did wrong was to not tell them the truth."  Do you see that?

A.   Yeah.

Q.   He's talking about not telling the law enforcement the truth about what happened?

A.   Yes.

Q.   So he lied to law enforcement, correct?

A.   That's what he's saying here.

Q.   Would you turn to page 27.

A.   Okay.

Q.   Here he's telling you about what happened the day that Dru Sjodin disappeared, correct?

A.   Yes.

Q.   And within this lengthy paragraph he again tells you that he was with this prostitute named Julie; is that right?

A.   Yes.

Q.   Okay.  Would you turn to page 29, ma'am.

A.   Okay.

Q.   You in the last paragraph have a heading: "Guilty Plea."  Do you see that?

A.   Yes.

Q.   So he's asking you about accepting a guilty plea but he's never admitted to you that he did it, correct?

A.   He never admitted to me that he did it.

Q.   But in the last sentence he asks you:  "How did they find the shoe?" meaning Dru's shoe; is that right?

A.   Yes.

Q.   Do you recall a time when you talked with him and he gave you a list of questions about the investigation and how certain things were found or whether they were found?

A.   Yeah.  I reviewed the documents in the last week and I ran across that document that had his list of questions.

MR. REISENAUER:  If the Court could give me one second, Your Honor?

Q.   (Mr. Reisenauer continuing)  When you talked with him about the sexual abuse when he was young, he told you about the nuns, do you recall that?

A.   Yup.

Q.   Are you aware that he didn't know anything about

that incident until Sylvia had informed other individuals?

A.   I guess I didn't -- yeah, I think I knew that.

Q.   And are you aware that he has no recollection of that incident even though he told you about it?

A.   Well, he told me of some detail about it so it appeared -- I mean, his memory's very poor.

Q.   Okay.

A.   But he did have quite a bit of detail.

Q.   You don't know where he got the detail from though.

A.   No.  I know he reacts to the Lemon Pledge smell inside churches and, you know, there's some visceral things that bear testimony to his having had some bad experience there.

Q.   Okay.  Remember him talking to you about when he was examined by Dr. Froming about his sense of smell?

A.   No, I don't remember that.

MR. REISENAUER:  Okay.  That's all the questions I have, Your Honor.

THE COURT:  Ms. Shaheed?

MS. SHAHEED:  Judge, I would just like five minutes.

THE COURT:  Certainly.

MS. SHAHEED:  Thank you.

(Recess taken; 3:53 p.m. to 4:00 p.m.)

(In open court, all counsel present.)

THE COURT:  Miss Shaheed.

MS. SHAHEED:  No further questions.

THE COURT:  You may step down, madam.  Thank you very much for your time.  Have a safe trip to Bad Medicine.

MS. CHRISTIANSEN:  Can I announce that this was my last act as a mitigation specialist?

THE COURT:  Well, enjoy your retirement.

MS. CHRISTIANSEN:  Thank you.  I hope to.

THE COURT:  Miss Shaheed, Mr. Luby, Mr. Rodriguez will call his next witness.

MR. LUBY:  Thank you, Your Honor.  The defense next calls Robert Hoy.

THE COURT:  Mr. Hoy, if you please would come forward, raise your right hand and take the oath.

THE CLERK:  Please raise your right hand. State your full name and spell your name.

MR. HOY:  Robert Hoy, H-o-y.

(Witness sworn.)

MR. LUBY:  Opposing counsel advises me that he would like a brief break so he can retrieve materials relative to this witness, two or three minutes.

THE COURT:  We'll take two minutes.

MR. REISENAUER:  Thank you, Your Honor.

(Pause.)

THE COURT:  Are we ready?

MR. LUBY:  Yes, Your Honor.

MR. REISENAUER:  We are, Your Honor, thank you.  Thank you, Mr. Hoy.

THE COURT:  Mr. Luby?

**ROBERT HOY,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. LUBY:**

Q.  Can you please state your name for the record.

A.  Robert Hoy.

Q.  And you're one of the trial attorneys for Mr. Rodriguez?

A.  Yes.

Q.  Who was your co-counsel in this matter, Mr. Hoy?

A.  Richard Ney from Wichita, Kansas.

Q.  He testified at the 2255 proceedings.

A.  He did.

Q.  And specifically as to the question of mitigation issues, what was your role in the defense compared to that of Mr. Ney?

