**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                                    )
United States of America,      )
                                    )
    Plaintiff/Respondent, )
                                    )
        vs.                )    **FILE NO. 2:04-cr-55**
                                    )
Alfonso Rodriguez, Jr.,        )
                                    )
    Defendant/Petitioner. )
                                    )
- - - - - - - - - - - - - - - -


**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**Evidentiary Hearing - Volume 3 of 9**

**January 30, 2019**

**Pages 368-576**


HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
        655 FIRST AVENUE NORTH
        FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

**A P P E A R A N C E S**

**MR. KEITH W. REISENAUER**                **COUNSEL FOR PLAINTIFF;**
**MS. MELISSA H. BURKLAND**
Office of U.S. Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102

**MR. JOSEPH W. LUBY**                **COUNSEL FOR DEFENDANT;**
**MR. ERIC J. MONTROY**
**MS. JAHAAN AKILAH RUTH SHAHEED**
**MS. ANNE FISHER**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

**I N D E X**

**W I T N E S S E S**

| DEFENDANT'S: | | PAGE NO. |
|---|---|---|
| **RICARDO WEINSTEIN** | | |
| Direct Examination by Mr. Montroy | | 373 |
| Cross-Examination by Mr. Reisenauer | | 544 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's 43 | CV of Ricardo Weinstein | 374 | 374 |
| Defendant's 44 | Report of Dr. Weinstein Dated 11/30/18 | 384 | 385 |
| Defendant's 45 | Dr. Weinstein resources | 387 | 389 |
| Defendant's 46 | Intellectual Disability - 11th Edition of the AAIDD Definition Manuel Copyright 2010 (green book) | 409 | 410 |
| Defendant's 47 | User's Guide-Intellectual Disability-11th Edition Copyright 2012 (green book) | 409 | 410 |
| Defendant's 48 | WRAT-Type Scores | 449 | 449 |
| Defendant's 51 | Declaration of Francisco "Paco" Rodriguez | | |
| Defendant's 53 | Declaration of Rosa Rodriguez | 494 | 494 |
| Defendant's 55 | Declaration of Belia Flores | 507 | 507 |
| Defendant's 56 | Declaration of Hector Gallegos | 517 | 517 |
| Defendant's 57 | Declaration of Maria del Refugio Ruiz | 517 | 517 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's 58 | Declaration of Gloria Gonzalez | 517 | 517 |
| Defendant's 62 | DSM-IV - 5th Edition | 409 | 410 |

**P R O C E E D I N G S**

(January 30, 2019:  The following proceedings commenced at 9:00 a.m., in open court, all counsel present:)

THE COURT:  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that Mr. Rodriguez has waived his presence.  His counsel of record are present.  The government appears through its counsel of record.

When we broke Mr. Rodriguez was about to call a witness out of order.

MR. MONTROY:  Yes, Your Honor.  Your Honor, Mr. Rodriguez would call Dr. Ricardo Weinstein to the stand.

THE COURT:  Sir, if you please would come forward, stand before the clerk, raise your right hand and take the oath.

THE CLERK:  Please raise your right hand. State your full name and spell your name.

MR. WEINSTEIN:  Ricardo Weinstein.  Do you want me to spell it?  R-i-c-a-r-d-o, W-e-i-n-s-t-e-i-n.

(Witness sworn.)

THE COURT:  Mr. Montroy, it's your witness.

MR. MONTROY:  Thank you, Your Honor.

**RICARDO WEINSTEIN,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. MONTROY:**

Q.   Just let me know when you get settled, Dr. Weinstein.

A.   It's hard to move when you wear three layers of clothes.

Q.   Good morning, Dr. Weinstein.

A.   Good morning.

Q.   Dr. Weinstein, if you could please tell the Court what your profession is.

A.   I'm a psychologist licensed in the state of California.

Q.   And could you describe the areas of psychology that you practice in.

A.   My primary practice is neuropsychology, forensic neuropsychology and kind of a specialty or subspecialty or some training and experience in intellectual development disabilities, which used to be mental retardation.

Q.   Thank you.  And could you just briefly, without going into tremendous detail, explain for the Court what neuropsychology is.

A.   Neuropsychology is the science that studies brain function in relationship to behavior.

MR. MONTROY:  Your Honor, may I approach, please?

THE COURT:  You may.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, do you recognize this document?

A.   Yes.  This is a copy of curriculum vitae.

Q.   And is it a copy of your CV?

A.   Yes, it is.

Q.   And is it a true and accurate copy of your CV?

A.   It is.  There's a couple of presentations that I have done since the beginning of 2018.

Q.   Okay.  And what have those presentations been on?

A.   Assessment of individuals in death penalty cases.

MR. MONTROY:  I'm marking Dr. Weinstein's curriculum vitae as Defendant's Exhibit 43.

THE COURT:  Are you offering it?

MR. MONTROY:  Yes, I'm offering it as well, Your Honor.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Forty-three is received.

MR. MONTROY:  Your Honor, if I could take a brief pause, I have a number of exhibits and I premarked them so I may move slightly out of order because after I

marked them I sort of shuffled things around a little bit so I probably will use all of them.  If I don't I'll be available and ready to clean up the record afterwards to make sure there isn't anything --

THE COURT:  That's fine.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, would you please take a look at Exhibit 43.

A.  Yes.

Q.  And does it accurately describe your educational and professional background?

A.  It does.  You know what I just realized, being that it's the beginning of the year I have not paid my dues on some of the professional associations that I -- like the National Academy of Psychology, I just got an e-mail saying that my dues are due.

Q.  Okay.  Well, since we're there maybe you could describe your -- you belong to some professional affiliations that are associated with your profession?

A.  That's correct.

Q.  Okay.  And that is -- are those all indicated on page 3 of Exhibit 43?

A.  They are.  You know, I haven't paid my dues in the American Psychology-Law Society.

Q.  Okay.

A.  I don't think the American Association of Mental

Retardation dues are due yet but I haven't paid them. Actually I only paid my dues this year for the American Neuropsychiatric Association.

Q. What is the American Association of Mental Retardation?

A. The American Association of Mental Retardation is an association of individuals interested in the field of intellectual developmental disabilities and I think the association's changed the name also to intellectual developmental disabilities.

Q. So the American Association on Intellectual Disability?

A. I think so.

Q. And how long have you been a member of that association?

A. I don't know. Six, seven years maybe.

Q. You're also a member of the National Academy of Neuropsychology?

A. Yes, I am.

Q. And American Neuropsychiatric Association?

A. Yes.

Q. Okay. In addition to professional affiliations, if you could just take a moment and describe what some of your -- describe your professional background.

A. Well, I was born and raised in Mexico and my

undergraduate degree is from Mexico, from the UNAM.  I grew up there.  Came to the United States when I was 36 years old maybe.  Been here since then.  Obtained Master's degree in psychology, a Doctoral degree in psychology, post-Doctoral training in neuropsychology, specialized training in quantitative electroencephalography, been a U.S. citizen since 1988. I don't know what else.  I've worked at public agencies and I worked in the school for eight years in the inner city of San Diego.

Q.  And all of these experiences that you're describing, they're contained here in your CV; is that right?

A.  Yes.

Q.  Okay.  And do you currently practice neuropsychology?

A.  I primarily practice forensic neuropsychology.

Q.  Can you explain what "forensic neuropsychology" is.

A.  Any forensic science is the interconnection between the law and the particular science.  I mean, you have forensic accountants, forensic engineers, forensic neuropsychologists.  So forensic neuropsychology is the interaction between the law and the brain function and behavior of an individual.

Q.   And how long have you practiced forensic neuropsychology approximately?

A.   I would say 20 years approximately.

Q.   And in that 20 years of practicing forensic neuropsychology, have you been involved in capital proceedings, meaning death penalty proceedings?

A.   I've participated in approximately -- I started doing what's called psychology, not forensic neuropsychology but forensic psychology before that.  So I participated in approximately 130 death penalty cases.

Q.   And those cases are both I assume cases that have not gone to trial or are going to trial or are in post-conviction proceedings?

A.   All of them the above.

Q.   And in the course of your work as a forensic neuropsychologist, have you had occasion to conduct evaluations of individuals either facing the death penalty or who have already been sentenced to death?

A.   Multiple times.

Q.   And in that work you've done psychological testing; is that right?

A.   Yes.

Q.   And neuropsychological testing?

A.   Yes.

Q.   Have you also investigated -- or strike that.

Have you also been involved in evaluating adaptive deficits and adaptive behaviors in those death penalty cases?

A.   Multiple times, about 30 times.

Q.   Okay.  Have you -- in the course of your career and in the course of your work doing forensic neuropsychology, have you ever been qualified as an expert in court as a neuropsychologist?

A.   I've been qualified as a neuropsychologist in both Federal and State courts in multiple states including California, Oregon, Washington, Idaho, Utah, Nevada, Arizona.  I'm trying --

Q.   It's been many times that you've been qualified as an expert in forensic neuropsychology; is that right?

A.   Yes.

Q.   Have you ever been -- have you ever been qualified as an expert in the area of intellectual disability in your work in capital cases?

A.   Multiple times.

Q.   And in Federal and State court?

A.   That's correct.

Q.   And you've described your education but if I could just point your attention back to Exhibit 43 and under -- on page 3, "Publications," is it fair to say that you've published on the topics of neuropsychology?

A.    I've published on the topics of brain development and also on quantitative electroencephalography and I published an article -- chapter in a book on assessing individuals from different cultures.

Q.    Okay.  And those are reflected in your CV from pages 3 to 4; is that right?

A.    Yes.

Q.    And is it also fair to say that you've done presentations on topics related to neuropsychology and death penalty cases?

A.    I've done presentations nationally and internationally on those issues.

Q.    If you wouldn't mind just taking a look at page 5 of your Curriculum Vitae, please, and I'm specifically looking at the presentation from the bottom.

A.    Yes.

Q.    And it's entitled "Cultural Competent Evaluations in Death Penalty Cases"?

A.    Yes.

Q.    And that was a presentation you did in Mexico?

A.    Correct.

Q.    In Mexico City?

A.    Correct.

Q.    And could you just briefly tell the Court what that presentation was about.

A.   Mexico has a program to support individuals that are facing the death penalty in the United States and it's part of the -- that program is run by the -- by the secretary of external -- you know, the same organization that is in charge of all the ambassadorships and things like that.  And they have a legal department and I made a presentation to the attorneys that work for the department.

Q.   Is it fair to say then that you have, during the course of your experience, worked on occasion with Mexican or other Latin American either nationals or descendants of nationals in your work in neuropsychology and in death penalty case?

A.   About half or a little bit more than half of the individuals I assess are Hispanics.

MR. MONTROY:  Thank you.  I don't have any other questions.  I don't know if you have cross-examination on the qualifications.

MR. REISENAUER:  Your Honor, we have no questions.

THE COURT:  The Court finds that the witness is competent to testify.

MR. MONTROY:  Right, Your Honor.  And I would actually ask that Dr. Weinstein be offered as an expert in forensic psychology and neuropsychology and in

intellectual disability.

THE COURT:  I don't receive experts.  It's just not my practice.  I think the more modern practice is to find that they're qualified to testify under Daubert and let them testify.

MR. MONTROY:  Very well, Your Honor.  That's fine.

THE COURT:  But I know that the practice is different in different parts of the country.  That's probably pretty much the way it's done in our circuit at this point unless you get to the far south parts.

MR. MONTROY:  Good to know.  Thank you, Your Honor.  If I could just have the Court's indulgence for one second?

THE COURT:  You may.

MR. MONTROY:  Thank you.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, are you familiar with the capital case of United States v. Alfonso Rodriguez?

A.  Yes, I am.

Q.  And in that case did my office, meaning the Federal Defender for the Eastern District of Pennsylvania, ask you to conduct an evaluation of Mr. Rodriguez's adaptive functioning?

A.  Actually what they asked me was to conduct an

evaluation of his neurocognitive functioning, especially in the aspect of intellectual developmental disability.

Q. And so we asked you to do an evaluation to determine his neurocognitive functioning, No. 1; is that right?

A. That's correct.

Q. All right. And then also to determine whether or not Mr. Rodriguez fulfills the diagnostic criteria of intellectual developmental disorder; is that correct?

A. That's correct.

Q. And is intellectual developmental disorder often referred to as IDD or ID?

A. It is referred to as ID for short, and it used to be what we used to call mental retardation before 2010 I think it was.

Q. So essentially mental retardation is the same as intellectual developmental disorder; is that right?

A. It is the exact same thing. It just changed the name because of the I guess stigma that the concept of mental retardation has.

Q. And for the purpose of this hearing if I refer to the term "ID" you understand that I'm referring to intellectual disability or intellectual developmental disorder; is that fair to say?

A. That's correct.

Q.   Otherwise, I'll be butchering that term.   Did you generate a report in connection with your work in this case?

A.   I did.

MR. MONTROY:  Your Honor, may I approach the witness?

THE COURT:  You may.

MR. MONTROY:  Thank you.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, I'm showing you what is marked as Exhibit 44 (indicating). Do you recognize this document?

A.   Yes.  This is a copy of the report I produced after evaluating Mr. Rodriguez.

MR. MONTROY:  And, Your Honor, I would offer Exhibit 44.

THE COURT:  Any objection?

MR. REISENAUER:  Just one question, Your Honor.

Dr. Weinstein, the report that you were just handed, you have page numbers on the top left hand; is that correct?

THE WITNESS:  Yes, sir.

MR. REISENAUER:  And the end of your report is page 15 and then attached to it are I believe three pages that are listed as sources?

THE WITNESS:  Yes.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Forty-four is received.

MR. MONTROY:  Thank you, Your Honor.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, have you had an opportunity to review this report?

A.  I have.

Q.  And to the best of your knowledge is everything in this report true and correct?

A.  It is with the exception of there was additional documents that I received after I produced the report and are not listed in the sources.

Q.  That's correct.  And when you're talking about sources you're talking about the final pages of your report, sources that are at the back of your report?  Is that what you're referring to?

A.  Yeah, because they were -- usually this is in part of the report but because of the number of sources that I received and I reviewed I just chose to add it as an addendum or attachment to it.

Q.  That's correct.

MR. MONTROY:  Your Honor, may I approach, please?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, I'm

handing you an exhibit that's marked as 45 (indicating). Could you just take a quick look at that, please.

A.   Yes (witness examining).

Q.   All right.  And this is entitled "Weinstein's Sources;" is that correct?

A.   Correct.  And I think it's either a copy or similar to what's attached to my report.

Q.   It's similar but it contains the additional sources that you reviewed; is that fair to say?

A.   The additional sources were three declarations, which if you point them out to me I will take less time to look for them, plus transcripts of the depositions of Dr. Welner and Dr. Seward.

Q.   If I told you, Dr. Weinstein, that this document here is a reflection of all the materials that my office has sent to you since you've been retained in the case, would you have any reason to dispute that?

A.   No, I wouldn't.

Q.   And does it look like that this document, No. 45, contains all the sources of information that you reviewed?

A.   Yes.  Towards the end there's a list of the declarations plus the deposition, copies of the depositions.

MR. MONTROY:  Okay.  Thank you.  I would

offer this as Exhibit 45, Your Honor, as all the sources of materials Dr. Weinstein has reviewed in this matter.

THE COURT:  Any objection?

MR. REISENAUER:  I have a couple questions if I could, Your Honor.

THE COURT:  You may.

MR. REISENAUER:  Thank you.  So I need to be clear, Dr. Weinstein, in the report that you submitted you had three pages of sources, correct?

THE WITNESS:  Yes, sir.

MR. REISENAUER:  And in Defendant's Exhibit 45 this has six pages, correct?

THE WITNESS:  Correct.

MR. REISENAUER:  But you're telling us that there's only five new additions?

THE WITNESS:  Yes.  Exhibit 45 is double-spaced and my report includes single-space so that probably is the difference because the only additional documents are contained in the last page of the exhibit and they're the five ones at the bottom.

MR. REISENAUER:  The declaration of Delores Rodriguez, the declaration of Sylvia D'Angelo, the declaration of Ileana Noyes, the deposition of Dr. Seward which took place just last month on December 18th of 2018, the deposition Dr. Michael Welner whose

deposition took place on January 9th of 2019?

THE WITNESS:  That's correct.

MR. REISENAUER:  Those are the only additions?

THE WITNESS:  That's correct.

MR. REISENAUER:  Did you type this up?

THE WITNESS:  No.

MR. REISENAUER:  Who did?

THE WITNESS:  Mr. -- Eric's office did.

MR. REISENAUER:  Mr. Montroy provided this to you?

THE WITNESS:  Mr. Montroy, yeah.  He just provided the additional sources to me.

MR. REISENAUER:  Okay.  So I have a couple more questions, Your Honor.

So obviously when you wrote your report, Doctor, you didn't have the depositions that we just took in December and January, correct?

THE WITNESS:  That's correct.

MR. REISENAUER:  And so anything in your report isn't based on their deposition, correct?

THE WITNESS:  That's correct.

MR. REISENAUER:  And are you saying the same about the declarations of Delores Rodriguez, Sylvia Sylvia D'Angelo and Ileana Noyes?

THE WITNESS: Those declarations, if I'm correct, are dated 2011 and I did interview these individuals so most of the information that's contained in the declarations is also information I obtained directly from their interviews.

MR. REISENAUER: Okay. So you interviewed them but you didn't have their declarations, correct?

THE WITNESS: Not these particular declarations, no.

MR. REISENAUER: Are these new declarations?

THE WITNESS: No. As I say, I think they're dated 2011.

MR. REISENAUER: Okay. But you didn't have them at the time that you did your report and talked with Mr. Rodriguez.

THE WITNESS: I don't think I did, no.

MR. REISENAUER: Okay. No objection, Your Honor.

THE COURT: Forty-five is received.

MR. MONTROY: Thank you, Your Honor.

Q. (Mr. Montroy continuing) Going back a bit, Dr. Weinstein, did you conduct an examination of Mr. Rodriguez?

A. I did.

Q. And what does that evaluation consist of?

A.   Well, I was asked to conduct an evaluation to determine his neurocognitive functioning and whether he fulfills the diagnostic criteria of intellectual developmental disability, and that's what I did.

Q.   So did you conduct an interview?

A.   I conducted an interview and there's a list of tests that I conducted in my report if you want me to go through them or just mention them.

Q.   We'll go through that, Dr. Weinstein, thanks.  So your evaluation, at least in part, consisted of an interview of Mr. Rodriguez and some testing of Mr. Rodriguez; is that accurate?

A.   Plus I interviewed multiple sources, collateral sources, and attempted to interview multiple collateral sources that would not talk to me or I couldn't find them.

Q.   And how was the interview relevant for the purpose of evaluating whether or not an individual has ID?

A.   Well, you want to be able to compare what the individual is saying to the information that you have based on history.  In this case Mr. Rodriguez has been evaluated multiple times over the course of the years and also to create some rapport to make sure that he's making a good effort, make sure that he understands the

purpose of the evaluation, make sure that he understands the limits of confidentiality of the evaluation, things of that nature.

Q.   And was all that expressed in your interview of Mr. Rodriguez?

A.   I'm not sure what you mean by "expressed."

Q.   Was that the experience that you had when you interviewed Mr. Rodriguez?

A.   Yes, I did.

Q.   Okay.  Did you videotape your interview of Mr. Rodriguez?

A.   No, I did not.

Q.   And is there a reason why you did or you did not videotape your interview?

A.   I don't usually videotape interviews.  I don't like to videotape interviews.  I don't find any usefulness in that.  In fact, I find it's detrimental to the relationship with the individual.  If for some reason the prosecution wants to have some information or some record of my participation and information, I prefer to have a third party that's qualified, meaning another psychologist, sitting there either with me or behind me.

Q.   And why would you say it could be detrimental in these circumstances to have an evaluation videotaped?

A.   Because I think it prevents or can potentially prevent the relationship and the -- you know, it's intrusive in a way that you are having somebody else there or something else happening and people may get intimidated.  They don't know what you're going to use it for.  They don't know what the records are going to show for.  They might be intimidated by the fact that you are recording them.

Q.   Okay.  And in your experience is it common within the practice of forensic neuropsychology to not videotape evaluations?

A.   In my experience most -- in most cases it's not. When either party requests it and it's ordered by the Court then it is done, but my preference is not to do it.

Q.   Okay.  And where did you conduct your evaluation of Mr. Rodriguez?

A.   At the prison in Terre Haute, Indiana.

Q.   And that's where Mr. Rodriguez is on death row; is that correct?

A.   That's correct.

Q.   And you also conducted a mental status exam?

A.   Yes.

Q.   And what is the purpose of a mental status exam?

A.   The mental status examination is to determine

whether the person can respond adequately to the questions you're asking and participate in the evaluation in terms of their ability to be focused on the issue that you're going to be talking about, the fact that you want to make sure they understand and that they can comprehend the language you're using.

And then it's a standard -- kind of standard number of questions that you ask an individual to determine whether they are suffering from some kind of hallucinations or major psychiatric disorders in the form of psychosis, schizophrenia or paranoia.  I mean, if a person is paranoid or if a person is schizophrenic and it's not -- does not have a hold on reality, it's important to note that in terms of the validity of the testing that you're going to conduct, if you can conduct any testing.

Q.   And in the course of your mental status exam, was Mr. Rodriguez exhibiting any signs of psychosis?

A.   No, he was not, and he denied experiencing any signs of psychosis.

Q.   Okay.  Did you also conduct neuropsychological testing on Mr. Rodriguez?

A.   I did.

Q.   And if you could turn to page 1 of your report.

A.   Yes, which is Exhibit 44, right?

Q.  Yes.  Thank you.  On page 1 about halfway down, a little bit past halfway down, you list all of the testing that you do; is that correct?

A.  I think most of it.  There's one item on page 2.

Q.  The Executive Functions Module?

A.  Yes, sir.

Q.  So is it fair to say that everything between the WAIS-IV, which is the third point on page 1, going on to executive function models on page 2, those are the tests that you conducted?

A.  That's correct.

Q.  If you could just briefly describe -- because we're going to come back to it, but if you could briefly describe generally speaking what these tests are about.

A.  Well, there's several tests that measure cognitive abilities or -- it's kind of difficult to say measure intelligence because there is really no clear definition of intelligence.  In fact, Dr. Lisak, who's the -- she's one of the most well-known neuropsychologists describes intelligence as that what IQ test measure.

So it's controversial to determine what intelligence is, but there's three tests that measure the ability to think in a way that would be reflective of some kind of level of intelligence.

Q.   Okay.

A.   And that's measured by IQ score, which is an intellectual quotient.

Q.   So is it fair to say that some of these tests are designed to measure intelligence more or less and some of the tests have a different purpose?

A.   That's correct.

Q.   All right.  And the other tests that aren't IQ tests, what are the purpose of those tests?

A.   The Dot Counting Test and the Rey 15 Item Test are considered tests of effort because you can measure effort but you cannot measure the tendency to malinger. But the assumption is that if a person is making a good effort then they're not malingering.

Q.   Okay.  When you say "effort" in other words are you saying whether the person is actually trying to do well on the test or not?

A.   Whether the person is doing their best or at least they're putting in a good effort of the test and the way -- for instance, the Dot Counting Test is a very simple test that only takes counting dots and see how fast they can do it.  It's a task that people with severe brain injuries can do and also individuals with no -- their norms for individuals with no known disabilities or what they're called normals.  And what

it gives you is a time that the person's taking in counting the dots and the accuracy that they're counting them with. And then you compare that to the normative sample and if people with significant damage to the brain, for instance, take less time than the person that you're testing, then that would suggest the person is not making a good effort.

