**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -

United States of America,    )
                             )
     Plaintiff/Respondent,   )
                             )
          vs.                )     **FILE NO. 2:04-cr-55**
                             )
Alfonso Rodriguez, Jr.,      )
                             )
     Defendant/Petitioner.   )
                             )

- - - - - - - - - - - - - - - -

**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**Evidentiary Hearing - Volume 4 of 9**

**January 31, 2019**

**Pages 577-831**

HELD AT:  QUENTIN BURDICK UNITED STATES COURTHOUSE
          655 FIRST AVENUE NORTH
          FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

**A P P E A R A N C E S**

**MR. KEITH W. REISENAUER**          **COUNSEL FOR PLAINTIFF;**
**MS. MELISSA H. BURKLAND**
Office of U.S. Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102

**MR. JOSEPH W. LUBY**          **COUNSEL FOR DEFENDANT;**
**MR. ERIC J. MONTROY**
**MS. JAHAAN AKILAH RUTH SHAHEED**
**MS. ANNE FISHER**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

**I N D E X**

**W I T N E S S E S**

**DEFENDANT'S:**                                                    **PAGE NO.**

**RICARDO WEINSTEIN**

Cross-Examination (cont.) By Mr. Reisenauer    582
Redirect Examination by Mr. Mr. Montroy        721
Recross-Examination by Mr. Reisenauer          768

**ANDRES M. LUGO**

Direct Examination by Ms. Shaheed              777
Cross-Examination by Ms. Burkland              820
Redirect Examination by Ms. Shaheed            829

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
| --- | --- | --- | --- |
| Defendant's 63 | Index and Background Materials | 724 | 725 |
| Defendant's 64 | Interview between Dr. Seward & Mr. Rodriguez | 739 | 739 |
| Defendant's 65 | Minnesota Security Hospital Admitted on: 1/2/75 | 748 | 748 |
| Defendant's 67 | CV of Andres M. Lugo | 778 | 778 |
| Defendant's 68 | Alfonso Rodriguez's Toxicology Investigation & Toxicology Assessment Dated: 12/17/18 | 784 | 784 |
| Defendant's 69 | Interview of Glenn Weise on 6/12/90 | 793 | 793 |
| Defendant's 70 | Letter to Mr. Richard Ney From D.J. Ecobichon, Ph.D. Dated 7/10/06 | 807 | 807 |

580

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's 71 | Minnesota Valley Testing Laboratories, Inc. (Testing for Lead) | 808 | 808 |
| Defendant's 72 | Minncor Industries Printing (7 pages) | 816 | 816 |
| Government's 574 | FBI Report dated 8/20/06 Re: Gordon Tolbert | 585 | 586 |
| Government's 575 | One page of report that was part of an exhibit entered by dft's team when 2255 was filed | 587 | 588 |
| Government's 576 | MN Security Hospital Admission Summary Dated 1/13/75 | 591 | 591 |
| Government's 577 | Interview with Delmer C. Eggert, MD Dictated on 2/3/75 | 594 | 594 |
| Government's 578 | MN Security Hospital Psychiatric Consultation Dictated on 10/25/76 | 596 | 597 |
| Government's 579 | Portion of a Transcript (2 pages) | 602 | 602 |
| Government's 580 | Raw data reviewed by Ricardo Weinstein, Ph.D. | 615 | 615 |
| Government's 581 | Specialty Guidelines for Forensic Psychology, American Psychological Association January 2013- American Psychologist | 613 | 613 |
| Government's 582 | Scoring Sheet (1 page) For demonstrative purposes | 618 | 618 |
| Government's 583 | Drawing | 622 | 622 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 584 | Journal of Clinical and Experimental Neuropsychology 2002, Volume 24, No. 5, Pages 561-573 | 627 | 628 |
| Government's 585 | Intellectual Disability - 11th Edition (page 41) | 640 | 640 |
| Government's 586 | Uses of the CTONI-2 | 641 | 641 |
| Government's 587 | Introduction and Overview TOGRA (2 pages) | 643 | 644 |
| Government's 588 | Administration and Scoring | 664 | 664 |
| Government's 589 | American Journal on Intellectual and Developmental Disabilities 2012, Volume 117, No. 4, Pages 291-303 | 666 | 666 |
| Government's 590 | Applied Neuropsychology 2009 Article, Pages 114-123 | 668 | 668 |
| Government's 591 | Archives of Clinical Neuropsychology 24 (2009) Pages 127-135 | 671 | 671 |
| Government's 592 | Professional Psychology: Research and Practice 2008 Volume 6, Pages 619-625 | 707 | 708 |
| Government's 593 | Weinstein Case Law | 709 | -- |

**P R O C E E D I N G S**

(January 31, 2019:  The following proceedings commenced at 9:00 a.m., in open court, all counsel present.)

THE COURT:  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that the defendant has waived his presence.  He appears through his counsel of record, each of whom is present here today, and the United States appears through its counsel of record as well.

When we broke Dr. Weinstein was on the stand.  Mr. Reisenauer was conducting a cross-examination.

Mr. Reisenauer, you may proceed.

MR. REISENAUER:  Thank you, Your Honor.  May I approach, Your Honor?

THE COURT:  You may.

**RICARDO WEINSTEIN,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**CROSS-EXAMINATION (CONT.)**

**BY MR. REISENAUER:**

Q.  Dr. Weinstein, I'm going to hand you Government's Exhibit 573, a number of pages, 10 pages.  It is

entitled on the top "Mitigation Themes" and ask you if you can take a look at that (indicating).

A. Yes, sir.

Q. Have you seen that before at all?

A. I don't think so.

Q. Okay. If I could, this particular document talks about experts at the top. Do you see that?

A. Yes.

Q. Okay. And Marilyn Hutchinson's name is listed. Do you see that?

A. Yes.

Q. And Karen Froming's name is listed. Do you see that?

A. Yes.

Q. You're aware that those are two experts that testified on the defendant's behalf at the time of trial?

A. I am aware of that, yes.

Q. And then as this is entitled "Mitigation Themes," there are a number of subheadings. No. 1 is "Poverty," correct?

A. Yes.

Q. No. 2 is "Race and Community Violence," correct?

A. Yes.

Q. And No. 3 is "Sexual Assault," correct?

A.   Yes.

Q.   Four is "Mental Illness - Brain Damage - Learning Disabilities," correct?

A.   Correct.

Q.   And No. 5 is listed "Drug - Alcohol," correct?

A.   Yes.

Q.   No. 6 is "Toxins from Fields - Other Health Issues"?

A.   Yes.

Q.   No. 7 is listed as "Fear of Release."  Do you see that?

A.   Yes.

Q.   No. 8 is entitled "Institutional Adjustment," correct?

A.   Yes.

Q.   No. 9 is "Institutional Failure"?

A.   Yes.

Q.   No. 10 is "Good Person Mitigation"?

A.   Yes.

Q.   No. 11, "Cost to His Family of Tito's Behavior"?

A.   Yes.

Q.   No. 12 is "Family History - Cultural Issues - Military"?

A.   Yes.

Q.   And No. 13 is just entitled "Death Penalty,"

correct?

A. Correct.

Q. I want to turn your attention though to in particular No. 4, "Mental Illness - Brain Damage - Learning Disability." Do you see that?

A. Yes.

Q. If you would just look at that, there's a couple letters below and what I want you to look for is any reference to mental retardation or intellectual disability.

A. I don't think there is. I think it's a mistake to consider somebody with an IQ and -- learning disabled instead of mentally retarded but there isn't any mention of mental retardation.

Q. Okay, thank you. And at the time of the case here intellectual disability as it is now known was known as mental retardation, correct?

A. I think so, yes. That's prior to 2010.

Q. Okay. Doctor, I'm going to hand you what's been marked as Government's Exhibit No. 574 (indicating). This is an FBI report in regard to an interview of Gordon Tolbert. Do you see that?

A. Yes, sir.

MR. REISENAUER: We would move in 574, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No objection, Your Honor.

THE COURT:  574 is received.

Q.  (Mr. Reisenauer continuing)  Doctor, if you would look at that report, this report is of Mr. Tolbert.  He was a teacher at the Crookston, Minnesota High School in the high school district.  Do you see that?

A.  I see that he was a teacher in the shop, in the workshop, yeah.

Q.  Okay.  If you'll turn down to paragraph three there?

A.  Yes, sir.

Q.  It says:  "Rodriguez was a student in Tolbert's Shop Class during Rodriguez' 8th grade junior high school year."  Do you see that?

A.  Yes.

Q.  He said that he "recalled that Rodriguez liked the shop class and did well on the 'tools test'."  Do you see that?

A.  Yes.

Q.  Next sentence says:  "At the time, Rodriguez was a small, thin, good looking kid who looks much different today.  Rodriguez was a 'nice kid' who did not 'run with the bad kids' while attending school."  Do you see that?

A.  Yes.

Q.   And then if you go on to the next paragraph he says:  "Tolbert advised that while attending shop class Rodriguez' motor skills appeared to be good and he performed well in his tests and projects.  Rodriguez operated the tools and machines 'well' and appeared to have an interest in his daily task."  Do you see that?

A.   Yes.

Q.   Did you review this report at all, Doctor?

A.   I don't recall specifically if I did or not.  I might.

Q.   Thank you.  Doctor, I'm next going to hand you what's been marked as Government's Exhibit 575 (indicating).  This is a report that was part of an exhibit entered by Mr. Rodriguez's defense team when they filed their 2255.

We would offer 575, Your Honor.

A.   I don't know what a 2255 is.

Q.   Don't worry about it.

A.   Okay.

THE COURT:  Mr. Weinstein, we're here today on a 2255 petition.  It's a petition that replaces a habeas corpus petition.  So it's reference to a statute, sir.

THE WITNESS:  Thank you, sir.

THE COURT:  Any objection to 575?

MR. MONTROY:  No, Your Honor.

THE COURT:  575 is received.

Q.  (Mr. Reisenauer continuing)  Doctor, I'm going to refer you to the second paragraph in this report and here it says:  "Mr. Rodriguez was afforded a battery of psychological tests in January 1975."  Do you see that?

A.  Yes.

Q.  "The results suggested he was 'quite' depressed and with considerable anxiety and undue sensitiveness."  Do you see that?

A.  Yes.

Q.  If you move down further in the paragraph it says:  "His estimated academic IQ was 85."  Do you see that?

A.  I do.

Q.  Were you aware of that test result?

A.  Yes.

Q.  You were, okay.  Thank you.

MR. MONTROY:  Sorry, Your Honor, could I just have a moment to consult with counsel?

THE COURT:  You may.

MR. MONTROY:  Thank you.

THE WITNESS:  Your Honor, can I clarify my answer?

THE COURT:  You may.

THE WITNESS:  I don't recall that he received any IQ testing.  It's no reference here to the IQ testing.  I recall the psychological reports from the hospital, but I don't recall that they were ever -- he was tested with any IQ test.

Q.  (Mr. Reisenauer continuing)  Okay.

A.  He was given the MMPI and I think that's the test that's referred here.  But he says an estimated academic IQ so they didn't test him for that.  They estimated that.

MR. MONTROY:  I'm sorry, Your Honor, if I could just clarify for the record.  My understanding is that in talking with Mr. Reisenauer that this was a document that was produced by the government firewall team and then was later attached as part of the 2255 proceedings by prior counsel.

THE COURT:  Very good.

MR. REISENAUER:  Okay.  Can I move on, Your Honor?

THE COURT:  Yes.

MR. REISENAUER:  Thank you.

Q.  (Mr. Reisenauer continuing)  Doctor, let's clarify, when you -- you just testified that you were aware of this test result, correct?

A.  But you didn't mention which test result.  I said

yes, I was aware of the psychological results of the tests.  But I don't recall -- and this is again I don't recall seeing any IQ testing from the hospital.  All the reports from the hospital -- all psychological reports from the hospital were -- contained testing that was not including any IQ testing.  And I think the statement here is clear that it's an estimate of his IQ.  It's not the results of IQ testing.

Q.  Okay, thank you.  Let me clarify what you testified about yesterday as far as IQ and a true IQ.  When you testified to a particular number, let's say Dr. Froming's 87, that was also an estimate.  You were giving us ranges of what it could or couldn't be, correct?

A.  What I said is that psychometrically, and that's how you develop tests, you can never know the true score.  The true score is an IQ score that the person would have.  And because of the fact that you're using psychometric tests, you will not obtain the same results --

Q.  Okay.

A.  -- anytime you test the person.

Q.  Let me stop you there.  So this statement that his estimated academic IQ was 85 falls in line with what you're trying to tell us, isn't it?

A.   No.   I'm stating that I don't recall that he was ever tested for an IQ score --

Q.   Okay, thank you.

A.   -- at the hospital.

Q.   Doctor, I'm going to hand you Government's Exhibit 576 (indicating).  This is a Minnesota Security Hospital record dated January 13, 1975.

We would move in 576, Your Honor.

THE COURT:   Any objection?

MR. MONTROY:   No, Your Honor.

THE COURT:   576 is received.

MR. REISENAUER:   Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Doctor, I'm going to refer you down towards the bottom of the page.  There's something called "Social History."  You see that?

A.   Yes.

Q.   And the first sentence there says:   "Mr. Rodriguez comes, from what he describes, as a close family."  You see that?

A.   Yes.

Q.   And then the last sentence -- well, let's just move to the next sentence.  It says:   "The family moved to Crookston from Texas, when Alfonso was in the second grade.  At that time, he could not speak English and was teased by his classmates."  And then the last sentence

says:  "Mr. Rodriguez says he was eventually accepted and liked by his peers."  You see that?

A.  I see this, yes.

Q.  Okay, thank you.  And then the last sentence says:  "He quit school at that time," meaning the 9th or 10th grade, "because he wasn't working at it and thought most of the students were aware of his sexual behavior and talking about him."  You see that?

A.  Yes.  This is his self-report, yes.

Q.  Okay.  If you could find Defendant's Exhibit 16, Doctor.  Should be in front of you on the left side there.  I don't know if they're in order.

A.  I think somebody was kind enough and put them in order.

Q.  If you could turn to page 6.

A.  Can you give me the Bates number?

Q.  Page 6, please.

A.  Are you --

Q.  Page 6 in the report, Doctor.

A.  Okay.

Q.  Do you see it?

A.  Correct.

Q.  Thank you.  This is pertaining to his education, correct?

A.  On the top, yes.

Q.   And again this is a report from the Minnesota Security Hospital.  On Question 5 it says:  "Age patient left school?  Reason for leaving school?"  And it says: "18 years - not interested - felt work would be better." You see that?

A.   Yes.

Q.   Question 6:  "Did patient repeat any grades?" And he says:  Yes, 2nd," correct?

A.   Right.

Q.   Question 11:  "What kept patient from carrying out ambitions?"  "Lack of interest."

This is again related to his education, correct?

A.   It's in that section, education, yes.

Q.   Okay.  And Question 12 is a little different.  It says:  "What games and sports did patient like?"  And it says:  "Football - hunting," correct?

A.   Correct.

Q.   And Question 14 says:  "What outside interests did the patient have while in school?"  And it says: "Sports," correct?

A.   Yes.

Q.   Okay, thank you.  Doctor, I'm going to hand you what's now been marked as Government's Exhibit 576. This is a Security Hospital --

THE CLERK:  Hold on, we've got two 576s.

MR. REISENAUER:  Can you change it to 577 for me?

THE COURT:  Thank you.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Doctor, this is a report from the Minnesota Security Hospital regarding an interview of          Mr. Rodriguez on February 3rd of 1975.  Do you see that?

A.   Yes.

MR. REISENAUER:  We would move 577, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No objection, Your Honor.

THE COURT:  577 is received.

Q.   (Mr. Reisenauer continuing)  Doctor, on the first page of that report there's a section called "Present illness" with a colon beside it.  Do you see that?

A.   On the first page?

Q.   Yes, the first page, the second paragraph.

A.   Yes.

Q.   And the first sentence says:  "The patient was interviewed and was a good informant."  Do you see that?

A.   Yes.

Q.   And then if you move down it again says that he

came to the Crookston area from Laredo, Texas.  "At that time the patient was a second grader."  You see that sentence?

A.   Yes.

Q.   Fourth line down, third and fourth line down, you see that, Doctor?

A.   I do.

Q.   The next sentence says:  He came without any abilities in English."  You see that?

A.   Yes.

Q.   "He had to repeat the second grade because of language difficulty," correct?

A.   That's a self-report, yes.

Q.   And then if you go down further on the page to the second to the last paragraph it starts:  "About three months ago," that paragraph, you see that?

A.   Yes.

Q.   And go towards the end of that paragraph.  He talks about the rapes that he was convicted of and says: "He admits remembering these incidents in their entirety at this present time even though he was drinking heavily at the time.  He has had many weeks to think about this and he has concluded that these rape came about because he was resentful and getting back at people."  You see that.

A.   You know, I'm lost.  If you say it's there, it's there.  But if you direct me to where it is if you want me to read it.

Q.   Okay.  Turn to the next page, Doctor, if you would.  If you go to the fourth paragraph down it says: "Mental status examination."  You see that?

A.   Yes.

Q.   And if you go to the bottom of that paragraph you see the sentence on the fourth line from the bottom, it says:  "The sensorium is clear"?

A.   Yes.

Q.   Then it says:  "I think that this man's intelligence is within the average range, but was compromised by language difficulties and difficulty with social acceptance."  You see that?

A.   Yes.

Q.   Were you aware of this report, Doctor?

A.   I think so, yes.

Q.   Okay.

A.   I don't recall the specifics but I do.

Q.   Doctor, I'm going to hand you what's been marked as Government's Exhibit 578 (indicating).  This is another Minnesota Security Hospital record and this is dated October 25 of the 1976.

We would move 578, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No objections, Your Honor.

THE COURT:  578 is received.

Q.  (Mr. Reisenauer continuing)  And, Doctor, as I just noted this report is October 25th of 1976.  You see that?

A.  I do.

Q.  And in the middle of the first page, this is one full paragraph, it says:  "He is a small person and perhaps felt sensitive about this."  Do you see that?

A.  Yes.

Q.  Okay.  And if you go down seven lines where the sentence starts -- or the line starts with the word "principally," do you see that?

A.  Yes.

Q.  It says:  "Principally the patient has a much improved self-concept.  He feels that he is not one of the low persons, he is not some low-class person, he is not striving to be in some other group."  Do you see that?

A.  Yes.

Q.  If you turn the page to the first full paragraph there, it says:  "Currently he seems quite confident. He seems quite socialized."  You see that?

A.  Second paragraph, yes.

Q.   Okay.  And then if you go down to the third paragraph it says this:  "The reports from the last Team meeting indicate that he had been rather quiet but still attentive, that he followed the discussion and asked appropriate questions, and that he was a positive leader."  Do you see that?

A.   No.  Can you direct me to where you're looking at?

Q.   The third paragraph down, it starts with "The reports..."

A.   Yes.

Q.   Do you want me to read it again?  I will.  "The reports from the last Team meeting indicate that he had been rather quiet but still attentive, and that he followed the discussion and asked appropriate questions, and that he was a positive leader."  Do you see that?

A.   Yes, I do.

Q.   And the next sentence says:  "It was reported that after some procrastination, he was going ahead with classes and he told me, by the way, that he was finishing up his high school."  Do you see that?

A.   Yes.

Q.   Were you aware of this report, Doctor?

A.   I think I was, yes.

Q.   And you are aware that he did finish high school

while he was at the Minnesota Security Hospital, correct?

A.   I haven't seen any certificate that he did that. He says he did.  I haven't seen any document indicating that he either received a GED or that he finished his schooling.

Q.   Did you see other reports from the Minnesota State Hospital indicating that, in fact, he did finish his GED or receive -- or graduate from St. Peters High School?

A.   What he told me, no.  I haven't seen any documents indicating that he graduated or finished high school, and what he mentioned to me had nothing to do with the hospital.  It had to do with the time of his incarceration in prison.

Q.   Okay, thank you.

A.   So it's contradictory.

Q.   Doctor, if you could find Defendant's Exhibit 13, please.

A.   Yes.

Q.   Okay.  You looked at this quite a bit yesterday. You recall that?

A.   Yeah.  This is the school records from Crookston.

Q.   Okay.  The tests that you were talking about, this Kuhlmann-Anderson test here, that's a group test,

right?

A.    Yes.    That's my understanding it's a group test, yes.

Q.    Okay.    And turn to your book there, the 11th Edition of the AAIDD if you would.

A.    Yes.

Q.    Turn to page 41, please.    Do you have it?

A.    Yes.

Q.    And there's a section titled "Test Selection." Do you see that?

A.    Yes.

Q.    And the first sentence says:    "For evaluating whether or not a person meets the significant limitations in intellectual functioning criterion for a diagnosis of ID, one should employ an individually administered, standardized instrument that yields a measure of general intellectual functioning."    See that?

A.    Yes.

Q.    Okay.    And these tests -- when he was in the first grade and second grade those were group tests, correct?

A.    Yeah.    But they were not for the purpose of diagnosing intellectual disability.

Q.    Okay, thank you.    I just noticed as I was sitting here that on that front page of Defendant's Exhibit 13

there's a test called Metropolitan.  That's another one of these grade equivalent-type tests, correct?

A.  I'm not familiar with that test.

Q.  Okay.

A.  But it's under the rubric of "Achievement" so I assume it's similar to the Stanford or to other nationally-given tests.

Q.  Similar to the Iowa Basic Test, correct?

A.  I would assume so but I don't know the test.

Q.  And this was taken in the first grade.  Do you see that?  Grade one?

A.  This was taken in grade one.  I see he had repeated in Laredo, Texas the first grade, and this is the second or the third time he was in the first grade, yes.

Q.  So this is taken in grade one and it shows that his grade equivalent was 1.7.  You see that?

A.  Yes.

Q.  Okay, thank you.  Doctor, I think you testified yesterday that you did receive --

A.  The 1.7, if I may, indicates --

Q.  No.  Thank you, Doctor.  Thank you.  We're going to move on.  Yesterday you testified --

THE WITNESS:  Your Honor --

MR. REISENAUER:  Your Honor, he answered the

question.  Thank you.

THE COURT:  You may answer.  I'm still the judge here.

THE WITNESS:  Your Honor, the thing is when you're reading school records you can't be partial.  You can't read a portion of it and not look at the rest of it.  So 1.7 indicates that it's just average and he's -- so for me this would indicate in the first grade after repeating it twice he's at an average of the first grade students.

THE COURT:  Very good.  Go ahead.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Doctor, yesterday you testified that you did receive the trial testimony of Drs. Froming and Hutchinson, correct?

A.  Yes.

Q.  Did you review those?

A.  I did.

Q.  Doctor, I'm going to hand you what's been marked as Government's Exhibit 579 (indicating).  This is the testimony of Dr. Hutchinson, pages 7981 and 7982.

We would move 579 into evidence, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No, Your Honor.

THE COURT:  579 is received.

Q.   (Mr. Reisenauer continuing)  Now, Doctor, if you would look at -- starting at page 7981, line 13, would you read that question there.

A.   Yes.

Q.   Can you read that out loud for us, please.

A.   The question?

Q.   Yes.

A.   Question:  "What IQ -- this IQ testing was done at the Crookston Public Schools?"

Q.   And the answer was?

A.   The answer was:  "Yes."  Page -- on line 15 the answer is:  "Yes."

Q.   Okay.  The next question was:  "And what IQ was he assigned?"  And Dr. Hutchinson says: "Seventy-seven," correct?

A.   Correct.

Q.   And then if you drop down to line 20 the question was:  "And where is the cutoff for mentally retarded in the IQ scale?"  And she says:  "Seventy-five."  Do you see that?

A.   Yes.

Q.   And then the question says:  "So he's two points above that."  And she says:  "Yes."  See that?

A.   Yes.

Q.   And then the next question says:  "Okay.  Is

there -- are you -- do you think that's an accurate IQ or what might be the effects on that?"  And what does she answer, if you'd read that to us?

A.  She says:  "Well, I think that that probably was not accurate of his sort of working intelligence.  But it would have been an accurate assessment of his ability to compete in school.  That his language difficulties, perhaps depression or anxiety problems that he was having, he got a 77 which means that he would have been functioning at a near retarded age, near retarded level of functioning at that time."

Q.  Continue on.

A.  "Since that time he has tested with a much higher -- not much higher, an 87 IQ, which is still below average.  But he has spent 20 years reading books. His English has improved and he has improved sort of his knowledge of the world.  So 87 is probably much more how he functions in the world now but he would have functioned at a 77 then."

Q.  Thank you.  Doctor, if you go to your report, I think your bell curve is now on the exhibit this morning.  It would be Exhibit 44.  It's your page 10, Doctor.

A.  Page 10 is missed from this exhibit.

Q.  It's not there yet.

A.   The page is not here, no.  Page 9, page 11.  I have a copy of the report if you want me to look at my copy but it's not the exhibit.

MR. REISENAUER:  We'll get one.

THE COURT:  It's been substituted in mine so why don't I give you --

MR. MONTROY:  I have a copy of it.  It was a photocopying problem.

THE COURT:  Anyhow the record should reflect that yesterday when we were testifying the graph itself was not visible and that the parties have substituted a new page 10 on Exhibit 44.  And on the original that has been filed with the Court the new page 10 does reflect the curve, the bell curving question.  And apparently the change was not made in the courtesy copy that was sitting on the witness stand.

THE WITNESS:  I have a copy of the report.

MR. REISENAUER:  We'll have that fixed, Your Honor.

Q.  (Mr. Reisenauer continuing)  Dr. Weinstein says he has a copy of the report with the bell curve in it so it's page 10, correct, Doctor?

A.  Yes, sir.

Q.  Okay, thank you.  You testified yesterday that in looking at the bell curve this is the bell curve for IQ

scores, correct?

A.   Yes.

Q.   And --

A.   Well, it's a bell curve.  The bell curve is a bell curve.  This is contained in the -- in a test -- in the -- the prodigal of a test for -- which is the Wechsler Adult Intelligence Scale III.  I think this is where this is from.

Q.   Okay.  And so when you norm a test, as you noted yesterday, the mean would be 100, correct?

A.   It's artificial but, yes, it would be 100.

Q.   Okay.  Well, that's what is used, correct?  100 is --

A.   That's what actually most if not all of the tests of intelligence that are published use is a hundred as a mean and 15 as the standard deviation.

Q.   Right.  And this is the bell curve that you use when you make a determination of an intelligence quotient and whether somebody is average, above average, high average as noted here, low average, correct?

A.   I'm not sure what your question is.

Q.   Is this what you use when you look at the results of an IQ test and place individuals at a certain level?

A.   In the classification specifically?  No.

Q.   No.  What do you use?

A.   I just mentioned before that you can't know the true scores so you use a range of scores in order to be able to determine whether an individual falls close to or within a certain range.

Q.   Let's go back to the definition in the DSM-5 and the AAIDD and it says that an individual that is ID is two what?

A.   Says approximately two standard deviations from the mean.

Q.   Two standard deviations from the mean.

A.   Approximately two standard deviations from the mean.

Q.   And the mean is 100, correct?

A.   That's correct.

Q.   Okay, thank you.  And according to your testimony yesterday and in looking at this bell curve, approximately 2.2 percent of the population is below that standard deviation, the two standard deviations, correct?

A.   Approximately 2.2 percent of the population is below two standard deviations from the mean, that's correct.

Q.   Okay, thank you.  Go to page 13 of your report, Doctor.  Are you there?

A.   I am.

Q.   The top of the page, the first paragraph there, the last sentence you write:  "In his present state he prefers to be isolated and he described what appear to be obsessive-compulsive behaviors."

A.   Correct.

Q.   What were those?

A.   Cleaning his cell, cleaning himself, making sure that everything is set up in order in his cell.  He needed to go back -- he wanted to go back when we were interviewing and testing because he needed to go back and put things in order and clean his cell.

Q.   Okay.  So he needed to keep his cell clean and tidy?

A.   Obsessively so, yes.

Q.   Okay.  And you were aware that that was a trait he had even when he was young, correct?

A.   Yes.

Q.   And when he got out of prison in 2003, he was living in his mother's house, correct?

A.   That's correct.

Q.   And he kept his -- he lived in the basement, you're aware of that, right?

A.   Right.  He lived not with the rest of the people, not with his mother, yes.

Q.   Okay.  And so you're aware that that area of the

house that he lived in he kept clean and tidy, correct?

