**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                 )
United States of America,  )
                 )
     Plaintiff/Respondent, )
                 )
       vs.        )   **FILE NO. 2:04-cr-55**
                 )
Alfonso Rodriguez, Jr.,   )
                 )
     Defendant/Petitioner. )
                 )
- - - - - - - - - - - - - - - -

**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**Evidentiary Hearing - Volume 5 of 9**

**February 1, 2019**

**Pages 832-1030**

HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
        655 FIRST AVENUE NORTH
        FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

**A P P E A R A N C E S**

**MR. KEITH W. REISENAUER**                    COUNSEL FOR PLAINTIFF;
**MS. MELISSA H. BURKLAND**
Office of U.S. Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102

**MR. JOSEPH W. LUBY**                         COUNSEL FOR DEFENDANT;
**MR. ERIC J. MONTROY**
**MS. JAHAAN AKILAH RUTH SHAHEED**
**MS. ANNE FISHER**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

I N D E X

W I T N E S S E S

**DEFENDANT'S:**                                              **PAGE NO.**

**JOSE ARTURO SILVA**

Direct Examination by Mr. Montroy                    838
Cross-Examination by Mr. Reisenauer                  910
Redirect Examination by Mr. Montroy                  984
Recross-Examination by Mr. Reisenauer               1001

**ROBERT G. HOY**

Cross-Examination by Mr. Reisenauer                 1004
Redirect Examination by Mr. Luby                    1024

E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's 73 | CV of J. Arturo Silva, MD | 839 | 839 |
| Defendant's 74 | Report of J. Arturo Silva Dated 10/14/11 | 846 | 847 |
| Defendant's 75 | The Forensic Panel - James Seward, Ph.D. Dated 8/31/13 | 991 | 991 |
| Defendant's 77 | Progress Report | 997 | 997 |
| Government's 594 | Partial Transcript of interview with Dr. Seward and Alfonso Rodriguez, Jr. | 917 | 917 |
| Government's 595 | Progress Notes - General Team Review | 930 | 930 |
| Government's 596 | Findings & Recommendations Hearing held 12/6/1978 | 931 | 931 |
| Government's 597 | Partial transcript of interview with Dr. Seward and Alfonso Rodriguez, Jr. | 935 | 935 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 598 | MRI Results of Alfonso Rodriguez, Jr. Dated: 9/28/12 | 946 | 946 |
| Government's 599 | Partial transcript of Dr. Welner | 958 | 958 |
| Government's 600 | Partial transcript of Dr. Welner | 961 | 961 |
| Government's 601 | Partial transcript from Dr. Hutchinson's testimony at trial | 974 | 974 |
| Government's 602 | Y-BOCS Symptom Checklist Dated: 10/21/05 | 974 | 974 |
| Government's 603 | Clarke Sex History Questionnaire for Males - Comprehensive Report Dated: 3/1/06 | 976 | 976 |
| Government's 604 | FBI - Grand Jury Material Dated: 5/19/04 | 979 | 979 |
| Government's 605 | Handwritten Notes by Robert Hoy - telephone conference on 11/21/05 | 1017 | 1017 |
| Government's 606 | Psychological Report Continued - page 2 Dated: 7/15/81 | 1003 | 1003 |
| Government's 607 | Handwritten Notes by Robert Hoy | 1005 | 1005 |
| Government's 608 | Handwritten Notes by Robert Hoy w/Illeana Noyes, sister, Crookston Dated 2/7/05 | 1010 | 1010 |
| Government's 609 | Handwritten Notes | 1014 | 1014 |
| Government's 610 | Handwritten Notes by Robert Hoy | 1017 | 1017 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 611 | Handwritten Notes by Robert Hoy taken during trial testimony of Dr. Marilyn Hutchinson | 1017 | 1017 |
| Government's 612 | Handwritten Notes by Robert Hoy with Dr. Edward Kelly | 1019 | 1019 |
| Government's 613 | Handwritten Notes by Robert Hoy with Dr. Edward Kelly | 1021 | 1021 |

**P R O C E E D I N G S**

(February 1, 2019:  The following proceedings commenced at 9:00 a.m., in open court, all counsel present.)

THE COURT:  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez, Jr.  It's File No. 2:04-cr-55.  The record should reflect that Mr. Rodriguez has waived his right to be personally present.  Appearing on his behalf are Mr. Montroy, Mr. Luby, Ms. Fisher and Ms. Shaheed.  Appearing on behalf of the United States are -- I'm sorry, my voice is just shot, Mr. Reisenauer, Miss Burkland.  When we broke the petitioner was about to call his next witness.

Mr. Montroy?

MR. MONTROY:  Thank you, Your Honor.  The defense would call Dr. J. Arturo Silva.

THE COURT:  Dr. Silva, if you please would come forward and stand before the clerk, raise your right hand and take the oath, please.

THE CLERK:  Raise your right hand.  State your full name and spell your name.

MR. SILVA:  Jose, J-o-s-e, Arturo A-r-t-u-r-o, Silva S-i-l-v-a.

(Witness sworn.)

THE COURT:  Dr. Arturo, the microphone in front of you is directional so if you speak into it directly it will pick you up.  If you just want to make sure you slow down and enunciate clearly, the court reporter and myself would both appreciate it.

Mr. Montroy, you may proceed.

MR. MONTROY:  Thank you, Your Honor.

**JOSE ARTURO SILVA,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. MONTROY:**

Q.  Good morning, Dr. Silva.

A.  Good morning.

Q.  Dr. Silva, what is your current profession?

A.  I'm a psychiatrist.

Q.  And could you describe what areas of psychiatry your work is in?

A.  I'm specialized in forensic psychiatry and I'm also specialized in lifespan psychiatry.

Q.  Could you describe for the Court just briefly what forensic psychiatry is.

A.  It's a field of psychiatry that focuses on the interface between psychiatry and the law.

MR. MONTROY:  Thank you.  Your Honor, may I

approach?

THE COURT:  You may.

MR. MONTROY:  Thank you.

Q.  (Mr. Montroy continuing)  Dr. Silva, could you please take a look what the I've marked as Exhibit 73.

A.  (Witness examining.)  I have.

Q.  And do you recognize this document?

A.  Yes, sir.

Q.  And is this your curriculum vitae?

A.  Yes.

Q.  And, Dr. Silva, does this document, Exhibit 73, accurately describe your educational and professional background?

A.  Yes.

MR. MONTROY:  Your Honor, I would move -- I would offer Exhibit 73.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Seventy-three is received.

Q.  (Mr. Montroy continuing)  Dr. Silva, I just have a few questions for you based on your experience and based on this document.

Dr. Silva, does this document contain your educational history?

A.  Yes.

Q.  You went to undergrad school at Stanford

University in California?

A. Yes.

Q. And you attended graduate school at the University of California San Diego?

A. Yes.

Q. And where did you attend medical school?

A. At Stanford University.

Q. And you graduated with your degree in 1981?

A. Yes.

Q. Did you do any residencies or internships postgraduate?

A. Yes.

Q. And where were those?

A. Stanford University.

Q. Dr. Silva, have you worked extensively in both the clinical and forensic psychiatric setting?

A. Yes, sir.

Q. And in terms of your clinical experience, if you could turn to page 3 of your CV.

A. I have.

Q. It indicates on page 3 that you were a staff psychiatrist at the National Center for Post-Traumatic Stress Disorder, the Veterans Affairs Palo Alto Healthcare System; is that right?

A. Yes.

Q. And you did that from 1997 to 2003?

A. That is correct. Sexually, the division in Menlo Park.

Q. In Menlo Park, okay. And what did your work there entail?

A. I worked there until -- roughly speaking it would be maybe around 2005 or not even that. It would be -- yeah, 2005.

Q. Okay. And what did your work there consist of? What did you do?

A. At the Post-traumatic -- at the Menlo Park division --

Q. Yes.

A. -- of the VA? I was running a clinic in post-traumatic stress disorder exclusively.

Q. Okay. And were you treating veterans who were suffering from PTSD?

A. All of them were suffering from PTSD.

Q. Okay. And I see you also did some inpatient clinical work; is that right?

A. Yes.

Q. And you were the staff psychiatrist at the Psychiatric Research Unit at the South Texas Veterans Health Care System; is that right?

A. Yes, sir.

Q.   And that was in San Antonio, Texas from 1992 to 1997?

A.   That is correct.

Q.   Dr. Silva, just turning momentarily to your forensic psychiatric experience, still on that page, you've dealt with issues of criminal competence; is that right?

A.   Oh, yes.

Q.   Abnormal sexual behaviors?

A.   Yes.

Q.   Post-traumatic stress disorder?

A.   Yes.

Q.   Serial homicidal behaviors?

A.   Yes.

Q.   Dr. Silva, your CV indicates that you've also had consultantships; is that accurate?

A.   Yes, sir.

Q.   And it indicates that you were a consulting psychiatrist for the Sex Offender Commitment Program for the California Department of Mental Health?

A.   Shortly for a while, yes.

Q.   Okay.  And that you were a member of the panel of forensic evaluators of the Superior Court, Santa Clara County?

A.   Yes.

Q.   And you did that from 1998 to 2003?

A.   Yes, sir.

Q.   And you also consulted for the Federal Bureau of Prisons, Terminal Island, in San Pedro, California 1985-1986?

A.   That's correct.

Q.   Dr. Silva, have you had any academic positions related to psychiatry?

A.   Yes.

Q.   Were you an assistant clinical professor of psychiatry and biobehavioral sciences at UCLA?

A.   Yes.

Q.   And that was 1986 to 1992?

A.   Yes.

Q.   And were you also an associate professor of psychiatry at the University of Texas?

A.   Yes.

Q.   And have you published in the field of psychiatry?

A.   Yes, sir.

Q.   Your CV indicates that you published a book entitled "Cultural Assessment in Psychiatry, Group for the Advancement of Psychiatry"?

A.   I co-authored.

Q.   You co-authored that?  And have you also

published journal articles and book chapters?

A. Yes.

Q. And your CV indicates that you've published 160 journal articles and book chapters; is that accurate?

A. Yes.

Q. And you've also done presentations in the area of psychiatry?

A. Yes.

Q. Dr. Silva, are you licensed to practice psychiatry?

A. Yes, I am.

Q. Where are you licensed?

A. In California.

Q. And you've been licensed since 1984?

A. Yes.

Q. And do you have any certifications in psychiatry?

A. In general psychiatry.

Q. And is that with the American Board of Psychiatry and Neurology?

A. And neurology, correct.

MR. MONTROY: Your Honor, I don't have anymore questions concerning qualifications.

THE COURT: Any voir dire on the witness's qualifications as an expert?

MR. REISENAUER: No, Your Honor. Thank you.

THE COURT:  The Court finds that he is an expert and qualified to testify in these matters.

Q.  (Mr. Montroy continuing)  Dr. Silva, are you familiar with the case of United States versus Alfonso Rodriguez?

A.  Yes.

Q.  And is that a capital case?

A.  Yes, sir.

Q.  And in that case were you asked to conduct a psychiatric evaluation of Mr. Rodriguez?

A.  I have.

Q.  And you were retained in that case by Joseph Margulies; is that accurate?

A.  Yes.

Q.  And Mr. Margulies was counsel in this matter prior to my office; is that your understanding?

A.  That's correct.

Q.  And as a result of your evaluation and psychiatric assessment, did you produce a report?

A.  Yes, sir.

MR. MONTROY:  Your Honor, may I approach?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  Dr. Silva, if you could please take a look at what's been marked as Exhibit 74 (indicating).

A.  (Witness examining.)  Yes.  This is the report that I wrote regarding the case of Alfonso Rodriguez.

Q.  Okay.  And you wrote that report on October 14, 2011?

A.  Yeah.  That was when it was finished.

Q.  And if I could direct your attention to page 7 of your report, please.

THE COURT:  Do you intend to offer the report?

MR. MONTROY:  I'm sorry?

THE COURT:  Do you intend to offer the report?

MR. MONTROY:  I'm sorry, Your Honor, I do. I intend to offer this document.

THE WITNESS:  I'm looking at page 7.

THE COURT:  Any objection?

MR. REISENAUER:  I have one question of Mr. Montroy if I could, Your Honor?

MR. MONTROY:  Your Honor, Mr. Reisenauer just noted that there's another document that was attached to the back.

THE COURT:  The declaration of Dr. Duggan?

MR. MONTROY:  Yeah.

THE COURT:  And so that would not be part of it.

MR. MONTROY:  That would not be part of it, Your Honor.  That was a whole separate declaration.  I'm not sure how that -- it's actually not attached to this one.  Thank you.  Sorry about that.

THE COURT:  All right.  As modified 74 is offered.  Any objection by the United States?

MR. REISENAUER:  Not with the deletion of Dr. Duggan's statement, Your Honor.  Thank you.

THE COURT:  It has been removed from the original.  Seventy-four is received.

Q.   (Mr. Montroy continuing)  Dr. Silva, as I was asking, could I direct your attention to page 7 of the report?

A.   I'm at page 7 now.

Q.   And you were directed by Mr. Margulies a specific referral question; is that accurate?

A.   That's correct.

Q.   And is that indicated in Section 1 of the "Ppsychiatric-Legal Issues"?

A.   That's correct.

Q.   And in your report it says:  "What are the medical, social, psychological, developmental, familial, cultural, religious and environmental factors that played an important role in shaping Mr. Rodriguez's development and functioning?"

A.   Yes, sir.

Q.   That was the question that was posed to you by Mr. Margulies?

A.   And by Attorney Jocelyn Recer.

Q.   Okay.  And if I could just turn your attention back to page 1 of your report.

A.   I'm on page 1.

Q.   As part of your evaluation, did you conduct an interview of Mr. Rodriguez?

A.   I conducted two interviews with Mr. Rodriguez on different days.

Q.   Okay.  And when were those interviews?

A.   The 13th and the 14th of 2011, September.

Q.   And about how long in total were the interviews that you conducted of Mr. Rodriguez?

A.   It was over 10 hours.

Q.   Okay.  And if you could turn to page 2, please.

A.   Yes.

Q.   Directing your attention to Table B.

A.   Yes, sir.

Q.   Does Table B indicate a number of interviews that you did in this matter?

A.   That is correct.

Q.   And would these be considered -- well, strike that.

Who did you interview?

A.   I interviewed several members of the defendant's family.

Q.   Okay.  And what was the purpose of you interviewing Mr. Rodriguez's family members?

A.   To be able to obtain collateral information or independent information other than his information.

Q.   Okay.  Is that generally an important thing to do in psychiatric evaluations?

A.   Yes, and in this case it's crucial.  I thought it was important to do it.

Q.   And why do you say that?

A.   Because I was asked to evaluate issues that have to do with his development from the time that he was born up until the time that I saw him.

Q.   Okay.  And Mr. Rodriguez obviously couldn't speak to prenatal, perinatal and periods of time when he was a toddler; is that --

A.   Yes, sir.

Q.   And in those interviews you interviewed Belia Flores?

A.   Yes, I did.

Q.   And Rosa Rodriguez?

A.   Yes, I did.

Q.   And Delores Rodriguez?

A.   That's correct.

Q.   And, Dr. Silva, did you review other sources of information besides the interviews that you had with Mr. Rodriguez's family members?

A.   I did.

Q.   And are those set forth on pages 3 to 6 of your report?

A.   They are set on pages 2 through 6, yes.

Q.   I apologize, 2 to 6.   And you list about 149 documents that you reviewed?

A.   Roughly that.

Q.   And it was actually more than that because some of them have sub-numbers, right?

A.   Roughly that.

Q.   Okay.   Now, Dr. Silva, on page 7 under the "Data" section, you use the term "developmental history."   What do you mean by "development history"?

A.   Developmental history in his case involves history that has to do with from the time that he was born up until the time that I evaluated him.

Q.   And is it important to give a thorough inquiry into a person's development history when attempting to determine issues related to that person's development and functioning?

A.   Yes, crucial.

Q.   And so is it fair to say then that you considered a variety of information and factors from Mr. Rodriguez's life that could have played a role in shaping his development and ability to function?

A.   Yes.

Q.   Now you start your report by talking about the history of Mr. Rodriguez's basic landmarks; is that right?

A.   Yes.

Q.   And when you say "basic landmarks," what does that consist of?

A.   Basic landmarks involve things like the time that he began to speak, the time that he spoke a few words, first words, the time that he was able to potty train. Those will be good examples, when he began to walk.

Q.   Okay.  And how did Mr. Rodriguez do attaining those basic landmarks?

A.   Basic landmarks, in the case of Mr. Rodriguez, he clearly had definitive delays on all of those or most of those landmarks.

Q.   Okay.  For instance, you indicate in your report that "Mr. Rodriguez's mother stated that by age three years he urinated without continence while awake"?

A.   That is correct.

Q.   Was that an example of a developmental delay?

A.   No, that was not an example of developmental delay, no.

Q.   What about Mr. Rodriguez's almost two years of age when he began to walk?

A.   That is definitely a delay.

Q.   And two and a half before he started to say a few words?

A.   That's correct.

Q.   And no phrases until the age of three?

A.   Roughly that.

Q.   Okay.  So was this type of information important to your psychiatric assessment?

A.   Yes.

Q.   And why is that?

A.   Because I have to -- I have to evaluate and assess whether or not there are delays or deficits in his functioning.

Q.   And these delays or deficits in his functioning that you describe in this -- the list of basic landmarks, did these delays affect his ability to function?

A.   Definitely.

Q.   Did the delays affect his ability to meet developmental and sociocultural demands in comparison with others of a similar age and background?

A.   Yes.

Q.   We can move along, Dr. Silva.  The next chapter you have is the "History of Bullying against Mr. Rodriguez Associated with his Anatomical Characteristics"?

A.   Yes, I'm looking at that.

Q.   And could you describe what you learned about this topic.

A.   Regarding anatomical characteristics, I can give you several examples.  He displayed an enlarged head that he was reported to have since he was born.  That would be a dramatic case but there were many other examples.  He had difficulties, for example, with walking normally due to the fact that he exhibited a limp or a difficult wide gait when he was walking.

Q.   And in this section you seem to indicate that he was bullied because of these characteristics.

A.   Can you repeat that again?

Q.   I'm sorry?

A.   Can you repeat that again?

Q.   I'm sorry, and you seem in this section to indicate that he was bullied because of these abnormal physical characteristics.

A.   He had been bullied especially with regard to the shape of his head, but there were other problems like

that.

Q.    For instance, kids called him cabezon.  Am I saying that correctly?

A.    Say what again?

Q.    Cabezon, big head?

A.    Yeah.  They called him cabezon and that means essentially he has a big head, which means that he either has a big head with regard to the anatomy, the size of the head is big, but it also means in other cases that he is a person that is not very smart.

Q.    Okay.  And how did this bullying make Mr. Rodriguez feel as a child?

A.    The way that he felt is that he felt like he was not liked, and from the very beginning he also experienced feeling humiliated or not liked.

Q.    And in that section you also indicate, this is on page 8, that Mr. Rodriguez's mother reports that he was the slowest learner of all her children.

A.    Yes, that's true.

Q.    And that his learning difficulties were known by the family before he even started elementary school.

A.    Oh, definitely.

Q.    Did these experiences and Mr. Rodriguez's response to those experiences show anything about his ability to meet developmental and sociocultural demands

in comparison with children of a similar age and background?

A.    Yes.

Q.    And how so?

A.    Well, depends on the different problems.  He had serious difficulties interacting with other people, including his family, siblings, people that he went to school with.  He was extremely shy and avoidant of people.  He would hardly talk to them.  He often did not communicate so he had to be really prodded to interact with other people.

Q.    And I notice that you reported that when he was picked on he didn't fight back.

A.    That's correct.  When he was very young he -- and even later he would not say much of anything so they -- if they said bad things about him, they called him names, he would just, quote unquote, take it, as he said.

Q.    And is that a significant fact?

A.    Is that important?

Q.    Yes.

A.    Yes.  Because, you know, he -- it's unusual for a kid not to react when people are bothering him or making him feel negative or unwanted or liked.  Yes, that definitely is true.

Q.   Okay.   The next category, Dr. Silva, is "Social Behavior During Childhood" on page 8.   And you started to touch upon this just a moment ago, but you indicate that Mr. Rodriguez was extremely shy and isolated?

A.   That's correct.

Q.   You write that other children that knew Mr. Rodriguez at about the age of six years old when he was in Laredo, Texas described him as watching more than playing with them.

A.   Yes, his siblings for example, definitely.

Q.   You saw examples of that?

A.   Well, they mentioned that, yes.

Q.   And that while he was in Laredo Mr. Rodriguez's friends were kids who had impairments?

A.   When he was actually attending Laredo.   It's unclear when that happened depending on reports but, yes, there is -- there's evidence that he was placed in a special therapeutic intervention for the purposes of aiding with his speech because he was not able to really speak well.

Q.   Okay.

A.   Even Spanish.

Q.   There is an indication in your report that when Mr. Rodriguez was watching television with other children and something funny was on the television

everybody would laugh except for Alfonso.  He would just sort of sit there quietly and not react to --

A.   It would go for minutes to hours depending on what happened.

Q.   And these examples, are they significant in understanding Mr. Rodriguez's ability to function?

A.   Most definitely.

Q.   Okay.  Do you recall a report from Mr. Rodriguez's younger brother who said:  "When I was little, I looked up to Tito.  I idealized him.  He was my big brother.  But, that didn't last because I caught up and passed him.  I was bigger than him by the time I was around 5 or 6.  Around the same time I passed him mentally.  I passed him socially by age 12 or so."

Do you recall that?

A.   Yes.

Q.   Does evidence before something like that experience, meaning younger children passing him socially, passing him conceptually, does that say something about his ability to function in the community?

A.   Yes, that's true.

Q.   And do these characteristics that were described in this section here, "Social Behavior During Childhood," that were exhibited by Mr. Rodriguez, do

they show anything about his ability to meet developmental and sociocultural demands in comparison with others of a similar age and background?

