**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                                )
United States of America,       )
                                )
   Plaintiff/Respondent,      )
                                )
       vs.                    )     **FILE NO. 2:04-cr-55**
                                )
Alfonso Rodriguez, Jr.,         )
                                )
   Defendant/Petitioner.      )
                                )
- - - - - - - - - - - - - - - -

**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**Evidentiary Hearing - Volume 6 of 9**

**February 4, 2019**

**Pages 1031-1260**

HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
        655 FIRST AVENUE NORTH
        FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

**A P P E A R A N C E S**

**MR. KEITH W. REISENAUER**                **COUNSEL FOR PLAINTIFF;**
**MS. MELISSA H. BURKLAND**
Office of U.S. Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102

**MR. JOSEPH W. LUBY**                **COUNSEL FOR DEFENDANT;**
**MR. ERIC J. MONTROY**
**MS. ANNE FISHER**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

**I N D E X**

**W I T N E S S E S**

<u>**DEFENDANT'S:**</u>                                            <u>**PAGE NO.**</u>

  <u>**LATOYA HAMPTON**</u>

  Direct Examination by Mr. Montroy                    1038

<u>**PLAINTIFF'S:**</u>

  <u>**JAMES D. SEWARD**</u>

  Direct Examination by Mr. Reisenauer                 1043
  Cross-Examination by Ms. Fisher                      1170

**E X H I B I T S**

| <u>EXHIBIT NO.</u> | <u>DESCRIPTION</u> | <u>OFR'D</u> | <u>REC'D</u> |
|---|---|---|---|
| Defendant's 78 | Email from Alice Smith Dated 12/10/18 Re: GED Records | 1040 | 1040 |
| Defendant's 79 | Email from Beckie Strom Dated 1/2/19 Re: GED Records | 1042 | 1042 |
| Defendant's 80 | Forensic Psychiatry and Forensic Psychology: Mental Handicap Disability | 1181 | 1181 |
| Defendant's 81 | Record Form - WAIS-IV (Full test) | 1188 | 1188 |
| Defendant's 82 | Copy of WAIS-IV that is published in Spanish | 1188 | 1188 |
| Defendant's 83 | WAIS-III (English) | 1235 | 1235 |
| Defendant's 84 | WAIS-III (Spanish/Mexican Version) | 1235 | 1235 |
| Defendant's 85 | The Death Penalty and Intellectual Disability (Pages 145,146,193,265) | 1237 | 1237 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's   86 | Raw Data provided by Dr. Seward (Sealed) | 1242 | 1242 |
| Government's 614 | CV of James D. Seward | 1044 | 1044 |
| Government's 615 | Report of James D. Seward Dated 8/31/13 | 1058 | 1058 |
| Government's 616 | Psychological Report Dated 1/29/75 from the Minnesota Security Hosp. | 1064 | 1064 |
| Government's 617 | Psychological Report Dated 3/19/80 | 1065 | 1065 |
| Government's 618 | Psychological Report Dated 11/28/78 | 1066 | 1066 |
| Government's 619 | Medical Progress Notes | 1068 | 1068 |
| Government's 620 | Partial Transcript | 1073 | 1073 |
| Government's 621 | Partial Transcript | 1073 | 1073 |
| Government's 622 | Partial Transcript | 1073 | 1073 |
| Government's 623 | Partial Transcripts of Conversations with Dr. Seward and Mr. Rodriguez | 1111 | 1111 |
| Government's 624 | Partial Transcripts of Conversations with Dr. Seward and Mr. Rodriguez | 1111 | 1111 |
| Government's 625 | State Parole & Probation Agent's Report Dated 2/24/75 | 1113 | 1113 |
| Government's 626 | Partial Transcript of Interview of Dr. Seward & Mr. Rodriguez | 1115 | 1115 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 627 | Partial Transcript from the Trial with Dr. Hutchinson | 1117 | 1118 |
| Government's 628A | DVD of Recording of Dr. Seward's Interview on 7/10/13 - Day 1 Part 19, Start @ 6:20 min to 13:42 min | 1121 | 1121 |
| Government's 628B | Transcript of Seward - News Events | 1121 | 1121 |
| Government's 629 | Partial Transcript of Interview with Dr. Seward & Mr. Rodriguez & (7/11/13) | 1122 | 1122 |
| Government's 630 | Partial Transcript of Interview with Dr. Seward & Mr. Rodriguez & (7/11/13) | 1126 | 1126 |
| Government's 631 | Partial Transcript of Interview with Dr. Seward & Mr. Rodriguez & (7/11/13) | 1129 | 1129 |
| Government's 632A | DVD of Recording of Dr. Seward's Interview on 7/10/13, Day 1, Disc 2, Part 19 - start @ 17:29 min to 30:38 min | 1131 | 1132 |
| Government's 632B | Transcript of Dr. Seward's Laredo, TX trip | 1131 | 1132 |
| Government's 633 | Partial Transcript of Interview with Dr. Seward & Mr. Rodriguez (7/11/13) | 1133 | 1133 |
| Government's 634 | Partial Transcript of Interview with Dr. Seward & Mr. Rodriguez (7/10/13) | 1135 | 1135 |
| Government's 635 | Partial Transcript of Clifford N. Hegg | 1137 | 1137 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 636 | Transcript of Interview with Dr. Seward and Mr. Rodriguez (7/10/13) | 1140 | 1140 |
| Government's 637 | Transcript of Interview with Dr. Seward and Mr. Rodriguez (7/10/13) | 1144 | 1144 |
| Government's 638 | Record Form - WAIS-IV | -- | -- |

**P R O C E E D I N G S**

(February 4, 2019:  The following proceedings commenced at 9:00 a.m., in open court, all counsel present.)

THE COURT:  All right.  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55. The record should reflect that the petitioner has waived his right to be present.  He appears through his counsel, Ms. Fisher, Mr. Luby, Mr. Montroy.  The United States appears through its counsel of record, Mr. Reisenauer and Ms. Burkland.

When we broke the petitioner had rested his case and, Mr. Reisenauer -- well, the United States was about to call their first witness.

MR. MONTROY:  Your Honor, if I may, I know that we rested on Friday.  We neglected -- we have a very short witness, Miss Hampton actually, just involving a couple records.  It's only going to take maybe probably less than five minutes so if we could reopen for the purpose of just calling Ms. Hampton.

THE COURT:  All right.  Go ahead.

MR. MONTROY:  Petitioner would call Latoya Hampton.

THE COURT:  If you please would stand before

the clerk, raise your right hand and take the oath.

THE CLERK:  State your full name and spell your name.

MS. HAMPTON:  Latoya Hampton, L-a-t-o-y-a H-a-m-p-t-o-n.

(Witness sworn.)

THE COURT:  Mr. Montroy.

MR. MONTROY:  Thank you, Your Honor.

**LATOYA HAMPTON,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. MONTROY:**

Q.  Good morning, Miss Hampton.

A.  Good morning.

Q.  Where are you currently employed?

A.  The Federal Defenders Office of the Eastern District of Pennsylvania in Philadelphia, Pennsylvania.

Q.  And how long have you worked there?

A.  Ten years.

Q.  And have you worked on Alfonso Rodriguez's case?

A.  Yes.

Q.  And what have your duties included as a member of the -- as an employee of the Federal Community Defender Office as a paralegal and specifically when -- in your

work on Mr. Rodriguez's case?

A.  Specifically or ultimately I interview -- or investigate all records pertaining to Mr. Rodriguez so I try and locate and investigate all records pertaining to mitigation and guilt phase litigation.

Q.  And in your work did you attempt to determine whether or not there were records for Mr. Rodriguez concerning either a diploma or a GED?

A.  I did.

MR. MONTROY:  Your Honor, may I approach?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  Miss Hampton, please take a moment to look at what's been marked as Defense Exhibit 78 (indicating).  And is this -- could you describe for the Court what this e-mail is?

A.  Yes.  This is an e-mail that I received from Alice Smith on it looks like December 10, 2018.  It is a response to my initial request for Mr. Rodriguez's GED.

Q.  Okay.  So did you initially reach out to Miss Smith to inquire as to whether or not there were records of a GED or diploma?

A.  I did.  I initially reached out to the Minnesota Department of Education, the GED office.

Q.  And it's your understanding that if Mr. Rodriguez had a GED or diploma that the record would

exist in the Department of Education from Minnesota?

A.   That's been my experience with other states, yes.

Q.   Okay.   And Miss Smith indicated that there was no records of any tests taken for the GED for Mr. Rodriguez; is that right?

A.   That's correct.

Q.   And there were no records that -- in the Department of Education that Mr. Rodriguez had ever attained a diploma or GED?

A.   That's correct.   According to the response that I received, that's correct.

MR. MONTROY:   Your Honor, may I approach, please?

THE COURT:   You may.

MR. MONTROY:   And, Your Honor, I'm sorry, I would offer 78.

THE COURT:   Any objection?

MR. REISENAUER:   I don't know what it is, Your Honor.   No objection, Your Honor.

THE COURT:   Seventy-eight is received.

MR. MONTROY:   Thank you, Your Honor.

Q.   (Mr. Montroy continuing)   Miss Hampton, I would direct your attention to what's been marked as Defendant's Exhibit No. 79 and if you could just take a second to look at that.

A.    (Witness examining.)

Q.    Miss Hampton, other than the Minnesota Department of Education, were there any other organizations that you reached out to in an attempt to determine whether or not Mr. Rodriguez had a diploma or GED?

A.    I did.  I reached out to the St. Peter school or -- the St. Peter School District and the record it stated that that was the organization or the school that had administered the GED or had given Mr. Rodriguez GED training in his Minnesota Security Hospital records.  So I reached out to that school district and this is the response that I received.

Q.    So Defendant Exhibit 79 is the response that you received from St. Peters?

A.    Yes, from Beckie Strom on January 2, 2019.

Q.    Okay.  And what was the response that you received from them?

A.    Her response was that she couldn't find any GED records and she also contacted the state GED office, state office that I had previously contacted as well.

Q.    Okay.  So is it fair to say that there was no records that you received from either St. Peters or the Minnesota Department of Education concerning Mr. Rodriguez ever having taken the GED or having received a diploma?

A.   I never received any records.

MR. MONTROY:  Okay.  Thank you.  Your Honor, I would offer Defense Exhibit 79.

MR. REISENAUER:  No objection.

THE COURT:  Seventy-nine is received.

MR. MONTROY:  Thank you, Your Honor.  I have no further questions.

MR. REISENAUER:  We have no questions, Your Honor.

THE COURT:  You may step down, Miss Hampton. Does the petitioner rest at this point?

MR. MONTROY:  Petitioner rests, yes, Your Honor.  Thank you.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  Thank you, Your Honor.  We would call Dr. James Seward, S-e-w-a-r-d.

THE COURT:  Dr. Seward, if you please would come forward, stand before the clerk, raise your right hand and take the oath.

THE CLERK:  Please raise your right hand. State your full name and spell your name.

MR. SEWARD:  James D. Seward, S-e-w-a-r-d.

(Witness sworn.)

MR. REISENAUER:  Your Honor, if I may, before Dr. Seward begins his testimony I notice that

Dr. Weinstein enjoys our weather so much he flew back here this weekend and is sitting in the courtroom.  I would ask that he be sequestered during the testimony of Dr. Seward and our other witness, Dr. Welner, who will be testifying following Dr. Seward.  I anticipate that he will, because he's here, be called again as a witness.

MR. MONTROY:  That's correct, Your Honor.  I advised Mr. Reisenauer this morning that Dr. Weinstein is a potential rebuttal witness for the defense, and as an expert we would object to any sequestration on the basis that as an expert Dr. Weinstein is permitted to consider and rely on sources, including the testimony of the government's experts.

THE COURT:  The objection's overruled.

MR. REISENAUER:  Thank you, Your Honor.

**JAMES D. SEWARD,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. REISENAUER:**

Q.  Dr. Seward, if you would state your name and spell it for us for the record, please.

A.  Sure.  James D. Seward, S-e-w-a-r-d.

Q.  And, Dr. Seward, you became involved in the case

of Alfonso Rodriguez; is that correct?

A. That's correct.

Q. And that was at the request of our office; is that correct?

A. Yes, sir.

Q. Okay. First, before we get into what you did in regard to our request, I would ask you to look at your CV that you provided to us if you would.

And this has been marked as Government's Exhibit 614 and we would move in 614, Your Honor.

THE COURT: Any objection?

MS. FISHER: I'm sorry, no objection, Your Honor.

THE COURT: 614 is received.

MR. REISENAUER: Thank you, Your Honor.

Q. (Mr. Reisenauer continuing) Dr. Seward, if you would, would you first tell us about your educational background, please.

A. Sure. So I have a Bachelor's in psychology which I received in, what, 1975. Then I went on to get a Master's in social work, a Master's in forensic psychology, then a Ph.D. in counseling psychology and most recently a Master's in applied statistics.

Q. Okay. And if you could extrapolate for us a little bit about your education. Where did you go to

school, sir?

A.   My Bachelor's in psychology was at Aquinas College, a small school in Michigan.  And then the Master's in social work was at Grand Valley State University, which is also in Michigan.  Let's see, I moved to New York to get the Master's in forensic psychology from John Jay College.  The Ph.D. in counseling psychology was from Temple University, and the Master's in applied statistics was from Villanova.

Q.   Okay.  And can you just tell us following receiving your Ph.D. what did you do in terms of practice and work experience?

A.   Sure.  I was at the Devereaux Center for Head Trauma for not very long and from there I went to the Bryn Mawr Rehabilitation Hospital as a neuropsychologist, which is outside Philadelphia.

Q.   And when did you go there and how long were you employed there?

A.   It was -- it was seven years from -- so I went there in 1991 and left in 1998.

Q.   Okay.  And what did you do there?

A.   Well, so it's a physical medicine and rehabilitation hospital so it had both -- served both inpatients and outpatients.  The inpatients there were people, for example, recovering from like a broken hip.

But then there were also people who had traumatic brain injuries and strokes, and I would be involved in the assessment and treatment of the brain injury cases and the stroke cases.  I also evaluated and treated outpatients so they would come in for assessment or for treatment.

Q.  Okay.  And so that would -- if I'm correct that would be basic practice in clinical neuropsychology then.

A.  That's correct.  And then about in 1995 I started a part-time private practice -- or a part-time independent practice doing neuropsychology initially in civil cases.

Q.  Okay.  And what did that entail?  What did you do as part of that work?

A.  Well, they were mostly -- as I recall mostly personal injury cases so I'd be retained by attorneys or sometimes by case management companies to evaluate plaintiffs.

Q.  Okay.  And then you said I think you were there until 1998; is that right?

A.  That's correct.

Q.  Okay.  And where did you go from there?

A.  In 1998 I went to the Delaware Psychiatric Center, which is the Delaware State Hospital, which is

in New Castle, Delaware.  There I was assigned to the forensic unit.

Q.   Okay.  And as part of your work there, what did that entail?

A.   Well, there were -- so these were defendants who there was some issue raised about their mental health so I would do evaluation and treatment.  And then there was also sort of a clinic where people would be brought in and I would evaluate them regarding forensic issues such as competency to stand trial or criminal responsibility.

Q.   Okay.  And you were there for approximately four years?

A.   That's correct.

Q.   Okay.  And then from there what did you do?

A.   Well, in let's see 2002 we moved to Arizona and I was -- let's see, I'm just trying to -- so I was not working a lot for a couple months but I picked up some work doing evaluations for Adult Protective Services of vulnerable adults.  And then I was employed at the Sun Health Research Institute, which does research for -- regarding dementing illnesses like Alzheimer's disease, and I worked there as a neuropsychologist and a researcher and a biostatistician.

Q.   Okay.

A.   And I'm looking -- that was until -- I was

associated with -- I had like an affiliation there until 2009 but I left there in 2004.

Q.   And what did you do at that time?

A.   Then I went to the Mericopa County Correctional Health Services.  Now they're -- Maricopa County is where Phoenix is.

Q.   Okay.

A.   And they have a -- for people that where their competency to stand trial is questioned they are -- the ones that are in custody are assessed and treated in custody.  So I worked with that program.

Q.   Okay.  And was that program a court-appointed type program?

A.   Yes, yes.  So people -- the defendants, again they were in custody.  They would be -- there would be a hearing and then the judge would place them into the competency restoration program.

Q.   And so the Court would appoint you to evaluate these individuals that were standing trial and you would attend the hearing?

A.   Correct.  And not appoint me personally but put the person in the program in which I worked, yes.

Q.   How long did you do that?

A.   Well, let's see, initially I was -- for two years I was working in the restoration component, which is

sort of the tail end of the program.  So these were people that were found not competent and they were receiving treatment.  So I would supervise their treatment, issue a report as to whether they were restored to competency.  And then in 2006 I went to the front end of the program and I would evaluate defendants as to whether or not they were competent to stand trial and should be placed in the competency program.

Q.  Okay.

A.  On my CV it's referred to as a Rule 11 psychologist in the Arizona code of criminal proceedings that deals with competency to stand trial.

Q.  Okay.  And how long did you participate in that?

A.  That was one year.

Q.  Okay.  And then what did you do?

A.  Well, 2007 I -- and I left there because -- I left Maricopa County because they would not let me go part time.  I wanted to work part time and devote more time to my private practice.

Q.  Okay.  So you still had a private practice going on?

A.  Yeah, I did.  Consistent since -- well, I don't know consistent -- from 1995 on with the caveat that things were a bit slow after we moved to Arizona.

Q.  Okay.  And was it the same type of practice that

you told us about before or was it different?  Was it a clinical-type practice?

A.  It was clinical.  I transitioned to doing criminal work.

Q.  Okay.  And then you said you left the Maricopa County program and where did you go?

A.  I worked at Arizona State Hospital briefly in their forensic unit, again assessing competency to stand trial, sometimes criminal responsibility.  I believe -- I think I was there for maybe nine months or so.

Q.  Okay.

A.  And I left there in that same year, in 2007, to work as a neuropsychologist at the Banner Alzheimer's Institute.

Q.  And what is that?

A.  Well, the Banner Alzheimer's Institute is a facility that does treatment of and research in dementing disorders, primarily Alzheimer's disease.  So they're involved in clinical trials.  They do some -- they do a fair amount of imaging, research, and patients are evaluated and treated.

Q.  Okay.  And how long did you work for Banner Health?

A.  Let's see, 10 years.  In fact, you know, I'm looking at this.  This Exhibit 614 is not my most recent

CV.

Q.   Okay.

A.   I have my most recent one here.

Q.   What's missing on 614?

A.   Well, I notice for like Banner Alzheimer's Institute it says 2007 to present.

Q.   Okay.

A.   And in the more recent one it says to 2018, which is correct.  I left there in April of last year.

Q.   Exhibit 614 is probably --

A.   I'm sorry, 2007.

Q.   Excuse me?

A.   I'm sorry, sir, I'm getting -- getting nervous and confused.  I left Banner in 2017.

Q.   Okay.  So Exhibit 614 is probably the CV you provided at the time that you submitted your report in this case?

A.   Well, it's possible.

Q.   Okay.  Well, let's just move on.  When you were -- when you were at Banner Health, you were acting as a neuropsychologist though?

A.   That's correct.

Q.   Okay.  And then you became involved in what is called The Forensic Panel; is that right?

A.   Yes, sir.

Q.   And tell us about that.

A.   Sure.  I have been involved with them since 1998. The Forensic Panel, based in New York, is a network of forensic professionals primarily in the behavioral health field; although, they also have criminologists and toxicologists and so on.

Q.   Okay.  And the chair of The Forensic Panel is Dr. Michael Welner, correct?

A.   That's correct.

Q.   And in terms of your involvement, how does that work?  How do you get involved in a particular case and what does that entail?

A.   Sure.  Well, I'll get a call from them about a case and then, you know, we talk about it and if I'm interested and the deadline's not looming I take the case.  And then The Forensic Panel has a peer review process.

Q.   Okay.  And what is that?

A.   Well, so -- and I've been a peer reviewer for them, too.  But so there is a primary person, and in this case it was me, and then I had the benefit of input from two peer reviewers, Dr. Suarez and Dr. Gilmet.

Q.   Okay.

A.   And they're involved in critiquing my work, making suggestions, providing input.

Q.   And so you said that you've been a peer reviewer so when you're involved in that I assume that then you take that role on in terms of reviewing somebody's work and providing input, correct?

A.   Yes, sir.

Q.   Okay.  And you've been involved with The Forensic Panel since 1998?

A.   Yes, sir.

Q.   Do you have any idea how many cases you may have been involved in with The Forensic Panel?

A.   It's hard to say.  It's irregular.  I can -- a year might go by where I wouldn't see a case.  Right now I'm involved with them more than I ever have been before.  I think I have like two or three cases going on, maybe four.  So it's irregular.

Q.   Okay.  And then you still have your independent practice?

A.   That's correct.

Q.   Okay.  And again that is neuropsychology work, correct?

A.   Forensic neuropsychology, that's correct, and some straight forensic cases.

Q.   Okay.  And I take it that your work with The Forensic Panel has been in your capacity as a neuropsychologist?

A.   Yes.

Q.   Okay.  Do you have any teaching background at all?

A.   I do.  So I was teaching a couple things.  Years ago I taught psychology at a small college outside of Philadelphia.  And then from 2007 to 2018 I was adjunct faculty as an osteopathic medical school.  They have a dental school and -- so as part of the dental school they have an orthodontics program.  And the orthodontics students or residents have to do a research project and I was working with them on research, design, analysis and things like that.

Q.   So would that have been part of your second Master's?

A.   Third.  That's part of the applied statistics Master's.

Q.   Okay.  How about presentations, I see in your resume you've done a number of presentations in various areas; is that correct?

A.   Yes, sir.

Q.   And then you also have a list of publications; is that right?

A.   That's correct.

Q.   I'm looking at that list and I guess I -- if you go to that page, Doctor, where you have your

publications listed, I just have a question.

A.   So I am looking at page 6.

Q.   Okay.  And maybe the one you're looking at doesn't have the updated version that I'm holding here that you provided me, but in 2017 you list a publication called "The Role of Psychologists as Expert Witnesses in the U.S. Criminal Justice System."  Do you recall that?

A.   Yes.

Q.   Can you tell us what that was?

A.   Well, I ran into -- I was at a conference overseas and I was speaking with somebody from Azerbaijan.

MS. FISHER:  I'm sorry, Your Honor, I don't have a copy of this most recent CV to see what this entry is.

MR. REISENAUER:  I can provide it to her, Your Honor.

THE COURT:  Please do.  The one that we're referring to in 614 is not the most recent one either.

MR. REISENAUER:  We can substitute later, Your Honor.  Thank you.

THE COURT:  All right.

Q.   (Mr. Reisenauer continuing)  Go ahead, Doctor. Can you just tell us about that.

A.   Oh, sure.  So I ran into somebody from Azerbaijan

and he was saying how in Azerbaijan the -- in a criminal matter the defense is often not allowed to nominate an independent expert so -- and he's the editor of this journal that is published.  And so he asked me to write an article about things in the U.S., how it works here.

Q.  Okay.  Doctor, are you a member of the AAIDD by any chance?

A.  Yes, I am.

Q.  Any other memberships in your field?

A.  Yes.  There's probably about a dozen or so.

Q.  Can you tell us those, if you can.

A.  Sure.  And I'm looking on page 9 of the updated CV.

Q.  Go ahead.

A.  So the American Academy of Clinical Neuropsychology, the American Academy of Forensic Sciences, the American Association on Intellectual and Developmental Disabilities, the American College of Epidemiology, the American Psychological Association, the American Statistical Association, the Arab Society for Forensic Sciences and Forensic Medicine, the Arizona Homicide Investigators Association, the Arizona Neuropsychological Society, the Association for Psychological Science, the Association of Threat Assessment Professionals, the International

Epidemiological Association, the International Neuropsychological Society, the National Academy of Neuropsychology, the New York Academy of Sciences and the World Association for Medical Law.  And let me give the caveat that for some of these places I probably haven't paid my 2019 membership yet.

MR. REISENAUER:  Okay.  Thank you, Doctor.

Your Honor, we would offer Dr. Seward as an expert in neuropsychology.

MS. FISHER:  No objection, Your Honor.

THE COURT:  Yeah.  Once again the Court will allow the witness to testify in the areas that he has demonstrated expertise in.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Doctor, you became -- as you noted earlier, you became involved in the case we're in court for today, Alfonso Rodriguez Jr.; is that correct?

A.  That's correct.

Q.  And do you recall when that was?

A.  I do not.  I see that my report is dated August 2013 so my guess is that it would be sometime earlier in 2013 but again I can't say for sure.

Q.  Okay.  And you just referred to your report.  You submitted a report in this case, correct?

A.   Yes, sir.

Q.   I'm going to hand you Government's Exhibit 615 and ask if you can identify that (indicating).

A.   That is my report.

MR. REISENAUER:  We would offer Government's 615, Your Honor.

MS. FISHER:  No objection.

THE COURT:  615 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  And, Dr. Seward, as you noted, your report is dated August 31, 2013; is that correct?

A.   That's correct.

Q.   And in this particular case with regard to Mr. Rodriguez, you interviewed him; is that right?

A.   Yes.

Q.   Can you tell us when that was?

A.   Well, I would have to look in my report.  It was over the course of three days and I am -- my recollection is January -- I'm sorry, July 11 -- I'm sorry, July 10th, 11th and 12th.

