**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                              )
United States of America,   )
                              )
        Plaintiff/Respondent, )
                              )
            vs.             )   **FILE NO. 2:04-cr-55**
                              )
Alfonso Rodriguez, Jr.,     )
                              )
        Defendant/Petitioner. )
                              )
- - - - - - - - - - - - - - - -

**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**Evidentiary Hearing - Volume 7 of 9**

**February 5, 2019**

**Pages 1261-1490**

HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
        655 FIRST AVENUE NORTH
        FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

1262

**A P P E A R A N C E S**

**MR. KEITH W. REISENAUER**             **COUNSEL FOR PLAINTIFF;**
**MS. MELISSA H. BURKLAND**
Office of U.S. Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102

**MR. JOSEPH W. LUBY**             **COUNSEL FOR DEFENDANT;**
**MR. ERIC J. MONTROY**
**MS. ANNE FISHER**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

**I N D E X**

**W I T N E S S E S**

**PLAINTIFF'S:**                                                    **PAGE NO.**

  **JAMES D. SEWARD**

  Cross-Examination (cont) by Ms. Fisher            1267
  Redirect Examination by Mr. Reisenauer           1365


  **MICHAEL WELNER**

  Direct Examination by Mr. Reisenauer             1393


**E X H I B I T S**

| EXHIBIT NO. | | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|---|
| Defendant's | 87 | One page of Dr. Welner's Report (Pg 95 of 215) Dated 9/10/13 | 1280 | 1280 |
| Defendant's | 88 | Permanent Record Laredo Elementary Schools | 1294 | 1295 |
| Defendant's | 89 | Adaptive Behavior Assessment and the Diagnosis of Mental Retardation in Capital Cases by Marc J. Tasse | 1307 | 1307 |
| Defendant's | 90 | Partial transcript of Trial Testimony of Illeana Noyes (2 pages) | 1309 | 1309 |
| Defendant's | 91 | One Page of Dr. Pitts's Interview with Alfonso Rodriguez Dated 8/4/06 | 1328 | 1328 |
| Defendant's | 92 | Copy of Book Cover of The Rebels (Kent Family Chronicles) | 1332 | 1333 |
| Defendant's | 93 | St. Peter, Minnesota Security Hospital | 1334 | 1334 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's 94 | Medical Progress Notes Dated 2/27/76 | 1336 | 1336 |
| Defendant's 95 | Medical Progress Notes (B-1 Team 4/1/76) | 1337 | 1337 |
| Defendant's 96 | Medical Progress Notes Dated 7/1/76 | 1337 | 1338 |
| Defendant's 97 | Note by Judy Rodning, Social Worker Dated 2/14/77 | 1342 | 1342 |
| Defendant's 98 | I.T.P.S.A. MINI-Team Dated 9/21/78 | 1343 | 1343 |
| Defendant's 99 | One page Transcript of Interview with Dr. Seward and Mr. Rodriguez Dated 7/10/13 | 1353 | 1353 |
| Defendant's 100 | One page Transcript of Interview with Dr. Seward and Mr. Rodriguez Dated 7/10/13 | 1354 | 1354 |
| Defendant's 101 | One page Transcript of Interview with Dr. Seward and Mr. Rodriguez Dated 7/10/13 | 1355 | 1356 |
| Defendant's 102 | One page Transcript of Interview with Dr. Seward and Mr. Rodriguez Dated 7/12/13 | 1357 | 1357 |
| Defendant's 103 | Declaration of Karen Bronk Froming, Ph.D. Signed on 10/31/11 | 1364 | 1364 |
| Government's 639 | Standard Derivation of WAIS-III Scores for all Editions | 1373 | 1373 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 640 | IQ Scores should not be adjusted for the Flynn Effect in Capital Punishment Cases | 1381 | 1381 |
| Government's 641 | Report by FBI of Gordon Stoltz, Date of Transcription 7/16/06 | 1383 | 1383 |
| Government's 642 | CV of Michael Welner, MD | 1403 | 1403 |
| Government's 643 | Dr. Welner's Report | 1420 | 1420 |
| Government's 644 | Psychological Report | 1440 | 1440 |
| Government's 645 | Partial transcript of Interview with Dr. Welner and Mr. Rodriguez | 1441 | 1441 |
| Government's 646 | Statement of Shirley Seddon | 1449 | 1450 |
| Government's 647 | Statement of Ardyce Whalen Dated 4/14/80 | 1462 | 1462 |
| Government's 648 | Report by FBI Special Agent Ruben Lopez Dated 7/28/06 | 1482 | 1482 |
| Government's 649 | Psychological Report Dated 12/1/76 | 1485 | 1485 |

**P R O C E E D I N G S**

(February 5, 2019:  The following proceedings commenced at 9:00 a.m., In open court, all counsel present.)

THE COURT:  We'll go back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that Mr. Rodriguez has waived his presence.  The petitioner appears through his counsel, Ms. Fisher, Mr. Luby and Mr. Montroy.  Mr. Reisenauer appears on behalf of the United States.  When we broke Dr. Seward was on the stand.  Ms. Fisher was conducting a cross-examination.

A couple of things that I just want to note. Ms. Fisher, if you could slow down a little bit we would appreciate that.

MS. FISHER:  Yes.

THE COURT:  And would each of you let the other person finish before you start talking because what we've got is the witness stepping on the question and the questioner stepping on the witness's answer and it's hard to report.  And it's made more complex because there are a few Spanish words being tossed about and so if we could just do those things I'd appreciate it, okay?

MS. FISHER:  Absolutely.

DR. SEWARD:  Yes, Your Honor.

THE COURT:  Very good, thank you.  You may proceed, Ms. Fisher.

MS. FISHER:  All right.

**JAMES D. SEWARD,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**CROSS-EXAMINATION (continued)**

**BY MS. FISHER:**

Q.  Good morning, Dr. Seward.

A.  Good morning.

Q.  Dr. Seward, I believe when we left off yesterday we were talking about -- we were still talking about some of the testing, and I had just asked you to confirm that you had administered one IQ test to Mr. Rodriguez and that's the WAIS-IV, correct?

A.  That's correct.

Q.  All right.  And Dr. Weinstein gave three tests, two that we can agree are IQ tests and one other test. There was the WAIS-IV which he gave in Spanish, the TOGRA which he gave in English, and the CTONI-2 which is a nonverbal test.  Is that your understanding?

A.  Yes.

Q.  And we talked a little bit yesterday about what a

nonverbal test was.

A.  Correct.

Q.  I wanted to refer you to Defense Exhibit D-80, which was the article by Dr. Welner.  We'll get you a copy.

A.  Yes, ma'am.

Q.  Thank you.  And, Dr. Seward, if you could turn to page 640, the numbers are on the top.

A.  Oh, thank you.

Q.  Sure.

A.  Yes.

Q.  And you'll see there's a section called "Intelligence Testing"?

A.  Yes.

Q.  And then if you turn the page you see that Dr. Welner lists a number of tests in Table 1 called intelligence tests.

A.  Yes, ma'am.

Q.  And under the first one, which is the Wechsler Adult Intelligence Scale Fourth Edition, or the WAIS-IV, you'll see that in the column all the way to the right of that page under the question "Can it Detect Malingering?" Dr. Welner writes:  "Atypical responses may be an indication; however, this should be supplemented by another test.  Utilization of multiple

psychological tests is the best way to detect faked mental retardation."

Did I read that correctly?

A. Yes, ma'am.

Q. And you'll also see listed in this same chart, the same table of intelligence tests, on page 643 you'll see third item from the bottom that one of the intelligence tests that Dr. Welner lists is the Comprehensive Test of Nonverbal Intelligence Second Edition, or the CTONI-2. And that's described by saying: "The CTONI-2 measures analogical reasoning, categorical classification, and sequential reasoning, using six subtests in two different contexts;" is that correct?

A. That's correct.

Q. Thank you. All right. I wanted to go through some of the issues that you testified to on direct that were errors that you believe you found in Dr. Weinstein's testing.

So if you could refer to Government Exhibit 580, which is Dr. Weinstein's raw testing data.

THE CLERK: (Handing exhibit to the witness.)

THE WITNESS: Thank you.

Q. All right. And if you could turn to page --

there are "Ws" at the bottom with numbers.  Do you see that?

A.  Yes, ma'am.

Q.  All right.  So if you can turn to W103.

A.  Yes, ma'am.

Q.  All right.  And this is the -- arranging the blocks in the correct order, right?

A.  That's correct.

Q.  All right.  So I know we went over this a lot yesterday but I just want to make sure because this is now Dr. Weinstein's test.  You have no problem with starting at No. 5 and skipping 1 through 4 but still giving full credit because that's what the testing instrument says to do, correct?

A.  Correct, except in cases of suspected intellectual disability.

Q.  All right.  Well, then if you get them wrong there's instructions about what to do, right?  You go backwards and then you go forwards?

A.  That's correct.

Q.  All right.  And one of the things that you pointed out yesterday was that you're supposed to record the times in that middle column.  And Dr. Weinstein didn't record the times in the first four boxes of the actual test he was administering in items 5 through 8,

correct?

A.   That's correct.

Q.   All right.  Now you'd agree with me though that Dr. Weinstein did give Mr. Rodriguez full credit on all four of those questions where he didn't write down the time.

A.   Yes, ma'am.

Q.   So because he gave him full credit, it's fair to say that even though the timing's not written down, this didn't adjust his score negatively in any way because he got full credit.

A.   That's correct.

Q.   All right.  And then when he wrote down the times for 9, 10 and 11, on 10 and 11 he gave zero points but he wrote down the times in those two boxes.

A.   Correct.

Q.   Okay.  Turning to W104 and this is the "Semejanzas" or "Similarities" section.  And yesterday you pointed out that No. 9, which was "Baby" and "Bud" or "Capullo - Bebe," that Mr. Rodriguez gave the answer "young."  And according to the testing manual that should be a two-point answer.

A.   That's correct.

Q.   So there were really two problems with this, right?  There's -- one is that you lose those two points

he's supposed to get, and then the second problem is that because you have to keep going until you get three zeros in a row it prematurely terminated the test, correct?

A.  That's correct.

Q.  So if he had given him the two points -- and I will -- let's say correctly that he was supposed to give him the two points, I'm not arguing that right now at all, he would have had to go on to question 12, "Musica - Marea," correct?

A.  That's correct.

Q.  All right.  And if you'll turn for a minute to Defense Exhibit 86, which was your raw testing data. I'm sorry, I know it's a fresh day and we have to get new copies for everything.  D-86, which is Dr. Seward's raw testing data.

THE CLERK:  (Handing exhibit to the witness.)

Q.  All right, Doctor, and if you would turn to page SRD-243, which will be your WAIS-IV that you administered in that same section, "Similarities."

A.  If you could hold on just a second, please.

Q.  Of course.

A.  Yes, ma'am.

Q.  All right.  And we were saying that if

Dr. Weinstein had correctly given two points for "young" and -- for "Bud" and "Baby," he would have had to go on to question 12, "Musica - Marea," which we discussed yesterday meant "Music" and "Tides."  And if you'll look at your administered test on page 243, "Music" and "Tides," No. 11, would you agree with me that you wrote "IDK," which I assume stands for I don't know?

A.   Correct.

Q.   And he got zero points for that, correct?

A.   Yes, ma'am.

Q.   All right.  So if Dr. Weinstein had correctly scored the two points and moved on to the next question, it would have been "Musica - Marea" and presuming he would have answered the same as he did when you gave the test, which we don't know but for the sake of this discussion, he would have gotten a zero and then that would be the third zero in a row, correct?

A.   If he had gotten a zero, it would be the third zero in a row, yes, ma'am.

Q.   And then you would terminate the test at that point and then move on to the next section.

A.   Yes, ma'am.

Q.   All right.  Thank you.  All right.  In the next -- you can set aside your raw testing data and I'm going to go back to Dr. Weinstein's testing data.

A.   If you could excuse me just a second, I want to be sure not to get this messed up.  Well, anyway, okay.

Q.   Take your time.  It will give me the advantage of premarking my pages.

A.   Okay.  I'm back to Dr. Weinstein's data.

Q.   All right.  And we're going to go back to his WAIS-IV looking at page W105 which is the "Retencion de digitos" or number retention?

A.   Correct.

Q.   All right.  And the problem here is that the instructions tell you to record his answers and write them down and then score it.  And while he scored it there are -- he didn't write down the numbers or whatever Mr. Rodriguez said.

A.   Correct.

Q.   And so the problem here really is that you can't check -- double-check this on your own, right, because he didn't write down the answers?

A.   That's correct.

Q.   Now he still scored it and gave him points so there's still a score.  The real issue is you're not able to see if that score is right or wrong because he didn't show his work basically.

A.   That's correct.

Q.   All right.  And, Doctor, if you'll turn to page

109, it's the "Arithmetica" part at the top but I want to draw your attention to No. 7, the "Busqueda de simbolos."

A.    Yes.

Q.    All right.  Now I don't think you testified to this on direct yesterday but I believe when we spoke about -- gosh, I don't know what it was at this point, two weeks ago on the phone about your -- at a sort of mini deposition that we had, and of course Mr. Reisenauer was on the phone as well, you had mentioned that you caught a small scoring error in Section 7; is that correct?

A.    That's correct.

Q.    So that first box is 120 but the second box should be a 21 instead of 22?

A.    That's correct.

Q.    And the third box should be a 1 instead of a 0?

A.    Correct.

Q.    So that score in the box instead of being 22 should actually be a 20?

A.    That's correct.

Q.    And then turning the page to number -- page W111, the "Informacion" section.

A.    Yes, ma'am.

Q.    And I know we talked a lot about this yesterday

so I'm going to really try not to beat a dead horse as they say, but you would agree with me that -- would you agree with me that someone who was born and raised in the United States who's never attended school in Mexico, who actually spent most of his adult -- his life from eight years old on in Minnesota, probably wouldn't know who Emiliano Zapata was if asked that question?

A.  I think it's less likely than a person who was raised in Mexico.

Q.  Fair enough.  So by switching out with the question about the Civil War, which we acknowledged yesterday was from the English version of the test, it resulted in Mr. Rodriguez getting credit for that and then -- so that would -- strike that.

It resulted in Mr. Rodriguez getting credit for that.

A.  Yes, ma'am.

Q.  All right.  So again it didn't negatively affect his score.  By swapping them out it didn't artificially give him a lower score.  It allowed him to answer a question where he got the full credit.

A.  Correct.

Q.  Okay.  All right.  Again I don't believe you covered this on direct testimony yesterday but when we spoke on that phone call a few weeks ago I had asked --

do you remember that I had asked you if you tried --
there are a few computational errors in here; is that
fair to say?

A.   That's correct.

Q.   And I asked you if you had rescored them by
fixing the computational errors the best you could?

A.   Yes.

Q.   And allowing for the fact that the one section
was terminated early so that sort of is a bit of an
unknown; although, we talked about that today how the
next question presumably would have been a zero.

          So did you rescore this by fixing the
computational errors?

A.   I did.

Q.   And did you rescore it so the errors were
corrected and then compare that score against the
American norms?

A.   I believe I did.

Q.   And, in fact, you did and -- or at least you
reported to me that you did a couple weeks ago.  And
isn't it true that when you correct the score for the
computational errors you got a full-scale IQ score for
Mr. Rodriguez of 74?

A.   Using Dr. Weinstein's method.  I don't have my
notes with me but that does seem -- I have a vague

recollection of that.

Q.   Okay.  And I'm going to talk about the Flynn Effect shortly --

A.   Sure.

Q.   -- but before we talk about what it is, fair to say that that 74 that you got when you rescored Dr. Weinstein's testing against the American norms is not adjusted for the Flynn Effect?

A.   Yes, correct.

Q.   Okay.  I just want to go back to something you talked about on direct by looking at the cover sheet again, and the cover sheet is on page W101.

A.   Yes, ma'am.

Q.   All right.  And this is the cover sheet that's filled out.

A.   Correct.

Q.   Now Mr. Reisenauer, I think it was at the end of the section, he was talking to you about the Mexican norms versus the American norms and he had you go through sort of what he was reading as the accurate, is to how I took it, score for Mr. Rodriguez and that was the 89 as the full-scale IQ score.

Do you remember testifying to that?

A.   Yes.

Q.   And that 89 is the score that Dr. Weinstein got

against the Mexican norms; is that correct?

A.  Give me just a second.

Q.  Sure.

A.  That's correct.

Q.  So I just want to sort of synthesize this with what we were talking about yesterday with norms.

So what that 89 would represent, because we talked about an IQ score being relative, is what Alfonso Rodriguez, a person who was born in the United States, a person who has lived his entire life in the United States, a person who was educated in the United States, a person who has never lived anywhere but the United States, that would show how he did relative to a population that was raised in Mexico, lived in Mexico, and educated in Mexico; is that correct?

A.  Assuming that the test was given in the standardized way in Spanish, that's correct.

Q.  All right.  And -- all right, strike that.  All right.  Thank you.

There is one other thing I want to show you about that, about the testing, and then we can move on.

May I approach, Your Honor?

THE COURT:  You may.

Q.  (Ms. Fisher continuing)  And what I've marked as item D-87, Dr. Seward, you reviewed Dr. Welner's report

for this in preparation for writing your report, possibly in preparation for the hearing?

A.   Yes, ma'am.

Q.   All right.  And what I've given you here is page 95 of Dr. Welner's report, and at this time I would like to offer Defense Exhibit 87 into evidence.

MR. REISENAUER:  No objection.

MS. FISHER:  And I just wanted --

THE COURT:  Eighty-seven is received.

MS. FISHER:  I'm sorry, Your Honor.

Q.   (Ms. Fisher continuing)  I just want to draw your attention to one line here and it's the second from the bottom paragraph.  And you can just let me know if I read this first sentence correctly:  "Intellectual testing in Al Rodriguez confronts the challenge that English is his second language."

Is that what Dr. Welner wrote there?

A.   Yes, it is.

Q.   Thank you.  All right.  I want to talk a little bit about the Flynn Effect.  Dr. Welner -- I'm sorry, Dr. Seward, you're familiar with what the Flynn Effect is?

A.   I am.

Q.   Okay.  And just to sort of go through what the Flynn Effect is, you administered your WAIS-IV to

Mr. Rodriguez in 2013, correct?

A.    That's correct.

Q.    And the WAIS-IV was normed in 2006.

A.    Yes.   I think they stopped in early 2007. 2006-2007, yes.

Q.    Between 2006 and 2013 it's about a seven-year difference, right?

A.    That's correct.

Q.    And if you multiply, and we're going to get to why I'm using this number, .3, you'd come up with -- actually, hold on.   Let me get to that.   I'm going to back up and go through the steps a little more slowly.

All right.   We talked about a -- we talked a lot about an IQ score being a relative score.

A.    Yes.

Q.    And that means that the IQ score is showing you how someone does in relationship to other people based on a norm of -- a middle score, a mean or an average of 100.

A.    That's correct.

Q.    And what that means is of all the people who were normed on the test, the couple thousand or however many people they administer the test to, which is a cross sampling of a population, that they see how everybody does and the average right in the middle is 100, right?

A.   That's correct.

Q.   And when we're talking about intellectual disability, we're looking for something that's two standard deviations below the norm.

A.   More or less, yes.

Q.   And that's determined by a bell curve that shows you where the bulk of the population falls.

A.   Correct.

Q.   All right.  And it sort of falls evenly over that 100 median line.

A.   Yes.

Q.   Okay.  So the idea of the Flynn Effect is that a population as a whole gets smarter as years go on, right?

A.   Yes.  Although, that may not be -- that may have plateaued and in some countries it's been actually noted to reverse.

Q.   All right.  But that's the concept of the Flynn Effect.

A.   That's the concept, yes, ma'am.

Q.   Whether or not you agree with it, that's the concept behind it.

A.   That's correct.

Q.   All right.  And I sort of think a good way to think about it is kind of like if you're thinking about

athletics and tell me if you agree with this.

Anything from -- let's take a sixth grader who does gymnastics.  What a sixth grader is expected to do in a basic gymnastics class in 1980 will probably involve less technical skills than what that same sixth grader in 1990 is able to do.  And in the year 2000 -- because people sort of collectively get better, and you can see that if you watch even at the professional level sports what might be a 10 as an Olympic score in the 1980 Olympics, 20 years later if they perform that same routine might not give them a 10 because everything is evolving and getting better.

Does that make sense?

A.  Well, it's outside of my area of expertise.

Q.  All right.

A.  I think I understand what you're saying though.

Q.  Okay.  That collectively, even though it sounds sort of silly, a group and a population can improve with something over time.

A.  That's correct.

Q.  And that's what's behind the Flynn Effect with intelligence instead of athletic ability.

A.  That's correct.

Q.  And so the idea behind the Flynn Effect is if the population's IQ is rising -- and would you agree with me

that with the Flynn Effect the idea that it rises by a third of a point over a year, so over 10 years it would be three points, that that mean of a hundred -- if the entire population's intelligence is rising by three points over 10 years, 10 years later that mean would actually be 103?

A.    That's correct.  For the average, yes.

Q.    Right.  So the idea of the Flynn Effect is that you're adjusting it because the test was normed with an average of a hundred but now as time has passed -- and I'm using the 10-year period example because it's a convenient example.  Now the mean is 103 and you want to readjust it so you're back with the norm of a hundred.

A.    That's the concept.

Q.    Okay.  And, Dr. Seward, I'd like to refer you to what was Defense Exhibit No. 2 and this was an article called "Psychology, Public Policy, and Law."

THE COURT:  Shelley, Exhibit 2.

MS. FISHER:  Defense Exhibit 2 and it's an article.

THE CLERK:  (Handing exhibit to the witness.)

MS. FISHER:  Thank you.

Q.    (Ms. Fisher continuing)  All right.  Dr. Seward, do you have this in front of you?

A.   I do.

Q.   All right.  If you could just turn to the first page.

A.   Yes.

Q.   I believe it's the journal page on the front cover and then you'll see this is an article called: "Tethering the Elephant:  Capital Cases, IQ, and the Flynn Effect."  And this article's actually written by James R. Flynn, who is the Flynn of the Flynn Effect; is that correct?

A.   That's correct.

Q.   If you could turn your attention to page 173, and the numbers are on the top right corner.

A.   Yes, ma'am.

Q.   Okay.  And there's a paragraph that's the second paragraph from the bottom and I'm going to read it and you tell me if I read it correctly:  "Failure to adjust the scores is to take flight from reality.  Suppose you are coaching an athlete who aspires to qualify for the Olympic high jump.  He jumps 6 ft 6 in, and you assure him that he will qualify.  He replies:  'But that was the standard in 1985.  Since then, performances have improved, and today, I have to jump 7 feet to qualify. You are judging my performance in terms of the norms of yesterday rather than today.'  He would do well to hire

a new coach."

Is that how Dr. Flynn is explaining the Flynn Effect here?

A.   That's correct.

Q.   Okay.   Doctor, next I'd like to direct you to Defense Exhibit 47, which is the User's Guide to the AAIDD manual.   It's the small floppy green book.

THE CLERK:   (Handing exhibit to the witness.)

Q.   All right.   I don't think you and I have dealt with this book yet.   We talked a little bit yesterday about the AAIDD.   We established that you were a member of the AAIDD?

A.   Yes.

Q.   And I am assuming you've seen this book before?

A.   I have.

Q.   You probably own this book.

A.   I'm not sure if I have this edition of the User's Guide.

Q.   All right.   But you're familiar with this.

A.   Yes.

Q.   And would you agree with me that the "Definition, Classification, and Systems of Supports," commonly known as the green book and the User's Guide, are really sort of the governing standards put out by the AAIDD and used

in the ID community?

A.  Yes.

Q.  All right.  If you would turn to page 23 of the User's Guide.

A.  Yes, ma'am.

MR. REISENAUER:  Excuse me, Your Honor, what exhibit is this?

MS. FISHER:  This is D-47.

MR. REISENAUER:  Thank you.

Q.  (Ms. Fisher continuing)  All right.  And I'm going to read the section under "Flynn Effect."  "The Flynn Effect refers to the increase in IQ scores over time (i.e., about 0.30 points per year).  The Flynn Effect effects any interpretation of IQ scores based on outdated norms.  Both the 11th edition of the manual and this User's Guide recommend that in cases in which a test with aging norms is used as part of a diagnosis of ID, a corrected Full Scale IQ upward of three points per decade for age of norms is warranted."

Did I read that correctly?

A.  Yes, ma'am.

Q.  All right.  And at this point I'd like to refer to Defense Exhibit 46, which is the "Intellectual Disability Definition, Classification, and Systems of Support," also known as the green book, also published

by AAIDD.

THE CLERK:  (Handing exhibit to the witness.)

Q.  And, Doctor, would you please turn to page 37.

A.  Got it.

Q.  All right.  And I'm going to read from that last paragraph on 37 above the cited paragraph.  "As discussed in the User's Guide that accompanies the 10th edition of this Manual, best practices require recognition of a potential Flynn Effect when older editions of an intelligence test (with corresponding older norms) are used in the assessment or interpretation of an IQ score."

Did I read that correctly?

A.  You did.

Q.  All right.  Now we've talked about some IQ scores but we haven't adjusted them for the Flynn Effect.  So I want to go through some of them and you just let me know if I'm correctly adjusting them with the Flynn Effect.

So why don't we start with the full-scale IQ score that was in your report, which was Government Exhibit 615, and the score -- the full-scale IQ score in your report was an 86.

A.  Hold on a second, please.

Q.  Sure.

A.   Yes, ma'am.

Q.   All right.  And you'd agree with me that when you reported Mr. Rodriguez's IQ score in your -- sorry, just looking for the page, page 36.  In your report the full-scale IQ score was an 86?

A.   Yes, ma'am.

Q.   So if that were to be adjusted with the Flynn Effect, that would go down to an 83?

A.   So let me think.  So we're talking seven years and so seven times .3, it's kind of early in the morning but it would be 2.1 I believe.

