1491

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                              )
United States of America,     )
                              )
      Plaintiff/Respondent,   )
                              )
          vs.                 )    **FILE NO. 2:04-cr-55**
                              )
Alfonso Rodriguez, Jr.,       )
                              )
      Defendant/Petitioner.   )
                              )
- - - - - - - - - - - - - - - -

**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**Evidentiary Hearing - Volume 8 of 9**

**February 6, 2019**

**Pages 1491-1719**

HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
         655 FIRST AVENUE NORTH
         FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

**A P P E A R A N C E S**

**MR. KEITH W. REISENAUER**              **COUNSEL FOR PLAINTIFF;**
**MS. MELISSA H. BURKLAND**
Office of U.S. Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102

**MR. JOSEPH W. LUBY**                   **COUNSEL FOR DEFENDANT;**
**MR. ERIC J. MONTROY**
**MS. ANNE FISHER**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

# I N D E X

## W I T N E S S E S

**GOVERNMENT'S:**                                                    **PAGE NO.**

   **MICHAEL WELNER**

   Direct Examination (Cont.) By Mr. Reisenauer    1497
   Cross-Examination by Ms. Fisher                 1570
   Redirect Examination by Mr. Reisenauer          1653

**DEFENDANT/PETITIONER'S:**

   **RICARDO WEINSTEIN**

   Direct Examination by Mr. Montroy               1672

## E X H I B I T S

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's 104 | Newsroom - Allentown Morning Call B1 Dated 3/29/02 | 1587 | 1589 |
| Defendant's 105 | Transcript of Interview Between Mr. Rodriguez and Dr. Welner | 1594 | 1594 |
| Defendant's 106 | Transcript of Interview Between Mr. Rodriguez and Dr. Welner | 1596 | 1596 |
| Defendant's 107 | Transcript of Interview Between Mr. Rodriguez and Dr. Seward | 1602 | 1602 |
| Defendant's 108 | Transcript of Interview Between Mr. Rodriguez and Dr. Welner | 1606 | 1606 |
| Defendant's 109 | Demonstrative Exhibit Re: Alfonso Rodriguez Interview Information about Drug Dealing Marijuana | 1608 | 1609 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Defendant's 110 | Progress Notes Dated 11/13/79 | 1619 | 1619 |
| Defendant's 111 | Letter to Dr. Sheppard Dated 1/14/75 | 1630 | 1630 |
| Defendant's 112 | FBI Report Re: Robert Whalen, date transcribed 8/21/06 | 1631 | 1631 |
| Defendant's 113 | Transcript of Closing Argument at Trial | 1645 | 1645 |
| Defendant's 114 | Trial Testimony of Special Agent Ahlquist | 1646 | 1646 |
| Defendant's 115 | Declaration of Ron Ruiz | 1704 | 1704 |
| Defendant's 116 | The Post-High School Outcomes of Young Adults With Disabilities up to Eight Years After High School | 1708 | 1709 |
| Defendant's 117 | Chart put together by Dr. Ricardo Weinstein | 1710 | 1712 |
| Government's 650 | Transcript of State of MN County of Polk v. Alfonso Rodriguez Jr. File No. 5447 | 1498 | 1498 |
| Government's 651 | Transcript of Interview Between Dr. Welner and Mr. Rodriguez | 1500 | 1500 |
| Government's 652 | Transcript of Interview Between Dr. Welner and Mr. Rodriguez (6/28/13) | 1505 | 1505 |
| Government's 653 | Report of Statement | 1507 | 1507 |

**E X H I B I T S**

| EXHIBIT NO. | DESCRIPTION | OFR'D | REC'D |
|---|---|---|---|
| Government's 654 | Transcript of Interview Between Dr. Welner and Mr. Rodriguez 6/28/13 | 1519 | 1519 |
| Government's 655 | FBI Report Re: Gayle Vagley, Date Transcribed 8/19/06 | 1522 | 1522 |
| Government's 656 | Transcript of Interview Between Dr. Welner and Mr. Rodriguez | 1527 | 1527 |
| Government's 657 | Supplementary Investigation Report Dated 12/03/03 | 1531 | 1531 |
| Government's 658 | FBI Report Re: David Hall, Date of Transcript 7/21/06 | 1536 | 1536 |
| Government's 659 | Psychological Addendum MN Security Hospital Dated 4/2/1979 | 1536 | 1536 |
| Government's 660 | 1-page (Document 777-3 Page 3 of 9) | 1536 | 1536 |
| Government's 661 | Interview of Alfonso Rodriguez Jr. and Dr. Welner | 1540 | 1541 |
| Government's 662 | General Team Review - Progress Notes | 1547 | 1548 |
| Government's 663A | DVD - Dr. Welner Interview on 6/28/13 | 1557 | 1557 |
| Government's 664B | Transcript of Dr. Welner Interview On 6/28/13 | 1557 | 1557 |

**P R O C E E D I N G S**

(February 6, 2019:  The following proceedings commenced at 9:00 a.m., in open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled United States of America versus Alfonso Rodriguez.  It is File No. 2:04-cr-55.  The record should reflect that the petitioner has waived his right to be present.  He appears through his counsel, Ms. Fisher, Mr. Luby and Mr. Montroy.  The United States appears through their counsel, Mr. Reisenauer and Ms. Burkland.  And when we broke Dr. Welner was on the stand.  Mr. Reisenauer was conducting a direct examination.  And -- or -- yes.

Dr. Welner, just one thing.  Yesterday you gave a number of rather long narrative answers and volunteered information.  That deprives the defense of an opportunity to object even though they didn't raise any objections.  I would appreciate it if you would answer only the question asked and then counsel can put another question to you at that point.  It is regular order in courtrooms to act that way.

Mr. Reisenauer?

MR. REISENAUER:  Thank you, Your Honor.

**MICHAEL WELNER,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION (CONT)**

**BY MR. REISENAUER:**

Q.  Doctor, yesterday we were talking about the assessment of Mr. Rodriguez's intellect and as it pertains basically to criteria A there is I think one more domain of intelligence or intellect that we didn't get covered and that I believe is called the "Legal self-interest."

A.  That's correct, the ability to act in one's legal self-interest.

Q.  Okay.  And can you tell us what's reflected on his ability to act in his legal self-interest if you would.

A.  Yes.  What I would point out is that historically his experiences of dealing with police officers right back from his first arrest for the encounter with Shirley Seddon he was questioned.  He admitted to being in the car with her and then he invoked his legal right to silence and he has consistently raised his rights to remain silent in questioning.

In the context of later colloquy in court on his right -- charges involving Ms. Seddon and

Ms. Knudson, he offered in colloquy a statement expressing a lot of remorse.  That was in marked contrast to how he related to those incidents in our interview when he expressed contempt for Miss Seddon and Miss Knudson and a sense of satisfaction of what had happened.

So his ability to essentially portray himself a certain way in court in order to further his legal interest at the time during that colloquy reflected his ability to act in accordance with his legal self-interest.  He --

Q.  Let me stop you there, Doctor, if we could.  On that note let me hand you Government's Exhibit 650.

Your Honor, this is the plea colloquy that the doctor just alluded to in regard to the Elizabeth Knudson case.  We would offer Government's Exhibit 650.

THE COURT:  Is there any objection?

MS. FISHER:  No objection.

THE COURT:  650 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  And this is what you were alluding to how he spoke with the Court in regard to what occurred and his feelings so to speak on the issue with Miss Knudson?

A.  Yes.  That's what I was referencing.  And, if I

may, I believe we entered an exhibit yesterday or had an exhibit up here of my report, if I could have that just so that I could reference it from time to time as need be, but if I could also continue with my last answer to your last question.

Q.   What are you referring to?

A.   I gave all the exhibits back at the end of the day and one of the exhibits was my report.

Q.   Oh, you want the report.

A.   Yeah.

THE COURT:  No, that would be Exhibit 643.

MR. REISENAUER:  Thank you, Your Honor.

THE WITNESS:  Thank you.

MR. REISENAUER:  That was my fault.

A.   Another example of Mr. Rodriguez's ability to act in his legal self-interest was his adamant denial of the actions attributed to him involving Miss Whalen.  What was significant is that he maintained that denial even after the disposition of his case and long after he was incarcerated.

It was similar to the adamant denial that he had demonstrated in the aftermath of the arrest on Miss Carlson's case and, of course, he was acquitted in the Carlson case.  He likewise maintained an adamant denial of involvement in Dru Sjodin's disappearance all the way

through his questioning, and what was particularly notable about that was that he resisted family pressure to be more forthcoming with police. And so in so doing he was acting in his self-interest by not admitting to his participation in her disappearance.

Q. (Mr. Reisenauer continuing) Okay. Let me get you back to something I think you mentioned earlier and that was in your discussion with him, in your interview, he basically had the opposite stance so to speak that he took with the Court in his plea colloquy and that was basically he had I'll use the word "contempt" for Miss Seddon and Miss Knudson. You recall that?

A. That's correct. He spoke about them and attributes of them to suggest that they deserved what happened to them for different reasons.

Q. Okay. I'm going to hand you Government's Exhibit 651 if I could (indicating). This is part of the transcript of your conversation with him about this particular subject.

And I would offer 651, Your Honor.

A. Yes.

MS. FISHER: No objection.

THE COURT: 651 is received.

Q. (Mr. Reisenauer continuing) I'm going to turn your attention right away, Dr. Welner, to the very top

of the page.

A.   Yes.

Q.   And where Mr. Rodriguez says:  "I had hate in my heart for her," here he's talking about the incident with Shirley Seddon?

A.   Shirley Seddon, that's correct.

Q.   And this is what you were referring to some -- 20-some years later he indicates that as noted by his statement there that he had hate in his heart for her and he goes on to describe the incident.  And towards the bottom of the page he says four lines up, Mr. Rodriguez, you had asked him about what was going to happen and he just simply says:  "I was going to rape her.  That's it."  You say:  "That you were going to do what?"  And he says:  "Have sex with her."

There was some testimony or presentation of evidence previously that he stated that he did this because she laughed at him when he was pantsed when he was young.  You recall that?

A.   I'm familiar with that.

Q.   Okay.  There was -- was there any indication from him here that he had any remorse for what he had done to Miss Seddon?

A.   No.  And in his -- and in his reflections on the incident, he spoke in the past tense.  He said:  "I had

hate in my heart for her. That's all I had." So he wasn't reflecting on how he felt at the time of our meeting. He was reflecting on how he felt at the time. "I didn't care about the sex. I didn't have sex with her. I just wanted her humiliated the way she humiliated me, and so that's all it was."

And then he -- as you noted before he said basically that he was going to rape her and that's it.

Q. Okay. We have now -- Doctor, have we covered the areas of intellectual disability in terms of criteria A or not?

A. Well, I had one more point about his acting in his legal self-interest.

Q. Okay. Go ahead.

A. And that references his -- importantly at least because it relates to this matter of Dru Sjodin. When we spoke about the event itself, in his recollections of what happened he minimized his initiative and intent and portrayed her death as essentially a by-product of her being violent with him. And when he walked through it, his recounting, he essentially made her the aggressor and put himself in a position of just merely trying to restrain her because she was so out of control, kicking him, hitting him while he was trying to drive the car. So again that would minimize his responsibility and

suggest that he was, in fact, the victim when --

notwithstanding her being tied up because she was

kicking him and trying to get out of the car.

Q.   Okay, thank you.  We'll get back to this criteria A stuff a little bit later when we cover the decisions you've made or the diagnosis you've made.  But let's move on to the area of adaptive functioning if we could.

There are a number of different domains in this area.  I think you touched on I guess the three areas.  If you could just --

A.   That's correct.

Q.   -- tell us about those.

A.   Well, they're -- the three areas of adaptive skills that we appraise and assess in intellectual disability are conceptual, social and practical everyday independent skills.  There are three areas of conceptual, there are six of social, and there are eight of practical.

Q.   Okay.  Well, let's dive into those if we could.  The first one sounds similar to what we talked about yesterday and that is cognitive flexibility.  What is that and can you tell us what reflected on Mr. Rodriguez's cognitive flexibility?

A.   Well, the cognitive flexibility more specifically

shifts to an individual's ability to just shift priorities from what might be a focus at one particular time.  And a good example of his ability to utilize, to rely upon his cognitive flexibility, was in the Minnesota State Hospital records where they referred to his ability to relate to other peers despite going through a trial.  In other words he was going through the Carlson trial at the time and while he was able to do that he could still relate to other prisoners and to connect with them that he was not so self-absorbed.

As it specifically relates to the more recent events, he very quickly cleaned his car after the Sjodin disappearance.  And so on his own he was able to shift into some other aspects of what was necessary at the time.

On a more immediate basis as it relates to the Sjodin -- the Sjodin killing, when she died he spoke about how she began to bleed after she died and in order that her blood not get into his car he found just a bag that happened to be lying around very quickly and by his account placed it over her head in order that she not bleed in his car.  And, in fact, while there were a couple of drops of blood in the car otherwise there was nothing to be found.  But he improvised and was able to deal with the situation at hand using something that had

a completely different purpose in order to satisfy what he identified as a longer-term need.

Q.   And you talked to him about that in your interview, correct?

A.   Yes, I did.

Q.   Okay.  I'm going to hand you Government's Exhibit 652 (indicating), and it's a two-page part of your interview.

We would offer 652, Your Honor.

THE COURT:  Any objection?

MS. FISHER:  No objection.

THE COURT:  652 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  And let's talk about this conversation just quickly, Doctor.  I want to direct your attention to the bottom of page one where you actually say:  "Okay.  And, um, and you said that she was - you said that she started to bleed from her mouth."

You see that?

A.   Yes.

Q.   And then he says:  "Mm-hmm."  And you ask him to tell you more about that.  Mr. Rodriguez says:  "She was bleeding from the mouth, and I got worried, and I put a bag over her head for her not bleed on my car.  And that

was it.  But she was already gone by then."

That's what you were just referring to, Doctor?

A.  Yes.  And there's also an item on the next page and he's more specific.  He says it was a K-Mart bag. So again it was something that he got for a completely different purpose and he just improvised and that's cognitive flexibility.

Q.  Okay.  And at the time of the trial are you aware that there was, in fact, a K-Mart bag -- testimony in regard to the K-Mart bag that was found over Miss Sjodin's head?

A.  Yes.

Q.  Let's if we could --

A.  I --

Q.  Let me stop you there, Doctor.  There is an incident I think you talked about maybe yesterday in regard to the discussion Mr. Rodriguez had with Miss Seddon about going to the pastor?

A.  Yes.

Q.  Do you recall that?

A.  Yes.

Q.  Does that fall into this area?

A.  That's another example of cognitive flexibility, in other words his ability to, after an assault,

appreciate the priority of ensuring that he wouldn't be held accountable for his attack.  And so he immediately shifted from getting her to be sexually responsive to him -- or sexually available to him I should say and he immediately shifted to getting her to refocus on either getting help for her or to connect with whatever help he needed for himself as opposed to reporting him to the authorities and holding him accountable for rape.

Q.   Okay.

A.   And that's an excellent illustration of cognitive flexibility.

Q.   Let me hand you Government's Exhibit 653.  I believe this is Ms. Seddon's statement in regard to the incident (indicating).

Offer 653.

MS. FISHER:  No objection.

THE COURT:   653 is received.

Q.   (Mr. Reisenauer continuing)  Doctor, I'm going to just jump back.  We talked yesterday about his statement to Elizabeth Knudson after the incident with her where he said he felt ridiculous or foolish or something.  You recall that?

A.   Yes.

Q.   Does that fit into this realm as well?

A.   It does.  It speaks to his shifting priorities as

well as how it manifests itself in his behavior and the impression that he needs to cultivate in someone else where he was an aggressor.  As soon as it was done and she was taking him back to the city, he recognized that it was in his interest to adopt a more sympathetic posture and he did.

Q.  Okay.

A.  And whether it was effective or not is irrelevant.  As I pointed out it is consistent with a modus operandi of sex offenders who as a matter of their sophistication they relate to the victim in such a way to try to persuade them, sometimes to compel them, but they use different maneuverings to try to persuade them, convince them not to report or to redirect them to just other personal interests.

Q.  Okay.  Let's move on to -- let's see here, on page 112 you have something called "Functional academic skills" so let's talk about that in a minute.

You've obviously reviewed his school records and not only the records from school but also the records from when he was taking classes at the Minnesota Security Hospital and whether he got a diploma or a GED. You're aware of those particular school items?

A.  I am.

Q.  Okay.  And you are aware that when he first

started school when he was in the first, second, third grade or so he basically did not speak English.

A.    That's right.

Q.    Okay.  Now his failures or struggles with grades and then quitting school, you're aware of that as well?

A.    I'm aware of that.

Q.    Okay.  And --

A.    I've reviewed it.

Q.    So this particular area, functional academic skills, how does his schooling and later receiving his GED and all that -- how is that reflected at all, if at all, in his -- what you would call his functional academic skills?

A.    Well, one tracks that whole question from a chronological perspective.  When he first came to Crookston he didn't speak English.  Took him about two years to become fluent, and he was going to school in the language that he was completely illiterate in.  On top of that they spoke Spanish at home so there was no opportunity for him to go home and to be cultivated in a language in a way where he would have day-to-day familiarity.

On top of that, and unlike perhaps others who might be unfamiliar with the language, who might be unfamiliar even at home, the family was part of a social

network of Mexican Americans.  So everybody that he hung out with socially was also Spanish speaking so he was essentially contained in an environment which was removed, not only from a language perspective but also a cultural perspective.

As he became more acculturated, as he became better schooled, his grades improved and they maintained an improvement and an adequacy for him to move forward until the time that he began using drugs and alcohol. And what's particularly notable about that is that when he used drugs and alcohol he spoke in the records of actually becoming intoxicated before he even went to school.  To some people they may be affected by what they're abusing substance was but if you're intoxicated before you even get into classes of course you're going to be at a disadvantage whether you come to classes or not, and ultimately he dropped out.

Q.  Let me stop you there if I could.

A.  Yes.

Q.  So his grades frankly aren't very good but part of what he told you and others was that he didn't try. He was like -- you just suggested he was drinking alcohol and using drugs and he didn't like school and eventually he just quit because he wasn't interested, correct?

A.   Correct.

Q.   But once he got frankly into trouble and was at the Minnesota Security Hospital, he got back into the academics and did well at that point, correct?

A.   That's correct.

Q.   And by then he had decided that he was going to basically try put himself in a position of attempting to do what he could do and that's reflected in I think an interview with Dr. Seward and yourself; that when he actually put himself to the task he was capable of doing all right.

A.   And the records reflect that.  The records reflect his taking a different approach to learning, to self-betterment and to academic and specifically functional academic skills when he was at Minnesota State Hospital.  And over time they reflected that he not only learned English but his reading improved significantly, that he participated in a higher education program that was offered for adults there that involved heavy reading, that involved math, that he was able to succeed.  And there were comments from his teachers that are reflected therein that he had interest, that he had curiosity, that he learned quickly.  Specifically pivotal to a question of intellectual disability, not only does he learn but he

learns quickly when he's particularly motivated.  So these were that he retained and that he was expressive, that he could communicate well.

So these are all relevant domains.  They were all noted by his teachers and they contributed to his ability to participate and to perform adequately in these programs.

Q.   Okay.  So let's, if I could, reflect back on the beginning.  He didn't know English and so he struggled from the get-go in first, second, third, fourth grade and then frankly he was behind, correct?

A.   Yes.

Q.   And so his attitude was poor about the schooling at that point and then he got into the alcohol and drugs and quit school because he didn't care.

A.   His motivation was poor as it related to school and scholastic achievement.  And it's worth pointing out that notwithstanding that his father was a hard working man who supported the family well, there's also just further alienation because there was a time that he was essentially commuting the family between Laredo and Crookston so he wasn't grounded in the community and grounded in a peer group that would necessarily cultivate those kinds of influences.

And what's more his father was illiterate,

yet his father was perfectly capable of functioning as an adult and supporting the family and being a good dad. And his sister was illiterate and his sister went on to -- she is -- at least at the time of trial she was doing public relations for a doctor's office so for somebody who couldn't read who then actually developed a career in which communication is significant.

I think it's helpful to appreciate that he was growing up in a house where his sister was illiterate, his father was illiterate, there were a lot of influences around him which didn't necessarily encourage scholastic advancement but had other priorities.  He worked on the farm.  He did other things.  He was involved in the family.  And so there were just different priorities within the home.

Q.   Okay.  Page 115, Doctor, is a brief area that you have titled "Short term memory," and so this is an area I think that is reflected partially in Dr. Seward's testing and frankly Dr. Froming's testing prior to trial.

And so is this what you're talking about, this type of area?  And is there anything more that reflected on his short-term memory that you saw in the documents or from your interview?

A.   The documents of those who taught him in the

academic programs, teachers' comments spoke to his ability to retain.  We met over the course of three days and he demonstrated the ability to retain.  He showed adequate short-term memory.  So in addition to my experience of his functional academic skills, my experience of his short-term memory skills were that he needs no supports at all in either of those adaptive domains.

Q.  Okay.  On the same page there, Doctor, you have "Regulation of emotion and behavior in age-appropriate fashion."  What are you talking about there and what reflected on his ability in that regard?

A.  Well, he's been in custody for about 40 years and he's -- his record, his movements, are well monitored and scrutinized and his infraction history is really unremarkable for someone who's been locked up.  He's been locked up around many people who are instigators who have anti-social personality who are themselves predatory, and yet he's avoided involvement in those kinds of activities despite being around all kinds of elements of the underbelly that could impact him in one way or another.

So he's demonstrated a very clean record. That's been rewarded in terms of others' appraisal of him, and specifically he was incarcerated for 23 years

on the Whalen case and he was primarily on what's known as an honor unit. And you're on the honor unit because you can control your behavior and because you do. So he was recognized consistently for the regulation of his emotions and his behavior.

On a more micro level, on a more personal level, the Minnesota State Hospital notes reflected that the way he communicated with others when he was in conflict, when he was in conflict, not just generally, but he was able to be supportive and to control his own frustration and anger. So it wasn't just that he was -- that he avoided incidents but that even when he was in conflict he was able to communicate in such a way that he would discipline his frustration and anger. So these are examples of his ability to so regulate.

Q. And do you also recall from the records discussions, statements from members of his family that within the family itself, Doctor, he avoided conflict in terms of, you know, he didn't get involved in the arguments and, you know, the -- that as family dynamics are, the arguments within the family, whether it was between brothers and sisters or mom and dad or frankly the parents and the kids.

A. That's right. And it's notable because for people who are in prison and people out of prison,

people who are patients who come to see us in the clinical sense, they will primarily show their most polite and most put-together, most considerate face to the rest of the community, but to their family they show their worst.

And in his case around his family, notwithstanding the seriousness of what he'd been convicted for, his family never had a problem with his impulse control, with his behavioral management or his regulation of emotions and didn't need to support him in any way for the maintenance of his emotions and his behavior.

Q.   Okay.  The bottom of page 115, Doctor, you have "Understanding of risk in social settings."  What reflects his ability to do that?

A.   In his earlier years, in his youth, someone who knew him spoke of how when they as a group could potentially get into things that Al Rodriguez was one to avoid getting involved in activity that -- as he put it: If things got wild we could potentially go to jail.

So he could recognize before something might get out of hand and he would not participate in that activity with other people and expose himself to that kind of risk.

Q.   Okay.  That makes sense.

A.   Johnny Rocha was the name of the friend.

Q.   Okay.  Although, we did talk yesterday about his involvement in the burglaries but that wasn't part of a big group.  That was just with his buddy, Bill Mauer, right?

A.   And he was very specific about doing that under conditions that would minimize risk of entering a home and somebody actually being present and minimizing the potential for anyone even recognizing that something was missing.  So he characterized himself generally as someone who keeps himself out of the limelight, keeps himself off to the side.

And even for his illegal activity that's how he described it as something that he did either privately or very, very selectively of whom he might be doing it with.  Even when he said that he sold drugs he said he did it very selectively.  He did it only to a couple of people or he did it on the Indian reservations where he knew law enforcement to have a much less motivated presence for drug sale crimes, by his account.

Q.   As long as you're talking about drug sales, when he was in prison though he attempted and I think was successful at convincing at least some of the other inmates that he was a big drug dealer.  You recall that?

A.   Yes.

Q.  Does that reflect anything in this realm?

A.  Well, it does.  We spoke at length I think about a variety of aspects of drugs in prison, and what he expressed to me was that he did not use drugs in prison because he did not want to expose himself to having any debt to anyone because that would put him at risk.  The people who incur drug debt, because of ongoing drug use or habits that they develop, those are people who by virtue of being in that position they put themselves in peril.  So for that reason he specifically avoided drug use in prison and reflected his understanding of the greater risks involved just from the drugs themselves.

Secondly, he said that he elected not to lend money to people who were involved in drugs because if he did, again people once they start to borrow money from you, again it sets up the kind of dynamic that can potentially create risk.

And then as you reference here about the drug -- the drug dealer or the kingpin, maybe "kingpin" is -- that's my word, not his.  It wasn't an exaggeration but just the idea that he was a significant drug dealer apart from -- apart from insinuating that he was in prison for reasons that had nothing to do with his actual charges, which might have made him a target as many rapists are.

What he was also creating was an impression in other people that he was sending money outside of the prison because he had some kind of a business going on that others were taking care of and in so doing engendering the impression that the person you're dealing with here, it's not just me but it's my people outside the prison. And so it's a very clever way of setting up your own sense of protection as an unseen hand of someone that people can't account for. And that was an example of managing risk, understanding risk, of the need to make himself more imposing than he might actually be physically in person. And he was not attacked in prison and not exploited by others financially.

Q. Government's Exhibit 654, Doctor, is your discussion about that in particular that you just talked about.

We'd offer 654, Your Honor.

MS. FISHER: No objection.

THE COURT: 564 is received.

Q. (Mr. Reisenauer continuing) That's your discussion with him in regard to this drug dealing, sending money back while in prison, correct?

A. Yeah, and among other things. And he makes -- you know, he makes, as he does in many instances when

one speaks to him, very pragmatic forthright observations. He basically -- when I asked him about that specific point he said: "I would say in every prison you try to lie as much as possible." And he really spoke about how, you know, you have to put a rap out there in order to just get people to respond or have people think what you want them to think about you; that it's a matter of adaptation to the environment in order to manage your risk.

