**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

- - - - - - - - - - - - - - - -
                                )
United States of America,       )
                                )
     Plaintiff/Respondent,      )
                                )
          vs.                   )     **FILE NO. 2:04-cr-55**
                                )
Alfonso Rodriguez, Jr.,         )
                                )
     Defendant/Petitioner.      )
                                )
- - - - - - - - - - - - - - - -


**T R A N S C R I P T**

**O F**

**P R O C E E D I N G S**

**Evidentiary Hearing - Volume 9 of 9**

**February 7, 2019**

**Pages 1720-1778**


HELD AT: QUENTIN BURDICK UNITED STATES COURTHOUSE
          655 FIRST AVENUE NORTH
          FARGO, NORTH DAKOTA  58102

BEFORE:  THE HONORABLE RALPH R. ERICKSON

COURT REPORTER:  KELLY A. KROKE

1721

**A P P E A R A N C E S**

**MR. KEITH W. REISENAUER**                    **COUNSEL FOR PLAINTIFF;**
**MS. MELISSA H. BURKLAND**
Office of U.S. Attorney
655 1st Avenue North, Ste. 250
Fargo, ND 58102

**MR. JOSEPH W. LUBY**                    **COUNSEL FOR DEFENDANT;**
**MR. ERIC J. MONTROY**
**MS. ANNE FISHER**
Office of Federal Community Defender
601 Walnut Street, Ste. 545 West
Philadelphia, PA  19106

**I N D E X**

**W I T N E S S E S**

<u>**DEFENDANT/PETITIONER'S:**</u>                                    <u>**PAGE NO**</u>.

   <u>**RICARDO WEINSTEIN**</u>

   Direct Examination (cont) by Mr. Montroy        1723
   Cross-Examination by Mr. Reisenauer             1744

**E X H I B I T S**

| <u>**EXHIBIT NO**</u>. | <u>**DESCRIPTION**</u> | <u>**OFR'D**</u> | <u>**REC'D**</u> |
|---|---|---|---|
| D-62A | Neurodevelopmental Disorders | 1773 | 1774 |
| D-118 | Applied Psychometrics 101: The Flynn Effect Series | 1772 | 1772 |

**P R O C E E D I N G S**

(February 7, 2019:  The following proceedings commenced at 10:00 a.m., in open court, all counsel present.)

THE COURT:  We'll go on the record in a case entitled United States of America versus Alfonso Rodriguez.  It's File No. 2:04-cr-55.  The record should reflect that the petitioner has waived his right to appear personally.  He's represented by his counsel, Mr. Montroy, Mr. Luby and Ms. Fisher.  Mr. Reisenauer and Ms. Burkland appear on behalf of the United States.

When we broke Dr. Weinstein was on the stand and Mr. Reis- -- Mr. Montroy, were you still conducting a direct examination?

MR. MONTROY:  Yes.

THE COURT:  So Dr. Weinstein is being subjected to a direct examination by Mr. Montroy.

You may proceed, sir.

MR. MONTROY:  Thank you, Your Honor.  I like that description "subjected to."

THE COURT:  It's kind of true.

MR. MONTROY:  It is.  It's pretty appropriate.

**RICARDO WEINSTEIN,**

HAVING BEEN FIRST DULY SWORN TO TELL THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH, RELATIVE TO

SAID CAUSE, TESTIFIED AS FOLLOWS:

**DIRECT EXAMINATION (cont)**

**BY MR. MONTROY:**

Q.   Good morning, Dr. Weinstein.

A.   Good morning.

Q.   Dr. Weinstein, do you recall when you were listening to Dr. Seward's testimony that he spoke a little bit about the Flynn Effect?

A.   Yes.

Q.   And is it your recollection that he testified that the Flynn Effect was controversial?

A.   He testified to that I think.

Q.   In your opinion is the Flynn Effect a topic of much controversy in the neuropsychological community?

A.   Not in the field of intellectual disability.

MR. MONTROY:  Your Honor, may I approach?

THE COURT:  You may.

MR. MONTROY:  Thank you.

Q.   (Mr. Montroy continuing)  Dr. Weinstein, I'm handing you what's been marked as Exhibit 118 (indicating).

A.   Yes.

Q.   And what is the document that I just handed you?

A.   This is what is called a mental study.  That's a study of all the public -- all the articles that had

been published at the time and it's dated 2010.  So it's dated but it is, I mean, somewhat dated but it's still I think very much applicable to the field.

Q.  And it's entitled:  "Applied Psychometrics 101: The Flynn Effect Series"?

A.  Yes.

Q.  And then it's entitled:  "#7: Is the Flynn Effect a Scientifically Accepted Fact?"

A.  Yes.

Q.  And you pointed out this was published in 2010?

A.  That's what the date says down here.

Q.  Okay.  And if you could turn to the first page and it asks the question:  "Is the Flynn Effect a Real and Scientifically Recognized and Accepted Fact?"

A.  Yeah, that's the question.

Q.  All right.  And then -- and then down about halfway down the page it discusses some statistics involving all the publications that deal with the Flynn Effect; is that right?

A.  Yes, at the time.

Q.  At the time, that's right, okay.  And so it says: "According to the classification of 113 references, 86 (76.1%) were classified as affirmative ("yes"), 9 (8.0%) classified as not supportive of the Flynn Effect ("no"), 4 (3.5%) were mixed or neutral, and 14 (12.4%) were not

relevant or appropriate for the current analysis."

A.   Correct.

Q.   And then the last sentence, the last half of the last sentence on that page says:  "...it appears that one can conclude, with reasonable degree of scientific certainty, that the majority of the scientific and professional community that has written about the Flynn effect recognizes the validity of the Flynn effect in the context of norm-referenced intelligence testing; is that right?

A.   Yes.

Q.   And then if you look to -- I think it's about six pages in there's a table that's attached?

A.   Yes.

Q.   And would you agree with me that this table, Appendix A, says: "Summary of Flynn effect (FE) research studies and commentaries:  Classified by support for FE and relevant comments regarding the use of the FE adjustment to individual IQ scores"?

A.   Right.

Q.   And following that in that table is a list of at least what purports to be all of the relevant publications concerning the Flynn Effect with summaries; is that right?

A.   That's correct.

Q.   Dr. Weinstein, I'm going to ask you a couple questions about the WAIS-IV.

A.   Okay.

Q.   You heard on direct examination of Dr. Seward that he offered testimony about your administration of the WAIS-IV in the Spanish language; is that right?

A.   Yes.

Q.   And on direct exam you testified that you took what's been referred to as the Mexican-published version of the WAIS-IV with you when you went to Terre Haute to administer it?

A.   Correct.

Q.   When you went to administer this to Mr. Rodriguez; is that right?

A.   That's correct.

Q.   And did you take the Spanish language version because you understood that Mr. Rodriguez was bilingual or because he spoke Spanish or what was your understanding?

