**CRIMINAL CASE NO. 2:04-cr-55**

_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHEASTERN DIVISION**

_____

UNITED STATES OF AMERICA,
Plaintiff-Respondent,

v.

ALFONSO RODRIGUEZ, JR.,
Defendant-Petitioner.

_____

**PETITIONER'S POST-HEARING BRIEF
CONCERNING *ATKINS* AND MITIGATION CLAIMS**

_____

Respectfully submitted,


JOSEPH W. LUBY
ERIC J. MONTROY
JAHAAN SHAHEED
ANNIE FISHER
Federal Community Defender Office
for the Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut St., Suite 545W
Philadelphia, Pennsylvania 19106
(215) 928-0520

Dated: September 8, 2020

**TABLE OF CONTENTS**

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Procedural history. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Summary of the post-conviction evidence. . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.      Facts relating to Petitioner's intellectual disability. . . . . . . . . . . . . . 8

     A.     The Diagnostic Criteria. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          1.     Petitioner's evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
          2.     The Government's evidence. . . . . . . . . . . . . . . . . . . . . . . 9

     B.     Prong One - significantly subaverage intellectual
          functioning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
          1.     Petitioner's evidence. . . . . . . . . . . . . . . . . . . . . . . . . . 10
                  The WAIS-IV results and the Flynn effect. . . . . 10
                  The Spanish-language WAIS-IV. . . . . . . . . . . . 11
                  Corroborative test results. . . . . . . . . . . . . . . . . 13
                  Academic skills and history. . . . . . . . . . . . . . . 14
                  The pretrial IQ score and its significance. . . . . . 16
           2.     The Government's evidence. . . . . . . . . . . . . . . . . . . . . 17
                  The WAIS-IV results and the Flynn effect . . . . . 18
                  Corroborative test results. . . . . . . . . . . . . . . . . 18
                  The Spanish-language WAIS-IV. . . . . . . . . . . . 19
                  Academic skills and history. . . . . . . . . . . . . . . 22
                  Qualitative observations. . . . . . . . . . . . . . . . . . 24

     C.     Prong Two - adaptive deficits. . . . . . . . . . . . . . . . . . . . . . . 25
          1.     Petitioner's evidence. . . . . . . . . . . . . . . . . . . . . . . . . . 25
                  Conceptual deficits. . . . . . . . . . . . . . . . . . . . . . 26
                  Social deficits. . . . . . . . . . . . . . . . . . . . . . . . . . 27
                  Practical deficits. . . . . . . . . . . . . . . . . . . . . . . . 30
                  ABAS testing. . . . . . . . . . . . . . . . . . . . . . . . . . 30
           2.     The Governments evidence. . . . . . . . . . . . . . . . . . . . . 31
                  Dr. Seward's analysis. . . . . . . . . . . . . . . . . . . . 31
                  Dr. Welner's analysis. . . . . . . . . . . . . . . . . . . 34

     D.     Prong Three - onset before the age of 18. . . . . . . . . . . . . . . . 37

     E.     Risk factors for intellectual disability. . . . . . . . . . . . . . . . . 38

II.    Facts relating to trial counsel's ineffectiveness. . . . . . . . . . . . . . . . 40

 A.    Petitioner's intellectual disability.. . . . . . . . . . . . . . . . . . . . . 40

 B.    Toxin exposure. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
  1.    Dr. Donald Ecobichon. . . . . . . . . . . . . . . . . . . . . . . 43
  2.    Dr. Andres Lugo.. . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

I.    Petitioner is ineligible for the death penalty because the evidence
establishes that he is intellectually disabled under the authoritative
diagnostic standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

 A.    Petitioner's claim of intellectual disability must be determined
by current diagnostic standards, which invalidate much of the
Government's expert evidence. . . . . . . . . . . . . . . . . . . . . . . . . 51

 B.    Petitioner has qualifying deficits in intellectual functioning. . . . . . . 56
  1.    The Flynn-corrected full-scale IQ score of 70 obtained
on Dr. Weinstein's administration of the WAIS-IV
satisfies prong one, regardless of any other test results. . . . . . 56
   a.    Prong one requires only a single valid qualifying
IQ score. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
   b.    Dr. Weinstein's WAIS-IV result is scientifically
valid, notwithstanding criticisms from Dr. Seward. . . . 58
    i.    The Spanish-language test. . . . . . . . . . . . . . . . 58
    ii.    American norms instead of Mexican norms. . . . 60
    iii.    The Flynn effect. . . . . . . . . . . . . . . . . . . . . . . 61
    iv.    Validation of the WAIS-IV score by other test
results as well as educational records. . . . . . . . . 62
    v.    Corroboration by risk factors for intellectual
disability.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64
    vi.    Dr. Welner's qualitative analysis.. . . . . . . . . . . 65
  2.    IQ scores obtained by Dr. Froming in 2005 and Dr. Seward
in 2013 do not diminish Petitioner's qualifying intellectual
deficits.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

 C.    Petitioner has qualifying adaptive deficits. . . . . . . . . . . . . . . . . . . 69
  1.    Conceptual deficits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
  2.    Social deficits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
  3.    Practical deficits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

D.      Petitioner's limitations originated before the age of 18. . . . . . . . . . . 77

II.     Trial counsel was ineffective for failing to investigate and present evidence of petitioner's intellectual disability to preclude the imposition of a death sentence and as mitigating evidence. . . . . . . . . . . . . . . . . . . . . . . 77

A.      Counsel misapprehended the diagnostic criteria to establish intellectual disability under *Atkins v. Virginia*. . . . . . . . . . . . . . . . . . 79

1.      Counsel's decision to abandon an Atkins defense due to his misapprehension of the law and controlling diagnostic criteria was not a reasonable strategic decision. . . . . . 81

2.      Counsel failed to make reasonable inquiry into Dr. Froming's reported IQ score of 87, in light of counsel's surprise at the score as well as counsel's notice of facts showing that the score overstated Petitioner's intellectual functioning. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

B.      Counsel failed to develop and present evidence of adaptive deficits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

C.      Petitioner was prejudiced. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

III.    Trial counsel rendered ineffective assistance by failing to adequately investigate and present evidence of petitioner's lifelong exposure to toxins and the effects of that exposure. . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

A.      Counsel's limited investigation of Petitioner's toxin exposure was objectively deficient. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

B.      Counsel's deficient investigation and presentation of toxin-related evidence prejudiced the penalty phase defense. . . . . . . . . . . 97

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

## TABLE OF AUTHORITIES

**Cases**

*Andrus v. Texas*, 140 S. Ct. 1875 (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Atkins v. Virginia*, 536 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Brumfield v. Cain*, 576 U.S. 305 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . 96

*Caro v. Woodford,* 280 F.3d 1247 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . 95, 96, 98

*Ex parte Briseño*, 135 S.W.3d 1 (Tex. Crim. App. 2004). . . . . . . . . . . . . . 51, 52, 54

*Ex Parte Moore*, 548 S.W.3d 552 (Tex. Crim. App. 2018). . . . . . . . . . . . . . 58, 69

*Ex Parte Moore*, 587 S.W.3d 787 (Tex. Crim. App. 2019). . . . . . . . . . . . . . . 69

*Foster v. State*, 848 So.2d 172 (Miss. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Hall v. Florida*, 572 U.S. 701 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . 51, 56, 67

*Harris v. Sharp,* 941 F.3d 962 (10th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . 78, 79

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014). . . . . . . . . . . . . . . . . . . . . . 81, 94, 95

*In re Hawthorne*, 105 P.3d 552 (Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Jackson v. Kelley*, 898 F.3d 859 (8th Cir. 2018). . . . . . . . . . . . . . . . . . . 55, 68, 72

*Kenley v. Armontrout,* 937 F.2d 1298 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . 95

*Kimmelman v. Morrison*, 477 U.S. 365 (1986). . . . . . . . . . . . . . . . . . . . . . . . 81

*Martinez v. Ryan*, 566 U.S. 1 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Moore v. Texas*, 137 S. Ct. 1039 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Penry v. Lynaugh*, 492 U.S. 302 (1989). . . . . . . . . . . . . . . . . . . . . . . . 25, 89, 90

*People v. Superior Court*, 155 P.3d 259 (Cal. 2007). . . . . . . . . . . . . . . . . . . . . 69

*Porter v. McCollum*, 558 U.S. 30 (2009). . . . . . . . . . . . . . . . . . . . . . 78, 92, 93

*Ramirez v. Ryan*, 937 F.3d 1230 (9th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . 79

*Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . 78

*Rompilla v. Beard*, 545 U.S. 374 (2005).. . . . . . . . . . . . . . . . . . . . . . . . . 95, 99, 100

*Showers v. Beard*, 635 F.3d 625 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . 78

*Siehl v. Grace*, 561 F.3d 189 (3d Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . 78

*Sinesterra v. United States*, 600 F.3d 900 (8th Cir. 2010). . . . . . . . . . . . . . . . . 78

*State v. Agee*, 364 P.3d 971 (Ore. 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*State v. Gumm*, 864 N.E.2d 133 (Ohio Ct. App. 2006).. . . . . . . . . . . . . . . . . . 82

*State v. Lott*, 779 N.E.2d 1011 (Ohio 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . 77, 81, 92, 93

*United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009). . . . . . . . . . . . . . . 87

*United States v. Edelin*, 134 F. Supp. 2d 45 (D.C. 2001).. . . . . . . . . . . . . . . . . 94

*United States v. Hardy*, 644 F. Supp. 2d 749 (E.D. La. 2008). . . . . . . . . . . . . 87, 88

*United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901
      (N.D. Ohio 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*United States v. Lujan*, 530 F. Supp. 2d 1224 (D. New Mex. 2008). . . . . . . . . . . 94

*United States v. Montgomery*, 2014 WL 1516147
  (W.D. Tenn. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*United States v. Nelson,* 419 F. Supp. 2d 891 (E.D. La. 2004). . . . . . . . . . . . . . 87

*United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009). . . . . . . . . . . . . . . . . . 6

*United States v. Roland,* 281 F. Supp. 3d 470 (D.N.J. 2017). . . . . . 1, 57, 66, 67, 87

*United States v. Sablan*, 461 F. Supp. 2d 1239 (D. Colo. 2006). . . . . . . . . . . . . 87

*United States v. Shields*, 2009 WL 10714661 (W.D. Tenn. 2009). . . . . . . . . . . . 87

*United States v. Williams*, 1 F. Supp. 3d. 1124 (D. Hawaii 2014). . . . . . . . . . . . 87

*United States v. Williams*, Crim. No. 06-00079, 2014 WL1669107
  (D. Hawaii Apr. 25, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. Wilson*, 170 F. Supp. 3d 347 (E.D.N.Y. 2016). . . . . . . 1, 57, 60, 69

*United States v. Wilson*, 922 F. Supp. 2d 334 (E.D.N.Y. 2013). . . . . . . . . . . . . 87

*Wallace v. Stewart*, 184 F.3d 1112  (9th Cir.1999). . . . . . . . . . . . . . . . . . . . . . 83

*Wesson v. Jenkins*, No. 5:14 CV 268, 2020 WL 1066531
  (N.D. Ohio Mar. 5, 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Williams v. Taylor*, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . 78, 92, 93, 99

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . 82, 83

## Statutes and court rules

18 U.S.C. § 1201(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 3596(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 50, 54

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Fed. R. Crim. P. 12.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 44, 94

**<u>Other authorities</u>**

American Association on Intellectual and Developmental Disabilities,
*Intellectual Disability: Definition, Classification, and Systems
of Support* (11th ed. 2010) ("AAIDD-2010"). . . . . . . . . . . . . . . . . . . *passim*

American Association on Intellectual and Developmental Disabilities,
*User's Guide to Accompany the 11th Edition of Intellectual
Disability: Definition, Classification, and Systems of Support*
(2012) ("AAIDD-2012"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

American Association on Intellectual and Developmental Disabilities,
*The Death Penalty and Intellectual Disability* (2015)
("AAIDD-2015"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

American Association on Mental Retardation, *Mental Retardation:
Definition, Classification, and Systems of Supports*
(10th ed. 2002) ("AAMR-2002"). . . . . . . . . . . . . . . . . . . . . . 38, 41, 80, 81

American Bar Association, *Guidelines for the Appointment and
Performance of Counsel in Death Penalty Cases* (2003). . . . . . . . . . . . 87, 88

American Psychiatric Association, *Diagnostic and Statistical
Manual of Mental Disorders-5th Edition* (2013) ("DSM-5"). . . . . . . *passim*

Michael Welner, *Forensic Psychiatry and Forensic Psychology: Mental
Handicap and Learning Disability*, from *Encyclopedia of Forensic
and Legal Medicine*, Vol. 2 (2016). . . . . . . . . . . . . . . . . . . . . . 10, 19, 22, 63

**INTRODUCTION**

Petitioner Alfonso Rodriguez is intellectually disabled under established clinical standards. Those standards require significant limitations in intellectual functioning, significant limitations in adaptive behavior, and the onset of these limitations before the age of 18. *See* American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Supports* 5 (11th ed. 2010) ("AAIDD-2010"); American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders-5th Edition* 33 (2013) ("DSM-5").[1]

Petitioner satisfies all three criteria. ***First***, his intellectual limitations fulfill the requirement of "an IQ score that is approximately two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations." AAIDD-2010 at 31. The standard is met "if even one valid IQ test score generates a range that falls to 70 or below." *United States v. Roland*, 281 F. Supp. 3d 470, 503 (D.N.J. 2017); *United States v. Wilson*, 170 F. Supp. 3d 347, 366 (E.D.N.Y. 2016). The Court need not resolve the conflict between the differing IQ scores that

---

[1] At the time of trial, intellectual disability was referred to as "mental retardation." Because that term has been recognized as stigmatizing and otherwise problematic, *see* AAIDD-2010 at xvi, undersigned counsel refer to the condition as "intellectual disability" other than when necessary to quote the previous term in authorities, case records, and the like.

1

were presented at the hearing. It suffices that Dr. Ricardo Weinstein administered the WAIS-IV and arrived at a score of 74, which presents a range of 69 to 79 even without correction for the Flynn effect. Hrg. 418, 426-28; Pet. Ex. 44 at 11. And even though the Government's experts criticized Dr. Weinstein's administration of the WAIS-IV, neither expert disputed that Dr. Weinstein validly administered the Comprehensive Test of Nonverbal Intelligence, 2nd edition; that the CTONI-2 is a valid intelligence test; and that Petitioner scored a 64. Hrg. 417-22, 442-43, 1259; Pet. Ex. 44 at 11.

*Second*, Petitioner suffers from significant limitations in adaptive behavior in one or more of three domains: conceptual, social, and practical. *See* AAIDD-2010 at 43; DSM-5 at 37-38. Dr. Weinstein and Dr. José Silva described pronounced deficits in all three domains, including Petitioner's persistent social isolation, his poor academic skills as demonstrated by school records as well as test results from adulthood, and his lifelong inability to live independently and to cope with any environment other than prison. Hrg. 500-07, 516-19, 528-36, 855, 857-60, 866-70, 895-96, 954-55; Pet. Ex. 13, 48, 51, 53, 56, 57, 58.

The Government's evidence on adaptive behavior was insubstantial and contra-diagnostic. The bulk of that evidence, from Dr. Michael Welner and Dr. James Seward, described Petitioner's perceived functioning in prison or during his crimes. Whatever label Drs. Welner and Seward employed—such as "cognitive flexibility," "problem-solving," "impression management," or "criminal

cunning"—the evidence does not bear on Petitioner's adaptive functioning. The AAIDD instructs that clinicians "not use past criminal behavior or verbal behavior to infer level of adaptive behavior." AAIDD, *User's Guide to Accompany 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports* 20 (2012) ("AAIDD-2012"). "The diagnosis of ID is not based on the person's 'street smarts', behavior in jail or prison, or 'criminal adaptive functioning.'" *Id.*; *see also Moore v. Texas*, 137 S. Ct. 1039, 1050 (2017) ("[c]linicians . . . caution against reliance on adaptive strengths developed in a controlled setting, as a prison surely is") (citing AAIDD-2012 and DSM-5). Dr. Welner offered little more than disagreement with the principle of disregarding of criminal activity and prison life, which he believes is motivated by the AAIDD's unscientific agenda as an "advocacy organization." Hrg. 1575-78, 1613. Notwithstanding Dr. Welner's disagreement, the Court is required to follow the same clinical standards that the Supreme Court has followed and accepted as binding. *See Moore*, 137 S. Ct. at 1049, 1052–53.

Other findings from Drs. Welner and Seward rest on obsolete stereotypes of intellectually disabled persons. The Government's experts observed that Petitioner could maintain employment, operate a car and learn to use its electronic accessories, and engage in a conversation about current events, among other things. But those findings reflect "incorrect" stereotypes that "must be dispelled." AAIDD-2012 at 26. Such stereotypes include the notions that intellectually

3

disabled persons "cannot acquire vocational and social skills necessary for independent living"; "cannot get driver's licenses, buy cars, or drive cars"; "cannot do complex tasks"; and "look and talk differently from persons from the general population." *Id.*; *see also Moore*, 137 S. Ct. at 1052 (noting that "the medical profession has endeavored to counter lay stereotypes of the intellectually disabled," and citing AAIDD-2012). Drs. Welner and Seward did not apply the diagnostic standards, and their testimony should be accorded little or no weight.

*Third*, there is no dispute that Petitioner's limitations originated before the age of 18. *See* AAIDD-2010 at 5. School records demonstrate Petitioner's intellectual struggles since childhood, and Petitioner's friends and relatives describe his social and practical deficits from an early age. Hrg. 516-19, 532-35, 855, 858-60; Pet. Ex. 13 at 1-4; Pet. Ex. 51 at 1; Pet. Ex. 53 at 5, 8-12; Pet. Ex. 58 at 2. Petitioner satisfies all three diagnostic requirements for intellectual disability, and the Court should reduce his sentence to life imprisonment. *See Atkins v. Virginia*, 536 U.S. 304, 321 (2002); 18 U.S.C. § 3596(c).

Alternatively, the Court should vacate Petitioner's death sentence and order a new penalty trial on account of trial counsel's ineffectiveness. Testimony at the evidentiary hearing described two critical errors in the penalty phase defense. First, trial counsel ceased investigating a defense of intellectual disability based solely on Petitioner's reported pretrial IQ score of 87, even though counsel (a) reasonably believed that Petitioner was functioning below a "low average" level of

4

intelligence, (b) believed that Petitioner would score in the 70s as he had during childhood, and (c) was aware of the governing clinical standards that rejected any IQ score cut-off as part of the diagnosis. Counsel failed to discover that the reported score of 87 was inflated, but more importantly, he failed to investigate Petitioner's adaptive functioning despite voluminous notice of the defendant's social, conceptual, and practical deficits. The penalty phase therefore lacked any evidence of Petitioner's intellectual disability. That evidence would have mitigated Petitioner's crime even without a judicial or jury finding that the diagnostic criteria were satisfied.

Second, counsel knew that Petitioner had been exposed to environmental toxins during his family's experience as migrant farmworkers, but counsel precluded his toxin expert from interviewing Petitioner or his family, visiting and analyzing the sites of his exposure to toxins, or ascertaining precisely which toxins had which effects on Petitioner's neurological and psychological functioning. Counsel avoided these inquiries out of gamesmanship. He believed that he could avoid disclosing the expert or a report under Fed. R. Crim. P. 12.2 so long as the expert refrained from examining Petitioner. But the rule does not condition such disclosure on an examination. Rather, the discovery obligations are triggered when the expert's testimony "relate[s] to" the defendant's mental condition, as the expert's evidence did here by describing the types of neuropsychological consequences that can result from exposure to the types of toxins that were used in

5

Red River Valley during Petitioner's childhood. Counsel's misunderstanding prevented the defense from fully investigating the nature, extent, and consequences of Petitioner's actual exposure—including the highly neurotoxic insecticides Paris Green and parathion, as well as toxic solvents and heavy metals to which Petitioner was exposed during his two decades of work in a prison print shop.