A.  I had a much more limited role in the mitigation

354

phase of the case.  It was unique to death penalty cases and Mr. Ney had considerably more experience in that than I did.  So I tried to help him when I could.  But as far as knowing what should be done and how to best go about doing it, Mr. Ney was largely in charge of that.

Q.  And the defense retained Ingrid Christiansen as a mitigation specialist?

A.  She was our mitigation specialist, yes.

Q.  Whose decision was it to retain Ms. Christiansen?

A.  Oh, I think Mr. Ney and I both talked about it, but he had a better idea than I did as to what we might need and how it might work out.  And so it may have been a joint decision, but largely I would have been following whatever his recommendation may have been.

Q.  And what kind of involvement did you have with Miss Christiansen over the course of representing Mr. Rodriguez in your trial preparations?

A.  I had fairly regular periodic contact with her. She would talk with us.  We would decide on maybe what needed to be done or some things that we thought should be done.  She was also independently doing a background investigation in mitigation issues, would send us memos periodically on people she had spoken with or new developments that she became aware of.

We occasionally met when she was in Fargo.

I would meet with her.  Occasionally Mr. Ney would join us if he was here as well.  And I think we actually met a couple of other times out of the area, once in Kansas getting ready for trial and I think we met at least one conference somewhere the three of us met.

Q.  You've testified I believe that Miss Christiansen was doing mitigation investigation independently?

A.  Well, she was working the case for Mr. Rodriguez -- working Mr. Rodriguez's case for us but she was -- in large measure it appeared to be fairly self-directed.  I mean, she knew what she needed to be working on and would make connections and make interviews and follow-up to the next one.  I'm sure she was also in contact with Mr. Ney perhaps on occasions that I was not involved with her but that was the perception that I had, yes.

Q.  Would it have been your role to give her any instructions concerning her investigation or which witnesses to interview, that sort of thing?

A.  I wouldn't call it instruction.  If something came to my attention that I thought maybe we should follow up with, I would send her an e-mail or talk to her about it.  But I left the instructing of her to Mr. Ney.

Q.  Do you recall that the defense retained Karen

Froming as a neuropsychologist and Dr. Marilyn Hutchinson as a clinical psychologist?

A.    Both of those names ring a bell, yes.

Q.    And whose decision was it to retain those two experts?

A.    My recollection is that Mr. Ney made those decisions.

Q.    What was your personal level of involvement with Dr. Froming and Dr. Hutchinson in the course of your trial preparations?

A.    Very, very, very little.  I may have sat in on a meeting with Mr. Ney and one or both of them at different times.  But as far as making the decision to retain them or the nature of their testimony or working with them concerning what their testimony was likely to be, that would have been Mr. Ney's responsibility.

Q.    Including which mitigating issues to present through their testimony?

A.    Yes.

Q.    Mr. Hoy, there's a big old pile of exhibits in front of you.  I don't know what kind of order it's in. If you could please refer to Defense Exhibit 7.

A.    Defense Exhibit 7?

Q.    Yes, please.  It's one of the thicker ones and if you can't find it I can bring you an extra one.

A.   They're here but they're in no order.

MR. LUBY:   If I may approach the witness?

THE COURT:   You may.

Q.   (Mr. Luby continuing)   Just so the record reflects that I'm handing the witness what's been marked and admitted into evidence as Defendant's Exhibit 7 (indicating).   Now he's found it?

A.   Just found it, yup.

Q.   Do you recognize this document, Mr. Hoy?

A.   Probably.   I have no immediate recall of the details of it but this looks like a document that was probably put together, if I recall correctly, by Ms. Christiansen.

Q.   To the best of your recollection, do you believe that you read that document at some point or different points during the course of your trial preparations?

A.   Yes, I would have read it shortly after I received it.

Q.   And could I ask you to please refer to Defense Exhibit 4.   And again if I may approach?

A.   I'm sure it's here.   I just have to dig it out. I found it.

Q.   And can you tell us what this document is, Mr. Hoy, if you recall?

A.   It's been a long time and there's been a lot of

documents, but I believe this would have been a document prepared by Ms. Christiansen as well at some point prior to trial.

Q.   And do you believe, as far as you remember, that you reviewed that document during the course of your trial preparations?