Q. Okay. And did you give those to Mr. Rodriguez because you wanted to determine whether or not he was putting in a good effort on all of the tests that you were administering?

A. Yes. There's two ways of finding out when somebody is putting in a good effort. One is by doing this test -- specific tests of effort and the other one is by making sure that there is some consistency in the results that you obtain. I mean, if you, for instance, obtain an IQ score in the intellectual developmental disability range or close to it and yet you obtain achievement scores that are very high, that is only explained if the person has a learning disability but if the person does not have a learning disability -- and actually I must correct myself.

That would not be explained by a learning disability because the achievement is higher. So let's say you get somebody with an IQ in the 70s range but is

able to function and read in the adult range with somebody with an education over 18 years, that would be suspect, you know.  You want some consistency.  If their IQ is in the 70s, you want them to not have such a disparity.

Q.  So in that case you would expect achievement testing to be more in the young adult or youth area; is that fair to say?

A.  Yes, that's fair to say.  And you would expect some delays in terms of their ability to achieve academically.  You know, in other words somebody with an intellectual developmental disability tends to have the academic skills that go anywhere from the fourth to the seventh grade or sixth grade but not much higher than that.

Q.  Okay.  And these tests of effort that you administered to Mr. Rodriguez, did you reach a conclusion about whether or not he was exhibiting good effort?

A.  He did very well on both tests of effort.  And there's a third way that you can also measure effort. Let's say there's tests, multiple tests, at least two tests in which you're asking the person to repeat digits.  You know, I'm going to say a series of numbers that I want you to -- so at one time they can repeat

seven digits but another time they can repeat 12 digits. That's not consistent so you want them to be -- six and seven would be kind of in the range.

Q. So those tests don't indicate anything about intelligence. They just indicate about effort.

A. The Dot Counting Test and the Rey 15 Item Test are just tests of effort, yes.

Q. And those tests showed that Mr. Rodriguez was exhibiting good effort?

A. Right. And therefore you can state that he was not malingering. There's some validity to the findings.

Q. And these tests that you conducted, the ones that we just talked about on page 1 and page 2, the full battery of tests, are those tests reasonably relied upon by experts in your field?

A. Yes, they are.

Q. Is it quite common for neuropsychologists to administer the same tests that you administered here?

A. If I was conducting a full psychological testing, I would probably have done additional tests.

Q. Okay. But all the tests that you did conduct are commonly used tests; is that fair?

A. Some of them may not be as common as others. I mean, like the TOGRA is not a test that's used a lot outside the school system but the other ones are all

very common tests of neuropsychological assessment.

Q.   You mentioned earlier that in addition to the testing and the interviewing that you did you also -- you also considered outside or collaborative sources of information or collateral sources of information; is that accurate?

A.   Yes.

Q.   Let's start with records.  In connection with writing the report and your testimony here today, you reviewed some records, correct?

A.   Extensive records.  I don't think -- this is probably the case where I have approximately 10,000 pages of records.

Q.   Okay.  And those records are the records that are indicated at the back of your report?

A.   And on Exhibit 45.

Q.   And then also on 45, right?

A.   Yes.

Q.   And 45 contains sources that were provided to you via supplemental background packets that were sent to you; is that accurate?

A.   That's correct.

Q.   Okay.  And the records that you reviewed, are they the types of records that are reasonably relied upon by experts in forensic neuropsychology and

intellectual disability?

A.    In intellectual disability primarily you want to look at school records and other health records, and neuropsychology certainly you want to look at everything that's available.  In this case Mr. Rodriguez has been tested multiple times by multiple experts and has had I think probably eight or nine different evaluations.

Q.    Okay.  And is it fair to say that you at least in part relied on these records and these sources of information when you wrote your report and as the basis of your testimony here today?

A.    I relied on them because I reviewed them.

Q.    Sure.  Okay.  Moving on to third-party interviews, in addition to the records that you reviewed, did you also conduct clinical interviews of third-party reporters?

A.    I don't know if you would consider those being clinical interviews but interviews in the sense of -- I mean, I wasn't very interested in finding out a lot of history from some of these people but certainly their relationship to Mr. Rodriguez and their memory of how he functioned at the ages -- developmental ages.

Q.    So would you say that -- is it important, when you're doing an evaluation of a person who may or may not have ID and you're trying to figure that out, to

interview witnesses who have some knowledge or who have some experience of the person who you're evaluating?

A.  Yes, it's -- you have to do it.  I mean, you can't depend on what the person is telling you because the person -- particularly people with intellectual disabilities tend to mask it or hide it.  They're not going to tell you.  So -- and you cannot tell whether it's the truth or it's not the truth without some corroborative information.

Plus because the definition of "intellectual developmental disability" requires that this disability be present prior to the age of 18, you need to speak to people that actually recall this person growing up and had some kind of relationship with this person during those developmental years.

Q.  Okay.  And what are you trying to find out when you talk to people who had that relationship with the person during the developmental years?

A.  In general you're trying to find out what their general functioning is but specifically for the definition you want to find out if they had any adaptive behavior deficits meaning if there was something about their behavior that would require some formal or informal supports for them to be able to function in society.

Q.  And you conducted those interviews in Mr. Rodriguez's case; is that correct?

A.  I did, yes.

Q.  Okay.  And in addition to interviews, did you also review declarations and affidavits that were provided to you of interviews with potential witnesses?

A.  Yes.  I was not able to go to El Paso, Texas where he spent a portion of his childhood and where he related to other people, and I reviewed the declarations from people from Texas primarily.  I mean, I reviewed a lot of declarations but the ones that were significant for the diagnosis were the ones from El Paso where I did not have an opportunity to interview people on a face-to-face basis.

Q.  Did you mean Laredo?

A.  I mean Laredo, Texas, yeah.  I'm sorry.

Q.  So the declarations from people who were living with Alfonso Rodriguez while he was in Laredo, Texas, you found those to be important sources of information?

A.  Yes.

Q.  Thank you.  And are declarations like those that you just discussed, are those reasonably relied upon by experts in intellectual disability and neuropsychology to assist in making determinations about adaptive functioning?

A.   They are necessary but not sufficient.  In other words it's important to know what other people think about this individual and what they've said about this individual which is contained in their testimony or their statements under oath but it's not sufficient. You really need to be able to talk to some -- at least some people that knew him and were in charge of his care during developmental time.

Q.   So declarations are something you review and you consider and at least in some part you rely on, but they're just one data point in a number of data points?

A.   Yes.  And let me give you an example.  I mean, if you review school records you're going to find out what kind of scores they take -- they had.  But if you have the opportunity, which in this case we didn't for obvious reasons, I mean, the gentleman is 65 years old so it's unlikely that his teachers would be around.  But if, let's say, he's much younger than that and teachers are still around, not only are school records relevant but to be able to talk to some of the teachers would be extremely relevant because they would tell you if they recall.

In my experience teachers, for instance, even though they had thousands of students over the course of their careers they tend to remember kids that

either excel or kids that are very low.  And if they remember your client then that's a good thing when it's possible but it's not always possible.

Q.  Can you also ascertain that information by looking at school records?

A.  Right.  That's what I said.  You do it by school records, and when you can and when it's available you want to have a personal source.

Q.  Let's talk about intellectual disability.  Are you -- are you familiar with the diagnosis of intellectual disability?

A.  I am.

Q.  And are there diagnostic authorities that discuss what is necessary to diagnose someone as intellectually disabled?

A.  Well, the American Association of Intellectual and Developmental Disabilities has done, over the course of many years, a lot of research in the field, and they have come up with numerous different publications in which some changes have occurred on the definition.  The Diagnostic and Statistical Manual, which is the DSM and now it's in the 5th Edition, traditionally or usually has followed the definitions that the AAMR or the IDD, AIDD organization come up with.

Q.  You mentioned just a second ago the American

Association on Intellectual and Developmental Disabilities; is that right?

A.   Correct.

Q.   And so you're familiar with that organization?

A.   Yes.  I'm a member of it, yes.

Q.   You're a member of the AAIDD as it's also referred to?

A.   Yes.

Q.   And the AAIDD produces one of the diagnostic manuals concerning ID; is that right?

A.   One of the main purposes of their functioning is to do research in the field of ID, DD or ID.

Q.   And the diagnostic manual that they produce is commonly referred to as the green book; is that right?

A.   That's -- the last edition is a green book.  The prior edition, which is right here under Exhibit 1, is the red book.

Q.   And the green book, the most recent edition was published in 2010?

A.   That's correct.

Q.   And it's entitled "Intellectual Disability Definition, Classification, and Systems of Support - 11th Edition?

A.   Yes.

           MR. MONTROY:  Your Honor, may I approach?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, I'm showing you what's marked as Exhibit 46 (indicating).

A.  Yes.

Q.  Is that the AAIDD 2010 book that we just discussed?

A.  Yes, it is.  And it's a brand new copy of it, which is nice.

MR. MONTROY:  Your Honor, I have a copy for the Court as well.

THE COURT:  Thank you.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, are you also familiar with the AAIDD User's Guide to Intellectual Disability Definition, Classification and Systems of Support - 11th Edition User's Guide?

A.  Yes.  It's a thin booklet.

Q.  And that was published in 2012; is that correct?

A.  I don't know exactly when it was but I believe you that it was published in 2012.

Q.  All right.  And would you agree that it's also one of the diagnostic authorities that discuss the diagnoses of intellectual disability?

A.  Yes.  It's a condensation perhaps of the green book more specifically addressing practical issues in terms of the diagnosis.

MR. MONTROY:  May I approach, Your Honor?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, I'm handing you what's marked as Exhibit 47 (indicating).

A.  Correct.

Q.  Do you recognize that as the User's Guide AAIDD?

A.  Yes.

Q.  And the book that we just discussed?

A.  Correct.

Q.  Now I think you mentioned this, Dr. Weinstein -- well, actually let me back up a second.

These two books that were just marked Exhibit 46 and 47, do they constitute the most recent diagnostic guidelines that are published by the AAIDD?

A.  As far as I know, yes.

Q.  And you consider these to be authorities in the field of intellectual disability?

A.  It's not my opinion but it is --

Q.  Okay.

A.  It's not only my opinion but it's the controlling organization in definitions of "intellectual developmental disability."

Q.  Okay.  And I think you mentioned the Diagnostic and Statistical Manual of Mental Disorders - the 5th Edition, which is also known as the DSM-5; is that

correct?

A.   That is correct.

Q.   And is that also one of the authoritative guides on intellectual disability?

A.   Yes.  As I mentioned before, it usually follows the definitions of the AAIDD organization.  If I may explain a little bit, the DSM-5 is constituted by experts in a particular field getting together and determining which are the criteria that needs to be fulfilled for the diagnoses to be adequate or correct. It's an attempt to be objective.

The experts that participate in the DSM-5 also participate in the User's -- in the AAIDD definitions and they tend to always follow the definition.  So the controlling definition is probably more so contained in the AAIDD manuals.

Q.   Okay.  And who --

A.   The publications.

Q.   And who publishes the DSM-5?

A.   The American Psychiatric Association.

Q.   And is the DSM-5 the most current diagnostic guide published by the American Psychiatric Association, otherwise known as APA?

A.   As far as I know, it is.  I know -- as far as I know, they're working on some revisions that have not

been published.

MR. MONTROY:  And, Your Honor, may I approach?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, I'm handing you Defendant's Exhibit 62 (indicating).

A.  Yes.

Q.  And do you recognize this as a partial copy of the DSM-5?

A.  Yes.  It's the -- a copy of the front cover of the DSM-5 plus pages 33 to 41 that contain the definitions of "intellectual disability."

MR. REISENAUER:  Excuse me, Your Honor, did he say 13 to 41?

THE WITNESS:  Thirty-three.

MR. REISENAUER:  Thirty-three to 41?

THE WITNESS:  Yes.

THE COURT:  I think the original's on the -- at the witness table and I think this is a copy.

MR. MONTROY:  I'm sorry, I meant that for the Court.  Sorry about that.  Your Honor, I apologize, I think I lost track about offering the exhibits.

THE COURT:  You have not offered 46, 47 or 62.

MR. MONTROY:  I would offer those.

THE COURT:  Any objection?

MR. REISENAUER:  I believe I have copies of the two books, Your Honor, so we have no objection.

THE COURT:  Forty-six, 47 and 62 are received.

Q.  (Mr. Montroy continuing)  And, Dr. Weinstein, I think you may have answered this question but are the DSM-5 and the AAID manuals the authoritative guidelines that are relied upon by those who work in the field of psychology, neuropsychology and psychiatry for diagnosing individuals with intellectual developmental disorder?

A.  Yes.

Q.  And do both of these authorities define "intellectual disability"?

A.  Correct.

Q.  Dr. Weinstein, I'd ask you to just take a look back at Exhibit 44, which is your report.

A.  Yes.

Q.  And if you could turn to page 5.

A.  Yes.

Q.  On page 5 do you lay out the definitions of "intellectual developmental disability" or ID or IDD from both the AAIDD and the DSM-5?

A.  Yes.

Q.   Let me ask you a couple questions about ID.   Are there three elements to the diagnosis of intellectual disability?

A.   Yes.   There's three prongs to the fulfillment of the -- you have to fulfill all three categories in order to be able to diagnose it.

Q.   Okay.   And do both the APA and the AAIDD have essentially the same characteristics in their three prongs that you have to show in order to prove intellectual disability?

A.   The DSM-5 and the AIDD '10, yes.   The DSM-4-TR, which was the prior edition, was still using the definition that was contained in the prior two versions of the AIDD manuals.

Q.   Okay.   But as far as the DSM-5 and the 2010 AAIDD, they're essentially the same three prongs; is that correct?

A.   The DSM-5 and the AIDD 2010, yes, they are.

Q.   And could you just briefly describe for the Court what those three prongs are.

A.   Well, basically -- I mean, the wording might differ a little bit but basically an intellectual cognitive disability contains three prongs to it.   The first one is a cognitive aspect to it or of deficits in intellectual functioning, and that's measured with some

kind of standardized tests that produce usually an IQ in a particular range.  You know, you don't have -- it's an approximate range.

Q.  And so that's prong one.

A.  That's prong one.

Q.  Deficits in intellectual functioning.

A.  Correct.

Q.  Okay.  And what about prong two?

A.  Prong two has to do with adaptive behaviors and has to do with deficits, not with strengths, because it's recognized that individuals have strengths as well as deficits.  They don't have all the deficits contained and you don't require them to have all the deficits contained in the definition in order to be able to diagnose them.

Q.  And what is a deficit?

A.  A deficit is the inability or the lack of some kind of functioning that prevents that individual from functioning independently in society.

Q.  Okay.  And so that's prong two, deficits in adaptive behavior.

A.  That's correct.

Q.  And what is prong three?

A.  Because it's a developmental disability, prong three talks about developmental years.  In most states

it's considered to be between the ages of zero and 18. Those are the developmental years; although, I have an issue with that but that's because we know from research that the human brain does not develop fully until the age of 25.  So if it's a developmental stage that should not be cut off at 18 but it is cut off at 18 in most states.  And that's what's contained in the DSM-4 -- I'm sorry, DSM-5 and the AIDD 2010.

Q.  Okay.  And when you were evaluating Mr. Rodriguez and determining whether or not he meets the diagnostic criteria for intellectual disability, did you rely on these three prongs when making your determination?

A.  You have to, yes.

Q.  Okay.

A.  Because if you miss one -- let's say you miss the age of development, okay, then you have the same deficits but they don't occur during the age of development.  You had a person that functioned perfectly well but had a motorcycle accident and damaged their brain and now they have cognitive disabilities and now they also have intellectual disabilities and they have adaptive behaviors.  They can't function independently. But it occurred after the age of development, you know. That's not an intellectual developmental disability. That's brain damage.

Q.   So in accordance with prong three, you looked for adaptive deficits with an onset before the age of 18.

A.   You have to, yes.

Q.   And that's what you did.

A.   That's what I did, yes.

Q.   Okay.  Let's talk a little bit in greater detail about -- I'm not sure if the Court wants to take a break.  Moving slightly -- it's not a huge change in what we're talking about but we're focusing on a particular area.

THE COURT:  All right.  How long is it going to take?  Usually I'd like to break in another ten minutes but if you want to break now we can --

MR. MONTROY:  I think it's probably going to take more than ten minutes.

THE COURT:  Why don't we break for 20 minutes at this point.  We'll start again at 10:30.

MR. MONTROY:  Thank you, Your Honor.

(Recess taken; 10:07 a.m. to 10:30 a.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  When we broke Mr. Montroy was conducting a direct examination of Dr. Weinstein.

You may proceed, sir.

MR. MONTROY:  Thank you, Your Honor.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, let's sort of focus for a moment on prong one, deficits in intellectual functioning.  Would you agree that both the AAIDD 2010 and DSM-5 in prong one involve subaverage intellectual functioning?

A.   Involves subaverage, yes.

Q.   I'm sorry, involves an inquiry into subaverage -- strike that.  Involves a showing of subaverage intellectual functioning?

A.   Correct.

Q.   And specifically I'd point to page 31 of the AAIDD 2010 version, an IQ score of approximately two standard deviations below the mean.  Is that consistent with your understanding of subaverage intellectual functioning as it relates to prong one?

A.   Yes.  I mean, according to the definition and according to the manual, it's approximately two standard deviations.  But subaverage would only refer to below average.

Q.   Okay.  And were you able to determine whether Mr. Rodriguez meets the criteria for prong one, significant deficits in intellectual functioning of the ID diagnosis?

A.   Yes.

Q.   And what is your conclusion?

A.   My conclusion is that his IQ scores over the course of many years and through multiple evaluations by multiple different evaluators always was within the range of intellectual developmental disability.

Q.   Okay.

MR. REISENAUER:  Pardon me, I didn't hear that answer.

THE WITNESS:  I said that over the course of many years and over the course of many evaluators, the scores that he has obtained would be considered to be approximately in the range of intellectual developmental disability.

Q.   (Mr. Montroy continuing)  So it sounds like in determining that he meets the diagnostic criteria for prong one, you in part relied on testing that was done by others in part?

A.   In part, yes.  I mean, I -- because I reviewed it and I know it existed.  He's been tested since he was a child by the school system.

Q.   And --

A.   Over the course of many years.

Q.   And then you also did your own testing; is that right?

A.   I did three different tests of intellectual functioning.

Q.   Let's actually talk about those tests, if you could turn to page -- to your report, Exhibit 44.

A.   Yes.

Q.   Looking at Exhibit 44 would you, Dr. Weinstein, please turn to page 11.  And you conducted three tests or you administered three tests for the purpose of determining IQ; is that accurate?

A.   Yes.

Q.   And what were those three tests?

A.   The WAIS-IV, which stands for Wechsler Adult Intelligence Scales, and is the fourth iteration of this particular test; the Test of General Reasoning Ability, the TOGRA; and the Comprehensive Test of Nonverbal Intelligence - 2nd Edition, or the CTONI-2.

Q.   And why did you choose to, No. 1, administer three separate IQ tests and, 2, these particular IQ tests?

A.   Well, No. 1, because if you only have one score there is no way to find what is called the reliability of the scores.  In other words you can't say that, in fact, he obtained similar scores in tests or similar tests that test for the same concept or construct.  So I always try to at least do two or three different tests.

Now why did I choose the tests?  Well, the Wechsler --

Q.  Let me just stop you right there, I apologize, before you go on to the second part of that question.

So was there -- is it fair to say that there's a corroborative nature of using more than one IQ test?  You want to see if, you know, the scores that you get from one particular test are corroborated by the scores from a different kind of test?

A.  Right.  Especially in forensic cases where you're concerned that the person may not be putting adequate effort or has a reason to obtain a score that is in the intellectual developmental disability range.

Q.  Okay.  And so moving along you were about to answer the second part of question in terms of why you chose to do the WAIS-IV, the TOGRA and the CTONI-2.

A.  The WAIS is probably the most used test in the field of psychology in terms of measuring intellectual quotient, or IQ.  It is considered to be -- or some people have called it the gold standard of testing meaning that that's what you want to do.  It's not necessarily the best test in my opinion but it is the most widely used.

This test has been translated into Spanish and because Mr. Rodriguez was a Spanish speaker the

first few years of his life, I wanted to know if language would make a difference for him.

The second test, which is the TOGRA, the Test of General Reasoning Ability, which is published by one of the two in my opinion most prestigious publishers of tests in the United States, it requires an individual to read or to reason some of the questions and it's a timed test.  It's a relatively easy test to conduct.  It's nonthreatening.  The person doesn't know how long you're going to give them or you can tell them.  I mean, actually the instructions do say you have 16 minutes to do as many items as you can and requires some language in that the person has to read the questions and some of the questions are in words like, you know -- a question that comes to mind is:  What's the right number that follows two, four, six, and then there's a blank, and 10?  Well, the correct answer is eight.  So it gives you five different options.  It's a multiple-choice test.

There's some that are just simple pictures.  This is to this one, this is to this one.  So that's the TOGRA, the Test of General Reasoning Ability.

Q.   And is the TOGRA a fairly different test than the WAIS-IV?

A.   It's a completely different test from the WAIS-IV.

Q.   And could you describe what in your opinion are the main differences in the TOGRA and the WAIS-IV.

A.   The WAIS-IV consists of subtests, in other words a number of tests that you are to give to the person or there are some tests you can substitute by other ones. But the core of the test consists of I think it's nine subtests and that produces four different what's called indicis and a full-scale IQ score, which is different from the prior iterations where you have a verbal IQ score and a performance IQ score.  And this iteration of the test you have four different scores plus a full-scale IQ score.

Q.   And the TOGRA is administered in a particular language?

A.   The TOGRA's in English so there's no Spanish translation of the TOGRA.

Q.   So you administered the TOGRA in English, is that fair to say here, for Mr. Rodriguez?

A.   Yes.  He read it in English and responded to the questions that were posed to him in English.

Q.   And if you could describe for the Court the third test, the CTONI-2.

A.   The CTONI stands for Comprehensive Test of Nonverbal Intelligence.  It is the only test of nonverbal intelligence that's contained or was contained

in the DSM -- pardon me, the AIDD prior edition of the red book as a substitute for people that you want to test that have problems with language, whether it's they don't speak the language or -- it doesn't require any mastery or any understanding of any language whatsoever because you can actually give the instructions in pantomime.  There's ways to do that.

But the bottom line is that it's a nonverbal intelligence test, supposedly is cultural free, although I don't believe there are any tests that are culture free.  But it provides us a full-scale IQ score in that it has two different components to it: the pictorial component and a geometric component.  And then there is a -- not average because they load differently but it provides for a full-scale IQ score that you can compare with the full-scale IQ score of the other tests that you did.

Q.  Okay.  So you administered one IQ test in Spanish because Mr. Rodriguez, during his early years, spoke Spanish and knows Spanish; is that accurate?

A.  Let me state that I attempted to do it in Spanish but he chose to respond to many of the questions in English.

Q.  Okay.

A.  I had to explain to him some of the issues.  He's

Spanish, although he speaks Spanish is not --

Q.   If I can cut you off, we're getting more into depth in the WAIS-IV.  I'm just sort of getting an overview of the different tests that you ran, and I just want to clarify the differences between the three tests.