A.   Right.  He had to.  He felt he had to, yes.

Q.   And are you aware from the records that you reviewed that when he was living with his mother in 2003 he was helping her with the chores and with cooking and with the yard and with the laundry and going and buying groceries and so forth?

A.   That's what she reported, yes.

Q.   Can you find Defendant's Exhibit 40, Doctor.  Do you have it there?

A.   Defense Exhibit 40, yes.

Q.   Thank you.  Can you turn to page 2.  Page 2, you see it?

A.   Are we talking about this --

Q.   Well, turn to page 2.  What do you see on page 2?

A.   I see a blank page with just two sentences:  "Had happened during the evening" --

Q.   Let me help you, sorry.

A.   That's what's here.

Q.   Let's turn to page 3.  They're out of order is what's the problem.  Okay.  All right.  That first sentence says, "On November 19, 1974 he called home to have his clothes washed.  His father went to his apartment at approximately 6 p.m."  Do you see that?

A.   Yes.

Q.   Okay.  Yesterday you testified that he wasn't able to take care of himself and he couldn't even do his own laundry.  Do you remember that?

A.   I didn't testify that he was not able to take care of himself.  I testified that he was not able to live independently in that even when he did leave for a short period of time his father had to help with the laundry, yes.

Q.   And so does it say anywhere on this page that he was incapable of doing his laundry?

A.   It doesn't say that.  What it says is that "His father went to his apartment at approximately 6 p.m. Alphonso Jr., his girlfriend and one other girl were there talking.  His father didn't stay long."  It doesn't say -- I mean, it said he -- oh, at the beginning it says, "On November 1974 he called home to have his clothes washed."

Q.   Yes.  It doesn't say that he was incapable of doing his own laundry, does it?  It says --

A.   I think that was reported to me by his mother.

Q.   You think that?

A.   I think so, yes.

Q.   Do you know whether there was a wash machine or a dryer in the apartment where he lived?

A.   No, I don't.

Q.   Let's talk about the tests, if we could, that you did and we'll get to that here in a second.

Doctor, did you testify yesterday that you were a member of the American Psychological Association?

A.   No.

Q.   You're not a member?

A.   I'm not a member of the American Psychological Association, no.

Q.   Okay.  So you don't follow their ethical principles at all?

A.   I do follow their ethical principles I think but, I mean, most of them, if not all of them, but I'm not a member.

Q.   Okay.  Well, let me ask you this:  The ethical principles of the American Psychological Association say:  "Psychologists administer, adapt, score, interpret or use assessment techniques, interviews, tests or instruments in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of the techniques."

MR. MONTROY:  Your Honor, I would object.  I don't -- I'm not sure what -- this is an exhibit.  I'm not sure what Mr. Reisenauer is reading from.

THE COURT:  Perhaps you want to identify it,

Mr. Reisenauer.

MR. REISENAUER:  I will, Your Honor.  I apologize.  It is the American Psychological Association Ethical Principles of Psychologists and Code of Conduct and it is effective June 1, 2010.

Q.  (Mr. Reisenauer continuing)  Doctor, did you listen to what I read?

A.  I did.

Q.  Okay.  Do you follow that principle?

A.  Yes.

Q.  Okay.  And then I'll read you one more: "Psychologists use assessment instruments whose validity and reliability have been established for use with members of the population tested.  When such validity or reliability has not been established, psychologists describe the strengths and limitations of test results and interpretation."

Would you follow that?

A.  I am familiar with that.  Yes, I do follow it.

Q.  And then one final one:  "Psychologists use assessment methods that are appropriate to an individual's language preference and competence unless the use of alternative language is relevant to the assessment issues."

I take it you would follow that?

A.  Yes.

Q.  Doctor, I'm going to hand you what's been marked as Exhibit 581.  These are entitled "Specialty Guidelines for Forensic Psychology."  Are you familiar with those?

A.  Yes.

MR. REISENAUER:  We would move 581, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No objection, Your Honor.

THE COURT:  581 is received.

MR. REISENAUER:  I'm out of order, Your Honor, I apologize.

THE COURT:  Yeah, I was going to ask whether there was a 580.

MR. REISENAUER:  There is.  It's been premarked.

THE COURT:  Okay.

Q.  (Mr. Reisenauer continuing)  Doctor, if you would turn to page 15.  Do you see that?

A.  Yes.

Q.  And I would guide you down to guideline 10.02 on the bottom of the page, "Selection and Use of Assessment Procedures."  Do you see that?

A.  Yes.

Q.   And it says, "Forensic practitioners use assessment procedures in the manner and for the purposes that are appropriate in light of the research on or evidence of their usefulness and proper application. This includes assessment techniques, interviews, tests, instruments, and other procedures and their administration, adaptation, scoring, and interpretation, including computerized scoring and interpretation of systems."

Do you see that?

A.   Yes.

Q.   And I take it you follow this guideline?

A.   I do.

Q.   And then if you move further down that page there's a paragraph that starts with the word "When..." Do you see that?

A.   Paragraph -- Guideline 10.03?

Q.   10.02.  Nope, 10.02 still.

A.   Oh, okay.

Q.   Paragraph starts:  "When the validity..."  Do you see that?

A.   Yes.

Q.   It says:  "When the validity of an assessment technique has not been established in the forensic context or setting in which it is being used, the

forensic practitioner seeks to describe the strengths and limitations of any test results and explain the extrapolation of these data to the forensic context."

Would you follow that?

A. I do.

Q. Thank you. Now let's talk about your test if we could. I'm going to hand you Government's Exhibit 580 (indicating). I believe these are your raw records from the tests you gave Mr. Rodriguez; is that right?

A. These are the -- yes.

Q. And --

A. I think -- I don't know if they're complete but, yes.

Q. Did you provide a complete copy of your raw data to counsel?

A. I did.

Q. Okay. And if I tell you that's what I received, that would be all of your raw data; is that right?

A. Again, I'm not saying it's not. I just don't know. You know, I don't know if it's all of it.

MR. REISENAUER: We will move 580, Your Honor.

MR. MONTROY: No objection, Your Honor.

THE COURT: 580 is received.

Q. (Mr. Reisenauer continuing) Well, let's go

through the tests if we could.

A.   Okay.

Q.   The first page there it is marked "W1."   Do you see that?

A.   Yes.

Q.   Okay.  And that says:  "Rey complex figure test and recognition trial test booklet, correct?

A.   This doesn't say that, no.

Q.   It doesn't say that?

MR. MONTROY:  That's not what I have either.

MR. REISENAUER:  I got it, sorry.  If I could have one minute, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  Thank you.

Q.   (Mr. Reisenauer continuing)  Okay, Doctor, your page W1, what is on that, if you could tell me?

A.   It's just the reproduction of the Rey Complex Figure drawing that Mr. Rodriguez did, and what you can see clearly is that he has a tremor.

Q.   Okay.  And can you tell us what the Rey Complex Figure drawing test is?

A.   It's just a test where you ask the individual to reproduce a stimuli, which I have my computer if you want to see it.

Q.   And how does that work?

A.   You have a copy of the stimuli.  You put it in front of the person.  You give them a blank piece of paper and say, "Copy this."  That's the first part of it.

Q.   Okay.  And this particular -- this particular test has a scoring sheet; is that right?

A.   There's several different ways of scoring.  The original doesn't have any scoring.  The scoring came after that.  And there's two systems of scoring:  one developmental and one -- I forgot the name of the author of the scoring but the original test Rey did not have a scoring system on it.

Q.   The original test doesn't have a scoring sheet.  This is a drawing that the individual is supposed to duplicate; is that correct?

A.   Yes.  It's supposed to copy it.

Q.   Okay.  And so they can look at the drawing and copy it; is that right?

A.   The first part of the test is they're looking at the stimuli and they're copying it.

Q.   You didn't include the drawing that Mr. Rodriguez was supposed to copy in your raw data, correct?

A.   No, that's the stimuli.  That's not included in here, no.

MR. REISENAUER:  Your Honor, I apologize but

I only have one scoring sheet and I would offer 582.  It has some numbers on it but for purposes of discussion I would offer Government's Exhibit 582 just for demonstrative purposes.

THE COURT:  582 has been offered at this point for demonstrative purposes.  Any objection?

MR. MONTROY:  No, Your Honor.

THE COURT:  582 is received for demonstrative purposes.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Doctor, that is a copy of a scoring sheet, is that correct, for the Rey Complex?

A.  That's one of the systems of scoring the Rey Complex.  This is not the only one but there are several others.

Q.  Excuse me, the drawing on 582, that is the drawing that Mr. Rodriguez was supposed to copy; is that correct?

A.  No.  Mr. -- I can show it to you.  It has no numbers in it.

Q.  Okay.  This is the scoring sheet, correct?

A.  This is again the scoring sheet for one of the systems of scoring the Rey Complex.

Q.  Okay.  Can you tell us what is presented to

Mr. Rodriguez or what was presented to Mr. Rodriguez to copy?  Is it that drawing?

A.  Again it is not this drawing because this drawing has numbers on it.

Q.  Okay.  Would it be that drawing without the numbers on it?

A.  That is correct.

Q.  Okay.

A.  Something similar but it's in a page 9 x 11.

Q.  Do you have the drawing with you?

A.  I have the stimuli in my computer.  I can show you the computer copy of it.  I have it electronically. I don't have the actual page that I use in my testing.

Q.  If I'm going to review what Mr. Rodriguez drew for you as a copy, how do I know whether or not he did a good job or not if you don't include what he was supposed to copy?

MR. MONTROY:  Your Honor, I'm going to object.  Dr. Weinstein was asked to provide his raw data and we've provided that.  What Mr. Reisenauer's talking about is an actual part of the test and I think that Mr. Reisenauer would know from our conversation with our experts that there are copyright issues and we can't actually provide portions of the test without permission.  And in any event we weren't asked to

provide the actual test.

THE COURT:  All right.  Well, this is a convenient moment for us to break anyhow.  Perhaps you want to take a look at what the stimulus looks like and then if there needs to be a copy produced under seal for court purposes only not to be disclosed, I'll enter the appropriate protective order.

MR. REISENAUER:  Thank you, Your Honor.

MR. MONTROY:  Thank you, Your Honor.

THE COURT:  We'll take 20 minutes.

(Recess taken; 10:05 a.m. to 10:30 a.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States versus Alfonso Rodriguez. It's File No. 2:04-cr-55.  Counsel of record are present.  Dr. Weinstein remains on the stand. Mr. Reisenauer was conducting a cross-examination.

You may proceed.

MR. REISENAUER:  Thank you, Your Honor.  A couple housekeeping matters.

THE COURT:  All right.

MR. REISENAUER:  We were looking for the drawing.  First, Your Honor, if the Court looks at Government's Exhibit 580, which is the big pile, if the Court goes to the very, very last page there actually is

a guide to that pile.  It is on the last page, and it might help the Court to follow along.

THE COURT:  Got it.

MR. REISENAUER:  Okay.  Second, on the break, Your Honor, counsel provided the United States with the drawing that we were talking about when we broke.  And so we -- although I just offered Government's Exhibit 582 as a demonstrative exhibit, we do not need to even address that.  We're going to put in the actual drawing.  And so if the Court prefers I will withdraw 582 or we can leave it and I will mark this as 583.

THE COURT:  Do you have a preference?

MR. MONTROY:  I don't have a preference, Your Honor.  Whatever is easier for the Court.

THE COURT:  Shelley, you have a preference? What would you prefer?

THE CLERK:  It doesn't matter but we should probably keep it in there.

THE COURT:  Let's go ahead and mark it 583.

MR. REISENAUER:  Thank you, Your Honor.

THE WITNESS:  If I may, Your Honor, there's no copyright limitations.  This is not published by --

THE COURT:  All right.

THE WITNESS:  So there's no need for a

protective order.

THE COURT:  Thank you.

Q.  (Mr. Reisenauer continuing)  Dr. Seward --

A.  Weinstein.

Q.  Excuse me, Dr. Weinstein, Government's Exhibit 582 had --

THE COURT:  Did I receive 583?

MR. REISENAUER:  No, I haven't offered it yet.

THE COURT:  Oh, okay.

Q.  (Mr. Reisenauer continuing)  582 had a drawing with the numbers on it you were talking about, correct?

A.  Correct.

Q.  Okay.  And I've handed you Government's Exhibit 583.  This is the same drawing without the numbers; is that right?

A.  That's correct.

Q.  And this is the drawing that you asked Mr. Rodriguez to copy?

A.  Yes.

MR. REISENAUER:  Okay.  We would offer Government's Exhibit 583, Your Honor.

THE COURT:  583 -- any objection?

MR. MONTROY:  No objections, Your Honor.

THE COURT:  -- is received.

Q.   (Mr. Reisenauer continuing)  And if you would then for clarification, Dr. Weinstein, you asked Mr. Rodriguez to copy this and that would be actually while he was looking at it he was supposed to draw it; is that correct?

A.   That is correct.

Q.   Okay.  And is this a timed thing?

A.   No.

Q.   Okay.  And there is a way to score how he did on this?

A.   There are many scoring systems.  There's at least three that I know of.  But there is no scoring in the original test.  The test was developed by an individual by the name of Rey who was a neuropsychologist and he just used it the way -- just looked at the way people reproduce it.  Didn't score it.

Q.   You didn't score it?

A.   I don't score it.  The original is not scored.

Q.   Okay.  Let me follow up.  You had him then also draw this same figure from his memory, correct?

A.   You take away the stimuli immediately after and you ask him to reproduce it from memory, yes.

Q.   Okay.  So first he copies it with the drawing in front of him and then you take it away and then he is supposed to reproduce it from memory; is that right?

A.  That's correct.

Q.  Okay.  And you had him do that in this particular instance?

A.  I did.

Q.  And is it like immediate after he draws the copy then you take it away and he's supposed to draw again?

A.  You do it immediately and then you have an option to do it later on, whether it's 20 minutes or the next day.  If you're going to see him the next day, you can ask him to reproduce it.

Q.  So it would be a copy, immediate recall and then delayed recall or memory, correct?

A.  If you believe you want to have -- if you want to do that, yes.

Q.  Okay.  But you didn't do that I take it?

A.  Delayed?  No.

Q.  Okay.  And on the second drawing from his immediate recall did you score that?

A.  Again I don't use a scoring system for the Rey.

Q.  Okay.  So you didn't score either one, correct?

A.  Well, you already asked me that.

Q.  Okay.  And so your answer is no, you didn't score either one.

A.  I don't use a scoring system for the Rey Complex Figure drawing.

Q.   Okay.  Did you receive in your review what Dr. Seward's Rey Complex Figure test results were?

A.   I think I did.

Q.   Did you compare Mr. Rodriguez's results from Dr. Seward with yours at all?

A.   No.

Q.   If you would turn, Doctor, to the next part of your raw data.  It's "W3" on the bottom.  Do you have that?

A.   Yes.

Q.   And can you tell us what that is.

A.   That's called the Rey 15-Item Test.

Q.   Okay.  And what is the Rey 15-Item Test?

A.   It's a test of effort.

Q.   Is that also known as a test for malingering?

A.   There are no tests for malingering.

Q.   Okay.  So that's a term that you don't use; is that right?

A.   It has nothing to do with my decision.  There are no tests that are designed for malingering.  The tests are designed for reference but not for malingering.

Q.   Okay.  And can you tell us what -- this is the Rey 15-Item Test; is that correct?

A.   That's correct.

Q.   Okay.  And how does that work?

A.   The stimuli, which you don't have, is -- but it's exactly the same thing, is just a page with these 12 figures or 15 figures or 15 stimuli that you put in front of the person for 10 seconds and ask them to look at it.  You take it away and you ask them to reproduce what they saw.

Q.   Okay.  And in this particular instance, this is W3, is what Mr. Rodriguez wrote down?

A.   That's correct.

Q.   Okay.  This is his handwriting?

A.   That's correct.

Q.   Okay.  And do you know if -- do you know if Mr. Rodriguez, in this particular test, he just took this one part of the test or is this the whole test?

A.   There is a recognition portion of the test which you provide with a printed -- you provide a printed page with stimuli that contains the 15 items.  Then you ask them to circle the ones, and I think he did that.

Q.   You didn't include that with your raw data?

A.   You don't have it so if I didn't include it or if they didn't give it to you.

Q.   Okay.  Is there a scoring mechanism to this at all?

A.   There's two ideas behind it.  If they're able to reproduce 12, and Dr. Lisak says nine, then they are

making a good effort.  The cutoff -- which means the cutoff point meaning that if they're not able to do the -- at least what the cutoff point is that can be interpreted as meaning that they are not making a good effort because people with severe brain damage are able to reproduce the nine stimuli.  But there's no question in this case because he did the 15 out of the 15.

Q.  Doctor, do you know whether or not the Rey 15-Item Test has been controversial at all?

A.  I'm not sure what you mean by that but I don't know any controversy about it.

Q.  Okay.

A.  It's published by Dr. Lesak and by Dr. Orey, which are the two compendiums of neuropsychological testings.

Q.  Okay, thank you.  I'm handing you what's been marked as Government's Exhibit 584 (indicating).  This is from the Journal of Clinical and Experimental Neuropsychology.  It is titled "The Rey 15-Item Recognition Trial."  Are you familiar with that at all?

A.  No.

MR. REISENAUER:  Your Honor, we would offer Government's Exhibit 584.

THE COURT:  Any objection?

MR. MONTROY:  No objection.

THE COURT:  584 is received.

Q.  (Mr. Reisenauer continuing)  If I could, Doctor, I'd move your attention to the very first sentence of this particular document.  It says:  "Numerous publications on the Rey 15-Item Memorization Test have cited limitations primarily in test sensitivity, as well as to some extent in specificity."

You see that?

A.  Correct.

Q.  Were you aware of that at all?

A.  I don't know what the sensitivity and specificity of the tests are.  That means how many people are identified as false positives and false negatives.  That's what it means.  And I don't know what the numbers are for that test.

Q.  Okay.

A.  I don't know anybody that has done the studies in this.

Q.  If you move down on the page to the right-hand side, the first full paragraph there, it says:  "In the light of the above limitations, several authors have questioned whether the 15-item test should be employed for the determination of malingering."

Do you see that?

A.  I agree with that statement.

Q.   Okay.  But you weren't aware of at least this article or anybody that questioned this test; is that right?

A.   You already asked me if I'm aware of this article.  I said no.

Q.   Okay, thank you.  In your opinion how did Mr. Rodriguez do on this test?

A.   On which test?

Q.   On the one we've been talking about, the Rey 15-Item Test.

A.   I just said that he reproduced 15 items out of 15 items.

Q.   So you thought he did well on it?

A.   You can't reproduce more than 15 items so he did perfectly well.

Q.   Okay, thank you.  Turn to page W4.  Here you gave him The Dot Counting Test; is that correct?

A.   That's correct.

Q.   And what is that?

A.   That's again a test of effort.

Q.   And can you explain how this test worked.

A.   You just show them some cardboard stimuli with dots in it and you ask them to count them and you time it.

Q.   And this here W4, this is the record of that

particular test; is that right?

A.  That's correct.

Q.  Okay.  Can you explain this page here to me, especially this box on the lower left-hand corner?

A.  The box in the lower left corner, you mean the one that says:  "The following values are filled in during interpretation"?

Q.  Are you on page W4, sir?

A.  I am.

THE COURT:  You're reading from the lower right corner.  He wants from the lower left corner.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  The other box, Doctor, on the left.

A.  Yes.

Q.  There's a box there.  It says:  "Card 1, 2, 3, 4, 5."  You see that?

A.  Yes.

Q.  Okay.  Can you explain that particular box for me.

A.  Okay.  The box says Card 1 has 11 dots, and then you have blanks and you report how many was the person counting and how long did it take him to count.  If they commit an error, then you mark it in the second column or the third column or the fourth column, whichever

column you want to call it, of responses.

But as you can see he did not make any mistakes in counting them and so there's only two columns that are filled:  the number of dots that he counted and the time it took him to count them.

Q.   And the purpose of this test is for what?

A.   You're measuring effort.

Q.   Okay.  So the test before this was an effort test and then this is an effort test; is that right?

A.   That's correct.

Q.   Okay.  Did you give any other effort tests?

A.   No.

Q.   Is it normal to give just two effort tests?

A.   That's what I usually do.

Q.   Okay.

A.   If I'm testing the person one day, I give them two tests the same day.  If I'm testing the person in two days, I give them one test each day.

Q.   Okay, thank you.  Then let's turn to the next page and let's go through this.  This is the D-KEFS Verbal Fluency Test; is that right?

A.   That's correct.

Q.   And what is that?

A.   Delis-Kaplan Executive Function System is a group of tests that were developed by Dr. Delis and

Dr. Kaplan, and they are adaptations of other tests that have been used in neuropsychology for many years.  This is one of the subtests or one of the tests in the system and it's called a Verbal Fluency Test.  Normally the Verbal Fluency Test when it's used like Rey has a Verbal Fluency Test and a few others have Verbal Fluency Tests and they just consist of asking the person to name as many words that start with a particular letter.  In this case they add several other stimuli and they come up with four different versions.

Q.  Okay.  And you did score this test.  It looks like on W6, if I'm reading this right, he got a 24; is that right?

A.  This is the first part of the test on W6 and that's the letter fluency test, yes.

Q.  Okay.

A.  And -- no, the correct number is 21.

Q.  Twenty-one.  On the way right-hand side, you're saying that's the correct number?

A.  Well, that's the number of correct responses.

Q.  Okay.

A.  Twenty-four includes the ones he repeated, which you noted that there's an "R" next to the words that he repeated and there's a "9" next to the words that are intrusions.  In this case you can see in column three

under the letter "S" he says "Sally" when the instructions that were given to him were not use proper names.

Q.   So on the very bottom where you have the number 24 so there were 24 questions and he got 21 right; is that how I'm reading this?

A.   No.

Q.   No.  What does that mean then?

A.   He gave 24 answers out of which 21 were correct and three were incorrect.

Q.   So he did pretty well on that.

A.   No.

Q.   He didn't?

A.   No.

Q.   Okay.  Let's turn to the next page.

THE COURT:  I'm a little confused before we go to the next page.  He's supposed to say, what, as many words that start with an "F" as possible?

THE WITNESS:  Within a minute's time, yes.

THE COURT:  Within a minute, and he came up with like, what, four the first time.  And then there's an interval, then you go to "A" and then "S" and back to "F;" is that it?

THE WITNESS:  No.  He did four in the first 15 seconds, two in the second 15 seconds, one on the

third 15 seconds and one on the fourth 15 seconds for the letter "F." So the total amount of words that he correctly included in one minute for the letter "F" were eight.

THE COURT: I got it, okay. And then there was a minute for "A" and a minute for "S" and the same thing and he got seven and six.

THE WITNESS: That's correct, Your Honor.

THE COURT: All right. Okay, thank you. You may proceed.

MR. REISENAUER: Thank you, Your Honor.

Q. (Mr. Reisenauer continuing) And then on W7 it's "animals" and "Boys' Names," correct?

A. Right. It's category fluency, yes.

Q. And then --

A. He did much better on this one.

Q. Excuse me, on W8 it was "Fruits and Furniture," correct?

A. That requires for him to switch categories from fruits to furniture.

Q. Let's move on to W11 then. This is called the "D-KEFS Trail Making Test;" is that right?

A. This is condition one of the D-KEFS Trail Making Test.

Q. And what is that?

A.   The Trail Making Test again is a very old test in neuropsychology but this is an adaptation of that by Delis and Kaplan where instead of just using two categories they use four -- I think five.  I'm sorry, five.

Q.   Okay.  Let's go back just if we can just for one second on the Verbal Fluency Test.

Dr. Froming gave this test.  Are you aware of that?

A.   Yes.

Q.   And her results were different than yours in the sense that Mr. Rodriguez did better on some and worse on others.  Do you remember that?

A.   I don't remember.  I did not compare them.

Q.   Okay.  So let's go back to the Trail Making Test if we could.  What is he supposed to do in this test on W11?

A.   Well, the first condition is just a test of scanning whether -- and the reason they're doing this one is because they want to rule out that it's not a visual problem, that he can actually see and scan the page and that it's not a problem with the scanning or the visual ability of the individual.

Q.   Okay.  And there's a number of different pages regarding this particular test you have listed and they

go through visual scanning, number sequencing, letter sequencing, number/letter switching?

A.   And yes if I can --

Q.   Motor speed, correct?

A.   Right.

Q.   And how did Mr. Rodriguez do on these tests?

A.   Lousy.

Q.   Lousy?

A.   Yes, sir.

Q.   What's the purpose of that test?

A.   The important one here is condition four and condition four requires for him to switch between numbers and letters.  The original Trail Making Tests consist just of connecting numbers and then connecting letters or connecting letters and then switching numbers and letters.  So it's three conditions.

He did poorly in the sense that he responded -- it took him a very long time.  It took him 169 seconds to complete the task, and that corresponds to a standard score of six, which is more than one standard deviation below the mean.

Q.   Okay.  And then if you turn to W26 you did the D-KEFS Proverb Test; is that right?

A.   Yes.

Q.   And can you explain what that is.

A.   You ask him to -- there's two parts to the test but you can do only -- half of it is the one that's scored.  And the first part of the test is just asking him to explain common or some sayings.  Some are common and some are not common as far as abstract reasoning.

Q.   Okay.  Turn to page W30 if you would.  This is called the D-KEFS Color-Word Interference Test, correct?

A.   Do you want to know how he did on the abstract reasoning test?

Q.   Pardon?

A.   Do you want to know what he did on the Proverb Test or do you want to just go to the next test?

Q.   No.  Let's just talk about this one if we could first, okay?  What is the Color-Word Interference Test?

A.   Similar to the Stroop Test where you are presenting an individual first with a number of colors and with a number of letters and then with the letters in a color that does not correspond or with a word that does not correspond to the color of the letters.  And ultimately this Delis-Kaplan adds a fourth one, which is a little bit more complicated that requires to switch in some instances and not in others.

Q.   Okay.  Turn to page W37 if you would.  This is the CTONI-2 test I think you talked with Mr. Montroy about yesterday; is that right?

A.   Correct.

Q.   And the --

A.   It's a comprehensive test of nonverbal intelligence.

Q.   Okay, nonverbal intelligence.  Can you tell me how this test works.

A.   You show the individual the stimuli and they have five choices to complete the -- to choose from five different pictures, which one corresponds to what they're supposed to -- or fill in the blank.

Q.   Fill in the blank, okay.

A.   Yes.

Q.   So the first page there, that's the Examiner Record Form.  That's what you fill out?

A.   The first page is the summary of the scores you obtain.

Q.   You fill that out, right?

A.   Yes.

Q.   Okay.

A.   I fill out everything.

Q.   Okay.  So up on the top of the page there where it has an area where it has a space for examiner's name and title, you didn't fill that in, right?

A.   No.

Q.   Okay.  And where it says:  "Administration

Method, English, Other, Sign, Pantomime," you didn't fill that in?

A. No.

Q. Can you tell me again how this test works?

A. Which test?

Q. This test, the CTONI-2.

A. You have condition categories that -- well, two different types of stimuli: One is pictorial, one is geometric. And you have three different conditions that have different tasks in it and then they choose from five possible answers.

Q. Okay. And this is a sign language-type test?

A. If they don't understand English or Spanish or you don't know what language or deaf, you can give the instructions in pantomime. It's very simple. You just point out to this is to this is to which one? Pick one of the five.

Q. Is that the purpose of the test for those people who can't speak English or have a problem with English or have to pantomime?

A. No, that's not the purpose of the test. The purpose of the test is to obtain a score from a nonverbal IQ test.

Q. Okay. And this is an IQ test.

A. Yes. It's a test of nonverbal intelligence.

Q.   And if you turn to W39, Doctor.

A.   Yes.

Q.   It has -- it looks like there are four subtests; is that right?  Or, no, excuse me, six subtests; is that right?

A.   There's two, one pictorial and geometric task. And there's three different tasks or three different things.  One is analogies, this is to this is to what; categories, which is of the -- which is the right answer here; and sequences, which is the next picture from the five.  And they pick one of the five.

Q.   Okay.  I'm going to hand you Government's Exhibit 585 and 586 (indicating).  585 is a copy again of the green book and it's page 41 and we'll refer to that in a minute.