A.  Oh, definitely.

Q.  And how so?

A.  Well, you know, they most -- the most obvious problem had to do with social interactions.  He was a child that interacted very little with anybody except maybe his mother and his older sister.  He interacted so little that people literally had to bring him into the table.  They wanted him to be there.  But what he would often do he would just leave.  He did not want to be with his family.  He would -- it was very common for him to leave the table because he didn't want to be there. He would even -- it was very common for people not to ever see him wanting to eat with them.  He will retreat and go to another room, sometimes a basement in one of the homes that they had.  He would stay there immobile and sometimes, of course, eating on his own.  That was very common.

Q.  So it sounds from your description that he exhibited deficits in social functioning.

A.  Oh, definitely.  He interacted very little with his family, definitely with his siblings.  Siblings always talked about:  Maybe he doesn't like us, you

know.  We don't know why he doesn't want to be with us.  But overall there was no explanation.  He was just a quiet child that interacted very little.

Q.  I'm sorry?

A.  And that's what was happening.

Q.  And that continued into his adolescence; is that right?

A.  No.  He actually improved even before then but difficulties, interactions were pretty stark during the preschool period, for example.

Q.  If I could turn your attention to the next section, "Social Behavior During Adolescence and Early Young Adulthood Until 1974."

A.  Page which one again?

Q.  Page 10.

A.  I'm there now.

Q.  Okay.  You indicate on this page of your report that according to his brother, Francisco, his brother hung out with other people who had problems and were also what he describes as the word "behind."  Do you recall that?

A.  In the beginning, yes.

Q.  Yeah.  And that Mr. Rodriguez was two years older than his friend, Juan Rocha, when they were in 9th grade together even though Mr. Rocha was two years younger

than him?

A.  That's correct.

Q.  Is that sort of behavior indicative of somebody who had challenges functioning in a social dynamic?

A.  I need a clarification.  Can you explain which behavior?

Q.  The behaviors that we just described: hanging out with other children who are behind, other children who have problems, other children who are younger than you?

A.  That's right.  He was -- he would tend to gravitate with children that were younger than him for a whole host of reasons but one of them is that he felt more comfortable to the extent that he interacted because even there there were a lot of problems.

Q.  Moving on to your next section, Dr. Silva, "History of Social Anxiety and Avoidant Behavior."

A.  Yes.

Q.  That's on page 11, do you see that?

A.  Yes.

Q.  You indicate that Mr. Rodriguez stated that since his childhood he viewed himself as unappealing to others because of the way he looked, his tremors, his head size, his shakes and his skin color.

A.  That's right.  All those comments that he made to me and by others also.

Q.   Okay.   And then also he felt inferior because he was of Mexican-American background?

A.   Yes.

Q.   And, for instance, what is his tremor?  Could you just explain that to the Court?  What is a tremor?

A.   "Tremor" is an essentially shaking of a part of the body.  In his case it means that shaking is present either in the neck, the limbs, upper limbs, lower limbs and the shaking is not one amplitude.  It's very small when he's actually doing that.  It's best seen when he writes, for example, and he was limited in his case to the upper limbs.

Q.   To the upper limbs?

A.   That's correct.

Q.   And did you observe this essential tremor?

A.   Oh, definitely.

Q.   Is this a problem that he's had basically his entire life?

A.   It's a problem that he was noted to have very early in his life before he started -- before he began elementary school.

Q.   And was that one of the things that he was made fun of by other children?

A.   Yes.  Depending on the age, you know, the people made fun of him or he thought they were making fun of

him.  He definitely talked about that and other people mentioned it.

Q.  Okay.  And Rosa Rodriguez indicated to you that Mr. Rodriguez as a teenager didn't have very much self-esteem, thought he was ugly?

A.  That's right.

Q.  And that since childhood he tended to avoid others because he knew that they would reject him?

A.  He would -- that would be one of the reasons, not the only reason.

Q.  Well, speaking about alternate reasons, do you recall examples where Mr. Rodriguez exhibited avoidant behavior when there was arguing or confrontation in his household?

A.  Yes.  The problem with his family is that his father was very impulsive, impatient and sometimes aggressive physically or an aggressive person towards the family.  And to begin with he had difficulties just being with people but especially when people were aggressive and display aggression, whether or not it was directed at him, he became very anxious.

Q.  Okay.  Did these experiences and his response show anything about his ability to meet developmental and sociocultural demands in comparison with others of a similar age and background?

A.  Yes, because he couldn't -- he wouldn't communicate much.  He wouldn't interact with people.  He couldn't make any friends.  He pretty much tended to be on his own, living on his own in his own world.

Q.  Dr. Silva, you have a section of your report entitled "History of Mr. Rodriguez's Interests and Activities" on page 12?

A.  Yes, I'm looking at page 12.

Q.  First you indicate that he didn't excel in any games or sports?

A.  Yes, that's true.

Q.  And that's based on some of the interviews and information that you reviewed?

A.  Well, that's what other people said, not necessarily what he said at times, especially when he grew up.

Q.  And in that section you actually talk about some of the things that he has expressed to other individuals about his interests and activities, and on the top of page 13 you note his interview with Dr. Pitt.

A.  Yes.

Q.  And did you have an opportunity to review his interactions with Dr. Pitt and Dr. Pitt's report?

A.  Yeah, his interview with Dr. Pitt.

Q.  And what are some of the things that Alfonso

Rodriguez told Dr. Pitt?

A.   Well, you were talking about, for example, the sports interests.  He talked about being interested in marital -- I'm sorry, in martial arts and that he was actually a proficient -- highly proficient person.  He was able to develop to the point where he could overpower or confront people significantly stronger or larger than him.  He also mentioned that to me.

Q.   Do you recall him telling people -- telling Dr. Pitt that he knew how to decapitate somebody?

A.   Yes.  I mean, I read that section.

Q.   And did you see anything in your review of Mr. Rodriguez's social history, other than what he told Dr. Pitt, about martial arts; that, in fact, Mr. Rodriguez had any experience in martial arts, had taken any classes, had any sort of expertise in martial arts?

A.   I spoke with his family, some members of his family, and the answer was consistently negative and they were saying that he did not have that kind of background.

Q.   And do you think that Mr. Rodriguez was exaggerating or making something up here?

A.   Yes, I think he was, and I agree with Dr. Pitt in that regard.

Q.   I'm sorry?

A.   I agree with Dr. Pitt in that regard, that he was exaggerating.

Q.   He's exaggerating.

A.   Yeah, grossly exaggerating.

Q.   And did you see other examples of that in the record?

A.   Yes.  You know, he -- there's examples such as, for example, going hunting and being highly proficient with hunting; although, that depends on when you ask him those questions.  Sometimes he talked about, you know, being able to kill deer, but then again once you delve into it a little bit more it was much less the case that he did not have those kinds of abilities and he did not have that kind of a record killing animals.

Q.   And that's right.  His brother, in fact, said that he had never killed a deer in the way that Mr. Rodriguez had described it; is that correct?

A.   That's the case.  No one really said that he had never killed -- he had never killed a deer or anything along those lines, but the defendant exaggerated at times, grossly exaggerated his accomplishments in that area.

Q.   And why do you think he does that?  What's the reason or the psychiatric reason or the mental health

reason behind why he would exaggerate?

A.   I think it's pretty much from his own perspective.  It's like most people, they want to be able to show other people that they are valuable, that they -- in other words they have self-esteem and that was a way for him to -- at least in his mind to show to others how good he was in several areas even though many times it was not true.

Q.   Okay.  And it's fair to say that he didn't want people to see his inadequacies?

A.   That's correct.  And he was trying to make up for that by essentially making up stories or exaggerating at least his true accomplishments.

Q.   Dr. Silva, if you could turn your attention to page 14.

A.   Yes.

Q.   Do you have a section in your report entitled "Educational History"?

A.   Okay.  I'm looking at page 15 then.

Q.   Starting at the very bottom of page 14, moving on to page 15.

A.   That's right.

Q.   And is it fair to say that you have a detailed history of Mr. Rodriguez's educational history?

A.   I provided you with a summary of his educational

history, yes.

Q. And is it important when you're doing a psychiatric assessment to understand and explore the person who you're assessing's educational history?

A. Definitely.

Q. And was it important in Mr. Rodriguez's case?

A. Yes.

Q. In your opinion how did Mr. Rodriguez do in school?

A. Mr. Rodriguez pretty much consistently did very poorly from the very start, first grade, for example, and it went on until he left school in the 9th grade when he dropped out.

Q. Okay. And you indicate in your report, for instance, that in 1965 when Mr. Rodriguez was in 5th grade he had an IQ test, the Kuhlmann-Anderson IQ test, and on that test he scored a 74?

A. Yes.

Q. And is that a low IQ score?

A. It's a low IQ score.

Q. And 74 on the Kuhlmann-Anderson test, do you know whether or not that that particular score falls within the mental retardation range when it was administered in 1965?

A. I did not think that that was the case.

Q.   Okay.  He also took the Iowa Basic Skills Test?

A.   Yeah.

Q.   And he scored the grade equivalent of 4.1; is that right?

A.   Yes.

Q.   And would you agree that Mr. Rodriguez was 12 to 13 years old when he was in 5th grade?

A.   What about it again?

Q.   I mean, he was older by the time he was in 5th grade.

A.   Yeah.

Q.   He was 12 or 13.

A.   He was consistently placed in a given grade but his actual -- his actual ability or his actual testing showed that he was behind usually about a year.

Q.   Okay.

A.   So if he was taken to the 5th grade he would actually be -- he would be functioning as being in the fourth grade.

Q.   Okay.  And he was actually -- as a 12 to 13-year-old he could conceivably be in the 7th grade at that particular time; is that --

A.   He could be in the what?

Q.   He could be in the 7th grade as a 12 and 13-year-old; is that fair?

A.   Yeah, he could be that.

Q.   On page 16 you indicate that when Mr. Rodriguez was 17 years old he started 9th grade for the second time?

A.   The 9th grade the second time --

Q.   In the fall of 1970?

A.   Yeah, he began the -- he began the 9th grade at that time, that's right.  That's the last year when he is in school.

Q.   And he was 18 years old when that school year ended?

A.   Yes, that's correct.

Q.   And you indicate that the records show that he attended 172 out of 177 days with zero days tardy?

A.   Yeah.  He was actually quite -- it was actually quite impressive in terms of how little he was -- he was documented to be attending or anybody actually.

Q.   So you know he was in school.

A.   I knew that he was -- he was recorded as being in school, yes.

Q.   And he got an F in science and a D in health and a D in grammar that year?

A.   Yes.  He was actually doing poorly along those lines.

Q.   Okay.

A.   Actually it was very poor.  F's, you know, like -- or D's especially.

Q.   And how did Mr. Rodriguez's poor academic abilities affect his ability to function?

A.   It depends on what -- what you're thinking about in terms of the challenges that you need to have to function.  Maybe you can provide me with an example.

Q.   And let me maybe just rephrase that question. What does Mr. Rodriguez's poor academics, his poor academic achievement suggest about his ability to meet the developmental and sociocultural demands in comparison with children of the same age or adolescents or young adults of the same age?

A.   In his case it meant that he -- he wasn't really achieving the capacities to be able to function reasonably independent on his own either because he was not reasoning things well, had all the -- a whole host of problems and also he was having also difficulties -- some difficulties, difficulties with again social interactions, though improved, though improved.

Q.   When he was in high school?

A.   Oh, yeah.

Q.   Okay.

A.   Yes.

Q.   Along the lines of his academic achievements,

when Mr. Rodriguez was a little bit older and he was incarcerated, you'll see that he told -- or you may have seen that he told the people about the number of books that he was able to read?

A.   Yes.   He talked about, you know, reading books anywhere from, depending on who you talked to or where you read, hundreds or hundreds of books.

Q.   Did he tell you how many books he read?

A.   He mentioned -- he mentioned that he -- yeah, he mentioned that he read many books.  I would say depending on the interest that he had he might have even said something along these lines:  I read 50 books that have to do with the war, for example, or he also mentioned:  I read several hundred books.

Q.   He told Dr. Martell that he read 500 books?

A.   Yeah, and other people.

Q.   Have you heard him say to others that he read 900 books?

A.   I think he did once.

Q.   Okay.  And did you ask him what kind of books he read?

A.   Yeah.  He mentioned -- he will mention in the area of several hundred books.

Q.   Did you have any sense of whether or not he could understand the books that he was reading?

A.   I think he had some understanding of some of the books that he was reading but it was clearly exaggerated and it was clearly the case that he also had to re-read some of those books in order to be able to understand what was actually going on.

Q.   Okay.

A.   And that was my impression.  I thought that he -- of course, depending on the book I believed that he read a good many books, but I thought it was an exaggeration in terms of what he was actually doing.

Q.   Okay.  And you just mentioned that he -- you had the impression that he had to read books multiple times to be able to understand them?

A.   Some of them, yes.

Q.   And he actually told you that during your interview with him.

A.   Yes.

Q.   You also indicate that -- in your report that "I asked Mr. Rodriguez for details concerning some of the books he read, but he mostly talked about books which eventually became movies."

A.   Yeah.  I mean, he mentioned the books as well though.  But he talked about books that were like Harry Potter, for example, that he enjoyed and that kind -- those kinds of books he talked about.  But he also

talked about other books that were like short books from what I understand, serials about -- I don't recall all of the details.

Q. And do you recall his sister, Rosa, talked about giving him books that he could read?

A. Oh, yeah, definitely. I talked to her about what was her impression and she said that she worked diligently to provide him with books that she thought he could actually read and understand.

Q. And those were young adult books?

A. Yeah. They were generally very relatively straightforward books for people that may have some difficulties reading and he liked -- he enjoyed having his sister bring books.

Q. "The Indian in the Cupboard" book, did you come across that?

A. No. I don't know enough about that.

Q. Is that one book that you recall his sister giving him or not?

A. No. I mean, I -- I don't remember those details, no.

Q. Sure. You mention that you thought that he exaggerated a bit when he talked about the number of books that he read and the quantity of books that he read. Do you have any understanding or sense of why he

would exaggerate in that regard?

A.   Because he wants -- my opinion because he wants you to like him.  He wants you to be impressed with him.  You know, it's his way of feeling like he's accepted, which is not unusual of course.  So he -- he will gravitate to people who do that for him and he will seek to interact with some of those people.  But he doesn't do that with people in general as far as he would tell me as what other people -- you know, he did that with the examiners and other people as well but there was a tendency overall, overall not to speak to anyone.

Q.   So are you saying that when he was, you know, directly being asked questions about his intelligence or directly being asked questions about his, you know, ability to do something, that's when he would more likely engage and exaggerate about his abilities?

A.   He might in those situations.  If he perceived that you actually were interested in him that way, then he will be -- that would encourage him to give you more information.  And the more he'd talk the more likely it was that you would see evidence of exaggeration, gross exaggeration.  Not always.  You know, he may at times appear to be accurate.

Q.   And in the course of your assessment of Mr. Rodriguez, did you also look into his family

history?

A.   Yes.

Q.   If I could turn your attention to page 18 of your report, do you recall reading documents from Ileana Noyes?

A.   Yes.  You mean his sister, yeah.

Q.   Yeah, Mr. Rodriguez's sister, right.

A.   Mm-hmm.

Q.   Do you recall what she said about their father, her and Mr. Rodriguez's father?

A.   About his -- what she said about the father?

Q.   About their father, yeah, about his personality, about how he conducted himself in the family, that sort of thing.

A.   He was described as being a hot head, impulsive, an angry man, a man that had very little patience for his children and at times he was abusive, to watch them both physically but she was impressed also about the psychological abuse, the hard words, cruel words that he used to deal with his children.  She was also negatively impressed with his tendency at times to engage in physical violence to his wife.

Q.   And what about Mrs. Rodriguez, Delores Rodriguez, do you recall any information about Mrs. Rodriguez being emotionally detached, removed from, you know, her

children and family?

A.   Yeah.   That was a consistent report from all of his siblings.

Q.   And you indicate in your report on page 18 that Rosa Rodriguez, Alfonso Rodriguez's sister, referred to their mother as a cold fish?

A.   Yes.   She tends to be also relatively quiet, not as interactive as maybe other people.

Q.   And do you recall that Mr. Rodriguez, meaning Alfonso Rodriguez, corroborated some of the stories of being physically abused by the father?

A.   Yeah.   He talked about that, being physically abused and also -- also being psychologically abused because he was afraid of him.

Q.   And how might the experiences that you just talked about, the physical abuse, the emotional abuse from the father, how might those experiences -- what might they suggest about Mr. Rodriguez's ability to meet developmental and social demands in comparison with children of the same age?

A.   I'm not sure that I am catching that question. Are you thinking about how he reacted to his father's behavior?

Q.   Let me rephrase it.   Being subjected to physical and emotional abuse as a child, can that have an impact

on you psychiatrically?

A.   It can but it -- in his case he was so fearful of people in general that in his case it was especially dramatic for him.  This is a kid that to begin with had difficulties just being with other people, with his family, with his mother, his parents, let alone when somebody became psychologically aggressive using hard speech or beating up on people.  So that was especially traumatic for him.  That's not unusual when there are people that are extremely sensitive, and he certainly was one of those types of children.

          But it was a lot more than what the other kids experienced.  He was extremely afraid.  When people -- when you hear people thinking about him and which emotion really characterized him, they would say it was fear.  And definitely himself says that he was very much afraid.  I mean, I'm talking here about especially around the time when he was a child.  Afterwards there was still that issue but he did better.

Q.   So when you're somebody who has, say, deficits in social behavior or social adaptations and you're subjected to physical or emotional abuse, it sort of exacerbates the effects; is that fair to say?

A.   Exacerbates the attack of anxiety you mean or --

Q.   Yeah.  You're not as equipped to deal with it as

you might be as somebody who doesn't have those problems?

A.   Yes, especially in his case during his childhood period.

Q.   Dr. Silva, if I could turn your attention to the section on Mr. Rodriguez's psychosexual history on page 28 and actually, yeah, 28 to 29.

A.   Yes, I'm there, page 28.

Q.   And in Section 7 you talk a bit about the fact that Mr. Rodriguez has a history of being sexually abused.

A.   That's true.

Q.   How does being a victim of sexual abuse potentially impact a person from a psychiatric perspective?

A.   Well, it certainly makes -- in his case it -- it was particularly damaging because not only was he sexually traumatized, which is a problem for most people, but he was very much afraid also of being touched.  He didn't like being touched a whole lot. Maybe his mother and his sister to some extent would be able to touch him and he felt somewhat more comfortable, but it was especially -- especially traumatic for him when people not only did that but they actually sexually abused him as well.

Q.   Okay.

A.   So it was harder.  As somebody who doesn't want to be with people, he's afraid of people, he's frightened with people so in addition to that then you add the invasive aspect of unwanted or un- -- not well understood sexuality.

Q.   And there were multiple instances of sexual abuse; is that right?

A.   Yes.  As to history, yes.

Q.   If we could talk just for a few minutes about Mr. Rodriguez's psychiatric history, Dr. Silva, and you lay out his psychiatric history in your report on page 30.

A.   Yes, I'm at page 30.

Q.   And you diagnose Mr. Rodriguez with a mood disorder; is that right?

A.   Yes.

Q.   And if you could just explain briefly what a mood disorder is.

A.   Well, depends on who you talk to but overall a mood disorder, the way I'm using it, it's -- can be a type of illness that is associated with malfunctioning emotions especially.  In his case it would be anxiety, fear and also depression and to some extent impulsivity problems.

Q.   And did you also diagnose him with anxiety and depression?

A.   Yes.

Q.   Okay.  And you also diagnosed him with post-traumatic stress disorder; is that right?

A.   Correct.

Q.   And is it your opinion here today to a reasonable degree of scientific certainty -- of psychiatric certainty that he meets the diagnostic criteria set forth for mood disorder, for anxiety, for depression in the DSM-V?

A.   Yeah.  And there's many disorders but, yes, I mentioned that.  The answer is yes, of course.

Q.   And at the time of your report you were relying upon the DSM-IV-TR; is that right?

A.   Correct.

Q.   And does Mr. Rodriguez meet all of those disorders that we just described in the DSM-IV-TR?

A.   Yeah, he -- I think that I -- I enumerated the disorders and the answer is yes.

Q.   So he meets the criteria under both versions of the DSM?

A.   You mean for the mood problems, right?

Q.   Yeah, strike that.  You already answered the question.  I asked the question twice.

On page 34 when you're talking about Mr. Rodriguez's history of sexually inappropriate telephonic communications, you talk about an incident where Mr. Rodriguez was in a group setting and there was an accusation that someone had been making obscene phone calls and Mr. Rodriguez claimed that he hadn't been involved in making the phone calls but eventually stood up and announced in front of the group that, you know, he did it and essentially took responsibility for making those phone calls.

A.   Yes.

Q.   Do you recall that?  And do you attach any significance to the fact that he was -- he would be willing to do something like that?

A.   Oh, yeah, that's definitely the case.  I do attach great significance.  May I explain?

Q.   Yes, please.

A.   Yeah.  He is an individual that he is so riddled by anxiety and fear, interaction with people and people confronting other people; just like he happened to be when he was a child and so that anything that induced confrontation with other human beings in front of him, like other classmates or people that were in the unit, he would -- he would not be able to tolerate that.  In the past when he was at home he will hide, he'll go

away, that kind of thing.

But in that particular instance the people that were in the unit until you -- somebody essentially tells us who that person was you're going to stay here. We're going to stay here in group and we're not leaving. And so he after several -- probably after several hours and they wanted to either go to sleep and in his case he was extremely frightened, bothered, dysphoric if I can say that word. He essentially said: Enough is enough for this and I would rather go -- I'd rather tell them that I'm the person so that I can leave the area and not having to confront anybody. So he was willing to do that.