Q.   Okay.

A.   2013.

Q.   I think if you turn to page 9 of your report it notes July 10th, July 11th and July 12th, 2013.

A.   Yes.

Q.   Would that be correct?

A.   Yes.

Q.   And where did your interview of Mr. Rodriguez take place?

A.   At the federal prison in Terra Haute, Indiana.

Q.   Okay.  And I take it during those three days you had an opportunity to interview him as well as do some testing?

A.   That's correct.

Q.   Okay.  And when you did this, did you audio or videotape your interview?

A.   Yes, sir, both.

Q.   Okay.  And that has been made available to our office; is that right?

A.   Yes, sir.

Q.   Let's -- if you would turn back to page 4 of your report just briefly, your report indicates that there were a number of questions posed to you but I want to concentrate on this one.

You were -- you were asked whether the collective testing data in conjunction with the pertinent collateral history of Mr. Rodriguez causes you to opine in your professional capacity that -- or whether Mr. Rodriguez is mentally retarded or in today's

language intellectually disabled; is that correct?

A.   That's correct.

Q.   And so that was part of the purpose of your interviews and testing; is that right?

A.   Yes, sir.

Q.   And so in that regard can you explain to us what your understanding of "mental retardation" or "intellectual disability" is?

A.   Sure.  Well, there are three -- there's three prongs.  First of all, you have to have significantly subaverage intellectual functioning as measured by IQ testing, individually administered IQ testing.  You have to have deficits in adaptive functioning that interfere with your life, and the onset has to be in the developmental period, which is usually defined as prior to age 18.

Q.   Okay.  And is it correct that as you've recited the intellectual functioning deficit and the adaptive functioning deficits you have to have both of those?

A.   That's correct.

Q.   Okay.  And as far as the adaptive functioning deficits, you need to show some type of support.  We all have deficits, of course, so you need to show that the deficits the individual has causes the need for some type of supports of that individual?

A.   That's correct.

Q.   And you're familiar with the AAIDD manual and the DSM-V; is that correct?

A.   Yes, I am.

Q.   Okay.  And the recitation you just gave us of "mental retardation" or "intellectual disability," those are taken from both of those manuals, correct?

A.   That's correct.

Q.   And, Doctor, 'm going to hand you what was marked and entered as Defendant's Exhibit No. 1 (indicating).  This is I guess calling it the red book.  You're familiar with that?

A.   Yes.

Q.   And this is the former 10th Edition back then known as the AAMR; correct?

A.   Yes.

Q.   Okay.  I'm going have you turn to page 1 and that sets forth the definition of "mental retardation;" is that correct?

A.   Yes, sir.  At that time, yes, sir.

Q.   Right.  And are the three criteria that you just testified to, are those set out on page 1 there?

A.   They are.

Q.   Okay.  And they're as you just testified; is that correct?

A.   Correct.

Q.   Okay.

A.   I guess the primary difference is the change in terminology.

Q.   Okay.  From "mental retardation" to --

A.   Intellectually --

Q.   -- "intellectual disability"?

A.   Yes, sir.

Q.   And so the green book that I'm holding here is the 11th Edition and that entails the change of the language from "mental retardation" to "intellectual disability"?

A.   Yes, sir.

Q.   Okay.  Other than that the three prongs are the same; is that correct?

A.   That's correct.

Q.   Okay.  If we could, I'm going to have you then turn back to your report, Doctor.  And let's do this: If you'd turn to page 30 of your report, Doctor.

A.   Got it.

Q.   Turn to page 29 if you would first.

A.   Okay.

Q.   Here you're talking about previous testing data, correct?

A.   Yes, sir.

Q.   Okay.  And, if you would, you first talk about the Kuhlmann-Anderson test; is that right?

A.   That's correct.

Q.   And there's some scores that you list there.  Now you have a footnote on the bottom of that page that says:  "Per the test publisher website, the Kuhlmann-Anderson Tests measure academic potential by assessing cognitive skills related to the learning process."

You see that?

A.   Yes, sir.

Q.   So this -- if I'm reading this correct, these test scores provide to the various teachers or school officials the potential for the student at that time; is that right?

A.   Well, the website quote is from 2013 and this test would have been given in the late '50s, early '60s.  So that is -- that's what they're saying now.  I couldn't find anything about what it was like back then.

Q.   Okay.  But you note in the sentence above that in parentheses that this is a group-administered instrument.

A.   Yes, sir.

Q.   And is the IQ measurement that you work with, is that recommended as a type of instrument, a

group-administered instrument?

A.   It is not.

Q.   You're supposed to use an individual instrument?

A.   That's correct.  You could imagine you have a classroom full of kids, for example.  They're taking a test.  Teacher has no practical way of ensuring that there's engagement amongst all the students in doing the test.

Q.   Okay.  Then turn to page 30, if you would.

A.   Yes, sir.

Q.   Here you talk about a couple different other test results.  I want to touch on those, if we could.

MS. FISHER:  I'm sorry, what page is this?

MR. REISENAUER:  Thirty.

MS. FISHER:  Thank you.

Q.   (Mr. Reisenauer continuing)  This has been marked as Government's Exhibit 616, Dr. Seward.  It is a report from the Minnesota Security Hospital.  It's entitled "Psychological Report."

We would offer 616, Your Honor.

THE COURT:  Any objection?

MS. FISHER:  No objection.

THE COURT:  616 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Doctor, this

particular report, if you would look on the second page there, there were a number of -- it says "Tests Administered" and there's a list of a number of tests. You see that?

A.   I do.

Q.   Okay.  And here right about in the middle of those listed tests it says "Academic IQ Estimate 85." Do you see that?

A.   Yes, sir.

Q.   Is there a particular test that relates to that that you can see?

A.   I don't see it written.  My assumption is that's the Shipley but I could be wrong.

Q.   And the Shipley test, that has an IQ component to it?

A.   Yes, sir.

Q.   Okay.  Doctor, I'm going to hand you Government's Exhibit 617 (indicating).  This is another report from the Minnesota State Hospital.

We would offer 617, Your Honor?

MS. FISHER:  No objection.

THE COURT:  617 is received.

Q.   (Mr. Reisenauer continuing)  Doctor, I'm going to refer you to what would be the second full paragraph that starts with "The results..."  Do you see that?

A.   Yes.

Q.   Can you just read that to us.

A.   Sure.  "The results of the California Psychological Inventory (CPI) are fairly well within the normal limits.  Positive traits seem to include his being imaginative, informal, spontaneous, talkative and as having an expressive, ebullient nature.  He's also likely to be seen as mature, independent and self-reliant.  On the negative side, this test seems to indicate that he may be undercontrolled and impulsive in his behavior.  Defensiveness, a demanding nature and rebelliousness may become manifest and he may be deceitful in his dealings with others."

Q.   Does the CPI test have an intelligence component to it, Doctor?

A.   Well, sort of.  It's not a cognitive test as such but somehow they infer -- they make inferences about intellectual functioning from the test.

Q.   Okay, thank you.  Doctor, I'm going hand you what's been marked as Government's Exhibit 618 (indicating).  This is another psychological report from the Minnesota Security Hospital.

We would offer 618, Your Honor.

MS. FISHER:  No objection.

THE COURT:  618 is received.

Q.   (Mr. Reisenauer continuing)  Doctor, turn to the second page of that particular report.  Earlier you mentioned the Shipley test.

A.   Yes, sir.

Q.   This is cited on the second page.  Do you see that?

A.   I do.

Q.   Okay.  And here it says:  "Shipley Institute of Living Scale, Verbal Score 21, Abstraction Score 20, Estimated Academic Aptitude-average range."  Do you see that?

A.   Yes, sir.

Q.   Can you tell us about this particular test and how this would be arrived at.

A.   The Shipley has two parts.  I haven't used it for a while but I recall part of it has to do with completing sequences and I believe similarities.  It's a -- and, as it says here, it comes up with an academic aptitude score.  I know I'm kind of fumbling here but I haven't used the test for a while.

Q.   It doesn't provide an IQ number but it provides a range that you can utilize and look at in terms of your academics; is that right?

A.   Well, my recollection is that it actually does provide a number.  But it looks like here they --

instead of giving you a number they gave the range.

Q. Okay. So the exhibit we put in before, you believe that was a Shipley test result and that had an academic IQ estimate of 85, correct?

A. Correct.

Q. Okay. On page 1, Doctor, just while we're on this particular exhibit, there's reference to the California Psychological Inventory which is mentioned also on page 2, correct?

A. Yes, sir.

Q. On page 1 in the -- it would be -- again the second full paragraph starts with the word "Results..." Do you see that?

A. Yes, sir.

Q. Can you read those first two sentences for us.

A. Sure. "Results of the current California Psychological Inventory are quite similar to profiles of November, 1976, and December, 1977. The characteristics of rebelliousness, rigidity, and moodiness continue to appear in the profile."

Q. Thank you.

A. You're welcome.

Q. Doctor, Government's Exhibit 619 is again a report from the Minnesota Security Hospital.

We would move 619 into evidence, Your Honor.

MS. FISHER:  No objection.

THE COURT:  619 is received.

Q.  (Mr. Reisenauer continuing)  Doctor, if you would on 619, the fourth full paragraph -- I believe this is a report from Dr. Eggert.  Do you recall that?

A.  Yes, I do.

Q.  In the fourth full paragraph, the last two, three sentences say:  "The sensorium is clear.  I think that this man's intelligence is within the average range, but was compromised by language difficulties and difficulty with social acceptance.  He shows a good general and personal knowledge.  He shows a fair amount of insight and good judgment."

Do you see that?

A.  Yes, sir.

Q.  You referred to that in your report.  Do you recall that?

A.  I do.  I -- I don't recall the exact page though.

Q.  Okay.  But you were aware of Dr. Eggert's thoughts and opinions regarding Mr. Rodriguez's intelligence?

A.  Yes, sir.

Q.  At the time of trial in this matter, the defense called Dr. Karen Froming.  Are you familiar with that?

A.  Yes.

Q.   And you're familiar with Dr. Froming's prior testing at the time of trial?

A.   Yes, sir.

Q.   Doctor, I'm going to hand you Defendant's Exhibit 24, have you take a look at that (indicating).

A.   (Witness examining.)

Q.   That would be Dr. Karen Froming's report that she submitted in the original trial.  Are you familiar with that, Doctor?

A.   Yes, sir.

Q.   Okay.  And on that first page Dr. Froming did some IQ testing, correct?

A.   Correct.

Q.   And what test was that?

A.   That was the Wechsler Adult Intelligence Scale-Third Edition.

Q.   Okay.  And the Wechsler Intelligence test, that is one of the more common tests; is that correct?

A.   Yes, it is.

Q.   And is that a test that is recommended by either -- any of the associations you belong to or the DSM-V or the AAIDD at all?

A.   The AAIDD.

Q.   And they recommend the Wechsler test?

A.   Yes, sir.

Q.   Any other tests they recommend?

A.   The Stanford-Binet as far as individual testing.

Q.   Okay.  So those two.

A.   Yes, sir.

Q.   Okay.  So let's get back to Dr. Froming's report for a second.  Her test you noted was the Wechsler-Third Edition, correct?

A.   Correct.

Q.   And in looking at her report there, what does she indicate the results of her testing of Mr. Rodriguez were?

A.   Well, according to her report the full-scale IQ was 87, the verbal IQ was 86 and the performance IQ was 89.

Q.   Okay.  And back then did you just get those three types of results in that test, do you know?

A.   No.  There are four indices that can be calculated.

Q.   Okay.

A.   And those are the verbal comprehension index, the perceptual organization index, the working memory index, and the processing speed index.

Q.   Okay.  Her full-scale IQ result was 87 though.

A.   That's correct.

Q.   In looking at the exhibit there, she does list

the four subtest areas; is that right?

A.  That's correct, the four indices.

Q.  Okay.  And the verbal comprehension index he scored a 96?

A.  Yes, sir.

Q.  The perceptual organization index he scored a 91?

A.  Yes, sir.

Q.  And then his working memory index was not as good.

A.  Correct.

Q.  Scored a 69?

A.  Yes.

Q.  And then the processing speed index is 88, correct?

A.  Correct.

Q.  And then going up above where she has the three other scores, can you explain the top two to us.

A.  Sure.  Well, the Wechsler Scales have -- are made up of different subtests.  So the current WAIS-IV has 10 I guess core subtests and those subtests are divided into tasks where, for example, I would ask the person a question and they would answer in the verbal task and then performance task where I would ask the person to do something.  And they're interspersed and the purpose of that is to sort of keep the testing from being too

tedious so mixing up different things.  And so the verbal subtest contributes to the verbal IQ and the subtest where the person has to perform something contributes to the performance IQ.

Q.   Okay.  And then you arrive at the full-scale IQ in looking at those two.

A.   That's correct.  In looking at the sum of the subtest scores, yes.

Q.   Okay.  Dr. Froming testified at the trial and you were aware of that?

A.   Yes, sir.  And I may be wrong but I believe it's pronounced FROE-ming (phonetic).

Q.   Oh, okay.  Well, I may be wrong in my pronunciation.

A.   Yeah.  So if I say Froming that's who I'm talking about?

Q.   Dr. Seward, as I just asked you, Dr. Froming testified at trial.  Government's Exhibits 620, 621 and 622 are transcripts of part of her trial testimony and we would offer those at this time, Your Honor.

MS. FISHER:  No objection.

THE COURT:  620, 621 and 622 are all received.

Q.   (Mr. Reisenauer continuing)  Doctor, on 620 at the bottom of the page there Dr. Froming is asked on

line 22:  "Now this is a guy with an 87 IQ, right?  And she responds:  "Correct."

You see that?

A.  Yes, sir.

Q.  Okay.  So that goes along with what her report indicated.

A.  Yes, it does.

Q.  If you turn to Government's Exhibit 621, she talks there about his IQ scores starting on line 1, if you would just read that to us.

A.  Sure.  So this is Dr. Froming's response:  "His IQ scores -- first of all, I should say again average is 100.  Any departure from 100 by 15 points is above or below average, and then you can be 30 points above or below and then you get into superior performance or mentally retarded performance.

"He is in the low-average range on verbal IQ with a score of 86.  He has a performance IQ, which differs from verbal IQ in terms of it mostly being -- dealing with shapes and perception of shapes and motor ability, and he has a score of 89 again in the average range."  I believe that's a mistake.  I believe that should be low-average.  "There are four neuropsychological variables that are also part of the IQ test and these variables are verbal comprehension so

generally speaking more focused on one's verbal skills and abilities.  He has an 96, which is pretty spot on average.  Perceptional organization, his ability to kind of see shapes, attention to detail in pictures, being able to solve visual problems, is a 91 score.  Again average ability."

Q.   Let me stop you there, Doctor.

A.   Yes, sir.

Q.   If you turn to Government's Exhibit 622, here Dr. Froming is talking about memory performance and if you start on line 4 and read her answer there.

A.   Okay.  "Yeah.  There are some striking findings with his memory performance.  I do several measures of memory functioning and, as I said, working memory is kind of a necessary prerequisite, and being able to pay attention is a necessary prerequisite for being able to learn and remember things.

"Again there's a differentiation between verbal material and spacial material and how well you learn and remember those things.  Mr. Rodriguez has a 92 on his verbal immediate memory, his ability to listen to a paragraph and remember the paragraph of material.  So he's average ability in that.

"His visual immediate memory, his ability to look at faces and remember faces to solve perceptual

problems, visual problems, is 134.  Again two standard deviations or the top two percent of most people. That's a very striking disparity.  It is a total of, let's see, 42 points difference, which is highly unusual.  It's found in greater than -- or in less than one percent of the population.  So it's a very unusual finding."

Q.   Okay, thank you.

A.   You're welcome.

Q.   This is the memory performance.  That's a separate test; is that correct?

A.   That's correct.

Q.   And do you know what test she gave for that?

A.   The Wechsler Memory Scale.

Q.   Okay.  Did you give that type of test at all?

A.   I did.  I gave an abbreviated version of it.

Q.   We'll talk about that later.  So, Dr. Seward, on July I think it was 10th, 11th and 12th of 2013, you met with Mr. Rodriguez, correct?

A.   Yes, sir.

Q.   Okay.  And if you'd turn to page 43 of your report, Doctor -- well, let's turn to I think it's page 42.  I misspoke.  You have a subheading called "Mental Status examination"?

A.   Yes, I do.

Q.   Okay.  And can you tell us what your mental status examination entailed with Mr. Rodriguez?

A.   Sure.  Let me explain a little bit about what it is first --

Q.   Sure.

A.   -- the concept.  So as part of testing or really as part of any psychological evaluation you assess how the person is doing at that moment because, for example, if they're extremely fatigued or anxious or somehow disturbed that could affect the results of the testing.  And I also comment on the testing environment especially since it's an unusual environment being in a prison.

Q.   Okay.

A.   And so, first of all, I told Mr. Rodriguez who I was and why I was there to, you know, clarify any questions he may have.  And also very important I informed him that there was no confidentiality.  And the reason I do that -- and, of course, not just me but people may go into a meeting with a psychologist or a doctor with the idea that there's going to be confidentiality like when I go see my physician.

And I also told him I wasn't going to be doing any kind of counseling or treatment.  I made sure that he understood that.  I described the setting in the prison, which typically prisons and jails are kind of

noisy.

Q.   In this particular situation I take it you met with Mr. Rodriguez in some type of either attorney meeting room or small room.  It wasn't his cell, was it?

A.   You're correct.  It was some kind of meeting room.  There was a table that -- the room was divided by a table and Mr. Rodriguez would enter from one door and I would enter from another on opposite sides of the table.

Q.   Okay.  Security guard inside the room at all with you?

A.   No.

Q.   Just you and Mr. Rodriguez?

A.   That's correct.

Q.   But you were able to videotape and audiotape your conversations?

A.   Yes, sir.

Q.   So as far as the mental status exam, what can you tell us about that itself?

A.   Well, sure.  So, first of all, something to cover a person's ability to communicate, maybe I should say my ability to communicate with the person.

Q.   Okay.

A.   And Mr. Rodriguez spoke fluent English and English is my best and only language so that worked out.

He was awake.  He was alert.  He knew where he was.  He denied any hunger or fatigue.  He was -- he engaged well.  He socialized well with me.

Q.  Okay.  Any problem with you understanding what he was trying to tell you or vice versa that you noticed?

A.  Absolutely not except the acoustics were pretty bad in the room but other than that, no.

Q.  Okay.  All right.  Did he seem oriented to time and place and knew why you were there and understood all that?

A.  Yes, sir.

Q.  Okay.  Let's do this.  I think -- I'm not getting pages very well this morning but if you turn to page 34, you have a subheading called "Psychological Testing."  You see that?

A.  Yes, sir.

Q.  Okay.  And here again you note that you met on July 10th, 11th and 12th and you administered a number of what you call psychological and neuropsychological tests to Mr. Rodriguez, correct?

A.  That's correct.

Q.  And your next sentence says:  "These tests were chosen in order to provide a comprehensive assessment of his neuropsychological status, replicate the findings of previous evaluators, and assess his level of motivation

and involvement in this evaluation."

You see that?

A.  Yes, sir.

Q.  Okay.  And then below you note you did the clinical interview and then a number of tests that you set forth on that page and the following page.

A.  That's correct.

Q.  So if you can briefly tell us, starting on page 34 there as the list goes, what tests you gave him and what was the purpose of the tests.

A.  Sure.  Well, the clinical interview is not a test.  It's me getting background information, also information on how he was doing at that time.

The Neuropsychological Symptom Checklist is pretty much what it sounds like.  It's a checklist of various symptoms that could indicate some neurologic problem, and this is something that he just completes and I would ask him about or I asked him about.

The Minnesota Multi-phasic Personality Inventory is a wide-range test of psychiatric and emotional functioning.  It has a lot of questions.  I believe it's 567.  I could be wrong.  They're true and false questions and it is scored by computer.  So it's not a cognitive test.

Q.  And what's the purpose of the test?

A.   Sure.  Well, there's many -- a person's psychiatric and emotional status can affect their ability to perform well on cognitive testing.  So, for example, if somebody's really nervous, they're -- they may likely have trouble concentrating.  In an extreme case, let's say they're hallucinating, then they're going to have trouble or may have trouble paying attention to the task at hand.

Q.   Okay.  And as the result of that test, was there a problem with Mr. Rodriguez emotionally or physically that you discovered that would not have allowed him to complete the testing process as it is designed?

A.   Well, the testing -- the MMPI showed some exaggeration symptoms.

Q.   Okay.  What do you mean by that?

A.   He was -- so it's true or false questions I think I said or perhaps not.  He was endorsing a lot of atypical symptoms that people that are generally mentally ill would not endorse.

Q.   Okay.  Would that have caused any of the other test results to be skewed at all?

A.   I don't believe so because he did seem engaged and his affect was -- his affect did not seem depressed or very anxious.

Q.   Okay.  So the following day on July 11th then you

note follow-up questions.  Was that in regard to the same type of inquiry that you made the first day?

A.  Sure.  So typically I'll, you know, get back to the hotel room where -- if I'm in Phoenix I'll get back to the office or get home and I'll think to myself: Well, why didn't I ask that?  I'll review my notes and kind of review the session in my mind and think of other things.

Q.  Okay.  And then take us through the tests on July 11th quickly.

A.  Sure.  Well, one of the things, one of the recommendations in forensic practice, forensic neuropsychology practice, is to periodically assess a person's level of engagement or a person's level of effort throughout the testing.

Q.  Okay.

A.  And to look for instances of possible malingering.  And so there are stand-alone tests that are designed to look at them, and the basic premise of these tests is that they're actually very easy to perform.  They're easy to do well on but they look hard. And they have to be easy to do well on because otherwise you would have a person with a genuine brain injury do poorly on them and it really wouldn't tell you anything.

So the Victoria Symptom Validity Test is one

such test.

Q. Okay.

A. Again looking at validity.

Q. Okay. And then the next test is the Wechsler Adult Intelligence Scale-Fourth Edition. Now we talked about Dr. Froming's Third Edition results, and you gave what I assume is a most recent edition at that time?

A. That's correct. It remains the most recent edition.

Q. Okay. And then the next test is Structured Interview of Malingered Symptomology, and this again is another malingering type or effort test?

A. Right. It's a screening test for malingered cognitive and emotional and psychiatric symptoms.

Q. Okay. And what's the Booklet Category Test?

A. That is a -- that's a test of nonverbal problem solving.

Q. Okay. The Wechsler Memory Scale, is that the same type of test Dr. Froming gave that we discussed earlier?

A. That's correct, the same type of test.

Q. Okay. The Dot Counting Test, I think we learned last week, is a test for effort or malingering; is that right?

A. That's correct.

Q.  Okay.  And the Wide Range Achievement Test, we heard some testimony about that test last week, and the WRAT4 is and was the most recent test at that time?

A.  At that time.

Q.  Is there a WRAT5 now?

A.  There is.

Q.  Okay.  And then the Trauma Symptom Inventory-2, what is that?

A.  That is similar to the MMPI.  It's a self-report test, a questionnaire, of trauma-related symptomatology.

Q.  Okay.  And then on July 12th you gave him a number of other tests, correct?

A.  That's correct.

Q.  And on page 34 there on the bottom you have the Word Memory Test.  What is that?

A.  That is another test of malingering or effort.

Q.  Okay.  The Wisconsin Card Sorting Test?

A.  That is -- it's similar to the Booklet Category Test.  It's a test of nonverbal problem solving.

Q.  Okay.  And on page 35 you have a number of other tests listed, the WAIS-IV Letter-Number Sequencing?

A.  Sure.  That is a -- that's an optional -- one of the optional WAIS-IV subtests, which is a test of concentration.

Q.  Okay.  And Rey Complex Figure Test, I believe we

heard some testimony last week about that test.  What is the purpose of that test?  And that's the test where Mr. Rodriguez copies an -- I'll call it a figure and then I believe also attempts to draw the figure from memory after the copy is done, correct?

A.  That's correct, twice actually.

Q.  Okay.

A.  So there's an immediate recall and then there's a delayed recall and there's a recognition trial.

Q.  Okay.  The recognition trial is the copy or not?

A.  Sort of.  So for the recognition trial there's four pages and the pages have segments of the design, of the actual design, interspersed with segments that were not on the design.

Q.  Okay.

A.  And then the examinee circles or indicates which segments were on the original design.

Q.  Okay.  And so what is the purpose of this test, Doctor?

A.  Two things.  So there's a copy portion and the copy portion is looking at things like visual perception, does the person see the world the way everybody else does?  And there's also a planning element.  It's a complex figure with a lot of lines and there's a good way to do it and there are ways that are

less good.

Q.   Okay.  So when you gave the test you said there's a copy, there's an immediate --

A.   Immediate recall.

Q.   And a delayed recall?

A.   Correct.  And the immediate and delayed recall and recognition trials are looking at memory.

Q.   Okay.  Would there be a reason to have the copy and the immediate recall drawing but not the delayed?

A.   Well, I suppose if there was some time constraint or something.  I'm not sure.  If you're there anyway you might as well do the delayed and do the complete test.

Q.   Okay.  The manual has those as the instructions I take it?

A.   The version I use, yes.

Q.   Okay.  The Stroop Color and Word Test, what is that?

A.   That's kind of clever.  It's a test of mental flexibility so you look at -- it has three parts.  The first part is there's a page that has, oh, I think five columns or so and the columns are just the words "red," "blue" and "green" repeated in different order and you just read the words as fast as you can.  And you're given 45 seconds.

And then the second part is -- the format's

the same but instead of using words there are Xs in different colors and you just say the name of the color. Again it's going to be red, blue or green.

Q.   Okay.

A.   The third part is a tricky part where there are the words "red," "blue" and "green" in different combinations but they're printed in different-colored ink.  So "red" might be printed in blue ink and so the task is not to read the word but to say the color of the ink as quickly as possible.

Q.   Okay.

A.   So it's a natural reaction to read the word instead of saying the color of the ink, and the person has to inhibit that reaction.