Q.   Okay.  So an 84.

A.   Eighty-four.

Q.   Okay.  And that would also then change the confidence interval?

A.   It would, although not necessarily by subtracting 2.1 from each -- from the upper limit and the lower limit.

Q.   I understand.  I understand.  I'm learning that that's a more complicated --

A.   That's correct.

Q.   -- computation.

A.   Yes.

Q.   But once you adjust for the Flynn Effect, then you also adjust that confidence interval, correct?

A.   That's correct.

Q.   And we talked about the IQ score Dr. Froming got and I believe we said Dr. Froming said that she recorded a full-scale IQ score of 87?

A.   That's correct.

Q.   All right.  Now we didn't go over this yesterday and I'd like to talk about one thing with Dr. Froming today.  And I'd like to draw your attention to Exhibit D-23, Defense Exhibit 23 which was introduced last week. I don't think you've seen it yet, Dr. Seward, and this is the "Declaration of Karen Bronk Froming Ph.D."

THE CLERK:   (Handing exhibit to the witness.)

THE WITNESS:   Thank you.  Yes, ma'am.

Q.   All right.  And I'd like to direct your attention to paragraph No. 13 of Dr. Froming's declaration.

Actually before I do that, Doctor, let me establish what year this was.  If you'll look at the last page under paragraph 22 on page 9.

A.   Yes, ma'am.

Q.   This declaration, under penalty of perjury, is dated October 13, 2011, correct?

A.   I have June 10, 2005.

MS. FISHER:   May I approach, Your Honor?

THE COURT:   You may.

MS. FISHER:  May I have one moment, Your Honor?  I see that I -- the exhibit I referenced is an earlier declaration.  Thank you.

Your Honor, I'm going to come back to this point.

THE COURT:  All right.

MS. FISHER:  I do apologize.  I saw the heading on the exhibit list and I clearly had the wrong exhibit.

Q.   (Ms. Fisher continuing)  All right.  We had talked a minute ago about when you rescored Dr. Weinstein's test and using the corrected computations and scoring it against the American norms, and you had said you got a score of 74.  And if you adjusted that for the Flynn Effect, would that adjust down then to 71 because it was given more recently?

A.   Yes, ma'am.

Q.   Okay, thank you.  All right.  I want to talk a bit about Mr. Rodriguez's schooling generally, and yesterday the government introduced Exhibit 624, which was a page of your interview with Mr. Rodriguez.  And I'd like to bring your attention to Government Exhibit 624.

THE CLERK:  (Handing exhibit to the witness.)

THE WITNESS:  Thank you.

Q.  And what Mr. Reisenauer brought out when he was talking to you about this document is when you asked Mr. Rodriguez why he would have flunked all the grades and he said:  "Because I was flunking."

And then you said:  "But I mean why?"

And he said:  "Because I wasn't doing anything."

And you said:  "And why weren't you doing anything?"

And he said:  "Because I didn't care after a while."

You'd agree with me that this explanation for why he flunked is Mr. Rodriguez's self-reporting?

A.  Yes, ma'am.

Q.  Okay.  And turning your attention to Government Exhibit 625 which was also introduced by Mr. Reisenauer.

THE CLERK:  (Handing exhibit to the witness.)

Q.  And I believe Mr. Reisenauer brought your attention to page 4, the "Education" section.  And I just wanted to point out a couple of things.

Would you agree with me that the first sentence of that "Education" sentence says:  "Defendant completed the ninth grade at Central High School in

Crookston, Minnesota"?

A.  Yes, ma'am.

Q.  And we know that to be incorrect, right, because he didn't finish the ninth grade.  He dropped out in ninth grade; is that correct?

A.  I do recall that, yes.

Q.  The last grade he finished was actually eighth grade?

A.  I recall something to that effect.

Q.  All right.  So that sentence is not correct.  I would also like to draw your attention on that same page to the section right below "Military" that says "Economics."

A.  Yes.

Q.  And would you agree with me that under "Economics" -- and just to be clear this is a state parole and probation agent's report dated February 24, 1975.

Under the "Economic" section it says: "Defendant has no savings or checking account, and states he owns a television set, a .25 caliber pistol, and is in debt to Gambles for $290.00"?

A.  Yes, ma'am.

Q.  Thank you.  Court's indulgence one minute?

And I'd like to talk a little bit more about

Mr. Rodriguez's schooling.  When Mr. Rodriguez was in school in Laredo, Texas when he started, do you remember that he told you that the classes were in Spanish and the materials were in Spanish so it was a language that he was familiar in?

A.  I have a vague recollection of that.

Q.  Okay.  If you turn to your report on page 16.

A.  Yes, ma'am.  That is correct.

Q.  All right.  Did you see the part I'm looking for that he told you all his classes were in Spanish in Laredo?

A.  That's correct.  It's the second sentence in that section.

Q.  All right.  Thank you.  Does that refresh your recollection?

A.  It does.

Q.  Okay.  And I'm going to show you a document that I'm going to mark as Defense Exhibit 88 (indicating).

All right.  Dr. Seward, do you recognize this exhibit as Alfonso Rodriguez's elementary school records when he attended the Leyendecker School in Laredo?

A.  Yes.

MS. FISHER:  All right.  At this point I'd like to move Defendant's Exhibit 88 into evidence.

MR. REISENAUER:  No objection.

THE COURT:  Eighty-eight is received.

Q.  (Ms. Fisher continuing)  All right.  And you'll see that they have the "SCHOOL ATTENDED" on the left. It says "Leyendecker" for all of those.  Obviously Mr. Rodriguez's name is along the top and it says "TERM ENDING" and in the first column it says "TERM ENDING" in "5/60," the month and the year.  It has his chronological age of six, grade placement one.

He was in the first grade at that first year, correct?

A.  Correct.

Q.  And then the second line "TERM ENDING 5/61," this is the next year, and his chronological age is seven and he's still in grade one; is that correct?

A.  I'm sorry.

Q.  It's the third column.  It's just in the very beginning there after his age?

A.  Oh, oh, yes.

Q.  So he repeated the first grade in Texas before he moved to Minnesota when all of his classes and materials were in Spanish; is that right?

A.  I'm just trying to reconcile this with the "Grade Placement" column on the far right.

Q.  Mm-hmm.

A.   That's correct.

Q.   Okay, thank you.  And going back to your report, at the top of page 17 you have:  "Achievement testing conducted in grade school produced the following scores," and I believe these are all once he moved to Minnesota.  Would you agree with that?

A.   Well, I'm sorry, I'm looking at the bottom line. It says:  "Moved out of town January 30, 1963."  I'm looking at the bottom line on Exhibit 88.

Q.   Okay.  Do you remember --

A.   Oh, I see.  I apologize, ma'am.  Above that it says:  "Left 4-17-62."

Q.   Right.  He would sort of leave before the school year was over because migrating to do the farming was critical to the family.

A.   Yeah.

Q.   All right.  So you've got the month and the year, the grade, the test he took, and the grade equivalent. And in May of '62 when he was in the first grade his grade equivalent was 1.7, and at that point he was already two years older than the average first grader, right?

A.   Correct.

Q.   So even though he was two years older than the average first grader, he was still in grade one and his

grade equivalent was 1.7.  In April of '63 when he was in grade two and would have been two years older than the average second grader, his grade equivalent was a 2.1.  In 1963 when he was in grade three, grade equivalent 2.3.  In 1964 when he was in the fourth grade, his grade equivalent was 3.3.  1965 when he was in the fifth grade, grade equivalent 4.1.  And in 1966 when he was in the sixth grade, again he would have been the same chronological age as eighth graders but he was scoring a grade equivalent of 4.8; is that correct?

A.  That's correct.

Q.  And then you write right after that in your report:  "Note that his best scores were obtained during the years in which he was reportedly least proficient in English."  Is that what you have here?

A.  That's correct.

Q.  So it's fair to say then that his problems in school were not necessarily due to language difficulties.

A.  That's correct.

Q.  Okay.  And on page 29 of your report you go through the various test scores he got on the Kuhlmann-Anderson test, which we talked about being a group administered test.

A.  Correct.

Q.   And much like we saw with his grade equivalency testing, here we have in grade one he got a 77, in grade two he got an 80, in grade three he got a 79, and in grade five he got a 74.

So again there was no correlation with his English improving and his test scores improving.  In fact, he got the lowest test score when he would have been most proficient in English, correct?

A.   That's correct.

Q.   So the same observation can be made then that the difficulties he's having on the testing are not necessarily attributable or entirely attributable to difficulties with the English language.

A.   Correct.

Q.   Okay.  And I do want to talk for a second about group administered test scores.

A.   Sure.

Q.   And you read from -- I don't remember.  It may have been the manual.  You read from an authority source about group administered test scores and how they're not to be used diagnostically for IQ -- for diagnosing ID or something along those lines.  Am I getting it right?

A.   That's correct.

Q.   Okay.  I'd like to refer you back to Defense Exhibit 80, which was the article by Dr. Welner.  And if

you can turn to that first section we went to under "Intelligence Testing," which is on page 640.

A. Yes, ma'am.

Q. Okay. I'm going to read under the "Intelligence Testing" section in the second paragraph and I'm going to start with the second sentence, which is "Group administered achievement tests..."

Do you see where I am?

A. Yes.

Q. All right. "Group administered achievement tests, such as those administered in scholastic settings, inform assessments of intelligence but are not given the scientific weight of individually standardized measures. Group administered tests, which also include employment entrance examinations to civil service and the military, may add very useful data when testing results are ambiguous or contradict the functional presentation across domains."

Is that what Dr. Welner wrote there?

A. It is.

Q. Thank you. All right. You briefly mentioned the Shipley test yesterday, and that was in regards to Government Exhibit 616, which was a psychological report from the Minnesota Security Hospital.

THE CLERK: (Handing exhibit to the

witness.)

Q.   All right.  And if I may draw your attention to page 2.  And I believe this is dated January 29, 1975, and I believe Mr. Reisenauer had asked you about that line entry that says:  "Academic IQ Estimate 85."

A.   Yes.

Q.   And you opined that that was probably taken from the Shipley Institute of Living test.

A.   I did.

Q.   And that was your -- that was your guess because it's not totally clear from this document, would you agree?

A.   That's correct.

Q.   Okay.  And would you agree with me that the Shipley Institute of Living test -- that the publisher of that test described the test as, quote, ideal when you need to obtain quick ability estimates, screen for cognitive dysfunction, or qualify participants for research study?

A.   I don't recall that from the manual but it makes sense.

Q.   Okay.  It's a screening test.

A.   That's correct.

Q.   All right.  And screening tests, like group administered tests, according to the DSM-5 are not to be

used to give diagnostic value to determine if someone is intellectually disabled.

A.   That's correct.

Q.   Okay.  I want to talk a bit about adaptive behavior.  So obviously if you have contemporaneous documentation of developmental years that would be ideal, right?

A.   That's correct, yes.

Q.   It can be very hard in a case like this for everybody when you have someone who is in his 50s when he's accused of the crime.  Here we are today when he's in his mid 60s and we're all trying to figure out what he was like when he was a kid.  Is that fair?

A.   That's very fair.

Q.   Okay.  And we have his school records and we have his IQ testing, but otherwise would you agree with me that for everybody there's not much of a contemporaneous documentation of his behavior aside from what I mentioned with the school records and the IQ testing?

A.   That's correct.

Q.   And so everybody has to kind of do their best to try to figure out what witnesses and who is out there who can give us insight into this.

A.   That's correct.

Q.   All right.  You brought up a lot of adaptive

behavior yesterday and you brought up adaptive behavior from your interview with Mr. Rodriguez, things that you observed and were able to comment on, from folks at the prison commenting on things he had achieved while he was at the prison.

But is it fair to say that all of the adaptive behavior that you discussed yesterday was after Mr. Rodriguez was 18 years old?

A.   That's correct.

Q.   Okay.   And what you showed us were a lot of adaptive strengths that he has, right?

A.   Correct.

Q.   Okay.   Now I'd like to draw your attention back to Exhibit D-46, which is the green book or the "Intellectual Disability Definition, Classification, and Systems of Supports."

A.   Yes.

Q.   And on page 47 you'll see at the top there it says:   "Assessment of Adaptive Behavior."   And then there's a section that's the third section on that page that says:   "Use Knowledgeable Respondents."   And I'm going to read starting on the second sentence. "Generally, individuals who act as respondents should be very familiar with the person and have known him/her for some time and have had the opportunity to observe the

person function across community settings and times. Very often, these respondents are parents, older siblings, other family members, teachers, employers, and friends.  Parents are often the best respondents available because they have known the individual the longest and observed attainment of developmental milestones, maturation, and the achievement of adaptive behavioral skills."

Did I read that correctly?

A.   You did.

Q.   Okay.  And I'd next like to bring your attention to Exhibit D-85, which was the copy of what's known as the gray book.  It was that AAIDD book that's -- I believe it's called intellectual disabilities in death penalty -- or "The Death Penalty and Intellectual Disability."  It's Defendant's Exhibit 85.

THE CLERK:   (Handing exhibit to the witness.)

Q.   All right.  If you would turn to page 193.  Okay. You see there's the section "Retrospective Use of Standardized Adaptive Behavior Scales in Atkins cases"?

A.   Yes.

Q.   Okay.  "Retrospective Use of Standardized Adaptive Behavior Scales in Atkins cases" and I'm going to read the first two paragraphs there:  "The assessment

of AB..."  can we assume that means "adaptive behavior"?

A.   Yes, ma'am.

Q.   All right.  "The assessment of adaptive behavior in *Atkins* cases focuses on behavior in children [sic] through the time of the crime and is, thus, inherently retrospective.  The examiner must draw information from as many sources as possible and give each source its appropriate weight, using clinical judgment to arrive at a diagnostic conclusion.  Among the most common and potentially most valuable sources are interviews with family members and others who have known the individual well in varied community settings.  Multiple informants who have known the individual at different ages before the pertinent crime can provide consensual validity regarding adaptive functioning.

"The importance of clinical judgment is especially great in *Atkins* evaluations, because the various sources of adaptive behavior information are subject to many kinds of bias.  For instance, interviewing several informants who have known the defendant as different times can be helpful in judging the potential bias of any particular source.  Parents are the most common source for interviews and the administration of adaptive behavior scales, but they may also be biased in providing information that could

contribute to the death penalty for their son or daughter.  Bias may also influence their reporting in a different way.  That is, they may exaggerate accomplishments or deny impaired functioning in order to avoid the stigma of disability.  If the information that they provide is congruent with information from other sources, the validity of their information is strengthened."

Did I read that correctly?

A.   Yes.

Q.   Thank you.

A.   A very minor point, you said "children" instead of "childhood."

Q.   Oh, thank you. All right.  And I'd like to point you to another exhibit that I'm going to introduce.

A.   Ma'am, you gave me two -- maybe it doesn't make any difference.  Yeah, I think you gave me two copies.

Q.   That's entirely possible.  All right.

Dr. Seward, this is an article called "Adaptive Behavior Assessment and the Diagnosis of Mental Retardation in Capital Cases" written by Marc Tasse.  And I believe you're familiar with Marc Tasse.  We had spoken about him a couple weeks ago.

A.   Yes, I am.

Q.   All right.  Have you actually read this article?

A.   I don't recall.

Q.   I was only asking because I know you had mentioned him and some of the concepts we talked about are covered in this article.  All right.  But allow me to move on.

You'd agree with me that Marc Tasse is one of the preeminent experts in intellectual disability?

A.   Correct.  He's on this -- he's on the board of this.

Q.   Of AAIDD?

A.   Yes.

Q.   And if you would turn to page 119.

A.   Yes, ma'am.

Q.   Okay.  And I'd like to draw your attention to the bottom section in the first column that says: "Correctional Officers as Respondents."  And I'm going to read from there.  "Correctional officers and other prison personnel should probably never be sought as respondents to provide information regarding the adaptive behavior of an individual that they've observed in a prison setting.  The only extreme circumstance where one might consider interviewing a member of the prison personnel regarding an inmate's adaptive behavior would be if there is absolutely no one alive who can provide any information regarding the individual's

functioning prior to incarceration.  The main hesitation to involving prison personnel as respondents is related to the nature and contingencies of the prison setting. The prison setting is an artificial environment that offers limited opportunities for many activities and behaviors defining adaptive behavior."

Did I read that correctly?

A.  Yes, you did.

Q.  Thank you.

THE COURT:  Do you intend to offer 89?

MS. FISHER:  Thank you, Your Honor.  I do. I would like to offer Defendant's Exhibit 89 into evidence.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Eighty-nine is received.

Q.  (Ms. Fisher continuing)  All right.  And we talked a little bit yesterday and some of the reading that I've brought out today talks about the potential of bias in reporters, even family reporters.  And the bias has to do with it being a death penalty case, and you'd agree with me that the potential for that is that if a loved one doesn't want to see their family -- their family member get executed they may, with knowledge or without knowledge, be exaggerating or not reliably

relating certain symptoms; is that true?

A.   Yes, ma'am.

Q.   Okay.  And you would agree with me that at the time of Mr. Rodriguez's trial his trial counsel, they were not arguing that he was intellectually disabled.

A.   Correct.  That's my recollection, yes.

Q.   Okay.  In fact, I believe one of your source materials was the original petition which is arguing that his original trial counsel were ineffective for not arguing that he was intellectually disabled.  But that certainly wasn't something that the jury had to decide.  It wasn't a defense that the defense put up.  It wasn't something where there was a hearing like this.  It wasn't part of their defense, correct?

A.   Correct.

Q.   Okay.  And I know this seems really obvious but just to connect the dots, we're here today as a post-conviction action.  So the trial took place many years before what we're doing today, which is trying to establish what we're doing today, which is trying to establish that Mr. Rodriguez is intellectually disabled.

A.   That's my understanding.

Q.   Okay.  All right.  Dr. Seward, what I'm showing you is testimony from the original trial from Ileana Noyes, who is Mr. Rodriguez's sister, and I'd like to

direct your attention to line 14.

Question:  "You told us here earlier that you are seven years younger than Alfonso."

Answer:  "That's correct."

Question:  "He was your older brother by seven years.  Over the years that you've known him and interacted with him, have you had a relationship with him as an older brother/younger sister or has it been something different?"

Answer:  "Guess it should have been that, but for some reason I've always -- when I look at my brother Tito, I don't see an adult man.  I see -- I see him like he was like a young, young teen or just entering his teens.  I don't see him as a man -- like an adult man.  I see him someone like a 13-year-old, 13, 14, right in that age group.  And so I always felt like I needed to protect him and do whatever I could for him."

Did I read that correctly?

A.  Yes, you did.

THE COURT:  Do you move the admission of 90?

MS. FISHER:  Thank you, Your Honor.  I'd like to move Exhibit D-90 into evidence.

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  Ninety is received.

Q.   (Ms. Fisher continuing)  And I'd also like to refer you to what was formerly marked as Exhibit D-15. It's a "State Parole and Probation Report."

A.   Ma'am, do I have that here?

Q.   No, we'll provide it for you, thank you.  By "we" I mean the Court will kindly provide it for you.

THE CLERK:   (Handing exhibit to the witness.)

THE WITNESS:   Thank you.

Q.   All right.  Are you ready?

A.   I am.

Q.   Okay.  You'd agree with me that this is a State Parole and Probation report and it's dated February 24, 1975?

A.   Yes, ma'am.

Q.   And obviously that's many years before Mr. Rodriguez was ever arrested for this crime.

A.   Correct.

Q.   Okay.  And if you turn to page 3 under "FAMILY HISTORY" above the section that says "Siblings" is a paragraph that starts:  "Defendant's parents..."  And I'm going to read from the second sentence.  "Both the parents agree that defendant was not a disciplinary problem and that he was very quiet and reserved during his childhood, oftentimes accepting the blame for things

he was not involved with.  According to the parents, as a child defendant did experience prejudice and stated he could not understand why he was not liked."

Did I read that correctly?

A.  Yes, ma'am.

Q.  Okay.  All right.  You testified on direct yesterday that the ABAS-3 I believe you read, may have been from the User's Guide, some source of authority that stated that it was not to be -- supposed to be used retroactively.  It's really supposed to be used -- it's an adaptive behavior scale that's supposed to be used with people who know someone contemporaneously; is that correct?

A.  You know, I don't recall.  That is correct.  That characterization is correct.

Q.  Okay.  I remember you testifying to this --

A.  I'm sorry.

Q.  I will credit you for testifying to that that the ABAS was not an appropriate tool to be used retroactively.

A.  Yes.

Q.  And you would agree with me that the ABAS is an adaptive behavior scale?

A.  Yes, it is.

Q.  I want to direct your attention back to Exhibit

D-85, which is "The Death Penalty and Intellectual Disability," the gray book.

A.   Yes, ma'am.

Q.   And if you could turn back to page 193.

A.   Yes.

Q.   The bottom paragraph under "Retrospective Use of Standardized Adaptive Behavior Scales in *Atkins* cases," I'm going read that last paragraph.  "Given the fact that adaptive behavior assessment for adults in the criminal justice system is likely to necessitate having a retrospective component, examiners can complement the administration of an adaptive behavior scale in which the informant is asked to rate the individual's behavior at a specific time before the crime with interviews that also focus on the relevant areas of adaptive functioning."

          Did I get that correct?

A.   Yes, you did.

Q.   Okay.  All right.  Dr. Seward, in your report and in your testimony yesterday, and you don't have to turn to a specific page, you were talking about prong two under the definition of "intellectual disability" and the sort of adaptive deficits that one needs to find. And you ultimately made a conclusion, both in your report and in your testimony, that Mr. Rodriguez is not

intellectually disabled, not just because of prong one having to do with the IQ testing but because he also didn't meet the prong for -- the prong two for ID having to do with adaptive behavior deficits; is that correct?

A.   That's correct.

Q.   And in deciding that Mr. Rodriguez does not meet the standards for intellectual disability and does not have deficits in adaptive functioning, you mentioned several things that led you to that conclusion.  And I'm going to just go through them and if I -- if I'm wrong just tell me I'm wrong.

You relied on the fact that he was well-behaved and could control his impulses and manage his emotions while he was in prison.

A.   Yes.

Q.   You relied on the fact that Mr. Rodriguez worked in the print shop in prison and received very positive reviews and was able to hold down that job for a long period of time.

A.   Yes.

Q.   You relied on the fact that Mr. Rodriguez was able to get a driver's license and drive his car.  I believe -- if I may, I believe that Mr. Reisenauer actually had you read a section about him getting his driver's license and how they make it in the print shop.

And you had commented on how that led to your conclusion that he was not intellectually disabled.

A.   Yes.

Q.   The fact that Mr. Rodriguez was referred to as having leadership qualities when he was at the Minnesota Security Hospital.

A.   Yes.

Q.   The fact that Mr. Rodriguez could have a conversation with you about current events or books that he was reading and he could respond to your questions coherently, rationally and on point.

A.   Yes.

Q.   And the fact that he took classes at Minnesota Security Hospital and his teachers gave him positive reviews about how he was doing in the classes and that he seemed to be advancing in the classes.

A.   That's correct.

Q.   Okay.  I'd like to sort of go through some of these in a little more depth.  Oh, I left one out, the fact that Mr. Rodriguez was a voracious reader.

A.   Yes.

Q.   Okay.  Let's go through them one -- let's go through some of them in a little more depth.  And I want to start with the conclusion that he was well-behaved in prison and I'm going to refer you back to the User's

Guide, which is Defense Exhibit 47, the User's Guide to the green book.  And I'd like you to turn to page 20.

A.  Yes, ma'am.

Q.  All right.  Okay.  If you look at box 11 on this table -- and just to be clear the table starts on page 19, Table 3.3, "Guidelines for Synthesizing Obtained Information" and there are 12 boxes.

And is it true that box 11 reads:  "Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior.  The diagnosis of intellectual disability is based on meeting three criteria: significant limitations in intellectual functioning; significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills; and age if onset prior to age 18.  The diagnosis of ID is not based on the person's 'street smarts,' behavior in jail or prison, or 'criminal adaptive functioning.'"

Did I read that correctly?

A.  Yes, you did.

Q.  Okay.  And I would like to talk about the conclusion that you agreed with that one of the reasons you determined he was not intellectually disabled were those classes, those high school equivalency classes he took at Minnesota Security Hospital where he was getting

really positive reviews from the folks who were going to the prisons teaching that.

I'd like to refer to Exhibit G -- I'm sorry, G-626, which was introduced by the government yesterday, and it's a page of transcript from your interview with Mr. Rodriguez.

THE CLERK:  (Handing exhibit to the witness.)

Q.  You ready?

A.  Yes, ma'am.

Q.  I'm actually going to have you read much of the same portion that you read yesterday.  I'm going to start about two-thirds of the way down the page and -- actually I'll just start halfway down the page with "Dr. Seward:  It seems like you were doing really poorly in school, from what you were saying.

"Mr. Rodriguez:  Well it isn't that I was doing poorly.  If I pushed myself I could've done it but I didn't care.

"Dr. Seward:  Okay.

"Mr. Rodriguez:  I didn't wanna deal with kids and in this school you were one-on-one.

"Dr. Seward:  Oh at the St. Peter's place?

"Mr. Rodriguez:  Yeah, yeah.

"Dr. Seward:  Okay so did you have trouble

with the academics there at St. Peter's?

"Mr. Rodriguez:  No, no, like I said if I put myself out there I could do it.

"Dr. Seward:  But I mean you would've had a lot of catching up to do.

"Mr. Rodriguez:  Yeah, well I had five years to do it."

Did I read that correctly?

A.   Yes, ma'am.

Q.   Dr. Seward, turning to page 17 of your report.

A.   Got it.

Q.   All right.  About the bottom quarter of the page the paragraph that starts with "Mr. Rodriguez reports..."  "Mr. Rodriguez reports graduating from St. Peter's High School in 1979, while a resident at MSH. In contrast to his previous academic experience, Mr. Rodriguez stated that he was motivated to do well and that he benefited from 'one-on-one' instruction.  He does not recall his GPA.

"Though no transcript or diploma was made available, progress notes from Minnesota Security Hospital document his performance in classes."

Is that an accurate reading of what you wrote there?

A.   It is.

Q.   Okay.   And I'd like to show you what was previously marked as Exhibit D-14 and it's a Classification Summary.

THE CLERK:   (Handing exhibit to the witness.)