And he said in the same exchange he didn't feel the need to impress people. It wasn't because he wanted to impress people but it was because he was managing an idea that he wanted other people to have as a matter of keeping him safe and comfortable.

Q. Okay, thank you. Let's move on to page 117, Doctor. Here you have an area that you call "Maturity of Social Judgment." Now let me ask you a couple of questions about that.

I presume we're talking here about the relationships that he would have maintained, like his friendships with Bill Mauer, Johnny Rocha, whatever his friends are. We heard from I believe Dr. Seward. We put an exhibit in where in their discussion Mr. Rodriguez and Dr. Seward talk about, oh, I'm guessing 20 to 30 friends that he grew up with and hung

around with and then girlfriends as well.

Is this the type of area or type of thing that you're addressing here?

A.    Sure.    With respect to just maturity of social judgment, it's that but it's also a little bit more. His friendships were age-appropriate.    They were with individuals who were not themselves intellectually disabled but they were essentially peers either from school or from his community.    There was certain social groups where people would gather and get together.    So it was actually a fairly large group with a smaller group of people that he was closer to.

He also had girlfriends, age-appropriate girlfriends.    So he had girlfriends.    He had friends. He maintained these.    And while that may seem at odds with his persistent deviant sexual arousal, that's not at all at odds because the idea of a person's intimacy and a sense of desire may be in conflict with the sexual desire that they recognize is incompatible with someone else's comfort zone.

Q.    Well, let me stop you there, Doctor.    And I'm going to hand you Government's Exhibit 655 (indicating). This is a report and interview of Gayle Vagley.    Gayle Vagley was I guess one of his girlfriends in his younger years.    You recall that?

A.   Yes.

MR. REISENAUER:  We would offer Government's 655, Your Honor.

MS. FISHER:  No objection.

THE COURT:  655 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.   (Mr. Reisenauer continuing)  And, Doctor, I guess I'll -- I will lump all the girlfriends together.  None of them, including Gayle Vagley that I just gave you the report on, none of them, including her or Dotsie Dahl, indicated that Mr. Rodriguez was anything but frankly polite with them and didn't force them into any sexual situations or anything of the like.

A.   Yeah.  He was socially appropriate.  He was polite.  They were comfortable with him.  His family was comfortable with him and that also reflects in the maturity of his social judgment.  Everything that I had testified to yesterday about his essentially taking care of his mom and looking after her, well, his sister would have to be comfortable with that.  And she was comfortable by virtue of the maturity of his social judgment.

In all of the employment records that we have, he might have had an infraction here or an infraction there.  He got in trouble at the print shop

for printing a picture of LeAnn Rhimes but he never got in trouble for his interpersonal relationships with other people.  And people get fired every day and no one questions their intelligence because they can't get along with their co-workers.  He never had an issue in terms of his interpersonal, his social relationships with co-workers.  So that's another example of the maturity of his social judgment.

And then a further example is Ileana, his sister, her comfort level and the amount of time and the nature of unsupervised time he had with their children -- or with her children.  He is a convicted rapist.  His sister knows all about his history and she has no problem with him being with the kids and there never was a problem.  She talked about him playing with them.  He played appropriately.  He drove them places. He was very much involved in their lives.  And so again that's an example of maturity of social judgment, not just because -- not just because he didn't get in trouble but you have to be a certain way around children or they don't want to be around you, whether you're an offender or not.

So he was able to modulate his behavior socially such that the children would find that enjoyable and find him to be a person they'd want to be

around.

Q.   Okay.  And would that be -- take it one step further to the adults like the neighbor, Mr. Hegg.  When he was around him it was a mature conversation and he acted appropriately.  Mr. Hegg didn't indicate anything other than that, correct?

A.   That's correct.

Q.   Okay.

A.   I think it's also --

MS. FISHER:  Objection, nonresponsive.

THE COURT:  There's no question.  Sustained. Go ahead.

Q.   (Mr. Reisenauer continuing)  Why don't you turn your page, Doctor, to 118, please.  Here you have a section you call "Gullible."  This would be like gullibility, correct?

A.   Yes.

Q.   And if you would is there anything that reflects on whether or not Mr. Rodriguez is gullible?

A.   Yeah, there are a few things.  First of all, from his early days in describing him that he did not get involved in some of the other trouble-making activities of his adolescent peers demonstrates that from an early age he was able to resist peer pressure.

Secondly, when he was in the Minnesota State

Hospital he was put in positions of leadership, whether it was on a Unit Board of Directors or whether it was the RAP where he was a leader among peers, not a follower of peers.

And then as a matter of just his social way of relating when he was out in the community he had friends and people that he might interact but he was primarily described by his family as a loner and that he preferred to keep to himself. So he wasn't so needy that he had to be around someone else or to latch onto another person by virtue of his limitations that he could be led around. He led himself around. And it vividly manifests itself exquisitely I would say without exaggeration in his interrogation by law enforcement officers.

Q. How is that, Doctor?

A. Because he -- and this is coming from a reference point of having to deal on a professional level interrogations as a matter of my daily responsibilities. He was -- he was interrogated with a lot of pressure in a high profile case, a very sensitive case, and one can feel the intensity of the interrogation that he was subject to by multiple law enforcement officers.

Q. Now you're talking about this case we're in court for today.

A.   That's correct.  That's correct.  And not only did he resist their efforts to cajole him, to persuade him to be more cooperative, but even with no control over the environment he's sitting there in an interrogation and he's got these law enforcement officers and they're controlling the room and the tempo. He was successfully misleading them about Dru Sjodin and her whereabouts.  He was using -- and, of course, this involves not just his lack of gullibility but his communication facility, his cognitive flexibility and his overall sophistication.

But, for example, he was leading them to an impression that Dru Sjodin was in Grand Forks somewhere or that she might just be by the road but not where he actually put her but doing it in a way that was not at all obvious.  He was doing it very gently as they were pressuring him and trying to engage him in kind of exercises of, well, let's just talk about where you think that she might be.

And so he was able in a situation where he would have far less control than people who were gullible are persuaded and he was actually manipulating the officers who had control of the room.

Q.   Okay.  Different kind of gullibility in my mind here of like -- frankly my phone rings two, three times

a day and it's somebody trying to convince me that my school loans are still behind after 40 years and, you know, we have a lot of that type of activity going on in the country right now, rip-off artists I'll call them.

So in the sense of Mr. Rodriguez, you had discussion with him about his drug dealing and how he -- frankly at one time somebody tried to rip him off. Do you recall that?

A. That's right. He said that he -- somebody tried to sell him tea.

Q. Okay.

A. And -- or something that -- he thought it was tea and so he didn't buy it. But he smelled it and he was careful not to buy something that he would ultimately feel -- come to realize was worthless.

MR. REISENAUER: Let me provide that you transcript here quick, Government's 656 (indicating).

I would offer 656, Your Honor.

THE COURT: Any objection to 656?

MS. FISHER: I'm sorry, Your Honor, no, sir.

THE COURT: 656 is received.

Q. (Mr. Reisenauer continuing) And in this discussion if you would just read from the top of where you ask him: "Did you ever worry about being robbed?" Dr. Welner.

A.   And he says:  "No, because it was, 'I give you that.  Give me my money,' and that's it.  There was no, 'Here's the stuff.  Pay me later.'"

So he didn't operate on the layaway plan and specifically because he didn't want to be ripped off. "But did you ever worry" -- I asked him:  "Did you ever worry about meeting somebody and somebody would show up with a weapon and just say, 'Give me the stuff.'"  And he says:  "No, not with these people."

And then I asked him:  "Tell me what the difference - What gave you a sense of security?"  And he says:  "Well I knew they-they were - They - they had a lot to lose too and they were constantly in motion. They would - They would know that their parents would be finding out, you know?  So I didn't have any fear of that.  I had fear when I bought it from the big guy that he was gonna rip me off 'cause you never knew what was in the bag.  It was pretty hard to - to tell.  One guy tried to still me one time some tea."

So this speaks to what I had testified to earlier about how he was very selective about his clients and would -- would select people who had something to lose so they would be invested in having a more honest relationship with him.

But then he goes on and says:  "Some tea

bags."  I said:  "What did you do?"  He says:  "I didn't pay them.  I smelled it right off the bat.  He told me to roll up a joint, and he lit it up and he says, 'Here.'  And it tasted and smelled like - like weed but it's tea you know?"

So that's an example of -- "How did you know the difference if it tasted and smelled like weed?"  He said:  "I smelled it.  I smelled the tea before he, uh, lit it up and it smelled like tea."

Q.  Okay.  And obviously he later tells you that so he didn't buy it as you reflected?

A.  That's right.  He didn't pay for it.

Q.  Okay.  Move on to page 125, Doctor.

A.  Yes.

Q.  And here I believe we've addressed -- you know, part of what fits in here is -- and your section here is called "Maturity of communication and conversation," correct?

A.  Yes.

Q.  And so what reflects on this in terms of what we have previously discussed or anything else that comes to mind?

A.  Well, I began to touch on this in his discussions with law enforcement, not only the manipulation but the -- essentially what he exhibits in that

interrogation is how strong-minded he is.

Q. Okay.

A. But be that as it may, another aspect of his communication that I haven't touched on which is very advantageous to him and has been, it's more than an adaptive skill, it's a skill, is that he has a quick explanation for everything; that if he is accountable and it was manifested in certain aspects of this case in its investigation he's got a ready answer to explain everything. And unless one actually follows it up it's a credible, reasonable answer that would be convincing and he's able to generate it on the fly.

Q. So let me stop you there. In this particular case during the investigation Mr. Rodriguez informed his sister, Ileana, in fact that on the day that Miss Sjodin disappeared that his -- he locked his keys in his car. You recall that?

A. That's correct, and that that's why he was delayed.

MR. REISENAUER: Hang on there a second. If I can have one second, Your Honor?

THE COURT: You may.

MR. REISENAUER: Your Honor, I apologize, I only have one copy of this exhibit, 657.

THE COURT: That's fine.

Q.   (Mr. Reisenauer continuing)  This is an interview of Ileana regarding the story that Mr. Rodriguez told her about locking the keys in the car.  Do you recall this discussion, Doctor?

A.   Yes.

MR. REISENAUER:  And we would offer 657, Your Honor.  I will provide a copy to the Court.

MS. FISHER:  No objection.

THE COURT:  657 is received.

Q.   (Mr. Reisenauer continuing)  So, Doctor, this goes back to what you just said I believe about him having the ability to tell a story and unless it's checked out I guess that's the way it's going to be.

What did -- what did Ileana do in regard to this story about his keys being locked in his car?

A.   Well, Ileana actually took the initiative to call a locksmith, which was certainly quite unusual, but she was familiar with his history and she was worried and she was a concerned member of the community with the trauma of a disappeared young woman.  And she found that the locksmith wasn't open so he couldn't have gone to the locksmith.  And she confronted him with it and he turned it around and said:  Oh, well, you know, I decided to use a hanger and I used a hanger to get into the car.  So he had a response at the ready.

And that was consistent with how he approached different aspects of this investigation such as asking him to account for his whereabouts when he was at the mall.  Oh, I went to a movie and the movie started at 4:30, because she went missing during the time that he would be expected to be in a movie.  So that's consistent with his being able to produce an explanation readily and a reflection of his impressive communication skills.

Q.  Okay.  And at the same time a different sense of that would be your interview or Dr. Seward's interview that you had that were recorded, and certainly over that period of time you see his ability and maturity of his communication, correct?

A.  Sure.  There are numerous examples and in many ways they reflected on that intellectual ability to act in his legal self-interest because he would steer our discussion in ways that we'd reinforce the doctors' points of their reports.

Q.  Okay, thank you.  Turn to page 126 of your report.

A.  Okay.

Q.  And here you have a section that you entitle "Social maturity and perceiving social cues."

What's reflected on those?  And let me start

this way.  Obviously he had different friends for different purposes.  He had the girlfriends and then he had his drug dealer friends and then he had the other set of friends that he may have participated in going fishing with and so forth.

So is that what you're speaking of here?

A.  Well, that's an example.  It's not obvious.  Not everybody can do that.  Not everybody can have different friends for different purposes for -- you know, this is my fishing friend and this is my drug friend and this is my other friend.  And he described having different friends for different purposes and that is a maturity.  The ability to recognize that, yeah, you know, you can do certain things with this person, but if you can't do certain things with them doesn't mean you can't be their friend.  You can be friends with them for this and friends with someone else for that.

And that does reflect a maturity.  It reflects a maturity that others found him appropriate, that others found him polite, that he would relate.  It reflects a maturity and is certainly unusual in my experience when someone has many incarcerations and a long history of rape when you communicate with collateral informants.  When I spoke to him about it he would underplay the relationships and characterize them

as sort of acquaintances.  But talking to them on the telephone they would say:  Oh, yeah, he was my friend. So people would readily characterize him as a friend notwithstanding his notoriety and that speaks to their fondness and their recollection of him on a personal level and also just how he related to them.  If you're not sensitive to other people, they're not going to maintain that continuity.

When he left Minnesota State Hospital after a number of years on rape convictions, he reunited with an old girlfriend.  So another example of someone who was willing to rekindle a relationship notwithstanding his notoriety, notwithstanding the offense, and that speaks to the quality of their personal connection.

In Minnesota State Hospital where you have mental health professionals who were praising the behavior, the emotions, the relatedness, he was described by one person as socially responsive and responsible.  He was described by somebody else as sensitive, caring, empathic.  These are -- especially among people who are convicted of those charges, that's impressive.

So you don't get depicted as empathic and sensitive unless you can perceive social cues in a mature manner and alternatively as an appropriate role

model.  Literally another chart referenced him as an appropriate role model socially and recreationally.  So that's an example of his maturity of him socially and his ability to perceive cues.

Q.  And I expect that's reflected also by the people at the Minnesota Security Hospital who placed him in a position of being one of the leaders of the group and watching over some of the other people within the unit.

A.  That's right.  And the idea of adjusting well, adapting well to the needs of others, which was another way in which he was characterized.

Q.  Okay.

A.  You can't adapt to the needs of others if you can't perceive social cues.

Q.  Speaking of needs of others, let's go to his personal needs or personal life.  Your area regarding personal care is on page 128 of your report, Doctor.

A.  Yes.

Q.  Let's turn to that.  This is -- I expect you're talking about whether he takes a shower, wears clean clothes and keeps himself at least groomed and has -- and has hygiene, right?

A.  Well, it's a number of things.  That's an example.  He's consistently described as being well-groomed.  He's consistently described as attending

to his hygiene.  He maintains his diet.  He maintains his fitness and again in an environment that's not necessarily known for being a spa.  He is -- his room was clean.  The home was clean when he was out in the community.  He was not only functioning as a homemaker but he was essentially functioning as a homeowner for all of the maintenance that he was taking responsibility for.

So he was -- he was involved in a variety of different aspects of his personal care, not only his own care but also caring for his mother.  So he not only reflected that he didn't need help for his own care but that he was able to attend to the care of others.

Q.  Okay, hang on there for a second, Doc.  I think we have a couple exhibits that we want to put in in regard to -- of what you were just talking about.

Doctor, I'm going to hand you three exhibits, 659 --

THE COURT:  658.

MR. REISENAUER:  Yup, here's 658 and then 660 on the back.  And we would offer those three exhibits, Your Honor.

MS. FISHER:  No objection.

Q.  (Mr. Reisenauer continuing)  Doctor, these are --

THE COURT:  They're received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Turn your attention to 658 first, Doctor.

A.  Yeah.

Q.  On the first page the fourth paragraph down this is a statement by David Hall, who's a retired corrections officer from the Minnesota Department of Corrections.  You see that up in the corner?

A.  Yes.

Q.  And the fourth paragraph down reads:  "Hall recalled that despite this opinion, he could say that Rodriguez awoke each day by 5:30 a.m. to shower and ready himself for the day.  Rodriguez had one of the cleanest units on the floor.  Rodriguez always had clean, finely creased shirts and shoes that were well shined."

You see that?

A.  Yes.

Q.  This is what you were speaking of?

A.  Yes.

Q.  Okay.  And if you turn to the next exhibit, 659, the second paragraph there says -- this is again another report from the Minnesota Security Hospital.  You see that?

A.  Yes.

Q.   And here it reflects:  "Mr. Rodriguez was seen in a clinical interview on March 29, 1979, lasting approximately one hour.  He appeared to be clean and well-groomed, dressed in a brown knit shirt, brown jeans and, well-polished boots."

You see that?

A.   Yes, I do.

Q.   And then his family also in their statements reflected his hygiene and cleanliness as well, correct?

A.   That's correct.

Q.   And if you look at Government's Exhibit 660, this is part of a statement of one of his sisters, and again in this statement it reflects his cleanliness if you go to paragraph 14.

A.   Yes.

Q.   She says:  "As a kid, Tito would clean his possessions over and over again.  If he had finished playing with a toy, he would clean it and put it back in its place.  He had a little case that had a cleaning solution and a cleaning cloth inside of it.  That's what he used to clean his things, especially his shoes.  When he finished cleaning one of his possessions, he would fold up the little cloth and put it neatly back in its case.  Tito would clean his shoes every day when he came home from school, as he was taking them off."

Do you see that?

A.   Yes.

Q.   And those three exhibits are examples of what you've been talking about and there's numerous other examples throughout the documentation, correct?

A.   Sure, of other aspects of personal care.  He was entrusted to take his own medication.  These are other examples of where he attended to his personal care.

Q.   Okay.  Well, we'll get to more about his medication as we go on here.  The next two sections on page 130 and 131 kind of lead us into that.  You have one section called "Healthcare decisions" and the next section is entitled "Nutrition."

You see those?

A.   Yes.

Q.   Okay.  Let's address the healthcare decision part.  What in your interview or documentation that you reviewed reflects on his ability to make proper healthcare decisions?

A.   Well, the records reflect that he -- over the course of being in custody, he had numerous interactions with healthcare professionals and there were procedures that he accepted such as colonoscopy and there were things that medical people recommended to him that he refused such as a flu vaccine.  And no health

professional ever contested or questioned his capacity to refuse treatment or to accept treatment.  So his healthcare -- his understanding of conditions, his understanding of procedures, his understanding of risks and benefits was completely acceptable to all of the healthcare professionals who interacted with him.

He had an awareness in our discussion of different conditions that he was at risk for, things that he needed to manage such as his diabetes.  He learned to utilize biofeedback as I said in my earlier testimony but not only for hypoglycemia but he also learned to utilize biofeedback to treat headaches.  So he learned to self-manage his conditions as well.  So he didn't require any additional supports for making healthcare decisions or for managing his personal healthcare needs.

Q.   Okay.  You mentioned a discussion about his diabetes and you've talked to him about that, correct?

A.   Yes.

Q.   I'm going to just hand you a one-page exhibit (indicating).  It's 661.  And here you briefly on this page talked to him about his control and recognition of his diabetes.

We would offer Government's Exhibit 661, Your Honor.

MS. FISHER:  No objection.

THE COURT:  661 is received.

Q.   (Mr. Reisenauer continuing)  In looking at 661, Doctor, you have a discussion about his ability to check himself or determine whether or not he needs medication. I will refer you to the top half of the page there.

Mr. Rodriguez says:  "Uh, I stay away from all kindsa sweets."  You see that?

A.   That's correct, yes.

Q.   Can you read that conversation you have with him from there?

A.   I had asked him:  "Was there anything that you did on your own to prevent getting diabetes?"  He said: "Well, I quit drinkin' pop and I avoid, uh, sweets, you know, so that's all I did."

And I said:  "So is that a part of what you're doing now to keep it under control?"  And he said:  "Yeah.  I don't drink coffee no more.  I stay away from, uh, like rice, uh, stuff like that.  Uh, the doctor said I can eat rice, but only about half a cup."

So he's following medical advice and he's having a discussion with his care providers.  "Uh, I stay away from all kindsa sweets.  But sometimes I have to eat sweets because my sugar gets too low sometimes. Like one time I got, I checked it and it was, uh, 80,

84.  I like to keep it around 105."

So I said:  "How do you check it?"  And he says:  "You just poke your, poke yourself, put the blood on the, uh, strip and use the meter."

So he uses a glucometer and he knows how to evaluate the results.

"How do you know when to check it?"  "I can, I can check it in the mornings," he says.

"And do you, do you have - are there times where you just may, on your own, say, I have to check my sugar?"  He says:  "Yeah."

"What kinds of things would make you check your sugar?"  "Feel a little dizzy, you know?  I, I got more problems, now.  I got more problems now with low blood sugar than I do high, 'cause that's when I, when I'm low, that's when I feel clammy, dizzy, um, anxious, and, uh, and then, as soon as I eat somethin', it goes away."

And that's a proper appraisal of what the symptoms of hypoglycemia are:  anxiety, clamminess and dizziness.

Q.  Okay.  That kind of has a bit to do with nutrition.

A.  Sure.

Q.  But nutrition is also not just attending to his

diabetes problem but frankly the idea of being able to make your own food and sustain yourself, correct?

A. Sure.

Q. Okay. And we have -- I think we've had discussion already about -- and we have in the records that he did some baking with his mother, helped can some vegetables or fruits, you recall that?

A. He knows how to can fruits and vegetables. I don't know whether his mother helped or whether he just did that for her as part of what he did for them. But he knew how to can vegetables. He knew how to -- he knew how not only to catch the fish but to prepare the fish. He baked -- he did bake with his mom. And again it speaks to not only him caring for her but caring for her on her terms. So that's an issue of his sensitivity to her and his capability in that regard.

But with respect to his nutrition, in our discussion we not only touched on his nutrition as it was sensitive to diabetes but also how he managed his diet to control his weight, to minimize his risk for heart disease, which was in his family, and to also keep his cholesterol in line. So he was aware of all of these risk factors that he needed to be mindful of and attentive to that.

Q. Is there anywhere in any of the records, Doctor,

that indicate from either declarations from his family or friends or the Minnesota State -- Minnesota Security Hospital or the Department of Corrections that indicates that he did not have the ability to eat properly or take care of his nutrition?

A.  No, there isn't.  And there's no reference to him needing any support to maintain his nutrition or his attentiveness to his healthcare.

Q.  Okay.  We touched on the next section you have. You have -- well, the next section is titled "Grocery shopping" but we've talked about that already in terms of his ability to help his mother and go buy groceries. But there's also evidence that we put in about him going -- when he was in that RAP program, he apparently was able through that program to go buy different foods for the other inmates as well as himself, correct?

A.  Well, he would take a shopping list so he would essentially function as a personal shopper for food for others.  They trusted him and he was reliable enough to fill others' needs.  And he shopped for his mom and he shopped for himself when he was out in the community, and this speaks to his money management.

He maintained a credit card and did so responsibly and once he was in custody he attended to his needs with commissary and did so responsibly and was

not exploited by others for his commissary or otherwise taken advantage of inside and outside of the community.

Q. And I don't know if you recall this but we also watched a short clip of a discussion Mr. Rodriguez had with Dr. Seward, and he mentions going to a butcher shop in a small town outside of Crookston a little ways from Crookston.

Do you recall that at all?

A. I don't recall it.

Q. Okay. But that would reflect his ability to obviously go grocery shopping if he decided to go to a different butcher shop in a different town because they had good meat or the meat he wanted?

A. That's right, to be selective about shopping and that's just a higher grade. One is to just simply get your needs fit, which is really the expectation that one would have for not needing additional supports. Another is to refine one's tastes to say: Well, this is a meat that I actually prefer because to me it's worth going there to get.

Q. Okay. Page 133, Doctor, you talk about "Transportation." We've talked about him getting his driver's license back, utilizing a car that his family bought for him. I think we may have even touched on him reading the Owner's Manual from the new car he had so he

could learn how to utilize the electronics properly.

A. Yes, we did.

Q. There is some testimony from Dr. Seward as I just noted, the interview he had with the map and the discussion about the trip down to Laredo, Texas, driving with Ileanna's sons and daughters, navigating around to the different locations like I just suggested with him going to the butcher shop, those sorts of things.

So I presume all of those things reflect on his ability to use transportation?

A. Sure. They reflect that he doesn't need additional sources of support in order to adequately attend to transportation needs as does his comfort in driving at night, as his comfort driving on back roads, recognizing and attending to the safety that he not strike a deer, that he drive on gravel roads such as when he deposited Dru Sjodin's remains as he did.

All of that reflects on his skills as a driver and as well as just the implicit trust. No responsible parent will let their kids drive with someone that they know well that they don't feel is a very capable driver and will get lost and can't manage transportation.

Q. And the next section is "Banking/money management," but I don't believe from any of the records

that I've seen that Mr. Rodriguez actually had a bank account so to speak but there is some records indicating that he had developed a budget before he was released from prison.

Do you recall those?

A.   That's correct.  That's right.

Q.   And --

A.   This was evaluated.  This was evaluated.  My recollection was that it was actually Minnesota State Hospital and that their sense of it was that his budget plan was adequate.  It may have been in the prison.  I thought it was at Minnesota in the security hospital but that -- his budget he reviewed with someone who expressed confidence in his budget plan.  So he has a capacity to maintain a budget just as he did the use of a credit card account and responsible financial decision-making.

Q.   Let me stop you there, Doctor.  As a matter of fact, your recollection is better than mine.  It was at the Minnesota Security Hospital.  This is Government's Exhibit 662, Doctor (indicating), and this is entitled "GENERAL TEAM REVIEW" and signed by Mr. Richard Seely who was the unit director.

We would offer 662, Your Honor.

THE COURT:  Any objection?

MS. FISHER:  No objection.

THE COURT:  662 is received.

MR. REISENAUER:  Thank you, Your Honor.

Q.  (Mr. Reisenauer continuing)  Doctor, I just want to direct your attention to -- in the typed portion of the document, it would be the fifth line up from the bottom.

A.  Yes.

Q.  It reads here:  "Mr. Rodriguez has developed a realistic budget.  Mr. Rodriguez's request to move into independent living is supported by Mr. Hunter and the staff at Horizon House."

You see that?

A.  Correct.

Q.  Thank you.  In the opposite approach to this, and we talked about gullibility earlier, but the idea that an individual has the ability to manage their money, there's no indication that Mr. Rodriguez was ever taken advantage of in terms of, you know, spending his money wisely or losing money or being ripped off?

A.  No evidence and no history.

Q.  The next section, if you turn the page, page 134, Doctor, you have a short section there where you call it "Support in legal decisions."

A.  That's right.

Q.   And what do you mean by that and what's reflected in the documents or your interviews in regard to that?

A.   His communications are such that he is aware of his legal challenges and his communications are consistent with supporting them.  And by every indication he's worked cooperatively and collaboratively with his legal counsel through the proceedings.