A.   My understanding was that he was bilingual and so am I.

Q.   And was there -- was there a reason then that you were going to administer the WAIS-IV specifically in Spanish as opposed to English?

A.   I wanted to have both English and Spanish

norms -- I mean, both English and Spanish scores and nonverbal. So I took three tests that obtain an equivalent of an IQ score.

Q. So the WAIS-IV was the one you were going to give in Spanish, correct?

A. That's correct.

Q. And then what were the other two tests?

A. The Test of General Reasoning Ability and the CTONI-2, or the Comprehensive Test of Nonverbal Intelligence-2nd Edition.

Q. And the TOGRA is a test that you administered in English?

A. The TOGRA is in English, yes.

Q. And the CTONI is nonverbal?

A. Correct.

Q. And I think -- my understanding of what you testified on direct was when you got to the prison and met with Mr. Rodriguez he told you that he felt more comfortable taking the -- taking tests in English than in Spanish?

A. Yes.

Q. And so was it at that point that you determined that it was more appropriate to ask him questions from the WAIS-IV in English rather than in Spanish?

A. That was his choice. I had to respect that.

Q.   And have you given the WAIS-IV in the Spanish language before?

A.   Hundreds of times.

Q.   Hundreds of times?

A.   I don't know how many but, yes, many.

Q.   And have you given the WAIS-IV in English before?

A.   Again many, many times.

Q.   Okay.

A.   The WAIS I have given hundreds of times.  The version -- the WAIS-IV version I don't know how many.

Q.   And I think you said your understanding of it on direct is that they are very, very similar tests.

A.   Very identical tests.  It's just the translation of the test.

Q.   So it's the same test translated from English to Spanish and that's the Mexican version; is that right?

A.   It's translated with permission and under the supervision of the publisher, yes.

Q.   And I think we heard on your direct examination as well as the direct examination of Dr. Seward that there are a couple slight differences between the two; is that accurate?

A.   There's three steps.  The first step is a translation.  The second step is a pilot study that allows to determine the -- what's called adaptation of

the test.  In that portion of the -- that portion of the process is where they determine which of the items that you're using are more difficult than others.  And because you want to -- in most cases you want to start from the easy ones and go to the difficult ones, and then they determine what order they should use.  And with a few exceptions they're just about identical to the U.S.

Q.  Okay.  And I think there was one question that you pointed out you changed to the English version which was the question about Emiliano Zapata, right?

A.  Correct.

Q.  And you used the question about the Civil War and the United States?

A.  Which is a question contained in the U.S. version, yes.

Q.  So when you -- well, let's back up for a second. I just want to break down exactly how you did this.

So Mr. Rodriguez told you that he preferred to take the test in English and then you decided you were going to basically translate the Spanish into English so he could understand the questions and take the test in his more preferred language; is that right?

A.  That's correct.

Q.  Okay.  So is it fair to say that first you read

the question to him in Spanish?

A.   I read the questions in Spanish, translated them into English, and asked him if he had any questions.

Q.   So Mr. Rodriguez heard the question twice:  Once in Spanish, once in English?

A.   That's correct.

Q.   Okay.  And then he answered in English; is that right?

A.   That's correct.

Q.   And you recorded the answers in English?

A.   I did.

Q.   And when you translated the questions from Spanish to English, did you translate them as they would have appeared on the American version, the English version?

A.   Pretty much.  To the best of my knowledge, yes.

Q.   I mean, did -- strike that.

Did you have any difficulty translating the questions?

A.   Not at all.

Q.   You're fluent in Spanish, right?

A.   That's my first language, yes.  But as my wife says I forgot Spanish, never learned English.

Q.   The nonverbal sections you didn't have to translate anything, is that right, on the WAIS-IV?

A.   Other than directions.

Q.   Do you have any reason to believe -- well, strike that actually.

And the full-scale IQ score that you got on the WAIS-IV for Mr. Rodriguez was a 74; is that right?

A.   That's correct.

Q.   Do you have any reason to believe that your administration of the WAIS-IV where you translated directions from Spanish to English resulted in an inaccurately lower full-scale IQ score than if you had actually just had the English version with you and administered it that way?

A.   No.

Q.   And why do you say that or what makes you believe that you obtained the right IQ score on the WAIS-IV?

A.   First of all, because I've done this many times. Second, because it's confirmed.  The scores are similar to the ones I obtained with the other two tests.  One is the --

Q.   The CTONI and the TOGRA?

A.   That's correct.

Q.   I'm sorry, go ahead.

A.   I mean, that's the answer.

Q.   Okay.  I have a couple questions for you about the WAIS-III.  There was some discussion about the

WAIS-III during the cross-examination and the redirect examination of Dr. Seward.

Do you recall that?

A.   Yes, I do.

Q.   And Dr. Seward acknowledged that there were problems with the WAIS-III Mexican norms and that neuropsychologists and psychologists were given information that if they -- that they could apply the American norms and that they should apply the American norms; is that accurate?

A.   There's a difference.  The WAIS-III, in the actual manual of the WAIS-III you have both the English -- or the American norm tables and the Mexican norm tables.  And the original -- in the original version when they first published it, there was a notice saying you could choose to use either norms.  That was -- that was the publisher's statement.

Further, later on they sent a notice saying: We've become aware that our norms are faulty; therefore, we do not recommend that you use Mexican norms and we are recommending that you use the U.S. norms.

So first was an option and then became kind of like -- not necessarily mandatory.  They can't tell what you to do once you own -- it's your property but they're recommending that you don't use the Mexican

norms because they are defaulted.  They're faulty.

Q.  So if you were administering the Mexican version of the WAIS-III back when the WAIS-III was in use, you were instructed in essence to use American norms and not Mexican norms; is that right?

A.  Originally you were given the option. Secondarily you were instructed not to use the Mexican norms.

Q.  Okay.  And so the norms you would have used would have been the American norms?

A.  Absolutely.

Q.  Okay.  Doctor, I'd like to turn your attention to Exhibit 639.

THE CLERK:  (Handing exhibit to the witness.)

THE WITNESS:  Thank you, very much.

MR. MONTROY:  Thank you.

Q.  (Mr. Montroy continuing)  Have you had a chance to look at Exhibit 639?

A.  Yes.

Q.  Do you recall when Dr. Seward was testifying on redirect he discussed a chart that was entitled: "Standard Deviation of WAIS-III Scores for all Editions"?

A.  Yes.

Q. And this chart was not actually created by Dr. Seward; is that right?

A. No. I think he testified it was created by Dr. Suarez, S-u-a-r-e-z.

Q. And did you also hear Dr. Seward say that he had no experience conducting the WAIS-IV in Spanish?

A. The WAIS-III, yes.

Q. The WAIS-III or the WAIS-IV; is that right?

A. That's correct.

Q. Okay. And Dr. Seward said that somebody -- you've indicated that it was Dr. Suarez that created this chart and then gave it to Dr. Seward who passed it along to the government and then it was used as an exhibit at this hearing; is that right?