Petitioner's jurors were materially uninformed about the man they sentenced to death. If the Court is not persuaded that Petitioner is intellectually disabled under current diagnostic standards (*see* Argument I), it should vacate Petitioner's death sentence and grant a penalty phase retrial (*see* Arguments II-III).

## PROCEDURAL HISTORY

Previous filings have detailed the factual and procedural history of the case, which are only briefly summarized here. Petitioner was convicted of, and capitally sentenced for, the offense of kidnapping Dru Sjodin across a state line, resulting in her death. *See* 18 U.S.C. § 1201(a)(1). At trial in this Court, Petitioner was represented by attorneys Richard Ney and Robert Hoy. The Eighth Circuit affirmed Petitioner's conviction and sentence on direct appeal. *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), *cert. denied*, 562 U.S. 981 (2010). Petitioner thereafter moved for post-conviction relief under 28 U.S.C. § 2255. *See* ECF Doc. No. 752. The Court has held evidentiary hearings on three categories of claims: juror misconduct, forensic evidence, and mitigating evidence concerning mental health and related issues. *See* ECF Doc. Nos. 984, 1051, 1058, 1109. The

6

parties have fully briefed the first two categories of claims—*see* ECF Doc. Nos. 950, 953, 964, 969, 971, 998, 1004, 1083, 1093, 1094, 1101, 1111—and Petitioner now offers his post-hearing brief on the third.

At the end of the most recent hearing, the Court requested that the parties brief not only the claims that were the subject of the hearing, but also any "previously-raised issues for which there has been no evidentiary hearing." Hrg. 1776. Petitioner offers no such additional briefing here, and instead he will rest on his previous briefs as well as his § 2255 motion. Petitioner reserves the right to reply to any such additional briefing from the Government.

**SUMMARY OF THE POST-CONVICTION EVIDENCE**

The most recent hearing involved evidence on three different claims: first, that Petitioner is intellectually disabled and cannot be executed under the Eighth Amendment; second, that trial counsel performed ineffectively by not developing and asserting a claim that Petitioner is intellectually disabled; and third, that trial counsel were ineffective in their development of evidence that Petitioner was exposed to environmental toxins during his childhood and suffered impairments as a result. Those three categories of post-conviction evidence are summarized below.[2]

---

[2] For the convenience of the Court and opposing counsel, Petitioner waives the portion of his post-conviction claim concerning trial counsel's failure to investigate and present evidence of post-traumatic stress disorder and a "dissociative state"

## I.    FACTS RELATING TO PETITIONER'S INTELLECTUAL DISABILITY

### A.    The Diagnostic Criteria

### 1.    Petitioner's evidence

Neuropsychologist Ricardo Weinstein, Ph.D., described two sources as authoritative in defining intellectual disability. First, the American Association on Intellectual and Developmental Disabilities published the Eleventh Edition of its manual in 2010, entitled *Intellectual Disability: Definition, Classification, and Systems of Support* ("AAIDD-2010"). Hrg. 404-05; Pet. Ex. 46. Subsequent to the 2010 manual, the AAIDD published a *User's Guide* in 2012 ("AAIDD-2012"), which Dr. Weinstein described as both authoritative and helpful in addressing how to apply the diagnostic criteria. Hrg. 406; Pet. Ex. 47. Similarly authoritative—and relied on by Dr. Weinstein as well as forensic psychiatrist José Silva, M.D.—is the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders–5th Edition* (2013) ("DSM-5"). Hrg. 407-09, 891-95; Pet. Ex. 62. Dr. Weinstein testified that the DSM "tend[s] to always follow" the AAIDD in defining the diagnostic criteria, and that the "controlling definition is probably more so contained in the AAIDD manuals" than in the DSM-5. Hrg. 408.

relating to childhood sexual abuse, and as described by Dr. Pablo Stewart. *See* Petition (ECF Doc. 752), at 185-86, 193-97, 201-02, 207. Previous counsel pleaded that issue as part of Claim IV, but Petitioner did not present any evidence on it at the hearing.

The AAIDD and DSM-5 provide a similar three-part definition of intellectual disability. First, the individual must have significant deficits in intellectual functioning of approximately two standard deviations below the mean, or a full-scale IQ score of approximately 65 to 75—which accounts for a test's standard error of measurement. Hrg. 411-12, 415, 426-28; AAIDD-2010 at 31; DSM-5 at 37. Second, the individual must display significant deficits in at least one of three categories of adaptive behavior: conceptual, social, and practical skills. Hrg. 412, 466-68; AAIDD-2010 at 43-44; DSM-5 at 37-38. An adaptive deficit is "the inability or the lack of some kind of functioning that prevents that individual from functioning independently in society," and the clinician considers only whether the person has a qualifying deficit regardless of any adaptive strengths. Hrg. 412; AAIDD-2010 at 7; AAIDD-2012 at 25-26. Third, the person's intellectual and adaptive deficits must have originated before the age of 18. Hrg. 412-13; AAIDD-2010 at 5, 11; DSM-5 at 33, 38.

## 2.    The Government's evidence

Testifying on behalf of the Government, neuropsychologist James Seward, Ph.D., recognized the same three diagnostic criteria, as well as the authoritativeness of the DSM-5, AAIDD-2010, and AAIDD-2012. Hrg. 1060-62, 1286-87. Somewhat to the contrary was the testimony of psychiatrist Michael Welner, M.D. Dr. Welner described the AAIDD as an "advocacy organization" whose mission includes broadening the definition of intellectual disability based on

9

a "social policy initiative" rather than "scientific research." Hrg. 1571-78; Pet. Ex. 80 at 637. Dr. Welner therefore rejects AAIDD's guidance that a person's criminal activity, adaptive strengths, and conduct in prison must be disregarded when assessing that person's intellectual functioning or adaptive behavior. Hrg. 1575-78. He has also criticized the DSM-5 for requiring that practitioners use "clinical judgment" to interpret IQ test results. Pet. Ex. 62 at 37; Pet. Ex. 80 at 636.

**B.      Prong One – Significantly Subaverage Intellectual Functioning**

**1.      Petitioner's evidence**

Dr. Weinstein examined Petitioner at USP Terre Haute; administered several tests of his intellectual and neuropsychological functioning; interviewed third-party witnesses including Petitioner's mother, his three sisters, and five of his friends from childhood; and reviewed extensive background materials such as educational records, memorialized witness interviews, and court transcripts. Hrg. 390-403; Pet. Ex. 44 (report) at 1-3, 16-18. Based on Petitioner's IQ score and corroborating test results and other evidence, Dr. Weinstein concluded that Petitioner satisfies the intellectual deficits requirement for a diagnosis of intellectual disability. Hrg. 416, 429, 433, 465-66. Dr. Silva agreed. Hrg. 909 (using DSM-5 criteria).

*The WAIS-IV results and the Flynn effect* – As relevant here, Dr. Weinstein administered the WAIS-IV—the most widely used IQ test—and reported Petitioner's full-scale IQ as 74. Hrg. 418, 426; Pet. Ex. 44 at 11. A score of 74 gives rise to a 95 percent probability that Petitioner's true IQ is between 69 and 79.

Hrg. 427-28. That range satisfies the intellectual deficit prong of the diagnosis. Hrg. 429.

Use of the Flynn effect lowers Petitioner's score to 70, or a range of 65 to 75. Hrg. 432-33; Pet. Ex. 44 at 11. Dr. Weinstein explained that the Flynn effect adjusts an individual's IQ score to account for the population's increased intelligence since the "norming" of the test, which is the process by which the population's average performance level is established as a score of 100. Hrg. 432-33. Pet. Ex. 44 at 11. For each year beyond the establishment of a test's norms, the population's mean IQ score grows by approximately one-third of a point—an observation that has been replicated in 26 other countries. Hrg. 431-32, 707-08. Dr. Weinstein testified that the Flynn effect is not controversial in the field, that only one or two out of 102 published studies reject the idea of correcting an individual's IQ score for the Flynn effect, and that the AAIDD instructs the test administrator to correct for it. Hrg. 707-08, 765-67; AAIDD-2012 at 23; AAIDD-2010 at 37. Because the WAIS-IV test norms were established in 2006, or twelve years before Petitioner took the test, the Flynn effect lowers the score from 74 to 70. Pet. Ex. 44 at 11. The lower score "certainly" satisfies the first diagnostic criterion. Hrg. 433.

*The Spanish-language WAIS-IV* – Based on Petitioner's bilingual status and the fact that he spoke Spanish predominantly or exclusively during the first several years of his life, Dr. Weinstein brought to the prison a Spanish translation of the American WAIS-IV. Hrg. 671-74, 759, 1727-29, 1766. Petitioner verbally advised

11

Dr. Weinstein, however, that he prefers to speak English and to take the test in English. Hrg. 671, 1727-28, 1765. As a result, Dr. Weinstein read the test questions in Spanish and translated them into English, and Petitioner generally answered in English. Hrg. 434, 1730-31.

Dr. Weinstein explained that the Spanish-language test is an approved translation of the English-language test, and the two are all but identical. Hrg. 436, 672-74, 759, 1728-29. The only Spanish-language version of the WAIS-IV is published in Mexico, and there are only "very minor differences" between it and the English version used in the United States. Hrg. 436-37, 761. The Spanish-language test includes a handful of general-knowledge questions that are specific to Mexico; for example, the test asks the subject to name the president of Mexico during the War of Reform (Emiliano Zapata), while the English-language test asks for the name of the United States president during the Civil War (Abraham Lincoln). Hrg. 436-38, 693-94. In those instances Dr. Weinstein substituted the English-language question for the Spanish-language one. Hrg. 693-94, 1160 (Abraham Lincoln instead of Emiliano Zapata; William Shakespeare instead of Miguel de Cervantes).

Dr. Weinstein testified that his use of the Spanish-language test, in which he translated the questions into English, did not lower Petitioner's score from what it would have been on the English test. Hrg. 1732. Moreover, Petitioner's score on the WAIS-IV was similar to his scores on two other tests that require little or no

12

use or understanding of language (as described more fully below concerning the CTONI-2 and the Test of General Reasoning Ability (TOGRA). Hrg. 1732.

In order to arrive at Petitioner's full-scale IQ score, Dr. Weinstein measured Petitioner's test responses in comparison to the American population rather than the Mexican population. Hrg. 435. Dr. Weinstein used the American testing norms instead of Mexican norms because Petitioner has lived in America his entire life, and is being judged for violating American laws, so his IQ score should reflect how he compares to other Americans—including Hispanic Americans who have been included in the American testing norms. Hrg. 438-40, 696-99, 760-63.

On questioning from the Court, Dr. Weinstein confirmed that Americans have "on average better and deeper educations" than Mexicans. Hrg. 772-74. As a result, the same raw score, based on the same set of correct answers, will yield a higher scaled score with the use of Mexican norms than with American norms— and thus a higher full-scale IQ score because Petitioner would be compared to a lesser-educated population. Hrg. 773-74. Dr. Weinstein confirmed that he used American norms to measure Petitioner's IQ "because he's an American who was educated in America." Hrg. 774.

*Corroborative test results* – Dr. Weinstein administered two additional measures of intellectual functioning: the Comprehensive Test of Non-verbal Intelligence, 2nd edition (CTONI-2), as well as the Test of General Reasoning Ability (TOGRA). Hrg. 417; Pet. Ex. 44 at 11. Dr. Weinstein gave the additional

13

tests in order to determine whether the WAIS-IV score could be validated by similar scores on other instruments. Hrg. 417-22. Dr. Weinstein explained that the CTONI is the only test of non-verbal intelligence that has been recognized by the AAIDD. Hrg. 420-21. The CTONI is a "nonverbal intelligence test" that measures the subject's ability to "think in a rational manner," and it provides a full-scale IQ score that the examiner can compare to other tests. Hrg. 421, 442. Petitioner scored a 64 on the CTONI-2, which adjusts to a 59 under the Flynn effect, and a scoring range of 54 to 64—all of which "most certainly" satisfies the first diagnostic criterion for intellectual disability. Hrg. 442-43; Pet. Ex. 44 at 11.

Dr. Weinstein explained that the TOGRA requires only "some language," and the test's instructions are in English. Hrg. 419-20. The test includes questions that require the subject to recognize patterns in numbers and diagrams, among other non-reading tasks. Hrg. 419. Petitioner scored a 70 on the TOGRA, or a 68 with correction for the Flynn effect. Hrg. 441; Pet. Ex. 44 at 11. The TOGRA test result provides a number that practitioners use as an "equivalent" to a full-scale IQ score. Hrg. 441. Dr. Weinstein testified that Petitioner's score of 68 yields a range of 63 to 73. Hrg. 441.

*Academic skills and history* – Dr. Weinstein found additional evidence of Petitioner's intellectual deficits in his school records. On the Kuhlman-Anderson IQ test, Petitioner scored a 77 in the first grade, 80 in second grade, 79 in third grade, and 74 in fifth grade. Pet. Ex. 13 at 1, 3; Hrg. 443-44. Dr. Weinstein pointed

14

out that the Kuhlman-Anderson test is group-administered, and the AAIDD requires the use of individually-administered IQ scores to diagnose intellectual disability. Hrg. 444, 599-600. Although Dr. Weinstein did not diagnose Petitioner based on the Kuhlman-Anderson scores, he testified that the scores from childhood are consistent with the WAIS-IV score from 2018. Hrg. 444, 600. Dr. Weinstein also observed that the Kuhlman-Anderson scores went down as Petitioner got older. Hrg. 734. Consequently, Dr. Weinstein observed that the lower scores were not attributable to language difficulties, or to the fact that Petitioner spoke Spanish for the first several years of his life. Hrg. 733-34.

School records confirm Petitioner's limited intellect, according to Dr. Weinstein. Hrg. 454-55, 727-28. Petitioner's grade reports are littered with D's and F's for academic subjects. Hrg. 503-04; Pet. Ex. 13. In eighth grade, for example, Petitioner earned F's in English, Math, and Social Studies; D's in Science and Health/Music; and C's in Physical Education and Shop. Pet. Ex. 13 at 4; Hrg. 726-27. In addition to repeating the first and second grade, Petitioner twice flunked the ninth grade before dropping out of school—even though his records document consistent attendance, including 172 out of 177 school days during his second attempt at ninth grade. Hrg. 503-06, 601; Pet. Ex. 13 at 4.

Dr. Weinstein also drew parallels between Petitioner's IQ score and his performance across several administrations of the Wide Range Achievement Test (WRAT). Hrg. 446-54. The WRAT measures the subject's grade-level equivalent

15

in various academic skills. Hrg. 446. Petitioner took the WRAT in 1980 in the

Minnesota prison system, in 2006 prior to trial (with neuropsychologist Karen

Froming), in 2013 with Dr. Seward, and in 2018 with Dr. Weinstein. Pet. Ex. 48.

The scores show a consistent pattern of Petitioner operating at the sixth grade level

or below in reading and mathematics, with the exception of a grade level 10.9

result in "sentence comprehension" on Dr. Seward's testing (which itself shows

spelling at grade level 3.5, word reading at 6.0, and math computation at 6.9). Hrg.

450-53; Pet. Ex. 48. The obtained scores are consistent with intellectual disability,

Dr. Weinstein concluded. Hrg. 453-54, 506-07, 740-41.

 *The pretrial IQ score and its significance* – Neuropsychologist Karen

Froming, Ph.D., evaluated Petitioner before trial. She administered the WAIS-III in

2005 and reported a full-scale IQ score of 87. Pet. Ex. 24 at 1. Dr. Weinstein

explained several respects in which the score of 87 should be adjusted downward.

First, Dr. Weinstein testified that Dr. Froming later reviewed her testing data and

found scoring errors that result in a revised IQ score of 84. Hrg. 455-56; Pet. Ex.

103 at 5-6. Second, the Flynn effect lowers the revised score from 84 to between

80 and 81. Hrg. 456. Third, Dr. Weinstein explained that the professional literature

recognizes errors in the original norms for the WAIS-III, justifying a further

reduction of 2.34 points. Hrg. 457-60; Pet. Ex. 2 at 179. After all three

adjustments, Dr. Froming's test reveals a score in the range of 74 to 84—a range

that intersects with Dr. Weinstein's Flynn-adjusted range of 65 to 75. Hrg. 460

("[I]t's the same score."); *see also* Hrg. 416 (stating that Petitioner's many IQ scores are all "within the range of intellectual disability" or "approximately in the range").

Dr. Weinstein explained that IQ scores are only approximations, and there is no "cut-off" score that disqualifies a person from being intellectually disabled. Hrg. 460-64; *see also* AAIDD-2010 at 40 ("An IQ score should be reported with confidence intervals rather than a single score."). The diagnosis of intellectual disability "is intended to reflect a clinical judgment rather than an actuarial determination," according to the AAIDD. Hrg. 461-63; AAIDD-2010 at 40; DSM-5 at 33. A cut-off score is not "psychometrically justifiable," and Dr. Weinstein testified that an IQ score in the 80s would not preclude a diagnosis of intellectual disability. Hrg. 463, 465.

Dr. Silva agreed that the DSM-5 de-emphasizes the importance of IQ scores. Hrg. 900, 902. The diagnostic community focuses on "what goes on from day to day." Hrg. 900. ("Can somebody interact with other people? Can somebody perform multiplications like everybody else? . . . [C]an somebody interact with other children? Can somebody write decently so that you can actually be understood and so forth?").

### 2.    The Government's evidence

Dr. Seward described a variety of tests that he conducted during his three-day examination of Petitioner, including a mental status evaluation, a wide range

17

of neuropsychological tests, the Minnesota Multiphasic Personality Inventory, the WRAT, and the WAIS-IV, among others. Hrg. 1077-92. He also reviewed and evaluated records from Petitioner's educational and correctional history, much as Dr. Weinstein did.

*The WAIS-IV results and the Flynn effect* – Dr. Seward arrived at a full-scale IQ score of 86 on the WAIS-IV, which he considered similar to Dr. Froming's score of 87. Hrg. 1101. He described Petitioner's IQ as being in the "low average" range, and he concluded that Petitioner does not meet the intellectual deficits prong for a diagnosis of intellectual disability. Hrg. 1313; Govt. Ex. 615 at 36, 43-44. Dr. Seward testified that he was aware of a "controversy" about whether to adjust IQ scores for the Flynn effect. Hrg. 1380-82. Nevertheless, he did not offer an opinion on the "controversy" or otherwise testify that Petitioner's scores should not be so adjusted. *Id.* Dr. Seward acknowledged that the AAIDD states that an IQ score adjustment of three points per decade of the age of the test's norms "is warranted," and more generally that the AAIDD is "the preeminent organization that deals with intellectual disability," and that its manual and user's guide provide the "governing standards … used in the ID community." Hrg. 1236, 1286-87; AAIDD-2012 at 23. If the Flynn effect were to be applied to Dr. Seward's test result, it would require a two-point correction of Petitioner's IQ, to a score of 84. Hrg. 1289, 1382.

*Corroborative test results* – Dr. Seward acknowledged that Dr. Weinstein had administered the CTONI-2, which resulted in an IQ score of 64. He did not

dispute that the CTONI-2 is an intelligence test, or the validity of Dr. Weinstein's result. Hrg. 1258-59. Dr. Welner, too, described the CTONI-2 as an "intelligence test" in his chapter of the *Encyclopedia of Forensic and Legal Medicine*. Pet. Ex. 80 at 643. Dr. Welner has advised that the use of "multiple psychological tests is the best way to detect faked mental retardation." *Id.* at 641; Hrg. 1268-69.