A.   I have no present recollection of doing that, but I made it a practice of reviewing everything as it came in so I would say that my belief is that I would have reviewed this at the time it came to my attention.

Q.   If you could just take a moment to scan that document if you haven't already?

A.   (Witness examining.)  I've looked at it generally.

Q.   Do you recall being present during discussions or meetings of the defense team concerning those themes?

A.   There was a meeting in Wichita, Kansas a couple, three months before the trial between Mr. Ney, myself and Ms. Christiansen where information like this or topics like this, among others, were discussed.  This may have been discussed at that meeting.  If it was discussed elsewhere, I don't have a recollection of when that might have been.

            MR. LUBY:  Your Honor, might I approach?

            THE COURT:  You may.

MR. LUBY:  I'm handing the witness what's been marked as Defendant's Exhibit 41 (indicating).

Q.  (Mr. Luby continuing)  Do these appear to be some handwritten notes of yours, Mr. Hoy?

A.  Yes, they do.

MR. LUBY:  And at this point I would offer Defendant's Exhibit 41.

MR. REISENAUER:  No objection.

THE COURT:  Forty-one is received.

Q.  (Mr. Luby continuing)  And if you could take a minute to review those notes, please.

(Witness examining.)

Q.  Do those appear to reflect a meeting or a discussion of mitigation themes?

A.  Yes.  I think this is a portion of the notes that I took at the meeting in Wichita, Kansas between Mr. Ney, myself and Miss Christiansen as we prepared for trial on the mitigation issues.

Q.  Is it approximately three months before trial?

A.  In that ballpark, two or three months.  I forget the exact dates.

Q.  If you could please turn to page 2 of this document.

A.  Is that the back side of page 1?

Q.  Yes.

A.   Okay.

Q.   There's a heading No. 6.  Do you see where it says "toxins/brain damage/MI/LD"?

A.   Yes.

Q.   What do "MI" and "LD" stand for?

A.   I believe "MI" would have been quick shorthand for mental illness and "LD" is probably shorthand for learning disabilities.

Q.   And a couple lines below that you've written the words "low average"?

A.   Yes.

Q.   And is that a reference to IQ testing on Mr. Rodriguez?

A.   Reading in context I believe that that's true, yes.

Q.   And the line above that says:  "IQ is higher" with higher underlined "than we expected"?

A.   Yes.

Q.   Do you recall who made that statement?

A.   I do not other than I'm fairly confident it wasn't me.

Q.   So it could have been Mr. Ney or it could have been Ms. Christiansen?

A.   Yes.

Q.   But they don't necessarily -- those notes don't

necessarily reflect what you were expecting with respect to Mr. Rodriguez's IQ testing?

A.    That's correct.  I was trying to jot down notes for my own reference so I would be on the same page with Mr. Ney and Miss Christiansen going forward, where we were at and where we were going to go with it.

Q.    And issues of learning disability or mental illness weren't among the circumstances and issues that you were preparing for trial?

A.    No.  I was primarily involved in the guilt phase of the case and Mr. Ney was largely involved in working on the other portion of the case.

Q.    Is it fair to say, Mr. Hoy, that you didn't really have any expectations one way or another as to what Mr. Rodriguez's IQ testing would reveal?

A.    I think that's a fair statement.

Q.    On the question of toxin exposure, do you recall that the defense retained Dr. Donald Ecobichon?

A.    Yes.

Q.    And whose decision was it to retain Dr. Ecobichon as an expert in this area?

A.    I believe it was Mr. Ney's.  It was not mine.

Q.    Did you have any personal dealings with Dr. Ecobichon during your representation of Mr. Rodriguez?

A.  I believe I did not.

Q.  If we could refer back to Defense Exhibit 41 and again the second page, the back of the first page.

A.  Yes, I'm there.

Q.  In the middle of the page where "Dr. Donald Ecobichon" is underlined?

A.  Yes.

Q.  And below that to the left do you see a note that says:  "We will not be offering testimony on Tito's specific case" and then an exclamation point?

A.  Yes.

Q.  And then an arrow from that to Dr. Ecobichon?

A.  Yes.

Q.  And do you recall if that was a statement that somebody made or is that simply your understanding of a decision?  What circumstances are reflected by your having written that particular statement?