So the WAIS-IV, you conducted that in Spanish; the TOGRA, you administered that in English; and the CTONI-2 is a nonverbal so you didn't use Spanish or English; is that right?  Is that a fair characterization?

A.   Except in his case because he does understand English clearly I give him the instructions in English instead of pantomime.

Q.   Okay.  And is there -- was there a purpose as to particularly the -- in Mr. Rodriguez's case why you used three IQ instruments that vary -- that are varied and different at least in terms of language?

A.   As we mentioned before, it provides some reliability to the findings in terms of if you give him another test or two different or three different tests and he obtained similar results and they're all measuring intelligence or provide an IQ score, then you have some validation of the scores that you obtain.

Q.   Okay.  If I could direct your attention, Dr. Weinstein, to page 44 -- I'm sorry, Exhibit 44, page

11.

A.    Yes.

Q.    And at the top of that page it's entitled "IQ Scores;" is that correct?

A.    Correct.

Q.    And the first object is a graph, a chart, that lists the scores that Mr. Rodriguez obtained on the WAIS-IV.

A.    Correct.

Q.    And could you describe to the Court what these scores mean and how they were obtained and how you arrived at these scores.

A.    The way you obtain these scores is you first obtain what's called a raw score, which means how many correct answers did he give you on a particular subtest. You convert that subtest score to what's called scaled scores, and scaled scores have a mean of 10 and standard deviation of three. Then each of the scores loads, in other words combines, with other scale scores of subtests that then you add up, and then you transform that into what's called standard scores. And standard scores have a mean of 100 and standard deviation of 15, which is what the combination of those four different indicis give you a full-scale IQ score.

Q.    Okay. Could you describe -- you just used the

word "standard deviation."  In terms of IQ testing, what is a standard deviation and why is that important?

A.  "Standard deviation" is a statistical concept that means how far from the mean?  The bottom line is the -- the concept is how far from the mean a particular score falls.

Q.  And did you include a chart that helps describe this on page 10 of your report?

A.  Yes, I did.  Unfortunately in this particular copy there is no -- it doesn't show because that I obtained from a WAIS-III form actually.  But it's the same as a WAIS-IV and it's in colored blue and I guess the copier didn't copy.

Q.  But this shows what you're talking about in terms of standard deviations, right?

A.  What it shows -- yes, what it shows is a curve which is called the bell curve or the standard curve and most of us have some memory of that from high school.  I guess that we know what -- but really what it's doing is showing a distribution.  The theory of it is that if you test enough people you'll find that they follow distribution meaning that some will fall within the range of X number approximately the shape of a bell curve.

Q.  And so you get an average to start with, right?

After you've tested a number of people there's an average score or a mean?

A. You get a mean which is not an average but it's the -- the mean is the line that divides the curve in half, okay? So 50 percent of all the scores will fall above the mean and 50 percent of the scores will fall below the mean.

Q. Okay. And so when it comes to IQ testing the mean is a 100; is that right?

A. In terms of standard scores, yes, the mean is 100 and that's by agreement, you know. That's what we're going to do.

Q. Okay. And what is one standard deviation from the mean?

A. Because again by agreement we use 15 as a standard deviation, one standard deviation below the mean would be 85.

Q. Would be 85. So one standard deviation below the mean would take you to 85.

A. That's correct.

Q. Okay. And two standard deviations?

A. Two standard deviations will take you to 70 because it's 15 times two is 30. One hundred minus 30 is 70.

Q. Okay. And when we're talking about two standard

deviations when we get to 70, do you also account for a standard error of measurement?

A.   When you're doing testing you have to account for the standard error of measurement, but what's relevant about two standard deviations if you look at the curve that's there is that a very small percentage of the population, approximately two percent of the population, 2.2 percent of the population obtain scores that are two standard deviations below.

In approximately two standard deviations above the mean, the scores of 130 and above, and only about two percent of the population obtained those scores.  That's the relevance of the form of the curve, the percentage of people, the number of people that obtained those scores.

Q.   Okay.  So going back to the WAIS-IV, did you ultimately arrive at a full-scale IQ score after you scored the WAIS-IV?

A.   I did.

Q.   Okay.  And what is that -- what was the score that you obtained on the WAIS-IV?

A.   The standard score was 74 but you don't report a standard score because of what's called the true score. You can never know what the true score of a test is because there's different conditions that may change the

scores that you obtain.  So theoretically speaking if you were to test somebody multiple times they would obtain different scores.  And you can say to a -- you can use a one standard error of measurement or two standard errors of measurement to determine where you want -- what the range is of the score -- where the true score would fall.

So in this case we can say that the full-scale IQ score is 74 but we can be 95 percent sure that if we were to test and retest this individual theoretically without the individual learning anything from the testing that score would fall somewhere between 70 and 79.

Now that's a statistical calculation and it's obtained -- that's obtained -- I obtained this from the tables on the manual.  But the American Association of Intellectual and Developmental Disabilities and the DSM-5 suggests that instead of going through the process of calculating each time what the score is, use approximately plus or minus five points to obtain that range of scores in which -- so in this case would be 69 to 79.

Q.  So you get a standard -- a full-scale IQ score. In this case it was a 74 and built -- once you -- after you get that score then you calculate for the standard

error of measurement; is that correct?  Is that what you're saying?

A.  Yes.

Q.  And that is plus or minus five.

A.  That's the agreement that the AIDD says it uses, plus or minus five.  It may be a little bit more one way or the other.

Q.  But you have to apply that based on the diagnostic criteria; is that correct?

A.  Well, you have to apply it because if you don't apply it you don't know where the range is in which the true score would fall.  And you never know the true score.  The score you obtained is not true in the sense that, you know, maybe the person was feeling better today than the last time he was tested or feeling worse or had some issues.  So there's a lot of reasons why an IQ score can be affected.

Q.  Okay.  And when you apply the standard error of measurement in Mr. Rodriguez's case which you're required to do under the diagnostic criteria, you determine that Mr. Rodriguez's IQ score on the WAIS-IV is between 69 and 79?

A.  That's correct.

Q.  Okay.  Now in your report -- and let me just back up.  Is a score -- an IQ score of 69 to 79, does that

satisfy prong one of the diagnostic criteria for intellectual disability?

A.  Yes, of course it does.

Q.  Okay.  Just below your chart when you're talking about the scoring on the WAIS-IV you mention the Flynn Effect; is that correct?

A.  Correct.

Q.  And if I could direct your attention to page 11 -- well, actually maybe in your own words if you could just explain what the Flynn Effect is.

A.  Dr. Flynn is a scientist that has done a lot of research and his research has been reproduced in 23 different countries.  And what he found is that the quotients of intelligence tend to increase in the population over time.  And he calculated that and came to the conclusion that there's approximately .33 points, or one-third of a point, for every year, which means 10 years after the test was normed, not published but normed, the score would be three points lower or three points higher, depending on what you're measuring.

But the point is that if you have -- if you think about it if the mean is 100 in a test that was normed 10 years ago, 10 years later the mean of that particular test, if you were to use it, would be 103.

Q.  Okay.  I think we can just step back for a

second.  Just to clarify this a little bit, you used the word "normed."  And when you said the Flynn Effect it depends on when a particular IQ test was normed; is that right?

A.  That's correct.

Q.  Okay.  So maybe you could describe for the Court what it means to -- what "norms" mean and how you norm a test.

A.  What "norms" mean is that you take a population, the number of people that you give them the test and you obtained their scores.  And those scores then you calculate them or you put them into a distribution.  And again by definition 50 percent of the scores will fall below 100 and 50 percent of the scores will fall above 100, or below and above the mean, whatever the mean you choose to choose.

Q.  So norms get you to a place where you know -- it gets you to a mean so you can compare somebody's test score with a mean to be able to determine whether or not they're average or below average or above average?

A.  It gets you to where you find out what your test is measuring as a distribution of the population.  If your sample is correct that will include all the people in the population.

So, for instance, the WAIS-IV is based on

approximately 4,000 individuals that were tested that follow the same distribution of the census, which means that if the census says there's 50 percent females and 50 percent males then they take 50 percent females, 50 percent males.  If the census say that of the United States 10 percent of the population is Hispanic, then it includes 10 percent of those 4,000 are Hispanics.  If the means -- if the census say that 32 percent of the people are between the ages of 40 and 50, then you have 32 percent of the 4,000 people that you're using being from this particular age.

Q.  So it's a snapshot -- essentially it's a snapshot of the demographics.

A.  It's a sample of the demographics, yes.

Q.  Okay.  And so under the Flynn Effect a test like the WAIS-IV is normed a particular year; is that accurate?

A.  It's usually normed --

Q.  Is that the first step?

A.  It takes about two years to norm a test so if it's published, let's say, in 2012 that means it was normed in 2010.

Q.  And under the Flynn Effect after a test gets normed essentially the population -- does the population get smarter or gets better at IQ tests?  How does that

work exactly?

A.    I don't know if it gets smarter.  Probably to some extent in some issues it gets smarter.  But the population's IQ scores increase and that's what Dr. Flynn found and was reproduced in many countries around the world.

Q.    So if you administer the WAIS-IV to somebody 10 years after it's normed, all right, and under the Flynn Effect you have to deduct basically .33 of a point for every year, you would then deduct three points from the full-scale IQ score?

A.    If you're testing somebody with an instrument that is 10 years old normed, 10 years old, yes.

Q.    And what was -- when you applied the Flynn Effect in Mr. Rodriguez's case, did that affect the IQ score of Mr. Rodriguez from the WAIS-IV?

A.    Yes.  If you applied the Flynn Effect I think what I have here is that the IQ score would be 70.

Q.    Okay.  So it's 70 and that's before you factor in the standard error of measurement?

A.    Correct.  So that score would fall somewhere between 65 and 75.

Q.    Okay.  So when you account -- when you take Mr. Rodriguez's full-scale IQ score of 74 and pursuant to the diagnostic criteria set forth in the AAID and the

DSM and you first apply the Flynn Effect, that takes you down to a 40, all right -- or a 70, I'm sorry.

A.   Seventy.

Q.   Seventy to 80.  And when you account for the standard error of measurement, which is plus five or minus five, what is the final IQ score that you arrived at for Mr. Rodriguez?

A.   It's not 80.  It's 65 to 75, not 70 to 80.

Q.   I'm sorry?

A.   Let me just correct that.

Q.   Thank you.

A.   So it's 65 to 75, that's the range, which means that you can be 95 percent sure that the true score this person would obtain in an IQ test score would be between 65 and 75.

Q.   And does the score -- and IQ score of 65 to 75, does that fall within the diagnostic criteria for prong one of somebody who's intellectually disabled?

A.   Certainly.

Q.   Now you mentioned that you conducted the WAIS-IV in Spanish; is that correct?

A.   I used the Spanish version in terms of the form that I used and in terms of the instructions. Instruction manual is in Spanish.

Q.   Okay.

A.   Because of his -- he asked me to interpret or translate some of the instructions into English, which I did, and some of the questions posed to him in English, which I did.  And even though I was asking him questions in Spanish sometimes he would answer them in English and I would record them as his answers were in English.

Q.   So if he had any trouble with a question in Spanish, you would translate it to English so he would understand it?

A.   I would translate the instructions or the question but I would not explain it to him.

Q.   Okay.  Because you're not supposed to explain questions when you're administering IQ tests; is that correct?

A.   That is correct.

Q.   If you would have administered the test in English and someone didn't understand the question, you wouldn't explain it to them; is that right?

A.   I wouldn't explain the question but if they didn't understand because of language, let's say somebody that is more fluent in Spanish but the question was in English, I would translate into Spanish.

Q.   So the real issue isn't whether or not you understand the language as long as it's properly translated.  The real issue is -- for determining IQ is

whether or not someone has the ability to understand the question and then answer it; is that right?

A.   Right.

Q.   Okay.   Now in -- when you scored the WAIS-IV, did you use -- what norms did you use?

A.   I used the U.S. norms.

Q.   Are there Mexican norms?

A.   The Mexican version of the WAIS-IV there's three steps to it, okay?  There's three steps to having a test being in a different country.  The first one is the translation and those three steps are independent.  So the translation is independent from the norms.

Once you obtain the translation because the people that you're going to test don't understand English or it's not their dominant language, then you make sure that the tests -- the items that you're going to give them in the test follow a certain order because you want the order to be from easier to harder.

And maybe, for instance, just to give you an example, in English the word "love" may be more difficult or considered to be more difficult than the word "bed," but maybe in Spanish it's not.  So you want to make sure that in Spanish also the word that you're going to ask him to give you a definition for follows a particular pattern.  So that's one of the adjustments

that you have to make.

Then some items --

Q.   And just to back up did you do that when you administered the Spanish version of the WAIS-IV?

A.   No, I did not.  When I -- I'm not sure what your question is though.  What I did is I just used the form and I asked him the questions.

Q.   Okay.  Is that because the Spanish version of the WAIS-IV is essentially the same as the English version of the WAIS-IV?

A.   It's practically identical because the translation is just the translation.  It's just -- in fact, if you read the manual and now you have a copy of it with me, what you will see is that the preamble or the preface is just a translation of the history of the Wechsler test.  It's exactly what the U.S. says.  And the only caveat there is that it states that this translation is done with permission of the publisher in the United States.

Q.   Okay.  So the Mexican version is the same as the English version for the most part with the exception of it being in Spanish.

A.   There's some very minor differences and, for instance, there's a subtest called "Information," okay?  And that is -- the information has to do with people

understanding or knowing things that they should have learned in school.

So the English version has a question, for instance, of who was the president of the United States during the Civil War?  Now people that went to school in Mexico wouldn't know that necessarily if they didn't study any U.S. History.  So that particular question is not only translated but it's changed into who was the president of Mexico during the War of Reform?

But that's just one question.  I don't think there are any other questions that -- other than that that change between the translation of one or the other.

Q.   So when you administered the test to Alfonso Rodriguez, did that particular question, the one question that you indicated is really one of the only differences between the two tests, did that question ask:  Who is the president of Mexico or something along those lines?

A.   You know, I don't recall because it's not one of the easier questions.  I don't recall if he got all the way up there.  But if he got all the way up there I would have asked him the question in English:  Who was the president of the United States during the Civil War because --

Q.   Which is the question that appears on the English

version of the WAIS-IV?

A.   That's correct.

Q.   Okay.  So when it came time to scoring it, did you apply the Mexican norms or did you apply the American norms to determine Mr. Rodriguez's full-scale IQ score?

A.   I believe you always have to apply the U.S. norms.

Q.   Okay.  And why do you believe that you should apply the U.S. norms to Mr. Rodriguez specifically as opposed to the Mexican norms?

A.   Mr. Rodriguez was not born in Mexico. Mr. Rodriguez's primary language is not Spanish. Mr. Rodriguez never lived in Mexico.  Why would I compare him to a Mexican population?  That's half of it.

         The other half is Mr. Rodriguez -- the purpose of the evaluation is contextual.  In other words we want to evaluate him to determine whether he fulfills the definition of "intellectual developmental disability" in the United States because he is being judged according -- he committed a crime for which he is being punished and judged in the United States, not in Mexico.  So there's no reason to compare him to the Mexican population.

Q.   It sounds like from what you were saying earlier

that the American norms of the WAIS-IV would have already accounted for somebody like Mr. Rodriguez, somebody who was an American citizen but came from Mexican-American linage; is that accurate?  When that test is normed it takes into account like the whole of the American population including, you know, somebody who might be of Mexican-American ancestry?

A.    Of course, because they're part of the census.

Q.    Would the Mexican norms take into account an American who never lived in New Mexico?

A.    The Mexican norms?  No.

Q.    The Mexican norms wouldn't have anything to do with Mr. Rodriguez or his life?

A.    None whatsoever.

Q.    And is that why you wouldn't -- in part why you wouldn't apply the Mexican norms?

A.    No, I wouldn't.

Q.    And if you applied the Mexican norms, would you get a skewed outcome?

A.    I haven't done the full analysis of the Mexican norms but if you compare -- I did compare on the WAIS-III the test -- the WAIS-III was published in Mexico, was published in Puerto Rico, was published in Spain and was published in the United States.  And if you compare those four norms you obtain a higher score

with the same correct answers in Spain than you do in the United States, but you obtain a higher score in the United States than you do in Mexico and you do obtain a higher score in Mexico than you would in Puerto Rico.

Q.   So is it fair to say if you would have applied the Mexican norms you wouldn't be as confident as you would as applying the American norms that the ultimate full-scale IQ that you got from Mr. Rodriguez was accurate or close to accurate?

A.   If I didn't know what the difference would be between the Mexican norms and the U.S. norms, I wouldn't have any way to know what his close-to-true score would be because I wouldn't be able to transfer one score to the next.

Q.   Okay.  And you applied the American norms because you thought that would be closest to the true score?

A.   I applied the U.S. norms because Mr. Rodriguez lives in the United States, grew up in the United States, went to school in the United States, was born in the United States.  I have to compare him to the U.S. population.  In addition to which the purpose of the evaluation is to determine whether he fulfills a definition in the United States.  So there's no reason whatsoever to use Mexican norms in this case.

Q.   And so that's why you used the American norms?

A.   That's correct.

Q.   Moving on from the WAIS-IV, there were two other IQ tests that you administered that you talked about, the TOGRA and the CTONI-2?

A.   Yes.

Q.   And you've talked about those tests but I just want to ask you about the scores that you obtained.  So did you obtain a full-scale IQ for the TOGRA?

A.   Equivalent of a full-scale IQ.  It's not a full-scale IQ score.

Q.   What was the equivalent score that you obtained from administering the TOGRA to Mr. Rodriguez?

A.   Seventy.

Q.   Okay.  Is that -- is there a Flynn Effect that you apply to the TOGRA?

A.   Yes, because it was published before the time I tested him and was normed before the time I tested him so I calculated the dates -- approximate dates where it was normed and the Flynn Effect correction was approximately two points.

Q.   Okay.  And so that would take you to a 68?

A.   That would take you to a 68 with five plus or minus points, which would be a 63 to a 73.

Q.   And a 63 to 73, does that IQ score meet the diagnostic criteria for satisfying prong one of ID?

A.   Of course it does, yes.

Q.   And what about the CTONI-2?

A.   The CTONI-2 requires nonverbal participation and it's really what's measuring, with the use of pictures and with the use of geometric figures, abstract reasoning which is --

Q.   And did you obtain a -- I'm sorry.

A.   Which gives you an equivalent to -- an ability that individuals have to think in a way -- in a rational manner.

Q.   Okay.  And did you obtain a full-scale IQ score from the CTONI-2, the equivalent of the full-scale IQ?

A.   Yes.

Q.   Okay.  And what was that?

A.   That was a 64.

Q.   And did you apply the Flynn Effect to the CTONI-2 full-scale IQ score?

A.   If you apply the Flynn Effect, it's approximately five points less.

Q.   And so what would the range of Mr. Rodriguez's full-scale IQ score be -- I'm sorry, what would the range of Mr. Rodriguez's IQ score be on the CTONI-2?

A.   Would be 54 to 64.

Q.   And does that score satisfy the diagnostic criteria for intellectual disability and in particular

prong one of intellectual disability?

A.   Most certainly, yes.

Q.   And IQ scores that you obtained from these three separate tests, are they -- would you say that they're more or less consistent with one another?

A.   They're comparable to one another and, in fact, if you look at the range they overlap in the range of scores.

Q.   Okay.  Moving along you had mentioned earlier that Mr. Rodriguez -- you considered for Mr. Rodriguez IQ scores that -- an IQ test that had been administered to him since he was a kid.  Is that fair?

A.   I looked at the scores that he had obtained before, yeah.  In all the testing that he had done before, yes.

Q.   I'd like to point your attention, Dr. Weinstein, to Exhibit 13.  I think it's up there, Dr. Weinstein.  I'm directing your attention to Exhibit 13.  You had an opportunity to review Mr. Rodriguez's school records from Crookston; is that correct?

A.   Yes.

Q.   All right.  And did you notice when you reviewed these records that Mr. Rodriguez was administered the Kuhlmann-Anderson test on multiple occasions?

A.   Yes, three occasions I think.

Q. Yes. And those scores that were -- well, first let me ask you this: What is the Kuhlmann-Anderson? Is that an IQ test?

A. It is but it's a group test. It's not an individually-performed test.

Q. But the end result is it obtained an IQ score; is that accurate?

A. Yes.

Q. Okay. And when Mr. Rodriguez was administered the Kuhlmann test, the scores that he received were -- in 1961 he received a 77; in 1963 he received an 80; in 1963, the fall of 1963 he received a 79; and the last time he was administered the test in October of '65 he received a 74 IQ score on the Kuhlmann-Anderson. Does that sound accurate?

A. Yes. It's right here on page -- on the second full page of Exhibit 13 and has a number underneath that says "IC0002614."

Q. And would you agree that the age range from when he was administered these tests, September of '61 to October of '65, his age range was from eight years old to 12 years old?

A. Yeah. I think he was born 1953.

Q. Okay. And these scores as they existed at the time that the testing takes place, under the standards

at that particular time, did they place Mr. Rodriguez in the mental retardation range?

A.   At the time he was tested, the IQ score that the AAIDD or at that time AAMR suggested to use as a cutoff point would be 85, which was one standard deviation below the mean, not two.

Q.   And so under each of these test scores Mr. Rodriguez met the diagnostic criteria at the time for mental retardation; is that right?

A.   Yes, because at this time the AAMR did not require the adaptive behavior deficits as part of the definition.

Q.   So back at that time it was just strictly IQ score.  Nothing else matters.  You were either above or you're below.  You're either mentally retarded or you're not based on the IQ score; is that right?

A.   That was contained in the definition.  That was the research that was done.  A score of 85 gives you 60 percent, which means 60 percent of the population would obtain that.  And then through research they found out that that was over-classifying individuals that should not be classified as intellectually disabled or mentally retarded.  And, therefore, they changed it from one standard deviation to approximately two standard deviations.

Q.   Are the scores that Mr. Rodriguez received on the Kuhlmann-Anderson test as of trial, are they consistent with the scores that he received on the WAIS-IV, the CTONI and the TOGRA that you administered?

A.   Yes, they are.

Q.   Are you familiar with the WRAT?

A.   Yes.   That's Wide Range Achievement Test.

Q.   And is the WRAT a test that is routinely administered?

A.   It's routinely administered in psychological evaluations.   It's not necessarily routinely administered in school settings.

Q.   Okay.   And what does the WRAT test for?

A.   Well, as I mentioned the WRAT stands for Wide Range Achievement Test.   So what it's attempting to test or what it's attempting to give you is a score that relates to the ability of the individual to conduct academic skills or to have academic skills in reading, writing and arithmetic.

Q.   Okay.   And you're aware that Mr. Rodriguez has been administered the WRAT on multiple occasions; is that right?

A.   That's correct.

Q.   Specifically in Exhibit 18 Mr. Rodriguez was given the WRAT -- strike that, Your Honor.

Your Honor, could I have the Court's indulgence for one moment?

THE COURT:  You may.

MR. MONTROY:  Your Honor, may I approach the witness?

THE COURT:  You may.

MR. MONTROY:  Thank you.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, I'm handing you Exhibit 48 (indicating), and would you identify this document as a demonstrative exhibit of different WRAT scores that Mr. Rodriguez has obtained collected from the records?

A.  At the top it says "WRAT-Type Scores."  Although, in the -- not all of the scores contain -- are related to the WRAT.  Like the first score contained here is based on the Peabody.