I would offer 585, Your Honor.

THE COURT:  585 is just a few pages of a previous item.  It's received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  And then Government's Exhibit 586 is part of the CTONI-2 uses. Are you familiar with this?

A.   From where?

Q.   From the CTONI-2 manual?

A.   Yes.

MR. REISENAUER:  We would offer 586, Your Honor.

THE COURT:  Any objection to 586?

MR. MONTROY:  This is from the CTONI manual. Is that what you said?

MR. REISENAUER:  Yes.

MR. MONTROY:  No objection.

THE COURT:  586 is received.

Q.  (Mr. Reisenauer continuing)  So turn to page 41 of the AAIDD if you would, Doctor.  Do you have it in front of you?

A.  Yes.

Q.  Okay.  In green print it says:  "Although the Wechsler and SBIS scales are perhaps the most widely used and accepted measures to assess intelligence, there are clearly circumstances in which neither will be appropriate.  This may be because the individual being assessed has cognitive deficits that fall below the floor of the test; has sensory or motor limitations that preclude certain forms of test presentation/response; or is influenced by a variety of cultural, social, ethnic, and language based factors.  When this is the case, it may be necessary to select among alternative instruments rather than rely on the more traditional intelligence tests.  For example, it may be appropriate to use a test

such as the CTONI."

You see that?

A.   Yes.

Q.   Now Mr. Rodriguez was given this test for what reason?

A.   Because I gave him a test in English, I gave it in Spanish and I gave him a nonverbal test because he is bilingual.

Q.   Okay.

A.   And because I always use a nonverbal test when I'm assessing for intellectual disability in a forensic case.  I want to be able to have several different scores from several different tests.

Q.   If you turn to the next document, Doctor, it says:  "The CTONI has two principal uses."  No. 1 is:  "The first use is to estimate the intelligence of people for whom traditional ability tests might be inappropriate."

You see that?

A.   Yes.

Q.   Is there any reason that a traditional test would be inappropriate for Mr. Rodriguez?

A.   I didn't know at the time I was testing him but no, sir, not that I tested him, not that I know of.

Q.   Okay, thank you.  Let's move on if we could to

W40.  This is the TOGRA test; is that right?

A.  Test of General Reasoning Ability.

Q.  Okay.  And what does that measure?  Reasoning?

A.  It measures reasoning, yes, reasoning ability.

Q.  Okay.

A.  Which is part of the -- it's part of the intelligence reasoning.

Q.  Okay.  It's not designed to determine intellectual disability, is it?

A.  No, it's not designed -- there's no test that I know of that's designed to identify intellectual disability.  There are tests to measure or that are designed to measure adaptive behavior deficits, but in terms of the cognitive abilities none that I know of is specifically designed to measure intellectual disability.

Q.  Okay.  Doctor, I'm going to hand you what's been marked as Government's Exhibit 587 (indicating).  This is an Introduction and Overview regarding the TOGRA test.  Are you familiar with that?

A.  I am familiar with the manual, yes.

MR. REISENAUER:  We would offer 587, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No, Your Honor.

THE COURT:  587 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Dr. Weinstein, I direct you to the highlighted portion on page 1 there. It says:  "The TOGRA will be useful to examiners in many settings whenever a speeded measure of reasoning ability and problem solving under pressure is considered useful in the selection process."

You see that?

A.  Yes.

Q.  And then it goes on to say:  "This use extends to evaluating athletes, managerial and executive-level staff, and even public safety officer candidates, including those seeking positions as 911 operators or as emergency medical service staff and those who are required to carry a weapon."

Do you see that?

A.  I see that.

Q.  And then in the green highlighted portion towards the bottom of the page it says:  "The TOGRA is not recommended for use in the diagnosis of clinical disorders such as intellectual disability, specific learning disabilities, or related phenomena; instead, it will have applications in broad, rapid screening."

You see that?

A.   Yes.

Q.   Go to W43 if you would.  And this is the NAB or Neuropsychological Assessment Battery; is that right?

A.   This is one aspect of it, yes.

Q.   Okay.  There are two modules; is that right?

A.   I gave the two modules.  I think there are five.

Q.   And you gave him the Executive Functions Module?

A.   And the Attention Module.

Q.   Okay.  Let's talk about that a bit if we could.

          MR. MONTROY:  I'm sorry, what page are you on?

          MR. REISENAUER:  Forty-three.

Q.   (Mr. Reisenauer continuing)  Did you give this test to him in English?

A.   Yes.

Q.   Okay.  If you turn the page W44, do you see that?

A.   Yes.

Q.   I have a couple questions about that if I could, Doctor.  Forty-four is a blank -- it looks like -- it says "Score Summary Sheet" on the top.  Do you see that?

A.   Yes.

Q.   And it is blank, right?

A.   Beg your pardon?

Q.   It is blank.  It's not filled in, correct?

A.   Yes.

Q.   So there's a portion there that says "Normative Sample," right?

A.

Q.   And then it says "Demographically Corrected Sample" or "U.S. Census-Matched Sample."  You see that?

A.   Yes.

Q.   You didn't check either box.

A.   This is computer generated.  I don't know why it's blank.  I think I did score it and provide the summary scoring, which I don't see it amongst the pages you have.  I have to look it up.  I have to use an old computer because my Apple doesn't have the software so I don't have it with me.

Q.   Okay.  So this is the scoring sheet but you didn't fill it out but you're saying it was computer scored?

A.   I don't fill this out because I don't score it by hand.  I score it with the computer-generated scoring system.

Q.   Okay.  Do you know which norming sample you used or the computer used?

A.   I choose to use a U.S. Census-Matched Sample, yes.

Q.   So if you turn to W45, that has nothing on it either, correct?  Is that because it was computerized

scoring?

A.  I don't know why you have these pages blank.  I mean, I don't know if that's how it was generated and there was a mistake.  But these two pages that we're talking about are part of the computer-generated scoring system.  Why they're blank I don't know.

Q.  Okay.  Well, turn to the next page then.  W46, 47, 48, 49, those have the boxes filled in, correct?

A.  Some of them, yes.

Q.  You filled those in or did he?

A.  No, I did.

Q.  You did.  So this is your scoring of this test for him.

A.  This is the timing, yes, and the scoring according to the manual, yes.

Q.  Okay.  If you'd turn to page 48 for me, can you tell us how this test worked.

A.  Yes.  You ask the questions on the left:  "Why should you blow out candles before going to bed?"  And you write down the answer.

Q.  Okay.  And you write the answer he tells you?

A.  Yes.

Q.  All right.  So "Why should you blow out candles before going to bed?"  That's question one.  He said "Fire"?

A.   He said "fire" so you ask him to -- that's one of the things you want to know more about so you query about it and he says:  "Burn your house down."

Q.   Okay.  So he said "fire" and you have a "Q" there in parentheses.  You queried him and then he said: "Burn your house down," right?

A.   Yes.

Q.   And then on page W49 you gave him two points for that, correct?

A.   Yes.

Q.   Okay.  So up on the top of the page on W48 it says:  "Recording.  Record responses verbatim.  If examinee is queried to say more place a Q in brackets at that point in examinee's response."

And so you did that for No. 1, right?

A.   Yes.

Q.   Let's go to No. 4.  That question says:  "What should you do if you take too much of a prescription medication?"

A.   Which one are you talking about?

Q.   No. 4.

A.   Yes.

Q.   "What should you do if you take too much of a prescription medication?"  You see that?

A.   Yes.

Q.   And what was his answer?

A.   "You overdose - drink some throw up medicines."

Q.   And on page 49 you gave him a zero for that?

A.   Correct.  Two points says:  "Addresses need for immediate response (I.e., calling 911, Poison Control) 1 point:  Addresses at least 1 appropriate immediate response BUT includes 1 inappropriate response. O points:  No mention of appropriate immediate response. 'Induce vomiting' is an inappropriate response."

Q.   Okay.  So "overdose" was not an appropriate response for what should you do?  Drink something so you throw up?

A.   That's if you should overdose.  If you take too many medications you should overdose purposely.  That's the correct answer?

Q.   No, I'm just asking you if that's incorrect.

A.   It is incorrect.

Q.   Okay.  Would it have been worth querying him more about that or not?

A.   He immediately stated that you have to throw up and there's clearly some mention on the criteria to score it which says clearly here "'induce vomiting' is an inappropriate response."  You get zero points.

Q.   Okay.  Let's move on to No. 5.  That question is: "Why should you not unplug electrical appliances while

your hands are wet?"  And his answer was:  "Get electrocuted," correct?

A.  And that's one point because for two points it requires:  "Addresses potential danger of shock/electrocution AND concept of water acting as a conductor of electricity."

Q.  Okay.  Did you query him about his answer?

A.  I did ask him why you get electrocuted.  He had no answer.

Q.  You did?  You didn't note that in your --

A.  When he doesn't give me an answer after that I don't put the Q.

Q.  Okay.  So you queried him, at least you recall querying him, although you didn't write it down; is that right?

A.  He didn't respond additionally to the question.

Q.  Okay.  No. 6:  "Why are certain foods marked with an exclamation [sic] date?"

A.  Expiration date.

Q.  Yes.  And you wrote "DK."  What does that mean?

A.  Don't know.  That was his answer, don't know.

Q.  Okay.  Let's turn to W63 if we would.  This is the "Attention Module Response Booklet," correct?

A.  Yes.

Q.  Okay.  And what is this test?

A.    This is not a test.    This is the Attention Module Response Booklet face page.

Q.    Okay.    And what is it measuring?

A.    Are you talking of W63 or are you talking about the module?

Q.    I'm talking about the module.

A.    Attention.

Q.    Okay.    If you turn to page W71 if you would.    Are you there, sir?

A.    I am.

Q.    Okay, thank you.    This is the Score Summary Sheet and it's again blank?

A.    Correct.

Q.    And is that because this was also computer scored?

A.    Same answer as in the executive.    I don't know why it's blank.    It should have all the answers and it should be computer-generated and scored.

Q.    Okay.    And then the same answer with the box there how it was normed, that's not checked?

A.    Yes.

Q.    Is that again because of the computer?

A.    Correct.

Q.    Okay.    And how did you norm this test?

A.    I don't norm it.    It's normed.    The test is

normed.  I decide to use U.S. Census-Matched sample or I decide to use demographic and I used Census-Matched.

Q.  Okay.  And again the next page, W72, that's the same answer as before.  This was computer scored so it's blank; is that right?

A.  Yes.

Q.  Okay.  Go to W73 if you would.

A.  Okay.

Q.  W73 at the top says:  "Recording, record responses verbatim."  Do you see that?

A.  Yes.

Q.  Okay.  And these circles on the right-hand side is the score you gave Mr. Rodriguez?

A.  Yes.  This is not a portion of the test that I use because I have already asked him all these questions before.

Q.  You said you didn't use this portion?

A.  I don't ask him the questions.  I know he's already given me his full name.  I already know.  He gave me the date of birth and how old he is.

Q.  Okay.  Let me stop you, Doctor.  I have a couple questions, all right?  So you're telling me that in this part of this module you gave him scores based upon something he told you before but you didn't write the responses down; is that right?

A.   This has to do with orientation and I know he's oriented to time, place and person.  I already mentioned that in the report.

Q.   Okay.  So you didn't ask him these questions but you gave him a score.  Is what you're saying, right?

A.   That's correct.

Q.   Okay.  So where you were supposed to write his responses down, you didn't write them down because he had told you it before; is that right?

A.   That's right.  Because I didn't ask him the questions, I don't know what he -- I don't have verbatim responses.

Q.   Okay, thank you.  So W74 if you would, the next page?

A.   Yes.

Q.   Okay.  The same thing up on the top, it says: "Record responses verbatim."  Here you -- looks like -- well, what does this entail?  What does this test entail?

A.   Just asking to repeat numbers.

Q.   Repeat numbers, okay.  So he's supposed to say No. 1 there "5-8-3" and then he gets a 1 if he gets -- if he says "5-8-3."

A.   That's correct.

Q.   Okay.  So here it says "Record Responses

Verbatim" and there's nothing recorded.

A.   No, I didn't write down what he said.  I only write down when he makes a mistake.

Q.   Okay.  So you didn't write any of the responses, correct?

A.   On the second trial I put a line saying -- meaning that he doesn't -- he couldn't do it.  He just says:  "No, I can't do it."

Q.   But the directions say:  "Record Responses Verbatim."  You didn't do that, did you?

A.   No.

Q.   Okay.  If you go to the next page then, W75, that's the same thing.  You didn't record his responses.  You just gave him a score, correct?

A.   If he responded correctly I gave him a score of 1, and if he couldn't do it in this case I just put a line in there.  If it was incorrect, I would have recorded it.

Q.   Okay.  And then if you turn to the next page, W76, again this is some kind of a dot test; is that right?

A.   He's got to identify -- you show him a stimuli with dots.  Then you take your test.  And either way you show him a new stimuli with an additional dot and he's got to choose which dot is the new one.

Q.    Okay.  So up on the top it says -- where it says "Recording" it says:  "Dot layouts for each item show the 'new dot' in green.  Circle the dot examinee chooses," correct?

A.    Yes.

Q.    And you didn't circle any of the dots, did you?

A.    No.  I just gave him a score if he answered correctly or if he didn't answer correctly.

Q.    Okay.  The next page, W77, again up on the top it says:  "Recording.  Record the running time as examinee completes each four-row section of Part A.  Place a check mark in the box provided below to track examinee's completion of each row within the four-row section."

Those are the directions, correct?

A.    Yes.

Q.    Okay.  And in this particular test you didn't do that, did you?

A.    If you notice there's dark -- well, you can't see it here but there's a dark -- those are the only numbers that you score where it's dark.  So you record the running time -- there's a score for the running time of the first four rows and how many errors they make, and then there's a scoring for the total time and total errors they make.

Q.    You didn't check any of the boxes though, did

you?

A.    No.

Q.    And turn to the next page, W78.  Here again you're supposed to record the running time as the examinee completes each four-row section and --

A.    May I correct you?  You're not supposed to. There's some CD-ROMs that come with the test.  It's a very long test and gives you certain options, but what you need to record for sure is what you're going to score.

Q.    Okay.

A.    The instructions, I agree with you, say to do it and I didn't do it.

Q.    You didn't do it.  It does say "Record the running time" right up on the top, doesn't it?

A.    Yes.

Q.    Okay, thank you.

A.    And the total running time is 106 seconds.

Q.    Again let's turn to the next page, W79, if you would.  This is similar.  It says:  "Record the running time (in seconds) as examinee completes each four-row section," correct?

A.    It's the same subtest numbers and letters, Part C.

Q.    Okay.  On the bottom of the page that's blank.

You didn't fill in that.  You didn't give him a raw score; is that right?

A.  The computer calculates this.  I just didn't put the numbers.

Q.  This is computerized here?

A.  This is not computerized.  If you're doing computerized, you don't need to do this manually.

Q.  Okay.  Let's turn to W85 if we could.  This is the WRAT4 test that you gave; is that right?

A.  Yes.

Q.  Okay.  Let's talk about that briefly.  The WRAT4, what is that again?

A.  Wide Range Achievement Test 4th version or 4th edition or 4th iteration.

Q.  Okay.  So let's talk a little bit about part of this test I guess.  I'm a little confused.  Turn to page W89 if you would.  Are you there, Doctor?

A.  I am.

Q.  Okay.  And then W92 and keep them -- I guess I have a question about both of them, okay?

A.  Yes.

Q.  W89 says:  "Spelling Subtest Part 1" and W92 says:  "Spelling Subtest Part 2."  You see that?

A.  Yes.

Q.  Okay.  So W89 is that -- that form has

Mr. Rodriguez's name on it but there is nothing on it. It's blank.  There's no writings, no raw score or anything, correct?

A.  On the subtest one, on the letter writing Part 1? No.

Q.  Okay.  So you didn't give him that?

A.  No.

Q.  Okay.

A.  You don't have to.

Q.  You don't have to.  You pick and choose which ones you want to do?

A.  Well, because of his age and because I know he knows, A, to write the letter "A," he knows how to write letter "B."  That's all it takes here is to write the letter and to write his name.  He did it before.

Q.  Okay.  So --

A.  If you notice here on page W92 where it says: "Letter Writing Raw Score," Part A, 15, I did give him the 15 points.

Q.  Okay.  You didn't give him the test but you gave him credit for it, right?

A.  That's correct.  I don't need to give him the test because of his age and because of his knowledge.

Q.  Okay.

A.  And that's in the manual by the way.

Q.   So let's go to W92, all right?  And what is this?  It says "Spelling" up on the top.  How does this work?

A.   There's a group -- there's a card that says tests -- I mean, words that you're asking him to spell and you give him the word, then you use the word in a sentence, and then you give him the word again.

Q.   Okay.  So it looks like you gave him a raw score of eight, right?

A.   Correct.

Q.   Okay.  I'm a little confused.  I assume you give him a word and -- and this is his writing, right?

A.   That's correct.

Q.   Okay.  So you give him a word and he's supposed to spell it, correct?

A.   He's supposed to spell the word, yes, if he knows how to or tell you:  No, I can't.

Q.   So 1 is blank and 2 is blank.

A.   Yes.  You don't have to start from the -- from 1.

Q.   You can start wherever you want?

A.   Based on how he reads, you can decide where he starts, yes.

Q.   Okay.

A.   If he doesn't know a word, then you go backwards until he is able to answer I think it's five correct questions.

Q.   Okay.

A.   I mean, five correct words.

Q.   So let me follow up then.  No. 3 he wrote "him" and No. 4 he wrote "make."  No. 5 he wrote "trust." No. 6 he wrote "cook."  Seven he wrote "light."  Eight there's a line.  Nine there's a line.  Ten he wrote "should."  Eleven there's a line.  Twelve there's a line, and 13 it looks like he wrote m-i-n and then a line and then the next five or so there's lines, right?

A.   Right.

Q.   Okay.

A.   And I told him:  If you don't know how to spell it, just put a line on it.

Q.   So you gave him a raw score of eight, correct?

A.   Yes.

Q.   I see "him" No. 3 is right, four, five, six, seven.  So that would be five right.  No. 10 is right so that would be six right?

A.   You assume he can do one and two.  You give him credit for the whole thing.

Q.   Okay.  You assumed he could do one or two so you gave him credit?

A.   Correct.  So if you add seven correct ones that he did plus the eighth one and then he missed seven which is five and seven.  That's the rule.

Q. All right. So you can assume that he can spell a word and just give him credit without asking him to do it?

A. Those are the instructions.

Q. Those are the instructions?

A. Yes. Five and seven, five correct, seven. And you give him credit for the ones that --

Q. Okay, thank you. So if you turn to page W95 if you would. Real quick, Doctor, on W95 here Mr. Rodriguez has asked to fill in a blank on a sentence; is that right?

A. No, he's not asked to fill in a blank. He's asked to read a card with a word missing and to tell you what the word -- what word he thinks is missing.

Q. Okay. So let's just read question 21. "Today there was no fog covering the park. The brightly colored flowers growing there could easily be" and then there is a blank "by the children as they gazed outside."

So he's supposed to fill in the blank, in my terms, with a word, correct?

A. He's supposed to tell you.

Q. Yes.

A. He's not supposed to write anything on this one.

Q. Just tell you out loud?

A.   Yes.

Q.   Okay.  And he -- apparently you circled the word "seen."  There's a number of correct responses listed, right?

A.   Yes.

Q.   And you circled "seen"?

A.   Yes.

Q.   And you give him credit for that score, right?

A.   The "seen" is under correct responses.

Q.   So you're supposed to circle the word that he says if it's a correct response?

A.   Some examples of correct responses.  Not all of them.

Q.   Okay.  But you didn't circle what he responded in 22 or 23 or 24 but you gave him credit, right?

A.   Yes.  Again that's the --

Q.   Okay.

A.   He was able to do five in a row so -- if you notice I started at point E based on how many words he could read, but he didn't do it correctly so the instructions are if he doesn't answer one correctly you go back until he answers five correctly and then you go back to where you left before.

Q.   Okay.  Let's move back to your report, Doctor, for a minute if we could, if you would go to page 13 I

believe, and you talk about the ABAS-3?

A.   Yes.

Q.   And that's the Adaptive Behavior Assessment System, correct?

A.   Yes.  I don't know if it's system or scales but it's one of the two.

Q.   Okay.  And that particular -- the ABAS, that is used to assess adaptive behavior for individuals, correct?

A.   As I mentioned yesterday, designed to be contemporaneous, yes.

Q.   Okay.  And you gave the ABAS to two people, Sylvia D'Angelo and Rosa Rodriguez; is that right?

A.   I gave them different forms of it but, yes.

Q.   You gave them different forms of it?

A.   Yeah.  There's a form for primary caretaker from ages five to 21, a form for teachers from five to 21 and then there's a form for adults.

Q.   Okay.  And so can you tell me which tests you gave to who?

A.   It says here that I gave the -- Sylvia D'Angelo, caretaker, approximate age eight years of age.  So she was the primary caretaker and she recalled how he functioned when he was about eight years old.  That's when she felt she could remember the most.  So that's

the primary caretaker from ages five to 21.

Q.   Okay.  Excuse me, I have the wrong one, sorry.

Dr. Weinstein, I'm going to hand you Government's Exhibit 588 (indicating).  This is in regard to administration and scoring of the ABAS-3, that part of the manual.  You recognize that?

A.   Yes.

MR. REISENAUER:  We would move 588, Your Honor.

MR. MONTROY:  No objection, Your Honor.

THE COURT:  588 is received.

Q.   (Mr. Reisenauer continuing)  I would direct you to the highlighted portion there, Dr. Weinstein.  It reads:  "All respondents should have had frequent, recent, prolonged contact with the individual over the last few months.  These contacts must have offered the respondent an opportunity to observe the various adaptive skill areas measured by the ABAS-3."

Do you see that?

A.   Yes.

Q.   When you gave the ABAS-3, you gave it when?

A.   I just mentioned that it's designed for this purpose and that's how I used it because there are no tests to my knowledge that exist for a retrospective evaluation.

Q.   Okay.   So even though this test is made for individuals who have frequent, recent, prolonged contact with the individual, you used it anyway even though Sylvia D'Angelo and Rosa Rodriguez have not had recent contact with Mr. Rodriguez?

A.   If you look at my report, it says although the scores are based on recollection and are affected by culture and living conditions.  So that's how I did it. I asked them to recollect.  There's no way -- he's been incarcerated most of his adult life.  There's no way anybody could have seen him.  Plus you're asking somebody to report on the developmental years when you're really talking about a 65-year-old man.  That's who I was evaluating at the time.

Now the reason to give him a test that is not going to be accurate is because it's suggested in the AAMR and AIDD manuals that you should use a standardized test to measure it to add some objectivity to it.

Q.   So you knew that this test was not to be used in the way that you used it but you did it anyway.

A.   There is literature that's been published in terms of using this instrument in the way I used it in Atkins cases and there's several articles about that, retrospective evaluations in Atkins cases.

Q.   Okay, thank you.  I'm going hand you Government's Exhibit 589 (indicating).  Are you familiar with the American Journal on Intellectual and Developmental Disabilities?

A.   Yes.

Q.   This is an article called "The Construct of Adaptive Behavior: Its Conceptualization, Measurement, and Use in the Field of Intellectual Disability."

Are you familiar with that article, Doctor?

A.   I think I read it.

MR. REISENAUER:  Okay.  We would offer 589, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No, Your Honor.

THE COURT:  589 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  If you'd turn to page 296 of that article, Doctor.  Are you there?

A.   Yes.

Q.   Okay.  Up on the top right-hand portion of the page it says in No. 3:  "None of the existing adaptive behavior scales have been standardized or normed using a retrospective administration methodology."

Would you agree with that?

A.   That's what I testified to.

Q.   Okay.  And then No. 4:  "The respondent's ability to recall adaptive behavior accurately may deteriorate rapidly as the time interval for the retrospective assessment increases."

          Would you agree with that?

A.   Yes.

Q.   And then down below in that last highlighted portion it says:  "Conducting a retrospective assessment of a person's adaptive behavior is very challenging.  As noted by Tasse, there is no research available examining the reliability or error rate of adaptive behavior assessments obtained retrospectively."

          Do you agree with that?

A.   Absolutely.

Q.   Okay, thank you.  Would that possibly be because individuals lose their memory?

A.   It could be possible.  Individuals lose their memory all the time, sure.

Q.   Would it also be possible that at least the two individuals you gave this particular test to may be biased?

A.   Is it possible?  I'm sure it is possible.

Q.   Do you know Marc Tasse?

A.   I do.

Q.   You'd agree with what he said in this particular

article or what was mentioned about his studies?

A.   I'm not sure what you're asking me, sir.

Q.   Well, I'll follow up here in a minute.

Dr. Weinstein, I'm going to hand you what's been marked as Government's Exhibit 590 (indicating). This is an article by Dr. Tasse on the "Adaptive Behavior Assessment and the Diagnosis of Mental Retardation in Capital Cases."  This is in the Applied Neuropsychology journal.  Are you familiar with that?

A.   Yes, I am.

MR. REISENAUER:  We would offer 590, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No objection, Your Honor.

THE COURT:  590 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  If you would turn to page 120 of the article, Doctor.

(Witness complies.)

Q.   Are you there?

A.   Yes.

Q.   In that highlighted portion it says:  "In the capital cases there is a particular worry regarding the bias introduced by family members in reporting on the adaptive behavior of their loved one.  This might be

interpreted as a form of malingering by proxy, where a parent might want to under-report adaptive skills to intentionally lower their loved one's adaptive behavior performance, in order to increase the likelihood of a diagnosis of mental retardation and result in a reprieve of the death penalty.  Again, best practice is to obtain adaptive behavior information from multiple respondents and multiple sources in order to obtain a complete evaluation and identify areas of convergence."

Would you agree with that?

A.  Absolutely.

MR. REISENAUER:  Your Honor, now may be a time to break for lunch.

THE COURT:  We'll go ahead and we'll break until 1:15.  So we'll recommence at that time.

THE WITNESS:  Your Honor, I have to be at the airport -- I have to leave.  I have an appointment and I have an issue tomorrow at home that I cannot miss so my flight I think leaves at 4:30 today.

THE COURT:  Leaves at 4:30?  We'll start again at 1:00; is that okay?

THE WITNESS:  Thank you.  I appreciate it.

THE COURT:  How much longer do you have?

MR. REISENAUER:  Maybe an hour, Your Honor.

THE COURT:  How long do you anticipate your

direct?

MR. MONTROY:  Not very long, Your Honor.
Maybe probably not more than a half hour.

THE COURT:  We'll start at 1:00.

THE WITNESS:  Thank you, Your Honor.
Appreciate that.

(Recess taken; 11:55 a.m. to 1:00 p.m.)

(In open court, all counsel present.)

THE COURT:  We are on the record in a case
entitled United States of America versus Alfonso
Rodriguez.  All counsel of record are present.
Dr. Weinstein is on the stand.  Mr. Reisenauer was
conducting a direct -- or a cross-examination.

Mr. Reisenauer, I intend to stop you at 2:10
if you're not done before then and then we'll take a
five-minute break and then we'll do the redirect.  And
that way we'll make sure you get to where you need to
be.  Did you find a ride by the way?

THE WITNESS:  I think the attorneys will
provide one for me.  Thank you, Your Honor.

THE COURT:  All right.  Mr. Reisenauer?

MR. REISENAUER:  Thank you, Your Honor.

MR. MONTROY:  Your Honor, could we have just
one moment?

Q.  (Mr. Reisenauer continuing)  Doctor, I'm going to

hand you what's been marked as Government's Exhibit 591 (indicating).  This is a paper called "Professional Considerations for Improving the Neuropsychological Evaluation of Hispanics."

Are you familiar with that?

A.  Yes, I am.

MR. REISENAUER:  We would offer 591, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No objection.

THE COURT:  591 is received.

Q.  (Mr. Reisenauer continuing)  And if we could, Doctor, if you could turn to the second page, the highlighted portion there.  It says:  "An initial and important step in a neuropsychological evaluation is for the clinical neuropsychologist to determine the best language to use for the evaluation of specific examinees."

Do you see that?

A.  Yes.

Q.  And you testified yesterday that I believe it's in your report that English is Mr. Rodriguez's preferred language, correct?