Q. Is that similar to the type of fear and anxiety that you described earlier when he wouldn't stand up for himself if he was being picked on? He'd rather sort of get away and just be victimized than --

A. Yeah, right. But in this instance it was difficult for him to go anywhere because they were saying: Stay here. Kind of like locked up in a therapeutic unit and they wouldn't allow him to leave and that's what produces for him very intense dysphoria. In other words a mix of anxiety and depression, feelings that he doesn't want to deal with. And they're coming from him because that's -- constitutionally that's

what -- who he is.  He's been like that since he was a young school child.

Q.  So with all the historical information that you reviewed that we've talked about, was all of this information important to you in the conclusions that you have reached about Mr. Rodriguez and, you know, his psychiatric assessment?

A.  Yes.  That is part of the problem.  That is a substantial part of the problem and he -- he has a real problem dealing with his emotions, and he doesn't know how to be able to deal with them more effectively, how to think about this about how he might be able to deal with them in a more effective way.  And he feels trapped, you know, trapped.  And once you do that and still with other people try to find out how you can resolve the problems, he just stays there, doesn't want to do much of anything.

Q.  And do these experiences and what you're describing, these characteristics of Mr. Rodriguez, do they impact his development and his ability to deal with sociocultural demands when you compare him with people that are of a similar age and background?

A.  Yes because, you know, part of it is being the whole question of social interactions.  What am I going to do with these people?  How am I going to interact

with them?

But also in this case he had this special concern about the questions of race and he was fearful and he was extremely uncomfortable because he thought that people were putting him down in part, in part because he was Hispanic or that he displayed characteristics that have to do with being Hispanic, that people put him down and so forth.  So, yes, it was a sociocultural shock for him.  He was dealing with that at the time.  Not all the time, but it was a real problem.

Q.   Now in discussing your use of the developmental approach, which you talked about at the beginning of your testimony --

A.   Yes.

Q.   -- you indicate in your report an importance on looking into Mr. Rodriguez's medical conditions; is that right?

A.   Medical conditions?

Q.   Yes.

A.   Yes.

Q.   Okay.  And I specifically want to take a look at Mr. Rodriguez's medical conditions that were when he was -- before he was born and when he was -- at birth and very young.

A.   Okay.

Q.   So if I could turn your attention to page 42.

A.   I'm there now.

Q.   Yeah.  Under 3.2 you have a section that's entitled "Developmental History of Mr. Rodriguez's Gastrointestinal Problems with Onset at birth."

A.   Yes.

Q.   Do you see that section?

A.   Yes.

Q.   Do you describe what you mean and what that section is about, what Mr. Rodriguez's gastrointestinal problems were and how they affected him?

A.   Well, since birth, in other words since maybe age one, he began to display extreme difficulties with tolerating nourishment, first with mother's milk and later with other nutrients, such as for example cow's milk, such as for example rice, what is called rice milk, mix water with rice, those kinds of things.  And there were like -- it's something that it appeared that he was not able to tolerate because he was not able to digest.  But in addition to that more subtly it looked like he even could not do well suckling.  So there's always that question of those two reasons why he was having difficulties.

         The end result of all that is that he --

that he began to lose weight and did lose weight, substantial amount of weight. That's what I called -- what I called malnourishment, malnutrition, both because he's not really being fed protein or he's not able to -- he's not able to assimilate sugar, carbohydrates, anything of that.

So, yeah, he started losing weight and there came a point that it was very noticeable that he was in a state of malnourishment, though not to the point where people thought that he was seriously starved. It was malnourishment.

Q. Malnourishment. And you seem to indicate that his malnourishment at least in part led to the development of Mr. Rodriguez's neuropsychiatric mental disorders; is that right?

A. Yes.

Q. And actually backing up a bit I had a question for you about Mr. Rodriguez's socioeconomic state when he's at this age and actually during his youth. You write: "It should be emphasized that his mother's economic situation often precluded her from caring for Mr. Rodriguez. For his first seven years, she was a farm worker for about five months per year in Minnesota, and a more extensive history with others may shed further light on Mr. Rodriguez's gastrointestinal

problems."

So thinking about the socioeconomic implications of Mr. Rodriguez's family life, did that impact his development and ability to function?

A.   Well, he would qualify as being a neglected child, especially when the parents had to leave and work in the fields and he was often with his older sister on their own.  They were very young.  Not all the time because at times the grandparents were there but there were times when they were not.

And, yes, I would qualify this.  You have a child that is, say, six years of age or seven years of age taking care of a sibling himself, the defendant, when he's four, for example, that would qualify as child neglect, not because the mother wanted to do that but because they felt compelled to make sufficient amount of money to take care of the kids.

Q.   Were the Rodriguez's poor?

A.   Were they what?

Q.   Were the Rodriguez's poor?  Were they a poor family?

A.   They were -- now you're talking about now Minnesota or you want to specify like in Laredo?

Q.   Well, let's talk about when they were going back and forth between Laredo and Crookston, Minnesota when

they were migrants.

A. Right. Yeah, they would definitely qualify as people that were in the lower stratum of society.

Q. And does poverty have any implications on a child's ability to develop and function?

A. Yes, for the same reason that if you have somebody who's -- who has a mental illness like, for example, mental retardation or an anxiety disorder and you don't have enough means to take care of that, it's like -- you know, it happens, you know, people that have these problems. If they are cared for early, they have a better chance of doing better in life and develop better.

But in their case they were trying to make ends meet, like provide food, shelter, that kind of a thing. So questions like issues of -- issues that have to do with mental illness were moved to the side.

Q. Okay. Thank you, Dr. Silva. If we could move along to Section 3.6 on page 45.

THE COURT: Perhaps this would be a good place for us to break for 20 minutes. We'll stand in recess until twenty to 11:00. Thank you.

(Recess taken; 10:20 a.m. to 10:45 a.m.)

(In open court, all counsel present.)

THE COURT: We are back on the record in the

2255 case involving Alfonso Rodriguez.  All counsel of record are present at this time.  Mr. Montroy was conducting a direct examination.

You may continue, sir.

MR. MONTROY:  Thank you, Your Honor.

Q.  (Mr. Montroy continuing)  Dr. Silva, we had just finished talking about malnutrition and you -- and then moving on you indicate that malnutrition signals the beginning of a history of delayed development landmarks which also signals at least in part the beginning of Mr. Rodriguez's cognitive disorder.

Mr. Rodriguez's early delay in motor and verbal performance represents a serious prelude to the destructive effects of his neurodevelopmental problem; is that correct?

A.  Yes.

Q.  All right.  So you indicate that Mr. Rodriguez has a cognitive disorder and that the cause of that, at least initially, was malnutrition; is that right?

A.  It was part of the problem.

Q.  Okay.

A.  Part.

Q.  And in that section on cognitive disorder starting on page 46, you talk about at length Mr. Rodriguez's, using your words, "very poor academic

history;" is that right?

A.   I'm trying to look in here.  Say that again.

Q.   And I said you talk at length in this section about Mr. Rodriguez's very poor academic history.

A.   Yes.

Q.   And you actually go through his records and you calculate that his highest grade point average, minus art and music, is only a 1.62.

A.   Right.

Q.   And that occurred when he was in the fourth grade --

A.   Yes.

Q.   -- while he was living in Crookston.  And he was a few years older or at least a year or two older than the rest of his classmates at that point; is that right?

A.   It looked that way, yes.

Q.   On the bottom of page 46 you state:  "Given the available information, Mr. Rodriguez's overall performance in elementary school is consistent with the performance of a child who at the very outset of his stay in elementary school was seriously cognitively challenged.  This information, coupled with his history of developmental delays prior to entering elementary school, supports my opinion that Mr. Rodriguez began to suffer from a neuropsychiatric developmental disorder

with the onset dating to his infancy;" is that correct?

A.   That's true.   That's correct.

Q.   Dr. Silva, I want to ask you just some questions about some of the factors involving your diagnosis of cognitive disorder NOS.

Dr. Silva, are you familiar with the diagnosis of intellectual disability?

A.   Yes.

Q.   And is "intellectual disability" another updated term for the term "mental retardation"?

A.   Yes.

Q.   And they're essentially interchangeable, mental retardation, intellectual disability?

A.   There are some differences.

Q.   Okay.   But by and large they mean the same thing?

A.   Yeah.   They're dealing with what was known as mental retardation in terms of the deficits especially.

Q.   Okay.   And if you will on -- well, strike that.

Are you familiar with the criteria for a diagnosis of intellectual disability?

A.   Yes, sir.

Q.   And under the DSM-V if you were to look at page 33, and I'll quote it:   "Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both

intellectual and adaptive functioning deficits in conceptual, social, and practical domains."

A.   Yes.

Q.   That's consistent with your understanding of intellectual disability?

A.   That's true.

Q.   And the onset period, is that the period of time from birth until the age of 18?

A.   No.   In terms of the diagnosis?

Q.   Mm-hmm.

A.   No.   It's a lifetime diagnosis.

Q.   Okay.   But when you look -- I'm sorry, I should rephrase that question.   When you're looking at adaptive functioning, the prong two, the DSM requires that you look to the period of onset during the developmental period; is that right?

A.   During the early developmental period definitely.

Q.   Okay.   And that earlier developmental period extends from the age of birth until the age of 18, right, when you're talking about adaptive functioning anyways?

A.   That's true.

Q.   Okay.   And so this is your understanding for the diagnosis of intellectual disability otherwise known as ID?

A.   In terms of the deficits, yes.

Q.   Okay.  So the -- and, in fact, we're just talking about this, the deficits in adaptive functioning.  Are you familiar with what is known as adaptive functioning?

A.   Yes.

Q.   And under the DSM-V the definition of "adaptive functioning" is, quote, to meet developmental and sociocultural demands for personal independence and social responsibility in comparison to others of similar age and social background.

A.   Yeah.  That's part of it, yeah.

Q.   That's your understanding of adaptive functioning?

A.   That's true.

Q.   Okay.  And there are three domains --

A.   Yes.

Q.   -- is that correct?

A.   Yes.

Q.   And in order to meet the diagnostic criteria of intellectual disability, you have to prove one adaptive deficit in one of the three domains.

A.   You have to have one deficit at least, yes.

Q.   Okay.  And those three domains are conceptual, social and practical?

A.   Yes.

Q.   Okay.  And correct me if I'm wrong but in the conceptual domain that includes executive functioning like judgment, planning, impulse control, abstract thinking, problem solving, memory, language, functional academic skills and self-direction.

A.   All of those things.

Q.   Okay.  And in the social domain that would include social judgment and competence, interpersonal responsibility, self-esteem?

A.   Yes.

Q.   Gullibility and naivete?

A.   That's correct.

Q.   Following rules and obeying laws, avoiding victimization and emotional regulation, are those --

A.   Those are good examples.

Q.   And in the practical domain, the third and last domain, activities of daily living and learning and self-management across life settings, occupational skills, use of money, health and safety, other self-care skills.

A.   Yes.

Q.   Is that your understanding of the practical domain?

A.   That's true.

Q.   In your opinion does Mr. Rodriguez have deficits

in adaptive functioning?

A.   Yes.

Q.   Okay.  And does Mr. Rodriguez have deficits of adaptive functioning in the conceptual domain?

A.   Yes.

Q.   And what would be some examples -- or what would be an example of adaptive deficit in the conceptual domain?

A.   You will see it mostly or highlighted -- best highlighted in the school performance, for example.  Can he understand -- can he develop mathematical skills?  Can he learn how to write or how to speak appropriately as scheduled?  He can have problems with inattention, which he did.  Those are some good examples that you would be looking at, especially in the early times when he's going to school.

Q.   And you compare him to other children of the same age and background, is that correct, when you're determining whether or not there's adaptive deficits?

A.   Yes, you're doing that, but you're trying to specify what they look like so other people know.

Q.   And in terms of Mr. Rodriguez's school records, you indicated that in the children that he went to class with, the children from his community, he did substandard and poorly and failed multiple times and

ultimately didn't succeed.

A.   Yes.   As I describe in my report, he failed the first grade twice, which is highly unusual.  He had difficulties passing the -- into the third grade but it looks like he was passed on the basis of age.  He had many difficulties with performing well in terms of grades and it got worse.  But even before he entered the adolescent period it was very clear that he was performing very poorly throughout.

Q.   Okay.

A.   And dramatically very poorly.

Q.   Okay.  In terms of the social domain, did you see any evidence of adaptive deficits in the social domain?

A.   Oh, most definitely, probably more than anywhere else.

Q.   Okay.  And what are some of the examples?

A.   In the childhood period?

Q.   In the childhood period of Mr. Rodriguez.

A.   Again in the childhood period he had difficulties again interacting with other people.  He had difficulties speaking so he -- since he couldn't speak he couldn't interact with other kids.  He, unlike his siblings, was unable to learn English readily as well as they were.  And so to begin with he was in a great disadvantage compared to his siblings, for example.  And

it goes on and on.  He's having difficulties with handwriting.  He's having difficulties just being there essentially.

Q.   Okay.

A.   And you can see it in the -- in how he actually performs from year to year to year.

Q.   Okay.  And then lastly there's the practical domain.  Did you observe any adaptive deficits in the practical domain?

A.   Well, those you see less but there are also problems there as well.  Those are better highlighted with regards to how he performs after he leaves school.

Q.   Okay.

A.   The occupational level, for example.

Q.   His inability to, you know, participate in some of the games that he saw other kids participating in, would that be an example of a deficit in the practical domain?

A.   Yeah.  For example, he would -- here's an example.  In terms of instead of being with other kids when he -- when they were playing marbles, he would stay on his own, stay on his own and play marbles by himself as opposed to join other kids and interact with them and play games that way.

Q.   Are the deficiencies in adaptive behavior that

you've just identified and have testified to at length today, are those consistent with the diagnostic criteria of intellectual disability?

A.   Yes.

Q.   The diagnosis of intellectual disability requires the showing not only of deficiencies in -- sorry, the diagnosis for ID requires a showing not only of deficiencies in adaptive behaviors but also in intellectual functioning; is that correct?

A.   That's correct.

Q.   And determining the existence of intellectual deficiencies often involves IQ scores; is that correct?

A.   Say the last sentence.  I couldn't quite hear you.

Q.   I'm sorry, yeah.  Determining whether or not there is a deficit in intellectual functioning in the first prong of the diagnosis often involves an IQ score or IQ testing; is that right?

A.   It involves IQ testing.  Especially before DSM-V there was a more stringent requirement.

Q.   Okay.  We'll actually get to that.  Hold that thought.

Now when you wrote your report in 2011, you had been given the results of one full-scale IQ score of Mr. Rodriguez; is that right?

A. That's correct.

Q. And that was the test score Dr. Froming obtained from Alfonso Rodriguez prior to trial in this case?

A. Yes.

Q. And do you recall that that full-scale IQ score was an 87?

A. Yes. It was at that level, yeah.

Q. Okay. Did you believe at that point that a full-scale IQ score of 87 precluded or hindered you from meeting the prong one, what is known as the substantial intellectual deficits requirement of the ID diagnosis?

A. You mean DSM-IV-TR?

Q. Yes, IV-TR, and that was an 87.

A. Yeah. Well, because at that point the DSM-IV-TR was formalized in such a way that you have to adhere to certain specific ranges to diagnose mental retardation and levels as well such as, for example, mild retardation versus moderate retardation and so forth.

So, yes, you have to -- you have to really follow the criteria, and that involved IQ testing at certain criteria, which were less liberal than the intellectual deficits.

Q. Okay. And the DSM-V, the DSM-V allows you to -- well, strike that.

You say it's less stringent. How so? What

is the DSM-V --

A.    DSM-V essentially what it does is it focuses more on what people think is more important in terms of functioning.  It focuses on the deficits that people that have a mental retardation diagnosis have.  It focuses on what goes on from day-to-day.  Can somebody interact with other people?  Can somebody perform multiplications like everybody else?  Can somebody -- can somebody interact with other children?  Can somebody write decently so that you can actually be understood and so forth?

So the emphasis was increased in DSM-V but it was also there in the DSM-IV-TR pretty much the same except that the DSM-IV-TR also put more emphasis on the IQ ranges as described in that manual.

Q.    And would you agree that in the DSM-V it warns against -- or having a cutoff number for an IQ score as being determinative as to whether somebody now meets the criteria for intellectual deficiency?

A.    Yes.

Q.    And if I could refer you, Dr. Silva, to page 37 of the DSM and I can read this.  "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks.  For example, a person

with an IQ score above 70 may have such severe adaptive behavior problems and social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with the lower IQ score.  Thus, clinical judgment is needed in interpreting the results of IQ tests."

A.  Yes, definitely.

Q.  Is that basically what you're saying?

A.  That's true.  I think if you do not do that you really are not having an understanding of what mental retardation is or ID.

Q.  Now -- so you were -- when you issued this report, you were working off the DSM-IV-TR; is that right?

A.  That is correct.

Q.  And I just cited to you the DSM-V; is that right?

A.  Well, in terms of the different facets, you know, there's three of them.

Q.  DSM-V is the current diagnostic criteria; is that right?

A.  Yeah, they're formalized more.  They say:  Look, these are the -- the main deficits that you have to take into account is more formalized in the DSM-V.  They describe it in a table.  For example, I'm looking here

at Table 1, page 34, of the DSM-V.  And so it makes it more explicit that you really need to be looking at that there and that's really what they are trying to convey to you.  They're trying to convey to you that you gotta be able to look at things practical in terms of what human beings have to do to be able to adapt in society.  That's really what they're looking at, not just an IQ number or a range.

Q.  Okay.

A.  They de-emphasize it in DSM-V but it doesn't mean there's no consideration.

Q.  Okay.

A.  There is.

Q.  There still is consideration?

A.  There's some.  You can see it if you look at, say, page 37 as I'm doing right now and then you see that you really are looking at, for example, a range of 65 to 75 for mild mental retardation, for example.  That's kind of like one sample that I can mention.

Q.  And in that -- on page 37 it also mentions clinical training and judgment are required to interpret results and assess intellectual performance, right?  And does that idea of clinical judgment, does that place some responsibility and some leeway for the examiner, the person who's making the determination, whether or

not the individual meets the diagnosis to use their experience and to use their knowledge and to use their understanding of ID to determine whether or not that individual meets the criteria of ID?

A.   Yeah.   They focus a lot more on the real-life situations, what is an individual with mental retardation going to do rather than saying:  Well, I have an IQ of 70 whatever -- or 70, for example, to be mentally retarded or whatever number you want to use.

What they're saying is that look at what you have to do with somebody who has this problem.  In other words they're trying to tell psychiatrists or psychologists if you have somebody like that comes out to see you, you know, there you are.  Somebody who doesn't -- who doesn't talk very much, somebody who's doing -- working doing extremely poorly in school who's flunking many, many -- you know, flunking grades and so forth, somebody who is just not experiencing -- not able to talk to other people, somebody who has speech problems and therefore is really doing poorly.  What are you going to do with him?

See, that's the practical thing.  What is clinician going to be doing with that person?  How are you going to cope?  How are you going to help the individual cope so that he can do better on that?  So

they are really looking at -- they're looking at deficits because that's what you gotta work and not just an IQ number or anything like that.  There's less emphasis on that.

Q.  Okay, thank you.  And speaking of numbers since your report in 2011 you've learned that 87 full-scale IQ score that was obtained by Dr. Froming, when the Flynn Effect is applied and two scoring errors are adjusted, actually drops to an IQ score of around 78, plus or minus five.  Did you learn that?

A.  Yeah, I don't -- that's not my area of expertise but I certainly know that when you apply those considerations, yeah, the IQ is going to be -- it's going to be lower.

Q.  Well, you said you don't -- you don't actually do neuropsychological testing.

A.  I don't do neuropsychological testing.

Q.  You rely on a neuropsychologist or psychiatrist or psychologist?

A.  That's correct.  I also rely on my experience. If somebody comes in and they tell me that they have an IQ of 90 and I find out that that person flunked two or three grades or four grades and is not able to speak to other people, cannot communicate, I'm going to have some questions about the validity of the IQ test just from my

experience.  It's just too gross to --

Q.  So in your experience then is it fair to say that deficits in adaptive functioning can corroborate an IQ score?  If, say, for instance you have a 90 IQ score and you have -- from one practitioner and you have a 70 IQ score from another practitioner and you have the individual who has significant adaptive deficits, can that corroborate the validity or the likely validity of the 70 as opposed to the 90?

A.  Yeah.  That's right.  The emphasis is going to be on the deficits.  What is the person having problems with and what can you do about it rather than saying what's your IQ test?  In fact, a lot of clinicians will say if somebody comes to see you they're going to focus on the deficits.  That's really the main message because that's really what you gotta do in terms of interventions.  How can you help that person function better in school, home, society at large?

Q.  Okay.  You learned, also subsequent to the writing of this report, that Mr. Rodriguez was administered IQ tests by Dr. Ricardo Weinstein?

A.  Yes.

Q.  And Dr. Weinstein conducted three separate IQ tests, right?

A.  Right.

Q.   In those IQ tests Mr. Rodriguez received scores at or below two standard deviations from the mean in those tests, which place Mr. Rodriguez in the ID/MR range as having a significant intellectual impairment as far as IQ testing is concerned.

A.   That's right.

Q.   And in your opinion -- in your opinion using clinical judgment, using your experience, does Dr. Weinstein's scoring -- do those test scores, those IQ scores that he obtained, are those scores consistent with what you have observed in terms of the adaptive deficits?

A.   Yes, definitely.

Q.   Okay.  Is it your opinion today that to a reasonable degree of scien- -- strike that.

Is it your opinion today to a reasonable degree of psychiatric certainty that Mr. Rodriguez meets the diagnostic criteria for intellectual disability?

A.   Yes, definitely.

Q.   Now at the time that you issued your report -- going back to cognitive disorder, at the time you issued your report you diagnosed him with a cognitive disorder; is that right?