Q.   Okay.  The next test?

A.   California Verbal Learning Test, that is a -- it's a list-learning test.  I read a list of words five times.  Each time after I read the list -- there's 16 words on it.  Each time after I read the list the examinee says back as many as they can.  Then I read a separate list, totally different list, have the examinee read that back and then I ask the examinee to tell me the words on the original list, do something else for 20 minutes.  And then the list -- the words on the list are divided into four categories, and so then after I ask

the examinee to read the whole list I say:  Well, tell me all the words on the list that are ways of traveling.

Q.   Okay.   What is the Trail Making Test?

A.   Okay.   That is two parts.   A piece of paper has some circles on it.   It's kind of connect the dots.   The circles are numbered.   The first part the person connects the numbered circles as quickly as possible.   The second part has both numbers and letters and the person has to go from a number to a letter to a number to a letter, 1 to A, 2 to B and so on.

Q.   Okay.   The 15-Item Test with Recognition, what is that?

A.   That's another malingering or effort test.   A person is presented with a card or piece of paper with 15 items on it.   They're shown it for 10 seconds.   They have to draw as many as they can.

Q.   Okay.

A.   And then the recognition part there is 30 items, 15 of which were on the original list and 15 of which were not.

Q.   All right.   So that's an effort or malingering test?

A.   That's correct.

Q.   The Boston Naming Test?

A.   The person is shown a series of pictures and has

to identify what the picture is.

Q.   Okay.  Verbal Fluency and then Category Fluency?

A.   Similar, both similar tests.  A person -- I say a letter of the alphabet.  The person has 60 seconds to give me as many words as they can that begin with that letter.  Category Fluency, I say a category.  The person has 60 seconds to name as many items in that category as they can.

Q.   Okay.  And then the next test is called the Test of Memory and Malingering.  I take it that's another effort or malingering test?

A.   That's correct.

Q.   Okay.  The WRAT4 Spelling test --

A.   Yes.

Q.   -- is that part of the WRAT4 that you gave the day before or is that a separate test?

A.   That's part of that.  And because some of these tests have delayed recall trials, I have to intersperse a test -- a different test in that interval.

Q.   Okay.  What is the Finger Tapping Test?

A.   It's measuring fine motor speed using both the right and the left forefinger.

Q.   Okay.  The Thurstone Word Fluency Test?

A.   Similar to -- similar to verbal fluency except a person has to write down the words.

Q.   And the Personality Assessment Inventory?

A.   Yes, similar to the MMPI.

Q.   Okay.  And finally a Continuance Performance Test-II?

A.   Yes.  That is a test -- a computerized test of attention and vigilance.

Q.   Okay.  And you indicate you did follow-up questions, correct?

A.   That's correct.

Q.   All right.  The next paragraph you say, "Consistent with professional guidelines, multiple measures of symptom validity were administered in the course of this examination."  Are those these malingering effort tests?

A.   That's correct.

Q.   And how many did you give?

A.   I gave six freestanding tests over the course of three days, and some of these other I guess regular tests have malingering indicators embedded in them.

Q.   Okay.  And so why would you give so many of these types of tests?

A.   According to professional standards, in the course of a lengthy evaluation, a person's motivation or cooperativeness could vary.

Q.   Okay.  So if an individual was giving a battery

of tests like we've been talking about and only gave two or one, that would not meet the guidelines?

A.  Well, the -- according to questionnaires, I believe in a forensic evaluation the industry standard I think is an average of six or so.

Q.  Okay.

A.  This is in the professional literature.

Q.  Okay.  And in your evaluation of Mr. Rodriguez, I believe you note here that there were no clear-cut indications of malingered cognitive impairment that you saw.

A.  That's correct.

Q.  Let's turn to the next page, Doctor, page 36. And here on this page you note your WAIS-IV composite results; is that correct?

A.  That's correct.

Q.  So, if you would, tell us about the WAIS-IV.  And you earlier talked briefly about the WAIS-III.  How is the WAIS-IV different and what does this test?

A.  Well, when they -- the company that produces the Wechsler Scales is Pearson Clinical Assessments, and when they come up with a new version of tests they go through the old version and maybe change the wording, maybe take out things that -- questions that might no longer be relevant, update it.  They update the norms.

The structure of the WAIS-III and the WAIS-IV is pretty close.

Q. Okay. And this has these various subtests or subcomponents to arrive at a full-scale IQ; is that correct?

A. That's correct.

Q. And the WAIS-IV that you gave, how does it work in terms of determining a full-scale IQ? What's the process that goes about at arriving at an IQ score?

A. Sure. So you have -- is it okay if I pull out my WAIS protocol, my raw data to refer to, or would you rather I not?

Q. Well, if you can tell us without looking, that would be fine.

A. Okay, sure. So for each subtest there's a raw score and so the raw score by itself is meaningless. So, for example, let's say you have a raw score of 12 on one test and of 24 on another subtest. That raw score of 24 is not necessarily twice as good as a raw score of 12. So those raw scores are converted into scaled scores based on a person's age. Scaled scores have a mean of 10 and standard deviation of three so 10 is average.

Q. Okay. And from the scaled scores then you have -- in the manual you have a way of determining from

the total what the IQ of that individual is?

A.   That's correct.  Although I do it on a computer but, yes.

Q.   Okay.  So let's go back.  When the tests are originated by the company, we had the WAIS-III and now we have the WAIS-IV, there's something called norming?

A.   That's correct.

Q.   Can you tell us what that is?

A.   Sure.  They give the proposed items to a representative sample of people to determine -- essentially to determine what average performance is.

Q.   Okay.  And you gave Mr. Rodriguez the test in English, the English version, correct?

A.   Yes, sir.

Q.   And the -- to arrive at Mr. Rodriguez's IQ I take it -- I think you said -- and if you didn't I guess correct me, but you used the person's age?

A.   Yes.  Well, unfortunately expectations for people's cognitive abilities tend to decline as they get older.

Q.   Okay.  And so in making a determination of the IQ of the -- the norming process includes an age component; is that right?

A.   That's correct.  An age correction, yes.

Q.   Okay.  At the risk of my IQ going lower, is what

you're saying that as I get older or you get older or the judge gets older the IQ component takes our aging into account?

A.   That's correct.   The change is more evident on some types of things versus other types of things.

Q.   Okay.   And so the age component is taken into account on the tables that are utilized to determine the IQ?

A.   That's correct.

Q.   And then let's go back to the norming for a second.   When the tests are normed the test is -- if I understand you correctly the test is given to a number of U.S. citizens to arrive at this average score; is that right?

A.   I'm not quite sure if they have to be citizens but that's correct.

Q.   Okay.   But they're individuals within the United States.

A.   Yes.

Q.   Okay.

A.   And they screen that population to screen out -- they're essentially -- they're looking for a healthy population.

Q.   Okay.   And so if we -- can we call that -- we would call that the U.S. norm then?

A.   That's correct.

MR. REISENAUER:  Now would be a good time for a 15-minute break, Your Honor.

THE COURT:  All right.  We'll go ahead and break at this point for 20 minutes and so we'll start at 10 to 11:00.

(Recess taken; 10:30 a.m. to 10:55 a.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that all counsel of record are present.
Mr. Rodriguez has waived his presence.  When we broke the United States, Mr. Reisenauer, was conducting a direct examination.

You may continue, sir.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Dr. Seward, we were just going to talk about your WAIS-IV testing of Mr. Rodriguez.  You would have the results on page 36 I believe of your report.  If you would just walk us through the testing that Mr. Rodriguez completed on the WAIS-IV.

A.   Okay.  Well, similar to the WAIS-III, the WAIS-IV comes up with four indices, also a full-scale IQ and

something called the general ability index, which separates out the speed of information processing component.

Q.   Okay.  You might have to explain that to me.

A.   Sure.  There's something called the processing speed so some of these subtests require the person to do things quickly.

Q.   Okay.

A.   And so that contributes to what's called the processing speed index, which is a speed of mental information processing.  That can be -- because a person is using their hand, that can be affected by problems with their upper extremity so that separates that out.

Q.   Okay.  So let's -- if you would walk through the subtest scoring.

A.   Sure.  And again these are indices rather than subtests.  Each index is -- is made up -- or is determined by the results of two or more subtests.

Q.   Okay, got you.  I'll try not to pick that up.  So go ahead and tell us about the verbal comprehension.

A.   Sure.  So I am turning to page 39 so verbal comprehension I have it under -- I have it categorized as a language function and this is from the test manual. "The VCI," that is a verbal comprehension index, "is a measure of verbal concept formation, verbal reasoning,

and knowledge acquired from one's environment."

And so Mr. Rodriguez's score on the verbal comprehension index was in the average range.

Q.   Okay.

A.   And, of course, this is -- like I said before, this is all in English.

Q.   Okay.  And I take it you gave him the whole test in English?

A.   Yes, just because --

Q.   You didn't go into Spanish at all?

A.   No.

Q.   Okay.  So his result is a 95 which you note is in the average range, correct?

A.   That's correct.  And then the perceptual reasoning index --

Q.   What does that measure, sir?

A.   Sure.  That's on page 39 under "Perceptual and Visuospatial Skills."  So according to the test manual it "is a measure of perceptual and fluid reasoning, spatial processing, and visual-motor integration."  So in the WAIS-III this would have been called a performance -- these would be performance subtests because the person has to do some task as opposed to answering questions.

Q.   Okay.  And in your WAIS-IV test Mr. Rodriguez, I

believe you indicate, scored an 88, correct?

A.   Yes, sir.

Q.   And that is in the low average you have, I believe, on that chart that we were looking at on page 36.

A.   That's correct.

Q.   Okay.  So let's just jump back if we could to the verbal comprehension index.  You have a 95 and I believe in Dr. Froming's report I'm looking at Mr. Rodriguez scored a 96; is that right?

A.   Yes.  I don't have her report in front of me anymore but it's up here somewhere.

Q.   Yeah.  Do you have it up there still?

A.   I do.  Excuse me, Your Honor, for fumbling and, of course, it's at the bottom of the pile.  So yes, sir, he -- and I'm sorry, sir, could you repeat the question?

Q.   Yes.  The verbal comprehension score you have a 95 and I believe if I'm looking at her report correctly he scored a 96 with Dr. Froming?

A.   That's correct.

Q.   All right.  And then on the perceptual reasoning, 88 you have, correct?

A.   That's correct.

Q.   Okay.  And am I reading her report correct that it would be a 91 when he took it with her?

A.   That's correct.  It's essentially the same.  They call it the perceptual organization index in the WAIS-III.

Q.   Okay.  Working memory?

A.   Yes, sir.

Q.   Tell us about that.

A.   Sure.  And I have working memory, I talk about that in the "Attention and Concentration" section.  So he received a working memory index of 80, low average.  And again quoting from the manual:  "Working memory tasks require the ability to temporarily retain information in memory, perform some mental operation on or manipulation of it, and produce a result."

Q.   Okay.

A.   So that's -- like I alluded to, that's a fancy way of saying attention and concentration.

Q.   Okay.  And that is different than what the Wechsler Memory Scale tests for?

A.   That's correct.  The Wechsler Memory Scale has a component of that but -- in fact, the Wechsler Memory Scale also -- the full version also tests for attention and concentration I believe.

Q.   Okay.  And the testimony we read earlier from Dr. Froming in regard to the Wechsler Memory Scale scores he did average to superior, way above average,

right?

A.   That's my recollection, yes.

Q.   And this is a little different.  This is a working memory and he scored 80 on your test and didn't do very well with Dr. Froming.  He scored a 69.

A.   That's correct.

Q.   The next index is the processing speed?

A.   Yes, and I spoke about that briefly.  And I have that subsumed under "Attention and Concentration" in my report.  So again quoting from the test manual:  "The processing speed index provides a measure of the examinee's ability to quickly and correctly scan, sequence or discriminate simple visual information."

Q.   And Mr. Rodriguez scored an 89 on processing speed.

A.   That's correct.

Q.   And that would be low average?

A.   Yes, sir.

Q.   Dr. Froming, I believe in her report she shows he scored an 88 and he scored an 89 with you.

A.   Correct.

Q.   So then finally through what we talked about before break in terms of arriving at the full-scale IQ, you take these -- am I correct you take these four indices and the scores that you arrive at to then

finally determine what the full-scale IQ is?

A.   That's essentially correct, yes.  Again the scaled scores are converted into IQ scores and index scores.

Q.   Okay.

A.   And again I enter it into a computer.  I enter the raw scores into a computer.

Q.   Okay.  And in the WAIS-IV test you gave, Mr. Rodriguez had a full-scale IQ of 86?

A.   That's correct.

Q.   And Dr. Froming -- I believe we did have some discussion and testimony earlier when Dr. Froming gave the WAIS-III that Mr. Rodriguez had a full-scale IQ of 87.

A.   According to her report, correct.

Q.   You talked about attention and concentration. You have on the bottom of page 37 a subheading called "Executive Functions."

A.   Sure.  Yes, sir.

Q.   Can you tell us what that entails?  What do you mean by that?

A.   Well, I'm going to -- I'm going to read from a dictionary of neuropsychology for the definition so forgive me for reading.  So executive functions are the "Cognitive abilities necessary for complex goal-directed

behavior and adaptation to a range of environment changes and demands.  Executive function includes the ability to plan and anticipate outcomes (cognitive flexibility) and direct the attentional resources to meet the demands of nonroutine events."

Q.  Okay.

A.  So I know that's kind of jargony there.

Q.  You have that quote in your report, correct?

A.  That's correct, at the top of page 38.

Q.  Okay.  And so as far as Mr. Rodriguez's executive functioning is concerned, you talk about that in your report on page 38.

A.  That's correct.

Q.  Okay.  And do some of the tests that we talked about or that you talked about earlier that you gave address Mr. Rodriguez's executive functioning?

A.  Yes.  The way -- I divide these tests according to cognitive domain.  The way they're divided is somewhat arbitrary because these cognitive functions overlap somewhat.

Q.  Okay.  Can you tell us then how the tests you gave provide you information in regard to Mr. Rodriguez's executive functioning?

A.  Well, I guess the executive summary is that there was no evidence of any marked difficulties with

executive functioning.

Q.  Okay.

A.  Should I expand on that?

Q.  Yeah, go ahead.

A.  Sure.  So a couple of these tests are actually challenging.  So I mentioned before the Booklet Category Test and the Wisconsin Card Sorting Test.  These are both tests where the examinee is presented a problem but with minimal guidance on how to solve the problem or problems.  And so they will try something.  They will attempt a solution.  I will say if they're right or wrong, and they have to deduce the principle essentially by trial and error.  So it's a fairly -- these are fairly difficult tasks.

Q.  Okay.

A.  And --

Q.  On the executive functioning-type tests that you're talking about, if I heard you correctly Mr. Rodriguez did fairly well on those tests and there was no indication of problems with his cognitive functioning.

A.  That's correct.

Q.  If you turn the page to page 39 of your report, Doctor, you talk about a couple of other items, "Language Functions," and I believe probably the

"Perceptual and Visuospatial Skills" are part of the WAIS-IV test; is that right?

A.   That's correct, supplemented by other testing.

Q.   Okay.  Talk about the language functions section if you would of your report.

A.   Sure.  So I already mentioned the verbal comprehension index from the WAIS-IV.  That included a couple -- some tests of verbal fluency which actually -- they have an executive functioning component so they're discussed in the "Executive Functioning" section.

Let's see, so I'm going back to page 38.  He did very well on category fluency although borderline abnormal on verbal fluency, spoken verbal fluency. Written verbal fluency was low average.  And then the Boston Naming Test, which I talked about earlier, is where a person identifies pictures of things and his score on that was average.

Q.   So as far as his language functioning, those tests didn't reveal any evidence that he had difficulty with language and that would be despite him being I guess born into a household that spoke Spanish and he had to learn English at an early age?

A.   That's correct.

Q.   Okay.  The perceptual and visuospatial skills, what are you talking about there?

A.   Sure.   And again forgive the jargon but this is sort of a -- the way the person perceives things and is able to deal with nonverbal problems.

Q.   Okay.   Is this part of the perceptual reasoning index of the WAIS-IV then?

A.   Some of it is.

Q.   Okay.   And he did -- as you noted or we talked about earlier, he scored an 88 which was low average. Are there any other types of tests that you gave him that would apply in this perceptual skill area?

A.   Sure.   We talked about the Rey Complex Figure Test, and so the copy portion of that test is a perceptual task.   Also it has an executive functioning component because if you do some planning it comes out much better.

Q.   Okay.   So let me ask you how he did on that when you gave him the Rey Complex Test.

A.   He did well except he has a bit of a tremor so the line was a little bit shaky in his drawings.

Q.   Okay.   Any other tests that would fit into this area?

A.   Well, the Trail Making Test, the first part where you connect the dots, connect the numbers in order, and that was average.   The second part where you go from number to letter to number to letter which has an

executive component -- I'm sorry, executive functioning component because you have to have some cognitive flexibility. You can't get stuck in a way of responding.

Q. Okay. How did he do on that?

A. His score on that was low average.

Q. Okay.

A. And so that -- let's see, that is it for the perceptual and visuospatial skills.

Q. Okay. The next subheading you have is "Motor Skills."

A. Yes.

Q. Are there tests that you gave that address that?

A. Yes. I just gave -- well, yes, there was the Finger Tapping Test, which is looking at fine motor speed. And it was -- his performance was -- his speed was low average with his right hand, dominant hand, and mildly abnormal with his left hand.

Q. Okay.

A. When Dr. Froming saw him he had the opposite pattern. And then --

Q. Let me stop you there.

A. Sure.

Q. That really I guess doesn't tell us too much if he had a problem with one hand with you and the opposite

with Dr. Froming, does it?

A.   That's correct.

Q.   Okay.  Let's --

A.   And then there's -- I'm sorry, sir.

Q.   That's okay.  Let's go back if we could to page 36 for a second.  We haven't talked about this, Doctor. It's your WRAT4 testing I think you have on the bottom of page 36.

A.   Yes, sir.

Q.   Okay.  Can you tell us about that.

A.   Sure.  The WRAT stands for Wide Range Achievement Test and it is looking at academic functioning.

Q.   Okay.  This isn't an IQ test at all, correct?

A.   It is not.

Q.   Okay.  It provides an attempt at a grade equivalency as a result of various subtests?

A.   That's correct.  And it is individually administered as opposed to the sort of achievement testing that we -- that I took in school anyway.

Q.   Okay.  Okay.  And then your results are set forth in a box there:  "Word Reading, Sentence Comprehension, Spelling, Math Computation, Reading Composite," right?

A.   Yes, sir.

Q.   Okay.  And you indicate that his "math abilities and overall reading skills are in the low average to

average range, with a pronounced weakness in spelling."

A.   That's correct.

Q.   Okay.

A.   And if I could explain the word reading subtest briefly because the name is somewhat misleading?

Q.   Go ahead.

A.   So for the word reading subtest the examinee has a card with different words on it and they just have to pronounce the words correctly.  It does not look at word understanding.  And I think perhaps in a -- I think earlier I mispronounced "ebullient" because I'm not sure how to pronounce it but that would be an example.  You'd see that word and have to say it.

Q.   The sentence comprehension has a grade equivalent of 10.9 when he took your test, correct?

A.   Correct.

Q.   The scores that were achieved by Mr. Rodriguez when Dr. Froming tested him, the grade equivalents were similar to yours except for the sentence comprehension. Yours is higher, correct?

A.   The version of the WRAT she used did not have a sentence comprehension subtest.

Q.   Okay.

A.   And the test developers added the sentence comprehension subtest -- well, I'm sorry, I'm assuming

they added that because the word reading subtest is not that informative.

Q.   Okay.   Are you familiar with Dr. Weinstein's testing that he gave Mr. Rodriguez?

A.   Yes.

Q.   And Dr. Weinstein's results were all lower than the results that either you or Dr. Froming obtained; is that right?

A.   As I recall, yes.

Q.   You are aware from your interview of Mr. Rodriguez about his book reading?

A.   Yes.

Q.   And you had a lengthy conversation with him about a number of books that he told you he had read?

A.   Correct.

Q.   And he talked about the authors, the types of books and so forth?

A.   That's correct.

Q.   His sentence comprehension grade level here, would that be possibly a reflection of all the reading he's been doing while he's been incarcerated?

A.   Consistent with it, yes.

Q.   Let's turn back to page 40 of your report, Doctor.

A.   Yes, sir.

Q.   Here you have a subheading called "Learning and Memory."  Do you see that?

A.   Yes, sir.

Q.   Can you tell us about that.

A.   Sure.  Well, as I mentioned I gave an abbreviated version of the Wechsler Memory Scale-III and I did that in order to have time to do other supplemental test of memory.  And so his scores on the abbreviated version of the Wechsler Memory Scale-III, his summary scores were average; that is, his composite scores.

Q.   Okay.  If I'm looking at your report and reading this correct, would that be the total memory composite score of 99?

A.   That's correct.

Q.   Okay.  And is that somehow again a combination of the immediate memory composite score of 91 and the delayed memory composite score of 109?

A.   That's correct.

Q.   Dr. Froming also gave him a similar test?

A.   Yes.

Q.   And I think earlier this morning when we went through the transcript of her testimony she talked about his results on this test; is that right?

A.   On the full version of the test, yes.

Q.   Okay.  And you note here her administration of

the test resulted in a general memory index of 105.

A.   Yes.  Yes, sir.

Q.   And again that would be average?

A.   Yes.

Q.   Okay.  And my recollection is that on one of the memory tests she gave he scored a 134.  You recall that?

A.   I do.

Q.   And do you remember what that was in regard to?

A.   It had to do with visual memory as I recall.

Q.   Do you recall discussing with Mr. Rodriguez various aspects of his schooling, grade schooling, high school and so forth?

A.   Yes.

Q.   And you're aware that he quit or dropped out of high school?

A.   Yes, I believe in the 9th grade.

Q.   Okay.  Let's talk about that a little bit. Doctor, I'm going to hand you Government's Exhibits 623 and 624.  They are transcripts from your conversation with Mr. Rodriguez.

We would offer 623 and 624, Your Honor.

MS. FISHER:  No objection.

THE COURT:  623 and 624 are received.

Q.   (Mr. Reisenauer continuing)  If you would, Doctor, let's look at 623 first.  If you would let's --

there's no numbers on the transcript here.  Go to the middle of the page where you say:  "Let's see, I think in Crookston so you went to second grade there."

You see that?

A.  Yes, sir.

Q.  Could you just read from there Mr. Rodriguez's responses and then your ongoing discussion.

A.  Okay.  Mr. Rodriguez:  "Yeah, yeah."

Me:  "It sounds like things were kinda rough.  You got put back a couple years."

Mr. Rodriguez:  "Yeah, yeah."

Me:  "How did your life go from then, which I know is a very general question?"

Mr. Rodriguez:  "Well, it didn't get any better."

Me:  "Okay."

Mr. Rodriguez:  "You know I started to the point where I hated going to school.  I tried a couple times to get my mom to send me back to Texas."

Me:  "Why did you hate to go to school?"

Mr. Rodriguez:  "Huh?"

Me:  "Why did you hate to go to school?"

Mr. Rodriguez:  "Because there was always a fight between me and the kids."

Me:  "I see."

Mr. Rodriguez:  "Yeah sometimes it would be three ganging up on me all the time."

Q.  Okay.  Thank you, Doctor.  Then if you turn to Exhibit 624 and just start at the top if you would.

A.  Okay.  This is Mr. Rodriguez:  "I bet you I flunked.  If they would've really graded me I would've flunked every class all the way from fourth grade to ninth, tenth grade."

Me:  "How come you would've flunked?"

Mr. Rodriguez:  "Huh?"

Me:  "I mean how come you would've flunked?"

Mr. Rodriguez:  "Because I was flunking."

Me:  "But I mean why?"

Mr. Rodriguez:  "Because I wasn't doing anything."

Me:  "And why weren't you doing anything?"

Mr. Rodriguez:  "Because I didn't care after a while."

Me:  "Okay."

Mr. Rodriguez:  "You know?  Got to the point where I didn't care."

Q.  Okay.  Thank you, Doctor.  Doctor, Government's Exhibit 625 is a state parole and probation agent's report, Harley Swenson.

We would offer Government's Exhibit 625,

Your Honor.

MS. FISHER:  No objection.

THE COURT:  625 is received.

Q.  (Mr. Reisenauer continuing)  If you would turn to page 4, Doctor.

A.  Yes, sir.

Q.  Up in the I guess middle part of the page there there's a section called "Education."  You see that?

A.  Yes, I do.

Q.  And it says:  "Defendant completed the ninth grade at Central High School in Crookston, Minnesota."  You see that?

A.  Yes, sir.

Q.  And the last two sentences read:  "He was not considered to be a discipline problem but was considered to be a 'loner.'  The only complaint the school officials made was that defendant made little effort in regard to his academic work."

Do you see that?

A.  Yes, sir.

Q.  While we're here, Doctor, if you turn to page 3 there's a little section in regard to his mother Delores.

Do you see that?

A.  Yes.

Q.   The middle of that first paragraph it says: "Defendant's mother is a very understanding person and has demonstrated much affection for her children."

Do you see that?

A.   Yes, that's correct.

Q.   In your interview with Mr. Rodriguez, did he give any indication that he had any problems with his mother?

A.   I don't recall.

Q.   Okay, thank you.

A.   You're welcome.

Q.   Government's Exhibit 626, Doctor, is further conversation you had with Mr. Rodriguez about schooling.

And I would offer Government's Exhibit 626, Your Honor.

THE COURT:  Any objection?

MS. FISHER:  No objection.