Q.   All right.   Would you agree with me that the date on this document is 9/8/1980?

A.   Yes, ma'am.

Q.   And this would be when Mr. Rodriguez was switching from the Minnesota Security Hospital to the maximum security prison because he had been convicted of the new crime and his parole was revoked and all of that?

A.   Yes.

Q.   And you see that there's achievement level scores and they have that WRAT test?

A.   Yes.

Q.   And on his reading his grade equivalent level was a 6.7 and his math equivalent level was a 4.3.

A.   Yes.   And the reading is word pronunciation.

Q.   All right.   And this was after -- that reading and math scores was after he had taken all of those classes and gotten close to graduating high school or graduated high school or close to his GED or whatever happened there.

A.   That's correct.

Q.   Okay.  All right.  You testified yesterday in detail about Mr. Rodriguez's experience working in the print shop at the prison.

A.   Yes.

Q.   And we learned the interesting fact that you yourself used to work at a print shop.  And at that print shop Mr. Rodriguez was supervised by someone named Gordon Stoltz, correct?

A.   Correct.

Q.   And there's I think a good two or three pages in your report where you talk about all of the positive things that Gordon Stoltz said about Mr. Rodriguez and how able he was to perform the many tasks over the years of working at the print shop; is that correct?

A.   That's correct.

Q.   I'd like to bring to your attention Defense Exhibit 21.  It's the general assessment questionnaire.

THE CLERK:   (Handing exhibit to the witness.)

Q.   All right.  Are you looking at this document?

A.   I am.

Q.   Okay.  This is a general assessment questionnaire and you can see at the time Mr. Rodriguez was 50.  And this is a document that was provided by the FBI to

various acquaintances, people who knew Mr. Rodriguez, just to have them all fill out the same sort of general assessment. And this general assessment questionnaire is filled out by Gordy Stoltz, the production supervisor from Minncor Printing; is that correct?

A.  That's correct.

Q.  All right.  I'd like to turn your attention to -- let's start with question 27.  A lot of these are blank, you'd agree with me?  I'm not just trying to skip a ton.

A.  That's correct.

Q.  And question 27:  "How is the subject's physical health and well-being?"  Mr. Stoltz wrote:  "Out of shape."

Question 29 -- he didn't answer question 28. Question 29:  "Describe the subject's usual eating habits."  He wrote:  "Junk food."

Question 30:  "What is the subject's attitude about his/her health and level of fitness?"  He wrote:  "He thought he was in great shape and strong."

Question 33:  "How does subject relate to co-workers?"  Answer:  "Loner.  He liked to work alone."

Question 34:  "How does subject relate to superiors?"  Answer:  "He wanted to be acknowledged."

He didn't answer 35.  Question 36:  "What personal/professional impact would the subject

experience if he/she were to lose his/her job?"  And he wrote:  "I terminated his employment with Minncor.  He had a tough time with it."

On question 45 it says -- and he skipped everything up until 45.  Question 45:  "How does the subject relax?"  And Mr. Stoltz wrote:  "Eat junk food and watch TV."

Moving on he doesn't answer anything on the next page or the next page.  Next question he answers is question 63:  "What makes the subject angry?"  And Mr. Stoltz wrote:  "Being corrected makes him mad.  He always wants to be right."

"How is that anger displayed?  Goes off by himself."

Sixty-four:  "What event seemed so shake the subject's self-confidence?"  Answer:  "When he is corrected."

Question 74:  "Is the subject viewed by others as someone who can be trusted?"  And he wrote: "The other offenders thought he was rich with lots of money."

And then turning to the sort of open section where the person filling this out can write without the limits of the question, Gordon Stoltz wrote -- under the question "OTHER INFORMATION WHICH WOULD HELP IN

UNDERSTANDING THE SUBJECT'S PERSONALITY," he wrote:  "He is lazy.  He does not put a lot of energy or creativity in any of his work.  While in prison he told other offenders that his grandmother was rich and left him a ranch in Texas.  He always said he was making more interest from her money than most people make for wages. I never seen him exercise.  He was out of shape."

And then "Please provide a narrative description of this individual's personality."  He said: "My name is Gordy Stoltz.  I have supervised the subject since March of 1993.  He thinks he is better than he really is.  He is very lazy.  He liked food.  I terminated him for scanning a picture of LeAnn Rhimes on his computer about 18 months before his release.  He never put much effort into any of his work.  He wanted other offenders to think he was great."

Is that what Gordon Stoltz wrote in this general assessment?

A.  Yes, it is.

Q.  Thank you.

THE COURT:  We'll go ahead and we'll break at this point for 20 minutes.  So we will start again at quarter to 11:00.

(Recess taken; 10:30 a.m. to 10:50 a.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States versus Alfonso Rodriguez. It's File No. 2:04-cr-55.  The record should reflect that all counsel of record are present.

When we broke Ms. Fisher was conducting a cross-examination of Dr. Seward.  You may proceed.

MS. FISHER:  Thank you, Your Honor.

Q.  (Ms. Fisher continuing)  Dr. Seward, I was in the process of breaking down some of those -- or elaborating on some of the conclusions that you -- some of the facts that you based your conclusion that Mr. Rodriguez is not ID and does not have adaptive deficits and one of them that we mentioned is that he's a voracious reader.

A.  Yes, ma'am.

Q.  All right.  So you've done an interview.  You've read Dr. Pitt's interview, Dr. Welner's interview, all of their reports.  Are you aware of this sort of controversy over did he read 500 books?  Did he read 900 books?  I think some of it was mentioned yesterday.

A.  Yes.

Q.  And the idea of it is at some point he self-reported that he had read either 900 books or 500 books, and there's been sort of a back and forth about whether he really did or if that's possible or if it's an exaggeration and we've all sort of given our two

cents on it.

Does that sound accurate?

A. It does.

Q. Okay. And I think -- and you actually concluded that it's plausible, it's plausible that he did this. And I believe that Dr. Welner referred to this in his report also because he's been incarcerated for over 10 years, for really 20-plus years. So the idea that someone who really likes reading and is sitting around in a cell all day it's not really that crazy to think that over the course of 20 years or so he may have read 500 books. Is that accurate?

A. Yes.

Q. Okay. So I thought it would be helpful to get to the source of that statement, and I'm going mark this as Exhibit D-91.

All right. Dr. Seward, what I'm showing you is a transcript of Dr. Pitt's interview that he did and it was recorded much like yours was with Mr. Rodriguez on August 4, 2006 and I'm going to read to you from the top.

It says: "SP" which is I believe Steven Pitt?

A. Yes.

Q. And "AR" of course is Alfonso Rodriguez.

So Dr. Pitt says:  "How many books would you say you've read over the past two years?"

Mr. Rodriguez says:  "Wow, uhm, I've got a list right now.  About 900."

Dr. Pitt says:  "Really?"

Mr. Rodriguez says:  "But not all in two years.  I'm...all the books I could remember reading.  You know, it's about 900.  But I've read...since I've been in the County Jail I've probably read about 500 maybe."

All right.  So you'd agree with me this is the source of that 500/900 controversy?

A.  Yes.

Q.  Or it appears that way?

A.  Yes, it appears that way.

Q.  Fair enough.  And what he says there is that he's read 500 books since he's been in the county jail and you'd agree with me the county jail is where he was when he was awaiting trial for the murder of Ms. Sjodin; is that correct?

A.  Yes.

Q.  Because before that he was in a maximum security prison and he was at the Minnesota Security Hospital.  But the county jail is where he's waiting and certainly it's in context with this article -- I'm sorry, with

this interview of when he was awaiting trial.  And he was arrested for the murder on December 1st of 2003?

A.  Yes.

Q.  And this interview took place on August 4th of 2006?

A.  Correct.

Q.  So that's approximately 32 months?

A.  Yes.

Q.  So if Mr. Rodriguez read 500 books in 32 months, that would be about 15.625 books a month.  You are welcome to do the math.  You can trust my math.

A.  I will trust your math.

Q.  Okay.  So that would mean completing an entire book every two days for 32 months in a row, correct?

A.  Correct.

Q.  Okay.  Now in your interview with Mr. Rodriguez, he talked about the types of books he liked to read, right?

A.  Yes.

Q.  And you actually checked out some of the plots or your staff checked out some of the plots to see if he was being accurate, right?

A.  That's correct.

Q.  And he talked a lot about the sort of categories of books he likes, right?  He likes the war books, spy

books, historical, historical fiction, things like that. Does that sound accurate?

A.   Yes, it does.

Q.   Okay.  And he specifically actually mentioned The Kent Chronicles.  Do you remember that?

A.   I do.

Q.   And that was one of the books -- because he told you the plot and that's one of the books that you went back and did your homework and made sure that he was accurately reporting the plot of that book.

A.   Correct.

Q.   And indeed you found he was correct.

A.   Yes.

Q.   Okay.  Which would be a way to show that he read that book.

A.   Correct.

Q.   And you had -- you had mentioned -- actually let me go back.  The Kent Chronicles, he actually elaborated, it's a series.  He seems to like series of books: The Bastard, The Rebel.  The Bastard, The Rebels sort of go in that -- I think you listed them in his interview with you.

Does that sound right?

A.   It does.

Q.   Okay.  And did you actually know that The Kent

Chronicles were made into made-for-TV movies in the mid '70s?

A.  You know, I think I might have commented on that to him.

Q.  Yeah.  And I thought it would be helpful because we're talking about these books in the abstract to --

Oh, actually before I go on, Your Honor, I would like to offer D-91 into evidence.

MR. REISENAUER:  No objection.

THE COURT:  D-91 is received.

Q.  (Ms. Fisher continuing)  I thought it would be helpful to just get a sense of sort of what one of these books look like as we are talking about them.

All right.  I'm showing you what I've marked as D-92 (indicating).  This is a picture of a paperback copy of "The Kent Family Chronicles, Volume II, The Rebels" by John Jakes, correct?

A.  Yes.

Q.  And all of -- you had mentioned some books to Mr. Rodriguez to see if he read those and you were sort of trying to follow his genre appreciation and you asked him if he read any John McCarry and he said no.  You asked him if he read Watership Down.  He said no.  You asked him if he read Game of Thrones.  He said no.  He hadn't read any of those books or authors but he did

mention tons of others along the lines of this Kent Family Chronicle type books.  Sometimes they took place in England.  Sometimes they took place in the wild west, stuff like that.

And would you agree with me that really most of these books are basically mass market paperbacks?

A.   This one certainly is.

Q.   Okay.  And as far as the difficulty level goes, mass market paperbacks are roughly the same reading level as young adult books.  The main difference being that young adult books have cleaner language and fewer sexual situations?

A.   That's my impression, yes.

Q.   Okay, thank you.  All right.  I'd like to talk a little bit more about the Minnesota Security Hospital and before I do I just want to generally address the concept of how intellectual disability is different than having mental health problems.

So you are the expert.  Definitely correct me if this isn't a fair generalization.  But is it fair to say that one of the main differences between a number of mental health problems, like being bipolar or being schizophrenic or having depression, is that those things can be treated?  They may not be successfully treated and they can't all be treated, but that you can attempt

to treat a lot of mental health problems with either medication or therapy or a combination of both.  And it may be short-term, it may be long-term.  But there's often a treatment component with a mental health problem.

Whereas, with intellectual disability while supports are needed to get through the world it's not like if you give a person a pill they won't be intellectually disabled anymore or if you just get them through 40 sessions of counseling you'll get rid of that whole intellectual disability.

They're really different types of illnesses; is that fair?

A.  That's fair.

Q.  And we already talked earlier when I was going over your CV that another distinction I want to make is that being intellectually disabled is different than being incompetent.  If you're incompetent, you know this better than anyone, you did this work, that you probably can't stand trial because you're not competent to stand trial; is that correct?

A.  (No response.)

Q.  There may be limits to that.  I'm grossly generalizing.

A.  Could you maybe restate that?

Q.   Sure.   Why don't I back it up and break it into two parts.

A.   Sure.

Q.   Being intellectually disabled is different than being incompetent.

A.   Incompetent to stand trial?

Q.   Yeah.

A.   Yes.

Q.   That's a better way to put it.

A.   On intellectually a person may be incompetent to stand trial because they're intellectually disabled.

Q.   But not all people who are intellectually disabled are incompetent, correct?

A.   Correct, yes.

Q.   Okay.   You could be intellectually disabled and still spend the rest of your life in prison if you're convicted of a crime.

A.   Right.

Q.   Assuming you are competent to stand trial.

A.   You could be intellectually disabled and competent to stand trial.

Q.   Okay.   All right.   So I want to move to the -- to Minnesota Security Hospital and I'm going to introduce this as (no further response).

All right.   Mr. Rodriguez was sentenced to

go to the Minnesota Security Hospital after he was convicted of attempted rape, I believe two of them, correct?  An attempted rape and a rape?

A.  Correct.

Q.  And those are I think by anyone's standards very serious crimes, right?

A.  Absolutely.

Q.  So the Minnesota Security Hospital, it's not like going to an outpatient clinic for treatment.  It's still a very secure environment with controls that any prison might have in terms of safety for the community, but they're going to focus on treatment and trying to address various problems that the individual may have.

Is that a fair assessment?

A.  It makes sense.

MS. FISHER:  Okay, okay.  And I'd like to show you an exhibit that I'm marking as D-93 (indicating).

Your Honor, if I may, I believe I neglected to offer D-92 into evidence.  I'd like to do that now.

THE COURT:  Any objection?

MR. REISENAUER:  (No response.)

THE COURT:  That's the cover of the book.

MR. REISENAUER:  It's what, Your Honor?

THE COURT:  D-92 was never offered.  That's

the cover of the book.

MR. REISENAUER:  No objection to that, Your Honor.

THE COURT:  Ninety-two is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Ms. Fisher continuing)  All right.  So we were talking about what the Minnesota Security Hospital is, and this is something to be perfectly candid that I printed off recently about the Minnesota Security Hospital.  This isn't from 1975 to 1980.  And I just wanted to really get a sense of something from them that sort of captured what we've been talking about.

So this printout that says "St. Peter Minnesota Security Hospital" and it has a heading called "THE STORY," the first sentence says:  "The Minnesota Security Hospital is the only secure facility in the state designed to provide assessment and treatment of individuals with severe mental health disorders who are also considered dangerous."

And that's sort of what we've been talking about and certainly would fit the description of what they were also doing in 1975?

A.  That would be an assumption.  I mean, I can't -- I would say -- let me back up.  I would say it makes sense.

Q.   Okay.  All right.  And I'm basing that on the fact that Mr. Rodriguez had been convicted of rape and attempted rape.

A.   Sure.

Q.   And was sent there and, in fact, when he was sent there he was sent there to get sex offender treatment and was -- he was -- it was stipulated that he must attend the intensive treatment program for sexual assault because he was there for the treatment of being a sex offender, correct?

A.   That's correct.

Q.   And although they did various testing, including the Shipley test, there was no WAIS or Stanford-Binet issued to Mr. Rodriguez while he was at the Minnesota Security Hospital; is that correct?

A.   That's correct.

Q.   And I just wanted to read you some entries.

MR. REISENAUER:  Did she offer D-93, Your Honor?

MS. FISHER:  Thank you.  I would offer D-93 into evidence.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Ninety-three is received.

Q.   (Ms. Fisher continuing)  And, Doctor, you're

aware that -- did you work at a hospital similar to this?

A.   Oh, yeah, a couple.

Q.   So you're aware that they -- they write a lot of progress notes.  Everything is very well documented.

A.   Sure.

Q.   Social workers, psychologists, psychiatrists, whoever sees him pretty much documents what's going on.

A.   That's correct.

Q.   In fact, there were approximately 600 pages of documents from the Minnesota Security Hospital just for the five years that Mr. Rodriguez was there.

A.   I'll take your word for that.

Q.   Okay.  So I would like to go over some of the entries that the staff at the Minnesota Security Hospital made while Mr. Rodriguez was there.  And this is D-94 and I'll be more specific in a moment.

All right.  The date of that top entry is 2/27/76.  I'm going to do my best reading this handwriting.  It looks like it's from a J. Rodriguez, social worker, and I'm going to read sort of the last paragraph above the "7/76" entry.  "In the meantime Al continues work in project 20, groups, RAP activities, etc.  Some hesitancy is noted in his commitment to parts of the program he says he does not understand.  In group

he can be vocal and make a lot [sic] -- alive [sic] observations, however, he tends more toward passivity."

A.   If I may?

Q.   Yeah.

A.   I believe that word is "valid."

Q.   "Valid," thank you.   "In group he can be vocal and make valid observations, however, he tends...toward passivity."

Did I read that correctly?

A.   "He tends more toward passivity."

Q.   Thank you, thank you.   With that correction, is that what it says?

A.   Yes.

MS. FISHER:   And, Your Honor, I'd like to offer D-94 into evidence.

MR. REISENAUER:   No objection.

THE COURT:   D-94 is received.

Q.   (Ms. Fisher continuing)   And this next one is dated -- I'm looking at this note sort of right in the middle of the page.   It's dated April 11, 1976.   It's signed by Tom O'Shea.   It's a "B-1 monthly group summary" and it says:   "Al's participation in groups has been minimal.   His written assignments are poor but this is due partly to his poor writing ability.   Even so, his caring exercises do not show much depth."

Is that what that says?

A.  Yes.

MS. FISHER:  All right.  And I'd like to offer D-95 into evidence.

MR. REISENAUER:  No objection.

THE COURT:  Ninety-five is received.

Q.  (Ms. Fisher continuing)  All right.  This entry is the B-1 team.  Looks like a note that was entered -- I'm looking right in the middle of the page there in the typed portion entered on 7/8/76 by Dr. Sheppard and reading about halfway through that entry:  "Mr. Rodriguez was interviewed by the Team.  He said that he does hold back thoughts and feelings in group if he feels other group members are ganging up on a particular resident.  He said he would rather express his feelings to that resident on an individual basis.  He indicated that it was a possibility that he didn't want to risk friendships through confrontation and was at times prone to covering up for others by admitting to things he didn't do."

Did I read that correctly?

A.  Yes.

THE COURT:  Offer D-96?

MS. FISHER:  Yes, thank you, Your Honor.  I do.

MR. REISENAUER:  No objection.

THE COURT:  Ninety-six is received.

Q.   (Ms. Fisher continuing)  The next exhibit I'd like to show you has been previously marked as Defense Exhibit 17.

THE CLERK:  (Handing exhibit to the witness.)

Q.   And this is a Psychological Report from the Minnesota Security Hospital.  All right.  And this is dated December 1, 1976, and if you turn to the last page, which is page 4, this was submitted by really two psychologists and a medical director, Ms. Pengelly, Dr. Beltt and Dr. Sheppard and I direct your attention to the last page.

I'm going to start with the second sentence: "He seems to have serious difficulty in thinking and communication, be overly suspicious of other people, and have poor impulse control."

And then moving down about halfway down that paragraph a little further it starts with:  "In a controlled environment..."

A.   Yes.

Q.   "In a controlled environment, such as this Hospital, Mr. Rodriguez may appear to be quite well organized and able to control his behavior; however,

without significant controls at this time there is a good possibility that he would resume his old behavior patterns."

Did I read that correctly?

A.   Well, my copy is cut off on the right side.

Q.   Oh, I do apologize.

May I approach, Your Honor?

THE COURT:  You may.  That's the original that's filed with the Court so if it's cut off on the right side it's cut off on the right side.  So you could substitute a better copy if you wish.

MS. FISHER:  All right.

THE COURT:  Maybe we should take a look at it.  Is yours cut off, Keith?

MR. REISENAUER:  Yes, it is.

MS. FISHER:  I have two copies that are not cut off in addition to mine.  May I substitute it now?

THE COURT:  Yes.

MS. FISHER:  So this is D-17 (indicating).

THE COURT:  Just give us one that you haven't written on unless you wrote on a sticker.

MS. FISHER:  I just wrote the number.  I'm sorry.

THE COURT:  Okay.

MS. FISHER:  And I'll give this one to the

witness.

THE COURT:  No, we'll give him the original.

THE CLERK:  (Handing exhibit to the witness.)

MS. FISHER:  All right.  I do apologize.

MR. REISENAUER:  It's 17, correct?

MS. FISHER:  Yes, Defense Exhibit 17.

Q.  (Ms. Fisher continuing)  So was it the second part I read or the first part or both that were cut off?

A.  The entire right margin --

THE COURT:  The entire right margin on page 4 is cut off.

MS. FISHER:  All right.  Let me start over.

Q.  (Ms. Fisher continuing)  I'm reading on page 4. This is dated December 1, 1976.  It's the last paragraph.  I'm going to read the second sentence:  "He seems to have serious difficulty in thinking and communication, be overly suspicious of other people, and have poor impulse control."

Did I read that correctly?

A.  You know, I really apologize.  Okay, I'm sorry. Yes, you did.

Q.  Okay.  And then moving down?

A.  Yes.

Q.  About a little over halfway through that

paragraph:  "In a controlled environment..."

A.   Yes, ma'am.

Q.   All right.  "In a controlled environment, such as this Hospital, Mr. Rodriguez may...be quite well organized and able to control his behavior; however, without significant controls at this time there is a good possibility that he would resume his old behavior patterns."

Is that correct?

A.   You left out -- I think you left out "appear." "Mr. Rodriguez may appear to be quite well organized."

Q.   Thank you.  That's correct.  With that correction, is that what it says?

A.   That is correct.

Q.   Thank you, Doctor.

And that was previously marked, correct?

THE COURT:  Yeah, it's previously been marked and received and I'll receive the substitute 17 at this point.

MS. FISHER:  Thank you, Your Honor.

Q.   (Ms. Fisher continuing)  All right.  What I've marked as D-97, it says:  "RESIDENT:  Alphonso Rodriguez."  The date is 2/14/77 and this is by Judy Rodning, a social worker.  And I'm going to read the last sentence of that second paragraph:  "In many

instances the way Al handles or perceives situations seems to indicate that, although he has gained new information and insight about himself he has not internalized much and his values remain pretty much the same."

Is that correct?

A.  That's correct.

THE COURT:  Is that offered?

MS. FISHER:  Yes, Your Honor, I'd like to offer Exhibit D-97 into evidence.

MR. REISENAUER:  No objection.

THE COURT:  Ninety-seven is received.

MS. FISHER:  I'm going to hand out 98 and 99 together.  They're the last two of these.  Actually I'm just going to do D-98.  The next one has been previously marked.

Q.  (Ms. Fisher continuing)  All right.  This entry from the Minnesota Security Hospital is dated 9/21/78. It's by Richard K. Seely who's that -- the sex offender treatment program director and there are three paragraphs on this page.  I'd like to read from the entry about midway through the second paragraph starting with "Mr. Rodriguez reported..."

A.  Yes.

Q.  Okay.  "Mr. Rodriguez reported having difficulty

thinking about others' opinion of him when he re-enters society.  He stated, 'I'm having a problem with facing society.'  He apparently has heard about a supportive group which helps Spanish people re-entering society after release from an institution.  He believes he can make contact with this group through MSH.  He discussed his release plan stating, 'I'm having trouble with my release plan.'  Apparently he believes projected long range planning is too difficult to detail."

Is that correct?

A.  Yes.

Q.  And the last Minnesota State Hospital record I'd like to show you was previously marked as -- oh, Your Honor, I would like to move Exhibit D-98 into evidence.

MR. REISENAUER:  No objection.

THE COURT:  Ninety-eight is received.

Q.  (Ms. Fisher continuing)  The last Minnesota Security Hospital record I'd like to show you was previously marked as Defense Exhibit 19.

THE CLERK:  (Handing exhibit to the witness.)

Q.  All right.  I'm going to read that entry that's dated 4/16/80.  It's someone's handwriting and very difficult to read so you've been great at letting me know if I have read something incorrectly.  Please do

not hesitate to do that now.

All right.  This is by a Mr. Clancy, social worker, at the bottom.  And I'm going to read the first part to you.  "Al Rodriguez was contacted on 4-15-80 and 4-16-80 by telephone relative to his adjustment on community pass.  Mr. Rodriguez reports constant fear of his vulnerability in the community.  He is not socializing and he's apparently isolating himself in his parents home.  He states he only feels safe and comfortable at Minnesota Security Hospital and desires to return early from pass.  His parents have encouraged him to remain in the community for several more days.  Mr. Rodriguez is presenting reluctant to pursue his release plan wanting to return full time to MSH until he's able to deal with his fears."

Is that a fair reading of that?

A.  Correct.  Although that last clause there's no "his."

Q.  Thank you.  Actually as I finished I realized I added a "his" so thank you.

All right.  Moving on to the Minnesota State Security Hospital records, I just wanted to address a couple of the exhibits that the government introduced yesterday.  And I'd like to start with Government Exhibit 632B, which is the transcript of the video that

was shown when Mr. Rodriguez was detailing the routes he took going to Laredo and back and around the Crookston area.

THE CLERK:  (Handing exhibit to the witness.)

Q.  All right.  So first just generally I wanted to ask you -- and I actually think this came up when you were talking to Mr. Rodriguez.  The route he was showing you, the roads he took when he traveled from Minnesota to Laredo, you would agree with me that as a child growing up that was a route he took all the time with his family because they were migrant farmers and so they went back and forth between Crookston and Laredo at least twice a year.

A.  Correct.  I don't know if he would have taken that specific route each time.

Q.  That's fair, that's fair.  Between the two cities that's a trip he would make, and we know that he traveled by car, not by airplane or train or anything like that.

A.  Correct.

Q.  Okay.  And I'd like to bring your attention to page 7, line 24.

A.  Got it.

Q.  "Dr. Seward:  How did you pay for gas?

"Mr. Rodriguez:  Huh?

"Dr. Seward:  That's a fairly big car, a Mercury Sable.  How did you pay for gas?

"Mr. Rodriguez:  My mom's credit card.

"Dr. Seward:  Oh, okay.  And she'd put the money on it?

"Mr. Rodriguez:  Well, a lot of the stuff I was doing for her, it would be cheaper paying for the gas than paying somebody else to do it."

And did you interpret that to mean then that he used his mom's credit card to pay for gas and his mother put the money on the credit card?

A.  Yes.

Q.  All right.  The next is Government Exhibit 630. This is a page from your interview with Mr. Rodriguez.

THE CLERK:  (Handing exhibit to the witness.)