Q.   Okay.  And then on the very next page at the top of that page you have a section called "Vocational training and learning."  I take it you're talking about his work background and his ability to learn different areas that may address, you know, household living or daily practical living, correct?

A.   And to use them.  He pointed out that when he dropped out of school that he went to work very shortly thereafter as a janitor in the high school in the same place but the grounds as he described them were substantial.  There were significant demands both indoors and outdoors.  And not only that but it was an atmosphere where his work had to operate under inspection.

So he was accountable to people to make sure that things were really clean.  And this was not just inspection from the local -- from supervisors in the school but there were inspections I suppose from the

school board or from some other higher authority to just make sure that the school itself was properly maintained for the children.

So he had to not only perform in a variety of tasks that are detailed in my report on page 135, and they're various, they're extensive, and this is from a teenage age, but he had to succeed and he had to be responsive to performance expectations. So whether he was in custody or out of custody he could readily be replaced. No person who's in a state hospital or who's in prison is going to turn around and say: Well, you can't fire me because I'm in a union. If you don't succeed they'll replace you and somebody will be there wanting to take that job.

So you have to perform to some expectation. The expectations may have been even higher in the school, but he demonstrated the ability to use what he was being trained in, whether it be the print shop that he would train others in or whether it be more custodial responsibilities, whether it was work as a carpenter or -- look, he was working eight to 10 hours a day in a community when he was arrested on these charges and taking care of the home and looking after his mom. So he was -- he was putting up drywall then so he was -- he was not fired for lack of competence. He was not fired

for interpersonal problems.  He was maintaining his employment.  And even when he left this janitor position, when I spoke to him about it, he had left for something that would pay him more and so he left on his terms.

Q.  Okay.  Let's talk about a couple of those issues and we'll just hit on that.  We do have an exhibit.  I don't know what the number is but we do have an exhibit in the record which is a Presentence Investigation Report which reflects what you were just talking about when he quit school.  I'll just read it to you.

It says:  Before quitting high school in 1970, the defendant was employed with the Crookston Public Schools as a maintenance worker earning a dollar fifteen an hour.  During the summer of 1972, he was employed with Roger Tollefson Farms of Beltrami, Minnesota.  From September of 1972 till March of 1973, he was employed at American Crystal Sugar.  During the summer of 1974, he was employed at the Red River Alfalfa Company.  And from September until the time of his arrest, he was employed at American Crystal Sugar.

You were aware of all those different employments --

A.  Yes.

Q.  -- jobs?

A.   Yes.

Q.   And then you did mention the print shop job.  And he had that job for quite a long time, correct?

A.   That's correct.

Q.   And as you noted he became proficient enough that he taught other people how to work in the print shop.

A.   That's correct.

Q.   And the only problem he ever had was that picture of LeAnn Rhimes, which apparently he was then relieved of his duties in the print shop for a while but he did get the job back, correct?

A.   Sure.  For what he had to do, he was engraving name plates.  His boss said that he actually developed his own a technique for bevelling a name plate where it would still catch.  So he was able to be creative and to actually come up with solutions.  Again a reflection of his reason but he was valuable enough as an employee to come back and do something that was a specialized skill working with the software as well as the equipment.

Q.   Okay, thank you.  I think that gets us through all those areas, Doctor.

A.   That's right.

Q.   Okay, thank you.  So let's go back to the DSM-5. So we got three criteria, correct?

A.   That's correct.

Q.    Okay.  We got the intellectual functioning under criteria A?

A.    That's right.

Q.    And then the adaptive functioning that we just talked about under criteria B?

A.    That's right.

Q.    And then criteria C -- well, let -- and there's need for support, correct, for these areas?

A.    That's right.  There is deficits in intellect, deficits in adaptive skills conceptually, socially and practical independent living, and if a person doesn't have ongoing support -- not "Hey, can you help me put up drywall because I need an extra pair of hands."

Q.    Or for that matter he needed help learning English, right?  That doesn't -- that's not support that's ongoing.  He needed help learning English when he was young and --

A.    Everybody needs a tutor.

Q.    Yeah.

A.    So -- you know, but it's -- people ask for help but it's the idea of ongoing support in order to meet the sociocultural and developmental expectations of your peer group.  In other words that all your peers don't need this ongoing help but you do.  That's the problem with that adaptive skill that you have.  And DSM is very

clear that this has to be derived from home, community, work, school, so that you don't cherry pick. You know, you don't pick this and go: Uh-huh, he got drunk at the hospital; ergo, he's not socially responsible. Well, he's an alcoholic. But one instance does not reflect on his overall prevailing social maturity, social judgment.

So it is meant -- DSM is very specific in the criteria to talk about ongoing support and to derive an impression from a variety of different contexts so that one can get a consistent sense of this intellectual domain, this social domain, this practical domain, and a real feel for the skill and informed clinical judgment.

Q. Okay. And so there's the criteria C which is occurrence prior to age 18 it used to be, and now the wording has changed a bit. But those are the three criteria, correct?

A. That's correct.

Q. And all three have to have been met for the individual to be found to be intellectually disabled.

A. That's right. One has to have criterion A and criterion B and criterion C.

Q. Okay.

A. Or one is not intellectually disabled.

Q. And we've talked about the Minnesota Security Hospital a number of times in the last day or so, and in

your review of all of the records, not just from there but all of the other records in this particular case, are there any doctors or psychologists or therapy leaders, psychiatrists, anybody who followed Mr. Rodriguez, monitored him, assessed him, that found that he fit in the mental retardation area?

A.    In four to five years of documentation of psychiatrists, psychologists, social workers, other professionals giving continuous observation in custody, no one diagnosed him with being mentally retarded.  No one referenced him as being intellectually disabled.  No one found him to be intellectually limited and none consistently across the board.

Q.    Okay.  And in your interview with him and in your review of all the documents, interviews and so forth, you have similarly not found that, correct?  He doesn't fit criterion A, he doesn't fit criterion B nor criterion C obviously.

A.    He doesn't fit those -- he doesn't meet the criteria A, B or C.  In each of the subdomains that I've discussed, that I've evaluated, there wasn't one domain that I found that he needed support let alone ongoing support.  He was capable to manage as any other average individual might be expected of his peer group and his sociocultural and developmental level.

MR. REISENAUER:  Okay, thank you.  Doctor -- sorry, Your Honor, now might be a good time for a break.

THE COURT:  Yeah, that's what I was just going to suggest; that perhaps you'll be moving on. We'll break for 20 minutes at this point.  We'll start again at 10 to 11:00.

(Recess taken; 10:35 a.m. to 10:55 a.m.)

(In open court, all counsel present.)

THE COURT:  We are back on the record in a case entitled Rodriguez -- well, United States versus Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that all counsel of record are present, that the petitioner has waived his right to appear.  Dr. Welner remains on the stand.

When we broke Mr. Reisenauer was conducting a direct examination.  You may continue.

MR. REISENAUER:  Thank you, Your Honor.  And sorry for the delay.  We had a little technical problem. I think we have it fixed.

Q.  (Mr. Reisenauer continuing)  Dr. Welner, you testified I believe it was yesterday that you met with Mr. Rodriguez over a three-day period, correct?

A.  That's correct.

Q.  And you did videotape your interview with him as well?

A.   Yes, that's correct.

Q.   And I take it that as a result of not only your review of the records as we've discussed but from your interview as we've also discussed that you have learned certain things from your discussion with him as it relates to his intellect and his adaptive functioning.

A.   Yes.

Q.   We have a short clip from your interview that we're going to play and then I'm going to ask you a few questions from that.  This is a clip you've reviewed since you've been here, correct?

A.   Yes, I have.

MR. REISENAUER:  Your Honor, the clip itself is marked 663A and then the transcript is Government's Exhibit 663B and I would -- I think I'm correct.  I don't believe this particular clip has the scrolling transcript so the Exhibit 663 would have to be looked at while the video is playing if you want to follow along.

We would offer those two exhibits, Your Honor.

THE COURT:  Any objection?

MS. FISHER:  I'm sorry, Your Honor, no objection.

THE COURT:  663 and 663A -- well, 663A and B are received.

MR. REISENAUER:  Thank you, Your Honor.  If we could go ahead and play that?

THE COURT:  You may.

(Government's Exhibit 663A played.)

Q.  (Mr. Reisenauer continuing)  Doctor, if we could I have a few questions in regard to these -- this small portion of your interview with Mr. Rodriguez.  We talked previously about I guess how your conversation ended there in terms of him placing the bag over her head after she was bleeding --

A.  Yes.

Q.  -- did you notice that?  And indicated earlier that that was part of his cognitive flexibility in terms of like what to do in that kind of situation and he reacted in the manner that he described, correct?

A.  Yes.  Not only to react and to come up with a solution of a problem where he was already thinking about how he would cover any trace of evidence but also just to utilize something that had a completely different purpose and to improvise and to quickly put it on and be thinking about leaving biological evidence behind so close in time to her death.

Q.  Okay.  And then I just want to touch on a couple other things here.  He told you about throwing the shoe off the bridge.  You recall that?

A.   That's correct.

Q.   And he said he threw it in the river but are you aware that one of the shoes was found because the river was iced over?  You recall that?

A.   Yes.

Q.   And then he talked about taking the Fisher road to the ravine.  Tell us how that reflects on anything that you can relate to.

A.   Well, he specifically took the road as a strategy to avoid exposure to law enforcement just as he specifically threw the shoe in the river because if you throw it in the river, well, the river's going to flow somewhere and it's going to make it that much more difficult to recover.  So it was also to further the end of concealment as a matter of solving his problem, that he had committed a murder.  He did not want to be detected.

Dru Sjodin was in his back seat.  And so he went to a darkened road, a road where if he had to stop for whatever reason nobody would be able to look into his car and see what was in his car and also just a road that would be seldom traveled by anybody except somebody who might live there and something that he was familiar with and also to a spot that he had identified would be appropriate to deposit a body and in a crack that would

be, by his account, fairly impossible to see from the road, especially if he went to the end of covering it with grass as he did.

Q.   And this was a ravine that he was well aware of from his past he told you.

A.   That's correct.  So he was learning from his experiences about what might be a suitable place to not only leave Dru Sjodin's remains but he left her remains far, far away where it would be very difficult for them to be discovered, by his account, 22 miles away.  A search would really have to cover a substantial area just to even encompass that location.  And that doesn't even take into account how difficult it would be to spot from the road right next to it.

Q.   And then the thought of driving the 20 or so miles to a location that you just described and that he described in the video that was a ravine that he was well aware of and had these crevices that maybe he could hide the body in.  That certainly doesn't indicate, at least to me, a panic-type situation after she died.

A.   No.

Q.   It's more of an ability to react as we were talking frankly about the bag over the head and to make a calm decision on what might be the best place to hide the body.

A.   Sure.   It's reasoning.   It's following through on a plan that he made and that he was improvising and also with the idea of protecting himself against discovery and implication in her disappearance.   And that was -- and he was very consistent about separating himself from the prospect of murder.

Again I spoke earlier about his communication to law enforcement when they were asking him about her whereabouts and he specifically -- he was -- with the same level of discipline that he showed in this video of where to go and even what to reveal to me, he was disciplined about what he would reveal to law enforcement.   When he spoke to them, he never referred to her death.   He said:   I'm on -- you know, you think I kidnapped her.   He never referenced her posthumously.

So he only accounted for their awareness that she had disappeared and she had been taken, but he was careful not to suggest that he might be aware of more.   And another suspect in my experience might actually cross that line and catch the attention of law enforcement inadvertently.   So he maintained discipline all the way through.

Q.   Okay.   And obviously this is just a snippet from your conversation, am I correct, in saying that at least the part of the interview where you're discussing the

kidnapping and death of Dru tells you similar aspects of his abilities to learn or use the criminal cunning and so forth?

A.   Yes, sometimes.  There were times where he was evasive.  Again I may have testified to this.  If I didn't, I want to make clear, we spoke about the events for quite a while but to listen to him and not be aware of all the evidence one might think that all of this took place over a course of about 15 minutes and it didn't.  It spanned up to two hours.  But to hear him tell the story one would think that he picked her up, he tried to have sex with her in the back seat of his car, he drove out, he kind of got lost, then the police came and she started kicking him and he tried to calm her down and she wouldn't calm down and that was when he killed her and then he drove and deposited the body.

So he was dealing with a much more selective time frame accounting for a couple of things along the way but not much more than that.  So that was also a discipline on his part of what to reveal and what not to reveal in the same spirit of portraying her as someone who was aggressive to him and that if she just didn't kick him he was going to take her back to the mall kind of thing.

Q.   So it was more of a concise version of what may

or may not have happened but certainly by review of the video and your interview with him his memory of what occurred was, you know, very clear down to what we just heard.

A.    Oh, sure.  Look, there were certain details where he was clearly avoiding revealing but he referenced a K-Mart bag.  They found a K-Mart bag on her.  He referenced this happening in the back seat.  That's where they found the drops of blood.  So what he was disclosing was matching up with available evidence.  And, of course, where they found her was consistent with where he had left her and how he would have approached the scene.  So he wasn't hermetically sealed.  He did talk to me but there were certain other aspects where he was much more -- and again it wasn't apparent from the interview.  The interview he gives the appearance of being as cooperative there all the way throughout.  That was a pretty consistent presentation.  But other aspects of what he communicated he was much more circumspect, much more cautious.

Q.    Okay.

A.    And that's advancing his legal interest.  Again this is a videotaped interview.  And it's not so much the presence of the videotape but he's aware that it's something that may at some point be presented in court

and he's being cautious and again adaptively acting in his own legal interest.  There's no way that he can tell that story in a way that advantages him.

Q.  So last week, Doctor, Dr. Arturo Silva testified. He was asked by me on cross-examination whether or not he believed that Mr. Rodriguez had a paraphilia at all. And at the time of the trial St. Steven Pitt testified that he diagnosed Mr. Rodriguez with a paraphilia, and I want to just address that a little bit if we could.

Do you have an opinion whether or not Mr. Rodriguez I'll call it a -- obviously he has some type of deviate sexual arousal or behavior.  We've had some evidence come in about his fantasizing.  There was an exhibit that we put in that -- I believe it was Dr. Hutchinson who testified at trial had him complete a sexual symptom behavior document where he indicated that he fanaticized using pornographic videos and she actually also testified that he told her that he fantasized about tall blonde women.

You're aware of all that?

A.  I'm aware of that.  I'm also aware that the same questioner -- he spoke to having a fantasy of having sex with someone by force, which is more directly I think pertinent to what happened with Dru Sjodin in this case.

Q.  So he has these -- this history of long-standing

deviant fetishes and frankly then the acts that he had been previously convicted of, correct?

A.   Yes, he does.

Q.   You also -- in your discussion I recall he talked to you about collecting women's underwear.  Do you remember that?

A.   Yes.

Q.   What did he tell you about that?

A.   That he had a fetish for women's underwear.  This even came up in the context of burglary, and the available record actually demonstrated that at some point during the search of his belongings in custody many years later there was an ad that had been cut out for women's underwear.  So that was among the deviant fetishes that he had demonstrated and, in fact, acted on over the years.

Q.   And my recollection of your interview with him you talk about Miss Sjodin's underwear as well.

A.   Yes.

Q.   And what did he tell you about that?  He actually remembered what type of underwear it was.

A.   That's correct.  He was able to describe it for me.

Q.   Okay.

A.   And it is notable that when he said on this tape

that he discarded items that he discarded her panties so they had to have been off when he discarded them.

Q.   And obviously you're aware that Miss Sjodin was blonde, correct?

A.   Yes.

Q.   So that fits this fantasy or fetish thing that he had previously even informed Dr. Hutchinson about.

A.   Yes.  There's nothing -- there's nothing deviant about a fantasy for blondes.  But what I did find is that I reviewed his consumption of pornography from when he was out of custody after 2003 and prior to his arrest, the titles that he had taken out, and well-represented at least in a starring featured role were women who were blonde and who were the same body type generally as Dru Sjodin and as the woman that he had followed before he followed and seized Dru.

So it was consistent with a blonde person, the type of Dru Sjodin being part of his fantasy life.  Now that's not part of his deviant fantasy life.  But his deviant fantasy life and his fantasy life otherwise to come together is not unusual in my experience of evaluating and assessing and working with sex offenders.

Q.   Okay.  And so in your diagnosis as a psychiatrist in using the DSM-5, do you come to the same conclusion as Dr. Pitt did that Mr. Rodriguez suffers from a

paraphilic disorder then?

A.   Yes.   In my professional opinion Al Rodriguez had a paraphilic disorder.  A paraphilic disorder -- a few paraphilic disorders but that is most pertinent to this case was deviant sexual arousal of rape.  When he first came to the attention of the hospital authorities after he raped Shirley Seddon, he presented, he presented for psychological attention saying that he had persistent rape fantasies which he was to some degree medicating with alcohol but he was acting on them because he raped Shirley Seddon and he raped Elizabeth Knudson.

So he went into a program in which he learned math.  He learned English.  He was in a therapeutic community that was specifically targeted at sex offending.  He was in a community that treated alcohol insofar as it can be a risk factor for continued offending; that he was working socially within a community and was making the gains that he made, such that there's no way that he would have ever been released without the full written confidence of all the therapeutic authorities there who felt that he had made an improvement.  And very quickly upon his release he was arrested.

Now he was acquitted of the Carlson rape, but in the course of the investigation in his apartment

in the investigation they found rape pornography.  So it continued.  Even after this seemingly successful treatment experience, he continued to have that as a focus of his turn-on notwithstanding the consequences.

Q.   Let me stop you there, Doctor.  And so then he gets sentenced after the Ardyce Whalen attack --

A.   That's correct.

Q.   -- and is in prison for a number of years, and upon his release in 2003 again he kind of just turns back to the same thing.  He -- during the period he was not in custody, that seven- or eight-month period there, there's a whole list of -- and you referred to it, a whole list of pornographic videos that he had rented, a number that had blonde women in it.  But a number of those had the theme, I will use as best as I can, of forcible rape within them, too, correct?

A.   The significance of his overall sexual history as it relates to a diagnosis of paraphilia is that one has to have a deviant sexual arousal, and one has to have a continued deviant sexual arousal that one acts on despite a known awareness of the consequences.

So he was released from confinement, and he very quickly offended with an attempted rape.  And he very quickly emersed himself or availed himself of rape pornography and fed the fetish.  He's released in 2003.

In fairly short order he raped and murdered Dru Sjodin. And he did so specifically -- specifically he -- by his account, he took her in order to have sex with her and after tying her up, which is an essential element of a rape fetish, is having sex with someone by force, by restraint.

So again aware of the consequences. He was aware that this would subject him to arrest and continued confinement. So you have the persistent deviant arousal and you have his full awareness of the consequence and indulging that arousal continuing all the way through time. And those are repeated expressions and fulfillment of criteria of a paraphilic disorder of rape-type.

Q.   Okay.  So despite the fact that he was arrested and convicted of Shirley Seddon's forced situation, the Elizabeth Knudson forced situation, the Ardyce Whalen forced situation, and then 20-some years of imprisonment.  During the short period he gets out, it's the same arousal from the prior history that continues. And he follows it up with the final incident with Dru Sjodin knowing full well what the consequences may be, but it's the arousal that causes him to continue the deviant sexual behavior.

A.   Sure.  He knew he had a deviant arousal.  He

presented -- when he first presented in the '70s to psychologists, he characterized it as deviant. He was saying that he was treating it with alcohol. And so he was aware for many years that it was unacceptable but that's what turned him on. And that's what he continued to pursue when he was released the first time. That is what he acted on with Dru Sjodin. He continued in a rape and a deviant sexual arousal of rape because that's what turned him on. And that is what characterizes a paraphilia because it's an arousal. It's what someone chooses and what someone follows.

MR. REISENAUER: Okay, thank you. If I could have one second, Your Honor?

THE COURT: You may.

MR. REISENAUER: That's all the questions that we have, Your Honor.

THE COURT: Ms. Fisher?

MS. FISHER: Yes, Your Honor.

**CROSS-EXAMINATION**

**BY MS. FISHER:**

Q. Good morning, Dr. Welner.

A. Good morning.

Q. Dr. Welner, I want to start off by asking you a few questions about the DSM and the definitions of "intellectual disability" and the authorities that

surround that, okay?

A.   Okay.

Q.   Dr. Welner, you've concluded that Mr. Rodriguez is not intellectually disabled under the framework described in the DSM-5, correct?

A.   Correct.

Q.   And the DSM-5 is published by the American Psychiatric Association?

A.   It is.

Q.   And that's a distinct organization, a different organization from the American Association on Intellectual and Developmental Disabilities, also known as the AAIDD, correct?

A.   It's a different organization.

Q.   And I believe yesterday you testified, when referring to the AAIDD, that it's an advocacy organization.  Did I hear you correctly?

A.   Yes, that's correct.

Q.   All right.  And at this point I'd like to show you what's been previously marked as Defense Exhibit 80. This is the article by Dr. Welner.

THE CLERK:   (Handing exhibit to the witness.)

THE WITNESS:   Thank you.

Q.   And do you have that exhibit in front of you?

A.   Yes.

Q.   All right.  And, Dr. Welner, this is the article entitled "Forensic Psychiatry and Forensic Psychology: Mental Handicap and Learning Disability"?

A.   That's correct.

Q.   And you've authored this article?

A.   Yes.  This was -- actually this is a chapter in the Encyclopedia of Forensic Sciences.

Q.   Thank you.  Dr. Welner, will you please turn to page 637 of that article.

A.   Yes.

Q.   And I'm going to read to you from the section called "Profound intellectual disability."

A.   Yes.

Q.   And when I'm done if you could just tell me if I've read what you've written here correctly, all right? And I'm going to start on that second paragraph where it says:  "Some differences exist..." and I'm going to start in the second sentence that says "DSM-5."

A.   Yes.

Q.   All right.  "DSM-5 is geared toward providing the clinical and research community with criteria best supported by the science of psychiatry, while the AAIDD has an advocacy mission that includes establishing a definition in which greater numbers of the general

public would be captured and therefore part of the organizations' constituency.  The AAIDD has revised the criteria for intellectual disability multiple times in recent years to enhance its advocacy mission.  These revisions are not rooted in scientific research, but rather the social policy initiative to enlarge its constituency."

And did I read that correctly?

A.   Yes.

Q.   All right.  And at this point, Doctor, I'd like you to take a look at what was previously marked as Defense Exhibit 47, which is the User's Guide to the intellectual disability definition, classifications of support.

THE CLERK:   (Handing exhibit to the witness.)

THE WITNESS:   Thank you.

Q.   Is that in front of you?

A.   Yeah.

Q.   Thank you.  And do you recognize this book, Doctor?

A.   I do.

Q.   All right.  And this is the AAIDD's publication of their sort of seminal publication, the "Intellectual Disability Definition, Classification, Systems of

Supports"?

A.   This is their publication.  In terms of seminal is this the first time that something like this has been published?  I don't know.  But if that's your representation I'll take it at that.

Q.   All right.  If Dr. Seward called it the gold standard, would that be enough for you?

A.   No.

Q.   All right.

A.   But if Dr. Seward testified to that then it would be a gold standard for the AAIDD.  I can certainly accept it.

Q.   All right.

A.   But in terms of seminal, I'll accept it if that's -- I'm not aware of its history enough to know whether it was published before 2012.  But if it wasn't published before 2012 then I'll accept that this is the first time the AAIDD came out with this.

Q.   All right.  And if you would turn to page 20 in this book.  And I'm going to read to you from No. 11 and just like before just let me know if I've read this correctly, all right?  And just because this is a table just so I can be clear about what table we're reading from this says:  "Guidelines for Synthesizing Obtained Information."

A.   Sure.

Q.   All right.  Box 11:  "Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior.  The diagnosis of intellectual disability is based on meeting three criteria; significant limitations in intellectual functioning; significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills; and age of onset prior to age 18.  The diagnosis of ID is not based on the person's 'street smarts,' behavior in jail or prison, or 'criminal adaptive functioning.'"

          Did I read that correctly?

A.   You did read it correctly.

Q.   All right.

A.   That's something that I disagree and it's not based on any --

Q.   Doctor, my question was:  Did you read it -- did I read it correctly?

A.   I did read it.

Q.   All right.  So it's fair to say as we sat here through your direct examination yesterday and today that you've relied extensively on Mr. Rodriguez's criminal behavior in both Ms. Sjodin's case and his prior offenses in your assessment of his adaptive behavior?

A.   I relied on all of his history from a variety of

records, from 143 sources of information.  I relied on his criminal behavior in particular to inform his criminal cunning because that's an aspect of adaptive behavior; that is, an intellect that is specific to one's criminal history.

Q.   And I believe as we sat here through your testimony you would reference his criminal behavior throughout many of the different areas that you were talking about.

A.   It's an aspect of his life just like all other behavior.  There's no where in the behavior sciences of any credible science that comes from a source that's nonadvocacy in any diagnosis under any circumstances in which professionals are taught to ignore an aspect of a life as if someone's been suspended in animation.

Q.   All right.  So is it fair to say that you --

A.   That's -- that's just --

THE COURT:  Hold on --

A.   That's just --

THE COURT:  Hold on, hold on.  It's not going to be possible for the court reporter to take down two people speaking at once and so we've got to get a question and then an answer, okay?  And so this isn't Crossfire or whatever is on TV in this day and age where people are allowed just to talk over each other and

shout because it's no -- we can't make a record of that. So if you please would exercise a little more discipline, I'd appreciate it.

Now, Miss Fisher, you may put a question to the witness.

MS. FISHER:  Thank you, Your Honor.

Q.   (Ms. Fisher continuing)  So is it fair to say, Doctor, that you disagree with the AAIDD that past criminal behavior should not be used in order to infer the defendant's adaptive functioning?

A.   Well, they're an advocacy organization so I don't agree with their advocacy.  But it's not scientific and as a scientific exercise it has nothing to do with psychiatry or the behavioral sciences.  So if you ask me in my capacity as a psychiatrist and a forensic psychiatrist, I disagree because it goes against everything that we are trained in as behavioral scientists.

But they're an advocacy organization so I would expect them, in the course of their advocacy, to say ignore someone's criminal behavior because if you act like something doesn't exist you don't have to account for it.  So I expect this to be part of an advocacy manual that guides policy and how one would approach this.