A. And if I recall correctly he stated that Dr. Suarez created this for an old case in which I testified and he testified.

Q. Okay. And Dr. Seward, based on this chart, gave some testimony that when you calculated Mr. Rodriguez's IQ score you inappropriately transformed the raw scores to the subscale using U.S. norms.

Is that your understanding of what he said?

A. Can you repeat the question and be more specific about which occasion --

Q. If you would turn to page 2 --

A.   Yes.

Q.   -- and page 3, if you could kind of look at those simultaneously.  On page 2, and correct me if I'm wrong, but my recollection of Dr. Seward's testimony is that he says you -- based on this chart you're supposed to take the total raw score, that's box A, right?

A.   Yes.

Q.   And then transform the raw score totals to subscale scores using the Mexican norm tables; is that right?

A.   That's what it says here.  That's a second step, yes.

Q.   Okay.  That's what he's saying is a second step, right?

A.   Right.

Q.   And then you transform the sum of the subscale scores to get an IQ score, index scores?

A.   What this particular chart is showing is that you transform -- you're using two separate norms.  It's the same score.  It's just transformation of one score to the other.  And he's suggesting -- or Dr. Suarez suggested that you transform one score obtained with one set of norms into a different set of -- to a different score --

Q.   So he's saying --

A.   -- from a different type of norms.

Q.   So is he saying that when you get to B you should use the Mexican norms for the subscales?  And is that regarding age?  Is B where you factor in age or do I have that wrong?

A.   The transformation from raw scores to scale scores is based on the -- it's based on the stratified age of the sample.

Q.   And there's a table -- an age table for U.S. norms, American norms, and then Mexican norms; is that right?

A.   That's correct.

Q.   Okay.  And Dr. Seward was suggesting that what you should do is you should use the Mexican age tables, part B, right?

A.   If I recall correctly it's not what he was suggesting.  He was stating that according to the manual that's what it said to do and that's false.  That's not true.

Q.   Okay, exactly.  And so if we look on page 3 -- maybe you could just explain for the Court exactly how you're supposed to do this, how you did it and according to the manuals in the WAIS-III, what is the appropriate way to get -- to take a total raw score, then you get a subscale score, and then apply the norms in the final

steps.  What is the appropriate --

A.  No.  You apply the norms in the second step also. It's just -- that's the point, that you have to be consistent with which norms you're going to be using. If you're going to transform raw scores into a particular set of norms, whether they're American or Japanese or Chinese or Mexican, you need to stay with that because you can't go from one -- I mean, it doesn't make sense to me to say:  Go from one set of norms to another set of norms.  The transformation is just that. It's a transformation of certain scores into other scores.  It's not different norms.

Q.  So you don't use half Mexican norms and then half American norms?

A.  Exactly.  That's what they're suggesting to do.

Q.  That's what this chart is saying that you should do, is that when you get to the second step you use the Mexican norms and then when you get to the third step you use the American norms.  That's what Dr. Suarez or Dr. Seward is suggesting through this chart; is that right?

A.  That's what Dr. Suarez understood that the publisher in Mexico was saying but it's false.  It's not what the publisher in Mexico is saying at all.  The publisher --

Q.   So what would be the appropriate way --

A.   -- the publisher in Mexico clearly stated --

THE REPORTER:   Just a minute.   One at a time, please.

MR. MONTROY:   I'm sorry.

THE WITNESS:   I'm sorry.

A.   The publisher in Mexico clearly stated you can have a choice of -- originally stated you can have a choice of using U.S. norms or Mexican norms, not half and half.   Then they said don't use Mexican norms.

Q.   (Mr. Montroy continuing)   Okay.   So if you're calculating a full-scale IQ score, you have to be consistent in the norms that you apply; is that accurate?

A.   Of course.

Q.   If you're using the American norms use the American norms the whole way through.   If you're using the Mexican norms use the Mexican norms the whole way through.

A.   That's correct.

Q.   And Dr. Seward I take it was wrong in suggesting that you apply a mixture of Mexican norms and American norms?

A.   Anybody that suggests that I think is wrong.

Q.   Okay, thank you.

Just a few more questions, Your Honor.

Doctor, does an IQ score, say, in the 80s preclude a diagnosis of intellectual disability?

A.    Not in my opinion, no.

Q.    And why is that?

A.    Because a score in the 80s -- well, first of all, you've got to remember that up to 1973 the IQ score, the cutoff IQ score for the definition of "intellectual disability" or at that time "mental retardation" was 85. And it's only because of the over-classification of individuals that people were saying:  Well, anybody with an IQ score of 85 or below is mentally retarded, which is not necessarily true either.

I mean, if you get a score of 85 or in the 80s, you're really only talking about less than 16 percent of the population, okay?  And that's because that's one standard deviation, and one standard deviation below the mean gives you a percentile rank of 16, which means 16 percent of the people obtain higher scores.  But there's many reasons why you can obtain a higher score than it actually reflects your capacities. And, you know, you never know the true score.

Q.    So if you had a situation where there was an IQ score that was in the 80s, I guess based on your testimony you wouldn't end the inquiry as to whether or

not the person was intellectually disabled.

A.  No.  I know many cases where people have been found to be intellectually disabled by the Courts where the IQs are in the 80s.

Q.  And in Mr. Rodriguez's case if you came across an IQ score that was in the 80s, for instance, and you hadn't done any psychological testing or intelligence testing, would you still want to make a determination -- or would there still be a basis for you to inquire further as to whether or not Mr. Rodriguez might meet the definition of "intellectual disability"?

A.  Of course, because the scores that I reviewed -- I mean, let's talk specifically about this case.  The scores in the 80s, the IQ scores in the 80s I reviewed were scores that he obtained in the prison system way after he was 18 years of age.  Remember, you have to consider the scores in terms of what those scores could have been or should have been when he was before 18, and that's a very difficult way to look at things.

We know that, for instance, in his case once he was incarcerated he had no access to drugs.  He wasn't drinking.  He was watching educational television.  He was reading books.  So you would expect his IQ to increase significantly just because of what he was exposed to and what he was doing and what he was not

doing.

So an IQ in the 80s does not preclude in my opinion the diagnosis. You have to look at how he functioned prior to the age of 18 to make that determination.

Q. And the testing that you did, the full-scale IQ score that you got, was two standard deviations below the mean; is that right?

A. Approximately two standard deviations considering the standard error of measurement, yes.

Q. And the IQ scores that were attained by Dr. Seward and Dr. Froming were in between one and two standard deviations below the mean; is that right?

A. With the standard error of measurement, yes.

Q. Is that a big difference between where your scores were at and what those scores were from Dr. Seward and Dr. Froming?

A. Not at all. Actually I think if you -- I don't recall if I did this but if you look at the standard -- the range of scores potentially obtained, there is some overlap amongst them.