Dr. Seward was less supportive of Dr. Weinstein's use of the TOGRA, which tests abstract reasoning and is sometimes used as a screening test in vocational settings. Hrg. 1148-49. Dr. Seward explained that the TOGRA is not an IQ test, and that the manual instructs against its use to diagnose intellectual disability. Hrg. 1149. Dr. Weinstein later explained that he administered the TOGRA to corroborate the result from the WAIS-IV, rather than to diagnose intellectual disability by itself. Hrg. 757, 1733.

*The Spanish-language WAIS-IV* – Dr. Seward offered several critiques of Dr. Weinstein's administration of the Spanish-language WAIS-IV. First, he testified that the WAIS-IV should be administered in the subject's primary language, which for Petitioner is English. Hrg. 1368. Second, Dr. Seward testified that the WAIS instructional manual does not allow the tester to administer one country's test while applying another country's norms, and that Petitioner's IQ on Dr. Weinstein's test would be 89 with the use of Mexican norms rather than the 74 that Dr. Weinstein obtained with American norms. Hrg. 1169. Dr. Seward acknowledged, however, that the use of Mexican norms would result in an IQ

19

score that compares Petitioner to residents of Mexico, where he has never lived. Hrg. 1228-30.

Third, Dr. Seward observed that the Mexican-published test differs somewhat from the American-published test. Some of the questions are specific to one culture, such as the American question about Abraham Lincoln and the Mexican question about Emiliano Zapata. Hrg. 1159-60. Dr. Seward acknowledged that, by substituting the Abraham Lincoln question for the Emiliano Zapata question on the Spanish-language test, a question for which Petitioner received credit, Dr. Weinstein's adjustment to the test did not negatively affect Petitioner's score. Hrg. 1276.

A few other test questions, however, appear in a different order in the two tests. Hrg. 1157. On the 18-question "Similarities" section, for example, the examinee must explain the connection or similarity between two words. Hrg. 1195. The Spanish and English tests have identical queries for the first eight questions. Hrg. 1196. The tests then have a slightly different order for Questions 9-13:

| Question No. | English Question | Spanish Question |
| --- | --- | --- |
| 9 | Badge / Crown | Bud / Baby (Capullo / Bebé) |
| 10 | Bud / Baby | Anchor / Fence (Ancla / Cerca) |
| 11 | Music / Tides | Badge / Crown (Insignia / Corona) |
| 12 | Poem / Statue | Music / Tides (Música / Marea) |
| 13 | Anchor / Fence | Poem / Statue (Poema / Estatua) |

Hrg. 1196-98. Questions 14 through 16 are identical in the two tests, and then Questions 17 and 18 are inverted. Hrg. 1198.

The sequencing of the questions is potentially important, Dr. Seward testified, because the questions are sequenced in order of difficulty, and the administrator must stop asking questions after the subject has given three incorrect responses. Hrg. 1368-69. Despite the non-identical sequencing, Dr. Seward did not identify any particular questions for which the sequencing made a difference in Petitioner's IQ score. On the question of "Bud and Baby," for example, Dr. Seward disagreed with Dr. Weinstein's decision to give zero points (instead of two) for the answer "young." Hrg. 1155. The zero point response was Petitioner's third incorrect answer, so Dr. Weinstein stopped the questions. Hrg. 1155-556. Nevertheless, when Dr. Seward administered the English version of the test, Petitioner answered "don't know" to the next question, which was "Music and Tides." Hrg. 1272. The "don't know" response would have led to the termination of questioning, and thus, no additional opportunities for points. Hrg. 1272-73.

Dr. Seward pointed to other scoring errors that he perceived from Dr. Weinstein's testing data, including two excess points on one of the mathematical tests. Hrg. 1275. On cross-examination, however, Dr. Seward acknowledged that he reran Dr. Weinstein's data after correcting the perceived errors, measured Petitioner's IQ using American norms, and arrived at the same full-scale IQ score of 74. Hrg. 1277-78.

21

*Academic skills and history* – Dr. Seward stated that Petitioner's scores on the Kuhlman-Anderson IQ test were "near the range of Mental Retardation/ Intellectual Disability." Govt. Ex. 615 at 43-44. Those scores showed an IQ of 77 in first grade, 80 in second grade, 79 in third grade, and 74 in fifth grade. Hrg. 1298. Dr. Seward discounted the Kuhlman-Anderson scores for two reasons. First, he observed that the Kuhlman-Anderson test is group-administered and that the DSM requires an individually-administered IQ test in order to diagnose intellectual disability. Hrg. 1063-64, 1298; Govt. Ex. 615 at 44 n.9. Dr. Seward nevertheless acknowledged Dr. Welner's view that group-administered tests from an academic setting "may add very useful data when testing results are ambiguous or contradict the functional presentation across domains." Hrg. 1299; Pet. Ex. 80 at 640.

As a second reason for discounting the grade school IQ scores, Dr. Seward observed that Petitioner had an "impoverished upbringing" and "did not learn English until he was about 8 years old." Govt. Ex 615 (report) at 44. On cross-examination, though, Dr. Seward acknowledged evidence that contradicted his explanation. School records from Laredo showed that Petitioner flunked the first grade and was two years older than his classmates, even though the classes were taught in Spanish. Hrg. 1295-97. In addition, the sequence of Kuhlman-Anderson scores do not show a correlation between Petitioner's English improving and his IQ improving; instead, Petitioner's lowest score of 74 was obtained when he was in the fifth grade and almost 13 years old. Hrg. 1297-98; Pet. Ex. 13 at 3.

Concerning Petitioner's poor performance in school, Dr. Seward observed that Petitioner told him that he could have done better "if I pushed myself" but "I didn't care." Hrg. 1115-16. Dr. Seward also credited Petitioner's statement that he earned a high school diploma or GED while in prison, and that contemporaneous reports stated that he was performing well in his classes. Hrg. 1116-17. On cross-examination, Dr. Seward acknowledged that Petitioner had been given five years to complete high school courses, that the classes involved extensive one-on-one instruction, and that even after completing almost all of the high school classes (as of 1980), Petitioner tested on the WRAT at a 6.7 grade level for reading and a 4.3 grade level for mathematics. Hrg. 1317-19. In addition, neither Dr. Seward nor any other witness reported ever seeing an actual high school diploma or GED certificate in Petitioner's name. Hrg. 165, 599, 9229, 987-88, 1039-42, 1117.

Dr. Seward also administered the WRAT to Petitioner, with scores showing "low average" levels in math and overall reading. Hrg. 1107-08. Nevertheless, Dr. Seward found that Petitioner operated at a grade 10.9 level in the area of "sentence comprehension." Hrg. 1108. That level is "consistent with" Petitioner's claim of having read several hundreds of books while in prison, Dr. Seward testified. Hrg. 1109. Dr. Seward acknowledged the AAIDD's recognition of "masking," through which intellectually disabled persons exaggerate their abilities and accomplishments and minimize their limitations in order to appear non-disabled, as Petitioner may have done during portions of his interview with Dr. Seward. Hrg.

23

1349-57.

*Qualitative observations* – Dr. Welner testified that the intellectual deficits prong of the diagnosis depends not only on standardized test scores and academic data, but also eleven categories of "clinical expressions of intelligence." Hrg. 1422-23. Dr. Welner analyzed several such categories in concluding that Petitioner does not have the intellectual deficits required for prong one. For example, Dr. Welner explained that Petitioner is proficient at abstract thought, as evidenced by Petitioner's ability to describe the events surrounding George Zimmerman's shooting of Trayvon Martin in 2012 and the ensuing criminal trial of Mr. Zimmerman. Hrg. 1451-52. Dr. Welner also cited Petitioner's ability to think symbolically, such as by his statement that "I don't go to prostitutes because that's like Russian roulette." Hrg. 1452-53.

Dr. Welner added that Petitioner "learns from experience," based on Petitioner's reported ability to learn detailed tasks during his prison job at a print shop and to teach those same tasks to other prisoners. Hrg. 1457-58. Petitioner also demonstrates "criminal cunning," Dr. Welner explained. Hrg. 1478-79. Dr. Welner pointed to Petitioner's crime against Shirley Seddon, in which Petitioner created the setting for a rape by asking for a ride home from someone who already knew him. Hrg. 1478. To similar effect was the crime against Dorothy Knudson, in which Petitioner used a ruse of car trouble in order to lure the victim. Hrg. 1478-79.

24

On cross-examination, Dr. Welner acknowledged the AAIDD's disapproval of considering the subject's criminal activity or behavior in prison when determining whether the person is intellectually disabled. Hrg. 1575-78. Dr. Welner testified that he disagrees with the AAIDD's position. According to Dr. Welner, the AAIDD's position is based on "advocacy" instead of science, and it would require the clinician to ignore relevant information. Hrg. 1575-78.

As for "criminal cunning," Dr. Welner attributed that same quality to notorious Texas prisoner John Paul Penry, whose IQ was in the 50s or 60s. Hrg. 1586-90; *see also Penry v. Lynaugh*, 492 U.S. 302 (1989) (holding that the Eighth Amendment does not forbid executing "mentally retarded" persons), *overruled by Atkins v. Virginia*, 536 U.S. 304 (2002). As Dr. Welner explained to a Pennsylvania legislative committee, Mr. Penry had spotted a woman he found attractive, found out where she lived, broke into her house and raped her, then killed her because he concluded that she was likely to call the police. Hrg. 1588-90. The point that Dr. Welner was trying to convey during the Pennsylvania discussion was that Penry was in fact "mentally retarded" even though he had demonstrated "criminal cunning." Hrg. 1588.

### C.   Prong Two – Adaptive Deficits

### 1.   Petitioner's evidence

The AAIDD defines adaptive functioning as "the collection of conceptual, social, and practical skills that have been learned and performed by people in order

to function in their everyday lives." Hrg. 466-67; AAIDD-2010 at 43. The DSM-5 definition is essentially identical: "the ability to meet developmental and sociocultural demands for personal independence and social responsibility." Hrg. 467; DSM-5 at 33. Adaptive functioning falls into three categories: conceptual, social, and practical. Hrg. 468. The second prong of the diagnosis of intellectual disability requires deficits in any one of those three areas. Hrg. 468-69.

Dr. Weinstein explained that an adaptive deficit is one that requires supports in order for the person to function in society. Hrg. 67, 1753. Because the purpose of the diagnosis is to identify and furnish the supports that an intellectually disabled person needs in order to function, clinicians do not balance adaptive strengths against adaptive weaknesses; rather, an intellectually disabled person's strengths exist alongside the disability and independently of it. Hrg. 484-85, 1676-77; AAIDD-2010 at 7, 16; AAIDD-2012 at 25. In addition, the diagnostic standards do not consider the person's criminal activity (as opposed to typical day-to-day behavior), or behavior in the highly-structured environment of prison. Hrg. 1680-82, 1687; AAIDD-2010 at 45; AAIDD-2012 at 20.

*Conceptual deficits* – The conceptual domain includes skills like language, reading and writing, money, time management, number concepts, and more generally the ability to learn and achieve in a school setting. Hrg. 502. Petitioner's conceptual deficits are made most clear by what Dr. Weinstein described as "the consensus between all evaluators" that Petitioner has deficient reading skills and

26

has not achieved beyond the sixth grade level, even with the slightly more favorable WRAT results found by Dr. Seward. Hrg. 502-03, 506-07. In addition, Petitioner's grades in school were mostly D's and F's in the academic subjects, despite regular attendance. Hrg. 503. He twice flunked the ninth grade, then dropped out of school after the second attempt—at which point he was eighteen years old. Hrg. 505-06. Drs. Weinstein and Silva agreed that Petitioner's consistent academic troubles demonstrate qualifying conceptual deficits. Hrg. 501, 503-07, 866-70, 895-96.

*Social deficits* – Both examiners also found qualifying social deficits. Hrg. 468-69, 896. Dr. Weinstein described Petitioner as socially withdrawn and unable to communicate effectively. Hrg. 519, 532-35. That assessment relied on declarations from family friends during Petitioner's early years in Laredo, as well as from his siblings. Hrg. 516-19, 532-35; Pet. Ex. 56 (Hector Gallegos Declaration); Pet. Ex. 57 (Maria del Refugio Ruiz Declaration); Pet. Ex. 58 (Gloria Gonzalez Declaration); Pet. Ex. 51 (Francisco Rodriguez Declaration); Pet. Ex. 53 (Rosa Rodriguez Declaration). Childhood friend Gloria Gonzalez, for example, explained that "When we watched television, the other kids would talk and laugh about what was on, but Tito wouldn't." Pet. Ex. 58 at 2. "He didn't react to things. He just sat there quietly." *Id.*

Dr. Silva described a similar pattern of social withdrawal and avoidance. During childhood, Petitioner had considerable difficulty interacting with other

27

people, including his siblings and parents. Hrg. 855, 858-59. He avoided the family dinner table and spoke very little with anyone other than his two sisters. Hrg. 858. Dr. Silva also observed that, during Petitioner's adolescent years, he tended to gravitate toward younger peers, and most of Petitioner's friends were younger than he was by two years or more. Hrg. 859-60; *see also* Hrg. 533-34 (similar analysis from Dr. Weinstein).

Petitioner's social isolation persisted even when he was preparing to be released from prison in 1980, at which point he chose to return to confinement instead of living with his parents and preparing for life in the community. Hrg. 1344. A social worker made the following observation about Petitioner's time on "community pass":

> Al Rodriguez was contacted on 4-15-80 and 4-16-80 by telephone relative to his adjustment on community pass. Mr. Rodriguez reports constant fear of his vulnerability in the community. He is not socializing and he's apparently isolating himself in his parents' home. He states he only feels safe and comfortable at Minnesota Security Hospital and desires to return early from pass. His parents have encouraged him to remain in the community for several more days. Mr. Rodriguez is presenting (*sic.*) reluctant to pursue his release plan wanting to return full time to MSH until he's able to deal with his fears.

Pet. Ex. 19.

Some twenty-three years later, Petitioner was out of prison for six months before he was arrested for the crime in this case. Petitioner remained socially isolated during those six months, spending the bulk of his time in a cubicle-like space in his mother's basement. Hrg. 499-500, 608-09. Dr. Weinstein explained

28

that Petitioner's tendency to self-isolate, and to prefer prison over freedom, shows that he lacks the ability to interact successfully with other people. Hrg. 500. Petitioner has been incarcerated almost continuously since the age of 21. Hrg. 1653. The only exceptions are a one-month furlough in 1980 and a six-month period in 2003, and both of those stints ended with an arrest and prosecution. Hrg. 1653. "[F]or him imprisonment, although not a pleasant place, is safe[,] and somebody else is controlling his behavior and his unfortunate lack of ability to control himself," Dr. Weinstein observed. Hrg. 500.

In addition to his social isolation, Petitioner was easily victimized by his peers—further suggesting social deficits. Hrg. 532, 535-36. He "didn't say anything or do anything to stick up for himself" when peers would tease him about his large head, dark skin, or physical limitations that included a hand-tremor and a slight limp. Hrg. 535-36, 853-54; Pet. Ex. 53 at 8 (per Rosa Rodriguez); Pet. Ex. 51 at 1 (per Francisco Rodriguez). Petitioner would laugh along when being called "easy out" because of his poor baseball skills, even though the nickname hurt him. Pet. Ex. 53 at 8. He "got bullied a lot" as a child and tends to "avoid[] argument and confrontation." *Id.* at 12; Pet. Ex. 51 at 1. On one occasion, in the fourth grade, other children grabbed Petitioner and pulled his pants down in front of the class. Hrg. 536. Petitioner also displayed a tendency to accept the blame for his peers' acts of misbehavior, which suggests gullibility. Hrg. 532, 535 (per Dr. Weinstein), 954-55 (per Dr. Silva); Pet. Ex. 15 at 3 (probation report from 1980, stating

29

parents' observation that Petitioner "oftentimes accept[ed] the blame for things he was not involved with").

*Practical deficits* – Examples of practical skills include "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone." Hrg. 521; AAIDD-2010 at 44. In finding that Petitioner's practical skills are deficient, Dr. Weinstein pointed to observations from Petitioner's younger brother, Francisco "Paco" Rodriguez. Hrg. 528-30. Paco is two and a half years younger than Petitioner, but he "passed" his brother physically and mentally at the age of five or six, and socially around the age of 12. Hrg. 857; Pet. Ex. 51 at 1. Paco explained that Petitioner was not capable of working at their father's radiator shop or at the restaurant where their mother worked. Hrg. 528-29; Pet. Ex. 51 at 2. At the local sugar plant, Petitioner worked exclusively in the most simple and menial job—at the "pelletizer," a "smelly" job to which they assign "the dummies"—while Paco performed several jobs that were more difficult. Hrg. 529; Pet. Ex. 51. Petitioner has shown a diminished ability to learn skills, follow directions, and live independently. Hrg. 530.

*ABAS testing* – The DSM and AAIDD manuals recommend, but do not require, the administration of a standardized instrument to measure the subject's adaptive behavior. Hrg. 538-39; AAIDD-2010 at 43; DSM-5 at 37. Dr. Weinstein administered the Adaptive Behavior Assessment System (3d ed.) to two of

30

Petitioner's sisters, Sylvia D'Angelo and Rosa Rodriguez. Sylvia D'Angelo is eight years older than Petitioner and served as his caretaker from the ages of five to 21. Hrg. 539, 663-64; Pet. Ex. 44 at 13. The ABAS asks the reporter a number of questions about the subject's abilities and aptitudes. Dr. Weinstein acknowledged that the ABAS is not designed to be answered retrospectively (i.e., analyzing the adaptive skills of an adult by reflecting on the developmental period) Hrg. 538-40, 664-65. The task of measuring is made more difficult by the fact that Petitioner was 65 years old when his sisters completed the ABAS in 2018, so that both respondents were relying on their memory of Petitioner's functioning from decades earlier. Hrg. 538-40, 664-65. Dr. Weinstein testified that there are no adaptive behavior tests designed for retroactive application. Hrg. 664. Dr. Weinstein therefore placed a "caveat" on the results, and he explained that he would not rely exclusively on a retrospective ABAS score when evaluating adaptive deficits. Hrg. 539-40. He testified that the professional literature supports the use of retrospective evaluations in *Atkins* cases. Hrg. 665.

Caveats aside, the ABAS employs the same scoring structure as the WAIS-IV. The mean score is 100, the standard deviation is 15, and a score of 70 is two standard deviations below the mean. Pet. Ex. 44 at 13. Petitioner's composite score was 53 on Sylvia D'Angelo's questionnaire and 67 on Rosa Rodriguez's questionnaire. *Id.* Dr. Weinstein cautioned that the scores "are based on recollections and are affected by culture and living conditions." *Id.*; Hrg. 665.

31

Nevertheless, the ABAS results "reflect a consistent pattern of adaptive behavior deficits that buttress the information obtained from interviews and declarations." Pet. Ex. 44 at 13.

### 2.    The Government's evidence

*Dr. Seward's analysis* – Dr. Seward criticized Dr. Weinstein's use of the ABAS, observing that the test is not designed to be applied retrospectively. Hrg. 1150, 1311. On cross-examination, however, Dr. Seward acknowledged the AAIDD's allowance of such testing in *Atkins* cases. Hrg. 1312. The AAIDD encourages the examiner to "complement" such retrospective testing "with interviews that also focus on the relevant areas of adaptive functioning." Hrg. 1312; *see also* AAIDD, *The Death Penalty and Intellectual Disability* 193 (2015) ("AAIDD-2015") (Pet. Ex. 85).