A.  I think that would have been my understanding of a decision that had been made by Mr. Ney.

Q.  And also then to the direct left Dr. Ecobichon's name circled it says "Not a Rule 12.2 witness" and again with an exclamation point?

A.  Yes.

Q.  And what does that particular note reflect in terms of who made what kind of statement or made what

sort of decision?

A.   Again that would have been my understanding of a decision that had been made by Mr. Ney.

Q.   Mr. Hoy, did you have any input into the decision Dr. Ecobichon would not physically examine Mr. Rodriguez?

A.   I think it was during the time I'm drafting these notes on Exhibit 41 that I was appreciating the decision that had been made by Mr. Ney and so I did not have any input.  I think it's fair to say I had no input in that decision, yes.

Q.   And so too on the decision that he was not a Rule 12.2 witness?

A.   That's correct.

Q.   And also that he would not be issuing an expert report as a Rule 12.2 witness would be expected to do?

A.   That's correct.

Q.   Mr. Hoy, can you describe more generally what role, if any, you had on the toxins issue in the course of your trial preparations in this case.

A.   Because I was in Fargo and Mr. Ney was not, it was easier for me to work with some of the local factual issues and try and do some of the investigative work on what toxins maybe were used back in those days.  We're talking the late 19 -- as early 1960s in the ag

industries.  And so I had some personal effort in attempting to learn some of that.  I also asked my legal assistant, Josh Roaldson, to do some work on that as well and I know that we tracked down some information that the local sugar beet industry had available.  I believe we would have contacted NDSU and probably University of Minnesota-Crookston to see if they had any information about that and generally tried to find out what kind of -- what kind of pesticides were used, when they were used, how they were applied, what quantities, what concentrations, background information that we could then get to Mr. Ney who I assume was going to provide it to Mr. Ecobichon or perhaps others.

Q.  So that information -- as a result of your investigation, you would have provided that to Mr. Ney rather than to Dr. Ecobichon?

A.  That's correct.  I don't believe I had any direct contact with Dr. Ecobichon.

MR. LUBY:  Thank you.  Your Honor, may I approach?

THE COURT:  You may.

Q.  (Mr. Luby continuing)  I'm now handing the witness what's been marked as Defendant's Exhibit 42 (indicating).  Could you please take a look at that document, Mr. Hoy.  Does that appear to be the testimony

that you elicited at this trial from Ileanna?

A.   That appears to be true, yes.

Q.   And who was Ms. Noyes?

A.   Ileanna would have been one of Alfonso Rodriguez's sisters.

Q.   If I could please direct your attention to pages 8445, the bottom of 445 and the top of 446.  Does that appear to be around the end of your direct examination of Ms. Noyes?

MR. LUBY:  While you're doing that I will go ahead and offer Defendant's Exhibit 42, which I neglected to offer.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Forty-two is received.

THE WITNESS:  I've read the pages that you referred me to.

Q.   (Mr. Luby continuing)  Thank you.  On page 8445 do you see on line 17 you ask the question:  "He was your older brother by seven years.  Over the years that you've known him and interacted with him, have you had a relationship with him as older brother/younger sister or has it been something different?"

A.   I see that.

Q.   And what is her response?

A.   Her answer is:  "I guess it should have been

that, but for some reason I've always -- when I look at my brother Tito, I don't see an adult man.  I see -- I see him like he was like a young, young teen or just entering his teens.  I don't see him as a man -- like an adult man.  I see him someone like a 13-year-old, 13, 14, right in that age group.  And so I always felt like I needed to protect him and do whatever I could for him."

MR. LUBY:  And, thank you, Mr. Hoy, and those are all of my questions.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  Could we approach the bench, Your Honor?

THE COURT:  You may.

(Off the record.)

THE COURT:  Let's go on the record and here's what we'll say.  We're going to adjourn for the day.  We'll reconvene with Dr. Weinstein tomorrow morning at 9 a.m. and we'll take up Mr. Hoy with his cross-examination on Thursday morning at 9:00 in anticipation that Dr. Weinstein will take most of the day tomorrow.

Is that agreeable to Mr. Rodriguez?

MR. LUBY:  It is, Your Honor.

THE COURT:  And to the United States?

MR. REISENAUER:  Yes, Your Honor.  Thank you.

THE COURT:  We'll stand in recess till tomorrow morning.

(Adjourned at 4:40 p.m.)