Q.  The second score that's contained in Exhibit 18, which is a report from the Minnesota Department of Corrections and it was a WRAT that was administered on September 8, 1980?

A.  According to this record, yes.

Q.  According to this record, yeah.  And you had an opportunity to -- well, strike that.

The second -- after the Department of Corrections, that is contained for the record in

Exhibit 24.  It says "Froming - Trial Report."  And that was the WRAT3 that was administered on June 27, 2006?

A.  That's what it says here and I recall Dr. Froming doing that.

Q.  You had an opportunity to review Dr. Froming's report, right?

A.  Yes.

Q.  Okay.  And then below Dr. Froming subsequently determined that she'd made a scoring error on the WRAT.

A.  Yes.

Q.  And then filed a declaration on October 13, 2011. You had an opportunity to review that as well, did you not?

A.  Yes.

Q.  And Dr. Seward administered the WRAT on August 31, 2013?

A.  Right.  But I must clarify that even though it's the WRAT it's different iterations of the WRAT.

Q.  And we can talk about that.  And then you administered -- on the second page you administered the WRAT on November 30, 2018?

A.  Correct.

Q.  If you could just take a moment to review these scores.

A.  Let me correct you.  I did not.

MR. REISENAUER:  Your Honor, if I may interrupt.  This exhibit hasn't been entered yet and I may have some questions.

THE COURT:  All right.  Exhibit 48, I assume you intend to offer it?

MR. MONTROY:  I'm sorry, Your Honor, if I can just have the Court's indulgence.

I'm sorry, Your Honor.  On this Defendant's Exhibit 48 I identified one of the exhibits as being previously identified as Exhibit 18, the Department of Correction Classification Summary.  It's actually 14.

THE WITNESS:  Can I correct something?

THE COURT:  Hold on, wait a minute.  At this point the document has not yet been offered and I assume you intend to offer it?

MR. MONTROY:  Yes, Your Honor.

THE COURT:  And do you have an objection?

MR. REISENAUER:  With the clarification, Your Honor, we have no objection.  But there isn't a question posed to the doctor yet.

THE COURT:  Exactly.  It's received.  And now put a question to the witness, please.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, did you have a chance to look at Mr. Rodriguez's WRAT scores?

A.  I do.  I just wanted to correct the fact that I

tested him on August 9, 2018; although, my report is dated November 30, 2018 so --

Q.    Okay, thank you.

A.    -- the actual testing was done on 8/9/2018, not on 11/30/2018.

Q.    It was just reported on November 30, 2018; is that right?

A.    It's contained in my report, yes, those scores.

Q.    And my question to you is:  Just having reviewed this demonstrative exhibit and the underlying exhibits from which these scores are pulled, what do the results on these tests say to you about Mr. Rodriguez's academic achievement?

A.    Well, with the exception of one score that was obtained from Dr. Seward, they all fall below the sixth grade level or around the sixth grade level.  In other words that his reading or recognition of words, his arithmetic and his spelling is at the sixth grade level or below.

Q.    Okay.  So when he was administered the test in 1980, he was in the sixth grade level in reading and the fourth grade level in math and how old was he in 1980?

A.    He was born in '53 so approximately 17.

Q.    I think he was older than that.

A.    Twenty-seven.

Q.  Yeah, 27.

A.  I'm sorry, my math is faulty.

Q.  Mine as well.  So he was born in 1953 so he would have been -- so at that age he was -- he was in the sixth grade reading level and the fourth grade math level?

A.  Yes.

Q.  In 2006 when Dr. Froming gave him the test, he was in the sixth grade equivalent for reading, the fourth grade equivalent for spelling and the seventh grade level for arithmetic?

A.  And then she corrected that arithmetic score and brought it down to the second grade level.

Q.  Okay.  And then Dr. Seward administered the test and for word reading he was a sixth grade level and then for sentence comprehension he was a 10.9 grade level. And you had I think referenced that when I first asked you the question that that result is -- differs from the other ones.

A.  That's the only result that differs.  And when I rechecked it, his scoring, there was I think a mistake that he actually had a question mark on and I don't think he should have given him credit for that score. And in this particular case one -- I don't know.  I have to go back and look at the manual, but one point may be

the difference between one grade and the next grade.

Q.   So it's possible that that score is inflated due to a scoring error; is that accurate?

A.   Yes.

Q.   Okay.

A.   But it's also what's called an outlier, meaning compared to all the other scores obtained from four different people or four different testing is much higher than the rest of the other scores.

Q.   Because even in Dr. Seward's other testing he received a 3.5 grade equivalent in spelling, a 6.9 equivalent in math computation.  The reading score got cut off there.  And then in your testing --

A.   Sixth grade level in reading -- in reading without comprehension.

Q.   And that's in Dr. Seward's report, sixth grade reading?

A.   Yeah, this is right here.  The first thing, word reading, sixth grade score.

Q.   And then in your -- when you conducted the test in August of 2018, word reading was a fourth grade equivalent, sentence comprehension was a fifth grade equivalent, spelling was a second grade equivalent, math was a fifth grade equivalent?

A.   Correct.

Q.   So are the scores that Mr. Rodriguez has obtained on the various times that he has been given this test more or less consistent?

A.   I think they're very consistent with the exception of that outlier that makes it look like he has a higher level reading comprehension than what I tested him for and it's possible that that's true.  But it's slightly inflated I think.

Q.   Okay.  And on page 14 of Exhibit 44 of your report where you lay out your scores from when you administered the WRAT, underneath those scores you write:  "The scores reflect Mr. Rodriguez' academic difficulties and support the diagnosis of IDD."

So is that your opinion today that Mr. Rodriguez's scores over the years on the WRAT support the diagnosis of ID?

A.   Yes.  The scores that I obtained would support it because as I mentioned before research shows that people with ID have an academics ability below the sixth grade level, which all the scores I obtained were below the sixth grade level.

Q.   And are the WRAT scores, are they consistent with the Kuhlmann-Anderson IQ tests that were administered?

A.   They're consistent but they're measuring different concepts or constructs.

Q.   Do the WRAT scores corroborate the IQ scores that you obtained when you administered IQ testing in Mr. Rodriguez and the Kuhlmann-Anderson scores?

A.   I'm not sure I understand the question.

Q.   All right.  Does the fact that Mr. Rodriguez consistently underachieved on the WRAT testing, do those scores -- that underachievement, does that in any way corroborate the IQ scores that you obtained?

A.   They're consistent with it.  They're not supportive of it.  I mean, they don't support the numbers because they're testing different concepts.  But they are consistent and they're also consistent with the scores he obtained -- with the grade scores that he obtained in the different subjects that he was taking in school and with the fact that he couldn't pass the ninth grade.

Q.   So let's move on to that.  You're familiar with Mr. Rodriguez's academic history; is that correct?

A.   Yes.

Q.   And you reviewed his records, his school records?

A.   I did, yes.

Q.   Is Mr. Rodriguez's academic history consistent with someone who is intellectually disabled?

A.   I think so, yes.

Q.   And you had mentioned that he failed multiple

grades?

A. As far as I recall, he failed the second -- the first and the second grade. He repeated those and then he did -- he twice tried to pass the ninth grade but he couldn't.

Q. And the second time that he failed ninth grade he was 18 years old?

A. He was 18 years old and he quit school.

Q. Did you have an opportunity to review the IQ testing that was done by Dr. Froming and Dr. Seward?

A. I did, yes.

Q. And let's talk about Dr. Froming. Dr. Froming administered the WAIS-III prior to trial; is that correct?

A. Yes.

Q. And you had an opportunity to review Dr. Froming's test data; is that right?

A. Yes.

Q. And those materials were provided to you prior to your evaluation and report in this case?

A. Yes.

Q. Does the listed IQ score of 87 on Dr. Froming's report properly reflect her testing data?

A. I think she -- no. She wrote a declaration saying that she made some mistakes in scoring it. I

have noticed those mistakes of scoring and she corrected it.  I think it boiled down to an 84.

Q.   So her testing brought the score down to an 84 and do you recall if Dr. Froming applied the Flynn Effect?

A.   I don't recall that she did, no.

Q.   And when you applied the Flynn Effect, did you arrive at a full-scale IQ score of 81 or an IQ score of 81 I should say?

A.   At best, yes.

Q.   Okay.

A.   Between 80 and 81 so the scores would be somewhere between 75 and 85.

Q.   And so we just talked about the Flynn Effect and earlier you talked about Dr. Flynn who the Flynn Effect is named after?

A.   Correct.

Q.   I'm going to turn your attention to what was marked -- previously marked as Defense Exhibit 2.  Do you have Exhibit 13 up there?  I'll put it back.

         Dr. Weinstein, do you have Defense Exhibit 2 in front of you?

A.   Yes.

Q.   And does this appear to be an article by Dr. Flynn?

A.    Yes.    I think that is an article by Dr. Flynn.    I am familiar with the article, yeah.

Q.    And is this an article that appeared in the journal of American Psychological Association?

A.    It's one of the different journals that the American Psychological Association publishes, yes.

Q.    And this one is dated in May of 2006; is that right?

A.    Yes.

Q.    And you would agree with me that it's titled "Tethering the Elephant:    Capital Cases, IQ, and the Flynn Effect"?

A.    Yes.

Q.    Will you please turn to page 178 of the article.

A.    178?    Yes.

Q.    And if you could please turn your attention to the underlying language that's about two-thirds of the way down the page.

A.    Okay.

Q.    And do you see where it's talking about the WAIS-III?

A.    Yes.

Q.    And the WAIS-III is that test Dr. Froming administered; is that correct?

A.    That's correct.

Q.  Of Mr. Rodriguez?

A.  Yes.

Q.  And he says -- Dr. Flynn writes there that there were problems with the norming of the WAIS-III in particular; is that right?

A.  Correct.

Q.  And so just to read what Dr. Flynn writes:  "It is clear that the WAIS-III inflated IQ scores by about 2.34 points even at the time it was normed.  That is, its normative sample was a bit substandard compared with other IQ tests, and therefore, its average performance was easy to beat."

A.  "Easier to beat."

Q.  "Easier to beat," I'm sorry.  Do you see that?

A.  Yes.

Q.  And then if you could just continue and turn to page 179.

A.  Yes.

Q.  If you could look at that underlying language at the end of the first paragraph.

A.  All right.

Q.  And in that section in that language do you see that Dr. Flynn gives instructions as to how to apply the Flynn Effect to a WAIS-III score?

A.  Yes.

Q.   And first Dr. Flynn instructs:  "Deduct .33 IQ points per year from the scores of defendants for every year that passed between when the test was normed and when the test was taken."  Do you see that?

A.   Yes.

Q.   And that's the normal Flynn Effect, right?

A.   That's what the Flynn Effect suggests.

Q.   And when you did that in Dr. Froming's test you took it from an 84 to around an 81 when you applied the Flynn Effect, right?  So you did that so far.

Then in the next sentence Dr. Flynn instructs:  "Deduct an extra 2.34 points from the WAIS-III scores on the grounds that it gave inflated IQs even in the year when it was normed."

A.   Correct.

Q.   So, Dr. Weinstein, do you agree with Dr. Flynn's instructions when it comes to adjusting WAIS-III scores?

A.   I do.  Although, that was not suggested to be done by the AAMRD -- AAMR manual or the DSM-4.  Whereas, the Flynn Effect was contained in those and suggested to be adjusted.

So there is no literature that suggests you have to do that.  I agree with it.  You should do it.  But again because it's a -- you know, we're not talking of exact number.  It becomes more relevant when there's

a cutoff point than when there is no cutoff point.  And we don't have a cutoff point for the diagnosis of intellectual and developmental disability.

Q.   Okay.  And we're going to talk about that.  But just to focus on this one point about Dr. Froming's testing, when you apply the Flynn Effect and you get down to an 81, which you said was appropriate, and then you said that you would apply this additional deduction that Dr. Flynn talks about of --

A.   2.34.

Q.   -- 2.34, what is the IQ score of Alfonso Rodriguez based on Dr. Froming's testing?

A.   Will fall between 74 and 84.

Q.   Thank you.  And is that score in your opinion materially different from the score of 74 that Mr. Rodriguez obtained on the WAIS-IV last fall?

A.   No, it's the same score.

Q.   You're aware that Dr. Seward obtained a full-scale IQ score of 86 --

A.   Yes.

Q.   -- on the WAIS-IV?

A.   Yes.

Q.   And he did not apply the Flynn Effect, correct?

A.   He did not, no.

Q.   So if you apply the Flynn Effect the IQ score

would be 83; is that right?

A.   Eighty-three or 82, yes.

Q.   Eighty-two or 83.  And then with the standard error of measurement what would Dr. Seward score?

A.   Somewhere between 77 and 82.

Q.   Okay.

A.   I mean, an 87, I apologize.

Q.   I'm sorry?

A.   Between 77 and 87.

Q.   Thank you.  Do the DSM-5 and the AAIDD discuss limitations of IQ testing when determining if an individual meets the diagnostic criteria for intellectual disability?

A.   Yes.

Q.   And if you would just turn your report, Exhibit 44, to page 5 and this is the -- at the top of the page from the section that you copied from the DSM-5, I'm going to direct your attention to point A.

A.   Yes.

Q.   "Deficits in intellectual functions, such as reasoning, problem-solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing;" is that right?

A.   That's correct.

Q.   So it calls for -- the DSM calls for clinical assessment?

A.   Yes.

Q.   And the AAID, if you look to the green book, page 39 to 40, I'll read it but it's in the exhibit there if you want to look it up.  It's at the bottom of the page. Under the section "Determining a Cutoff Score, The significant limitations in intellectual functioning criterion for a diagnosis of ID is an IQ score of approximately two standard deviations below the mean, considering the standard error of measurement for the specific instruments used and the instruments' strengths and limitations.  It is clear from this significant limitations criterion used in the manual that AAIDD (just as the American Psychiatric Association, 2000) does not intend for a fixed cutoff point to be established for making the diagnosis of ID.  Both systems (AAIDD and APA) require clinical judgment regarding how to interpret possible measurement error. Although a fixed cutoff for diagnosing an individual as having ID is not intended and cannot be justified psychometrically, it has become operational in some states.  It must be stressed that the diagnosis of ID is intended to reflect a clinical judgment rather than an

actuarial determination.  A fixed point cutoff score for ID is not psychometrically justifiable."

Are you aware of that language in the AIDD?

A.  I am.  Although, I couldn't follow it in the book.

Q.  Okay.  But the DSM calls for clinical assessment and the AIDD explicitly says that there isn't to be an explicit cutoff IQ score for determining IQ; is that correct?

A.  Correct.

Q.  And the AAID also talks about using clinical judgment --

A.  Yes.

Q.  -- is that right?  So could you describe to the Court what "clinical judgment" is.

A.  "Clinical judgment" is the -- it's what a clinician should use to determine what their conclusions are.  And it's a well-thought rationalized, something that can be explained.  It's not just because I say so.  It's because X,Y, Z are consistent with my conclusion.  So in other words you have to have a rational explanation of your conclusion that other psychologists or other individuals of your profession should be able to follow.

Q.  Okay.  And did you exercise clinical judgment in

accordance with the guidelines that we just -- that I just read in assessing whether Mr. Rodriguez meets the diagnostic criteria of prong one concerning deficits in intellectual function?

A.  As a clinician you have to always use clinical judgment.  Tests are instruments that are used as tools. They're not determinative.  In other words you can't say:  Because the test says this, this is the result. You can look at the test and say:  Considering the test and everything else I know, this is my conclusion and this is why this is my conclusion.  And you need to be able to explain why that's your conclusion.

Q.  Okay.  And there's a lot more to Alfonso Rodriguez's potential intellectual disability than the scores that he obtained on the IQ testing; is that accurate?

A.  Absolutely.  I mean, it's the way he functions and the way he has functioned.

Q.  And what do you mean by that exactly?

A.  I mean, you have to look at the overall picture of who he is and what he's done in his life and how he's developed and how -- you know, in his case the most easy way to look at him is to compare him with what his siblings have achieved because that would theoretically control for the upbringing and the background and the

poverty and everything else.

So if the siblings were reared in the same environment as he was and like one of the siblings has two Master's degrees, another one has a Master's degree, another one is attempting to get a Master's degree, but all of them have high functioning jobs and are able to function in society but he could never do that, that would tell you that there's something unusually wrong with him not only because of his genetics and because of his poverty and because of his environment but because of whatever, who he is.

Q.   In your opinion would an IQ score in the 80s, for instance, rule out someone from meeting the diagnostic criteria of intellectual disability?

A.   Not an all.  There's some individuals with intellectual disability that have obtained high IQ scores and there's some individuals without intellectual disability that obtained lower IQ scores.

Q.   And so that's where a clinical judgment comes into play.

A.   That's correct.

Q.   Okay.  In your opinion does Mr. Rodriguez meet the diagnostic criteria to establish prong one of the intellectual disability diagnosis as defined by the APA and the AAIDD?

A.    In my opinion it does fulfill the criteria contained in the first prong.

Q.    Thank you.  Dr. Weinstein, moving away from prong one --

THE COURT:  Hold on, if you're going to move away from prong one, it's five minutes to noon.  I think we should break for lunch and come back.  We'll go ahead and start at 1:15 so we'll stand in recess until then.

MR. MONTROY:  Thank you.

(Recess taken; 11:55 a.m. to 1:20 p.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  The record should reflect that all counsel of record are present, that Dr. Weinstein remains on the stand and Mr. Montroy was conducting a direct examination.

You may proceed.

MR. MONTROY:  Thank you, Your Honor.

Q.    (Mr. Montroy continuing)  Dr. Weinstein, I want to talk about adaptive functioning and some of your initial findings.  Would you agree with this definition of "adaptive functioning" as expressed on page 43 of AAIDD, the 2010 book, quote,...the collection of conceptual, social, and practical skills that have been

learned and performed by people in order to function in their everyday lives.

A. Correct.

Q. And on page 33 of the DSM-5 the ability to, quote, meet developmental and sociocultural demands for personal independence and social responsibility.

A. Correct.

Q. So what is necessary in your opinion for prong two of the ID diagnosis to be satisfied?

A. What you've got to look for, because of the definition of "intellectual disability," is for the weaknesses, for the aspects of this individual's behavior that requires some kind of support. The overall purpose of the diagnosis of intellectual disability is to identify what kind of supports the individual needs in order to be able to function in society or to maximize their capacity to function.

So if they're capable of doing everything except one thing, then you focus on the one thing they can do. If they can't do anything independently, then you have to provide services or supports so they can do everything. But the point is you're looking for the issues that the individual has the inability to conduct in a fulfillment way, in a fulfilled way.

Q. And I believe you testified earlier -- well,

strike that.

When you say "weaknesses," is "weaknesses" another word for deficiencies or deficits?

A.   Correct.

Q.   Okay.  And under the diagnostic criteria the deficits to which you speak have to fall into one of three domains; is that accurate?

A.   That's what the research shows, that the necessary abilities to function adequately fall into one of those three categories, which are social, practical and conceptual skills.

Q.   Okay.  And those are the three -- those three domains are listed under prong two under the AAIDD's current guidelines; is that accurate?

A.   Yes.

Q.   And the DSM as well?

A.   That's correct.

Q.   And did you reach a conclusion as to whether Mr. Rodriguez met the criteria for prong two, significant deficits in adaptive behavior, of the ID diagnosis?

A.   I think he meets the criteria.  I think he clearly demonstrated deficits during his developmental years in all three areas.

Q.   In all three areas.  And just to be clear is

it -- you don't have to meet all three domains, right? You just have to show a deficit in one of the three domains.

A.   That's correct.

Q.   But you're saying that Mr. Rodriguez has deficits in all three domains?

A.   I believe so, yes.

Q.   Okay.  And before we talk about the three domains I want to talk, first of all, about risk factors.  Is it your understanding or your belief or your opinion that Mr. Rodriguez has a number of recognized risk factors for ID?

A.   When you look at Mr. Rodriguez's risk factors, the question becomes why wouldn't he be intellectual developmental delayed?  Not why he is not but why wouldn't he be with all the risk factors that piled up in his background.

Q.   And are there recognized risk factors for ID under the criteria?

A.   Well, there's a lot of literature about intellectual developmental disabilities but the DSM -- pardon me, the AAIDD manual has from research produced a table.  I think it's Table 8.8.

Q.   And is that the table that you included in your report?

A.    That's correct.

Q.    And that's located on page 9 of your report, which is Exhibit 44?

A.    Yes.

Q.    And before we discuss that report, you mention the AAIDD and there's a chapter on etiology and risk factors in the AAIDD; is that correct?

A.    Yes.

Q.    And I would just turn your attention to Chapter 6 of the AAIDD, page 57.

A.    Okay.

Q.    And at the very top of that first page is a section that sort of lays out definitions of "Etiology in the Diagnosis of Intellectual Disability," and I just want specifically one line.  It's the third line down. Starts out with "Diagnostic assessment and classification of the etiology consists of a description of all of the risk factors that are present in a particular individual and that contribute to the individual's present functioning and potential diagnosis of intellectual disability."

A.    Correct.

Q.    And what does that mean exactly?  What are risk factors and how do they factor in with the determination of whether or not somebody is ID?

A.  Well, they factor in that we -- you know, it's not sufficient to say this is what I believe.  But the big picture is provided by the risk factors and by how the individual -- or what it's called, validity, which is what the individual is able to do in real life.  But the risk factors give you an historical group of data or information, data points, that allow you to say:  Well, makes sense that this person behaves the way he behaves because he was exposed to X, Y, Z.

Q.  So there's a correlation between risk factors and the presence of an ID diagnosis; is that fair to say?

A.  I don't know of any studies that have conducted correlations between those two factors, but I agree if you're using the word "correlation" as -- if you find the risk factors it must be -- you know, it's like if it looks like something it must be something.  A correlation is a statistical --

Q.  Is there a better way of saying it than by saying there's a correlation between risk factors and ID or maybe a more scientifically accurate way of --

A.  Well, I think correlation is a scientific concept and that's why I was asking if -- I don't know of any scientific studies.  That doesn't mean they don't exist.  I just don't know about them.

But what you're saying I agree with is that

if many risk factors are present then it's more likely than not that the condition exists than if there are no risk factors whatsoever.

Q.   Okay.   And the chart that you included on page 9 of your report, that's the same chart that's found on page 60 of the AAIDD book, 11th Edition, right?

A.   I think so, yes.

Q.   So you were applying the contemporary criteria when you were determining whether or not Mr. Rodriguez has risk factors for ID?

A.   Yeah.   It's the exact same table.

Q.   This is related to the question -- I'm tentative to use the word "correlate" but is the presence of risk factors -- is there a correlation between the presence of risk factors and the presence of deficits in adaptive behavior, or is it the same -- is it the same -- basically the same question that I asked you before?

A.   Well, it's not the same question but the risk factors would suggest that, you know, there are certain areas where you would find some deficits, yes.

Q.   And you had mentioned that there are quite a few risk factors in Mr. Rodriguez's history; is that right?

A.   Many.

Q.   Okay.   And if you could turn your attention to page 10.

A.   Of my report you mean?

Q.   Of your report.  And at the top of the page you address some of the risk factors that you took note of in Mr. Rodriguez's life.

A.   Correct.

Q.   And so what are some of the risk factors that you found to be present in Mr. Rodriguez's life?

A.   Well, the first one -- and many of the risk factors are well correlated in this case.  There are studies that show that with brain development, how the brain develops.  So malnutrition, for instance, is a risk factor for ID but it's also well correlated with poor development, brain development.