A.  Correct.

Q.  Okay, thank you.  Let's turn then, Doctor, if we

could to your raw data.  It's page W101 I believe.

A.  Yes.

Q.  Okay.  Do you have it there?

A.  I do.

Q.  Thank you.  Okay.  So can you tell us about this particular test.  This is the Wechsler Adult Intelligence Scale; is that right?

A.  Yes.

Q.  Okay.  And this is WAIS-IV it's commonly called; is that right?

A.  That's correct.

Q.  Okay.  And tell us about this test.  What is this test -- this is the IQ test, correct?

A.  As I mentioned yesterday, this is the 4th iteration of the Wechsler Adult Intelligence Scales.

Q.  Okay.  And you gave this test to Mr. Rodriguez, correct?

A.  I did.

Q.  And this test is the Mexican version of the WAIS-IV; is that right?

A.  The test -- the protocol is translated in Mexico and published in Mexico, yes.

Q.  Okay.  And --

A.  But it's not the Mexican version.  It's a translation of the American version.

Q.   Okay.  Hang on.  You gave this test to Mr. Rodriguez, correct?

A.   I did.

Q.   Did you give it in English or in Spanish?

A.   Both.

Q.   Both?

A.   I mean, he used both languages.  In cases he answered in English and in some cases he answered in Spanish.

Q.   So Mr. Rodriguez, he was born in Laredo, Texas, correct?

A.   That's correct.

Q.   Okay.  And when he was young his family migrated from there to Crookston as migrant farm workers; is that right?

A.   Correct.

Q.   And then eventually his family settled in Crookston, correct?

A.   As far as I know, yes.

Q.   And Mr. Rodriguez has never lived in Mexico; is that right?

A.   No.

Q.   But you gave him this Mexican version of the test?

A.   It's not a Mexican version of the test.  It's a

translation into Spanish of the test.  It's different.

Q.  Okay.  Let's go through a few things here if we could.  That first page 101 -- and pardon me but I do not know Spanish so you're going to have to help me along here the best you can.

This particular test involves a number of, I'll call them, subtests; is that right?

A.  Yes.

Q.  Okay.  And those are listed on the left-hand column of the front page there, correct?

A.  Correct.

Q.  Okay.  And so the top there says "subprueba" I think?

A.  Right.

Q.  And does that mean subtest?

A.  Yes.

Q.  Okay.  And those are listed and the next word says "punctuacion natural."  What's that mean?

A.  That's the actual number of correct answers.

Q.  Okay.  And then the next column says "punctuacion escalar."  What does that mean?

A.  That means the transforming of the -- the raw number of correct answers to all scaled scores.

Q.  Okay.  To let's talk about the subheadings just briefly.  What's the first one?

A.   The first one is called "diseno con cubos."

Q.   What does that mean?

A.   The actual translation would mean designed with cubes but this is equivalent to the test that's called block design in English.

Q.   And the next one is "semejanzas"?

A.   Semejanzas.

Q.   What does that mean?

A.   Similarities.

Q.   Okay.  And what's the next one?

A.   "Retencion de digitos."

Q.   Okay.  What does that mean?

A.   Digit retention.  That's a correct translation but it's -- that's a -- in English it's called digit repetition.

Q.   Okay.  The next one is "matrices"?

A.   Matrices, yes.

Q.   What does that mean?

A.   Matrices means matrices.

Q.   And the next one is "vocabulario."  Is that vocabulary?

A.   That's correct.

Q.   And "aritmetica," is that arithmetic?

A.   That's correct.

Q.   And what's the next one?

A.    "Busqueda de simbolos" which stands for symbol search.

Q.    Okay.  And what's the next one?

A.    "Rompecabezas visual."

Q.    What is that for?

A.    Visual puzzles.

Q.    And the next one is "informacion"?

A.    Information, yes.

Q.    And then the final one?

A.    "Claves."

Q.    We'll talk about those a little further but the raw scores then you write those in; is that right?

A.    Correct.

Q.    And then we'll talk about the two numbers in each of those other boxes as they're listed there.  And then on the bottom of that particular box it says:  "Suma de puntuaciones escalares"?

A.    "Escalares," yes.

Q.    What does that mean?

A.    Scaled score sum or sum score scales.

Q.    So I take it you add the numbers in each of those columns up and put the total down on the bottom; is that right?

A.    That's correct.

Q.    Okay.  And then down below there's another box.

Do you see that?

A.  Yes.

Q.  Okay.  And what is that box?

A.  That's the conversion of the sum of scaled scores to standard scores.

Q.  Okay.  And the first one is the verbal comprehension?

A.  Verbal comprehension.

Q.  And then perceptual?

A.  That's -- in English it's called perceptual reasoning.

Q.  Okay.  And then the third one?

A.  Working memory.

Q.  Okay.  And the fourth one?

A.  Processing speed.

Q.  And then the last one is the total, correct?

A.  Yes, full-scale IQ score.

Q.  Okay.  And then going across that box you put in the sums from the horizontal box above there, correct?

A.  I beg your pardon?

Q.  So in the box just to the right of what you were just telling me about, you have put in the scores from up above, correct?

A.  That's where you make the transformation from the sum of scaled scores to standard scores.

Q. Okay. So in the first column you have the sum, right?

A. Correct.

Q. From up above.

A. Correct.

Q. Okay. And then in the box there you see there's 78, 82, 68, 84, 74?

A. Correct.

Q. What are those scores?

A. Those are standard scores.

Q. Those are the standard scores and you have two numbers written in there, right, on each box?

A. Yes.

Q. Okay. And then down below there you have Flynn dash 3, correct?

A. Minus 3.

Q. Minus 3, okay. We'll come back to that later. Turn to 103 if you would.

A. Yes.

Q. Okay. Here what's this test?

A. Beg your pardon?

Q. What is this test?

A. This is the diseno con cubos or block design.

Q. Let me ask this before we go on. Why did you give him a Spanish -- or Mexican test when his preferred

language is English?

A.   Because to be blunt I didn't bring the -- after I asked him, I didn't have the manual in English.  I had it in Spanish.  I brought the test in Spanish.  I didn't bring it in English.

Q.   So wouldn't it have been easier for him to take an English test since that's his preferred language?  He's never even been in Mexico.

A.   This test doesn't require any language and actually what -- this test is one of the most sensitive to what is called practice effect.

Q.   Okay.  Well, let's go on to my question on 103.  You got that page?

A.   I do.

Q.   And what is this test?

A.   Block design.

Q.   And what is he supposed to do here?

A.   You show him a stimuli, a card that shows a figure that he has to reproduce with cubes.

Q.   Okay.  And you scored this on the right-hand side; is that right?

A.   Correct.

Q.   Okay.  Are you supposed to record the time on how long it takes him to do this?

A.   You have to -- not necessarily.  I mean, you do

when -- you see on the right columns on the right side?

Q.   Where you've scored it?

A.   Right.   Where it says 31, below 31 or something, then 21 to 30, 11 to 20.   This one's 31 to 60, 21 to 30, 11 to 20 and one to 10.

Q.   Yeah.

A.   Depending on how long it takes him.   In those particular ones that's how many points he gets, anywhere from four to seven.   Prior to that particular stimuli as long as he finishes in the time constraint he gets the score, the four points or the two points, depends on which ones.

Q.   Okay.   So turn to the next page, 104, if you would.   What is this test?

A.   This is similarities.

Q.   Okay.   And what does this test entail?

A.   The question is:   What's the similarity between two stimuli?   And then you write down the answer.

Q.   Okay.   And so is this your writing on here?

A.   Yes.

Q.   And let's -- just give me an example, No. 2, "Amarillo-Verde."

A.   Right.

Q.   Okay.   What's the person supposed to do?

A.   You don't start there.   You actually see there it

says 16 to 90?

Q. Pardon?

A. You see that little arrow that says 16 to 90?

Q. Yes.

A. That's where you start. You only go back -- if the person doesn't give you an answer that adds two points, then you go back until you get two scores of two.

Q. Okay. So let's just start then on No. 4, "Cabailo - Tigre."

A. Cabailo is a horse and tigre is a tiger.

Q. Okay.

A. You see at the top here it says English that's -- he wanted me to give him the stimuli in English so I told him -- I translated them into English.

Q. So on this particular test it is listed here in Spanish but you wrote "English" on the top of --

A. Because I translated those stimuli in --

Q. You translated to him the words?

A. Correct.

Q. Okay. And so he says -- so you said "horse" and "tiger" and he said: "Have 4 legs"?

A. Yes. I said -- first I say "cabailo - tigre" and then I translated it.

Q. Okay. And he's supposed to tell you what's

similar about the two?

A.    Right.

Q.    And he told you:   "Have 4 legs."

A.    That's correct.

Q.    Okay.  And you -- he can get two points but you only gave him one?

A.    Because of -- correct.  For two points he needs a higher level of abstraction like something like animals or mammals or something like that.

Q.    Okay.

A.    And that's why you go back because he didn't give you two points.

Q.    So let's try No. 7.  What are those words?

A.    "Nariz - lengua."

Q.    And what do they mean?

A.    Nose, tongue.

Q.    So he's supposed to tell you what's similar between a nose and a tongue and he told you part of a face?

A.    Yes.

Q.    And he only got one point for that?

A.    Right.  He's got -- the two-point answer requires something related to senses, being able to taste and smell or they're human senses.

Q.    Can you query them like you did in the other

test?

A.   You can when it tells you to or if he -- and if you do it gives you a different answer or that's in addition.  Then you record that.

Q.   So let's skip down to numbers 10 and 11 there. You just drew a line, right?

A.   Right.  He didn't know the answers.

Q.   That's what drawing a line means?

A.   Yes.

Q.   Okay.  You gave that portion -- you translated into English for him?

A.   I read the stimuli in Spanish and translated into English because he said he preferred English.

Q.   Okay.

A.   And that's one of the tests that requires language.

Q.   So on the front page, 101, is that what you meant by the Es that you have up on the top page there?

A.   Yes.

Q.   Remember last week you didn't know what that scribble was?

A.   I don't remember if I recognized it.  I don't remember if I was wearing my glasses.  I can't see without glasses.

Q.   Okay.  So go to 105 then.  What is this test?

A.    This is a test where you ask him to repeat the numbers.

Q.    Okay.  Nine seven he's supposed to say nine seven?

A.    Correct.

Q.    Okay.  So if he got a one, a one, which equals two on the first portion --

A.    Yes.

Q.    -- is that right?

A.    Yes.

Q.    And the same on the second portion, he got that correct?

A.    Correct.

Q.    But then on the third portion you gave him zeros, right?

A.    He couldn't recall those.

Q.    Okay.  So --

A.    He can only retain three numbers at a time.

Q.    In the middle there, that white portion that's blank, it says "Puntuacion."  Do you see that?

A.    Yes.

Q.    What does that mean?

A.    "Puntuacion," you just said it, punctuation.

Q.    What he said?

A.    You can record what he said or if it's correct

you just give him the correct.

Q.   Is this similar to the other test where it said record responses?

A.   Yes.  It is the exact same test actually.

Q.   But you didn't record whatever he told you, right?

A.   On this one -- on neither of them I didn't, no.

Q.   Okay.  Go to 107.  This test is called "Vocabulario," correct?

A.   Correct.

Q.   And how does this test work?

A.   You just ask him:  What does the word mean?

Q.   Okay.  And again up on the top you write "English."

A.   Correct.

Q.   So you translated this into English for him?

A.   Some, yes.

Q.   Okay.  So let's just say on the No. 5 there it says "Finalizar" or something like that?

A.   "Finalizar."

Q.   Pardon?

A.   "Finalizar," that's what it says, f-i-n-a-l-i-z-a-r.

Q.   So when you translate this, how does it work? Tell me how this test is given.

A.   Well, the instruction is:  I'm going say some words to you and I want you to tell me what they mean, or something like that.  So you just use it.

Q.   Okay.

A.   In English -- the word that is used in English is "terminate," not "finalizar."

Q.   So when you translated it to Mr. Rodriguez you would say "terminate"?

A.   I would say "terminate" because that's the word that's in English, yes.

Q.   Okay.  And he told you "finish."

A.   Correct.

Q.   And you gave him credit.

A.   That's in the manual, yes.

Q.   And the reason that you didn't give him the English version of this test was because you didn't have it with you?

A.   I did not have the manual in English with me. That's correct.

Q.   Okay.  What is No. 13?

A.   Remorse.

Q.   Okay.  So that word translated into English means remorse?

A.   Correct.

Q.   And he told you:  "Feel sorry"?

A.   Correct.

Q.   But he didn't get full credit for that?

A.   No.  As you can see there's an inquiry because I asked him to repeat, to tell me more.  According to the manual that's what it says and he didn't have any additional answers.

Q.   Okay.  Okay.  Go to 109 if you would.

A.   Yes.

Q.   This is an arithmetic test I take it?

A.   Yes.

Q.   And what are you supposed to do here?

A.   You ask him the questions and he is supposed to give you an answer.

Q.   Okay.  And let's just go with the first one because I don't understand it.  This is arithmetic so what's -- how does this work?  Explain that first question to me.

A.   In the manual it says something like John had five blankets and gave Jim three.  How many blankets did he have left?  Or had 11 and gave him three, how many did he have left?  The correct answer is eight.  He gave me the correct answer.

Q.   Okay.  So you read the problem to him?

A.   Yes.

Q.   And did you read it in English or Spanish?

A.   I read it in Spanish and whenever he needed some translation I translated.  And in the WAIS-IV if a person asks you to repeat the question you can repeat it once.  In the WAIS-III you cannot.

Q.   Okay.  So I take it in your scoring here you gave him credit for the first eight, is that right, first eight --

A.   That's correct.

Q.   Okay.

A.   And again see the little arrow 16 to 90?

Q.   Yes, I see that.

A.   That's where you're supposed to start when somebody's 16 to 90.  If they don't answer correctly, then you go back.  Otherwise, you just give them the correct -- I mean, you just give them the credit for the answers.

Q.   Okay.  You're supposed to record the times here that it took him, correct?

A.   No, you're not supposed to record the times. They have a maximum of I think it's 30 seconds after the -- when they get to the -- as long as they do it within 30 seconds, it's okay.

Q.   Okay.

A.   It's not a timed test but they have a maximum limit of time.

Q.   All right.  Turn to 110, please.  What's this test?

A.   The No. 8 test is visual puzzles.

Q.   Okay.  How does this work?

A.   You show them the stimuli and he's gotta pick three -- you have to give him the instructions that he has to pick three of five different -- I mean, it's six actually in this case, three out of six different possibilities to put together so they can make the figure that you're showing them.

Q.   Okay.  And then here you have some items circled, correct?  Not just your score but there's a column there that you have numbers circled.  What is that for?

A.   Those are the correct -- those are the numbers that he's giving you of the figures, figure one, figure two, figure three, figure four, figure five, figure six.

Q.   Those are the numbers that he what?

A.   That he's choosing from the different stimuli available.

Q.   Okay.  So here you're circling what he's telling you, correct?

A.   Correct.

Q.   But you didn't circle anything on one, two, three or four, did you?

A.   Again you see the little arrow that says 16 to

90?  That's where you start.  You only circle those --
or you only ask those if he doesn't answer correctly.

Q.  Okay.

A.  See at the top where there's that little U-turn
arrow?

Q.  Yup.

A.  Let me translate that for you.  It says
"Inversion."

Q.  Okay.

A.  If he obtains a score of zero in the stimuli five
or six, then you apply the stimulus four in inverse
order until you obtain two continuous scores of one.

Q.  Okay.

A.  Or two continuous scores that are correct.

Q.  But you didn't circle the ones he told you on
those.

A.  He didn't tell me because I didn't have to ask
him.  It says to start on stimuli five.  If he wouldn't
have five or six correct, I would have gone back.  But I
didn't have to.

Q.  Okay.  But you did --

A.  He gets credit for that.  You don't need to.  You
don't ask him the questions.  You don't know what the
answers are, what answers he gave you because that's the
instructions.  I just read them to you.

Q.   Okay.   So in the boxes on that test there there's another area to put the times that it took, correct?

A.   And I only -- if he takes -- the maximum time that he's allowed in order to give you a response.   So when I put a 30 there that means it took him more than 30 seconds so he didn't get credit for that, and the other one he took more than 20 seconds or at 20 seconds he hasn't given me an answer.

Q.   Okay.   So it's not just if he gets it right or gets it wrong.   It's if he doesn't give you an answer?

A.   If he doesn't give you an answer within the time that is allowed, you don't give him credit for that.

Q.   And that's when you write the 30 seconds down?

A.   That's when I wrote 30 seconds.   It took him more than 30 seconds to answer.

Q.   Okay.

A.   So when they don't answer you go to the next question.

Q.   Okay.   Go to 111 then, sir.

A.   111?

Q.   Yes, 111.   This is a test.   Up on the top it's called "Informacion"?

A.   Yes.

Q.   Okay.   So is there a -- this starts with I assume question seven.   Is there a page that is one through six

somewhere that I don't have?

A. You do have it. It's on W110. That's where it starts, test nine, "Informacion."

Q. Okay, thank you.

A. And again if you look at the little arrow there, that's where you start.

Q. Okay. I see. All right. Sorry. Let's go to -- back to 111 then and again this is in Spanish, right?

A. I translated. And I also not only translated but I gave him the questions that are in the manual, the English manual.

Q. Okay. So hang on, how does this test work? What do you do?

A. You ask him the question that's in the manual.

Q. Okay. And so what kind of questions are they? Let's go to page 110 if you would and let's just start with the first one. "Termometro" it says?

A. "Termometro," yeah.

Q. Pardon?

A. The word is "termometro." It's thermometer. And the question is: What's a thermometer for?

Q. And he told you temperature?

A. Yeah. Measures temperature, yeah.

Q. All right. And so again here you translated from the Spanish to the English and asked him the question?

A. I asked him the question in Spanish and then I asked him -- when he couldn't understand it, I asked it in English.

Q. All right.

A. Or I helped him by translating some of the words into English.

Q. Okay. But you didn't write "English" on this part like you did earlier, right?

A. I wrote what he gave me in the -- No. 3 says "temperature" so that's English.

Q. I meant in the portions of the test earlier you wrote on the form "English" because you translated it into English. You didn't do that here though.

A. No.

Q. Okay, thank you. Now let's turn back to 111, please. Question seven has the name "Emiliano Zapata"?

A. Yes.

Q. And who's he?

A. He's a Mexican revolutionary.

Q. Okay. And so Mr. Rodriguez is supposed to know who Emiliano Zapata is?

A. No. That's why I asked him the question that's in the English manual, which is: Who was the president of the United States during the Civil War?

Q. Okay. Is that question No. 7 in the English

manual?

A.    I don't know what number it is but it's in the English manual.  It's around there.

Q.    Okay.  So you just took the question out of the English manual and asked him who was president during the Civil War, right?

A.    Yes.

Q.    And he told you Abe Lincoln?

A.    Correct.

Q.    So you just thought that was a question that fit this portion of the test?

A.    I know that that's a question that's equivalent in English.

Q.    Okay.  So let's go back to the first page if we could, 101, right?

A.    Yes.

Q.    Let's talk about how Mr. Rodriguez scored then, okay?  So starting with the first column you have -- his raw score is a 28, correct?

A.    Eighteen.  I mean, you mean block design?  Yes, 28.

Q.    Twenty-eight, right.  Okay.  And so you said that then you convert that somehow, right?

A.    Right.  There's a table that gives you, based on his age, what his scaled score is.  And scaled scores

have a mean of 10 and a standard deviation of three.

Q.   So a scaled score -- you have two numbers there, right?

A.   The scaled score is nine.

Q.   All right.  So what is the little number and then the bigger number?

A.   The little number is for my -- you know, I just wanted to make the comparison between the U.S. norms and the Mexican norms.  But it's not relevant to testing Mr. Rodriguez because he does not -- there's no reason to use Mexican norms.

Q.   Well, this is a Mexican version of the test.  Why wouldn't you use the Mexican norms?

A.   Because he's not Mexican.  He never lived in Mexico.  He wasn't born in Mexico.

Q.   But you gave him the Mexican test.

A.   There's three steps, as I explained yesterday. The first one is the translation of a test and that's what I used, a translation of the test.

The second one is an adaptation of the test, which is primarily only in -- two ways it's adapted. The adaptation is based on the difficulty of the items, in which order to put them, and the second adaptation is what I just mentioned before like you don't -- you're not going to ask somebody in Mexico who the president of

the United States was during the Civil War because they don't necessarily have to study or have to learn U.S. History.

Q. Okay. So wouldn't it be logical, if you're going to give somebody the Mexican version of the test, that you would score it by the Mexican norms because that's how this test was normed?

A. You are not supposed to use Mexican norms. You have to understand psychometrics. "Psychometrics" means the design of a particular test for a particular purpose. Most psychometric tests have to have two issues: One is validity and one is reliability.

Q. Okay.

A. When you're looking at the scores if you -- if you're going to use norms of a person that's never lived in Mexico that's not Mexican and if you use norms for Mexican people, you have no validity to your findings because the person has nothing in common.

Q. So let me stop you and make this clear. You used the U.S. norms because Mr. Rodriguez lives in the U.S.?

A. That's one of the reasons, yes.

Q. Okay. You also used the U.S. --

A. No, no, I didn't say he lives. He's never been to Mexico. He's not Mexican.

Q. Got you.

A.   And he's part of the U.S. norms.  I mean, he's represented in the U.S. norms.  The U.S. norms are based on the census of the United States, and individuals like Mr. Rodriguez are represented in the census.

Q.   Okay.  And you also used the U.S. norms because I think yesterday you testified that because he is -- he was charged with the crime in the United States, correct?

A.   The purpose of a test -- any test, any psychological test psychometrically basically has two purposes and it's contextual in nature.  One is to identify a condition.  It's called COI, condition of interest, okay?  So that's one purpose.  Are you identifying a condition?

And the second one is for the purpose of predicting.  It has predicting value and let me give you an example.  If you have an LSAT, what's the purpose of an LSAT?  An LSAT is to determine whether a person is likely to succeed in law school.  If you're using LSAT to predict whether somebody's going to be successful in law school, doesn't matter whether that person went to undergraduate school in Mexico, Japan, in China or in the United States.  Everybody's going to go to law school in the United States.  That's why you give the LSAT.  You don't use norms.  You don't say:  Well, this

person went to Mexico to undergraduate school so let me find a test or norm a test that will show whether he will be or not capable of going to law school in the United States.  That's what's called predictive.

Q.   Okay.

A.   When you're talking about condition of interest, which is the case here, what's the purpose of determining whether he is intellectually disabled or not?  It's not -- there's no purpose to determining whether he's intellectually disabled or not in this case in Mexico.  The only purpose of determining whether he's intellectually disabled or not, and that's the context of the condition of interest, is whether he's eligible or not for the death penalty in the United States.

Q.   Okay.  So let me follow that up.  So you're telling me that because he's facing the death penalty in the United States you have to use the U.S. norms when you give him the test, correct?

A.   I don't know if you didn't hear what I was trying to explain to you but that's not what I said.  That's not the reason.

Q.   You've testified --

A.   The reason is because the purpose of the test is to determine if he has an intellectual developmental disability according to the rules and according to the

definitions and according to the expectations of the United States of America, not of Mexico.  So you're not going to compare somebody to a country or to a place regardless of where they were born if what you're trying to find out is if they're eligible or not to receive a particular dispensation or a particular treatment according to the law in another country.

Q.  Okay.  Let me re-ask it this way then.  So if I was a Mexican citizen and my culture was Mexican, you would give me the Mexican version of the test, correct?

A.  If you didn't speak any English, I would give you the translation of the test.  And if you went to school in Mexico, I would ask you the questions that are relevant to people that were educated in Mexico.

Q.  And if I was facing the death penalty, however, in the United States, you would use the U.S. norms, right?

A.  In order for you to face the death penalty in the United States, regardless whether you're Mexican or not, you have to have broken the law in the United States, not in Mexico.

Q.  Right.  And so you -- so what you're telling me then is you use the U.S. norms, right?

A.  That's correct.  I compare you to other people in the same circumstances and the same environment.

Q. Okay. And so a different example, if I was German is there a German version of the WAIS-IV do you know?

A. As far as I know, there's no German. There's Spanish in Spain or there was on the WAIS-III. I don't know if there's a WAIS-IV.

Q. Okay. Well, let's just assume for argument sake so I'm understanding you that if I was German and there was a German version of the test but I was facing the death penalty in the United States you'd use the U.S. norms, correct?

A. That's correct.

Q. Okay, thank you. Okay. Let's go back to your first page, 101.

A. Okay.

Q. So you have your scores here. The first column you have nine and nine and then eight and five, six and three. You following me?

A. Right. Those are the scaled scores.

Q. Yeah, scaled scores. And one is the scaled score using the U.S. norm and one is the scaled score using the Mexican norm, correct?

A. That's what it is, but I just explained to you that the purpose of doing that for me was just for my own personal --

Q.   Yeah.

A.   -- interest.  It was not --

Q.   I'm just trying --

A.   -- not relevant to what we're doing here but, yes, that's correct.

Q.   Okay.  I'm just trying to follow what you did here.  So then go to the bottom here.  You have small 26, small -- big 18, right?

A.   (No response.)

Q.   Right?

A.   Yes.

Q.   Okay.  And the small 26 is the U.S. norm and the big 18 is the Mexican norm, right?

A.   No, the other way around.

Q.   The other way around?

A.   I'm sorry -- no, I think you're right if you said the small 26 is the Mexican norms and the big 18 is the U.S. norms.

Q.   Right.  Okay.  All right.  And so you have five numbers across that row and then on the bottom you take those numbers and you fill it in on the left-hand side, correct?

A.   Are you talking about the conversion into standard scores?

Q.   Yes, on the bottom here.

A.    Yes.

Q.    Okay.  All right.  And then move over to the next column and here's where you get what score?

A.    Which --

Q.    This next column to the right.

A.    That's the percentile rank.

Q.    That's what?

A.    Percentile rank, that's how many people --

Q.    No, no, no --

A.    -- obtain scores --

Q.    I don't want this way on the right.  I want the very next column.

A.    That's what I'm telling you.  That's a percentile rank.

Q.    Okay.  That's his score on each of the subtests, right?

A.    (No response.)

Q.    Is that the standard score?

A.    Where are you asking me?  I'm not sure.

Q.    Right here, sir (indicating).

A.    Where it's blank?

Q.    No.  All right.  We're on the left column here, right?

A.    Yes.

Q.    And you took these numbers from this horizontal

line and you transposed them down here, correct?

A.   Correct.

Q.   Okay.  Now I would like you to go to the very next column over --

A.   Yes.

Q.   -- all right?  Can you do that?

A.   Yes.

Q.   All right.  What are those numbers?

A.   Those are standard scores.

Q.   That's what I just asked you.  These are the standard scores, correct?

A.   You've asked me that before and we went through this before.

Q.   Okay.  We're going to do it one more time.  All right.  The small number here on the first line is No. 90, correct?

A.   Correct.

Q.   And then a 78, right?

A.   Correct.

Q.   And each one in that column again on the left-hand side, the small numbers, that is the U.S. norm number, correct?

A.   Can you say that again?

Q.   The small number on the left-hand side, that is which norm number?

A.    The Mexican.

Q.    Right?

A.    Mexican norm.

Q.    Mexican norm.  And then on the right-hand side it's apparently the U.S. norm, correct?

A.    The larger numbers -- you don't see it here but the numbers are bold numbers.  They're larger.  That's the ones I used.

Q.    So on the bottom the very last -- the very last box "CIT" --

A.    Yes.

Q.    -- that's the IQ score that you arrived at, correct?

A.    Correct.

Q.    All right.  And you have 74 in the U.S. norms, right?

A.    Correct.

Q.    And 89 if you score it by the Mexican norms.

A.    Yes.  You want to know why the difference is?

Q.    No, I do not.  Thank you.

A.    All right.

Q.    So do you remember testifying in a case United States v. Umana?

A.    Yes.

Q.    And you --

A.   In Virginia.

Q.   Pardon?

A.   It's a case from Virginia.

Q.   Yes.

A.   Okay.

Q.   And in that particular case you also gave that defendant the Mexican version of the test, correct?

A.   I gave him several tests.

Q.   Did you give him the Mexican version of the WAIS-III or WAIS-IV?

A.   WAIS-III.

Q.   Okay.  And you normed it the same way there, correct?

A.   I normed it according to the U.S. norms.  I didn't norm it but I used the U.S. norms to obtain the scores.

Q.   Aren't you -- by doing that aren't you divorcing the test from its normative database that it was designed for?

A.   The test was not designed for the normative sample.  That's where I think not only you, I'm sorry to say, but a lot of my colleagues are mistaken.  The test is not designed for a particular norming.  The norms in the test themselves are separate things.  The translation of a test and the norms of a test are

separate.