A.   Correct.

Q.   And it was a cognitive disorder NOS.

A.    Correct.

Q.    And what does "NOS" mean?

A.    Not otherwise specified.

Q.    And so not otherwise specified, is that basically a catch-all if the diagnosis doesn't fit any of the more recognized specified diagnoses that fall within a particular category of psychiatric disorders?

A.    Yes, but I can tell you in this instance what it really means.  In this instance at the time that I was evaluating the defendant what it means is that I did not have -- I did not have sufficient data that I thought would enable me to make a diagnosis of mental retardation based on that criteria.  But it is true that in terms of the deficits, deficits that we're talking about, he had them, okay?  There they are.  They're there whether or not you use the DSM-IV-TR or they're there if you use ID.

Q.    So when you're saying you didn't have sufficient data, are you referring to the 87 full-scale IQ score?

A.    That's right.  I mean, the problem is that you have -- the only thing you have is IQ scores, information that from the perspective of DSM-IV-TR are not consistent with mental retardation, are not consistent but they are consistent with real severe disabilities.  So all that I can do given what I have is

to say:  Look, this person has huge disabilities.  You can call it whatever you want to call it and get whatever IQ you have given me to an extent, you know, within a reasonable range.  And the real action that you have to be looking at is how is that person functioning, okay?

And so that's what I have.  I have sufficient data for cognitive functioning or dysfunctioning of this person or intellectual functioning in terms of problems and also social-based abilities.  And that's what I focused on because it doesn't mean that I -- the problem is that I don't have the IQ test.  But what I do have, and there's plenty of evidence, testing that shows that this person has cognitive deficits, frontal lobe problems, those kinds of things, problems in terms of how they're performing in school, all of those things.

And so the only thing that I can do is say: There's something here and what I'm going to have to use is cognitive disorder because I have no other choice, you know, in terms of either ignoring everything or saying:  You still have a problem here.  You gotta deal with this person.

Q.  Okay.  And cognitive disorder, the other -- well strike.

So under the DSM-V as you sit here today, under the DSM-V with the knowledge of all the deficits in adaptive functioning that you've discussed, with Dr. Weinstein's full-scale IQ scores, with the properly adjusted full-scale IQ score of Dr. Froming, is it your opinion to a reasonable degree of psychiatric certainty that Mr. Rodriguez meets the definition of "intellectual disability"?

A.   Yes, it does.  But I don't even have to have all of that data anymore, okay?  What I need to have is a substantial emphasis on describing the deficits, the lack of adaptation that those deficits bring, okay?  So that's really what it means.  And the IQ testing is not as significant as before.

So all I have to do is really look at this person with my experience and say:  Is this person really having these problems with deficits that may lead to the diagnosis of -- diagnosis of what used to be mental retardation, deficits, and is that true also now?

So there's no -- there's way less clear emphasis on IQ.  It's what that person is experiencing in terms of maladaptiveness deficits that you focus on. That's what clinicians do.  They see somebody having problems and they're going to act on the basis of, you know, what can they do for this person who's having real

serious problem.

MR. MONTROY:  Your Honor, could I have the Court's indulgence for one moment?

THE COURT:  You may.

MR. MONTROY:  Thank you, Dr. Silva.  Your Honor, I don't have any additional questions at this point.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Good morning, Dr. Silva.

A.  Good morning.

Q.  We met once before, correct?

A.  Yes, sure.

Q.  We had a deposition last summer; is that right?

A.  A little later probably or thereabouts.

Q.  If you would turn to your CV for just a second. It's Exhibit 73 I think.

A.  I'm looking at it.

Q.  I just have just a couple questions.  On the second -- excuse me, the third page Mr. Montroy asked you a couple questions about your forensic psychiatric experience.  You see that?

A.  Yes.

Q.   Okay.  And in No. 1 there you list your legal experience and you testified in court before, correct?

A.   Yes.

Q.   And then No. 2 you list criminal history, psychiatric-legal issues; is that right?

A.   Yes.

Q.   And then he read you a few of those I believe, criminal responsibility, cultural and racial factors, abnormal sexual behaviors, serial homicidal behaviors, correct?

A.   Yes.

Q.   Is there such a thing as serial rapist behaviors?

A.   Some people use that, sure.

Q.   And you've dealt with that?

A.   Did I account for that in here?  Did I put that in there?

Q.   Have you dealt with that?

A.   Yes.

Q.   Would that be part of abnormal sexual behaviors in your opinion?

A.   Yes.

Q.   And then you list in your report a number of interviews that you did.  I believe you interviewed Mr. Rodriguez, correct?

A.   Yes.  I did two interviews with him.

Q.   Pardon?

A.   I did two interviews with him.

Q.   Okay.  And that was in September of 2011, right?

A.   I think it was the 13th or 14th, something like that.  It's in my first page and I think that is not -- is not -- I'm looking here at page --

Q.   Page 2?

A.   -- page 2 and its not -- it is not 20.  It's the 13th and the 14th.

Q.   Okay.

A.   Okay?

Q.   Did you record your conversations with him at all?

A.   No.

Q.   Did you take any notes of your conversations?

A.   Yes, I took some notes and I also -- I performed some -- some specific schedules designed to diagnose mental disorders systematically.

Q.   Okay.  Have you provided them to counsel?

A.   They didn't ask for that.

Q.   Okay.  Was there anybody with you when you talked with Mr. Rodriguez at all?

A.   No.

Q.   And then the Table B there, as long as you're on page 2, you say you had telephonic interviews with

Delores, Rosa and Belia Flores, right?

A.    Yeah.

Q.    Okay.  Were those recorded or do you have any notes of those?

A.    No, they're not recorded.  I'm sure that I have some notes.

Q.    Okay.  And you didn't provide those to counsel either?

A.    They didn't ask for that.

Q.    Okay.  And I'm going to have you go very briefly to page 7 if you would.

A.    Page 7 of --

Q.    Of your report.

A.    My report.

Q.    Thank you.

A.    Sure.  I'm looking now at page 7.

Q.    Okay.  So you have there information in regard to Mr. Rodriguez and him having a big head, correct?

A.    Him having a what again?

Q.    A big head.  You talk about information --

A.    Yes.

Q.    -- you received?

A.    Yes.

Q.    And that's from his sister, Sylvia, correct?

A.    Oh, no, that's from -- actually information that

comes from many sources.

Q. Okay.

A. For example, my own -- my own history from the defendant himself, from the siblings, from the siblings, from other people that discussed the issue with the siblings. Also that information also comes from me because I actually measured his head.

Q. You measured his head?

A. Measured his head circumference which determines whether or not he actually does have an enlarged head.

Q. Where's that in your report, sir?

A. That will be -- that is going to be somewhere in the -- in the area. I don't have it in front of me but where I describe the results of the physical examination.

Q. Okay. Well, maybe we'll get to that.

A. Yes. But there you are going to find the actual numbers so that people can guide themselves with that and compare that with what I got, and if they want to challenge that they certainly can.

Q. Okay, thank you.

A. Sure.

Q. People have different size heads, correct?

A. Yes, they do.

Q. Okay. Turn to page 8. I believe when you were

testifying in response to Mr. Montroy you said that Mr. Rodriguez was placed in some type of therapeutic setting when he was young.  Do you recall that?

A.  Yes.

Q.  Where is that in the evidence?

A.  I think the -- in terms of the sources of information, for example?

Q.  Yes.  Where is that in the evidence?  Can you point --

A.  For example, it was listed in the report of Dr. Hutchinson.  For example, she mentions that.

Q.  Okay.  I don't recall seeing that.  Do you know where that is?  That's in her report you said?

A.  No, it's in the -- well, it's in the report of Dr. Hutchinson but it's also in my -- in my assessment of the defendant.  I asked him that same question and it was consistent with what Dr. Hutchinson said.

Q.  Okay.  All the evidence that we've heard so far indicates that it's possible that he may have gotten some help with learning his English.  Is that what you're talking about?

A.  No.

Q.  Okay.

A.  That's a very good question from my perspective.

Q.  All right.  Thank you.

A.    People do not --

Q.    Thank you.  And then there's -- I believe you mentioned in your testimony that his brother, Frankie Rodriguez, grew taller, correct?

A.    Yes.  He -- he grew -- I don't know how much taller but people say that he essentially grew taller than the defendant.

Q.    Okay.  And so you mention that on your direct testimony.  It's not unusual to have different size individuals within a family, is it?

A.    Not at all.  I think that's correct.  Not at all.

Q.    On your direct testimony, Doctor, you testified that Mr. Rodriguez really was a loner and wasn't able to socialize, didn't have any friends.  You recall that?

A.    Yeah.  I will say -- I will say that many people used the word "loner."  I'm going to be -- I'll be listing different terminologies here.  He was avoidant. He was isolative.  He tended to stick to himself.  As I said before, he would tend to eat on his own even when he was two, three years old to the point he would hide in his room.  All of those things are the crucial behaviors and terminologies and examples that I'm talking about, not the word "loner."

Q.    Did you receive Dr. Seward or Dr. Welner's reports in this case?

A.   Yes.

Q.   And did you receive their interviews of Mr. Rodriguez at all?

A.   The interviews by Dr. Welner?

Q.   Yes, and Dr. Seward?

A.   Dr. -- no, I received the -- I received the interviews of Dr. Welner and the transcripts of those interviews.

Q.   Okay.  Doctor, this is a transcript from a -- Mr. Rodriguez's interview with Dr. Seward.  It's been marked as Government's Exhibit 594.

We would offer 594, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No, Your Honor.

THE COURT:  594 is received.

MR. REISENAUER:  Thank you.  Your Honor.

Q.   (Mr. Reisenauer continuing)  And if we could, Doctor, I just want to direct you to part of these two pages.  In the middle of the first page, Dr. Seward asked:  "Did you have any other buddies back then that you'd hang out with?"

You see that question?

A.   Yeah.

Q.   And Mr. Rodriguez responds:  "Well Johny Rocha. I hanged out with him a long time and Rick Simmons

and Richie Simmons, Peter Cushman.  Peter is dead.  He died not very long ago."

Do you see that?

A.  Yes, sir.

Q.  And then he goes on to say:  "Yeah.  Yeah.  Yeah.  And who else?  And Gerald Nelson but he died too.  Harvey Nordberg."

You see that?

A.  Yes.

Q.  And at the bottom of the page he says:  "He sang pretty good.  Who else?  Who else?  What is his name?  I can't remember it.  Cruz Marino and Tom and Vincent Mendez, Angelo Mendez, Mark Diaz, Richard Diaz, Leonard Diaz, Jesse Espinosa, Andy Garcia, not Garcia, Mike Garcia and Andy ___ and who else?  Oh Albert de Leon and Ruben de Gal and what was that guy's name?  Peter.  No, not Peter.  What was his name?  Victor.  Victor uh, Victor de Leon, Sylvia de Leon. ___, Alex Mendez, Sylvia ___.  There was a whole bunch but a lot of them are dead you know passed away but a lot of them mostly, mostly passed away from cancer."

You see that?

A.  Yes.

Q.  Okay.  And then on the second page, sir, he goes on to say:  "And Rick, Rick Simmons he's probably about

two years older than me and Richie's about two years younger.  Cruz is about two years younger.  Who else?  Harvey Nordberg was probably four years younger and John ___, he's probably three years younger.  Uh, Andy - let's see, Leonard, he was probably six years older than me.  Jesse was probably eight years older."

          You see that?

     A.   Yes.

     Q.   And he goes on and says:  "And Sammy was probably six years older than me."  And further on down the page:  "Yeah.  Guys that I grew up with.  Guys that would by us booze.  Sammy would by us booze every weekend just about and who else?  God.  Who else?  And then there was girls that we hanged out with Gail ___, Darlene Quamme, Dorothy Dole, Gail Vagely, Marilyn Moe, Barb Moe, Pam Pester, Melody Albertson, Diane Micha, Marlene Micha, Linda Porter, Terry Sylvester, Darlene Quamme.  Who else?  Betsy Nelson, Lisa Lebow, uh, who else?  Oh, Cookie Midwaters, Marianne Greenoch, Donna, Donna Gilbertson, Delores Gilbertson, Daryl Gilbertson.  God.  I didn't think I could remember that many."

          Do you see that?

     A.   Yes.

     Q.   So there he lists a number of individuals, male, female, younger, older, that he hung out with that were

his friends, correct?

A.   No.   That's what he said.

Q.   That's what he said?

A.   That's what the defendant stated.

Q.   Yes.

A.   As I'm, you know, listening to you and reading the material, yes, that's what he stated.

Q.   Okay, thank you.  On page 11, if you'd turn to page 11, Doctor, on page 11 you say in the second paragraph there --

A.   Yes.

Q.   -- "Mr. Rodriguez stated that since childhood, he viewed himself as unappealing."

You see that?

A.   I'm looking at page 11, right.

Q.   Yes, page 11.

A.   And which paragraph are you talking about now? Unappealing, second one, paragraph two.

Q.   You see that?

A.   Mm-hmm.

Q.   Okay.

A.   Yes.

Q.   And then further down in the fourth paragraph, the first sentence, you write:  "He stated that he later learned that some of his concerns about being rejected

were not realistic."

Do you see that?

A.  That's right.

Q.  Okay.  Now when you were talking with Mr. Montroy here he asked you about the tremor that Mr. Rodriguez has had.

A.  Right.

Q.  And he's had that since he was young; is that right?

A.  That's correct.

Q.  Okay.  And you agree that that was an inherited thing.  He inherited that from his mother and father?

A.  I think that that is -- there is -- there's information to that effect.  I'm not necessarily going say that that's the only reason why he has the illness but I think it's a component.

Q.  Okay.  Well, his father had the tremor, correct?

A.  To a lesser extent.

Q.  And his sister has the tremor; is that right?

A.  To even a lesser extent.

Q.  Okay.  If you would -- do we have the other exhibits?  Doctor, I'm going to hand you two exhibits: Government's Exhibit 574 and then Government's Exhibit 577 (indicating).

A.  Sure.

Q.   I'm going to ask you a couple questions.

Exhibit 577 -- 574, excuse me, Doctor, is a report of an interview with a Gordon Tolbert; is that right?

A.   Yes.

Q.   If you look in the third paragraph there --

A.   Yes.

Q.   -- Mr. Tolbert had Mr. Rodriguez in shop class. You see that?

A.   Yes.

Q.   And in the middle of that paragraph it says:  "At the time, Rodriguez was a small, thin, good looking kid who looks much different today."

You see that?

A.   Yes.

Q.   Turn to the next exhibit if you would, Doctor.

A.   Yes.

Q.   And this is a report from the Minnesota Security Hospital.  You see that?

A.   Yes.

Q.   And if you turn to the second page on the middle of that page there says:  "Mental status examination." You see that?

A.   Yes.

Q.   And it says:  "The patient is a small man

appropriately dressed, and neatly groomed.  He is a rather good-looking man.  He is quiet in his manner, pleasant, cooperative and apparently frank and honest in the interview."

Do you see that?

A.  Yes.

Q.  There's nothing wrong with being quiet, is it?

A.  It depends how quiet.  If you're quiet to the extent that you cannot talk to most people, especially when he was younger, there is something really wrong like --

Q.  Well, there are many young kids who are quiet and shy when they're young; isn't that true?

A.  That is right.  Quiet but not like him.

Q.  Okay.  If you would turn to -- back to your report, Doctor, if you could.

A.  Yes.

Q.  And at the bottom of that page you say:  "History of Mr. Rodriguez's Interests and Activities."  You see that?

A.  We're looking at which page again?

Q.  Page 12, sir, at the bottom of the page.

A.  Yes.

Q.  Do you have listed "History of Mr. Rodriguez's Interests and Activities"?

A.   Yes.

Q.   And it says -- you write:  "A medical document from January, 1975, indicated that Mr. Rodriguez liked football and hunting, but didn't excel in any games or sports."

Do you see that?

A.   Yes.

Q.   And if you turn the page you go on to talk about his hunting, correct?

A.   Yes.

Q.   And fishing?

A.   Yes.

Q.   Okay.  And did you learn that Mr. Rodriguez learned how to go hunting from his father at any point?

A.   Yes.

Q.   Okay.  And so that's not an unusual activity, correct?

A.   No, of course not.

Q.   And the fact -- and are you aware that hunting is a very popular sport in this area where Mr. Rodriguez lived?

A.   I'm aware that that is the case actually.

Q.   Okay.  And you have no evidence that Mr. Rodriguez, in fact, didn't ever shoot a deer, do you?

A.   No.   That he never shoot a -- no.   His report is that he did shoot a deer.

Q.   Okay.   And you have no evidence that he didn't shoot one, correct?

A.   That's correct, because he said that he did.

Q.   Okay.   And you don't know how big the deer was if he did shoot one, do you?

A.   Say that again?

Q.   You do not know how big the deer was, do you?

A.   Oh, no, I didn't ask that question.

Q.   All right.

A.   He wasn't a very -- he said that it was smaller but didn't specify any more than that.

Q.   And you know that Mr. Rodriguez is a very tidy, clean individual; is that correct?

A.   He looks tidy, clean, and when I interviewed him he appeared that way.

Q.   Were you able to view the evidence in regard to this particular case that showed his room at the house he lived in prior to being arrested in this case?

A.   I don't recall that at this point in time, the details of that house, but I know that it's been said that he is a clean individual and tends to keep his room clean.   He said that himself.

Q.   Okay.

A.   And I believe him.

Q.   He told you that too, didn't he?

A.   Yeah, yes, yes.

Q.   You talked a lot about his schooling and his education when he was in the first few grades.  You recall that?

A.   He -- I talked about schooling, not just in the first few grades.  I talked about beginning the first grade until the ninth grade.

Q.   Okay.  Let me stop you there for a second.  When Mr. Montroy was asking you towards the end of your direct about the education and the grades, I believe you said that how he did in the first few grades was indicative of his intellectual disability.  Is that what you said?

A.   Yes.

Q.   Okay.  So if a person fails a couple times in the first couple grades, doesn't have good grades in the first few years of schooling, that doesn't mean that they're intellectually disabled, correct?

A.   That is part of evidence that he -- that somebody may be intellectually disabled and in his case that is what's going on.  So that evidence is supportive in his case.

Q.   Okay.  And isn't it true, Doctor, that in the

first few grades, the first, second, third, fourth grade, that he was a Spanish-speaking individual who was learning to speak English within the school system?

A.    He was trying to do that, that's right.

Q.    Okay.  And the same went for his sister, Sylvia; is that correct?

A.    And the same way for his sister, Sylvia, and also his other siblings.

Q.    Okay.  And his brother, Frankie, as well, correct?

A.    That's correct, yes.

Q.    And Mr. Rodriguez decided to quit school and not finish high school; is that right?

A.    Mr. Rodriguez quit school.

Q.    Yes.  Thank you.  Many, many, many people in the United States quit high school and don't complete high school; isn't that true?

A.    Yes.

Q.    And, in fact, his brother, Frankie, quit high school, dropped out of high school; isn't that true?

A.    Yes.

Q.    Let me -- let me jump forward for a second here. When Mr. Rodriguez -- after Mr. Rodriguez was arrested for the first two rapes that he was convicted on, he was sent to the Minnesota Security Hospital, correct?

A.   Yes.

Q.   And while he was there he completed either his GED or his high school diploma.  You know that, right?

A.   No.  I know that he might have completed his GED or his high school diploma because that had been verified.

Q.   Neither one has been verified?

A.   As far as I know, yes, as far as I know.

Q.   Doctor, I'm going to hand you what's been marked as Defendant's Exhibit D-64 (indicating).  This is further conversation with Mr. Rodriguez and Mr. -- and Dr. Seward.  I'll have you take a look at that.  If you would read that to yourself.

A.   The whole page here, right?

Q.   Yeah, if you'd just read it to yourself for a second there.

A.   (Witness complies.)  Yes.

Q.   Okay.  That conversation there entails Mr. Rodriguez informing Dr. Seward that he got his high school diploma; is that right?

A.   Where you reading now?

Q.   Well, here let me I guess walk you through it. On the third line, Dr. Seward asked him:  "Okay and did you ever go back to school?"

Mr. Rodriguez says:  "Yeah, when I was in

the security hospital."

The next line says:  "Was that a GED program?

And Mr. Rodriguez says:  "To tell you the truth I got a diploma."

A.  Yes, that's what he -- that's correct.  He said it to other people.

Q.  Okay.  And what you're telling us is that you never saw any documentation that he either got his GED or his diploma; is that right?

A.  Yeah.  The documentation should be a diploma that you can actually look at, not what he stated.  Where's the diploma, you know, piece of paper?  Did he actually get a diploma or a GED or high school --

Q.  And not what Mr. Rodriguez stated, correct?  Is that what you're saying?

A.  And Mr. Rodriguez stated that he did finish a GED.

Q.  Okay.  And so are you saying that in this instance at least we shouldn't rely on Mr. Rodriguez?

A.  I think that -- I think that he might have finished that, finished the GED, but I have no evidence for it.

Q.  Okay.  Doctor, I'm going to hand you what's now been marked as Government's Exhibit 595 (indicating).

It's a record from the Minnesota Security Hospital.

We would move in 595, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No, Your Honor.

THE COURT:  595 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Doctor, if you would I'm going to refer you down to -- towards the bottom of the page there, the sixth line up, it starts in the middle of that line a sentence:  "In the Team meeting..."  Do you see that?

A.  Yes.

Q.  It says:  "In the Team meeting, Mr. Rodriguez noted that he has almost completed his education, and he hopes that within approximately a six-week period to have achieved his GED."

Do you see that?

A.  Yes.

Q.  Okay.  That's a record from the state hospital; is that right?

A.  That's correct.

Q.  Doctor, I'm now going to hand you what has been marked as Government's Exhibit 596 (indicating).  This is a record from the "Department of Public Welfare, Special Review Board, In the Matter of Alfonso

Rodriguez, Jr."