THE COURT:  626 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Dr. Seward, in the middle of the page there you say:  "It seems like you were doing really poorly in school from what you were saying."

You see that?

A.   Yes, sir.

Q.   Can you read from there on down?

A.   Mr. Rodriguez:  "Well it isn't that I was doing poorly.  If I pushed myself I could've done it but I didn't care."

Me:  "Okay."

Mr. Rodriguez:  "I didn't wanna deal with kids and in this school you were one-on-one."

Me:  "Oh at St. Peter's place?"

Mr. Rodriguez:  "Yeah, yeah."

Me:  "Okay so did you have trouble with the academics there at St. Peter's?"

Mr. Rodriguez:  "No, no, like I said if I put myself out there I could do it."

Q.   Okay, thank you.  Doctor, turn to page 17 of your report if you would.

A.   Yes, sir.

Q.   On that page and the next two full pages and part of page 20, you talk about information that you gleaned from the Minnesota Security Hospital records regarding Mr. Rodriguez's schooling while at the Minnesota Security Hospital; is that right?

A.   That's correct.

Q.   And here you do note that there wasn't a transcript or diploma made available to you by the Minnesota Security Hospital; is that right?

A.   That's correct.

Q.   But you do recite a number of classes that he took while there?

A.   Correct.

Q.   And he did report to you that he graduated from St. Peter's High School?

A.   Correct.

Q.   So on page 17, 18, 19 and then part of 20 can you just relay to us what information you learned about his casework there.

A.   Well, in general he did well in school.  He was motivated.  He would request extra work.  He would bring in things that he was interested in.  And the documentation is that he was very close to receiving his high school diploma as of March 29, 1979.

Q.   Okay.  And the records that you reviewed indicate that he was doing well, that he was knowledgeable, contributed in the class?

A.   Yes, sir.

Q.   Doctor, I'm going to hand you Government's Exhibit 627 (indicating).  This is a transcript from the trial from Dr. Marilyn Hutchinson.  Are you familiar with her name as part of this case?

A.   Yes, I am.

MR. REISENAUER:  We would move 627, Your Honor.

MS. FISHER:  No objection.

THE COURT:  627 is received.

Q.  (Mr. Reisenauer continuing)  If you go to line 3, Doctor, Dr. Hutchinson is asked:  "Did he tell you why he quit school?"  If you would just read from there.

A.  Answer:  "He was 18 years old.  He wasn't being very successful.  His friends were all out of school and so he quit."

Should I continue?

Q.  Go ahead.

A.  Question:  "Do you recall reading in the Minnesota state hospital records that he indicated that he had quit school because he was not working at it and thought most students were aware of his sexual behavior?"

Answer:  "Yes, I do remember that.  Thank you.  I'd forgotten that piece of it right now."

Question:  "Okay.  You do know that he did complete high school and received a high school diploma while he was at St. Peter?"

Answer:  "I do know that."

Question:  "Certainly there are a lot of people in this world that haven't completed high school, correct?"

Answer:  "That's correct."

Question:  "And that could be for any number of reasons; isn't that correct?"

Answer:  "Yes, it is."

Question:  "One of which could be like Mr. Rodriguez said, he wasn't working at it.  He wasn't putting forth the full effort he could."

Q.   And read the final answer there.

A.   Answer:  "That's right."

Q.   Thank you.  Doctor, earlier this morning when you began your testimony we talked about the definition of "mental retardation" or "intellectual disability" and you mentioned that there is an intelligent component as well as an adaptive functioning component, correct?

A.   That's correct.

Q.   And you looked into adaptive functioning to a degree in this matter; is that right?

A.   I did.

Q.   One of those areas is called ability to think abstractly?

A.   Yes, sir.

Q.   And do you recall, Doctor, in your interview with Mr. Rodriguez that you spoke with him about a number of subjects, including a gentleman by the name of Mr. Snowden?  Do you recall that?

A.   That's correct.

Q.   Of a trial of an individual by the name of Zimmerman?

A.   Yes.

Q.   And again your interview with Mr. Rodriguez was videoed?

A.   That's correct.

Q.   And I asked you earlier if you provided that to my office and you did, correct?

A.   Yes, that's correct.

Q.   And this was the whole interview process; is that right?

A.   That's correct.

Q.   Okay.  And that entailed three days.  Did you videotape the testing as well or not?

A.   I did not.

Q.   Okay.  So it was just the interview process, the mental examination and the interviews that you had with him?

A.   That's correct.  I may have videotaped him completing the MMPI and questionnaires.  I do not recall.

MR. REISENAUER:  Your Honor, we intend on offering a clip that we've taken from Dr. Seward's interview of Mr. Rodriguez regarding what he just testified about if we could.  It's about five minutes I

think and we have a separate CD of this clip, Your Honor, that we would offer, plus the transcript.

We would offer what I've marked, Your Honor, as 628A, which is the actual CD -- DVD and the transcript is 628B.

MS. FISHER:  No objection.

THE COURT:  628A and B are received.

MR. REISENAUER:  If we could play the exhibit, Your Honor?

THE COURT:  (No response.)

MR. REISENAUER:  Your Honor?

THE COURT:  You may.

MR. REISENAUER:  Thank you.

(Government's Exhibit No. 628A played in its entirety.)

Q.   (Mr. Reisenauer continuing)  Dr. Seward, if I may, this conversation in regard to Mr. Zimmerman and Fox News and politics and Mr. Snowden, how does that demonstrate Mr. Rodriguez's ability to think abstractly?

A.   Well, it's -- actually there's a few things going on there.

Q.   Go ahead.

A.   I guess most of all the conversation is pretty unremarkable in the sense of it -- I could imagine having that conversation with somebody, you know,

waiting in an airport or something like that.

Q.   Okay.

A.   Also he has a cognitive ability to follow stories and he is offering critiques of the news media, for example.  That makes sense.  That makes a point.  And also there's an element of socialization there.  He's -- even though he knows why I was there, he knows that I've been retained by your office, and yet he's relating with me in a friendly everyday conversational manner.

Q.   The fact that you were videotaping and audiotaping him didn't seem to affect his wanting to be open and talk with you about subjects?

A.   Correct, correct.  He was actually a little bit on the verbose side.

Q.   Okay.  Do you recall a further discussion you had with him about God and religion?

A.   I do.

Q.   Doctor, I'm going to hand you Government's Exhibit 629 (indicating).  That is a further transcript of your conversation with Mr. Rodriguez.  It contains three pages.

We would offer 629, Your Honor.

THE COURT:  Any objection?

MS. FISHER:  No objection.

THE COURT:  629 is received.

Q.   (Mr. Reisenauer continuing)  And, Doctor, let's just start with -- towards the lower half of the page where Mr. Rodriguez says:  "I believe that there's a higher power."

Do you see that?

A.   Yes, sir.

Q.   Do you want to read us about your conversation after that point.

A.   Okay.  So me:  "Yeah."

Mr. Rodriguez:  "But I don't believe because when I read the Bible I get so upset about the Bible."

Me:  "Why's that?"

Mr. Rodriguez:  "Because you had people that are actually saying that slavery is ok or, um, or beating your wife is ok or treating her like a second class citizen is ok."

Me:  "Well what part of the Bible are you talking about?"

Mr. Rodriguez:  "What was it?  Proverbs and all - well different sections of the Bible there's certain verses about what is right and what is not right.  The women don't have a right to worship with men and I don't believe all that."

Me:  "Where does it say that?"

Mr. Rodriguez:  "I can't remember but I just

didn't believe in a lot of stuff, the wording that they used like saying this guy lived for 600 years in Genesis.  It says that in Genesis.  Somebody lived 500 years and then they're lucky if they lived 30 years you know so I would get into, I would get into conversations with this one guy that he's a Christian."

Me:  "Mm-hmm."

Mr. Rodriguez:  "And he spouts all that stuff all the time and I would tell him 'Just think about it, what you're saying.'  You know, 'cause we'd get in discussions about the Bible sometimes and I would challenge him on that.  I would say, 'You're trying to tell me that this whole earth is only 5000 years old?  Do you really believe that?'  And he would say 'yes.'  And I would say, 'Well, I don't.'"

Dr. Seward:  "Well let's say you're talking to somebody you disagree with.  Do you usually kind of win the argument?"

Mr. Rodriguez:  "Well with a fanatic like that you can't win an argument, you know, so you just let him talk and then say 'I don't believe it.'"

Me:  "Okay."

Mr. Rodriguez:  "Because with a person like that you can't, you can't have a conversation because they're going by, by what he's been told instead of what

he should be learning."

Me:  "Mm-hmm."

Mr. Rodriguez:  "You know.  He believed that we walked around with the dinosaurs you know.  He's telling me that dinosaurs were around 3000 years ago."

Me:  "Mm-hmm."

"And I says, 'I don't know where you got that from' you know so...and he believes if, if we are not a member of his church we're not going to go to heaven."

Me:  "Ok."

Mr. Rodriguez:  "You know, so all that.  I have a hard time with religion period."

Me:  "Yeah."

Mr. Rodriguez:  "You know I think it's a bunch of goop you know.  I think religion's been the problem of this whole world for years.  A lot of people have been killed because of religion and how can - if there was a so called God of the Bible how could he let all these things happen you know?"

And me:  "Yeah.  That's a good question."

Mr. Rodriguez:  "And how can he send you or me to hell?"

Me:  "Uh-huh."

Mr. Rodriguez:  "If he's so merciful you

know so and if he doesn't want evil in the world why doesn't he get rid of it if he's God?  You know?  So it's just a bunch of shit."

Q.  Thank you, Doctor.

A.  Okay.

Q.  So that discussion about religion and God, does that show Mr. Rodriguez's ability to think abstractly?

A.  Yes.  The issues he's raising are actually pretty sophisticated and they're -- it's part of theology with some fancy words, some fancy titles.

Q.  Okay, thank you.  Government's Exhibit 630, Dr. Seward, again this is a one-page document about your further conversation with Mr. Rodriguez.

We would offer 630, Your Honor.

THE COURT:  Any objection?

MS. FISHER:  I'm sorry, no, Your Honor.  No objection.

THE COURT:  630 is received.

Q.  (Mr. Reisenauer continuing)  Doctor, earlier we talked about Mr. Rodriguez's schooling.  This one-page document, I want to refer you to your conversation about -- it entails his driving a vehicle.  Just start up on the very top.

A.  Okay.  Me:  "But I mean you haven't been driving, you haven't been driving for 20 years or something."

Mr. Rodriguez: "Yeah. I know. I know. It was strange in the beginning."

Me: "I bet."

Mr. Rodriguez: "But I got used to it after a while you know."

Me: "Cause I know I've gotten rental cars that had electronic stuff on it that -"

Mr. Rodriguez: Yeah. Me neither. I had to read the book."

Me: "Yeah."

Mr. Rodriguez: "You know because mine had cruise control and you push a button and it would stop and you pushed another button and it would go back to where it was."

Me: "I had a rental car a couple years back and I couldn't figure out how to get the trunk open so I had to ask somebody."

Mr. Rodriguez: "You just push the button."

Me: "Yeah. I had to push a button twice."

Mr. Rodriguez: "Yeah. Mine, mine has that too. On my key, on my key thing it had a, it would pop the trunk."

Me: "Yeah."

Mr. Rodriguez: "And it would also set the alarm."

Me:  "Mm-hmm."

"And what else?  And it would turn the lights on you know and it would honk the horn too."

Me:  "Mm-hmm."

Mr. Rodriguez:  "It had uh for emergencies like somebody, somebody's coming at you you push the button and the horn would blow and the light would flash.  Yeah."

Q.  Okay, thank you.  So Mr. Rodriguez informed you that when he got out of prison he got -- apparently he got a new car that he wasn't used to from the 20 years prior, and he read the manual to learn how to properly use it and figure out what the various items within the car were and how they worked?

A.  That's correct.  Although I recall it was actually a used car.

Q.  Okay.

A.  I could be wrong.

Q.  That's what this conversation entailed though is his --

A.  Yes, sir.

Q.  His ability to learn how to run the car by reading the manual?

A.  Correct.

MR. REISENAUER:  Might be a good time for

lunch, Your Honor.

THE COURT:  All right.  We'll go ahead and break until 1:15.

(Recess taken; 12 o'clock noon to 1:15 p.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States versus Alfonso Rodriguez and it's 2:04-cr-55.  The record should reflect that all counsel of record are present.  Dr. Seward remains on the stand.  When we broke Mr. Reisenauer was conducting a direct examination.

You may continue, sir.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Doctor, I'm going to hand you Government's Exhibit 631 (indicating).  This is further conversation you had with Mr. Rodriguez and basically entails a discussion about driving his motor vehicle after he was released from prison.

We would offer 631, Your Honor?

THE COURT:  Any objection?

MS. FISHER:  No objection.

THE COURT:  631 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Dr. Seward, I believe you were -- at the top of this page you were

discussing with Mr. Rodriguez him taking his nieces and nephews to various locations.  If you would start with what he says there on the second line.

A.  Mr. Rodriguez:  "And took them to Grand Forks to the zoo and we went to an amusement park, uh, and took them shopping in the city.  We went to the Mall of America."

Me:  "Oh now when you got out of prison did you have a driver's license?"

Mr. Rodriguez:  "Mm-hmm.  Yeah."

Me:  "You had one while - how does that work?  You had a driver's license while you were in prison?"

Mr. Rodriguez:  "I just renewed it every four years."

Me:  "Oh ok.  I thought, I thought you had to like take a test or something."

Mr. Rodriguez:  "The only test you had to take was an eye test."

Me:  "Oh ok.  So you could just do that by mail every four years?"

Mr. Rodriguez:  "Yeah."

Me:  "Oh wow."

Mr. Rodriguez:  "And out of all the prisons they got, now they can make the licenses right there."

Me: "Is that right?"

Mr. Rodriguez: "Yeah. Like the month that I got out - no, two months before I got out, they had a machine there already that would make the actual license and they would put your, it in the vault in your file so when you got out you had all the paperwork there."

Me: "Well I don't mean to be insulting or anything but did your, like, sister have any concerns about your driving ability? I mean you hadn't driven for a while."

Mr. Rodriguez: "I was pretty good."

Me: "Yeah? Ok."

Mr. Rodriguez: "I've always been a good driver. I just don't like it."

Q. Thank you, Doctor. You had further discussion with Mr. Rodriguez in regard to a trip that he took with his family when he got out of prison in 2003 down to Laredo, Texas. You recall that?

A. Yes, I do.

MR. REISENAUER: Again we have a short video of this conversation that we will offer at this time.

THE COURT: And is it 632A and B again?

MR. REISENAUER: Yes, Your Honor. Thank you.

THE COURT: Any objection?

MS. FISHER:  No objection.

THE COURT:  632A and 632B are received.

MS. FISHER:  I'm sorry, I haven't actually received the exhibit.

MR. REISENAUER:  I'm trying.

MS. FISHER:  Okay, that's fine.

MR. REISENAUER:  Thank you, Your Honor.  And if we could play the video, Your Honor?

(Government's Exhibit 638A played in its entirety.)

Q.   (Mr. Reisenauer continuing)  Doctor, obviously from your conversation here with Mr. Rodriguez he appears to certainly have a grasp of reading an atlas or a map?

A.   Yes, sir.

Q.   And in your conversation there with him, he talked about a number of locations he had visited or lived and driven to those places.

How does that relate to his practical understanding of day-to-day life or activities?

A.   Well, actually it relates to a couple areas.

Q.   Okay, go ahead.

A.   Not just practical but again communication.  He was able to explain things.  Socialization there was a back and -- a conversational back-and-forth.  He was

tracking what he said.  He was, you know, relating in a friendly manner.  And then there's a practical aspect of route finding.

Q.  Of what?

A.  Using a map, route finding.

Q.  Okay.  And obviously he was able to transport himself using the vehicle to these different locations as he related?

A.  Yes, according to him.  And also there's -- just from a short-term memory standpoint, he's not repetitive.  His thinking is logical, goal directed.

Q.  Okay.  Government's Exhibit 633, Doctor, is further part of your conversation with Mr. Rodriguez.

We would offer 633, Your Honor.

MS. FISHER:  No objection.

THE COURT:  633 is received.

Q.  (Mr. Reisenauer continuing)  And, Doctor, if you would look at 633.  You were actually talking at this point with Mr. Rodriguez about Dru Sjodin and if you would start at the very top there and read that conversation.

A.  Okay.  Mr. Rodriguez:  "And I still didn't know what I was gonna do with her, you know?"

Me:  "And - oh, I'm sorry - look - sorry to interrupt.  Where was she at this -"

Mr. Rodriguez:  "In the backseat."

Me:  "In - still in the backseat?  Okay."

Mr. Rodriguez:  "Yeah, yeah, yeah.  And, uh, um, we drove.  I took county roads, you know?

Me:  "Mm-hmm.  How come?

Mr. Rodriguez:  "Well, I didn't want to get stopped, you know?

Me:  "Okay."

Mr. Rodriguez:  "So I took mostly gravel roads all the way home."

Me:  "Mm-hmm."

Mr. Rodriguez:  "And, uh, I knew this place where there was a - it was a big ravine, you know?"

Me:  "Mm-hmm."

Mr. Rodriguez:  "And in this ravine it had these, uh, what would you call them?  Furrows coming down like this where the earth opened up because of water."

Me:  "Oh, yes."

Mr. Rodriguez:  "You know?  And then some of them were pretty deep so I - I - that's where I put her and when -"

Me:  "Okay, how - why were you familiar with this area?"

Mr. Rodriguez:  "Because I - I used to live

there, pretty close by."

Me:  "Oh, that's - uh-huh."

Mr. Rodriguez:  "You know?  I used to hang out at that ravine."

Q.  Okay.  Thank you, Doctor.  This particular conversation obviously shows that he has the ability to transport, but what is the thought process here that he used to take the gravel roads and to find a place that he was well aware of that he could place Miss Sjodin in an effort to hide her body?

A.  Well, from his perspective it was problem solving.

Q.  Okay.  And you're aware that as a result of this particular problem solving that he exhibited that Miss Sjodin's body wasn't found for about seven months?

A.  I don't recall the time period but I do recall it took a while.

Q.  Okay.  Doctor, I'm going to hand you Government's Exhibit 634 (indicating).  This is a further conversation with Mr. Rodriguez.

We would offer 634, Your Honor.

MS. FISHER:  No objection.

THE COURT:  634 is received.

Q.  (Mr. Reisenauer continuing)  And, Doctor, in your earlier conversation that we watched, Mr. Rodriguez

talked about going and buying meat from a certain butcher shop in one of the towns.  You recall that?

A.   Yes, sir.

Q.   Okay.  And this conversation is in regard to when he was at the Minnesota Security Hospital, and if you would just read the first two paragraphs up above.

A.   Sure.  Starting with my question?

Q.   Yes, at the top.

A.   Okay.  So this is me:  "So how did that work?  You would just sign out of the secure hospital?"

        Mr. Rodriguez:  "Yeah, I would sign out and I'd pick up all the money that the other guys - what they wanted and I'd either go buy groceries - I had a little wagon that I had and I'd fill out the orders, you know?  They wanted to buy groceries so I'd fill it out and I'd get 'em all ready and then I'd go back to town and I'd stop by the A&W or the Hardee's or Kentucky Fried Chicken or pizza and buy the pizzas that the guys wanted.  A lotta times they would just call and ask.  The only place that didn't deliver was A&W and Hardee's.  The other, the pizza place delivered, so."

Q.   Okay, thank you.  Dr. Seward, I'm going to hand you what's been marked as Government's Exhibit 635 (indicating).  This is the testimony of a Clifford Hegg from the trial.

We would offer 635, Your Honor.

THE COURT:  Any objection?

MS. FISHER:  No objection.

THE COURT:  635 is received.

Q.  (Mr. Reisenauer continuing)  Dr. Seward, Exhibit 635 as I noted is the testimony of Mr. Clifford Hegg. He was a neighbor of Mr. Rodriguez's mother Delores.  Do you recall Mr. Hegg at all?

A.  Yes.  I believe he was the elderly neighbor.

Q.  Yes.  If you would turn to what would be page 8289.

A.  Yes, sir.

Q.  And up on the top there there's a question to him that says:  "Okay.  Have you ever had occasion to meet Delores's son Alfonso or Tito Rodriguez?"

You see that?

A.  Yes, I do.

Q.  Can you just read the answers from the rest of that page -- or the questions and answers I guess?

A.  Yes, sir.  Answer:  "I met him after he come home."

Question:  "That would have been after May of -- May of 2003 -- "

Answer:  Yes, sir.

Question:  " -- when he got out of prison

and came home?"

Answer:  "Right, sir."

Question:  "Can you tell us how you met him?"

Answer:  "Well, I knew he was coming home, but I didn't know when.  I take care of Delores, like I say, bring her back and forth to any appointment or anything she's gotta go.  And I walked over that day, and then that's the day I met him."

Question:  "Okay."

Answer:  "Because I was going to go over there and pick up garbage, her garbage, and take out."

Question:  "Okay.  Did her son -- were you introduced to Alfonso?"

Answer:  "Yes, I was."

Question:  "And is it fair to say that from the time that he got home that he took over those household chores for his mother, taking out the garbage and getting her around town to get shopping and her needs, taking care of the yard?"

Answer:  "Yes, sir, that's what he did then. I didn't have to do it."

Question:  "Did you have any kind of a relationship with Alfonso Rodriguez after he got home?"

Answer:  "I and him were just as friendly as

anybody that lived next door.  He was outside, I'd go over and talk to him.  When I was outside, he'd come over and talk to me.  Anything he'd needed, I told him to come and see me.  If he couldn't find it at home, a wrench or something like that, he'd need to fix something, come over and ask me."

Question:  "Did he do that?"

Answer:  "Yes, sir, he did."

Question:  "Okay.  Did you and Mr. Rodriguez develop some kind of friendship?"

Answer:  "Yes.  Like I say, every time he was out I'd go over there and talk to him or he'd see me out in my yard, he'd come over and talk to me."

Question:  "What types of things did you fellows talk about?"

Answer:  "Always asked me the places I'd been fishing or where there was good fishing around."

Question:  "Did you ever have occasion to talk about the yard or the flowers or the shrubs?"

Answer:  "Well, he just stated that he'd take care of the flowers and that since he was home."

Question:  "Did you see him doing that?"

Answer:  "Yes, I did, sir."

Question:  "Was he able to get flowers to grow?"

Answer:  "Right, sir."

Question:  "Did he mow the lawn?"

Q.   You can stop there, Doctor.

A.   Okay.

Q.   You can stop there.  Thank you.

A.   Yes, sir.

Q.   The last two exhibits, they basically talk about daily living activities and buying groceries and taking care of the yard and so forth, correct?

A.   Yes, sir.

Q.   Okay.

A.   And if I may add, also the socialization aspect.

Q.   Okay.  Doctor, I'm going to hand you Government's Exhibit 636 (indicating).  This is a further discussion you had with Mr. Rodriguez.

We would offer 636, Your Honor.

MS. FISHER:  No objection.

THE COURT:  636 is received.

Q.   (Mr. Reisenauer continuing)  And, Doctor, there's a number of pages in this document.  Here you are talking about Mr. Rodriguez's blood sugar and his nutrition and diet.  Do you recall this?

A.   Yes, sir.

Q.   And I don't want you to read the whole thing but on the very first page here towards the bottom you start

talking about getting him a meal and then you say: "With - now with your diabetes, uh, do you like have to eat meals every so often to keep your blood sugar up?" And he answered: "Yeah."

Do you see that?

A.   Yes, sir.

Q.   Okay.  And you further talked to him about cooking and apparently he's able to make some meals in his cell?

A.   Yes.

Q.   Okay.  And what did he relate, if you recall, about that?

A.   Could you be more specific, please?

Q.   Yeah.  I think on the second page there you asked him how does he cook.

A.   Oh, okay.

Q.   And what he cooks.

A.   Sure.  Yeah, he was saying:  "It's mostly ramen noodles."

Q.   Okay.

A.   And he makes it in the sink.  He said:  "The water in the sink comes out pretty hot."

Q.   You ask him about how he feels -- or he says he can feel it when his blood sugar goes down.  Do you see that on the bottom of the page?

A.    That's right.  I asked him how he feels and he says that he feels clammy, that he feels a little anxiety and lightheadedness.

Q.    And apparently you bought him a pop or he had a pop when you were with him?

A.    Yes.

Q.    If you turn to the next page you talk about that in the middle.  He says:  "This is the first pop that I probably have had in a year."

Do you see that?

A.    Hold on just a second.  And I'm sorry, sir, what --

Q.    Page 6 up on the top.

A.    Oh, I'm sorry, I was -- okay.

Q.    In the middle of the page he says:  "This is the first pop that I probably have had in a year"?

A.    I'm sorry, Your Honor, yes, I do.

Q.    Okay.

A.    And I asked him if he's going to be okay with this.

Q.    Yeah.  If you skip down a couple lines there you say:  "You're not gonna flip out or anything."  You see that?

A.    Yes.

Q.    And what does he answer?

A.   "No, I can even drink a regular pop just as long as I don't do it every day, or stuff like that.  Like I don't drink pop that often.  And there's certain foods, like tomatoes, that they have too much sugar, especially when they're cooked.  The sugar pops up."

Q.   And as the conversation goes he talks to you about other foods that have sugar in it and then if you turn to page 8, are you there, sir?

A.   Yes, sir, I am.

Q.   You ask him about his treatment for diabetes and he tells you he's on medication and then he tells you the medication he's on and what he takes?

A.   That's correct.

Q.   So from your conversation it appears that he was well-versed in his problem with diabetes and what he needed to do to manage it and control that with his food intake?