Q.  All right.  And this was the page that you read about how -- you were talking about driving a modern car because he had just gotten out of prison and how all of the sort of bells and whistles were different on a modern car.  And he said that he had to read the book and certainly implied, if not directly told you, that he could figure out how to work the car because he read the manual.

A.  Yes.

Q.  And the only reason -- the only source of information that he learned that from reading the manual is his self-reporting, correct?

A.  That's correct.

Q.  We have no idea if his -- you know that his sister bought him that car, right?  He mentioned that earlier in the interview?

A.  I don't recall that but it seems reasonable.

Q.  All right.  And we have no way of knowing if his sister who bought him the car taught him to drive the car versus him teaching himself as he self-reported from the manual; is that fair?

A.  That's correct.

Q.  And finally Government Exhibit 634, this is another page of your interview with Mr. Rodriguez.

THE CLERK:  (Handing exhibit to the witness.)

Q.  And this is the portion Mr. Reisenauer had you read about when he was at the Minnesota Security Hospital and it was probably the Residents Assistance Program then and he talked about -- I'll just read it, the first two -- this is really all we need.

"Dr. Seward:  So how did that work?  You would just sign out of the secure hospital?"

And Mr. Rodriguez said: "Yeah, I would sign out and I'd pick up all the money that the other guys - what they wanted and I'd either go buy groceries - I had a little wagon that I had and I'd fill out the orders, you know? They wanted to buy groceries so I'd fill it out and I'd get 'em all ready and then I'd go back to town and I'd stop by the A&W or the Hardee's or Kentucky Fried Chicken or pizza and buy the pizzas that the guys wanted. A lotta times they would just call and ask. The only place that didn't deliver was A&W and Hardee's. The other, the pizza place delivered, so."

And then "Dr. Seward: So would you - how long could you be gone for?"

And "Mr. Rodriguez: I could be gone up to three hours."

Now this again is when he was at -- it's a treatment facility but it's still a secure facility for someone who's been convicted of rape and attempted rape, correct?

A. That's correct.

Q. And we certainly have documentation that he was in this Residents Assistance Program, which did give him some additional privileges that other people didn't have, right?

A. That's correct.

Q.   But as far as having the license to be gone for hours buying fast food for all the inmates, the only source of information we have for that would be Mr. Rodriguez's self-reporting, correct?

A.   Regarding fast food, correct.

Q.   All right.  Thank you.  All right.  I'd like to move on to a different topic and I'd like to bring your attention back to Exhibit D-85, "The Death Penalty and Intellectual Disability," the AAIDD, what's known as the gray book.

A.   Sorry, Your Honor, for fumbling here.  Yes, found it.

Q.   All right.  And if you could turn to page 265, it's the last page in this little photocopy.

A.   Yes, ma'am.

Q.   And have you heard of the Cloak of Competence when it comes to intellectual disability?

A.   Yes, by Edgerton.

Q.   And I'm going to read from this book about the Cloak of Competence and let me know if this is your understanding as well of what the Cloak of Competence is.  All right.  And I'm going to start from the first full paragraph on the top of that page.

         "Research has identified certain defensive characteristics of people with ID in which they minimize

symptoms (associated with ID) that may confound accuracy in a retrospective diagnostic process.  The stigma associated with being labeled with ID leads many people to attempt to hide their condition, to minimize and underreport symptoms so as to appear higher functioning and to otherwise seek to appear more competent at a task than they may actually be.  This characteristic of some people with ID makes an accurate diagnosis more difficult, tending to systematically under identify those with ID.  This feature has been termed the 'Cloak of Competence,' in which a person who truly has ID may sometimes be successful at appearing to have average functioning (sometimes referred to as 'masking'), answering questions as if the person understands the question or has some information about the topic to appear better functioning and avoid the stigma of low cognitive ability.

"The Cloak of Competence ruse can make attorneys, judges, and juries believe that the defendant cannot be intellectually impaired because, as one psychiatrist in a Florida case testified, 'He doesn't look retarded...He has that 'spark of intelligence' in his eyes.  Such behavior, even in the face of serious consequences, speaks to the power of the self-stigma and the fear of being publically labeled as a person with

ID."

And is that your basic understanding of the Cloak of Competence?

A.  That's mischaracterizing Edgerton's findings.

Q.  All right.  Would you agree that I read from the manual correctly?

A.  You did.

Q.  Okay.  And I'd like to point you to a few interactions from your interview with Mr. Rodriguez. All right.  I'm going to read from this page that's from your interview with Mr. Rodriguez and starting at the very top.

"Dr. Seward:  Why did you hate to go to school?

"Mr. Rodriguez:  Because there was always a fight between me and the kids.

"Dr. Seward:  I see.

"Mr. Rodriguez:  Yeah, sometimes there would be three ganging up on me all the time.

"Dr. Seward:  Because you were Mexican?

"Mr. Rodriguez:  Yeah, and I was always fighting all the time and sometimes I'd win but the majority of the time I would lose, you know, and I got tired of getting beat up.

"Dr. Seward:  If it was one-on-one were you

pretty good?

"Mr. Rodriguez:  Yeah, if it was one-on-one I was pretty good, not all the time but at least it was fair and if it was fair I didn't have nothing to bitch about, you know, and a lotta the time that happened, you know?  I wasn't that good of a fighter, you know, and because a lot of the guys that were my age were a lot bigger than me.  I was a lot shorter than them and so they were a little stronger than me, too, and so by then I had to go through all that all the time or embarrassments because I talked funny, so.

"Dr. Seward:  You talked - you mean talked --

"Mr. Rodriguez:  Well I had an accent.

"Dr. Seward:  I see, okay.

"Mr. Rodriguez:  And I spoke English but I spoke it so broken up that the girls would laugh and I couldn't do nothing about that and - but and then the guys would laugh and then we'd get into a big brawl and stuff.  Every day at recess I was always in a fight, you know, with somebody and not only my own grade but like when I was in the fourth grade I would be getting into fights with people from high school."

All right.  This information that he was getting in fights every day and three-on-one and when he

was in the fourth grade he was fighting with people from high school, that's all his own self-reporting, correct?

A.   That's correct.

Q.   And would you agree with me that it seems likely that he's probably exaggerating there?

A.   To an extent, yes.

MS. FISHER:   Okay.   And I'd like to offer this exhibit into evidence.

MR. REISENAUER:   No objection.

THE COURT:   Ninety-nine is received.

Q.   (Ms. Fisher continuing)   All right.   D-100 is another page of your interview with Mr. Rodriguez and I'm going to read from the top.

"Dr. Seward:   Okay now for this, when you were doing this RAP thing, so you weren't getting paid but would you get any kind of - I don't know - benefit out of it or --

"Mr. Rodriguez:   I was free.

"Dr. Seward:   Oh, I see so you got to go --

"Mr. Rodriguez:   I could go into town any time I wanted.

"Dr. Seward:   Huh?

"Mr. Rodriguez:   I could go into town anytime I wanted."

And would you agree with me that it seems

unlikely that even though he was part of this RAP program, an inmate at a security facility for violent offenders could actually go into town anytime he wanted?

A.   Seems like he'd have to attend the groups and the treatment.

Q.   So that would be an exaggeration?

A.   Correct.

MS. FISHER:  Thank you.  And I'd like to offer Exhibit D-100 into evidence.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  One hundred is received.

Q.   (Ms. Fisher continuing)  All right.  D-101 is another page from your interview with Mr. Rodriguez and I'm going to read from the top of that page.

"Mr. Rodriguez:  Yeah and we would go on fishing trips.  We would go on - they were real strange. You wouldn't believe it but they would take us out fishing and the staff would buy a 12-pack and we'd sit out there and fish and drink beer all afternoon.

"Dr. Seward:  Huh, that sounds pretty good.

"Mr. Rodriguez:  It's weird.

"Dr. Seward:  And the staff got to do that, too?

"Mr. Rodriguez:  Yeah."

And do you remember the context of this, Dr. Seward?  This was still talking about his job as an RAP at the Minnesota Security Hospital?

A.    Correct.

Q.    All right.  Would you agree with me that it seems a little unlikely that even with his RAP privileges an inmate at a secure facility for violent offenders was taken -- let me also add there was a drug and alcohol treatment component to this program, right?

A.    That's correct.

Q.    He had to attend drug and alcohol treatment.  Or he did attend drug and alcohol treatment; is that correct?

A.    I don't recall that specifically but I do recall the drug and alcohol being mentioned.

Q.    Okay.  So would you agree with me that it seems unlikely that the staff at the Minnesota Security Hospital would take the inmates out fishing, buy them a six pack and sit with them fishing and drinking beer all afternoon?

A.    Especially the drinking beer part.

Q.    All right.  So fair to say that's an exaggeration?

A.    Probably.

MS. FISHER:  And I'd like to offer D-101

into evidence.

MR. REISENAUER:  No objection.

THE COURT:  101 is received.

Q.  (Ms. Fisher continuing)  All right.  And finally I'm showing you another page from the -- your interview with Mr. Rodriguez and again this was talking about the Minnesota Security Hospital and I'm going to start from the middle of the page after that note "Side Conversation."

"Mr. Rodriguez:  Oh.  No, I have never really had very good experiences with therapists, you know?"

"Dr. Seward:  Okay.  Yeah.

"Mr. Rodriguez:  And state hospitals. They're - they - well, look when I was telling you, the state hospital, they - you'd uh - they'd buy you beer.

"Dr. Seward:  Mm-hmm.

"Mr. Rodriguez:  They'd give you wine at lunch - at lunch - at - at - at, uh, at holidays, you know?

"Dr. Seward:  Oh.

"Mr. Rodriguez:  So - and here you are, at treatment, center, for alcoholics and they're giving you booze, you know?  So -

"Dr. Seward:  Yeah.  Yeah.

"Mr. Rodriguez:  It was all a joke to them, you know?"

So based on much like our earlier conversation -- or the last example, seems pretty unlikely that the hospital was serving him wine at lunch and on the holidays, correct?

A.  Correct.

Q.  Okay.  This would also be an exaggeration?

A.  I think it would be more deceit than exaggeration.

Q.  All right.  Fair enough.  Thank you.

THE COURT:  Do you offer 102?

MS. FISHER:  Yes, Your Honor, I do.

THE COURT:  Any objection?

MR. REISENAUER:  No, Your Honor.

THE COURT:  102 is received.

MS. FISHER:  Your Honor, I'm on the very last section just to give you a sense of where we are with timing, and it's not a long section.

THE COURT:  I'm just looking at my watch.

MS. FISHER:  I was going to tell you that before I saw you looking at your watch.

THE COURT:  I just write down the time the exhibit's received so if I need to find when it was offered and received I have it.

MS. FISHER:  It was a total coincidence.  I had intended to tell you that either way.  It was an unfortunate coincidence on my part.  I apologize.

Q.  (Ms. Fisher continuing)  And finally, Dr. Seward, you described in your testimony yesterday and today lots of examples of ways that Mr. Rodriguez has shown a certain understanding of abstract issues and we went through some of those ways that he has adaptive strengths, ways he can carry on a normal conversation.  I think you referred to it sort of like something you might have small talk with someone at the airport and things like that.

And I just wanted to discuss one last concept and I'd like to refer you to Defense Exhibit 47, which is the User's Guide to the intellectual disability book published by the AAIDD.

A.  Got it.

Q.  All right.  And I'd like to read the section "Overcoming Common Stereotypes."

A.  I'm sorry, could you give me a page?

Q.  I'm so sorry, page 25.

A.  Okay.

Q.  And this is at the bottom.  Do you see the section entitled "Overcoming Common Stereotypes"?

A.  I do.

Q.  All right.  "Stereotypes are not unique to persons with ID.  Indeed, most individuals or groups who are perceived as different on some basis are stereotyped based on the perceiver's mental model or image of such persons or groups.  In reference to persons with ID, historical terminology contributes to stereotyping as reflected in such terms as idiot, imbecile, or moron.  Physical appearance can also contribute to stereotypes as reflected in the statement that 'if you don't have the look (as in Down syndrome) then you are not intellectually disabled.  It should be noted that the vast majority of persons with an ID have no dysmorphic feature and generally walk and talk like persons without an ID.

"Regardless of their origin, a number of incorrect stereotypes can interfere with justice.  These incorrect stereotypes must be dispelled."  And I'm going to read those incorrect stereotypes right here.  And I'm going to just ask you as I finish each one to tell me if I read it correctly.

"Persons with ID look and talk differently from persons from the general population."

A.  Correct.

Q.  "Persons with ID are completely incompetent and dangerous."

A.  Correct.

Q.  "Persons with ID cannot do complex tasks."

A.  Correct.

Q.  "Persons with ID cannot get driver's licenses, buy cars, or drive cars."

A.  Correct.

Q.  "Persons with ID do not (and cannot) support their families."

A.  Correct.

Q.  "Persons with ID cannot romantically love or be romantically loved."

A.  Correct.

Q.  "Persons with ID cannot acquire vocational and social skills necessary for independent living."

A.  Correct.

Q.  "Persons with ID are characterized only by limitations and do not have strengths that occur concomitantly with the limitations."

A.  Correct.

Q.  All right.  And right at the end of those incorrect stereotypes is the final section of that -- is the final passage of that section:  "These incorrect stereotypes are unsupported by both professionals in the field and published literature.  Stereotypes are best addressed by understanding the characteristics of

persons with ID and especially those common characteristics of persons with ID with higher IQs that were summarized in Tables 3.1 and 3.2."

A.    Correct.

MS. FISHER:  All right.  Thank you, Dr. Seward.  I have no further questions.

THE WITNESS:  You're welcome.

MS. FISHER:  Oh, Your Honor, I do just have that one exhibit that I didn't have a copy of.  I can do it very quickly.

THE COURT:  You may.

Mr. Reisenauer, how long do you anticipate your redirect to go?

MR. REISENAUER:  It will be a while, Your Honor.

THE COURT:  Why don't we break until 1 o'clock at this point for lunch.

MR. REISENAUER:  Thank you.

THE COURT:  And we'll start with your redirect right when we get back.  Thank you.

MS. FISHER:  Should I do this last thing first right now?

THE COURT:  Yeah.

MS. FISHER:  Okay.  And if I didn't do it I wanted to move D-102 into evidence.

THE COURT:  Any objection to -- I think 102 is received.

MS. FISHER:  It is?  Okay, I'm sorry.

THE COURT:  Oh, I see.  This is -- okay.

MS. FISHER:  This is what I messed up before.

Q.  (Ms. Fisher continuing)  All right.  Dr. Seward, I actually believe that this was one of the items you reviewed in your background packet.  This is a Declaration of Karen Froming and if you look at the last page on page 9 it's dated October 13, 2011?

A.  Correct.

Q.  All right.  And I was bringing this up in the context of the Flynn Effect and applying the Flynn Effect to the various full-scale IQ scores that Mr. Rodriguez has received through different testers.  And I just wanted to bring your attention to paragraph 13 which is on page 5.

A.  Yes.

Q.  And there am I correct that Dr. Froming said:  "I have reviewed my data.  I have also noted some scoring errors that I have now corrected.  These include a transcription error on the Wide Range Achievement Test-3rd Edition for the Arithmetic subtest.  I mistakenly copied the raw score for the Word Recognition

in the Arithmetic section as well.  The following are corrected scores:  Raw Score = 21, Standard Score = 49, percentile rank = 2, and grade equivalent = 2.  This is severely defective performance."

And then paragraph 14:  "On the Wechsler Adult Intelligence Scale-3rd Edition," or WAIS-III, "Mr. Rodriguez scored the following:"  And I'll just bring your attention to, instead of going through all of the scores, the next page on page 6.

The full-scale IQ score, it was "Formerly 87 Standard Score, 19th percentile, rescored 84 Standard Score, 14th percentile;" is that correct?

A.  That's correct.

Q.  All right.  So you'd agree with me in that Dr. Froming is saying that her 87 was incorrect because of a scoring error.  It should have been an 84?

A.  That's correct.

Q.  And would you agree with me that if you apply the Flynn Effect that this was -- she applied the WAIS-III, that when that test was normed that would bring that 84 down to 81.

A.  Although I can't recall when it was normed, the WAIS-III.

Q.  Well, how about this.  Would you agree with me that to apply the Flynn Effect we'd find out when it was

normed and give it a third of a point per year and then deduct that from the 84?

A.   That's correct.

MS. FISHER:  All right.  Thank you very much.  No further questions.

THE COURT:  Do you offer 103?

MS. FISHER:  I do, Your Honor.

MR. REISENAUER:  No objection.

THE COURT:  103 is received.  We'll break till 1:15.

(Recess taken; 11:50 a.m. to 1:15 p.m.)

(In open court, all counsel present.)

THE COURT:  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that the petitioner has waived his appearance.  All of his counsel of record appear.  The respondent appears through their counsel of record.  Ms. Burkland has joined us this afternoon having been not with us in the morning.  Welcome back.

MR. REISENAUER:  She was here most of the morning.

THE COURT:  Oh, she came late.  You weren't here when we went on the record to begin with so that's the reason why I noted.  Sorry.

MS. BURKLAND:  That's okay.

THE COURT:  All these people are glad I'm going to be the finder of fact given my ability to notice things, right?  In any event Mr. Reisenauer is about to commence with a redirect examination of Dr. Seward.

MR. REISENAUER:  Thank you, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. REISENAUER:**

Q.  Dr. Seward, I have a number of questions for you. Let's just start with this.  There was some questions about your CV and your experience in Atkins hearings. Do you recall that discussion?

A.  Yes, I do.

Q.  Okay.  So maybe it's my fault we didn't cover your experience as well as we should have on direct but you testified on direct that in your career you have been involved in a number of competency hearings.  You recall that?

A.  Yes, sir.

Q.  Okay.  And you also testified that I believe you worked at the Arizona State Hospital for a period of time?

A.  Correct.

Q.  And you've been involved in neuropsychology for

how long, sir?

A.   Well, let's see, I completed my post-doctoral fellowship in I believe it was 1991 or 1990.

Q.   Okay.   And how long would you say you've been involved in doing IQ testing?   About the same length of period?

A.   That's correct.

Q.   Any estimate as to how many IQ exams you've given over your career?

A.   Over a thousand.

Q.   Okay.   And other than the testifying that you related to Miss Fisher about in an Atkins hearing, have you been involved in other death penalty cases?

A.   I have.

Q.   Do you have any idea how many?

A.   I'm estimating maybe 70.

Q.   Okay.   And I take it you've testified in a number of those cases at trial?

A.   About 50.

Q.   How many?

A.   I'm sorry, about 50, five zero.

Q.   Okay, thank you.   And in those cases did your involvement entail psychological testing then?

A.   In almost all of them, yes.

Q.   And are there any cases where you testified or

for that matter didn't testify that involved Atkins situations?

A.   Yes.

Q.   Okay.  And in any of them did you find that the individual was either mentally retarded or intellectually disabled?

A.   Yes.

Q.   Okay, thank you.

A.   I'm sorry, were you talking about testimony or --

Q.   That you found.

A.   Right, regardless of whether I testified?

Q.   Yes.

A.   Yes.  That's correct.

Q.   Okay, thank you.  And in this particular case Miss Fisher talked to you briefly about the peer review process with The Forensic Panel; is that right?

A.   That's correct.

Q.   And that occurred in this case; is that right?

A.   That's correct.

Q.   There was some discussion that was had about the WAIS-IV testing and also some discussion about the WAIS-III.  You recall that?

A.   I do.

Q.   Okay.  Doctor, I'll hand you Defendant's Exhibit 81 and 82 (indicating).  Those were the examples of the

WAIS-IV in English and the Mexican version, correct?

A.   That is correct.

Q.   There was some discussion about the use of standardized tests that says that you are supposed to use the test that the individual is most proficient in in terms of language?

A.   That's correct.

Q.   And in this particular case Mr. Rodriguez is most proficient in English; is that correct?

A.   That's correct.

Q.   And that's the test that you gave him, correct?

A.   Correct.

Q.   Other than the Mexican version, we have some testimony that there were adaptations in 20 different languages and 20 different countries?

A.   Something like that, yeah, 20 or so.

Q.   Okay.  Have you ever given a test to somebody in another language that was proficient in English?

A.   No, sir.

Q.   You recall Miss Fisher went through a number of examples in the WAIS-IV in which there were different orders to the questions in the Mexican version as opposed to the English version?

A.   Yes.

Q.   And I believe you testified that the item order

is meaningful if I recall how you said that.

A.   That's correct.

Q.   And can you tell us what you mean by that?  Why is the order meaningful?

A.   On many of these subtests the items are ranked from the easiest to the hardest.  They're ranked in order of difficulty.

Q.   In some of the questions in the Mexican version, they were ordered differently than in the English version, correct?

A.   That's correct.

Q.   And can you explain why that would be?

A.   Oh, I'm just assuming between the different cultures that for whatever reason that rank order would be different.

Q.   Okay.  So that would be what you mean by the item order is meaningful then.

A.   That's correct.  And the reason for that is because any items can be discontinued after three wrong items to avoid frustrating the examinee.

Q.   Okay.  And so if the order is different there is a reason for that, correct?

A.   That's correct.

Q.   And then my recollection is that on the portion of the Mexican version test that was given by

Dr. Weinstein he changed some of the questions as well, correct?

A.   That's correct.

Q.   And the one that I guess we've been talking about is the one about Emiliano Zapata.  Do you recall that?

A.   Correct.

Q.   And so he changed that question to fit the -- basically the American -- or English version of the test and asked who the president was during the Civil War, correct?

A.   That's correct.

Q.   Okay.  And not only is that changing the test but the order of that question isn't exactly where the Zapata question is on the English version; is that right?

A.   Let me double check on that.

Q.   Yeah, if you would.

A.   So that is -- on the Mexican version, that is No. 7.  On the English version, that is No. 11.

Q.   Okay.  So that order is different.

A.   That's correct.

Q.   Why don't you stay on that particular part of the test if you would and on the Mexican version question No. 5 "agua" being water is different in location and order than it is on the English version as well, right?

A.   That's correct.

Q.   Let me ask you this.  In the thousand or so tests you might have given and in your experience and review of other IQ tests, have you -- do you know anyone who has given tests in a language that is not the person's preferred language other than Dr. Weinstein?

A.   I do not.

Q.   Let's -- for argument sake here I guess, there was some discussion with Miss Fisher about the WAIS-III. Do you recall that?

A.   I do.

Q.   Okay.  I'm going to hand you 83 and 84, Doctor (indicating).  Miss Fisher I think read out of an article about the -- the idea that at one time when the WAIS-III was being used that there was apparently an alternate way of scoring using the U.S. norms.  You recall that?

A.   I do.

Q.   Okay.  And do those documents 83 and 84, do they have a copyright on them?

A.   You know, I was just looking for that.  It looks like it might have been cut off at the bottom.

Q.   Okay.

A.   Oh, no, I'm sorry.  I see 1997.

Q.   19 --

A.    1997.

Q.    Okay.

A.    For the English version.

Q.    Okay.

A.    And the same copyright for the Spanish version, 1997.

Q.    Okay, thank you.  And so she read an article to you saying that use of that WAIS-III had the possibility of an alternate norm that you could use, correct?

A.    Correct.

Q.    Okay.  And are you familiar with what was allowed when that alternate method was utilized?

A.    Yes.

Q.    Let's talk about that if we could.  Doctor, I'm going to hand you Government's Exhibit 639.  It has three pages and I would ask you to take a peek at those real quick if you would (indicating).

A.    (Witness examining.)  Yes.

Q.    You've seen this before?

A.    Yes, I have.

Q.    And they do what?  What do they tell us?

A.    Well, so there is a -- and I spoke about this previously but there's a three-step process in scoring a WAIS.  And true both the WAIS-III and WAIS-IV, a three-step process.  You take the raw score.  You

transform it into a scaled score based on the person's age and then those scaled scores are used to produce the full-scale IQ and the various indices.

Q. Okay. And that would be depicted on page 1, correct?

A. That's correct.

Q. And then page 2 and 3 they basically talk about this alternative method we've just been talking about?

A. All right. So as was mentioned there were some normative problems with the WAIS-III, the Mexican version of the WAIS-III. So they offered -- I'm sorry, sir.

MR. REISENAUER: That's okay. Hang on a second. We would offer Government's Exhibit 639, Your Honor.

MS. FISHER: No objection.

THE COURT: 639 is received.

MR. REISENAUER: Thank you, Your Honor.

Q. (Mr. Reisenauer continuing) So let's back up just a bit, Doctor, if we could. So the figure on page 1 is the method you described earlier in your testimony taking the raw scores for each subscale, transforming them into the standardized scores and then into the IQ index scores.

A. That's correct. And Figure 1 is true for both

the WAIS-III and the WAIS-IV.

Q.   Okay, thank you.  So if you turn the page to Figure 2, you just talked about the alternative computation procedure that was allowed in the WAIS-III, correct?

A.   That's correct.

Q.   And if you would walk us through that figure.

A.   Sure.  Well, A and B are the same so you take the raw scores and then you transform them into scaled scores for each subtest.

Q.   Okay.

A.   And in this case for part B you use the Mexican -- the Mexican scaled scores --

Q.   Okay.

A.   -- from the normative tables.

Q.   So you take the raw score, you convert them to the scaled scores in B, and then there was this alternate method of either using the Mexican norms or the U.S. norms.

A.   Correct, and that was optional.

Q.   Okay.

         MS. FISHER:  Your Honor, I apologize, I know I said no objection.  I don't think I have an objection. May I just clarify one thing though about this exhibit?

         THE COURT:  Just hold on.  Do you wish to

ask questions?

MS. FISHER:  No.  Before -- I said no objection to the exhibit but I actually need one piece of information before I know I have no objections.  I'm just not clear if this is something that the government created as a demonstrative exhibit or if this is coming from something.

MR. REISENAUER:  Well, it was created through Dr. Seward.  We received it so it is not from a manual or a book if that's what you're asking.

MS. FISHER:  All right.  Thank you.  No objection.

THE COURT:  Okay.

MR. REISENAUER:  Thank you, Your Honor.

THE COURT:  Just for clarification purposes you prepared this exhibit?