Q.   All right.  And so then it's fair to say that you haven't followed that directive in your assessment of Mr. Rodriguez's adaptive behavior?

A.   It's not a directive.  It's an advocacy mission. And I follow psychiatric and forensic psychiatric practice, and that's not something that's taught in any psychiatric practice.

Q.   All right.

A.   The AAIDD is a respectable organization with a noble advocacy mission but it has an advocacy mission just as the AARP does.

Q.   Thank you.  And I'd like to move on and I would -- I want to ask you a few sort of general questions about some of the things that you discussed about Mr. Rodriguez's reasoning abilities, his judgment, some of his skills and those sorts of issues.

A.   Yes, ma'am.

Q.   And these are things that you listed and talked about in your testimony and they're those aspects of Mr. Rodriguez's abilities that suggest he's not intellectually disabled.  And I'm going to sort of characterize some of your testimony, and if you feel I've accurately characterized it you simply need to answer yes or that's accurate.  Obviously if you don't agree with it then you should say so, all right?

However, if you agree you don't need to restate the testimony or review what you said.

A.   Okay.

Q.   All right.  Dr. Welner, at least one of those abilities would be that Mr. Rodriguez could not only drive a car but was trusted with driving his niece and nephew on errands; is that correct?

A.   Yes.

Q.   And you've also described some other tasks that you say Mr. Rodriguez can perform like the ability to grow flowers in a garden, to do cooking around the home, to buy groceries for his mother and to do at least some electrical/plumbing work; is that correct?

A.   That's correct.

Q.   And now leaving aside whether factual questions -- leaving aside factual questions of whether or not he can actually do those things, your testimony is that an ability to carry out those types of tasks suggests that Mr. Rodriguez is not intellectually disabled; is that correct?

A.   It speaks to those specific domains to which I attribute.

Q.   All right.  And similarly, Dr. Welner, you've explained that Mr. Rodriguez was able to work full time in the drywall business after his release from prison

and before his release he held a job for years at the print shop in the prison and that job required complex and detailed tasks; is that correct?

A.   Yes.

Q.   And your testimony is that Mr. Rodriguez's ability to perform those jobs suggests that he is not intellectually disabled?

A.   My testimony was specifically that it demonstrates his ability to use what he learns vocationally in an adaptive manner.

Q.   All right.  And you've also said that Mr. Rodriguez supports his family, at least to the degree that he made money working on the drywall crew, and that he sometimes bought presents for his niece and nephews.

And does that testimony also suggest that -- to you that Mr. Rodriguez is not intellectually disabled or has deficits in those adaptive domains?

A.   Well, that wasn't my testimony.  But since you suggest it I do agree that if he was buying presents for his nieces and nephews that that's an attentiveness to social cues and recognizing the children respond to that.  Of course, it's not -- again it's not something that I testified to.  And that would only speak to his awareness of a social cue and that's really where I

would limit its relevance.

Q.   All right.  And, Dr. Welner, you've also described Mr. Rodriguez's ability to plan.  We had a whole section on planning and you talked about how he was released in -- before he was released in 2003, he planned.  He made arrangements at the prison to get his driver's license.  He talked about possibly moving, where he would live, maybe going to a different state or possibly Mexico.

And is it your testimony that these sorts of planning tasks also suggest that Mr. Rodriguez is not intellectually disabled?

A.   They demonstrate his capability of planning without assistance.

Q.   All right.  Doctor, I just want to go back to a few things that you talked about from your CV.  Early in your direct examination yesterday you explained that you've given presentations on mental retardation and the death penalty to both the legislatures in Pennsylvania and Texas; is that correct?

A.   That's correct.

Q.   And I thought I heard -- and I may have heard this wrong so again please correct me.  At least as far as the Pennsylvania testimony, I believe you represented or perhaps Mr. Reisenauer asked and you agreed that the

legislatures had asked you to come and testify on that topic before them; is that correct?

A.   Not the legislature but the state -- the legislative -- the Judiciary Committee that was specifically concerning itself with the definitions. Not the entire legislature, but the Judiciary Committee was taking up the definitions so I testified before their committee.

Q.   Right.   In Pennsylvania it was the committee on the -- in the Pennsylvania Senate, correct?

A.   That's right, Senator Greenleaf's committee.

Q.   And I had thought when I watched that that you had been asked a question by one of the senators about who brought you to testify to that committee.   I thought they said it was the Pennsylvania District Attorneys Association; is that correct?

A.   That's correct, sure.

Q.   So it was the District Attorneys Association who asked you to speak at that hearing?

A.   Sure, that's correct.

Q.   And that was around 2002, right?

A.   I don't recall but it's going to be in my CV so that sounds about right.

Q.   All right.   So your CV --

A.   It's -- is it post Atkins?   I'd have to go back.

If that's in my CV, that's when it was.

Q.   And you're aware of the fact that 2002 is preAtkins, right?

A.   Okay.  If it was in 2002 then -- and it was preAtkins, then it was preAtkins.

Q.   Well, the Pennsylvania judiciary was trying to decide at that point whether they should adopt a law whether or not it was unconstitutional under the Pennsylvania Constitution to execute people who were mentally retarded.  And certainly Atkins would have made that unconstitutional under the federal constitution.  So the fact that Pennsylvania was also deciding that I think would also tell us that that was before Atkins?

A.   I don't recall whether they were deciding on the constitutionality.  What I recall was -- and I may be mistaken, but I recall that I was asked to testify because there was specific legislation before the Judiciary Committee that had scientific aspects.  I don't testify about constitutional issues because I'm not an attorney and not a constitutional scholar so --

Q.   No.

A.   So I wasn't aware of any kind of discussion about what they were taking up.  I was aware that there was certain scientific questions of competing laws and that that's what I was testifying about.  That's all I know.

Q.   Of course, and I did not mean to imply that your role there was to decide on the constitutionality of the bill.  But Senate Bill 26, which you were asked to come testify about, was a bill proposing that executing mentally retarded folks in Pennsylvania should not be allowed.  That was the topic of Senate Bill 26 in which you were asked to testify.

A.   I just don't know.  I wouldn't be able to -- I don't remember and I'd have to look at it again, go back into my records about just the circumstances of the invitation from the PDAA and exactly what they asked me to come in and talk about.

Q.   All right.  Do you remember the fact that your testimony in that senate hearing was that Pennsylvania should not adopt Senate Bill 26 which would prevent the mentally retarded from getting executed except in cases where the defendant's mental retardation caused the crime or if the defendant didn't know what he or she was doing?

A.   I'd have to look at my testimony and I'm sure that that's available.  And I think that the thrust of my testimony was probably a lot more scientific than that.

Q.   All right.

A.   If I recall correctly, my testimony was extensive

and would have covered a lot of topics of the forensic and assessment intersection.

Q.  I understand that.  I'm not trying to capture your entire testimony in one sentence.  I guess what I'm trying to ask you, Doctor, is this was a hearing where they brought in people who were in favor of this bill and people who were against this bill.

A.  Sure.

Q.  And you were brought there because you were one of the witnesses who was against this bill.

A.  That's correct.

Q.  All right.  And when you were there -- and I want to talk about a case you mentioned and it was a case you consulted on.

A.  Sure.

Q.  So perhaps you'll remember the case even if you don't remember the details --

A.  Sure.

Q.  -- as you discussed them at the hearing.

But before I do that, and this may refresh your recollection about some of this, I'd like to enter an exhibit.

May I approach, Your Honor?

THE COURT:  You may.

MS. FISHER:  (Handing exhibit to the

witness.)

THE WITNESS:  Thanks.

Q.   (Ms. Fisher continuing)  All right.  Doctor, what I'm showing you is an article dated March 29, 2002 from the Allentown Morning Call and the name of the article is entitled:  "An IQ under 70 does not mean killer isn't lever."  And in this article which covers that hearing for Senate Bill 26 the article talks about a case you described and it's a case you've actually mentioned to me when we were in our deposition and that's the case of John Paul Penry.

A.   Sure.

Q.   I'm assuming you remember that case?

A.   I do.

Q.   And you were asked to consult on that case, correct?

A.   That's correct, for the State of Texas.

Q.   And in that case you -- and I'm going to get to the facts a little bit more, but you advised them that Mr. Penry was mentally retarded, correct?

A.   I did.

Q.   Now at the time the law was different and he was still scheduled to be executed.  But nonetheless you did testify that you found him mentally retarded, correct?

A.   I didn't testify.  I told the attorneys that I

thought he was retarded and they did not call me as a witness.

Q.   Fair enough.  I should have phrased that more carefully.  You consulted on the case.

A.   I consulted to the attorneys and I advised them of my opinion and they pursued their case and they pursued it with an expert who would give them the opinion that they wanted.

Q.   All right.  And the way the article described your description of Mr. Penry is by saying, and this is on the second page starting at the top?

THE COURT:  Do you intend to offer 104?

MS. FISHER:  Yes, Your Honor.  Thank you.  I do offer Defense 104 into evidence.

THE COURT:  Any objection?

MR. REISENAUER:  If I may ask a couple questions, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  Dr. Welner, you just testified that you had -- I gather from your testimony that you had done an assessment of Mr. Penry and informed the prosecutor's office that you believed he was mentally retarded; is that correct?

THE WITNESS:  That's correct.

MR. REISENAUER:  And did you talk with the

individual who wrote this particular article at all?

THE WITNESS:  No.  I -- I provided written testimony to the Pennsylvania State Senate Judiciary Committee in which as I recall, and it was extensive, much more so than this, I provided several case vignettes, a few of which were cases that I worked on. I think there were a couple that I just changed certain facts.  And I wanted to illustrate before the legislature the dilemma of the determination of mental retardation and the ambiguity that by fixating on certain issues like IQ or something else a person might be misguided.

And I presented Mr. Penry's case in the context of a dilemma of basically saying:  Is he or isn't he?  And I came to the conclusion in Mr. Penry's case that while he demonstrated criminal cunning that he was mentally retarded because as we articulated in -- or as I testified to in my direct, there are many things that you look at.  And he certainly had criminal cunning but in many, many different aspects of his life he was functioning at a very poor level.

MR. REISENAUER:  Okay.  Let me stop you there.  Thank you.  But you didn't talk to the person who wrote this particular article.

THE WITNESS:  No.  He didn't interview me

but he was sitting in on the testimony and wrote an article based on what was in my written testimony and perhaps what I might have said in the Q and A before the senators.

MR. REISENAUER:  We have no objection, Your Honor.

MS. FISHER:  All right.  And --

THE COURT:  It's received.

MS. FISHER:  Thank you, Your Honor.

THE COURT:  104.

Q.  (Ms. Fisher continuing)  And I'm using the language in the article merely because it's a convenient way to summarize what -- the way you described the crime.  Obviously you were the expert who was retained on the case and so if I'm not describing the facts correctly I ask you to correct me, okay?

A.  Sure.

Q.  All right.

A.  No harm, no foul.

Q.  He cited the example of a man who had been incarcerated for several rapes.  After he was released on parole, and this is speaking about Mr. Penry, the man spotted the woman he found attractive and traveled across town to find her home.  There he cases the area to ensure she is alone, Welner testified.  He said the

man then broke into her home -- into the home and raped her. Then concluding that she will tell police about him he decides after having raped her that he will kill her. His IQ is in the 50s and 60s.

And does that -- it's a summary. I understand that I'm sure the description's longer but that's a fairly accurate summary?

A. There's nothing inaccurate about that. I either said it or it's a very accurate facsimile of what I would have said.

Q. Okay. So then Mr. Penry, whose IQ is in the 50s or 60s, who you found was mentally retarded, was also able to plan a crime, carry it out, adjust to the circumstances and avoid detection; is that correct?

A. That's correct.

Q. All right, thank you. All right. You testified both yesterday and today about these burglaries that Mr. Rodriguez told you about and I want to talk about them briefly.

A. Yes.

Q. I believe you said the burglaries showed that Mr. Rodriguez had certain adaptive strengths. I'm -- forgive me that I'm not remembering all the categories you said they fit into, but you reference the burglaries in several different areas as an example of certain of

his adaptive strengths, correct?

A.   What I referenced was primarily his reasoning about how the burglaries would be chosen and undertaken and who would be specifically targeted was an illustration of his ability to reason.

Q.   Right.  And I do understand that you gave the caveat that that was true whether he did the burglaries or not.

A.   The point was his reasoning about a modus operandi.  If he did them he did them, but if he didn't he didn't.  But what he was doing was he was illustrating his ability to reason in the exercise.  He said he did them.  I just haven't had the opportunity to corroborate it one way or another.

Q.   All right.  And one of the ways --

A.   Because Bill Mauer is dead.  That's another reason.  I attempted to but Mr. Mauer's dead and there's no one to talk to.

Q.   All right.  I'm going to get to that in a moment. And another reason there was no corroboration is that he has never been arrested for a burglary, correct?

A.   Correct.

Q.   Now you reviewed in your documents when you were writing your report, the reports of -- and interviews by Dr. Pitt and Dr. Martell, the report of Dr. Hutchinson,

and would you agree with me that Mr. Rodriguez has never to anyone before mentioned committing burglaries?

A.  I don't remember whether that came up with them or not.  I just -- it was a while ago that I read it and I just don't remember whether it's in there or not.

Q.  All right.  And I thought you said yesterday, and again if I got this wrong let me know, that another reason there was no corroboration is because Mr. Rodriguez told you that it was only the two of them or that they didn't want people to know.  I may not be remembering it exactly right.  And if you didn't say that then that's fine.  Just let me know.

A.  Well, I believe my testimony was that he was selective and he was careful about either doing things alone or being careful about whom he would do something with and that he trusted Bill Mauer to do that with him.

Q.  Okay.  Was it your impression that the only person he committed burglaries with was Bill Mauer?

A.  I think so but I'm not positive.  I'd probably have to go back and look at exactly what he told me in the interview, and I haven't looked at that part of the interview for quite a while.

Q.  All right.  Well, we can get to that part of the interview.

Court's indulgence one moment?  I just want

to make sure I have both exhibits I need.

THE COURT:  Maybe this is a good time to break for lunch.  We'll break at this point.  We'll start again at 1:15.

MS. FISHER:  Thank you, Your Honor.

(Recess taken; 12:00 noon to 1:15 p.m.)

(In open court, all counsel present.)

THE COURT:  We'll go ahead and go back on the record in a case entitled United States versus Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that the petitioner has waived his right to be present.  All counsel of record appear on behalf of the petitioner.  All counsel of record appear on behalf of the United States.  Dr. Welner remains on the stand. Ms. Fisher was conducting a cross-examination.

You may proceed.

MS. FISHER:  Thank you, Your Honor.

Q.   (Ms. Fisher continuing)  And good afternoon, Dr. Welner.

A.   Good afternoon.

Q.   Dr. Welner, I believe when we broke I was talking to you about the burglaries that Mr. Rodriguez told you he committed and we were discussing whether or not he committed them -- that he told you he committed them just with Bill Mauer or with other people, and you said

it would be helpful to review the transcript in those places he talked to you about that.  So I thought we should do that.

A.   Okay.

MS. FISHER:  So we can see what he actually said, I'm going to mark this exhibit as D-105.

Q.   (Ms. Fisher continuing)  All right.  And, Doctor, what I'm showing you in D-105 is one of the places in your interview with Mr. Rodriguez where you discussed the issue of burglary.  And it's a five-page document because I wanted to capture the whole conversation but in a minute I'd like to direct your attention to one portion.

But first I'd ask that D-105 be admitted into evidence.

MR. REISENAUER:  No objection.

MS. FISHER:  All right.  Your Honor, is D-105 admitted?

THE COURT:  D-105 is admitted.

MS. FISHER:  Thank you.

THE COURT:  I'm sorry, I was reading it.

MS. FISHER:  That's okay.

Q.   (Ms. Fisher continuing)  And I'd like to direct your attention to the second page.  There is an exhibit number at the bottom.  It would be page 309.

A.   Yes.

Q.   And a little past halfway down the page -- and because there's not context that it's about burglary I included that first page so you could see you were asking him questions about the burglary.

And you said:  "And when you, um - was it just the two of you?  Or, were others with you?

"Mr. Rodriguez:  We were -- he was there.

"Dr. Welner:  So it was -

"Mr. Rodriguez:  With me it was just Bill - usually -

"Dr. Welner:  When you went and you got those" blank, "more than just the two of you?

"Mr. Rodriguez:  Yeah.  There was a few of us.  But mostly, uh, with Bill, you know.  Him and Bruce they did burglaries - they got caught doing a burglary, and, uh, Cruise got away with it but Bill had - he pled guilty and went to, uh, a reformatory."

And did I read that correctly?

A.   Yes.

Q.   Thank you.  And I'd like to now just direct your attention to one other place in your interview with Mr. Rodriguez where you talked about burglaries, and this is going to be Exhibit D-106 (indicating).

A.   Thank you.

Q.   And in the middle -- D-106 again is a portion of your interview with Mr. Rodriguez where you talk about burglaries among other things.

At this point I would offer D-106 into evidence.

MR. REISENAUER:   No objection.

THE COURT:   106 is received.

Q.   (Ms. Fisher continuing)   All right.   And about a third of the way down the page, Dr. Welner:   "You said there was Andy Gallegos."

A.   Gallegos, yeah, mm-hmm.

Q.   "Mr. Rodriguez:   Yeah, yeah.   He didn't hang out with us that much.

"Dr. Welner:   But he did the burglaries with you guys?

"Mr. Rodriguez:   Yeah.   He lived at the apartment too but he didn't hang out with us too much."

Did I read that correctly?

A.   Yeah.

Q.   All right.   And, Dr. Welner, you had a chance to speak with a number of Mr. Rodriguez's friends over the phone I'm assuming before you completed your report; is that correct?

A.   I did speak with some.

Q.   And when you spoke to some of his friends, and I

think you spoke to other people who had been in his life at various points, you made some notes; is that correct?

A.   I did.

Q.   And no where in those notes did anyone say that they remember Mr. Rodriguez committing any burglaries; is that true?

A.   That's correct.

MS. FISHER:  Okay.  And at this point I would ask that the witness be shown what was previously marked as Government Exhibit 560.  This is the memo from Ingrid Christiansen to Robert Hoy and Richard Ney about her interview with Bill Mauer.

THE CLERK:  (Handing exhibit to the witness.)

THE WITNESS:  Thank you.

Q.   (Ms. Fisher continuing)  All right.  And, Dr. Welner, what you have in front of you has previously been authenticated and entered into the record as Government Exhibit 560.  You'll see that on top it says: "TO:  Robert Hoy, Richard Ney."

Are you familiar with the fact that Robert Hoy and Richard Ney were Mr. Rodriguez's trial team at the actual trial for this case?

A.   I don't remember but this would refresh my exposure to it.  I read their trial transcript a number

of years ago and I didn't remember the names of the attorneys.

Q.   All right.

A.   I'll remember your name in six years.

Q.   I appreciate that.

A.   But I don't remember their names.

Q.   All right.  Would you take my word for it that they were --

A.   Sure, absolutely.

Q.   All right.  And I don't know if you remember that Ingrid Christiansen was the mitigation specialist who worked with Mr. Hoy --

A.   Yes.

Q.   -- and Mr. Ney.  All right.  And you'll see that in the "RE:" or regarding line it says:  "Interview with Billy Mauer."

A.   Yes.

Q.   And I just want to point your attention to a few things on this interview.  This was a telephone interview that took place on January 20, 2006, and Ms. Christiansen indicates that she had a telephone interview with Bill Mauer.  She's talking about a number of things but at the end of that first paragraph:  "He agreed that he and Tito were best friends for many years in high school."  He confirms in that "DUI" section that

he "did time in St. Cloud for a couple of burglaries" in 1971.  And I just want to draw your attention to the two lines right below the "DUI" section.

A.   Mm-hmm.

Q.   "He said:  Al was pretty quiet back then, he stayed out of trouble.  He would not want to run around with us and be crazy when we were doing bad stuff.  He stayed out of trouble."

Did I read that correctly?

A.   That's correct.

Q.   All right.  So what I really want to ask you, Dr. Welner, is considering that there really is no corroboration that he actually committed any burglaries, and there has been a bit of investigation to see if that was true between talking to his friends and Bill Mauer himself saying that he wasn't involved in anything that would get him in trouble and that he was quiet and stayed away from that stuff, combined with the fact that Mr. Rodriguez spent the past 23 years before he met with you in prison where it is likely he came across other people who had committed burglaries.

And we know that self-reporting alone as an information source is very dangerous in cases when examining someone, as you've mentioned both when you testified and in your report, had you considered the

situation that when Mr. Rodriguez told you about clever ways to commit burglaries perhaps he was parroting what his best friend, Bill Mauer, said? Because we know Bill Mauer committed burglaries. We have proof of that. Or is it possible that he was parroting what someone in prison said because it's likely that he was in prison with other people who committed burglaries?

A. Okay. That's a very long question and I have to -- the only way I can answer it is if I answer it in segments. First answer is we have no idea from this that this corroborates that Mr. Rodriguez was not involved in burglaries and that he was not involved with Mr. Mauer.

These interviews aren't videotaped. I don't know what she asked. I don't know what she didn't ask. I don't know how she asked it. And I don't know to what degree Mr. Mauer would feel inclined to reflect favorably on his friend to suggest that he was or was not involved in things.

I think what is consistent is that he avoided scenarios which would, as Johnny Rocha put it, get wild and that might be things done in a group activity. It is certainly possible that Bill Mauer was the prime mover and he went along with him and that Mauer took initiative.

I think your scenario that you suggest that perhaps he's parroting something, sure, he could be parroting.  He could have burglarized.  He could have done either one.  I don't think that there's any way, with the information yet available, to establish that because he doesn't have arrests.

Clearly if Mr. Mauer had such a successful modus operandi as described by Mr. Rodriguez, well, then Mr. Rodriguez wasn't arrested but Mr. Mauer was.  So maybe Mr. Mauer was following a different modus operandi than the one that Mr. Rodriguez was suggesting and proposed, and that's why Mauer got caught and Rodriguez did not.

So I think that the range of possibilities is really manyfold, including some that you suggested and including some that you did not.

Q.  All right.  Thank you.  That's fair.  And I'd like to move on and talk about Mr. Rodriguez's drug dealing and you testified on direct that the fact that Mr. Rodriguez was -- facts about Mr. Rodriguez being a drug dealer contributed to your understanding that he did not have impairment in his adaptive behavior and you detailed many ways.  I remember you talking about him not being gullible because of the tea and how it showed a certain -- you didn't use the word "savvy" but a

certain savviness by only selling to a few people or on an Indian reservation where there's limited law enforcement. So I want to talk about the places that Mr. Rodriguez talked about that drug dealing. And let me ask you a question first.

Is it fair to say that everything you know about Mr. Rodriguez's business of drug dealing came from him either in your interview or in his interview with Dr. Seward, which you also reviewed?

A. That's correct.

Q. Okay. And I'd like to mark this as Defense Exhibit 107 and this is a section of the interview with Mr. Rodriguez and Dr. Seward (indicating).

A. Thanks.

Q. All right. As I indicated, Dr. Welner, this is a portion of the interview with Mr. Rodriguez and your colleague, Dr. Seward?

A. Yes.

MS. FISHER: And I'm marking this as D-107 and at this time I would offer it into evidence.

THE COURT: Any objection?

MR. REISENAUER: No, Your Honor.

THE COURT: 107 is received.

Q. (Ms. Fisher continuing) And I'm going to start almost three-quarters of the way down the page where

Dr. Seward asks Mr. Rodriguez:  "And how were you supporting yourself then?"

Do you see where I am?

A.  Correct.

Q.  All right.

A.  I see it.

Q.  Dr. Seward said:  "And how were you supporting yourself then?

"Mr. Rodriguez:  Selling dope.

"Dr. Seward:  Oh, really?

"Mr. Rodriguez:  Yeah.

"Dr. Seward:  What kind of dope?

"Mr. Rodriguez:  Mostly grass, LSD, speed and mescaline, a little bit of coke but, back then, that was too expensive.

"Dr. Seward:  When was this?

"Mr. Rodriguez:  Oh back in the late '60s.

"Dr. Seward:  Late '60s huh?

"Mr. Rodriguez:  '60 - I started selling when I was 1966.

"Dr. Seward:  Uh-huh.

"Mr. Rodriguez:  Yeah.

"Dr. Seward:  So you would've been 13.

"Mr. Rodriguez:  Yeah.

"Dr. Seward:  Wow.

"Mr. Rodriguez:  Yeah.

"Dr. Seward:  Now I don't even think there were even songs about cocaine back then, I don't know.

"Mr. Rodriguez:  No, no.  It was pretty expensive.  That was the rich man's but we only did it a couple of times.  No, we stayed mostly with weed.

"Dr. Seward:  In Crookston?

"Mr. Rodriguez:  Hmm?

"Dr. Seward:  This was in Crookston?

"Mr. Rodriguez:  Mmm-hmm?

"Dr. Seward:  How would that work?  I mean it's a small town, right?

"Mr. Rodriguez:  No but you got Grand Forks and you got college.  You got two colleges.

"Dr. Seward:  Yeah?

"Mr. Rodriguez:  Actually 8 colleges within 70 miles, you know, so there's plenty of people.

"Dr. Seward:  So you had a route or something?

"Mr. Rodriguez:  Huh?

"Dr. Seward:  You had a route?

"Mr. Rodriguez:  No, we would go places. We'd go to Fargo for concerts.  We would go to games. We would go to Grand Forks.  We were there just about every weekend.  We'd go to movies, we'd go to parties.

"Dr. Seward:  But I mean would you - was this arranged that you'd meet up with people or was it more like --

"Mr. Rodriguez:  No just things we would do like on Sundays we'd go out to the lake.  They had a pavilion out there and Sundays was a big dance.  A band would have come so there was plenty of people to sell to and on Saturdays we'd go to another town, about 30 miles away where there was a dance there and that was the same thing in Crookston.  It was Friday, Friday night.

"Dr. Seward:  Well how did that - I'm trying to think of how the business - how that would work, economy, so how much were you selling?

Mr. Rodriguez:  We would make - and we wouldn't do it as a group, we would do it individually. I would sell enough to make $300 a week, you know, every week.

"Dr. Seward:  That's decent money at that time.

"Mr. Rodriguez:  Yeah, yeah.

"Dr. Seward:  How much would that be?

"Mr. Rodriguez:  What do you mean?

"Dr. Seward:  I mean how much like marijuana or whatever would you have to sell to profit?

"Mr. Rodriguez:  Probably about four or five

pounds.