Q. And I think you testified this on direct examination but just to be clear under the diagnostic criteria, the APA and AAIDD, is it appropriate to have an IQ cutoff score when analyzing whether or not an

individual has significant deficits in intellectual functioning?

A.  No.

Q.  One more question about Dr. Seward's testimony. Dr. Seward said that it was industry standard to conduct six tests concerning effort and malingering.

Do you recall that?

A.  I do.

Q.  And is that accurate?

A.  No, it's not a standard.  I think what he was talking about there's a -- we all get surveys every now and then, you know, say:  How many do you use this and that?  And the average may have been six.  Actually I think he was referring to two a day.  Because he was with him three days, would be six.  I did two in one day.

Q.  And you did two full tests for effort?

A.  Yeah.  I remember Dr. Seward testified that I only did one and a half because I didn't do the recognition trial of the 15 Item Test.  The original 15 -- the original Rey 15 Item Test that I used is the original.  It's the one that Rey used.  It's the one that Dr. Lezak, L-e-z-a-k, uses in her treatises.  And there are not only one, there's several different versions or several different variations of the Rey 15

Item Test.

For instance, there's one that uses 16 items, four rows of four instead of five rows of three. There's just variations. And those variations sometimes they claim it's because they increase the sensitivity. Sensitivity indicates the lack of false positives, and the truth I think has to do with the fact that somebody wants to make money off the scoring system so they publish it with a scoring category and they sell it as such.

Q. Okay. In your opinion did you adequately test Mr. Rodriguez for effort?

A. Of course.

MR. MONTROY: Your Honor, I don't have any further questions. Thank you.

THE COURT: Thank you.

Mr. Reisenauer?

MR. REISENAUER: Thank you, Your Honor.

**CROSS-EXAMINATION**

**BY MR. REISENAUER:**

Q. Dr. Weinstein, I want to cover a number of areas here. Just briefly, you weren't just a couple minutes ago testifying that you shouldn't consider what scores he's obtaining now on your IQ tests? You have to look back at the scores he obtained when he was 18 or under,

were you?

A.  I didn't testify to that, no.

Q.  Okay.  Well, maybe I misunderstood you.  I thought you said something to the effect that if you consider -- maybe this is what you said.  If you consider his scores now, you have to look back and see what he would have scored when he was 18.  Is that what you said?

A.  The diagnosis is in reference to prior to the age of 18 so you would have to consider that the IQ score that you're looking at now is not an IQ score that he obtained prior to the age of 18 because he's not 18 or lower.

Q.  Well, how do you do that?  That's impossible.

A.  It's not impossible because in many occasions you do have scores.  Like in this case we do have scores that go back to his childhood but they are scores from tests that we don't consider as individually addressed.  So it's not impossible.  I mean, it's not possible to turn him back before the age of 18, and that's why it's an estimate.

Q.  Well, if somebody is mentally retarded at age 15, they don't magically become not mentally retarded because they have a higher score when they're 53, correct?

A.   You're equating an IQ score to the diagnosis of intellectual disability and it's not correct.

Q.   That's one of the criteria, isn't it?

A.   It's one of the criteria but it's not the full criteria.  That's why specifically the research shows you don't use IQ scores exclusively as a means of diagnosing ID.

Q.   Would you agree with me that you can't outgrow mental retardation?

A.   No, I don't.

Q.   You don't agree with that?

A.   No, sir.

Q.   Okay.  Let's move on then.

A.   That's a very controversial issue.

Q.   But the Flynn Effect isn't controversial.  Is that what you're saying?

A.   Well, if you take 86 percent of the people that are involved in the field and publish saying that you should use it, I don't think that's controversial.

Q.   Okay.  Do you recall when I first cross-examined you I asked you about the case law in this area of the Flynn Effect?  Do you recall that?

A.   And I responded I'm not an attorney and I don't know about case law.

Q.   Okay.  So as far as the judicial system is

concerned, there may be a controversy with the use of the Flynn Effect but you're not aware of that; is that right?

A.   I'm aware that it's been admitted in many courts and I'm aware that it's not been admitted in some courts, yes.

Q.   Okay, thank you.  Now you said -- when Mr. Montroy was asking you about Mr. Rodriguez's deficits, I believe if I quoted you correctly, you said Mr. Rodriguez is a sick man, correct?

A.   In the context of these deficits.  But, yes, I said he was not a well man, yes.  And that we -- if I recall correctly what I testified to was that we may disagree on the fact -- or the diagnosis or the name of the disease that he has but we can't negate -- I don't think anybody would believe that he is a healthy person.

Q.   Okay.  And I wrote down that you said:  He is a sick man.  He has depression, obsessive-compulsive disorder, and he has problems with impulse control, correct?

A.   He does have those conditions, yes.

Q.   And those are diagnoses under the DSM-5 for mental disorders, mental health problems, correct?

A.   They can be, yes.

Q.   Okay.  And then you said that he -- he needed to

be -- or he needs to be in a controlled environment, correct?

A.   Yes.

Q.   Like prison?

A.   Correct.

Q.   And that's because he has a problem with raping women, correct?

A.   The best predictor of human behavior is past behavior, yes.

Q.   Well, individuals that are mentally retarded are not placed in a prison facility because they're mentally retarded, correct?

A.   (No response.)

Q.   They're placed there because they're convicted of crimes, correct?

A.   Right.  And we saw in the longitudinal study I think it was 37 percent of the people with an intellectual disability were involved in the criminal justice system.

Q.   Okay.  I don't think that answered my question but I'll move on.

Now yesterday you also testified that you cannot rely on the defendant, in this case Mr. Rodriguez, for facts related to his history pertaining to whatever problems he might have, whatever

strengths or whatever weaknesses; is that right?

A.   His function in general, yes.

Q.   And I think you talked about this issue with how many books he reads, correct?  Do you recall that?

A.   I just gave that as an example of something that -- some exaggerations, and Dr. Seward admitted to many exaggerations, too.

Q.   Okay.  And so there were some other exaggerations that were mentioned, basically apparently how much marijuana he sold per week.  Do you recall that?

A.   Yes.

Q.   And apparently how the fact that he was telling inmates that when he got out he was going to get some money.  Do you recall that?

A.   Yes.

Q.   Exaggerations aren't uncommon for society frankly.  Probably half the people or three-fourths of the people sitting in this room exaggerate sometimes; isn't that true?

A.   It's true.

Q.   Okay.  That doesn't make us or him mentally retarded, correct, that fact?

A.   No, just makes us -- if we constantly exaggerate and people know we're exaggerating if we say something they're going to consider that in their statements or in

their -- and our credibility, let's put it that way.

Q.   Okay.   There was a question posed to you about Dr. Welner's testimony regarding Mr. Rodriguez being a homeowner.   Dr. Welner never testified that Mr. Rodriguez was a homeowner, correct?