Dr. Seward also offered several qualitative observations to support his opinion that Petitioner lacks adaptive deficits and does not require significant supports to function in society. Hrg. 1146-47. Among other things, Dr. Seward observed that:

●Petitioner discussed current events, including the WikiLeaks story and Edward Snowden, as well as the criminal prosecution of George Zimmerman for fatally shooting African-American teenager Trayvon Martin. Hrg. 1119-20; Govt. Ex. 628A, 628B. According to Dr. Seward, Petitioner's statements suggest that he can follow news stories, offer critiques, and carry on "a conversation with

somebody" as if "waiting in an airport or something like that." Hrg. 1121-22.

●Petitioner could drive a car, maintained his driver's license from prison by renewing it every four years with a vision test, learned how to operate the car in 2003 after two decades of incarceration, and ran local errands as well as a long distance trip to Laredo, Texas (albeit a trip that Petitioner had taken many times before). Hrg. 1127-33, 1345.

●Petitioner demonstrated "problem-solving" by concealing Dru Sjodin's murder and death. Hrg. 1133-35. Petitioner drove on back roads after Ms. Sjodin's death and left her body in a deep ravine. Hrg. 1134-35.

●In prison, Petitioner avoids certain foods (or quantities of foods) because of his diabetes, and was able to recite his medications to Dr. Seward. Hrg. 1141-43. In addition, Petitioner worked at the print shop for some 20 years during his incarceration in Minnesota. Hrg. 1144-45.

●Petitioner held a number of different jobs before his incarceration at the age of 21, including working as a janitor at school, as a farm laborer, and at the Crystal Sugar plant. Hrg. 1145-46.

On cross-examination, Dr. Seward acknowledged a number of countervailing clinical standards concerning how to diagnose intellectual disability. First, the AAIDD states that an assessment of adaptive functioning must not consider the subject's criminal conduct or behavior in a highly structured environment like prison. Hrg. 1314-15; AAIDD-2012 at 20.

33

Second, Dr. Seward acknowledged the AAIDD's list of "Common Stereotypes" that "must be dispelled" because they are incorrect and "unsupported by both professionals in the field and the published literature." Hrg. 1359-61; AAIDD-2012 at 26. Those stereotypes include the views that persons with intellectual disability:

(i)   "look and talk differently from persons from the general population";

(ii)   "cannot do complex tasks";

(iii)   "cannot get driver's licenses, buy cars, or drive cars";

(iv)   "do not (and cannot) support their families";

(v)   "cannot acquire vocational and social skills necessary for independent living"; and

(vi)   "are characterized only by limitations and do not have strengths that occur concomitantly with the limitations"

Hrg. 1359-61; AAIDD-2012 at 26.

The AAIDD's disfavor of stereotypes finds support in a longitudinal study of intellectually disabled people conducted by the U.S. Department of Education. Hrg. 1709-14. Dr. Weinstein explained, on rebuttal, that 79 percent of those studied were either employed or engaged in training or education toward employment; that 62 percent were registered to vote; that 42 percent had a savings account; that 39 percent had a driver's license; and that 36 percent lived or have lived independently. Hrg. 1710-14.

*Dr. Welner's analysis* – As explained above, Dr. Welner described the

34

AAIDD's requirement of ignoring prison behavior and criminal behavior as unscientific, driven by the organization's advocacy agenda, and misguided because it instructs clinicians "to ignore an aspect of a life as if someone's been suspended in animation." Hrg. 1575-78, 1613. Dr. Welner stated that he follows a "psychiatric and forensic psychiatric practice," which considers all diagnostically relevant information. Hrg. 1578, 1613-14.

Pursuant to his "psychiatric" approach, Dr. Welner credited Petitioner with a number of adaptive strengths. For example, Dr. Welner testified that Petitioner demonstrated "functional academic skills" because he overcame his early inability to speak English. Hrg. 1508-09. He attributed Petitioner's trouble in school to a lack of motivation as well as language problems and the family's seasonal migration. Hrg. 1509-12. Nevertheless, Dr. Welner explained, Petitioner became motivated to succeed in school when he was incarcerated at the Minnesota State Hospital, where he earned a GED. Hrg. 1509-12 ("[H]e learns quickly when he's particularly motivated.").

Dr. Welner also described Petitioner's "cognitive flexibility." Hrg. 1503-04. After sexually assaulting Shirley Seddon and Elizabeth Knudson, for example, Petitioner tried to gain each victim's sympathy so that neither would call the police. Hrg. 1506-08. During the crime against Ms. Sjodin, Petitioner placed a plastic bag over her head so that her blood would not leak onto the car upholstery, and he cleaned the car after the crime in an effort to avoid detection. Hrg. 1504-06.

35

Petitioner thereby "improvised," or showed the ability to adjust his actions based on changing circumstances. Hrg. 1504-05. Petitioner similarly improvised by driving Ms. Sjodin's body 22 miles to a location that was not visible from the road, Hrg. 1559-61, albeit in a place that might be traced to Petitioner because "I used to live there, pretty close by." Hrg. 1134-35. Later, Dr. Welner explained, Petitioner improvised when questioned by the police. Hrg. 1526, 1529-30. The police confronted Petitioner with a version of the facts, and Petitioner "conform[ed] his response to adapt to the known facts on the fly" by giving a phony alibi. Hrg. 1638-39.

Dr. Welner also relied on Petitioner's peaceable life in prison, among other circumstances. Petitioner spent some 40 years in prison, but he lived in the "honor unit," avoided becoming victimized by his fellow prisoners, and reportedly "adapt[ed] well to the needs of others." Hrg. 1514-15, 1535. Petitioner kept a clean cell, folded his shirts, shined his shoes, maintained appropriate hygiene, kept track of his diabetes medications, avoided excessive sweets, checked his glucose level, used biofeedback to help with hypoglycemia and headaches, and "interacted" with "healthcare professionals" by accepting a colonoscopy on one occasion and declining a flu shot on another. Hrg. 1535-42.

On rebuttal, Dr. Weinstein testified that Dr. Welner was not applying the diagnostic criteria for intellectual disability. Hrg. 1678-87. Among other problems with Dr. Welner's analysis, Petitioner's strengths may coexist with his weaknesses

and do not balance them out or cancel them. Hrg. 1677-78. Dr. Welner repeatedly relied on Petitioner's crimes, even though the AAIDD "clearly state[s]" that the examiner must not "consider criminal behavior as a basis to determine whether somebody has a disability or not." Hrg. 1687. Dr. Welner also relied heavily on Petitioner's conduct in prison, which is a highly controlled and structured environment. Hrg. 1678, 1681, 1685. The prison environment itself controls behavior because it provides an elaborate set of rules and swift consequences for breaking them—thus freeing the prisoners from having to exercise the same degree of impulse control that the outside world requires for successful functioning. Hrg. 1681, 1701 ("[I]t hides any deficits that he may have because he doesn't have to make any decisions."). Prison behavior is therefore irrelevant, Dr. Weinstein explained. Hrg. 1678-80, 1681.

D.    **Prong Three – Onset Before the Age of 18**

Although the witnesses disputed the severity and significance of Petitioner's limitations, they did not dispute that the limitations began before Petitioner reached adulthood. On the question of intellectual deficits, for example, Petitioner had difficulties in school, flunked numerous grade levels, and scored between 74 and 80 on four group-administered IQ tests. *See* Pet. Ex. 13 at 1, 3-4. On the question of adaptive deficits, Dr. Weinstein emphasized Petitioner's functioning before the age of 18, and based largely on contemporaneous documents and witness accounts from the developmental period. Hrg. 501-03, 520, 531, 541, 1679.

37

### E.    Risk Factors for Intellectual Disability

The AAIDD's manuals provide a list of recognized risk factors for intellectual disability, which are also set forth in Dr. Weinstein's report. Hrg. 469-70; Pet. Ex. 44 at 9; AAIDD-2010 at 60; American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 127 (10th ed. 2002) ("AAMR-2002" – Pet. Ex. 1). The AAIDD recognizes several types of risk factors, including biomedical factors (such as genetic disorders or birth injuries), social factors (such as poverty or institutionalization), behavioral factors (such as domestic violence or child neglect), and educational factors (such as inadequate special education services and inadequate family support). Pet. Ex. 44 at 9; AAMR-2002 at 127. Dr. Weinstein explained that risk factors validate a diagnosis of intellectual disability, even though they do not establish the diagnosis. Hrg. 470-72, 719-20.

Dr. Weinstein described numerous risk factors in Petitioner's background. Petitioner experienced malnutrition as a baby, when he was unable to tolerate breast milk and his mother fed him rice water for a period of several months until doctors warned that her baby was starving. Hrg. 473; *see also* Trial Tr. 7642-44 (Pet. Ex. 11) (testimony of Delores Rodriguez); Pet. Ex. 8 (pretrial memorandum from Angela Daniel) at 1. Dr. Weinstein explained that adequate nutrition is "critical for brain development." Hrg. 473. Another risk factor is Petitioner's exposure to neurotoxic pesticides, both *in utero* and as a young child. Hrg. 474-76;

38

Pet. Ex. 8 at 1. Other demonstrated risk factors include chronic poverty, physical abuse from Petitioner's father, parental neglect, the lack of appropriate interventions from Petitioner's school or any social service agencies, and sexual abuse as described at trial. Hrg. 475-78; Pet. Ex. 8 at 2; Pet. Ex. 9 at 1 (pretrial memo); Pet. Ex. 10 at 1 (pretrial memo); Pet. Ex. 12 at 2 (verdict form showing that seven jurors found that Petitioner had been sexually abused).

Dr. Silva explained that sexual abuse tends to make people (including Petitioner) avoidant of physical touch and fearful of social interaction even from parents and siblings. Hrg. 878-79. He also described Petitioner's childhood malnourishment and testified that it played a causal role in his neuropsychological problems and a cognitive disorder. Hrg. 885-86, 889. The family's poverty, on top of parental neglect, left Petitioner without help to overcome or compensate for his difficulties. The family struggled to make ends meet, so that "issues that have to do with mental illness were moved to the side." Hrg. 888.

Petitioner's developmental delays and poor academic performance suggest that "Mr. Rodriguez began to suffer from a neuropsychiatric developmental disorder with the onset dating to his infancy." Hrg. 890-91; Pet. Ex. 74 (report) at 47. Dr. Silva also observed that Petitioner's head circumference is 24.5 inches, which is three standard deviations above normal. Hrg. 996. Such enlargement is associated with people having disabilities. Hrg. 996; Pet. Ex. 74 at 49.

## II.    FACTS RELATING TO TRIAL COUNSEL'S INEFFECTIVENESS

### A.    Petitioner's intellectual disability

Petitioner was represented at trial by attorneys Richard Ney and Robert Hoy. At the evidentiary hearing before this Court, Ney testified that as learned counsel, he was primarily responsible for developing issues related to the penalty phase, including concerns about intellectual disability. Hrg. 16. Hoy remained primarily focused on the guilt phase.

Ney testified that prior to Petitioner's case, he had had some experience dealing with *Atkins* claims, having previously represented two clients where intellectual disability had been a potential issue. Hrg. 20. Before trial, Ney believed that Petitioner that "was not functioning at a low average intelligence," in light of Petitioner's prior IQ scores in the 70s and his own "significant" personal observations of Petitioner. Hrg. 84. Ney testified that he retained two experts to evaluate Petitioner for possible mitigation: neuropsychologist Karen Froming and clinical psychologist Marilyn Hutchinson. Ney asked Dr. Froming to evaluate Petitioner for any "neurological deficits, brain damage, intellectual deficits, literally anything she can tell us about his neurological makeup." Hrg. 79.

Dr. Froming tested Petitioner's intelligence using the WAIS-III. Hrg. 83. Dr. Froming reported Petitioner's full scale IQ score to be an 87. Hrg. 83. Ney testified that he was "surprised" that Petitioner scored an 87, and had expected his IQ score to be in "the seventies" Hrg. 84; *see also* Pet. Ex. 41 at 2 (Hoy notes from meeting,

stating that Petitioner's IQ was "higher than we expected"). In light of Petitioner's surprisingly high IQ score, counsel spoke with Dr. Froming about the scores and the Flynn effect. Hrg. 85. Although counsel initially recalled that Dr. Froming said that she had applied Flynn, he later testified that the 87 IQ score was the "raw" score. Hrg. 86. The 87 IQ score did not account for the Flynn effect or other scoring errors. Ney did not question any aspect of Dr. Froming's scoring of the WAIS-III. In fact, Ney testified that he never looked at Dr. Froming's raw data from the WAIS-III and "wouldn't have understood it, probably if I had." Hrg. 86. Dr. Froming informed Ney that because of the "numbers" (Petitioner's 87 IQ score), Petitioner was of low average intelligence and did not meet the criteria for intellectual disability. Hrg. 87. After that consultation Ney chose not to pursue an *Atkins* defense at trial. Hrg. 87.

Published in 2002, the American Association on Mental Retardation's manual was the authoritative guide to intellectual disability (then called "mental retardation") at the time of Petitioner's trial. *See* AAMR-2002 (Pet. Ex. 1). Ney was familiar with AAMR's manual—commonly referred to as the "red book"—at the time of Petitioner's case. Hrg. 23. The AAMR and the American Psychiatric Association expressly advised against using an IQ cutoff in assessing intellectual disability. Hrg. 27. Ney, however, determined that a current IQ score near 70 or below was an essential element to establishing intellectual disability: "In other words, we were looking for IQ numbers that at least put us in a clear range of

41

lower functioning with 70 tend[ing] to be[] the magic number, if you will." Hrg. 22. Ney thus determined that because Petitioner's IQ score was above what he believed to be the perceived cutoff for establishing intellectual disability; he "didn't look at adaptive functioning," and the trial team "didn't say: 'No matter what the number is let's look at criteria two'" (adaptive functioning). Hrg. 187. Consistent with Ney's understanding, Dr. Hutchinson testified at trial that Petitioner's IQ was above the "cutoff" level. Trial Tr. 7981-82.

Ney testified that his understanding of intellectual disability evolved shortly after Petitioner's trial. In the cases that he worked following Petitioner's trial, Ney said that IQ score was no longer the "driving factor" in determining whether someone fit the criteria for intellectual disability. Hrg. 22-23. In those subsequent cases, Ney pursued intellectual disability by investigating adaptive deficits even when IQ scores were in the "80s or high 70s." Hrg. 23. "IQ scores really don't mean as much as we thought they did and don't mean very much at all in a lot of cases," counsel said. Hrg. 179. Ney acknowledged that if he had known at the time of trial what he learned a few years later, he would have pursued an *Atkins* claim in Petitioner's case and would have retained an expert to address adaptive functioning. Hrg. 23, 180-81.

Ney's stated reasons for not pursuing a defense of intellectual disability were corroborated by mitigation specialist Ingrid Christiansen, who had been retained by Ney to investigate potential mitigation in Petitioner's case. Christiansen explained

42

that, although the legal team talked "a little" about intellectual disability as a possible defense, she was never directed by Ney, or anyone else on the legal team, to investigate adaptive functioning in the context of an intellectual disability claim. Hrg. 213, 239. Christiansen's mitigation investigation uncovered several "red flags" or risk factors for intellectual disability, as well as adaptive deficits. Hrg. 239-40. These red flags include malnutrition as a baby, exposure to neurotoxic pesticides *in utero* and as a young child, chronic poverty, neglect, physical abuse, sexual abuse, and adaptive deficits in all three categories: conceptual, social, and practical. Hrg. 214-40. Nevertheless, Ney never sought to have the trial Court preclude the death penalty on the basis of intellectual disability, nor did he present evidence of intellectual disability in mitigation at the penalty phase.

### B.    Toxin exposure

### 1.    Dr. Donald Ecobichon

Defense counsel learned of Petitioner's potential exposure to pesticides through discussions with the Rodriguez family and mitigation expert Ingrid Christiansen. Hrg. 38. The defense then retained a toxicologist, Dr. Donald Ecobichon, to assess Petitioner's exposure to neurotoxins. Hrg. 97. Counsel provided Dr. Ecobichon with summaries from Christiansen, records about pesticides used on farms in the Red River Valley, and Dr. Froming's report. Hrg. 98, 100-103. 364. Dr. Ecobichon did not review Petitioner's prison, medical, or mental health records. Hrg. 102. He did not interview Petitioner, his family, or

anyone in their community. Hrg. 108. And he did not visit any of the sites where Petitioner had been exposed to toxins.

Dr. Ecobichon informed counsel that it was "crucial" that counsel provide documentation of Petitioner's work history. Pet. Ex. 28 at 1. Counsel sent Dr. Ecobichon a summary of Petitioner's work in a sugar beet factory as a teenager. Pet. Ex. 31 at 2. Although Petitioner worked for over 20 years in the prison print shop where he was exposed to multiple chemical solvents, counsel did not provide these records to the expert. Hrg. 103. At the evidentiary hearing, counsel testified that he was unaware that Petitioner encountered toxins in the prison. Hrg. 103.

Prior to trial, counsel decided that Dr. Ecobichon would not testify about "evidence on [Petitioner's] specific case!" Hrg. 362; Pet. Ex. 49 at 2 (exclamation in original). Counsel believed that, by omitting information specific to Petitioner and the impact toxins had on his mental health, counsel avoided the protocol for Fed. R. Crim. P. 12.2, which would have required disclosure of an expert report to the prosecution. Hrg. 109, 362-63.

In the penalty phase of the trial, Dr. Ecobichon testified generally about toxic chemicals used in the Red River Valley area. Trial Tr. 7713. His testimony consisted of scientific terminology and a broad overview of toxins without any reference to Petitioner's life circumstances. For example, Dr. Ecobichon explained that exposure to toxins could lead to "poor learning skills, sleeping disorders," loss of comprehension, and impaired judgement. Trial Tr. 7749. But he did not explain

44

that Petitioner experienced many of these adverse effects, or why. Counsel elicited testimony that mothers pass toxins to their babies through breast milk. Trial Tr. 7722. But Dr. Ecobichon did not testify about Petitioner's negative reaction to his mother's breast milk and the consequences it had on his development. In keeping with counsel's decision, Dr. Ecobichon did not present any evidence that Petitioner's physical, medical, or psychological issues could be linked to neurotoxin exposure. Trial Tr. 7773-74.

On cross-examination, Dr. Ecobichon testified he did not "know for a fact whether [Petitioner] was directly exposed to A, B, C or D chemical, but given the problems with all of the migrant workers . . . I would say there is a pretty good chance that [Petitioner] was exposed. I couldn't tell you a level." Trial Tr. 7774. He admitted that "tens of thousands of people in this area have been exposed to these exact chemicals." Trial Tr. 7775. He likewise noted that he was unaware of the "quantities and conditions of" Petitioner's exposure to toxins. Trial Tr. 7775.

By his own admission, Dr. Echobichon's testimony applied to "everyone who happens to be living in the same area; Mr. Rodriguez's family, his neighbors, the other people who lived in Crookston and all throughout this area." Trial Tr. 7775. When asked by the prosecution, Dr. Ecobichon testified that he did not "suggest [a] connection between exposure to these farm chemicals and someone's propensity for violent crime." Trial Tr. 7782.

In closing arguments, the prosecution exploited the defense's skeletal

45

evidence. It argued that Dr. Ecobichon's testimony lacked any specific facts:

> On the issue of chemicals the defense called Dr. Ecobichon to explain the theory on chemicals hurting someone's brain. But when he testified he admitted no knowledge to what chemicals, if any, this defendant was exposed to in significant doses. There were hints regarding the defendant's hand tremor at that time, but then during the remainder of the defense case it was established that the hand tremor was a benign inherited tremor with no causation linked to chemicals.