Q.   And so let's take that malnutrition.  You observed in the interviews that you did or the records that you reviewed evidence of malnutrition in Mr. Rodriguez's life?

A.   From very early on in life he experienced malnutrition.  When he was born he was not able to digest the mom's milk and he was basically starving.  So for a few months they fed him just rice water till eventually he was able to digest some more nutritious foods.  But that six-month period in which he was not fed properly and was starving is critical for brain development.

Q. Okay.

A. Then later on in life when the family was very poor and moving into a different area, they lacked enough food for the family and he was not eating properly or sufficiently.

MR. MONTROY: Your Honor, may I approach?

THE COURT: You may.

Q. (Mr. Montroy continuing) Dr. Weinstein, I would like to turn your attention to Defendant's Exhibit 8. Do you have that document in front of you?

A. I do.

Q. And it's titled "Memorandum;" is that right?

A. Yes. It looks like it's a memorandum written by Angela D. Daniel.

Q. And the subject is it's an "Interview of Delores Rodriguez on June 29, 2004"?

A. Correct. And Delores is Mr. Alfonso Rodriguez's mother.

Q. And I turn your attention to the second paragraph at the bottom of the first page and the memorandum states in the third or fourth sentence: "At that time they lived at 2019 Lee Avenue in Laredo, Texas. For the first five months of her pregnancy she worked as a beet puller at Roland Breed Farm. Pesticides were sprayed on the fields while she worked. She described that she was

very depressed at that time because the family didn't have enough food or money and it was hard working out in the cold and rain.  Alfonso, Jr. was born on February 18, 1953 at Mercy Hospital in Laredo, Texas. He had been carried to term and it was a normal vaginal delivery.  As an infant, Alfonso had diarrhea and was very fussy.  He would cry throughout the day and night until it was discovered that he was 'starving to death' on the rice water formula that he was being fed."

And, Dr. Weinstein, my question to you is: Are there risk factors for ID that you would identify in that particular passage?

A.  Well, there's several.  I mean, one is certainly the malnutrition.  Another one is the poverty that the family experienced.  The third one is exposure to what's called teratogens, which is toxic substances that affect the brain development of a child and affect the brain of an adult.

Q.  Okay.  And how is poverty a risk factor?

A.  Poverty's a risk factor because it combines, if you may, with some of the other factors.  Like if you're -- you don't have enough food because of poverty, that's going make it lead to malnutrition.  If you don't have a good place where you can stay with shelter that would be exposed to certain circumstances, that would be

deleterious for the development of a child.

So poverty has to do with the ability to provide adequately for children. And when you have a lot of poverty, when there's poverty in the family, it becomes a primary need to provide food and not necessarily take care of the emotional needs of a child.

Q. And you mentioned exposure to neurotoxins; is that correct? Did I say that right?

A. Yes. Neurotoxins are teratogens. Teratogens are neurotoxins, meaning that they affect the brain of a person.

Q. And how was that a risk factor for ID?

A. Well, you know, if you poison a brain that's not going to -- if you're killing cells in the brain and the brain doesn't have the ability to connect the different avenues of the brain because they don't have enough cells, that's going to produce deficits.

Q. What about abuse and neglect, is that a risk factor for ID?

A. Yes. There's substantial literature about how a child reacts to abuse and neglect. Without proper emotional support and stimulation, the child's brain will not wire properly.

Q. And is there in Mr. Alfonso's case, in his life, is there evidence of abuse?

A.    There are reports from him and other sources that the father was physically abusive towards particularly the boys.  He was also abusive verbally and physically towards the mother.  And there was evidence of neglect in that both parents had to go out to the fields and work and he was left by himself.  So that's neglectful.

Q.    What about sexual abuse, would that constitute a risk factor?

A.    Sexual abuse is a major risk factor because again there's literature that shows that a child that's exposed to sexual abuse at an early age will suffer some developmental -- a brain dysfunction, developmental problems.

Q.    And did you note evidence of sexual abuse of Mr. Rodriguez in this particular case?

A.    He reported -- personally his sister reported it. His mother and his other sisters stated that after he was involved in the first incident at a very early age of sexual misbehavior the sister reported to them that they had been molested and abused.  "They" meaning Sylvia the sister and Alfonso the brother.

MR. MONTROY:  If I could just have the Court's indulgence.

Q.    (Mr. Montroy continuing)  On page 10 of your report under risk factors you also note, quote, the lack

of adequate and timely intervention from educational and family support services.  Is that a risk factor?

A.  It's a major risk factor because early intervention will help the brain develop adequately.  In his case I think what happened is because he didn't have major control of the language the school assumed that his deficits were related to language more than to inability to learn.

Q.  There has been evidence presented both during this hearing and also in the records that Mr. Rodriguez had issues with alcohol and substance abuse.

My question for you is:  Do individuals who have ID frequently have problems with drug and alcohol abuse?

A.  I think individuals with ID that are not properly supported and they are not properly diagnosed and treated and provided with the necessary supports will be maladjusted.  And one of the characteristics of individuals with ID is their inability to socialize, to become healthy, to create healthy social contacts.

So isolation is one of the -- certainly leads to what we call in the profession self-medication, meaning that people are starting to use drugs and alcohol to ease their pain and discomfort.

Q.  So in Mr. Rodriguez's case did you see evidence

of him isolating himself, staying away from associating with other people, that sort of behavior?

A.   There is information regarding Mr. Rodriguez that he never adjusted to school.  He didn't have friends. He was shy.  He was withdrawn.  And he -- from several different sources, including declarations in my personal interviews, he did not want to be identified with the Mexican community because he felt that because he was Mexican he had been rejected and he was rejected by the Anglo community.

Q.   Okay.  If I could turn your attention to page 12 of your report, at the very -- very bottom, the last paragraph, second sentence, you write:  "He resorted to self-medicating with alcohol and mind-altering substances in order to function."

A.   I'm sorry, I'm looking at the wrong page.

Q.   Page 12.

A.   Yeah, correct.  And which paragraph you said?

Q.   The very last paragraph starting with "He was unable..."

A.   Correct.

Q.   And the second sentence you --

A.   Yeah, right.

Q.   So you found that in Mr. Rodriguez's case that, you know, as he withdrew he medicated -- self-medicated

with alcohol and drugs?

A. Yes. That's typically what happens with individuals, and according to him and the family Mrs. Rodriguez always suffered from depression from a very early age, and that seemed to be a familial kind of thing in terms of Mom was depressed and siblings are depressed.

Q. And that behavior -- or those characteristics are consistent with ID?

A. The self-medication?

Q. Yes.

A. Yeah, they're consistent. I mean, they're not diagnostic of it, but they are consistent with it.

Q. Okay. Dr. Weinstein, a couple times during your testimony today you mentioned the word "strengths" and the word "weaknesses" in terms of analyzing adaptive behavior; is that fair?

A. Yes.

Q. Those are terms that are frequently used in addressing adaptive behavior?

A. Yes.

Q. Do people who are intellectually disabled have both strengths and weaknesses?

A. Absolutely.

Q. And do sometimes those strengths and weaknesses

coexist side by side?

A.    Most of the time they coexist.

Q.    Okay.  And can you give an example of what that means in real life generally speaking, not specifically to Mr. Rodriguez but how do strengths and weaknesses operate side by side?

A.    Well, people may be able to, for instance, socialize adequately.  They have a lot of friends or be very social and have no problems with that, which that would be a strength but at the same time would not -- let's say we're talking about a child.  At the same time he has adequate social skills that child is unable to achieve academically.

So that child would require supports in academics to achieve academically, although would not require any kind of intervention in the social area in order for him or her to function adequately.

Q.    And if I could just point your attention to page 5 of your report, Exhibit 44, and on this page you quote from both the DSM and the AAIDD manual; is that correct?

A.    Yes.

Q.    And I want to specifically point your attention to the last sentence on that page.

A.    Right.

Q.    Point No. 3.

A.   Right.

Q.   And what does that say?

A.   It says:  "Within the individual, limitations often coexist with strengths."

Q.   Okay.  And before those three numbers are broken down there, the last sentence in the paragraph above that leads into those points says:  "The following five assumptions are essential to the application of this decision;" is that correct?

A.   Yes.

Q.   So essential to the application of determining adaptive behavior and ID, one of those points that you have to consider is within the individual limitations often coexist with strengths; is that right?

A.   That's correct.

Q.   Dr. Weinstein, could you look at Exhibit 47.

A.   Yes.

Q.   Which is the AAIDD 2012 User's Guide.

A.   Sure.

Q.   And if I could direct your attention to page 25.

          MR. REISENAUER:  What exhibit number is that?

          MR. MONTROY:  It's 47.

          MR. REISENAUER:  Thank you.  Your Honor, I just for the record would state that we do not have a

copy of that exhibit so I'm trying to keep up that way.

THE COURT:  Let me see, 47 -- you never got 47?  It's been offered and received?

MR. MONTROY:  It's one of the books, Your Honor.  Mr. Reisenauer had at least one copy of the book so I'd be happy to show this to him after I read it. I'm just going to read a few sentences.

MR. REISENAUER:  All right.  I now have a copy, Your Honor.

THE COURT:  Thanks.

MR. REISENAUER:  Thank you.

THE COURT:  Okay.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, would you turn your attention to the second paragraph.

A.  On page 25?

Q.  Of page 25, yes.

A.  Yes.

Q.  And this is under "Foundational Aspects of ID;" is that right?

A.  Correct.

Q.  And that paragraph says:  "Second, within an individual, limitations often coexist with strengths. Individuals may have capabilities and strengths that are independent of ID such as strengths in social or physical capabilities, some adaptive-skill areas, or in

one aspect of an adaptive skill in which they otherwise show an overall limitation."

So is this consistent with what you're talking about, that people with ID can be really strong in one area but then have deficits in the other area?

A.   Yes.

Q.   Is it ever permissible when making a diagnosis of ID or considering a possible diagnosis of ID to weigh an individual's strengths against an individual's weaknesses when determining if prong two is met?

A.   Not at all, no.  The purpose of the diagnosis is not to see an individual and diagnose him and medicate him or anything like that.  The purpose is to find the weaknesses that require support.  So if you're just balancing one against the other, you're going to find maybe that the strengths are more than the weaknesses, that person will not receive any supports.

Q.   So the diagnosis then and specifically the second prong is about the presence of weaknesses.

A.   Exclusively the presence of weaknesses.

Q.   So is it fair to say then that there's no specific behavior or accomplishment that could rule out a diagnosis of ID?

A.   Well, the only behavior is -- if there are overall no deficits in behaviors then you rule it out,

but if there are any deficits then you diagnose it.

Q.   Okay.   So it's not based on what a person can do. It's based on what they can't do.

A.   Exactly, and there's a good reason for that. Again, you know, the reason is you need to identify where you need to provide supports for the individual to overcome their limitations.

Q.   Okay.   Dr. Weinstein, if you could turn to the AAIDD book, not the User's Guide but Exhibit 46.

A.   Yes.

Q.   And turn to page 47.

A.   Yes.

Q.   Do you see the section that's entitled "Focus on Typical Performance"?

A.   Yes.

Q.   I'm going to talk about typical performance in a second but I just want to draw your attention down to the middle of that paragraph four lines up from the bottom that starts with the word "individuals."

A.   Yes.

Q.   "Individuals with an ID typically demonstrate both strength and limitations in adaptive behavior. Thus, in the process of diagnosing ID, significant limitations in conceptual, social, or practical adaptive skills is not outweighed by the potential strengths in

some adaptive skills."

A.   That's what we were just talking about.

Q.   That's consistent with your understanding?

A.   Yes.

Q.   Is the focus -- moving away from strengths and weaknesses, although I think it's related, but is the focus of prong two -- when you're assessing adaptive functioning, is the focus on the person's typical performance or their maximum performance?

A.   No, it's typical performance.  You don't -- you know, you want to look at how the person functions most of the time, not what they can do occasionally or how they can do it occasionally.

Q.   Okay.  And going back to page 5 of your report where you cite from the AAIDD and this one going to point one, that's on the bottom of page 5, "Limitations in present functioning must be considered within the context of community environments typical of the individual's age peers and culture."

A.   Correct.

Q.   Is that accurate of assessing typical functioning and not maximum functioning?

A.   Not only that -- it means that but it also means the fact that you have to look at the person according to where they are and who they are, not where they

should be or they could be.

Q.   And going back to page 47 when we were talking about strengths and weaknesses of the AAIDD, the diagnostic criteria directs an individual to assess typical performance, right?  Not optimal or maximum performance.

A.   Right.  What that means, at least what I understand that means is, you know, if somebody that plays golf does a hole-in-one one time that's not how you're going to rate them, you know.  If they're not able to hit the ball most of the time, that's what you consider them, not a good golfer.  Even though for whatever reason on one occasion they were able to hit the ball and hit a hole-in-one, you're not going to say that that person's a very good golfer because they hit a hole-in-one.

Q.   Moving on, Dr. Weinstein, earlier in your testimony you mentioned the word "masking" and is masking, the concept of masking, is it an established dynamic in ID and the understanding of ID?

A.   Yes.  ID, what it used to be called, mental retardation, carries a big stigma.  People don't want to be identified.  People that relate to people with intellectual disability don't want to be identified with people relating to intellectual disability.

So people that have the limitations will go to all kinds of behaviors in hopes, in actions, in order to limit their exposure and pretend that they are a lot more functional than they truly are.  And that has been determined to be called masking.  There's a book.  I think it's -- I forgot if it's -- I forgot the name of the author.  I mean, my brain is -- must be the cold of North Dakota, Your Honor, but it may be my age.  I don't know.

The bottom line is there is a book that is written about masking.  There's plenty of literature that shows that individuals will do many, many things to hide their disability.

Q.  And is masking a recognized concept in the community of psychologists and neuropsychologists that people who have ID engage in the sort of behavior that you just described?

A.  Yes.  I would say that it's a very well-known concept in the field of intellectual developmental disability.

Q.  And in your experience conducting evaluations and interviewing people who potentially meet the criteria of ID, do you see examples of masking on a regular basis?

A.  Yes.  Everybody that I talk to and actually sometimes I can tell you that I've interviewed people

who were married to somebody that we're dealing with and we consider them and we say:  Well, this is something that we're considering.  They say:  You're crazy.  How can they possibly be married to a person who's got ID?  They just don't want to be identified with that even though when you start asking them:  So how much of the burden of financial supports does this person take?  None.  How much do they manage the finance of the family?  None.  How much do they do X, Y and Z?  None.

So masking is one concept.  The other one is usually they find somebody that would be your supporter or protector, and usually that can be an older person or it could be a sibling or it could be somebody that takes care of protecting them and making sure that they're not harmed.

Q.  Okay.  And is masking similar to exaggerating or, you know, puffing themselves up?  I think maybe the cloak of competence is an expression that's been used and how does that work exactly?  What does that mean and how does that work?

A.  Well, you know, an example is somebody that has the disability that may be repeating words that they heard on television or somewhere else or by somebody else's conversation to pretend that they can understand certain concepts when they really don't and they just

will repeat them.  You know, they will just pretend.  Or somebody that would say:  Oh, I've read thousands of books, when in reality that person does not have the capacity to read.  You know, "thousands of books" may mean one a day.  How many books can you read?  But the reality is that that person doesn't understand that it takes X amount of time but they'll say or they'll pretend to have read many, many books.

Q.  So as a forensic neuropsychologist how do you account for this idea that the person that you're evaluating and that you're interviewing might in fact be masking symptoms of intellectual disability?

A.  I'm not sure what you mean by "how do you account" but if you mean how you deal with it is by not depending on what the person is reporting to you but by going to other sources, whether it's school records, medical records, or interviewing and -- not "or" but and interviewing other people that have known this person through the course of their lives.

Q.  So is it fair to say that when you're interviewing somebody who might be ID you perhaps take the information they give you with a grain of salt?

A.  Exactly.  You don't go with it and come to conclusions based on what they're saying to you.

Q.  And is that because they might be making stuff up

to make themselves look better?

A.   Right.

Q.   Because they don't want to be ID.

A.   I don't know anybody that wants to be diagnosed with ID.  I mean, I have people in death penalty cases that say:  Have you mentioned I'm ID?  I'm going to volunteer for execution.  They'd rather die than be identified as such.

Q.   Have you had that experience before?

A.   I have in Arkansas.  We were very careful not to mention the word "ID" or "mental retardation," and on cross-examination the first thing that the prosecutor said:  So aren't you saying that the person has ID or mental -- is mentally retarded?  And the defendant immediately jumped up and said:  Your Honor, I want to be executed.  So, you know, this person was so gullible and naive that actually he admitted to things that he had never done.

Q.   And you may have touched upon this but the term "cloak of confidence" does that have any meaning in the field of ID?

A.   "Cloak of confidence" is again the same thing as masking in the sense that what it means is they pretend to be able to do things that they're not able to.

Q.   In your evaluation of Mr. Rodriguez and your

review of the records and your interviews, did you find evidence of masking?

A.   I think there's a report that -- like, for instance, I think he mentioned in his years of incarceration that he had read over 900 or a thousand books.  If you take 20 years of incarceration, that's 50 books a year.  That's a book a week.  I mean, unless you are a very sophisticated reader and based on the fact that we're measuring how well he reads, it would be impossible for him to do that.  But, I mean, that would be an example of somebody saying something that it's clearly not possible and yet they're saying it because they want to pretend to be very high functioning.

MR. MONTROY:  Your Honor, may I approach?

THE COURT:  You may.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, I'm handing you an exhibit that's been marked as Defendant's Exhibit 53 (indicating).

A.   Correct.

Q.   Could you identify that document.

A.   Yeah.  This is one of the declarations that I recently received and it's a declaration of Rosa Rodriguez, which is Mr. Rodriguez's mother.

MR. MONTROY:  If I could have the Court's indulgence for one second.  Could I see that copy?  I'm

going to give you mine.  I'm sorry, Your Honor, I might have given you my copy.  Had some writing on it on the inside on one of the pages.

THE COURT:  Why don't I give --

MR. MONTROY:  Mind if I take a look at it?  I apologize, sorry.

THE COURT:  I'm sure I couldn't interpret your secret notes written in the lawyer code.

MR. MONTROY:  That's right.

THE COURT:  They're so secret you don't even have them.

MR. MONTROY:  That's right.  I wrote it in invisible ink.  It was right here.  Sorry, Your Honor.  I won't blame it on the cold.

THE WITNESS:  Or on your age.

Q.  (Mr. Montroy continuing)  Okay.  Going back to this exhibit, Exhibit No. 53, Dr. Weinstein, this is a declaration of Rosa Rodriguez; is that correct?

A.  That's correct.

Q.  And do you recall who Rosa Rodriguez is?

A.  Mr. Rodriguez's mother -- no, I'm sorry, Rosa Rodriguez is Mr. Rodriguez's youngest sister.

Q.  That's correct.  And if I could turn your attention to page 28 -- I mean, paragraph 28, I apologize, paragraph 28 of this exhibit.

THE COURT:  Is 53 in?

MR. MONTROY:  I don't believe it is, Your Honor.  I keep forgetting, Your Honor, I apologize.  I would offer this exhibit.

MR. REISENAUER:  No objection.

THE COURT:  Fifty-three is received.

MR. MONTROY:  Thank you, Your Honor.

Q.   (Mr. Montroy continuing)  If you could turn to paragraph 28 of this exhibit and that paragraph says: "Tito tries to make you think he is smart.  He has a hard time admitting he has challenges, and that he has troubles learning and that he struggles with reading and writing."

And Tito here -- just to be clear, Tito is what Rosa Rodriguez called her brother, Alfonso; is that right?

A.   Tito is the name that the family called him and Rosa Rodriguez, by the way, is the youngest sister.  She has two Master's degrees.  She works at a university.  She's a counselor so she does have experience with individuals with intellectual disabilities.

Q.   Okay.  And paragraph 28, is that an example of masking?

A.   That would be one, yes.  In her statement that's exactly what she's talking about.

MR. MONTROY:  If I could just have the Court's indulgence for one second.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, I'm going to move on to the issue of Mr. Rodriguez's functioning in a prison setting.

Would you agree that Mr. Rodriguez spent the vast majority of his adult life in prison?

A.  Yes, he has.  I mean, he was 19 years old when he went to prison for the first time.  He did 23 years in prison.  He came out for six months and then he's been in prison since 2003.

Q.  And when thinking about adaptive functioning, are there any problems associated with assessing a client's functioning in prison as opposed to the outside community, the normal community?

A.  There are many problems because, you know, I believe -- and this is a person that intellectual developmental disability is related to poorly developed frontal lobes.  The frontal lobes are the part of the brain that allow for individuals to make decisions, have judgment and function in society and make, you know, goal-directed -- have goal-directed ideas and plans.

When you're in prison the structure of the prison functions as your frontal lobe so it's very hard to identify.  The frontal lobes tell you what's right

and what's wrong, what you should do, what you shouldn't do, when you should wake up, how soon you should get to work.  All these decisions he doesn't have to make during his imprisonment because he's told exactly how to behave, and the consequences are not going to wait or they're going to have long-term effects.  They're immediate and they have long-term effects.  If he doesn't behave he's going to go to the hole or they're going to take away his privileges in like store or anything else.  So he doesn't make any decisions.  And the ones he makes, they're very prescribed.

Q.  Okay.  And when you're assessing adaptive functioning, by the criteria it means you're functioning, your ability to adapt in the community, not in a prison setting; is that right?

A.  Right.  I mean, the whole idea is for you to be able to function in society.

Q.  And I think you had mentioned this but prison isn't a community.  It's a rigidly controlled environment.

A.  That's correct.  I mean, people don't have to -- don't have the freedom to decide things.  Most of the things that happen in prison are things that are decided for people.

Q.  If you could turn your attention to the 2012

User's Manual, the AAID User's Manual.

A.   Yes.

Q.   Exhibit 47.  And the User's Guide indicates that the diagnosis of ID is not based on the person's street smarts, behavior in jail or prison or on criminal adaptive functioning; is that right?  Is that familiar with your understanding of --

A.   Yeah.  I recall reading that and learning about that, that you can't consider that somebody that has street smarts, if they're able to deal drugs, doesn't mean they're not ID.  If they're able to do a lot of things in prison, follow rules or do whatever, they're not ID.

Q.   And why is that?  Why is it possible to live in prison or to exist in prison and be able to follow the rules and to not get in trouble and to function at a level that's higher than you might be able to function in the community?  How does that phenomena exist?

A.   Primarily because you don't have to make any decisions.  All the decisions are made for you.  I mean, they tell you when you go to bed and when you get up. They tell you when to go to chow or eat and you go eat. And if you break any of the rules the consequences are immediate, you know.  Somebody is watching you. Somebody's taking care of you all the time.

Q.  Can a person who is ID see improvement in areas of intellectual and adaptive functioning when in prison as opposed to in a community?

A.  Of course they can and they do most of the time. And the reason being is, you know, let's say the typical person with ID might not know about nutrition, might not eat, especially if they're self-medicating with alcohol or other drugs in the street.  When they're in prison they're not allowed to and usually they don't have access to drugs or alcohol, plus they're fed regularly.

Now a person without ID in the community that is anti-social in the sense that they are out there committing crimes or misbehaving or have maladaptive behaviors, in that sense they get to prison, they can't do those things so what are they going to do?  What's available?  And what's available usually is some kind of educational television or participating in some kind of educational program.  So they are exposed to positive things that assist them in overcoming some of their limitations.