Q.    Okay.

A.    Now you can't norm it in a language that you don't translate it into but that's not necessarily -- the three steps as I already explained and I'm only using one of the three steps.

Q.    Okay, thank you.  We'll get back to that, all right?  So at the bottom there you have the Flynn Effect.  You took three points off for that then, correct?

A.    It's approximately three points.  Although, it would be more than three points because the test was published -- the WAIS-IV was published I think in 2008 and I tested him in 2018.  That's 10 years since the publication.  There's an estimate that it takes two years to standardize a test.  And as we saw yesterday in the article from Dr. Flynn, you consider it based on the time when it was standardized, not the time when it was published.

Q.    Okay.  So on page I think 11 of your report, Doctor, if you can find that if it's there for you.

A.    Yes.

Q.    You talk about the Flynn Effect there; is that right?

A.    Right.

Q.   And here you said that this should be deducted based upon the Flynn Effect, right?

A.   Yes.

Q.   Would you agree with me that the Flynn Effect is a highly controversial subject?

A.   No, not at all.  I don't think it's controversial at all.  I think it's a well-established scientific phenomena that's been reproduced in 23 countries. There's actually a study that --

Q.   Just hang on a second if you would, Doctor.

A.   Yup.

Q.   Thank you.  Doctor, I'm going to hand you what's been marked as Government's Exhibit 592 (indicating). This is a document from the Professional Psychology: Research and Practice journal.  It's called "Adjusting IQ Scores for the Flynn Effect:  Consistent with the standard of practice."

Have you seen that before?

A.   Yes, I have.

Q.   Okay.

A.   And it's one -- there were 102 studies that were researched and this is one of the two that says you shouldn't do it or that's controversial.

MR. REISENAUER:  Thank you.  We would offer 592, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No, Your Honor.

THE COURT:  592 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  I would direct you, Dr. Weinstein, to the second column on the right-hand side.  And as you just noted this paper questions the Flynn Effect, correct?

A.   Yes.

Q.   And here it says:  "A debatable but potentially emerging standard is whether psychologists should subtract from an individual's obtained IQ score on the basis of the Flynn Effect."

Do you see that?

A.   No.  Where were you -- I believe that's what it says there but I don't know where you're reading from.

Q.   On the right-hand side there on the top paragraph.  It's the third line down.  It says:  "A debatable but potentially emerging standard is whether psychologists should subtract points from an individual's obtained IQ score on the basis of the Flynn Effect."

A.   Yes.

Q.   Okay, thank you.

A.   And the rest of the statement there you want to

read it or do you want me to read it or you don't want the Court to know about it?

Q.   No, thank you.

MR. MONTROY:  I'm sorry, I didn't follow exactly where you were.

MR. REISENAUER:  (Indicating.)

Q.   (Mr. Reisenauer continuing)  Doctor, do you know of any case law that has questioned the Flynn Effect at all?

A.   Do I know of case law?

Q.   Yes.

A.   I know that there's some places where it has not been admitted, but I know of a lot of places it has been admitted.

Q.   Okay.

A.   But I'm not an attorney.  I don't know case law.

Q.   Thank you.  I've handed you a binder there that has some case law in it in regard to the Flynn Effect.

A.   Sir, I'm not an attorney.  I don't know about case law.

MR. REISENAUER:  Okay.  Your Honor, I would offer Government's Exhibit 593.  It's just a number of cases that have been put together regarding the Flynn Effect and Dr. Weinstein.

MR. MONTROY:  Your Honor, could I have a

moment?

THE COURT: You may.

MR. MONTROY: Your Honor, I'm going to object on two bases. One, I'm not sure what's in here and I've never seen this before. We haven't. And, second of all, it sounds like this is actually more appropriate for legal argument than for any kind of evidentiary value seeing it's just a collection of cases.

THE COURT: Looks like it's something that should be briefed. I'll sustain the objection.

Q. (Mr. Reisenauer continuing) Dr. Weinstein, your deposition last week, do you recall that?

A. Some of it.

Q. Okay. And you recall I asked you how many cases that you've been involved in, I think we talked about that yesterday, in death penalty cases and you said about 150; is that right?

A. I said I don't know exactly but I said approximately 150.

Q. Okay. And so you've been doing this for quite some time I think you told us, correct?

A. Twenty-five years.

Q. You work on death penalty cases for the prosecution on any occasion?

A.   I explained to you that I don't work a death penalty case for the prosecution.

Q.   And so every case that you've worked on has been on the defense side; is that right?

A.   No.  I explained to you that in some of the cases I was appointed by the Court to do it.  What I explained to you is that if my findings were not consistent with the needs of the -- needs of the defense but there were needs of the prosecution, I would not work for the prosecution because I wouldn't assist in the death penalty.

Q.   Okay.  And I asked you last week how many times, in the cases that you worked on, that you found the individual to be either mentally retarded or intellectually disabled.  Do you recall that?

A.   I don't recall the question.  I think I said about one-third of them.

Q.   You said what?

A.   I think it's about a third of the ones I've worked on.

Q.   Well, if I say that your answer was:  "So in that situation I would say, you know, it's a fairly high number of people but I found that have mental retardation maybe 80, 85 percent of the cases that are referred to me specifically to look into whether they

have an intellectual developmental disability."

Is that what you said?

A. And I think I explained to you that when the referral is specifically to determine whether they have is different from when there's a general referral. The 150 cases I worked on are not all of them referred for determination of intellectual disability.

Q. Okay. So when you are referred to look into individuals for intellectual disability, you have found that 80 to 85 percent of the time.

A. That's correct. And I think I explained to you that that's because there's a prescreening of sorts when the referral is specific for that purpose or there's a suspicion of it.

Q. Okay.

MR. MONTROY: And, Your Honor, I would just ask Mr. Reisenauer to point -- for the record to point where in the deposition he's referring to in regards to that.

MR. REISENAUER: Oh, I'm sorry, it would be just towards the beginning, page 13 and 14.

MR. MONTROY: Thank you.

Q. (Mr. Reisenauer continuing) Now you've testified a number of times in death penalty cases, correct?

A. Yes, sir.

Q.   And wouldn't it be correct, Doctor, that in many of the cases the Court has questioned what you have done in terms of your testing and your testimony and the methods that you used to arrive at your conclusions?

A.   Well, first of all, that's a very vague question. I don't know what "many" means.  And I've been questioned I think -- I don't know directly but I guess in general the answer is no, I'm not questioned by the Court.

Q.   Okay.  Well, let me ask you about a couple of those cases if I could.  In United States v. Xavier Jimenez-Bencevi, Jimenez, J-i-m-e-n-e-z, dash B-e-n-c-e-v-i.  Do you recall that case?

A.   Yes, I do.

Q.   And in that particular case the Court did not follow your method in terms of giving the test and arriving at your conclusion; is that correct?

A.   I'm not sure what you're asking me.

Q.   The Court did not give you credit for your method that you used; is that correct?

A.   Can you be specific, please?

Q.   I can't be any more specific than I just asked. The Court did not give you credit or approve the method that you used; is that correct?

MR. MONTROY:  Your Honor, I'm going to

object to the question based on its vagueness.

THE COURT:  Sustained.  You must have a case.  If you want to cite it in a brief, I'll read it.

MR. REISENAUER:  I will, Your Honor, United States v. Xavier Jimenez-Bencevi, in the District of Puerto Rico, Criminal 12-221.

THE WITNESS:  I recall that case but I -- and I recall that the judge was not very kind in his statements, but I don't know what you're asking me.

Q.   (Mr. Reisenauer continuing)  Okay.  Do you recall a case in the Fifth Circuit, Maldonado v. Thaler?  Did you testify in that case, Mr. Maldonado's case?

A.   Was that in Virginia?

Q.   That was in the Fifth Circuit, sir, in the Southern District of Texas, Virgilio Maldonado.

A.   Virgilio Maldonado, I remember the name, yes.

Q.   Okay.

A.   It's a very old case.

MR. REISENAUER:  If I could, Your Honor, that case is as I noted in the Fifth Circuit in 2010. It's No. 10-70003.  In that case the Fifth Circuit said it was, quote, troubled, end quote, with Dr. Weinstein's complete inability to explain his irregular methodology, including his failure to, quote, report partial conclusions --

MR. MONTROY:  Objection, Your Honor.  Again this is legal briefing or legal argument.  It's not a question and it's not relevant at this point.

MR. REISENAUER:  Your Honor, I think it's very relevant to whether or not the witness is properly providing the Court with testing that can be relied on and it goes to his credibility.

THE COURT:  And I think you could ask that question.  I'm just not sure that you can just, you know, cite a case and then tell me what the judge said.  I mean, it strikes me that there's a difference between a legal conclusion and a finding of fact.

And so if you ask a question that goes along the lines:  Did the judge reject your finding saying that the methods were unorthodox and inadequately explained in that case?  Yes or no.  Yes.  That's fine.  But, I mean, that's -- I'm not really interested in you reading the case to me or him.

MR. REISENAUER:  I understand that, Your Honor, but when I ask him and he answers that he doesn't know or he can't remember or doesn't know what I'm talking about, all I can do is tell him what the Court said.  That's my point.

MR. MONTROY:  And, Your Honor, there's no real basis here for him to even know what a Court would

say.  I mean, he comes into court, he testifies, and that's it.  That's stuff that lawyers do.

THE COURT:  You can use anything to refresh recollection.  I get that.  But if you're going to frame a question, frame a question.  If you want to look at something to refresh his recollection, that's fine, too.  Go ahead.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  I will go back, Dr. Weinstein.  In the Maldonado case do you recall the Court indicating --

A.  No, sir, I don't.  I'm sorry for interrupting you.  I never had any direct communication with the Court in any of the cases I've testified, never.

Q.  Okay.

A.  A judge has never told me this or told me that. I never -- and for the most part, as far as I know, attorneys never provide me with -- if the case seems like that's not where the case was heard but that was where the case was appealed to.  Fifth District doesn't hear cases.

Q.  Okay.  I'll do it this way.  You are not aware that the Court was troubled with your inability to explain your irregular methodology in Maldonado; is that right?

A.    I'm not aware of that.

Q.    Okay.  Do you recall testifying in a case regarding a Mr. Ortiz in the Western District of Missouri, sir?

A.    Yes.

Q.    Okay.

A.    I think he's Columbian.

Q.    Thank you.  In that particular case are you aware that the Court found that it appeared that -- that you appeared more concerned with legal culpability than with --

MR. MONTROY:  Objection, Your Honor. Dr. Weinstein has informed the Court and just answered the question that he's never had any contact with the Court.  He's never been informed by the Court.  He's never been informed by any attorneys who appeared before the Court as to Court opinions or any kind of communications about Dr. Weinstein, his testing or even the results of the case.  So his recollection can't be refreshed by the form of this question, and it otherwise is relevant for legal briefing and not a question posed to Dr. Weinstein.

THE COURT:  Well, let's hear the question first.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Dr. Weinstein, are you aware --

A.   No, I'm not.

MR. REISENAUER:  Can I finish the question, Your Honor?

THE COURT:  You certainly may.

MR. REISENAUER:  Thank you.

Q.   (Mr. Reisenauer continuing)  Dr. Weinstein, let me finish the question.

A.   Yes, sir.

Q.   In Ortiz v. United States are you aware that the Court there found that it appeared that you were more concerned with the legal culpability than with an objective assessment of intellectual capability?

A.   I'm not aware.

Q.   Thank you.

A.   But I will give you an answer that I've always gave.  I have no control over what people believe or what judges may disagree with me.  I respect the judge's position.  I have no control over that.

Q.   Did you testify in a case regarding an individual by the name of Pizzuto, P-i-z-z-u-t-o?

A.   I don't recall if I testified but I remember the name of Pizzuto, yes.

Q.   And in that particular case are you aware that

the Court did not credit your IQ scores of Mr. Pizzuto based upon the methodology that you did?

A.  I am not aware of that.

Q.  We talked a bit earlier about the case of United States v. Umana.  Do you recall that?

A.  Yes.

Q.  And do you recall in Umana the Court did not credit you with your methodology or your comprehensive IQ scores?

A.  I don't recall that.  I don't know that.  I'm not aware of it.

Q.  So earlier we talked about the mitigation themes that you looked at and the list of items on that mitigation theme exhibit.  Do you recall that?

A.  I recall looking at it.  I recall you giving it to me.

Q.  And you have in your report a list of risk factors for intellectual disability, correct?

A.  Correct.

Q.  Risk factors such as poverty don't make somebody intellectually disabled; is that correct?

A.  It's a risk factor.

Q.  It's a factor that you look at; is that right?

A.  Yes.

Q.  And so just because somebody's poor won't make

them intellectually disabled, correct?

A. No. I think I gave the example of the family where out of five siblings one is and they all have the same poverty -- well, not all of them because I don't know -- the last two kids grew up in the same environment.

Q. And the same goes with all the other risk factors; is that right?

A. "Same goes" with what respect?

Q. All the other risk factors, they don't necessarily make you intellectually disabled; is that right?

A. They're risk factors. They're not determinative.

Q. Okay. And a number of the mitigation themes that were listed there are risk factors, would you agree?

A. I think so.

Q. Okay. But no where in the thousands and thousands and thousands of pages of records did anyone ever, including Dr. Hutchinson at trial or Dr. Froming at trial, no where is there any mention that Mr. Rodriguez is mentally retarded; isn't that correct?

A. I don't recall seeing any -- in all the documents I reviewed anybody mentioned that.

MR. REISENAUER: That's all the questions I have, Your Honor.

THE COURT:  Thank you.  We'll take five minutes.

(Recess taken; 2:10 p.m. to 2:15 p.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  All counsel of record are present. Dr. Weinstein remains on the stand.  Mr. Reisenauer had just concluded his cross-examination.

Mr. Montroy?

MR. MONTROY:  Thank you, Your Honor,

**REDIRECT EXAMINATION**

**BY MR. MONTROY:**

Q.   Good afternoon, Dr. Weinstein.

A.   Good afternoon, sir.

Q.   Dr. Weinstein, yesterday there was some discussion about the -- about the materials that you received and reviewed in this case, materials specifically that you received from my office?

A.   Yes.

Q.   And there was an exhibit that was introduced, Exhibit No. 45, that just -- it said Weinstein sources and it had several pages of documents?

A.   Yes.

MR. MONTROY:  Just to clarify any confusion,

Your Honor, may I approach?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  Do you remember receiving background packets from Latoya Hampton?

A.  Yes.

Q.  And those contained the materials that you reviewed, the sources that you reviewed; is that right?

A.  Yes.

Q.  And I'm going to hand you what's marked as Defendant's Exhibit 63 (indicating).  If you wouldn't mind just taking a quick look at this document.  And if you would turn -- the first page says "Index to Background Materials;" is that right?

A.  Yes.

Q.  And these materials are the ones that appear on the back of your report?

A.  Yes.

Q.  And then if you would turn about four pages in there's a document with a separate title on it that says "Index to Supplemental Background Materials"?

A.  Yes.

Q.  And there's four documents there, listed there?

A.  Yes.

Q.  And you received those documents from my office?

A.  In addition to two other declarations, yes.

Q.   And then if you would turn to the next page, it says "Index to 2nd Supplemental Background Materials."

A.   Yes.

Q.   Do you see that?

A.   Yes.

Q.   And that was a separate background packet that was sent to you by my office and materials that you reviewed?

A.   Correct.

Q.   And then if you will turn one more page, that one's entitled "Index to 3rd Supplemental Background Materials"?

A.   Yes.

Q.   And that contains six additional documents; is that right?

A.   Yes.

Q.   Okay.  And those are materials that you received in the form of a background packet from my office, right?

A.   From your office, yes.

Q.   Okay.  And those are all materials that you reviewed before you testified here today?

A.   Yes.

            THE COURT:  Do you want to see 45, Keith?  We've got it right here.

MR. REISENAUER:  We found it.

THE COURT:  Like magic.

MR. MONTROY:  And, Your Honor, I would offer that exhibit, Exhibit 63.

THE COURT:  Can you tell me what the number is on it because I don't believe we technically --

THE WITNESS:  Sixty-three.

THE COURT:  Sixty-three, any objection?

MR. REISENAUER:  I just have a couple questions, Your Honor.

THE COURT:  You may.

MR. REISENAUER:  Dr. Weinstein, maybe you don't know the answer.  Mr. Montroy probably does.  Sixty-three, as we look at it now, is it different than 45?

THE WITNESS:  I don't know.  Forty-five might not have had the third supplemental background.  I don't recall that 45 had subtitles to it.

MR. REISENAUER:  Okay.  But your testimony is that whatever is in 63 now is what was provided to you?

THE WITNESS:  What was sent to me, I think this is the background materials.  As I mentioned to you before, it was tons of material.

MR. REISENAUER:  Okay.  Did you put this

together?

THE WITNESS:  No, I did not.

MR. REISENAUER:  All right.  Your Honor, I don't know whether there's need to object, but I'll ask further questions on recross if I need to.

THE COURT:  I'll take that as a waiver of the right to object and receive it.

MR. REISENAUER:  No objection.  Thank you.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, could you please look at Government Exhibit 574 that was introduced today?

THE COURT:  That's the 302 report from Gordon Tolbert?

MR. MONTROY:  That's right.

THE WITNESS:  Which one?

THE COURT:  It's an FBI report of an interview of Gordon Tolbert.  Do you have it?

THE WITNESS:  I don't know.  I thought you said 573.

Q.  (Mr. Montroy continuing)  Sorry about that, 574.

A.  574, yes.

Q.  And do you recall Mr. Reisenauer asking you some questions about this document which involves Mr. Rodriguez's shop teacher from 8th grade?

A.  Yes.

Q.   And according to this 302 and the report of Mr. Rodriguez's teacher, Mr. Rodriguez seems to have done okay in shop class in 8th grade?

A.   Yes.

Q.   And could you also get ahold of Exhibit 13 of Mr. Rodriguez's Crookston school records which you testified about yesterday.

A.   Yes.

Q.   And if you could turn to the fourth page of that exhibit.

A.   You mean fourth page?  They're double-sided so --

Q.   It says "2615" at the bottom.

A.   Okay, yes.

Q.   And you'll see, if you look at the second half of that page, the bottom of the page, it says "Junior Secondary School Achievement Record."

A.   Yes.

Q.   And you'll notice that in the second column it says 8th grade?

A.   Yes.

Q.   Year ending 1969?

A.   Yes.

Q.   And four lines down you'll see that Mr. Rodriguez got a C in shop class; is that right?

A.   Yes.

Q.   And then if you look up to the top of that column it notes that Mr. Rodriguez got an F in English?

A.   Yes.

Q.   And an F in math?

A.   Yes.

Q.   An F in social studies?

A.   Yes.

Q.   A D in science?

A.   Yes.

Q.   A C in phys-ed?

A.   Yes.

Q.   And a D in health?

A.   Yes.

Q.   And a C in music?

A.   Yes.

Q.   And he attended 165 of 175 days of school that year; is that right?

A.   Correct.

Q.   So is it fair to say that while Mr. Rodriguez had somewhat of a strength in shop class, I guess an average strength in shop class, there are several other weaknesses in his academic record?

A.   He failed all the subjects that require -- I mean, they're not -- I mean, they are academic.

Q.   And yesterday you talked about and you referenced

the AAIDD manual and the DSM-5 manual about people with intellectual disability having strengths and weaknesses; is that right?

A.   Yes.

Q.   And are the weaknesses that Mr. Rodriguez exhibited in 8th grade consistent with deficits in adaptive functioning in a conceptual domain?

A.   Yes.

Q.   Are they consistent with someone who's intellectually disabled?

A.   I think so, yes.

Q.   If you can next turn to Exhibit 575, please. It's a one-page document.

A.   Okay.  Yes, I have it.

Q.   And this was identified as a document that was produced by government -- prosecutors from the government at the time of trial, and Mr. Reisenauer asked you about the second paragraph.  Do you recall that?  Specifically I'm going to reference a line about halfway through that says:  "His estimated academic IQ was 85."

A.   Yes.

Q.   You don't have any understanding of where that particular number came from or that reference?

A.   No.  I think it's from the hospital but I don't

know.

Q. You don't know what kind of IQ test was administered?

A. I don't recall any IQ tests being administered in the hospital.

Q. So is it fair to say for all you know it could have been just some person in the hospital saying: I think maybe he has an IQ score of 85?

A. That's how I read it here. It says an estimated -- and I don't know what an academic IQ -- I don't understand what the -- I don't know what an academic IQ is.

Q. Yeah. Is that a term that's recognized in the criteria estimated IQ score -- or, I'm sorry, estimated academic IQ score?

A. I've never heard of an academic IQ score.

Q. It's just an IQ score; is that right? That's what --

A. No. If it's an intellectual quotient, it's an IQ score. If it's a -- like a score from a WRAT that gives you some academic skills, then it's a standard score.

Q. Yeah. And that's just normally referred to as IQ score, right, not academic IQ score?

A. I never heard the term "academic IQ score."

Q. If you could next turn to Government Exhibit 576,

Dr. Weinstein.  If you could look at this document as well as the next, Government Exhibit 577.

A.  Yes.

Q.  Starting with 576 Mr. Reisenauer asked you specifically about a line at the very end of the first page and noted:  "He quit school at that time because he wasn't working at it and thought most of the students were aware of his sexual behavior and talking about him."

Do you see that line?

A.  Yes.

Q.  And that's Mr. Rodriguez self-reporting his reason why he quit school in 9th grade?

A.  That's my understanding of the source of this information is from Mr. Rodriguez.

Q.  Okay.  And if I could turn your attention to Exhibit 577.  Up at the top of 577, Mr. Reisenauer asked you about the line "He had to repeat the second grade because of language difficulty.  From that point on he progressed through school but was considered rather slow at school.  He finished the 9th grade and started the 10th but quit.  At that time he was 18 years of age."

Do you see that?

A.  Yes.

Q.  So in both of these situations, in both of these

documents, 576 and 577, it involves the self-reporting of Mr. Rodriguez to the reasons why he quit school; is that right?

A.   Yes.

Q.   And this particular document, document 577, was a document that was prepared by Dr. Eggert, if you look at the last page, 577?

A.   Yes.

Q.   And that was affiliated with the Minnesota Security Hospital?

A.   Yes.  They're progress notes.  It's not a report. It's a progress note.

Q.   All right.  And as far as we can tell from this document, there's no indication Dr. Eggert ever reviewed any records of Mr. Rodriguez?

A.   No.  He would have noticed that he wasn't in the 10th grade when he quit but only 9th grade.

Q.   Correct.  He never went to 10th grade.

A.   That's correct.

Q.   And Dr. Eggert never administered any testing as far as we know from this document?

A.   This document wouldn't have any -- I mean, I don't know.  It's not a report.  It's a progress note.

Q.   But this report doesn't reference any kind of intelligence testing or IQ testing?

A.   I haven't read the whole report but I assume not.

Q.   And there's no indication from this report Dr. Eggert at any point talked to any witnesses, any family members of Mr. Rodriguez, any friends of Mr. Rodriguez?

A.   Again I think it's self-report and it's a progress note.  It's not a report so I don't think there's any sources that he talked to.

Q.   Okay.

A.   But I haven't read the whole thing.

Q.   And on the second page Dr. Eggert writes:  "I think that this man's intelligence is within the average range, but was compromised by language difficulties and difficulty with social acceptance."

A.   I remember that that's one of the things that I was asked about.

Q.   That you were asked about?  As far as this document is concerned, it appears that that conclusion is based on Dr. Eggert's interview with Mr. Rodriguez alone; is that right?

A.   That's what it appears to be, yes, his opinion about his -- his impression, not opinion, his impression about how he functions, yes.

Q.   And --

A.   Although it seems like what he's saying to me --

it seems like what he's saying is he must be of average intelligence, but based on the fact that he had problems with language and problems with this and this that's why he's of average intelligence.

Q.   And in both of these documents, 576 and 577, Mr. Rodriguez offers an explanation that, you know, he was either having trouble with language as a reason for leaving school or not doing well in school or not having an interest in school so he left school.

But again looking back at Exhibit 13 on page -- the fourth page again, we see that Mr. Rodriguez, in his second attempt at 9th grade when he was 18 years old, went to school 172 days out of 177 days; is that accurate?

A.   Yes.

Q.   So would you agree that he told Dr. Eggert that he wasn't interested in school but yet he kept going every day?

A.   Yes.

Q.   And he kept failing; is that accurate?

A.   Well, he's got an F in science and D minus in health.  That's the last attempt he did to --

Q.   And the year before that when he was 17 years old in the 9th grade he got an F in English, an F in social studies, an F in science, a D in math and an F in

health.

A.   Correct.  And a C in physical education.

Q.   And if you could just recall, Dr. Weinstein, the Kuhlmann-Anderson tests that were referenced yesterday and today, do you recall that in the four times that Mr. Rodriguez took that test his scores actually went down as he got older?

A.   Yes.

Q.   Dr. Weinstein, Mr. Reisenauer asked you a question on a document where he referenced Mr. Rodriguez being helpful doing chores around the house.  Do you recall that?

A.   That he was helping his mother when he was released after 23 years in prison, yes.

Q.   Helping your mom out with chores around the house, is that in any way inconsistent with deficits in adaptive behavior?

A.   No, it's not.

Q.   If I could turn your attention to Government Exhibit 578, please, Dr. Weinstein.  Have you found that document?

A.   Yes.

Q.   If you could turn your attention -- and this is a Minnesota Security Hospital document?

A.   It's a psychiatric consultation from the

Minnesota Security Hospital, yes.

Q.   And first question I have is if you could look down to the paragraph that starts with the words "The reports from the last Team meeting..."  Do you see that paragraph?

A.   It's all one paragraph but --

Q.   On page 2?

A.   Oh, I'm sorry.  Yeah, I think it's the third paragraph down.

Q.   Okay.  And, if you could, the third sentence of that paragraph starts:  "It was reported that after some procrastination, he was going ahead with classes and he told me, by the way, that he was finishing up his high school."

And does this appear to be self-reporting the idea that he was finishing up with high school?

A.   That's what the psychiatrist is saying that that's what he told him.

Q.   You, I believe, mentioned that you've never seen any records of Mr. Rodriguez finishing high school; is that correct?

A.   Not in all the documents I reviewed, no.

MR. MONTROY:  Your Honor, may I approach, please?

THE COURT:  You may.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, I'm handing you what I've marked as D-64 (indicating), which is a partial -- it's an interview that was conducted with -- of Mr. Rodriguez by Dr. Seward and it's one page of that interview.

A.   Yes.

Q.   And if I could turn your attention to about halfway down the page where Dr. Seward asks:  "So how long did you last in school?"

A.   Yes.

Q.   Do you see that?  Okay.  So Dr. Seward says:  "So how long did you last in school?"

"Mr. Rodriguez:  Until the tenth grade, the ninth grade actually."

"Dr. Seward:  And you finished ninth."

"Mr. Rodriguez:  Yeah."

"Dr. Seward:  And you left during tenth?"

"Mr. Rodriguez:  Huh?"

"Dr. Seward:  You left school during tenth grade?"

"Mr. Rodriguez:  No, no, I flunked ninth grade."

"Dr. Seward:  Oh, okay."

"Mr. Rodriguez:  And then that year when I was gonna start ninth grade again, I quit."

"Dr. Seward:  Oh, all right so actually, technically, the last grade you finished was 8th grade."

"Mr. Rodriguez:  Yeah."

"Dr. Seward:  Yeah, okay."

"Mr. Rodriguez:  Well, I didn't really finish it.  They just passed me to get rid of me."

"Dr. Seward:  On paper."

"Mr. Rodriguez:  On paper, yeah."

"Dr. Seward:  Okay and did you ever go back to school?"

"Mr. Rodriguez:  Yeah, when I was in the security hospital."

"Dr. Seward:  Was that a GED program?"

"Mr. Rodriguez:  To tell you the truth I got a diploma."