Do you see that?

A.    You're looking at -- yes.

Q.    And these are findings and recommendations, you see that?

A.    Yes.

MR. REISENAUER:  We would offer 596, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No, Your Honor.

THE COURT:  596 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.    (Mr. Reisenauer continuing)  Doctor, if you would turn to page 2 of that document, and the top of the page would be Roman Numeral V.  That paragraph reads:  "The patient's treatment has consisted of small group therapy sessions four times weekly, classes on human sexuality, resocialization activity including dances, completion of his GED, participation in therapeutic community and participation in the residence assistance program."

Do you see that?

A.    Yes.

Q.    Okay.  So that indicates that he, in fact, did complete his GED, correct?

A.    You know, I would say that he might have

completed his GED.  Just like -- and I think that he might have but I have no evidence that he actually did.

Q.  Okay.

A.  And no one has given me evidence to that effect.

Q.  Okay, thank you.

A.  Sure.

Q.  This is the findings of a hearing officer.  Would you agree with that?

A.  Yes, yes.

Q.  Okay.  And if you turn to the first page, just for the record this -- these findings are dated December 6, 1978; is that right?

A.  (No response.)

Q.  It's on the fifth line down.

A.  Yes.

Q.  Okay, thank you.  Now, Doctor, if you would go back to your report if you would.

A.  Yes.

Q.  On the bottom of page 16.

A.  I'm there now.

Q.  In this area where you talk about Mr. Rodriguez reading books?

A.  Yes.

Q.  Okay.  And you testified about that on your direct examination, correct?

A.   Yes.

Q.   And I think you mentioned Harry Potter books, correct?

A.   For example, yes.

Q.   Did you discuss -- when you talked with Mr. Rodriguez about his book reading, did you discuss like the authors of the books or the themes, what the books were about or anything?  Did he give you any information about that?

A.   Yes, sure.

Q.   And he was able to do that?

A.   He was able to provide me with his interests and kinds of books that he liked to read.

Q.   Okay.

A.   Like war books, for example, like Harry Potter, for example.  Yes, he did.

Q.   Okay.  And the books that you discussed, had you read any of those yourself?

A.   Like Harry Potter, for example?

Q.   Yes.

A.   Sure.

Q.   Okay.  And so just, for instance, in the Harry Potter books was he able to -- did he understand the books?  Did he know what they were about?  Was he able to tell you about the characters in the books and the

themes of the books?

A.   He was able to talk a little bit about that, yes. He didn't go into great depth but definitely to me it was evident that he was able to read some of those books.

Q.   He was able to?

A.   Yeah.

Q.   Okay.

A.   Yes.  I said that before, yes.

Q.   Pardon?

A.   I said that before.  He was able to read those books.

Q.   And the books that you talked to him about, did you feel like those were remedial reading books like fourth grade level or --

A.   I think that from conversing with his sister there was some evidence that she would provide him with books that were relatively easier to read because he would understand them.  So from that perspective it looks like they were relatively easy reading.

On the other hand, he was able to read once again a book like -- some of the books like Harry Potter and which, you know, would require some patience and ability to read and interest.  And he was able to read books at that level and of that type.

Q.    Doctor, I'm going to hand you what's now been marked as Government's Exhibit 597 (indicating).  It is again further discussion with Dr. Seward and Mr. Rodriguez and contains a number of pages.

We would move in Government's Exhibit 597, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No, Your Honor.

THE COURT:  597 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.    (Mr. Reisenauer continuing)  And in Exhibit 597, Doctor, as I noted it contains a number of pages, I believe six or seven pages, wherein Mr. Rodriguez discusses with Dr. Seward books he's been reading.

A.    Yes.

Q.    And let's start on the first page there towards the bottom of the page.  Dr. Seward says:  "So what are you reading?"

Mr. Rodriguez says:  "Well, I read a lot of stuff.  Right now, I'm reading Web - Web Griffin."  And Mr. Rodriguez says:  "Heard of him?"

Dr. Seward says:  "Um, yeah, remind me though.  What's the genre?"  And he uses the word "genre," doesn't he?

A.    Yes, that's right.

Q.   And Mr. Rodriguez says:   "He mostly writes about spies, the army, the marine corps, the police, the CIA."

Dr. Seward says:   "Yeah."

Mr. Rodriguez says:   "Uh, what else does he write?"  He's thinking.   "Oh, he writes uh - yeah, that's about it.   That's all that he writes."

Dr. Seward says:   "So Web is like initials. Like W-E-B."

And Mr. Rodriguez says:   "W-E-E-B."

Dr. Seward says:   "Oh, okay."

And Mr. Rodriguez on his own says:   "I don't know, that's all it is.   Doesn't even give his real name for the initials but could probably be William something.   But there's probably like one of the series is called *Honor Bound*.  He had four books on that series, and then there's another series that he writes. It's called *The Brotherhood of War*, and he has - let's see, *Lieutenant, The Captain, The Major, The Colonel, The Aviator, The Berets, The General, The New Breed*, and the - he has another book.   I can't remember it now. The other one is called *The Corps*, and he has probably about 22 books on that series."

You see that?

A.   Yes.

Q.   Did he discuss those books with you?

A.  He didn't discuss those books with me but he mentioned those types of books.  He enjoyed books that have to do with war, with history.  He also mentioned that he -- that there were books that come in a series. Sometimes -- and, you know, he definitely said that he enjoyed following one book after another and he mentioned all of that.

Q.  Okay.

A.  So essentially a lot of what you're pointing to me.  Yeah, he's mentioned that he read books and more than one book and was related to each other in a series.

Q.  Okay.  Then in the middle of that page Mr. Rodriguez says:  "He - you would call, uh, a right-wing fanatic because he writes about - he has one series called the Ash Series."

Dr. Seward says:  "Ash?"

Mr. Rodriguez says:  "Yeah.  It's about the end of the United States.  You know?  Everybody - there's a nuclear war, and the survivors, all the books are about the survivors.  You know?"

You see that?

A.  Yeah.

Q.  Turn to what would be -- if you would, on the top of the page there's page numbers.  Turn to page 15.

A.  Yes.

Q.   Up on the top of the page it should say "Page 15."  See that?

A.   Yeah.

Q.   Okay, thank you.  Towards the bottom see where Dr. Seward says:  "And so you don't go through them all at once."

Mr. Rodriguez says:  "Yeah, like right now, I got - I'm reading four series.  I got - I got *The Blood Honor*.  I already read that."

Dr. Seward asks:  I'm sorry, the -

And he says:  "*The Blood Honor*."

"What's that?"

He says:  "*Honor Bound*."

And then he goes on on the bottom of the page to say:  "Yeah and then the brother - I got all the *Brotherhood of War* - all the books.  I got them, and I got most of the *Ash* books.  I got the *Gunfighter* series all done.  And I got half of the *Mountain Men* series.  I also read Ross.  Have you ever read him?  He wrote *Independence*."

That's on the next page there.  You see that?

A.   Yes.

Q.   Okay.  And then on the third line he says:  "It's Dana Fuller Ross I think."

Dr. Seward says:  "Yeah, I don't know.  Yeah."

Mr. Rodriguez says:  "He wrote all the state books, like - like, uh, *Independence* was the first book and then it was *Wyoming, Washington, Montana, South Dakota*, all the states."

Dr. Seward says:  "Are these like kind of historical novels?"

And Mr. Rodriguez says:  "Yeah, it's about five families."  And then he goes on to say:  "And Yates, John Yates, remember *The Bastard*?  The book *The Bastard*?  They made it into a movie."

Dr. Seward says:  "No, I don't remember that."

A.  I see that.

Q.  Okay.  And then finally towards the bottom of the page Mr. Rodriguez says:  "It's about a family back in the 16 - 1600s.  It's called *The Kent Chronicles*.  It's about the family Kent."

Dr. Seward says:  "Kent."

And he says:  "Yeah."

"In England or something?"

And then Mr. Rodriguez goes on and says: "Well, the - the father of this guy, he was a lord England, but his mother was a French actress, and he was

born in France.  And at the beginning, that's where the bastard is.  He's trying to reclaim his - his, uh, his father to accept him.  And the whole thing comes up that, uh, they go to England, and the mother goes to the house, the Kent mansion and proclaims that this is his son, but he never talks to - they tell her - the wife tells her that the father is dead, and so they try to kill them."

And he continues on the next page and talks about *The Kent Chronicles* and *The Bastard* and *The Rebel* and *The Furious*.  Do you see that?

A.  Yes.

Q.  So would you agree that it appears that he read numerous books and he understood the themes of the books and what they were about?

A.  I would say that he has read -- he has read many books as I mentioned before but I also will cast reservation on exactly how well he knew the -- and understood the books.  He certainly improved in terms of developing an interest in books, especially when you arrive to jail to spend that many years.  All that I agree with.

But I also -- I also cannot say that he has great understanding of a lot of those books.  There's no way I can really tell you that.  All I know is that he

has improved.  And, by the way, I also know that people that have mental retardation can read, can read books of that sort in over a period of, say, 25 years or whatever the amount of years he spent there.  He I'm sure read many of those books.

Q.  Okay.

A.  It doesn't change the diagnosis of mental retardation or ID at all.

Q.  Thank you, Doctor.

A.  Yes.

Q.  Go back to your report.

THE COURT:  Are you moving away from books at this point because --

MR. REISENAUER:  I am, Your Honor.

THE COURT:  Let's go ahead and break at this point.  We'll break till 1:15.

(Recess taken; 12:00 p.m. to 1:15 p.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that the defendant's waived his appearance.  All of his counsel of record are appearing along with the counsel for the United States.

When we broke Dr. Arturo Silva was on the

stand and Mr. Reisenauer was conducting a cross-examination.

Mr. Reisenauer, you may proceed.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Doctor, let's go back to page 16 of your report.  I think that's where we left off.

A.  I'm there.

Q.  Okay.  Excuse me?

A.  I said I'm looking at page 16.

Q.  Do you have a binder in front of you?  What's that, Doctor, that binder there?

A.  What is this binder?

Q.  Yeah.

A.  Oh, this is my copy of my -- my copy of my report for -- my own copy.

Q.  Oh, okay.

A.  And this one is the copy.

Q.  Got you.  I was just wondering.  Thank you.

So on the bottom of the page there, Doctor, you have a heading called "Family's Educational History."  Do you see that?

A.  Yes.

Q.  And if you turn the page you talk about his brothers and sisters and their educational history,

correct?

A.   Yes.

Q.   And there you have Sylvia and some IQ scores of hers when she was younger, correct?

A.   Yes.

Q.   Okay.  And then you say that her school records show that she made several F's throughout her academic career though she made mostly C's and D's, right?

A.   Yes.

Q.   And then you have that she did graduate from high school.

A.   That's listed in there, yes.

Q.   Okay.  And you know that she became a public relations person in Washington, DC?

A.   That's my understanding.  That's about all I know.

Q.   So despite her F's in grade school or high school, she graduated and became successful in public relations, correct?

A.   Despite having some of those grades, that is correct.  That is what she did.

Q.   Okay.

A.   And was able to do.

Q.   And then the next paragraph there, Doctor, you talk about his brother, Frank.  Do you see that?

A.   Yes.

Q.   Okay.  And there is some IQ scores there as well; is that right?

A.   Yes.

Q.   Okay.  And so there he has -- you have listed an IQ of 76 and up to 93 and then down to 77, right?

A.   Yup.

Q.   So a person can't do better than they're capable, correct?

A.   He can do better than he's capable or cannot?

Q.   Cannot.  You can only do as good as you can do, right?

A.   Well, it depends on what you're looking at.  You know, people are complex people.  They have all different abilities and sometimes, yes, you'll be able to do better.  Other times you will not.  But overall you will stay in the same range.

Q.   Okay.  But if you have an IQ of 93 on one test and 77 on another, that reflects a number of things.  But you can't do better than you're capable on an IQ test, can you?

A.   I think that you can score different in different IQ testings, but when that happens you have to call into question what is actually going on.

Q.   Okay.

A.    That's really crucial.  When I look at something like a differential of 20 points, you have to start asking questions:  What is actually going on with the testing?  What actually took place?  All of those things have to be taken into account.

Q.    Okay.  In terms of Frank, he also was held back in the first grade, correct?

A.    That's correct.

Q.    Okay.  And he received C's, D's and F's and failed 11th grade and then quit high school as well, correct?

A.    Yeah, that's right.

Q.    Okay.

A.    He did better.

Q.    Let's move on to page 20 if we could, and on page 20 you talk about his history of head abnormalities, correct?

A.    Yes.

Q.    Okay.  At some point you -- you asked or believed that Mr. Rodriguez may have a Chiari malformation; is that right?

A.    I have said before that he has a Chiari Syndrome.

Q.    Okay.  And you suggested some testing in regard to determining whether he had an Arnold Chiari malformation, correct?

A.    Initially, yes.

Q.    And that was done.  You have knowledge of that, right?

A.    Yes.

Q.    Doctor, I'm going to hand you what's been marked as Government's Exhibit 598 (indicating).  You've seen that before?

A.    Yes, I have.

Q.    Yes.  And these are the test results of Mr. Rodriguez, correct?

A.    For his MRI head scan.

MR. REISENAUER:  Thank you.  We would move 598, Your Honor.

MR. MONTROY:  No objection, Your Honor.

THE COURT:  598 is received.

Q.    (Mr. Reisenauer continuing)  So, Doctor, a Chiari malformation basically occurs in the second or third decade of life; is that right?

A.    No.  It can -- on the contrary.  People think that Chiari malformation is very early happening in life.

Q.    Okay.

A.    It's discovered later many times, way later.  But what people think it's essentially a problem that people are born with.

Q.   Okay.   And in this particular case as you indicated Government's Exhibit 598 is the MRI results of Mr. Rodriguez, correct?

A.   Yes.

Q.   And the purpose was to determine whether or not he had the Arnold-Chiari malformation, correct?

A.   Correct.   I suggested that, yes.

Q.   And it also is able to determine whether or not a person has hydrocephalus, correct?

A.   Oh, you do an MRI head scan?

Q.   Yes.

A.   Yes.

Q.   Okay.   And the results of this MRI on Mr. Rodriguez indicate that he does not have a Chiari malformation, correct?

A.   No.   What they're stating is that if the person does not have a cerebral herniation of five millimeters he doesn't have a Chiari malformation.

Q.   Okay.

A.   But that is not exactly correct.   In fact, it is not correct at all.

Q.   This report indicates that the findings do not constitute a Chiari malformation; is that right?

A.   That's what the report says.

Q.   Okay.

A.   I disagree with that statement.

Q.   You didn't do the MRI, did you?

A.   That's correct.

Q.   Did you read the MRI?

A.   Yeah, I had the MRI results.

Q.   And you disagree with the results that are stated in the report?

A.   No.  I disagree with this -- with what a malformation is in this instance.  He has cerebellar herniation, period.  That is different than saying whether or not he has a Chiari malformation of five millimeters.  It really doesn't matter for the purposes for which I send the report.  The question is -- the answer is:  He has cerebellar malformation and that's the bottom line that I was looking for and it is there.

Q.   Isn't it correct that the report basically says that there's no herniation that has taken place?

A.   No.

Q.   Okay.

A.   No, not at all.  Not at all.

Q.   Okay.  There's no evidence of hydrocephalus as a result of the MRI; is that correct?

A.   That's correct.

Q.   You don't disagree with that conclusion?

A.   No.

Q.   You also suggested that it's possible that Mr. Rodriguez suffered from what is called Fragile X Syndrome; is that right?

A.   The only place where I heard that statement being made is the report by Dr. Welner when he stated that either Dr. GREES-man (phonetic) or Dr. Silva, he wasn't sure, stated that I had -- that they had asked for a Fragile X testing and the answer to that is Dr. Welner's report is wrong.  I never made any comment about Fragile X and so the question regarding me is completely incorrect.

Q.   Okay.  So maybe I misspoke.  There was a test for Fragile X, are you aware of that?

A.   That's what I understood.

Q.   Okay.  And you're aware that Mr. Rodriguez does not have Fragile X Syndrome; is that right?

A.   That's what I understand, that's correct.

Q.   Okay, thank you.  So if you would next turn to page 33 of your report, Doctor, --

A.   Sure.

Q.   -- just briefly.

A.   Yes, I'm there now.

Q.   Okay.  And on that page you have a section called "History of Posttraumatic Stress Disorder Symptoms and Related Psychopathology," correct?

A.   Yes.

Q.   If you go to the last paragraph there of that section --

A.   Yes.

Q.   -- the first sentence says:  "Mr. Rodriguez denied any visual recollections of his past sexual abuse."  Do you see that?

A.   Yes.

Q.   Then turn back to page 28 if you would.  Just let me know when you get there.

A.   I'm on page 28.

Q.   Okay.  And here on this page in Section 7 you have something listed, "Psychosexual History," correct?

A.   Yes.

Q.   And here you have recited a list of prior sexual abuse of Mr. Rodriguez, correct?

A.   Yes.

Q.   Okay.  And if you would just go down to that first paragraph, there is mention that Mr. Rodriguez's older sister remembered he was abused when he was four, correct?

A.   Yeah.

Q.   And he has no recollection of that; is that right?

A.   You know what -- my opinion is that he has the

recollection of that.  That's my opinion.

Q.  Okay.  And then the second one is -- well, he has no recollection of that, correct?

A.  And the second what?

Q.  The second incident, he has no recollection of that one either, right?

A.  The one where the young woman engaged --

Q.  Yeah.

A.  I think he has some -- he has some recollection of that event.

Q.  Okay.  You believe he does on that one?

A.  Yeah.  I think there is some indication that he has some recollection.

Q.  Okay.  So if he told other people he didn't recall that one, that would be different than what he told you or what you believe?

A.  No.  He has -- he has a recollection of that.

Q.  Okay.

A.  Including the smell of -- the smell of Lemon Pledge and also recollection that it was a young woman who --

Q.  I think that's the third one you're referring to. Look at the third paragraph.

A.  Okay.

Q.  The third paragraph says:  "Mr. Rodriguez was

also molested in the summer of 1959 at an overnight church camp by a female college student."

A.   That's the one that I was referring to.

Q.   That's the Lemon Pledge one, right?

A.   Yes.

Q.   Okay.

A.   So you're asking me about when it begins:  "When Mr. Rodriguez was around six years old"?

Q.   Well, the one right before that, yes.  He doesn't have any recollection of that one either, correct?

A.   Oh, he does.  He does have some recollection.

Q.   Okay.  Well, let's go to the paragraph you were just talking about, the one where he says he was molested by the female college student.

A.   Yes.

Q.   And you have a paragraph there about what he told you.  He recalled that she comforted him and then kissed him and had him place his hand on her breast and laid next to him and put her hand in his pants and rubbed against him.  Do you see that?

A.   Yes.

Q.   So he does have a visual recollection of that; is that right?

A.   He has a visual recollection of that.

Q.   Okay.

A.    Which is different than what I was referring to in the other statement of recollections.

Q.    Okay.  Well, you clearly said in that statement: "Mr. Rodriguez denied any visual recollections of his past sexual abuse."

A.    Now we're looking at --

Q.    Page 33.

A.    Yeah, page 33, here we go, page 33.  And that statement there to clarify for you -- and this is very reasonable to ask -- to ask that question in my opinion.

Q.    No, that's fine.

A.    I am referring to flashbacks, visual flashbacks. That's what I'm referring to.  But I called it visual recollections from that perspective so I'm clarifying that.

Q.    All right.  Thank you.

A.    Yes, sir.

Q.    Let's move on to page 34 then if we could.  On this page here, Doctor, when Mr. Montroy was asking you questions you were talking here about the last paragraph here, about some obscene phone calls that apparently had been made while he was at the Minnesota Security Hospital, right?

A.    Yes.

Q.    Okay.  And you said that Mr. Rodriguez told you

that he had never made the phone calls but he did admit to them when the staff was questioning the people in the group, correct?

A.   He made the statement that he had made -- that he had made those calls but he also stated that he did not make those calls.

Q.   Okay.  He told you he didn't make them but he told them that he did; is that right?

A.   That is correct.

Q.   Okay.

A.   That's what he told them.

Q.   Okay.  And you're aware that when he was younger when he was in high school that he, in fact, had been making obscene phone calls to people?

A.   Definitely.

Q.   Okay.  It wouldn't surprise you that he, in fact, had made these then.

A.   No, because actually the people -- from what I understand he did not -- he did not -- he did not -- he did not state that he actually -- at least to me that he had actually made those calls.  And he also stated that there were no consequences because the staff realized that he had actually taken the blame because he wanted to leave the area.

So unless I find evidence that he was

actually the one person who did it, according to the staff I have to keep the same opinion that I have; namely, that he wasn't the person who did it.  He's the person who said "I did it" so that they could let him go and allow him to go to sleep.

Q.   Okay, thank you.

A.   Yes.

Q.   Let's turn to page 37 if you would.

A.   Yes, sir.  I am there, sir.

Q.   Okay, thank you.  Now this you title, at the bottom of the page, "The Capital Offense;" is that right?

A.   Yes.

Q.   And on the second paragraph you say:  "He described the day when Miss Sjodin died."  Do you see that?

A.   Yes.

Q.   And you say:  "He found himself walking in a mall.  He had no interest in meeting anyone and no desire to abduct or rape anyone."  Do you see that?