A.   Yes, sir.

Q.   And he was also well aware of what medication he was on and what he was supposed to take in regard to that?

A.   That's correct.

Q.   Doctor, I'm going to hand you Government's Exhibit 637 (indicating).  This is further conversation you had with Mr. Rodriguez, and this is in regard to his

job at the print shop while he was in prison.  Do you recall that?

A.  Yes.

MR. REISENAUER:  We would offer 637.

MS. FISHER:  No objection.

THE COURT:  637 is received.

Q.  (Mr. Reisenauer continuing)  And this is again quite a lengthy conversation, Doctor.  I don't want you to read it but towards the bottom of the first page you -- he tells you:  "I work in the print shop for 20 some years."

You see that?

A.  Yes, sir.

Q.  After you asked him about what kind of job he had been looking for, and then you asked him what he did in the print shop, correct?

A.  Correct.

Q.  And he goes on then for the next three pages of this transcript explaining to you what he did in the print shop and how it worked; is that right?

A.  Yes, that's correct.

Q.  Do you know anything about how print shops work at all yourself?

A.  Sort of.  In the '70s I worked -- I had a couple jobs in different print shops as just real -- one I was

a janitor and the other one was an in-house print shop at a company and I was the chauffeur, a corporate chauffeur, and when I wasn't driving people around I would work in the stockroom or the print shop.

Q.   Did you work in the print shop like Mr. Rodriguez did?

A.   I was really low level.

Q.   There's an exhibit, if I can find it, that we put in this morning and maybe we don't have it here.  It was from the probation officer.  Government's Exhibit 625, Dr. Seward, and let's just talk about this while I'm standing here.  This was the state parole and probation agent's report and on page 4 towards the bottom here it has a subsection called "Vocational."

Do you see that?

A.   Yes, sir.

Q.   Can you just read that to us?  Thank you.

A.   "Before quitting school in 1970, defendant was employed with the Crookston Public Schools as a maintenance worker earning $115 an hour."  The decimal's missing, decimal point.  "During the summer of 1972 defendant was employed with Roger Tollefson Farms of Beltrami, Minnesota earning $2.00 an hour.  From September of 1972 until March of 1973, defendant was employed with the American Crystal Sugar Company as a

laborer earning $3.02 an hour.  During the summer of 1974 defendant was employed with the Red River Alfalfa Company earning $3.00 an hour.  From September until the time of his arrest defendant was employed at the American Crystal Sugar Company earning $3.52 an hour."

Q.  Okay, thank you.  So it appears at least from that probation and parole report that prior to his arrest Mr. Rodriguez had a number of different employers or jobs either in high school or after he quit high school, correct?

A.  That's correct.

Q.  Okay, thank you.  So, Doctor, in your review of all of the documents that you were provided, and you list those in your report in the first few pages, and in your conversation with Mr. Rodriguez, is there any indication that he had lack of impulse control at all?

A.  Other than related to his offenses.

Q.  Okay.  And what do you mean by that?

A.  Well, his offenses -- I did not do an in-depth review of the offenses.  It seemed like they involved planning, but the offense itself would be related to -- presumably related to some kind of sexual desire or impulse.

Q.  Okay.  And regarding the adaptive abilities that we've been just talking about, granted he's been in

custody for a lengthy period of his life, but is there anything that you have seen either living in the community or frankly living within the confines of the prison system that provided you with any evidence that he was ever in need of any particular support as a result of any deficit he may have?

A. Not to any significant degree.

Q. And prior to this particular offense after he was released in 2003, he managed his own affairs by providing for himself, his mother, helping his nieces and nephews, relationships with family members and making plans and seeking employment and frankly obtaining employment, correct?

A. Correct.

Q. Doctor, let's move to a different area here. Dr. Weinstein testified last week in this court in regard to his evaluation of Mr. Rodriguez. You have reviewed his report and his data on his evaluation; is that right?

A. Yes, I have.

Q. Can you tell whether or not Dr. Weinstein did any tests for any psychological or emotional functioning?

A. Not to the best of my knowledge.

Q. You don't see any?

A. I do not.

Q. Okay. And earlier this morning we talked briefly about the tests that you performed and I think you said you did six malingering tests; is that right?

A. That's correct.

Q. Okay. And from your review of Dr. Weinstein's data, how many types of those tests did he do?

A. He gave one complete, the Dot Counting Test, and then gave the Rey-15 Item Test without the recognition trial.

Q. So he did half of that one?

A. Correct.

Q. Okay. And as you noted earlier, the practice within your field is to do a number of tests, six or five?

A. I believe that was the number, yes.

Q. Okay.

A. The average.

Q. Okay. Dr. Weinstein did a test called the TOGRA. Are you familiar with that?

A. I was not until I saw his testing.

Q. Okay. And so you've done a little research on what that was?

A. That's correct.

Q. And within -- well, let me ask you this: Have you found whether or not that is an IQ test?

A.   It is not.

Q.   It's not an IQ test.  What kind of test is it?

A.   It's recommended for -- it's a test of abstract thinking and it's recommended for screening purposes, for things like academic placement and employee selection.

Q.   Okay.  So it doesn't provide an IQ result.

A.   Correct.  And there's something in the manual, I forget the exact wording, but it's not recommended for the assessment of intellectual disability.

Q.   Okay.

A.   Again I forget the exact wording.

Q.   Okay.  And in Dr. Weinstein's report of -- I believe it's at page 11.  Hang on, I'll get the report. Exhibit 44 there he refers to the TOGRA test results and he has a 70 there and in parentheses he has "IQ."

         You see that?

A.   Yes.

Q.   You just told us it's not an IQ test; is that right?

A.   That's correct.

Q.   There's also within his report, Doctor, a test or a measurement tool that he gave.  It's called the ABAS-3?

A.   Correct.

Q.    That is a test for adaptive functioning?

A.    That's correct.  And it's not strictly a test.

Q.    Yeah.

A.    It's an interview.  It's like a questionnaire more, yeah, but I'm quibbling.

Q.    And that's designed for people that either live with or see the individual on a frequent daily basis, correct?

A.    That's correct.

Q.    And it's not made for retrospective purposes; is that correct?

A.    It is not.

Q.    Well, let's do this, Doctor.  If you can direct yourself to the WAIS-IV in your mind here, Dr. Weinstein testified last week that he gave the WAIS-IV to Mr. Rodriguez.  Are you aware of that?

A.    Yes.

Q.    And if we could for a second I have a few questions about the WAIS-IV.  I know we talked about it a little earlier, and you gave what I guess would be known or commonly called the U.S. or the English version of the test, right?

A.    That's correct.

Q.    Dr. Weinstein testified last week that he gave the Mexican version of the WAIS-IV.  Are you aware of

that?

A.   Yes.

Q.   Okay.   And the Mexican version of the WAIS-IV is known to you?

A.   Yes.

Q.   Okay.   I think Dr. Weinstein testified that he was aware that there was also a Spanish version.   Are you aware of that?

A.   Yes.

Q.   And do you know how many versions of the WAIS-IV there may be?

A.   About 20 for different cultures and languages.

Q.   So like I'm just pulling countries out of the air here.   There might be a German version, an Italian version, a French version and so forth?

A.   There might be.

Q.   And so you know there's about 20.

A.   Yes.

Q.   Okay.   So those would basically be the WAIS-IV that has been adapted to those other countries, correct?

A.   That's correct.

Q.   Okay.   And they -- we talked about norming earlier today.   They would be normed for their country.

A.   That's correct.

Q.   And the Mexican version is normed for Mexico.

A.  That's correct.

Q.  Let me ask a couple other questions before we move into Dr. Weinstein's test itself.  In the English version that you gave, is there anything in the manual that allows you to ask the questions like in French or in Spanish?

A.  There is not.

Q.  So if Dr. Weinstein asked if he gave -- not if, he gave Mr. Rodriguez the Mexican version.  If he asked -- or translated some of the questions into English or asked some of the questions in English, that is not in the manual; is that right?

A.  To my understanding, correct.

Q.  Let's go if we could to a couple of the -- couple portions of the test.  Doctor, I'm going to hand you Government's Exhibit 580 (indicating).  This is the raw data we received on Dr. Weinstein's WAIS-IV.

You've looked at this before; is that correct?

A.  I have and this is actually -- looks like it's the complete raw data.

Q.  Okay.  You've reviewed the raw data; is that right?

A.  That's correct.

Q.  Okay.  And there were some discrepancies that you

found; is that correct?

A.  Could you be more specific, please?

Q.  Well, let's just go to a few of the pages if we would, okay?

A.  Sure.

Q.  Go to page -- would be 103.

A.  Yes, sir.

Q.  And this is in Spanish, correct?

A.  That's correct.

Q.  Okay.  This particular item, you're familiar with this test?

A.  Yes, I am.

Q.  Okay.  And on this page here in this particular test, is there anything that you noticed that appears not to have been done properly by the guidelines in the manual?

A.  Well, at least according to the U.S. manual, the completion times for each item should be recorded.

Q.  Okay.  And there are no recordations or there are a couple, right?

A.  That's correct.

Q.  And so are you saying that they all should be recorded?

A.  It's not me saying it.  It's the manual, yes, sir.

Q.   Yes, okay.  The next page, 104, in this particular portion of the test Dr. Weinstein has the word "English" written up on the top.  Do you see that?

A.   That's correct.

Q.   And he testified last week that what he did in this test is he read the terms on the left-hand side of this test to Mr. Rodriguez and then he translated them into English for him.

Do you know whether or not anywhere in any of the manuals you're aware of where that is allowed?

A.   I am not aware of that being allowed.

Q.   Okay.  And then if you would -- I have a couple questions.  Go to No. 4 if you would.

A.   Yes, sir.

Q.   That says "Cabailo-Tigre" and I think Dr. Weinstein said that those two terms meant horse and tiger?

A.   Yes.

Q.   Would that be similar to the English version?

A.   Yes, sir.  There is an identical item in the English version.

Q.   Okay.  And Mr. Rodriguez said they "have 4 legs." You see that?

A.   Yes.

Q.   And he was given one point.  Do you see that?

A.    Yes.

Q.    Is there anything about that particular question-answer series that causes you to give pause?

A.    Sure.

Q.    What would that be?

A.    In the English, at least in the English manual for these items you can either get a zero, a one or a two.  And the English manual says that if an examinee gives a vague or incomplete reply then you query by saying something like:  Tell me more.

Q.    Okay.

A.    And, in fact, in the manual they actually have some of the common incomplete or vague replies that you have a mandatory query for.

Q.    Okay.

A.    So this is one of those items, horse and a tiger.  The defendant replied "have 4 legs," which is correct.  But also a table and a chair can have four legs.

Q.    Okay.

A.    And so according to the manual you would query that by something neutral like:  Tell me more about it or tell me more.

Q.    Okay.

A.    And this would give the examinee the opportunity to get a two-point response.

Q.  Okay.  And it doesn't appear here that Dr. Weinstein allowed for a query or asked a query?

A.  That's correct.  Per the manual, the query should be indicated by like a "Q" in parentheses or I suppose in Spanish an "I."

Q.  No. 9, "capullo" and "bebe."  Do you know what those terms are?

A.  I'm assuming it means a bud and a baby.

Q.  Okay.  And would that be similar to the English version then?

A.  Well, that's identical in the English version.

Q.  Okay.  And here according to what was written down Mr. Rodriguez gave the answer "young," correct?

A.  Correct.

Q.  And he received zero points.  Do you see that?

A.  Yes.

Q.  And a bud and baby what would be wrong with "young" as an answer.  Anything?

A.  That's a two-point response.

Q.  So he should have gotten two points per the English version anyway and he got zero.

A.  That's correct.

Q.  Okay.

A.  And the problem with that is you discontinue this test.  You discontinue the subtest after three incorrect

answers so as not to wear out the person.

Q.   So if he would have gotten one point or two points for that, it wouldn't have been discontinued after the next two.

A.   That's correct.

Q.   Let's just turn to page 105.

A.   If I could also point out the Mexican version is not a direct translation because the items are in different order and there's also some items that are specific to Mexican culture.

Q.   Okay.  And we discussed this earlier but Mr. Rodriguez's preferred language is English.  You're aware of that?

A.   Yes.

Q.   Okay.  105 if you would turn to.

A.   Yes, sir.

Q.   Here frankly there's nothing written down in the blank on this page.  This is a number sequencing test; is that right?

A.   That's correct.

Q.   Okay.  And he did receive scores but there's a big blank area in the middle of that page.  Do you know what that's for?

A.   According to the test manual, the examinee's responses should be written down verbatim.

Q.  Okay.  And there were no responses written down at all?

A.  That's correct.

Q.  How about let's go to page 107 quick.

A.  Yes, sir.

Q.  Here again at the top it notices that apparently Dr. Weinstein translated these terms into English.  You see that?

A.  I see the word "English," yes.

Q.  And again no where in the manual does it indicate that you're allowed to interpret, correct?

A.  That's correct.

Q.  Look at No. 13 there.  I don't know what that word is but the answer says "feel sorry."  You see that?

A.  Yes, sir.

Q.  And then in parentheses there is a letter "I."  Do you see that?

A.  Yes, sir.

Q.  Do you have any idea what that might indicate?

A.  My guess is that means he queried that response.

Q.  Okay.  So certainly Dr. Weinstein knows that he should query at least on occasion.

A.  Yes, sir.

Q.  How about if we jump to page 110, 110 and 111.  Let's talk about that particular subtest.  It's called

"Informacion"?

A.  Yes.

Q.  And how did this -- how does this test work?  Can you tell us?

A.  Sure.  This is a test of basic knowledge and so you ask the examinee questions like, for example, what is a thermometer used for?  And then they explain it and it starts simple and it gets harder as it goes along.

Q.  Okay.  So because this is the Mexican version, it asks questions frankly that the English version wouldn't include; is that right?

A.  That's correct.

Q.  Okay.  And I'll direct you to No. 7.

A.  Correct.

Q.  Page 111?

A.  Got it.

Q.  And here the Mexican version has the name of "Emiliano Zapata."  You see that?

A.  Yes, sir.

Q.  But here Dr. Weinstein changed the question to as he writes down "Civil War" and I believe he testified last week that he asked then Mr. Rodriguez who the president was during the Civil War and the answer is written down there:  "A Lincoln."

        You see that?

A.   Yes, sir.

Q.   Okay.  So I take it that that isn't a justified way to do this test at least in the English version; is that right?

A.   That's correct.

Q.   Okay.

A.   But that is an item from the English version.

Q.   Okay.  So --

A.   And that's -- I'm sorry, sir.

Q.   So Dr. Weinstein substituted some of the questions in the English version to this Mexican version of the test.  Is that the way it looks?

A.   Yes.  Also it looks like No. 9 he might have done that.

Q.   And No. 9, I think if I read this right, says "Shakespeare"?

A.   Yes.

Q.   When the Mexican version question asks something about "de la Mancha"?

A.   Yeah.  I think it's looking for Cervantes, but I could be wrong.

Q.   Okay.  And there Mr. Rodriguez didn't know the answer even to the Shakespeare question it looks like.

A.   Yes, sir.

Q.   Okay.  Now on this particular test I just have

one more question about this.  As Dr. Weinstein scored this from the top it's 11010 and then there's no score on the question 12 or 13.  Do you see that?

A.  Yes, sir.

Q.  And then a 000.  Question 12 says:  "Linea."  Do you know what that might be?

A.  I can speculate based on the English language version.

Q.  And what would that be?

A.  On the English language version, there's a question:  What is the imaginary line that divides the earth into northern and southern halves?

Q.  Okay.  And that would be the equator?

A.  That's correct.

Q.  And so that would be the correct answer there at least in the English version?

A.  That's correct.

Q.  But it's not scored at all.

A.  Correct.

Q.  And then question 13 it has the word "olimpiadas" and there's an answer:  "Greece."  Do you know what question that would be in English?

A.  My speculation is that's the item from the English test that says:  In what country were the first Olympic games?

Q.   And so Greece would be the correct answer.

A.   That's correct.

Q.   But there's no score.

A.   Yes.  The score is not indicated, yes, sir.

Q.   So he was given credit for nine correct answers on the score sheet.  Do you see that?

A.   Yes.

Q.   And if I add the circle of 1s, that does come up to nine but we didn't get any score for 12 or 13.

A.   That's correct.

Q.   Doctor, can you turn then back to page 101.

A.   Got it.

Q.   Dr. Weinstein testified last week that this reflects the scoring that Mr. Rodriguez had on the WAIS-IV.  Would you agree with that?

A.   Yes, sir.  It is the scoring face sheet, yes, sir.

Q.   Okay.  I'm going to hand you Government's Exhibit 638, Doctor (indicating).  Can you tell us what that is?

A.   Sure.  This is a blank scoring face sheet for the WAIS-IV.

Q.   And this would be a blank scoring sheet for the WAIS-IV in English, correct?

A.   Correct.

Q.   And would you agree it's the same type of score

sheet that is included in page 101?

A.   With the exception of the score sheet in 101 being in Spanish.

Q.   Right.

A.   Yes, sir.

Q.   Okay.  But it's the same score sheet that you use in the English version.

A.   It's the same format, correct.

Q.   Okay.  So in looking at 101 and following on the English version, the subtests are listed on the way left-hand column, correct?

A.   That's correct.

Q.   And then next to that there's some blocks that are the raw scores?

A.   Yes.

Q.   Okay.  And then in the next column are the scaled scores?

A.   Yes.

Q.   And we talked earlier, I think you told us, that the raw scores are the numbers from each of the subtests?

A.   That's correct.  You add up the points.

Q.   Okay.  And then you take those and they become the scaled score, correct?

A.   That's correct.  You turn to the -- again I do

this by computer, but you turn to the appropriate page of the manual for the appropriate age group and you obtain the scaled scores and you put them in the boxes to the right.

Q.   Okay.  And so in Dr. Weinstein's record form at 101, he writes in the raw scores in the boxes on the left, right?

A.   Correct.

Q.   Okay.  And were those the correct scores, raw scores, as you saw them from the raw data?

A.   A couple corrections, small corrections, and then there was the issue with the information subtest with the two missing items.

Q.   Okay.  When the raw scores were translated I'll use the word into scaled scores, were you able to check whether or not those scaled scores were correct?

A.   Yes, based on the raw scores that are recorded.

Q.   And they're recorded correctly?

A.   I mentioned some minor errors.

Q.   Okay.

A.   But based on -- they're transferred correctly, yes, sir.

Q.   That's what I meant, sorry.  So in Dr. Weinstein's scaled scores he has -- in each box he has two numbers.  You see that?

A.   Yes, sir.

Q.   Okay.  And he told us that the lighter number and smaller number were the Mexican scaled scores and the bolder, bigger numbers were the U.S. scaled scores.

A.   That's correct.  But to avoid confusion I'm going to refer to them as small font and big font.

Q.   Okay.  But the way I described it, that is your understanding of the scores?

A.   Yes.

Q.   Okay.  And you total each of those columns and place the sum of the scaled scores at the bottom; is that right?

A.   That's correct.

Q.   Okay.  So as his numbers read across the sum of the scaled scores, he has a 26 in verbal comprehension and that would be using the U.S., and then -- or, excuse me, the Mexican and 18 in the U.S., correct?

A.   That's correct.

Q.   Okay.  And then the next one is perceptual reasoning?

A.   Yes.

Q.   He has 26 and 21, correct?

A.   Yes, sir.

Q.   And then the next one is working memory?

A.   Correct.

Q.   And I read that 13 and 8?

A.   Correct.

Q.   Processing speed, 20 and 14?

A.   Correct.

Q.   Okay.  And then the full-scale of 85 and 61?

A.   That's correct.

Q.   Okay.  And then the next chart down below that you take those sum of the scaled scores and you composite -- you get a composite score upon conversion, correct?

A.   That's correct.  And these are standard scores.

Q.   And those are then reflected in the middle column called composite score?

A.   Correct.

Q.   And so if I'm reading this correctly the verbal comprehension is 90 in the Mexican score and then Dr. Weinstein used the U.S. norms to arrive at a 78 using the U.S. norms; is that right?

A.   That's correct.

Q.   Okay.  And the next one will be perceptual reasoning and he scored a 91 in the Mexican norms and 82 using the U.S. norms?

A.   Correct.

Q.   And then the working memory is 82 in the Mexican norms, 68 in the U.S. norms?

A.   Correct.

Q.   And finally the processing speed is a 100 in the Mexican norms and 84 in the U.S. norms?

A.   That's correct.

Q.   And he would then have obtained a full-scale IQ of 89 in the Mexican norms and 74 using the U.S. norms; is that right?

A.   That's correct.

Q.   Doctor, I want you to just take a look at the Mexican norm from the Mexican version of this test and let's just briefly compare Mr. Rodriguez's scores with Dr. Froming's and yours if we could.

     The verbal comprehension is an 90 with Dr. Froming, he had a 96 and with you he had a 95; is that right?

A.   I don't have that information in front of me. Should I dig that out?

Q.   Yeah, if you can find Dr. Froming's report there. Do you recall that yours was a 95?

A.   It sounds right but I'd rather be sure.

Q.   Okay.

A.   Sir, I may have -- I may no longer have Dr. Froming's --

Q.   I think it's 24.  I have Dr. Froming's here (indicating).

A.   All right.

Q.   Dr. Froming's was a 96; is that right?

A.   Yes, sir.

Q.   And yours was a 95.

A.   Let's see, yes, sir, it was.

Q.   Okay.  And then perceptual reasoning he scored a 91 in Dr. Weinstein's test.  Yours is an 88 I believe?

A.   I'm sorry, were you talking about Dr. Froming?

Q.   No.  Yours is 88?

A.   Yes, sir.

Q.   And then Dr. Froming's is an 89.

A.   Actually she has the perceptual organization index as a 91.

Q.   A 91.

A.   Yes.

Q.   Okay, I misspoke.  The working memory he scored an 82 for Dr. Weinstein?

A.   Correct.

Q.   He scored an 80 for you?

A.   Yes.

Q.   But in Dr. Froming's the score there was lower. It was a 69 I believe.

A.   That's correct.

Q.   Processing speed, it was 100 in Dr. Weinstein's, correct?

A.    Correct.

Q.    And he scored an 89 for you?

A.    Yes.

Q.    And an 88 for Dr. Froming?

A.    That's correct.

Q.    So higher for Dr. Weinstein.

A.    Yes.

Q.    And then the full-scale IQ, an 89 for Dr. Weinstein, an 86 for you and an 87 for Dr. Froming?

A.    Correct.

Q.    Now earlier you testified, Doctor, that you believe the WAIS-IV has been adapted in I believe you said 20 different languages and countries, correct?

A.    Correct.

Q.    Is there anywhere in the manual that allows one to give like in instances the Mexican version of a test and use the U.S. norms or for that matter any other norms from any other country?

A.    Not that I'm aware of.

Q.    If I'm reading this right by the Mexican version of the test Mr. Rodriguez has an IQ of 89, correct?

A.    Yes, sir.

        MR. REISENAUER:   That's all the questions I have, Your Honor.

        THE COURT:   Why don't we go ahead and take a

break at this point.  Looking at that clock it says 2:35.  It's 2:30 so we've been after it for an hour and 15 minutes.  Let's take a 15-minute break.  We'll start again at 2:45.

(Recess taken; 2:30 p.m. to 2:45 p.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  The record should reflect that Mr. Rodriguez has waived his presence.  His counsel of record are present.  The United States' counsel of record are present.  When we broke Ms. Fisher was about to conduct a cross-examination.

You may proceed.

MS. FISHER:  Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MS. FISHER:**

Q.  Good afternoon, Dr. Seward.

A.  Good afternoon.

Q.  Dr. Seward, I'd like to just go over a few items from your CV.

A.  Yes, ma'am.

Q.  Which I believe was Government Exhibit No. 614.

A.  Yes.

Q.  I'm going to look at the marked exhibit but I

believe when I spoke to you in Phoenix you had mentioned the updated resume so --

A.   That's correct.

Q.   You'll just let me know if anything's changed that I missed.

A.   Okay.

Q.   All right.  Dr. Seward, fair to say you've testified in over a hundred criminal cases?

A.   Oh, yes.

Q.   And in all of the criminal cases in which you testified, you've been testifying for the prosecution; is that correct?

A.   That's not correct.

Q.   That's not correct?

A.   That is not correct.

Q.   All right.  Do you remember attending a deposition with me in Phoenix?

A.   I do.

Q.   I'm going to -- and before I go into this, just to be clear I'm talking about cases in which you testified, not in which you were retained.

A.   That's correct.  As I recall I think I explained at the time that when I was working for Maricopa County I was working for the -- I was appointed by the Court.

Q.   All right.  Then let me clarify.

A. Sure.

Q. When you were appointed by the Court in Maricopa County, your role was to do competency evaluations, correct?

A. That's correct, yes.

Q. And the Court would give you an order and then you were really working for the Court, not actually for one side or the other.

A. That's correct.

Q. And I suppose you testified in those cases?

A. In some of them, yes.

Q. All right. So excluding those --

A. Sure.

Q. -- in which your role was as an evaluator who did competency tests.

A. Sure.

Q. And I'm speaking exclusively of the times you've been retained.

A. Sure.

Q. Either through The Forensic Panel or just by someone retaining you --

A. Yes.

Q. -- all of those have been for the prosecution; is that correct?

A. You know, I think -- you know, I recall

testifying in a death penalty case for the defense in I believe it was 1995.  And then I think I mentioned when I was doing immigration pro bono cases I would testify for the detainee.