THE WITNESS:  Actually, no, it was prepared by Dr. Suarez.

THE COURT:  Who's Dr. Suarez?

MR. REISENAUER:  You can answer that.

THE WITNESS:  Sure.  Dr. Suarez is one of the peer reviewers on my report, Enrique Suarez.

THE COURT:  And what's his background?

THE WITNESS:  He is a neuropsychologist and he is bilingual, English-Spanish.

THE COURT:  Very good.

MS. FISHER:  And, Your Honor, at this point I would object only because Dr. Suarez isn't here and subject to cross-examination so I can't ask him about this.  I only know what he told Dr. Seward who is now telling us.

So aside from the hearsay and the confrontation clause problems, I would object because I'm not able to cross-examine the person who created the chart and it's being offered I assume for the truth of what's on this chart.

MR. REISENAUER:  If I could, Your Honor --

THE COURT:  You may.

MR. REISENAUER:  -- ask a couple questions?

THE COURT:  You may.

Q.   (Mr. Reisenauer continuing)  Dr. Seward, you are aware of the -- well, you're testifying to the alternative method and you know how this alternative method was utilized or allowed to be utilized; is that correct?

A.   That's correct.

Q.   Okay.  And this demonstrative exhibit you received from Dr. Suarez for the purpose of basically complimenting your testimony.  You just didn't create it.  You are aware of the alternative method.

A.   Well, I became aware of it through consultation with Dr. Suarez.

Q.   Okay.

MS. FISHER:  May I ask a follow-up question, Your Honor?

THE COURT:  Yeah, you may.

MS. FISHER:  So when did Dr. Suarez prepare this for you?

THE WITNESS:  He had prepared this for a previous case is my understanding.

MS. FISHER:  When did you receive this that has the name Dr. Weinstein on it from Dr. Suarez?

THE WITNESS:  You know, I'm not sure.  I'm going to guess sometime in December but I'm not sure.

MS. FISHER:  And when did you give it to Mr. Reisenauer?

THE WITNESS:  I don't recall that either.  I think I gave him the PowerPoint the other day, a couple days ago.

MR. REISENAUER:  Your Honor, I'm going to object.  What difference does that make when I received it?  I could have received it at noon for that matter. It doesn't really matter.  This expert can testify about his knowledge of the alternative method and that's all he's doing.  This is a demonstrative exhibit.

MS. FISHER:  Well, my issue, Your Honor, is Dr. Seward has said he doesn't have any knowledge of this.  He's learned all of his information from Dr. Suarez, who's not available to be cross-examined.

MR. REISENAUER:  Well, Your Honor, he learned the information.  It doesn't matter if he learned it from an article or a manual or another expert.  He has knowledge of it.

THE COURT:  The objection's overruled.  You may testify.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Okay.  Doctor, we have gone through Figure 2 and if you move to Figure 3 this is basically depicting how Dr. Weinstein calculated the IQ scores frankly in this particular case, correct?

A.  That's correct.

Q.  Okay.  And here what he has done is he's taken the raw scores and then in the -- what you have depicted here as letter B, he transforms the raw scores to subscale scores in the U.S. norming tables, correct?

A.  That's correct.

Q.  And that is not allowed based upon the alternative method that that actually was allowed back in the WAIS-III days.

A.  That's correct.  And the reason is that -- one of

the reasons anyway is that it totally separates it from the normative sample.

Q.   Okay.  So as you noted this particular test has a copyright of 1997.

A.   Yes, sir.

Q.   When did the WAIS-IV come out?

A.   2008.

Q.   2008, okay.  And this use of the alternative method that you have set forth in Figure 2, is that allowed in the WAIS-IV?

A.   It's not mentioned.

Q.   Okay.  And do you have any knowledge of this being allowed in the WAIS-IV at all?

A.   I do not.

Q.   Now in the test that Dr. Weinstein actually gave he -- he utilized the method that is set forth in Figure 3; is that right?

A.   That's correct.

Q.   Okay.  And there is no alternative method allowed but he used this method in Figure 3.  Have you had a chance to score this utilizing the method he actually used?  He would be a 74 under his method, correct?

A.   Correct.

Q.   He's an 89 using the Mexican norms, correct?

A.   I would have to check that.  Hold on, please.

1380

Q. It would be page 101.

A. Yes, sir, 89.

Q. Okay. All right. Have you had a chance to -- if the alternative method in Figure 2 was allowed and you used the U.S. norms, have you had a chance to score the WAIS-IV test that Dr. Weinstein gave Mr. Rodriguez?

A. I have.

Q. And what was his full IQ if you used the alternative method that was actually allowed 10 years ago?

A. The same, 89.

Q. Still 89?

A. Yes.

Q. Okay, thank you. There was some discussion, Doctor, and I'll touch on this briefly, about the Flynn Effect. Do you recall that?

A. Yes.

Q. And Miss Fisher asked you some questions and read out of I think the manual or some type of study about the Flynn Effect. As a matter of fact, I think it was written by Dr. Flynn himself. You recall that?

A. I do.

Q. You're aware of the controversy with the use of the Flynn Effect?

A. Yes, I am.

Q.    And are you aware of case law that addresses that controversy?

A.    I am, although I'm unable to cite the names of the cases.

Q.    I'm not going to ask you.

A.    Okay.

Q.    You're safe that way.  Doctor, first I'm going to hand you Government's Exhibit 640 (indicating).  This is an article out of the Journal of Psychoeducational Assessment.  Do you see that up on the right-hand side?

A.    I do.

MR. REISENAUER:  We would offer Exhibit 640, Your Honor.

MS. FISHER:  No objection.

THE COURT:  640 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.    (Mr. Reisenauer continuing)  Doctor, this is an article titled "IQ Scores Should Not Be Adjusted for the Flynn Effect in Capital Punishment Cases."  Do you see that?

A.    Yes.

Q.    Are you aware -- and just a second.  I'm also going to hand you Defendant's Exhibit 89 (indicating).  This is another article about the use of the Flynn Effect in capital cases.  Do you see that?

A.   Yes.

Q.   I take it these aren't the only two articles that you're aware of regarding the controversy that the Flynn Effect has caused.

A.   That is correct.

Q.   And even if we use the Flynn Effect on the WAIS-IV test result that you had, your results were that Mr. Rodriguez scored an 86.  I believe you testified that the Flynn Effect would lower it to 84?

A.   I thought it was four points.

Q.   Okay.

A.   No, I'm sorry, you're absolutely right.  It was 2.1.

Q.   Yeah, 2.1.

A.   Correct.

Q.   So down to about 84.

A.   Correct.

Q.   That has a -- is it deviation?  Is that the right word here?  I lost my word, a range.

A.   A confidence interval.

Q.   So there's an upper range and a lower range, right?

A.   Correct.

Q.   So it could be as high as maybe 88, 89, 90?

A.   Correct.  Yeah, the confidence interval is

symmetric so it's -- that's just a fancy way of saying it goes both directions.

Q.   Yeah, okay.  Thank you.  Miss Fisher read out of another journal article I believe indicating that you probably shouldn't take into account what corrections officers have to say.  Do you recall that when we started talking about adaptive behavior?

A.   I do.

Q.   But it also says that you should take into account friends and teachers and neighbors and employers and other individuals that know the defendant, correct?

A.   Correct.

Q.   And that was taken into account in your analysis?

A.   That's correct.

Q.   Doctor, I'm going to hand you what's been marked as Government's Exhibit 641 (indicating).  This is an FBI interview of Gordon Stoltz Jr.  Do you see that?

A.   Yes, sir.

MR. REISENAUER:  We would offer 641, Your Honor.

MS. FISHER:  No objection.

THE COURT:  641 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  Doctor, take a look at this report.  It's seven pages long.  Do you see

that?

A.  Yes, sir.

Q.  Mr. Stoltz is the prison industry manager at Moose Lake.  Do you see that?

A.  Correct.

Q.  Okay.  This particular report entails Mr. Stoltz talking about Mr. Rodriguez's work in the prison industry print shop; is that correct?

A.  Yes, sir.

Q.  Okay.  And it basically entails his description of Mr. Rodriguez's tasks in the print shop; is that right?

A.  Yes, sir.

Q.  Okay.  And he gives him a good review.  As a matter of fact, if you turn to page 4 towards the bottom of the page there's a paragraph that starts:  "This also required that Rodriguez utilize a Vanguard 9000 Engraving Machine manual."  You see that?

A.  Yes.

Q.  "The manual is complete with detailed and complicated instructions for utilizing the engraving machine and producing signs."  Do you see that?

A.  Yes, sir.

Q.  And then the next paragraph says:  "Stoltz opined that Rodriguez was a good worker and showed up every day

and on time for his job."  You see that?

A.   Yes.

Q.   The next paragraph though does say that "Rodriguez was a braggart regarding his financial status and his manhood," correct?

A.   Yes, sir.

Q.   Okay.  So he talked about his work and that he did good work but that he was kind of a bragger, right?

A.   Correct.

Q.   Okay.  Are you aware that at the time of trial that during the mitigation phase there was evidence produced about Mr. Rodriguez's proficiency in the print shop?  As a matter of fact, one of the signs he made was introduced as evidence.

A.   Yes.

Q.   Now, Doctor, you worked in the Arizona State Hospital for quite some time you testified earlier.

A.   Actually I was only there for maybe seven, eight or nine months.

Q.   Okay.  But you have been involved in the treatment of individuals throughout your career?

A.   My focus has been more in assessment than treatment.

Q.   Okay.  Would it be correct that individuals have good days and bad days no matter who you are, whether

it's me or the judge or Miss Fisher?

A.   Well, I can't speak for you folks but I do.

Q.   Okay.  And so there are a lot of records from the Minnesota State Hospital in this case?

A.   Yes, sir.

Q.   And some of those records reflect on different occasions, different days, that Mr. Rodriguez was mentioned and was involved in certain activities, treatment with his psychiatrist or social workers but other activities as well, correct?

A.   Correct.

Q.   And some of the documents reflect on the fact that Mr. Rodriguez was not participating on certain days in treatment and was participating on certain days in treatment; is that correct?

A.   That's correct.

Q.   And some of the reflections indicate that maybe he was depressed on certain occasions, correct?

A.   Correct.

Q.   And some days indicate that, in fact, he was -- he was doing well; is that right?

A.   Correct.

Q.   Okay.  Could you find D-17, Doctor, if you would.

A.   Here we go.  I'm sorry, could you tell me what that is, please?

Q.   It's a report -- a psychological report from the Minnesota Security Hospital.  You find it?

A.   Let's see, 21.  Seventeen, yes, sir.

Q.   Okay.  Miss Fisher used this exhibit in her cross and it contains I think four pages; is that correct?

A.   That's correct.

Q.   Just go to the first page here if you would, the second full paragraph.  The second sentence says: "Apparently his family was in the migrant stream but settled out of it and relocated to Crookston."

A.   Yes, sir.

Q.   It says:  "He dropped out of school when he was in the 10th grade and school reports indicate that he did barely passing work but was not a behavioral problem."  See that?

A.   Yes.

Q.   And then it says:  "Part of his difficulty in school appeared to be related to his lack of proficiency in the English language."  Do you see that?

A.   Yes, I do.

Q.   And so will you agree, Doctor, that in numerous Minnesota Security Hospital records there are mentions of school and mentions of his life and how he did prior to entering into the Minnesota Security Hospital?

A.   Yes.

Q. And then as the records reflect and as this one does, because this is written by Psychologist Lyn Pengelly and Bruce Beltt, who's another psychologist, that his various problems, whether it be anxiety or depression, are related in the reports; is that right?

A. That's correct.

Q. If you turn to the last page there where it is signed by the two psychologists, the last paragraph, first sentence reads: "At the present time Mr. Rodriguez appears to be suffering from an alcoholic personality disorder with some paranoid, schizoid, and anti-social tendencies." Do you see that?

A. Yes.

Q. In all of the records from the Minnesota Security Hospital that you reviewed, there's no mention of Mr. Rodriguez being mentally retarded; is that correct?

A. That's correct.

Q. In all of the records that you reviewed that were sent by you, is there anywhere that it is mentioned that Mr. Rodriguez is mentally retarded?

A. There is not.

Q. There was some questioning about Mr. Rodriguez exaggerating in certain instances and circumstances. You recall those questions?

A. I do.

Q.   We all exaggerate at times, don't we?

A.   I would be exaggerating if I said I never exaggerated.

Q.   Okay.  And some of the things, such as Mr. Rodriguez's involvement in the murder of Dru Sjodin, he initially lied about; is that correct?

A.   Correct.

Q.   And he, as well as everybody else in the world, has the ability to lie; is that right?

A.   Correct.

Q.   And so when you were having a conversation with him about -- well, let me back up a second.  When he was at the Minnesota Security Hospital, he was involved in this RAP program.  You recall that?

A.   Yes.

Q.   And Miss Fisher presented a document about the Minnesota Security Hospital and alluded to the fact that it is a security hospital and it's for individuals that need treatment; is that right?

A.   Yes.

Q.   Okay.  But they did have a RAP program that Mr. Rodriguez was involved in.  You do know that, right?

A.   Yes, I do.

Q.   And as part of that program he was able on occasion to leave the hospital; is that correct?

A.  That's correct.

Q.  Okay.  As a matter of fact, he got a job at Kato Engineering while he was at the Minnesota Security Hospital.  You recall that?

A.  I do.

Q.  Okay.  And the fact that he was able to be part of the RAP program that provides us some insight as to frankly how he was doing there and the fact that the people there probably trusted him; is that right?

A.  That's correct.

Q.  Okay.  On the other hand he told you that he was able to get beer or wine on occasion, and I think one of the exhibits that was presented to you, if you can find D-102?

A.  Got it.

Q.  D-102 is one of the conversations you had with him about him being able to get beer or being provided alcohol or booze.  Do you recall that?

A.  Yes.

Q.  Okay.  And as a matter of fact he said on holidays they'd provide them with alcohol.  You see that?

A.  I do.

Q.  And then the last line he says:  "It was all a joke to them, you know?"

A.  Yes.

Q.  Do you see that?  Okay.  So as Miss Fisher asked you we don't know if that's true or not, correct?

A.  Correct.

Q.  He might be lying about that, correct?

A.  Correct.

Q.  And a lie isn't necessarily an exaggeration; is that right?

A.  That is correct.

Q.  And maybe Mr. Rodriguez was trying to tell you that the Minnesota Security Hospital personnel frankly didn't care, as he noted there, about the people that were there and did provide alcohol or wine.  We don't know that.

A.  That's correct.

Q.  But maybe he was lying and just trying to throw them under the bus so to speak.

A.  Possible.

MR. REISENAUER:  That's all I have, Your Honor.  Thank you.

MS. FISHER:  Nothing else, Your Honor.

THE COURT:  I have just one question.

THE WITNESS:  Yes, sir.

THE COURT:  At one point you testified that a statement was a mischaracterization of Edgerton's

findings.  How so?

THE WITNESS:  Well, what Edgerton did, they did a long-term follow-up of some people that were released from a facility and they were able to locate 48 people.  Of those 48 people, eight of them had IQs of 80 or above so would not fall into what was then the mentally retarded range.  Two of them had IQs of 77.

And what was most -- and they asked these folks what was most important to them, and what was most important to them was not avoiding stigma or passing but was maintaining a good quality of life.

THE COURT:  Okay.  Anything as a result of my questions, Mr. Reisenauer?

MR. REISENAUER:  No, Your Honor.  Thank you.

THE COURT:  Miss Fisher?

MS. FISHER:  No, thank you, Your Honor.

THE COURT:  Thank you.

THE WITNESS:  You're welcome, sir.

THE COURT:  You may step down.

THE WITNESS:  Thank you, sir.

THE COURT:  United States will call their next witness.

MR. REISENAUER:  Thank you, Your Honor.  Could we approach for one minute, Your Honor?

THE COURT:  You may.

(Off the record.)

THE COURT:  We'll take a 15-minute break at this point.

(Recess taken; 2:00 p.m. to 2:15 p.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that all counsel of record appear.  When we broke Mr. Reisenauer was about to call his next witness.

MR. REISENAUER:  Thank you, Your Honor.  We would call Dr. Michael Welner.

THE COURT:  Dr. Welner, if you please would come forward, raise your right hand and take the oath.

THE CLERK:  Please state your name and spell your name.

MR. WELNER:  My name is Michael W-e-l-n-e-r, M.D.

(Witness sworn.)

THE COURT:  Mr. Reisenauer.

MR. REISENAUER:  Thank you, Your Honor.

**MICHAEL WELNER,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. REISENAUER:**

Q.   Dr. Welner, let's just begin this way.  Your last name is spelled W-e-l-n-e-r; is that correct?

A.   Yes.

Q.   And, Doctor, I'm going to ask you a few questions about your qualifications if we could first.  What is your occupation, sir?

A.   I'm a psychiatrist and forensic psychiatrist.

Q.   And you reside in New York City; is that correct?

A.   I do.

Q.   And let's, if we could, beyond just being a psychiatrist you practice in forensic psychiatry, correct?

A.   I do.

Q.   And are you board certified?

A.   I am board certified in forensic psychiatry and recertified.

Q.   Okay.

A.   Board certification in forensic psychiatry is effective for 10 years and I originally certified in 1996 and recertified in 2006 and then recertified again in 2017.

Q.   Okay.  So from what you just told us I assume that you have to be recertified about every 10 years; is that right?

A.   You do in forensic psychiatry.  The different subscale -- I've been board certified in a few subspecialities, but in forensic psychiatry the regulations are different and based on how quickly the field is perceived to change.  There's a lot to keep up on, and in 10 years the nature of the questions and the subject matter may be quite different from what you've been expected to be on top of 10 years earlier.

Q.   Okay.  That makes sense.  So would you be board certified in psychiatry as opposed to forensic psychiatry or both?

A.   I'm board certified in psychiatry.  I'm board certified in forensic psychiatry and recertified.  I'm board certified in psychopharmacology and recertified, but the psychopharmacology certification is no longer offered so when it is I'll let you know.  And I'm certified in disaster medicine.  So those are the four areas that I've been certified in.

Q.   Okay.  So help me out here.  What is "psychopharmacology"?

A.   "Psychopharmacology" is the assessment and treatment of different psychiatric disorders specifically oriented toward how to treat them with medication or other physical kinds of treatments, whether they be light therapy or magnetotherapy, that

sort of thing.

Q.   Okay.  We've heard some testimony from Dr. Seward that he is part of what you call The Forensic Panel, and I believe he told us that you are the -- the right words, correct, the chairman of that?

A.   Yes, sir.

Q.   And can you just tell us what that is?

A.   Yes.  The Forensic Panel is a multi-specialty consultation practice that is based in New York but consults on different specialities within our domain: psychiatry, psychology, pathology, toxicology, and several areas of medicine.  And that's where our specialists derive from.  It is a practice that employs prospective peer review in many, if not most, of our evaluations, some of which are what we have here but some of which have nothing to do with psychiatry.

Q.   Okay.  So you mentioned peer review and we've had a little discussion with Dr. Seward about that.  Can you just explain that a little more to us?

A.   Prospective peer review, as The Forensic Panel practices it, builds in a goal of oversight over the course of the evaluation so that a primary examiner is held accountable to peer reviewers for objectivity, requisite diligence and adherence to standards of the field.  Those are the three objectives of peer review.

The primary examiner has the opinion but is accountable to the oversight and input and critique up to the point that the report is issued of those peer reviewers.

Q.   Okay.  So let's just, for example, take Dr. Seward.  And in this particular case he indicated to us that when he did his report that there were peer reviewers so they would -- they would basically -- and this is my dumbed-down version of what you're telling us I think and that is they check his work and make sure that there is some consensus about what he arrived at.

A.   Almost but not quite actually.  Over the course of the evaluation, the structure has built in the oversight such that at an earlier point before Dr. Seward would sit down and conduct an examination he would have to consult a peer reviewer saying:  Here's the history.  These are tests that I'm thinking of offering.  What kinds of tests do you think that I should give?  Do you have an alternative idea or do you have some concerns about whether for this particular examinee maybe another test should be something that we're considering?  Are there things that I should be exploring in my interview that impact the testing goals? Are there things that I should be looking at diagnostically, or just pertaining to whatever number of issues that Dr. Seward may have been working on when he

came in.

So the peer reviewers are very much involved at a point right before the primary examiner sits down and meets with someone in order to marshal all of that brain power.  It's meant actually to replicate what goes on in the hospital where we were trained.  You train in a teaching hospital.  You have primary responsibilities.  But you go down the hall after you see a patient, you'll talk to your attending or you'll talk to a colleague and a colleague will tell you in a way that's very interactive:  Hey, you know, make sure you look at this.  Get this test.  And have you thought of this or that?

And then they would reconvene, when the report is written in draft form by Dr. Seward for critical oversight, and a peer reviewer might say:  Well, you can't say that.  You don't have enough evidence.  Or have you considered this article because it might give you a little bit more information in order that -- it's Dr. Seward's opinion but it's got to conform with standards of the field.

It's not up to the peer reviewers to have an opinion because they didn't do the evaluation.  They haven't read the records.  But they're there to discipline the process, to make sure that the science that he's representing is the science that we're all

practicing with the methods that we all practice because we're all different but there's a certain consistency that binds us as professionals.

Q.    And so beyond Dr. Seward I take it that this process of peer review goes on with each one of the individuals that is part of The Forensic Panel, including yourself.

A.    Sure.   Dr. Seward's role in this case was different from my own, and his peer reviewers had expertise that was complimentary to what he was focusing on.   My peer reviewers were selected for different reasons.   Their expertise was complimentary to my own in a way that I can learn from them and be challenged by them.   It's set up in that way to have people who have their own bona fides.   They bring something to the table that's especially pertinent to the case that you feel that if there are nuances or if there's information on the periphery or new research that these are people who are going to be more on top of things and you can rely on their experiences as senior colleagues, even if you may have slightly different areas of focus.

And with my peer reviewers there are things that we have in common and there are different areas of overlap where -- or there are different areas that we don't overlap where their input and their expertise is

very instructive to me.  And that's why they were selected, why Dr. Shweta, Dr. First, Dr. Burgess, three very different people, very different areas of focus. Dr. Shweta is a forensic psychologist.  He is -- he's done a lot of training of people in the military.  He has extensive experience in his military forensic work in assessing sex assault, sex assault victims, sex assault perpetrators.

So here's an examination of somebody that I was doing who was accused of a sex crime and he has phenomenal experience.  It's one of those things that the expression out-of-the-box score, he's got a nice CV but I know that he has rich experience there.  So he's a psychologist.  He can interpret things like personality testing.  I don't do that.  And it was part of the records that I had.  It's helpful to be able to incorporate that and also give it context based on his experience.

Dr. First is a psychiatrist and his -- his distinctive qualities, he's the text editor of the DSM-5 so, I mean, here's somebody from a standpoint of diagnostic bona fides is not only at the heart of developing it but is also privy to all of the -- you know, all of the maneuvering and the jockeying over this word and that word because before there's a finished

product and all the editing that goes back and forth in the controversy, much of which is well publicized, he's someone who was there and can speak to nuance.

Dr. Burgess is an editor of the Crime Classification Manual. She has extensive experience in sex assaults. She's a pioneer in forensic nursing in the United States so we're talking about three different disciplines. But when you look at the range of issues that were brought to my attention in Rodriguez, you can see how each of them would contribute something that the other peer reviewer couldn't.

Q. Okay.

A. And that one can learn from.

Q. So these are the three people that --

A. For me.

Q. -- were peer reviewers for you in this matter.

A. Correct.

Q. So I got ahead of myself and --

A. Dr. Seward was another -- Dr. Seward -- because he had a different focus so he had different peer reviewers to provide oversight. My peer reviewers wouldn't have been adequate for him.

Q. I was just saying -- I kind of got ahead of myself. Let's get back to your education. Can you just run that down for us if you would?

A.    Sure.    I went to the University of Miami School of Medicine in Florida and got my M.D. in 1988.   I'm smiling because I -- I saw my first sun dog yesterday and the sun has a different definition in Miami.   And I then went to Beth Israel Medical Center in Manhattan and did a rotating internship in emergency medicine and medicine and psychiatry between 1988 and 1989.   I then continued at Beth Israel Medical Center in a psychiatry residency that spanned 1989 to 1992.   And in 1991, concurrent with my last year at Beth Israel, I did a fellowship in forensic psychiatry at the University of Pennsylvania in Philadelphia.

Q.    Okay.    And then from the educational experience that you had as far as employment and your work in the field, you know, just briefly run through that if you would.

A.    Sure.    I embarked on a two-track career.   I was a full-time attending physician, which means a staff physician, on the forensic psychiatry and correction psychiatry unit at Bellevue Hospital, which is a city hospital in Manhattan to which pretrial detainees are sent for a variety of evaluations.

Q.    Okay.

A.    At the same time -- pardon?

Q.    No, that's okay, go ahead.

A.   At the same time I assumed a patient care load of about 40 people in a private practice from somebody who was retiring and had a number of people who were treated primarily for psycho -- with psychopharm for a variety of conditions.  So I was working both of those until I just got tired essentially in about 1995 and I left Bellevue and went into practice full time, psychopharmacology part of my time, forensic psychiatry part of the time.  And then in 1998, as an evolution of the practice, started The Forensic Panel.

Q.   Okay.  Let's just jump back for a second.  Well, let's do this here.  I'm going to hand you Government's Exhibit 642 (indicating).  It is your CV.  It may be from what you originally provided us when you also provided us your report in this matter so it might be a little behind.

But we would offer 642, Your Honor?

MS. FISHER:  No objection.

THE COURT:  642 is received.

Q.   (Mr. Reisenauer continuing)  Doctor, let's just get back to your first employment then that you mentioned at Bellevue.  What did you do there, sir?

A.   The correction psychiatry unit we were responsible -- I was responsible for providing treatment to pretrial detainees and so I would be not only

providing medication, decision-making for people whose impulse control problems or behavioral problems were too much for them to be managed in the jail and they needed more ongoing supervision but also to deal with them psychotherapeutically about whatever they were going through, whether it be guilt or shame about their alleged crime, whether it be stress over their charges and what they were facing in court, whether it be stresses that related to the impact of their arrest on their family or their other responsibilities.