"Dr. Seward:  So you would sell four or five pounds a week.  In what quantities?

"Mr. Rodriguez:  Lids, an ounce, about that."

Does that capture what was printed here?

A.  Yes.

Q.  All right.  And at this point I'm going to mark this next section of your interview with Mr. Rodriguez as Defense Exhibit 108 (indicating).

A.  Thank you.

Q.  And, Dr. Welner, do you recognize this as a portion of the transcript from your interview with Mr. Rodriguez?

A.  Correct.

MS. FISHER:  And I'd like at this time to offer D-108 into evidence.

MR. REISENAUER:  No objection.

THE COURT:  108's received.

Q.  (Ms. Fisher continuing)  All right.  And I'm going to read to you starting from about six lines down where you ask Mr. Rodriguez:  And, but most of your business was coming from pot."

A.  Mm-hmm.

Q.  So "Dr. Welner:  And, but most of your business

was coming from pot.

"Mr. Rodriguez:  Yeah.

"Dr. Welner:  Which you would sell in 16 ounces.

"Mr. Rodriguez:  Yeah.

"Dr. Welner:  And then where - whoever you sold it to, whatever they did with it.

"Mr. Rodriguez:  Yeah.

"Dr. Welner:  They did with it but you only --

"Mr. Rodriguez:  They broke it up into smaller quantities and -

"Dr. Welner:  And you only dealt with them unless you [inaudible comment].

"Mr. Rodriguez:  Yeah like we would buy a pound for - for $55.00 back then.

"Dr. Welner:  Mm-hmm.

"Mr. Rodriguez:  And we would sell every ounce for, uh, $15.00 you know.  So - and, uh, - and then we would also go to the reservation and sell it there too."

And did I read that correctly?

A.  That's correct.

MS. FISHER:  All right.  At this point I'm going to mark something as D-109, which is a

demonstrative exhibit that I created, and I will let Mr. Reisenauer take his time looking at it. That just reflects some of those numbers and everything is taken from -- from what we just read and put on the record and I will let you look at that as well to make sure you agree with that (indicating).

All right. This is a demonstrative exhibit that I created to make this line of questioning and our cross-examination go easier because I thought without looking at this stuff on the paper it would be very difficult for everyone to keep track of what was going on. However, I don't claim to be an expert in math. If I misrepresented anything right here that was just read on the record or if you find my math is faulty, please speak up.

At this point I would offer D-109 into evidence.

MR. REISENAUER: If I can have a second, Your Honor?

THE COURT: Sure.

MR. REISENAUER: Thank you.

MS. FISHER: Or I could offer it at the end of cross if it's easier.

MR. REISENAUER: Just give me a second here, Your Honor.

MS. FISHER:  Sure.

MR. REISENAUER:  I have no objection.

THE COURT:  109 is received for demonstrative purposes only.

Q.   (Ms. Fisher continuing)  All right.  So based on the information that we just learned from your interview with Mr. Rodriguez and Dr. Seward's interview with Mr. Rodriguez on the same topic of his drug dealing that he self-reported to each of you, Mr. Rodriguez would make $300 a week every week, as he said, selling marijuana or drugs generally.  I'm not trying to nitpick between marijuana and other drugs.  Mr. Rodriguez would sell four to five pounds of drugs a week --

MR. REISENAUER:  Your Honor, now I'm going to object.  The $300 a week was I believe the marijuana amounts that were testified to.

MS. FISHER:  I will be happy to change this to all marijuana.  I was expecting pushback the other direction.  I was only trying to be more inclusive. That's fine.  We can limit it to marijuana.

Mr. Rodriguez would make $300 a week selling marijuana every week.  Mr. Rodriguez would sell four to five pounds of marijuana a week.  Those are both from Dr. Seward's interview.  As Mr. Rodriguez told you, he would buy a pound of marijuana for $55 and he would sell

an ounce then for $15.

So to go over the math of the money Mr. Rodriguez spent a week to purchase their marijuana that he would turn around and sell, he would sell four to five pounds a week by the ounce.  There are 16 ounces in a pound, which you also pointed out, so four times 16 would be 64 ounces.  Five times 16 would be 80 ounces.  So he would sell 64 to 80 ounces of marijuana a week.  All I've done is translate that from pounds to ounces.  He would sell an ounce for $15 so if he was selling four to five pounds a week, or 64 to 80 ounces a week, 64 times 15 is $960 and 80 times 15 is $1200.

So Mr. Rodriguez would make, without subtracting what he spent to buy the marijuana, $960 to $1200 a week selling marijuana.  But, of course, for this to be accurate we need to subtract the money he used to buy marijuana.  So to figure out how much profit he would be making 960 minus 220 would be $740.  1200 minus 275 would be $925.

So according to Mr. Rodriguez's self-reporting, he should have been making $740 a week to 925 a week based on what he said.  Although, he reported that using these figures he made $300 a week.

Is that math accurate.

A.   You mean the math that you wrote down on the

page?

Q.   Yes.

A.   Yeah, it's accurate.

Q.   All right.  And we had just covered Mr. Mauer, his best friend, saying that he would stay out of trouble and those notes from your conversations with friends of Mr. Rodriguez you specifically asked them if they remember him dealing drugs and they all told you no, correct?

A.   I don't know that I asked all of them but I know that there were people who I asked who said that they did not remember him dealing drugs.

MS. FISHER:  Okay.  And I'd like the witness to be shown Government Exhibit 568, please.  This is the memo from Ingrid Christiansen to Robert Hoy and Richard Ney about her interview with Gail Alterpeter.

THE CLERK:  (Handing exhibit to the witness.)

THE WITNESS:  Thank you.

Q.   (Ms. Fisher continuing)  And, Dr. Welner, I'm showing you a document I'm guessing you haven't seen before because it's from the trial file of the trial attorneys from the original trial.  This was authenticated and offered into evidence earlier in this hearing.  And again this is a memo from Mitigation

Specialist Ingrid Christiansen to Mr. Hoy and Mr. Ney about their interview with Gail Alterpeter.

And do you remember that Gail Alterpeter is one of Mr. Rodriguez's friends that he named in your interview with him that was part of that -- the Secula's crowd?

A.   Yes.

Q.   And I'd like to bring your attention to the section that says "The Case and Prior Cases," and I'm just going to read you the first two sentences.  "He was the one person who stayed out of trouble.  He'd leave the group if the guys were talking about doing anything illegal or troublesome."

And did I read that correctly?

A.   And yet he ended up in trouble.

Q.   Yeah, for the rape.  This was --

A.   Yes.

Q.   And actually for the murder, too.  This was taken just to be clear April 13, 2006 after he was arrested for the murder of Dru Sjodin, correct?

A.   Yes.

Q.   All right.  Thank you.  All right.  Before we go on to the next topic I just want to hit one more thing and I won't belabor it about the AAIDD that I neglected to ask before.

So, Doctor, early in your cross-examination we discussed the AAIDD and its publications, and specifically I had quoted a section from you -- to you from the AAIDD that stated that the evaluator should not rely on the defendant's crimes or on the defendant's behavior in prison in order to assess the defendant's adaptive functioning.  And I had -- we had talked about focusing on the defendant's crime, but I just wanted to follow up and make sure I understood your thoughts about the defendant's behavior in prison.

And is it fair to say that your view is that the principle that you shouldn't rely on the defendant's behavior in prison is also bad science because it ignores diagnostically relevant information?

A.   Yeah, that's my position.

Q.   And you've explained -- actually strike that.

And that's why in your assessment of Mr. Rodriguez you did consider his behavior in prison as part of your analysis, correct?

A.   I considered whatever I could find, whatever was provided to me.  I considered it but, you know, I had to appraise every piece of information and some I afforded perhaps more weight to, there was more depth and more substance to so I was forced to not rely on as much because there wasn't as much detail or substance behind

it and it was ambiguous.  But I considered whatever I had access to.

Q.  I understand and thank you.  At this point I want to move on to something else that you talked about on your direct examination.  You referred a few times in your answers to things by saying that Mr. Rodriguez was practically -- I'm not using your word.  It was a version of that.  Practically a homeowner or virtually a homeowner.

A.  No.  I said he was acting as a homeowner would.

Q.  Okay.  And am I correct that you were referring to the person that -- I'm sorry, you were referring to the time that Mr. Rodriguez was living in his mother's basement for the six months before he was arrested?

A.  Sure.

Q.  All right.  Because you'd agree with me that he wasn't involved in purchasing that home or any home; is that correct?

A.  No.  But he was -- what I was specifically referring to was his caretaking and his attention to the function and orderly operation of a home.  And that's what a homeowner does.  A homeowner concerns themselves with electrical, concerns themselves with plumbing, concerns themselves with tiling, concerns themselves with making sure that a place is clean, making sure that

1615

the landscaping is maintained.  A homeowner makes sure that the garden is as it appears to be that might be pleasing for someone else who lives there.  You know, that's what a homeowner does.

Q.  All right.  And a homeowner also pays -- usually unless they've purchased their home outright pays mortgage or rent in some circumstances, pays insurance, pays bills.  You'd agree with me that Mr. Rodriguez didn't do any of those things.

A.  Oh, I didn't reference that.  That wasn't a part of my consideration.  I was only speaking as a matter of responsibility and as a matter of again the quality of his maintenance as it related to his ability to use vocational knowledge that he had as well as personal care because he was parlaying these skills in order to better take care of his mom so that she wouldn't have to worry about the house.

I can tell you my mom wished that I would do that for her house, and she would gladly have me live in the basement, too, to do that.

Q.  I understand.  Thank you.  I also want to reference the fact you brought out in your direct testimony about how the fact that Mr. Rodriguez was able to read the Owner's Manual of a car for a car that he got and he had been in prison for a while so he wasn't

familiar with the sort of modern bells and whistles of a car.

A.   They didn't make them that way in 1979.

Q.   That's correct.  And I just want to be -- and I think you referenced this but you're aware that his sister and mom purchased that car for him?

A.   Yes, I am.

Q.   Okay.  And the fact that Mr. Rodriguez learned to drive that car by reading the Owner's Manual, the exclusive source of that information would be Mr. Rodriguez's own self-reporting to you, correct?

A.   Yes.  But it's also -- it's also inferential because he used the car extensively and he would not have been able to operate it with the level of freedom that he did if he could not operate it electrically.  At some point it catches up to you.

Q.   For sure.

A.   But he knew how to drive a car.  He had a license.  But in terms of again the bells and whistles. Again he's driving around in North Dakota.  You gotta know how the heat works.  You know, you have to be able to do things that are electronically driven in your car or at some point it's going to catch up to you, whether it's a maintenance issue or just a comfort issue.

Q.   And I wasn't -- I didn't mean to focus on whether

or not he could drive the car.  I was actually focusing more on the part that he learned that information by reading the Owner's Manual as opposed to his sister, Ileana, sitting next to him and very patiently and carefully showing him over the course of however long it took how to operate the car that she purchased for him.

A.  I didn't have that information.

Q.  Okay.  Because the only information you had was from Mr. Rodriguez, right?

A.  About that particular issue.  That's the only place I derived that particular information from was him.

Q.  All right.  Thank you.  Moving on I want to talk about the -- what you said you learned -- I should rephrase that.  Strike that.

I want to talk about what you indicated, the fact that Mr. Rodriguez moved back into the Minnesota State Hospital after the Nancy Carlson rape --

A.  Yes.

Q.  -- said about Mr. Rodriguez and his adaptive behavior and his adaptive strengths.  So I apologize because there are a lot of subject categories and I didn't always get them down.  But certainly that fact fell into one if not more of the subcategories; is that correct?

A.    I brought it up with respect to problem-solving.

Q.    Thank you.    I wrote down "problem-solving" but I was second-guessing myself.

A.    We'll work as a team on this.

Q.    Okay.    And so he had been approved for independent living as part of his parole plan from the halfway house --

A.    Yes.

Q.    -- which was sort of a step down from the Minnesota State Hospital and was at that independent living facility in Mankato.    And that's part of that program.    You're on parole.    You're not just done.    But you're part of this structured parole program and that's where he was before -- for about a month before Nancy Carlson was raped -- before Nancy Carlson was raped, correct?

A.    Yes.    I believe so.

Q.    That's my understanding as well.    And after about a month Nancy Carlson is raped and then I think it was about four days later, a week later as you indicated, I'm not trying to be completely precise but approximately a week later he goes back and asks to live at Minnesota State Hospital.    And you made two comments about that and let's talk about the first one.

The first one is you talk about how clever

it was of him that he was able to convince the Minnesota State Hospital to take him back and that showed skills because he was able to convince them when he was already out to I think you used the word "readmit" him to the Minnesota State Hospital?

A.  Correct.

Q.  All right.  I just want to grab an exhibit.  And I'm marking this as Defense Exhibit 110.

A.  Thank you.

Q.  And, Doctor, what I'm showing you is an entry from the Minnesota State Hospital really right at that time after he moved back.  You can see the date is 11/13/79.  This is a progress note by a social worker with the last name that starts with C.  It looks like Clancy to me.

And first I'd like to offer D-110 into evidence.

THE COURT:  Any objection?

MR. REISENAUER:  No objection.

THE COURT:  110 is received.

Q.  (Ms. Fisher continuing)  And I'm going to start reading about midway down the page.  It's in the middle of a -- middle of a line.  It's the beginning of a sentence that starts with:  "Mr. Rodriguez remains on parole..."

Do you see where I am?

A.    Yeah.

Q.    All right.  "Mr. Rodriguez remains on patrol as ordered previously by the Commissioner of the Public Welfare and thus continues to be a resident of the Minnesota Security Hospital in the Intensive Treatment Program for Sexual Aggressiveness.  His return to this program is as a voluntary admission for residents on Step 13 of the Intensive Treatment Program's Steps of Progress.

A.    Mm-hmm.

Q.    And fair to say that this appears to capture that time when he moved back?

A.    It doesn't say when he actually came in but it's the period of his being in the hospital.  It doesn't speak about the date and the actual entry.  It just says that he voluntarily came in.

Q.    All right.  You understand -- do you remember that before he moved in, before he went back that he had been detained at the -- I just want to get the name right.  At the Mankato Law Enforcement Center because he was targeted as a sex offender and they questioned him before they released him after Nancy Carlson was raped?

A.    I'd have to review those records.  I don't know that this captures that --

Q.  All right.

A.  -- sequence of events.  I'd have to look at the exact sequence of events of his admission relative to his contact with law enforcement.

Q.  That's fine, Dr. Welner.  I wasn't trying to make it difficult.  I thought this was just a document that we could enter into the record that perfectly captured what we both agree happened.  But that's fine.  You don't need to agree to it.

All right.  So we would both agree then that according to his testimony he went back to the Minnesota State Hospital after Nancy Carlson --

A.  Was raped.

Q.  -- was raped.

A.  Correct.

Q.  And I had mentioned that you talked about how clever it was to convince -- to convince them to take him back.  But you'd agree with me that he was -- he wasn't discharged.  He was simply on parole and then he returned to the facility that had been incarcerating him, for lack of a better word, before he was paroled.

A.  But it wasn't an incarceration.  It was a treatment facility.

Q.  It was a secure facility for violent offenders and you could not come and go as you pleased, correct?

A.   That's exactly right.  You couldn't come as you please either.  It's not the easiest thing once a person steps out of a custodial environment to just come back, and that's why those decisions are made with a lot of gravity by the staff because they -- notwithstanding that someone goes into a halfway house program, the intention is for a person to go to a step-down environment only when they're in a position to really be released to the community in short order.

Q.   All right.  Well, the document that I read to you certainly indicates that there's something that is called a voluntary admission for residents, correct?

A.   Correct.

Q.   All right.  And the second point that you made about Mr. Rodriguez moving back into the Minnesota State Hospital after the Nancy Carlson rape is that you were saying how, I think the words you used were, incredibly clever it was because it would give him an alibi.

And I don't know if I'm missing something but he moved back a week after Nancy Carlson was raped, right?

A.   I don't know that I said that it was incredibly clever because it would make -- I'd really want to read a transcript because I don't know that I used the word "incredibly" but I certainly think that it would be

clever for him to take himself out of circulation so that if police are looking for him they can't locate him and he happens to be at a place where they're not aware, that he's just not around.  If he's not around and they can't find him and they don't think that he's -- they can't reach him or he can't be questioned, he can't be held accountable.

Q.  Yet he's at a facility --

A.  A secure facility.  How are they going to get to a secure facility to even talk to him?

Q.  He's a registered sex offender, correct?

A.  I understand that.  But he's in a secure facility and it's not so easy for law enforcement to access people once they are locked up in a state hospital. That's not -- they have their own procedural loops and hoops that they have to go through.

Q.  Oh, I understand.  Believe me, I understand how state hospitals and prisons work.  What I'm asking you is:  He was there -- this was a Court-ordered facility, correct?

A.  That's how he got in there in the first place.

Q.  Yes.

A.  In '74.

Q.  All right.  Well, let me ask you this:  Three days later did they find him in the facility and arrest

him?

A.  I don't know.  I'd have to go back and look.  He was eventually arrested on this case.

Q.  While he was living at the Minnesota State Hospital?

A.  That's right.

Q.  So they found him there.

A.  Yes, they did.

Q.  Which isn't so crazy considering the Court ordered him there.  He's participating in programs there and he's a registered sex offender, which means he's required to put -- to allow law enforcement to know his address, correct?

A.  Can you ask the question again?  You said it isn't so --

Q.  They found him at the Minnesota State Hospital.  Actually strike that.  I'm going to move on and ask a different question.

Mr. Rodriguez didn't choose to flee, leave the state, leave the midwest, leave the region, perhaps assume a different name, hide in a motel.  He went back to the Minnesota State Hospital, correct?

A.  He went back to the Minnesota State Hospital but again I don't know that he had the means to flee.  I don't know that he had the infrastructure support to

support him if he fled having been locked up for a few years.  And I don't know that I can establish that by going to the Minnesota State Hospital that he wasn't fleeing.

In my experience of 26 years in forensic psychiatry, I have worked on a number of cases of people who have been released from institutional confinement, either as forensic -- for forensic purposes or civil commitment, and it is very unusual for someone to effect a readmission right after a crime and to do so as quickly as he did.  It's an unusual strategy and it's certainly something that he was attempting to do in the wake of this rape that had occurred that by his assertion and successful assertion with the clinical staff he wasn't responsible.  They gave him a presumption of innocence in terms of engaging him and taking him in.  And so I think that speaks to an unusual set of circumstances that one does not see.

Now eventually he was arrested but that doesn't make the strategy any less self-serving in an effort on his part to position himself as a patient instead of a rapist.  If he's in the hospital, he's being cared for by people who are nurturing and caring who are attentive and say:  We know this person.  We just evaluated him.  We are invested in our impressions

of him not being harmless to the community.  He says he's innocent.  And he's surrounding himself essentially with people who are his advocates who can protect him against law enforcement that otherwise in the community he would not have people advocating for him and he would be seen as just an ordinary rapist who got out of confinement and that they felt really didn't have any need for clinical services.

So he really did position himself as a patient and as a person for whom a psychiatric condition was, quote, relevant because he was now in a state hospital, which is a completely different appearance from someone who's out in the community and in a position to offend and is perceived as such by law enforcement.

Q.   I understand.  On direct you'd used the word "alibi."  You'd agree with me it's not an alibi if he wasn't living in the hospital at the time of the offense.

A.   I agree.  And if I used the word "alibi" and the time doesn't line up, then I've misspoken.  I think that it was a good strategy on his part for other reasons and I shouldn't have used the word "alibi."

Q.   And you'd agree with me at the very least that the police department in Mankato was able to locate him

in a very short period of time and arrest him for that rape.

A.   Good cops.

Q.   Moving on.  All right.  You spoke on direct about another -- something else that Mr. Rodriguez did that you thought was very clever.  And I believe I wrote down "problem-solving" again.  Correct me if this wasn't an example of his problem-solving.  And that was when he went to the Northwest Treatment Center in Minnesota after he was arrested for the obscene phone calls?

A.   Dr. Whalen.

Q.   Correct.  Dr. Whalen, exactly, Robert Whalen. And he saw Dr. Whalen once and then he -- I think he didn't go back and then he was arrested for the Shirley Seddon rape?

A.   Yes.

Q.   And then he went back and there was a technicality where he said:  Talk to my lawyers.  And they said:  You can speak to him.  And then he spoke to Mr. Rodriguez I want to say three more times after that.
         Does that sound right?

A.   The number of times I just don't remember but the sequence of events that's how I remember them, correct.

Q.   That's fine.  And you had commented on how that was very clever because it showed that he was able to

manipulate the situation.  I'm not saying you used the word "manipulate."  That's my word.  But --

A.  Or even that I used the word "clever" but, you know, I'll listen to your question --

Q.  I believe you used the word "clever."

A.  What I specifically said was that it was an example of problem-solving.

Q.  All right.

A.  He had a problem and that's how he chose to solve it.

Q.  And the reason that was --

A.  In doing so he psychiatricized himself.

THE COURT:  Hold on.

A.  That's what I said.

Q.  (Ms. Fisher continuing)  And the reason that that was clever -- I'm sorry, I didn't mean to say "clever." And the reason that was solving his problem was because, if I understood you correctly, he was using a -- the fact that he sought out a therapist or a sort of therapeutic environment or person to control what happened to him in the Shirley Seddon rape because he had learned from what happened when he sought out Mr. Whalen after the obscene phone calls because he was ultimately never arrested for making those calls.

Did I understand that correctly?

A.   That's not what I said and I should clarify.  And it's not that you're misunderstanding.  I need to be a little more precise about the history.

When he first went to Mr. Whalen, he was younger.  And so it wasn't my testimony nor did I intend to testify that he sought Dr. Whalen out when he had made the obscene phone calls.  No, his parents sent him and he was routed into a disposition that essentially saw him as a, quote, mental health problem.

So he self-referred when he was an adult based on the reference point of his history of recognizing that he would be perceived as a mental health problem as opposed to a predatory rapist and then ultimately he was.  He was perceived as someone who needed mental health services, but notwithstanding that he came into custody and was ultimately -- that was the disposition of his case for the Seddon and the Knudson rapes.  He did not need psychotropic medication.  He did participate in a therapeutic community but ultimately he was all together resistant to sex offender treatment because after his arrest on the Whalen charges when he went away in 1980 he declined to participate in the sex offender -- so his participation was active but it wasn't something that necessarily -- unless Court-mandated that he necessarily would have sought

out.

However, he was portrayed within the system with the patina of someone who had an illness that needed intervention as opposed to someone who had a deviant sexual arousal that he was prepared to act on except for instances in which he might have intoxicated himself with alcohol.  Or the opportunity simply did not make itself available because the Seddon and Knudson crimes were opportunistic rapes.

Q.   All right.  I'm going to mark this exhibit as D-111.

A.   Thanks.

Q.   All right.  Dr. Welner, what I've shown you is Exhibit D-111.  This is a letter to the medical director at the Minnesota Security Hospital.  The letterhead you see says "NW Mental Health."  And if you turn it over on the back you can see that it's signed by Robert J. Whalen.

And I'd like to offer Exhibit D-111 into evidence.

MR. REISENAUER:  No objection.

THE COURT:  111 is received.

Q.   (Ms. Fisher continuing)  All right.  And I just want to draw your attention to two sentences on the back page.  It's the second paragraph from the bottom not

including "I hope the above information is helpful." The paragraph that starts with:  "Al indicated a history of headaches..." but I'm going to read the last two sentences.

"Al wanted to go to prison or get psychiatric help, but not just 'get out,' meaning probation.  Further discussion of this indicated the strong guilt feelings."

Did I read that correctly?

A.  Yes.

Q.  All right.  And I'd like to move on to Exhibit D-112.

A.  Thank you.

Q.  All right.  Doctor, what I'm showing you is the Federal Bureau of Investigation interview by Special Agent Brostrom from the date of 8/21/2006 with Robert Whalen.  I believe this was actually in the packet of materials that you reviewed in preparation for writing your report; is that correct?

A.  I'm sure I read this report.

MS. FISHER:  All right.  And I'd like to move item Defense Exhibit D-112 into evidence.

MR. REISENAUER:  No objection.

THE COURT:  112 is received.

MS. FISHER:  Thank you, Your Honor.

Q.   (Ms. Fisher continuing)  And if you would turn the document over to the very last page and I'm going to read the last paragraph.  "In summary, Whalen noted that, at the time of his contact with Rodriguez, Rodriguez was not oblivious to 'time and place.'  Whalen opined that Rodriguez could be considered as having 'borderline intelligence.'  Whalen explained that persons having a low intelligence level tend to use behavior to respond in socially difficult situations where as highly intelligence people tend to find a way to respond in the same situation, ie, they are social survivors."

And did I read that correctly?

A.   You read that correctly.

Q.   Thank you.  All right.  I wanted to address another thing you talked about on direct examination when you talked about the fact that Mr. Rodriguez chose not to go to sex offender therapy.  He had sort of said he'd go for a long time because he could get certain privileges by saying he would go.

A.   Yes.

Q.   But his sentence wasn't done for many, many years.  And then when the time got close he didn't go.  Once it became sort of go time, he chose not to go.

A.   Correct.

Q.   And you had commented that this reflected on his general adaptive behavior and the strength in his adaptive behavior.  And --

A.   I commented that it reflected upon his strategizing.

Q.   Thank you.

A.   It was his strategy not to go and it was his strategy to say he would go when he had no intention of going.

Q.   Got it.  And as I wrote here he strategized because the reason it was a strategy as you testified was the downside, if you want to call it a downside, was that he wouldn't get patrolled so he would have to serve the maximum term of his sentence but then when he finished he wouldn't be under any sort of supervision.

A.   Yes.

Q.   Okay.  And are you aware that when Mr. Rodriguez was up for parole he expressed to the staff at the prison where he was that he did not want to get out and he actually asked to be locked up without being locked up and pointed to the civil commitment facility on the grounds when he asked that he be able to stay locked up?

Do you remember that?

A.   I'm familiar with that exchange of documentation as well as the evaluation that followed it.

Q.   All right.   And even though he wasn't on parole he was still a Level 3 sex offender, correct?

A.   That's correct.

Q.   And as a Level 3 sex offender, it's fair to say there are a lot of limitations on your life.  I think you referred to some of them on direct.  It's not exactly the same thing as being on parole, of course.  You don't report to a parole agent.  You probably don't have to give random urines and things like that.  But there are restrictions, including making sure someone knows your address, your place of business.  I don't know if they had this then but you have to tell them what your car is and things like that, correct?