A.   I think what I said is Dr. Welner stated that he functioned as a homeowner because --

Q.   He was acting as a homeowner when he was living at his mother's house, correct?

A.   That's what Dr. Welner believed, yes.

Q.   Okay.   And have you read the testimony from the trial in regard to Mr. Rodriguez acting as a homeowner when he was released in 2003?

A.   You're asking me a question that doesn't make sense.   I mean --

Q.   Well, let me --

A.   It's not contained --

Q.   I'll rephrase it.

A.   I don't think I read anyplace that he acted as a homeowner.

Q.   Okay.   I guess that's a term that I used, okay, or Dr. Welner used.   Here's my question --

A.   Right.   But the question you asked me was did I read it in the transcript?   And that's my answer.   I did not read it in the transcript.

Q.   Okay.  I'll rephrase the question.

A.   Thank you.

Q.   Did you read in the transcript or in any of the declarations that Mr. Rodriguez cooked with his mother or cooked for his mother?

A.   I think so, yes.

Q.   Did you read in the transcript that Mr. Rodriguez took care of the yard, mowed the lawn, raised flowers and so forth?

A.   I think so, yes.

Q.   Did you read in the transcript or in any of the declarations that he went grocery shopping for his mother?

A.   Yes.

Q.   Did you read in the transcript or the declarations that he took care of the house; that he cleaned the house and put the laundry away and that sort of thing?

A.   That he did chores in the house?  Yes.

Q.   And would that be acting as a homeowner taking care of all those functions?

A.   I think Dr. Welner specifically talked about carpentry, talked about plumbing, talked about, you know, having those skills, which he doesn't.

MR. REISENAUER:  Okay, okay.  Sixty-two,

Shelley, I think.

THE CLERK:  (Handing exhibit to the witness.)

THE WITNESS:  Thank you.

MR. REISENAUER:  Forty-six as well.

THE CLERK:  (Handing exhibit to the witness.)

Q.  (Mr. Reisenauer continuing)  Doctor, I believe you have in front of you the two manuals that we've been talking about for the last week and a half, the DSM-5 and the green book, correct?

A.  Yes.

Q.  Okay.  Let's first start with the DSM-5, if we could.  Turn to page 33 of that exhibit.

A.  Yes.

Q.  Okay.  Are you there, sir?

A.  Yes, I am.

Q.  I'm going to talk about a couple things.  There are three sections to the definition of "intellectual disability" in the DSM-5, correct?

A.  Yes.

Q.  Okay.  Just direct your attention to subsection B if you would.

A.  Yes.

Q.  Yesterday you testified that you did not know

what ongoing support was.  Do you recall that?

A.  What I testified is that I didn't know what Dr. Welner meant by an "ongoing support."  I know what an ongoing support is.

Q.  Okay.  Well, that's not my recollection.  My recollection is you said you didn't know what ongoing --

A.  Well, I apologize if that's what you understood. What I meant was I did not know what Dr. Welner was talking about when saying not even supports he required let alone ongoing supports.

Q.  Okay.  Well, I'll just point your attention to subsection B then.  And from what you just said you are aware of what it says in the DSM-5 about the need for ongoing support for individuals who have deficits?

A.  That's how it reads here, yes.  "Without ongoing support, the adaptive deficits limit functioning in one or more activities of daily life..."

Q.  Okay.  So that says that an individual that has intellectual disability needs ongoing support, correct?

A.  It doesn't say that.  It says that for the purpose of the diagnosis you need to identify deficits that affect the person's living that without ongoing supports would not be able to overcome.

Q.  Okay.  I think we agree.  Turn to the green book if you would and in the green book at page 92 if you

would and on the bottom of the page there's a subsection called "Clinical Judgment Strategy."

Do you see that?

A.   Yes.

Q.   And there in subsection C it says:  "What supports are required to assist this individual with ID to be as competent and successful as possible?"

Do you see that?

A.   Yes.

Q.   Does that not indicate that an individual with ID needs supports to be as competent as they could in everyday life?

A.   That's the purpose of the definition and the diagnosis, yes.

Q.   Thank you.  Now if you would turn to pages 94 and 95 quickly.  Ninety-four and 95 have three sections called "Social History, "Medical History" and "Educational History," correct?

A.   Yes.

Q.   And it basically indicates that you should check into these areas when arriving at your determination, correct?

A.   Arriving at your judgment, yes.

Q.   Yes.  And these three subsections talk about items to look for; is that right?

A.  They give examples of it, yes.

Q.  Okay.  And these are examples, correct?  It's not a full-fledged this is all you look at, correct?  These are examples.

A.  Right.  That's the -- it's not all-inclusive, I mean.

Q.  Okay.  And, for example, if you turn to page 95 then, we'll just take a couple examples.  Subsection little (i) under "Educational History" it says: "Looking for other evidence of difficulties in cognitive adaptive skills besides grades and test performance." For example, "Student often late to class or confused about schedule, difficulty following classroom directions, poor record of handling homework, failing driver education."  The next section talks about something else, letter (j):  "Looking for difficulties in practical adaptive skills, poor grooming, inability to use money correctly, getting lost in school or on school grounds, unable to tell time."

Do you see those?

A.  Yes.

Q.  There's no evidence that any of those fit Mr. Rodriguez just for an example, right?

A.  Well, the ones you mentioned right now?

Q.  Yes.

A.   No.

Q.   Okay, thank you.

A.   Of the examples you gave?  No.

Q.   Let's turn to a different area that you testified to about yesterday.  I believe when Mr. Montroy asked you some questions about Mr. Rodriguez's friends you testified that he -- his friends were all younger than him, correct?

A.   No, I didn't say they were all.  I said he had a lot of friends that were younger than he was, yes.

Q.   Okay.  And a lot of them were older than him, correct?

A.   Some were older than him.

Q.   And a lot of them were the same age as him, correct?

A.   I'm thinking of the people that hung out at the -- I forgot the name of the restaurant in Crookston. That group had all kinds of ages and that's what I was told by one of the people that I interviewed, yes.

Q.   And so that group of people, that group of friends, had all ages.  Some were older, some were the same, some were younger, right?

A.   Right.

Q.   And he had lots of friends; isn't that true?

A.   I don't know how you define "friends."  He had a

lot of acquaintances.  He knew a lot of people.

Q.  Okay.  And are you saying that he had acquaintances but they weren't friends?

A.  That's not what I'm saying.  It's what he's saying.  He didn't consider -- and a lot of the people that I talked to or some of the people that I talked to didn't consider him a friend.  They considered him an acquaintance.

Q.  Okay.  Hang on a second.  Dr. Weinstein, you were present when Dr. Seward testified, correct?

A.  Right.  If I recall correctly he testified to the fact that the kids that he'd hang out with were younger because he was older.  He had been retained.

Q.  I'm going to hand you Government's Exhibit 594 (indicating).  On the front page here I'll just have you take a look.  Dr. Seward is talking with Mr. Rodriguez about his friends.

Do you see that?