Trial Tr. 8675. The Government emphasized Dr. Ecobichon's admission that he lacked knowledge of Petitioner's exposure to toxins or the severity and impact of such exposure. Trial Tr. 8675-76. The Government told the jury that the defense

> case fell utterly apart on any importance and what they call toxins, which we all know are farm inputs. On that and so many other points they wanted to make, the foundation simply was never laid.

Trial Tr. 8676.

Unsurprisingly, not one juror found that Petitioner "suffers from the effects of his exposure to toxins." Trial Tr. 8772-73; Special Findings Form, ECF Doc. 626, at 2. Relatedly, zero jurors found that Petitioner had neurological or psychological problems that impaired his ability to make sound decisions. Trial Tr. 8773.

### 2.   Dr. Andres Lugo

Undersigned counsel retained Dr. Andres Lugo, a medical toxicologist with over thirty years of experience. Pet. Ex. 67. Dr. Lugo assessed whether Petitioner had been exposed to highly neurotoxic chemicals, capable of affecting brain function. Pet. Ex. 68 at 1. To make this determination, he reviewed historical

46

documents and scientific studies on the areas where Petitioner was raised. He interviewed Petitioner at USP Terre Haute, and he examined Petitioner's medical records, prison records, and his neuropsychological and psychiatric evaluations. *Id.* at 2-3. Dr. Lugo also travelled to Laredo, Texas and Crookston, Minnesota to conduct in-person interviews with Petitioner's family and the community and to assess exposure sites. Hrg. 785-87; Pet. Ex. 68 at 2. At the evidentiary hearing, Dr. Lugo explained that these interviews provide social and cultural details that factored into his evaluation of the frequency and levels of Petitioner's toxin exposure. Hrg. 787.

Dr. Lugo conducted an exposure assessment in accordance with a United States Department of Health and Environmental Protection Agency protocol that was developed in the 1990s. Hrg. 788. He investigated Petitioner's exposure by (1) identifying toxic substances using records and interviews; (2) finding the environmental pathways that introduced toxins to Petitioner; (3) tracking the points of exposure to Petitioner's work or home; (4) finding the means of exposure such as inhalation, ingestion or otherwise; and (5) identifying Petitioner's susceptibility to neurotoxins. Hrg. 789-91.

First, Dr. Lugo identified toxic substances that Petitioner was exposed to as a child. He researched scientific studies and historical records about toxins used in the Red River Valley area. *Id.* at 7. He reviewed a 1990 interview with a farmer, Glenn Wiese, whose father hired migrant workers from southwest Texas towns

47

such as Laredo, including a migrant family with the surname Rodriguez. Pet. Ex. 69 at 2-3. Wiese explained that the workers thinned the sugar beet crop on their hands and knees. *Id.* In order to prevent the loss of crop, he used to spray Paris Green, a copper ester arsenate insecticide, which stays in the soil for a long time. *Id.* He also used the dangerous insecticide parathion. Pet. Ex. 69 at 24.

Dr. Lugo testified that Paris Green is a highly neurotoxic chemical that contains arsenic and copper. It can cause neural damage that results in tremors, numbness, or the loss of the ability to control extremities. Hrg. 797-800. Likewise, Dr. Lugo testified that parathion, an organophosphate insecticide, can cause neuropsychiatric problems and is especially dangerous to children. Hrg. 798-99. According to Dr. Lugo, Petitioner was exposed to these unsafe chemicals throughout his mother's pregnancy and well into his childhood. Hrg. 214-15, 230, 795. Petitioner's mother worked the sugar beet fields while pregnant with him. Hrg. 228-31. He was placed in the fields while he was an infant. Hrg. 228-231. Petitioner's exposure to insecticides continued within his home on the farm. Because of inadequate ventilation, chemical-filled dust accumulated. Hrg. 806-807. Petitioner drank contaminated water and ate food grown in contaminated soil. Pet. Ex. 68 at 3.

Dr. Lugo testified that Petitioner was also exposed to toxins in the prison print shop during his incarceration from 1980 to 2003. Hrg. 791-92; 814. For years, Petitioner spent several hours a day working for MinnCor, a prison company

48

offering printing services such as binding, assembly and signage. Hrg. 814; Pet. Ex. 68 at 13; Pet. Ex. 72. Petitioner worked with paints, ink, plastics, glues, turpentine, and chemical solvents. Hrg. 815. He recalled a consistently strong chemical odor, and his only protective equipment was a paper mask and latex gloves. Hrg. 815. In a 2002 photograph from the MinnCor website, a worker can be seen without protective equipment. Pet. Ex. 72. Dr. Lugo testified that inks are often made with heavy metals and solvents. Hrg. 815. Without protective equipment or special filtration systems, workers such as Petitioner inhale the solvents, which can lead to sustained changes in personality or mood as well as diminished impulse control. Pet. Ex. 68 at 13. Ultimately, Dr. Lugo determined that Petitioner has had lifelong exposure to highly neurotoxic and endocrine disrupting pesticides, as well as dangerous chemical solvents. Pet. Ex. 68 at 1.

Dr. Lugo testified that several of Petitioner's health and behavioral problems can be linked to his exposure to insecticides, including his headaches, lower intelligence, and disruptive behavior. Hrg. 810-12. Specifically, the toxins that Petitioner was exposed to affect the cortex of the brain that deal with retaining and processing information. Hrg. 802. The toxic chemicals can stop or slow down the brain's ability to transmit electrical impulses. *Id.* Dr. Lugo testified that these chemicals change the person's DNA, and the effects of these chemicals can emerge in adulthood after being latent for years. Hrg. 811.

Based on his investigation, Dr. Lugo testified that there was a connection

49

between Petitioner's exposure and his cognitive and behavioral problems. Hrg. 811, Def. Ex. 68 at 5. Dr. Lugo's conclusion conflicts with Dr. Ecobichon's statement that he was "not convinced that [Petitioner] was exposed seasonally to many organophosphorus or carbamate insecticides or there would have been some signs and symptoms of acute toxicity, however mild." Hrg. 804-05; Pet. Ex. 70. When asked to reconcile the difference in opinion, Dr. Lugo testified that Dr. Ecobichon did not conduct an epidemiological assessment. Hrg. 805.

## **ARGUMENT**

## I.    PETITIONER IS INELIGIBLE FOR THE DEATH PENALTY BECAUSE THE  EVIDENCE ESTABLISHES THAT HE IS INTELLECTUALLY DISABLED UNDER THE AUTHORITATIVE DIAGNOSTIC STANDARDS

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the United States Supreme Court ruled that the Eighth Amendment categorically bars the execution of intellectually disabled individuals. As the Court explained:

> Those mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes. Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct.

536 U.S. at 306. Alongside *Atkins*' constitutional protections, the Federal Death Penalty Act provides that "[a] sentence of death shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c).

The AAIDD and the APA have set forth the same three-part definition of

50

intellectual disability: (1) deficits in intellectual functioning/subaverage intellectual functioning ("prong one"), (2) deficits in adaptive functioning ("prong two"), and (3) onset before age eighteen ("prong three"). *See* AAIDD-2010 at 5; DSM-5 at 33; *see also Moore v. Texas*, 137 S. Ct. 1039, 1048-49, 1053 (2017) (recognizing the AAIDD manual and DSM-5 as authoritative). As the voluminous evidence summarized below shows, Petitioner satisfies all three criteria.

**A.    Petitioner's claim of intellectual disability must be determined by current diagnostic standards, which invalidate much of the Government's expert evidence**

The Court in *Atkins* recognized that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Atkins*, 536 U.S. at 318 (referring to the then-current diagnostic criteria for intellectual disability). *Atkins* excluded the "entire class" of intellectually disabled individuals from execution. *Id.* at 321. The determination of which individuals belong to that class must be "informed by the views of medical experts." *Hall v. Florida*, 572 U.S. 701, 721 (2014). The Supreme Court has disapproved the use of lay or other non-clinical definitions of intellectual disability when determining whether an individual should be exempted from the death penalty under *Atkins*. *See Moore*, 137 S. Ct. at 1049, 1052-53.

At issue in *Moore* was the Texas Court of Criminal Appeals' attempt to limit *Atkins*' protections to the "level and degree of mental retardation at which a

51

consensus of Texas citizens would agree that a person should be exempted from the death penalty." *Ex parte Briseño*, 135 S.W.3d 1, 6 (Tex. Crim. App. 2004), *abrogated by Moore*, 137 S. Ct. 1039. As relevant here, the Texas court adopted a "flexible" approach to prong one, observing that "sometimes a person . . . whose IQ tests below 70 may not be mentally retarded." *Id.* at 7 n.24; *see also id.* at 14 (crediting the trial court's finding that that petitioner's IQ scores of 72 and 74 "understated [his] intellectual functioning"). With regard to prong two, *Briseño* held that courts must evaluate adaptive functioning according to seven non-clinical factors that it deemed incompatible with a diagnosis of intellectual disability.[3]

    *Moore* rejected the Texas court's approach to *Atkins* claims as

---

[3] These seven factors, commonly referred to in subsequent case law and commentary as the "Briseño factors," were:

> (1) Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination? (2) Has the person formulated plans and carried them through or is his conduct impulsive? (3) Does his conduct show leadership or does it show that he is led around by others? (4) Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable? (5) Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject? (6) Can the person hide facts or lie effectively in his own or others' interests? (7) Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

*Briseño*, 135 S.W.2d at 8.

unconstitutional. 137 S. Ct. at 1044. The Court began by stressing that lower courts do not have "unfettered discretion to define the full scope of the constitutional protection" recognized in *Atkins*. *Id.* at 1052-53. Rather, courts are required to apply the "medical community's current standards" when assessing a claim of intellectual disability. *Id.* at 1053. Citing the current manuals from the APA and the AAIDD, the Court explained that "[r]eflecting improved understanding over time, . . . current manuals offer the 'best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Id.* (quoting DSM-5 at xli).

In reaching this conclusion, the *Moore* Court identified several problematic aspects of the Texas approach that are relevant to Petitioner's case. First, the Court faulted the Texas court's "flexible" approach to assessing intellectual functioning, rejecting the argument that courts may disregard IQ scores falling in the "lower end of the standard-error range" based on imprecise factors "unique" to the defendant. *Id.* at 1049. Mr. Moore had an IQ score of 74, which, "adjusted for the standard error of measurement, yields a range of 69 to 79." *Id.* Because this score placed him in the range for intellectual disability, the Texas court was wrong to conclude that he did not satisfy prong one. *Id.* at 1049-50. Rather, "where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits," prong one is established and courts must continue the inquiry on to prong two. *Id.* at 1050.

53

Second, the Supreme Court concluded that the Texas court had "overemphasized Moore's perceived adaptive strengths"—e.g., he "lived on the streets, mowed lawns, and played pool for money"—when "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." *Id.* at 1050 (emphasis in original).

Third, the Supreme Court reasoned that emphasis on Moore's conduct while in confinement was not relevant to a determination of intellectual disability under clinical standards. *Id.* at 1050. The Court observed that "[c]linicians . . . caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." *Id.* (citing DSM-5 at 38 and AAIDD-2012 at 20).

Fourth, the Court held that the Texas court's "attachment to the seven *Briseño* evidentiary factors further impeded its assessment of Moore's adaptive functioning." *Id.* at 1051. The Court explained that the *Briseño* factors had no basis in either medicine or law, but instead relied on inaccurate stereotypes of the intellectually disabled. *Id.* at 1051-52.

Current clinical standards, then, must guide the determination of whether Petitioner is intellectually disabled. *Id.* at 1053; *accord* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who *is* mentally retarded.") (emphasis added). That principle has several implications for Petitioner's case:

●A court cannot discount a qualifying IQ score based on imprecise or non-clinical assessments of Petitioner's perceived functioning. *See Moore*, 137 S. Ct. at

54

1049, 1052. *Compare, e.g.*, Hrg. 1451-52 (Dr. Welner relying on Petitioner's ability to discuss current events); *with* AAIDD-2012 at 26 (rejecting stereotype that "[p]ersons with ID look and talk differently from persons from the general population").

●The Flynn effect is recognized and required by the AAIDD, and its use falls within the "medical community's current standards" that govern Petitioner's claim. *Moore*, 137 S. Ct. at 1053; AAIDD-2012 at 23; AAIDD-2010 at 37. Even Dr. Seward did not testify *against* use of the Flynn effect, stating only that the principle is "controversial," while acknowledging that the AAIDD manual and user's guide provide the "governing standards … used in the ID community." Hrg. 1236, 1286-87, 1380-82.

●Petitioner's conduct in prison, as well as his criminal activity, do not bear on whether he is intellectually disabled or has qualifying adaptive deficits—despite Dr. Welner's and Dr. Seward's extensive reliance on Petitioner's "criminal cunning," his peaceable years behind bars, or his ability to maintain steady employment in a highly structured correctional setting. *Moore*, 137 S. Ct. at 1050; *Jackson v. Kelley*, 898 F.3d 859, 865 (8th Cir. 2018); AAIDD-2012 at 20.

●Perceived adaptive strengths do not balance against or "cancel out" demonstrated adaptive deficits, which must themselves be evaluated through clinical criteria instead of lay stereotypes. *Moore*, 137 S. Ct. at 1050; AAIDD-2010 at 47; AAIDD-2012 at 26. It does not impair Petitioner's claim, then, that he was

able to maintain his driver's license, drive a car and operate its electronic accessories, perform menial jobs outside of prison, or carry on a conversation as if he were "waiting in an airport or something like that." *Compare* Hrg. 1121-22, 1127-33, 1144-46, 1345 (describing such perceived skills), *with* AAIDD-2012 at 26 (incorrect counter-diagnostic stereotypes include that intellectually disabled persons "look and talk differently from persons from the general population," "cannot get driver's licenses, buy cars, or drive cars," "cannot acquire vocational and social skills necessary for independent living"; and "do not have strengths that occur concomitantly with the[ir] limitations").

### B. Petitioner has qualifying deficits in intellectual functioning

The standard error of measurement on an IQ test is "a statistical fact, a reflection of the inherent imprecision of the test itself." *Hall*, 572 U.S. at 723. Therefore, a full-scale IQ score of 75 or below is sufficient for prong one and requires the court to analyze prongs two and three. *Id.* at 712, 723; *Moore*, 137 S. Ct. at 1049-50; s*ee also Brumfield v. Cain*, 576 U.S. 305, 315 (2015) (IQ score of 75 was "squarely in the range of potential intellectual disability"); Hrg. 411-12, 415, 426-28; AAIDD-2010 at 31; DSM-5 at 37.

### 1. The Flynn-corrected full-scale IQ score of 70 obtained on Dr. Weinstein's administration of the WAIS-IV satisfies prong one, regardless of any other test results

Dr. Weinstein administered the WAIS-IV and reported Petitioner's full-scale IQ as 74, which reflects a 95 percent probability that Petitioner's true IQ is

56

between 69 and 79. Hrg. 418, 426-28; Pet. Ex. 44 at 11. An adjustment for the Flynn effect lowers Petitioner's score to 70, or a range of 65 to 75. Hrg. 432-33. Both ranges satisfy the intellectual deficit prong of the diagnosis. Hrg. 429, 433; AAIDD-2010 at 31; DSM-5 at 37.

### a.    *Prong one requires only a single valid qualifying IQ score*

The Court need not resolve any conflict between Dr. Weinstein's reported IQ score of 74 (Flynn-corrected to 70) and Dr. Seward's reported IQ score of 86 (corrected to 84). Rather, a court is required "to consider evidence of adaptive functioning if even one valid IQ test score generates a range that falls to 70 or below." *United States v. Wilson*, 170 F. Supp. 3d 347, 366 (E.D.N.Y. 2016); *United States v. Roland*, 281 F. Supp. 3d 470, 503 (D.N.J. 2017) (same). The defendant in *Wilson* had unadjusted test scores of 70, 76, 78, 78, 80, 80, 84, and 84. *Wilson*, 170 F. Supp. 3d at 373. Once adjusted for the Flynn effect, two of these tests yielded 95 percent confidence intervals that reached below 70. *Id.* Wilson therefore satisfied prong one—even though the court questioned Wilson's effort and behavior on both tests, as well as the effects of his language deficits on one of them. *Id.* at 373-75; *see also id.* at 372 ("[W]here application of the test-specific standard error measurement drawn to a confidence interval of 95% results in a range that reaches 70 or below, the defendant has demonstrated significantly subaverage intellectual functioning.").

The Texas Court of Criminal Appeals took the same approach on remand

from the Supreme Court in *Moore*. *See Ex Parte Moore*, 548 S.W.3d 552, 562 (Tex. Crim. App. 2018), *rev'd on other grounds sub nom. Moore v. Texas*, 139 S. Ct. 666 (2019). The state court in *Moore* observed that the prisoner had valid IQ scores of 74 and 78. *See id.* The court therefore ended its analysis of prong one and proceeded to prong two: "Because the score of 74 is within the test's standard error of measurement for intellectual disability (being within five points of 70), we must assess adaptive functioning before arriving at a conclusion regarding whether Applicant is intellectually disabled." *Id.*

**b.** ***Dr. Weinstein's WAIS-IV result is scientifically valid, notwithstanding criticisms from Dr. Seward***

Dr. Weinstein administered the WAIS-IV, which is the most widely-used IQ test among psychologists and has been described as the "gold standard." Hrg. 418. The Government and its witnesses offered several criticisms of Dr. Weinstein's test, but none of them undermines the scientific validity of Petitioner's Flynn-adjusted score of 70.

i.    *The Spanish-language test*

Dr. Seward criticized Dr. Weinstein's choice and administration of the test instrument. He observed that Dr. Weinstein administered the WAIS-IV in Spanish by using the Mexican-published version of the test, that Petitioner's preferred language is English, that the WAIS manual requires that the test be administered in the subject's chosen language, that the "Mexican version" of the test differs from the American "version," and that Dr. Weinstein scored some of Petitioner's

58

responses erroneously. Hrg. 1152, 1157-60, 1275, 1368-69.

These objections are insubstantial. Dr. Weinstein testified that he administered the Mexican-published test because that is the one he brought with him to the prison, based on his understanding that Petitioner is bilingual. Hrg. 671-74, 759, 1727-29, 1766. That particular test is not a different "version" from the American-published test. Rather, it is an approved translation of the same test, with minor differences for which Dr. Weinstein adjusted, such as the substitution of the American question concerning Abraham Lincoln for the Mexican question concerning Emiliano Zapata. Hrg. 436-38, 672-74, 693-94, 759, 1160, 1728-29.

Petitioner told Dr. Weinstein that he prefers to speak English, and Dr. Weinstein acquiesced to that preference. Hrg. 1728 ("That was his choice. I had to respect that."). The bilingual Dr. Weinstein read test questions in Spanish and English, and Petitioner generally answered in English. Hrg. 434, 1727, 1730-31. Dr. Weinstein discerned no reason to believe that his use of the Mexican-published test negatively affected Petitioner's score, and he noted that Petitioner had similar scores on two other intelligence tests that do not measure language skills. Hrg. 1732. Even accounting for the minor differences between the American- and Mexican-published tests and the alleged scoring errors, Dr. Seward did not even *contend* that Dr. Weinstein's use of the Spanish-language test had a lowering effect on Petitioner's score. Indeed, Dr. Seward re-ran Dr. Weinstein's testing data, corrected for all perceived errors, applied American testing norms, and arrived at

the same full-scale IQ score of 74. Hrg. 1277-78.