Q.  So is it fair to say then it's not unusual for a person with ID who is in a controlled environment to possibly read some books, maybe take some classes, work a routine job?

A.  Sure.  You know, show up to work on time because

somebody wakes them up and tells them:  You gotta go to work on time, you know, because somebody has to do whatever the job is.  And if you don't do the job often the consequence is you stay locked up in your room, and you don't want to do that so you just do the job.

Q.  And is it relevant at all to this discussion about prison functioning and ID that Mr. Rodriguez on multiple occasions stressed that he preferred to be in a controlled environment like prison as opposed to out on the street?

A.  I think a lot of that has to do with the fact that he knows he can't control certain impulses that he experiences and he's repeatedly stated that.  The other thing, I suspect that he has had all his life, undiagnosed, some kind of other developmental issues including some type of autistic spectrum disorder where he is very -- you know, to give you an example, everybody in the family mentioned that he couldn't stand the family arguing.

That's a typical behavior.  Loud noises are something that people with autism cannot sustain and they isolate themselves and he did.  Even though he lived at the parents' home for a relatively short period of time or prior to being incarcerated the first time, he chose not to eat with the family.  He would choose to

go and live in a little cubicle that he had isolated from the family.  The same thing in school, he isolated himself.  He just didn't function in society.

So for him imprisonment, although not a pleasant place, is safe and somebody else is controlling his behavior and his unfortunate lack of ability to control himself.

Q.  That isolationism that you just described during the periods when he would be outside of prison, the not leaving the basement, the not interacting with others, the fearfulness that was reported, that sort of isolationism, is that behavior that is consistent with intellectual disability?

A.  Sure.  Doesn't have the social skills to interact with other people.

Q.  Is there anything that you observed in Mr. Rodriguez's records or in the interviews that you conducted concerning his functioning in prison that led you to believe that he's not ID?

A.  No.  By definition you can't do that.  You can't consider the -- I mean, by definition anything that he's able to do in prison is not indicative of level of functioning.

Q.  And, Dr. Weinstein, is that point that you just made consistent with the DSM-5?  And I'm reading from

page 38:  Adaptive functioning may be difficult to assess in the controlled setting, e.g. prisons, detention centers.  If possible, corroborate information reflecting functioning outside those settings should be obtained.

A.  Right.  I mean, and in his case, I mean, he's been in prison most of his adult life.  So how he functions as an adult is not relevant to the diagnosis either.  It's how he functioned prior to the age of 18 that we're really concerned about.

Q.  Okay.  Going back a bit, Dr. Weinstein, did you find that Mr. Rodriguez had significant adaptive deficits?

A.  Of course he did, yes.

Q.  And you indicated that he had significant adaptive deficits in all three domains: conceptual, social and practical; is that right?

A.  Yes.

Q.  And did you find that those adaptive deficits in those three domains manifested themselves before the age of 18?

A.  That's correct.

Q.  And I think you just said that but why is that important that those deficits could be observed before he was 18 years old?

A.    Because the definition requires three prongs and the third prong is the deficits identified should be present prior to the age of 18 or during the developmental years.

Q.    Okay.  Let's talk about the conceptual domain. What are some of the general characteristics or skills that fall within the first of the domains, the conceptual domain?

A.    What activities you mean?  Or what is it that you're trying to assess for in conceptual domains?

Q.    If you look at page 12 of Exhibit 44, your report.

A.    Yes.  Conceptual domains include skills like language, reading and writing, and money, time and number concepts, money, time and number concepts.  So it's basically talking about the ability to learn in school, to achieve academically and to use what you're learning the proper way.

Q.    So in assessing whether or not Mr. Rodriguez has deficits in the conceptual domain, would you consider Mr. Rodriguez's academic history to be important?

A.    It's very important, very relevant.  And the results of the testing we did on the WRAT would suggest that he has problems with spelling, with arithmetic, with reading.  We might have a conflict with reading

comprehension, but I think there's a consensus between all evaluators that he has limitations in reading.

Q. A little while ago we talked about Exhibit 13, Mr. Rodriguez's school records from Crookston. Do you recall that?

A. Yes.

Q. And we looked specifically at the IQ testing that occurred when Mr. Rodriguez was in elementary school; is that right?

A. Correct.

Q. You had a chance to review Mr. Rodriguez's records from Crookston school while you were writing your report, correct, and conducting your evaluation?

A. Crookston, yeah.

Q. Okay. What did you notice about Mr. Rodriguez's academic history? And what do you recognize today that's relevant to whether or not Mr. Rodriguez has deficits in the conceptual domain?

A. Well, he scores -- his grades are F and -- Ds and Fs for the most part. I mean, I think he's got some Cs in things like physical education or things that are not academic in nature but overall he couldn't achieve. I mean, that's in spite of the fact that you can look at that on the records that he's attending. He has good attendance in school. So sometimes kids don't achieve

because they're not attending school but that's not the case.  He was attending school.

Q.  Okay.  And let me point your attention to in the 1966-1967 school year Mr. Rodriguez was 14 years old and he was in the sixth grade.  Is 14 years old a bit old to be in sixth grade?

A.  Typically maybe 11, 12 but he was retained twice in first and second grade.

Q.  Okay.  And that school year Mr. Rodriguez took Iowa Basic Skills test and his grade equivalent was 4.8.  Would you consider that Iowa test score to be a significant fact?

A.  Well, it's indicative that he's not achieving at grade level.

Q.  Okay.  And at the end of that school year Mr. Rodriguez passed sixth grade with Cs and Ds and an F in social studies and a B in physical education and he attended 172 days of 174 days.

Now you mention the importance of school attendance.  Is that evidence here Mr. Rodriguez struggled while still attending almost every day of school?

A.  Yes.

Q.  In the 1967-1968 school year in Crookston, Mr. Rodriguez was 15 years old.  He was in seventh grade

and he passed seventh grade with mostly Ds, and he attended 170 days out of 175 days.  In 1968 to 1969, Mr. Rodriguez was 16 years old.  He was in eighth grade and he passed eighth grade almost entirely with Fs, and he attended 165 days of 175 days.

A.  I think that's when he was promoted because of age, yes.

Q.  Okay.  I mean, is that significant that a 16-year-old -- 15 and 16-year-old is in eighth grade and is earning mostly Fs after attending 165 out of 170 days -- 175 days of school?

A.  Again it's not related to his absence from school.  So he's attending school.  He's just not able to achieve academically as he should have.

Q.  Okay.  And in ninth grade -- he attends ninth grade in 1969-1970 school year.  He's 16 and 17 years old, and the first time as you mentioned earlier he fails ninth grade; is that right?

A.  Right.  He never finished ninth grade.  He finished eighth grade but he never finished ninth grade.

Q.  Okay.  And that year he attended 143 days out of 175 days.  And then the following year, 1970-1971 school year, Mr. Rodriguez repeats ninth grade.  He gets an F in science, a D in health, a D in grammar and a C in physical education and received a half a credit for

grammar and he's 18 years old.  And he attended 172 out of 177 school days as an 18-year-old in ninth grade.  Is that information significant?  And my question to you is:  Do you see in Mr. Rodriguez's school records anything that suggests that he has deficits in adaptive functioning in the conceptual domain?

A.   Yes.  He's academically behind where he should be, and in spite of attending school he's not able to get positive grades.  And that would probably reflect not only in his academic skills but also in his way of thinking.  I mean, he's not able to -- people with an intellectual developmental disability are able to learn, learn skills and do a lot of things, but you cannot teach them to think.  And this is I think a clear indication of what -- in order to achieve academically you have to think.  You can't just learn by rote.

Q.   And then thinking back again on the WRAT scores that we went over at length, I think they were -- Exhibit 48 was the table that contained all of the scores.

Does Mr. Rodriguez's scoring on the WRAT suggest anything about whether he has or does not have adaptive deficits in the conceptual domain?

A.   Again I think that regardless of who tested him that he never achieved beyond the sixth grade I think

other than the comprehension part that Dr. Seward found him to be in the 10th grade level.

MR. MONTROY:  May I approach?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  I'm handing you a document which I've marked as Exhibit 55 (indicating) and ask that you just take a quick look at this document.

(Witness examining.)

Q.  Dr. Weinstein, do you recognize this as a declaration of Belia Flores?

A.  Yes.

Q.  And did you have an opportunity to review this document before your testimony today?

A.  I reviewed it before I wrote the report.  I didn't review it recently.

MR. MONTROY:  Okay.  And, Your Honor, I would offer this.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Sixty-five is received.

MR. MONTROY:  Your Honor, it's 55.  I apologize.  Did I write 55 on there?

THE COURT:  You wrote 65 on mine.  Do you have 55 on yours?

THE WITNESS:  Yes, Your Honor.

MR. MONTROY:  I apologize.

THE COURT:  All right.

Q.  (Mr. Montroy continuing)  And, Dr. Weinstein, I'll ask you to turn your attention to paragraph 27.

(Witness complies.)

Q.  Are you there?

A.  Yes.

Q.  If I could read that.  "Tito sometimes struggled to understand things as a child.  He would get stuck on just one idea of something and couldn't understand anything different.  Like, when he saw a picture of a traditional Thanksgiving turkey, he thought that's the only way a turkey could look.  When Isabel and Santos made a turkey in a Mexican 'mole' sauce, Tito didn't believe it was a turkey because it didn't look like the picture."

Now just a couple minutes ago you talked about ID being a problem with thinking, not learning.

A.  Correct.

Q.  And is this an example of that and is this an example of a deficit in the conceptual domain?

A.  It can be.  I mean, you can interpret it as he was able to learn what a turkey looks like but he didn't have the flexibility to believe or think that a turkey

can look different from what he learned already, that example.  But that's typically what you see is the rigidity, that ability to learn or to expand from what you have learned.

Q.   Executive functioning is a characteristic associated with conceptual domain; is that correct?

A.   Executive functions are basically high-level functions in the brain which include planning, organizing behaviors, having the ability to refrain from behaving in certain ways, understanding right from wrong, things like that.

Q.   Okay.  And did you find any deficiencies in executive functioning of Mr. Rodriguez?

A.   I did, yes.

Q.   Okay.  Could you elaborate on that.

A.   Well, the deficiencies I found were related -- I mean, specifically on the scores that he obtained in certain tests that require abstract reasoning.

Q.   Okay.

A.   Abstract reasoning is perhaps the telltale of all the -- well, I mean, executive functions include much more than abstract reasoning, but abstract reasoning is perhaps the one that requires the most brain power. Let's call it that.

Q.   Okay.  And where did you see that in terms of

your evaluation?  Was it from the interviews, review of records?  Was it from speaking with Mr. Rodriguez?  Was it from the testing of Mr. Rodriguez?

A.   From the review of records, from testing Mr. Rodriguez, from the scores he obtained during the testing materials.  Again ecologically validity of the findings looking at the records he doesn't learn from experience.  He does the same thing over and over again regardless of what the consequences may have been.

MR. MONTROY:  Your Honor, may I approach?

THE COURT:  You may.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, I'm putting before you Exhibit No. 17, previously marked as Exhibit 17 (indicating).  And if you could turn to the very last page and I'm sorry I should back up.

This is a psychological report from Minnesota Security Hospital; is that correct?

A.   Yes.

Q.   And it's dated December 1, 1976?

A.   Correct.

Q.   And in the very last paragraph on the last page, second sentence, concerning Mr. Alfonso the reporter writes:  "He seems to have serious difficulty in thinking and communication, be overly suspicious of people, and have poor impulse control."

Is that related to executive functioning?

A.  Yes, especially the part about impulse control.

Q.  Does that show a deficit in executive functioning?

A.  It does, yes.

Q.  And if I could turn your attention to the previous page, in the middle of the page the reporter writes:  "At this time there appears to be some impairment of ability to think straight."

A.  Can you tell me --

Q.  Yeah, it's right in the middle where that black circle is on the left-hand column in the middle.

A.  Yes, okay.  I see where you're talking, right.

Q.  "At this time there appears to be some impairment of ability to think straight"?

A.  Yes.

Q.  Is that an indication of a deficit in executive functioning?

A.  Right.  This is exactly what we're talking about. I mean, he can -- he can learn things but he cannot think.  You cannot teach him how to think.

Q.  And the paragraph before that, the second to the last sentence:  "He appears to have conflicts between the expressing and inhibiting of hostile aggressive impulses."

Does that also indicate deficiencies in executive functioning?

A.   Right.  Part of the purpose of the frontal lobes or the abilities of the frontal lobes is they act like a break on the brain.  You know, you may want to do something but you stop yourself from doing it because you know there's consequences that you don't want to suffer from.  And when you have deficits in there then you just behave without regards to the consequences and that's what this is -- or you lack impulse control.

Q.   Okay.

A.   And this is what this is relating to.

Q.   And on the second page of this report towards the bottom right by that black dot that's at the bottom of the page just a little bit before that:  "When faced with frustration he may become aggressive or impulsive, often out of proportion to the reality of the situation."

Is that again what we're talking about, executive functioning, impulse control?  Do you see a deficit there?

A.   Right.  He doesn't know how to control his emotions.

Q.   And problems with executive functioning are indicative of a deficit in the conceptual domain; is

that correct?

A.   Yes.

Q.   What about problems with language and communication, could that be construed as a deficit in the conceptual domain, a deficit in the area of communication skills, that sort of thing?

A.   The language issue with him is a little bit touchy because, as I said, he comes from a bilingual family.  The family spoke Spanish at home.  It's unclear -- although his Spanish is not good and the Spanish they speak at home is -- I mean, I spoke in Spanish with the mom and with the sisters and the sisters actually don't speak Spanish.

But the reality is that it's one of those things that he doesn't have real fluency in either Spanish or English.  He's more fluent in English than in Spanish but it's not a hundred percent.

Q.   Okay.  What about memory, is memory functionality a characteristic or a trait that would fall within the conceptual domain?

A.   No.  Memory is -- there's different kinds of memory so depends on what kind of memory.  But, you know, if you're talking about short-term memory or working -- what's called working memory, yes, that's a function of the -- that's an executive function, but

long-term memory is not an executive function.

Q. Okay. I'm referring to Exhibit 6, which is -- "Alfonso's Neurological Concerns" is the title. Point 6, "Memory problems, lapses, blackouts, including having no memory of ever having a headache. He also has no memory of several criminal acts he is known to have committed."

Is that kind of memory that would be relevant to the conceptual domain?

A. No. That's not -- that's not working memory. That's memories that he either repressed or forgot or, you know, some people that have alcoholic blackouts don't remember things that they did or what happened to them. But those are not executive functions. They're not related to the frontal lobes of the brain.

Q. What about the same with this document, Exhibit 6, point No. 14: "Learning disabilities/difficulties - can't retain numbers, or spoken things - better at visual."

Is that indicative of a deficiency potentially in the conceptual domain?

A. Potentially, yes. It's part of the academics, the lack of ability to achieve academically.

Q. And what about this example: "'Nerves bad from 1st to 6th grade;' speaking problems. Scared to speak

in front of class, sent to speech class, stuttered, scared to speak in front of the class because of nerves."

Could that be indicative of a deficit in adaptive functioning?

A.   Yes, in the sense that he has speech problems expressing his thoughts.

Q.   And lastly point No. 20 on this document, it says:  "ADHD - mine is I can't sit still.  If I can go outside I will.  I can't sit and watch a movie for 2 hours.  I would get up at the movie, stand, go to the bathroom - I can't watch TV for a whole hour.  Even reading, I have to take breaks."

Could that be construed or is that a deficit in conceptual domain of --

A.   It can be because it's related to attention and attention is one of the executive functions.

THE COURT:  Perhaps this is a good spot for us to take a break.  We'll break for 15 minutes.  We'll start again at five to 3:00.

MR. MONTROY:  Thank you, Your Honor.

(Recess taken; at 2:40 p.m. to 3:05 p.m.)

(In open court, all counsel present.)

THE COURT:  We're back on the record in a case entitled United States of America versus Alfonso

Rodriguez, File No. 2:04-cr-55.  When we broke Dr. Weinstein was on the stand and Mr. Montroy was conducting a direct examination.

You may proceed, sir.

MR. MONTROY:  Thank you, Your Honor.  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, I have just provided you with three documents that have been marked Defendant's Exhibits 56, 57 and 58 (indicating) --

A.  Right.

Q.  -- is that correct?

A.  Yes.

Q.  Would you mind taking a quick look at these documents?

A.  (Witness examining.)  I recall these as being declarations from different people.

Q.  I'll ask you a question about that in one second. First, I would draw your attention to Exhibit 56, Dr. Weinstein.

A.  Okay.

Q.  And this is the declaration of Hector Gallegos?

A.  Yes.

THE COURT:  Now that we interrupted you do

you intend to offer these three?

MR. MONTROY:  I do, Your Honor.  Thank you.

THE COURT:  Any objection?

MR. REISENAUER:  Do I have 56, 57, 58?

MR. MONTROY:  That's right.  Hector Gallegos is 56, Maria del Refugio Ruiz is 57, and Gloria Gonzalez is 58.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Fifty-six, 57 and 58 are received.

Q.  (Mr. Montroy continuing)  So turning to Exhibit 56, Dr. Weinstein --

A.  Yes.

Q.  -- Hector Gallegos, do you recognize him as a friend of Alfonso Rodriguez when Alfonso lived in Laredo, Texas?

A.  Yes, I recall the declaration.  I never met the gentleman.

Q.  Okay.  You reviewed this declaration --

A.  I did.

Q.  -- for today?

A.  I did.

Q.  And I want to direct your attention to paragraph 3.  "Tito was sad most of the time.  It was rare to see him smile or laugh.  Tito was also slower

than other kids.  Most of the time he was very quiet."

If I could turn your attention to Exhibit 57, the Declaration of Maria del Refugio Ruiz.

A.  Yes.

Q.  And according to -- and you've had an opportunity to review this declaration?

A.  I reviewed them before, yes.

Q.  Okay.  And Ms. Ruiz was a family friend who knew Delores and Alfonso Sr. well?

A.  Yes.

Q.  In Laredo, Texas?

A.  That's correct.

Q.  And I would direct your attention to paragraph 7 on page 2.  "Tito tended to just sit down and be quiet. His head was always up in the clouds somewhere, like he wasn't all there.  I don't remember seeing Tito smiling, he didn't express his emotions much.  I never saw Tito read or write."

And if I could turn your attention to Exhibit 58, the Declaration of Gloria Gonzalez.

A.  Yes.

Q.  Miss Gonzalez also was from Laredo, Texas?

A.  Yes.

Q.  And played with Mr. Rodriguez?

A.  Yeah.  They're the same age.

Q.  And you had an opportunity to review this declaration?

A.  I did, yes.

Q.  And if I could turn your attention to paragraph 7:  "Tito was different.  He was very quiet, quieter than his brothers and sisters.  Mostly Tito would just sit and be quiet.  Our house was the first house in the neighborhood with a television and lots of kids from the neighborhood would come over and watch with us.  When way watched television, the other kids would talk and laugh about what was on, but Tito wouldn't.  He didn't react to things.  He just sat there quietly."

The descriptions of Mr. Gallegos, Miss Ruiz and Miss Gonzalez, do their descriptions of Mr. Rodriguez say anything to you about whether or not Mr. Rodriguez has any adaptive deficits in the conceptual domain?

A.  Not in the conceptual but social.  I mean, he's withdrawn.  He's not able to communicate.  He's socially away from others, and also emotionally seems like everybody believed that he was depressed.

Q.  Okay.  And Mr. Gallegos describing Mr. Rodriguez as slow, would that be indicative to you of being a deficit in the conceptual domain as well as the social domain?

A.    I think "slow" is a term that doesn't have a lot of specificity to it so being slow in thinking and acting and behaving, but it is part of the three domains I think.

Q.    Whether it falls into social domain or conceptual domain, it's an example of adaptive deficit, just not necessarily a conceptual domain deficit.

A.    I think that people that don't have the ability to describe specifically why a person is functioning in a particular way they use the word "slow."

Q.    Okay.  So in terms of the conceptual domain, you have testified about a number of different adaptive deficits concerning the conceptual domain.  Is it your understanding or your observation that these adaptive deficits primarily occurred prior to the age of 18 years old?

A.    Everything we talked about today is prior to the age of 18.

Q.    In your opinion does Mr. Rodriguez meet the criteria for prong two for the conceptual domain by exhibiting deficits in adaptive functioning?

A.    The criteria doesn't require more than one of the three categories.  So by fulfilling the category of conceptual domain he would fulfill the definition of "intellectual disability," although, he did in my

opinion have also deficits in social skills and in practical skills.

Q. Okay. And let's turn to the practical domain. What are some of the general characteristics and skills associated with the practical domain? And I can turn your attention to page 12 of your report, Exhibit 44, where you list some of the deficits.

A. You're asking in general or about Mr. --

Q. Sure, generally speaking.

A. The ones that are listed as examples of adaptive behaviors in the practical skills area are "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone."

Q. Okay. And did you find deficits in Mr. Rodriguez's functioning that fall within the practical domain?

A. The most salient or the one I recall the best was he was I think 17 when he finally moved out of the house but his father had to go pick up his laundry because he couldn't clean his own laundry.

Q. I'm sorry, Dr. Weinstein, could you repeat that? When he couldn't --

A. He didn't know how to wash his own clothes. His

father had to come pick it up and take them to his mother.  So she would wash them for him.

Q.   And this was -- there was testimony about this occasion yesterday and it's brought out in Exhibit 40, Defense Exhibit 40.  And you're speaking about the time right before Mr. Rodriguez went to prison and he was living with his girlfriend, Dotsie Dahl?

A.   I think it was just a couple of weeks that he moved out of his parents' home and moved in with Dotsie.

Q.   That's right.  And they stayed together for a short period of time in her apartment?

A.   Very short period of time.

Q.   And what practical deficits did you observe?

A.   During that time is when his father had to come and take his laundry home because he didn't know how to do his own laundry.

Q.   And why is that a deficit in adaptive functioning?

A.   Because a 17-year-old kid should know how to do their own laundry.

Q.   Dr. Weinstein, I'm going to point your attention to Exhibit 16 which is up there in front of you.

Might I approach, Your Honor?

THE COURT:  You may.

MR. MONTROY:  Thank you.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, are you looking at Defense Exhibit 16?

A.   Yes.

Q.   And this is a Minnesota Security Hospital form?

A.   Yes, "Medical and Social History Questionnaire."

Q.   Okay.  And have you had an opportunity just to briefly look at this?

A.   I've seen it in the past.  I mean, right now -- I haven't seen it for quite a while.

Q.   Okay.  And this contains, would you agree, biographical information about Mr. Rodriguez?

A.   Yes.

Q.   I'd ask to turn your attention to page 5 under the subheading of "Birth and Childhood."  Do you see that?

A.   Yes.

Q.   And I'm going to direct your attention specifically to question 5 on that form:  "Was patient slow in growing up?  If so, describe."  And the word "yes" is written in; is that correct?

A.   That's correct.

Q.   And then down in the next question:  "Was patient hard to train in toilet habits?"  And the answer to that question is "yes"?

A.   Yes.

Q.   And then moving on to question 7:   "Controlled bowels at what age?"   "2 years" was the answer; is that correct?

A.   Yes.

Q.   "Stopped bed-wetting at what age?"

A.   "13 years."

Q.   "13 years," yeah.  First of all, do you consider those answers to those questions to be indicative of developmental delays?