"Dr. Seward:  Oh a regular diploma?"

"Mr. Rodriguez:  Yeah."

"Dr. Seward:  What was that?  I mean -- "

"Mr. Rodriguez:  Hmm?"

"Dr. Seward:  It seems like you were doing really poorly in school, from what you were saying."

"Mr. Rodriguez:  Well it isn't that I was doing poorly.  If I pushed myself I could've done it but I didn't care."

"Dr. Seward:  Okay."

"Mr. Rodriguez:  I didn't wanna deal with kids and in this school you were one-on-one."

"Dr. Seward:  Oh at the St. Peters place?"

"Mr. Rodriguez:  Yeah, yeah."

"Dr. Seward:  Okay so did you have trouble with the academics there at St. Peters?"

"Mr. Rodriguez:  No, no, like I said if I put myself out there I could do it."

"Dr. Seward:  But I mean you would've had a lot of catching up to do."

"Mr. Rodriguez:  Yeah, well I had five years to do it."

"Dr. Seward:  Okay."

So my question, Dr. Weinstein, is that it appears there, at least the self-reporting, that Mr. Rodriguez attended some kind of academic program when he was in the prison?

A.  Well, that's what he's saying here is when he was in the hospital.

Q.  Okay.  And the type of school that Mr. Rodriguez was attending was a school that involved some kind of one-on-one tutoring, is that accurate, from what Mr. Rodriguez is saying?

A.  That's what he's saying and he said it took him five years.

Q.   So it took him five years, assuming that he got a high school diploma, and you mentioned there's no record that he actually got a high school diploma.  But assuming for the sake of argument that he got a high school diploma, it took him five years of one-on-one tutoring; is that accurate?

A.   That's what he says in that paper, yeah.

Q.   Okay.

THE COURT:  Since we've read 64 are you going to offer it?

MR. MONTROY:  I am, Your Honor.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Sixty-four is received.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, you'll recall yesterday talking about the WRAT scores?

A.   Yes.

Q.   That Mr. Rodriguez has obtained from several testings?

A.   Yes.

Q.   And those are in Exhibit 48?

A.   Yes.

Q.   And those tests are specifically designed to assess Mr. Rodriguez's performance in academic skills, including reading and math; is that right?  Do you want

to take a look at 48?  Is that what you're looking for?

A.  I'm looking for it here.

MR. REISENAUER:  Your Honor, I'm going to object to this line of questioning.  I don't believe there was any questions on cross regarding the WRAT scores.

MR. MONTROY:  There was questions about whether or not Mr. Rodriguez went to high school and got a diploma, Your Honor, and this is testing the -- that assumption.

THE COURT:  Well, let's hear the question because at this point I don't really know exactly what it is.

Here's 48 though (indicating).  Don't mix it up with those because it's coming back to live with us.

THE WITNESS:  Okay, Your Honor.

Q.  (Mr. Montroy continuing)  If you want to just quickly look at 48.

A.  Yes, yes.

Q.  And in 48, the WRAT scores, what range does Mr. Rodriguez score on the WRAT scores regularly speaking?

A.  Sixth grade or lower in reading and arithmetic, with the exception of reading comprehension in Dr. Seward's scoring, he obtains a 10.9 rate.

Q.   So assuming that Mr. Rodriguez graduated from the high school program where he had one-on-one tutoring and it took him five years while he was in prison, does that negate his level of academic functioning that he attained on those WRAT tests?

A.   Well, according to the testing he never obtained anything close to the 12th grade level.

Q.   Thank you.

A.   Which that's what -- 12 grades of education is high school.

Q.   And assuming that he got a diploma, somehow that diploma wouldn't negate that testing, would it?

A.   No, not at all.

Q.   Sticking with 578, Government Exhibit 578, on the second page the first full paragraph Dr. Eggert writes: "Currently he seems quite confident.  He seems quite socialized.  He seems to accept the program in this hospital very well.  It doesn't seem to matter to him whether he was on this unit or whether he would be in an open setting."

        And on the first page towards the bottom half:  "He feels that he is not one of the low persons, he is not some low-class person, he is not striving to be in some other group."

        Is that sort of self-reporting consistent

with what you've identified as masking?

A.   I really don't know what the context is.  I mean, what I read here or what I understand from this is that the doctors say that he's comfortable in the hospital setting.  He doesn't want to be away from it.  He feels safe there.  That's how I read it.  And that's not necessarily masking.  I think he was comfortable in a controlled environment.

Q.   Dr. Weinstein, if you could turn to page 579 -- I'm sorry, Exhibit 579, Government Exhibit 579.

A.   Yes.

Q.   And I believe this was an excerpt of testimony of Dr. Hutchinson from trial.

A.   Yes.

Q.   And if you could look -- you were asked a couple of questions about this on cross-examination.  If you look at line 13, the question was asked of Dr. Hutchinson:  "What IQ -- this IQ testing was done at the Crookston Public Schools?"

Answer:  "Yes."

Question:  "And what IQ was he assigned?"

Answer:  "Seventy-seven."

Question:  "Seventy-seven?"

Answer:  "Yes."

Question:  "And where is the cutoff for

mentally retarded in the IQ scale?"

Answer:  "Seventy-five."

So this apparently refers to the Kuhlmann-Anderson IQ testing scores that were conducted in Crookston.  Would you agree with that?

A.   Yes.

Q.   And yesterday you provided the Court with some testimony about the IQ standards or the mental retardation standards, I should say, when Mr. Rodriguez was in elementary school as being different than they are today.  Do you recall that?

A.   I don't recall specifically but I know that up till 1973 the cutoff IQ score was 85, not 75.

Q.   So when Mr. Rodriguez took the Kuhlmann-Anderson and was scored with a 77 in the 1960's, he would have qualified as mentally retarded; is that accurate?

A.   If that was the only criteria and if it was an independent, individually administered test it would be, yes.

Q.   So Dr. Hutchinson would be a -- I'm sorry, strike that.

Dr. Hutchinson's understanding of what the cutoff score was on that particular test at that particular time was inaccurate.

A.   Well, I think she testified at a time where the

IQ score was already 70.  So she might have been confused about the time the testing took place and the time that she testified.

Q.  Dr. Weinstein, do you recall being asked some questions on cross-examination about the period of time when Mr. Rodriguez was living briefly with Dotsie Dahl and his father came and picked up some laundry?

A.  Yes.

Q.  And that's Exhibit 40?

A.  Defense Exhibit 40?

Q.  Yes, Defense Exhibit 40.

A.  I don't know.  I can look it up.  I don't have 40.  It goes up to 39.

THE COURT:  Here it is (indicating).

THE WITNESS:  Thank you, Your Honor.

MR. MONTROY:  May I approach, Your Honor?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  You recall this is a document that describes that interaction, right, Exhibit 40?

A.  Yes.

Q.  And just a couple questions about this, Dr. Weinstein.  Your understanding from this document was that Mr. Rodriguez's father came and picked up the laundry to do the laundry for Mr. Rodriguez.

A.   Yes.

Q.   And what did that mean to you that that was happening?

A.   (No response.)

Q.   What did that say about Mr. Rodriguez's adaptive functioning?

A.   That he was not self-sufficient.  I mean, if he -- if there was no washer and dryer I'm sure there's some public laundering places in the city where he was living.

Q.   Sure.  And so the record is clear that Mr. Rodriguez's father was actually picking up his laundry, Mr. Rodriguez's laundry, and taking it back to the parents' house, right?

A.   That's what this document says, yes.

Q.   And so there's no -- there's no indication that Mr. Rodriguez, as you mentioned, took the laundry to a laundromat; is that right?

A.   No, he didn't take it to the laundromat.  His father took it home to launder it for him.

Q.   But that's something that if Mr. Rodriguez was capable of taking care of himself independently he could have done, for instance, gone to the laundromat and done --

A.   If he was independent, yes.

Q.   Mr. Rodriguez could have taken the laundry to his parent's house and done it himself, correct?

A.   He could have done that, too, yes.

Q.   But that's not what happened here; is that right?

A.   According to this document, no.

MR. MONTROY:   Your Honor, may I approach?

THE COURT:   You may.

MR. MONTROY:   Sorry, Your Honor, if I could have just a second.   Your Honor, may I approach?

THE COURT:   You may.

MR. MONTROY:   Thank you.

Q.   (Mr. Montroy continuing)   I'm handing you what's marked as Defendant's Exhibit 65 (indicating). Dr. Weinstein, please take a quick look at this document.

A.   (Witness examining.)   Okay.

Q.   Do you recognize it's a "Medical and Social History Questionnaire" from the Minnesota State Hospital -- Minnesota Security Hospital, excuse me?

A.   Yes.   That's what it says, yeah.

Q.   And it's dated January 2, 1975?

A.   Yes.   I don't know if it's dated that.   It says that he was admitted to the hospital in 19 --

Q.   I apologize, you're right.   Okay.   And if you could turn to page 4, that talks about "Present Mental

Illness (cont)" at the top?

MR. REISENAUER:  If I may, Your Honor, I don't have a copy.  I don't know what he's looking at, and it hasn't been offered.

MR. MONTROY:  I'll get Mr. Reisenauer a copy.  I think I have one.  It's just somewhere on my -- (no further comment).

Q.  (Mr. Montroy continuing)  Dr. Weinstein, were you able to turn to page 4?

A.  Yes.

Q.  And I direct your attention to the five lines up.

A.  Yes.

Q.  "So after about a week he found an apartment and moved out."  And then "from approximately October 25, 1974 to November 19, 1974 he returned home only once. He would call home a couple times a week and we would visit him often and we did his washing for him."

Dr. Weinstein, is that consistent with your understanding of his parents doing the laundry for Mr. Rodriguez?

A.  Yes, it is.  I just don't know where you're asking me to read it.  Page 4?

Q.  Page 4 at the bottom.

THE COURT:  It's there.  It's the handwritten one-page statement.

THE WITNESS:  Okay.

THE COURT:  Do you offer 65?

MR. MONTROY:  I do offer 65, Your Honor.

MR. REISENAUER:  No objection.

THE COURT:  Sixty-five is received.

Q.   (Mr. Montroy continuing)  And, Dr. Weinstein, not being able to wash your own clothes and to live independently, that's an example of a deficit in adaptive functioning; is that right?

A.   I believe so, yes.

Q.   Dr. Weinstein, could you please refer to the big packet of testing of your raw data?

A.   Yes.

Q.   Government Exhibit 580.

A.   Yes.

Q.   And if you could refer to the W43, the Neuropsychological Assessment Battery?

A.   Yes.

Q.   You indicated on cross-examination when asked by Mr. Reisenauer that you believe that you scored these via computer; is that accurate?

A.   Yes.

Q.   And that when you printed out your raw data there must have been some issue with the computer-generated scores not showing up on the page?

A.   I don't understand how that page is there. That's what I said.

Q.   And during the break you looked on your computer and you found the scores; is that accurate?

A.   That's accurate.

MR. MONTROY:   And, Your Honor, just for the record Dr. Weinstein has provided those scores and I asked the government if they would like to have them.

Q.   (Mr. Montroy continuing)   While we're on your testing, could you please turn, Dr. Weinstein, to page W73.

A.   Yes.

Q.   And do you recognize this document?

A.   Yes.

Q.   And this is a page from your testing?

A.   Yes.

Q.   And Mr. Reisenauer asked you some questions about why you didn't fill in the responses --

A.   Correct.

Q.   -- is that correct?   And you informed Mr. Reisenauer that you had already asked Mr. Rodriguez those questions; is that correct?

A.   I knew he had answered some of these questions.

Q.   And if you wouldn't mind just looking at the scoring on the right-hand column.

A.   Yes.

Q.   Is it fair to say that you gave Mr. Rodriguez the highest score?

A.   I gave him credit for all the questions, yes.

Q.   So there was no negative impact on Mr. Rodriguez's scoring given --

A.   No, not at all.  I mean, as I mentioned before, this is just questions about his orientation and he was oriented to time, place and person.  He knew where he was.  But some of the questions applied to him like what city do you live in and things like that or what's your address?

Q.   So this particular page here had no bearing on any testing concerning Mr. Rodriguez's intelligence or ability to think, academic achievement?

A.   No.  This is just whether he's oriented where he knows where he is.  It's basically an issue of orientation.  That's what it says at the top.

Q.   And you had no concerns that he was -- Mr. Rodriguez, when you administered this test, that he was in any kind of psychotic state?

A.   No, he wasn't.

Q.   Could you please turn to W89 and specifically the WRAT4.

A.   I don't know where I have it.  It's not in this

pile.

MR. MONTROY:  Your Honor, may I approach?

THE COURT:  You may.

MR. MONTROY:  Thank you.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, I'm showing you page W89 and this is -- you would agree with me this is from the WRAT4?

A.  Yes.

Q.  And none of the spaces are filled out on this page, is that right, in the "Spelling Subtest Part 1: Letter Writing"?

A.  You're not to supposed to give him at his age Part 1, spelling.

Q.  Okay.  So the top instructions say don't complete this based on Mr. Rodriguez's age?

A.  Well, not if he can read words.

Q.  Yeah, okay.  And you ultimately credited Mr. Rodriguez for having 15 out of 15, a perfect score on this section.

A.  Yes.

Q.  So I guess two points, one when you did the WRAT4 you followed the instructions by not completing this particular page because it wouldn't have been appropriate for someone of Mr. Rodriguez's age to answer the subtest?

A.   Or capacity, yes.

Q.   And, second of all, he was accredited with the perfect score so no way affected his score negatively or made him seem less intelligent or --

A.   No, not at all.

MR. MONTROY:  Your Honor, may I approach?

THE COURT:  You may.

Q.   (Mr. Montroy continuing)  I'm going to turn your attention to W92 also of the WRAT, Spelling Subtest Part 2.

A.   Yes.

Q.   So Mr. Reisenauer asked you some questions about the scoring on this particular page and specifically why there was no answers filled in for No. 1 and No. 2?

A.   Right.

Q.   And why was that?

A.   It's called Rule Five Seven, which means he has to answer five correct answers.  You start based on his reading abilities and then if he doesn't get seven -- I mean, five correct then you start going backwards until he gets five correct and then you add those up.  He gets five correct before I go to the next one.

Q.   Okay.  So you followed the rules of the WRAT when you didn't fill in one and two?

A.   Yes.

Q.   And you also gave credit for Mr. Rodriguez correctly answering No. 1 and 2; is that right?

A.   That's the rule, yes.

Q.   And that's consistent with the rule?

A.   Yes.

Q.   All right.  So not answering No. 1 and 2 didn't negatively impact Mr. Rodriguez's score in any way, I mean, in terms of making him look less intelligent or lowering what his academic achievement --

A.   No.  It's considered in the total number of correct answers.

MR. MONTROY:  Your Honor, may I approach?

THE COURT:  You may.

MR. MONTROY:  Thanks.

Q.   (Mr. Montroy continuing)  I'm going to turn your attention, Dr. Weinstein, to page W95.

A.   Yes.

Q.   And specifically at "Starting Point D."

A.   Yes.

Q.   You were asked some questions on cross-examination about how you conducted this test, not filling in the blanks and not circling.  Do you recall that?

A.   Yes.

Q.   And the score that you gave Mr. Rodriguez for

each of the answers here?

A. He got credit for the answers. That's why I only went through D.

Q. And Mr. Rodriguez scored perfectly on this section of the test; is that right?

A. He was able to answer those four ones, yes.

Q. So he got four points out of four total points?

A. Yes.

Q. So you not circling one of the correct response items or filling in in the first column items didn't negatively affect Mr. Rodriguez's score, make him seem less intelligent?

A. No.

MR. MONTROY: Your Honor, may I approach again?

THE COURT: You may.

Q. (Mr. Montroy continuing) Mr. Rodriguez, I'm showing you from that same exhibit what's been identified as page 1 -- W110?

A. Yes.

Q. W110, and you recognize this is a page from the WAIS-IV?

A. Yes.

Q. And I know you were asked at length about this on cross-examination but you started asking the questions

of Mr. Rodriguez at No. 5; is that right?

A. Yes.

Q. You didn't ask -- you didn't start the question at one or one through four, right?

A. No. I gave him the sample test and he was able to do it so that's all I needed to know.

Q. Okay. And you gave him credit for answering one through four correctly.

A. Yes, because the manual says you start at five and you give credit for the ones that you don't do.

Q. And so that's consistent with the manual and the instructions on how to do the test?

A. Yes.

Q. All right. And there is an arrow next to five, correct?

A. Yes.

Q. Says --

A. Sixteen to 90.

Q. Sixteen to 90. And is that an indicator of a particular point where you might start the test or you should start the test?

A. Yes.

Q. And so you started the test in the way that the manual told you you should start the test?

A. I did, yes.

Q.   Dr. Weinstein, CTONI, the CTONI-2, you administered that test --

A.   Yes.

Q.   -- to Mr. Rodriguez.  And the CTONI-2 is a reliable test and an accurate test as far as IQ tests go; is that right?

A.   Right.  It's widely used, yes.

Q.   It's widely used by neuropsychologists and psychologists who administer this test?

A.   For a test of intelligence, yes.

Q.   Is it a reliable test for somebody who has language skills in English-Spanish?

A.   Yes.

Q.   So is it just as reliable for someone who can speak English or Spanish as it is for somebody who has problems with language skills?

A.   Yes.  It doesn't require any language.

Q.   Dr. Weinstein, concerning the WAIS-IV, you planned to administer the WAIS-IV to Mr. Rodriguez; is that correct?

A.   Did I plan to?  Yes.

Q.   And that's why you took the Spanish manuals to Terre Haute?

A.   Yes.

Q.   And is it fair to say that when you did that you

knew that you were going to be administering three separate IQ tests to Mr. Rodriguez?

A.   Yes.

Q.   And I believe yesterday you testified something along the lines of about wanting to have a varied and multiple set of tests to get a more accurate picture of what Mr. Rodriguez's IQ score may be.

A.   Yes.

Q.   And is that why you used the WAIS-IV in Spanish in conjunction with the CTONI and the TOGRA?

A.   I thought he spoke Spanish and that's why I used the WAIS-IV in Spanish.  And, yes, I used the TOGRA and the CTONI because I wanted to have more than one test that would reflect his cognitive or intellectual abilities.

Q.   You mentioned to Mr. Reisenauer that you were concerned about practice (indiscernible); is that right?

THE REPORTER:  I'm sorry, concerned about what?  Please step to the microphone.

MR. MONTROY:  I'm sorry, about practice effect.

THE REPORTER:  Thank you.

Q.   (Mr. Montroy continuing)  What is practice effect?

A.   "Practice effect" means that the individual

learns from having been exposed to the test prior and a few other times, yes.

Q.   So when you went to Terre Haute to administer the WAIS-IV in Spanish, was it your understanding that because the test was going to be administered in Spanish rather than English that you might be able to avoid some of the issues with -- related to practice effect?

A.   Well, the practice effect is really more related to nonverbal items because the verbal items are not timed.  And in my opinion practice effect really affects subtests that are timed because the individual learns skills or learns strategies on how to perform a certain test and does it faster than if you had no prior exposure to it.

Q.   On the WAIS-IV you identified on cross-examination that there's a difference between the test itself and the norms that are used; is that correct?

A.   Yes, of course.

Q.   Okay.  And what is that difference?  What is the distinction between a test that's in any language and the norms that are used?

A.   The way psychometrics work is -- the way you do testing is, No. 1, you find what items, what the construct or what the aspect of it you want to test.

Once you identify the items you do a pilot testing of it, meaning that you give it to a certain number of people to find out that you're actually -- that there is what's called phase validity, meaning that what you're trying to test is what you're testing. And that's the way you find it.

So the first aspect of it is to design the test. The second aspect of it then is to norm it. Now when you're using a test that's already been produced and normed and you're just translating, the first aspect -- which is the case of the Mexican version or the version that's published in Mexico of the WAIS because it's not a Mexican version it's just the translation.

First is to translate it. Second is if you want to follow you don't have to go and do the same kind of item validation that when you originally developed the test. That's why you're not creating a brand of tests. You're simply just using a test that already exists.

What you do or what you have to do in this case is making sure that the number of items that you're using follow the same level of difficulty as when you are doing your pilot testing. And that's the second aspect of it, which is what I call the adjusting the

test to the Mexican population.

Then the third part, and it's a totally separate different thing, is norming it.  And the norms don't correspond at all.

Q.  The norms are done completely independently?

A.  The norms are done independently and the norms don't correspond because they're not related to the U.S. Census.  How did they decide to -- what's called stratified, meaning how did they decide who they're going to test and where they're going to test?  Like, I can tell you that the WAIS-IV was not based on the Mexican Census, was based on six different sites or six different places in the United States.  They used about 52 percent females and 48 percent males.  That's not the census of the -- I mean, that's not based on the census of Mexico.  And the WAIS-IV in the United States is standardized in accordance to a sample that corresponds to the census.  In other words you use approximately 4,000 people to test it and 25 percent of the population lives in the West Coast, 25 percent of the testing was done in the West Coast [sic] and so forth.

Q.  So you want -- the norms are you want to have a broad aspect of America, of the United States.

A.  The American norms do, yes.  The Mexican norms don't do the same thing.

Q.   So if -- and there seemed to be some confusion a little while ago on the difference between language and the location -- the location of the test or where the test was published.

So let me ask you this question.  If someone, say, is Spanish speaking and they're an American citizen and they lived in the United States their whole life, their entire lives, but they exclusively speak Spanish, what version of the WAIS-IV would you give them?  Would you give them the Spanish version that is published in Mexico or would you give them the English version as published in the United States?

A.   Well, I don't know that there's any other version of the WAIS in Spanish other than the one that was published in Mexico at this point.  As I mentioned before, the WAIS-III, I knew that there was a Puerto Rican version and I knew there was a Spanish version from Spain.

Q.   So Mexico -- Mexico is where the Spanish version of the WAIS-IV -- there's only one WAIS-IV, right?

A.   As far as I know.

Q.   And there's a Spanish version and there's an English version; is that right?

A.   Correct.

Q.   So someone speaking Spanish in the United States would have to be given the Spanish version of the test.

A.   If they don't speak Spanish -- if they don't speak English and you want to give them the WAIS, you have to give it to them in the language they can understand.

Q.   Okay.   And what norm would you apply to that person?

A.   Depends for what purpose.   If I was going to test -- I mean, if I wanted to see if the person was capable of going to school in Mexico, I would use the Mexican norms.   If I wanted to know or predict how they would do in school in the United States, I would use U.S. norms.   So it's contextual.   It depends on what you want to find out, and that's based on the constant validity of a test, I mean, that's published.   Anybody that knows psychometrics understands that concept.

Q.   With that Spanish-speaking person you attempted to -- you're attempting to get an IQ score for, say, education purposes in the United States.

A.   Why would you use Mexican norms?   What is Mexican norms going to tell you?   What would Mexican norms tell you if what you want to know is how he would function in the United States?   You're comparing an individual when you use Mexican norms only to people that live in

Mexico.  So there's no context for that purpose.

Q.  So the test -- the test that's published in Mexico, the WAIS-IV that's published in Mexico isn't designed specifically for Mexicans.  It's a Spanish-speaking test.

A.  It's a Spanish-speaking test and it's used in Mexico for the purposes when people -- Mexican psychologists want to use a test to find out whether somebody's going to be able to do X, Y or Z.  Or sometimes self-referred people just want to have an evaluation.  You can use it to find out what the -- let's say, if you're worried about somebody becoming demented, you might want to test somebody compared to the population that's relevant to that -- the person who's in Mexico to Mexico.  You have what's called a baseline.  Then you test them a year later, two years later and you see if they're still able to maintain that level.  Then you use Mexicans because that's who you're comparing them.  You're in Mexico.

But let's say I want to use a test or the same test to determine the baseline of an individual and determine whether they're dementing according to the United States norms.  I wouldn't use Mexican norms if what I want to know is how is this person functioning in the United States?  I have to compare it to people that

live in the United States.

Q.   So would you agree then that the test, the Spanish test, the Spanish version of the WAIS-IV that is published in Mexico is routinely used for Spanish-speaking Americans?

A.   Can you ask the question again?

Q.   The Spanish version of the WAIS-IV that was published in Mexico is routinely used in the United States of America to test the IQ of Americans who speak Spanish?

A.   I'm not sure what you mean by "routinely."  I mean, it's not -- there's not that many people that are being tested in the United States for a particular purpose that don't speak English.

Q.   And I guess what I'm saying is it is used -- if you're a Spanish-speaking person who's an American, you would give that person the IQ test.  If you had to give them the WAIS-IV, you would give them the WAIS-IV, you know, the same one that you administered to Mr. Rodriguez.

A.   In some cases people use interpreters which they say -- you know, the American Psychological Association says be very careful when you use interpreters if you don't speak the language and you're using a version.  So if you don't speak Spanish you're not going to use a

Spanish version of a test because you can't do it.

Q.   I have some other questions, Dr. Weinstein, about the Flynn Effect.

THE COURT:  He's not going to make his flight if we go much longer.

MR. MONTROY:  His flight's actually delayed and I'm almost done.  He doesn't know this yet but I got a note here that Dr. Weinstein's flight is delayed.

THE COURT:  More good news for you.

MR. MONTROY:  Five more minutes of questioning and then someone's going to drive him to the airport.  Thank you for catching that, Your Honor.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, you were asked some questions about the Flynn Effect; is that right?

A.   Yes, I was.

Q.   And you testified that the Flynn Effect is not controversial in your field?

A.   In my opinion it's not controversial.  I mean, in my field -- you're talking about two separate things, okay?  In the field of -- individuals that work in the field of forensic psychology and that do work in Atkins cases, it's not controversial at all.  It's been admitted in multiple courts around the United States. And there is research that shows that out of I think

it's 102 different studies that have been published related to the Flynn Effect 98 percent of those believe that the Flynn Effect should be used.  And the article that I was shown is one of the two articles that I'm aware of that finds it not useful or not to be used.

Q.   And the AAID says that you should use the Flynn Effect; is that right?

A.   It does.  In the DSM-IV, the DSM-IV-TR said it. I don't know if the DSM-V -- I think the DSM-V said it. DSM-IV-TR did not.

Q.   Could you pick up the exhibit that is the User's Guide of the AAIDD?

THE COURT:  Here (indicating).

THE WITNESS:  Thank you, Your Honor.

Q.   (Mr. Montroy continuing)  And I'll ask you to turn to page 23.

A.   Yes.

Q.   Do you see the section that's called "Flynn Effect"?

A.   Yes.

Q.   I'm going to ask you to just look down to the third line where the sentence starts with the word "Both."

A.   Right.

Q.   You see that?

A.   Yes.

Q.   And I'll read:  "Both the 11th Edition of the manual and this User's Guide recommend that in cases in which a test with aging norms is used as a part of the diagnosis of ID, a corrected Full Scale IQ upward of three points per decade for age of the norms is warranted."

Is that consistent with your understanding of the Flynn Effect?

A.   It's very consistent and has a lot of -- makes reference to a lot of studies that show that, and that's what I was talking about.

Q.   And referring to all of those studies that appear right at the end of that sentence.

A.   Yes.

Q.   In that paragraph.

A.   Yes.

Q.   And is that what you do?  You apply the Flynn Effect when you conduct IQ tests that meet these criteria?

A.   Yes.

MR. MONTROY:  I don't have any other questions, Your Honor.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  Thank you, Your Honor.  I

just have a few.

## RECROSS-EXAMINATION

**BY MR. REISENAUER:**

Q.   Let's just talk about this Flynn Effect thing first if we could.  And so, Doctor, you said in your field it's not controversial; is that right?

A.   I try to explain that in the field of Atkins, in the realm of Atkins here it's not controversial, no.

Q.   Okay.  And not to try to get into the case law that I tried to get into earlier, but you are not aware then of the case law in which it has become a controversy; is that right?

MR. MONTROY:  Objection, Your Honor.

A.   I'm aware that -- sorry.

THE COURT:  Overruled.  Go ahead and answer it, what you're aware of.

A.   I'm aware that there's some courts that have not admitted it in the past.  I'm not aware of any recent courts that have not admitted it presently, but I am also aware that there's many, many different courts around the United States that have admitted it.

Q.   (Mr. Reisenauer continuing)  Okay, thank you.  And just so I'm clear you're talking about the field in regard to Atkins, correct?