A.   Yes, that's true.

Q.   Is that what he told you?

A.   That's what he stated.

Q.   Okay.  But you know for a fact that he had raped other people prior to this, right?

A.   He had engaged in sexual attacks, yes.

Q.   Pardon?

A.   Yeah.   He was engaged in -- he engaged in sexual attacks.

Q.   Okay.   Did you talk to him at all about his prior offenses?

A.   Yes.

Q.   Did he tell you why he had committed those offenses?

A.   Well, there were different explanations for the offenses.

Q.   Do you recall why he raped Shirley Seddon?   What did he tell you?

A.   Okay.   That's the first one?

Q.   Yes.

A.   I'm just looking at the notations that I have here, 1974.

Q.   Pardon?

A.   1974, page 29.

Q.   Page 29.

A.   Yes.

Q.   Okay.   Did he tell you why he raped her?

A.   He told me what took place, okay?

Q.   Okay.

A.   That's what he told me.   This is what he said.

He stated that he met her in a bar and he knew -- he had known her before and that eventually he was able to negotiate a ride to his home by her and that at some point he engaged in conversation in which she said to him why didn't you date me, ask me for a date when we knew each other, you know, in previous times?  And he also stated that he -- essentially that when he heard that he interpreted that she was still not being honest with him and she was still being disrespectful of him as when they knew each other before.  So that made him angry because he said:  She's not being honest.

And at some point he stated that he asked her to have sex with him, which she consistently refused.  Then after a while he engaged in -- against the will of the young lady in sexual behaviors, not rape per se but essentially engaged in asking her -- essentially telling her to give him oral sex, which she did.

Q.   Okay.  Let me stop you there and go back for a second.  So she asked him how come he didn't ask her out when they were in high school?  That's what you said, right?

A.   Yes.

Q.   And he got upset about that?

A.   He certainly got upset about that because he

thought she was being dishonest.

Q.  Okay.  I'm going to hand you what's been marked as Government's Exhibit No. 599, Doctor (indicating).  This is a two-page transcript of Mr. Rodriguez's conversation with Dr. Welner.

A.  Okay.

MR. REISENAUER:  Okay.  We would offer 599, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  I'm sorry, Your Honor, no objection.

THE COURT:  599 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  And, Doctor, if you would at the very top there Dr. Welner asked Mr. Rodriguez:  "Were there other experiences that you remember that didn't have anything to do with race, of people hurting you?"

And he says:  "No, everything was about race, with me, anyway."

Do you see that?

A.  Yes.

Q.  And then he goes on to talk about Shirley Seddon.

A.  Yes.

Q.  And Dr. Welner asked if he knew he was going to

have sex with her that night when they were in the bar. Do you see that?

A.  Yes.

Q.  And then down below here just a couple lines Mr. Rodriguez says:  "I didn't have sex with her."

And Dr. Welner says:  "But I understand that, but my point is that you saw her in the bar and you intended to have sex with her that night."

And he says:  "Yeah, yeah."

And then the doctor asked in the second line there:  "Did you think she would have sex with you?"

Mr. Rodriguez says:  "I wasn't going to ask."

And he says:  "Pardon?"

And he says:  "Wasn't going to ask."

And Dr. Welner says:  "I don't understand."

Mr. Rodriguez says:  "Wasn't going to ask her if she wanted to have sex."

And Dr. Welner asked:  "Had you had that experience before of just having sex with someone without asking?"

And Mr. Rodriguez says:  "No, I was going to take it."

Do you see that?

A.  Yes.

Q.   If you turn the page, Mr. Rodriguez up on the top of the page says:  "I had hate in my heart for her. That's all I had.  I didn't care about the sex.  I didn't have sex with her.  I just wanted her humiliated the way she humiliated me, and so that's all it was."

Do you see that?

A.   Yes.

Q.   "So we didn't finish - she tried - I told her to give me a blowjob."

Do you see that?

A.   Yes.

Q.   And then if you go down towards the bottom of the page, Doctor, Dr. Welner asked:  "What did you think was going to happen then?"

And Mr. Rodriguez says:  "Huh?"

And Dr. Welner says:  "What did you think was going to happen, um, before you shut the car off? How did you think it was all going to go down?"

And Mr. Rodriguez simply says:  "That I was going to rape her.  That's it."

A.   Yes.

Q.   Do you see that?

A.   Yes.

Q.   Let's go back to the description of the day that Ms. Sjodin died in your report, page 37.  And again you

said that he told you "He had no interest in meeting anyone and no desire to abduct or rape anyone," correct?

A.   That's what he said.

Q.   Okay.  And then after he -- if you turn the page, Doctor, to page 38.

A.   Yes, sir.

Q.   On the last paragraph of that section you start: "He stated that he never intended to have sexual intercourse with her."

A.   Yes, I'm there.

Q.   And he told you that?

A.   That's what -- these are his statements, yes.

Q.   Okay.  Doctor, this is Exhibit 600 (indicating). This is another part of the same transcript with Dr. Welner.

We would offer 600, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  I'm sorry, Your Honor.  No objection.

THE COURT:  600 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  If you would, Doctor, in the middle of that paragraph -- of that page there's a full paragraph beginning with the word "Because."  Do you see that?

A.  Yes.

Q.  And this is Mr. Rodriguez.  He says:  "Because the parking lot was completely full, I had to park way at the edge, far away from the mall so there was still a lot of people.  When I took her to my car there was a few people.  I don't know why she didn't say anything, you know, and I sat her in my back seat and I got in the front seat and I went to a different part of the mall, the - what was the name of that one - Sears, Sears parking lot.  There wasn't that many cars there.  I got into the back seat with her and I laid her down in the backseat and took off her pants and her panties and I was gonna rape her, you know."

You see that?

A.  Yes.

Q.  Okay.  So he told you he had no interest in that but he later told Dr. Welner that he was going rape her, correct?

A.  That's correct.

Q.  Okay.  Now, Doctor, you reviewed Dr. Hutchinson's report in this case?

A.  Yes.

Q.  You earlier testified that -- I believe that you found that Mr. Rodriguez suffered from PTSD; is that correct?

A.   Yes.

Q.   And Dr. Hutchinson similarly found that, do you remember that?

A.   Well, I don't know about similarly.  I know some with PTSD.

Q.   You both diagnosed him with PTSD, correct?

A.   Yes.

Q.   And you know that she testified to that effect at the time of trial?

A.   Yes.

Q.   Okay.

A.   That's my understanding, yes.

Q.   And you also know that she did not determine that Mr. Rodriguez was mentally retarded at the time?

A.   Yeah.  She did not do that, yes, sir.

Q.   And if I could I don't know if -- -- I'm going to hand you what's been marked as Defendant's Exhibit 1, Doctor (indicating).  Are you familiar with that book?

A.   Yes.

Q.   And that is the 10th Edition of the AAMR; is that correct?

A.   Yes.

Q.   And if you would turn to the copyright page I believe this is copyrighted 2002 so this was in effect in 2006, correct?

A.   Yes.

Q.   Okay.  And if you would turn to page 1.

A.   I'm looking at Chapter 1, page 5 --

Q.   No.  Just go to page 1 if you would.

A.   Here we go.

Q.   There you go?

A.   Yes.

Q.   That box there, that defines what "mental retardation" is, correct?

A.   This is their definition --

Q.   Yes.

A.   -- of "mental retardation" according to this book.

Q.   Right.  And this was the AAMR definition of "mental retardation" at the time; correct?

A.   Yes.

Q.   And it reads:  "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills.  This disability originates before age 18," correct?

A.   Yes.

Q.   Okay.  Earlier Mr. Montroy asked you about the DSM-V that is in existence today, correct?

A.   Yes.

Q.   And if you -- I'll hand you what's been marked as Government's Exhibit 525 (indicating).  This is a part of the DSM-V manual that Mr. Montroy was asking you about.

A.   Yes.

Q.   On the third I page here is reference to page 33. You're familiar with that, correct?

A.   Yes.

Q.   And that is the DSM-V.  This is the manual that in essence is the one that you follow today, correct?

A.   Yes, that's correct.

Q.   Okay.  And there "intellectual disability" rather than "mental retardation" is defined as:  "A disorder with onset during the developmental period."  That's similar to the age 18, correct?

A.   Yes.  It begins early.

Q.   Okay.  And this just says, "onset," correct?  You don't just use everything that happened before age 18 to make the determination, correct?

A.   No.  You can -- not onset.  You can -- you can have a diagnosis of intellectual disability earlier than that.

Q.   Right.  So but my point is that you have to look at items to show that it occurred prior to 18, correct?

You can't make a determination that somebody at 45 became intellectually disabled.  That would be a different problem.  Let's say somebody gets in a car accident and they need support, right?  That is not intellectual disability.

A.   No.  You've got to look at longitudinally what took place.  If there's evidence that this person has been diagnosed with mental retardation and at, let's say, an age less than 18 and then you find that there is another assessment at age 50, for example, you have to take into account both sources of information.  In fact, if you don't do that there's really serious problems with your diagnostic approach.

Q.   Okay.  And so let's continue reading that sentence.  And it "includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains."

A.   Yes, the three domains.

Q.   Okay.  And that is similar to the first -- the first document in the book that you looked at, correct?

A.   Well, it just depends how you conceptualize everything.  But I'm using -- in this instance I'm using DSM-V to make the diagnosis.

Q.   Okay.

A.   I am.

Q.   Okay.  I understand that because this is the book that is in existence now, correct?

A.   That's correct.

Q.   Okay.  Go down to subsection B there that talks about "Deficits in adaptive functioning..."  Do you see that?

A.   Are you looking at the red book again?

Q.   No, on the DSM-V?

A.   Okay.  I'm looking again at page 33?

Q.   Yup.

A.   Yup.

Q.   Sub B talks about deficits in adaptive functioning, right?

A.   That's right.

Q.   And the second sentence starts:  "Without ongoing support..."  See that?

A.   Yeah.

Q.   So an individual has to have ongoing support to meet this adaptive functioning deficit subsection; is that right?

A.   No.

Q.   No?

A.   You know, no.  All that it means is that you are assessing the deficits of the individual.

Q.   Yes.

A.   That's all that it means, okay.

Q.   And it says:  "Without ongoing support..."
correct?

A.   That's what it says.

Q.   Okay, thank you.  Doctor, let's turn to page 76.
We'll jump way ahead here.

A.   Seventy-six --

Q.   Of your report.

A.   Of my report.

Q.   This is a part that you talked about earlier in
your report and then you talked about it with
Mr. Montroy.  And here you talk about it again on page
76 and this has to do with Mr. Rodriguez's hunting and
his martial arts ability.

A.   Yes.

Q.   So I don't want to belabor this too much but it's
correct that Mr. Rodriguez told Dr. Pitt that he knew a
little bit about martial arts, right?  Do you remember
that?  He told him --

A.   He mentioned that to Dr. Pitt, yes.

Q.   That he knew a little bit, correct?

A.   That he knew some, yes.

Q.   He didn't tell them he was like a black belt in
karate or anything, did he?

A.   No, he didn't say that.  But he did state to me

that he had the capacity to attack people and he was well able to take people on that were clearly apparently stronger than him.

Q. Okay.

A. That was the impression that I got.

Q. He said to Dr. Pitt that he knew where to hit people if he was trying to get away from somebody, right?

A. Yes.

Q. Okay. And in your report you made a point of saying that he told Dr. Pitt that he could decapitate somebody. Do you remember writing that in your report?

A. Yeah.

Q. Okay.

A. In whose report?

Q. In this report.

A. In my report?

Q. Yes.

A. Where?

MR. MONTROY: I would just object and ask Mr. Reisenauer to point out exactly where that's located.

THE COURT: It might be helpful if you would just point to the general area.

MR. REISENAUER: I will, Your Honor.

Q.   (Mr. Reisenauer continuing)  Turn back to your report at page 12, Doctor.

A.   Yes.

Q.   Actually it's on page 13.

A.   Yes, sir.

Q.   That first full paragraph where you talk about Mr. Rodriguez and Dr. Pitt's conversation.

A.   Yes.

Q.   And you write that he told Dr. Pitt:  "Because that's the best place you could decapitate somebody to stop 'em, you know."  You see that?

A.   You're looking at the first paragraph?

Q.   Would be the second paragraph.  It starts: "Mr. Rodriguez told Dr. Pitt..."

A.   Yeah, that's right.

Q.   Okay.

A.   That's right.

Q.   You don't believe that he actually meant decapitate.  In other words he misused the word.  He meant incapacitate, correct?

A.   Yeah.  I think that in all likelihood that it was something else.

Q.   Okay.

A.   I wouldn't spend a lot of time thinking about it because essentially, yeah, that was a mistake.  That's

all.

Q.   He never said he could decapitate somebody?

A.   I never found any evidence that he was in any way, shape or form thinking about decapitating.

Q.   Okay, thank you.

A.   Sure.

Q.   So let's go back.  I apologize for mixing you up there.  Page 77.

A.   I'm there.

Q.   Okay.  In the middle of that page you have a very short subsection called "Sexual Fantasies."  Do you see that?

A.   Yes.

Q.   You write:  "Mr. Rodriguez stated he does not have a history of engaging in sexual fantasies in which he derives pleasure as a result of sexually attacking women or otherwise sexually coercing women."

Do you see that?

A.   Yes.

Q.   Okay.  And then you write:  "Although he denied these fantasies, there is some evidence in the records which mentions that Mr. Rodriguez suffered from rape fantasies."

A.   Yes.

Q.   Okay.  And do you know what evidence you were

referring to that indicated that he did suffer from that at all?

A.   Yes.  Well, not from me but from other -- I'm only stating that other people thought or may have thought that he was involved in making -- in engaging in rape fantasies.  That's about all.

Q.   Do you recall who that was?

A.   No.  I mean, I don't recall at this point who it was but it was only by way of other people --

Q.   Okay.  Well, let's --

A.   -- stating that.  But not me and I cannot tell you about me on that.

Q.   You don't recall who that was?

A.   Right.  I'm not -- I'm not -- I know that Dr. Pitts [sic] talked about that possibly that but that's about it.

Q.   Well, let's -- maybe I can help you.  I'm going to hand you what's been marked as Defendant's Exhibit 26 (indicating).  This is Dr. Hutchinson's report.  You've seen that, right?

A.   Yeah.

Q.   So if you would just turn to page -- it would be page 23 of her report.

A.   Yes.

Q.   And the last paragraph there, you see that?

A.  Yes.

Q.  It says:  "Mr. Rodriguez reported a long-standing preoccupation of sexual thought.  He reported very contradictory ideas:  (1) once he was in a relationship, sexual activity was not that important to him and he was angered by women's desire for him..."

Do you see that?

A.  Yeah.

Q.  Okay.  You were aware of that?

A.  Yes, yes.

Q.  And then No. 2 says:  "A long-standing habit of sexual fantasy regarding women that he would see in public.  They were usually tall and blonde."

Do you see that?

A.  Yes.

Q.  Were you aware of that?

A.  Yeah, I read that.

Q.  And do you recall that Dr. Hutchinson testified to that at the time of trial as well?

A.  I don't recall that right now whether he testified or not.

Q.  Doctor, I'm going to hand you Government's Exhibit 601.  This is a transcript from Dr. Hutchinson's testimony at trial (indicating), transcript page 7996.  And, Doctor, at the top there Dr. Hutchinson says:

"Another finding in his mental status is that he has very confused sexuality and a sexual pre-occupation."

You see that?

A.   Yes.

THE COURT:  Do you intend to offer 601?

MR. REISENAUER:  I do, Your Honor.

MR. MONTROY:  No objection, Your Honor.

THE COURT:  601 is received.

Q.   (Mr. Reisenauer continuing)  Doctor, are you aware of something called the Y-BOCS Symptom Checklist?

A.   Which one again?

Q.   The Y-BOCS Symptom Checklist?

A.   I don't recall.  Maybe if I see that but I don't --

Q.   Okay.  You don't recall seeing that or reviewing that in regard to Dr. Hutchinson's examination?

A.   No, I don't recall that.

Q.   Okay.  I'm going to hand you what's been marked as Government's Exhibit 602, Doctor (indicating).

We would move 602 into evidence, Your Honor.

THE COURT:  Any objection?

MR. MONTROY:  No objections, Your Honor.

THE COURT:  602 is received.

Q.   (Mr. Reisenauer continuing)  Doctor, if you look down, the third subheading down on this checklist, this

is a checklist that Dr. Hutchinson made during her examination of Mr. Rodriguez.

A.   Okay.

Q.   There's a subsection called "Sexual Obsessions."

A.   Yes.

Q.   Let me ask you this first:  Have you seen this type of checklist or used it before yourself?

A.   I definitely do not use this checklist.

Q.   Okay.

A.   And I would not -- I would not use it.

Q.   Okay.  Dr. Hutchinson used it and under "Sexual Obsessions" she checked both in the column of "Current" and "Past" "Forbidden or perverse sexual thoughts, images or impulses."

Do you see that?

A.   Yes.

Q.   And she also checked "Sexual behavior toward others (Aggressive)."

A.   Yes.

Q.   Thank you.  Doctor, are you familiar with the Clarke Sex History Questionnaire for Males?

A.   No.

Q.   Do you recall seeing that particular document in Dr. Hutchinson's examination?

A.   Nope.

Q.   Doctor, I'm going hand you what's been marked as Government's Exhibit 603 (indicating).  The second page contains the beginning of the questionnaire.

We would move 603 into evidence, Your Honor?

THE COURT:  Any objection?

MR. MONTROY:  No, Your Honor.

THE COURT:  603 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Doctor, if you would first turn to what would be page 12 of the questionnaire.

A.   I see it.

Q.   You see it?

A.   Yes.

Q.   And at the top it says:  "Comprehensive Report for Alfonso Rodriguez."  See that in the very first line up on the top there?

A.   Yes.

Q.   And then are you on the page that -- page 13 has "Fantasy and Pornography"?

A.   Yes.

Q.   And just if you would go down to -- right before it says:  "Fantasy Activities with Males."  Do you see that on the bottom?

A.   Yes.

Q.   Right above there it says:  "The respondent acknowledges fantasizing about the following sexually deviant behaviors with females."

Do you see that?

A.   Yes.

Q.   And Dr. Hutchinson notes "having anal intercourse with a female, controlling a female, female is controlling him, forcing a female to have sex with him, a female is forcing him to have sex with her."

See that?

A.   Yes.

Q.   Were you aware of this at all in your examination?

A.   In my evaluation?

Q.   Yes.

A.   Oh, I asked pretty much a lot of these questions.

Q.   Okay.

A.   And I have a long list of questions that have to do with different paraphilias.  I can enumerate them if you want that.

Q.   Okay.  You didn't put that in your report though, correct?

A.   No.  There's -- well, I did put it in my report that I agreed that there were -- that there were thoughts that related, of course, to the paraphilia and

his interest in women's underwear.

Q. We'll talk about that in a minute. Just turn the page, the next page real quick and then we'll get back to what you just said.

A. Yes.

Q. The next page talks about "Exposure to Pornography." Do you see that?

A. Yes.

Q. And towards the bottom it says -- the very last sentence says: "The respondent acknowledges use of pornographic materials for masturbation on a total of 36 or more occasions."

Do you see that?

A. Okay.

Q. Did you talk to him about that?

A. I talked to him about -- yes, I talked to him about the kinds of books that he had a chance to look at.

Q. Okay.

A. And, I mean, yes. The answer is definitely yes.

Q. Did you talk to him at all about the pornographic movies that he was renting and watching?

A. Yes.

Q. Did he tell you what types of pornographic movies they were?

A.    He mentioned most of what he mentioned was movies that have to do with regular sexual intercourse and that he enjoyed watching.

Q.    Okay.    Did he tell you that some of the movies he rented were about forcing sexual acts upon women or raping women?

A.    No.    He denied that.

Q.    He denied that, okay.    Doctor, I'm going to hand you what's been marked as Government's Exhibit 604 (indicating).    The first page refers to a grand jury subpoena.    The last page is a list of the movies that Mr. Rodriguez had rented prior to his arrest in this case.    Take a look at that.

We would offer 604, Your Honor.

THE COURT:    Any objection?

MR. MONTROY:    No objection, Your Honor.

THE COURT:    604 is received.

Q.    (Mr. Reisenauer continuing)    Are you familiar with this document, Doctor, at all?

A.    No.    I don't recall that I saw this document.

Q.    If I told --

A.    I would -- you know, I clearly do not recall looking at this list.

Q.    Thank you.

A.    Yes.

Q.   And so in looking at that list, you would have no way of knowing whether or not those pornographic movies depicted the forced sexual acts of women?

A.   Right.

Q.   Okay.  A little bit ago you talked about -- or you brought up women's underwear.

A.   Yes.

Q.   And Mr. Rodriguez told you, I take it, that he was interested in women's underwear when he was young?

A.   Yes.

Q.   Okay.  And then that progressed to the obscene phone calls?

A.   I think that he -- he didn't make -- actually he didn't make it very clear to me how that actually went. In fact, the best impression that I got from him is that he was using both the underwear and the telephone to -- at the same time.  So essentially he was making telephone calls and had female underwear, holding female underwear at the same time.

Q.   Okay.  And then it was after the obscene phone calls that he attacked Shirley Seddon, correct?  That came after?

A.   Yeah.  And he engaged in all of those obscene calls and the panties at an earlier stage.

Q.   Okay.  Now, Doctor, you -- you haven't determined

in your diagnosis under the DSM-V or the DSM-IV-TR that Mr. Rodriguez has a paraphilia disorder, correct?

A.    Well, paraphilia disorder, telephone.

Q.    Okay.  The telephone calls.

A.    Yeah.

Q.    But that's it?

A.    Well, you know, at the same time as I said, as I just stated, he was engaged in procuring female underwear and at the same time that he was also engaged in telephone scatophilia and it appeared to me that he was doing that at the same time.  Some people would say that that's really a combination of two paraphilias. Other people would combine it like Dr. Pitts [sic] did, put it together, paraphilia not otherwise specified.  I used only telephone scatophilia.

But I would go on record as stating that there was that component of female underwear that appeared to be associated with the telephone scatophilia.  But I don't have any problems if somebody decided to diagnose him with telephone scatophilia and then separately with the paraphilia associated with female underwear.

MR. REISENAUER:  Okay.  Let me move on here, Doctor.  I'm almost done, Your Honor.

THE COURT:  Okay.

MR. REISENAUER:  Thank you.