Q.  All right.  And those immigration cases are civil cases, not criminal, correct?

A.  Technically.  But they're locked up so, yeah.

Q.  All right.  Do you remember -- you do remember when we met?

A.  Sure, December 18 I believe.

Q.  And do you remember me asking you the question: I understand.  Okay.  And then so for all of your cases outside of that and I was referring to the same court appointment --

A.  Yes.

Q.  -- cases where you did competency evaluations.

A.  Yes.

Q.  Criminal cases for which you've been privately retained, those have all been for the prosecution.  Answer:  Of the ones I've testified in, that is correct.

A.  That's correct.

Q.  Is that what you -- is that what you told me at the deposition?

A.  That's what I told you and that is true, yes.

Q.  In this case, and Mr. Reisenauer addressed this

briefly, you were hired by The Forensic Panel to testify, correct?

A.   That's correct.

Q.   And the government's not paying you.  The Forensic Panel is paying you.

A.   That's correct.

Q.   And The Forensic Panel is owned by Dr. Michael Welner.

A.   That's correct.

Q.   And you've been retained both by The Forensic Panel and independently.

A.   That's correct.

Q.   All right.  And on your CV you list a number of publications and presentations on dementia and Alzheimer's.

A.   That's correct, yes.

Q.   And is it fair to say that for the bulk of your career, and I know not necessarily in the past 20 months or so, but for the bulk of your career Alzheimer's and dementia have been a bit of an area of specialty for you.

A.   Yes, for I think it would come out to maybe 14 years or so.

Q.   All right.

A.   But yes.

Q.   And out of all of the publications on your CV, none of those are on intellectual disability; is that fair?

A.   That's correct.

Q.   And you've never published anything on intellectual disability.

A.   That is correct.

Q.   And there are at least 26 publications listed on your CV, correct?

A.   I believe you.

Q.   Thank you.  All right.  Dr. Seward, do you know what an Atkins hearing is?

A.   Yes, I do.

Q.   All right.  And an Atkins hearing is a hearing to determine whether or not a defendant is intellectually disabled.

A.   Correct.

Q.   Much like what we are doing here, correct?

A.   Yes, ma'am.

Q.   Fair to say that you've only actually testified at one prior Atkins hearing?

A.   That is correct.

Q.   So this would be your second Atkins hearing?

A.   That's correct.

Q.   All right.  Also you've never administered any IQ

testing in Spanish; is that also right?

A.   That's very true.

Q.   You don't speak Spanish?

A.   No, minimally.

Q.   And you have no familiarity at all with Spanish language testing of any sort; is that fair?

A.   That's correct.

Q.   And I just want to clarify something.  When you were working for Maricopa County -- and we talked briefly about -- again about your role doing competency hearings.  I just want to be clear that whether or not someone is competent to stand trial is an entirely different standard than whether or not someone is intellectually disabled.  Would you agree with that?

A.   Yes.  Although, if somebody is intellectually disabled it could be a barrier to competency.  But you're correct.  Competency is a statute.

Q.   All right.  And you also testified on direct about the definition of "ID" and "MR," and Mr. Reisenauer had you read from the red book --

A.   Yes.

Q.   -- and then from the green book and he elicited the fact that the three prongs were basically for all practical purposes the same, very similar in each copy, right?

A.  That's correct.

Q.  Now there's also a definition of ID in the DSM-V, right?

A.  Yes.

Q.  And you're familiar with that?

A.  Yes.

Q.  And, in fact, the definition of "intellectual disability" of a DSM-V has changed a little bit from what it was in the DSM-4, right?

A.  That's correct.

Q.  And the biggest difference is that the definition of "intellectual disability" in the DSM-V adds this component of clinical judgment.  Would you agree with that?

A.  I don't recall that wording.

Q.  All right.

A.  Is that regarding the level of intellectual functioning?

Q.  We can take a look.

A.  Yes, ma'am.

Q.  That might be the easiest way.

A.  Sure, absolutely.

MS. FISHER:  Could Dr. Seward be provided with Defense Exhibit 62?

THE WITNESS:  I have one with me.

MS. FISHER: That works for me if the Court and government wants to follow along.

THE COURT: I would prefer to have him refer to the exhibit that's been received.

MS. FISHER: All right. So this is Defense Exhibit 62. This is the DSM manual.

THE CLERK: (Handing Defendant's Exhibit No. 62 to the witness.)

THE WITNESS: Thank you, ma'am.

Q. (Ms. Fisher continuing) Do you have it in front of you?

A. I do.

Q. And can you please turn to page 37.

A. Yes.

Q. All right. I'm just going to read from three places and you tell me if I'm reading it correctly, okay?

A. Correct.

Q. All right. The second paragraph there that begins with "Criterion A..."

A. Yes.

Q. The last sentence says: "Clinical training and judgment are required to interpret test results and assess intellectual performance."

Did I read that correctly?

A.  You did.

Q.  And then the next paragraph, one below the next paragraph, the one that starts with "IQ test scores..."

A.  Yes, ma'am.

Q.  The last sentence of that paragraph as well: "Thus, clinical judgment is needed in interpreting the results of IQ tests."

A.  Yes, ma'am.

Q.  All right.  And then I'm going read one more sentence to you.  The very last paragraph on the bottom starting with "Adaptive functioning..."  If you'll look at the line second from the bottom that begins with "Scores..."

A.  Yes.

Q.  "Scores from standardized measures and interview sources must be interpreted using clinical judgment."

A.  Correct.  And that's true of all psychological testing.

Q.  All right.  Then I would like to ask you a follow-up question to that regarding clinical judgment and whether it's present in all psychological testing.

I'm going to mark this.  Mark this as D-80.

May I approach, Your Honor?

THE COURT:  You may.

Q.  (Ms. Fisher continuing)  All right.  Dr. Seward,

would you agree with me that this is an article entitled:  "Forensic Psychiatry and Forensic Psychology: Mental Handicap and Learning Disability"?

A.  Yes.

Q.  Would you agree with me that this was written in 2016 by Dr. Michael Welner?

A.  Yes.

Q.  The same Dr. Michael Welner who's head of The Forensic Panel and who hired you, correct?

A.  Yes, ma'am.

Q.  All right.  I'd like you to turn to page 636. It's like the second page.

A.  Yeah, I'm sorry.  Got it.

Q.  All right.  And the first full paragraph starts with the "DSM-5's..." and tell me if I'm reading this correctly.  "The DSM-5's allowance for 'clinical judgment' to trump criteria is unique to its diagnostic definition of intellectual disability.  Nowhere else in DSM-5 does a diagnosis essentially allow the psychiatrist or psychologist to dispense with the criteria if one's 'clinical judgment' tells him otherwise."

Did I read that correctly?

A.  Yes, you did.

Q.  Thank you.  All right.  You mentioned that you

video and audio recorded your interview with Mr. Rodriguez.

A.   That's correct.

Q.   And, in fact, we saw portions of it here today.

THE COURT:   Do you intend to offer 80?

MS. FISHER:   I'm sorry.   Thank you, Your Honor.   I do intend to offer 80 into evidence.

MR. REISENAUER:   No objection, Your Honor.

THE COURT:   Eighty is received.

Q.   (Ms. Fisher continuing)   So we watched some of the video and audio recordings that you did.

A.   That's correct.

Q.   Now in your field in neuropsychology -- you're from the Phoenix area?

A.   I am.

Q.   So in the Phoenix area is it fair to say you're not aware of many people who record their examinations or interviews?

A.   A few but in general not.

Q.   It's not the common practice.

A.   That's correct.   It's not the -- what's the -- not the plurality I guess.

Q.   And that's in part I assume because there's nothing codified, no book of best practices, that talk about recording audio or video, making audio or video

recordings as necessary to meet certain criteria or standards in your field, right?

A.   I believe the law in Illinois requires competency evaluations to be videotaped.

Q.   It allows or requires?

A.   Requires.

Q.   Okay.

A.   To the best of my knowledge.

Q.   All right.  Aside from that example, generally in things outside of competency evaluations in Illinois it's not the practice.

A.   That's correct.  Well --

Q.   Let me rephrase that.

A.   Yes, ma'am.

Q.   It's not required or part of the best practices that's codified anywhere.

A.   That's correct.

Q.   Now as Mr. Reisenauer brought out, you did not video or audio record the interactive examination portion of your interview.

A.   That's correct.

Q.   And are you familiar with the observer effect?

A.   Yes, indeed.

Q.   And one reason that people do not record interviews is that having someone observe can affect a

person's performance in ways that can't be predicted. And that would extend even to recordings even if it's just a camera or microphone; is that correct?

A.   That's correct, with the emphasis on performance.

Q.   All right.  You also mentioned that your article -- I'm sorry, that your report was peer reviewed.

A.   Yes, ma'am.

Q.   And that's something that The Forensic Panel does, right?

A.   That's correct.

Q.   When you're not testifying as an expert or writing a report as part of The Forensic Panel, although you may consult other experts as is your right, you don't have someone peer review those articles otherwise.

A.   That's correct.

Q.   All right.  And I'd like to move to a few questions about your report itself.

A.   Sure.

Q.   This is exhibit -- Government Exhibit 615.

A.   And again should I refer to my copy or should I refer to an exhibit?

MS. FISHER:  Does Your Honor have a preference?

THE COURT:  I'd prefer that if we're going

to testify we testify off the exhibits so whatever the testimony is.

MS. FISHER:  The exhibit, please.

THE WITNESS:  I am not in possession of that I don't think.

THE CLERK:  (Handing Government's Exhibit No. 615 to the witness.)

THE WITNESS:  Here it is.  Thank you, ma'am. I'm sorry, go ahead.

Q.  (Ms. Fisher continuing)  Okay.  In that report on pages 5 through 8 -- I'm sorry, 5 through 9 --

A.  Yes.

Q.  -- you list all the sources of information that you reviewed for your report, correct?

A.  That's correct.

Q.  And all of the sources that you relied on in this case were documents; is that accurate?  I'm sorry, aside from your interview with Mr. Rodriguez.

A.  That is correct, yes.

Q.  You didn't speak to anyone in Mr. Rodriguez's family?

A.  I did not.

Q.  And you didn't speak to any of Mr. Rodriguez's friends from childhood, neighbors who knew him growing up, teachers, anything like that?

A.   I did not.

Q.   And I'd like to refer to Exhibit 628B, the transcript of the video we watched about the news.

A.   Hold on, ma'am.

Q.   Sure.

A.   I seem to have a bunch of transcripts up here.  I may not have that anymore.

THE CLERK:  What number?

MS. FISHER:  628B.  It's the transcript of the first video.

THE WITNESS:  Sorry, Your Honor, for taking the Court's time.

THE CLERK:  (Handing Government's Exhibit No. 628B to the witness.)

THE WITNESS:  Thank you, ma'am.

Q.   (Ms. Fisher continuing)  All right.  And we saw in this video and in the other video Mr. Rodriguez interacting with you?

A.   Yes.

Q.   And one thing you commented on was how he was social and friendly to you even though you had identified what your role was.

A.   That's correct.

Q.   So is it fair to say then that even knowing -- even though Mr. Rodriguez was told by you that he was

there for the government, the same government that had prosecuted him and sought a death sentence, the same government that was still seeking to uphold that death sentence, that he was very friendly and congenial and talkative and open and shared things with you?

A.   That's correct.

Q.   And he was talking about watching CNN and the news, right?

A.   Yes.

Q.   And I believe he said on page 1, lines 22 through 24:  "Dr. Seward:  Is that right?  Okay.  So what do you think about -- have you been watching CNN for a long time?"

         And Mr. Rodriguez said:  "Yeah, that's all I watch."

A.   Yes.

Q.   Now, Dr. Seward, I take it you've seen CNN before?

A.   I have.

Q.   Fair to say that CNN has pundits and people on discussing their opinions about various current news events?

A.   That's correct.

Q.   And the cases you brought up -- or the issues you brought up, Snowden and the Zimmerman trial, those were

current events at the time that you were asking him about those, right?

A. Yes.

Q. And so on CNN they would have information about those stories and then pundits who would talk about them and give their opinions on whether or not Snowden should get deported or whether or not Mr. Zimmerman was right in shooting Mr. Martin and those sorts of things?

A. That seems reasonable. I don't recall from the time but that's the way they work now, yes.

Q. All right. At this point I'd like to talk a little bit more about the American -- about the WAIS-IV that's in the Spanish language that was published in Mexico.

A. Sure.

Q. And about the English version of the WAIS-IV that's published in America.

A. Yes.

MS. FISHER: May I approach, Your Honor?

THE COURT: You may.

Q. (Ms. Fisher continuing) All right. And, Dr. Seward, would you agree with me that this is the WAIS-IV testing booklet in English?

A. That's correct.

Q. All right. And I know Mr. Reisenauer passed

around the front sheet but this is the entire test, correct?

A.    That's correct.

Q.    All right.  And I'm marking this as Defense Exhibit 82.  And you saw a copy of the WAIS-IV that was administered to Mr. Rodriguez by Dr. Weinstein.

A.    Yes, I did.

Q.    And would you agree that this is a copy of the WAIS-IV that's in Spanish that's published in Mexico?

A.    Yes, ma'am.

MS. FISHER:  All right.  At this time, Your Honor, I'd like to offer Exhibits D-81 and D-82 into evidence.

MR. REISENAUER:  No objection.

THE COURT:  Eighty-one and 82 are received.

Q.    (Ms. Fisher continuing)  All right.  Now, Dr. Seward, I'd like to go through some of these and I know that you don't speak Spanish.

A.    Minimal.

Q.    You were able to talk about some of the translations when you went through Dr. Weinstein's test.

A.    Sure.

Q.    Is that because you were able to like look them up on a translator app type thing?

A.    No.  I was kind of able to figure it out based on

my minimal knowledge.

Q.   All right.  If I translate some of these words, will you let me know if you disagree with anything of the translation or if you don't trust my translation?

A.   Oh, sure.

Q.   All right.  So first I'd like to start by talking about the test form itself.

A.   Sure.

Q.   And I know Mr. Reisenauer covered this a little bit but I'd like to go into some more detail.

You'd agree with me that aside from the language difference just looking at this face sheet, the layout, the boxes, the number of items, everything is pretty much identical.

A.   That's correct.

Q.   And they have -- there are the 15 subtests on both sides, on both the English in D-81 and in the Spanish on D-82, right?

A.   Correct.

Q.   And, in fact, they list the same things: block design, similarities, retention of digits, matrices, vocabulary, arithmetic, searching for symbols, visual puzzles, information, coding or keys, succession of letters and numbers, figurative weight, comprehension, cancellation, and picture completion or incomplete

figures.

A.    That's correct.

Q.    All right.  And so the subtests, at least by title, so far are identical, correct?

A.    That's correct.

Q.    And below the box that talks about verbal comprehension and perceptual reasoning and working memory, those are all the same on both the Spanish and English, correct?

A.    That's correct.

Q.    And you can even see the copyright there at the bottom on each test.  On D-81 it says:  "Copyright 2008 NCS Pearson, Inc."  And on the Spanish test it says: "Copyright 2008 NCS Pearson, Inc.," right?

A.    That's correct.

Q.    And even the sort of other things you'd fill in in terms of test date, date of birth, test age, all of those are identical on both tests.

A.    That's correct.

Q.    All right.  Why don't we turn to the next page. Now this is a sort of more complicated scoring grid; is that fair to say?

A.    Oh, are you referring to the one that's "Analysis" in English?

Q.    To the next page on both D-81 and D-82.  Yes,

"Analysis."

A.   Okay.  Yes, ma'am, I'm sorry.

Q.   The paper clip was covering the word.

A.   Okay.

Q.   And both of those start with the word "Analysis" at the top, right?

A.   Yes.

Q.   And they have identical scoring grids.  The only difference being that one is in English and one is in Spanish.

A.   That's correct.

Q.   And you can see on the side where -- and the English version it says:  "Basis for Comparison."  It says:  "Check one" and it has the same two boxes.  When it has a number of subtests, those numbers are the same. Divide by 10, divide by 3, divide by 3.  All of this is exactly the same, right?

A.   That's correct.

Q.   All right.  And I believe Mr. Reisenauer brought this out, but on a WAIS-IV there are 10 mandatory tests and five optional tests, correct?

A.   That's correct.

Q.   And you gave Mr. Rodriguez I believe the 10 mandatory tests?

A.   That's correct.

Q. And one of the optional tests?

A. That's correct.

Q. All right. Okay. So everything's identical again on this page with "Analysis."

A. Yes.

Q. All right. Then let's turn to page 3. All right. At the top it says: "Block Design" on D-81, the English test?

A. Correct.

Q. And on the Spanish test it says: "Diseno con cubos" or cube design, block design, right?

A. That is correct.

Q. Now this is a nonverbal test, right?

A. That's correct.

Q. So you're asking the examiner to -- or the examinee, rather, to put blocks in a certain shape that's the shape of the picture?

A. Sure. Let me back up just a bit. The output is nonverbal. The directions have to be given somehow or another.

Q. All right. Now when you administer the directions generally, and I'm glad you brought that up, someone who is administering the WAIS-IV doesn't just sort of give their own interpretation of what the instructions are, right?

A.   That's very correct.

Q.   You have to read verbatim from a script.

A.   That's correct.

Q.   And whether you're reading those words in English or Spanish, you're reading a script, correct?

A.   That's correct.

Q.   It would be way out there to just sort of ad-lib, right?

A.   You're very right.

Q.   So sticking to the script is essential.

A.   That's correct.

Q.   And whether the script is given in English or Spanish -- actually let me put it this way:  If the script was given in Spanish and the examinee didn't understand some words and then the script was regiven in English, that would actually help the examinee, right?

A.   Yes.

Q.   As opposed to harm the examinee.

A.   Sure.

Q.   So instead of it negatively affecting the score on the test, that would positively affect the score on the test, right?

A.   I suppose.  The manual does allow for additional explanation to be given, right.  Understanding the instructions is not part of the test.

Q.   Okay.  Fair enough.  All right.  So we had talked about the instructions are technically a verbal exercise but the test is testing something in a nonverbal manner.

A.   That's very correct.

Q.   And where it says "Model and Picture," "Modelo y dibujo" same words, model and picture or model and drawing, right?

A.   That's correct.

Q.   And you have these time limits written down and the time limits are also identical on both the English version and the Spanish version, right?

A.   That's correct.

Q.   So where it says 30 seconds for those first five, that's exactly the same 30 seconds for each of those on the Spanish test.

A.   That's correct.

Q.   And then you have a number that has 60-second time limits and then 120-second time limits, right?

A.   That's correct.

Q.   And there's no difference in any of those time limits on the English test versus the Spanish test.

A.   Very true.

Q.   And if you see the pictures of the blocks that the examinee is supposed to create, would you agree with me that on all of the items, items 1 through 14, all of

those pictures are identical?

A.   That's correct.

Q.   So it's not like on the Spanish test that you have to do a certain configuration but on the English test it's a different picture.  These are all identical.

A.   That's correct.

Q.   Let's move to the next page.

A.   Yes.

Q.   And this section is called "Similarities."

A.   Yes, ma'am.

Q.   And just like all the other sections you have to read a script for the instructions, right?

A.   That's correct.

Q.   And whether you're reading in English or in Spanish, you're reading the same script.

A.   That is correct.

Q.   So this one has a number of items and there's two words listed on each item.  And would you agree with me that up until No. 8, No. 1 says -- I'm going to read the English translation of the Spanish:  "Two" and "Seven," "Fork" and "Spoon," "Yellow" and "Green."  And I'm reading from D-82.

A.   Sure.  And I'll take your word for No. 1.

Q.   All right.

A.   That's not in my limited vocabulary.

Q.   All right.  Well --

A.   But I'm not disputing it.

Q.   All right.  If you learn at any point that I've been translating these incorrectly, I encourage you to speak up or let us know.  No. 3, "Carrots" and "Broccoli."  Four, we had talked about this on direct, "Horse" and "Tiger."  Five, "Piano" and "Drum"?

A.   Yes.

Q.   Six, ship or "Boat" and "Automobile"?

A.   Yes.

Q.   Seven, "Nose" and "Tongue"?

A.   Correct.

Q.   Eight, "Food" and "Gasoline"?

A.   Correct.

Q.   So even though these are written in Spanish, they are the exact same words on 1 through 8 that are written in English.

A.   That's correct.

Q.   And the instructions would be the same as well. Just one is given in Spanish and one's in English.

A.   Presumably, yes.

Q.   All right.  Now for items 9 through 13 -- on the Spanish test the item is nine, "Bud" and "Baby," and that's actually No. 10 on the American test, right?

A.   That's correct.

Q.   And No. 11 is "Anchor" and "Fence" and that's actually No. 13 on the English test.

A.   I am sorry.  So on the --

Q.   "Ancla - Cerca," No. 10?

A.   Correct, on the Spanish test and, I'm sorry, could you -- oh, yes, 13.

Q.   All right.

A.   Correct.

Q.   And No. 11:  "Insignia - Corona," "Badge" and "Crown," that's No. 9 on the English test.

A.   That's correct.

Q.   And No. 12:  "Musica - Marea," "Music" and "Tides," that's No. 11.  That's what's No. 12 on the Spanish test and is No. 11 on the American test.

A.   That's correct.

Q.   And No. 13:  "Poema - Estatua," "Poem" and "Statue," that's No. 12 on the American test but it's No. 13 on the Spanish test, right?

A.   That's correct.

Q.   And then 14 through 16 the order is the same again: "Desear - Esperar," "Wish" and "Expect."  That's the same as on the American test.  No. 15:  "Aceptacion - Negacion," "Acceptance" and "Denial," that's the same as on the American test?

A.   Yes, ma'am.

Q.   No. 16:  "Siempre - Nunca," "Always - Never," that's the same No. 16 as on the American test?

A.   Correct.

Q.   And then 17 and 18 the order's just swapped.  So on the Spanish test: "Permitir - Restringir," "Allow - Restrict," that's 18 on the English test.  And "Enemigo - Amigo," "Enemy - Friend," that's 17 so those two are swapped.

A.   That's correct.

Q.   So all the items are the same items except for numbers 9 through 13 have the order shuffled a little bit between the Spanish version and the English version, correct?

A.   Correct.

Q.   And No. 17 and 18 are just inverted, right?

A.   Correct.

Q.   The items themselves though are all the same.

A.   But the item order is meaningful.

Q.   I understand.  I understand.  All right.  Moving on to the next page that's at the top, No. 3, retention of digits or "Digit Span."

A.   Yes, ma'am.

Q.   Okay.  This is -- aside from the instructions, this is another nonverbal test; is that correct?

A.   No.  This is a verbal test.

Q.   Oh, because they're saying the numbers back to you?

A.   That's correct.

Q.   All right.  But it's not testing something like your knowledge of vocabulary or information.

A.   That's correct.

Q.   All right.  Now the Digit Span test has three sections.  Two of them are on page 5 where we are right now, "Orden directo" or forward, backward, or "Orden inverso" and then it continues on to the next page "Sequencing" or "Secuenia," right?

A.   Correct.

Q.   Now just like the other tests there would be very specific instructions you have to give.  You have to read them verbatim?

A.   That's correct.

Q.   And you'd read them either in English or in Spanish?

A.   Correct.  Again presumably this Spanish manual is the same.

Q.   All right.  Well, and the actual numbers have the exact same order on both the Spanish test and the English test, right?

A.   Well, yes, but it's a different task in that the English numbers and the Spanish numbers do not

necessarily have the same number of syllables.

Q.   All right.  Aside from the fact that English numbers and Spanish numbers don't have the same number of syllables, when you look at item one, for example, it says:  "9-7" and below that it says "6-3."

A.   Correct.

Q.   And "5-8-2 6-9-4."

A.   That's correct.

Q.   "7-2-8-6" "6-4-3-9."

A.   Correct.

Q.   "4-2-7-3-1" "7-5-8-3-6."

A.   Correct.

Q.   And the scoring sort of guide on the side has a "0 1" and a "0 1 2" in exactly the same setup on both the Spanish test and the English test.

A.   That's correct.

Q.   And for backwards, and I didn't go through all of them, but would you agree with me that in items 1 through 8 on "Forward" the numbers are the same numbers listed in the same order on both the English test and the Spanish test?

A.   That's correct.

Q.   All right.  Moving on to "Backwards," it's the same situation, right?  Technically the actual numbers are the same numbers written down on both tests.

A.   That's correct.  The numerals are the same.

Q.   The numerals are the same.  And the order of the numerals is also the same on both the English test and on the Spanish test.

A.   That's correct.

Q.   So No. 1 after "S" there:  "3-1," same thing on the Spanish test, "3-1, 2-4, 2-4."  Then moving on to No. 2:  "4-6, 5-7" and it shows you what the correct response is.  And all of the correct responses are the same on both tests, right?

A.   That's correct.

Q.   And all of the prompt items or test numbers that you give to see if they can recall it back to you, those are all identical on both tests, right?

A.   I'm sorry, the prompt numbers?

Q.   I'm calling them the prompt numbers, the number in the "Trial" column.

A.   Oh, yes.  Yes, ma'am.

Q.   All right.  All right.  Moving on to page 6.  So the top part is just the last part of the Digit Span test, the sequencing part.

A.   Yes.

Q.   And again -- and I don't mean to belabor this point, but you would agree with me that all of the numbers that are listed in the "Trial" section on the

English test and on the Spanish test are exactly the same numerals?

A.    That's correct.

Q.    And they are listed in the exact same order for every item number on both the English test and the Spanish test.

A.    That's correct.

Q.    And the correct responses also list the exact same numerals whether you're looking at the English test or the Spanish test.

A.    That's correct.

Q.    And the order of the numerals are exactly the same for the correct responses whether you're looking at the English test or the Spanish test.

A.    That's correct.

Q.    And the scoring columns, just like the others, give you the same options, a 0 or 1, and then a "0 1 2" on both the English test and the Spanish test.