But what I perhaps would like to underscore is just the unique kinds of clinical questions that come up for an inmate and especially for somebody at a -- who has been arrested on serious charges and is facing some enormous ramifications.

At the same time there was something in Manhattan, as there are in a number of major cities, called a court clinic where people are customarily sent for competency to stand trial, competency to waive counsel proceedings.  When the evaluations needed to be more complicated and involved because they could not be resolved with just the resources of the court clinic, those individuals would be referred to Bellevue.  They would be on our unit with the opportunity for 24-hour seven-day-a-week supervision where not only is a

physician -- you could see the patient but also when you weren't around you could rely upon corrections officers, physician's assistant, other people who are observing behavior. And because they observe inmates on a regular basis, they have the opportunity to give you a sense of whether someone is either malingering, whether someone is irrational, whether somebody has particularly sensitive issues, or whether there's something that's not being told to you that you might want to explore when you sit down with a patient. So that level of observation would give us more wherewithal within, say, a 30- to 60-day window to be able to evaluate these specific issues and then to provide the Court with a report.

At the same time we also provided psychiatric consultation to people on the medical unit. If somebody was arrested, they had no psychiatric issue and they went for medical care, surgery, something like that, we'd go and we'd examine them and treat as need be.

Q. And how long were you at Bellevue, sir?

A. For three years.

Q. Okay. And that at the same time I think you told us that you had started a private clinical practice?

A. That's right, in 1992.

Q.   Okay.   And I take it that was with patients that had some type of psychiatric problem?

A.   Sure.   It was a medication practice and my practice evolved over the course of, you know, a year or two such that my concentration of patients became people who were difficult to treat and people who had a history of violence.

Q.   Okay.   With respect to that private practice --

A.   Sorry, just a moment.   Can I just get a --

Q.   Yeah, go ahead.

A.   Thanks so much.   Okay.   Thanks.

Q.   Okay.   With respect to that private practice, Doctor, --

A.   Yup.

Q.   -- have you had occasion to examine anybody that was charged with murder?   And I'm talking separate from the Bellevue experience.

A.   Sure, sure.   Well, the -- my earliest experiences with people who were charged with murder were at Bellevue, but as my practice developed I became more and more exposed to murder defendants.   And then after I left Bellevue that was my exclusive exposure, and I would say that to date I've probably had an opportunity in 26 years to examine a few hundred people who have been charged with murder at this point.

Q.   Okay.   And I take it that is throughout the United States as opposed to just in the New York area?

A.   Sure.   In the first -- the first several years of my career my work as exclusively in New York and by the -- by the millennium, by 2000, 2001, I began being consulted in cases outside of New York and had a number of experiences in other states as well.

Q.   Okay.   And let's move to a different area.   In your board certifications are you expected to have expertise in the area of intellectual disability or mental retardation?

A.   Yes, you are, in your board certification in forensic psychiatry now.   In my earlier board certification that was not a -- that was not a hot issue, but with the Atkins ruling there was increasing sensitivity in the forensic mental health community and more of an expectation for that familiarity.

Q.   Okay.   And as part of that obviously you were asked to provide a diagnosis of the particular individual, correct?

A.   Sure.   Providing a diagnosis is almost ubiquitous to every forensic examination even though they -- there are many different types of forensic examinations one does of a potential or of a defendant, but almost always you're asked to provide a diagnosis.

Q.   Okay.  And we've been discussing a number of books with regard to intellectual disability and mental retardation but obviously you're familiar with the DSM-5, correct?

A.   I am.

Q.   Okay.  And this would be -- would this be the basis of what generally psychiatrists utilize in forming diagnoses with regard to certain mental disorders?

A.   It is the authoritative reference of mental health professionals.  And psychiatrists use it, psychologists use it, other mental health professionals use it as our authoritative reference point.

Q.   Okay.  And there have been, as is in most manuals or books that frankly -- books for learning in school and so forth, there's different editions, correct, as time goes on?

A.   That's correct.

Q.   And we're now on the DSM-5 and I think there was a DSM-4-TR before this one; is that right?

A.   Correct.

Q.   Okay.  When did this come out, do you know?

A.   I believe that it was 2011.

Q.   Okay.

A.   2010-2012, right around that time.

Q.   Okay.  So you've been using it for a while.

A.   Been using it for five, six years.

Q.   Okay.  Then the expertise that you are expected to have in terms of the intellectual disability and mental retardation area, I take it in your capacity with regard to the murder cases that you talked to us about that you have evaluated defendants that have raised Atkins claims in certain cases?

A.   I have.

Q.   Okay.  And have you done that in Federal Court?

A.   I've done that in Federal Court, I've done that in State Court, and I did it before Atkins.  So I've done it probably since -- since just after 2000.  Well, maybe even just before.  So I've been doing -- I've been assessing individuals in the death penalty context who have raised mental retardation claims and then subsequently intellectual disability claims for close to 20 years.

Q.   Okay.  And so I'm kind of jumping around here. We kind of got into your work experience.  You've been involved in presentations and publications as well?

A.   I have.

Q.   Okay.  And that -- those are contained within your CV; is that correct?

A.   At least up until that point but, yes, that's correct.

Q.   Okay.   And have you made presentations with regard to intellectual disability or mental retardation as far as Atkins claims at all?

A.   I have.   The domain of a forensic psychiatrist, of a mental health professional, is really more from a standpoint of the science of it as opposed to the law and other kinds of philosophical debates.

Q.   Okay.

A.   And so it's not so much the idea of Atkins but I have presented on the assessment of mental retardation claims, have presented on the assessment of those with intellectual disability who are sex offenders and diagnosis of individuals with -- who are capital defendants encompassing the range of possibilities.

So there have been several types of lectures that I've given before academic audiences about different aspects of the responsibilities that I have here today, not only in evaluating someone with an Atkins claim but also someone who's a sex offender and/or who is a convicted sex offender.   And that is its own genre of subpopulation that's distinctive to forensic mental health and our understanding of that group.

Q.   Okay.   And how about publication-wise, same sort of answer?

A.   I've written on intellectual disability in the forensic context.  I believe you told me that an article that I wrote has been quoted here in the court earlier in the proceedings, and I wrote that article for the Encyclopedia of Forensic Sciences and that's the 2nd Edition of that article.  I wrote it in the last edition and updated it for 2016.

Q.   Okay.  Teaching, any teaching in your background at all?

A.   Yes.

Q.   Can you tell us about that.

A.   It's not on my CV so I should probably update the Court that I am a clinical professor of psychiatry at Mount Sinai School of Medicine in New York.  They call it Icahn School of Medicine with Carl Icahn's influence of course.  And there I teach -- I teach at primarily Beth Israel Medical Center which is one of the affiliated hospitals and supervise training in forensic psychiatry of upper year residents, third-year and fourth-year residents in psychiatry.

Q.   Doctor, I think we touched on this just briefly but you've been consulted in capital cases for the purpose of intellectual disability, correct?

A.   I have.

Q.   And do you have any idea how many times that has

occurred?

A.   Probably roughly somewhere around 10, 12 times with that specific issue.

Q.   Okay.  And in each of those cases I take it you've been asked to make a determination of mental retardation or intellectual disability.  I assume that you used the DSM-5 criteria that is set forth; is that right?

A.   Yes.  But before the DSM-5 I used DSM-4-TR criteria.  Mental health professionals in this context consistently rely upon DSM as an authoritative reference in order to be able to provide some kind of consistency for us.  And actually that's why the DSM was developed in the first place.

Before the DSM -- and this isn't so long ago.  We're talking about 1950s or so.  There really was no standardization for psychiatry and so I could be a very learned and experienced person and come up here and tell you I think this person has depression and then Joey down there who's got great training could come up here and tell you:  Well, I don't think it's depression.  I think it's something else.

So the whole point of standardization was to give us some reference that we could use that could discipline us all to just follow criteria and do it in

the same way that we could have some reliability to our profession the same way a cardiologist would or a gastroenterologist would.

Q.   But obviously -- and this is I guess my mind thinking this.  Obviously there's still going to be some disagreements in certain areas of diagnoses, correct?

A.   Well, there are.  But the disagreements are really based on clinical judgment the way they would be for any medical specialty.  If you go and present the signs and symptoms of upper GI pain to a gastroenterologist, someone who's well-trained and with certain aspects of criteria or different conditions, there should be a reliability of conclusions.  But people may disagree about what's going on.  That's why people get second opinions because someone may see it a little bit differently.

But still there's an appreciation of criteria.  There's an appreciation of how one goes about diagnosing, which is consistent not only across medicine and into psychiatry but it's affected the other mental health professionals because they need to be taken seriously also.  They don't want to be caricatured the way people did about Freudian psychologists for all of those years, and that enables the mental health professions across the board to be seen as a much more

rigorous sign.

Q.   Okay.   In this area of mental retardation or intellectual disability, have you participated in any of the developments with regard to what you were just speaking of?

A.   Well, that's a bit of an open-ended question. I've been asked to consult by the Texas legislature and the Pennsylvania legislature when they were considering laws on their books about how "mental retardation" should be defined, and that was when Atkins first came out using the verbiage "mental retardation."

And so within the context of a policy discussion in which there was a highly, highly passionate debate on ideological reasons as opposed to scientific ones, I've been asked by two legislatures to come in and provide some scientific input to supplement perhaps the ideological passions that they were getting from other sources.

In 2007 our practice was consulted by the United States military in connection with the fracking homicide of Sergeant Martinez in Iraq where he killed his commanding officer and one other person.  He was charged with murder in a capital offense, and Sergeant Martinez raised an Atkins claim but the military at the time had no standard for mental retardation.  So we were

actually asked by the government to come in and to develop a standard because there was a vacuum for exactly how the law should relate to it.

And so while the Martinez case took a different turn, we were involved in actually a more developmental role with that case when we were involved. It wasn't so much the idea of providing an opinion initially so much as it was actually developing something for application to the case itself.

Q.   Okay.  And I take it that you've been -- in your practice and as chair of The Forensic Panel, you've been asked to consider either mental retardation and intellectual disability in Atkins cases or similarly examining individuals for the purpose of possible mitigation testimony in death penalty cases.

A.   In a variety of contexts.  I have treated people with mental retardation.  As I noted earlier, my early specialty was -- in clinical practice was treating violence in people who didn't respond to treatment.  So my clinical exposure was to people who had mental retardation who had behavioral problems and who needed medication management or some kind of an adjustment. So from a clinical context I had that experience.

In forensics my exposure to the intellectual disability population goes -- spans the cycle of the

case.  Pretrial people who disputed confessions said they were not competent to waive Miranda or people who in interrogation gave confessions and then said that they offered a self-incriminating statement but that they were intellectually disabled, that they were innocent and somehow exploited by the interrogation process.  So that's one example.

I've examined people for competency to stand trial who said that they were intellectually disabled and raised that issue.  I've examined people who raised mens rea questions by virtue of their intellectual disability, suggesting that they were not capable of forming intent.

And in addition to the Atkins context that we're speaking of today, I have examined people in a presentencing context, some people who were murder defendants and some people who were defendants in cases of assault or something else who put their intellectual disability or who put their intellectual situation at issue to sort out and seek to what degree it was mitigating.  So I've had the opportunity to engage this from an evaluative standpoint and from a variety of different vantage points and experiences.

Q.  Okay.  And then just briefly you've obviously testified in a number of these types of cases, correct?

A.   Not many.  I've testified I can think of once, maybe twice, but not many times have I gone to court.

Q.   You're referring to Atkins situations?

A.   Correct, yes.

Q.   I was -- unfortunately I didn't ask that question very well.  I was referring to all of the aspects that you just related to us.

A.   I've testified in a few of these cases where intellectual disability was at issue in a variety of contexts, yes.  I believe that in Atkins I can only think of one where I've testified, but there may be something out there and in ten minutes I'll think of it.

Q.   Okay, thank you.  Now obviously my office contacted you to look at a number of issues that had been presented to us in this case, correct?

A.   Yes.

Q.   Okay.

A.   A number of issues.

Q.   Yeah.  And at the time we provided you with, I guess I'll just put it this way, thousands of pages of discovery in this matter; is that right?

A.   I've reviewed thousands of pages of discovery relating to the different areas that you had asked me to explore.

Q.   Okay.  And you also interviewed Mr. Rodriguez in

this matter yourself, correct?

A.   I did.

Q.   Okay.  And we'll get back to that.  And then you did some interviews of your own of certain individuals that were involved in the case as well.

A.   I did.

Q.   Okay.

A.   I interviewed others.

Q.   And as you just noted there were a number of issues that were brought forward to you and you addressed all of the issues in a very lengthy report that you provided to us; is that correct?

A.   Well, I addressed all the issues that were of my specialty.  What was not my expertise I recommended to you to have Dr. Seward involved, and then there was specific questions that I felt were best reserved for Dr. Dragovic, who's also part of our practice, that I wouldn't be able to offer any expertise to.  So whatever was in my area of expertise I addressed.  There were either 10 or 13 issues, and I know I'm going to get my report up here sooner or later but it was a 215-page report.

Q.   And it would be correct to say that some of Dr. Seward's findings overlap with some of your findings as far as the mental retardation and intellectual

disability issue is concerned?

A. Oh, sure. It's a very -- it's a very common practice for psychiatrists to work in conjunction with a neuropsychologist who can supplement the clinical work being done by the psychiatrist with the expertise that a neuropsychologist uniquely has.

Q. Okay. However, would it be correct to say that you are not a neuropsychologist, correct?

A. I'm not.

Q. And so the testing procedures, that would have been Dr. Seward's area of expertise.

A. That's correct. I defer to a neuropsychologist's opinion about the tests. Some of them I understand a little bit more than others, but from a standpoint of expertise I would defer to neuropsychologists.

MR. REISENAUER: Okay. We would offer Dr. Welner as an expert in the field of psychiatry and in particular as we are sitting here today, Your Honor, in the field of mental retardation and intellectual disability.

MS. FISHER: No objection.

THE COURT: Once again I will allow him to testify in the areas in which he has expertise. And I'll just note that I don't receive experts. I don't think that's appropriate under the modern practice.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Dr. Welner, as you just noted, you provided our office with a report regarding all of the issues that have been presented to you; is that correct?

A.  Yes.

Q.  Doctor, I hand you what's been marked as Government's Exhibit 643 (indicating).  Do you recognize that as your report in this particular case?

A.  I do.

MR. REISENAUER:  We would offer 643, Your Honor.

MS. FISHER:  No objection.

THE COURT:  643 is received.

Q.  (Mr. Reisenauer continuing)  Doctor, I want to -- before we get to your report itself, I want to ask you a couple other questions.  So we've kind of bantered this around for a few days now but with respect to intellectual disability, can you just tell us what the DSM-5 criteria are that are utilized in your field?

A.  The DSM -- and actually just to reference DSM, I referenced it directly in my report on page 5.  I would refer you to that because I would want to be precise about quoting it and hang on one moment.  So --

Q.  Would it help, Doctor --

A.  I have it.  That's fine.

Q.  -- if I provide you with the manual?

A.  No, that's fine.  You know, I'll reference it from my report because it was a reference point for my conclusions so --

Q.  Go ahead.

A.  "Intellectual disability" is a -- it refers to a disability of intelligence such that an individual is affected not only as it relates to his intellect measures of one's cognition but also one's adaptive skills as a result of that intellectual deficit and has been for many years and specifically since childhood or adolescence.  And that as a result of that intellectual disability or intellectual deficit, that individual is unable to meet the expectations, the developmental expectations or the social expectations of peers unless someone has ongoing support because of those deficits.

So that's the -- I mean, that's a rough definition of it.  What the DSM specifically talks about is the -- is the deficit in intelligence being measured by standardized testing that is culturally appropriate that converges from a variety of different sources that demonstrates that someone's intellectual performance is two standard deviations below the population mean so somebody who is -- who would be performing exceptionally

poorly on appropriate standardized testing because if you gave me a test in German I probably wouldn't do very well myself.  So it has to be a test to fit the actual examinee.

And then on top of that there is -- there is other data about a person's cognition that additionally can inform clinical judgment about one's intellect.  But on top of that -- that's only one criteria.

Q.  Let me stop you there for a second so I'm clear. We have the standardized testing portion of the deficit in terms of looking at the possible intellectual disability, and in the DSM-5 that is criteria A I think it's listed as.

A.  That's correct.

Q.  Okay.  But there's also, and you just mentioned, the use of clinical judgment I think along with the testing itself; is that right?

A.  Well, it's -- clinical judgment is -- clinical judgment is the process of a conclusion but you use clinical data just as any other doctor does.  A doctor does a test and a doctor listens to a patient but a doctor listens to specifically what a person is conveying.

So with respect to intellect, there are very clear understandings about what clinically is relevant:

data about reason, data about planning, data about the ability to abstract, data about the ability to problem solve, data about the ability to strategize.  In fact, there are about approximately 11 areas that speak to clinical expressions of intelligence that one takes into account.  So --

Q.   Let me stop there, Doctor.  So those particular functions I'm calling them are set forth in the DSM-5, correct?

A.   Correct.

Q.   And these are aspects of cognition that as a clinician you look toward to make your diagnosis or assessment; is that right?

A.   Sure, you do.  And also as a forensic professional because, for example, in the clinical context you never have to deal with intelligence as it translates into criminal behavior.  Someone who, for example, may test very poorly because he's uneducated or unsocialized or poor may be quite cunning and may be a gang leader in a particular jurisdiction.  And nobody who has any acquaintance with that individual would ever think of that individual as intellectually disabled.

          So that's where clinical data comes in.  If it's somebody you see in an office, you're not going to necessarily get acquainted with somebody's criminal

portfolio but in a forensic context you do.  And that illustrates some of the separation between the forensic patient base and somebody that might see you for general care, a panic disorder or depression and how intellect plays itself out.

So there are a variety of different parameters that one looks at that speak to intelligence over and above what you derive from the testing, but the testing data has got to derive from psychometrically valid instruments that are appropriately applied to the context and the individual.

Q.  Okay.  And then there is the second prong I'll call it, which in the DSM-5 I think is letter B, and these are the deficits in adaptive functioning of the individual, correct?

A.  Correct.

Q.  Okay.  And you earlier said that this area has to show that the individual is in need of ongoing support I think you called it.

A.  Well, it's not what I called it.  That's the specific language that's used, is that -- I mean, even the advocacy organizations like the AAIDD use that language.

Q.  Yeah.

A.  The importance of the necessity of ongoing

support.  But what the DSM is specific about is that what that support is needed for is function in conceptual, social and practical or independent living domain.  So, I mean, a person could ask the question of adaptive skills, adaptive skills for what?  Adaptive skills to play football?  Again adaptive skills for what?

So what DSM is specific about is it's reference to conceptual, social or practical and independent living considerations that without ongoing supports, without those ongoing supports that a person is unable to function at a level that's developmentally appropriate or would be expected for them, for their peer group.

Q.  Okay.  And within the DSM-5 and in criteria B specifically, I'll just read this to you and ask if that's what you were just telling us.  It says: "Without ongoing support," as you just indicated, "the adaptive deficits limit functioning in one or more activities of daily life such as communication, social participation and independent living across multiple environments such as home, school, work and community."

A.  That's right.  And that's another very key point of this, that you've got to derive input from different contexts.  You derive them from a person's living

environment, from a person's work environment, from a person's relationship to the community around one and, if a person is involved scholastically, to what one can get from the school experience.

So those are four examples of where one can derive information from regardless of where a person lives. It's the same process in any forensic assessment. You draw data that is based on the person's habitat and take it from there.

Q. I take it that you -- the third criteria is onset of intellectual and adaptive deficits during the developmental period. In the DSM-5 it used to read I think at age 18.

A. That's correct.

Q. But you don't limit your review of the person's life history to just before 18. You look at the person's entire life; is that correct?

A. You look at what you can get data from. And sometimes people have poorly documented origins, perhaps people who emigrate from places that just have poor record keeping. But you get the data that you can, but certainly what historically we've appreciated mental retardation and intellectual disability to be is that it's a developmental problem, that it's something that an individual is handicapped with such that early enough

in life it was impacting that individual on other domains such that those impacts could be chronicled.

Q. Okay. And so I take it that would be then inclusive of the thousands and thousands of pages of discovery or documents that were sent to you for review.

A. Correct.

Q. Okay. And it would also be inclusive of what you may have learned from your interview with Mr. Rodriguez himself?

A. Correct.

Q. And other interviews that you did on your own.

A. That's correct.

Q. Okay. Well, let's jump ahead to this aspect just briefly. You interviewed Mr. Rodriguez. Do you recall when that was?

A. It was -- it was -- I want to --

Q. Go ahead.

A. I'm going to consult the report because it was about six years ago. June 26 to 28, 2013.

Q. What's the date?

A. The 26th to the 28th of 2013 so it was about -- close to six years ago.

Q. Okay. And where did that take place, Dr. Welner?

A. In Terre Haute.

Q. Okay.

A.  On the facility of the death row prison.

Q.  Okay.  And at the time that you interviewed Mr. Rodriguez I think your report notes that you videotaped and audiotaped the interviews over the days you were with him.

A.  I did.  I try to do that with all interviews.

Q.  Okay.  And why do you do that?

A.  Well, the nature of what one is doing in any forensic assessment is such that you really need to know what was asked, what was answered, the context of how it was asked and answered, what wasn't asked, what wasn't followed up on.  You need to be able to appreciate the dynamic between the examiner and the interviewee and the -- there is an appreciation all across the forensic sciences for transparency, whether it's DNA, whether it's toxicology, whether it's pathology.

It's a matter of a transparency.  It's a matter of whether it be Dr. Stewart or whether it be someone else, that they have the opportunity to see exactly what I saw in order to improve the reliability of an opinion because if two different people are looking at two different pieces of evidence, if I examine someone and I was in the room and someone else is supposed to decipher their own impressions based on my scribbling what happened in the room, how could that

possibly be reliable because they weren't there?

So it enables a transparency of fairness so that a colleague of mine that defense counsel may appoint may agree or disagree or make their own interpretation. The other thing which is incredibly valuable and I've found this come up in different contexts of capital litigation, people can change over time. So you can examine some -- I could examine him in 2013 and let's say you sent me back there three years later and he was very different and there was some dramatic change in his condition.

And that actually happened to me in a capital case where I was retained by the U.S. Attorney and I examined somebody and I sat with him and I didn't feel right about the experience. And I compared my experience of him with a tape that had been recorded sometime earlier and I stopped my examination and I went back to the prosecutors and said: He's falling apart. This process can't continue. He's psychotic because I could see the deterioration. If you don't have a videotape, you have no reference point. But if you create a reference point if there's a later deterioration of someone's condition, especially in matters of this level of sensitivity, you have a record.

So -- and then lastly it gives someone the

opportunity for an unguided impression.  A professional can say:  You know what?  I'm not going to look at Dr. Welner's report.  I just want to sit back and watch this and I want to see what hits me when I watch Alfonso Rodriguez talk about X, Y or Z or A, B and C.  If you don't have that kind of record, you can't do that.

And so there are so many advantages for it and that's why for 20 years I've been videotaping almost every exam that I do and in The Forensic Panel it's a practice that we strongly encourage.  We don't do it all the time but we always encourage it and recommend it and do it when we can.

Q.  Okay.  We heard some testimony earlier on in the case that videotaping an individual may cause them not to be as open as if you're not videotaping.  In this particular case was that a problem with Mr. Rodriguez that you felt?

A.  Well, I don't think that it was a problem.  Again you can only say that for certain if you conduct the exact same interview under the same conditions but you don't use a tape and you gauge what you're getting.  I felt that he participated.  I felt that he was cooperative.  I felt that he had a certain way of approaching the interview.  There were times that he was evasive.  There were times that he was -- maneuvered or

manipulated the discussion, which is a testament to him cognitively.  But I can't assess that he would do anything under different circumstances because of the predicament of our examination.  You know, it's a capital litigation and he has a certain interest that he's trying to protect and I respect that.

What I would say is this:  It's a very important consideration.  We're trained as mental health professionals to talk to people and get them to talk to us.

Q.  Right.

A.  And so there's always going to be some adversity.  It could be the adversity of a camera.  It can be the adversity that you're sitting in an interview room in a jail that's uncomfortable and nobody feels good.  You have to break down walls no matter what you do.  So you can always say that something is an impediment but at the end of the day the ethical, the ethical nature of what we aspire to be as forensic scientists we can't say that we provide transparency in a way that all other forensic sciences have the expectation of transparency.  I mean, who would ever think of like a DNA sample being tested and then telling the other side:  Well, take my word for it because this is what I found.

So that's not tolerated in another forensic

science so it's a matter of just us keeping the same level of rigor. So under the circumstances you use your skills. Just get someone to try to talk to you. And if they can they can, and if you can't you do your best.

Q. Okay. And that's understandable and in this particular instance with Mr. Rodriguez you interviewed him over the period of three days I believe. And so obviously over a period of three days you had a quite lengthy conversation about any number of issues, correct?

A. Correct.

Q. Okay. He didn't just -- to use this term he didn't just blow you off and say: I'm not talking to you. See you in another world.

A. No, he did not.

Q. Okay. And so you had -- at least at some point you had some type of rapport with him in terms of being able to talk with him for three days about the various subjects.

A. I felt we had a decent rapport and I feel that he was relatively easy to establish a rapport with. He's someone who is -- I didn't have enough exposure to him to say that he was gregarious, but he's someone who's social that you can connect with and you can establish a social rapport in an interview as opposed to some

individuals, some examinees, and this is not an uncommon problem, who are so guarded and who have just enough paranoia that you really have to -- you really have to work and labor to try to connect with them and hopefully it happens over time. But from very early in the interview we were able to establish a sufficient rapport that we had back and forth and built on it from one visit to the next.

Q. Okay. And I guess I'm assuming but I better ask, he knew what you were there for; is that correct?

A. Oh, sure. I have to disclose that at the beginning. Ethically he needs to know that I've been retained by the government. He needs to know that there's a videotape. He needs to know the limits of confidentiality. So all of that stuff is put out even before we start with anything in an interview.