A.   There's accountability.

Q.   All right.   And would you agree with me that if he were on parole he would certainly be able to go to a mall and drive a car?  That wouldn't be prohibited if he were just on parole.

A.   I don't know what the conditions of parole would be.  He had a colorful history and conditions can be set different ways for different people.  He might have been restricted in certain ways.

Q.   All right.  Thank you.  And when talking about Mr. Rodriguez's practical understanding, you referred to a few things and I just wasn't sure what you were

referring to.  I may have completely missed it so I just wanted to get some clarity because I was unsure.

So I believe you had listed that he gained a practical understanding of electrical work and plumbing and carpentry.  Do those sound familiar?

A.  He may have been a carpenter long before that but that he learned plumbing and electrical work.

Q.  All right.  When you say --

A.  No, no, I'm sorry.  I'm sorry. (Dr. Welner's cellphone ringing.)  For God's sake, I apologize.

Q.  I think I can ask a question.

A.  I've got your question.  I'm just trying to actually answer it because you wanted me to clarify.

When I raised the plumbing and electrical, I raised it in connection with reason.  I said you cannot do plumbing and electrical work successfully unless you have the capacity to reason.  Otherwise you create a mess or you make a big problem bigger.  And that's the only context in which I raised the practical understanding.

I don't know where he acquired the knowledge to do that.  He may have acquired it in prison.  He may have acquired it before prison.  Somewhere along the line he learned it.  But when I brought those up -- there was a third one that you mentioned that I think I

applied differently.  I just -- if you could -- which one was it?

Q.  That was carpentry.

A.  Yeah.  The carpentry, I believe I only brought it up in the context of the nature of the work that he was doing as a matter of his home care and how he was assisting, that he was providing these kinds of skills. He was lending these kinds of skills as a matter of personal and home care.

Q.  And were you referring to something specific that leads you to believe that those were skills he developed?  I just had no idea what you were talking about.  I don't know when you say home care generally how that means he knows electrical -- how to do electrical stuff and plumbing stuff and carpentry stuff.

A.  I didn't use carpentry interchangeably with electrical and plumbing, and I used them in different ways.  And again I believe my knowledge of his carpentry may have actually come from the family interviews who said that he was a very able carpenter.  I believe that's actually where I derived it.  But where he learned carpentry I don't know.  He may have learned it out of custody or in custody.  It was their familiarity. And a person can use carpentry skills around the house to help in so many ways.

Q.   All right.  The question was:  Where did you learn that information, not where did Mr. Rodriguez --

A.   Yeah.  I believe that I learned that from interviews with his support system.  That's my recollection.

Q.   Can you point me to any documents or interviews or people?

A.   I can't.  I'd have to go back and look.

Q.   Do you know what they meant by plumbing or electrical work?

A.   Carpentry -- again carpentry is different from plumbing and the electrical.  The plumbing and the electrical is from him.  It's something that he mentioned as something that he was doing in the house.  That came from his interview.  Carpentry I believe came from somewhere else.

Q.   Got it.  Thank you.  That's exactly what I was trying to figure out.  I appreciate it.

When you talked -- I actually think this part was today about Mr. Rodriguez's ability to manage his finances.  I believe you mentioned that one of the things was that he managed a credit card.

A.   Yes, he had a credit card.

Q.   And you were aware that that credit card was in his mother's name and she paid the bill, correct?

A.   Yes.

Q.   All right.  All right.  I want to cover the section of your testimony that dealt with Mr. Rodriguez's criminal cunning in the Dru Sjodin murder and you referenced it several times in several ways.  Some of the things you mentioned are that he demonstrated a degree of criminal cunning by avoiding detection by law enforcement because he was able to give the police an alibi.  When they talked to him it took them several months to find Miss Sjodin's body because he did a good job of hiding it.  And I'm sure you listed more in more detail but that was the gist of it.

A.   Are you speaking about my testimony or my report?

Q.   I thought your testimony.

A.   I don't believe I mentioned alibi as criminal cunning in my testimony.

Q.   How did you characterize alibi?

A.   I spoke about it with respect to his cognitive flexibility, that he was essentially aware of the nature of the facts in the case and was conforming his response to adapt to the known facts on the fly.  He was flexible enough to change his story in accordance with what he knew.  Knowing that Dru Sjodin had gone missing at the time that she had gone, he gave a story that he went to a movie that would have covered that time.  And so I

gave that to speak more to his cognitive flexibility.

Strategizing, I did specifically point out that it was a strategy of his to take the body as far away as he did. So, yes, that's how I -- that's how I assigned that quality of his.

Q. All right. And I assure you I'm not trying to trip you up by interchanging these. You are the expert on what these are, not me. That's why I've been using adaptive behavior generally because I'm not trying to quibble about which category --

A. I appreciate that, and you're raising a point that was part my testimony also and that I believe I testified to the Court that I wasn't attempting to be rigid because there's reasonable overlap for a number of categories. I was making a best effort to try to be precise about what I was attributing.

So I -- I see -- I can see that you're in the same situation and I'll help however I can to clarify.

Q. Thank you. All right. So would you agree with me that certainly Mr. Rodriguez used a knife in this crime and that the police found a knife sheath that Mr. Rodriguez left right next to Ms. Sjodin's car?

A. Yes.

Q. All right. And that sheath matched a knife that

officers found in Mr. Rodriguez's car.

A.   Yes.

Q.   Certainly fair to say that Mr. Rodriguez, aside from leaving the matching sheath right next to Miss Sjodin's car, kept the knife, kept it in his car and didn't throw it away.

A.   Correct.

Q.   All right.  Would you also agree with me that Mr. Rodriguez was seen on the Target video right before he kidnapped Ms. Sjodin?

A.   Shortly before.

Q.   Fair enough, shortly before.  And so he was in an area that had video surveillance in a large retail store placing himself at the scene of the crime he was about to commit shortly before he committed that crime; is that accurate?

A.   The crime occurred in the mall and he was at Target.  The Target was not at the mall.  He left the Target to go to the mall.  They were two different locations.

Q.   Are you sure of that?  That mall has a Target.

A.   But the Target was some distance away from where he actually kidnapped Dru Sjodin.  It was not -- the Target was not, you know, just a short walk away.  The distance between the Target and Dru Sjodin was not

just -- it was not a -- it was not a like from here to there walk. That's my point.

It may have been on the other side of a complex but we're not talking about two places that his -- his being at the Target by video didn't position him next to Dru Sjodin. His being at the Target contradicted his alibi that it took me so long because I was looking for pants in this store and this store and this store and this store and this store. No. The video showed that he was sitting at a Target on a bench casing everybody who walked by and then followed a blonde out of the Target. That's what it did. Otherwise there wasn't anything to more directly connect him to Dru Sjodin.

Q. Dr. Welner, have you seen the layout of this mall?

A. I have.

Q. Have you been there? You'd agree with me that at the mall there are department stores sort of at the far ends and then there are smaller retail shops that connect the general areas?

A. Sure.

Q. So are you saying that the Target wasn't part of the large complex that made up the mall?

A. I'm not saying that. What I'm saying is I want

to make it clear that the idea of him being on the video at Target doesn't attach him to Dru Sjodin's disappearance. That's the only thing that I'm saying. The significance of it for me was that it contradicted his effort to say that he was running around looking for pants when he was not. That's all.

Q. All right. It placed him at the mall, correct?

A. It placed him at the mall.

Q. All right. We also discussed that Mr. Rodriguez had Dru Sjodin's phone on him because we know that the phone pinged off the cell tower at least an hour after the kidnapping happened, correct?

A. Two and a quarter hours.

Q. All right. So fair so say that when -- and actually let me back up. Mr. Rodriguez knew that Miss Sjodin had a phone because she was on the phone when he first approached her, correct?

A. That's correct.

Q. And instead of throwing the phone out the window or smashing the phone, which has all these tracking abilities and location abilities, he kept the phone with him the whole time and it was actually used as part of the investigation, correct?

A. I don't know what kind of tracking abilities were available in -- at the time of Dru Sjodin's

disappearance.  I know what tracking abilities and pinging are now as part of an investigation, but I don't know how commonly they were employed back then.  They were certainly ultimately employed in this case.

Q.   That's right.

A.   But the case had a special interest in the community, far more of an interest than Elizabeth Knudson and Shirley Seddon's rapes did and so -- and now pinging and cellphone, that kind of thing is ubiquitous. But I don't know -- I can't speak to how ubiquitous it was back then.

Q.   But you'd agree with me certainly that they used that technology as part of their investigation in this case.

A.   Yes.

Q.   All right.  And I want to go back to a fact we established when talking about the Nancy Carlson rape. Mr. Rodriguez knew that he was a suspect in the Nancy Carlson rape because they went to talk to him because he was a registered sex offender and certainly that's a very common practice if there's a sex assault or a kidnapping that the police would investigate sex offenders, correct?

A.   Yes.

Q.   All right.  And Mr. Rodriguez wasn't just a sex

offender.  He was a Level 3 sex offender when he got out of prison in 2003.  And that's the highest level sex offender there is, correct, in Minnesota?

A.  Correct.

Q.  By the Minnesota classification system.  All right.

I'm just going to mark an exhibit.

A.  Thank you.

Q.  All right.  So let me back up for a minute before we go over this document.  We've just established that Mr. Rodriguez was aware of the fact that if certain crimes -- if a rape or a kidnapping occurred as a sex offender even before he was raised to the level of a Level 3 sex offender he would be questioned about that crime.  He knew that and we know that because we've talked about how he experienced that with Nancy Carlson.  And even knowing that he still went ahead with this kidnapping.

And at this point I want to ask you a question based on Exhibit D-113, which is part of the trial testimony, and I'm going to start at line 17?

MR. REISENAUER:  Excuse me, Your Honor, this exhibit hasn't been offered.

MS. FISHER:  Thank you.  May I?

MR. REISENAUER:  Go ahead.

MS. FISHER: So I'd like to start by --

MR. REISENAUER: Hang on, are you going to offer it?

MS. FISHER: Offering D-113 into evidence.

MR. REISENAUER: Thank you, Your Honor. I have an objection. This is not trial testimony. This is closing argument if the Court takes a look at it.

MS. FISHER: I'm sorry, I mischaracterized it. This is from the closing argument of the trial.

THE COURT: Do you still object?

MR. REISENAUER: I don't, Your Honor. I just want to make clear what this was.

MS. FISHER: I appreciate it. I did misspeak. Thank you.

THE COURT: All right. Subject to that clarification, 113 is received.

Q. (Ms. Fisher continuing) All right. And I'm going to start by reading on line 17. This is part of the closing argument. Thank you. "On November 26, 2003, Special Agents Ahlquist and Barker were assigned to interview Level 3 sex offenders -- or a Level 3 sex offender who had just gotten out of prison in May of that year, just six months earlier. That offender's name is Alfonso Rodriguez, Jr. Almost from the moment that Mr. Rodriguez started to talk to the agents at his

job site, questions about his alibi and inferences of his guilt started to pile up."

And did I read that correctly?

A.  Yes.

MS. FISHER:  And I'm going to mark this as D-114.  Exhibit D-114, this is actually the trial testimony from the trial of Mr. Rodriguez, and at this point I would offer D-114 into evidence.

MR. REISENAUER:  And, Your Honor, I'm not going to have an objection if we know whose trial testimony this is.

MS. FISHER:  This was the detective that I just read his name, Ahlquist I believe, being questioned about what he did to find Mr. Rodriguez.

MR. REISENAUER:  No objection.

THE COURT:  And it is the testimony of Detective Ahlquist, is that what we're saying?

MS. FISHER:  Yes.

THE COURT:  All right.  114 is received.

Q.  (Ms. Fisher continuing)  All right.  Reading on line 4, question:  "Can you tell me how that came about?

Answer:  "I was provided with a list of sex offenders sometime on Tuesday.  These offenders were said to have had stranger victims and it was my duty -- I was assigned to investigate these sex offenders.

There were I believe seven on the list.  Mr. Rodriguez was the only Level 3 sex offender and I decided to start with him."

Question:  "Okay.  So you had a list of individuals that had prior convictions, is that what you're saying?"

Answer:  "Correct."

Question:  "And these individuals included Mr. Rodriguez?"

Answer:  "Yes."

Question:  "You mentioned he was the only I think you said Level 3 offender.  Sex offenders are delineated levels, is that what you're saying?"

Answer:  "Yes."

Question:  "Okay.  And as a Level 3 offender you went and then found out where he was living or residing or working and wanted to interview him?"

Answer:  "Yes."

Question:  "How did you go about that then?"

Answer:  "I contacted a deputy sheriff who works out of the Crookston office, the Polk County Sheriff's Office, and we set up a meeting.  I wanted to visit with him about Alfonso Rodriguez.  We ended up meeting with this deputy and a city police officer in Crookston to discuss Alfonso Rodriguez.  There would

have been a lot of information available at the police department because of his offender status and the fact that he was a registered offender."

Question: "Okay. Mr. Rodriguez was in fact living in Crookston at the time. I assume you learned that."

Answer: "Yes."

All right. And did I read that correctly?

A. Yes.

Q. All right. So going back to what we were talking about, despite the fact that Mr. Rodriguez is not just a sex offender but a Level 3 sex offender and he knows that if a crime occurs he will be contacted and investigated, in fact, he's guaranteed to be a subject when the police talked to him approximately a week later would you agree with me he gives them an alibi that he was seeing a movie that was, in fact, not even playing at the time?

A. That's correct.

Q. All right. And --

A. That was not playing in the mall. It was -- my understanding is it was not playing at that location. It was not playing in the mall.

Q. All right. If I can take a minute I can find the testimony from the detective where he says it was not

playing anywhere in the area.

A.   That was my interpretation, that it was not playing in the mall where he was saying that he was seeing a movie and they found that it was not playing in the area.  It might have been playing somewhere else.

Q.   Fair to say it didn't really suffice as an alibi?

A.   It was an unsuccessful alibi.

Q.   All right.  And he had -- he had a week to come up with an alibi because he knew they would be coming to talk to him and when they came --

A.   How did he know that?

Q.   Because he's a Level 3 sex offender.  This is what we were just talking about.

A.   The fact that he's a Level 3 sex offender doesn't give him the ability to divine what police are going to do or how they're going to investigate.  That's not accounted in his -- it may be his experience.  But he cleaned his car and he didn't necessarily have any guarantee that they would come looking for him.

Q.   I want to go back to the Nancy Carlson rape and we just were talking about this a moment ago.

A.   Different police departments work different ways and different law enforcement pursue different leads and different angles.  At that point Dru Sjodin was missing and they may have been exploring it for all kinds of

potential leads, such as that she took off with somebody, such as that she might have been seen somewhere else; that he had no way of knowing that at that point that they were necessarily exploring this as a crime in which a kidnapping or sex offense had taken place.  Nothing more than a kidnapping.  There was a kidnapping.  It was not a confirmed rape.  It's a presumption of a sex offense in a kidnapping of those people who might be inclined to think that way, but the only available information was that she had been kidnapped from a mall, not that she was a person complaining of having been sexually assaulted.

Q.   Fair to say that Mr. Rodriguez was incredibly frustrated with the fact that his status as a sex offender affected many aspects of his life and that everyone seemed to know that he was a sex offender, correct?

A.   Well, "incredibly frustrated," I don't know whether I would necessarily agree with that.  He had to adapt to it and he made adaptations to not call attention to it.  But he was able to work and he essentially set up a way of life for himself where he was able to do things and he was able to recreate and indeed he was able to rape.  He was able to act on his deviant sexual arousal notwithstanding that he was a

Level 3 sex offender.  So he made adjustments in order to not come under scrutiny but otherwise he was -- I think the biggest source of his frustration that I can recall from my work on this case was that he was concerned that it was impacting his ability to get all employment opportunities that might otherwise have been available to him.

Q.   Because the job you referenced was the job his sister got him laying drywall, correct?

A.   But it was a job and he was able to get a job, but he was frustrated that he felt that there were opportunities that were not available to him because his status was otherwise known.

Q.   That's right.  And he certainly knew that Ms. Sjodin had been kidnapped.  Fair to say?

A.   Sure.

Q.   And he knew that in the past his mere status as a sex offender caused him to be the target of investigations, correct?

A.   Target of investigation for a rape in which a Mexican was identified and in which he had left a living victim to identify his features.

Q.   Doctor, you've talked about the fact that Ms. Sjodin was found without any underpants on and without any pants on, and you seem to be making the

connection that it was Mr. Rodriguez who did that.

A.  Yes.

Q.  So fair to say Mr. Rodriguez knew that she didn't have her underpants on and didn't have her pants on and that there was perhaps a sexual component to this crime?

A.  Oh, certainly.  But Dru Sjodin was not in any position to inform law enforcement of who had attacked her, and that's the distinction between that and the Carlson case.  The Carlson case Ms. Carlson was able to go to law enforcement and tell them of the nature of the interaction that she had and to describe her attacker.

Q.  And yet as the document D-114 established, the very first thing the detective did was speak to not just one of the seven sex offenders but to the Level 3 sex offender, correct?

A.  You mean in the Sjodin case?

Q.  Yes.

A.  Yes.

Q.  And when they got to Mr. Rodriguez, he gave them an alibi that was very easily disproved; is that correct?

A.  It was disproved.

Q.  By checking to see if a movie was playing in the area?

A.  That's correct.

Q.  All right.  And, Dr. Welner, would you agree with me that with all of Mr. Rodriguez's criminal cunning that you testified to since the age of 21 aside from about a month on his pass when he was in Mankato and the six months that he was out, he has otherwise spent his entire adult life in prison.

A.  Yes.

MS. FISHER:  All right.  Thank you.  No further questions.

THE COURT:  We'll go ahead and we'll break at this point for 20 minutes.

(Recess taken; 2:35 p.m. to 3:00 p.m.)

(In open court, all counsel present.)

THE COURT:  We're back on the record in a case entitled United States versus Alfonso Rodriguez. It's File No. 2:04-cr-55.  All counsel of record are present and Dr. Welner's on the stand.  Mr. Reisenauer's about to commence his redirect.

You may proceed, sir.

MR. REISENAUER:  Thank you, Your Honor.  I will be brief.

**REDIRECT EXAMINATION**

**BY MR. REISENAUER:**

Q.  Dr. Welner, just a couple things in regard to the domains that you testified to earlier and then

Miss Fisher asked you about some of those.  And you have them placed in three categories I'll call them, correct?

A.  That's what the DSM does.

Q.  And that's the DSM-5, correct?

A.  That's correct.

Q.  And so you didn't make those up, correct?

A.  No.  I followed the diagnostic manual and I followed the procedures that I'm trained in as a psychiatrist and as a physician.

Q.  Okay.  And as you laid out in your report all of those areas within those three domains that we talked about, you didn't make those up on your own either, correct?

A.  No.  I derived them from the reference points.

Q.  Okay.  Miss Fisher asked you about an article that you wrote.  It's D-80, if you can find that up there still if you still have it?

THE COURT:  That's the chapter to the Encyclopedia of Forensic Science.

A.  I don't know that I have it up here actually, D-80.  I may have given it back to you.

THE CLERK:  (Handing exhibit to the witness.)

THE WITNESS:  Thank you.

MR. REISENAUER:  Thank you, Shelley.

Q.   (Mr. Reisenauer continuing)  And, Doctor, as I think Judge Erickson just alluded to you testified that this is part of an encyclopedia, is that right, a chapter in the encyclopedia?

A.   The Encyclopedia of Forensic Sciences, which is Wiley's, a major publisher.

Q.   And this is one chapter and you wrote this particular chapter.

A.   Yes, I did.

Q.   And Miss Fisher directed your attention I believe to page 637 if you recall that.  If you could go to page 637 up on the top of the page.

A.   Yes.

Q.   Do you see that?

A.   Yeah.

Q.   Okay.  And she read to you a paragraph on the second column there that starts:  "Some differences exist in the definition..."  Do you see that?

A.   Yes.

Q.   Okay.  And you cite in the bottom of that paragraph in parentheses "Greenspan et al., 2011."  You see that?

A.   Yes.

Q.   So that's where you got this information from in your research?

A.   Yes.   When I was referencing the AAIDD revising the criteria and its relationship to the number of people who would be captured or the percentage of the population captured, that came out of an article that was authored by Dr. Greenspan in 2011.

Q.   Okay.   And this is Dr. Steven Greenspan?

A.   Yes.

Q.   And you're aware that Dr. Greenspan was one of the experts for Mr. Rodriguez prior to this hearing?

A.   Yes, I'm aware of that.

Q.   Let's move on quickly to Mr. Penry and that case. And I don't believe that we need to look at the article that was written but you testified that Mr. Penry -- you found Mr. Penry to be mentally retarded?

A.   Yeah, I remember the case.

Q.   Okay.

A.   I did not testify but I reached a conclusion that he was mentally retarded and so the prosecutors elected not to call me as a witness because they had another objective.

Q.   Yeah, right.   And maybe I confused you.   I didn't mean that you testified at the trial.   You testified earlier?

A.   That's correct.

Q.   Okay.

A.    I just want the record to be clear because someone will reference this one day and I want to be consistent.

Q.    And so you found him to be mentally retarded and I take it he had certain deficits that he needed supports for when you assessed him.

A.    Well, Mr. Penry had IQ scores that were ranging in the 50s and 60s as opposed to Mr. Rodriguez whose IQ's in the 80s.  Mr. Penry had a range of adaptive deficits and so he didn't just have one.  He had a whole number of adaptive deficits.  He was living at home at the time.  He was incapable of not living at home at the time, not because of financial reasons but he was someone who just was limited in that regard.

Q.    Okay.

A.    He had certain skills that's true but those co-existed with a whole range of adaptive deficits.  And in this evaluation I reviewed three conceptual parameters, I reviewed six social parameters, eight personal independence parameters, all as described in DSM, and I did not find that Mr. Rodriguez needed -- not only ongoing support but he didn't need support in any of those areas.  And that's just very different from what I found with Mr. Penry on the adaptive -- on the adaptive aspect of things.

Q.   Okay.  And you still though apparently found that Mr. Penry at least had the ability to commit a crime and commit a murder even though he was mentally retarded. You wouldn't say that, correct?

A.   That's right.  And he was -- he did have criminal cunning.  He had the capacity for criminal cunning.

Q.   Okay.

A.   And that's exactly why I had included him in the discussion because the talk presented several scenarios and the rhetorical question that I posed to the legislators was:  Can you tell which one of these people has mental retardation?  It was really to illustrate the difficulty because the nature of the question that was before the legislature was:  Should we make a standard that basically says below 70 IQ that's how we're going to define "mental retardation"?  And interestingly enough in U.S. v. Hall years later the Court said that that wasn't adequate.  Pennsylvania took it up then and the point that I was trying to make was it's about a lot more than an IQ score because there's so many things that one has to take into account that these are difficult determinations.

So he was meant as an illustrative case without telling them -- I don't believe that I told them in my testimony this was my conclusion.  I just gave

them fact patterns to have them appreciate the dilemma that we're in as evaluators.

Q.   Okay, thank you.  I just want to address a couple of the exhibits that were brought to your attention. Miss Fisher talked to you about a statement that Gail Alterpeter gave to the mitigation specialist prior to trial in this case.

Would you turn to Government's Exhibit 568 just briefly?

A.   Mm-hmm, I see it.

Q.   Okay.  And she read you this sentence regarding Mr. Rodriguez:  "He was the one person who stayed out of trouble."  You recall that?

A.   Yes, I remember.

Q.   Turn to page 2 if you would.

A.   Mm-hmm.

Q.   There's a section called "Friends" there.  You see that?

A.   Yes.

Q.   And on the first sentence she talks about a number of friends that they hung out with and then she says:  "I asked her if there was anything obviously wrong with Al when she knew him and she said:  'No, I don't think so.'"

Do you see that?

A.   Yes.

Q.   And the next sentence reads: (CK) him or it "and I don't think people talked about him."  Do you see that?

A.   Correct.

Q.   And I'm going to turn your attention to Exhibit D-112, Doctor, briefly.

A.   Yeah.

Q.   This is an interview with Robert Whalen.  You are familiar with your discussion with Miss Fisher about --

A.   Yes.

Q.   -- about his meeting with Mr. Rodriguez, right?

A.   Yes.

Q.   And Mr. Rodriguez met with Mr. Whalen, I think you talked with Miss Fisher about that, prior to his arrest, later arrest.  And I just want to direct you to the bottom of page 1 if you would where Mr. Whalen is talking about the various obscene telephone calls he had made to females.

          And at the bottom of page 1 it says: "Whalen explained that the term 'not random' would indicate that Rodriguez did not choose his victims, randomly, for example out of an area telephone book. According to Whalen Rodriguez chose the victims with 'some purpose' as to who they were, the appropriate time

(when), and the topic of the obscene conversation."

This was his discussion about the first time he had met with Mr. Rodriguez regarding the obscene phone calls, correct?

A.   Yes.

Q.   And then the next sentence -- the next paragraph further goes into this meeting.  He says:  "At the time of the meeting with Whalen, Rodriguez was worried that the 'police were about to catch him.'  As a result, Rodriguez requested help in understanding and discontinuing his behavior.  Whalen advised that Rodriguez was worried about his behavior and actions and was concerned that the police would catch him in the near future."

See that?

A.   Yes.

Q.   Does that coincide with what you were talking about earlier in terms of his thought process about, first of all, not getting caught and going to mental health officials to basically address his issue but also not being arrested by law enforcement?

A.   It speaks to the -- it speaks to what I testified to on direct and cross of his problem-solving, of anticipating arrest and aligning himself with a supportive psychiatric entity so that he could be

portrayed not only as someone who had a, quote, problem but someone who was, quote, seeking help.

But from his earlier experience with the mental health professional, he didn't stay in treatment with the first referral when he was making obscene phone calls nor did he follow up when he went a second time. That was actually missing from our cross when he went a second time on the obscene phone calls. The third time when he went on the rape, well, that had the outcome that it did.

But that was the nature of contact that Mr. Whalen had and that was from these brief visits that were timed in such a way to reflect that they were motivated by his anticipation of being arrested and getting out in front of it to reestablish that arrangement with law enforcement.

Q. Okay. And then Miss Fisher did get around to the Sjodin murder in her cross of you and talked about a number of things that she wanted to touch on regarding what Mr. Rodriguez did and about his alibi. And I just want to address that a little bit with a couple questions.