A.  He's talking about some people, yes.

Q.  Yeah.  And they're his friends, right?  It says people he would hang out with right in the middle of the page here.  Dr. Seward asked him.

Do you see that?

A.  He says:  "Did you have any other buddies back then that you'd hang out with?"  Yes.  Hanging out with

somebody is not necessarily meaning you consider them a friend.  It's an acquaintance.

Q.  Do you hang out with people that aren't your friends?

A.  Yes, a lot of them.

Q.  Do you?  Well, at the bottom whether or not he was a friend or not he hung out with a lot of people, didn't he?  Do you see this list of names?  Here, I'll read it to you.  Cruz Moreno, Tom and Vincent Mendez, Angelo Mendez, Mark Diaz, Richard Diaz, Leonard Diaz, Jesse Espinoza, Andy Garcia, Mike Garcia, Albert Deleon, Ruben de Gal, Victor de Leon, Sylvia de Leon, Alex Mendez?

Do you see those?

A.  I think that's people he knew.  I mean, he talked to some of them and they didn't say that he was a friend.

Q.  Who was that?

A.  I think I talked to Richard, to Sylvia, to a few other people.

Q.  Do you think you did?

A.  I think so.

Q.  Okay.  Well, we'll check in a minute here.  The second page he says Ricky Simmons, Harvey Norberg.  Here's another list of names.  These are the women?

A.   I still don't know what the question is, sir.

Q.   Well, do you think these aren't friends?

A.   Do I know they are friends?  No, I don't know that they are friends.

Q.   Okay.

A.   He knows the names of people.  Doesn't mean they're friends with them.

Q.   Well, let's approach this a different way.  Do you recall the name of the mitigation specialist that defense counsel hired prior to trial?  Her name was Ingrid Christiansen.

Do you recall that?

A.   I remember -- I recall that name, yes.

Q.   Okay.  Miss Christiansen did a lot of interviews in this case pretrial of a lot of different people.  Did you review their statements, their declarations at all in your work?

A.   If they were provided to me I did, yes.

Q.   Okay.  Your sources are listed on the back of your report; is that right?

A.   Yes.

Q.   And your report is Government's Exhibit 43, correct?

A.   Yes.

Q.   Okay.  Let me ask you this.  In Miss

Christiansen's work as a mitigation specialist she interviewed Marilyn Moe Kuchan, Cathy Garcia, Mike Garcia, Morris Nelson, Johnny Rocha, Ricky Simmons, Gayle Vagley, Bill Mauer, Darlene Kvamme, Wayne Brule, Gail Alterpeter and another girlfriend, Dotsie Dahl. They all indicated in their declarations that they were friends of Mr. Rodriguez when they grew up.

Do you remember that?

A.   I don't recall the specifics about that but I believe you.

Q.   Okay.  Did you review their declarations?

A.   I did.

Q.   You did?

A.   If they were contained in the documents I reviewed, yes.

Q.   Okay.  You think you reviewed them but you didn't list them as sources of review in your report, did you?

MR. MONTROY:  Your Honor, I have an objection.  The -- we clarified in the beginning that Mr. -- Dr. Weinstein had received numerous additional sources other than what's contained in his report and those other sources are actually -- the list of the -- the full list of sources that he reviewed is actually an exhibit.  So it's not accurate to say that all of his sources he reviewed are contained at the end of his

report.

MR. REISENAUER:  Well, he can answer that, Your Honor.

THE COURT:  There was testimony as to that though, but he may answer the question.

MR. REISENAUER:  Thank you.

A.  I don't recall specifically.

Q.  (Mr. Reisenauer continuing)  Okay.  Let's turn just briefly to the testing that you did, okay?  So we've heard a lot of testimony about this WAIS-III Mexican norm, American norm, conversion, whatever you want to call it, correct?

A.  Yes.

Q.  Okay.  And a few minutes ago Mr. Montroy was asking you some questions about originally apparently there was this alternative method you said that was in the manual that you could either use the U.S. norms or the Mexican norms.

You remember that?

A.  It was not an alternative method.  It was just the norms for the American population and the norms for the Mexican population were contained in the manual, and there was a note by the publisher saying that you could use either one.

Q.  Okay.  But then later they decided that you

weren't supposed to do it that way; is that right?

A.   Later they send a note stating that they have discovered that the Mexican norms were faulty and, therefore, do not recommend them to be used at all.

Q.   Okay.  And Mr. Montroy asked you then if that's then how you had to do it and I think you said they cannot tell you what to do; is that right?

A.   That's correct.

Q.   So you can just decide on your own what to do or how to do it?

A.   You know, if you own a car the manufacturer cannot tell you how to drive it, you know.  They may recommend not to drive it in snow, for instance, but they can't tell you don't drive it.

Q.   Okay.  So you think that you can decide what norm to use on whatever test to use?

A.   As long as I'm consistent.

Q.   Okay.  The WAIS-IV test, that started in 2008, correct?

A.   In the United States, yes.

Q.   Yeah.  And the copyright I think on both of the samples that were exhibits, the English version and the Mexican version you gave, were both copyrighted in 2008.

         Do you recall that?

A.   I think that was a mistake.  Copyright --

Q.   You think the copyright on the documents is a mistake?

A.   No.  The copyright -- if you let me finish my answer I will.  What I'm saying is that the copyright of the U.S. version is 2008 and it's also copyrighted in Mexico in -- the U.S. version they cannot copyright.  It was not published till I think 2012.  That's when the publication was of the Mexican version.

Q.   Okay, hang on a second.  Doctor, I'm going to hand you what's been marked as Defendant's Exhibit 81.  This is the WAIS-IV English version I believe (indicating); is that right?

A.   Yes.

Q.   And on the bottom it says:  "Copyright 2008," correct?

A.   "2008 NCS Pearson, Inc."

Q.   Okay.  And this is Defendant's Exhibit 82 (indicating).  This is the Mexican version you gave Mr. Rodriguez, correct?

A.   Correct.

Q.   And down here it says:  "Copyright 2008," correct?

A.   That's copyright 2008 by NCS Pearson, Inc.  On the left side it says:  "Manual Moderno" and that's who published it in Mexico and they published it in 2012 and

they copyrighted it in Mexico in 2012.  Actually it says here Manual -- see that down there?  It says 2014.

Q.  Okay.  It doesn't say 2012 anywhere, does it?

A.  No.  It's 2014, I'm sorry.  "Espano" means translation to Spanish by Manual Moderno, M-o-d-e-r-n-o, in 2014.

Q.  Okay, thank you.  So this is the 2014 version.  Is that what you're saying?

A.  The translation was published in 2014.

Q.  Okay.  This particular booklet we're looking at, correct?

A.  Correct.

Q.  Copyrighted in 2008, correct?

A.  In the United States, yes.

Q.  Okay.  So --

A.  But that was not published in the United States so it's not copyrighted in the United States.

Q.  All right.  Let me ask you a question.  You gave that test to Mr. Rodriguez, correct?

A.  Yes.

Q.  Okay.  And that manual of that test does not say you were allowed to use U.S. norms, does it?

A.  That particular manual doesn't say -- doesn't contain the U.S. norms, no.

Q.  Right, right.  But you used the U.S. norms when

you gave the test to Mr. Rodriguez, correct?