Objections such as Dr. Seward's do not prevent Dr. Weinstein's test result from satisfying prong one. *See, e.g.*, *Wilson*, 170 F. Supp. 3d at 373-74 ("[A]lthough the court finds that Wilson has satisfied the requirements of prong one, the court has several concerns about the reliability of these [two] results."); *Ex Parte Moore*, 548 S.W.3d at 562 n.78 (prong one satisfied by score of 74, even though expert testified that the competing score of 78 "was the most reliable because it was the only full scale IQ test administered during Applicant's developmental period").

    ii.    *American norms instead of Mexican norms*

Dr. Weinstein measured Petitioner's IQ by using American norms. Hrg. 435. Dr. Seward testified that the WAIS instructional manual does not allow the tester to administer one country's test while applying another country's norms. Hrg. 1169. Petitioner's full-scale IQ would be 89 with the use of Mexican norms, as opposed to the 74 that Dr. Weinstein obtained with American norms. Hrg. 1169. Since Dr. Weinstein administered the Mexican test, the argument goes, he should have used the Mexican norms.

The norm-based objection, too, is insubstantial. Dr. Weinstein did not administer the "Mexican" test. He administered a Spanish-language translation of the American test published in Mexico and substituted questions from the American test when the two differed—thereby testing Petitioner for general

knowledge expected of Americans. Hrg. 693-94, 1160. More fundamentally, there is no psychometric or other reason to measure Petitioner's performance against that of residents from Mexico, where Petitioner has never lived. Hrg. 438-40, 696-99, 760-63. The Court grasped that the use Mexican norms would yield a higher IQ score because Mexico's population has, on balance, fewer educational and social opportunities than America's population. Hrg. 772-74. Dr. Weinstein confirmed the Court's understanding that "when you normed this thing to Mr. Rodriguez to the U.S. population, you did so because he's an American who was educated in America." Hrg. 774. The Court's understanding is correct.

> iii.   *The Flynn effect*

Dr. Seward testified that the question of whether to correct individual IQ scores for the Flynn effect is a "controversy" among psychologists. Hrg. 1380-82. Dr. Weinstein testified at length to the contrary, explaining that the overwhelming majority of scholarly papers endorse the Flynn effect so that the subject's IQ score is accurately compared to the intelligence level of the population at time of the test. Hrg. 431-33, 707-08, 765-67.

The Court need not resolve the disagreement between Dr. Seward and Dr. Weinstein, for two independent reasons. First, the Flynn correction is now required as a matter of law. Petitioner's claim of intellectual disability must be measured by current diagnostic standards, including those of the AAIDD. *See Moore*, 137 S. Ct. at 1052-53. Those standards establish "best practices" that require a Flynn

adjustment in order to account for aging norms. AAIDD-2010 at 37; AAIDD-2012 at 23. Drs. Weinstein and Seward both described the AAIDD's manual and user's guide as authoritative. Hrg. 406-08, 1236, 1286-87.

Second, the issue is undisputed as a factual matter. Dr. Seward testified only that a "controversy" surrounds the Flynn effect. Hrg. 1380-82. But he did not testify *against* adjusting Petitioner's IQ scores to account for the Flynn effect as Dr. Weinstein had done. And Dr. Seward did not endorse the merits of any scholarly article reflecting the "controversy" he described. Hrg. 1380-82; Govt. Ex. 640. To the contrary, Dr. Seward acknowledged that the AAIDD's manual and guide set forth "the governing standards put out by the AAIDD and used in the ID community." Hrg. 1286-87.

      iv.    *Validation of the WAIS-IV score by other test results as well as educational records*

Dr. Weinstein administered three separate tests to evaluate Petitioner's intelligence: the WAIS-IV, the Comprehensive Test of Non-verbal Intelligence (CTONI-2), and the Test of General Reasoning Ability (TOGRA). Hrg. 417-22; Pet. Ex. 44 at 11. The latter two of those tests do not assess the subject's language abilities. Hrg. 419-21. Petitioner attained a score of 70 on the TOGRA and 64 on the CTONI-2. Pet. Ex. 44 at 11. The results of those tests validate the full-scale IQ score of 74 that Dr. Weinstein obtained on the WAIS-IV, and, because they are non-verbal tests, they dispel any implication that Petitioner scored poorly on the WAIS-IV because he took the Mexican-published translation that Dr. Weinstein

62

adapted. *See* Hrg. 1732 (Dr. Weinstein explaining that the WAIS score is "confirmed" because "[t]he scores are similar to the ones I obtained with the other two tests"). To be sure, Dr. Seward criticized Dr. Weinstein's use of the TOGRA because it is not intended for use in diagnosing intellectual disability. *See* Hrg. 1149. Dr Weinstein, however, clarified that he used the TOGRA to corroborate the WAIS-IV result, rather than to diagnose intellectual disability by itself. Hrg. 757, 1732

Moreover, Dr. Seward offered no criticism of Dr. Weinstein's selection or administration of the CTONI-2, which the AAIDD has recognized as a valid test of non-verbal intelligence, and which is sometimes used for persons with language difficulties. Hrg. 420-21; *see also* Govt. Ex. 643 (Welner report) at 95 ("Intellectual testing in Al Rodriguez confronts the challenge that English is his second language."); Hrg. 642 (per Dr. Weinstein, "I gave him a nonverbal test because he is bilingual."). The CTONI-2 provides a full-scale IQ score. Hrg. 421, 442, 639. Dr. Seward acknowledged that the CTONI-2 is an IQ test. Hrg. 1258-59. Dr. Welner describes the CTONI-2 as an "intelligence test" that "measures analogical reasoning, categorical classification, and sequential reasoning, using six subtests in two different contexts." Hrg. 1269; Pet. Ex. 80 at 643. Even standing by itself, Petitioner's score on the CTONI-2 "most certainly" satisfies prong one. Hrg. 442-43.

Petitioner's score of 74 on the WAIS-IV finds additional support in group-

administered IQ tests from his childhood. On the Kuhlman-Anderson test, Petitioner scored a 77 in the first grade, 80 in second grade, 79 in third grade, and 74 in fifth grade. Pet. Ex. 13 at 1, 3; Hrg. 443-44. Dr. Weinstein observed that the childhood scores are consistent with the one he obtained in 2018. Hrg. 444, 600. They also suggest that Petitioner's troubles in school did not disappear after he learned English. Hrg. 733-74. Indeed, Petitioner flunked multiple grade levels despite consistent attendance over the years, and he quit school at the age of 18 after failing the ninth grade for the second time. Hrg. 503-06, 601; Pet. Ex. 13 at 4. Petitioner's poor performance in school supports Dr. Weinstein's finding of intellectual deficits. Hrg. 454-55, 727-28.

Tests of Petitioner's academic skills provide yet additional corroboration of his low IQ. Petitioner took the Wide Range Achievement Test in 1980, 2006, 2013, and 2018. Pet Ex. 48. The WRAT scores show that Petitioner operates at the sixth grade level or below in both reading and mathematics, despite taking high school courses in a prison setting for five years. Hrg. 450-53, 741; Pet. Ex. 48. Dr. Weinstein concluded that Petitioner's WRAT scores are consistent with intellectual disability. Hrg. 453-54, 506-07, 740-41.

v.    *Corroboration by risk factors for intellectual disability*

No etiology is required to establish a diagnosis of intellectual disability, and the majority of intellectual disability diagnoses have no confirmed etiology. *See* AAIDD-2010 at 57-62. Nevertheless, the presence of risk factors can corroborate a

diagnosis of intellectual disability and explain its origins. *See id.*; DSM-5 at 39; Hrg. 471-72. The AAIDD manual and the DSM-5 both identify risk factors for intellectual disability, including biomedical factors that result in direct insults to cognition. *See* AAIDD-2010 at 60; DSM-5 at 39; Pet. Ex. 44 (Weinstein report) at 7-9.

Dr. Weinstein identified numerous risk factors in Petitioner's background, which are documented in the trial record and witness accounts. These include Petitioner's experience of malnutrition when he was an infant and a doctor described him as "starving," his prenatal and postnatal exposure to neurotoxic pesticides, as well as physical abuse from his father, chronic neglect by both parents, and sexual abuse as described by his sister. Hrg. 473-78. Adequate nutrition during infancy, in particular, is "critical for brain development." Hrg. 473.

vi.    *Dr. Welner's qualitative analysis*

Dr. Welner purported to analyze eleven categories of "clinical expressions of intelligence" to suggest that Petitioner does not have qualifying intellectual deficits. Hrg. 1422-23. Chief among these "expressions" is Petitioner's criminal activity, including the "criminal cunning" by which he arranged for Shirley Seddon and Dorothy Knudson to enter his car. Hrg. 1478-79. Another such "expression" is Petitioner's ability to hold down a steady job at a prison print shop and to teach the job to other prisoners, suggesting Petitioner's ability to "learn from experience."

65

Hrg. 1457-58. Still another "expression" is Petitioner's ability to understand and discuss current events (the Zimmerman case) and to think and speak figuratively (visiting prostitutes is "Russian roulette"). Hrg. 1451-53.

But Dr. Welner's assessment was thoroughly non-clinical by his own admission. Dr. Welner described the AAIDD as an "advocacy organization," and he rejected as unscientific the AAIDD's teaching against considering the subject's prison behavior or criminal activity when assessing intellectual disability. Hrg. 1575-78; AAIDD-2012 at 20 ("The diagnosis of ID is not based on the person's 'street smarts,' behavior in jail or prison, or 'criminal adaptive functioning.'"). That same teaching was adopted by the Supreme Court in *Moore*. *See* 137 S. Ct. at 1050 ("Clinicians, however, caution against reliance on adaptive strengths developed in a controlled setting, as a prison surely is.") (citing AAIDD-2012 at 20 and DSM-5 at 38). That teaching is binding on the Court whether or not Dr. Welner agrees with it. The Court should give little or no weight to findings that reflect Dr. Welner's express rejection of the governing diagnostic standards. *See*, *e.g.*, *Jackson*, 898 F.3d at 865 ("[A]lmost all of the skills that the district court appears to have given significant weight are those that Jackson may have developed in prison, which, according to *Moore* and the DSM-5, should not be heavily relied upon."); *Roland*, 281 F. Supp. 3d at 486 (discounting credibility of Government's expert neuropsychologist because "Dr. Morgan expressed numerous disagreements with the clinical standards on which this Court is instructed to rely .… and relied on

66

evidence that these clinical standards prohibit.").

Moreover, the abilities described by Dr. Welner—who has testified only once or "maybe twice" on an *Atkins* claim, Hrg. 1417—do not militate against a diagnosis of intellectual disability. What Dr. Welner describes as "criminal cunning" was embodied in the *Penry* case by a defendant whose IQ was in the 50s or 60s. Hrg. 1586-90. The trait as Dr. Welner describes it reflects little more than a defendant's ability to plan a crime and then adjust the crime to ongoing circumstances—in Penry's case, the defendant's decision to kill the victim after raping her, because he determined that she was likely to call the police. Hrg. 1588-90. The balance of Dr. Welner's conclusions reflect stereotyped but incorrect beliefs about intellectually disabled persons. *See* AAIDD-2012 at 26 (intellectually disabled persons "look and talk differently from persons from the general population," "cannot do complex tasks," "cannot acquire vocational and social skills necessary for independent living," and "do not have strengths that occur concomitantly with the limitations").

### 2. IQ scores obtained by Dr. Froming in 2005 and Dr. Seward in 2013 do not diminish Petitioner's qualifying intellectual deficits

"An IQ score is an approximation, not a final and infallible assessment of intellectual functioning." *Hall*, 572 U.S. at 722. Nevertheless, in support of their opinions that Petitioner is not intellectually disabled, Drs. Seward and Welner relied on the IQ score of 87 that Dr. Froming reached on the WAIS-III prior to trial, as well as the score of 86 that Dr. Seward reached on the WAIS-IV during

these post-conviction proceedings. Hrg. 1101, 1313; Govt. Ex. 615 at 36, 43-44; Govt. Ex. 643 at 95.

Neither of the two scores undermines Petitioner's satisfaction of prong one. As for Dr. Froming's score of 87, it is inflated by several points in light of Dr. Froming's admitted scoring errors, the Flynn effect, and the WAIS-III's faulty testing norms. Hrg. 455-60; Pet. Ex. 2 at 179; Pet. Ex. 103 at 5-6. Correcting for these factors leads to a full-scale IQ of 79, and a range of 74 to 84 that intersects Dr. Weinstein's range of 65 to 75. Hrg. 460 ("[I]t's the same score."). Drs. Seward and Welner did not dispute the appropriateness of these adjustments.

As for Dr. Seward's score of 86 (Flynn-corrected to 84), acceptance of that score would not disqualify Petitioner from satisfying prong one. There is no specific cut-off IQ score that disqualifies a person from a diagnosis of intellectual disability. Hrg. 460-65. "The psychiatric and psychological communities, including those specializing in the treatment of mental retardation, agree [that] a fixed point cutoff score for mental retardation is not psychometrically justifiable." *Jackson*, 898 F.3d at 863 (quotation omitted); *accord State v. Agee*, 364 P.3d 971, 983, 989-90 (Ore. 2015) (remanding for redetermination of intellectual disability claim in light of *Hall* and the DSM-5, where defendant's IQ scores were 82 and 84); *Foster v. State*, 848 So.2d 172, 175 (Miss. 2003) ("Even assuming that Foster's IQ is 80, that determination alone does not address all the criteria of *Atkins*.").

68

Even if the Court were to credit Dr. Seward's WAIS-IV result, the entirety of Petitioner's IQ scores would still document a qualifying intellectual deficiency because *all* of the scores "over the course of many years" are either "within the range of intellectual disability" or "approximately in the range." Hrg. 416 (per Dr. Weinstein); *see also* AAIDD-2010 at 27 (intellectual deficits require "an IQ score that is *approximately* two standard deviations below the mean, considering the standard error of measurement for the specific assessment instruments used and the instruments' strengths and limitations") (emphasis added). Petitioner's scores resemble those of other prisoners who have been granted *Atkins* relief. *See*, *e.g.*, *Wilson*, 170 F. Supp. 3d at 363, 392 (scores of 70, 76, 78, 78, 80, 80, and 84); *People v. Superior Court*, 155 P.3d 259, 261, 267-68 (Cal. 2007) (scores of 77, 78, 81, and 92); *Ex Parte Moore*, 587 S.W.3d 787, 788-89 (Tex. Crim. App. 2019) (finding Moore intellectually disabled, and having earlier found that his two valid IQ scores were 74 and 78).[4]

### C.    Petitioner has qualifying adaptive deficits

Adaptive functioning is "the collection of conceptual, social, and practical skills that have been learned and performed by people in order to function in their everyday lives." Hrg. 466-67; AAIDD-2010 at 43. This second diagnostic criterion

---

[4] Moore's IQ scores are described by the court's earlier ruling in *Ex Parte Moore*, 548 S.W. 3d at 562.

for intellectual disability requires deficits in at least one of three categories: conceptual, social, and practical skills, such that the person requires services or supports in that category in order to function in society. Hrg. 467-69, 1753. Drs. Weinstein and Silva identified Petitioner's deficits in all three domains, as described below.

Dr. Weinstein also conducted ABAS interviews with two of Petitioner's sisters, in order to evaluate Petitioner's adaptive functioning during the developmental period alongside other interviews, materials, and records. *See* Pet. Ex. 44 at 13; AAIDD-2015 at 1312 (practitioner may "complement" such retrospective testing with relevant witness interviews). The ABAS scores revealed deficits in all three domains, with a composite score of 53 from Sylvia D'Angelo and 67 from Rosa Rodriguez—both more than two standard deviations below the mean score of 100. Pet. Ex. 44 at 13.

### 1.  Conceptual deficits

The DSM-5 refers to the conceptual domain as the "academic" domain. DSM-5 at 37. The domain involves "competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others." *Id.* Drs. Weinstein and Silva described Petitioner's conceptual deficits in detail. Hrg. 501-07, 866-70, 895-96. Academic-skills testing across multiple evaluators revealed persistent deficits in reading and mathematics, with Petitioner unable to achieve beyond a sixth-grade

70

level. Hrg. 502-03, 506-07; Pet. Ex. 48. Petitioner failed multiple grade levels in school, was unable to complete the ninth grade even though he was eighteen years old during his second attempt, and earned mostly D's and F's in his academic subjects. Hrg. 503-06; Pet. Ex. 13 at 3-4.

The Government offered little relevant evidence on the specific issue of conceptual/academic deficits. Dr. Welner credited Petitioner with "functional academic skills" for overcoming his early inability to speak English. Hrg. 1508-09. He attributed Petitioner's trouble in school to a lack of motivation as well as language problems and the family's seasonal migration. Hrg. 1509-12. But the objective evidence disproves Dr. Welner's explanations. Petitioner's academic troubles persisted and even worsened after he learned English and the family stopped migrating, despite consistent school attendance. Pet. Ex. 13 at 3-4. Even after taking high school courses in prison, Petitioner functioned at or below a sixth-grade level on WRAT tests in 1980, 2006, 2013, and 2018. Pet. Ex. 48.

Both of the Government's experts ascribed conceptual-type skills to Petitioner based on his crimes. Dr. Seward credited Petitioner with "problem-solving" for concealing Ms. Sjodin's murder by transporting her body some twenty miles on back roads and then leaving her body in a deep ravine where passers-by would not notice it. Hrg. 1133-35. Dr. Welner similarly described Petitioner's "cognitive flexibility." Hrg. 1503-04. According to Dr. Welner, Petitioner "improvised" by placing a bag over Ms. Sjodin's head in order to prevent her

71

blood from staining the car, by placing her body in a remote location, by cleaning his car after the fact, and by manufacturing an alibi when the police confronted him. Hrg. 1504-06, 1526, 1529-30, 1559-61, 1638-39. Dr. Welner attributed similar "cognitive flexibility" to Petitioner's attempts to garner sympathy from Shirley Seddon and Elizabeth Knudson after sexually assaulting them. Hrg. 1506-08.

But Petitioner's crimes do not demonstrate conceptual abilities in a diagnostic sense. For one thing, Petitioner's supposed "problem-solving" and "cognitive flexibility" did not prevent his arrest and conviction for all of the crimes discussed. *See*, *e.g.*, Trial Tr. 6855 (per prosecution's closing argument, "Almost from the moment that Mr. Rodriguez started to talk to the agents at his job site, questions about his alibi and inferences of his guilt started to pile up."). More importantly, a defendant's criminal activity is irrelevant to adaptive functioning. *See* AAIDD-2012 at 20 ("Do not use past criminal behavior or verbal behavior to infer level of adaptive behavior."); *Jackson*, 898 F.3d at 866 ("That Jackson's potential adaptive strengths were used to commit these crimes does not mean that adaptive deficits related to subaverage intellectual functioning do not exist.").

### 2.    Social deficits

Petitioner is especially deficient in social functioning. Hrg. 468-69, 896. From his earliest years, Petitioner has been consistently described as socially withdrawn, avoidant, and unable to communicate with his family or age-

72

appropriate peers. Hrg. 516-19, 532-35, 855, 858-60; Pet. Ex. 51, 53, 56, 57, 58.

Petitioner's sister, Rosa Rodriguez, explained that:

> Tito wouldn't sit with all of us at the dinner table, he avoided being with us. He would get his food and go downstairs to his cave in the basement. Tito had his own bedroom next to the kitchen that had a bed, but most of the time he would prefer to sleep on a cot in the basement.

Pet. Ex. 53 at 5; *accord* Pet. Ex. 57 at 2 (per Maria del Refugio Ruiz, "Tito tended to just sit down and be quiet. His head was always up in the clouds somewhere, like he wasn't all there."); Pet. Ex. 58 at 2 (per Gloria Gonzalez, "When he was outside with us, he would usually sit quietly by himself and watch us play."). Petitioner is unable to interact with other people and seemingly prefers confinement over freedom. Hrg. 500; *see also* Pet. Ex. 19 (per social worker report in 1980, Petitioner felt "safe and comfortable at Minnesota Security Hospital" and wanted to leave home, end his "community pass," and return to confinement).