A.   They are.  I mean, he was not reaching milestones at the same level or same age as most kids do.

Q.   Okay.  And does that qualify as an adaptive deficit in the practical domain?

A.   That is a developmental delay.  That qualifies as a developmental delay.  I mean, it's not per se a -- a two-year-old child is not expected of taking care of himself so you wouldn't be able to notice.  But, you know, a two-year-old child that has no bowel control, that's a problem.  And a 13-year-old certainly that is still having what is called anureses, it's not okay.  There's emotion problems usually connected to that.  But Mom reported to me that he started talking late, much later than the other kids, and he met all his developmental milestones much later than the other kids.

Q.   And those type of delays, do those -- are those

consistent with a deficit in adaptive functioning?

A.   They're not adaptive functioning because the person is not capable.  I mean, you don't expect a two-year-old to be independent or do any of those things.  So they are developmental delays but they're not examples of adaptive deficits.

Q.   What role, if any, do developmental delays play in diagnosing somebody with ID?

A.   Well, usually somebody that has developmental delays is the first sign that something is unusually wrong with the child.

Q.   Okay.

A.   And it plays a role in a family that's not neglectful or has the skills or it has the means to would make a proper referral for a two-year-old or three-year-old child with developmental delays so they can get early intervention.  The earliest you intervene the more likely you are to have some effect on a child's life.

Q.   So would this sort of information constitute a risk factor for ID?

A.   It is a risk factor in that it is indicative of developmental delays.  It is -- it's showing that he's not achieving his milestones at the level that he should and certainly in mother's words as compared to the other

siblings.

Q.   I'm going to turn your attention back to Exhibit 55, Declaration of Belia Flores.

A.   Okay.

Q.   Did you locate it?

A.   No.  I have 56, 57, 58.

Q.   Perhaps I didn't -- well, Dr. Weinstein, you will recall Belia Torez -- Belia Flores -- did you find it?

A.   Yes.

Q.   If you could turn your attention to paragraph 7, have you had an opportunity to see that?

A.   Yes.

Q.   "Tito's paternal grandfather was Antonio Rodriguez.  Antonio was born in Monterey, Mexico.  In Texas, we call people 'Spanish' if they are Spanish-speaking Hispanics.  That does not mean they come from Spain.  Usually, they come from Mexico or Honduras or El Salvador.  Tito could never understand that and he thinks his grandfather came from Spain. Everybody else that grows up in Texas understands that expression."

Do you recognize that as a deficit in the practical domain or the conceptual domain or not a deficit in adaptive functioning?

A.   I think it's an example of deficits in conceptual

domain in that he can't grasp the concept of the fact that a language is not necessarily identifying a country.

Q.   Okay.  And if I could turn your attention to paragraph 29, which is on page 1320.  "I used to play a game called jacks, where you bounce a ball and pick up the jacks.  Tito never played it though, he would just watch me.  I tried to show him how to play, but he didn't learn.  He would only watch me."

Mr. Rodriguez's inability to learn the game jacks, is that an example of a deficit in a conceptual domain or practical domain or not a deficit in adaptive functioning?

A.   I don't know exactly at what age because a lot of these behaviors are related to -- you know, are age related.  Again you don't expect a three-year-old to be able to catch a ball but you do expect an eight or 10-year-old to be able to do that.

Q.   Mm-hmm.

A.   So I'm not sure what age he's referring to but certainly -- I mean, she was expecting him to learn.  He must have been the age that he could learn and he wasn't.

Q.   Okay.  So it's potentially an adaptive deficit but not necessarily without knowing -- without having

more information?

A.   Right.  I mean, it's age related.  I mean, if -- there are certain behaviors you are expected to be able to do at a certain age and others that you don't.

MR. MONTROY:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, I'm going to hand you an exhibit that's marked Defendant's Exhibit 51 (indicating).  Dr. Weinstein, would you take a look at this.

A.   (Witness examining.)  Yes.

Q.   If you could turn your attention to paragraph 15: "I worked with my dad sometimes" -- I'm sorry, first of all, strike that.

This is the Declaration of Francisco Rodriguez; is that correct?

A.   Yes.

Q.   And Francisco Rodriguez is the younger brother of Alfonso Rodriguez; is that correct?

A.   That's correct.

Q.   Thanks.  Okay.  And you had an opportunity to review this declaration?

A.   Yes, I have.

Q.   And turning to paragraph 15 it says:  "I worked

with my dad sometimes in the radiator shop, and I worked in the restaurant with my mom.  Tito wasn't really good at anything and they didn't take him to work with them. He worked in the sugar plant for awhile and got put in the very worst job, on the pellatizer, which uses the stuff that is unfit for humans and makes it into pellets for animals.  It's smelly and that's the job they give to the dummies.  I worked in the main plant for years and did jobs that were much harder than Tito even though I was younger than him."

Is that an example of adaptive functioning in a practical domain?

A.   I think so.

Q.   And why is that?

A.   Because it shows that, you know, that he was not as efficient as his younger brother.  And Paco I think is two years younger than he was and Paco was able to do things that he wasn't at a relatively early age.  And it shows the deficits that Mr. Rodriguez exhibited at an early age in terms of his ability to work, to be independent, to do things, to follow instructions and those in the practical domain.

Q.   And if I could turn your attention to paragraph 7 on page 1:  "When we were kids, we would run around outside together.  We went fishing or hunting sometimes.

We caught rabbits mostly.  We never caught a deer or anything big.  If Tito says he caught a ten point deer, he is exaggerating.  That didn't happen.  Our dad shot a deer once and went to jail for it because it was the off season."

And then if I could also turn your attention to paragraph 16:  "Tito did date some girls.  Sometimes I introduced him to girls.  Once I was dating a girl and she brought her cousin to be Tito's date.  He would ride my coattails socially.  He dated Dotsie Dahl and a few other girls.  But, if he has said that he slept with 30 women, that must be an exaggeration."

And my question, Dr. Weinstein, with those last two paragraphs in his declaration, do you consider those to be examples of masking?

A.  I think they could be considered examples of masking in that he's attempting or trying to say he is much more capable than he actually is and has achieved a lot more things than he actually has.  And he does it in a way that it's not credible, certainly not to his brother anyway.

Q.  So if he was being -- in a forensic setting if he was being interviewed by a psychiatrist or a psychologist and he said things of this nature or if he said things of this nature to guys in prison, would you

consider that to potentially be an example of masking?

A.   I think it is an example of masking.

Q.   So, Dr. Weinstein, you've identified some examples of adaptive functioning -- strike that, I'm sorry.

Dr. Weinstein, you've identified some examples of deficits in adaptive functioning in the practical domain; is that accurate?

A.   We just talked about them, yes.

Q.   In your opinion does Mr. Rodriguez meet the criteria for prong two for the practical domain by exhibiting deficits in adaptive functioning?

A.   He does because he already had practical deficits and now he's -- we talked about practical and conceptual.

Q.   And did he -- and were these deficiencies apparent and observed before the onset of age 18?

A.   Right.   What Paco was describing occurred prior to the age of 18.

Q.   Dr. Weinstein, the third area of deficits in adaptive functioning is the social domain; is that accurate?

A.   Correct.

Q.   And if you would look at page 12 of your report, would you describe for the Court what are some of the

characteristics, skills associated with the social domain?

A.   I don't know where --

Q.   I'm sorry, page 12.

A.   I don't know where page 12 is but I can tell you some of them.

Q.   If you want to just explain what your understanding --

A.   Examples in DSM-5 are interpersonal skills, social responsibilities, self-esteem, gullibility, naivety, follow rules and laws, and avoid victimization, and he has good social problem-solving skills.

Q.   Dr. Weinstein, in your review of the records and in the interviews that you conducted -- actually strike that question, I'm sorry.

On page 12, moving back to your report, in the second paragraph from the bottom --

A.   Yes.

Q.   -- you write:  "He was frequently described as a withdrawn, shy individual, and as a loner who had low self-esteem; he often took the blame for misbehavior committed by his peers and would not stand up for himself when being teased or harassed.  He also had difficulties adjusting to the demands of a foreign culture.  He did not belong to the Anglo culture and

apparently he did not want to be identified with the Mexican culture."

So characteristics like withdrawn, shy, loner, low self-esteem, taking blame for misbehavior being committed by others, being teased and harassed, are those characteristics associated with the social domain?

A.   They are deficits in the social domain.

Q.   Okay.  And later on at the very bottom of the last -- the last line in -- on this page you write:  "He belonged to a group of 'outcasts' during his high school years."  Moving on to page 13:  "He did not socialize with individuals his own age and even tended to withdraw from family members into his 'little cubby-hole room.'  In his present state he prefers to be isolated and he described what appear to be obsessive-compulsive behaviors."

Those characteristics that you just describe in that paragraph, are those consistent with characteristics of the social domain?

A.   Deficits in the social domain, yes.

Q.   In your review of the records and your interviews, can you talk a little bit about your observation that he -- he belonged to a group of outcasts during his high school years, that he didn't

socialize with individuals his own age and tended to withdraw from family members?

A.   And the question was?  I'm sorry.

Q.   I'm sorry, the question is:  Can you talk a little bit about what you learned in that area of --

A.   Well, that was reported by some of the people that I interviewed as well as I read it in some of the declarations that he tended, for instance, to not be able to withstand the conflicts at home so he would not eat with the family.  He would withdraw.  He would go to his room.  He would not live with the family.  That's one example.

Several of the friends that I interviewed talked about belonging to a group of -- I call them outcasts but they are all kids that were not making it in school.  They were not part of any social group.  And they used to hang out at the -- I forgot the name of the restaurant but -- and they were mostly younger than Mr. Rodriguez.  He did not have friends his own age and even there he didn't socialize adequately with them. They used to play cards.  He occasionally played cards but he really didn't know how to.

Q.   Okay.  And is that sort of behavior demonstrative of a deficit in the social domain?

A.   Yes, that's one aspect of it.  Another aspect of

it is that repeatedly the family is saying that he would take blame for things he didn't do.  That's kind of gullibility in the sense that, you know, if somebody did something but blame it on him he would not say, no, it wasn't me.  I'll take the blame.  I'll take the punishment.  I'll take whatever.

Q.  Okay.  You also mention that victimization is an area in the social domain of adaptive functioning; is that correct?

A.  Yes.  It's contained in the DSM-5.

Q.  Okay.  And earlier we read portions of Exhibit 53, the Declaration of Rosa Rodriguez.  And I'm going to read from paragraph 36 of that declaration.  "Tito was teased about his height, and his trembling hands. People called him 'cabeza de tachuela,' which means tack head.  They also called Tito 'tronco de amarrar burros,' that's a tree trunk that a donkey is tied to.  When he was called these names, Tito didn't say anything or do anything to stick up for himself."

And that's from Rosa Rodriguez.  Rosa Rodriguez also states in paragraph 38 of her declaration:  "Tito wasn't a very good baseball player. They used to call him 'easy out.'  In Minnesota, the town Mexicans and the farm Mexicans would play against each other.  When Tito went up to bat the kids would get

close to him because they knew he wouldn't hit the ball far.  When they called him 'easy out,' he would laugh with them but he was hurt.  Tito didn't stick up for himself when they did this."

There's also evidence that in 1964 to 1965 school year Alfonso was in the fourth grade and he was grabbed by other children and they pulled down his pants in front of a bunch of other children.

Are these examples of victimization?

A.  I think so, especially the last one.  He was victimized.  He was bullied.  He was victimized.  He was teased because of his physical appearance and because of his background and experience.

Q.  And how is that an example of a deficit in adaptive functioning?

A.  It's an example because the person that doesn't have any deficits in this area either would avoid circumstances in which they would be victimized or they would do something about it and maybe report it to some of the authorities or simply just physically stand up for his own rights.  Although, you know, we know that he had some physical limitations that maybe prevented him from doing that.

Q.  And you talked at length earlier, I won't rehash all the examples, but you talked at length earlier about

isolationism and Mr. Rodriguez often isolating himself or removing himself from others and from society.

Is that isolationism an example of a deficit in adaptive functioning in the social domain?

A.   Yes.  I think he lacked the social skills to interact with others.

Q.   Examples of low self-esteem that Mr. Rodriguez exhibited, did you encounter those through your review of the records and interviews?

A.   There were several people, including his sisters, that mentioned that he had very low self-esteem.

Q.   Okay.  And those examples of low self-esteem, are they examples of deficits in adaptive functioning in the social domain?

A.   It's listed as one of the issues in the DSM-4 -- or DSM-5, I'm sorry.

Q.   So in your opinion does Mr. Rodriguez meet the criteria for prong two for the social domain by exhibiting deficits in adaptive functioning?

A.   Again he exhibits deficits in all areas of adaptive functioning.

Q.   Okay.  All three domains?

A.   Yes.

Q.   Okay.  And did Mr. Rodriguez exhibit deficits in the social domain prior to the age of 18?

A.   Everything we talked about that we know from declarations and from interviews has occurred prior to his turning 18.

Q.   And, Dr. Weinstein, I just want to ask you a couple questions about the ABAS.  What is the ABAS?

A.   The ABAS is a questionnaire.  It's a series of questions that are divided by different functions of the individual that actually can be scored into the three domains for adaptive behaviors and provide a number. And it's an instrument that is used -- was designed to be used in contemporaneous assessments.  In other words if you're assessing an 8-year-old child and you're asking the teacher about the 8-year-old child the teacher has the ability to observe the 8-year-old child and tell you no, he doesn't do this, he can't do this, et cetera.

Q.   So you used the word "contemporaneous." Obviously in this case you weren't able to use the ABAS contemporaneously; is that right?

A.   That's correct.  And that's why, you know, I mentioned that the -- there is some issues with the results in that he was -- I asked the people that actually gave me information, I asked them to recall certain behaviors at a particular age.

Q.   And on page 13 of your report there's a graph

that shows the scores of the ABAS?

A.    Yes.

Q.    For Sylvia D'Angelo and Rosa Rodriguez?

A.    Yes.  Sylvia is the older sister and when he was about eight years old she was the primary caretaker in the sense that Mom was going away to work and she stayed home with the younger siblings and she was in charge of the kids.

Q.    Okay.  And the scores that you attained from Sylvia and Rosa Rodriguez, do they place Mr. Rodriguez in the ID range?

A.    Yes.  As we were looking at the manual in terms of assessment, it doesn't require but recommends that you have a standardized instrument in the assessment. And that's why I use it because it's recommended but not because it was designed for this purpose.

Q.    So you seem to have a -- you know, be placing a caveat on these tests and the scores that you obtained.

A.    I do place a caveat.  I mean, the advantage of doing it to more than one person is that if they obtain scores in the same range that gives you some sense of what -- it's called test reliability or inter-relatability or both of them.

Q.    So is it fair to say that you're not relying on these -- on the ABAS but it's providing another data

point?

A. Right. It's not a -- I wouldn't rely exclusively on this data, no. I wouldn't diagnose him with intellectual developmental disability based on the results of this data.

Q. And in terms of prong three, onset of adaptive -- deficits in adaptive functioning before age 18, you've discussed this at length as we went through each of the domains; is that accurate?

A. Well, that's accurate. We talked about -- everything that we talked about prior to the age of 18 plus you gotta remember that when he was 19 years old, barely 19 years old he went to prison for 23 years. And then he comes out for six months and goes back to prison.

Q. And if you observe adaptive deficits after the age of 18, are those deficits -- those examples, are they useful in sort of a corroborative sense when related back to the deficits that occurred pre 18 or are they just completely not useful?

A. No, they're helpful. They're helpful but again they're not diagnostic. I mean, if I -- let's say you had somebody that functioned perfectly fine and goes to prison and after being in prison for a while they start dysfunctioning in a way that is clearly not to the level

that they were functioning before.  Then you start questioning whether there was an incident in the prison where he was hit and harm occurred with brain damage or he's experiencing some dementia or does he have a tumor? Something's unusual happening.

So what I'm trying to say is that if you have the information prior to the age of 18 and it's still present after the age of 18, even in a controlled environment, to some degree that helps you say this is consistent with it.

Q.   Okay.

A.   But it's not -- the inverse of that would not be consistent with the diagnosis.

Q.   Okay.  And so in the course of your evaluation and your interview of witnesses and reviews of the records, you observed deficits in adaptive functioning that were observed prior to the age of 18; is that correct?

A.   That is correct.

Q.   And if I could just ask you to turn your attention to page 14 of your report.

A.   Yes.

Q.   And I'm specifically going to ask you to look at "Neurocognitive Results."

A.   Yes.

Q.   And you identify deficits in -- you identify neurocognitive deficits; is that correct?

A.   Yes.

Q.   In executive functioning and attention?

A.   Yes.

Q.   And you write that Mr. Rodriguez was "particularly deficient in tasks requiring abstract reasoning"?

A.   Yes.

Q.   How do those neurocognitive deficits concern Mr. Rodriguez's diagnosis for ID?

A.   Technically they're independent to it but, you know, from my experience in dealing with individuals with ID they have dysfunction to the frontal lobes, and this is what basically I'm talking about.  So most of the time it's due to immaturity, you know.  They never developed adequate frontal lobes.

Q.   And are deficits in executive functioning and attention, are they consistent with adaptive deficits that were observed by you, deficits particularly in a conceptual domain?

A.   Are they consistent?  Yes.  They're not diagnostic of but they're consistent with.

Q.   Okay.  And lastly looking at your conclusion, Dr. Weinstein, on page 14 you write:  "It is my opinion

to a reasonable degree of scientific certainty that Mr. Alfonso Rodriguez fulfills the criteria for the diagnosis of Intellectual Developmental Disorder (formerly Mental Retardation) (IDD) according to the definitions, of the DSM-5 and the American Association of Intellectual and Development Disabilities (2010)."

And is that -- that was your opinion when you wrote this report?

A.   Yes.

Q.   And is that your opinion today as you testify?

A.   Yes.

MR. MONTROY:  Your Honor, could I just have like one moment, please?

THE COURT:  You may.

MR. MONTROY:  Thanks.  Your Honor, I have no additional questions.

THE COURT:  Very good.  Why don't we break for ten minutes at this point.  We'll start again at 4:00.

(Recess taken; 3:50 p.m. to 4:05 p.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  The record should reflect that all counsel of record are present.

Do you have something to add, Mr. Montroy?

MR. MONTROY:  I do, Your Honor.  It's come to my attention that I failed to offer Exhibit 51 so I would like to do that at this time before Mr. Reisenauer --

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

MR. MONTROY:  Thank you, Your Honor.

THE COURT:  Fifty-one is received.

Mr. Reisenauer, it's your witness.

MR. REISENAUER:  Thank you, Your Honor.

## CROSS-EXAMINATION

**BY MR. REISENAUER:**

Q.  Dr. Weinstein, I'm going to be a while as I indicated earlier so we'll start from the beginning. When you first took the stand Mr. Montroy talked to you about your CV, which is Exhibit 43.  Can you find that for us.

A.  Yes.

Q.  Exhibit 43 is your Curriculum Vitae, correct?

A.  Yes, sir.

Q.  And it is six pages; is that right?

A.  Yes.

Q.  Okay.  Let's talk about the second page of your CV there where you have your education listed.

A.   Yes.

Q.   I'd like to go through that just briefly if we can.  You said -- I think you told us that you were born in Mexico, correct?

A.   That's correct.

Q.   And where at in Mexico?

A.   Mexico City.

Q.   Okay.  And at the bottom of your list of education there you have in 1968 you apparently received some type of degree from Mexico City and I apologize I do not know Spanish at all.  Can you tell us what that is?

A.   That is a five-year program to obtain -- and I obtained a degree -- my undergraduate degree in business administration.

Q.   In business administration.  So that's what that's telling us at the University of Mexico in Mexico City?

A.   Yes, sir.

Q.   Okay.  And after you obtained that degree what did you do?

A.   I did quite a few entrepreneurial activities in addition to I worked for -- Arthur D. Little Company had an office in Mexico City and I worked for them.

Q.   Let me stop you there.  Who's that?

A.   Arthur D. Little.

Q.   Okay.  And what did you do for that company?

A.   Well, I was young and cheap labor for them.  I was doing running around and doing research for them.

Q.   Okay.  And was that at that time putting use to your degree then do you think?

A.   I'm not sure if it was after my degree or during my schooling that I was working for them.  I think I was -- it's been a while.  I think it was both and, yes, I was putting -- that was mainly my -- my field of education.

Q.   How long?

A.   How long I work for them?

Q.   Yeah.

A.   About two years.

Q.   A couple years.  And then what did you do?

A.   Then I started a -- I had a plant where I was manufacturing jeans in Mexico.  Then I started exporting jeans and I started an import expert consulting.  And at the time I subbed work for Arthur D. Little because they closed their office in Mexico and I started doing consulting on my own with -- I had a partner that we did consulting for a while.  And then I owned that business. I owned another business that I run for many years. During my school years I worked also.

Q.   What was that business?

A.   Which business?

Q.   Well, you said you owned another business.

A.   Oh, yeah, I owned another -- owned a store and I used to sell imported paper and paper flowers and a few other things that were used for parties like cardboard plates and plastic things and napkins and things of that nature.

Q.   How long did you have that business?

A.   I had that for a long time.  I had it -- actually when I moved to the United States I still had it and I was running it from here and going back there once a month spending some time running the business.

Q.   Okay.  When did you move to the United States?

A.   I think in 1977.

Q.   Okay.  And where did you move to?

A.   I first came to Phoenix, Arizona where I worked at the Camelback Hospital doing psychodrama.

Q.   Doing what?

A.   Psychodrama.

Q.   And how did you get into that job, that position?

A.   I had met some people in Mexico City through a psychiatrist that had some patients and I was doing some training in Arizona for a few months on psychodrama.

Q.   You took training?

A.   Yes, I did.

Q.   Okay.

THE COURT:  Excuse me, what exactly is psychodrama?

THE WITNESS:  Psychodrama is a form of psychotherapy which you -- it's a very condensed form of psychodrama in which you actually act out your issues more so than talk about them.

THE COURT:  Okay, thank you.

Q.   (Mr. Reisenauer continuing)  So you came from Mexico and got that job in Phoenix?

A.   It wasn't a job.  I wasn't paid to do it.  I was training.

Q.   Okay.

A.   I don't think I was paying either but I wasn't paid.

Q.   At this point you only had your business administrative degree; is that right?

A.   That's correct.

Q.   Okay.  And how long did you live in the Phoenix area?

A.   Just a few months, maybe four or five months.

Q.   Okay.  Then where did you move?

A.   I moved to Beacon, New York.

Q.   And why did you go there?

A.   Because that's where the Moreno Institute was and Moreno is the person that started the psychodrama thing and I was training there for about six months before I went to Detroit to the Merril Palmer Institute.

Q.   You moved to Detroit and went to the Merril Palmer Institute?

A.   That's correct.

Q.   Okay.  And that is the second thing you list here.  It says:  "M.A. Clinical and Humanistic Psychology, Merril Palmer Institute, Detroit," correct?

A.   Correct.

Q.   And is that -- that was a Master's degree?

A.   Yeah, I obtained a Master's degree from there.

Q.   You said what?

A.   I obtained a Master's degree from the Merril Palmer Institute.

Q.   Okay.  And that took how long?

A.   Two years.

Q.   And then from there what did you do?

A.   I went to Los Angeles and started my Ph.D. program at the International College.

Q.   Okay.  Let's go back if we could just for a second.  The Merril Palmer Institute, I've never heard of that, was that accredited?