A.   Yeah.  If you're not -- you know, if you're not

interested or you're not particularly knowledge -- if all you do in the field of psychology is psychotherapy, which a lot of psychologists do or other psychologists that do industrial psychology or other kinds of psychology, in those fields there's no -- not even mention.  They don't even know what the Flynn Effect is.

Q.  So they don't use -- like you just said, they don't even know what the Flynn Effect is.  They don't use the Flynn Effect, right?

A.  It's not relevant to their practice, no.

Q.  So if -- let's say, for instance, then so I'm clear, if I'm testing a child to determine whether or not they need supports, whether or not they're intellectually disabled and I give them an IQ test, I wouldn't use the Flynn Effect.  But if I'm testing somebody to decide if they're going to receive the death penalty, I should use it?

A.  No.  Actually if you're testing a child you should use it because if you don't use it what's happening is that you're using a cutoff point in schools.  Schools unfortunately or fortunately, you know, are based -- basing their decisions on cutoff points.

Q.  So what area of psychology, when I would give an IQ test, would I not use the Flynn Effect in your

opinion?

A.   I just mentioned, you know, if you use an IQ test and you want an accurate representation of the individual's capacity, you would always use the Flynn Effect.  If all you're doing is doing an evaluation for the purpose of having a global understanding of how the person is functioning in amongst those batteries of tests, you use some IQ test.  You might not want to because it's not relevant whether the IQ is 76 or 74 or 112 or 115.

Q.   Okay.  Let's move on.  Let's go back to this norming idea.  If I'm a Mexican citizen and I want to know what my IQ is and I come to you, you would use the Mexican norms, correct?

MR. MONTROY:  Objection, Your Honor, just on the basis that this has been pretty much hashed out by both sides.

MR. REISENAUER:  Well, Your Honor --

THE COURT:  Overruled.  Just go ahead.

MR. REISENAUER:  Thank you.

A.   If you're a Mexican citizen?

Q.   (Mr. Reisenauer continuing)  Yes.  And I come to you and I want you to give me the WAIS-IV.  You would use the Mexican norms, correct?

A.   Where do you live and what do you want it for?

Q.   Well, I'm a Mexican citizen.  I'm in Mexico.  I want to know what my IQ is.

A.   If you're in Mexico and you want to know what your IQ is in Mexico and for what purpose?  As I mentioned before, it's contextual.  I mean, just for a general understanding how you function?

Q.   Yeah.  I just want to know what my IQ is.  I'm curious.  You would use the Mexican norms, wouldn't you?

A.   If we are in Mexico and we're dealing with just you want to know what your IQ is compared to other people in Mexico, I would use Mexican norms.

Q.   Okay.  If I'm a Mexican citizen and I happen to be in the United States, you would use the U.S. norms?

A.   If you came here to -- if you came here and you wanted me to do that, yes, I would.

Q.   Okay.

A.   What's the purpose of you finding out your IQ?  For what purpose do you want --

Q.   Well, isn't your IQ your IQ no matter where you live?

A.   No, it's not.

Q.   It's not?

A.   No.

Q.   So I can have -- I can have a different IQ if I live in Mexico than if I live in the United States?

A.   No.   You can have a different purpose for what you want to know your IQ or for the purpose of what you want to discover through your IQ.  I mean, is it to determine whether you are going to be capable of doing something or is it to determine -- or it's just curiosity?  If it's just curiosity I don't know anybody that wants to spend thousands of Mexican pesos or dollars to find out if they have a -- just find somebody that doesn't have the ethical basis to say:  No, you don't need it.

THE COURT:  Let me ask this question.  Let me see if I understand what's happening here.  As I understand it, this Spanish translation that you have referred to is normed in Mexico and there are norms in the United States as well.  And the population of Mexico has different experiences and different academic backgrounds and different test aptitudes.

And so if, in fact, you take a raw score, doesn't matter what translation you do because you're going to norm it to the population you're comparing to, right?  That's what you're saying?

THE WITNESS:  Depends on the purpose.

THE COURT:  Yeah.  I mean, if we want to find out if you're mentally -- if you're developmentally disabled under Mexican law, we'll norm it to Mexican

norms, right?

THE WITNESS:  Right.

THE COURT:  And if we want to know if you're developmentally disabled under American law, you'd norm it to American populations, right?

THE WITNESS:  Right.  If for the purpose, let's say, that you want to be eligible for Social Security assuming disability, you know, Social Security Disability assuming that there would be the equivalent in Mexico.  If it's disability in Mexico, you want to compare it to the Mexican population.  If it's disability in the United States that you want to receive, you want to compare it to the U.S. population.

THE COURT:  But if you take 4,000 people from Mexico across the Mexican nation and you've normed the test to those 4,000 people, they would get a raw score of something that is different than the raw score that a group of 4,000 Americans would get, right?

THE WITNESS:  Yes.

THE COURT:  And that's the difference in the norming.  And so if, in fact, Americans on average have deeper and better educations, they're wealthier, have better access to educational aids, if you get a raw score of whatever that is if you take exactly the same number you're going to end up with a higher IQ when

normed against the Mexicans because of those economic/social/political differences.

THE WITNESS:  That's correct.

THE COURT:  Right.  And so when you normed this thing to Mr. Rodriguez to the U.S. population, you did so because he's an American who was educated in America.  Is that essentially what this is all about?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Very good.  Anything further, Mr. Reisenauer?

MR. REISENAUER:  Well, yes, Your Honor because now I'm way more confused because I thought I understood what he was saying.  So if I could ask a couple questions?

THE COURT:  You may.

MR. REISENAUER:  Thank you.

Q.   (Mr. Reisenauer continuing)  Dr. Weinstein, you said it depends on what the test is for?

A.   That's correct.

Q.   Okay.  So going back to the judge's question, if you give the person in Mexico the test and you norm it in Mexico, you get one score, correct?

A.   If you use Mexican norms, you get a different score than if you use American norms.  We just saw it in this example, yes.

Q.   But if you give the same test to somebody who's facing the death penalty, you're going to get a different score; is that right?

A.   You're not going to get a different score --

Q.   You said it depends on the purpose.  That's why I'm asking.

A.   Depends on the purpose that you want -- that you choose.  And again your example is not at all relevant to this case because this individual has nothing to do with Mexico.  Never lived in Mexico, is not Mexican, hardly speaks Spanish or doesn't speak Spanish as his dominant language according to him and everybody else. And he's been tested in English many, many times.

Q.   Well, you've testified before that people that are not from the United States that take this Mexican or Spanish version as you call it should be normed in the United States because they are charged in the United States with the death penalty, correct?

A.   You have to compare them to other people that are under similar circumstances if that's the purpose of your assessment.

Q.   Okay.  So if you give the test to somebody that has lived in Mexico their whole life, wouldn't that be the norm you would use to arrive at their IQ?

A.   What are you testing them for?

Q.   Okay.  That's my point here.  Because the person lived in Mexico their whole life and they happen to come to the United States and they were here for three days and they committed a murder and they're facing the death penalty, you are telling us that you should use the United States norms, correct?

A.   That is correct because the purpose of my testing is to determine whether he's eligible or not to receive the -- to be granted the supreme court's decision --

Q.   Okay.

A.   -- that he's not eligible for the death penalty.

Q.   So any person facing the death penalty in the United States that takes the WAIS-IV, no matter where they're from you're going to norm them in the United States no matter how long they're going to be there, right?  That's what you're telling me?

A.   I'm going to use the U.S. norms, yes.

MR. REISENAUER:  Thank you.  That's all I have, Your Honor.

THE COURT:  Thank you.  Anything further?

MR. MONTROY:  Nothing further.

THE COURT:  You may step down, sir.

THE WITNESS:  Thank you, Your Honor.  Appreciate it.  Should I leave this mess?

THE COURT:  Do we want to take 15 minutes?

THE REPORTER:  Yes.

THE COURT:  We'll start again at five to 4:00.

(Recess taken; 3:40 p.m. to 3:55 p.m.)

(In open court, all counsel present.)

THE COURT:  We're on the record in a case entitled United States of America versus Alfonso Rodriguez.  Mr. Rodriguez has waived his right to appear here.  His counsel are present.  All counsel of record are here.  All counsel for the United States are here.

Ms. Shaheed was about to call Mr. Rodriguez's next witness.

MS. SHAHEED:  The petitioner would call Dr. Andres Lugo.

THE COURT:  Sir, if you please would come forward, stand before the clerk, raise your right hand and take the oath.

THE CLERK:  Please state your name and spell your name.

MR. LUGO:  Andres M. Lugo, A-n-d-r-e-s, M as in Mary, L as in Louie u-g-o.

(Witness sworn.)

THE COURT:  Miss Shaheed.

**ANDRES M. LUGO,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO

SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MS. SHAHEED:**

Q.   Good afternoon, Dr. Lugo.

A.   Good afternoon.

Q.   What is your current profession?

A.   I'm a medical toxicologist.

MS. SHAHEED:  May I approach?

THE COURT:  You may.

Q.   (Ms. Shaheed continuing)  And I just handed Dr. Lugo what has previously been marked as Defense Exhibit 67.

Dr. Lugo, can you identify the document?

A.   Yes.  It is my CV, my resume.

MS. SHAHEED:  And I'm offering 67 into evidence.

THE COURT:  Any objection?

MS. BURKLAND:  No objection.

THE COURT:  Sixty-seven is received.

Q.   (Ms. Shaheed continuing)  And, Dr. Lugo, how many years of experience do you have in medical toxicology?

A.   A little over 30 years.

Q.   And can you please describe your educational experience as it relates to medical toxicology.

A.   Yes.  I was trained -- after completing medical

school in Mexico, I moved to California and I started training at the Los Angeles County Poison Center, University of Southern California. And after completion of the training and toxicology, I worked for the Poison Center. Since 1985-86 I started my work in medical toxicology.

And everything I've been doing after that, Master degree in public health or public health toxicology communities, a Master of Science in toxicology, and also Ph.D. studies in toxicology. So my work and the studies I've been doing here in the U.S. is all related to the toxicology.

Q. And where did you obtain your Master's degree?

A. The Master's, the first one, was University of Texas-Houston, the School of Public Health.

Q. And do you have an additional Master's degree?

A. Yeah. Additionally was in the University of Minnesota Master's of Sciences in toxicology at the University of Minnesota-St. Paul campus.

Q. And then where did you obtain your medical degree?

A. At University of Mexico.

Q. And you continued your studies towards your Ph.D.; is that correct?

A. Yes, I did.

Q.   But ultimately you did not complete your Ph.D.?

A.   Yes, I didn't.

Q.   Why not?

A.   I was working on the Ph.D.  I have completed every courses, laboratory classes, every work.  Even I exceeded the number of hours, credit hours for the Ph.D., but I was offer in 2007 a consulting work in Latin America, was a very good money and a lot of opportunity.  So I stopped doing it thinking that I will continue but I didn't even have time to continue.

Q.   And what type of business do you currently have?

A.   I'm a toxicology consultant.  I have a business known as Toxicorp USA, Mexico and Latin America, LLC.

Q.   And I think a minute ago you mentioned your experience at Poison Control?

A.   Yes.

Q.   Can you tell the Court about your work at the Poison Control Center?

A.   Yeah.  When I started working at the Los Angeles Poison Center, it was full-time work.  And this was -- all my work at Poison Center has been in hospital, university hospitals or teaching and service is the main thing.  So it's been -- I loved working in Poison Center because it was a daily challenge of work and a daily basis I used to see and assess approximately over 30

cases just by myself.

And after moving to another Poison Center in Texas at Texas Tech University, then it was the same thing.  And finally I moved to Minnesota to work at the Poison Center in Minnesota.  So everything in the Poison Center to work there I have to pass national examinations.  So every seven years I had to take -- become recertified to be able to work in Poison Centers.

Q.   And are you currently licensed to practice medicine in Mexico?

A.   Yes, I do.

Q.   And do you still see patients?

A.   Yes.

Q.   And do you hold any fellowships?

A.   Yeah.  I'm a fellow of the American College of Medical Toxicology with peer recognition.  I'm a member of the -- all the colleges of clinical and medical toxicology here in the U.S. and other parts.

Q.   And do you train others in toxicology?

A.   Yes.  I've been the teaching toxicology most of the time.  Now I'm an associate professor at the University of South Florida, the College of Public Health, Department of Toxicology, occupational environmental toxicology.

Q.   And returning to your consulting business, have

you ever worked on a capital case before?

A. Yes. I've been working since 2005 in approximately over 50 cases since then.

Q. And have you ever testified in a capital case?

A. Yes.

Q. And when you testified were you qualified as an expert?

A. Yes.

Q. And have you ever worked on civil cases as a toxicologist?

A. Yes, I do.

MS. SHAHEED: At this time I would ask that Dr. Lugo be accepted as an expert.

THE COURT: Does the United States have any voir dire on his background or his resume?

MS. BURKLAND: No, Your Honor.

THE COURT: Do you have any objection to him testifying on the areas within his expertise?

MS. BURKLAND: No, Your Honor.

THE COURT: I'll allow him to testify as an expert.

MS. SHAHEED: Thank you.

THE COURT: In the area of toxicology.

Q. (Ms. Shaheed continuing) Dr. Lugo, what does a toxicologist do?

A.    It's a science.  It's in the area of science that specializes in the toxic substances, any type of toxic substance and the effect of living organisms.

Q.    And what types of -- what types of things do you examine an individual for in toxicology?

A.    Well, everything -- every poison has different sites of effect.  During the training and during my work, I have to go through different organs and systems to see what organs and systems are affected in the body.  So in clinical and medical toxicology we are trained to look for the poisons in what sites of the body are affected.  For instance, could be cardio toxic substances, hepatic substances, neurotoxic substances.  So we deal with all type of toxic substances.  Depends on the organ that is affected.

Q.    And in your work do you commonly rely on other doctors such as psychologists and neuropsychologists in your toxicology assessments?

A.    I do.

Q.    And last year you were contacted by my office to work on Alfonso Rodriguez's case; is that correct?

A.    Yeah, that's correct.

Q.    And what were you asked to do?

A.    To assess whether or not Mr. Rodriguez was exposed to toxic -- neurotoxic substances.

Q.   And, Dr. Lugo, did you generate a report in this case?

A.   Yes, I did.

MS. SHAHEED:  May I approach?

THE COURT:  You may.

Q.   (Ms. Shaheed continuing)  And, Dr. Lugo, I handed you what I believe is marked Defense Exhibit 68.

A.   Yes.

Q.   What is this document?

A.   This is a toxicology report.

Q.   And did you create this report?

A.   Yes, I did.

MS. SHAHEED:  At this time I would offer Defense 68 into evidence.

THE COURT:  Any objection?

MS. BURKLAND:  No objection.

THE COURT:  Sixty-eight is received.

Q.   (Ms. Shaheed continuing)  And, Dr. Lugo, on page 3 of this document, can you turn to page 3, what is the list on this page?

A.   It's a list of materials that were provided by your office to me for review.

Q.   And what were some of these materials?

A.   Well, Alfonso Rodriguez's records, school records, medical-mental health records, Minnesota

Security Hospital, neuropsychological reports from Dr. Karen Froming, testing scores by Dr. Froming, the transcript of the psychiatric evaluations on Alfonso Rodriguez by Dr. Martell and Dr. Pitt, psychiatric evaluation by Dr. Pitt also, supplemental psychiatric evaluations by St. Pete, psychological and neuropsychological evaluations by Dr. Martell and --

Q.   And, Dr. Lugo, in addition to the materials that you were provided, did you do independent research?

A.   Yes, I did.

Q.   And what did that involve?

A.   Well, that involves an extensive search on the media for scientific publications and anything related to the neurotoxins, particularly on the region where he live and was working and the family residing.

Q.   So did you travel for this case?

A.   Yes.

Q.   Where did you travel?

A.   The first thing I was to travel to Laredo, Texas to see the area to do an on-site investigation about the exposure sites.  And second I traveled to Crookston, Minnesota to do the same thing, to do an on-site toxicology investigation to see for myself the region, the area and to have the exposure assessment developed in a manner.

Q.   And did you conduct any interviews when you traveled?

A.   Yes.

Q.   Who did you interview?

A.   I interviewed the closest relatives living there and those that I could find in Laredo.  And I interviewed people who were working at that period of time who were living in Laredo, Texas.  And in Minnesota I interviewed some close relatives also, Alfonso's relatives.

Q.   And did you interview Mr. Rodriguez?

A.   Yes, I did.

Q.   And do you remember the date that you interviewed Mr. Rodriguez?

A.   Yeah.  Well, it was --

Q.   Do you remember if it was September 25, 2018?

A.   Yes, yeah.

Q.   And why was it important to travel where Mr. Rodriguez lived?

A.   Well, one of the purposes of the investigation is to have the public health assessment of the exposure.  To do that I need to be in the place to assess whether or not there were agricultural places or what other type of economic or industrial activities are in the region.  So I have to look for myself and to find out -- to

develop the complete methodology of the exposure assessment.

Q.   And why was it important to do interviews in this case?

A.   To confirm and to get the feedback from the family about the perception.  One of the points that we assess during the public health assessment is the community health concerns or the family health concerns, how the people they see and perceive the problem.  So it is important to find out details on their way of living, past history, social, cultural, because that makes an influence on the toxic -- levels of toxic exposures.

Q.   And you just mentioned a public health assessment.  What is that?

A.   It's a methodology developed by the U.S. Department of Health to an agency that is part of the Department of Health.  It's called the Agency for Toxic Substances and Disease Registry.  They work together with the Environmental Protection Agency in Atlanta, Georgia so they develop this methodology that is currently the most important methodology just to investigate individuals and communities being exposed to toxic substances.

Q.   And how long has this methodology been around?

A.   Since the early 1990s.

Q.   And did you have any involvement in the creation of this methodology?

A.   Yeah.   When it was beginning the development, I was working as a consultant for the Mexican government. I was invited to travel to Atlanta and I spent almost two months where I participated as an observer and in the meetings of when these methodology was in the initial development.  And after that I was invited to some of the meetings on the U.S./Mexico border to participate as a liaison with the Mexican people to develop this training on the methodology.

Q.   And how many parts exist in this methodology?

A.   There are different levels.  One of the initial parts is to make the exposure assessment.  Together with that we have to gather environmental data, health data and the community health concerns.  The exposure assessment is the most important initial part to make the decision when someone has been exposed to something, to toxic substances.

If we complete the assessment and it's positive a hundred percent, then we can proceed with the investigation.  That means we have to make sure the individual is being exposed to the toxics, whatever toxic substances.  So the exposure assessment in summary we can tell you that it contains five points and if any

of these five points is missing, is not complete, then there is no exposure and then we stop investigation and we tell the people:  There is no way to prove or there is no proof that this individual or community has been exposed.

Q.  And what is the first step in the exposure assessment?

A.  To identify the substance or substances in the area.  In this case to identify pesticides and other things that could be at disposition and available for these people.  So identification has to do with all the knowledge on the physical, chemical, biological characteristics of that toxic substance and what type of toxicity it is.  So we start doing the classification but we have to identify the substance or substances.

The second point is --

Q.  I was going to say what is the second point?

A.  The second point is to find out the environmental pathways of exposure.  We have the substance or substances and now we need to find out through which ways it goes into the environment to reach the people or the point of exposure.  So it could be through the air, the water underground, surface water, the air, soil or people working getting into the field, getting out of their fields or work with their contaminated clothes,

through radiation.  Whatever the environmental pathway is, we have to investigate that.

Q.  And what is the third point?

A.  The point of exposure where the individual or individuals are living or located.  It's where based on the environmental condition, the physical characteristics, chemical of the substance, the environmental pathways and then if the chemical goes to the point where people is living, in this case where Alfonso was living or residing or the places where his family work and do things.  So we need to locate exactly those locations.

Q.  And then with the exposure assessment what is the fourth?

A.  It is the rounds of exposure.  Once the individual is in close contact if the substance has some bio availability so if it can get into the body through the inhalation, ingestion, through the skin, radiation. So we need to find out one or two or all the ways that it gets into the body biologically.

Q.  And then what is the final step in the exposure?

A.  The final -- the chemical is something that is going to affect certain individuals.  So to identify the susceptible population.  In this case children, pregnant women are highly susceptible to the toxic effects of the

pesticides and heavy metal.

So the five points of the exposure were completed so we closed the circle and we decided that it was positive for the exposure.  It happens.

Q.  And just to step back you've done exposure assessments for -- of individuals and for governments?

A.  Yes.

Q.  And also for businesses?

A.  I'm sorry.

Q.  And for businesses?

A.  Yes.

Q.  And did you complete a public health assessment for Mr. Rodriguez?

A.  Yes, I did.

Q.  And did you identify times in Mr. Rodriguez's life where he was exposed to toxic substances?

A.  Yes, I did.

Q.  And what were those times?

A.  There were before he was born during the prenatal stages of his life.  Then after he was born up to maybe his young adult life he was continued exposed on and off living and residing in places where pesticides and other things were used.

Q.  And what about in his adult life?

A.  Yeah.  And also after the investigation in

talking about his occupation in jail I found that he was working for quite a number of years in the print shop inside the jail.

Q.   And let's discuss prenatal exposure.  You interviewed Delores Rodriguez?

A.   Yes.

Q.   And you reviewed records related to Mrs. Rodriguez?

A.   Yes.

Q.   And when she was pregnant with Alfonso Rodriguez, what was her occupation?

A.   Well, she was a housewife but she stay in a very close proximity.  Sometimes she had to work in the fields and most of the time wherever the family was going she was traveling to work with her husband.  So she was in very close proximity to the agricultural fields.

Q.   You say "close proximity."  In some of the records isn't it indicated that she was working on the fields?

A.   Yes, she did.

Q.   And did you identify what toxic substances she might have been exposed to?

A.   Yes.

Q.   And what were those?

A.   Well, initially there are several groups of toxic pesticides or herbicides and fungicides so most of the most common were organochlorine pesticides, organophosphates, carbamates and pyrethroids.  But she was exposed to quite a number of different highly toxic pesticides, including DDT and others.

MS. SHAHEED:  May I approach?

THE COURT:  You may.

Q.   (Ms. Shaheed continuing)  Actually what number exhibit is it?

A.   Sixty-nine.

Q.   And I just handed Dr. Lugo what has previously been marked as Defendant's Exhibit 69.  What is this document?

A.   This is an interview performed in 1990 to a farmer in Minnesota, Mr. Glenn Weise.

MS. SHAHEED:  And I would offer Defendant Exhibit 69 into evidence.

THE COURT:  Any objection?

MS. BURKLAND:  No objection.

THE COURT:  Sixty-nine is received.

Q.   (Ms. Shaheed continuing)  And in this interview what is the date on this interview?

A.   June 12, 1990.

Q.   And this interview is between Glenn Weise and

Terry Shoptaugh; is that correct?

A.   Yeah, that's correct.

Q.   And towards the bottom GW, who is Glenn Weise, indicates that he moved to Crookston; is that correct?

A.   Yes.

Q.   And on page -- can you turn to page 5 of the document.  In the middle to the top of the page Glenn Weise says:  "It was on the farm and it was the Kiewel farm;" is that correct?

A.   Yes, mm-hmm.

Q.   And can you please turn to page 6.  Can you start -- read where it says:  "Were these Mexican Nationals?"  It's the second line from the top.

A.   Okay.  Page 6?

Q.   Yes.

A.   Yeah.  "Were these Mexican Nationals?"

            "No I don't think so."

            "You mean these were migrants from Texas, from the southwest?"

            "Yes."

            "And they had to do finger thinning?"

            "Yes, right down the hands and knees. Finger thinning--no hoeing--finger thinning because it would be up, what, ten or eleven plants to a hill."

Q.   Dr. Lugo, is that a description of sugar beet

farming?

A. Yes.

Q. And can you describe what this interview is indicating that a migrant farm worker would be doing?

A. The type of work and how they work doing the cleaning and thinning on the plants. And because this is a small bushy type of plant, they have to be on their knees and cleaning and removing weeds and removing extra leaves and different parts of the plant.

Q. And in your review of the records, did you -- are you aware that Delores Rodriguez was doing this work while she was pregnant with Alfonso Rodriguez?

A. Yes.

Q. Can you please turn to page 14. And on page 14 towards the bottom Mr. Weise is asked if he remembers some of the family names; is that correct?

A. Yes.

Q. And what is one of the family names that he remembers working with?

A. Rodriguez. He recalled that name Rodriguez.

Q. And what year did he say that the Rodriguez family was on his farm?

A. "I had a family here in 1952 and I got a Christmas card from them every year except the last two years."

Q. And then does it indicate another place where that family might have lived on that page?

A. Yeah. They were in Laredo, Texas.

Q. And, Dr. Lugo, if you would turn to page 24. Can you read the first two lines of that page?

A. Where at?

Q. On page 24.

A. "Did you ever lose a substantial amount of acreage..." or --

Q. Yes. So on that page Mr. Weise is asked if he lost a substantial amount of acreage to the web worm; is that correct?

A. Yes.

Q. And what is his response?

A. Yeah. He stated: "No. We stayed at them with spray and Paris Green."

Q. And what is Paris Green?

A. It's a heavy metal compound that was used a lot on -- as an insecticide. It's copper ester arsenate. It's an arsenic or arsenic compound.

Q. And how long does Paris Green remain in soil?

A. Oh, forever. It's a heavy metal. It can stay there. They usually -- people used to use this Paris Green and was mixing it with a lead arsenate, another compound that was also used together with a copper

arsenate.  They mix the copper ester arsenate with the lead arsenate to make it more -- like a more broad spectrum to kill more insects.  So it is a -- it was used as an insecticide spray by airplanes and it stays many, many years.  It doesn't go away.  It's a heavy metal.

Q.  And what are some of the side effects from exposure to Paris Green?

A.  Well, the arsenate has a lot more acute immediate toxicity than other heavy metals.  Arsenate can cause peripheral nervous system damages beginning like a numbness, tremors, losing control of the extremities.  That was one of the effects.  And it depends on the amount can kill somebody in a few days or minutes or hours.  It all depends on the amount but it's highly toxic.  Arsenic compounds are very rapid.  They're cellular poisons that can kill organisms.  That's why they use it as an insecticide because arsenic kills a lot of things.

Q.  And returning to page 24 of Defense Exhibit 69, is there another pesticide that --

A.  Parathion, Parathion.

Q.  What is that pesticide?

A.  This is an organophosphate that is currently -- as well as the Paris Green and all those things, they're

banned from the use all over the world.  This is a highly neurotoxic insecticide organophosphate.

Q.   And what are organophosphates?

A.   This is a group of chemicals known as cholinesterase inhibitors.  They are phosphoric ring-made chemicals that controls the nervous system by paralyzing some enzymes.

Q.   And what are the effects of organophosphates on human beings?

A.   Well, the immediate effect since they are cholinesterase inhibitors they locate the enzyme that breaks down the acetylcholine.  So the people start with -- if it's a large amount immediately may start with nausea, vomiting, flu-like symptoms, weakness.  But if it's a small amount this type of organic compounds get into the body and they cause mutations in the long-term, changes in the body.  Some individuals for a particular reason they develop kind of neuropsychiatric problems with organophosphates.

So not everybody will develop the cholinesterase problem, the cholinergic crisis with nausea and vomiting.  But some people who is exposed to this group may start developing neuropsychiatric problems.  We see it many times with this type of -- this group of chemicals.

Q.   And let's discuss childhood exposure.  Is there a difference between childhood exposure and adult exposure to toxins such as Paris Green?

A.   Yes.  It's a big difference because early body a child who's in their development, if it's prenatal stages it's worse or during the first few years of life. Nervous system is developing so in this type of substances they can resemble some organic parts of the cell and gets incorporated into the cells.

In the body the cells contains, and the nucleus, some receptors inside that catches this type of substances.  And through a process of metabolism, metabolic pathways, they cross the external membrane of the cells and they go into the membrane of the nucleus and they get into the DNA and causes toxic mutations that may be silent for some time, for years, and later in life they will cause a problem.

Q.   And are there physical reasons why children are more likely to be affected by pesticides than adults?

A.   Yeah.  There are many differences.  As a child metabolism is faster than compared to an adult.  The metabolic pathways are immature.  They are not fully developed.  The amount of substances that the child has access is a lot more because they breathe more volume of air compared to an adult by their size.  They eat a lot

more and the compartments of their body are different because they have a lot more water in their bodies.