Q.  (Mr. Reisenauer continuing)  Move to page 79, Doctor.

A.  Yes, sir.

Q.  You have there -- you call it "Appendix 3 Evaluation for Antisocial Disorders and Potentially Related Conditions."

Do you see that?

A.  Yes.

Q.  And you say:  "The criteria for DSM-IV-TR Conduct Disorder were considered."

Do you see that?

A.  Yes.

Q.  And you say:  "Mr. Rodriguez has never met for DSM-IV-TR Conduct Disorder," correct?

A.  Yes.

Q.  You also say:  "My analysis of Antisocial Personality Disorder for Mr. Rodriguez indicates that Mr. Rodriguez does not qualify" --

A.  Yeah.  That's what I thought, yes.

Q.  -- "for Antisocial Personality Disorder partially because he failed to meet criterion," correct?

A.  The criteria for Conduct Disorder --

Q.  Yes.

A.  -- yes.

Q.   And you're saying that's because he has no history of Conduct Disorder.  Do you have that --

A.   Yeah, that's correct.  I think he has some -- it depends.  This is a situation where it depends on what he says to people, okay?

Q.   But here you have in paren "(i.e. a history of Conduct Disorder)."

A.   That's what I said.

Q.   He doesn't have that.

A.   I don't think he has that.  He had Conduct Disorder by his admission, okay?  By his admission.

Q.   So by his admission?

A.   Yes.

Q.   Well, how about the obscene phone calls or the rape of Shirley Seddon or the rape of Elizabeth Knudson or the attack on Ardyce Whalen or the kidnapping and murder of Dru Sjodin?  Aren't those Conduct Disorders?

A.   That's right.  That would be.  What you have got to do first is determine whether or not he has Conduct Disorder, and so in his case most of what you're mentioning to me, not the telephone scatophilia but certainly the sexual attacks, please look at when they take place, how old he is.  And so by definition you cannot use that as evidence for Conduct Disorder at all.

MR. REISENAUER:  Okay.  Thank you, Your

Honor.  That's all I have, Your Honor.

THE COURT:  All right.  Why don't we go ahead and take a break at this point.  We'll stand in recess for 15 minutes.

(Recess taken; 2:30 p.m. to 2:50 p.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  Counsel of record are present.  When we broke Mr. Reisenauer just passed Dr. Silva as a witness.

Mr. Montroy?

MR. MONTROY:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. MONTROY:**

Q.  Dr. Silva, I would ask you to take a look at Exhibit 64, please, specifically on page 9.

A.  This is page 8.

Q.  Yeah, 9 is on the back.  If you flip it over you'll see page 9.

A.  Okay.

Q.  And about halfway down the page if you look there, now there was some question on cross-examination if -- concerning whether or not Mr. Rodriguez received a GED or diploma.  Do you recall that?

A.  Yes.

Q. And about halfway down on page 9 -- and this is an interview between Dr. Seward and Mr. Rodriguez; is that correct?

A. Yes.

Q. Dr. Seward asks Mr. Rodriguez if he got a diploma and Mr. Rodriguez replied: "To tell you the" -- I'm sorry, strike that.

He's asked if he got a GED by Dr. Seward and in response Mr. Rodriguez replies: "To tell you the truth I got a diploma."

Do you see that?

A. Page.

Q. It's on the top of the page, towards the top of page 8 right underneath where you see the word "GED program."

A. Yeah. You looking at page 8 or page 9?

Q. Page 8.

A. Page 8, okay.

Q. I apologize, page 9. I thought I had this totally ready to go.

A. Okay.

Q. Yes, page 9.

A. Okay.

Q. And Dr. Seward is asking Mr. Rodriguez about a GED program that he was in in the security hospital and

then Mr. Rodriguez replied:  "To tell you the truth I got a diploma."

A.   Yes.

Q.   And Dr. Seward says:  "Oh a regular diploma?"

And Mr. Rodriguez says:  "Yeah."  Okay?

A.   Yes.

Q.   And then a little bit later down the page Mr. Rodriguez describes the program that he's in and he says, referring to his old school:  "I didn't wanna deal with kids and in this school you're one-on-one."

And Dr. Seward asks him if that's St. Peter's place to which Mr. Rodriguez replies:  "Yeah, yeah."

A.   Yes.

Q.   And then at the very end Mr. Rodriguez says that he has "five years to do it;" is that right?  To go to the school?

A.   Yes.

Q.   And then if you could quickly turn your attention to Exhibit 595.

A.   I'm looking at 595.

Q.   Okay.  And in Exhibit 595 Mr. Rodriguez purportedly says that he is getting close to getting his GED.

A.   That's correct.  I see it.

Q.   And that differs than what he said to Dr. Seward, right?   He told Dr. Seward that he was going to get his diploma or that he got his diploma.

A.   That's right.   It's very different.   I went over that before with him too as well.

Q.   Okay.   And you would agree that both of these interviews here, both of these reports are self-reports by Mr. Rodriguez; is that right?

A.   That's correct.

Q.   And I think you testified earlier today that when it comes to self-reports Mr. Rodriguez tends to exaggerate when he's talking about himself --

A.   Yes.

Q.   -- is that right?

A.   I tried to clarify whether or not he's exaggerating or if he could tell me nonevasive answers to these questions of whether or not he obtained a GED or any similar type of diploma.   And the answer was along the lines that he was almost finished also, and this is now 2011 when I was doing the interview.

Q.   And so would you consider either one of these documents to be definitive proof that he actually completed a GED program or a high school diploma program?

A.   You know, they -- the GED part, it is possible he

was actually working on it.  But when I have -- asked him to tell me whether he did or not, he did not say that he completed it but at another point he -- he didn't say that he actually had a real degree or regular program or anything like that.  So he denied that.  As for the GED, as I said before he stated evasively that essentially he was almost finished.

Q.  And assuming that Mr. Rodriguez got his GED or received a diploma while in prison, you know, I would like you to consider for a second the description of the program that Mr. Rodriguez described.  He says that he's in school so he doesn't have to deal with any other kids.  He's in a one-on-one program, right?  And then he says that he has five years to complete the program.

A.  That's correct.

Q.  So I guess my question for you is:  This prison GED or high school program that he's describing, is that consistent in terms of standards and environment that a person would experience engaged in a regular school outside of a prison?

A.  Definitely not.

Q.  Okay.  So if Mr. Rodriguez did happen to get a GED or he did happen to get a diploma, would you agree that he got that diploma under very different controlled circumstances?

A.    And protected as well.

Q.    And protected as well?

A.    Yes.

Q.    Thank you.  And just one other point on this, if you could just turn your attention to page 596.

A.    Yes.

Q.    I mean Exhibit 596, I apologize.

A.    I got 596.

Q.    And 596 is -- the government showed you this document and asked you if you believe that this was definitive proof of Mr. Rodriguez's receiving a GED. And that is because on page 2, if you'll turn your attention to page 2, Section V, the page says that -- refers to the "completion of his GED;" is that right?

A.    I'm looking if he --

Q.    At the very top of the page.

A.    This is 596, the document number?

Q.    Yes, 596.

A.    And you're looking at -- are you asking me to look at the --

Q.    Page 2.

A.    Page 2, yeah.

Q.    Okay.  And then there's a little Roman Numeral V at the top.

A.    At the top, yeah.

Q.   And it talks about Mr. Rodriguez's treatment?

A.   Yes.

Q.   And work that he's been doing and includes --
says that he's completed his GED; is that right?

A.   Yes.

Q.   And if you look on the front page, it says that
the hearing for this order was held on December 6, 1978?

A.   Yes.

Q.   And so by this date this document purports to
show that Mr. Rodriguez has completed his GED; is that
right?

A.   No.   What it really says is that -- I don't
see -- I never really thought that it was enough for me
to know what all he did his GED.

Q.   You don't know whether or not Mr. Rodriguez got a
GED from that document?

A.   No.   And I asked him more than once to explain to
me what happened.   You got a GED or you're almost
getting a GED or what is actually happening?   And I was
not able to get an answer such that I thought that he
had actually got the GED.

Q.   Okay.

A.   Closest it came is that he was working on it
still, and this is when I was interviewing him.

Q.   So when you were interviewing him --

A.   Long time later.

Q.   In 2001 your understanding from him is that he was still working on it?

A.   Yes.   Something -- and it's many years.

MR. MONTROY:   Okay, thank you.   May I approach, Your Honor?

THE COURT:   You may.

MR. MONTROY:   I'm handing you what's marked as Exhibit D-75 (indicating).

Your Honor, I would identify -- I'm sorry, I would offer D-75 as a partial report Dr. Seward in these 2255 proceedings.

THE COURT:   Any objection?

MR. REISENAUER:   No, Your Honor.

THE COURT:   D-75 is received.

Q.   (Mr. Montroy continuing)   If you would turn your attention, Dr. Silva, to page -- page 19 of 25.

A.   Okay.

Q.   And do you see the notation down at the bottom "January 1979, regarding algebra"?

A.   Yes, I'm looking at that.

Q.   All right.   And this is a notation from prison records Dr. Seward is citing.   And at the very last line of that document the record reflects that:   "At this time he has these 24 hours plus another 8 hours earned

before leaving a balance of 10 hours of class to graduate."

A.    Yes, that's right.

Q.    Is that correct?  And that document is dated January 1979, correct?

A.    Yes.

Q.    And this document that the government showed you, Exhibit 596, this is a month earlier dated December 6, 1978; is that correct?

A.    Now you're looking at something else and I'm confused.  I have first -- I have first Seward and then after that please clarify that.

MR. MONTROY:  Your Honor, may I approach?

THE COURT:  You may.

Q.    (Mr. Montroy continuing)  No, this is the wrong one.  596, here you go right here (indicating).  So there's the date.

A.    All right.

Q.    You agree that 596, the government document 596, indicates that -- which was purported to indicate that Mr. Rodriguez got his GED by December 6, 1978?

A.    Okay.

Q.    And then P-75 is the document that I just read that shows by January 1979, a month later, he's still not completed his credits to earn a GED.  And while

you're on that document, P-76, which was just entered, if you could turn the page, Dr. Silva, and just briefly look at the prison notation from March 29, 1979.

A.   Okay.

Q.   And it's clear from that notation in the prison that Mr. Rodriguez has still not completed his credits to receive his GED?

A.   And where are you looking at?

Q.   I'm sorry, according to staffing on March 29, 1979, this is three months, three and a half months after the document that said he had his GED.

A.   Yeah.

Q.   Do you see that?

A.   I see the document but tell me just where exactly you want me to look at.

Q.   It's in the middle of the page and I'll read it. "Mr. Rodriguez has purported to be within hours of completing all educational courses required to receive his high school diploma."

A.   Yeah.

Q.   Okay.  And, Dr. Silva, I think you've said this already but just to be clear you've indicated that it's common for people who are intellectually disabled to learn how to read and to be able to read; is that true?

A.   Oh, sure.  They are able to learn how read and he

did.

Q.   And in Dr. Seward's interview which the government cross-examined you on, Mr. Rodriguez and Dr. Seward spoke a bit about a number of series of books that Mr. Rodriguez was purportedly reading?

A.   Yes.

Q.   Such as The Kent Chronicles and The Blood Honor?

A.   Yes.

Q.   Do you have any idea of what reading level those books are designed for?

A.   They're supposed to be lower degree -- level but the problem with all of this is that given what I know about his ability to read, organize himself and all of that, chances are remote that he was reading that many books as he describes.

Q.   Well, and let me ask you this:  What is a better determinant of Alfonso Rodriguez's reading level?  Is it basing it on a description of the series of books that he's read or would you say it's better to base it on the scores of academic achievement testing that had been administered to him over the course of years?

A.   Oh, definitely, yes.  And now -- like, for example, you take into account Dr. Weinstein's testing, that would be more indicative of how well he would actually do in terms of comprehensive ability to read.

My opinion is that it is remote that he's going to be able to read that many books at a fairly efficient degree of ability.  I don't think he can.

Q.  So if you were trying to make a -- not a diagnosis but a determination in a psychological or a psychiatric or even a scientific way, you would rely on the testing that had been administered to Mr. Rodriguez and not necessarily on the books that he's talking about having read in prison.

A.  Yes.  On the testing and also on his ability to focus on things, his ability to be patient, to be able to do that consistently over time.

Q.  Okay.

A.  I don't think he can.

Q.  And if you could just turn to your report and flip to page 40 quickly and this is just to clarify a point, Dr. Silva.  You were asked a question on cross-examination about why you didn't include in your report having measured Mr. Rodriguez's head?

A.  No, but -- yes, but I did.

Q.  Hold on, let me ask the question, Dr. Silva.  If you could turn to page 40.

A.  Okay.

Q.  In the middle of the page right above 11.5.

A.  Okay.  I'm looking at page 40.

Q.   Forty in your report?

A.   Yes.

Q.   And you indicate in your report that the head circumference being 24.5 inches?

A.   Yeah.  That's what I mentioned.  I said that I had done it and that you can confirm or disconfirm my measurements by doing it yourself.

Q.   Okay.

A.   And that's what I got.  The only thing that I would add is that those measurements, 24.5 inches, that corresponds to three standard deviations from what is considered to be normal.

Q.   Three standard deviations?

A.   Yeah, and that's associated also with people with disabilities as well, an association.

Q.   There's an association between people with disabilities and having a head that's three times the standard deviation for head size?

A.   It's extremely high.  Very small percentage.

Q.   Okay.  Dr. Silva, do you recall, I asked you a question about this on direct and then you were cross-examined on it about the situation where Mr. Rodriguez accepted blame for making obscene phone calls that he had not, in fact, made?

A.   Yeah.

Q.   And he indicated in the report that -- and you indicated in the report that the staff at the prison believed Mr. Rodriguez, that he actually hadn't done it and that he had actually -- and that what your opinion was is that he accepted responsibility in part out of fear and isolationism, that sort of thing; is that correct?

A.   What I said is that I found no evidence to the fact that the staff actually thought that he had done -- that he did engage in the telephone calls.  And that is consistent with what he has said to me; namely, that he did not engage in those telephone calls but did so because he was unable to tolerate the social -- the social stress of being there.

            MR. MONTROY:  Your Honor, may I approach?

            THE COURT:  You may.

            MR. MONTROY:  Thank you.

Q.   (Mr. Montroy continuing)  Dr. Silva, I'm handing you what's been marked as Exhibit 77 (indicating).  And this is a document from the Minnesota prison hospital?

A.   Okay.

            MR. MONTROY:  And, Your Honor, I would offer this exhibit.

            MR. REISENAUER:  No objection.

            THE COURT:  Seventy-seven is received.

Q.   (Mr. Montroy continuing)   If you could look at the first entry on September 24th.

A.   Yes.

Q.   And about halfway down where it references the obscene phone call and then it says "B-1," do you see that?

A.   Yes.

Q.   It says:  "B-1 staff feels he admitted to being the caller only to prevent the ward from going on restriction.  His information concerning the call was very inadequate and it is very doubtful that he made the call."

A.   Right.

Q.   And it's signed by a counselor.

A.   Okay.  I have no recollection of completely seeing this at all but it's consistent with what -- you know, the whole notion that the staff thought that nothing had occurred, he had not engaged in the scatophilia.

Q.   Could you turn in your DSM to page 40, please.

A.   Okay.

Q.   DSM-V.

A.   Yes.

Q.   Are you familiar with the term "comorbidity"?

A.   Yes.

Q.    And this term appears on page 40 within the framework of the intellectual disability diagnosis; is that right?

A.    Yes.

Q.    And what is "comorbidity"?

A.    Well, "comorbidity" means that you have at least two illnesses, two psychiatric disorders, and they tend to co-occur with each other in the same individual at the same time.

And in addition to that what often happens is that you have symptoms that really overlap with each other.  And so the reason why this is a concept, one of the most important concepts in my opinion regarding this case is that you've gotta be able to decide when you have a symptom where is that coming from, or a disability, where is that coming from?  Always you have to take that into account.

Q.    Okay.  And with --

A.    And if you can't you're going to be in real trouble in terms of trying to find out where things are coming from.  Is it the intellectual deficit or is it something else?

Q.    Okay.  And the comorbidity appears in the intellectual disability section; is that right?

A.    It can occur in many places.

Q. And if we look at the DSM-V, comorbidity section, it says: "Co-occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions (e.g. mental disorders, cerebral palsy, and epilepsy) three to four times higher than in the general population."

And then looking down: "The most common co-occurring mental and neurodevelopmental disorders are attention-deficit/hyperactivity disorder; depressive and bipolar disorders; anxiety disorders; autism spectrum disorder," and the list goes on.

But the point here is that you can have -- you can have an intellectual disability and have some multiple other mental health issues; is that right?

A. That's right. And what you will try to do is try to figure out what's causing -- in this case, for example, the intellectual disabilities, for example, what's doing it? Is it the -- the actual development -- the ID, okay? Is that what is causing everything or is it something else? What you do you're going to spend enough time to see what lasts in the end.

In this case in my opinion you're dealing with the ID diagnosis causing a lot of what's actually going on with him. Other things will fall apart. In my

opinion two things are working here together.  It's the ID and the problems with his affect, his mood in society.  They're all together working.  That's why you actually have deficits in the -- and deficits in the social area because we have these two syndromes together which form the ID itself.

MR. MONTROY:  Thank you, Dr. Silva.  I have no further questions, Your Honor.

THE COURT:  Mr. Reisenauer?

**RECROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.   Doctor, there's been a lot of questions about whether or not Mr. Rodriguez received a GED or a diploma while he was at the Minnesota Security Hospital, right?

A.   Yes.

Q.   The point is is that he continued classes while he was in college -- in the security hospital, right?

A.   Yes.

Q.   And if you look at Defendant's Exhibit 75, for instance, it's one of those last ones that was put in.

A.   Seventy-three, 77.

Q.   This one right here (indicating).

A.   I don't know.

Q.   Let's do it.  I'll just hand it to you (indicating).  Okay.  All right.  This is a report of

Dr. Seward.  So at the top of the page he's taking World History and American Government, right?

A.  Yes.

Q.  Okay.  And then he took Biology right?

A.  Yes.

Q.  And then he took Sociology, right?

A.  That's what it says.

Q.  Okay.  And then he took Social Studies?

A.  Yes.

Q.  And Algebra, right?

A.  That's correct.

Q.  Okay.  And to get your GED you would have to pass those classes whether it's a GED or a high school diploma, correct?

A.  Yes.  But the classes may actually be very different degree of --

Q.  Thank you, Doctor.

A.  -- seriousness and severity, difficulty.

Q.  Well, you weren't there taking the classes, were you?

A.  Was I taking the classes?

Q.  Yes.

A.  No, I was not taking the classes.  That's correct.

Q.  Thank you.  I just have one more question about

this GED diploma thing and this document is marked on the back Government's Exhibit 606.  It's a record from the Minnesota Security Hospital.

And we would offer 606, Your Honor.

MR. MONTROY:  No objection, Your Honor.

THE COURT:  606 is received.

Q.  (Mr. Reisenauer continuing)  Doctor, if you look at the very bottom of the page there, the last paragraph, the third line, it says:  "Specific benefits he cited including completing his GED diploma..."

Do you see that?

A.  Yes.

Q.  Okay.  That's dated 1981 so here it's called a GED diploma, right?

A.  That's what it says.

MR. REISENAUER:  All right.  I have nothing further, Your Honor.

THE COURT:  Anything as a result of that?

MR. MONTROY:  No, Your Honor.

THE COURT:  You may step down, Dr. Silva. Thank you.

THE WITNESS:  Thank you.

MR. REISENAUER:  Your Honor, could I have five minutes to rearrange for Mr. Hoy, who is here?

THE COURT:  Sure.

MR. REISENAUER:  Thank you.

(Off the record.)

THE COURT:  You may retake the stand, Mr. Hoy.  You remain under oath.

MR. REISENAUER:  Are we waiting for Mr. Montroy or not?

THE COURT:  No.  He's off to the airport.

MR. REISENAUER:  Oh, okay.

THE COURT:  We're waiting for you.

**ROBERT HOY,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q.  Good afternoon, Mr. Hoy.

A.  Good afternoon.

Q.  I'm going to ask you about a few documents this afternoon that I think you're familiar with so start with what's been marked as Government's Exhibit 607.  It is a number of pages that I believe are notes from your file, and if you'd just quickly take a look at that and tell me if you can identify those as your notes.

A.  (Witness examining.)  These all appear to be in my handwriting.  I'm not convinced they were all done on the same day.

MR. REISENAUER:  We would offer 607, Your Honor.

MR. LUBY:  No objection.

THE COURT:  607 is received.

Q.  (Mr. Reisenauer continuing)  And the first few pages, Mr. Hoy -- we should start with the first page if we could.  You have the letter "D" here called "Mitigation Themes;" is that right?

A.  Yes.

Q.  Okay.  And on that particular page you have listed "Migrants" and "Sexual Assault;" is that right?

A.  Yes.

Q.  Okay.  And let's turn to the next page.  Do you think these are different days here or the same?  You have -- on the first page you have 1, 2, 3 and then you have a 5.  I don't see a 4.  Do you know?

A.  I've been trying to sort these out and I forget your question.

Q.  Do you know whether they're from the same day or different days at all?

A.  I can't be sure.

Q.  Okay.  All right.  But let's just go back to the main heading there.  It's called "Mitigation Themes."  These were recurring themes that the team worked on in the case; is that right?

A.    At times, yes.

Q.    Okay.  And some -- these are notes you took, must have been, from a meeting where you discussed these mitigation themes; is that correct?

A.    I think most of these are from a meeting that Mr. Ney, myself and Ingrid Christiansen, our mitigation specialist, had in Kansas City a couple, three months before the trial as we were preparing.

Q.    Okay.  And in that meeting you discussed these various themes for mitigation to present at trial; is that right?

A.    These were themes that we thought we may present at trial.  I don't believe all of them were, but I think that this was the outline at the time, yes.