A.    Correct.

Q.    I'd like to move to item 4, "Matrix Reasoning." Would you call this one a nonverbal test?

A.    Yes.

Q.    So this is a nonverbal test.  This is testing a skill where you don't have to employ your language, right?

A.   That's correct.

Q.   And you're going to have to educate me here.

A.   Sure.

Q.   Are one of these things in the back one of the matrix reasoning booklets?

A.   No, ma'am.

Q.   So what are you showing when you're showing the matrix reasoning?

A.   Well, you have -- I guess I would describe it as sort of a flip chart or a booklet and it has -- the top part let's say would have a series of designs, a progression of designs, and then there would be a blank space.

Q.   Okay.

A.   And so then at the bottom there's -- it's sort of multiple choice.  You pick out the design that would go into the blank space and complete the sequence or fit the sequence.

Q.   Okay.  And I suppose we don't have those pictures here in front of us.

A.   Unless --

Q.   Let me put it this way:  I don't have these pictures.

A.   I don't have the stimulus booklet.  I don't think -- I don't know if there's a picture in the

manual.  I don't think so.

Q.  All right.  You have no reason to believe that for some reason the pictures in the Spanish version are different than the pictures in the English version.  And if you don't know, you don't know.

A.  I don't know.

Q.  All right.  You'd agree with me that the response grid looks identical in both the English version and the Spanish version?

A.  Yes.  However, because of the copy quality in the original form the correct answer -- the correct number is bolded.  And it comes through a little bit in the defense -- in Exhibit 81.  It doesn't really come through very well in Exhibit 82.

Q.  Yeah.  I see what you're talking about.  You can sort of see it.  Like if you look at numbers on matrix reasoning 6 and 7, on the English version it appears that the 4 is bolded.  Is that how you're seeing it?

A.  Yes.

Q.  And then if you look at the Spanish version, it sort of looks like the 4 is emboldened on both the 6 and 7.

A.  A hesitant yes.

Q.  All right.  I understand you're saying it's a little hard to see on these copies.

A.    Yes.

Q.    All right.  Perhaps No. 5 is another good example.  You can see the 3 is emboldened on the English test.  Are you able to see how the 3 is emboldened on the Spanish test?

A.    Sort of.

Q.    All right.  That's fair.  That could be a copying issue.

A.    You have younger eyes.

Q.    Well, thank you.  Otherwise, aside from being difficult to pick up on the emboldened numbers on Spanish test, certainly we're not seeing any numbers that are emboldened that contradict the numbers that are emboldened on the English test, right?

A.    That's correct.

Q.    All right.  And it's a scale of 1 through 5 on both tests, right?

A.    Yes.

Q.    And the score is a 0 1 whether you're looking at the English version or the Spanish version.

A.    That's correct.

Q.    And all of these -- and I haven't been going over it on each one.  They'll have a box at the bottom that says the maximum.  So for matrix reasoning on the English test it says "Maximum = 26" and the Spanish test

it says "Maxima = 26," right?

A.   That's correct.

Q.   All right.  The same thing above that with the digit retention, "Maximum = 48" for the raw score. That's true on both the English and Spanish version.

A.   That's correct.

Q.   All right.  Moving on to page 7, this is the "Vocabulary" or "Vocabulario" section.

A.   Yes, ma'am.  Got it.

Q.   All right.  So No. 1 through 3 on the English test the items are:  "Book," "Airplane" and "Basket" and numbers 1, 2, 3, on the Spanish test are:  "Libro" which means book, "Avion" which means airplane, and "Canasta" which means basket.

A.   Okay.  Yeah, I'm not sure about "Canasta" but I will not dispute that.

Q.   All right.  If you find out otherwise you can let us know.  Now No. 4 on the Spanish test says:  "Manzana" and that means apple and that's actually No. 5 on the English test, correct?

A.   Correct.

Q.   And No. 4 on the English test says "Bed" and that's No. 6.  On the Spanish test, it says "Cama."

A.   Okay.

Q.   No. 6 on the English test says "Glove" and that's

No. 7 on the Spanish test "Guante."

A.   Yes, ma'am.

Q.   No. 7 on the English test says "Breakfast" and No. 8 on the Spanish test says "Desayuno" which is breakfast.

A.   Yes.

Q.   All right.  And the items after that, No. 9 "Consumir" which means consume, that's No. 10 on the English test.  "Armar" which means assemble, that's No. 9 on the English test.  So some of them are a little higher up by one or two, some are lower.

Moving on, "Tranquilo," "Tranquil," that's No. 12 on the English test but it's No. 11 on the Spanish test.  No. 12 on the Spanish test says "Meditar" which is "Ponder."  That's No. 13 on the English test. No. 13 on the Spanish test says "Remordimiento" or "Remorse."  That's actually No. 16 on the next page of the English test.  No. 14 on the Spanish test, "Evolucionar," "Evolve."  That's found on the next page, No. 22 of the English test.

A.   That's correct.

Q.   And "Diverso" or "Diverse" is No. 23 on the English test, correct?

A.   Right.  No. 15 on the --

Q.   On the Spanish test.

A.   Correct.

Q.   And without going through the entire second page, you'd agree with me again the words start in the same order.  They're in -- the same words are on both exams and I understand the order matters but then they are in roughly different orders as the numbers get bigger starting with No. 6.

A.   To the extent that my -- to the extent of my limited Spanish, yes.

Q.   All right.  I appreciate you going along with me here.

All right.  Turning to the "Arithmetic" section now, in the "Arithmetic" section -- and this is on page 9 and I'm just moving ahead on both tests simultaneously on the "Arithmetic" section there's a word that's written down and am I right that that prompts you to read some sort of math or arithmetic question to the examinee?

A.   That's correct.  The word written down is, right, a prompt or a hint or a cue to the examiner.

Q.   All right.  So the person who -- so if you're the examinee, that doesn't mean anything to you, baseballs or flowers.  You have to tell people what they're supposed to do and then they do the arithmetic problem and the test lists here what the correct response is.

A.   That's correct.

Q.   All right.  So again going through this, the sample question, "Pelotas" that means balls on the Spanish test and in English it says "Baseballs."  And the correct response number is 3 on both of those, right?

A.   That's correct.

Q.   No. 1, "Flores" on the Spanish test, says "Flowers" on the English test, "Cuenta hasta 3" on the Spanish test and "Counts to 3" on the English test. Those are exactly the same, right?

A.   Correct.

Q.   No. 2 on the English test is "Apples."  No. 2 on the Spanish test says "Manzanas" which also means apples.  On the English test it says "Counts to 10" and on the Spanish test it says "Cuenta hasta 10" or whatever the Spanish number for 10 is?

A.   Yes, correct.

Q.   No. 3, in English it says "Bats."  No. 3 in Spanish says "Bates" which means bats.  And the correct answer for both is 6, right?

A.   Correct.

Q.   No. 4 in the English test it says "Birds."  No. 4 in the Spanish test it says "Pajaros" which means birds. The correct answer for both is 9.

A.    Correct.

Q.    No. 5 on the arithmetic test says "Leashes." No. 5 in Spanish says "Correas" which means leashes and the correct response is 2 for both tests, right?

A.    Correct.

Q.    No. 6 of the English test says "Blankets."  The Spanish test says "Cobijas" which means blankets and the correct answer on both the Spanish and English version is 8, correct?

A.    Correct.

Q.    No. 9 -- sorry, No. 7.  No. 7 on the English test says "Pens."  On the Spanish test it says "Plumas" which means pens.  And the correct answer for both is 5.

A.    Yes.

Q.    No. 8 says "Toys."  No. 8 on the Spanish test says "Juguetes" which means toys and the correct answer for both is 5, correct?

A.    Correct.

Q.    And No. 9, No. 9 on the Spanish test says "Books" and No. 10 says "Mas viejo."  Now in the English test No. 10 says "Books" and No. 9 says "Older."  So those two are inversed on the test, correct?

A.    That's correct.

Q.    So in the English test "Older" is 9; "Books" is 10.  And on the Spanish test "Books" is 9; "Older" is

10?

A.   That's correct.

Q.   But the point value is the same.  "Books" should have -- the prompt of "Books" still has a point value of 5 on both the Spanish and English test?

A.   Technically that's not the point value.  That's the answer.

Q.   I'm sorry, I'm sorry.  You're -- I misspoke.  That's correct.  The answer is 5 for books whether it's 9 or 10 on both the English and Spanish test?

A.   That's correct.

Q.   And No. 11, "Tickets" or "Boletos" which means tickets, that's the same as it's No. 11 on both tests and the correct answer is 3?

A.   Yes.

Q.   No. 12 "Packs" on the English test "Paquets" or packs on the Spanish test.  The correct answer is 200?

A.   Yes.

Q.   "Cards" or "Tarjetas" is -- let me rephrase that.  No. 13 on the English test is "Cards."  No. 13 on the Spanish test is "Tarjetas" and they both have a point value of 38 -- a correct score of 38?

A.   Correct answer, correct.

Q.   All right.  No. 14 on the English test says "Run."  No. 14 on the Spanish test says "Correr" and it

means run, and they both have a correct answer that's supposed to be 140.

A.  Correct.

Q.  No. 15 says "Line."  No. 15 on the Spanish test says "Fila" which means line, and they both have the correct answer which is supposed to be 30.

A.  Correct.

Q.  Now No. 16 it says "Horas" or hours on the Spanish test and that's actually No. 18 on the English test, right?

A.  That's correct.

Q.  But the correct answer for both, whether it's English or Spanish, is 47.

A.  Yes.  Although, there's an asterisk on the Spanish version which is not on the English version.

Q.  Correct.  All right.  Moving on No. 17 on the Spanish test says "Minutos."  There's an asterisk there as well, right?

A.  Yes.  I'm sorry, that's what I was referring to. I apologize.

Q.  Okay.  And there's not something that's called "minutos" or minutes on the American test, right?

A.  That's correct.

Q.  But there is an item on the English test that says "Cakes," No. 16?

A.   Let's see, yes, ma'am.

Q.   And that has a correct response of 186?

A.   Yes.

Q.   And you'd agree with me that the correct response for "minutos" is also 186?

A.   That's correct.

Q.   All right.  The -- so "Hours" was 16 on the Spanish test and 18 on the English test.  On the Spanish test had has something called "Dulces" which means sweet and it has a correct answer of 49 1/2.  There's a similar item, No. 19, "Pies" on the English test that also has a correct answer of 49 1/2?

A.   That's correct.

Q.   And 17 on the English test says "Maps" and 19 on the Spanish test says "Mapas" or maps.

A.   Yes.

Q.   They both have a correct answer of 600.

A.   That's correct.

Q.   Twenty on the Spanish test "Laps" is the same -- 20 on the English test says "Laps" and 20 on the Spanish test says "Vueltas" which means laps and that's the same.

A.   Correct.

Q.   And the correct answer of 51 is also the same.

A.   Correct.

Q.   Twenty-one in English says "Machines" and in Spanish it says "Maquinas" or machines and the correct answer is 96?

A.   That's correct.

Q.   And finally the last item, No. 22, "Mail," in Spanish it's "Correo" which means mail.  Same item, same item number, and correct answer, whether it's the English or Spanish, the examinee is supposed to do arithmetic and get to 23,100?

A.   That's correct.

Q.   All right.  Moving on "Symbol Search," would you call this one a nonverbal test?

A.   Yes.  This contributes to the processing speed index.

Q.   All right.  And so aside -- just like all the other tests, you read a very standard set of instructions?

A.   Correct.

Q.   And then those correspond, am I right, to the booklet in the back that says "Symbol Search" and there are pictures?

A.   That's right.

Q.   So this is after -- in the English test, or D-81, after the last page that says "WAIS-IV Record Form," there is a second paper clipped copy that says "WAIS-IV

Response Booklet."

A. Yes.

Q. All right. And so those are the symbols that you use for the symbol search.

A. That's correct.

Q. And if you look at D-82, the Spanish version, at the back there's also an additional response booklet that says "Busqueda de simbolos," or symbol search, and if you, Doctor, could turn to the equivalent page for each in both the English and the Spanish.

A. Got it.

Q. Okay. You'd agree with me that the symbols that are pictured here are completely identical in every way on both the English version and the Spanish version? And take your time.

A. Yes, thank you. This would actually be a good neuropsychological test.

Q. It's not a trick question.

A. Yes. They're exactly the same.

Q. All right. And the symbols go on for several pages?

A. Yeah.

Q. I believe seven pages?

A. That's correct.

Q. And the symbols contained in all seven pages are

identical in both the English and Spanish in the same order.  Everything is exactly the same.

A.   That's correct.

Q.   All right.  Going back to page 10, or D-81 and D-82, which is the section that begins with "Visual Puzzles."

A.   Yes.

Q.   Is this also a nonverbal test?

A.   That's correct.

Q.   All right.  And again by nonverbal there's no -- aside from understanding the instructions, there's no vocabulary or information set like that.

A.   That's correct.

Q.   And you'd agree with me that on the "Visual Puzzles," section 8 on the Spanish test, there's times that are written down along the time limit column for both the English and the Spanish test?

A.   That's correct.

Q.   And the times are exactly the same on both the English test and the Spanish test?

A.   That's right.

Q.   And that's true carrying over to the next column, items 13 through 26.  The times are identical on both the English test and the Spanish test?

A.   That's correct.

Q.   All right.  And the boxes look the same.  There's a "Completion Time" box.  There's "Response Choices."  Response choices are the same on both the English and the Spanish test?

A.   Yes, with the same caveat as on the matrix reasoning subtest.

Q.   About the emboldened numbers?

A.   Yes.

Q.   I can sort of see them.  If you can't I understand.  But you see how on like an S on the English test or P for the sample one on the Spanish test, it looks like the 1 is emboldened?  If you can't see it I understand.

A.   I can kind of see it.

Q.   Okay.

A.   It's more clear on the English test.

Q.   All right.  Okay.  So in terms of the numbers that are there with the caveat of the copy of the Spanish version is a little hard to see the embolden, everything's identical in all aspects of the "Visual Puzzles" section, correct?

A.   That's correct.

Q.   All right.  Now we talked a little bit about the "Information" section.

A.   Yes.

Q.   So I want to talk a little bit more about that. Now the "Information" section is supposed to test whether someone has sort of gleaned basic knowledge that they might learn in school.  Is that a fair way to say it?

A.   Well, that too and sort of knowledge accumulated throughout one's lifetime.

Q.   Okay.  And so you see that they -- numbers 1 through 6 are in the "Information" section on both the English and Spanish?

A.   I'm sorry, that's correct.

Q.   And No. 1 on the English starts with "Monday" and No. 1 on the Spanish starts with "Lunes" which is Monday?

A.   Correct.

Q.   And No. 2 on the English is "Shape" and No. 2 on the Spanish is "Forma" which means shape.  No. 3 on the English is "Thermometer" and No. 3 on the Spanish says "Termometro" which is thermometer.  And No. 4 on the English says "Seconds" and No. 4 on the Spanish says "Segundos" or seconds.  Is that all correct?

A.   That's correct.

Q.   And No. 3 and 4 on the English test have a sort of little cross next to them?

A.   Yes.

Q.   And No. 3 and 4 on the Spanish test has that same little cross next to them?

A.   That's correct.

Q.   And numbers 1 and 2 on the English test have an asterisk next to them?

A.   Correct.

Q.   And No. 1 and 2 on the Spanish test have an asterisk next to them?

A.   That's correct.

Q.   All right.  Now there are items as you said, as you indicated on direct, that are items you would only know within a certain culture?

A.   Yeah, may be culture specific.

Q.   That's a good way to put it, culture specific. For example, on the English test it has No. 5 and it says "MLK Jr."?

A.   That's correct.

Q.   And the Mexican test -- and I'm going to come back to this concept but I just want to introduce it now.

A.   Sure.

Q.   We talk a little about norms and I do want to cover that in more depth.  But when the Mexican test is normed it is normed on people living in Mexico who have grown up in Mexico.  They may or may not be citizens as

you point out but they're living in Mexico, correct?

A.   That's my assumption.

Q.   All right.  The same way that on the American test, and again I'm going to go into more detail about this, it is normed -- or the tests are given to determine what's average based on people living in the United States.

A.   That's correct.

Q.   So the idea is that if you were living in Mexico and you got this question that involved MLK Jr., that's not a part of your culture that you grew up with so that's not a question that would really be testing your knowledge of -- the base of knowledge that you would have acquired throughout your life.

A.   That's correct.

Q.   All right.  So if you turn to page 11 on both tests you would mention No. 7, "Emiliano Zapata" on the Spanish test and you had pointed out that that's someone that -- well, let me back up.

Would you agree with me that someone who was born in the United States, someone who grew up in the United States, someone who lived in the United States their entire life would not necessarily know or have gleaned through their regular education who Emiliano Zapata was?

A.   I agree.

Q.   That's a fair comment?

A.   Yes.

Q.   All right.

A.   Not necessarily, yes.

Q.   So if someone was American, born in America, grew up in America, has only lived in America, were given question 7, Emiliano Zapata, it's likely they would get that question wrong because they wouldn't know who it was.  I suppose there's a chance they could get it right.

A.   I guess I would say it is more likely that they would get it wrong than a person who grew up in Mexico.

Q.   All right.  But if they were given one of the culturally specific questions listed directly off of the English test, there's a better chance that that question which was designed on the English test would test their knowledge base of things they've acquired throughout their lifetime growing up in America.

A.   That's correct.

Q.   All right.  And the "Information" session -- section, excuse me, has a few different culturally-specific items.  For example, on the English test No. 11, "Civil War," we talked about that and No. 18 "Sacagawea" I would also say that's a

culturally-specific item on the English test.  Would you agree with me?

A.  Yes.

Q.  And we had pointed out on direct the example of "Emiliano Zapata" or "El Quijote de la Mancha" or possibly -- or probably No. 14, "Revolucion Mexicana"?

A.  Correct.

Q.  And the other questions have words that you see on both sides sometimes in the same order, sometimes in a close order but not exactly, much like we saw on the other examples that had words and vocabulary as opposed to nonverbal tests?

A.  Sometimes in the same order; sometimes in a different order, yes.

Q.  Right.  So, for example, on the English test it says "Gandhi" as No. 16 and on the Spanish test it has "Gandhi" as No. 17.

A.  That's correct.

Q.  On the English test it has "Relativity" as No. 15 and on the Spanish test it has "Relatividad" as No. 16?

A.  Correct.

Q.  So aside from the culturally-specific questions, this is sort of following the same pattern as the other sections we looked at where we've gone through them but many of them are in the same order and then sometimes

they're in a different order.

A.   Sometimes in the same order and sometimes they're in a different order, correct.

Q.   Section 10 at the bottom -- actually let me just go back to one thing where it says "Information Total Raw Score."

A.   Yes.

Q.   And it says "Maximum."  It says "26" on the English test and on the Spanish test also says "26"?

A.   That's correct.

Q.   The last item, No. 10 -- and would this be the last item of the mandatory subtests?

A.   No. 10 is, yes.

Q.   Right.  So it says "Coding" in English, it says "Claves" in Spanish, and this is another nonverbal test, correct?

A.   That's correct.

Q.   And I think in that little booklet, the response booklet that's at the back of both tests, the very back page --

A.   Got it.

Q.   Says "Coding"?

A.   Yes.

Q.   All right.  And I don't want to rush you so please take your time to look at it.  But the question

I'm putting to you, which I am guessing you can see coming, is these are exactly identical on both the English and Spanish versions of the test.

A.   Sure.  And I was not smiling at you.  I was kind of smiling at myself thinking that this is a task.  But just give me a second, please.

Q.   Sure.

A.   And they are exactly the same.

Q.   Okay.  And I believe you gave one additional section -- subsection, the "Letter-Number Sequencing."

A.   I did.

Q.   And that's page 12?

A.   Yes.

Q.   All right.  And looking at the Spanish test, it has a number and a letter or a letter and a number sometimes.  And on both the English test and on the Spanish test those are the same numbers and letters in the exact same order.  There's absolutely no difference in the numbers or the letters or the order in which they appear on either test, correct?

A.   Could you give me a second, please?

Q.   Sure.

A.   Oh, here it is, thank you.  Yes.  Hold on, ma'am.

Q.   And again this is page 12 going back to the original.

A.   That's correct.

Q.   Okay.  And this was the last of the subtests that you gave.

A.   That's correct.

MS. FISHER:  All right.  And I do have more, Your Honor.  I don't know if you wanted to take a break. I just need one second to -- I'm going to move this out of my way and grab my next exhibit.

THE COURT:  Why don't we go ahead and take five minutes here.

(Recess taken; 3:55 p.m. to 4:05 p.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record.  All counsel are present.  When we broke Ms. Fisher was conducting a cross-examination.  You may continue.

MS. FISHER:  Thank you.  Your Honor.

Q.   (Ms. Fisher continuing)  Dr. Seward, on direct examination you talked a bit about scoring and how to score a WAIS-IV.

A.   Yes.

Q.   And I just want to follow up on some of that.

A.   Sure.

Q.   So you count the number of answers to get a raw score, correct?

A.   That's correct.

Q.   And as you indicated the raw score is sort of meaningless as a number in and of itself.

A.   Exactly.

Q.   It's relevant when you convert it into a scaled score and then you check that scaled score against a grid which will tell you what the -- let me back up. One thing at a time.

A.   Sure.

Q.   You take the raw score and you convert it to a scaled score.

A.   That's correct.

Q.   And then in your case a computer or if you did it by hand there would be a grid you'd check that would sort of tell what that score -- the scaled score means in terms of these areas and your full-scale IQ, the subareas of the full-scale IQ?

A.   Sort of.  So maybe I misunderstood the way you're saying it but you have the raw score.

Q.   Yup.

A.   And then you go to the page in the manual for that age group and there will be the raw score in the -- the raw scores will be listed in the left-hand column and you go across to get the scaled scores for each subtest.

Q.   Okay.  And you ultimately check the scaled scores

against the norms of the test to get the actual IQ score?

A.   That's correct.  You sum the scaled scores to get the IQ score.  That's correct.

Q.   I want to talk about norms a little bit.

A.   Sure.

Q.   An IQ score -- let me back up.  An IQ is a relative score, right?  It's how you're doing relative to other people who are taking that test?

A.   That's very correct.

Q.   So it's not like your weight which is just a number that's fixed.  It's relative because it's telling you where you are in relation to other people who took that test.

A.   That's correct.  And I suppose you could do the same thing with weight.  You could have a relative weight based on a sample of people, yes.

Q.   Right.  I was going to give an example and tell me if you agree with this.

A.   Sure.

Q.   It's sort of like if you had a time that you could run a mile and let's say you can run a mile in six minutes.  That may be great; that may not be great.  But on your ranking of how you are as a runner, you would have to compare your time to other people's times?

A.   That's a good example because it also makes sense you'd probably want to do that within an age group.

Q.   All right.  Fair enough.

A.   Yeah, makes sense.

Q.   And when the English WAIS-IV that you administered is normed, it's normed against other people who have grown up and live in the United States.

A.   I believe so.  I'm not sure of if you're allowed to be foreign born.  It's in the -- those criteria are in the technical manual which I did not bring.

Q.   All right.  And the WAIS-IV American norms, actually are you aware they're thought of as the gold standard of the WAIS-IV norms?

A.   It doesn't surprise me but I didn't know -- I mean, seeing how it originated here, the Wechsler Scales, it doesn't surprise me.

Q.   All right.  And, in fact, the WAIS-IV norms track the U.S. Census to make sure that it's an even sample of people that really reflects the makeup of people who are living in the United States?

A.   That's correct.  It was like a stratified sample I believe, yes.

Q.   So when you get someone's IQ score because it's relative to how other people do, you're looking at if you compare -- if you take a test score, a scaled score,

and you use the American norms, it's comparing it to how somebody did who grew up in the United States and was living in the United States.  Maybe foreign born, maybe not.  But that's the population it's comparing it against, other people who have had the same -- who have lived in America, been exposed to the same information, vocabulary, that sort of thing, the same educational system, the same sort of food that's common.  All of that is the same on an American normed test for everyone who's in America, and if you're comparing the IQ -- the score to that normed group, you're comparing it to people from America.

A.  That's correct.  And that is the goal.

Q.  And it's giving you what that person's IQ is so how they are relative to other people who have been exposed to these same things.  And that's important, right?  This idea that, for example, in America there's a certain educational system.  We've got public schools that are of a certain quality.  There are private schools.  This is a normative sample.  We have certain dietary food that's available to us that's cultural that may not be available in a different country.

All of those things affect how people do on these tests, right?

A.  Well, when they normed it, as I recall, they took

people -- they included people from different geographic regions to capture that.

Q.   And the Mexican norms are just like the American norms.   That tests people who grew up in Mexico, right?

A.   Presumably, yes.

Q.   And so your score when compared -- your scaled score, if you're comparing it to the Mexican norms, would tell you how you're doing relative to people who grew up in Mexico.

A.   Yes.

Q.   Because it's a relative score.

A.   That's correct.

Q.   So if you want to know how someone who grew up in America compares to other Americans, you would look to the American norm because that's the sample group, the normative group, that had the same life experiences as that person.

A.   To the extent --

Q.   Roughly.   I don't mean to cut you off, Doctor.

A.   Life experiences may be a -- I think I understand but that is true if you give the American test exactly.

Q.   All right.   And likewise the Mexican norms, if you are looking at a scaled score and translating it into an IQ score by using the Mexican norms because it's relative, that's telling you how someone is doing

relatively to people who grew up in Mexico.

A.   And who took the Mexican test as part of the normative process.

Q.   And that's because the normative group, the sample group in Mexico takes the Mexican test and in America takes the American test?