Q. Okay. And that would be your standard operating procedure in any type of case that --

A. That's how we roll in our practice.

Q. Okay. And over the three days of interview, you did get into asking Mr. Rodriguez about the killing of Dru Sjodin; is that correct?

A. Oh, yes.

Q. And he talked to you about it?

A. We spent quite a bit of time talking about it.

What he spoke about I think was selective from his part but he certainly gave the appearance of being very forthcoming and providing very long and detailed answers to my questions.

Q. Okay. If we could -- let's get back, if we could, to the DSM-5 and the intellectual disability aspect and the criteria. First you talked about the criteria in subsection A that goes to his cognitive thinking?

A. Intellectual, yes, intellectual.

Q. Okay. And in your report -- well, let's just start here. In your report, Doctor, you address this area in terms of the different aspects that you related to us I think earlier as far as the cognitive thinking. And I'm going to just direct you first if we could to -- excuse me, to -- hang on just a second. My notes are a little mixed up here.

I'm going to direct you first to page -- well, on page 94 if you go there first, Doctor.

A. Mm-hmm.

Q. You talk about: "Does Mr. Rodriguez meet criteria for mental retardation?" Do you see that?

A. Yes.

Q. Okay. This is the area of the report that you address specifically that issue; is that correct?

A.    That's correct.

Q.    Okay.  And then you talk about criteria A on the next page there, page 95?

A.    Correct.

Q.    And then I want you to move on to page 96 if you would.

A.    Mm-hmm.

Q.    And you talk about "Reason" there.  You see that subheading?

A.    Correct.

Q.    And can you tell us, in your review of all the records that you were provided, the interview with Mr. Rodriguez, the interviews of other individuals, what reflects on his ability to reason, if you could?

A.    Sure.  Well, just to give the Court some context, I reviewed what are listed in the report as 143 sources of data in order to really provide a convergent -- a convergent data set about whatever it was I was reviewing.  And so my impressions about his ability to reason, that it was not impaired, were based on a variety of different slices of his life from the most ordinary such as the nature of the homemaking functions that he had, that prior to his arrest he was not only living at home but he was caretaking but he was more than caretaking his mom.  He was essentially functioning

as a homeowner. And so he was doing electrical work and plumbing work. You can't do plumbing work and electrical work unless you have an ability to reason because otherwise you won't accomplish anything. I mean, those are functions that specifically, for example, require reason.

And then this related in other aspects to some of his social history that he provided. From 1975 until around 1979 he was at Minnesota State Hospital and in a setting that has some similarities to what I experienced at Bellevue Hospital, although with an acute pretrial population. He's in a setting where he's continuously observed. He's got a lot of clinical staff around and he's got this group therapy program. He's got that program. So there's a lot of people weighing in with impressions, and there's a lot of data that was generated in the Minnesota State Hospital records that are informative about a variety of qualities.

And one of the things that we had spoken about in our interview which reflected in the data and the documentation that I had was that Mr. Rodriguez, over the course of his stay there, aligned himself with different groups. He had different peer groups that he aligned himself with, but he did it in order to manage impressions. In other words when he wanted to cultivate

a certain impression in the hospital or among his peers or within the hospital, there was a certain group he aligned with.  And then over time he changed and he was aligning with different people based on the impression that he wanted to manage.

And impression management was something that I noted in another aspect.  We had talked about how he managed, as a convicted rapist, as a convicted recidivistic sex offender and someone who is not a particularly fearsome guy physically, and yet he was completely comfortable and had a very unremarkable adjustment period.  And he talked about how he cultivated quietly the perception that he was some sort of big-time drug dealer; that he had money outside of the prison and that for that reason that he was not in a position to lend to others.  But otherwise if people felt that way about him they would not necessarily be thinking of him as a sex offender and that would diminish his likelihood of being targeted in the way that other kinds of rapists are.  So his management of impressions and how he wanted other people to think of him is an example of his reason from another context.

Another example of something that --

Q.  Let me stop you right there, Doctor.  It wasn't just his words you were relying on in this impression he

was trying to give to the rest of the people in the prison, correct?

A.   Not for this.   There was some things that he was mildly informant but this is -- as I have mentioned in earlier testimony, this was paralleled in the records that I had reviewed.

Q.   Okay.   I'm going to hand you, Doctor, Government's Exhibit 644 and unfortunately I just have the one page but this is a report from the Minnesota State Hospital (indicating).

A.   Mm-hmm.

Q.   And I'm going to refer you to the full paragraph on the bottom of the page there, and just briefly in the middle of that particular document if you can see there's a sentence that says:   "His friendship choices were viewed as enabling him to maintain his streetwise behavior and his 'invulnerable' image."

         Do you see that?

A.   Yes, I do.

Q.   Those are the kinds of things that you're referring to?

A.   That's right.

Q.   Okay.   Any other aspect of reason that you want to reflect on?

A.   Yeah.   I think the point that I'm making to the

Court is that that's not -- that's by design.  That doesn't happen by accident.  These were choices that he was making and the rationale behind was really an adaptive one.

We spoke about some of his earlier behavior when he was younger and what he disclosed in our interview was that he was involved in some burglaries.  And he spoke about what he chose as targets of places to steal from.  And he said that he would specifically choose places -- or homes that had no children because if there were children living in the home there would always be the possibility that when they broke into the home there might be a babysitter there and that if there were no children there was more of a likelihood that the home would be vacant and they didn't want to encounter anyone.

He also spoke to the idea of what he would steal.  He said that he was specific to items that would not be missed.  He said:  I would not look to take something like a TV set or your stereo because somebody would come home and obviously know that it was missed.  But if there was some small piece of jewelry that had value, somebody might not appreciate that it had been stolen.

So whether that happened or not was not

something for corroboration through criminal records but what he's displaying to me is that he's going through a reasoning process. Even if we were speaking hypothetically, he was able to present to me: Look, when it comes to burglary you go, you pick a home that doesn't have children because you don't want to run into somebody unexpectedly. And if you steal something you want to steal something that's not going to get noticed because you don't want it to be investigated and that is the reason.

So these are examples of different contexts in which he displayed just unremarkable but active reason that was no different from another adult who had reasoning challenges in one way or another and how he would go about it actively.

THE COURT: Do you intend to offer 644?

MR. REISENAUER: I'm sorry, Your Honor, yes, I so move at this time.

THE COURT: Any objection?

MS. FISHER: No objection.

THE COURT: 644 is received.

MR. REISENAUER: Thank you, Your Honor.

Q. (Mr. Reisenauer continuing) And then, Doctor, I'm going to hand you Government's Exhibit 645 (indicating). That is part of -- that's a transcript of

part of your conversation with Mr. Rodriguez with regard to the burglary aspect you were just talking to.

And we would move in 645, Your Honor.

THE COURT:  Any objection?

MS. FISHER:  No objection, Your Honor.

THE COURT:  645 is received.

Q.  (Mr. Reisenauer continuing)  Doctor, just look at that briefly and on the bottom of that first page you begin your talk with him about burglaries.  Do you see that?

A.  Yes.

Q.  Okay.  And then move on to the second page and at, let's see, would be the fourth section down you ask: "How did you know which house to go into?"  Do you see that?

A.  Yeah.  I just -- because you gave me this exhibit, what I wanted to call your attention to was someone whom I haven't mentioned in my testimony yet but somebody who came up in our discussion.  And other people that I spoke to confirmed that this was a friend of his, a friend that he grew up with whom he said he did burglaries with.

The significance of that is that he was quite clear to me in our discussions that he would not disclose his behavior to other people because he didn't

want them to be in a position to tell police about him and get him arrested.  That was part of his choices of whom he could trust and whom he could not.  And he was specific that he could trust Bill Mauer to do burglaries with him but only Bill Mauer.

So again this is a choice.  It's a reason. This is something that I can do but I'm only going to do it with him because others I would not feel comfortable, would not feel that I could necessarily trust them.  And he doesn't have an arrest record so either it reflects his reason for something he would do or it reflects his reason for activity that was successful insofar as he was never arrested for it.

Q.   Okay, thank you.  Anything else that comes to mind about reflecting of his ability to reason at all?

A.   I think that his recorded telephone calls are a rich source of data about his -- about several of his cognitive skills, and it's also helpful to illustrate to the listener how his own family historically related to him.  And again this is part of a forensic assessment. An individual who has intellectual disability and by its form or former iteration mental retardation, his own family that knows him well and has known him all of his life is going to relate to him in a way that's just different from somebody who is not intellectually

disabled.  And his family would seek him out over the telephone with a variety of different questions, some of which illustrated his reasoning and his reasoning being valuable to them.  They would pose these questions to him.  I'll probably reference that more in my discussion on problem solving.  But certainly listening to those discussions, and they're rich because of just the range of topics that they get into, speak to his reason and how he thinks through an ambiguous problem.

Q.  Okay.  And a number of these areas that you're referencing, like these phone calls, they would address a number of different areas of cognition as well as the one you just spoke to like -- my recollection and I guess maybe we'll present this later with those phone calls, these are recorded phone calls with members of his family at a time that he was in jail on this particular matter; is that right?

A.  That's right.  And I asked you for them and I listened to every one that you gave me that I could because they were illustrative of a number of questions and issues that you'd asked me to review.  But they're a very fertile source of information about how he relates to other people and people that he feels closer to.

Q.  And part of that goes to a different section of the cognition.  I think he related to his family members

a number of aspects in terms of like practical living --

A.   Sure.

Q.   -- day-to-day.

A.   Sure.   There are a lot of things and perhaps it's helpful for me to clarify to the Court that these -- these areas in DSM, they're not meant to be silos. There's bound to be some kind of an overlap between reasoning and problem solving.  It's not meant to be rigid.  But it's meant -- these categories exist in order to make sure you don't forget anything.

So if you have a number of things to look into, if you don't capture it by looking at reasoning, you're going to capture it when you look at problem solving or downstream.  So there are certain aspects of these that might pertain to more than one.

THE COURT:  All right.  We should take a break at this point because we'll need to take one somewhere along the line.  So we'll take -- let's take 15 minutes here and we'll start again at a quarter to 4:00.

(Recess taken; 3:30 p.m. to 3:45 p.m.)

(In open court, all counsel present.)

THE COURT:  We're on the record in a case entitled United States versus Alfonso Rodriguez, File No. 2:04-cr-55.  The record should reflect that

counsel of record are present.  When we broke Mr. Reisenauer was conducting a direct examination of Dr. Welner.

You may proceed, sir.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  I think we were just talking about the ability to reason with regard to Mr. Rodriguez.  Is there anything in all the records, the interviews that you reviewed, the interview that you had with Mr. Rodriguez, that would indicate that he is in need of supports with regard to his ability to reason?

A.  No.  There's nothing in my review of the records or experience with him, interviewing him, and we spent 14 and a half hours of face-to-face time together that would indicate that he needs any support to reason.

Q.  Okay.  Move on to the next section that you talk about in your report.  On page 97 you talk about planning.  Do you see that?

A.  Yes.

Q.  And obviously again there's a lot of information to glean through.

A.  Sure.

Q.  Can you talk about what you look at in terms of an ability to plan and what you -- what you can relate

to us in terms of a few examples of Mr. Rodriguez's ability to plan.

A.   Well, there were notably several items that came up as he anticipated his release from prison in 2003 and, for example, he sought out help from the social worker.  He wanted to get his driver's license renewed and he had his driver's license renewed, anticipating the need to live independently once he left custody.

He also explored the possibility of moving, moving out of the country, moving even to Mexico and specifically with an eye toward being in a place where he wouldn't necessarily have to worry about being a registered offender and having to contend with that. And so he explored that as a possibility.

When that was not possible, he expressed an interest and explored employment possibilities or relocation possibilities in New York and Georgia because he had been working in the prison and in particular had acquired some more advanced training in the printing shop and was hoping that if he were positioned there there would be more opportunities in the printing industry and that it might be a better idea to move there.  So this was among the things that he looked into.

And again this is a matter of planning,

planning for tomorrow.  Where do I get a good job?  Where do I live?  He talked about how when he left custody it was his preference to be in Grand Forks because he wanted to be able to go about his business without necessarily feeling that everybody was aware that he was a Level III sex offender.  So he was looking and anticipating a life not only of having to be in the community as a moderate sex offender as one that people might be aware of, but he was also thinking about how he would support himself.  He went to live with his mother because this way he could save on the expenses that he would otherwise have to incur if he had an apartment.  And he had not lived with his mother for many years.  Although, it was a close supportive family and their relationship was adaptive.

But these are examples of planning that played itself out or played themselves out as he anticipated being released in 2003.

Q.  Okay.  And so that's one example of planning obviously.  The aspect we talked about earlier in terms of your discussion with him in committing burglaries, you know, you talk about that in terms of his ability to reason but, you know, obviously at least from my view from this side of the table, that would be a form of planning as well where him and his buddy, Bill Mauer,

are picking certain homes to burglarize and what to burglarize.  That's a plan.

A.  And when.  And that's planning is when to actually burglarize at a point when somebody would not be home.  And that was manifested in some aspects of modus operandi that I -- that I had read about, that I had information about.  There were several -- of course, there's several crimes in his history but not all of them really speak to what led up to them but one in particular is the rape of Shirley Seddon.

He drew her to a home that he knew to be abandoned and so the idea of positioning them -- how he got to get a ride from her is a different issue as it relates to his intellect, but he drew her to a place that was abandoned and that was secluded and yet had the appearance of being in the middle of a residential neighborhood.  And so this way she would not be alarmed because she would be under the impression that she was merely taking him home.  But instead he actually drew her to a false home and drew her into a place that was dark and abandoned and they could be private.

So that's an example of planning ahead of time not only to be in a position to keep a prospective victim from being alarmed but to also carry out a crime without being detected by other people.  And that may be

present in where he parked his car in the Dru Sjodin murder, that he parked his car far from the mall as opposed to closer like the other vehicles. And by his account when he first attacked Dru Sjodin it was in his own car that was parked some distance from Dru Sjodin's car.

Q. We'll talk about that obviously later but I get what you're saying in terms of how that fits into this area.

A. It's freezing outside. But what's the point of parking your car far from the mall when it's cold outside? And so it fits in with other aspects of how he came to the mall that day with a rope, with a knife, with gloves, not necessarily shopping implements.

Q. Okay. Let's get back -- you got a little ahead of me. Government's Exhibit 646, this is the "Report of Statement" of Shirley Seddon that you were talking about. And it's not Mr. Rodriguez's statement about taking her to this abandoned place so to speak in terms of your conversation. This is Shirley Seddon's report as to how this all transpired; is that correct?

A. That's correct.

        MR. REISENAUER: Okay. We would offer 646, Your Honor.

        MS. FISHER: No objection.

THE COURT: 646 is received.

MR. REISENAUER: Thank you.

Q. (Mr. Reisenauer continuing) Was there anything, Dr. Welner, within this area of his ability to plan that you looked at in terms of the records or the interviews, his interview, that would lead you to believe that he was in need of support in this area of ability to plan?

A. I haven't seen any evidence from the available record that shows that he needs support in order to be able to plan as to a day-to-day responsibility of intelligence.

Q. Thank you. Page 98 of your report talks about abstract thinking. Now maybe I can --

A. I'm sorry, I just wanted to add something that's perhaps a little bit less flashy but I think more indicative of the kinds of things that one might overlook as it relates to planning.

At the time of his arrest, he was working 8- to 10-hour days. He wasn't close to home. He was some distance away. He was laying drywall as I understand it. But he was also not only caretaking the home but he was looking after his mom. So he shopped for her. He made food for her. He did what needed to be done around the house as a homemaker and as a homeowner. He also was driving his sister's kids places. He might drive

them to school.  He might drive them to an activity.  He might drive them to stock car racing as he noted.

So all of this has to fit into a schedule, and he's got to be on time for work and do what he's gotta do so that also requires planning.  Somebody's got to organize their scheduling and says:  Yeah, I can help you out on this day.  Yeah, you know, I'm going to have to -- we're getting low on these groceries.  I'm going to have to replenish this.

But that's part of the -- it may seem ordinary but again it's ordinary for someone who has unimpaired ability to plan their different responsibilities.  And by all accounts he carried off these sundry personal and vocational responsibilities in an orderly way as one would expect of a person who doesn't need assistance planning.

Q.  Okay, thank you.  I was going to get into the abstract thinking.  Let me start out this way.
Dr. Seward testified about a couple events that he related as reflecting on Mr. Rodriguez's ability to think abstractly.  And we saw a couple videos, one of which was a discussion that Dr. Seward had with Mr. Rodriguez regarding -- I guess I'll just call it current events.

This was -- if you recall, this was a

conversation he had about Mr. Snowden, CNN, Fox News and then I think they got into the Zimmerman trial.  You recall that?

A.  Yes.

Q.  Okay.  Would you agree that that would be an aspect of thinking abstractly in terms of those discussions, if you recall them?

A.  Well, it is.  But if I may, and I don't know whether Dr. Seward did this, when we speak of "abstract thinking" I want to clarify for the Court what I'm referring to because it's different from reason.  It's different from planning.  And it actually -- in a way it's more distinct from other domains of intelligence that have more overlap that I referred to earlier.

Simply put, "abstract thinking" is the ability to take a concept of point A and point B and to be able to appreciate the derivative point that's not obvious.  So it may involve some aspect of a thoughtful application of conversation.  It may be, as I referenced in here, being able to think in symbolism.  For example, why don't you go to prostitutes?  He says:  I don't go to prostitutes because that's like Russian Roulette.  That's thinking symbolically.  So he's able to use symbolism that if you go to a prostitute -- it's not the idea if he doesn't go to prostitutes that's an issue of

judgment, but it's the idea that he can conceptualize it properly or -- but he conceptualizes it with an appropriate symbolism of Russian Roulette and whatever he might get from sexual activity with a prostitute.

And similarly in his interview with law enforcement, which I have to tell you from a standpoint -- parenthetically from a standpoint of evaluating a variety of domains of intelligence, it's one of the most telling and impressive reflections of how intelligent he is in how he related to the law enforcement officers.  But he was thinking metaphorically.  He could speak to them but he was thinking metaphorically.

At some point they talked to him about what kind of road he was on and he says:  No, no, no, I'm on this road and you're on this road.  So he continued the discussion not missing a beat, joining where they were metaphorically and in speaking in metaphoric terms.  And that's abstract thinking when you can speak metaphorically, speak with the proper symbolism.  That's an example.  There are other examples from our experience.

Q.  Okay.  Let me stop you there just so I understand what you're saying.  So when he was being interrogated by law enforcement about Miss Sjodin's disappearance and

he was denying involvement, what you're saying is they were trying to get him to either admit or tell them what he knew about her disappearance and he in his denial is saying:  You're on one road and I'm on another.  That's what you're talking about.

A.   That's right.  That's right.  But they were using the idea of -- they were using the word metaphorically in terms of just the whole course of his criminal responsibility and what was happening with the investigation.  And he joined the discussion, used their metaphor and didn't miss a beat.  And I think the interview is important for other aspects of his intelligence but that's an example where he was able to think metaphorically, which is abstract thinking.

Some of the experiences that I had with him were when we talked about, for example, 24-hour news and he talked about -- he expressed a skepticism for 24-hour news and said that it was destined to essentially become tabloid because it was 24 hours, because of the pressures of being able to occupy the attention of the viewer.  And the reason that's abstract is because he's thinking beyond just the concept of, oh, all news all the time to be thinking of not only the end user experience but the experience that the news channel has to get people to tune into them.  So he's following it

all the way through and that's an example of abstract thinking even to take it to the end of the Zimmerman trial.

He used as an example the Zimmerman trial. He said Zimmerman was innocent.  It never should have gone this far but basically the news stations created the monster by making it so sensational that they were obliged to adhere to their position and once it became known that Trayvon Martin was on top of Zimmerman so he had a mastery of all the facts of the case.  This wasn't coming from me.  He just got into it and he knew the case.  He knew the specifics but he took it to a place to say:  This is why 24-hour news is bad.

And most people don't think about that but what he was saying was they became so invested in the sensationalism that by the time they saw that they bet on the wrong horse, by his account, they were stuck because they had invested -- and that's all abstract thinking and an example of well-developed adult intelligence.

His communication to Dr. Seward about God is --

Q.   I was just going to ask you about that.

A.   He's speaking on spiritual terms and that's a great way to appraise someone's abstract abilities to

speak to them about religious themes and he said:  You know, if God's so merciful why does he allow evil?  So it's all a bunch of nonsense.  And, of course, he was very matter of fact about it.

And then Snowden, the dialogue the people were used to having with Snowden is:  All right, was he wrong?  Was he right?  And he had a discussion that, look, he's going to end up back in the United States and here's why.  Because he's going to go to a country like Venezuela or Cuba.  Here he is in his place on death row, whatever exposures he has, he's aware of who our adversaries are.  He's aware of, you know, the possible destination points for Snowden and he's volunteering to me Venezuela and Bolivia.

So, you know, he's thinking geopolitically but on an abstract level that's just -- it's far more than simple.  Again, it's not an issue of whether I agree with it or disagree or he's right.  But he's not speaking about -- and keep in mind this was 2013.  We had a far less colorful relationship with Venezuela than we do now, but he was speaking of it in terms of the adversarial relationship then.

So again it speaks to his sophistication. We could -- whatever topic we happened to get into if he was comfortable with it he would pursue it, and he not

only spoke about it with a certain level of information but also engaged it with impressive abstract thought.

Q.   Okay.  So again in your review of everything that was provided to you and that you reviewed in this case, is there anything as far as his abstract thinking ability that you saw that he needed supports for?

A.   No.

Q.   Let's jump to page 102 of your report, Doctor, and here you talk about learning from instruction and experience.  You see that?

A.   Yes.

Q.   Okay.  There is a -- well, here, let's grab an exhibit here before you start talking.

THE COURT:  Mr. Reisenauer, it's hard to hear you when you are away from the microphone.

MR. REISENAUER:  I'm sorry, Your Honor.

Q.   (Mr. Reisenauer continuing)  Let me ask you this before we get into another exhibit, Doctor.  There is -- if you recall, there is a lengthy report regarding a number of things that he learned, I will use, while in the prison.  First, you mentioned already the print shop and that position of job he had.  But there were a number of other things that I recall being able to -- he learned how to do glazing and pottery and so forth.

Do you recall that?

A.   Yes.

Q.   Does that fit into this area of learning from instruction even though he was in a prison facility?

A.   Sure.   There are a variety of different vocations that he learned.  You just mentioned glazing.  You mentioned pottery.  He learned wood lathe.  He learned how to make figurines.  He learned how to make things with leather.  And we know from other sources of information that he's a carpenter.  So he had a variety of skills and he supplemented them.  And his ability to learn these very distinctive skills, whether they be pottery, whether they be -- whether they be carpentry, reflects upon his ability to learn from instruction as well as experience.

          The print shop in particular, he was not only entrusted to learn what he did but he was ultimately entrusted to train other people.  So he had learned it well enough that he was actually training other inmates.

          So, yes, that's an excellent example of his capacity to learn and his capacity to learn enough that he moves on to the next thing to learn.  You know, learn one thing, master it.  Move on and keep learning.

Q.   Okay.  Is some of this learning reflected in some of his criminal offenses?

A.   Oh, absolutely.  Learning from experience, his -- the crimes changed and not unlike other offenders who repeat or attempt to repeat similar crimes, a person may learn either from their previous experience or may learn from other sources of information.

When he attacked Elizabeth Knudson he produced a knife.  It was the first time he produced a knife in an attack and got her to submit in a more public place.  So that was something that he had not done in the Seddon crime.

When he -- when he was arrested for Ardyce Whalen, it was the first time that he attempted to bring someone into his own vehicle.  In the previous offenses he had drawn or had accosted someone in their vehicle.  But in Whalen he tried to get Whalen into his own vehicle.  Again, in Knudson's vehicle he had to drive her back or he drove her back and he was ultimately apprehended.  In Seddon's vehicle he needed to get a ride home.  So he had far less control over the situation.  With his own vehicle it would give him a different degree of management of a situation and he attempted to draw her into his car, although unsuccessful.

And then Dru Sjodin, again similar qualities but different, but all on the rape and sex assault or

assault continuum of a female. And in the Sjodin case he followed her and was armed but accosted her at a time where she was on the phone and so she was -- he did not necessarily have to use guile as he used in the earlier offenses. With Shirley Seddon he said: Can I have a ride home? With Elizabeth Knudson there was some car trouble and so he was able to gain access.

So she is disengaged and so he followed her. And not only that but he was able to use her car to get over to his car and to eventually use his car as a secure place in which he would attempt to carry out a crime and then ultimately to carry out a crime. And then more conspicuously it was the first of these attacks to which he brought a rope and Dru Sjodin was restrained. And that is notable because she was with him for as much as two hours or possibly more, and by his description in our meeting there's no way that he would have been able to control the situation unless he had physically restrained her.

Ardyce Whalen was not restrained. Elizabeth Knudson was not restrained. Shirley Seddon was not restrained. So this was the first such crime in which he brought a restraint to the crime and he tied her, by his account, immediately. As soon as he got her into his car he tied up her arms so that she would be unable

to use them and to fight him off with her arms.  And then, of course, he killed her and in the previous crimes that's not how they ended.  He drove Elizabeth Knudson back.  He drove Shirley Seddon back.  He was acquitted of the rape of Nancy Carlson but she testified that he was there.  And in killing Dru Sjodin there was going to be no one to testify against him.

And these are all examples of learning from experience that was reflected in his criminal modus operandi of rape and ultimately murder.

Q.  And the information that you just relayed to us, this isn't just from him telling you.  Some of this is documented from the other victims; is that right?

A.  Well, also, look, we know -- we know from the available data of the crime scene about the rope.  We know that.  And we know that Dru Sjodin's cellphone pinged at 7:45 and that she disappeared at 5:30.  Now, okay, by his account he said it pinged because he -- it pinged when he threw it and disposed of the phone.  But he said that while she was with him that she didn't make a call so that time span comes from the available cell records.

But in terms of the other cases and what's available about them, sure, yeah, that material is available.  Ms. Whalen was in a position to inform.