First she talked about the possible video at the mall or at Target and I'm assuming with her questioning that she is saying that who in their right

mind would grab somebody or attack somebody if they thought there was some video around.

First of all, my question to you is in that day and age not as much video but this day and age there's frankly videos everywhere.  And we see crimes being resolved by use of video but that doesn't make all these people that get caught that commit crimes where videotape is used -- that doesn't make them mentally retarded, does it?

A.  I think what immediately comes to mind is probably one of the most talked about news stories in the last six months and that was the murder of the Khatari spy who was presented as a Washington Post journalist, Khashoggi.  And that entire incident was left -- was lain credible because of videotape evidence that showed him coming in and not coming out.  And the people who were implicated, including -- included none other than the head of the Saudi Arabian forensic science -- their head of forensics sciences who we actually have a passing familiarity with in our practice and he's not a knucklehead.

So people who are highly educated and who are even professionally trained from the law enforcement business can be implicated and happening to be caught up in something that they can't account for every single

1664

videotape that -- look, another point.

When Mr. Rodriguez was at Target he didn't know he was going to kill Dru Sjodin at some point later. He knew he was at Target and there was a videotape. So he didn't necessarily anticipate that he was going to see someone and something would happen or even how it would go from there. So I think you can only follow that all the way through.

Q. Sure.

A. You can only follow it through. Well, I'll say McDonald's but, oh, I just remembered McDonald's had a videotape so I better not use that as an alibi. That would require tremendous powers of enduring observation for people to be able to not only account for their surroundings but to recall every aspect of the atmosphere sometime later.

Q. You just touched on the alibi issue and let's talk about that just for a second if we would. Simply because Mr. Rodriguez's alibi was one that was by good law enforcement thrown out the window so to speak and didn't work, that certainly doesn't make him mentally retarded either, correct?

A. No. And the idea of the alibi, as I testified to, was the idea that he had cognitive flexibility. If he was presented with a certain amount of facts, he

would adjust in a way that was -- that required somebody to follow up on it in order to disprove it because if they didn't follow up on it it would fit the facts.

And I was pointing that out to illustrate his cognitive flexibility just basically shift according to the information that had been presented to him, whether it was the locksmith with his sister or whether it was the McDonald's or whether it was using the coat hanger or a number of other things that he might have said and at different times.

Q.   Okay.  I'm going to finish with this.  And this was Defendant's Exhibit 113 which was the closing argument that was mentioned regarding Mr. Rodriguez being a Level 3 sex offender.  And maybe this will clarify where Target is compared to the Columbia Mall, not that it really matters.  If you find that exhibit it's 113.  Do you have it?

A.   Yeah, I do.

Q.   If you turn to the second page the first full paragraph says:  "Alfonso Rodriguez acknowledged he had been to Grand Forks on November 22nd.  He said he'd been to Sam's Club, Wal-Mart, Target and from there he went over to the Columbia Mall."

That's where -- this is my word.  That's where Miss Sjodin was taken from.  And then back to the

transcript.

"And he said that he had gone shopping at J.C. Penney's, Sears and Marshall Field's.  Though Mr. Rodriguez admitted certain things, he earnestly claimed that he wasn't at the mall when Dru Sjodin was abducted.  His alibi was that he had left the mall to go see a movie, 'Once Upon a Time in Mexico' he told authorities, and that he was at the movie beginning at 4:30 or 4:40.  And later he changed it.  Maybe it was 4:20 a little further away from 5:04," which was the time that she was kidnapped.

This particular story that he provided them caused them to do a number of investigative procedures, including checking if that movie was being showed -- shown anywhere, whether they could find him at Sam's Club, Wal-Mart, Target, J.C. Penney's, Sears, Marshall Field's and so forth, correct?

   A.   That's correct.

         MR. REISENAUER:  That's all I have, Your Honor.

         THE COURT:  Thank you.

         MS. FISHER:  Nothing.  Thank you, Your Honor.

         THE COURT:  I do have just a couple of questions.  During the course of your testimony and

Dr. Seward's testimony, there was a number of conversations or piece of testimony that related to the observations about the Martin case and about the Snowden case and his ability to relate an intelligible theory.

My question is:  Is it possible or is it -- the question I've got is that there are all kinds of talking heads on CNN, on other news stations, talking about those incidents.  And is it possible that he was just parroting what he'd heard as opposed to having formed these opinions for himself?

THE WITNESS:  I think it's possible with some of the opinions.  I think certainly with Snowden he could have pulled that right out of the news.  I certainly wouldn't expect CNN to be taking about Trayvon Martin's criminal responsibility in the course of his death but -- and that was certainly a minority-expressed opinion but he could have drawn it.

In the interest of substituting something that could not have come from someone else, and I didn't testify to this but this is part of the same answer, when I asked him about whether he preferred fiction or nonfiction, he specifically spoke about how, well, when you look at nonfiction the difference between nonfiction and fiction may not be as much as you think because nonfiction is impressionistic.  When people are writing

about nonfiction they're writing it through their eyes and it may actually be closer to fiction than you think, which that was an appraisal and again it related to his -- the de-construction of seemingly historical nonfiction but appreciating it for its bias, which I think really does give a more insulated example.

Now, of course, it could have been somebody that he had a conversation with on the ward who said that and he thought, well, gee, that's a good point. I'll keep that in mind. I can't account for that. But there were a number of examples and he showed a ready capability in whatever we were talking about that if he would go there he would go there as well as other kinds of capabilities of being able to join in a metaphoric speech or to speak with symbolism and to do that properly. And that's what abstract thinking is.

THE COURT: The other -- the question that I had related to he was a very neat and organized person from childhood forward, right? Including that he had a cleaning solution and he used it to clean his toys and his shoes every day when he got home.

And my question is: When you testified about that -- those -- like his neatness and his orderly behavior showing the ability to kind of function as adaptive behaviors, right, my issue is that -- what

about the sort of obsessive-compulsive component that may be in that?  Is that anything that the Court ought to consider?

THE WITNESS:  Well, not as part of intellectual disability.  If there's some aspect of him that has obsessive traits or even an obsessive-compulsive condition, it can coexist with intellectual disability or it can occur independently of intellectual disability.  But it's not part of intellectual disability.

And this is a much more crude way of depicting it but the mechanism of intellectual -- of obsessive-compulsive behaviors are hyperfunction as opposed to lack of function.  In other words a person does something, does it appropriately but does it so many times and does it to such a degree that it's functional dysfunctionality because a person overshoots the mark.

The parameters that we're assessing when we talk about personal care and all of the personal independence functions are a person's inability to do a variety of things.  And again speaking to Ms. Fisher's questions, look, a person could be perfectly capable of grooming and hygiene and still be intellectually disabled but that's because they have other adaptive

skill problems.

In his issue I reached the conclusions that I did not just because he was clean and was groomed and was taking care of -- not only taking care of his mom but doing it on her terms, getting food she wanted to eat, not just what he thought they should buy for the house.  But it wasn't just that but it was all of the different components of personal independence and all of the different components of social where he didn't need supports for any of them.

THE COURT:  The last area was that, you know, while he was in school he had friends that -- he made friends with people that were younger than himself quite frequently and oftentimes two and three years younger than himself.  Now part of that may be explained by the fact that he was three years behind and he was in those classrooms all the time with those people.

But would that be an area of concern generally?

THE WITNESS:  I think you just hit on it. If you're seeing people in school every day and they become your peer group, if your peer group is comprised of people who are in higher grades, well, naturally it's going to be obvious that you don't fit in and you're going to have to answer for something that might be

embarrassing to you.  I do think though that as he advanced that his peers were age-appropriate and as he was in his adulthood that his -- the friendships that he maintained were people who advanced and matured into adulthood.

And I didn't get anything from people saying that they outgrew him, and I didn't see anything in the record of people who just felt that they left him behind.  And that does happen in the course of these evaluations and not even -- and not even just with respect to intellectual disability.  Sometimes we'll find that with offender populations where people will say with that or drug use.  They'll just say, you know, that may have been my thing then but it's not my thing now and I just sort of left him behind.  And I didn't find that with him.  The distancing was more physical distance and just a separation by life circumstance.

THE COURT:  Thank you.  Any questions as a result of my questions?

MR. REISENAUER:  No, Your Honor.  Thank you.

THE COURT:  Any questions?

MS. FISHER:  No, thank you, Your Honor.

THE COURT:  You may step down.  Thank you.

Government will call their next witness.

MR. REISENAUER:  We have no more witnesses,

Your Honor.  We would rest.

THE COURT:  Does the --

MR. MONTROY:  Yes.  The defense would recall Dr. Ricardo Weinstein.

THE COURT:  Dr. Weinstein, if you please would come forward, you'll remain under oath.  You may retake the stand.

MR. MONTROY:  I'm sorry, Your Honor, if I could have a moment to get my things situated?

THE COURT:  You may.

MR. MONTROY:  May I, Your Honor?

THE COURT:  You may.

MR. MONTROY:  Thank you.

**RICARDO WEINSTEIN,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION**

**BY MR. MONTROY:**

Q.  Good afternoon, Dr. Weinstein.

A.  Good afternoon.

Q.  Dr. Weinstein, on direct examination last week you testified that it was your opinion to a reasonable degree of psychological certainty that Mr. Rodriguez meets the criteria for a diagnosis of intellectual disability; is that right?

A.   That's correct.

Q.   And you had an opportunity to be in the courtroom the last few days during the testimony of Dr. Seward and Dr. Welner; is that right?

A.   Yes.

Q.   Is it still your opinion today that to a reasonable degree of psychological certainty that Mr. Rodriguez meets the criteria for a diagnosis of intellectual disability?

A.   It is, yes.

Q.   And is it your opinion that Mr. Rodriguez has significant deficits in intellectual functioning?

A.   I believe so, yes.

Q.   Is it still your opinion to a reasonable degree of psychological certainty that Mr. Rodriguez has deficits in all three domains of adaptive functioning and those deficits were evident before he reached the age of 18 years old?

A.   I believe so, yes.

Q.   I want to talk a little bit about adaptive functioning, Dr. Weinstein.

A.   If you give me a second just in case I need any of my notes.

Q.   Okay.  For starters is the AAIDD 2010 green book that we've referred to many times in this hearing the

controlling authority setting forth the diagnostic criteria for intellectual disability?

A. It is. And there's several articles but one by Dr. Greenspan specifically that speaks about the history of the diagnosis of intellectual disability. And the reality -- and that's clear by the way the different definitions have been said on the DSM is that the authority is the AAIDD, or AAMR as it used to be known, and that the DSM follows the definition of intellectual disability based on the research that the AAIDD, or AAMR, has done.

Q. So the green book then in other words is based on a body of research that's conducted by the AAIDD.

A. AAIDD conducts research constantly and that's one of their main issues is research. It's a scientific organization. It's not a -- it's not comparable to the AARP.

Q. And is there any organization or institution in the United States that conducts research in the same I guess manner or -- in the same manner that the AAIDD does when it comes to intellectual disability?

A. There's a few but the most respectable one perhaps is the American Association -- American Psychological Association, the APA, has a Division 33 and publishes a journal and Division 33 is on my last --

I don't know if they changed their name but it was mental retardation.

Q.   And the APA is the American -- what does that stand for?

A.   American Psychological Association.

Q.   All right.  Turning to adaptive behaviors, does the AAIDD recognize proper criteria or criteria for determining whether deficits in adaptive functioning exist?

A.   The criteria, the primary criteria is the identification of deficits regardless of what strengths an individual has and there's a good rationale for that. The rationale behind it is that the purpose of the definition and the purpose of the identification of deficits is to provide adequate supports in order for the individual to improve, if not to overcome the deficits.

Q.   And so that's like if you were doing this in sort of a clinical setting, right?  That's what you'd be looking to do.  You'd be looking to identify deficits so you could come up with supports for that individual; is that right?

A.   That's correct.

Q.   Okay.  And --

A.   There's some exceptions to that and that's -- for

instance, if you apply for a Social Security -- SSI for I think it's -- the name escapes my brain but Social Security Disability or something like that, SSI.  Then they don't care about supports.  It's just determine whether you do have or not the disability and the determination as to whether you are entitled or not to money on a monthly basis from Social Security.

Q.   The -- you mention the word "deficits."  And in deficits does the AAIDD in their book refer to deficits as limitations or weaknesses or is that the idea behind a deficit?

A.   The idea behind a deficit is that it's a limitation that prevents you from functioning in your community in a full and healthy manner and, you know, gives -- determines that it should be according to the standards of your community and standards of your culture and things like that.

Q.   Okay.  And so I think you mentioned that the emphasis is then on the deficit and not on any strengths in functioning; is that right?

A.   Right.  And there's a common mistake to believe that it's -- you know, it's kind of like a balance between the deficits and the -- and it's not at all. Has nothing to do.  I mean, it's very clearly stated by all the definitions that the purpose of identifying or

diagnosing somebody with the condition is to identify the deficits that require supports.

Q. Okay. And the AAIDD 2010 green book talks about identifying weaknesses and not comparing weaknesses against strengths just as you explained; is that right?

A. That's exactly what I meant by that.

MR. MONTROY: I'm sorry, Your Honor, if I could have just a second.

Q. (Mr. Montroy continuing) Dr. Weinstein, at length we've spoken about the User's Guide --

A. Yes.

Q. -- of the AAIDD and just to go to what you just mentioned about strengths and weaknesses on page 25 of the User's Guide, second paragraph.

MR. REISENAUER: What exhibit is that, Eric?

MR. MONTROY: This is Exhibit 47.

MR. REISENAUER: Thank you.

MR. MONTROY: Sorry about that.

Q. (Mr. Montroy continuing) The User's Guide states that "Second, within an individual, limitations often coexist with strengths. Individuals may have capabilities and strengths that are independent of ID such as strengths in social or physical capabilities, some adaptive-skill areas, or in one aspect of adaptive skill in which they otherwise show an overall

limitation."

Are you familiar with that passage?

A. Yes.

Q. And is that consistent with your understanding of how to consider potential strengths and weaknesses in a person's adaptive functioning?

A. Yes. You don't consider the strengths to determine whether somebody has or does not have the condition or the diagnosable condition.

Q. Okay. Now when Dr. Seward testified he acknowledged on cross-examination that he focused only on the strengths of adaptive functioning. Do you recall that?

A. Yes, I do.

Q. All right. And you heard Dr. Welner testify yesterday and today as well, right?

A. That's correct.

Q. In your opinion did Dr. Welner appropriately apply the diagnostic criteria when determining whether Mr. Rodriguez has deficits in adaptive functioning?

A. Not at all. I think that Dr. Welner, first of all, ignores the mandates. I think he believes that unless you're a medical doctor you're not a scientist. But the reality is that the controlling documents of the definition and how you go about determining when

somebody has intellectual disability is the AAIDD. And we know historically that the DSM follows the AAIDD so to ignore or simply say "I don't believe in it and therefore I don't follow it" I think is a huge mistake.

So focusing on what Mr. Rodriguez in this case was able to do is not relevant at all for the diagnosis when you're discussing something that he's able to do in a very controlled environment like a prison.

Q.   Okay.  And we'll get to that.  And so is it your testimony that essentially what Dr. Welner was doing was picking out particular strengths or what he perceived to be strengths in certain areas of adaptive functioning while ignoring deficits in adaptive functioning?

A.   Well, my impression is that what Dr. Welner was doing was finding ways of -- or at least expressing his opinion about how well-functional and how bright Mr. Rodriguez is without concern to issues related to his functioning.

Plus I think that the biggest issue here is in the definition you have to be concerned with how the individual functions prior to the age of 18, not in a prison system where he's been there for 40 years.

Q.   And most of the prison -- most of the examples of Mr. Rodriguez's functioning, as pointed out by Dr.

Welner and Dr. Seward, was in the prison setting; is that right?

A.   With the exception of this concept that he was able to perform duties as a carpenter and as a plumber and as a homeowner, during the short period of time that he lived with his mother between the time that he was released from prison after 23 years of a sentence and the time he was again detained for the present offense, everything had to do with the time that he was in prison.

Q.   Okay.  And I think based on what you've described that's problematic for two reasons.  The first reason is, as you just mentioned, all of that behavior was after Mr. Rodriguez had turned 18 years of age; is that right?

A.   That's correct.

Q.   Okay.  And the second problem, which you've also just briefly identified, is that Mr. Rodriguez was, in fact, in prison and prison isn't an environment where you can properly diagnose or recognize adaptive behaviors; is that right?

A.   That's correct.

Q.   Okay.  Why is -- why is prison behavior problematic when considering whether or not a person has deficits in adaptive functioning?

A.   From my perspective, scientific perspective, one of the issues related to intellectual disability is lack of maturity in terms particularly of the brain in the frontal lobes.  The frontal lobes are the part of the brain that control your behavior.  They are like the brakes.  They're like the parts of the brain that tell you what's right, what's wrong.  If I do X or Y or Z, what's going to happen?

When you're in a prison environment, that is taken over by the environment.  You don't have to think about things like, okay, what's going to happen if I behave such and such way?  It's very clear what's going to happen.  I mean, you don't do what you're told, you immediately get some consequences.  If you don't get up and go to work, there will be immediate consequences.  Nobody has to wake you up.  You wake up or you don't eat.

So, you know, they tell you when to take a bath, when to shower.  They give you the specific time.  Your decision-making process is extremely limited in a prison environment and that's what -- that's where the -- most of your deficits will be reflected in your decision-making process and the activities that you do or you don't do.

Q.   So you mentioned some problems within

Mr. Rodriguez in the area of executive functioning, and what is your basis for concluding that Mr. Rodriguez has deficits in executive functioning, impulse control, things of that nature?

A.  Well, I don't think we need to go into the impulse control aspect of it.  I mean, the fact that he has a disease is unquestionable.  I mean, we may argue about what diagnosis we can give him but nobody's going to say that he's not a sick man.  I mean, he is a sick man, whether he's a paraphiliac or has a problem with impulse control or has deviant sexual arousal or he's depressed or he's intellectual developmentally disabled.  That may be argued but the fact that he's not a normal person I don't think anybody can argue that.

Q.  And you mention that there's a variety of problems that Mr. Rodriguez could have in addition to being intellectually disabled; is that right?

A.  I think there's no question that -- I mean, as Your Honor mentioned, there's components of an obsessive-compulsive behavior.  There's components or a history of depression over his life.  There are components of a -- I believe, you know, his behaviors would suggest that there are some similarities to individuals with a -- what we now talk about, an autism spectrum disorder.  It's a spectrum.  It's not a

specific thing.  But we know that he's been exposed to so many different -- from genetics to environmental.

Q.  And my question, Doctor, is that when somebody has a diagnosis of intellectual disability, which you and others have diagnosed him with during the course of this hearing -- when someone has a diagnosis of intellectual disability, is it also common for that diagnosis to coexist with other diagnoses that you can find in DSM, for instance?  You mentioned, you know, depression.  You mentioned anxiety.  The list goes on.

And is that -- No. 1, is that possible?  And, two, is that what's known as comorbidity?

A.  It's comorbidity.  I mean, how frequent it occurs with what particular disorders I don't know.  I mean, I'm not familiar with the literature.  I'm sure it exists.  But it is not uncommon to find somebody with an ID with other problems and other issues.

Q.  And just getting back to the executive functioning, is there evidence in the record, any psychological testing or any evidence that you did that would point to Mr. Rodriguez having deficits in executive functioning?

A.  I don't think there's a question he has severe deficits, very significant deficits.  Dr. Froming identified them.  Even Dr. Seward identified some.  But,

you know, they're reported in the raw materials that he presented.  I identified several.

Q.  Okay.

A.  The problem that we have at this stage is determining whether those existed prior to the age of 18 but he does have them now.

Q.  Okay.  Dr. Weinstein, does the DSM and the AAIDD User's Guide both point to problems with using prison behaviors to diagnose adaptive functioning?

A.  If I recall correctly, and I don't recall the wording specifically, but the -- it specifically states you should not use behaviors that an individual exhibits.

Q.  Okay.  And I'm going to point your attention to page 20 of Exhibit 47, the User's Guide in box 11.

A.  Yes.

Q.  The last sentence:  "The diagnosis of ID is not based on the person's 'street smarts,' behavior in jail or prison, or 'criminal adaptive functioning.'"

A.  You said the -- that's correct.

Q.  Box 11, last line.

A.  Yes, yes.

Q.  Okay.  And while we're talking about this particular citation in the User's Guide, the idea of not diagnosing ID based on criminal adaptive functioning,

are you familiar with what that is, criminal adaptive functioning?

A.   Can you repeat the question?

Q.   Sure.

A.   You turned around.  I didn't hear it.

Q.   I walked away, I'm sorry.

The concept of not determining a diagnosis of ID based on criminal adaptive functioning, that concept, are you familiar with that concept?

A.   Very much so, yes.

Q.   And in this particular case would you agree with me that Dr. Welner testified at length about his findings that Mr. Rodriguez was not intellectually disabled based upon Mr. Rodriguez's criminal adaptive behavior?

A.   I think Dr. Welner testified at length about his understanding and his inferences about what Mr. Rodriguez's behavior -- criminal behavior meant and what it demonstrated to him.  On the other hand, you know, he also testified in the Penry case that the criminal behavior that he exhibited was totally independent from what he determined to be an intellectual disability.

Q.   Okay.  And those two cases would be inconsistent then.  Is that your opinion?

A.   I think so, yes.

Q.   And my question was a bit -- was a bit wordy but Dr. Welner testified at length about Mr. Rodriguez, about his planning, about his cognitive flexibility, about his problem-solving, the list goes on and on.  And much of his discussion in those areas was based upon how Mr. Rodriguez acted when he was committing crimes.  Is that fair to say?

A.   Yes.

Q.   And in using that information Dr. Welner determined that because Mr. Rodriguez in his opinion had that cognitive flexibility or had those problem-solving skills that he was therefore not ID because he was not demonstrating deficits in intellectual behavior.

Would you agree with that?

A.   I think the way he stated it was that he didn't need any supports because of all those issues and then he said let alone ongoing supports.  I'm not familiar with what that means but ongoing supports are not necessary for the diagnosis.  No supports are necessary for a diagnosis.  That's totally independent from the diagnosis.

Q.   Okay.  But would you agree with me that that rationale, that logic that Dr. Welner used concerning criminal adaptive functioning, is improper under the

AAIDD User's Guide?

A.   It's clearly stated in the User's Guideline in several books, not only this one but the red book also. It's clearly stated do not consider criminal behavior as a basis to determine whether somebody has a disability or not.

Q.   Okay.

A.   They even use the words "street smarts" if I recall correctly.

Q.   That's correct.  The AAIDD User's Guide uses the words "street smarts."

A.   Yes.

Q.   So I want to just talk about some of Dr. Welner's examples that he cited not just regarding criminal adaptive behaviors but regular adaptive behaviors or adaptive behaviors that fall into other categories and ask you a couple questions about some of the examples that Dr. Welner used.

          And I want to start with -- when I give you these examples, I want to assume for the sake of argument that Dr. Welner's factual representations that underlie these examples are actually accurate.  And so actually let me step back and ask you this first.

          When you were listening to Dr. Welner testify -- when you were listening to Dr. Welner

testify, did you have any concerns with some of the factual representations that he made in terms of it being the basis of those examples that he gave?

A.   Well, you know, I don't want to go into specifics but basically another issue that I do have a very serious concern about is that for many, if not for most, of the examples that he gave he was basing it on what Mr. Rodriguez had stated to him.  And that is again something that you can't do in order to properly diagnose somebody because we know that people with intellectual disability are going to try to do all they can to hide or mask their disability and therefore will just pretend or talk out and be very verbose about their behaviors.

Q.   And are there examples in the record in the interviews that Dr. Welner and Dr. Seward conducted with Mr. Rodriguez of him either exaggerating or outright lying about particular circumstances in his life?

A.   Well, I mean, the first that comes to mind is if you figure out 900 books -- to be able to read 900 books in 20 years that would require somebody that's reading two books a week at least.  And to read two books a week you have to have access to them, and you don't have access to two books a week in the prison system.  I mean, they do have a library and they come around with a

cart and you can pick books, but not every -- not two every week.

Q.   What about Mr. Rodriguez talking about selling pounds of drugs on a weekly basis?  Does that strike you as an exaggeration?

A.   Yes, I believe so.  I don't think that he had the skills or the ability to become such a big drug dealer.

Q.   Dr. Welner talked about Mr. Rodriguez having a rich aunt in Arizona with a ranch.  In any of your interviews with family members or review of the records, did you ever encounter any corroborative evidence of him having a rich aunt in Arizona?

A.   I think he mentioned it was a rich grandmother that owned a big ranch.  Not at all.  I mean, the family is very poor.  The people in the town where he was -- the parents lived in a place called Dolores, which is right on the border with Mexico, and it's just not that far from Laredo.  They moved to Laredo but everybody that lives in Laredo, according to the descriptions from the family, they're poor.  They're people that are, you know --

Q.   So there was no evidence that you saw that he had a rich aunt who had a farm or a ranch that was sending him proceeds from that ranch?

A.   No.  And, you know, the fact that he was talking

about having all this money to -- when he got out and he was going to have access to it, that was just an exaggeration. I mean, the only money he had when he left was what was provided by his family and this is in a period that he was able to leave the prison for -- after 23 years of being in prison.

Q. What about evidence of -- I'm sorry, strike that.

There was testimony from Dr. Welner that Mr. Rodriguez had skills in carpentry, plumbing, electricity, and he referred to him also as a homeowner.

Was there any evidence that you saw in the record that Mr. Rodriguez had skills in carpentry or electricity or plumbing?

A. No. The only thing that I recall in the records is that when he was living at his mother's house after 23 years in prison he was cleaning the house. He was helping with the chores of the home. Now that's far from owning a property or managing a property or doing plumbing and carpentry and all those things.

When he had the job as a -- when he was hanging -- or theoretically speaking was helping other people with the chore of hanging drywall and that was a job that his sister got for him because he was not able to obtain employment.

Q. Okay. So assuming that Mr. Rodriguez told

Dr. Welner that he had skills or training in carpentry, electricity, plumbing, those would have been an exaggeration or at least uncorroborated; is that right?

A.   If I recall correctly, Dr. Welner stated that that was an assumption he made and that he was using that as an example of being a homeowner; that he was acting as a homeowner because he was managing his mother's house.

Q.   And that's why I asked you to assume that Mr. Rodriguez said those things to Dr. Welner.  So assuming that Mr. Rodriguez said those things to Dr. Welner in his interview, those appear to be an exaggeration; is that right?