A.   I think we went over this many times and let me put it to rest, sir.  It doesn't matter if I used it or I didn't use it.  If you don't want to consider it and if the Court doesn't want to consider it, that's fine with me.  It's still my opinion regardless of what scores he obtained and what I did or didn't do that he --

Q.   So you didn't follow the manual --

THE COURT:   Hold on, let him finish.

A.   So it's the Court's decision whether to consider that or not.  My opinion is not dependent on the results of this test so I don't know that we need to keep on arguing about whether I did the right thing or the wrong thing.  Maybe I did the wrong thing.  Maybe I did the right thing.  That's up to the Court to decide.

Q.   (Mr. Reisenauer continuing)  Okay, thank you.  A couple more questions about this area.  You testified earlier that you took the Mexican version of the test to give to Mr. Rodriguez but you found out that he preferred English, correct?

A.   I did say that, yes.

Q.   Okay.  And in death penalty cases it is a very serious question whether or not the individual who is in an Atkins hearing is mentally retarded or not, correct?

A.   And that's why I always use more than one test, yes.

Q.   You could have gotten an English version of this test to give him, couldn't you?

A.   Well, were you here this morning, sir?  I just explained I didn't bring it with me.  I said that before in my testimony.  I didn't have it with me.  If I would have had it with me, I would have used it.  I didn't have it with me.  I live in California.  He's in Terre Haute, Indiana.  I had traveled to Terre Haute, Indiana.

I'm not sure that you're aware because you represent the government but for people that are not representing the government we have to provide a specific list of all the documents that we're bringing in, a very specific list of all the information that we're providing.  And they go through every single page and every single copy of the test and every single pencil that you bring.  You have to tell them how many pencils you're bringing.

Q.   Okay.  I do work for the government and I do understand what you're saying so thank you.  I just have a few more questions.  This is in regard to Mr. Rodriguez's deficits.  And we talked a bit earlier about the sources of information that you reviewed and I will assume then for the record that you did review the

declarations that Ingrid Christiansen provided to the Court and they include those individuals that I started to talk about earlier:  Marilyn Moe Kuchan, Cathy Garcia, Mike Garcia, Morris Nelson, Johnny Rocha, Ricky Simmons, Gayle Vagley, Bill Mauer, Darlene Kvamme, Wayne Brule, Gail Alterpeter and Dotsie Dahl.

No where in any of those declarations do those individuals indicate that Mr. Rodriguez needed any support during the time of his use when they were friends with him; is that correct?

A.  Using that word?

Q.  Yes.  No, not using that word.  Do they indicate that he needed help in anything?  They don't, do they?

A.  Not to my recollection, no.

Q.  Okay.  Did you review the declarations of some of his teachers:  Dale Steiner, Debbie Hasbrook, Ronald Thompson?

Did you review any of those?

A.  I don't recall that.

Q.  Okay.  None of his teachers indicated that he needed support.

A.  Sir, I don't recall them so how can I recall the content of them?

Q.  Okay.  Mr. Deleon, that was his employer in 2003. Do you remember him?

A.   I don't have a specific recollection of any of the declarations or who said what or when they say it.

Q.   Mr. Deleon didn't say that he needed to help Mr. Rodriguez?

A.   I don't recall reading it.  I don't recall whether I read it or not so I don't recall what the contents of it is.

Q.   Okay.  How about Clifford Hegg, the neighbor, do you remember him?

A.   No.

Q.   You don't.  Mr. Hegg gave testimony at the trial and a declaration that Mr. Rodriguez was doing a lot of --

A.   Are you asking me a question or are you testifying, sir?

Q.   Pardon?

A.   Are you asking me or are you saying what's the content because I told you I don't remember him and I don't remember anything about it.

Q.   Okay.  How about his probation officers, do you remember them saying anything about him needing any support?

A.   I remember reading some of the probation officers' presentencing reports but I don't remember the contents specifically.

Q.  Okay.  There was nothing in there that indicated he needed any support, correct?

A.  I don't recall the specific content of it.

Q.  Well, let's approach it this way how about?  From his school records in Texas or in Minnesota, none of the school records indicate that he needed any support, is that right, other than learning English?

A.  I'm not sure what you mean by "indicate."  If he's not able to achieve more than Fs and Cs -- I mean, Ds and Fs and Cs, that requires supports.  Obviously if he is retained required support.  I don't recall reading and I don't think there was an IEP in existence.  An IEP is an Individualized Educational Program where they specifically state what they're going to do for the child in order to overcome the limitations.  I don't think there was an IEP.

Q.  Okay, thank you.  Mr. Rodriguez was convicted on at least three prior occasions before this case.  You know that, right?

A.  Yes.

Q.  Okay.  And did you review the documents, the Court documents from those cases?

A.  I think so.

Q.  Okay.  None of the judiciary indicated that Mr. Rodriguez was in need of support or was mentally

retarded at any time, correct?

A.   Nobody has diagnosed him before, no.

Q.   Okay.  And that would include his stay at the Minnesota Security Hospital.  None of the psychologists or psychiatrists or doctors that saw him there determined that he was in need of support or that he was mentally retarded, correct?

A.   Those are two separate questions.  The fact that he was in the program indicates to me that he required support.  Otherwise, why would he be in the program?

Q.   Well --

A.   The second part of -- anybody mentioned that he was mentally retarded in any of those documents?  No.

Q.   Thank you.  The same goes for the Department of Corrections in Minnesota; is that right?

A.   I haven't read any diagnosis of intellectual developmental disability or mental retardation in any of the documents that I reviewed.

Q.   Okay.  Do you remember the name Dr. Edward Kelly at all?  He was the psychiatrist at St. John's Hospital.

A.   Do I remember his name?

Q.   Yes.

A.   Do I remember reading something?  Do I remember that it was brought into evidence here?  Yes.

Q.   Okay.  And he didn't find that Mr. Rodriguez was

mentally retarded, did he?

A.   I didn't see anything anywhere in any of the documents I reviewed that states that he was mentally retarded in any of the documents that I reviewed.

Q.   And that would include Dr. Froming and Dr. Hutchinson at the time of trial, correct?

A.   That's correct.

Q.   And that would also include Dr. Martell and Dr. Pitt, correct?

A.   That's correct.  The only declaration I recall stating was Dr. Greenspan's declaration that he's a specialist in the field found him to be intellectually mentally disabled.

Q.   Dr. Greenspan didn't come and testify; is that right?

A.   He's not here.

MR. REISENAUER:  That's all I have, Your Honor.  Thank you.

THE COURT:  Redirect?