Dr. Weinstein, Dr. Silva, and Petitioner's siblings also described a consistent pattern of victimization during Petitioner's childhood. Hrg. 532, 535-36, 853-54; Pet. Ex. 51 at 1; Pet. Ex. 53 at 8-12. Petitioner "got bullied a lot" for his appearance and physical limitations, and yet he would not "say anything or do anything to stick up for himself." Pet. Ex. 51 at 1; Pet. Ex. 53 at 8. At other times, Petitioner would take the blame for acts of misbehavior committed by his peers and siblings. Hrg. 532, 535, 954-55; Pet. Ex. 15 at 3. Petitioner's history of victimization and gullibility suggests social deficits, Drs. Weinstein and Silva explained. Hrg. 532, 535-36, 854-55, 954-55.

73

As with Petitioner's conceptual deficits, the Government's relevant evidence was sparse. Drs. Seward and Welner both observed that Petitioner could carry on an adult conversation and describe current events like the WikiLeaks scandal and the Zimmerman/Martin case. Hrg. 1119-22, 1451-52. But the Court was correct to suggest that Petitioner may have been "parroting" what he heard from the "talking heads" on television. Hrg. 1666-67. In any event, Petitioner's mere *capacity* to converse during a court-ordered psychological examination does not contradict his lifelong social avoidance (Hrg. 499-500)—let alone the more general set of abilities possessed by intellectually disabled persons. *See* AAIDD-2012 at 26 (incorrect stereotype that the intellectually disabled "look and talk differently from persons from the general population").

Dr. Welner, who rejects the governing diagnostic standard of avoiding reliance on prison behavior, relied extensively on Petitioner's prison behavior. He credited Petitioner with successful "impression management" during his time in the Minnesota correctional system, and testified that Petitioner deftly "aligned himself" with different peer groups. Hrg. 1436-37. According to Dr. Welner, Petitioner "cultivated" among his peers the impression that he was a "big time drug dealer," and in so doing, avoided being victimized in prison as a sex offender. Hrg. 1436-37. More generally Petitioner avoided trouble during his forty years of Minnesota confinement, adapted well to the needs of other inmates, lived in the honor unit, and successfully "interacted" with correctional healthcare providers.

74

Hrg. 1514-15, 1535-42.

Dr. Welner's observations are, of course, contra-diagnostic. *See* AAIDD-2012 at 20 ("The diagnosis of ID is not based on the person's 'street smarts,' behavior in jail or prison, or 'criminal adaptive functioning.'"); *Moore*, 137 S. Ct. at 1050 (citing AAIDD-2012 at 20). Dr. Weinstein explained that prison is a highly-structured environment. Hrg. 1678, 1681, 1685. Adaptive functioning depends on whether a person can get along in society without services or supports. Hrg. 467, 1753; DSM-5 at 38. Prison is itself an ongoing support through which the institution dictates the social choices that an inmate would otherwise have to make on his or her own. Hrg. 1678-81, 1701.

### 3.    Practical deficits

Petitioner is also deficient in practical skills, and has been from the time of his childhood. Unlike his younger brother Paco, Petitioner was unable to help at his father's radiator shop or the restaurant where his mother worked. Hrg. 528-29; Pet. Ex. 51 at 2. Petitioner worked several menial and undemanding jobs before his lengthy incarceration, including the "pelletizer" position that the local sugar plant reserved for "the dummies." Hrg. 529; Pet. Ex. 51. Paco is two and a half years younger than Petitioner, but by the age of 5 or 6 he had mentally "passed" his older brother. Hrg. 857; Pet. Ex. 51 at 1.

Here as elsewhere, the Government's purportedly contrary evidence is unhelpful. Drs. Seward and Welner pointed out that Petitioner drove a car, kept his

75

driver's license, ran errands, and even learned how to use the car's accessories by reviewing the owner's manual. Hrg. 1126-33, 1345-46, 1483-84. But the ability to operate a car and maintain a driver's license is widely held among the intellectually disabled. *See* AAIDD-2012 at 26 (describing incorrect stereotype that intellectually disabled persons "cannot get driver's licenses buy cars, or drive cars"); Hrg. 1713. And even if Petitioner's ability to understand an owner's manual were an adaptive strength, it would not diminish his broader practical deficits. *See* AAIDD-2012 at 26 (incorrect stereotype that intellectually disabled persons "do not have strengths that occur concomitantly with the[ir] limitations"); *Moore*, 137 S. Ct. at 1050 (state court incorrectly weighed adaptive strengths against adaptive deficits).

Neither are practical deficits disproven by Petitioner's ability to work a series of menial jobs cited by Drs. Seward and Welner—such as a school janitor before his incarceration or on a drywall crew after his release. Hrg. 1145-46, 1549-52. Intellectually disabled persons are able to obtain and keep jobs. *See* AAIDD-2012 at 26; Hrg. 1710. Much like the "very worst" job that the sugar plant reserved for "the dummies," Hrg. 529, tasks such as janitorial work, farm labor, and sheetrock installation do not show an overall adequacy of practical skills that would allow Petitioner to live independently instead of rent-free in his mother's basement at the age of 50. Hrg. 238, 608-09.

Similarly unilluminating are various practical-type skills that Petitioner displayed during his decades in prison. Drs. Seward and Welner noted that

Petitioner monitors his diet on account of his diabetes, can recite his list of medications, and keeps himself and his prison cell in a neat and orderly state. Hrg. 1141-43, 1535-42. As explained elsewhere, behavior in prison does not bear on a person's adaptive functioning. *See* AAIDD-2012 at 20; *Moore*, 137 S. Ct. at 1050.

### D.    Petitioner's limitations originated before the age of 18

A diagnosis of intellectual disability requires the person's intellectual and adaptive deficits to have manifested before the age of 18. *See* AAIDD-2010 at 5; DSM-5 at 33. Evidence of Petitioner's intellectual disability has existed since his early childhood, including his school records and the facts of his impoverished social history that included malnutrition during his infancy. As detailed above, people who have known Petitioner since childhood attest that, throughout his youth and into adulthood, he exhibited intellectual and adaptive impairments that affected all facets of his life. Drs. Weinstein and Silva both concluded that Petitioner's limitations surfaced before the age of 18. Hrg. 501-02, 520, 531, 541, 890-91. The Government's experts did not contend otherwise.

### II.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT EVIDENCE OF PETITIONER'S INTELLECTUAL DISABILITY TO PRECLUDE THE IMPOSITION OF A DEATH SENTENCE AND AS MITIGATING EVIDENCE

Petitioner's intellectual disability precludes his death sentence, and trial counsel's failure to adequately investigate and litigate this fact "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Likewise, counsel's failure to present any evidence of Petitioner's

intellectual disability in mitigation constituted deficient performance that prejudiced the defense.

Capital counsel have an "obligation to conduct a thorough investigation of the defendant's background" for "all reasonably available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 522, 524 (2003); *Porter v. McCollum*, 558 U.S 30, 39 (2009); *Sinesterra v. United States*, 600 F.3d 900, 907 (8th Cir. 2010). As part of their duty to investigate, counsel must seek out and interview family members and others familiar with the client's life history and background, obtain records pertaining to the client's life history, and obtain appropriate evaluations by mental health experts. *Williams v. Taylor*, 529 U.S. 362, 416 (2000); *Wiggins*, 539 U.S. at 516; *Porter*, 558 U.S. at 39-41.

Moreover, simply retaining an expert does not fulfill defense counsel's duty to investigate the client's impairments. Counsel must also effectively consult with the experts they retain, develop an understanding of the subject matter for which the experts were hired, and also choose experts with the area of expertise necessary for the needs of the case. *See Siehl v. Grace*, 561 F.3d 189, 198-99 (3d Cir. 2009); *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007); *Showers v. Beard*, 635 F.3d 625, 631-34 (3d Cir. 2011). Finally, counsel's obligations to investigate, develop, and present adequate mitigation extends to the defense of intellectual disability. *See, e.g.*, *Harris v. Sharp*, 941 F.3d 962, 977 (10th Cir. 2019) (counsel ineffective for failing to move to preclude death penalty when he possessed

significant evidence of Petitioner's difficulties in intellectual and adaptive

functioning); *Ramirez v. Ryan*, 937 F.3d 1230, 1248 (9th Cir. 2019) (cause

established under *Martinez v. Ryan*, 566 U.S. 1 (2012), to excuse default of

substantial claim of ineffective assistance of trial counsel for failure to pursue and

present mitigating evidence of intellectual disability); *Wesson v. Jenkins*, No. 5:14

CV 268, 2020 WL 1066531 (N.D. Ohio Mar. 5, 2020) (same, despite trial

counsel's having consulted with an expert on the issue).

A.    **Counsel misapprehended the diagnostic criteria to establish intellectual disability under *Atkins v. Virginia***

Prior to trial, counsel Richard Ney believed that Petitioner was likely

intellectually disabled. Hrg. 84. Counsel discerned this possibility from school

records and intelligence testing that fell near or within the intellectual disability

range. Counsel's personal observations of Petitioner also led him to believe that

Petitioner was functioning below the "low average" level indicated by previous IQ

scores that ranged from 74 to 80. Hrg. 84. While preparing for the trial, counsel's

mitigation specialist, Ingrid Christiansen, collected a variety of records and

conducted interviews with Petitioner's family and friends that uncovered several

risk factors for intellectual disability that supported counsel's suspicions. Hrg. 239-

40.

Counsel retained Dr. Karen Froming to evaluate Petitioner for any

"neurological deficits, brain damage, and intellectual deficits, literally anything she

can tell us about his neurological makeup." Hrg. 79. Dr. Froming tested

79

Petitioner's intelligence using the WAIS-III and determined his full scale IQ to be 87. Hrg. 83. Ney testified that he was "surprised" that Petitioner scored an 87, and he had expected his IQ score to be in "the seventies." Hrg. 84. Dr. Froming advised counsel that the IQ score excluded Petitioner from meeting the diagnostic criteria for intellectual disability. Hrg. 87. Counsel decided not to pursue an *Atkins* defense based on the IQ score alone. Counsel was "looking for IQ numbers that at least put us in a clear range of lower functioning with 70 tend[ing] to be[] the magic number, if you will." Hrg. 22, 27.

Counsel's sole reliance on IQ testing to determine intellectual disability was clinically and legally wrong. At the time of Petitioner's trial, the diagnostic criteria for intellectual disability were set forth in the 10th edition of the American Association of Mental Retardation's manual, published in 2002. Hrg. 23-24; Pet. Ex 1. Counsel testified that he was familiar with the AAMR manual at the time of trial and that the manual set forth the definition of "mental retardation" as a "disability characterized by significant limitation in adaptive behavior as expressed in conceptual, social, and practical adaptive skill . . . (that) originates before 18." *Id*. at 24. Counsel testified that this definition was consistent with his understanding of intellectual disability at the time of trial, Hrg. 25, and that the AAMR manual was "the Bible of mental retardation at the time." Hrg. 26.

When presented with the AAMR manual at the evidentiary hearing, counsel agreed that the AAMR and American Psychiatric Association (publisher of the

80

DSM-IV-TR) expressly advised against using a fixed cutoff IQ score in assessing intellectual disability: "It is clear that neither of these organizations intends for a fixed cutoff point for making the diagnosis of intellectual disability. Both specify consideration of adaptive behavior skills and the use of clinical judgment." Hrg. 27; Pet. Ex. 1 at 58. Despite the clear admonishment in the AAMR and DSM to avoid using a fixed IQ cutoff score, counsel did just that, and stopped pursuing intellectual disability as a viable defense solely because of Petitioner's reported score of 87 on the WAIS-III.

> **1.      Counsel's decision to abandon an *Atkins* defense due to his misapprehension of the law and controlling diagnostic criteria was not a reasonable strategic decision**

Counsel has a duty to know and understand the law. The U.S. Supreme Court has held that "ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point [is] a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (counsel's misunderstanding of discovery procedure rendered counsel's performance deficient). Counsel's misapprehension of the law and the diagnostic criteria governing intellectual disability was not a reasonable basis to abandon Petitioner's *Atkins* defense.

*Atkins* itself described and relied on "clinical definitions of mental retardation." 536 U.S. at 318. It was therefore incumbent on counsel to know those

definitions and apply them to Petitioner's case. Had counsel adequately researched this issue before deciding to drop intellectual disability as defense, he would have learned that courts had followed the AAMR and DSM in rejecting a cutoff IQ score. *See*, *e.g.*, *State v. Gumm*, 864 N.E.2d 133, 657-58 (Ohio Ct. App. 2006) (despite having multiple IQ tests over 70, Gumm rebutted the presumption that he was not intellectually disabled by demonstrating "significant[] subaverage intellectual functioning and significant limitations in social, self-direction, and functional-academics adaptive skills"); *State v. Lott*, 779 N.E.2d 1011, 1014 (Ohio 2002) (IQ tests are a factor to be considered but not sufficient alone to make a final determination on the issue); *In re Hawthorne*, 105 P.3d 552, 557 (Cal. 2005) ("[A] fixed cutoff is inconsistent with established clinical definitions and fails to recognize that significantly subaverage intellectual functioning may be established by means other than IQ testing.").

Counsel's reliance on Dr. Froming's IQ score of 87, without understanding the correct law and diagnostic criteria himself, constitutes deficient performance. Counsel cannot merely retain an expert and then abandon all further responsibility on a particular issue; counsel must understand the operative legal standard and then equip the expert with evidence relevant to meeting that standard. *See Wilson v. Sirmons*, 536 F.3d 1064, 1089-90 (10th Cir. 2008) ("[C]ounsel must at a minimum continue to exercise supervisory authority over the expert. . . . Only once either the expert or counsel has consulted all readily available sources can counsel's reliance

on the expert's opinion be reasonable."); *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999) ("[A]n attorney ha[s] a responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request.").

### 2.    Counsel failed to make reasonable inquiry into Dr. Froming's reported IQ score of 87, in light of counsel's surprise at the score as well as counsel's notice of facts showing that the score overstated Petitioner's intellectual functioning

Trial counsel failed to recognize scoring problems in the WAIS-III test administered by Dr. Froming, which yielded an artificially inflated IQ score of 87—as explained in a scholarly article in counsel's file that counsel acknowledged having read, and which described the WAIS-III's faulty testing norms. *See* Hrg. 33; Pet. Ex. 2 at 179. In addition, the Flynn effect lowers Dr. Froming's score by three to four points beyond the 2.34 point reduction for faulty norms—also available to the trial team and as later described by Dr. Weinstein at the hearing. Hrg. 32-33, 455-69; Pet. Ex. 2.

Counsel failed to recognize any of these issues in Dr. Froming's scoring. First, counsel testified that he was aware of the Flynn effect at the time of Petitioner's trial and understood its implementation in reducing raw IQ scores. Hrg. 30-33; Pet. Ex. 2. And although counsel did not clearly recall his discussions with Dr. Froming about the Flynn effect (Hrg. 85-86), a Flynn correction was not

83

reflected in the 87 IQ score.[5] Second, counsel possessed literature about the scoring problems in the WAIS-III, and had an obligation to ask Dr. Froming if the 87 IQ score accounted for this error. Lastly, counsel had an obligation to ask Dr. Froming to review her own scoring for possible errors (as she later did on post-conviction review) in light of counsel's own surprise that Petitioner's IQ score was so high. Had counsel taken these basic steps, Dr. Froming's inaccurate score of 87 would have been adjusted to a score in the range of 74 to 84. Hrg. 457-60.

When counsel asked Dr. Froming to conduct an IQ test of Petitioner, counsel believed that Petitioner would score in the "seventies" Hrg. 84. Counsel was also aware of Petitioner's low IQ scores from childhood and his history of low academic achievement, and he believed that Petitioner was functioning below a "low average intelligence level" based on Petitioner's interactions with counsel. Hrg. 84. In this context, Dr. Froming's IQ score of 87 rightfully gave counsel pause. Hrg. 85. Nevertheless, rather than investigating possible problems with Dr. Froming's scoring, counsel merely scratched the surface by asking whether the 87 IQ score reflected the Flynn effect. Counsel never looked at Dr. Froming's raw data and never attempted to understand it. Hrg. 86. Nor did counsel review the raw

---

[5] Counsel recalled having some discussion about with Dr. Froming about the Flynn effect. He initially testified that Dr. Froming told him that she had applied the Flynn effect to Petitioner's score, Hrg. 85, but later corrected this, adding that the 87 IQ score was her "raw data." Hrg. 86.

data with Dr. Froming to ascertain if there were mistakes, or ask that Dr. Froming do so herself. Counsel simply accepted Dr. Froming's result without serious inquiry or explanation.

Counsel's failure to review and understand Dr. Froming's scoring in this context constitutes deficient performance. His testimony that he "wouldn't have understood it probably" is not a reasonable basis for abandoning a viable *Atkins* defense in a capital trial. Based on what counsel already knew about Petitioner's intellectual functioning, "the known evidence would [have] le[d] a reasonable attorney to investigate further." *Andrus v. Texas*, 140 S. Ct. 1875, 1883 (2020) (quoting *Wiggins*, 539 U.S. at 27).

## B.    Counsel failed to develop and present evidence of adaptive deficits

Counsel also failed to consider adaptive deficits and risk factors in support of an *Atkins* defense. As previously discussed at length, Petitioner's record is replete with risk factors for intellectual disability and adaptive deficits. In terms of risk factors, Petitioner's background revealed malnutrition as a baby, exposure to neurotoxic pesticides *in utero* and as a young child, chronic poverty, neglect, and physical and sexual abuse, among others. Hrg. 214-25, 230-31, 240. In terms of deficits in conceptual, social, and practical functioning, Petitioner had deficient reading and academic scores, he was socially withdrawn and unable to communicate effectively, and he could only perform menial jobs and demonstrated a diminished ability to learn skills and live independently. Hrg. 226-29, 232-40.

85

Mitigation specialist Ingrid Christiansen explained that Petitioner's life history is rife with examples of adaptive deficits and risk factors, which are "red flags" for a defense of intellectual disability. Hrg. 239-40. Christiansen described Petitioner as "very immature." Hrg. 233. Petitioner would "endlessly" discuss his high school social life, and "[i]t was as though you were talking to a third grader." Hrg. 232-33. Petitioner was repeatedly punched, pinched, made fun of, and bullied by his childhood peers; he felt like an "outsider," and his teacher made him sit in the back of the class. Hrg. 235-36. Petitioner was never able to live independently, and he worked only short stints at simple jobs, such as on farms or at a gas station. Hrg. 237-39. Christiansen acknowledged that counsel chose to abandon an *Atkins* defense without specifically investigating possible risk factors and adaptive behavior. The legal team talked "a little" about intellectual disability as a possible defense, but Christiansen was never directed by counsel, or anyone else on the legal team, to investigate adaptive functioning in the context of an intellectual disability defense. Hrg. 213, 239.

At the evidentiary hearing, counsel acknowledged that his understanding of intellectual disability changed after Petitioner's trial. An IQ score was no longer the "driving factor" in determining whether someone fit the criteria for intellectual disability, and Ney pursued intellectual disability claims by investigating adaptive deficits even when IQ scores were in the "80s or high 70s." Hrg. 22-23. In those cases, counsel said that he would "hire an expert in what's called adaptive

86

functioning or adaptive behavior to take a closer look at the individual based on that specialty." Hrg. 22-23. Counsel acknowledged that if he had known at the time of trial what he learned merely a few years later, he would have pursued an *Atkins* defense in Petitioner's case. Hrg. 23, 180-81.