A.   Merril Palmer Institute was part of Wayne

State -- was at the Wayne State campus.  As far as I know was funded by one of the Ford heirs and when she died they had no more funding.  But it was -- what they specialized in before I went there they didn't have a Master's in humanistic psychology.  I don't -- I'm not sure what you mean by "accredited" but one of the reasons I went there is because I was able to get a student visa from them.  So they were recognized by the federal government as being able to provide student visas for people for that program.

Q.  Do you know if that institute is still in existence?

A.  It's not in existence anymore.

Q.  It's not?

A.  No.

Q.  Do you know why?

A.  Because the funding was -- after Mrs. Ford died they had no more funding for the research they were doing in child development.

Q.  Okay.  So then from there you went directly to school in Los Angeles?

A.  Correct.

Q.  And that was at the International College; is that correct?

A.  That is correct.

Q. And your CV says that you received your Ph.D. in clinical psychology from International College; is that right?

A. That's correct.

Q. It was in 1981?

A. That's when I received the Ph.D., yes.

Q. Okay. So that only took two years?

A. Two years to get the Ph.D., yes.

Q. Okay. And again I've never heard of that college. Was that accredited?

A. It was accredited in the state of California. I was able to obtain a license as a psychologist from California, yes.

Q. Okay. But it wasn't accredited in the rest of the states by the United States?

A. Well, again, you know, one of the reasons I went there was because they were able to give me a student visa versus a few other institutions that they would not. I could not afford it at the time and I could not do a full-time program at any university because I still had to work and I had a child I had to support.

Q. Okay. So you were married and had kids at the time?

A. I wasn't married but I had a Down syndrome son that still stayed and lived in Mexico.

Q.   Can we jump back a little bit?  How old were you when you first moved to the United States from Mexico?

A.   In 1977 I was 31 years old.

Q.   Okay.  International College, that's no longer in existence either, correct?

A.   No.  That was a tutorial college and they didn't have -- they did have a campus but they didn't have a library so I think that's why they had to fold in with another institution that did have a library.

Q.   Okay.  So tutorial college, does that mean that you didn't have classes?

A.   No, I didn't have classes at the institute.  I took some classes at UCLA and -- but I did have a tutor that would --

Q.   Okay.

A.   -- supervise my work and my classes in my Ph.D. program.

Q.   And then the next item you have is "Post-Doctoral Certificate Program in Neuropsychology," correct?

A.   That's correct.

Q.   Now that's not -- that's not a separate degree, correct?

A.   To the best of my knowledge there is no degree. It's post-doctoral training.

Q.   This is the training where you received a

certificate for completion of the training?

A.   That's correct.

Q.   And again that was at another college that I haven't heard of, the Fielding Institute you have listed near Santa Barbara, California, correct?

A.   Correct.

Q.   And that was in 1998 so that was sometime after you received your Ph.D.

A.   Yes.  It was quite a bit afterwards.

Q.   Is the Fielding Institute, does that exist still do you know?

A.   Yes, it does, yes.

Q.   It does.  Okay.  So after you received your Ph.D. in 1981, did you set up a clinical practice then?

A.   I worked for part of the time under the supervision of Dr. Pick.  I had a private practice. Also then once I got my license I started doing private practice as well as I did some evaluations for the courts.

Q.   Okay.  I thought when we took your deposition last week that you said that you did some counseling in the schools; isn't that right?

A.   I worked at the -- yeah, I was the psychologist. It's a program where -- and I worked there I think for a year or something.  From 1992 to 2000 I worked at an

inner school.

Q.   At what school?

A.   An inner school called Baker Elementary School.

Q.   Where was that at?

A.   Inner city, in the inner city, downtown San Diego.

Q.   Okay.  And so I take it from after you received your Ph.D. until 1981 you moved to San Diego and then you started --

A.   I moved to San Diego in 1984.

Q.   Okay.  And since the year 2000 you've been doing this type of work?

A.   Since the year 2000 I've had my private practice. No, actually I did have a private practice during the time I was working at Baker Elementary School so it's been much longer than that that I had a private practice.  I had a private practice maybe for 25 years. I closed it about five years ago.

Q.   You closed it five years ago?

A.   Approximately five, six years ago, yeah.

Q.   What kind of private practice did you have?

A.   Well, I would see patients.  I would also do evaluations again for the courts, juvenile court and for other entities, you know, in San Diego.

Q.   Okay.

A.   Before I got involved in death penalty cases, I was -- I think the first death penalty case I did was 1995.

Q.   What did your private practice consist of?  What kind of work?

A.   Well, I had patients.  I did psychotherapy and again I did consulting and I did evaluations for juvenile court and also for -- I did some custody evaluations.  I did other types of evaluations.

Q.   And since about 2000 I think you told us that you have been involved in Atkins type cases; is that correct?

A.   Since '95 approximately, yes.  Not Atkins necessarily.  I don't think I started doing Atkins till 2002.  I think that's when Atkins came out is 2002.

Q.   And you started your forensic psychology evaluations and testimony in court in 1995?

A.   Before that.  I mean, when you do evaluations for the Courts in juvenile hall you're doing forensic work.

Q.   Okay.

A.   I think I started in 1987 but I don't recall exactly when I started.

Q.   And if you would turn to page 5 of your CV there, Doctor.  Mr. Montroy asked you about a presentation you made which is third from the bottom there in 2002,

correct?

A.   Yes.

Q.   And it says:  "Cultural Competent Evaluations in Death Penalty Cases."  That was in Mexico City, correct?

A.   Right.

Q.   And you've been giving that same presentation over the years, correct?

A.   Not the same one but similar themes.

Q.   All right.

A.   Different groups.

Q.   Earlier this morning Mr. Montroy asked you how many death penalty cases that you have been involved in. Do you recall that?

A.   Yes.

Q.   And how many did you tell him?

A.   I think I said about 130 but I don't know. Somewhere in the neighborhood of 130 to 150.

Q.   Okay.  So if I told you you told me 150 last week, that still fits that area?

A.   That fits that range, yes.

Q.   You don't have a list of the cases you've been involved in?

A.   No, I don't.

Q.   How many cases would you say that you've been involved in in the last five years?

A.    Death penalty cases or just in general?

Q.    Yes, death penalty cases.

A.    I would say 20, 25.

Q.    So about a year ago you would have said about a hundred?

A.    How many cases I've done five years ago?

Q.    Yeah.  About a hundred?

A.    I would think so more or less.

Q.    Do you remember testifying in a case in Puerto Rico in United States v. Xavier Jiminez-Bencevi?

A.    Yes.

Q.    Do you remember telling the Court there that you had been involved in 40?

A.    I don't know if that's in reference to how many cases I've testified in or in how many cases I worked because it's not the same thing.  I don't testify in all the cases I work in.

Q.    Okay.  Now earlier this morning Mr. Montroy asked you about your interview with Mr. Rodriguez.  Why don't you grab your report there, Doctor.  It's Exhibit 44.

A.    (Witness complies.)  Okay.

Q.    Do you have it?

A.    Yes, sir.

Q.    Okay, thank you.  On the very first page you say: "I interviewed and tested Mr. Rodriguez on August 9,

2018..." do you see that?

A.   Yes.

Q.   Okay.  And that was at the Terre Haute prison in Indiana, correct?

A.   Yes.

Q.   And I think you told Mr. Montroy that you didn't videotape the interview; is that correct?

A.   That is correct.

Q.   And that is -- I think you said that is not your practice; is that right?

A.   That's correct.

Q.   Did you audiotape the interview at all?

A.   No, that's not my practice to audiotape either. I mean, if I'm asked to I would but I haven't.  No one asked me to.

Q.   Counsel didn't ask you to do that?

A.   No.

Q.   You did take some notes though, correct?

A.   Some notes, yes.

Q.   Some?

A.   Yes, sir.

Q.   And you wrote them in Spanish yourself, correct?

A.   I'm not sure.  I don't recall whether they were in English or Spanish.

Q.   Okay.

A.   They probably are in both languages because I spoke both languages with Mr. Rodriguez.

Q.   You provided those to counsel though, didn't you?

A.   I did, yes.

Q.   Okay, thank you.  And then if you stick to page 1 of your report there it lists a number of things that you did in this interview.  You say you did a clinical interview, correct?

A.   Correct.

Q.   And what do you mean by that?

A.   It's just talking about the individual's history, his life, his upbringing, his perception of how he developed.  Basically that's what a clinical interview is, a history of the person's life.

Q.   And then you say you also did a mental status exam which I think you talked about later in the report, correct?

A.   Yes.

Q.   And what's the purpose of that?

A.   That's the standard kind of questions to determine whether the person is oriented to time, place and space, where they're aware of what's going on, where they're exhibiting psychotic symptoms, where they're suicidal or homicidal or too depressed to participate, where they understand -- where they can understand the

reason for the evaluation, the limits of confidentiality.

So there's some kind of -- it's a structured kind of interview but you ask the same questions to people and you make some observations about how the person appears, you know, if they are properly dressed and groomed, if they are -- they're able to walk or ambulate adequately.

Q. Okay.

A. If they can understand and communicate, in what language they do that, et cetera.

Q. Well, let's talk about that for a second. If you would turn to page 4, please.

A. (Witness complies.) Yes, sir.

Q. Okay. In the first paragraph, the last two sentences, you say: "The interview was conducted in Spanish and English. Most of the testing was performed in English, Mr. Rodriguez' preferred language," correct?

A. To be tested in, yes.

Q. And his preferred language is English, correct?

A. For testing. When I asked him -- I don't recall exactly what I asked him or -- but I recall that he answered that he didn't mind speaking English or Spanish. Whatever was fine. He could speak both.

Q. Okay. He speaks good English, correct?

A.   Yes.

Q.   Okay.  And then later in the third paragraph you say:  "He was able to communicate adequately and no significant receptive or expressive language deficits were identified," correct?

A.   Are we on page --

Q.   Same page, third paragraph of that section.  It starts:  "Mr. Rodriguez was open, disclosing and cooperative.  He was able to communicate adequately..."

A.   Okay.  So this is -- now we're on page 4?

Q.   Yes.  You don't see that?

A.   Yeah, I see it, yes.

Q.   Okay.

A.   I mistakenly was on page 3.

Q.   Okay.  So let's go back to that paragraph, okay?

A.   Yes.

Q.   So the record is clear.

A.   Yes.

Q.   You wrote:  "Mr. Rodriguez was open, disclosing and cooperative.  He was able to communicate adequately and no significant receptive or expressive language deficits were identified," correct?

A.   Correct.

Q.   Go to the next paragraph then and the third line down there's a sentence you wrote:  "His knowledge of

current affairs was more than sufficient.  He commented that he likes to watch the news, public television and read books."  He told you that?

A.  He told me that, yes.

Q.  If you go to the next paragraph you write:  "He denied experiencing visual, auditory or olfactory hallucinations.  There was no paranoid ideation identified;" is that correct?

A.  Correct.

Q.  And then in the second to the last paragraph he did tell you that he has diabetes and hypertension that he takes medication for, correct?

A.  Yes.

Q.  And then your last sentence says that his "capacity for psychological insight is limited."  Now that was your opinion, correct?

A.  That's my observation, yes.

Q.  Okay.  "Although he is aware of the consequences of his actions," correct?

A.  Correct.

Q.  And then let's go back to page 1 if we could.  So that was the extent of your mental status exam, correct? That's what you got on page 4?

A.  Yes.

Q.  So on page 1 then after mental status exam you

list I believe the tests you gave him; is that right?

A. Yes.

Q. And so if we could just briefly just go through the list and we're going to talk about these in detail later. But so the first one is that WAIS-IV test that you talked with Mr. Montroy about, right?

A. Yes.

Q. And how long does that take?

A. It takes about 45, 50 minutes to an hour.

Q. Okay. And then the next one is the TOGRA test. I think you also talked with Mr. Montroy about that. That's the Test of General Reasoning Ability, correct?

A. Right.

Q. Okay. How long does that one take?

A. Well, between the time you start and the time you end probably about 20, 25 minutes. The actual test is 16 minutes.

Q. So that's a timed test?

A. Yes.

Q. Okay. We'll talk about that later. The next test is the CTONI test that you talked with Mr. Montroy about, the Comprehensive Test of Nonverbal Intelligence. And how long does that take?

A. That test can take anywhere from half an hour to 45 minutes to an hour, depends on the number of correct

answers because you -- you terminate a particular subtest after three incorrect answers.  So if they can go to 25 answers then you -- or only can do nine answers correctly and three incorrect.

Q.  Okay.  We'll talk about that a little more.  Then you did the Dot Counting Test.  I think you described that briefly to Mr. Montroy.  How long does that take?

A.  That's a fast test.  That probably takes no more than ten minutes altogether.

Q.  Okay.  The next one, the Rey 15 Item Test, I think you also mentioned that earlier today.  How long does that take?

A.  That takes about I would say ten minutes or so.

Q.  And the Rey Complex Figure test you didn't talk about with Mr. Montroy but that involves some drawing, correct?

A.  Yes.

Q.  And how long does that take?

A.  Depends on how long it takes for the person to do it but in this case probably about nine minutes, ten minutes, 12 minutes.

Q.  Okay.  And that involves generally three different drawings, correct?

A.  At least two.  My experience is two.

Q.  Okay.  The next test is the WRAT4 that you talked

with Mr. Montroy about.  How long did that take?

A.   That can take maybe 45 minutes to an hour.

Q.   Okay.  And then the next test is called the Delis-Kaplan Executive Function System, D-KEFS.  You list four what I will call subtests; is that right?

A.   Well, they're all tests on their own but they are components of the system, of the D-KEF system.

Q.   Okay.  And so those are each individual tests is what you're saying?

A.   Yes.

Q.   And how long I guess total I'll ask does that take?

A.   The four together or each of them?

Q.   Well, you can tell me either one.  The four together is fine.

A.   Probably 45 minutes to an hour.

Q.   Okay.  And then you gave the Neuropsychological Assessment Battery, which is in parentheses, (NAB), and that has two modules to it, correct?

A.   It has more modules but I just gave him two of the modules.

Q.   You just gave him two?

A.   Yes.  The same with the Kaplan, it has a lot -- it has maybe I think nine tests but I don't do the nine tests.

Q.   So the two you gave were the attention module and the executive functions module, right?

A.   That's correct.

Q.   And how long did those take?

A.   That takes about an hour.

Q.   Okay.  So earlier you testified that I believe Mr. Montroy asked you about whether a couple tests that you gave Mr. Rodriguez you called effort, I think that showed effort, right?

A.   Yes.

Q.   You testified that he gave good effort in those couple tests that reflects that?

A.   Yes.

Q.   And can you tell us whether or not in all of the tests that Mr. Rodriguez was able to do those tests when you gave them?  Was he able to do them?

A.   He had some problems with the Rey Complex Figure drawing because of his shaking.

Q.   That's not my question.  Did he attempt to do all of the tests?

A.   Yes.

Q.   Okay.  And he was able to at least complete the tests as far as you were concerned?

A.   Yes.

Q.   Okay.  Now the next page, page 2, you have a list

of people that you interviewed, correct?

A. Correct.

Q. People who you attempted to interview but you were refused?

A. They refused to talk to me, yes.

Q. Okay. And then the third list is you attempted to contact people but you apparently weren't able to contact them at all; is that right?

A. Right. They weren't home and they didn't contact us back even though we went there a couple of times.

Q. Okay. So let's go back up to the top here. You have a list of various people: Delores Rodriguez, his mother, his three sisters, and then people you list as friends, five of those, correct?

A. Yes.

Q. And did you -- did you video or audio record your interviews with those people?

A. No, I did not.

Q. Do you have reports of your interviews with those people?

A. Reports? No.

Q. No? And then the next list is individuals that refused to talk to you so there's nothing that is available for those, right?

A. Right. They didn't want to talk to me.

Q.   And then the next list is the ones you couldn't find so there's nothing for those people?

A.   I'm sorry, yeah, that's correct.

Q.   Okay.  And then you go on to say that there's a list of documents attached of people that -- of documents that you reviewed, right?  And that's the sources that you talked with Mr. Montroy about?

A.   That's correct.

Q.   So let's turn to the sources in your report.

A.   Okay.

Q.   Are you there?

A.   I am, yes.

Q.   Okay.  So there you list some school records from Laredo, from Crookston -- well, let's go back.  So the school records you've reviewed, you have Laredo Independent School District records on Alfonso Rodriguez Jr., correct?

A.   Correct.

Q.   And then the other school records that you have listed there are not for Alfonso, they're for other people; is that right?

A.   They're for siblings, yes.

Q.   Okay.

A.   I think what I'm missing here is I did receive the Crookston school records for Mr. Rodriguez but that

was after I wrote the report.  I was provided --

Q.  Are you talking about the school records that you talked with Mr. Montroy about today?

A.  Yes.

Q.  You received those but you didn't list them?

A.  I received them after I wrote the report.

Q.  After you wrote the report.

A.  I think -- I think it was at the time that we met in San Diego for the deposition that he provided me with the records.

Q.  Okay.  So all you had when you did this report was the Laredo school records, correct?

A.  Those were the ones that I was able to review that I had personally -- review of records --

Q.  Do you have those with you at all, the Laredo school records?

A.  No, I don't think I have any of those.

Q.  We haven't looked at those today at all, correct?

A.  No, we haven't.

Q.  Okay.  And then if you go down to the next part, the "Medical/Mental Health Records," these are records you also received from counsel; is that right?

A.  Yes.

Q.  You didn't go out on your own and obtain any additional medical records or mental health records?

A.   No, I did not.

Q.   Okay.  So let's go through a couple of those just so I'm aware of what you actually looked at.  The fifth line down says:  "Neuropsychological Report on Alfonso Rodriguez by Dr. Karen Froming - June 27, 2006."  Do you see that?

A.   Yes.

Q.   And then the next line is "Test Scoring Sheets by Dr. Froming."  Do you see that?

A.   Yes.

Q.   Okay.  And you received those?

A.   Yes, I did.

Q.   Okay.  And I take it you reviewed those, correct?

A.   I did.

Q.   Okay.  And then I'm going to have you turn the page if you would because you have this in a little different area.  Turn the page.  Down on the bottom you have a title called "Mitigation Related Records Report of Mitigation on Alfonso Rodriguez by Dr. Marilyn Hutchinson."  Do you see that?

A.   Yes.

Q.   And then "Tests Administered...by Dr. Marilyn A. Hutchinson" and "Test Scoring Sheets by Dr. Marilyn A. Hutchinson," correct?

A.   Yes.

Q.   And you received each of those three?

A.   Yes, I did.

Q.   Did you review those?

A.   I did.

Q.   If you turn the page, Doctor, you have listed depositions and testimony?

A.   Yes.

Q.   In the middle of that section you have "United States District Court of North Dakota - United States v. Alfonso Rodriguez - Trial Testimony of Marilyn Hutchinson, Ph.D."  Do you see that?

A.   Yes.

Q.   So you received the transcript of her testimony I take it.

A.   I did.

Q.   Okay.  And you have reviewed that?

A.   I did.

Q.   Okay.  Go one page back if you would, please.

A.   Okay.

Q.   There is a list in the middle of that page you call "Declarations/Affidavits."

A.   Right.

Q.   Do you see those?

A.   Yes.

Q.   Those are the declarations that Mr. Montroy put

in evidence this afternoon and talked to you about, correct?

A.   Yes.  And then I did receive three additional declarations.

Q.   Okay.  The ones that were on that separate list that was put in earlier today?

A.   Yes.

Q.   Okay.  These particular declarations, they were primarily made in the late summer, early fall of 2011, correct?

A.   I think so.  If I recall correctly that's the date when they were signed.

Q.   Okay.  These were not declarations or statements given by individuals prior to the trial in this case, correct?

A.   I don't know.

Q.   Okay.  Well, you just told me that most of them were made in the summer or early fall of 2011.

A.   That's when they're dated.  I think some are dated as early as 2009 but I think most of them are 2011, yes.

Q.   Okay.

A.   I really don't know when the trial -- I don't remember when the trial was.

Q.   Okay.  The trial was in 2006.

A.  Then it's after because this is 2011 I think.

Q.  Right.  Okay, thank you.  The list of declarations that you reviewed, did you receive -- let me ask you this:  Did you receive the records from interviews that took place prior to the trial?

A.  If they're not listed here, I didn't receive them.  If they're listed, I did.

Q.  Okay.

A.  These are the materials that I received and reviewed.  Again there's about 10,000 pages of materials and I don't recall exactly --

Q.  Okay.  You received 10,000 pages of materials?

A.  I think approximately something like that, yes.

Q.  Okay.  Let me ask it this way:  Do you recall reading materials provided by an individual by the name of Ingrid Christiansen?

A.  I don't recall that.

Q.  You recall that name at all, Ingrid Christiansen?

A.  (No response.)

Q.  No?

A.  Is she the mitigation specialist?

Q.  She is.

A.  I think I did receive a timeline that she might have produced.

Q.  A timeline?

A.    I think so.

Q.    Well --

A.    I don't know if I saw it or if it's in parts of -- it's a little confusing to tell you where I seen all this information but keep on getting a lot of information.

Q.    Well, let me ask you this.

A.    There's several interviews by Ingrid Christiansen listed here in mitigation-related records.

Q.    Pardon?

A.    I have at least let me see, chronology of Alfonso Rodriguez by Ingrid Christiansen under mitigation-related records.  I have listed also memorandum of interview with Gail Alterpeter and I have a memorandum of interview with Dotsie Dahl by Ingrid Christiansen.

Q.    So you have -- you have three records from Ingrid Christiansen, correct?

A.    I think so.

Q.    The chronology, the interview with Gail Alterpeter and with Dotsie Dahl; is that right?

A.    I think so, yes.

Q.    Okay.  So those are the only memos and interviews you received and reviewed; is that right?

A.    You know, as far as I know because they're listed

here.  I don't recall specifics of any of those, but again it's not something I read recently.

Q.  Okay.  But you would have listed them because you listed these interviews, correct?

A.  Yeah, that's correct.

Q.  Okay.  So you didn't review an interview with Johnny Rocha?

A.  No.

Q.  Ricky Simmons?

A.  No.

Q.  Jim Stordahl?

A.  Not that I recall.

Q.  Ed Ross?

A.  No.

Q.  Gail Vogley?

A.  No.

Q.  Elba Chavez?

A.  Not that I recall.

Q.  Gregoria Chavez?

A.  No.

Q.  Genaro Chavez?

A.  No.

Q.  Joel Mauer?

A.  No.

Q.  Clifford Hegg?

A.   I don't think so.

Q.   Bruce Bomier?

A.   Other than the two that we went over here, I don't recall reviewing any other interviews by Miss Christiansen.

Q.   So you didn't read the interview of Wayne Brule?

A.   No.

Q.   Okay.

THE COURT:  Are you moving on to another topic at this point or is there something you want to conclude yet this afternoon?

MR. REISENAUER:  We can finish right now, Your Honor.  That's fine.

THE COURT:  We'll go ahead and we'll break at this point.  We'll start again tomorrow morning at 9 o'clock.  Presumably one of you will bring the bad news to Mr. Hoy.

MR. REISENAUER:  I think they already did, Your Honor.

THE COURT:  You already did.  Well done. We'll see you in the morning at 9:00.

(Adjourned at 4:50 p.m.)