Also a child, because of their size, they are in closer contact to the ground where the heaviest things in the environment are closer to the one feet above the ground.  So the child crawling on the floor is getting a lot more access to toxic substances like this. And in many of these substances they are sprayed, for instance, once every maybe a week or every month but they were very persistent.

Many of the pesticides used in the past used to remain with the environmental half-life of several weeks or months or even years.  So if a field was sprayed with the chemicals, the chemicals will remain in the ground, in the soil, in the water for months or weeks or months.

So the exposure was community.  Every time was bigger and bigger because after one application and another there's an accumulation of the amount of that, and a child is more exposed to that.

Q.  And, Dr. Lugo, what are some of the developmental symptoms of toxin exposure?

A.  Well, there's a delay in their development of the nervous system.  We can see two types of effects when someone is exposed to toxic substance.  We can divide it

in two main groups.  One group is going to be a substance that will cause organic change, physical change of the cell.  For instance, something that causes the cancer, the person is exposed to that and the cells of some mutations in DNA and 15, 20, 30, 40 years later then cancer will break out.  The cells have program cell death.  It's called apoptosis.  So this program cell death, many years later the cell degenerates and starts growing the cancer so it spreads all over or it kills the person or kills the organ.

And the other group is things have cause no physical change but functional.  Like pesticides are those in that group that causes many times changes in the DNA that will create this dysfunction of that part of the cells or that organ.  In this case in the brain some areas of the brain that has to do with cognitive functions, our normal development of social, personal intersocial life, our behavior, our control of our impulses.

So those chemicals get into that area, creates a mutation, is silent for maybe years and may start during adolescence years or early childhood, but it's hard to detect especially when the family is more concentrated in economic problems or they don't have access to healthcare services or many years ago we

didn't have that knowledge about the cognitive problems.

So that behavior -- physiological life-changing function is not so visible as the cancer but it's there.  So the cells are not functioning well so it's a dysfunction of that part of the organ, in this case of the brain.

Q.   And did you find any evidence in the record that Mr. Rodriguez was suffering from similar side effects?

A.   Yeah.  On the different areas, different reports, he's referred to have some developmental problems, some cognitive problems.

Q.   And do you remember if in the records Mr. Rodriguez was slow to early developmental milestones?

A.   Yes.  He was slow learning and he has a not good social development initially.

Q.   And, Dr. Lugo, can you explain how toxins can affect an individual's IQ.

A.   Well, the IQ is -- I'm not a neuropsychologist but I see it as a toxicology how these things affect the brain.  There are changes sometimes if the effect that the toxin affects areas of the cortex that has to do with retaining information, processing information, then it connected to some central parts of the brain.  Those toxins slow down the transmission between one cell to

another.

For instance, the organochlorine pesticides if we see a neuron, a brain cell like with the body, the soma and the axon so the cell like is looking at like a little snakey kind of form.  So when one of the impulse -- electrical impulses comes to the cell, comes through some chemistry.  If the chemistry reaches the receptor from that cell of the brain cell and that transmits that as an electrical impulse through the membrane.

When the chemical of the organochlorine pesticides affects, gets into the cells, slows down that depolarization of the membrane and the transmission is not the same.  They will slow down and it will create like short circuits.  If the amount of exposure is too high, the person can go into convulsions, immediately developing a neuropsychiatric problem, convulsive stages, coma and even be dead.  So that's one of the mechanisms.

Others causes the transmission of the chemicals between one neuron to another to be interrupted, and the mediators or the neurotransmitters begin to accumulate in the synapse.  That's the gap in between one nerve cell to another.  So that amount of neurochemical is accumulating and make -- makes changes

in how the brain is going to be working so interferes with the cell function, those type of effects.

MS. SHAHEED:  May I approach?

THE COURT:  You may.

Q.  (Ms. Shaheed continuing)  And I've just handed Dr. Lugo what was previously marked as Defense Exhibit 70 (indicating).

Dr. Lugo, do you recognize this letter?

A.  Yes.

Q.  And was this provided to you by our office?

A.  Yes.

Q.  And is this a letter between Dr. Ecobichon and Richard Ney?

A.  Yes.

Q.  And do you know who Dr. Ecobichon is?

A.  He's a toxicologist.  He was doing some assessment of the exposure to neurotoxins or the pesticides.

Q.  In this case, correct?

A.  In this case, yeah.

Q.  And can you read in the first paragraph the last sentence?  It starts with:  "I am not..."

A.  Yeah.  "I am not convinced that he was exposed seasonally to many organophosphorus or carbamate insecticides or there would have been some signs and

symptoms of acute toxicity, however mild."

Q.   And do you agree or disagree with this statement?

A.   I disagree.

Q.   Why?

A.   Because he's not doing an assessment of the situation.  When we assess human exposure, especially children living in a field, there are numerous very large number of studies, scientific publications, in which we tested and people have been testing soil, have been testing the water, food, everything.  And the level of contamination where the children are near the fields or in the middle of agricultural fields usually camps where the farm workers are held to live, they are provided places to live, they were usually provided in the middle of the -- or very close to the agricultural fields.

So the child was exposed a hundred percent because as I mention many of these chemicals were -- now the half-life, biological half-life is shorter compared to those previously.  But many of these had a very long environmental half-life so a child was much more exposed.

Q.   And, Dr. Lugo, in this case do you recall whether or not Alfonso Rodriguez's family lived on the farm where his parents worked?

A.   Yeah, they lived there.  They live there.

Q.   And can you describe those conditions?

A.   Yeah.  Usually are small houses and shacks.  They may have some sanitary conditions but the fact that it's right in the middle of the field it makes it a lot worse because a building, a house, isn't as -- it has to protect us from the environmental, from the outside. The conditions inside of one block or one room with not adequate ventilation is much worse than being outside because every toxin that is sprayed the dust is more accumulated indoors.

So the homes and houses located in close proximity and in the middle of the fields are -- their levels of contamination many times are greater than the outside because of the dust collection.  And once we have -- for instance, in this room we have a volume of air, for instance, in that corner one cubic meter of air.  It has -- if we measured the concentration of different chemicals it will be much higher the concentration there than a meter above that.  And that is because the air in that part is not moving unless we put some engineering and air-conditioning systems that can move the volume of air, one-third of the volume of the whole thing per hour.  So it has to be really very effective.  And poor housing they don't have that so the

accumulation is usually permanent, especially with lack of indoor plumbing, no toilets and no sewage.

Q. And, Dr. Lugo, we were discussing the home conditions. In your report you discuss lead. Is that another way that Mr. Rodriguez was exposed to toxins?

A. Yeah. After talking to Delores and other people in Laredo, Texas and in my experience poor agricultural farm workers, the cheapest cooking utensils and dinnerware was pottery. And back then in the 1940s, 50s up to the 1990s there were no environmental laws in Mexico to protect people not to use lead in pottery. So it was the only way to protect and give long life to those products, pots, cups.

MS. SHAHEED: May I approach?

THE COURT: You may.

MS. SHAHEED: And I don't believe I offered Defense Exhibit 70 into evidence.

THE COURT: You have not.

MS. SHAHEED: I'd like to offer it.

THE COURT: Is there any objection?

MS. BURKLAND: No objection.

THE COURT: Seventy is received.

Q. (Ms. Shaheed continuing) And, Dr. Lugo, do you recognize this document which was previously marked as Defense Exhibit 71?

A.   Yes.

Q.   What is it?

A.   It's a laboratory report on testing clay cup, testing for lead.

MS. SHAHEED:  And I'd like to offer Defense Exhibit 71 into evidence.

MS. BURKLAND:  No objection.

THE COURT:  Seventy-one is received.

Q.   (Ms. Shaheed continuing)  And can you describe the type of testing that was done based on this document?

A.   Yeah.  They put acetic acid, four percent, into a small clay cup and then they digested that with other acids and then they use ICP-MS technique to analyze for lead content.

Q.   And in your experience have you had clay cookware tested for lead before?

A.   Well, usually what we do is to scratch off the glaze to measure the amount of the -- because the thing is when you analyze just like without scratching off the glazed part the bright part of this pot it's lead.  If you can do that scratching you will not take a lot just with the acid.  The acid will just remove a little tiny portion of the surface but not the whole thing on the lead.  That means if this pot is going to be used as a

cup if it's going to be used only once, not problem. Seems like a very small amount of lead, nothing.

Well, even with that amount it's not too small but it's a little above the --

Q. And you're saying based on the document lead was found in the cup that was tested?

A. Yes. It was reported .0093 milligram per liter. If we look at the divided milligram per liter, we will have -- parts per million will have 9.3 parts per million.

Q. And just to go back one step, you were saying that you would scratch off some of the surface of the --

A. The glazey part of the --

Q. Yeah, the glaze. And what would you do with the -- how would you further test that?

A. Well, with that we measure the amount of lead that is on the glaze because that's the purpose. Sometimes clay is -- contains some lead. All the soil all over the world on the planet contains tiny, tiny amounts but it does contain. But there are permissible levels so the way to do it in the laboratory you have to scratch off that.

Q. And is there another way to test clay products?

A. Yeah. To break the whole thing and then grind it and then from that to see per gram of the whole matter

how much is.

Q. And that wasn't done in this --

A. No.

Q. And just going back to Dr. Ecobichon, were you able to review his testimony at the trial?

A. Yes.

Q. And since the trial in 2006 have there been any advances in the understanding of pesticides and their effect on children in particular?

A. Yes, a lot.

Q. And what types of advances?

A. In the past 10 years or before there's been a new knowledge on neurocognitive damages by neurotoxic substances. In the past every problem has to be only addressed to the intelligence coefficient. But we know, we learn that investigators starting to looking into the other cognitive functions besides intelligence and it was discovered more in the past maybe six, seven years that other areas of function in areas of the brain, the cognitive functions, are also affected in different ways also by these neurotoxins.

Q. And can being exposed -- and I think you mentioned this before, but can being exposed to toxins as a child have an effect when you're an adult?

A. Yes. This long -- especially long-term or known

as chronic exposure, environmental exposure to toxins creates -- because the amounts are maybe not so high or maybe are causing mild problems that are not well recognized.  But many of the problems with these neurotoxins are these organic compounds, they resemble some parts of the endocrine system sometimes or other areas of the cell function.

Some of these -- a lot of these pesticides are also classified as endocrine-disrupting substances. So that means they get into the cells and create resembling like testosterone, androgens, estrogens.  And neurotoxins are some chemicals that our brain uses.  So our brain has its own endocrine system so these type of substances causes changes that will be more visible with the time.  We will change the function as I mentioned before having like a latency period or delayed effect.

Q.  And, Dr. Lugo, in this case do you recall if Mr. Rodriguez had headaches?

A.  Yes.

Q.  And how does that fit into your exposure assessment?

A.  Yeah.  Well, some of the developmental changes I was -- reviewed that he was diagnosed with having a head larger of the size -- possibly somebody mentioned the possibility of some incomplete hydrocephalus.

So some of the neurological changes of these endocrine-disrupting chemicals are related to some chemicals that causes defects, neurative defects. And those neurative defects are like anencephaly, hydrocephalus, spina bifida. And there are -- in this case seems like it was not a fully developed problem of the development of this central part of the brain but his head got bigger and could explain that, the reason of headaches and of some exposure to these chemicals.

Q. And, Dr. Lugo, is it possible to do a blood test and determine the level of pesticides in someone's blood?

A. In people?

Q. In people.

A. Yeah. You can do it. It is very difficult to test for pesticides because they don't last very many -- many, many years. There are very, very few that stays almost forever in the body like DDT. It is transforming in the body. DDE is a metabolite, the main metabolite. If we test -- and this has been done all over the world. If we test any human we'll have levels -- well, people who are adults who were exposed to the DDT, we still have DDT in our bodies. But it is not recommended to start testing. It has to be tested in like subcutaneous fat, fat tissue, and it can be detected but is not

practical for the assessment.

Lead can be tested also but is not going to give a reliable response because the body is growing and the distribution changes, the nutrition and everything. So lead has a very long half-life of 20 years, 25 years in the blood and -- in the connective tissue, I'm sorry, and bones and nerves but is not practical like to test to do biopsies on bone or in the nerves to measure the body of these things.  It's better to do the assessment like a historical analysis of the exposure and looking at the developmental changes.

Q.   And I just wanted to clarify, you stated that pesticides do not remain in the body for a long time. But you also stated that pesticides can have an effect that is not realized until later in a person's life?

A.   Yes.

Q.   How do you reconcile those two ideas?

A.   Yeah.  So when the chemical gets into the body it goes through the process of kinetics.  It is absorbed. It crosses barriers.  The blood in the cells gets into the organs.  It's becoming part of the metabolism.  The remaining part if it's something that's going to be -- most are discarded from the body.  The body just filters that and through different mechanisms helps to detoxify the substance.

So it has a half-life in the body of maybe hours, days or weeks, and then it's been eliminated. But the effects -- some of the parts of this type of chemical are incorporated into the DNA.  Those are the parts that create the change, the mutation and then create the changes later on in life.

Q.  And as an adult was Mr. Rodriguez exposed to toxins?

A.  Yes, he was exposed.

Q.  How?

A.  He worked, well, in the print shop.  The way it is settle those places are not really to be an industrial site.

Q.  Sorry to interrupt.  You're saying "those places."  Did you say the prison print shop?

A.  Yes.  It's not like a factory that has been in that purpose.  It's a building with all the engineering and everything settled to protect the workers and their environment, with equipment to protect from gases, from solvents.

Q.  And what types of toxic substances, I think you just said "solvents," are in print shops?

A.  Well, in this one as far as I could see -- I tried to get information from that company.  I couldn't get any information.  But for the -- in general print

shops use basic ink and inks are made with heavy metals and solvents.  And those chemicals operate and there is a need like working in those circumstances to have special extraction of the gases, special filtration systems, and the individuals need to wear some protective filters to breathe less of the gases.

MS. SHAHEED:  And may I approach?

THE COURT:  You may.

Q.  (Ms. Shaheed continuing)  And, Dr. Lugo, a minute ago you said that you were not able to get information from the company that Alfonso worked for.

A.  Yes.

Q.  And you were meaning the chemicals that they used?

A.  Yeah.  I tried to get the Material Safety Data Sheets.  Any company, any manufacturer or people who's doing processes or using chemicals, anything, it's good to request that.  The MSDS, or Material Safety Data Sheets, contain the list of chemicals contained in inks, cleaning, anything.  Any substance has a list of the chemicals.

Q.  And I have just handed you what was previously marked Defense Exhibit 72.  Do you recognize that document?

A.  Yes.

Q.   What is it?

A.   It's from Minncor Industries.  It shows what they do in the print shop business.

Q.   And Minncor is the company that Alfonso worked for; is that correct?

A.   Yes.

MS. SHAHEED:  I would offer Defense Exhibit 72 into evidence.

MS. BURKLAND:  I just have a question about the last page.  It looks like it's the first few pages.  Looks likes it's a part of a website printout but the last page looked like it's something that was created and attached to the document.

MS. SHAHEED:  It's actually a PDF from the website.  But the last two pages are from the more recent version of the website.

MS. BURKLAND:  Okay.  No objection.

THE COURT:  Seventy-two is received.

Q.   (Ms. Shaheed continuing)  And, Dr. Lugo, on the photograph that is on the second page, I think you have it in your hand.

A.   Okay.

Q.   Can you describe that photograph?

A.   It's some workers moving and operating machinery in the print shop.

Q.   And typically if you were in a print shop what type of protective gear would you need to have?

A.   Well, depends on the area.  You have to wear masks because if you're working with inks and solvents you need to wear some mask to protect from the vapors and the gases.

Q.   And is a paper mask sufficient?

A.   No.

Q.   Is there additional materials that you would need to wear to protect yourself?

A.   Gloves, goggles, boots, helmet, depends on the area but essentially if you're working with solvents you need special filtration system that can remove the gases because it's continuously evaporating.  You need to have special design engineering for the print shop.

Q.   And do you recall how long Mr. Rodriguez worked in the print shop in --

A.   Many years.  He didn't specify but it seems like more than 10 years.

Q.   And from your review of the prison records in his case, did that confirm that he worked at the prison print shop?

A.   Yes.

THE COURT:  All right.  How much longer do you have for your direct?

MS. SHAHEED:  Maybe ten minutes.

THE COURT:  How long is your cross going to go?

MS. BURKLAND:  I mean, not long but I would say like at least 30 minutes.

THE COURT:  He has a flight out at 6:00 in the morning?

MS. BURKLAND:  6:00 in the morning.

THE COURT:  And our question is I can only do so much.  I can sit here but the court reporter can't go forever.  Let me just talk and see where we're at here.  If we can, Kelly, go off the record.

(Off the record.)

THE COURT:  Ms. Shaheed?

Q.   (Ms. Shaheed continuing)  And, Dr. Lugo, is everyone equally susceptible to toxic substances?

A.   No.

Q.   And can you explain why?

A.   Yeah.  Many times people wonder why somebody is affected and other people is not affected.  And we see it.  We do a scientific study in a population.  Could be humans, children, adults, or it could be in laboratory animals.  Not everybody will respond the same because of our genetic makeup, our body metabolism, the way the physical conditions.  There are a lot of different

factors, environmental, circumstantial things that makes different responses in the body.  So not everybody will have the same response.

We will see if a family, for instance, is living in a house, we will see probably one person or two or three.  We don't know.  Depends on the type.  But many times people wonder why this person is affected because that is the reason, our differences.  We may be like a twin.  We have a set of twins that are identical but their metabolism will be different.  The rate of doing things in the body will be different.  The concentration and the places where they are could be different.  So there are a lot of variables that has to be incorporated in an analysis so we will see different responses.

Q.   And, Dr. Lugo, what is the additive effect?

A.   That's when someone is exposed to one toxin and gets damage and is exposed to another toxin that is also toxic and damaging.  So we have those -- added those effects or summarize the addition of one effect goes to the other increasing the level of toxicity.

Q.   And did you observe any additive effect in Mr. Rodriguez's case?

A.   Yeah.  He's been exposed to a lot of these neurotoxic pesticides.  He was exposed to lead and later

in his life he was exposed to solvents.

Q.   And, Dr. Lugo, did you reach any conclusions in your public health assessment of Mr. Rodriguez?

A.   Yeah.  That he was exposed and he was affected by neurotoxic substances.  The neurotoxic substances affected the development of cognitive functions, that the cognitive functions are those that allows us to do normal things.  So the brain was not working well because of neurotoxic effects.

MS. SHAHEED:  No more questions.

THE COURT:  Ms. Burkland?

**CROSS-EXAMINATION**

**BY MS. BURKLAND:**

Q.   Dr. Lugo, I would just like to refer you to what's been marked as Defense Exhibit 67.  It's your CV.

A.   Yes.

Q.   And quite briefly it looks like you completed your medical residency in linguistic communications; is that correct?

A.   Yes.  Neurolinguistic was the area.

Q.   It was neurolinguistic?

A.   Okay.

THE COURT:  Hold on, I promised my court reporter I'd take a ten-minute break and I didn't so why don't we go ahead and break here.  I'm sorry.

MS. BURKLAND:  That's okay.

(Recess taken; 5:05 p.m. to 5:15 p.m.)

(In open court, all counsel present.)

THE COURT:  We're back on the record in a case entitled United States of America versus Alfonso Rodriguez, 2:04-cr-55.  Counsel are present. Ms. Burkland was conducting a cross-examination.

You may proceed, madam.

MS. BURKLAND:  Thank you, Your Honor.

Q.  (Ms. Burkland continuing)  Dr. Lugo, I believe we were still looking at your CV, which has been marked as Defense Exhibit 67.

A.  Yes.

Q.  And you were just telling me that even though your CV says linguistics, it was actually neurolinguistics?

A.  Neurolinguistics, yeah.

Q.  And do you have -- do you have any medical training in neurology?  Did you do any residency training in neurology?

A.  No.

Q.  Or psychiatry?

A.  No.

Q.  Radiology?

A.  No.

Q.   And if I understand correctly, you're not licensed to practice medicine in any state in the United States; is that correct?

A.   That's correct.

Q.   Okay, thank you.  So you wouldn't be able to, say, diagnose somebody with brain damage or any psychiatric condition, correct?

A.   That's correct.

Q.   Thank you.  Now we can turn to your report, please, which has been marked as Defense Exhibit 68.

A.   Yes.

Q.   And I am -- I'm now turning to page 2 of 23 and looking at your sources of information.

A.   Twenty-three?

Q.   Two of -- page 2 of 23.

A.   Page 2, yes.

Q.   Okay.  Thanks, Doctor.  And it looks like you made two psych visits: one to Laredo, Texas and one to Crookston; is that correct?

A.   Yeah, that's correct.

Q.   And you mention that you interviewed Alfonso's closest relatives and others with knowledge of his life.  Could you please be a little bit more specific?  Who exactly did you interview?

A.   Yeah, I interviewed Delores's sister.  I

interviewed --

Q.   Delores's sister?

A.   Delores's -- Alfonso's aunt.

Q.   And which aunt?

A.   Delores's sister.  I don't have the name right now.

Q.   Okay.  So did I hear you correctly that you interviewed Delores and Delores's sister?

A.   Yes.

Q.   And do you have notes of those interviews?

A.   Yes.  I don't have it with me but do have notes.

Q.   Did you record the interviews in any way?

A.   No, no recordings.

Q.   Okay.  Did you provide your interview notes to Mr. Rodriguez's counsel?

A.   Not yet, no.

Q.   Okay.  All right.  Do you -- and then you said "friends."  Which friends did you interview?

A.   Neighbors that were living during that time and people who were longtime residents.  I walked through the area where they were living looking for people who were residents from that time.

Q.   Residents from that time.  And did you do this in both Laredo and Crookston or just Crookston?

A.   Just in Laredo, and in Crookston I interviewed

only the closest relatives of -- sisters and the mother.

Q. Okay. All right. Moving farther along into your report, I'd like to turn you to page 11, please, Dr. Lugo.

A. Okay.

Q. And in the final paragraph right after your London 2012 cite you state: "Alfonso's neurologic and cognitive problems were caused by chronic exposure to highly neurotoxic pesticides."

Did you consult with any neurologists or psychiatric professionals in making that conclusion?

A. Well, in my experience I've been talking to neurologists and neuropsychiatrists. That's why I came up with this. I been --

Q. But in a specific case did you consult with anybody --

A. No, no, no.

Q. -- to make that -- okay, thank you.

THE REPORTER: Just a minute. We need only one at a time and I didn't even get your question.

Q. (Ms. Burkland continuing) I said in this specific case did you consult with any neurologist or psychiatric professionals to make that conclusion?

A. No.

Q. Thank you. And I'm going to turn to the next

page, page 12 of your report, please.

A.   Okay.

Q.   Now you discussed the use of some Mexican pottery and potential lead poisoning with Mr. Rodriguez. There's not really any way for us to test Mr. Rodriguez today to see if he was exposed to lead as a child; is that correct?

A.   That's correct.

Q.   Thank you.  And I'm sure in your research you came to appreciate that the Red River Valley is a very heavily agricultural area; is that correct?

A.   Yes.

Q.   And so when we're talking about the pesticides and farm chemicals that were used, we're also talking about thousands of other people because of the heavy agricultural area that were also exposed to those chemicals; is that correct?

A.   Yes.

Q.   And there's no way for us to test Mr. Rodriguez today in 2019 and definitively find that he was exposed to chemicals as a child; is that right?

A.   Well, the physical testing, no.  But with the review of historical exposure we can come up to conclusions of exposure.  That was the purpose to prove that he was exposed.

Q.   Okay.  And in your -- the list that you have of sources that you reviewed in drafting your report, it's the final few pages of your report and I see about 71 sources of materials.  There are various articles and internet sites?

A.   Yes.

Q.   When I reviewed these I didn't find any articles that specifically linked a higher incidence of brain damage to individuals that live in Crookston; is that correct?

A.   Well, I reviewed the articles that related to some malformations and birth defects and reproductive effects that were performed.  I didn't include those here but it's on the part of my knowledge and experience because when I did my training and Master's and Ph.D. here at the University of Minnesota one of my mentors was one of the main investigators on this type of problem.  So I was familiar with this.  That's why I was capable to complete this type of statement because it is my experience after talking to the people who was doing all these investigations.

Q.   But you said that you don't have that site -- you don't have a specific article in your report that links a specific higher incidence of brain damage to folks in Crookston, correct?

A.   Yeah.   It's more based on all the experience I had from the 30 -- over 30 years.

Q.   And there was no -- no article that you provided that linked a higher incidence of homicide or sexual assault rates to pesticide use; is that correct?

A.   I didn't include any.

Q.   Okay, thanks.  And I'd also like to turn to what's been marked as Defense Exhibit 72, the Minncor printing.

A.   Yes.

Q.   And you testified earlier that you weren't able to interview anybody from the Minncor printing company; is that correct?

A.   No, I was not able, yeah.

Q.   Okay.  And so the section in your report that talks about Mr. Rodriguez's exposure to printing toxins, that would have been based on these website materials and then also your interview with Mr. Rodriguez; is that correct?

A.   Yeah, and on the reports, some of the records that contain that information where he work in the print shop.

Q.   Sure, thank you.  And it looks like the pages aren't numbered in Defense Exhibit 72 but page 2 has the picture of the individual that is in the print shop?

A.    Yes.

Q.    You're not aware and there's no way for you to confirm that this was a working photo, correct?

A.    Well, it's available on their website as publicity for the work they do.

Q.    Okay.  But there's no way for us to know if this is a stock photo or if this was actually a picture of the lab at the time; is that correct?

A.    In my experience it's from recent picture but in my experience I can't observe because a lot of my work has been in occupational.  So most of my work I've been going to factories, into the places where they do things, and this seems like a place where they were doing the work of printing.

Q.    Okay.

A.    But without some specific equipment, personal protective equipment or --

Q.    Sure.

A.    -- more details about the exposure.

Q.    Thank you.  So it looks like that but there's no way for us to verify that this was actually a picture of somebody working at the time with the printing toxins without protective gear?

A.    Yeah.  The reality could be much worse because this picture was made for -- to make it look nice but

the conditions sometimes are not the same.

Q.   Okay, thank you.  Turning for a moment back to Defense Exhibit 67, which is your CV, and in your "Professional Experience" you list about halfway down the page that you have 17 years working as a medical toxicology consultant in civil and criminal cases to include capital punishment; is that correct?

A.   Yes.

Q.   Has your capital punishment work been for both the state, and I mean prosecution side, and the defense?

A.   Just the defense.

Q.   You've just worked on the defense side?

A.   Yes.

Q.   So every time that you testified it has been on behalf of a capital defendant?

A.   Yes.

MS. BURKLAND:  Okay, thank you.  I have no further questions, Your Honor.

THE COURT:  Redirect, Miss Shaheed?

MS. SHAHEED:  If I can have one moment?

THE COURT:  You may.

MS. SHAHEED:  Just a few questions.

THE COURT:  You may.

**REDIRECT EXAMINATION**

**BY MS. SHAHEED:**

Q.   Dr. Lugo, when you interviewed Delores Rodriguez, did you discuss clay pottery?

A.   Yes.

Q.   And what did you learn?

A.   Yeah.  She describe all the dinnerware, the cooking ware that she used back then and she said -- I ask her for any that was from her and she said no, she didn't have any and so I couldn't get any of it.

Q.   And are you aware if the clay cup that was tested in this case was a cup that was used when Alfonso was a child?

A.   It was not.  It was from somebody else.

Q.   And when you went to Laredo, Texas I believe you said you spoke with Mrs. Rodriguez's sister?

A.   Yes.

Q.   And did you discuss clay pottery with her?

A.   Yes.  And I looked for -- also besides her I asked her to talk to neighbors and friends who were from that time if any had pots but now most people they just disposed of those.  They no longer use them.

Q.   And so is your conclusion that Mr. Rodriguez was affected by lead also based on your conversations with Mrs. Rodriguez and her sister?

A.   Yes.

MS. SHAHEED:  No further questions.

THE COURT:  Anything further?

MS. BURKLAND:  No, Your Honor.

THE COURT:  All right.  You may step down, sir.  Thank you for your time.  We'll stand in recess until 9 o'clock tomorrow morning.  Thank you.

(Adjourned at 5:30 p.m.)