Q.    Okay.  If you hang on there for a second, Defendant's Exhibit 41 was put into evidence earlier, Mr. Hoy, and again these are your notes; is that right?

A.    Yes, they are.

Q.    And they're similar to what you were just looking at in this last exhibit; is that right?

A.    Yes.  I think Government's Exhibit 607 has just got more pages of more notes than Defendant's Exhibit 4.

Q.    Okay.

A.    Or 41, whatever.

Q.    And then I'm going to hand you Government's

Exhibit 573 (indicating) and ask if you could take a look at that, please.

A.   (Witness examining.)  All right.

Q.   And does that look familiar to you?

A.   Yes.  I believe this is a document that was put together by our mitigation specialist, Ingrid Christiansen, and probably distributed to both Mr. Ney and myself at some point.

Q.   Okay.  And this document 573 is entitled "Mitigation Themes," correct?

A.   Yes.

Q.   And it lists a number of areas of possible mitigation that may or may not have been presented at the time of trial; is that right?

A.   Yes.

Q.   Okay.  And if you would I'm going to direct you to page 3.  There's a subheading there called "Mental Illness - Brain Damage - Learning Disabilities."  Do you see that?

A.   I do.

Q.   And I take it that was discussed as part of the mitigation presentation on the case.

A.   These items were talked about by the team and, yeah, considered for presentation at trial in some fashion, yes.

Q.   Okay.  And would you agree that that type of evidence was presented during mitigation through various witnesses, including Dr. Hutchinson and Dr. Froming?

A.   To be honest I don't have a photographic recollection of exactly what all was presented at the trial in this regard, but I do know that Dr. Hutchinson, Dr. Froming and other witnesses, including some family members, talked about some of these topics, yes.

Q.   Okay.  And when you had the various meetings regarding the mitigation teams, Mr. Hoy, were discussions had after the reports were received in this particular case from the various experts?  I take it they were had before and after?

A.   I don't recall exactly when we received different reports from the different experts.  I know we had a meeting in Kansas City a couple, three months before trial and I think that there was some information available at that time, some of the work that Ms. Christiansen had done as exemplified by Government Exhibit 573.  And I know that Mr. Ney was pursuing some experts and working with them at the time as I recall. I don't recall seeing their reports until much later. And I think as a result of that meeting all of us went back and did some follow-up work that may have been necessary to get the background information that some of

the experts may have needed.

Q.   Okay.  You sat in on -- did you sit in on any of the testing that was done by either Dr. Froming or Dr. Hutchinson?  Do you recall that?

A.   I do not believe I sat in on any of that.

Q.   Did you sit in at all on the testing by any of the other experts?

A.   I believe I sat here on a Saturday while the government experts were testing or interviewing Mr. Rodriguez.

Q.   Okay.  And were you in the room or were you in a position outside of the room to watch?

A.   On that occasion?

Q.   Yes.

A.   I would have been -- I would have been present so I could hear what was going on but did not participate.

MR. REISENAUER:  Your Honor, I apologize, I need five minutes to get this in order.

THE COURT:  That's good.

MR. REISENAUER:  Thank you.

THE COURT:  Let's go ahead and let's take ten minutes at this point.  We'll start again at about five to 4:00.  I guess that's 15 minutes.  We'll start at 10 to 4:00.

(Recess taken; 3:40 p.m. to 3:55 p.m.)

(In open court, all counsel present.)

THE COURT:  We'll go back on the record. When we broke Mr. Hoy was on the stand.  Mr. Reisenauer was conducting a cross-examination.  Mr. Montroy has reappeared.

You may proceed, Mr. Reisenauer.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Mr. Hoy, I'm going to hand you what's now been marked as Government's Exhibit 608 (indicating).  These appear to be more notes that you took in the case?

A.  Yes.  It's my handwriting.

MR. REISENAUER:  We would move 608, Your Honor.

MR. LUBY:  No objection.

THE COURT:  608 is received.  I don't seem to have a 605 just so --

MR. REISENAUER:  Yeah, we skipped that.

THE COURT:  Okay.

MR. REISENAUER:  Sorry, Your Honor.

THE COURT:  Well, no, that's fine.  I just want to make sure that it's not something you intended to offer somewhere along the line.

MR. REISENAUER:  Thank you.

THE COURT:  Thanks.

Q.  (Mr. Reisenauer continuing)  If you would turn, Mr. Hoy, to I believe what is the third page, the second page -- turn to the second page first if you would.

A.  I'm there.

Q.  Okay.  The second page is dated 11/21/04, correct?

A.  Yes.

Q.  And this says a meeting at the Radisson Hotel; is that right?

A.  Yes.

Q.  And it's Richard Ney, Ingrid Christiansen and I take it yourself.

A.  Yes.

Q.  And here you're discussing the mitigation issues it looks like?

A.  Yes.

Q.  Okay.

A.  Among other things, yes.

Q.  All right.  And then if you turn to the next page you have:  "Experts needed" and "forensic psych" you have written down and "Marilyn Hutchinson," correct?

A.  Yes.

Q.  And then later down in that line you write: "Child psych impact Marilyn Hutchinson"?

A.  Correct.

Q.   And up above on that same page you have: "Prospective clinical psych Marilyn Hutchinson," correct?

A.   Yes.

Q.   And eventually Dr. Hutchinson did become your expert witness in this particular case?

A.   Yes.

Q.   On that same page on the bottom you have: "Possibilities:" and then if I'm reading this right you wrote:  "Mount a losing psychiatric defense @ trial as a prelude to a diminished capacity mitigation case."

          See that?

A.   I do.

Q.   So I take it that was discussed as part of the trial strategy?

A.   That would have been discussed -- again I'm not positive that page 3 of this exhibit is a part of page 2 but it could be.

Q.   Okay.

A.   And, yes, that would have been discussed as a possibility.  I can't tell you how close to trial or not that was.

Q.   Okay.  Well, this looks like this was prior to the retention of Dr. Hutchinson as an expert witness; is that right?

A.   That may well be true.

Q.   Okay.  And then prior to actually receiving her opinion and Dr. Froming's opinion, who became an expert witness, you wouldn't have made any decisions on what issues were going to be presented as far as those mitigation themes we talked about earlier regarding mental illness or learning disabilities or anything pertaining to any type of mental illness, correct?

A.   I think that -- I think that as we got information during the case, we laid out possibilities. And as we got more information, we either added additional possibilities or ruled out others that we had already considered.  And that process went on until we got much closer to trial and got actual opinions from the experts.

Q.   Okay.  Just before the break, Mr. Hoy, I think I asked you if you sat in on the examination of Dr. Pitt with Mr. Rodriguez; is that right?

A.   I couldn't have told you it was Dr. Pitt but now that you say that that sounds familiar.

Q.   I'll hand you Government's Exhibit 609 and ask if those appear to be your notes from that examination (indicating).

A.   These appear to be notes I took in my own handwriting from that observation of those exams.  All

but the last two pages, I believe, it appears to be were notes of the interview done by Dr. Pitt.  It looks like the last two pages would have been looks like maybe the following day when Dr. Martell was doing the interviewing.

MR. REISENAUER:  We would offer 609, Your Honor.

MR. LUBY:  No objection.

THE COURT:  609 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Mr. Hoy, to make it easy go back to those last two pages and then go just two pages before that if you would.

A.  I think I'm there.

Q.  And then towards the bottom of the page there you write:  Issue with women, question mark.  You see that?

A.  Yes.

Q.  And in quotes you say:  "Think I used to."  Would that be what Mr. Rodriguez was telling Dr. Pitt?

A.  Interpretation of my notes would have been -- the issue with women would have been a paraphrase of the question that he was asked by Dr. Pitt, and "think I used to" would have been my close quote of what he would have told in response.

Q.  And then you write:  "Not strangers.  It was

women I knew."

A.   Yes.

MR. REISENAUER:  Okay, thank you.  Your Honor, we'll fill in 605 for you.

Q.   (Mr. Reisenauer continuing)  Mr. Hoy, I'm going to hand you two exhibits:  Government's Exhibit 605 first and 610 (indicating) and ask again if these are your notes?

A.   Yes.  They both appear to be copies of my handwritten notes.

Q.   Okay.  And 605, that's dated 11/21/05; is that right?

A.   Yes.

Q.   These appear to be notes from a meeting or a phone call you had with Dr. Froming and Mr. Ney; is that right?

A.   Yes.

Q.   And on the top of the page here you say she got "excellent data;" is that correct?

A.   Yes.

Q.   And then the next line says:  "Average IQ: Verbal 86, performance 89, full-scale 87;" is that right?

A.   Yes.

Q.   But she does, by your notes, indicate to you that

she believes he has frontal lobe damage "consistent with neurotoxin exposure," right?  Am I reading that right?

A.  Yes.  "Consistent with neurotoxin exposure" is sort of a note I've got out to the left margin and I wanted to make sure, if I could, which portion of my notes that referred to.  But I think you're correct.

Q.  Okay.  And if you would look at your notes there, there's no where on this page that there's indication from Dr. Froming that Mr. Rodriguez was mentally retarded, correct?

A.  That's correct.

Q.  And then if you go to the next exhibit that I handed you?

A.  610?

Q.  610, yes.  Those notes appear to be your notes possibly from her testimony at trial; is that correct?

A.  Yes.  That's the way they appear, hers and some other witnesses, yes.

Q.  Okay.  And if you look at your notes from her testimony at trial if you would?

A.  Okay, I'm there.

Q.  I think you say there that she was a "nice witness" you have written?

A.  Yes.

Q.  Okay.  And she testified about Mr. Rodriguez's IQ

scores, do you see that?

A.  Yes.

Q.  And you have no notes there indicating that there's any testimony about Mr. Rodriguez being mentally retarded; is that correct?

A.  That would be true.

MR. REISENAUER:  I'm sorry, Your Honor, I didn't offer 605 and 610 apparently.  We would so move.

THE COURT:  Any objection?

MR. LUBY:  No, Your Honor.

THE COURT:  605 and 610 are received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Mr. Hoy, I'm going to hand you Government's Exhibit 611 (indicating).  These appear to be notes of yours regarding Dr. Hutchinson's testimony; is that correct?

A.  Yes.  These are my notes in my handwriting and they appear to have been taken at the trial during the course of her testimony.

MR. REISENAUER:  We would offer 611, Your Honor.

MR. LUBY:  No objection, Your Honor.

THE COURT:  611 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  And, Mr. Hoy, if you

could look through those notes regarding
Dr. Hutchinson's testimony, if you would.

A.    (Witness examining.)

Q.    There's no reflection that she testified that
Mr. Rodriguez was mentally retarded; is that correct?

A.    I have no recollection of her testifying to that
and I see nothing in my notes that would indicate that.

Q.    Okay.  Do you recall any discussion in any of
your meetings with Mr. Hoy or Miss Christiansen or
Dr. Froming or Dr. Hutchinson where there was discussion
regarding any presentation of any evidence of the fact
that Mr. Rodriguez was mentally retarded?

A.    My recollection is that the defense team did not
have any information at that time that led us to believe
that he was mentally retarded.

Q.    And in all the discovery that you received or
investigation that your team did, you didn't find any
indication from historical records or declarations,
statements that were made by any other individuals, that
Mr. Rodriguez was mentally retarded, correct?

A.    I'm aware of no information that we received from
anyone else that believed that Mr. Rodriguez was
mentally retarded.

Q.    Okay, thank you.  Mr. Hoy, I'm going to handing
you Government's Exhibit 612 (indicating).  These appear

to be your notes regarding a Dr. Edward Kelly; is that right?

A.  Yes.

MR. REISENAUER:  We would offer 612, Your Honor.

MR. LUBY:  No objection.

THE COURT:  612 is received.

Q.  (Mr. Reisenauer continuing)  If you look at the first page, Mr. Hoy, the notes there are dated July 15th of '04, correct?

A.  Yes.

Q.  And you must have had a meeting with Dr. Kelly; is that correct?

A.  I would have said it was a phone call but I -- I could have met him.

Q.  Okay.  And let's just talk about your notes if you would.  You have down here -- I think you wrote "opinions" and you underlined it with a colon; is that correct?

A.  Yes.

Q.  And you write in quotes:  "Remarkably consistent;" is that right?

A.  Yes.

Q.  Okay.  Dash, "denied the crime."

A.  Yes.

Q.   Did Dr. Kelly do some type of evaluation of Mr. Rodriguez that you're aware of?

A.   It's my recollection that before I was involved in the case Dr. Kelly was retained in some fashion by the attorney in Grand Forks, Mr. Dusek, that was handling the state kidnapping case.  And after I became involved and Mr. Dusek was no longer involved I got an authorization to talk to Dr. Kelly and I did that.  And so exactly what all he had done before and what opinions he had was part of the reason I was calling him.

Q.   Okay.

A.   And it looks like he did lots of interviews, did an MMPI, some other psychological testing.

Q.   Okay.  Let's go down a little further on your notes here.  You write:  "Story of prostitution-like conduct" -- I can't read your writing there.  "By" something.

A.   "By victim."

Q.   "By victim."  And then the next line what did you write?

A.   "Could she provoke physical confrontation."

Q.   And then the next line you have written in a quote.  Can you read that to us?

A.   "Either smooth psychopath or more to story than in public domain."

Q. Okay. And then you also write: "Also has denied the prior two convictions."

A. Yes.

Q. I'm going to hand you Government's Exhibit 613, Mr. Hoy (indicating). These appear to be more notes of a different conversation possibly the next day with Dr. Kelly; is that right?

A. Yes.

MR. REISENAUER: And I would offer Government's Exhibit 613, Your Honor.

THE COURT: Any objection?

MR. LUBY: If I may just take a look. No objection, Your Honor.

THE COURT: 613 is received.

MR. REISENAUER: Thank you, Your Honor.

Q. (Mr. Reisenauer continuing) Again as you just testified, Mr. Hoy, you had a meeting with Dr. Kelly on July 16th; is that correct?

A. Yes.

Q. And those notes reflect that meeting and your discussion with him.

A. Yes.

Q. And do you see on your notes that he, meaning Mr. Rodriguez, "admitted seeing her," and I assume he's talking about Miss Sjodin, "that night" but denied

involvement in her death.

A.   I see that on the bottom of the first page, yes.

Q.   Okay.   And then within your notes you also indicate that Dr. Kelly told you, quote, either he is a damn good liar, in paren, psychopath, end paren, or others are involved.

Do you see that?

A.   I see that, yes.

Q.   Mr. Hoy, do you recall we had a prior discussion about some lead testing that was done on a cup in this case?

A.   Yes.

Q.   And you testified I believe that the cup that was tested was obtained from Delores Rodriguez, correct?

A.   I don't recall where we got it but I believe it came through the family, yes, the Rodriguez family.

Q.   And I assume you were told that this was a cup from the family that was used when he was young?

A.   The concern was that there may have been lead leaching from pottery that the family had used during the course of his lifetime, and we were trying to verify or disprove that and we were trying to find some pottery that the family may have used at that time.   I know we got a cup but I can't recall as I sit here where we got it or how old it was supposed to be or what the history

of it was.

Q.  Okay.

A.  I know I ended up with it and had it tested and so I'm sure I've got notes about that.

Q.  Okay.  So obviously it wouldn't do you any good to test a cup that some other family used, correct?

A.  Correct.

Q.  If I say that during your deposition you said -- so the question became whether that could leach out and cause lead poisoning to individuals.  So as I recall I obtained a mug or a cup from -- I believe it was from Mr. Rodriguez's mother Delores and we sent that off for testing somewhere for lead and got a result back.

Does that sound --

A.  I don't dispute that.  I just don't -- as I sit here, I don't recall if I got it from Delores but I may well have.

MR. REISENAUER:  Okay, thank you.  If I could have one second, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  That's all the questions I have of Mr. Hoy, Your Honor.

THE COURT:  Mr. Luby?

MR. LUBY:  If I could just have a minute, Your Honor?

THE COURT:  You may.

MR. LUBY:  Thank you.  Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. LUBY:**

Q.  Mr. Hoy, could you please refer to Government's Exhibit 607 and 573.  Those were two of the documents that Mr. Reisenauer was asking you about.

A.  607 and 573?

Q.  Yup.

A.  I have them.

Q.  607 should be the handwritten notes starting with the "Mitigation Themes" and then 573 is the "Mitigation Themes" --

A.  Correct.

Q.  So if you look at 607 I think Mr. Reisenauer pointed out that the numbering on these notes appears to go from topic 1, 2, 3 and then to 5 without a 4.

A.  Yes, that's correct.

Q.  Okay.  And if you could turn to page -- excuse me, the other exhibit, 573, category No. 4 is "Mental Illness - Brain Damage - Learning Disabilities," am I right about that?

A.  Yes.

Q.  Okay.  And then category No. 6 would be toxins?

A.   Yes.

Q.   If you'd refer back to the handwritten note that is on Exhibit 607.

A.   Okay.

Q.   You see a category six that says:  Toxins slash brain damage slash MI slash LD?

A.   I see that.

Q.   And you testified I think the other day that "MI" stands for mental illness and "LD" for learning disability?

A.   Yes.

Q.   Does it appear that you may have combined category four considering "Mental Illness - Brain Damage - Learning Disabilities" and category six concerning "Toxins from Fields - Other Health Issues" into the same general discussion on your notes?

A.   In general, yes.  My notes that we're referring to if I may, Government Exhibit 607, I believe I took during the course of a couple days meeting with Mr. Ney and Miss Christiansen in Kansas preparing for trial.

Exhibit 573, the mitigation themes document, the one nicely typed that you can actually read as opposed to my notes, is a document that was prepared by Ingrid Christiansen and she would have prepared that and provided that to Mr. Ney and myself, I'm assuming prior

to our meeting but I don't know exactly what date that would have happened.

So my notes in Exhibit 607 I'm not trying to track her document to my knowledge.  It probably came up in that order but I'm not trying to track it necessarily.

Q.   Specifically on Exhibit 573 under the fourth category for mental illness, if you could take a look at page 3.

A.   Yes, I'm there.

Q.   Do you see the names of experts Marilyn Hutchinson and Karen Froming?

A.   Yes.

Q.   And then if you could please refer to the other exhibit, page 2.  Under category six you also see a discussion under there of Dr. Hutchinson and Dr. Froming or at least notes reflecting such a discussion?

A.   Yes.

Q.   And you said earlier today that you think this meeting might have been in Kansas City.  I think you may have testified the other day that it was in Wichita.  Do you recall which place it would have been?

A.   I'm sorry, it was in Wichita.  I misspoke if I said Kansas City.

Q.   Thank you.  And this is the meeting at which

there was some discussion of IQ test results and your notes reflect a sense that the IQ is higher than we expected?

A.   Yes.

Q.   And that would have been either the recollection that you testified the other day of Mr. Ney or Ms. Christiansen or both?

A.   It would have been one of them because I had no expectation.

Q.   And it was Mr. Ney I assume and not you who would have made the decision of what mitigating circumstances to elicit through Dr. Hutchinson or Dr. Froming or both or other experts?

A.   Mr. Ney was much more knowledgeable than I on that and he took the lead on that and I deferred to his views.

Q.   Mr. Reisenauer asked you a series of questions about a Dr. Kelly.

A.   Yes.

Q.   I believe your testimony was that he would have been retained by David Dusek, who was representing Mr. Rodriguez on the state court charges?

A.   That's my recollection, yes.

Q.   And Mr. Dusek didn't testify at trial in this matter?

A.   In this case?  No, he did not.

Q.   And if you would refer to the mitigation themes document again, Government Exhibit 573, under "Mental Illness - Brain Damage - Learning Disabilities," do you see any mention of Dr. Kelly?

A.   Of Dr. Kelly?

Q.   Yes.

A.   No.

Q.   To your knowledge did you or did co-counsel, Mr. Ney, rely on anything Dr. Kelly said so as to truncate your investigation of any questions of mental illness or mental health on the part of Mr. Rodriguez?

A.   Would you ask that again, please?

Q.   Yes.  Do you recall whether you or Mr. Ney ever used Dr. Kelly's observations, anything that he said, as a basis for truncating your investigation of Mr. Rodriguez's mental health?

A.   No.

Q.   The defense then continued to rely on Dr. Hutchinson and Dr. Froming notwithstanding whatever Dr. Kelly would have said earlier?

A.   That's true.

MR. LUBY:  I believe those are all my questions.

THE COURT:  Thank you.  Mr. Reisenauer?

MR. REISENAUER:  No questions, Your Honor.

THE COURT:  You may step down, Mr. Hoy.

THE WITNESS:  Thank you.  Hope you enjoy the balmy whether that we'll be having tomorrow.

THE COURT:  Petitioner have any other witnesses to call?

MR. MONTROY:  No, Your Honor, we do not.

THE COURT:  And so are you resting at this point?

MR. MONTROY:  Yes, Your Honor.

THE COURT:  All right.  And your witnesses are scheduled to show up on -- subject to making sure all the exhibits are in is fine.  Is there anything else that --

MS. SHAHEED:  Yes, for the record I will not be here next week.  I just wanted to let the Court know.

THE COURT:  Really?  Ms. Shaheed, are you going to go back and have fun in the warmer parts of the climate here?

MS. SHAHEED:  I don't know about fun but it will be warmer.

THE COURT:  Good for you.  It's been a pleasure having you here.

MS. SHAHEED:  Thank you.

THE COURT:  Have a safe trip home.

MS. SHAHEED:  Thank you.

THE COURT:  I do apologize again for blowing your name on the first day.  That wasn't very good. I'll try and do better.

Mr. Reisenauer, you'll be ready to start at 9 o'clock on Monday morning?

MR. REISENAUER:  Yes, Your Honor.

THE COURT:  All right.  We'll do that. Thank you.  Have a good weekend.

MR. MONTROY:  Have a nice weekend, Your Honor.

(Adjourned at 4:35 p.m.)