A.   Exactly.

Q.   And just like we talked about in America there are certain educational systems, certain, you know, food that's available, sports, things like that, that's going to be different in a different country, right?

A.   Very true.

Q.   So in Mexico where there's an entirely different educational system, there may be different food that affects development, things like that.  How a raw score converts to a scaled score and then how that scaled score converts to the IQ score is going to reflect how someone, if it's a Mexican test taker, did in comparison to people who also grew up with that same -- that sample size, the same education, background, the same food, that sort of thing.

A.   Correct.

Q.   All right.  Okay.  Now, Doctor, you've administered the WAIS -- actually I just want to correct one thing real quickly.

A.   Sure.

Q.   On direct -- and I really just want to clarify. Mr. Reisenauer said something about there being a test in all these different countries, these WAIS-IV tests?

A.   Yes.

Q.   And he said there's a Mexican test and a Spanish test?

A.   Yes.

Q.   Now I take that to mean Spanish.  There's a test for Spain, Spanish meaning Spain, right?

A.   My understanding, and I could be wrong here, is that it's Puerto Rican but I could be wrong.

Q.   If I told you there was also a Puerto Rican test with a normative sample from Puerto Rico and there's a Spanish test with a normative group from Spain, would that sound --

A.   Sure.  And that's very plausible given the 20 or so different versions, yes.

Q.   Okay.  Now, Doctor, we were looking at the WAIS-IV because that's the most current iteration, correct?

A.   That's correct.

Q.   And you've administered the WAIS-III before, which was the version of the WAIS that is -- was published before the WAIS-IV.

A.   That's correct, and the WAIS and the WAIS-R.

Q.   Focusing on the WAIS-III for a moment.

A.   Yes.

MS. FISHER:  I'm just thinking about the order I want to do that.  All right.  I'm just going to mark these exhibits.

May I approach, Your Honor?

THE COURT:  You may.

Q.   (Ms. Fisher continuing)  Now what I've marked as D-83, Defense Exhibit 83, would you agree with me that this is the WAIS-III in English?

A.   Yes.

Q.   And what I've marked as D-84, at least as far as you can see this, appears to be the WAIS-III in Spanish?

A.   That's correct.

Q.   Actually the Mexican version of the WAIS-III?

A.   Well, it's in Spanish certainly.

Q.   This is the Mexican version of the WAIS-III, which is D-84.  The English version is D-83.

A.   Okay.

Q.   Now I'm not going to take you through every line painfully like we did before, but generally aside from sort of the layout the test changed in some ways but not radically, right?

A.   I'm sorry, between the --

Q.   Between -- let me clarify between the WAIS-III and the WAIS-IV versions.

A.   There's some new subtests that were added. There's subtests that were taken away but.  It's the same concept.

Q.   Okay.  And you'd agree with me, and I'm just picking an example here, like in the "Vocabulary" section which is on page 1 on D-83 "Breakfast" is No. 5 and "Desayuno," breakfast on the Spanish version, is 84 much like we were looking at and I won't go through each one.  They have some of the same items but not always in the same order, at least from the example I just gave?

A.   Yes, that's correct.

Q.   All right.  And the WAIS-III also has an "Information" subtest much like the WAIS-IV, correct?

A.   Yes.  Yes, indeed.

Q.   All right.  And if you'd turn to page -- item No. 9 --

A.   Yeah.

Q.   -- on the WAIS-III?

A.   Yes.

Q.   That says "Information"?

A.   Correct.

Q.   And if you turn to item No. 9 on the WAIS-III in Spanish that also says "Informacion"?

A.   That's correct.

Q.   And you'd agree with me that -- or would you agree with me looking at both tests side by side that much like the WAIS-IV there are culturally-specific references that appear on the WAIS-III in English that are different than the WAIS-III in the Mexican version because they're culturally-specific to that culture?

For example, No. 11 on "Information" on D-83, the English American test, says "Civil War President" whereas No. 12 on "Informacion" on the Spanish test, on the Mexican test, it says "Presidente de Mexico"?

A.   Yes, that's correct.

Q.   So much like we were looking at on the WAIS-IV, the WAIS-III also has these differences.

A.   That's correct.

Q.   All right.  And you can set those aside.

A.   Okay.

MS. FISHER:  And at this point, Your Honor, I'd like to offer D-83 and D-84 into evidence.

MR. REISENAUER:  No objection.

THE COURT:  Any objection?

MR. REISENAUER:  No.

THE COURT:  Eighty-three and 84 are received.

Q.   (Ms. Fisher continuing)  All right.  And, Doctor, you mentioned when you were talking about your credentials that you're a member of the AAIDD; is that correct?

A.   That's correct.

Q.   And you're aware that the AAIDD publishes various books or User's Manuals or other guides to help guide the average user to better understand use, diagnosis, all of those things having to do with intellectual disability?

A.   That's correct.

Q.   And they are sort of the preeminent organization that deals with intellectual disability.

A.   That's correct.

Q.   That's probably why you're a member of the AAIDD.

A.   Correct.

Q.   Okay.  Are you familiar with this book published by the AAIDD called "The Death Penalty and Intellectual Disability"?

A.   Yes, I am.  I'm not sure if it's -- I'm not sure if it's the same edition but I do own that book.

MS. FISHER:  Terrific.  All right.  Let me just mark this exhibit.

Q.   (Ms. Fisher continuing)  All right.  Doctor, fair so say I gave you some copied pages from the book I just

showed you?

A.   That's correct.

MS. FISHER:  And I'd like to mark it as D-85 and offer it into evidence.

THE COURT:  Any objection?

MR. REISENAUER:  Just a second, Your Honor, if I may.  Just for the record, Your Honor, what I received and I'm assuming what Dr. Seward received are pages 145, 146, 193 and 265?

MS. FISHER:  That's correct.  That should be everyone's copies.

MR. REISENAUER:  No objection.

MS. FISHER:  Thank you.

THE COURT:  Received.

Q.   (Ms. Fisher continuing)  All right.  And I want to turn your attention to page 145, which is the first copy page here.

A.   Yes.

Q.   You'll see it says:  "Problems with Test Norms"?

A.   Correct.

Q.   And then on page 146 in that section I'd like to draw your attention to the middle of the page where it says, "In addition..."

A.   Correct.

Q.   And tell me if I'm reading this correctly.  "In

addition to the problems noted previously concerning construction problems or obsolescence of norms, a third issue is that test publishers may use incorrect statistical formulae or make other statistical mistakes, which have the effect of producing IQ test scores that cannot be interpreted.  That is what happened with the Mexican version of the WAIS-III.  It is essentially identical to the U.S. version, except that the instructions and items are translated into Spanish.  The IQ test scores obtained when using the Mexican norms were considerably higher than when using the U.S. norms provided for the same test.  The publisher attributed this to differences between the U.S. and the Mexican populations.  However, when examining the test's technical manual, Suen and Greenspan discovered many statistical and other mistakes (in addition to improper sampling methods) that were made when these norms were constructed.

"Publication of these findings caused the test publisher to send out a notice steering purchasers away from using the Mexican norms and urging them to use the U.S. norms.  The main lesson here is that translated versions of established intelligence tests may or may not have valid norms, and it is incumbent upon users of these tests to look into the validity data for any test

they are relying upon and not to assume that all IQ norm tables are adequately constructed."

Did I read that correctly?

A.   Yes, you did.

Q.   And I believe you were aware from prior conversations that the WAIS-III, the Mexican WAIS-III as it says here, the publishers instructed users of the Mexican WAIS-III to use the American norms because the Mexican norms were messed up and not valid.

A.   That's correct.  I believe they gave that as an option.

Q.   All right.

A.   Yes.

Q.   And we looked at the WAIS-III in Spanish?

A.   Yes.

Q.   And we looked at the WAIS-III in English, and they had those same characteristics of the WAIS-IV in Spanish and English in that there was a section that had cultural differences.  There were words that were the same word but perhaps in a different order.  Yet the AAIDD describes this test by saying:  "It is essentially identical to the U.S. version, except that the instructions and items are translated into Spanish."

That's what this says here, correct?

A.   That's correct.

Q. And the publishers themselves urged test takers who took the Mexican WAIS-III to still use American norms even though the test was in Mexican, and that's because despite the differences we saw they were substantially the same.

A. Well, they gave that as an option.

Q. All right.

A. And, you know, as you mentioned, we did not go through the WAIS-III item by item.

Q. All right. One of the big issues that you had with the WAIS-IV was the "Information" section?

A. That's one of the issues, yes, ma'am.

Q. And we looked at that and we can go item by item but I just picked out a few examples. At the very least we saw those same culturally-relevant type issues on the "Information" section, an example of the word translated there. And I know we haven't -- you don't have the benefit of us going through that right now.

A. That's correct.

Q. But you'd agree at the very least what we looked at reflected that?

A. Yes.

Q. And, as we discussed, you don't speak Spanish, correct?

A. I do not, minimal.

Q.   And you have no expertise in administering Spanish language testing at all.

A.   That's very true.

Q.   So you aren't able to read the technical and administration manual for the Mexican WAIS-IV; is that correct?

A.   That's correct.

Q.   So you're not -- and that's the manual that says how those tests are normed, correct?

A.   That's correct.

Q.   And so you're not able to read the Mexican technical administration manual and have an understanding of how the Mexican WAIS-IV is normed.

A.   That's correct.  And actually that would be the technical manual, not the administration.

Q.   I'm sorry.

A.   But, yes, you're correct.

Q.   All right.  Thank you, Doctor.

MS. FISHER:  All right.  I'm going to move on to another section.  Your Honor, may I approach with the government?

THE COURT:  You may.

MS. FISHER:  I'm about to talk about some of the testing materials, the raw data of Dr. Seward.

THE REPORTER:  Could you speak up, please?

THE COURT:  This does not have to be reported.

THE REPORTER:  Oh, okay.

(Off-the-record sidebar.)

THE COURT:  All right.  What's been lodged with the Court and marked as Exhibit 86, as I understand it, is the raw data that you have provided to the parties; is that true, Dr. Seward?

THE WITNESS:  Yes, Your Honor.

THE COURT:  And that data is subject to certain intellectual property rights on the part of the parties that produced the testing; is that true?

THE WITNESS:  Yes, sir.

THE COURT:  And you are obligated by contract not to disclose those items of intellectual property unless ordered to do so?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  What I'm going to do is two things:  The first is I'm going to order you to answer questions on the raw data as they are presented to you.  I will direct that Exhibit 86 -- is it offered?

MS. FISHER:  Yes, Your Honor.  I would offer it with the request that it's under seal.

THE COURT:  Is there objection to that?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Eighty-six will be received and it will be kept under seal to protect the intellectual property rights of the publishers of the tests.

Go ahead.

MS. FISHER:  Thank you, Your Honor.

Q.  (Ms. Fisher continuing)  Dr. Seward, you're looking at D-86 and this is your raw data for the testing that you did that you testified to today that is in your report concerning Alfonso Rodriguez, correct?

A.  Correct.

Q.  All right.  And there are -- I don't know about that cover page, but there are numbers at the top that say "SRD" like with a Bates stamp type number.  Do you see those numbers?

A.  I do.

Q.  I'm going to refer to those numbers when I'm asking you questions.

A.  Okay.

Q.  All right.  Before I begin I just don't remember if we covered this on direct.  You gave a number of tests to test for malingering or lack of effort?

A.  That's correct.

Q.  And fair to say that Mr. Rodriguez's scores on those tests were all in the normal range indicating adequate effort and no malingering?

A. Well, there were a couple of scores that were low. There was a low score in the Word Memory Test. And then on the Digit Span subtest of the WAIS-IV I believe that was a little bit low, and that's -- the latter is an embedded measure of malingering.

Q. Okay.

A. But overall --

Q. But those tests -- those scores were in the range that you're still relying on them and testify to what the results said in court today?

A. That's correct.

Q. Okay. So I just want to go through a few things on your testing.

A. Okay.

Q. And if you turn to SRD-21, the Boston Naming Test.

A. Hold on, please, ma'am. Yes, ma'am.

Q. All right. And if you turn to page -- turn to page 6, you have answers filled out here and is it fair to say that you start on question 30?

A. That's correct.

Q. And 26 through 29 aren't filled out at all.

A. That's correct.

Q. And presumably 1 through 25 are not filled out either. They're not even included here in this raw data

packet.

A.    I apologize but that's correct.

Q.    And you didn't include them I'm guessing because they were blank?

A.    That's correct.

Q.    And is it fair to say you were following instructions of the test when you started at No. 30?

A.    That's correct.

Q.    You wouldn't just randomly pick a number where you want to start and not fill out the rest.  Some neurological testing instructs you to start at a number other than 1.

A.    That's correct.

Q.    So the test administrator, when administering tests that tell you to start at a number other than 1, a person who followed those instructions would be doing exactly what they're supposed to do.

A.    That's correct.

Q.    And this is an example of that.

A.    Yes.

Q.    All right.  I'd like you to turn to SRD-25, The Booklet Category Test.

A.    Yes.

Q.    And you'll see there's a cover page here that's page 25?

A.   That's correct.

Q.   And there's a box that says:  "Name, ID #, Gender, Ethnicity, Handedness, Birthdate, Age, Education, Examiner"?

A.   Yes.

Q.   And you filled out "Rodriguez" and the "Test Date 7/11/2013" and then the rest of those fields were left blank, correct?

A.   That's correct.

Q.   And you left them blank because it's not really relevant to the test, correct?

A.   That's correct, because -- yes.

Q.   And you know what his gender is.  Whether you write his gender down or not doesn't really change the test itself or how it's scored or -- it's a box technically you're supposed to fill out but not filling it out doesn't really change anything.

A.   That's correct.

Q.   And as the test examiner you make those choices because you're the professional.  So you decide if a field like gender, ethnicity, handedness, education examiner, age, isn't important you're making a decision using your clinical judgment not to fill that out.

A.   Correct, because this is all covered in the report.

Q.   Okay, great.  And for the score summary you have the raw scores there and there's another column that says 'T score' and those aren't on this report, right?

A.   That's correct.

Q.   That doesn't mean you didn't generate what the T scores were.  That just means that even though you generated them, because they're somewhere elsewhere you can access them, you didn't physically fill in all of those boxes.

A.   That's correct, and that's -- the total T score is I think the last two pages of my report.

Q.   All right.  And there's a section here, rather, that says "Normative table/comparison group," and you didn't put what normative group you did on this cover page, did you?

A.   I did not.

Q.   But you know what normative group you used I assume.

A.   I could figure it out, yes.

Q.   All right.  And so even though you didn't write down which normative group you used even though the form itself has a line for it, you chose not to fill it out because that's part of the judgment calls you make when administering tests.  You don't necessarily have to fill in every line on every piece of paper if you know where

to find the answer and as long as that information is available to you.

A.   That's correct.  If I know where to find the answer, yes.

Q.   And that would be true of any neuropsychologist who administered tests and had to make these choices about filling out fields.  I'm not saying they would make the same choices you did, but that's a choice that you made in this situation.

A.   That's correct.

Q.   All right.  And, Doctor, this is something that confused me that maybe you can help me figure out.  The CPT II, the Conner's Continuous Performance Test II --

A.   Sure, can you give me a --

Q.   This is on, I'm sorry, page 33 through 58.

A.   Yeah, hold on just a second.  Yes, ma'am.

Q.   If you look at page -- sorry, page 57 and page 33, I just can't figure out if there's like three copies of the exact same thing in here or if they're different.

A.   Let's see, I'm sorry, page 33.

Q.   So 33 through 56 would be one version?

A.   Oh, yes, yes.  So there's different -- there's different defaults you can set the computer program to. As I recall -- I don't use this version of the test anymore, but as I recall there's a way of maximizing

false positives or maximizing false negatives.  Anyway you can tweak the computer output and I included both options.

Q.   Okay.  And what you have contained in the pages of 33 through 56 or 57 through -- I actually think there's three versions all the way through 104.

A.   Okay.

Q.   These are the computerized -- the results that were outputed by the computer, right?

A.   That's correct.

Q.   And even though this is a booklet of your raw data, we don't see here Mr. Alfonso's [sic] actual answers or the questions he was asked.

A.   That's correct, because it is administered on the computer so there's no document generated.

Q.   All right.  And that's because sometimes with testing it will be on the computer.  It's not always a page you fill out that is easily producible when having to present the government with your raw data, correct?

A.   Sure.

Q.   Okay.  Doesn't mean you're doing anything shady.  This is just how this test result looks, and the tests that you gave happened to be on the computer.

A.   That's correct.

Q.   All right.  All right.  And on page 113?

A.   Yes, ma'am.

Q.   All right.  So there's "Trial 1, Trial 2, Trial 3, Trial 4, Trial 5."  Is this -- which test are we on?  This is the CVLT-II, the California Verbal Learning Test, Volume II?

A.   That's correct.

Q.   All right.  And there's words listed which I'm assuming are the answers Mr. Rodriguez gave?

A.   Very correct.

Q.   And is this your writing or his writing?

A.   That's my writing.

Q.   All right.  So it's certainly not improper or uncommon for you to write down what he said, correct?

A.   No.  That's the way the test is done, yes.

Q.   All right.  And you didn't -- there's a box on the bottom that says:  "Total Correct, Total Repetitions, Total Intrusions."  Now you didn't fill those out, right?

A.   That's correct.

Q.   And I'm assuming that's because you've recorded them somewhere.

A.   Well, it's on the actual -- if you go to -- excuse me, if you go to 117 --

Q.   Mm-hmm.

A.   -- it's on there.  This is the -- the answers for

this test can be scored by computer.

Q.    Okay.  And so even though there are boxes to fill in, you didn't fill them in because a computer scored it.

A.    That's correct.  And also because the computer captured that information, it's captured in this computerized report.

Q.    And because the information is captured somewhere else, it would be a bit redundant for you to physically go in and handwrite in what the total correct scores were even though there's a box where you're supposed to fill that in.

A.    That's correct.  And I'd be more apt to make errors with hand scoring.

Q.    Fair enough.  All right.  And, Doctor, please turn to page 120.

A.    Yes.

Q.    This is The Dot Counting Test?

A.    Mm-hmm.

Q.    And this has a box at the bottom and it says "Card" number, "Correct Count," then there's a column that says "Examinee Count" and "Error," correct?

A.    That's correct.

Q.    And you're supposed to write -- and then, I'm sorry, there's also a comment that says "Response Time"?

A.   That's correct.

Q.   This is one of those malingering tests, right?

A.   That's correct, yes.

Q.   In the "Examinee Count" you're supposed to write how many dots the examinee got and compare that to the correct count, correct?

A.   Yes.  Well, I'm not sure.  I don't recall from the manual.

Q.   All right.  But what you did was you just circled the number under "Correct Count."

A.   That's correct.

Q.   And that's because he got them all right.

A.   That's correct, except for one.

Q.   Right, and I'll get to that.

A.   Yes.

Q.   So you did actually, if you look at that column of "Examinee Count," write down a number in one of the boxes and that's No. 9.  You wrote "Examinee Count 12" and the count was supposed to be 16.

A.   That's correct.

Q.   And the reason you wrote it down there and not in all the others is because that's the one where he got it wrong so that's the one that matters.

A.   That's correct.

Q.   Thank you.

A.   You're welcome.

Q.   All right.   I'd like to turn to page 213.

A.   Yes, ma'am.

Q.   And this is the TOMM, the Test of Memory and Malingering?

A.   Correct.

Q.   Okay.   There are instructions written here, right?

A.   Yes.

Q.   The instructions say:   "Each trial lists both correct (**bold**, <u>underlined</u>) and incorrect (regular text) responses.   While running the test, circle the name of the item that the respondent chooses."

These are instructions for you as the examiner, right?

A.   Correct.

Q.   "After administering the test, put a checkmark in the box beside each number that has a circled **bold** and <u>underlined</u> response.   Add up the number of checkmarks in both columns to obtain the total number of correct responses and record it at the bottom of each trial."

And then will you please turn to 214 and 215.

A.   Yes.

Q.   And you see column A and column B and there are

numbers -- sorry, words in column A and words in column B and some are circled and there are 50 items on this Trial 1, correct?

A.   Correct.

Q.   And you see those boxes where the checkmarks are supposed to go if they got the item right?

A.   Correct.

Q.   And you didn't put checkmarks in the boxes, right?

A.   I did not.

Q.   But you wrote the total score at the bottom nonetheless and the total score was 50.

A.   Correct.

Q.   So he got full credit on this.

A.   Yes, he did.

Q.   And so it would seem sort of silly or redundant, even though the instructions tell you to, to go through and put a checkmark in each of those boxes because he got them all right and you wrote that number 50 in the total score.

A.   That's correct, because that information -- like you say, it is redundant.  That information is there.

Q.   Right.  And even though the instructions tell you to fill that box out, you're an experienced examiner. You could recognize that not putting 50 checkmarks and

writing the number 50 was conveying the same information.

A.   That's correct.

Q.   All right.

A.   In the same sense that somebody looking at this right now could see that was the information.

Q.   Right.  Okay.  Doctor, will you turn to page 242.

A.   Yes, ma'am, got it.

Q.   Now we're back to the WAIS-IV, and this is actually the WAIS-IV that you administered to Mr. Rodriguez; is that correct?

A.   That's correct.

Q.   And we covered this a little bit on a different test but I really want to cover it for the WAIS-IV.

So you'll see that items -- you started on question 5, right?

A.   That's correct.

Q.   And that's because the instructions, you can see it up there under "Block Design," say ages 19 through 90, sample item, then 5.

A.   Correct.

Q.   All right.  So you didn't ask him to do problems 1 through 4.

A.   That's correct.

Q.   But you still gave him two points for each of

those questions.

A.   That's correct.

Q.   And that's because the instructions tell you to do that.

A.   That's correct.

Q.   So you were following the instructions by skipping the first four questions and still giving full credit for them.

A.   Yes, ma'am.

Q.   All right.  And any other neuropsychologist who followed those same instructions and skipped those same questions but gave credit just like you would be also likewise following the instructions.

A.   That's correct.

Q.   All right.  That would also be true for page 243 for "Similarities."  You start on item 4 but you still gave full credit even though he didn't answer the questions on items 1 through 3.

A.   That's correct.

Q.   I believe it's true for page 245, "Matrix Reasoning," same idea?

A.   Correct.

Q.   "Vocabulary," same thing.  You start on question 5 but you gave him points for the ones he didn't answer?

A.   Yes, ma'am.

Q.   And that's all because it's according to the instructions?

A.   That's correct.

Q.   Same thing for No. 6, "Arithmetic"?

A.   Correct.

Q.   And No. 8, "Visual Puzzles"?

A.   Correct.

Q.   And No. 9, "Information"?

A.   Let's see, that is correct.

Q.   Okay.  Doctor, if you'd turn to page -- I believe it's 295.

A.   Yes, ma'am.

Q.   Let me get there myself.  Okay.  Starting on 295 we've talked a lot about the WRAT4, the WRAT4 test?

A.   Yes.

Q.   This is the WRAT4 test that you administered?

A.   Yes.

Q.   Okay.  And if you'll turn to page 296 and 297, there it looks as though there are different starting points.  You can start at Point A, Point B or Point C or Point D or on 298 you can start on Point E or Point F.

A.   That's correct.

Q.   All right.  And you made the choice for whatever reason to start at Point E.

A.   Yes.  And that is dictated by the score on -- I'm

fumbling for the page here, the score on the Word Reading subtest.

Q. Okay. And so you're not being incomplete or sloppy by not administering the tests that are consumed in starting point A, B, C and D. You're following instructions because some tests have instructions that even though they have lots of questions leading up to a different question or entire sections they tell you to start at a different point based on the examinee's level.

A. That's correct. And it's on page 295.

Q. Thank you. All right. You should feel free to set that aside.

A. Okay.

Q. All right. Doctor, I'd like to draw your attention to Government Exhibit 580, which was Dr. Weinstein's raw testing data.

A. I'm not sure that I have that up here. Oh, yes, ma'am. I'm sorry, I apologize. Yes, I got it.

Q. All right. So actually before we talk about this I want to -- I just want to cover a couple of general things. You administered one IQ test and that was the WAIS-IV; is that correct?

A. That's correct.

Q. All right. And Dr. Weinstein administered three

tests at the very least.  Two we can agree on are IQ tests: the WAIS-IV, the CTONI-2 and the TOGRA; is that correct?

A.  That's correct.

Q.  And the WAIS-IV he administered in the Spanish language.  The --

A.  Well, Spanish and English as I understand it.

Q.  Correct.  And the TOGRA was administered in English?

A.  Yes.

Q.  And the CTONI-2 is a nonverbal test so it's one of those tests like we talked about before with symbols and things like that.

A.  That's correct.

Q.  "Nonverbal" doesn't mean it's for people who can't speak or only use sign language or anything like that, right?

A.  That's correct.

Q.  It just means that it uses symbols and pictures and things like that.

A.  That's correct.

Q.  All right.  And, Doctor, if you could refer to -- Court's indulgence?

THE COURT:  How much longer is your --

MS. FISHER:  You know, I think what would

make sense, Your Honor, if it's okay I can finish up this section on the testing.  There's probably about 20 more minutes, maybe less, and then that might be a good place to break.  Or I can -- whatever Your Honor thinks. I probably have about 20 more minutes on this testing as I'm just getting started with it.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  I'd just as soon break now, Your Honor.

MS. FISHER:  I do have more after that so it's not like we'll be done for the day.

THE COURT:  Let's break now.

MS. FISHER:  Okay.

THE COURT:  We'll go ahead and we'll start at 9 o'clock tomorrow morning.  Thank you.

(Adjourned at 4:50 p.m.)