Ms. Carlson made her statements.  Although, again he may have been innocent of that crime, he was certainly -- he was acquitted of it.  And Knudson was a witness, so was Seddon.

Q.   Okay.  And those documents in regard to the statements of the other victims you have read through and that's where you're gathering your information?

A.   That's correct.

Q.   So this would be another type of data-related information that you utilized in forming your opinion on his ability to learn or reason or so forth, correct?

A.   To learn from experience, to learn from instruction and experience.  The instruction we talked about earlier, this is an example of him learning from experience.

Q.   Okay.  So now I'm handing you Government's Exhibit 647 (indicating) and just for example this is Ardyce Whalen's statement with regard to what occurred with her, correct?

A.   Yes, her encounter and how he tried to seize her.

MR. REISENAUER:  Thank you.  We would offer 647, Your Honor.

MS. FISHER:  No objection, Your Honor.

THE COURT:  647 is received.

Q.   (Mr. Reisenauer continuing)  Again, Doctor, did

any of the records in this area in terms of learning from instruction or experience, did any of the records that you reviewed or interview of Mr. Rodriguez indicate that he was in need of support or assistance in this area of cognition?

A.   There is nothing.  There were a variety of different things that he was learning, including what I'll probably speak of later is he learned biofeedback. Whatever it was that he was learning there was no indication across a variety of different -- whether they had been trades.  He was also in prison higher education programs.  Whether it was that, whether it's biofeedback, there's no indication that under any circumstances he needed support to learn in any -- with any instruction and he demonstrated the ability to learn from experience.

Q.   Okay.  And then you mentioned biofeedback there. My recollection from the Minnesota Security Hospital records is basically that he himself indicated that the biofeedback program was helping him and he learned how to cope with some of his problems.  I guess in particular I'm thinking like anxiety.

A.   Yeah, he was -- he was taught -- biofeedback is useful for a variety of different psychological and also physical applications.  And he specifically learned

biofeedback using biofeedback equipment in order to help alleviate his own anxiety.  And he learned it well enough that eventually he was not only able to use biofeedback to alleviate his anxiety but he was able to do it without equipment, which means that he was -- when you use biofeedback without equipment you're relying on your own body and your own mind.  You're relying on the strength of your mind to say:  I'm going to slow my breathing.

For example, I don't know what -- here's an example how you use biofeedback in order to alleviate anxiety.  I'm going to slow my breathing.  I'm going to calm my body.  I'm going to let each muscle relax.  That's a person speaking and communicating and dialoguing with their body.

What he conveyed in our interview and our meeting together, and this is also significant as it relates to some of his personal care in terms of his healthcare, that not only was he self-managing anxiety without medication but he was also able to monitor for signs of hypoglycemia because he had abnormal sugar metabolism.  And he was able to use biofeedback and his own body awareness to recognize when he was hypoglycemic and when he needed to attend to his sugar level.

Q.  Okay.  Let's move to the next section you have

entitled "Problem Solving, Cognitive Efficacy, and Strategizing."  What reflected on his ability in this area?

A.  Well, as one would allude from these all being housed together, there is considerable overlap but I would -- there are a variety of different domains that speak to his problem solving.  I spoke earlier about how on the telephone he would speak with his family and they would pose different questions:  Are the heating bills high?  Well, have you checked the windows?  Check the windows.  That may the reason the heating bill's high.  Well, the gas bill's high.  Well, go call Homeowner's Insurance Company because they -- they ought to be involved in helping you to manage your gas bill.  There may be some structural problem in the home.  So this is his troubleshooting over the phone with his family.

In terms of just his vocational training, he was trained, for example, in office equipment repair.  He was trained in sewing machine repair.  You can't repair unless you problem solve.  You assess a problem.  You fix a problem.  If you don't have problem-solving abilities, how are you going to repair anything?  So he was trained as a repair person with a variety of different -- so manually as well as cognitively he had problem-solving skills.

Q.   Let me stop you there for a second.  Let's just go back to these discussions and phone calls you just alluded to again.

There are a number of pages of recorded phone calls that you reviewed and you're just alluding to some of them.  There are any number of areas that he was asked about in these phone calls by his family that he was telling them how to address them like you just talked --

A.   Yeah.

Q.   The heating and other --

A.   I mean, they're diverse areas.  Even giving tax advice, things like how to deal with something with the IRS or why you do a controlled burn at a farm or -- the farm -- a farm within the family -- in the family's possession, may lose water rights and so he was advising them to sell the farm because otherwise the property value's going to suffer.  If there's any prospect, prospect of losing water rights on this land sell the farm before that happens.

Q.   That was a discussion he had with his sister, correct?

A.   Yes, that's correct.  So it's not just -- it's not just his mother.  It's his sister.  And they're relating to him as a problem solver as well as a source

of information and a person who has just practical understanding, which is one of the other items here, a person you ask questions because he knows things.

Q.   Okay.   Anything in this area that indicated his need for support in terms of solving problems?

A.   Not in problem solving.   And again going beyond just his skills there was some areas where he was demonstrably clever.   When he was -- when Nancy Carlson was raped he immediately went to Minnesota State Hospital from where he had been released and convinced them to admit him again.   He had not even yet been arrested but he did so with the rationale of saying:   I know they're looking for a Mexican and so had himself admitted into the hospital so as to provide at least some semblance of an alibi that he couldn't have done this because he was locked up.

But he was successful in convincing them, which again I think speaks to his communication skills, to readmit him.   But he immediately thought to move on a mental health track in order to remove him from perhaps the scope of responsibility or suspicion such as was in this case.

Look, he was -- if he wasn't a Level III we would never be here.   I wouldn't be here.   This crime would never have been solved.   And so he recognized

under the circumstances that he would be a target, of course, because the victim survived and was in a position to potentially identify him.  He got to the hospital immediately.  That's problem solving.  That's an example of problem solving.

When he was making obscene phone calls as a teenager, and these are records about the obscene phone calls, he was taken to a psychologist.  He was with the psychologist for some period of time and then no longer.  No treatment, no follow-up, whatever.  After the Seddon rape he went right back to the same psychologist and the by-product of that as a matter of problem solving is he was routed into the mental health system.  Somebody else who didn't solve the problem might have just done straight time, hard time.  But he became a mental health person in a state hospital getting all of those services, which, you know, may have been the right thing.  But that was something of a problem solving that he initiated that had significant impact on the legal disposition of his case.  So that's an example of problem solving and very adept problem solving.

Q.  Okay.  Let me stop you there and I just want to make sure that -- the record reflects obviously he was arrested and found not guilty of the Nancy Carlson rape but what you're saying is that when he heard at least --

give him credit for the not guilty --

A. Sure.

Q. -- okay? But when he heard that they were looking for a Mexican individual or Hispanic individual, he went to the hospital and said: Let me in.

A. But let me make this clear. That's even more impressive.

Q. Right.

A. Let's operate under the presumption that he was actually innocent. He had the presence of mind to recognize that he was going to get arrested for something that the police hadn't even contacted him yet for and positioned himself in a hospital and, yes, eventually they arrested him. So let's presume he was innocent. How intelligent does that make him that he could see police activity before it even comes?

Q. Got it. Okay. His cognitive efficacy, how does that fit into all of this in terms of him being able to process everything and to fit into society and frankly pull these offenses off and do what he does?

A. I think his cognitive efficacy for someone who -- you know, obviously there are only going to be a few people in this room who watched the 14 and a half hours of our interview, but that is a great example of his impression management. He was cooperative but he was

very aware of certain aspects of his case that had already been emphasized, and he was in ways that were sometimes subtle, sometimes not subtle, but was very clever and in the natural flow of discussion managing my impression in accordance with the points that his defense would be emphasizing at the time and where he would take a story and the emphasis that he would draw to it.

It aligned itself with things that had been in the reports of the other doctors. So that's cognitive efficacy. That's the ability to sit in a discussion and steer a discussion in a certain way seamlessly and in a way that doesn't at all detract. But for somebody who's familiar with all the issues of the case, you watch those 14 and a half hours, you see him doing it all the time but in a natural flow of easy conversation where it doesn't undermine our ability to just communicate. And that's his wheels turning and that's his working.

That's an example of cognitive efficacy just as it is, for example, in the aftermath of the rape of Shirley Seddon. He rapes her and immediately pivots to a discussion of how he's pathetic and he needs help and she ought to go see her pastor. The reason that that's cognitive efficacy is because he is immediately guiding

her away from seeking out law enforcement.

And something in my qualifications that you didn't touch on but I wanted to point out its relevance and clinical familiarity.  I completed the first large-scale study of drug-facilitated sex assaulters in the United States.  The significance of that is that it's a population of people who are of higher intellectual functioning, and the difficulty in that crime is that perpetrators right after they offend and they are discovered -- if they are discovered by the victim they pivot into a manipulative tactic of redirecting the victim away from thinking about going to police and going to get help but thinking about going in alternative directions.

So it was akin to what one sees in a drug-facilitated sex assault with how a perpetrator approaches a victim using verbal skills and cognitive efficacy to redirect the victim from saying:  Get out of my car.  I'm going to go call the cops.  And instead giving them a ride home and talking about how he needs to get help.  He's going to go get help and that sort of thing.

Q.  Well, my recollection -- you just talked about Shirley Seddon.  The same sort of aftermath occurred with I believe it was Miss Knudson.

A.   That's right, where he said he felt ridiculous.

Q.   Yeah.

A.   He felt ridiculous about what happened but he raped her first and then he felt ridiculous when he was getting a ride back to town.  So this is the shifting of the posture that demonstrates a cognitive efficacy to have the presence of mind to realize how he needs to present at a given time for a given individual.  That's another example of cognitive efficacy as well as his interview performance that I spoke of before.

Q.   Okay.  Anything reflected in anything you reviewed in this area that would lead you to believe that he needs support in cognitive efficacy?

A.   No.

Q.   Strategizing, is that something different than what we've been talking about, Doctor?

A.   Yes.

Q.   Tell us about that.

A.   Well, strategizing is -- it's -- certainly planning is involved but it's planning with a goal in mind.  And a couple of examples of how he strategized in an impressive way is that he expressed a willingness in prison to participate in sex offender treatment but because his release was not impending he was not obliged to participate in it.  But he needed to express a

willingness to participate in order to be eligible for the work detail that he wanted to participate.

So he never had any intention of participating in sex offender treatment but he recognized that in order to be eligible he would have to say he was willing. But he also knew that because he was going to be locked up for a long time it wouldn't be enforced and the issue would not be -- would not be emphasized.

At the point where his release became more of a prospect once we got into -- you know, the run-up time to 2003 and he was approached about sex offender treatment, he declined then but the consequence of that was that he would not be eligible for parole. But again strategically no matter because he was comfortable in prison. He was comfortable with his situation.

There were a lot of uncertainties for him about living outside, and the big hook for him was that when he was released even if it meant that he wouldn't get early release and he would have to serve out the rest of his time it would mean that he would be released without parole. And he's a person who by everything that I've read he wants to do his own thing. He wants to be his own person. He wants his independence, and he wants to be self-directed. And the idea of not having

to chafe under the supervision of parole was something that had its own appeal and worth the trade-off of not participating in a sex offender program and all of its obligations as well as pitfalls because a sex offender program that would have maintained him under that much more scrutiny would have exposed his ongoing deviant sexual arousal to detection and monitoring.  And this is a way that he could maintain its concealment by keeping it a bit removed from scrutiny and ongoing probing.  And that's strategy.

And then, of course, the -- the offense itself reflects a couple of examples of strategy, most notably when Dru Sjodin was seized.  As he details it, he followed her out of the mall and there were people there.  And she was walking on one side of a lane.  He was walking on another.  And there were people in between but he was maintaining a certain distance so that he was close enough but there were people there so there would have been no reason for her to feel that she was being followed.

He noticed that she was on the phone and he continued to follow her as she was on the phone.  He had -- by his account to me he was holding a knife.  He was walking holding the knife.  But he didn't attack her.  He restrained himself and he waited and she got in

her car, still on the phone, still on the phone, and he was watching her and he did not seize her.

She got into the car.  She put the keys in the ignition and that was when he struck.  So he was able to hone in on exactly when she would be physically vulnerable and it would be easy for him to take control of the vehicle.  The keys are in the ignition.  She's on the phone talking to someone else.  He has a knife.  She's in her car.  There's nowhere for her to go.  And suddenly he confronts her by his account with a knife, at which point she hung up abruptly.

And then just whether it was reflexively or whether it was fear she moved over by his account into the passenger seat and he was able to go into a car that already had the keys in the ignition.  That's a timing issue.  That's a strategy.  If you do it too soon it doesn't work.  If you do it too late she hangs up the phone and starts gauging her surroundings.  So he picked the exact instant to strike and to seize her.  And that's strategic thinking, when not to do it too soon and when not to do it too late.  That's one example from the crime that we know about.

And I need to clarify.  By his account, and I alluded to this earlier, I spoke about the idea of being self-serving and evasive.  To listen to his

account and all of its detail to me, it gives the impression that everything was over in 15 minutes and it wasn't.  So there's a lot of in-between time that he doesn't fill in.

But what he does detail is that after he killed her he took some of her belongings, he was by Grand Forks, he deposited them in a dumpster but he didn't leave her there.  And he made the determination to take her out of town and to take her way out of town.  And he said he specifically took her to a place that he thought of, he had thought of that it would be a good place by his account.  It would be a good place to put a body and it was very remote.

And he not only picked a place that was remote but it was so remote that the only reason she was ever found is because the community mobilized to the degree that it did to search, that a search would be going on six months later because it was found so many miles away.  But he made that determination to go so far away.  And then the nature of the place that he put her, he said that he put her in a ravine in a crevasse covered over with grass that, by his account, would be virtually impossible to see from the road, hoping that in the intervening period the grass would -- excuse me, would continue to grow.  I apologize, Your Honor.

Q.   Doctor, let me stop you there.  We'll get back into that but from your recitation there in terms of the idea of the ravine and the area where he put her, that's part of strategizing as well?

A.   Strategy is she can't be found.  I need to put her in a place where she can't be found.  And what I'm going to speak about a little later in the whole cognitive thing in his communication with law enforcement he directed them away from there, again in pursuit of the aim that she not be found.  So he put her in a place where she wouldn't be found and she really wasn't found.  She was found six months later but again it was essentially a miracle that she was found at all.

Q.   And this was a place that he knew, correct?  This wasn't just a place that he dumped her at that was by per chance where he stopped?

A.   It was a place that he knew.  It was a place that he had identified would be a good place to dump a body by his account to me and it was a place that was very hard to reach.  He had to drive on gravel roads.  He had to drive in pitch black so it was unsafe driving conditions.  There could have been deer that he would have had to contend with.  But he specifically chose to drive the way he drove because he said that he wanted to avoid any possibility that police might pass him and see

her in the back seat dead.  So there was a strategy about how he got there, not just where he went and that's strategic thinking.

Q.  Okay, thank you.  We've been talking about the various prior offenses here this afternoon somewhat. You have in your report an area that you entitled "Criminal Cunning."  Do you see that?

A.  Yes.

Q.  And how is that reflected in what you've been telling us earlier this afternoon.

A.  I think the simplest way of encapsulating it is guile and credible pretense.  So he got Shirley Seddon to put herself in a position to be victimized by simply asking her for a ride home, somebody that he knew and who wouldn't say yes.  So he intended to rape her.  He wanted to rape her.  He expressed in our interview that he was unrepentant for doing so but to her what he conveyed was that he wanted a ride home.  And he also engaged her according to the record in very harmless discussion.  She was a friend of his brothers and she had no reason to suspect that she would have been sexually assaulted until they reached the actual point where they had pulled over and she was unable to take the car out of there.  So that's an example.

With Knudson when he approached her it

was -- again it was under the guise of offering some assistance for a car that would not start.  With Ms. Whalen he was disarming and he said, you know, is this 313 or he asked her about an address.  Who's not going to answer a question like that?  But her mind was elsewhere and that was when he attempted to seize her.  So his use of guile is an expression of criminal cunning.

Q.  Okay.  Anything in what you reviewed -- of course, this may be a silly question but he doesn't need any support in this area of his criminal cunning.  It's not like he needed help from somebody else to accomplish these things.

A.  But that's not a flippant question because there are offenders -- and in my experience there are offenders who would not be a capable of committing an offense unless they had some partner.  And he's perfectly capable of committing these offenses and thinking through every aspect of it from whom to target.  And again he was sitting in Target on video.  He followed someone out.  He didn't attack that blonde person.

He did attack Dru Sjodin.  There was no one else there spotting targets.  He was there alone.  He made a decision of how he would take -- how he would

seize her.  They went right from there to his car and then out of the mall, and there wasn't anyone else who sort of sketched this up for him.  No one to say:  Bring gloves, a knife and rope and tie her as soon as you take her.

So all of this is orchestrated by him without assistance.  And in other instances -- and some people offend together for their own shear deviance where that would have to be the case that an individual would not be capable of that level of cunning, including how to prevent one being caught.  And that was also part of it, how he would prevent being apprehended and even somebody who drew suspicion so soon after she disappeared.

Q.  Okay, thank you.  Now we've got kind of a different area of -- at least it appears to be a different area.  You have "Practical Understanding."  So that's kind of more of a day-to-day life aspect if I'm reading that correctly?

A.  Sure.

Q.  Okay.

A.  Sure.

Q.  And what reflects on that?

A.  Practical understanding, there are a number of aspects of his life that reflect upon his general

knowledge.  All of the range of homemaking and home care responsibilities that he had I already spoke about some of the repair, you know, electrical, plumbing.  But he's also somebody who was planting vegetables and flower beds at home.  And so, you know, you have to have an understanding of what to plant, when to plant it, and what would be appropriate for the soil for the garden.  So he set that up beyond just maintenance.

In his discussions with his family, they talked about birds.  They talked about bird houses.  He was very familiar and volunteered the species of birds that are native to the area.  I believe it was his sister, may have been his mother but I'd have to go back and look at the record, had a problem with squirrels with one of the bird feeders and he was giving advice about:  Well, how do you get rid of a squirrel problem?

So whether it was that or some of the other areas that I spoke to earlier, there were a variety of areas of general knowledge that he could parlay into either advice or his actual doing, whether it be tiling, whether it be home repairs, whether it be baking with his mom, whether it be canning fruits and vegetables which he was able to do.  So this reflects a broad practical understanding for many things that other adults don't even have.

Q.   Let me stop you there, Doctor.   You talked about all these phone calls a number of times here and I'm going to hand you Government's Exhibit 648 (indicating). And here I believe in this exhibit are the phone calls you were referring to.

We would offer 648, Your Honor.

THE COURT:   Any objection?

MS. FISHER:   I'm sorry, no objection.

THE COURT:   648 is received.

MR. REISENAUER:   Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)   We had some information that we put in, Doctor, if you would with one of the witnesses, a neighbor, Clifford Hegg?

A.   Mm-hmm.

Q.   Hegg was a neighbor of Delores Rodriguez.   Do you recall Mr. Hegg at all?   I think he talked about meeting Mr. Rodriguez and provided some information in regard to Mr. Rodriguez helping his mother around the yard and mowing and the flowers and that stuff.

A.   Yes.   That's consistent with my understanding.

Q.   Okay.   So that would fit into this area as well?

A.   Sure.   And fishing and he didn't need anyone to fish.   Sometimes he fished with people but he would fish.   He would clean his fish.   So didn't just sport fish but that was part of what he would prepare for

himself.  So these are a variety of aspects and that may have been a neighbor that he fished with.  I'm not sure if that's the neighbor that he did -- that he fished with.  But that came to mind when you brought him up.

Q.  Okay.  And so anything in this realm that you reflect on from reading reports or documents or the interview or anything that indicate that Mr. Rodriguez is in need of ongoing support?

A.  No.  And I want to underscore it by using an illustration of another example.  Mr. Rodriguez was not limited -- is not limited in anything he wants to learn about.  He's self-directed when it comes to learning. An example of this is when he was released from prison in 2003 his family bought him a car.  Now he'd been locked up for a while and it was late model Mercury Sable.  And in order to become acquainted with the electronics he read the manual.  He self-taught.

So if he doesn't learn, if he doesn't know, he self-teaches.  If he doesn't self-teach and someone else is teaching him, he learns.  But he acquires practical understanding and he's interested.  There are things that he demonstrated are practical understanding of that I have no interest in, and that just speaks to the idea if something's interesting to him he goes and he acquires knowledge and he learns what he's going to

learn about.  And what it leads to is a familiarity about a variety of subjects but more importantly the ability to apply them.

He obviously was a good enough driver that his sister Ileana trusted her children being driven by him.  If you don't think someone's a good driver, you're not going to allow that to happen.  So he learned what he needed to learn to master that car and he used it and used it for his practical day-to-day needs.  And he acquired the practical understanding and needed no assistance from anybody in order to do so.

Q.  Okay.  Next area that you address, Doctor, is called "Judgment."

A.  Yes.

Q.  And how -- or what reflected on Mr. Rodriguez's judgment capabilities?

A.  The most documented reflection of this were the records from Minnesota State Hospital, which in various places speak to how he earned housing and other kind of work privileges by virtue of the confidence that the staff had in him.  And they had confidence in him -- they had enough confidence in his judgment that he was appointed to a leadership role in what they called the Residents Assistance Program, or the RAP, at the hospital.  And so he was given the responsibility to

accompany people out on a pass from a secure facility. That's a typical staff. So he was entrusted with responsibilities that one would give to staff.

And so that speaks to the staff's confidence in his judgment. You're not going to send somebody with staff-quality responsibilities to a completely unmonitored area unless you have confidence in his judgment. So their exposure and experience with him was such that he engendered that level of confidence in his judgment, and it was also reflected in some of the other activities he was able to participate in while he was there.

Q. Let me -- let me show you Government's Exhibit 649 if I could (indicating). This is just one page of a psychological report in regard to Mr. Rodriguez.

We would offer 649, Your Honor.

MS. FISHER: No objection.

THE COURT: 649 is received.

Q. (Mr. Reisenauer continuing) And I think you're talking about what's reflected, Doctor, on the last paragraph on the page. I'll just read this. It says: "Mr. Rodriguez was transferred to the Sex Offender Treatment Unit to participate in the program on June 17, 1975." So this is early on, fairly early on in his stay. And it says: "He currently resides on the

treatment unit which operates according to therapeutic community guidelines, has been a member of the Unit Board of Directors, and has been involved in the Resident Assistant Program, a program in which he must accept responsibility for helping other residents."

That's what you're referring to?

A.   Yes.

Q.   Okay.   These --

A.   Although, additionally what it points out is the idea of his being on the Unit Board of Directors is actually a separate leadership responsibility that he was provided.   There's actually more than one leadership responsibility that he had while he was there.

I think this is notable because this is dated December 1976, and the record demonstrates that over time he made from a standpoint of psychological mindedness, insight, that he matured and impressed the staff all the more as his hospitalization continued.   So this would have been at an even earlier stage of his hospitalization.

What I want to tell you is that the documentation only became more impressive in terms of his function and his mastery of the experience by the time he was released a few years later.

Q.   Thank you.   Anything in this realm that you read,

heard about, that indicates that he needs support?

A.    No.    And there are a couple of other examples of judgment that are notable especially given what we're here about.  He's someone who had guns and we talked about it.  And he said that he would not go out with guns because they would be too easy to use.  And we spoke about his experience with knives and this was an opportunity I actually had to follow up with a witness and get his input about a confrontation he had.  And he had never attacked someone with a knife.  He used the knife for effect.  But he did not actually stab someone but was in a fight with someone and was afraid of the person he was in a fight with so he pulled out the knife.  And I contacted that person we spoke about.

So he was comfortable if he had a knife but he wouldn't bring -- he had guns but he would not bring a gun out with him because he felt that he would be too easily put in a position where he might use one.  Now you might say:  Well, what does that mean?  We also spoke about his drug use and his drug sales and it was in that kind of context.  It would not be surprising for a person who's selling drugs or who's buying drugs to find himself in a place where he might get robbed or he might otherwise face an aggressor.  This is a very realistic idea.  Where he took that judgment-wise is

that if he had a gun on him he might be put in a position where he would use it.  And he would not want to be in that position so better not carry something that he otherwise would use because he hunted so he didn't just have guns.  He used them.

So this is an example of the application of judgment, which is adult.  Again some people might do it differently, but this is not the judgment of a person who has a level of intellectual disability.  Now he's thoughtful about it.  And even in our discussion about drugs there were drugs he did not use because he was aware of their effects on him.  He did not want to be affected that way.  So he was employing a selectivity. So these are other examples cognitively of judgment and how he went about his day.

Q.  Let me stop you there, Doctor.  I recall a document that I believe is in evidence where he indicated that he stopped using certain drugs.  Would that reflect his judgment as well?

A.  Sure, because it reflects an awareness that drugs may have a detrimental impact on him.  Certainly he was aware and from an early age that while he was a person who had a -- who had a long-standing intense arousal from the fantasy of rape and that alcohol could medicate it, that alcohol became part of the problem for him at

an early age. And so when he first came into custody in the mid 1970s he presented with an awareness, however superficial or, you know, however he deeply internalized it, that alcohol was part of the problem.

Now flash forward to many years later. When we spoke about his life out in the community after he had been released in 2003, he said he would not go to any local bars in part because he was a registered sex offender but there's also this recognition on his part that if he had alcohol that it might lead to other things, which might then create problems for him as a person under that level of scrutiny.

So he did have insight into the consequences of drug and alcohol abuse. It doesn't mean that he was necessarily sober but it certainly means that he learned a lot along the way.

Q. And there's no indication or evidence that after he was released in early 2003 that he was drinking alcohol at all to my knowledge in the record. Would that be correct?

A. I would have to go back and study it. Certainly the idea of drug abuse and dependence was not a significant part of his portfolio and he was sober when he attacked and killed Dru Sjodin.

Q. Okay.

A.    But in terms of the role, you know, what was going on with him recreationally, I'd have to go back and look at my record of exactly what's there on that issue.

THE COURT:  All right.  We'll -- this looks like a time we should break and so we'll go ahead and break for the day.  We'll start again tomorrow morning at 9 a.m.

MR. REISENAUER:  Thank you, Your Honor.

(Adjourned at 4:55 p.m.)