A.   Pure exaggerations.

Q.   And is that the kind of example why you don't rely on the self-reporting of an individual when you're making a determination as to whether or not they meet the criteria for intellectual disability?

A.   That's one of the things.  I mean, the literature says that -- there's an article by Ali who's a well-known researcher in the field of intellectual disabilities, and he was a professor -- I forgot -- at the University of Virginia or someplace like that.  He's retired now.

But he wrote an article specifically

pointing out to the fact that you cannot depend on self-report, and he also wrote a chapter in a book on the adaptive behavior deficit scales specifically stating don't give a person that you're assessing for intellectual disability with adult form because it's not a credible -- it wouldn't be credible answers.  They're exaggerating.

Q.   Thank you.  So I'm going to give you a couple examples.  I'm not going to go through every single example that Dr. Welner relied upon, but I'm going to go through some of the examples that Dr. Welner testified to and said that he relied upon in determining that Mr. Rodriguez is not intellectually disabled.

And for each of these examples I'm just going to ask that you consider the following questions: One, did Dr. Welner apply the appropriate diagnostic standards while considering that particular example or task?  Two, can people with intellectual disability do the test that Dr. Welner talked about?  And, three, does Mr. Rodriguez's ability to do the tasks show that he doesn't have deficits in adaptive functioning?

All right.  We can go through those but those are the three main questions that I have for each of these?  My first question actually was his discussion about Mr. Rodriguez obsessively keeping his room clean.

Does that shed any light on adaptive behaviors?

A.   Not at all.  I mean, that's a behavior that is expected of any adult to keep your things, your person in decent shape.  When he's doing it obsessively and there's a lot of anxiety over the fact that he's not able to do it, that's a disorder and that's consistent with OCD, or obsessive-compulsive disorder.

Q.   And do you think Mr. Rodriguez was doing that obsessively?

A.   I think so, the way it was described as a child and the way that he couldn't wait to go back to his cell when I interviewed him because he needed to clean and he needed to make sure that everything was in order.

Q.   Okay.  So can people with intellectual disability manage to do what Mr. Rodriguez did in terms of, you know, cleaning his things, organizing his room?  Is that a task that people with ID can do?

A.   Absolutely.

Q.   And does Mr. Rodriguez's ability or his constantly cleaning, engaging in this activity, does that in any way show that he's not intellectually disabled?

A.   Not at all.

Q.   Dr. Welner talked about Mr. Rodriguez driving the car and learning how to operate a car after he got out

of prison.  Again is that a task -- is that an activity that people with intellectual disability can do and often do?

A.  Most adults with intellectual disability do that. There's research that shows that.

Q.  And Mr. Rodriguez's ability to drive a car and learn how to operate a car when he got out of prison, does that rule out his diagnosis of intellectual disability?

A.  Not at all.

Q.  What about mowing the lawn and planting flowers?

A.  That would not negate the possibility, in fact, has very little -- it requires very little skill.

Q.  What about reading books in prison?  There was a lot of testimony about Mr. Rodriguez reading books in prison and I think you had an opportunity to hear some of the books that he was reading, the Kent series and I think one was called The Bastard.

Mr. Rodriguez's ability to read those books, one, is that -- is reading books in prison a task that people with intellectual disability can do?

A.  Research shows that individuals with intellectual disability often having the reading skills of a sixth to seventh grader.

Q.  Okay.

A.  So, I mean, he has the ability and obviously he has the time.

Q.  And actually that's the question that I didn't ask you.  Is Mr. Rodriguez's ability to read books like he's reading in prison, is that even an appropriate consideration for whether or not Mr. Rodriguez has deficits in adaptive functioning since he's in prison while he's doing it?

A.  No, not at all.  And, you know, we know from not only my testing but Dr. Seward's testing and Dr. Froming's testing that he can read at a sixth grade level.  So that would not negate that.  But not beyond that, I mean, he wouldn't be able to read other kinds of books and if I recall a conversation I had with his sister who said:  I send him books and then I try to talk to him about the books and he just couldn't discuss them with me.  And these were simple books.  They were not complicated books.

Q.  I'm going to turn your attention to Exhibit 53, Doctor.  I don't know if that's up there.  I'm sorry, 53.

Dr. Weinstein, you just mentioned that you remembered having a conversation with Mr. Rodriguez's sister.

A.  I forgot to say it was with Rosa Rodriguez, which

is another sister.

Q.   Okay.  And Rosa Rodriguez -- and you're looking at Exhibit 53 right now; is that correct?

A.   Correct.

Q.   And that's the Declaration of Rosa Rodriguez?

A.   Yes.

Q.   And I'm going to ask you to turn your attention to page 28 -- I mean, paragraph 28.

A.   Okay.

Q.   And I'm going to read from -- starting on paragraph 28 and Rosa Rodriguez states in her declaration:  "Tito tries to make you think he is smart. He has a hard time admitting that he has challenges, and that he has trouble learning and that he struggles with reading and writing.

"I send Tito books for him to read.  When he was in jail in Fargo, I sent him the first four Harry Potter books, but I stopped sending them to him because I believed he couldn't read and understand them.  He told me that he read them, but when I tried to have a conversation about the books with him, about his favorite character or something, he would change the subject or just let me talk about the books and what I liked about them.  He would avoid talking about the books.  I started to send him puzzles like word searches

because I didn't think he was reading and understanding the books I was sending him.

"I started to send Tito pre-teen books like the 'Indian in the Cupboard' series.  I remember at Tito's trial hearing something about him reading Tom Clancy books.  There is no way Tito would be able to read a Tom Clancy book if he can't even read pre-teen level books.  Books on tape would be much better for Tito, He would understand the stories much better if they were read to him.  I think magazines would be better for Tito as well."

Is this what you recall talking to Miss Rodriguez about?

A.   Yes.  And just a clarification, Tito is the family name that he has, that Mr. Rodriguez has.

Q.   And is what Miss Rodriguez states here, is that consistent with somebody who has intellectual disability?

A.   Very much so, yes.

Q.   So he can read on some level but maybe he doesn't understand.  Maybe he can't read at a high level?

A.   That's correct.

Q.   But people who have ID can read books; is that right?

A.   Of course.

Q.   By the way, at any point did you hear Dr. Welner talk about any of the declarations that were submitted by Mr. Rodriguez's family members about the time period when he was young?

A.   No.

Q.   And the focus of the criteria with intellectual disability is pre the age of 18 onset; is that right?

A.   That's correct.

Q.   What about baking bread with his mother, is baking bread with someone an activity that people with intellectual disability can do?

A.   I can tell you that my son with Down syndrome bakes bread with me all the time and he pretty much takes charge of baking it.  I just supervise and I make sure that he's not going to burn himself but he's the one that does the mixing.  He's the one that does everything.  We bake bread together.

Q.   So he can follow a recipe?  He can put the ingredients together; is that right?

A.   I don't know if he can follow the recipe.  He knows it by heart.  He memorized it.

Q.   Okay.  And to put this in context because you're speaking about your son, but is your son's intelligence on the same level as Mr. Rodriguez or is he --

A.   Oh, no, no.  He's got Down syndrome.  He's --

MR. REISENAUER:  Your Honor, I'm going to object to this line of questioning.  This isn't about Dr. Weinstein's son who's autistic.

THE WITNESS:  He's not autistic.  He's got Down syndrome.

MR. REISENAUER:  Sorry.

MR. MONTROY:  And, Your Honor, I'm not interested in drawing comparisons between Mr. Rodriguez and Dr. Weinstein's son.  Just that Dr. Weinstein's son came up and they are at varying levels in terms of their ability to function.  That's all I wanted to show, that there is some difference.

THE COURT:  The Court's well aware that people with Down syndrome can bake bread.  I have a cousin with Down syndrome and I've known many people with Down syndrome in my life.  Go ahead.

MR. MONTROY:  Thank you, Your Honor.

Q.   (Mr. Montroy continuing)  Just a couple more examples.  Mr. Rodriguez's use of a credit card, is that consistent with something that a person with ID can do, use a credit card?

A.   They can.  And I've had multiple cases where they use ATM machines and they require a card with an ATM and a code.  But Mr. Rodriguez, as far as I know, he did not have a credit card and did not own a credit card.  He

used his mother's credit card.

Q.   Okay.  And is that an important factor for you that it wasn't actually his credit card?

A.   It is an important factor in that he -- as far as I know he never established the credit to get a credit card.  He never established the ability to have a bank account or anything like that and that's perhaps related to the fact that he wasn't in the community.

Q.   And Dr. Welner said that he saw no examples of Mr. Rodriguez needing support; is that right?  Do you recall him saying that, that he saw no --

A.   I recall --

Q.   -- of him relying on somebody else for support?

A.   I recall that.

Q.   And is this an example actually of one of the scenarios, one of the areas of adaptive functioning where Mr. Rodriguez, in fact, did need support?  He needed to use his mom's credit card to be able to go places and buy things.

A.   Well, he needed his mother's credit card.  He also needed to be in a controlled environment.  He couldn't function in society.  I mean, that was very clear.  And to not consider the system in a prison a support I think it's a mistake.  I mean, it might not be something that we choose to have but it provides a lot

of support.

It tells you, for instance, in the case of Mr. Rodriguez, who has some dietary needs due to his diabetes, he's fed a specific diet. And he is told when he should take the medication and they come around and give him the medication and inject him. I mean, I witnessed it personally that they came -- the nurse comes around at a time and he doesn't have a choice. Well, he has a choice to reject it but he doesn't have a choice in terms of saying it's time for my medication. I better go take it.

Q. So you're saying the prison itself is a support. It functions like a support. It is a support. It meets all of his needs that he might not otherwise be able to meet without that support.

A. Right. And it hides any deficits that he may have because he doesn't have to make any decisions.

Q. So the food is provided to him three times a day. He doesn't have to go out and buy it. He doesn't have to cook it.

A. That's correct, and he doesn't have to choose.

Q. He doesn't have to make sure that it's not expired and gone bad and couldn't make a meal?

A. That's correct.

Q. Dr. Welner talked about Mr. Rodriguez learning

while he was at the Minnesota State Hospital and that, you know, his academics improved while he was in prison. And I pose those same questions to you.

Is that an appropriate consideration under the diagnostic criteria?  Is it -- is improving in learning something that people with intellectual disabilities can do and do do?  And does it rule out Mr. Rodriguez from the diagnosis of intellectual disability?

A.  No, not at all.  Intellectual disability is not a disability of learning.  It's a disability of thinking. Individuals with intellectual disability learn and they learn many skills.  The issue is the thinking.  I mean, they can't do it independently.  They can't live independently.

That example simply shows that he was able to -- you know, when supports were provided it improved. But we know -- I mean, for a fact we know -- I mean, two things we know.  One is that even though he claims that he's got a GED it doesn't seem like he ever was able to achieve it.  And the second thing we know is that his level of reading, arithmetic and spelling -- and I'm going to leave out the sentence comprehension because that does not apply in terms of all the testing that we have as an adult, but we know that all the other skills

are a sixth grade level or below because we've tested that.

Q.   You're talking about the scores on the WRAT test?

A.   Well, I'm -- yes, specifically on the WRAT test, yes.

Q.   I believe that Dr. Welner was talking about this in the context of the social domain; although, I'm not sure that it was clear.

But Dr. Welner -- do you recall Dr. Welner testifying that in his opinion Mr. Rodriguez was friends -- had age-appropriate friends and did not have people -- did not have friends and was not friends with people who are intellectually disabled?  Do you recall him testifying to that much?

A.   Yes.

Q.   Okay.  And you've had a chance to review the records.  Do you recall much about Mr. Rodriguez having friends who were a different age group than him and do you recall evidence of Mr. Rodriguez hanging out with kids who were slower and who may have also had intellectual disability?

A.   Yes.  Particularly before the age of 18 I recall a couple of declarations from Laredo, Texas where at least two individuals that provided declarations have disabilities, very significant disabilities.  It was --

I was also told by some of the people that I interviewed about his relationships, and he basically was hanging out with all the kids that couldn't make it and most of the time with much younger kids than he was.

MR. MONTROY:  Your Honor, may I approach?

THE COURT:  You may.

Q.  (Mr. Montroy continuing)  Dr. Weinstein, I'm showing you what's been marked as Exhibit 115 (indicating).

A.  Yes.

Q.  And this is the Declaration of Juan Ruiz?

A.  That's correct.

MR. MONTROY:  And, Your Honor, I would offer this exhibit.

THE COURT:  Any objection?

MR. REISENAUER:  No objection, Your Honor.

THE COURT:  115 is received.

MR. MONTROY:  Thank you, Your Honor.

Q.  (Mr. Montroy continuing)  If you could just take a moment to look at this declaration.

A.  (Witness examining.)  Yes.

Q.  And you've seen this declaration before?

A.  I have, yes.  That's one of the declarations I was talking about.

Q.  Okay.  And Mr. Ruiz was a friend of

Mr. Rodriguez's when they were young; is that right?

A.  Yes.

Q.  In Laredo, Texas?

A.  Correct.

Q.  I would direct your attention to paragraph four.

A.  Okay.

Q.  "Tito Rodriguez was my best friend.  He was quiet, too.  We played together.  We both went to Leyendecker Elementary.  We would walk to school together.  I didn't do good in school.  They said Tito was slow, but he seemed normal to me because we were the same.

"Our other friend was Beto Gallegos.  He is mentally retarded and epileptic, but he is very nice and he was my good friend.  And, he was Tito's good friend. The three of us played together.  If our moms went to the store, another neighborhood boy named 'Gingi' Mendiola would watch the three of us.  He is only one year older than me and two years older than Tito, but our moms asked him to watch us."

Did I read that accurately?

A.  You did, yes.

Q.  And is this evidence that Mr. Rodriguez had friends that were similar to him in terms of adaptive functioning and intellectual abilities?

A.   Yes, as a child.  And I think --

Q.   So you would agree that Mr. Rodriguez, at least in part based on this declaration, did in fact have friends who were at least potentially intellectually disabled.

A.   He's talking about that here, yes, the person that made the declaration, Juan Ruiz.

Q.   Could you turn back to Exhibit 53, please, which is the Declaration of Rosa Rodriguez.

A.   Yes.

Q.   And could you take a look at paragraph 18. "Tito's friends in Laredo were the slower kids.  He was friends with the Gallegos children, who were all a little odd.  One of them was in special education classes, he was a very innocent boy who was easily amazed at things.  Another one of the gallon leg owes children that Tito was close with had epilepsy."

Is that what that says?

A.   Yes.

Q.   I know on direct examination you talked at length about examples of Mr. Rodriguez's deficits in the social domain but these examples, the Juan Ruiz declaration and the examples that we've read in the Rosa Rodriguez declaration, are these examples of deficits in Mr. Rodriguez's adaptive functioning?

A.   I think -- I think they show that he feels comfortable with people that are not able to function in society and compete in society with other kids his own age and shows that he chooses to socialize with kids with a similar condition that he has.

MR. MONTROY:   Your Honor, may I approach?

THE COURT:   You may.

Q.   (Mr. Montroy continuing)   Dr. Weinstein, I'm showing you what has been marked as Exhibits 116 and 117 (indicating).

A.   Correct.

Q.   If you would just take a moment to look at those.

A.   (Witness examining.)

Q.   Doctor, could you please describe what Exhibit 116 is.

A.   Exhibit 116 is a -- what's called a longitudinal study.   That's a study that was sponsored by the U.S. Department of Education and conducted by the National Center for Special Education Research and consists of -- basically it's called a longitudinal study because what they did was they did research on people with special needs or special conditions and they followed them from -- for 10 years, from the time they were in high school until 10 years later, to determine how they were functioning in society after 10 years.

Q.   Okay.

A.   A portion of this, about I think it's 3,000 -- this is a large study.  This is conducted with I think somewhere around the neighborhood of 11- or 12,000 people, 3,000 of which had intellectual developmental disabilities.  The other ones had different other disabilities from being deaf and -- or blind to having paraplegia or epilepsy or they were people that required some support because of their disability.

Q.   And I think you mentioned the purpose of this study was to determine how well children with disabilities were able to function; is that correct?

A.   What happened with individuals with disabilities after 10 years of becoming young adults or 16, 17, 18 years old.

MR. MONTROY:  And, Your Honor, I would offer Exhibit 116.

MR. REISENAUER:  Well, I'm going to object, Your Honor.  This has included within it, as Dr. Weinstein just testified, test results or outcomes from people with all kinds of disabilities, not just mental retardation.  And I don't think we can rely on whatever results are set forth in it.

MR. MONTROY:  And, Your Honor, I'm not interested at all in the -- the studies are broken up.

I'm not interested in the portions of the study that talk about how children who had deficiencies in hearing or vision or any other deficiencies were able to function. I'm specifically interested in functioning for children who had been diagnosed as mentally retarded.

THE COURT: Yeah. Here's the thing. This is a bench proceeding and what I'll do is I'll receive it and then to the extent that you can actually break it out I see that in looking at like, for example, Table 27 which talks about employment of young adults that they do break them out by disability category. And they have mental retardation as one of the ones that they're looking at. Looks like the study itself is an eight-year out-of-high-school study for kids that participated in special education and what the outcomes were. The objection's overruled.

MR. MONTROY: Thank you, Your Honor.

Q. (Mr. Montroy continuing) And just to clarify, just to make it a little bit easier, if I could direct your attention, Dr. Weinstein, to an exhibit that's been marked as Exhibit 117.

A. Yes.

Q. And this is a table that charts specifically how -- the outcomes in functioning of children in the

study who have mental retardation; is that right?

A.   That's correct.  This is a table I prepared.

Q.   Okay.

A.   It's a summary of the -- exclusively the individuals with intellectual developmental disabilities.

Q.   So if you went to the various tables in this report, you would see these specific results in individual tables based on, for example, children who were engaged in education, employment or training for employment, 79 percent.  You would find that in another table in this report; is that right?

A.   That's correct.  And I want to correct myself.  I mentioned -- I said it was somewhere around 3,000 individuals.  It's 1,300 individuals.

MR. MONTROY:  Okay, thank you.  So, Your Honor, I would ask that 117 be offered as a demonstrative exhibit.

THE COURT:  117?

MR. MONTROY:  That's right, the individual chart that was produced by Dr. Weinstein based on the study, on the longitudinal study.

MR. REISENAUER:  If I could ask a couple questions, Your Honor?

THE COURT:  You may.

MR. REISENAUER:  Dr. Weinstein, you put 117 together?

THE WITNESS:  Yes, I did.  It is from the tables on the -- on 116.

MR. REISENAUER:  So if 116 is admitted -- so if I looked at 116 I'm going to find what you put on 117?

THE WITNESS:  That's correct.

MR. REISENAUER:  Well, we don't need 117 then, Your Honor.  I would object.  And I know this is a bench hearing, Your Honor, but Dr. Weinstein's been called as a rebuttal witness.  This isn't rebuttal to anything that was entered by the United States.  So I don't see how this line of questioning is rebuttal.

MR. MONTROY:  Your Honor, it's rebuttal in that Dr. Welner made a number of assertions about how people with intellectual disability are able to function, and our position is that those assertions are completely inaccurate and run against the criteria and run against this study.  This study shows that a lot of the things that Dr. Welner said people with ID can't do they, in fact, can do and have done well.

For instance, like 39 percent have a driver's license and 42 percent have a savings account. Dr. Welner suggested that, you know, if you have a

savings account, because you can drive a car, then you're not intellectually disabled.  This study shows that that's actually not accurate.

MR. REISENAUER:  Your Honor, if I may, and I'll address this on cross, but that is not what Dr. Welner testified to.  He didn't say if you can drive a car then you're not mentally retarded or intellectually disabled.  There's no such testimony like that.  But I'll cover it on cross.  Thank you.

MR. MONTROY:  I think the point is, Your Honor, is that he used examples of things that Mr. Rodriguez can do that are consistent with things that people with ID can do in the study to show that Mr. Rodriguez didn't have adaptive deficits in a particular area so that's how -- that's what I believe the relevance is of the longitudinal study, Your Honor.

THE COURT:  All right.  I don't think we should wallow in this thing because I think that whatever point's to be made has been made.  I'll receive 117 as a summary.

MR. MONTROY:  Thank you, Your Honor.

Q.   (Mr. Montroy continuing)  Doctor, I just have a few questions about this chart and what it represents.

Based on the longitudinal study that's marked Exhibit 116, does this chart show the percentage

of the individuals in the study who carried out the associated function in that chart; is that right?

A.   This is -- yeah, the percentage of individuals with intellectual disability or that have been classified as mentally retarded and received special education because of that.

Q.   Okay.  And we're using the word "mentally retarded" in this study because this study was published in 2011; is that right?

A.   That's correct.

Q.   So if I'm correct, and just to make a couple examples here so it's clear for the record, but in this study 42 percent of those who are intellectually disabled were found to have savings accounts; is that right?

A.   That's correct.

Q.   Thirty-nine percent had a driver's license?

A.   That's correct.

Q.   Ten percent were married?

A.   Yes.

Q.   Sixty-two percent were registered to vote?

A.   Yes.

Q.   Thirty-six percent lived or have lived independently?

A.   Yes.

Q.   And 37 percent were involved in the criminal justice system?

A.   Yes, 37 percent, yes.

Q.   Okay, thank you.  Dr. Weinstein, the AAIDD discusses stereotypes that are associated with people who are intellectually disabled; is that right?

A.   Yes.

Q.   And it warns against falling into the trap of abusing those stereotypes when you're considering whether somebody is intellectually disabled or not; is that right?

A.   Correct.

Q.   And are those -- is that description of stereotypes and that admonition about stereotypes found on page 26 of the AAIDD User's Guide?

A.   Yes.

Q.   And that's Exhibit 47?

A.   That's correct.

Q.   And it says on that --

          MR. REISENAUER:  Your Honor, I'm going to object.  This has already been entered into evidence and testified to by one of the witnesses.  This isn't rebuttal.

          THE COURT:  Sustained.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, the

strengths that were relied upon and testified to by Dr. Seward and Dr. Welner, do they in your opinion concern activities that seem to suggest can't be carried out by someone that has ID?

A.   (No response.)

Q.   I'm sorry, strike that.  The activities that Dr. Welner and Dr. Seward suggested during their testimony of activities that people with ID can't do, types of activities like, you know, reading books or driving a car, you know, the examples are in the record, are those activities consistent with the outdated stereotypes that are found in the User's Guide by the AAIDD?

A.   Yes.

Q.   Dr. Weinstein, Dr. Welner testified that Mr. Rodriguez was, quote, not limited in anything, end quote, because he can learn and be self-taught.  Is that an accurate assessment?

A.   Yes.  As I mentioned before, intellectual disability is a disability of thinking, not of learning.

Q.   Dr. Welner spoke at length yesterday about his system of peer review.  Do you recall that?

A.   Yes.

Q.   And that's peer review that they use at his organization?

A.   The Forensic Panel.

Q.   Correct.  Is that description of a peer review consistent with your understanding of what it means to be peer reviewed?

A.   Not at all.  I think peer review has to do with journals that you publish, scientific papers that you -- what he described like when he was talking about going down the corridor in the hospital and talking to another physician about a particular case, that's consultation. That's not peer review.

Peer review -- the peer reviewers usually are blind in terms of knowing who the writer is and the writers are pretty much unknown.  They don't -- never know who is peer reviewing or who's reviewing their work.  Another big difference is peer reviewers, as far as I know up to now, and that's one of the issues that they have brought up, they don't get paid.  It's an honor to peer review some documents.  You know, whoever's going to publish the paper or whoever the editor of the journal that is -- the paper has been submitted to, sends it to a reviewer but with no pay.  I mean, it's just an honor to be a peer reviewer.

Q.   And the peer reviewers that Dr. Welner spoke of, are those other individuals who either work for or are contracted with The Forensic Panel?

A.   I think that's what Dr. Welner testified -- or, I mean, Dr. Seward testified to; that -- and I don't remember if he testified or it's in his deposition, but what he stated clearly is that he's working for The Forensic Panel.  He's getting paid and he's -- gets paid when he's a peer reviewer.

Q.   Thank you.  The Shipley test, we heard some testimony about the Shipley test.  You heard he evidence that Mr. Rodriguez was given an IQ score based on the Shipley.

What is the Shipley and is it appropriate to get an IQ score from the Shipley?

A.   I haven't used it for a long time.  It's a very old test.  It's called the Shipley Institute of Living Scales and it's not a test of intelligence.  It's not a test that is used for that purpose.  There is a way to convert.  There's a table that converts the scores to an estimated IQ score, but it's not a test of intelligence.

Q.   Okay, thank you.  I want to ask you some questions about the WAIS-IV.  Dr. Seward --

THE COURT:  Hold on, how much longer do you have?  Because we are right up against what --

MR. MONTROY:  Maybe like 15 or 20 minutes, maybe a half hour on the high end.  I don't think so but maybe.

THE COURT:  And I presume that your recross will be longer than just a couple minutes, Mr. Reisenauer.

MR. REISENAUER:  I presume that too, Your Honor.

THE COURT:  All right.  Why don't we go ahead and break for the day at this point.  We'll come back -- are there any other witnesses that anyone intends to call?

MR. MONTROY:  No, Your Honor, not from our side.

MR. REISENAUER:  No, Your Honor.

THE COURT:  Given the weather, should we start at 10 o'clock rather than 9:00?  What do you think, Shelley?

MR. MONTROY:  Could I just have a quick word with Mr. Reisenauer, Your Honor?

That's fine.  If Your Honor would like to start a 10:00, that's fine.

MR. REISENAUER:  Either way, 9:00 or 10:00.

MR. MONTROY:  We don't think we have that much longer.  I only have a couple pages and I can move through it pretty quickly.

MR. REISENAUER:  They have a flight at like 3:30, 4 o'clock, and that's what he was asking.

MR. MONTROY:  Allegedly.

THE COURT:  All right.  Let's start at 9:00, you know, and then what we'll do is we'll figure out whether we can get here or not in the morning.  That is my concern is that if, in fact, we were to get 15 inches of snow getting out of our neighborhoods becomes problematic.

MR. REISENAUER:  Well, Your Honor, I would say let's try 9:00 and if we're not all here we know that we need to wait, right?

THE COURT:  Right.  That's right.  We'll start at 9:00.

MR. REISENAUER:  Thank you.

THE COURT:  All right.

(Adjourned at 4:35 p.m.)