MR. MONTROY:  One second, Your Honor, please?

Your Honor, I don't have any additional questions.

THE COURT:  Dr. Weinstein, you may step down.  Thank you very much for your time.

DR. WEINSTEIN:  I appreciate it very much, Your Honor, as long as I can get out of here.

THE COURT:  Breaks my heart to think you don't love this and the weather.  In any event let's -- I hope you get home today.

DR. WEINSTEIN:  Thank you.  I appreciate it.

THE COURT:  Petitioner may call their next rebuttal witness.

MR. MONTROY:  Your Honor, the petitioner has no additional witnesses or evidence.  Actually I should make one point.

I don't think I offered Exhibit 118 so I would do that at this time.

MR. REISENAUER:  We have no objection, Your Honor.

THE COURT:  What was the number?  I missed it.

MR. MONTROY:  It was 118.  It was the Flynn -- the journal article on the Flynn Effect.

THE COURT:  Exhibit 118 is received.

MR. MONTROY:  And, Your Honor, there was one additional issue that came to my attention.  I believe it's Exhibit 62 which is the DSM photocopy of the section on intellectual disability.  There were a couple of pages in the exhibit that were inadvertently left

off.  There's a couple -- if you look at the exhibit you'll see that there's some charts and two of the charts are missing from the exhibit so we have copies if we could substitute the exhibits or add them to the exhibit.

THE COURT:  All right.  So what I've got is the evidence has not yet been closed because I haven't accepted that it's closed, and there's an offer of an exhibit that would be 62A.  Is that a problem?  I'm going to rename it as 62A so that we know what the new exhibit is.

THE CLERK:  I thought I had gotten a new copy of it.

THE COURT:  Why don't you check and see if 62 is complete as it's been received by the Court.

MR. MONTROY:  I think it's page 35 and 36 or 34 and 35 that's missing, 34 and 35.  They're just charts about the severity levels for intellectual disability.

MR. REISENAUER:  Yup.  Thirty-four and 35, those two pages are missing, Your Honor.

THE COURT:  All right.  We'll mark that as 62A.

Any objection to 62A?  Mr. Reisenauer, do you object to 62A?

MR. REISENAUER:  No, You Honor, I don't.

THE COURT:  62A is received.  I'll hold the record open to make sure that everybody has the exhibits in that they want.  You can check with the clerk.

Do you intend to file post-hearing briefs or would you prefer to argue the case at this point?  From the petitioner's standpoint?

MR. MONTROY:  I think from our standpoint, Your Honor, we intend to submit post-hearing briefs.

THE COURT:  Mr. Reisenauer?

MR. REISENAUER:  Well, Your Honor, obviously closing argument is one thing but I think we would also like to submit a brief since part of the discussion was about the Flynn Effect.  That may or may not affect the Court's decision but there's a lot of case law regarding that that the Court indicated we should submit so I think that filing briefs is appropriate.

THE COURT:  All right.  Why don't I -- given the length of the hearing, I suspect the parties would like to see the transcript before they file the briefs.  Yes or no?

MR. LUBY:  Very much so, Your Honor.

THE COURT:  The government have a position on that?

MR. REISENAUER:  No, Your Honor.

THE COURT:  Okay.  Why don't I do this.  How long -- if I say 60 days after the filing of the transcript, is that sufficient time to file a brief?

MR. LUBY:  Yes, Your Honor.

MR. MONTROY:  Yes, Your Honor.

THE COURT:  And then if I say 30 days to respond, is that sufficient for the government or would you prefer 60 days, Mr. Reisenauer?

MR. REISENAUER:  Well, I think we would prefer 60 days.  And as this has transpired over time certainly if the parties need a little additional time we haven't had a problem with that.  So I think if we each have 60 days at this point that's good.

THE COURT:  All right.  So what I'll do is 60 days after the filing of the transcript the petitioner's brief is due.  The respondent's brief is due 60 days after the filing of the petitioner's brief whenever that happens, right?  So if there's an extension it automatically will extend the time for the government to respond.

Now there is the fourth cluster of issues that are -- that were presented in the original petition.  They're basically errors that the Court made, alleged errors the Court made in its determinations and at one point previous counsel has indicated that they

did not intend to present any evidence in support of that and instead they intended to rest on their briefs.

Does that continue to be the petitioner's belief?

MR. LUBY:  Yes and no, if I may.  We don't intend to present evidence on any additional claims that are pleaded.  There may or may not be -- and I don't think there is -- I don't think there's a need for any additional briefing on the other claims.  There are a couple of -- if I recall correctly, and it's been a while since I've looked at some of it.  But I think there may be a Sixth Amendment issue or two.  And with that having been briefed several years ago, there may or may not be some intervening authority that we may need to address but it certainly would be relatively small in scale.

THE COURT:  What I'd like to do is that this final brief would include any updating of any arguments on any issue that was presented here during this two-week period as well as any previously raised issue for which there has been no evidentiary hearing.  And so that we'll get all the briefing complete and then I can finalize my opinions which I probably will put in a single opinion by the time I get to the end.

Anything further from the petitioner?

MR. LUBY:  I did want to give the Court just a heads-up that several weeks ago something that might be an additional claim crossed our radar screen and we didn't have time to prepare it and we're still investigating it.  We're not in a position to put any evidence on, but I did just want to alert the Court to the possibility that within the next several weeks either -- well, one or two possibilities.  Either we'll be presenting something in the nature of a Motion for Leave to Amend and Request for Evidentiary Hearing or an e-mail to the Court saying, hey, we finished our investigation and we've concluded there isn't a claim. I just wanted the Court to be aware that there's a possibility there.

THE COURT:  Do we know what that is about? Are you willing to disclose what the issue is?

MR. LUBY:  I probably shouldn't just because we're currently -- we're still investigating it and we will I think be able to fin- -- well, we certainly will finish it up as promptly as we can.

THE COURT:  Does it fit within any of the other areas where we've held hearings?

MR. LUBY:  No.

THE COURT:  All right.  Mr. Reisenauer, anything further from the government?

MR. REISENAUER:  No, thank you, Your Honor.

THE COURT:  Thank you.  We will stand adjourned in this matter -- or in recess in this matter till the briefing's complete.  Thank you.

MR. MONTROY:  Thank you, Your Honor.

(Concluded at 11:20 a.m.)

**CERTIFICATE OF REPORTER**

I, Kelly A. Kroke, a duly appointed Registered Professional Reporter;

DO HEREBY CERTIFY that I reported in shorthand the foregoing proceedings had and made a record at the time and place indicated.

I DO HEREBY FURTHER CERTIFY that the foregoing and attached (1,778) typewritten pages contain an accurate transcript of my shorthand notes then and there taken.

Dated this 22nd day of April, 2020.

/s/ Kelly A. Kroke
KELLY A. KROKE - RPR, RMR
United States District Court Reporter
District of North Dakota
Eastern Division