### C.   Petitioner was prejudiced

Petitioner was prejudiced by counsel's deficient performance. For all of the reasons set forth above, there was sufficient evidence from which to develop and litigate an *Atkins* defense prior to trial. Had counsel adequately apprised himself of the relevant law and controlling diagnostic criteria, evaluated potential scoring errors in Dr. Froming's administered WAIS-III, and investigated risk factors and adaptive behavior, there is a reasonable probability that counsel would have established Petitioner's intellectual disability by a preponderance of the evidence and that the trial Court would have precluded the death penalty.[6] *See* American

---

[6] Most district courts have held that, once such a defense is interposed, the question of intellectual disability should be resolved by the court itself at a pretrial evidentiary hearing, with the burden on the defendant by a preponderance of the evidence. *See United States v. Roland*, 281 F. Supp. 3d 470, 474 & n.5 (D.N.J. 2017); *United States v. Montgomery*, 2014 WL 1516147 at *4 (W.D. Ten 2014); *United States v. Williams*, 1 F. Supp. 3d. 1124, 1134 (D. Haw. 2014); *United States v. Wilson*, 922 F. Supp. 2d 334, 342-43 (E.D.N.Y. 2013); *United States v. Lewis*, 2010 WL 5418901, at *1 (N.D. Ohio 2010); *United States v. Shields*, 2009 WL 10714661, at *2 (W.D. Tenn. 2009); *United States v. Davis*, 611 F. Supp. 2d 472, 474 (D. Md. 2009); *United States v. Hardy*, 644 F. Supp. 2d 749, 751 (E.D. La. 2008); *United States v. Sablan*, 461 F. Supp. 2d 1239, 1241 (D. Colo. 2006); *United States v. Nelson*, 419 F. Supp. 2d 891, 893-894 (E.D. La. 2004).

Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* § 10.8 Commentary (2003) ("Because of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case.")

Petitioner was also prejudiced by the jury's inability to consider evidence of intellectual disability as a mitigating circumstance. *See United States v. Hardy*, 644 F. Supp. 2d 749, 750 (E.D. La. 2008) ("If the Court concludes that Hardy has failed to establish his mental retardation by a preponderance of the evidence at the pretrial hearing, Hardy may still present evidence and argue his alleged mental retardation to the jury"); *United States v. Williams*, Crim. No. 06-00079, 2014 WL1669107, at *4 (D. Haw. Apr. 25, 2014) (defendant allowed to present evidence of intellectual disability to the jury as mitigation at sentencing hearing, even though not as determinant of eligibility for death penalty). In both *Williams* and *Hardy*, the defendants were initially unsuccessful in their pre-trial attempts to preclude the death penalty, but nonetheless presented evidence of intellectual disability to the jury during the penalty phase. Petitioner's counsel, however, made no presentation of intellectual disability to either the Court or the jury.

The prosecution's closing argument encapsulates the harm done by counsel's failure to present Petitioner's intellectual disability as a mitigating circumstance. From the prosecution's perspective, Petitioner was reduced to a

88

sexual predator, with no serious mental health problems or other impairments to justify a sentence of less than death. The Government used Petitioner's supposed lack of intellectual disability as a weapon against him, arguing in closing:

> Dr. Hutchinson took a look at the childhood photograph of the Defendant and proclaimed his head to be big. Big compared to what? Big how? No measurements. No medical records or doctors who examine the Defendant. Nothing direct. Just inferences and nonsense in a court of law. This is the nature of the case in mitigation. Put it up, hope it sticks. Dr. Hutchinson claimed that when kids have big heads, that sometimes can signify autism or retardation. Of course you recall that Mr. Reisenauer caught and asked Dr. Hutchinson whether she had any evidence that the Defendant is autistic or retarded. No was her answer, neither of those. She should guess not. IQ of 87, able to converse with psychiatrists for five hours, 500 books in a period of a couple years, rattle off all the authors. Why mention it then? Just another cloud to blast up into the air hoping that no one is going to notice.

Trial Tr. 8686-84.

This simplified characterization by the Government of Petitioner as "not retarded" was far from reality, and indeed, intellectual disability affected all aspects of Petitioner's life. Evidence available to trial counsel, and as presented at the evidentiary hearing, described Petitioner as malnourished as a baby, exposed to toxins as a child and teenager, unable to keep up at school, plagued by feelings of inadequacy, marked as an easy target for sexual and physical abuse, socially isolated within his family and beyond, and unable to live independently at any point of his adult life—all related to his intellectual disability. Petitioner's limitations and impairments would have given the jury a compelling reason to spare his life. *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[E]vidence about

89

the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.") (quotation omitted). Had counsel performed effectively, there is a reasonable probability that at least one juror would have rejected the Government's superficial arguments about Petitioner in favor of death, and sentenced Petitioner to life. *Wiggins*, 539 U.S. at 536.

## III.   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO ADEQUATELY INVESTIGATE AND PRESENT EVIDENCE OF PETITIONER'S LIFELONG EXPOSURE TO TOXINS AND THE EFFECTS OF THAT EXPOSURE

Mr. Rodriguez was denied his Sixth Amendment right to the effective assistance of counsel. Because of trial counsel's ineffectiveness, the mitigation presentation did not include Petitioner's well-documented exposure to toxins and the deleterious effects of this exposure. At the evidentiary hearing, Dr. Andres Lugo testified that Petitioner, the son of migrant farm workers, spent his childhood exposed to dangerous insecticides that contained arsenic and copper. Hrg. 796-97; 806-07; Pet. Ex. 68 at 6. His mother worked the fields that contained these insecticides during her pregnancy. Hrg. 214-15, 230, 795. When Petitioner was an infant, his mother laid him on the ground as she moved from row to row on her hands and knees while thinning sugar beet plants. Hrg. 228-31. Dr. Lugo testified that Petitioner's family lived on the farm, drinking contaminated water and eating food grown in contaminated soil. Hrg. 806-07. Because of poor ventilation and

90

poor hygiene, the family had no reprieve from the chemicals inside of their living quarters. *Id.*; Pet. Ex. 68 at 6.

Petitioner's exposure to chemicals continued throughout his adulthood. His first adult job was working at the American Crystal Sugar Plant, where he handled harvested beets and alfalfa. Pet. Ex. 29 at 2 (Ney informs Dr. Ecobichon about Petitioner's job and opines that this potential exposure may result "in a kindling effect linked to his earlier exposures"). While incarcerated, Petitioner worked for MinnCor, a printing company that operated within the prison. Hrg. 791-92; 814. At the print shop, Petitioner was exposed to heavy metals and solvents while cleaning equipment. Hrg. 814; Pet. Ex. 68 at 13; Pet. Ex. 72. He lacked protective gear and was repeatedly subjected to damaging chemicals. Hrg. 815. His lifelong exposure to chemicals had a cumulative effect—because he was poisoned by insecticides as a child, he was more vulnerable to the effects of toxins at the print shop. Hrg. 819-20.

According to Dr. Lugo, Petitioner's exposure to neurotoxins was a contributing factor to his physical ailments, as well as his cognitive and behavioral problems. Pet. Ex. 68 at 16. Dr. Lugo testified that Petitioner's history of excruciating headaches and an enlarged head are related to his toxin exposure. Hrg. 811-12. Petitioner's cognitive problems such as brain damage and intellectual disability can be causally linked to toxin exposure. Hrg. 802; Pet. Ex. 68 at 14-15. His social and behavioral problems including reduced impulse control are

characteristics of his prolonged toxin exposure. Hrg. 801-02; Pet. Ex. 68 at 16. Yet, the jury never heard this important evidence.

Although trial counsel retained a toxicologist, counsel precluded the expert from developing and testifying about the specific facts of Petitioner's toxin exposure and its aftermath. Counsel's decision to omit this powerful mitigation was objectively unreasonable, and it left Petitioner to be sentenced by an ill-informed jury.

### A.   Counsel's limited investigation of Petitioner's toxin exposure was objectively deficient

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a prisoner seeking to establish ineffective assistance of trial counsel must demonstrate: (1) that counsel's performance fell below "an objective standard of reasonableness," (i.e., deficient performance); and (2) that but for counsel's deficient performance, there is a reasonable probability that the factfinder would have had a reasonable doubt with respect to the defendant's guilt or the appropriate punishment (i.e., prejudice). 466 U.S. at 688, 695; *Wiggins v. Smith*, 539 U.S. 510, 538 (2003); *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

The Supreme Court has discouraged "detailed rules for counsel's conduct" or a "checklist" that might "distract counsel from the overarching mission of vigorous advocacy for the defendant's cause." *Strickland*, 466 U.S. at 688-91. But counsel is nevertheless "oblig[ed] to conduct a thorough investigation of the defendant's background." *Wiggins*, 539 U.S. at 523; *see also Porter v. McCollum* ,

92

558 U.S. 30, 39-40 (2009) (counsel's minimal investigation failed to satisfy prevailing professional norms). Failure to conduct a thorough and reasonable investigation constitutes deficient performance under *Strickland*. *See Wiggins*, 539 U.S. at 523 (focus is on "whether the investigation supporting counsel's decision . . . was *itself unreasonable*") (emphasis in original). Moreover, counsel's failure to introduce mitigation cannot be "justified as a tactical decision" when "counsel did not fulfill their obligation to conduct a thorough investigation." *Williams*, 529 U.S. at 396. Neither may counsel "ignore[] pertinent avenues for investigation of which he should have been aware." *Porter*, 558 U.S. at 40.

Here, trial counsel failed to present evidence that Petitioner suffered specific cognitive impairments because of his exposure to specific neurotoxic substances. Counsel was aware of Petitioner's history of exposure to toxic chemicals. Hrg. 38. As a result, the defense retained a toxicologist, Dr. Ecobichon. Hrg. 97. In order to avoid disclosing Dr. Ecobichon's existence to the Government, counsel prohibited the expert from interviewing or testifying about Petitioner. Hrg. 362; Pet. Ex. 49 at 2. He made this decision without giving the expert necessary background material, specifically Petitioner's prison records that documented his work in the print shop. Hrg. 103. As a result, Dr. Ecobichon was unable to fully evaluate Petitioner's toxin exposure and could not say where and when Petitioner had been exposed, to which particular toxins, or with what consequences. Because counsel had not properly investigated, his "strategic" decision was patently unreasonable. Counsel

93

prioritized gamesmanship over substance, and failed to explain to the jury that toxins had a detrimental effect on Petitioner's functioning.

Trial counsel's performance was deficient in two respects. ***First***, counsel made a legal error by limiting Dr. Ecobichon's evaluation of petitioner and trial testimony in order to prevent disclosure of a report under Fed. R. Crim. P. 12.2. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (counsel deficiently hired an unqualified expert because he misunderstood the law and failed to understand the resources available to him). Under Rule 12.2(b), the defendant must notify the Government in writing if the defense "intends to introduce expert evidence relating to a mental disease or defect or any other mental condition." Counsel testified that "if Dr. Ecobichon had examined Alfonso and was going to testify to his findings about Alfonso's physical and mental state," then the defense would have had to disclose that information to the Government. Hrg. 109.

But Rule 12.2(b) is not limited to experts who have examined the defendant, and the rule requires the disclosure of experts whose opinion is based on records. *United States v. Lujan*, 530 F. Supp. 2d 1224, 1239 (D.N.M. 2008) (citing *United States v. Edelin*, 134 F. Supp. 2d 45, 51-52 (D.D.C. 2001)). Therefore, if Dr. Ecobichon had evaluated Petitioner, interviewed relevant witnesses, or examined the relevant exposure sites, none of that would have changed counsel's disclosure requirement. Whether Dr. Ecobichon conducted an epidemiologically sound exposure investigation or wrote a report was inconsequential to Rule 12.2. As in

94

*Hinton*, trial counsel in this case misunderstood the law relating to experts and limited the defense as a result of that misunderstanding. *See* 134 S. Ct. at 1088. Counsel's fact-crippling gambit was too clever by half.

**Second**, counsel limited the defense's evidence of toxin exposure without first investigating what that evidence would be. The investigation supporting counsel's decision not to introduce detailed mitigating evidence of Petitioner's toxin exposure *was itself unreasonable*. *See Rompilla v. Beard*, 545 U.S. 374, 385, 389 (2005); *Wiggins*, 539 U.S. at 523. Counsel truncated the development of the toxin issue without knowing the particulars of Petitioner's exposure from Dr. Ecobichon or otherwise. That decision was unsound: "Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Kenley v. Armontrout*, 937 F.2d 1298, 1308 (8th Cir. 1991) (quotation omitted).

The present case is similar to *Caro v. Woodford*, 280 F.3d 1247, 1257 (9th Cir. 2002), in which trial counsel was ineffective for failing to investigate and present evidence of the defendant's acute and chronic exposure to toxins and his related brain damage. Counsel was aware of the defendant's exposure and had a blood test performed on the defendant, but failed to further investigate or provide this information to the experts whom counsel had hired, and failed to seek out additional experts to evaluate the damage from the defendant's exposure. *Id.* at 1255. "[C]ounsel's failure to investigate and provide appropriate experts with the

95

information necessary to evaluate" the defendant rendered counsel's performance deficient. *Id.* at 1254.

As in *Caro*, Petitioner's counsel had ample documentation of his client's exposure to neurotoxins. He had "unearthed" some of the mitigation, but made the unreasonable decision not to develop toxin-related evidence and then present it to a jury—as a direct result of not furnishing it to the expert and directing that expert to make adequate inquiry of Petitioner's exposure. The mere hiring of Dr. Ecobichon did not render counsel's performance effective. Counsel had a duty to prepare his toxin expert appropriately and to provide him with all relevant materials, allowing him to testify as forcefully as his expertise would allow, and defending him from hostile cross-examination. "Counsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult." *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999). "Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert." *Id.*; *accord Glenn v. Tate*, 71 F.3d 1204, 1210 (6th Cir. 1995) (counsel must "insure" that the expert is fully aware of all helpful facts).

Counsel in this case failed to provide necessary materials to Dr. Ecobichon. The expert never received Petitioner's health or prison records. Hrg. 102, 108. Counsel testified that he never made Dr. Ecobichon aware of Petitioner's employment in the prison print shop despite Dr. Ecobichon's requests for Petitioner's work history. Hrg. 103; Pet. Ex. 28 at 1. Beyond the fact that counsel

ignored the expert's specific request for Petitioner's work history, counsel was on notice that Petitioner had worked for two decades in a print shop, which would have exposed him to chemicals, even if counsel did not know the effects of those chemicals. Petitioner's prison work history was within counsel's possession, but he did not share this "crucial" information with the expert. Hrg. 103, Pet. Ex. 28 at 1.

In addition, counsel failed to properly prepare Dr. Ecobichon for his direct and cross-examinations. Counsel did not allow Dr. Ecobichon to testify about the specifics of Petitioner's case (which counsel had not arranged for Dr. Ecobichon to investigate in the first place), and the resulting testimony was generalized and unhelpful. On cross-examination, Dr. Ecobichon was easily targeted for his failure to explain the effects that toxins had on Mr. Rodriguez. He could not specify the chemicals that Petitioner was exposed to growing up. Trial Tr. 7774. He testified that there was a "pretty good chance" that Petitioner was exposed to toxins. *Id.* Dr. Ecobichon's testimony fell flat because it did not distinguish Petitioner from the "tens of thousands of people" who were exposed to the same chemicals. Trial Tr. 7775. Without any details of Petitioner's exposure to neurotoxins and the effects it had on Petitioner's brain, the foundation for this mitigation was, in the Government's words, "simply never laid." Trial Tr. 8676.

**B.     Counsel's deficient investigation and presentation of toxin-related evidence prejudiced the penalty phase defense**

As a result of his deficient investigation of toxins and inadequate preparation of Dr. Ecobichon, trial counsel failed to convince a single juror that Petitioner

97

suffered from the effects of toxin exposure or that he suffered from neurological problems that affected his decision-making. Trial Tr. 8772-73; Special Findings Form, ECF Doc. 626, at 2. Counsel prevented Dr. Ecobichon from testifying about Petitioner, and failed to provide his expert with the documents necessary to fully evaluate Petitioner's exposure to neurotoxins. Had counsel conducted a reasonable investigation and presented evidence of Petitioner's specific exposure to toxins, the jury would have heard important testimony that explained Petitioner's impaired cognitive and emotional functioning, and his seemingly unexplainable ailments such as excruciating headaches. The jury was unable to "place this evidence on the mitigating side of the scale." *Wiggins*, 539 U.S. at 537.

In contrast to his vacuous testimony at Petitioner's trial, Dr. Ecobichon testified in *Caro* that the defendant suffered from "'persistent CNS [central nervous system] and peripheral damage,' due to acute and chronic exposure to neurotoxicants." 280 F.3d at 1253. He further testified that "acute exposure to certain pesticides, such as organophosphates, causes not only physiological reactions, but also depression, mental confusion, schizophrenic reactions and temper outbursts." *Id.* at 1253 n.5. Dr. Ecobichon's defendant-specific post-conviction testimony resulted in the district court finding that Caro suffered from brain damage caused by neurotoxins and his traumatic background. *Id.* at 1258. The Ninth Circuit confirmed that Caro was prejudiced by this omission and entitled to relief for ineffective assistance of counsel. *Id.*

98

Similarly, at the evidentiary hearing in this case, Dr. Lugo described substantial evidence of acute toxic exposure. By conducting interviews and independently investigating records, Dr. Lugo made significant findings that were not presented to the jury at trial: corroboration of specific insecticides used on a farm where Petitioner's family lived, as well as the revelation that Petitioner was continuously exposed to chemical solvents while working at the prison print shop. The jury never heard evidence of Petitioner's exposure to two identifiable insecticides—Paris Green and parathion. Hrg. 797-98; Pet. Ex. 69. The jury was not informed that Petitioner's exposure to neurotoxins extended beyond his life in the Red River Valley and into his life in the prison on a daily basis. This fact was especially important because, in order to persuade jurors who grew up on farms in the same area as Petitioner, the defense needed particularized evidence, showing particularized exposures to specific types of toxins, and with specific effects. *See* Trial Tr. 7775 (cross-examination of Dr. Ecobichon).

Importantly, the jury was never told that Petitioner's decision-making was influenced by toxin exposure and the changes that it made to his DNA and brain. As in *Caro*, information that directly linked Petitioner's brain damage to neurotoxin exposure could and should have been presented to the jury at Petitioner's trial. Testimony causally linking Petitioner's cognitive and behavioral impairments to toxins "might well have influenced the jury's appraisal" of Petitioner's moral blameworthiness. *Williams*, 529 U.S. at 398; *Rompilla*, 545 U.S.

99

at 393. Petitioner was sentenced by an uninformed jury, and the Court should vacate his unconstitutional death sentence.

## CONCLUSION

For the reasons set forth above, this Court should grant Petitioner's motion under 28 U.S.C. § 2255, vacate his death sentence, resentence Petitioner to a term of life imprisonment on his claim of intellectual disability, grant Petitioner a new and fair sentencing trial on the ineffective-assistance claims described herein, grant appropriate relief on Petitioner's claims relating to jury misconduct and forensic issues as previously briefed, and grant such other and further relief as law and justice require.

Respectfully submitted,

*s/ Joseph W. Luby*
JOSEPH W. LUBY
Eric J. Montroy
Jahaan Shaheed
Annie Fisher
Federal Community Defender Office,
Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-0520

Dated: September 8, 2020

100

# CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2020, the foregoing document was filed electronically with the Clerk of Court through ECF, and that ECF will send a Notice of Electronic Filing (NEF) to the following:

Drew H. Wrigley
drew.wrigley@usdoj.gov

Melissa H. Burkland
melissa.burkland@usdoj.gov

*/s/ Joseph W. Luby*
*Counsel for Petitioner*